UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID FLOYD and LALIT CLARKSON;

                Plaintiffs,

    -against-

THE CITY OF NEW YORK; NEW YORK
CITY POLICE COMMISSIONER RAYMOND
KELLY, in his individual and official capacity;
MAYOR MICHAEL BLOOMBERG, in his
individual and official capacity; NEW YORK
CITY POLICE OFFICER RODRIGUEZ, in his
individual capacity; NEW YORK CITY
POLICE OFFICER GOODMAN, in his
individual capacity; NEW YORK CITY
POLICE OFFICER JANE DOE, in her
individual capacity; and NEW YORK CITY
POLICE OFFICERS, JOHN DOES ##1 and
2, in their individual capacities;

                Defendants.

**COMPLAINT**
**DEMAND FOR JURY TRIAL**

---

## PRELIMINARY STATEMENT

1.    This is a civil rights action brought by Plaintiffs David Floyd and Lalit Clarkson to

seek relief for Defendants' violation of their rights, privileges, and immunities secured by the Civil

Rights Act of 1871, 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States

Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), *et seq.* ("Title VI"), and

the Constitution and laws of the State of New York.

2.    The Defendants in this action, the City of New York ("City"), New York City Police

Commissioner Raymond Kelly ("Kelly"), the Mayor of the City of New York, Michael Bloomberg

("Bloomberg") and New York City Police Officers Rodriguez, Goodman, Jane Doe and John Does

##1 and 2 have implemented and are continuing to enforce, encourage and sanction a policy, practice and/or custom of unconstitutional stops and frisks of City residents by the New York Police Department ("NYPD").

3.     Without the reasonable articulable suspicion required under the Fourth Amendment, NYPD officers have been, and are engaged in, rampant stops and frisks of individuals, including Plaintiffs.   NYPD officers, in violation of the Equal Protection Clause of the Fourteenth Amendment, often have used, and continue to use, race and/or national origin – not reasonable suspicion – as the determinative factors in deciding to stop and frisk individuals.   The victims of such racial and/or national origin profiling are principally Black and Latino.

4.     The NYPD's widespread constitutional abuses have flourished as a result of, and are directly and proximately caused by, policies, practices and/or customs devised, implemented and enforced by the City, Kelly and Bloomberg.   The City, Kelly and Bloomberg have acted with deliberate indifference to the constitutional rights of those who would come into contact with NYPD officers by: (a) failing to properly screen, train, and supervise NYPD officers, (b) inadequately monitoring NYPD officers and their stop and frisk practices, (c) failing to sufficiently discipline NYPD officers who engage in constitutional abuses, and (d) encouraging, sanctioning and failing to rectify the NYPD's unconstitutional practices.

5.     As a direct and proximate result of defendants' policies, practices and/or customs, hundreds of thousands of City residents, in particular Black and Latino individuals, have been subjected to unconstitutional stops and frisks by NYPD officers.   Indeed, many Black and Latino persons repeatedly have been victims of suspicionless stops and frisks by the NYPD.   Moreover, the NYPD's constitutional abuses have been attended by unlawful searches and seizures and, at times,

excessive force, of which the fatal shooting of Sean Bell by NYPD officers is but one tragic example.

6.      Plaintiffs seek injunctive and declaratory relief that the policies, practices and/or customs described herein violate the Fourth and Fourteenth Amendments and an injunction enjoining defendants from continuing such policies, practices and/or customs.  In addition, Plaintiffs seek compensatory and punitive damages, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

## JURISDICTION

7.      Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

8.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

9.      Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

10.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 (b) and (c).

## JURY DEMAND

11.      Plaintiffs demand trial by jury in this action on each and every one of their claims.

## PARTIES

### Plaintiffs

12.      Plaintiff DAVID FLOYD ("Floyd") is a 28-year-old African-American man who

resides in the City of New York, Borough of the Bronx. Floyd resides in and/or visits neighborhoods where NYPD officers are and/or have been deployed and conduct stop and frisks.

13.      Plaintiff LALIT CLARKSON ("Clarkson") is a 26 year-old African-American man who resides in Harlem in the City of New York.  Clarkson resides in and/or visits neighborhoods where NYPD officers are and/or have been deployed and conduct stop and frisks.

## Defendants

14.      Defendant CITY OF NEW YORK ("City") is a municipal entity created and authorized under the laws of the State of New York.  It is authorized under the laws of the State of New York to maintain a police department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.  The NYPD's operations include the operations as described herein.  On information and belief, the law enforcement activities of the NYPD are funded, in part, with funds from the federal government.

15.      Defendant New York City Police Commissioner RAYMOND KELLY is and was, at all times relevant herein, the Police Commissioner for the City, and is and was responsible for, and the chief architect of, the policies, practices and/or customs of the NYPD, a municipal agency of the City. He is and was, at all times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD, including the Defendants named herein.  He is sued individually and in his official capacity.

