UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID FLOYD, LALIT CLARKSON and
DEON DENNIS, individually and on behalf
of a class of all others similarly situated;

                    **Plaintiffs,**

      **-against-**

THE CITY OF NEW YORK; NEW YORK
CITY POLICE COMMISSIONER
RAYMOND KELLY, in his individual and
official capacity;  MAYOR MICHAEL
BLOOMBERG, in his individual and official
capacity; NEW YORK CITY POLICE
OFFICER RODRIGUEZ, in his individual
capacity; NEW YORK CITY POLICE
OFFICER GOODMAN, in his individual
capacity; NEW YORK CITY POLICE
OFFICER JANE DOE, in her individual
capacity; NEW YORK CITY POLICE
OFFICER HERNANDEZ, Shield #15957, in
his individual capacity; NEW YORK CITY
POLICE OFFICER JOYCE, Shield #31274,
in his individual capacity; NEW YORK
CITY POLICE OFFICER KELLY, Shield
#34759, in his individual capacity; NEW
YORK CITY POLICE OFFICER JOHN
DOE #1, in his individual capacity; NEW
YORK CITY POLICE OFFICER JOHN
DOE #2, in his individual capacity; NEW
YORK CITY POLICE OFFICER
POPICHURDO, in his individual capacity;
NEW YORK CITY POLICE OFFICER
SALERNO, Shield # 7116, in his individual
capacity; NEW YORK CITY POLICE
OFFICER HAYES, in his individual
capacity;

                    **Defendants.**

_____/

08 Civ. 01034 (SAS)

FIRST AMENDED CLASS ACTION
COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND INDIVIDUAL
DAMAGES (REDACTED)

**DEMAND FOR JURY TRIAL**

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which named Plaintiffs David Floyd, Lalit Clarkson and Deon Dennis, on behalf of themselves and a class of similarly situated individuals, seek relief for Defendants' violation of their rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), *et seq.* ("Title VI"), and the Constitution and laws of the State of New York.

2.    The Defendants in this action, the City of New York ("City"), New York City Police Commissioner Raymond Kelly ("Commissioner Kelly"), the Mayor of the City of New York, Michael Bloomberg ("Bloomberg"), New York City Police Officers Rodriguez, Goodman, Jane Doe, Hernandez, Joyce, Kelly (Shield #34759), John Doe #1, John Doe #2, Popichurdo, Salerno and Hayes have implemented and are continuing to enforce, encourage and sanction a policy, practice and/or custom of unconstitutional stops and frisks of City residents, including Plaintiffs, by the New York Police Department ("NYPD") which are being done without the reasonable articulable suspicion required under the Fourth Amendment.

3.    In addition, this pattern and practice of unconstitutional stops and frisks by NYPD officers, often have used, and continue to use, race and/or national origin, not reasonable suspicion, as the determinative factors in deciding to stop and frisk individuals in violation of the Equal Protection Clause of the Fourteenth Amendment.  The victims of such racial and/or national origin profiling are principally Black and Latino males.

4.    The NYPD's widespread constitutional abuses have flourished as a result of, and are directly and proximately caused by, policies, practices and/or customs devised, implemented and

2

enforced by the City, Commissioner Kelly and Bloomberg.  The City, Commissioner Kelly and Bloomberg have acted with deliberate indifference to the constitutional rights of those who would come into contact with NYPD officers by: (a) failing to properly screen, train, and supervise NYPD officers, (b) inadequately monitoring NYPD officers and their stop and frisk practices, (c) failing to sufficiently discipline NYPD officers who engage in constitutional abuses, and (d) encouraging, sanctioning and failing to rectify the NYPD's unconstitutional practices.

5.      In 1999, the Center for Constitutional Rights filed a class action lawsuit, *Daniels, et al. v. The City of New York, et al.*, Case No. 99 Civ. 1696 (SAS), in the United States District Court for the Southern District of New York, to challenge the NYPD's unconstitutional policy, practice and/or custom of conducting rampant stops and frisks of individuals in violation of the Fourth and Fourteenth Amendments.  A Stipulation of Settlement was reached in 2003 in which the NYPD was required to implement a written policy prohibiting police stop and frisks which impermissibly used race and/or national origin, not reasonable suspicion, as the determinative factors in initiating police action.  However, Defendants' unlawful policy, practice and/or custom continues despite the written policy prohibiting unconstitutional stops and/or frisks.

6.      As a direct and proximate result of Defendants' policies, practices and/or customs, hundreds of thousands of City residents, in particular Black and Latino individuals, have been subjected to unconstitutional stops and frisks by NYPD officers.  Indeed, many Black and Latino persons repeatedly have been victims of suspicionless stops and frisks by the NYPD.  Moreover, the NYPD's constitutional abuses have been attended by unlawful searches and seizures and, at times, excessive force, of which the fatal shooting of Sean Bell by NYPD officers is but one tragic example.

7.      The named Plaintiffs seek to represent a certified class for the purpose of obtaining

3

injunctive and declaratory relief only. The named Plaintiffs seek a class-wide judgment declaring that the policies, practices and/or customs described herein violate the Fourth and Fourteenth Amendments and a class-wide injunction enjoining Defendants from continuing such policies, practices and/or customs. In addition, the named Plaintiffs seek compensatory and punitive damages for themselves. All Plaintiffs seek an award of attorneys' fees and costs and such other relief as this Court deems equitable and just.

### JURISDICTION

8.    Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

9.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

10.    Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

### VENUE

11.    Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 (b) and (c).

### JURY DEMAND

12.    Plaintiffs demand trial by jury in this action on each and every one of their claims.

### PARTIES

### Plaintiffs

13.    Plaintiff DAVID FLOYD ("Floyd") is a 28-year-old African-American man who

resides in the City of New York, Borough of the Bronx. Floyd resides in and/or visits neighborhoods where NYPD officers are and/or have been deployed and conduct stop and frisks.

14.     Plaintiff LALIT CLARKSON ("Clarkson") is a 26 year-old African-American man who resides in Harlem in the City of New York. Clarkson resides in and/or visits neighborhoods where NYPD officers are and/or have been deployed and conduct stop and frisks.

15.     Plaintiff DEON DENNIS ("Dennis") is a 37 year-old African-American man who resides in Harlem in the City of New York. Dennis resides in and/or visits neighborhoods where NYPD officers are and/or have been deployed and conduct stop and frisks.

## Defendants

16.     Defendant CITY OF NEW YORK ("City") is a municipal entity created and authorized under the laws of the State of New York. It is authorized under the laws of the State of New York to maintain a police department, the NYPD, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers. The NYPD's operations include the operations as described herein. On information and belief, the law enforcement activities of the NYPD are funded, in part, with funds from the federal government.

17.     Defendant New York City Police Commissioner RAYMOND KELLY is and was, at all times relevant herein, the Police Commissioner for the City, and is and was responsible for, and the chief architect of, the policies, practices and/or customs of the NYPD, a municipal agency of the City. He is and was, at all times relevant herein, responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD, including the Defendants named herein. He is sued

individually and in his official capacity.

