UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID FLOYD, *et al.*,

     Plaintiffs,

    -against-

THE CITY OF NEW YORK, *et al.*,

     Defendants.

08 Civ. 1034 (SAS)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL THE PRODUCTION OF UF-250 DATA AND INFORMATION SUBJECT TO THE PROTECTIVE ORDER IN *DANIELS***

Dated: June 2, 2008

Andrea Costello (AC-6197)
Darius Charney (DC-1619)
Kamau Karl Franklin (KF-6837)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
T (212) 614-6439; F (212) 614-6499

Jonathan C. Moore (JM-6902)
BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, 16th Floor
New York, New York 10016
T (212) 490-0900; F. (212) 490-0400

Attorneys for Plaintiffs

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 1

ARGUMENT ........................................................................................................ 4

I.     The City Must Provide Plaintiffs With All of the UF-250 Data From 1998 to the
       Present Without Redactions Until the City Proves Why a Protective Order Should
       Issue as to Any Information in the Data ..................................................................... 4

II.    The City Has Not Proven Why a Protective Order Should Issue to Prevent
       Plaintiffs From Obtaining Certain Information in the UF-250 Data or Why Certain
       Information Should be Designated as Confidential ..................................................... 6

       A.     The Standard for a Protective Order ................................................................. 7

       B.     The UF-250 Data Fields and Information That the City Refuses to Produce or
              Argues is Privileged or Confidential ................................................................. 8

              UF-250 DATA FIELDS THE CITY ASSERTS IT WILL NOT PRODUCE
              (Category #1) .................................................................................................... 8

              UF-250 DATA FIELDS WHICH THE CITY WILL PRODUCE, BUT
              ARGUES PRIVILEGE OR CONFIDENTIALITY FOR (Category #2) ............... 9

       C.     The City Cannot Object to Providing Plaintiffs With Information That was
              Disclosed to Other Entities ............................................................................ 10

III.   Plaintiffs Have Established That the Data Fields Which the City Refuses to Produce
       are Relevant to Plaintiffs' Claims ........................................................................... 14

       A.     ███████████████████████████ ........................................... 15

       B.     ███████████████████████████████████████████████
              ███████████████████████████████████████████████
              ████████████████████████████████████████████ ... 16

       C.     ███████████████████████████████████████████████
              ███████████████████████████████████████████████
              ████████████████████████████████████████████

████████████████████████████████████ ... 16

D.    ██████████████████████████ ████████ ................................... 17

E.    ████████████████████████████████████ ........ 18

F.    ████████████████████████████ ..................... 19

G.    ██████████████████████████████████ ................. 20

H.    ████████████████████████████████ ... 20

I.    ████████████████████ ..................................... 20

IV.    Certain Information Which Was Subject to the Protective Order in *Daniels* is
Relevant to Plaintiffs' Claims and Should be Produced in This Case ............................... 21

A.    Attorney work product and attorney client privileged documents which
contain references to information in the UF-250 data or other information
designated as "confidential" under the *Daniels* protective order ........................... 21

B.    Documents Which Relate to NYPD Training and Policies Concerning Stops
and Frisks, Including Those Relating to the SCU Deployment Tactics and
Methods, Operations, Training, Goals, Policies and Arrests, and Depositions
of NYPD supervisors With Key Roles in Stop and Frisk Policy and Training .... 22

CONCLUSION ................................................................................................................. 25

CERTIFICATE OF SERVICE................................................................................................. 26

## TABLE OF AUTHORITIES

<u>Federal Cases</u>

*City of Canton v. Harris*, 489 U.S. 378 (1989)............................................................. 25

*Daniels, et al. v. The City of New York, et al.*, 99 Civ. 1695 (SAS) ...................................... passim

*Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000)............................................. 23

*Gambale v. Deutsche Bank AG*, 377 F.3d 133 (2d Cir. 2004)............................................. 8, 9, 13

*In Re Dep't of Investigation of the City of New York*, 856 F.2d 481 (2d Cir. 1988)..................... 13

*MacNamara v. City of New York*, 2008 U.S. Dist. LEXIS 25982
 (S.D.N.Y. March 31, 2008)........................................................................................ 16, 17

*Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978) ........................... 22

*Morrissey v. City of New York*, 171 F.R.D. 85 (S.D.N.Y. 1997)............................................. 7, 15

*Schiller v. City of New York*, 2007 U.S. Dist. LEXIS 4285 (S.D.N.Y. Jan. 19, 2007) ............ 7, 13

*U.S. v. Nixon*, 418 U.S. 683 (1974)............................................................................. 7

*Ware v. Jackson County*, 150 F.3d 873 (8th Cir. 1998)............................................. 23

<u>Federal Rules</u>

Fed. R. Civ. P. 26(b) .......................................................................................... 14, 15

