UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FLOYD, *et al.*,

　　　　　　　　Plaintiffs,

　-against-

THE CITY OF NEW YORK, *et al.*,

　　　　　　　　Defendants.

---

**08 Civ. 1034 (SAS)**

**DECLARATION OF ANDREA COSTELLO IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL**

ANDREA COSTELLO hereby declares as follows:

1.　　　　I am a staff attorney with the Center for Constitutional Rights, attorneys for Plaintiffs in the above-captioned action.

2.　　　　I submit this declaration in support of Plaintiffs' Motion to Compel disclosures of (a) the New York City Police Department's UF-250 entire database for the years 1998 to the present, and (b) all other materials from the related lawsuit *Daniels, et al v. The City of New York, et al.*, 98 Civ. 1696 (SAS), which Plaintiffs, at the Court's direction, provided to counsel for Defendant City of New York ("City") in sealed boxes on March 25, 2008, and April 3, 2008, until the Court could resolve this motion.

3.　　　　On February 6, 2008, I appeared before the Court in a conference in the present action. During this conference, the Court ordered Plaintiffs to send all of the UF-250 data they had received from the City pursuant to the Stipulation of Settlement in the *Daniels* case, which included quarterly NYPD stop-and-frisk data from 1998 through the first quarter of 2007, and all written materials related to and generated from such data, including Plaintiffs' counsel's work product, to the City's attorneys in sealed boxes to be stored but not opened in the City's attorneys' offices. The Court further specified that to re-obtain these materials for use in the

present action, Plaintiffs would have formally to request them again from the City. *See* Transcript of Proceedings held February 6, 2008, at 16-17, attached hereto as Exhibit 1.

4.     On March 25, 2008, and April 3, 2008, I sent all of the materials described in Paragraph 3 of this Declaration in sealed boxes to the offices of the Corporation Counsel of the City of New York.

5.     On April 18, 2008, Plaintiffs served their First Request for the Production of Documents on the City. In this request, Plaintiffs sought production of the entire NYPD UF-250 database for the years 1998 to the present, as well as all written materials related to and generated from such data, including the aforementioned materials which Plaintiffs returned to the City pursuant to the Court's February 6, 2008 directive. A copy of Plaintiffs' First Request for the Production of Documents is attached hereto as Exhibit 2.

6.     On May 1, 2008, Defendant City of New York served Plaintiffs with Responses and Objections to Plaintiffs' First Request for the Production of Documents. A copy of Defendants' Responses and Objections is attached hereto as Exhibit 3. In its Reponses and Objections, the City objects on grounds of relevance to producing any UF-250 data from before February 1, 2004, and specifies that it will only produce UF-250 data from after February 1, 2004, subject to a protective order. The City also objects on relevance grounds to producing that portion of the materials related to and/or generated from the data which predates the Stipulation of Settlement in the *Daniels* case and specifies that it will only produce the portion that post-dates the *Daniels* Settlement subject to a protective order.

7.     On May 19, 2008, the parties appeared before the Court for a conference concerning the issues raised by the this motion. A copy of the transcript from the conference is attached hereto as Exhibit 4. During the conference, the Court ruled that all of the UF-250 data

requested by the Plaintiffs, including the data pre-dating the 2004 *Daniels* settlement, is relevant to Plaintiffs' claims in the present action and, therefore, must be produced by the City  Ex. 4  at pp. 22, 29-30.  With respect to the protective order issue, the Court ruled that, as a general matter, the burden is on the City to show why any portion of the UF-250 data should be produced subject to a protective order. Ex. 4 at p. 29.  In addition, the Court ruled that if the City provided any of the fields in the 2006 UF-250 database to the RAND Corporation, the National Archive of Criminal Justice Data ("National Archive"), the New York City Council, or any other entity, without a requirement that the fields be kept confidential, then the corresponding fields in the UF-250 databases for all the years from 1998 to the present could not be subject to a protective order when the City produced them to Plaintiffs in this case. Ex. 4 at pp. 30, 37.  The Court directed the parties to meet and confer regarding the remaining disputed issues on May 23, 2008, and for the City to inform Plaintiffs, by that date, of the conditions under which it provided the 2006 UF-250 data to RAND, National Archive and the City Council. Ex. 4 at pp. 40-42. The Court and the parties agreed that Plaintiffs would brief the issue of the relevance of the UF-250-related materials that are subject to the Protective Order in *Daniels*.  Ex. 4 at pp. 39-40.

8.      On May 23, 2008, Plaintiffs' counsel met with counsel for the City at the Office of the Corporation Counsel.  During the meeting, the City's attorneys provided us with a chart listing all of the data fields in the UF-250 database for 2004, and a redacted copy of the NYPD's agreement with the RAND Corporation ("RAND Agreement") regarding RAND's analysis and use of the 2006 UF-250 data.  A copy of the chart is attached hereto as Exhibit 5, and a copy of the agreement is attached hereto as Exhibit 6.   Entire pages of the RAND agreement were redacted, including provisions dealing with the confidentiality and permitted puiblication of the UF-250 data by RAND.

9.     On May 28, 2008, the City's attorneys provided me with a chart listing all of the data fields in the UF-250 database for 2006.  This chart included more and different fields than the chart of the 2004 data fields.  A copy of this chart is attached hereto as Exhibit 7.

10.     During the meeting with the City's attorneys on May 23, 2008, and in several subsequent phone conversations and emails with counsel for the City on May 27, 28, 29, and 30, 2008, the parties discussed their respective positions regarding production of the various data fields in the UF-250 databases for the years 1998 to the present.  While the parties were able to agree on the disclosure of certain UF-250 data fields, the disclosure of the majority of data fields remain in dispute.  Despite the Court's clear ruling on May 19, 2008, that the City must produce all of the UF-250 data going back to 1998, as relevant to Plaintiffs' claims, counsel for the City took the position that certain data fields would not be produced to Plaintiffs under any circumstances, including regardless of whether a protective order is issued.  In addition, counsel for the City stated there are several UF-250 data fields that the City will only produce subject to a protective order and other fields will be produce without any restrictions.  Attached as Exhibit 8 is a chart created by Plaintiffs which lists the UF-250 data fields that the City is refusing to produce, the fields that the City will only produce subject to a protective and the fields that the City will produce without any restrictions.

11.     Attached hereto as Exhibit 9 is a true and correct copy of the Order and Decision issued by The Honorable Marylin G. Diamond, J.S.C., filed on May 29, 2008.

12.     Attached hereto as Exhibit 10 is a true and correct copy of the RAND Report entitled, "Analysis of Racial Disparities in the New York Police Department's Stop, Question and Frisk Practices," dated 2007.

13.    Attached hereto as Exhibit 11 is a true and correct copy of an article from the New York Times dated March 1, 2007.

14.    Attached hereto as Exhibit 12 is a true and correct copy of two charts compiled by Plaintiffs' counsel which list the documents which are relevant to Plaintiffs' claims and should be produced and those documents which are not sought in this action based on the documents in the sealed boxes which were ordered to be returned to the Corporation Counsel for the City of New York pursuant to the Court's rulings on February 6, 2008.

15.    Attached hereto as Exhibit 13 is a true and correct copy of the Stipulation of Settlement in *Daniels, et al v. The City of New York, et al.*, 98 Civ. 1696 (SAS).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 2, 2008.

*andrealostello*
_____
Andrea Costello (AC-6197)

EXHIBIT 1

826MFLOC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DAVID FLOYD and LALIT
    CLARKSON,
4
                    Plaintiffs,

5
            v.                          08 Civ. 1034 (SAS)
6
    THE CITY OF NEW YORK;
7   COMMISSIONER RAYMOND KELLY,
    New York City Police, in his
8   official capacity; RAYMOND
    KELLY, individually; MAYOR
9   MICHAEL BLOOMBERG, in his
    official capacity; MICHAEL
10  BLOOMBERG, individually;
    POLICE OFFICER RODRIGUEZ, New
11  York City, in his official
    capacity; RODRIGUEZ,
12  individually; POLICE OFFICER
    GOODMAN, New York City, in his
13  official capacity; GOODMAN, in
    his official capacity; POLICE
14  OFFICER JANE DOE, New York
    City, in her official
15  capacity; JANE DOE,
    individually; POLICE OFFICERS
16  JOHN DOES, New York City, 1
    and 2, in their official
17  capacity; JOHN DOES 1 and 2,
    individually,
18
                    Defendants.
19
    ------------------------------x
20                                      New York, N.Y.
                                        February 6, 2008
21                                      4:05 p.m.

22  Before:

23              HON. SHIRA A. SCHEINDLIN,

24                                      District Judge

25

826MFLOC

1                          APPEARANCES

2    BELDOCK LEVINE & HOFFMAN
          Attorneys for Plaintiffs
3    BY:  JONATHAN C. MOORE
          -and-
4    ANDREA COSTELLO
     KAMAU FRANKLIN
5.
     MICHAEL A. CARDOZO, Corporation Counsel
6    for the City of New York
          Attorney for Defendants
7    BY:  HEIDI GROSSMAN
          LINDA DONAHUE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

826MFLOC

1          (Case called)

2          THE COURT:  You know, to be honest, this didn't make

3     that much sense to calendar maybe for today after all because I

4     received a fax, 26-page fax, from the government less than an

5     hour ago while I had a jury out in a murder case, and I haven't

6     had a minute to look at the city's submission, not a minute.  I

7     suppose because I'm here and you're here and the court reporter

8     is here, maybe you can argue, but I'm in no way prepared to

9     rule on anything.  I haven't read the submissions.

10         MR. MOORE:  I don't think we have gotten it.

11         THE COURT:  I only got it an hour ago and I haven't

12    had a chance to look at it.  Therefore, it's untouched by my

13    hand.  If one of your team sort of wants to skim my copy and

14    hand it back to me.  Between the three of you, one of you could

15    skim the letter.  You want to skim that before you're heard,

16    Mr. Moore?

17         MR. MOORE:  Briefly.

18         THE COURT:  All we are really only going to be able to

19    do is have an argument.  Does anybody think written briefing is

20    required, more formal written briefing in letters, or do you

21    feel the letters should be sufficient plus the argument to

22    decide this.

23         MS. COSTELLO:  Your Honor, on the point of whether or

24    not we can retain the data until your Honor can decide whether

25    or not a protective order should issue in this case, because we

826MFLOC

1   are still at this point technically operating under the

2   protective order that has since expired in the Daniels case --

3           THE COURT:  I thought I said you can hold it until I

4   can decide this, until I can reasonably hear you and decide

5   this.

6           MS. COSTELLO:  That's our understanding.

7           THE COURT:  In order to decide the real issue, does

8   anybody think we need formal briefing as opposed to the letter

9   submissions I now have?

10          MS. GROSSMAN:  Your Honor, if we are talking about the

11  retention of data, I would like to address the Court.  But if

12  we are talking about the protective order and whether it should

13  be lifted, I don't think at this point the plaintiff has made

14  any showing --

15          THE COURT:  I think it was the former.  Retain the

16  data issue, not lifting the protective order.  I don't know if

17  the plaintiff has made a showing as to why to lift the

18  protective order, but I'm happy to hear you.  Maybe we will

19  address the briefing issue after I hear you.  You want to be

20  heard, Ms. Costello?

21          MS. COSTELLO:  Yes, your Honor.  There are really two

22  points.  One of the things we wanted to seek from the Court

23  today is clarification that the order that your Honor signed on

24  January 31 would follow through and carry through until your

25  Honor could make a decision formally as to whether or not a

5

826MFLOC

1    protective order should issue in this case.  As to the other

2    issues --

3            THE COURT:  I don't know what you mean my protective

4    order.

5            MS. COSTELLO:  Right now we are operating under the

6    Daniels protective order, which governed the UF-250 data which

7    was produced pursuant to the stipulation of settlement in

8    Daniels.  We agreed to temporarily abide by that so we could

9    retain the data and file a new case, which we did by January

10   31, as your Honor instructed.

11           And at this point it's our position that the Court now

12   in this case, because of changed circumstances and different

13   information that's come to light about the city basically

14   picking and choosing who it provides the data to and who it

15   doesn't, we believe that the standard in this instance should

16   be -- the burden is on the city to show good cause under Rule

17   26 why a protective order shouldn't issue now.

18           THE COURT:  Aren't you putting the cart before the

19   horse?  I mean, the city's position -- I have not read the

20   papers -- is you have to return this anyway.  It's as if you

21   don't have the information.  Before I worry whether you have it

22   under a protective order or whether you have it without a

23   protective order, you don't have it.  You know what I mean?

24   You have to first say, I'm entitled to this data in this

25   lawsuit and I think we have to do that first.  Then when you

6

826MFLOC

1    obtain information in the lawsuit, it's either under a

2    protective order or not under a protective order.  But the

3    first step is obtaining the data.  You sort of have it by

4    accident right now, so to speak, by dint of a stipulation of

5    settlement in a prior lawsuit which expired.

6         So the city says, you don't have it, it doesn't belong

7    in your possession, you're supposed to return it.  Then, of

8    course, as in any other lawsuit, you can seek discovery.  You

9    can ask for all this back again.  Obviously, we can't destroy

10   evidence.  If it's returned to us in the morning, we'd have to

11   preserve it.  Then you'd have to request it and I'd have to

12   make a decision whether you get it.

13        Then let's say I ruled in your favor that you're

14   entitled to it.  Then comes the question about whether it

15   should be under a protective order or not.  The very first

16   question is getting it.

17        MS. COSTELLO:  Your Honor, it's absolutely relevant to

18   our Monell allegations.

19        THE COURT:  You're now going to argue why you should

20   get it?

21        MS. COSTELLO:  Yes.

22        THE COURT:  All I was saying, that's step one.  I

23   didn't know we were going to have that argument today because

24   in a lawsuit typically there are steps to getting records.

25   Document requests is the usual way with the party.  With a

826MFLOC

1   nonparty it's subpoenas.  But with a party, it's document

2   requests and you would make document requests, for example, for

3   all UF-250s, the city would either agree you're entitled to

4   that as relevant, or they would file an objection explaining

5   why it's not discoverable; and then if you prevail, we reach

6   the protective order question.

7          MS. COSTELLO:  Your Honor, with all due respect, it

8   defies common sense a little bit because we have the data, we

9   filed a complaint under seal pursuant to your Honor's order

10  that we could do so.  So we have allegations contained in the

11  complaint that relate directly to what's contained in the data.

12         THE COURT:  I think to say it defies common sense is a

13  little silly.  What you really mean is; the law is at times

14  ennis, the famous quote from a justice in England.  I didn't

15  make up that quote.

16         All you're saying, why do we have to jump through all

17  the hoops of civil procedure when in fact we have it?  We have

18  it right now.  The answer is, because you have it under the

19  terms of a stipulation of settlement, which required that it be

20  returned 30 days after that case was for all time closed, which

21  it is.

22         So, in theory, you should -- in theory -- I'm not

23  ruling yet, you should return it, they preserve it, put it in a

24  box or cabinet, you ask for it, you're probably, just as a

25  guess, entitled to it, and it comes back.  Your real point is,

826MFLOC

1   should you go through all those hoops or should we just put it

2   in a box or a cabinet, ask for it, you'll rule, and assuming we

3   are entitled to it, we never went through the problem of giving

4   it back because partially we may have written on it, it may not

5   be in the same condition.  I don't know if there might be work

6   product now on it that you don't want them to see.  I don't

7   know whether we are talking about physical paper that you may

8   have written, I don't know if you're talking about CD.

9       MS. COSTELLO:  Both.  A lot.

10      THE COURT:  It may be that when I take this and decide

11  it, I'll say, it seems silly to go through the effort of

12  putting it in a box, delivering it with a ribbon to defendant,

13  defendant has to keep it preserved, then you get to ask for it,

14  then it gets sent back.  Maybe all that is silly and maybe I

15  will say, you can hold onto it until I decide that you're

16  entitled to it here, and if I decide you're entitled to it

17  here, you take the ribbon off and start using it again.  This

18  is just almost a physical transfer.

19      Now that we have figured out step one of how we are

20  going to discuss whether you're entitled to it at all, go ahead

21  and talk about the protective order issue.  Let's assume

22  hypothetically you win point 1 and you reobtain it, so to

23  speak.

24      MS. COSTELLO:  I do want to amplify for the Court that

25  there is a tremendous amount of work product that's attached to

826MFLOC

1   the UF-250 data that's in our possession, so extracting that

2   would be difficult, if not --

3           THE COURT:  Expensive, if nothing else, in terms of

4   time.  Let's assume you get it back in this theoretical world.

5   What's this issue about the protective order?

6           MS. COSTELLO:  Well, there are really two ways to look

7   at this and we think the first way is probably the more proper

8   way to look at it.  One is, in the first instance, in order for

9   any type of protective order to issue in this case --

10          THE COURT:  I agree.  It's the burden of the party who

11  wants it protected to show why they are entitled to protection.

12          MS. COSTELLO:  We believe that the city cannot show

13  good cause.

14          THE COURT:  Let me drop for one moment your argument

15  to ask Ms. Grossman, does your letter -- it addresses point 1

16  that they should it give back.

17          MS. GROSSMAN:  It mostly addresses point 1.  It also

18  says that they haven't made a showing that the protective order

19  should be lifted.  There was obviously good law --

20          THE COURT:  I agree with the plaintiffs already.  This

21  is a new case and you would have to show -- in the existential

22  world I described to you, it gets returned to you in a box with

23  a ribbon.  Then they request it as discovery.  They win that

24  discovery.  This is all hypothetical.  It goes back to them.

25  You have the burden in this new lawsuit to show why it should

826MFLOC

1  be under a protective order, why any discovery you produce in

2  this new lawsuit called Floyd v. City should be under

3  protective order.

4         In other words, you can't have it both ways.  You

5  can't say the protective order continues from Daniels; by the

6  way, Daniels is over and I get it all back.  Daniels is done.

7  There is no continuation of the protective order by your own

8  argument that Daniels is over.  Therefore, you have the burden

9  under 26(c) to show why any material you produce in discovery

10 in Floyd is entitled to protection.

11        MS. GROSSMAN:  If we had the data back we could -- we

12 would be in a position to make that argument --

13        THE COURT:  Either way, you are.  It's all

14 theoretical.  Whether there is boxes sitting in your office or

15 her office, we all know it's a bunch of UF-250s.  It doesn't

16 matter where it physically sits.  I can have it delivered to

17 the courtroom and hold onto it.  That's not the point.  The

18 point is, you now have a burden to show in Floyd why this

19 material should be subject to a protective order.  The argument

20 can't be because it was in Daniels.  That case is done.

21        I think the plaintiff was going to come back with an

22 argument that I've caught wind of that now it's been released

23 publicly or some to sections of the public or to some

24 governments or something.  I'm only hearing this.  I haven't

25 read anything.  I haven't had any time.  I think they are going

11

826MFLOC

1    to tell me circumstances are quite different.  I need to know

2    what the changed circumstances might be.  But I still say it is

3    your burden in the first instance in any lawsuit to say, I have

4    responsive materials to the discovery requests, but I ask that

5    it be under a protective order.  Under 26(c) you have the

6    burden to show why.

7          MS. GROSSMAN:  That's right.  There was extensive

8    briefing in the prior litigation --

9          THE COURT:  I understand.  But this is many years

10    later.  It could be entirely different.  If you're saying your

11    application is easy to make because all you have to do is copy

12    your old briefs, fine, you can make it on that barebones.  If

13    you want to saying whatever I said the last time and they would

14    come back and say in response, no longer valid because this

15    information is now publicly available or partially publicly

16    available or whatever they want to say and you can reply, that

17    would require briefing.

18          MS. GROSSMAN:  It would require briefing, your Honor.

19          THE COURT:  With you first.  If you want to just make

20    the same arguments you made the first time, that's okay, but

21    you have the burden to show why it should be protected.  I

22    think I figured out half of this argument.  The briefing on the

23    protective order issue has to be city, plaintiff, city.

24          Now we are just down to the first issue.  Where should

25    the material reside in the next bunch of weeks or months while

826MFLOC

1    the protective order issue is being briefed and decided?

2            MS. GROSSMAN:  Your Honor, we submit that there was a

3    contract, an agreement that was entered into with the

4    plaintiffs.  They are to return the data to us the moment that

5    the agreement has terminated.

6            THE COURT:  But you do concede that when you got it

7    back you could do nothing with it but preserve it because it

8    may be relevant to a pending matter.

9            MS. GROSSMAN:  That may be so.

10           THE COURT:  It's not may be so.  This is cut and dried

11   black letter law.  Once you have notice that that information

12   is relevant to a pending litigation you have a duty to preserve

13   it.

14           MS. GROSSMAN:  That's relevance, though, and not all

15   of the data that they have is relevant.

16           THE COURT:  Any party that interprets relevance

17   narrowly and risks destruction of records, as you know in

18   today's world of spoliation decisions, is making a huge

19   mistake.  There is no way you wouldn't obviously just hold this

20   stuff in a locked cabinet.

21           MS. GROSSMAN:  Absolutely, your Honor.

22           THE COURT:  If you're only going to hold it in a

23   locked cabinet, I guess the question is, why should they go

24   through the time and expense in having to extract work product

25   information or data that's all interwoven now with their copies

826MFLOC

1   of the UF-250s in the interim, so long as they can't use the

2   material in any way until I decide?  If it's just a matter of

3   physical custody, it's sitting in the locked cabinet in their

4   room or it's sitting in a locked cabinet in your room, or

5   sitting in a locked cabinet in the court.  Until I decide, they

6   can't use it.  They can't file it.  They can't do anything with

7   it until -- why should I go through the step of packing it up

8   and returning it to you, which is going to be a great cost and

9   burden because they have to try and separate out their work

10  product?

11          MS. GROSSMAN:  The cost and burden was contemplated

12  when we negotiated this settlement agreement years ago and they

13  agreed to it.  They agreed.  They agreed and we contemplated it

14  and engaged in lengthy negotiations, arm's length negotiations

15  about what it is that we needed to settle this case, and they

16  agreed that they would return it.

17          THE COURT:  I understand.  If there have been events

18  since then that would cause them to believe that the city is in

19  violation of whatever consent decree we were operating under

20  and that, therefore, this material is now relevant to a new

21  litigation, then I say it is just a practical matter where it's

22  held until I can decide whether it has to be reproduced anyway,

23  and the second time whether it's under a protective order.

24          Now we are down to who is going to safeguard it, they

25  or you.  Since they have an expense involved in deconstructing

14

826MFLOC

1   it to get work product removed from it and shipped back to you,

2   so long as there are conditions under which they can maintain

3   it, namely, they can't release it, they can't use it, they have

4   to sit on it in their office, I don't see why they should go

5   through the expense of returning it right now.

6           MS. GROSSMAN:  Your Honor, in terms of the expense, we

7   have an agreement, we have a contract --

8           THE COURT:  I repeat, the events since that contract,

9   according to the allegations, the city is in violation of that

10  consent decree.  Is that right, Mr. Moore?

11          MR. MOORE:  That's one of the issues.  The consent

12  decree doesn't exist anymore, but that they acted contrary to

13  that decree.

14          THE COURT:  There was a consent decree?

15          MR. MOORE:  There was a stipulation of settlement.

16          THE COURT:  Your allegation is that they violated it?

17          MR. MOORE:  The allegation is they were adopting a

18  policy that said that they would not engage in the act of stops

19  and frisks.  They in fact did that.

20          MS. GROSSMAN:  That is not an allegation that we were

21  in violation of the agreement.

22          THE COURT:  The agreement was to not violate stop and

23  frisk policies in the very conduct that you agreed to stop.

24          MR. MOORE:  I think it goes -- we had this argument

25  last time about whether the city is saying that they are going

826MFLOC

1    to adopt a policy that prohibits racial profiling and stops and

2    frisks.  Whether that means they just have to --

3              THE COURT:  Say it or do it.

4              MR. MOORE:  Right.  So I think that's at least an open

5    issue at this point, and we would be relying on what we believe

6    to be the violation of the letter, if not the spirit of that

7    agreement, as evidence in this case.

8              THE COURT:  Right.  Because when you say, part of the

9    agreement is to adopt a policy forbidding racial profiling and

10   stop and frisk and such a policy is actually adopted, that's

11   just words.  But if there is a wink and a nod and people go

12   right on doing the bad thing, that, as you said, violates the

13   spirit of the settlement.

14             MR. MOORE:  Let me say one other thing, Judge.  I

15   agree with that.  But also in the five years or however long

16   the time we had all this data, we preserved it in a way that

17   the city never had any objection to it.  In other words, we

18   didn't release it to anybody.  There is no suggestion that it's

19   going to be at risk of being --

20             THE COURT:  I don't see any risk.  That's why I said,

21   whoever safeguards it until I can decide whether it should be

22   produced in this litigation and if it should be produced under

23   what conditions, while I'm deciding that, it's just a matter of

24   safeguarding it.  It can be safeguarded in the office where it

25   is now, the city's office, or the Court.  It can be safeguarded

826MFLOC

1  anywhere.  It's just a matter of keeping it from being

2  destroyed.

3          MS. GROSSMAN:  Your Honor, I don't quite understand

4  the expense involved.  If they want to put it in a box, seal it

5  and we can preserve it, fine.  We are officers of the Court --

6          THE COURT:  Why is that important to you then?  They

7  are officers of the Court.

8          MS. GROSSMAN:  Let me explain.  In order for us to

9  agree to settle cases, we need to be able to rely on the word

10 of the plaintiff.  And when they execute an agreement and they

11 make promises, we need to be able to rely on it.  There is a

12 very simple promise that was made, they would return the data

13 to us, and we are entitled to have the data back .

14         THE COURT:  I find that personally to be kind of an

15 immature argument, but it's valid.  Whether it's mature or

16 immature is irrelevant.  Why don't you put it all in a box,

17 including your work product, put it in all a box, seal it up,

18 store it in their office.  I trust her.  It says they obey the

19 letter of the agreement.  This is all kind of an immature fight

20 because everybody -- at least I trust all the lawyers here,

21 both sides.  If she says she is not going to look, she is not

22 going to look.  Put a ribbon around it, send it over, let it

23 sit in Ms. Grossman's office.  Then you'll win the argument

24 that you're entitled to discovery in this matter, which I

25 suspect is relevant, you're going to get it.  Who knows.  It

826MFLOC

1  hasn't been briefed.

2       Then the question is whether it's in a protective

3  order box.  There can't be an expense, but they can put it all

4  in the box.  The only thing is, you were worried about

5  extracting work product from it.  Since she agrees not to look

6  at it, put it in a box and send it back.

7       MS. COSTELLO:  There is only a couple of problems with

8  that, your Honor.  One is that the work product, the way the

9  data -- the data is just on a series of disks themselves.  Some

10  of it we have culled out and used to create different types of

11  analyses --

12       THE COURT:  Put your disks in a shoebox, put a string

13  on it, put a seal on it.

14       MS. COSTELLO:  How do we prepare our case in the

15  meantime?

16       THE COURT:  That's the point.  You can't use it until

17  I say you can get it in discovery.  We can expedite discovery.

18  The rules are 30 days, and it also says the judge can shorten

19  or lengthen it at your discretion.  Serve your response for all

20  the UF-250s for the last two years.  They object, say it's not

21  relevant, I rule the third day.

22       MS. COSTELLO:  There are also several e-mails with

23  information contained in it on each of our hard drives.

24       THE COURT:  Did you agree to return them?  Is that the

25  material that you would have to return?

826MFLOC

1              MS. COSTELLO:  Return or destroy.

2              THE COURT:  The e-mails that relate to the data?  That

3    was part of your agreement?

4              MS. COSTELLO:  Well, the way the protective order is

5    written, it says all information that extracts any information

6    from the data.

7              THE COURT:  Must be returned?

8              MS. COSTELLO:  Must be returned.

9              THE COURT:  You wrote it.  Print out your 300 e-mails,

10   put that in a box, too, and agree not to use the data that

11   remains electronically.  You can't be asked to destroy the

12   electronic part of it.  It's totally silly.  If you want to

13   print out all the ones you can locate and put it in the same

14   box, fine.

15             MS. COSTELLO:  Your Honor, if we serve a document

16   request to the city this afternoon --

17             THE COURT:  Ask for all the UF-250s.  The objector

18   says, that's not relevant because, and you have to explain why

19   and you can respond.  I can expedite that completely.  There is

20   not a rule of 30 days that binds me.  Make a document request

21   tonight or tomorrow, ask them for the very same data.  I don't

22   know what in the world Ms. Grossman's objection will be, but if

23   she has one, she has one.

24             MR. FRANKLIN:  One more thing, your Honor.  As you

25   decide the simplicity of what's easier and better and more

826MFLOC

1  convenient, also, to cull lengthy e-mails --

2      THE COURT: I didn't write your agreement. That's

3  what you agreed to do. You agreed that some day you would have

4  to do that.

5      MR. FRANKLIN: I understand, your Honor. In terms of

6  you making a decision as to what may be simpler and more

7  expedient --

8      THE COURT: That's not my basis for deciding. I'm

9  adopting Ms. Grossman's argument that a contract is a contract,

10  makes a deal. I think it's kind of silly because the

11  likelihood is it's going to go right back, but she is entitled

12  to the letter of her contract, even though I don't understand

13  it. If that's what you're contracted to do, do it. But you've

14  agreed not to open the box, for the record?

15      MS. GROSSMAN: Yes, your Honor.

16      THE COURT: So there. She is not going to open it.

17      MR. MOORE: I know we are all officers of the Court.

18  It seems to me in good conscience for us to go through that

19  process, we'd have to go through the process of inventorying

20  what we are putting in that box.

21      MS. GROSSMAN: We should have inventoried so we know

22  what's relevant and what's not relevant. It would be a

23  disadvantage in arguing relevance and not knowing what we are

24  arguing about.

25      MR. MOORE: Essentially, we are arguing about the

20

826MFLOC

1    UF-250 database, and then there is obviously in the course of

2    litigating that the last case, clearly the information was

3    extracted from the electronic database, put in paper form, and

4    it was used to some extent both internally to analyze it,

5    sitting there with experts to look at it, and so if we are

6    going to expedite this process of making a motion for

7    discovery --

8              THE COURT:  You don't need to make a motion.  Last I

9    heard, you write a document request.  That's it.

10             MR. MOORE:  It just seems -- I know Ms. Grossman's

11   argument is made in good faith that a deal is a deal.

12             THE COURT:  It's not a practical argument.

13             MR. MOORE:  I am not even sure the agreement

14   contemplated the situation we have now.

15             THE COURT:  That's why I asked you, if you're saying

16   there is kind of a breach which changes everything, that's a

17   different issue.  But is it more expensive to litigate that or

18   just package it in a box and ship it out?

19             MR. MOORE:  There is a practical solution which I wish

20   the city would follow because there is simply no indication

21   that that information would be more protected sitting in

22   Ms. Grossman's office than in my office --

23             THE COURT:  That's not her argument.  She trusts you

24   and I trust her and all of that.  But she says the deal is, it

25   gets shipped back.  It's not a matter of trust.  She doesn't

826MFLOC

1    think she is going to do anything bad with it in her office.

2         MR. MOORE:  Then there is no --

3         THE COURT:  Other than the contract argument.

4         MS. COSTELLO:  There is a breach.  The breach is that

5    under the agreement the provisions of the stipulation of the

6    protective order do not apply to documents that are otherwise

7    publicly available.  We would ask for leave of Court to be able

8    to brief that, retain the data.

9         THE COURT:  What do you say is publicly available, all

10   of the UF-250 databases?

11        MS. COSTELLO:  The UF-250 databases for 2006, from

12   what we can tell, from public accounts, it -- the entire

13   database has been turned over to the RAND Corporation by the

14   NYPD Foundation so it can pay the RAND Corporation to do a

15   study and an analysis.  That's publicly available on a Web

16   site.

17        THE COURT:  I can get it?

18        MS. COSTELLO:  Yes, your Honor, you can get it.

19        MS. GROSSMAN:  You can't get the data.  You can get

20   the conclusions of the RAND organization.

21        MS. COSTELLO:  There is a lot of the data in the

22   report itself.  And the second thing --

23        THE COURT:  Give me the site.  My clerks know how to

24   do this stuff.  How do we go to that site?

25        MS. COSTELLO:  If you just Google RAND Corporation,

826MFLOC

1    you can pull it up.

2         MR. MOORE:  You can get it off the NYPD's Web site is

3    a copy of the RAND Corporation study which refers to the

4    information and the data that we are now arguing about.

5         THE COURT:  If it's publicly available, we are really

6    being silly.

7         MS. GROSSMAN:  We dispute that it's publicly

8    available.

9         THE COURT:  We will do our Googling.

10        MS. COSTELLO:  The second thing, your Honor, on

11   January 25, the New York Times reported that an official from

12   the New York City Law Department informed them that the NYPD

13   had turned over the UF-250 electronic database to the national

14   or chief of criminal justice data at the University of

15   Michigan, and the director of the archive is quoted in the

16   article as saying that they have every intention of making the

17   data available to the research community, says the is New York

18   City Law Department spokesperson.  And that data also even

19   includes personal identifying information of the suspects that

20   were stopped.

21        MS. GROSSMAN:  If I may be heard on that, your Honor,

22   first of all, there is -- nothing is publicly available.  And

23   to the extent that anything becomes publicly available, if that

24   is what happens, then, of course, for that particular time

25   period the plaintiffs will be able to access that and we would

826MFLOC

1    be able to work something out.

2        THE COURT:  We are moving in toward the protective

3    order argument, step 2.  If you give them this University of

4    Michigan research entity, who intends to release it, you're not

5    going to win the protective order argument anyway because you

6    can't do it selectively.  Why don't you contact the head of

7    this University of Michigan foundation and get an affidavit.

8    Contact this person.  Get them on the phone, get an affidavit.

9    You could have come in with that today.  What do they have, and

10   what are the terms under which they have it?

11       MS. COSTELLO:  We can do that, your Honor.  If they

12   choose to cooperate with that.

13       THE COURT:  They are a research foundation.  I don't

14   know that they won't.  Or subpoena them.  You have subpoena

15   power.  You have a lawsuit.  You have subpoena power.  Subpoena

16   all their records.

17       MS. COSTELLO:  We can do that, your Honor.

18       THE COURT:  You can do a lot of things.  That's why at

19   the end of the day, after you force me to dance around all

20   these heads of pins, they are going to get the information back

21   and it probably won't be under the protective order, unless you

22   can get the city to agree with you.  If you can't, get it in a

23   box and get it sent back, unless you want to sit around and

24   brief the fact that it's publicly available now and while

25   you're briefing that, I should be allowed to hold onto it.  If

826MFLOC

1    that's what you want to do.

2          You need an affidavit from this RAND people, from the

3    University of Michigan people, have to know what they got.  For

4    example, were the University of Michigan researchers at the

5    University of Michigan under any restrictions not to disclose

6    the data.

7          MS. GROSSMAN:  They are, your Honor.  If you were to

8    go onto the Web site, you would see a whole host of federal

9    regulations and federal laws that they are bound by, and

10   especially with confidential information.  There was a

11   tremendous amount of vetting.  The plaintiffs are having

12   assertions --

13         THE COURT:  Whose Web site did you now say I should go

14   on?

15         MS. GROSSMAN:  You can go on to the national archive

16   Web site, and I can give you the exact --

17         MS. COSTELLO:  Your Honor, there is a third way.

18         THE COURT:  Let me get the Web site information.  You

19   want it, too.

20         MS. GROSSMAN:  National Archive of Criminal Justice.

21         THE COURT:  Singular, not S?

22         MS. GROSSMAN:  Archive.  It specifically says on the

23   first page of the Web site that I looked at that these

24   collections are not publicly available, and there are very many

25   vetting requirements.  There are certain requirements.  You

826MFLOC

1  have to register.  You need certain criteria.  It is not

2  publicly available, per se.

3          MR. MOORE:  It's been released.  It was released from

4  the NYPD to a private entity --

5          THE COURT:  That's an argument for a waiver of any

6  right to be under the protective order.

7          MR. MOORE:  It's been released to the city counsel as

8  well.

9          THE COURT:  City counsel.  That's another place.

10  That's the third one I heard about.  First I heard RAND, then I

11  heard Michigan, and now I've heard city council.

12          MS. GROSSMAN:  They have received the data.  I believe

13  in the prior lawsuit they may have received it.

14          THE COURT:  They being city council?

15          MS. GROSSMAN:  City council has certain data in

16  compliance with local law.  That's available to the plaintiffs.

17  But the format --

18          THE COURT:  We are reaching the second argument, which

19  is the protective order.  If there has been all this

20  disclosure, it's unlikely you'll survive that.  Even with the

21  disclosure, you're saying it doesn't make it publicly available

22  because each one that got it is restricted in its

23  dissemination.

24          MR. MOORE:  Judge, what if you give us a week or two

25  weeks to prepare a motion with respect to the question of

826MFLOC

1    whether it's even privileged at this point, hold onto it while

2    we do that?

3              THE COURT:   That doesn't solve the contract problem.

4              MR. MOORE:   I understand that.

5              THE COURT:   What's privileged at this point has to do

6    more with the protective order and production.   Do you think

7    they are going to resist production on the ground that it's

8    privileged?

9              MR. MOORE:   No.   That it's confidential.   I misspoke.

10   It's just a silly argument.

11             THE COURT:   I know.

12             MR. MOORE:   It's a silly argument.

13             THE COURT:   It is and it isn't.

14             MR. MOORE:   It's asking us to go through hoops.   We

15   are not a RAND Corporation with unlimited resources.

16             THE COURT:   It's many less hoops than you're making it

17   sound.   Put the records in a box, seal it, the seal won't be

18   broken.   The e-mail search, to the extent it takes a little

19   time, I can't help it.   You agreed to it.

20             MR. MOORE:   What if we deposit it with the Court.

21             THE COURT:   What's the difference?   I trust Ms. Gross.

22   That was a silly argument.   I deposit it with the Court.   The

23   effort of whether you ship it to 500 Pearl or a law department

24   is identical unless you do not believe her that she will not

25   break the seal.   I believe her.   That's not an argument.

826MFLOC

1    Boxing it and shipping it is what you're arguing about, not the

2    address that it goes to, unless you really don't trust them --

3            MR. MOORE:  I'll hold my tongue.

4            MS. COSTELLO:  If we need to do an inventory,

5    Ms. Gross is saying she is also entitled to the inventory.

6            THE COURT:  Is that in the stipulation of settlement?

7            MS. COSTELLO:  No, it's not.

8            MS. GROSSMAN:  Your Honor, if I'm going to argue that

9    documents are not relevant --

10           THE COURT:  That's always the case.  Whenever you get

11   a discovery request, people don't give you an inventory.  They

12   say, produce any and all documents relating to A, B, or C,

13   produce documents about that, produce documents about this.

14   They have to be specific in their document request.

15           MS. GROSSMAN:  I think something was missed here.  As

16   long as they put it in the box, I don't need a separate

17   inventory.

18           THE COURT:  You don't.

19           MS. GROSSMAN:  As long as it's put in a box.

20           THE COURT:  Right.

21           MS. GROSSMAN:  And I have it.

22           THE COURT:  And you can't open it.

23           MS. GROSSMAN:  Right.

24           THE COURT:  You don't need an inventory.

25           MR. MOORE:  We will put it in a box.

826MFLOC

1          THE COURT:  Now, do we have any schedules?  We know

2   you're going to request the documents right away as a document

3   request.  I would ask you to object, if you're going to object,

4   to the production requested in this document request very fast,

5   within one calendar week, that's it.  And if they do object,

6   take however little time or much that you need to respond.  I

7   am not going to restrict you.  You're the ones who want it.

8   Just respond and you can reply.  That's it.

9          MS. COSTELLO:  There is a couple other issues, your

10  Honor.

11         THE COURT:  You want to file an amended complaint

12  already?

13         MS. COSTELLO:  Yes.  To include class action

14  allegations.

15         THE COURT:  I barely have the complaint.  You want to

16  file an amended complaint already.  There has been no

17  responsive pleading.  You have a right --

18         MS. GROSSMAN:  There hasn't been any service on any of

19  the individual defendants.

20         THE COURT:  That's all right.  They are still entitled

21  as a right to amend it.

22         MS. GROSSMAN:  Sure.

23         THE COURT:  Go amend it.

24         MS. COSTELLO:  The only other issue, your Honor, is

25  there are several Doe defendants that either the city can

826MFLOC

1    identify in their Rule 26, in which case we can see if that

2    does identify the officers to the extent that we need to in

3    order to serve them.  If not, then we may need to conduct

4    limited discovery as to their identities.  That's it.

5        MS. GROSSMAN:  Your Honor, just to move this further

6    along, if the plaintiffs could at least give us releases from

7    their clients for arrest information, that would facilitate our

8    ability --

9        THE COURT:  They know they have to do that down the

10   road.

11       MS. GROSSMAN:  If they can give it to us in a week,

12   that would allow us to do what we need to do to respond --

13       THE COURT:  Respond to what?

14       MS. GROSSMAN:  Respond --

15       MR. MOORE:  Nothing to respond to yet.

16       THE COURT:  I agree.  There has been no service.  They

17   don't have to do that within a week.  They know they have to do

18   that down the road.  There is no reason to rush that.

19       The only issue left to me is the briefing of the

20   protective order issue.  We have got a little simple schedule

21   here going for requesting the documents.  Once you get the

22   document request, don't you have a twofold response?  A, we

23   object or we don't.  If we don't object or if we do, we further

24   say that if we produce them, it has to be pursuant to a

25   protective order and here is why.  Why don't you do both at

826MFLOC

1    once.

2            You said it's an easy brief.  You said you copied the

3    same brief that you filed in the Daniels case.  That's what you

4    said.  Make your argument.  They have a different response this

5    time.

6                              o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FLOYD, *et al.*,                                    08 Civ. 01034 (SAS)

                 **Plaintiffs,**

     -against-

THE CITY OF NEW YORK, *et al.*,

                 **Defendants.**

---

## PLAINTIFFS' FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Local Rule 26.3 of the United States District Court for the Southern District of New York ("Local Rule") Plaintiffs, by and through their undersigned attorneys, hereby request that Defendants produce the documents described herein on or before May 1, 2008, pursuant to the Court's ruling at the status conference in this matter on February 6, 2008. These document requests are continuing and require supplemental responses if Defendants obtain additional documents called for between the time of the response and the conclusion of trial.

### DEFINITIONS

1.     "NYPD" shall mean the New York City Police Department, including its officers, supervisors, commanders, units, employees and agents.

2.     "UF-250 data" means any information and data, whether stored electronically through a database, other computer program and/or maintained through any documents not stored within or through a computer or other electronic means, which records, reflects and/or logs information from the "Stop, Question and Frisk Report Worksheet" "PD344-151A (rev. 11-

02)," "Worksheet 802" and "Worksheet 802A" and any prior or subsequent versions of these documents, which have been designated by the NYPD for its officers to use to record stop, question and/or frisk activities conducted by any of the NYPD's officers or employees.

3.　　"Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

4.　　"Document" is used in the broadest sense and includes, but is not limited to all originals, copies (if the originals are not available), non-identical copies (whether different from the original because of underlining, editing marks, notes made on or attached to such copy or otherwise), whether printed or recorded (through a sound, video or other electronic, magnetic or digital recording system) or reproduced by hand, including, but not limited to the following items: letters, telegrams, faxes, memoranda, records, summaries of personal conversations or interviews, minutes or records or notes of meetings or conferences, note pads, notebooks, postcards, "Post-It" notes, stenographic notes, opinions or reports of advisors or consultants, opinions or reports of experts, projections, financial or statistical statements or compilations, contracts, agreements, appraisals, analyses, orders (temporary, standing or otherwise), bulletins, manuals, guidebooks, publications, articles, books, pamphlets, circulars, microfilm, microfiche, reports, studies, logs, surveys, diaries, calendars, appointment books, maps, charts, graphs, bulletins, Photostats, speeches, data sheets, pictures, photographs, illustrations, blueprints, films, drawings, plans, tape recordings, videtapes, disks, diskettes, CDs, data tapes or readable computer produced interpretations or transcripts thereof, electronically transmitted messages (E-mail), voice mail messages, inter-office communications, and any other writings, papers and tangible things of whatever description whatsoever, including, but not limited to any information

contained on any computer, even if not yet printed out, within the possession, custody and/or control of Defendants.

5.    The term "identify" with respect to any person shall mean to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last know place of employment.  Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

6.    The term "identify" with respect to documents shall mean to give, to the extent known, the: (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

7.    "Concerning" means relating to, referring to, reflecting, describing, discussing, evidencing or constituting, in any way, directly or indirectly.

8.    The singular of any word includes the plural and the plural includes the singular.

9.    "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the request including rather than exclusive.

10.    "All" means "any and all" and "any" means "any and all."

11.    "Refer," "relate," or "reflect" means all documents that comprise, evidence, constitute, describe, explicitly or implicitly refer to, were reviewed in conjunction with, or were generated as a result of the subject matter of the request, including, but not limited to all documents that reflect, record, memorialize, discuss, evaluate, consider, review or report the subject matter of the request.

12.    The definitions set forth in Rule 47 of the Local Rules for the United States District Court for the Southern District of New York are incorporated herein by reference.

## INSTRUCTIONS

1.     In producing documents pursuant to these requests, the Defendants are required to furnish all documents in their possession, custody or control that are known or available to them, regardless of whether those documents are possessed by any Defendant or by any of their agents, attorneys, investigators, representatives, consultants or employees.  The Defendants must make a diligent search of their records, including, but not limited to paper records, computerized records, electronic mail records and voice-mail records, and of other papers and materials in their possession or available to them or their attorneys, consultants, investigators and other agents or representatives.

2.     Documents attached to each other, including, but not limited to by staple, clip, tape or "Post-It" notes, should not be separated.

3.     For each document or part thereof called for by this demand that is withheld under a claim of privilege or work product, the Defendants shall furnish a list setting forth as to each such document or redacted portion thereof, if any, the following information: (a) the nature of the document, *e.g.*, letter, memorandum, electronic mail, etc.; (b) the name, address, occupation, title and business affiliation of each person who prepared, received, viewed and has or has had possession, custody or control of the document; (c) the date of the document; (d) a description of the subject matter of the document; (e) a statement of the basis upon which the privilege or work product claim is made; and (f) the paragraph(s) of this request that call for the production of the document.

4.     If any document or part thereof called for by this demand has been destroyed, discarded, or otherwise disposed of, the Defendants shall furnish a list setting forth, as to each document or part thereof, the following information: (a) the nature of the document, *e.g.*, letter

memorandum, electronic mail, etc.; (b) the name, address, occupation, title and business affiliation of each person who prepared, received, viewed and has or has had possession, custody or control of the document; (c) the date of the document; (d) a description of subject matter of the document; (e) the date of destruction or other disposition; (f) a statement of the reasons for destruction or other disposition; (g) the name, address, occupation, title and business affiliation of each person who authorized destruction or other disposition; (h) the name, address, occupation, title and business affiliation of each person who destroyed or disposed of the document; and (i) the paragraph(s) of this request which call for the production of the document.

5.   The Defendants shall produce the responsive documents as they have been kept in the usual course of business or shall organize and label them to correspond with the enumerated requests in this demand.  The Defendants are requested to number each page of the responsive documents and to identify by prefix letter the person from whose files each document is taken. Defendants are requested to retain the originals of any responsive documents produced for inspection by Plaintiffs' counsel, if requested.

6.   If with respect to any category there are no responsive documents, the Defendants shall so state, in writing.

7.   Each request for production of documents is continuing in nature to the fullest extent permitted under the Federal Rules of Civil Procedure, and any requested documents obtained or discovered after the Defendants' initial production shall be promptly produced, in no event, later than at the final pre-trial conference.

## DOCUMENT REQUESTS

1.      All documents, databases, data, reports and any other information whether stored electronically or otherwise, which reflect, record and log all UF-250 data from UF-forms (see definition number 2 above) which is required to be prepared, completed, signed and/or filed by NYPD officers or otherwise relate to the activities of such officers in conducting stops, questioning, frisks and/or searches of individuals for the time period 1998 to present.   This information should be produced in an unredacted format.

2.      Any codebooks, lists, memoranda, and any other documents, stored electronically or otherwise, which contain information to explain each of the codes and/or categories in the documents, databases, data and any other information produced in response to request no. 1 above.

3.      All documents, including, but not limited to any notes, UF-250 data, attorney-work product, deposition transcripts, electronic mail printouts, CDs, memoranda and all other materials which were produced to Defendants by Plaintiffs' counsel, and the law firm of Debevoise & Plimpton, pursuant to the ruling at the status conference on February 6, 2008, which required Plaintiffs' counsel to temporarily turn over to Defendants' counsel, under seal, all information designated as "confidential" under the Protective Order entered in *Daniels, et al. v. The City of New York, et al.*, Case No. 99 Civ. 1695 (SAS), until the Court could issue a ruling in this litigation concerning Plaintiffs' request for this information.


By:_____*andrea Costello*_____
        Andrea Costello (AC-6197)

        Andrea Costello (AC-6197)
        Darius Charney (DC-1619)
        Kamau Franklin (KF-6837)

Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
T (212) 614-6439; F (212) 614-6499
acostello@ccrjustice.org
dcharney@ccrjustice.org
kfranklin@ccrjustice.org


Jonathan Moore (JM-6902)
Beldock, Levine & Hoffman, LLP
99 Park Avenue, 16th Floor
New York, NY 10016
T (212) 490-0400; F (212) 557-0565
jmoore@BLHNY.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of April 2008, that a true and correct copy of the

foregoing document was furnished via U.S. First Class Mail and electronic mail upon the

following:

>Linda Donahue
>David Hazan
>Jennifer Rossan
>Assistant Corporation Counsel
>Corporation Counsel of the City of New York
>100 Church Street, Room 3-158
>New York, NY 10007

*Andrea Costello*
_____
Andrea Costello

EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

FLOYD, *et al.*,

                                        Plaintiffs,

                    -against-

THE CITY OF NEW YORK, *et al.*,

                                        Defendants.

-------------------------------------------------------------------- x

**DEFENDANT CITY
OF NEW YORK'S
RESPONSES AND
OBJECTIONS TO
PLAINTIFFS' FIRST
REQUEST FOR THE
PRODUCTION OF
DOCUMENTS**

08 Civ. 01034 (SAS)

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, defendant responds and objects to plaintiffs' First Request for the Production of Documents as follows:

## GENERAL STATEMENT

1.     By responding to any request, defendant does not concede the materiality of the subject to which it refers. Defendant's responses are made expressly subject to, and without waiving or intending to waive, any questions, or objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the documents or information produced, or of the subject matter thereof, in any proceeding including the trial of this action or any subsequent proceeding.

2.     Defendant objects to this Interrogatory and Document Request to the extent that it demands documents and/or information which are protected by the attorney-client or work-product privilege, or which constitute material prepared for litigation purposes. Defendant also objects in the entirety to any request for documents which is not limited in time.

3.    Inadvertent production of any document or information which is privileged, was prepared in anticipation of litigation, or is otherwise immune from discovery, shall not constitute a waiver of any privilege or of another ground for objecting to discovery with respect to that document or any other document, or its subject matter, or the information contained therein, or of defendant's right to object to the use of any such document or the information contained therein during any proceeding in this litigation or otherwise.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR DOCUMENTS

### DOCUMENT REQUEST NO. 1:

All documents, databases, data, reports and any other information whether stored electronically or otherwise, which reflect, record and log all UF-250 data from UF-forms (see definition number 2 above) which is required to be prepared, completed, signed and/or filed by NYPD officers or otherwise relate to the activities of such officers in conducting stops, questioning, frisks and/or searches of individuals for the time period 1998 to present. This information should be produced in an unredacted format.

### OBJECTION AND RESPONSE TO REQUEST NO. 1:

Defendant objects to this document request on the ground that it is overbroad, vague, ambiguous, seeks irrelevant data, is not reasonably calculated to lead to the discovery of admissible evidence, seeks sensitive and confidential data, implicates privacy concerns under New York Criminal Procedure Law §160.50 and seeks data protected by the law enforcement privilege. Notwithstanding, defendant interprets this document request to seek production of the UF-250 database. Specifically, defendant objects to the production of the UF-250 database for the time period predating the so ordered Stipulation of Settlement in *Daniels, et al. v. The City of New York, et al.,* Case No. 99 Civ. 1695 (SAS), as it was the subject of a fully and finally

- 2 -

adjudicated matter, is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence.  Further, defendant objects to the production of the UF-250 database for the time period predating three years prior to the commencement of this lawsuit on the grounds that it is outside the statute of limitations period.  Notwithstanding the foregoing, defendant will produce the UF-250 database from February 1, 2005 through and including the end of the second quarter of 2007 under an appropriate protective order.  Defendant will consider production for subsequent time periods under an appropriate protective order.

**DOCUMENT REQUEST NO. 2:**

Any codebooks, lists, memoranda, and any other documents, stored electronically or otherwise, which contain information to explain each of the codes and/or categories in the documents, databases, data and any other information produced in response to request no. 1 above.

**OBJECTION AND RESPONSE TO REQUEST NO. 2:**

Defendant objects to this document request on the ground that it is overbroad, vague, and ambiguous.  Notwithstanding, defendant will produce responsive information that is contained in the production of the UF-250 database, under an appropriate protective order.

**DOCUMENT REQUEST NO. 3:**

All documents, including, but not limited to any notes, UF-250 data, attorney-work product, deposition transcripts, electronic mail printouts, CDs, memoranda and all other materials which were produced to Defendants by Plaintiffs' counsel, and the law firm of Debevoise & Plimpton, pursuant to the ruling at the status conference on February 6, 2008, which required Plaintiffs' counsel to temporarily turn over to Defendants' counsel, under seal, all information designated as "confidential" under the Protective Order entered in *Daniels, et al. v.*

*The City of New York, et al.,* Case No. 99 Civ. 1695 (SAS), until the Court could issue a ruling in this litigation concerning Plaintiffs' request for this information.

**OBJECTION AND RESPONSE TO REQUEST NO. 3:**

Defendant objects to this document request as it seeks documents that plaintiffs unconditionally agreed to return to defendant under the so ordered Stipulation of Settlement, in *Daniels, et al. v. The City of New York, et al.,* Case No. 99 Civ. 1695 (SAS), as part and parcel of the consideration underlying the Stipulation of Settlement. Defendant further objects to this document request to the extent that it seeks documents and materials that predate the date of the so ordered Stipulation of Settlement in *Daniels, et al. v. The City of New York, et al.,* Case No. 99 Civ. 1695 (SAS), as such documents and materials are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing, defendant will produce responsive documents that post-date the date of the so ordered Stipulation of Settlement in *Daniels, et al. v. The City of New York, et al.,* Case No. 99 Civ. 1695 (SAS), subject to an appropriate protective order.

Dated:       New York, New York
             May 1, 2008

                          MICHAEL A. CARDOZO
                          Corporation Counsel of the
                          City of New York
                          Attorney for Defendants
                          100 Church Street, Room 3-215
                          New York, New York 10007
                          (212) 788-0887

By:          _____
                          JENNIFER ROSSAN
                          Assistant Corporation Counsel

- 4 -

TO:   ANDREA COSTELLO (AC-6197)
      Center for Constitutional Rights
      666 Broadway, 7th Floor
      New York, NY 10012
      (212) 614-6439

7

EXHIBIT 4

# In The Matter Of:

*DAVID FLOYD LALIT CLARKSON, v.*
*THE CITY OF NEW YORK, et al.,*

---

*May 19, 2008*

---

*CONFERENCE*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 85JTFLOA.txt, Pages 1-43

**Word Index included with this Min-U-Script®**

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

---

**Page 1**

```
B5JTFLOA
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
DAVID FLOYD and LALIT
CLARKSON,

                 Plaintiffs,

          v.                        08 CV 1034 (SAS)

THE CITY OF NEW YORK, et al.,

                 Defendants.
------------------------------x
                                    New York, N.Y.
                                    May 19, 2008
                                    11:20 a.m.

Before:

              HON. SHIRA A. SCHEINDLIN,

                              District Judge


                     APPEARANCES

CENTER FOR CONSTITUTIONAL RIGHTS
        Attorneys for Plaintiffs
BY:   ANDREA COSTELLO
      DARIUS CHARNEY
      KAMAU FRANKLIN

BELDOCK, LEVINE & HOFFMAN
        Attorneys for Plaintiffs
BY:   JONATHAN C. MOORE

NEW YORK CITY LAW DEPARTMENT
      Attorneys for Defendants
BY:   HEIDI GROSSMAN
      LINDA DONAHUE
      JENNIFER ROSSAN
      DAVID HAZAN
```

---

**Page 2**

[1] THE COURT: Ms. Costello?

[2] MS. COSTELLO: Yes, your Honor.

[3] THE COURT: Good morning.

[4] Mr. Charney?

[5] MR. CHARNEY: Good morning, your Honor.

[6] THE COURT: Good morning.

[7] Mr. Franklin?

[8] MR. FRANKLIN: Good morning.

[9] THE COURT: Ms. Grossman, good morning. Ms. Donahue,

[10] good morning. Ms. Rossan, good morning. And is it Mr. Hazan?

[11] MR. HAZAN: That's correct.

[12] THE COURT: They go faster with the names I know.

[13] All right. I looked around the chambers convinced

[14] that I lost some submissions, but my clerk said I didn't lose

[15] anything. And we're here with only one letter in front of me,

[16] the letter of April 18th. And I'm sure that you would consider

[17] that a lead up to today's conference, but it does say that

[18] plaintiffs have served their UF 250 document requests on

[19] defendants, counsel for both sides have conferred and agreed on

[20] the following proposed schedule: That defendants will serve

[21] their objections to the plaintiffs' document request for the UF

[22] 250 data by May 1 and plaintiffs will file their motion to

[23] compel by no later than May 31, and defendants will file their

[24] opposition June 30th and plaintiffs will file their reply

[25] June 15. That's the only piece of paper that I think relates

---

**Page 3**

[1] to why we're here.

[2] So are we here because I wanted to talk this through

[3] to see why we have to have a schedule that takes two and a half

[4] months and makes such an enormous deal over things I keep

[5] reading about in The New York Times anyway? Is that the same

[6] thing that I'm reading about in The New York Times?

[7] MS. COSTELLO: Yes, your Honor.

[8] THE COURT: I'm reading about it, so what's the

[9] problem with turning it over to the plaintiffs' lawyers?

[10] Everybody seems to have it, at least the reporters from the New

[11] York Times has it, and therefore everybody that reads the

[12] morning paper has it.

[13] MS. COSTELLO: We have courtesy copies of the document

[14] request and the defendant's objections, if the Court would

[15] like.

[16] THE COURT: You could hand it up but I want to talk

[17] about the bigger issue. Everybody has this thing, the world

[18] seems to have it, what's the problems now for the plaintiffs'

[19] lawyers to get it back, so to speak? Because they had it at

[20] one time, too.

[21] What is it The New York Times has? Could you tell me,

[22] Ms. Grossman?

[23] MS. GROSSMAN: Your Honor, I don't know what The New

[24] York Times has.

[25] THE COURT: But you have been reading The New York

---

**Page 4**

[1] Times, haven't you?

[2] MS. GROSSMAN: I think that --

[3] THE COURT: Could I get a yes or no? Have you been

[4] reading the series of articles about it?

[5] MS. GROSSMAN: I'm not sure I know. There have been

[6] articles in The New York Times for the past year, so I don't

[7] know which article.

[8] THE COURT: Oh, no, last week there was a whole thing.

[9] Now Mr. Hazan, you're in trouble because you went

[10] mm-hmm; it doesn't show on the record but you acknowledged with

[11] an up-and-down nod as opposed to horizontal nod that yes, he

[12] knows that I'm talking about. There's a big front page article

[13] in the last week, maybe 10 days, about the UF 250 database.

[14] You must have seen it.

[15] MS. GROSSMAN: I have not read that article.

[16] THE COURT: Okay. You have been too busy then. You

[17] should work less and read the paper more because it's full of

[18] interesting articles; China, Burma, hundreds of thousands of

[19] people and whatnot. There's lot of things to read in the

[20] paper.

[21] In any event, it really is there, so if you haven't

[22] read it you may not be the best one to talk about it. For

[23] those of you on the defense team that has read it, what do they

[24] have? Because they were describing the database.

[25] MS. GROSSMAN: Your Honor, I don't know what The New

---

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

Page 5

[1] York Times has.

[2] **THE COURT:** No, because you haven't seen the article.
[3] I'm talking to the other three lawyers on your team. You read
[4] all about the UF 250 database, they were describing in some
[5] detail statistics that were drawn from the data in the
[6] database.

[7] **MS. GROSSMAN:** But your Honor, there has been data
[8] from 2006 that has been recycled from last December until now.
[9] So there's information that ends up being reused time and time
[10] again.

[11] But may I have one moment to confer?

[12] **THE COURT:** That's a good idea.

[13] **MS. GROSSMAN:** Yes, your Honor, as I suspected --

[14] **THE COURT:** Late attorneys who want to hear every word
[15] of this have just come in the room. At least one, Mr. Moore.
[16] Good morning.

[17] **MR. MOORE:** Good morning.

[18] **THE COURT:** Is this other person with you, or no?

[19] **MR. MOORE:** No.

[20] **THE COURT:** Oh, well.

[21] **MR. MOORE:** I apologize, I'm late because I was in
[22] Staten Island.

[23] **THE COURT:** I was late myself. In any event, we were
[24] just barely starting, and what I said to Ms. Grossman so far
[25] essentially was if The New York Times has all this, what's the

Page 6

[1] problem? And she said she wasn't familiar with the article.
[2] That's about as far as we got.

[3] **MS. GROSSMAN:** If I understand, the article makes
[4] reference to a report issued by the Rand Corporation.

[5] **THE COURT:** True, it does.

[6] **MS. GROSSMAN:** And that is data that was referenced in
[7] 2006. It's not all the data that we're talking about and that
[8] the plaintiffs are seeking in discovery. So that is
[9] information that was related to a report issued in the fall of
[10] 2007, I believe. So any reference today to the Rand report I
[11] don't believe is new information that is referenced.

[12] **THE COURT:** I don't even know if the plaintiffs have
[13] that data.

[14] **MS. GROSSMAN:** That's on the Rand Web site. There is
[15] a summary of their analysis. And the plaintiffs, I believe,
[16] have made representations in the past that they're familiar
[17] with what is in the Rand report.

[18] **THE COURT:** By you are not limited to that summary.
[19] All I'm trying to say is whatever data the Rand people have or
[20] The New York Times has or whatever, surely, before we can talk
[21] about anything else, the plaintiffs are entitled to the same
[22] data; not the summary but the data.

[23] **MS. GROSSMAN:** They do they have the data through -- I
[24] don't know if there's confusion.

[25] **THE COURT:** I'm sure I'm the only one confused, but go

Page 7

[1] ahead.

[2] **MS. GROSSMAN:** They have had the data for the relevant
[3] time period, they had it in relation to the other litigation.

[4] **THE COURT:** I made them turn that back. What do they
[5] have now?

[6] **MS. GROSSMAN:** That is the same data, 2006.

[7] **THE COURT:** They have it now?

[8] **MS. GROSSMAN:** No, they don't have the UF 250 database
[9] now, they returned that in connection with the lawsuit.

[10] **THE COURT:** True. So let's start from the beginning.
[11] They have nothing now, no data?

[12] **MS. GROSSMAN:** That's right.

[13] **THE COURT:** I'm saying they surely get the data that
[14] everybody else seems to have out there, like Rand and The New
[15] York Times and everybody else.

[16] **MS. GROSSMAN:** Your Honor, we're not saying they can't
[17] have that data back, we are saying that should be subject to a
[18] protective order.

[19] **THE COURT:** Protective from who, since the press has
[20] it and we get to read about it over morning breakfast?

[21] **MS. GROSSMAN:** The press does not have the raw data.
[22] Plaintiffs have turned over the data, they have turned it back
[23] to the city. We have no problem returning it to the plaintiff,
[24] but we would like it to be subject to the protective order that
[25] is in place for whatever identifying information that may

Page 8

[1] exist, which I think the plaintiffs are amenable to.

[2] And what I would like the Court to know, though, is
[3] that on Sunday we just received word from the plaintiffs that
[4] they are willing to work with us in terms of a protective order
[5] as to as to at least certain aspects the database.

[6] **THE COURT:** Would this solve my motion?

[7] **MS. GROSSMAN:** It might. It might solve part of it.
[8] But up until Sunday their position was all the data should not
[9] be subject to a protective order, including confidential
[10] information of the individual stopped, officers, arrest
[11] locations or stop locations, et cetera.

[12] So the first time on Sunday we learned the plaintiffs
[13] might consider a protective order that would limit the
[14] disclosure to the public of that kind of information. The
[15] issue that we have to work out is the use of that information.
[16] The plaintiffs appear to want to be able to now reach out to
[17] all people listed on the database. We don't have a class
[18] action that's been certified at this point in time.

[19] **THE COURT:** But do we have a putative one?

[20] **MS. GROSSMAN:** Yes. But as you may recall, I know I'm
[21] bringing you back many years in the Daniels matter, but the
[22] Court had serious restrictions in terms of the access to the
[23] individuals listed on the database. Given the private and
[24] confidential nature of the information there were procedures
[25] put in place where the plaintiffs contact these individuals --

DAVID FLOYD LALIT CLARKSON, v.                                                May 19, 2008
THE CITY OF NEW YORK, et al.,

---

**Page 9**

[1] THE COURT: Right.

[2] MS. GROSSMAN: -- eventually by not by making phone
[3] calls. We had to get the magistrate involved and there were
[4] certain steps that I think we all understand how it worked.

[5] THE COURT: But anyway, through the steps they were
[6] eventually able to contact the people.

[7] MS. GROSSMAN: After a class was certified. And down
[8] the road there was an attempt and they were able to contact
[9] some people and there were limits. And I think we can work
[10] that out, but there are a lot of events that have to take place
[11] before we get to that point. First the class would have to be
[12] certified, and I think that, for now, to make an issue out of
[13] this I think is premature.

[14] I think the key here is if we're moving forward on
[15] this case we should be able to work with the plaintiffs, give
[16] them the data, look at the data that's relevant to the case,
[17] let them analyze the data and let's move with discovery subject
[18] to a protective order so we can litigate the case, not worry
[19] about whether there's access to the public about the
[20] information. Let's stick with the litigation here at hand and
[21] see what happens during discovery. But I don't see the
[22] prejudice to the plaintiff in requiring a protective order that
[23] allows them to produce and publish all sorts of information in
[24] connection with this litigation.

[25] THE COURT: It allows them to do what?

---

**Page 10**

[1] MS. GROSSMAN: To make this information public and
[2] accessible.

[3] THE COURT: You mean prevents them from doing that?

[4] MS. GROSSMAN: Right, that's what I meant, I misspoke,
[5] prevents them. There's no prejudice to the plaintiffs. And I
[6] think what we should to is focus on the litigation. It makes
[7] sense to avoid litigation and avoid burdening the Court with
[8] papers to review and decisions to make.

[9] THE COURT: So The New York Times is going to get it
[10] anyway under FOIA? Is somebody out there making FOIA requests?
[11] It's an interesting story and it's in the press.

[12] MS. GROSSMAN: It's interesting that you mention that,
[13] your Honor, because there is a FOIA request pending, so there
[14] is other litigation that is going in another venue.

[15] THE COURT: Where is that?

[16] MS. GROSSMAN: Well, in the New York State courts.
[17] And so those issues are being litigated. So I don't see the
[18] reason why we need to burden this litigation with litigation of
[19] a protective order when we are willing to work with the
[20] plaintiffs in terms of --

[21] THE COURT: What's the status of that case? Do you
[22] know anything about it?

[23] MS. GROSSMAN: I think their papers are fully
[24] submitted and might be pending before the court in the New York
[25] State Court. I don't know which judge in particular.

---

**Page 11**

[1] THE COURT: How interesting. You want to say
[2] something, Ms. Costello?

[3] MS. COSTELLO: Yes, your Honor. As to the articles
[4] that your Honor is referring to, the most recent one was
[5] published on May 6th in The New York Times. I don't work for
[6] The New York Times, but it seems to me from the public
[7] accounting of it from The New York Times that the information
[8] that they're talking about that they have available in terms of
[9] UF 250 data was the information that was made available to the
[10] city counsel pursuant to a city ordinance, and the article
[11] refers to data from 2001 through the first quarter of 2008.

[12] THE COURT: Yes, it does. I remember the article.

[13] MS. COSTELLO: And as to protective --

[14] THE COURT: I read it with some interest because I
[15] said it sounds so similar to my case.

[16] MS. COSTELLO: It does. As to the protective order
[17] issue, we are willing to -- as to the personal identifying
[18] information -- to enter into a protective order as to that, but
[19] we still take the position, your Honor, that the defendants
[20] have been able to pick and choose who they would like to
[21] disclose the full database to, including now the Rand
[22] Corporation, the National Criminal Justice Archive, who I have
[23] checked --

[24] THE COURT: Look, I don't think they can do that. I
[25] never understood how it is that the city thinks it can fully

---

**Page 12**

[1] disclose the database to those it feels like but not to others.
[2] I never really heard of that. When people want to assert
[3] various kind of privileges they don't get to pick who they
[4] disclose things to.

[5] Have you fully disclosed this database, Ms. Grossman,
[6] to people outside the city, so to speak?

[7] MS. GROSSMAN: I understand that aspects -- not the
[8] full database.

[9] THE COURT: She said the full database.

[10] MS. GROSSMAN: With all due respect, your Honor, I
[11] don't think she has access --

[12] THE COURT: That's why I'm asking you. Have you
[13] disclosed the full database?

[14] MS. GROSSMAN: I understand that certain aspects or
[15] certain portions or excerpts of a database for 2006 only were
[16] provided to the Rand Corporation under a confidentiality order.

[17] THE COURT: How about the city counsel?

[18] MS. GROSSMAN: City counsel has certain data but not
[19] database that the plaintiffs have has access to.

[20] THE COURT: What do they have?

[21] MS. GROSSMAN: They have certain fields of information
[22] that I'm happy to report back the details. I don't want to
[23] misspeak.

[24] THE COURT: The order is simple, I'm ordering you to
[25] produce everything that you gave to the city counsel to the

---

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

---

Page 13

[1] plaintiffs.

[2] **MS. GROSSMAN:** It would be a hard copy of certain
[3] fields.

[4] **THE COURT:** Well, do it. Everything that city counsel
[5] gets, plaintiffs get. That's what they have gotten, that's the
[6] format they got it in, then you have to do that.

[7] **MS. GROSSMAN:** Your Honor, if that's all we have to
[8] do --

[9] **THE COURT:** I didn't say that's -- no, that's the
[10] first thing you have to do. Anything you have disclosed to
[11] others that are not within your world of privilege, so to
[12] speak, you have to give to the plaintiffs here. So I'm saying
[13] if you gave that to the city counsel in whatever format you did
[14] you have to give it to the plaintiffs here.

[15] Then she mentioned something else, too.

[16] **MS. COSTELLO:** National Criminal Justice Archive.

[17] **THE COURT:** What did you give to the National Criminal
[18] Justice Archive?

[19] **MS. COSTELLO:** Our understanding --

[20] **THE COURT:** I'm sorry, Ms. Grossman, do you know what
[21] you gave to them?

[22] **MS. GROSSMAN:** We gave only for 2006 certain excerpted
[23] data. But your Honor --

[24] **THE COURT:** To speed things right along, whatever you
[25] gave to others outside of the city you give to plaintiffs

---

Page 14

[1] immediately in the same format. But that's not all, that's for
[2] now. That's a no-brainer.

[3] **MS. GROSSMAN:** Well, your Honor, when we -- whatever
[4] information was provided to the Rand Corporation and whatever
[5] information was provided to the National Archives was subject
[6] to confidentiality concerns. So if that is -- if they're
[7] willing to agree to a confidentiality agreement of the same --
[8] that is equally protective, then I don't see where the
[9] prejudice is to the plaintiff or what the concern is.

[10] **THE COURT:** First of all, we're in two different
[11] stages here. First stage is you have to produce whatever you
[12] have produced to others.

[13] **MS. GROSSMAN:** That's not an issue.

[14] **THE COURT:** Okay. Whatever you gave to the city
[15] counsel, Rand, the National Crime statistics whatever, all
[16] those three places and anybody else, you have to give to the
[17] plaintiffs. The only issue left is whether they are subject to
[18] the same terms of production as it was to those entities.
[19] That's the only question left.

[20] **MS. GROSSMAN:** I hope you're not taking my
[21] representation in any way to mean that we're not willing to
[22] turn over the data. That's not an issue at all.

[23] **THE COURT:** Okay.

[24] **MS. GROSSMAN:** We have always been willing to turn
[25] over the data. They have had more data than -- they have had

---

Page 15

[1] complete data sets from all these --

[2] **THE COURT:** But I made them give it all back. That
[3] was in another case, that was Daniels.

[4] **MS. GROSSMAN:** That's right, your Honor.

[5] **THE COURT:** I made them give it back and agreed with
[6] you, but now they are here on a new lawsuit demanding the same
[7] data and they are entitled to it.

[8] So what's your position on this protective order
[9] problem? Because they say they're willing to give you
[10] everything they have given to anybody else but under the same
[11] terms as everybody else.

[12] **MS. COSTELLO:** Your Honor, we think -- I have examined
[13] the public documents, to the extent that they're available, and
[14] we have issued a subpoena to the Rand Corporation. We're in
[15] communication with the National Criminal Justice Archive. We
[16] believe that those disclosures made to those companies and then
[17] the information that then would be made publicly available for
[18] that -- for example, the Rand Corporation published an entire
[19] report using raw statistical data that they were given in an
[20] unredacted database. We think that waives any confidentiality
[21] that would attach to the database.

[22] We think the same is true for the Criminal Justice
[23] Archive. I have reviewed their online federal requirements,
[24] because they are a Department of Justice program, the only
[25] thing that they're required to do is certain confidentiality

---

Page 16

[1] provisions in the Code of Federal Regulations and the federal
[2] statutes as to personal identifying information. That type of
[3] information is information that can be withheld from the
[4] public.

[5] **THE COURT:** Are you willing to abide by those same
[6] restrictions?

[7] **MS. COSTELLO:** Yes, we are. As to personal
[8] identifying information, yes. And we think that if the NYPD is
[9] giving the entire database to the National Criminal Justice
[10] Archive so it can be archived and put on a Web site so
[11] researchers, members of the press, other individuals and
[12] advocates can get access to it, we should have the same access.

[13] **THE COURT:** That's correct, you should have the same
[14] identical excess.

[15] **MS. GROSSMAN:** For the 2006 I don't think that should
[16] be a problem with the plaintiffs. It is -- I don't think that
[17] will be an issue. And I think that the unfortunate events are
[18] that we have not had -- we tried to speak with the plaintiffs'
[19] counsel about working out some sort of arrangement with them
[20] about protective order. It wasn't until this Sunday that they
[21] even indicated that they would be willing to abide by a
[22] protective order that would protect identifying information.
[23] That's the first that we heard of this this morning coming in
[24] to court. Had we had a chance to speak with the plaintiffs we
[25] probably could have worked out something, especially with the

---

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

**Page 17**

[1] 2006 data. But that doesn't deal with the other data.

[2]    THE COURT: Which is what?

[3]    MS. GROSSMAN: The 2005, 2007, and any data that they
[4] would be seeking moving forward. And it also doesn't address
[5] the data that they're seeking in connection with the Daniels
[6] litigation. That data was dated prior to 2006.

[7]    THE COURT: What is your position on that data?

[8]    MS. GROSSMAN: As to data from the relevant time
[9] period in this litigation, we're willing to turn it over to the
[10] plaintiffs.

[11]    THE COURT: What do you define as the relevant time
[12] period in this litigation?

[13]    MS. GROSSMAN: Anything that predates the Daniels
[14] stipulation of settlement, which was in January of '04, our
[15] position is that it could not possibly be discoverable or
[16] reasonably likely to lead to discovery of admissible evidence.

[17]    Because unlike some other cases where there are claims
[18] that the data that goes back ten years might be relevant to a
[19] current Monell pattern and practice, the Daniels litigation was
[20] a live litigation. The parties went through discovery, we
[21] shared information and we concluded that case and disposed of
[22] it with a stipulation of settlement and it closed that case
[23] forever. So to go back and litigate the issue --

[24]    THE COURT: Except I thought I remember hearing that
[25] the plaintiffs might believe there were violations of the

**Page 18**

[1] settlement agreement.

[2]    MS. GROSSMAN: That's right, but that postdated the
[3] agreement. That would be after 2004, because we had an
[4] agreement that was entered into.

[5]    THE COURT: But you approved the violation, if there
[6] is one, and they have to analyze what happened before and what
[7] happened after, otherwise you would say that's not proof of a
[8] violation. So they found ten stops in a month, that's an error
[9] rate, that's no big deal, but if they showed there were ten or
[10] less stops before and you settled that and then the rate of
[11] stops continued or even increased, that's how you prove the
[12] violation, unless you want to stipulate to a violation.

[13]    I think Mr. Moore wants a turn.

[14]    MR. MOORE: It also goes to question of intent. If
[15] the Daniels stipulation was the result of years of litigation
[16] analyzing a database that went back to '98 or '99, I forget
[17] what year, '98, and that led to not just a declaration of a
[18] policy against racial profiling, it led to certain
[19] responsibilities that the city said took upon themselves to
[20] train, to audit, to review the UF 250 database, the database
[21] that we're talking about. If in fact they did none of that, or
[22] if in fact they did it and still didn't do what they should
[23] have done now going forward, that goes to the question of the
[24] city's intent with respect to violating.

[25]    THE COURT: But she's saying how does data that

**Page 19**

[1] predated -- I don't know whether it was January or December
[2] '04, but predated '04, how does that help to prove that?

[3]    MR. MOORE: If in fact the data shows --

[4]    THE COURT: Whose data?

[5]    MR. MOORE: We'll call it the Daniels data.

[6]    THE COURT: Pre-2004?

[7]    MR. MOORE: Before the stipulation was entered into,
[8] January, February, 2004, that data was the basis upon which the
[9] city agreed to do certain things. We need to be able to look
[10] at that data to evaluate whether what the city did with respect
[11] to the things we couldn't get into because of the constrictions
[12] of the decree here in Daniels, whether the city has actually
[13] used that data to do training, to do auditing, to do any kind
[14] of supervision.

[15]    THE COURT: You wouldn't need to see the data to do
[16] that. That's a different kind of discovery. The only thing
[17] that would be useful, I suppose, is to see whether the pre-data
[18] and the post data show any improvement. If they don't,
[19] obviously something has failed.

[20]    MR. MOORE: That's the other point. If in fact it has
[21] shown an improvement then I would think the city would want to
[22] have that.

[23]    One other thing that I want to point out to is for
[24] five or six years, I don't know how long the Daniels case went
[25] on, we had that data in our possession.

**Page 20**

[1]    THE COURT: I know that.

[2]    MR. MOORE: We used it, we didn't violate any terms of
[3] any confidentiality order. There's no reason to believe that
[4] would happen here.

[5]    THE COURT: Because the new argument is relevance.
[6] The new argument is how could data that predated the settlement
[7] in '04 be relevant to the charges now. And as I said, it seems
[8] to me an obvious way is to see if the data improves. If it
[9] stays the same or gets worse then that's bad. Then what was
[10] the point of the settlement?

[11]    MR. MOORE: Not so much what was the point of the
[12] settlement, if the data shows since that period of time that
[13] it's gotten worse --

[14]    THE COURT: Or stayed the same.

[15]    MR. MOORE: -- or even better, those are relevant to
[16] the issues before the Court. We know that the number of
[17] recorded stops has gone way up. We know that that is in fact
[18] the case. So if the incident of what we later determined to be
[19] suspicion of stops and frisks or stops and frisks based upon
[20] some profile, if that's gone up from the old data to the new
[21] data, that's significant, it seems to me, and something that
[22] Court would want to know about.

[23]    MS. GROSSMAN: Your Honor, I know that in decisions
[24] that you have written whenever you have looked at statistics
[25] you look at random sampling and certain percent of time. When

---

May 19, 2008

**Page 21**

[1] you look at post 2004 to 2008 and ongoing, that's a data set
[2] that the plaintiffs are free to make whatever arguments they
[3] need to make about the time period and if there is improvement
[4] or lack of improvement. But to now go back to data that was
[5] the subject of a prior lawsuit --

[6]     THE COURT: No, it predates the settlement. The idea
[7] is to compare the presettlement data to the post settlement
[8] data.

[9]     MS. GROSSMAN: But let's think about how would the
[10] plaintiffs use this at trial. If what it is that they are
[11] going to do is say that pre-2004 the data demonstrates there
[12] was an unconstitutional pattern and practice, that could not be
[13] because we entered into an agreement with the plaintiff. And
[14] there's no admission of wrongdoing, we agreed to take certain
[15] steps that resolved this lawsuit. So that issue was not fully
[16] litigated. They can't come into court right now and say that
[17] there was an unconstitutional pattern and practice when we
[18] entered into an agreement that those issues are fully disposed
[19] of and litigated and to its conclusion to now allow them to
[20] relate investigate that issue.

[21]     THE COURT: They're not relitigating that issue. It's
[22] a stipulation of settlement on the steps the city was going to
[23] take to change something, to improve something. And to prove
[24] that point you have to compare presettlement data and post
[25] settlement data.

**Page 22**

[1]     MS. GROSSMAN: No, you see, we agreed to take steps
[2] after '04, February '04, so that has no connection.

[3]     THE COURT: We just disagree, and when we disagree you
[4] lose. I can't fight with you much longer. That's the way the
[5] court system works. You take your case to a judge, you get a
[6] ruling, you live with it, and when it's appealable you appeal
[7] it. And I rarely see a discovery order that I have ever found
[8] that was appealable, but so be it.

[9]     There's no reason here to withhold the data. I
[10] haven't heard a good argument. Your best argument is relevance
[11] and it doesn't work. I can see a relevance at this point. I
[12] don't know if I'm right, they don't know if I'm right. These
[13] things work themselves out in the course of a case, but at
[14] least there is a colorable theory of why it's relevant. One
[15] studies data to see if things have changed.

[16]     It's not a matter of saying res judicata the city once
[17] admitted that it violated the constitution. No, there's no
[18] such admission, and they can't use it for that, but they can
[19] show a pattern over a long period of time as well as a shorter
[20] period of time. And they can introduce the settlement
[21] agreement, for what it's worth, and the changes that were
[22] agreed to to show that it created no change and in fact the
[23] stops went up, or didn't. I mean I don't know what the data
[24] would show, but that's what discovery is for. Discovery is it
[25] not for trial.

**Page 23**

[1]     MR. MOORE: I think her argument makes our case,
[2] actually, because we can't introduce the stipulation of
[3] settlement because this was no admission of liability, and
[4] we're not trying to do that. We're seeking the data that shows
[5] a pattern of conduct over a certain period of time.

[6]     THE COURT: I understand. What she's really worrying
[7] about is the terms under which you will have the data or use
[8] the data. What terms are you willing to agree to? What's the
[9] dispute? Can't you sit in the jury room and talk to each
[10] other? Since apparently they only heard from you Sunday about
[11] something other, do you want to go in other room?

[12]     MS. COSTELLO: Your Honor, with all due respect, I
[13] think that we're not going agree on the terms of disclosures
[14] because I think the only thing that we can agree on is to a
[15] protective order to the personal identifying information. But
[16] we think there are several arguments that go to why a
[17] protective order should not issue as to the rest of the data.

[18]     THE COURT: What are those?

[19]     MS. COSTELLO: Well, there's a few arguments. One is
[20] the fact that we think there's been a waiver of any
[21] confidentiality by all these disclosures that the city has
[22] made. They disclosed to Rand an unredacted database.

[23]     THE COURT: I already said they have to disclose to
[24] you the same information they gave to Rand in the same format.
[25] If they gave Rand an unredacted database you get an unredacted

**Page 24**

[1] database. But they come back and say we did give to Rand an
[2] unredacted database but there's two things to tell you about,
[3] it was only '06 and under certain terms and conditions. So we
[4] can't overstate what they gave to Rand. They apparently gave a
[5] certain year and they apparently gave it with terms and
[6] conditions.

[7]     MS. COSTELLO: With all respect to defense counsel we
[8] would like to see those terms and conditions. We have
[9] subpoenaed them from the Rand Corporation. We anticipate that
[10] there may be litigation related to that subpoena.

[11]     But the other issues, the National Criminal Justice
[12] Archive, we think that's a very broad disclosure without regard
[13] to -- the only caveat --

[14]     THE COURT: Did the National Criminal whatever also
[15] have terms and conditions limiting its use?

[16]     MS. GROSSMAN: It hasn't been made accessible to the
[17] public right now. That is under negotiations.

[18]     THE COURT: That's not an answer. When you gave them
[19] the data was it given certain limiting terms and conditions?
[20] Did the city say I will give it to you but only if you do X, if
[21] you keep X, Y, Z confidential?

[22]     MS. GROSSMAN: Yes. I would have to know the exact
[23] terms, I don't know personally.

[24]     THE COURT: I'm asking you.

[25]     MS. GROSSMAN: I know it's all subject to federal law

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

**Page 25**

[1] and federal regulations about keeping a --

[2] THE COURT: Federal law and regulations is no problem.
[3] The plaintiffs don't intend to violate federal law and
[4] regulations either. Were there any terms other than obeying
[5] the law?

[6] MS. GROSSMAN: I would have to get back to you on
[7] that.

[8] THE COURT: It's not getting back to me. I think what
[9] Ms. Costello is also saying is we should produce the agreement.
[10] Whatever the limiting agreement is you had with Rand or the
[11] National Criminal Justice Archive, whatever limiting agreement
[12] the city had with the National Criminal Justice Archive or
[13] Rand, produce the agreements so the city can see what they
[14] agreed to -- sorry, so the plaintiffs can see what they agreed
[15] to.

[16] MS. COSTELLO: And your Honor, I had one other point,
[17] which is there is a strong public interest in making the data
[18] publicly available.

[19] THE COURT: But that's not being litigated in FOIA
[20] case in the state court?

[21] MS. COSTELLO: It is.

[22] THE COURT: So we don't need to do that twice.

[23] MS. COSTELLO: Well, your Honor, there is one point.

[24] THE COURT: Who's the plaintiff in the FOIA case?

[25] MS. COSTELLO: The New York Civil Liberties Union is

**Page 26**

[1] litigating that point.

[2] There is one point, which is that the UF 250 form,
[3] which is what the data is taken from, is a public document. We
[4] have it, it's attached to stipulation of settlement that was
[5] filed with the Court. Anybody can go on the Court file and
[6] pull it off. The NYPD probably makes it publically available.
[7] That information from the UF 250 form is put in the database.

[8] So really anybody on the street -- and I know that the
[9] Court dealt with this recently, especially Judge Francis, in
[10] the Republican National Convention protest cases -- anyone who
[11] witnesses a stop and frisk on the street -- I won't make myself
[12] a fact witness, but I will tell you the other day I stopped to
[13] witness the stop and frisk of a mentally ill person. I could
[14] tell you the names of the officers, the badge numbers, the
[15] location where the stop occurred, whether the individual was
[16] searched, whether or not a weapon was recovered. I could tell
[17] you everything that went into the database by standing in
[18] street for ten minutes.

[19] So the fact that the city counsel, if you actually --
[20] if the Court actually takes all of the information that has
[21] been made publicly available and looks at it, the
[22] information that is being publically disseminated through the
[23] city counsel primarily is most if not the vast majority of the
[24] information in the database. And so I don't think that it's
[25] nuclear secrets as to a location where a stop occurred.

**Page 27**

[1] Again, we're not talking about revealing any suspects'
[2] names, because obviously there are privacy concerns, but the
[3] other information that's contained in the database as to
[4] whether or not a weapon was recovered, whether or not the
[5] individual was frisked subject to the stop --

[6] THE COURT: That's right. I mean I must say I agree
[7] with you. I don't understand what portions -- I don't
[8] understand what portions the city feels need to be
[9] confidential.

[10] MS. COSTELLO: Well, we don't either, your Honor, and
[11] the reason why --

[12] THE COURT: Then you should be negotiating with each
[13] other. You should be able to come back with a list and say
[14] these are the fields they say should be kept confidential, now
[15] you should please rule, Judge. Because I'm getting
[16] generalities.

[17] Ms. Grossman, every time you stand up I'm getting
[18] generalities. I don't know what you are worrying about in that
[19] database. She's saying whether a gun was recovered or not,
[20] whether charges were brought or not, whether -- I don't know
[21] what you said, but you gave a number of examples, the location.
[22] She said none of this is confidential and the city counsel is
[23] releasing it all the time.

[24] And I don't want a double standard. Whatever has been
[25] done with other people the plaintiffs get here under the same

**Page 28**

[1] conditions, not tighter. If the city counsel is getting it or
[2] releasing it, the plaintiffs can have it too.

[3] So what areas -- what fields are you claiming need to
[4] be confidential?

[5] MS. GROSSMAN: For all the data -- if we're putting
[6] together a database that has personal identifying information.

[7] THE COURT: Don't go over what they already know
[8] about. They said personal identifying information they totally
[9] agree, under federal law they're not releasing. Go to
[10] something else.

[11] MS. GROSSMAN: The specific locations of the stops,
[12] the specific locations of the stops will reveal law enforcement
[13] techniques, employment tactics.

[14] THE COURT: But are other people releasing that?

[15] MS. GROSSMAN: No, not in the same way.

[16] MR. MOORE: That can't be true, Judge. They can't
[17] analyze whether there was racial profiling in the stops or
[18] frisks without knowing the location of the stop or frisk. They
[19] can't do it.

[20] THE COURT: I think the Court is suffering from a lack
[21] of candor here.

[22] MS. GROSSMAN: Your Honor, this is not -- first of
[23] all, what we're talking about is the Rand Corporation from
[24] 2006. We have already talked about 2006 that we are willing to
[25] turn over whatever it is in whichever format we can give over

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

---

Page 29

[1] to the plaintiffs.

[2]    THE COURT: I don't see any difference between '05,
[3] '06 and '07 in regards of need for confidentiality.  If it's
[4] not confidential in '06 there's no need for it to be
[5] confidential in '07.  We are splitting hairs and it's wasting
[6] my time.  I don't want this big motion practice when I don't
[7] need it.  I know the answer.  It's going to have to all be
[8] turned over and you'll have to justify any part that should be
[9] kept confidential.  That's the way protective orders work.  The
[10] burden is on the party that claims confidentiality.

[11]    MS. GROSSMAN: I understand that, your Honor.

[12]    THE COURT: Let's go.  We're wasting time.  There's no
[13] reason for this to last until July 15th.

[14]    MS. COSTELLO: And your Honor, this is the first in
[15] the defendant's responses and objections to our requests for
[16] production.  This was the first that we heard about a law
[17] enforcement privilege.  There's been no evidentiary —

[18]    THE COURT: It's waived.  It's waived.  It's waived.
[19] If this material was out there with the city counsel it's out
[20] there with Rand, it's out there with the National Criminal
[21] Justice Archives, and they're able to use it and put out
[22] reports and get it on Web sites.  It's waived.  I'm not having
[23] a double standard.  You don't have the ability to choose who
[24] you are going share your data with.  There's tons of law on
[25] this.

---

Page 30

[1]    MS. GROSSMAN: Well, your Honor, first of all, we're
[2] not talking about — usually the law on privilege has to do
[3] with the production to the other side.  We have no issue about
[4] producing this information to the plaintiff.

[5]    THE COURT: You keep saying that.

[6]    MS. GROSSMAN: That's right.  We're talking about a
[7] protective order, just protecting from disclosure to the
[8] public.

[9]    THE COURT: First of all, you do have issues about
[10] producing, but I don't know whether there's anything other then
[11] the pre-'04 material.  You have no problem on '04 to present?

[12]    MS. GROSSMAN: That's right.

[13]    THE COURT: Clarified that.  '04 to the present date,
[14] no problem with producing it all, it's just the terms of
[15] production.  Then as far as the pre-'04 period I see there's a
[16] basis for it being relevant and should be produced also.

[17]    So now we're left with the terms of conditions.  And I
[18] still say whatever other people were allowed to do, and I don't
[19] care that it was '06, there can't be a law enforcement
[20] privilege for '05 and '07 that didn't apply to '06.  If you
[21] have given away the location of those fields were not
[22] confidential in '06, they are not confidential for '05, '07,
[23] '04, '03, '08 or any other year.

[24]    MS. GROSSMAN: Your Honor, I will respectfully submit
[25] that in 2006 I understand where you would say that if you're

---

Page 31

[1] giving over the precise location where an officer stops
[2] someone —

[3]    THE COURT: You don't understand, Ms. Grossman, I said
[4] it.  If you have given over a location for '06 it's waived for
[5] every other year.  There's nothing that makes it a law
[6] enforcement privilege the theory of a location.  If it wasn't
[7] privileged in '06 it isn't privileged in any year, there's
[8] nothing about it that is it privileged, and that's my ruling.
[9] I will issue the order this afternoon in writing.  I don't need
[10] briefs.  If you gave it away in one year you give it away for
[11] every year.  There's no law enforcement privilege on the
[12] location.

[13]    Is any other field that you want confidential?

[14]    MS. GROSSMAN: Your Honor, on the specific locations
[15] how could they not be for a particular year when officers are
[16] deployed to a particular location and that fact comes out to
[17] the public?

[18]    THE COURT: Ms. Grossman, I'm not in debate school
[19] with you, I've ruled.  If it was given in '06 it's not
[20] privileged for any other year.  The location is not privileged.

[21]    Is there any other field you claim is privileged?

[22]    MS. GROSSMAN: Well, there's other than —

[23]    THE COURT: Tell me a field.  What other field is
[24] privileged, as far as you're concerned?

[25]    MS. GROSSMAN: That is exactly why we worked out a

---

Page 32

[1] briefing schedule.

[2]    THE COURT: I don't need the briefing.  Now I must
[3] have said this five — how many people in this room think I
[4] said this more than four times?  Come on, your lawyers back
[5] there, don't be shy.  They all think so.  I have said it and
[6] said it.  I'm not required to say the same thing to you five
[7] times, so read the transcript.  I'm not saying it again.

[8]    Is there any field other than location that you claim
[9] is confidential or in need of protection?

[10]    MS. GROSSMAN: Well, talking generalities about
[11] personal identifying information it comes down —

[12]    THE COURT: We have closed the subject of personal
[13] identifying information.  The plaintiffs know that's protected.
[14] They're not revealing that.

[15]    MS. GROSSMAN: There are narratives throughout,
[16] scattered throughout the entire database that has information
[17] about arrests, about arrest locations.

[18]    THE COURT: We just covered locations.

[19]    MS. GROSSMAN: But arrests.  I mean arrest information
[20] is protected by the Criminal Procedure Law.

[21]    THE COURT: Then the plaintiffs I'm sure agree with
[22] that because that reveals the name of the suspect that was
[23] arrested.

[24]    Right, Ms. Costello?  You don't think you could reveal
[25] the name of the suspect who was arrested.

---

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

---

**Page 33**

[1] MS. COSTELLO: No, your Honor.

[2] MS. GROSSMAN: Or the complaint number, if that

[3] information --

[4] THE COURT: I don't know.

[5] MS. GROSSMAN: And any identifying features or

[6] characteristics that are described about a person. This data

[7] is very hard to speak in the abstract, your Honor, without

[8] actually going into and looking at a sampling.

[9] THE COURT: But one of the features would be race.

[10] Surely the whole point of the lawsuit is the race. Surely they

[11] want to know black, Hispanic, white. I don't see anything

[12] confidential about that.

[13] MR. MOORE: Judge, the UF 250 form was revised as

[14] result of the Daniels litigation. There's now a check off that

[15] has several boxes to check off which identifies certain

[16] characteristics that the officer identified before they made

[17] the stop and frisk and that's basis for the stop and frisk.

[18] So I don't know how -- other than obviously the name

[19] of the person, we have agree to that, but anything else, it

[20] seems to me, is part of what led that particular officer to

[21] make a stop and frisk, and that goes to the reasonableness of

[22] that particular police action.

[23] THE COURT: I do not think the race of a person

[24] stopped is confidential. That's the whole point, to see

[25] whether there's a racial pattern here.

---

**Page 34**

[1] What about the complaint number? Ms. Grossman

[2] mentioned complaint a number.

[3] MS. GROSSMAN: Leads to other information.

[4] THE COURT: I understand.

[5] MR. MOORE: There would only be complaint number if it

[6] led to arrest. If it's not an arrest I don't think there would

[7] be complaint number, and that's a very small percentage. There

[8] would be a UF 250 a number, like a log number for the UF 250.

[9] I don't think that's what she's referring to.

[10] THE COURT: No, she said complaint number. You agree

[11] to keep that confidential?

[12] MR. MOORE: Yes.

[13] THE COURT: So the complaint number, the individual's

[14] name and personal identifying information, yes, but the race,

[15] no.

[16] MS. GROSSMAN: I understand that. Your Honor, in

[17] terms of the way the form is set up there are many narratives

[18] that call upon particular information, and they're scattered.

[19] It's not as clear as having a field that identified someone by

[20] race. The narratives have various entries. So all the

[21] narratives should be redacted or subject to protective order --

[22] subject to protective order. Let the plaintiffs look at the

[23] narratives so that we don't burden ourselves having to go

[24] through and figure out what is confidential, what is personal

[25] identifying and what is not. That seems to make sense.

---

**Page 35**

[1] THE COURT: To speed this along why wouldn't the

[2] plaintiffs accept that for now subject to the state court

[3] action that may reveal this all anyway, just that part. The

[4] narrative would be given to you in full, not redacted, but you

[5] agree to keep the narrative confidential unless and until the

[6] state court says under FOIA it's all out there anyway. We'll

[7] not have a double standard there either.

[8] Right, Ms. Grossman? Once the state court ruling is

[9] final, obviously it applies here.

[10] MS. COSTELLO: The problem --

[11] THE COURT: Ms. Grossman, isn't that right?

[12] MS. GROSSMAN: Your Honor, you're taking data that

[13] only the Court -- that case involves a particular year of data

[14] and it has different -- there are different issues. We're

[15] talking about data that goes into the Daniels world, we're

[16] talking about post Daniels. We had a protective order in

[17] Daniels, and the way this is playing out is it's like obvious

[18] it's taking away the impact of that particular protective order

[19] that we entered into and given over in reliance upon the

[20] protective order.

[21] THE COURT: But the world changed. It sounds like the

[22] city is giving this data to other recipients, and I have gone

[23] over and over that with you.

[24] Yes, Ms. Costello.

[25] MS. COSTELLO: Your Honor, I could give two examples.

---

**Page 36**

[1] One is that part of the narrative -- and again we're in open

[2] court so I don't want to talk about the data, but let's just

[3] say that hypothetically if a narrative says that the reason why

[4] we stopped this particular individual is because we got a

[5] report of an African-American suspect in a high crime area --

[6] the NYPD says this publicly all the time, the NYPD says this

[7] publicly in the Rand report -- why should we be hiding -- the

[8] NYPD be able to behind a protective order and not publicly be

[9] able to have that information reputed through factual

[10] information that is in the database?

[11] THE COURT: I don't follow what you just said.

[12] MS. COSTELLO: For example, the reason why a suspect

[13] is stopped because they're African-American in a high-crime

[14] neighborhood. The NYPD has put that out in the Rand report as

[15] one of the reasons why the majority of individuals are being

[16] stopped based on the basis of being African-American. If the

[17] NYPD is putting that information out there, that explanation as

[18] to their alleged articulated reasonable suspicion for stopping

[19] an individual, why should we not be able to publicly then

[20] refute that information and say no, actually this is

[21] pretextual, it's based on race. If they're selectively using

[22] these reasons and making them publicly available --

[23] THE COURT: I don't understand how your refutation is

[24] based on the narrative in the UF 250 database. That's what the

[25] lawsuit is about; some day there will be a trial and you'll

---

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

Page 37

[1] refute it and say it's pretextual. I don't know what that has
[2] to do with the narrative. The narrative said what you said,
[3] that I made the stop because there was an African-American in a
[4] high-crime area and it was after midnight and this and that and
[5] various other facts.

[6] **MS. COSTELLO:** But the NYPD waived any confidentiality
[7] by putting that in the Rand report and allowing Rand to use
[8] that.

[9] **THE COURT:** We have been over and over that. If it's
[10] in Rand you get it without limitation.

[11] **MS. COSTELLO:** Yes, your Honor, but Rand is only as to
[12] 2006. And what we're saying is there's — just as with the law
[13] enforcement privilege that your Honor talked about, there has
[14] been a waiver of any confidentiality that attaches to those
[15] descriptions related to the reasons to detain suspects or stop
[16] suspects because they have revealed it in 2006. If they
[17] revealed it in 2006 they should reveal it for every other year.

[18] **THE COURT:** I agree. I don't see any principal basis
[19] to distinguish 2006 from 2005 or 2007. So if Rand was able to
[20] use those narrative descriptions without redaction, then the
[21] same ruling here. These plaintiffs can use it for every year.
[22] Either it was privileged and needed protection or it wasn't
[23] privileged and didn't need protection. There's no distinction
[24] from year to year. She's right. If Rand was able to do that
[25] without limitation, so can plaintiffs. We have to see what

Page 38

[1] Rand was allowed to do and not allowed to do and what the
[2] Criminal Justice Archive was allowed and what the city counsel.
[3] So the real direction is to produce the three agreements or the
[4] three statements you made when you turned over the data to
[5] these other agencies or entities.

[6] **MS. COSTELLO:** Your Honor, there's one other issue,
[7] which is the 17 or so boxes that we had to turn over to the
[8] city, to the corporation counsel. Again we make the same
[9] argument, those documents include deposition transcripts,
[10] training manuals, all the same information that we intend to
[11] request in this case. It also includes the UF 250 data that we
[12] were required to give back. And also includes a tremendous
[13] amount of our work product, our consultations with experts. It
[14] includes a lot of information that defendants would otherwise
[15] not be able to see.

[16] **THE COURT:** No, I think she said as officers of the
[17] Court they're keeping them secret. They haven't looked through
[18] private work material.

[19] **MS. GROSSMAN:** No, your Honor.

[20] **MS. COSTELLO:** But the city is making the same
[21] argument to the relevance.

[22] **THE COURT:** I think it's a relevance argument. If
[23] they're wrong on relevance it comes back. If they're right on
[24] relevance something comes back. All I talked about so far
[25] today was the UF 250 data itself. I don't know what else is in

Page 39

[1] there, whether it could be relevant. I could see some argument
[2] on the database that you want to track whether things have
[3] changed or not changed; other of that information may not be
[4] relevant to this lawsuit in any way and maybe shouldn't go back
[5] to you.

[6] So that's a fair subject for briefing because a
[7] relevance objection could make some sense even though I don't
[8] see it as the UF 250 data itself. It may relate to the other
[9] information that you're talking about. All the work that went
[10] on in the Daniels case may or may not be relevant to this case.

[11] **MS. COSTELLO:** So your Honor, we will agree to brief
[12] that, and that's fine, but one issue is that we would like to
[13] know if we could have our work product back at this point,
[14] because some of it relates to the briefing and we need to be
[15] able to look at some of the notes that we made and things that
[16] we did in order to brief some of these issues. And also we
[17] have an index of the documents, but without necessarily looking
[18] at a deposition transcript I can't tell you exactly what — we
[19] knew it was stamped confidential and maybe pages 23 and 24
[20] related to UF 250 data, but we were under such a time frame and
[21] there was so much information we turned over 17 boxes or 14
[22] boxes. So we did it as quickly as possible, and so I can't
[23] exactly tell you when Mr. Smolka testified about X what exactly
[24] was he talking about and how that's relevant. We can make
[25] general arguments as to supervision and training.

Page 40

[1] **THE COURT:** I guess you'll have to do that because I
[2] don't know — otherwise we have got the horse before the cart
[3] or the cart before the horse or something. If they have to
[4] turn it over there's no need to brief the issue. I can't order
[5] that. You'll have to brief it as best you can. I don't know
[6] what is there, really, other than what you just said.

[7] Can I get a time frame from the city to when I am
[8] going to know the conditions under which material was produced
[9] to these three entities?

[10] **MS. GROSSMAN:** Could I let you know by Friday, your
[11] Honor?

[12] **THE COURT:** Yes.

[13] Well, my hope was that this lengthy conference would
[14] narrow the motion to compel. I don't know if it has at all.
[15] Has it? It should have somewhat. This is the plaintiffs'
[16] motion to compel, May 31st. Shouldn't this — there's no point
[17] briefing things they are willing to give you or that I ruled
[18] you're going to get.

[19] **MR. MOORE:** I think it narrowed the issues, Judge.
[20] We'll get a transcript.

[21] **THE COURT:** Also more meeting and conferring. Why
[22] were you talking to each other on Sunday?

[23] **MS. COSTELLO:** It's my fault.

[24] **MS. GROSSMAN:** We tried to communicate and we got
[25] e-mails responding to our attempts on Sunday.

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

Page 41

[1]  **MR. MOORE:** It was sent on Friday.
[2]  **THE COURT:** What?
[3]  **MS. COSTELLO:** It's my fault.
[4]  **THE COURT:** Can you have a meet and confer, please,
[5]  before I get this motion? Could we have one personal sit down
[6]  face to face?
[7]  **MS. COSTELLO:** Absolutely.
[8]  **THE COURT:** I mean it, well before May 31st, which
[9]  probably means this week, because today is May 19th. Would you
[10] schedule a meeting? You won't do anything once you leave the
[11] courtroom. What date can you meet with each other?
[12] **MS. GROSSMAN:** I think we can work it out.
[13] **THE COURT:** I'm not sure. What is good for you,
[14] Mr. Moore?
[15] **MR. MOORE:** Friday, Thursday.
[16] **THE COURT:** Friday might be good because that's when
[17] Ms. Grossman thinks she can get the information about what were
[18] the conditions under which the material was produced to three
[19] other entities.
[20] **MS. GROSSMAN:** Friday is not date that I'm available,
[21] but we could look at -- I think if we could work with our
[22] calendars --
[23] **THE COURT:** But the motion is due the 31st. Can you
[24] get the information by Thursday so they can meet with you
[25] Thursday?

Page 42

[1]  **MS. GROSSMAN:** We can get the information by Friday,
[2]  and we can get --
[3]  **THE COURT:** Can you get the information by Thursday?
[4]  Because you can't meet on Friday. Can you meet on Thursday
[5]  face to face?
[6]  **MS. GROSSMAN:** I personally can't meet, but --
[7]  **THE COURT:** You can't meet Thursday or Friday?
[8]  **MS. GROSSMAN:** Sorry, your Honor, Friday if I'm not
[9]  available to meet. I have counsel here who can meet with them
[10] on Friday, so we can --
[11] **THE COURT:** And you'll have the answers to those three
[12] entity questions, they'll know the terms and conditions.
[13] **MS. GROSSMAN:** On Friday?
[14] **THE COURT:** Yeah.
[15] **MS. GROSSMAN:** We're going to go back, immediately
[16] speak to our clients and try to get that information.
[17] **THE COURT:** So Friday you'll have a meeting. Do you
[18] want to have a time?
[19] **MR. MOORE:** How about 2:00 on Friday?
[20] **THE COURT:** 2:00 Friday. Their office?
[21] **MR. MOORE:** That's fine.
[22] **THE COURT:** That's fine, too.
[23] **MR. MOORE:** Center for Constitutional Rights.
[24] **THE COURT:** Their office.
[25] **MR. MOORE:** We can go to their office. I will go to

Page 43

[1]  their office. That way they don't have to bring the agreement
[2]  and risk it being revealed to the public on the way from their
[3]  office.
[4]  **THE COURT:** Ms. Donahue's office, 2:00.
[5]  Can we cut back on the schedule? Since this motion is
[6]  narrowed I can't imagine the city needs 30 days to respond to a
[7]  May 31st motion. It's too long. This thing should move. It's
[8]  all over the paper anyway. So May 31st looks like a Saturday.
[9]  That should be May 30th.
[10] So the moving papers will be May 30th, the response
[11] papers should be June 20th, and the reply papers should be
[12] July 7th -- no, I was wrong, July 2nd. July 2nd. So that's
[13] the new schedule. Whatever is left to brief, maybe there's
[14] going to be less, hopefully a lot less. You'll have this
[15] in-person meet and confer. Try to get the agreements, you
[16] heard what rulings I made here, hopefully the state court is
[17] going to move forward, we'll know a lot more and hopefully this
[18] will be a much more limited motion.
[19] Okay. We're set for today. Thanks.
[20]                     o0o

This Page Intentionally Left Blank

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

**0**

03 30:23
04 17:14;19:2,2;20:7;22:2,
2;30:11,13,23
05 29:2;30:20,22
06 24:3;29:3,4;30:19,20,
22;31:4,7,19
07 29:3,5;30:20,22
08 30:23

**1**

1 2:22
10 4:13
14 39:21
15 2:25
15th 29:13
17 38:7;39:21
18th 2:16
19th 41:9

**2**

2:00 42:19,20;43:4
2001 11:11
2004 18:3;19:8;21:1
2005 17:3;37:19
2006 5:8;6:7;7:6;12:15;
13:22;16:15;17:1,6;28:24,
24;30:25;37:12,16,17,19
2007 6:10;17:3;37:19
2008 11:11;21:1
20th 43:11
23 39:19
24 39:19
250 2:18,22;4:13;5:4;7:8;
11:9;18:20;26:2,7;33:13;
34:8,8;36:24;38:11,25;
39:8,20
2nd 43:12,12

**3**

30 43:6
30th 2:24;43:9,10
31 2:23
31st 40:16;41:8,23;43:7,8

**6**

6th 11:5

**7**

7th 43:12

**9**

98 18:16,17
99 18:16

**A**

abide 16:5,21
ability 29:23
able 8:16;9:6,8,15;11:20;
19:9;27:13;29:21;36:8,9,
19;37:19,24;38:15;39:15
Absolutely 41:7
abstract 33:7
accept 35:2
access 8:22;9:19;12:11,
19;16:12,12
accessible 10:2;24:16
accounting 11:7
acknowledged 4:10
action 8:18;33:22;35:3
actually 19:12;23:2;
26:19,20;33:8;36:20
address 17:4
admissible 17:16
admission 21:14;22:18;
23:3
admitted 22:17
advocates 16:12
African-American 36:5,
13,16;37:3
afternoon 31:9
again 5:10;32:7;36:1
Again 27:1;38:8
against 18:18
agencies 38:5
agree 14:7;23:8,13,14;
27:6;28:9;32:21;33:19;
34:10;35:5;37:18;39:11
agreed 2:19;15:5;19:9;
21:14;22:1,22;25:14,14
agreement 14:7;18:1,3,4;
21:18,20;26:2,7;33:13;
43:1
agreements 25:13;38:3;
43:15
ahead 7:1
alleged 36:18
allow 21:19
allowed 30:18;38:1,1,2
allowing 37:7
allows 9:23,25
along 13:24;35:1
always 14:24
amenable 8:1
amount 38:13
analysis 6:15
analyze 9:17;18:6;28:17
analyzing 18:16
anticipate 24:9
apologize 5:21
apparently 23:10;24:4,5
appeal 22:6
appealable 22:6,8
appear 8:16
applies 35:9
apply 30:20

approved 18:5
April 2:16
Archive 11:22;13:16,18;
15:15,23;16:10;24:12;
25:11,12;38:2
archived 16:10
Archives 14:5;29:21
area 36:5;37:4
areas 28:3
argument 20:5,6;22:10,
10;23:1;38:9,21,22;39:1
arguments 21:2;23:16,
19;39:25
around 2:13
arrangement 16:19
arrest 8:10;32:17,19;34:6,
6
arrested 32:23,25
arrests 32:17,19
article 4:7,12,15;5:2;6:1,
3;11:10,12
articles 4:4,6,18;11:3
articulated 36:18
aspects 8:5;12:7,14
assert 12:2
attach 15:21
attached 26:4
attaches 37:14
attempt 9:8
attempts 40:25
attorneys 5:14
audit 18:20
auditing 19:13
available 11:8,9;15:13,
17;25:18;26:6,21;36:22;
41:20;42:9
avoid 10:7,7
away 30:21;31:10,10;
35:18

**B**

back 3:19;7:4,17,22;8:21;
12:22;15:2,5;17:18,23;
18:16;21:4;24:1;25:6,8;
27:13;32:4;38:12,23,24;
39:4,13;42:15;43:5
bad 20:9
badge 26:14
barely 5:24
based 20:19;36:16,21,24
basis 19:8;30:16;33:17;
36:16;37:18
beginning 7:10
behind 36:8
best 4:22;22:10;40:5
better 20:15
big 4:12;18:9;29:6
bigger 3:17
black 33:11
both 2:19
boxes 33:15;38:7;39:21,
22

breakfast 7:20
brief 39:11,16;40:4,5;
43:13
briefing 32:1,2;39:6,14;
40:17
briefs 31:10
bring 43:1
bringing 8:21
broad 24:12
brought 27:20
burden 10:18;29:10;
34:23
burdening 10:7
Burma 4:18
busy 4:16

**C**

calendars 41:22
call 19:5;34:18
calls 9:3
can 6:20;9:9,18;11:24,25;
16:3,10,12;22:11,18,20;
23:14;25:13,14;26:5;28:2,
25;37:21,25;39:24;40:5;
41:11,12,17,24;42:1,2,9,
10,25
Can 40:7;41:4,23;42:3,4;
43:5
candor 28:21
care 30:19
cart 40:2,3
case 9:15,16,18;10:21;
11:15;15:3;17:21,22;19:24;
20:18;22:5,13;23:1;25:20,
24;35:13;38:11;39:10,10
cases 17:17;26:10
caveat 24:13
Center 42:23
certain 8:5;9:4;12:14,15,
18,21;13:2,22;15:25;18:18;
19:9;20:25;21:14;23:5;
24:3,5,19;33:15
certified 8:18;9:7,12
cetera 8:11
chambers 2:13
chance 16:24
change 21:23;22:22
changed 22:15;35:21;
39:3,3
changes 22:21
characteristics 33:6,16
charges 20:7;27:20
Charney 2:4
CHARNEY 2:5
check 33:14,15
checked 11:23
China 4:18
choose 11:20;29:23
city 7:23;11:10,10,25;
12:6,17,25;13:4,13,25;
14:14;18:19;19:9,10,12,21;
21:22;22:16;23:21;24:20;

25:12,13;26:19,23;27:8,22;
28:1;29:19;35:22;38:2,8,
20;40:7;43:6
City 12:18
city's 18:24
Civil 25:25
claim 31:21;32:8
claiming 28:3
claims 17:17;29:10
Clarified 30:13
class 8:17;9:7,11
clear 34:19
clerk 2:14
clients 42:16
closed 17:22;32:12
Code 16:1
colorable 22:14
coming 16:23
communicate 40:24
communication 15:15
companies 15:16
compare 21:7,24
compel 2:23;40:14,16
complaint 33:2;34:1,2,5,
7,10,13
complete 5:1
concern 14:9
concerned 31:24
concerns 14:6;27:2
concluded 17:21
conclusion 21:19
conditions 24:3,6,8,15,
19;28:1;30:17;40:8;41:18;
42:12
conduct 23:5
confer 5:11;41:4;43:15
conference 2:17;40:13
conferred 2:19
conferring 40:21
confidential 8:9,24;
24:21;27:9,14,22;28:4;
29:4,5,9;30:22;32:23;31:13;
32:9;33:12,24;34:11,24;
35:5;39:19
confidentiality 12:16;
14:6,7;15:20,25;20:3;
23:21;29:3,10;37:6,14
confused 6:25
confusion 6:24
connection 7:9;9:24;
17:5;22:2
consider 2:16;8:13
constitution 22:17
Constitutional 42:23
constrictions 19:11
consultations 38:13
contact 8:25;9:6,8
contained 27:3
continued 18:11
Convention 26:10
convinced 2:13
copies 3:13
copy 13:2

Min-U-Script®

corporation 38:8
Corporation 6:4;11:22;
  12:16;14:4;15:14,18;24:9;
  28:23
Costello 2:1;11:2;25:9;
  32:24;35:24
COSTELLO 2:2;3:7,13;
  11:3,13,16;13:16,19;15:12;
  16:7;23:12,19;24:7;25:16,
  21,23,25;27:10;29:14;33:1;
  35:10,25;36:12;37:6,11;
  38:6,20;39:11;40:23;41:3,7
counsel 2:19;11:10;
  12:17,18,25;13:4,13;14:15;
  16:19;24:7;26:19,23;27:22;
  28:1;29:19;38:2,8;42:9.
course 22:13
court 10:24;16:24;21:16;
  22:5;25:20;35:2,6,8;36:2;
  43:16
Court 3:14;8:2,22;10:7,
  25;20:16,22;26:5,5,9,20;
  28:20;35:13;38:17
COURT 3:1,3,6,9,12;3:8,
  16,25;4:3,8,16;5:2,12,14,
  18,20,23;6:5,12,18,25;7:4,
  7,10,13,19;8:6,19;9:1,5,25;
  10:3,9,15,21;11:1,12,14,
  24;12:9,12,17,20,24;13:4,
  9,17,20,24;14:10,14,23;
  15:2,5;16:5,13;17:2,7,11,
  24;18:5,25;19:4,6,15;20:1,
  5,14;21:6,21;22:3;23:6,18,
  23;24:14,18,24;25:2,8,19,
  22,24;27:6,12;28:7,14,20;
  29:2,12,18;30:5,9,13;31:3,
  18,23;32:2,12,18,21;33:4,
  9,23;34:4,10,13;35:1,11,
  21;36:11,23;37:9,18;38:16,
  22;40:1,12,21;41:2,4,8,13,
  16,23;42:3,7,11,14,17,20,
  22,24;43:4
courtesy 3:13
courtroom 41:11
courts 10:16
covered 32:18
created 22:22
crime 36:5
Crime 14:15
Criminal 11:22;13:16,17;
  15:15,22;16:9;24:11,14;
  25:11,12;29:20;32:20;38:2
current 17:19
cut 43:5

D

Daniels 8:21;15:3;17:5,
  13,19;18:15;19:5,12,24;
  33:14;35:15,16,17;39:10
data 2:22;5:5,7;6:6,7,13,
  19,22,22,23;7:2,6,11,13,
  17,21,22;8:8;9:16,16,17;

11:9,11;12:18;13:23;14:22,
  25,25;15:1,7,19;17:1,1,3,5,
  6,7,8,18,18;18:25;19:3,4,5,8,
  10,13,15,18,25;20:6,8,12,
  20,21,21;1,4,7,8,11,24,25;
  22:9,15,23;23:4,7,8,17;
  24:19;25:17;26:3;28:5;
  29:24;33:6;35:12,13,15,22;
  36:2;38:4,11,25;39:8,20
database 4:13,24;5:4,6;
  7:8;8:5,17,23;11:21;12:1,5,
  8,9,13,15,19;15:20,21;
  16:9;18:16,20,20;23:22,25;
  24:1,2;26:7,17,24;27:3,19;
  28:6;32:16;36:10,24;39:2
date 30:41:11,20
dated 17:6
day 26:12;36:25
days 4:13;43:6
deal 3:4;17:1;18:9
dealt 26:9
debate 31:18
December 5:8;19:1
decisions 10:8;20:23
declaration 18:17
decree 19:12
defendants 2:19,20,23;
  11:19;38:14
defendant's 3:14;29:15
defense 4:23;24:7
define 17:11
demanding 15:6
demonstrates 21:11
Department 15:24
deployed 31:16
deposition 38:9;39:18
described 33:6
describing 4:24;5:4
descriptions 37:15,20
detail 5:5
details 12:22
detain 37:15
determined 20:18
difference 29:2
different 14:10;19:16;
  35:14,14
direction 38:3
disagree 22:3,3
disclose 11:21;12:1,4;
  23:23
disclosed 12:5,13;13:10;
  23:22
disclosure 8:14;24:12;
  30:7
disclosures 15:16;23:13,
  21
discoverable 17:15
discovery 6:8;9:17,21;
  17:16,20;19:16;22:7,24
Discovery 22:24
disposed 17:21;21:18
dispute 23:9
disseminated 26:22

distinction 37:23
distinguish 37:19
document 2:18,21;3:13;
  26:3
documents 15:13;38:9;
  39:17
Donahue 2:9
Donahue's 43:4
done 18:23;27:25
double 27:24;29:23;35:7
down 9:7;32:11;41:5
drawn 5:5
due 12:10;23:12;41:23
during 9:21

E

either 25:4;27:10;35:7
Either 37:22
else 6:21;7:14,15;13:15;
  14:16;15:10,11;28:10;
  33:19;38:25
e-mails 40:25
employment 28:13
ends 5:9
enforcement 28:12;
  29:17;30:19;31:6,11;37:13
enormous 3:4
enter 11:18
entered 18:4;19:7;21:13,
  18;35:19
entire 15:18;16:9;32:13,
  18
entities 14:18;38:5;40:9;
  41:19
entitled 6:21;15:7
entity 42:12
entries 34:20
equally 14:8
error 18:8
especially 16:25;26:9
essentially 5:25
et 8:11
evaluate 19:10
even 6:12;16:21;18:11;
  20:15;39:7
event 4:21;5:23
events 9:10;16:17
eventually 9:2,6
everybody 3:11;7:14,15;
  15:11
Everybody 3:10,17
evidence 17:16
evidentiary 29:17
exact 24:22
exactly 31:25;39:18,23,23
examined 15:12
example 15:18;36:12
examples 27:21;35:25
Except 17:24
excerpted 13:22
excerpts 12:15
excess 16:14
exist 8:1

experts 38:13
explanation 36:17
extent 15:13

F

face 41:6,6;42:5,5
fact 18:21,22;19:3,20;
  20:17;22:22;23:20;26:12,
  19;31:16
facts 37:5
factual 36:9
failed 19:19
fair 39:6
fall 6:9
familiar 6:1,16
far 5:24;6:2;30:15;31:24;
  38:24
faster 2:12
fault 40:23;41:3
features 33:5
February 19:8;22:2
federal 15:23;16:1;24:25;
  25:1,3;28:9
Federal 16:1;25:2
feels 12:1;27:8
few 23:19
field 31:13,21,23,23;32:8;
  34:19
fields 12:21;13:3;27:14;
  28:3;30:21
fight 22:4
figure 34:24
file 2:22,23,24;26:5
filed 26:5
final 35:9
fine 39:12;42:21,22
first 8:12;11:11;13:10;
  16:23;28:22;29:14,16;30:1
First 9:11;14:10,11;30:9
five 19:24;32:3,6
focus 10:6
FOIA 10:10,10,13;25:19,
  24;35:6
follow 36:11
following 2:20
forever 17:23
forget 18:16
form 26:2,7;33:13;34:17
format 13:6,13;14:1;
  23:24;28:25.
forward 9:14;17:4;18:23;
  43:17
found 18:8;22:7
four 32:4
frame 39:20;40:7
Francis 26:9
Franklin 2:7
FRANKLIN 2:8
free 21:7
Friday 40:10;41:1,5,16,
  20;42:1,4,7,8,10,13,17,19,
  20

frisk 26:11,13;28:18;
  33:17,17,21
frisked 27:5
frisks 20:19,19;28:18
front 2:15;4:12
full 4:17;11:21;12:8,9,13;
  35:4
fully 10:23;11:25;12:5;
  21:15,18

G

gave 12:25;13:13,21,22,
  25;14:14;23:24,25;24:4,4,
  5,18;27:21;31:10
general 39:25
generalities 27:16,18;
  32:10
gets 13:5;20:9
given 15:10,19;24:19;
  30:21;31:4,19;35:4,19
Given 8:23
giving 16:9;31:1;35:22
goes 17:18;18:14,23;
  33:21;35:15
good 2:9,10,10;5:12;
  22:10;41:13,16
Good 2:3,5,6,8;5:16,17
Grossman 2:9;3:22;5:24;
  12:5;13:20;27:17;31:3,18;
  34:1;35:8,11;41:17
GROSSMAN 3:23;4:2,5,
  15,25;5:7,13;6:3,6,14,23;
  7:2,6,8,12,16,21;8:7,20;
  9:2,7;10:1,4,12,16;12:3;12:7,
  10,14,18,21;13:2,7,22;
  14:3,13,20,24;15:4;16:15;
  17:3,8,13;18:2;20:23;21:9;
  22:1;24:16,22,25;25:6;
  28:5,11,15,22;29:11;30:1,
  6,12,24;31:14,22,25;32:10,
  15,19;33:2,5;34:3,16;
  35:12;38:19;40:10,24;
  41:12,20;42:1,6,8,13,15
guess 40:1
gun 27:19

H

hairs 29:5
half 3:3
hand 3:16;9:20
happen 20:4
happened 18:6,7
happens 9:21
happy 12:22
hard 13:2;33:7
Hazan 2:10;4:9
HAZAN 2:11
hear 5:14
heard 12:2;16:23;22:10;
  23:10;29:16;43:16
hearing 17:24

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

help 19:2
hiding 36:7
high 36:5
high-crime 36:13;37:4
Hispanic 33:11
Honor 2:2,5;3:7,23;4:25;
5:7,13;7:16;10:13;11:3,4,
19;12:10;13:7,23;14:3;
15:4,12;20:23;23:12;25:16,
23;27:10;28:22;29:11,14;
30:1,24;31:14;33:1,7;
34:16;35:12,25;37:11,13;
38:6,19;39:11;40:11;42:8
hope 14:20;40:13
hopefully 43:14,16,17
horizontal 4:11
horse 40:2,3
hundreds 4:18
hypothetically 36:3

**I**

idea 5:12;21:6
identical 16:14
identified 33:16;34:19
identifies 33:15
identifying 7:25;11:17;
16:2,8,22;23:15;28:6,8;
32:11,13;33:5;34:14,25
ill 26:13
imagine 43:6
immediately 14:1;42:15
impact 35:18
improve 21:23
improvement 19:18,21;
21:3,4
improves 20:8
incident 20:18
include 38:9
includes 38:11,12,14
including 8:9;11:21
increased 18:11
index 39:17
indicated 16:21
individual 8:10;26:15;
27:5;36:4,19
individuals 8:23,25;
16:11;36:15
individual's 34:13
information 5:9;6:9,11;
7:25;8:10,14,15,24;9:20,
23;10:1;11:7,9,18;12:21;
14:4,5;15:17;16:2,3,3,8,22;
17:21;23:15,24;26:7,20,22,
24;27:3;28:6,8;30:4;32:11,
13,16,19;33:3;34:3,14,18;
36:9,10,17,20;38:10,14;
39:3,9,21;41:17,24;42:1,3,
16
in-person 43:15
intend 25:3;38:10
intent 18:14,24
interest 11:14;25:17

interesting 4:18;10:11,
12;11:1
into 11:18;18:4;19:7,11;
21:13,16,18;26:17;33:8;
35:15,19
introduce 22:20;23:2
investigate 21:20
involved 9:3
involves 35:13
Island 5:22
issue 3:17;8:15;9:12;
11:17;14:13,17,22;16:17;
17:23;21:15,20,21;23:17;
30:3;31:9;38:6;39:12;40:4
issued 6:4,9;15:14
issues 10:17;20:16;
21:18;24:11;30:9;35:14;
39:16;40:19

**J**

January 17:14;19:1,8
judge 10:25;22:5
Judge 26:9;27:15;28:16;
33:13;40:19
judicata 22:14
July 29:13;43:12,12,12
June 2:24,25;43:11
jury 23:9
Justice 11:22;13:16,18;
15:15,22,24;16:9;24:11;
25:11,12;29:21;38:2
justify 29:8

**K**

keep 3:4;24:21;30:5;
34:11;35:5
keeping 25:1;38:17
kept 27:14;29:9
key 9:14
kind 4:9;12:3;19:13,16
knew 39:19
knowing 28:18
knows 4:12

**L**

lack 21:4;28:20
last 4:8,13;5:8;29:13
late 5:21,23
Late 5:14
later 2:23;20:18
law 24:25;25:2,3,5;28:9,
12;29:16,24;30:2,19;31:5,
11;37:12
Law 32:20
lawsuit 7:9;15:6;21:5,15;
33:10;36:25;39:4
lawyers 3:9,19;5:3;32:4
lead 2:17;17:16
Leads 34:3
learned 8:12

least 3:10;5:15;8:5;22:14
leave 41:10
led 18:17,18;33:20;34:6
left 14:17,19;30:17;43:13
lengthy 40:13
less 4:17;18:10;43:14,14
letter 2:15,16
liability 23:3
Liberties 25:25
likely 17:16
limit 8:13
limitation 37:10,25
limited 6:18;43:18
limiting 24:15,19;25:10,
11
limits 9:9
list 27:13
listed 8:17,23
litigate 9:18;17:23
litigated 10:17;21:16,19;
25:19
litigating 26:1
litigation 7:3;9:20,24;
10:6,7,14,18,18;17:6,9,12,
19,20;18:15;24:10;33:14
live 17:20;22:6
location 26:15;25;27:21;
28:18;30:21;31:1,4,6,12;
16,20;32:8
locations 8:11,11;28:11,
12;31:14;32:17,18
log 34:8
long 19:24;22:19;43:7
longer 22:4
look 9:16;19:9;20:25;
21:1;34:22;39:15;41:21
Look 11:24
looked 2:13;20:24;38:17
looking 33:8;39:17
looks 26:21;43:8
lose 2:14;22:4
lost 2:14
lot 4:19;9:10;38:14;43:14,
17

**M**

magistrate 9:3
majority 26:23;36:15
makes 3:4;6:3;10:6;23:1;
26:6;31:5
making 9:2;10:10;25:17;
36:22;38:20
manuals 38:10
many 8:21;32:3;34:17
material 29:19;30:11;
38:18;40:8;41:18
matter 8:21;22:16
may 4:22;5:11;7:25;8:20;
24:10;35:3;39:3,8,10,10
May 2:22,23;11:5;40:16;
41:8,9;43:7,8,9,10
maybe 4:13;39:4,19;

43:13
mean 10:3;14:21;22:23;
27:6;32:19;41:8
means 41:9
meant 10:4
meet 41:4,11,24;42:4,4,6,
7,9,9;43:15
meeting 40:21;41:10;
42:17
members 16:11
mentally 26:13
mention 10:12
mentioned 13:15;34:2
midnight 37:4
might 8:7,7,13;10:24;
17:18,25;41:16
minutes 26:18
misspeak 12:23
misspoke 10:4
mm-hmm 4:10
moment 8:5
Monell 17:19
month 18:8
months 3:4
Moore 5:15;18:13;41:14
MOORE 5:17,19,21;
18:14;19:3;5,7,20;20:2,11,
15;23:1;28:16;33:13;34:5,
12;40:19;41:1,15;42:19,21,
23,25
more 4:17;14:25;32:4;
40:21;43:17,18
morning 2:3,5,6,8,9,10,
10;3:12;5:16,17;7:20;16:23
most 11:4;26:23
motion 2:22;8:6;29:6;
40:14,16;41:5,23;43:5,7,18
move 9:17;43:7,17
moving 9:14;17:4;43:10
much 20:11;22:4;39:21;
43:18
must 4:14;27:6;32:2
myself 5:23;26:11

**N**

name 32:22,25;33:18;
34:14
names 2:12;26:14;27:2
narrative 35:4,5;36:1,3,
24;37:2,2,20
narratives 32:15;34:17,
20,21,23
narrow 40:14
narrowed 40:19;43:6
National 11:22;13:16,17;
14:5,15;15:15;16:9;24:11,
14;25:11,12;26:10;29:20
nature 8:24
necessarily 39:17
need 10:18;19:9,15;21:3;
25:22;27:8;28:3;29:3,4,7;
31:9;32:2,9;37:23;39:14;

43:13
mean 10:3;14:21;22:23;

43:13

40:4
needed 37:22
needs 43:6
negotiating 27:12
negotiations 24:17
neighborhood 36:14
new 6:11;15:6;20:5,6,20;
43:13
New 3:5,6,10,21,23,25;
4:6,25;5:25;6:20;7:14;
10:9,16,24;11:5,6,7;25:25
no-brainer 14:2
nod 4:11,11
none 18:21;27:22
notes 39:15
nuclear 26:25
number 16:20;27:21;
33:2;34:1,2,5,7,8,8,10,13
numbers 26:14
NYPD 16:8;26:6;36:6,6,8,
14,17;37:6

**O**

o0o 43:20
obeying 25:4
objection 39:7
objections 2:21;3:14;
29:15
obvious 20:8;35:17
obviously 19:19;27:2;
33:18;35:9
occurred 26:15,25
off 26:6;33:14,15
office 42:20,24,25;43:1,3,
4
officer 31:1;33:16,20
officers 8:10;26:14;
31:15;38:16
old 20:20
once 22:16;41:10
Once 35:8
one 2:15;3:20;4:22;5:11,
15;6:25;8:19;11:4;18:6;
25:16,23;26:2;31:10;33:9;
36:15;38:6;39:12;41:5
One 19:23;22:14;23:19;
36:1
ongoing 21:1
online 15:23
only 2:15,25;6:25;12:15;
13:22;14:17,19;15:24;
19:16;23:10,14;24:3,13,20;
34:5;35:13;37:11
open 36:1
opposed 4:11
opposition 2:24
order 7:18,24;8:4,9,13;
9:18,22;10:19;11:16,18;
12:16,24;15:8;16:20,22;
20:3;22:7;23:15,17;30:7;
31:9;34:21,22;35:16,18,20;
36:8;39:16;40:4

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

**ordering** 12:24
**orders** 29:9
**ordinance** 11:10
**others** 12:1;13:11;25;
14:12
**otherwise** 18:7;38:14;
40:2
**ourselves** 34:23
**out** 7:14;8:15,16;9:10,12;
10:10;16:19,25;19:23;
22:13;29:19,19,20,21;
31:16,25;34:24;35:6,17;
36:14,17;41:12
**outside** 12:6;13:25
**over** 3:4,9;7:20,22;14:22,
25;17:9;22:19;23:5;28:7,
25,25;29:8;31:1,4;35:19,
23,23;37:9,9;38:4,7;39:21;
40:4;43:8
**overstate** 24:4

**P**

**page** 4:12
**pages** 39:19
**paper** 2:25;3:12;4:17,20;
43:8
**papers** 10:8,23;43:10,11,
11
**part** 8:7;29:8;33:20;35:3;
36:1
**particular** 10:25;31:15,
16;33:20,22;34:18;35:13,
18;36:4
**parties** 17:20
**party** 29:10
**past** 4:6;6:16
**pattern** 17:19;21:12,17;
22:19;23:5;33:25
**pending** 10:13,24
**people** 4:19;6:19;8:17;
9:6,9;12:2,6;27:25;28:14;
30:18;32:3
**percent** 20:25
**percentage** 34:7
**period** 7:3;17:9,12;20:12;
21:3;22:19;20:23;5:30:15
**person** 5:18;26:13;33:6,
19,23
**personal** 11:17;16:2,7;
23:15;28:6,8;32:11,12;
34:14,24;41:5
**personally** 24:23;42:6
**phone** 9:2
**pick** 11:20;12:3
**piece** 2:25
**place** 7:25;8:25;9:10
**places** 14:16
**plaintiff** 7:23;9:22;14:9;
21:13;25:24;30:4
**plaintiffs** 2:18,22,24;6:8,
12,15,21;8:1,3,12,16,25;
9:15;10:5,20;12:19;13:1,5,

12,14,25;14:17;16:16,24;
17:10,25;21:2,10;25:3,14;
27:25;28:2;29:12;32:13,21;
34:22;35:2;37:21,25
**Plaintiffs** 7:22
**plaintiffs'** 2:21;3:9,18;
16:18;40:15
**playing** 35:17
**please** 27:15;41:4
**point** 8:18;9:11;19:20,23;
20:10,11;21:24;22:11;
25:16,23;26:1,2;33:10,24;
39:13;40:16
**police** 33:22
**policy** 18:18
**portions** 12:15;27:7,8
**position** 8:8;11:19;15:8;
17:7,15
**possession** 19:25
**possible** 39:22
**possibly** 17:15
**post** 19:18;21:1,7,24;
35:16
**postdated** 18:2
**practice** 17:19;21:12,17;
29:6
**pre-'04** 30:11,15
**pre-2004** 21:11
**Pre-2004** 19:6
**precise** 31:1
**pre-data** 19:17
**predated** 19:1,2;20:6
**predates** 17:13;21:6
**prejudice** 9:22;10:5;14:9
**premature** 9:13
**present** 30:11,13
**presettlement** 21:7,24
**press** 7:19,21;10:11;
16:11
**pretextual** 36:21;37:1
**prevents** 10:3,5
**primarily** 26:23
**principal** 37:18
**prior** 17:6;21:5
**privacy** 27:2
**private** 8:23;38:18
**privilege** 13:11;29:17;
30:2;20;31:6,11;37:13
**privileged** 31:7,7,8,20,
20,21,24;37:22,23
**privileges** 12:3
**probably** 16:25;26:6;41:9
**problem** 3:9;6:1;7:23;
15:9;16:16;25:2;30:11,14;
35:10
**problems** 3:18
**Procedure** 32:20
**procedures** 8:24
**produce** 9:23;12:25;
14:11;25:9,13;38:3
**produced** 14:12;30:16;
40:8;41:18
**producing** 30:4,10,14

**product** 38:13;39:13
**production** 14:18;29:16;
30:3,15
**profile** 20:20
**profiling** 18:18;28:17
**program** 15:24
**proof** 18:7
**proposed** 2:20
**protect** 16:22
**protected** 32:13,20
**protecting** 30:7
**protection** 32:9;37:22,23
**protective** 7:18,24;8:4,9,
13;9:18,22;10:19;11:13,16,
18;14:8;15:8;16:20,22;
23:15,17;29:9;30:7;34:21,
22;35:16,18,20;36:8
**Protective** 7:19
**protest** 26:10
**prove** 18:11;19:2;21:23
**provided** 12:16;14:4,5
**provisions** 16:1
**public** 8:14;9:19;10:1;
11:6;15:13;16:4;24:17;
25:17;26:3;30:8;31:17;
43:2
**publically** 26:6,22
**publicly** 15:17;25:18;
26:21;36:6,7,8,19,22
**publish** 9:23
**published** 11:5;15:18
**pull** 26:6
**pursuant** 11:10
**put** 8:25;16:10;26:7;
29:21;36:14
**putative** 8:19
**putting** 28:5;36:17;37:7

**Q**

**quarter** 11:11
**quickly** 39:22

**R**

**race** 33:9,10,23;34:14,20;
36:21
**racial** 18:18;28:17;33:25
**Rand** 6:4,10,14,17,19;
7:14;11:21;12:16;14:4,15;
15:14,18;23:22,24,25;24:1,
4,9;25:10,13;28:23;29:20;
36:7,14;37:7,7,10,11,19,
24;38:1
**random** 20:25
**rarely** 22:7
**rate** 18:9,10
**raw** 7:21;15:19
**reach** 8:16
**read** 4:15,17,19,22,23;5:3;
7:20;11:14;32:7
**reading** 3:5,6,8,25;4:4
**reads** 3:11

**real** 38:3
**really** 4:21;12:2;23:6;
26:8;40:6
**reason** 10:18;20:3;22:9;
27:11;29:13;36:3,12
**reasonable** 36:18
**reasonableness** 33:21
**reasonably** 17:16
**reasons** 36:15,22;37:15
**recall** 8:20
**received** 8:3
**recent** 11:4
**recently** 26:9
**recipients** 35:22
**record** 4:10
**recorded** 20:17
**recovered** 26:16;27:4,19
**recycled** 5:8
**redacted** 34:21;35:4
**redaction** 37:20
**reference** 6:4,10
**referenced** 6:6,11
**referring** 14:4;34:9
**refers** 11:11
**refutation** 36:23
**refute** 36:20;37:1
**regard** 24:12
**regards** 29:3
**regulations** 25:1,2,4
**Regulations** 16:1
**relate** 21:20;39:8
**related** 6:9;24:10;37:15;
39:20
**relates** 2:25;39:14
**relation** 7:3
**releasing** 27:23;28:2,9,14
**relevance** 20:5;22:10,11;
38:21,22,23,24;39:7
**relevant** 7:2;9:16;17:8,11,
18;20:7,15;22:14;30:16;
39:1,4,10,24
**reliance** 35:19
**relitigating** 21:21
**remember** 11:12;17:24
**reply** 2:24;43:11
**report** 6:4,9,10,17;12:22;
15:19;36:5,7;14;37:7
**reporters** 3:10
**reports** 29:22
**representation** 14:21
**representations** 6:16
**Republican** 26:10
**reputed** 36:9
**request** 2:21;3:14;10:13;
38:11
**requests** 2:18;10:10;
29:15
**required** 15:25;32:6;
38:12
**requirements** 15:23
**requiring** 9:22
**res** 22:16
**researchers** 16:11

**resolved** 21:15
**respect** 12:10;18:24;
19:10;23:12;24:7
**respectfully** 30:24
**respond** 43:6
**responding** 40:25
**response** 43:10
**responses** 29:15
**responsibilities** 18:19
**rest** 23:17
**restrictions** 8:22;16:6
**result** 18:15;33:14
**returned** 7:9
**returning** 7:23
**reused** 5:9
**reveal** 28:12;32:24;35:3;
37:17
**revealed** 37:16,17;43:2
**revealing** 27:1;32:14
**reveals** 32:22
**review** 10:8;18:20
**reviewed** 15:23
**revised** 33:13
**right** 2:13;7:12;13:24;
15:4;18:2;21:12;22:12;
24:17;27:6;30:6,12;35:11;
37:24;38:23
**Right** 9:1;10:4;32:24;35:8
**Rights** 42:23
**risk** 43:2
**road** 9:8
**room** 5:15;23:9,11;32:3
**Rossan** 2:10
**rule** 27:15
**ruled** 31:19;40:17
**ruling** 22:6;31:8;35:8;
37:21
**rulings** 43:16

**S**

**same** 3:5;6:21;7:6;14:1,7,
18;15:6,10,22;16:5,12,13;
20:9,14;23:24,24;27:25;
28:15;32:6;37:21;38:8,10,
20
**sampling** 20:25;33:8
**Saturday** 43:8
**saying** 7:13,16,17;13:12;
18:25;22:16;25:9;27:19;
30:5;32:7;37:12
**scattered** 32:16;34:18
**schedule** 2:20;3:3;32:1;
41:10;43:5,13
**school** 31:18
**searched** 26:16
**secret** 38:17
**secrets** 26:25
**seeking** 6:8;17:4,5;23:4
**seems** 3:10,18;7:14;11:6;
20:7,21;33:20;34:25
**selectively** 36:21
**sense** 10:7;34:25;39:7

DAVID FLOYD LALIT CLARKSON, v.
THE CITY OF NEW YORK, et al.,

May 19, 2008

sent 41:1
series 4:4
serious 8:22
serve 2:20
served 2:18
set 21:1;34:17;43:19
sets 15:1
settled 18:10
settlement 17:14,22;
18:1;20:6,10,12;21:6,7,22,
25;22:20;23:3;26:4
several 23:16;33:15
share 29:24
shared 17:21
shorter 22:19
show 4:10;19:18;22:19,
22,24
showed 18:9
shown 19:21
shows 19:3;20:12;23:4
shy 32:5
side 30:3
sides 2:19
significant 20:21
similar 11:15
simple 12:24
sit 23:9;41:5
site 6:14;16:10
sites 29:22
six 19:24
small 34:7
Smolka 39:23
solve 8:6,7
somebody 10:10
someone 31:2;34:19
somewhat 40:15
sorry 13:20;25:14
Sorry 42:8
sort 16:19
sorts 9:23
sounds 11:15;35:21
speak 3:19;12:6;13:12;
16:18,24;33:7;42:16
specific 28:11,12;31:14
speed 13:24;35:1
splitting 29:5
stage 14:11
stages 14:11
stampeded 39:19
stand 27:17
standard 27:24;29:23;
35:7
standing 26:17
start 7:10
starting 5:24
state 25:20;35:2,6,8;43:16
State 10:16,25
statements 38:4
Staten 5:22
statistical 15:19
statistics 5:5;14:15;20:24
status 10:21
statutes 16:2

stayed 20:14
stays 20:9
steps 9:4,5,21;15,22;22:1
stick 9:20
still 11:19;18:22;30:18
stipulate 18:12
stipulation 17:14,22;
18:15;19:7;21:22;23:2;
26:4
stop 8:11;26:11,13,15,25;
27:5;28:18;33:17,17,21;
37:3,15
stopped 8:10;26:12;
33:24;36:4,13,16
stopping 36:18
stops 18:8,10,11;20:17,
19,19;22:23;28:11,12,17;
31:1
story 10:11
street 26:8,11,18
strong 25:17
studies 22:15
subject 7:17,24;8:9;9:17;
14:5,17;21:5;24:25;27:5;
32:12;34:21,22;35:2;39:6
submissions 2:14
submit 30:24
submitted 10:24
subpoena 15:14;24:10
subpoenaed 24:9
suffering 28:20
summary 6:15,18,22
Sunday 8:3,8,12;16:20;
23:10;40:22,25
supervision 19:14;39:25
suppose 19:17
sure 2:16;4:5;6:25;32:21;
41:13
surely 6:20;7:13
Surely 33:10,10
suspect 32:22,25;36:5,12
suspected 5:13
suspects 37:15,16
suspects' 27:1
suspicion 20:19;36:18
system 22:5

**T**

tactics 28:13
talk 3:2,16;4:22;6:20;23:9;
36:2
talked 28:24;37:13;38:24
talking 4:12;5:3;6:7;11:8;
18:21;27:1;28:23;30:2,6;
32:10;35:15,16;39:9,24;
40:22
team 4:23;5:3
techniques 28:13
ten 17:18;18:8,9;26:18
terms 8:4,22;10:20;11:8;
14:18;15:11;20:2;23:7,8,
13;24:3,5,8,15,19,23;25:4;

30:14,17;34:17;42:12
testified 39:23
Thanks 43:19
theory 22:14;31:6
therefore 3:11
though 8:2;39:7
thought 17:24
thousands 4:18
three 5:3;14:16;38:3,4;
40:9;41:18;42:11
throughout 32:15,16
Thursday 41:15,24,25;
42:3,4,7
tighter 28:1
times 32:4,7
Times 3:5,6,11,21,24;4:1,
6;5:1,25;6:20;7:15;10:9;
11:5,6,7
today 6:10;38:25;41:9;
43:19
today's 2:17
together 28:6
tons 29:24
took 18:19
totally 28:8
track 39:2
train 18:20
training 19:13;38:10;
39:25
transcript 32:7;39:18;
40:20
transcripts 38:9
tremendous 38:12
trial 21:10;22:25;36:25
tried 16:18;40:24
trouble 4:9
true 15:22;28:16
True 6:5;7:10
try 42:16
Try 43:15
trying 6:19;23:4
turn 7:4;14:22,24;17:9;
18:13;28:25;38:7;40:4
turned 7:22,22;29:8;38:4;
39:21
turning 3:9
twice 25:22
two 3:3;14:10;24:2;35:25
type 16:2

**U**

UF 2:18,21;4:13;5:4;7:8;
11:9;18:20;26:2,7;33:13;
34:8,8;36:24;38:11,25;
39:8,20
unconstitutional 21:12,
17
under 10:10;12:16;15:10;
23:7;24:3,17;27:25;28:9;
35:6;39:20;40:8;41:18
understood 11:25
unfortunate 16:17

Union 25:25
unless 18:12;35:5
unlike 17:17
unredacted 15:20;23:22,
25,25;24:2
up 2:17;3:16;5:9;8:8;
20:17,20;22:23;27:17;
34:17
up-and-down 4:11
upon 18:19;19:8;20:19;
34:18;35:19
use 8:15;21:10;22:18;
23:7;24:15;29:21;37:7,20,
21
used 19:13;20:2
useful 19:17
using 15:19;36:21
usually 30:2

**V**

various 12:3;34:20;37:5
vast 26:23
venue 10:14
violate 20:2;25:3
violated 22:17
violating 18:24
violation 18:5,8,12,12
violations 17:25

**W**

waived 29:18,18,18,22;
31:4;37:6
waiver 23:20;37:14
waives 15:20
wants 18:13
wasting 29:5,12
way 14:21;20:8,17;22:4;
28:15;29:9;34:17;35:17;
39:4;43:1,2
weapon 26:16;27:4
Web 6:14;16:10;29:22
week 4:8,13;41:9
whatnot 4:19
what's 3:8,18;5:25;15:8
What's 10:21;23:8
whenever 20:24
whichever 28:25
white 33:11
whole 4:8;33:10,24
Who's 25:24
Whose 19:4
willing 8:4;10:19;11:17;
14:7,21,24;15:9;16:5,21;
17:9;23:8;28:24;40:17
withheld 16:3
withhold 22:9
within 13:11
without 24:12;28:18;33:7;
37:10,20,25;39:17
witness 26:12,13
witnesses 26:11

word 5:14;8:3
work 4:17;8:4,15;9:9,15;
10:19;11:5;22:11,13;29:9;
38:13,18;39:9,13;41:12,21
worked 9:4;16:25;31:25
working 16:19
works 22:5
world 3:17;13:11;35:15,
21
worry 9:18
worrying 23:6;27:18
worse 20:9,13
worth 22:21
writing 31:9
written 20:24
wrong 38:23;43:12
wrongdoing 21:14

**Y**

year 4:6;18:17;24:5;
30:23;31:5,7,10,11,15,20;
35:13;37:17,21,24,24
years 8:21;17:18;18:15;
19:24
York 3:5,6,11,21,24,25;
4:6;5:1,25;6:20;7:15;10:9,
16,24;11:5,6,7;25:25

EXHIBIT 5

By Order of the Court, this exhibit has been filed under seal.

EXHIBIT 6

By Order of the Court, this exhibit has been filed under seal.

EXHIBIT 7

By Order of the Court, this exhibit has been filed under seal.

EXHIBIT 8

By Order of the Court, this exhibit has been filed under seal.

EXHIBIT 9

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY
PRESENT:    HON. MARYLIN G. DIAMOND    PART 48
*Justice*

---

Matter of NEW YORK CIVIL LIBERTIES UNION,

                    Petitioner,

For a Judgment pursuant to Article 78 of
The Civil Practice Law and Rules,

            -against-

NEW YORK CITY POLICE DEPARTMENT
and RAYMOND KELLY, in his official capacity as
Commissioner of the New York City Police
Department,

                    Respondents.

INDEX NO. 115154/07

MOTION DATE

MOTION SEQ. NO. 001

MOTION CAL. NO.

**FILED**

MAY 29 2008

COUNTY CLERK'S OFFICE
NEW YORK

---

Cross-Motion:    [X] Yes    [ ] No

**Upon the foregoing papers, it is ordered that:** In this article 78 proceeding, the petitioner seeks review of the denial by the respondents New York City Police Department ("NYPD") and Raymond Kelly, as the NYPD Commissioner, of its request, made under the Freedom of Information Law ("FOIL") (Public Officers Law, article 6) for a copy of a database that contains information about approximately 850,000 police stops of civilians made since January 1, 2006. In lieu of an answer, the respondents have cross-moved to dismiss the petition for failure to state a cause of action, essentially arguing, as they would have in an answer, that the petition is without merit.

The petitioner alleges that officers of the NYPD who forcibly stop and/or search civilians are required to record information about those encounters on a worksheet known as a "Stop and Frisk Report Worksheet" or UF-250. The forms detail various aspects of the forcible stop, including the race and gender of the individual stopped and the reason for the stop. Also included in the report is identifying information about the officer who made the stop. In March, 2006, the NYPD directed that all of the information from the forms be entered into a centralized database.

On July 25, 2007, the petitioner New York Civil Liberties Union ("NYCLU") submitted a FOIL request to the NYPD for "the complete NYPD database of information entered from stop-and-frisk worksheets for 2006, for the first two quarters of 2007, and for any calender year prior to 2006 for which data exists in electronic form." The request specifically excluded any "individually identifiable information or other private individual information that may be in the database: the name of the person stopped, the street address of the person stopped, and the tax ID number of the officer who completed the form." On August 31, 2007, the NYPD denied the request for the release of the database, stating only that "Your request for data is denied on the basis of NY Public Officers Law sections 87(2)(a); 87(2)(b); 87(2)(e); 87(2)(f); 87(2)(i); and 89(2)." No further explanation for the denial was provided.

The NYCLU's subsequent administrative appeal of this decision was denied in a letter, dated October 15, 2007, which merely repeated the list of allegedly applicable statutory exemptions that had been previously cited in the NYPD's August 31, 2007 letter of denial and, in addition, briefly explained the

nature of each such exemption. The statutes relied on were (1) Public Officers Law § 87(2)(a), which exempts from disclosure records whose disclosure is otherwise barred by statute; (2) Public Officers Law §§ 87(2)(b) and 89(2), which exempt from disclosure records whose disclosure would create an unwarranted invasion of personal privacy; (3) Public Officers Law § 87(2)(e), which exempts from disclosure records which are compiled for law enforcement purposes and which, if disclosed, would: (i) interfere with law enforcement investigations or judicial proceedings, (ii) deprive a person of a right to a fair trial or impartial adjudication, (iii) identify a confidential source or disclose confidential information relating to a criminal investigation or (iv) reveal criminal investigative techniques or procedures, except routine techniques and procedures; (4) Public Officers Law § 87(2)(f), which exempts from disclosure records whose disclosure could endanger the life or safety of a person; and (5) Public Officers Law § 87(2)(i), which exempts from disclosure records which, if disclosed, would jeopardize an agency's capacity to guarantee the security of its information technology assets, such assets encompassing both electronic information systems and infrastructures.

This proceeding then followed. In the petition, the NYCLU argues that the NYPD has never provided it with any explanation as to how the cited statutes exempt the stop-and-frisk database from disclosure. It seeks an order directing the NYPD to furnish it with a copy of the requested database.

**Discussion**

It is well settled that government records, including police records, are presumptively open for public inspection and copying unless they fall within one of the exemptions of Public Officers Law § 87 (2). *See Matter of Gould v. New York City Police Department*, 89 NY2d 267, 274-275 (1996). In order to ensure that the public has maximum access to government documents, the "exemptions are to be narrowly construed , with the burden resting on the agency to demonstrate that the required material indeed qualifies for exemption." *Matter of Hanig v. State of New York Dept. Of Motor Vehicles*, 79 NY2d 106, 109 (1992). To invoke one of the exemptions contained in section 87(2), the NYPD must articulate "particularized and specific" justifications for not disclosing requested documents and, if appropriate and necessary to determine whether the withheld documents fall entirely within the scope of the asserted exceptions, the court can conduct an in camera inspection of representative documents and order the disclosure of all non-exempt material, appropriately redacted. *See Matter of Gould v. New York City Police Department*, 89 NY2d at 275.

Here, in its denial letter and in its rejection of the petitioner's appeal, the NYPD invoked six exemptions but failed to provide any explanation, much less a particularized and specific justification, as to why any of them was applicable to the stop-and-frisk report database. On its motion to dismiss, the NYPD now argues, as its sole justification for the denial of petitioner's FOIL request, that the release of the information in the report would provide the means by which an individual who wishes to inflict harm upon a particular officer could plot out the exact location of the officer at a given time based on the information contained in the database. According to the NYPD, the release of the database would create a danger to the safety of the officers conducting the stops and its refusal to provide the database was thus justified under Public Officers Law §§ 87(2)(e) and 87(2)(f).

The problem with this argument is that the NYPD does not address the feasability of turning over the requested database with a redaction of the names and personal information of the police officers. As already noted, where a document contains both confidential and non-confidential material, a court may, consistent with FOIL, order its disclosure subject to a redaction of personal information necessary to protect a person's safety and/or prevent an unwarranted invasion of personal privacy. *See, e.g., Data Tree LLC v. Romaine*, 9 NY3d 454, 464 (2007); *Beyah v. Goord*, 309 AD2d 1049, 1050-53 (3rd Dept. 2003). *See also Matter of Gould v. New York City Police Department*, 89 NY2d at 277. Indeed, the record before the court indicates that the NYPD has, in fact, provided copies of the database to at least two other outside

organizations, the RAND corporation and a research institute located at the University of Michigan. The NYPD has not offered any reason why the petitioner should be denied access to the same database which it has already shared with other outside organizations. With proper redaction of personal information concerning the officers who made the stop and/or the individuals stopped, the records are clearly subject to FOIL disclosure and the NYPD has not met its burden to show that the database falls squarely within the claimed exemptions.

Accordingly, the respondents' motion to dismiss is denied and the petition is hereby granted to the extent that, within 60 days of service of a copy of this order with notice of entry, the NYPD shall furnish the petitioner with a copy of the requested database in electronic form, with the exception of the names and addresses of the persons forcibly stopped and the names, addresses and tax ID numbers of the officers who made the stops and/or completed the form, which shall be redacted prior to disclosure. Since no purpose would be served by the respondents' submission of an answer, judgment may be entered without the service and filing of such a pleading. *See Matter of Nassau BOCES Central Council of Teachers v. Board of Cooperative Educational Services of Nassau County*, 63 NY2d 100, 104 (1984); *Matter of Kane v. New York State Dept. Of Correction*, 21 AD2d 919, 920 (3rd Dept. 1964).

The Clerk Shall Enter Judgment Herein

Dated: 5/7/08



**MARYLIN G. DIAMOND,** *J.S.C.*

Check one: [X] **FINAL DISPOSITION**    [ ] **NON-FINAL DISPOSITION**

FILED

MAY 29 2008

COUNTY CLERK'S OFFICE
NEW YORK

EXHIBIT 10A



Safety and Justice

A RAND INFRASTRUCTURE, SAFETY, AND ENVIRONMENT PROGRAM

THE ARTS
CHILD POLICY
CIVIL JUSTICE
EDUCATION
ENERGY AND ENVIRONMENT
HEALTH AND HEALTH CARE
INTERNATIONAL AFFAIRS
NATIONAL SECURITY
POPULATION AND AGING
PUBLIC SAFETY
SCIENCE AND TECHNOLOGY
SUBSTANCE ABUSE
TERRORISM AND
HOMELAND SECURITY
TRANSPORTATION AND
INFRASTRUCTURE
WORKFORCE AND WORKPLACE

This PDF document was made available from www.rand.org as a public service of the RAND Corporation.

Jump down to document ▼

The RAND Corporation is a nonprofit research organization providing objective analysis and effective solutions that address the challenges facing the public and private sectors around the world.

## Support RAND

Browse Books & Publications

Make a charitable contribution

## For More Information

Visit RAND at www.rand.org

Explore RAND Safety and Justice Program

View document details

## Limited Electronic Distribution Rights

This document and trademark(s) contained herein are protected by law as indicated in a notice appearing later in this work. This electronic representation of RAND intellectual property is provided for non-commercial use only. Unauthorized posting of RAND PDFs to a non-RAND Web site is prohibited. RAND PDFs are protected under copyright law. Permission is required from RAND to reproduce, or reuse in another form, any of our research documents for commercial use. For information on reprint and linking permissions, please see RAND Permissions.

This product is part of the RAND Corporation technical report series. Reports may include research findings on a specific topic that is limited in scope; present discussions of the methodology employed in research; provide literature reviews, survey instruments, modeling exercises, guidelines for practitioners and research professionals, and supporting documentation; or deliver preliminary findings. All RAND reports undergo rigorous peer review to ensure that they meet high standards for research quality and objectivity.

TECHNICAL
REPORT

# Analysis of Racial Disparities in the New York Police Department's Stop, Question, and Frisk Practices

Greg Ridgeway

Sponsored by the New York City Police Foundation



Safety and Justice

A RAND INFRASTRUCTURE, SAFETY, AND ENVIRONMENT PROGRAM

The research described in this report was sponsored by the New York City Police Foundation and was conducted under the auspices of the Center on Quality Policing (CQP), part of the Safety and Justice Program within RAND Infrastructure, Safety, and Environment (ISE).

The RAND Corporation is a nonprofit research organization providing objective analysis and effective solutions that address the challenges facing the public and private sectors around the world. RAND's publications do not necessarily reflect the opinions of its research clients and sponsors.

**RAND®** is a registered trademark.

© Copyright 2007 RAND Corporation

All rights reserved. No part of this book may be reproduced in any form by any electronic or mechanical means (including photocopying, recording, or information storage and retrieval) without permission in writing from RAND.

Published 2007 by the RAND Corporation
1776 Main Street, P.O. Box 2138, Santa Monica, CA 90407-2138
1200 South Hayes Street, Arlington, VA 22202-5050
4570 Fifth Avenue, Suite 600, Pittsburgh, PA 15213-2665
RAND URL: http://www.rand.org
To order RAND documents or to obtain additional information, contact
Distribution Services: Telephone: (310) 451-7002;
Fax: (310) 451-6915; Email: order@rand.org

# Preface

In February 2007, the New York City Police Department (NYPD) released statistics that indicated that more than a half-million pedestrians had been stopped on suspicion of a crime in New York City in 2006. Almost 90 percent of the stops involved nonwhites. The department immediately faced questions regarding its stop, question, and frisk (SQF) patterns and practices. The department contacted the RAND Center on Quality Policing (CQP) to conduct an objective analysis of data collected in street encounters between the police and the public, and the New York City Police Foundation funded a project that began later that month.

This report documents the methods and findings from the RAND researchers' analysis of NYPD's SQF data. This report should be of interest to NYPD executives and command staff and New York City policymakers and community members. This report may also prove useful to residents and officials in other jurisdictions where similar practices are under consideration and similar issues are being confronted. Related RAND work that may be of interest to readers of this report includes the following:

- *Police-Community Relations in Cincinnati* (Riley et al., 2005)
- *Police-Community Relations in Cincinnati: Year Two Evaluation Report* (Ridgeway et al., 2006)
- *Testing for Racial Profiling in Traffic Stops From Behind a Veil of Darkness* (Grogger and Ridgeway, 2006)
- *Assessing the Effect of Race Bias in Post-Traffic Stop Outcomes Using Propensity Scores* (Ridgeway, 2006)
- *Race and the Decision to Seek the Death Penalty in Federal Cases* (Klein, Berk, and Hickman, 2006)
- *Police Personnel Challenges After September 11: Anticipating Expanded Duties and a Changing Labor Pool* (Raymond et al., 2005)
- *Assessing Racial Profiling More Credibly* (Ridgeway and Riley, 2004).

## The RAND Center on Quality Policing

This research was conducted under the auspices of the Center on Quality Policing (CQP), part of the Safety and Justice Program within RAND Infrastructure, Safety, and Environment (ISE). The center's mission is to help guide the efforts of police agencies to improve the efficiency, effectiveness, and fairness of their operations. The center's research and analysis focus on force planning (e.g., recruitment, retention, training), performance measurement, cost-

effective best practices, and use of technology, as well as issues in police-community relations. The mission of RAND Infrastructure, Safety, and Environment is to improve the development, operation, use, and protection of society's essential physical assets and natural resources and to enhance the related social assets of safety and security of individuals in transit and in their workplaces and communities. Safety and Justice Program research addresses occupational safety, transportation safety, food safety, and public safety including violence, policing, corrections, substance abuse, and public integrity.

Questions or comments about this report should be sent to the project leader, Greg Ridgeway (Greg_Ridgeway@rand.org). Information is available online about the Safety and Justice Program (http://www.rand.org/ise/safety) and the CQP (http://www.rand.org/ise/centers/quality_policing/). Inquiries about the CQP should be made to its associate director, Jeremy Wilson (Jeremy_Wilson@rand.org). Inquiries about research projects should be sent to the following address:

Greg Ridgeway, Acting Director
Safety and Justice Program, ISE
RAND Corporation
1776 Main Street
P.O. Box 2138
Santa Monica, CA 90407-2138
310-393-0411, x7734
Greg_Ridgeway@rand.org

# Contents

Preface ............................................................................................................ iii
Figures ........................................................................................................... vii
Tables ............................................................................................................. ix
Summary ......................................................................................................... xi
Acknowledgments ........................................................................................ xvii
Abbreviations ................................................................................................ xix

CHAPTER ONE
**Introduction: Review of the New York City Police Department's Stop, Question, and
Frisk Policy and Practices** .......................................................................... 1
Introduction ................................................................................................... 1
Levels of Police-Initiated Contacts Between Police and Citizens in New York State ... 2
    Level 1: Request for Information ................................................................... 2
    Level 2: Common-Law Right of Inquiry ....................................................... 2
    Level 3: Stop, Question, and Frisk ................................................................ 2
    Level 4: Arrest .............................................................................................. 2
Training of Officers on Stop, Question, and Frisk Policies ................................ 3

CHAPTER TWO
**Description of the 2006 Stop, Question, and Frisk Data** ................................... 7

CHAPTER THREE
**External Benchmarking for the Decision to Stop** ........................................... 13
Summary ....................................................................................................... 13
Introduction .................................................................................................. 14
Residential Census ......................................................................................... 16
Arrests in 2005 .............................................................................................. 18
Crime-Suspect Descriptions ........................................................................... 19
Conclusions ................................................................................................... 19

CHAPTER FOUR
**Internal Benchmarking for the Decision to Stop** ........................................... 21
Summary ....................................................................................................... 21
Introduction .................................................................................................. 22
Methods ........................................................................................................ 26
Results ........................................................................................................... 30
Conclusions ................................................................................................... 30

**CHAPTER FIVE**
**Analysis of Post-Stop Outcomes** ................................................................. 31
Summary ........................................................................................................... 31
Introduction ..................................................................................................... 32
Methods ............................................................................................................ 35
Results .............................................................................................................. 40
Analysis of Hit Rates ....................................................................................... 42
Conclusions ...................................................................................................... 42

**CHAPTER SIX**
**Conclusions and Recommendations** ............................................................ 43
Conclusions ...................................................................................................... 43
Recommendations ............................................................................................ 44
   Officers Should Clearly Explain to Pedestrians Why They Are Being Stopped .............. 44
   The NYPD Should Review the Boroughs with the Largest Racial Disparities in Stop
      Outcomes ................................................................................................... 44
   The UF250 Should Be Revised to Capture Data on Use of Force ......................... 45
   New Officers Should Be Fully Conversant with Stop, Question, and Frisk Documentation
      Policies ....................................................................................................... 45
   The NYPD Should Consider Modifying the Audits of the UF250 ......................... 45
   NYPD Should Identify, Flag, and Investigate Officers with Out-of-the-Ordinary Stop
      Patterns ...................................................................................................... 46

**APPENDIXES**
A. **Details of Statistical Models Used in the External-Benchmark Analysis** ............ 47
B. **Details of Propensity-Score Weighting** .................................................... 49
C. **Estimating False Discovery Rates** ............................................................ 51
D. **Unified Form 250: Stop, Question, and Frisk Report Worksheet** ................. 53

**References** ....................................................................................................... 57

# Figures

2.1.  Stops per 1,000 People (estimated daytime population) ........................................ 7

2.2.  Seven Most Common Suspected Crimes Reported as Reason for the Stop, by Race ...... 8

3.1.  Comparison of Stop Rates to Seven External Benchmarks................................. 18

4.1.  Maps of the Sample Officer's Stops and of Similarly Situated Stops Made by
      Other Officers......................................................................... 23

4.2.  Distribution of 2,756 Officer-Level Analyses ............................................ 27

# Tables

2.1.   Frequency of Suspected Crimes and Recovery Rates of Contraband for Frisked or
       Searched Suspects, by Race................................................................. 11

3.1.   Results of a Residential-Census Benchmark Analysis.................................. 14

4.1.   Construction of an Internal Benchmark for a Sample Officer .......................... 24

4.2.   Comparison of the Percentage of Stops for a Particular Suspected Crime for the
       Sample Officer and the Officer's Internal Benchmark ................................... 25

4.3.   Internal-Benchmark Analysis for Stop Rates of Black Suspects........................ 28

4.4.   Internal-Benchmark Analysis for Stop Rates of Hispanic Suspects .................... 29

4.5.   Internal-Benchmark Analysis for Stop Rates of Hispanic Suspects, Excluding
       Stops Based on Suspect Descriptions or Calls for Service ............................... 29

5.1.   Distribution of Stop Features, by Race, for Manhattan South............................ 33

5.2.   Comparison of Stop Outcomes for White Pedestrians with Those for Nonwhite
       Pedestrians Who Are Similarly Situated to the Stopped White Pedestrians .............. 36

5.3.   Comparison of Stop Outcomes for Black Pedestrians with Those for Pedestrians of
       Other Races Who Are Similarly Situated to the Stopped Black Pedestrians.............. 38

5.4.   Hypothetical Example of a Hit-Rate Analysis ............................................. 41

5.5.   Frisked or Searched Suspects Found Having Contraband or Weapons.................... 42

## Summary

In 2006, the New York City Police Department (NYPD) was involved in a half-million encounters with pedestrians who were stopped because of suspected criminal involvement. Raw statistics for these encounters suggest large racial disparities—89 percent of the stops involved nonwhites. Fifty-three percent of the stops involved black suspects, 29 percent Hispanic, 11 percent white, and 3 percent Asian, and race was unknown for the remaining 4 percent of the stops. Forty-five percent of black and Hispanic suspects were frisked, compared with 29 percent of white suspects; yet, when frisked, white suspects were 70 percent likelier than black suspects to have had a weapon on them.

These figures raise critical questions: first, whether they point to racial bias in police officers' decisions to stop particular pedestrians, and, further, whether they indicate that officers are particularly intrusive when stopping nonwhites.

Seeking answers, the NYPD turned to RAND to help it gain a clearer understanding of this issue and identify recommendations for addressing potential problems identified in the analysis. To examine the issue, RAND researchers analyzed data on all street encounters between NYPD officers and pedestrians in 2006, more than 500,000 stops that officers documented in SQF report worksheets (NYPD Unified Form 250 or UF250; see Appendix D for a reproduction).

RAND researchers conducted three types of analysis. First, we compared the racial distribution of stops to a variety of benchmarks. This process, commonly referred to as *external benchmarking*, attempts to construct what the racial distribution of the stopped pedestrians would have been if officers' stop decisions had been racially unbiased. Constructing valid external benchmarks is a difficult task, since it involves assessing the racial composition of those participating in criminal activity and the racial composition of those exposed to the patrolling officers. Both the rates of criminal participation and police exposure are challenging to estimate. We completed analyses using several candidate benchmarks, each of which has strengths and weaknesses for providing plausible external benchmarks. For example, residential census data—that is, the racial distribution of the general population in New York—possibly provide an estimate of the racial distribution of those exposed to police but do not reflect rates of criminal participation. As a result, external benchmarks based on the census have been widely discredited. The racial distribution of arrestees has been proposed as a more reliable benchmark. A more promising external benchmark is the racial distribution of individuals identified in crime-suspect descriptions, though this benchmark also has serious pitfalls.

Second, we compared each individual officer's stopping patterns with a benchmark constructed from stops in similar circumstances made by other officers. This process, known as

*internal benchmarking*, avoids the primary limitations of external benchmarking and is useful for flagging officers who are substantially overstopping nonwhites compared to their peers.

Third, we examined the outcomes of stops, assessing whether stopped white and non-white suspects have different rates of frisks, searches, uses of force, and arrests.

The results from these three analyses are described in more detail in the chapters that follow.

It is worth noting that most of the report focuses on comparisons between stops involving black, Hispanic, and white suspects. Concerns of racial bias also pertain to other racial groups and ethnic subgroups, such as those from Asia. Asians represent 3 percent of all stops, a relatively small proportion. However, and unfortunately, statistical analysis is unreliable under those circumstances.

## Results of External-Benchmarking Analysis

Evaluating racial disparities in pedestrian stops using external benchmarks is highly sensitive to the choice of benchmark. Therefore, analyses based on any of the external benchmarks developed to date are questionable.

Benchmarks based on crime-suspect descriptions may provide a good measure of the rates of participation in certain types of crimes by race, but being a valid benchmark requires that suspects, regardless of race, are equally exposed to police officers.

We found that black pedestrians were stopped at a rate that is 20 to 30 percent lower than their representation in crime-suspect descriptions. Hispanic pedestrians were stopped disproportionately more, by 5 to 10 percent, than their representation among crime-suspect descriptions would predict.

We provide comparisons with several other benchmarks to demonstrate the sensitivity of external benchmarking. The arrest benchmark has been featured prominently in previous analyses of NYPD stop patterns (Spitzer, 1999; Gelman, Fagan, and Kiss, 2007). However, arrests may not accurately reflect the types of suspicious activity that officers might observe, arrests can occur far from where the crime occurred, and, since police make both the arrests and the stops, the arrest benchmark is not independent of any biases that officers might have.

Black pedestrians were stopped at nearly the same rate as their representation among arrestees would suggest. Hispanic suspects appear to be stopped at a rate slightly higher (6 percent higher) than their representation among arrestees.

The most widely used, but least reliable, benchmark is the residential census. Census benchmarks do not account for differential rates of crime participation by race or for differential exposure to the police. Comparisons to the residential census are not suitable for assessing racial bias.

Black pedestrians were stopped at a rate that is 50 percent greater than their representation in the residential census. The stop rate for Hispanic pedestrians equaled their residential-census representation.

## Results of Internal-Benchmarking Analysis

This analysis compared the racial distribution of each officer's stops to a benchmark racial distribution constructed to match the officer's stops on time, place, and several other stop features. This analysis found the following:

- Five officers appear to have stopped substantially more black suspects than other officers did when patrolling the same areas, at the same times, and with the same assignment. Nine officers stopped substantially fewer black suspects than expected.
- Ten officers appear to have stopped substantially more Hispanic suspects than other officers did when patrolling the same areas, at the same times, and with the same assignment. Four officers stopped substantially fewer Hispanic suspects than expected.
- Six of the 15 flagged officers are from the Queens South borough.

To put these findings into perspective, the analysis flagged 0.5 percent of the 2,756 NYPD officers most active in pedestrian-stop activity. Those 2,756 most active officers, about 7 percent of the total number of officers, accounted for 54 percent of the total number of 2006 stops. The remaining stops were made by another 15,855 officers, for whom an accurate internal benchmark could not be constructed, mostly because they conducted too few stops. While the data suggest that only a small fraction of the officers most active in pedestrian stops may be outliers, the stops made by the 15,855 that we could not analyze may still be of concern.

## Results of Outcome Analysis

If there is race bias in the behavior of the 15,000-plus officers whose individual behavior we could not analyze with the internal benchmark, it may still reveal itself in the patterns of stop outcomes—that is, post-stop frisks, searches, uses of force, and arrests. Therefore we analyzed the outcomes of police stops. Our analysis found the following:

- Officers frisked white suspects slightly less frequently than they did *similarly situated* nonwhites (29 percent of stops versus 33 percent of stops). Black suspects are slightly likelier to have been frisked than white suspects stopped in circumstances similar to the black suspects (46 percent versus 42 percent). While there is a gap, this difference is much smaller than what the aggregate statistics indicated.
- The rates of searches were nearly equal across racial groups, between 6 and 7 percent. However, in Staten Island, the rate of searching nonwhite suspects was significantly greater than that of searching white suspects.
- White suspects were slightly likelier to be issued a summons than were similarly situated nonwhite suspects (5.7 percent versus 5.2 percent). On the other hand, arrest rates for white suspects were slightly lower than those for similarly situated nonwhites (4.8 percent versus 5.1 percent).
- Officers were slightly less likely to use force against white suspects than they were to use it against similarly situated nonwhites (15 percent versus 16 percent); however, in Queens,

Brooklyn North, and the Bronx, there was no evidence that use-of-force rates varied across races.

- Officers recovered contraband (such as weapons, illegal drugs, or stolen property) in 6.4 percent of the stops of white suspects. The contraband recovery rate was 5.7 percent for similarly situated black suspects and 5.4 percent for similarly situated Hispanic suspects.

Overall, after adjustment for stop circumstances, we generally found small racial differences in the rates of frisk, search, use of force, and arrest. Nonwhites generally experienced slightly more intrusive stops, in terms of having more frequent frisks and searches, than did similarly situated white suspects. While most racial differences in post-stop outcomes were small, for some outcomes in some boroughs, the gaps warrant a closer review. For example, the Staten Island borough stands out particularly with several large racial gaps in the frisk rates (20 percent of whites versus 29 percent of similarly situated blacks), search rates (5 percent for whites versus 8 percent of similarly situated blacks), and use-of-force rates (10 percent for whites and 14 percent for similarly situated blacks).

The raw numbers on recovery rates for contraband indicated that frisked or searched white suspects were much likelier to have contraband than were black suspects. However, after accounting for several important factors, the disparity reduces sharply. The recovery rate for frisked or searched white suspects stopped in circumstances similar to those of black suspects was slightly greater than it was for black suspects (6.4 percent versus 5.7 percent). When considering only recovery rates of weapons, we found no differences by race. For every 1,000 frisks of black suspects, officers recovered seven weapons, and, for every 1,000 frisks of similarly situated white suspects, officers recovered eight weapons, a difference that is not statistically significant.

## Conclusions

The raw statistics cited in the first paragraph of this summary distort the magnitude and, at times, the existence of racially biased policing. For example, we found that there are some legitimate factors that explain much of the difference between the frisk rate of black suspects (45 percent) and the frisk rate of white suspects (29 percent). Some of those factors include police policies and practices that can legitimately differ by time, place, and reason for the stop. As a result, the raw statistics, while easy to compute, often exaggerate racial disparities. Any racial disparities in the data are cause for concern. However, accurately measuring the magnitude of the problem can help police management, elected officials, and community members decide between the need for incremental changes in policy, reporting, and oversight or sweeping organizational changes.

Our results using more precise benchmarks do not eliminate the observed racial disparities. However, they do indicate that the disparities are much smaller than the raw statistics would suggest. This result does not absolve the NYPD of the need to monitor the issue, but it also implies that a large-scale restructuring of NYPD SQF policies and procedures is unwarranted.

## Recommendations

Overall, we have six recommendations for NYPD to improve interactions between police and pedestrians during stops and to improve the accuracy of data collected during pedestrian stops.

### Officers Should Clearly Explain to Pedestrians Why They Are Being Stopped

In 90 percent of the stops, the detained individual is neither arrested nor issued a summons. To mitigate the discomfort of such interactions and to bolster community trust, officers should explain the reason for the stop, discuss specifically the suspect's manner that generated the suspicion, and offer the contact information of a supervisor or appropriate complaint authority, so that the person stopped can convey any positive or negative comments about the interaction. While the latter suggestion might increase the number of official complaints, it might also reduce the number of unofficial complaints that would otherwise circulate in the suspect's social network. For a trial period in select precincts, the NYPD could require that officers give an information card to those stopped pedestrians who are neither arrested nor issued a summons. An evaluation of the program could identify the kinds of stops likeliest to result in positive or negative feedback from the stopped pedestrians. Most important, ongoing communication and negotiation with the community about SQF activities are helpful in maintaining good police-community relations.

### The NYPD Should Review the Boroughs with the Largest Racial Disparities in Stop Outcomes

For most stop outcomes in most parts of the city, we found few, if any, racial differences in the rates of frisk, search, arrest, and use of force. However, for some particular subsets of stops, there are racial disparities, and, in some boroughs for some outcomes, the disparities are fairly large. In particular, there was evidence of large racial differences in frisk rates in several boroughs. For example, on Staten Island, officers frisked 20 percent of white suspects and 29 percent of similarly situated black suspects. Officers were likelier to use force of some kind against black suspects in Brooklyn South than they were to use it against similarly situated white suspects (29 percent versus 22 percent). However, the use-of-force finding on which we base this recommendation may be the result of incomplete details on the reason officers used force, the subject of the next recommendation. Regardless, a closer review of these outcomes in these boroughs may suggest changes in training, policies, or practices that can reduce these disparities.

### The UF250 Should Be Revised to Capture Data on Use of Force

All of the reported differences resulting from our analysis are potentially due to unobserved or unmeasured features of the stops rather than racial bias. For example, the 1 percent difference observed in rates of use of force between stops of white and nonwhite suspects may be due to a factor not recorded on the UF250. It is possible that nonwhite suspects were slightly likelier to attempt to flee or threaten officers. If the percentage of nonwhite-pedestrian stops in which the suspect resisted officers was 0.8 percent more than the frequency with which white suspects resisted officers, then, statistically, the frisk rates would be indistinguishable. However, these reasons—attempting to flee or resisting officers—are not recorded on the UF250. The UF250 was intended for investigative purposes and not for assessing officer performance or

racial disparities. For the data to be more useful for careful analysis of racial bias in use-of-force incidents, the reason for the use of force needs to be recorded.

## New Officers Should Be Fully Conversant with Stop, Question, and Frisk Documentation Policies

Officers with more than one year of experience seemed fully informed of the SQF practices and documentation policies. However, informal discussions with and observations of recent academy graduates indicated that some were not fully aware of the documentation policies and procedures, despite a substantial investment of time in the academy training curriculum on SQF. This is an issue that likely impacts a small fraction of stops. For the purposes of assessing racial bias, we do not find a need for investment to correct this, but, since data on UF250s are used in other facets of NYPD evaluation, some correction in training during new officers' initial days on the street might be in order, particularly for any evaluation of Operation Impact programs.

## NYPD Should Consider Modifying the Audits of the UF250

The NYPD has multiple layers of auditing to ensure that the UF250s are complete and contain valid and sufficiently detailed entries to each question. This does not address whether stops are occurring that are not documented. Since officers have an incentive to demonstrate productivity through UF250s, most stops should be documented. However, particularly problematic ones may not be. Radio communications could be monitored for a fixed period in a few randomly selected precincts. Notes of the times and places of street encounters that should have associated UF250s can be noted and requests made for the forms.

All of our analyses rely on the data that officers record on UF250s. The accuracy of the information on the forms, such as time, place, and reason for the stop, is assumed to be approximately correct for the purposes of our analyses. For inaccuracies to adversely affect our analyses, officers would have had to consistently record events differently for nonwhites than they did for white suspects. However, unless officers were carefully tabulating which actions they failed to report, the analyses in this report would interpret the patterns that would result as evidence of a disparity. For example, if officers consistently did not record frisks of nonwhite suspects, then our analysis would have found white suspects to be substantially overfrisked. There is no evidence of such general patterns. That said, in interpreting the findings of this study, we must offer the caveat that systematic misreporting of data on the UF250 could potentially distort the findings.

## NYPD Should Identify, Flag, and Investigate Officers with Out-of-the-Ordinary Stop Patterns

Our analysis indicates that the racial distribution of stops for several officers is skewed substantially from those of their colleagues. We recommend that the NYPD review these flagged officers and incorporate into their early warning system a component that flags officers with extreme deviations from their colleagues. These measured disparities are evidence that these officers differ substantially from their peers; however, they are not necessarily conclusive evidence that these officers practice racially biased policing. Supervisors may then investigate and address the disparities.

# Acknowledgments

I would like to thank Lorie Fridell, Paul Heaton, Jeremy Wilson, and Andrew Morral, who provided comments on drafts of this report, as well as David Adamson and Lisa Bernard who helped polish the final report. Although I benefited from these reviews, I alone remain responsible for errors and omissions in this analysis.

# Abbreviations

BJS      Bureau of Justice Statistics

CPW     criminal possession of a weapon

CQP     Center on Quality Policing

fdr       false discovery rate

GLA     grand larceny, auto

ICO      integrity control officer

NYPD    New York City Police Department

OLBS    Online Booking System

SQF     stop, question, and frisk

UF250   Unified Form 250

CHAPTER ONE

# Introduction: Review of the New York City Police Department's Stop, Question, and Frisk Policy and Practices

## Introduction

In February 2007, the New York City Police Department (NYPD) engaged the RAND Corporation to analyze data that NYPD officers had collected on stop, question, and frisk (SQF) forms (Unified Forms 250, or UF250s) to understand whether the data from stops documented in the forms indicated racial bias. The department provided NYPD identification cards permitting RAND researchers to freely enter police headquarters, provided access to NYPD officers and staff at all ranks, and furnished data that RAND requested. On March 11, 2007, RAND researchers received and began analyzing a data set of 506,491 UF250s (see Appendix D for a copy of the UF250), documenting street encounters that occurred in 2006. In addition, the researchers studied the training curriculum associated with the UF250, met with officers responsible for training other officers in their precincts,[1] and observed officers on the streets involved in SQF street encounters.[2] This report describes the SQF policies and procedures, documents our analysis of the UF250 data, and interprets the findings of the analysis.

An endless number of queries could be put to these data. The data can be sliced in many ways: by suspected crime, by borough, by stop outcome, and so on. We have crafted this report to focus on the main questions directed at the NYPD and the main questions that stakeholders in this process are likely to ask. In particular, we address whether the racial distribution of the stops suggests racial bias, whether certain officers seem to be disproportionately stopping nonwhites, and whether there are racial differences in the rates of frisk, search, recovery of contraband, use of force, and arrest.

All of these analyses examine general patterns, averages, and rates. Any findings that do not suggest racial bias are not intended to deny any individuals' personal experiences with NYPD officers. Even though, in some comparisons, we find no differences across the racial groups on average, this obviously does not imply that individuals always have pleasant experiences with the police or even that all encounters are bias free. These analyses are helpful in understanding whether the frisk that a nonwhite pedestrian in New York might have perceived to be unnecessary is part of a pattern at NYPD of frisking nonwhites at higher rates or an incident that deserves individual attention through a complaint process rather than a department-wide change in policies and practices.

---

[1] The seven training officers interviewed were from precincts from throughout the city and were selected based on their availability to come to the police headquarters.

[2] Observations were conducted in one night shift over the course of eight hours in and around an NYPD impact area. Three hours were spent in an unmarked NYPD vehicle, one hour at the precinct, and four hours in a marked NYPD patrol car. The observed officers were either on foot patrol or assigned to a patrol car.

## Levels of Police-Initiated Contacts Between Police and Citizens in New York State

In the state of New York, the courts have recognized four levels of police-initiated contacts between police and the public (*People v. De Bour*, 40 N.Y.2d 210, 1976). The rights of the citizen and the authority of the officer vary greatly across the four levels.

### Level 1: Request for Information

While officers are not authorized to question any individuals at random, an officer can approach an individual for any articulable reason. The officer may ask basic questions about the individual's identity, reason for being in the area, or facts related to the reason the officer approached in the first place, such as a concern for the individual's health or safety. The citizen has no obligation to answer, cannot be subject to search, and is free to walk away.

### Level 2: Common-Law Right of Inquiry

An officer may ask more probing questions when the officer believes (has "founded suspicion") that an individual may be involved in criminal activity, but the officer has no additional information to raise suspicion to the third level, described next. This officer's belief may develop as a result of a request for information if, for instance, the individual gives false answers to a request for information. The officer may ask to search the individual or the individual's bags, but, at this level, the officer cannot force the individual to answer questions, and the individual may walk away from the officer.

### Level 3: Stop, Question, and Frisk

This level is reached when the officer has *reasonable suspicion* that a person is involved in criminal activity. This suspicion may result from the individual matching a crime suspect's description, carrying objects commonly used in a crime, such as a lockout tool (e.g., a slim jim), or fleeing from the scene of a recent crime. The difference between levels 2 and 3 is subtle and is the subject of many court decisions regarding proper search and seizure. The officer may frisk an individual for weapons to ensure the safety of the officer conducting the questioning. The officer may ask for identification, request an explanation for the observed suspicious behavior, and detain the individual until the officer can determine whether the individual is involved in criminal activity.

This level is the only level that should be documented on NYPD's UF250. Stops may begin as either of the first two levels and rise to the level of an SQF incident, which would be documented. An SQF incident that leads to an arrest should also produce documentation with the UF250. However, arrests that occur directly from a level-4 encounter, described next, should not be documented on a UF250.

### Level 4: Arrest

When an officer has *probable cause* to believe that an individual was involved in a crime, the officer may arrest the suspect. Such situations include officers witnessing the crime, suspects being caught red-handed, or incidents in which victims identify the perpetrator. Officers should generally search the suspect for weapons or evidence, and the officers may use reasonable force to keep the suspect detained and to conduct the search.

The distinctions among these can be confusing in some instances, and this can affect which encounters officers actually document with UF250s. For example, if an officer detains a suspect who matches the description of an assailant given by the victim and then the victim positively identifies the suspect as the assailant, the officer should document this encounter on the UF250, because it began as a stop for reasonable suspicion of a crime. If, instead, the officer was with the victim and the victim pointed out the suspect across the street, the officer has probable cause to believe that the identified person has committed a crime, and no UF250 needs to be completed. Regardless of policy, however, there is a strong incentive for officers to complete the UF250 anyway, to provide further documentation of the incident and indicate the officer's productivity.

The difficulty of classifying some instances arises in discussions with officers. One Operation Impact officer,[3] a few weeks out of the academy, noted that UF250s are completed "when I stop someone that fits a criminal suspect description and it turns out not to be the person we were looking for." While that is true, the UF250 should also be completed when the suspect turns out to be the person for whom the officer was looking and is subsequently arrested. This difficulty points to the need for appropriate training.

## Training of Officers on Stop, Question, and Frisk Policies

The NYPD academy trains new recruits on legal background issues during the first trimester of the academy in seven sessions lasting a total of 10.5 hours. In addition, students participate in a 4.5-hour SQF workshop. All patrol officers in the department receive regular training on SQF at their precincts during roll call. Training officers indicated that they discuss the topic of UF250s in this forum about once every two months. To assist in communicating the law and NYPD policy on the issue, the NYPD legal bureau has prepared a video series describing each of the levels of interactions. As of this writing, precinct training officers have been shown videos covering the first three levels. Last, all officers also carry in their memo books a summary sheet of these levels and instructions on what they can and cannot do during the encounters (NYPD, 2000).

We asked officers about SQF policy to determine whether the training had been retained. Officers who were fresh out of the academy seemed particularly confused about when to document stops, as the earlier quote from the Operation Impact officer indicates. We observed another Operation Impact officer stopping and frisking a pedestrian who matched a description of a boy wanted for a robbery that had occurred a few minutes earlier. An interview of the frisked pedestrian moments later suggested that the officer did not explain the reason for the stop, although the individual did not speak English well and may not have understood. A subsequent interview of the officer who conducted the stop and frisk indicated that the officer was not sure whether a UF250 should be completed. After questions about paperwork and some prodding, the officer eventually responded that such a stop should be documented in a UF250. A later check confirmed that this officer documented the stop with a UF250.

While it appears that some of the newest members of the force are uncertain about how to document street encounters properly, this is not entirely surprising. The interviewed officers

---

[3]  Operation Impact places new graduates from the NYPD academy on foot posts in crime "hot spots" around New York City.

are working essentially alone in extremely busy areas and are learning to put their academy training into practice. Officers interviewed who had a year or more on the job knew the policies and the practices well and expressed no confusion on the issue.

NYPD has several layers of auditing to check that UF250s are complete and have valid entries. First, a supervisor within each command reviews completed UF250s. Second, data-entry staff screen forms for missing entries or illegible fields. Third, NYPD has a police-initiated enforcement program that each command's integrity control officer (ICO) manages. The program involves the ICO reviewing, monthly, five arrests resulting from police-initiated contact, checking that the arrests have been properly documented (including a UF250), and assessing the accuracy of the associated UF250. The Quality Assurance Division also audits the ICO's audits. Last, NYPD's Quality Assurance Division periodically selects a date and then collects from each command (each precinct, transit and housing division, crime unit, and task forces) the 25 most recent UF250s. Auditors complete a worksheet check for particularly critical elements: the suspected crime and whether it is a felony or penal-law misdemeanor, the circumstances leading up to the stop, documentation of frisks and searches, the race and sex of the suspect, and the name of the officer who made the stop. The audit in the last quarter of 2006 revealed some deficiencies. Depending on the patrol borough, in 3 to 9 percent of the stops, the race was not recorded. The cases with race missing are few enough so that it is unlikely to affect the results of the analysis. For other stop features critical to our analysis, the audits suggest that the data are fairly complete. Audited stops indicate that officers generally documented the suspected crime accurately. In the database, the suspected crime is recorded in 99.4 percent of the stops. For the remaining 0.6 percent of the stops, the suspected crimes were too vague, frequently recorded as "misdemeanor" or "felony."

While these steps might result in UF250s that are filled out completely and legibly, there is no auditing process to ensure that officers complete a UF250 for every police-initiated contact. To examine the SQF process, we spent time with patrol officers, observing their practices. In one eight-hour shift, we noted a dozen encounters that should be documented and, with a later check, confirmed that they had been.

In addition, we monitored precinct radio communications for information on other stops in the precinct. In one instance, an assault-and-robbery victim gave a description of the suspects. A pedestrian directed officers to a train platform, where officers found three men, two of whom matched the description. The officers detained the three, and the victim soon confirmed them as the assailants. Officers correctly submitted three UF250s for this interaction, since the initial contact was for reasonable suspicion of a crime. The subsequent positive identification by the victim gave the officers probable cause for the arrest.

The description of the suspects at the time was vague, giving only race and a loose description of clothes ("black jeans"). A weak description, possibly due in part to a victim's memory, increases the risk that innocent pedestrians will be detained. Radio traffic just before the arrest for the assault and robbery indicated two other street encounters of suspects. One of these encounters was with an individual about 30 years of age in a stop lasting more than 10 minutes, a rather long stop of an individual who was quite different from the actual perpetrators (a group of teenagers). Good suspect descriptions not only help solve crimes; they have the extra benefit of decreasing the risk of unnecessary negative interactions between the police and the public.

The remainder of the report focuses on the analysis of the UF250s. Chapter Two provides basic statistics from the UF250 database. In Chapter Three, we compare the racial distribution

of stops to the racial distribution of the residential census, arrestees, and criminal suspects. In Chapter Four, we examine each officer's collection of stops to see whether the racial distribution of those stops differs from the racial distribution of similarly situated stops made by other officers. Lastly, in Chapter Five, we compare the outcomes of stops across race groups, assessing differences in rates of frisk, search, use of force, and arrest.

CHAPTER TWO

## Description of the 2006 Stop, Question, and Frisk Data

In 2006, NYPD officers documented 506,491 stops. The stops occurred throughout the city's five boroughs, as shown in the map in Figure 2.1. The map shades the NYPD precincts by the number of stops per 1,000 people in the daytime population. Such a rate is particularly important in places like Manhattan, where the daytime population can swell by a factor of 20 or more. It does show that pedestrians in certain areas of the city have a greater chance of being stopped by police than in others.

**Figure 2.1**
**Stops per 1,000 People (estimated daytime population)**



SOURCE: Number of stops computed from NYPD (2006). Daytime population figures are from the New York City Planning Department as reported in Spitzer (1999, Appendix I).

RAND TR534-2.1

The reasons listed for these stops are numerous. They range from suspicion of minor offenses, such as scalping tickets, riding a bicycle on the sidewalk, and sales of untaxed cigarettes,[1] to more serious suspected crimes, such as surveillance for terrorism, murder, and assault. Figure 2.2 shows the number of stops by race of the suspect for the seven most common suspected crimes. These seven reasons comprise 87 percent of all of the stops. The percentage listed under each suspected crime indicates that crime's share of the total number of stops.

Figure 2.2 raises several important issues. First, black pedestrians bore the greatest burden of stops of any group in six of the top seven stop categories (burglary being the only exception, by a small margin). This statistic raises the issue of whether black pedestrians are targeted unfairly for pedestrian stops and are therefore the victims of racial discrimination. Identifying racial discrimination is an analytic challenge—one that has received the attention of the National Academies (Blank, Dabady, and Citro, 2004). Analysis in subsequent sections will attempt to address this issue with a series of carefully constructed comparisons.

Second, judging by the height of the bars in Figure 2.2, the total number of stops appears to be quite large. The total number of stops implies roughly six stops for every 100 residents of New York City, about the same number even after accounting for the increase in New York's daytime population.[2] The Bureau of Justice Statistics (BJS) periodically conducts national surveys on contacts between the police and members of the public. The most recent report

**Figure 2.2**
**Seven Most Common Suspected Crimes Reported as Reason for the Stop, by Race**



SOURCE: Computed from NYPD (2006).
RAND TR534-2.2

---

[1]  Although officers may initiate contact with ticket scalpers, sidewalk cyclists, and untaxed cigarette vendors, such stops technically do not require an officer to complete a UF250, since they do not rise to the level of a suspected felony or penal-law misdemeanor.

[2]  The U.S. Census Bureau estimates that New York City's daytime population due to regular workers commuting into New York City is about 7 percent larger than its residential population (U.S. Census Bureau, 2007).

(Durose, Smith, and Langan, 2005) indicates that 19 percent of the public had some contact with the police during a one-year period, although 41 percent of those encounters were the result of traffic stops, which UF250s do not document. The BJS data have a substantial amount of missing information, but we can use them to construct rough estimates. On average, people have 0.3 face-to-face contacts with police officers annually, about one encounter every three years. Of the respondents having had at least one face-to-face interaction with an officer, 10 to 13 percent indicated that the most recent encounter was officer initiated in a non–traffic-stop situation in which the officer was not providing the person with assistance.[3] Even with the most liberal assumptions about these rates, these statistics suggest that New York would have roughly 250,000 to 330,000 stops rather than the 500,000 stops actually recorded.[4]

There are several plausible reasons that the rate of stops with NYPD officers is so much greater than the rate suggested from our rough estimates from the BJS figures.[5] First, the estimates for daytime population used in the calculations do not account for visitors to New York City for temporary business, shopping, school, recreation, or tourism. We do not know by how much this could affect the projections. Second, New Yorkers may be more exposed to the police. New York has about 44 officers per 10,000 residents (BJS, 2007), among the largest per capita officer populations of all major cities in the United States. Nationally, the rate is 29 officers per 10,000 (Office of Justice Programs, 2006). New York also has pedestrian-traffic volume greater than that of most U.S. cities. Given the high level of exposure that New York has to police, NYPD officers are likelier to observe criminal activity when it occurs than are officers in other communities around the country. Third, while the BJS statistics are based on voluntary reports by the public, the NYPD is proactive at documenting policing activities and using that information to evaluate its policies through CompStat.[6] Officers have little disincentive to complete a UF250 even when doing so is not necessary, though some may view it as a hassle. If anything, NYPD's CompStat focus gives officers a strong incentive to generate UF250s. An officer's UF250 numbers suggest productivity. A precinct captain can use UF250 numbers to show that the precinct's officers are active in the areas that are generating complaints and where crimes occur. Officers can also use a UF250 as a record of an interaction. The last reason that the number of stops in New York is greater than the number projected from the national figures is that crime rates vary across the nation. New York, while experiencing a decrease in crime over the past several years, had a violent crime rate in 2005 of 673 per 100,000 people, compared with the national average of 469 per 100,000 (BJS, 2006). The property-crime rate (2,002 per 100,000) in New York City, however, is 42 percent below the national average of 3,430 per 100,000.

We can further consider the volume of stops by comparing it to the volume of arrests. In 2006, the NYPD received 470,000 felony and misdemeanor crime complaints, made 370,000 arrests, and issued 470,000 criminal-court summons. About 50,000 of those arrests and sum-

---

3  The survey also asked whether the police had suspected the respondent of a crime, a more relevant question for our purposes, but only 7.5 percent of respondents with a face-to-face encounter with a police officer answered this question.

4  The figure of 250,000 to 330,000 stops is based on a daytime population of 8.5 million × 0.3 stops per person × 10 percent or 13 percent of stops that are officer initiated and nontraffic and in which the officer was not providing a service.

5  BJS surveyed only those older than 16 years of age, and 5 percent of NYPD's stops were under 16, so that is not likely to be a major reason.

6  CompStat is a process that NYPD uses to regularly analyze crime issues, devise crime-reduction plans, reallocate resources, and evaluate strategies.

mons were the result of stops documented with UF250s, leaving 790,000 encounters between police and citizens in which officers observed or were responding to criminal activity that rose to the level of probable cause. While this in no way affirms that 500,000 UF250s is the right number, it is plausible that officers may have actually observed 500,000 incidents rising to the level of reasonable suspicion of a crime. Of the 506,491 stops made in 2006, 49,328 resulted in an arrest or a summons. This implies that, for every stop that resulted in an arrest or summons, there are nine stops that do not result in an arrest or summons. Given the volume of stops, this represents a large number of people who had an intrusive interaction with the police in which the police either determined that the suspect was innocent or did not have enough evidence to make an arrest. There is no objective benchmark with which to compare these numbers, as those stops not resulting in an arrest may have a valuable public-safety function, such as preventing a crime or following up on a tip. This is a matter of policing strategy that should be open to negotiation involving community representatives, elected officials, and NYPD management. It is imperative that police, in these cases in particular, communicate the reason for the stop and even proactively offer supervisor contact information to the suspect to use in the event that the suspect felt unfairly treated.

The third issue that Figure 2.2 raises is this: Weapon possession is the top reason for these encounters with police. Such stops can be evaluated to some degree based on whether a weapon was found. However, the legal grounding for frisks in *Terry v. Ohio* (88 S. Ct. 1868, 1968) gave police the right to pat down a suspect if the officer had reasonable suspicion that the individual might be armed or pose a threat to the officer's safety. In some neighborhoods, this feeling of threat to officer safety may be more pronounced than in other neighborhoods. On the other hand, the *Terry* decision does not support frisks if an officer perceives greater threats merely on the basis of a suspect's race.

For those suspects whom officers frisked (pat searches based on *Terry v. Ohio*, 88 S. Ct. 1868, 1968) or searched (based on consent or probable cause), Table 2.1 shows the frequency distribution of suspected crime and the rates of recovery of contraband (e.g., weapons, drugs, stolen property) broken down by race. Of the stops used for the analysis shown in Table 2.1, 84 percent involved frisks, 1 percent involved searches, and 15 percent involved both frisks and searches. Overall, officers are nearly twice as likely to find contraband when frisking or searching white suspects than they are when frisking or searching black suspects (6.4 percent versus 3.3 percent). However, the difference in contraband recovery rates varies by reason for the stop, with the greatest differences for stops involving suspected weapon possession and drug crimes. Since the frequency of suspected crimes for these frisks varies for black and white suspects, the overall disparity may be exaggerated by not accounting for the reason.

To account for suspected crime, we can compare the recovery rate for black suspects (3.3 percent) with what the total recovery rate for frisked white suspects would have been if their distribution of suspected crimes matched the distribution of suspected crimes of the frisked black suspects. Specifically, rather than 7 percent of frisked white suspects having the assault recovery rate of 3.4 percent, we consider what would have happened if instead 3 percent (the percentage of frisked black suspects who were suspected of assault) of the frisked white suspects had the assault recovery rate of 3.4 percent. By similarly replacing the actual frequency of each

**Table 2.1**
**Frequency of Suspected Crimes and Recovery Rates of Contraband for Frisked or Searched Suspects, by Race**

| | Black | | White | |
|---|---|---|---|---|
| Suspected Crime | Frequency of Suspected Crime | Contraband Recovery Rate from Frisks and Searches | Frequency of Suspected Crime | Contraband Recovery Rate from Frisks and Searches |
| Assault | 3 | 1.9 | 7 | 3.4 |
| Burglary | 4 | 2.7 | 16 | 3.2 |
| Criminal possession of a weapon (CPW) | 51 | 2.1 | 28 | 5.0 |
| Trespass | 6 | 8.1 | 5 | 10.3 |
| Drugs | 10 | 11.1 | 15 | 16.7 |
| Auto theft | 5 | 3.6 | 15 | 5.9 |
| Robbery | 21 | 1.3 | 14 | 2.0 |
| Total | 100 | 3.3 | 100 | 6.4 |

SOURCE: Computed from NYPD (2006).

suspected crime for frisked white suspects with the frequency observed for frisked black suspects, we find the adjusted recovery rate for whites to be 5.8.[7] This implies that part of the gap between the 3.3 percent recovery rate for black suspects and the 6.4 percent recovery rate for white suspects is due not to race but rather to differences in suspected crimes.

Critical in all evaluations of the stop data is the understanding that comparisons based on raw figures ignore basic differences in the situations in which the stops occur. Within the stop-reason categories shown in Table 2.1, substantial differences persist, but other factors not included in Table 2.1, such as time, place, and age of the suspect, may further explain the gap. "Analysis of Hit Rates" in Chapter Five of this report uses statistical methods to account for several of these important factors and many more and finds a rate of contraband recovery of 3.8 percent for frisked white suspects adjusted to have stop features similar to the frisked black suspects (see Table 5.5), nearly but not completely eliminating the observed racial disparities in recovery rates.

---

[7]  Computed as $0.03 \times 3.4\% + 0.04 \times 3.2\% + 0.51 \times 5.0\% + 0.06 \times 10.3\% + 0.10 \times 16.7\% + 0.05 \times 5.9\% + 0.21 \times 2.0\% = 5.8\%$.

CHAPTER THREE
# External Benchmarking for the Decision to Stop

## Summary

This chapter compares the racial distribution of stopped pedestrians to the racial distribution of the residential census, arrestees, and criminal suspects. External benchmarking is fraught with challenges, and the conclusions from these analyses are highly sensitive to the choice of the benchmark.

Benchmarks based on crime-suspect descriptions may provide a good measure of the rates of participation in certain types of crimes by race, but being a valid benchmark requires that suspects, regardless of race, are equally exposed to police officers.

We found that black pedestrians were stopped at a rate that is 20 to 30 percent lower than their representation in crime-suspect descriptions. Hispanic pedestrians were stopped disproportionately more, by 5 to 10 percent, than their representation among crime-suspect descriptions would predict.

We provide comparisons with several other benchmarks to demonstrate the sensitivity of external benchmarking. The arrest benchmark has been featured prominently in previous analyses of NYPD stop patterns (Spitzer, 1999; Gelman, Fagan, and Kiss, 2007). However, arrests may not accurately reflect the types of suspicious activity that officers might observe.

Black pedestrians were stopped at nearly the same rate as their representation among arrestees would suggest. Hispanic suspects appear to be stopped at a rate slightly higher (6 percent higher) than their representation among arrestees.

The most widely used, but least reliable, benchmark is the residential census. Census benchmarks do not account for differential rates of crime participation by race or for differential exposure to the police. Comparisons to the residential census are not suitable for assessing racial bias.

Black pedestrians were stopped at a rate that is 50 percent greater than their representation in the residential census. The stop rate for Hispanic pedestrians equaled their residential-census representation.

## Introduction

In 2006, 53 percent of NYPD pedestrian stops involved black suspects, 29 percent Hispanic, 11 percent white, and 3 percent Asian, and race was unknown for the remaining 4 percent of the stops. A legitimate question is whether NYPD stops should have this representation of the various race groups and whether the large fraction of nonwhites among those stops suggests

racial bias. *External benchmarking* describes an analysis that compares the racial distribution of the stops to the racial distribution of another source believed to represent the population at risk of being stopped by police, assuming no bias. In this chapter, we discuss issues with external benchmarking and evaluate several benchmark choices, including the residential census, arrests from 2005, and crime-suspect descriptions.

## Residential Census

Historically, a common practice for judging racial fairness in police stops has been to compare the racial distribution of stops to the racial distribution of the jurisdiction's residents as reported in the decennial census. Table 3.1 indicates that blacks are overrepresented in stops by NYPD officers compared with their representation in the census. Whites and Asians are underrepresented.

The numbers in Table 3.1 show disparity and thus may cause concern. However, the census benchmarking method has been widely criticized by social scientists (see Fridell, 2004). The people who live in New York City are not at equal risk of being stopped by police even in an unbiased world. As a result, the residential population is a couple of steps removed from our ideal benchmark. Several factors could produce these disparities. The disparities could be produced by race bias—an increased tendency, whether intentional or unintentional, for officers to detain black pedestrians. Officers may view a black pedestrian with greater suspicion than they would a white pedestrian in the same situation.

Other factors are also plausible in explaining the disparities. For instance, a second factor that may account for some of the differences in Table 3.1 involves differential exposure to the police. The police have allocated their patrols to focus on areas that they view as having the greatest needs, due to the volume of crime, the number of calls for services, requests from residents and businesses, or risk assessments. The NYPD partitions the city into 76 precincts.[1] Many of the precincts with a large allocation of patrol officers also have large nonwhite populations. If an unbiased police force has 100 officers in a precinct of 1,000 residents with 90 percent nonwhite population and 20 officers in another precinct of the same number of residents

**Table 3.1**
**Results of a Residential-Census Benchmark Analysis**

| Measure | Asian | Black | Hispanic | White |
|---|---|---|---|---|
| NYPD stops (%) | 3 | 55 | 31 | 11 |
| New York City census (%) | 12 | 24 | 28 | 35 |
| Representation in stops relative to the census | 0.2 | 2.3 | 1.1 | 0.3 |
| Representation in stops relative to the census (adjusting for precinct) | 0.4 | 1.5 | 1.0 | 0.4 |

SOURCE: Number of stops computed from NYPD (2006), excluding those with race missing. Census data taken from U.S. Census Bureau (2007, data for 2005).

---

[1]  Our external benchmark analyses use data at the precinct level, since arrest data and crime-suspect descriptions were readily available at the precinct level.

with 30 percent nonwhites, then collectively we would expect 80 percent of stops to involve nonwhites,[2] even though the nonwhites compose 60 percent of the community.[3] This is a well-known phenomenon in statistics called Simpson's paradox. It implies that looking at citywide aggregate comparisons can confound the comparison and that an analysis that accounts for neighborhood characteristics is essential. In addition to police allocation, there may be differences between the residential population and those on the streets exposed to the police. The racial distribution of people coming into neighborhoods for work, shopping, or entertainment can differ markedly from the racial distribution of those living in the neighborhood. Therefore, even accounting for neighborhood in an analysis cannot overcome this problem.

Table 3.1 also shows the representation of the various racial groups relative to the census of 2000. The third row of Table 3.1 shows the ratio of the stop percentage to the race percentage. The estimates in the fourth row are derived from a statistical model that compares the racial distribution of stops and the residential racial distribution within each precinct and essentially averages the ratio of the two (see Appendix A for details of the model). Accounting for precinct shows that a large part of the difference in the racial distributions of the census and stops is attributable to precinct. Blacks appear to be stopped at a rate that is 50 percent higher than the census would predict, but others factors may account for this as well.

The third factor that may account for disparities is differential rates of criminal participation. Several studies suggest that there are differences by race in the commission of crimes. In 69 percent of violent crimes reported to NYPD, the reported suspect is black. On the other hand, while drug use varies little by race, drug choice and acquisition do vary by race and can affect exposure to the police. A national survey indicates that, in large metropolitan areas, 8.6 percent of whites, 9.7 percent of blacks, and 7.2 percent of Hispanics have used an illicit substance within the last month (National Survey on Drug Use and Health and Substance Abuse and Mental Health Services Administration, 2007). However, whites are twice as likely as blacks to abuse prescription medications, and Goode (2002) noted that black drug users and sellers are likelier to be involved in frequent, public drug transactions that increase the risk of police noticing them.

Regardless of the external benchmark selected—census, arrests, suspect descriptions, or any other—the racial composition of the stops involves the interaction of the rates of criminal participation and the racial distribution of the population that the officer encounters. To put some hypothetical numbers to this, consider an unbiased officer who makes stops only when a pedestrian matches a suspect description. This officer works in a precinct with 40 blacks matching suspect descriptions and 40 whites matching suspect descriptions. If all 40 of the white suspects stay inside, travel only by car, or avoid the specific area in which the officer patrols, then this officer will stop only black pedestrians, deviating substantially from the precinct's suspect-description benchmark of 50 percent. Even the less extreme situation, in which 20 of the white suspects are exposed to the officer, results in the officer involving blacks in 67 percent of all of that officer's stops. The suspect benchmark is valid only if the suspects from the various racial groups are equally exposed to police officers.[4] Therefore, even with unbiased officers, we cannot

---

2 $(0.90 \times 100 + 0.30 \times 20)/120$.

3 $(0.90 \times 1{,}000 + 0.30 \times 1{,}000)/2{,}000$.

4 Formally, P(race = R|stop) = P(race = R|visible,suspect) = P(visible|race = R,suspect)P(race = R|suspect)/P(visible|suspect). For the stop distribution, P(race = R|stop), to equal the suspect benchmark, P(race = R|suspect), we need P(visible|race = R,suspect) = P(visible|suspect). This requires that *visible* be independent of race, given that an individual is a suspect.

necessarily expect seemingly sensible external benchmarks to match the racial distribution of stops. This example effectively demonstrates that any of the external benchmarks described in this section must be viewed with caution.

The primary reason for using census data is that it is inexpensive, quick, and easy. However, for the reasons previously listed, benchmarking with census data does not help us measure racial bias. Simple refinements to the residential census are possible, such as focusing on subpopulations likeliest to be involved in crime, such as men or young adults. These may explain some of the remaining differences, but other, unmeasured factors cannot be eliminated as possible explanations. Fridell (2004) summarized the problem with using the census as a benchmark by noting that "this method does not address the alternative hypothesis that *racial/ethnic groups are not equivalent in the nature and extent of their . . . law-violating behavior*" (p. 106, emphasis in original).

Dissatisfaction with the census as a benchmark has led some researchers to develop observation benchmarks, fielding teams of observers to locations to tally the racial distribution of those observed. However, even if observers could produce an accurate benchmark for those pedestrians in the area—a challenge on its own—several issues remain. There is no reason to believe that police stops should be representative of the population in the area. Officers target behaviors that they believe indicate drug transactions, stop individuals fitting a description, and respond to calls for service. Furthermore, the courts have not consistently supported the use of observational benchmarks. *United States v. Barlow* (310 F.3d 1007, 7th Cir., 2002), a case involving profiling at an Amtrak station, rejected the benchmark, since the observations were made in a different time frame from the one in which the alleged discrimination occurred. *United States v. Alcaraz-Arellano* (302 F. Supp. 2d 1217, 1229–1232, D. Kan., 2004) rejected the benchmark, since it was developed for a general population, not those violating the law.

## Arrests in 2005

Gelman, Fagan, and Kiss (2007) presented an analysis of NYPD's SQF data from January 1, 1998, to March 31, 1999. This analysis also appeared in Appendix H of the New York Attorney General's report on this issue (Spitzer, 1999). Gelman, Fagan, and Kiss quoted then–Police Commissioner Howard Safir:

> The racial/ethnic distribution of the subjects of stop and frisk reports reflects the demographics of known violent crime suspects as reported by crime victims. Similarly, the demographics of arrestees in violent crimes also correspond with the demographics of known violent crime suspects. (2007, p. 4)

Gelman, Fagan, and Kiss (2007) expressed a preference for comparing the racial distribution of stops to rates of actual crime participation. They relied on data about the races of arrestees in the previous year (1997, in their analysis) as a proxy for actual crime participation and then used the arrest data as a benchmark for the racial distribution of stops. Though such data may roughly capture the racial distribution of participation in crimes for which one is likely to be caught, they may be less applicable to situations documented in UF250s. Arrests can also take place some distance away from where the crime actually occurred. More problematic is that, if officers are racially biased, in the prior year, they will have arrested a disproportionate

fraction of nonwhites, and that same bias will cause them to overstop nonwhites in the current year. Such a benchmark may actually hide bias if it exists.

We replicate the most promising statistical model from Gelman, Fagan, and Kiss (2007), described in equation 4 of their article, on the 2006 SQF data, using 2005 arrest data as a benchmark. This model can be characterized in the following way: In 2005, there was a large pool of potential arrestees with a particular racial distribution, and the 2005 arrestee data represent a sample that NYPD drew from that large pool. In 2006, there was a large pool of potential suspects with a particular racial distribution; the actual stops represent a sample from that large pool. If one believes that arrestees represent a suitable benchmark for assessing stops, then one must assume that the racial distribution of the large pool of potential arrestees is the same as the racial distribution of the large pool of potential stop suspects. Gelman, Fagan, and Kiss's model tests this assumption—whether the samples drawn from these two populations (arrestees and suspects) have sufficiently similar racial distributions to indicate that the arrestee and suspect populations have the same racial distribution. Appendix A describes the Gelman statistical model in more detail.

We used Gelman's model to analyze arrest data from NYPD's Online Booking System (OLBS) extract files. We tallied, by race and precinct, the number of top charge arrests, the severest charge in an arrest for violent crime (robbery, rape, murder, or assault), the number of top charge arrests for drug crimes, and the number of top charge arrests for weapons.[5] Violent crime (18 percent), drug crime (12 percent), and weapon possession (23 percent) are among the most common suspected crimes for which NYPD officers stop suspects. We compared the racial distribution of the arrestees to the racial distribution of stops in which the suspected crime was compatible with the benchmark. That is, the racial distribution of stops for suspected drug crimes was compared to the racial distribution of arrests for drug crimes.

Figure 3.1 shows the results of the analysis. Like Spitzer (1999) and Gelman, Fagan, and Kiss (2007), we used data only on black, Hispanic, and white suspects, since other racial groups had counts that were too small for statistical analysis. The top three bars indicate the rate of stops (for any reason) relative to arrests (for violent crimes, weapons, property crime, or drug crime). Black suspects were stopped at nearly the same rate (1 percent less) as their representation among arrestees would suggest. The horizontal lines through the bar represent 95 percent confidence intervals that convey the uncertainty in these estimates. For black suspects, the interval intersects with zero, indicating that there is no statistical evidence that blacks are stopped at a rate different from their arrest rate. Hispanic suspects, however, appear to be stopped at a rate slightly higher (6 percent higher) than their representation among arrestees.

The second set of bars from the top compares the racial distribution of stops for suspected violent crimes with the racial distribution of those arrested for violent crimes. All of the observed differences between the stop rates and arrest rates are less than 2 percent, and none is statistically different from zero. The same is true for the third set of bars, which compares stops for suspected drug crimes with drug arrests. There appears to be no statistical evidence for a race effect, as all of the intervals intersect with zero.

The fourth set of bars from the top of Figure 3.1 compares stops for suspected criminal possession of a weapon (the most common reason for UF250s) to arrests in which the top charge was weapon possession. Officers stop black suspects for suspected weapon possession

---

5 Those arrested for serious crimes, such as robbery, who also had a gun will have that serious crime, not a weapon offense, as the top charge.

18   Analysis of Racial Disparities in the New York City Police Department's Stop, Question, and Frisk Practices

**Figure 3.1**
**Comparison of Stop Rates to Seven External Benchmarks**



SOURCE: Computed from NYPD (2006).
NOTE: Each bar compares a race's percentage share of the pedestrian stops to its percentage share of the specified benchmark. Bars to the right of 0 indicate more stops than the benchmark would suggest, and bars to the left of 0 indicate fewer stops than the benchmark would suggest. The horizontal line through each bar represents the 95 percent confidence interval that conveys the uncertainty in these estimates.
RAND TR534-3.1

at a rate greater (8 percent greater) than their weapon arrest rate. White suspects, on the other hand, have a stop rate that is 11 percent lower than their weapon arrest rate. The weapon arrest benchmark is constructed from cases in which the top charge is illegal weapon possession. Robbery arrests in which the suspect has a weapon are not counted as a weapon arrest because the top charge is robbery. If white arrestees are likelier to have no other criminal involvement beyond illegal firearm possession, then their representation in the weapon arrestees might be a reasonable benchmark for stops of white pedestrians for suspected weapon possession. If black suspects are likelier to have an illegal firearm and have additional criminal involvement, then they will be underrepresented in the weapon-arrestee population, which could be one explanation for the disparity observed in Figure 3.1.

## Crime-Suspect Descriptions

As the quotation from then-Commissioner Safir indicated, violent-crime suspect descriptions as reported by crime victims might be a better benchmark. This category represents the public's requests to the NYPD to look for individuals matching a certain description. In 30 percent of the stops, a call for service or a suspect description initiated the stop. During the one shift observed by a RAND researcher, all of the UF250s observed were generated as a result of calls for service or suspect descriptions.

We supplemented the arrestee data with data on suspect descriptions for violent crime in 2006 from the NYPD's complaint-report data file and compared them with stops for violent crimes. To compare the racial distribution of stops for violent crimes with the racial distribution of violent-crime suspects and arrestees, we used the same model used for the arrest benchmark described previously. We also constructed a benchmark from crime-suspect descriptions alone without arrestees. Figure 3.1 also shows the results from external benchmarks using violent-crime suspects with and without arrestees.

The bottom three sets of bars in Figure 3.1 indicate that black suspects are substantially understopped relative to their representation in crime-suspect descriptions. The inclusion or exclusion of violent-crime arrestees along with violent-crime suspects does not change this result. Overall, black suspects were described in 69 percent of all violent-crime suspect descriptions even though black pedestrians comprise 53 percent of all stops and 24 percent of the city's population. The last set of bars restricts the set of stops to only those in which the officer indicated that the suspect fit a crime-suspect description. This restriction does not change the conclusions.

## Conclusions

External benchmarking is fraught with challenges. Every analysis based on external benchmarking requires careful interpretation. Most important, the method can either detect or hide racial bias due to unobserved or unmeasured factors that affect both the racial distribution that the benchmark establishes and the racial distribution of the stops. For example, drug arrests take many forms, including complex buy-bust operations, complaints from residents, and direct observation by officers. Stops documented in UF250s are generated only from the latter two situations, while the drug-arrest benchmark includes all of these arrests. Goode (2002) noted that black drug sellers and buyers are likelier to be involved in street-level sales and, therefore, have greater exposure to the police and are likelier to appear in UF250s than the arrestee benchmark might suggest.

Our analysis in this section has examined several external benchmark choices. Importantly, this chapter has shown that the conclusions from external benchmarking are highly sensitive to the choice of benchmark. In other words, the results of any analysis using external benchmarks may vary drastically depending on which benchmark is used. The residential census is a commonly attempted first-look analysis, but researchers who study racial profiling discourage its use, arguing that the people exposed to the police could be different from those who live in the neighborhood (e.g., people from outside the precinct) and noting the belief that the census tends to undercount nonwhites. The 1999 report from the New York Attorney General's office used the previous year's arrests to establish a benchmark (Spitzer, 1999). We replicated this analysis for the 2006 data with separate analyses for drug and weapon arrests. Last, we utilized data on crime-suspect descriptions, a benchmark suggested in Gelman, Fagan, and Kiss (2007).

With the exception of the residential census benchmark, the external-benchmark analysis does not indicate that black pedestrians were overstopped. Hispanic pedestrians appear to have been stopped more frequently than their representation among arrestees and crime-suspect descriptions would predict.

# EXHIBIT 10B

CHAPTER FOUR

# Internal Benchmarking for the Decision to Stop

## Summary

This chapter describes an analysis that compares the racial distribution of each officer's stops to a benchmark racial distribution constructed using similarly situated stops made by other officers. Our analysis found the following:

- Five officers appear to have stopped substantially more black suspects than other officers made when patrolling the same areas, at the same times, and with the same assignment. Nine officers stopped substantially fewer black suspects than expected.
- Ten officers appear to have stopped substantially more Hispanic suspects than other officers made when patrolling the same areas, at the same times, and with the same assignment. Four officers stopped substantially fewer Hispanic suspects than expected.
- Six of the 15 flagged officers are from the Queens South borough.

## Introduction

If racial bias is a result of a few problem officers, then the methods described in the previous chapter, which examine bias at the departmental level, are unlikely to detect the problem, and, even if somehow they have the statistical power to detect the problem, they cannot help to identify potential problem officers. Walker (2001, 2002, 2003) conceptualized the internal benchmark, a framework that compares officers' stop decisions with decisions made by other officers working in similar situations. We developed an internal benchmark methodology to compare the racial distribution of pedestrians whom individual police officers have stopped with that of pedestrians whom other officers in the same role have stopped at the same times and places.

While this process is useful for flagging potential problem officers, it has some drawbacks. First, if officers in the entire precinct are equally biased, the method will not flag any officers as being problematic. We must rely on other analyses to assess that issue. Second, officers whom the method flags as outliers may have legitimate explanations for the observed differences. For example, a Spanish-speaking officer may appear to make an excessive number of stops of Hispanic suspects, when, in fact, whenever the officer or the officer's partner detains a Hispanic suspect, the Spanish-speaking officer takes the lead because of language specialty and completes the UF250. Such situations should be detectable when supervisors review cases.

Otherwise, the method eliminates possible explanations based on time or place, so the range of explanations is limited.

## Methods

The fundamental goal of internal benchmarking is to compare the rate of nonwhite-pedestrian stops for a particular officer with the rate of nonwhite-pedestrian stops for other officers patrolling the same area at the same time. Matching in this way assures us that the target officer and the comparison officers are exposed to the same set of offenses and offenders.

Several matching procedures have been proposed. Direct matching to construct internal benchmarks may provide an insufficient quantity of matches for some officers. To increase the set of matched officers, matching criteria might be broadened to the point at which officers are matched with officers making stops at substantially different times and places. For example, Decker and Rojek (2002) matched each St. Louis police officer to all other officers working in the same police districts. It is unclear whether matching by district alone was sufficient to ensure validity. They did not match by time of day or day of week, although they argued that officers rotated shifts sufficiently so as not to warrant concern.

But in many NYPD jurisdictions, matching by precinct alone is insufficient because the racial mix of the population and law-enforcement practices can vary substantially within a precinct. More precise measures of the location of the stop are, therefore, necessary if such propositions are true. Additionally, matching at the officer level is inappropriate because officers' assignments can vary in several ways, such as geography and time of the year. Therefore, we use a method that matches each officer's collection of stops to a collection of stops made by other officers at the same times and places. Stops were matched on month, day of week, time of day, precinct, x-y coordinates of the stop location, whether it was a transit or public-housing location, the officer's assigned command, whether the officer was in uniform, and whether the stop was a result of a radio run.

Consider Officer A, who patrols in Brooklyn North. In 2006, Officer A made 392 stops. Of those stops, 83 percent involved black suspects, and another 10 percent involved Hispanic suspects. Our internal-benchmark analysis involves comparing these numbers to the racial distribution of other officers' stops that are similar with regard to time, place, and other factors. We selected those similarly situated stops by using a method called *propensity-score weighting*. Propensity-score weighting allows us to characterize the stops made by other officers in a way that provides a useful comparison to the distribution of the stop features for an individual officer (see Appendix B for details). For Officer A, the method effectively identified 3,676 similarly situated stops made by other officers. These stops were selected as the benchmark group for Officer A because they were similar to Officer A's stops in terms of when they occurred (e.g., date, time of day), where they occurred (e.g., precinct, x-y coordinates), the assigned command of the officer making the stop, whether the officer making the stop was in uniform, and whether the stop was a result of a radio call. Figure 4.1 and Table 4.1 demonstrate that this collection of 3,676 is nearly identical to the officer's stops in several respects.

The map shown in the left panel of Figure 4.1 indicates the locations of this officer's stops in 2006. The contour lines mark a region in the southern end of the 79th precinct, where the majority of the stops occurred. The map shown in the right panel indicates the locations of the 3,676 similarly situated stops selected to match the officer's stops. In addition to matching

**Figure 4.1**
**Maps of the Sample Officer's Stops and of Similarly Situated Stops Made by Other Officers**



SOURCE: Computed from NYPD (2006).
NOTE: The left map shows the sample officer's stops; the right map shows similarly situated stops made by other officers. The contours indicate the regions of the maps with the highest concentrations of stops.
RAND TR534-4.1

the precinct in which the officer works, the contours in the right panel show that the matched stops used for constructing the internal benchmark also occurred in the southern end of the precinct. Any differences between the racial distribution of suspects involved in the officer's stops and the racial distribution of the matched stops cannot be due to location.

While Figure 4.1 demonstrates that effective matching by location is possible, the method simultaneously matches on numerous other attributes. All of these other attributes, such as time of the stop, can also be incorporated in the propensity-score weighting. Table 4.1 demonstrates that we can also select stops that match Officer A's stops by month, day of the week, time of day, additional location details, the officer's assignment (NYPD command), the frequency with which the officer is in uniform, and the frequency with which the officer's stops are a result of radio runs (calls for service). These matches are simultaneous. That is, the same collection of 3,676 stops made by the other officers matches the distribution of features of the officer in question.

Some features are not perfectly balanced in Table 4.1, such as the frequency of being in uniform and being on a radio run. We accounted for these slight differences using regression adjustment, a standard statistical practice for further removing chance differences among groups (Kang and Schafer, 2007).

For several reasons, the internal benchmark does not match officers on the reason for the stop. First, officers patrolling the same areas at the same times should be exposed to similar suspicious activity. However, for the sample officer in Table 4.1, the crimes suspected in the officer's stops are quite different from those in the benchmark, as shown in Table 4.2. Most noticeably, the sample officer frequently recorded suspected drug sales as the suspected crime, while similarly situated officers more evenly split suspected drug crimes between possession

**Table 4.1**
**Construction of an Internal Benchmark for a Sample Officer**

| Stop Characteristic | | Officer A (%) (N = 392) | Internal Benchmark (%) (N = 3,676) |
|---|---|---|---|
| Month | January | 3 | 3 |
| | February | 4 | 4 |
| | March | 8 | 9 |
| | April | 7 | 5 |
| | May | 12 | 12 |
| | June | 9 | 9 |
| | July | 7 | 7 |
| | August | 8 | 9 |
| | September | 10 | 10 |
| | October | 11 | 10 |
| | November | 11 | 11 |
| | December | 9 | 10 |
| Day of the week | Monday | 13 | 13 |
| | Tuesday | 11 | 10 |
| | Wednesday | 14 | 15 |
| | Thursday | 22 | 21 |
| | Friday | 15 | 16 |
| | Saturday | 10 | 11 |
| | Sunday | 15 | 14 |
| Time of day | [12–2 a.m.] | 11 | 11 |
| | (2–4 a.m.] | 5 | 5 |
| | (10 a.m. –12 p.m.] | 0 | 1 |
| | (12–2 p.m.] | 12 | 13 |
| | (2–4 p.m.] | 13 | 12 |
| | (4–6 p.m.] | 9 | 10 |
| | (6–8 p.m.] | 8 | 8 |
| | (8–10 p.m.] | 23 | 23 |
| | (10 p.m. –12 a.m.] | 17 | 17 |
| Patrol borough | Brooklyn North | 100 | 100 |
| Precinct | 77 | 0 | 0 |
| | 79 | 98 | 98 |
| | 81 | 1 | 1 |
| | 88 | 1 | 0 |

**Table 4.1—Continued**

| Stop Characteristic | | Officer A (%) (N = 392) | Internal Benchmark (%) (N = 3,676) |
|---|---|---|---|
| Inside or outside | Inside | 4 | 6 |
| | Outside | 96 | 94 |
| Housing or transit | Transit | 0 | 0 |
| | Housing | 0 | 0 |
| | Other | 100 | 100 |
| Command | 79th precinct | 100 | 100 |
| In uniform | Yes | 99 | 97 |
| | No | 1 | 3 |
| Radio run | Yes | 1 | 3 |
| | No | 99 | 97 |

SOURCE: Computed from NYPD (2006).
NOTE: The numbers in the table indicate the percentage of stops having that feature.

and sale. They may have been observing the same kinds of suspicious activity but simply categorizing differently. Second, while officers have some discretion as to what suspicious activity to investigate, the selectively targeting or avoiding of certain types of suspect crimes can have disparate impact on the racial makeup of stopped suspects. Rather than having the internal benchmark match on the stop reasons, NYPD can evaluate the stop reasons for those officers who are flagged as stopping a disproportionate fraction of nonwhites. In addition to assessing issues of racial profiling, supervisors can evaluate whether the officer's stop patterns are consistent with precinct priorities.

In 2006, 3,034 officers completed more than 50 UF250s, the minimum number of stops for which we could accurately establish an internal benchmark. For each officer, in turn, we constructed a separate internal benchmark like the one shown in Table 4.1, one specifically tailored for each officer's patterns of stops. For 278 of those officers, a suitable set of comparison-group stops could not be constructed. The best set of comparison-group stops differed from

**Table 4.2**
**Comparison of the Percentage of Stops for a Particular Suspected Crime for the Sample Officer and the Officer's Internal Benchmark**

| Crime Suspected | Sample Officer's Stops (%) | Benchmark Stops (%) |
|---|---|---|
| Criminal trespass | 4 | 2 |
| Burglary | 13 | 13 |
| Weapon possession | 3 | 13 |
| Robbery | 15 | 14 |
| Drug possession | 6 | 27 |
| Drug sale | 47 | 20 |

SOURCE: Computed from NYPD (2006).

the officer's stops by more than 10 percent on some factors. These officers generally made few stops, scattered across numerous precincts and even multiple boroughs, in a variety of roles (e.g., transit police, sometimes in uniform). Our final set for analysis includes 2,756 officers.[1] These officers collectively made 54 percent of the stops.

For the sample officer's benchmark, 78 percent of the 3,676 benchmark stops involved black suspects, and 9 percent involved Hispanic suspects, a lower rate of nonwhite-pedestrian stops than the officer's stop pattern of 83 percent black and 10 percent Hispanic. Our analysis focuses on comparisons of the rate of black and Hispanic suspects, since the rates of other non-white groups were generally too small. The remaining question is whether this difference presents a large disparity. Chance differences are likely, especially when the stops are few. Statistical measures that account for the number of stops are useful for setting appropriate cutoffs.

The z-statistic is the commonly used statistical measure for assessing the magnitude of the difference between an officer's nonwhite-pedestrian–stop fraction and the officer's internal benchmark (Fridell, 2004). The z-statistic scales the difference to account for the number of stops that the officer made and the number of stops used to construct the internal benchmark, so that large differences based on a small number of stops are treated with greater uncertainty than large differences based on a large number of stops. Given the value of an officer's z-statistic, we can estimate the probability that a flagged officer is, in fact, an outlier. We flagged all officers with an outlier probability exceeding 50 percent. The choice of 50 percent leads to a z-statistic cutoff of about 5.0 for the black-suspect internal benchmark and a cutoff of 4.0 for the Hispanic-suspect internal benchmark. That cutoff is subjective and depends on the costs associated with failing to flag a problem officer and the costs associated with investigating each flagged officer. The commonly selected cutoff is 80 percent (Efron, 2004), but we believed that such a choice would undervalue the cost of failing to identify a problem officer. In addition, the 50 percent probability cutoff produces a short list of officers for closer evaluation. Appendix C contains technical details about the methodology.

## Results

Figure 4.2 shows a histogram of the 2,756 results from an internal-benchmark analysis for the rate of black-suspect stops. The arrows mark the cutoff at which the probability of being an outlier exceeds 50 percent. The five blocks at the extreme right of the histogram represent five officers who overstopped black suspects relative to similarly situated stops made by other officers. The analysis flags a total of nine officers in the extreme left tail of the histogram for greatly understopping black suspects relative to their internal benchmark.

---

1   All RAND studies go before an institutional review board that reviews research involving human subjects, as required by federal regulations. RAND's Federalwide Assurance for the Protection of Human Subjects (NIH, through 2010) serves as its assurance of compliance with the regulations of 16 federal departments and agencies. According to this assurance, the committee is responsible for review regardless of source of funding. These federal regulations prevent RAND research from singling out specific individuals whom its research could adversely affect. The analysis in this section offers an estimate of the number of the NYPD's patrol officers of concern, but RAND cannot identify individual officers. For the Cincinnati Police Department, RAND has transferred the analytical capabilities to the department's analysts so that they can properly review their officers. A similar arrangement may be possible with NYPD.

**Figure 4.2**
**Distribution of 2,756 Officer-Level Analyses**



SOURCE: Computed from NYPD (2006).
NOTE: Each bar represents the number of officers having the z-statistic specified on the horizontal axis.
The arrows mark the cutoff at which the probability of being an outlier exceeds 50 percent.
RAND TR534-4.2

   Table 4.3 describes the features of the flagged officers' stops in greater detail. The first five rows correspond to those officers with a percentage of stops involving black suspects (shown in the second column) that greatly exceeds the calculated benchmark (column three). Column four and five, respectively, indicate the number of stops the officer made and the number of stops composing the benchmark. Since the comparison-group stops are weighted to make their features align with the officer's stop features, we used the effective sample size[2] to measure the number of comparison-group stops.

   The last column of Table 4.3 shows the estimated probability that the officer's stop pattern is an outlier and that the observed differences are not simply due to chance. All of the probabilities for the officers that appear to have overstopped black suspects are well in excess of 50 percent. While there may be a reason aside from racial bias that could explain these differences, the analysis has eliminated all of the reasons listed in Table 4.1, such as time and place, and the calculated probabilities indicate that it is unlikely that the differences are due to chance.

   The bottom nine rows of Table 4.3 show stop information for the nine officers who are substantially understopping black suspects relative to similarly situated stops.

   The stops that these officers make consist of a mixture of low- and high-discretion stops. We reran the internal benchmark excluding stops resulting from calls for service and those based on suspect descriptions, those that offer the least opportunity for officers to express any racial biases. This focused the analysis on those stops for which racial bias is likelier to have

_____
2  The effective sample size is the number of observations from a simple random sample needed to obtain an estimate of the race effect with precision equal to the precision obtained with the weighted comparison observations.

28   Analysis of Racial Disparities in the New York City Police Department's Stop, Question, and Frisk Practices

**Table 4.3**
**Internal-Benchmark Analysis for Stop Rates of Black Suspects**

| Measure | Black (%) | | Stops | | Outlier probability |
|---|---|---|---|---|---|
| | Officer | Benchmark | Officer | Benchmark | |
| Stop rate of black suspects in excess of the benchmark | 86 | 55 | 151 | 773 | 97[a] |
| | 85 | 67 | 218 | 473 | 62[a] |
| | 77 | 56 | 237 | 1,081 | 86 |
| | 75 | 51 | 178 | 483 | 78 |
| | 64 | 20 | 59 | 695 | 98 |
| Stop rate of black suspects less than the benchmark | 57 | 79 | 152 | 1,593 | 89 |
| | 56 | 80 | 63 | 304 | 51 |
| | 49 | 74 | 94 | 621 | 70 |
| | 46 | 77 | 61 | 633 | 70 |
| | 42 | 80 | 99 | 872 | >99 |
| | 36 | 87 | 92 | 1,696 | >99 |
| | 19 | 56 | 53 | 679 | 62 |
| | 17 | 49 | 65 | 355 | 55[a] |
| | 8 | 39 | 71 | 291 | 52[a] |

SOURCE: Computed from NYPD (2006).

NOTE: Each row represents one officer and reports the statistics pertaining to that officer.

[a] These officers also appear in Table 4.4.

an impact. Out of 1,910 officers for whom we could construct good internal benchmarks, the reanalysis flagged two officers, both of whom already appear in Table 4.3.

Table 4.4 shows the analysis that identified officers who appear to have overstopped Hispanic suspects and flagged nine officers for overstopping Hispanics. Three officers appear to have been substantially understopping Hispanics. Four of the officers listed in Table 4.4 also appear in Table 4.3; they are marked in both tables. One officer's pattern of overstopping black suspects (86 percent black, shown in Table 4.3) has the effect of reducing the officer's rate of stopping Hispanics (11 percent Hispanic, shown in Table 4.4). A similar effect occurs for two of the officers who appear to have been overstopping Hispanics.

Table 4.5 shows the results from rerunning the internal benchmark excluding stops based on suspect descriptions and stops resulting from calls for service. Most of the officers flagged from this analysis also appear in Table 4.4. However, the analysis also flagged two additional officers, one for overstopping Hispanics and another for substantially understopping Hispanics relative to their internal benchmark.

We also attempted an analysis to determine whether officers targeted nonwhite pedestrians generally. This analysis was problematic, since there are few white suspects in the data. Fifteen percent of the officers stopped no white suspects, but all of the benchmarks for these officers had the expected fraction of nonwhites stopped greater than 90 percent, most of them exceeding 97 percent. For those officers who did not stop only nonwhites, 121 of them

**Table 4.4**
**Internal-Benchmark Analysis for Stop Rates of Hispanic Suspects**

| Measure | Hispanic (%) | | Stops | | Outlier Probability |
|---|---|---|---|---|---|
| | Officer | Benchmark | Officer | Benchmark | |
| Stop rate of Hispanic suspects in excess of the benchmark | 86 | 52 | 71 | 291 | 72[a] |
| | 80 | 43 | 65 | 355 | 83[a] |
| | 48 | 24 | 122 | 194 | 65 |
| | 44 | 21 | 97 | 396 | 65 |
| | 43 | 20 | 84 | 1,294 | 65 |
| | 42 | 23 | 113 | 1,493 | 59 |
| | 29 | 10 | 77 | 1,100 | 77 |
| | 22 | 3 | 82 | 139 | >99 |
| | 14 | 2 | 200 | 510 | >99 |
| Stop rate of Hispanic suspects less than the benchmark | 14 | 43 | 84 | 431 | 52 |
| | 11 | 38 | 151 | 773 | 98[a] |
| | 7 | 26 | 218 | 473 | 92[a] |

SOURCE: Computed from NYPD (2006).

NOTE: Each row represents one officer and reports the statistics pertaining to that officer.

[a] These officers also appear in Table 4.3.

**Table 4.5**
**Internal-Benchmark Analysis for Stop Rates of Hispanic Suspects, Excluding Stops Based on Suspect Descriptions or Calls for Service**

| Measure | Hispanic (%) | | Stops | | Outlier probability |
|---|---|---|---|---|---|
| | Officer | Benchmark | Officer | Benchmark | |
| Stop rate of Hispanic suspects in excess of the benchmark | 86 | 51 | 70 | 266 | 91[a] |
| | 80 | 44 | 65 | 336 | 92[a] |
| | 46 | 22 | 91 | 635 | 88[a] |
| | 45 | 20 | 78 | 1,310 | 92[a] |
| | 38 | 16 | 72 | 488 | 71 |
| Stop rate of Hispanic suspects less than the benchmark | 24 | 54 | 90 | 171 | 65 |
| | 7 | 26 | 203 | 652 | 94[a] |

SOURCE: Computed from NYPD (2006).

NOTE: Each row represents one officer and reports the statistics pertaining to that officer.

[a] These officers also appear in Table 4.4.

understopped nonwhites relative to their benchmark, and only one appeared to overstop nonwhites, with a nonwhite-pedestrian stop rate of 50 percent relative to a benchmark of 32 percent.

No obvious patterns emerged from the features of the 15 officers who overstopped either black or Hispanic suspects relative to their benchmark. Six of the officers were from the Queens South borough, a statistically disproportionate number, given that 12 percent of the stop activity occurred in Queens South. The remaining nine officers were distributed fairly uniformly across the boroughs. Twelve of the officers were precinct patrol officers, two were public-housing officers, and one was assigned to an anticrime unit.

## Conclusions

The internal-benchmark analysis flagged five officers among those making at least 50 pedestrian stops who were substantially overstopping black suspects and 10 officers who were substantially overstopping Hispanic suspects. In addition, nine other officers were substantially understopping nonwhites. At this stage, we do not know whether there is a problem with these officers, but we have removed numerous plausible explanations for the difference, including chance differences and differences in time and place. We encourage NYPD supervisors to identify and follow up on flagged officers to evaluate other plausible reasons for the disparity. The method implemented for the analysis in this chapter eliminates the obvious explanations that are based on time, place, or assignment, so discussions between supervisors and the flagged officers must delve more deeply than these reasons.

As for the public's concern about problem officers, the internal-benchmark analysis has flagged 0.5 percent of the 2,756 NYPD officers most active in pedestrian-stop activity. Those 2,756 most active officers, about 7 percent of the total number of officers, account for 54 percent of the total number of 2006 stops. The remaining stops were made by another 15,855 officers, for whom an accurate internal benchmark could not be constructed, mostly because they conducted too few stops. While the data suggest that only a small fraction of the officers most active in pedestrian stops may be outliers, the stops made by the 15,855 stops that we could not analyze may still be of concern. Racial bias in their SQF behavior may collectively reveal itself in post-stop analyses of frisks, searches, uses of force, and arrests.

CHAPTER FIVE
# Analysis of Post-Stop Outcomes

## Summary

This chapter assesses racial disparities with regard to activities that occur after a stop is made, including frisks, searches, uses of force, and arrests.

Our analysis found the following:

- Officers frisked white suspects slightly less frequently than they did *similarly situated* nonwhites (29 percent of stops versus 33 percent of stops). Black suspects were slightly likelier to have been frisked than white suspects stopped in circumstances similar to the black suspects (46 percent versus 42 percent). While there is a gap, this difference is much smaller than what the aggregate statistics indicated.
- The rates of searches were nearly equal across racial groups, between 6 and 7 percent. However, in Staten Island, the rate of searching nonwhite suspects was significantly greater than that of searching white suspects.
- White suspects were slightly likelier to be issued a summons than were similarly situated nonwhite suspects (5.7 percent versus 5.2 percent). On the other hand, arrest rates for white suspects were slightly lower than those for similarly situated nonwhites (4.8 percent versus 5.1 percent).
- Officers were slightly less likely to use force against white suspects than they were to use it against similarly situated nonwhites (15 percent versus 16 percent); however, in Queens, Brooklyn North, and the Bronx, there was no evidence that use-of-force rates varied across races.
- Officers recovered contraband (such as weapons, illegal drugs, or stolen property) in 6.4 percent of the stops of white suspects. The contraband recovery rate was 5.7 percent for similarly situated black suspects and 5.4 percent for similarly situated Hispanic suspects.

## Introduction

At first glance, the raw statistics indicate large racial disparities in the outcomes of stops. For example, in Manhattan South, 29 percent of stopped white pedestrians were frisked, compared with 38 percent of nonwhites whom officers stopped. Differences of similar magnitude occurred in other boroughs as well on other stop outcomes, such as use of force. These stark differences are cause for concern but require closer inspection.

Our first finding is that pedestrians of various racial groups were stopped at different times and places and for different reasons. This is not surprising—census data indicate, and

31

New York residents know, that certain neighborhoods have concentrations of different races. Even within an NYPD precinct, the residential racial distributions vary greatly. Furthermore, economists have documented that work hours can vary greatly by race (Hamermesh, 1996), which affects the racial distribution of pedestrians exposed to the police at various times of the day. Figure 2.2 in Chapter Two also showed that the reasons for the stops vary substantially by race. As a result, some of the observed differences in stop outcomes could be attributable to time, place, and reason for which the stop occurred.

The analysis described in this chapter made comparisons between white and nonwhite pedestrians who were stopped in similar situations, in the same places, at the same times, and for the same reasons. By comparing similarly situated pedestrians, the analysis removed many alternative explanations for any observed differences. We also compared stops of black pedestrians to similarly situated white, Hispanic, and all nonblack pedestrians.

## Methods

Table 5.1 uses Manhattan South as an example and shows that white and nonwhite pedestrians were stopped under different circumstances. The first two columns list a variety of stop features. The third column of the table shows the percentage of the stopped white pedestrians whose stops had a particular feature. For example, 20 percent of the stopped white pedestrians were stopped in the 14th precinct, which includes Penn Station, Times Square, Madison Square Garden, and the New York Public Library. Of the nonwhites stopped in Manhattan South, 28 percent were stopped in the 14th, as shown in the last column, "Nonwhite (unadjusted)." When compared with nonwhite pedestrians, white pedestrians were also likelier to be stopped for burglary and drug possession, to have a physical form of identification, or to be stopped as a result of a radio run, but they were less likely to be stopped by housing and transit police and slightly less likely to be stopped in the early afternoon. It is possible that bias causes some of the differences in when, where, and why these stops occurred. However, this chapter focuses on detecting biases after these stop decisions have already been made.

To isolate the effect of racial bias, we must adjust for all factors associated with both race and post-stop outcomes, and we have made a concerted effort to include all such observable features in this analysis. The main issue identified in Table 5.1 is that differences by race in the rates of frisks and searches may be due to differences in when, where, and why the stops occurred. These factors may, independently of race, influence an officer's post-stop decision-making process. Suspicion of weapon possession, for example, should almost always result in a frisk.

To ensure a fair comparison, we matched similarly situated white and nonwhite pedestrians and compared their stop outcomes. The column labeled "Nonwhite (adjusted)" in Table 5.1 shows the results of a propensity-score weighting technique (Ridgeway, 2006) that reweights the stops involving nonwhite pedestrians so that they have the same distribution of features as those involving white pedestrians. The technique adjusts for times, in places, and for reasons that are atypical of stopped white pedestrians. Simultaneously, stops of nonwhite pedestrians that have features similar to stops of white pedestrians are given more weight. As a result, the percentages shown in the "White" and the "Nonwhite (adjusted)" columns are nearly identical. Any differences in search rates, for example, cannot be due to differences in any of the features listed in Table 5.1. Arriving at this near match

**Table 5.1**
**Distribution of Stop Features, by Race, for Manhattan South**

| Stop Feature | | Stopped Pedestrians | | |
|---|---|---|---|---|
| | | White (N = 5,547) | Nonwhite (adjusted) (N = 9,781) | Nonwhite (unadjusted) (N = 31,716) |
| Crime suspected (%) | Assault | 7 | 7 | 6 |
| | Burglary | 15 | 15 | 7 |
| | CPW | 9 | 10 | 11 |
| | Drugs | 5 | 5 | 3 |
| | Trespass | 6 | 7 | 9 |
| | Grand larceny | 9 | 10 | 14 |
| | Grand larceny, auto (GLA) | 5 | 5 | 4 |
| | Petit larceny | 6 | 6 | 9 |
| | Robbery | 5 | 5 | 11 |
| Precinct (%) | 1 | 6 | 6 | 5 |
| | 5 | 7 | 8 | 9 |
| | 6 | 9 | 9 | 7 |
| | 7 | 8 | 8 | 12 |
| | 9 | 14 | 14 | 12 |
| | 10 | 9 | 9 | 8 |
| | 13 | 9 | 9 | 9 |
| | 14 | 20 | 20 | 28 |
| | 17 | 8 | 8 | 3 |
| | 18 | 9 | 9 | 8 |
| Average age (years) | | 33 | 33 | 32 |
| Time of day (%) | [12–4 a.m.] | 24 | 23 | 18 |
| | (4–8 a.m.] | 8 | 8 | 6 |
| | (8 a.m.–12 p.m.] | 11 | 11 | 10 |
| | (12–4 p.m.] | 16 | 16 | 21 |
| | (4–8 p.m.] | 20 | 20 | 23 |
| | (8 p.m.–12 a.m.] | 21 | 21 | 21 |
| Location (%) | Housing | 4 | 5 | 14 |
| | Transit | 22 | 22 | 36 |
| | Other | 74 | 73 | 50 |

**Table 5.1—Continued**

| Stop Feature | | Stopped Pedestrians | | |
|---|---|---|---|---|
| | | White (N = 5,547) | Nonwhite (adjusted) (N = 9,781) | Nonwhite (unadjusted) (N = 31,716) |
| Month (%) | January | 10 | 9 | 9 |
| | February | 8 | 8 | 8 |
| | March | 9 | 9 | 9 |
| | April | 8 | 9 | 8 |
| | May | 9 | 8 | 8 |
| | June | 7 | 7 | 7 |
| | July | 8 | 8 | 8 |
| | August | 9 | 9 | 10 |
| | September | 8 | 8 | 9 |
| | October | 9 | 9 | 9 |
| | November | 8 | 8 | 8 |
| | December | 7 | 7 | 7 |
| Male (%) | | 88 | 88 | 91 |
| Day of the week (%) | Sunday | 13 | 13 | 11 |
| | Monday | 10 | 11 | 11 |
| | Tuesday | 16 | 17 | 17 |
| | Wednesday | 16 | 17 | 18 |
| | Thursday | 16 | 16 | 17 |
| | Friday | 15 | 14 | 15 |
| | Saturday | 14 | 13 | 12 |
| Type of ID (%) | Physical | 64 | 63 | 56 |
| | Verbal | 30 | 31 | 37 |
| Radio run (%) | Yes | 21 | 21 | 13 |

SOURCE: Computed from NYPD (2006).

NOTE: The stop features are sorted by how much the stopped white and nonwhite pedestrians differed with regard to that feature. The levels of crime suspected shown are limited to those representing at least 5 percent of the stops.

on the distribution of stop features required effectively paring the set of 31,716 stops of non-white pedestrians in Manhattan South down to 9,781 comparable stops. We repeated this process, separately matching black and Hispanic pedestrians to have the same distribution of stop features as the white pedestrians had. Appendix B provides technical details on this methodology.

In addition to the stop features listed in Table 5.1, we matched white and nonwhite pedestrians on 20 other features: the x-y coordinates of the stop location, being reported by witness,

being part of an ongoing investigation, being in a high-crime area, being at a high-crime time of day, being close to the scene of an incident, detecting sights and sounds of criminal activity, evasiveness, association with known criminals, changing direction at the sight of an officer, carrying a suspicious object, fitting a suspect description, appearing to be casing, acting as a lookout, wearing clothes consistent with those commonly used in crime, making furtive movements, acting in a manner consistent with a drug transaction or a violent crime, or having a suspicious bulge.

For each of the eight patrol boroughs, we selected a matched set of black, Hispanic, and all nonwhite (composed of black, Hispanic, Asian, and other nonwhite races) pedestrians with the same distribution of features as the stopped white pedestrians had in that borough. We then compared the two groups in terms of the rates of frisk, search, summon, arrest, and use of force.

Since the analysis reweights the black-, Hispanic-, and all-nonwhite-pedestrian stops to have the same stop features as those of white pedestrians, this analysis addresses only whether there is racial bias in the contexts (times, places, and reasons) in which white pedestrians are stopped. If bias occurs largely in the contexts in which black pedestrians are stopped, then even the white-black comparison will misrepresent the problem. In response to this issue, we repeated the analysis by comparing the outcomes of stops of black pedestrians with similarly situated stops of Hispanic, white, and nonblack (Asian, Hispanic, white, and all other nonblack races) pedestrians. This latter analysis addresses whether there is differential treatment at the times and places at which stops of black pedestrians generally occur.

## Results

Table 5.2 shows the results of the analysis comparing stops of white pedestrians with similarly situated stops of nonwhites. The stops of nonwhites tend to be slightly more intrusive than those of similarly situated white suspects. For example, stopped nonwhites have a frisk rate that is about 3 to 4 percent higher than that for white pedestrians. These estimates have sufficient precision to conclude that the differences are not chance differences. Search rates appear to be similar between white- and nonwhite-pedestrian stops, though search rates in Staten Island were slightly elevated for nonwhites, particularly for black pedestrians.

In three of the patrol boroughs, white suspects were slightly likelier to be issued a summons than were similarly situated nonwhites (5.7 percent versus 5.2 percent). One possible reason for this is that the stopped white suspects might be likelier to be involved in criminal activity, but other explanations are possible. Officers might have made some stops of nonwhites based on weaker evidence and, therefore, believed that prosecution for those suspected crimes is less likely to succeed. However, the absolute difference in rates is small enough to suggest that such a biased practice could not have been frequently applied, if at all. A third possible explanation based on previous analysis of videotapes of hundreds of traffic stops in Cincinnati indicated that officers were likelier to state that they were giving the driver "a break" when the driver was not white (Ridgeway, Schell, et al., 2006). Perhaps likeliest, given some symmetry in the rates of arrest and summons, is that an officer may be likelier to arrest nonwhites rather than issue a summons. We were able to account for whether the suspect had physical or verbal identification, but the quality or validity of the identification may differ across races and would directly affect an officer's decision between arresting and issuing a summons.

**Table 5.2**
**Comparison of Stop Outcomes for White Pedestrians with Those for Nonwhite Pedestrians Who Are Similarly Situated to the Stopped White Pedestrians**

| Borough | Outcome | White (%) | Black (%) | Hispanic (%) | All Nonwhite (%) |
|---|---|---|---|---|---|
| Bronx | N= | 2,758 | 4,045 | 5,165 | 11,111 |
| | Frisked | 46.5 | 50.7[a] | 49.8[a] | 50.3[a] |
| | Searched | 8.5 | 9.0 | 8.6 | 8.7 |
| | Summon issued | 7.8 | 7.0 | 7.1 | 6.8 |
| | Arrested | 4.9 | 5.2 | 5.1 | 5.1 |
| | Force used | 30.3 | 29.5 | 28.9 | 29.5 |
| Brooklyn North | N= | 4,705 | 2,391 | 5,099 | 12,772 |
| | Frisked | 24.7 | 27.7[a] | 28.2[a] | 28.4[a] |
| | Searched | 3.0 | 3.4 | 3.5 | 3.6 |
| | Summon issued | 6.7 | 5.4[a] | 5.1[a] | 5.3[a] |
| | Arrested | 1.7 | 1.8 | 1.9 | 2.0 |
| | Force used | 10.0 | 10.6 | 10.3 | 10.8 |
| Brooklyn South | N= | 13,270 | 2,256 | 3,186 | 4,105 |
| | Frisked | 29.0 | 30.9[a] | 31.4[a] | 30.7[a] |
| | Searched | 5.6 | 6.1 | 5.9 | 5.5 |
| | Summon issued | 5.5 | 4.8 | 5.5 | 5.1 |
| | Arrested | 4.0 | 4.5 | 4.4 | 4.0 |
| | Force used | 13.6 | 15.3[a] | 14.3 | 14.9[a] |
| Manhattan North | N= | 4,859 | 5,304 | 6,042 | 14,334 |
| | Frisked | 29.1 | 32.5[a] | 32.2[a] | 32.1[a] |
| | Searched | 7.2 | 7.2 | 6.9 | 6.9 |
| | Summon issued | 7.0 | 5.8[a] | 6.5 | 6.2[a] |
| | Arrested | 5.2 | 5.8 | 5.0 | 5.2 |
| | Force used | 14.2 | 16.2[a] | 14.9 | 15.6[a] |
| Manhattan South | N= | 5,547 | 4,072 | 3,641 | 9,781 |
| | Frisked | 29.0 | 33.7[a] | 33.9[a] | 33.4[a] |
| | Searched | 9.5 | 9.4 | 10.0 | 9.7 |
| | Summon issued | 4.5 | 3.5[a] | 3.4[a] | 3.7[a] |
| | Arrested | 8.1 | 7.7 | 8.4 | 7.8 |
| | Force used | 19.3 | 20.9[a] | 21.5[a] | 20.9[a] |

**Table 5.2—Continued**

| Borough | Outcome | White (%) | Black (%) | Hispanic (%) | All Nonwhite (%) |
|---|---|---|---|---|---|
| Queens North | N= | 9,811 | 2,907 | 7,730 | 14,828 |
| | Frisked | 34.3 | 38.0[a] | 37.9[a] | 36.8[a] |
| | Searched | 7.3 | 7.7 | 7.8 | 7.3 |
| | Summon issued | 5.3 | 4.6 | 5.8 | 5.5 |
| | Arrested | 5.1 | 5.7 | 6.2[a] | 5.7[a] |
| | Force used | 12.7 | 14.1[a] | 13.5 | 13.1 |
| Queens South | N= | 4,074 | 3,635 | 4,282 | 8,544 |
| | Frisked | 31.6 | 36.6[a] | 33.3 | 34.2[a] |
| | Searched | 7.4 | 8.2 | 8.1 | 7.9 |
| | Summon issued | 6.5 | 6.2 | 6.9 | 6.6 |
| | Arrested | 6.5 | 6.2 | 5.8 | 6.1 |
| | Force used | 18.7 | 20.3 | 19.2 | 19.8 |
| Staten Island | N= | 8,476 | 1,069 | 663 | 1,908 |
| | Frisked | 20.3 | 29.2[a] | 24.5[a] | 26.2[a] |
| | Searched | 4.8 | 8.1[a] | 4.6 | 6.1[a] |
| | Summon issued | 4.7 | 3.3[a] | 4.7 | 4.0 |
| | Arrested | 4.0 | 6.9[a] | 4.1 | 5.4[a] |
| | Force used | 10.1 | 13.5[a] | 12.0[a] | 12.4[a] |
| Overall | Frisked | 29.3 | 33.5[a] | 32.8[a] | 32.6[a] |
| | Searched | 6.4 | 7.2[a] | 6.7 | 6.7 |
| | Summon issued | 5.7 | 4.8[a] | 5.5 | 5.2[a] |
| | Arrested | 4.8 | 5.4[a] | 5.1 | 5.1[a] |
| | Force used | 14.5 | 16.2[a] | 15.4[a] | 15.7[a] |

SOURCE: Computed from NYPD (2006).

NOTE: In this table, stops of black, Hispanic, and all nonwhite pedestrians are reweighted to have the same distribution of features as those of the stopped white pedestrians.

[a] Figures that differ statistically from the rate for black pedestrians.

Use of physical force includes hands-on physical restraint and handcuffing as well as use of force instruments, such as a baton or pepper spray, and drawing a firearm. Rates of use of force were fairly evenly distributed across the racial groups. In five boroughs, the rate of use of force was about 1.5 percent higher for black pedestrians than for white pedestrians. The race effect for use of force appears to be greatest in Staten Island, where officers used force on black suspects in 13.5 percent of stops compared with 10.1 percent for white suspects. This translates into an estimated 36 stops (3.4 percent of 1,069) of black suspects involving force in excess of what would be expected, judging by similarly situated stops of white pedestrians.

The results shown in Table 5.2 are the result of matching nonwhites to have the same distribution of features as white pedestrians. Matching in this way investigates how nonwhites fare in the times, places, and situations in which white suspects are detained. Instead, to assess whether racial disparities occur in the common contexts in which officers stop black suspects, we repeated the analysis, this time creating additional sets of matched stops specifically constructed for black suspects.

Table 5.3 shows the results of the analysis comparing black with similarly situated Hispanic, white, and the collection of nonblack pedestrians. The rates shown in Table 5.3 differ

**Table 5.3**
**Comparison of Stop Outcomes for Black Pedestrians with Those for Pedestrians of Other Races Who Are Similarly Situated to the Stopped Black Pedestrians**

| Borough | Outcome | Black | Hispanic | White | Nonblack |
|---|---|---|---|---|---|
| Bronx | N= | 36,165 | 20,376 | 724 | 26,916 |
| | Frisked | 57.2 | 55.9[a] | 53.3[a] | 55.2[a] |
| | Searched | 9.4 | 8.7[a] | 9.7 | 8.7[a] |
| | Summon issued | 8.1 | 8.6[a] | 8.8 | 8.6[a] |
| | Arrested | 5.3 | 5.0 | 5.2 | 5.0 |
| | Force used | 27.0 | 26.1[a] | 26.9 | 26.3[a] |
| Brooklyn North | N= | 79,950 | 9,123 | 1,451 | 13,014 |
| | Frisked | 39.3 | 38.1[a] | 34.1[a] | 37.7[a] |
| | Searched | 3.5 | 3.2 | 2.8 | 3.2 |
| | Summon issued | 5.4 | 5.2 | 6.1 | 5.2 |
| | Arrested | 1.8 | 1.4[a] | 1.4 | 1.4[a] |
| | Force used | 12.3 | 12.0 | 11.2 | 12.0 |
| Brooklyn South | N= | 32,887 | 1,777 | 567 | 3,086 |
| | Frisked | 55.1 | 53.7 | 53.7 | 54.2 |
| | Searched | 7.2 | 6.8 | 6.5 | 7.1 |
| | Summon issued | 3.9 | 4.4 | 5.5[a] | 4.8[a] |
| | Arrested | 3.6 | 3.7 | 3.8 | 3.9 |
| | Force used | 28.6 | 29.9 | 22.1[a] | 28.6 |
| Manhattan North | N= | 44,964 | 9,256 | 1,326 | 13,655 |
| | Frisked | 46.4 | 45.5 | 44.3 | 44.7[a] |
| | Searched | 7.5 | 7.5 | 7.1 | 7.5 |
| | Summon issued | 6.5 | 6.9 | 7.7 | 7.0 |
| | Arrested | 4.4 | 4.0 | 4.5 | 4.0[a] |
| | Force used | 23.2 | 22.1[a] | 22.0 | 21.5[a] |

**Table 5.3—Continued**

| Borough | Outcome | Black | Hispanic | White | Nonblack |
|---|---|---|---|---|---|
| Manhattan South | N= | 17,915 | 6,345 | 2,441 | 11,230 |
| | Frisked | 37.1 | 37.7 | 32.0[a] | 35.7[a] |
| | Searched | 8.8 | 8.9 | 8.5 | 8.5 |
| | Summon issued | 2.4 | 2.3 | 2.6 | 2.4 |
| | Arrested | 6.4 | 6.3 | 7.0 | 6.2 |
| | Force used | 20.1 | 20.4 | 18.9 | 19.5 |
| Queens North | N= | 9,578 | 2,670 | 559 | 3,050 |
| | Frisked | 35.6 | 36.9 | 31.9[a] | 35.3 |
| | Searched | 8.3 | 8.5 | 6.2[a] | 8.0 |
| | Summon issued | 10.2 | 10.1 | 8.6 | 9.7 |
| | Arrested | 7.4 | 7.5 | 6.7 | 7.0 |
| | Force used | 13.5 | 13.0 | 12.6 | 12.5[a] |
| Queens South | N= | 39,265 | 3,346 | 509 | 3,995 |
| | Frisked | 45.9 | 43.2[a] | 44.9 | 43.3[a] |
| | Searched | 7.2 | 7.4 | 9.3 | 7.1 |
| | Summon issued | 5.7 | 6.8[a] | 7.7[a] | 6.6[a] |
| | Arrested | 4.9 | 4.1[a] | 7.1[a] | 4.4 |
| | Force used | 28.1 | 25.3[a] | 31.8 | 26.6[a] |
| Staten Island | N= | 6,742 | 1,705 | 683 | 3,558 |
| | Frisked | 37.7 | 34.5[a] | 33.4[a] | 34.1[a] |
| | Searched | 8.7 | 7.5 | 8.5 | 8.0 |
| | Summon issued | 3.3 | 3.3 | 2.8 | 3.2 |
| | Arrested | 7.3 | 6.3 | 8.1 | 6.7 |
| | Force used | 22.9 | 22.4 | 21.8 | 22.0 |
| Overall | Frisked | 45.5 | 44.3[a] | 42.1[a] | 43.3[a] |
| | Searched | 6.6 | 6.4 | 6.5 | 6.4 |
| | Summon issued | 5.7 | 6.0[a] | 6.7[a] | 6.3[a] |
| | Arrested | 4.0 | 3.7[a] | 4.3 | 3.9 |
| | Force used | 21.3 | 20.6[a] | 20.2[a] | 20.4[a] |

SOURCE: Computed from NYPD (2006).
NOTE: In this table, stops of Hispanic, white, and all nonblack (includes Hispanic and white) pedestrians are reweighted to have the same distribution of features as those of the stopped black pedestrians.
[a] Figures that differ statistically from the rate for black pedestrians.

from those shown in Table 5.2 because these stops have been reweighted to reflect the contexts (e.g., times, places, reasons) in which officers commonly stop black pedestrians. Comparisons between the columns for black and white pedestrians in Table 5.3 address the unanswered issue left from the white-nonwhite comparisons in Table 5.2: Perhaps bias occurs in the contexts in which officers detain black pedestrians. Generally, black pedestrians have a greater frequency of negative outcomes from the stops, though this pattern does not appear in all boroughs or for all outcomes. For example, black pedestrians have a frisk rate that is about 2 percent higher than that for similarly situated nonblack pedestrians. Statistically, these are not chance differences. While the percentage-point difference may seem small, black pedestrians account for 267,466 stops, implying that the 2 percent difference amounts to an excess of 5,350 black pedestrians frisked. Staten Island has the largest gaps in frisk rates, as much as 4 percent. Disparities in search rates appear to be minimal, because search rates across the racial groups are nearly equal.

There are few differences in the rates of receiving a summons for black suspects than those for similarly situated suspects of the other races. In the Bronx and Brooklyn South, the rate was slightly lower for black suspects, which may suggest that officers either are likelier to give them a break or are initiating some stops of black suspects in which the likelihood of criminal activity is minimal.

Force was slightly likelier to be used against black suspects than against similarly situated nonblack suspects. However, the UF250 does not document whether the suspect cooperated with the officers. If black suspects are likelier to flee or resist, the observed difference in rates of use of force may not be due to officer bias. The largest observed difference was in Queens South, with a 1.5 percent difference in the rate of use of force. Citywide, the rate of force being used against a black suspect was about 3.9 percent larger than it was for a similarly situated nonblack suspect and 4.9 percent larger than for a similarly situated white suspect. If black suspects experienced the use-of-force rate that nonblack suspects experienced, there would have been 2,000 fewer use-of-force incidents in stops of black pedestrians.

## Analysis of Hit Rates

Chapter Two of this report suggests that the *hit rate*, the rate at which contraband has been recovered from frisked or searched suspects, might be a useful measure of racial disparities in searches. If the hit rate for searched nonwhite suspects is less than the hit rate for searched white suspects, police might be applying a lower standard of suspicion to nonwhite suspects when deciding whether to search. As with the analyses presented in previous chapters, simple comparisons of hit rates can distort the true differences. A simple example demonstrates.

Assume that suspects are stopped for either burglary or robbery. Further assume that there is no racial difference in the rates at which suspects carry contraband and that police are racially neutral in making stop and frisk decisions (essentially blind to race). Last, consider the information shown in Table 5.4. Within a crime category, hit rates are equal for black and white suspects. In this example, officers detain many more white suspects on suspicion of robbery, a crime with a higher hit rate, than they do black suspects, who are likelier to be stopped for burglary. In this example, though, those large differences in the rates of stops for burglary and robbery by race are due not to officer bias but to other factors, such as racial differences in criminal participation. As a result, the total hit rate for white suspects is 4.6 percent

**Table 5.4**
**Hypothetical Example of a Hit-Rate Analysis**

| Race | Measure | Burglary | Robbery |
|------|---------|----------|---------|
| White | Stopped and frisked | 100 | 900 |
| | Had contraband | 1 | 5 |
| | Had contraband | 1 | 45 |
| Black | Stopped and frisked | 900 | 100 |
| | Had contraband | 1 | 5 |
| | Had contraband | 9 | 5 |

([1+45]/1,000), and, for black suspects, the hit rate is 1.4 percent ([9+5]/1,000). One could conclude from these two numbers alone that racially biased officers overfrisk black suspects and underfrisk white suspects, but officers in the example are race neutral by design. Hit rates are equal across races for suspected burglars and equal across races for suspected robbers. This is a reminder that failing to account for an important factor—suspected crime, in this example—can distort the conclusions.

This example illustrates a statistical problem that Ayres (2002) termed the *subgroup validity problem*,[1] in which a particular relevant feature is more prevalent for certain racial groups. Other factors may impact the hit rate as well. Officers in some precincts may be likelier to frisk, due to crime in the area, recent surges in weapon recoveries, or a recent shooting of a fellow officer. An elevated frisk rate in some precincts may not meet with the community's approval; however, it would be premature to attribute this variation to racial bias without examining other factors. Therefore, it is critical to account for factors that might be associated with both race and the rate of contraband recovery.

We used the same analytical framework as we did for our analysis of stop outcomes to address the question of disparities in hit rates. We used all of the variables listed in Table 5.1 along with the 20 additional variables described following Table 5.1. Table 5.5 shows the results. We focused the analysis on comparisons of black, Hispanic, and white suspects, since other nonwhite groups had too few similarly situated stops that could be included in the analysis.

Frisked or searched white suspects were likelier to have contraband of some form. Black and Hispanic suspects stopped in situations that were similar to the collection of white suspects had hit rates of 5.7 percent and 5.4 percent, respectively, compared with a hit rate of 6.4 percent for white suspects. There was no statistical evidence for a difference between the recovery rates from frisks and searches of black suspects and those for similarly situated Hispanic and white suspects. Furthermore, for all racial comparisons, there were no differences in the rates at which officers found weapons on suspects.

It is plausible that the *carry rates*, the percentage of stopped suspects that have contraband, differ by race. If white suspects simply carry drugs more frequently, perhaps believing that officers are unlikely to search them, then the contraband recovery rates for white suspects will be higher. Knowles, Persico, and Todd (2001) theorized that criminals will be able to accurately assess their risk of being searched and adjust their frequency of carrying drugs and weapons

---

1 This is more generally known as Yule's reversal paradox or Simpson's paradox.

42   Analysis of Racial Disparities in the New York City Police Department's Stop, Question, and Frisk Practices

**Table 5.5**
**Frisked or Searched Suspects Found Having Contraband or Weapons**

| Outcome | Reference Group (%) | Comparison Racial Groups (adjusted) (%) | |
|---|---|---|---|
| | White | Black | Hispanic |
| Any contraband | 6.4 | 5.7[a] | 5.4[a] |
| Weapon | 1.2 | 0.9 | 1.1 |
| | Black | Hispanic | White |
| Any contraband | 3.3 | 3.2 | 3.8 |
| Weapon | 0.7 | 0.7 | 0.8 |

SOURCE: Computed from NYPD (2006).
NOTE: Numbers from the comparison racial groups differ from those in Table 2.1 because their stops have been reweighted to have the same distribution of features as the reference group.
[a] Figures that differ statistically from the rate for the reference group.

accordingly, so that an outcome test will be appropriate. It is difficult to confirm this in practice, and, as a result, conclusions drawn from Table 5.5 must allow for the possibility that carry rates are not uniform across racial groups.

## Conclusions

The citywide aggregate figures showed large differences between racial groups in the rates of frisk, search, use of force, and arrest. Accounting for important factors, such as time, place, and reason for the stop, indicates that a large portion of that gap is actually due to differences in these factors and not necessarily race.

After adjusting for stop circumstances, we found differences in the rates of some outcomes in some boroughs. On average, nonwhites experience more intrusive stops than do similarly situated white suspects. The Staten Island borough stands out particularly, with several large racial gaps in the frisk, search, and use-of-force rates.

The aggregate figures on contraband recovery rates were, perhaps, the most startling, given that recovery rates for white suspects were nearly twice those for black suspects. However, after accounting for several important factors, the recovery rate for white suspects is 12 percent greater than that for black suspects (6.4 percent versus 5.7 percent). When considering only recovery rates of weapons, we find no differences at all by race. For every 1,000 frisks of black suspects, officers recovered seven weapons; for every 1,000 frisks of similarly situated white suspects, they recovered eight weapons, a difference that is not statistically significant.

CHAPTER SIX
# Conclusions and Recommendations

## Conclusions

Racial differences in SQF rates generated substantial concern in New York in the early part of 2007 and continue to be discussed in the media and by policymakers. The volume of stops is cited as a cause for a large number of complaints and lawsuits against the police. Furthermore, only 10 percent of the stops result in an arrest or a summons. The value of those arrests compared with the cost of the false positives is a topic worthy of discussion in the community. Is the value of one arrest worth the cost of nine stops of suspects who have committed no crime and are not arrested? Statistical analysis cannot provide the answer.

The racial disparities in the stops have generated as much concern as has the volume of stops; 89 percent of the stops involved nonwhites, 45 percent of black and Hispanic suspects were frisked compared with 29 percent of white suspects, and, when frisked, white suspects were 70 percent likelier than were black suspects to have had a weapon on them. Our analysis clarified these observed disparities. The racial distribution of stops was similar to the racial distribution of arrestees in most categories. Hispanics were stopped 5 to 10 percent more than their representation in crime-suspect descriptions would predict. Black suspects, on the other hand, were stopped substantially less than would be expected, 20 to 30 percent less than their representation in crime-suspect descriptions.

Officers frisked 29 percent of stopped white suspects, 34 percent of similarly situated black suspects, and 33 percent of similarly situated Hispanic suspects. Note that the latter rates are much lower than the aggregate rate of 45 percent previously mentioned. Three-fourths of the racial gap in frisk rates was due to differences in time, place, and other situational factors. There remains a difference of 4 percent that none of the numerous factors included in the analysis can explain.

Analysis of data on weapons recovered from searches and frisks revealed that weapon recovery rates were nearly equal across racial groups of similarly situated suspects. The aggregate figure that frisked white suspects were 70 percent likelier to have a weapon than was a black suspect is distorted by racial differences in time, place, and reason for the stop. Regarding all contraband, such as weapons, stolen property, or drugs, when we compared white, black, and Hispanic suspects who were matched to have similar stop features, we learned that recovery rates are nearly the same (whites have slightly higher rates), suggesting that officers apply nearly the same standard of suspicion regardless of race.

Comparing thousands of stops at a time across entire boroughs can miss some of the problems that might be occurring on a smaller scale. We assessed whether there were evidence that certain officers may be disproportionately stopping nonwhites. Our analysis flagged a total

43

of 15 officers who appear to have been stopping nonwhites substantially more than were other officers patrolling at the same time and place and in the same assignment. This represents 0.5 percent of the NYPD officers most active in pedestrian-stop activity. Again, while we found some evidence of unequal treatment across racial groups, our analysis estimates that the problem is not of a massive scale, but rather one that police management can address with effective supervision, monitoring of police activity, and effective interventions when problems are identified.

NYPD has invested heavily in the use of information to monitor crime patterns, nimbly adapt to emerging trends, and evaluate its force allocation. Those skills, to which the crime drop in New York is at times attributed, can also be effective at monitoring for problematic officers, precinct-level disparities in frisk and recovery rates, and evaluating the effect of training and policy changes on racial disparities. Such effort communicated effectively to the community members can be constructive for improving police-community relations.

## Recommendations

Overall, we have six recommendations for NYPD to improve interactions between police and pedestrians during stops and to improve the accuracy of data collected during pedestrian stops.

### Officers Should Clearly Explain to Pedestrians Why They Are Being Stopped

In 90 percent of the stops, the detained individual is neither arrested nor issued a summons. To mitigate the discomfort of such interactions and to bolster community trust, officers should explain the reason for the stop, discuss specifically the suspect's manner that generated the suspicion, and offer the contact information of a supervisor or appropriate complaint authority so that the person stopped can convey any positive or negative comments about the interaction. While the latter suggestion might increase the number of official complaints, it might also reduce the number of unofficial complaints that would otherwise circulate in the suspect's social network. For a trial period in select precincts, the NYPD could require that officers give an information card to those stopped pedestrians who are neither arrested nor issued a summons. An evaluation of the program could identify the kinds of stops likeliest to result in positive or negative feedback from the stopped pedestrians. Most important, ongoing communication and negotiation with the community about SQF activities are helpful in maintaining good police-community relations.

### The NYPD Should Review the Boroughs with the Largest Racial Disparities in Stop Outcomes

For most stop outcomes in most parts of the city, we found few, if any, racial differences in the rates of frisk, search, arrest, and use of force. However, for some particular subsets of stops, there are racial disparities, and, in some boroughs for some outcomes, the disparities are fairly large. In particular, there was evidence of large racial differences in frisk rates in several boroughs. For example, on Staten Island, officers frisk 20 percent of white suspects and 29 percent of similarly situated black suspects. Officers were likelier to use force of some kind against black suspects in Brooklyn South than they were to use it against similarly situated white suspects (29 percent versus 22 percent). However, the use-of-force finding on which we base this recom-

mendation may be the result of incomplete details on the reason officers used force, the subject of the next recommendation. Regardless, a closer review of these outcomes in these boroughs may suggest changes in training, policies, or practices that can reduce these disparities.

### The UF250 Should Be Revised to Capture Data on Use of Force

All of the reported differences resulting from our analysis are potentially due to unobserved or unmeasured features of the stops rather than racial bias. For example, the 1 percent difference observed in rates of use of force between stops of white and nonwhite suspects may be due to a factor not recorded on the UF250. It is possible that nonwhite suspects were slightly likelier to attempt to flee or threaten officers. If the percentage of nonwhite-pedestrian stops in which the suspect resisted officers was 0.8 percent more than the frequency with which white suspects resisted officers, statistically, the frisk rates would be indistinguishable. However, these reasons—attempting to flee or resisting officers—are not recorded on the UF250. The UF250 was intended for investigative purposes and not for assessing officer performance or racial disparities. For the data to be more useful for careful analysis of racial bias in use-of-force incidents, the reason for the use of force needs to be recorded.

### New Officers Should Be Fully Conversant with Stop, Question, and Frisk Documentation Policies

Officers with more than one year of experience seemed fully informed of the SQF practices and documentation policies. However, informal discussions with and observations of recent academy graduates indicated that some were not fully aware of the documentation policies and procedures, despite a substantial investment of time in the academy training curriculum on SQF. This is an issue that likely impacts a small fraction of stops. For the purposes of assessing racial bias, we do not find a need for investment to correct this, but, since data on UF250s are used in other facets of NYPD evaluation, some correction in training during new officers' initial days on the street might be in order, particularly for any evaluation of impact programs.

### The NYPD Should Consider Modifying the Audits of the UF250

The NYPD has multiple layers of auditing to ensure that the UF250s are complete and contain valid and sufficiently detailed entries to each question. This does not address whether stops are occurring that are not documented. Since officers have an incentive to demonstrate productivity through UF250s, most stops should be documented. However, particularly problematic ones may not be. Radio communications could be monitored for a fixed period in a few randomly selected precincts. Notes of the times and places of street encounters that should have associated UF250s can be noted and requests made for the forms.

All of our analyses rely on the data that officers record on UF250s. The accuracy of the information on the forms, such as time, place, and reason for the stop, is assumed to be approximately correct for the purposes of our analyses. For inaccuracies to adversely affect our analyses, officers would have had to consistently record events differently for nonwhite than for white suspects. However, unless officers were carefully tabulating which actions they failed to report, the analyses in this report would interpret the patterns that would result as evidence of a disparity. For example, if officers consistently did not record frisks of nonwhite suspects, our analysis would have found white suspects to be substantially overfrisked. There is no evidence of such general patterns. That said, in interpreting the findings of this study, we must

offer the caveat that systematic misreporting of data on the UF250 could potentially distort the findings.

**NYPD Should Identify, Flag, and Investigate Officers with Out-of-the-Ordinary Stop Patterns**

Our analysis indicates that the racial distribution of stops for several officers is skewed substantially from those of their colleagues. We recommend that the NYPD review these flagged officers and incorporate into their early warning system a component that flags officers with extreme deviations from their colleagues. These measured disparities are evidence that these officers differ substantially from their peers; however, they are not necessarily conclusive evidence that these officers practice racially biased policing. Supervisors may then investigate and address the disparities.

APPENDIX A

# Details of Statistical Models Used in the External-Benchmark Analysis

## Statistical Model for Comparisons with the Residential Census

Let $y_{ij}$ indicate the number of stops of suspects in precinct $i$ who are of race $j$, and let $n_i$ be the total number of stops in precinct $i$. Let $p_{ij}$ indicate the percentage of residents in precinct $i$ who are members of race $j$. We modeled the counts of stops as a Poisson and allowed for the rate to vary by precinct and by race: $y_{ij} \sim \text{Poisson}(p_{ij}n_i\alpha_j)$.

The term $p_{ij}n_i$ essentially represents the expected number of stopped suspects of race $j$ if the stop pattern reflected the residential census. The primary term of interest is $\alpha_j$, a multiplier that depends on race that either increases or decreases the expected number of stopped suspects, depending on their race. This model can be fit with standard software for generalized linear models, restricting there to be no intercept, an offset term of $\log\left(p_{ij}n_i\right)$, and a categorical race effect.

There is a well-known connection between the Poisson distribution and the multinomial. If $(y_{i1}, y_{i2}, y_{i3}, y_{i4}, y_{i5})$ are the counts in precinct $i$, then $(y_{i1}, y_{i2}, y_{i3}, y_{i4}, y_{i5})$ conditional on their sum being equal to $n_i$ has a multinomial distribution with probabilities $(p_{i1}\alpha_j/K_i, p_{i2}\alpha_j/K_i, p_{i3}\alpha_j/K_i, p_{i4}\alpha_j/K_i, p_{i5}\alpha_j/K_i)$, where $K_i$ is the normalizing constant that makes the terms sum to 1.

## Statistical Model for Comparisons with 2005 Arrestees

Let $y_{ij}$ indicate the number of stops of suspects in precinct $i$ who are of race $j$, and let $n_{ij}$ be the number of arrestees from precinct $i$ who are of race $j$. We used a variation on the statistical model proposed in Gelman, Fagan, and Kiss (2007, equation 4):

$$y_{ij} \sim \text{Poisson}(\theta_{ij}\exp[\mu + \beta_i + \alpha_j + \varepsilon_{ij}])$$

$$n_{ij} \sim \text{Poisson}(\theta_{ij}).$$

We constrained the sum of the $\beta_i$s and the sum of the $\alpha_j$s to equal 0. The term $\theta_{ij}\exp(\mu + \beta_i)$ captures the expected number of stops of suspects of race $j$ in precinct $i$. The multiplier $\exp(\alpha_j)$ indicates whether the rate of stops of race $j$ appears to be in excess of what would be expected. The term $\varepsilon_{ij}$ is modeled as a Normal$\left(0, \sigma^2\right)$ random variable, to allow for extra-Poisson variability (overdispersion) in the outcome.

Gelman, Fagan, and Kiss (2007) attempted to further decompose $\theta_{ij}$ into components representing the residential census, race, and precinct, but that additional structure is not necessary for the estimation of the race effect, $\exp(\alpha_j)$.

We estimated the parameters using OpenBUGS 3.0.1.

APPENDIX B
# Details of Propensity-Score Weighting

We used propensity-score weighting to reweight stops from some comparison groups to have the same distribution of features as the stops in a reference group. The choice of reference and comparison groups differs by the analytical question being addressed. In Chapter Four, stops from one officer formed the reference group, and the collection of other officers' stops comprised the comparison group. In Chapter Five, stops involving suspects of one racial group formed the reference group, and stops of suspects of other races comprised the comparison group.

Stops in the comparison are weighted and are not technically included or excluded from the sample. The weights are constructed in such a way that any weighted statistic of the comparison group (e.g., weighted average age, weighted percentage from precinct 14, weighted percentage stopped between midnight and 4 a.m. resulting from a radio run) will match the same unweighted statistic computed for the reference group.

Let $\mathbf{x}$ represent the collection of stop features and $t$ be a binary indicator that the stop is a member of the reference group. The distribution $f(\mathbf{x}|t=1)$ represents the conditional distribution of stop features for those stops in the reference group, and $f(\mathbf{x}|t=0)$ represents the distribution of features for stops in the comparison group. We wanted to weight the latter distribution so that

$$f(\mathbf{x}|t=1) = w(\mathbf{x})\,f(\mathbf{x}|t=0),$$

where $w(\mathbf{x})$ is the weighting function of interest to us. Solving for $w(\mathbf{x})$ and applying Bayes' theorem to the numerator and denominator yields

$$w(\mathbf{x}) = K f(t=1|\mathbf{x})/f(t=0|\mathbf{x}),$$

where $K$ is a constant that will later drop out of the analysis. The right-side expression is proportional to the probability that a stop with features $\mathbf{x}$ is in the reference group divided by the probability that a stop with features $\mathbf{x}$ is in the comparison group.

This indicates that, for a comparison-group stop with features $\mathbf{x}$, we should apply a weight equal to the odds that a stop with features $\mathbf{x}$ was in the reference group. Note that, if reference-group stops rarely occur in precinct 14, for example, then all comparison-group stops made in precinct 14 will receive a weight near 0. On the other hand, comparison-group stops with features much like those of the reference group will receive large weights.

To estimate $f(t=1|\mathbf{x})$, we used a nonparametric version of logistic regression. See McCaffrey, Ridgeway, and Morral (2004) for complete details. We evaluated the quality of the weights by how well the distribution of the features matched between the reference group and

the weighted stops in the comparison group. For example, comparing the third and fourth columns in Table 4.1 in Chapter Four indicates that the computed weights align the distribution of stop features for nonwhite suspects with the distribution of stop features for white suspects.

APPENDIX C
# Estimating False Discovery Rates

Fridell (2004) noted that a popular statistic for measuring the difference between an officer's nonwhite-pedestrian stop fraction and the officer's internal benchmark is the z-statistic,

$$z = \frac{p_t - p_c}{\sqrt{\dfrac{p_t(1-p_t)}{N_t} + \dfrac{p_c(1-p_c)}{N_c}}}.$$

C.1

In this measure, $p_t$ and $p_c$ are, respectively, the proportion of stops involving nonwhite pedestrians for the target and the weighted comparison-group stops. The denominator normalizes this term to have variance 1. This statistic is computed for all officers under consideration. In standard circumstances, $z$ will have a standard normal distribution, and the probability that the absolute value of $z$ exceeds 2.0 when there is no difference between the officer's stop rate and the internal benchmark is 5 percent. However, in a collection of 2,756 *independent* comparisons with no racial bias, we should expect about 138 (5 percent of 2,756) officers to have z-statistics exceeding 2.0 by chance. Thus, flagging officers with $z$ exceeding 2.0 is bound to select officers with no racial biases. Further complicating matters is that the 2,756 z-scores are *not* independent. They are correlated with each other, since each officer might be used in another officer's internal benchmark. In this case, the empirical distribution of the zs may be much wider (or narrower) than would be predicted by statistical theory (Efron, 2006).

Benjamini and Hochberg (1995) pioneered the use of the false discovery rate (fdr) as an alternative methodology for locating truly extreme values in multiple comparison situations. The fdr is the probability of no group difference given the value of an observed test statistic, $z$ (Efron, 2004).

We can derive the probability of an officer being outlier as

$$P(\text{outlier} \mid z) = 1 - P(\text{not outlier} \mid z)$$
$$= 1 - \frac{f(z \mid \text{not outlier}) f(\text{not outlier})}{f(z)}$$
$$\geq 1 - \frac{f_0(z)}{f(z)},$$

C.2

where $f_0(z)$ is the distribution of $z$ for nonoutlier officers, and $f(z)$ is the distribution of $z$ for all officers (Efron, 2004). If the fraction of problem officers is small (less than 10 percent), the

bound in the last line of Equation C.2 is near equality. We estimated $f_0(z)$ with the empirical null assuming normal but with location and variance estimated using only the central data of the distribution.

We used the R package locfdr 1.1-4 for this analysis' calculations.

APPENDIX D
## Unified Form 250: Stop, Question, and Frisk Report Worksheet

The following pages contain a copy of the UF250.

**(COMPLETE ALL CAPTIONS)**

**STOP, QUESTION AND FRISK REPORT WORKSHEET**
PD344-151A (Rev. 11-02)

| Pct.Serial No. | |
|---|---|
| Date | Pct. Of Occ. |

| Time Of Stop | Period Of Observation Prior To Stop | Radio Run/Sprint # |
|---|---|---|

Address/Intersection Or Cross Streets Of Stop

☐ Inside    ☐ Transit
☐ Outside   ☐ Housing

Type Of Location Describe:

Specify Which Felony/P.L. Misdemeanor Suspected | Duration Of Stop

## What Were Circumstances Which Led To Stop?
**(MUST CHECK AT LEAST ONE BOX)**

☐ Carrying Objects In Plain View Used In Commission Of Crime e.g., Slim Jim/Pry Bar, etc.
☐ Fits Description.
☐ Actions Indicative Of "Casing" Victim Or Location.
☐ Actions Indicative of Acting As A Lookout.
☐ Suspicious Bulge/Object (Describe)
☐ Other Reasonable Suspicion Of Criminal Activity (Specify)

☐ Actions Indicative Of Engaging In Drug Transaction.
☐ Furtive Movements.
☐ Actions Indicative Of Engaging In Violent Crimes.
☐ Wearing Clothes/Disguises Commonly Used In Commission Of Crime.

| Name Of Person Stopped | Nickname/ Street Name | Date Of Birth |
|---|---|---|

| Address | Apt. No. | Tel. No. |
|---|---|---|

Identification:  ☐ Verbal    ☐ Photo I.D.    ☐ Refused
☐ Other (Specify) _____

Sex:☐ Male  Race:☐ White  ☐ Black☐ White Hispanic ☐ Black Hispanic
☐ Female    ☐ Asian/Pacific Islander  ☐ American Indian/Alaskan Native

| Age | Height | Weight | Hair | Eyes | Build |
|---|---|---|---|---|---|

Other (Scars, Tattoos, Etc.)

| Did Officer Explain Reason For Stop ☐ Yes  ☐ No | If No, Explain: |
|---|---|

| Were Other Persons Stopped/ Questioned/Frisked? | ☐ Yes ☐ No | If Yes, List Pct. Serial Nos. |
|---|---|---|

If Physical Force Was Used, Indicate Type:
☐ Hands On Suspect
☐ Suspect On Ground
☐ Pointing Firearm At Suspect
☐ Handcuffing Suspect
☐ Suspect Against Wall/Car

☐ Drawing Firearm
☐ Baton
☐ Pepper Spray
☐ Other (Describe)

| Was Suspect Arrested? ☐ Yes  ☐ No | Offense | Arrest No. |
|---|---|---|
| Was Summons Issued? ☐ Yes  ☐ No | Offense | Summons No. |

| Officer In Uniform? ☐ Yes  ☐ No | If No, How Identified? ☐ Shield ☐ I.D. Card ☐ Verbal |
|---|---|

**Was Person Frisked?** ☐ Yes ☐ No    IF YES, MUST CHECK AT LEAST ONE BOX
☐ Inappropriate Attire - Possibly Concealing Weapon    ☐ Furtive Movements    ☐ Refusal To Comply With Officer's Direction(s)
☐ Verbal Threats Of Violence By Suspect    ☐ Actions Indicative Of    ☐ Leading To Reasonable Fear For Safety
☐ Knowledge Of Suspects Prior Criminal    Engaging In Violent    ☐ Violent Crime Suspected
Violent Behavior/Use Of Force/Use Of Weapon    Crimes    ☐ Suspicious Bulge/Object (Describe)
☐ Other Reasonable Suspicion of Weapons (Specify)

**Was Person Searched?** ☐ Yes ☐ No  IF YES, MUST CHECK AT LEAST ONE BOX ☐ Hard Object ☐ Admission Of Weapons Possession
☐ Outline Of Weapon    ☐ Other Reasonable Suspicion of Weapons (Specify)

**Was Weapon Found?** ☐ Yes ☐ No    If Yes, Describe: ☐ Pistol/Revolver ☐ Rifle/Shotgun ☐ Assault Weapon ☐ Knife/Cutting Instrument
☐ Machine Gun ☐ Other (Describe)

**Was Other Contraband Found?**    ☐ Yes ☐ No If Yes, Describe Contraband And Location _____
Demeanor Of Person After Being Stopped _____
Remarks Made By Person Stopped _____

**Additional Circumstances/Factors:**    (Check All That Apply)
☐ Report From Victim/Witness    ☐ Evasive, False Or Inconsistent Response To Officer's Questions
☐ Area Has High Incidence Of Reported Offense Of Type Under Investigation    ☐ Changing Direction At Sight Of Officer/Flight
☐ Time Of Day, Day Of Week, Season Corresponding To Reports Of    ☐ Ongoing Investigations, e.g., Robbery Pattern
Criminal Activity    ☐ Sights And Sounds Of Criminal Activity, e.g., Bloodstains, Ringing
☐ Suspect Is Associating With Persons Known For Their Criminal Activity    Alarms
☐ Proximity To Crime Location
☐ Other (Describe)

Pct. Serial No. _____ Additional Reports Prepared: Complaint Rpt.No. _____ Juvenile Rpt. No. _____ Aided Rpt. No. _____ Other Rpt. (Specify) _____

REPORTED BY: Rank, Name (Last, First, M.I.)    REVIEWED BY: Rank, Name (Last, First, M.I.)
Print _____ Tax# _____    Print _____ Tax# _____
Signature _____ Command _____    Signature _____ Command _____

# References

Ayres, Ian, "Outcome Tests of Racial Disparities in Police Practices," *Justice Research and Policy*, Vol. 4, No. 1, 2002, pp. 131–142.

Benjamini, Yoav, and Yosef Hochberg, "Controlling the False Discovery Rate: A Practical and Powerful Approach to Multiple Testing," *Journal of the Royal Statistical Society, Series B (Methodological)*, Vol. 57, No. 1, 1995, pp. 289–300.

BJS—*see* Bureau of Justice Statistics.

Blank, Rebecca M., Marilyn Dabady, and Constance F. Citro, eds., *Measuring Racial Discrimination*, Washington, D.C.: National Academies Press, 2004.

Bureau of Justice Statistics, "Crime Trends," last revised December 13, 2006. As of November 9, 2007: http://bjsdata.ojp.usdoj.gov/dataonline/Search/Crime/Crime.cfm

———, *Census of State and Local Law Enforcement Agencies*, Washington, D.C.: U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, June 2007. As of November 9, 2007: http://www.ojp.usdoj.gov/bjs/abstract/csllea04.htm

Decker, Scott H., and Jeff Rojek, *Saint Louis Metropolitan Police Department Traffic Stop Patterns*, St. Louis, Mo.: University of Missouri, 2002.

Durose, Matthew R., Erica Leah Smith, and Patrick A. Langan, *Contacts Between Police and the Public: Findings from the 2002 National Survey*, Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, NCJ 207845, 2005. As of November 9, 2007: http://purl.access.gpo.gov/GPO/LPS13168

Efron, Bradley, "Large-Scale Simultaneous Hypothesis Testing: The Choice of a Null Hypothesis," *Journal of the American Statistical Association*, Vol. 99, No. 465, 2004, pp. 96–104.

———, *Correlation and Large-Scale Simultaneous Significance Testing*, 2006. As of November 9, 2007: http://www-stat.stanford.edu/~brad/papers/Correlation-2006.pdf

Fridell, Lorie A., *By the Numbers: A Guide for Analyzing Race Data from Vehicle Stops*, Washington, D.C.: Police Executive Research Forum, 2004. As of November 9, 2007: http://www.policeforum.org/upload/BytheNumbers%5B1%5D_715866088_12302005121341.pdf

Gelman, Andrew, Jeffrey Fagan, and Alex Kiss, "An Analysis of the New York City Police Department's 'Stop-and-Frisk' Policy in the Context of Claims of Racial Bias," *Journal of the American Statistical Association*, Vol. 102, No. 479, 2007, pp. 813–823.

Goode, Erich, "Drug Arrests at the Millennium," *Society*, Vol. 39, No. 5, 2002, pp. 41–45.

Grogger, Jeffrey, and Greg Ridgeway, *Testing for Racial Profiling in Traffic Stops From Behind a Veil of Darkness*, Santa Monica, Calif.: RAND Corporation, RP-1253, 2006. As of November 8, 2007: http://www.rand.org/pubs/reprints/RP1253/

Hamermesh, Daniel S., *Workdays, Workhours, and Work Schedules: Evidence for the United States and Germany*, Kalamazoo, Mich.: W. E. Upjohn Institute for Employment Research, 1996.

Kang, Joseph D. Y., and Joseph L. Schafer, "Demystifying Double Robustness: A Comparison of Alternative Strategies for Estimating a Population Mean from Incomplete Data," *Statistical Science*, submitted. As of November 9, 2007:
http://www.e-publications.org/ims/submission/index.php/STS/user/submissionFile/290?confirm=14e47e26

Klein, Stephen P., Richard A. Berk, and Laura J. Hickman, *Race and the Decision to Seek the Death Penalty in Federal Cases*, Santa Monica, Calif.: RAND Corporation, TR-389-NIJ, 2006. As of November 8, 2007:
http://www.rand.org/pubs/technical_reports/TR389/

Knowles, John, Nicola Persico, and Petra Todd, "Racial Bias in Motor Vehicle Searches: Theory and Evidence," *Journal of Political Economy*, Vol. 109, No. 1, February 2001, pp. 203–229.

McCaffrey, Daniel F., Greg Ridgeway, and Andrew R. Morral, *Propensity Score Estimation with Boosted Regression for Evaluating Causal Effects in Observational Studies*, Santa Monica, Calif.: RAND Corporation, RP-1164, 2004. As of November 9, 2007:
http://www.rand.org/pubs/reprints/RP1164/

National Institutes of Health, Office of Human Subjects Research, Federalwide Assurance for the Protection of Human Subjects: RAND Corporation, expires October 3, 2010.

National Survey on Drug Use and Health, and Substance Abuse and Mental Health Services Administration, Office of Applied Studies, *The NSDUH Report: Illicit Drug Use by Race/Ethnicity, in Metropolitan and Non-Metropolitan Counties: 2004 and 2005*, Rockville, Md.: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Office of Applied Studies, June 19, 2007. As of November 9, 2007:
http://www.oas.samhsa.gov/2k7/popDensity/popDensity.cfm

New York City Police Department, "Street Encounters—Legal Issues," brochure, PD344-153 (11-00)-RMU, November 2000.

———, "Unified Form 250: Stop, Question, and Frisk Report Worksheet," PD344-151A, November 2002.

———, *Stop Question and Frisk Report (UF250) Database*, data for 2006, extracted March 2007.

NIH—*see* National Institutes of Health.

NYPD—*see* New York City Police Department.

Office of Justice Programs, *Justice Expenditure and Employment in the United States*, Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, April 2006. As of November 9, 2007:
http://www.ojp.usdoj.gov/bjs/abstract/jeeus03.htm

*People v. De Bour*, 40 N.Y.2d 210, 352 N.E.2d 562, App. N.Y., June 15, 1976.

Raymond, Barbara, Laura J. Hickman, Laura Miller, and Jennifer S. Wong, *Police Personnel Challenges After September 11: Anticipating Expanded Duties and a Changing Labor Pool*, Santa Monica, Calif.: RAND Corporation, OP-154-RC, 2005. As of November 8, 2007:
http://www.rand.org/pubs/occasional_papers/OP154/

Ridgeway, Greg, *Assessing the Effect of Race Bias in Post-Traffic Stop Outcomes Using Propensity Scores*, Santa Monica, Calif.: RAND Corporation, RP-1252, 2006. As of November 9, 2007:
http://www.rand.org/pubs/reprints/RP1252/

Ridgeway, Greg, and K. Jack Riley, *Assessing Racial Profiling More Credibly*, Santa Monica, Calif.: RAND Corporation, RB-9070-OAK, 2004. As of November 8, 2007:
http://www.rand.org/pubs/research_briefs/RB9070/

Ridgeway, Greg, Terry Schell, K. Jack Riley, Susan Turner, and Travis L. Dixon, *Police-Community Relations in Cincinnati: Year Two Evaluation Report*, Santa Monica, Calif.: RAND Corporation, TR-445-CC, 2006. As of November 8, 2007:
http://www.rand.org/pubs/technical_reports/TR445/

Riley, K. Jack, Susan Turner, John MacDonald, Greg Ridgeway, Terry Schell, Jeremy M. Wilson, Travis L. Dixon, Terry Fain, Dionne Barnes-Proby, and Brent D. Fulton, *Police-Community Relations in Cincinnati*, Santa Monica, Calif.: RAND Corporation, TR-333-CC, 2005. As of November 8, 2007:
http://www.rand.org/pubs/technical_reports/TR333/

Spitzer, Eliot, *The New York City Police Department's Stop and Frisk Practices: A Report to the People of the State of New York from the Office of the Attorney General*, New York: Civil Rights Bureau, December 1, 1999. As of November 9, 2007:
http://purl.org/net/nysl/nysdocs/43037966

*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, June 10, 1968.

U.S. Census Bureau, *The American Community Survey*, Washington, D.C., last modified November 1, 2007. As of November 9, 2007:
http://www.census.gov/acs/www/

————, Population Division, Journey to Work and Migration Statistics Branch, "Estimated Daytime Population," last modified February 23, 2007. As of September 20, 2007:
http://www.census.gov/population/www/socdemo/daytime/daytimepop.html

*United States v. Alcaraz-Arellano*, 302 F. Supp. 2d 1217, D. Kan., January 22, 2004.

*United States v. Barlow*, 310 F.3d 1007, 7th Cir., November 18, 2002.

Walker, Samuel, "Searching for the Denominator: Problems with Police Traffic Stop Data and an Early Warning System Solution," *Justice Research and Policy*, Vol. 3, No. 2, 2001, pp. 63–95.

————, *The Citizen's Guide to Interpreting Traffic Stop Data: Unraveling the Racial Profiling Controversy*, unpublished manuscript, 2002.

————, *Internal Benchmarking for Traffic Stop Data: An Early Intervention System Approach*, 2003.

EXHIBIT 11

The New York Times
nytimes.com



---

March 1, 2007

# Amid Claims of Police Profiling, Study Will Review 'Stop and Frisks'

By AL BAKER

The New York City Police Department has commissioned a six-month independent review of the way it stops people on the streets, sometimes searching them for illegal weapons, after the release of statistics that showed the department stopped 508,540 people in the five boroughs last year, officials said yesterday.

The study will focus on the role that race plays in everyday street stops: some critics have suggested that minorities, particularly black people, were unfairly singled out, a claim the police deny. It will be done by the RAND Corporation, a private nonprofit organization that has studied the issue in other cities, including Oakland, Calif., and Cincinnati, officials said.

Nearly two months ago, Police Commissioner Raymond W. Kelly commissioned RAND to review several aspects of firearm use in the department after the fatal police shooting of Sean Bell in Queens in November. That study is still under way.

The issue of stopping people on the streets — known in department parlance as "stop and frisks" — has been a source of occasional tension between the police and residents. As part of the study, analysts from RAND will not only examine last year's 508,540 stops, but also ride with police officers on duty. The officers will be interviewed about their decisions to make stops.

Analysts will also see firsthand how officers complete forms known as UF-250s, which they are supposed to fill out after all such stops. The form captures several points of data, including the circumstances that led to the stop, whether physical force was used, whether the stop included a frisk, and the race or ethnicity of the person stopped. A factor cited frequently on the forms is "area has high crime incidence."

The analysts will also review an electronic database of all the stops made by officers last year and "take steps to audit the data collection process," said Greg Ridgeway, the associate director of RAND's Safety and Justice Program, who will lead the research in New York.

Police officials released statistics on Feb. 2 showing that the number of people stopped last year increased to 508,540 from 97,296 in 2002, the last time the department divulged the data from a single calendar year.

The officials have said that the steep increase is partly due to greater adherence to departmental rules for filling out the stop-and-frisk forms and more aggressive crime-fighting activities, particularly in high-crime neighborhoods. They have repeatedly said that officers do not practice racial profiling.

In a statement announcing the RAND study yesterday, Mr. Kelly said that while the department's own analysis of its data "in general terms showed that stops were consistent with concentrations of crime and of

victim descriptions of suspects," the RAND analysts would work "to determine whether there are any flaws that we may need to address."

Responding to complaints of profiling, the department noted that while 55.2 percent of those stopped were black, 68.5 percent of reported crimes involved suspects described as black.

Mr. Kelly added, "We thought it was important to have a separate, independent review, and we turned to RAND again because of its reputation for objectivity and quality research."

The study will cost $120,000 and will be paid for by New York City Police Foundation, a charity that supports the Police Department.

Donna Lieberman, the executive director of the New York Civil Liberties Union, said that the department's raw data — not just its own summary of its data — should be disclosed publicly and to an array of interested parties, not just to its "chosen consultants" at RAND.

"The situation cries out for an independent review," she said.

Critics have said that the summary the department released in early February raises as many questions as it answers and, in isolation, is hard to understand.

For instance, according to the department's data, the average number of people arrested per quarter as a result of street stops doubled to 5,317 last year, from 2,819 in 2002. But Ms. Lieberman pointed out that the story behind the numbers was that in 2002, one person was arrested for every 8.5 stops, while last year, one person was arrested for every 25 stops.

Thomas A. Reppetto, a police historian, said he was eager to hear what RAND finds.

"I want the constitutional question answered," Mr. Reppetto said. "Are these stops, frisks and searches reasonable? That is what the U.S. Constitution demands, that searches not be unreasonable."

Copyright 2007 The New York Times Company

EXHIBIT 12

By Order of the Court, this exhibit has been filed under seal.

EXHIBIT 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

KELVIN DANIELS; POSEIDON BASKIN; DJIBRIL
TOURE; HECTOR RIVERA; RAYMOND RAMIREZ;
KAHIL SHKYMBA; BRYAN STAIR; TIARA BONNER;
THERON McCONNEYHEAD; and HORACE ROGERS,
individually and on behalf of a class of all others similarly
situated,

                                           Plaintiffs,

                          -against-

THE CITY OF NEW YORK; and MAYOR RUDOLPH
GIULIANI; NEW YORK CITY POLICE
COMMISSIONER HOWARD SAFIR; NEW YORK
CITY POLICE OFFICERS JOHN DOES ## 1-500; NEW
YORK CITY POLICE OFFICER ANTHONY CURTIN;
NEW YORK CITY POLICE SERGEANT PETER
MANTE; and NEW YORK CITY POLICE OFFICER
WALTER DOYLE, in their individual and official
capacities,

                                          Defendants.

------------------------------------------------------------------------- x

99 Civ. 1695 (SAS)

## STIPULATION OF SETTLEMENT

         **WHEREAS**, the plaintiffs commenced the above-captioned action with the filing

of the Complaint in 1999 pursuant to 42 U.S.C. §1983, the Fourth and Fourteenth Amendments

of the United States Constitution, Title VI of the Civil Rights Act of 1964, and the Constitution

and laws of the State of New York; and

         **WHEREAS**, the Third Amended Complaint, filed on April 12, 2000, alleges that

defendants implement and enforce, encourage, and sanction a policy, practice and custom of

unconstitutional stops and frisks of New York City residents by the Street Crime Unit ("SCU")

of the New York City Police Department ("NYPD"), and further alleges that SCU officers

stopped individuals without the reasonable suspicion required by the Constitution and often used race and/or national origin as the determinative factors in deciding to stop and frisk individuals, in violation of the Equal Protection Clause of the United States Constitution; and

WHEREAS, on January 26, 2001, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the Court certified a class consisting of:

> All persons who have been or will be subjected by officers of the Street Crimes [sic] Unit ("SCU") of the New York City Police Department ("NYPD") to defendants' policy, practice and/or custom of illegally stopping and/or frisking persons within the City of New York:
>
> (a) in the absence of the reasonable articulable suspicion of criminal activity that is required by the Fourth Amendment to the United States Constitution and Article 1, Section 12, of the New York State Constitution, including, but not limited to, persons who have been stopped, or stopped and frisked;
>
> (b) in a manner that discriminates on the basis of race and/or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 1, Section 11, of the New York State Constitution, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d) *et seq.*

and

WHEREAS, the parties have engaged in extensive discovery relating to the stop, question, and frisk practices of the SCU and the NYPD, including the depositions of the commanding officers of the SCU during the relevant period, and production of more than 40,000 pages of documents; and

WHEREAS, the terms of this Stipulation of Settlement (the "Stipulation") were vigorously negotiated over a period of several months; and

WHEREAS, the negotiation discussions have resulted in this Stipulation, which, subject to the approval of the Court, settles this action in the manner and upon the terms set forth below,

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and between the undersigned, as follows:

## A.    INTRODUCTION

1.    The parties enter into this Stipulation for the purpose of avoiding the burdens of further litigation, and mutually to support vigorous, lawful, and nondiscriminatory enforcement of the law. Settlement of this action under the terms stated in this Stipulation is in the public interest because the Stipulation avoids diversion of private and City resources to adversarial action by the parties.

2.    Municipal Defendants deny that they had or currently have a policy or engaged in or currently engage in a pattern or practice of conduct that deprived persons of rights, privileges, or immunities secured or protected by the Constitution and laws of the United States.

3.    This Stipulation does not and shall not be deemed to constitute any admission by the defendants as to the validity or accuracy of any of the allegations, assertions, or claims made by plaintiffs. No determinations have been issued by the Court concerning the merit or lack of merit of the allegations made by plaintiffs in the Third Amended Complaint. This Stipulation does not constitute an admission, adjudication, or finding on the merits of the above-captioned action.

4.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391.

**B.     DEFINITIONS**

1.     The date upon which this Stipulation enters into effect (the "Effective Date") is thirty (30) days after the Court dismisses this action with prejudice.

2.     Notwithstanding the foregoing in paragraph B.1., in the event that any appeals or petitions are taken or filed regarding the Court's approval of the settlement or dismissal of this action with prejudice, any and all obligations required to be undertaken pursuant to this Stipulation by defendants are stayed pending the final determination of any such appeals or petitions.  This Stipulation shall not become effective nor shall the defendants be required to undertake any obligations in the event that the final determination of any such appeals or petitions results in a rejection of the settlement as set forth in this Stipulation or a reversal of the order dismissing this action with prejudice.

3.     "Class Members" shall mean all members of the class as defined by the Court, cited in the Preamble above.

4.     "Class Representatives" shall mean all named plaintiffs in the above-captioned action.

5.     "Class Counsel" shall mean the plaintiffs' attorneys of record in the above-captioned action.

6.     "Municipal Defendants" shall mean defendants the City of New York, the New York City Police Commissioner, and the Mayor of New York City.

7.     "UF-250 Report" shall mean the form, designated UF-250 by the NYPD, used by NYPD officers to record stop, question, and frisk activity.

8.     "Stop, Question and Frisk" shall mean:

Any incident in which a police officer temporarily

detains a person for questioning and physically runs

4

his/her hands over the clothing of the person detained, feeling for a weapon.

## C.    RACIAL PROFILING POLICY

  1. The NYPD shall have a written policy regarding racial or ethnic/national origin profiling that complies with the United States Constitution and the New York State Constitution (the "Racial Profiling Policy"). The current Racial Profiling Policy is attached as Attachment A.

  2. The NYPD may alter the Racial Profiling Policy at any time in compliance with paragraph C.1. without prior notice to plaintiffs. Neither Class Counsel nor plaintiffs are entitled to any form of consultation regarding the contents of the Racial Profiling Policy. The NYPD has no present intention to alter the Racial Profiling Policy.

  3. The Municipal Defendants shall provide to Class Counsel a copy of any new or revised Racial Profiling Policy adopted by the NYPD, within thirty days of adoption.

  4. No later than fourteen days following the Effective Date of this Stipulation, the Police Commissioner shall issue a FINEST message stating the current Racial Profiling Policy in effect. A copy of the FINEST message shall be distributed to all NYPD officers, and the FINEST message shall be read aloud at ten consecutive roll calls in all commands.

  5. The NYPD shall supervise, monitor, and train officers regarding the Racial Profiling Policy as set forth below in this Stipulation.

## D.    SUPERVISION AND MONITORING

  1. The NYPD Quality Assurance Division ("QAD") has developed protocols necessary to integrate review of stop, question and frisk practices into its existing audit cycle of

NYPD commands, including determinations as to what material shall be reviewed and what standards shall be applied. Municipal Defendants have provided Class Counsel with an audit outline that includes these protocols. QAD shall conduct audits that at a minimum address the following issues:

> a.    Whether, and to what extent, documents (i.e., UF250s, officer activity logs) that have been filled out by officers to record stop, question and frisk activity have been completed in accordance with NYPD regulations; and

> b.    Whether, and to what extent, the audited stop, question and frisk activity is based upon reasonable suspicion as reflected in the UF250 forms.

2.    The QAD shall continue to audit  training records maintained by the NYPD regarding stop, question and frisk practices in a manner consistent with its existing practice.

3.    Within 120 days after the Effective Date, review of stop, question and frisk practices shall be fully integrated into existing regular Quality Assurance audit cycles.

4.    Within 45 days after final review by the Police Commissioner of each Quality Assurance audit of stop, question and frisk practices, Municipal Defendants shall provide Class Counsel with a copy of the results of such audit.

5.    Inquiry about stop, question and frisk activity shall continue to be integrated into the NYPD's existing Compstat review process.

**E.    TRAINING**

1.    The NYPD has conducted in service training regarding the Racial Profiling Policy, which has been presented to NYPD commands. The NYPD shall provide annual in service training regarding the Racial Profiling Policy.

2.    The NYPD shall maintain that portion of the Police Academy curriculum that pertains to training regarding the Racial Profiling Policy.

3.    The NYPD shall continue to train police officers about the legal and factual bases for conducting and documenting stop, question, and frisk activity; continue to implement the Police Academy curriculum for training police officer recruits about the legal and factual bases for conducting and documenting stop, question, and frisk activity; and continue to provide training for Police Academy instructors about the legal and factual bases for conducting and documenting stop, question, and frisk activity.

4.    The NYPD shall continue to train all recruits and police officers in cultural diversity and integrity and ethics, including department policies regarding false statements, reporting misconduct by other police officers, professionalism, filing of civilian complaints and cooperating in department investigations.

5.    The NYPD shall continue to provide recruit and in service training on the law of search and seizure.

6.    The Police Academy will continue to consider informally factual incidents brought to its attention for use in training.

7.    The NYPD is in the process of reviewing the recruit curriculum. As part of that process, the NYPD Deputy Commissioner of Training will conduct a review of the present training materials relating to stop and frisk activity and the racial profiling policy. The Deputy Commissioner of Training will complete the review of these materials within ninety (90) days of the Effective Date and will make whatever revisions, if any, that he believes will enhance their effectiveness.

8.    The NYPD shall continue to provide all newly promoted Sergeants and Lieutenants with supervisory and leadership training which, in addition to addressing the matters stated in paragraphs E (3) and (4) above, address the Racial Profiling Policy and effective supervisory techniques to promote integrity and prevent misconduct.

9.    The Municipal Defendants have provided to Class Counsel a copy of the training materials specified in paragraphs E.1 and E.2 of this Stipulation.

10.    The NYPD shall continue to document training provided for in this Stipulation in the same manner and consistent with existing practices and procedures employed by the NYPD.

## F.    INCIDENT DOCUMENTATION

1.    The NYPD shall continue its requirements that all NYPD officers document stop, question and frisk activity in UF-250 Reports.  The UF-250 Report form shall conform in all significant respects to Attachment B.

2.    The NYPD shall continue to maintain its requirements that NYPD officers and supervisors document stop, question, and frisk activity in additional documents, including but not limited to memo books, logs, and monthly activity reports.

3.    The NYPD reserves the right to revise the UF-250 Report from time to time, subject to the condition that any revised version of the UF-250 Report shall contain each and every category of information included in the version of the UF-250 Report attached to this Stipulation.

4.    The Municipal Defendants shall provide to Class Counsel a copy of any new or revised UF-250 Report form adopted by the NYPD within 45 days of its adoption.

5.    The NYPD shall continue to compile a database consisting of all of the UF-250 Reports (the "UF-250 Database") prepared.  A CD Rom of the UF-250 Database shall be

provided to Class Counsel on a quarterly basis and shall be redacted as to information identifying civilians and NYPD officers. A copy of the CD Rom of each quarterly UF-250 Database shall be provided to Class Counsel within six months of the end of the quarter to which the reports correspond.

      6.    The NYPD may change its stop, question and frisk policies, practices, guidelines, forms, records, and documentation of any kind to enhance or improve them, to comply with changes in the law, or to reflect future technological advances.

## G.  PUBLIC INFORMATION AND OUTREACH

      1.    The NYPD has made copies of the NYPD's Department Policy Regarding Racial Profiling, Operations Order 11, dated March 13, 2002, available to attendees of NYPD community meetings.

      2.    NYPD and plaintiffs agree to conduct joint public meetings to be known as "Joint Community Forums" and to conduct such forums in a cooperative and non-adversarial manner, with an agreed upon agenda and within the framework set forth below:

      a.    The Joint Community Forums will be held to inform and educate communities about the NYPD racial profiling policy and the rights of citizens who are stopped, questioned and frisked by the police. The forums will be held in a spirit of unity and commitment between NYPD, the class and the community to enhance effective police enforcement while safeguarding citizens' rights.

      b.    Plaintiffs will designate an individual to act as a coordinator and contact person ("Coordinator") for the Joint Community Forums.

      c.    Within a reasonable amount of time in advance of each Joint Community Forum, plaintiffs' Coordinator and a representative of NYPD will

meet to plan the agenda and agree on the details of the presentations to be made at the Joint Community Forums, including any materials that will be disseminated.

d.    NYPD agrees to send a representative with appropriate knowledge and rank to each of the Joint Community Forums.

e.    NYPD agrees to advertise the Joint Community Forums in a manner consistent with its current practices for advertising community affairs events.

f.    During the first year of the term of the Stipulation, one Joint Community Forum will be held in each county.  For the remainder of the term of the Stipulation, one or two Joint Community Forums will be held each year in rotating locations.

3.    NYPD shall develop a program to present 40-50 workshops to select high schools about stop, question and frisk encounters between NYPD and the public, at which materials may be disseminated as noted below in paragraphs G.4. and G.5. At the end of each calendar year occurring during the term of the Stipulation, class counsel may request in writing from defendants the number of workshops presented during the calendar year and defendants will provide the number within sixty (60) days of the receipt of such request.

4.    Within ninety days of the Effective Date, NYPD will revise its current pamphlet entitled "Understanding Your Rights," to include appropriate information regarding stop, question and frisk encounters between police and citizens.  The pamphlet shall be made available for dissemination to the public when appropriate, as determined by NYPD, in connection with suitable Community Affairs events and programs, including but not limited to

Joint Community Forums, high school workshops described in paragraph G.3., Clergy Liaison Program, Community Council Meetings and special events such as parades and movies.

5.    Within ninety days of the Effective Date, NYPD will design and create a palm card providing contact information and procedures, including the telephone number of the Civilian Complaint Review Board, for citizens who have concerns arising from a stop, question and frisk encounter with the police.  The palm cards shall be made available for dissemination to the public when appropriate, as determined by NYPD, in connection with suitable Community Affairs events and programs, including but not limited to Joint Community Forums, high school workshops described in paragraph G.3., Clergy Liaison Program, Community Council Meetings and special events such as parades and movies.

**H.    CONFIDENTIALITY**

1.    Subject to paragraph H.3 below, Class Counsel shall preserve the confidentiality of all documents and information in any form provided to him or her by the Municipal Defendants unless and until the Municipal Defendants expressly authorize the disclosure of each specific document or piece of information.

2.    Nothing in this Stipulation or undertaken pursuant to this Stipulation constitutes or is intended to constitute a waiver of any applicable privilege.

3.    All documents and information provided to Class Counsel shall be subject to the January 31, 2000 protective order issued in this case, a copy of which is attached hereto as Attachment C, and all other orders of the Court regarding disclosure of documents and information in this case.

4.    All confidential documents subject to the January 31, 2000 protective order, and copies made thereof, produced to plaintiffs by defendants prior to the Effective Date shall be returned to the Corporation Counsel's office upon the Effective Date, unless, prior to the

Effective Date, defendants have expressly authorized the retention of specific documents itemized in writing by plaintiffs until, at the latest, the termination of this Stipulation.  All documents provided to plaintiffs in any form by defendants under the terms and during the course of this Stipulation shall be deemed confidential, and plaintiffs shall return to the Corporation Counsel's office all such documents, and any copies made thereof, upon the termination of this Stipulation.

## I.    DOCUMENT MAINTENANCE

1.    The NYPD shall maintain all records that document its compliance with the terms of this Stipulation and all records required by or developed as a result of this Stipulation.

2.    The NYPD shall maintain all files that contain any investigation of misconduct with regard to stop, question, and frisk practices of NYPD officers and supervisors, as well as disciplinary files maintained in conjunction therewith, as required by current City and department regulations.

## J.    CLASS NOTICE

1.    The parties shall cause to be published a notice in the form attached hereto as Attachment D.  Such notice shall be published in The New York Post, The Amsterdam News, and El Diario three times within the same two-week period, or as otherwise ordered by the Court.

2.    Costs of publication of notice shall be borne by Municipal Defendants.

## K.    EFFECT OF THE SETTLEMENT STIPULATION ON THE PENDING ACTION

1.    Plaintiffs will take all necessary and appropriate steps to obtain approval of this Stipulation and dismissal of the above-captioned action with prejudice.  If the Court approves this Stipulation, and if there is an appeal from such decision, defendants will join the plaintiffs in defense of the Stipulation.

2.    On the Effective Date, the above-captioned action will be dismissed, with prejudice, and without costs, expenses, or fees in excess of the amount authorized by the Court or agreed upon by the parties.

3.    In no event shall this Stipulation become effective unless the Court dismisses the above-captioned action with prejudice.

4.    The Court shall retain jurisdiction over this action for the purpose of enforcing compliance with the terms and provisions of this Stipulation.    The terms of this Stipulation shall be a full, final and complete resolution of this action, with the exception of the individual damages claims of the class representatives and Class Counsel's fees and expenses. The parties reserve their right to appellate review of the Court's decisions concerning compliance under the Stipulation, as governed by applicable law.

5.    Upon termination of this Stipulation on December 31, 2007, the Court shall retain no further jurisdiction over this action.

## L.    DISPUTE RESOLUTION

1.    At any time prior to the expiration of this Stipulation, should the Class Representatives and/or class members determine that the Municipal Defendants have failed to comply with any term of the Stipulation, Class Counsel shall forward written notification of such non-compliance to the Deputy Commissioner for Legal Matters of the NYPD and to the Office of the Corporation Counsel.

2    a.    Should the Municipal Defendants agree that they have not complied with the specified term(s), the Municipal Defendants shall specifically perform said term(s) within a reasonable period of time, to be mutually agreed upon through the good faith efforts of the parties and their counsel.

b.    Should the Municipal Defendants dispute the Class Representatives' and/or class members' determination of the Municipal Defendants' non-compliance, or if the parties cannot agree on a time frame within which the Municipal Defendants are to perform an obligation with which they agree they have not complied, or in the event the Municipal Defendants fail to perform an obligation they have agreed to perform in accordance with the provisions of paragraph 2(a) above, Class Representatives and or class members may apply to the Court for an order directing specific performance of that term or terms.  Such application may not be made fewer than thirty days after the initial notification of non-compliance to the NYPD and Office of the Corporation Counsel.

c.    In no event shall any of the Municipal Defendants be held in contempt for proven non-compliance with any of the terms or provisions of this Stipulation unless and until the Municipal Defendants fail to comply with an order from the Court directing specific performance of such terms or provisions, obtained by the Class Representatives and/or class members in compliance with the provisions of this paragraph.

## M.    RELEASE

1.    The Stipulation, as of the Effective Date, resolves in full any and all claims or rights of action against the defendants and their predecessors, successors, or assignees, together with past, present, and future officials, employees, representatives, and agents of the NYPD and the City of New York (the "Released Persons"), by any Plaintiffs and/or Class Members, including the Class Representatives, contained in and/or arising from the Complaint and Amended Complaints in this action, and any other claims or rights of action that Plaintiffs and/or Class Members, including the Class Representatives, may have based upon or arising from any alleged policy, pattern or practice of unconstitutionality in the stop, question, and frisk

practices of the NYPD that could have been raised at this time, with the exceptions of individual damage claims and Class Counsel's fees and expenses.

2.    As of the Effective Date, Plaintiffs and/or Class Members, including the Class Representatives, hereby release and waive any and all claims and any and all rights to pursue, initiate, prosecute or commence any and all causes of action, claims, damages, awards, equitable, legal and administrative relief, interest, demands or rights, before any court, administrative agency or other tribunal, or to file any complaint with regard to acts of commission or omission by the Released Persons related to, connected with, arising out of, or based upon the allegations contained in or arising from the Complaint and Amended Complaints in this action and/or related to, connected with , arising out of or based upon any alleged policy, pattern, practice or custom of unconstitutionality in the stop, question, and frisk practices of the NYPD that could have been raised at this time with the sole exception of individual damage claims.

3.    This Release will be, and may be, raised as, a complete defense to and will preclude any action or proceeding encompassed by the release of the Released Persons.

## N.    APPLICATION AND PARTIES BOUND

1.    Each Plaintiff and/or Class Member, including the Class Representatives, shall be deemed to have submitted to the jurisdiction of this Court.

2.    This Stipulation applies to and is binding upon the Plaintiffs and/or Class Members, including the Class Representatives, and Municipal Defendants and their officers, agents, employees, successors, and assigns.  This Stipulation is enforceable only by the Plaintiffs and/or Class Members, including the Class Representatives,  and Defendants.  The undersigned representatives of the Plaintiffs and/or Class Members, including the Class Representatives, certify that they are authorized to enter into and consent to the terms and conditions of the

Stipulation and to execute and legally bind the Plaintiffs and/or Class Members, including the Class Representatives, to it.

3.    The terms of this Stipulation shall be forever binding on the Plaintiffs and/or Class Members, including the Class Representatives, as well as their heirs, executors, and administrators, successors and assigns, and those terms shall have res judicata and all other preclusive effect in all pending or future claims, lawsuits or other proceedings maintained by or on behalf of any such persons, to the extent those claims, lawsuits, or other proceedings involve matters encompassed by the Release.

O.  **MODIFICATION    AND    TERMINATION    OF    THE    SETTLEMENT STIPULATION**

1.    This Stipulation represents the entire agreement among the parties, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Stipulation shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein, or to determine the meaning of any provisions herein. This Stipulation can be modified only on the written consent of all parties.

2.    This Stipulation shall terminate on December 31, 2007.

**P.    ATTORNEYS' FEES AND COSTS**

1.    Pursuant to applicable law, Class Counsel will make application to the Court for approval of an award of reasonable attorneys' fees and disbursements.

2.    To the extent that Class Counsel incurs reasonable attorneys' fees for necessary and appropriate legal services provided to the Class in direct connection with and during the term of the Stipulation, Class Counsel may submit quarterly written invoices to the Municipal Defendants requesting payment for such reasonable attorneys' fees. Class Counsel shall not seek fees or reimbursement of any kind for their retention, if any, of experts, consultants, or other individuals. Municipal Defendants will not pay attorneys' fees exceeding a total of $25,000.00 for all Class Counsel attorneys' fees combined in any one year. This provision shall in no way prejudice any claim that Plaintiffs' may have for attorneys' fees incurred before the Effective Date of this Stipulation.

**Q.    NOTIFICATION OF PARTIES UNDER THE STIPULATION**

All notices contemplated by this Stipulation (other than notice to the class pursuant to Section J) shall be delivered by hand and by telefax as follows:

Jonathan Moore, Esq.
William H. Goodman, Esq.
Moore & Goodman, LLP
740 Broadway, Fifth Floor
New York, New York  10003
Fax: (212) 674-4614

Heidi Grossman, Esq.
Assistant Corporation Counsel
Special Federal Litigation
Corporation Counsel of the
  City of New York
100 Church Street, Room 3-205
New York, New York  10007
Fax: (212) 788-0367

Managing Attorney
Adam Gale, Esq.
Jennifer R. Cowan, Esq.
Debevoise & Plimpton
919 Third Avenue
New York, New York  10022
Fax: (212) 909-6836

Deputy Commissioner of Legal Matters
New York City Police Department
One Police Plaza
New York, New York  10007
Fax: (646) 610-8428

Dated:  New York, New York
        September 24, 2003

_(signature)_

JONATHAN C. MOORE, Esq. (JM-6902)
WILLIAM H. GOODMAN, Esq.(WG-6499)
MOORE & GOODMAN, LLP
740 Broadway – Fifth Floor
New York, New York  10003
(212) 353-9587

_(signature)_

JEFFREY FOGEL, Esq. (JF-3948)
NANCY CHANG, Esq. (NC-5331)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York  10012
(212) 614-6420

_(signature)_

ADAM GALE, Esq. (AG-8783)
JENNIFER R. COWAN, Esq. (JC-6090)
DEBEVOISE & PLIMPTON
919 Third Avenue
New York, New York  10022
(212) 909-6000

_(signature)_

ROBERT F. VAN LIEROP, Esq. (VL-4659)
VAN LIEROP & BURNS, LLP
320 Convent Avenue
New York, New York  10031
(212) 491-8000

*Attorneys for the Plaintiff Class and Individual
Plaintiff Class Representatives*


IT IS SO ORDERED:


_____
SHIRA A. SCHEINDLIN
UNITED STATES DISTRICT JUDGE

MICHAEL A. CARDOZO
CORPORATION COUNSEL OF THE
  CITY OF NEW YORK
*Attorney for Defendants The City of New York,
Mayor Rudolph Giuliani, New York City Police
Commissioner Howard Safir, and New York
City Police Officer Anthony Curtin*
100 Church Street, Room 3-205
New York, New York 10007
(212) 788-0892

_(signature)_

HEIDI GROSSMAN, Esq. (HG-0933)
Assistant Corporation Counsel

EXHIBIT A

NYC-036894



## OPERATIONS ORDER

| SUBJECT: **DEPARTMENT POLICY REGARDING RACIAL PROFILING** | |
|---|---|
| DATE ISSUED: | NUMBER: |
| **03-13-02** | **11** |

1.     The New York City Police Department is committed both to the impartial enforcement of law and the protection of Constitutional rights. Therefore, to emphasize these commitments and to ensure all members of the service engage only in constitutionally sound policing practices, the Department prohibits the use of racial profiling in law enforcement actions. Racial profiling is defined as the use of race, color, ethnicity or national origin as the determinative factor for initiating police action.

2.     All police-initiated enforcement actions, including but not limited to arrest, stop and question, and motor vehicle stop, will be based on the standards required by the Fourth Amendment of the U.S. Constitution or other applicable law. Officers must be able to articulate the factors which led them to take enforcement action, in particular those factors leading to reasonable suspicion for a stop and question, or probable cause for an arrest. Officers are also reminded that the use of characteristics such as religion, age, gender, gender identity, or sexual orientation as the determinative factor for taking police action is prohibited.

3.     While performing their duties, members are reminded that this policy in no way precludes them from taking into account the reported race, color, ethnicity, national origin, religion, age, gender, gender identity, or sexual orientation of a specific suspect in the same way the member would use pedigree information, e.g., height, weight, age, etc., about specific suspects.

4.     Commanding Officers will establish a self-inspection protocol within their command to ensure that the contents of this order are complied with. The Quality Assurance Division will include compliance with this directive in all of its command inspections. Performance in this area will also be included in Compstat review.

5.     Commanding Officers will ensure that the contents of this order are brought to the attention of members of their commands.

**BY DIRECTION OF THE POLICE COMMISSIONER**

**DISTRIBUTION**
**All Commands**

NYC 0036894

EXHIBIT B

**(COMPLETE ALL CAPTIONS)**

**STOP, QUESTION AND FRISK REPORT WORKSHEET**
PD344-151A (Rev. 11-02)

| Pct.Serial No. | |
|---|---|
| Date | Pct. Of Occ. |

| Time Of Stop | Period Of Observation Prior To Stop | Radio Run/Sprint # |
|---|---|---|

Address/Intersection Or Cross Streets Of Stop

☐ Inside   ☐ Transit   Type Of Location
☐ Outside  ☐ Housing   Describe:

Specify Which Felony/P.L. Misdemeanor Suspected | Duration Of Stop

## What Were Circumstances Which Led To Stop?
**(MUST CHECK AT LEAST ONE BOX)**

☐ Carrying Objects In Plain View Used In Commission Of Crime e.g., Slim Jim/Pry Bar, etc.
☐ Fits Description.
☐ Actions Indicative Of "Casing" Victim Or Location.
☐ Actions Indicative of Acting As A Lookout.
☐ Suspicious Bulge/Object (Describe)
☐ Other Reasonable Suspicion Of Criminal Activity (Specify)

☐ Actions Indicative Of Engaging In Drug Transaction.
☐ Furtive Movements.
☐ Actions Indicative Of Engaging In Violent Crimes.
☐ Wearing Clothes/Disguises Commonly Used In Commission Of Crime.

| Name Of Person Stopped | Nickname/ Street Name | Date Of Birth |
|---|---|---|
| Address | Apt. No. | Tel. No. |

Identification:  ☐ Verbal   ☐   Photo I.D.   ☐   Refused
☐   Other (Specify)

Sex:☐ Male  Race:☐ White  ☐ Black  ☐ White Hispanic  ☐ Black Hispanic
☐ Female  ☐ Asian/Pacific Islander  ☐ American Indian/Alaskan Native

| Age | Height | Weight | Hair | Eyes | Build |
|---|---|---|---|---|---|

Other (Scars, Tattoos, Etc.)

Did Officer Explain Reason For Stop  ☐ Yes  ☐ No | If No, Explain:

Were Other Persons Stopped/ Questioned/Frisked?  ☐ Yes  ☐ No | If Yes, List Pct. Serial Nos.

If Physical Force Was Used, Indicate Type:
☐ Hands On Suspect
☐ Suspect On Ground
☐ Pointing Firearm At Suspect
☐ Handcuffing Suspect
☐ Suspect Against Wall/Car
☐ Drawing Firearm
☐ Baton
☐ Pepper Spray
☐ Other (Describe)

| Was Suspect Arrested?  ☐ Yes  ☐ No | Offense | Arrest No. |
|---|---|---|
| Was Summons Issued?  ☐ Yes  ☐ No | Offense | Summons No. |

Officer In Uniform?  ☐ Yes  ☐ No | If No, How Identified? ☐ Shield  ☐ I.D. Card
☐ Verbal

NYC 037520

**Was Person Frisked?** ☐ Yes ☐ No  IF YES, MUST CHECK AT LEAST ONE BOX
☐ Inappropriate Attire - Possibly Concealing Weapon
☐ Verbal Threats Of Violence By Suspect
☐ Knowledge Of Suspects Prior Criminal Violent Behavior/Use Of Force/Use Of Weapon
☐ Other Reasonable Suspicion of Weapons (Specify)

☐ Furtive Movements
☐ Actions Indicative Of Engaging In Violent Crimes

☐ Refusal To Comply With Officer's Direction(s) Leading To Reasonable Fear For Safety
☐ Violent Crime Suspected
☐ Suspicious Bulge/Object (Describe)

**Was Person Searched?** ☐ Yes ☐ No  IF YES, MUST CHECK AT LEAST ONE BOX  ☐ Hard Object ☐ Admission Of Weapons Possession
☐ Outline Of Weapon ☐ Other Reasonable Suspicion of Weapons (Specify)

**Was Weapon Found?** ☐ Yes ☐ No  If Yes, Describe: ☐ Pistol/Revolver ☐ Rifle/Shotgun ☐ Assault Weapon ☐ Knife/Cutting Instrument
☐ Machine Gun ☐ Other (Describe)

**Was Other Contraband Found?** ☐ Yes ☐ No If Yes, Describe Contraband And Location _____
Demeanor Of Person After Being Stopped _____
Remarks Made By Person Stopped _____

**Additional Circumstances/Factors:  (Check All That Apply)**
☐ Report From Victim/Witness
☐ Area Has High Incidence Of Reported Offense Of Type Under Investigation
☐ Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity
☐ Suspect Is Associating With Persons Known For Their Criminal Activity
☐ Proximity To Crime Location
☐ Other (Describe)

☐ Evasive, False Or Inconsistent Response To Officer's Questions
☐ Changing Direction At Sight Of Officer/Flight
☐ Ongoing Investigations, e.g., Robbery Pattern
☐ Sights And Sounds Of Criminal Activity, e.g., Bloodstains, Ringing Alarms

Pct. Serial No. _____ Additional Reports Prepared: Complaint Rpt.No. _____ Juvenile Rpt. No. _____ Aided Rpt. No. _____ Other Rpt. (Specify) _____

REPORTED BY: Rank, Name (Last, First, M.I.)     REVIEWED BY: Rank, Name (Last, First, M.I.)
Print _____                                    Print _____
Signature _____     Tax# _____     Command _____     Signature _____     Tax# _____     Command _____

NYC 037521

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

NATIONAL CONGRESS FOR PUERTO RICAN
RIGHTS, by Richie Perez, National Coordinator; and
KELVIN DANIELS; POSEIDON BASKIN; DJIBRIL
TOURE; HECTOR RIVERA; RAYMOND RAMIREZ;
KAHIL SHKYMBA; BRYAN STAIR; AND TIARA
BONNER, individually and on behalf of a class of all
others similarly situated,

                                                        Plaintiffs,


        - against -

THE CITY OF NEW YORK; NEW YORK CITY
POLICE OFFICERS JOHN DOES ## 1-500; and NEW
YORK CITY POLICE OFFICER ANTHONY CURTIN;
MAYOR RUDOLPH GIULIANI; and NEW YORK
CITY POLICE COMMISSIONER HOWARD SAFIR,
in their individual and official capacities,

                                                        Defendants.


------------------------------------------------------------------------x

**PROTECTIVE ORDER**

99 Civ. 1695
(SAS) (HBP)

        WHEREAS, preparation for trial and trial of the above-captioned action (the

"Action") may require the discovery, production and use of documents that contain information

deemed confidential or otherwise deemed inappropriate for public disclosure; and

        WHEREAS, good cause exists for the entry of an order pursuant to Rule 26(c) of

the Federal Rules of Civil Procedure;

        **NOW, THEREFORE, IT IS HEREBY ORDERED:**

        1.  As used herein, a "Party" or the "Parties," respectively, shall mean plaintiffs

and defendants individually or together, and "Confidential Materials" shall mean (a) the database

of stop and frisk reports (PD344-151, also referred to as "UF 250 reports") for 1998 and 1999,

with certain redactions, (b) the weekly Tactical Deployment reports generated by the Street

Crime Unit for 1998 and 1999, with certain redactions, (c) any documents that the Parties agree

are subject to this order; and (d) any documents that the Court directs to be produced subject to this order.

    2. Confidential Materials shall not be disclosed to any person other than an attorney of record for a Party or any member of the staff of his or her law office, except under the following conditions:

    a.    Disclosure may be made only if necessary to the preparation or presentation of the Party's case in the Action.

    b.    Disclosure before trial may be made only to a Party or its employees, to an expert who has been retained or specially employed by a Party's attorney in anticipation of litigation or preparation for the Action, to a witness at deposition, or to the Court.

    c.    Before any disclosure is made to a person listed in subparagraph (b) above (other than to the Court), the Party's attorney shall provide each such person with a copy of this Stipulation and Protective Order, and such person shall consent in writing, in the form annexed hereto as Exhibit A, not to use the Confidential Materials for any purpose other than in connection with the prosecution or defense of the Action and not to further disclose the Confidential Materials except in testimony taken in this case. The signed consent shall be retained by the Party's attorneys and a copy shall be furnished to the producing Party's attorney upon request.

    3. Documents that constitute Confidential Materials shall be marked by placing the word "CONFIDENTIAL" on each page of the document, where a physical copy is produced, or on the thing or container within which it is produced. Deposition testimony concerning any

Confidential Materials which reveals the contents of such materials shall be deemed confidential, and the transcript of such testimony, together with any exhibits referred to therein, shall be separately bound, with a cover page prominently marked "CONFIDENTIAL." Such portion of the transcript shall be deemed to be Confidential Materials within the meaning of this Stipulation and Protective Order.

4. If any paper which incorporates any Confidential Materials or reveals the contents thereof is filed in this Court, those portions of the papers shall be delivered to the Court enclosed in a sealed envelope bearing the caption of this action, an indication of the nature of the contents, and the following legend:

## CONFIDENTIAL

> This envelope contains documents or information designated confidential pursuant to an order entered by the United States District Court for the Southern District of New York in the above-captioned action. This envelope shall not be opened or unsealed without the express direction of a judge of this Court, and its contents shall not be displayed or revealed except as the Court may order. This envelope and its contents shall at all times be maintained separate and apart from the publicly available files of this case.

5. The provisions of this Stipulation and Protective Order shall not apply to documents produced by a Party as "Confidential Materials," to the extent that they (a) are obtained from sources other than the producing Party, or (b) are otherwise publicly available. Nothing in this Stipulation and Protective Order shall preclude a producing Party from disclosing or using for any purpose any documents it has produced as Confidential Materials.

6. Any Party intending to use Confidential Materials at trial or at any hearing shall give prior notice to the producing Party. Upon a showing that Confidential Materials may

be disclosed at a hearing or at trial and that the disclosure should be protected, the Court may impose appropriate safeguards for the presentation of such Confidential Materials.

7. Within 30 days after the termination of this case, including any appeals, the Confidential Materials, including all copies, notes, and other materials containing or referring to information derived therefrom, shall be returned to the producing Party's attorneys or, upon their consent, destroyed, and all persons who possessed such materials shall verify their return or destruction by affidavit furnished to the producing Party's attorneys.

8. The terms of this order may be modified by further order of the Court.

Dated: New York, New York
       January 31, 2000

SO ORDERED:

_____
U.S.D.J.

-4-

## EXHIBIT A

The undersigned hereby acknowledges that he/she has read the Stipulation and Protective Order entered in the United States District Court for the Southern District of New York on _____, 2000 in the action entitled National Congress for Puerto Rican Rights v. City of New York, 99 Civ. 1695 (SAS), and understands the terms thereof. The undersigned agrees not to use the Confidential Materials defined therein for any purpose other than in connection with the prosecution or defense of this case, and will not further disclose the Confidential Materials except in testimony taken in this case.

_____          _____
Date                                        Signature

                                           _____
                                           Print Name

                                           _____
                                           Occupation

EXHIBIT D

*Without Prejudice*
*For Settlement Purposes Only*

## LEGAL NOTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

KELVIN DANIELS, et al.,                                          :

                    Plaintiffs,          :     99 Civ. 1695 (SAS)

    -against-                                             :

THE CITY OF NEW YORK, et al.,                             :

                  Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### IF YOU HAVE BEEN STOPPED AND/OR FRISKED BY A MEMBER OF THE NEW YORK CITY POLICE DEPARTMENT ("NYPD"), YOU MAY HAVE THE RIGHT TO COMMENT ON OR OBJECT TO A PROPOSED LEGAL SETTLEMENT ABOUT THE NYPD'S POLICIES AND PROCEDURES CONCERNING STOPS AND FRISKS.

     A settlement has been proposed in a class action lawsuit against New York City, the Commissioner of the NYPD, and other City officials, known as *Daniels v. City of New York*. The complaint in the lawsuit alleges that defendants implement and enforce, encourage, and sanction a policy, practice and custom of unconstitutional stops and frisks of New York City residents by the Street Crime Unit of the NYPD. Defendants deny these allegations. Plaintiffs' counsel are: Center for Constitutional Rights; Moore & Goodman, LLP; Debevoise & Plimpton; and Van Lierop, Burns.

     NOTICE IS HEREBY GIVEN, pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Southern District of New York (the "Court"), dated _____, 2003, that a hearing (the "Fairness Hearing") will be held before the Honorable Shira A. Scheindlin, in the United States Courthouse, 500 Pearl Street, Courtroom 12C, New York, New York, 10007 at 1:00 p.m., on November 25, 2003 to determine whether a proposed settlement of this action, on the terms and conditions set forth in the Stipulation of Settlement dated September 24, 2003 (the "Settlement"), should be approved as fair, reasonable and adequate.

     If the Settlement is approved, Class Members will be bound by its terms and deemed to have released the defendants from liability of all claims raised in this class action lawsuit. Approval of the Settlement will not constitute a release of, and will not limit, Class Members' rights to sue for money damages if his or her rights have been violated. This Notice does not constitute a determination by the Court concerning the merit or lack of merit of the allegations made by plaintiffs in the complaint. Further, the Settlement and Notice are not to be construed as admissions of liability of any kind whatsoever by the defendants.

     *IF YOU ARE A MEMBER OF THE "CLASS" IN THIS CASE, YOUR RIGHTS MAY BE AFFECTED BY THIS SETTLEMENT. IF YOU ARE A MEMBER OF THE "CLASS," YOU HAVE THE RIGHT TO COMMENT ON OR OBJECT TO THE PROPOSED SETTLEMENT.*

### ARE YOU A MEMBER OF THE CLASS?

A class was certified by the Court in this case consisting of:

All persons who have been or will be subjected by officers of the Street Crime Unit of the New York City Police Department to defendants' policy, practice and/or custom of illegally stopping and/or frisking persons within the City of New York:

(a) in the absence of the reasonable articulable suspicion of criminal activity that is required by the Fourth Amendment to the United States Constitution and Article 1, Section 12, of the New York State Constitution, including, but not limited to, persons who have been stopped, or stopped and frisked,

(b) in a manner that discriminates on the basis of race and/or national origin in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 1, Section 11 ,of the New York State Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) *et seq.*

### WHAT BENEFITS WOULD THE PROPOSED SETTLEMENT PROVIDE?

**This lawsuit did not ask for money for the Class, and the proposed Settlement does not involve the payment of any money to the Class.**

Among other things, the proposed Settlement provides that the NYPD has agreed to:

- Maintain a written racial profiling policy that will comply with the Constitution of the United States and the State of New York (the "Racial Profiling Policy").

- Maintain its current requirement that all stop, question and frisk activity be documented on a special NYPD form, known as a UF-250 form.

- Audits by the Quality Assurance Division of the NYPD of NYPD documentation of stop, question and frisk activity to determine (1) whether, and to what extent, documentation of stop, question and frisk activity is being completed in accordance with NYPD regulations and (2) whether, and to what extent, the audited stop, question and frisk activity is based upon reasonable suspicion as reflected in UF-250 forms.

- Continue to compile a computerized database of all completed UF-250 forms, which reflect stop, question and frisk activity conducted by the NYPD. These databases will be provided to the lawyers for the class and class representatives on a quarterly basis, after the names of the officers and the civilians are deleted for privacy reasons.

- Continue to require its officers and supervisors to document stop, question and frisk activity on other written NYPD forms, including the police officers' memo books and monthly activity reports.

- Continue to provide training, and to document and record training, regarding: the Racial Profiling Policy, which will be provided on an annual in service basis; the proper factual and legal bases for conducting and documenting stop, question and frisk activity; cultural diversity and integrity and ethics, including department policies

2

regarding false statements, reporting misconduct by other police officers, professionalism, filing of civilian complaints and cooperating in department investigations.

• Conduct joint public meetings with the Class Members and/or Class representatives, with an agreed upon agenda. These meetings will address the Racial Profiling Policy and the rights of persons stopped, questioned and frisked by the police. Five meetings (one in each borough) will be held in the first year after the Settlement takes effect, and one to two meetings will be held in each of the three years thereafter.

• Revise its pamphlet "Understanding Your Rights" to include appropriate information regarding stop, question and frisk encounters between civilians and the police and make it available for dissemination at suitable public events and programs.

• Design and create a palm card which provides the telephone number of the Citizen Complaint Review Board for those who have concerns about stop, question and frisk encounters with the NYPD. This palm card will be made available for dissemination at suitable public events and programs.

• Develop a program of 40-50 workshops to be held at selected high schools in the City of New York about educating students as to their legal rights in stop, question and frisk encounters with the police. At these workshops, the pamphlet "Understanding Your Rights" and the palm card may be distributed.

• A method to resolve any disputes which may arise regarding compliance with this agreement.

The Court will have the power to enforce compliance with the terms of the Settlement. The Settlement will be in effect until December 31, 2007. During that time lawyers for the Class and the Class representatives will take steps to ensure that the NYPD complies with the terms of the Settlement.

## How Can You Comment on (or Object to) the Proposed Settlement?

If you are a Class Member, you have the right to object to and/or comment on the proposed Settlement. Your comment may be in favor of the proposed settlement, or you may object to any aspect of the proposed Settlement.

You must file your comment or objection in writing with the Clerk of the Court, United States District Court, 500 Pearl Street, New York, New York, 10007. Your comment or objection must be received by the Court **no later than October 30, 2003**, which is 26 days before the Fairness Hearing. Comments or objections received after **October 30, 2003** will not be considered (by appeal or otherwise). Each comment or objection must include the name of this Action and the case number on the top of the first page of the comment or objection. In addition, for any such comment or objection to be considered, it must be served on each of the following counsel on the same date that it is provided to the Court:

3

Plaintiffs' Counsel:    Managing Attorney          and    Jonathan Moore, Esq.
                        Debevoise & Plimpton               William Goodman, Esq.
                        919 Third Avenue                   Moore & Goodman, LLP
                        New York, NY 10022                 740 Broadway, 5th floor
                                                           New York, NY 10003

and

Defendants' Counsel: Heidi Grossman, Esq.
                     New York City Law Department
                     100 Church Street
                     New York, NY 10007

Any Class Member who files and serves a timely written comment or objection as described above may also appear at the Fairness Hearing either in person or through counsel retained at the Class Member's expense. Class Members or their counsel intending to appear at the Fairness Hearing must serve on the counsel listed above, and file with the Court at the address listed above, no later than October 30, 2003, a Notice of Intention to Appear, setting forth the name of the case, the case number, and the name and address of the Class Member (and if applicable, the name and address of the Class Member's counsel). Any Class Member who does not timely file and serve a Notice of Intention to Appear will not be permitted to appear at the Fairness Hearing except for good cause shown. Class Members do not need to appear at the Fairness Hearing or take any other action to indicate their approval of the proposed Settlement.

## HOW CAN YOU LEARN MORE ABOUT THE PROPOSED SETTLEMENT?

This Notice contains only a summary of the terms of the proposed Settlement. You may inspect the proposed Settlement in full at the Office of the Clerk of the United States District Court for the Southern District of New York, United States Courthouse, 500 Pearl Street, New York, New York, 10007 during regular business hours.

PLEASE DO NOT CALL THE COURT OR THE CLERK OF THE COURT.

Dated: _____ 2003

                              By Order of the Court
                              Clerk of the Court

4

21583394v4