`UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

DAVID FLOYD, LALIT CLARKSON,
DEON DENNIS, and DAVID OURLICHT,
on behalf of themselves and all others
similarly situated,

                Plaintiffs,

  - against -

THE CITY OF NEW YORK, *et al.*,

                Defendants.

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  6/25/2010

## OPINION AND ORDER

08 Civ. 1034 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

In this civil-rights action, plaintiffs allege, among other things, that the New York City Police Department ("NYPD") requires rank and file officers — under threat of adverse employment consequences leveled by their superiors — to stop, question, and frisk specific numbers of individuals. Plaintiffs further contend that such mandatory quotas lead to unconstitutional racial profiling by officers, which is the gravamen of plaintiffs' complaint. The City of New York, Mayor Michael Bloomberg, Police Commissioner Raymond Kelly, and the other defendants adamantly deny the existence of compulsory quotas and racially-

motivated policing. Defendants do not, however, disavow productivity goals

aimed at ensuring police officers do the job for which they are employed and

compensated. Defendants further state that any productivity goals are

accompanied by a requirement that officers possess the legal predicate —

reasonable suspicion of criminal activity — before pursuing a stop, question, and

frisk.

By plaintiffs' own admission, they have encountered difficulty

proving their quota theory, notwithstanding broad discovery.[1]  However, in the

Spring of 2010, plaintiffs learned that Officer Adhyl Polanco of the 41st Precinct

in the Bronx, Officer Adrian Schoolcraft of the 81st Precinct in Brooklyn, and

officers from Transit District 23 in Queens separately alleged that "quotas"[2] were

imposed in their respective commands.[3]  The NYPD's Internal Affairs Bureau

---

[1]      *See* Plaintiffs' Letter to the Court (June 8, 2010) at 3.

[2]      For ease of reference, I refer to the officers' allegations in terms of
"quotas." My doing so reflects no present judgment about either the officers'
allegations or the evidence bearing on those allegations — that is, in particular,
whether the evidence supports a finding of hard quotas, productivity goals, or
something else altogether. And as I explained at the June 14, 2010 conference in
this matter, for plaintiffs to prove their quota theory, they must establish not only
the existence of quotas, but also that such conditions generate or otherwise lead to
impermissible stop, question, and frisks.

[3]      Officer Polanco's and Officer Schoolcraft's allegations surfaced
publicly through various media outlets. *See, e.g.*, Graham Rayman, "The NYPD
Tapes: Inside Bedstuy's 81st Precinct," *The Village Voice* (May 4, 2010). It is

2

("IAB"), which investigates claims of serious misconduct and corruption of members of the NYPD, is currently investigating these allegations.

Plaintiffs now seek an order from this Court compelling defendants to disclose documents from the IAB's investigations into the quota allegations. Defendants argue against disclosure on the grounds that the IAB files are confidential, contain irrelevant information, and are protected by the law enforcement privilege. Defendants provided the IAB files to the Court for *in camera* inspection, along with a declaration from Deputy Inspector David Grossi about the sensitive nature of the materials.

For the reasons provided below, defendants are ordered to disclose only those documents in the IAB files addressing the issue of quotas. From that limited set of documents, defendants may redact irrelevant information and may apply to the Court for redaction of truly sensitive information. All disclosures shall be subject to an attorneys' eyes only protective order.

## II.    THE LAW ENFORCEMENT PRIVILEGE

The purpose of the law enforcement privilege is "'to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to

---

unclear how plaintiffs discovered the allegations relating to Transit District 23.

