UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

FLOYD, et al.,

                                              Plaintiffs,

                    -against-

CITY OF NEW YORK, et al.,

                                              Defendants.

-----------------------------------------------------------------------X

**REPLY
DECLARATION OF
HEIDI GROSSMAN**

08 Civ. 1034 (SAS)

        **HEIDI GROSSMAN** declares, pursuant to 28 U.S.C. 1746, under penalty of perjury, that the following is true and correct:

        1.      I am an Assistant Corporation Counsel in the office of Michael A. Cardozo, Corporation Counsel of the City of New York, attorney for Defendants in the above action.  As such, I am familiar with the facts stated below and submit this declaration in support of Defendants' motion for summary judgment pursuant to F.R.C.P. 56. This Declaration is submitted, in part, to correct citation errors made in the Defendants' Statement of Facts Pursuant to Local Rule 56.1, dated February 2, 2011 ("Ds 56.1"), to provide complete and accurate citations to the record which were omitted from Plaintiffs' Additional Facts ("PAF") (which begin at page 82 of Plaintiffs' Amended Response to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated February 9, 2011 ("Ps 56.1")) and to provide additional citations to the record so that the Court has a complete record from which it can evaluate what Defendants submit are mischaracterizations made in the PAF, consisting of 328 paragraphs and 77 pages.

2.      At the Court conference dated January 26, 2011, Defendants understood that the Court would not permit them to submit a reply 56.1 to Plaintiffs' 56.1 Response. 1/26/11 Ct. Tr. at 17:7-12.  Thus, to the extent Defendants are not permitted to submit a reply, it is unclear if a formal response to the PAF would be in violation of the Court's order.  While Defendants are not admitting or denying the PAF in view of the Court's order directing Defendants not to submit a reply, to the extent there are new facts asserted by Plaintiffs that are not simply objections to Ds 56.1, Defendants are in no way conceding the truth of the matters or characterization of the evidence asserted therein. Subject to the foregoing, Defendants submit that the attached are true and correct copies of the documents described below.[1]

3.      With regard to Ds 56.1 ¶37, Defendants respectfully refer the Court to the corrected citation at Bates Nos. NYC_2_00013369-14038 (corrected from "NYC_2_0001369-4038").

4.      With regard to Ds 56.1 ¶44, Defendants respectfully refer the Court to the corrected citation at Bates Nos. NYC060001-NYC060014 (corrected from "NYC_2_000006001-0014").

5.      With regard to Ds 56.1 ¶90, Defendants respectfully refer the Court to the corrected citation at Bates Nos. NYC_2_00004926-4929 (Confidential) (corrected from "NYC00004926-NYC00004929").

6.      With regard to Ds 56.1 ¶91, Defendants respectfully refer the Court to the corrected citation at Bates Nos. NYC_2_00004926-4929 (Confidential) (corrected from "NYC00004926-NYC00004929").

---

[1] Duplicates of certain documents and deposition excerpts cited in the Reply Dec. are attached hereto as exhibits for the Court's convenience, and are also included in Defendants' Appendix.

7.     With regard to Ds 56.1 ¶195, Defendants respectfully refer the Court to the following corrected citations: Bates Nos. NYC-00005363-5408 (corrected from "NYC-000536-5408"); Bates Nos. NYC_2_00020637-20656 (corrected from "NYC-P00010694-713"), attached hereto as Exhibit A; Bates Nos. NYC_2_00020657-20676 (corrected from "NYC-P00010157-76") attached hereto as Exhibit B; Bates Nos. NYC_2_00020677-20705 (corrected from "NYC-P00010714-42"), attached hereto as Exhibit C; Bates Nos. NYC_2_00020706-20731 (corrected from "NYC-P00010177-202"), attached hereto as Exhibit D.

8.     With regard to Ds 56.1 ¶200, Defendants respectfully refer the Court to the following corrected citations: Bates Nos. NYC-00004163-4204 (corrected from "NYC-P00008532"), attached hereto as Exhibit E; NYC-00004206-4213 ("NYC-P00008575-582"), attached hereto as Exhibit F.

9.     With regard to Ds 56.1 ¶204, Defendants respectfully refer the Court to the following corrected citations, attached collectively as Exhibit G: Bates Nos. NYC-00004217 (corrected from "NYC-P00008586"); NYC-00004218-4219 (corrected from "NYC-P00008587-588"); NYC-00004220-4222 (corrected from "NYC-P00008589-591").

10.     With regard to Ds 56.1 ¶246, Defendants respectfully refer the Court to the corrected citation at Ruggiero Tr. at 80:24-81:3 (corrected from "Ruggiero Tr. at 80:24-21:3").

11.     With regard to Ds 56.1 ¶283, Defendants respectfully refer the Court to the corrected citation at NYC_2_00020732-20736 (corrected from "PG 202-18, 202-19, 202-20"), attached hereto as Exhibit H.

12.    With regard to Ds 56.1 ¶462, Defendants respectfully refer the Court to the corrected citation at 8/5/2009 Hernandez Tr. at 171:20-172:12 (corrected from "8/5/2009 Hernandez Tr. at 171:20121:12").

13.    With regard to 2/02/2011 Grossman Dec. ¶13 Exh. L, Defendants respectfully refer the Court to the corrected citation at Bates No. NYC_2_00011852-53 (corrected from "NYC 00011852-53").

14.    In response to Plaintiffs' objections concerning the NYPD Letter dated November 15, 2010, to the Honorable Christine C. Quinn (2/02/2011 Grossman Dec. Exh. J) ("NYPD Letter"), and in furtherance of Ds 56.1 ¶71, Defendants respectfully refer the Court to the following evidence previously cited in Ds 56.1, as additional support for the assertions made: Interim Order Revision to Patrol Guide Section 212-11, Apr. 23, 2009 ("Revision 4/23/09") (Bates No. NYC_2_00006984), attached hereto as Exhibit I; Information Card, "What Is A Stop, Question and Frisk Encounter?" (Bates No. NYC_2_00004925), attached hereto as Exhibit J; Defendants also respectfully refer the Court to the Interim Order Revision to Patrol Guide Section 212-11, May 18, 2010 ("Revision 5/18/10") (Bates No. NYC_2_00020634-00020636), attached hereto as Exhibit K, which was referenced in the NYPD Letter dated November 15, 2010 but was not cited as an Exhibit in Ds 56.1.

15.    In response to Plaintiffs' objections concerning the NYPD Letter, and in furtherance of Ds 56.1 ¶72, Defendants respectfully refer the Court to Revision 4/23/09 (Bates No. NYC_2_00006984) attached hereto as Exhibit I, as additional support for the assertions made.

16.    In response to Plaintiffs' objections concerning the NYPD Letter and in furtherance of Ds 56.1 ¶¶ 76-79, Defendants respectfully refer the Court to Revision 05/18/10, at

¶1 (Bates No. NYC_2_00020634-00020636), attached hereto as Exhibit K, as additional support for the assertions made, and to Farrell Tr. at 242:25-244:8 (stating that the NYPD had implemented a pilot program in select precincts requiring officers to provide an information card regarding stop, question and frisk encounters to pedestrians who were stopped but not arrested nor issued a summons), attached hereto as Exhibit L.

17.    In furtherance of Ds 56.1 ¶91, Defendants respectfully refer the Court to a more complete excerpt of the cited Farrell testimony (Farrell Tr. at 236:13-237:9), attached hereto as Exhibit M.

18.    In furtherance of Ds 56.1 ¶132, Defendants submit the additional testimony of Chief Esposito (8/07/2009 Esposito Tr. at 44:14-25, 45:1-11, 59:10-61:2; 11/23/2009 Esposito Tr. at 349:16-350:21), attached hereto as Exhibit N.

19.    In furtherance of Ds 56.1 ¶¶ 496-518 and in response to PAF ¶¶ 311-326, Defendants respectfully refer the Court to the chart (regarding attempts to identify John Doe defendants allegedly involved in the June 6 or June 9, 2008 Ourlicht incident) attached hereto as Exhibit O.

20.    With regard to PAF ¶¶ 50-51, Defendants respectfully refer the Court to the QAD audit results for the years 2006-2009, showing satisfactory overall ratings for the 43rd and 107th Precincts (previously cited at Bates Nos. NYC_2_00000772-773, NYC_2_00000778-779, NYC-00004290, NYC-00004293, NYC-00004308, NYC-00004311, NYC_2_00018527, NYC_2_00018530), attached hereto as Exhibit P.

21.    With regard to PAF ¶58, Defendants respectfully refer the Court to Officer Pichardo's Monthly Performance Report for January 2008 (Bates Nos. NYC-00008330-8331) (showing that he issued only 1 criminal court summons during his overtime tour on Jan. 11th, 2

criminal court summonses during his overtime tour on Jan. 12th, and no criminal court summonses during his overtime tours on Jan 10th and Jan. 29th), attached hereto as Exhibit Q. Defendants further refer the Court to Pichardo Tr. at 231:23-232:11 (in which Officer Pichardo testified that he has never experienced adverse employment action for failing to issue a certain number of summonses during his time with the Anti-Crime Unit), attached hereto as Exhibit R, and to the testimony of the following officers who stated that they have never been made aware of any type of quota or target for UF250s or criminal court summonses, nor have they been warned of negative consequences for failing to conduct a certain number of stops or issue a certain number of summonses, attached collectively as Exhibit S: Bennett Tr. (Confidential) at 26:5-24 (was never told of a requirement to make a certain number of stops per month, and had never heard of officers facing repercussions for not making a certain number of arrests or summonses per month); Cousin-Hayes Tr. at 167:5-9 (does not recall being directed to make a certain number of stops per tour while with the Anti-Crime Unit); Eddy Tr. at 214:7-215:7 (was never told to, and never felt pressure to, conduct a certain number of stops per Spike Overtime tour, and was not rewarded based on the number of stops conducted); Fundaro Tr. (Confidential) at 22:19-25:5 (has never discussed a goal, target number or productivity standard of summonses per month for officers, never discussed quotas or productivity standards for numbers of arrests or stops, and has never been told by a supervisor to make a certain number of arrests, stops or summonses), 32:23-34:9 (has never faced repercussions for not making a certain number of arrests, stops or summonses and has never heard of this occurring to any other officer); Gonzalez Tr. at 22:23-23:21 (has never been told by a supervisor that he was conducting too few stops of civilians, and is not expected to conduct a certain number of stops as an Anti-Crime officer); Herran Tr. (Confidential) at 50:1-54:25 (is only aware of goals officers set among themselves for

6

arrest or summons activity, not any pressure from supervisors; officers' stop, question and frisk activity is not used by their superiors to evaluate them), 76:11-25 (has never, in fifteen years as an officer, been advised of any productivity standards for officers), 78:13-24 (officers are not told of any productivity standards they are expected to meet); Hu Tr. at 87:4-13 (has never been told by supervisors that he stopped too few or too many civilians), 92:16-25 (has never been told that he must conduct a certain number of stop, question and frisks, and has never heard of any other officer being told as such); Joyce Tr. at 170:19-171:22 (is not aware of any quotas or expectations for stop, question and frisk activity, does not recall ever being encouraged to increase his stop, question and frisk activity, and is not aware of being evaluated on such basis); Navaretta Tr. at 73:11-74:23 (has never been told that he must conduct a certain number of stops, arrests or summonses, is not aware of being evaluated on such basis, and has never been told of any such requirements at roll call), 82:4-25 (is not concerned with making a certain number of stop, question and frisks per month).[2]

22.   Defendants note that the Plaintiffs did not provide the Court with complete excerpts of the audio recordings referenced in PAF ¶¶ 67-71, 79, 89, 90 and 92, and respectfully refer the Court to the following deposition testimony for the complete content and context of the recordings referenced therein, attached collectively as Exhibit T: Bennett Tr. (Confidential) at 64:12-67:16, 73:18-81:1; 11/23/2009 Esposito Tr. at 368:24-369:10, 369:19-23; Herran Tr. (Confidential), at 26:13-29:2, 54:22-55:2; Mauriello Tr. at 110:17-116:17; McHugh Tr. at 52:24-53:18, 53:22-54:4, 55:9-15; McHugh Tr. (Confidential) at 77:12-78:2, 89:18-90:11, 90:24-92:23.

---

[2] Confidential documents have been provided to the Court separately, under seal.

23.     With regard to PAF ¶¶ 113-116, Defendants respectfully refer the Court to the original draft of the RAND report, dated Sept. 19, 2007, at xi-xii (Bates No. NYC_2_00002880-2881) (containing an analysis of the relative merits of various external benchmark options, similar to what appears in the final version of the RAND report), attached hereto as Exhibit U.

24.     With regard to PAF ¶¶ 121-122, Defendants respectfully refer the Court to Farrell Tr. at 244:9-246:8 (explaining the NYPD's finding that stops in Staten Island have not resulted in a disproportionate share of civilian complaints), attached hereto as Exhibit V.

25.     With regard to PAF ¶¶ 123-124, Defendants respectfully refer the Court to the RAND report at p. 26, FN1 ("All RAND studies go before an institutional review board that reviews research involving human subjects, as required by federal regulations. RAND's Federalwide Assurance for the Protection of Human Subjects (NIH, through 2010) serves as its assurance of compliance with the regulations of 16 federal departments and agencies. According to this assurance, the committee is responsible for review regardless of source of funding. These federal regulations prevent RAND research from singling out specific individuals whom its research could adversely affect. The analysis in this section offers an estimate of the number of the NYPD's patrol officers of concern, but RAND cannot identify individual officers. For the Cincinnati Police Department, RAND has transferred the analytical capabilities to the department's analysts so that they can properly review their officers. A similar arrangement may be possible with NYPD."), and to Farrell Tr. at 238:4-239:7 (stating, in part, that "[t]he RAND study was conducted under federal rules of confidentiality and protection of human subjects under the Institutional Review Board process, and as a result, was unable to provide us with any

identifiers regarding anybody reviewed in the study."), attached hereto as Exhibit W. Defendants further respectfully refer the Court to 45 C.F.R. §§ 46.101-46.124.

26.     With regard to PAF ¶175, Defendants respectfully refer the Court to the following excerpts of Officer testimony, which Plaintiffs omitted and which Defendants submit to the Court for their complete content and meaning; deposition excerpts referenced in ¶¶ 26-27 are attached collectively as Exhibit X: Agron Tr. at 169:11-18 (understood prohibition on racial profiling); Dang Tr. at 12:25-13:10 (understood prohibition on racial profiling); Dang Tr. (Confidential) at 60:4-61:8 (acknowledged following racial profiling prohibition in addition to other procedures regarding stop and frisk reports); Eddy Tr. at 194:24-195:10 (understood prohibition on racial profiling), 242:11-17 (confirmed he had been trained on racial profiling at the Police Academy), 242:18-21 (confirmed he had been trained on racial profiling since graduating from Police Academy); Hegney Tr. at 214:12-215:14 (understood prohibition on racial profiling); Marino Tr. at 101:15-102:7 (understood prohibition on racial profiling); Mulligan Tr. at 17:5-13 (recalled statement within Field Training Guide about policy), 22:18-23:9 (training on stops indirectly addresses racial profiling policy), 107:20-108:21 (training addresses racial profiling); Charles Ortiz Tr. at 124:4-127:14 (identifies prohibition against racial profiling as training issue), 145:12-147:21 (explains training involves prohibition against racial profiling, outreach as part of overall effort to make sure racial profiling does not occur); Palmieri Tr. at 87:19-88:5 (recognized Operations Order on NYPD policy prohibiting racial profiling; contradicts Plaintiffs' cite at 88:6-8 that he had not seen the policy prior to meeting with his attorneys).

27.     With regard to PAF ¶176, Defendants respectfully refer the Court to the following excerpts of Officer testimony, which Plaintiffs omitted and which Defendants submit

to the Court for their complete content and meaning; deposition excerpts referenced in ¶¶ 26-27 are attached collectively as Exhibit X: Dang Tr. at 12:25-13:10 (understood prohibition on racial profiling); Hegney Tr. at 214:12-215:14 (understood prohibition on racial profiling); Marino Tr. at 101:15-102:7 (understood prohibition on racial profiling); Charles Ortiz Tr. at 124:4-125:18 (identified Operations Order against racial profiling); Palmieri Tr. at 87:19-88:5 (recognized Operations Order on NYPD policy prohibiting racial profiling).

28.     With regard to PAF ¶200, Defendants respectfully refer the Court to the CCRB 2009 Annual Report, at Appendix Table 17 (which was cited as Charney Dec. Exh. 158 but was not attached to the Charney Dec.), attached hereto as Exhibit Y, and to the following: CCRB 2004 Annual Report (Bates No. NYC-00007036); CCRB 2005 Annual Report (Bates No. NYC-00007272); CCRB 2006 Annual Report (Bates No. NYC-00007530); and CCRB 2007 Annual Report (Bates No. NYC-00007747), attached collectively as Exhibit Z, referencing stop, question and frisk investigations while noting the number of complaints which also include allegations of racial profiling.

29.     With regard to PAF ¶¶ 243-245 and 299-305, regarding the investigation of the January 2008 Ourlicht complaint, Defendants respectfully refer the Court to the following: Bates Nos. NYC-00000613-615 (the investigation file, including the UF250 form indicating that Ourlicht was White and notes that the complainant, Ourlicht's mother, did not wish NYPD to contact her son and refused to provide his contact information), attached hereto as Exhibit AA; testimony of Sergeant Hegney (Hegney Tr. at 272:12-273:7) (explaining that he spoke with Mrs. Ourlicht on 4/14/08, at which time she told him that she wanted to drop the complaint because she was only concerned that her son would have a warrant but she had worked everything out in court), attached hereto as Exhibit BB; and further testimony of Sergeant Hegney (Hegney Tr. at

271:25-272:3, 272:17-19, 274:13-18, 276:3-5) (explaining that he was not able to speak with David Ourlicht about the complaint brought by Mrs. Ourlicht), attached hereto as Exhibit BB.

30.     With regard to PAF ¶¶ 246-253, regarding the investigation of the Dennis January 2008 incident, Defendants respectfully refer the Court to the following testimony of Sergeant Flavio Rodriguez, who investigated Dennis's girlfriend's complaint about the incident and determined that the officers involved had been told from two sources that Dennis did have an active warrant and that therefore, the officers had acted appropriately (Rodriguez Tr. at 63:13–64:15), attached hereto as Exhibit CC.

31.     Attached as Exhibit DD is *Hargroves v. City of New York*, 10-0952-cv (2d Cir. Feb. 22, 2011) (summary order).

Dated: New York, New York
        February 23, 2011

                                MICHAEL A. CARDOZO
                                Corporation Counsel of the
                                  City of New York
                                Attorney for Defendants
                                100 Church Street
                                New York, New York 10007
                                (212) 788-0792

                        By:     _____
                                Heidi Grossman
                                Assistant Corporation Counsel
                                Special Federal Litigation Division

cc:     <u>Via Email</u>
        Darius Charney, Esq.
        Center for Constitutional Rights
        666 Broadway, 7th Floor
        New York, NY 10012

Exhibit A



# POLICE STUDENT'S GUIDE
## Policing Impartially

In this chapter, you will read about *Policing Impartially*. The Patrol Guide contains more extensive direction and procedures. The following mandatory Patrol Guide reading **must be** read in conjunction with this chapter. **Questions for the 1st Trimester Exam may come from this procedure.**

### MANDATORY PATROL GUIDE READING

P.G. 207-10  Bias Motivated Incidents

### WHY IS IT IMPORTANT FOR POLICE OFFICERS TO KNOW ABOUT IMPARTIAL POLICING?

Police officers work in diverse communities among people who may not share their race, ethnicity, cultural background, or way of looking at the world. As a result, officers sometimes find their beliefs challenged by people who may or may not be breaking the law. In this context, hidden biases are likely to surface and sometimes threaten the officer's ability to professionally use discretion and communicate with the public. In a jurisdiction as diverse as New York City, such biases and the conduct they may produce can be disastrous. This chapter explores what you, as a police officer, need to know in order to deal with a diverse population in a manner consistent with law and Department guidelines.

*2009*

ially without regard
the same time, we
against certain groups
g patterns of
ations and
country. In 1805,
rs in the City of New
and to enforce the
class status of
qually bizarre and
separate black

force comprised of African-American officers who patrolled Miami's black neighborhoods. The late Maurice Turner, the African-American former Chief of Police in Washington DC, often recounted what he found when he entered that department in the 1960s – he was not permitted to share patrol cars with white officers, and was not permitted to arrest white people.

NYC-00005363



# POLICE STUDENT'S GUIDE
## Policing Impartially

In this chapter, you will read about *Policing Impartially*. The Patrol Guide contains more extensive direction and procedures. The following mandatory Patrol Guide reading **must be** read in conjunction with this chapter. **Questions for the 1st Trimester Exam may come from this procedure**.

## MANDATORY PATROL GUIDE READING

P.G. 207-10  Bias Motivated Incidents

## WHY IS IT IMPORTANT FOR POLICE OFFICERS TO KNOW ABOUT IMPARTIAL POLICING?

Police officers work in diverse communities among people who may not share their race, ethnicity, cultural background, or way of looking at the world. As a result, officers sometimes find their beliefs challenged by people who may or may not be breaking the law. In this context, hidden biases are likely to surface and sometimes threaten the officer's ability to professionally use discretion and communicate with the public. In a jurisdiction as diverse as New York City, such biases and the conduct they may produce can be disastrous. This chapter explores what you, as a police officer, need to know in order to deal with a diverse population in a manner consistent with law and Department guidelines.

