USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/31/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AMY HAUS, et al.,

:

              Plaintiffs,     :

      -against-       :

CITY OF NEW YORK, et al.,     :

              Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>REPORT & RECOMMENDATION</u>

03 Civ. 4915 (RWS)(MHD)

TO THE HONORABLE ROBERT W. SWEET, U.S.D.J.:

      Seventeen plaintiffs commenced this class-action lawsuit under 42 U.S.C. § 1983 to seek relief for what they contend were numerous violations of their constitutional rights by the City of New York and by at least twenty-two officials and employees of the New York City Police Department during a massive anti-war protest on February 15, 2003 in mid-Manhattan. They ask for declaratory, injunctive and monetary relief based on asserted violations of their First, Fourth and Fourteenth Amendments as well the commission of state common-law torts and violations of the New York State Constitution.

      At the conclusion of discovery, defendants and the fifteen

1

remaining plaintiffs[1] have each moved for partial summary judgment. For the reasons that follow, we recommend that defendants' motion be granted in part and denied in part and that plaintiffs' motion be denied. Plaintiffs have also moved for class certification, an application that we recommend be denied.

## I. The Nature of Plaintiffs' Claims

This case is an outgrowth of the City's efforts to manage crowd control at a huge protest rally called to express public opposition to the impending plans of the Bush administration to commence a war against the government of Iraq. In anticipation of the scheduled event, City officials declined to permit a protest march, citing concerns for public safety and security, and instead authorized a stationary demonstration, to take place on First Avenue at 51st Street, in the vicinity of the United Nations, and extending northward on that avenue. Ultimately, crowds that may have numbered in the hundreds of thousands assembled or attempted to assemble at that venue, but significant numbers of people were

---

[1] Plaintiffs Scott Fitzgerald and Alain DeHalleux did not appear for their depositions and are apparently no longer pursuing their claims in this case. Plaintiffs' counsel has agreed to voluntarily dismiss their claims with prejudice. (Decl. of Dara L. Weiss, Esq., Aug. 2, 2007, ("Weiss Decl.") at ¶¶ 20-22; Defs.' Mem. of Law at 1 n.3).

unable to reach First Avenue either because of the mass of participants already there or, allegedly, because of actions taken by the police that, whether intended or not, limited access to the site of the rally.

This lawsuit was commenced by a group of plaintiffs who alleged that their rights -- and those of numerous others -- had been violated in a variety of ways because of either policies or practices adopted by the Police Department to control the throngs who were seeking to appear at the site of the planned rally or actions taken that day by individual police personnel. Most of the plaintiffs complain that they were denied their First Amendment rights of expression and association (or assembly) by virtue of the police physically preventing them from reaching First Avenue. The particular tactics of which they principally complain include the erection of metal barricades, the blockage of side streets leading to First Avenue and the use of various forms of allegedly excessive physical force, including in some instances the unreasonable use of horses to obstruct their path. (2d Am. Compl. at ¶¶ 53-55). Most also complain that they were arrested without probable cause, in violation of their Fourth Amendment rights, for the sole purpose of clearing the streets, and that after long delays under uncomfortable conditions they were given summonses signed by police

3

personnel who had no knowledge of their encounter with the arresting officers and had no factual basis to sign the summonses. (<u>Id.</u> at ¶¶ 56(c)).

Apart from these allegations and claims, most of the plaintiffs assert that, in violation of the Fourth and Fourteenth Amendments, they were subjected to excessive and unnecessary force in the process of being arrested and detained, or that they were manhandled and otherwise assaulted by police officers or police horses even when they were not arrested, presumably in violation of due-process requirements. (<u>Id.</u> at ¶¶ 56(a)). A few of these plaintiffs allege that they suffered significant physical injuries or psychological trauma from these contacts with the police, and some also complain of pain inflicted on them by virtue of their being tightly rear-cuffed for extended periods of time. (<u>Id.</u> at ¶¶ 57-61, 64, 68-69).

Most of the arrested plaintiffs also assert that, after being arrested, they were detained for extended -- and, by implication, unnecessarily long -- periods of time under inappropriately harsh conditions. These conditions included prolonged exposure to the cold, denial of access to a toilet, denial of food and water, and refusals to unlock or loosen painfully tight handcuffs. (<u>Id.</u> at ¶¶

58-67, 69-71, 73).

Based on these allegations, plaintiffs assert constitutional-tort claims, and a host of state-law claims as well, all of which are alleged in consolidated fashion under the heading of four causes of action. The first invokes section 1983 as an umbrella for the federal claims, including denial of plaintiffs' rights of expression and association, false arrest, malicious prosecution, unreasonable detention and excessive force. (Id. at ¶¶ 74-75). The second asserts a Monell claim that the City is liable, based on all of the federal claims asserted against the individual defendants. (Id. at ¶¶ at 76-78). The third cause of action encompasses a host of common-law torts, including assault and battery; trespass; false imprisonment; negligence; intentional infliction of emotional distress; negligent hiring, training, supervision and retention; and conspiracy, as well as claims arising under the New York State Constitution. (Id. at ¶¶ at 79-81). The last cause of action invokes respondeat superior to hold the City liable for the state-law torts of police personnel. (Id. at ¶¶ 82-83).

In the complaint plaintiffs seek certification of a class consisting of all "persons whose rights of free expression, protest, assembly and association were denied on February 15, 2003

and in the future are likely to be denied, in violation of the
First and Fourteenth Amendments . . . as a result of the policies
and practices of the defendants which denied them access to the
site of the protest and/or meaningful and unencumbered
participation at the site of the protest against the war in Iraq."
(Id. at ¶ 39). The pleading proposes three sub-classes, consisting
of (1) all those "who were victims of the unreasonable and
excessive use of force" allegedly employed by defendants in
violation of the First, Fourth and Fourteenth Amendments, (2) all
those arrested without probable cause or other legal justification
in "mid Manhattan for merely attempting to engage in a lawfully
protected, peaceful anti-war demonstration and who in many but not
all instances were then criminally charged based upon sworn
statements by NYPD officers . . . who had no knowledge of the
circumstances of the arrests," and (3) all those "subjected to
unreasonable and excessive detentions and conditions of detention
. . .", including extended unduly tight handcuffing, refusal to
provide food and water, failure to provide toilet facilities, and
exposure to extreme cold. (Id. at ¶¶ 39(a)-(c)).[2]

_____

[2] As will be seen, plaintiffs have somewhat revamped their
class-certification request in their pending motion, and now seek
certification of four separate classes. (See Pls.' Class Mem. of
Law at 1; pp. 248, infra.).

6

## II.  The Current Summary-Judgment Motions

### A.  Defendants' Summary-Judgment Motion

Defendants seek summary judgment on most, though not all, of plaintiffs' claims. They advance a plethora of arguments to achieve this result.[3]

Defendants first address the conditions-of-detention claims. They argue that the proof fails to sustain a claim of municipal liability for the challenged conditions, that the evidence fails to demonstrate that plaintiffs' rights were violated by virtue of those conditions, that plaintiffs cannot demonstrate that any of the named individual defendants was responsible for the deprivation of their rights as a result of those conditions, and, finally, that the individual defendants are entitled to qualified immunity for any such hypothesized violations. (Defs.' Mem. of Law at 4-46; Defs.' Reply Mem. of Law at 5-12).

Defendants then turn to the First Amendment claims. They first argue that plaintiffs cannot demonstrate municipal liability for

---

[3] We cite the three briefs on defendants' summary-judgment motion as follows: "Defs.' Mem. of Law at __", "Pls.' Mem. in Opp'n at __," and "Defs.' Reply Mem. of Law at __".

7

any such violations. (Defs.' Mem. of Law at 48-52; Defs.' Reply Mem. of Law at 16-23). Next they assert that plaintiffs cannot establish that the crowd-control methods employed by the New York City Police Department violated their First Amendment rights. (Defs.' Mem. of Law at 52-58; Defs.' Reply Mem. of Law at 23-31). They then contend that the evidence regarding individual police actions taken against some of the plaintiffs cannot be shown to have transgressed those plaintiffs' First Amendment rights. (Defs.' Mem. of Law at 58-63). Finally, they argue that plaintiffs cannot demonstrate that any of the individual defendants violated their First Amendment rights and that in any event those defendants who participated in the challenged police actions are entitled to qualified immunity. (Defs.' Mem. of Law at 63-65).

Defendants next target the excessive-force claims. They assert that plaintiffs cannot show a basis for municipal liability, that the excessive-force claims of some of the plaintiffs fail as a matter of law, that plaintiffs do not plead and cannot demonstrate the liability of any of the individual defendants, and that the defendants who did interact with the plaintiffs are entitled to qualified immunity. (Defs.' Mem. of Law at 66-83).

As a fourth category of challenges to plaintiffs' case,

8

defendants focus on the false-arrest claims. Again, they first argue against municipal liability. (Defs.' Mem. of Law at 83-89). They then assert that some of the arrests were buttressed by probable cause as a matter of law and that some cannot be challenged because the arrests led to adjournments in contemplation of dismissal. (Defs.' Mem. of Law at 89-112). They then argue that plaintiffs fail to plead, or to offer sufficient evidence to prove, these claims against some of the individual defendants and that the individual defendants actually involved in the incidents are entitled to qualified immunity. (Defs.' Mem. of Law at 112-22).

Defendants next attack the malicious-prosecution claims. They argue that plaintiffs cannot prove these claims because the individually sued defendants did not initiate the criminal proceedings. (Defs.' Mem. of Law at 124). Defendants further argue that some of the plaintiffs cannot prevail because the criminal proceedings against them did not end in their favor, that liability is precluded on all of plaintiffs' malicious-prosecution claims because the triggering arrests were supported by probable cause, and that the claims fail because the individual defendants were not animated by malice. (Defs.' Mem. of Law at 125-26). Finally, they assert that these defendants are entitled to qualified immunity. (Defs.' Mem. of Law at 127).

9

Defendants then turn to plaintiffs' state-law claims. They assert that some of these claims fail as a matter of law because plaintiffs did not exhaust required administrative remedies, that certain plaintiffs' claims should be dismissed because they fail to plead cognizable claims, and that liability on the state-law claims is precluded because defendants are protected "by good faith snd governmental immunities". (Defs.' Mem. of Law at 127-37; Defs.' Reply Mem. of Law at 84-89). Finally, defendants argue that, as a matter of law, plaintiffs are not entitled to either injunctive or declaratory relief. (Defs.' Mem. of Law at 137-45).

## B. Plaintiffs' Summary-Judgment Motion

Plaintiffs oppose most of defendants' motion, and they also move for partial summary judgment, although their motion is somewhat more circumscribed than defendants' application.[4] They seek summary judgment on liability against the City and the individual defendants on their First Amendment and equivalent state-law claims premised on the implementation of the policing plan for the demonstration. (See Pls.' R.56 Mem. of Law at 10-46). They seek similar relief against certain individual defendants for

---

[4] We cite the three briefs addressing plaintiffs' Rule 56 motion as follows: "Pls.' R.56 Mem. of Law at __", "Defs.' R.56 Mem. in Opp'n at __", and "Pls.' R.56 Reply Mem. of Law at __".

10

the use of excessive force. (Pls.' R.56 Mem. of Law at 47-53).
Finally, they ask for summary judgment for some of the plaintiffs
on their false-arrest claims. (Pls.' R.56 Mem. of Law at 53-59).

C. The Class-Certification Motion

Plaintiffs have moved for class certification, which they seek
under both Civil Rules 23(b)(2) and (3).[5] They are asking for
certification of four classes, representing, respectively, (1)
individuals whose First Amendment rights were violated on February
15, 2003 or are likely to be violated in the future, (2) persons
subjected to excessive force on that date or likely to be so
victimized in the future, (3) members of the public who were
arrested in connection with the same demonstration without probable
cause or other legal justification, or are likely to face such
arrests in the future, and (4) persons who were arrested on that
date and "subjected to unlawful conditions of confinement," or who
are likely to be so treated in the future. (Pls.' Class Mem. of Law
at 1).

---

[5] The pertinent briefing of the class-certification motion is
cited as follows: "Pls.' Class Mem. of Law at __", "Defs.' Class
Mem. in Opp'n at __", and "Pls.' Class Reply Mem. of Law at __".

<u>ANALYSIS</u>

I. <u>The Summary-Judgment Motions</u>

Before assessing the parties' respective summary-judgment motions, we briefly summarize the standards applicable to such Rule 56 applications. We then turn to an evaluation of the parties' arguments, organizing our discussion on a claim-by-claim basis, starting with defendants' motion.

A. <u>Summary Judgment Standards</u>

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); <u>see</u>, <u>e.g.</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Feingold v. New York</u>, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Shade v. Hous. Auth. of the City of New Haven</u>, 251 F.3d 307, 314 (2d Cir. 2001) (quoting

12

Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. Pro. 56(c); see, e.g., Celotex, 477 U.S. at 323; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet its initial burden, however, the motion will fail even if

13

the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970); Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003). If the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact on any such challenged element of its claim. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 323-24; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party may not rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. Pro. 56(e); see, also, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti, 374 F.3d 56, 59-60 (2d Cir. 2004), nor may he rely on his pleadings or on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann,

21 F.3d 522, 526 (2d Cir. 1994).

If both sides move for summary judgment, the court must separately assess the adequacy of each motion. Thus, if neither movant satisfies his Rule 56 burden, the court must deny both motions. E.g., <u>Marvel Entm't, Inc. v. Kellytoy (USA), Inc.</u>, 769 F. Supp.2d 520, 524 (S.D.N.Y. 2011) (citing <u>Heublein, Inc. v. United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993)).

B. <u>Defendants' Motion: The First Amendment Claims</u>

At the heart of plaintiffs' First Amendment claims is a challenge to perceived inadequacies or improprieties in the Police Department's plan for crowd control, and its implementation of that plan, during the February 15 demonstration. In substance, plaintiffs contend that they and others were deprived of the ability to participate in the demonstration through the utilization of rectangular pens along the First Avenue site of the demonstration, the blocking off of many side streets -- particularly in the Fifties -- leading to First Avenue (notably blocks east of Second or Third Avenues), and the Department's failure to inform the public (or even, apparently, some police personnel manning the barriers) as to the details of how would-be

15

demonstrators could access First Avenue. Plaintiffs also appear to contend that some officers engaged in conduct of a punitive or obstructive nature designed to punish putative demonstrators for their intention to participate in the event or to prevent them from doing so. They also argue in their summary-judgment motion papers that the First Amendment rights of some of the plaintiffs were violated by the use of unlawful arrests and the exercise of excessive force. This argument seems to rest on the notion that the arrests and use of excessive force -- even if not designed either to prevent people from reaching the site of the demonstration or to punish them for seeking to participate in the protest -- had the effect of preventing the affected plaintiffs from attending the demonstration. Based on these various theories, plaintiffs press claims against the City as well as against the individual defendants.

