Otero, when and if they would be permitted to advance further or (in plaintiff's case) would be allowed to exit in order to head west. Each time the officers indicated that no such permission would likely be forthcoming, and Otero at some point suggested that they should seek to exit from the rear of the pen, that is, by way of the barriers nearest 60th Street. (Douglas Apr. Dep. at 36-39). As narrated by Ms. Douglas, she squeezed her way to the rear of the pen but was unable to leave that way because the police there were barring any exit by others who were also seeking to leave. (Id. at 39-40). She then returned to the front end of the pen and informed the officers there, including Officer Otero, that she had not been permitted to exit the rear of the pen and again asked to be released at the front of the pen. (Id. at 40-42, 43-44). As time passed, she moved back from the front barriers several times to make cell phone calls to a friend and to her husband. (Id. at 49-50). At some point while she was standing some distance away from the front of the pen, she observed people around her moving forward, and she took several steps in the same direction. (Id. at 53-54, 57-59). She did not see anyone move the barriers, but she observed a small opening between two of the front barriers and saw that a number of people who had been in the pen were now in the cross-section in front of that pen, that is, in or around 59th Street. She also saw a number of police officers initially standing

101

in front of the opening on the outside of the pen. (<u>Id.</u> at 59-62).

According to Ms. Douglas, while she was standing inside the pen and still away from the front barriers, a group of four officers, including Otero, charged into the pen. She heard Otero yell "get her" and at that moment two officers barreled into her, knocking her onto her back and side. (<u>Id.</u> at 62-67). They and Otero then pressed her into the ground, grabbed her by her legs and one arm, flipped her over, rear-cuffed her and dragged her out of the pen and into the intersection, ripping her coat and frightening her. (<u>Id.</u> at 67-70, 74-75, 77). They then jerked her up and slammed her onto the hood of a patrol car, and then threw her into the car, banging her head against the door jamb in the process. (<u>Id.</u> at 77-82).

Eventually the three officers brought Ms. Douglas to the 19th Precinct, where she was given a summons for disorderly conduct and told by an officer that if she showed up in court, the charge would almost surely be dismissed. (<u>Id.</u> at 104-05, 110). She appeared several times in court, and the charge was eventually dismissed when Officer Otero reported that he could not positively identify her. (<u>Id.</u> at 106-09).

Given this testimony, it is readily apparent that defendants cannot prevail on summary judgment. Based on Ms. Douglas's testimony, she was doing nothing illegal, and there was no evident reason for Officer Otero to think otherwise.[37] The fact that others in front of her may have dislodged a police barrier and left or attempted to leave the pen gave the officers no justification for arresting people who did not do so and were simply standing peacefully inside the designated pen. For the same reason, judgment cannot be granted to Otero on his immunity defense since, if plaintiff's version is credited, Otero could not have reasonably believed that he had probable cause to arrest her.

### i. Sara Parkel

Defendants seek summary judgment for defendant Jeff Millenbach, the officer who arrested Ms. Parkel. (Defs.' Mem. of Law at 115-16). The record precludes such relief.

Ms. Parkel testified that she was walking with a group of people on 39th Street heading east towards Sixth Avenue, with the

---

[37] Indeed, if Otero represented at the state court appearance that he could not identify plaintiff (see Otero Dep. at 94-95, 100), it is at least open to question whether he can credibly testify now inconsistently with plaintiff's representation.

object of getting to a demonstration at First Avenue near 39th Street. She testified that at some point while the group was walking on the sidewalk under scaffolding, the police surrounded the entire group, bringing it to a halt. (Parkel Dep. at 18-20). According to plaintiff, one of the officers warned the trapped individuals that they were not to go onto the roadbed or they would be arrested. (Id. at 20-21). Subsequently the police told the assembled crowd that they would be allowed to leave, heading either east or west -- Ms. Parkel was unclear as to which direction the people in question would be allowed to head towards -- but that anyone going in the opposite direction would be arrested. (Id. at 25). In Ms. Parkel's account, the police subsequently let approximately five people leave, but then proceeded to arrest everyone else, including her, even though the arrestees were on the sidewalk and were being blocked from walking away by the police. She further confirmed that if she had been allowed to move, she would have gone home. (Id. at 18-29, 74-75; see also id. at 67-70).

Under this scenario, the police obviously had no probable cause to arrest anyone in this crowd. The arrestees had been walking on the sidewalk, and thus not blocking pedestrian traffic, until they were stopped by the police. If civilian traffic was then blocked, it was only because the police refused, for no apparent

104

reason, to permit the bulk of the approximately fifty people to continue walking in either direction. In short, it was the police who, in this account, manufactured the purported crime by blocking a large number of people from moving.

It follows as well that if Ms. Parkel's account is credited, Officer Millenbach cannot demonstrate as a matter of law that he had a reasonable basis to believe that he had probable cause to arrest her. Defendants rely on Millenbach's deposition testimony to the effect that he heard an order to the crowd to disperse, that he saw people blocking pedestrian traffic, that he observed another officer lead Ms. Parkel out of the group, and that he then placed her in handcuffs and became her arresting officer. (Millenbach Dep. at 65-66). Accordingly, he says that he had probable cause to arrest her or at least that he reasonably believed that he had such a legal justification for her arrest. (Defs.' Mem. of Law at 116).[38]

As noted, however, Ms. Parkel testified in substance that she had not violated any police order, and that it was the police who

---

[38] We note that Ms. Parkel testified that she did not see Millenbach at the time of her arrest and first met him at the 7th Precinct. (Parkel Dep. at 41-42). In view of defendant's testimony that he in fact participated in her arrest, there is no occasion for excusing him from the case on the theory that he had nothing to do with her arrest.

had blocked her and the others from moving. Moreover, although Millenbach refers to another officer having led Ms. Parkel out of the crowd, that fact does not in itself excuse his taking credit for the arrest, in which he concededly participated. (Millenbach Dep. at 65-66; Defs.' Ex. T). He either had a basis (or an arguable basis) for arresting her or he did not. The record on that point is not settled, and hence summary judgment should be denied.

### 3. The Effect of Some Plaintiffs' Receipt of Adjournments in Contemplation of Dismissals

Three of the plaintiffs -- Parkel, Dellal and Cavanna -- received an adjournment in contemplation of dismissal ("ACD"). Defendants argue that this disposition of the charges against them precludes their assertion of false-arrest claims, because it is inconsistent with the required proof of a lack of probable cause for the arrest. (Defs.' Mem. of Law at 111-12). We disagree.

The federal courts look to state law for the elements of false-arrest and malicious-prosecution claims. Jaegly, 439 F.3d at 151-52 (false arrest); Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010) (malicious prosecution). As noted, to demonstrate a false arrest the plaintiff must show that he was deprived of his liberty, that this was done without his consent and

that the seizure was not privileged, a standard that in this context looks to whether the seizure was supported by probable cause. See, e.g., Escalera, 361 F.3d at 743; Savino 331 F.3d at 75. Unlike the tort of malicious prosecution, a false-arrest claim does not require the plaintiff to demonstrate that any criminal proceeding that followed the arrest ended in her favor. Compare Savino, 331 F.3d at 75 (listing elements of false-arrest claim) with Manganiello, 612 F.3d at 161 (listing elements of malicious-prosecution claim as "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.") (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997))(emphasis added).

The New York courts have long held that acceptance of an ACD precludes a malicious-prosecution claim because the ACD is not a favorable termination for the plaintiff, which is a required element of that tort. See, e.g., Rothstein v. Carriere, 373 F.3d 275, 286-87 (2d Cir. 2004) (quoting, inter alia, Smith-Hunter v. Harvey, 95 N.Y.2d 191, 196-97, 712 N.Y.S.2d 438, 441-42 (2000)). That remains the case today. Id.; see also Smith-Hunter, 95 N.Y.2d at 197, 712 N.Y.S.2d at 441-42 (citing Hollender v. Trump Vil.

Coop., 58 N.Y.2d 420, 461 N.Y.S.2d 765 (1983)). In contrast, however, the New York courts recognize with some consistency that an ACD does not preclude the assertion of a false-arrest claim, since a favorable termination is not an element of that tort. See, e.g., Scherr v. City of Lackawanna, 79 A.D.3d 1785, 1786, 913 N.Y.S.2d 602, 602 (4th Dep't 2010) (quoting Hollender, 58 N.Y.2d at 423, 461 N.Y.S.2d at 433). If we are obliged to apply New York law to this federal tort, as we must, see, e.g., Weyant, 101 F.3d at 852, then it follows that the ACD does not itself provide a defense to the false-arrest claim, a conclusion that several courts in this circuit have adopted. See, e.g., Picciano v. McLoughlin, 723 F. Supp.2d 491, 501 n.38 (N.D.N.Y. 2010); Worytko County of Suffolk, 2007 WL 1876503, at *2-3 (E.D.N.Y. June 28, 2007); Cumberbatch v. Port Auth. of N.Y. & N.J., 2006 WL 3543670, at *10 & n.17 (S.D.N.Y. Dec. 5, 2006).

To the extent that some decisions have held that the ACD bars a false-arrest claim, e.g., Bowles v. State, 37 F. Supp.2d 608, 611-12 (S.D.N.Y. 1999), they seem to rest on a Second Circuit decision predating Weyant that indicated that a favorable termination is a prerequisite for such a claim. See Roesch v. Otarola, 980 F.2d 850 (2d Cir. 1992); cf. Johnson v. Bax, 63 F.2d 154, 159 (2d Cir. 1995). The Second Circuit's subsequent decision

108

in Weyant addressed Roesch and distinguished it in part on the basis that New York law clearly did not impose a favorable-termination requirement on false-arrest claims, whereas Roesch had originated in Connecticut district court and Connecticut state law was unsettled on that point. Weyant, 101 F.3d at 853 (citing Broughton, 37 N.Y.2d at 456, 373 N.Y.S.2d at 93; Roesch, 980 F.2d at 853). Given the clear indication in Weyant and later cases that we should follow the lead of the New York courts, we reject the notion, espoused here by defendants, that the false-arrest claims should be barred if the plaintiffs received an ACD.[39] Accord, e.g.,

---

[39] We note that Roesch reasoned that if a malicious-prosecution claim is barred absent a favorable termination, it would make sense to preclude a plaintiff from prevailing on a false-arrest claim, even in the provable absence of probable cause for the arrest, if the charges in question ultimately led to a conviction. Regardless of whether that be a convincing point as a policy matter, the New York courts have disagreed with that suggestion, and if we must look to state law, then we are bound by their conclusion. In any event, it is not all clear why a plaintiff should be denied any remedy if he was arrested without probable cause, merely because the charges were later disposed of on a basis that was not inconsistent with guilt. The two torts are distinct, and address different conduct. Weyant, 101 F.3d at 853 (quoting Broughton, 37 N.Y.2d at 456, 373 N.Y.S.2d at 93). The false-arrest claim rests on the contention that the decision to arrest was unlawful and that the time spent in custody as a consequence, until the filing of formal charges, is compensable. See Broughton, 37 N.Y.2d at 459-60, 373 N.Y.S.2d at 96. In contrast, the malicious-prosecution claim looks to the subsequent decision to file formal charges, and it challenges the propriety of that separate decision. Id. It makes perfect sense, given the nature of that type of claim, to impose a favorable-termination requirement, since, absent such a termination, the decision to charge was presumably justifiable. Moreover, this distinction is further appropriate since it is entirely possible that an arrest,

MacNamara, 2011 WL 1991144, at *18 n.18; Wahhab v. City of New
York, 386 F. Supp.2d 277, 293 (S.D.N.Y. 2005).


    4. Disposition of the False-Arrest Claims Against the City and
       Supervisory Individual Defendants

    Although the false-arrest claims should survive against the
arresting officers, plaintiffs also seek to press those claims
against the City itself and against various supervisory defendants,
specifically, defendants Kelly, Joseph and Michael Esposito, Grasso
and Smolka. (Pls.' Mem. in Opp'n at 71-81).[40] Defendants argue that
these claims should not survive against these defendants for lack
of proof that the City or the supervisory defendants bore
responsibility for any unjustified arrests. (Defs.' Reply Mem. of
Law at 55-58, 74-76).


    With respect to the City, plaintiffs argue in general terms
that the plan approved by the Police Department for the event was
defective either in design or in implementation because it did not

-----

with consequent injury, may have been made without basis, but
that the authorities subsequently acquired enough evidence to
file formal charges.

    [40] Plaintiffs at this stage do not press false-arrest claims
against defendants Acerbo, Aanonsen, Flynn, Willoughby, Brady,
Carney, Secreto, Scali and Reilly. (Pls.' Mem. in Opp'n at 79
n.25).

adequately prepare the police on the ground for crowd control on the scale required by such a large demonstration -- a failing that led to unnecessary crowd congestion and confusion by the police as to how to deal with that circumstance -- and that this failing represents a policy decision by the City that ignored the overwhelming likelihood that police personnel would engage in large-scale false arrests as a means of handling such a large turnout. (Pls.' Mem. in Opp'n at 71-72, 76). Plaintiffs further argue that the City may also be held liable for failure to supervise the police force because a number of supervisory defendants were at the site of the event and they should have realized during the demonstration that the officers under their command were making numerous false arrests and that this behavior must be stopped. (Id. at 72, 77-78).

As for the supervisory defendants, plaintiffs argue, in like terms, that since they were present for the demonstration, they were surely aware of extensive misconduct by their subordinates in making arrests, and yet failed to correct the problem. Hence, according to plaintiffs, they may be found individually liable for their subordinates' conduct in making arrests. (Id. at 79-81).

Plaintiffs' Monell arguments are not buttressed by evidence

sufficient to permit a finding that the City may be held liable for
any of the arrests in question. Insofar as they attack the crowd-
control plan, they argue in effect that it was not well-designed,
and that in particular its crowd-control provisions -- including
the blocking of side streets and the failure to ensure that all
officers assigned to the demonstration knew what access plans were
in place -- led to overcrowding, which in turn led to arrests
without basis as a means of clearing the overcrowded streets.
(Pls.' Mem. in Opp'n at 71-72, 76-78). As we have already noted, we
have found that the plan, as designed, was within the discretion of
the Police Department and hence not subject to First Amendment
challenge and that its implementation by senior Department
personnel was (with the triable exception of the failure to provide
updated access information to the crowd) also consistent with
municipal policing discretion. (<u>See</u> pp. 35-66, <u>supra</u>). Even if that
were not the case, however, plaintiffs offer no evidence that the
plan embodied a policy or practice by the Department as an
institution to direct, encourage or approve of unlawful arrests. At
most, plaintiffs argue that the plan was poorly designed, an
assertion that, even if correct in some respects, does not assist
them in showing that the Department had, either explicitly or by
unavoidable implication, adopted such an unconstitutional policy.

