assumption about the existence of a contrary City policy. As for the three plaintiffs held overnight, one -- Ms. Parkel -- complains that the toilet to which she had access had a plumbing problem causing some overflow and as a result was dirty and, she implies, unusable. (Parkel Dep. at 38-39). Similarly, Ms. Venizelos complained that the toilet in her cell was so dirty as to be unusable. (Venizelos Dep. at 66).

The failure to provide access to any toilets for the length of time at issue for most of the plaintiff arrestees -- setting aside for the moment any factual dispute over whether such a failure in fact occurred -- was obviously a serious inconvenience for them, particularly for those, if any, with weaker bladders. Whether the failure to provide such access for such a time period could amount to a Fourth Amendment violation is less clear and would seem to depend on the circumstances. See Groves v. New York, 2010 WL 1257858, at *8 n.15 (N.D.N.Y. Mar. 1, 2010) (discussing potential Eighth Amendment claim for denial of prisoner's request to use the bathroom). Whether the City itself can be taxed for such a failing is still a further question. Given the previously noted assumption by the officials who planned the policing for the demonstration that arrest processing would take less time than it ultimately did, it is not surprising that more elaborate plans had not been made

201

for the toilet needs of arrestees who were going to be released on a summons.

In any event, the record does not reflect that the denial of toilets for up to fourteen hours, even if it triggered potential Fourth Amendment violations, can be found to be attributable to a policy-making decision by the Police Department's ultimate decision-maker that contemplated encouraging, approving or acquiescing in such a violation or that it reflected deliberate indifference to a contemplated and predictable violation of arrestees' rights. The difficulty of dealing with an unexpectedly large and sudden influx of arrestees in a short time span cannot be reconciled with the notion that the Commissioner had, in effect, given his blessing to the violation of arrestees' rights to access a toilet within a reasonable time or that he and other senior officials were deliberately indifferent to a predictable violation of arresteees' rights in respect to the availability of toilets during arrest processing.

The remaining challenged adverse condition involved the prolonged use of handcuffs that a number of the plaintiffs found to be too tight. Some complained during their detention, and they generally were met either with no response by officers or by the

reply that the officers lacked the tools to loosen the handcuffs. (Bryant Dep. at 27-37, 39-40; Connor Dep. at 101-03; Dodde Dep. at 83-84; Stevens Dep. at 25-26; Silva Dep. at 109-11, 124; Venizelos Dep. at 20-25)   For reasons already discussed, we have concluded that the failure or refusal to remove or loosen handcuffs over a period of many hours may justify a claim for the use of excessive force. (See pp. 128-30, 134, supra). That excessive-force claim is pressed by plaintiffs under the Fourth Amendment, and to the extent that they re-characterize it here as part of a claim for unreasonable conditions of detention, they again assert it under the Fourth Amendment. Since the standards ultimately are the same -- that is, whether this insistence on keeping the cuffs on and tight amounted to an unreasonable use of force under the circumstances -- we see no need to reiterate our earlier analysis.

In any event, as we have already noted, plaintiffs fail to demonstrate a basis for municipal liability for this arguable example of excessive force. There is no evidence that the ultimate policy-maker approved either handcuffs that were too tight on arrestees or prolonging that status unduly, or that the Department was guilty of deliberate indifference to the refusal of some officers to loosen remove the cuffs to end arrestees' suffering. Indeed, we note that some plaintiffs reported that one or more

203

officers proved able and willing to loosen cuffs on request and that others had initially placed handcuffs on them in a manner that was not unduly tight. (Dellal Dep. at 77; Douglas Apr. Dep. at 97; Parkel Dep. at 27-28, 52). This testimony reflects an absence of any proof of a practice commanded or encouraged by the Police Department. Finally, plaintiffs offer no evidence of a failure of training in this respect or of a failure of supervision in the face of a known prior pattern of pertinent misconduct.

G.   <u>State-Law Claims</u>

In plaintiffs' complaint they asserted an array of common-law tort claims against the defendants. These include assault, battery, trespass on the person, false imprisonment, negligence, intentional infliction of emotional distress, negligent hiring and retention, negligent screening, negligent supervision, negligent training, and conspiracy to commit these torts. (2d Am. Compl. at ¶¶ 79-81). They also assert claims for violation of provisions of the New York State Constitution. (<u>Id.</u>).

Defendants have launched a potpourri of arguments in favor of dismissal or summary judgment with respect to these claims. First, they contend that plaintiffs failed to properly exhaust their

204

statutorily mandated administrative procedures because their claim
forms specified only claims of false arrest, false imprisonment,
malicious prosecution, excessive force and First Amendment
violations. Accordingly, in defendants' initial papers they say
that plaintiffs cannot pursue state-law claims for any negligence
theory, intentional infliction of emotional distress, conspiracy
and violations of the State constitution, although in their reply
papers they appear to limit the argument to plaintiffs' negligence
theories. (Defs.' Mem. of Law at 128; Defs.' Reply Mem. of Law at
84). Second, they argue that the complaint fails to identify with
the requisite specificity which defendants are alleged to have
committed which torts, and that this portion of the pleading should
therefore be dismissed for failure to state a claim. (Defs.' Mem.
of Law at 128-29). Third, they argue that summary judgment should
be granted "on the merits" with respect to claims for intentional
infliction of emotional distress, assault and battery, trespass on
the person, false imprisonment, all negligence theories,
conspiracy, and violations of the New York Constitution. (Defs.'
Mem. of Law at 129-36). Finally, they argue that the individual
defendants are protected from liability based on a theory of "good
faith immunity" and that the City is protected by municipal
immunity. (Defs.' Mem. of Law at 136-37).

In response, plaintiffs have withdrawn their claims for intentional infliction of emotional distress, trespass on the person and conspiracy, and do not dispute that plaintiffs Lamb and Cavanna did not file administrative notices of claim, thus precluding their assertion of state-law tort claims. (Pls.' Mem. in Opp'n at 126). Otherwise they oppose defendants' application. (<u>Id.</u>).

1. <u>General Municipal Law § 50-e</u>

The General Municipal Law requires, as a predicate to suit against the City for tortious conduct, that the putative plaintiff first file a notice of claim with the agency, specifying the time, place and manner in which the claimed injury occurred. N.Y. Gen. Mun. Law § 50-e. Plaintiffs (except for Lamb and Cavanna) filed such notices of claim, asserting in substance the wrongful conduct on which they have also predicated their current lawsuit, that is, allegations of false arrest, false imprisonment, malicious prosecution, excessive force and interference with protected First Amendment activity, all of which was said to have occurred on a specified date and time and at a specified location. They also described their injuries in terms of loss of their rights under the federal and state constitutions and other applicable laws, and

referred to having incurred physical and emotional pain and suffering. (Defs.' Ex. TT).

To the extent that the defendants may be arguing that the notices of claim did not bear the appropriate legal label for plaintiffs' claims of violation of the State constitution, we disagree, since they refer explicitly to the New York State Constitution. (Defs.' Ex. TT). Moreover, the General Municipal Law requirement of administrative-remedy exhaustion does not turn on the specific legal label appended to the claim form, but rather requires sufficient disclosure of the facts and the nature of the wrongful conduct and injury to permit the City to investigate and assess the claim and decide whether to seek to compromise it before suit is filed. See, e.g., Bick v. City of New York, 1997 WL 639236, at *2 (S.D.N.Y. Oct. 14, 1997) (citing, inter alia, DeLeonibus v. Scognamillo, 183 A.D.2d 697, 698, 583 N.Y.S.2d 285, 286 (2d Dep't 1992)); Frazier v. City of New York, 1997 WL 214919, at *3 (S.D.N.Y. April 24, 1997); cf. Zhao v. City of New York, 656 F. Supp.2d 375, 402-03 & n.24 (S.D.N.Y. 2009).

Defendants stand on a stronger footing in challenging the invocation of the negligence theories. As they point out, the administrative claim forms all articulated facts and legal theories

pointing to claims for intentional torts. (Defs.' Mem. of Law at 128; Defs. Reply Mem. of Law at 84 (citing Weiss Decl., Defs.' Ex. TT)). As such, they were unlikely to suggest to the reviewing agency that one aspect of the plaintiffs' claims involved how the Police Department hired, trained or supervised their personnel. Furthermore, to the extent that plaintiffs are now asserting claims that some of the individual defendants acted negligently in their dealings with the plaintiffs, the notices of claim do not suggest that this was a contention of the claimants. In short, we view the notices of claim as inadequate to preserve the negligence claims that plaintiffs now seek to advance. See Mahase v. Manhattan and Bronx Surface Transit Operating Auth., 3 A.D.3d 410, 411, 771 N.Y.S.2d 99, 100-01 (1st Dep't 2004) (theory of liability precluded where original notice of claim did not assert it and period to file amended or late notice of claim had lapsed).[76]

---

[76] We note that plaintiffs do not argue that, by waiting until the summary-judgment stage to raise the adequacy of administrative exhaustion, the defendants have waived the defense or should be estopped from asserting it. See, e.g., Zhao, 656 F. Supp.2d at 400-01 & n.21. Plaintiffs have also not argued that their claims against the individual defendants should survive even if their claims against the City may be dismissed for failure to properly exhaust the administrative process, so we do not address such an argument. See, e.g., id. at 398 n.19.

2. <u>Adequacy of the Complaint</u>

Defendants next seem to target all of the state-law claims, arguing that the complaint fails to allege with the requisite specificity which defendants committed which tortious acts. (Defs.' Mem. of Law at 129). In effect, they invite us to grant Rule 12(b)(6) relief on these claims at the summary-judgment stage.

We decline defendants' invitation. Even if the Second Amended Complaint were deemed too vague in the respect cited by defendants, that purported lack of clarity has been fully cured by the gargantuan discovery undertaken by the parties and further distilled in the plaintiffs' various summary-judgment motion papers. Hence, the only relief available to the defendants on this aspect of their motion would be a dismissal with leave for plaintiffs to amend to recapitulate in still more detail the various events to which the individual parties and other witnesses have already exhaustively testified. Such a step would be a complete waste of time and expense, particularly in the absence of any hint of prejudice to defendants, who have obviously been able to create a very detailed factual record on all claims and to determine in exquisite detail who among the defendants are said to have done what in purported violation of the rights of each

plaintiff. If further fleshing out is to be done concerning the specific alleged responsibility of each defendant for any of the common-law torts, it should be done as part of the process of creating a joint pre-trial order in the wake of disposition of the current motions.

3. <u>The Merits of the State-Law Claims</u>

Defendants next pursue a variety of arguments as to the lack of evidentiary or legal merit of some of the state-law claims and, in one case -- involving claims of assault -- the plaintiffs' purported failure to give proper notice in the administrative claims. We address these in roughly the order pursued by the parties.

a. <u>Assault and Battery</u>

In challenging plaintiffs' assault and battery claims, defendants first argue that they failed (except for plaintiff Spitzer) to specify it adequately in their administrative claim forms. (Defs.' Mem. of Law at 132). To the extent that this argument is premised on the notion that the claimant must provide a legal label in the claim form corresponding to the cause of

action asserted in court, defendants are, for reasons already noted, simply wrong. (See pp. 206, supra). If they are also contending that the plaintiffs failed to offer proper notice because their references to false arrest and excessive force do not adequately convey the notion of an assault -- that is, intentionally placing the plaintiff in fear of imminent harmful or offensive bodily contact, e.g., Green v. City of New York, 465 F.3d 65, 86 (2d Cir. 2006) (quoting Charkhy v. Altman, 252 A.D.2d 413, 414, 678 N.Y.S.2d 40, 41 (1st Dep't 1998)) -- or a battery, which is "an intentional wrongful physical contact with another person without consent," id. (quoting Charkhy, 252 A.D.2d at 414, 678 N.Y.S.2d at 41), they are equally incorrect. The combined allegations of false arrest and excessive force adequately convey elements of claims of common-law assault and battery, that is, the notion that in the moments leading up to the arrest the claimant was in apprehension of harmful or offensive bodily contact and the approach was not privileged, and that the force used in the course of the arrest was a wrongful physical contact without the plaintiff's consent. See Posr v. Doherty, 944 F.2d 91, 94-95 (2d Cir. 1991) ("essential elements of" claims for "§ 1983 use of excessive force and state law assault and battery" are "substantially identical.") (citing Raysor v. Port Auth. of New York and New Jersey, 768 F.2d 34, 40 (2d Cir. 1985)). In short, the

claim notices were adequate.

As for the merits of the assault and battery claims, defendants' challenge is premised on the notion that the parallel federal claims for false arrest and excessive force have no basis. (Defs.' Mem. of Law at 133). For reasons that we have already addressed, however, that assumption is incorrect, and hence the predicate for defendants' argument is misguided. In short, these are triable claims.

### b. False Imprisonment

Defendants argue that false imprisonment is simply a repeat of the tort of false arrest. (Defs.' Mem. of Law at 133-34 (citing Jenkins v. City of New York, 478 F.3d 76, 88 n.10 (2d Cir. 2007); Weyant, 101 F.3d at 853)). Plaintiffs do not respond to this argument, which appears to accurately reflect the state of the law, and hence we recommend that this aspect of defendants' motion for judgment be granted.

