# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID FLOYD, *et al.*,

        Plaintiffs,

-against-

THE CITY OF NEW YORK, *et al.*,

        Defendants.

08 Civ. 01034 (SAS)

DECLARATION OF
DAVID FLOYD

---

DAVID FLOYD declares as follows pursuant to 28 U.S.C. § 1746:

1. I am a named plaintiff in the above-captioned case. I submit this declaration in support of Plaintiffs' motion for class certification.

2. I am a 32 year-old African-American man. In 2001, after graduating from college, I moved to New York City, where I continued to live full time (with the exception of a three-month stay in New Orleans in 2007) until the fall of 2010.

3. Since the fall of 2010, I have been enrolled as a medical student at La Escuela Latinoamericana de Medicina in Havana, Cuba. While I have been studying in Cuba for the past year, I continue to maintain ties to New York City, where I still have a lot of close friends. After finishing my medical school exams next July, I intend to visit New York City during my month-long summer break from school. I still consider New York City my home and intend to move back after I finish school.

4. I have never been convicted of any crimes.

5. From 2004 to 2007, I was an active member of the Malcolm X Grassroots Movement (MXGM), a community-based human rights organization which, among other things, helps educate members of the Black and Latino communities on their rights during interactions

with police officers. Through the organization, I participated in "Know Your Rights" trainings, as well as Copwatch, a program in which MXGM members videotape NYPD officers' street encounters with civilians in order to document police misconduct and abuse of citizens' rights.

6. I decided to become a named plaintiff in this lawsuit after having been illegally stopped, frisked, and searched by New York City Police Department (NYPD) officers on or around April 20, 2007. Then, one month after joining the lawsuit in January 2008, I was illegally stopped, frisked, and searched a second time.

**The April 2007 Stop-and-Frisk**

7. The April 2007 incident took place a little before 3 o'clock in the afternoon on a Saturday, approximately a block and a half from my home on Beach Avenue in the Bronx, while I was walking home from the subway. As I was walking on the sidewalk on Beach Avenue, a dark van with three uniformed NYPD officers inside pulled up next to me, and the driver, a Latino male officer, asked if he could speak to me, at which point I slowed down to look at him.

8. The Latino Officer, a White male officer in the front passenger seat, and a White female officer in the backseat all exited the van, and the Latino and White male officers walked towards me quickly and aggressively, causing me to stop walking altogether. The white female officer stood near the van. The Latino officer asked to see my identification. In response, I immediately took my wallet with my driver's license in it out of the back right pocket of my jeans and handed it to the Latino officer.

9. At this time, the Latino officer was standing between me and the street, while the White male officer stood to my left, between me and my home. As a result, I did not feel that I was free to leave.

2

10. As the Latino officer examined my driver's license, the White male officer moved closer and began to frisk me. While the white male officer was frisking me, he asked if I had any weapons or contraband on me, and I told him I did not and that I did not consent to a search. All I had in my pockets at that time was my Blackberry cell phone and a small key chain with two or three keys on it, neither of which was shaped or felt like a weapon. Nevertheless, the White male officer searched the insides of my right and left front jean pockets. He did not find any weapons or contraband.

11. While I was being frisked and searched, I asked the two officers why they had stopped me, but neither of them responded. The Latino officer asked me how long I had lived in New York, and I told him five years.

12. The Latino officer then gave me my wallet and driver's license back, and all three officers got back in the van and drove off.

**The February 2008 Stop-and-Frisk**

13. The second incident occurred at 2:45 in the afternoon on February 27, 2008, right in front of my home at 1359 Beach Avenue Bronx, New York. That afternoon, as I was leaving my home to go to class at City College, my neighbor who lived in the basement apartment of my godmother Marta Vega's three-story home, stopped me to ask if I could help him get into his apartment because he was locked out. Since I had a key to my godmother's apartment, I went into her apartment and retrieved a set of about 7-10 keys to try to open my neighbor's basement apartment door with.

