UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————— X

DAVID FLOYD, LALIT CLARKSON,
DEON DENNIS, and DAVID OURLICHT,
on behalf of themselves and all others
similarly situated,

                   **Plaintiffs,**

     - against -

THE CITY OF NEW YORK, *et al.*,

              **Defendants.**

——————————————————————— X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/23/11

**OPINION AND ORDER**

08 Civ. 1034 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

        Plaintiffs David Floyd, Lalit Clarkson, Deon Dennis, and David

Ourlicht bring this putative class action against the City of New York and named

and unnamed New York City Police Officers, alleging that defendants have

implemented and sanctioned a policy, practice, and/or custom of unconstitutional

stops and frisks by the New York Police Department ("NYPD") on the basis of

race and/or national origin, in violation of Section 1983 of title forty-two of the

United States Code, the Fourth and Fourteenth Amendments to the United States

Constitution, Title VI of the Civil Rights Act of 1964,[1] and the Constitution and laws of the State of New York.[2]

As I have previously explained, this case involves an issue of great public concern – namely, the disproportionate number of African-Americans and Latinos, as compared with Caucasians, who become entangled in our criminal justice system.[3] The specific allegation brought by the plaintiffs in this case is that the NYPD is engaged in a widespread pattern and practice of suspicionless and race-based stops and frisks.

The policing policies that the City has implemented over the past decade and a half have led to a dramatic increase in the number of pedestrian stops, on pace to reach 720,000 per year.[4] There is "a disturbingly large racial disparity in who is victimized by these practices,"[5] although the precise extent of the disparity and its causes are matters of dispute. While the City credits its "pre-

---

[1]     42 U.S.C. § 2000(d), *et seq*.

[2]     *See* Second Amended Complaint ("Compl.") ¶¶ 2, 3.

[3]     *See Floyd v. City of New York*, — F. Supp. 2d —, No. 08 Civ. 1034, 2011 WL 3856515, at *1 (S.D.N.Y. Aug. 31, 2011).

[4]     *See* Memorandum of Law in Support of Plaintiffs' Motion for Class Certification at 1.

[5]     Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 1.

2

emptive" policing, and accompanying high stop rates, for the decline in crime,[6]

plaintiffs argue that African-American and Latino men have been the targets and

borne the brunt of these policies, as hundreds of thousands of law-abiding citizens

have been stopped, questioned, and frisked based, in large part, on their race.[7]

One of the plaintiffs' specific allegations is that on February 28, 2007,

three police officers unlawfully stopped and frisked David Floyd and then searched

his pockets.  On February 24, 2011, defendants brought a motion for partial

summary judgment, arguing that the undisputed evidence showed that at the time

of his stop, the police officers had reasonable suspicion to believe that Floyd was

engaged in a burglary and were thus justified in stopping and frisking him.  On

August 31, 2011, I granted defendants' motion on the plaintiffs' claims arising out

of that stop and frisk.[8]  My ruling was based on the presence of two facts that were,

at the time, undisputed: *first*, that when the police stopped Floyd he was standing

in front of an apartment door, trying numerous different keys on the lock, and

attempting to gain entry into the apartment; and *second*, that "there had been a

---

[6]     *See* Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶¶ 92-190; Supplemental Report of Jeffrey Fagan, Ph.D, in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, at 1 n.3.

[7]     *See* Compl. ¶ 6.

[8]     *See Floyd*, 2011 WL 3856515, at *17.

3

burglary pattern for that time of day in the neighborhood."[9]

On September 28, 2011, plaintiffs filed a motion for reconsideration.[10] After I issued my Opinion and Order, plaintiffs analyzed the NYPD's crime data and, according to their analysis, found that "far from a 'burglary pattern,' there was only one reported burglary in the vicinity of Mr. Floyd's home in the two months preceding his February 27, 2008 stop-and-frisk."[11]  According to plaintiffs, this evidence showing an absence of a burglary pattern raises a disputed issue of fact as to whether the officers who stopped Floyd has the legally-requisite reasonable suspicion to do so.  Because there is now a disputed issue of fact, they argue, summary judgment is inappropriate.

Defendants object to this motion.[12]  They argue that the plaintiffs have not made the showing necessary for relief under Rule 60(b): the plaintiffs previously failed to exercise due diligence to obtain the evidence regarding an absence of a burglary pattern and thus should be precluded from presenting it now;

---

[9]      *Id*. at *4, *17.

[10]      *See* Memorandum of Law in Support of Plaintiffs' Motion for Relief Under Rule 60(b) of the Court's August 31, 2011 Opinion and Order ("Pl. Mem.").

[11]      *Id*. at 1.

[12]      *See* Defendants' Memorandum of Law in Support of Their Opposition to Plaintiffs' Motion for Relief Under Rule 60(b) of the Court's August 31, 2011 Opinion and Order ("Def. Mem.").

