08 CV 1034 (SAS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID FLOYD, *et al.*,

Plaintiffs,

-against-

THE CITY OF NEW YORK, *et al.*,

Defendants.

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' PROPOSED EXPERT REPORTS, OPINIONS AND TESTIMONY OF JEFFREY FAGAN

***MICHAEL A. CARDOZO***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Heidi Grossman*
*Tel: (212) 788-0792*
*Fax: (212) 788-9776*
*hgrossma@law.nyc.gov*

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

ARGUMENT

POINT I

FAGAN'S RAS ANALYSIS IS IRRELEVANT AND UNRELIABLE .......... 1

A. Fagan's Analysis Consists of Impermissible Legal Analysis and Conclusions .......... 2

B. Fagan's Legal Classification Scheme Suffers From Fatal Methodological Flaws .......... 3

C. Fagan Offers Speculative and Conjectural Opinions .......... 7

POINT II

FAGAN'S MULTIPLE REGRESSION ANALYSES ARE IRRELEVANT AND UNRELIABLE .......... 10

A. Fagan's Model Employs An Inappropriate Benchmark .......... 11

B. Fagan's Models Omit Key Variables and Fail to Consider Alternative Explanations .......... 13

C. Fagan's Models Suffer from Additional Deficiencies .......... 15

CONCLUSION .......... 16

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Arista Records, LLC v. Usenet.com*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009) .......... 2

*Bazemore v. Friday*,
478 U.S. 385 (1986) .......... 14

*Bickerstaff v. Vassar Coll.*,
196 F.3d 435 (2d Cir. 1999) .......... 14

*Cameron v. City of New York*,
598 F.3d 50 (2d Cir. 2010) .......... 3

*Cerbelli v. City of New York*,
99 CV 6846 (AAR) (RML), 2006 U.S. Dist. LEXIS 69902 (E.D.N.Y. Sept. 27, 2006) .......... 3

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......... 1, 2, 8, 16

*E.E.O.C. v. Sears, Roebuck & Co.*,
839 F.2d 302 (7th Cir. 1988) .......... 15

*Floyd v. City of New York*,
08 CV 1034 (SAS), 2011 U.S. Dist LEXIS 99129 (S.D.N.Y. Aug. 31, 2011), *reconsideration granted on other grounds*, 2011 U.S. LEXIS 135293 (S.D.N.Y. Nov. 23, 2011) .......... 9

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) .......... 15

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) .......... 12

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992) .......... 3

*In re REMEC Inc. Secs. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) .......... 14, 15

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) .......... 2, 8, 10

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......... 1

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) .......... 2

*New Jersey v. Soto*,
734 A.2d 350 (N.J. Super. Ct. App. Div. 1996) .......... 12

*Nimley v. City of New York*,
414 F.3d 381 (2d Cir. 2005) .......... 1

*Sobel v. Yeshiva Univ.*,
839 F.2d 18 (2d Cir. 1988) .......... 14

*Stagl v. Delta Air Lines, Inc.*,
117 F.3d 76 (2d Cir. 1997) .......... 2

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) .......... 2, 3

*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007) .......... 1

*Wards Cove Packing Co., Inc. v. Atonio*,
490 U.S. 642 (1989) .......... 12

**Statutes and Rules**

Fed. R. Evid. 403 .......... 1

Fed. R. Evid. 702 .......... 1

## PRELIMINARY STATEMENT

Defendants respectfully submit this memorandum of law in support of their motion pursuant to Fed R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) to exclude all reports and opinions stated by Jeffrey Fagan, Ph.D. ("Fagan").[1]

## ARGUMENT

### POINT I
### FAGAN'S RAS ANALYSIS IS IRRELEVANT AND UNRELIABLE

Fagan concludes that out of a total of 2,805,721 stops conducted by the NYPD between 2004 and 2009, 1,928,641 (68.9%) were legally "Justified," 697,203 (24.8%) were "of Indeterminate Legality," and 179,977 (6.41%) were "Unjustified." However, Fagan's errors in interpreting and applying the caselaw governing reasonable suspicion and his errors in implementing his own classification scheme led to erroneous counts which are not reliable and are unhelpful to a jury.[2] Correctly applying Fagan's own classification scheme would result in the addition of at least 349,042 "Justified" stops, and 156,625 less "Unjustified" stops. Further, since 23,806 UF-250 forms have no box checked on side one, applying Fagan's scheme, less than 1% of the stops are "Unjustified." DS Decl. ¶ 4. Finally, proper interpretation of reasonable suspicion case law dictates that thousands more stops which Fagan classified as "Unjustified" or "Indeterminate" should have been classified "Justified."

