UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
     :
DAVID FLOYD, *et al.*,     :
     :
     :
     Plaintiffs,     :    08 Civ. 01034 (SAS)
     :
     -against-     :    ECF CASE
     :
THE CITY OF NEW YORK, *et al.*,     :
     :
     Defendants.     :
     :
     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' PROPOSED EXPERT REPORTS, OPINIONS AND TESTIMONY OF JEFFREY FAGAN

CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0900

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY ...............................2

ARGUMENT .....................................................................................................................3

I.      PROFESSOR FAGAN'S RAS ANALYSIS IS ADMISSIBLE ...........................................3

         A.     Fagan's Quantification and Classification of UF250 Stop
                Circumstance  Combinations Will Assist the Trier of Fact
                and is Admissible................................................................................3

         B.     None of Defendants' Critiques Amount to "Fatal Methodological Flaws." ...........5

                1.     Defendants' "Omitted Data" Arguments are Meritless ...................................5

                2.     Classification of Stops Based on Additional Stop Factors Only ....................7

                3.     Classification of Stops Based on One or More Conditional Stop
                     Factors Only...............................................................................8

                4.     Minor Coding and Textual Errors in Fagan's Report........................................8

                5.     Aggregating Stop Data and Combining Indeterminate and
                     Unjustified Stops .........................................................................10

          C.     Fagan's Opinions Are Not Speculative or Conjectural ..........................................10

II.     FAGAN'S MULTIVARIATE REGRESSION ANALYSES ARE ADMISSIBLE .........12

CONCLUSION...............................................................................................................16

## TABLE OF AUTHORITIES

**CASES**

**Page(s)**

*Am. Home Assurance Co. v. Merck & Co.*,
462 F. Supp. 2d 435 (S.D.N.Y. 2006) .................................................................. 6

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ................................................................................. 2

*Arista Records, LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009) .................................................................. 4

*Aventis Envtl. Sci, USA LP v. Scotts, Co.*,
383 F.Supp.2d 488 (S.D.N.Y. 2005) ................................................................... 15

*Bazemore v. Friday*,
478 U.S. 385 (1986) ............................................................................................ 13

*Brown v. Texas*,
443 U.S. 47 (1979) .............................................................................................. 11

*Cameron v. City of New York*,
598 F.3d 50 (2d Cir. 2010) .................................................................................. 4

*Cerbelli v. City of New York*,
No. 99 CV 6846 (ARR) (RML), 2006 WL 2792755 (E.D.N.Y Sept. 27, 2006 ....... 5

*Cullen v. Vill. of Pelham Manor*,
No. 03-CV-2168 (CS), 2009 WL 1507686 (S.D.N.Y. May 28, 2009) ................... 5

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .................................................................................. 2, 5, 10, 13

*EEOC v. Bloomberg, L.P.*,
No. 07 Civ. 8383 (LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) ............. 2, 7

*Fiataruolo v. United States*,
8 F.3d 930 (2d Cir. 1993) .................................................................................... 3

*Florida v. J.L.*,
529 U.S. 266 (2000) ............................................................................................ 9

*Hygh v. Jacobs*,
961 F.2d 359 (2d Cir. 1992) ................................................................................ 5

*Illinois v. Wardlow,*
   528 U.S. 119 (2000)...............................................................................11

*In re MTBE Prods. Liab. Litig.,*
   643 F. Supp. 2d 471 (S.D.N.Y. 2009) ........................................................7, 9

*In re MTBE Prods. Liab. Litig.,*
   No. 1358 (SAS), 2008 WL 1971538 (S.D.N.Y. May 7, 2008) ......................4

*In re Paoli R.R. Yard PCB Litig.,*
   35 F.3d 717 (3d Cir. 1994) ........................................................................2

*In re Rezulin Prods. Liab. Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................................5

*Int'l Bhd. of Teamsters v. United States,*
   431 U.S. 324 (1977)...............................................................................12

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)................................................................................2

*McCullock v. H.B Fuller Co.,*
   61 F.3d 1038 (2d Cir. 1995) ....................................................................5

*Nimley v. City of New York,*
   414 F.3d 381 (2d Cir. 2005) ....................................................................2

*People v. Barreto,*
   555 N.Y.S.2d 303 (N.Y. App. Div. 1990) ..................................................9

*People v. Batista,*
   88 N.Y.2d 650 (N.Y. Ct. App. 1996) .......................................................9

*People v. Fernandez,*
   16 N.Y.3d 596 (N.Y. Ct. App. 2011) .......................................................8

*People v. Francis,*
   847 N.Y.S.2d 398 (N.Y. Sup. Ct. 2007) ...................................................9

*People v. Giles,*
   647 N.Y.S.2d 4 (N.Y. App. Div. 1996) ....................................................9

*Periera v. Cogan,*
   281 B.R. 194 (S.D.N.Y. 2002) .................................................................4

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,*
   326 F.3d 1333 (11th Cir. 2003) ...............................................................9

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004) ...................................................................4

*United States v. Bellamy*,
   592 F.Supp.2d 308 (E.D.N.Y. 2009) ................................................................9, 11

