UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

DAVID FLOYD, et al.,

                                          Plaintiffs,

                      -against-

THE CITY OF NEW YORK, et al.,

                                          Defendants.

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' PROPOSED EXPERT REPORTS, OPINIONS AND TESTIMONY OF JEFFREY FAGAN** [1]

**08 Civ. 01034 (SAS)**

------------------------------------------------------------ x

---

[1] The relevant facts are summarized in the following: the Declaration of Heidi Grossman Esq., sworn to on December 19, 2011 ("12/19/11 HG Decl.") (Dkt # 180); the Declaration of Dennis C. Smith, Ph.D., sworn to on December 19, 2011 ("12/19/11 DS Decl.") (Dkt # 181); the Supplemental Declaration of Heidi Grossman, sworn to on January 6, 2012 ("HG Supp. Decl.") (Dkt # 183); the Reply Declaration of Heidi Grossman, Esq., sworn to on February 16, 2012 ("HG Reply Decl."); and the Reply Declaration of Dennis C. Smith, Ph.D., sworn to on February 16, 2012 ("DS Reply Decl."); with citations to the record, relevant portions of which are submitted herewith.   Fagan's analyses and the topics of his proposed testimony are presented in: the Report of Jeffrey Fagan, Ph.D., of October 15, 2010 ("Report"); the Supplemental Report of Jeffrey Fagan, Ph.D., of December 3, 2010 ("Supp. Report"); Fagan's Affidavit of September 28, 2011 ("JF Aff."); his Declaration of November 6, 2011 ("11/6/11 JF Decl."); and his Declaration of February 2, 2012 ("2/2/12 JF Decl.") – collectively referred to as the "Reports." The Reports are in the record before the Court as follows: Report and Supp. Report on plaintiffs' opposition to defendants' motion for summary judgment (filed under seal as Dkt #132), JF Aff. on plaintiffs' motion to amend/correct Order on defendants' motion for summary judgment (Dkt # 156), 11/6/11 JF Decl. on plaintiffs' motion for class certification (Dkt #168), and 2/2/12 JF Decl. (Dkt # 189).  The relevant moving and opposition papers on this issue are in the record as follows: Defendants' Motion in Limine to Exclude Plaintiffs' Proposed Expert Reports, Opinions, and Testimony of Jeffrey Fagan ("Def. Mot.") (Dkt # 178); Defendants' Memorandum of Law in Support of Def. Mot. ("Def. Br.") (Dkt # 179); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude Plaintiffs' Proposed Expert Reports, Opinions and Testimony of Jeffrey Fagan. ("Pl. Br.") (Dkt # 187); February 2, 2012 Declaration of Darius Charney ("2/2/12 DC Decl.") (Dkt # 188) ; and 2/2/12 JF Decl. (Dkt # 189).

### POINT I: FAGAN'S RAS ANALYSIS IS IRRELEVANT AND UNRELIABLE

Replete with fatal errors, Fagan's revised attempt to employ a classification scheme[2] to categorize the more than 2.8 million stops recorded in the NYPD's UF250 database runs afoul of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). In response to defendants' moving papers, Fagan now identifies an "inadvertent computer coding error,"[3] which artificially inflated his count of stops classified as "indeterminate" by 36.6% in his original Report, while deflating the number of stops classified as legally "justified" by 13.5%. *See* DS Reply Decl. at ¶ 3.[4]

Fagan's new analysis now concludes that out of a total of 2,805,721 stops conducted by the NYPD between 2004 and 2009, 2,281,051 (78.1% instead of about 68%) were legally "Justified," 433,764 (15.46% instead of about 24.8%) were of "Indeterminate Legality," and 179,846 (6.41%) were "Unjustified."[5] When Fagan's classification is applied appropriately,

---

[2] Since receiving Fagan's new analysis on February 2, 2012, defendants have not had an opportunity to analyze the effect the new analysis has had on all of his opinions, reports, tables, and various submissions. Inadequate notice and time constraints prevent defendants from fully addressing the extent to which Fagan has failed to satisfy "event classification" methodology and *Daubert*. Indeed, preclusion is appropriate where time constraints prevent a party from effectively responding to a supplemental expert report that presents new opinions and/or factual support. *See In re Omeprazole*, M-21-81, MDL Docket No. 1291, 2002 U.S. Dist. LEXIS 3225, at *6-9 (S.D.N.Y. Feb. 26, 2002).

