UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

FLOYD, et al.,

                                      Plaintiffs,

        -against-

CITY OF NEW YORK, et al.,

                                      Defendants.

-------------------------------------------------------------------------X

**REPLY DECLARATION OF DENNIS C. SMITH**

08 Civ. 1034 (SAS)

        **DENNIS C. SMITH** declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

        1.        I am an Associate Professor of Public Administration at the Robert F. Wagner School of Public Service at New York University. I have been retained by the Defendants in this action as a testifying expert. I have previously submitted a report in this case, Report of Dennis C. Smith, Ph.D., dated November 15, 2010 ("Smith Report"), excerpts of which are annexed hereto as Exhibit A, which also contains my curriculum vitae; as well as a Declaration, dated December 19, 2011 ("12/19/11 DS Decl. (Dkt. # 181)"). I submit this Reply Declaration in further support of Defendants' motion to preclude all expert reports and opinions of Jeffrey Fagan, Ph.D ("Fagan"). I have personal knowledge of the facts contained herein based on my review of documents and business records of the City of New York. I have reviewed all analyses submitted by Fagan in this case, including: the Report of Jeffrey Fagan, Ph.D., of October 15, 2010 ("Fagan Report"), the Supplemental Report of Jeffrey Fagan, Ph.D., of December 3, 2010 ("Supp. Report") (Fagan's Affidavit of September 28, 2011 ("JF Aff."), his Declaration of November 6, 2011 ("11/6/11 JF Decl."), and his Declaration of February 2, 2012 ("2/2/12 JF

Decl.").[1]  I have also reviewed the transcript of Fagan's deposition taken on February 9, 2011, as well as all articles and sources cited herein.

**I. Legal Classification of Stops from the NYPD UF250 Database**

**A. Corrections of Errors and New Opinions**

2.	I re-examined Fagan's methodology and conclusions regarding his scheme for classifying all 2,805,721 stops recorded by the NYPD from 2004-2009 into three categories: legally "justified"; "unjustified"; or "indeterminate," in light of various "inadvertent errors" and "corrections" described by Fagan in the 2/2/12 JF Decl. (*see* ¶¶ 14-17).  Upon receipt of Fagan's computer coding instructions on February 14, 2012, I also performed a replication of Fagan's analysis to verify his methodology.

3.	In addition to correcting various other errors my colleagues and I had previously identified in his computer coding instructions and reconciling some inconsistencies within his Report (*see* 12/19/11 DS Decl. (Dkt. # 181) at ¶¶ 2-4), one of the "computer coding corrections" creates a new class of "justified" stops – those for which two or more "conditionally justified"[2] stop circumstances are checked, regardless of whether any "additional circumstances"

---

[1] I am informed that the Reports are in the record before the Court as follows: Report and Supp. Report on plaintiffs' opposition to defendants' motion for summary judgment (filed under seal as Dkt. #132), JF Aff. on plaintiffs' motion to amend/correct Order on defendants' motion for summary judgment (Dkt. # 156), 11/6/11 JF Decl. on plaintiffs' motion for class certification (Dkt. #168), and 2/2/12 JF Decl. on plaintiffs' opposition to defendants' motion to exclude Fagan (Dkt. # 189).  Other sources cited herein are in the record before the Court as follows: Declaration of Heidi Grossman Esq., sworn to on December 19, 2011 ("12/19/11 HG Decl.") (Dkt. # 180); Defendants' Memorandum of Law in Support of Def. Mot. ("Def. Br.") (Dkt. # 179); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude Plaintiffs' Proposed Expert Reports, Opinions and Testimony of Jeffrey Fagan. ("Pl. Br.") (Dkt. # 187).

[2] *See* 12/19/11 HG Decl. (Dkt. # 180) at Ex. C (annotated UF250 form demonstrating Fagan's designation of stop circumstances listed on the form as either "justified," "conditionally justified," "indeterminate", or "additional circumstance(s)").

are also indicated (2/2/12 JF Decl. at ¶ 17). Previously, Fagan's scheme classified stops based on two or more "conditionally justified" stop circumstances as legally "indeterminate". *Id.* This "inadvertent computer coding error" artificially inflated Fagan's count of stops classified as legally "indeterminate" by nearly 40 percent (i.e., 36.6%) in his original Report and analyses, while deflating the number of stops classified as legally "justified" by 13.5 percent.[3] Correcting this error brought the total number of stops Fagan classifies as legally "justified" to nearly 80 percent (i.e., 78.1%). Fagan does not make the latter finding explicit; however, I calculated the result myself.

