C38AAFLOC                        Hearing

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    DAVID FLOYD,

4                   Plaintiff,

5            v.                              08 CV 1034 (SAS)

6    CITY OF NEW YORK, ET AL.,

7                   Defendants.

8    ------------------------------x
                                        New York, N.Y.
9                                       March 8, 2012
                                        2:20 p.m.
10
     Before:
11
                   HON. SHIRA A. SCHEINDLIN,
12
                                        District Judge
13
                        APPEARANCES
14
     CENTER FOR CONSTITUTIONAL RIGHTS
15        Attorneys for Plaintiff Floyd
     BY:  DARIUS CHARNEY
16
     NEW YORK CITY LAW DEPARTMENT
17        Attorneys for Defendants City
     BY:  HEIDI GROSSMAN
18

19

20

21

22

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

C38AAFLOC                          Hearing

1           (Case called)

2           THE COURT:  So this is Professor Fagen.  Good

3    afternoon.

4           MR. FAGEN:  Good afternoon.

5           THE COURT:  We have had a lot of submissions on the

6    issue of the experts' reports, how the reports were prepared

7    and methodology the opinions.  In short there's a Daubert

8    challenge by the City to the opinions that Professor Fagen

9    would like to give in this case.

10          The opinions in the simplest form address two issues.

11   In the simplest form one is the Fourth Amendment issues but

12   then there was reason for suspicion for the stops and to do

13   that he worked with the universe of 2.8 million UF-250s which

14   is the form that police officers use to record the basis for

15   making a stop.  And then he also gave opinions with respect to

16   disparate treatment and those use the UF-250s but in a

17   different way.  So that's the first big divide and I want to

18   talk about that for a moment.

19          With respect to the Fourth Amendment issue, the UF-250

20   has what's called a side one and a side two.  We're going to be

21   talking about that a lot.  And side one has the question -- and

22   I quote, "What were circumstances which led to stop?"  And the

23   police officer can check at least one box but could check more.

24   And on side two of that form there are other questions and one

25   of them is called Additional Circumstances/Factors and the

C38AAFLOC                    Hearing

1    directs the officers to check all that apply.  So it was

2    Professor Fagen's study of the 2.8 million UF-250s that led to

3    his opinion.

4           With respect to the opinion on the Fourteenth

5    Amendment issue, the alleged disparate treatment, I am not sure

6    I am right about this but the only part of the UF-250 that's,

7    particularly, important is the box that says "race".  And in

8    that box the choices are "White", "Black", "White Hispanic",

9    "Black Hispanic", "Asian Pacific Islander", "American

10   Indian/Alaskan Native".  That opinion doesn't turn at all on

11   the boxes about the circumstances leading to the stop or the

12   additional circumstances.  It only has to do with the race and

13   maybe the crime.  It's a box that says, specify which

14   felony/penal law misdemeanor is suspected.  Leading to some

15   extent is broken down with that in mind but it does not depend

16   on the so-called coding issues.

17          So we have two different sets of opinions in a way and

18   the city attacks both for different reasons.  I think it's

19   always helpful to know the Court's initial thoughts.  It helps

20   you focus your arguments.  And I will say that with respect to

21   the Fourteenth Amendment opinion on this alleged disparate

22   treatment, it's the easier of the two.  The city essentially

23   has one big attack and the one big attack is that Professor

24   Fagen did not use as a benchmark the race suspects in crimes.

25   The City thinks he should have.  The City thinks there's data

C38AAFLOC                    Hearing

1    on the race of suspects at least in a high percentage of

2    crimes, not 100 percent but a lot of crimes.  The plaintiffs,

3    actually, think that there's no good data with respect to the

4    race of suspects.  It's not good enough that there is a

5    percentage where the race is actually known.  There's a

6    percentage where the race is suspected and there's a percentage

7    where we have no idea of the race.

8           And there is some selection bias maybe when the race

9    is identified.  And for a host of reasons the professor made

10   the decision not to use that as a benchmark but he had many

11   other ideas of benchmarks to extract his opinion from the data

12   he had.  And I said I would share with you my initial

13   impression.  My initial impression is he is using credible

14   methodology.  He is qualified in the field and he should be

15   allowed to give the opinion everything else is

16   cross-examination.  Nothing really much more to be said.  I am

17   certainly willing to have the City have some oral argument here

18   if only for the record but maybe in the hope of convincing me

19   but as of now I am inclined to let that part go forward.

20   That's the easy part.

21          With respect to the Fourth Amendment claim, I have

22   very little criticism with Professor Fagen but I have some big

23   questions.  And that is, and I don't speak lightly when I know

24   every word I speak is on the record, but what choice is there?

25   We have 2.8 million stops.  The only data we have on those 2.8

C38AAFLOC                    Hearing

1    million stops is what the police officer decides to check off.

2    Its accuracy is, obviously, questionable but there's no other

3    data.  We, obviously, cannot have 2.8 mini trials.  We,

4    obviously, don't have the time for that, don't have the staff

5    for that, don't have the ability for it.  It would shut down

6    the police department.  Every officer who made a stop over the

7    last nine years would have to come to court and describe all

8    the things that were in his mind.  So the only way one could do

9    a study of the reasons for those stops is on the form that the

10   City created.  That's the only data we have is the form the

11   City created and the form that the City uses itself to analyze

12   the appropriateness of its actions with respect to stops and

13   frisks.  So I don't think we have any choice but to accept the

14   UF-250s as the starting point.

15           Then the only tact was with the coding.  How did the

16   professor, who I am not sure of this but I don't think is a

17   lawyer but, certainly, not a judge and certainly not a jury,

18   doesn't look like 12 people to me.  He looks like one, so he

19   not a jury, not a judge.  Is he a lawyer?  No, not a lawyer.

20   How does he decide the notion of what is justified, what is

21   unjustified and what is indeterminate?  How does he do that?

22   Well, his methodology was to look at the case law.  And,

23   clearly, one couldn't look at all cases that all judges all

24   over the State of New York are writing on stops and frisks that

25   too is impossible.  So he used some.  Some were New York Court

C38AAFLOC                          Hearing

1    of Appeals, some were the Second Circuit, some were the federal

2    district court and some were the New York lower courts.  And he

3    reads those cases and puts their holding in a parenthetical and

4    draws out from that holding the guidelines of what courts have

5    accepted as a basis for reasonable suspicion.  The City then

6    looks at some cases and questions his interpretation of those

7    cases.

8            And I've looked at the long, long chart that's part of

9    Ms. Grossman's declaration.  It's really four different charts.

10   And I think we're going to be spending some time this afternoon

11   on the four different charts to see if there's really all that

12   much disagreement.  And to the extent there is, how material is

13   it?  Because in one or two cases my view is that even if the

14   City is right, for example, that the Fernandez case comes out

15   different than the Francis case maybe it's, certainly, a higher

16   court, certainly, four years later but it's a trivial

17   difference in the outcome of the statistics.  So even if one

18   corrected one or two of the standards to be drawn from the

19   cases it wouldn't change very much.

20           And when I look at the last of the City's four charts

21   which was only eight cases, I didn't think the City would

22   necessarily write out its interpretation of the case over his

23   interpretation of the case.  And, of course, the plaintiffs

24   came back and said the same thing and wrote a brief saying the

25   City is relying on a dissent.  The City is relying on the fact

C38AAFLOC                          Hearing

1    that the Second Circuit hasn't decided a sert issue.  The City

2    this, the City that, but it's not so clear that the holding as

3    described by the professor at least was wrong.

4            And the question is, is there or was there a better

5    way to do that?  Instead of Professor Fagen, who is not a

6    lawyer, judge or jury, deciding what the factors are that would

7    justify a stop should he have asked the Court to do that before

8    the coding?  I don't know that that would have been acceptable

9    to the City either.  Should the City have appointed a neutral

10   master to read the cases and decide the coding?  Maybe.  Should

11   we have asked the jury whose 12 nonlawyers are far less

12   qualified than Professor Fagen's reading those cases to decide

13   what the factors are?  Surely not.  So, again, I'm not sure

14   there was any other way to get at that.  The case law method

15   was a good method.  He tries to say, let's extract from the

16   case law what factors justify a reasonable suspicion stop and

17   which don't.  And, of course, the cases aren't consistent.

18   That's another problem.  Certainly, lower courts are never

19   consistent until the higher courts get ahold of it.  And

20   circuits differ around the country than the Supreme Court

21   because they're final, not because they're right, correct,

22   everybody.  So that's the way it is.

23           So, again, I am not entirely sure I understand what

24   the City would have wanted.  Once we have to agree that the

25   UF-250 database is the only way to go, I am not entirely sure

C38AAFLOC                         Hearing

1    what the real quarrel with this methodology is.

2            Now, another tact the City has is that he made a

3    coding error, fairly big coding error and that effected the

4    outcome by many percentage points, maybe eight and he corrected

5    it.  He realized the error.  He corrected it.  The City said,

6    we're prejudiced.  This is too late.  It's not fair to us.

7    Well, I would understand that argument if our trial was

8    scheduled for April of 2011.  It is not, sadly.  We have these

9    Daubert motions.  We have class certificate motions.  We have

10   motions that keep us busy.  Some day we may have motion in

11   limine.  I don't have a trial date and I don't know when it is.

12   I wish I did know when the trial date is but I know it's not

13   next month.  I know it may not be in 2012.  So I am not

14   entirely sure what the prejudice is.  The City has months and

15   months to adjust to the correction which, frankly, was

16   graciously made.  He realized it was in error, corrected his

17   statistics or figures, totals and percentages.  It is what it

18   is.  It's corrected.

19           So those are some of my initial thoughts.  I haven't

20   reached a thought yet as to whether to allow this but I am

21   somewhat mystified as to what the choices are given what I've a

22   just said is the background of the matter, how you look at 2.8

23   million stops other than with the very system the City has

24   created.  It's not a perfect system, clearly, but from the data

25   that the professor put in front of me, I can see that the

C38AAFLOC                          Hearing

 1   police officers in my opinion are just checking more boxes and

 2   they're checking the ones that I think will defend any stopping

 3   that doesn't apply.  So we're seeing a rise in furtive moments

 4   and we're seeing a rise in high crime areas and, frankly, it

 5   doesn't matter that it's a high crime area.  It's just a good

 6   thing to check.  So I don't think that anybody is saying the

 7   forms are, particularly, accurate but there is nothing else we

 8   have.  So those are some preliminary thoughts.

 9          Given that it's the City's motion I guess we should

10   begin to some extent -- this is going to sound vague -- with an

11   oral argument that may address some of the points I made or it

12   may address some of the points the City wants to make to

13   highlight in their briefs.  A lot of paper here.  I have read a

14   lot of it but it doesn't hurt to distill it down to your key

15   point and then allow the plaintiff's lawyers a chance to

16   respond to you and then I may have some questions for Professor

17   Fagen and you may too and that's why he is here as a witness.

18   So that's I guess the order in which we're going to proceed.

19          MS. GROSSMAN:  Thank you, your Honor.

20          Well, I think the first issue about the UF-250 is the

21   only way to go.  There is no other better choice.  I think that

22   just because there's no other choice doesn't mean that you have

23   to accept the methodology that is flawed in many respects.

24          THE COURT:  Let's pause here.  How could you study 2.8

25   million stops other than through the UF-250s?

C38AAFLOC                         Hearing

1            MS. GROSSMAN:  Study for what purpose?  To make a

2     decision about the unconstitutionality of the stops?

3            THE COURT:  To analyze whether the stops are justified

4     under reasonable suspicion standard.  How would you do that

5     other than by studying the 2.8 million UF-250s?

6            MS. GROSSMAN:  But the purpose of the UF-250 form is

7     not to establish --

8            THE COURT:  I'm not asking you that.  That's not my

9     question.  You really have to focus in on the question.  How

10    else could you propose analyzing 2.8 million stops to see

11    whether there's a problem in terms of reasonable suspicion

12    being the basis for a stop?  Is there any way to study 2.8

13    million stops?

14           MS. GROSSMAN:  I don't see a way.  And the reason why

15    I don't see a way is when you think about hearings that have

16    been held before you, your Honor, on the issue of reasonable

17    suspicion look at how fact intensive --

18           THE COURT:  Absolutely right.  That's why I am asking

19    the question.  Can you think of any other way --

20           MS. GROSSMAN:  No.

21           THE COURT:  -- seem to me that's quite a concession on

22    your part.  I am not saying that negatively but I am saying you

23    therefore agree with me that if it's to be done, if one is

24    supposed to look at all 2.8 million we have nothing but the

25    UF-250s.  We can't have a suppression type hearing which is

C38AAFLOC                         Hearing

1    what I do, you are right.  You said look at the hearings held

2    before you.  It usually comes up in a criminal case and

3    somebody moves to suppress saying the stop and essentially the

4    arrests are bad and I spend hours, three hours or five hours

5    taking testimony from the police officers, briefing, argument

6    and I either find there was a basis or not.  And if it was no

7    basis I suppress the evidence received.  If there is no trial

8    the indictment is dismissed.  That happens once in a while, not

9    very often but it happens and it takes three to six hours for

10   one and that is your point.  So that's why I said respectfully

11   that was quite a concession.  You are saying there is no way to

12   look at 2.8 million, period.  That's your answer.

13            MS. GROSSMAN:  That's my answer.

14            THE COURT:  But it's not an answer I can accept.  I

15   can't do that.  Therefore, we are a back to the UF-250, so we

16   have to start with the proposition that there's no alternative.

17   The database we have is the universe of 2.8 million UF-250s.

18   Now we can go from there.

19            MS. GROSSMAN:  This is the first time this particular

20   question has been represented on that issue and that from my

21   perspective and from what I am looking at as a lawyer I am not

22   an expert.  I am using argument.  I am trying to use what I

23   know.  But for my own understanding is it does not appear that

24   there's another way.  But I would like to have an opportunity

25   to give thought to that, to get back to your Honor about that

C38AAFLOC                          Hearing

1   because it's a very serious question.

2           THE COURT:  It's a very serious question.  It's the

3   one that's been keeping me up nights losing, a lot of sleep,

4   saying to myself if it's not the 2.8 million UF-250s, what is

5   it?  I, obviously, cannot have 2.8 million three hour hearings

6   and everybody know that.  I understand it.  So we can't go the

7   one by one hearing.  If your answer would be a sampling which I

8   know in another context, how many could we reasonable have that

9   would be a viable sample?  There are two experts here who know

10  a lot about sampling, I assume.  Doctors Fagen and, was it

11  Smith?

12          MS. GROSSMAN:  Yes.

13          THE COURT:  And they know much more than I do but I

14  suspect it's also more than could be done with live hearings.

15  It is just not possible, I think, to do enough.  You have them

16  with enough different circumstances, enough different scenarios

17  that you could then extrapolate from some reasonably small

18  sample the rate of either unjustified or indeterminate stops.

19  I don't think you could do it.  That's my strong guess if you

20  were to do the sampling, also impossible.

21          So then you'd be back to statistical samples.  You

22  would be using less than 2.8 samples but you would still be

23  using UF-250s.  So I suggest to you we are all stuck with the

24  UF-250 but, yes, you could consult afterwards and if you want

25  to suggest an alternative of interest, go ahead, but I suspect

C38AAFLOC                          Hearing

1    we'd be past that.  There is no alternative.

2              MS. GROSSMAN:  Let me just raise an issue that is of

3    very, it's a very significant issue because if you are going to

4    allow the use of the UF-250 database to be used to establish

5    reasonable suspicion --

6              THE COURT:  Well, you put it a different want than I

7    would.  I am starting a different proposition.  I am saying,

8    how do we examine whether there's a problem?  Whether there are

9    stops, too many stops that are not based on reasonable

10   suspicion as defined in the law?  How do we go about the

11   inquiry?  And the only way I can think of is to use the UF-250s

12   data because there's 2.8 million of them.  We could sample

13   database but it's still the database.  That's all we've gotten

14   to so far.  I think it has to be recognized that we start with

15   the UF-250 database.