16.      Defendants NEW YORK CITY POLICE OFFICERS RODRIGUEZ, GOODMAN JANE DOE and JOHN DOES ##1 and 2 are, and/or were, at all times relevant herein, officers,

4

employees, and agents of the NYPD, a municipal agency of the City. Defendants Rodriguez, Goodman, Jane Doe and John Does ##1 and 2 are sued in their individual capacities.

17.     Defendant MICHAEL BLOOMBERG is and was, at all times relevant herein, the Mayor of the City of New York and the chief policy making official for the City and its departments, including the NYPD. He is sued in both his individual and official capacities.

18.     At all times relevant herein, Defendants Rodriguez, Goodman, Jane Doe, John Does ##1 and 2, Kelly and Bloomberg have acted under color of state law in the course and scope of their duties and functions as agents, employees, and officers of the City and/or the NYPD in engaging in the conduct described herein. At all times relevant herein, Defendants have acted for and on behalf of the City and/or the NYPD with the power and authority vested in them as officers, agents and employees of the City and/or the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the City and/or the NYPD.

19.     At all times relevant herein, Defendants Rodriguez, Goodman, Jane Doe, John Does ##1 and 2, Kelly and Bloomberg have violated clearly established constitutional standards under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment of which a reasonable person would have known.

## STATEMENT OF FACTS

20.     On April 20, 2007, Plaintiff David Floyd, a freelance film and video editor, was walking in the middle of the day on the sidewalk on Beach Avenue in his Bronx neighborhood, several homes away from where he lives. He witnessed several NYPD officers engaged in a stop of an African-American male on the block where he was walking. Floyd crossed the street and was approached by two male NYPD Officers, Rodriguez and Goodman, and one female officer, Jane

Doe. The officers were riding in a van near Plaintiff as he walked on the sidewalk. These appeared to be the same officers who Floyd had just seen stopping the other individual in the same area. Without any basis to formulate a reasonable, articulable suspicion that Floyd had engaged in or was about to engage in criminal conduct, the officers told Floyd to stop and the officers exited the van. Defendants Rodriguez and Goodman surrounded Floyd and questioned him about where he was going, what he was doing, asked for identification and whether he had any weapons. Floyd responded to these questions and told the officers that he was simply walking home, did not have any weapons and provided the officers with his driver's license. Floyd asked the officers why he was being stopped, but they refused to answer or provide any reason for the stop. With no reasonable belief that Floyd was armed or dangerous and without probable cause, Defendant Goodman proceeded to search under Floyd's shirt and put his hands into Plaintiff's pants pockets. Floyd asked what probable cause the officers had for searching and frisking him, but the officers ignored his question. Floyd informed Defendants Goodman and Rodriguez that he did not consent to the search. When the officers did not find a gun, drugs or any other illegal item on Floyd, one of the officers asked why Floyd's driver's license was from out of state and told him that he could be arrested because it was illegal to not have a New York State identification. Floyd informed the officers that he did not drive in New York State. The officers returned Floyd's identification and got back into their van to leave. Floyd asked the officers for their names and badge numbers. Defendant Rodriguez identified himself and jokingly asked the other officers for their names and badge numbers. Defendant Jane Doe stood near the police van during this encounter. The officers left without explaining why they had stopped and searched Floyd. Floyd did not witness any of the officers that stopped and frisked him filling out any paperwork. These officers subjected Floyd to

a suspicionless stop, frisk and unlawful search based on his race and/or national origin.  In the past year, Floyd has noticed considerably more NYPD officers in his neighborhood and witnessed an increase in police stop and frisks.

21.    On a weekday in January 2006, at approximately 1:00 p.m., Plaintiff Lalit Clarkson was on his lunch break from his job as a teaching assistant at Grand Concourse Academy Charter School in the Bronx.  He walked to a Subway restaurant on 167th Street and Walton Avenue about two blocks from Grand Concourse Academy.  At the time, Clarkson was in his work clothes, a dress shirt, tie and slacks.  After buying his lunch at the Subway restaurant, Clarkson walked back up Walton Avenue to 169th Street where he entered a bodega on the corner of 169th and Walton Avenue, directly across the street from the Grand Concourse Academy.  Upon entering the bodega, Clarkson noticed Defendant Officers John Doe #1 and John Doe #2, both dressed in plain clothes, standing in the aisles.  Clarkson purchased some food items and then exited the bodega.  Without any basis to formulate a reasonable, articulable suspicion that Clarkson had engaged in or was about to engage in criminal conduct, Defendant Officers John Doe #1 and John Doe #2 immediately followed Clarkson out of the store and called out to him.  Clarkson was walking on the sidewalk in front of the window of the bodega and stopped and turned around to see what they wanted.  When Clarkson turned, John Does ##1 and 2 crossed in front of his path and flashed their police badges. The officers, who were both at least half a foot taller than Clarkson, positioned themselves less than two feet away from him and stood between Clarkson and the street.  The officers' positions placed Clarkson with his back against the bodega window.  The officers stated that they wanted to ask Clarkson some questions and, without waiting for Clarkson to consent or object, asked him where he was coming from.  Clarkson told Defendants John Doe ##1 and 2 that he was on his lunch break