18.     Defendant MICHAEL BLOOMBERG is and was, at all times relevant herein, the Mayor of the City of New York and the chief policy making official for the City and its departments, including the NYPD. He is sued in both his individual and official capacities.

19.     Defendant RODRIGUEZ is, and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  Rodriguez is sued in his individual capacity.

20.     Defendant GOODMAN is, and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  Goodman is sued in his individual capacity.

21.     Defendant JANE DOE is, and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City. Jane Doe is sued in her individual capacity.

22.     Defendant HERNANDEZ is, and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  Hernandez is sued in his individual capacity.

23.     Defendant JOYCE is, and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a muncipal agency of the City.  Joyce is sued in his individual capacity.

24.     Defendant KELLY, Shield #34759, is, and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  Kelly is sued in his individual capacity.

25.     Defendant JOHN DOE #1, is, and/or was, at all times relevant herein, an officer,

employee and agent of the NYPD, a municipal agency of the City.  John Doe #1 is sued in his individual capacity.

26.    Defendant JOHN DOE #2, is, and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  John Doe #2 is sued in his individual capacity.

27.    Defendant POPICHURDO is and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  Popichurdo is sued in his individual capacity.

28.    Defendant SALERNO, Shield #7116, is and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  Salerno is sued in his individual capacity.

29.    Defendant HAYES is and/or was, at all times relevant herein, an officer, employee and agent of the NYPD, a municipal agency of the City.  Hayes is sued in his individual capacity.

30.    Defendant NEW YORK CITY POLICE OFFICERS RODRIGUEZ, GOODMAN, JANE DOE, HERNANDEZ, JOYCE, KELLY, JOHN DOE #1, JOHN DOE #2, POPICHURDO, SALERNO and HAYES are, and/or were, at all times relevant herein, officers, employees, and agents of the NYPD, a municipal agency of the City.  Defendants Rodriguez, Goodman, Jane Doe, Hernandez, Joyce, Kelly, John Doe #1, John Doe #2, Popichurdo, Salerno, Hayes are sued in their individual capacities.

31.    At all times relevant herein, Defendants Rodriguez, Goodman, Jane Doe, Hernandez, Joyce, John Doe #1, John Doe #2, Kelly, Popichurdo, Salerno, Hayes, Commissioner Kelly and Bloomberg have acted under color of state law in the course and scope of their duties and functions

7

as agents, employees, and officers of the City and/or the NYPD in engaging in the conduct described herein. At all times relevant herein, Defendants have acted for and on behalf of the City and/or the NYPD with the power and authority vested in them as officers, agents and employees of the City and/or the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the City and/or the NYPD.

32.    At all times relevant herein, Defendants Rodriguez, Goodman, Jane Doe, Hernandez, Joyce, Kelly, John Doe #1, John Doe #2, Popichurdo, Salerno, Hayes, Commissioner Kelly and Bloomberg have violated clearly established constitutional standards under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment of which a reasonable person would have known.

## CLASS ACTION ALLEGATIONS

33.    Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a certified Plaintiff class consisting of all persons who have been or will be subjected by NYPD officers to Defendants' policy, practice and/or custom of stopping or stopping and frisking persons in the absence of a reasonable, articulable suspicion that criminal activity is taking place, in violation of the Fourth Amendment, including persons stopped or stopped and frisked based on race and/or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment.

34.    The members of the class are so numerous as to render joinder impracticable. Based on information made publicly available by the NYPD, hundreds of thousands of people are stopped or stopped and frisked each year by the NYPD without reasonable, articulable suspicion of criminal conduct.

35.    In addition, joinder is impracticable because, upon information and belief, many members of the class are not aware of the fact that their constitutional rights have been violated and that they have the right to seek redress in court. Many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many class members who have been victimized by the NYPD's unconstitutional practices do not bring individual claims for fear of retaliation and reprisals by NYPD officers. There is no appropriate avenue for the protection of the class members' constitutional rights other than a class action.

36.    The class members share a number of questions of law and fact in common, including, but not limited to:

(a)    whether the NYPD engages in a policy, practice and/or custom of stopping and frisking members of the class in the absence of reasonable, articulable suspicion of criminal conduct required by the Fourth Amendment;

(b)    whether the NYPD engages in profiling on the basis of race and/or national origin in targeting class members for such stops and frisks in violation of the Equal Protection Clause of the Fourteenth Amendment;

(c)    whether the NYPD, incidental to such stops and frisks, conducts searches and seizures and uses excessive force in violation of the Fourth Amendment;

(d)    whether the City, Commissioner Kelly and Bloomberg have failed to adequately and properly screen, train, supervise, monitor and discipline NYPD officers, and whether those failures have caused the constitutional violations inflicted by NYPD officers against class members; and

(e)    whether the City, Commissioner Kelly and Bloomberg have

encouraged, sanctioned and failed to rectify unconstitutional stops and frisks by members of the NYPD, and whether such acts and omissions have caused constitutional violations by NYPD officers against class members.

37.    The named Plaintiffs' claims are typical of those of the class. Like the other members of the class, the named Plaintiffs have been and likely will be again victims of the NYPD's policy, practice and/or custom of suspicionless stops and frisks in that they have been and likely will continue to be, stopped or stopped and frisked with the reasonable articulable suspicion of criminal conduct required under the Fourth Amendment and on the basis of their race and/or national origin.

38.    The legal theories under which the named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the named Plaintiffs are typical of the harms suffered by the class members.

39.    The named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Plaintiff class, and will fairly and adequately protect the interests of the class. The named Plaintiffs are all African-American men and reside in and/or visit neighborhoods where NYPD officers have been deployed and conduct stop and frisks. As long as the NYPD engages in its policy, practice and/or custom of suspicionless stops and frisks, the named Plaintiffs are, and will remain, at high risk of being illegally stopped and frisked again by the NYPD. Indeed, two of the named Plaintiffs have been victimized by NYPD officers repeatedly. The named Plaintiffs are seeking compensatory and punitive damages only on an individual basis.

10

40.    The named Plaintiffs are represented by Andrea Costello, Kamau Franklin and Darius Charney of the Center for Constitutional Rights and Jonathan Moore of the law firm Beldock, Levine & Hoffman, LLP. All are experienced civil rights counsel who have litigated a wide range of class action lawsuits. Counsel for the Plaintiffs have the resources, expertise and experience to prosecute this action. Counsel for the Plaintiffs know of no conflicts among members of the class or between the attorneys and members of the class.

41.    The Plaintiff class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate.

## STATEMENT OF FACTS

### The Experiences of the Named Plaintiffs

**David Floyd**

42.    On April 20, 2007, Plaintiff David Floyd, a freelance film and video editor, was walking in the middle of the day on the sidewalk on Beach Avenue in his Bronx neighborhood, several homes away from where he lives. He witnessed several NYPD officers engaged in a stop of an African-American male on the block where he was walking.

43.    Floyd crossed the street and was approached by two male NYPD Officers, Rodriguez and Goodman, and one female officer, Jane Doe. The officers were riding in a van near Plaintiff as he walked on the sidewalk. These appeared to be the same officers who Floyd had just seen stopping another African-American male in the same area.