Fed. R. Civ. P. 26(b)(1)....................................................................................... 7, 8

Fed. R. Civ. P. 26(c)(2)....................................................................................... 15, 17

Fed. R. Civ. P. 30(b)(6)....................................................................................... 26

## INTRODUCTION

The central allegation in this action is that the Defendants have implemented, and are continuing to enforce, encourage and sanction a policy, practice and/or custom of unconstitutional stops and frisks of City residents by the New York City Police Department ("NYPD") without the reasonable suspicion required by the Fourth Amendment and using race and/or national origin, not reasonable suspicion, as the determinative factors in violation of the Fourteenth Amendment. Plaintiffs submit this memorandum of law in support of Plaintiffs' motion to compel production of the NYPD's "UF-250 Data" from 1998 to the present (*i.e.*, the information recorded on a UF-250 form regarding stop and frisks). Plaintiffs also seek the disclosure and return of relevant information related to their previous representation of a certified class in *Daniels, et al. v. The City of New York, et al.* ("*Daniels*"), Case No. 99 Civ. 1695 (SAS), which they were permitted to retain to file this related action. The information Plaintiffs have moved to compel is relevant and critical to the fair adjudication of this case. Defendants have not met their burden to raise or prove why a protective order should issue to either prevent the disclosure of certain information in the UF-250 data, or as to why the disclosure of certain data should be restricted.

## FACTUAL BACKGROUND

Following the filing of this action on January 31, 2008, the Court held an initial conference on February 6, 2008, to discuss the UF-250 data and related information which the Court permitted Plaintiffs to retain from their representation of a certified class in *Daniels* so that they could to file this action after the expiration of the *Daniels* Stipulation of Settlement ("Stipulation"). Plaintiffs were ordered to return the UF-250 data quarterly from 1998 through the first quarter of 2007 to the City pursuant to the *Daniels* Stipulation along with related

documents generated from the data, including Plaintiffs' counsel's work product analyzing the data. Plaintiffs were also required to, and did, to return all documents subject to the *Daniels* protective order to the City's attorneys in sealed boxes to be stored, but not opened, until the Court resolved this motion. The Court specified that to obtain these materials for use in the present action, Plaintiffs had to request it from the City through discovery. *See* Declaration of Andrea Costello at Ex. 1 at 16-17.

Plaintiffs served their First Request for the Production of Documents on the City on April 18, 2008, and requested the entire NYPD UF-250 database for the years 1998 to the present, the listing of codes and explanatory files which accompany the data and the materials which Plaintiffs returned to the City pursuant to the Court's February 6, 2008 directive. Ex. 2. The City objected to producing the UF-250 data from 1998 to the present based on privacy concerns, law enforcement privilege and relevance. Ex. 3. The City's main argument was that any information pre-dating the *Daniels* Stipulation was not relevant to Plaintiffs' claims. *Id.* The City agreed to produce only the UF-250 database from February 1, 2005, through the second quarter of 2007 under an appropriate protective order. Ex. 3. Defendant's objections to producing the information which was subject to the *Daniels* protective order, including the UF-250 data, were that the request seeks documents that Plaintiffs unconditionally agreed to return as part of the consideration underlying the Stipulation, and to the extent that the request it seeks documents and materials that predate the *Daniels* Stipulation, that such documents and materials are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Ex. 3.

On May 19, 2008, the parties appeared before the Court for a conference concerning the issues raised in this motion. Ex. 4. The Court ruled that all of the UF-250 data requested by the

Plaintiffs, including the data pre-dating the 2004 *Daniels* settlement, is relevant to Plaintiffs'

claims in the present action and must be produced by the City. Ex. 4 at 22, 29-30. With respect

to the protective order issue, the Court ruled that, as a general matter, the burden is on the City to

show why any portion of the UF-250 data should be produced subject to a protective order. Ex.

4 at 29. In addition, the Court ruled that if the City provided any of the fields in the 2006 UF-

250 database to the RAND Corporation, the National Archive of Criminal Justice Data

("National Archive"), the New York City Council, or any other entity, the City had to turn over

that information to Plaintiffs for the years 1998 to the present. The City was also ordered to

produce the agreements about the terms of disclosures of the UF-250 data to other entities so that

any confidentiality provisions could be examined. Ex. 4 at 30, 37. The Court directed the

parties to meet and confer on May 23, 2008, regarding the remaining disputed issues and for the

City to inform Plaintiffs, by that date, of the conditions the NYPD which it provided the 2006

UF-250 data to other entities. *Id.* at 40-42. The Court and the parties agreed that Plaintiffs

would brief the issue of the relevance of the UF-250-related materials that were subject to the

protective order in *Daniels*. *Id.* at 39-40.