3

safeguard the privacy of individuals involved in an investigation, and otherwise to

prevent interference with an investigation.'"[4] These are important goals of very

real consequence.[5] Nevertheless, the law enforcement privilege is not an

instrument by which law enforcement agencies may shield themselves from public

scrutiny. Therefore, courts must vigilantly review an assertion of the privilege and

must often conduct an *in camera* inspection of the materials in question.[6]

       The Second Circuit's recent decision in *In re The City of New York*

enunciated with precision the legal standard for assessing when an invocation of

---

[4]    *In re The City of New York*, No. 10-0237, — F.3d —, 2010 WL
2294134, at *12 (2d Cir. June 9, 2010) (quoting *In re Dep't of Investigation of the
City of New York*, 856 F.2d 481, 484 (2d Cir. 1988)).

[5]    *See id.* ("Th[e] goals [of the law enforcement privilege] are of such
importance that the privilege, though it developed at common law from executive
privilege, has been largely incorporated into both New York state and federal
statutory law. It is hard to imagine, therefore, many questions of law that carry
greater significance than the question of when the goals of the law enforcement
privilege must give way to a party's need for discovery." (quotation marks,
citations, footnotes, and alterations omitted)).

[6]    *See id.* at *19 ("[T]he district court may, in the exercise of its
informed discretion and on the basis of the circumstances presented, require that
the party possessing the documents appear *ex parte* in chambers to submit the
documents for *in camera* review by the judge . . . ."); *Borchers v. Commercial
Union Assurance Co.*, 874 F. Supp. 78, 79-81 (S.D.N.Y. 1995) ("Although the
decision of whether to engage in *in camera* review rests in the sound discretion of
the district court, *in camera* review is particularly encouraged in cases invoking
governmental claims of privilege. (citations omitted)). *See also United States v.
Zolin*, 491 U.S. 554, 569 (1989) (approving *in camera* inspection of documents
over which there is a claim of privilege).

4

the law enforcement privilege must yield to a party's need for discovery. The

ultimate burden of showing that the law enforcement privilege blocks disclosure

falls on the party asserting the privilege.[7] Placing the burden on the party raising

the privilege "ensure[s] that the privilege is presented in a deliberate, considered,

and reasonably specific manner."[8] To meet its burden, "[t]he party asserting the

law enforcement privilege must show that the documents contain information that

the law enforcement privilege is intended to protect."[9]

> Specifically, th[is] party . . . must show that the documents
> in question contain (1) information pertaining to law
> enforcement techniques and procedures, (2) information
> that would undermine the confidentiality of sources, (3)
> information that would endanger witness and law

---

[7]     *See In re The City of New York*, 2010 WL 2294134, at *14 (citing *In re Sealed Case*, 856 F.2d 268, 271-72 (D.C. Cir. 1988)); *id.* at *15 n.21 ("We are mindful that the ultimate burden of demonstrating the law enforcement privilege is on the party asserting the privilege . . . but we nevertheless expect the opposing party to establish its 'compelling need' for the information. This is so because the party seeking disclosure of information is uniquely situated to explain to a court why it wants and needs that information." (citations omitted)).

     While certainly a party seeking disclosure "is uniquely situated" to articulate its need for discovery, in many circumstances the party seeking disclosure will know little, if anything, about the content of materials withheld pursuant to an assertion of privilege. In this regard, a party seeking disclosure may be distinctly disadvantaged in making arguments about something it has not seen and perhaps knows nothing about — a reality that underscores the significance of a court's *in camera* review.

[8]     *In re Sealed Case*, 856 F.2d at 271 (citing *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341-42 (D.C. Cir. 1984)).

[9]     *In re The City of New York*, 2010 WL 2294134, at *14.

enforcement personnel, (4) information that would undermine the privacy of individuals involved in an investigation, or (5) information that would seriously impair the ability of a law enforcement agency to conduct future investigations.[10]

"[I]t should be clear that the focus of the law enforcement privilege is to protect information related to *investigations*."[11] "'An investigation . . . need not be ongoing for the law enforcement privilege to apply as the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information' is revealed to the public."[12] On the other hand, that an investigation is open does not guarantee protection from disclosure;[13] otherwise, a party could simply keep an investigation open during the pendency of a lawsuit in order to avoid disclosure.