## BIAS AND POLICE HISTORY

As police officers, you are required to enforce the law impartially without regard to race, class, ethnicity, culture, gender, and sexual orientation. At the same time, we are members of a larger society in which bias and discrimination against certain groups of people are matters of historical and statistical fact. The changing patterns of prejudice that are part of U.S. history are reflected in major organizations and institutions, including urban and rural police departments across the country. In 1805, African American "free men of color" were first hired as police officers in the City of New Orleans. Ironically, their major duties were to catch runaway slaves and to enforce the Slave Code. For generations thereafter, the conflicted and second-class status of African-Americans in policing took many forms that, today, appear equally bizarre and insulting. As recently as the 1940s, the City of Miami maintained a separate black police force comprised of African-American officers who patrolled Miami's black neighborhoods. The late Maurice Turner, the African-American former Chief of Police in Washington DC, often recounted what he found when he entered that department in the 1960s – he was not permitted to share patrol cars with white officers, and was not permitted to arrest white people.

NYC-00005364



# POLICE STUDENT'S GUIDE
### Policing Impartially

Women were hired as police matrons in the 1920s and assigned to work in areas traditionally viewed as *feminine*, such as counseling juveniles and children, investigating missing persons and sex offenses, and performing clerical work. Because patrol was a prerequisite for promotions, police matrons remained at the bottom of the hierarchy, regardless of their skill and accomplishments. This began to change in the 1960s, when two New York City *Policewomen*, Felicia Spritzer and Gertrude Schimmel, sued the Department and won the right to compete with *Patrolmen* on promotional exams. Prior to their victory, police women were barred from supervisory and command positions in the NYPD.

Another major change came in the 1970s with the passage of the Equal Employment Opportunity Act and a United States Supreme Court decision called *Griggs v. Duke Power Company*. In *Griggs*, the Supreme Court ruled that publicly supported employers who used discriminatory standards to hire or promote people had to be able to show, when sued, that the standards they used were *job relevant*, and served to separate people who could perform the job from those who could not. In other words, a police department could insist on hiring only men for patrol officers' jobs only if it could show that men did the job better than women could. In addition, as the NYPD did at the time, a police department could insist on hiring only people who were 5'8" only if it could show that people more than 5'8" tall could be effective police officers while those less than 5'8" tall could not. No police department could show any of these things, of course.

The NYPD became one of only a few large urban departments that integrated women without the force of a lawsuit. They also changed its physical, strength, and agility standards to avoid discriminating against other groups. It was at this time – in 1973 – that women were first hired by the NYPD on the same basis as men, and that the former *patrolman* and *policewoman* job titles were eliminated in favor of today's *police officer*.

Gay police officers have been members of the service from the start, but their status was a hidden secret punishable by expulsion in many departments. While the reasons for such policies remain unclear, they seem to be based on irrational beliefs that gay men are unfit for combat and are likely to sexually harass their heterosexual partners. In 1981, New York City Police Sergeant Charles Cochrane destroyed these myths about gay men in policing when he publicly announced he was gay and declared that he was not alone.

The United States has made tremendous progress in overcoming discrimination. A generation ago, this was an agency composed almost entirely of tall men. Most were white, and all, publicly at least, professed to be heterosexual. If you look at the diversity of your class, you will see that much has changed since then. This Department is now far more diverse than it has ever been.

NYC-00005365



# POLICE STUDENT'S GUIDE
### Policing Impartially

The Department's efforts to overcome bias within its ranks have been accompanied by our attempts to treat the public in an evenhanded and bias-free manner. This is the most diverse and culturally rich city in the United States, and we take great pride in our responsiveness to its needs and demands. In doing so, it is important that we recognize that even open minded and well-intentioned individuals are likely to carry the burden of history on their shoulders, regardless of their education, political orientation, and color of their skin. Subtle and overt forms of bias and discrimination continue to live in our consciousness, no matter who we are and what our role is in the social system.

This point can be illustrated by a quick glance at the privileges that many members of the dominant social group take for granted. White middle class males can use checks, credit cards, or cash, and can count on the fact their skin color will not work against the appearance of financial stability. Those who are surgical residents can wear scrubs in the workplace without peers and strangers assuming they are nurses or technicians. When a white man obtains major advancement in rank, position or pay inside an organization dominated by people who look like him, no one whispers that he *slept his way to the top*, gained his status because of his race, or is an *exception to the rule* among people of his race. Typically, white men are treated as *individuals*, while men of color, gays, and women often are regarded in terms of their membership in those classes. It is critical that we are aware of this tendency, and that we do everything possible to avoid it in our own behavior.

## Perception and Bias

As New York City police officers, you will be exposed to a wide variety of people from a multitude of racial, ethnic, cultural and religious backgrounds. Those of you who are open to alternative ways of perceiving the world will welcome the experience and appreciate the diversity. Others may find the exposure unnerving. This also is a natural response, usually determined by one's background. We cannot do anything to change your background, and we cannot compel you to change how you may feel about people who seem different from yourself. However, you are required to keep from expressing your personal views in discriminatory words and actions.

This is not as easy as sounds. People are not always conscious of their biases. Without our awareness, cultural beliefs and stereotypes filter our perception and influence what we see. The result is that two rational people may interpret the same reality in very different ways. Alternatively, one person may view identical behavior differently, depending on the racial, ethnic or cultural identity of the actor. When ordinary citizens do this, it may be merely insulting; when cops do it on the street, it is both dangerous to life and damaging to our relations and our ability to do the job.

NYC-00005366



# POLICE STUDENT'S GUIDE
## Policing Impartially

Here is an example:  you and your partner are patrolling the streets in a precinct in Brooklyn at 2 a.m.  You come across a black male, armed with a gun, holding a white man against the wall.  Would you see this as a robbery in progress or as a plainclothes police officer in the process of arresting a dangerous suspect?   Would your perception of what was happening be different if the man with the gun was white and the man against the wall was black?

Similar perceptual conflicts may affect contacts between the police and the public, resulting in words or actions that strengthen the stereotypes on the part of both the police and the public.

Here is another example:  Imagine you and your partner receive a call that a black male, carrying a shotgun in a shopping bag, is heading towards an apartment building on 23rd Street. You arrive at the location and observe a man with a shopping bag, walking up the stairs to the building on 23rd Street.  You approach the man and insist on searching his bag, which turns out to contain a quart of milk, a frozen pizza, a cold six-pack, and a pound of coffee.  The man gives you a dirty look and whispers "racist" and "harassment" under his breath.  Annoyed and bewildered, you utter your favorite expletive to your partner, slam the car door shut, and return the man's glare as your partner drives off.

Replay the tape. Ask yourself if there is a safe way to handle the situation, at one point or another, that might break the cycle of miscommunication, resulting in a more satisfactory conclusion for both parties.   Can you understand why the man might react in this way?  Can you think of things you might do in this circumstance to leave him feeling better about his contact with you?  What could you do to make it easier for the next cop who encounters this individual?

**Policing and Prejudice**

There are many reasons why you, as a police officer, must not engage in discriminatory behavior.  For one thing, it is against the 14th Amendment of the U.S. Constitution, as well as Article 1, Section 11 of the New York State Constitution which states that no person shall be denied equal protection of the law: **as a police officer, you simply may not base your treatment of people on their gender, race, ethnicity, age, sexual orientation, or membership in any class.**

**Racial Profiling**

Within this context, it is important for you to understand the difference between *racial profiling* and *criminal profiling*.  **Racial profiling refers to those times when a police officer decides to stop and question a person when the sole rationale for the contact is the race, ethnicity, or national origin of the person being stopped.**

NYC-00005367



# POLICE STUDENT'S GUIDE
### Policing Impartially

By contrast, criminal profiling is a method by which officers, through careful observation of activities and environment, identify a suspicious person who, for perfectly legal and legitimate reasons, may be stopped. You cannot stop and question or otherwise intervene in the lives of members of a group merely because you believe that members of that group are disproportionately involved in wrongful behavior. You can stop people when you have very particular suspicions about the individuals you are stopping. For example:

- You would be race profiling if you stopped and questioned a young black man simply because he was walking in a neighborhood in which young black men reportedly committed most crime. But you would not be race profiling if, in the same neighborhood, you stopped and questioned a young black man who closely matched a reasonably detailed description (e.g., "male, black, early 20s, dark complexion, thin build, black pants, dark leather coat") of a person who had just committed a crime in the neighborhood.

- You would be race profiling if you stopped and questioned a young white man in a car because someone had told you "the only white people who came into the neighborhood were there to buy drugs." However, in the same neighborhood, you would not be race profiling if you stopped and questioned a young white man who slowly drove through the neighborhood, and made brief stops at locations that had a history of drug dealing.

Prejudiced behavior is problematic not only because it violates the law and Departmental guidelines, but also because it damages public trust and undermines the relationship between the police and the community. Citizens feel unprotected when they believe that those who they entrust with the responsibility for their safety are capable of using racist language and acting in discriminatory ways. The communication of biases by police officers also reinforces common stereotypes that designate *all* police as bigots. This, in turn, creates a dangerous atmosphere for the police, who cannot work safely or effectively without community support.

### UNDERSTANDING BIAS

Understanding some of the myths that surround the concept of race may help correct some misconceptions that underlie bias. **Race is a cultural rather than a biological construct. There is no scientific evidence to support the idea that differences in personality, temperament, character, or intelligence are based on race.** In other words, the differences that we see in color generally are only skin-deep and do not translate into widespread biological differences that are unique to groups.

NYC-00005368



# POLICE STUDENT'S GUIDE
### Policing Impartially

The large groups that we characterize as races are too heterogeneous to lump together in a scientific way. The percentage of your genes that are reflected in external appearance, the basis by which we talk about race, seems to be in the range of .01 percent (one in 10,000). For this reason, most genetic scientists do not view race as a biological concept.

The human brain, however, is highly attuned to differences in appearance, leading people to exaggerate the significance of what has come to be called race. The false beliefs that come to be linked with race then take on a life of their own and are resistant to change. The reasons for this are complex. In any case, prejudice is attached to strong emotions that are often buried in past experience. The result is that we tend to accept new information *only* if it reinforces previous attitudes. Conflicting evidence is then dismissed as insignificant or untrue, or otherwise rationalized according to previous notions. For example, if a person has a negative belief about some group, he or she is likely to interpret any unpleasant behavior by a member of that group as "the way they all are." However, if the same prejudiced person should encounter a member of the same group whose behavior is contrary to the prejudice, he or she is likely to write it off as an exception – "Yeah, maybe that guy treated me okay, but most of them are terrible."

## The Development of Prejudice

Understanding where biased attitudes come from may help you recognize and overcome the ones that you have come to take for granted. Most of us adopt the beliefs and values of our parents and siblings, which probably reflect those of the cultural, ethnic, class and racial group of which they are a part. In addition, traumatic events occurring in childhood may also influence how you understand and react to situations arising in the world around you. If, as a kid, you had a bad experience with a member of a group your parents or neighbors stereotyped, it is likely to have convinced you that the stereotype was correct.

Experience with peers in school further refined or changed attitudes, reinforcing or challenging biases that were learned earlier in life. Prejudice is often based on unfamiliarity. If you have never had contact with a member of a group different from your own, you are likely to have expectations about them that are based on what other people say, or how that group is portrayed in the movies and the news. Many people have never been to New York City because of what they have seen on television – a city full of crime, violence, hustlers, and self-centered egomaniacs. Consider what you would think about New York City if the only things you "knew" about it were what you "learned" on *NYPD Blue*, *Law and Order*, *Third Watch*, and *Seinfeld*. As you consider this, think also about the accuracy of what you think you know about another city you have never actually visited. If you have never been to Los Angeles, your expectations of it may be based on what you have seen in movies and on television. What makes you think they portray life in L.A. any more accurately than *NYPD Blue* portrays life in Manhattan?

NYC-00005369



# POLICE STUDENT'S GUIDE
## Policing Impartially

Nevertheless, people who have had the opportunity to develop friendships with groups from diverse social backgrounds may be more open than others to alternative ways of understanding humanity. Their experience overcomes the anxiety and confusion that are linked to the unknown, and teaches the falsehood of racial and ethnic stereotypes.

Occupational experiences also inform attitudes. When you began your career as a police officer, you entered a subculture with a unique set of values, rules, and language that define who is and who is not a member of the police family. In time, you will be able to recognize most police officers by the way they talk, act and, to some degree, think about the world around them. Police officers do not usually gain popularity by questioning the views of peers or challenging shared attitudes. The result is that biases are sometimes reinforced in group context and passed on to new officers who are eager to gain the acceptance of their veteran colleagues.

Some of the attitudes that may set police apart from others are partly determined by the highly selective exposure police have to the community they serve. Police officers tend to interact with specific categories of people, including crime victims; helpless persons, emotionally disturbed people, criminal offenders, and naïve or unwilling citizens who do not particularly want to do what you ask. Much of the time, these people are upset, angry or otherwise in a negative state of mind. As cops have observed, many of the people police come in contact with are emotionally upset; are in trouble; have committed crimes; have been victimized or witnessed crimes; they have had accidents; they are involved in arguments; they have lost their keys – or (even worse) their kids. As much as officers try to help these folks when it is appropriate to do so, dealing with them is not easy. When these individuals look different from officers – when they are from a different race or ethnic group, when they speak a different language or have a different sexual orientation – it becomes very easy to stereotype the entire group based on our experience with a few.

Further, because they are symbols of authority, police sometimes are blamed for events over which they have little control. This can be demoralizing and can alienate the police from the public. Because of their limited exposure, police tend to forget that most members of the community are good and upstanding people who appreciate their presence and the positive influence they have on children and young people. Police officers then begin to view the occasional instances of praise as aberrations.

Because of these distortions, police officers must work hard to maintain a balanced perspective about the people they serve and about humanity in general. Remember that a courteous, professional, and respectful police officer who illustrates the opposite of bias and discrimination helps create a partnership with the community and builds rapport with the people. The result is that the citizens become our allies and, in turn, policing becomes safer and easier. This enhances our effectiveness and increases our pride and pleasure in what we do.

NYC-00005370



# POLICE STUDENT'S GUIDE
## Policing Impartially

### COMMUNICATION GUIDELINES

- **Explain yourself.** Telling people why you stopped them will help dispel the myth that stops are racially motivated and prevent altercations and misunderstandings from arising. Often, officers stop individuals because they match suspect descriptions or because they are acting in ways that do, in fact, look suspicious, only to learn that there is a perfectly legitimate explanation for what they were doing. These people do not know why you stopped them and, unless you tell them why you did, they are likely to believe that your actions were arbitrary. It takes only a few seconds to do this, and it usually turns an angry person into someone who appreciates your effort -- "I'm sorry, Sir. We were looking for a person who had just committed a mugging, and you matched the description. Let me ask the radio dispatcher to repeat the description, and you can listen to it. Then you'll know why we stopped you."

- **Do not assume that only criminals fear the police.** You will encounter people from countries in which oppressed populations learned the hard way that they could not trust the police in their city. Some New Yorkers came here from places in which police or military authorities have engaged in genocidal massacres and torture of the civilian population. These people will not always be able to distinguish you from the authorities who killed their families and friends. As a result, they may avoid contacts with you in just the same way that they would have in their native countries.

- **Be wary of ethnocentrism.** *Ethnocentrism* is the false assumption that one person's cultural beliefs and practices are inherently superior to another's. Unless you are dealing with people who practice a particular cultural activity that violates the law – like polygamy, cockfighting, drug use, or animal sacrifice – this is the wrong view to take. Unless people are violating the law, we are not in the business of making judgments about their beliefs and customs.

- **Understand the effect of proper tactics on innocent people.** The public may perceive proper police tactics as alienating and scary. Remember that many of the people you stop will be released without further action because it turns out that there is a legitimate explanation for their activity and/or because there is no evidence that they were doing anything wrong. Keep in mind that what is routine for you – stopping and questioning pedestrians or motorists – is far from routine for most of the people you are stopping. Keep in mind also that, when you stop and question people, you are letting them know that (in your judgment at least) they look wrong. This is a very negative assessment, so you need to expect that the people you stop may resent it. Be aware of that, and do what you can to ease their resentment.

NYC-00005371



# POLICE STUDENT'S GUIDE
### Policing Impartially

- **Be sensitive to individual's language preferences.** Do not take it personally if an individual of another gender, race, ethnicity, or from another country wants to speak with your partner who shares his or her characteristics. Even individuals who speak English may prefer to speak their native language because it makes them more comfortable or they are afraid that police will be critical of their grammar and pronunciation.

- **Be wary of being intolerant.** Intolerance may exist among police officers that are members of minority groups as well as those who are not. Indeed, sometimes minority police officers may feel more intolerant towards certain behavior on the part of members of the racial, ethnic, religious, or gender group with which they identify. Such feelings may result from a concern that other officers will assume the behaviors are representative of the group as a whole. No matter who you are or where you come from, your job as a police officer is to deal with people as individuals, not as members of groups, whether those groups are your own or another.

- **Do not engage in racial profiling.** It is against the law. It violates fundamental democratic precepts and freedoms. It violates this Department's policies. It is offensive. It violates your responsibility to treat people equally. It diverts us from catching real criminals. It alienates us from people who need us, and hurts our ability to do our job. It makes things more difficult for every police officer who will subsequently encounter its victims. It breeds disrespect and distrust of every level of government. It embarrasses and humiliates people. It can get you disciplined, fired, sued, and prosecuted. You can probably think of other reasons not to do it, but the point is that you **will not** do it.

- **Avoid assumptions based on a person's minority affiliation.** Do not overlook a witness because you do not believe that a member of his or her particular group could possibly have valuable information. Do not let your feelings about a particular class of people affect your recognition of a victim.

- **Be aware of miscommunications resulting from language.** Language differences can lead to serious problems for non-English speakers. In one case, a man was arrested for agreeing that he molested his daughter. It turned out that the man had only confessed that his drinking bothered his daughter. In Spanish, the verb "molestar" means, "to bother." This is very different from the English meaning of "molesting;" what father has not *bothered* his daughter?

- **Be aware of cultural notions of space.** Notions of personal space and behavior are cultural and indicate respect. Nigerians, for example, have a proper social distance – the range at which people talk to each other – and it may be less than 15 inches. If you are like most Americans, you may think that anyone who stands this close to you while he or she talks is trying to get *"in your face."* This is not the case, however. In many parts of the world, standing close up is a

NYC-00005372



# POLICE STUDENT'S GUIDE
### Policing Impartially

sign of respect. Similarly, most Americans look people in the eye when they talk to them. Natives of many Third World countries, however, show respect by averting their eyes when talking to authority figures like police. Be conscious of both of these cultural habits, and take them for what they are: signs of respect and attention, rather than disrespect and inattention.

- **Do not imitate the speech patterns of others.** Police officers should not imitate speech patterns of other racial, ethnic and class groups when communicating cross culturally. They appear disingenuous, artificial and, possibly, racist.

- **Do not use terms or words that devalue groups of people** or stereotype them. We have already told you that, when you are dealing with people, you must treat them as individuals, not as members of groups. Therefore, you should never use the derogatory terms used by ignorant people to devalue members of groups. You know what they are – they are gender, racial, and ethnic slurs and insults about people's sexual orientation. They have no place in your vocabulary. When you use them on duty, you demean people and yourself. When you use them off-duty, you build habits that are not easy to turn off at work.

- **Do not tell or tolerate ethnic, racial or sexist jokes,** even if you think they are not offensive. In this area, what one person sees as harmless, politically incorrect fun may be deeply insulting to others.

- **Avoid expressing stereotypical assumptions that spotlight** minorities or other groups, or that set them apart from others. Examples: "For a woman cop, she did a good job" (implying that this is the exception rather than the rule; or that female cops should be judged by different standards than males); "He's Latino, but he works hard"; "She's black, but she really knows her stuff"; "He's gay, but he'll leave you alone"; "He's Colombian but not involved with drugs"; "She's Italian, but I don't think her family has any mob connections"; "He's Irish, but I've never seen him drunk." No matter who you are, you can think of some negative reference to one or more of the groups of which you are a part. You can also think of how disrespected you feel when you have heard them. Keep that in mind, and do not make any such references about anybody else.

- **Do not take unfounded accusations of racial or ethnic bias personally.**

- **Be courteous.** People are offended when the police are rude and discourteous. They will become angry when they believe that law enforcement officials treated them "like criminals" because they were poor, or persons of color. For good reasons, the poor and people of color are sensitive about the way they are treated by police: do not feed into this by turning their worst fears about the police into reality.

NYC-00005373



# POLICE STUDENT'S GUIDE
## Policing Impartially

- **Be self-aware.** Understanding ourselves and what makes us tick will help us to shape the way we interact with others.

  - Self-awareness about one's early life experiences that helped to shape perceptions, filters, and assumptions about people.

  - Self-awareness about how one feels toward someone who is "different"

  - Management of assumptions and discomfort in dealing with people who are different (e.g., do we try to deny that differences exist and laugh differences away, or imitate "them" in order to appear comfortable?)

  - Ability to be authentic in communication with others while modifying communication style, when necessary

- **Follow these directions when dealing with people that use English as a second language.**

  - Speak slowly and enunciate clearly.

  - Face the person and speak directly even when using a translator.

  - Avoid concentrated eye contact if the other speaker is not making direct eye contact.

  - Do not use jargon, slang, idioms, or reduced forms (e.g. "gonna", "gotta", "wanna", "couldja").

  - Avoid complex verb tenses (e.g., "If I would have known, I might have been able to provide assistance.").

  - Repeat key issues and questions in different ways.

  - Avoid asking questions that can be answered by "yes" or "no". Ask questions so that will allow the answer to show understanding.

  - Use short, simple sentences; pause between sentences.

  - Use visual cues such as gestures, demonstrations, and brief written phrases.

  - Use active rather than passive verbs (e.g., "I expect your attention" [active] rather than "Your attention is expected" [passive].

  - Have materials duplicated in bilingual format.

NYC-00005374



# POLICE STUDENT'S GUIDE
## Policing Impartially

- o Pause frequently and give breaks.  Monitor your speed when you speak.

- o Use only one idea per sentence.

- o Respect the silence and pauses that non-native English speakers need to formulate their sentences and to translate them in their minds.

- o Check comprehension by having the other speaker repeat material or instructions, and summarize frequently.