In opposition, defendants first press the argument that liability may not be imposed on the City because the Department's crowd-control plans and the actions taken by police personnel (including supervisors and patrol officers) to implement these plans were not pursuant to a municipal policy, custom or practice. Otherwise stated, defendants contend that the plans were designed and implemented by officials who were not municipal decision-makers

16

within the meaning of case law that has defined the full reach of the Supreme Court's decision in <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658 (1978), and that the Department did not approve or acquiesce in any police conduct that was designed to, or did, violate the plaintiffs' First Amendment rights. They then argue that liability may not be imposed on any individual defendant for alleged First Amendment violations because the evidence would not permit a trier of fact to find that any of the plaintiffs' First Amendment rights had been violated. Next they argue that some of the plaintiffs' claims fail because they do not demonstrate that any of the named defendants bore personal responsibility for the alleged misconduct. Finally, defendants invoke a qualified-immunity defense on behalf of all of the individual defendants who may have been involved in conduct cited by plaintiffs.

1. <u>The Pertinent Record</u>

We start by summarizing some of the pertinent evidence regarding the evolution of police planning for the demonstration. In this regard, we note that many of the basic facts may be found in testimony at a 2004 preliminary-injunction hearing in the case

17

of <u>Stauber v. City of New York</u>, 03 Civ. 9162 (S.D.N.Y.),[6] and in the findings made by Judge Sweet in the wake of that hearing, <u>see</u> <u>Stauber v. City of New York</u>, 2004 WL 1593870, at *1-6 (S.D.N.Y. July 19, 2004), as well as in findings made by Judge Jones in connection with a preliminary-injunction motion filed ten days before the February 15, 2003 event. <u>See</u> <u>United for Peace & Justice</u> <u>v. City of New York</u> ("<u>UPJ</u>"), 243 F. Supp.2d 19, 20-21 (S.D.N.Y. 2003), <u>aff'd per curiam</u>, 323 F.3d 175 (2d Cir. 2003). Additional detail is provided by the deposition testimony of senior Police Department officials involved in the preparation and implementation of the Department's plans. (<u>E.g.</u>, Defs.' Exs. X, Z, CC, DD; <u>see</u> <u>also</u> <u>Stauber</u> Tr. at 332 (admitting into evidence designated portions of the deposition of Capt. Christopher Acerbo[7] )).

The demonstration was sponsored by an organization known as United for Peace and Justice ("UPJ"), a coalition of national

---

[6] The transcript of this hearing is attached as Exhibit Y to defendants' memorandum of law, and is cited as "<u>Stauber</u> Tr. at __".

[7] Excerpts of Captain Acerbo's deposition are attached as Exhibit 50 to the Affirmation of Vera M. Scanlon, Esq., in support of plaintiffs' motion for class certification ("Scanlon Aff."). Captain Acerbo's full deposition is attached as Exhibit 2 to the Declaration of Jonathan C. Moore, Esq., in support of Pls.' Opp'n Mem. of Law. Unless otherwise noted, citations to "Pls.' Ex. __" are citations to materials submitted as exhibits to the Scanlon Aff.

18

organizations that opposed the impending invasion of Iraq by the United States and other governments. UPJ, 243 F.Supp.2d at 20. UPJ applied on January 24, 2003 for a permit from the Police Department for a February 15, 2003 protest march that it anticipated would involve at least 50,000 to 100,000 demonstrators. Id.; see also Defs.' Ex. PP. Under the group's proposal, the march would have started at Dag Hammerskjold Plaza on First Avenue, just north of the United Nations, with any overflow crowds to gather on Second Avenue, and would have proceeded south past the United States Mission and the United Nations, then west on 42nd Street to Seventh Avenue, from where the marchers would have headed north to the Sheep Meadow in Central Park for a rally. UPJ, 243 F. Supp.2d at 20.

After some negotiation, the Police Department denied the requested permit on February 4, 2003, citing security and crowd-control problems in policing a march of that size or even larger (the UPJ having indicated that the crowd might well be significantly larger than 100,000), and it offered instead a stationary demonstration on First Avenue starting at the Dag Hammerskjold Plaza (which occupies that avenue from 47th to 49th Streets) and stretching as far north on First Avenue as needed to accommodate the number of demonstrators who appeared. Id. at 20-21.

Although UPJ challenged the denial of a march permit in this court by way of a preliminary-injunction motion, the District Court and the Second Circuit upheld the decision of the Police Department and found that the stationary demonstration, which would be held on and in front of a stage at 51st Street, within sight of the United Nations, was an adequate alternative for First Amendment purposes. See id. at 23-31; UPJ, 323 F.3d at 176-78.

The Second Circuit's decision was issued on February 12, 2003, only three days before the demonstration. In the few days leading up to the planned event, the Police Department prepared a set of plans for crowd control for what was anticipated to be potentially a very large turnout, an assumption that was more than amply fulfilled by the appearance of what UPJ itself, as well as others, estimated was a crowd in the hundreds of thousands. (Defs.' Ex. X at 29-30; M. Esposito Dep. at 11-12,[8] Gannon Dep. at 191;[9] see also

---

[8] Department Chief Joseph Esposito was deposed for this case on December 27th and 28th, 2005. The transcripts of the two days of his deposition are cited as, respectively, "Defs.' Ex. X at __" and "Defs.' Ex. Z at __." He was also deposed in the Stauber case on April 23, 2004, and this deposition is cited as "Defs.' Ex. UU at __." The parties also cite to the deposition of Michael Esposito, who was the Chief of Patrol Borough Manhattan South on February 15, 2003. His deposition is attached as Exhibit CC to defendants' motion for summary judgment, and is cited as "M. Esposito Dep. at __."

[9] As with most of the depositions cited herein, the deposition of Lieutenant Dennis Gannon (Defs.' Ex. DD) is

20

<u>Stauber</u> Tr. at 313, 324). To ensure some level of access by the police and their vehicles to First Avenue and to avoid a potentially dangerous crush of demonstrators in a limited space, the Department decided to use metal barriers to create a series of rectangular pens along First Avenue north of the stage, which was at 51st Street. (<u>Stauber</u> Tr. at 160, 484-85; <u>see also</u> Defs.' Ex. X at 118-22, M. Esposito Dep. at 88-97). As planned, the pens were to start at 51st Street on First Avenue and would be set up in a series stretching north along the Avenue as far as necessary to provide access for all who wanted to participate in the demonstration. (<u>Stauber</u> Tr. at 256-58; Defs.' Ex. X at 28-32; Gannon Dep. at 158-59). To control the flow of people, the Department planned to close off side streets leading to First Avenue in those areas where the pens were full, and to direct demonstrators who were present on the more westerly avenues, particularly Second Avenue, to proceed north on those avenues before turning east to enter First Avenue. (<u>Stauber</u> Tr. at 256-58; Defs.' Ex. X at 32-34; M. Esposito Dep. at 122-24; Gannon Dep. at 163-65). The participants would then be permitted to filter south through the series of pens until they filled the southern-most available pens. (<u>Stauber</u> Tr. at 258; Gannon Dep. at 163-65). It was

---

included in its entirety as a single exhibit to either defendants' or plaintiffs' papers. Where this is the case, the deposition will be cited without further explanation.

estimated that each pen could contain up to 3,000 people, although some estimates suggest that the number might approach 4,000 or even 5,000. (Defs.' Ex. X at 27-28, M. Esposito Dep. at 15-16); <u>Stauber</u>, 2004 WL 1593870, at *9. The Police Department at one point estimated that the pens on First Avenue, if filled up to 75th Street, could accommodate up to 100,000 people. (Scanlon Aff. at ¶ 128).

The Police Department provided an oral summary of these plans to UPJ a few days before the demonstration, but neither provided a written summary of their plans to UPJ nor posted the details on the Police Department website. <u>Stauber</u>, 2004 WL 1593870, at *7; <u>Stauber</u> Tr. at 256, 258. UPJ also failed to post the details of the plan on its own website. <u>Stauber</u> Tr. at 298-301. It appears that the Police Department did not provide written instructions to the large numbers of officers and other police personnel who were assigned to police the demonstration, and that the written information provided to the supervisory police personnel did not contain specifics on how the demonstrators were to access the demonstration site. <u>Stauber</u> Tr. at 256; Defs.' Ex. X at 104-11.

In the event, it appears that at least 80,000 to 100,000 people, and perhaps as many as 500,000, showed up to take part in

the demonstration. (Gannon Dep. at 139-41, 190-91; Defs.' Ex. QQ at 1).[10] Large numbers ended up, as planned, on First Avenue, filling the pens for a considerable distance up the Avenue, perhaps as far north as 82nd Street. (Defs.' Ex. W, NN at 1, QQ at 1).[11] Each pen apparently extended almost from sidewalk to sidewalk, thus covering almost all of the roadway of First Avenue and most of the distance between the north and south ends of each block. (E.g., Stauber Tr. at 481-82; Cavanna Dep. at 128; Douglas Mar. Dep. at 78; Defs.' Ex. X at 27).

Many other people apparently remained on Second and Third Avenues in the Fifties after being confronted with barriers on adjacent side streets, precluding direct access to First Avenue.

---

[10] The NYPD's official after-action report states that 100,000 people had attended (Defs.' Ex. QQ at 1), but this estimate apparently includes only those demonstrators who reached First Avenue. (Gannon Dep. at 139-41). One of the plaintiffs, Donna Lamb, reported that 700,000 people had participated in the demonstration, presumably including those who did not reach First Avenue. (Defs.' Ex. NN, at 1).

[11] One of the plaintiffs, Delaine Douglas, testified that she accessed First Avenue at 72nd Street and entered a pen between 71st and 72nd Streets. (Ms. Douglas's deposition took place over two days, March 27, 2005, and April 6, 2005. Since the transcript of each day begins with page 1, the transcript is cited as "Douglas Mar. Dep. at __" and "Douglas Apr. Dep. at __".) She and the other demonstrators with her in that pen were subsequently allowed to move south one block at a time, and she ended up in a pen between 60th and 59th Streets. (Douglas Mar. Dep. at 74-75, 78-80, 92-93; Douglas Apr. Dep. at 25).

Some of these people apparently were not aware that First Avenue was filled, as per the Department's plans, at the side-street levels where they were seeking to proceed directly to First Avenue. It also appears that some did not know that to access First Avenue they needed to proceed north some distance and then east to First Avenue. (<u>Stauber</u> Tr. at 50-51, 53, 64-65, 163-164; Bryant Dep. at 21-22; Dodde Dep. at 49-51, 55-56). There is also evidence that some police officers on the scene were not fully aware of that fact or had not been clearly instructed to let the crowds on Second Avenue know how to get to First Avenue. (<u>Stauber</u> Tr. at 214, 262-263; <u>see also</u> Blair Dep. at 26; Dodde Dep. at 49-51, 54-56; Defs.' Ex. X at 33-41, 150-51). Other evidence, however, suggests that the pens on First Avenue filled up so quickly that, even early in the day, it became impossible to accurately communicate how far north the crowd would have to travel to reach First Avenue, since by the time the crowd reached the side street that they had been previously informed was open, that street would inevitably be closed. (M. Esposito Dep. at 123-24, 132-33; <u>see</u> Gannon Dep. at 204-05, Cavanna Dep. at 121-22, 125-26).

Other complications, possibly unanticipated by the Department, were encountered by some demonstrators. Thus some individuals -- including one plaintiff -- who reached First Avenue entered pens

24

along with other members of the public, and, while waiting for the demonstration program to begin or finish, found a need to exit the pens, either to go for refreshments or to leave because of illness or for other reasons, and were either denied a means of exiting the pen or were told by a nearby police officer that if they left they would not be permitted to return. (See Stauber Tr. at 51-52, 119-122, 125-126, 212-213, 368-370; Douglas Mar. Dep. at 71-72).[12]

Other plaintiffs recount instances in which they encountered a crush of people on Second or Third Avenues and reported that police officers on the scene denied them either the ability to head to First Avenue or any information as to how to get there. (Stauber Tr. at 64-65, 163-164, 210-211; Blair Dep. at 26; Dodde Dep. at 49-51, 55-56). Still others mentioned individual instances in which police officers ordered them to disperse but offered no means to do so since they were trapped in crowds who were also unable to move because of a crush of people. (Stevens Dep. at 18-22; see also Connor Dep. at 62-65). Several plaintiffs also recounted that, while they were trapped in large and immobilized crowds, the police attempted to push the crowds onto already filled sidewalks, either

---

[12] The only plaintiff who reported such a problem was Delaine Douglas. At least one plaintiff reached First Avenue and participated in the rally, encountering a problem only after leaving the site of the demonstration. (See, e.g., Cavanna Dep. at 127-28, 152-53).

by physically pressing the front rows of people in the roadway or by aggressive maneuvering of police horses. (Stauber Tr. at 79-80, 164-65, 263; Dodde Dep. at 56-61; Connor Dep. at 58-87). Finally, one plaintiff testified that, while trapped in such a crowd, she fell or was pushed to the ground and was then seriously injured when a mounted police officer's horse stepped on her leg (Haus Dep. at 55-59, 72-86, 88-91), two others testified that they too had been trapped in a crowd and then bumped into or stepped on by a horse, and suffered some relatively minor injury in the process. (Connor Dep. at 78-79; Silva Dep. at 80-81), and a fourth plaintiff testified that he had been bumped by a horse but suffered no injury. (Stevens Dep. at 23-25).

### 2. Defendants' Monell Theory

As noted, plaintiffs seek to hold the City liable for the alleged violation of their First Amendment rights. Before assessing defendants' arguments on this point, we summarize the applicable standards for municipal liability.