Plaintiffs do not attempt, as an alternative ground for <u>Monell</u> liability, to demonstrate that there was a Department practice before February 15 to control these types of demonstrations by the use of unlawful arrests. They also cannot show that the Department knew in advance of the likelihood that police officers would confront a huge (and, in places, unruly or even riotous) throng and would try to handle it by making numerous, or any, unjustified arrests. Rather, they seek to impose liability on the City based on a theory of failure of supervision, but this theory founders for lack of evidence.[41]

As we have noted, a claim of failure to supervise cannot succeed unless the plaintiff proffers evidence from which a trier of fact may infer that the senior City personnel were aware that their subordinates were engaging in unconstitutional behavior or that they were highly likely to do so absent more stringent supervision, and that the senior supervisors then failed to act to

---

[41] At one point plaintiffs appear to articulate, in passing, a theory of failure to train the police. (Pls.' Mem. in Opp'n at 72). This nascent argument fails for lack of any specific evidence as to how the police were trained in crowd control, what defects were reflected in that training, and why the Department should have known to a moral certainty that failure to provide more extensive or better training would lead to a pattern of false arrests in the context of mass demonstrations. <u>Cf.</u> <u>Connick</u>, 131 S.Ct. at 1359-60 (discussing "deliberate indifference" requirement for failure-to-train claims); <u>Reynolds</u>, 506 F.3d at 192-93 (same); <u>Walker</u>, 974 F.2d at 296-98 (same).

correct or avoid the problem. <u>See</u> <u>Thomas v. Roach</u>, 165 F.3d 137, 145-46 (2d Cir. 1999) (granting summary judgment to defendant city where "[plaintiff's] evidence was not sufficient to show that the City . . . had a policy of deliberate indifference that led to his injuries."); <u>Searles</u>, 652 F. Supp.2d at 443-44 (dismissing failure-to-supervise claim where "[plaintiff]'s evidence . . . fails to establish 'that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and [that] the policymaker's failure to investigate or rectify the situation evidences deliberate indifference . . . .'") (quoting <u>Amnesty Am.</u>, 361 F.3d at 128). Rhetoric aside, plaintiffs do not proffer an adequate showing to permit such findings to be made here. The closest that they come in this regard is citing the fact that defendant Smolka signed a number of summonses for arguably unjustified arrests and that he did so without having witnessed the events that had triggered the arrests. His role, while it may open him to liability for his conduct in approving these specific arrests, does not translate into a Department policy not to supervise the behavior of patrol officers in making arrests despite knowledge to a moral certainty that, absent such supervision, the officers on the ground would engage in a pattern of false arrests.

114

As for the possible liability of the various supervisory defendants, we start by addressing the pertinent legal standards, which are currently in some flux. As we have noted, a plaintiff may not prevail on a constitutional tort claim against an individual defendant absent proof that the defendant was personally responsible in some way for the alleged misconduct. It is well settled that, regardless of a defendant's position in the governmental hierarchy, he cannot be held liable under section 1983 for an award of damages absent some form of personal involvement in the constitutional tort. See, e.g., Scott, 616 F.3d at 110 (quoting McKinnon, 568 F.2d at 934); Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

Until recently the accepted standard for personal involvement by a supervisor was that articulated in Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). In Colon the Court identified five categories of conduct that may demonstrate the personal involvement of a supervisory defendant. Such personal involvement, the Court held, may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices

115

occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiff]s by failing to act on information indicating that unconstitutional acts were occurring.

Id.; accord Provost, 262 F.3d at 154; Wright, 21 F.3d at 501; see also Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (quoting Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Recently, however, the scope of what qualifies as "personal involvement" by a supervisor has come into question by virtue of a 2009 decision in which the Supreme Court held, in a pleading context, that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 129 S.Ct. at 1948. The Second Circuit has not yet addressed how Iqbal affects the five categories of conduct that give rise to supervisory liability under Colon. However, because Iqbal specifically rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," several decisions in this district have held that Iqbal has nullified most of the

116

longstanding Colon factors. See Bellamy v. Mount Vernon Hosp., 2009
WL 1835939, at *4 (S.D.N.Y. June 26, 2009)[42]; Newton v. City of New
York, 640 F.Supp.2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to
train claims pursuant to section 1983 have not survived the Supreme
Court's recent decision in Ashcroft v. Iqbal."). These courts have
concluded that "[o]nly the first and part of the third Colon
categories pass Iqbal's muster," and that "[t]he other Colon
categories impose the exact types of supervisory liability that
Iqbal eliminated," because only the first and third categories
sufficiently allege personal involvement to permit supervisory
liability to be imposed after Iqbal. Bellamy, 2009 WL 1835939 at
*6; Spear v. Hugles, 2009 WL 2176725, at *2 (S.D.N.Y. July 20,
2009) ("The Supreme Court explicitly rejected the argument that, 'a
supervisor's mere knowledge of his subordinate's discriminatory
purpose amounts to the supervisor's violating the Constitution.' .
. . Accordingly, only the first and third Colon factors have
survived the Supreme Court's decision in Iqbal.").

We disagree with this narrow interpretation of Iqbal, as have

---

[42] "Only the first and part of the third Colon categories
pass Iqbal's muster - a supervisor is only held liable if that
supervisor participates directly in the alleged constitutional
violation or if that supervisor creates a policy or custom under
which unconstitutional practices occurred." Bellamy, 2009 WL
1835939, at *6.

a number of other courts. <u>See</u>, <u>e.g.</u>, <u>Delgado v. Bezio</u>, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011); <u>Qasem v. Toro</u>, 2010 WL 3156031, at *3 (S.D.N.Y. Aug. 10, 2010); <u>D'Olimpio v. Crisafi</u>, 2010 WL 2428128, at *4 -5 (S.D.N.Y. June 15, 2010). We believe, as observed in <u>Sash v. United States</u>, 674 F. Supp.2d 531 (S.D.N.Y. 2009), that "[i]t was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." <u>Id.</u> at 544 (internal citation omitted). Thus, as in the present case, where the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in <u>Colon</u> should still apply. <u>Id.</u> (citation omitted); <u>D'Olimpio</u>, 2010 WL 2428128 at *4-5. Hence we look to earlier Second Circuit precedent that applies the tests of deliberate indifference or gross negligence to assess supervisory liability, a standard that defendants themselves invoke (<u>see</u> Defs.' Reply Mem. at 49 (citing <u>Meriwether v. Coughlin</u>, 879 F.2d 1037, 1048 (2d Cir. 1989)), and that demands a showing of actual or constructive notice by the supervisory defendant of constitutional torts committed by their subordinates. <u>Sash</u>, 674 F.Supp.2d at 544;

118

cf. Connick, 131 S.Ct. at 1360.[43]

Applying these standards, we conclude that plaintiffs cannot sustain a false-arrest claim against any supervisory defendant other than Smolka. There seems to be no dispute that defendant

---

[43] Although Connick dealt solely with municipal liability under section 1983, we believe that its analysis is informative as to the scope of personal liability for supervisors and supports our conclusion that Colon remains viable. In the context of either municipal liability or supervisory liability, the Supreme Court has clearly stated that a defendant is only responsible for his own actions. Compare Connick, 131 S.Ct. at 1359 ("[U]nder § 1983, local governments are responsible only for 'their own illegal acts' . . . [t]hey are not vicariously liable under § 1983 for their employees' actions.") (quoting Pembaur, 475 U.S. at 479) (emphasis in original), with Iqbal, 129 S.Ct. at 1948 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Hence, if failure-to-train claims or the "deliberate indifference" test for a supervisor's personal involvement in constitutional violations under § 1983 were no longer viable after Iqbal, we would expect that the same type of § 1983 claims would fail if asserted against a municipality. Yet in Connick, the Supreme Court applied the "deliberate indifference" test to a failure-to-train claim. 131 S.Ct. at 1360-66. Connick ultimately rejected municipal liability on the grounds that the plaintiff had not proven the "pattern of similar violations" establishing that the supervisory defendant had received adequate notice of the specific constitutional violation allegedly resulting from his failure to adequately train his subordinates, and thus failed to show a "'policy of inaction' that [was] the functional equivalent of a decision by the city itself to violate the Constitution." Id. at 1366 (quoting City of Canton, 489 U.S. at 395). The Court did not, however, suggest that municipal liability was unavailable because it was premised on a failure-to-train claim, compare Newton, 640 F. Supp.2d at 448, or allegations of deliberate indifference, which would seem to fall within Colon's fifth category of personal. Compare Bellamy. See 2009 WL 1835939, at *6.

Grasso was neither involved in planning for the policing of the demonstration nor present for the event. (See Scanlon Aff. at ¶¶ 11-46). Hence he plainly cannot be held liable for it. As for Commissioner Kelly, since the plan that he appears to have approved or acquiesced in was not itself constitutionally inadequate, and since there is no indication that he was present at the demonstration or handling on-the-spot decisions by the Department's senior supervisors, he too cannot be held responsible for the arguably false arrests.[44]

As for defendants Joseph Esposito and Michael Esposito, plaintiffs' argument for supervisory liability against the two Espositos fails because they do not proffer an adequate evidentiary basis for the assertion that these defendants knew that the level of supervision that they were providing at the demonstration would be inadequate to protect against the likelihood of false arrests by the police. In substance, plaintiffs suggest that these defendants should have been aware at some point during the day that too many people were being arrested and that this was a red flag that

---

[44] This is not the sort of claim for which the head of the Department may be held liable for police misconduct because he surrendered to more junior personnel the responsibility to make policy decisions that should have been his. Cf. Gutierrez v. City of New York, 756 F. Supp.2d 491, 514-15 (citing, inter alia, Praprotnik, 485 U.S. at 130).

120

matters were out of control and that the arrests being made were unjustified. (Pls.' Mem. in Opp'n at 77-78, 81). This argument is based on rhetoric rather than evidence. The Department's plan projected up to 250 arrests, and the final total was only marginally higher. (See O'Connell Dep. at 113, 116-17, 180-81; Defs.' Ex. QQ). Moreover, plaintiffs offer no specifics to justify their implied assertion that the projection of 250 legitimate arrests was too high.[45] The actual number of purely lawful arrests at a mass demonstration is inevitably a product of crowd behavior as well as police responses to that behavior, rather than pre-ordained police planning, and there is undisputed evidence that in a number of instances on February 15 groups of protesters or others present at the event engaged in unlawful behavior, thus triggering the need for at least some arrests. (Acerbo Dep. at 94-95, 109, 115-19; M. Esposito Dep. at 131-33, 159-63, 196-97; Gannon Dep. at 184-85, 191-94; Beale Dep. at 13-14, 64-67). Plaintiffs offer no

_____

[45] At one point plaintiffs seem to argue that this estimate was too high and somehow betokens the notion that the police intended to pursue unjustified arrests. (Pls.' Mem. in Opp'n at 76). The only articulated basis for this is the plaintiffs' assertion that the police had never arrested that many people at prior demonstrations, an argument that, apart from being undocumented, is beside the point, since there is no dispute that the February 15 protest was the largest political demonstration that the police had ever confronted. In any event, for reasons already noted, plaintiffs fail to demonstrate a basis for finding that the plan as originally designed -- even if in haste -- was outside the broad discretion of the police in seeking to ensure public safety and order.

121

basis for inferring that the supervisory defendants should have known at any particular moment that their supervision of the officers on the scene was manifestly inadequate to protect the right of the public to demonstrate peacefully.

Finally, defendant Smolka was actively involved on the streets, including in making arrests and then later signing summonses for other arrestees. (Smolka Dep. (Pls.' Ex. 76) at 45-46; see also Defs.' Ex. S, Pls.' Ex. 14). To the extent that he made or approved arrests for which there was no basis, he may be held liable.[46] But plaintiffs offer no basis for holding him in particular liable for arrests that he neither carried out nor approved.[47]

---

[46] These arrests include the arrests of plaintiffs Silva and Bryant, for whom Smolka signed summonses. (Pls.' Exs. 10, 31). As stated above, defendants do not challenge these plaintiffs' false-arrest claims on summary judgment. (See pp. 72, supra). Defendants also fail to address the false-arrest claim of plaintiff Melvyn Stevens, whose summons was signed on behalf of defendant Neil Spadaro. (Pls.' Ex. 31; Spadaro Dep. at 51-70).

[47] At one point plaintiffs appear to criticize Smolka, and perhaps the Espositos, for placing themselves on the streets rather than at a command post, where they supposedly could have more effectively monitored the day's events and performance by the police under their command. (Pls.' Mem. in Opp'n at 77-78). Whether, as matter of police management efficiency, this is a valid criticism is uncertain, but it does not save plaintiffs' claims, since the constitutional claims that they are asserting do not turn on an after-the-fact grading of management competence. For purposes of a deliberate-indifference claim against either the City or the supervisory defendants, the

D. <u>Defendants' Motion: The Excessive-Force Claims</u>

Defendants also target most or all of plaintiffs' claims of
excessive force. These claims are based mainly, but not
exclusively, on confrontations between some of the plaintiffs and
police officers in the context of an arrest. They include
assertions by many of the arrestee plaintiffs that the police
officers, in arresting them, unjustifiably threw them to the
ground, pushed or pummeled them, and then exerted additional and
unnecessary force on them as part of the handcuffing process. Some
also contend that the police placed handcuffs on them that were so
tight as to cause pain or other injuries, and that other officers
refused over many hours either to loosen or to remove the cuffs
even though there was no need for such painful restraints. A few
plaintiffs also contend that the police improperly used horses to
physically engage demonstrators, causing needless harm or fear.
(Pls.' Mem. in Opp'n at 86-88).