### c. Negligence

If it were determined that the notices of claim adequately

preserved plaintiffs' negligence claims, those claims would survive summary judgment. Citing the prospect of a favorable outcome on the battery claims, defendants argue that plaintiffs cannot prevail at the same time on a claim for negligence growing out of the same event. (Defs.' Mem. of Law at 134). While this is true, the evidence in the record would permit a trier of fact to find either that various instances of excessive force amounted to a battery because the force was exerted with intent, or alternatively that the impact was unintended and attributable to negligence by the officer.

In short, the record would not justify summary judgment on the negligence claims. Plaintiffs may present alternative claims to the jury, e.g., Heinemann v. Howe & Rusling, 260 F. Supp.2d 592, 599 (W.D.N.Y. 2003) (quoting Bridges v. Eastman Kodak Co., 800 F. Supp. 1172, 1179 (S.D.N.Y. 1992)), and the trial court will instruct the jurors to make findings about intent that will dictate which theory, if either, will be found to have been proven.

d. Negligent Hiring, Screening, Retention, Supervision and Training

In addition to a general negligence claim, plaintiffs have invoked a litany of specific claims against the City for what they

213

claim was negligence in hiring, screening, retaining, supervising and training police personnel. (2d Am. Compl. at ¶¶ 80(d), (f)). Defendants seek dismissal of these claims because they are precluded by plaintiffs' respondeat superior claims against the City. (Defs.' Mem. of Law at 134-35). We agree.

The New York courts recognize the principle that if an employer is sued on the basis of respondeat superior for the negligent conduct of his employee who was acting within the scope of his employment, then claims for negligent hiring, training, supervision and the like will not be entertained. As one oft-quoted Appellate Division decision explained, "if the employee was not negligent, there is no basis for imposing liability on the employer, and if the employee was negligent, the employer must pay for the judgment regardless of the reasonableness of the hiring or retention or the adequacy of the training." Karoon v. New York City Transit Auth., 241 A.D.2d 323, 324, 659 N.Y.S.2d 27, 29 (1st Dep't 1997). This remains the law in New York. See, e.g., Sugarman v. Equinox Holding, Inc., 73 A.D.3d 654, 655, 901 N.Y.S.2d 615 (1st Dep't 2010); Rosetti v Board of Educ. of Shalmont Cent. School Dist., 277 A.D.2d 668, 670, 716 N.Y.S.2d 460, 461-62 (3d Dep't 2000); Hendrix v. Jinx-Proof LLC, 27 Misc.3d 1223(A), 2010 WL

1945805, *2 (Sup. Ct. N.Y. Cty. Apr. 30, 2010).[77]

    e. <u>New York State Constitution</u>

    Plaintiffs have asserted claims arising directly under provisions of the New York State Constitution and paralleling their section 1983 claims. (2d Am. Compl. at ¶¶ 80(h)-81). Defendants seek dismissal premised on the contention that the state courts do not recognize such claims unless there is a demonstrated showing of a need for such an implied <u>Bivens</u>-like claim, and that the availability of the comparable section 1983 claims demonstrates the absence of such a need. (Defs.' Mem. of Law at 136; Defs.' Reply Mem. of Law at 88-89). In response plaintiffs suggest that dismissal would be premature because it will not be apparent until final adjudication of their federal claims whether they are viable

_____

[77] We note that plaintiffs cite one decision from a Kings County Supreme Court justice that appears to be to the contrary. (Pls.' Mem. in Opp'n at 131-32) (citing <u>Barton v. City of New York</u>, 15 Misc.2d 504, 512, 831 N.Y.S.2d 882, 890 (Sup.Ct. Kings Cty. 2007)). The court there noted that it was unsettled in that case whether the employee had been acting within the scope of his duties, <u>Barton</u>, 15 Misc. 2d at 509-10, 831 N.Y.S.2d at 888-89, a circumstance not encountered here. In any event, it is apparent that the various Appellate Division departments have spoken with some consistency in the opposite direction, and we are bound by their determination of state law absent some compelling reason to conclude otherwise, <u>see</u>, <u>e.g.</u>, <u>New York v. Nat'l Serv. Indus., Inc.</u>, 460 F.3d 201, 210-11 (2d Cir. 2006) (citing <u>inter alia</u>, <u>Comm'r of Internal Revenue v. Estate of Bosch</u>, 387 U.S. 456, 465 (1967)), which we do not have.

and thus available. (Pls.' Mem. in Opp'n at 132).

In Brown v. State, 89 N.Y.2d 172, 652 N.Y.S.2d 223 (1996), the New York Court of Appeals recognized civil claims under the New York State Constitution, Art. I, §§ 11-12, for violation of equal protection based on large-scale allegedly racially motivated police interrogations. In doing so, it observed that recognition of such a constitutional claim was "consistent with the purposes underlying the duties implied by these [State constitutional] provisions and [wa]s necessary and appropriate to ensure the full realization of the rights they state." Id. at 189, 652 N.Y.S.2d at 233.

Subsequently the same court took a narrow view of Brown when confronted with a comparable claim in Martinez v. City of Schenectady, 97 N.Y.2d 78, 735 N.Y.S.2d 868 (2001). In that case the plaintiff had been arrested and convicted based on a search that he claimed had been undertaken without probable cause. On appeal from the conviction, the New York Court of Appeals agreed with Martinez and reversed the conviction because the search had been invalid. Id. at 82, 735 N.Y.S.2d at 870. Martinez then filed a federal lawsuit under section 1983, asserting claims for malicious prosecution and other federal constitutional torts. That suit was ultimately dismissed on summary judgment, except with

216

regard to the section 1983 claims against the individual officers, as to which the district court found an issue of fact regarding the officers' qualified-immunity defense. The Second Circuit affirmed the dismissal of the remainder of the suit, and reversed the district court's decision on qualified immunity, finding that Martinez's claims against the officers were barred by the qualified-immunity defense. Id. at 82, 735 N.Y.S.2d at 870-71.

Martinez then filed a state-court suit on the same basis, but asserted claims under state law, including provisions of the New York State Constitution. The trial court dismissed the constitutional claims, a ruling affirmed by the Appellate Division and then by the New York Court of Appeals. In its ruling the Court of Appeals characterized the Brown decision as providing a "narrow remedy," Martinez, 97 N.Y.2d at 83, 735 N.Y.S.2d at 871, and as resting on the need "to ensure the full realization of the rights" embodied in the equal-protection and search-and-seizure clauses of the New York Constitution. Id. at 83, 735 N.Y.S.2d at 871. As the Court noted, in Brown the plaintiffs had no remedy other than a damages suit; according to the Court, neither injunctive nor declaratory relief was available in that earlier case, and since the plaintiffs had not been arrested and charged, suppression was also not available. As the court put it, "For those plaintiffs it

217

was damages or nothing."[78] Id. at 83, 735 N.Y.S.2d at 871. It further observed that, in Brown, the Court had made clear that to obtain a damages award based on a constitutional violation, the plaintiffs must establish not only the violation but "grounds that entitle them to a damages remedy." Id. at 83, 735 N.Y.S.2d at 871.

In rejecting Martinez's justification, the Court said that she had failed to demonstrate that the "recognition of a constitutional tort claim . . . is . . . necessary to effectuate the purposes of the State constitutional protections plaintiff invokes []or appropriate to ensure full realization of her rights." Id. at 83, 735 N.Y.S.2d at 871. It observed that in her case the suppression of evidence and reversal of her conviction despite proof of guilt beyond a reasonable doubt "will serve the public interest of promoting greater care in seeking search warrants." Hence the

---

[78] The Martinez court did not explain why injunctive and declaratory relief was not available. 97 N.Y.2d at 83, 735 N.Y.S.2d at 871. We infer that the panel was referring to the fact that the New York Court of Claims -- in which the Brown plaintiffs had filed their suit -- has subject matter jurisdiction only if the primary claim is for money damages, and may only grant equitable relief if such relief is incidental to the monetary relief sought, see, e.g., Sarbro IX v. State Office of Gen'l Servs., 229 A.D.2d 910, 911, 645 N.Y.S.2d 212, 213-14 (4th Dep't 1996) (citing cases), although the Brown court at one point suggested that neither injunctive nor declaratory relief would be an effective remedy for the wrong suffered by the plaintiffs in that case. Brown, 89 N.Y.2d at 192, 652 N.Y.S.2d at 235.

deterrence goal of <u>Brown</u> was already satisfied. <u>Id.</u> at 83-84, 735 N.Y.S.2d at 871-72. The Court further held that money damages are not "appropriate to ensure full realization" of the rights plaintiff invoked. <u>Id.</u> at 84, 735 N.Y.S.2d at 872. In this regard the Court observed that Martinez had already gotten the benefit of suppression and vacatur of her conviction, and had cited no circumstances suggesting that it was appropriate to give her a damages remedy as well. <u>Id.</u> at 84, 735 N.Y.S.2d at 872.

Since <u>Brown</u> and <u>Martinez</u> were decided, a number of lower state courts have declined to entertain State constitutional claims on the basis that the plaintiff had other remedies under state law for the same alleged misconduct. <u>See</u>, <u>e.g.</u>, <u>Bullard v. State</u>, 307 A.D.2d 676, 678-79, 763 N.Y.S.2d 371, 374 (3d Dep't 2003) (invoking availability of Article 78 proceeding); <u>Lyles v. State</u>, 194 Misc.2d 32, 752 N.Y.S.2d 523, 526-27 (Ct. Cl. 2002) (invoking state common-law tort theories); <u>Remley v. State of New York</u>, 174 Misc.2d 523, 665 N.Y.S.2d 1005, 1009 (Ct. Cl. 1997) (same). In a somewhat different (albeit parallel) vein, a number of courts in this circuit have held that a State constitutional claim is barred if the plaintiff has available to him a federal constitutional claim under section 1983. <u>See</u>, <u>e.g.</u>, <u>Washpon v. Parr</u>, 561 F. Supp.2d 394, 409-10 (S.D.N.Y. 2008); <u>Vilkhu v. City of New York</u>, 2008 WL

219

1991099, at *8-9 (E.D.N.Y. May 5, 2008); <u>Coakley v. Jaffe</u>, 49 F. Supp.2d 615, 628-29 (S.D.N.Y. 1999), <u>aff'd</u> <u>mem.</u> <u>on</u> <u>other</u> <u>gds.</u>, 234 F.3d 1261 (2d Cir. 2000). It is this line of cases that defendants in effect invoke, to argue that the New York courts would not recognize plaintiffs' constitutional claims, since they have colorable section 1983 claims for the same misconduct. (Defs.' Mem. of Law at 136).

The federal cases are consistent in assuming that the availability of a federal-law claim is sufficient to distinguish <u>Brown</u>. We are less certain that this assumption is correct. It bears emphasis that we are addressing a set of claims grounded in New York law, and not dependent, on their face, on federal legal theories. It is certainly possible, then, in the absence of New York case law treating federal legal claims as decisive in determining whether State constitutional claims may be asserted, that the New York courts would not choose this means of avoiding creation of a state-law damages claim. Moreover, this uncertainty is magnified by a closer look at <u>Brown</u> and <u>Martinez</u>.

In <u>Brown</u>, the plaintiffs were claiming that the police were engaging in racially targeted stops and interrogations, and the Court of Appeals chose to recognize a set of claims under the New

York Constitution premised on the contention that these stops violated the equal-protection clause and the unreasonable-search-and-seizure provisions of the State constitution. If, however, the availability of a section 1983 claim were a basis for declining to make a State constitutional claim available, then Brown should have come out the other way, since the plaintiffs in that case had, at least in theory, a viable set of section 1983 claims for violation of the United States Constitution's Fourteenth Amendment Equal Protection Clause and its provision barring unreasonable searches and seizures.

The problem with defendants' theory is further underscored by Martinez. As noted, the plaintiff there not only had an available federal constitutional theory by which to seek civil relief, but had actually employed it before repairing to state court. Moreover, although she ultimately lost her federal suit on the basis of a qualified-immunity defense, defendants argue that it is the mere availability of a legal remedy -- even if it proves unavailing -- that triggers a bar on a State constitutional damages claim. Yet, contrary to what we might expect, the Court in Martinez, when explaining its rejection of her claims, did not invoke the very theory that defendants here espouse -- that is, the availability of a section 1983 suit. Rather, the Court undertook a quasi-Bivens

221

analysis, see Martinez, 97 N.Y.2d at 83-84, 735 N.Y.S.2d at 871-72, and held that Martinez's success at suppression and vacatur in her criminal case justified the conclusion that recognizing a civil damages remedy under the State constitution was unnecessary. The Court's silence on the more obvious, and easier-to-justify, theory that defendants here invoke raises a strong question whether the New York courts, if confronted with defendants' current theory, would adopt it.

Finally, we note that the federal cases that have treated a section 1983 remedy as preclusive of a damages claim predicated on the State constitution have not confronted either the lack of state precedent for this theory or the seeming inconsistency of both Brown and Martinez with their own holding. Rather, they have simply assumed that the state cases support their own somewhat different conclusions.