14. The neighbor and I went to the front door of the basement apartment, which was visible from the street, and began trying the keys in the lock. We tried about 5-6 keys over the course of about a minute, before finding the right key.

3

15. However, before we could open the apartment door, three plainclothes NYPD officers came up behind us, told us to stop what we were doing, and ordered us to put our hands against the wall, which we did. The officers, who I later learned were Defendants Cormac Joyce, Eric Hernandez, and James Kelly, then frisked us, and the officer who was frisking me then reached inside of my front pants pockets without my permission. However, all I had in my pockets at that time was my cell phone, a small set of two or three keys, and some coins, none of which resembled a weapon. The officers did not find any weapons or contraband on either myself or my neighbor.

16. After they finished frisking and searching us, the officers turned my neighbor and me around to face them and asked whether we lived there and that we produce identification. I gave them my driver's license, which at the time was from Louisiana (I had obtained it during my three-month stay in New Orleans in 2007). I also provided the officers a copy of a utility bill for my Beach Avenue address, which I happened to have had with me at the time.

17. I then asked the officers why they had stopped and frisked us, and one of them responded that there had been several robberies in the neighborhood recently. However, I was not aware of any crime problems in the neighborhood at that time, and I understand that the NYPD's crime data indicates that there were virtually no burglaries or robberies reported in my neighborhood in the two months preceding this stop-and-frisk incident.

18. The two incidents described above were very upsetting and humiliating for me. I strongly believe that the NYPD officers who stopped, frisked, and searched me did so without any basis to suspect I had committed, was committing, or was about to commit a crime or to believe that I was armed and/or dangerous. I was not doing anything suspicious at the time of either stop, nor was I carrying anything that resembled a weapon or contraband. While I cannot

be sure of the exact reasons why the officers stopped me on either occasion, I believe that both times the officers stopped and frisked me because I am Black.

19. Through my work with the Malcolm X Grass Roots Movement, I have heard many stories similar to my own, primarily from Black and Latino residents of New York City. Because of these experiences and my knowledge of the NYPD's stop-and-frisk statistics, which I learned about through stories in the local New York City media and in connection with this lawsuit, I strongly believe that the NYPD has a department-wide policy and practice of illegal and racial discriminatory stops-and-frisks. For these reasons, I constantly fear being stopped and frisks in violation of my constitutional rights by NYPD officers whenever I am on the streets of New York City.

20. My goal in joining this lawsuit, much more than recovering money damages for myself, is to change the NYPD's stop-and-frisk practices to stop the NYPD from ever stopping-and-frisking me or other New Yorkers without reasonable suspicion or based on their race.

21. Since joining this lawsuit as a plaintiff, I have participated in extensive discovery, including sitting for two all-day depositions and responding to two separate sets of document requests and interrogatories from the Defendants.

22. I understand that if I am certified as a class representative, it will be only for purposes of injunctive and declaratory relief. As I described above, I share a common interest with all victims of the NYPD's unconstitutional and racially-discriminatory stop-and-frisk policies and practices: to put an end to such policies and practices. Therefore, I do not have any claims for injunctive and declaratory relief that are unique to me, and there is no reason why I would not be able to adequately protect the interests of absent class members with respect to injunctive relief.

23. I understand that, if I am certified as a class representative, I may be called upon to formulate settlement offers and evaluate offers from the City of New York that have to do with reforming the NYPD's policies and practices related to stop-and-frisk. I understand that a settlement would involve some degree of compromise. I am prepared to discuss the options with my attorneys and represent the interests of the class to the best of my ability.

24. I am represented in this litigation by attorneys from the Center for Constitutional Rights, Beldock, Levine, and Hoffman LLP, and Covington & Burling LLP. I am in regular contact with my attorneys and I have been very satisfied with their legal representation. I am confident that if appointed as class counsel, that they will vigorously and competently represent the interests of the class members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: Havana, Cuba
November 2, 2011

_____
DAVID FLOYD