4

the evidence would not change the result of the earlier ruling; and no extraordinary circumstances exist to warrant relief.

For the reasons explained below, plaintiffs' motion to reinstate David Floyd's claims arising out of his February 27, 2008 stop and frisk is granted.

## II.   BACKGROUND

Although I provided a detailed summary of Floyd's stop and frisk in my previous decision, I repeat much of that summary here for the sake of completeness.  I summarize the relevant portions of my August 31, 2011 Opinion and Order, describe the evidence regarding the crime data newly presented by the plaintiffs (and the defendants), and then describe the evidence submitted by the parties regarding the plaintiffs' prior access to that crime data.

### A.   The February 2008 Incident Alleged by Floyd

Floyd, an African-American man, testified that on February 27, 2008, he was walking on the path adjacent to the house in which he lived at 1359 Beach Avenue in the Bronx, New York.[13]  He encountered the basement tenant, also an African-American man, who indicated that he was locked out of his apartment and asked for help.[14]  Floyd, whose godmother owned the building, went upstairs to

---

[13]     *See* Def. 56.1 ¶ 438; Plaintiffs' Reply Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 438; Compl. ¶ 13.

[14]     *See* Def. 56.1 ¶ 438; Pl. 56.1 ¶ 438.

5

retrieve the key.[15]   Unsure of the correct key for the basement lock, he retrieved

seven to ten keys, some on chains and some loose, which he took back outside with

him.[16]   Floyd and the tenant went to the basement apartment door and started trying

the various keys.[17]   After trying five or six keys, they found the correct one.[18]

However, before they could open the door, three NYPD officers

approached them – Officer Cormac Joyce, Officer Eric Hernandez, and Sergeant

James Kelly.[19]   The officers asked the two men what they were doing, told them to

stop, and proceeded to frisk them.[20]   The officer who frisked Floyd reached into

both of his front pockets, which contained a phone, his keys, and some change.[21]

The officers then turned the two men around and asked again what they were

doing.[22]   The officers asked the men to produce identification and asked why the

---

[15]     *See id.*; Compl. ¶ 50.

[16]     *See* Def. 56.1 ¶ 439; Pl. 56.1 ¶ 439.

[17]     *See* Def. 56.1 ¶ 440; Pl. 56.1 ¶ 440.

[18]     *See* Def. 56.1 ¶ 442; Pl. 56.1 ¶ 442.

[19]     *See* Def. 56.1 ¶¶ 442, 456, 457, 463; Pl. 56.1 ¶¶ 442, 456, 457, 463.

[20]     *See* Def. 56.1 ¶ 445; Pl. 56.1 ¶ 445.

[21]     *See* Def. 56.1 ¶¶ 446-447; Pl. 56.1 ¶¶ 446-447.

[22]     *See* Def. 56.1 ¶ 448; Pl. 56.1 ¶ 448.

basement tenant did not have any.[23]  The officers asked whether the two men lived

there.[24]  Floyd gave the officers his Louisiana driver's license and when the

officers noted that the address on the license did not match the address of the

building, he retrieved a bill from his bag, which reflected the building address.[25]

       Officer Joyce testified that he stopped Floyd because he believed

Floyd was in the middle of committing a burglary; he saw Floyd jostling a

doorknob and nervously looking back; and he believed there had been a burglary

pattern for that time of day in the neighborhood.[26]  Joyce recorded Floyd's stop and

frisk on a UF250 form, indicating that the suspected crime was burglary.[27]  He also

noted in the box for "Physical Force Used" that he had put his hands on Floyd

while Floyd was up against a wall.[28]  Regarding the circumstances that led to the

---

[23]    *See id.*

[24]    *See id.*

[25]    *See* Def. 56.1 ¶ 449; Pl. 56.1 ¶ 449.

[26]    *See* Def. 56.1 ¶ 457 (citing 8/25/09 Deposition of NYPD Officer
Cormac Joyce at 126:10-128:19); Pl. 56.1 ¶ 457.

[27]    *See* Def. 56.1 ¶ 458; Pl. 56.1 ¶ 458.

[28]    *See* Def. 56.1 ¶ 460; Pl. 56.1 ¶ 460; UF250 Form completed by
Officer Joyce on 2/27/08 ("Joyce UF250"), Ex. 170 to Declaration of Darius
Charney, plaintiffs' counsel, in support of Plaintiffs' Opposition to Defendants'
Motion for Summary Judgment ("Charney Decl.").

arrest, Joyce checked the box corresponding to "Furtive Movements."[29]  In the area of the form entitled "Additional Circumstances/Factors," with instructions to "Check All That Apply," Joyce checked the box corresponding to "Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity," as well as the boxes corresponding to "Evasive, False, Or Inconsistent Responses To Officer's Questions," and to "Ongoing Investigations, e.g., Robbery Pattern," but did not check the box corresponding to "Area Has High Incidence Of Reported Offense Of Type Under Investigation."[30]  In response to the question "Was Person Searched?," Joyce checked "No."[31]

Officer Hernandez testified that he suspected Floyd of committing a burglary because he saw two men focused on the front door very close to each other with their hands playing with the lock; because he saw one of the two men look toward the street and then focus back on the door, as if looking to see if anyone was looking at them; and because he knew there had been burglaries in the 43rd Precinct.[32]  He also testified that Floyd was holding a key ring that looked like

---

[29]     Joyce UF250.