---

[1] *See also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (The Fed.R.Evid. "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). *See also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (the "proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied") (citations omitted).

[2] *See Nimley v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005) ("In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.') (citing Fed. R. Evid. 403).

### A. Fagan's Analysis Consists of Impermissible Legal Analysis and Conclusions

In arriving at his conclusions, Fagan—a non lawyer –first attempted to interpret state and federal statutes, cases[3], articles and legal treatises about police stops, search and seizure and reasonable articulable suspicion ("RAS"). *See* Report (Dkt # 132), *passim*.[4] Next, Fagan applied his understanding of the relevant legal framework to the UF-250 form – used by the NYPD to record information about civilian stops – including checkboxes indicating possible circumstances which motivated the stop. *See* Report (Dkt # 132) at 49 (Appendix D). Relying on his interpretation of both the caselaw and the UF-250 fields,[5] Fagan developed a scheme to classify recorded stops as either legally "justified," legally "unjustified," or "of indeterminate legality" by judging which of the various circumstances or combinations of circumstances described on the UF-250 he believed would support a judicial finding of RAS.[6]

Fagan explicitly acknowledges that his analysis contains legal conclusions: "Next, the City's report raises the question of whether 'unjustified stops' are also 'unconstitutional.' The

[3] *See* HG Decl. Ex. A (Chart itemizing errors in Fagan's interpretation of caselaw, hereinafter "Chart")). *See also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (As "a general rule[,] an expert's testimony on issues of law is inadmissible." (citation omitted)); *In re Rezulin Prods.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (experts may not "tell the jury what result to reach or communicate a legal standard – explicit or implicit – to the jury").

[4] Fagan's application of state law to his analysis can only cause confusion as the central question in this case for *Monell* purposes is whether police are making unconstitutional stops under federal law, not state law. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[5] Fagan has no law degree or formal legal training, has never taken courses at any law school, has not been trained by law enforcement, has never worked in a law enforcement field, has never completed a UF250 form, never conducted a Stop, Question & Frisk ("SQF") and never observed more than a few SQFs or gone for a ride along with a NYPD officer to even observe a SQF. *See* Report (Dkt #132) at Appendix A (Fagan's CV); HG Decl. Ex. B (JF Dep. at 5). Under *Daubert*, "a court must ensure that an expert will be proffering opinions on issues or subject matter that are within his area of expertise." *Arista Records, LLC v. Usenet.com Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997)).

[6] *See* Report (Dkt #132) at 49-50 and Appendix D; Supp. Report (Dkt #132) at 35-36. *See also* HG Decl. at ¶¶ 7-10 (explaining Fagan's classification scheme) & Exh. C (annotated UF250 form reflecting Fagan's classifications).

short answer has to be yes." Supp. Report (Dkt # 132) at 36. Labeling the recorded stops as "justified," "unjustified" and "indeterminate" rather than what they truly represent – whether or not stops conducted by the NYPD are constitutional – is a backdoor attempt by the plaintiffs and Fagan to submit inadmissible legal conclusions and analysis of caselaw.[7]

**B. Fagan's Legal Classification Scheme Suffers From Fatal Methodological Flaws**

Fagan admits that he oversimplified the UF-250 data in his classification scheme, explaining that "[t]he enormous number of combinations of circumstances [on a UF250] made an analysis of the legal sufficiency of individual cases extremely difficult, unwieldy and uninformative." Report (Dkt # 132) at 49; DS Decl. Ex. A (Smith Report) at 11-13. Fagan attempted to classify the stops based *only* on a review of the boxes checked on the UF-250 form. *See* Report (Dkt # 132) at 49.[8] He did not review or include any handwritten notes on the UF-250 form which can be made when a box marked "other" is checked.[9] Fagan's method entirely ignores the possibility that description for stops for which one of these "other" boxes was the

[7] Expert testimony "must be carefully circumscribed to assure that the expert does not usurp the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Bilzerian*, 926 F.2d at 1294 (citations omitted). "[T]he law in the Second Circuit is clear that although an expert may provide an opinion to help the jury or the judge understand a particular fact, the expert may not offer testimony stating ultimate legal conclusions based on those facts." *Cerbelli v. City of New York*, 99 CV 6846 (AAR) (RML), 2006 U.S. Dist. LEXIS 69902 at *39 (E.D.N.Y. Sept. 27, 2006); *see also Cameron v. City of N.Y.*, 598 F.3d 50, 54 (2d Cir. 2010) (in false arrest/malicious prosecution case, witnesses' testimony that probable cause existed for the arrests amounted to "erroneously admitted and highly prejudicial testimony" which "violated bedrock principles of evidence law that prohibit witnesses...from testifying in the form of legal conclusions"); *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (in excessive force case, error to allow expert to testify that force used by police officer was "not justified under the circumstances, not warranted under the circumstances, and totally improper." (internal quotations omitted)).