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ..............................................................................4

## STATUTES

Fed. R. Civ. P. 26............................................................................................14

FRE 702 ..................................................................................................2, 3, 12, 13

FRE 704(a)............................................................................................................4

## OTHER AUTHORITIES

Gross, S. R., and Livingston, D., *Racial Profiling Under Attack*, 102 COLUM. L. REV.
   1413 (2002)........................................................................................................12

Knowles, J., Persico, N., and Todd, P., *Racial Bias in Motor-Vehicle Searches: Theory
   and Evidence,* 109 JOURNAL OF POLITICAL ECONOMY 109, 203 (2001)..................12

The New York Police Department's "Stop and Frisk" Practices: *A Report to the People of
   the State of New York from the Office of the Attorney General* (1999) .......................1

# INTRODUCTION

Plaintiffs submit this memorandum of law in opposition to Defendants' motion to exclude Plaintiffs' expert Jeffrey Fagan, PhD, a Columbia Law School professor and nationally-recognized expert on policing and statistical analysis who has co-authored five published studies analyzing claims of racial bias and unconstitutionality in the NYPD's stop-and-frisk practices. *See* Fagan Rpt. (Dkt # 132), App. A.[1] Defendants misapprehend the legal standards governing the admissibility of expert evidence and the legality of police stops and frisks, and mischaracterize the nature of Fagan's analyses and opinions:

- Plaintiffs will proffer Fagan's reasonable articulable suspicion ("RAS") analysis not for legal conclusions, but rather to demonstrate that Defendants' regime for regulating the constitutionality of the huge volume of stops is ineffective and insensitive to the actual conduct of stops. Fagan's RAS opinions will be of great assistance to the trier of fact, which lacks the specialized training and resources necessary to analyze and organize the data regarding the 2.8 million stops conducted by the NYPD during 2004-2009, in ruling on Plaintiffs' Fourth Amendment policy and practice claims. Fagan will offer no legal conclusions, much less an opinion as to the ultimate issue in the case. The Court, not Fagan, will say what the law is, *e.g.*, whether a given combination of articulated stop circumstances means the stop violated the Fourth Amendment. Defendants' complaints about data Fagan did not consider are wrong, or go merely to weight, not admissibility.

- Defendants' attacks on Fagan's RAS and mulitivariate regression analyses do not identify any fundamental methodological flaws, but rather take issue with his conclusions and focus on minor computer coding or typographical errors and methodological choices that have little or no impact on his results and about which experts can reasonably differ. None of these critiques are grounds for excluding his testimony. This is not even a battle of experts: Defendants' criticism of Fagan's methodologies and conclusions is based primarily on the opinions of their supposed rebuttal expert, Dennis Smith, who concededly has no statistical expertise and little or no familiarity with or experience using many of the statistical methods which he claims Fagan applied unreliably.

Accordingly, Defendants' motion should be denied in its entirety.

---

[1] Although not mentioned in his C.V., Fagan also co-authored the statistical analysis sections of the New York State Attorney General's study, *The New York Police Department's "Stop and Frisk" Practices": A Report to the People of the State of New York from the Office of the Attorney General* (1999) (the "AG Report"). Declaration of Darius Charney In Opposition to Summary Judgment (Dkt # 132), Ex. 117; Declaration of Jeffrey Fagan, dated February 2, 2011 ("Fagan Decl.") Decl. ¶ 6.

## LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

For an expert witness's opinion testimony to be admissible under Federal Rule of Evidence 702, the expert must be qualified by knowledge, education, skill, experience, or training to render his/her opinion, the opinion must be based on reliable data and methodology, and the testimony must assist the trier of fact (*i.e*, be relevant to the facts of the case). Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590-91 (1993); *Nimley v. City of New York,* 414 F.3d 381, 395-97 (2d Cir. 2005); *EEOC v. Bloomberg, L.P.*, No. 07 Civ. 8383 (LAP), 2010 WL 3466370, *5-6 (S.D.N.Y. Aug. 31, 2010).

The reliability inquiry must focus solely on principles and methodology, not the conclusions they generate. *Daubert*, 509 U.S. at 594-95. If an expert's opinion is based on "good grounds,"—*i.e*., the methods and procedures of science—it should be admitted into evidence, even if the Court disagrees with the expert's ultimate conclusion; "[g]rounds for an expert's opinion merely have to be good, not perfect." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (citing *Daubert*, 509 U.S. at 590). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). *Daubert* instructs that the "traditional and appropriate means of attacking" an expert's methodologies are "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof" at trial. 509 U.S. at 596. "If an expert's testimony lies within the 'range where experts might reasonably differ,' the jury, not the trial court, should 'decide among the conflicting views of different experts.'" *Bloomberg,* 2010 WL 3466370, at *6 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). Under *Daubert* and its progeny, "the rejection of expert testimony is the exception rather than the rule." Advisory

Committee Notes to 2000 Amendments to Rule 702. Defendants' motion disregards the governing legal standards.

## ARGUMENT

### I.     PROFESSOR FAGAN'S RAS ANALYSIS IS ADMISSIBLE

#### A.     Fagan's Quantification and Classification of UF250 Stop Circumstance Combinations Will Assist the Trier of Fact and is Admissible.