[3] 2/2/12 JF Decl. (Dkt # 189) at ¶¶ 17-18 (Fagan even creates a new category).

[4] This is particularly troubling given the Court's significant reliance on Fagan's opinions in denying defendants' summary judgment motion.

[5] Fagan's presentation of the data masks positive trends uncovered by his methodologies. Applying Fagan's "corrected" coding scheme, the percentage of "Unjustified" stops has decreased by nearly 50% -- from 9.7% in 2004 to 4.5% in 2009, while the percent "Justified" has increased from 69.1% in 2004 to 84.4% in 2009; stops of "Indeterminate" legality have also decreased by almost one-half, from 21.2% in 2004 to 11.1% in 2009. Further, when approximately 600,000 "Indeterminate"/"Unjustified" stops are viewed in the context of 22,000-26,000 officers on patrol over a six year period, there are at most 4.5 stops per year, per officer; when further considered in light of the fact that officers work on average 20 days a month, 8

which he failed to do, an effect of Fagan's new numbers reveals that the "Justified" stops increase to 90%: of the 433,764 "Indeterminate" stops, approximately 350,000 consist of forms with the box "other" checked on Side One with at least one or more of the 10 "additional circumstances" listed on Side Two of the UF-250.  Since case law[6] holds that any number and combination of the "additional circumstances" could support a finding of RAS (which Fagan admits that he never considered), these 350,000 stops should be reclassified from "Indeterminate" to "Justified," changing Fagan's percentages again to 90.6% Justified, 3% Indeterminate, and 6.4% Unjustified.

Consequently, according to Fagan's classifications and coding scheme, the UF250s left in the "Unjustified" category should only include UF250s where only one "CJ" was checked on Side One and nothing was checked on Side Two, and UF250s where no boxes were checked on Side One regardless of whether any boxes were checked on Side Two.  However, because Fagan once again limited his classifications to considering only the "stop circumstance" checkboxes on Side One of the UF250 forms and disregarding other relevant data fields, *e.g.*, narrative handwritten information and stop locations -- information which may support whether RAS existed for a stop – the 6.4% "Unjustified" stops is not reliable: Fagan's rationalization for ignoring critical data on the UF250, namely that the data that was not contained in checkboxes did not lend itself to reliable uniform categorization, underscores that Fagan's classification model does not capture all of the pertinent data and is not a reliable technique upon which conclusions can be drawn.  For example, Fagan disregarded the handwritten entry of the address

hours a day, the number of alleged problematic stops is infinitesimal and hardly evidence of a widespread policy or practice of illegal stops.

[6] The chart appended as Ex. A to the 12/19/11 HG Decl. (Dkt # 180) responds to Fagan's misleading and/or incorrect recitation of RAS case law and is not an attempt to circumvent the Court's page limits.

at which the stop took place.   This resulted in his failure to count as "Justified" stops made in "high crime areas" per the address, if the "high crime area" box had not been checked as an "additional circumstance" on Side Two of the UF250.  Thus, if stops made in Impact Zones, which are by definition high crime areas and can be ascertained by the address on the UF250, had only one "conditionally justified"[7] stop circumstance checked on Side One of the UF250 and no "high crime area" box checked on Side Two, Fagan erroneously counted these UF250s as "Unjustified," when by his own categorization, they should have been counted as "Justified." Approximately 32,957[8] of Fagan's "Unjustified" stops, or close to 20%, may require reclassification because of Fagan's failure to account for all the data on the UF250.

Fagan's RAS analysis is also irrelevant and not helpful to the ultimate issue in this case. Plaintiffs claim that they will offer it only as one of the bases from which the jury may infer that a policy/practice of suspicionless stops exists.[9]  His new analysis, however, uses nothing more than his old methodology of reviewing boxes and combination of boxes checked on the UF250s, with an admitted disregard of narrative information, and a categorization of the forms that

---

[7] Fagan's new opinion reclassifies a stop for which a "Conditionally Justified" stop circumstance is checked and no "additional circumstances" are checked from "Indeterminate" to "Unjustified" notwithstanding plaintiffs' acknowledgement that there are circumstances under which a "Conditionally Justified" stop should be classified "Justified". Pl. Br. at 8.  Plaintiffs miss the point illustrated by the RAS chart that RAS case law is subject to interpretation and that Fagan's and his researchers' interpretation of RAS case law, amounts to impermissible legal conclusions and renders his classification model fatally flawed.