4.      In summary, Fagan's new analysis now concludes that out of a total of 2,805,721 stops conducted by the NYPD between 2004 and 2009, 2,281,051(78.1%) were legally "justified," 433,764 (15.46%) were of "indeterminate legality," and 179,846 (6.41%) were "unjustified."

5.      While I do not concede the validity of Fagan's methods nor the accuracy of his counts of stops by legal sufficiency, I note that applying Fagan's analysis with the "corrected" coding would classify only 6.41 percent of the 2.8 million total stops in the UF250 database as "unjustified;" this amounts to 179,846 stops out of the total 2,805,721.

6.      Again, I observe that his presentation of the data masks positive trends uncovered by his own methodologies. For example, applying Fagan's "corrected" coding scheme, the percentage of "unjustified" stops has decreased by nearly 50% – from 9.7% in 2004 to 4.5% in 2009 – while the percent "justified" has increased from 69.1% in 2004 to 84.4% in

---

[3] *Compare* Fagan Report (Dkt. # 132) at 55 *with* 2/2/12 JF Decl. at ¶ 17.

2009; stops of "indeterminate" legality have also decreased by almost one-half, from 21.2% in 2004 to 11.1% in 2009.[4]

7.   I also note that Fagan repeatedly misrepresents the data, improperly combining legally "indeterminate" stops – i.e., those about which his classification scheme does not permit any inference of legality or illegality to be made – with the "unjustified" stops, producing the illusion of a greater proportion of "unjustifieds."[5]  While good science counsels generally against such misleading presentation of data, it is particularly concerning in this instance, where, as explained below (*see* paragraph 8) it is more likely given the oversimplified and skewed structure of Fagan's classification scheme, that the "indeterminate" category is in fact replete with uncounted "justified" stops.

8.   Fagan's classification model appears biased against finding "justified" stops. For example, the failure to even attempt to code data captured in the "Other" stop circumstance on Side One of the UF250, which by Fagan's admission[6] could contain circumstances which would justify a stop, almost certainly leads to the under-counting of "justified" stops and the misclassification of untold numbers of stops as legally "indeterminate."

---

[4] On the topic of trends, It is not clear what Fagan means by "invalid values" for suspected crimes indicated on the UF250, which he claims have increased over the five year period studied. There is no way for us to corroborate his numbers.

[5] *See*, *e.g.*, Fagan Report (Dkt. # 132) at 55;  11/6/11 JF Decl. (Dkt. # 168) at Table 1; *id.* at Fig.1.

[6] "There may be some valid indicia of suspicion which do not fall into the checklist that officers have to choose from . . ."  Supp. Report (Dkt. # 132) at 36; Def. Br. at 3-4.

9.      I also note that all of the "inadvertent errors" in Fagan's original analyses had the effect of significantly decreasing the count of stops categorized as "legally justified" while falsely inflating the number of stops whose legality Fagan explicitly called into question.[7]

**B. Lingering Methodological Faults**

10.     In spite of Fagan's attempts to "correct" and improve his legal classification scheme, I reiterate many of my methodological challenges to it.  Firstly, Fagan continues to base his classification of stops on an admittedly oversimplified review of the UF250 forms, considering only the "stop circumstance" checkboxes[8] and disregarding other relevant data fields that may contain information critical to determining whether RAS existed for a stop – i.e., information necessary to accurately classify stops within Fagan's model.  These include any handwritten notes such as those accompanying a check of the stop circumstance "Other" on Side One of the UF250, as well as other fields containing information regarding circumstances surrounding a stop, such as time of day and location/address.  *Id.*  As noted above, Fagan concedes that information captured in the "Other" field could support a finding of reasonable, articulable suspicion ("RAS") for a stop.  This leads to under-counting of "justified" stops and over-counting of stops whose legality cannot be determined by Fagan's scheme.

11.     At the request of defendants, I conducted an analysis of the 433,764 (15.46%) stops classified of "indeterminate legality" by Fagan's "corrected" scheme.  I calculated that of the 433,764 "indeterminate" stops, approximately 348,078 consist of forms with the box

---

[7] *See, e.g.*, Fagan Report (Dkt. # 132) at 55 ("[N]early 30 percent of all stops appear to be either facially unconstitutional, or lacking sufficient information to make a complete determination"); 11/6/11 JF Decl. (Dkt. # 168) at Table 1; *id.* at Fig.1.