16             MS. GROSSMAN:  So, the problem that I raise that I

17   think is something that the Court really has to give serious

18   thought to is the burden of proof here.  And if you're in a way

19   allowing the UF-250 database and opinions by Professor Fagen

20   that says "X" number of stops --

21             THE COURT:  You are going way past me.  I didn't want

22   to get to the second problem yet which is how we analyze the

23   data.  I want to see how we get to agreement that this is the

24   only data we can work with, then we get to the question of once

25   we agree on that did he do it right or did he make bad coding

C38AAFLOC                          Hearing

1    decisions leaps that he shouldn't have made.  He is not a

2    lawyer.  All the rest of the argument, but you want to first

3    start with the overriding proposition that with 2.8 million

4    stops to deal with we don't have a choice except for the UF-250

5    database, then you could tell me all the things you did wrong

6    in using that data but I want to see if we can agree that there

7    was no choice to use that data.

8          MS. GROSSMAN:  Well, I still -- and I don't mean to

9    belabor the point -- but I do still think that whatever if --

10   you are right.  Professor Fagen opines on UF-250s and says X

11   numbers are unjustified and you look at the case law and you

12   say, okay, that's reasonable.  Let's accept that as true, at

13   the end of day that never means anything about the actual

14   Constitutionality about all of the stops.

15         THE COURT:  If I agree with that but if you were to

16   have an individual suppression hearing on everyone of the 2.8

17   million stops you would learn much more than is on the UF-250

18   form.  The officer would testify.  He would say, I don't have

19   time to write everything down.  I checked off the boxes.  But

20   now let me tell you everything I remember or everything that's

21   in my memo book or whatever, but we can't do it.  There's no

22   way to have 2.8 million hearings.  We have gone over this and I

23   don't think you could do it by sampling if you had to have live

24   hearings.  We have gone over the same grounds.  I understand

25   your point.  But if I had one hearing, ten hearings, each one

1   would take hours.  Each officer, if he had notes in his memo

2   book or something, might be able to add information to the form

3   but none of that's possible.  It's not practical.  It's not

4   possible.  The City itself uses the UF-250 for its quality

5   control and to make sure there is integrity in the process of

6   these stops.

7            MS. GROSSMAN:  The question is what does this data in

8   that opinion go to?  What is it there to prove?

9            THE COURT:  We'll talk about the Fourth Amendment

10  claim.  I've already put the other thing aside.

11           MS. GROSSMAN:  The question about the

12  constitutionality of the stops on a wide scale basis, what

13  question does that go to?  Goes to the Monell question whether

14  the City has pattern and practice of suspicionless stop,

15  whether they're on notice.

16           THE COURT:  Correct.

17           MS. GROSSMAN:  And so even if we accept that Professor

18  Fagen believes that "X" number are insufficient,

19  unconstitutional and that the Court analyzes the case laws and

20  agrees that his interpretation is correct, that doesn't

21  translate into the police department being on constructive

22  notice about the wide scale problem of unconstitutional stops.

23           THE COURT:  That's fine.  But it's an argument way

24  down the road that I don't need to have a hearing on.  The

25  hearing today is a Daubert hearing.  Let's put the credentials

C38AAFLOC                          Hearing

1    aside because I am satisfied.  We're not here for that but you

2    are attacking the methodology.  That's fine.  I want to take

3    that in small steps.  The first step is the universe of data.

4    And I am fairly convinced there was no choice.  You didn't pick

5    the wrong universe of data that's doable.  You said, may I

6    consult after the hearing with my expert and if we have

7    anything else to offer we'll let you know.  Putting aside that,

8    I said sure.  Now, I don't think we have any alternative.  This

9    is the data the City keeps.  It's the way it records the basis

10   for stopping people.  There has to be a basis.  We don't have a

11   country where you can just stop anybody, hopefully.  So you

12   have to have a reasonable suspicion and the law defines the

13   parameters of reasonable suspicion.

14            MR. CHARNEY:  Your Honor, I would submit that in fact

15   while the City has this.

16            THE COURT:  Has this?

17            MS. GROSSMAN:  Has the UF-250 forms.  It requires the

18   officer to prepare the UF-250 forms.  There are orders and

19   audit procedures to review.  I would submit that the City

20   really doesn't under Monell have a requirement, an obligation

21   to do that.

22            THE COURT:  I agree but it does.  It doesn't have an

23   obligation.  It chose to track.  It chose to document for good

24   reason.  I think there's a lot of reasons people document a lot

25   of things.  One is to be able to defend itself.  One is for

C38AAFLOC                          Hearing

1    transparency, a lot of good reasons to document what you do but

2    it chose to do it.  We have this data.  It's available.  It's

3    not perfect data because I don't trust that the person who

4    entered the data necessarily was writing down what happened, so

5    to speak, but that's a different issue.  This is the only data

6    we have.  We're back to the beginning.  So I want to get past

7    that now.  Let's assume that the only data we have, now we are

8    ready for your attacks on how he manipulated the data, how he

9    dealt with the data.  What was wrong with it?

10            MS. GROSSMAN:  Yes.  We set out all our concerns in

11   our papers.

12            THE COURT:  I said you could distill it in oral

13   argument.

14            MS. GROSSMAN:  What Professor Fagen did was he took,

15   he looked at ten boxes on a certain part of the form.

16            THE COURT:  Side one and side two.

17            MS. GROSSMAN:  Okay.  Side one.  We'll use that

18   annotative form that we attached.  That might be very helpful.

19            THE COURT:  Yes, I have it.

20            MS. GROSSMAN:  So what Professor Fagen and his team

21   did was looking at side one of the form, they looked at the

22   check-off boxes, the ten boxes under what were circumstances

23   which led to the stop and he looked at on side two --

24            THE COURT:  On side two?

25            MS. GROSSMAN:  And then he looked on side two of the

C38AAFLOC                    Hearing

1    form at some of the boxes checked off there.  And what he did

2    was he came up with a method to put any combination into

3    certain buckets.

4             THE COURT:  Right.  Three buckets, "justified",

5    "conditionally justified", "indeterminate".

6             MS. GROSSMAN:  That's right.

7             THE COURT:  Well, no.  I was wrong.  "Justified",

8    "unjustified" and "indeterminate".

9             MS. GROSSMAN:  Sorry, your Honor.  Now you can look --

10   there's many, much more information on the form from which to

11   determine reasonable articulable suspicion.  And Professor

12   Fagen's scheme doesn't at all consider that and address that it

13   omits that because he can't address the form.  So accepting --

14            THE COURT:  Because he can't what?

15            MS. GROSSMAN:  Because the information on the form was

16   too unwieldy and too complicated to do as thorough a search on

17   whether the forms really showed reasonable articulable

18   suspicion.  So he simplified the classification.

19            THE COURT:  What are you referring to in particular?

20   I thought one of your criticisms is he didn't consider the

21   handwritten notes.

22            MS. GROSSMAN:  But there's much more information.

23            THE COURT:  I thought that was one big one.

24            MS. GROSSMAN:  It was.

25            THE COURT:  Let's talk about that one for a minute

C38AAFLOC                    Hearing

 1    cause I know he didn't.  What percent of the 2.8 million have

 2    handwritten notes?  I either didn't find that in your brief or

 3    missed it.  Do you know?

 4          MS. GROSSMAN:  I don't think the plaintiffs, Professor

 5    Fagen ever set that out.

 6          THE COURT:  So you don't know either.

 7          MS. GROSSMAN:  We don't know because look at every

 8    field on that form that's handwritten, entries everywhere.

 9          THE COURT:  Where are there handwritten entries?

10          MS. GROSSMAN:  There are fields throughout the form

11    that require handwritten entries.  You can start at the top,

12    the address or intersection of a cross street of stop.  Someone

13    has to put in information about the location of the stop.

14    There's information in that location of that stop.  We said in

15    our brief high crime area.

16          THE COURT:  But high crime is on the chart, page two.

17          MS. GROSSMAN:  That's right.  But, your Honor,

18    consider this.  Professor Fagen's scheme when he puts -- when

19    he considers a form, a CJ, conditional justified stops on side

20    one of the form, his scheme says CJ on the side one, plus a

21    field in the ACAF field like high crime area, he says that

22    should be a justified stop.  However, there are many stops that

23    take place in high crime areas where the high crime area box is

24    not checked off.  There are thousands of those that could

25    potentially exist.  But Professor Fagen's scheme did not

C38AAFLOC                          Hearing

1   consider that and it's a huge omission and it really renders

2   this in combination with many other concerns we have had.  It

3   renders the whole classic model flawed, fatally flawed.

4             THE COURT:  But there is a problem with that too and

5   that's the definition of high crime area.  We've gone over this

6   before.  Is the whole precinct a high crime area?

7             MS. GROSSMAN:  That's right, your Honor.  You are

8   absolutely right.  And Professor Fagen imposes his own

9   definition of high crime area which is not necessarily

10  consistent with the definition of high crime area.

11            THE COURT:  I thought his is with the officer checked

12  the box on side two.

13            MS. GROSSMAN:  He doesn't give consideration to what

14  the other information in the form tells you about whether the

15  stop took place in a high crime area.  So that omits, that

16  deflates the number of justified stops.

17            THE COURT:  Well, if the officer doesn't see fit to

18  check it, obviously, that wasn't his reasonable suspicion.

19  That's the problem.  The officer is supposed to check off boxes

20  that form the basis of his suspicion.  If he didn't check that

21  off this is high crime area then I guess that wasn't the reason

22  he checked the box.

23            MS. GROSSMAN:  That doesn't mean the stop under the

24  circumstances because of the totality of circumstance test and

25  you know that if an officer came into a hearing and didn't

1    check off high crime area but he gave testimony about and I am

2    sure you have had tons of hearings where the paperwork doesn't

3    reveal everything done by the testimony.

4            THE COURT:  You are right.  I couldn't possibly have

5    2.8 million hearings.

6            MS. GROSSMAN:  Consider your own experience.  How

7    often is it that every detail of a stop or an encounter is

8    actually in the paperwork?  If you find that's reliable in that

9    way then there's really no basis to think that these forms with

10   a check-off box gives you everything that happens.  You know

11   that's not there.

12           THE COURT:  You are right.  I know that it's not

13   everything that's happened but I know it's sufficient to the

14   police department when they have to analyze the quality

15   control, they have to work with this too.  There's a lot of

16   stops being made.  We can't do them one by one.  I cannot

17   question every officer and every stop for hours on details.  We

18   have to live with the data we have.

19           MS. GROSSMAN:  The purpose of the audit is not to

20   establish reasonable suspicion.

21           THE COURT:  It's to see whether on audit basis there a

22   high incidence of suspicion stuff.  They're worried too.

23   Police department wants to get this right and so they're

24   checking, reviewing to make sure that there's not a high

25   percentage of stops but don't have the basis and suspicion, the

C38AAFLOC                         Hearing

1   reason it was suspicious.  Otherwise what's the audit for?

2              MS. GROSSMAN:  OK.  Then if the auditors are looking

3   at the form and let's start with what happens.  It goes through

4   process and supervisor is looking at the form.  It goes through

5   channels.  It's entered into a database.  Eventually, audits

6   are done there are samples and if the question is while you

7   look at -- if I were a precinct commander and I know that high

8   crime area and I see that there's a furtive movement and I know

9   that even the high crime area box is not checked off, I know

10  this is a high crime area.  That's what this is we've sent him

11  out there.  I know that if those two equal reasonable

12  suspicion, there was reasonable suspicion.  The fact that the

13  motivation of the officer and what he checked off may be

14  reflected in the form or not doesn't mean it wasn't there.  And

15  so I think that that presents a challenge here in coming up

16  and -- in accepting Professor Fagen's methodology.

17             THE COURT:  Figure 13 of the Fagen report somewhat

18  troubling chart which seems to show that high crime area is the

19  basis for the stop in all areas regarding how high the crime

20  really is in that area.  So it's being used or checked at the

21  same rate across all the various areas.

22             MS. GROSSMAN:  It's a very good point and let me

23  address that.  What Professor Fagen assumes is the way that

24  crime is addressed to the department and how high crime area is

25  used.  There can be a low precinct crime, a low crime rate but

C38AAFLOC                    Hearing

1      there can be hot spots and high crime areas within.  But

2      Professor Fagen's analysis is are not looking at those hot

3      spots.  He is looking at data that's precinct wide.

4                THE COURT:  That's right.

5                MS. GROSSMAN:  So his analysis and his odd methods

6      don't take into account the spikes in crime and what we're

7      talking about here.  It hides it and masks it and that's a real

8      problem when the reality of policing you can look at it --

9                THE COURT:  I think you use precincts when you want to

10     and don't use precincts when you don't want to.  The fact is

11     that there is an overall crime rate in these various areas and

12     it just definitely is lower in some areas an higher in others.

13     Essentially it's the same rate in all five of these divisions.

14     It tells me something about the officers' use of the phrase

15     "high crim rate" is a safe bet to put on the court.  I don't

16     think this form is perfect but it's the only data we have.

17               MS. GROSSMAN:  There actually is no box on the side

18     two.

19               THE COURT:  I realize that.  It has areas.  It has

20     high incidents of reported offense of type under circumstances

21     but I suspect the officer in the field translates that to high

22     crime rate because I don't think he could probably know.

23               MS. GROSSMAN:  That is an assumption.

24               THE COURT:  On my part?  We've just proved it with

25     David Floyd.  I am saying that you can't expect the person on

C38AAFLOC                         Hearing

```
 1    the beat to know what's the burglary rate or the pickpocket
 2    rate or one the gun rate or whatever of which I now stopped
 3    this person.  They know in their precinct where there may be a
 4    high crime area but they can't know all crimes on all corners.
 5          MS. GROSSMAN:  You've just proven my point, your
 6    Honor.  Using David Floyd as an example, just because there
 7    might be three block radius and maybe not does not mean that
 8    ten blocks away --
 9          THE COURT:  Then you are up to precinct-wide data.
10          MS. GROSSMAN:  No.
11          THE COURT:  It's much larger than the exact area of
12    the crime under investigation.  So I am sorry but the side two
13    box that says area has high incident of reported type under
14    investigation is translates to high crime rate.
15          MS. GROSSMAN:  Well, that's something that's implicit
16    assumption built into is, that's very weighty and it's very
17    complicated and to put that to the jury that's going to be very
18    confusing.  I don't know how you could ever put that in a jury
19    charge and the concerns of --
20          THE COURT:  I don't know what you mean by putting it
21    in a jury charge.  And the exact words are what they are.  It
22    will be either be checked off or not.  I am missing the point.
23          MS. GROSSMAN:  You are even suggesting that --
24          THE COURT:  Your real point is that even if the
25    officer didn't check it out.  If it's a known high crime area
```

C38AAFLOC                          Hearing

1    it should count.

2             MS. GROSSMAN:  That's one of my points.

3             THE COURT:  That's problematic because you get into

4    defining what you think is the high crime area, the whole

5    precinct, the hot spot, is it the corner type of crime?  We

6    want to be as objective as possible but what the boxes allow

7    you to do is to stay objective.  Once you start with the areas

8    where you can write in something it becomes less objective.

9    Now you have to interpret what somebody wrote.  So somebody

10   puts, maybe they'll put the Soundview section of the Bronx.

11   Maybe they'll put a street corner.  I don't know what they'll

12   put exactly.  Maybe they'll just put the borough.  That's why I

13   leave it to the objective boxes that the officer actually

14   picked.  Oh, well.

15            MS. GROSSMAN:  Your Honor, just to make clear

16   Professor Fagen doesn't even use -- he uses last month's data.

17            THE COURT:  What does that mean?

18            MS. GROSSMAN:  It means he's making a comparison, he

19   is not using -- when the stop happens he is -- his analysis

20   looks to and relies upon old data from the previous month that

21   isn't necessarily correlated --

22            THE COURT:  I don't know what you are talking about.

23   I thought I'm talking about his coding of the UF-250.

24            MS. GROSSMAN:  We are, but it's related because you

25   are accepting the notion that a high crime area is, that there

C38AAFLOC                    Hearing

1    is no high crime area in the -- I am sorry.  Let me think that

2    through a little bit more and I'll get back to that.