from his job at Grand Concourse Academy across the street and physically pointed to the school. In response, Defendant Doe #2 told Clarkson that he had allegedly observed him coming from the direction of a building on Walton Avenue which, the officer claimed, was a known center for drug activity. Clarkson then explained that he had bought lunch at the Subway restaurant on 167th Street and Walton Avenue and, thus, had to pass by the building the officer was referring to as he was on his way back to work on 169th Street. Defendant Doe #2 asked Clarkson if he had any contraband on him and whether the officers would find any contraband if they searched him. Clarkson responded that he did not have any contraband and that he did not consent to a search. John Doe #2 asked the same question a second time and Clarkson, again, responded that he did not have any contraband and did not consent to a search. At this point, John Doe #2 took several steps toward Clarkson and, raising his voice, asked the same question a third time. Clarkson gave the same answer he previously had. By this time, several people in nearby stores had come out onto the sidewalk to witness the police officers' interrogation and detention of Clarkson. After Clarkson's third refusal to consent to a search, the officers left the scene. At no point did Clarkson observe either John Doe #1 or John Doe #2 fill out any paperwork. These officers subjected Clarkson to a suspicionless stop and detention based on his race and/or national origin.

22.     Defendants Rodriguez, Goodman, Jane Doe and John Does ##1 and 2 have implemented, enforced, encouraged and sanctioned a policy, practice and/or custom of suspicionless stops and frisks in violation of the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment. This unconstitutional conduct is a direct and proximate result of policies, practices and/or customs of the City, Kelly and Bloomberg and their confederates whose identities are presently unknown to Plaintiffs. Those policies, practices and/or customs include: (a) the failure

to adequately and properly screen, train, supervise, monitor and discipline NYPD officers, and (b) the explicit and tacit encouragement, sanctioning, and ratification of and failure to rectify the NYPD's rampant unconstitutional practices. Defendants each knew, or should have known, that as a direct and proximate result of the policies, practices and/or customs described herein, the constitutional rights of tens of thousands of individuals, particularly Black and Latino individuals, would be violated. Despite this knowledge, and with deliberate indifference to and reckless disregard for the constitutional rights of such individuals, defendants have implemented, enforced, encouraged, sanctioned and failed to rectify such policies, practices and/or customs.

### NYPD's History of a Policy, Practice and/or Custom of Suspicionless Stops and Frisks

23.     The NYPD has a history of conducting suspicionless stops and frisks which traces back to the formation of the "Street Crime Unit" ("SCU") in the 1970's. The SCU was an elite, commando-like squad of police officers whose self-proclaimed mission was to interdict violent street crime in the City and, in particular, to remove illegal firearms from the streets. The SCU was little noticed until Rudolph Giuliani ("Giuliani") took office as Mayor of the City of New York in 1994. Giuliani had campaigned on a promise of more aggressive law enforcement, and once he assumed office, the SCU became a centerpiece of Giuliani's anti-crime strategy, and its officers primary enforcers of his highly aggressive policies.

24.     The SCU, which consisted predominantly of White men, was deployed in so-called "high crime" areas, largely populated by minorities. Race and/or national origin – not the reasonable, articulable suspicion of criminal activity required under the Fourth Amendment – were often the determinative factors in the SCU's decision to stop and frisk. The SCU's policy, practice and/or custom of suspicionless stops and frisks led to a massive deprivation of constitutional rights. In

9

1997, the SCU reported over 18,000 stops and frisks, but made less than 5,000 arrests. The next year, the SCU reported a 50% increase in stops and frisks, but even fewer arrests than in 1997. The SCU's own figures revealed that over a two-year period more than 35,000 law-abiding people were stopped and frisked. The unconstitutional practices of the SCU led not only to unlawful stops, searches and seizures, but also to violence. One of the most commonly known incidents occurred in February 1999 when the SCU's tactics turned deadly when four SCU officers killed West African immigrant Amadou Diallo in the Bronx in a hail of 41 bullets as he stood in the vestibule of his apartment building.