44.    Without any basis to formulate a reasonable, articulable suspicion that Floyd had engaged in or was about to engage in criminal conduct, the officers told Floyd to stop and the

11

officers exited the van. Defendants Rodriguez and Goodman surrounded Floyd and questioned

him about where he was going, what he was doing, asked for identification and whether he had

any weapons. Floyd responded to these questions and told the officers that he was simply

walking home, did not have any weapons and provided the officers with his driver's license.

Floyd asked the officers why he was being stopped, but they refused to answer or provide any

reason for the stop.

     45.    With no reasonable belief that Floyd was armed or dangerous and without

probable cause, Defendant Goodman proceeded to search under Floyd's shirt and put his hands

into Plaintiff's pants pockets. Floyd asked what probable cause the officers had for searching and

frisking him, but the officers ignored his question. Floyd informed Defendants Goodman and

Rodriguez that he did not consent to the search.

     46.    When the officers did not find a gun, drugs or any other illegal item on Floyd, one

of the officers asked why Floyd's driver's license was from out of state and told him that he

could be arrested because it was illegal to not have a New York State identification. Floyd

informed the officers that he did not drive in New York State. The officers returned Floyd's

identification and got back into their van to leave.

     47.    Floyd asked the officers for their names and badge numbers. Defendant

Rodriguez identified himself and jokingly asked the other officers for their names and badge

numbers. Defendant Jane Doe stood near the police van during this encounter. The officers left

without explaining why they had stopped and searched Floyd.

     48.    Floyd did not witness any of the officers that stopped and frisked him filling out

any paperwork. These officers subjected Floyd to a suspicionless stop, frisk and unlawful search

based on his race and/or national origin.

49.    Plaintiff Floyd was unlawfully stopped, questioned and frisked, again, by NYPD officers in February 2008. Just after leaving his home in his neighborhood in the Bronx, Floyd ran into an acquaintance who rents a basement apartment from Floyd's godmother. Floyd lives in a small house directly in back of a home, on the same property, which is owned by his godmother. The tenant informed Floyd that he was locked out of his apartment and asked if Floyd could get the spare set of keys from his godmother's upstairs apartment to let him in. Not knowing which key was the correct one for the apartment, Floyd obtained all of the spare keys he could find in his godmother's apartment and returned to assist the tenant.

50.    As Floyd and the tenant were standing outside the apartment door attempting to find the correct key, they were approached from behind by Defendants Hernandez, Joyce and Kelly. Without any basis to formulate a reasonable, articulable suspicion that Floyd had engaged in or was about to engage in criminal conduct, the officers asked what Floyd and the tenant were doing. Without giving Floyd or the tenant time to offer an explanation, the officers them to get up against the wall with their hands spread.

51.    Floyd explained to the officers that he lived in the rear house and that he was attempting to help a tenant who lived in a basement apartment owned by his godmother who had locked himself out of his apartment. Floyd explained that they were not sure which spare key would open the apartment door and that they were trying the keys that he had obtained from his godmother's apartment upstairs.

52.    The officers asked Floyd and the tenant for identification and subjected Plaintiff Floyd to a search by putting their hands inside his pockets. Floyd produced his driver's license

13

and the officers questioned why the address did not match where he said he lived. The tenant did

not have any identification because it was inside his apartment which he was locked out of.

Floyd offered to open the apartment for the tenant so that he could retrieve his identification.

After inspecting the tenant's identification, the officers left the scene.

53.    Floyd did not witness any of the officers that stopped and frisked him filling out

any paperwork. These officers subjected Floyd to a suspicionless stop, frisk and unlawful search

based on his race and/or national origin.

**Lalit Clarkson**

54.    On a weekday in January 2006, at approximately 1:00 p.m., Plaintiff Lalit

Clarkson was on his lunch break from his job as a teaching assistant at Grand Concourse

Academy Charter School in the Bronx. He walked to a Subway restaurant on 167th Street and

Walton Avenue about two blocks from Grand Concourse Academy. At the time, Clarkson was

in his work clothes, a dress shirt, tie and slacks.

55.    After buying his lunch at the Subway restaurant, Clarkson walked back up Walton

Avenue to 169th Street where he entered a bodega on the corner of 169th and Walton Avenue,

directly across the street from the Grand Concourse Academy. Upon entering the bodega,

Clarkson noticed Defendant Officers John Doe #1 and John Doe #2, both dressed in plain

clothes, standing in the aisles. Clarkson purchased some food items and then exited the bodega.

56.    Without any basis to formulate a reasonable, articulable suspicion that Clarkson

had engaged in or was about to engage in criminal conduct, Defendant Officers John Doe #1 and

John Doe #2 immediately followed Clarkson out of the store and called out to him. Clarkson

was walking on the sidewalk in front of the window of the bodega and stopped and turned around

14

to see what they wanted.

57.    When Clarkson turned, John Does ##1 and 2 crossed in front of his path and flashed their police badges. The officers, who were both at least half a foot taller than Clarkson, positioned themselves less than two feet away from him and stood between Clarkson and the street. The officers' positions placed Clarkson with his back against the bodega window.

58.    The officers stated that they wanted to ask Clarkson some questions and, without waiting for Clarkson to consent or object, asked him where he was coming from. Clarkson told Defendants John Doe ##1 and 2 that he was on his lunch break from his job at Grand Concourse Academy across the street and physically pointed to the school.

59.    In response, Defendant John Doe #2 told Clarkson that he had allegedly observed him coming from the direction of a building on Walton Avenue which, the officer claimed, was a known center for drug activity. Clarkson then explained that he had bought lunch at the Subway restaurant on 167th Street and Walton Avenue and, thus, had to pass by the building the officer was referring to as he walked back to work on 169th Street.

60.    Defendant John Doe #2 asked Clarkson if he had any contraband on him and whether the officers would find any contraband if they searched him. Clarkson responded that he did not have any contraband and that he did not consent to a search. John Doe #2 asked the same question a second time and Clarkson, again, responded that he did not have any contraband and did not consent to a search.

61.    At this point, John Doe #2 took several steps toward Clarkson and, raising his voice, asked the same question a third time. Clarkson gave the same answer he previously had. By this time, several people in nearby stores had come out onto the sidewalk to witness the police

officers' interrogation and detention of Clarkson. After Clarkson's third refusal to consent to a

search, the officers left the scene.

62.    At no point did Clarkson observe either John Doe #1 or John Doe #2 fill out any

paperwork. These officers subjected Clarkson to a suspicionless stop and detention based on his

race and/or national origin.

**Deon Dennis**

63.    On January 12, 2008, Plaintiff Deon Dennis was standing on the sidewalk outside

an apartment building located at 2034 7th Avenue (between 122nd and 121st Streets) at

approximately 11 p.m. while he waited for his fiancé to return from running an errand to a local

store to get supplies for her birthday party.