During the parties' in-person meet and confer, the City's attorneys provided a chart

listing the UF-250 data fields in the 2004 database and a copy of the NYPD's agreement with the

RAND Corporation ("RAND Agreement") regarding analysis and use of the data. Exs. 5, 6.

Entire pages of the RAND agreement were redacted, including provisions dealing with the

confidentiality and permitted publication of the data by RAND. On May 28, 2008, the City's

attorneys provided Plaintiffs' counsel with a chart listing all of the UF-250 data fields for the

2006 data. This 2006 chart included additional and different fields than the 2004 data fields

chart previously provided by the City. Ex. 7.

3

During the meeting with the City's attorneys on May 23, 2008, and in numerous subsequent phone conversations and emails on May 27, 28, 29, and 30, 2008, the parties discussed their positions regarding production of the various fields in the UF-250 databases for the years 1998 to the present. While the parties were able to agree on the disclosure of certain UF-250 data fields, the disclosure of the majority of data fields remains in dispute.

Despite the Court's clear ruling on May 19, 2008, that the City must produce all of the UF-250 data starting in 1998 because it is relevant to Plaintiffs' claims, the City asserts that certain data fields will not be produced under any circumstances, even with a protective order and, other fields will only be produced subject to a protective order. In light of the number of data fields at issue, for the Court's ease of reference, Plaintiffs have provided a chart in support of their motion which lists the UF-250 data fields that the City refuses to produce, the fields that the City will only produce subject to a protective, the data fields that the City will produce without any restrictions and the data fields which were provided by the City to other entities. Ex. 12. Plaintiffs have also indicated where the City has not informed Plaintiffs about its position on certain data fields even though several requests were made prior to filing this motion.

## ARGUMENT

### I.    The City Must Provide Plaintiffs With All of the UF-250 Data From 1998 to the Present Without Redactions Until the City Proves Why a Protective Order Should Issue as to Any Information in the Data

The Court has clearly determined that the UF-250 data from 1998 to the present is relevant to Plaintiffs' claims and required the City to produce all of the UF-250 data to Plaintiffs' counsel.

> **MS. GROSSMAN:** Anything that predates the *Daniels* stipulation of settlement, which was in January '04, our position is that it could not possibly be discoverable or reasonably likely to lead to discovery of admissible evidence. Because unlike some other cases where there are claims that the data that goes

4

back ten years might be relevant to a current *Monell* pattern and practice, the *Daniels* litigation was a live litigation.  The parties went through discovery, we shared information and we concluded that case and disposed of it with a stipulation of settlement and it closed that case forever.  So to go back and relitigate the issue – (p. 17, lines 13-23)

. . .

**THE COURT**: But you approved the violation, if there is one, and they have to analyze what happened before and what happened after [the *Daniels* Stipulation] otherwise you would say that's not proof of a violation.  So they found ten stops in a month, that's an error rate, that's no big deal, but if they showed there were ten or less stops before and you settled that and then the rate of stops continued or even increased, that's how you prove the violation, unless you want to stipulate to a violation.  (p. 18, lines 5-12)

. . .

**THE COURT**: [T]he new argument is relevance.  The new argument is how could data that predated the settlement in '04 be relevant to the new charges now.  And as I said, it seems to me an obvious way is to see if the data improves.  If it stays the same or gets worse then that's bad.  Then what was the point of the settlement? (p. 20, lines 5-10)

. . .

**THE COURT**: They're not relitigating the issue.  It's a stipulation of settlement on the steps the city was going to take to change something, to improve something.  And to prove that point you have to compare presettlement and post settlement data.  (p. 21, lines 21-25)

. . .

**THE COURT**: There's no reason here to withhold the data.  I haven't heard a good argument.  Your best argument is relevance and it doesn't work.  I can see a relevance at this point.  [T]here is a colorable theory of why it's relevant.  One studies data to see if things have changed. . . .  [T]hey can show a pattern over a long period of time as well as a shorter period of time. . . . (p. 22, lines 9-23)

. . .

**THE COURT**: '04 to the present date, no problem with producing it all, it's just the terms of production.  Then as far as the pre-'04 period I see there's a basis for it being relevant and should be produced also.  So now we're left with the terms of conditions. (p. 30, lines 13-17)

Thus, the Court's rulings at the recent conference, the only issue that remained for the parties to discuss was whether certain information in the data should be treated as confidential and only disclosed to Plaintiffs' counsel, or, if the data should be publicly available without any protections. Ex. 4 at p. 30, lines 13-17.