Because the law enforcement privilege is a qualified privilege (*i.e.*, not absolute), the inquiry does not end with a successful showing that the privilege

---

[10]   *Id.* at *18 (quotation marks and citations omitted).

[11]   *Morrissey v. City of New York*, 171 F.R.D. 85, 90 (S.D.N.Y. 1997).

[12]   *In re The City of New York*, 2010 WL 2294134, at *18 (quoting *National Congress for Puerto Rican Rights ex rel. Perez v. City of New York*, 194 F.R.D. 88, 95 (S.D.N.Y. 2000)) (quotation marks omitted).

[13]   *See Kitevski v. City of New York*, No. 04 Civ. 7402, 2006 WL 680527, at *3 (S.D.N.Y. Mar. 16, 2006) (explaining that the ongoing status of an investigation is insufficient, in and of itself, to sustain the law enforcement privilege).

applies to the materials in question.[14]   While a "'strong presumption'" exists

against lifting the privilege,[15] the party seeking disclosure may rebut the

presumption by establishing:

> (1) that the suit is non-frivolous and brought in good faith,
> (2) that the information sought is not available through
> other discovery or from other sources, and (3) that the party
> has a compelling need for the privileged information[.][16]

If the presumption against disclosure is successfully rebutted, "the

district court must then weigh the public interest in nondisclosure against the need

of the litigant for access to the privileged information before ultimately deciding

whether disclosure is required."[17]   By its very nature, this "sensible balancing

---

[14]     *See In re The City of New York*, 2010 WL 2294134, at *15 (citing *In re Sealed Case*, 856 F.2d at 272).

[15]     *Id.* (quoting *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir. 1997).  I note that *In re The City of New York* describes the presumption against lifting the law enforcement privilege as both "pretty strong" and "strong."  *Compare id.* at *15 ("Once a court has determined that the law enforcement privilege applies, we agree with the Seventh Circuit that 'there ought to be a *pretty* strong presumption against lifting the privilege.'" (quoting *Dellwood Farms*, 128 F.3d at 1125) (emphasis added)) *with id.* at *18 ("There is a '*strong* presumption against lifting the privilege.'" (quoting *Dellwood Farms*, 128 F.3d at 1125) (emphasis added)).  Presumably some distinction exists between a "pretty strong" presumption and a "strong" presumption; however, the Second Circuit did not explain why it eliminated the adjective "pretty" from all but one of its repeated quotations of *Dellwood Farms*.

[16]     *Id.* at *18 (quotation marks and citations omitted).

[17]     *Id.*

7

test"[18] is multi-factored, non-mechanical, and circumstance-specific.

In balancing the interests favoring and disfavoring disclosure, the sensitivity of the information in question is a significant factor — the greater the sensitivity, the greater the protection, and vice versa. Further, the court "must consider the effect of a protective order restricting disclosure to the plaintiff and the plaintiff's attorney, or to the plaintiff's attorney alone. Such an order can mitigate many if not all of the oft-alleged injuries to the police and to law enforcement."[19] Other protective measures are also available, such as redaction, limitations on where and when items may be viewed, and constraints on the manner in which information may be utilized post-disclosure.[20]

Another important factor is whether a lawsuit involves a matter of public concern such as civil rights — a factor that will usually support disclosure.[21]

_____

[18]    *Id.* at *15.

[19]    *King v. Conde*, 121 F.R.D. 180, 190 (E.D.N.Y. 1988)

[20]    *See In re The City of New York*, 2010 WL 2294134, at *19 ("In an effort to minimize the effects of disclosure . . . the district court may order that the documents be 'revealed only in a specified way.'" (quoting Fed. R. Civ. P. 26(c)(1)(G)).