- o Encourage and provide positive feedback on the person's ability to communicate.

- o Listen even more attentively than you do when communicating with a native speaker of English.

- o Be patient.

- o Do not speak louder.  It will not help.

**Note:** These are *general* guidelines for communicating with persons to whom English is a second language.  There may exceptions to the above guidelines when communicating with certain cultures.

NYC-00005375



# POLICE STUDENT'S GUIDE
### Policing Impartially

## RACIAL PROFILING AND THE LAW

### What is Racial Profiling?

Racial profiling may be defined as the stopping of motor vehicles, the stopping and questioning of individuals and the frisking and searching of persons without individualized suspicion or legal cause to justify such conduct, but instead based solely upon a person's actual or perceived racial, ethnic or national origin status.

### Why Racial Profiling is Illegal

The 14th Amendment to the United States Constitution, as well as Article 1, Section 11 of the New York State Constitution, contain equal protection clauses, which state that no person shall be denied equal protection of the law.  This means that all persons must be treated fairly and equally by administrators of the law, including the police, in all jurisdictions of the country and New York State.  Additionally, New York State has afforded increased protection to its citizens under its Civil Rights Law, Section 40-C.  This law states, "No person shall be subjected to any discrimination in his civil rights, or to any harassment because of race, creed, color, national origin, sex, marital status or disability, by any other persons."

Many of the actions taken by police officers are governed by statutory regulations and requirements.  When we stop a person on the street, stop a motor vehicle, or arrest an individual, there are specific standards of proof that must be met for our actions to be considered lawful.  These standards are a composite of both federal and state constitutions, as well as state procedural law.  Harsh consequences follow when police officers disregard these guidelines.  If it is determined that a police officer has not followed the prescribed guidelines the following situations may result:

- The law enforcement action (summons, arrest, etc.) taken by the police officer is dismissed.

- The police officer may be subject to Departmental discipline or termination.

- The police officer and/or the Department may be subject to civil and/or criminal penalties (monetary fines and/or imprisonment).

The New York State Assembly has introduced legislation that specifically defines racial profiling and prohibits law enforcement agencies from engaging in its practice. Additionally, this new legislation would give individuals and the State Attorney General the right to seek damages from a law enforcement agency, including particular employees and their supervisors.

NYC-00005376

 # POLICE STUDENT'S GUIDE
## Policing Impartially

**NYPD Policy Regarding Racial Profiling**

The New York City Police Department has always had a strict prohibition against racial profiling because of its inherent unlawful nature and societal effect. Individual citizens can become subjects of Police Department action based only upon actual, perceived, or suspected violations of law. Can race or ethnicity *ever* be a factor in determining when a police officer takes action? The answer is yes. However, an officer's decision to encounter a citizen should be based upon objective, credible facts, and not on a whim or personal bias. Again, you can stop citizens because of *what they are doing* or because they match descriptions of people who have done something wrong – but you cannot stop people because of *what they are.*

## BIAS INCIDENTS
## (Patrol Guide 207-10)

**Hate Crimes**

Prejudice can distort our interpretations of external reality. Prejudice is often unconscious and linked to powerful emotions. Membership in peer cultures that share biased attitudes will reinforce and help excuse or justify prejudiced acts.

Prejudices are most likely to be acted out during hard economic times or periods of great social change. When jobs become hard to find, economic competition grows among groups and hidden prejudices come to the surface. When formerly powerless groups start to gain economic and political power competition for housing begins; neighborhoods *change*, and prejudices are acted out. Conversely, when formerly poor and working class neighborhoods become stylish, *gentrified*, and expensive, the class prejudices of people who can no longer afford to live in them may turn nasty. When this happens, bias incidents – including hate crimes – may occur.

**Handling Bias Incidents**

The best way to deal with bias incidents and hate crimes is to prevent them. As a Department, we try to do this every day by building relationships with the communities we police, by learning as much as possible about them and their relationships with other groups, and by trying to anticipate and mediate differences among them.

Created in 1980, the Department's Hate Crime Task Force is specifically charged to assist patrol units in these tasks. It monitors and investigates any offense or unlawful act that is motivated in whole or in part by the identification of a person or group or location with a particular race, religion, ethnicity, gender, age, disability, or sexual orientation (including gay, lesbian, bi-sexual and transgender), as determined by the Commanding Officer, Hate Crime Task Force.

NYC-00005377



# POLICE STUDENT'S GUIDE
## Policing Impartially

The definition of a *disability*, for the purposes of this procedure, is when a person possesses or is perceived to possess any of the following: a physical, medical, mental or psychological impairment, or a history or record of such impairment.  This includes individuals who have sustained any injury or damage to any system of the body including muscular, sensory, respiratory, speech, heart, reproductive, digestive, blood, immunity (i.e., AIDS), and skin.  Also included are recovering alcoholics, drug or other substance abusers who currently are not using alcohol or drugs.

As the first officer on the scene of a disturbance, you must be aware of the possibility of a bias incident, in order to provide a proper referral and maintain order in the community.   An officer dispatched to the scene of an incident, which may be a bias incident should:

- Evaluate the condition and take police action appropriate for the stabilization of the area, if necessary

- Determine if possibility exists that offense or unlawful act is motivated by bias or prejudice according to the definition of "Bias Incident"   (PG 207-10)

- Request *patrol supervisor* to respond if bias incident is suspected

**Types of Bias Incidents:**

- Harassment.

- Property Damage.

- Physical Violence.

NYC-00005378



# POLICE STUDENT'S GUIDE
### Policing Impartially

## HOMEWORK - BIAS INCIDENTS

Which of the following assignments would constitute a suspected bias incident?
Explain your answer in each case.

1. Two officers respond to a Jewish cemetery on a complaint of burglary.
   At the scene, the head grounds keeper tells the officers that the copper gutters
   were stolen from the main building sometime during the night.

2. An officer patrolling the "F" train observes two teenagers spray painting
   *swastikas* on advertising posters near the main entrance at the Utica Avenue
   Station in the heavily populated Hasidic area of Crown Heights of Brooklyn.

3. Upon entering the main lobby of a Housing building, an officer observes two male
   Hispanics clubbing a male black, with a baseball bat, while yelling racial
   obscenities at him.  The officer knows all three youths, since they play on the
   same baseball team in the PAL, and they are always hanging out together.

4. A male who seems very upset approaches an officer patrolling her foot post.  He
   asks her if he can do anything about the threatening phone calls and letters he is
   receiving concerning his sexual orientation.

5. Two officers respond in their RMP to a motor vehicle accident at a parking
   garage.  Upon their arrival at the scene, they see the two apparent operators, a
   man and a woman, yelling obscenities at each other.

6. An officer walking his post observes a male attempting to scrub some painted
   words and designs off a car.  Upon initial inquiry, the man tells the officer that
   since he moved into the neighborhood, unidentified people have been damaging
   his car and home, by painting white supremacist designs and slogans on his
   property.  The man tells the officer he does not understand it, since he is not
   black, and emigrated to the U.S. from India.

7. An officer hears a 10-85 for a backup unit coming over her portable radio.  She
   runs to the scene, since the location given is only a couple of blocks away.
   Arriving at the scene, she sees two of her fellow officers with three men in
   custody, and under arrest.  The men were caught attempting to burn down a gay
   men's community center.  The officer notices that a large crowd of people is
   gathering, and they are yelling anti-police and anti-gay slogans.

8. Two officers are on meal at a diner in their patrol car sector, and overhear an
   argument between two customers and a waiter.  The waiter suddenly screams,
   "You Jews are all the same!"  She then throws a tray of food at one of the
   customers.

NYC-00005379

 # POLICE STUDENT'S GUIDE
### Policing Impartially

9.     Two officers respond to a robbery in progress at a grocery store.  Arriving after the suspect has fled, they find that the complainant, a black man, who is obviously shaken.  The complainant explains that the suspect, a male white, teenager, said "Give me all your money," using several ethnic slurs.  The suspect then fired a shot from a 32-caliber revolver into the ceiling.

10.    An officer takes a report of criminal mischief from Imam Muhammad, for the vandalism to the doors and widows of his mosque.

NYC-00005380



# POLICE STUDENT'S GUIDE
### Policing Impartially

### BIAS HOTLINE FACT SHEET

**Q.**   **What is a Bias Incident?**
**A.**   *A bias incident or hate crime is an act motivated by prejudice against people because of their race, religion, ethnicity, age, gender, disability or sexual orientation. Bias can involve criminal activity, or may be non-criminal in nature such as name-calling, harassment, and intimidation.*

**Q.**   **What is the Bias Hotline?**
**A.**   *The Bias Hotline is a 24-hour, 140 Language response and referral phone service operated at the Commission on Human Rights. It operates 7:00 a.m. - 11:00 p.m. with live operators and 11:00 p.m. to 7:00 a.m. with a tape and referral suggestions.*

**Q.**   **Who should call the Bias Hotline?**
**A.**   *If you are a victim or a witness to a Bias incident, or an observer of tensions between groups in your community, call the Hotline number (212-306-7450). If a crime is in progress, call 911.*

**Q.**   **What is the purpose of the Bias Hotline?**
**A.**   *The Hotline has been established to address the widespread problem of bias incidents and hostile inter-group relations. It will provide community residents with an alternative to the police when reporting bias incidents and community tensions, particularly when they may be non-criminal in nature. The Bias Hotline will provide immediate referrals (including legal, health and police services) for bias victims, witnesses and concerned residents.*

NYC-00005381



# POLICE STUDENT'S GUIDE
## Policing Impartially

### References

Brown, B., and W.R. Benedict, 2002. "Perceptions of the Police." *Policing: An International Journal of Police Strategies and Management.* Vol 25. Issue 3: 545–580.

Carlson, Daniel. P. 2002. *When Cultures Clash: The Divisive Nature of Police–Community Relations and Suggestions for Improvement.* Upper Saddle River, NJ: Prentice Hall.

Shusta, R.M., R. D.R. Levine, P.R. Harris and H. Z. Wong, 2002. *Multicultural Law Enforcement: Strategies for Peacekeeping in a Diverse Society.* Upper Saddle River, NJ: Pearson Education, Inc.

Stoutland, S.E. 2001 "The Multiple Dimensions in Resident/Police Relations in Boston. *Journal of Research in Crime and Delinquency,* Vol. 33 No.3: 226–256.

Weitzer R., and S.A. Tuch. 2002. "Perceptions of Racial Profiling: Race, Class and Personal Experience." Vol 40, Issue 2. *Criminology.*

NYC-00005382



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

**Mandatory Homework Assignment**: After reading this chapter, complete a STOP, QUESTION AND FRISK REPORT WORKSHEET based on the following Robbery fact pattern.  _Note_: This is the same fact pattern as the homework scenario completed for chapter 9, Investigation and Report Writing.  You have already completed the Complaint Report Worksheet for this crime and will now prepare the accompanying UF-250 Report.

After interviewing the victim of a robbery, sector "Charlie" broadcasts a description of the perp.  You are riding in sector "George", confines of the 73rd precinct and hear the transmission.

**Date**:       Today              **Time**: 2000 hours

**Victim's Statement**: "Approximately ten (10) minutes ago, a man stole my pocketbook at knifepoint."

**After listening**
- The inci                                                                                     ıy
  Avenue
- Descripı
  Approxiı                                                                               hirt
  with a bl                                                                               ;hort
  black ha
- Weapon
- Stolen: \

**While canvass**                                                                        ion
at the corner of
scene and 3 mir

**You order the s** _____  _____ He complies (no physical force is necessary).  You frisk the suspect but do not feel any weapons and do not go into his pockets at this time.

**You then call sector "Charlie" to the scene**.  Two minutes later, the sector arrives with the victim riding in the back.  She identifies the suspect as her assailant.  You arrest the suspect and search him, finding $86 in his pocket.  You do not find the stolen pocketbook and do not recover a knife.

**Suspect identified as:**

| | |
|---|---|
| Joseph Cruz | **Arrest #** 37526 |
| 18 Saratoga Ave | **Complaint #** 2008073567 |
| Brooklyn New York 11212 | **Precinct Serial #** 2008073068 |
| D.O.B. March 5, 1976 | **Sprint #** X1151976 |

NYC-00005383



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

**Mandatory Homework Assignment:** After reading this chapter, complete a STOP, QUESTION AND FRISK REPORT WORKSHEET based on the following Robbery fact pattern.  *Note: This is the same fact pattern as the homework scenario completed for chapter 9, Investigation and Report Writing.  You have already completed the Complaint Report Worksheet for this crime and will now prepare the accompanying UF-250 Report.*

After interviewing the victim of a robbery, sector "Charlie" broadcasts a description of the perp.  You are riding in sector "George", confines of the 73rd precinct and hear the transmission.

**Date:**    Today              **Time:** 2000 hours

**Victim's Statement:** "Approximately ten (10) minutes ago, a man stole my pocketbook at knifepoint."

**After listening to sector "Charlie's" transmission, you learn that:**
- The incident occurred on Pitkin Avenue, at the northeast corner of Rockaway Avenue. The perp ran south on Rockaway Avenue.
- Description: Male, white skinned Hispanic. Approximately 20 years old. Approximately 6' tall, 180 pounds. Wearing blue jeans, a red long sleeved shirt with a black undershirt, blue Yankees cap, diamond earring in his left ear.  Short black hair. Spider web tattoo on his neck.
- Weapon: Medium sized knife with a black handle.
- Stolen: White leather pocketbook with approximately $50 inside.

**While canvassing the area**, you observe a male fitting the detailed above description at the corner of Rockaway Avenue and Dumont Avenue (3 blocks from the robbery scene and 3 minutes after hearing sector "Charlie's" radio transmission).

**You order the suspect to stop at gunpoint.** He complies (no physical force is necessary).  You frisk the suspect but do not feel any weapons and do not go into his pockets at this time.

**You then call sector "Charlie" to the scene.**  Two minutes later, the sector arrives with the victim riding in the back.  She identifies the suspect as her assailant.  You arrest the suspect and search him, finding $86 in his pocket.  You do not find the stolen pocketbook and do not recover a knife.

**Suspect identified as:**

Joseph Cruz
18 Saratoga Ave
Brooklyn New York 11212
D.O.B. March 5, 1976

**Arrest #** 37526
**Complaint #** 2008073567
**Precinct Serial #** 2008073068
**Sprint #** X1151976

NYC-00005384



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

In this chapter you will read about *Policing Legally: Street Encounters.*  The Patrol Guide contains more extensive direction and procedures.  The following mandatory Patrol Guide and Legal Bureau Bulletins reading **must** be read in conjunction with this chapter.  **Questions for the 1st Trimester Exam may come from these procedures.**

### MANDATORY PATROL GUIDE READING

P.G. 212-11          Stop and Frisk

### MANDATORY LEGAL BUREAU BULLETINS READING

| TOPIC | CASE | VOLUME |
|---|---|---|
| ANONYMOUS GUN RUN | J.L. | 32 No. 2 |
| FRISK FOR VIOLENT OFFENSE | MACK | 1 No. 3 |
| FRISK BASED ON WITNESS INFO | ADAMS/WILLIAMS | 2 No. 12 |
| FRISK OF HANDBAG | MOORE | 3 No. 7 |
| FRISK ON INFO FROM UNIDENTIFIED INFORMANT | GREEN | 4 No. 11 |
| STOP ON LESS THAN REASONABLE SUSPICION | CANTOR | 5 No. 3 |
| FRISK EVERY SUSPECT STOPPED | SANCHEZ | 6 No. 3 |
| STOP AND REQUEST INFORMATION | DE BOUR | 6 No. 11 |
| APPLICABILITY OF MIRANDA WHEN GUN IS DRAWN | HUFFMAN | 7 No. 2 |
| ANONYMOUS PHONE TIP AND FRISK | WILLIAMS/STEWART | 7 No. 3 |
| STOPPING A VEHICLE ON REASONABLE SUSPICION | SOBOTKER | 8 No. 3 |
| DEVELOPMENT OF STOP AND FRISK | RAY | 8 No. 8 |
| RANDOM AUTO STOPS | DELAWARE/PROUSE | 9 No. 3 |
| NON-CONSENTING SUSPECT TO STATION ON REASONABLE SUSPICION | DUNAWAY | 9 No. 4 |

NYC-00005385



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

| | | |
|---|---|---|
| ANONYMOUS TIP MAN WITH GUN-FRISK | BENJAMIN | 11 No. 1 |
| NON CONSENTING PERSON TO STATION HOUSE ON LESS THAN PROBABLE CAUSE | DUNAWAY | 9 No 4. |
| ANONYMOUS PHONE TIP MAN WITH GUNS/FRISK | BENJAMIN | 11 No 1. |
| AUTO STOP/DIRTY RENTAL CAR | HARRISON | 13 No. 2 |
| TIME DETAINED ON REASONABLE SUSPICION | SHARP | 15 No. 5 |
| DETAINED ON REASONABLE SUSPICION AND TRANSPORTED TO A CRIME SCENE | HICKS | 17 No. 1 |
| VEHICLE STOPS (SEE BELOW) | ROBINSON | 20 No. 3 |
| CIRCUMSTANCES IN WHICH A POLICE OFFICER MAY APPROACH A PERSON IN A PUBLIC PLACE TO ASK QUESTIONS | HOLLMAN/ SAUNDERS | 22 No. 2 |
| STOP, QUESTION, & FRISK- THE PLAIN TOUCH | DIAZ | 23 No. 2 |
| FORCIBLE STOP-PURSUING A FLEEING INDIVIDUAL | MARTINEZ | 23 No. 4 |
| VEHICLE STOPS – ORDERING PASSENGERS OUT OF CAR | ROBINSON | 20 No. 3 |
| VEHICLE STOPS – USE OF TURRET LIGHTS SPOTLIGHTS AND/ OR LOUDSPEAKER | MAY | 24 No. 1 |
| PERSON WALKING AWAY FROM SCENE OF SUSPECTED CRIMINAL ACTIVITY | BORA/REYES | 25 No. 1 |

NYC-00005386



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

## WHY IS IT IMPORTANT FOR POLICE OFFICERS
## TO KNOW THE MATERIAL IN THIS CHAPTER?

As a police officer you will have enormous responsibility to enforce the law, to give people orders and instructions that help to maintain order, to serve the community, and to protect the constitutional rights of citizens.  Interactions with citizens can range from a friendly salutation to a life and death struggle with an armed perpetrator.  Your ability and authority to interact and, at times, intrude on an individual's liberty will depend largely upon your knowledge of the law and department regulations as well as an understanding of your environment and members of the community.

Later in this chapter, and throughout the course of your training, you will learn about proper police conduct during investigations, including the most serious police intrusions involving the use of force and your authority to deprive people of their freedom.  This section will illustrate how you can conduct effective field investigations by interacting with citizens.  You must remember that the goal is to strike a balance between crime prevention and detection, your safety, and a citizen's right to be free from *unnecessary* government intrusion.

## LEVELS OF SUSPICION

As you have already learned, the manner in which we interact with citizens is greatly influenced by our perception of people, places, and events.  In addition, you have also learned that perception itself is a product of our attitudes, our physical and psychological states, the environment, and our expectations.  As police officers, you must keep in mind that the perception of the police by the public, and thus *their* behavior, is swayed by the same factors.

Therefore, the manner in which we police – and interact – is a direct product of our training, rules, regulations, and perception.  No interaction is more significant legally, administratively, and morally than those encounters initiated for purposes of investigation.  This section focuses on such interactions and on the limits of your authority given various *levels of suspicion*.

### What are *Levels of Suspicion*?

Case law has carved out various standards and criteria by which police conduct is measured.  Because any police interaction with a citizen is largely viewed as a governmental intrusion into the person's liberty, courts have created guidelines that dictate the extent to which a police officer can impose on a citizen's freedom.  Simply put, *levels of suspicion* are the amounts of information that the courts have held will justify certain police conduct.  The more information or suspicion a police officer has, the greater the level of intrusion the courts allow.

NYC-00005387



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

**Intrusion Comparison to Legal Standards of Proof**

The legal standards required by courts as a justification for various police actions are as follows:

*Probable Cause.* This is also referred to as *reasonable cause to believe or reasonable grounds to believe* and is the standard that must exist before law enforcement officials can lawfully deprive a person of freedom by arresting him or her in order to bring the person before the appropriate court to answer criminal charges. (This area will be discussed in greater detail in the chapter on "Authority to Arrest").

*Preponderance of the Evidence.* This level of proof is attained when the evidence presented is more convincing than the evidence offered against it. Essentially, it is where the scales tip, however slight, in favor of one party.  This standard is used in two separate settings.  It is the level of proof that a defendant must meet in a criminal trial when raising an affirmative defense, such as entrapment or mental disease or defect (see the chapter on "Introduction to the Penal Law").  It is also the level of proof required to prevail in a civil matter.

*Clear and Convincing Evidence.* This level is attained when there is a reasonable certainty of the truth of the ultimate fact in controversy; where the truth of the facts asserted is highly probable.  It requires more than a preponderance of the evidence, but less than proof beyond a reasonable doubt. This is the standard used in administrative trials and hearings that rule on matters such as traffic violations and parking regulations.

*Beyond A Reasonable Doubt.* In criminal cases, the prosecution must prove every element of a crime *beyond a reasonable doubt*.  This standard is the highest known in law and constitutionally required because, as one court concluded, "a society that values the...freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt." *Reasonable doubt* exists when a jury lacks an unwavering belief, to a moral certainty, to the truth of the charge.

The chart on page 21 demonstrates how the level of permissible police intrusion rises commensurately with the amount of police knowledge.  As a point of reference, it also indicates how different legal standards of proof result in judicial determinations. Simply put, the more evidence you have, the higher and further into the criminal justice system you can go.