### a. Monell Criteria

Municipal liability under section 1983 may be imposed only on

26

the basis of a showing that the City bore some responsibility for the alleged violation of the plaintiff's constitutional rights. See, e.g., City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under section 1983 only where the municipality *itself* causes the constitutional violation at issue.") (emphasis in original). To establish such liability, the plaintiff must demonstrate that his constitutional rights have been infringed by a municipal agent "whose acts may be fairly said to be those of the municipality" and that his injury was caused by a "municipal 'policy' or 'custom.'" Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403-04 (1997) (quoting, inter alia, Monell, 436 U.S. at 694). A single unconstitutional act or decision, when taken by an authorized decision-maker, may be considered policy and thus subject a municipality to liability. Brown, 520 U.S. at 405-06. Alternatively, a policy may be established by showing that the acts of the municipal agent were part of a widespread practice that, although not expressly authorized, constitutes a custom or usage of which the supervising policy-maker must have been aware. See, e.g., Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011); City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); Monell, 436 U.S. at 690-91.

The Supreme Court has further held that, in appropriate

27

circumstances, a municipality's failure to provide adequate training or supervision of its agents, if it amounts to deliberate indifference, may constitute such a policy or custom and thereby trigger liability under section 1983. See, e.g., Brown, 520 U.S. at 407-08 (citing City of Canton, 489 U.S. at 387-91); see also Sorlucco v. N.Y. City Police Dep't, 971 F.2d 864, 873 (2d Cir. 1992). But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 131 S.Ct. at 1359 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822-23 (1985)). In order to incur liability, the inaction by the municipality "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Id. (quoting City of Canton, 489 U.S. at 388) (brackets in original)). This "deliberate indifference" standard is satisfied only in narrowly circumscribed circumstances, that is, when the City's policy-makers are on notice of the strong likelihood that failure to act -- most commonly, failure to adequately train municipal officials -- will lead to constitutional violations. See, e.g., Connick, 131 S.Ct. at 1359-60 (quoting, inter alia, Brown, 520 U.S. at 407, 410). This generally requires proof of "[a] pattern of similar constitutional violations by untrained employees." Id. at 1360 (citing Brown, 520 U.S. at 409). Similarly, a failure to supervise will trigger Monell

28

liability only if the municipality was aware of a pattern of violations by hitherto-unsupervised employees or had another compelling reason to know that a failure to provide closer supervision was likely to lead to violations by those employees. E.g., <u>Reynolds v. Giuliani</u>, 506 F.3d 183, 192-93 (2d Cir. 2007) (discussing <u>Walker v. City of New York</u>, 974 F.2d 293, 297-98 (2d Cir. 1992)).

b. <u>The Final-Decision-Maker Defense</u>

Defendants seem to suggest that the City cannot be held responsible for any First Amendment violations because the plan for crowd control and its implementation were in the hands of senior police personnel other than the Police Commissioner. (Defs.' Mem. of Law at 49-50). We reject this argument, since the evidence in this case could permit a trier of fact to conclude that some complained-of conduct by the police was directed by, approved of, or acquiesced in by the ultimate policy-maker in the Police Department and that other aspects could be viewed as reflecting deliberate indifference by the Department's decision-makers.

There is no dispute that in formulating a plan for managing this demonstration, the Department anticipated the presence of a

vast number of people, an event for which it had to quickly make detailed and broad-scale preparations and commit a very large contingent of police personnel. Moreover, the sensitivity of the event and how the Department would handle it obviously was underscored when UPJ asked for a parade permit for up to 100,000 people and the Department rejected that request for security and safety reasons, offering instead the alternative of a large-scale stationary demonstration. Finally, the importance of the issue and its public-safety ramifications were further emphasized by the emergency litigation that occupied both the District Court and the Second Circuit in the days after the Department's decision to refuse a march permit.

Under these circumstances, defendants' suggestions that the Police Commissioner, who is concededly the most senior decision-maker within the Department, bore no responsibility for the crowd-control plan that the Department developed as an alternative to the march that it vetoed is, to put it mildly, less than plausible. Indeed, the evidence indicates that the plan was initially prepared by Lt. Dennis Gannon and his staff and reviewed and approved both by the Chief of the Department, Joseph Esposito, and by the Commissioner, Raymond Kelly. (See, e.g., Gannon Dep. at 216-24; Kelly Dep. 66-67; Defs.' Ex. X at 112-17; Stauber Tr. at 460-61).

Moreover, even if one were to allow for the possibility that the Commissioner simply delegated all responsibility to his subordinates, that possibility does not amount to evidence so compelling as to preclude a reasonable trier of fact from finding to the contrary.

Second, Chief Joseph Esposito -- who is among the highest-ranking officials in the Police Department -- testified that he reviewed and approved the plan in question and was on-site at the demonstration throughout the day to implement it. (Defs.' Ex. X at 41, 112-17, 150-51). Whether decisions made by Esposito could subject the City to liability for the alleged deprivation of plaintiffs' rights is unclear. See Praprotnik, 485 U.S. at 123-25 (discussing guidelines for identifying which municipal officials have final policy-making authority for purposes of subjecting a municipality to section 1983 liability); Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (concluding that an elected county sheriff had final policy-making authority in the context of section 1983 liability, but that a New York Police Department sergeant did not); Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000). In any event, the record does not conclusively demonstrate that still higher-ranking Police Department officials, including the Commissioner, bore no responsibility for the tactics used by

the police. Moreover, if the Commissioner simply deferred to his chiefs, he -- and thus the City -- could still be fairly taxed with responsibility for that hand-off in view of the nature of the challenges at stake in dealing with such a massive public turnout. See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127-29 (2d Cir. 2004) (finding that a police chief's failure to supervise at a demonstration could trigger municipal liability under Monell); Allen v. City of New York, 2007 WL 24796, at *19 (S.D.N.Y. Jan. 3, 2007) (express delegation of policy-making authority by decision-maker subjects City to liability) (citing Pembaur v. City of Cincinnati, 475 U.S. 480, 483 (1986)). As the Supreme Court noted in Praprotnik: "If . . . a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." 485 U.S. at 126.

In sum, insofar as plaintiffs' First Amendment claims are based on the plan for policing the demonstration that was prepared by the Police Department, we cannot recommend summary judgment for the City on those First Amendment claims based solely on the Commissioner's purported lack of involvement in preparing the

32

plan.[13]

c. The Potential Responsibility of the City Based on a Pattern of Behavior or Lack of Training or Supervision

Insofar as plaintiffs may be seeking to hold the City liable on their First Amendment claims on alternative <u>Monell</u> grounds, they fail to proffer an adequate basis to present at trial. As noted, absent a policy explicitly approved by a municipal decision-maker, a municipality may be held liable if the plaintiff demonstrates that a pattern of prior misconduct that may be linked to the violation alleged in his case indicates that the City had an informal policy or custom of promoting or permitting violations, or that the City failed to act (either by appropriate training or greater supervision) to prevent predictable violations of the rights of members of the public. <u>Connick</u>, 131 S.Ct. at 1359-60. The record is devoid of such proof.

Plaintiffs proffer no evidence that in the period preceding the February 15 demonstration, the City experienced widespread

---

[13] Insofar as plaintiffs seek to impose First Amendment municipal liability through the Commissioner's involvement, their claims must be read as limited to the design of the plan, not to specific actions taken by police personnel that were not dictated by the plan and that involved on-the-ground decisions as to the closing of specific streets or tactics used to clear blocked thoroughfares or whether to make specific arrests.

First Amendment violations by the police when faced with large-scale demonstrations. Indeed, the February 15 demonstration was apparently unprecedented in its size, and given both the uncertainty regarding the size of the demonstration and the short time frame in which planning could take place, presented a unique challenge for policing, as Judge Jones recognized in denying UPJ's request for an injunction granting them a march permit. UPJ, 243 F. Supp.2d at 26-27; see also M. Esposito Dep. at 205-06. Moreover, although plaintiffs attempt to make a case for the notion that the Police Department has persisted in violating the First Amendment rights of protesters in succeeding events (see Pls.' Mem. in Opp'n at 39), they fail to proffer meaningful evidence establishing that First Amendment violations by the police have been a pattern of City life in the context of political events,[14] much less that before February 15, 2003 the Police Department knew of the propensity of its personnel to violate the First Amendment rights

---

[14] Plaintiffs principally invoke the fact that lawsuits have been filed, and some are still pending, that raise issues about police conduct at later protests, notably in connection with the 2004 Republican National Convention (see Pls.' Mem. in Opp'n at 39), but the pendency of these suits, which principally involve Fourth Amendment claims, see, e.g., MacNamara v. City of New York, __ F.R.D. __, 2011 WL 1991144, at *12-26 (S.D.N.Y. May 19, 2011), cannot be used as proof of a pattern of animus by the Police Department to First Amendment activity, much less as suggesting that whatever occurred in 2004 or later can shed meaningful light on whether such a policy or custom existed in 2003.

of the public and chose not to act to prevent a recurrence of such a pattern.

As for possible City inaction betokening a _sub rosa_ policy to violate the First Amendment rights of the public, plaintiffs do not offer proof sufficient to take such a theory to trial on their First Amendment claims. They proffer no meaningful evidence of a systematic failure by the Department to supervise its personnel in the face of an awareness that, absent more aggressive supervision, the police on the street would pursue such a political agenda. Plaintiffs equally offer no evidence that the Department's training was in any specific respect inadequate to provide police officers with an understanding of their responsibility to respect the public's right to exercise First Amendment rights, much less that Police Department supervisors were aware of the danger and knew that, absent more rigorous training, the police under their command would pursue First Amendment vendettas or otherwise violate the public's right to engage in protected activities.

3. The Merits of the First-Amendment Challenge to the Plan

Defendants next argue that the plan for policing the February 15, 2003 demonstration (and its implementation) cannot be found to

35

have transgressed the First Amendment rights of the plaintiffs. On
this basis they seek summary judgment for the City as well as the
individual defendants. Alternatively, they invoke a qualified-
immunity defense for the individual defendants.


a. The Plan Itself


We start with the premise that the free expression of personal
views, particularly in the political arena, stands at the apex of
constitutional guarantees. See, e.g., Boos v. Barry, 485 U.S. 312,
318 (1988); Cohen v. California, 403 U.S. 15, 24 (1970); cf. United
States v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938).
Nonetheless, the exercise of this guarantee in public fora may be
circumscribed by local authorities asserting their police powers to
safeguard public health and safety. Reasonable time, place and
manner restrictions on public speech are permissible if they are
content-neutral, that is, "justified without reference to the
content of the regulated speech", and if they are "narrowly
tailored to serve a significant governmental interest and . . .
leave open ample alternative channels for communication of the
information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)
(quoting Clark v. Committee for Creative Non-Violence, 468 U.S.
288, 293 (1984)).

36

Defendants bear the burden of establishing that their restrictions were narrowly tailored. Deegan v. City of Ithaca, 444 F.3d 135, 241 (2d Cir. 2006). Narrow tailoring of a restriction means that the limitation is "not substantially broader than necessary to achieve the government's interest." Ward, 491 U.S. at 800. It need not, however, be "'the least restrictive or least intrusive means' of regulating speech." UPJ, 323 F.3d at 177 (quoting Ward, 491 U.S. at 798); accord, e.g., Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8, 12 (1st Cir. 2004). The government has meaningful discretion in choosing among alternative protocols, and the validity of its choice does not depend on "'a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted." Ward, 491 U.S. at 800 (quoting United States v. Albertini, 472 U.S. 675, 689 (1985)). Of particular note, the courts have recognized that the City is not required to do all that it is physically capable of doing to promote First Amendment expression. Rather, it is given the discretion to balance often-conflicting strands of public interest, including the need to ensure access to the streets by emergency vehicles, the ability of the police to deal with public disorders or crises, ensuring access by members of the public not participating in the event to their own homes, and more generally

37

the preservation of public safety and order. <u>See</u>, <u>e.g.</u>, <u>Million Youth March, Inc. v. Safir</u>, 155 F.3d 124, 125-27 (2d Cir. 1998); <u>Coalition to March on the RNC & Stop the War v. City of St. Paul</u>, 557 F. Supp.2d 1014, 1024-27 (D. Minn. 2008). As the Supreme Court has noted: "The requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." <u>Ward</u>, 491 U.S. at 798-800 (quoting <u>Albertini</u>, 472 U.S. at 689).

The application of these general nostrums to restrictions on marches and stationary demonstrations is reflected in a growing body of case law. These decisions -- many in the context of the quadrennial national political-party nominating conventions -- make plain that, when confronted with proposed large-scale demonstrations, the City may preclude marches if they involve anticipated crowds so large that the police reasonably fear that they will seriously disrupt traffic or present other insuperable logistical difficulties inimical to public health or safety. <u>E.g.</u>, <u>UPJ</u>, 323 F.3d at 177. They further make plain that the authorities may restrict stationary demonstrations in terms of the geographic area in which they may take place, <u>e.g.</u>, <u>Million Youth March, Inc.</u>, 155 F.3d at 126-27; <u>Bl(a)ck Tea Society</u>, 378 F.3d at 10-11, 14-15,

38

that they may require that the demonstrators be limited in terms of where on the streets they may stand so as to ensure access for police and other emergency vehicles, see, e.g., Stauber, 2004 WL 1593870 at *21, *25-29, *33; see also ACLU of Colorado v. City & County of Denver, 569 F. Supp.2d 1142, 1162 (D. Colo. 2008), and that they may require that crowds in excess of the safe capacity of the designated demonstration area be channeled to other locations. See, e.g., UPJ, 323 F.3d at 176-78; Million Youth March, Inc., 155 F.3d at 125-27; Stauber, 2004 WL 1593870 at *25. See also Bl(a)ck Tea Society, 378 F.3d at 12-15; Coalition to March on the RNC, 557 F. Supp.2d at 127-31; National Council of Arab Ams. v. City of New York, 331 F. Supp.2d 258, 272 (S.D.N.Y. 2004).