Defendants argue that plaintiffs Lamb, Parkel, Bryant, Dellal

_____

plaintiffs must demonstrate knowledge by senior Department
personnel of a specified likelihood of illegal behavior by the
police absent more stringent supervision and the feasibility of
such more intensive supervision. For purposes of this analysis,
even proof of negligence does not trigger constitutional
liability. <u>See</u> <u>Amnesty Am.</u>, 361 F.3d at 128 (citing, <u>inter</u> <u>alia</u>,
<u>City of Canton</u>, 489 U.S. at 389).

and Stevens cannot show that they were subjected to any or more than de minimis force; that plaintiff Haus has admitted that the force to which she was subjected was unintentional on the part of the police officer, thus precluding liability on her constitutional claim; and that the claims of plaintiffs Connor, Sanchez, Stevens, Bryant, Dodde, Spitzer, Cavanna, Venizelos, Douglas, Silva, Blair, Parkel and Lamb must also fail because they cannot identify which individual defendant, if any of them, was involved in the application of force. (Defs.' Mem. of Law at 73). Plaintiffs respond that all of the excessive-force claims are based on actions that constituted more than de minimis use of force, that the arresting officers are liable for the use of force, as are the supervisory defendants, and that the City too may be held liable. (Pls.' Mem. in Opp'n at 85-107).

### 1. The Standards for Assessing Force as Excessive

We first address defendants' challenges to the evidence underlying six of the plaintiffs' contentions that they were subjected to excessive force by City police. We start by summarizing what we understand to be the pertinent criteria for determining whether a particular degree of force is constitutionally excessive.

A claim of excessive force in the context of an arrest must be evaluated under the Fourth Amendment standard of reasonableness. See, e.g., Graham v. Connor, 490 U.S. 386, 397 (1989); Anderson v. Branen, 17 F.3d 552, 558-59 (2d Cir. 1994). In applying this test, the trier of fact must look to whether, in light of the circumstances confronting the arresting officers, the amount and nature of the force used was "objectively reasonable." Graham, 490 U.S. at 397; Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995); Anderson, 17 F.3d at 559. As emphasized by the Supreme Court, the "determination of reasonableness under the Fourth Amendment" is fact-specific, and "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396. Accord, e.g., Kerman, 261 F.3d at 238-39. In making this assessment the court must consider all of the pertinent facts, "including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officer or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

In assessing a force claim, context is of course crucial. It is thus essential for the court to avoid conflating excessive-force

analyses from the prison context with such claims made in non-prison contexts, for two reasons. First, the standard for assessing uses of force is less forgiving when the force is applied to a member of the public, including particularly during the course of an arrest. Compare, e.g., Hudson v. McMillian, 503 U.S. 1, 7-10 (1992) (court looks to whether force was used by prison guard "maliciously and sadistically," that is, "wantonly," and whether it was more than de minimis), with Graham, 490 U.S. at 398-99 (test is whether the amount of force used in arrest was reasonably necessary to accomplish the arrest safely). Second, the courts recognize that in a prison setting the need for some degree of force is more commonly encountered than would likely be true on the outside. See, e.g., Hudson, 503 U.S. at 9 ("not every malevolent touch by a prison guard gives rise to a federal cause of action.") (citing Johnson v. Glick, 481 F.2d 1028 (2d Cir. 1973)). Hence the courts are generally careful to treat force claims in a prison context somewhat differently from those that arise when the police deal with members of the public. See, e.g., United States v. Walsh, 194 F.3d 37, 47-50 (2d Cir. 1999) (addressing Hudson and specifying that its test applies to force claims "in a prison context").

As for the amount of force that would trigger liability, the courts do seem to recognize a requirement that the force used in

126

either context should usually be more than <u>de</u> <u>minimis</u>. Nonetheless, even in prison cases the Supreme Court has cautioned that the <u>de</u> <u>minimis</u> use of force triggers an Eighth Amendment violation if its application is "repugnant to the conscience of mankind", <u>Hudson</u>, 503 U.S. at 10, a term that the Second Circuit has held to cover any "malicious use of force". <u>Walsh</u>, 194 F.3d at 50 (quoting <u>Blyden</u> <u>v. Mancusi</u>, 186 F.3d 252, 263 (2d Cir. 1989)).

In the context of an arrest, some courts, in decisions cited by defendants, have said that a use of force is <u>de</u> <u>minimis</u> -- and by implication not litigable -- if it does not cause injury. <u>E.g.</u>, <u>Davis v. United States</u>, 2004 WL 324880, at *10 n.6 (S.D.N.Y. Feb. 19, 2004); <u>Bowles v. New York</u>, 37 F. Supp.2d 608, 612 (S.D.N.Y. 1999). Invoking those cases, defendants argue that a number of the plaintiffs cannot prevail on their excessive-force claims because they conceded in their deposition testimony that the pertinent use of force, even if arguably disproportionate to the circumstances, did not cause them physical injury. (Defs.' Mem. of Law at 75). We disagree.

As a general matter, the Fourth Amendment formulation of the test for excessive force does not itself impose an injury requirement. All that it requires is proof that the amount of force

127

used was objectively unreasonable under all of the circumstances. Presumably the infliction of injury -- that is, a physical manifestation that may arise in the wake of the use of force -- is pertinent on two issues: it is probative of the degree of the force actually used and it will likely affect the amount of damages. See, e.g., Tracy v. Freshwater, 623 F.3d 90, 97 (2d Cir. 2010). Consistent with this analysis, a number of courts have explicitly rejected a requirement of injury to sustain a Fourth Amendment excessive-force claim. As the Seventh Circuit recently observed in an arrest case involving a police officer's display of a firearm:

> Plaintiffs need not show physical injury in order to sustain an excessive force claim. Such a rule would be inconsistent with the Supreme Court's ruling in *California v. Hodari D.*, 499 U.S. 621 . . . (1991), recognizing that an arrest can be effectuated by the slightest application of physical force, or by some show of authority. Id. at 625. The issue is simply whether, once it is clear (as it is here) that a seizure has occurred, that seizure meets Fourth Amendment standards.

Baird v. Renbarger, 576 F.3d 340, 344 (7th Cir. 2009); accord Mlodzinski v. Lewis, __ F.3d __, 2011 WL 2150741, *12-13 (1st Cir. June 2, 2011) (rejecting summary judgment on excessive-force claim for pointing firearm at unthreatening plaintiff); see also, e.g., Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005) (en banc); Holland v. Harrington, 268 F.3d 1179, 1192-93 (10th Cir. 2001); Baker v. Monroe Township, 50 F.3d 1186, 1193-94 (3rd Cir. 1995).

The panel in <u>Baird</u> went on to say:

> As noted earlier, . . . the physical injury requirement has
> not been adopted by this circuit, and for good reason.
> Rigid insistence on physical injury would be tantamount to
> a rule under which pointing a gun is always *per se*
> reasonable. This would not be consistent with *Graham* or
> *Hodari D,* which require us to delve into the facts to
> determine the context in which the gun pointing occurs.

<u>Baird</u>, 576 F.3d at 346. To similar effect is the concurring opinion

of Justice Kennedy in <u>Muehler v. Mena</u>, 544 U.S. 93 (2005), a

decision that addressed the handcuffing of occupants of an

apartment during a police search. In offering future guidance for

police, Justice Kennedy noted that the use of handcuffs entailed

the exercise of force, thus triggering Fourth Amendment analysis,

and he specified that under the pertinent reasonableness test, even

if the initial use of handcuffs was reasonable to protect the

searchers, "[t]he restraint should . . . be removed if, at any

point during the search it would become readily apparent to any

objectively reasonable officer that removing the handcuffs would

not compromise the officers' safety or risk interference or

substantial delay in the execution of the search." 544 U.S. at 103

(Kennedy, J., concurring). The implication of this observation is,

of course, that the Fourth Amendment would compel that step even if

the handcuffs did not cause injury or even transient pain. Justice

Kennedy also observed that the handcuffs must be removed or

129

loosened, seemingly even if there was some danger, in the event that the handcuffed person complained that the handcuffs were too tight and were causing pain. <u>Id.</u>

The Second Circuit has not conclusively decided this precise issue, but it has indicated in a number of decisions that the plaintiff may prevail on a Fourth Amendment excessiveness claim absent physical injury, as for example in the context of (1) the police pointing a gun at a civilian, <u>e.g.</u>, <u>Mills v. Fenger</u>, 216 Fed. Appx. 7, 9-10 & n.1 (2d Cir. Dec. 26, 2006) (citing <u>DiSorbo v. Hoy</u>, 343 F.3d 172, 184 (2d Cir. 2003), and <u>Robinson v. Solano Cnty.</u>, 278 F.3d 1007, 1015 (9th Cir. 2002)), or (2) an officer orally threatening to "blow [arrestee's] brains out," <u>Kerman</u>, 261 F.3d at 232, 239-40. Other panels in this Circuit have indicated repeatedly that a plaintiff need not show serious injury to prevail on an excessive-force claim, although in those cases they have cited some evidence of injury that the plaintiff claimed to have suffered. <u>See</u>, <u>e.g.</u>, <u>Maxwell v. City of New York</u>, 380 F.3d 106, 108-10 (2d Cir. 2004); <u>Robison v. Via</u>, 821 F.2d 913, 924-25 (2d Cir. 1987).

Based on this legal authority, we infer that a plaintiff asserting a claim for excessive physical force in this context must

130

demonstrate, at most, that the force was disproportionate to the circumstances and that it either was enough to cause some pain or other physical discomfort at the time that the force was applied or else resulted in some injury, even if minor. Based on this standard, we conclude that the testimony of some of the targeted plaintiffs suffices to create a triable issue as to the excessiveness of the force that the police applied. Among these plaintiffs, however, many fail to attribute the violation to any of the named individual defendants. Finally, plaintiffs fail to demonstrate a basis for liability by the City or, with one exception, by the supervisory defendants.

### 2. Assessment of the Targeted Claims

#### a. Donna Lamb

Donna Lamb was not arrested, or even touched, by a New York City police officer, much less injured. (Lamb Dep. 68, 71). She testified only that, while in the vicinity of 53rd and 54th Streets on Third Avenue, she and others were "forced" onto a sidewalk from a roadway by police oral commands and the maneuvering of mounted police. (Lamb Dep. at 68, 71). Although she reported that the police had admonished her, in peremptory terms, to stay on the

131

sidewalk (Lamb Dep. at 65, 77), that does not constitute a constitutional tort. <u>See</u>, <u>e.g.</u>, <u>Bowles</u>, 37 F. Supp.2d at 613. Hence her claim should be dismissed, as plaintiffs now concede. (<u>See</u> Pls.' Mem. in Opp'n at 86 n.28).


   b. <u>Don Bryant</u>


   Don Bryant complains that he was handcuffed and that the cuffs caused him discomfort and abrasions. (Bryant Dep. at 48). Defendants argue that he did not refer to such a complaint when he testified at his 50-h hearing, but first mentioned this injury at his deposition. (Defs.' Mem. of Law at 77). For this reason, they argue that he should not be allowed to pursue his claim.


   Contrary to defendants' contention, Bryant did refer at his 50-h hearing to the tightness of the handcuffs and the fact that he suffered abrasions from wearing them for some number of hours. (Defs.' Ex. SS at 20). That testimony offers no basis for striking this claim.


   Defendants' alternative argument is that the handcuffing of an arrestee is standard practice, that no additional force was used upon Bryant, and hence that Bryant cannot show that any force used

on him was excessive. (Defs.' Mem. of Law at 77). We disagree.

Plaintiff bears the burden of demonstrating that the force used on him was unreasonable under the circumstances. Bryant testified that the only force used at the time of his arrest involved an unidentified arresting officer tapping him on the shoulder (Defs.' Ex. SS at 13-14) and the application of the handcuffs. (Id. at 15, 20). Plainly the shoulder tap does not amount to excessive force. As for the handcuffs, plaintiff does not argue, and certainly cannot demonstrate, that their use under the circumstances was impermissible. The handcuffing of arrestees is standard procedure (Defs.' Ex. II (NYPD Patrol Guide § 208)), and was particularly appropriate in the circumstances presented during the demonstration, when the police were confronted with vast numbers of people, some apparently engaging in one form or another of civil disobedience (Acerbo Dep. at 109, 115-19; Defs.' Ex. X at 155-56), and some engaging in at least minor violence. (Acerbo Dep. at 94-95; Beale Dep. at 13-14, 63-67; M. Esposito Dep. at 196-97). In these circumstances, there was ample justification for the arresting officers to initially cuff all arrestees, even those -- such as Mr. Bryant -- who were neither violent nor actively resisting arrest. See generally Muehler, 544 U.S. at 99-100; see

133

also id. at 102-04 (Kennedy, J., concurring).[48]

That said, it is possible for a plaintiff to sustain a case for excessive force based on the use of handcuffs if he can show that the handcuffs were unduly tight or that he was kept in cuffs for an unreasonable amount of time. Id. at 102-04 (Kennedy, J., concurring) (discussing the possibility that objectively reasonable handcuffing could become unreasonable if unreasonably prolonged); Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp.2d 459, 468-69 (S.D.N.Y. 2008) (unduly tight handcuffs) (listing cases). Bryant testified that he was tightly rear-cuffed, and then spent at least four hours with the handcuffs on even though he was confined in four different police vehicles. He further reported that he had repeatedly asked the police to loosen the handcuffs and was ignored until the prisoners on the last bus were taken off and shackled to each other. (Bryant Dep. at 27-37, 39-40). In view of the fact that, according to Bryant's testimony, he was rear-cuffed and held in that position for many hours even though he was not resisting and seemed to pose no threat whatsoever when confined in police

---

[48] Bryant was one of a number of people arrested at the time in the vicinity of 54th Street for remaining in the roadway after the police had ordered demonstrators in his area to return to the sidewalk. (Defs.' Ex. SS at 11-12, 14-15). He was charged with disorderly conduct. (Defs.' Ex. SS at 21). Defendants do not contest the fact that he has a triable claim for false arrest. See (Defs.' Mem. of Law at 89).

134

vans and buses, that he repeatedly complained that the cuffs were too tight and that the abrasions that the cuffs left in the wake of his detention corroborate his complaints of pain and excessive tightness, there is sufficient evidence in the record to permit a trier of fact to find that the force used on him in the form of extended tight handcuffing was constitutionally excessive.

This claim fails, however, for a different reason. Bryant conceded that he could not identify the officer who had placed the handcuffs on him (Bryant Dep. at 30-32), and he also does not identify any of the officers who refused to loosen them when he complained. (See id.). Plaintiff thus fails to show that any of the defendant officers were responsible for such injury as he may have suffered in this respect. Absent a showing of personal involvement by a defendant in an alleged constitutional tort, the plaintiff may not hold him liable. E.g., Scott, 616 F.3d at 110.