Under the circumstances -- and without the benefit of the certification procedure that is available to our circuit court, see N.Y.C.R.R. tit. 22, § 500.27; 2d Cir. Local R. 27.2 -- we view it as the more prudent course at this stage to deny defendants' application to dismiss the State constitutional claims. If plaintiffs prevail on their parallel federal claims, there will be

222

no occasion to address the issue definitively since the state-law claims will be duplicative and thus not trigger any additional relief. If the plaintiffs fail in their burden of proof on the federal claims, the state-law claims will also presumably fail since they embody comparable legal standards. Finally, if -- for reasons not apparent at present -- it turns out that the state-law claims succeed at trial despite the failure of the federal claims, the Second Circuit will have the opportunity, if it wishes, to seek clarification from the New York Court of Appeals by way of the certification procedure.[79]

### f. "Good Faith and Government Immunities"

Defendants seek in fairly conclusory terms to invoke an immunity from tort liability for both the individual defendants and the City. (Defs.' Mem. of Law at 136-37). Their argument is unpersuasive.

---

[79] We note that an argument might be made that plaintiffs have common-law claims that parallel some of their state constitutional claims, and on that basis the constitutional claims should be precluded. Defendants have not advanced this argument, however -- which seems inconsistent with <u>Brown</u> -- much less identified which common-law tort claims should preclude which constitutional claims and why. Hence we do not address such an hypothesized analysis.

223

The scant authority that defendants cite for the immunity of the individual defendants relies on precedent for government immunity and looks to whether the government employees exercised discretion in policy matters. (Id. (citing Estate of Rosenbaum v. City of New York, 982 F. Supp. 894, 895-96 (E.D.N.Y. 1997)).[80] The New York Court of Appeals has focused more specifically on the immunity of state officers and has adhered to the notion that these individuals will be deemed immune if they exercised discretion rather performed ministerial acts. See Tango v. Tulevich, 61 N.Y.2d 34, 40-42, 471 N.Y.S.2d 73, 76-77 (1983). Defendants, however, in arguing for immunity, fail to identify which defendants purportedly exercised discretion, whether in policy matters or otherwise, so as to claim such immunity, and which tort claims are defeated by such immunity. This omission is significant since, as the Court of Appeals recognized in Tango, the distinction between discretionary and ministerial acts for this purpose is far from straightforward, id. at 40-41, 471 N.Y.S.2d at 76, and involves an assessment of the functions and duties of the individual as well as whether he

---

[80] The one case that defendants cite, Estate of Rosenbaum, appears to conflate the immunity of the government (in that case the City) with immunity of government employees. See 982 F. Supp. at 895-96 (citing Mon v. City of New York, 78 N.Y.2d 309, 574 N.Y.S.2d 529 (1991), and Haddock v. City of New York, 75 N.Y.2d 478, 554 N.Y.S.2d 439 (1990), to justify immunity of employees; both cited cases, however, addressed only immunity of the government).

"exercise[d] reasoned judgment which could typically produce different acceptable results . . . ." Id. at 40, 41, 471 N.Y.S.2d at 76, 77; see also Barnes v. County of Nassau, 108 A.D.2d 50, 53-54, 487 N.Y.S.2d 827, 830-31 (2d Dep't 1985). As the New York courts have observed, "each case must be decided on the circumstances involved, the nature of the duty, the degree of responsibility resting on the officer, and his position in the municipality's table of organization." Tango, 61 N.Y.2d at 40, 471 N.Y.S.2d at 76 (quoting Rottkamp v. Young, 21 A.D.2d 373, 249 N.Y.S.2d 330 (2d Dep't 1964), aff'd, 15 N.Y.2d 831, 257 N.Y.S.2d 944 (1965); see also, e.g., Lewis v. City of New York, 19 Misc.3d 1109(A), 859 N.Y.S.2d 904 (Table, Text in WESTLAW), 2008 WL 787243, at *9-11 (Sup. Ct. N.Y. Cty. Mar. 26, 2008). The decision to arrest a member of the public without a legal basis, as plaintiffs contend, may not come within such a principle, particularly if a policy component is required to trigger immunity, nor does the use of excessive force in making arrests or otherwise interacting with the public. See, e.g., Della Pietra v. State, 125 A.D.2d 936, 938, 510 N.Y.S.2d 334, 336 (4th Dep't 1986) (unlawful search does not involve discretion).[81] As for the balance of plaintiffs' common-law

---

[81] In the wake of Tango, the New York courts continue to look to whether the officer's actions involve a component of policy. See, e.g., Smelts v. Meloni, 5 Misc.3d 773, 778, 784 N.Y.S.2d 834, 838 (Sup. Ct. N.Y. Cty. 2004).

225

claims, defendants are equally silent, and accordingly we see no basis for awarding them relief on this theory at the summary-judgment stage. Whether the proof at trial will yield a more specific ground for invoking this defense must await the trial.

As for defendants' argument about municipal immunity, the short answer is that "[m]unicipalities surrendered their common-law immunity for the misfeasance of their officers and employees long ago." <u>Tango</u>, 61 N.Y.2d at 40, 471 N.Y.S.2d at 76. Thus, if plaintiffs prove that some of the individual defendants committed torts while engaging in actions within the scope of their employment, then the City may be held vicariously liable. <u>See</u>, <u>e.g.</u>, <u>Green</u>, 465 F.3d at 80; <u>Elmore v. City of New York</u>, 15 A.D.3d 334, 335, 790 N.Y.S.2d 462, 463 (2d Dep't 2005) (citing <u>Riviello v. Waldron</u>, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302 (1979)); <u>see also Carnegie v. J.P. Phillips, Inc.</u>, 28 A.D.3d 599, 815 N.Y.S.2d 107, 108-09 (2d Dep't 2006). In contrast, the municipal-immunity defense to which defendants allude applies only in limited circumstances to defeat a claim directly against the City, such as for negligent hiring. <u>See</u>, <u>e.g.</u>, <u>Mon</u>, 78 N.Y.2d at 313-16, 574 N.Y.S.2d at 531-34. Moreover, it applies only to the exercise of discretion in policy matters. <u>See</u>, <u>e.g.</u>, <u>Haddock</u>, 75 N.Y.2d at 483-86, 554 N.Y.S.2d at 442-44. Since plaintiffs now clarify that they

seek a finding of municipal tort liability on the basis of respondeat superior (Pls.' Mem. in Opp'n at 132), the defendants' immunity argument does not avoid this form of municipal liability.

Finally, insofar as plaintiffs also assert tort claims directly against the City for such failings as negligent hiring and training, we have already noted that these claims are precluded for a separate reason -- that plaintiffs assert tort claims against the individual police defendants for actions within the scope of their official duties, and hence the City is subject to respondeat superior liability on those claims. (See pp. 213-14, supra). Had we not done so, however, we do not believe that defendants' immunity arguments would prevail.[82] As illustrated by the contrast between the outcomes of Mon and Haddock, the determination of whether the conduct targeted by a tort claim is discretionary in the sense meant by the immunity doctrine requires a fairly detailed assessment of the precise scope of the discretion and the manner in which the alleged conduct either came within the confines of that discretion or did not. See Mon, 78 N.Y.2d at 313-16, 574 N.Y.S.2d

---

[82] Oddly, defendants never make the perhaps more straightforward argument that some of the negligence claims asserted against the City, notably for negligent hiring and perhaps for negligent training, are not sufficiently supported by evidence to survive summary judgment. Since defendants have not presented such an argument, we do not address it here.

at 531-34; <u>Haddock</u>, 75 N.Y.2d 483-86, 554 N.Y.S.2d 442-44. Defendants' brief and conclusory municipal-immunity argument, which does not address any of these details, is manifestly inadequate to justify a conclusion that the claims would be barred by the asserted defense.

## H. Injunctive and Declaratory Relief

Defendants' last target is plaintiffs' request for injunctive and declaratory relief. We first address the injunction question.

Insofar as the complaint requests entry of an injunction to prohibit policies allegedly maintained by the Police Department in derogation of plaintiffs' First Amendment right to demonstrate and other rights -- including interference with access to demonstrations, false arrests, use of excessive force and exposure of arrestees to adverse detention conditions -- defendants argue (1) that plaintiffs lack standing because they have not shown that they are likely to be harmed in the future, (2) that the underlying claims on which the injunction request is predicated are meritless under summary-judgment standards, and (3) that plaintiffs cannot demonstrate irreparable harm since any future violations of their rights may be remedied by the award of damages. (Defs.' Mem. of Law

at 137-43). Plaintiffs respond that at least some of them intend to participate, or have participated, in other demonstrations or are being chilled from doing so by virtue of the City's challenged policies, that the evidence of record and the course of later lawsuits suffices to demonstrate that the Police Department has continued to engage in practices intended to deter members of the public from participating in political demonstrations, and that the violation of their First Amendment rights constitutes irreparable harm. (Pls.' Mem. in Opp'n at 134-35). They also assert that they seek, in substance, the entry of a permanent injunction that mirrors the preliminary injunction entered in the parallel case of Stauber v. City of New York, 03 Civ. 9162 (RWS). (Pls.' Mem. in Opp'n at 133).

Although we disagree with the grounds advanced by defendants for precluding injunctive relief, we conclude that at least a portion of such relief should be denied at this stage as moot. Moreover, to the extent that we recommend granting summary judgment for defendants on some of the claims against the City, injunctive relief for those claims must also be denied.

We first address defendants' arguments, beginning by noting that at least some of the plaintiffs have put their standing in

229

issue by testifying that they either have participated in demonstrations in New York since the February 15, 2003 protest or have been discouraged from doing so by virtue of their experience with the police conduct of which they complain in this lawsuit. (E.g., Bryant Dep. at 60-62; Blair Dep. at 100-01; Parkel Dep. at 51-52, Stevens Dep. at 51-52; Haus Dep. at 92-95; Spitzer Dep. at 33-34). The substantial potential for exposure to the use of police crowd-control tactics in mass demonstrations that are said to violate First and Fourth Amendment rights in itself would be sufficient to provide standing to plaintiffs who still attend such demonstrations, subject of course to satisfactory proof at trial, see Stauber, 2004 WL 1593870, at *17-19, but in any event, to the extent that some of the plaintiffs testified to an objective chill -- that is, to being deterred from participating in subsequent demonstrations by their exposure to the challenged practices on February 15 (Connor Dep. at 138-42; Dellal Dep. at 100-01; Dodde Dep. at 102-03) -- they surely have standing to seek injunctive relief. See, e.g., Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008); see also Hsu v. Roslyn Union Free School Dist., 85 F.3d 839, 861 (2d Cir. 1996).

As for the purported lack of merit to plaintiffs' underlying claims predicated on alleged illegal City policies or practices, we

have addressed those merits in preceding sections of this Report and Recommendation, and, among other matters, recommended that plaintiffs' claim regarding the Police Department's alleged failure to provide notice of means of access to the demonstration site be reserved for trial. If all the First Amendment claim are ultimately dismissed, then injunctive relief, to the extent predicated on those claims, would necessarily have to be denied, but that is a matter yet to be resolved. The same is true of plaintiffs' false-arrest, excessive-force and malicious-prosecution claims, as to which there are triable issues of material fact. If some of those claims survive, as we recommend, then the injunction request must be addressed at trial.

As for defendants' remaining argument -- that the availability of damages precludes equitable relief -- that is surely not the case. As the Supreme Court and other courts have long held, the violation of First Amendment and other constitutional rights in itself constitutes irreparable harm. E.g., Elrod v. Burns, 427 U.S. 347, 373 (1976); Doninger, 527 F.3d at 47; cf. Salinger v. Colting, 607 F.3d 68, 82 (2d Cir. 2010). Indeed that was the premise for the entry of the preliminary injunction in the Stauber case. 2004 WL 1593870, at *23-25, *26-29. If plaintiffs prove such violations at trial and proffer adequate evidence of likely future injury, they

231

will have satisfied their burden, subject of course to the trial court's balancing of pertinent equitable considerations.

Notwithstanding the foregoing analysis, we conclude that some of the injunctive parts of plaintiffs' case should be dispensed with for an entirely separate reason. Following the entry of a preliminary injunction in Stauber, the defendants there filed a notice of appeal. Some time later, however, the appeal was withdrawn and the parties entered into a stipulation of settlement that was so ordered by Judge Sweet and filed on April 7, 2008. (Stipulation of Settlement and Order, Stauber v. City of New York, 03-cv-9162 (S.D.N.Y. Apr. 7, 2008), ECF No. 67). That settlement provided, in pertinent part, that the Police Department would include in the Patrol Guide a set of provisions that squarely address a number of issues raised in Stauber and in this case about police practices in handling the February 15 demonstration, and, by extension, other such large-scale demonstrations. (Id. at 3-4).