[30]     *Id.*

[31]     *Id.*

[32]     *See* Def. 56.1 ¶ 461 (citing 8/5/09 Deposition of NYPD Officer Eric Hernandez ("Hernandez Tr.") at 140:21-141:9; 153:8-154:2; 169:2-19); Pl. 56.1 ¶

8

it had been made with a wire hanger with more than fifty keys on it.[33]  He did not

see a bulge in the clothing of either man that might indicate possession of a

weapon.[34]

        Sergeant Kelly testified that he suspected that the two men were

committing a burglary because he saw them fumbling with a lock and jostling a

door, and because he knew there was a burglary pattern in the neighborhood.[35]  He

suspected that the bag at the men's feet might have contained burglary tools.[36]  He

testified that as he was approaching the two men, he noticed that one of them "was

holding a very large key chain with . . . numerous keys on it, raising [his] suspicion

that maybe they were using several keys to try to get into that house."[37]  He

reasoned that if they were in the process of committing a home invasion, they

might have a weapon.[38]  Kelly filled out a UF250, but did not make an entry in his

_____

461.

[33]    *See* Hernandez Tr., Ex. 57 to Charney Decl., at 145:21-25.

[34]    *See* Def. 56.1 ¶ 462; Pl. 56.1 ¶ 462.

[35]    *See* Def. 56.1 ¶ 463 (citing 8/7/09 Deposition of NYPD Sergeant James Kelly ("Kelly Tr."), Ex. 67 to Charney Decl., at 32:25-33:25, 37:7-15, 38:24-39:18); Pl. 56.1 ¶ 463.

[36]    *See* Def. 56.1 ¶ 464; Pl. 56.1 ¶ 464.

[37]    Kelly Tr. at 44:3-10.

[38]    *See* Def. 56.1 ¶ 465; Pl. 56.1 ¶ 465.

memo book regarding the stop and frisk of Floyd.[39]

###### B.      This Court's August 31, 2011 Summary Judgment Order

In my previous Order, I held that the officers' stop of David Floyd was lawful because the undisputed facts showed that they had had reasonable suspicion, supported by articulable facts, that he was engaging in criminal activity.[40]  In particular, I held the following:

> 1. "The existence of a midday burglary pattern is undisputed. All three officers testified that they were aware of such a pattern. Plaintiffs have not submitted evidence  to contradict the assertion."[41]
>
> 2. "[W]hether Floyd and his neighbor were 'nervously looking back' toward the street is a disputed fact, as Floyd testified that he had his back to the officers..."[42]
>
> 3. "[I]t is undisputed that Floyd and his neighbor were attempting to open the door. Floyd describes trying several different keys in the lock, while the officers describe the men as "jostling," "fumbling with," or "playing with" the lock. Floyd's description of his activity does not contradict the officers' description of his physical movements."[43]
>
> 4. "[W]hether the men had ten keys or fifty keys is a disputed fact, the resolution of which requires a credibility

---

[39]      *See* Def. 56.1 ¶ 467; Pl. 56.1 ¶ 467.

[40]      *See Floyd*, 2011 WL 3856515, at *17.

[41]      *Id.* at *15.

[42]      *Id.* at *16.

[43]      *Id.*

determination."[44]

I found that in combination, the two undisputed facts regarding the burglary pattern and Floyd's effort to open the door using multiple keys "create enough reasonable suspicion to justify the officers briefly detaining the men for an investigatory stop."[45]  I explained that neither fact, standing alone, would be sufficient for the stop.[46]  The Supreme Court has clearly held that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[47]  And, as I explained, "jostling a lock is an activity consistent with the criminal activity of attempting to break into a house, and consistent with the innocent activity of trying to open a door that you are authorized to open when you are unsure which is the correct key."[48]  Standing alone, such a furtive movement would not preclude a reasonable juror from finding that the police had lacked reasonable suspicion to stop Floyd.  In combination with the burglary pattern, however, it would.

---

[44]    *Id.*

[45]    *Id.* at *17

[46]    *See id.* at n.254.

[47]    *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000).

[48]    *Floyd*, 2011 WL 3856515, at *16.