[8] *See also* HG Decl. Ex. B (JF Dep.) at 220:19-221:2.

[9] The fields in the UF-250s which contain a text field are "Other Reasonable Suspicion of Criminal Activity (Specify)" (listed as a possible "Circumstance[] Which Led to Stop" on Side One) and "Other (Describe)" (listed as a possible "Additional Circumstance[]/Factor[]" on Side Two). *See* HG Decl. Ex. C.

only stop "circumstance" box checked could support a finding of RAS. Indeed, Fagan himself concedes this flaw. "There may be some valid indicia of suspicion that do not fall into the checklist that officers have to choose from…" Supp. Report (Dkt # 132) at 36. This failure to account for valid data renders his conclusions unreliable.

Fagan's analysis also omitted stop information captured in other fields on the UF-250, such as details regarding the location (*e.g.*, "Address/Intersection Or Cross Streets of Stop"; "Type of Location – Describe"). *Id.* Such information may support whether RAS existed for a stop.[10] As an example, certain precincts, such as the 73 and the 75, are identified by the NYPD as "impact zones" or "mega zones," indicating a high level of crime across the entire precinct. *See* HG Decl. Ex. E (Impact Zones Chart); *see also* HG Decl. Ex. F (Giannelli Dep.) at 124:7-17. By definition, a stop that occurs within one of these precincts takes place in a "high crime area." However, Fagan does not recognize such a stop as occurring in a "high crime area" unless the "high crime area" box was checked on the backside of the UF-250 as an "additional circumstance."

Instead, Fagan treats these stops as stops for which a "conditionally justified" stop circumstance is checked and no "additional circumstances" are checked. This would cause Fagan to classify the stop as "of **indeterminate** legality" –when by Fagan's own definition the stop would be "justified" since the locations of the stop substitutes for the lack of a check of the box. Report (Dkt # 132) at 50 (emphasis in original). Accounting for the above would result in a minimum of 89,357 or about 10% less stops classified as **indeterminate** resulting in a concomitant increase of "justified" stops according to Fagan's scheme.[11]

---

[10] *See*, *e.g.*, HG Decl. Ex. D (Cronin Dep.) at 47:22-49:22

[11] 89,357 stops are calculated by adding 44,913 and 44,444 "Indeterminate" stops from the 73 and 75th Precincts, respectively. *See* JF Decl. (Dkt # 168), Table 1, Stop Justifications by NYPD

Fagan's incomplete UF-250 review also fails to adequately address the 10 "additional circumstances" listed on Side Two of the UF-250.[12] He fails to distinguish among them and does not consider whether any of them, either individually or in combination, could give rise to RAS in the absence of a stop circumstance checked on Side One. *See* Report (Dkt # 132) at 49-50. Instead, Fagan classified as "unjustified" all stops for which no circumstances on Side One of the UF-250 were checked but for which any number of "additional circumstances" on Side Two were checked. *Id.* at 50. Fagan provides no caselaw to support his conclusion as to the legal insufficiency of the "additional" stop circumstances on Side Two of the UF-250. *See id.*; *see also id.* at Appendix D. In fact, caselaw holds that any number and combination of these "additional circumstances" could support a finding of RAS. *See* HG Decl. Ex. A (Chart) at pp. 10-14. Fagan's scheme similarly fails to account for the possibility that a stop for which multiple "conditionally justified" circumstances were checked but no other justified circumstance (i.e., casing, drugs, violent – "J" on side one of annotated form), or "additional circumstance" (i.e., AC/AF Factors on side two of annotated form) was checked could be based on RAS; instead, he classifies such stops as "indeterminate." Report (Dkt # 132) at 50. However, caselaw clearly holds otherwise, finding RAS on the basis of Fagan's so-called "conditionally justified circumstances" alone or in combination. *See* HG Decl. Ex. A (Chart) at p. 1-15. Accounting for the above dictates that thousands, if not all, of the 697,203 "Indeterminate" stops and 179,977 of the "Unjustified" stops should be classified as "Justified."

---

Precinct, 2004-2009. The total of "Indeterminate" stops would be reduced by thousands more since impact zones exist throughout the City.

[12] *See* Report (Dkt # 132) at 49 ("Because stop circumstances are listed in a check-box format on the back of the UF-250 form, officers may indicate any number of the 10 circumstances listed, or that 'other' circumstances apply. There are therefore 1,024 possible combinations of 'additional circumstances' that could apply (plus 'other additional circumstances').").