Fagan reviewed each of the 2,805,721 UF250's filled out by NYPD officers between 2004 through 2009 and allocated each to one of six categories depending on the stop circumstances ("CS"), additional circumstances ("AC"), or combinations of circumstances checked by the officer who made the stop. He will be called to testify that, *inter alia*, he classified over 170,000 stops, or 6.71%, as "Unjustified" because the particular combinations of CSs and ACs checked off on the corresponding UF250s do not indicate that the officer had RAS (under the law as the Court, not Fagan, will state), and over 400,000, or 15.46% , as "Indeterminate" because the existence of RAS cannot be determined from the checked CSs and ACs. This will help the fact-finder.  There are 1,024 possible combinations of CSs, and another 1,024 of ACs. *See* Fagan Rpt. at  49. The fact-finder cannot review 2.8 million UF250s, much less determine the stop factor combinations of each or otherwise analyze them in any way that could help it determine Plaintiffs' Fourth Amendment policy and practice claim. *See Fiataruolo v. United States*, 8 F.3d 930, 941-42 (2d Cir. 1993) (accounting expert could testify that defendant was "responsible party" under tax code since he "gave the jury helpful information beyond a simple statement on how its verdict should read.").

The fact that Fagan's classifications of stop combinations was informed by his reading of case law is not disqualifying. Experts cannot give testimony as to ultimate legal issues in a case. The ultimate issue is whether Defendants have a policy and/or practice of conducting

suspicionless stops. Fagan's testimony will be far removed from that question. Rather, he will opine as to his analysis of the 2.8 million UF250s, which the fact-finder will be asked to consider along with other evidence including, *inter alia*, the acts and omissions of NYPD personnel charged with ensuring that its officers comply with the law, in determining the ultimate issue. The Court, not Fagan, will state the legal significance of particular combinations of stop circumstances, *e.g.*, whether as a matter of law a given combination is insufficient to establish RAS. Fagan will opine as to how many UF250s recorded such combinations. Such testimony is admissible. *See, e.g., U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*, 313 F. Supp. 2d 213, 240 (S.D.N.Y. 2004) (allowing expert to "point to factors that would tend to show anticompetitive conduct … [and] indicate whether he believed those factors existed here"); *Periera v. Cogan*, 281 B.R. 194, 198-99 (S.D.N.Y. 2002) (permitting expert testimony "taken directly from previous opinions in [that] case … and serv[ing] merely as part of a '"longer exposition"').[2]

In addition, Fagan may use the terms "Unjustified" and "Indeterminate." They will be "phrased in terms of 'adequately explored legal criteria'" and will not "t[ell] the jury what result to reach." *In re MTBE Litig.* ("*MTBE*"), 2008 WL 1971538, at *16-14 (S.D.N.Y. May 7, 2008) (Scheindlin, J.) (quoting FRE 704(a) and Adv. Comm. Notes) (expert in product liability case could opine that another product was a "feasible alternative").[3] Finally, Defendants' expressed concern that a fact-finder hearing Fagan use the word "Unjustified" will interpret it as

---

[2] As shown below, the Court already has held, or should hold, that stops based on certain combinations that Fagan classified as Unjustified do lack RAS as a matter of law, and that legality cannot be determined from combinations that Fagan classified as Indeterminate. See *infra.* at 7-9 n.10.

[3] The cases Defendants cite, *see* Def. Br. at 2 n.3, either support admissibility, *see United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991); do not address the question, *Arista Records, LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409 (S.D.N.Y. 2009); or are inapposite because they held merely that an expert could not opine as to whether an essential element of a particular tort was satisfied, *see Cameron v. City of New York*, 598 F.3d 50, 62-65 (2d Cir. 2010) (malicious

"unconstitutional" can be alleviated by an appropriate Court instruction, and if his reports are offered into evidence, the Court may exclude parts that improperly express legal conclusions.

**B.      None of Defendants' Critiques Amount to "Fatal Methodological Flaws."**

Defendants do not question the reliability of the overall approach of using information recorded on stop-and-frisk forms by NYPD officers to classify all of the recorded stops into three categories.[4] Instead, Defendants attack choices Fagan made in applying this methodology to their data. *See* Def. Br. at 3-7. Alleged "faults in [an expert's] use of [a particular] methodology. . . go to the weight, not the admissibility of his testimony." *McCullock v. H.B Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995); *Cullen v. Vill. of Pelham Manor*, No. 03-CV-2168 (CS), 2009 WL 1507686, *18 (S.D.N.Y. May 28, 2009). Moreover, as explained below, these choices were reasonable and supported by well-established statistical, social scientific, and/or jurisprudential principles, and had either a minimal or no impact on the overall results of Fagan's RAS analysis.