[8] 32,957 stops are calculated by adding 10,532, 10,710, 5630 and 6085 "Unjustified" stops from the 73, 75, 44 and 46 precincts, respectively, which have been designated as mega impact-zones during certain years between 2004 and 2009.  *See* JF Decl. (Dkt# 168), Table 1.  The total of "Unjustified" stops would be reduced by thousands more since Impact Zones exist throughout the City.

[9] *See* Pl. Br. at 3-4.  Plaintiffs also offer Fagan to show an "ineffective regime regulation." *Id.* at 1.  This is part of the very regime that Class Counsel agreed to in the *Daniels* settlement, which included Class Counsel's approval of the UF250 form with check boxes as well as the Quality Assurance Division audit protocols.

inherently required his non-expert legal opinion about whether they reflected Unjustified – or legally "Indeterminate" stops.  Plaintiffs offer no case law to support that an inference of a suspicionless stop – let alone a widespread policy/practice of suspicionless stops – can be made based on UF250 paperwork.  As this Court stated, lack of reasonable suspicion cannot be determined solely on the face of UF250s.   Further, Fagan cannot testify to inherent legal conclusions.[10]   In *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992), the court precluded an expert's testimony that certain conduct was not "justified under the circumstances."  Fagan's conclusions are equivalent here because "even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard – explicit or implicit – to the jury." *Id.*[11]  Finally, Fagan does not rely on actual proof that any UF250 stop was conducted without reasonable suspicion, much less significant numbers of UF250s to reflect a pattern/policy.  The inference that plaintiffs advocate based on Fagan's RAS analysis simply seeks to bridge too far a gap and is not reasonable.  Thus, Fagan's RAS analysis is no help to the jury and would be highly prejudicial to defendants.

---

[10] For example, even in his revised tallies, Fagan continues to categorize stops as "Unjustified." Regardless of his protestations that he is not opining on the ultimate legal issue of whether a pattern of suspicionless stops exists, he is clearly opining that the stops in his self-made category are not justified, *i.e*, suspicionless.  Review of a UF250, even if nothing is checked, cannot establish a lack of reasonable suspicion, so Fagan has once again injected a non-expert and inappropriate legal opinion into his analysis. Any other suggestion by plaintiffs is merely wordplay.

[11] The cases plaintiffs cite to support their claim that Fagan's classification scheme is admissible are inapposite.  *See Fiataruolo v. United States*, 8 F.3d 930, 942 (2d Cir. 1993) (expert testimony that "lies near the border, close to a prohibited invasion" only admissible because expert was able to explain "in some detail…[the] factual explanations" for that determination); *Pereira v. Cogan*, 281 B.R. 194, 198-99 (S.D.N.Y. 2002) (only admissible portions of expert testimony were examples of good corporate practices according to industry and custom, and principals and rules guiding corporate governance practices); *In re MTBE Litig*., 2008 WL 1971538, at *14. (S.D.N.Y. May 7, 2008) (expert in products liability case permitted to opine on availability of a feasible alternative, because that was a "question of fact," not a question of law or a mixed question of law and fact).

Plaintiffs' attempts to dismiss Fagan's many and varied errors as "minor" or otherwise going to the weight rather than the admissibility of Fagan's testimony are unavailing[12] and ignore their fatally unreliable cumulative nature. The errors and Fagan's inability to implement his own RAS classification scheme have severely prejudiced defendants and sharply impugn his reliability.[13]

Additionally, Fagan's speculation into possible motivations of officers checking off such RAS factors as "high crime area" ("HCA") and "furtive movements" ("FM") stray far beyond the bounds of permissible expert testimony. For example, Fagan's claim that HCA and FM "are