[8] Fagan Report (Dkt. # 132) at 49; 12/19/11 DS Decl. (Dkt. # 181) Ex. A (Smith Report) at 11-13; 2/2/12 JF Decl. (Dkt. # 189) at ¶¶ 9-14.

5

"Other" checked on Side One, with at least one or more of the 10 "additional circumstances" listed on Side Two.

13. Fagan's rationalizations[9] for ignoring critical data fields on the UF250 underscore the failure of his choice of analytic model to reliably classify UF250 data. For example, his concern that the accuracy and consistency of handwritten notes may vary depending on the circumstances in which they are recorded – i.e., whether in the field "when an officer is in a state of arousal from an encounter with a suspect" or after a longer period has elapsed since the event, and his further concern that there is no way to determine from the UF250 how and when the narrative fields were completed.[10] These weaknesses may be said to apply equally to all data fields on the UF250, including the checkboxes Fagan chose to rely upon in attempting to classify the stops. This suggests that the model chosen by Fagan is an unsuitable technique for analyzing the rich and varied data captured on a UF250; his oversimplified and arbitrary approach necessarily limits the inferences which can be validly drawn from his model. I do not accept his justification for disregarding handwritten notes or other information regarding circumstances surrounding a stop captured on the form, when such information may be critical to making a determination as to the legality of the stop, in accordance with the stated aim of the scheme.

13. Fagan's claim that handwritten narrative data entries cannot be reliably coded renders his methodology unreliable and his conclusions incorrect. I understand that in past

---

[9] See 2/2/12 JF Decl. (Dkt. # 189) at ¶¶ 9-13.

[10] *See* 2/2/12 JF Decl. (Dkt. # 189) at ¶ 12 (*citing* J. Roberts et al., *A Test of Two Methods of Recall for Violent Events*, 21 JOURNAL OF QUANTITATIVE CRIMINOLOGY 175-93 (2005)).

studies Fagan has relied upon – and codified – narrative information, much of which in its original form contained handwritten entries.[11]

14. These methodological design errors are compounded by Fagan's failure to correctly and consistently implement his own event classification model. These include several errors identified by myself and my colleagues while attempting to test and verify plaintiffs' expert's methodology. In light of the multitude of unexpected errors we uncovered,[12] we deemed it prudent to attempt to replicate and to verify as many of Fagan's analyses as possible. Unfortunately, between February 2, 2012 and today, we lacked the time to vet all of Fagan's methodologies to the extent we would consider necessary in order to rely upon them with any measure of scientific certainty.

15. The "computer coding correction" described by Fagan is new analysis and opinion, the effects of which would likely require him to change many of the data, opinions and conclusions presented throughout his Reports. Since receiving Fagan's new analysis on February 12, 2012, my colleagues and I have not had a full opportunity to analyze the effect that Fagan's new analysis has on each of his Reports, including all tables and other presentations of his data and opinions contained within his various submissions. There are now serious questions

---

[11] *See*, *e.g.*, Exhibit 117 to the Declaration of Darius Charney in Opposition to Defendants' Motion for Summary Judgment (Dkt. # 132), *The New York Police Department's Stop and Frisk Practices: A Report to the People of the State of New York from the Office of the Attorney General* (1999). In this report and other studies Fagan published using NYPD stop data from 1997-1998, prior to the creation of the current UF250 forms, he necessarily relied upon computer-readable data that was produced from handwritten reports, as the former UF250s were typically handwritten.

[12] *See*, *e.g.*, 12/19/11 DS Decl. (Dkt. # 181) at ¶¶ 2-4. These include inconsistencies and contradictions between Fagan's description of his classification scheme as represented in his Report and the implementation of his classification scheme as accomplished by his computer coding instructions.

whether the opinions and tables can be reconciled with Fagan's acknowledged errors. For example, Fagan opines that "Another legally indeterminate stop factor, suspicious bulge was cited in 34.4 percent of weapons stops..."[13] This opinion is incorrect in light of Fagan's admitted errors. Since the only category of stops which are now rendered "Indeterminate" according to Fagan's new analysis are stops with "Other" on the front of the form, this conclusion is incorrect. Fagan also opines that, "One other result in Table S5 is noteworthy. The odds of a stop being classified as indeterminate decrease by 52.7% for each additional stop factor or additional circumstance that is checked off on the UF-250 form."[14] We need to consider whether Table S5 may likely be incorrect in light of Fagan's errors. We have not been able to fully review and consider Fagan's reports and various Declarations and tables contained in hundreds of pages since we received notice of Fagan's errors shortly after February 2, 2012.