3              THE COURT:  Okay.  One of the tacks is, certainly, he

4    doesn't consider the fill in the bank parts of the form such as

5    the location.  That's one of the criticisms.

6              MS. GROSSMAN:  Yes.

7              THE COURT:  What else does he not consider besides the

8    location, the address/intersection or cross streets?

9              MS. GROSSMAN:  Well, in addition as we've also set out

10   in our papers given Professor Fagen's scheme, if a box that's

11   checked "other" on side one with no other box checked on side

12   one but it has a box checked on side two he has categorized

13   that as an indeterminate, I believe.

14             THE COURT:  That's correct.  That's my notes too.  Any

15   time side one is checked only with the box "other" doesn't

16   matter what's on the second side.  He considers it

17   indeterminate.

18             MS. GROSSMAN:  So I know that I don't know that

19   anyone's done any study of narratives but Professor Fagen did

20   not consider the narratives that would have populated the field

21   "other" to really get a sense of --

22             THE COURT:  What field are you talking about?

23             MS. GROSSMAN:  Look on side one and then look down six

24   boxes.  It says other reasonable suspicion of criminal activity

25   specified, the last box on the left side.

C38AAFLOC                              Hearing

1                THE COURT:  Yes.

2                MS. GROSSMAN:  Are there reasonable conditions,

3      criminal activity specified.  Professor Fagen did not --

4                THE COURT:  Oh, well, that was the one I was really

5      asking you when I say do we know how many have the narrative,

6      you really meant there when it says "specified".  I have no

7      idea.  Maybe somebody knows how many of these did have a

8      handwritten explanation of the other.  My guess is very few but

9      I don't know that.

10               MS. GROSSMAN:  It could be.  I don't know but I do

11     know that there are other areas in the form, there are other

12     locations in the form that Professor Fagen did not include in

13     his classification scheme.

14               THE COURT:  Like?

15               MS. GROSSMAN:  Look at "other".  Let's go down to

16     "other", "scars", "tattoos", etc.,.

17               THE COURT:  I got it.

18               MS. GROSSMAN:  And other scars.  I guess my point is

19     that you can look through this entire form.  There are many

20     fields.

21               THE COURT:  I know but age, height, weight is after

22     the stop.  That could not be the basis of reasonable condition.

23     That's what you fill in after you stop the person.

24               MS. GROSSMAN:  I guess my point is that all the

25     information tell you something.

C38AAFLOC                    Hearing

1        THE COURT:  No, they don't.  That's precisely what I

2   am disagreeing with.  I am saying filling in a person's age,

3   height and weight is after the fact.

4        MS. GROSSMAN:  I am not talking --

5        THE COURT:  I know but there are on the forms.  There

6   are other areas on the form that have nothing to do with

7   reasonable suspicion.  Was suspect arrested?  Even that

8   although you will talk about that later in a different context

9   one of these is a suspicion for the stops, so many of the

10  people, many of the lines on this form don't relate to

11  reasonable suspicion.

12       MS. GROSSMAN:  Your Honor, with all due respect, I

13  think that's taking a very limited view of the form.

14       THE COURT:  Really?  Now, you are usually a very good

15  advocate.  I am sure you don't mean that.  Tell me how in the

16  name of person stopped has to do with reasonable suspicion.

17       MS. GROSSMAN:  Not the name.

18       THE COURT:  So do I have to put you through on every

19  one of those?  You know that many of those boxes don't relate

20  to reasonable suspicion.

21       MS. GROSSMAN:  Let's look to side two.

22       THE COURT:  Let's stay with side one.  That's there

23  after the fact.  You've got to concede that you don't care

24  about hair, eyes and build.  That's afterwards.

25       MS. GROSSMAN:  Physical force used.

C38AAFLOC                              Hearing

1          THE COURT:  Okay.  I am happy to talk about the ones

2     that you want to talk about but let's just be real about the

3     ones that don't count.  If physical force was used indicate

4     type.  I don't think you mean that one either.  Handcuffing

5     suspect?  That's after the stop.

6          MS. GROSSMAN:  Well, I think we have a fundamental

7     difference of opinion about what the form means.  And if you

8     are going to take -- if your understanding of form is that the

9     only --

10         THE COURT:  I didn't say that.  I just said point to

11    me what you think goes to reasonable suspicion.  I haven't

12    picked anything.  I am asking you the questions.  You help me.

13    What do you think on this form goes to reasonable suspicion

14    other than the question, What were the circumstances which led

15    to the stop?

16         MS. GROSSMAN:  Your Honor, how about a trial that we

17    had just last week with you, when we had an individual who was

18    very upset and started kicking the car and the officer exited

19    the car and he goes to try to remove her off the corner and in

20    the middle of that attempt there's physical force used to

21    remove her and she kicks him and that is part of the basis also

22    for arresting for assault.  And so --

23         THE COURT:  But we're not having an arrest case here.

24    We're having a stop, question, frisk case.  Let's stay with

25    that.

C38AAFLOC                          Hearing

```
 1              MS. GROSSMAN:  There's so many fluid situations in an
 2       encounter that it is very hard to be so precise.
 3              THE COURT:  I know but I have a stop, question and
 4       frisk case.  That was a false arrest case.  Well, tried, I
 5       might add.  So, but here we are on stop, question and frisk
 6       case, so let's stay with that.
 7              MS. GROSSMAN:  Well, time of day.  Time of day could
 8       also relate to the patterns.  And it all matches with the
 9       information.  You have to look at a lot of the information.
10       It's time of day, the offense charged that could give insight
11       into the suspicion of suspicious bulge.
12              THE COURT:  Say that one again slowly.
13              MS. GROSSMAN:  Criminal possession of a weapon.  If
14       you have a particular offense charged which is information
15       that's handwritten onto the form, misdemeanor suspected.
16              THE COURT:  Right.  And if the person were to write
17       down possession of a weapon, what do you think that would go
18       to?
19              MS. GROSSMAN:  Well, it's clearly going into what he
20       thinks he is seeing.
21              THE COURT:  True.  But that's covered by the ten
22       boxes, there is know doubt about it.  Carrying objects in plain
23       view used in commission of crime.
24              MS. GROSSMAN:  We're backing into a purpose of if the
25       form that was not there.  That's not what the purpose of the
```

C38AAFLOC                        Hearing

1    form was for.  It's to true try to put information into the

2    form.  It's not -- the purpose of the form isn't to make, to

3    look at just one part of the form and say, I can't look at the

4    whole.

5              THE COURT:  I agree with you.  I just want to know

6    what other portions you think should have been studied in this

7    analysis and that go to the topic of reasonable suspicion and

8    you've pointed out one at the moment, the time of day.  Okay,

9    that is one.  Then you said which felony but exactly the

10   example you gave is covered by the boxes clear.  You said if

11   the person's arrested for possession of a weapon or for

12   suspicion of possession of weapon then the officer couldn't

13   help but check carrying objects in plain view, or suspicious

14   bulge so I am still trying to look for the other parts that you

15   think he should have considered and didn't now the biggest one

16   you have is location.  I guess you still feel very strongly

17   that when a person writes an address/intersection or cross

18   street of stop that is really important to analyze because it

19   would have been able to be correlated with data.

20             MS. GROSSMAN:  Let me make another point.  On side two

21   and, again, this wasn't part of Professor Fagen's report.  We

22   didn't respond to it in that way.  And we can certainly look

23   back and give more thought about what the other boxes are to

24   respond to your questions sufficiently but just looking quickly

25   at the form's side two.  Was person frisked?

C38AAFLOC                          Hearing

```
 1            THE COURT:  Okay.

 2            MS. GROSSMAN:  I am going to take you all the way over

 3    the right column at very top and you see the first box on the

 4    right column says "refusal to comply".  Let's go down to two,

 5    to suspicious bulge object/(describe).  Do you see that

 6    suspicious bulge object it's the last box on the right?

 7            THE COURT:  Yes.

 8            MS. GROSSMAN:  And it says "describe".  So let's talk

 9    about the reality of filling out this form.  Let's not only

10    think, did you only check off the box on the front?  So let's

11    suppose there is a suspicion of criminal possession of a weapon

12    or there's some consideration that there is a bulge and that

13    was the basis for the stop.  But, perhaps, the officer instead

14    of putting the description on the front of the form put it on

15    the back of the form.  It's very hard to be so rigid about

16    where you put information and I think from the officer's

17    perspective, the key about this form is transparency.  Just

18    give the information and if it's not perfect, that's okay.  As

19    long as the information is there as long as you document the

20    stop someone can come back to you.

21            THE COURT:  I agree with the example you just gave is

22    there is a box called "was the person frisked".

23            MS. GROSSMAN:  But you are limiting that to was person

24    frisked.  What could very well have happened in the real world

25    that the officer didn't put the bulge that he thought he saw in
```

C38AAFLOC                          Hearing

1    the front of the form but instead put it in that portion.  It's

2    just an imperfect system.

3              THE COURT:  It's an imperfect world but it's not

4    unlikely that the officer would put it in the question, Was the

5    person frisked.

6              MS. GROSSMAN:  Your Honor, what causes an office tower

7    want to frisk someone when he sees a suspicious bulge?

8              THE COURT:  I'm only saying he's got that choice on

9    page one in a question that's not limited to frisk.  It says

10   very clearly what were the circumstances which led to the stop?

11   On the side two it says, Was the person frisked, yes or no?  If

12   "yes", must check at least one box.  That's when the person

13   would check "suspicion bulge" there.

14             MS. GROSSMAN:  Well, "must check at least one box".

15             THE COURT:  Yes.  If "yes" there may not have been a

16   frisk.  We got "stop and frisk".  The front talks about what

17   are the basis for the stop.  This question is already the next

18   step.  Was the person frisked?  Yes.  If "yes", check a box

19   please.  Don't check a box if the person wasn't frisked.

20             MS. GROSSMAN:  I don't think that that reflects the

21   reality of what happens on the street.

22             THE COURT:  These people trained in using UF-250s.

23   They are not that hard.  I hope our police officers can read

24   this.  They're trained to read a UF-250.  They're trained to

25   fill it out.

1          MS. GROSSMAN:  I think the form cannot possibly

2    capture every single scenario.  It's too small a form.  If your

3    Honor is suggesting that in the future we have to maintain

4    documents like this and then we are going to be subjected to

5    these kinds of cases where we can't even defend then maybe we

6    should just put ten page forms together.

7          THE COURT:  Don't create a strawman and then knock it

8    down.  I'm not saying what you should do at all, what the

9    police department should do.  This is not a case where I'm

10   setting a rule.  I'm only talking about the data that has been

11   collected.  Police department designed this form, I didn't.

12   The police department trains people in using this form.  I am

13   sure that they get a lesson on how to fill out UF-250 and then

14   they fill out many of them over the course of their career.  I

15   am just trying to read it in a logical way.

16          To say that it's not logical that they can read the

17   was person frisked, I'm not being in reality and in touch with

18   the streets, the person is trained.  The front says, why did

19   you stop them?  And the first page says, Was the person

20   frisked?  No.  Then they don't check any more boxes.

21          MS. GROSSMAN:  I still have a problem with that one

22   and I don't like to belabor it.  We have very limited time.

23          THE COURT:  Way too limited.  Well, we had some

24   scheduling problems but --

25          MS. GROSSMAN:  But when you think about the -- what

C38AAFLOC                      Hearing

1   were the circumstances which led to the stop?  And then going

2   on to side two, Was person frisked?  Those two are not mutually

3   exclusive.  "Exclusive" meaning that they -- you can check off

4   "suspect".  You can let me just look at these "suspicious bulge

5   object" described.

6            THE COURT:  But you wouldn't if there was no frisk is

7   all I am saying.  I take your point if there was a frisk the

8   person could check that off.  And if Professor Fagen didn't

9   bother to look at that box he may have lost some data.  I

10  understand but still that's only supposed to apply as a frisk.

11           MS. GROSSMAN:  Well, I think we just -- I mean the

12  same -- I take the same position with a lot of other

13  information.  I mean, frankly, the check off boxes exist

14  throughout the form and Professor Fagen didn't even consider

15  those in the context of reasonable articulable suspicion.  He

16  didn't include the handwritten entries and we understand why.

17  It's just that the form is just unwieldy and it doesn't

18  sound --

19           THE COURT:  If the form is unwieldy that, certainly,

20  isn't the professor's problem.  The form is the City's form.

21  The City designed the form.  The City uses the form and we've

22  already said this is the only data we have for 2.8 million

23  stops.  I think the plaintiffs would argue we're not thrilled

24  with the data but this is all that there is.  We didn't design

25  this thing.

C38AAFLOC                         Hearing

1          MS. GROSSMAN:  But you can't really force a

2     methodology that doesn't work with data that just doesn't get

3     you to the place that you want to go.  Even if it's the best

4     available for Professor Fagen --

5          THE COURT:  No.  No. that's the best for anybody

6     studying this.  He didn't choose it over another.  Look, I

7     started this whole conversation saying what alternative did we

8     have for data?  The answer is no alternative.  This is the

9     data.  Then he works with the data and we have to respect and

10    listen to all your attacks on the way he's worked with the

11    data.  But not his choice of data, not the design of the form,

12    those aren't his problems.

13         One problem you've point out is he chose not to pay

14    attention to certain parts of the form which you think go to

15    reasonable articulable suspicion.  You've identified a couple,

16    not all the ones you've tried to but the address is one you've

17    mentioned and I think that's about it.

18         MS. GROSSMAN:  "Other" on the front of the form.

19         THE COURT:  Where it says "specified" but my problem

20    with that one is I have no idea how many people specify

21    anything.  I suspect it's long but I do know that.

22         MS. GROSSMAN:  Is that the basis for an expert report

23    to come in?

24         THE COURT:  No.  No.  But if we were to learn that

25    only two percent of these forms specified anything under

C38AAFLOC                    Hearing

1    "other" then it's not a material error.  I'd like to know how

2    many wrote something under the word "other"?  That I would like

3    to know.  I don't know what it would take to go back and figure

4    out.

5            MS. GROSSMAN:  I am not saying that looking at one,

6    it's not just about one piece.  It's collective and so it adds

7    up but I understand your point, your Honor.

8            Then again what other contraband was found?  Describe

9    the contraband and location.  Demeanor of person after being

10   stopped.  Remarks --

11           THE COURT:  That doesn't go to the reasonable

12   articulable suspicion.  That's after the stop.  Why do you

13   bring that up?  That's after the stop.

14           MS. GROSSMAN:  Again, I agree with you.  It is after

15   the stop.

16           THE COURT:  So who cares?  It can't relate to

17   reasonable articulable suspicion.  The officer if he was

18   sitting here has to tell me what he noticed before the stop so

19   it doesn't matter.

20           MS. GROSSMAN:  Let me go then to --

21           THE COURT:  It doesn't matter what contraband was

22   found after that.  If you think it doesn't, that's very

23   interesting because the arrest rate is very low.  The finding

24   of actual contraband is very low.  Apparently, randomized stops

25   do better than all of this which is quite interesting in terms

C38AAFLOC                         Hearing

1    of stopping millions of people for a very low heel but you

2    didn't want to go there.  You should say we shouldn't be

3    looking at hit rate.  Yet, you want me to look at was

4    contraband found.

5              MS. GROSSMAN:  That isn't, actually, what I meant.

6              THE COURT:  That's how it came out.  You want to know

7    was contraband found.  In other words, did we have a hit.  And

8    yet another context you argued, judge, don't look at the hit

9    rate which is very low.  It's five percent or six percent

10   better on randomized stop.

11             MS. GROSSMAN:  Let's go to the additional

12   circumstances factor, check all that apply.  Clearly, you would

13   agree that that all goes to additional circumstances really to

14   the stop.  And Professor Fagen, actually, didn't even do the

15   legal analysis regarding these boxes to see would those in

16   combination with one another add up to reasonable articulable

17   suspicion.

18             THE COURT:  If nothings on side one.

19             MS. GROSSMAN:  Right.  And if "other" which is

20   represents hundreds of thousands of stops indeterminate

21   category, if there is an "other" checked off in the front --

22             THE COURT:  I know.

23             MS. GROSSMAN:  And then on the back he did not -- the

24   boxes could in combination add up to reasonable articulable

25   suspicion.