     25.    In 1999, the Office of the Attorney General ("OAG") conducted an investigation and released a study of the NYPD's stop and frisk practices for the period of January 1, 1998 through March 31, 1999, which concluded that there was evidence of racial disparities and disparate impact on the basis of race. Analyzing the UF-250 stop and frisk data for the time period from January 1998 through March 1999, the OAG found that although Blacks comprised 25.6% of the City's population and Hispanics 23.7%, these two groups made up 83.6% of all stops by the NYPD. By contrast, Whites were 43.4% of the City's population, but accounted for only 12.9% of all stops. In precincts where Black and Hispanic persons each represented less than 10% of the total population, individuals identified as belonging to these racial group accounted for more than half (53.4%) of the stops in these precincts. The rate at which stops led to arrests also differed by race: only 1 out of 9.5 stops of Blacks, 1 out of 8.8 stops of Hispanics, and 1 out of every 7.9 stops of Whites resulted in an arrest. These stop to arrest rates demonstrated that the stops of Whites were more likely to lead to arrests, whereas those for Blacks were more indiscriminate because fewer of the persons stopped in these broader sweeps were actually arrested. The OAG also found that when examining the crime

rate statistics from the New York Division of Criminal Justice Services ("DCJS") during this time period, Blacks were stopped 23% more often than Whites; Hispanics were stopped 39% more often than Whites.  Controlling for precincts actually increased these discrepancies.  The OAG also estimated that SCU officers completed a UF-250 form for only 10%-20% of the stops and frisks they conducted.

26.     In 1999, the Center for Constitutional Rights filed a class action lawsuit, *Daniels, et al. v. The City of New York, et al.*, Case No. 99 Civ. 1696, in the Southern District of New York to challenge the NYPD's unconstitutional policy, practice and/or custom of conducting rampant stops and frisks of individuals without the reasonable articulable suspicion required under the Fourth Amendment and which impermissibly used race and/or national origin -- not reasonable suspicion -- as the determinative factors in deciding to stop and frisk individuals. In 2003, a settlement of the case was reached which resulted in a Stipulation that required, *inter alia*, the NYPD to adopt a written policy prohibiting unlawful racial profiling. The Stipulation also required the NYPD to produce quarterly data concerning the NYPD stop and frisk activity which is contained in its UF-250 forms. During the pendency of the lawsuit, the NYPD claimed it had disbanded the SCU, however, the unlawful practices perfected by the NYPD through the SCU have continued, through other methods, as part of the NYPD's anti-crime strategy.[1]

27.     [PARAGRAPH FILED UNDER SEAL]

---

[1] Pursuant to the directions provided by The Honorable Shira A. Scheindlin at a hearing on December 21, 2007, in *Daniels, et al. v. The City of New York, et al.*, the undersigned Plaintiffs' counsel was permitted to retain the UF-250 data provided under the Stipulation of Settlement. Counsel was directed to file, under seal, the portions of this Complaint which contain information from the UF-250 database that are subject to the Protective Order issued in *Daniels* until such time as the Court can hear Plaintiffs' motion that the UF-250 data should be made publicly available. Accordingly, paragraphs 27 through 32 herein are filed herewith under seal.

28.    [PARAGRAPH FILED UNDER SEAL]

29.    [PARAGRAPH FILED UNDER SEAL]

30.    [PARAGRAPH FILED UNDER SEAL]

31.    [PARAGRAPH FILED UNDER SEAL]

32.    [PARAGRAPH FILED UNDER SEAL]

33.    On information and belief, NYPD officers are also under pressure to conduct increased stops and frisks.  On information and belief, the stop and frisk reports and tracked and evaluated at the NYPD's weekly CompStat meetings where commanders are questioned about their precinct's crime statistics.  CompStat focus gives NYPD officers a strong incentive to generate UF-250s because an officer's UF-250 numbers suggest productivity.

34.    Public accounts provide further evidence of unlawful stops and frisks which lack the reasonable suspicion required by the Fourth Amendment and reveal intent to discriminate on the basis of race.  For example, on October 10, 2006, the *Daily News* reported that NYPD officers informed the news source that they were given a roll call order by Captain Michael Vanchieri to stop, question and frisk all black males at the Seventh Avenue Park Slope subway station in Brooklyn after he described a series of robberies on the F subway line in Brooklyn that were concentrated near that station.  This directive prompted calls by One Hundred Blacks in Law Enforcement and the National Latino Officers Association for an investigation of police commands that were indicative of racial profiling.

35.    A report by the New York City Civilian Complaint Review Board ("CCRB") also shows that the incidents of unlawful stops and frisks has risen dramatically since 1999.  The CCRB reported that in 1999, 1,240 individuals made complaints of being subjected to stops and frisks

12

which were an abuse of police authority. In 2006, the complaints for improper stops and frisks totaled 5,089; the overall total for complaints made for that year was 7,669. According to the CCRB, the substantiation rate for allegations of unlawful stops and frisks was at least more than twice the rate for any other allegation made from 2002 through 2006.