64.    Without any basis to formulate a reasonable articulable suspicion that Dennis had

engaged in or was about to engage in criminal conduct, Defendants Popichurdo and Salerno

drove up in a police van and approached Plaintiff Dennis as he stood outside the apartment

building. Defendants asked why Plaintiff was there, whether he had been drinking and whether a

cup that was a few feet away from Dennis belonged to him.

65.    Dennis responded to the questions and informed Defendants that the cup was not

his and that he had a drink earlier while attending his fiancé's birthday party in an apartment

inside the building. Defendants Popichurdo and Salerno did not make any movement towards

the cup or examine its contents, if any.

66.    Defendants Popichurdo and Salerno positioned themselves to either side of

Dennis and asked for Dennis' identification. Dennis complied with this request and provided

one of the officers with his driver's license. With no reasonable belief that Dennis was armed or

dangerous and without probable cause, Defendants searched Plaintiff Dennis by putting their hands into his pockets and asked if he had any weapons. Defendants' search of Plaintiff Dennis did not reveal anything other than his wallet.

67.    The officer, to whom Dennis had given his identification, went to the police van and returned several minutes later to inform Dennis that he allegedly had an outstanding warrant for taking the subway without paying. The officer knowingly made this false statement. The officers handcuffed Dennis and transported him to the 28th Precinct.

68.    After being taken to the precinct, Dennis was held at the front desk area while one of the officers who had arrested him left the area to, upon information and belief, run a check for any outstanding warrants. Upon the officer's return, the officer informed Dennis that he did not have any outstanding warrants.

69.    Defendant Hayes then came out of a room in the rear of the reception area where Dennis was being held and approached Plaintiff Dennis and the other officers. Hayes informed Plaintiff Dennis that he had a warrant from 1994 for an alleged disorderly conduct charge in New York City. Defendant Hayes knowingly made this false statement. Dennis informed Defendant Hayes, and the other officers present, including Popichurdo and Salerno, that he was living in South Carolina during 1994. One of the officers who had arrested Dennis at the scene told him that there was nothing that she could do concerning Defendant Hayes' statement that there was an alleged warrant.

70.    Dennis was fingerprinted and given a voucher for his property which stated that Defendant Hayes was his arresting officer even though Hayes had not been present at the scene when Dennis was initially stopped, questioned, searched and arrested.

17

71.     During the time that Dennis was at the precinct, his fiancé attempted to see him, inquired about why he had been arrested and asked to retrieve his wallet. The officers present would not provide her with any information concerning Plaintiff Dennis' whereabouts, why he had been arrested or give her his property.

72.     Dennis was held for approximately 6 hours at the precinct and then transported to central booking. At central booking, Dennis was placed in another cell for approximately 4 hours. At one point, Dennis was taken upstairs to a room where an officer ran a check for warrants. At that point, Dennis was informed that he did not have any outstanding warrants and that he was free to leave.

73.     Dennis was in jail for approximately 10-11 hours. When Dennis returned to his fiancé's apartment later in the day after being released from jail, the cup, which Defendants had asked him about, was still in the same place.

74.     Defendants Popichurdo and Salerno subjected Dennis to a suspicionless stop, frisk and unlawful search based on his race and/or national origin. In addition, over the past year, Plaintiff Dennis has been stopped repeatedly, on multiple occasions, by other uniformed and plainclothes NYPD officers who have demanded to search his person and automobile without the reasonable, articulable supicion that he had engaged in, or was about to engage in, any criminal conduct. Following each of these stops and searches, Dennis was never given a citation and was permitted to leave following the detention.

75.     Defendants Rodriguez, Goodman, Jane Doe, Hernandez, Joyce, Kelly, John Doe #1, John Doe #2, Popichurdo, Salerno and Hayes have implemented, enforced, encouraged and sanctioned a policy, practice and/or custom of suspicionless stops and frisks in violation of the

18

Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment. This

unconstitutional conduct is a direct and proximate result of policies, practices and/or customs of

the City, Kelly and Bloomberg and their confederates whose identities are presently unknown to

Plaintiffs.

76.     Defendants each knew, or should have known, that as a direct and proximate

result of the policies, practices and/or customs described herein, the constitutional rights of tens

of thousands of individuals, particularly Black and Latino individuals, would be violated.

Despite this knowledge, and with deliberate indifference to and reckless disregard for the

constitutional rights of such individuals, defendants have implemented, enforced, encouraged,

sanctioned and failed to rectify such policies, practices and/or customs.

### NYPD's History of a Policy, Practice and/or Custom of Suspicionless Stops and Frisks

77.     The NYPD has a history of conducting suspicionless stops and frisks which traces

back to the formation of the "Street Crime Unit" ("SCU") in the 1970's. The SCU was an elite,

commando-like squad of police officers whose self-proclaimed mission was to interdict violent

street crime in the City and, in particular, to remove illegal firearms from the streets. The SCU

was little noticed until Rudolph Giuliani ("Giuliani") took office as Mayor of the City of New

York in 1994. Giuliani had campaigned on a promise of more aggressive law enforcement, and

once he assumed office, the SCU became a centerpiece of Giuliani's anti-crime strategy, and its

officers primary enforcers of his highly aggressive policies.

78.     The SCU, which consisted predominantly of White men, was deployed in so-

called "high crime" areas, largely populated by minorities.  Race and/or national origin – not the

reasonable, articulable suspicion of criminal activity required under the Fourth Amendment –

were often the determinative factors in the SCU's decision to stop and frisk.

79.    The SCU's policy, practice and/or custom of suspicionless stops and frisks led to a massive deprivation of constitutional rights. In 1997, the SCU reported over 18,000 stops and frisks, but made less than 5,000 arrests. The next year, the SCU reported a 50% increase in stops and frisks, but even fewer arrests than in 1997. The SCU's own figures revealed that over a two-year period more than 35,000 law-abiding people were stopped and frisked.

80.    The unconstitutional practices of the SCU led not only to unlawful stops, searches and seizures, but also to violence. One of the most commonly known incidents occurred in February 1999 when the SCU's tactics turned deadly when four SCU officers killed West African immigrant Amadou Diallo in the Bronx in a hail of 41 bullets as he stood in the vestibule of his apartment building.

81.    In 1999, the Office of the Attorney General ("OAG") conducted an investigation and released a study of the NYPD's stop and frisk practices for the period of January 1, 1998 through March 31, 1999, which concluded that there was evidence of racial disparities and disparate impact on the basis of race. Analyzing the stop and frisk data for the time period from January 1998 through March 1999, the OAG found that although Blacks comprised 25.6% of the City's population and Hispanics 23.7%, these two groups made up 83.6% of all stops by the NYPD. By contrast, Whites were 43.4% of the City's population, but accounted for only 12.9% of all stops. In precincts where Black and Hispanic persons each represented less than 10% of the total population, individuals identified as belonging to these racial group accounted for more than half (53.4%) of the stops in these precincts. The rate at which stops led to arrests also differed by race: only 1 out of 9.5 stops of Blacks, 1 out of 8.8 stops of Hispanics, and 1 out of

every 7.9 stops of Whites resulted in an arrest. These stop to arrest rates demonstrated that the stops of Whites were more likely to lead to arrests, whereas those for Blacks were more indiscriminate because fewer of the persons stopped in these broader sweeps were actually arrested.  The OAG also found that when examining the crime rate statistics from the New York Division of Criminal Justice Services ("DCJS") during this time period, Blacks were stopped 23% more often than Whites; Hispanics were stopped 39% more often than Whites.  Controlling for precincts actually increased these discrepancies.  The OAG also estimated that SCU officers completed a UF-250 form (*i.e.*, the form on which all NYPD officers are required to record information about stop and frisk practices) was completed for only 10%-20% of the stops and frisks they conducted.