Contrary to the Court's ruling, the City now refuses to provide Plaintiffs with certain

information that is contained in the UF-250 data even where Plaintiffs have agreed to treat it as

confidential.[1] Accordingly, Plaintiffs seek the entry of a written order explaining that the Court

has made a determination that the UF-250 data from 1998 to the present is relevant to Plaintiffs'

claims and requiring the City to immediately produce the UF-250 data to Plaintiffs' counsel

without any redactions.  Until the Court can resolve the issues related to Defendants' arguments

concerning a protective order, to the extent that the Court or Defendants have not already

determined the information is subject to disclosure without any limitations, Plaintiffs agree to

treat such information as confidential.[2]

**II.    The City Has Not Proven Why a Protective Order Should Issue to Prevent Plaintiffs From Obtaining Certain Information in the UF-250 Data or Why Certain Information Should be Designated as Confidential**

Although Defendants were ordered to produce all of the UF-250 data from 1998 to the

present, the City has refused to produce certain information contained in the data under any

circumstances and argues that other information should only be disclosed if it is protected as

confidential.  These arguments are based upon: (1) unsupported assertions of law enforcement

privilege, (2) "personal identifying information" that may, or may not, be contained within a

field, and (3) generalized notions of confidentiality.   The City also takes the position that if any

narrative responses in a data field contain any information that the City argues should not be

produced in the first instance, such as an individual's name, the City asserts the ability to retrieve

---

[1] Plaintiffs also requested the listing of codes or other explanatory files which accompany the data and specify the various fields.  The same reasoning for any arguments herein which address the disclosure of the UF-250 data would also apply to the listing of codes and related explanatory files.

[2] By doing so, Plaintiffs do not waive any arguments to challenge Defendants' designations of certain information as confidential or privileged.

that information as a condition of producing it.[3]  The City bears the burden of proving that a
protective order should issue to prevent Plaintiffs from obtaining relevant information or to
restrict the terms of disclosure by proving asserted privileges.  Either of these restrictions on
disclosure of the UF-250 data requires an evidentiary showing that has not been made.

A.    **The Standard for a Protective Order**

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the
claim or defense of any party. Fed. R. Civ. P. 26(b)(1).  The discovery sought need only appear
reasonably calculated to lead to the discovery of admissible evidence. *Id.*  See also *U.S. v.
Nixon*, 418 U.S. 683, 709 (1974) (finding discovery should be broad and a generalized assertion
of privilege must yield to the demonstrated specific need for evidence).  In federal actions,
discovery should be broad, and all relevant materials which are reasonably calculated to lead to
the discovery of admissible evidence should be discoverable. *Morrissey v. City of New York*,
171 F.R.D. 85, 88 (S.D.N.Y. 1997). It is well established that "'[t]he party seeking a protective
order [under Rule 26(c)] has the burden of showing that good cause exists for issuance of that
order.'" *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004).  In the absence of
such a protective order, "parties to a law suit may disseminate materials obtained during
discovery as they see fit." *Schiller v. City of New York*, 2007 U.S. Dist. LEXIS 4285, *7
(S.D.N.Y. Jan. 19, 2007) (citations omitted).  "Ordinarily, good cause [for a protective order]
exists when a party shows that disclosure will result in a clearly defined, specific and serious
injury." *Id.* at *17-18.  "Broad allegations of harm, unsubstantiated by specific examples of

---

[3]  For example, Defendant asserts that "personal identifying information," which should not be
disclosed, even under a protective order, includes the names, nicknames, addresses and phone numbers of
putative class members.

articulated reasoning, do not satisfy the Rule 26(c) test.  Moreover, the harm must be significant, not a mere trifle." *Id.* at *18 (citations omitted).

**B.    The UF-250 Data Fields and Information That the City Refuses to Produce or Argues is Privileged or Confidential**



.[4]   All of the fields in both of these databases were discussed by the parties and counsel for the City represented that the same information was contained in the UF-250 databases prior to 2004.   The data fields at issue are as follows:

## UF-250 DATA FIELDS THE CITY ASSERTS IT WILL NOT PRODUCE
### (Category #1)



_____

[4]  As the Court may recall, the UF-250 Form which NYPD officers are required to fill out when conducting stops and frisks, was revised as a result of the *Daniels* Stipulation of Settlement in January 2004.  Prior to the *Daniels* Stipulation, additional narrative information was contained in the data. Defendants should be precluded from raising any additional relevancy or privilege arguments as to any other UF-250 data prior to 2004 based upon their representations that all fields in the 2004 and 2006 data discussed by the parties represent all fields in the data.

[5]  The UF-250 data field names and numbers referred to herein correspond to those listed in the chart compiled by Plaintiffs entitled, "Plaintiffs' Chart re: Production of UF-250 Data, "Ex. 8, based on two charts produced by the City for the 2004 and 2006 data fields which noted what was provided to RAND, the National Archive or the City Council and incorporates the parties' positions. Exs. 5, 7.