[21]    Though *In re The City of New York* concerned civil rights claims, the Second Circuit did not mention, let alone address, the longstanding line of cases holding that "[l]awsuits brought under 42 U.S.C. § 1983 require special attention to full disclosure . . . [and that t]he great weight of the policy in favor of discovery in civil rights actions supplements the normal presumption in favor of broad discovery." *King*, 121 F.R.D. at 195. I do not interpret the Second Circuit's

The public has a profoundly important interest "in giving force to the federal civil

rights law,"[22] and in reasonable transparency from law enforcement agencies. As

the court in *Wood v. Breier* eloquently explained:

> Each citizen acts as a private attorney general who takes on
> the mantel of the sovereign, guarding for all of us the
> individual liberties enunciated in the Constitution. Section
> 1983 represents a balancing feature in our governmental
> structure whereby individual citizens are encouraged to
> police those who are charged with policing us all. Thus, it
> is of special import that suits brought under this statute be
> resolved by a determination of the truth rather than by a
> determination that the truth shall remain hidden.[23]

---

silence as implicitly overruling this reasoning, which is both well-founded and just.
Furthermore, because the Second Circuit held on the facts of *In re The City of New
York* that the plaintiffs did not have a compelling need for the privileged
information, the court did not have occasion to fully consider all of the factors
bearing on the ultimate question of disclosure. *See In re The City of New York*,
2010 WL 2294134, at *17. Further, given the flexible quality of the balancing test
adopted by the Second Circuit for evaluating law enforcement privilege claims,
concepts and concerns not addressed in *In re The City of New York* may be
evaluated.

[22]     *King*, 121 F.R.D. at 195. *Accord Kitevski*, 2006 WL 680527, at *3
("Since the government has a vital interest in upholding civil rights, impediments
to fact-finding in a § 1983 case are not favored."); *Perez*, 194 F.R.D. at 96 ("[T]he
strong public interest in uncovering the civil rights violations alleged in this
Complaint would be substantially harmed if access to the relevant portions of the
disciplinary records is denied."); *King*, 121 F.R.D. at 195 ("In a federal civil rights
action, a claim that the evidence is privileged 'must be so meritorious as to
overcome the fundamental importance of a law meant to insure each citizen from
unconstitutional state action . . . .'" (quoting *Wood v. Breier*, 54 F.R.D. 7, 13 (E.D.
Wisc. 1972)); *Skibo v. City of New York*, 109 F.R.D. 58, 64 (E.D.N.Y. 1985).

[23]     *Wood*, 54 F.R.D. at 10-11 (quotation marks and footnotes omitted).

9

In *In re The City of New York*, the Second Circuit took the "extraordinary"[24] step of issuing a writ of mandamus to vacate a district court order compelling the NYPD to disclose "Field Reports" of undercover officers who had infiltrated organizations planning to protest the 2004 Republican National Convention ("RNC").  The Circuit held that the City of New York — the party asserting the privilege — met its burden of establishing that the law enforcement privilege applied to the Field Reports:  (1) the documents "even in their redacted form, contain detailed information about the *undercover* operations of the NYPD"; (2) disclosing such information would hinder future NYPD *undercover* investigations; and (3) "even the redacted documents contain some information that could disclose the identity of an NYPD *undercover* officer."[25]

The risk of public disclosure of the Field Reports was so potentially perilous, the Circuit ruled that disclosure was not permitted even under various safeguards imposed by the district court[26] — namely that portions of the documents were to be redacted; that the production was limited to a single set of documents to be stored at the New York Civil Liberties Union; and that the documents were for

---

[24]   *In re The City of New York*, 2010 WL 2294134, at *14.

[25]   *Id.* at *15 (emphasis added).