NYC-00005388



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

## CONSTITUTIONAL CONSIDERATIONS

As you will learn, arrest and full search situations are the result of your knowledge of past criminal activity based on a standard of proof, or level of information, known as *probable cause*.  Suppose, however, you are merely performing routine patrol and a brief encounter or interaction with a citizen makes you somewhat suspicious. Although unsure that a crime was committed, what, if anything, may you do?  May you question the person?  Detain the person?  Use force?  Search the person or their belongings?  If so, to what extent may you interfere with their right to be free from governmental intrusion?  Before any of these questions can be answered, you must have an understanding of a citizen's constitutional protections, the effects of improper police action, and how the law has evolved to grant officers greater latitude to conduct investigations while continuing to protect the rights of citizens.

### The Fourth Amendment to the Constitution

The Fourth Amendment to the U.S. Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized."  Thus, the Fourth Amendment applies to searches and seizures of property and arrests of persons.  Its purpose is not to provide protection against all searches and seizures, rather it guarantees against unreasonable governmental intrusions.  The large majority of Fourth Amendment issues that arise are based on the reasonableness of searches.

### The Exclusionary Rule

In an effort to deter unlawful or improper police conduct, the U.S. Supreme Court created the exclusionary rule (*Weeks v. U.S.* [1914]).  Basically the rule provides that evidence obtained by violating the defendant's constitutional rights may not be introduced by the prosecution for the purpose of providing proof of the defendant's guilt. The "suppressed," or inadmissible, evidence limits the prosecution's ability to obtain a conviction.  Additionally, improper police activity can result in disciplinary action, or civil and or criminal liability upon the officer.

## U.S. SUPREME COURT DECISION IN *TERRY v. OHIO* (1968)

Despite the Fourth Amendment and the exclusionary rule, there are situations where officers, in the interest of investigating or preventing crime, must act on less than probable cause.  In the landmark case of *Terry v. Ohio*, the U.S. Supreme Court, for the first time, addressed the issue of a seizure and a search of a suspect on less than probable cause.

NYC-00005389



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

**Facts:**  McFadden, an experienced plainclothes officer on a foot patrol in a commercial area observed two men in the process of "casing" a store.  He watched both men walk, sometimes alone other times together, to the front of the store.  On each trip, they looked inside and around, and then left the area.  He then saw the men confer with a third man who joined the first two as they walked toward the store.  The men repeated the routine several times.  McFadden then approached them, identified himself and requested an explanation.  When they responded incoherently, McFadden spun one man around and patted down his overcoat, felt a pistol and removed it.  The defendant, Terry, was later convicted of carrying a concealed weapon.

**Question for the Court:**  Is it always unreasonable for a police officer to forcibly stop a person and conduct a frisk without probable cause?

**Court's answer:** No. The Court held that the stop of Terry amounted to a seizure – though only a brief one - and that the frisk was, in fact, a search - though not a full search - within the meaning of the 4th Amendment.  The Court, however, rejected the notion that probable cause was required for McFadden's actions and held the gun to be admissible evidence against Terry.

**Analysis.**  In its decision, the Court reasoned that McFadden's stop was proper under the circumstances because they believed it would have been "poor police work" for an officer of McFadden's experience to witness the particular behavior and not attempt to investigate further.  Therefore, the test was not whether McFadden had probable cause, but whether his conduct was reasonable.  Additionally, the court held that the frisk was also reasonable since it was based on two important factors: (1) McFadden justifiably feared that the men were armed and his safety was in jeopardy; and (2) it was limited to an exterior "pat down" for a hard object.

## Stop and Frisk Law

American police had been stopping and frisking suspicious people long before the Supreme Court decided *Terry*.  Still, *Terry* is a significant case because it marked the Supreme Court's approval of stop and frisk, which previously had occurred without a clear basis.  In its conclusion, the Court noted that where an officer, in light of his experience, reasonably suspects that criminal activity is taking place and that the persons he confronts may be armed or dangerous, he may investigate and make reasonable inquiries.  The Court further stated that "...where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled...to conduct a carefully limited search of the outer clothing...in an attempt to discover weapons which might be used to assault him.  The New York courts adopted their own standard, or guidelines, for permissible police activity during investigative encounters with citizens.  The New York State Court of Appeals' decision in *People v. DeBour* created the standard by which all investigative encounters are assessed.

NYC-00005390



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

### THE NEW YORK STANDARD: *PEOPLE V. DeBOUR* (1976)

*People v. DeBour* is an important case for many reasons.  Specifically, the case outlined four levels of police encounters and defined the amount of information required for each level.  In creating the four-tiered analysis, the Court expanded on Terry, which dealt with the narrow issue of a possible crime in progress, as compared to *DeBour*, which as you will see, began as a simple request for information.  Just as importantly however, the Court deviated from the Supreme Court's position that only encounters that result in actual seizures are entitled to 4th Amendment protection.  This created a more restrictive interpretation of a police officer's authority to confront and question citizens.

**Facts.**  At 0015 hours, two police officers assigned to a foot-post were patrolling a deserted residential street in Brooklyn when they noticed someone walking in their direction.  The area was experiencing a high incidence of narcotic related activity.  As the solitary figure came within 40 feet of the officers, he crossed the street.  The officers followed and waited for the man to reach them.  When he did, one of the officers asked him what he was doing in the neighborhood.  The man, later identified as DeBour, nervously replied that he had just parked his car and was walking home.  The officer then asked DeBour for identification.  As Debour answered that he had none, the officer noticed a waist-high bulge in DeBour's jacket.  The officer asked DeBour to unzip his jacket and when he complied, the officer noticed a revolver in his waistband.  DeBour was arrested and charged with possession of the firearm.

**Question for the Court:**  May a police officer approach a private citizen to request information without having any indication of criminal involvement?

**Court's answer:**  Yes. The Court held that although the officers did not have any indication of criminal activity, the initial approach and subsequent questions were only intended to elicit information as a result of the defendant's evasive actions and the subsequent observation of the bulge in the waistband.  Thus, the intrusion was minimal and "...reasonably limited in scope and intensity..." and thereby constitutionally valid.

**Analysis:**  The Court noted that the Fourth Amendment protects against unreasonable searches and seizures by the government.  Further, the Court confirmed that any approach by police, whether it amounts to a seizure or not, is a violation of the constitution if it is based on whim, caprice, arbitrariness, or a desire to harass.  In this case, however, the Court reasoned that DeBour was not seized within the meaning of the Fourth Amendment, but merely approached and questioned in a non-threatening manner.  DeBour's attempt to avoid the officers in a high crime area late in the evening justified the approach.  Moreover, his failure to produce identification coupled with the suspicious bulge necessitated

NYC-00005391



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

further inquiry.  Thus, the police officer's actions were reasonable based on the amount of information known to them.

### The Effect of People *v. DeBour*

The Court in *DeBour* went on to establish the four-tiered analysis that dictates the permissible level of police intrusion.  Although the State Court agreed with the U.S Supreme Court in *Terry* that, "...there is nothing in the Constitution which prevents a police officer from addressing questions to anyone in the streets," the State Court cautioned that an officer must have a justifiably legitimate reason for intrusions that affect a person's liberty.

Therefore, as a police officer, your ability to confront or seize or to request information or search will be based on your ability to articulate a legally recognized level of permissible intrusion.  They are as follows:

Level 1: Request for Information
Level 2: Common Law Right of Inquiry
Level 3: Reasonable Suspicion (Stop, Question, and Possibly Frisk)
Level 4: Probable Cause (Arrest)

## LEVEL 1: REQUEST FOR INFORMATION

The request for information is the most **insignificant** and **minimal** encounter or interaction an officer can have with a citizen.  Under this level, an officer can approach to request information when there is "some **objective credible reason** for that interference which is not necessarily indicative of criminality."  The intrusion cannot be based on whim, caprice, curiosity, bias, or a desire to harass.  The Court made distinctions between two types of requests for information: public service and law enforcement.

**Public Service.**  In this function officers are given more latitude to ask questions.  This includes situations where an officer may be looking for the parents of a lost child, investigating an accident, or helping someone in distress.

**Law Enforcement Function.**  This is a more restrictive standard which will "hinge on the manner and intensity of the interference, the seriousness of the crime, and the circumstances" surrounding the interaction.  The questions must **not** be threatening or accusatory.

NYC-00005392



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

**Types of Questions**

The Court emphasized that under either approach, the objective is to gather information and not to "focus on the citizen as a potential suspect in a criminal investigation." Officers may, therefore, ask a person questions regarding his or her identity, destination, and reason for being in the area

> **Example:** A detective observed the defendant purchase a holster for a firearm. While such a purchase is not criminal, it did furnish a sufficient basis for inquiry by the detective. *People v. Samuels* (1980)

> **Example:** Defendant was observed at 0445 hours carrying two large garbage bags filled with bulky items in a burglary prone area. These circumstances justified the officer's initial approach for inquiry. *People v. Williamson* (1985)

> **Example:** The officer had an articulable reason for speaking to the defendant, a possible witness to a kidnapping who was observed walking away from the scene. *People v. Hopkins* (1980)

> **Example:** A crowd of people stood around defendant's open trunk examining clothing and shoes that still had the original store tags. As the officer approached, the defendant slammed the trunk closed and the crowd began to disperse. This was an objectively credible reason for a level one inquiry. *People v. Wallace* (1986)

**Verbal Commands**

The Court of Appeals ruled that an officer's request to stop ("Excuse me, may I speak with you?") so that the officer may approach is permissible as long as it is done in order to get the attention of someone who is unaware that the officer wishes to speak to him or her and the command is ***general*** and ***non-threatening***.

**Permission to Search**

Because a level 1 inquiry is based on an "objective credible reason" and is not necessarily indicative of criminality, the police may not ask for permission to search at this level.

**Right to Walk or Run Away**

Although the police have the right to request information, a citizen has the right not to answer the police, and that refusal, in itself, does not permit further action by police. In fact, a citizen can even run away, and, ***without indication of criminal activity, an officer may not pursue***. However, false, inconsistent or evasive answers may raise the officer's suspicion to a founded suspicion of criminality.

NYC-00005393



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

### LEVEL 2: COMMON LAW RIGHT OF INQUIRY

A level 2 inquiry is based on an officer's suspicion that some indication of criminality exists.  Courts refer to this as a *"founded suspicion that criminal activity is afoot."*  The officer must be able to articulate that **suspicious** or **unusual activity** was taking place.  The Court stated that under this level, an officer may interfere with a citizen "to the extent necessary to gain **explanatory information**, but short of actual seizure."  One court referred to this level as "closing in on a defendant as a suspected law-breaker."

### Criminal Activity Afoot

Courts have defined this term to mean that there is a "present indication of criminality based on **observable conduct** or **reliable hearsay** information."  It cannot be based on a hunch, or "gut feeling."

### Types of Questions

This level results in a wider scope and more intense level of questioning because the encounter *focuses on the citizen as a possible suspect*.  The officer's questions can be *pointed, invasive, and accusatory* in nature and are intended to elicit an incriminating response.  The officer, however, may not touch the person, display a weapon, or act in a threatening manner.

### Permission to Search

An officer may ask for permission to search at this level, but **may not compel** a person to submit to a search of their person or belongings.  The consent, if given, must be provided knowingly, intelligently and voluntarily.

### Difference Between the First Two Levels

Even courts agree that the difference between the first two levels is subtle.  In the first level, the officer must have an objective credible reason to *ask for information.*  In the second level, the officer must have information that indicates criminal activity and his or her *questions are related to the possible criminal activity.*  Therefore, innocuous (i.e. harmless, innocent) behavior may justify a level 1 approach, but not a level 2 encounter.

### Refusal to Answer or Flight of Suspect

While police can ask for explanations and answers, a citizen has no obligation to cooperate.  His or her silence cannot be used as a reason to escalate the encounter

NYC-00005394



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

into a more intrusive one.  Innocuous answers to questions, without further indication of criminal involvement, will not justify additional questioning.

If a confronted citizen walks away without answering, the officer may follow to continue questioning, but may not forcibly detain.  In instances where an officer approaches to make a *common-law inquiry* and the person flees, the officer is justified in pursuing because the person's flight will elevate the officer's reason for the approach in the first place.  In other words, if the officer already suspects criminality ("founded suspicion"), the flight of the person is an additional factor that raises the officer's suspicion to that of reasonable suspicion.

> **Example:** A radio run from an anonymous source furnishing a general description of a man selling drugs gives officers the right to conduct a common-law inquiry when the person fits the description. *People v. Erazo* (1994).

> **Example:** Police had a founded suspicion when they heard a gunshot and noticed a group of people looking in the direction of defendant who was the only person walking away from the area.  *People v. Salva* (1996).

## LEVEL 3: STOP, QUESTION, AND POSSIBLY FRISK
### ("Reasonable Suspicion")

The third level of permissible police intrusion is the right to **forcibly stop** a citizen.  Under this level, an officer may forcibly stop and detain a person when he or she has a **reasonable suspicion** that the person has committed, is committing, or is about to commit any **felony** or a **penal law misdemeanor**.  The officer may detain the person for a reasonable amount of time in order to **confirm or dispel** his or her suspicion, and may conduct a **limited search, or frisk,** of the individual under certain circumstances.  As noted above, the U.S. Supreme Court first addressed this type of forcible stop in *Terry v. Ohio*.  The specific elements of a stop, question, and possible frisk will be discussed in greater detail later in this chapter.

## LEVEL 4: PROBABLE CAUSE - ARREST

The fourth and final level of police intrusion is the arrest stage.  An arrest involves the **seizure** of a suspected criminal offender.  The purpose for the arrest is to bring the offender before the appropriate court to answer charges against him or her.

The police officer must be able to articulate facts that support a finding of **probable cause**.  Probable cause is a legally recognized standard of proof because it results in a significant interference of the person's liberty and is the initial stage of a criminal prosecution that may result in incarceration.

NYC-00005395



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

**Probable Cause**

Probable cause consists of facts and circumstances within the arresting officer's knowledge, and of which he or she has reasonably trustworthy information, that would warrant a person of reasonable caution to believe that an offense is or has been committed and that the person to be arrested had committed it.  This area will be discussed in greater detail in the chapter on "Authority to Arrest."

## ELEMENTS OF A STOP, QUESTION, AND POSSIBLE FRISK

As previously discussed, the third level of permissible police intrusion is the right to forcibly stop and investigate a person suspected of criminal activity.  Thus, a constitutionally valid stop, question, and possible frisk consists of the following elements.

1.  Knowledge that amounts to *reasonable suspicion*;
2.  A *stop* and *detention* of a person in a public place;
3.  *Reasonable force* may be used;
4.  Takes place within the officer's *geographical area of employment* ("GAOE");
5.  The officer may *frisk* under certain circumstances.
6.  The officer conducts *questioning* regarding the crime;
7.  Investigation lasts a reasonable amount of *time*.

**Reasonable Suspicion - Defined**

The Court of Appeals has defined reasonable suspicion as that "quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand."  Additionally, the U.S. Supreme Court requires that an officer have a "particularized and objective basis for suspecting" the person of criminal conduct.  The officer must supply specific and articulable facts; hunches or gut feelings are not sufficient.

In New York, reasonable suspicion has since been codified under the criminal procedure law.  It requires that the officer have sufficient information regarding a **felony** or a **penal law misdemeanor.**

NYC-00005396



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

**N.Y.S. Criminal Procedure Law §140.50**

Section 140.50 of the New York State Criminal Procedure Law entitled, "Temporary questioning of persons in public places; search for weapons" reads, in part, as follows:

> **Subdivision (1)** "...a police officer may stop a person in a **public place** located within the **geographical area** of such officer's employment when he **reasonably suspects** that such person is committing, has committed or is about to commit either (a) a **felony** or (b) a **misdemeanor** defined in the penal law, and **may demand** of him his **name, address,** and an **explanation** of his conduct."

> **Subdivision (2)** "...a **peace officer**...who provides security services for any **court** of the unified court system may stop a person **in or about the courthouse** to which he is assigned when he **reasonably suspects** that such person is committing, has committed or is about to commit either (a) a **felony** or (b) a **misdemeanor** defined in the penal law, and **may demand** of him his **name, address,** and an **explanation** of his conduct."

> **Subdivision (3)** "...upon stopping a person under circumstances prescribed in subdivisions one and two, a police officer or court officer, as the case may be, **reasonably suspects** that he is in **danger of physical injury,** he may **search** such person for a **deadly weapon or any instrument, article, or substance readily capable of causing serious physical injury** and of a sort not ordinarily carried in public places by law-abiding persons.  If he finds such a weapon or instrument, or any other property possession of which he reasonably believes may constitute the commission of a crime, he may take it and keep it **until the completion of the questioning,** at which time he shall either **return it,** if lawfully possessed, or **arrest such person.**"  (Emphasis added.)

**NOTE:**   **Your authority to conduct a Stop, Question and Frisk exists whether you are on duty or off duty.**  However, as a recruit officer, you are not much different from the day before you were sworn in to the Department. You have not been trained as a police officer; you have not been equipped as a police officer; and you have not had any practice or experience as a police officer. Thus, the limits on your discretion are simple:  **DO NOT BECOME INVOLVED IN ANY INCIDENT THAT REQUIRES POLICE ACTION, SKILLS, OR EQUIPMENT BEYOND YOUR TRAINING OR CAPABILITIES.** Instead, you can assist in police matters by using your observational skills, obtaining descriptions, and reading wanted posters.  For further information on reporting an emergency, criminal activity or unusual occurrence, consult

NYC-00005397



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

the Police Student's Guide (Introduction to the NYPD), Recruit Officer Handbook and Patrol Guide Procedures 212-32 and 212-34.

## *The Stop and the Use of Reasonable Force*

As previously noted, the issue of investigatory stops based on less than probable cause was first addressed by the United States Supreme Court in the landmark case of *Terry v. Ohio* and, as a result, some courts still refer to such encounters as a "Terry stops." It is important to remember that a stop is a significant interruption in a person's liberty and amounts to a limited seizure. However, the Court in *Terry* held that this type of investigative stop did not require probable cause.

Accordingly, a police officer may stop a citizen on less than probable cause provided the officer can articulate reasonable suspicion that the subject is committing, has committed or is about to commit a felony or a misdemeanor in the penal law.

A forcible stop may take many different forms. It can be constructive in nature or it could be an actual stop. Surrounding a suspect, blocking their path with an RMP, giving certain verbal commands or ordering a motorist to pull over with the use of turret lights are all examples of constructive stops. Physically subduing suspects by grabbing or holding them would be an actual stop. The test is whether a reasonable person would know that they are not free to leave. In any event, it is important for officers to understand that, in the eyes of the law, they could be stopping people even though they do not physically touch them. Officers should also understand that only the minimum amount of force necessary could be used in achieving their objective.

## Pursuit vs. Surveillance

The New York State Court of Appeals has determined that pursuing a person amounts to a seizure and a violation of a person's Fourth Amendment rights. As was previously discussed, police can only use this amount of intrusion when they have reasonable suspicion. On the other hand, no level of proof is needed for an officer to simply conduct surveillance so long as the surveillance is unobtrusive and doesn't restrict the subject's freedom of movement.

## Public Place

The Penal Law defines a public place as any area "to which the public or a substantial group of persons has access, and includes but is not limited to, highways, transportation facilities, schools, places of amusement, parks, playgrounds, and hallways, lobbies and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence."

NYC-00005398



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

### Geographical Area of Employment

A police officer's geographical area of employment ("G.A.O.E.") consists of the county, city, town or village that *employs* him or her.  If the local government functions in more than one county, the geographical area of employment of a police officer employed by the local government extends throughout all such counties; for example, *a* **New York City police officer's** *geographical area of employment is made up of the* **five counties – or boroughs - of New York City:** Manhattan, Brooklyn, Queens, Staten Island, and the Bronx.

A New York City police officer, therefore, may **only** conduct a stop, question, and possible frisk within the five boroughs of New York City - your G.A.O.E.  Although you have arrest powers throughout New York State, arrests are based on probable cause; *New York City police officers are not authorized to conduct stops on less than probable cause outside the City of New York.*

### The Frisk

The N.Y.S. Criminal Procedure Law authorizes a *search* under certain circumstances.  Courts refer to these searches as frisks since the objective under the law is to remove a deadly weapon or instrument.  Usually, such items are located by just "patting" the person's clothing.  Thus, a frisk is defined as a limited touching of the suspect for the purpose of feeling for any **dangerous weapons**.  Thus, a frisk cannot be used to search for other contraband such as drugs; it is strictly a **protective measure**.  If an officer feels an object that he/she believes may be dangerous, the officer may go into the pocket to retrieve and examine the item.

The officer must be able to articulate that he reasonably suspected the crime and that he reasonably suspected that the person was armed.  There are two situations in which the officer may lawfully frisk pursuant to a Terry Stop; they are as follows:  .

**Fear for Safety.**  The officer observes something on the person that she reasonably suspects is a weapon or may be used as a weapon against her.  An example of this is a bulge in the shape of a firearm in or near the waistband.  At this point, the officer may conduct a frisk of the area to ensure her safety or remove the weapon and place the subject under arrest.

**Reasonable Suspicion of a Violent Crime.**  In situations in which an officer has reasonable suspicion that the subject has committed, is committing, or is about to commit a violent crime, such as assault, rape, etc., the officer may conduct a frisk to determine if the person is armed with a weapon.  Courts have included the suspicion of burglary among the list of violent crimes since burglars tend to carry "tools" (e.g., screwdrivers, picks, etc.) that can be used as weapons against

NYC-00005399



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

police officers.  An officer need not articulate independent facts of a weapon; only facts regarding a violent crime.

***Frisk of a Portable Container.***  In the event an officer develops reasonable suspicion that a portable container contains a dangerous item, the officer may frisk by squeezing the container, or if the container is solid, the officer may open it to determine whether a dangerous object is present.