The evidence in this case reflects that the City's plan for the February 15 demonstration met these criteria. The plan was unquestionably content neutral, that is, it was not triggered by hostility to, or concern with, the political message of the demonstrators. Indeed, the Second Circuit so held in affirming the decision of Judge Jones to deny the preliminary-injunction motion of UPJ, UPJ, 323 F.3d at 176-77, and the current record is consistent with that finding.[15] Hence the pertinent test is the

_____

[15] Plaintiffs mount a challenge to this conclusion principally in their own summary-judgment motion, an argument that we reject for reasons discussed in more detail at pp. 236-

"reasonable time, place and manner" standard rather than the more stringent "prior restraint" criterion espoused by plaintiffs. <u>Cf.</u> <u>Hill v. Colorado</u>, 530 U.S. 703, 733-34 (2000) (citing, <u>inter alia</u>, <u>Schenck v. Pro-Choice Network</u>, 519 U.S. 357, 374 n.6 (1997), and <u>Madsen v. Women's Health Ctr., Inc.</u>, 512 U.S. 753, 674 n.2 (1994)); <u>Bl(a)ck Tea Society</u>, 378 F.3d at 12 ("The Supreme Court has explicitly rejected attempts to analyze security-based time-place-manner restrictions as prior restraints[.]") (citing cases).

As for the substance of the plan, it was consistent with First Amendment "time, place and manner" constitutional standards. <u>UPJ</u>, 323 F.3d 177. It allowed for large -- indeed, potentially unlimited -- numbers of people to gather. (Gannon Dep. at 158-65; Defs.' Ex. X at 28-34; M. Esposito Dep. at 122-33). It provided a location for the rally that was within sight of the United Nations and the United States Mission, both ostensible targets of the demonstrators' intended message, <u>see</u> <u>UPJ</u>, 243 F. Supp.2d at 21-22,

_____

47, <u>infra</u>. It suffices for present purposes to note that, apart from whatever preclusive or persuasive effect may or may not be found in the <u>UPJ</u> decisions, the record evidence in this case is barren of any meaningful indication that the Police Department as an institution, or its basic crowd-control plan, was animated by hostility to the demonstration or its proponents. This of course does not exclude the possibility that individual officers may have evinced such hostility, and as we explain below, on one or more claims plaintiffs have a triable issue on their contention that individual defendants were so motivated.

despite the security concerns inherent in allowing a large gathering of people in that area. (See Gannon Tr. at 92-93, 112-16, 131-32). It used large pens, occupying almost all of the roadbed on First Avenue between side streets, as a means of allowing large numbers of people to attend on First Avenue while preventing an undue crush of people in any given geographic area on First Avenue and as a way of ensuring that police and emergency vehicles had access to all areas adjacent to the demonstration. (E.g., Stauber Tr. at 481:16-482:8; Cavanna Dep. at 128; Douglas Mar. Dep. at 78:4-14; Otero Dep. at 36-37; Defs.' Ex. X at 27-34; M. Esposito Dep. at 88-97). It closed off side streets on a rolling basis as an additional measure to ensure that the crowds in any one part of First Avenue not grow so large as to endanger public safety. (Defs.' Ex. X at 32-41, 118-22; M. Esposito Dep. at 88-97; Gannon Dep. at 163-64). It provided for people desirous of accessing the site of the demonstration to do so through other side streets progressively further north, as blocks along First Avenue north of the front of the demonstration filled up. (Defs.' Ex. X at 27-34, 150-51; Gannon Dep. at 163-64). Moreover, the record reflects that perhaps a hundred thousand people successfully participated in the rally in accordance with this plan, that is, by journeying in one way or another to First Avenue north of 51st Street. (E.g., Defs.' Ex. QQ at 1, M. Esposito Dep. at 106-07; Gannon Dep. at 139-41).

All of these aspects of the plan appear to have been well within the constitutional discretion of the Police Department, and insofar as plaintiffs may be heard to complain about them, we find nothing in the record that would justify a trier of fact in finding that these aspects of the plan violated the demonstrators' First Amendment rights. In this regard we note that the plan was reasonable in its general approach and details, and plaintiffs proffer no meaningful evidence that it was designed or intended to deny anyone the right to express his or her views by participating in the planned demonstration or that, in these basic elements, it constituted an unreasonable set of time, place and manner restrictions on the exercise of First Amendment rights.

In resisting this conclusion, plaintiffs appear to rely in major part on the fact that large numbers of people found themselves unable to reach First Avenue, either in the Fifties or further north.[16] That in itself does not provide a basis to challenge the City's plan. As noted, that plan provided for a potentially unlimited number of people to go to First Avenue,

---

[16] Indeed, at one point in plaintiffs' own summary-judgment motion they seem to contend that all people who appeared at the demonstration -- no matter how numerous -- were entitled under the First Amendment to crowd onto First Avenue sufficiently close to the stage at 51st Street to hear all the speakers. (Pls.' R.56 Mem. of Law at 24-25). This assertion is legally insupportable and, as a matter of common sense, is absurd.

albeit by way of a northern entry. Moreover, although more people would presumably have been able to access First Avenue in the Fifties and Sixties if the police had not used pens and had left all side streets open, the City is not obliged to ensure that everyone who wishes to appear at a First Avenue venue is enabled to do so, irrespective of consequences. Even if the police could have physically handled such an overflow and resultant crush of people on First Avenue, they were not obliged to do so and potentially put at risk public health or safety.

Moreover, the record reflects that the turnout of people on February 15 was so large that it was almost unavoidable that substantial numbers of would-be demonstrators would be unable to access First Avenue in the Fifties. To the extent that many of those people sought access to First Avenue directly in the Fifties, it was virtually inevitable that they would find themselves in very crowded conditions on the adjoining avenues and streets. Again, this is not tantamount to a denial of the First Amendment rights of these individuals.

Alternatively, plaintiffs rely on what they refer to as expert testimony by an individual named Lou Reiter, who reports having extensive experience in police practices, including crowd control.

(Pls.' Mem. in Opp'n at 6 & n.9; see also Reiter Dep. at 1-62). In substance, Mr. Reiter offers his opinions on the adequacy of the Police Department's planning for the demonstration, which he finds deficient -- especially in not better preparing the details for assuring access by demonstrators to First Avenue -- and, in some respects, inconsistent with what he views as better practices by other police departments. (Reiter Dep. at 64-67, 77-78, 80-82, 85-93, 98-109, 111-15). Insofar as his testimony is intended to address the First Amendment issues,[17] we assume for present purposes at least some minimal competence or expertise on his part, but conclude that his personal critique of the plan, while perhaps relevant to a claim of negligence -- if one were otherwise viable -- does not meaningfully speak to the First Amendment question, and in any event his opinions on the adequacy of the plan are largely couched in terms of his view of the ultimate legal merits of the First Amendment claims (see id. at 87, 98-100, 112-15), which is not a proper subject for an expert witness. See, e.g., United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991); In re Initial Public Offering Secs. Litig., 174 F. Supp.2d 61, 64 (S.D.N.Y. 2001) ("[E]very circuit has explicitly held that experts

---

[17] He also discusses the evidence pertaining to certain other aspects of the case, notably involving the use of horses, which is pertinent to the excessive-force claims. (Reiter Dep. at 64, 98-101).

may not invade the court's province by testifying on issues of law.") (collecting cases). Moreover, his largely conclusory assertion of his personal opinions does not fulfill the role of an expert in that it does not assist a trier of fact in dealing with a technical or otherwise specialized area. <u>Cf.</u> Fed. R. Evid. 702. In short, his testimony does not alter the arc of our analysis of plaintiffs' challenge to the plan itself under the pertinent First Amendment standards.

Based on these findings, we conclude that plaintiffs' First Amendment claims against both the City and the individual defendants, insofar as predicated on the substance of the plan for crowd control, cannot survive summary judgment, and we recommend that defendants be granted summary judgment on these claims. There remain for consideration plaintiffs' First Amendment claims insofar as they are premised on the actual implementation of the plan.

b. <u>First-Amendment Challenges to the Plan's Implementation:
The Alleged Failure to Inform the Public of Access Routes</u>

A number of the plaintiffs complain that they were unable to access the First Avenue rally for reasons other than arrest, principally because they attempted to walk eastward to First Avenue and encountered blocked side streets and a crush of people (<u>e.g.</u>,

45

Connor Dep. at 58-65, Haus Dep. at 44-50, Stevens Dep. at 18-22),
and some because they were left in the dark by police officers, who
did not inform them that they could get to First Avenue by heading
north some distance and then east to the rally site. (See, e.g.,
Bryant Dep. at 22). One plaintiff also complains that he was
blocked by the police from proceeding northward along Second, Third
or Lexington Avenues in order to access the demonstration site, as
had been planned by the Police Department. (Dodde Dep. at 42-56).
Deeming this set of allegations to amount to a claim against both
the City (and, presumably, some of the supervisory individual
defendants) for failure to supervise,[18] we find issues of fact that
preclude summary judgment on one portion of this set of claims.

Insofar as plaintiffs appear to complain about blocked side
streets, their claim fails since this was part of a plan to funnel
people to the north before they turned east to enter First Avenue,
at which point they would be free to filter south towards the
demonstration stage, at least as far as space could be found in the
pens set up along the Avenue. As we have noted, this aspect of the
plan was intended to avoid a dangerous crush of people on First
Avenue in the Fifties, a danger that likely would have been

_____

[18] Plaintiffs do not identify as defendants any of the
officers who allegedly failed or refused to tell them how to
access First Avenue.

realized if unchecked numbers had headed instead directly to that Avenue in the lower Fifties, and it is well within the broad discretion of the City in designing a plan for crowd control in anticipation of such a large congregation of demonstrators. UPJ, 323 F.3d at 177; see also, e.g., Million Youth March, Inc., 155 F.3d at 126-27 (allowing police to limit number of people at designated demonstration site and "divert any excess crowds to nearby sites" "[i]n the event that more people attend than can be safely accommodated within the [designated] area"); Coalition to March on the RNC, 557 F. Supp.2d at 1022-31. In fact, some plaintiffs testified that they were able to reach First Avenue and participate in the demonstration. (Cavanna Dep. at 127-28; Douglas Mar. Dep. at 74-80). Their testimony and the appearance of vast numbers of other people on First Avenue reflect that the plan had some success.

As for the experience of a number of plaintiffs who encountered a crush of people on Second and Third Avenues, often leading to an inability to move forward in the direction that they wanted to go, the record reflects that this crush was largely attributable to the huge turnout of people, all seeking to head for the same location on First Avenue. (See, e.g., Defs. Ex. X at 155-56; M. Esposito Dep. at 122-28, 131-33, 141-43). There is no

evidence that the defendants caused the vast numbers of people to turn out or to concentrate in any one geographic area. Although plaintiffs may be heard to complain that the barricades used by the police on side streets and on Second and Third Avenues contributed to the immobility of the crowds -- an assertion that is supported in a few instances by plaintiffs' testimony (see, e.g., Connor Dep. at 58-65, 74-76, Dodde Dep. at 49-56, Dellal Dep. at 51-55) -- the evidence reflects that most of the barriers to which plaintiffs refer appear to have been set up either to keep people from heading directly to First Avenue in the Fifties or to press them onto the sidewalks in order to keep the roadway open to some traffic or at least to police and other emergency vehicles. (See, e.g., Cavanna Dep. at 120-28, Connor Dep. at 58-65, Dodde Dep. at 56-64; M. Esposito Dep. at 88-97, 122-28). Whether or not in individual instances barricade placements were ill-chosen, such discrete judgment errors do not remotely come within the scope of a viable First Amendment claim in view of the considerable latitude that the police have, and indeed must have, in policing such large-scale public events. And in any event plaintiffs offer no evidence of decisions by defendant police supervisory personnel or other individual defendants that were either intended to preclude First Amendment activity by plaintiffs or were so irrational as to exceed allowable police discretion in crowd-control tactics when

48

confronting such a large-scale, high-density event. In short, this aspect of plaintiffs' experience cannot be found to demonstrate that defendants were responsible for unreasonable time, place and manner restrictions.

Insofar as plaintiffs cite instances in which they were unable to reach First Avenue, they may be heard to complain that more people could have accessed that thoroughfare to attend the event activities if the police had not blocked any side streets and had not confined people on First Avenue to pens. While that might well be true, there were valid reasons for these measures -- ensuring against a potentially dangerous crush of people on First Avenue near the 51st Street stage and preserving a lane on First Avenue sidewalks for the police and emergency workers to have access as needed. These limitations are fully consistent with precedent governing crowd-control measures for public demonstrations. See, e.g., UPJ, 323 F.3d at 177; Million Youth March, Inc., 155 F.3d at 126; Coalition to March on the RNC, 556 F. Supp.2d at 1027 (citing cases); see also Stauber, 20024 WL 1593870 at *24-29 (finding likelihood of success on plaintiffs' First Amendment claims as to limited information regarding access to demonstration and ingress/egress from pens, but not as to use of pens in general). Moreover, given the expected and realized size of the turnout on

February 15, there is no question that the basic format designed by the Department reflected a reasonable approach to the problem of allowing a mass demonstration without posing serious dangers to public health and safety and the ability of other New Yorkers to access public thoroughfares, particularly given the limited time frame in which the plan was designed.[19] UPJ, 323 F.3d at 176-77; Cf. Bl(a)ck Tea Society, 378 F.3d at 12-15. Indeed, the evidence reflects that ultimately the participants in the demonstration filled all of the pens north from 52nd Street to the Seventies and perhaps the Eighties. (E.g., Scanlon Aff. at ¶¶ 228-30; Lamb Dep. at 61-62; Defs.' Ex. QQ at 1 (stating that UPJ "conducted a planned demonstration on 1st Avenue from E. 49th Street to E. 82nd Street").

Insofar as plaintiffs also seem to challenge the refusal of the police to allow people already assembled in the pens to exit them or to return, we note that the record makes plain that such

---

[19] At various points in plaintiffs' briefing, they appear to take issue with the decisions of Judge Jones and the Second Circuit to uphold the Police Department's rejection of a march and ask us to reconsider parts of those decisions. (See, e.g., Pls.' R.56 Mem. of Law at 19-21). Putting to one side whether these decisions have any preclusive effect, we note that plaintiffs offer no evidence to suggest that the denial of the march permit itself constituted an unreasonable time, place and manner restriction, particularly given the broad discretion accorded local authorities in matters of this kind.

refusals were not part of the plan. Indeed, the testimony of at least one of the plaintiffs, Ms. Douglas, refutes that implicit contention. As she testified, she accessed First Avenue at 72nd Street, where she and many others entered a pen between that street and 71st Street, and thereafter she and the other demonstrators were permitted successively to exit that pen and enter the next pen, and then again to move further south, pen by pen, until they had reached and entered the pen between 60th and 59th Streets. (Douglas Mar. Dep. at 74-75, 78-80, 92-93; Douglas Apr. Dep. at 25). To the extent that Ms. Douglas then encountered police officers who did not permit demonstrators to exit from the 59th Street pen (Douglas Apr. Dep. at 36-39), that action was unquestionably an error by those officers and did not reflect the overall implementation of the plan. In fact, the officer who later arrested Douglas stated that he had allowed another demonstrator to exit the 59th Street pen to use the restroom in a nearby Food Emporium and return to the pen afterwards. (Otero Dep. at 56).