We further note that to the extent that Bryant may contend that the City or supervisory police personnel were responsible for this injury, the claim also fails for lack of proof. There is no evidence that the City promoted or tolerated a practice of using handcuffs that were too tight for their stated purpose, and there is no indication that any of the defendant supervisors were aware

135

that the unidentified arresting officer who placed cuffs on Bryant
had done so, or would do so, in a manner to cause him unnecessary
pain, much less that other officers would fail to loosen them when
he complained. Indeed, we note that one of the plaintiffs testified
that the handcuffs with which she were confined were not too tight,
and another reported that when she complained that her handcuffs
were too tight, an officer loosened them. (Dellal Dep. at 77;
Parkel Dep. at 27-28, 52).


   c. <u>Sara Parkel</u>


     Sara Parkel testified that when she was arrested, she was
handcuffed. She admitted that while she was restrained in handcuffs
for about five hours, the handcuffs were not unduly tight and that
she suffered no injury. (Parkel Dep. at 27-28, 52). She also never
asked that the cuffs be loosened. (<u>See</u> <u>id.</u> at 35-36). Absent any
other physical contact by the police -- for which there is no
evidence -- and with no injury, she cannot demonstrate that the
force used by the police was excessive and hence cannot sustain an
excessive-force claim.


136

d. <u>Jasmine Dellal</u>

Jasmine Dellal also asserts a claim for excessive force. As already noted, the evidence reflects that while she was standing in front of a barrier on a side street between Second and First Avenues, she was told to back away from the barricade, and the officer who gave her that order -- described by Dellal as possibly being defendant Hannon -- then pushed her away from the barrier with his hand. According to Ms. Dellal, defendant Hannon was assembling a barricade and in the course of attempting to do so he pressed it down on her foot while her leg was partly over the barrier directly in front of her, and he continued to do so despite her protestation that it prevented her from withdrawing her leg, a process that caused her pain for about a half hour. (Dellal Dep. at 56-58). She testified at her deposition that she experienced hip pain severe enough to cause her to limp "for several days afterwards," presumably as a result of Det. Hannon's actions. (<u>Id.</u> at 91-92).

Dellal later climbed over the barrier, as described above, leading to her arrest. In the wake of the arrest, unidentified officers took her from behind by the arms and marched her to what was identified as the Lipstick Building for detention and later

processing. (Id. at 63-67). She testified that in the wake of the seizing of her arms by these officers, some of her fingers on both hands became numb or tingly, a symptom that she had previously experienced in her left hand as a result of a herniated disc. (Id. at 91-92). During her detention she did not seek medical attention for either of her alleged injuries. She was asked whether she had any medical conditions -- in her words, "if [she] had any life-threatening diseases" -- but she did not alert any police personnel to this sensation in her hands or the pain in her hip. (Id. at 87-88). She later sought treatment by an acupuncturist and two different chiropractors. (Id. at 92-96).

This evidence is sufficient in only one respect to permit a trier of fact to find that a defendant violated plaintiff's rights by the use of excessive force. The push by the officer to move her away from the barricade, even if unwarranted, does not amount to excessive force under the circumstances. Moreover, the pressing of a barricade on plaintiff's leg, if accidental, would not trigger liability for a constitutional tort even if the force thereby generated was "excessive." See, e.g., O'Neill v. Krzeminski, 839 F.2d 9, 11 n.1 (2d Cir. 1989). Plaintiff's testimony, however, could lead a trier of fact to find that the officer's conduct in this respect was not accidental, particularly since she reports

138

telling him repeatedly that her leg was trapped, and he nonetheless continued to press the barrier down on her lower leg, causing her pain during and after the episode. Absent some justification for his behavior, that testimony could suffice to buttress a finding of excessive force, even if of a modest nature. As for the identity of the offending officer, Ms. Dellal tentatively identified him as defendant Hannon (Dellal Dep. at 60-61), thus permitting her to pursue this claim against him.[49]

As for the alleged pinioning of plaintiff's arms by unidentified officers, we assume that there would be a triable issue as to whether the force exerted in that instance was excessive (based on the plaintiff's testimony about the resulting injury and asserted need for treatment).[50] Nonetheless, the claim

_____

[49] Defendants also assert a defense of qualified immunity for defendant Hannon. (Defs.' Mem. of Law at 83). This argument is unavailing because, as stated above, there is a dispute of material fact as to the reasonableness of the force used against Dellal, and "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." Searles, 652 F.Supp.2d at 446 (quoting Kerman, 261 F.3d at 240).

[50] Defendants hint at a contrary conclusion based on the fact that the plaintiff had suffered a similar symptom on an earlier occasion as a result of herniated disk and did not report the injury while in custody. (Defs.' Mem. of Law at 78). We view those facts as supportive of an argument to the trier of fact that the force used was not as substantial as might otherwise be inferred from the fact that the pinioning allegedly led to numbness and tingling, but ultimately the extent of the force

139

fails since plaintiff has not identified any of the defendants as having been responsible for the force used on her arms, much less proffered evidence to support that identification.

Finally, we note that plaintiff has failed to demonstrate a triable case for pursuing her claim against the supervisory defendants or against the City. There is no indication that the supervisory defendants were on notice of the likelihood that Det. Hannon or the officers who arrested Ms. Dellal would cause her unnecessary pain or injury, and there is no basis for a finding that such behavior was either a product of a municipal policy or practice or attributable to any failure by the Police Department to train or supervise the officers adequately.

### e. Melvyn Stevens

Melvyn Stevens testified that he had unsuccessfully attempted to reach First Avenue from as far north as the Sixties, and that while returning south on Second Avenue, he was in the midst of a large crowd in the roadbed, apparently because the sidewalks were filled at the time to overflowing. According to Mr. Stevens, the

---

used would seem to be a triable issue in view of both plaintiff's report of the effect of that force and her testimony about the need for follow-up treatment.

140

police ordered everyone to leave the roadway, but he and the others were unable to do so because the sidewalk was completely filled and the crowd was also hemmed in by barriers and police officers, some mounted. (Stevens Dep. at 17-22). At some point, he reported, half a dozen mounted police used their horses to push into the crowd, apparently in an effort to press them onto the sidewalks. Although one horse came in contact with him, apparently bumping him in the chest, the contact did not injure him or knock him down. (Id. at 23-25). However, shortly after that, unidentified police officers grabbed him, threw him to the ground, placed tight handcuffs on him, pulled him off the ground and marched him to a police van. (Id. at 25-26). As they threw him to the ground, he called out that they were hurting him, but the police did not respond. (Id. at 26). Once placed in the van, he remained there for perhaps four hours with the handcuffs holding his arms behind his back. He repeatedly complained of pain but was told by other officers that he would have to wait. He was transported in the van to One Police Plaza, where the cuffs were removed and he was placed on a Department of Corrections bus, where he remained uncuffed. (Id. at 34). After two to three hours on the bus, he was shackled to other prisoners and taken to a waiting area outside One Police Plaza, where he remained in the cold for another two hours. (Id. at 36-39). Eventually, he was again handcuffed and placed in a police van, where he waited

141

for another hour, but he testified that these handcuffs were "bearable". (<u>Id.</u> at 42-44).

Based on this evidence Stevens may well have been subjected to excessive force by the police, but he cannot prevail on an excessive-force claim. The momentary contact by a police horse, which did not knock him down or, apparently, cause him any pain or injury, does not suffice to trigger potential liability since it appears to have been a <u>de</u> <u>minimis</u>, if somewhat unusual, contact. As for his being forced to the ground at the time of his arrest, rear-cuffed, picked up and pulled to the van, and then forced to remain rear-cuffed for many hours, a trier of fact could find that the police used excessive force. By his account, he was trapped in a crowd and offering no resistance. His being thrown to the ground and cuffed in a manner that apparently caused him at least some pain appears not to have been justified. He was then forced to wear handcuffs that were unduly tight and to bear the pain for perhaps four hours while confined in a police van. Moreover, he repeatedly told the available officers that he was in pain and asked in vain for relief. These circumstances, again, would justify a finding of force that was unnecessary and damaging to the plaintiff.[51]

---

[51] Indeed, the lack of necessity for the tight handcuffs was underscored by plaintiff's testimony that, when placed in a police bus after standing outside, he was put in handcuffs that

142

All of that said, Mr. Stevens was unable to identify any individual defendant who might have been responsible for tackling him at the time of his arrest, placing him in tight handcuffs, and refusing to loosen them for many hours despite his requests. Moreover, plaintiffs offer no evidence that the specific conduct of these unidentified officers was attributable either to a City policy or practice, or to a failure by the City or police supervisors to train or supervise these officers.

     f. <u>Amy Haus</u>

Amy Haus is asserting a claim of excessive force based on an incident in which she was allegedly stepped on by a police horse. Defendants argue that her testimony demonstrates that this constitutional claim is not viable. (Defs.' Mem. of Law at 79-80). We disagree.

As she recounted her experience, she and her friends, after meeting at the subway station at the intersection of Lexington Avenue and 53rd Street, had attempted unsuccessfully to get to First Avenue for the demonstration. (Haus Dep. at 44-48). They got as far as Second Avenue in the Fifties or perhaps further north but

---

were "bearable". (Stevens Dep. at 44).

143

were prevented by the congestion of people and the blocking of side streets from going any further. (Id. at 49-50). They then started back down Second Avenue, but the crush of the crowd was so great that the people could not move in any direction, and as a result she and they became stranded in the roadway in the vicinity of 54th Street, along with some mounted police. (Id. at 50-54). At some point she fell to the ground, possibly because the crowd was pressing her from behind, although she did not observe how this occurred. While lying on the ground, she saw a horse above her and felt a pain in her leg. She observed the horse walk over her and felt it step on her leg, causing extreme pain and ultimately serious permanent injury requiring surgery. (Id. at 55-59; see also id. at 72-86, 88-91 (describing the extent of her injury)). The horse apparently moved away, and her friends were ultimately able to get her to a sidewalk, then to a nearby store to examine the wound and ultimately to a hospital. (Id. at 60-71). In her testimony, she was unable to identify the rider of the horse, presumably a mounted officer. (Id. at 63).

In the absence of any other evidence pertaining to this incident, defendants argue that her claim for excessive force cannot succeed because she conceded that the contact between the horse and her body was an accident. (Defs.' Mem. of Law at 79-80).

144

That is not the case.

The evidence reflects that, at the time in question, the entire street, including the roadway, was taken up with people. Thus Haus testified that the crowd was unable to move, either north or south or towards either sidewalk. The mounted police were apparently also present in the street, and a trier of fact could find, based on Ms. Haus's testimony, that one or more of these mounted officers started moving through the crowd in an apparent attempt to disperse them. The trier of fact could also find that Ms. Haus was knocked off her feet by the movement of the crowd when pressed against by the horses, and plainly she was badly injured as a result of a horse moving through that crowd and stepping on her.

It is certainly true that there is no evidence that, in the crowded conditions of the street as described by Ms. Haus, the officer in question was seeking to use the horse to step on pedestrians. Nonetheless, the scenario that she described would permit a finding that the officer and perhaps other mounted police were using their mounts to physically force the crowd off the roadway, which was plainly blocked. The question, then, is whether such an action could be found to involve constitutionally excessive force. We conclude that it could.

145

The testimony of defendant Capt. Christopher Acerbo, the Commanding Officer of the Mounted Patrol, supports this conclusion. Acerbo described the protocol used by the Police Department in both its training and its utilization of the mounted police to disperse crowds from the street. He noted that horses would not be used for dispersal unless the crowd that was intended to be dispersed had a means of egress. (Acerbo Dep. at 31). He further stated that the horses would be held to a slow walk and that they would approach the crowd but not come in contact with it because of the danger of injury. (Id. at 32-35). If the crowd did not disperse when the horses neared them, the horses would be halted and the foot patrol would assess the situation and use other means of dispersal. (Id. at 34-37). He further emphasized that the horses would not go into a crowd except in very extreme, "life-threatening situations", and would not be used in this manner to seize or arrest people. (Id. at 37-39).[52]

From the testimony of Ms. Haus, a trier of fact might deduce that the mounted police at 54th Street and Second Avenue

_____

[52] At one point Acerbo left some ambiguity as to whether the horses would be allowed any initial contact with a group of people who refused to disperse when nose-to-nose with the horses. (Acerbo Dep. at 71-82). Nonetheless he reaffirmed that any such contact was to be avoided and in ordinary situations proper police procedure would not involve sending the horses into a crowd. (Id.).

146

disregarded this protocol and proceeded to attempt to use their mounts to physically push demonstrators out of the street and to do so when, because of the crush, those people had no means to disperse, since they were pressed together by virtue of the volume of people at that location. This inference is further supported by the testimony of co-plaintiff Melvyn Stevens, who, as noted, was apparently in the same area at about the same time and was subjected to contact by a police horse. (Stevens Dep. at 23-25).

If the mounted police acted in the manner suggested by this evidence, the trier of fact could conclude that the police at the time were using force -- in the form of horses actually pressing into a dense and compacted crowd -- even though the Department recognized that this form of force was so great as to imperil public safety. Such findings would permit a trier of fact to conclude that whoever undertook this tactic was using excessive force under the circumstances.[53]

_____

[53] At one point Acerbo described the use of horses to disperse demonstrators by contact as a use of force and as potentially involving excessive force. (Acerbo Dep. at 46-49). As noted, he also testified that actual contact with members of the public would be appropriate only in a "life threatening situation," but later diluted this statement by suggesting that any blockage of vehicular traffic or even of a sidewalk for part of a block would constitute a life-threatening circumstance. (Id. at 37-39, 66-67, 69). In applying the constitutional excessive-force standard, the court and any trier of fact would obviously not be bound by this standard in assessing whether the use of

In seeking to avoid this conclusion, defendants assert that plaintiff herself characterized the event as an "accident." (Defs.' Mem. of Law at 80 (citing Defs.' Rule 56.1 Statement at ¶¶ 151, 122). This assertion is a misrepresentation of plaintiff's testimony. At no time did Ms. Haus opine as to the mind-set of the mounted officer in question or as to that of whoever instructed him to engage in the maneuver that led to the incident. Although she used the term "accident" once during her deposition, she was plainly referring simply to the event -- whether called accident or incident or something else -- and not seeking to characterize the intent with which the horse was led to step on her. (See Haus Dep. at 87). Indeed, given her account -- in which she was pushed from behind by an unidentified force (possibly the crowd or a horse) and then stepped on by the horse -- she would have had no independent knowledge regarding the officer's intent.