Specifically, the stipulation and order requires that, when demonstrations are conducted, the Department is to disseminate to the media and to the event organizers and is to post on the Department's web site, if possible, "information on expected street and sidewalk closings and information on how the public may access

232

[the] demonstration." (<u>Id.</u> at 3). Moreover, it requires that detailed information on street closings and access points, as well as unanticipated changes in access, must be given to the officers and supervisors assigned to the event, and those personnel are to provide that information to the public. (<u>Id.</u> at 3-4). This provision deals directly and comprehensively with the one First Amendment claim that, as discussed above, should survive against the City rather than merely against one or a few individual defendants.

To the extent that plaintiffs are pursuing other challenges to the Department's plan for crowd control on February 15, the <u>Stauber</u> stipulation and order addresses a number of the main issues. Thus, it requires inclusion in the Patrol Guide of a provision that "barrier configurations for demonstrations" may not "unreasonably restrict access to and participation in the event." (<u>Id.</u> at 4). As an example, it targets the current plaintiffs' principal complaints about the use of pens on First Avenue by requiring that demonstrators be permitted to leave the pens at any time and that, if possible, they should be permitted to leave and then return to the same area if they wish. (<u>Id.</u>). In addition, it specifies that the police must maintain appropriate openings in the pens to permit egress and return by the demonstrators. (<u>Id.</u>).

The Stipulation and Order also addresses claims aired in this lawsuit about the use of the Mounted Patrol to control large crowds. Thus it specifies an additional Patrol Guide provision that if such mounted units are needed for crowd control, the incident commanders must "ensure that a crowd or group to be dispersed has sufficient avenues of escape and/or retreat available to them and has had a reasonable chance to disperse." (<u>Id.</u>).

Upon learning of the entry of the <u>Stauber</u> order, we invited the parties to address its impact on any issues raised by the parties' pending summary-judgment motions and the plaintiffs' class-certification motion. In response, neither side referred to the potential mooting effect of this order on some or all of the plaintiffs' injunction requests, which, as noted, have been targeted by defendants. (<u>See</u> April 18, 2009 Letter to the Court from Ass't Corp. Counsel Elizabeth Dollin, Esq.; May 1, 2008 Letter to the Court from Jonathan C. Moore, Esq. and Vera M. Scanlon, Esq.). Notwithstanding the parties' silence on this point, we conclude that, to the extent that the cited provisions overlap with portions of the plaintiffs' claims that should or will survive summary judgment, the <u>Stauber</u> order should moot those aspects of

234

plaintiffs' injunctive requests.[83]

Insofar as defendants attack plaintiffs' request for a declaratory judgment -- arguing that it was never pled and that it is unnecessary (Defs.' Mem. of Law at 143-45) -- we note that plaintiffs offer no substantive response. Under the circumstances, however, since plaintiffs articulate such a request in their class-certification motion, it is necessary to consider defendants' point. They cite cases that address the propriety of a declaratory-judgment action divorced from any other request for relief (see Defs.' Mem. of Law at 144 (citing, inter alia, Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734 (2d Cir. 1992))), but that is not the situation here. Whether the facts as laid out at trial will justify declaratory relief is entirely unclear on the presently contested record, and defendants point to no evidence as such that would necessarily preclude granting a declaration. Accordingly, rejection of such a request for relief at this stage would be premature.

---

[83] That said, plaintiffs will be free to argue at trial for other forms of equitable relief if they can demonstrate that the Stauber provisions are inadequate or do not cover claimed misconduct that needs future correction.

235

## II. Plaintiffs' Summary-Judgment Motion

Plaintiffs have moved for summary judgment on three sets of claims. They seek such relief on their First Amendment attack on the Police Department plan for policing the February 15 demonstration, as well as on their claims for false arrest and excessive force. The motion is meritless.

### A. The First Amendment Claims

In seeking summary judgment on their First Amendment claims, plaintiffs offer an extended, if general, critique of the competence of the Police Department in designing its plan for crowd control. They then assert that the arrangements at issue should be assessed using strict scrutiny because, they say, the plan was not viewpoint-neutral, and they argue that, so judged, the plan constituted an unconstitutional prior restraint. (Pls.' R.56 Mem. of Law at 10-21). Within this argument, they appear to take issue with the decisions of the district court and circuit court in UPJ, insofar as they indicated that the proposed plan for a stationary demonstration was content-neutral and adequate as an alternative to the requested march. (Id. at 15-18, 20-21). Alternatively, they assert, the plan embodied unreasonable time, place and manner

restrictions because it involved (1) the use of pens, (2) the closure of side streets and (3) a refusal to provide access information to would-be demonstrator. (<u>Id.</u> at 21-25).

Plaintiffs' argument that, as a matter of law, the policing plan was not content-neutral appears to rest principally on the notion that because the demonstration was political in nature and the Police Department adopted a plan for its policing, the plan is <u>ipso</u> <u>facto</u> not content-neutral. (<u>Id.</u> at 15-16). This reasoning is strange, to say the least. The Police Department obviously had to develop a plan unique to the demonstration because the anticipated appearance of 100,000 people, and possibly many more, all seeking to congregate in the neighborhood of the United Nations, plainly required the preparation of a plan that addressed the logistics of that particular event. Plaintiffs also make a general reference to the notion that if the local authorities have broad discretion in handling crowds, that may be indicative of a lack of content-neutrality. (<u>Id.</u> at 17-18). The context here for discretion does not reflect that the plan was not content-neutral. The authorities (and the event sponsors) did not know how many people would show up for the demonstration or the routes that they would take to reach the site of the event, and hence it is obvious that broad discretion would appropriately have to be retained by the police to

237

manage matters on the ground in accordance with how events evolved. That is not tantamount to content bias and most assuredly does not demonstrate as a matter of law that the plans and their implementation were anything other than time, place and manner restrictions rather than prior restraints.

In any case, discretion aside, the specifics of the plan do not demonstrate that the police imposed restrictions that were so far removed from prior tactics and so stringent as to suggest First Amendment bias. As for the use of pens and side-street closures, neither was unprecedented and, in any event for reasons noted, each had an evident justification, and was well within the discretion of the local authorities in handling massed crowd events. Finally, as we have also discussed, the evidence indicates that the plan did not reflect any intention to keep access routes secret, although there appear to have been problems in communicating those details to some of the people who took part in the demonstration. That alone is not evidence of a lack of content-neutrality, and the record offers no evidence to support plaintiffs' contention in this respect, much less proof beyond triable dispute.

As for whether the plan and its implementation involved time, place and manner restrictions that were not reasonable, we have

238

addressed those issues in assessing defendants' Rule 56 motion and have found triable issues regarding the access-information claim.[84] We have also found triable issues regarding whether some defendants violated the First Amendment rights of the arrested plaintiffs. The

---

[84] Plaintiffs cite some cases in which courts have found that police rules excluding any demonstrators from certain locations involved unreasonable restrictions. (Pls.' R.56 Mem. of Law at 24-25). These cases are unhelpful to plaintiffs (and certainly do not support granting them summary judgment) since the plan at issue here did not bar all demonstrators from a given location -- in this case First Avenue -- but rather sought to control the density of the crowds on that Avenue. The fact that some of the plaintiffs were unable to gather on First Avenue in the Fifties does not demonstrate that the plan was unreasonable either in concept or in application, since there is no evidence that the pens on First Avenue were not filled or that it was unreasonable for the police to seek to limit the size of the crowds on each block to avoid potentially dangerous overcrowding and to ensure adequate lanes for emergency personnel and vehicles.

To the extent that plaintiffs also complain that some of them could not hear the speakers located on First Avenue at 51st Street because they "were several blocks north of the intended audience" (Pls.' R.56 Mem. of Law at 25), their argument verges on the frivolous. If upwards of 100,000 people show up for a demonstration, plainly not all of them will be able to fit within the few blocks from which a speaker on a pre-designated platform is likely to be heard. Furthermore, how far north a speaker can be heard is in major part a function of the loudspeaker system, if any, that the sponsors choose to use. Moreover, the appearance by members of the public at such a huge demonstration -- even if not within vocal range of the speaker -- does not necessarily constitute denial of participation. Plainly the demonstration was intended to serve as an expression of public discontent with the Bush administration's war plans, and the number of people who showed up gave obvious voice to that message regardless of whether the people who demonstrated could hear the speaker. In any event, as we have previously discussed, local authorities are not required to compress as many people as will fit into a given area if it may threaten public safety. See, e.g., Million Youth March, Inc., 155 F.3d at 127.

239

record, however, demonstrates that the facts pertinent to assessing those questions are very much in genuine dispute, thus precluding any basis for granting plaintiffs summary judgment on any version of their First Amendment claims.[85]

B. <u>The Excessive-Force Claims</u>

Plaintiffs have moved for summary judgment on some of their excessive-force claims. In their initial papers, they did not identify on which plaintiffs' behalf they were seeking Rule 56 relief and against which defendants. (<u>See</u> <u>generally</u> Pls.' R.56 Mem. of Law at 47-53). They subsequently clarified that they were seeking judgment for plaintiffs Haus, Connor, Dodde, Silva and Stevens, and that their motion was targeting the City as well as defendants Kelly, Joseph Esposito, Michael Esposito, Smolka, Acerbo, Flynn, Willoughby, Brady, Carney, Secreto, Scali and

_____

[85] Plaintiffs also separately invoke the provisions of the New York State Constitution assuring freedom of speech, and they seem to argue that this guarantee is more stringent than the First Amendment as interpreted by the federal courts. (Pls.' R.56 Mem. of Law at 26-28). The implication seems to be that even if summary judgment may not be awarded on the federal version of the claims, it is appropriate with respect to the state-law variant. Plaintiffs fail, however, to demonstrate in any respect why the state-law standard clarifies and eliminates the disputed factual issues that are material to the federal claims and further fail to explain why, as they imply, the invocation of state law eliminates the materiality of the disputed fact issues that are plainly dispositive of the federal claims.

240

Reilly. (Pls.' R.56 Reply Mem. of Law at 44-51). The premise for this aspect of their motion is the contention that these defendants were responsible for the aggressive use of horses as a means of crowd control.

For reasons already noted, none of the plaintiffs in question were able to identify the officers whose horses came in contact with them. Hence, there is no evidentiary basis to hold any of the mounted officers liable on these claims. Similarly, for reasons already noted, the record does not reflect that any of the supervisory defendants except for Capt. Acerbo, Joseph Esposito ad Bruce Smolka potentially bore responsibility for the alleged misuse of the police mounts, that is, their use in penetrating massed crowds rather than limiting them only to controlling the perimeter of such gatherings. It necessarily follows that summary judgment cannot be granted against any of these defendants.

As for Acerbo, Esposito and Smolka, we have noted that their self-described roles at the demonstration, including their presence at the specific locations at which several of the plaintiffs claimed to have been injured, may lend itself to a finding that they were responsible for the on-the-spot decisions as to how to use the horses and hence for the asserted excessive use of force

241

complained of by these individuals. That said, the testimony of Acerbo about what the police under his command did is inconsistent with the tactics that -- if deliberate and directed or acquiesced in by him -- would expose him and the other two supervisors to liability. Since the plaintiffs' testimony suggests a deliberate intrusion by the mounted police directly into several massed crowds and since Acerbo denied seeing or ordering that, the claims against him and against Esposito and Smolka are triable and not susceptible to resolution by summary judgment.

As for possible liability by the City, we have already addressed that question in assessing defendants' motion, and have concluded that plaintiffs have not created a triable issue with respect to the facts material to any recognized theory for municipal liability. (See pp. 158-70, supra). It necessarily follows that plaintiffs' application for Rule 56 relief against the City on these claims must be denied.

Finally, even if the cited plaintiffs could identify the mounted officers in question or the supervisors responsible for the acts of which they complain, they could not achieve summary judgment. As we have noted, plaintiffs Haus and Connor apparently suffered some injury -- Haus's being particularly serious -- and

Silva reported being so forcefully struck in the head by a horse that he was "stunned." (Silva Dep. at 80-81; see also Connor Dep. at 79; Haus Dep. at 55-59, 72-86, 88-91). Their accounts, however, do not compel a trier of fact to find that the police engaged in deliberate use of force that led to their injuries. As we have discussed, the circumstances to which they testified certainly lend themselves to such an inference, but they do not compel that conclusion, and the testimony of defendant Acerbo is to the contrary. In short, there are triable issues of fact pertinent to the circumstances in which the plaintiffs suffered their injuries and particularly relevant to whether the contact from the horses resulted from a deliberate decision by the police to penetrate the crowd (representing a potentially excessive use of force) or whether the contacts resulted from the mounted officers inadvertently losing control of their mounts, as one plaintiff in fact speculated (Connor Dep. at 78-79), thus potentially reflecting an accident and not a liability-creating use of force. (See pp. 131-69, supra).[86]

In sum, plaintiffs' application for summary judgment on their equine excessive-force claims should be denied.

---

[86] Dodde did not report any contact by a horse. (See Dodde Dep. at 55-56). He has not proffered evidence sufficient to take to trial on a claim of excessive force by a horse.