## C.    Evidence Newly-Submitted By the Plaintiffs

On September 28, 2011, twenty-eight days after I issued the summary judgment Opinion and Order, plaintiffs filed their motion for reconsideration.  The motion is based on the findings of Jeffrey Fagan, professor of law at Columbia University, whom plaintiffs have retained as an expert this case.  According to his affidavit, Fagan analyzed the NYPD's criminal complaint report data in order to determine the total number of burglaries that were reported in the vicinity of Floyd's home in January and February of 2008.[49]  Floyd's home, at 1359 Beach Avenue, was located in Census Tract No. 66, according to the 2000 Census.  Because Beach Avenue itself was the boundary between Census Tracts 66 and 214, homes across the street from Floyd's were in Census Tract 214.  Fagan therefore analyzed crime totals for both of the two tracts, which together comprise 36 square blocks and, in 2008, were home to approximately 4,861 people.[50]  According to Fagan, between January 1, 2008 and February 28, 2008, there was one burglary reported in Census Tract 66 and were no burglaries reported in Census Tract 214.[51]

Defendants do not dispute Fagan's findings.  Instead, they produce

---

[49]    *See* Affidavit of Jeffrey Fagan ¶¶ 5-10.

[50]    *See id.*  ¶¶ 11-12.

[51]    *See id.*  ¶ 14.

evidence showing that there were more reports of burglaries and related crimes over a larger geographic area and a longer time period.  In essence, they challenge plaintiffs' conclusion that the data shows no pattern of burglaries.  Defendants show that in January and February of 2008, there were 66 complaints of burglaries in the 43rd Precinct (which includes all of Census Tracts 66 and 214 and was home to approximately 167,633 people as of the 2000 Census), 62 of which occurred within one mile of Floyd's home and 28 of which occurred within one half mile of his home.[52]  In addition, in the six months between July 1, 2007 and December 31, 2007, there were 233 complaints of burglaries and 19 complaints of stolen property within the 43rd Precinct.[53]  Finally, defendants show that for the entire borough of the Bronx in January and February of 2008, there were 560 complaints of burglary, 116 complaints of possession of stolen property, and 6 complaints of possession of burglar tools.[54]

### D.   Plaintiffs' Access to the Crime Data

Plaintiffs acknowledge that at the time their summary judgment opposition papers were due, they were in possession of the NYPD's data on

---

[52]     *See* Declaration of Tracy S. Mullet, supervisor of the Geospatial Information and Analysis Group in the New York Police Department, ¶¶ 3-6.

[53]     *See id.* ¶¶ 9-10.

[54]     *See id.* ¶¶ 13-16.

reported crime in the 43rd Precinct.[55]  Defendants state that plaintiffs have been in

possession of the data since "no later than August 2009"[56] (although they do not

specify a precise date) and plaintiffs do not contradict that statement.

Defendants also submit evidence showing that plaintiffs have known,

since at least May 11, 2009 or, at the very latest, since November 16, 2010, that

defendants would be relying in part upon a burglary pattern in order to justify the

Floyd stop and frisk.[57]  In their May 11, 2009 letter to the Court, copied to

plaintiffs' counsel, defense counsel wrote that "at some point one of the officers

explained to Floyd that they stopped him because there had been robberies in the

neighborhood . . . ."[58]  On November 16, 2010, defendants first served their

summary judgment motion (withdrawn and later re-filed), which included the

argument that the stop was justified because there had been a mid-day burglary

pattern.[59]  And, as defendants point out, plaintiffs' counsel only performed the data

---

[55]     *See* Pl. Mem. at 3.

[56]     Def. Mem. at 10.

[57]     *See id.* at 8.

[58]     May 11, 2009 Letter, Ex. C to Declaration of Heidi Grossman, defendants' counsel, in support of Defendants' Opposition to Plaintiffs' Motion for Relief Under Rule 60(b) of the Court's August 31, 2011 Opinion and Order at 5.

[59]     Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment at 3.

analysis of the alleged crime pattern after I issued the August 31, 2011 Opinion

and Order.[60]

## III.   LEGAL STANDARD

### A.   Motion for Reconsideration

Plaintiffs have brought this motion under Federal Rule of Civil

Procedure 60(b)[61] and defendants have treated it as such.[62]  However, Rule 60(b)

permits relief "from a *final* judgment, order, or proceeding" (emphasis added).[63]

My August 31, 2011 Opinion and Order granted in part and denied in part

defendants' motion for summary judgement.[64]  Because that decision did not fully

adjudicate the parties' claims, it was not appealable and thus not final for the

purposes of Rule 60(b).[65]  Therefore, plaintiffs' motion for reconsideration cannot

---

[60]     *See* Def. Mem. at 9; Pl. Mem. at 4.

[61]     *See* Pl. Mem. at 1.

[62]     *See* Def. Mem. at 6.

[63]     Fed. R. Civ. P. 60(b).  *Accord Transaero, Inc. v. La Fuerza Aerea Boliviana*, 99 F.3d 538, 541 (2d Cir. 1996) ("By its own terms, Rule 60(b) applies only to judgments that are final.").