Fagan's legal classification scheme also suffers from multiple internal contradictions and inconsistencies:

- The coding instructions used to implement Fagan's classification scheme categorize UF-250s with a *single* "conditionally justified" circumstance plus an "additional circumstance" as justified; however, the coding instructions fail to categorize as justified those UF-250s with multiple "conditionally justified" circumstances plus an "additional circumstance" which instead are categorized as indeterminate. This error deflates the count of stops that should be categorized as "justified" according to the Report's description by 261,042 thousand (9.3% of total stops). DS Decl. at ¶ 3.

- Fagan's Report states that "Stops are of **indeterminate** legality if the circumstance or circumstances listed are (all) conditionally justified, and no additional circumstances are indicated." (Report (Dkt #132) at 50) (emphasis in original); however, the coding instructions categorize UF-250s with a single "conditionally justified" circumstance and no "additional circumstance" as **unjustified**. This contradicts the Report and erroneously inflates the number of stops that are categorized as "unjustified" by 156,625 thousand. DS Decl. at ¶ 4.

- Others include: Fagan's assertion that "'Actions Indicative of Engaging in Drug Transactions' is **not coded** as an unconditionally justified stop factor" (Report (Dkt # 132) at Appendix D, Sec. B.6), which is inconsistent with his assertion elsewhere that the "Drug Transactions" circumstance is coded as sufficient as the sole rationale for a stop (*id.* at 50); and his assertion that "Actions Indicative of Engaging in Violent Crimes" is not a factor that, standing alone, can serve as the basis of a lawful stop," (Report at Appendix D, Sec. B.8), which contradicts his statement that stops based on this factor alone were coded as "justified." *Id.* at 50.

Additionally, Fagan's method of aggregating five years of stop data obscures the fact that the rate of stops he classifies as "justified" from 2004-2009 has increased, while the percentages of "unjustified" and "indeterminate" stops decreased. For example, the amount of "Unjustified" stops decreased from 9.73% in 2004 to one-half that amount, 4.32%, in 2009. *See* DS Decl. at ¶ 7. Fagan's conclusions are further misleading in that he combines the "unjustified" stops (6.7%) with the stops of "indeterminate legality" (24.4%). This overstates the significance of his findings and runs afoul of customary statistical procedures. *See* Report (Dkt # 132) at 55 ("Overall, nearly 30 percent of all stops appear to be either facially unconstitutional, or lacking

sufficient information to make a complete determination.").[13] The inability of Fagan's scheme to definitively determine the legality of 24.4 % of stops more likely reflects the limitations of his classification scheme rather than, as he suggests, documentation deficiencies or problems with the validity of the underlying stops. Here, Fagan's opinions – that "the legal sufficiency of 31 percent of all stops cannot be shown" because it cannot be determined that these were based on RAS (Report (Dkt #132) at 55), and that this pattern disproportionally affects Blacks and Hispanics – not only lack probative value and shift the burden of proof to defendants, they are the ultimate legal issues that the jury will be asked to reach. *Id.* at 3 ("[T]he NYPD has engaged in patterns of unconstitutional stops of City residents that are more likely to affect Black and Latino citizens.").

### C. <u>Fagan Offers Speculative and Conjectural Opinions</u>

Fagan opines on the organization and meaning of the UF-250 checkboxes and the process by which officers complete the form, without citing any source material. Report (Dkt #132) at 48-49. Fagan's groundless, highly speculative exposition insinuates that NYPD officers routinely do not adhere to the requisite legal standard of RAS in making stops; that they target "group[s]" rather than making stops based on individualized suspicion; and that they make stops without an articulable basis and invent a justification after the fact in order to complete the UF-250 – all of which are ultimate issues which the jury will be asked to decide. Fagan also opines that "there...are several circumstances where the substantive meaning of the stop factor or additional circumstance does not match the crime category. For example, *casing* is cited in

---

[13] Generally accepted statistical procedures dictate that when data is unknown or undetermined, one either sets aside the data as missing data or apportions the data to the classifications already made, in proportion to those classifications. *See* DS Decl. at ¶ 8. Overall 93% of stops according to his scheme are "justified" or "indeterminate." Fagan provides no justification for why "indeterminate" stops should be lumped together with "unjustified" stops.

nearly half the cases where a violent crime is suspected." *Id.* at 52. Not only does Fagan lack support or expertise to opine on the proper pairing of "stop factors" and "additional circumstances" with "crime categories," his opinion is misleading - as he fails to mention that the UF-250 form explicitly states that the "casing" checkbox may refer to casing a location *or* a victim, the latter of which is clearly consistent with behavior which could give rise to suspicion of violent crime (*e.g.*, street robbery). *See* HG Decl. Ex. C (annotated UF-250 form).[14]