1.      *Defendants' "Omitted Data" Arguments are Meritless.*

Defendants make a vague, conclusory assertion that Fagan's RAS analysis is flawed because it did not consider the "possibility" that handwritten notes that can be made on a UF250 if the officer checked off the Circumstance "Other." Def. Br. at 3; Smith Decl. ¶ 6.[5] They offer no reason based in principles of statistical analysis why Fagan should have considered such

---

prosecution/probable cause); *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992); *Cerbelli v. City of New York*, No. 99 CV 6846 (ARR) (RML), 2006 WL 2792755, at *11-12 (E.D.N.Y Sept. 27, 2006); *In re Rezulin Prods.Liab. Litig.*, 309 F. Supp. 2d 531, 557 (S.D.N.Y. 2004)).

[4] Nor could they, given that this kind of event classification approach is a statistical method widely used in criminology, policing, and social scientific studies. *See*, AG Rept. ; Fagan Decl. ¶ 8 (citing studies using similar event classification methods). Moreover, Defendants were able to run Fagan's analysis and even relied on the results they obtained. *See* Smith Decl. ¶¶ 2-5; *see also Daubert*, 509 U.S. at 593-94 (fact that expert's theory is "general[ly] accept[ed]" and "can be (and has been) tested" supports admissibility).

[5] Defendants quote language from Fagan's report so far out of its context as to distort its meaning entirely: His statement that "[t]he enormous number of combinations of circumstances

notes. In fact, there is no methodologically sound way to account for such inherently idiosyncratic, non-systematic and subjective writings. *See* Fagan Decl. ¶¶ 9-13. Therefore, at most this issue may go to the weight of Fagan's RAS testimony, but it is no basis for exclusion. *See, e.g., Am. Home Assur. Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 451-52 (S.D.N.Y. 2006) (expert's non-consideration of "certain details" is not grounds for exclusion; "cross-examination at trial provides ample opportunity . . . to challenge" such omissions) (citations omitted).

Defendants also complain that Fagan did not consider other information outside of the CS and AC fields on the UF250 form. However, Inspector Mary Cronin, the head of the NYPD's Quality Assurance Division, testified that the NYPD itself looks only to the information provided in those two stop-circumstance fields to assess reasonable suspicion in its internal audits of officer stop activity. *See* Grossman ("HG") Decl. (Dkt # 180), Ex. D at 48:11-49:22.

Defendants' argument that all stops made in the 73rd and 75th precincts occurred in "high crime areas" even if that AC was not checked off on the UF250 form is meritless for several reasons. *First*, automatically deeming all such stops as "high-crime area" stops contradicts the NYPD's asserted approach to crime-pattern analysis and crime-fighting. Impact Zones are designated and remain in place for six-month intervals, *see* Declaration of Darius Charney ("DC") Decl., Ex. B, but Defendants have asserted that NYPD crime patterns fluctuate on a daily, weekly, and monthly basis and that NYPD enforcement efforts respond to these fluctuations. *See* Smith Rpt. at 18-19, 37-38, 55. Similarly, the NYPD analyzes crime patterns and focuses its enforcement efforts in very small geographical areas, and crime rates often vary widely between different areas in the same precinct. *Id.* Finally, as Smith has noted, the "high-

---

[on a UF250] made an analysis of the legal sufficiency of individual cases extremely difficult, unwieldy and uninformative," *see* Def. Br. at 3, referred not to handwritten notes, but rather, to the huge volume of possible combinations of UF250 circumstances, *see* Fagan Rpt. at 49.

crime area" AC is especially germane to the work of Operation Impact officers, *id.* at 12, and NYPD officers are trained to check *every* stop circumstance box on the UF250 that is relevant to their formation of RAS. *See* DC Decl., Ex. A at NYC 5417. Therefore, it is entirely reasonable to assume that all or almost all of those 73rd and 75th precinct stops in which the "high-crime area." AC was not checked off did not occur in high-crime areas of these precincts.[6]

2.      *Classification of Stops Based on Additional Stop Factors Only.*

Relying on an improper, attorney-created exhibit, HG Decl., Ex. A (the "Grossman Caselaw Chart"),[7] Defendants argue that Fagan erred in his classification of stops based solely on one or more ACs but no CSs, which Plaintiffs contend violate the Fourth Amendment. The total number of such stops is 17,924, or 0.6%, of all stops analyzed by Fagan. *See* Dkt # 168 at Table 2. Thus Fagan's inclusion of these stops in this category, even if erroneous, had no meaningful impact on the overall results of his analysis, and therefore would not warrant exclusion. *See Bloomberg,* 2010 WL 3466370, at *5-6; *In re MTBE,* 643 F. Supp. 2d at 471. Moreover, in none of the cases cited at pp. 10-14 of the Grossman Caselaw Chart did a court find reasonable suspicion based solely on the presence of one or more ACs. Instead, reasonable suspicion in all these cases was based on the presence of ACs *and* at least one CS. *See* DC Decl. Ex D, at 4-10 (correcting summaries of cases cited in HG Decl. (Dkt # 180), Ex A at 10-14),

---

[6] In addition, Defendants have produced nothing showing that either precinct was designated as mega (precinct-wide) impact zones during the years 2004, 2005, or 2009, *see* DC Decl. ¶ 17, Ex. B and Smith's Operation Impact study indicates that the 75th Precinct had no impact zones at all in 2005. *See* Smith Rpt. App. D at 23. Thus, at best, Defendants' argument could apply to only a portion of the stops made in those two precincts during the six-year period.