---

[12] Fagan's errors have resulted in unreliable "moving targets" in his conclusions and are most like those in *In re MBTE Products Liab. Litig.*, 593 F. Supp. 2d 549, 560 (S.D.N.Y. 2009), where the court excluded expert testimony for failure to provide a consistent opinion about the percentage of the population that could detect the contaminant, as such failure "severely detracts from [the expert's] reliability." Plaintiffs' broad assertion that the *manner* in which an expert executes his methodology does not go to admissibility misapplies the case law. *See Ruggerio v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (discussing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995)). Both *McCullock* and *Cullen v. Village of Pelham Manor*, 2009 WL 1507686 (S.D.N.Y. May 29, 2009), addressed an expert's decision to use a particular accepted methodology, not the manner in which it was carried out. *See McCullock*, 61 F.3d at 1044; *Cullen*, 2009 WL 1507686, at *17-18. *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002), upholds exclusion of expert testimony based on failure to apply methodology reliably by omitting necessary variables. Expert evidence is not "good" where its methodology is unreliable *or misapplied*. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 & 763-71 (3d Cir. 1994) (affirming exclusion of expert evidence based on analysis of after-the-fact questionnaires). Other cases relied on by plaintiffs are factually dissimilar to this case. *See E.E.O.C. v. Bloomberg L.P.*, 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) (expert analyzed *accurate* data using two reliable methods and reached *same* result); *In re MBTE*, 643 F. Supp. 2d 471, 481 (S.D.N.Y. 2009) (sales data recalculated and opinion reliable because the "conclusions and proposed testimony [were] unchanged"); *Am. Home Ins. Co. v. Merck & Co., Inc.*, 462 F. Supp. 2d 435, 452 (S.D.N.Y. 2006) (expert opinion based on whether undisputed facts constituted *sufficient* grounds to declare delivered goods damaged, unlike the present case where *all* circumstances must be examined to determine RAS); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1344-45 & n.11 (11th Cir. 2003) (alleged methodological flaw related to *how* "fan pressure ratio" should be calculated and not inaccurate underlying data).

[13] Fagan's new analysis affects and likely requires him to change many of the opinions contained in his original and supplemental reports which render the opinions inadmissible. Plaintiffs, not defendants, should bear defendants' costs of having expended enormous amounts of time, effort and resources to identify Fagan's errors. Fed. R. Civ. P. 37.

often used to provide an erroneous post-hoc justification for stops made without reasonable articulable suspicion"[14] is irrelevant as speculative and conjectural.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Second, the accusation that officers falsify their stop paperwork is tantamount to a credibility assessment, which is not permitted by any witnesses, *see Nimely v. City of N.Y.*, 414 F.3d 381, 397-98 (2d Cir. 2005), and is highly prejudicial to defendants and likely to confuse the issues for the jury.[15]  Further, Fagan's description of the meaning of the UF250 fields and how they may be interpreted by officers is not only speculative and unsupported by any expertise, personal knowledge, or qualification on Fagan's part (he is not a police practices expert), it is also highly prejudicial to defendants.[16]

Fagan's use of arrest or "hit rates" to cast suspicion on the legality of stops, particularly those based in part on HCA and FM, is also inherently misleading and confuses the issues.[17] Fagan's use of a "counterfactual assumption" to support his inference that HCA and FM are not valid indicators of RAS fails because it starts with a faulty assumption, that the frequency of use of the HCA stop factor would perfectly parallel precinct crime rates.  Fagan's opinion that "[t]his lack of correlation between the crime rate (the independent variable) and the likelihood that stops are justified with 'high crime area' (the dependent variable) supports my conclusions that officers are not correctly using the 'high crime area' stop circumstance," 2/2/12 JF Decl. (Dkt #

---

[14]  2/2/12 JF Decl. (Dkt # 189) at ¶ 4(h).  *See also* Report (Dkt # 132) at 53-55.

[15]  *See, e.g., Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 729-30 (S.D.N.Y. 2011).

[16]  *See* Report (Dkt # 132) at 48-49.  Fagan's explanation that officers rely upon "*group-based* identifiers rather than markers of *individual* behavior" in identifying RAS introduces a significant risk of juror confusion, in which the central question is whether officers are properly acting on *individualized* RAS in making stops or are targeting certain racial or ethnic *groups*. Fagan's use of such loaded terms is likely to prejudice and mislead a jury.