16.     The magnitude of Fagan's errors raises serious questions about Fagan's various analyses which depend on coding instructions and we cannot know until we test them to see if there are other fatal errors. These errors also raise serious questions about the reliability of Fagan's AG report; the methods deployed by Fagan in the AG report have not been tested by comparing the coding instructions to the classification scheme he used and without testing cannot be deemed reliable in light of the errors made herein. These now-questionable data form the basis for Fagan's findings expressed in all of his publications cited in his Reports.

**II. Descriptive Statistics and Unsupported Conclusions On "Stop Factors" and Outcomes**

---

[13] Fagan Report (Dkt. # 132) at 57.

[14] Supp. Report (Dkt. # 132) at 38.

17.     I continue to dispute Fagan's use of "hit rates" as an indicator of "successful"[15] stops, and I take particular issue with his use of "hit rates" to question the validity of stops based in part on the UF250 stop factors "high crime area" ("HCA") and "furtive movements" ("FM").[16] Firstly, Fagan's misplaced emphasis on "hit rates" ignores deterrence as a successful outcome of a stop.  Fagan's reliance on "hit rates" is also misleading in that "hit rates" are irrelevant to determining whether RAS existed for stops in the first place.  Among police practices experts – and law enforcement officers, alike – it is understood that a stop need not yield contraband nor lead to an arrest in order to be justified by RAS.  Law enforcement officers are not trained to stop someone only when they are absolutely certain that individual has a gun.  Fagan's use of "hit rates" to challenge whether RAS existed for certain stops is problematic for another reason.  In failing to credit police stops with preventing and deterring crime, Fagan fails to consider a plausible alternative hypothesis for the observed low "hit rates" of stops – i.e., deterrence through police action.  In drawing inferences about police behavior, Fagan consistently fails to address the plausible alternative hypothesis that police are making stops based on observed RAS behavior in order to prevent and deter crime, rather than targeting individuals based on race or national origin.  Failure to consider and rule out plausible alternative explanations for observed phenomena is a basic breach of the scientific method and strongly suggestive of bias.  The comparison of "hit rates" from police stops conducted at random checkpoints[17] also misses the mark.  NYPD police deployment and "hot spot" policing is anything but random.  Random road stops, however, are just that: random.  Potential offenders

---

[15] Fagan Report (Dkt. # 132) at 62.

[16] *Id.* at 53.  *See also* 2/2/12 JF Decl. at ¶ 20.

[17] 2/2/12 JF Decl. at ¶ 4(i).

are not forewarned and don't have the opportunity to decide to leave their guns or contraband at home. On the subject of HCA and FM, I also note that Fagan offers no basis for his implicit assumption that stops based on different suspicions should have the same rate of "hits". In sum, I find that Fagan's preoccupation with "hit rates" is an irrelevant distraction.

18. Fagan also makes numerous inaccurate assumptions regarding the meaning of "high crime area." To begin with, there is no checkbox on the UF250 whose meaning plainly corresponds to this "stop factor" to which Fagan refers.[18] Instead, Side Two of the UF250 has a checkbox under "Additional Circumstances/Factors" which states: "Area Has High incidence Of Reported Offense Of Type Under Investigation." Fagan apparently adopted the general "high crime area" language from RAS jurisprudence and decided to "map" it onto a UF250 checkbox with a very specific plain meaning of its own, without any evidence the two corresponded.[19] Fagan not only ignored the plain meaning of the so-called "HCA" checkbox as he used it in his analyses, he made no attempt to understand what it means to the officers who use the forms in conducting stops. Instead, he chose to ignore evidence regarding what "HCA" means to NYPD officials in making deployment decisions and what it means to individual officers on the street making stops and completing UF250s, instead substituting his own judgment as to the frequency and circumstances in which it would be appropriate for trained officers in the field to check off HCA. There is ample evidence that the NYPD's conception of "high crime area" includes a "hot spot" or "Impact Zone," a generally small geographic area not necessarily located within a precinct with a high overall crime rate, but which may be experiencing a spike, wave or pattern of crime and which has been targeted for increased deployment. The explicit language of the

---

[18] *See* 12/19/11 HG Decl. at Ex. C (annotated UF250 form).