C38AAFLOC                          Hearing

1          THE COURT:  I agree.  That's one of the stronger facts

2     which --

3          MS. GROSSMAN:  That's pretty much what is left in the

4     indeterminate.

5          THE COURT:  I need to talk to plaintiff's lawyers

6     about that.  That's an attack I understand.

7          MS. GROSSMAN:  Well, then I am sorry for wasting your

8     time.  I should have gone right there.  I apologize.

9          THE COURT:  Is there any our points that you do want

10    to make about the methodology and working with the UF-250 data?

11         MS. GROSSMAN:  Just give me a second.

12         THE COURT:  Sure.

13         MS. GROSSMAN:  As to classification I think that in

14    addition to what's in our papers those are pretty much the

15    arguments that we raise --

16         THE COURT:  You had said on side one at the time of

17    the stop would be important but it's actually one of the

18    additional circumstances on page two.  It does say "time of

19    day", "day of week", "season", "corresponding to reports",

20    "criminal activities", one of the box one could check in

21    additional circumstances.  So, actually, he did consider time

22    of stop.  Not by the narrative entry under page one, "time of

23    stop" but on the box that says "time of day".  It is there.

24    It's the third box.

25         MS. GROSSMAN:  And that's only if it was checked.

C38AAFLOC                    Hearing

1           THE COURT:  Correct.  I understand.  Okay.  Did you

2     say there's more right now?

3           MS. GROSSMAN:  On the classification other than what's

4     in our paper and if you have any other questions that you would

5     like me to address I would be happy to do that.  On the

6     regression I know you understand the issue with the regression

7     but I would just like to point out that when you look at some

8     of the case law in employment discrimination cases and you look

9     I think it's a New Jersey case regarding Driving While Black

10    case involving the state troopers, it was very important in

11    look at the regression and the reliability of the regression to

12    look at the benchmark and offending behavior identifying those

13    who are engaged in offending behavior is really critical.  So I

14    would just -- I didn't a chance given the space constraints to

15    fully develop those arguments but I know that you could look at

16    the cases and when you've considered the employment

17    discrimination cases, for hiring case, for example, you don't

18    look to you -- look to the qualified applicants to determine

19    whether there's a discrimination in the hiring practices.  You

20    don't look to the population because not everyone in the

21    population is eligible.

22           THE COURT:  But what I don't understand about that

23    argument is the ability to identify the race of those who one

24    suspects of having committed the crime.  Sometimes we have race

25    identification and sometimes we don't.

C38AAFLOC                          Hearing

1              MS. GROSSMAN:  Yes.

2              THE COURT:  How do we extrapolate from maybe the 50 or

3     60 percent maybe we have accurate race data and the 40 percent

4     that we don't?

5              MS. GROSSMAN:  Well, your Honor, I think that there is

6     some extrapolation that's done in many statistical analyses.

7              THE COURT:  Given the source of the information on the

8     cases where we do have race data and the kinds of crimes where

9     we don't have race data, I don't know that that extrapolation

10    would be fair.

11             MS. GROSSMAN:  Well, when you -- let's look at there's

12    some high crime precincts in some of our submissions that we

13    provided to you where for total crimes the suspect descriptions

14    are known at a higher rate than in others.  And for all crimes

15    the rate we know 62 percent of the suspects.  And remember for

16    all crime remember also there are categories of crime.

17             THE COURT:  That's exactly my point.

18             MS. GROSSMAN:  The property crime is I believe and I

19    could be wrong.  I might not be accurate but I believe that the

20    property crime has lower -- there are lower suspect

21    descriptions.  You know less of the suspects and they're more

22    unknown.  But it doesn't mean that there's no reason to believe

23    that the proportion of stops based on the information we know

24    about the crime that's being committed and the demographics of

25    whose committing the crime, there is no reason to think there

C38AAFLOC                    Hearing

1  is no evidence to suggest that the data wouldn't match.  It

2  wouldn't be the same proposition.

3          THE COURT:  I wonder if we have the burden of proof on

4  that if you think you can extrapolate from the 62 percent where

5  you have race information to the 38 percent where you don't, I

6  don't know what your scientific basis is for believing you can

7  just assume it would be the same ratio in the 38 percent

8  unknown.

9          MS. GROSSMAN:  Your Honor, to that point I would say

10  Professor Fagen himself has relied on that kind of data.  So

11  why is it okay in one context but not okay in other context?

12  Maybe the question wasn't asked.  Maybe it wasn't what the

13  plaintiff's attorneys wanted him to look it at.

14          THE COURT:  It was a question I was going to ask at

15  this hearing.  I noticed that he didn't in one of his articles,

16  maybe it was the Journal American -- Association he did at that

17  time.

18          MS. GROSSMAN:  And in the Attorney General's report

19  for Attorney General Spitzer at the time in 1999.

20          THE COURT:  That's a long time ago.  Maybe he learned

21  from his errors.  Maybe he doesn't think it's valid any longer.

22  That's a lot of years ago.  So I think if I am going to have

23  any time left for the plaintiffs --

24          MS. GROSSMAN:  Thank you for your attention.

25          THE COURT:  Mr. Charney.

C38AAFLOC                        Hearing

1          MR. CHARNEY:  Yes, your Honor.

2          THE COURT:  From the long conversation I've just had I
3     am trying to focus more on the methodology used to analyze the
4     2.8 million UF-250s and, of course, there are some problems.
5     First of all, as you know there was one error that got
6     corrected.  Secondly, there's a whole question of coding
7     extrapolating factors in cases whether he is the one who should
8     have made a determination.  And then very importantly is, I
9     guess, his decision not to consider any other spaces or boxes
10    on these forms and why didn't he.  Fourth, I've already asked
11    three questions.  Another one would be why if nothing was
12    checked on side one did he decide that that had to be an
13    indeterminate or, actually, I think an unjustified if there is
14    nothing on side one no matter what's on side two an in
15    determinate if the only check on side one is an "other".  So
16    these are big decisions that were made that affect the
17    statistics a lot.  And then to add to all the other questions,
18    how you can remember all those, I noticed you weren't taking
19    notes.

20          MR. CHARNEY:  That was earlier.

21          THE COURT:  We could have is read back slowly but on
22    top of that now -- I may have lost my train of thought.  Oh,
23    dear, there was one more.  Well, I think I've forgotten the,
24    one more was about choice.

25          MR. CHARNEY:  Well, I can try to take them in reverse

C38AAFLOC                        Hearing

1    order.

2            THE COURT:  Yeah, I just wish I remembered one more I

3    was going to ask you but it's gone.

4            MR. CHARNEY:  I think I can address very quickly the

5    question you had about --

6            THE COURT:  Oh, I know.  Does he have any idea of the

7    percentage of these forms that actually specified the other

8    reason on page one, side one.  Nobody seems to know whether

9    that's two percent of these forms or 20 percent of these forms.

10   I don't know.

11           MR. CHARNEY:  Okay.  On the point about the, how I

12   classified, the stops where the, only the circumstances on page

13   two were checked off in additional circumstances --

14           THE COURT:  He said that was unjustified.  Nothing on

15   side one.  It's always unjustified.

16           MR. CHARNEY:  Just to let you know that the universe

17   of stops that had that characteristic, in other words, were

18   only things on side two were checked off, I believe it was

19   something like 17,000.

20           THE COURT:  Oh, I remember that.

21           MR. CHARNEY:  20 and 30.  It's basically around one

22   percent of the 2.8 million stops that he looked at.  So I think

23   with respect to whether or not this would affect his analysis

24   either way --

25           THE COURT:  Hold on.  I know about 17,924 stops but I

C38AAFLOC                          Hearing

1  think he mischaracterized those 17,924.

2          MR. CHARNEY:  I thought those are the ones where only

3  additional circumstances were checked off.

4          THE COURT:  I think that's where there is at least one

5  side, one conditionally.  I'll tell you what I think.  The

6  17,000, at least one side one conditionally justified

7  circumstances as well as the side two additional circumstances

8  I thought there were only 17,000.

9          MR. CHARNEY:  If you had our Daubert opposition brief

10  page 7, the paragraph in the middle.

11          THE COURT:  Oh, well, it doesn't matter.  I see what

12  you mean.  I take it if there's nothing on side one and there's

13  only additional circumstances on side two you are saying

14  there's only 0.6 percent of that 17,924, so it wouldn't affect

15  the analysis.  That's one answer on that question.

16          MR. CHARNEY:  Now, you had the question about where

17  they check "other" on side one and then check an "additional

18  circumstance" on side two and that was labeled as, classified

19  as "indeterminate".

20          THE COURT:  Right.

21          MR. CHARNEY:  Professor Fagen can talk more about

22  this, about the other category, obviously, "other" on its face

23  without looking at anything else doesn't tell you anything you

24  actually have to look at other things.

25          THE COURT:  That's exactly the City's argument that it

 1    says specified how many of them wrote out.

 2              MR. CHARNEY:  He can tell you about that.  I am not

 3    going to try to --

 4              THE COURT:  Okay.

 5              MR. CHARNEY:  -- tell you how that works so we can

 6    have him answer that question.

 7              With respect to the question had you about some of

 8    these other sections of the form where other information is

 9    located, I think you already answered or you made one of my

10    points with respect to the time of day.  It's actually in the

11    form.  I mean with respect to the location I would say much of

12    the same thing.  And the reason being that, and I think we put

13    some of this in our Daubert submissions exhibit, police

14    officers are trained very extensively on how to fill out these

15    forms and the training manuals say very explicitly for that

16    section "check all boxes that apply".  So to argue that there

17    are hundreds of thousands or tens of thousands of officers who

18    don't check off "high crime area" when it is a high crime area

19    doesn't seem like a very reasonable assumption for the City to

20    make especially since they haven't provided any data suggesting

21    that's the case.

22              The argument about the impact zone --

23              THE COURT:  Let's not leave the location point yet.

24    If he had looked at that box and it correlated it had to

25    precinct data because it says addressed/intersection, if one

C38AAFLOC                          Hearing

1    had looked at every single address/intersection for 2.8 million

2    forms one would know according to Ms. Grossman whether it's a

3    high crime area because of the precinct it's in or the hot spot

4    it's in or whatever.

5             MR. CHARNEY:  I guess I would also refer back to the

6    analysis that you also pointed out and showed us the chart that

7    they used that stop factor in our view inaccurately often.  But

8    the other thing I wanted to say on this point of they may not

9    check off "high crime area" when they should, an argument is

10   actually inconsistent with how the police department itself

11   reviews the UF-250s because the head of their quality assurance

12   division when asked, how do you determine whether the stop was

13   based on reasonable suspicion, she said, well, I look at those

14   stop circumstance boxes the same ones that Professor Fagen

15   looked at.  So to now come back and say, well, he should have

16   looked at more.  That would have told you whether it was really

17   based on reasonable suspicion.  They are essentially

18   criticizing their own review process because their review

19   process focuses on looking at the stop circumstance boxes and

20   so he is doing what they do.  And that actually --

21             THE COURT:  Yeah, but that's not fair.  They are not

22   reporting to be an expert in the lawsuit trying to prove the

23   constitutionality of stops.  They are doing a rough audit of

24   their officers to be sure that there isn't a high incidence or

25   suspicionless stops.  They're satisfied.  They are allowed to

C38AAFLOC                          Hearing

1    put, design whatever tests they want.  They've designed a test

2    based solely on the boxes and if they're satisfied, enough

3    books are checked that stops aren't suspicionless they move on.

4    They have a different purpose in reviewing these forms than you

5    do.

6              MR. CHARNEY:  That's right.  But I guess two things I

7    would say in response to that would be the first being, I have

8    no idea how many stops where "high crime area" was not checked

9    off, in fact in the city occurred a high crime area.  I don't

10   know the answer to that question.  I don't think anyone's told

11   us the answer to that question.

12             The other thing I will say is that I think it's

13   important to keep in mind the purpose of Professor Fagen's

14   analysis and what he used that analysis, what opinion he formed

15   from that analysis.  And I think you pointed it out in your

16   summary judgment decision.  I think it's stated very clearly on

17   page 55 of his report which is the fact that there's this high

18   number of stops that it's really hard to -- you can't --

19   looking at the face of the form you can't establish reasonable

20   suspicion but this is really not a good way, it's not an

21   affective way to monitor and regulate the constitutionality of

22   officers --

23             THE COURT:  Are you saying you are not using his

24   opinion to prove to a jury that "X" percent of the stops were

25   unconstitutional?  I need to know that because that's what

C38AAFLOC                          Hearing

1    you've just articulated is a different argument.  When say what

2    you just articulated was this was not a good method to monitor

3    or give notice or track, that's a different argument.  Are you

4    also saying that it proves "X" percentage of unconstitutional

5    stops?

6           MR. CHARNEY:  We are using it to show a pattern and

7    practice of unconstitutional stops and we are using it to show

8    because we remember we have several theories of Monell

9    liability in this case, failure to monitor and supervise.

10          THE COURT:  I understand the second one.  If you are

11   saying this is not a good method, fails to talk about

12   monitoring and training, fine, but for the first purpose --

13          MR. CHARNEY:  We are using it to show a widespread

14   practice.

15          THE COURT:  So, for example, if he says there's

16   nothing on side one but four boxes are checked on side two or

17   three he calls that always unjustified.  Why?  Should I ask him

18   or you but why is that unjustified?

19          MR. CHARNEY:  You could probably ask both of us.  It

20   is our position and I know there's definitely some case law to

21   back this up that -- I'll address it two ways.  First of all,

22   again, I refer back to the fact that we're talking about a

23   small universe of stops.  We say it's 17,000.

24          THE COURT:  That's right.  That is the nothing on side

25   one.  Then I won't ask that again.  Then what's the size of the

C38AAFLOC                          Hearing

1   universe with side one as "other"?

2              MR. CHARNEY:  Well, a couple things that we need to

3   keep in mind about that one.  Remember they're allow to check

4   as many boxes as they want on side one.  So there are a

5   significant number of stops where "other" plus another side one

6   factor are checked off.  A lot of times other plus two other

7   side one factors checked off and there may be some checked off

8   on the second page.  So a lot of the stops where "others" were

9   checked --

10             THE COURT:  I was interested in only --

11             MR. CHARNEY:  "Other" by itself.  That I would have to

12  ask Professor Fagen.

13             THE COURT:  Okay.  You mean the numbers of those?

14             MR. CHARNEY:  Yes, the numbers were --

15             THE COURT:  Okay.

16             MR. CHARNEY:  And the, obviously, he has a lot to say

17  about the handwritten notes in his decision, not to look at

18  those which we submit are based on very sound methodological

19  principles.

20             THE COURT:  All right.  So maybe it's time to talk to

21  him but you had wanted to say one more thing about hot spots

22  or --

23             MR. CHARNEY:  Oh, sure.

24             THE COURT:  -- or impact zone.

25             MR. CHARNEY:  The only other thing maybe just for the

C38AAFLOC                     Hearing

1   record because I think your Honor already hit the nail on the

2   head and we, obviously, agree with what you said, but

3   Ms. Grossman claimed that with respect to that analysis about

4   their use of high crime area doesn't necessarily correlate with

5   the crime in the area.  In other words, they're using it in low

6   crime precincts.  They're using it in high crime.  Ms. Grossman

7   made the point, well, you have to look at smaller geographical

8   areas.  You have to look at little sections within a precinct.

9   He didn't do that.  That's actually false.  He did do that.  If

10  you look at his Daubert, the declaration he put in in

11  opposition to the Daubert motion in Paragraph 19, as well as

12  Exhibit C of that declaration, he does the same analysis at the

13  census track level as you recall from the day before the motion

14  is very, very small geographic area, usually a matter of city

15  blocks.  And he looked traffic and the crime rate and the use

16  of high crime area as justification for stops in that census

17  track and you can see the same pattern.