36.     The Fourth Amendment prohibits police officers from conducting stops and frisks without a reasonable, articulable suspicion of criminal conduct; frisking persons without a reasonable belief that they are armed or presently dangerous; searching and seizing persons without probable cause; or using excessive force in the course of policing activities.   Additionally, the Equal Protection Clause of the Fourteenth Amendment bars police officers from targeting individuals for stops and frisks on the basis of race or national origin.

37.     Defendants have applied a facially neutral policy, the anti-racial profiling policy, to Plaintiff, and similarly situated individuals, in an intentionally racially discriminatory manner.

**NYPD's Suspicionless Stop and Frisk Practice is A Direct and Proximate Result of
Defendants' Policies, Practices and/or Customs**

38.     The pervasive unconstitutional practices of the NYPD are a direct and proximate result of policies, practices and/or customs devised, implemented, enforced and sanctioned by the City, Kelly and Bloomberg and their confederates whose identities are presently unknown, with the knowledge that such policies, practices and/or customs would lead to violations of the Fourth and Fourteenth Amendments.  Those policies, practices and/or customs include: (a) failing to properly screen, train and supervise NYPD officers, (b) failing to adequately monitor and discipline NYPD officers, and (c) encouraging, sanctioning and failing to rectify the NYPD's custom and practice of suspicionless stops and frisks.

**Failure to Properly Screen, Train and Supervise NYPD Officers**

39.     Although fully aware that the work of the NYPD demands extensive training, superior judgment and close supervision, the City, Kelly and Bloomberg failed to properly screen, train and supervise NYPD officers, knowing that such failures would result in Fourth and Fourteenth Amendment violations.

40.     The inadequate screening, training and supervision of the NYPD is a direct and proximate cause of the NYPD's rampant unconstitutional stops and frisks. As a direct and proximate result of the defendants' failure to screen, train and supervise NYPD officers, tens of thousands of people have been subjected to unlawful stops and frisks, many times simply because of their race and/or national origin. By failing to properly screen, train and supervise NYPD officers, the City, Kelly and Bloomberg have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD.

**Failure to Monitor and Discipline NYPD Officers**

41.     The NYPD's widespread abuses are also a direct and proximate result of the failure of the City, Kelly and Bloomberg to properly and adequately monitor, discipline and take necessary corrective action against NYPD officers who engage in, encourage or conceal unconstitutional practices. Among other things, these Defendants knowingly, deliberately and recklessly have failed:

   (a)     to take appropriate disciplinary action and corrective measures against NYPD officers who have engaged in suspicionless stops and frisks;

   (b)     to adequately monitor NYPD officers who have incurred a substantial number of civilian complaints, even in instances where the number of complaints should have triggered monitoring under established departmental guidelines;

   (c)     to devise and implement appropriate oversight, disciplinary and remedial

measures in the face of extensive evidence that no charges are brought against the overwhelming majority of persons stopped and frisked by NYPD officers;

(d)  to conduct adequate auditing to determine if the stop and frisks conducted by NYPD officers comply with the NYPD's written policy prohibiting stop and frisks that are not based upon reasonable suspicion and use race and/or national origin as the determinative factor in initiating police action;

(e)  to take sufficient, if any, steps to curb NYPD officers' non-compliance with departmental directives requiring that UF-250's be completed for each stop and frisk;

(f)  to take sufficient corrective and remedial action against NYPD officers who provide fabricated, false, or impermissible justifications for stops and frisks; and

(g)  to take sufficient corrective, disciplinary and remedial action to combat the so-called "blue wall of silence," wherein NYPD officers regularly conceal or fail to report police misconduct, *inter alia*, in sworn testimony, official reports, statements to the Civilian Complaint Review Board (CCRB) and the Internal Affairs Bureau, and in public statements.

42.  The City, Kelly and Bloomberg failed to properly and adequately monitor, discipline and take necessary corrective action against NYPD officers, knowing that such omissions would lead to Fourth and Fourteenth Amendment violations. By such acts and omissions, the City, Kelly and Bloomberg have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD.

**Encouraging, Sanctioning and Failing to Rectify the NYPD's Suspicionless Stops and Frisks**

43.  With the knowledge that such acts and omissions would create a likelihood of Fourth and Fourteenth Amendment violations, the City, Kelly and Bloomberg also have encouraged, sanctioned and failed to rectify the NYPD's abusive and unconstitutional practices.

44.  For example, Defendants, on information and belief, have enacted and enforced

unwritten "productivity standards" or de facto quotas of a certain number of stops and frisks and specific types of arrests per month for each NYPD officer. On information and belief, NYPD officers who fail to meet the productivity standards face adverse employment consequences. In their efforts to satisfy the productivity standards, NYPD officers have engaged in widespread suspicionless stops and frisks of individuals.