82.     In 1999, the Center for Constitutional Rights filed a class action lawsuit, *Daniels, et al. v. The City of New York, et al.*, ("*Daniels*") to challenge the NYPD's unconstitutional policy, practice and/or custom of conducting rampant stops and frisks of individuals without the reasonable articulable suspicion required under the Fourth Amendment and which impermissibly used race and/or national origin -- not reasonable suspicion -- as the determinative factors in deciding to stop and frisk individuals.

83.     In 2003, a settlement  was reached in *Daniels* which resulted in a Stipulation that required, *inter alia*, the NYPD to adopt a written policy prohibiting unlawful racial profiling. The Stipulation also required the NYPD to produce quarterly data concerning the NYPD stop and frisk activity which is contained in its UF-250 forms.

84.     During the pendency of *Daniels*, the NYPD claimed it had disbanded the SCU, however, the unlawful practices perfected by the NYPD through the SCU have continued,

through other methods, as part of the NYPD's anti-crime strategy.[1]

85.    Defendants have applied a facially neutral policy, the written anti-racial profiling policy, to Plaintiffs, and similarly situated individuals, in an intentionally racially discriminatory manner.

86.    [PARAGRAPH FILED UNDER SEAL]

87.    [PARAGRAPH FILED UNDER SEAL]

88.    [PARAGRAPH FILED UNDER SEAL]

89.    [PARAGRAPH FILED UNDER SEAL]

90.    [PARAGRAPH FILED UNDER SEAL]

91.    [PARAGRAPH FILED UNDER SEAL]

92.    On information and belief, NYPD officers are also under pressure to conduct increased stops and frisks.  On information and belief, the stop and frisk reports are tracked and evaluated at the NYPD's weekly CompStat meetings where commanders are questioned about their precinct's crime statistics.  CompStat focus gives NYPD officers a strong incentive to generate UF-250s because an officer's UF-250 numbers suggest productivity.

93.    Public accounts provide further evidence of unlawful stops and frisks which lack the reasonable suspicion required by the Fourth Amendment and reveal intent to discriminate on the basis of race.  For example, on October 10, 2006, the *Daily News* reported that NYPD

---

[1] Pursuant to the Court's Order dated April 14, 2008, (Dkt. #10), Plaintiffs' counsel was permitted to file, under seal, the portions of this Amended Complaint which contain information from the NYPD's UF-250 database, which records all stop and frisk activity, which is subject to the Protective Order issued in the related case of *Daniels, et al. v. The City of New York, et al.*, until such time as the Court can hear Plaintiffs' motion that the UF-250 data should be made publicly available. Accordingly, paragraphs 86 through 91 herein have been filed under seal.

officers informed the news source that they were given a roll call order by Captain Michael Vanchieri to stop, question and frisk all black males at the Seventh Avenue Park Slope subway station in Brooklyn after he described a series of robberies on the F subway line in Brooklyn that were concentrated near that station. This directive prompted calls by One Hundred Blacks in Law Enforcement and the National Latino Officers Association for an investigation of police commands that were indicative of racial profiling.

94.    A report by the New York City Civilian Complaint Review Board ("CCRB") also shows that the incidents of unlawful stops and frisks has risen dramatically since 1999. The CCRB reported that in 1999, 1,240 individuals made complaints of being subjected to stops and frisks which were an abuse of police authority. In 2006, the complaints for improper stops and frisks totaled 5,089; the overall total for complaints made for that year was 7,669. According to the CCRB, the substantiation rate for allegations of unlawful stops and frisks was at least more than twice the rate for any other allegation made from 2002 through 2006.

### NYPD's Suspicionless Stop and Frisk Practice is A Direct and Proximate Result of Defendants' Policies, Practices and/or Customs

95.    The Fourth Amendment prohibits police officers from conducting stops and frisks without a reasonable, articulable suspicion of criminal conduct; frisking persons without a reasonable belief that they are armed or presently dangerous; searching and seizing persons without probable cause; or using excessive force in the course of policing activities. Additionally, the Equal Protection Clause of the Fourteenth Amendment bars police officers from targeting individuals for stops and frisks on the basis of race or national origin.

96.    The pervasive unconstitutional practices of the NYPD are a direct and proximate

23

result of policies, practices and/or customs devised, implemented, enforced and sanctioned by the City, Commissioner Kelly and Bloomberg and their confederates whose identities are presently unknown, with the knowledge that such policies, practices and/or customs would lead to violations of the Fourth and Fourteenth Amendments. Those policies, practices and/or customs include: (a) failing to properly screen, train and supervise NYPD officers, (b) failing to adequately monitor and discipline NYPD officers, and (c) encouraging, sanctioning and failing to rectify the NYPD's custom and practice of suspicionless stops and frisks.

**Failure to Properly Screen, Train and Supervise NYPD Officers**

97.     Although fully aware that the work of the NYPD demands extensive training, superior judgment and close supervision, the City, Commissioner Kelly and Bloomberg failed to properly screen, train and supervise NYPD officers, knowing that such failures would result in Fourth and Fourteenth Amendment violations.

98.     Pursuant to the Stipulation of Settlement in *Daniels*, Defendants City, Commissioner Kelly and Bloomberg were required to implement numerous training requirements concerning the written policy prohibiting racial profiling that required as part of the settlement. On information and belief, Defendants have failed to properly train and supervise NYPD officers, including supervisors, concerning the legal and factual bases for conducting stops and/or frisks that comply with the Fourth and Fourteenth Amendments in an effective manner.

99.     The inadequate screening, training and supervision of the NYPD is a direct and proximate cause of the NYPD's rampant unconstitutional stops and frisks. As a direct and proximate result of the Defendants' failure to screen, train and supervise NYPD officers, tens of

thousands of people have been subjected to unlawful stops and frisks, many times simply

because of their race and/or national origin. By failing to properly screen, train and supervise

NYPD officers, the City, Commissioner Kelly and Bloomberg have acted recklessly and with

deliberate indifference to the constitutional rights of those who would come into contact with the

NYPD.