**UF-250 DATA FIELDS WHICH THE CITY WILL PRODUCE,
BUT ARGUES PRIVILEGE OR CONFIDENTIALITY FOR**
(Category #2)



treat such information as confidential and will not be not disclosed beyond Plaintiffs' counsel

and any paralegals or experts that need access to this information for purposes of prosecution of

this case. Plaintiffs made this representation with the caveat that if any analysis was generated

by using personal identifying information, Plaintiffs would be able to publicly disseminate their

analysis (without the individual's name) without a confidentiality limitation. For example, no

confidentiality would attach to making a statistic about the racial disparities in a particular

officer's stops in a particular geographic area, if the officer's name was not revealed.

Even with Plaintiffs' agreement concerning the confidentiality of personal identifiers, the

City still refuses to produce the information listed in Category #1 above and has limited the

production of information in Category #2 to the extent it contains any information listed in

Category #1. Therefore, the issues of whether a protective order should prevent Plaintiffs from

obtaining the information listed in Category #1, or, should limit the terms of disclosure for

information in Category #2 need to be resolved by the Court on a motion to compel by the City.

### C.   The City Cannot Object to Providing Plaintiffs With Information That was Disclosed to Other Entities

As a starting point, the Court has already ordered the City to provide Plaintiffs with the

same UF-250 data which was provided to the City Council, the RAND Corporation, the National

Archive of Criminal Justice Data or any other entity or individual.    However, the City still

refuses to produce some of this information.

> **THE COURT**: To speed things right along, whatever you gave to others outside
> of the city you give to plaintiffs immediately in the same format.  But that's not
> all, that's for now.  That's a no-brainer.  (p. 13, lines 24-25)
>
> . . .
>
> **THE COURT**: Whatever you gave to the city counsel, Rand, the National Crime
> statistics whatever, all those three places and anybody else, you have to give to
> the plaintiffs.  The only issue left is whether they are subject to the same terms of
> production as it was to those entities.  That's the only question left. (p. 14, lines
> 14-19)

The only UF-250 data fields which were <u>not</u> produced to one or more entities outside the

NYPD include:



Therefore, based on the Court's ruling that Defendants must provide Plaintiffs with any

of the UF-250 data that was produced to another entity, Defendants cannot assert that a

protective order should issue to prevent disclosure of certain fields and must produce the

following, without any further delay:



Plaintiffs also note that with regard to the information in the UF-250 data fields ▮▮▮▮

▮▮▮▮, which Defendants have objected to providing under any circumstance, the Supreme

Court of the State of New York for New York County, issued an Order on May 29, 2008,

requiring the NYPD to disclose the information about the location of a stop. Ex. 9. The Court

rejected the City's arguments that several statutory exemptions contained in the Public Officer's

Law Sections 87(2) and 89(2), *et seq.*, which relate to personal privacy, law enforcement

purposes and an agency's security of its electronic information systems. Ex. 9. The NYPD also

argued, unsuccessfully, that disclosure of the information sought in the UF-250 database would

provide the means by which an individual who wishes to inflict harm upon a particular officer

could plot out the exact location of the officer at a given time based on the information contained

in the database. *Id.* These are almost identical arguments as those which the City relies on to

refuse to disclose certain information in the UF-250 data to Plaintiffs. This Court should reject

similar unsupported arguments made by the City here.[7]  Pursuant to the FOIL decision, the City

---

[7]       At the parties' in-person meet and confer, the City asserted virtually identical arguments
as to why ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ should not be disclosed based on a federal law
enforcement privilege. This privilege "prevent[s] disclosure of law enforcement techniques and
procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement
personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent
interference with an investigation." *In Re Dep't of Investigation of the City of New York*, 856 F.2d 481,
484 (2d Cir. 1988). "To sustain the privilege, the party invoking it 'must make a clear and specific
evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is

must make the data publicly available and can only redact personal identifying information (which was never initially requested by the party seeking FOIL disclosure of the data).

The Court determined at the May status conference that the City had to disclose the data about a location of a stop and that any assertions of law enforcement privilege related to this information were waived. Ex. 4, p. 31, lines 4-12. This information was also provided to the RAND Corporation and was incorporated into the public report which RAND published based on an analysis of the data. Ex. 10 at p. 22-25, 36-39. There is also nothing "confidential" about the location of police activity that any member of the general public can readily observe. *See Schiller*, 2007 U.S. Dist. LEXIS 4285, *23-24.