[26]   *See id.* at *7-*8.

attorneys' eyes only.[27]  Nor did the Circuit accept that filing the documents under

seal with the district court would provide sufficient security from leaks.[28]

Turning to plaintiffs' rebuttal of the presumption against lifting the

privilege, the Circuit explained that the only dispute between the parties was

whether plaintiffs — suing the City for constitutional deprivations stemming from

their arrests during demonstrations of the RNC — had a compelling need for the

Field Reports.  To assess this issue, the Circuit "review[ed] the general contours of

the parties' putative arguments at trial" and observed that "[a]t issue . . . is the

seriousness of the threat facing the RNC and the City in the summer of 2004."[29]

Based upon its *in camera* review of the Field Reports, the Circuit held that because

the documents did not undermine but rather reinforced information previously

disclosed to plaintiffs, plaintiffs failed to establish any need for the Field Reports,

let alone a compelling need.[30]  "In any event," the Circuit concluded, any need of

plaintiffs for the information "certainly [did] not outweigh the public's substantial

interest in nondisclosure as a means to preserve the integrity of the NYPD's

---

[27]     *See id.* at *4; *MacNamara v. City of New York*, Nos. 04 Civ. 9216, 04
Civ. 7921, 04 Civ. 7922, 2009 WL 4789421, at *5 (S.D.N.Y. Dec. 14, 2009).

[28]     *See In re The City of New York*, 2010 WL 2294134, at *8-*10.

[29]     *Id.* at *16.

[30]     *See id.* at *16-*17.

11

*undercover* operations."[31]

## III.   APPLICATION

Based upon my careful *in camera* inspection of the nearly 2,100 pages at issue here, I make the following findings and conclusions. As an initial matter, the vast majority of documents in the IAB files are irrelevant to plaintiffs' claims — these irrelevant documents concern, for example, past inquiries entirely disconnected from the question of quotas and plaintiffs' broader claims.

For those documents that do concern quotas or are otherwise relevant, I find that defendants have met their burden that the law enforcement privilege is applicable to these items. At the general level, because IAB investigations are confidential, including within the NYPD, public disclosure of either the existence of an ongoing investigation or the specific investigative steps taken or planned could possibly taint the inquiry or chill the accessibility and candor of complainants and witnesses.[32] Here, of course, the officers' quota allegations have

---

[31]    *Id.* at *17 (emphasis added).

[32]    *But see Wong v. City of New York*, 123 F.R.D. 481, 483-74 (S.D.N.Y. 1989); *King*, 121 F.R.D. at 192-93; *Kelly v. City of San Jose*, 114 F.R.D. 653, 665 (N.D. Cal. 1987); *Mercy v. County of Suffolk*, 93 F.R.D. 520 (E.D.N.Y. 1982). For instance, the court in *Kelly* explained:

> In short, officers will feel pressure to be honest and logical when they know that their statements and their work product will be subject to demanding analysis by people

been publicly disclosed — thus, in a sense, the cat is already out of the bag. On the

other hand, potential targets of and witnesses to the IAB investigations may not

know either that IAB is pursuing these matters or that they are implicated by the

allegations. Additionally, the officers mentioned in the IAB documents have a

limited privacy interest in the confidentiality of the files, particularly in unresolved

accusations of misconduct or corruption.[33]

Next, plaintiffs have successfully rebutted the strong presumption

against lifting the privilege. The information contained in the IAB files is not

available through other discovery or from other sources,[34] and plaintiffs have a

_____

> with knowledge of the events under investigation and
> considerable incentive to make sure that the truth comes out
> (i.e., a civil rights plaintiff and her lawyer). Thus there is a
> real possibility that officers working in closed systems will
> feel less pressure to be honest than officers who know that
> they may be forced to defend what they say and report.

114 F.R.D. at 665.

[33]     *See, e.g., Dangler v. New York City OTB Corp.*, No. 95 Civ. 8495,
2000 WL 1510090, at *4 (S.D.N.Y. Oct. 11, 2000) (observing that "there is a clear
need to safeguard the privacy of the statements made by . . . employees about other
employees" in the course of a Department of Investigation probe that ultimately
found no wrongdoing).