**NOTE:  There is no requirement to question a suspect prior to an authorized / lawful frisk.**

## Questioning

The officer may question the subject to the extent necessary to ***confirm or dispel*** his suspicion.  The questions, therefore, should be pointed and accusatory, and directly related to the reason for the stop as well as for pedigree information regarding the subject.  Courts have held that as long as the questioning does not go beyond the reason for the stop, *Miranda* advisements (that a person who is not free to leave has the right to silence and to counsel), are not required. (For a further discussion on *Miranda*, refer to the chapter on "Criminal Procedures")

## Length of Time

The duration of the stop and question must be ***reasonable*** under the circumstances.  There is no set limit on how long an officer can detain a person for the purpose of conducting an investigation.  The Court of Appeals only mentions "brief" time limits for the police to accomplish their goals.  This means that the officer must act reasonably and diligently, and not use the stop to "wait out" a suspect.  A longer detention will be upheld in situations where officers transport a subject to a victim for identification purposes, while only a brief detention is authorized to receive information over the radio to confirm a description.

## FACTORS THAT MAY LEAD TO REASONABLE SUSPICION

It is simple for an officer to know that he or she needs to have reasonable suspicion before conducting a forcible stop.  However, it can be difficult to understand exactly when you actually have reasonable suspicion.  Because this is such an elusive concept, no judge, manual, or course could ever list every single scenario in which you would or would not have reasonable suspicion.

The courts, however, have identified a few common factors which would give an officer reasonable suspicion.

NYC-00005400



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

### 1.   Information from an Informant

Reasonable suspicion cannot be based solely on anonymous information. Therefore, if an officer receives information from communications (job from central dispatcher) about a suspect and the identity of the caller is not known and/or the caller gave no contact number, the officer will only have a common law right of inquiry at this point. (*Exception to the rule*: anonymous call of a man with a bomb or an anonymous call of an intoxicated driver).

In order for the officer to reach reasonable suspicion in "anonymous call" situations, he or she needs at least one more piece of information that would tend to show the reliability of the informant.  The following would qualify as additional information: a call back number given by the caller; the officer observes the subject take specific actions that the caller predicted; the officer observes actions consistent with criminal activity; or the informant gave the information to the officer in person.

### 2.   Furtive Behavior

If an officer observes strange, suspicious, or evasive behavior, he or she may have reasonable suspicion.  The officer's experience and/or expertise are often taken into account in these situations.  Furtive behavior in the form of misleading or deceptive answers can also form the basis for reasonable suspicion.

### 3.   Resemblance to the Suspect of a Crime

The police are justified in conducting a forcible stop on a person who bears a strong resemblance to a known person who is wanted for a crime.

### 4.   Flight

Similar to anonymous information, flight alone cannot serve as the basis for reasonable suspicion.  The police cannot start chasing a person merely because the person started running when he or she saw the police. Under certain circumstances, flight can be considered an escalating factor that may authorize an officer's stop of a suspect.

### SPECIAL CONCERNS RELATING TO INVESTIGATORY ENCOUNTERS

**Racial Profiling**

The Department defines racial profiling as the use of race, color, ethnicity, or national origin as the determinative factor for initiating police action.  As we will emphasize throughout your training and your whole career, officers should be cautioned not to confuse good police work with racial profiling.  There is absolutely nothing wrong

NYC-00005401



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

with taking the above listed factors into account the same way you would consider pedigree information such as height, weight, age, etc. about specific suspects.  *Always remember that no action is solely or completely attributable to one racial or ethnic group.*

Although a radical Muslim faction is responsible for the World Trade Center attacks, we can't make assumptions about all Muslims nor can we assume that all white males want to bomb government buildings, as did Timothy McVeigh.  Similarly, it would be unacceptable to stop an African American person based solely on the fact that he or she is in a neighborhood that is not known to have African American residents.

**Confrontation Situations**

There have been incidents in the past where on duty officers have mistaken plainclothes officers for armed criminals.  The results were too often tragic.  The Department, in an attempt to avert these tragedies, has set up guidelines to ensure the safety of all individuals involved.  In such encounters, the actions of the members in the first few seconds are crucial.  It must be absolutely clear in the minds of all members of the service that the burden of proving identity rests with the **confronted officer** whether on or off duty.  The **challenging officer,** however, is responsible for using sound tactics and judgment in approaching these situations.

**General Business Law**

Ordinarily, if a civilian detained a person against that person's will, the civilian could be charged with false imprisonment and/or assault.  However,  §218 of the General Business Law provides an affirmative defense for merchants or persons acting on behalf of merchants.  According to this section, a merchant or a merchant's agent is allowed to detain a person providing the following criteria are met:

1.  The person must have been detained on the premises or in the immediate vicinity of the premises of the retail mercantile establishment.

2.  The merchant or agent must have had reasonable grounds to believe that the subject committed or attempted to commit a larceny of the merchant's merchandise.

3.  The person must have been detained for a reasonable amount of time for investigation or questioning.

For the purposes of this section, *reasonable cause to believe* means knowledge that a person has concealed possession of stolen merchandise.  A *reasonable time* is the time necessary to permit the person detained to make a statement or to refuse to

NYC-00005402



# POLICE STUDENT'S GUIDE
## Policing Legally:  Street Encounters

make a statement and the time necessary to examine witnesses and store records.  In addition to civilians, such as security guards,   §218 of the GBL also pertains to police and peace officers acting pursuant to their official duties.

## PREPARATION OF DEPARTMENT FORM:
## "THE STOP AND FRISK REPORT"

There are two possible outcomes of an investigatory stop of a person based on reasonable suspicion: either the officer develops probable cause and places the suspect under arrest, or the officer's investigation does not lead to probable cause and he or she releases the suspect and continues to search for the perpetrator of a crime. In either case, it is important to **record** all of the details that convinced the officer to stop a suspect.  This is because the courts closely scrutinize all incidents that lead to an arrest or to the seizure of contraband or evidence.  Failure to accurately record details would mean that an officer would have to rely only on memory while testifying in court. This is why officers are mandated to record all information regarding a street encounter that is based on reasonable suspicion in two places: the Stop, Question and Frisk Report Worksheet and the Activity Log.

Patrol Guide section 212-11, "Stop and Frisk" states that a member of the service will prepare a Stop Question and Frisk Report Worksheet for EACH person stopped. Patrol Guide Section 212-08, "Activity Logs" states that an officer must make an entry in his or her Activity Log for all assignments received and all tasks performed.  So in ALL cases in which an officer detains someone based on reasonable suspicion of a felony or a misdemeanor as defined in the Penal Law, a Stop, Question, and Frisk Worksheet must be prepared, and an Activity Log entry must be made.

**Proper Documentation**

In every situation in which a Stop, Question, and Frisk Worksheet is prepared, Activity Log entries must also be made.  All pertinent details regarding a street encounter must be recorded.  It is advisable to assume that the Stop, Question and Frisk Worksheet may be lost or misplaced and the officer will have to base his/her testimony regarding an incident solely on the entry he/she made in the Activity Log.

Remember: A Stop, Question, and Frisk Worksheet is prepared only when an officer has reasonable suspicion of a felony or a Penal Law misdemeanor.  Should a street encounter start out at probable cause (for example, a complainant points out a perpetrator from a past crime), it would be incorrect to prepare a Stop, Question, and Frisk Worksheet in this case.

NYC-00005403



# POLICE STUDENT'S GUIDE
### Policing Legally:  Street Encounters

## LEVELS OF SUSPICION



**BEYOND A REASONABLE DOUBT**

CRIMINAL CONVICTION

**55**

**CLEAR & CONVINCING EVIDENCE**

TRAFFIC COURT CONVICTION

**$**

**PREPONDERANCE OF THE EVIDENCE**

CIVIL LIABILITY

**PROBABLE CAUSE**

ARREST

**REASONABLE SUSPICION**

STOP, QUESTION, POSSIBLE FRISK

**COMMON LAW RIGHT OF INQUIRY**

INVESTIGATE POSSIBLE CRIMINALITY

**REQUEST FOR INFORMATION**

RIGHT TO APPROACH

NYC-00005404

| TYPE OF ENCOUNTER | LEVEL OF SUSPICION REQUIRED | NATURE AND EXTENT OF PERMISSIBLE QUESTIONING | AUTHORITY TO SEARCH | FORCE AND DETENTION |
|---|---|---|---|---|
| I. Request for Information | Any articulable reason to approach. Suspicion of criminality is not required. However, the member of the service must be able to articulate a basis beyond mere whim and caprice. | Questions concerning the subject's name, address, or presence at the location | At this level of suspicion, there is no basis to search. A request for consent to search a bag, pocketbook, luggage, or other item of personal property is improper | Force may not be used to detain a subject at this level of suspicion. The subject is free to walk away from the member of the service if he/she so desires. He/she need not answer questions |
| II. Common-Law Inquiry | A founded suspicion that criminality is afoot. This could be triggered by false responses to questions posed during the request for information, as well as observations by the MOS | MOS may conduct more extensive questioning. Accusatory-type (guilt-seeking) questions may be asked | A subject may be asked to consent to the search of an item of personal property. This consent must be voluntary, intelligently, and knowingly on the subject's part. | Force may not be used to detain a subject at this level of suspicion. The subject is free to leave if he/she desires. He/she need not answer questions |

NYC-00005405

| | | | |
|---|---|---|---|
| III. Stop, Question, and Frisk. | A reasonable suspicion that a person is committing, has committed, or is about to commit a felony or Penal Law misdemeanor. Reasonable suspicion exists when the information known to the MOS is of such weight and persuasiveness as to make the MOS, depending on his/her judgment and experience, reasonably suspect criminality. | The MOS may stop the subject, ask for his/her name and address, an explanation of conduct , and detain him/her while an expeditious investigation is conducted to determine if there is probable cause to arrest the subject | In addition to the consent search described above, the MOS may frisk the subject for a deadly weapon, or any instrument or article readily capable of causing serious physical injury when the MOS reasonably suspects he/she is in danger of physical injury [Criminal Procedure Law 140.50(3)]. | A MOS is permitted to use reasonable force to stop and question a subject. The subject is not free to walk away. The type and amount of physical force used must ultimately be objectively reasonable under the attendant circumstances facing the MOS. Thus, the more violent an encounter, the greater the physical force that may be employed. |
| IV. Arrest | Probable cause to believe that (a) an offense was committed and (b) that the subject arrested committed it. Probable cause requires the existence of facts and circumstances which when viewed together would lead a reasonable person possessing the expertise of the arresting officer to conclude that an offense has been committed | A MOS may engage in constitutionally permissible custodial interrogation (i.e., *Miranda* waiver must be lawfully obtained). *Miranda* waiver not required to obtain pedigree information) | "Search incident to arrest" (i.e., a search of a subject conducted immediately after the arrest to secure weapons, prevent evidence destruction) "Inventory" (i.e., examination of property that comes into the lawful custody of the Department), etc. | A MOS is permitted to use reasonable force to arrest and detain a subject |

*POLICING LEGALLY: STREET ENCOUNTERS*

NYC-00005406



# POLICE STUDENT'S GUIDE
## Policing Legally: Street Encounters

## STOP, QUESTION AND FRISK WORKSHEET (SIDE ONE)

(COMPLETE ALL CAPTIONS)

**STOP, QUESTION AND FRISK REPORT WORKSHEET**
PD344-151A (Rev. 11-02)

| Pct.Serial No. | | |
|---|---|---|
| Date | | Pct. Of Occ. |

| Time Of Stop | Period Of Observation Prior To Stop | Radio Run/Sprint # |
|---|---|---|

Address/Intersection Or Cross Streets Of Stop

| ☐ Inside   ☐ Transit | Type Of Location |
|---|---|
| ☐ Outside  ☐ Housing | Describe: |

| Specify Which Felony/P.L. Misdemeanor Suspected | Duration Of Stop |
|---|---|

### What Were Circumstances Which Led To Stop?
**(MUST CHECK AT LEAST ONE BOX)**

☐ Carrying Objects In Plain View Used In Commission Of Crime e.g., Slim Jim/Pry Bar, etc.
☐ Fits Description.
☐ Actions Indicative Of "Casing" Victim Or Location.
☐ Actions Indicative of Acting As A Lookout.
☐ Suspicious Bulge/Object (Describe)
☐ Other Reasonable Suspicion Of Criminal Activity (Specify)

☐ Actions Indicative Of Engaging In Drug Transaction.
☐ Furtive Movements.
☐ Actions Indicative Of Engaging In Violent Crimes.
☐ Wearing Clothes/Disguises Commonly Used In Commission Of Crime.

| Name Of Person Stopped | Nickname/ Street Name | Date Of Birth |
|---|---|---|
| Address | Apt. No. | Tel. No. |

Identification:  ☐ Verbal   ☐  Photo I.D.   ☐   Refused
☐   Other (Specify)

Sex:☐ Male  Race:☐ White  ☐ Black☐ White Hispanic  ☐ Black Hispanic
☐ Female    ☐ Asian/Pacific Islander  ☐ American Indian/Alaskan Native

| Age | Height | Weight | Hair | Eyes | Build |
|---|---|---|---|---|---|

Other (Scars, Tattoos, Etc.)

| Did Officer Explain Reason For Stop  ☐ Yes   ☐ No | If No, Explain: |
|---|---|

| Were Other Persons Stopped/ Questioned/Frisked? | ☐   Yes  ☐  No | If Yes, List Pct. Serial Nos. |
|---|---|---|

If Physical Force Was Used, Indicate Type:
☐ Hands On Suspect
☐ Suspect On Ground
☐ Pointing Firearm At Suspect
☐ Handcuffing Suspect
☐ Suspect Against Wall/Car

☐ Drawing Firearm
☐ Baton
☐ Pepper Spray
☐ Other (Describe)

| Was Suspect Arrested?  ☐   Yes  ☐   No | Offense | Arrest No. |
|---|---|---|
| Was Summons Issued?  ☐   Yes  ☐   No | Offense | Summons No. |
| Officer In Uniform?  ☐   Yes  ☐   No | If No, How Identified? ☐ Shield    ☐ I.D. Card  ☐ Verbal | |

NYC-00005407



# POLICE STUDENT'S GUIDE
## Policing Legally: Street Encounters

## STOP, QUESTION AND FRISK WORKSHEET (SIDE TWO)

**Was Person Frisked?** ☐ Yes ☐ No  IF YES, MUST CHECK AT LEAST ONE BOX
- ☐ Inappropriate Attire - Possibly Concealing Weapon
- ☐ Verbal Threats Of Violence By Suspect
- ☐ Knowledge Of Suspects Prior Criminal Violent Behavior/Use Of Force/Use Of Weapon
- ☐ Other Reasonable Suspicion of Weapons (Specify)
- ☐ Furtive Movements
- ☐ Actions Indicative Of Engaging In Violent Crimes
- ☐ Refusal To Comply With Officer's Direction(s) Leading To Reasonable Fear For Safety
- ☐ Violent Crime Suspected
- ☐ Suspicious Bulge/Object (Describe)

**Was Person Searched?** ☐ Yes ☐ No  IF YES, MUST CHECK AT LEAST ONE BOX
- ☐ Outline Of Weapon  ☐ Other Reasonable Suspicion of Weapons (Specify)  ☐ Hard Object  ☐ Admission Of Weapons Possession

**Was Weapon Found?** ☐ Yes ☐ No  If Yes, Describe: ☐ Pistol/Revolver  ☐ Rifle/Shotgun  ☐ Assault Weapon  ☐ Knife/Cutting Instrument
- ☐ Machine Gun  ☐ Other (Describe)

**Was Other Contraband Found?** ☐ Yes  ☐ No If Yes, Describe Contraband And Location
Demeanor Of Person After Being Stopped
Remarks Made By Person Stopped

**Additional Circumstances/Factors:  (Check All That Apply)**
- ☐ Report From Victim/Witness
- ☐ Area Has High Incidence Of Reported Offense Of Type Under Investigation
- ☐ Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity
- ☐ Suspect Is Associating With Persons Known For Their Criminal Activity
- ☐ Proximity To Crime Location
- ☐ Other (Describe)
- ☐ Evasive, False Or Inconsistent Response To Officer's Questions
- ☐ Changing Direction At Sight Of Officer/Flight
- ☐ Ongoing Investigations, e.g., Robbery Pattern
- ☐ Sights And Sounds Of Criminal Activity, e.g., Bloodstains, Ringing Alarms

Pct. Serial No. _____  Additional Reports Prepared: Complaint Rpt No. _____  Juvenile Rpt No. _____  Aided Rpt. No. _____  Other Rpt. (Specify) _____

REPORTED BY: Rank, Name (Last, First, M.I.)  REVIEWED BY: Rank, Name (Last, First, M.I.)

Print _____  Tax# _____  Print _____  Tax# _____

Signature _____  Command _____  Signature _____  Command _____

NYC-00005408



# POLICE STUDENT'S GUIDE
### Policing Impartially

## WHY IS IT IMPORTANT FOR POLICE OFFICERS TO KNOW ABOUT IMPARTIAL POLICING?

Police officers work in diverse communities among people who may not share their race, ethnicity, cultural background, or way of looking at the world. As a result, officers sometimes find their beliefs challenged by people who may or may not be breaking the law. In this context, hidden biases are likely to surface and sometimes threaten the officer's ability to professionally use discretion and communicate with the public. In a jurisdiction as diverse as New York City, such biases and the conduct they may produce can be disastrous.

... officer need to know in order
to deal ... rtment
guidelin ... al
underpi ... to
safely a
appear: ... s
governi

$2003$

regard ... out
same ti ... he
against ... ation
changir ... najor
organizations and institutions, ... s
across the country. In 1805, African American "free men of color" were first hired as police officers in the City of New Orleans. Ironically, their major duties were to catch runaway slaves and to enforce the Slave Code. For generations thereafter, the conflicted and second-class status of African-Americans in policing took many forms that, today, appear equally bizarre and insulting. As recently as the 1940s, the City of Miami maintained a separate black police force comprised of African-American officers who patrolled Miami's black neighborhoods. The late Maurice Turner, the African-American former Chief of Police in Washington DC, often recounted what he found when he entered that department in the 1960s -- he was not permitted to share patrol cars with white officers, and was not permitted to arrest white people.

Women were hired as police matrons in the l920s and assigned to work in areas traditionally viewed as *feminine*, such as counseling juveniles and children, investigating missing persons and sex offenses, and performing clerical work. Because patrol was a prerequisite for promotions, police matrons remained at

NYC_2_00020637



# POLICE STUDENT'S GUIDE
## Policing Impartially

## WHY IS IT IMPORTANT FOR POLICE OFFICERS TO KNOW ABOUT IMPARTIAL POLICING?

Police officers work in diverse communities among people who may not share their race, ethnicity, cultural background, or way of looking at the world.  As a result, officers sometimes find their beliefs challenged by people who may or may not be breaking the law.  In this context, hidden biases are likely to surface and sometimes threaten the officer's ability to professionally use discretion and communicate with the public.  In a jurisdiction as diverse as New York City, such biases and the conduct they may produce can be disastrous.

This chapter explores what you, as a police officer, need to know in order to deal with a diverse population in a manner consistent with law and Department guidelines. We will begin by examining some of the psychological and social underpinnings of bias.  We will go on to outline some tips that will help you to safely and effectively interact with the public and avoid both bias and the appearance of bias.  We will conclude with a discussion of the relevant laws governing hate crimes.

### BIAS AND POLICE HISTORY

As police officers, you are required to enforce the law impartially without regard to race, class, ethnicity, culture, gender, and sexual orientation. At the same time, we are members of a larger society in which bias and discrimination against certain groups of people are matters of historical and statistical fact. The changing patterns of prejudice that are part of U.S. history are reflected in major organizations and institutions, including urban and rural police departments across the country.  In 1805, African American "free men of color" were first hired as police officers in the City of New Orleans.  Ironically, their major duties were to catch runaway slaves and to enforce the Slave Code.  For generations thereafter, the conflicted and second-class status of African-Americans in policing took many forms that, today, appear equally bizarre and insulting.  As recently as the 1940s, the City of Miami maintained a separate black police force comprised of African-American officers who patrolled Miami's black neighborhoods.  The late Maurice Turner, the African-American former Chief of Police in Washington DC, often recounted what he found when he entered that department in the 1960s – he was not permitted to share patrol cars with white officers, and was not permitted to arrest white people.

Women were hired as police matrons in the l920s and assigned to work in areas traditionally viewed as *feminine*, such as counseling juveniles and children, investigating missing persons and sex offenses, and performing clerical work. Because patrol was a prerequisite for promotions, police matrons remained at

NYC_2_00020638



# POLICE STUDENT'S GUIDE
## Policing Impartially

the bottom of the hierarchy, regardless of their skill and accomplishments. This began to change in the 1960s, when two New York City *Policewomen*, Felicia Spritzer and Gertrude Schimmel, sued the Department and won the right to compete with *Patrolmen* on promotional exams. Prior to their victory, policewomen were barred from supervisory and command positions in the NYPD.

Another major change came in the 1970s with the passage of the Equal Employment Opportunity Act and a United States Supreme Court decision called *Griggs v. Duke Power Company*. In *Griggs*, the Supreme Court ruled that publicly supported employers who used discriminatory standards to hire or promote people had to be able to show, when sued, that the standards they used were *job relevant*, and served to separate people who could perform the job from those who could not. In other words, a police department could insist on hiring only men for patrol officers' jobs only if it could show that men did the job better than women could. In addition, as the NYPD did at the time, a police department could insist on hiring only people who were 5'8" only if it could show that people more than 5'8" tall could be effective police officers while those less than 5'8" tall could not. No police department could show any of these things, of course.

The NYPD became one of only a few large urban departments that integrated women without the force of a lawsuit. They also changed its physical, strength, and agility standards to avoid discriminating against other groups. It was at this time – in 1973 – that women were first hired by the NYPD on the same basis as men, and that the former *patrolman* and *policewoman* job titles were eliminated in favor of today's *police officer*.