Plaintiffs' complaint about the failure of the police to provide needed information as to how to access the demonstration presents a more viable potential claim. We start by noting that at least implicit in the Police Department's plan was an intention to provide information to the policing officers and, through them, to

the public as to how to access the designated protest area. Were this not the case, the plan itself might well fail to pass constitutional muster; time, place and manner restrictions are to be judged by a standard of reasonableness, though mediated by a presumption of broad police discretion, and a plan for crowd control that was premised in major part on successive closing off of streets leading to the designated demonstration area and re-direction of the assembly towards the remaining open streets could fairly be viewed by a trier of fact as unreasonable if it failed to provide for some means to communicate to the public necessary details concerning access to the site of the event. E.g., Stauber, 2004 WL 1593870, at *27. Moreover, if such an omission actually caused putative demonstrators to be denied access to the demonstration despite the availability of space at the protest site, those individuals might well have a viable First Amendment claim against those who were responsible for the omission. See id. at *27-28.

In this case, there is no triable dispute that the designers of the plan contemplated that the officers and more senior police personnel on the scene would provide access information to the

52

public.[20] Indeed, Lt. Gannon so testified and also reported that during the event he and other police personnel on Second Avenue provided such information to members of the public, as did other senior police personnel, and that the plan called for information on street closings and available access points to be broadcast on police radios. (Gannon Dep. at 163-64, 168-78, 181-86; see also Defs.' Ex. X at 150-51; M. Esposito Dep. at 122-24, 132-33; Acerbo Dep. at 65-66). Moreover, some of the plaintiffs confirmed that the police were informing members of the public of the need to head north in order to access First Avenue. (E.g., Defs.' Ex. SS (Bryant 50-h hearing) at 7-8 ("We were going to the higher number streets thinking that we could get over to the rally from that point, because someone told us."); Spitzer Dep. at 18-19; Connor Dep. at

---

[20] Plaintiffs seem to argue the contrary, premised on the notion that the Police Department failed to take certain useful steps -- such as posting signs at the closed side streets or using loudspeakers to announce instructions as to how to access the open side streets or posting instructions on the Police Department website -- and that these omissions demonstrate the constitutional inadequacy of the plan. (Pls.' Mem. in Opp'n at 18-19; Stauber Tr. at 466-68). We assume that such omissions may buttress a claim that the implementation of the plan was inadequate, in a constitutional sense, for some demonstrators, but that is not tantamount to a showing that the plan was itself constitutionally deficient. In this regard we have noted that local authorities have broad discretion in designing the details of time, place and manner restrictions, and if they chose other means of providing practical access, including by planning for police personnel to provide the information as needed on the street to inquiring demonstrators, then no First Amendment violation would be shown.

68-69; Lamb Dep. at 61-62; Douglas Mar. Dep. at 74-75). Furthermore, the very fact that vast numbers of people ultimately filled First Avenue from 51st Street going as far north as the lower Eighties indicates that access plans were not being kept secret. Nonetheless, there is evidence in the record that the plan in this respect may not have been adequately effectuated.

The validity of time, place and manner restrictions ultimately rests on an evaluation of how they were actually implemented and not merely on how they were designed in the abstract or on paper. See, e.g., Field Day, LLC v. County of Suffolk, __ F. Supp.2d __, 2011 WL 2580346, at *9 (E.D.N.Y. June 28, 2011) (citing, inter alia, Ward, 491 U.S. 781; Million Youth March, Inc., 18 F. Supp.2d at 345-47). Given the current record, a trier of fact could find that if responsible officials failed to take adequate measures to inform the public as to how to access the demonstration site, the net effect of the time, place and manner restrictions, as implemented, unreasonably limited the ability of some members of the public, including some of the plaintiffs, to exercise their First Amendment rights. In this respect, a number of the plaintiffs have testified to having been prevented from accessing the demonstration in circumstances that suggest that some officers on Second or Third Avenues did not provide timely instructions -- or

any instructions at all -- which might have avoided the access
problem for them. (Dodde Dep. at 49-51, 55-56; Bryant Dep. at 21-
22).[21] This evidence justifies the conclusion that some of the
plaintiffs would have a triable claim if those plaintiffs proffered
adequate evidence as to who was at fault for this alleged lapse.

The current record does not reflect that the alleged failure
to provide details to the public was traceable to a decision by the
City itself or by the Commissioner. In short, the City cannot be
held responsible for errors in the implementation of the plan.
Since, however, defendants Joseph and Michael Esposito have claimed
credit for designing, approving and implementing the plan (Defs.'
Ex. X at 9-14; Gannon Dep. at 216-20; M. Esposito Dep. at 119-33,
180-82), they may be found responsible by a trier of fact for the
level of public outreach by the Department in the days leading up
to the demonstration and on February 15 itself, and it is

---

[21] Our point is limited to the ability of the named
plaintiffs to arrive at First Avenue in the area allotted to the
demonstration, that is, some place north of 51st Street. Whether
all of the people who showed up on the East Side to protest the
impending war could have squeezed onto First Avenue is unclear.
Moreover, there is at least a strong question whether the
presence of these many people in the streets and avenues adjacent
to the First Avenue site amounts to their participation in the
demonstration and hence an adequate means of allowing them to
exercise their First Amendment rights in this unique setting of a
mass demonstration involving perhaps hundreds of thousands of
protesters, as one of the demonstration's organizers seems to
have believed. (See Stauber Tr. at 322-23).

conceivable that a trier of fact could find those efforts so deficient as to demonstrate that the restrictions actually imposed by the Department were, in this respect, not reasonable.[22] As for which plaintiffs may pursue such a claim, the proffered deposition testimony reflects that plaintiffs Bryant, Connor, Dodde, Lamb, Silva, Spitzer, and Stevens report that they were prevented from accessing First Avenue (at least in part) by virtue of an absence of information at to how to get there, and hence they may pursue a claim against the Esposito defendants for that denial of access based on lack of information.[23]

---

[22] We address in detail in a later section of this Report and Recommendation the applicable standards for holding a supervisory official liable for violations of the constitutional rights of members of the public. See pp. 114-19, infra. For present purposes, to succeed on the lack-of-notice aspect of their First Amendment claim, plaintiffs would have to show that the individual defendants bore direct responsibility for the alleged violations. See, e.g., Scott v. Fischer, 616 F.3d 100, 110 (2d Cir. 2010) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977), cert. den., 434 U.S. 1087 (1978)). We also note that these defendants, even if found responsible for constitutional violations in this respect, might be able to invoke a qualified-immunity defense. Since, however, defendants have not specifically asserted or sought to apply that defense in the current context -- that is, the lack-of-access- information claim -- we do not address it here.

[23] As we have noted, the record reflects that UPJ failed to post the details of the Department's plan on its website. That evidence is certainly pertinent to causation, as would be any testimony concerning the availability of information through the media or from other sources as to the access plans of the Police Department. Moreover, if a plaintiff was prevented from moving north for other reasons -- such as by virtue of the crush of the crowd -- or was simply disinclined to undertake an extended walk

c. <u>First-Amendment Challenges to the Plan's Implementation:
    The Use of Arrests to Preclude First-Amendment Activity</u>


In plaintiffs' opposition to defendants' motion, they assert,
as a variant of their more traditional First Amendment claim, a
theory premised on the notion that some of them were arrested
without probable cause, and that since the arrests occurred in the
context of their effort to attend a demonstration, the illegality
of the arrests reflects not only a violation of their Fourth
Amendment rights but also a First Amendment violation. In this
context they note that our Circuit Court has held that the police
may not interfere with an ongoing exercise of First Amendment
rights absent "a clear and present danger" to public safety, and
they assert that there was none. (Pls.' Mem. in Opp'n at 25-28
(citing, <u>inter alia</u>, <u>Jones v. Parmley</u>, 465 F.3d 46, 56-58 (2d Cir.
2006))).


Defendants argue that this claim should be "disregarded"
because plaintiffs failed to plead it explicitly in their
complaint. (Defs.' Reply Mem. of Law at 33). Alternatively they
assert that the arrests in question were supported by probable

---

in crowded streets for that purpose (<u>see</u> M. Esposito Dep. at
185), that litigant would be unable to show that a lack of
information caused his or her inability to access First Avenue.

cause, thus undercutting the premise for the claim, and that in any event the police did face a clear and present danger, thus immunizing the arrests from a First Amendment claim. (<u>Id.</u> at 34). We recommend denying summary judgment on this claim.

We reject defendants' pleading defense. In substance it amounts to a Rule 12(b)(6) challenge, which triggers a requirement that we accept all factual allegations in the complaint and draw all reasonable inferences in the plaintiffs' favor. <u>E.g.</u>, <u>Hayden v. Paterson</u>, 594 F.3d 150, 160 (2d Cir. 2009) (quoting <u>Johnson v. Rowley</u>, 569 F.3d 40, 43-44 (2d Cir. 2009)). Plaintiffs' complaint adequately pleads the facts pertinent to this claim, that is, they allege that many of them were seeking to attend or were attending a mass demonstration and that they were arrested without probable cause while engaging only in lawful behavior in the midst of a generally peaceful gathering of protesters. (2d Am. Compl. at ¶¶ 53-55, 56(c)). The complaint goes on to assert claims of First Amendment violations. (<u>Id.</u> at ¶¶ 74-75). This form of pleading suffices. The adequacy of the complaint is to be measured by the facts alleged in it, and it will pass muster even if the pleader does not attach the correct legal label to the factual allegations. <u>See</u>, <u>e.g.</u>, <u>Oneida Indian Nation of New York v. County of Oneida</u>, 617 F.3d 114, 132 (2d Cir. 2010) ("[A] complaint need not specify

the legal theory underlying its claims . . . .") (quoting <u>Amron v.</u>
<u>Morgan Stanley Inv. Advisors Inc.</u>, 464 F.3d 338, 343 (2d Cir.
2006)). In this case, the complaint pleads the facts that would
trigger First Amendment scrutiny and invokes the First Amendment.
Hence the pleading suffices for present purposes.

As for defendants' alternative, evidence-based challenge to
this claim, it too should be rejected. As explained in <u>Jones v.</u>
<u>Parmley</u>, 465 F.3d at 56-60, the police may not interrupt or
disperse a gathering that is the occasion for the exercise of First
Amendment rights -- notably, a political demonstration -- either
because they disagree with the content of the speech or because of
fear of disorder. <u>Id.</u> at 56 (citing, <u>inter alia</u>, <u>Edwards v. South</u>
<u>Carolina</u>, 372 U.S. 229, 237 (1963)). They may, however, "stop or
disperse public demonstrations or protests where 'clear and present
danger of riot, disorder, interference with traffic upon the
streets, or other immediate threat to public safety, peace, or
order appears.'" <u>Id.</u> at 56-57 (quoting <u>Cantwell v. Connecticut</u>,
310 U.S. 296, 308 (1940)); <u>see also</u> <u>Feiner v. New York</u>, 340 U.S.
315, 317-21 (1951). It bears emphasis, however, that the required
clear and present danger is not established by "energetic, even
raucous, protesters who annoy or anger audiences []or
demonstrations that slow traffic or inconvenience pedestrians." <u>Id.</u>

at 58 (citing <u>Cox v. Louisiana</u>, 379 U.S. 536, 546-47, 549 n.12 (1965)).

The implication of this analysis is that the arrest of a person participating in a political protest, in effect entirely precluding the arrestee's further participation in that First Amendment activity, will trigger a First Amendment violation unless the arrest is supported by probable cause or the police reasonably apprehended that, absent the arrest, the peace or safety of the public would be endangered. For reasons to be noted in addressing the Fourth Amendment portion of defendants' motion, there are triable issues as to the legality of the arrests of the eleven plaintiffs who were taken into custody on February 15. <u>See</u> pp. 76-105, <u>infra</u>. Hence the lawfulness of the arrests cannot be used as a basis for summary judgment on this First Amendment claim.

Insofar as defendants also argue that the police faced such disorder during the demonstration as to immunize their arrests of the plaintiffs from First Amendment scrutiny (Defs.' Mem. of Law at 59-60), summary judgment cannot be granted on this basis because there are triable issues of fact pertaining to the circumstances surrounding those arrests and whether there was any clear and present danger of sufficient moment to justify denying those

particular plaintiffs the opportunity to continue to participate in the demonstration. Although defendants allude to outbreaks of disorder by some number of protesters at various locations and various times during the massive demonstration (e.g., Acerbo Dep. at 94-95, 109, 115-19), the evidence would allow a trier of fact to find that the overwhelming majority of participants at this event were peaceful and law-abiding (e.g., M. Esposito Dep. at 132, 174-75) and that the outbreaks cited in general and unilluminating detail by the defendants (Defs.' Reply Mem. of Law at 33) were isolated and did not at all involve the plaintiffs themselves. In such circumstances, the police may not use the misconduct of what may be a small minority of participants[24] to justify the exclusion of the plaintiffs from this First Amendment event. See, e.g., Jones, 465 F.3d at 58 (rejecting clear-and-present-danger argument based on some protesters having blocked a highway; court notes that plaintiffs alleged that they stayed away from the highway, that "they made no threats of physical harm to police or members of the public, [and] did not incite violence and displayed no dangerous weapons," that "only a few protesters demonstrated on the Interstate," "that their activities did not affect the peaceful

---

[24] Defendants themselves trumpet the fact that only 274 people were arrested in connection with a demonstration that appears to have involved at least one hundred thousand participants. (Defs.' Mem. of Law at 85-86).

tenor of the main protest," and "that the few protestors who did enter the highway desisted from their conduct before the police broke up the demonstration.").