Furthermore, if we are to parse plaintiff's use of descriptive words to characterize the encounter, the inference drawn would not be what defendants suggest. At her deposition, Haus plainly used terms that suggest malign intent by the police. Thus she described the police as "literally attacking me in an event where I had shown

---

horses to make physical contact with a member of the public involved excessive force.

148

up to do nothing unlawful" (id. at 103) and reported that the experience felt like "brutal aggression." (Id. at 104).

In any event, regardless of whether the rider or his supervisors were seeking to cause injury -- and there is no evidence that they were -- if any defendant undertook actions that he knew were likely to endanger members of the public, that action may be viewed as a use of force (whether or not excessive) and not as an accident.[54]

### 3. Individual Defendants

As a separate matter, defendants seek either dismissal or, alternatively, summary judgment on the excessive-force claims for either all or a number of individually named defendants as well as the City. The dismissal is requested based on the asserted pleading inadequacies of the complaint, and summary judgment is sought based

---

[54] We infer that plaintiff did not harbor a belief that the officer intended to have his mount step on a fallen member of the public -- indeed we share that assumption -- but that is not determinative of the issue. Rather, the question for the trier of fact would be whether the aim was to use the horses to disperse the crowd, if necessary by physical contact, a step that, in the circumstances described by Ms. Haus, would be potentially extremely dangerous even in the estimation of the Mounted Patrol commanding officer. In that event the encounter could fairly be held to involve excessive force.

on the absence of evidence linking the various individual defendants with the alleged instances of excessive force. (Defs.' Mem. of Law at 80-83). We address these arguments separately.

    a. <u>Dismissal</u>

In support of the dismissal version of defendants' motion, which is presented in their initial motion papers, they argue principally that the complaint fails sufficiently to identify which defendants were responsible for which alleged exercise of excessive force, and they contend that this omission from the pleading is fatal to the claims. (Defs.' Mem. of Law at 80 (citing <u>Ruben H. Donnelley Corp. v. Mark I Mktg. Corp.</u>, 893 F. Supp. 285, 291 (S.D.N.Y. 1995)). Unfortunately, this argument is vague to the point of obscurity, defendants having failed to identify which specific excessive-force claims are defective as a matter of pleading and which individual defendants ought to be dismissed from the case as a result. We also note that this pleading argument was not raised until after the close of discovery, during the course of which the parties presumably either fleshed out the details of which defendants supposedly used excessive force against which of the plaintiffs or determined that, as an evidentiary matter,

150

plaintiffs could not prove such involvement by an identified defendant.

It is perhaps for this reason that defendants shift course somewhat in their reply papers, where they argue that judgment should be granted to all individual defendant officers because plaintiffs are still unable to identify any of them as responsible for the excessive force or because those officers are entitled to qualified immunity. (Defs.' Reply Mem. of Law at 48). Defendants then add a new argument, that summary judgment should be granted to the supervisory defendants based on plaintiffs' inability to link them to any of the alleged instances of excessive force. (Id. at 48-52).

Because the alleged original pleading deficiency has only been noted at this late stage, we conclude that granting relief on this point would involve substantial inefficiencies and lead to no practical closure. If the claims in question were found deficient as a pleading matter, they would almost certainly be dismissed with leave to re-plead. See, e.g., Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 118 (2d Cir. 2007) ("[w]hen a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'") (quoting Ronzani v. Sanofi S.A., 899 F.2d 195, 198

(2d Cir. 1990)); see also Fed. R. Civ. P. 15(a). At that point plaintiffs -- to the extent that they could, by virtue of the discovery that has taken place, link specific plaintiffs and defendants -- would then re-plead those claims and drop those for which discovery has not demonstrated participation by any named defendant. In short, the exercise would simply disclose the fruits of discovery, leaving the parties and the court to parse the evidentiary record on a subsequent summary-judgment motion. Furthermore, to the extent that defendants invoke qualified immunity as an alternative basis for dismissal on the face of the complaint (Defs.' Reply Mem. of Law at 48), they ignore the fact that immunity turns on an assessment of the particular circumstances in which the defendant dealt with a given plaintiff, see Searles, 652 F. Supp.2d at 446, and that in this case such an assessment cannot be made (particularly on an excessive-force claim) based on the allegations of the complaint.

In any event, the defendants have, on their current motion, offered arguments for summary judgment with respect to most of the named defendants, including some of those with supervisory rank, and we address those arguments now. To the extent that defendants have also pressed qualified immunity as a basis for summary judgment, we consider those arguments as well.

152

b. <u>The Summary-Judgment Arguments</u>

(i). <u>The Officer Defendants</u>

Defendants note that a number of the plaintiffs asserting excessive-force claims were unable to identify the officers who allegedly exercised the force that they claim was excessive. These plaintiffs are said to include Connor, Sanchez, Silva, Dodde, Spitzer, Cavenna, Venizelos and Blair, as well as the plaintiffs whose claims we addressed above. Defendants argue, therefore, that the claims of excessive force by these plaintiffs, insofar as they are asserted against officers Millenbach, Ryan, Otero, Loccisanno, Spadaro, Beale, Aanonsen, Willoughby, Brady, Carbey, Secreto, Scali and Reilly, should be dismissed.[55] (Defs.' Mem. of Law at 73, 80-82). This argument is not sustainable with respect to a number of the plaintiffs' claims.

As for John Connor, he testified that, while at Second Avenue and 54th Street, he was stepped on and knocked down by a police

_____

[55] Defendants do not press this argument regarding plaintiff Dellal's claims against defendant Hannon. As we have noted, plaintiff Dellal testified about the encounter with Hannon and a trier of fact could find that her version of events reflected the excessive use of force by that officer. Hence her claim against Hannon should not be dismissed.

153

horse immediately after its rider had ridden it backwards into a female demonstrator, knocking her into the crowd. (Connor Dep. at 78-81). Although he initially said that the rider may have lost control of the horse, he then observed more specifically that the mounted police were all backing their horses into the crowd at that point, and he could not tell whether the one officer had lost control or was simply more aggressive in backing his horse into the crowd. (Id.). Since, however, Connor testified that he was unable to identify the mounted officer (id. at 82-83), his claim cannot be pursued against that officer, although, for reasons to be noted with respect to Ms. Haus, Connor has a potentially triable claim against defendants Acerbo, Smolka, and Joseph Esposito, who were apparently present for this encounter. (See pp. 167-70, infra.). Although Connor also testified to having been thrown to the ground and mauled by arresting officers, with consequent shoulder and kidney issues (Connor Dep. at 91, 127-133), he cannot identify the offending officers and thus likewise cannot pursue his claim against any of the defendant officers for that incident. (Id. at 87, 91).

Carlos Sanchez testified that he was beaten by the police when they arrested him, and that this occurred despite the fact that he was not resisting, or indeed engaging in any misconduct. (Sanchez

50-h Hearing Tr. at 20-21, 23-25). He too, however, has not been able to identify the officers who used this seemingly unjustified force (Id. at 23), and hence his claim cannot survive against the defendant officers for that incident.

Carlos Silva testified that, while standing near the corner of 53rd Street and Third Avenue, he was forced onto the sidewalk by mounted police. (Silva Dep. at 74-80). While on the sidewalk, a horse's chest made contact with his head and he was "stunned." (Id. at 80-81). Shortly afterwards, he was arrested by defendant Officer Kelly. While being arrested, he was grabbed by the collar and thrown face-down on the ground, then beaten and sat upon by multiple officers. When he complained that he could not breathe, defendant Officer Kelly told him to "shut the fuck up," and deliberately bent back the fingers on his left hand, injuring them. (Silva Dep. at 84-90). He also reported having suffered through many hours of tight handcuffs placed on him by Kelly, which at least one other officer refused to loosen. (Id. at 109-11). However, he also reported that he was able to slide his right hand free of the cuffs (id. at 118), and it appears that he was not re-cuffed until he was shackled to another arrestee after arriving at One Police Plaza. (Id. at 118-20). To the extent that he asserts a claim about the cuffs, he cannot pursue it against the unidentified

155

officer, although he has a triable claim against Officer Kelly for the violence allegedly used during his arrest.[56]

Robert Dodde reported that he was seized, knocked down and dragged some distance by the police before being brought to his feet and walked to a police vehicle waiting at the intersection of 53rd Street and Second Avenue. (Dodde Dep. at 71-72, 75-78). He was unable, however, to identify the officers who were involved in this alleged violence. (Id. at 75). His claim therefore also subject to summary judgment as against the officer defendants.

Adele Spitzer described being clubbed in the back by an unknown police officer, an assault that was entirely without provocation. (Spitzer Dep. at 22-26). Since she cannot identify the offending officer, she cannot assert an excessive-force claim against him, although she presumably may pursue at least a battery claim against the City if she has preserved it through the

---

[56] We note that defendants have not included Officer Kelly among those defendants for whom they seek summary judgment on the plaintiffs' excessive-force claims. They do represent that this officer was never served with a summons and the complaint (Defs.' Mem. of Law at 81 n.21). Although we infer that this footnoted assertion is correct since plaintiffs do not explicitly respond to it, there has as yet been no motion by defendants to dismiss under Rule 4(m) and no competent proffer of evidence as to non-service. Accordingly we view it as inappropriate to dismiss as against Officer Kelly on the current motion.

administrative-claim process.[57]

Matthew Cavanna reported an encounter with a group of police officers that led to his arrest, and he described in particular the efforts of two officers, apparently including defendant Beale, to seize him, throw him forcefully to the ground and wrestle his video camera from him. (Cavanna Dep. 176-78). Beale confirms that he was directly involved in the arrest. (Beale Dep. at 26; Defs.' Ex. T). Since the viability of this plaintiff's excessive-force claim is contested only on the basis that Cavanna fails to identify his attackers (Defs.' Mem. of Law at 81), that challenge should be rejected and the claim allowed to proceed against Beale, including insofar as Cavanna alleges that the use of excessive force was triggered by First Amendment animus.

Emily Venizelos testified that she was set upon by a group of police officers who, without provocation, not only arrested her and her companion but treated them with unwarranted violence. (Venizelos Dep. at 18-19, 40-45, 106-09). Since Officer Loccisanno

---

[57] Similarly, other plaintiffs who proffered sufficient evidence of excessive force by a police officer may be able to assert common-law tort claims against the City. See, e.g., Disorbo v. Hoy, 74 Fed. Appx. 101, 102-02 (2d Cir. 2003) (upholding jury verdict in favor of plaintiff on claims of excessive force, battery, and abuse of process claims against police officer).

confirmed that he was a participant in subduing Ms. Venizelos (Loccisanno Dep. at 81-96), her claim of excessive force should survive against him.

Abraham Blair testified to an encounter with a group of police officers who allegedly used excessive force in subduing him. (Blair Dep. at 46-51). There is no dispute that defendant Ryan was one of these officers. (Ryan Dep. at 84-93). Accordingly, since Mr. Blair's testimony suffices to permit a trier of fact to find that the officers used excessive force in subduing him, his claim may proceed against Ryan.

Delaine Douglas testified that a group of four officers, including defendant Otero, tackled her forcefully, held her to the ground, rear-cuffed her, then dragged her to a patrol car (ripping her coat in the process), slammed her onto the hood of the car to effect a search, then forced her into the back of the car, banging her head on the door jamb. (Douglas Apr. Dep. at 62-70, 74-75, 77-82). There is no question that Otero was one of the officers involved in this altercation, although his testimony differs on the amount of force used and the number of officers involved. (Otero Dep. at 88-92). Accordingly, a trier of fact could find that Otero used excessive force against Douglas, and hence Douglas's claim may

proceed against Otero.

As for Amy Haus, she cannot identify the rider whose horse caused her serious injuries. (Haus Dep. at 63). Accordingly, she cannot link any of the officer defendants to the incident, and they therefore may not be held responsible for it, although, for reasons to be noted, defendants Acerbo, Smolka, and Joseph Esposito may be found liable for his supervisory role in that encounter. (See pp. 167-70, infra).

### (ii). The Supervisory Defendants and the City

Defendants also seek summary judgment for the supervisory defendants and the City on the excessive-force claims, contending that these defendants were not responsible for alleged acts of violence by the defendant officers. (Defs.' Mem. of Law at 82-83). In responding to this aspect of defendants' motion, plaintiffs focus on the alleged responsibility of some of the supervisory defendants, who include Kelly, Grasso, Joseph and Michael Esposito, Smolka, Acerbo and Flynn. (Pls.' Mem. in Opp'n at 97). Plaintiffs argue that these supervisory defendants and the City are liable for the individual officers' use of excessive force because (1) they failed to train the officers in proper crowd control and instead

supposedly advised the officers to use illegal arrests and excessive force, and (2) they failed to train the mounted police in the proper limits on the use of horses in close proximity to members of the public. (Id. at 97-98). We conclude that -- except with respect to defendants Acerbo, Smolka, and Joseph Esposito, whose involvement in the use of the Mounted Patrol we discuss below in connection with the claim of Ms. Haus -- plaintiffs' argument in this respect does not succeed. (See pp. 167-70, infra).

To the extent that plaintiffs press a claim against the City and supervisory defendants for excessive force generally -- whether it involves throwing arrestees to the ground, kneeing them in the back, rear-cuffing them or engaging in other arguably unnecessarily forceful behavior -- they fail to establish a triable case. They do not make any showing that the City, through the Police Commissioner, adopted a policy or pursued a practice of requiring, encouraging or acquiescing in the use of excessive force at the February 15 demonstration. Plaintiffs also fail to identify any specific failing in the Department's training of officers in the need to limit the use of force to what is reasonable under the circumstances of each encounter with members of the public. Plaintiffs also fail to demonstrate that the Department knew, in advance of the February 15 demonstration, that greater supervision

of individual police officers was needed to avoid the strong likelihood of violations of the rights of the public not to be exposed to undue police violence and that it failed to undertake such necessary additional steps.

As for the cited supervisory defendants, the plaintiffs offer no evidence that would justify a finding that -- insofar as any individual police officers may have exceeded permissible bounds in their physical handling of any of the plaintiffs -- defendants Kelly, Joseph Esposito, Michael Esposito or any other supervisory defendants were responsible in any cognizable way for those violations.