C. <u>The False-Arrest Claims</u>

Plaintiffs seek summary-judgment on some of their false-arrest claims. In substance they argue that the disorderly-conduct charges pressed against plaintiffs Blair, Cavanna, Connor, Delal, Dodde, Douglas, Parkel, Sanchez, Silva, Stevens and Venizelos -- as reflected in the charging instruments filed against them -- were not supported by probable cause or arguable probable cause. (Pls.' R.56 Mem. of Law at 53-55). They also argue that such a charge cannot be sustained if the arrestee has not violated a prior police warning to disperse, and that this element is constitutionally required. (<u>Id.</u> at 58).

Defendants respond that asserted defects in the charging instrument are irrelevant to a probable-cause analysis for a false-arrest claim, and they note that plaintiffs have not proffered evidence that there was no probable cause as measured by what the police observed at the time of the arrests. (Defs.' R.56 Mem. in Opp'n at 49-53). As for the constitutional challenge to arrests for disorderly conduct in the absence of an order to disperse, defendants complain that plaintiffs did not plead this theory. (Defs.' R.56 Mem. in Opp'n at 53-55). They further offer to provide still more briefing on that theory if ordered by the court. (Defs.'

R.56 Mem. in Opp'n  at 55).

As to the charging instruments, defendants' initial argument is well taken. Plaintiffs' focus on the purported defects in some of the charging instruments is misguided. The existence or non-existence of probable cause is measured by the events occurring at the time of the arrest, and while a defect in the charging document may lead to the dismissal of the charge, that does not demonstrate that the arrest was invalid. See, e.g., Carthew v. County of Suffolk, 709 F. Supp.2d 188, 197-201 & n.9 (E.D.N.Y. 2010) (finding that probable cause existed for plaintiff's arrest and granting summary judgment on false-arrest claim, despite the fact that state-court prosecution had been dismissed due to defective charging instrument).[87] Moreover, even if there is no probable cause for the crime or violation listed in the charging instrument, the arrest may be deemed valid and not subject to constitutional challenge if the facts apparent to the officers at the time of the arrest would have supported a different charge. See, e.g.,

---

[87] Indeed, the Criminal Court may choose to give the State leave to file an amended complaint if it can correct the pleading error in the initial document. See, e.g., People v. Thompson, 28 Misc.3d 483, 498, 905 N.Y.S.2d 449, 461-62 (N.Y. City Crim. Ct. 2010) (dismissing misdemeanor information as facially insufficient but permitting motion to amend to cure defects in charging instrument); see also N.Y. C.P.L. § 200.70 (permitting amendment of criminal pleadings).

Devenpeck v. Alford, 543 U.S. 146, 152-56 (2004).

For purposes of plaintiffs' motion, the question then must be whether the individual plaintiff or the arresting officer or some other eyewitness has testified to facts that, if accepted for purposes of this motion, would give rise to probable cause or arguable probable cause for a criminal charge. Since on this motion plaintiffs bear the initial burden of making the contrary showing, we look to their proffer, which is inadequate.

First, plaintiff's initial argument addresses only the adequacy of the accusatory instruments that named plaintiffs Blair, Connor, Dodde, Sanchez, Silva, Stevens, Parkel and Venizelos. (Pls.' R.56 Mem. of Law at 54-55).[88] Of these charging instruments, they observe that all but the documents naming Parkel and Venizelos accuse the cited plaintiff of having, with others, blocked a roadway, and thereby obstructed vehicular traffic despite having been directed by the police to disperse. (Id.). Even if the test of their false-arrest claims were, as plaintiffs assume, the facial adequacy of the charging instrument, they do not demonstrate that these charging instruments were legally inadequate. Indeed, they cite only a New York Court of Appeals decision in People v. Jones,

_____

[88] Plaintiffs make no reference to Mr. Cavanna.

246

9 N.Y.3d 259, 848 N.Y.S.2d 600 (2007), in which the Court determined that a criminal complaint that alleged that Jones had been standing on a sidewalk -- behavior that the Court in <u>Jones</u> characterized as "'apparently innocent' conduct", <u>id.</u> at 262, 848 N.Y.S.2d at 602 (quoting <u>People v. Carcel</u>, 3 N.Y.2d, 327, 331, 165 N.Y.S.2d 113, 116 -- was facially inadequate because it did not suggest the requisite intent or recklessness. <u>Id.</u> at 262, 848 N.Y.S.2d at 602. The difference between standing on a sidewalk, thereby allegedly obstructing pedestrian traffic, and standing in a roadway, thereby obstructing vehicular traffic, is sufficient to distinguish <u>Jones</u> on this pleading point. In short, the sworn allegations in the criminal instruments for these plaintiffs suffices to create a triable issue on probable cause.[89]

Second, as noted, the adequacy of the criminal pleading does not control the probable-cause determination. Since plaintiffs have failed to address the evidentiary record pertinent to the existence or non-existence of probable cause or arguable probable cause in their first round of motion papers, they have not met their initial

---

[89] The instruments that named Parkel and Venizelos refer to their blocking a sidewalk (Pls.' Exs. 27 (Parkel), 36 (Venizelos)), and hence those instruments may have been inadequate under <u>Jones</u>. As we have noted, however, the pleading defects are not dispositive of the probable-cause issue on a false-arrest claim.

247

Rule 56 burden, and hence their motion must be denied.[90]

Finally, we address plaintiffs' argument that New York's disorderly-conduct statute is unconstitutional because it permits the police to make arrests without first giving an order to disperse. Defendants contend that we should not consider this argument, since the complaint did not explicitly challenge the constitutionality of the disorderly-conduct statute and we should not address a legal argument raised for the first time on summary judgment. (Defs.' R.56 Mem. in Opp'n at 53-55). Plaintiffs respond that they pled the unconstitutionality of various individual plaintiffs' arrests, and that this should have been sufficient to place defendants on notice of a challenge to the statute under which plaintiffs were arrested. (Pls.' Reply R.56 Mem. of Law at 53). Regardless of whether that is so, we believe summary judgment on this argument is inappropriate for several reasons.

First, it is not immediately clear whether the plaintiffs who were arrested under the disorderly-conduct statute were arrested under Penal Law § 240.20(5), which refers only to "obstruct[ing]

---

[90] We note in any event that for a number of the plaintiffs, the testimony of the arresting police officers, if credited as we must, suggests a potential basis for finding probable cause or arguable probable cause for the arrests. (See, e.g., Ryan Dep. at 84-91, Hannon Dep. at 33-39; Otero Dep. at 74, 79-83, 87-93).

vehicular or pedestrian traffic," or Penal Law § 240.20(6), which prohibits "congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse" (emphasis added). Clearly, the latter subsection cannot be unconstitutional due to its failure to require a dispersal order, since by its plain text it requires not only a dispersal order, but a "lawful" one -- presumably, one that complies with the First Amendment. See Jones v. Parmley, 465 F.3d at 60-61 (citing, inter alia, N.Y. Penal Law § 240.20(6)). The disorderly conduct statute also requires that the arrestee have obstructed traffic "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." N.Y. Penal Law § 240.20. "New York courts have interpreted this statute to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic." Jones, 465 F.3d at 59 (citing, inter alia, People v. Nixon, 248 N.Y. 182, 185, 187 161 N.E. 463, 465, 466 (1928)). Plaintiffs have not addressed the effects of either the intent requirement or the New York courts' limiting construction on the constitutionality of the statute, instead simply asserting that the statute is unconstitutional without the requirement of a dispersal order. Without further explanation or more clearly established facts, we cannot say as a matter of law that plaintiffs are correct in that assertion. Cf. Jones, 465 F.3d

at 58 ("[T]he First Amendment does not insulate individuals from criminal sanction merely because they are simultaneously engaged in expressive activity.") (citing Cox, 379 U.S. at 554).

Second, we address plaintiffs' citation to Jones's ruling that several disorderly-conduct arrests without a dispersal order violated the First Amendment. (Pls.' R.56 Mem. of Law at 57 (citing Jones, 465 F.3d at 60-61)). In Jones, the plaintiffs were on private property, and the police defendants conceded that they could not identify those who had previously obstructed traffic by walking on the highway. 465 F.3d at 60. "Defendants could not, then, have reasonably thought that indiscriminate mass arrests without probable cause were lawful under these circumstances." Id. Moreover, -- as the court in Jones appears to have recognized -- without the capability to identify those who had previously violated § 240.20(5), the plaintiffs in that case must have been arrested under Penal Law § 240.20(6), which requires that the police first give a lawful dispersal order. Such an order could not have been given in the context of those plaintiffs' First Amendment activities "absent imminent harm[.]" Jones, 465 F.3d at 60. We contrast that with the situation encountered here, where there are disputes of fact regarding the circumstances of plaintiffs' arrests, including whether probable cause existed for those

250

arrests, whether dispersal orders were in fact given prior to the arrests, whether certain plaintiffs were actually engaged in First Amendment activity when they were arrested, and whether there was a threat of the type of "imminent harm" that the Court in <u>Jones</u> suggested might warrant arrests that might otherwise tread on First Amendment rights. Given these disputes, plaintiffs cannot be granted summary judgment on their challenge to the constitutionality of the disorderly-conduct statute.

### III. The Class-Certification Motion

Plaintiffs have moved to certify four classes under Rules 23(b)(2) and (b)(3). They refer to these classes as "a First Amendment access class, an excessive force class, a false arrest class, and an unlawful conditions of confinement class." (Pls.' Class Mem. at 1). In further elucidation, plaintiffs described the proposed First Amendment class as consisting of two sub-classes, one involving all people denied access to First Avenue and the other involving "those who reached First Avenue but whose lawful unencumbered exercise of their First Amendment rights was denied by defendants." (Pls.' Class Mem. at 6; <u>see also</u> Pls.' Reply Class Mem. of Law at 1).

Defendants oppose the motion. In substance they argue that the motion, filed after the completion of all discovery, is untimely (see Defs.' Class Mem. in Opp'n at 1-4), and that in any event plaintiffs are unable to satisfy any of the pertinent Rule 23 requirements for certification. (See generally id.).

## A. The Basic Requirements

The plaintiffs' application is governed by the terms of Rule 23, including the requirements imposed on all class actions by Rule 23(a) and the further prerequisites of Rules 23(b)(2), which concerns suits for injunctive relief, and of Rule 23(b)(3), which addresses claims for damages. Rule 23(a) requires the movant to demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Pro. 23(a). These four factors are referred to, respectively, as "numerosity, commonality, typicality, and adequacy." Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010).

252

Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." As for Rule 23(b)(3), it authorizes maintenance of a class if "questions of law or fact common to class members predominate over any questions affecting only individual members" and class treatment would be "superior to other available methods for fairly and efficiently adjudicating the controversy." See, e.g., Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2548-49 & n.2 (2011); Brown, 609 F.3d at 476.

Satisfaction of these requirements depends, not on the adequacy of the party's pleading, but on a proffer of evidence sufficient to demonstrate that the case meets these criteria. As the Supreme Court recently noted:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact etc. We recognized in Falcon that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, 457 U.S. at 160, and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied, id., at 161; see id. at 160 . . . . Frequently that "rigorous analysis" will entail some overlap with the merits of the

253

> plaintiff's underlying claim. That cannot be helped. "'[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Falcon, supra,* at 160 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 (1978) . . . .

<u>Wal-Mart</u>, 131 S.Ct. at 2551-52 (emphasis and brackets in original) (quoting and citing, <u>inter alia</u>, <u>Gen'l Tel. Co. of Southwest v. Falcon</u>, 457 U.S. 147, 160 (1982)); <u>see also</u> <u>In re Initial Public Offering</u>, 471 F.3d 24, 40 (2d Cir. 2006) (discussing the requirement that a district judge certify a class "only after making determinations that each of the Rule 23 requirements has been met" based on the resolution of any relevant factual disputes, including those factual disputes that go to the merits of the case). In short, "[e]ach of the Rule 23 requirements must be satisfied by a preponderance of the evidence . . . and the burden to prove each element is on the party seeking certification." <u>MacNamara v. City of New York</u>, __ F.R.D. __, 2011 WL 1991144, at *7 (S.D.N.Y. May 19, 2011) (citing, <u>inter alia</u>, <u>Teamsters Local 445 Freight Div. Pensino Fund v. Bombardier Inc.</u>, 546 F.3d 196, 202 (2d Cir. 2008)) (internal citation omitted).

Judged by these standards, and in light of our determinations regarding the nature and viability of plaintiffs' claims, we

conclude that certification cannot be justified.[91] We address each proposed class separately.

B. <u>The First Amendment Class</u>

The proposed First Amendment class consists, as noted, of all individuals who either were "denied access" to First Avenue or were able to reach First Avenue "but whose lawful unencumbered exercise of their First Amendment rights was denied by defendants." (Pls.' Class Mem. of Law at 8). The premise for the class application is that the City undertook a broad-based plan or set of practices that violated the First Amendment rights of any demonstrator who did not get to First Avenue or who, despite arriving on that avenue, was restricted in some fashion in his or her enjoyment of First Amendment rights.

It appears that the first sub-class is designed to capture an allegedly illegal set of time, place and manner restrictions -- including side-street closures, the use of pens on First Avenue to limit the number of people who could stand on any given block of

---

[91] For present purposes, we assume without deciding that the class motion was not untimely under Rule 23(c)(1)(A). <u>See</u> Fed. R. Civ. Pro. 23(c)(1)(A), 2003 Advisory Committee Notes, Federal Judicial Procedure and Rules at 131-32 (West 2011).