[64]     *See Floyd*, 2011 WL 3856515, at *2.

[65]     *See* 12 James Wm. Moore et al., Moore's Federal Practice, § 60.23 (2011) ("[t]he standard test for whether a judgment is 'final' for Rule 60(b) purposes is usually stated to be whether the judgment is sufficiently 'final' to be appealed."); *United States v. 228 Acres of Land & Dwelling*, 916 F.2d 808, 811 (2d Cir. 1990) ("[a]n order that denies summary judgment or grants partial summary

be properly brought under either Rule 60(b) or Rule 59. The instant motion is thus considered as brought pursuant to Local Rule 6.3.[66]

Local Rule 6.3 requires litigants to bring motions for reconsideration within fourteen days of the initial determination, unless otherwise provided by the Court. I extended that deadline to twenty-eight days,[67] so the motion is timely. "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."[68] "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly

---

judgment cannot by itself be the basis for an appeal, since it is nonfinal.").

[66]   *See Williams v. County of Nassau*, 779 F. Supp. 2d 276, 280 n.2 (E.D.N.Y. 2011) (explaining that neither Rule 60(b) nor Rule 59 applies to a motion for reconsideration of an order denying in part and granting in part a motion for summary judgment); *Kittay v. Korff (In re Palermo)*, No. 08 Civ. 7421, 2011 WL 446209, at *4 (S.D.N.Y. Feb. 4, 2011) ("[b]ecause a denial of a motion to dismiss is an interlocutory order from which no appeal lies . . . a motion pursuant to 59(e) to modify this order is procedurally improper . . . [and] the only ground available for [defendant] to move for reconsideration is under Local Civil Rule 6.3.").

[67]   *See* 9/23/11 Transcript of Proceedings at 45 [Docket No. 157].

[68]   *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

in the interests of finality and conservation of scarce judicial resources.'"[69]   The

purpose of the rule is to "ensure the finality of decisions and to prevent the practice

of a losing party examining a decision and then plugging the gaps of a lost motion

with additional matters."[70]

   "The major grounds justifying reconsideration are an intervening

change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent manifest injustice."[71]   Defendants correctly note that,

generally, reconsideration on the basis of new evidence is only appropriate when

that evidence is truly newly discovered and could not have been found by due

diligence.[72]   However, courts may reconsider their previous decisions in light of

new information when manifest injustice would result from a refusal to do so.[73]

---

[69] *RST (2005) Inc. v. Research in Motion Ltd.*, 597 F. Supp. 2d 362, 365
(S.D.N.Y. 2009) (quoting *In re Health Mgmt. Sys. Inc. Secs. Litig.*, 113 F. Supp. 2d
613, 614 (S.D.N.Y. 2000)).

[70] *Families for Freedom v. United States Customs & Border Prot.*, No.
10 Civ. 2705, 2011 WL 4599592, at *2 (S.D.N.Y. Sept. 30, 2011)

[71] *Virgin Atl. Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245,
1255 (2d Cir. 1992) (quotation omitted).

[72] *See* Def. Mem. at 7 (citing *United States v. Potamkin Cadillac Corp.*,
697 F.2d 491, 493 (2d Cir. 1983)).

[73] *See Mikol v. Barnhart*, 554 F. Supp. 2d 498, 503 (S.D.N.Y. 2008)
(reconsideration granted, in light of newly submitted evidence, in order to prevent
a manifest injustice); *Tamayo v. City of New York*, No. 02 Civ. 8030, 2004 WL
725836, at *3 (S.D.N.Y. Mar. 31, 2004) (reconsideration granted in light of newly

17

The fundamental principle underlying Rule 60(b) is the need to "strike[] a balance between serving the ends of justice and preserving the finality of judgments."[74]  That balancing act changes when the judgment at issue is not final and the motion is brought under Local Rule 6.3.  As a result, in this Circuit, "[t]he law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment."[75]  Ultimately, "[a] district court retains absolute authority to reconsider or otherwise affect its interlocutory orders any time prior to appeal."[76]

### B.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[77]  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material

_____

submitted evidence that had long been in movant's possession).

[74]    *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986).

[75]    *Virgin Atl.*, 956 F.2d at 1255.

[76]    *Williams*, 779 F. Supp. 2d at 280.  *See* Fed. R. Civ. P. 54(b) ("[A]ny order or decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

[77]    Fed. R. Civ. P. 56(a).

18

if it might affect the outcome of the suit under the governing law."[78]

"The moving party bears the burden of establishing the absence of any genuine issue of material fact."[79]   To raise an genuine issue of material fact, and thus defeat the summary judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," and "may not rely on conclusory allegations or unsubstantiated speculation."[80]

In deciding a motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."[81]   However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[82] "The role of the court is not to resolve disputed issues of fact but to assess whether

---

[78]    *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quotation omitted).