Fagan asserts that *furtive movements* and *high crime area* "either separately or in conjunction with one another-are legally insufficient to justify a stop" (Report (Dkt #132) at 52); however, caselaw supports a finding of RAS for stops based on a combination of "high crime area" and "furtive movements."[15] Observing that "high crime area" and "furtive movements" are the two most common items checked off on the UF-250, Fagan offers various other unsupported opinions regarding these circumstances. *See* Report (Dkt #132) at 52. Fagan has no basis and is unqualified to render an opinion as to what might be the appropriate frequency for officers to conduct stops based in part on observed "furtive movements" or on presence in a "high crime area," or under which circumstances it would be proper for an officer to check off these boxes on the UF-250. In making such assertions, Fagan is not only substituting his own unqualified, subjective judgments for those of trained officers in the field, he is substituting his legal conclusions for those of the judge and the jury. See. *In re Rezulin Prods.*, 309 F. Supp. 2d at 541. Fagan's related point that "high crime area" is checked off equally often regardless of the overall crime rate within each precinct (*see id.* at 53) is likewise misleading. As Fagan concedes, "[n]o doubt there are high crime pockets in each of the precincts, regardless of the precinct's

[14] Expert testimony should be excluded if it is "speculative or conjectural." *Daubert*, 509 U.S. at 593.

[15] *See* HG Decl. Ex. A (Chart) at pp. 6-9.

overall crime rate." *Id.* It is not unreasonable for officers to check this box when a stop occurs in a specific location within a precinct which is known to have a higher crime rate relative to the rest of the precinct.

Fagan's reliance on arrest rate or "hit rate" as an indicator of a "successful" or lawful stop is misguided on several counts. Report (Dkt # 132) at 62. First, it ignores deterrence as an outcome of a stop, which is perhaps the most successful outcome.[16] Of greater concern is that Fagan's use of arrest rate to cast doubt on "whether stops based on these factors [*furtive movement or high crime area*] are valid markers of RAS" (Report (Dkt # 132) at 53), conflates the legal standards required for stops and arrests. As this Court noted, while RAS is the requisite constitutional standard for a civilian stop, a higher legal threshold – probable cause – must be met for an arrest. *See Floyd v. City of New York*, 08 CV 1034 (SAS), 2011 U.S. Dist. LEXIS 99129 (S.D.N.Y Aug. 31, 2011), *reconsideration granted on other grounds*, 2011 U.S. LEXIS 135293 (S.D.N.Y. Nov. 23, 2011).

In furtherance of Fagan's unsupported, subjective belief that the categories of "high crime area" and "furtive movements" are improperly or over-utilized by NYPD officers in completing UF-250s he states:

> Recall that the stop factors are entered onto the UF-250 form **after** the stop is completed. If the initial basis for suspicion leading to the stop was thin, then adding on either of these subjective and ill-defined factors, both of which are constitutionally problematic, provides a post hoc justification to a stop that was most likely erroneous with respect to whether crime was afoot, and might have been based on a threshold of suspicion that otherwise would have been legally insufficient to justify the stop. (Report (Dkt # 132) at 53-55) (emphasis in original).

Expert testimony offering "interpretations of conduct or views as to the motivation of

---

[16] For example, an officer, who stops a person for casing an individual or property, before such person has an opportunity to commit an offense, may have successfully prevented the commission of a crime. Such success is difficult to measure by arrest or "hit rates.

parties" has been excluded on the grounds that it invades the province of the jury and addresses matters that jurors are capable of understanding on their own. *In re Rezulin Prods.*, 309 F. Supp. 2d at 541. Fagan's insinuation that officers provide false stop justifications on their UF-250s is also tantamount to an impermissible credibility assessment.

Further, Fagan's observation that there has been an increase in the rate of stops based in part on "high crime area" over time does not consider the possibility that this trend may reflect police response to a spike in crime, conditions or trends. *See* DS Decl. at ¶ 10.[17]

## POINT II
## FAGAN'S MULTIPLE REGRESSION ANALYSES ARE IRRELEVANT AND UNRELIABLE

With regard to the Plaintiffs' Fourteenth Amendment claim, Fagan concludes that the racial disparity in stops can only by explained by discrimination. *See* Report (Dkt # 132). He bases this on a multiple regression analysis which purports to ask to what extent an individual's race predicts the likelihood that he or she will be stopped.[18] In attempting to do so, Fagan constructs a general regression equation with race as the major independent variable, and police stop activity as the dependent variable, or "outcome". Fagan's model also includes an independent variable which he terms "Plausible Non-Race Influences", described as "a set of variables representing non-race factors that also might influence the outcome...." Report (Dkt # 132) at 12. Fagan explains, "The goal in specifying these models is to identify the effects of race on outcomes after simultaneously considering factors that may be relevant to race." *Id.* at 13.