[7] This 18-page, single spaced exhibit was created by City lawyers specifically for litigation and contains no factual information, but only legal argument and analysis. It is a blatant attempt to circumvent the Court's 15-page limit on Defendants' memorandum of law, which it specifically imposed at the September 23, 2011 conference and reiterated in its order denying Defendants' application to extend that limit. Dkt # 173. The Grossman Caselaw Chart should be disregarded.

which is completely consistent with Fagan's stop categorizations. *See* Fagan Rpt. at 50; Fagan Decl. ¶ 14.

3.   *Classification of Stops Based on One or More Conditional Stop Factors Only.*

Relying on the Grossman Caselaw Chart, Defendants also argue that Fagan erroneously classified stops based solely on one or more "conditionally justified" CSs [8] and no ACs as Indeterminate, and that virtually all such stops should be re-classified as Justified. This mischaracterizes Fagan's methodology: He classified stops based solely on one conditional CS as "Unjustified," and stops based on two or more conditional CSs as "Indeterminate." *See* Fagan Decl. ¶ 14. In only one case cited in the Grossman Caselaw Chart, *People v. Fernandez*, 16 N.Y.3d 596 (N.Y. Ct. App. 2011), was reasonable suspicion established based solely on the presence of what arguably corresponds to a single conditional CS. HG Decl., Ex. A 1-5; DC Decl., Ex. D at 1-3. In any event, if a suspect carrying an illegal gravity knife in plain view (as in *Fernandez*) corresponds to the CS "carrying in plain view an object commonly used in the commission of a crime," this was the sole stop factor in only 4,846, or 0.17%, of the 2.8 million stops analyzed by Fagan, Fagan Decl. ¶ 18, which would again have no meaningful impact on Fagan's overall results. The classification of stops based on two or more conditional CSs as "Indeterminate" is discussed in the following section.

4.   *Minor Coding and Textual Errors in Fagan's Report.*

Defendants attempt to make much of what they characterize as three "internal contradictions" in Fagan's RAS analysis. Def Br. at 6. None is a "fatal methodological flaw. Instead, these are:

---

[8] The "Conditionally Justified" stop circumstances include (i) carrying objects in plain view used in commission of a crime, (ii) fits description, (iii) actions indicative of acting as a look-out, (iv) suspicious bulge, (v) furtive movements, and (vi) wearing clothing/disguises commonly used in commission of a crime. *See* HG Decl., Ex. C.; Fagan Rpt. at 49-50, App. D.

- an inadvertent computer coding error that mistakenly categorized stops based on two or more conditional CSs and one or more ACs as "Indeterminate" rather than Justified. Def. Br. at 6. This goes to weight of Fagan's conclusions, not the reliability of his methodology. This coding error has been corrected to reclassify all stops based on two or more conditional CSs as Justified, whether or not any ACs also were checked off. *See* Fagan Decl. ¶ 17. Applying these new coding instructions, the percentage of stops in the Unjustified category is unchanged, at 6.71%, and Indeterminate stops decrease to from 24.37% to 15.46%. Still the UF250s for more than one in five stops, 22.16%, lack enough information to establish their legality. *Id.*

- a typographical error at p. 50 of Fagan's report, which had no impact on the results of his analysis. The computer coding instructions correctly categorized stops based on one conditional CS and no ACs as Unjustified, which is supported by Fourth Amendment caselaw.[9] The numerical totals for the Unjustified category as reported in Fagan's Report are based on the correct coding instructions. Fagan Decl. ¶ 15.

- a typographical error, in Appendix D of his report, which had no impact on the results of his analysis. All stops based on "Actions indicative of engaging in drug transactions" were classified as Justified. *See* Fagan Decl. ¶ 16; Fagan Rpt. at 50.

These three points go only to the "probativeness" of Fagan's testimony, not its

admissibility. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th

Cir. 2003) (refusing to exclude expert's testimony for his use of incorrect numbers, because

"identification of such flaws in generally reliable scientific evidence is precisely the role of cross

examination"); *In re MTBE*, 643 F. Supp. 2d at 481 (an error in expert's work not ground for

exclusion because underlying method was reliable, used by defendants' experts, and after

discovering his error, he ran new calculations that did not change his opinions).

---

[9] *See, e.g., People v. Francis*, 847 N.Y.S.2d 398, 402 (N.Y. Sup. Ct. 2007)(Officer's observation of object resembling a knife sticking out defendant's pants pocket did not provide reasonable suspicion of criminal activity); *Florida v. J.L.*, 529 U.S. 266, 268-69 (2000)(fact that suspect fits description provided to police anonymously, not from the report of an identified victim or witness, does not by itself establish RAS); *People v. Barreto*, 555 N.Y.S.2d 303, 304 (N.Y. App. Div. 1990)(three-to-four-inch long bulge under suspect's t-shirt at his waste did not by itself establish RAs); *United States v. Bellamy*, 592 F.Supp.2d 308 (E.D.N.Y. 2009)(furtive movement alone insufficient to establish RAS); *People v. Batista*, 88 N.Y.2d 650, 655 (N.Y. Ct. App. 1996)("Although a bulletproof vest is properly linked to the inference that the wearer might be carrying a gun, more is usually required to justify a frisk of the suspect"); *People v. Giles*, 647 N.Y.S.2d 4, 8(N.Y. App. Div. 1996)("fact that defendant was wearing a long winter coat on a hot summer night, standing alone, is no more than 'odd' behavior").