[17]  *See* 2/2/12 JF Decl. (Dkt # 189) at ¶¶ 4(h)-(i); *id.* at ¶20.  The use of low "hit rates" – or high proportions of stops which do not result in arrest – as a basis to challenge whether RAS existed for a stop is inherently misleading, as two different legal standards are required for a stop (RAS), and for a search or arrest (probable cause).

189) at ¶ 19, is without basis in expertise or qualification.  Fagan, who is not a police practices expert, chose to ignore evidence regarding how the NYPD uses crime data to define "high crime areas" and instead substituted his own untrained judgment for that of qualified and experienced police officers and officials.[18]  Fagan's lack of understanding of police practices leads to speculative and prejudicial inferences, which would impermissibly influence a jury.

## POINT II:  FAGAN'S REGRESSIONS ARE IRRELEVANT AND UNRELIABLE

Fagan's multiple regression analyses purporting to show evidence of racial discrimination in stop patterns by the NYPD are so replete with methodological errors that they are "fatally flawed" and lack probative value.[19]  The most fundamental flaw is Fagan's choice of crime rate as a benchmark; without considering rates of participation in crime by race, his model cannot reliably discern the presence of racial discrimination.  Statistical literature and case law establish that the ability to draw a valid inference of discrimination is contingent upon selection of the proper statistical "comparison pools" – i.e., selection of an appropriate benchmark.[20]  Fagan acknowledged that a valid benchmark for this inquiry "requires estimates of the supply of

---

[18] Fagan makes inaccurate assumptions regarding the meaning of "high crime area."  No checkbox on the UF250 plainly corresponds to this "stop factor."  Side Two of the UF250 has a checkbox under "Additional Circumstances/Factors" which states: "Area Has High incidence Of Reported Offense Of Type Under Investigation."  Fagan relabeled the box as "high crime area," ignored the plain meaning of the so-called "HCA" checkbox,  made no attempt to understand what it means to the officers who fill out  the forms and ignored evidence regarding what "HCA" means to NYPD officials in making deployment decisions.  "High crime area" includes  a "hot spot" or "Impact Zone," a generally small, geographic area not necessarily located in a precinct with a high crime rate overall, but in a precinct with a low crime rate, experiencing a spike, wave or pattern of crime and which has been targeted for increased deployment.

[19] *In re REMEC Inc. Secs. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010); s*ee also E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 326 (7th Cir. 1988).

[20] *See, e.g., Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184-85 (9th Cir. 2002) (statistical evidence may be used to establish a prima facie case of disparate impact discrimination drawn from the appropriate comparison pools).

individuals of each racial or ethnic group who are engaged in the targeted behaviors and who are available to the police as potential targets for the exercise of their stop authority."[21]

Fagan further acknowledged that the ideal proxy for the "offending population" would include "measures of the race-specific crime rates in each precinct (or other social area) in order to help construct precise benchmarks based on the participation in the behavior of interest by persons of each race and ethnicity."[22] However, he refused to use such data despite its availability in precinct crime reports and arrest data.[23]  Such data is available for 85% of violent crimes and 62% of all crimes.[24] Data on the overall crime rate of a precinct is not a valid benchmark to gauge whether police are properly stopping individuals based on RAS behaviors, as it fails to account for *who* is participating in the crime.  *See* 12/19/11 DS Decl. at ¶ 14. Fagan's model thus fails to capture the necessary information to support a valid causal inference of discrimination.  *See id.*  That Fagan has produced reports and published papers using a benchmark that is fatally flawed does not render his methodology valid.  *See* DS Reply Decl. at ¶ 21.[25]

Fagan's refusal to include known data reflecting the high correlation between race and participation in crime (*i.e.,* suspect descriptions from crime complaints and arrest reports) in his regression model is a key omission which dramatically skews his results.  *See* 12/19/11 DS Decl.

---

[21] Report (Dkt # 132) at 15. S*ee also* 12/19/11 HG Decl. (Dkt # 180), Ex. G at 318.

[22] Report (Dkt # 132) at 17. S*ee also* 12/19/11 HG Decl. (Dkt # 180), Ex. G at 318.