[19] *See generally* Fagan Report (Dkt. # 132) at Appendix D; *id.* at Appendix Table D1.

UF250 would be consistent with the idea of a geographic area even smaller than a designated "hot spot," and we believe it is often used by officers to indicate as such.

    a. Fagan's counterfactual assumption methodology fails because it starts with a faulty assumption – there is simply no reason that the frequency with which officers check off the HCA stop factor should parallel precinct-wide crime rates.[20] Fagan acknowledges the fallacy of this assumption when he states, "[n]o doubt there are high crime pockets in each of the precincts, regardless of the precinct's overall crime rate."[21] Nevertheless, Fagan concludes "that officers are not correctly using the 'high crime area' stop circumstance."[22] Notably, Fagan has not hypothesized a reason why the UF250 checkbox he chooses to refer to as "high crime area" should correlate with precinct-wide crime rates.

    b. This analysis by Fagan has not used the concept of counterfactual analysis correctly. In the source cited by Fagan,[23] Donald T. Campbell uses the term counterfactual analysis to refer to the varying results of an intervention against the results obtained in the absence of the intervention. Classically designed experiments with randomly reassigned treatment and control groups are the most rigorous test used in this analysis. Fagan's analysis that compares his own assertion of what constitutes a "real" HCA with the officers' understanding of what is conveyed when they check the box on the UF250 form is a test of validity.

---

[20] *See also* Fagan Report (Dkt. # 132) at 53; Def. Br. at 8-9.

[21] Fagan Report (Dkt. #132) at 53.

[22] 2/2/12 JF Decl. (Dkt. # 189) at ¶19.

[23] *See id.*

> But, in this test Fagan is using one construct – overall crime rate in a precinct at a particular point in time chosen by Fagan – to test the validity of a very *different* construct: "area has high incidence of reported offense of type under investigation." This "additional circumstance" implies specificity of place, time and type of crime that do not match Fagan's construct. This lack of correlation cannot be used to challenge the validity of police reporting.

19. Fagan's analyses regarding "post-stop outcomes" also rest on faulty assumptions. Fagan's observation that "Black and Hispanic individuals are treated more harshly during stop-and-frisk encounters with NYPD officers than Whites who are stopped on suspicion of similar crimes"[24] illustrates Fagan's lack of understanding of police practices. Fagan does not consider the alternative hypothesis, well supported with evidence, that it is not racial discrimination but other factors which account for differences in post-stop outcomes among individuals of different races. For example, it is well understood among police practices experts that how persons are treated in an encounter is a function of many factors, not all of which are captured in the U250.[25] The fact that more Blacks and Hispanics are frisked when stopped (i.e., subjected to so-called "harsh treatment") may be explained in part by the racial disparities exhibited by patterns of participation in violent crime in general, including the use of firearms.[26] The well documented differing rates of participation by race in differing types of crimes is the

---

[24] 2/2/12 JF Decl. (Dkt. # 189) at ¶4(d).

[25] *See also* 12/19/11 HG Decl. (Dkt. # 180) Ex. H (Ridgeway & MacDonald), at 197 ("Actions [which] transpire after the decision to stop may be confounded with race. There is a body of research in criminology that suggests a variety of reasons for racial differences in stop outcomes.").

[26] *See* Smith Report at 28, Table 3.

more plausible evidence-based explanation of why the outcome of stops based on the same documented initial suspicion could justifiably be different.

### III. Multiple Regression Analyses

20. I have also examined Fagan's methodology and conclusions regarding his various multiple regression analyses.[27] I maintain that Fagan's choice of precinct or census tract crime rate as a benchmark renders his model of no use in discerning the presence of racial discrimination. It is axiomatic in statistical literature that the ability to draw a valid inference of discrimination is contingent upon selection of an appropriate benchmark.[28] Fagan states that a valid benchmark for this inquiry "requires estimates of the supply of individuals of each racial or ethnic group who are engaged in the targeted behaviors and who are available to the police as potential targets for the exercise of their stop authority."[29] However, data on the local crime rate is a poor proxy for this baseline measure,[30] as it fails to capture *who* is participating in the crime. Without knowing who the perpetrators are, this measure provides no information by which we can assess whether the motivation for police stops was properly based on suspicion of criminal activity (RAS) or on race alone.