18          THE COURT:  But that's in the disparate treatment.

19          MR. CHARNEY:  No, that's actually another Fourth

20  Amendment opinion which I think, the last point I would like to

21  make it's also important to keep in mind that Professor Fagen

22  has offered several separate opinions as the Fourth Amendment.

23          THE COURT:  I notice a couple of thing them do not

24  depend on this coding.

25          MR. CHARNEY:  Your Honor is making my job easier.

C38AAFLOC                          Hearing

1          THE COURT:  Well, I noticed one.  Certainly, one that

2     stood out was the percent of all stops that resulted in arrest,

3     nothing to do with coding and the summons and however often

4     force is used more likely to be used against Blacks and

5     Hispanics and Whites nothing to do with the code.

6          MR. CHARNEY:  Also this high crime area analysis

7     because he is just tracking how often are they using it?  Are

8     they using it when the crime rate is higher or when it's low?

9     It's on a separate analysis and he uses that to opine that it's

10    a very questionable indicator of reasonable suspicion.

11         THE COURT:  I know and I was focusing on the coding

12    issues.

13         MR. CHARNEY:  Okay.

14         THE COURT:  The other only other one you should defend

15    maybe before I get a chance to start taking testimony is the

16    benchmark argument that Ms. Grossman ended with.

17         MR. CHARNEY:  Okay.  Well, I have a couple things we

18    can say about that.  I mean most of this is in our papers.  The

19    first, I think, obvious one that we made upfront was that

20    because you have so much missing race data in the crime suspect

21    data it really would be statistically unsound --

22         THE COURT:  Well, is the 62 percent accurate?  Is the

23    data that's allegedly -- race in 62 percent?

24         MR. CHARNEY:  But you have to extrapolate that to the

25    entire universe would create various --

C38AAFLOC                         Hearing

1          THE COURT:  I'm not asking you to extrapolate to the

2    60 to 38 unknown --

3          MR. CHARNEY:  That's the data we were given.  We can't

4    dispute it.

5          THE COURT:  So for this purpose you accept that for 62

6    percent of the crimes we do have race data?

7          MR. CHARNEY:  Yes.

8          THE COURT:  But what you say is we don't have race

9    data and the other 38 percent would be inappropriate to

10   extrapolate from the 62 to 38 and why is that?

11         MR. CHARNEY:  One being that we don't know what parts

12   of the City the 38 percent are in.  We don't know what types of

13   crimes the 38 percent apply to.  And the reason that's

14   important is because depending on the crime category the racial

15   demographics of a suspect differs greatly so there could be

16   serious selection by if you were going to extrapolate from the

17   62 to the hundred and the other piece of it is --

18         THE COURT:  But he did that.  He used that benchmark

19   in the past himself, right?

20         MR. CHARNEY:  Well, he used -- so what he did in his

21   other studies is he actually used arrest data.  He didn't have

22   access to the crime data.  And he will tell you that crime data

23   is superior when what you are trying to measure is the crime

24   rate in a particular locality.  And that was, actually, what he

25   was trying to do here because what he is analyzing is are the

C38AAFLOC                        Hearing

1   stop patterns the NYPD driven by, as they say, crime?  In other

2   words, because crime is higher here, we are going to go here?

3   Or is it the racial composition of these particular localities?

4   And that is the analysis he was doing.

5            So he looked at racial composition and crime rate in

6   different localities and tried to assess what influences crime

7   versus racial composition were having on the stop patterns.

8   That's the analysis he was doing.  And so he -- that's the

9   reason he chose that benchmark.  There is -- he has used it

10   many times before.  It's been Peer Reviewed.  It's been

11   published.  And to now suggest that it's so out of whack that a

12   jury can't even hear about it is taking it way too far

13            THE COURT:  All right.  What I would like to do now is

14   have a five minute recess and then have Professor Fagen take

15   the stand and answer some of the Court's questions and if

16   anybody else wants to ask a few questions, we're not going to

17   have hours and hours of another deposition but if the lawyers

18   want follow-up, that's fine.

19            MS. GROSSMAN:  Your Honor, I just want -- I don't

20   think the plaintiff addressed your question about the hundreds

21   of thousands indeterminate where there is an "other" checked

22   off on front with the AFs on the back and I just thought that

23   would be beneficial.  That's one of our arguments.

24            THE COURT:  Okay.  I think he said he was always

25   indeterminate if the only one checked on front side was

1    "other".

2              MS. GROSSMAN:  Right.  Now --

3              THE COURT:  Doesn't matter how many were checked off

4    on side two if the only thing on side one was "other" he always

5    said was indeterminate.

6              MS. GROSSMAN:  But I just didn't think plaintiffs

7    addressed the fact that the box is checked that supports

8    reasonable suspicion.

9              THE COURT:  That question is why did he code it that

10   way if the only one on side one is "other" he didn't care how

11   many were on side two it's all indeterminate?

12             MR. CHARNEY:  Cause we don't have any reason to

13   believe and, again, this is why he classified those based only

14   on the second page as "unjustified".  We don't have any reason

15   to believe that if you only checked off the ones on side two

16   that wouldn't constitute reasonable suspicion, so by adding

17   "other" to the mix, we don't know, maybe "other" gets you

18   there.

19             THE COURT:  So your argument really is that no matter

20   how many of these side twos you check off they can't alone

21   create reasonable suspicion.

22             MS. GROSSMAN:  Because the case law which the City, of

23   course, goes into in detail in its chart, none of those cases

24   where they claim that additional circumstances alone establish

25   reasonable suspicion, there was always something else.  There

C38AAFLOC                    Hearing

1    was also one of the page one factors, there was a suspicious

2    bulge, someone acting as a lookout.  It was never just this is

3    a high crime area by itself or this is a time of day where --

4              THE COURT:  But we are talking about multiple on side

5    two.  So if on side two you had a report from a victim and it's

6    a high crime area and it's at night and this were evasive

7    action, did you have all four of those which are all on side

8    two, why isn't that reasonable suspicion to stop somebody?

9              MR. CHARNEY:  I guess, again, I haven't seen any cases

10   where that particular fact pattern when you have a combination

11   of only side two factors.

12             THE COURT:  I disagree.  I think there are many such

13   cases.

14             MR. CHARNEY:  The other point again to go back to is

15   we're talking about 17,000.

16             THE COURT:  No.  17,000 was where --

17             MR. CHARNEY:  You are talking about "other" plus.

18             THE COURT:  Yes.  Plus a whole talking about other on

19   the side one and a whole combination on side two theoretically.

20             MR. CHARNEY:  I am not going to accept the defendant's

21   estimate that there are hundreds of thousands of stops where

22   you have "other" and "multi".

23             THE COURT:  Do we know or can we find out?

24             MS. GROSSMAN:  Your Honor, we can supply you with

25   those numbers.  We can't now but I can tell you from my

C38AAFLOC                        Hearing

1    preliminary look, they are hundreds, maybe 433,000.

2              THE COURT:  That sounds pretty specific.

3              MR. CHARNEY:  I guess to be clear, are we talking

4    about "other" plus one or more ACs or are we talking about

5    "other" and "multiple"?

6              THE COURT:  I don't know.  I'll find out.

7              MR. CHARNEY:  No.  So I take exception or I disagree

8    with the estimate that it's "other" and "multiple".  It may be

9    "other" and "one or more".

10             THE COURT:  Okay.  All right.  Let's take a break now

11   till five of four, about six minutes.

12             (Recess)

13             THE COURT:  So my additional question, Mr. Charney, is

14   this, when there is nothing on the front in a combination of

15   circumstances on side two, you said oh, it is so small it

16   wouldn't change the analysis.  It's 17,000.  It's 0.6 percent.

17   So I took that to mean so if you want to eliminate that or

18   whatever, we can live with it.  But once you do that you've got

19   a problem because then can't be worse off if you check "other".

20   So now the front has "other" and the back, the second side has

21   "multiple".  There's no point in telling me how small the

22   universe is that has "none" on the front and "multiple" on side

23   two because it's a slippery slope argument for you if you are

24   willing to say oh, we can live with that.  We'll recode.

25             MR. CHARNEY:  You need to be able to figure out how

C38AAFLOC                         Hearing

1    many have "other" on the front and "multiples" on the back.

2           THE COURT:  Because you can't treat it differently

3    than you would treat none on the front.  So the fact that such

4    a small universe of 17,000 which is only 0.6 percent, I think

5    you probably are willing to say, fine, recode it.  Do what you

6    want.  But you really can't because it has to be treated the

7    same as or worse than "other" on the front and "multiple" on

8    the back.

9           MR. CHARNEY:  So if I understand correctly you just

10   want to make sure you are now talking about stops where "other"

11   is checked on the front and then more than one additional --

12          THE COURT:  We will get to the "one" or "more than

13   one" but for the sake of argument let's say more than one.

14          MR. CHARNEY:  And I guess my response to that is that

15   I don't know if the answer to the question is how many stops

16   fall into that group and, again, if it is a very small number I

17   guess I would say --

18          THE COURT:  Same problem.  But if it's a very big

19   number and Ms. Grossman was talking about close to half a

20   million, now she may have been thinking when she said a half a

21   million, it was "other" on side one and only one other factor

22   on side two but it's more than one on side two, then it's a

23   combination of factors.

24          MS. GROSSMAN:  It was the one or more.

25          THE COURT:  That's what he was afraid of.  He would

C38AAFLOC                          Hearing

1   like you to separate the "one" and "more than one" because what

2   he is saying, his argument is no one factor on side two

3   standing alone has supported reasonable articulable suspicion

4   in the case law.  You are correct, when you have multiple

5   factors you showed them your case chart.  I don't think he

6   disagrees.  If you have multiple factors, some case law would

7   support reasonable suspicion.

8              With that, Mr. Fagen, can we ask you some questions?

9              MR. CHARNEY:  If you are going to be referring to the

10  binder --

11             THE COURT:  Sure.

12   JEFFREY FAGEN,

13       called as a witness by the Plaintiff,

14       having been duly sworn, testified as follows:

15  DIRECT EXAMINATION

16  BY THE COURT:

17  Q.  Professor Fagen, you've been present today throughout this

18  time we have had oral argument.  You have heard my comments and

19  questions.  You've heard the lawyers' arguments.  I do have

20  some questions for you.

21             Why did you decide that you would only look at the two

22  sections where the officer checks boxes, namely, the one that

23  says what circumstances were the circumstances which led to

24  stop on side one and additional circumstances/factors on side

25  two, why did you decide to only look at those two parts of the

C38AAFLOC                         Fagen - Direct

1    form?

2              THE WITNESS:  And which specific parts so, for

3    example, the question about the address or location of --

4              THE COURT:  I'm doing that yet.  I am saying why did

5    you decide to look only at those portions I described on side

6    one and two.  Why did you decide not to look at those things?

7              THE WITNESS:  We looked, the data that were most

8    consistently and completely available to us referred to those

9    two sections of the report.  Some of the information in, for

10   example, there was box for the location of the stop.  That

11   information was actually by the police department for some

12   years and by our staff for other years.  Geo-coded so that we

13   could locate the exact spot on the map where it took place.

14             So we did know the locations of the stops.  We used

15   the locations of the stops because in each of our analysis we

16   counted up the number of stops that took place in a particular

17   area, then we took into account characteristics of those areas.

18   In one analysis we did it by the precincts and then in we did

19   it by the census track.  So we did use the location information

20   because it was incorporated into that.

21             The other --

22             THE COURT:  But not on our analysis justified,

23   unjustified and indeterminate to make that determination you

24   used only the boxes in two areas, side one.  What were the

25   circumstances which led to the stop and side two, additional

C38AAFLOC                          Fagen - Direct

1       circumstances/factors.  You decided to consider any other

2       evidence on the UF-250 forms and I am asking you why.

3               THE WITNESS:  Okay.  There are detail codes available

4       for several of the categories that are checked off on side one.

5       For example, description of what -- I think there is a

6       description of what the bulge is and some other details about,

7       that relate to the box itself.  And set aside the question of

8       the other box for a second.  Those are very inconsistently and

9       often rarely completed.  So we decided it wasn't enough usable

10      information in those boxes to make a systematic analysis.

11      Again, our goal was to come up with something systematic and

12      reliable.  With respect to the "other" we actually did look at

13      those.

14              THE COURT:  You looked at what?

15              THE WITNESS:  The text stream that was associated with

16      CS "other", with the circumstances "other".  And it was filled

17      out quite often.  When the officer did check off "CS other" it

18      was on filled out.  However, the information that's available,

19      the notations that were written, weren't recorded in a way

20      where the information was useful to us.  So, for example, we

21      would note things, I guess, I'd use the word "gibberish".

22      There'd be a letter "X", a very high percentage or a number of

23      them where it said "NA", "not applicable" others that had

24      notations that we couldn't interpret like "XNE".  We had no

25      idea what that meant.  Others that said "hanging out in the

C38AAFLOC                    Fagen - Direct

1   hallway".  Others that said "trespass" which was a crime but

2   that didn't help us ascertain what the basis of suspicion was

3   for that stop, the conclusion about a crime.  Others said

4   "loitering" which was again a conclusion about a crime.  So we

5   were unable to identify information in a sufficient number of

6   cases using those boxes where we could come up with a

7   statistically reliable estimate that would add more information

8   than what we'd already had.

9           THE COURT:  But you said high percentage of officers

10  who checked "other" actually did specify something in writing?

11          THE WITNESS:  They did.  But what was specified was

12  not something that was usable to us in making a systematic

13  analysis ever that particular box to make some additional

14  conclusion about the nature of that information.

15          THE COURT:  Well, that answers the questions about the

16  "other" box and specifying in writing, what the other was.  But

17  let's go back to my initial question.  Why did you decide not

18  to consider any of the other boxes on the form other than the

19  two that we've talked about?

20          THE WITNESS:  Example, your Honor?

21          THE COURT:  All of them.  Do you have the form in

22  front of you?

23          MR. CHARNEY:  Your Honor, is asking a question that I

24  understand but he may --

25          THE COURT:  Don't rephrase this for me, Mr. Charney.

C38AAFLOC                         Fagen - Direct

1    I've been doing this a long time.  I am sure he gets it too but

2    I'm happy to rephrase it.  Do you have the form in front of you

3    now?

4            THE WITNESS:  Yes, I do.  Okay.

5            THE COURT:  All I am saying is, you made the decision

6    that your analysis of what is justified, unjustified,

7    indeterminate and is based solely on two portions of the form.

8    On side one what were the circumstances which led to stop?  On

9    side two additional circumstances/factors?  I am just asking

10   you a general matter why did you not consider any of the other

11   information on the form?  You can do it one by one or you can

12   do it collectively but you chose not to consider any of

13   remaining information on the form in your reasonable suspicion

14   analysis.  I am just asking you why.

15           THE WITNESS:  We can go section by section.  So

16   starting on side two, the information under "was person

17   frisked" that was not relevant to determining the basis for the

18   stop.  We have that information but we decided that it wasn't

19   helpful in deciding was there a reasonable and articulate

20   suspicion for the stop.  The same goes for "was person

21   searched".

22           We did use the box for "was weapon found".  Because I

23   think as your Honor noted, we looked at the number of cases

24   where a weapon was recovered and it was a very tiny fraction of

25   the stops, roughly, one weapon for every thousand stops.  So we

C38AAFLOC                         Fagen - Direct

1     did use that as one of the bases on which to conclude the form

2     was doing work that it was designed to do.

3              THE COURT:  The form?

4              THE WITNESS:  That the stops themselves were based on

5     accurately reasonable suspicion.  In other words, if reasonable

6     suspicion was being concluded in an accurate way, then we would

7     have guessed that there would have been a much higher number of

8     weapons recovery.

9              THE COURT:  Right.  Go ahead.

10             THE WITNESS:  "Was other contraband found"?  We did

11    the same with that.  We recorded the types of contraband found,

12    drugs.  And we were given information in the database about

13    whether drugs were recovered.  There was specific mentions of

14    contraband.  So we did use that again as another estimate about

15    whether reasonable suspicion was being applied in an accurate

16    way.

17             I think that takes care of the back of the form.

18             THE COURT:  So you did not consider, of course,

19    "demeanor of person after being stop" or "remarks made by

20    person after the stop".