45.     As a direct and proximate result of the above policies, practices and/or customs, tens of thousands of people have been, and will continue to be, subjected to unconstitutional stops, frisks, searches and seizures by NYPD officers, sometimes in violent encounters, simply because such individuals happen to be the wrong color, in the wrong place, at the wrong time. Through such acts and omissions, the City, Kelly and Bloomberg have acted recklessly and with deliberate indifference to the constitutional rights of individuals who would come into contact with the NYPD.

**Recent Measures Are Inadequate and Insufficient to Eradicate, Curb or Deter the
Suspicionless Stop and Frisk Policy**

46.     Pursuant to the Stipulation in *Daniels, et al. v. The City of New York*, Defendant City and the NYPD were required to implement a written policy which prohibits racial or ethnic/national origin profiling which violates the United States and New York State Constitutions. As explained herein, Defendants have violated that written policy. Defendant City and the NYPD were also required, *inter alia*, to supervise, monitor and train officers and supervisors regarding the policy prohibiting unlawful racial profiling; to conduct supervision and monitoring of the policy through audits by the NYPD Quality Assurance Division that determine whether, and to what extent, the audited stop, question and frisk activity is based upon reasonable suspicion; to require that NYPD officers and supervisors document stop, question and frisk activity in UF-250 forms, memo books,

logs and monthly activity reports; to compile a database of all UF-250 reports; to conduct public information and outreach through community forums, high school workshops and distribution of materials informing the public about their rights concerning stop, question and frisk encounters and making complaints about concerns arising from a stop, question and/or frisk encounter with the police.

47.     None of these measures, however, sufficiently or adequately have addressed, much less irrevocably eradicated, curbed or deterred the NYPD's pervasive policy, practice and/or custom of unconstitutional stops and frisks.   Thus, despite these initiatives, Plaintiff, and hundreds of thousands of other individuals, continue to face the imminent likelihood of becoming victims of the NYPD's constitutional abuses in violation of the Fourth and Fourteenth Amendments to the U.S. and New York State Constitutions.

## FIRST CLAIM
### (Claim Pursuant to 42 U.S.C. § 1983 Against All Defendants for Violations of the Fourth Amendment)

48.     Plaintiffs repeat and re-allege paragraphs 1 through 47 above as if fully set forth herein.

49.     Defendants City, Kelly, Bloomberg, Rodriguez, Goodman, Jane Doe and John Does ##1 and 2 and have implemented, enforced, encouraged and sanctioned a policy, practice and/or custom of stopping and frisking individuals without the reasonable articulable suspicion of criminality required by the Fourth Amendment.   These constitutional abuses often are coupled with unconstitutional searches and seizures and, at times, excessive force.

50.     The NYPD's constitutional abuses and violations were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced,

17

encouraged and sanctioned by the City, Kelly and Bloomberg, including: (1) the failure to adequately and properly screen, train, and supervise NYPD officers; (2) the failure to properly and adequately monitor and discipline NYPD officers; and (3) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the NYPD's suspicionless stop and frisk practices.

51.     Each of the Defendants has acted with deliberate indifference to the Fourth Amendment rights of Plaintiffs and other similarly situated individuals.  As a direct and proximate result of the acts and omissions of each of the Defendants, Plaintiffs' Fourth Amendment rights have been violated.   By acting under color of state law to deprive Plaintiffs of their rights under the Fourth Amendment, the Defendants are in violation of  42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

52.     The NYPD targets Black and Latino individuals for illegal stops and frisks in areas where Plaintiffs reside and/or visit.  Thus, a real and immediate threat exists that Plaintiffs' Fourth Amendment rights, and the rights of other similarly situated persons, will be violated by NYPD officers in the future.  Moreover, because Defendants' policies, practices and/or customs subject Plaintiffs, and other similarly situated persons, to stops and frisks without any reasonable, articulable suspicion of criminality, and often on the basis of  race and/or national origin, Plaintiffs, and other similarly situated individuals, cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the NYPD.

53.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice and/or custom of unconstitutional stops and frisks, and the policies, practices and/or customs that have directly and proximately caused such constitutional abuses.

**SECOND CLAIM**
**(Claim Pursuant to 42 U.S.C. § 1983 Against All Defendants for**
**Violation of Equal Protection Clause)**

54.     Plaintiffs repeat and re-allege paragraphs 1 through 53 as if fully set forth herein.

55.     The City, Kelly, Bloomberg, Rodriguez, Goodman, Jane Doe and John Does ##1 and 2 have implemented and enforced a policy, practice and/or custom of stopping and frisking individuals, including Plaintiff, based solely on race and/or national origin. These suspicionless stops and frisks have and are being conducted predominantly on Black and Latino individuals, on the basis of racial and/or national origin profiling. As a result, the NYPD's policy, practice and/or custom of suspicionless stops and frisks violate the Equal Protection Clause of the Fourteenth Amendment. The NYPD's constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City, Kelly and Bloomberg, including: (1) the failure to adequately and properly screen, train, and supervise NYPD officers; (2) the failure to adequately and properly monitor and discipline the NYPD and its officers; and (3) the encouragement and sanctioning of and failure to rectify the NYPD's use of racial and/or national origin profiling in making stops and frisks.