**Failure to Monitor and Discipline NYPD Officers**

100.    The NYPD's widespread abuses are also a direct and proximate result of the

failure of the City, Commissioner Kelly and Bloomberg to properly and adequately monitor,

discipline and take necessary corrective action against NYPD officers who engage in, encourage

or conceal unconstitutional practices. Among other things, these Defendants knowingly,

deliberately and recklessly have failed:

> (a)    to take appropriate disciplinary action and corrective measures against
> NYPD officers who have engaged in suspicionless stops and frisks;
>
> (b)    to adequately monitor NYPD officers who have incurred a substantial
> number of civilian complaints, even in instances where the number of
> complaints should have triggered monitoring under established
> departmental guidelines;
>
> (c)    to devise and implement appropriate oversight, disciplinary and remedial
> measures in the face of extensive evidence that no charges are brought
> against the overwhelming majority of persons stopped and frisked by
> NYPD officers;
>
> (d)    to conduct adequate auditing to determine if the stop and frisks conducted
> by NYPD officers comply with the NYPD's written policy prohibiting
> stop and frisks that are not based upon reasonable suspicion and use race
> and/or national origin as the determinative factor in initiating police
> action;
>
> (e)    to take sufficient, if any, steps to curb NYPD officers' non-compliance
> with departmental directives requiring that UF-250 forms be completed for

each stop and frisk;

    (f)    to take sufficient corrective and remedial action against NYPD officers who provide fabricated, false, or impermissible justifications for stops and frisks; and

    (g)    to take sufficient corrective, disciplinary and remedial action to combat the so-called "blue wall of silence," wherein NYPD officers regularly conceal or fail to report police misconduct, *inter alia*, in sworn testimony, official reports, statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau, and in public statements.

101.    The City, Commissioner Kelly and Bloomberg failed to properly and adequately monitor, discipline and take necessary corrective action against NYPD officers, knowing that such omissions would lead to Fourth and Fourteenth Amendment violations. By such acts and omissions, the City, Kelly and Bloomberg have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with the NYPD.

**Encouraging, Sanctioning and Failing to Rectify the NYPD's Suspicionless Stops and Frisks**

102.    With the knowledge that such acts and omissions would create a likelihood of Fourth and Fourteenth Amendment violations, the City, Commissioner Kelly and Bloomberg also have encouraged, sanctioned and failed to rectify the NYPD's abusive and unconstitutional practices.

103.    For example, Defendants, on information and belief, have enacted and enforced unwritten "productivity standards" or de facto quotas of a certain number of stops and frisks and specific types of arrests per month for each NYPD officer. On information and belief, NYPD officers who fail to meet the productivity standards face adverse employment consequences. In their efforts to satisfy the productivity standards, NYPD officers have engaged in widespread

suspicionless stops and frisks of individuals.

104.    As a direct and proximate result of the above policies, practices and/or customs, tens of thousands of people have been, and will continue to be, subjected to unconstitutional stops, frisks, searches and seizures by NYPD officers, sometimes in violent encounters, simply because such individuals happen to be the wrong color, in the wrong place, at the wrong time. Through such acts and omissions, the City, Commissioner Kelly and Bloomberg have acted recklessly and with deliberate indifference to the constitutional rights of individuals who would come into contact with the NYPD.

### Recent Measures Are Inadequate and Insufficient to Eradicate, Curb or Deter the Suspicionless Stop and Frisk Policy

105.    Pursuant to the Stipulation in *Daniels*, Defendant City and the NYPD were required to implement a written policy which prohibits racial or ethnic/national origin profiling in violation of the United States and New York State Constitutions.  As explained herein, Defendants have violated that written policy.

106.    Pursuant to the Stipulation in *Daniels,* Defendant City and the NYPD were also required, *inter alia*, to: (a) supervise, monitor and train officers and supervisors regarding the policy prohibiting unlawful racial profiling; (b) to conduct supervision and monitoring of the policy through audits by the NYPD Quality Assurance Division that determine whether, and to what extent, the audited stop, question and frisk activity is based upon reasonable suspicion; (c) to require that NYPD officers and supervisors document stop, question and frisk activity in UF-250 forms, memo books, logs and monthly activity reports; to compile a database of all UF-250 reports; and (d) to conduct public information and outreach through community forums, high

school workshops and distribution of materials informing the public about their rights concerning

stop, question and frisk encounters and making complaints about concerns arising from a stop,

question and/or frisk encounter with the police.  On information and belief, Defendants did not

perform all of these requirements.

107.    None of these measures, moreover, sufficiently or adequately addressed, much

less irrevocably eradicated, curbed or deterred the NYPD's pervasive policy, practice and/or

custom of unconstitutional stops and frisks.  Thus, despite these initiatives, Plaintiffs, and

hundreds of thousands of other individuals, continue to face the imminent likelihood of

becoming victims of the NYPD's constitutional abuses in violation of the Fourth and Fourteenth

Amendments to the U.S. and New York State Constitutions.

### FIRST CLAI M
**(Claims of Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983**
**Against All Defendants for Violations of the Fourth Amendment)**

108.    Plaintiffs repeat and re-allege paragraphs 1 through 107 above as if fully set forth

herein.

109.    Defendants City, Commissioner Kelly, Bloomberg, Rodriguez, Goodman, Jane

Doe, Hernandez, Joyce, Kelly (Shield #34759), John Doe #1, John Doe #2, Popichurdo, Salerno

and Hayes and have implemented, enforced, encouraged and sanctioned a policy, practice and/or

custom of stopping and frisking the members of the Plaintiff class without the reasonable

articulable suspicion of criminality required by the Fourth Amendment.  These constitutional

abuses often are coupled with unconstitutional searches and seizures and, at times, excessive

force.

110.    The NYPD's constitutional abuses and violations were, and are, directly and

28

proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by the City, Commissioner Kelly and Bloomberg, including: (a) the failure to adequately and properly screen, train, and supervise NYPD officers; (b) the failure to properly and adequately monitor and discipline NYPD officers; and (c) the overt and tacit encouragement and sanctioning of, and the failure to rectify, the NYPD's suspicionless stop and frisk practices.

111.    Each of the Defendants has acted with deliberate indifference to the Fourth Amendment rights of the named Plaintiffs and other members of the class. As a direct and proximate result of the acts and omissions of each of the Defendants, the Fourth Amendment rights of the named Plaintiffs and other class members have been violated. By acting under color of state law to deprive the named Plaintiffs and other class members of their rights under the Fourth Amendment, the Defendants are in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

112.    The NYPD targets Black and Latino individuals for illegal stops and frisks in areas where Plaintiffs reside and/or visit. Thus, a real and immediate threat exists that the Fourth Amendment rights of the named Plaintiffs and other class members will be violated by NYPD officers in the future. Moreover, because Defendants' policies, practices and/or customs subject the named Plaintiffs and other class members to stops and frisks without any reasonable, articulable suspicion of criminality, and often on the basis of race and/or national origin, the named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the NYPD.

113.    The named Plaintiffs and other members of the class have no adequate remedy at

29

law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice and/or custom of unconstitutional stops and frisks, and the policies, practices and/or customs that have directly and proximately caused such constitutional abuses.