> **MS. GROSSMAN**: The specific locations of the stops, the specific locations of the stops will reveal law enforcement techniques, employment tactics.
> . . .
> **THE COURT**: I don't see any difference between '05, '06 and '07 in regards of need for confidentiality. If it's not confidential in '06 there's no need for it to be confidential in '07. It's going to have to all be turned over and you'll have to justify any part that should be kept confidential. That's the way protective orders work. The burden is on the party that claims confidentiality.
> . . .
> **THE COURT**: If you have given over a location for '06 it's waived for every other year. There's nothing that makes it a law enforcement privilege the theory of a location. If it wasn't privileged in '06 it isn't privileged in any year, there's nothing about it that is [] privileged, and that's my ruling. . . . If you gave it away in one year you give it away from every year. There' no law enforcement privilege on the location. (p. 31, lines 4-12)

There are also several data fields, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for which Defendant argues that the information should be shielded based on a general notion of confidentiality, but just as sensitive personal information (*i.e.*, ▮▮▮▮▮▮▮▮▮▮) which could lead to the discovery of an officer's identity was disclosed to RAND and used as part of a

---

permitted, and they may not rely simply on generalized reiterations of the policies underlying the privilege.'" *Schiller*, 2007 U.S. Distr. LEXIS 4285, * 20. No such showing has been made here.

published analysis. Ex. 10 at p. 24-25, 28-29. Also, there is no general "confidential" protection available when a party asserts that a protective order should issue. *See* Fed. R. Civ. P. 26(b).

Although the City claims ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the public RAND report contains data analysis of information about particular officer's radio runs. Ex. 10 at 24, 33 (Tables 4.1 and 5.1). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



## III. Plaintiffs Have Established That the Data Fields Which the City Refuses to Produce are Relevant to Plaintiffs' Claims

"In federal actions, discovery should be broad, and all relevant materials which are reasonably calculated to lead to the discovery of admissible evidence should be [discoverable]." *Morrissey*, 171 F.R.D. at 88. Given the breadth of discovery in federal actions, if the

14

information sought is relevant, in the absence of a privilege, such information is discoverable.

*Id.*  In light of the "great weight of the policy in favor of discovery in civil rights actions and the normal presumption in favor of broad discovery, defendants' case for non-disclosure or restricted disclosure must be extremely persuasive." *MacNamara v. City of New York*, 2008 U.S. Dist. LEXIS 25982, *21 (S.D.N.Y. March 31, 2008) (citations omitted).  For each UF-250 data field that the City has objected to providing, under any circumstances, Plaintiffs have addressed below why the information is relevant to Plaintiffs' allegations and should be produced.   Defendants bear the burden of filing a motion with the Court and show "good cause" as to why a protective order should issue to prevent the discovery of relevant information.  Fed. R. Civ. P. 26(c)(2).

A.  ███████████████████████████████[8]

████████████████████████████████████████████████████████████████████████████████████

---

[8]  The UF-250 data field names and numbers referred to herein correspond to those listed in the chart compiled by Plaintiffs entitled, "Plaintiffs' Chart re: Production of UF-250 Data."  Ex. 8.

[9]  ███████████████████████████████████████████████████



**B.**

The City will not produce this information based on arguments that it is privileged and involves sensitive law enforcement information about police techniques and deployments. Defendant's objections to the production of this information involve an assertion of law enforcement privilege for which the City bears the burden of proof and must affirmatively move for a protective order. *See e.g., MacNamara*, 2008 U.S. Distr. LEXIS 25982, *21.

The location data is relevant to Plaintiffs' claims concerning the use of race and/or national origin as the determinative factor in conducting unlawful stops, questioning and frisks of individuals. The NYPD frequently publicly asserts that the reasons its stops and frisks result in 90% of persons stopped who are African-American or Latino is a result of patrolling so-called "high crime" areas which are predominantly African-American or Latino neighborhoods. As noted by the *New York Times* concerning the UF-250 data that was made available to the City Council, "a factor cited frequently on the [UF-250] forms is 'area has high crime incidence'" as an articulated reason for a stop. Ex. 11.

**C.**

The City will not produce this information based on arguments that it contains personal identifying information, raises privacy issues and was not provided to any other entity. These are not relevancy objections, but, rather, raise issues concerning whether a protective order should issue as to the terms of disclosing the information. As Plaintiffs' counsel noted at the May status conference, this information is relevant to Plaintiffs' representation of the class members. The class consists of:

> all persons who have been or will be subjected by NYPD officers to Defendants' policy, practice and/or custom of stopping or stopping and frisking persons in the absence of reasonable, articulable suspicion that criminal activity is taking place, in violation of the Fourth Amendment, including persons stopped or stopped and frisked based on race and/or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment.

*See* Unredacted Amended Complaint ("UAC") at ¶33.

Plaintiffs agree that individual class members' privacy and identity should be protected, but disagree with Defendants that this information is not relevant to the case. Ex. 4 at p. 34, lines 1-15. Without the names and contact information for putative class members, Plaintiffs would be unable to contact and interview individuals to add additional Plaintiffs and allegations regarding Defendants' stop, question and frisk practices by the September 15, 2008, deadline for amending the pleadings and adding parties. This information is also relevant to Plaintiffs' counsel obtaining information from class members to refute the alleged articulated reasonable suspicion for a stop in a UF-250 form for a particular person is relevant to Plaintiffs' claims of widespread constitutional violations.