[34]     Defendants are uniquely situated as the party asserting the privilege
to demonstrate that plaintiffs already have (or have access to) the information
contained in the IAB records. Defendants have made no such showing.

compelling need for the information.[35]  As noted earlier, plaintiffs have been

unable to prove their quota theory through other discovery.  Nonetheless,

plaintiffs' theory gained some possible traction, or at least unexplored avenues for

discovery, when various police officers separately alleged the existence of quotas.

Plaintiffs emphasize that they have obtained from Officers Polanco and Schoolcraft

recordings each made of roll calls where numerous officers (of a variety of ranks)

can be heard discussing target numbers or quotas for certain law enforcement

activity.[36]  These recordings, at a minimum, bear on the question of whether quotas

exist, even if they do not ultimately demonstrate plaintiffs' argument that

mandatory quotas lead to unconstitutional stop, question, and frisks.[37]  That

plaintiffs are in possession of these recordings and are poised to depose the officers

---

[35]      Defendants do not argue, nor could they, that plaintiffs' suit is
frivolous or brought in bad faith.

[36]      Defendants contend that Officers Polanco and Schoolcraft are
"apparently disgruntled employees" and thereby intimate that their quota
allegations may be fabricated.  *See* Defendants' Letter to the Court (June 1, 2010)
at 3.  While the disciplinary history of Officers Polanco and Schoolcraft may bear
on their character for veracity, this is largely beside the point given that a number
of officers took part in the recorded conversations.

[37]      *See supra* note 2 (explaining that plaintiffs not only need to prove the
existence of quotas, but also that quotas lead to unconstitutional stop, question, and
frisks).

heard on the recordings does not eliminate their need for the IAB materials.[38]  For

example, plaintiffs have little, if any, information about the allegations from

Transit District 23.  Furthermore, to the extent that the IAB materials corroborate

or contradict the officers' quota allegations, they are probative with respect to

NYPD officials' deposition testimony denying the existence of quotas.

Because plaintiffs have overcome the presumption against lifting the

law enforcement privilege, I must weigh the interests in favor of and against

disclosure.  The balance easily tips to plaintiffs.  To begin, the IAB documents are

a far cry from the highly-sensitive Field Reports that drove the Second Circuit's

decision in *In re The City of New York*.  Unlike the Field Reports, the quota

information contained in the IAB files does not involve secret operations or

undercover officers.  Nor do the IAB investigations implicate such vital concerns

as terrorism, mass unrest or riots, spiraling violence or chaos, or anything of the

like.[39]  Disclosure of the IAB files will not cause an emergency or endanger any of

the officers mentioned therein.  The low sensitivity of the IAB materials weighs in

favor of lifting the privilege.

---

[38]     *See Perez*, 194 F.R.D. at 96 ("Generally, in civil rights cases against
police departments, it is unlikely that plaintiffs will be able to obtain information
of comparable quality from any other source.").

[39]     *Cf. In re The City of New York*, 2010 WL 2294134, at *2 (recounting
the major security concerns for New York City related to hosting the RNC).

Nor does disclosure of these IAB documents risk divulging any secret law enforcement techniques or procedures. The select materials ordered disclosed do not contain a roadmap or manual to IAB investigations generally or these investigations specifically. To the extent that the IAB materials show investigative steps taken by or available to the IAB, an attorneys' eyes only protective order alleviates any concern about about revealing this information *to those who might abuse it* (*e.g.*, subjects and witnesses who are presently unaware that they are named in an IAB inquiry). Therefore, disclosure of the IAB materials to plaintiffs' counsel is highly unlikely to either impair the integrity of the IAB investigations or weaken any future law enforcement program.[40] By contrast, the court in *In re The City of New York* was clearly concerned that if the Field Reports were leaked publicly, future *undercover* operations might be negatively affected. There is no comparable concern in this case.