Gay police officers have been members of the service from the start, but their status was a hidden secret punishable by expulsion in many departments. While the reasons for such policies remain unclear, they seem to be based on irrational beliefs that gay men are unfit for combat and are likely to sexually harass their heterosexual partners. In 1981, New York police officer Sgt Charles Cochrane set the record straight about gay men in policing when he publicly announced his homosexual status and declared that he was not alone.

The United States has made tremendous progress in overcoming discrimination. A generation ago, this was an agency composed almost entirely of tall men. Most were white, and all, publicly at least, professed to be heterosexual. If you look at the diversity of your class, you will see that much has changed since then. This Department is now far more diverse than it has ever been.

NYC_2_00020639



# POLICE STUDENT'S GUIDE
## Policing Impartially

The Department's efforts to overcome bias within its ranks have been accompanied by our attempts to treat the public in an evenhanded and biasfree manner. This is the most diverse and culturally rich city in the United States, and we take great pride in our responsiveness to its needs and demands. In doing so, it is important that we recognize that even open minded and well-intentioned individuals are likely to carry the burden of history on their shoulders, regardless of their education, political orientation, and color of their skin. Subtle and overt forms of bias and discrimination continue to live in our consciousness, no matter who we are and what our role is in the social system.

This point can be illustrated by a quick glance at the privileges that many members of the dominant social group take for granted. White middle class males can use checks, credit cards, or cash, and can count on the fact their skin color will not work against the appearance of financial stability. Those who are surgical residents can wear scrubs in the workplace without peers and strangers assuming they are nurses or technicians. When a white man obtains major advancement in rank, position or pay inside an organization dominated by people who look like him, no one whispers that he *slept his way to the top*, gained his status because of his race, or is an *exception to the rule* among people of his race. Typically, white men are treated as *individuals*, while men of color, gays, and women often are regarded in terms of their membership in those classes. It is critical that we are aware of this tendency, and that we do everything possible to avoid it in our own behavior.

**Perception and Bias**

As New York City police officers, you will be exposed to a wide variety of people from a multitude of racial, ethnic and religious backgrounds. Those of you who are open to alternative ways perceiving the world will welcome the experience and appreciate the diversity. Others may find the exposure unnerving. This also is a natural response, usually determined by one's background. We cannot do anything to change your background, and we cannot compel you to change how you may feel about people who seem different from yourself. However, you are required to keep from expressing your personal views in discriminatory words and actions.

This is not as easy as sounds. People are not always conscious of their biases. Without our awareness, cultural beliefs and stereotypes filter our perception and influence what we see. The result is that two rational people may interpret the same reality in very different ways. Alternatively, one person may view identical behavior differently, depending on the racial, ethnic or cultural identity of the actor. When ordinary citizens do this, it may be merely insulting;

NYC_2_00020640



# POLICE STUDENT'S GUIDE
### Policing Impartially

when cops do it on the street, it is both dangerous to life and damaging to our relations and our ability to do the job.

Here is an example:  you and your partner are patrolling the streets in a precinct in Brooklyn at 2 a.m.  You come across a black male, armed with a gun, holding a white man against the wall.  Would you see this as a robbery in progress or as a plainclothes police officer in the process of arresting a dangerous suspect?  Would your perception of what was happening be different if the man with the gun was white and the man against the wall was black?

Similar perceptual conflicts may affect contacts between the police and the public, resulting in words or actions that strengthen the stereotypes on the part of both the police and the public.

Here is another example:  Imagine you and your partner receive a call that a black male, carrying a shotgun in a shopping bag, is heading towards an apartment building on 23rd Street. You arrive at the location and observe a man with a shopping bag, walking up the stairs to the building on 23rd Street. You approach the man and insist on searching his bag, which turns out to contain a quart of milk, a frozen pizza, a cold six-pack, and a pound of coffee.   The man gives you a dirty look and whispers "racist" and "harassment" under his breath. Annoyed and bewildered, you utter your favorite expletive to your partner, slam the car door shut, and return the man's glare as your partner drives off.

Replay the tape. Ask yourself if there is a safe way to handle the situation, at one point or another, that might break the cycle of miscommunication, resulting in a more satisfactory conclusion for both parties. Can you understand why the man might react in this way?  Can you think of things you might do in this circumstance to leave him feeling better about his contact with you?  What could you do to make it easier for the next cop who encounters this individual?

## Policing and Prejudice

There are many reasons why you, as a police officer, must not engage in discriminatory behavior.  For one thing, it is against the 14th Amendment of the U.S. Constitution, as well as Article 1, Section 11 of the New York State Constitution which states that no person shall be denied equal protection of the law: **as a cop, you simply may not base your treatment of people on their gender, race, ethnicity, age, sexual preference, or membership in any class**.

NYC_2_00020641



# POLICE STUDENT'S GUIDE
### Policing Impartially

Racial Profiling.  Within this context, it is important for you to understand the difference between *racial profiling* and *criminal profiling*.  Racial profiling refers to those times when a police officer decides to stop and question a person when the sole rationale for the contact is the race, ethnicity, or national origin of the person being stopped.  By contrast, criminal profiling is a method by which officers, through careful observation of activities and environment, identify a suspicious person who, for perfectly legal and legitimate reasons, may be stopped.  You cannot stop and question or otherwise intervene in the lives of members of a group merely because you believe that members of that group are disproportionately involved in wrongful behavior.  You can stop people when you have very particular suspicions about the individuals you are stopping.  For example:

-  You would be race profiling if you stopped and questioned a young black man simply because he was walking in a neighborhood in which young black men reportedly committed most crime.  But you would not be race profiling if, in the same neighborhood, you stopped and questioned a young black man who closely matched a reasonably detailed description (e.g., "male, black, early 20s, dark complexion, thin build, black pants, dark leather coat") of a person who had just committed a crime in  the neighborhood.

-  You would be race profiling if you stopped and questioned a young white man in a car because someone told you "the only white people who came into the neighborhood were there to buy drugs."  However, in the same neighborhood, you would not be race profiling if you stopped and questioned a young white man who slowly drove through the neighborhood, and made brief stops at locations that had a history of drug dealing.

Prejudiced behavior is problematic not only because it violates the law and Departmental guidelines but also because it damages public trust and undermines the relationship between the police and the community.  Citizens feel unprotected when they believe that those who they entrust with the responsibility for their safety are capable of using racist language and acting in discriminatory ways. The communication of biases by police officers also reinforces common stereotypes that designate *all* police as bigots. This, in turn, creates a dangerous atmosphere for the police, who cannot work safely or effectively without community support.

NYC_2_00020642



# POLICE STUDENT'S GUIDE
## Policing Impartially

### UNDERSTANDING BIAS

Understanding some of the myths that surround the concept of race may help correct some misconceptions that underlie bias. **Race is a cultural rather than a biological construct. There is no scientific evidence to support the idea that differences in personality, temperament, character, or intelligence are based on race.** In other words, the differences that we see in color generally are only skin-deep and do not translate into widespread biological differences that are unique to groups. The large groups that we characterize as races are too heterogeneous to lump together in a scientific way. The percentage of your genes that are reflected in external appearance, the basis by which we talk about race, seems to be in the range of .01 percent (one in 10,000). For this reason, most genetic scientists do not view race as a biological concept.

The human brain, however, is highly attuned to differences in appearance, leading people to exaggerate the significance of what has come to be called race. The false beliefs that come to be linked with race then take on a life of their own and are resistant to change. The reasons for this are complex. In any case, prejudice is attached to strong emotions that are often buried in past experience. The result is that we tend to accept new information *only* if it reinforces previous attitudes. Conflicting evidence is then dismissed as insignificant or untrue, or otherwise rationalized according to previous notions. For example, if a person has a negative belief about some group, he or she is likely to interpret any unpleasant behavior by a member of that group as "the way they all are." However, if the same prejudiced person should encounter a member of the same group whose behavior is contrary to the prejudice, he or she is likely to write it off as an exception – "Yeah, maybe that guy treated me okay, but most of them are terrible."

### The Development of Prejudice

Understanding where biased attitudes come from may help you recognize and overcome the ones that you have come to take for granted. Most of us adopt the beliefs and values of our parents and siblings, which probably reflect those of the cultural, ethnic, class and racial group of which they are a part. In addition, traumatic events occurring in childhood may also influence how you understand and react to situations arising in the world around you. If, as a kid, you had a bad experience with a member of a group your parents or neighbors stereotyped, it is likely to have convinced you that the stereotype was correct.

Experience with peers in school further refined or changed attitudes, reinforcing or challenging biases that were learned earlier in life. Prejudice is often based on unfamiliarity. If you have never had contact with a member of a

NYC_2_00020643



# POLICE STUDENT'S GUIDE
## Policing Impartially

group different from your own, you are likely to have expectations about them that are based on what other people say, or how that group is portrayed in the movies and the news.   Many people who have never been to New York City because of what they have seen on television – a city full of crime, violence, hustlers, and self-centered egomaniacs:  consider what you would think about New York City if the only things you "knew" about it were what you "learned" on *NYPD Blue*, *Law and Order*, *Third Watch*, and *Seinfeld*.  As you consider this, think also about the accuracy of what you think you know about another city you have never actually visited.  If you have never been to Los Angeles, your expectations of it may be based on what you have seen in movies and on television: what makes you think they portray life in L.A. any more accurately than *NYPD Blue* portrays life in Manhattan?

Nevertheless, people who have had the opportunity to develop friendships with groups from diverse social backgrounds may be more open than others to alternative ways of understanding humanity.  Their experience overcomes the anxiety and confusion that are linked to the unknown, and teaches the falsehood of racial and ethnic stereotypes.

Occupational experiences also inform attitudes. When you began your career as a police officer, you entered a subculture with a unique set of values, rules, and language that define who is and who is not a member of the police family.  In time, you will be able to recognize most police officers by the way they talk, act and, to some degree, think about the world around them.  Police officers do not usually gain popularity by questioning the views of peers or challenging shared attitudes.  The result is that biases are sometimes reinforced in group context and passed on to new officers who are eager to gain the acceptance of their veteran colleagues.

Some of the attitudes that may set police apart from others are partly determined by the highly selective exposure police have to the community they serve.   Police officers tend to interact with specific categories of people, including crime victims, helpless persons, emotionally disturbed people, criminal offenders, and naïve or unwilling citizens who do not particularly want to do what you ask.  Much of the time, these people are upset, angry or otherwise in a negative state of mind.   As cops have observed, many of the people police come in contact with are emotionally upset:  are in trouble; have committed crimes, t have been victimized or witnessed crimes; they have had accidents; they are involved in arguments; they have lost their keys – or (even worse) their kids.  As much as officers try to help these folks when it is appropriate to do so, dealing with them is not easy.  When these folks look different from officers – when they are from a different race or ethnic group; when they speak a different language or

NYC_2_00020644



# POLICE STUDENT'S GUIDE
### Policing Impartially

have a different sexual orientation − it becomes very easy to stereotype the entire group based on our experience with a few.

Further, because they are symbols of authority, police sometimes are blamed for events over which they have little control. This can be demoralizing and can alienate the police from the public. Because of their limited exposure, police tend to forget that most members of the community are good and upstanding people who appreciate their presence and the positive influence they have on children and young people. Unfortunately, this majority is largely silent about their appreciation, so that officers hear only from unhappy, vocal, few. Police officers then begin to view the occasional instances of praise as aberrations.

Because of these distortions, police officers must work hard to maintain a balanced perspective about the people they serve and about humanity in general.   Remember that a courteous, professional, and respectful police officer who illustrates the opposite of bias and discrimination helps create a partnership with the community and builds rapport with the people. The result is that the citizens become our allies and, in turn, policing becomes safer and easier. This enhances our effectiveness and increases our pride and pleasure in what we do.

## COMMUNICATION GUIDELINES

- **Explain yourself**. Telling people why you stopped them will help dispel the myth that stops are racially motivated and prevent altercations and misunderstandings from arising. Often, officers stop individuals because they match suspect descriptions or because they are acting in ways that do, in fact, look suspicious, only to learn that there is a perfectly legitimate explanation for what they were doing. These people do not know why you stopped them and, unless you tell them why you did, they are likely to believe that your actions were arbitrary. It takes only a few seconds to do this, and it usually turns an angry person into someone who appreciates your effort -- "Gee, I'm sorry, Sir. We were looking for a person who had just committed a mugging, and you matched the description. Let me ask the radio dispatcher to repeat the description, and you can listen to it. Then you'll know why we stopped you."

- **Do not assume that only criminals fear the police.** You will encounter people from countries in which oppressed populations learned the hard way that they could not trust the police in this city. Some New Yorkers came here from places in which police or military authorities have engaged in genocidal massacres and torture of the civilian population.

**NYC_2_00020645**



# POLICE STUDENT'S GUIDE
## Policing Impartially

These people will not always be able to distinguish you from the authorities who killed their families and friends. As a result, they may avoid contacts with you in just the same way that they would have in their native countries.

- **Be wary of ethnocentrism.** *Ethnocentrism* is the false assumption that one person's cultural beliefs and practices are inherently superior to another's. Unless you are dealing with people who practice a particular cultural activity that violates the law – like polygamy, cockfighting, drug use, or animal sacrifice – this is the wrong view to take. Unless people are violating the law, we are not in the business of making judgments about their beliefs and customs.

- **Understand the effect of proper tactics on innocent people.** The public may perceive proper police tactics as alienating and scary. Remember that many of the people you stop will be released without further action because it turns out that there is a legitimate explanation for their activity and/or because there is no evidence that they were doing anything wrong. Keep in mind that what is routine for you – stopping and questioning pedestrians or motorists – is far from routine for most of the people you are stopping. Keep in mind also that, when you stop and question people, you are letting them know that (in your judgment at least) they look wrong. This is a very negative assessment, so you need to expect that the people you stop may resent it. Be aware of that, and do what you can to ease their resentment.

- **Be sensitive to individual's language preferences.** Do not take it personally if an individual of another gender, race, ethnicity, of from another country wants to speak with your partner who shares his or her characteristics. Even individuals who speak English may prefer to speak their native language because it makes them more comfortable or they are afraid that police will be critical of their grammar and pronunciation.

- **Be wary of being intolerant.** Intolerance may exist among police officers that are members of minority groups as well as those who are not. Indeed, sometimes minority police officers may feel more intolerant towards certain behavior on the part of members of the racial, ethnic, religious, or gender group with which they identify. Such feelings may result from a concern that other officers will assume the behaviors are representative of the group as a whole. No matter who you are or where you come from, your job as a police officer is to deal with people as individuals not as members of groups, whether those groups are your own or another.

**NYC_2_00020646**



# POLICE STUDENT'S GUIDE
## Policing Impartially

- **Do not engage in racial profiling.** It is against the law. It violates fundamental democratic precepts and freedoms. It violates this Department's policies. It is offensive. It violates your responsibility to treat people equally. It diverts us from catching real criminals. It alienates us from people who need us, and hurts our ability to do our job. It makes things more difficult for every police officer who will subsequently encounter its victims. It breeds disrespect and distrust of every level of government. It embarrasses and humiliates people. It can get you disciplined, fired, sued, and prosecuted. You can probably think of other reasons not to do it, but the point is that you **will not** do it.

- **Avoid assumptions based on a person's minority affiliation.** Do not overlook a witness because you do not believe that a member of his or her particular group could possibly have valuable information. Do not let your feelings about a particular class of people affect your recognition of a victim.

- **Be aware of miscommunications resulting from language.** Language differences can lead to serious problems for non–English speakers. In one case, a man was arrested for agreeing that he molested his daughter. It turned out that the man had only confessed that his drinking bothered his daughter. In Spanish, the verb "molestar" means, "to bother." This is very different from the English meaning of "molesting:" what father has not *bothered* his daughter?

- **Be aware of cultural notions of space.** Notions of personal space and behavior are cultural and indicate respect. Nigerians, for example, have a proper social distance – the range at which people talk to each other – and it may be less than 15 inches. If you are like most Americans, you may think that anyone who stands this close to you while he or she talks is trying to get *"in your face."* This is not the case, however: in many parts of the world, standing close up is a sign of respect. Similarly, most Americans look people in the eye when they talk to them. Natives of many Third World countries, however, show respect by averting their eye when talking to authority figures like police. Be conscious of both these cultural habits, and take them for what they are: signs of respect and attention, rather than disrespect and inattention.

- **Do not imitate the speech patterns of others.** Police officers should not imitate speech patterns of other racial, ethnic and class groups when

NYC_2_00020647

 **POLICE STUDENT'S GUIDE**
Policing Impartially

communicating cross culturally. They appear phony and artificial and, possibly, racist.

- **Do not use terms or words that devalue groups of people** or stereotype them. We have already told you that, when you are dealing with people, you must treat them as individuals, not as members of groups. Certainly, therefore, you should never use the derogatory terms used by ignorant people to devalue members of groups. You know what there are – they are gender, racial, and ethnic slurs and insults about people's sexual orientation. They have no place in your vocabulary. When you use them on duty, you demean people and yourself. When you use them off-duty, you build habits that are not easy to turn off at work.

- **Do not tell or tolerate ethnic, racial or sexist jokes**, even if you think they are not offensive. In this area, what one person sees as harmless, politically incorrect fun may be deeply insulting to others.

- **Avoid expressing stereotypical assumptions that spotlight** minorities or other groups, or that set them apart from others. Examples: "For a woman cop, she did a good job" (implying that this is the exception rather than the rule; or that female cops should be judged by different standards than males); "He's Latino, but he works hard;" "She's black, but she really knows her stuff;" "He's gay, but he'll leave you alone;" "He's Colombian but not involved with drugs;" "She's Italian, but I don't think her family has any mob connections;" "He's Irish, but I've never seen him drunk." No matter who you are, you can think of some negative reference to one or more of the groups of which you are a part. You can also think of how disrespected you feel when you have heard them. Keep that in mind, and do not make any such references about anybody else.

- **Do not take unfounded accusations of racial or ethnic bias personally.**

- **Be courteous.** People are offended when the police are rude and discourteous. They will become angry when they believe that law enforcement officials treated them "like criminals" because they were poor and persons of color. For good reasons, the poor and people of color are sensitive about the way they are treated by police: do not feed into this by turning their worst fears about the police into reality.

- **Be self-aware.** Understanding ourselves and what makes us tick helps us to shape the way we interact with others.

NYC_2_00020648



# POLICE STUDENT'S GUIDE
## Policing Impartially

---

**Officer Self – Awareness**
- Self-awareness about one's early life experiences that helped to shape perceptions, filters, and assumptions about people.
- Self-awareness about how one feels toward someone who is "different"
- Management of assumptions and discomfort in dealing with people who are different (e.g., do we try to deny that differences exist and laugh differences away, or imitate "them" in order to appear comfortable?)
- Ability to be authentic in communication with others while modifying communication style, when necessary (Shusta et al. 2002: 118)

---

- **Follow these directions when dealing with people that use English is a second language.**

---

**Tips for communicating when English is a second language**
- Speak slowly and enunciate clearly.
- Face the person and speak directly even when using a translator.
- Avoid concentrated eye contact if the other speaker is not making direct eye contact.
- Do not use jargon, slang, idioms, or reduced forms (e.g. "gonna", "gotta", "wanna", "couldja").
- Avoid complex verb tenses (e.g., "If I would have known, I might have been able to provide assistance.").
- Repeat key issues and questions in different ways.
- Avoid asking questions that can be answered by "yes" or "no" rather, ask questions so that the answer can show understanding.
- Use short, simple sentences; pause between sentences.
- Use visual cues such as gestures, demonstrations, and brief written phrases.
- Use active rather than passive verbs (e.g., "I expect your attention" [active] rather than "Your attention is expected" [passive].
- Have materials duplicated in bilingual format.
- Pause frequently and give breaks.  Monitor your speed when you speak.
- Use only one idea per sentence.
- Respect the silence and pauses that non-native English speakers need to formulate their sentences and to translate them in their minds.
- Check comprehension by having the other speaker repeat material or instructions, and summarize frequently.
- Encourage and provide positive feedback on the person's ability to communicate.
- Listen even more attentively than you do when communicating with a native speaker of English.
- Be patient.  Every first generation of non-English speaking immigrants' struggles with the acquisition of English.
- Do not speak louder.  It will not help.  (Shusta et al. 2002:124)

---

NYC_2_00020649



# POLICE STUDENT'S GUIDE
## Policing Impartially

### RACIAL PROFILING AND THE LAW

**What is Racial Profiling?**

Racial profiling may be defined as the stopping of motor vehicles, the stopping and questioning of individuals and the frisking and searching of persons without individualized suspicion or legal cause to justify such conduct, but instead based solely upon a person's actual or perceived racial, ethnic or national origin status.

**Why Racial Profiling is Illegal**

The 14th Amendment to the United States Constitution, as well as Article 1, Section 11 of the New York State Constitution, contain equal protection clauses, which state that no person shall be denied equal protection of the law. This means that all persons must be treated fairly and equally by administrators of the law, including the police, in all jurisdictions of the country and New York State. Additionally, New York State has afforded increased protection to its citizens under its Civil Rights Law, Section 40-C. This law states, "No person shall be subjected to any discrimination in his civil rights, or to any harassment because of race, creed, color, national origin, sex, marital status or disability, by any other persons."

Many of the actions taken by police officers are governed by statutory regulations and requirements. When we stop a person on the street, stop a motor vehicle, or arrest an individual, there are specific standards of proof that must be met for our actions to be considered lawful. These standards are a composite of both federal and state constitutions, as well as state procedural law. Harsh consequences follow when police officers disregard these guidelines. If it is determined that a police officer has not followed the prescribed guidelines the following situations may result:

- The law enforcement action (summons, arrest, etc.).taken by the police officer is dismissed.

- The police officer may be subject to Departmental discipline or termination.

- The police officer and/or the Department may be subject to civil and/or criminal penalties (monetary fines and/or imprisonment).

NYC_2_00020650



# POLICE STUDENT'S GUIDE
### Policing Impartially

The New York State Assembly has introduced legislation that specifically defines racial profiling and prohibits law enforcement agencies from engaging in its practice. Additionally, this new legislation would give individuals and the State Attorney General the right to seek damages from a law enforcement agency, including particular employees and their supervisors.