Whether plaintiffs' version will be borne out is a matter of dispute properly left for trial. For now, it suffices to note that defendants have not linked the plaintiffs beyond triable dispute to the alleged disorders. Accordingly this claim is triable.

In evaluating plaintiffs' arrest-based First Amendment claims, we note that, as alleged in the complaint, they may also be asserting that their arrests were undertaken for the purpose of preventing their participation in First Amendment protected activities or in retaliation for their engaging in protected conduct. (2d Am. Compl. at ¶¶ 55, 56(c), 75). With one exception, however, the record is bare of any evidence that would justify a finding that any of the defendants or other unnamed arresting officers were so motivated in making the arrests in question. In this regard we note that at least a hundred thousand individuals freely participated in First Amendment activities on the day of the demonstration, and the total of arrests for the day was only 274 (Defs.' Ex. QQ at 1), a modest increment over the initial police anticipation that there would be no more than 250 arrests in

connection with the demonstration. Furthermore -- as we will discuss in connection with plaintiffs' Fourth Amendment claims -- although the question of probable cause for the various plaintiffs' arrests is subject to triable dispute (see pp. 76-105, infra), the evidence pertinent to all but one of the eleven arrests at issue here reflects no evident First Amendment animus by the officers who triggered or carried out the arrests. While such a motivation might be theoretically possible, a trier of fact would be reduced to pure speculation on that question, which is not an adequate basis for trying a claim. The one exception, which we address below in assessing the defendants' challenge to plaintiffs' Fourth Amendment claims, concerns plaintiff Cavanna, who offers a version of his encounter with the police -- including defendant John Beale -- that can be read as suggesting First Amendment animus by one or two arresting officers, including Beale. See pp. 94-99, infra.

d. First-Amendment Challenges to the Plan's Implementation: The Use of Excessive Force

Plaintiffs' remaining theory for their First Amendment claims is the notion that at least some of the defendants engaged in excessive force when confronting some of the plaintiffs and that the use of such force amounted to a violation of the plaintiffs' First Amendment rights. (Pls.' Mem. in Opp'n at 23-25). We conclude

that this variant of their First Amendment claims is tenable for several of the plaintiffs.

Defendants note that plaintiffs failed to plead this excessive-force claim under the First Amendment, and they accordingly urge us to ignore this legal theory. (Defs.' Reply Mem. of Law at 32). Since rejection of the claim on that basis would unquestionably trigger a request to amend the complaint and since the underlying facts for the claim have not only been pled, but thoroughly explored in discovery, there is no basis to dismiss the claim at this stage rather than assess its viability under Rule 56 standards.

That assessment leads us to conclude that the record suffices to permit several plaintiffs to take this claim to trial. The stated premise for plaintiffs' claim is that the use of force in the context of a demonstration constitutes a time, place and manner restriction, and hence if the force was excessive, then this "restriction" was necessarily unreasonable. The out-of-circuit decisions cited by plaintiffs appear to support this suggestion, at least to the extent that a plaintiff may demonstrate that the use of force interfered with or prevented his exercise of his First Amendment rights. See Logsdon v. Hains, 492 F.3d 334, 346 (6th Cir.

2007); <u>Lamb v. Decatur</u>, 947 F. Supp. 1261, 1264 (C.D. Ill. 1996);

<u>cf.</u> <u>Bourgeois v. Peters</u>, 387 F.3d 1303, 1316-17 (11th Cir. 2004).

This would be akin to the theory, which we have already addressed,

that a lawless arrest of a person seeking to exercise his First

Amendment rights may constitute a First Amendment violation since

it precluded his engagement at that time in protected activities.

Although defendants urge rejection of these authorities on the

basis that they do not originate within this circuit (Defs.' Reply

Mem. of Law at 33), they offer no reason to do so (other than

implicit provincialism). Rather, the reasoning of these cases

appears generally consistent with the Second Circuit authority

cited above in connection with the arrest issue, and hence we

decline defendants' invitation to reject it.


As for the evidence, a number of the plaintiffs (including

both arrestees and non-arrestees) testified that they were

subjected to force that they contend was excessive, a contention

that we find in a succeeding section of this Report to be triable

for some of the plaintiffs. These include plaintiffs Haus, Connor,

Dellal, Cavanna, Douglas, Silva, Venizelos, Stevens and Blair. (<u>See</u>

pp. 123-70, <u>infra</u>). Their testimony also could justify a trier of

fact in finding that the use of force against them interfered with

or prevented their exercise of their First Amendment rights. (<u>Id.</u>).

65

In short, if their testimony is credited, as it must be for present purposes, their First Amendment claims in this respect are triable.

We further take note of an alternative theory for plaintiff's First Amendment claim, one pled in their complaint -- their contention that the use of force against them was intended to interfere with, or retaliate for, their exercise of their First Amendment rights, that is, their decision to engage in protected activity. (2d Am. Compl. at ¶¶ 55, 56(a), 75). Although -- for reasons to be noted -- there are triable disputes regarding whether excessive force was used in some instances by police officers (see pp. 123-70, infra), the record does not reflect any basis for a reasonable trier of fact to find that the use of such force by any of the defendant officers (except for defendant John Beale's use of force on plaintiff Cavanna) was motivated by hostility to plaintiffs' exercise of their First Amendment rights. As for plaintiff Cavanna, for reasons discussed at pp. 94-99, 157, infra, we conclude that a trier of fact could find that he was subjected to excessive force and that this misconduct was triggered by First Amendment animus.

e. <u>Political Interrogation</u>

In defendants' summary-judgment motion, they note that
plaintiffs' class-certification motion seeks to certify a class of
arrestees who were subjected to political interrogation by the
police while they were in custody. (Defs.' Mem. of Law at 35-36
(citing Pls.' Class Mot. at 19)). Defendants suggest that the
complaint makes no mention of such a transgression, and they urge
that the claim therefore be disregarded or (if the class motion
were deemed somehow to constitute a supplemental pleading) that the
claim be dismissed as time-barred. (Defs.' Mem. of Law at 36).

Questioning by the police about political beliefs or
affiliations may intrude on an arrestee's First Amendment rights
(and possibly his Fourth Amendment rights as well). <u>See</u>, <u>e.g.</u>
<u>Fountain v. City of New York</u>, Report & Recommendation dated May 8,
2007, at 52-58 (citing cases). Moreover, this type of questioning
is not only mentioned in the complaint (2d Am. Compl. at ¶¶ 62, 71,
73), but several plaintiffs also testified to having been
questioned in this fashion. (Parkel Dep. at 43-45, Venizelos Dep.
at 31, Cavanna Dep. at 217, Dellal Dep. at 73, 83). Nonetheless,
plaintiffs' responding papers do not directly address defendants'
argument (<u>see</u> <u>generally</u> Pls.' Mem. in Opp'n), but rather glancingly

67

refer to it in a context that seems unresponsive to defendants' point.

Plaintiffs' only mention of this issue is in their response to defendants' assertion that the complaint fails adequately to identify which individual defendants were involved in the violation of which plaintiff's rights. (See Pls.' Mem. in Opp'n at 129). In response, plaintiffs contend that their pleading of allegations of personal responsibility by the defendants has been clarified by discovery, a process that the Federal Rules contemplate and that assertedly justifies denial of a Rule 12(b)(6) dismissal on that basis. They then go on to say that "plaintiffs are permitted to conform the complaint to the facts," although they do not actually request amendment of their pleading. Instead they simply assert, as follows: "For example, although not specifically stated as a claim, plaintiffs who were interrogated about their political beliefs at One Police Plaza are permitted to raise this point now as the complaint identifies the conditions of confinement and the First and Fourth Amendment as the sources of plaintiffs' rights". (Id.).

This assertion is, to say the least, odd. The complaint alleges a variety of asserted unconstitutional conditions of detention, and political questioning is in fact among them,

although not as commonly referenced as, for example, lengthy
exposure to the cold. Had plaintiffs in fact failed to allege such
misconduct,[25] we would be inclined to agree with defendants that,
although plaintiffs casually refer to being "permitted to raise
now" a hitherto-unarticulated claim, they plainly have no such
right through the guise of either a memorandum of law opposing a
summary-judgment motion or by way of a class-certification motion.
If plaintiffs were to seek to assert a previously unmentioned
claim, they would be required to move to amend their complaint, and
in this specific context they would need to justify not only the
validity of the proposed new claim but the timing of the
application, as well as explain why the proposed claim is not time-
barred.

Since, however, three of the plaintiffs initially pled that
they were subjected to political interrogation (2d Am. Compl. at ¶¶
62, 71, 73), and affirmed as much in their depositions (Parkel Dep.
at 43-45, Venizelos Dep. at 31, Cavanna Dep. at 217), we reject

---

[25] The complaint contains references to political
interrogation of plaintiffs Cavanna, Parkel, and Venizelos.
Plaintiff Jasmine Dellal testified at her deposition that she was
repeatedly questioned about her political affiliation by
Detective Hannon and another unidentified officer (Dellal Dep. at
73, 83), but the narrative of her arrest and detention in the
complaint does not contain any reference to political
interrogation. (2d Am. Compl. at ¶ 70).

defendants' contention that such a claim cannot now be asserted. Although defendants have not requested summary judgment on the merits of this claim, we briefly examine the basis for it to determine whether plaintiffs may proceed with it at trial.

Plaintiffs' claim that the custodial interrogation violated their constitutional rights is most likely based on a line of precedent holding that compelled disclosure of organized political activity can constitute a violation of the First Amendment right to associate for political purposes. See, e.g., NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460-62 (1958); Church of the Am. Knights of the KKK v. Kerik, 356 F.3d 197, 208-09 (2d Cir. 2004). The record reflects undisputed testimony that some police representatives quizzed three plaintiffs about their political affiliations or activities, and we are mindful of other cases arising out of the February 15, 2003 demonstration that generated testimony of the same conduct directed at other arrestees. E.g., Fountain Report & Recommendation at 15-16.

As we mentioned in Fountain, defendants have failed to articulate any interest that the City may have had in obtaining these disclosures. Particularly in the absence of any articulated law-enforcement justification for the questioning, there is at

least a triable issue of fact as to whether defendants' conduct constituted a violation of plaintiff's associational rights. See, e.g., NAACP, 357 U.S. at 463-64; Kerik, 356 F.3d at 208 & n.10. There is one complication for these claims, however: none of the three plaintiffs who complained that they were subjected to political interrogations were able to identify the officer who questioned them. (Parkel Dep. at 43-45, Venizelos Dep. at 31, Cavanna Dep. at 217).[26] Hence they cannot assert these claims against any individual officer. See, e.g., Scott, 616 F.3d at 110.

The evidence suggests, however, that there may have been a Police Department policy or practice in place requiring officers to inquire about certain arrestees' political affiliations. In addition to the three plaintiffs asserting claims for unconstitutional political interrogation, plaintiff Dellal testified that she was interrogated regarding her political affiliations, as did the plaintiff in another case arising out of the February 15, 2003 demonstration and two other individual witnesses in that case (Fountain Report & Recommendation at 15-16 & n.8), one of whom was arrested on February 15, 2003, the other of

---

[26] Plaintiff Dellal alleged that she was questioned about her political affiliations by defendant Hannon (Dellal Dep. at 73), but she did not plead a political-interrogation claim. (2d Am. Compl. at ¶ 70).

71

whom was arrested at a later demonstration and filed his own case against the City. (Id.; see also Defs.' Ex. WWW (Bradley v. City of New York, 04 Civ. 8411, Report & Recommendation dated Oct. 19, 2006)). This circumstantial evidence suggests that there may have been a police directive of some sort requiring officers to inquire about arrestees' political affiliations, indicating that it may have reflected a Police Department policy or practice. Defendants neither contest the fact that these political interrogations took place nor offer a legitimate law-enforcement justification for such questioning.[27] Hence we believe that there is an issue of material fact as to the existence of a municipal policy or practice of political interrogation of certain arrestees that may have infringed plaintiffs' First Amendment rights, and therefore plaintiffs Cavanna, Parkel, and Venizelos may proceed with this claim against the City at trial.

---

[27] The plaintiff in Bradley testified that he was interrogated twice, by two police officers. One of these officers "remarked that plaintiff did not look like a radical protestor, and that the officer would therefore skip the 'affiliation questions' . . ., but another officer asked him whether he belonged to any political organizations or whether he was affiliated with any particular group." (Bradley Report & Recommendation at 13 (quoting Pl. Dep.)).

## C. Defendants' Motion: the False-Arrest Claims

Defendants have moved for summary judgment on the false-arrest claims of nine plaintiffs -- Connor, Sanchez, Blair, Dodde, Dellal, Venizelos, Cavanna, Douglas and Parkel.[28] They represent that they do not at this stage contest the equivalent claims of plaintiffs Bryant and Silva (Defs.' Mem. of Law at 89), and they also fail to address the same claim by plaintiff Stevens.[29]

### 1. Legal Standards

A section 1983 claim for false arrest is based on an individual's Fourth Amendment right to be free from unreasonable searches and seizures. See, e.g., Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006) (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). In analyzing federal claims for false arrest, courts "have generally looked to the law of the state in which the arrest

---

[28] At one point defendants represent that they do not challenge the false-arrest claims of Ms. Douglas and Ms. Parkel on the current motion (Defs.' Reply Mem. of Law at 53 n.33), but their initial papers do in fact seek such relief on these plaintiffs' claims. (See Defs.' Mem. of Law at 115-16; see also id. at 89 (stating that defendants do not seek Rule 56 relief on the false-arrest claims of Messrs. Bryant and Silva)).

[29] Three plaintiffs -- Haus, Lamb and Spitzer -- were not arrested and therefore do not assert such claims. (Pls.' Mem. in Opp'n at 44-45 n.14; see also Compl. at ¶¶ 58, 68, 72).

73

occurred." Id. (quoting Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004)). Under New York law, for a plaintiff to prevail on a false-arrest claim, he must demonstrate that the defendant intentionally confined him, that the plaintiff was aware of being confined, that he did not consent to the confinement, and that the confinement was not justified or otherwise privileged. See, e.g., Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Weyant, 101 F.3d at 852 (2d Cir. 1996)); Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). The existence of probable cause would justify the arrest, and thus is an absolute defense to a false-arrest claim under both federal and state law. See, e.g., Jaegly, 439 F.3d at 152; Savino, 331 F.3d at 76; Weyant, 101 F.3d at 852. Probable cause exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Jaegly, 439 F.3d at 152 (quoting Weyant, 101 F.3d at 852); see also Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979).