Plaintiffs do press a more specific contention regarding municipal liability for the use of horses in crowd control at the February 15 demonstration. Thus they assert that there were deficiencies in the training of the Mounted Patrol because a number of plaintiffs testified to the aggressive use of horses to push back crowds of people. (Pls.' Mem. in Opp'n at 101, 103-07). This theory of municipal liability also fails. The testimony of several plaintiffs indicates that on several occasions horses used by the police came into contact with, or came close to, crowds of demonstrators (see Haus Dep. at 55-59; Connor Dep. at 74-87;

161

Stevens Dep. at 23-25), and they assert that this use of horses was improper. (Pls.' Mem. in Opp'n at 91-94, 97-98). Aside from the opinion of their purported police-practices expert -- who proffers no independent evidence (see Reiter Dep. at 89-92, 118) -- they offer no basis on which a trier of fact could find that the training provided at the Police Academy concerning the use of horses in crowd control was so deficient as to amount to deliberate indifference to the constitutional rights of the public to be free from excessive force.

As defendants point out, a plaintiff may not demonstrate the constitutional deficiency of training based on a single incident, except perhaps in the rare circumstance that "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations," Connick, 131 S.Ct. at 1361, or "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Tuttle, 471 U.S. at 824; see also, e.g., Kirsch v. City of New York, 1997 WL 375684, at *11 (S.D.N.Y. July 7, 1997) (citing cases). Moreover, the City cannot be deemed to be constitutionally deficient in training if it fails to train employees for "rare or unforeseen events." Walker, 974

F.2d at 297. Defendants argue that a demonstration of the magnitude of this event, involving more than 100,000 people, is sufficiently sui generis to excuse the municipality if it failed adequately to train the police for its occurrence. In this regard they note that this was the first demonstration of this magnitude in the City and that in preparation the Department relied on its experience with the somewhat different circumstances that they do traditionally encounter, that is, crowd control during the annual New Year's gathering in Times Square. (Defs.' Reply 56.1 Statement at ¶ 289; see also M. Esposito Dep. at 205-06).

We do not believe that the City's training or planning concerning crowd control is shielded in this case from constitutional scrutiny merely because no prior demonstrations of this magnitude have ever occurred in New York. Nonetheless, the size of the crowd and undisputed evidence that some participants did engage in intentionally disruptive and occasionally illegal behavior is pertinent to the manner in which the police acted. It also follows that, to the extent that the plaintiffs challenge police training based on the actual conduct of the police at this demonstration, the full context in which the police acted is obviously pertinent to evaluating the deficient-training argument.

163

In challenging the City's training regarding mounted patrols, plaintiffs complain that officers exhibited a lack of restraint by charging their mounts into crowds, thus causing unnecessary injuries and panic. (Pls.' Mem. in Opp'n at 92-94, 98-99). Plaintiffs themselves, however, in asserting that such activity took place, characterize it as contrary to Police Department training (id. at 94-95), and indeed the record reflects that the training and conduct standards of the Department are unexceptionable. They require that mounted officers always approach members of the public at a very slow pace and not make contact with them unless absolutely necessary. Those standards further require that if a crowd is ordered to clear an area and does not do so once the horses approach, the mounted officers are required to consult police supervisors. Moreover, if arrests must be made, that will normally done by unmounted officers. (Acerbo Dep. at 28-39, 43-44).

Implicit in plaintiffs' argument is the unstated implication that it is constitutionally improper to use horses to assist in clearing a street during a mass demonstration. There is no case law suggesting such a proposition, and with good reason. The police have a responsibility to ensure public health and safety, and that obligation involves keeping major thoroughfares clear of people to allow for passage of vehicular traffic, particularly emergency and

law-enforcement vehicles, as well as to ensure that other traffic has a means of ingress and egress in a crowded city. N.Y. City Charter § 435(a) (2009)[58]; see also Cox, 379 U.S. at 554-55; Cox v. New Hampshire, 312 U.S. 569, 574 (1941). When large crowds end up blocking major arteries that are not set aside for purely First Amendment activities, it is incumbent on the police to clear such arteries. N.Y. City Charter § 435(a) (2009).

The evidence in this case reflects that the use of mounted police was limited to clearing streets -- notably short sections of Second and Third Avenues -- that had been blocked by large crowds, some engaged in civil disobedience and occasionally engaging in violent acts. (Acerbo Dep. at 65-66, 86-119; Defs.' Ex. Z at 18-19; Defs.' Ex. UU at 206-211, 219-20, 228). Although there is evidence

_____

[58] The New York City Charter provides (and provided in 2003, see Stauber, 2004 WL 1593870, at *25) in relevant part as follows:

> The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, suppress riots, mobs and insurrections, disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks and places . . . regulate, direct, control and restrict the movement of vehicular and pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health; [and] remove all nuisances in the public streets, parks and places[.]

of instances in which the use of horses may have been so aggressive as to transgress standards inculcated in Mounted Police training, that does not demonstrate that the training itself was so deficient as to trigger potential municipal liability. To demonstrate deliberate indifference by way of inadequate training, the plaintiffs must be able to point to specific deficiencies in such training. See, e.g., Connick, 131 S.Ct. at 1363 ("failure-to-train liability is concerned with the substance of the training"); Amnesty Am., 361 F.3d at 129. In this case, plaintiffs have failed to do so.

Captain Acerbo's testimony makes plain that the mounted police are subjected to a continuing and rigorous training regimen that fully incorporated the requirements of the mounted patrol guide concerning the stringent limitations on the use of horses in dealing with crowd dispersal. (E.g., Acerbo Dep. 18-22, 26-39). Although plaintiffs seek to characterize the testimony of two mounted officers as reflecting confusion as to the guiding rules (Pls.' Mem. in Opp'n at 106 (citing Reilly Dep. at 125-26, Scali Dep. at 130-31)), the testimony they cite does not so indicate, nor does it reflect a basis for finding that the City training program is defective or that any such defect led to the injury of any of the plaintiffs.

There is also no evidence that the City, in planning for the February 15 demonstration, adopted a policy or practice that ignored the normal caution that applies to use of the Mounted Patrol when confronting crowds of people in the street. Moreover, liability cannot be imposed on the City for lack of supervision, since there is no indication that the Department was aware from prior experience that greater supervision at the most senior level was called for to avoid likely violations of the rights of the public not to be assailed by horse-borne officers.

All of this said, we do conclude that the evidence of record creates a triable issue as to the liability of defendant Acerbo for the injuries or other discomfort suffered by Amy Haus, John Connor and William Silva when allegedly struck by Mounted Patrol horses. Such liability would not be premised on plaintiffs' principal theory of liability -- a claim of failure to adequately train the mounted officers -- but rather on Acerbo's possible direct responsibility for the tactics used by the officers on the day in question or his manner of supervision of his command when he was apparently present at the scene. Acerbo was fully knowledgeable about the dangers of using horses in massed crowds and indeed testified extensively about the protocol for such use for dispersal purposes, and the training that is undertaken to ensure proper

167

control of the Mounted Police when engaged in such maneuvers.
(Acerbo Dep. at 18-22, 26-39, 48-50). Moreover, he was present for
the demonstration and, according to his testimony, was closely
overseeing what his subordinates were doing to clear both Second
and Third Avenues, as well as Lexington Avenue in the lower
Fifties, when they became blocked because of the crush of the crowd
or, in one or two instances, because of civil disobedience by some
demonstrators. (See Acerbo Dep. at 64-126). Given this testimony,
a trier of fact could find that Acerbo, though fully aware of the
restrictions on the use of horses in physically confronting massed
demonstrators and equally aware of the great danger in allowing
horses to be used to come into physical contact with such people,
authorized or tolerated the use of the horses in violation of those
limitations, with the consequent great danger -- fully realized in
the case of Ms. Haus and to a lesser extent in the cases of Messrs.
Connor and Silva -- of serious injury.[59]

The evidence also creates a triable issue as to the liability

---

[59] Acerbo testified that the use of the horses in and around
52nd to 54th Streets on Second, Third and Lexington Avenues was
carefully done and was consistent with Department standards.
(E.g., Acerbo Dep. at 114). Since, however, the testimony of
plaintiffs Haus, Stevens, Silva and Connor suggests that the
horses were moved into crowds in a more aggressive and dangerous
manner (Haus Dep. at 55-59; Stevens Dep. at 23-25; Silva Dep. at
74-81; Connor Dep. at 74-87), there is plainly a triable issue as
to what Acerbo directed or authorized the mounted officers to do.

of defendants Smolka and Joseph Esposito for the injuries caused to these plaintiffs by police horses. Captain Acerbo testified that the Mounted Unit is not deployed to disperse crowds except pursuant to a decision made "between [him]self and the zone commander." (Acerbo Dep. at 100; see also id. at 70-71). While Acerbo could not recall who the zone commander was at the various locations where the Mounted Unit was deployed on February 15 (id. at 87, 101), he also testified that Chief Joseph Esposito was present at several of those locations. (Id. at 136-37, 140-42). While Acerbo could not recall having a conversation with Chief Esposito about deploying the Mounted Unit at any of those locations, Acerbo also stated that "[Esposito] is the chief of department so . . . if he was at the scene any directive that was given would be under his purview." (Id. at 140). Esposito himself testified that he had ordered and observed the deployment of the Mounted Unit to disperse crowds on two to five occasions, although he was unsure whether he had given the order to deploy the horses on all of the occasions he observed, and he testified at another point that he did not know who had ordered in the Mounted Unit at one of the locations where they had been deployed. (Defs.' Ex. CC at 238-39; Defs.' Ex. UU at 206-11, 218-231; see also Stauber Tr. at 450-54). Esposito's testimony also reflected that he was at least somewhat aware of the danger

inherent in sending horses into a crowd of people,[60] and that he would only do so in certain conditions. (Defs.' Ex. CC at 239-40; Defs.' Ex. UU at 209-12). Given this testimony, a trier of fact could find that Esposito ordered or tolerated the deployment of the Mounted Unit in situations where their use constituted excessive force. Similarly, it appears that Chief Bruce Smolka was present at one of the locations where the Mounted Unit was used to disperse demonstrators, and may have given the order to deploy the Mounted Unit. (Acerbo Dep. at 128-34; Defs.' Ex. UU at 220-21). Indeed, Smolka himself testified that he may have given the order to deploy the Mounted Unit. (Ex. 8 to Pls.' Mem. in Opp'n at 135-36). Hence we believe that a trier of fact could find that he was sufficiently involved in the deployment of the Mounted Unit into the crowd that he could be held personally liable for the resulting injuries.

In sum, the City cannot be held liable for the alleged use of excessive force by named or unnamed officers, nor may the supervisory defendants (except for Captain Acerbo, Chief Smolka, and Chief Joseph Esposito) be shown to have been responsible for the conduct of officers under their command that may have exceeded

---

[60] In fact, Esposito testified at one point that deliberately directing a horse to strike members of a crowd would be covered under the Department's policy governing the use of force. (Defs.' Ex. UU at 120).

Fourth Amendment bounds.

E. <u>Malicious Prosecution</u>

Plaintiffs assert malicious-prosecution claims under section 1983 and the Fourth Amendment. Defendants have now moved for summary judgment on these claims or for their dismissal for failure to state a claim. They assert that some plaintiffs did not receive a favorable outcome in their respective criminal cases, that in all instances the plaintiffs' claims fail because the individual defendants did not initiate the prosecutions, that the claims are also barred because there was probable cause for the charges, and that the defendants did not act with malice. (Defs.' Mem. of Law at 122-26). Defendants' motion, insofar as it targets malicious-prosecution claims against the arresting officers by plaintiffs who did not receive ACDs, is groundless. It is justified, however, with respect to the three plaintiffs who did receive ACDs and also with regard to most of the supervisory defendants.

A section 1983 malicious-prosecution claim is governed largely by state law. <u>See</u> <u>Russell v. Smith</u>, 68 F.3d 33, 36 (2d Cir. 1995); <u>see also</u> <u>Fulton v. Robinson</u>, 289 F.3d 188, 195 (2d Cir. 2002). To establish a malicious-prosecution claim under New York law, "a

171

plaintiff must show that a proceeding was commenced or continued against him, with malice and without probable cause, and was terminated in his favor." Id. at 195; see also Savino, 331 F.3d at 72; Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997); Russell, 68 F.3d at 36. To establish a malicious-prosecution claim under section 1983, a plaintiff must also show, in addition to the state-law elements, that there was a "sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." Rohman v. New York City Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000); see Murphy, 118 F.3d at 944-46; see also Davis v. City of New York, 373 F. Supp.2d 322, 329 (S.D.N.Y. 2005).

The arrested plaintiffs other than Parkel, Dellal and Cavanna all received either dismissals of the charges or, in the case of Venizelos, an acquittal after trial. In short, for those defendants the charges ended in a favorable termination -- that is, a disposition not inconsistent with the plaintiff's innocence. See, e.g., Rothstein v. Carriere, 373 F.3d 275, 286 (2d Cir. 2004).[61] For

---

[61] Defendants' argument on this point in their initial brief is confusing, to say the least. In the text they assert that all of the plaintiffs except Venizelos cannot show a favorable termination, thus implying that all of those claims should be dismissed at this stage. (Defs.' Mem. at 125). In a subsequent footnote, however, defendants say that they are not seeking summary judgment on this theory except for the plaintiffs who received ACDs. (Id. at 125 n.35).

reasons already noted, however, insofar as plaintiffs Parkel, Dellal and Cavanna received ACDs, they cannot pursue this claim, since such a disposition is deemed not to be favorable for purposes of a malicious-prosecution claim. (See pp. 106-09, supra).

Defendants do not dispute that the other plaintiffs suffered a deprivation of liberty by being forced to appear in court on one or more occasions to answer the criminal charges that had been brought against them. See, e.g., Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003) (being required to attend criminal proceedings suffices as a post-arraignment deprivation of liberty). The parties disagree, however, on each of the other elements of these plaintiffs' claims.

First, defendants argue that plaintiffs' claims against the defendant officers must fail because plaintiffs cannot show that the officers did anything more than sign a criminal complaint, which does not constitute "initiating a criminal proceeding" for the purpose of a malicious-prosecution claim. (Defs.' Mem. of Law at 124 (quoting Rohman, 215 F.3d at 217)). In the same vein, they argue that the Manhattan District Attorney's Office made an independent decision to prosecute plaintiffs, and that no officer can therefore be said to have proximately caused plaintiffs'

173

prosecution. (Id.).