First Avenue, lack of information on the location of access points for First Avenue, and the use of false arrests and excessive force (notably aggressive Mounted Police activity) -- that assertedly prevented large numbers of people from reaching "the NYPD-designated stationary demonstration site on First Avenue." (Id.). The second sub-class is vaguely defined, but is presumably intended to encompass, at a minimum, all individuals who were either required to stand in the pens on First Avenue and were not allowed to leave their pen for some period of time or were prevented from returning to their original pen. Given some of the plaintiffs' explanation of their First Amendment theories, it may also include anyone who was prevented from moving further down First Avenue from their initial pens and possibly anyone who was not permitted to gather within sight and hearing of the stage at 51st Street. (See Pls.' R.56 Mem. of Law at 24-25).

In addressing the viability of this class, we briefly review in somewhat greater detail the substance of the Rule 23 requirements. Plaintiffs fail to satisfy a number of them.

1. Numerosity

The first requirement under Rule 23(a) is that the proposed

256

class is "so numerous that joinder of each member is impracticable." As a general matter, if the potential class exceeds forty members, the numerosity requirement will be viewed as satisfied, whereas a class of less than twenty is likely to be viewed as too small. See, e.g., MacNamara, 2011 WL 1991144, at *8 (citing Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)). Other pertinent factors that the court should consider -- especially when assessing proposed classes the size of which is in a grey area -- include such matters as "(1) the judicial economy of avoiding multiple suits; (2) the geographic dispersion of the proposed class members; (3) the financial resources of the proposed class members, (4) the ability of the proposed class members to file individual suits; and (5) requests for prospective injunctive relief which would involve future class members." Id. (citing Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)).

For present purposes, given plaintiffs' definition of the first proposed sub-class, we view it as sufficiently large to meet this requirement. The evidence reflects that far more than forty people remained on Second and Third Avenues, and we may fairly infer that a sizeable portion of them would have chosen to go to First Avenue if the side streets had been opened to them. That

257

said, for reasons noted in connection with defendants' summary-judgment motion, the numerosity of the class is placed into severe question because the plaintiffs' First Amendment claims, insofar as based on the contention that the City adhered to a plan that itself violated the participants' First Amendment rights, cannot be sustained. As we have observed, the use of street closures and pens does not constitute a set of unreasonable time, place and manner restrictions; the alleged use of arrests and excessive force has not been shown to be part of any City plan or practice that prevented access to First Avenue; and the alleged inadequacy of information regarding access points may or may not have itself prevented significant numbers of people from reaching First Avenue, but the record on this point is entirely opaque.

As for the second sub-class, it is so vaguely defined that it is difficult, if not impossible, to arrive at any realistic assessment of how many people would be included, and there is little or no evidence as to the number of people who were not allowed to leave their pens for the purpose of departing from the demonstration,[92] or were allowed to leave but not permitted to

---

[92] We so phrase this category because plaintiffs rely for their pertinent constitutional theory on the notion that individuals have the right to not participate in a First Amendment event or to withdraw from it. (Pls.' R.56 Mem. of Law at 38). One of the plaintiffs, Ms. Delaine Douglas, testified

return, or were prevented from moving southward when a more southern pen was not filled.[93]


2. <u>Commonality & Typicality</u>


The second Rule 23(a) requirement is that "there are questions of fact or law common to the class." Fed. R. Civ. Pro. 23(a)(2). Commonality is not satisfied merely because there are some common issues; rather, the Rule requires "that plaintiffs identify some unifying thread among the class members' claims that warrant[s] class treatment." <u>Damassia v. Duane Reade, Inc.</u>, 250 F.R.D. 152, 156 (S.D.N.Y. 2008) (quoting <u>Bolanos v. Norwegian Cruise Lines Ltd.</u>, 212 F.R.D. 144, 153 (S.D.N.Y. 2002)); <u>see also Friedman-Katz v. Lindt & Sprungli (USA), Inc.</u>, 270 F.R.D. 150, 155 (S.D.N.Y. 2010). In this regard, the recent observations of the Supreme Court in the <u>Wal-Mart</u> case are instructive. The Court there noted that the wording of Rule 23(a)(2) -- that "there are questions of law

---

that she was prevented from leaving her pen, although her reason for seeking to do so was to arrive at Bloomingdale's in time for a pre-scheduled facial. (Douglas Mar. Dep. at 71-72; Douglas Apr. Dep. at 25, 32-33).

[93] We note that the only instances of such problems in the record -- apart from the experience of Ms. Douglas -- were recounted during the <u>Stauber</u> hearing by several non-parties to the current lawsuit. (<u>Stauber</u> Tr. at 51-52, 119-21, 125-26, 212-13, 368-70).

and fact common to the class" -- are "easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'" 131 S.Ct. at 2551 (quoting Nagareda, "Class Certification in the Age of Aggregate Proof," 84 N.Y.U. L. Rev. 97, 131-32 (2009)). The Court went on to observe:

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," *Falcon*, *supra*, at 157. This does not mean merely that they have all suffered a violation of the same provision of law. . . . Their claims must depend upon a common contention, . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.
>
> "What matters to class certification . . . is not the raising of common 'questions' -- even in droves -- but, rather the capacity of a classwide proceeding to generate common *answers*  apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Nagareda, *supra*, at 132.

Id. (emphasis in Nagarenda).


The requirement of typicality is closely linked to that of commonality. See, e.g., Brown, 609 F.3d at 475. To demonstrate typicality, the plaintiff must show that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." In re Flag Telecom Holdings, Ltd., 574 F.3d 29, 35 (2d Cir. 2009)

(quoting Robidoux, 987 F.2d at 936). "A plaintiff's claims are typical of the class claims 'where the plaintiff's and the class members' 'injuries derive from a unitary course of conduct by a single system.'" MacNamara, 2011 WL 1991144 at *8 (quoting Marisol A. v. Giuliani 126 F.3d 372, 377 (2d Cir. 1997)).

Given the limitations that we have recognized with regard to the viability of plaintiffs' First Amendment theories, they cannot satisfy these linked tests. Plaintiffs' assertion that the City applied a uniform set of policies and practices -- imbedded in a their crowd control plan -- to preclude access to First Avenue, in violation of the First Amendment rights of numerous would-be demonstrators, cannot, for reasons already stated, survive summary judgment. Necessarily, then, the question of whether any single demonstrator was denied his or her First Amendment rights by being prevented from reaching First Avenue[94] cannot be answered by a

---

[94] For purposes of this analysis, we assume arguendo that if a putative protester was prevented by the police from reaching First Avenue somewhere north of 51st Street, that would be tantamount to a violation of that protester's First Amendment rights. This premise is based on the assumption built into the City's plan that all people who wished to appear on First Avenue, however far north that would be (depending on the size of the crowd that appeared), could be accommodated. As indicated by the Second Circuit decision in Million Youth March, Inc., 155 F.3d at 127, however, that is an overly generous view of the defendants' constitutional obligations, since they may choose to limit the size of the crowd actually present for a demonstration on a given street and require that any overflow remain on adjacent streets.

single finding that the City crowd-control plan blocked side streets, and used pens on First Avenue, thus limiting the number of participants on any single block to perhaps 3,000 to 4,000. It also cannot be answered based on the notion that the City systematically used baseless arrests or applied excessive force to prevent people seeking to reach First Avenue from accomplishing that end. Furthermore, based on our prior analysis, which rejected the notion that the City deliberately or systematically chose to deny access information to the public, it cannot be said that a determination that some officers failed to provide such information could determine the violation of a large number of class members' First Amendment claims insofar as predicated on the denial of access to First Avenue. (See pp. 45-56, supra).

As a result, the determination of whether any one class member was denied his or her First Amendment rights cannot be decided based on the resolution of any still-open common question. Though many individuals did not reach First Avenue, the reasons for that involve a host of apparently varied answers, most of which do not implicate First Amendment violations by the City and others of which involve varied circumstances that members of the public encountered that day.

We assume, with plaintiffs, that many sought to arrive directly at First Avenue in the Fifties, but were caught in large crowds of people on Second and Third Avenues, most or all of whom were also seeking to go directly to First Avenue in the lower Fifties. This congestion was presumably largely attributable to the facts that the pens on the adjoining portions of First Avenue had already filled and that the police had (legitimately) closed the side streets leading into that area of First Avenue. For reasons discussed, this would not itself implicate a constitutional violation. Moreover, if individuals then chose not to go further north to get to the demonstration -- deciding instead either to depart or to remain on the more westerly avenues as part of a large crowd that constituted a satellite demonstration -- that would not trigger First Amendment liability by defendants.

Some of the would-be demonstrators may have been prevented from getting to First Avenue because they initially sought direct access in the Fifties and for some period of time police officers blocked the route going north on Second or Third Avenues. Such blockage might well implicate First Amendment rights, but there is no showing that this was part of the City plan rather than an order issued by some unidentified mid-level supervisor that lasted for some unspecified period of time and prevented some from reaching

263

their intended destination (a category limited to those who, in the crowded condition of the lower Fifties, would have been prepared, but for the police blockage, to walk up to the Seventies or Eighties to get to First Avenue).

Others were perhaps frustrated in reaching their goal because they asked a police officer for directions and were either given inaccurate information or denied any guidance. The ignorance of some officers as to how the public was to reach First Avenue does not create a basis for a class in view of the undisputed record that (1) upwards of 100,000 people did reach the appointed site, (2) the plan anticipated that the police would direct people northward if they sought to enter already filled portions of First Avenue, (3) some police officers were providing accurate information, (4) if any member of the public could not learn from one police officer where to go, he or she was free to ask other officers or supervisors on the scene, and (5) only if a would-be demonstrator was unable, after making reasonable efforts, to learn how to access First Avenue and would have been willing to walk north for a significant distance had the correct information been furnished, might he establish a claim. Given these parameters, it is evident that proof of a constitutional violation on the basis of a class member's failure to access First Avenue turns on a

264

multitude of factual determinations that are not common to the proposed class or subclass.

Insofar as plaintiffs press an alternative form of First Amendment claim, premised on the alleged use of excessive force or false arrests, for reasons already noted they cannot sustain a claim based on the contention that the City pursued a systematic practice of using such force or arrests to prevent people from attending the rally. (See pp. 56-66, supra). Under these circumstances, the determination of whether any class member -- that is, someone who could not get to First Avenue -- was thereby denied his First Amendment rights would turn on the unique circumstances of his encounter with the police, including an assessment of whether the force that he was met with was justified or excessive under the circumstances and whether, in the event of an arrest, the arrest was or was not supported by probable cause. In short, these determinations are also not common to the class and require individual assessments wholly incompatible with a class action.

Finally, the second subclass also fails for lack of commonality as well as for lack of an articulable legal basis for a First Amendment claim. The evidence reflects that people were

permissibly required to stay in pens on First Avenue. As for the alleged refusal to allow people to head south through the pens or to depart from First Avenue or to return to the pens after departure, there is no evidence that these restrictions were part of a plan or practice of the City or were systematically imposed. Indeed, the plaintiffs' own testimony and other evidence that has been proffered demonstrates the contrary. (See, e.g., Douglas Apr. Dep. at 36-39, 39-40, 40-42, 43-44 (detailing police officers' contradictory instructions regarding leaving a pen at First Avenue between 59th and 60th Streets)). In short, any failures by the police in these respects would inevitably reflect on-the-spot decisions either by patrol officers or by low-level supervisors on the street at the time, and hence do not implicate an across-the-board Police Department decision that may appropriately be assessed for an entire class or sub-class.

The foregoing analysis adequately demonstrates that the proposed class and subclasses for plaintiffs' First Amendment claims also fail to satisfy the typicality requirement of Rule 23(a). The named plaintiffs' circumstances cannot be said to have been shown as typical of those encountered by the members of the purported class and sub-classes because the range of circumstances that led to their purported inability to reach First Avenue or to

266

leave it have not been shown to mirror those of the other members of the class and subclasses.

### 3. Adequacy

We assume that the class representatives would "fairly and adequately protect the interests of the class." Fed. R. Civ. Pro. 23(a). The record does not reflect any inherent conflicts, and class counsel is experienced and qualified. Cf. MacNamara, 2011 WL 1991144, at *9 (quoting, inter alia, Brown, 609 F.3d at 479; Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000) (stating requirements for adequacy)); id. at *15-16 (applying requirements to class of demonstrator-plaintiffs).

### 4. Rule 23(b)(2) Criteria

Rule 23(b)(2) certification is intended for cases in which "broad class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." Robinson v. Metro-North, 267 F.3d 147, 162 (2d Cir. 2001). According to the Advisory Committee Notes, it does not apply to "cases in which the appropriate final relief relates exclusively or predominantly to money damages." See MacNamara, 2011 WL 1991144, at *9 (quoting Fed. R. Civ. Pro.