[79]    *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

[80]    *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quotations omitted).

[81]    *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation omitted).

[82]    *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quotation and emphasis omitted).

19

there are any factual issues to be tried."[83]

## C.    Stops and Frisks

"'[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.'"[84] This form of investigative detention has become known as a *Terry* stop.[85] "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."[86] "'The officer [making a *Terry* stop] . . . must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'"[87] "Reasonable suspicion is an objective standard; hence, the subjective

---

[83]    *Brod*, 653 F.3d at 164 (quotation omitted).

[84]    *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Under New York law, the justifications required for different levels of police intrusion were established in *People v. DeBour*, 40 N.Y.2d 210 (1976).

[85]    *See Terry v. Ohio*, 392 U.S. 1 (1968).

[86]    *Wardlow,* 528 U.S. at 123 (quoting *Sokolow*, 490 U.S. at 7).  *Accord Alabama v. White*, 496 U.S. 325, 329-30 (1990); *Immigration and Naturalization Servs. v. Delgado*, 466 U.S. 210, 217 (1984).

[87]    *White*, 496 U.S. at 329 (quoting *Sokolow*, 490 U.S. at 7).

intentions or motives of the officer making the stop are irrelevant."[88]

It is sometimes the case that a police officer may observe, "a series of acts, each of them perhaps innocent in itself, but which taken together warrant[] further investigation."[89]  "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[90]  However, "the fact that the stop occurred in a 'high crime area' [may be] among the relevant contextual considerations in a Terry analysis."[91]  A court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."[92]  "[T]he proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing."[93]

---

[88]     *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

[89]     *Terry*, 392 U.S. at 22.

[90]     *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)).

[91]     *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 144, 147-48 (1972)).

[92]     *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks and citation omitted).

[93]     *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990).

## IV.   DISCUSSION

### A.      The Existence of a Burglary Pattern

The evidence newly produced by plaintiffs is deeply concerning to

this Court and it goes to the heart of this litigation.  According to an expert report

previously submitted as part of this litigation, NYPD officers check off "high

crime area" as a justifying circumstance in more than fifty-five percent of all

stops.[94]  In addition, they check off "Time Of Day, Day Of Week, Season

Corresponding To Reports of Criminal Activity" in 34.1 percent of all stops and

"Ongoing Investigations, e.g., Robbery Pattern" in 12.2 percent of all stops.[95]

Shockingly, according to the report, the use of the "high crime area" justification

does not vary based on the area's crime rate – it is checked off by police officers in

approximately fifty-five percent of all stops, regardless of whether those stops

actually take place in a high crime area, a low crime area, or an area with an

---

[94]      *See* Report of Jeffrey Fagan, Ph.D ("Fagan Report") in support of
Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 51. The
box's full description on the NYPD's UF250 form is "Area Has High Incidence Of
Reported Offense Of Type Under Investigation."  These specific statistics exclude
stops made pursuant to "radio runs," where officers are directed to a specific
location based on a civilian's or officer's report of crime.  *See* Fagan Report at 35,
51.

[95]      *See id.* at 51.

average rate of crime.[96]  Equally disturbing, the report finds that in cases where

officers checked off "high crime area" on their post-stop report, they were

approximately eighteen percent less likely to have made an arrest than in cases

where they did not check that box.[97]  That is to say, although the Supreme Court

has held that "the fact that the stop occurred in a 'high crime area' [is] among the

relevant contextual considerations" in determining whether the stop was

constitutionally permissible,[98] the reliance on that factor by NYPD police officers

appears to in fact *reduce* the likelihood that crime was indeed afoot.  One

hypothesis raised by plaintiffs' expert to explain this strange result is that:

> [i]f the initial basis for suspicion leading to the stop was thin, then
> adding [high crime area] . . . provides a post hoc justification to a
> stop that was most likely erroneous with respect to whether crime
> was afoot, and might have been based on a threshold of suspicion
> that otherwise would have been legally insufficient to justify the
> stop.[99]

It is of course not my role to make the factual determination of whether

Fagan's  data is correct, let alone whether his hypothesis properly explains that data.

It is appropriate, however, for me to observe that plaintiffs have made the NYPD's use

---

[96]        *See id.* at 53.

[97]        *See id.* at 52.

[98]        *Wardlow*, 528 U.S. at 124 (quoting *Adams*, 407 U.S. at 144, 147-48).

[99]        Fagan Report at 53-55.

and alleged misuse of the justifications "high crime area," "time of day," and "ongoing investigation, e.g., robbery pattern" a central part of their suit. And they have now brought forward strong evidence suggesting that, at least in the case of the NYPD's stop of Floyd on February 27, 2008, the use of those justifications may not have been supported by the objective pattern of crime in the neighborhood.