---

[17] Defendants respectfully note, that due to page limit constraints imposed by the Court, defendants are not able to fully address all of the reasons why Fagan's report, opinions and testimony should be excluded.

[18] Fagan's regression analysis concluding that race improperly influences stop decisions cannot be reconciled with his conclusions based on his legal classification scheme that 68.9% of the same stops were "justified," i.e., based on reasonable suspicion. Thus, his regression analysis does not reliably inform the claims of the putative class members. He has not offered any meaningful information to aid the fact finder in determining whether these stops were constitutionally valid. *See* DS Decl. at ¶ 11.

A. **Fagan's Model Employs An Inappropriate Benchmark**

As set forth more fully in the Smith Declaration, the most logical and reliable method to assess the question of whether police are stopping individuals based on race or on RAS is to use a benchmark of rates of criminal participation by race. *See* DS Decl. at ¶ 20. Data on suspect race captured in crime complaints and arrest reports ("suspect description") is a reliable indicator of this measure; it is also the best available proxy for the proportion of people in society who are engaged in behaviors which give rise to RAS. *Id.* at ¶ 12.[19]

Fagan's choice of local crime rate[20] as a benchmark to measure possible evidence of bias in NYPD stop-and-frisk activity is a fundamental methodological flaw which robs his analysis of any probative value. As Fagan himself acknowledges, "The selection of a benchmark against which to assess police enforcement activity is a basic question in reliably measuring the extent of racial disparities in police-citizen interactions." Report (Dkt # 132) at 15. Fagan concludes:

> "[F]or this analysis of police stop activity, a valid benchmark requires estimates of the supply of individuals of each racial or ethnic group who are engaged in the targeted behaviors and who are available to the police as potential targets for the exercise of their stop authority." *Id.*[21]

However, Fagan testified that data on the population of individuals engaging in the "targeted behaviors" did not exist. *See* HG Decl. Ex. B (JF Dep.) at 213:22-214:1. Instead, he used crime rate data as a proxy for "the supply of individuals engaged in the targeted behaviors."

---

[19] *See* Declaration of Heidi Grossman dated February 2, 2011 (Dkt # 137), Ex. I (RAND Summary), Ex. Q (excerpts from "Crime and Enforcement Activity in New York" 2008 and 2009); defendants' memorandum of law in support of motion for summary judgment (Dkt # 135); defendants' reply in support of motion for summary judgment (Dkt # 141) at pp. 7-8 fn15; defendants' 56.1 statement (Dkt # 136) at pp. 149-150, 151-152.

[20] *See* Report (Dkt # 132) at 15-18, Supp. Report (Dkt # 132) at 10. *See also* HG Decl. Ex. B (JF Dep.) at 64:12-17.

[21] *See also* HG Decl. Ex. G ("Street Stops and Broken Windows Revisited"), at 318: "This approach requires estimates of the supply of individuals engaged in the targeted behaviors, and the extent of racial disproportionality is likely to depend on the benchmark used to measure criminal behavior."

*Id.* at 213:12-21; *see also id.* at 154:9-25. Data on the overall crime rate of a precinct is a poor proxy for this baseline measure; it measures only gross crime occurring within an area accounting for *who* is participating in the crime. *See* DS Decl. at ¶ 14. A baseline measure of overall crime would be appropriate only if the question was whether total stops were proportionate to crime committed. In an analysis concerned with *whom* the police are stopping, a reliable benchmark must take into account *who* is committing the crime. *Id.*[22] Fagan's model fails to capture the information necessary to support a valid causal inference of racial discrimination. DS Decl. at ¶ 14.[23] Fagan's attempt to defend his choice of benchmark by claiming that "[s]ince crime and race are correlated, indexing or benchmarking to crime should account for race simultaneously," (Supp. Report (Dkt # 132) at 10), misses the point.[24] By