9

5.  *Aggregating Stop Data and Combining Indeterminate and Unjustified Stops.*

Defendants' complaints about Fagan's reporting of the results of his analysis in the aggregate rather than separately by year and combining Unjustified and Indeterminate stop totals, Def. Br. at 6, relate solely to the manner of presentation of his conclusions, not the reliability of his methodology, and therefore are not grounds for exclusion, *see Daubert*, 509 U.S. at 595.[10] In addition, Defendants' claim about combining categories is false. *See* Fagan Supp. Rpt. at 36-37.[11] Finally, as stated above, Fagan's opinion that the legal sufficiency of 31% (now 22%) of all stops cannot be shown from the information entered on the UF250 forms does not address "the ultimate legal issue" in the case but instead provides reliable statistical evidence that will greatly assist the fact-finder in deciding what is the ultimate legal issue.

**C.    Fagan's Opinions Are Not Speculative or Conjectural.**

Fagan's statement that officers appear to be inventing stop justifications after the fact is not speculative. It is shown by the statistical patterns he found through his analysis of the UF250 data, *see* Fagan Rpt. at 53-55, and is consistent with NYPD roll-call recordings, on which a patrol squad supervisor is heard directing officers to do precisely this, *see* Hoffman Decl. (Dkt # 132), Ex. B (Schoolcraft Aff.) ¶¶ 9(c),(e) and Ex. 1 thereto.

Similarly, Fagan's conclusion that the "furtive movement" and "high crime area" stop justifications are used by officers so often and indiscriminately that they are no longer

---

[10] Moreover, Fagan's explanation for the decline in the percentage of Unjustified and Indeterminate stops over time in his supplemental expert report, which is supported both by his statistical analysis of the UF250s and social science literature, *see* Fagan Supp. Rpt. at 38-47, was cited with approval by this Court, *see* Dkt # 153 at 65-66 n.256.

[11] Defendants assertion that Fagan should have allocated the Indeterminate stops proportionately between the Justified and Unjustified categories, *see* Smith Decl. ¶ 8, is unfounded. Such an allocation would entail serious sample selection bias, and his choice not to do it is well supported in the statistical and social science literature and by this Court. *See* Fagan Supp. Rpt. at 24 n.63, 37; Dkt #153 at 64 n.253.

meaningful markers of reasonable articulable suspicion, Fagan Rpt. at 52-53, is based on sound methodology.[12] Fagan began with a counterfactual assumption, a commonly used statistical device, that if "high crime area" were used by officers in the way its meaning suggests, it would be used more frequently for stops in high crime areas than for stops in low crime areas. *See* Fagan Decl. ¶ 19. However, his analysis of the UF250 and NYPD crime complaint data revealed that "high-crime area" was checked off in more than 50% of stops in precincts with high, low, and average crime rates. *See* Fagan Rpt. at 53, Fig. 13. This lack of correlation between the independent variable (crime rate) and the dependent variable (use of "high crime area" as a stop justification) supports the conclusion that officers do not use "high crime area" properly. Fagan Decl. ¶ 19. Defendants' argument that this finding is "misleading" and can be explained by high-crime pockets within precincts is simply a disagreement over Fagan's conclusions, which goes to weight, not admissibility, and is also wrong as a factual matter. *Id.* ¶ 19, Ex. C

Defendants' criticisms of Fagan's hit-rate analysis for the furtive movement and high-crime area stops, Def. Br. at 9, are also meritless. Crime deterrence is irrelevant to whether a stop and frisk complies with the Fourth Amendment. *See Brown v. Texas*, 443 U.S. 47, 51-52 (1979). Moreover, Fagan's analysis does not "conflate" legal standards for stops and arrests because he did not measure whether the hit rates for the furtive movement and high-crime area stops were, as an absolute matter, too low, but rather, whether they were significantly lower than the hit rates for stops based on other stop factors. *See* Fagan Rpt. at 52. Such comparative hit-rate analysis has been used often in peer-reviewed, published studies assessing the legality and fairness of

---

[12] While Defendants are correct that stops based on both furtive movements and high crime area are constitutional, *see* Def. Br. at 8, stops based solely on either one of these factors alone are unconstitutional. *See Illinois v. Wardlow*, 528 U.S. 119 (2000); *United States v. Bellamy*, 592 F.Supp.2d 308 (E.D.N.Y. 2009). Moreover, Fagan classified all stops based on a combination of these factors as Justified. *See* Fagan Rep. at 50, App. D, Fagan Decl. ¶ 14.

police stop practices.[13]