[23] *See* Report (Dkt # 132) at 17-18; Supp. Report (Dkt # 132) at 12.  *See also* 12/19/11 HG Decl. (Dkt # 180) Ex. B (JF Dep.), at 144:14-145:13, 152:23-154:28, 121:11-23, 134-140.

[24] *See* 12/19/11 DS Decl. (Dkt # 180) at ¶ 12.

[25] A standard methodology to assess whether racial profiling exists in policing activity is to conduct observational studies of citizens, such as drivers, in order to compile data on the racial makeup of the "offending population," *e.g.*, traffic violators, to use as a benchmark to evaluate whether drivers of certain races were stopped out of proportion to their representation in the "offending population."  *See New Jersey v. Soto*, 734 A.2d 350 (N.J. Super. Ct. App. Div. 1996).

at ¶ 16.  Analysts' failure to consider alternate explanations for observed phenomena (in this case, Fagan's refusal to consider that higher stop rates of Blacks and Hispanics may be explained by the higher rates of participation of Blacks and Hispanics in criminal activity, rather than by racial profiling), and the corresponding failure to include key variables to account for such possibilities in multiple regression analyses have been deemed fatal to the methodology under the *Daubert* analysis.  *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448-50 (2d Cir. 1999). Regarding the validity of the suspect race data, Fagan continually understates the percentage of crimes for which suspect race is known; he claims it is 60% but in fact it ranges between 70% and 80% in the precincts with highest crime rates.  *See* DS Reply Decl. at ¶ 23.  Furthermore, Fagan has in the past used benchmark data that were far less available than suspect race information captured in NYPD crime complaints and arrest reports today, which represents the "best available data" on which to rely.  *See id.*  Fagan's multiple regression models suffer from numerous other flaws which, taken together, have led courts to exclude such evidence.[26]

Fagan's criticism[27] of defendants' regression analysis for using crime suspect race data as a benchmark[28] is also without merit.[29]  Suspect race data is available for a greater percentage of crimes than Fagan credits.[30]  It is available for 62% of all crimes and 85% of violent crimes.[31] Fagan offers no evidence to support the notion that the participation ratios of Black and Hispanics would be different for unknown suspects.  *See id.* at ¶ 24.  As to Fagan's criticism that

---

[26] *See EEOC*, 839 F.2d at 326; *see also* Def. Br. (Dkt #179) at 15 (addressing the flaws).

[27] *See* 2/2/12 JF Decl. (Dkt # 189) at ¶¶ 26-27.

[28] *See* 12/19/11 DS Decl. (Dkt # 180) at ¶¶ 30-31; DS Reply Decl. at ¶ 22.

[29] Defendants' experts possess the necessary qualifications. *See* DS Reply Decl. at ¶ 1; Purtel Reply Decl. at ¶¶ 1-4.  Also, plaintiffs' contention that defendants' alternative regression should be precluded lacks support. *See* HG Reply Decl. at ¶¶ 9-11.

[30] *See* DS Reply Decl. at ¶ 23.

[31] *See* 12/19/11 DS Decl. (Dkt # 181) at ¶ 12.

"the race of violent criminal suspects is not a valid proxy for the population most likely to engage in the kinds of behaviors that arouse reasonable suspicion in NYPD officers because so few stops (14%) are made by the NYPD based on suspicion of violent crimes,"[32] the latter point is irrelevant as the suspected crime which provokes a particular stop may not be the same category of crime which has provoked the police presence at that particular place and time.[33] Furthermore, the suspect data used in defendants' analyses included felonies and misdemeanors, not just violent crime.[34]

---

[32] *See* 2/2/12 JF Decl. (Dkt # 189) at ¶ 27.

[33] *See* DS Reply Decl. at ¶ 27.

[34] *See id.*

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant their Motion to Exclude Plaintiffs' Proposed Expert Reports, Opinions, and Testimony of Jeffrey Fagan, together with such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       February 16, 2012

                                           MICHAEL A. CARDOZO
                                           Corporation Counsel of the
                                            City of New York
                                           Attorney for Defendants
                                           100 Church Street
                                           New York, New York 10007
                                           (212) 788-0792

                              By:                          _____

                                           Heidi Grossman
                                           Assistant Corporation Counsel
                                           Special Federal Litigation Division

*Of Counsel*:  Stephanie Breslow, Esq.