21. Fagan defends his choice of benchmark by noting that he has employed similar benchmarks in multiple regression studies in the past.[31] The fact that Fagan has produced

---

[27] *See* Smith Report, 12/19/11 DS Decl. (Dkt. # 181).

[28] *See*, *e.g.*, 12/19/11 HG Decl. (Dkt. # 180) Ex. H (Ridgeway & MacDonald).

[29] Report (Dkt. # 132) at 15; *see also* 12/19/11 HG Decl. (Dkt. # 180) Ex. G ("Street Stops and Broken Windows Revisited"), at 318.

[30] *See* 12/19/11 HG Decl. Ex. B (JF Dep.) at 213:12-214:1.

[31] 2/2/12 JF Decl. (Dkt. # 189) at ¶¶ 21-22; *see also* Pl. Br. at 13.

reports and published papers using an invalid benchmark does not render his methodology reliable.

22. Fagan dismisses our "alternative" multiple regression analysis which shows that suspect description significantly predicts patterns of stops by race/ethnicity better than racial composition of precincts, as he claims that the availability of data on suspect race is still too low to be valid by social science standards. While we acknowledge that our model does not include all of the variables included by Fagan, it does offer strong evidence to support our contention of an omitted variable bias problem. Including information on suspect race in a model substantially similar to Fagan's drastically alters the results, revealing any evidence of discrimination produced by his model to be illusory.[32]

23. Regarding the validity of crime suspect data, Fagan continually understates the percentage of crimes for which suspect race is known. While previously citing the percent known as ranging variously from 45% down to 20%, he now acknowledges that suspect race data is known in 60% of crimes overall. In fact, the percent known for violent felony crime exceeds 80%, and in many of the highest crime precincts in the City, where the highest volume of stops also occur, suspect race information is known for between 70% and 80% of crimes.[33] Fagan has repeatedly cited the "low" percentage of crimes with known suspects as the basis for rejecting use of suspect race information to assess bias in police stop activity. However, this supposedly scientifically-based objection is contradicted by his own use of arrest data as a measure of both crime and of the race/ethnicity of offenders, in his report for Attorney General

---

[32] *See* 12/19/11 DS Decl. (Dkt. # 181) at ¶¶ 30-31.

[33] *See* 12/19/11 DS Decl. (Dkt. # 181) Ex. C.

Spitzer and the several published articles using data from that same study.[34] In the focal years of his study, 1997 and 1998, less than 25% of all NYC crimes in the FBI Uniform Crime Report were "cleared" by arrests.[35] It is not at all clear why arrest data, which was available for a much lower percentage of crimes, was acceptable for Fagan to rely upon in his published articles alleging racial bias, while data which has a much higher percentage of suspects known should be excluded. Just as Fagan and his coauthors stated in the 2007 article that relied upon arrest data, suspect race information captured in crime complaints and arrest reports today represents the "best available data" on which to rely.[36]

24. Further, the fact that suspect description is known for a higher percentage of certain categories of crime relative to others does not render the data unreliable. It is well accepted historically that certain types of crimes, such as property crimes, have low incidences of clearance rates and thus of information on suspect identity. Fagan offers no evidence to support the notion that the known rates of criminal participation of Blacks and Hispanics would be different among unknown suspects.

25. Significantly, Fagan's 2007 article acknowledged that both crime complaint and arrest report data are sources of information about the race/ethnicity of suspects. This

---

[34] *See* 12/19/11 HG Decl. (Dkt. # 180) Ex. J (Gelman, Fagan & Kiss); Exhibit 117 to the Declaration of Darius Charney in Opposition to Defendants' Motion for Summary Judgment (Dkt. # 132), *The New York Police Department's Stop and Frisk Practices: A Report to the People of the State of New York from the Office of the Attorney General* (1999).

[35] *See* FEDERAL BUREAU OF INVESTIGATION, Crime Index Offenses Cleared (1997), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/1997/97sec3.pdf.