21             THE WITNESS:  No.  The information there was very

22    spotty in the database.

23             THE COURT:  I don't know what precinct, serial number

24    and all that.

25             THE WITNESS:  We took into account precinct, the spec

C38AAFLOC                          Fagen - Direct

1    location of the stop in terms of -- We thought we did not

2    include height, weight, gender.

3              THE COURT:  Now you are going to side one?  Why don't

4    you start at the top.

5              THE WITNESS:  We didn't include the time of stop.  I

6    think there is some information where we looked at time of

7    stop.  It didn't seem to be, particularly, helpful to us.

8    "Period of observation", I think that's simply the length of

9    time that the officer was in the encounter.

10             THE COURT:  Did you consider it or not in assessing

11   reasonable suspicion?

12             THE WITNESS:  We did not consider that.

13             THE COURT:  Why?

14             THE WITNESS:  We didn't think that it mapped well on

15   to the case law.

16             We looked at the intersection.  We did not consider

17   whether the stop was done on the inside.

18             THE COURT:  When you said we looked at the

19   intersection, let me understand that.  When you concluded

20   justified, unjustified or indeterminate, I thought you did that

21   solely on the --

22             THE WITNESS:  I'm sorry.  You are right.

23             THE COURT:  You didn't consider the address for that

24   purpose?

25             THE WITNESS:  Correct.  We didn't use it, right.

1            THE COURT:  You didn't use inside/outside?

2            THE WITNESS:  No, that didn't --

3            THE COURT:  Right.  Or transit or housing?

4            THE WITNESS:  No.

5            THE COURT:  Or type location?

6            THE WITNESS:  No.

7            THE COURT:  How about the next box?

8            THE WITNESS:  We didn't use the crime suspected for

9    reasonable suspicion, nor did we use duration of the stop.  The

10   next set of boxes we did use.

11           THE COURT:  You did?

12           THE WITNESS:  What circumstances led to the stop.

13           THE COURT:  Oh, that of course.  Go ahead.

14           THE WITNESS:  We did not have the information on the

15   name of the person, their nickname, street address date of

16   birth, address.  We didn't know any identifying information

17   about the individual, so all of that was set aside.  We didn't

18   know the nature -- well, I think we, actually, did know the

19   nature of the identification that was provided.

20           THE COURT:  Where is that?

21           THE WITNESS:  Below "address" it says

22   "identification", "verbal", "photo ID", we did not use that.

23           THE COURT:  Oh, okay.  I see that.  Go ahead.

24           THE WITNESS:  We did not use that for the reasonable

25   suspicion analysis, nor did we use the person's gender, race,

C38AAFLOC                        Fagen - Direct

age, height, weight, hair color, eye color or build.  We did

not use information on scars and tattoos as basis for

reasonable suspicion.  I don't recall but I don't believe that

that's, actually, in the database other than one of the

notation boxes and that was, again, very rarely filled out.

        Whether the officer explained the reason for the stop

was not relevant to us for that particular analysis.

        Were other persons stopped, questioned or frisked, we

did not include that as a basis or reasonable suspicion.

        THE COURT:  Why not?

        THE WITNESS:  It didn't seem to be as we, again, as we

articulated in our memo about the cases that we read we didn't

see a group stop as being something that was relevant to case

law -- in case law.

        We did not use physical force.  Our interpretation of

the physical force box was physical force that was used by the

officer.

        THE COURT:  During the stop?

        THE WITNESS:  Yes.  So that was after the stop.

        THE COURT:  That would be true of the arrest and

summons and all that.

        THE WITNESS:  Correct.

        THE COURT:  So you've anticipated that question.  Now,

why did in coding this, why did you conclude that the only box

checked on side one was "other" and there were multiple boxes

C38AAFLOC                    Fagen - Direct

1    on side two that had to be coded as "indeterminate"?

2             THE WITNESS:  I have to go back and check that

3    particular number of cases.  I don't recall why we made that

4    determination.

5             THE COURT:  Who made that determination?

6             THE WITNESS:  We did.

7             THE COURT:  Who is "we"?

8             THE WITNESS:  Myself and my research assistant.

9             THE COURT:  Okay.

10            THE WITNESS:  We read the case law.  We did not

11   consider multiple additional circumstances.  Our reading was

12   that -- and this is sort of the general framework for the

13   analysis -- was what was on the front of the box was were the

14   basis for suspicion that led to the stop.  And the additional

15   circumstances were things that would qualify or condition that

16   initial factor.  We felt that the presence of -- well, I

17   actually don't know how many boxes.  And, again, as I said, I

18   have to go back and check how many boxes were checked off in

19   multiple ACs, we just don't know.  But I'll have to go back and

20   see.  It could be it was such a small number that we did not

21   consider it to be something that would move the dial measurably

22   in this analysis.

23            THE COURT:  You keep saying "we decided" or "we

24   determined".  Who are these research assistants?

25            THE WITNESS:  These were my second and third year law

C38AAFLOC                         Fagen - Direct

1   students.  I consulted on occasion members of the faculty, law

2   faculty.

3          THE COURT:  Right.  So, let's turn back to side one.

4   So in deciding whether to code a certain box as "justified" or

5   "conditionally justified", who made that decision and how was

6   it made?

7          THE WITNESS:  We read the case law.

8          THE COURT:  Well, when you are saying "we" did you

9   read --

10         THE DEFENDANT:  I read the case law together with my

11  research assistants and they made a recommendation and I

12  questioned them and we went back and we discussed each one of

13  the factors.  We updated the memo most recently in the fall of

14  2000 and I believe, 08.  Case law as of that time when we began

15  to work on this.

16         THE COURT:  What is your background or training that

17  allows you to read a legal decision and decide what the holding

18  is?

19         THE WITNESS:  Well, I have been teaching law for at

20  least the past, since 1998 and reading cases and looking at the

21  interpretation and applications of those cases and in a variety

22  of different areas of law.

23         THE COURT:  Have you taken courses in law?

24         THE WITNESS:  No, I have not.  But I am doing research

25  and reading extensively and deeply in law review articles, as

C38AAFLOC                           Fagen - Direct

1    well as case law and opinions, very active conversations with

2    my colleagues at law school who are --

3             THE COURT:  What is your educational background?

4             THE WITNESS:  I have a PhD in civil engineering.

5             THE COURT:  Are you a criminologist?

6             THE WITNESS:  Yes.  My research practice is in

7    criminology.

8             THE COURT:  Any training in criminology.

9             THE WITNESS:  My doctorate was in a special program in

10   urban systems SUNY Buffalo and I concentrated in that doctoral

11   program in criminal justice.

12            THE COURT:  Did you take courses in that?

13            THE WITNESS:  One or two, yes.

14            THE COURT:  At SUNY?

15            THE WITNESS:  During my training.

16            THE COURT:  Okay.

17            THE WITNESS:  I was on the faculty at Rutgers for

18   seven years and before that the faculty of John Jay College.

19            THE COURT:  Teaching what?

20            THE WITNESS:  Various courses in criminology and

21   research --

22            THE COURT:  All right.  Let's turn to question of the

23   benchmark.  You heard the discussion here about benchmarking.

24   And why is it first of all, that you don't think you can

25   extrapolate from the 62 percent of suspects where race is known

C38AAFLOC                         Fagen - Direct

1      to the 38 percent where race is not known and just project on

2      the 62 percent where race is known happened to be 60 percent of

3      minority and 40 percent white, why can't you extrapolate that

4      to the other 38 percent?

5                THE WITNESS:  First of all, your Honor, the data that

6      we were given to do the analysis for this report, the figure

7      was not 62 percent.  It was actually closer to 50 percent.

8                THE COURT:  Where did I get the 62 and 38?  Asking the

9      lawyers.

10               MR. CHARNEY:  They subsequently this past fall

11     produced new investigations of the 2009 and 2010 crime date but

12     that was more than a year after he did his expert.

13               THE COURT:  So the current number is 62 and 38 but it

14     wasn't then?

15               MR. CHARNEY:  Only for those two years.  And he

16     actually looked at, I believe, five or six years of data going

17     back from '04 to '09.

18               THE COURT:  So at that time what was the breakdown

19     between known and who remembers?

20               THE WITNESS:  It was in the low 50s.

21               THE COURT:  Why can't you extrapolate from one to the

22     other?

23               THE WITNESS:  The method -- that would require an

24     analysis that called in is statistics and imputation analysis.

25     One would have to impute to missing observations, information

C38AAFLOC                          Fagen - Direct

1    that's known from observations where it's not missing.  There's

2    a great deal of disagreement and fighting among statisticians

3    about the best way to do such imputations, even the context in

4    which such imputations are actually done.

5           There's an area of social science which is very

6    commonly used database about homicides across the United

7    States.  And the best minds in that field when they work with

8    that data set conclude that one can make imputations at very

9    large units of analysis, generally, at the state level.  But to

10   make imputations of units of analysis that are smaller than

11   that would be a big mistake, meaning counties or city or

12   smaller areas than that.  I offer that just as an example of

13   disagreements about imputations, so that's one reason.

14          Second, and I think your Honor articulated the

15   question of selection bias really well.  I think that we would

16   be taking a risk by making assumptions about cases when we only

17   have information in half or slightly more than half about what

18   was going on in the other half of the cases where we had no

19   information.  The risk of error there would bias what we

20   concluded if we were to make that kind of large scale

21   application to missing data.

22          It's kind of like a keys and lamppost problem.  If we

23   were to make, we're looking for keys and we only look under the

24   lamppost, there's a vast area beyond the lamppost where they

25   are other things going on out there that we simply don't know

1    about.

2              THE COURT:  All right.  That answers the question of

3    why you didn't extrapolate from the known data to the unknown.

4    But why didn't you want to choose to consider race as a factor

5    in terms of the known crime rate suspects when you tried to

6    analyze the disparate impact allegedly of the stops in one

7    community over another?  Why didn't you think you had to

8    compare the suspect, in other words, those who were committing

9    the crime?

10             THE WITNESS:  Couple of reasons.  One was, again, we

11   did not want to make assumptions based on -- we didn't want to

12   do a test of the disparate impact or disparate treatment of

13   suspects or individuals based on information which was

14   incomplete about the universe of people in that the racial

15   distribution of people in that neighborhood.

16             THE COURT:  So you're saying the answer to the second

17   question is pretty much the same as the first because the data

18   is incomplete and you can't extrapolate to the whole it's not

19   safe to use that benchmark.

20             THE WITNESS:  We believe that the bias that would be

21   produced would make the analysis -- where I to submit such an

22   analysis to Peer Review Journal -- I have two peer reviews --

23   it would be rejected out of hand.

24             THE COURT:  What was the benchmark you used?

25             THE WITNESS:  We used benchmark, two simultaneously

1   one was total amount of crime in the area.  The first analysis

2   was done by the precinct.  The second by the census track.  And

3   we also used the population that was in that area at that time.

4           THE COURT:  By race?

5           THE WITNESS:  Yes.  The total population and the

6   racial distribution within that area.  We thought that those

7   two benchmarks in tandem gave complete information about the

8   crime.

9           THE COURT:  I believe you questioned the accuracy of

10  the information that police officers report on the record on

11  the UF-250.  To some extent they now are checking more boxes to

12  play it safe.  They are checking furtive movements, high crime,

13  they're easy to check and hard to investigate, so to speak.  So

14  if you have your own doubts about the accuracy of the data that

15  how can it support any opinion if the data itself is bad?

16          THE WITNESS:  Well, we take the information as it's

17  given to us.  We take the conditions as it's given and make

18  assumptions about it and --

19          THE COURT:  But do you think the data is inaccurate to

20  begin with, how can we draw any conclusions from bad data?

21          THE WITNESS:  I think you can make conclusions about

22  the data generating process based on what the data itself

23  looked like.  So, for example, as you noted, your Honor, if we

24  see a very high rate of a particular box being checked off that

25  says high crime area regardless of the crime rate in the area

C38AAFLOC                          Fagen - Direct

1    or furtive movements which is a very broad subjective category

2    of perception or a sharp increase in a particular box being

3    checked off, violent crime action is indicative of violent

4    crime, we see this as something that comments about the data

5    generating process itself and that was a bases for my criticism

6    of the reliability of the data for using it as an accurate way

7    to regulate --

8              THE COURT:  Right.  And I understand that.  But, my

9    last question was, Mr. Charney, what are you using this expert

10   for?  And he said two things.  One is that the City is not

11   sufficiently monitoring and training and all that.  That's one.

12   But for the other purpose for trying to analyze the

13   constitutionality or unconstitutionality of the stops as a

14   pattern, if the data is bad, if you believe on the one hand

15   that police officers are just willy-nilly are checking boxes or

16   checking boxes that they know don't relate or will get them by

17   on an audit, if the data is bad, how can it support an opinion

18   as to whether a stop is justified or not justified if you

19   yourself believe the data is inaccurate?

20             THE WITNESS:  It's a slightly convocated answer.

21             THE COURT:  Well, I am here to hear.

22             THE WITNESS:  We take the data.  We assume that the

23   data are giving us information that the police are putting

24   forward as their justification for the stops.  Our comment has

25   to -- we caveat and we say if this is right, if the police are

C38AAFLOC                      Fagen - Direct

1    articulating the date that is actually the basis for the stop,

2    then we analyze the data based on what they say to us.  Our

3    conclusion afterwards says, well, we have some reasons to

4    believe that some of the indicia that they marked off for a

5    reasonable suspicion seem to be used in a rather undisciplined

6    way.

7              So I mean, perhaps, I am not answering the question

8    correctly.  I understand that.  But we can only analyze what'

9    put before us in terms of data and draw some conclusions based

10   on patterns that we observed.

11             THE COURT:  I understand but your background is an

12   engineer.  If you knew that the data that you were studying was

13   inaccurate would you be willing to make any scientific

14   conclusion based on data you knew or believed to be inaccurate?

15   Would you want to say, gee, that bridge is safe, when you

16   thought you had false data from the inspectors?  I don't think

17   so.  Because then the bridge would collapse and hundreds of

18   people would die.  So the question is, what can you do with

19   data you don't believe has integrity?

20             THE WITNESS:  One of the things that we do with it is

21   we poke and prod the data to see if it is reliable and

22   consistent.  There's different measures for looking at the

23   quality of data.  One is reliability, meaning does the same

24   person report the same thing consistently over time when

25   confronted with the same circumstances?  We see reliability of

C38AAFLOC                    Fagen - Direct

1    data but reliability doesn't necessarily mean validity.  In

2    other words, is what's written down a correct observation of

3    what's actually happening out in the world?  It's a little bit

4    harder to test because we can test that for internal validity.

5    One of the analysis that we did that we did not report in here

6    was something called a factor analysis of those, the reasonable

7    suspicion markers.

8            A factor analysis is, basically, a way to look at

9    correlations between particular items.  Are there underlying

10   patterns?  And one of the things we found in that analysis, the

11   factor analysis, was that in fact things did kind of hang

12   together that should have hung together.  So, for example,

13   there is two or three of both the stop factors in the

14   additional circumstances that address the question of violent

15   crime in one way or another.  We found that those, actually,

16   did hang together in the correlation.  I'd be happy to supply

17   those if the Court's interested.

18           So we did find, actually, that there was some validity

19   internally to those analysis, I mean, to the use of those

20   markers.  Somebody who was interpreted actions indicative of a

21   violent crime who was actually likely to mark off another

22   factor that seemed to speak to the same underlying construct.

23   So we thought there was some validity based on the way that

24   these things grouped to go.

25           THE COURT:  Another question is, you remember the

C38AAFLOC                          Fagen - Direct

 1   error about Category Five and Category Five is the one where it

 2   should be justified if there's two or more conditionally

 3   justified stopped circumstances on side one but originally you

 4   coded Category Five as indeterminate, when later you said it

 5   was justified if there are two or more.  How did that error get

 6   there and how did it get out?

 7              THE WITNESS:  There are many, many, it's a very

 8   detailed analysis, many pages of documentation.  I could sit

 9   here and explain how an error happened.