56.     Each of the Defendants has acted with deliberate indifference to Plaintiffs' Fourteenth Amendment rights. As a direct and proximate result of the aforesaid acts and omissions of the Defendants and each of them, Plaintiffs' Fourteenth Amendment rights have been violated. By their acts and omissions, Defendants have acted under color of state law to deprive Plaintiffs of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

57.     Due to the NYPD targeting Black and Latino persons in areas where Plaintiffs and similarly situated individuals reside and/or visit, a real and immediate threat exists that Plaintiffs'

19

Fourteenth Amendment rights will be violated by NYPD officers in the future.  Moreover, because Defendants' policies, practices and/or customs subject Plaintiffs and other similarly situated individuals to repeated stops and frisks without any reasonable, articulable suspicion of criminality, and often on the basis of race and/or national origin, Plaintiffs cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the NYPD.

58.     Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice and/or custom of unconstitutional race and/or national origin-based stops and frisks, and the policies, practices and/or customs that have directly and proximately caused  such constitutional abuses.

### THIRD CLAIM
**(Claims Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d),** *et seq.*
**Against the City)**

59.     Plaintiffs repeat and re-allege paragraphs 1 through 58 as if fully set forth herein.

60.      The law enforcement activities described in this complaint have been funded, in part, with federal funds.

61.     Discrimination based on race in the law enforcement activities and conduct described in this complaint are prohibited under 42 U.S.C. § 2000(d), *et seq.*  The acts and conduct complained of herein by the Defendants were motivated by racial animus, and were intended to discriminate on the basis of race and/or had a disparate impact on minorities, particularly Blacks and Latinos.

62.     As a direct and proximate result of the above mentioned acts, Plaintiffs have suffered injuries and damages and have been deprived of their rights under the civil rights laws. Without appropriate injunctive relief, these violations will continue to occur.

## FOURTH CLAIM
### (Plaintiff Floyd's Claims Pursuant to 42 U.S.C. § 1983 Against Rodriguez, Goodman and Jane Doe)

63.     Plaintiffs repeat and re-allege paragraphs 1 through 62 as if fully set forth herein.

64.     The conduct of Defendants Rodriguez, Goodman and Jane Doe in stopping, frisking and searching Plaintiff Floyd were performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds.  Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

65.     As a direct and proximate result of such acts, Defendants Rodriguez, Goodman and Jane Doe deprived Plaintiff Floyd of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

66.     As a direct and proximate result of those constitutional abuses, Plaintiff Floyd has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

67.     The acts of Rodriguez, Goodman and Jane Doe were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff Floyd to an award of punitive damages.

## FIFTH CLAIM
### (Plaintiff Clarkson's Claims Pursuant to 42 U.S.C. § 1983 Against John Does ## 1 and 2)

68.     Plaintiffs repeat and re-allege paragraphs 1 through 67 as if fully set forth herein.

69.     The conduct of Defendants John Does ##1 and 2 in stopping and detaining Plaintiff Clarkson were performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds.  Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

70.     As a direct and proximate result of such acts, Defendants John Does ##1 and 2 deprived Plaintiff Clarkson of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

71.     As a direct and proximate result of those constitutional abuses, Plaintiff Clarkson has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

72.     The acts of Defendants John Does ##1 and 2 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff Clarkson to an award of punitive damages.

## SIXTH CLAIM
### (Claims Against the City, Kelly and Bloomberg)

73.     Plaintiffs repeat and re-allege paragraphs 1 through 72 as if fully set forth herein.

74.     With deliberate indifference to Plaintiffs' constitutional rights, Defendants City, Kelly and Bloomberg have directly and proximately caused the NYPD's policy, practice and/or custom of suspicionless stops and frisks in violation of the Fourth and Fourteenth Amendments by devising, implementing, enforcing, adopting, sanctioning and ratifying a policy, practice and/or custom of (a) failing to properly screen, train, and supervise NYPD officers; (b) failing to adequately monitor and discipline the NYPD and its officers; and (c) encouraging,  sanctioning and failing to rectify the NYPD's constitutional abuses.