### SECOND CLAIM
**(Claims of Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983
Against All Defendants for Violation of Equal Protection Clause)**

114.    Plaintiffs repeat and re-allege paragraphs 1 through 113 as if fully set forth herein.

115.    The City, Commissioner Kelly, Bloomberg, Rodriguez, Goodman, Jane Doe, Hernandez, Joyce, Kelly (Shield #34759), John Doe #1, John Doe #2, Salerno, Popichurdo and Hayes have implemented and enforced a policy, practice and/or custom of stopping and frisking the named Plaintiffs and members of the Plaintiff class without the reasonable articulable suspicion of criminality required by the Fourth Amendment and based solely on their race and/or national origin. These suspicionless stops and frisks have and are being conducted predominantly on Black and Latino individuals on the basis of racial and/or national origin profiling. As a result, the NYPD's policy, practice and/or custom of suspicionless stops and frisks violate the Equal Protection Clause of the Fourteenth Amendment. The NYPD's constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City, Commissioner Kelly and Bloomberg, including: (a) the failure to adequately and properly screen, train, and supervise NYPD officers; (b) the failure to adequately and properly monitor and discipline the NYPD and its officers; and (c) the encouragement and sanctioning of and failure to rectify the NYPD's use of racial and/or national origin profiling in making stops and frisks.

116.    Each of the Defendants has acted with deliberate indifference to the Fourteenth Amendment rights of the named Plaintiffs and class members.  As a direct and proximate result of the aforesaid acts and omissions of the Defendants and each of them, the Fourteenth Amendment rights of the named Plaintiffs and class members have been violated.  By their acts and omissions, Defendants have acted under color of state law to deprive the named Plaintiffs and class members of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

117.    Due to the NYPD targeting Black and Latino persons in areas where the named Plaintiffs and other class members reside and/or visit, a real and immediate threat exists that the Fourteenth Amendment rights of the named Plaintiffs and other class members will be violated by NYPD officers in the future.  Moreover, because Defendants' policies, practices and/or customs subject the named Plaintiffs and other class members to repeated stops and frisks without any reasonable, articulable suspicion of criminality, and often on the basis of race and/or national origin, the named Plaintiffs and other class members cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the NYPD.

118.    The named Plaintiffs and other class members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing the NYPD's policy, practice and/or custom of unconstitutional race and/or national origin-based stops and frisks, and the policies, practices and/or customs that have directly and proximately caused  such constitutional abuses.

## THIRD CLAIM
**(Claims of Named Plaintiffs and Class Members Under Title VI of the
Civil Rights Act of 1964, 42 U.S.C. § 2000(d), *et seq.* Against the City)**

119.    Plaintiffs repeat and re-allege paragraphs 1 through 118 as if fully set forth herein.

120.    The law enforcement activities described in this complaint have been funded, in part, with federal funds.

121.    Discrimination based on race in the law enforcement activities and conduct described herein are prohibited under 42 U.S.C. § 2000(d), *et seq.*  The acts and conduct complained of herein by the Defendants were motivated by racial animus, and were intended to discriminate on the basis of race and/or had a disparate impact on minorities, particularly Blacks and Latinos.

122.    As a direct and proximate result of the above mentioned acts, the named Plaintiffs and members of the class have suffered injuries and damages and have been deprived of their rights under the civil rights laws. Without appropriate injunctive relief, these violations will continue to occur.

### FOURTH CLAIM
**(Individual Claims of Floyd Pursuant to 42 U.S.C. § 1983 Against Rodriguez, Goodman, Jane Doe, Hernandez, Joyce and Kelly (Shield #34759))**

123.    Plaintiffs repeat and re-allege paragraphs 1 through 122 as if fully set forth herein.

124.    The conduct of Defendants Rodriguez, Goodman, Jane Doe in stopping, frisking and searching Plaintiff Floyd on April 20, 2007, and the conduct of Defendants Hernandez, Joyce and Kelly, in stopping, frisking and searching Floyd in February 2008, were performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds.  Moreover, each of these stops and frisks were performed on the basis of racial and/or national origin profiling.

125.    As a direct and proximate result of such acts, Defendants Rodriguez, Goodman, Jane Doe, Hernandez, Joyce and Kelly deprived Plaintiff Floyd of his Fourth and Fourteenth

Amendment rights in violation of 42 U.S.C. § 1983.

126.    As a direct and proximate result of those constitutional abuses, Plaintiff Floyd has suffered, and will continue to suffer, physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

127.    The acts of Rodriguez, Goodman, Jane Doe, Hernandez, Joyce and Kelly were intentional, wanton, malicious, reckless and oppressive, thus, entitling Plaintiff Floyd to an award of punitive damages.

### FIFTH CLAIM
### (Individual Claims of Clarkson Pursuant to 42 U.S.C. § 1983 Against John Does ## 1 and 2)

128.    Plaintiffs repeat and re-allege paragraphs 1 through 127 as if fully set forth herein.

129.    The conduct of Defendants John Does ##1 and 2 in stopping and detaining Plaintiff Clarkson in January 2006, were performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop and frisk was performed on the basis of racial and/or national origin profiling.

130.    As a direct and proximate result of such acts, Defendants John Does ##1 and 2 deprived Plaintiff Clarkson of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

131.    As a direct and proximate result of those constitutional abuses, Plaintiff Clarkson has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

132.    The acts of Defendants John Does ##1 and 2 were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff Clarkson to an award of punitive damages.

**SIXTH CLAIM**
**(Individual Claims of Dennis Pursuant to 42 U.S.C. § 1983**
**Against Popichurdo, Salerno and Hayes)**

133.    Plaintiffs repeat and re-allege paragraphs 1 through 132 as if fully set forth herein.

134.    The conduct of Defendants Popichurdo, Salerno and Hayes in stopping, frisking, arresting and imprisoning Dennis on January 12, 2008, were performed under color of law and without any reasonable suspicion of criminality or other constitutionally required grounds. Moreover, this stop, frisk, arrest and imprisoning was performed on the basis of racial and/or national origin profiling.

135.    As a direct and proximate result of such acts, Defendants Popichurdo, Salerno and Hayes deprived Plaintiff Dennis of his Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

136.    As a direct and proximate result of those constitutional abuses, Plaintiff Dennis has suffered and will continue to suffer physical, mental and emotional pain and suffering, mental anguish, embarrassment and humiliation.

137.    The acts of Defendants Popichurdo, Salerno and Hayes were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiff Dennis to an award of punitive damages.

**SEVENTH CLAIM**
**(Individual Named Plaintiffs' Claims Against the City, Commissioner Kelly and Bloomberg**
**Pursuant to 42 U.S.C. § 1983)**

138.    Plaintiffs repeat and re-allege paragraphs 1 through 137 as if fully set forth herein.

139.    Defendants City, Commissioner Kelly and Bloomberg have directly and proximately caused the NYPD's policy, practice and/or custom of suspicionless stops and frisks

34

in violation of the Fourth and Fourteenth Amendments, with deliberate indifference to the constitutional rights of Plaintiffs Floyd, Clarkson and Dennis, by devising, implementing, enforcing, adopting, sanctioning and ratifying a policy, practice and/or custom of: (a) failing to properly screen, train, and supervise NYPD officers; (b) failing to adequately monitor and discipline the NYPD and its officers; and (c) encouraging, sanctioning and failing to rectify the NYPD's constitutional abuses.