**D.** ████████████████████████████████

The City will not produce this information because it might contain a personal identifier,

████████████████████████████████    ████████████████████

████████████████████████████████████████████

■■■■■■■■■■■■■■■■■■■■■ These objections,

however, do not challenge the relevance of the information and are only properly raised in a

motion for a protective order.



E. ■■■■■■■■■■■■■■■



Plaintiffs

agreed at the May status conference to treat this information as confidential to protect the

identity of individuals who are subjected to Defendants' stop and frisk practices.  No arguments

were made by Defendants as to why this information is not relevant to Plaintiffs claims.

10  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■





Defendants objected to providing this information, but, when asked what information this field actually contains, counsel for the City did not know. As of the filing of this motion, Plaintiffs have asked several times for that information, however, it has not been provided. Plaintiffs are unable to articulate the relevancy of this information without knowing what it is.

I. 

Defendants objected to providing this information, but, when asked what information this field actually contains, counsel for the City did not know. As of the filing of this motion, Plaintiffs have asked several times for that information, however, it has not been provided. Plaintiffs are unable to articulate the relevancy of this information without knowing what it is.

**IV.    Certain Information Which Was Subject to the Protective Order in *Daniels* is Relevant to Plaintiffs' Claims and Should be Produced in This Case**

In response to Plaintiffs' discovery request to obtain the return of materials subject to the expired protective order in *Daniels*, the City only agreed to produce "responsive documents that post-date the date of the so ordered Stipulation of Settlement in *Daniels*, subject to an appropriate protective order."[11]   Ex. 3.   Plaintiffs have, in support of this motion, provided a list of the documents which are relevant to this litigation and a list of those documents which Plaintiffs are not requesting. Ex. 12.   Whether such information would be admissible at trial is not the standard by which the Court determines the relevance of the information at this stage. Plaintiffs have established that the information requested is relevant and should be produced. The documents from the *Daniels* case that Plaintiffs seek returned fall into several categories.[12]

**A.    Attorney work product and attorney client privileged documents which contain references to information in the UF-250 data or other information designated as "confidential" under the *Daniels* protective order**

The Court has already determined that the UF-250 data from 1998 to the present is relevant to Plaintiffs' claims. Ex. 4 at 30. Similarly, the information derived from the UF-250 data, including attorney work product of Plaintiffs' counsel, that includes Plaintiffs' analysis or examination of the data, is also relevant to Plaintiffs' claims.   The majority of attorney work product for Plaintiffs' counsel concerns the UF-250 data, including counsels' analysis of the data.   The remaining privileged documents involve interviews with plaintiffs in *Daniels*  or

---

[11] This also included the UF-250 data in Plaintiffs' possession for the time period of 1998 through the first quarter of 2007. The discovery issues related to the UF-250 data have been addressed herein. Plaintiffs have also addressed the so-called "derivative" UF-250 data information which is subject to the *Daniels* Protective Order because it contains information from the data, including Plaintiffs' analysis of the data.

[12] ████████████████████████████████████████████

discussions between Plaintiffs' counsel about strategy related to discovery or other issues in the

litigation that may mention information designated as "confidential" under the *Daniels*

Stipulation. This work product is relevant to Plaintiffs' claims that, despite the *Daniels*

Stipulation which developed a written policy to prohibit and prevent unconstitutional stops and

frisks, Defendants' unlawful policy, practice and/or custom of impermissibly using race and/or

national origin, not reasonable suspicion, as the determinative factors in initiating police action,

has continued. UAC at ¶ 5; *See Monell v. Dep't of Social Services of City of New York*, 436 U.S.

658 (1978).

**B.    Documents Which Relate to NYPD Training and Policies Concerning Stops
and Frisks, Including Those Relating to the SCU Deployment Tactics and
Methods, Operations, Training, Goals, Policies and Arrests, and Depositions
of NYPD supervisors With Key Roles in Stop and Frisk Policy and Training**

These documents are relevant to examine and determine whether, and how, Defendants'

policies regarding stops and frisks have changed, if at all, over time. Plaintiffs claim, here, that

Defendants have applied a facially neutral policy, the written policy prohibiting racial profiling,

to Plaintiffs, and similarly situated individuals, in an intentionally racially discriminatory

manner. UAC at ¶ 85. Defendants drafted a piece of paper that prohibited racial profiling, but

the extent to which the policy was actually implemented remains an open subject for discovery

in this case. *See e.g., Daskalea v. District of Columbia*, 227 F.3d 433, 442-43 (D.C. Cir. 2000)

("a paper policy cannot insulate a municipality from liability where there is evidence…that the

municipality was deliberately indifferent to the policy's violation); citing *Ware v. Jackson*

*County*, 150 F.3d 873, 882 (8th Cir. 1998) ("The existence of written policies of a defendant are

of no moment in the face of evidence that such policies are neither followed nor enforced.")