Another factor weighing in favor of disclosure is that this suit involves questions of broad public concern and civil rights — racial profiling by the NYPD and unconstitutional searches and seizures. Moreover, as various courts have recognized, "the possibility of disclosure to civil rights plaintiffs is probably

---

[40]     *See King*, 121 F.R.D. at 192.

16

not of great import"[41] to police officer witnesses in IAB investigations, who "do not have section 1983 cases in mind"[42] at the time the investigations are conducted. If anything, "[a]n officer's incentives to hide a friend's misconduct, or to be scrupulously forthcoming lest he be disciplined for having concealed information, are probably much more closely tied to the internal investigative machinery than to the fear of civil rights litigation."[43] This is especially true in this case because none of the IAB investigations relate to incidents involving the named plaintiffs.

As to the officers' privacy interest in the confidentiality of the IAB files, I first note that none of these officers are undercover, obviating any concern about blowing a cover and jeopardizing the safety of an officer. Furthermore, because the IAB investigations concern on-the-job conduct of police officers rather than matters in their personal lives, the privacy interests at issue here, though not inconsequential, are "'limited in view of the role played by the police officer as public servant who must be accountable to public review.'"[44] "Moreover, 'these privacy interests must be balanced against the great weight afforded to federal law

----

[41] *Id.*

[42] *Morrissey*, 171 F.R.D. at 92. *Accord Wong*, 123 F.R.D. at 483-84 .

[43] *King*, 121 F.R.D. at 192.

[44] *Perez*, 194 F.R.D. at 96 (quoting *King*, 121 F.R.D. at 191).

17

in civil rights cases against police departments.'"[45]  In short, the officers' limited

interest in the confidentiality of the IAB files must yield to the interests served by

disclosure.  Nonetheless, in order to minimize impact on the officers, I have

carefully restricted the documents to be disclosed, omitting a great deal of

personnel and personal information.

        Defendants' reliance on *Borchers v. Commercial Union Assurance*

*Co.* is misplaced.  In *Borchers*, the court denied a request for discovery of witness

statements and other information related to an open Fire Department of New York

("FDNY") criminal arson investigation based on the law enforcement privilege.[46]

The court concluded that disclosure of the identities of witnesses and the substance

of witness interviews to plaintiffs could jeopardize the ongoing investigation by

discouraging witness candor and cooperation in the investigation and in future

investigations.[47]  *Borchers*, however, is distinguishable.[48]  First, *Borchers* did not

---

[45]    *Id.* (quoting *Soto v. City of Concord*, 162 F.R.D. 603, 616 (N.D. Cal. 1995)).  *Accord Kitevski*, 2006 WL 680527, at *3 (ordering production of records from an ongoing IAB investigation to a plaintiff in a section 1983 action, and holding that the "'need to uncover possible evidence of misconduct on the part of the City overcomes defendant [police officer's] need for confidentiality'" (quoting *Skibo*, 109 F.R.D. at 64).

[46]    *See* 874 F. Supp. at 80.

[47]    *See id.*

[48]    *Cf. Kitevski*, 2006 WL 680527, at *4 (distinguishing *Borchers*).

involve civil rights claims, but rather was an action to recover the proceeds of an insurance policy.[49] Second, unlike here, the party seeking the documents was *the subject of* the FDNY investigation.[50] This difference is significant because a witness would be unlikely to make a statement to investigators implicating someone else if he knew his statements would be disclosed to the person he implicated.

Because an attorneys' eyes only protective order will mitigate defendants' concerns about disclosure of the IAB files, this factor also weighs in favor of disclosure. Defendants argue that "an attorney's eyes only disclosure is ill-suited to protect the law enforcement interests and would be meaningless to plaintiffs anyhow, since it would prohibit counsel from disclosing any information, including through their deposition questions."[51] Defendants also object to plaintiffs' offer to keep the depositions of IAB investigators and witnesses confidential as insufficient to safeguard defendants' interests.[52] Defendants argue that disclosure even to plaintiffs' counsel could cause potential witnesses or the subjects of the investigations to tailor their testimony or modify their behavior to

---

[49]     *See* 874 F. Supp. at 79.