## NYPD Policy Regarding Racial Profiling

The New York City Police Department has always had a strict prohibition against racial profiling because of its inherent unlawful nature and societal effect. Individual citizens can become subjects of Police Department action based only upon actual, perceived, or suspected violations of law. Can race or ethnicity *ever* be a factor in determining when a police officer takes action? The answer is yes. However, an officer's decision to encounter a citizen should be based upon objective, credible facts, and not on a whim or personal bias. Again, you can stop citizens because of *what they are doing* or because they match descriptions of people who have done something wrong – but you cannot stop people because of *what they are.*

### Bias Incidents
## Hate Crimes

Prejudice can distort our interpretations of external reality. Prejudice is often unconscious and linked to powerful emotions. Membership in peer cultures that share biased attitudes will reinforce and help excuse or justify prejudiced acts.

Prejudices are most likely to be acted out during hard economic times or periods of great social change. When jobs become hard to find, economic competition grows among groups and hidden prejudices come to the surface. When formerly powerless groups start to gain economic and political power and the ability to break out of geographic and social ghettos, competition for housing begins, neighborhoods *change*, and prejudices are acted out. Conversely, when formerly poor and working class neighborhoods become stylish, *gentrified*, and expensive, the class prejudices of people who can no longer afford to live in them may turn nasty. When this happens, bias incidents – including hate crimes – may occur.

## Handling Bias Incidents

The best way to deal with bias incidents and hate crimes is to prevent them. As a Department, we try to do this every day by building relationships with the communities we police, by learning as much as possible about them and their

NYC_2_00020651

 # POLICE STUDENT'S GUIDE
### Policing Impartially

relationships with other groups, and by trying to anticipate and mediate differences among them.

Created in 1980, the Department's Bias Incident Unit (Hate Crime Task Force) is specifically charged to assist patrol units in these tasks. It monitors and investigates any offense or unlawful act that is motivated in whole or in part by the identification of a person or group or location's with a particular race, religion, ethnicity, sexual orientation, or disability as determined by the Commanding Officer, Hate Crime Task Force. The Unit also handles bias issues that arise for persons with disabilities.

The definition of a *disability*, for the purposes of this procedure, is when a person possesses or is perceived to possess any of the following: a physical, medical, mental or psychological impairment, or a history or record of such impairment. This includes individuals who have sustained any injury or damage to any system of the body including muscular, sensory, respiratory, speech, heart, reproductive, digestive, blood, immunity (i.e., AIDS), and skin. Also included are recovering alcoholics, drug or other substance abusers who currently are not using alcohol or drugs.

As the first officer on the scene of a disturbance, you must be aware of the possibility of a bias incident, in order to provide a proper referral and maintain order in the community.

**Types of Bias Incidents:**

1.      Harassment.

2.      Property Damage.

3.      Physical Violence.

**Geographical Areas:**

1.      Highest percentage takes place in adjoining non-integrated neighborhoods. **(Read: Patrol Guide Procedure #207-10)**

NYC_2_00020652



# POLICE STUDENT'S GUIDE
### Policing Impartially

## CLASSROOM EXERCISE - BIAS INCIDENTS

Which of the following assignments would constitute a suspected bias incident? Explain your answer in each case.

1.   Two officers respond to a Jewish cemetery on a complaint of burglary. At the scene, the head grounds keeper tells the officers that the copper gutters were stolen from the main building sometime during the night.

2.   An officer patrolling the "F" train observes two teenagers spray painting *swastikas* on advertising posters near the main entrance at the Utica Avenue Station in the heavily populated Hasidic area of Crown Heights of Brooklyn.

3.   Upon entering the main lobby of a Housing building, an officer observes two male Hispanics clubbing a male black, with a baseball bat, while yelling racial obscenities at him.  The officer knows all three youths, since they play on the same baseball team in the PAL, and they are always hanging out together.

4.   A male who seems very upset approaches an officer patrolling her foot post.  He asks her if he can do anything about the threatening phone calls and letters he is receiving concerning his sexual orientation.

5.   Two officers respond in their RMP to a motor vehicle accident at a parking garage.  Upon their arrival at the scene, they see the two apparent operators, a man and a woman, yelling obscenities at each other.

6.   An officer walking his post observes a male attempting to scrub some painted words and designs off a car. Upon initial inquiry, the man tells the officer that since he moved into the neighborhood, unidentified people have been damaging his car and home, by painting white supremacist designs and slogans on his property.  The man tells the officer he does not understand it, since he is not black, and emigrated to the U.S. from India.

7.   An officer hears a 10-85 for a backup unit coming over her portable radio. She runs to the scene, since the location given is only a couple of blocks away.  Arriving at the scene, she sees two of her fellow officers with three men in custody, and under arrest.  The men were caught attempting to burn down a gay men's community center.  The officer notices that a large crowd of people is gathering, and they are yelling anti-police and anti-gay slogans.

NYC_2_00020653



# POLICE STUDENT'S GUIDE
## Policing Impartially

8.    Two officers are on meal at a diner in their patrol car sector, and overhear an argument between two customers and a waiter.  The waiter suddenly screams, "You Jews are all the same!"  She then throws a tray of food at one of the customers.

9.    Two officers respond to a robbery in progress at a grocery store.  Arriving after the suspect has fled, they find that the complainant, a black man, who is obviously shaken.  The complainant explains that the suspect, a male white, teenager, said "Give me all your money," using several ethnic slurs.  The suspect then fired a shot from a 32-caliber revolver into the ceiling.

10.   An officer takes a report of criminal mischief from Imam Muhammad, for the vandalism to the doors and widows of his mosque.

NYC_2_00020654



# POLICE STUDENT'S GUIDE
### Policing Impartially

**BIAS HOTLINE FACT SHEET**

**Q.**   **What is a Bias Incident?**
**A.**   *A bias incident or hate crime is an act motivated by prejudice against people because of their race, religion, ethnicity, age, gender, disability or sexual orientation.  Bias can involve criminal activity, or may be non-criminal in nature such as name-calling, harassment, and intimidation.*

**Q.**   **What is the Bias Hotline?**
**A.**   *The Bias Hotline is a 24-hour, 140 Language response and referral phone service operated at the Commission on Human Rights.  It operates 7:00 a.m. - 11:00 p.m. with live operators and 11:00 p.m. to 7:00 a.m. with a tape and referral suggestions.*

**Q.**   **Who should call the Bias Hotline?**
**A.**   *If you are a victim or a witness to a Bias incident, or an observer of tensions between groups in your community, call the Hotline number **NO-2-Bias** (212-662-2427).  If a crime is in progress, call 911.*

**Q.**   **What is the purpose of the Bias Hotline?**
**A.**   *The Hotline has been established to address the widespread problem of bias incidents and hostile inter-group relations.  It will provide community residents with an alternative to the police when reporting bias incidents and community tensions, particularly when they may be non-criminal in nature.  The Bias Hotline will provide immediate referrals (including legal, health and police services) for bias victims, witnesses and concerned residents.*

NYC_2_00020655



# POLICE STUDENT'S GUIDE
### Policing Impartially

### References

Brown, B., and W.R. Benedict, 2002. "Perceptions of the Police." *Policing: An International Journal of Police Strategies and Management.* Vol 25. Issue 3: 545–580.

Carlson, Daniel. P. 2002. *When Cultures Clash: The Divisive Nature of Police–Community Relations and Suggestions for Improvement.* Upper Saddle River, NJ: Prentice Hall.

Shusta, R.M., R. D.R. Levine, P.R. Harris and H. Z. Wong, 2002. *Multicultural Law Enforcement: Strategies for Peacekeeping in a Diverse Society.* Upper Saddle River, NJ: Pearson Education, Inc.

Stoutland, S.E. 2001 "The Multiple Dimensions in Resident/Police Relations in Boston. *Journal of Research in Crime and Delinquency*, Vol. 33 No.3:226–256.

Weitzer R., and S.A. Tuch. 2002. "Perceptions of Racial Profiling: Race, Class and Personal Experience." Vol 40, Issue 2. *Criminology.*

NYC_2_00020656

Exhibit B



# POLICE STUDENT'S GUIDE
## Policing Impartially

In this chapter, you will read about *Policing Impartially*. The Patrol Guide contains more extensive direction and procedures. The following mandatory Patrol Guide reading **must be** read in conjunction with this chapter. **Questions for the 1st Trimester Exam may come from this procedure**.

### MANDATORY PATROL GUIDE READING

P.G. 207-10  Bias Motivated Incidents

**WHY IS IT IMPORTANT F( TO KNOW ABOUT IMPAR**

Police officers work i͏                                        o may not share their race, ethnicity, cultural                          ͏ld.  As a result, officers sometimes find thei͏                       ͏r may not be breaking the law.  In this co͏                      and sometimes threaten the officer's ability                          ͏municate with the public.  In a jurisdiction as d                     d the conduct they may produce can be disast͏                        a police officer, need to know in order to de͏                       consistent with law and Department guidelines.

As police officers, yo͏                                ͏ally without regard to race, class, ethnicity, cul͏                      he same time, we are members of a larger so͏                       ͏inst certain groups of people are matters of his͏                      ͏patterns of prejudice that are part of U.͏                        ͏tions and institutions, including urban͏                      ͏country.  In 1805, African American "free men͏                       ͏s in the City of New Orleans.  Ironically, their ma͏                      and to enforce the Slave Code.  For generations thereafter, the conflicted and second-class status of African-Americans in policing took many forms that, today, appear equally bizarre and insulting.  As recently as the 1940s, the City of Miami maintained a separate black police force comprised of African-American officers who patrolled Miami's black neighborhoods.  The late Maurice Turner, the African-American former Chief of Police in Washington DC, often recounted what he found when he entered that department in the 1960s – he was not permitted to share patrol cars with white officers, and was not permitted to arrest white people.

NYC_2_00020657



# POLICE STUDENT'S GUIDE
### Policing Impartially

In this chapter, you will read about *Policing Impartially*. The Patrol Guide contains more extensive direction and procedures. The following mandatory Patrol Guide reading **must be** read in conjunction with this chapter. **Questions for the 1st Trimester Exam may come from this procedure.**

### MANDATORY PATROL GUIDE READING

P.G. 207-10  Bias Motivated Incidents

## WHY IS IT IMPORTANT FOR POLICE OFFICERS TO KNOW ABOUT IMPARTIAL POLICING?

Police officers work in diverse communities among people who may not share their race, ethnicity, cultural background, or way of looking at the world. As a result, officers sometimes find their beliefs challenged by people who may or may not be breaking the law. In this context, hidden biases are likely to surface and sometimes threaten the officer's ability to professionally use discretion and communicate with the public. In a jurisdiction as diverse as New York City, such biases and the conduct they may produce can be disastrous. This chapter explores what you, as a police officer, need to know in order to deal with a diverse population in a manner consistent with law and Department guidelines.

## BIAS AND POLICE HISTORY

As police officers, you are required to enforce the law impartially without regard to race, class, ethnicity, culture, gender, and sexual orientation. At the same time, we are members of a larger society in which bias and discrimination against certain groups of people are matters of historical and statistical fact. The changing patterns of prejudice that are part of U.S. history are reflected in major organizations and institutions, including urban and rural police departments across the country. In 1805, African American "free men of color" were first hired as police officers in the City of New Orleans. Ironically, their major duties were to catch runaway slaves and to enforce the Slave Code. For generations thereafter, the conflicted and second-class status of African-Americans in policing took many forms that, today, appear equally bizarre and insulting. As recently as the 1940s, the City of Miami maintained a separate black police force comprised of African-American officers who patrolled Miami's black neighborhoods. The late Maurice Turner, the African-American former Chief of Police in Washington DC, often recounted what he found when he entered that department in the 1960s – he was not permitted to share patrol cars with white officers, and was not permitted to arrest white people.

NYC_2_00020658



# POLICE STUDENT'S GUIDE
### Policing Impartially

Women were hired as police matrons in the 1920s and assigned to work in areas traditionally viewed as *feminine*, such as counseling juveniles and children, investigating missing persons and sex offenses, and performing clerical work.  Because patrol was a prerequisite for promotions, police matrons remained at the bottom of the hierarchy, regardless of their skill and accomplishments.  This began to change in the 1960s, when two New York City *Policewomen*, Felicia Spritzer and Gertrude Schimmel, sued the Department and won the right to compete with *Patrolmen* on promotional exams.  Prior to their victory, policewomen were barred from supervisory and command positions in the NYPD.

Another major change came in the 1970s with the passage of the Equal Employment Opportunity Act and a United States Supreme Court decision called *Griggs v. Duke Power Company*.  In *Griggs*, the Supreme Court ruled that publicly supported employers who used discriminatory standards to hire or promote people had to be able to show, when sued, that the standards they used were *job relevant*, and served to separate people who could perform the job from those who could not.  In other words, a police department could insist on hiring only men for patrol officers' jobs only if it could show that men did the job better than women could.  In addition, as the NYPD did at the time, a police department could insist on hiring only people who were 5'8" only if it could show that people more than 5'8" tall could be effective police officers while those less than 5'8" tall could not.  No police department could show any of these things, of course.

The NYPD became one of only a few large urban departments that integrated women without the force of a lawsuit.  They also changed its physical, strength, and agility standards to avoid discriminating against other groups.  It was at this time – in 1973 – that women were first hired by the NYPD on the same basis as men, and that the former *patrolman* and *policewoman* job titles were eliminated in favor of today's *police officer*.

Gay police officers have been members of the service from the start, but their status was a hidden secret punishable by expulsion in many departments.  While the reasons for such policies remain unclear, they seem to be based on irrational beliefs that gay men are unfit for combat and are likely to sexually harass their heterosexual partners.  In 1981, New York City Police Sergeant Charles Cochrane destroyed these myths about gay men in policing when he publicly announced he was gay and declared that he was *not* alone.

The United States has made tremendous progress in overcoming discrimination.  A generation ago, this was an agency composed almost entirely of tall men.  Most were white, and all, publicly at least, professed to be heterosexual.  If you look at the diversity of your class, you will see that much has changed since then.  This Department is now far more diverse than it has ever been.

NYC_2_00020659



# POLICE STUDENT'S GUIDE
### Policing Impartially

The Department's efforts to overcome bias within its ranks have been accompanied by our attempts to treat the public in an evenhanded and bias-free manner. This is the most diverse and culturally rich city in the United States, and we take great pride in our responsiveness to its needs and demands. In doing so, it is important that we recognize that even open minded and well-intentioned individuals are likely to carry the burden of history on their shoulders, regardless of their education, political orientation, and color of their skin. Subtle and overt forms of bias and discrimination continue to live in our consciousness, no matter who we are and what our role is in the social system.

This point can be illustrated by a quick glance at the privileges that many members of the dominant social group take for granted. White middle class males can use checks, credit cards, or cash, and can count on the fact their skin color will not work against the appearance of financial stability. Those who are surgical residents can wear scrubs in the workplace without peers and strangers assuming they are nurses or technicians. When a white man obtains major advancement in rank, position or pay inside an organization dominated by people who look like him, no one whispers that he *slept his way to the top*, gained his status because of his race, or is an *exception to the rule* among people of his race. Typically, white men are treated as *individuals*, while men of color, gays, and women often are regarded in terms of their membership in those classes. It is critical that we are aware of this tendency, and that we do everything possible to avoid it in our own behavior.

**Perception and Bias**

As New York City police officers, you will be exposed to a wide variety of people from a multitude of racial, ethnic, cultural and religious backgrounds. Those of you who are open to alternative ways of perceiving the world will welcome the experience and appreciate the diversity. Others may find the exposure unnerving. This also is a natural response, usually determined by one's background. We cannot do anything to change your background, and we cannot compel you to change how you may feel about people who seem different from yourself. However, you are required to keep from expressing your personal views in discriminatory words and actions.

This is not as easy as sounds. People are not always conscious of their biases. Without our awareness, cultural beliefs and stereotypes filter our perception and influence what we see. The result is that two rational people may interpret the same reality in very different ways. Alternatively, one person may view identical behavior differently, depending on the racial, ethnic or cultural identity of the actor. When ordinary citizens do this, it may be merely insulting; when cops do it on the street, it is both dangerous to life and damaging to our relations and our ability to do the job.

NYC_2_00020660



# POLICE STUDENT'S GUIDE
## Policing Impartially

Here is an example: you and your partner are patrolling the streets in a precinct in Brooklyn at 2 a.m. You come across a black male, armed with a gun, holding a white man against the wall. Would you see this as a robbery in progress or as a plainclothes police officer in the process of arresting a dangerous suspect? Would your perception of what was happening be different if the man with the gun was white and the man against the wall was black?

Similar perceptual conflicts may affect contacts between the police and the public, resulting in words or actions that strengthen the stereotypes on the part of both the police and the public.

Here is another example: Imagine you and your partner receive a call that a black male, carrying a shotgun in a shopping bag, is heading towards an apartment building on 23rd Street. You arrive at the location and observe a man with a shopping bag, walking up the stairs to the building on 23rd Street. You approach the man and insist on searching his bag, which turns out to contain a quart of milk, a frozen pizza, a cold six-pack, and a pound of coffee. The man gives you a dirty look and whispers "racist" and "harassment" under his breath. Annoyed and bewildered, you utter your favorite expletive to your partner, slam the car door shut, and return the man's glare as your partner drives off.

Replay the tape. Ask yourself if there is a safe way to handle the situation, at one point or another, that might break the cycle of miscommunication, resulting in a more satisfactory conclusion for both parties. Can you understand why the man might react in this way? Can you think of things you might do in this circumstance to leave him feeling better about his contact with you? What could you do to make it easier for the next cop who encounters this individual?

## Policing and Prejudice

There are many reasons why you, as a police officer, must not engage in discriminatory behavior. For one thing, it is against the 14th Amendment of the U.S. Constitution, as well as Article 1, Section 11 of the New York State Constitution which states that no person shall be denied equal protection of the law: **as a police officer, you simply may not base your treatment of people on their gender, race, ethnicity, age, sexual orientation, or membership in any class.**

## Racial Profiling

Within this context, it is important for you to understand the difference between *racial profiling* and *criminal profiling*. **Racial profiling refers to those times when a police officer decides to stop and question a person when the sole rationale for the contact is the race, ethnicity, or national origin of the person being stopped.**

NYC_2_00020661



# POLICE STUDENT'S GUIDE
**Policing Impartially**

By contrast, <u>criminal profiling</u> is a method by which officers, through careful observation of activities and environment, identify a suspicious person who, for perfectly legal and legitimate reasons, may be stopped.  You cannot stop and question or otherwise intervene in the lives of members of a group merely because you believe that members of that group are disproportionately involved in wrongful behavior.  You can stop people when you have very particular suspicions about the individuals you are stopping.  For example:

- You would be race profiling if you stopped and questioned a young black man simply because he was walking in a neighborhood in which young black men reportedly committed most crime.  But you would not be race profiling if, in the same neighborhood, you stopped and questioned a young black man who closely matched a reasonably detailed description (e.g., "male, black, early 20s, dark complexion, thin build, black pants, dark leather coat") of a person who had just committed a crime in  the neighborhood.

- You would be race profiling if you stopped and questioned a young white man in a car because someone had told you "the only white people who came into the neighborhood were there to buy drugs."  However, in the same neighborhood, you would not be race profiling if you stopped and questioned a young white man who slowly drove through the neighborhood, and made brief stops at locations that had a history of drug dealing.

Prejudiced behavior is problematic not only because it violates the law and Departmental guidelines, but also because it damages public trust and undermines the relationship between the police and the community.  Citizens feel unprotected when they believe that those who they entrust with the responsibility for their safety are capable of using racist language and acting in discriminatory ways.  The communication of biases by police officers also reinforces common stereotypes that designate *all* police as bigots. This, in turn, creates a dangerous atmosphere for the police, who cannot work safely or effectively without community support.

## UNDERSTANDING BIAS

Understanding some of the myths that surround the concept of race may help correct some misconceptions that underlie bias. **Race is a cultural rather than a biological construct.  There is no scientific evidence to support the idea that differences in personality, temperament, character, or intelligence are based on race**. In other words, the differences that we see in color generally are only skin-deep and do not translate into widespread biological differences that are unique to groups.

NYC_2_00020662



# POLICE STUDENT'S GUIDE
### Policing Impartially

The large groups that we characterize as races are too heterogeneous to lump together in a scientific way. The percentage of your genes that are reflected in external appearance, the basis by which we talk about race, seems to be in the range of .01 percent (one in 10,000). For this reason, most genetic scientists do not view race as a biological concept.

The human brain, however, is highly attuned to differences in appearance, leading people to exaggerate the significance of what has come to be called race. The false beliefs that come to be linked with race then take on a life of their own and are resistant to change. The reasons for this are complex. In any case, prejudice is attached to strong emotions that are often buried in past experience. The result is that we tend to accept new information *only* if it reinforces previous attitudes. Conflicting evidence is then dismissed as insignificant or untrue, or otherwise rationalized according to previous notions. For example, if a person has a negative belief about some group, he or she is likely to interpret any unpleasant behavior by a member of that group as "the way they all are." However, if the same prejudiced person should encounter a member of the same group whose behavior is contrary to the prejudice, he or she is likely to write it off as an exception – "Yeah, maybe that guy treated me okay, but most of them are terrible."

**The Development of Prejudice**

Understanding where biased attitudes come from may help you recognize and overcome the ones that you have come to take for granted. Most of us adopt the beliefs and values of our parents and siblings, which probably reflect those of the cultural, ethnic, class and racial group of which they are a part. In addition, traumatic events occurring in childhood may also influence how you understand and react to situations arising in the world around you. If, as a kid, you had a bad experience with a member of a group your parents or neighbors stereotyped, it is likely to have convinced you that the stereotype was correct.