Defendants argue that none of the targeted plaintiffs can demonstrate that they were arrested without probable cause. (Defs.' Mem. of Law at 89-111). Alternatively, they assert that, even if

probable cause was lacking, the arresting officers are shielded by qualified immunity. (Id. at 114-22). To invoke such immunity at this stage to fend off liability for a false arrest, the defendants must demonstrate beyond triable dispute that they had what has been referred to as "arguable" probable cause, that is, that "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well established law." Cerrone v. Brown, 246 F.3d 194, 202-03 (2d Cir. 2001). Moreover, summary judgment may not be granted on this defense unless the defendant establishes beyond triable dispute the facts that would demonstrate the reasonableness of his belief that he had probable cause to arrest. See, e.g., Wong v. Yoo, 649 F. Supp.2d 34, 60-61 (E.D.N.Y. 2009) (denying motion for summary judgment on qualified-immunity basis due to disputes of material fact); Searles v. Pompilio, 652 F. Supp.2d 432, 446 (S.D.N.Y. 2009) ("[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.") (quoting Kerman v. City of New York, 261 F.3d 229, 240 (2d Cir. 2001)).

Apart from these arguments, defendants assert that some of the plaintiffs cannot demonstrate that their criminal case ended

favorably to them because they received adjournments in contemplation of dismissal. (Defs.' Mem. of Law at 111-12). They further argue that various of the individual defendants are entitled to judgment because there is no evidence that they were involved in the alleged improper arrests. (Defs.' Mem. of Law at 112-13). Finally, defendants argue that the plaintiffs cannot prevail on the municipal-liability variant of their false-arrest claims because the City was not responsible for any unlawful arrests. (Defs.' Mem. of Law at 84-89).

### 2. Probable Cause & Arguable Probable Cause

We first address whether there are triable issues as to the existence of probable cause for the arrests of the targeted plaintiff's claims and whether the arresting officers may prevail at this stage on the basis of claimed qualified immunity. We conclude that the evidence, including principally the plaintiffs' testimony, establishes triable issues as to whether probable cause existed for each of the contested arrests. Moreover, that testimony also ensures that there are triable issues as to whether the arresting officers had arguable probable cause, thus precluding summary judgment by reason of qualified immunity.

a. <u>John Connor</u>

Defendants rely exclusively on Mr. Connor's deposition testimony to argue that his arrest was lawful. (Defs.' Mem. of Law at 94-95). To the contrary, his testimony establishes triable issues as to probable cause and arguable probable cause.

Connor testified that he had walked north with crowds of people on Lexington Avenue up to 53rd Street, and then crossed over to Third Avenue. As he and vast numbers of others attempted to cross Third Avenue, still heading east, he found that he could not reach the east side of the avenue because of the crush of people in the vicinity. He and a large crowd of other would-be demonstrators remained stalled in that position, unable to move to the east side sidewalk or to return to the west side sidewalk. (Connor Dep. at 58-59, 62-65). While stuck in that position, he observed other demonstrators standing on top of a white van filming or taking pictures of the demonstration, and stated that he saw mounted police officers "pulling [the demonstrators] off the van, and beating on them." (<u>Id.</u> at 66; <u>see</u> <u>also</u> <u>id.</u> at 66-68). Connor then made his way to the east side of Third Avenue, where he was informed by a police officer that he could not continue east on 53rd Street and needed to travel further north. Connor then

proceeded north to 54th Street and was permitted to walk east with
the crowd to the intersection of 54th Street and Second Avenue,
where he was again forced to stop by the crush of people. (Id. at
68-73). He then observed a row of mounted police clear a portion of
the avenue just south of where he was. (Id. at 73-74). Connor
testified that he was not able to proceed once the intersection was
clear, as the crowd was still too thick and police barricades
prevented the crowd from moving east, as did two groups of mounted
police, who positioned themselves back-to-back on Second Avenue
facing the crowd. (Id. at 74-76). At this point, Connor testified,
he assumed "that there was a concerted effort by the City, and
police, to make sure that people did not get to this rally[,]" and
that he had observed the police permit a woman to cross the
intersection after she informed them that she was not part of the
demonstration. (Id. at 78). He then saw the mounted police
officers, who had turned their horses around, back their mounts
into the crowd. One officer in particular "back[ed] up forcefully,"
striking a woman with his horse and knocking her into the crowd;
the same officer then "appeared to lose control" of his horse,
which then "stepped on [Connor's] foot, knocking [Connor]
backwards." (Id. at 78-79). The horse pushed Connor to the street
and knocked to the ground a flag that he was carrying. (Id. at 80-
81).

78

In Connor's account, when he stood up, he picked up his flag, and the same mounted officer who had backed his horse into Connor -- and who, by then, had turned his horse so that it was again facing the crowd -- attempted to grab Connor's flag, but failed to do so and slipped in his saddle, causing laughter by people in the area. The officer then motioned to another mounted officer, and the two of them pushed their mounts against Connor. The horses' heads made contact with Connor, pushing him back a step, at which point two officers on foot approached Connor through the crowd, seized him and took him to the intersection, where he was thrown to the ground, kneed and cuffed. (Id. at 84-91). He was later processed and charged with disorderly conduct. (Pls.' Ex. 14).

Defendants offer no basis for their contention that this sequence of events demonstrates beyond triable dispute that Connor's arrest was supported by probable cause. If Mr. Connor was one of a large number of people unable to get to either sidewalk simply because there was too large a crowd in the area, he was presumably not committing any crime or violation -- and was certainly not committing the crime of disorderly conduct[30] -- and

---

[30] "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . (5) he obstructs vehicular or pedestrian traffic; or (6) he congregates with other persons in a public place and refuses to comply with a lawful

there would have been no reason for an officer to conclude otherwise. Moreover, the alternative defense of qualified immunity would not apply because there would at least be a triable issue as to whether an officer in such circumstances could have reasonably believed that he had probable cause to arrest Connor.

The potential complication for Connor's claim is that he is unable to identify the officers who arrested or caused his arrest. (Connor Dep. at 87, 91). Since, however, defendant Bruce Smolka signed his citation as the purported arresting officer (id. at 118-19; Pls.' Ex. 14), he is certainly an appropriate defendant on this claim.

### b. Carlos Sanchez

Mr. Sanchez was arrested on Second Avenue while he was attempting to cross the Avenue with two friends. Again, defendants seek summary judgment based solely on his deposition testimony. (Defs.' Mem. of Law at 95-96). In doing so, defendants mischaracterize that testimony, which does not at all support their argument.

---

order of the police to disperse." N.Y. Penal Law §§ 240.20(5)-(6).

Mr. Sanchez's testimony was not a model of clarity and detail, but he did testify that he was attempting to cross Second Avenue with others, that a police officer ordered him to hurry up, that he was slowed by the large crowds surrounding him, that mounted police came close, and that he was then arrested and charged with disorderly conduct. (Sanchez 50-h Hearing Tr. at 15, 20-21, 25-26). Although defendants seem to say that he conceded that he had violated a police order (Defs.' Mem. of Law at 95), he did not so testify, and his actual testimony does not demonstrate beyond triable dispute that the police had probable cause to arrest him or even a reasonable basis to believe that they had such probable cause.

As for the appropriate defendant on this claim, plaintiff could not identify who arrested him. (Sanchez 50-h Hearing Tr. at 23). Since, however, defendant Smolka signed the summons as the purported arresting officer (Defs.' Ex. S), he plainly is a permissible defendant on this claim.

c. <u>Abraham Blair</u>

Abraham Blair was arrested on 42nd Street between Sixth and Seventh Avenues, as he was walking with friends towards the Port

81

Authority bus terminal after they had given up their attempt to access First Avenue. Defendants invoke his testimony and that of the arresting officer, Det. Daniel Ryan, to argue that his arrest was supported by probable cause. Specifically, they contend that Blair refused an order by a police officer and assaulted one or more officers. (Defs.' Mem. of Law at 97-101). For reasons that follow, we conclude that triable issues remain regarding the facts that would demonstrate whether there was probable cause and whether the arresting officer is entitled to immunity.

In describing the encounter that led to his arrest, Blair's testimony was somewhat vague -- possibly in part because of language limitations[31] -- but, if favorably construed, indicated that while walking west on 42nd Street towards Seventh Avenue, he and his friends observed a number of would-be demonstrators walking east, presumably in the direction of First Avenue, and a phalanx of police running after them. (Blair Dep. at 31-32). He and his friends stopped for a moment to observe the chase, when he was confronted by an officer who said to Blair "get out". (Id. at 45). Blair recounted in general terms that he asked the officer why he was supposed to leave the sidewalk -- apparently his interpretation

---

[31] Defendants' counsel noted during the deposition that plaintiff was not a native English speaker. (Blair Dep. at 20).

of the cryptic order -- at which point he was surrounded by a number of officers, thrown to the ground and arrested. (Id. at 46, 47-51). He was later charged with resisting arrest,[32] second-degree assault of a police officer,[33] and two counts of disorderly conduct. (Id. at 78; see also Ryan Dep. at 63).

Det. Ryan's version was quite different from Blair's and, if credited, would justify the arrest based on his assertion that Blair, together with hundreds of others, were ordered to leave a corner at 42nd Street and Seventh Avenue because the crush of people was interfering with vehicular traffic, and Blair refused, in a hostile manner, to do so. (Ryan Dep. at 68-85). Ryan also reported that at some point he had observed Blair shoving another police officer and determined to arrest Blair; that during the course of that arrest, Blair had resisted by flailing his arms to avoid being handcuffed, and in doing so Blair had knocked off his helmet and elbowed him in the eye, thus adding a second basis for

---

[32] "A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer from effecting an authorized arrest of himself or another person." N.Y. Penal Law § 205.30.

[33] "A person is guilty of assault in the second degree when . . . (3) With intent to prevent . . . a police officer . . . in the course of performance of duty as such . . . from performing a lawful duty . . . as such . . . police officer . . . he or she causes physical injury to such . . . police officer . . . ." N.Y. Penal Law § 120.05(3).

the arrest. (Ryan Dep. at 65-68, 84-91).

The difficulty with defendants' argument is that it reads Blair's testimony in a manner that, although arguably permissible, is not compelled. As we have noted, probable cause requires a very fact-specific assessment. In this case, if Blair, when faced with a somewhat ambiguous and puzzling police order, asked a quick question of explanation, that would not necessarily establish probable cause to arrest. Depending on how his question was phrased and depending further on whether the police officer's order was, in context, clearer or more reasonable than it appears from plaintiff's testimony, the officer might well have had probable cause and, by extension, a reasonable basis to believe that he had probable cause. But those contextual facts are not established beyond triable dispute because the testimony of the plaintiff is not self-evidently consistent with that of Det. Ryan. Moreover, although Det. Ryan reported that Blair had assaulted him and another officer, plaintiff denied that he had done so. (Blair Dep. at 55-56).

In short, there are triable issues as to the validity of the arrest and the factual basis for defendants' invocation of the qualified-immunity defense.

d. Robert Dodde

Defendants seek summary judgment on Mr. Dodde's false-arrest claim based on his deposition testimony. (Defs.' Mem. of Law at 102-04). Given the circumstances immediately preceding the arrest, as testified to by Dodde, we disagree.

Dodde reported that he and two friends had walked east on 42nd Street from Grand Central Terminal to Third Avenue and then turned north, planning to access First Avenue from a more northerly side street. In his account, they reached 53rd Street and sought to proceed east but were blocked by the police. (Dodde Dep. at 42-51). They then wanted to head further north but again were blocked at the intersection by another row of police and at least one police vehicle. (Id. at 51-52). Seeking then to head west to Lexington Avenue in order to try to go north on that avenue, they were again prevented from reaching the avenue by still more police. Finally, they tried to head south on Third Avenue, but were stopped at 52nd Street by the police. (Id. at 52-53). Eventually they returned to the southeast corner of 53rd Street and Third Avenue, where they and a very large crowd attempted without success to obtain some information from the nearby police as to how to exit the area. (Id. at 53-56).

Since they effectively were trapped, they and the rest of the crowd waited in that location for about fifteen minutes, when a large contingent of mounted police entered the intersection, apparently coming west from Second Avenue, and began to press south and north on Third Avenue to move the large number of people who were standing in the street onto the sidewalk. (Id. at 56-57). At about the same time, Dodde observed officers on foot placing metal barriers along 53rd Street and in Third Avenue and then using those barriers to press against the crowd in the street, apparently to force them onto the sidewalk. At some point all the crowd was on the sidewalk, but, according to Dodde, the police continued to press against the front of the crowd, apparently using the barriers and possibly some of the horses to do so. (Id. at 57-61). Because of the very intense congestion at that point, many people were complaining about the increasing crush caused by this police tactic, including particularly people at the back of the crowd, who were being pressed against the wall of the nearby buildings. Since some of the police were insisting that it was the crowd that was pushing against them, people began to sit down to show that they were not doing so, and ultimately the entire crowd sat, at which point the police stopped pushing. (Id. at 61-64).

As recounted by Dodde, after a peaceable few minutes, people

86

began to stand up again, at which point the police again began to press against the front of the crowd. Dodde then urged the crowd to resume sitting, hoping to repeat the pacifying effect of the immediately preceding sit-down. Once the crowd did so, however, officers came through the crowd, seized his companions and arrested him. (<u>Id.</u> at 65-71). He was later charged with disorderly conduct. (<u>Id.</u> at 93; Defs.' Ex. S).

If this account is credited, as it must be for present purposes, there is plainly a triable issue as to whether the arrest was supported by probable cause. According to Dodde's testimony, he did not fail to obey any police orders, and neither he nor the rest of the crowd blocked pedestrian entry or egress. Rather, given the size and compactness of the crowd, no such passageway was possible on the sidewalk, and the collective decision of the crowd to sit down was intended to avoid the dangerous effects of the police pressing against the front of the gridlocked crowd. Moreover, the fact that the police stopped the pressure after the crowd had sat down the first time and only resumed it when they stood up again indicates that the officers themselves recognized that the act of sitting was intended to avoid a confrontation with law enforcement, not to provoke one. Under these circumstances, a trier of fact would be permitted to find no probable cause for the arrest and no

87

reasonable basis for the arresting officers to believe that they had probable cause for the arrest of the plaintiff.