Defendants' argument -- which largely reiterates the arguments their counsel have made in a number of other related protest-case motions (see, e.g., Bradley Report & Recommendation at 5-6)[62] -- plainly fails. Civilians who simply report a crime to the police and serve as witnesses cannot be said to have initiated a prosecution for purposes of a malicious-prosecution claim. See Rohman, 215 F.3d at 217. However, the courts have applied a different standard in cases where malicious-prosecution claims are asserted against police officers. See, e.g., White v. Frank, 855 F.2d 956, 961 (2d Cir. 1988) (noting that police officers may be held liable for malicious prosecution if their actions cause criminal proceedings to be commenced, for example, by serving as "complaining witnesses"); Rosario v. Amalgamated Ladies' Garment Cutters' Union, 605 F.2d 1228, 1250 (2d Cir. 1979) (holding that "the issuance of an Appearance Ticket commences a prosecution for purposes of determining whether an action for malicious prosecution lies"); Llerando-Phipps v. City of New York, 390 F. Supp.2d 372,

_____

[62] Strangely, defendants' counsel annex to their reply memorandum a copy of the Bradley Report & Recommendation (Decl. of Elizabeth M. Daitz, Esq., in Opp'n to Pls.' Mot. for Partial Summ. J., at Ex. WWW), but ignore its holding with respect to Bradley's malicious-prosecution claim, a holding that rejects precisely the argument that defendants now make here. (See Bradley Report & Recommendation at 72-74).

382-83 (S.D.N.Y. 2005) (explaining that plaintiffs in a number of cases had satisfied the initiation element by showing that officers "filled out complaining and corroborating affidavits . . . or swore to and signed a felony complaint") (citations omitted).

The defendant officers, by their own account, arrested and assisted in booking plaintiffs, issued a summons or desk appearance ticket, and swore out at least one criminal complaint. (E.g., Loccisanno Dep. at 52-61, 90-101, 107-11, 114-17; Millenbach Dep. at 61-65, 73-75; Otero Dep. at 88-92; Ryan Dep. at 6-7, 62-68). A finder of fact could therefore conclude that they were sufficiently involved in initiating the criminal proceedings against plaintiffs to be held liable for malicious prosecution. See, e.g., Ricciuti v. N.Y. City Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); Davis, 373 F. Supp.2d at 334; Sulkowska v. City of New York, 129 F. Supp.2d 274, 295 (S.D.N.Y. 2001).

Next, defendants argue that there was probable cause to prosecute plaintiffs. (Defs.' Mem. of Law at 125-26). According to defendants, since the officers had probable cause to arrest plaintiffs, they also had probable cause to initiate their prosecution. Unsurprisingly, plaintiffs argue that since the officers had no probable cause for their arrests, they could have

175

had no probable cause to initiate the prosecutions. (Pls.' Mem. in Opp'n at 83).

While "[p]robable cause for an arrest is often sufficient to provide probable cause for the ensuing prosecution," Davis, 373 F. Supp.2d at 334, the two analyses are distinct because they are measured at different points in time. See id.; see also Posr v. Court Officer Shield No. 207, 180 F.3d 409, 417 (2d Cir. 1999); see generally Rounseville v. Zahl, 13 F.3d 625, 629 (2d Cir. 1994) (defining probable cause in the context of a malicious-prosecution claim as "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of") (citations omitted). Nonetheless, since probable cause for the underlying arrests is at issue in this case, so too is probable cause for the prosecutions. See Posr, 180 F.3d at 417. As we have already noted, the competing versions of the circumstances surrounding the various plaintiffs' arrests preclude summary judgment on the issue of probable cause to arrest. Moreover, there is nothing in the record to indicate that any new evidence came to light to demonstrate probable cause in the time between the plaintiffs' arrests and the filing of charges against them. Therefore, summary judgment cannot be granted to defendants based

176

on their assertion that probable cause supported the criminal charges.

Defendants further argue that they should be granted summary judgment on plaintiffs' malicious-prosecution claims because plaintiffs fail to proffer any evidence that their prosecutions were undertaken with malice on the part of the defendants. (Defs.' Mem. of Law at 126). We disagree. Under New York law, malice can be inferred from a lack of probable cause. See Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause -- while not dispositive -- tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause."); Llerando-Phipps, 390 F. Supp.2d at 383. Once again, since the evidence in the record would permit a finding that there was no probable cause for the plaintiffs' arrest or prosecution, it also would justify an inference of malice on the part of the arresting officers.

In sum, summary judgment should be denied to the arresting-officer defendants on the plaintiffs' malicious-prosecution claims, except for those of plaintiffs Parkel, Dellal and Cavanna.

177

Finally, to the extent that plaintiffs may seek to press these claims against any of the supervisory defendants other than Bruce Smolka, the defendants' motion should be granted. Plaintiffs offer no evidence that the supervisory defendants (other than Smolka, who actually signed charging documents (see Defs.' Ex. S, Pls.' Ex. 14)) participated in or could otherwise be held legally responsible for the prosecution of baseless charges against any of the plaintiffs.

F. <u>Post-Arrest Detention Claims</u>

Plaintiffs pled a series of complaints about the conditions under which most of the arrested plaintiffs were held. These include accusations that some arrestees were improperly sent to One Police Plaza for processing and issuance of desk appearance tickets rather than issued summonses on the spot, with the result that they were kept in custody for undue lengths of time and exposed to very cold weather. (2d Am. Compl. at ¶¶ 55(b), 58-60, 64-68, 69-71). They also allege that they were kept handcuffed, and that some were shackled, for a lengthy period of time and that they were not provided food or water or, in some cases, toilet facilities. (<u>Id.</u> at ¶¶ 55(b), 58-67, 69-71).

Defendants have moved for summary judgment on these claims. (Defs.' Mem. of Law at 4-47). In plaintiffs' response they appear to eschew any argument that the individual defendants may be held responsible for these asserted violations and rather press a theory of municipal liability. (Pls.' Mem. of Law at 125-26). We conclude that plaintiffs have failed to demonstrate a basis for these claims.

As noted, to prevail on a Monell claim, the plaintiff must demonstrate either affirmative action by the City, through its ultimate decision-makers, compelling a practice that predictably violates the constitutional rights of its residents or inaction in the face of a pattern of misconduct, suggesting that "the local government has acquiesced in or tacitly authorized its' subordinates' unlawful actions." Reynolds, 506 F.3d at 192 (citing Jett v. Dallas Indep. School Dist., 491 U.S. 701, 737 (1989)). As the Second Circuit has noted, "[s]uch a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of Monell." Id. (citing, inter alia, Monell, 436 U.S. at 690-91; Jeffes v. Barnes, 208 F.3d 49, 61 (2d Cir. 2000)).

The governing standard for assessing challenges to conditions

179

of confinement in the context of arrests -- that is, before charges are filed or a probable-cause assessment is made -- is the "objective reasonableness" criterion of the Fourth Amendment. See, e.g., Bryant v. City of New York, 404 F.3d 128, 135-36 (2d Cir. 2005) (citing cases); see also Albright v. Oliver, 510 U.S. 266, 278-81 (1994) (Ginsburg, J., concurring). That general standard must be applied to testimony by eleven of the arrested plaintiffs that involved in substance the following, as articulated in plaintiffs' memorandum in opposition (at pp. 109-13):

- Abraham Blair was held in handcuffs for five to six hours. He was transported after his arrest to One Police Plaza for processing. During his transport, he sat in an unheated van for approximately one to two hours, and stood on line outside in the cold for approximately one hour. He was later transported to Criminal Court and was not released until 35 hours after his arrest.[63]

- Don Bryant was transported in police vans for a number of hours, during which he was subjected to the cold in those vehicles, and was not given toilet facilities, food and water despite his requests. He was then transported to One Police Plaza, where he was

_____

[63] Blair Dep. at 52, 59, 62, 81.

180

shackled with other prisoners and required to stand in line in the cold for several hours before being given a summons. He was not released until approximately twelve hours after his arrest.[64]

 - Matthew Cavanna was handcuffed on arrest with metal cuffs that were so tight as to cause bruising and was placed in a van for two to four hours. He was then taken to One Police Plaza and required to stand in the cold for approximately two hours before being given a desk appearance ticket. He was released about twelve hours after his arrest.[65]

 - John Connor was tightly handcuffed on arrest, placed in an overcrowded police wagon and transported to One Police Plaza for processing. He remained in these handcuffs for four hours, despite his complaints. His handcuffs were then removed, and he was shackled. He remained in the cold outside One Police Plaza and denied toilet facilities, food and water, despite his requests and his statements to the police . He was released approximately twelve hours after his arrest.[66]

_____

[64] Bryant Dep. at 33-41.

[65] Cavanna Dep. at 185-86, 196, 198-200, 211.

[66] Connor Dep. at 93-110.

181

- Jasmine Dellal was handcuffed on her arrest and placed in a police van for about six hours before being deposited at One Police Plaza. She was kept outside in the cold for about 45 minutes and denied access to toilet facilities and water during that time. She was then placed in a holding cell, processed and finally released about twelve hours after her arrest.[67]

- Robert Dodde was handcuffed, placed in a police van for about ninety minutes and then taken to One Police Plaza. He was then placed in another van and remained there for about four and a half hours, during which time the police refused to remove the handcuffs despite his request and did not give him access to toilet facilities. He was then shackled, and placed outside in the cold for another hour and a half, when he was given a summons and released, about twelve hours after his arrest.[68]

- Sarah Parkel was handcuffed on arrest and transported first to the Javits Center, then to One Police Plaza and finally to the 7th Precinct, a process that consumed five-and-a-half to six-and-a-half hours. During this period, she and other arrestees asked that their cuffs be removed but they were not. She and the others also

---

[67] Dellal Dep. at 67-68, 70-71, 80-91.

[68] Dodde Dep. at 79-97.

asked for access to toilets, which was not granted. At about 11:30 p.m. she was locked in a cell at the 7th Precinct and remained there until about 7 a.m the following morning, when she was issued a summons and released. During that time she had access only to a dirty, unusable toilet and was not given "suitable" food (she was offered a ham sandwich, but is a vegetarian).[69]

- Carlos Sanchez was handcuffed after arrest in tight cuffs that caused pain, and held in a police vehicle for some hours. He was then brought to One Police Plaza, processed, and released approximately fourteen hours after his arrest.[70]

- William Silva was handcuffed and placed on a police bus that transported him to One Police Plaza. He remained on the bus for nine to ten hours. During that time he asked for his cuffs to be loosened, but the police did not do so. He was, however, able to free his right hand from the cuffs of his own accord. He was not re-cuffed, but was shackled to other prisoners in lieu of handcuffs and made to stand outside in the cold for some hours before being placed back on the bus and issued a summons. He was denied toilet facilities throughout his detention and was released about twelve

---

[69] Parkel Dep. at 27-39.

[70] Sanchez 50-h Hearing Tr. at 25-29.

183

hours after his arrest.[71]

   - Melvyn Stevens was tightly handcuffed on arrest and placed in a police van for an hour and a half, during which time he unsuccessfully asked that the cuffs be loosened. He was brought to One Police Plaza and remained in the van for three hours. He was then uncuffed and transferred to a bus, where he waited for two to three hours, during which time he requested that he be allowed to use a bathroom, but his request was denied. He was then shackled to other prisoners and required to stand outside in the cold. While outside, he and the other arrestees to whom he was shackled requested food, water, and bathroom breaks, as well as to be allowed to wait in a heated area, but all of their requests were denied. He and the other prisoners ultimately urinated outside One Police Plaza while they were shackled together, with the group forming a circle around the person urinating to create some semblance of privacy. After approximately two hours standing outside, Stevens was handcuffed again and placed in a police van for an hour before he was given a summons and released. During his detention he was never provided toilet facilities, food or water.[72]

_____

   [71] Silva Dep. at 98-101, 109-10, 112-15, 118-20, 160-61.

   [72] Stevens Dep. at 25-44.

- Emily Venizelos was tightly handcuffed at her arrest and put in a van for about an hour. During this time, she asked that the police loosen her cuffs, but they did not do so. She was next transported to One Police Plaza, where she waited outside in the cold for two hours, with her hands turning blue from the chill. She was then brought inside and placed in a very cold cell where she waited until 7:30 the next morning in handcuffs, and was denied food and water despite her requests. The cell also lacked access to a clean toilet. At some point during the night -- her testimony was not clear as to exactly when -- her handcuffs were removed. At about 7:00 a.m. she was taken to Central Booking, where she was subjected to a partial strip search and denied water and access to an attorney despite requesting both. She was offered a ham sandwich, but did not eat it because she is a vegetarian. Finally, she was given a desk appearance ticket and released thirty hours after her arrest.[73]

To assess the reasonableness of the conditions of an arrestee's confinement, the court must apply an objective standard. As the Second Circuit has noted, "the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." Bryant, 404

---

[73] Venizelos Dep. at 18-26, 59-80, 90, 115-16.

185

F.3d at 136 (quoting Graham, 490 U.S. at 397). In this case, since plaintiffs are asserting these claims solely against the City, they must also demonstrate that the City bore legal responsibility for the conditions about which they complain. See, e.g., Solomon v. Nassau Cnty., 759 F. Supp.2d 251, 262-63 (E.D.N.Y. 2011) (citing, inter alia, Maxwell v. City of New York, 108 Fed. Appx. 10, 12 (2d Cir. 2004)); Woodward v. Morgenthau, 740 F. Supp.2d 433, 440 (S.D.N.Y. 2010).

In seeking to satisfy these demanding standards, the plaintiffs make three related arguments. First, they assert that the City normally handles disorderly-conduct arrests by issuing summonses, a process that can be accomplished on-site or at the precinct level, and they contend that it was only because the arrests at the February 15 protest grew out of the public's exercise of First Amendment rights that the police chose to subject arrestees to the more drawn-out process of booking at One Police Plaza, thus ensuring that the arrestees would be held in custody for extended periods. (Pls.' Mem. in Opp'n at 108). According to plaintiffs, this treatment reflected a hostility to the invocation of plaintiffs' free-speech rights and constitutes a violation of their rights under the First Amendment. (Id. at 118-19). Second, plaintiffs argue that the extended time that they spent in

186

detention was unnecessary, and hence unreasonable, in view of the availability of the quicker processing procedure, and therefore constituted an unreasonable detention, in violation of their Fourth Amendment rights. (Id. at 118, 120-22). Third, plaintiffs argue that the conditions under which they were held -- including prolonged exposure to cold, extended tight handcuffing, denial of access to toilets, and failure to provide food and water when requested -- also amounted to unreasonable conditions of detention, in violation of the Fourth Amendment. (Id. at 122-25).