267

23(b)(2), 1966 Advisory Committee Note (West 2011)). In applying
this test, the court is to look to whether reasonable plaintiffs
would bring the lawsuit to seek injunctive or declaratory relief
even if monetary relief were unavailable and whether injunctive or
declaratory relief would be "reasonably necessary and appropriate
if plaintiff were to succeed on the merits." Id. (citing Robinson,
267 F.3d at 164); see generally Wal-Mart, 131 S.Ct. at 2557-61
(discussing rationale and standards for Rule 23(b)(2) class).


     For reasons already noted, the one failing in the
implementation of the crowd-control plan that appears to have been
fairly widespread was the inadequacy of circulation of up-to-date
and specific information about access points, both for police
officers at the scene and for intended demonstrators. While in
theory that failing might form the basis for injunctive relief, the
settlement in the Stauber case led to the inclusion in the Police
Department Patrol Guide of specific provisions requiring advance
planning with documented specifics as to access routes for
demonstrations and assurances that the police on the scene will be
fully informed of those details in advance, and that the
Department, through public media, including its own web site, as
well as through the officers on the scene, will communicate those
details to the public. That is the type of relief that plaintiffs

would presumably have sought here; indeed, they claim to want a
permanent injunction that tracks the preliminary injunction imposed
in Stauber case. (Pls.' Mem. in Opp'n at 133; see also Pls.' Class
Reply Mem. at 41-42).

Given that alteration in Department procedures, the case for
even the limited injunctive relief that plaintiffs originally
sought is significantly undercut. Moreover, that development
underscores the further fact that plaintiffs cannot satisfy the
requirements of Rule 23(b)(2). Injunctive relief of this nature
would presumably not be necessary -- indeed the plaintiffs' request
in this case seems to have been mooted by the consent order in the
other case -- and under these circumstances it necessarily follows
that a reasonable plaintiff would not bring a lawsuit now for this
form of injunctive relief.

5. Rule 23(b)(3) Criteria

To satisfy the requirements of Rule 23(b)(3), the plaintiff
must show that common questions "predominate over any questions
affecting only individual members" of the class and that class
resolution "is superior to other available methods for fairly and
efficiently adjudicating the controversy." Fed. R. Civ. Pro.

269

23(b)(3). Again, plaintiffs fail to satisfy these criteria.

Predominance is shown if the plaintiff "establish[es] that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." <u>Cordes & Co. Fin. Servs. Inc. v. A.G. Edwards & Sons</u>, 502 F.3d 91, 107-08 (2d Cir. 2007) (quoting <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 280 F.3d 124, 136 (2d Cir. 2001) (superseded by statute on other grounds)) (internal quotation marks and ellipsis omitted). Notably, predominance "is a more demanding criterion than the commonality inquiry under Rule 23(a)." <u>Moore v. PaineWebber, Inc.</u>, 306 F.3d 1247, 1252 (2d Cir. 2002) (citing <u>AmChem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 623 (1997)). We have already concluded that plaintiffs fail to satisfy the commonality requirement. Necessarily, then, they cannot demonstrate predominance.[95]

---

[95] Given this conclusion, we need not offer a prolonged exegesis on superiority. We note only that the absence of predominant common issues means that a class proceeding would be dominated by the necessity of individual proof of most key issues on the First Amendment claims. We also note that many people who were present at the February 15 demonstration and had adverse experiences have long ago brought separate lawsuits and sought individual relief, and all of those suits have either settled or been resolved at trial. (Stipulation of Settlement and Order, <u>McEnery v. City of New York</u>, 03-cv-6307 (S.D.N.Y. Sept. 28, 2007), ECF No. 70; Stipulation & Order of Settlement and Dismissal, <u>Fountain v. City of New York</u>, 03-cv-4526 (S.D.N.Y. July 13, 2007), ECF No. 70; <u>see also</u>, <u>e.g.</u> <u>Scherer v. City of New</u>

## C. The Excessive-Force Class

The plaintiffs' second requested class would consist of all people who were subjected to excessive force on February 15 and all "those who are likely to be so subjected in the future." (Pls.' Class Mem. of Law at 8). We understand the latter portion of the formulation to be intended to encompass even people who were not at the demonstration, apparently on the theory that they might participate in future demonstrations, and we assume that this formulation is intended to match up with the requirements for a Rule 23(b)(2) class.

The apparent premise for plaintiffs' application for the excessive-force class is that the City pursued either a policy or a consistent practice of utilizing excessive force against the people seeking to participate in the February 15 demonstration. Indeed, otherwise the excessive-force claims would be self-evidently inappropriate for class treatment since each alleged victim's claim would turn on the particulars of his or her encounter with the police officer who used the force that the class member is contending was excessive. We assess the pertinent Rule 23 factors and conclude that plaintiffs have not justified

_____

York, 2007 WL 2710100 (Sept. 7, 2007)).

certification of the requested class.

1. <u>Numerosity</u>

The number of people subjected to what plaintiffs refer to as excessive force is not readily discernible. We infer from the plaintiffs' testimony that a fairly large number of people in the vicinity of the demonstration -- that is, on or near Second, Third and Lexington Avenues -- and some even further away, including near Sixth and Seventh Avenues, were subjected to some degree of force by the police. That said, the circumstances of these encounters vary considerably from person to person. For example, some were apparently pressed against or pushed by police officers seeking to move crowds of people from roadbeds onto sidewalks; at least one was struck in the back, seemingly without provocation; some were pushed by police horses and at least a few were stepped on by the mounts; some were physically seized and thrown to the ground as part of an arrest; some were also kneed as part of an arrest and/or had their arms twisted in preparation for handcuffing; and some were handcuffed in positions that caused discomfort or pain.[96]

---

[96] In plaintiffs' briefing they also refer to demonstrators being pepper-sprayed by the police and assert that the police "used pepper spray as a means of crowd control." (Pls.' Class Mem. of Law at 15). None of the named plaintiffs, however, reported being subjected to pepper spray.

Whether any, some or all of these encounters involved excessive force is subject to triable dispute, the resolution of which would require an exploration of the particular circumstances in which force was used, including the extent of the force and the reasons for its use.

For purposes of the present motion it is reasonable to assume, based on the testimony of plaintiffs, that more than forty individuals were subjected to force that may give rise to a colorable, that is, a triable, claim of excessiveness.[97] The other pertinent factors, however, demonstrate that class certification would be inappropriate.

### 2. Commonality & Typicality

We have already concluded that the evidence of record cannot

---

[97] As we note below, in briefing the excessive-force class application, plaintiffs focus on the Department's allegedly aggressive use of the Mounted Patrol. We infer that this focus was chosen because, as we have seen above, the use of horses at the demonstration is the one aspect of the Department's use of force that is susceptible to at least a triable claim of lack of supervision by the Mounted Patrol commander and two other senior supervisors, and hence it suggests the possibility of some uniformity of the facts underlying liability. That said, this focus would narrow considerably the number of people who were said to have been injured or otherwise adversely affected as a result of the alleged use by the Police Department of excessive force.

273

sustain plaintiffs' contention that the City engaged in a policy or practice of exerting excessive force against members of the public who sought to participate in the February 15 demonstration. (See pp. 159-70, supra). This does not mean that there were not instances of excessive force or that such instances were not numerous, but it does require that claims for excessive force turn on a case-by-case evaluation of each encounter. This fact readily demonstrates that plaintiffs cannot satisfy the commonality and typicality requirements of Rule 23(a).

This problem is comparable to that faced by the plaintiffs in the recent Wal-Mart decision. In that case the plaintiffs sought a nationwide class to pursue claims of gender discrimination premised on the contention that Wal-Mart had engaged in a pattern or practice of such discrimination. In rejecting the class application, the Supreme Court noted that an individual's Title VII claim turned on "the reason for the particular employment decision." 131 S.Ct. at 2552 (quoting Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 (1984)). Since the proposed class encompassed a challenge to a vast number of individual employment decisions, commonality in that context depended on whether there was "some glue holding the alleged reasons for all those decisions together." Id. at 2552 (emphasis in original). To provide that

"glue," the plaintiffs were required to demonstrate some across-the-board practice (whether by use of objectively biased criteria or a policy or practice of discrimination), id. at 2553 (discussing Falcon, 457 U.S. at 157-58), and in fact the Wal-Mart plaintiffs contended that Wal-Mart followed a widespread -- indeed, national -- pattern or practice of discriminating against female employees. Since the Supreme Court found that the record on the class motion demonstrated an absence of such an affirmative policy or practice, id.,[98] it held that the plaintiffs had failed to establish commonality. Because of the absence of an across-the-board policy or practice, the proof of discrimination would necessarily require, at the very least, individualized proof as to the circumstances surrounding each store manager's decisions. Hence there was no meaningful commonality between the particular experiences of the named plaintiffs and those of the class. Id. at 2554-55.

By parity of reasoning, plaintiffs' excessive-force claims in this case cannot satisfy the commonality and typicality standards. Absent a City policy or practice of undertaking, encouraging or

---

[98] According to the Court, the only national policy or practice in evidence was to allow individual store managers broad discretion in hiring and promotion. Id. at 2554. It further found no evidence that this discretion was uniformly exercised by the managers in the direction of discriminating against women. Id. at 2554-55.

uniformly acquiescing in the use of excessive force against would-be demonstrators, there is no "glue" to hold together the disparate claims of excessive force by members of the class. Each instance of force would have to be examined to determine whether it was excessive, and hence the class format would be unworkable.

Moreover, although plaintiffs' papers have emphasized, as the principal targeted use of force, the Department's utilization of the Mounted Patrol, and although we have recommended preserving several plaintiffs' horse-related claims against defendants Acerbo, Smolka and Joseph Esposito, that does not save the class. First, as noted, the various encounters that a few plaintiffs had with police horses varied considerably one from another, with one reporting horses coming close to her or pushing others in a crowd (Venizelos Dep. at 49-51), another reporting being pushed or struck in the head by the chest of a horse, although with no lasting injury (Silva Dep. at 80-81), another being knocked down and having his foot stepped on (Connor Dep. at 79), and one whose leg was seriously injured when a horse apparently inadvertently stepped on her. (Haus Dep. at 55-59, 72-86, 88-91). There is also no evidence that the allegedly over-aggressive use of the horses injured a sufficient number of other people in such comparable circumstances as to permit a single adjudication against Acerbo, Esposito and

Smolka of both excessiveness of force and lack of adequate supervision. Indeed, the horses were used in a number of different locales at different times and in somewhat varying circumstances, and hence inevitably the specifics of each individual encounter would have to be examined to determine the viability of a class member's claim.

In sum, plaintiffs fail to establish such uniformity of conduct by the police as would justify a finding of commonality. For the same reasons, they also fail to demonstrate that their claims in this respect are typical of the purported class members.

### 3. Adequacy

As was the case with plaintiffs' requested First Amendment class, we see no basis to question the adequacy of the named plaintiffs to represent the proposed excessive-force class.

### 4. Rule 23(b)(2) Criteria

Even if the plaintiffs had satisfied the Rule 23(a) standards for the class as they define it, we would find that they have not shown that the obtaining of an injunction against excessive force

277

was sufficiently central to the current case for to justify Rule 23(b)(2) certification. As noted, the evidence reflects that the Police Department has adequate standards that it utilizes in training its Mounted Police, and the record does not reflect Department-wide failings in supervising its personnel in the utilization of force. Ultimately, then, this case appears to be, in this respect, one predominantly for individualized damages for provable use of excessive force, and hence it does not meet the Rule 23(b)(2) criteria.

If the class were limited to people injured or likely to be injured by the failure of the Department to apply its recognized standards to the use of its Mounted Patrol, the argument for an injunction might, in theory, be somewhat stronger, and we do not reject out of hand the potential propriety of such relief. Nonetheless, as noted, such relief would likely be mooted -- in whole or in part -- by the <u>Stauber</u> stipulation and order. Moreover, since plaintiffs fail to demonstrate satisfaction of the principal other requirements for such a horse-limited class -- notably commonality, typicality and (as we shall see) predominance, as well as possibly numerosity -- we need not definitively assess this particular question here.

### 5. Rule 23(b)(3) Standards

Finally, we note that plaintiffs cannot meet the predominance requirement of Rule 23(b)(3). As we have observed, that criterion is still more stringent than the commonality and typicality prerequisites of Rule 23(a), and since plaintiffs have failed to satisfy those, perforce they cannot meet this test either.

### D. The False-Arrest Class

The proposed false-arrest class is defined in a manner parallel to that of the excessive-force class. Our analysis of this application also parallels that applied to the preceding class-certification request.

Briefly, although the total number of people arrested at the February 15 demonstration vastly exceeds forty, how many were arrested without justification is entirely unknown, and there is no basis for assuming that all or even a substantial number of those arrests were without probable cause. This absence of proof is related to the fact that, as noted before, plaintiffs fail to demonstrate a basis for concluding that the City undertook a policy

or practice of engaging in illegal arrests at the demonstration.[99]
(See supra pp. 56-63).

The absence of any such proof also readily establishes that
plaintiffs cannot satisfy the commonality, typicality and
predominance requirements of Rules 23(a) and 23(b)(3). The
lawfulness of each arrest requires an assessment of the
circumstances surrounding it. Necessarily, then, there is not a
common issue or set of issues that would be subject to triable
dispute and would be dispositive of, or significant for, the
resolution of the arrest claims that may be advanced by or on
behalf of the members of the proposed class.