Officers Joyce and Hernandez and Sergeant Kelly all testified that they stopped Floyd in part because there was a pattern of burglaries in the neighborhood.[100] The existence of such a burglary pattern was one of the two undisputed facts that I found were necessary in order for defendants to justify Floyd's stop and frisk on summary judgment.[101] Plaintiffs have now raised severe doubts about the existence of that pattern by producing evidence that over the two months prior to Floyd's stop, there was only one burglary reported for the two census tracts surrounding Floyd's home.

Defendants argue that plaintiffs' new evidence is not convincing and should not change the outcome of my previous summary judgment Order. First, they argue that the area selected by plaintiffs and Fagan for analysis is too small. They do not indicate what precise area would be more appropriate, but they do

---

[100]    *See* Def. 56.1 ¶¶ 457, 461, 463.

[101]    *See Floyd*, 2011 WL 3856515, at *17 n.254.

provide statistics showing that in the two months prior to Floyd's stop, there were 28 burglaries within one half mile of Floyd's home, 62 burglaries within a mile of his home, 66 burglaries within the 43rd Precinct, and 560 burglaries throughout the Bronx.[102]  Defendants point out that the plaintiffs never asked defendants Hernandez, Joyce, or Kelly about the boundaries of the burglary pattern on which they relied when making the stop, and that plaintiffs have "not cited to any depositions or other documents to support their use of these subjective boundaries."[103]  Furthermore, defendants argue that plaintiffs "have unilaterally and arbitrarily determined that a two-month period is appropriate to draw the conclusion that no pattern existed," and point out that if the examination is extended back to December 1, 2007, there were even more burglaries.[104]

Plaintiffs reply that the parties' disagreement shows that there is a disputed issue of material fact and that summary judgment is therefore

---

[102]    *See* Def. Mem. at 13-14.  I must note, however, that defining the entire Bronx as the scene of a pattern of burglary would undermine the Fourth Amendment rights of that borough's 1.3 million residents and their visitors and eviscerate the logic behind the Supreme Court's decision in *Wardlow*.

[103]    *Id.* at 12.

[104]    *Id.*

inappropriate.[105]  Plaintiffs argue that their position is reasonable and the dispute is

therefore "genuine" under the summary judgment standard:

> plaintiffs' use of the nine-by-four block area surrounding Mr.
> Floyd's home and the two-month time period preceding his stop
> as the geographic and temporal units of their statistical analysis is
> not 'arbitrary' but instead comports with the statements of high-
> ranking NYPD officials, defendants' own testifying expert, and
> defendant Sergeant James Kelly himself about how the NYPD
> reviews and analyzes crime trends.[106]

Plaintiffs cite evidence showing NYPD discussions about drug offense

patterns at a single intersection in the 25th Precinct and shooting statistics in an eight

square block area in the 28th Precinct.[107]  More persuasively, plaintiffs point out that

the defendants' own expert, Dennis Smith, has submitted a report explaining that

precinct-level crime analysis is out of date and that, since 2003, the NYPD has

focused on "hot spot policing" that analyzes crime patterns in smaller areas within

precincts. According to Smith, "[s]mall areas of violent crime within selected

precincts have been the locus of crime fighting efforts during the entire period" from

---

[105]    *See* Plaintiffs' Reply Memorandum of Law in Further Support of
Their Motion for Relief Under Rule 60(B) from the Court's August 31, 2011
Opinion and Order at 3.

[106]    *Id.* at 3-4.

[107]    *See* PBMN 10-10-08, Ex. 48 to Declaration of Darius Charney In
Opposition to Summary Judgment at NYC_2_00007023, NYC_2_00007026.

2004 to 2009.[108]   According to Smith, under the NYPD's current approach, "a team of officers is assigned to a hot spot, an Impact Zone, in precisely those blocks where a violent crime pattern has been found."[109]

In essence, plaintiffs have marshaled two central pieces of evidence in their effort to show that the existence of a burglary pattern in the vicinity of Floyd's home is a disputed issue of fact: first, there was only one reported burglary in the thirty-six square blocks surrounding his house in the two months before his stop; and second, according to the defendants' own expert, the NYPD analyzes crime patterns in a block-by-block, hot-spot method.[110]

According to the officers who stopped Floyd, there was at the time a pattern of burglary in the area. According to the NYPD's data, and a method of analysis that appears to comply with the method that the defendants' own expert says is used by the NYPD, there was only one reported burglary in the two months

---

[108]     Report of Dennis C. Smith at 5.

[109]     *Id.* at 11. "Another critical flaw in the model used in the statistical analyses in the Fagan Report is the assumption, repeatedly stated, that police crime pattern analysis and resource deployment are based at the precinct level rather than small areas within precincts." *Id.* at 17.