---

[22] *See also New Jersey v. Soto*, 734 A.2d 350 (N.J. Super. Ct. App. Div. 1996) (expert witness engaged to assess whether racial profiling occurred in traffic stops conducted an observational study to establish baseline counts of the drivers who violated traffic laws -- i.e., the "offending population" -- to use as a benchmark in evaluating whether Black drivers were stopped out of proportion to their representation in the "offending population"). "Courts have long recognized that statistical evidence may be used to establish a prima facie case of disparate impact discrimination. The statistical evidence, however, must be drawn from the appropriate comparison pools. In the context of statistical analysis, comparison 'pools' are the groups of individuals from which data is collected and compared." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184-85 (9th Cir. 2002). An instructive example arises in the context of employment discrimination claims. In *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S.642 (1989), the Supreme Court held that the proffered statistics were not probative of disparate impact discrimination in the workplace because the analysis compared only the number of whites and nonwhites in specific positions within the company, but did not consider the pool of qualified candidates for the respective positions. "The proper comparison is between the racial composition of the at-issue jobs and the racial composition of the qualified . . . population in the relevant labor market." *Wards Cove Packing Co.*, 490 U.S. at 650 (internal quotation marks and citation omitted).

[23] *See* HG Decl. Ex. H (Ridgeway & MacDonald), at 182 ("Fridell summarized the problem with using the census as a benchmark with regard to offender exposure by noting that 'this method does not address the alternative hypothesis that racial/ethnic groups are not equivalent in the nature and extent of their . . . *law-violating behavior.*'") (*citing* HG Decl. Ex. I (Fridell), at 106) (emphasis in original). Fagan's benchmark similarly fails to capture the relationship between race and "targeted behavior."

[24] *See* DS Decl. at ¶ 15, Ex. D. *See also* HG Decl. Ex. B (JF Dep.) at 170:8-24, 214:2-14.

ignoring data on who is committing crimes, which Fagan acknowledges could be accomplished by use of suspect description, Fagan's benchmark represents a poor estimate of the "available populations to be stopped" as it presents an incomplete picture of "the parameters of crime that would shape police behavior". *See* HG Decl. Ex. B (JF Dep.) at 199:3-18; DS Decl. at ¶ 14.[25]

**B. Fagan's Models Omit Key Variables and Fail to Consider Alternative Explanations**

Data showing the indisputably strong correlation between race and participation in crime indicates that Fagan's models are significantly biased by the omission of this variable. *See* DS Decl. at ¶ 16.[26] As Fagan explains: "The goal in specifying these models is to identify the effects of race on outcomes after simultaneously considering factors that may be relevant to race. Failure to do so raises the risk of 'omitted variable bias', which could lead to erroneous conclusions about the effects of variables that do appear in a regression test." Report (Dkt # 132)

---

[25] Fagan himself acknowledged that the ideal proxy for the "offending population" would include "measures of the **race**-specific crime rates in each precinct (or other social area) in order to help construct precise benchmarks based on the participation in the behavior of interest by persons of each race and ethnicity." Report (Dkt # 132) at 17; *see also* HG Decl. Ex. G ("Street Stops and Broken Windows Revisited") at 318. Fagan further acknowledged that suspect race information contained in crime reports and arrest data could function as a measure of "the race-specific crime rates in each precinct." Report (Dkt # 132) at 17-18. However, he declined to use this data (HG Decl. Ex. B (JF Dep.) at 144:14-145:13, 152:23-154:28), claiming the data was not available in enough cases to be relied upon. *See* Report (Dkt # 132) at 17-18; Supp. Report (Dkt # 132) at 12; HG Decl. Ex. B (JF Dep.) at 121:11-23, 134-140. But Fagan drastically understates the availability of such data, (*see*, *e.g.*, HG Decl. Ex. B (JF Dep.) at 204:3-7 (claiming that data on suspect descriptions for violent crimes was "missing in almost 80 percent of the cases")) which is, in fact, known for 85 percent of violent crimes and 62 percent of nonviolent crimes for the years 2009-2010, based on an aggregate of crime complaint and arrestee data. *See* DS Decl. Ex. 12. Moreover, the data is currently available. *See* DS Decl. at ¶ 12.

[26] Note that data show even in racially heterogeneous and predominately white neighborhoods, crime perpetrators or suspects are disproportionately minorities. DS Decl. ¶ 17. ("As an illustration of the omitted variable bias manifest in Fagan's model, I note that NYPD stops are not proportionally correlated with the gender of local populations. 95% of all stops in 2009 were of males while only 4% were of females, who constitute 52.5% of the population. If an analyst were to conduct a regression analysis using Fagan's model design but including gender (rather than race) as an independent ("explanatory") variable, stop rates of men would appear disproportionately large. Without taking into account data on the radically different contributions by men and women to commission of crime, an analyst would be left to conclude erroneously that police are targeting people for stops because they are male.")