Finally, Defendants' contention that Fagan's conclusion that NYPD officers may be using the "high crime area" and "furtive movement" stop factors as post-hoc justifications for illegal stops is an "interpretation of the motivation of the parties" that invades the province of the jury, Def. Br. at 9 (emphasis omitted), is inaccurate. Fagan will not opine as to the state of mind of any defendant officer, nor will he ascribe motivations to any of the NYPD supervisory-level officials with respect to any policy decisions challenged in this lawsuit. Moreover, Defendants' reasoning would prevent a plaintiff in a pattern-and-practice race discrimination case from using statistical analysis to prove discriminatory intent, which is clearly contrary to law. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977).[14]

## II.    FAGAN'S MULTIVARIATE REGRESSION ANALYSES ARE ADMISSIBLE.

All of Defendants' criticisms of Fagan's multivariate regression analyses boil down to the argument that he used the wrong benchmark—local crime rate and population demographics by precinct, neighborhood and census tract instead of citywide criminal suspect race data—to analyze the racial disparities in NYPD stop-and-frisk activity. *See* Def Br. at 11-15. This is an insufficient ground for excluding these analyses under FRE 702 for several reasons. *First*, as this Court has already noted, the Supreme Court has long recognized multivariate regressions as

---

[13] *See* Gross, S. R., and Livingston, D., *Racial Profiling Under Attack*, 102 COLUM. L. REV. 1413 (2002); Knowles, J., Persico, N., and Todd, P., *Racial Bias in Motor-Vehicle Searches: Theory and Evidence,* 109 JOURNAL OF POLITICAL ECONOMY 109, 203 (2001). Moreover, this Court has already found Fagan's comparative hit-rate analysis to be relevant and probative evidence for Plaintiffs' Fourth Amendment policy and practice claim. Dkt # 171 at 23.

[14] Defendants' argument that Fagan's finding about the increase in the rate of high-crime area stops over time does not consider the possibility of police responses to spikes in crime or crime trends, *see* Smith Decl. ¶ 10, is unavailing because overall crime went down significantly Citywide over the course of the six years studied by Fagan, 2004-2009, *see* Smith Rep, App. D and E., Def. 56.1 Stmt (Dkt # 136) ¶ 98, so that a one or two-month spike would not explain why the yearly totals of "high crime area" stops were so much higher in 2009 than in 2004.

a reliable statistical methodology to prove racial discrimination in civil rights cases, *see* Dkt # 153 at 65 n.255 (listing cases). "Normally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (overturning exclusion of expert multiple regression analysis in employment discrimination case for failure toinclude certain variables thought to affect salary levels).

*Second*, Fagan used this local population-crime rate benchmark in four published statistical studies, two of which were peer-reviewed, of racial disparities in NYPD stop-and-frisk practices, as well as the AG Report. *See* Fagan Decl. ¶ 21, Exs. D-F. *See Daubert*, 509 U.S. at 594 ("[P]ublication (or lack thereof) in a peer reviewed journal" is "a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised."); Adv. Comm. Notes to FRE 702 (fact that expert "propose[s] to testify about matters growing naturally and directly out of research they have conducted independent of the litigation" is "relevant" to its admissibility).

*Third*, Fagan's benchmark is specifically designed to test one of Defendants' main explanations for the enormous racial disparities in NYPD stop rates: NYPD "concentrate[s] its vigilance and enforcement activities in areas where the preponderance of crime, particularly violent crime, occurs, which is in communit[ies] where a disproportionate share of the Black and Hispanic population reside." *See* Smith Rpt. at 5; Fagan Rpt. at 30-31; Fagan Decl. ¶ 23.

*Fourth*, there is a methodologically sound reason why Fagan rejected the crime suspect race benchmark advocated by Defendants: the need to avoid sample selection bias due to the extremely large percentage of reported crimes in the NYPD crime complaint data (45%) for which suspect race was unknown. *See* Fagan Rpt. at 17-18, 75-77; Fagan Supp. Rpt. at 12. There is extensive support for this reasoning in the relevant social science literature, *see* Fagan Rpt. at

77 n.112 (citing articles), and this Court has already found Fagan's explanation of his methodological choices to be satisfactory, *see* Dkt # 153 at 71 n.269. Defendants attempt to minimize Fagan's valid selection bias concerns with newly reconciled 2009 and 2010 NYPD crime and arrest data belatedly produced to Plaintiffs in November and December of 2011,[15] which includes a higher percentage of criminal suspects whose race is known. *See* Def. Br. at 13 n. 25; Smith Decl. ¶ 12. However, even putting aside the fact that this data was not available to Fagan at the time he conducted his regression analyses more than a year ago, the new data does not eliminate the selection bias problem because the race of almost 40% of all criminal suspects is still unknown. *See* Smith Decl. ¶ 12, Ex. B.[16]

   *Fifth*, Smith, the source of most of Defendants' asserted critiques of Fagan's multivariate regression analyses, is unqualified to assess the reliability of such analyses. Smith is unfamiliar with a multi-level poisson regression, one of the two multivariate regressions that Fagan conducted in this case. He has never performed a negative binomial regression, which is the other multivariate regression conducted by Fagan, nor previously conducted a statistical study analyzing data on racial disparities in police stops or any other kind of police enforcement activity. *See* DC Decl., Ex. C. (Smith 3/4/11 Tr.) 113:6-125:11, 128:8-13, 129:5-10, 132:25-134:5; Smith Rpt. App. D at 32, App. E at 63, 67-68.