[36] *See* 12/19/11 HG Decl. (Dkt. # 180) Ex. J (Gelman, Fagan & Kiss) at 816: "Data on actual crimes are not available, of course, so as a proxy we use the number of arrests within New York City in the previous year, 1997, as recorded by the Division of Criminal Justice Services (DCJS) of New York State and categorized by ethnic group and crime type. This was deemed to be the Continued…

appears to contradict his prior criticism that the use of that suspect data found only in arrest reports was available in too few cases to be reliable – as Fagan was obviously aware that there existed a supplemental source of the information.[37]

26. Fagan's past willingness to rely on race-specific arrest data as a proxy for racial patterns of participation in crime[38] also contradicts his current claims that race-specific arrest data is not a reliable source of information about racialized patterns of participation in crime.

27. As to Fagan's criticism that "the race of violent criminal suspects is not a valid proxy for the population most likely to engage in the kinds of behaviors that arouse reasonable suspicion in NYPD officers because so few stops (14%) are made by the NYPD based on suspicion of violent crimes,"[39] the latter point is irrelevant as defendants' analyses are

---

best available measure of local crime rates and directly addresses concerns such as Safir's that stop rates be related to the ethnicity of crime suspects."

[37] *See id.*: "Perhaps a more relevant comparison, however, is to the number of crimes committed by members of each ethnic group. For example, then New York City Police Commissioner Howard Safir stated (Safir 1999), 'The racial/ethnic distribution of the subjects of 'stop and frisk' reports reflects the demographics of known violent crime suspects as reported by crime victims. Similarly, the demographics of arrestees in violent crimes also correspond with the demographics of known violent crime suspects."

[38] *See* 12/19/11 HG Decl. (Dkt. # 180) Ex. J (Gelman, Fagan & Kiss, "An Analysis of the New York City Police Department's 'Stop-and-Frisk' Policy in the Context of Claims of Racial Bias"), at 816: "Perhaps a more relevant comparison, however, is to the number of crimes committed by members of each ethnic group . . . . Data on actual crimes are not available, of course, so as a proxy we use the number of arrests within New York City in the previous year, 1997, as recorded by the Division of Criminal Justice Services (DCJS) of New York State and categorized by ethnic group and crime type. This was deemed to be the best available measure of local crime rates and directly addresses concerns such as Safir's that stop rates be related to the ethnicity of crime suspects."

[39] 2/2/12 JF Decl. (Dkt. # 189) at ¶27.

16

based on suspect descriptions for all categories of crime, not just violent crime.[40] This data is known in 60% of crimes citywide, and 70%-80% in high-crime precincts.[41] Fagan is mistaken in his claim that the graphs annexed as Exhibit C to my prior declaration are misleading because they "[do] not state that the statistics on criminal suspects, expressed in percentages, are based only on those crimes in which the suspect's race is known, rather than all crimes reported in the precinct."[42] The graphs in this exhibit show known suspect race information as a percentage of *all* crimes in each precinct, including crimes in which suspect race is known as well as those in which it is unknown.[43]

28. Plaintiffs' criticism regarding Exhibits C, D, and E of my previous Declaration, that "Smith's statement that blacks and Hispanics constitute a disproportionately high percentage of the violent criminal suspects in three precincts with majority-white populations ignores the fact that in each of these precincts the percentage of persons stopped and frisked who were Black and Hispanic was significantly higher (roughly 10%) than the percentage of criminal suspects of those two races, while the stop-and frisk/crime suspect disparities for whites in those precincts were the opposite,"[44] is a red herring. It is still true that the known ratios of Black and Hispanic suspects are much higher proportionally than their representation among the local population in these precincts. There is no reason to expect a 1:1 ratio of crimes suspected to stops. A difference of 10% in this case represents an insignificant outlier. Given the huge disparity of crime committed by Blacks and Hispanics in nonminority

---

[40] *See* 12/19/11 DS Decl. (Dkt. # 181) at ¶¶ 13, 15, 16; *id.* at Exs. C, D, & E.

[41] *See* 12/19/11 DS Decl. (Dkt. # 181) Ex. C.

[42] 2/2/12 JF Decl. (Dkt. # 189) at ¶28.

[43] *See* 12/19/11 DS Decl. (Dkt. # 181) at ¶ 13, Ex. C.

neighborhoods we would expect the figures we find in the 2009 and 2010 tables. The higher the disparity between population pattern and criminal activity by race, the more likely stops will exceed crimes. For the City as a whole, of course, the scatter plot shows how much better the correlation between stops and suspects is than stops and population.

---

[44] Pl. Br. at 15 n.17.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York, on February 16, 2012.

Dated: New York, New York
       February 16, 2012

Dennis C. Smith