10              THE COURT:  That particular error where you had two or

11   more conditionally justified circumstance on side one but coded

12   as indeterminate, how did that creep in?

13              THE WITNESS:  It was an error.  We wrote many lines of

14   code --

15              THE COURT:  Computer code.  Okay.

16              MS. GROSSMAN:  -- to do this.  And there was a mistake

17   in the computer code and we went back and we read it and

18   mistakes still got through.

19              THE COURT:  OK.  So it was a computer error, so to

20   speak.  I realize you created the error in creating the code

21   but that's how it got there.

22              THE WITNESS:  Yes.

23              THE COURT:  How did you realize the error was there?

24              THE WITNESS:  We realized it when the City's papers --

25   and we were quick to correct it, as you know.

C38AAFLOC                          Fagen - Direct

1          THE COURT:  The indeterminate percentage of stops

2     increased from 15 to 24.

3          THE WITNESS:  Decrease.

4          THE COURT:  The error increased it and the

5     correction --

6          THE WITNESS:  The percentage of stops remained, the

7     stops remain the same.  The number shifted downward.

8          THE COURT:  To 15.4.

9          THE WITNESS:  Percentage of stops that you were

10     justified shifted upwards.

11          THE COURT:  So you ended up with 15.4 of indeterminate

12     and 16.7 unjustified for a total of roughly 22.

13          THE WITNESS:  Right, yes.

14          THE COURT:  How much weight did you put on so-called

15     hit rate?

16          THE WITNESS:  Well, as your Honor noted, we thought

17     that when we -- and we continue to think that a hit rate in

18     terms of right seizure of contraband or weapons on the one hand

19     or making a viable arrest on the other hand was very, very low.

20     And we didn't have a sense about what that should be.

21          THE COURT:  Right.  How do you know six percent is

22     low?  Maybe it's high.

23          THE WITNESS:  Statisticians always ask the question,

24     how well does this thing happen better than chance?  If you

25     can't do much better than chance then your system is not very

C38AAFLOC                          Fagen – Direct

1  helpful.

2              THE COURT:  Right.

3              THE WITNESS:  So we went, set about in looking for

4  different cases where there were roadblocks.  We thought

5  roadblocks were actually the most relevant.

6              THE COURT:  Because everybody is stopped at the

7  roadblock.

8              THE WITNESS:  Right.  There was one other research

9  study that we looked at which was where they did the kind of

10  analysis of, actually, of narratives but they were narratives

11  that were recorded by an independent observer.  And I think I

12  cited to that study was published in the Journal called

13  Criminology in the Public Policy.

14              In that one they said 45 percent, they had a hit rate

15  of that was somewhat lower and a little bit higher.  We looked

16  at the study in Michigan which is Sisk and we looked at Edmund

17  in Indianapolis and the hit rates there were higher in terms of

18  seizure of drugs and contraband from the hit rate here.

19              THE COURT:  Were those random?

20              THE WITNESS:  Roadblocks.  To the best of our

21  knowledge they were checkpoints.

22              THE COURT:  Everybody stopped.

23              THE WITNESS:  Yes.  On some random schedule and I

24  think that was part of the hold in those cases.  And they were

25  finding 13 percent I think was the case in Sisk.  So we said,

C38AAFLOC                    Fagen – Direct

1    okay, this is a reasonable benchmark maybe plus or minus two or

2    three percent in either direction would be good but we're

3    finding hit rates very, very far below that.

4          THE COURT:  From that you conclude that there was

5    never reasonable suspicion in the first place.  The stops were

6    essentially random, not random but baseless.  In other words,

7    they were just stops.

8          THE WITNESS:  They were inaccurate.  I think the term

9    that we use is "inaccurate".  And therefore whatever the

10   training, whatever the methodology was that the police officers

11   were using to determine a reasonable suspicion and make a stop

12   based on that was simply not accurate and not yielded.  It was

13   wrong.  Suspicion that was inaccurate.

14         THE COURT:  You judged that as I say by hindsight by

15   comparing it to randomize stops, like roadblocks or

16   checkpoints?

17         THE WITNESS:  Correct.

18         THE COURT:  I've asked a number of questions that were

19   of concern to me.  The next question is who goes next?  I don't

20   know if there is anything else you want to bring out.  I may

21   have missed something that I questioned you about that I said I

22   would take up later with him or maybe not.  So I'll give you

23   the first chance to see if there's something you want to fill

24   in before Ms. Grossman.

25         MR. CHARNEY:  Can I have one moment?

C38AAFLOC                    Fagen - Direct

1          THE COURT:  Sure.

2          (Pause)

3          MR. CHARNEY:  I just have maybe one or two questions.

4  CROSS-EXAMINATION

5  BY MR. CHARNEY:

6  Q.  Professor, I think Judge Scheindlin asked you this

7  question.  When you went through the various sections of the

8  UF-250 form, the ones you considered and didn't consider and

9  maybe I may have missed it, but could you tell us why you

10  didn't use the stop location section of the form as part of

11  your analysis of classifying stops as justified, unjustified or

12  indeterminate?

13  A.  The reason for using stop locations would have been to

14  qualify or provide some additional information relative to the

15  crime rate in the area.  I believe it would have been most

16  germane than to an assessment whether the stop took place in a

17  high crime area.  And there were a couple issues with that.

18  One, we assumed and based our decision on the fact that

19  officers were trained to check all that applied.  And we

20  assumed that if, in fact, the stop took place in a high crime

21  area they would have checked the box accordingly.  So we really

22  didn't want to second guess the decision of the officer.

23          Second, we didn't want to impose our decision or

24  criteria about what's a high crime area versus a low crime

25  area.  I think as you can see from some of our charts crime

C38AAFLOC                          Fagen - Cross

 1   distributes very widely across the city from very low claim

 2   rates in some places to high crime rates in other places.  We

 3   didn't know what the cut-off was.  We couldn't say how officers

 4   are trained to think about high crime area.  Was it very high

 5   in the last month or week?  What constitutes high?  Three stops

 6   or robberies, is ten total felony crimes?  Does it include

 7   felonies plus misdemeanor?  We have no basis for imposing --

 8           THE COURT:  So the sole objective was the checkmark on

 9   the box.

10           THE WITNESS:  Correct.  And the most consistently

11   applied.

12   BY MR. CHARNEY:

13   Q.  And then just referring back to the benchmark question.  In

14   your 2007 study that you did with Professor Gelman what

15   benchmark did you use in that case?  Sorry.  In that analysis?

16   A.  We used a combination of the population in the police

17   precincts and the race and crime specific arrest rate in that

18   precinct.

19   Q.  Okay.  Now, did you use arrest data in this study that you

20   did for this case?

21   A.  No, we did not.

22   Q.  Why didn't you use arrest data?

23   A.  After we -- we have always said and I think we said in 2007

24   article that it would have been better, we would have preferred

25   to use actual data on the crime.  We were not provided with

C38AAFLOC                          Fagen - Cross

1    those data at that time.  We use the best date that were

2    available to us at the time we did that study.

3            In addition, there were some researchers who had been

4    writing in some of the professional journals, including people

5    who did the random analysis for the city, Mr. Ridgeway, who

6    were very critical in fact of our use of arrest data as

7    benchmark.  They said that it was inadequate.  We needed a much

8    broader and richer measure of crime itself to understand the

9    acts of the police officers in an area and we thought, yes, we

10   agree.

11           THE COURT:  Why was the arrest data not accurate

12   enough?

13           THE WITNESS:  Because arrest, when you study arrests

14   it's only really a partial view of crime.  There are many, many

15   crimes that are not cleared.

16           THE COURT:  Not what?

17           THE WITNESS:  "Cleared" meaning when you can't

18   identify who actually committed the crime by an arrest

19   clearance rate is basically the percentage of crimes as result

20   in an arrest.  Clearance rates vary quite a bit, very low to

21   very high.  As we say in criminology, if you rely only on

22   arrest data to estimate criminal activity you are really

23   relying more on the actions.  You are measuring the actions of

24   the police as much as you are the criminals.  So we chose

25   instead to use a measure of total amount of crime and that's

C38AAFLOC                              Fagen - Cross

1    what we used.

2    BY MR. CHARNEY:

3    Q.   In that 2007 study were you comparing stop rates between

4    precincts in that study?  In other words, were you comparing

5    the level of stops done in Precinct A with the level of stops

6    that you had done in Precinct B in that 2007 study?

7    A.   No.  That 2007 study analyzed the likelihood of an

8    individual of a specific race to be stopped by the police in a

9    particular area.  And in that case precincts relative to the

10   race specific and crime specific rates of activity in that

11   area.

12   Q.   What about in the analysis you did for this case?

13   A.   The analog in case would be in Table Seven of my report.

14   Table seven of the report looks at the likelihood of a Black

15   person or Hispanic or an other race person relative to a White

16   person being stopped in a neighborhood for a particular type of

17   crime.

18   Q.   Okay.  What about the first question I asked.  In the

19   analysis you did in this case, did you do any comparison of

20   stop activity in one precinct or one source of census track and

21   compare it to stop activity in another census track for

22   another --

23   A.   Yes, we did.  That would be results reported in Table Five.

24   That was the comparison of stop rates across precincts looking

25   at the combination of the racial composition of the precincts

1    and the crime rate in that precinct.

2    Q.  And that analysis where you were looking across precincts

3    what, if anything, did you discover about the correlation

4    between racial composition of a precinct, the census track or

5    neighborhood and stop rate controlling for the crime rate?

6              THE COURT:  Say that again.

7    Q.  The correlation between the stop rate in the precinct or

8    census track between that and the racial composition of that

9    precinct, the correlation between those two things controlling

10   for the crime rate, what did you discover?

11   A.  We discovered that after one controls for the crime rate in

12   the precinct, in one analysis in the precinct, the second in

13   the census track that the racial composition of the

14   neighborhood predicted the stop rate in the neighborhood and we

15   did that both total stops and when we just aggregated it for

16   stops for a particular type of crimes that were alleged on the

17   form.

18   Q.  And the last question:  When you looked at census tracks,

19   in your analysis of that were census tracks bigger than

20   precincts, smaller or around the same size?

21   A.  Much smaller than precincts.  Precincts have roughly

22   100,000 people on average.  Census tracks have roughly five

23   thousand people on average.  The footprint of a precinct is

24   very large.  The footprint in a census track in some cases is

25   large when have you sparsely populated areas of the Bronx, for

C38AAFLOC                           Fagen - Cross

1    example.  But for the most part the foot print is, actually,

2    quite small, a few square blocks.

3    Q.  What, if anything, can you say about the racial

4    demographics of census tracks that you looked at?

5    A.  They're internally consistent.  New York City for better or

6    worse, more for worse I think in the minds of many people is a

7    pretty segregated city.  So there is a great deal of --

8    population distribution within the census track.

9              THE COURT:  Okay.  Ms. Grossman.

10   BY MS. GROSSMAN:

11   Q.  Professor Fagen, you said that you had some second year law

12   students assist you in your research analysis.

13   A.  Second and third year law students, several of whom were

14   on, a few of whom were on law review, yes.

15   Q.  But they were law students.  They had not taken the bar

16   yet; is that right?

17   A.  Correct.

18   Q.  How many of the cases did you read?

19   A.  The ones that they cited.

20   Q.  How many were cited in your memo?

21   A.  I didn't count.

22             THE COURT:  I did today.  It was maybe 40.

23   BY THE COURT:

24   Q.  How many?

25   A.  I probably read 25.

C38AAFLOC                        Fagen - Cross

1    Q.  How many times did you read them?

2    A.  Probably in some cases more than once but that was a few

3    mostly one time.

4    Q.  And how many time did you spend reading those cases?

5    A.  I can't recall.  Reading a case from start to finish, 20

6    minutes.

7    Q.  Okay.  And --

8              THE COURT:  Did you say that on occasion you also

9    consulted faculty members?

10             THE WITNESS:  On occasion.

11             THE COURT:  About cases or holdings in cases?

12             THE WITNESS:  Well, about the summary of, about my

13   view of about the applicability of the factor and see if they

14   had a sense of their view of the case law at large if it

15   differed.

16             THE COURT:  Not to second guess your understanding of

17   a particular case?

18             THE WITNESS:  No, not on the case.  On the general

19   conclusion.

20             THE COURT:  I understand.  Did you also consult with

21   counsel in this case?

22             THE WITNESS:  No.  I gave them our memo and that's it.

23             THE COURT:  Okay.

24   BY MS. GROSSMAN:

25   Q.  Now, you also discussed or mentioned something about

C38AAFLOC                    Fagen - Cross

1   imputations at the state level and you mentioned that you don't

2   want to make too many risks to make assumptions but something

3   about what you said about this imputation at the state level,

4   it was important and significant to you about the size of the

5   area; is that right?

6   A.  Yes.

7   Q.  But then NYPD is a very large area relative to that; isn't

8   that true?

9   A.  Yes.

10             THE COURT:  NYPD is not --

11             MS. GROSSMAN:  I'm sorry.

12  Q.  The City of New York is a large city so that imputation

13  issue that you may be concerned about with smaller areas

14  doesn't really -- it's not really relevant here what the city

15  the size of New York City?

16             THE COURT:  Is that accurate are or is that backwards?

17  I thought size worked the other way.  Imputing to a large size

18  is a dangerous thing.

19             THE WITNESS:  No.  Imputing to a smaller size --

20             THE COURT:  Okay.

21  A.  No, that's not right.  If we were to do imputations, we

22  would do them in very small areas because we're trying to

23  understand and compare areas.  So we wouldn't want to impute

24  for the whole city.  That would unfairly weight what happens in

25  the Rockaways to what happens in the Bronx.  And so instead we

C38AAFLOC                         Fagen - Cross

1    were much more interested in trying to make imputations within

2    either precincts -- in either case would have been probably not

3    a healthy thing to do statistically.

4    BY MS. GROSSMAN:

5    Q.  Thank you, Professor Fagen.  Now you mentioned that the use

6    of arrest data is no longer preferable in the way that you had

7    used it in past articles; is that right?

8    A.  That seems to be the weight of opinion among researchers

9    who were doing this kind of work.

10   Q.  Well, you just told the judge and all of us that that's one

11   of the reasons why you don't use it.

12   A.  Why we didn't use in this analysis.

13   Q.  But that was the data that was used in the ABs report?

14   A.  Yes.

15   Q.  So based on the fact that you don't, that arrest data is

16   really not to be used, is not really recommended to be used for

17   these kinds studies, the AG's report is really not a valid

18   report any longer in terms of reliability; isn't that right?

19   A.  I don't think that was a fair conclusion.  We used data

20   that was available in the AG's report and we did have measures

21   at the citywide crime rate.  We were able to take that in

22   consideration, but not the specific local precincts.

23   Q.  But the fact is you just told us that that very same arrest

24   data that you did use in your previous study is the same data

25   that you used in the AG report and that is the reason why you

C38AAFLOC                          Fagen - Cross

1   did not use it in this report.  So the methods --

2   A.  The same data?

3   Q.  The same arrest data?

4   A.  From 1999?

5   Q.  Arrest -- the quality of data, the arrest data?

6   A.  We did not use 1999 arrest data.

7              THE COURT:  She is not saying the same -- she's saying

8   the same type of data.  Did you use the same type of data in

9   the Attorney General's study?

10  A.  Yes.

11             THE COURT:  She is asking do you still consider the A

12  government's report to be an accurate report or accurate

13  opinion since it did rely to some extent on arrest data that

14  you wouldn't use now.

15  A.  I think the conclusions are accurate to the extent that the

16  analysis that we did consider multiple factors including

17  arrests, we did look at the correlations which we knew totally

18  about crime and arrest data and we were satisfied that the

19  arrest data at that time was the best alternative.

20             THE COURT:  Sure.  But looking back today you still

21  would stand by the reliability of the outcome?

22             THE WITNESS:  I think I would, yes.

23  BY MS. GROSSMAN:

24  Q.  And so you could use the same arrest data in this case?

25             MR. CHARNEY:  Objection, your Honor.

C38AAFLOC                          Fagen - Cross

           THE COURT:  I think -- No.  He is saying it's not the

best way to do is although he was asked --

A.  We took the best route.  And truth is we, actually, have

looked at but didn't report what would happen if we actually

used arrest data, the results are unchanged.