75.     As a direct and proximate result of the aforesaid acts and omissions, Defendants City, Kelly and Bloomberg, have each deprived Plaintiffs of their Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

76.     The acts and omissions of Defendants Kelly and Bloomberg explained herein were

intentional, wanton, malicious, reckless and oppressive, thus, entitling Plaintiffs to an award of punitive damages.  In engaging in such conduct, Kelly and Bloomberg acted beyond the scope of their jurisdiction, without authority under law, and in abuse of their powers.

## SEVENTH CLAIM
### (Violation of Plaintiffs' Rights Under New York Law)

77.    Plaintiffs repeat and re-allege paragraphs 1 through 76 as if fully set forth herein.

78.    By the actions described above, each and every Defendant, jointly and severally, has committed the following wrongful acts against Plaintiffs, which are tortious under the Constitution and laws of the State of New York:

a)    assault and battery;

b)    trespass;

c)    violation of the right to privacy;

d)    negligence; and

e)    violation of rights otherwise guaranteed under the Constitution and the laws of the State of New York.

79.    In addition, Defendants City, Kelly and Bloomberg were negligent in their hiring, screening, training, supervision and retention of Defendants Rodriguez, Goodman, Jane Doe and John Does ##1 and 2.

80.    The foregoing acts and conduct of Defendants were a direct and proximate cause of injury and damage to Plaintiffs and violated the statutory and common law rights as guaranteed to them by the Constitution and laws of the State of New York.

## EIGHTH CLAIM
### (Respondeat Superior Claim Against the City Under New York Common Law)

81.     Plaintiffs repeat and re-allege paragraphs 1 through 80 as if fully set forth herein.

82.     The conduct of Defendants Officers Rodriguez, Goodman, Jane Doe and John Does ##1 and 2 occurred while they were on duty, in and during the course and scope of their duties and functions as New York City police officers, and while they were acting as agents and employees of defendant City.  As a result, Defendant City is liable to Plaintiffs under the doctrine of respondeat superior.

83.     WHEREFORE, Plaintiffs pray that the Court will:

a)     Issue a judgment declaring that the NYPD's policy, practice and/or custom of suspicionless stops and frisks challenged herein is unconstitutional in that it violates the Fourth and Fourteenth Amendments to the United States Constitution, Title VI, and the Constitution and laws of the State of New York, and that its implementation, enforcement and sanctioning by NYPD officers is a direct and proximate result of the following policies, practices and/or customs of the City, Kelly and Bloomberg:

      i)     failing to adequately screen, train and supervise officers;

      ii)     failing to adequately monitor the NYPD and its officers and discipline those NYPD officers who violate the constitutional rights of residents of the communities they patrol; and

      iii)     encouraging, sanctioning, and failing to rectify the NYPD's unconstitutional stops and frisks.

b)     Issue an order for the following injunctive relief:

      i)     enjoining the NYPD from continuing its policy, practice and/or custom of suspicionless stops and frisks;

      ii)     enjoining the NYPD from continuing its policy, practice and/or custom of conducting stops and frisks based on racial and/or national origin profiling;

      iii)     enjoining the use of formal or informal productivity standards or other de facto quotas for arrests and/or stops and frisks by NYPD officers;

iv)    requiring the City, Kelly and Bloomberg to institute and implement improved policies and programs with respect to training, discipline, and promotion designed to eliminate the NYPD's policy, practice and/or custom of suspicionless stops and frisks;

v)    requiring the City, Kelly and Bloomberg to deploy NYPD officers with appropriate and adequate supervision;

vi)    requiring the City, Kelly and Bloomberg to institute and implement appropriate measures to ensure compliance with departmental directives that NYPD officers complete UF-250's on each and every stop and frisk they conduct;

vii)    requiring the City, Kelly and Bloomberg to institute and implement appropriate measures to mandate that UF-250's or other documentation be prepared and maintained in an up to date computerized database for each stop conducted by an officer, regardless of whether the stop is followed by the use of force, a frisk, a search, or an arrest; and

viii)    requiring the City, Kelly and Bloomberg to monitor stop and frisk practices of the NYPD, including periodically and regularly reviewing form UF-250's to determine whether reported stops and frisks have comported with constitutional requirements.

c)    Award Plaintiffs compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

d)    Award Plaintiffs damages against Defendants Kelly, Bloomberg and the individual Officer Defendants, to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, in an amount which is fair, just and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

e)    Award Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

f)    Award Plaintiffs costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

g)    Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

DATED: January 31, 2008

By: _____*andrea costello*_____

Andrea Costello (AC-6197)

Andrea Costello (AC-6197)
Kamau Franklin (KF- 6837)
Darius Charney (DC-1619)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439 (t); (212) 614-6499 (f)
acostello@ccrjustice.org
kfranklin@ccrjustice.org
dcharney@ccrjustice.org


Jonathan Moore (JM-6902)
BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0900 (t); (212) 557-0565 (f)
jmoore@BLHNY.com

ATTORNEYS FOR PLAINTIFFS