140.    As a direct and proximate result of the aforesaid acts and omissions, Defendants City, Commissioner Kelly and Bloomberg, have each deprived Plaintiffs Floyd, Clarkson and Dennis of their Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

141.    The acts and omissions of Defendants Commissioner Kelly and Bloomberg explained herein were intentional, wanton, malicious, reckless and oppressive, thus, entitling Plaintiffs to an award of punitive damages. In engaging in such conduct, Commissioner Kelly and Bloomberg acted beyond the scope of their jurisdiction, without authority under law, and in abuse of their powers.

## EIGHTH CLAIM
### (Violation of Rights Under New York Law)

142.    Plaintiffs repeat and re-allege paragraphs 1 through 141 as if fully set forth herein.

143.    By the actions described above, each and every Defendant, jointly and severally, has committed the following wrongful acts against the named Plaintiffs and other class members, which are tortious under the Constitution and laws of the State of New York:

        a)      assault and battery;

        b)      trespass;

    c)    violation of the right to privacy;

    d)    negligence; and

    e)    violation of rights otherwise guaranteed under the Constitution and the laws of the State of New York.

144.    In addition, by the actions described above, Defendants Popichurdo, Salerno and Hayes, jointly and severally, have committed the following wrongful acts against Plaintiff Dennis, which are tortious under the Constitution and laws of the State of New York:

    a)    false arrest; and

    b)    false imprisonment.

145.    In addition, Defendants City, Commissioner Kelly and Bloomberg were negligent in their hiring, screening, training, supervision and retention of Defendants Rodriguez, Goodman, Jane Doe, Hernandez, Joyce, Kelly, John Doe #1, John Doe #2, Popichurdo, Salerno and Hayes.

146.    The foregoing acts and conduct of Defendants were a direct and proximate cause of injury and damage to the named Plaintiffs and other class members and violated the statutory and common law rights as guaranteed to them by the Constitution and laws of the State of New York.

**NINTH CLAIM**
**(Respondeat Superior Claim Against the City Under New York Common Law)**

147.    Plaintiffs repeat and re-allege paragraphs 1 through 146 as if fully set forth herein.

148.    The conduct of Defendants Officers Rodriguez, Goodman, Jane Doe, Hernandez, Joyce, Kelly, John Doe #1, John Doe #2, Popichurdo, Salerno and Hayes occurred while they were on duty, in and during the course and scope of their duties and functions as New York City police officers, and while they were acting as agents and employees of defendant City.  As a

36

result, Defendant City is liable to Plaintiffs under the doctrine of respondeat superior.

**WHEREFORE**, the named Plaintiffs and other members of the class they seek to represent pray that the Court will:

a)   Issue an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

b)   Issue a class-wide judgment declaring that the NYPD's policy, practice and/or custom of suspicionless stops and frisks challenged herein is unconstitutional in that it violates the Fourth and Fourteenth Amendments to the United States Constitution, Title VI, and the Constitution and laws of the State of New York, and that its implementation, enforcement and sanctioning by NYPD officers is a direct and proximate result of the following policies, practices and/or customs of the City, Commissioner Kelly and Bloomberg:

    i)   failing to adequately screen, train and supervise officers;

    ii)   failing to adequately monitor the NYPD and its officers and discipline those NYPD officers who violate the constitutional rights of residents of the communities they patrol; and

    iii)   encouraging, sanctioning, and failing to rectify the NYPD's unconstitutional stops and frisks.

c)   Issue an order for the following injunctive relief:

    i)   enjoining the NYPD from continuing its policy, practice and/or custom of suspicionless stops and frisks;

    ii)   enjoining the NYPD from continuing its policy, practice and/or custom of conducting stops and frisks based on racial and/or national origin profiling;

    iii)   enjoining the use of formal or informal productivity standards or other de facto quotas for arrests and/or stops and frisks by NYPD officers;

    iv)   requiring the City, Commissioner Kelly and Bloomberg to institute and implement improved policies and programs

with respect to training, discipline, and promotion designed to eliminate the NYPD's policy, practice and/or custom of suspicionless stops and frisks;

v)      requiring the City, Commissioner Kelly and Bloomberg to deploy NYPD officers with appropriate and adequate supervision;

vi)     requiring the City, Commissioner Kelly and Bloomberg to institute and implement appropriate measures to ensure compliance with departmental directives that NYPD officers complete UF-250's on each and every stop and frisk they conduct;

vii)    requiring the City, Commissioner Kelly and Bloomberg to institute and implement appropriate measures to mandate that UF-250's or other documentation be prepared and maintained in an up to date computerized database for each stop conducted by an officer, regardless of whether the stop is followed by the use of force, a frisk, a search, or an arrest; and

viii)   requiring the City, Commissioner Kelly and Bloomberg to monitor stop and frisk practices of the NYPD, including periodically and regularly reviewing UF-250 forms and audits conducted of the NYPD's stop and frisk practices to determine whether reported stops and frisks have comported with constitutional requirements.

d)   Award named Plaintiffs Floyd, Clarkson and Dennis compensatory damages in amounts that are fair, just and reasonable, to be determined at trial;

e)   Award named Plaintiffs Floyd, Clarkson and Dennis damages against Defendants Commissioner Kelly, Bloomberg, Rodriguez, Goodman, Jane Doe, John Doe #1, John Doe #2, Popichurdo, Salerno and Hayes, to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, in an amount which is fair, just and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

f)   Award all Plaintiffs, including the members of the class, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

g)   Award all Plaintiffs, including the members of the class, costs of suit pursuant to

38

42 U.S.C. §§ 1920 and 1988; and

h)  Award such other and further relief as this Court may deem appropriate and
equitable, including injunctive and declaratory relief as may be required in the
interests of justice.

DATED: April 15, 2008                    By: _*Andrea Costello*_____

                                         Andrea Costello (AC-6197)

                                         Andrea Costello (AC-6197)
                                         Kamau Franklin (KF- 6837)
                                         Darius Charney (DC-1619)
                                         CENTER FOR CONSTITUTIONAL RIGHTS
                                         666 Broadway, 7th Floor
                                         New York, NY 10012
                                         (212) 614-6439 (t); (212) 614-6499 (f)
                                         acostello@ccrjustice.org
                                         kfranklin@ccrjustice.org
                                         dcharney@ccrjustice.org

                                         Jonathan Moore (JM-6902)
                                         BELDOCK LEVINE & HOFFMAN, LLP
                                         99 Park Avenue, Suite 1600
                                         New York, NY 10016
                                         (212) 490-0900 (t); (212) 557-0565 (f)
                                         jmoore@BLHNY.com

                                         ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April 2008, that a true and correct copy of the

foregoing document was furnished via U.S. First Class Mail and electronic mail upon the

following:

> Linda Donahue
> David Hazan
> Jennifer Rossan
> Assistant Corporation Counsel
> Corporation Counsel of the City of New York
> 100 Church Street, Room 3-158
> New York, NY 10007

_Andrea Costello_
_____
Andrea Costello