These documents show Defendants' stop, question and frisk policies and procedures before,

during and following the Daniels Stipulation and are relevant to the extent, if any, that Defendants' practices improved, or did not, over time.

The information related to the deployment tactics, methods, operations, training, goals, activities and policies of the SCU remains relevant in this case because the SCU was Defendants' former primary vehicle for carrying out an aggressive stop and frisk program. Plaintiffs have alleged that while the NYPD claimed it had disbanded the SCU during the pendency of the *Daniels* case, the unlawful practices perfected by the NYPD through the SCU have continued, through other methods as part of the NYPD's anti-crime strategy. UAC at ¶ 84.

The SCU was an elite, commando-like squad of police officers whose self-proclaimed mission was to interdict violent street crime in the City and, in particular, to remove illegal firearms from the streets. UAC at ¶ 77. The SCU was deployed in so-called "high crime" areas, largely populated by minorities and used race and/or national origin often as the determinative factors in decisions to stop and frisk. UAC at ¶¶ 78-81.

For example, in Support of the City's Motion to Dismiss the Article 78 Petition filed by

the New York Civil Liberties Union to obtain the UF-250 database for 2006 pursuant to the

Freedom of Information Law, the NYPD asserts that "much of the enforcement by way of street

encounters described in Stop, Question and Frisk reports, are conducted by specialized

plainclothes units whose very success in detecting criminal activity depends on their ability to

patrol areas in a covert manner." Affirmation of Jesse Levine in Support of Cross-Motion to

Dismiss, dated January 16, 2008, at ¶18. The NYPD's current description of its tactics with

regard to stop and frisk activities, sounds all too familiar to the aggressive undercover stop and

frisk operations and tactics employed by the NYPD through the SCU.

The existence of an official municipal policy or custom can also be demonstrated by

establishing a deliberate government policy of failing to train or supervise its officers. *See City of*

*Canton v. Harris*, 489 U.S. 378, 388-89 (1989). Municipal liability only attaches where the

failure to train amounts to deliberate indifference to the rights of persons with whom the police

come into contact. *Id.* at 388.

As part of the *Daniels'* Stipulation, the NYPD agreed to 10 training requirements with

regard to stop, question and frisk practices. Ex. 13, Sec. (E)(1) to (10). Plaintiffs have alleged

that these training changes were never implemented, or were implemented in a manner that

resulted in the intentional violation of class members' constitutional rights, or with deliberate

indifference to class members' rights. The documents which Plaintiffs seek the return of concern

NYPD training on stop and frisks and are relevant to Plaintiffs' claims that Defendants have

acted with deliberate indifference to the constitutional rights of those who would come into

24

contact with NYPD officers by: (a) failing to properly screen, train, and supervise NYPD officers, (b) inadequately monitoring NYPD officers and their stop and frisk practices, (c) failing to sufficiently discipline NYPD officers who engage in constitutional abuses, and (d) encouraging, sanctioning and failing to rectify the NYPD's unconstitutional practices. UAC at ¶¶3-4.

The deposition transcripts which Plaintiffs seek returned include several individuals with supervisory level positions within the NYPD during the *Daniels* litigation and who testified about the NYPD's stop, question and frisk practices and policies. Many of these witnesses were produced in response to Fed. R. Civ. P. 30(b)(6) Notices of Deposition concerning these issues.

## CONCLUSION

Based on the foregoing reasons, Plaintiffs' Motion to Compel the Production of the UF-250 Data and Information Subject to the Protective Order in Daniels should be granted.

Dated:  June 2, 2008

By:___*Andrea Costello*_____

Andrea Costello (AC-6197)
Darius Charney (DC-1619)
Kamau Franklin (KF-6837)
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
T (212) 614-6439; F (212) 614-6499
acostello@ccrjustice.org
dcharney@ccrjustice.org
kfranklin@ccrjustice.org

Jonathan Moore (JM-6902)
Beldock, Levine & Hoffman, LLP
99 Park Avenue, 16th Floor
New York, NY 10016
T (212) 490-0400; F (212) 557-0565
jmoore@BLHNY.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June 2008, that a true and correct copy of the

foregoing document was furnished via U.S. First Class Mail upon the following:

Linda Donahue
David Hazan
Jennifer Rossan
Assistant Corporation Counsel
Corporation Counsel of the City of New York
100 Church Street, Room 3-158
New York, NY 10007

*andrea costello*

Andrea Costello

26