[50]     *See id.*

[51]     Defendants' Letter to the Court (June 10, 2010) at 3.

[52]     *See id.*

19

escape detection of misconduct.  However, if plaintiffs' counsel cannot disclose the documents to anyone and the depositions of IAB investigators and witnesses are kept confidential, there is little chance that potential witnesses or the subjects of the investigations will learn any of this information.

In sum, restricting disclosure to only a small portion of the IAB files, redacting irrelevant and truly sensitive information, and imposing an attorneys' eyes only protective order is a sensible balance between plaintiffs' compelling need for the information and the low sensitivity of the materials generally.  I reiterate that the complaining officers' quota allegations are public, meaning the officers mentioned in the IAB files may already know they are being investigated. Indeed, my review of the files indicates that many if not all of the officers named appear to have already been contacted by IAB, further diminishing any possibility that disclosure to plaintiffs' counsel will negatively impact the investigations at issue here.  Nor will any information disclosed here affect any future IAB investigations.  Finally, to further limit the scope of disclosure — and to reduce defendants' burden associated with generating redacted documents — duplicative information need not be produced.

## IV.   CONCLUSION

Plaintiffs' motion to compel is granted.  Defendants are ordered to disclose the following documents:

20

1.     For IAB Log Number 08-10828:  Bates Numbers 91-92, 100-19, 131-
       33, 203-06, 240-42, 262, 269-76, 284-86, 289-90, 319-24, 339-40,
       430, 432-33, 453-56, 464-69, 473-76, 482-86, 490-99, and 500-02.

2.     For IAB Log Number 09-41517:  Bates Numbers 220-28, 244, 266-
       67, 269, 322, 437, 514-17, 532, 560-63, 937-38, 949-50, and 953.

3.     For IAB Log Number 09-63301:  Bates Numbers 75-77, 84, 95, 105-
       08, 112, 119-21, 132, 135-36, 149-51, 156-58, 553-55, 600, 604-06,
       608, and 612.[53]

       Because the IAB investigations are open and ongoing, defendants are

ordered to continue making disclosures consistent with this Opinion and Order.[54]

       For all documents ordered disclosed or to which the continuing

---

[53]     Various of the documents ordered produced are notes of IAB
investigators of their interviews of police officers.  The files also contain audio
recordings of many if not all of these interviews.  Many of these interviews
concerned a number of topics other than quotas — irrelevant information that will
be redacted from the documents disclosed to plaintiffs.  Defendants are not
presently ordered to produce the audio recordings.  Should plaintiffs show a
compelling need for these audio tapes in the future, defendants will be required to
produce those portions of the recordings relating to quotas.

[54]
       I recognize that to avoid any further disclosures, IAB could simply
delay or even suspend its investigation of the quota allegations during the
pendency of discovery in this matter.  The Court does not believe that IAB, which
plays such an important role in oversight of police misconduct, would do such a
thing to avoid a discovery obligation specifically ordered by a federal court.  What
is more, if IAB were to suspend its investigation, this may have some bearing on
the City's *Monell* liability at issue in this suit.

21

obligation of disclosure attaches, defendants may redact information irrelevant to the issue of quotas, and may also apply to the Court for redaction of information that, upon careful reflection, is truly sensitive.

All disclosures shall be subject to an attorneys' eyes only protective order negotiated by the parties or imposed by the Court.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 24, 2010

## - Appearances -

**For Plaintiffs:**

Darius Charney, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6464

Taylor M. Hoffman, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, New York 10018
(212) 841-1206

Jonathan C. Moore, Esq.
Rachel Kleinman, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0900

**For Defendants:**

David M. Hazan
Linda Donahue
Jennifer Rossan
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-8084