Experience with peers in school further refined or changed attitudes, reinforcing or challenging biases that were learned earlier in life. Prejudice is often based on unfamiliarity. If you have never had contact with a member of a group different from your own, you are likely to have expectations about them that are based on what other people say, or how that group is portrayed in the movies and the news. Many people have never been to New York City because of what they have seen on television – a city full of crime, violence, hustlers, and self-centered egomaniacs. Consider what you would think about New York City if the only things you "knew" about it were what you "learned" on *NYPD Blue*, *Law and Order*, *Third Watch*, and *Seinfeld*. As you consider this, think also about the accuracy of what you think you know about another city you have never actually visited. If you have never been to Los Angeles, your expectations of it may be based on what you have seen in movies and on television. What makes you think they portray life in L.A. any more accurately than *NYPD Blue* portrays life in Manhattan?

NYC_2_00020663



# POLICE STUDENT'S GUIDE
### Policing Impartially

Nevertheless, people who have had the opportunity to develop friendships with groups from diverse social backgrounds may be more open than others to alternative ways of understanding humanity.  Their experience overcomes the anxiety and confusion that are linked to the unknown, and teaches the falsehood of racial and ethnic stereotypes.

Occupational experiences also inform attitudes.  When you began your career as a police officer, you entered a subculture with a unique set of values, rules, and language that define who is and who is not a member of the police family.  In time, you will be able to recognize most police officers by the way they talk, act and, to some degree, think about the world around them.  Police officers do not usually gain popularity by questioning the views of peers or challenging shared attitudes.  The result is that biases are sometimes reinforced in group context and passed on to new officers who are eager to gain the acceptance of their veteran colleagues.

Some of the attitudes that may set police apart from others are partly determined by the highly selective exposure police have to the community they serve.  Police officers tend to interact with specific categories of people, including crime victims; helpless persons, emotionally disturbed people, criminal offenders, and naïve or unwilling citizens who do not particularly want to do what you ask.  Much of the time, these people are upset, angry or otherwise in a negative state of mind.  As cops have observed, many of the people police come in contact with are emotionally upset; are in trouble; have committed crimes; have been victimized or witnessed crimes; they have had accidents; they are involved in arguments; they have lost their keys – or (even worse) their kids.  As much as officers try to help these folks when it is appropriate to do so, dealing with them is not easy.  When these individuals look different from officers – when they are from a different race or ethnic group, when they speak a different language or have a different sexual orientation – it becomes very easy to stereotype the entire group based on our experience with a few.

Further, because they are symbols of authority, police sometimes are blamed for events over which they have little control.  This can be demoralizing and can alienate the police from the public.  Because of their limited exposure, police tend to forget that most members of the community are good and upstanding people who appreciate their presence and the positive influence they have on children and young people.  Police officers then begin to view the occasional instances of praise as aberrations.

Because of these distortions, police officers must work hard to maintain a balanced perspective about the people they serve and about humanity in general.  Remember that a courteous, professional, and respectful police officer who illustrates the opposite of bias and discrimination helps create a partnership with the community and builds rapport with the people.  The result is that the citizens become our allies and, in turn, policing becomes safer and easier.  This enhances our effectiveness and increases our pride and pleasure in what we do.

NYC_2_00020664



# POLICE STUDENT'S GUIDE
### Policing Impartially

### COMMUNICATION GUIDELINES

- **Explain yourself.** Telling people why you stopped them will help dispel the myth that stops are racially motivated and prevent altercations and misunderstandings from arising. Often, officers stop individuals because they match suspect descriptions or because they are acting in ways that do, in fact, look suspicious, only to learn that there is a perfectly legitimate explanation for what they were doing. These people do not know why you stopped them and, unless you tell them why you did, they are likely to believe that your actions were arbitrary. It takes only a few seconds to do this, and it usually turns an angry person into someone who appreciates your effort -- "I'm sorry, Sir. We were looking for a person who had just committed a mugging, and you matched the description. Let me ask the radio dispatcher to repeat the description, and you can listen to it. Then you'll know why we stopped you."

- **Do not assume that only criminals fear the police.** You will encounter people from countries in which oppressed populations learned the hard way that they could not trust the police in their city. Some New Yorkers came here from places in which police or military authorities have engaged in genocidal massacres and torture of the civilian population. These people will not always be able to distinguish you from the authorities who killed their families and friends. As a result, they may avoid contacts with you in just the same way that they would have in their native countries.

- **Be wary of ethnocentrism.** *Ethnocentrism* is the false assumption that one person's cultural beliefs and practices are inherently superior to another's. Unless you are dealing with people who practice a particular cultural activity that violates the law – like polygamy, cockfighting, drug use, or animal sacrifice – this is the wrong view to take. Unless people are violating the law, we are not in the business of making judgments about their beliefs and customs.

- **Understand the effect of proper tactics on innocent people.** The public may perceive proper police tactics as alienating and scary. Remember that many of the people you stop will be released without further action because it turns out that there is a legitimate explanation for their activity and/or because there is no evidence that they were doing anything wrong. Keep in mind that what is routine for you – stopping and questioning pedestrians or motorists – is far from routine for most of the people you are stopping. Keep in mind also that, when you stop and question people, you are letting them know that (in your judgment at least) they look wrong. This is a very negative assessment, so you need to expect that the people you stop may resent it. Be aware of that, and do what you can to ease their resentment.

NYC_2_00020665



# POLICE STUDENT'S GUIDE
### Policing Impartially

- **Be sensitive to individual's language preferences.** Do not take it personally if an individual of another gender, race, ethnicity, or from another country wants to speak with your partner who shares his or her characteristics. Even individuals who speak English may prefer to speak their native language because it makes them more comfortable or they are afraid that police will be critical of their grammar and pronunciation.

- **Be wary of being intolerant.** Intolerance may exist among police officers that are members of minority groups as well as those who are not. Indeed, sometimes minority police officers may feel more intolerant towards certain behavior on the part of members of the racial, ethnic, religious, or gender group with which they identify. Such feelings may result from a concern that other officers will assume the behaviors are representative of the group as a whole. No matter who you are or where you come from, your job as a police officer is to deal with people as individuals, not as members of groups, whether those groups are your own or another.

- **Do not engage in racial profiling.** It is against the law. It violates fundamental democratic precepts and freedoms. It violates this Department's policies. It is offensive. It violates your responsibility to treat people equally. It diverts us from catching real criminals. It alienates us from people who need us, and hurts our ability to do our job. It makes things more difficult for every police officer who will subsequently encounter its victims. It breeds disrespect and distrust of every level of government. It embarrasses and humiliates people. It can get you disciplined, fired, sued, and prosecuted. You can probably think of other reasons not to do it, but the point is that you **will not** do it.

- **Avoid assumptions based on a person's minority affiliation.** Do not overlook a witness because you do not believe that a member of his or her particular group could possibly have valuable information. Do not let your feelings about a particular class of people affect your recognition of a victim.

- **Be aware of miscommunications resulting from language.** Language differences can lead to serious problems for non-English speakers. In one case, a man was arrested for agreeing that he molested his daughter. It turned out that the man had only confessed that his drinking bothered his daughter. In Spanish, the verb "molestar" means, "to bother." This is very different from the English meaning of "molesting;" what father has not *bothered* his daughter?

- **Be aware of cultural notions of space.** Notions of personal space and behavior are cultural and indicate respect. Nigerians, for example, have a proper social distance – the range at which people talk to each other – and it may be less than 15 inches. If you are like most Americans, you may think that anyone who stands this close to you while he or she talks is trying to get "*in your face.*" This is not the case, however. In many parts of the world, standing close up is a

NYC_2_00020666



# POLICE STUDENT'S GUIDE
### Policing Impartially

sign of respect. Similarly, most Americans look people in the eye when they talk to them. Natives of many Third World countries, however, show respect by averting their eyes when talking to authority figures like police. Be conscious of both of these cultural habits, and take them for what they are: signs of respect and attention, rather than disrespect and inattention.

- **Do not imitate the speech patterns of others.** Police officers should not imitate speech patterns of other racial, ethnic and class groups when communicating cross culturally. They appear disingenuous, artificial and, possibly, racist.

- **Do not use terms or words that devalue groups of people** or stereotype them. We have already told you that, when you are dealing with people, you must treat them as individuals, not as members of groups. Therefore, you should never use the derogatory terms used by ignorant people to devalue members of groups. You know what they are – they are gender, racial, and ethnic slurs and insults about people's sexual orientation. They have no place in your vocabulary. When you use them on duty, you demean people and yourself. When you use them off-duty, you build habits that are not easy to turn off at work.

- **Do not tell or tolerate ethnic, racial or sexist jokes**, even if you think they are not offensive. In this area, what one person sees as harmless, politically incorrect fun may be deeply insulting to others.

- **Avoid expressing stereotypical assumptions that spotlight** minorities or other groups, or that set them apart from others. Examples: "For a woman cop, she did a good job" (implying that this is the exception rather than the rule; or that female cops should be judged by different standards than males); "He's Latino, but he works hard"; "She's black, but she really knows her stuff"; "He's gay, but he'll leave you alone"; "He's Colombian but not involved with drugs"; "She's Italian, but I don't think her family has any mob connections"; "He's Irish, but I've never seen him drunk." No matter who you are, you can think of some negative reference to one or more of the groups of which you are a part. You can also think of how disrespected you feel when you have heard them. Keep that in mind, and do not make any such references about anybody else.

- **Do not take unfounded accusations of racial or ethnic bias personally.**

- **Be courteous.** People are offended when the police are rude and discourteous. They will become angry when they believe that law enforcement officials treated them "like criminals" because they were poor, or persons of color. For good reasons, the poor and people of color are sensitive about the way they are treated by police: do not feed into this by turning their worst fears about the police into reality.

NYC_2_00020667



# POLICE STUDENT'S GUIDE
### Policing Impartially

- **Be self-aware.** Understanding ourselves and what makes us tick will help us to shape the way we interact with others.

  - Self-awareness about one's early life experiences that helped to shape perceptions, filters, and assumptions about people.

  - Self-awareness about how one feels toward someone who is "different"

  - Management of assumptions and discomfort in dealing with people who are different (e.g., do we try to deny that differences exist and laugh differences away, or imitate "them" in order to appear comfortable?)

  - Ability to be authentic in communication with others while modifying communication style, when necessary

- **Follow these directions when dealing with people that use English as a second language.**

  - Speak slowly and enunciate clearly.

  - Face the person and speak directly even when using a translator.

  - Avoid concentrated eye contact if the other speaker is not making direct eye contact.

  - Do not use jargon, slang, idioms, or reduced forms (e.g. "gonna", "gotta", "wanna", "couldja").

  - Avoid complex verb tenses (e.g., "If I would have known, I might have been able to provide assistance.").

  - Repeat key issues and questions in different ways.

  - Avoid asking questions that can be answered by "yes" or "no". Ask questions so that will allow the answer to show understanding.

  - Use short, simple sentences; pause between sentences.

  - Use visual cues such as gestures, demonstrations, and brief written phrases.

  - Use active rather than passive verbs (e.g., "I expect your attention" [active] rather than "Your attention is expected" [passive].

  - Have materials duplicated in bilingual format.

NYC_2_00020668



# POLICE STUDENT'S GUIDE
### Policing Impartially

- o   Pause frequently and give breaks.  Monitor your speed when you speak.

- o   Use only one idea per sentence.

- o   Respect the silence and pauses that non-native English speakers need to formulate their sentences and to translate them in their minds.

- o   Check comprehension by having the other speaker repeat material or instructions, and summarize frequently.

- o   Encourage and provide positive feedback on the person's ability to communicate.

- o   Listen even more attentively than you do when communicating with a native speaker of English.

- o   Be patient.

- o   Do not speak louder.  It will not help.

**Note:** These are *general* guidelines for communicating with persons to whom English is a second language.  There may exceptions to the above guidelines when communicating with certain cultures.

NYC_2_00020669



# POLICE STUDENT'S GUIDE
## Policing Impartially

### RACIAL PROFILING AND THE LAW

**What is Racial Profiling?**

Racial profiling may be defined as the stopping of motor vehicles, the stopping and questioning of individuals and the frisking and searching of persons without individualized suspicion or legal cause to justify such conduct, but instead based solely upon a person's actual or perceived racial, ethnic or national origin status.

**Why Racial Profiling is Illegal**

The 14th Amendment to the United States Constitution, as well as Article 1, Section 11 of the New York State Constitution, contain equal protection clauses, which state that no person shall be denied equal protection of the law. This means that all persons must be treated fairly and equally by administrators of the law, including the police, in all jurisdictions of the country and New York State. Additionally, New York State has afforded increased protection to its citizens under its Civil Rights Law, Section 40-C. This law states, "No person shall be subjected to any discrimination in his civil rights, or to any harassment because of race, creed, color, national origin, sex, marital status or disability, by any other persons."

Many of the actions taken by police officers are governed by statutory regulations and requirements. When we stop a person on the street, stop a motor vehicle, or arrest an individual, there are specific standards of proof that must be met for our actions to be considered lawful. These standards are a composite of both federal and state constitutions, as well as state procedural law. Harsh consequences follow when police officers disregard these guidelines. If it is determined that a police officer has not followed the prescribed guidelines the following situations may result:

- The law enforcement action (summons, arrest, etc.) taken by the police officer is dismissed.

- The police officer may be subject to Departmental discipline or termination.

- The police officer and/or the Department may be subject to civil and/or criminal penalties (monetary fines and/or imprisonment).

The New York State Assembly has introduced legislation that specifically defines racial profiling and prohibits law enforcement agencies from engaging in its practice. Additionally, this new legislation would give individuals and the State Attorney General the right to seek damages from a law enforcement agency, including particular employees and their supervisors.

NYC_2_00020670



# POLICE STUDENT'S GUIDE
### Policing Impartially

**NYPD Policy Regarding Racial Profiling**

The New York City Police Department has always had a strict prohibition against racial profiling because of its inherent unlawful nature and societal effect.  Individual citizens can become subjects of Police Department action based only upon actual, perceived, or suspected violations of law.  Can race or ethnicity *ever* be a factor in determining when a police officer takes action?  The answer is yes.  However, an officer's decision to encounter a citizen should be based upon objective, credible facts, and not on a whim or personal bias.  Again, you can stop citizens because of *what they are doing* or because they match descriptions of people who have done something wrong – but you cannot stop people because of *what they are.*

### BIAS INCIDENTS
### (Patrol Guide 207-10)

**Hate Crimes**

Prejudice can distort our interpretations of external reality.  Prejudice is often unconscious and linked to powerful emotions.  Membership in peer cultures that share biased attitudes will reinforce and help excuse or justify prejudiced acts.

Prejudices are most likely to be acted out during hard economic times or periods of great social change.  When jobs become hard to find, economic competition grows among groups and hidden prejudices come to the surface.  When formerly powerless groups start to gain economic and political power competition for housing begins; neighborhoods *change*, and prejudices are acted out.  Conversely, when formerly poor and working class neighborhoods become stylish, *gentrified*, and expensive, the class prejudices of people who can no longer afford to live in them may turn nasty.  When this happens, bias incidents – including hate crimes – may occur.

**Handling Bias Incidents**

The best way to deal with bias incidents and hate crimes is to prevent them.  As a Department, we try to do this every day by building relationships with the communities we police, by learning as much as possible about them and their relationships with other groups, and by trying to anticipate and mediate differences among them.

Created in 1980, the Department's Hate Crime Task Force is specifically charged to assist patrol units in these tasks.  It monitors and investigates any offense or unlawful act that is motivated in whole or in part by the identification of a person or group or location with a particular race, religion, ethnicity, gender, age, disability, or sexual orientation (including gay, lesbian, bi-sexual and transgender), as determined by the Commanding Officer, Hate Crime Task Force.

NYC_2_00020671

 # POLICE STUDENT'S GUIDE
### Policing Impartially

The definition of a *disability*, for the purposes of this procedure, is when a person possesses or is perceived to possess any of the following: a physical, medical, mental or psychological impairment, or a history or record of such impairment. This includes individuals who have sustained any injury or damage to any system of the body including muscular, sensory, respiratory, speech, heart, reproductive, digestive, blood, immunity (i.e., AIDS), and skin. Also included are recovering alcoholics, drug or other substance abusers who currently are not using alcohol or drugs.

As the first officer on the scene of a disturbance, you must be aware of the possibility of a bias incident, in order to provide a proper referral and maintain order in the community. An officer dispatched to the scene of an incident, which may be a bias incident should:

- Evaluate the condition and take police action appropriate for the stabilization of the area, if necessary

- Determine if possibility exists that offense or unlawful act is motivated by bias or prejudice according to the definition of "Bias Incident"  (PG 207-10)

- Request *patrol supervisor* to respond if bias incident is suspected

**Types of Bias Incidents:**

- Harassment.

- Property Damage.

- Physical Violence.

NYC_2_00020672



# POLICE STUDENT'S GUIDE
## Policing Impartially

### HOMEWORK - BIAS INCIDENTS

Which of the following assignments would constitute a suspected bias incident?
Explain your answer in each case.

1.    Two officers respond to a Jewish cemetery on a complaint of burglary.
      At the scene, the head grounds keeper tells the officers that the copper gutters
      were stolen from the main building sometime during the night.

2.    An officer patrolling the "F" train observes two teenagers spray painting
      *swastikas* on advertising posters near the main entrance at the Utica Avenue
      Station in the heavily populated Hasidic area of Crown Heights of Brooklyn.

3.    Upon entering the main lobby of a Housing building, an officer observes two male
      Hispanics clubbing a male black, with a baseball bat, while yelling racial
      obscenities at him.  The officer knows all three youths, since they play on the
      same baseball team in the PAL, and they are always hanging out together.

4.    A male who seems very upset approaches an officer patrolling her foot post.  He
      asks her if he can do anything about the threatening phone calls and letters he is
      receiving concerning his sexual orientation.

5.    Two officers respond in their RMP to a motor vehicle accident at a parking
      garage.  Upon their arrival at the scene, they see the two apparent operators, a
      man and a woman, yelling obscenities at each other.

6.    An officer walking his post observes a male attempting to scrub some painted
      words and designs off a car.  Upon initial inquiry, the man tells the officer that
      since he moved into the neighborhood, unidentified people have been damaging
      his car and home, by painting white supremacist designs and slogans on his
      property.  The man tells the officer he does not understand it, since he is not
      black, and emigrated to the U.S. from India.

7.    An officer hears a 10-85 for a backup unit coming over her portable radio.  She
      runs to the scene, since the location given is only a couple of blocks away.
      Arriving at the scene, she sees two of her fellow officers with three men in
      custody, and under arrest.  The men were caught attempting to burn down a gay
      men's community center.  The officer notices that a large crowd of people is
      gathering, and they are yelling anti-police and anti-gay slogans.

8.    Two officers are on meal at a diner in their patrol car sector, and overhear an
      argument between two customers and a waiter.  The waiter suddenly screams,
      "You Jews are all the same!"  She then throws a tray of food at one of the
      customers.

NYC_2_00020673



# POLICE STUDENT'S GUIDE
### Policing Impartially

9.    Two officers respond to a robbery in progress at a grocery store.  Arriving after the suspect has fled, they find that the complainant, a black man, who is obviously shaken.  The complainant explains that the suspect, a male white, teenager, said "Give me all your money," using several ethnic slurs.  The suspect then fired a shot from a 32-caliber revolver into the ceiling.

10.   An officer takes a report of criminal mischief from Imam Muhammad, for the vandalism to the doors and widows of his mosque.

NYC_2_00020674



# POLICE STUDENT'S GUIDE
### Policing Impartially

### BIAS HOTLINE FACT SHEET

**Q.   What is a Bias Incident?**
A.    *A bias incident or hate crime is an act motivated by prejudice against people because of their race, religion, ethnicity, age, gender, disability or sexual orientation.  Bias can involve criminal activity, or may be non-criminal in nature such as name-calling, harassment, and intimidation.*

**Q.   What is the Bias Hotline?**
A.    *The Bias Hotline is a 24-hour, 140 Language response and referral phone service operated at the Commission on Human Rights.  It operates 7:00 a.m. - 11:00 p.m. with live operators and 11:00 p.m. to 7:00 a.m. with a tape and referral suggestions.*

**Q.   Who should call the Bias Hotline?**
A.    *If you are a victim or a witness to a Bias incident, or an observer of tensions between groups in your community, call the Hotline number (212-306-7450).  If a crime is in progress, call 911.*

**Q.   What is the purpose of the Bias Hotline?**
A.    *The Hotline has been established to address the widespread problem of bias incidents and hostile inter-group relations.  It will provide community residents with an alternative to the police when reporting bias incidents and community tensions, particularly when they may be non-criminal in nature.  The Bias Hotline will provide immediate referrals (including legal, health and police services) for bias victims, witnesses and concerned residents.*

NYC_2_00020675



# POLICE STUDENT'S GUIDE
### Policing Impartially

### References

Brown, B., and W.R. Benedict, 2002. "Perceptions of the Police." *Policing: An International Journal of Police Strategies and Management.* Vol 25. Issue 3: 545–580.

Carlson, Daniel. P. 2002. *When Cultures Clash: The Divisive Nature of Police–Community Relations and Suggestions for Improvement.* Upper Saddle River, NJ: Prentice Hall.

Shusta, R.M., R. D.R. Levine, P.R. Harris and H. Z. Wong, 2002. *Multicultural Law Enforcement: Strategies for Peacekeeping in a Diverse Society.* Upper Saddle River, NJ: Pearson Education, Inc.

Stoutland, S.E. 2001 "The Multiple Dimensions in Resident/Police Relations in Boston. *Journal of Research in Crime and Delinquency,* Vol. 33 No.3: 226–256.

Weitzer R., and S.A. Tuch. 2002. "Perceptions of Racial Profiling: Race, Class and Personal Experience." Vol 40, Issue 2. *Criminology.*

NYC_2_00020676