As for the identity of the individual defendant on this claim, there seems to be no dispute that Chief Smolka signed Dodde's summons. (Dodde Dep. at 112-14; Defs.' Ex. S). Hence he is a proper defendant for Dodde's false-arrest claim.

e. Jasmine Dellal

Defendants target the false-arrest claim of plaintiff Jasmine Dellal based on her deposition testimony. (Defs.' Mem. of Law at 104-05). The circumstances of her arrest, as she described them, bear some modest resemblance to those of her co-plaintiff Dodde.

She testified that she arrived with a friend by subway at 51st Street and Lexington Avenue and proceeded east to Third Avenue, where she was told to head north to access First Avenue. (Dellal Dep. at 42-44). She arrived at 53rd Street and waited for a short time on the northeast corner for friends to meet her. Initially there were no barriers preventing people from proceeding east on that side street, but within a few minutes the police began erecting barriers across 53rd Street. (Id. at 45-51). The barriers

88

Case 1:08-cv-01034-SAS-MHD   Document 180   Filed 08/31/11   Page 89 of 293

blocked the north sidewalk, on which she was standing, as well as part of the roadway, but there were gaps between the barriers -- indeed, one gap remained on the south side of 53rd Street -- and the police at that point were allowing people to pass through the gaps going both east and west. Indeed, she estimated that there were equal numbers of civilians on both sides of the barriers. (<u>Id.</u> at 51-53).

According to Ms. Dellal, she was on the west side of the barriers trying to move south towards the gap in the barriers through which people were passing eastward, but at some point she was being pressed by the compacted crowd behind her into the barrier directly in front of her. She recounted that, even as an officer called "get back" to "the crowd," she and others were being "squashed" into the barriers, a situation aggravated by the fact that the police themselves had begun pressing the barriers against the crowd. She said that some people in that situation were going over the barriers in order to avoid the pressure. (<u>Id.</u> at 53-56, 59).

Frightened by the situation and pressed from both sides, she too attempted to climb over the barrier that was directly in front of her, which the police were pressing against her. She did so by

putting one leg on the top, at which point an officer, identified as Det. Dennis Hannon, approached with another barrier, put it directly on her elevated foot, which was partly over the other barrier, and he then pressed down on the new barrier, thus trapping her. While she was stuck in this position, she told the officer that he was pressing on her foot, but he continued to do so. Moreover, he told her to get back and shoved her in the chest, but she could not move because the officer continued to press the barrier down on her foot despite her asking him not to do so. (Id. at 56-58).

At some point Det. Hannon stopped pressing the barrier against her as he became engaged in conversation with someone else. In an effort to escape the press of the barriers that he and the other police officers were pushing, Ms. Dellal pulled herself over the barrier on which she had been stuck. In her testimony she explained that going forward rather than backwards was the only way she could get out since her foot was still partly trapped by the barrier that Hannon had placed on top of it. After she surmounted the barrier, she walked a short distance and was then arrested. (Id. at 60-67).

Defendants argue that, based either on Det. Hannon's pushing her and telling her to get back, or the similar command of other

officers to the crowd, plaintiff was in violation of a police order when she surmounted the barrier in front of her, thus justifying her arrest. (Defs.' Mem. of Law at 105). A trier of fact could certainly so find, but, depending on the details of the testimony of both parties involved in this episode, a contrary finding cannot be ruled out.

According to Ms. Dellal, she was compelled to climb over the barrier as a matter of self-protection by virtue not only of the crowd pressure behind her but the insistent pushing by Det. Hannon and other police personnel of the barriers in front of her, as well as Hannon's continuing to press down a barrier on her foot, thus effectively trapping her in place and preventing her from complying with any directive to "get back". Moreover, if her account is credited, Hannon was aware, or should have been aware, that his actions and those of his fellow officers had precluded her compliance with any directive to retreat. Although a trier of fact is of course not compelled to credit this scenario, it is a permissible one on the current record, and if it were credited, it would be permissible to find that Hannon did not have probable cause to arrest her.

As for arguable probable cause, the record leaves open some

modest question as to whether the arresting officers had a reasonable basis to believe that they had probable cause to arrest Dellal. It is apparent from plaintiff's own testimony that at some point the police sought to have the crowd move away from the barriers that they had placed in the street. If, however, they used the barriers as a weapon to push the crowd, a trier of fact could conclude that they should reasonably have known that people directly in front of the barriers could not obey because of the crush of the crowd behind them. As for Ms. Dellal in particular, since she testified that she had communicated her distress and quandary directly to Det. Hannon and that his actions had prevented her compliance with such an order and necessitated her climbing the barrier to extract herself, a trier of fact might also find -- depending on the precise circumstances -- that the defendant had reason to understand that his efforts had both trapped her and compelled her to surmount the barrier in order to release her pinioned leg. In such a scenario, the trier of fact might well make findings inconsistent with the contention that defendant Hannon reasonably believed that he had probable cause to arrest Dellal.

     f. <u>Emily Venizelos</u>

     Defendants also seek summary judgment on the false-arrest

claim of Emily Venizelos. Ms. Venizelos was arrested and charged with two counts of disorderly conduct. (Venizelos Dep. at 66). Defendants base their application on the deposition testimony of the arresting officer, Rocco Loccisanno, who reported that Ms. Venizelos had repeatedly pushed him when he directed her to proceed in a particular direction in the Times Square area. (Defs.' Mem. of Law at 105-07; Loccisanno Dep. at 84-88).

Defendants' argument is surprising, to say the least, since plaintiff testified to a completely different version of the facts. According to plaintiff, she and several friends were directed by a police officer, apparently not Loccisanno, to cross the street at 42nd Street in the direction of a subway entrance that they were seeking to access, and while she crossed behind the others, another officer demanded to know where she was going. (Venizelos Dep. at 18). When she responded that she had been told by the first officer that she could cross that street, she was set upon by a number of police officers -- apparently including Officer Loccisanno -- who shoved her into a wall, cursed at her, and seized and handcuffed her without explanation. (Id. at 19).[34] At the same time, she

---

[34] While Venizelos did not identify Loccisanno as one of her assailants, his testimony that he had participated in her arrest (Loccisanno Dep. at 81-96) would allow a trier of fact to find that he was directly involved in the allegedly violent interaction with her that led to her arrest.

recounted, another group of police officers set upon one of her friends when he told one of the officers that Ms. Venizelos was with him and his friends, and violently beat him. (Id. at 19, 40-45). She further specifically denied that she had disobeyed any order, pushed any officer or offered any resistance. (Venizelos Dep. at 106-07, 109). Finally, it bears mention that Ms. Venizelos went to trial on the criminal charges filed against her and was acquitted. (Venizelos Dep. at 122).

Given this acute divergence in the two versions of plaintiff's arrest, it is painfully obvious that summary judgment cannot be granted on the basis of Loccisanno's testimony. There are triable issues both as to probable cause and with respect to the immunity defense asserted by the officer.

### g. Matthew Cavanna

Defendants seek summary judgment on the false-arrest claim of Matthew Cavanna. In doing so they rely in part on the plaintiff's deposition testimony and in part on the testimony of defendant Det. John Beale. (Defs.' Mem. of Law at 107-10). We conclude that there are triable issues as to the legality of the arrest and the detective's qualified-immunity defense.

Again, the versions of the events at issue offered by the plaintiff and the defendant arresting officer differ radically. Mr. Cavanna, after describing his attending the demonstration on First Avenue (Cavanna Dep. at 127-50), testified that he had subsequently walked with two friends to the vicinity of 39th Street east of Broadway, apparently on Seventh Avenue. He was using a video camera to films scenes throughout the day and at one point while in the vicinity of Seventh Avenue, he observed several hundred individuals trapped between streets and chanting. (_Id._ at 160-63). He did not join in, but rather approached four officers standing together about half a block away on the sidewalk and engaged them in conversation about how their day had gone and whether there was any logic to how the police had been instructed to handle the crowds of the day. (_Id._ at 163-64, 167). The discussion went on for at least five minutes in an apparently friendly way with two of the officers, but one other (hereafter "the angry officer"), seemingly annoyed with the protesters and possibly with Cavanna for filming, screamed at him at one point "Get the fuck out of here" and "You've had your fun already." (_Id._ at 164-65). He may also have said "Get off the sidewalk." (_Id._). According to Cavanna, despite this outburst he continued his conversation not only with the other officers, who admitted that they were uncertain what they were supposed to do, but also with the angry officer, who apparently

95

then offered his view that the demonstrators should remember the events of September 11, 2001. In Cavanna's account, this discussion went on for several minutes, and he then started to leave. (Id. at 164-72). As he walked away, still filming, the officers followed him and were supplemented by another officer, in riot gear, who yelled, in substance, "What's going on here." (Id. at 176). At some point while Cavanna continued to walk away, that officer -- who appears to have been defendant Det. John Beale -- lunged at him, grabbing his arm and throwing him to the ground, while the previously described angry officer tried to grab Cavanna's camera. (Id. at 176-77). Cavanna tried to pass his camera to his friends but one of the officers threatened them with arrest. (Id. at 177-78). Cavanna was then placed under arrest and later charged with disorderly conduct. (Id. at 178-79, 211). As for his camera, it was not returned to him when he was released. It took four months for him to locate the camera in a collection of property held by the Police Department for destruction, and when he retrieved it he discovered that the film had been removed. (Id. at 225-29).

In contrast to this account, Det. Beale testified that Mr. Cavanna was part of a large group of disorderly and possibly violent protestors, that Cavanna had repeatedly disobeyed orders to clear the street and move on, and had returned to the area after

96

being physically escorted away by Det. Beale, and that, as Cavanna was being escorted away from the area for a second time, he pushed the officer escorting him. (Beale Dep. at 13-17, 24-26). These two accounts are irreconcilable, and if plaintiff's version is credited, there would be at least a triable issue regarding whether there was probable cause or arguable probable cause for his arrest.

Defendants appear to rest their argument principally on the contention that, according to Cavanna's testimony, he disobeyed an order -- presumably to "get the fuck out of here" and possibly to get off the sidewalk -- and that failing to comply with a police order provides a ground for arrest. (Defs.' Mem. of Law at 107-08, 110). This argument is misguided.

From the plaintiff's testimony it is not at all clear that the statement "get the fuck out of here" amounted to an order rather than simply a colorful expression of one officer's distaste for the demonstrators and for Mr. Cavanna's use of a video camera. Given the context, including the inaction of the other officers at the time of the expletive-laden comment, and even the inaction of the angry officer at that point -- according to Cavanna, he continued the conversation and was clearly engaging in political debate with Cavanna -- it is more plausible to infer that none of the officers

at the time took that comment to be an actual order (much less one grounded in any legal basis whatsoever, as opposed to simple fury at the events of the day or at Cavanna's videotaping). In fact, according to Cavanna the discussion between him and the officers -- which covered such topics as the anger of the demonstrators at the impending war, the significance of September 11, the manner in which the police were handling the demonstrators, and the logic of what was going on down the street -- continued for several minutes after the "get the fuck out of here" comment. (Cavanna Dep. at 164-72). Moreover, plaintiff then started to walk away, an action that at least would seem to comply with the "get the fuck out of here" directive -- if such it was. As for the events that immediately followed -- including the additional officer's statement to get off the sidewalk -- since the assault on plaintiff allegedly began right after that statement and there is no context from the plaintiff's testimony indicating why he should have been ordered off the sidewalk, there is adequate ground for a trier of fact to view the order as having no basis and to view the seizure of plaintiff and his camera as predicated, not on his purported failure to instantaneously start walking in the roadway, but rather on animus to his use of the camera.[35]

---

[35] Notably, there is no testimony that the officers ordered plaintiff to stop filming, and hence there is no need to parse the legitimacy of such an order, if it had been given.

98

In sum, there are substantial disputes as to the nature and evolution of the interaction between plaintiff and the police at 39th Street, and plaintiff's version is consistent with his arrest not having been supported by probable cause and as having actually been motivated by animus towards his exercise of his First Amendment rights. Under the circumstances we cannot find that the legality of the arrest is beyond triable dispute. We also cannot find that an arrest arguably triggered by a policeman's anger about the demonstrations and/or plaintiff's use of a video camera can be protected by qualified immunity as a matter of law.[36]

Finally, insofar as Det. Beale concededly participated in plaintiff's arrest (Beale Dep. at 26; see also Defs.' Ex. T), he is an appropriate defendant on this claim.

h. <u>Delaine Douglas</u>

The next false-arrest claim targeted (at least initially) by defendants is that of Delaine Douglas. In support of their application for summary judgment, they rely on the deposition

---

[36] In view of plaintiff's testimony, we also find that the arrest may be viewed as having been triggered by animus towards plaintiff's exercise of his First Amendment rights, and if so the arrest may also provide the basis for a First Amendment claim. <u>See</u> pp. 65-66, <u>supra</u>.

99

testimony of the arresting officer, defendant Wesley Otero, and argue that he is entitled to qualified immunity as a matter of law. In substance, they characterize him as reporting that he had arrested her because "she was amid a group that breached a police barricade." (Defs.' Mem. of Law at 116).

This assertion does not accord with Ms. Douglas's testimony. She recounted having journeyed to First Avenue by way of 72nd Street, at which point she was directed into a pen between 72nd and 71st Streets. (Douglas Mar. Dep. at 74-75). Over a period of one hour or more, she and the other people in that pen were allowed to move southward, street by street, into pens further downtown, until she and the others arrived at the block between 60th and 59th Streets. As she described it, that pen was very crowded, and she began at some point to move her way through the crowd towards the front of the pen, that is, to the barriers closest to 59th Street. She and the others in this crowded pen waited for some time to see if they would be permitted to leave it. (Douglas Apr. Dep. at 25, 32-33). We infer that most of the people were seeking to move further south, but Ms. Douglas had planned to do some shopping and have a pre-scheduled facial at Bloomingdale's on 59th and Lexington Avenue. (Douglas Mar. Dep. at 71-72). She and others repeatedly asked the police stationed at the front barriers, including Officer