### 1. The Length of the Detentions

We start with the arguments regarding delay. In the context of warrantless arrests, the Fourth Amendment requires a prompt judicial determination of probable cause as a "prerequisite to any extended restraint on liberty" following the arrest. Gerstein v. Pugh, 420 U.S. 103, 114 (1975). "'[P]rompt' generally means within forty-eight hours of the warrantless arrest," Powell v. Nevada, 511 U.S. 79, 80 (1994), and a pre-trial detention that exceeds forty-eight hours is thus presumptively unreasonable. Id. at 83. In addition, a pre-trial detention that does not exceed forty-eight hours may violate the Fourth Amendment if an arrestee can show that

187

the detention was unreasonably delayed. In distinguishing reasonable from unreasonable delay, the Supreme Court has explained:

> Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

County of Riverside v. McLaughlin, 500 U.S. 44, 56-57 (1991).

Plaintiffs argue that they could have been given summonses or DATs at the place of their arrests or a local precinct and that defendants' failure to do so reflected retaliation for their protected activity as protesters and also resulted in their excessive detention. More specifically, they assert that under ordinary circumstances, their arrests could have been processed within four hours, and that the policy decision to process the demonstration arrestees at One Police Plaza resulted in their detention for up to thirty-five hours for no legitimate law-enforcement purpose and in contrast to the normal handling of

188

disorderly-conduct arrests. (Pls.' Mem. in Opp'n at 118-21).

Defendants assert that plaintiffs cannot demonstrate any basis for municipal liability. (Defs.' Mem. of Law at 4-19). As for the merits of these claims, they argue, first, that plaintiffs have no legal right to a DAT and, second, that in any event most of them were held for only twelve or so hours, a time period so short -- given the logistical demands of the occasion, which involved 274 protest-related arrests in a limited time -- that the time consumed was both reasonable and necessary to process demonstration arrestees at a central facility. (Defs.' Mem. of Law at 23-24; Defs.' Reply Mem. of Law at 4).

a. Undue Delay: First Amendment Retaliation

Insofar as plaintiffs contend that their First Amendment rights were violated by a municipal decision that was hostile to their engaging in protected activities, they fail to proffer any evidentiary basis for the claim. The record reflects that the Police Department undertook hurried, last-minute planning to accommodate a gathering expected to involve up to 100,000 people and which in fact appears to have encompassed more, and that they

189

apparently modestly underestimated the number of arrests to flow from that gathering. (See O'Connell Dep. at 113, 116-17, 180-81; Defs.' Ex. QQ). Whether the Department's planning for arrest processing was or was not deficient, we see no evidence either that the decision-makers harbored any hostility to people engaging in this protest or that they designed the arrest-processing portion of the plan to retaliate against the anticipated arrestees. Moreover, plaintiffs' comparison to asserted police practices regarding the arrest of individuals in other circumstances for disorderly conduct (Pls.' Mem. in Opp'n at 108) does not save their claim. The record does not reflect the frequency with which such arrests end with DATs, and in any event, the processing of large numbers of people at any one time involves unique logistical considerations, which are not encountered in routine day-to-day arrests of individuals for unruly behavior. Fountain Report & Recommendation at 49-52 (quoting, inter alia, McLaughlin, 500 U.S. at 57). In any event, pointing to a change of practice for this event is not a substitute for probative evidence of First Amendment animus.

b. Undue Delay: Fourth Amendment Unreasonableness

As for plaintiff's Fourth Amendment claim, with the possible exception of Ms. Venizelos and Mr. Blair -- who were held for

190

thirty and thirty-five hours, respectively -- plaintiffs have
failed to proffer an evidentiary basis to demonstrate that their
detentions were unreasonably long. We first note that their
contention that their rights were somehow violated by defendants'
failure to issue them DATs has been squarely rejected by the Second
Circuit, which has reiterated that arrestees have no constitutional
right to a DAT at all, let alone a right to a DAT immediately
following an arrest. See Bryant, 404 F.3d at 138-39; see also
Mandal v. City of New York, 2006 WL 2950235, at *6 (S.D.N.Y. Oct.
17, 2006); Greenfield v. City of New York, 2000 WL 124992, at *9
(S.D.N.Y. Feb. 3, 2000) (discussing authorities and noting that
"[u]nder New York law, a 'defendant has no constitutional or
statutory right to a DAT, and a police officer who has arrested a
defendant for a misdemeanor may choose instead to retain custody of
the defendant until his arraignment in a local Criminal Court.'").
Indeed, we rejected a similar claim in a parallel suit growing out
of an arrest involving the same demonstration. Fountain Report &
Recommendation at 50-51. Thus, a claim of excessive detention
cannot be based on the contention that plaintiffs should have been
immediately issued a DAT.

In addition, nothing about the plaintiffs' detentions (apart
from those of plaintiffs Venizelos and Blair) suggests unreasonable

delay. Their detentions, which generally lasted between twelve and fourteen hours from the moment of arrest to the moment of release, fall well short of the presumptively unreasonable forty-eight-hour mark. See, e.g., Bryant, 404 F.3d at 131, 138 (finding no Fourth Amendment violation where plaintiffs had been held in custody for between five and twenty-three hours before being released); Mandal, 2006 WL 2950235, at *6 (dismissing plaintiffs' excessive-detention claims because plaintiffs' twenty-four-hour detentions were not presumptively unreasonable). Moreover, plaintiffs have not even hinted at the existence of circumstances that would suggest "unreasonable delay," such as delay for delay's sake, malicious delay or delay to permit further investigation. The record amply shows that whatever delay occurred falls within the category of reasonable, "often unavoidable" delays resulting from "practical realities" such as "transporting arrested persons from one facility to another" or "handling late-night bookings." McLaughlin, 500 U.S. at 57. Indeed, plaintiffs effectively acknowledge that the delay was a result of such practical realities when they blame their extended detentions on the back-up in post-arrest processing that occurred, as opposed to any malevolence on the part of defendants. (See Pls.' Mem. in Opp'n at 125).

As for Ms. Venizelos and Mr. Blair, even if we assume that the

192

very length of their detentions -- including the disproportion between their time in custody and the time spent by the other plaintiffs -- may be indicative of a lack of justification, their claims cannot survive. As noted, these claims target only the City, since the record does not reflect the personal responsibility of any individual defendant for the asserted delays, and these plaintiffs fail to proffer any evidence that would suggest that the unusually long waits that they encountered -- in contrast to the experience of all of the other arrested plaintiffs -- were caused by a policy or custom of the City. Indeed, the very fact that all of the other plaintiffs were released far more quickly strongly suggests otherwise.

In the absence of evidence linking the disproportionate delays suffered by Ms. Venizelos and Mr. Blair to any decision by a City policy maker or to deliberate indifference on the part of the City, summary judgment for the City is appropriate.

2. Conditions of Confinement

The arrested plaintiffs further argue that, given the length of time they were in custody, their exposure to a variety of adverse or unpleasant conditions violated their rights under the

193

Fourth Amendment. These include exposure to the cold in the open at One Police Plaza and in one or several cold police buses and in one case in a cold cell, prolonged failure to loosen or remove tight handcuffs, prolonged failure to provide access to toilets or to a clean bathroom, and failure to supply food or water. Again, they assert this set of claims only against the City. (Pls.' Mem. in Opp'n at 125-26).

Defendants respond that the conditions described by plaintiffs do not amount to a violation of the Fourth Amendment protection against unreasonable seizures. (Defs.' Mem. of Law at 24-35). They also argue that plaintiffs are unable to demonstrate that the City itself was responsible for the conditions about which plaintiffs complain. (Id. at 5-19).

We start by noting that the planning for the demonstration involved a prediction that about 250 people might be arrested, and that in the event, although it appears that far more people showed up than the 50,000 to 100,000 originally estimated by UPJ, the number of arrests -- 274 -- did not substantially exceed the original estimate. (Defs.' Exs. NN, PP, QQ; O'Connell Dep. at 113, 116-17, 180-81). As for the adverse conditions cited by the plaintiffs, they cannot be simply lumped together, as they each

194

involve somewhat different circumstances. In addition, contrary to much of defendants' initial argument, since the governing standard derives from the Fourth Amendment, the proper analysis does not look to whether the police acted with intent to punish -- as would be the case in an Eighth Amendment analysis -- or whether the conduct "shocks the conscience," as would be required of a Fourteenth Amendment substantive-due-process analysis. (See Defs.' Mem. of Law at 20-22).

The exposure to the cold for each of the defendants of course occurred because (a) the day of the demonstration happened to be very cold and (b) the complaining plaintiffs and others were required to stand outdoors for between 45 minutes and several hours at One Police Plaza. In addition, a few plaintiffs complained that the bus or van in which they sat was also cold, and one plaintiff asserted that the cell in which she was held for a number of hours was cold. Exposure to cold for a limited number of hours as an incident to arrest processing would normally not in itself be properly viewed as a constitutional violation unless it could be shown to be intended to harm the arrestee or to reflect deliberate indifference to the arrestee's well-being. In the context of a Monell claim, the plaintiff must presumably demonstrate that the City's policy-maker anticipated that the weather would be very cold

195

and either chose to arrange a processing system that would keep arrestees out in that cold for a prolonged period or at least anticipated that failure to ensure that all arrestees could be promptly sheltered would likely expose those individuals to harsh conditions and that the decision-maker ignored that likelihood.

Plaintiffs fail to offer a basis for a trier of fact to make such findings. We start by noting that there is evidence, notably in the testimony of a number of the plaintiffs, that the initial arrest-processing plan proved to be inadequate in that significant numbers of arrestees were required to stand outside One Police Plaza for some limited period of time in fairly harsh conditions. (See supra pp. 178-87). That said, the record is also undisputed that the Department recognized the problem at some point during the day and undertook some corrective measures, including transporting some arrestees to the 7th Precinct for quicker processing, putting some arrestees who had been standing in the cold at One Police Plaza back onto heated vehicles, and -- to minimize the backlog -- issuing summonses to some of the arrestees on the buses rather than processing them through the system at One Police Plaza. (Defs.' Rule 56.1 Statement at ¶¶ 28, 30, 32, 34, 38; Defs.' Reply Rule 56.1 Statement at ¶ 326). Moreover, it is not disputed that more than half the arrests -- 170 of them -- took place during a four-

196

hour period (Defs.' Rule 56.1 Statement at ¶ 272), thus triggering the processing backlog in which most of the plaintiffs were caught.

Whether the initial planning for arrest processing can be said to have been negligent in not anticipating the large number of arrests in a short time period, the plaintiffs fail to make a triable case for the notion that City policymakers -- specifically the Commissioner -- adopted a plan geared to cause discomfort or turned a blind eye to the discomfort caused. Moreover, we conclude in any event that the fact that some of the plaintiffs were exposed to cold for up to several hours as they awaited processing -- the very same cold that they chose to brave to participate in the demonstration -- did not constitute such a harsh condition that whoever was responsible for it may be deemed to have violated their Fourth Amendment rights. Finally, insofar as a few plaintiffs complained that the police vehicles in which they were held, or their cell, was cold, that assertion does not demonstrate either a violation of Fourth Amendment norms or municipal responsibility and liability for those conditions.

The prolonged denial to detainees of access to food, water and toilets may, depending on the circumstances, be viewed as inconsistent with due-process standards. Nonetheless, the evidence

197

does not permit a finding that the plan developed by the Police Department was so deficient in this respect as to trigger Fourth Amendment violations, and the implementation of the plan with respect to these plaintiffs cannot be viewed as in violation of those standards.

The failure of the Department to prepare to provide food and water for arrestees who were to be processed and then released with a summons or a desk appearance ticket was not unreasonable in view of the assumption that the arrestees could have been processed more efficiently than actually occurred (see O'Connell Dep. 113, 116-17, 122) and in view of the fact that these individuals were not going to be spending the night in police custody. Insofar as some of the plaintiffs may have had to wait longer to be processed -- most being held between twelve and fourteen hours -- it is not surprising that some asked for food or water, which was not provided, but these instances have not been shown to have resulted from a decision by a City policy maker or from deliberate indifference by the Police Department as an institution to an obvious threat to the well-being of the arrestees. In fact, a witness for the City testified that he contacted the Department of Corrections and asked them to provide meals for arrestees on February 15 -- and that doing so was standard procedure for events

198

where large numbers of arrests were expected (id. at 51) -- and placed water coolers outside the cells at One Police Plaza. (Id. at 116-17). Moreover, if individual police officers chose not to provide water when they could have or did not go out of their way to find food to feed the arrestees who made the request, that is clearly not a basis for holding the City liable for a violation of the arrestees' Fourth Amendment rights.

As for the three plaintiffs who were held overnight -- Blair, Parkel and Venizelos -- it does not appear that Blair and Parkel were denied access to food. Blair did not testify that he was denied food. (See generally Blair Dep.). Although Parkel is characterized as having been denied "suitable" food (Pls.' Mem. of Law at 109) -- the police offered ham sandwiches but she is a vegetarian (Parkel Dep. at 39) -- this critique of the nature and quality of the food supplied does not remotely trigger any Fourth Amendment concerns. As for Venizelos, she says that she asked for food and water but received no water at any time during her confinement and was not offered food until she was transferred to Central Booking the next morning.[74] (Venizelos Dep. at 115-16). If so, that might well seem to be a sufficient allegation to trigger

---

[74] As with Parkel, Venizelos was offered a ham sandwich that she could not eat because she is a vegetarian. (Venizelos Dep. at 115-16).

Fourth Amendment concerns. The difficulty, however, is that she offers no evidence from which it can be inferred that the failure to give her food and water was attributable to the City, that is, to a policy decision by a municipal policy-maker or to deliberate indifference by the Police Department or other municipal agency to an anticipated prospect that subordinate City personnel would deprive an arrestee housed in jail for more than a one-day period of any sustenance.[75]

Some plaintiffs testified that they requested access to toilets and were not given it for the twelve to fourteen hours during which they were held for processing. (Bryant Dep. at 33-34; Connor Dep. at 102, 105-09; Dellal Dep. at 73-74; Dodde Dep. at 97; Stevens Dep. at 35, 40-41). On the other hand, Inspector John O'Connell, the police official in charge of the mass-arrest-processing facility at One Police Plaza on February 15, 2003, testified that he saw numerous arrestees brought inside to use the bathroom after requesting to do so, then taken back outside and put on police buses to await their turn for processing. (O'Connell Dep. at 153-57). That testimony is undisputed and undercuts any

---

[75] With regard to food, the very fact that plaintiff Parkel was offered a sandwich suggests that a failure to provide the same to Venizelos until the following morning was not a product of a policy or practice adopted by the Department, much less approved by the Commissioner or other senior management.