As for the Rule 23(b)(2) criteria, absent some basis for
inferring a policy or widespread practice of false arrests, there
would seem to be little or no rationale for a suit designed to
enjoin false arrests at demonstrations. In short, plaintiffs cannot
meet this test either.

---

[99] This failing distinguishes this case from MacNamara, in
which the plaintiffs proffered evidence of geographically
distinct mass arrests by the police in the days before or during
the Republican National Convention in 2004. 2011 WL 1991144, at
*2-5. It was on that basis that the court in MacNamara certified
a class and a series of sub-classes of all those arrested in
those specifically defined locations. Id. at *16-17.

E. <u>The Unlawful-Conditions-of-Detention Class</u>

Plaintiffs' remaining class-certification request seeks recognition of a class consisting of everyone who was arrested at the February 15 demonstration and subjected to "cruel and inhumane conditions of confinement, including excessive detention," as well as all who are likely to be so detained in the future. (Pls.' Class Mem. of Law at 8-9). According to plaintiffs' briefing, this category is intended to encompass arrestees who were held for an extended period of time, which plaintiffs do not define but seem to assume involves detention for at least eight, ten or twelve hours; who were exposed to cold weather during some portion of their detention; who were denied food or water during their detention; who were denied access to toilets during their detention; who were handcuffed for extended periods of time in cuffs that caused pain or other discomfort; and who were subjected to interrogations about their political affiliations. (Pls.' Class Mem. at 8-9, 19-20).

For reasons that we have noted, all but three of the plaintiffs were released within twelve to fourteen hours and cannot show an undue delay in their processing, and the remaining plaintiffs have not been able to show a link between their extensive detentions and any of the defendants, including the City.

281

(See pp. 187-93, supra). Accordingly, the claim for delayed processing cannot form the basis for a class action in any event. We have also concluded that exposure of some of the plaintiffs to the cold for limited periods of time does not trigger any constitutional liability, and hence that circumstance does not provide a basis for certification of a class. Similarly, the failure of the police to provide food or water to the arrested plaintiffs released within twelve hours did not trigger constitutional exposure by the City or by any named individual defendants and hence no class can be certified for arrestees so affected.[100] (See pp. 193-203, supra).

As for the balance of the complained-of conditions, the denial of toilets to some of the plaintiffs and the maintaining of tight handcuffs for extended periods despite requests that they be loosened were the product of individual decisions by police officers who have not been identified as including any of the individual defendants here. Since there is no evidence that the City itself followed a plan or practice of denying toilet access to

---

[100] It appears that those arrestees held for longer periods -- that is, overnight -- were offered some food. (Parkel Dep. at 39; Venizelos Dep. at 115-16). It is also the case that those arrestees who had brought food or water with them to the demonstration were permitted to eat or drink what they had brought. (Dodde Dep. at 96, 114-16; Defs.' Ex. DDD at 338).

arrestees or that it pursued a systematic policy of not loosening tight handcuffs -- indeed, some of the arrestees reported that their cuffs had been loosened and that at various points they were removed -- plaintiffs cannot demonstrate a uniform decision the invalidity of which would establish the claims or an essential part of the claims of class members for exposure to unconstitutional conditions of detention.

Based on the lack of a City policy or practice to which plaintiffs can point that would have required, encouraged or acquiesced in denial of essential necessities for arrestees being processed, plaintiffs cannot demonstrate commonality or typicality under Rule 23(a) or predominance under Rule 23(b)(3). Given the varied experiences of the plaintiffs when in custody and particularly the absence of any defendant against whom such a claim of unreasonable conditions of detention may be pressed, their application for a class corresponding to these various versions of such a claim must be denied.

A slightly different analysis applies to certain plaintiffs' claims with respect to their political interrogation, which we have found raise issues of material fact as to whether the City had in place a policy or practice regarding political interrogation and

283

what justification, if any, the police had for it, as well as questions as to whether that type of interrogation violates the First Amendment. Four of the fifteen remaining plaintiffs testified that they had been questioned in this manner (Parkel Dep. at 43-45, Venizelos Dep. at 31, Cavanna Dep. at 217, Dellal Dep. at 73, 83), and three of those plaintiffs actually included a claim for such interrogation in the complaint. (2d Am. Compl. at ¶¶ 62, 71, 73). As we noted above, such claims have been brought in other cases arising out of the February 15 demonstration. (See pp. 66-72, supra; Fountain Report & Recommendation at 15 & n.8). As plaintiffs reference political interrogation in their class certification motion (Pls.' Class Mem. of Law at 19), we address whether certification would be appropriate for a class limited to the political-interrogation issues.

Other than the four named plaintiffs's allegations of political interrogation (and the fact that some other arrestees were apparently treated in the same manner), we are presented with only one piece of evidence as to what proportion of arrestees were questioned in this manner: a report by the New York Civil Liberties Union, recounting that, out of "over 300 witness accounts received by the NYCLU about police actions on February 15" (Pls.' Ex. 5 at 338), "eight accounts tell of detainees being questioned about

284

their organizational affiliations." (Id. at 358). This evidence seems to suggest that political interrogation was in fact limited to a small subset of the arrestees. Hence, while plaintiffs have raised an issue of material fact as to the existence of a policy or practice of political interrogation, albeit one that clearly was not followed in the case of every arrestee, we do not believe that they have carried their burden to show, by a preponderance of the evidence, that the potential class of arrestees subjected to political interrogation on February 15 is sufficiently numerous to warrant class certification.[101] In the interest of completeness, we will briefly address the remaining Rule 23 criteria as applied to this subclass.

If we were to assume that a narrowly-defined class consisting of only those who were arrested and subjected to political interrogation on February 15 could satisfy the numerosity requirements of Rule 23(a), we would likewise assume that they would adequately represent the interests of the class. (See pp. 267, supra). Furthermore, it appears that three questions of fact

---

[101] We note as well that at least two potential members of this class have long since brought and settled their own individual lawsuits. (See Fountain Report & Recommendation at 15 & n.8; Stipulation & Order of Settlement and Dismissal, Fountain v. City of New York, 03-cv-4526 (S.D.N.Y. July 13, 2007), ECF No. 70; Stipulation & Order of Settlement and Dismissal, Schneider v. City of New York, 04-cv-5978 (S.D.N.Y. Mar. 8, 2006), ECF No. 7).

285

and law central to this claim -- whether the City in fact had a policy or practice of political interrogation, whether there was a legitimate law-enforcement purpose to that interrogation, and whether the policy of political interrogation violates the First Amendment -- are indeed common to the class, and that the three individual plaintiffs' claims are typical of the claims of the class as a whole. Hence it appears that this limited subclass, were it sufficiently numerous, might satisfy the requirements of Rule 23(a).

It also appears that, with respect to this narrow subclass, "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof," Cordes & Co. Fin. Servs., Inc., 502 F.3d at 107-08 (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d at 136), and thus satisfy the requirements of Rule 23(b)(3). The primary factual question relating to the City's liability with respect to plaintiffs' political-interrogation claims is whether there was in fact a policy or practice of asking certain arrestees questions that invaded their First Amendment association rights. The proof on this issue will necessarily be the same for each class member. Similarly, any potential justification for the City's alleged

interrogation policy would presumably be part of the policy itself and thus subject to generalized proof, as would the question of whether that justification may pass First Amendment scrutiny. Although the question of whether any individual plaintiff's interrogation was justified would necessarily be individualized, this does not preclude certification.

If we ignored the numerosity requirement, we would then ask whether a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "[T]he factors relevant to this analysis include: the interest of class members in controlling separate actions; the extent and nature of existing litigation concerning the controversy; the desirability or undesirability of concentrating litigation of the class claims in the particular forum; and the likely difficulties in managing a class action." MacNamara, 2011 WL 1991144, at *19 (citing Fed. R. Civ. P. 23(b)(3)). We believe that the latter two of these factors weigh in favor of class adjudication, since political-interrogation claims against the City must necessarily be in this District regardless of whether they are class actions or individualized claims, and managing the litigation of this claim would be no more difficult if three of the seventeen plaintiffs represented a class on this

287

issue. While there has been litigation by other putative class members regarding this issue in the past (see supra pp. 66-72), it appears that those cases have settled, and hence "the remaining putative class members have not expressed a similar interest [in controlling their own claims] by filing separate actions." MacNamara, 2011 WL 1991144, at *19. It thus appears that, numerosity aside, a class action would be superior to individual adjudication of the political-interrogation claims.

We believe that the subclass would satisfy the requirements of Rule 23(b)(2), as it would challenge an alleged Police Department police or practice that could be the subject of injunctive or declaratory relief that would apply to the class as a whole. But, as stated above, without evidence showing that a sufficiently numerous class of plaintiffs was in fact subjected to political interrogation, neither a Rule 23(b)(2) class nor a Rule 23(b)(3) class limited to this issue not be certified. Hence plaintiffs Cavanna, Parkel, and Venizelos may proceed with their political-interrogation claims against the City, but they may not do so as representatives of a class.

CONCLUSION

For the reasons stated, we recommend that defendants' motion for partial summary judgment be granted in part and denied in part, that plaintiffs' motion for partial summary judgment be denied, and that plaintiffs' motion for class certification be denied. Specifically, we recommend that the following claims be permitted to proceed to trial under section 1983:

- Plaintiffs Bryant, Connor, Dodde, Lamb, Silva, Spitzer, and Stevens' First Amendment claims against defendants Joseph and Michael Esposito with respect to the implementation of the plan, specifically, the lack of communication of access information to the public;

- Plaintiffs Cavanna, Parkel, and Venizelos' First Amendment claim against the City for an alleged policy or practice of unconstitutional interrogation about their political affiliations;

- Amy Haus's excessive-force claim against Christopher Acerbo, Bruce Smolka, and Joseph Esposito;

- John Connor's excessive-force claim against Acerbo, Smolka,

289

and Joseph Esposito, and his false-arrest and malicious-prosecution claims against Smolka;

- Carlos Sanchez's false-arrest and malicious-prosecution claims against Smolka;

- Delaine Douglas's claims against Wesley Otero of excessive force, false arrest, and malicious prosecution;

- Sara Parkel's false-arrest claim against Jeff Millenbach;

- Abraham Blair's claims against Daniel Ryan of excessive force, false arrest, and malicious prosecution;

- William Silva's false-arrest and malicious-prosecution claims against Smolka and "Officer Kelly", his excessive-force claim against "Officer Kelly", and his excessive-force claim against defendants Acerbo, Smolka, and Joseph Esposito;

- Melvyn Stevens' false-arrest and malicious-prosecution claims against Neil Spadaro;

- Don Bryant's false-arrest and malicious-prosecution claims

against Smolka;

- Robert Dodde's false-arrest and malicious-prosecution claims against Smolka;

- Jasmine Dellal's false-arrest and excessive-force claims against Dennis Hannon;

- Emily Venizelos' claims against Rocco Loccisanno for excessive force, false arrest, and malicious prosecution; and

- Matthew Cavanna's claims against John Beale for excessive force and false arrest, including the claim that the arrest and use of force were in retaliation for Cavanna's exercise of his First Amendment rights.

Furthermore, as stated above, each of the plaintiffs (except Cavanna) who retains a section 1983 claim for excessive force may also assert the parallel state common-law claim for assault and battery against the arresting officer defendant and the City. Similarly, each of the plaintiffs (except Cavanna) who retains a section 1983 claim for false arrest and/or malicious prosecution may also assert the parallel state common-law claims against the

291

arresting officer defendant and the City. In addition, Adele Spitzer may assert a state common-law claim for assault and battery against the City on the basis of respondeat superior. Finally, each of the plaintiffs (except Cavanna and Lamb) may assert parallel claims for civil damages as a remedy for the alleged violation of their rights under the New York State Constitution. We note, as stated above, that the City may be held liable on these claims on the basis of respondeat superior. (<u>See</u> pp. 203-226, <u>supra</u>).

We further recommend that all other claims against all other defendants be dismissed.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Robert W. Sweet, Room 1940, 500 Pearl Street, New York, New York, 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. Pro. 72, 6(a), 6(e); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>DeLeon v. Strack</u>, 234 F.3d 84, 86 (2d.

Cir. 2000) (citing <u>Small v. Sec'y. of Health & Human Servs.</u>, 892

F.2d 15, 16 (2d Cir. 1989)).


Dated: New York, New York
       August 31, 2011




_____
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE




Copies of this Report & Recommendation are being mailed today to:

Jonathan C. Moore, Esq.
Vera M. Scanlon, Esq.
Beldock Levine & Hoffmann LLC
99 Park Avenue
Suite 1600
New York, New York 10016

Susan Halatyn, Esq.
Dara L. Weiss, Esq.
Mark Zuckerman, Esq.
Elizabeth Dollin, Esq.
Michael Gertzer, Esq.
Elizabeth M. Daitz, Esq.
Corporation Counsel
  of the City of New York
100 Church Street
New York, New York 10007