[110]     Even if there were no evidence to suggest that the NYPD measures crime patterns in this way, there would still be a dispute of fact about whether the officers could reasonably consider Floyd's home to be in a "high crime area," for the purposes of the Fourth Amendment, given what the data shows.

preceding his stop.  In order to survive a motion for summary judgment, Floyd must show that – construing the facts in the light most favorable to him and resolving all ambiguities and drawing all reasonable inferences in his favor – there exists a genuine dispute of fact.  He easily passes that hurdle.

**B.      Reasonable Suspicion in the Absence of a Burglary Pattern**

Defendants argue, however, that even if there is a genuine dispute of fact as to the burglary pattern, the officers nonetheless had reasonable suspicion to stop Floyd.[111]  But I squarely rejected that argument in my earlier ruling:

> Plaintiffs assert that "[t]he only undisputed material facts are that three officers observed, for no more than one minute, two Black men trying to unlock the front door of a house in the middle of the afternoon using keys." To that description, I must add the undisputed fact that the officers were aware of a midday burglary pattern in the neighborhood. Those factors in combination—even without the disputed facts of whether the men were nervously looking back and whether they had ten keys or fifty—create enough reasonable suspicion to justify the officers briefly detaining the men for an investigatory stop.[112]

It was only in combination with the burglary pattern that I found that the police officers, as a matter of law, had reasonable suspicion to stop Floyd.  Defendants cannot establish that, as a matter of law, Floyd's furtive movements and possession

---

[111]      *See* Def. Mem. at 14-17.

[112]      *Floyd*, 2011 WL 3856515, at *17 (quoting Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 4).

of a number of keys[113] were themselves sufficient to create reasonable suspicion. The existence of the burglary pattern is a material fact because it could affect the outcome of Floyd's claim.

### C.    The Newly Submitted Evidence

The raw data on which Professor Fagan has relied was indeed in plaintiffs' possession – for many months – before I granted partial summary judgment to the defendants. And, given plaintiffs' ample resources and expertise, they should have been able to run the data on the existence of a burglary pattern before I issued my Opinion. That said, the evidence was not an obvious red flag staring plaintiffs in the face, but was rather a small part of a large data set, which required skilled work to uncover. Plaintiffs' failure to submit this evidence to the Court was obviously not a tactical decision for which they must now pay the price. Instead, it was simply a serious oversight.

Reinstating Floyd's claims based on his stop and frisk would not reopen a closed case or disturb a well-established decision. It would not prejudice the defendants or punish their reliance. Nor would doing so subject any new defendants

---

[113]    Defendants argue that "Floyd's use of a large set of keys to gain entry" was also an undisputed fact. *See* Def. Mem. at 15. But Floyd testified that he had only seven to ten keys, a fact that, if true, would not lend any reasonable support to an officer's suspicion that crime is afoot. Thus, I have already found that the number of keys in Floyd's possession raises a material issue of fact. *See Floyd*, 2011 WL 3856515, at *16.

to litigation (since my previous Opinion denied summary judgment on the police officers' search of Floyd's pockets[114]) or reduce in any way compliance with the Supreme Court's wisdom that "there must be an end to litigation someday"[115] (since these claims are but two of the many that plaintiffs bring in this putative class action).

But reinstating Floyd's claims *would prevent* a manifest injustice.[116]   I do not take lightly my decision to grant plaintiffs' motion for reconsideration.  The great majority of requests for reconsideration based on the submission of new evidence that could have been produced at the time of the original motion are rightly denied.  Granting such a motion is an exceptional remedy, but this is an exceptional situation.  It would be a miscarriage of justice to grant summary judgment against Floyd on the basis of a local pattern of burglaries when the newly submitted evidence puts the existence of such a pattern very much in doubt; that injustice would be particularly acute given the serious concerns that the Fagan report raises about the widespread and potentially improper reliance on such crime patterns by the NYPD.  Important factual questions of credibility are raised by the circumstances of Floyd's

---

[114]    *See Floyd*, 2011 WL 3856515, at *17.

[115]    *Ackermann v. United States*, 340 U.S. 193, 198 (1950).

[116]    "When a party timely presents a previously undisclosed fact so central to the litigation that it shows the initial judgment to have been manifestly unjust," reconsideration, even of a final judgment, is appropriate.  *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980).

stop – questions that go to the heart of the plaintiffs' claims – and these questions should be answered by a jury.

## V.    CONCLUSION

For the reasons stated above, plaintiffs' motion to reinstate Floyd's claims arising out of his February 27, 2008 stop and frisk is granted.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             November 23, 2011

31

**- Appearances -**

**For Plaintiffs:**

Darius Charney, Esq.
Sunita Patel, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6464

Philip Irwin, Esq.
Eric Hellerman, Esq.
Gretchen Hoff-Varner, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, New York 10018
(212) 841-1190

Jonathan C. Moore, Esq.
Jennifer Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 277-5850

**For Defendants**:

Heidi Grossman
Linda Donahue
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-8084

32