at 13 (citations omitted).[27] By omitting a variable which is so strongly correlated with race, Fagan's models attribute a disproportionate share of explanatory power to the race variable with respect to predicting the likelihood that an individual will be stopped by the police, giving rise to a false inference of discrimination.[28] In fact, when data on suspect race are added into Fagan's regression model, the results show that the total stops in a precinct in a month are explained by the number of total Black and Hispanic suspects rather than by the percentage Black or Hispanic population. *See* DS Decl. at ¶ 31. This contradicts Fagan's theory that race *per se* explains stop rates, and shows that when proper variables are used, evidence of racial discrimination disappears.[29] *Id.* In fact, the proportion of criminal suspects and arrestees by race (r = .84) is very highly correlated with stop rates by race and much more so than with crime rates (r = .66). The raw data on suspect description virtually mirrors the racial composition of the people stopped. For example, in 2009 and 2010 respectively, Blacks and Latinos represented 84.4 %

---

[27] *See* HG Decl. Ex. K (Rubinfeld) at 314: "Other things being equal, the greater the correlation between the omitted variable and the variable of interest, the greater the bias caused by the omission. As a result, the omission of an important variable may lead to inferences that do not assist the trier of fact."

[28] *See* HG Decl. Ex. K (Rubinfeld) at 314: "Failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect that is actually caused by the excluded variable." Fagan's model omits other key independent variables, including information on officers' subjective impression and motivations in making stops. *See* DS Decl. at ¶¶ 17-18. *See also Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."). However, "[t]here may...be some regressions so incomplete as to be inadmissible as irrelevant..." *Id.* at 400 n.10. *See, e.g., Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999); *In re REMEC Inc. Secs. Litig.*, 702 F. Supp. 2d 1201, 1273 (S.D. Cal. 2010) ("[Wh]ere significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is inadmissible as irrelevant and unreliable.") (citation omitted).

[29] Under *Sobel v. Yeshiva Univ.*, 839 F.2d 18 (2d Cir. 1988), a party challenging the validity of a regression analysis, claiming variables were omitted that should have been included, has to make a showing that the factors it contends should have been included would weaken the analysis. *But see Freeland v. AT&T Corp.*, 238 F.R.D. 130, 145 ("Because the burden of proving helpfulness and relevance rests on the proponent of a regression analysis, it is the proponent who must establish that the major factors have been accounted for in a regression analysis.").

and 83.9 % of the people stopped and 81.8 % and 81.6 % of the suspects and arrestees described as having committed reported crime. DS Decl. at ¶ 15 and Ex. C, D & E.

**C. Fagan's Models Suffer From Additional Deficiencies**

As Smith explains, Fagan's multiple regression models suffer from additional methodological deficiencies which render his conclusions unreliable[30]: his selection of independent variables creates a multicolinearity problem, which skews his results;[31] he used an incorrect and misleading unit of spatial analysis for multiple of his controls;[32] he employed an inaccurate time lag in his attempt to control for police response to crime;[33] he improperly aggregated crime statistics;[34] he utilized logged data; and which distorted his measure of crime;[35] he used unreliable data on patrol strength;[36] and his accounting for unemployment data fails to aggregate the data at a level that corresponds to units of police action.[37]

---

[30] *See, e.g., E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 324 (7th Cir. 1988) (in which the court "found a myriad of flaws in [the proffered multiple regression analyses] …and thus determined that they could not be given any weight."); *REMEC*, 702 F. Supp. 2d 1273 (the court determined the expert's multiple regression analysis was "fatally flawed such that his results cannot be relied upon by a trier of fact.").

[31] *See* DS Decl. at 21; HG Decl. Ex. K (Rubinfeld) at 314: "It is essential in multiple regression analysis that the explanatory variable of interest not be correlated perfectly with one or more of the other explanatory variables… When two or more variables are highly, but not perfectly, correlated – that is, when there is *multicollinearity* – the regression can be estimated, but some concerns remain. The greater the multicollinearity between two variables, the less precise are the estimates of individual regression parameters, and an expert is less able to distinguish among competing explanations for the movement in the outcome variable…"

[32] *See* DS Decl. at ¶ 22.

[33] *See id.* at ¶ 23.

[34] *See id.* at ¶ 24, Ex. H.

[35] *See id.* at ¶ 24.

[36] *See id.* at ¶ 25. *See also* Report (Dkt # 132) at 9-10; *id.* at Appendix E.

[37] *See id.* at ¶ 18.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant their *Daubert* motion, together with such other and further relief as this Court may deem just and proper.

Dated: New York, New York
December 19, 2011

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street
New York, New York 10007
(212) 788-0792

By: ______________________
Heidi Grossman
Assistant Corporation Counsel
Special Federal Litigation Division