   Finally, none of Smith's critiques, data, or alternative statistical analyses undermine the

---

[15] This data was produced eight months after the close of expert discovery, more than a year after Fagan completed his expert report, fifteen months after the close of fact discovery, and almost two years after Plaintiffs requested it. DC Decl. ¶¶ 3-15; Fagan Decl. ¶ 24 Defendants have blatantly violated their discovery obligations under Fed. R. Civ. P. 26 and should therefore be precluded from using this data for the current motion or at trial in this case.

[16] The fact that suspect race is known in 85% of violent crimes is of little significance because only a very small portion of all stops, around 14%, are made on suspicion of violent crimes. *See* Fagan Rpt. at 75, App. C5. To determine the demographics of the population exhibiting "targeted" behaviors, Smith Decl. ¶ 20, would instead require a review of data on race of non-violent criminal suspects, which, as discussed above, is very incomplete. *Id.* ¶ 12, Ex. B.

reliability of Fagan's choice of benchmark. Smith's proffered regression analysis, *see* Smith Decl. ¶¶ 30 and 31 & Ex. I, raises more questions than it answers because Defendants have not provided the computer code he used nor specified whether he used suspect race data for violent crimes only or all crime categories. Moreover, Smith's use of this incomplete suspect race data, severely undermines the reliability of his analysis for the reasons stated above, Fagan Decl. ¶¶ 24-27, and his charts comparing the racial breakdowns for stops and frisks and crime suspect race descriptions in each precinct, *see* Smith Decl., Ex. C, are misleading for the same reasons. Fagan Decl. ¶ 28.[17] Smith's critique that Fagan's benchmark fails to account for differing levels of criminal participation by race within a precinct, Smith Decl. ¶¶ 14-15, ignores the fact that the small geographic areas which Smith claims are the proper units of analysis—"hot-spots", impact zones, census tracts, etc., *see* Smith Rpt. at 5, 11, 17, 37; Fagan Supp. Rpt. at 7-8—tend to be racially homogenous. *See* DC Decl. Ex. C at 106:16-107:4; Fagan Decl. ¶ 28. In addition, Fagan did account for racial differences in criminal participation rates at the precinct level by conducting a series of sensitivity tests on his negative binomial regression analysis using interaction terms for precinct racial demographics and crime rate, and these did not alter the results of his analysis. *See* Fagan Decl. ¶ 29.[18]

---

[17] In addition, Smith's statement that Blacks and Hispanics constitute a disproportionately high percentage of the violent criminal suspects in three precincts with majority-white populations (Smith Decl. ¶ 15) ignores the fact that in each of these precincts the percentage of persons stopped and frisked who were Black and Hispanic was significantly *higher* (roughly 10%) than the percentage of criminal suspects of those two races, while the stop-and-frisk/crime suspect disparities for whites in those precincts were the opposite. *See id.*, Ex. C at 6, 8.

[18] Space precludes response to Defendants' laundry-list of picayune critiques on the last page of their brief. All either are wrong or so minor as to go at most to weight, not admissibility. *See* Fagan Decl. ¶¶ 30-37; *Ramos v. Simplexgrinnell, L.P.*, 796 F. Supp. 2d 346, 372-75 (E.D.N.Y. 2011); *Aventis Envtl. Sci, USA LP v. Scotts, Co.*, 383 F.Supp.2d 488, 514 (S.D.N.Y. 2005). Plaintiffs will be glad to address in more detail, with Court permission, any that might cause the Court any concern.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Exclude Plaintiffs' Proposed Expert

Reports, Opinions and Testimony of Jeffrey Fagan should be denied.

Dated:      New York, New York
            February 2, 2012

                              By:   _____
                                    DARIUS CHARNEY

                                    Darius Charney
                                    Sunita Patel
                                    CENTER FOR CONSTITUTIONAL RIGHTS
                                    666 Broadway, 7th Floor
                                    New York, New York 10012
                                    (212) 614-6439
                                    dcharney@ccrjustice.org
                                    spatel@ccrjustice.org

                                    Jonathan Moore
                                    Jennifer Borchetta
                                    BELDOCK LEVINE & HOFFMAN, LLP
                                    99 Park Avenue, Suite 1600
                                    New York, New York 10016
                                    (212) 490-0900
                                    jmoore@BLHNY.com
                                    jborchetta@BLHNY.com

                                    Philip A. Irwin
                                    Eric Hellerman
                                    Gretchen Hoff Varner
                                    COVINGTON & BURLING LLP
                                    The New York Time Building
                                    620 Eighth Avenue
                                    New York, New York 10018-1405
                                    (212) 841-1000
                                    pirwin@cov.com
                                    ehellerman@cov.com
                                    ghoffvarner@cov.com

                                    *Attorneys for Plaintiffs*

16