Q.  Well, in fact, the best available data, wouldn't you agree,

is really suspect described by race if you could have that

data, right?

A.  It's incomplete.

Q.  But in a perfect world that be the preferable --

A.  It is not a perfect world.

           THE COURT:  But she's saying if every --

A.  If we knew for every felony instead of 50 percent, if we

knew a hundred percent, possibly.  I'd have to look and see.  I

can't make a blanket conclusion.

           THE COURT:  This is only a hypothetical question.  If

you happen to know the race of every single perpetrator of a

crime you would use it if you knew it for a fact.

           THE WITNESS:  In a perfect world, sure.

BY MS. GROSSMAN:

Q.  You also mentioned when the judge asked you about the

"other" boxes and the type of information that was contained in

the narrative portion of other than side one of the form; do

you remember that?

A.  (Nodding)

C38AAFLOC                           Fagen - Cross

1   Q.  You said there was a high percentage that was populated but

2   there was a lot of information that you just couldn't define,

3   you couldn't interpret, correct?

4   A.  Yes.

5   Q.  You ever produce those results of your analysis to the

6   City?

7   A.  No.

8   Q.  Do you have them?

9              THE COURT:  Did you do an analysis?

10  A.  We looked at them.  We inspected them.  We took a sample of

11  those cases, the fairly large sample, printed out all of them

12  and inspected it and it just wasn't useful.

13  Q.  That was never produced to the City?

14  A.  No.

15             THE COURT:  When you say "produced" what?

16             MS. GROSSMAN:  In discovery.

17             THE COURT:  I understand what "produced" means.  But

18  what was there to produce?  What could you, if they said show

19  us now what data you checked with respect to the narrative part

20  of "other", do you have computer printouts with these notations

21  like XNE?

22             THE WITNESS:  The data that was provided to us had the

23  text field in text form.  So we put up in the computer and we

24  said, give us, take a sample of a thousand.  So we took a

25  random sample of the thousand and start to look at the text

C38AAFLOC                         Fagen - Cross

1    streams.

2              THE COURT:  Did you have a report of what was on those

3    one thousand samples?

4              THE WITNESS:  We didn't prepare a report.

5              THE COURT:  I don't know the order report but did the

6    computer spit out in some way what was on these one thousand

7    sample UF-250s?

8              THE WITNESS:  We could ask the computer to do it.  We

9    inspected it and look --

10             THE COURT:  It was a thousand?

11             THE WITNESS:  Well, we took a sample of how --

12             THE COURT:  It was, in fact, a thousand?

13             THE WITNESS:  Yes.

14             THE COURT:  You looked at the explanation on "other"

15   where it says "specified" and the computer could now spit out

16   what was on those one thousand to you?

17             THE WITNESS:  Yeah, if we asked it to.

18             THE COURT:  But you hadn't asked it to, but you could?

19             THE WITNESS:  We could.

20             THE COURT:  I am not sure there was any failure to

21   produce anything.

22             THE WITNESS:  At the time of the report we simply

23   looked at what was on the screen.

24             THE COURT:  Never produced.

25   BY MS. GROSSMAN:

C38AAFLOC                          Fagen - Cross

1   Q.  You never generated copies of what you found on the

2   computer?

3   A.  For that particular analysis, no.

4   Q.  When you did do the analysis of the fields that were

5   populated, the entries that were made, it was based on your

6   interpretation of what's there.  I mean that's your own

7   interpretation of the information?

8   A.  Sorry.  I don't understand.

9            THE COURT:  Nobody else second guessed it for you.

10  You didn't have an expert in police lingo or something to tell

11  you that EXN meant something.  You just looked at it yourself?

12           THE WITNESS:  Correct.

13           THE COURT:  Okay.

14  BY MS. GROSSMAN:

15  Q.  Now, Professor Fagen, you in your classification analysis

16  you conclude that about, close to about 80 percent of the stops

17  fall into the "justified" category, right?

18  A.  Right.

19  Q.  Now, did you consider the impact that the 80 percent of

20  justify stops had on your regression and anallys contained in

21  your report?

22  A.  I am sorry.  I don't understand.

23           THE COURT:  Neither do I.

24  Q.  Meaning that if we have 80 percent justified stops your

25  regression analysis is not limited to the 20 percent that are

C38AAFLOC                          Fagen - Cross

1   problematic; isn't that right?

2           THE COURT:  I don't understand question.  I think he

3   is focused on the fact that 20 percent of 2.8 million people

4   is -- somebody help me.

5   A.  Five hundred thousand.

6           THE COURT:  Five hundred thousand people were

7   unjustifiably stopped.  That's a lot of people to have suffered

8   an unjustifiable stop.  That's already clear.  I don't think he

9   was thinking anything about the 80 percent.  I think he was

10  saying five hundred thousand people is a lot of people.

11  Q.  But your conclusion in your regression, Professor Fagen, is

12  that race predicts the stop rate; isn't that light?

13  A.  Over and above the crime rate.

14  Q.  And that was -- that analysis was done for all 2.8 million

15  stops, correct?

16  A.  Yes.

17  Q.  Now, how do you reconcile that finding against the fact

18  that 80 percent of the stops were justified?

19  A.  Well, again, I have to confess I don't understand what you

20  are asking.  You are asking whether or not our analysis of

21  reasonable suspicion somehow bears on our analysis equal

22  protection?

23  Q.  Exactly.  Because if there's reasonable suspicion for a

24  stop, it's a race neutral reason for a stop.  Race can't be the

25  reason.  It's a race neutral reason.  A reasonable suspicion

C38AAFLOC                      Fagen - Cross

1    under the case law is a race neutral reason for a stop.  Did

2    you consider that?

3              THE COURT:  In determining what?

4    A.  I am sorry.

5              THE COURT:  One person at a time, professor.

6              Did you consider in determining what?

7              MS. GROSSMAN:  In determining whether race was the

8    factor, the reason the -- what that race predicted the stop

9    rate, that race was the influence of the stop rate, that race

10   caused the stop, it was the reason for the stop.  So we're

11   getting back to what is the reason for the stop?

12             THE COURT:  I think by definition, if 80 percent of

13   the stops were justified as to those stops, you can say that

14   race was the factor that drove the stop, right?  You can't say

15   that or can you?

16             THE WITNESS:  Well, I can say this, one of the

17   analysis that we did was in Table Thirteen and we looked at

18   whether or not the indicia of suspicion actually assisted

19   understanding the patterns of stops.  In that model we found

20   that, in fact, if we looked at all of the measures that we used

21   to predict the pattern of stops without using reasonable

22   suspicion we found a certain distribution.  Did we then get any

23   additional understanding or explanation of the stops by adding

24   in the factors having to do with reasonable suspicion?  And the

25   answer was on balance, no, we didn't learn anything new.

C38AAFLOC                        Fagen - Cross

1    Q.  But you didn't do that analysis?

2    A.  I'm sorry.

3    Q.  You didn't actually consider it.  We just learned from your

4    corrected, by correcting your coding errors the numbers went up

5    from 70 percent to 80 percent of the justified category.  So

6    you didn't consider that 80 percent and how that impacts your

7    regression analysis?

8              MR. CHARNEY:  Objection, your Honor.

9              THE COURT:  I think sustained because I don't

10   understand the question.  Whether it's 70 or 80, all he is

11   saying is he compared rates where putting whole reasonable

12   suspicion analysis aside and just predicting what the stops

13   would be based on population and the crime rate it would have

14   been the same, in any event.

15             MS. GROSSMAN:  That's what table?

16             THE COURT:  He said "thirteen".

17   A.  Thirteen.

18   Q.  But in your regression analysis you control from particular

19   factors; isn't that right?

20   A.  Which regression?

21   Q.  There are various regressions in your report.  Isn't one of

22   the regressions among them one of the controls that conducted

23   was for patrol strength?

24   A.  Yes.  In the regressions --

25   Q.  But in that regression analysis you didn't control for

1   reasonable suspicion the fact that 80 percent of the stops here

2   were explained by reasonable suspicion?

3   A.  No, we didn't.

4   Q.  Thank you.  Professor Fagen, did you quality control your

5   coding that you made mention of earlier?

6   A.  Coding of what?

7   Q.  Coding of the classification methods.

8   A.  What do you mean "quality coal"?

9   Q.  Well, when you had researchers go through and code to you

10  under the term "quality control"?

11  A.  Of course.

12  Q.  What do you understand it to be, professor?

13  A.  To accuracy.

14  Q.  Okay.

15  A.  Uniform application of criteria.  We could go on.

16  Q.  Sure.  So, did you do any of that in your coding process?

17  A.  Sorry.  Coding of -- we used a lot of codes.  Which one?

18  Q.  There were some that were quite problematic here; isn't

19  that right?

20  A.  I am sorry.  I really don't understand what you are

21  referring to.

22  Q.  The coding errors that were made that you corrected,

23  correct?

24  A.  Okay.

25          MR. CHARNEY:  Objection, your Honor,

1    mischaracterization of his testimony.  That was only one.

2            THE COURT:  She used the word "errors".  He said it

3    was one.  He said in the computer code the computer code that

4    was written said that if there were two conditional justified

5    boxes that was coded in the end as unjustified instead.

6            THE WITNESS:  We moved them from "indeterminate"

7    innocent to "justified".

8            THE COURT:  Should have been coded as "justified".

9    BY MS. GROSSMAN:

10   Q.  So my question to you is, what kind of quality control did

11   you do during your, during the running in and the analysis of

12   coding your classification method?

13   A.  For that particular analysis?

14   Q.  Yes.

15   A.  We read the code and looked at the result and read the code

16   again and looked again and the mistake leaked through, the one

17   mistake.

18           THE COURT:  But is there no real judgment calls in

19   this kind of coding here.  No researcher has to make a judgment

20   call because it was decided in advance what would be called,

21   which of these boxes would be conditionally justified,

22   unjustified or indeterminate.  Each one is assigned word "J" or

23   "CJ" or "I" so nobody makes a judgment.

24           THE WITNESS:  Right.  It was simply a question of

25   translating our memorandum into a set of computer instructions.

1           THE COURT:  Right.  So that after those boxes are

2   added up, so to speak, you then have to see how many had one

3   box, how many had no box, whether the box was justified or

4   conditionally justified and how many boxes on the other side

5   and that's where the code error crept in.

6           THE WITNESS:  Yes, right.

7           THE COURT:  But there's no coding objective decisions

8   to be made in this particular study.

9           THE WITNESS:  That is correct.  So it wasn't -- so

10  less of a coding error than it was a writing.

11          THE COURT:  Computer instructions.

12  BY MS. GROSSMAN:

13  Q.  Professor Fagen, you appear to be -- you find that you are

14  very critical of the UF-250 form, right?

15  A.  Well, I make some conclusions that it's not a very helpful

16  way of gauging suspicion.

17          THE COURT:  Why is that?

18          THE WITNESS:  Because it leads to very low hit rates

19  because it seems to include some things, patterns that are

20  nonrandom.

21          THE COURT:  Like?

22          THE WITNESS:  The excess use of movement in high crime

23  area and unresponsive use of high crime area.

24  Q.  Well, it's not necessarily an intention behind the officer.

25  Could just be a function of the form and the way it's prepared,

1   correct?

2   A.  I can't offer an opinion.

3          THE COURT:  It's almost the opposite.  Nothing wrong

4   with the form but if the officer decides everybody is going to

5   check high crime area, play it safe.  It's not the form's fault

6   at all.  That would be a training area.  They are just

7   protecting themselves.

8          THE WITNESS:  That's fair enough.  It's a bump.  It

9   helps to move something from being in a gray area.

10          THE COURT:  If a police officer knows that and wants

11   to protect himself or herself, everybody checks high crime.

12          THE WITNESS:  More or less.

13   BY MS. GROSSMAN:

14   Q.  So you are critical of the form and you find fault with the

15   form.  You our aware that the UF-250 form was result of a

16   negotiated settlement between the City of New York and class

17   counsel in the Daniels case?

18          MR. CHARNEY:  Objection.

19          THE COURT:  Do you know that?

20   A.  I do know that but had no bearing even how we use the form.

21          THE COURT:  That's not the question.  So let's answer

22   what's asked.

23   Q.  You know that was adopted as the agreement of class counsel

24   who were the same class counsel in this case, right?

25          THE COURT:  Do you know that?

C38AAFLOC                          Fagen - Cross

1    A.  To the best of my knowledge, it's true.

2    Q.  Well, that's because you know that because you were the

3    consulting expert for the plaintiffs then, weren't you?

4    A.  No.

5    Q.  Did you consult with the plaintiffs in the Daniels case?

6    A.  No.

7    Q.  Didn't you have consultations with them?

8    A.  No.

9         THE COURT:  He just said he wasn't involved.

10   A.  I had one meeting with one of the attorneys from

11   plaintiff's counsel to answer some questions that he asked.

12   That was it.

13        THE COURT:  Was it one meeting?

14        THE WITNESS:  One meeting.

15        THE COURT:  You don't know what stage of that case?

16   Was it the end, the beginning, in the middle, you don't know?

17        THE WITNESS:  No idea.  Can't recall.

18        MS. GROSSMAN:  Just one second please.

19        (Pause)

20   BY MS. GROSSMAN:

21   Q.  Professor Fagen, do you remember being deposed in this case

22   by Mr. Larkin?

23   A.  Yes.

24   Q.  And do you remember being asked some questions and giving

25   some answers at that deposition; do you remember that?

1   A.  Yes.

2   Q.  Do you remember these questions and these answers?

3        I had conversations with people from the Center for

4   Constitutional Rights, correct?

5   A.  Yes.

6   Q.  Do you remember that question?

7   A.  Yes.

8   Q.  Sometime prior to early 2009 you met with Mr. Charney,

9   correct?

10  A.  Prior to 2009?

11  Q.  Yes.

12  A.  When did I begin?

13       MR. CHARNEY:  Your Honor, can I ask defense counsel

14  what page of the transcript?

15       MS. GROSSMAN:  Sorry.  That's page 37.  Page 38,

16  actually, line five.

17  Q.  Prior to your phone call with Mr. Charney did you have any

18  conversation with any other attorney who you understood to be

19  representing the plaintiffs in this case?

20       THE COURT:  She asked you to read slowly.

21       MS. GROSSMAN:  Sorry.

22  Q.  Prior to the phone call with Mr. Charney did you have any

23  questions with any other attorney who you understood to be

24  representing the plaintiffs in this case?

25  A.  I have had conversions in the past with Mr. Moore and

1  Mr. Goodman but this was a number of years ago in the wake of

2  the Daniels case.

3          THE COURT:  So do you remember that answer?

4  A.  Yes.  I have met on occasion with Goodman & Moore.  This

5  was to have lunch or to have a drink.  We had a shared mutual

6  interest and the question of this particular policy by city.

7  It wasn't about a specific case.

8          MR. CHARNEY:  Can I just point out that the testimony

9  that was read says "in the wake of".

10          THE COURT:  Yes, I saw that.  I heard that "in the

11  wake up".

12          MR. CHARNEY:  Just to clarify the record.

13          THE COURT:  Thank you.  I heard it.

14          MS. GROSSMAN:  Thank you.  I have no further

15  questions.

16          MR. CHARNEY:  Can I ask one redirect?

17          THE COURT:  Sure.

18  BY MS. GROSSMAN:

19  Q.  Going back to the use of the arrest data, Professor Fagen,

20  is it your testimony that you using arrest data to do an

21  analysis like the one that was done in the Attorney General's

22  report, is it your opinion today that that is unreliable data

23  used and therefore an unreliable methodology?

24  A.  No, it's not unreliable.  It's less reliable than using

25  full compliment of crime data.

C38AAFLOC                    Fagen – Cross

1          MR. CHARNEY:  No other questions.

2          THE COURT:  Okay.  I think that closes the hearing.

3     We managed to get it accomplished by roughly five o'clock.  I'm

4     appreciate of that.  Thank you.

5                         (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25