UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— X

DAVID FLOYD, LALIT CLARKSON,
DEON DENNIS, and DAVID OURLICHT,
individually and on behalf of a class of all
others similarly situated,

     Plaintiffs,

  - against -

THE CITY OF NEW YORK;
COMMISSIONER RAYMOND KELLY,
individually and in his official capacity;
MAYOR MICHAEL BLOOMBERG,
individually and in his official capacity;
NEW YORK CITY POLICE OFFICER
RODRIGUEZ, in his official capacity;
NEW YORK CITY POLICE OFFICER
GOODMAN, in his official capacity; NEW
YORK CITY POLICE OFFICER
SALMERON, Shield #7116, in her
individual capacity; NEW YORK CITY
POLICE OFFICER PICHARDO, Shield
#00794, in his individual capacity; NEW
YORK CITY POLICE SERGEANT
KELLY, Shield #92145, in his individual
capacity; NEW YORK CITY POLICE
OFFICER JOYCE, Shield #31274, in his
individual capacity; NEW YORK CITY
POLICE OFFICER HERNANDEZ, Shield
#15957, in his individual capacity; NEW
YORK CITY POLICE OFFICER
MORAN, in his individual capacity; and
NEW YORK CITY POLICE OFFICERS
JOHN AND JANE DOES,

     Defendants.

—————————————————— X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/16/12

<u>OPINION AND ORDER</u>

08 Civ. 1034 (SAS)

1

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.     INTRODUCTION**

Police officers are permitted to briefly stop any individual, but only upon reasonable suspicion that he is committing a crime.[1]  The source of that limitation is the Fourth Amendment to the United States Constitution, which guarantees that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  The Supreme Court has explained that this "inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs."[2]

The right to physical liberty has long been at the core of our nation's commitment to respecting the autonomy and dignity of each person: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."[3]  Safeguarding this right is quintessentially the role of the judicial branch.

---

[1]     *See Terry v. Ohio*, 392 U.S. 1, 30 (1968).

[2]     *Id.* at 9.

[3]     *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

No less central to the courts' role is ensuring that the administration of law comports with the Fourteenth Amendment, which "undoubtedly intended not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights."[4]

On over 2.8 million occasions between 2004 and 2009, New York City police officers stopped residents and visitors, restraining their freedom, even if only briefly.[5]  Over fifty percent of those stops were of Black people and thirty percent were of Latinos, while only ten percent were of Whites.[6]  The question presented by this lawsuit is whether the New York City Police Department ("NYPD") has complied with the laws and Constitutions of the United States and the State of New York.  Specifically, the four named plaintiffs allege, on behalf of themselves and a putative class, that defendants have engaged in a policy and/or

---

[4]      *Yick Wo v. Hopkins*, 118 U.S. 356, 367 (1886) (citation and quotation omitted). "Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." *Id.* at 373-74.

[5]      As the Supreme Court has explained, being stopped and frisked "must surely be an annoying, frightening, and perhaps humiliating experience."  *Terry*, 292 U.S. at 25.

[6]      The parties use the terms Hispanic/Latino interchangeably.

3

practice of unlawfully stopping and frisking people in violation of their Fourth Amendment right to be free from unlawful searches and seizures and their Fourteenth Amendment right to freedom from discrimination on the basis of race.

Plaintiffs David Floyd, Lalit Clarkson, Deon Dennis, and David Ourlicht are Black men who seek to represent a class of similarly situated people in this lawsuit against the City of New York, Police Commissioner Raymond Kelly, Mayor Michael Bloomberg, and named and unnamed police officers. On behalf of the putative class, plaintiffs seek equitable relief in the form of (1) a declaration that defendants' policies, practices, and/or customs violate the Fourth and Fourteenth Amendments, and (2) a class-wide injunction mandating significant changes in those policies, practices, and/or customs.

This case presents an issue of great public concern: the disproportionate number of Blacks and Latinos, as compared to Whites, who become entangled in the criminal justice system. The specific claims raised in this case are narrower but they are raised in the context of the extensively documented racial disparities in the rates of stops, arrests, convictions, and sentences that continue through the present day. Five nonprofit organizations have filed an *amicus* brief with this Court arguing that the NYPD's stop and frisk practices are

harmful, degrading, and demoralizing for too many young people in New York[7] and twenty-seven of the fifty-one members of the New York City Council have filed a second *amicus* brief arguing that the practices are a citywide problem that "reinforce[] negative racial stereotypes" and have created "a growing distrust of the NYPD on the part of Black and Latino residents."[8]

The NYPD's stop and frisk program was first presented to this Court over thirteen years ago, in a class action entitled *Daniels v. City of New York*.[9] That case was resolved in 2003 through a settlement that required the City to adopt several remedial measures intended to reduce racial disparities in stops and frisks. Under the terms of that settlement, the NYPD enacted a Racial Profiling Policy; revised the form that police fill out when they conduct a stop so that the encounters would be more accurately documented; and instituted regular audits of the forms, among other measures.

---

[7]     "The fact that being stopped is simply a part of life for a young person of color in New York City can only have profound psychological and economic impacts on already disadvantaged communities."  *Amicus curiae* Brief of the Bronx Defenders, Brotherhood/Sister Sol, the Justice Committee, Picture the Homeless, and Streetwise and Safe in Support of Plaintiffs' Motion for Class Certification at 8-9.

[8]     Brief of *Amicus Curiae* the Black, Latino, and Asian Caucus of the Council of the City of New York in Further Support of Plaintiffs' Motion for Class Certification at 3.

[9]     99 Civ. 1695 (SAS).

5

In 2008, after the *Daniels* settlement expired, plaintiffs brought this action, alleging that defendants had failed to reform their policies and practices.  In 2011, after examining the parties' voluminous submissions, I denied defendants' motion for summary judgment.[10]  In April of this year, upon another voluminous record, I granted in part and denied in part defendants' motion to exclude the testimony of Jeffrey Fagan, plaintiffs' statistics and criminology expert.[11]  Plaintiffs now move for certification of the following class:

> All persons who since January 31, 2005 have been, or in the future will be, subjected to the New York Police Department's policies and/or widespread customs or practices of stopping, or stopping and frisking, persons in the absence of a reasonable, articulable suspicion that criminal activity has taken, is taking, or is about to take place in violation of the Fourth Amendment, including persons stopped or stopped and frisked on the basis of being Black or Latino in violation of the Equal Protection Clause of the Fourteenth Amendment.[12]

Because plaintiffs satisfy the legal standard for class certification, their motion is granted.

---

[10]    *See Floyd v. City of New York* ("*Floyd I*"), 813 F. Supp. 2d 417 (S.D.N.Y. 2011), *partial reconsideration granted*, 813 F. Supp. 2d 457 (S.D.N.Y. 2011).

[11]    *See Floyd v. City of New York*, No. 08 Civ. 1034, 2012 WL 1344514 (S.D.N.Y. Apr. 14, 2012) ("*Floyd II*").

[12]    *See* Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Pl. Mem.") at 1.

## II.   LEGAL STANDARD

### A.   Rule 23(a)

Rule 23 of the Federal Rules of Civil Procedure permits individuals to sue as representatives of an aggrieved class.  To be certified, a putative class must first meet all four prerequisites set forth in Rule 23(a), generally referred to as numerosity, commonality, typicality, and adequacy.[13]  "[C]ertification is proper only if the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."[14]  This rigorous analysis requires examining the facts of the dispute, not merely the pleadings, and it will frequently "entail some overlap with the merits of the plaintiff's underlying claim."[15]

Even before the Supreme Court clearly articulated this standard in its

---

[13]   *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008) ("*Teamsters*").  In full, Rule 23(a) reads: "Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

[14]   *Wal-Mart Stores, Inc. v. Dukes* ("*Wal-Mart*"), 131 S. Ct. 2541, 2551 (2011) (quotation omitted).

[15]   *Id.*  "Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, *e.g.*, jurisdiction and venue, is a familiar feature of litigation."  *Id.* at 2552.

2011 *Wal-Mart* decision, the Second Circuit had "required district courts 'to assess all of the relevant evidence admitted at the class certification stage'" and to apply "the preponderance of the evidence standard" when resolving factual disputes relevant to each of the Rule 23 requirements.[16] *Wal-Mart* has adopted that standard and it remains the case that at the class certification stage, "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement."[17]  The court's "determination as to a Rule 23 requirement is made only for purposes of class certification and is not binding on the trier of facts, even if that trier is the class certification judge."[18]

"The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible – only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate."[19] Sufficient numerosity can be presumed at a level of forty members or more,[20] and

---

[16]     *Teamsters*, 546 F.3d at 202 (quoting *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)* ("*IPO*"), 471 F.3d 24, 42 (2d Cir. 2006)).

[17]     *Shahriar v. Smith & Wollensky Restaurant Group, Inc.*, 659 F.3d 234, 251 (2d Cir. 2011) (quotation omitted).

[18]     *IPO*, 471 F.3d at 41.

[19]     *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007).

[20]     *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

courts do not require "evidence of exact class size or identity of class members to satisfy the numerosity requirement."[21]

Commonality requires plaintiffs "to demonstrate that the class members 'have suffered the same injury,'" and the claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[22]

In this context, "the commonality and typicality requirements of Rule 23(a) tend to merge."[23]  "Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability.'"[24]  Rather than focusing on the precise nature of plaintiffs' injuries, the typicality requirement may be satisfied where "injuries derive from a unitary course of conduct by a single

---

[21]   *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

[22]   *Wal-Mart*, 131 S. Ct. at 2551 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)).

[23]   *Id*.

[24]   *Central States*, 504 F.3d at 245 (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

system."[25]  A lack of typicality may be found in cases where the named plaintiff "was not harmed by the [conduct] he alleges to have injured the class"[26] or the named plaintiff's claim is subject to "specific factual defenses" atypical of the class.[27]

   The question of adequacy "entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."[28]

   Some courts have added an "implied requirement of ascertainability"[29] to the express requirements of Rule 23(a) and have refused to certify a class "unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."[30] However, because notice is not obligatory and because the relief sought is injunctive rather than compensatory, "it is not clear that the implied requirement of

---

[25] *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997).

[26] *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006).

[27] *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006).

[28] *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

[29] *IPO*, 471 F.3d at 30.

[30] *Casale v. Kelly*, 257 F.R.D. 396, 406 (S.D.N.Y. 2009).

definiteness should apply to Rule 23(b)(2) class actions at all."[31]  As stated in the

Advisory Committee Note to Rule 23(b)(2), it was designed to cover "actions in

the civil-rights field where a party is charged with discriminating unlawfully

against a class, *usually one whose members are incapable of specific*

*enumeration.*"[32]

### B.    Rule 23(b)(2)

If the requirements of Rule 23(a) are met, the court "must next

determine whether the class can be maintained under any one of the three

subdivisions of Rule 23(b)."[33]  Plaintiffs seek certification under Rule 23(b)(2),

which applies where "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole."

### C.    The *Galvan* Doctrine

Under the doctrine established by the Second Circuit's decision in

*Galvan v. Levine*, certification of a Rule 23(b)(2) class is unnecessary when

---

[31]    William B. Rubenstein et al, *Newberg on Class Actions* § 3:7 at 1-172 (2011).

[32]    Fed. R. Civ. P. 23 1966 Advisory Committee Note (emphasis added).

[33]    *McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008).

"prospective relief will benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment."[34]

## III.   FACTS

At the class certification stage, district courts must engage in a rigorous analysis of the underlying facts in order to determine whether the plaintiffs have satisfied the requirements of Rule 23.  The following factual findings, based on a preponderance of the evidence, are made only for the purpose of adjudicating this motion and will not be binding on the jury at trial.[35]

### A.   The NYPD's Stop and Frisk Program

It is indisputable that the NYPD has an enormous stop and frisk program.  There were 2.8 million documented stops between 2004 and 2009.  Those stops were made pursuant to a policy that is designed, implemented, and monitored by the NYPD's administration.  In support of their motion for summary judgment, defendants cited numerous examples of NYPD policies and practices

---

[34]      *Berger v. Heckler*, 771 F.2d 1556, 1566 (2d Cir. 1985) (citing *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir. 1973) (Friendly, J.) (affirming denial of certification of a 23(b)(2) class after the government "withdrew the challenged policy" and "stated it did not intend to reinstate the policy")).

[35]      *See IPO*, 471 F.3d at 41.

regarding training,[36] monitoring,[37] supervision,[38] and discipline in order to rebut

plaintiffs' allegations of municipal liability for widespread constitutional violations

during stops and frisks.[39]   That evidence shows that the stop and frisk program is

centralized and hierarchical.

     Decisions about the policy are made at the highest levels of the

department.[40]   At the regular CompStat[41] meetings involving the NYPD's top

---

    [36]    *See* Defendants' Statement of Undisputed Facts Pursuant to Local
Rule 56.1 ("Def. 56.1") ¶¶ 191-246; Plaintiffs' Reply Statement of Undisputed
Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶¶ 191-246; Plaintiffs' 56.1
Additional Facts ("PAF") ¶¶ 166-198.

    [37]    *See* Def. 56.1 ¶¶ 2-59; Pl. 56.1 ¶¶ 2-59; PAF ¶¶ 1-54.

    [38]    *See* Def. 56.1 ¶¶ 247-301; Pl. 56.1 ¶¶ 247-301; PAF ¶¶ 159-165.  *Cf.*
PAF ¶¶ 55-100 (presenting facts to support plaintiffs' allegations that top-down
pressure to increase enforcement activity and stop/summons/arrest quotas lead to
widespread unconstitutional stops).

    [39]    *See Floyd I*, 813 F. Supp. 2d at 429.  The debate at the summary
judgment stage centered on whether the NYPD's official policies aimed at
ensuring the constitutionality of stops were properly implemented in practice.

    [40]    *See* 4/29/09 Letter from Police Commissioner Raymond W. Kelly to
Christine C. Quinn, Speaker, New York City Council, App'x G to Report of
Jeffrey Fagan ("Fagan Report") [Docket No. 132]; 11/23/09 Deposition of Joseph
Esposito ("Esposito Dep"), Ex. 11 to Declaration of Darius Charney ("Charney
Decl."), plaintiffs' counsel, at 364:10-365:6 (explaining that Commissioner Kelly
"has the last word" on the stop and frisk policy).
     Plaintiffs have submitted a sworn affidavit from New York State
Senator Eric Adams, who retired as a police captain after more than twenty years
of service in the NYPD.  Senator Adams says that in July 2010 he met with
Commissioner Kelly to discuss proposed legislation regarding stop and frisk
practices and that during the meeting "Commissioner Kelly stated that the NYPD

officials, "[s]top, question and frisk activity is commonly discussed"[42] in detail and

"[t]he process allows top executives to monitor precincts and operational units,

evaluate the skills and effectiveness of managers and properly allocate

resources."[43]  The Chief of Patrol's office discusses stop and frisk activity with the

individual borough commanders and precinct commanders.[44]

---

targets its stop-and-frisk activity at young black and Latino men because it wants to instill the belief in members of these two populations that they could be stopped and frisked every time they leave their homes so that they are less likely to carry weapons."  Affidavit of Eric Adams, Ex. 10 to Charney Decl., ¶ 5.  Commissioner Kelly denies Senator Adams' claim: "At that meeting I did not, nor would I ever, state or suggest that the New York City Police Department targets young black and Latino men for stop and frisk activity.  That has not been nor is it now the policy or practice of the NYPD.  Furthermore, I said nothing at the meeting to indicate or imply that such activity is based on anything but reasonable suspicion.  At the meeting, I did discuss my view that stops serve as a deterrent to criminal activity, which includes the criminal possession of a weapon."  Declaration of Raymond W. Kelly, Ex. A to Declaration of Heidi Grossman ("Grossman Decl."), Assistant Corporation Counsel, in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, ¶¶ 3-4.

[41]      "One of the key features of NYPD oversight is the CompStat process. . . . COMPSTAT, which is short for COMPuter STATistics or COMParative STATistics, is the name given to the NYPD's accountability process and has since been replicated in many other departments.  CompStat is a multilayered dynamic approach to crime reduction, quality of life improvement, department oversight and personnel and resource management and employs Geographic Information Systems, which map crime and identify high-crime and problematic areas."  Def. 56.1 ¶¶ 92-93.

[42]      *Id.* ¶ 143.

[43]      *Id.* ¶ 114.

[44]      *See id.* ¶ 135.  *See generally id.* ¶¶ 92-152.

The UF-250 form was designed by the NYPD and must be filled out by officers after every stop.  The form is sometimes reviewed at CompStat meetings[45] and  "the Chief of Patrol's office reviews UF-250s [from high crime 'Impact Zones'] in order to determine whether the precinct as a whole is properly deploying its resources."[46]  The NYPD requires that "[a] supervisor must sign off on every stop, question and frisk UF-250 report."[47]

According to defendants, the NYPD "provides multiple levels of training for officers,"[48] including numerous courses that cover stop and frisk procedure,[49] a 4.5-hour role-playing workshop on stop and frisk,[50] numerous memos and special videos about the law of reasonable suspicion, and ongoing training after graduating from the police academy.[51]

"The NYPD functions through a chain of command."[52]  Officers are

---

[45]     *See id.* ¶ 134.

[46]     *Id.* ¶ 172.

[47]     *Id.* ¶ 271.

[48]     *Id.* ¶ 191.

[49]     *See id.* ¶ 195.

[50]     *See id.* ¶ 203.

[51]     *See id.* ¶¶ 207-222.

[52]     *Id.* ¶ 247.

15

monitored by their supervisors; supervisors are monitored through inspection

teams, integrity control officers, and precinct commanding officers; and the

Internal Affairs Bureau monitors police personnel throughout the department and

is notified of all complaints alleging excessive force, abuse of authority,

discourtesy, or offensive language.[53]

In short, the overwhelming and indisputable evidence shows that the

NYPD has a department-wide stop and frisk program; the program has been

designed and revised at the highest levels of the department; the implementation of

the program is conducted according to uniform and centralized rules; and

monitoring of compliance with the program is hierarchical. Defendants

acknowledge much of this reality: "To be sure, NYPD's department-wide policies

generate from a centralized source and NYPD employs a hierarchical supervisory

structure to effect and reinforce its department-wide policies."[54]

**B.     The Centralized Use of Performance Standards and Quotas**

Hotly contested, however, is whether the NYPD has set quotas

governing the number of stops and summonses that NYPD officers must make on a

---

[53]     *See id.* ¶¶ 281-292, 307-308.  "Search and seizure allegations relating to stop and frisk fall under the abuse of authority jurisdiction."  *Id.* ¶ 317.

[54]     Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Mem.") at 8.

16

monthly basis.  New York's Labor Law makes it unlawful for the NYPD to

penalize a police officer, expressly or impliedly, for the officer's failure to meet a

summons, arrest, or stop quota.[55]  Defendants argue that

> [w]hile the NYPD requires performance goals, they are
> specifically expected to be set by a command's managers and to
> be met within appropriate legal standards, including stop activity.
> These performance goals are not necessarily numerical in
> character and are instead goals to be set and achieved in relation
> to current crime conditions in an officer's command.  Plaintiffs
> have made no showing that numerical goals for enforcement
> activity exist and/or are uniform throughout the NYPD.[56]

Whether the "performance goals" are accurately characterized as

"quotas" under the New York Labor Law is surely important to the NYPD and to

police officers and their union.  But at the class certification stage of this lawsuit,

the applicability of that legal definition is much less important than the substantive

question of whether or not the unlawful stops of putative class members result

from a common source: the department's policy of establishing performance

standards and demanding increased levels of stops and frisks.  The preponderance

of the evidence shows that the answer to that question is yes.

        To begin with, the scope of the NYPD's stop and frisk program is a

---

[55]     *See* N.Y. Lab. L. § 215-a. A "quota" is defined as "a specific number
of" tickets, summons, or stops. *Id.*

[56]     Def. Mem. at 14-15.

result of institutional decisions and directives.  Over the fourteen months beginning
in January 1998, "NYPD officers documented 174,919 street 'stops' on UF-250
forms."[57]  That is equivalent to just under 12,500 stops per month or 150,000 stops
per year.  In 2004, officers documented over 313,000 stops, and since then the
number has increased every year except 2007, rising to over 684,000 in 2011.[58]
Given the hierarchical nature of the NYPD, any reasonable observer would
conclude simply by looking at the trend that this dramatic increase in the number
of stops represents the intentional implementation of a departmental objective.  But
I need not rely on the overwhelming circumstantial evidence showing that the
increase in stops is due to central directives because there is ample direct evidence
as well.  A small sample of this evidence includes the following:

• In a recent Operations Order, Commissioner Kelly directed all
commands that "Department managers <u>can</u> and <u>must</u> set performance goals,"

---

[57]     The New York Police Department's "Stop and Frisk" Practices: A
Report to the People of the State of New York from the Office of the Attorney
General, Ex. 117 to Declaration of Darius Charney in Support of Plaintiffs'
Opposition to Defendants' Motion for Summary Judgment ("Charney SJ Decl.")
at 91.

[58]     *See* Fagan Report at 19; Sean Gardiner, *Stop-and-Frisks Hit Record in
2011*, Wall St. J., Feb. 14, 2012, at A21.  In the first three months of 2012, the
NYPD stopped eleven percent more people than it did in the first three months of
2011.  *See* Al Baker, *New York Police Release Data Showing Rise in Number of
Stops on Streets*, N.Y. Times, May 13, 2012 at A19.

relating to "the issuance of summonses, the stopping and questioning of suspicious individuals, and the arrests of criminals."[59]  As part of a weekly review of each police officer, "the squad/unit sergeant will compare the member's current monthly activity as it pertains to the member's daily assignment" and at the end of every month, officers will complete a report "indicating the total activity for the month."[60]  The Order states that during performance evaluations, "a high degree of review and consideration will be given to member's daily efforts" and that "[u]niformed members . . . who do not demonstrate activities . . . or who fail to engage in proactive activities . . . will be evaluated accordingly and their assignments re-assessed."[61]

• In response to questions about the major increase in stops in recent years, Deputy Commissioner Paul Browne has made clear that the Department continues to embrace stops as a central part of its crime-fighting strategy: "stops save lives," and "[t]hat is a remarkable achievement—5,628 lives saved—attributable to proactive policing strategies that included stops."[62]

---

[59]   10/17/11 Police Officer Performance Objectives Operations Order, Ex. 12 to Charney Decl., at 1.

[60]   *Id.* at 3.

[61]   *Id.* at 5.

[62]   Gardiner, *Stop-and-Frisks Hit Record in 2011.*

•       At a CompStat meeting on July 17, 2008, NYPD Chief of Department Joseph Esposito (who is the highest ranking uniformed member of the force) told the executive officer of the 28th Precinct: "Your enf[orcement] numbers are way down . . . As an [executive officer] you have to look at that . . . If you look at raw number of 250s you are down 50 percent."[63]  At a CompStat meeting three months later, Esposito and Inspector Dwayne Montgomery, who was the commander of the 28th Precinct from 2005 to 2009, discussed the number of stops that an average officer should perform.[64]  At his deposition, Montgomery testified that during those years he expected his officers to conduct a "minimum" of 2.3 UF-250 stops per month and that he used that quota "as a way of just gauging whether or not they were doing their job."[65]  He had discussed that precise figure with Chief Esposito.

•       From 2006 until 2009, Adhyl Polanco worked as a patrol officer in the 41st Precinct.  At his deposition, he testified that his commanding officers announced specific quotas for arrests and summons (quotas that rose dramatically between early 2008 and 2009) and for UF-250s, assigned supervisors to patrol with

---

[63]     NYC_2_7010-7017, Ex. 47 to Charney SJ Decl.  Plaintiff Deon Dennis was stopped by officers from the 28th Precinct.

[64]     *See* NYC_2_00007026, Ex. 48 to Charney SJ Decl.; PAF ¶ 56.

[65]     10/14/09 Deposition of Dwayne Montgomery ("Montgomery Dep."), Ex. 6 to Charney SJ Decl., at 202:4, 14-15; 209:4-9.

under-performing officers so as to ensure that quotas were met, threatened to

reduce overtime for officers who failed to perform well, and reassigned to less

desirable posts officers who failed to meet quotas.[66]

•       In September and October of 2009, Polanco made audio recordings of

the roll calls in the 41st Precinct, which he provided to the Internal Affairs Bureau

and plaintiffs provided to the Court. In those roll call meetings, supervisors

established specific quotas for summonses and arrests; a union delegate told

officers that the union and the NYPD management agreed on a quota of one arrest

and twenty summons per month; and a supervisor told officers that the Bronx

Borough Commander was yelled at by the Chief of Patrol and others at NYPD

headquarters for low summons activity and that officers in the 41st Precinct were

expected to increase their summons numbers.[67]

•       In 2008 and 2009, police officer Adrian Schoolcraft recorded roll calls

---

[66]     *See* Deposition of Adhyl Polanco ("Polanco Dep."), Ex. 76 to Charney
SJ Decl., at 22-36.

[67]     *See* PAF ¶¶ 64-69 and the evidence cited therein.  At his deposition,
Polanco testified that he believed the NYPD "absolutely" has a problem with racial
profiling: "I work in a minority community and what we do to people in the South
Bronx you would never do to people in midtown Manhattan. . . . Illegally
searching, illegally stopping, illegally handcuffing, put phoney charges on them,
put it through the system."  Polanco Dep. 18:7-22.  Polanco testified that while he
worked at the NYPD, he personally witnessed officers stop and question civilians
without having reasonable suspicion "every day."  *Id*. at 52:14-18.

in the 81st Precinct; on the tapes, supervisors can be heard repeatedly telling

officers to conduct unlawful stops and arrests and explaining that the instructions

for higher performance numbers are coming down the chain of command.[68]

       In response to this evidence, defendants point to the testimony of

numerous police officers who say that they have not been subject to or aware of

quotas to make "a certain number" of stops or arrests or issue "a certain number"

of summonses.  Other officers say that they were not even aware of productivity

standards or asked to increase their number of stops, arrests, and summonses.  And

---

[68]     See CD Bates-numbered PL000093, Ex. 1 to Affirmation of NYPD Officer Adrian Schoolcraft ("Schoolcraft Aff."), Ex. B to Declaration of Taylor Hoffman, plaintiffs' counsel, in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.  The following is a small sampling of the statements made by supervisors that can be heard on the tapes. Lieutenant Delafuente, July 15, 2008: "I want a couple of 250s out of there please, alright?" Deputy Inspector Mauriello, October 31, 2008 (Halloween night): "And they got any bandanas around their necks, Freddy Krueger masks, I want them stopped, cuffed, alright, brought in here, run for warrants. They're juveniles, we're gonna leave 'em in here 'till their parents come and pick 'em up." Sergeant Stukes, November 23, 2008: "If they're on a corner, make 'em move. They don't wanna move, lock 'em up. You can always articulate [a charge] later." Sergeant Stukes, December 8, 2008: "You're gonna be 120 Chauncey [St.]. You're gonna be [in a?], uh, vehicle out there. Shake everybody up. Anybody moving, anybody coming out of that building – [UF] 250"; "You're gonna be Howard and Chauncey 1900, post one. Same thing. Two, three [inaudible]. Everybody walking around. Stop em. 250-em"; "Anybody walking around, shake 'em up, stop 'em, 250-em, doesn't matter what it takes."  Lieutenant Delafuente, January 13, 2009: "Chief [of Transportation Michael] Scagnelli, three star chief, at traffic stat today. . . he says to two commanders 'How many. . . superstars and how many losers? . . . Then he goes down and asks how many summonses per squad?'"

many were never subject to or aware of discipline or rewards relating to quotas or

productivity standards.[69]  I have no reason, at this juncture, not to credit these

officers' testimony as truthful.  I accept (for now) defendants' representation that

some officers were not subjected to "quotas" and even that some officers were not

aware of productivity standards, although there is no dispute that the use of

performance standards is departmental policy.[70]  Nevertheless, the overwhelming

evidence – including the precipitous rise in the number of stops, the policy

statements from Commissioner Kelly's office, the many comments of Deputy

Commissioner Browne and Chief of Department Esposito, the recordings of roll

calls from precincts in the Bronx and Brooklyn, and the testimony of numerous

police officers – shows that the dramatic increase in stops since 2004 is a direct

consequence of a centralized and city-wide program.

## C.    Statistical Evidence of Unlawful Stops

NYPD officers are required to fill out a detailed worksheet, called a

UF-250, describing the events before and during every stop that they perform.  2.8

million of these forms were filled out between 2004 and 2009 and all of them were

---

[69]    *See* Reply Declaration of Heidi Grossman in Support of Defendants'
Motion for Summary Judgment ¶ 21 [Docket No. 142].

[70]    *See* 10/17/11 Police Officer Performance Objectives Operations
Order, Ex. 12 to Charney Decl.

compiled in a database – a database that now contains a wealth of information about millions of interactions between police officers and civilians.

Both parties have retained experts to perform extensive statistical analysis of this data. Plaintiffs rely heavily on their expert – Jeffrey Fagan, a Columbia University professor – in order to show that the NYPD has stopped many civilians without reasonable suspicion and unlawfully targets Blacks and Latinos for stops, summonses, arrests, and excessive force.[71] In *Wal-Mart*, the Supreme Court strongly suggested that *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (which governs the admissibility of expert testimony) applies at the certification stage of a class action proceeding.[72] As a result, and in response to defendants' motion to strike plaintiffs' expert, I engaged in a detailed review of Fagan's qualifications and methodology.[73] Because portions of his analysis were deeply intertwined with the law of reasonable suspicion, I conducted a *de novo* review of those portions and ordered adjustments to his findings in the two

---

[71] *See* Fagan Report and Supplemental Report of Jeffrey Fagan ("Supp. Rep.") [Docket No. 132].

[72] *See Wal-Mart*, 131 S. Ct. at 2541 (citing *Daubert*, 509 U.S. 579 (1993)).

[73] *See Floyd II*, 2012 WL 1344514.

instances where his report misstated the law.[74]  After a rigorous review, I found him qualified and his methodologies reliable, and found much of his report probative and helpful.  It is therefore appropriate for me to consider Fagan's conclusions at the class certification stage.  In particular, I find that the following factual determinations provide strong evidence regarding the existence of a Fourth Amendment class, and a Fourteenth Amendment subclass, which satisfy the requirements of Rule 23:

## 1.    **Fourth Amendment Class**

•      In at least six percent of all documented stops, police officers' stated reasons for conducting the stop were facially insufficient to establish reasonable suspicion.  That is to say, according to their own explanations for their actions, NYPD officers conducted at least 170,000 unlawful stops between 2004 and 2009.[75]

---

[74]      *See id.* at *14-*19.

[75]      I say "at least" because a significant number of the 400,000 stops that include only an "Other" indicator of suspicion on Side 1 of their UF-250 are also facially insufficient; these do not include any of the 170,000.  *See Floyd II*, 2012 WL 1344514, at *14-*16.  However, neither party has yet convincingly explained to the Court how to properly estimate how many of those 400,000 are facially insufficient.

       As I discussed at length in my *Daubert* evaluation of Fagan's report, I recognize that the legality of an individual stop cannot be determined on the basis of the corresponding UF-250 alone: a lawful stop is not made unlawful simply because the police officer fails to fill out the paperwork properly and an unlawful

•        In over 62,000 of those cases, police officers gave no reason other than "furtive movement" to justify the stop.  These facially unlawful stops occurred in every precinct in the City – from a low of fourteen such stops in Central Park's 22nd Precinct and forty-one such stops in Staten Island's 123rd Precinct to a high of over 3,500 in the western Bronx's 46th Precinct and East New York's 73rd and 75th Precincts.[76]

•        In over four thousand stops, police officers gave no reason other than "high crime area" to justify the stop.  These facially unlawful stops also occurred in every precinct in the City.[77]

•        In the 81st Precinct, where Adrian Schoolcraft's recordings document supervisors repeatedly telling officers to conduct unlawful stops, the percentage of stops that were facially unlawful was below the City-wide average.[78]  At least according to this metric, stop and frisk conduct in dozens of New York City

_____

stop is not made lawful because the police officer fills out the paperwork dishonestly or inaccurately.  *See Floyd II*, 2012 WL 1344514, at \*11-\*12.  Nevertheless, it is powerful and probative evidence that police officers themselves have justified 170,000 stops on the basis of legally insufficient criteria.

[76]        *See* Table 2 to Declaration of Jeffrey Fagan in Support of Plaintiffs' Motion for Class Certification ("Fagan Decl."); *Floyd II*, 2012 WL 1344514, at \*17.

[77]        *See* Table 2 to Fagan Decl; *Floyd II*, 2012 WL 1344514, at \*18 n.130.

[78]        *See* Table 1 to Fagan Decl.

26

precincts was similar to stop and frisk conduct in the 81st Precinct.

•       The percentage of documented stops for which police officers failed
to list an interpretable "suspected crime" has grown dramatically, from 1.1 percent
in 2004 to 35.9 percent in 2009.[79]  Overall, in more than half a million
documented stops – 18.4 percent of the total – officers listed no coherent suspected
crime.[80]

•       "High crime area" is listed as a justification for a stop in
approximately fifty-five percent of all recorded stops, regardless of whether the
stop takes place in a precinct or census tract with average, high, or low crime.[81]

•       5.37 percent of all stops result in an arrest; 6.26 percent of stops result
in a summons.[82]  In the remaining eighty-eight percent of cases, although they were
required by law to have objective reasonable suspicion that crime was afoot when
they made the stop, police officers ultimately concluded that there was no probable
cause to believe that crime was afoot.  That is to say, according to their own
records and judgment, officers' "suspicion" was wrong nearly nine times out of

---

[79]        See *Floyd II*, 2012 WL 1344514, at *7 n.41.

[80]        See Fagan Report at 23.

[81]        See *id.* at 52–55.

[82]        See *id.* at 63.

ten.[83]

- Guns were seized in 0.15 percent of all stops.  This is despite the fact that "suspicious bulge" was cited as a reason for 10.4 percent of all stops.[84]  Thus, for every sixty-nine stops that police officers justified specifically on the basis of a suspicious bulge, they found one gun.[85]

### 2.   Fourteenth Amendment Subclass

- "The racial composition of a precinct, neighborhood, and census tract is a statistically significant, strong and robust predictor of NYPD stop-and-frisk patterns even after controlling for the simultaneous influences of crime, social conditions, and allocation of police resources."[86]

- Based on Fagan's analysis of the UF-250s, "the search for weapons is

---

[83]   In addition, approximately seventeen percent of summonses from 2004 and 2009 were thrown out by the New York courts as being facially (*i.e.*, legally) insufficient and more than fifty percent of all summons were dismissed before trial.  *See Stinson v. City of New York*, No. 10 Civ. 4228, 2012 WL 1450553 (S.D.N.Y. Apr. 23, 2012).

[84]   *See* Fagan Report at 51, 63.

[85]   I recognize that officers may occasionally have some other reason to cite "suspicious bulge," but guns are surely the most obvious.  In addition, I presume that guns are sometimes recovered in instances when "suspicious bulge" is not checked on the UF-250 form.

[86]   Declaration of Jeffrey Fagan in Support of Plaintiffs' Opposition to Defendants' Motion to Exclude Plaintiffs' Proposed Expert Reports, Opinions and Testimony of Jeffrey Fagan ("Fagan *Daubert* Decl.") ¶ 4(a).

(a) unrelated to crime, (b) takes place primarily where weapons offenses are less

frequent than other crimes, and (c) is targeted at places where the Black and

Hispanic populations are highest . . . . [T]he search for drug offenders is (a)

negatively related to rates of crime or drug offenses specifically, and is (b)

concentrated in neighborhoods with high proportions of Black and Hispanic

residents."[87]

&bull;     "NYPD stops-and-frisks are significantly more frequent for Black and

Hispanic residents than they are for White residents, even after adjusting for local

crime rates, racial composition of the local population, police patrol strength, and

other social and economic factors predictive of police enforcement activity."[88]

&bull;     "Black and Hispanic individuals are treated more harshly during

stop-and-frisk encounters with NYPD officers than Whites who are stopped on

suspicion of the same or similar crimes."[89]

---

[87]    Fagan Report at 34.

[88]    Fagan *Daubert* Decl. ¶4(b).  This particular aspect of Fagan's report has been criticized vehemently by defendants, who argue that it fails to account for *who* is engaging in crime and, relatedly, *who* is engaging in suspicious behavior that justifies a stop.  *See Floyd II*, 2012 WL 1344514, at *4, *10-*11.  There are good arguments on both sides of this debate.  I do not know if this evidence, standing alone, would be sufficient to certify a Fourteenth Amendment subclass. However, in combination with Fagan's other findings and plaintiffs' qualitative proof, the preponderance of the evidence clearly supports certification.

[89]    Fagan *Daubert* Decl. ¶4(d).

- Police officers are more likely to list no suspected crime category (or an incoherent one) when stopping Blacks and Latinos than when stopping Whites.[90]

- Police officers are more likely to list the stop justification "furtive movement," which is a highly nebulous and not particularly probative of crime, when stopping Blacks and Latinos than when stopping Whites.[91]

## IV.   DISCUSSION

### A.   Plaintiffs Have Standing to Seek Injunctive Relief

Article III of the Constitution requires that a federal court entertain a lawsuit only if the plaintiff has standing to pursue the relief that she seeks. Concrete injury is a prerequisite to standing and a "plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future."[92]

The Supreme Court emphasized this requirement in *City of Los*

---

[90]   This occurred in 19.68 percent of stops of Blacks, 18.27 percent of stops of Latinos, and 16.66 percent of stops of Whites.  *See* Report at 23.

[91]   Officers list "furtive movement" in 45.5 percent of stops of Blacks, 42.2 percent of stops of Latinos, and 37.4 percent of stops of Whites.  *See* Fagan Report App'x Table D1.  *See also Floyd II*, 2012 WL 1344514, at *17.

[92]   *Deshawn v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983)).

*Angeles v. Lyons*, when it held that Lyons, who had been subjected to a dangerous chokehold by a Los Angeles police officer, did not have standing to pursue an injunction against the police department's practice of using chokeholds because his past injury "does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part."[93]

Defendants argue that plaintiffs Clarkson, Dennis, and Floyd lack standing to seek injunctive relief.[94]  Clarkson and Dennis allege that they were each stopped improperly only once between 2004 and 2009 and Dennis and Floyd no longer live in New York (although Dennis regularly visits his friends and family here and intends to move back in the future and Floyd intends to move back to the City after he finishes medical school).[95]  Accordingly, defendants argue, "[plaintiffs'] assertion that they will again be stopped and deprived of their constitutional rights is wholly speculative."[96]

---

[93]     *Lyons*, 461 U.S. at 105.

[94]     *See* Def. Mem. at 20-21.

[95]     *See* Declarations of Lalit Clarkson, Deon Dennis, David Floyd, and David Ourlicht ("Plaintiffs' Declarations"), Exs. 2-5 to Charney Decl.

[96]     Def. Mem. at 20-21.

The simplest way to address defendants' concern is by noting that David Ourlicht, the fourth plaintiff, indisputably does have standing and that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."[97]  *First*, unlike Lyons, who alleged only one past instance of unconstitutional police behavior, Ourlicht was stopped by NYPD officers three times in 2008 and once again in 2010, after this lawsuit was filed.[98] "The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented."[99]  *Second*, unlike the plaintiffs in *Lyons* and *Shaine v. Ellison*,[100] Ourlicht's risk of future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law.  The risk of injury is not based on a string of unlikely contingencies: according to his sworn affidavit, Ourlicht was stopped and frisked while going about his daily life –

---

[97]     *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006).

[98]     *See* Affidavit of David Ourlicht, Ex. 5 to Charney Decl., ¶¶ 6-18.

[99]     *Nicacio v. United States Immigration & Naturalization Serv.*, 768 F.2d 1133, 1136 (9th Cir. 1985).  *Accord Aguilar v. Immigration & Customs Enforcement Div. of the United States Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 828 (S.D.N.Y. 2011) (finding standing in a case where one set of plaintiffs had allegedly been subject to two unlawful searches and other plaintiffs feared repeat injury because the searches were part of defendants' "condoned, widespread, and ongoing" practice).

[100]    356 F.3d 211 (2d Cir. 2004).

32

walking down the sidewalk, sitting on a bench, getting into a car.[101]

> *Finally*, as I explained in the *Daniels* litigation, the frequency of
alleged injuries inflicted by the practices at issue here creates a likelihood of future
injury sufficient to address any standing concerns.[102]  In *Lyons*, the police
department's challenged policies were responsible for ten deaths; here, the police
department has conducted over 2.8 million stops over six years and its paperwork
indicates that, *at the very least*, 60,000 of the stops were unconstitutional (because
they were based on nothing more than a person's "furtive movement").  Every day,
the NYPD conducted 1200 stops; every day, the NYPD conducted nearly thirty
facially unlawful stops based on nothing more than "subjective, promiscuous
appeals to an ineffable intuition."[103]  In the face of these widespread practices,
Ourlicht's risk of future injury is "'real and immediate,' not 'conjectural' or

---

[101]     *See Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1041-42 (9th Cir.
1999) (*en banc*) (stating that the Supreme Court in *Spencer v. Kemna*, 523 U.S. 1,
15 (1998) "characterized the denial of Article III standing in *Lyons* as having been
based on the plaintiff's ability to avoid engaging in illegal conduct")).

[102]     *See National Congress for Puerto Rican Rights by Perez v. City of
New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) (later renamed *Daniels*).

[103]     *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005)
(Posner, *J.*) (criticizing the use of the vague term "furtive" and opining that
"[w]hether you stand still or move, drive above, below, or at the speed limit, you
will be described by the police as acting suspiciously should they wish to stop or
arrest you. Such subjective, promiscuous appeals to an ineffable intuition should
not be credited.").

'hypothetical,'"[104] and he satisfies Article III's standing requirements.  Because
Ourlicht has standing, I need not consider the standing of the other plaintiffs.[105]  I
nevertheless note that Dennis and Floyd have each been stopped by the NYPD
more than once (although two of Dennis' three stops occurred many years ago).
Even Clarkson's single stop, in light of the tens of thousands of facially unlawful
stops, would likely confer standing.[106]

### B.     Plaintiffs Satisfy the Four Prerequisites of Rule 23(a)

#### 1.     Ascertainability

Defendants argue that the "description of the class must be
'sufficiently definite so that it is administratively feasible for the court to determine
whether a particular individual is a member.'"[107]  Defendants believe that
plaintiffs' proposed class definition – all persons who have been or in the future
will be unlawfully stopped in violation of the Fourth Amendment, including all

---

[104]     *Lyons*, 461 U.S. at 102.

[105]     *See Forum for Academic and Institutional Rights, Inc.*, 547 U.S. at 53
n.2.

[106]     "[T]here is no per se rule requiring more than one past act, or any
prior act, for that matter, as a basis for finding a likelihood of future injury."  *Roe
v. City of New York*, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001).

[107]     Def. Mem. at 16 (quoting 7A Wright, Miller & Kane, *Federal
Practice and Procedure* § 1760).

persons stopped on the basis of being Black or Latino in violation of the

Fourteenth Amendment – is impermissibly indefinite because "an individualized

inquiry must be made into the facts and circumstances surrounding [each] stop"

and the "analysis is highly specific and unique in every case."[108]

   The NYPD repeats this argument despite its unsurprising lack of

success for over three decades.  In 1979, Judge Charles Haight of this Court was

presented with a motion for class certification in the landmark *Handschu* litigation

that sought to curtail unconstitutional behavior by the NYPD, including the

surveillance of left wing political groups.  Plaintiffs sought to certify a class of

"[a]ll individuals . . . who are physically present in the City of New York . . . who

engage in or have engaged in lawful political, religious, educational or social

activities and who, as a result of these activities, have been, are now or hereafter

may be subjected to or threatened by" surveillance or violence by the NYPD.[109]

The defendants' "strenuously pressed arguments against certification" focused on

the indefinite nature of the class definition.  Judge Haight rejected those

arguments: "Where, as here, the 23(b)(2) class action seeks equitable relief as

opposed to money damages, obviating the need for notice to class members,

---

[108]  *Id*.

[109]  *Handschu v. Special Servs. Div.*, No. 71 Civ. 2203, 1979 U.S. Dist.
Lexis 12148, at *3 (S.D.N.Y. May 25, 1979).

precise delineation of the class has been held unnecessary."[110]

Rule 23 does not demand ascertainability. The requirement is a judicial creation meant to ensure that class definitions are workable when members of the class will be entitled to damages or require notice for another reason.[111] In contrast, as Judge Haight noted, the drafters of the Rule specifically envisioned the use of (b)(2) classes "in the civil-rights field where a party is charged with discriminating unlawfully against a class, *usually one whose members are incapable of specific enumeration*."[112] The most prominent treatise on class actions notes that because of the absence of individual damages, "it is not clear that the implied requirement of definiteness should apply to Rule 23(b)(2) class actions at all."[113]

Defendants repeated their ascertainability argument twenty years after

---

[110]    *Id.* at *10.

[111]    *See IPO*, 471 F.3d at 30. Defendants cite to *Forman v. Data Transfer*, 164 F.R.D. 400, 403 (E.D. Pa. 1995) for support, but that decision concerned a proposed (b)(3) class that sought individual damages. The need for ascertainability in (b)(1) or (b)(3) cases – or in (b)(2) cases that, pre-*Wal-Mart*, sought individual damages – has no bearing on the need for such ascertainability in (b)(2) cases seeking only injunctive relief for the class.

[112]    Fed. R. Civ. P. 23 1966 Advisory Committee Note (emphasis added).

[113]    William B. Rubenstein et al., *Newberg on Class Actions* § 3:7 at 1-172 (2011).

*Handschu*, in the *Daniels* case, which sought certification of a nearly identical

class to the one sought here.  As I explained then, "[b]ecause 'general class

descriptions based on the harm allegedly suffered by plaintiffs are acceptable in

class actions seeking only declaratory and injunctive relief under Rule 23(b)(2),'

plaintiffs' proposed class is sufficiently definite to warrant certification."[114]

        Both the Second Circuit and numerous district courts in the circuit

have approved of class definitions without precise ascertainability under Rule

23(b)(2).[115]  Other circuits agree with this approach.  The Tenth Circuit has made

---

[114]     *Daniels*, 198 F.R.D. at 415 (quoting *Wanstrath v. Time Warner Entm't Co.*, No. 93 Civ. 8538, 1997 WL 122815 (S.D.N.Y. Mar. 17, 1997)). Defendants argue that *Daniels* was more narrow in scope because it addressed only the stop and frisk practices of one unit of the NYPD.  *See* Def. Mem. at 17-18.  But the smaller number of people stopped by the Street Crimes Unit (18,000 in 1997) has no impact on the ascertainability question.  The court cannot (and need not) determine which of the class members' stops were lawful, whether the number in question is 18,000 or 2.8 million.

[115]     *See Marisol v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) (certifying a class of children who "are or will be at risk of neglect or abuse and whose status is or should be known to" a City agency).  *See also, e.g., Biediger v. Quinnipiac Univ.*, No. 09 Civ. 621, 2010 WL 2017773, at *7 (D. Conn. May 20, 2010) (certifying a class of all present and future female students who "want to end Quinnipiac University's sex discrimination" even though ascertaining who will be a future student and what these students will want is of course impossible); *Mental Disability Law Clinic v. Hogan*, No. 06 Civ. 6320, 2008 WL 4104460, at *18 (E.D.N.Y. Aug. 26, 2008) (certifying a class of "all individuals who (1) suffer from mental illness . . ." and explaining that "because only declaratory and injunctive relief is sought, individual assessments of disability need not be made"); *Finch v. New York State Office of Children & Family Servs.*, 252 F.R.D. 192, 203 (S.D.N.Y. 2008) ("Rule 23(b)(2) classes need not be precisely defined").

clear that "while the lack of identifiability is a factor that may defeat Rule 23(b)(3)

class certification, such is not the case with respect to class certification under Rule

23(b)(2)."[116]  Similarly, the First Circuit has said that ascertainability is

unnecessary when "the conduct complained of is the benchmark for determining

whether a subdivision (b)(2) class exists."[117]

It would be illogical to require precise ascertainability in a suit that

seeks no class damages.  The general demarcations of the proposed class are clear

– those people unlawfully stopped or who may be stopped by the NYPD – and that

definition makes the class sufficiently ascertainable for the purpose of Rule

23(b)(2).

### 2.    Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all

members is impracticable."  In the Second Circuit, "numerosity is presumed at a

---

[116]     *Shook v. El Paso County*, 386 F.3d 963, 972 (10th Cir. 2004).

[117]     *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972) ("notice to the members of a (b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited").  *Accord Baby Neal v. Casey*, 43 F.3d 48, 54 (3d Cir. 1995) (certifying the entirely unascertainable class of "all children in Philadelphia who have been abused or neglected and are known or should be known to the Philadelphia Department of Human Services").

level of 40 members."[118]  Defendants argue here that "in the absence of

ascertainability plaintiffs cannot establish numerosity,"[119] but they cite no law for

that proposition.[120]  Again, the language of the Rule's drafters is helpful: (b)(2) is

meant for classes "whose members are incapable of specific enumeration."[121]  The

preponderance of the evidence indicates that the proposed class and subclass easily

exceed forty members.  Indeed, the size of the class is likely to be well over one

hundred thousand.

### 3.    Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common

to the class."  This requires plaintiffs "to demonstrate that the class members 'have

suffered the same injury.'"[122]  In *Wal-Mart*, plaintiffs sought to certify a class of

approximately 1.5 million female employees of the retail giant, alleging that "the

discretion exercised by their local supervisors over pay and promotion violates

---

[118]    *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d
Cir. 1995).

[119]    Def. Mem. at 18.

[120]    *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) ("Courts
have not required evidence of exact class size or identity of class members to
satisfy the numerosity requirement.").

[121]    Fed. R. Civ. P. 23 1966 Advisory Committee Note.

[122]    *Wal-Mart*, 131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 157).

Title VII by discriminating against women."[123]  The Supreme Court found that the

plaintiffs had failed to satisfy commonality because the putative class members

were subjected to an enormous array of *different* employment practices:

> [P]ay and promotion decisions at Wal-Mart are generally
> committed to the local managers' broad discretion . . . [who may
> make employment decisions] with only limited corporate
> oversight[124] . . . . Wal-Mart has no testing procedure or other
> companywide evaluation method that can be charged with bias.
> The whole point of permitting discretionary decisionmaking is to
> avoid evaluating employees under a common standard[125] . . . .
> Other than the bare existence of delegated discretion, respondents
> have identified no 'specific employment practice' – much less one
> that ties all their 1.5 million claims together.[126]

Judge Richard Posner recently applied the *Wal-Mart* decision to the

claims of Black Merrill Lynch brokers alleging racial discrimination.  This was his

summary of the *Wal-Mart* holding:

> *Wal-Mart* holds that if employment discrimination is practiced by
> the employing company's local managers, exercising discretion
> granted them by top management . . . rather than implementing a
> uniform policy established by top management to govern the local
> managers, a class action by more than a million current and

---

[123]     *Id.* at 2547.

[124]     *Id.*

[125]     *Id.* at 2553.

[126]     *Id.* at 2555.

former employees is unmanageable.[127]

Merrill Lynch had a policy of permitting brokers in the same office to form work teams of their choosing and a policy of giving the accounts of departed brokers to existing brokers on the basis of various performance formula.  Plaintiffs alleged that the "fraternity" nature of the teaming policy and the rich-get-richer nature of the accounts policy had a disparate impact on Black brokers.  Reversing the lower court and granting certification, Judge Posner explained that the two policies

> are practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim.  Therefore challenging those policies in a class action is not forbidden by the *Wal-Mart* decision; rather that decision helps (as the district judge sensed) to show on which side of the line that separates a company-wide practice from an exercise of discretion by local managers this case falls.[128]

The court determined that "the plaintiffs' claim of disparate impact is most efficiently determined on a class-wide basis rather than in 700 individual lawsuits"[129] because, unlike in *Wal-Mart*, there were two company-wide policies at issue and a class action would be the best mechanism for determining the impact that those policies had on the earnings of Merrill Lynch's brokers.  Thus, Judge

---

[127]    *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488 (7th Cir. 2012).

[128]    *Id.* at 490.

[129]    *Id.*

Posner's opinion stands for the proposition that even after *Wal-Mart*, Rule 23(b)(2) suits remain appropriate mechanisms for obtaining injunctive relief in cases where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of the impact may vary by class member.

This has long been the Second Circuit's standard.[130]  In *Marisol A.*, the Court of Appeals affirmed the certification of a class of all children challenging many different aspects of the child welfare system that implicated different statutory, constitutional, and regulatory schemes.  Finding that the district court's characterization of the claims "stretches the notions of commonality and typicality," the court nevertheless affirmed because defendants' actions were alleged to "derive from a unitary course of conduct by a single system."[131]  More recently, the Second Circuit has reiterated the rule that "where plaintiffs were 'allegedly aggrieved by a single policy of the defendants,' and there is 'strong commonality of the violation and the harm,' this 'is precisely the type of situation for which the class action device is suited.'"[132]

---

[130]   *See* Pl. Mem. at 12.

[131]   *Marisol A.*, 126 F.3d at 377.

[132]   *Brown v. Kelly*, 609 F.3d 467, 468 (2d Cir. 2010) (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 146 (2d Cir. 2001)).  *Accord Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008) ("Commonality does not mean that all issues must be identical as to each member,

42

Case 1:08-cv-01034-SAS-HBP   Document 206   Filed 05/16/12   Page 43 of 57

As documented above, there can be no dispute that the NYPD has a single stop and frisk program. Defendants concede that the "NYPD's department-wide policies generate from a centralized source and NYPD employs a hierarchical supervisory structure to effect and reinforce its department-wide policies."[133] The stop and frisk program is far more centralized and hierarchical than even the employment policies in *Merrill Lynch*. Precinct commanders are not given leeway to conduct stops and frisks if, when, and how they choose; instead, they are required to use the tactic as a central part of the Department's pro-active policing strategy. They are required to monitor, document, and report their stop and frisk activity to headquarters using a uniform system; all officers are subject to centralized stop and frisk training; performance standards are obligatory and a recognized part of productivity evaluations in all precincts. Since *Wal-Mart*, at least three district courts have granted class certification in cases alleging Fourth and Fourteenth Amendment violations due to a police department's policy and/or practice of making unlawful stops and arrests; all of these courts have rejected the

_____

but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment.") (quotation omitted); *Daniels*, 198 F.R.D. at 417; *D.S. v. New York City Dep't of Educ.*, 255 F.R.D. 59, 71 (E.D.N.Y. 2008).

[133]    Def. Mem. at 8.

43

notion that the individual circumstances of a stop defeat commonality.[134]

Defendants argue that "individual officers' decisions to make stops are akin to the

Wal-Mart 'policy' of allowing discretion to supervisors over employment matters,"

---

[134]    Three weeks ago Judge Robert Sweet of this court certified a class of 620,000 people who were issued summonses by the NYPD between 2004 and 2009 and who had those summonses dismissed for being facially insufficient. *See Stinson*, 2012 WL 1450553.  In *Stinson*, like in this case and unlike in *Wal-Mart*, plaintiffs allege "a specific policy promulgated by defendants" (namely that NYPD officers issue summonses without probable cause in order to meet their quotas). *See also Morrow v. City of Tenaha*, No. 08 Civ. 288, 2011 WL 3847985, at *192-94 (E.D. Tex. Aug. 29, 2011) (certifying class of Latinos who were stopped for alleged traffic violations and finding commonality in light of statistical evidence showing significant increases in the number of minorities stopped after the adoption of a new police policy); *Ortega-Melendres v. Arpaio*, No. 07 Civ. 2513, 2011 WL 6740711, at *19 (D. Ariz. Dec. 23, 2011) (certifying class of Latino motorists alleging racial profiling and finding that differences in subjective motivations of officers do not defeat commonality or typicality when there is evidence of a departmental policy of violating constitutional rights).  Four weeks ago, Judge Katherine Forrest denied plaintiffs' motion to certify a class of all Latinos in the New York area who have been or will be subject to a home raid operation by Immigration and Customs Enforcement.  *See Aguilar v. Immigration and Customs Enforcement Div. of U.S. Dept. of Homeland Sec.*, No. 07 Civ. 8224, 2012 WL 1344417 (S.D.N.Y. Apr. 16, 2012).  Judge Forrest placed significant emphasis on the fact that defendants' raids on the named plaintiffs' homes took place in 2007 and that there was "no evidence in the record" to suggest that defendants' practices in 2012 shared commonality with the practices in 2007. *Id.* at *9.  She therefore deemed injunctive relief inappropriate.  Here, in contrast, there is ample evidence to show that stop and frisk practices have not changed since the 2004 to 2009 period, except that the numbers of stops have continued to rise.  It is also worth noting that Judge Forrest did not emphasize that the lack of commonality in *Wal-Mart* was based on the company's de-centralized approach to employment decisions.  As the courts in *Stinson*, *Morrow*, and *Ortega-Melendres* explained, Wal-Mart's structure is worlds away from centralized and hierarchical policing practices.

44

and so the NYPD has "essentially a policy against having a uniform practice."[135]

This is belied by the 437 paragraphs of facts that defendants submitted, in support

of their motion for summary judgment, showing just how centralized and

hierarchical the NYPD's policies and practices are.[136]   Moreover, defendants

confuse the exercise of judgment in implementing a centralized *policy* with the

exercise of discretion in formulating a local store policy or practice.[137]

     Plaintiffs allege that their Fourth and Fourteenth Amendment rights

are violated as a result of the NYPD's policies and practices.  As they argue, these

claims raise "central and core questions of fact and law that, when answered, will

---

[135]    Def. Mem. at 8 n.9.

[136]    Some of this material was submitted in order to show that the NYPD was not liable for failure to train, supervise, monitor, and discipline because it in fact has a robust system of training, supervision, monitoring and discipline.  I denied summary judgment on this claim because there exist material disputes of fact about the "constitutional sufficiency" of this system, not about its existence. *Floyd I*, 813 F. Supp. 2d at 429.

[137]    I also note that plaintiffs' level of proof here is particularly strong: if plaintiffs in *Wal-Mart* had produced sixty thousand human resource forms, including forms from every Wal-Mart store in the country, in which supervisors gave facially unlawful reasons for denying women employees raises or promotions, the Supreme Court's commonality determination may well have been different.  As the *Wal-Mart* Court explained, plaintiffs could establish commonality even in the absence of a centralized employment system by showing "'significant proof' that Wal-Mart 'operated under a general policy of discrimination.'" *Wal-Mart*, 131 S. Ct. at 2553 (quoting *Falcon*, 457 U.S. at 159).

resolve all class members' *Monell* claims against the City."[138]  In the terminology

of *Wal-Mart*, a class wide proceeding here will "generate common answers" to

these questions that are "apt to drive the resolution of the litigation."[139]

### 4.    Typicality and Adequacy

Defendants make overlapping objections on the basis of typicality and

adequacy, and so I address these two Rule 23(a) prerequisites in tandem.[140]

"Typicality 'requires that the claims of the class representatives be typical of those

of the class, and is satisfied when each class member's claim arises from the same

course of events[] and each class member makes similar legal arguments to prove

---

[138]     Pl. Mem. at 12.  Plaintiffs list four such questions: (1) Whether New York City has a Policy and/or Practice of conducting stops and frisks without reasonable suspicion? (2) Whether the City has a Policy and/or Practice of stopping and frisking Black and Latino persons on the basis of race rather than reasonable suspicion? (3) Whether the NYPD's department-wide auditing and command self-inspection protocols and procedures demonstrate a deliberate indifference to the need to monitor officers adequately to prevent a widespread pattern of suspicionless and race-based stops? (4) Whether the NYPD's Policy and/or Practice of imposing productivity standards and/or quotas on the stop-and-frisk, summons, and other enforcement activity of officers is a moving force behind widespread suspicionless stops by NYPD officers?

[139]     131 S. Ct. at 2551.

[140]     Adequacy requires both that the plaintiffs themselves be adequate representatives of the class and that the plaintiffs' counsel be qualified, experienced, and able to conduct the litigation.  Defendants do not challenge the second prong and there is no doubt that plaintiffs are in excellent hands.  *See* Charney Decl. ¶¶ 3-12.  Defendants' challenge to plaintiffs' Article III standing, discussed above, was also framed as a problem of adequacy.

46

the defendant's liability.'"[141]   Rather than focusing on the precise nature of

plaintiffs' injuries, the typicality requirement may be satisfied where "injuries

derive from a unitary course of conduct by a single system."[142]

The purpose of typicality is to ensure that class representatives "have

the incentive to prove all the elements of the cause of action which would be

presented by the individual members of the class were they initiating

individualized actions."[143]   Similarly, "[a]dequacy is twofold: the proposed class

representative must have an interest in vigorously pursuing the claims of the class,

and must have no interests antagonistic to the interests of other class members."[144]

As defendants acknowledge, in order to defeat a motion for certification, any such

conflicts must be "fundamental."[145]

Here, the four named plaintiffs' stops arise from the same course of

conduct – *i.e.*, the NYPD's centralized program of stops and frisks – and their legal

arguments are precisely the typical ones that are made by others who bring or

---

[141]     *Central States*, 504 F.3d at 245 (quoting *Robinson*, 267 F.3d at 155).

[142]     *Marisol A.*, 126 F.3d at 377.

[143]     *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 510 (S.D.N.Y. 1996).

[144]     *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

[145]     *In re Flag Telecom Holdings*, *Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).

could bring claims for Fourth and Fourteenth Amendment violations by defendants.  The named plaintiffs are vigorously pursuing their claims[146] and defendants have failed to identify any ways in which plaintiffs' interests are antagonistic to those of other class members.[147]

Defendants' argument is twofold:  *First*, "the Court would be required to assess any unique defenses of the defendants before determining liability, which could include a fact-intensive qualified immunity defense" and "the claims of putative class members who cannot identify an NYPD officer involved in the stop will be subject to unique defenses" that threaten to engulf the litigation.[148]  *Second*, because none of the named representatives are Latino, "they cannot represent the alleged Latino class members who make race-based claims."[149]  Neither argument is persuasive.

*First*, courts and juries must *always* consider defendants' individual

---

[146]    *See* Plaintiffs' Declarations.

[147]    "An order requiring defendants to comply with federal and state law in order to remedy the systemic failures that are the source of plaintiffs' claims constitutes relief that would serve the entire putative class."  *Marisol A. v. Giuliani*, 929 F. Supp. 662, 692 (S.D.N.Y. 1996).

[148]    Def. Mem. at 14; *see id.* at 21-23.

[149]    *Id.* at 19.

48

defenses before determining liability. That is no bar at the certification stage.[150]

"In practice, courts in this Circuit . . . [refuse] certification only when confronted

with a sufficiently clear showing" that a defense unique to the representative

plaintiff's claims will in fact defeat those claims.[151]

        It is true that the parties have not been able to identify the police

officers involved in five of the plaintiffs' eight alleged stops.[152]  At trial, defendants

will argue that plaintiffs cannot establish liability for those stops; the jury may or

may not agree.  But defendants already moved for summary judgment on the

claims of two of the four plaintiffs, including those of David Ourlicht, who was

unable to identify the police officers who stopped him.  Summary judgment was

---

[150]     The court "should not assess any aspect of the merits unrelated to a Rule 23 requirement" and must ensure "that a class certification motion does not become a pretext for a partial trial of the merits." *IPO*, 471 F.3d at 41. "'The unique defense rule, however, is not rigidly applied in this Circuit, and is intended to protect plaintiff class – not to shield defendants from a potentially meritorious suit.'" *Duling v. Gristede's Operating Corp.*, 267 F.R.D. 86, 97 (S.D.N.Y. 2010) (quoting *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 71 (S.D.N.Y. 2009)). *Accord Sirota v. Solitron Devise, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982) ("If [] defendants were arguing that a district court must determine whether the named plaintiffs have a meritorious claim before they can be certified as class representatives, they would plainly be wrong.").

[151]     *In re Omnicom Group, Inc. Sec. Litig.*, No. 02 Civ. 4483, 2007 WL 1280640, at *4 (S.D.N.Y. Apr. 30, 2007) (explaining that the court "need not deny certification merely because of the presence of a colorable unique defense").

[152]     *See* Plaintiffs' Declarations.

denied because I found that if a juror were to credit Ourlicht's testimony, she could find that he was stopped in the absence of objective reasonable suspicion that crime was afoot.[153]  That is to say, defendants failed to show that the John Doe defense will defeat plaintiffs' claims.

This issue does not create a "fundamental" conflict between named plaintiffs and unnamed class members:  Indeed, it may be that officers often fail to complete the required UF-250 when they conduct a quick stop and frisk.[154]  In addition, three of the named plaintiffs allege stops involving identified police officers and at least two of those stops came from precincts in which commanding officers have acknowledged the use of performance standards or quotas.[155]  The

---

[153]     *See Floyd I*, 813 F. Supp. 2d 417.

[154]     At a recent conference regarding a related action, one Assistant Corporation Counsel informed me that "the UF-250s, they're not always, you know, made or written . . . . I suspect for many of the incidents in the complaint, there would not be UF-250s," although a second Assistant Corporation Counsel said that "that's not the case.  When there's a stop based on a penal law violation or misdemeanor, there will be a UF-250."  4/17/12 Transcript at 10:7-25 [Docket No. 15], *Ligon v. City of New York*, No. 12 Civ. 2274.

[155]     Defendant Officer Luis Pichardo, who stopped plaintiff Deon Dennis in the 28th Precinct in January 2008, testified that his supervisors imposed a five summons-per-tour quota on the officers working his tour when he stopped Dennis.  Dwayne Montgomery, who was commander of the 28th Precinct at the time, testified that he imposed monthly stop and frisk and summons requirements on all officers and disciplined officers who failed to meet those quotas.  *See* Pichardo Dep., Ex. 68 to Charney SJ Decl., at 218-219 and PAF ¶ 58.  Plaintiff David Floyd was stopped by officers from the 43rd precinct.  Chief Esposito told the

issues involved in these stops go to the core of plaintiffs' claims.

The doctrine of unique defenses is intended to protect absent members of the plaintiff class by ensuring the presence of a typical plaintiff.  The doctrine is not meant to protect defendants by permitting them to defeat certification because the facts raised by the claims of the representative plaintiffs are not *identical* to the facts raised by the claims of all putative class members.  Because the named plaintiffs' claims arise from the same policy or practice and the same general set of facts as do the claims of the putative class members, the typicality prong is satisfied.[156]

Defendants' contention regarding qualified immunity is similarly unavailing: the NYPD routinely argues that its officers are protected by qualified immunity.  That defense is common to innumerable *Terry* stops and frisks; it cannot defeat typicality at the class certification stage.

*Second,* defendants' claim that the named plaintiffs cannot represent Latinos is likewise unconvincing.  The cases that defendants cite denied certification because the named plaintiffs fell outside the subclass that they sought

---

commander of the 43rd, Charles Ortiz, that his officers did not have enough stops and summonses and Ortiz frequently conveyed that message to his subordinates. *See* PAF ¶¶ 80-82.

[156]    *See Central* States, 504 F.3d at 245; *Daniels*, 198 F.R.D. at 419.

to represent.[157]  Plaintiffs seek certification of a Fourteenth Amendment subclass of Blacks and Latinos stopped because of their race; plaintiffs clearly fall inside that definition.[158]

Plaintiffs' complaints are typical of those of the class and they will fairly and adequately protect the interests of the class.  All four prerequisites of Rule 23(a) are met.

## B.    Class Certification Is Proper Under Rule 23(b)(2)

To certify a class under Rule 23(b)(2), plaintiffs must show that defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  As the Supreme Court explained in *Wal-Mart*, Rule 23(b)(2) is intended to cover cases such as this one:

> When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute.

---

[157]    *See Norman v. Connecticut State Bd. of Parole*, 458 F.2d 497, 499 (2d Cir. 1972); *Kenavan v. Empire Blue Cross & Blue Shield*, No. 91 Civ. 2393, 1996 WL 14446 (S.D.N.Y. Jan. 16, 1996).

[158]    *See, e.g., Leonard v. Southtec, LLC*, No. 04 Civ. 72, 2005 WL 2177013 (M.D. Tenn. Sept. 8, 2005) (certifying Black named plaintiffs to represent Blacks and Latinos).

Predominance and superiority are self-evident.[159]

Defendants argue that certification under (b)(2) is inappropriate because they have

not "acted or refused to act on grounds generally applicable to the class" and

because plaintiffs "fail to identify an official policy, or its equivalent, and seek a

broad-based structural injunction."[160]   Again, these arguments do not withstand the

overwhelming evidence that there in fact exists a centralized stop and frisk

program that has led to thousands of unlawful stops.  The vast majority of New

Yorkers who are unlawfully stopped will never bring suit to vindicate their

rights.[161]  It is precisely for cases such as this that Rule 23(b)(2) was designed.[162]

---

[159]   131 S. Ct. at 2558.  *See also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class actions).

[160]   Def. Mem. at 23-24.

[161]   *See* James Forman, Jr. *Criminal Law: Community Policing and Youth As Assets*, 95 J. Crim. L. & Criminology 1, at n.47 (2004) (citing the scholarship of Professors Charles Ogletree, Angela Davis, Pamela Karlan and others who document that the vast majority of people who are unconstitutionally stopped and not charged with any crime will never bring civil actions in court).

[162]   Under the doctrine established in *Galvan*, 490 F.2d 1255, district courts *may* decline to certify a class if doing so would not further the implementation of the judgment.  *See Davis v. Smith*, 607 F.2d 535 (2d Cir. 1978). As plaintiffs note, the doctrine is only applicable when a defendant affirmatively states that it will apply any remedy across the board.  Here, defendants have offered to apply any remedy to "all persons similarly situated to the named plaintiffs" but simultaneously argue that the alleged class members *are not* similarly situated to the named plaintiffs.  "It is plainly inconsistent for Defendants

53

Defendants close their argument regarding the applicability of Rule 23 with this disturbing statement:

> [E]ven if [plaintiffs] prove a widespread practice of suspicionless stops and *Monell* causation, it is not at all clear that an injunction would be a useful remedy. Certainly, no injunction could guarantee that suspicionless stops would never occur or would only occur in a certain percentage of encounters . . . . Here, plaintiffs essentially seek an injunction guaranteeing that the Fourth Amendment will not be violated when NYPD investigates crime. If a court could fashion an injunction that would have this effect, then it is likely that lawmakers would have already passed laws to the same effect . . . . An injunction here is exactly the kind of judicial intrusion into a social institution that is disfavored . . .

Three points must be made in response. *First*, suspicionless stops should never occur. Defendants' cavalier attitude towards the prospect of a "widespread practice of suspicionless stops" displays a deeply troubling apathy towards New Yorkers' most fundamental constitutional rights.

*Second*, it is not readily apparent that if an injunction preventing such widespread practices could be fashioned, it would already have been passed by lawmakers. The twenty-seven members of the Black, Latino and Asian Caucus of

---

to argue that any relief granted in connection with this action will be applied to benefit every member of the class, while at the same time they contest the existence of commonality and typicality." *Bishop v. New York City Dep't of Hous. Pres. and Dev.*, 141 F.R.D. 229, 241 (S.D.N.Y. 1992). In addition, because potentially complex City-wide injunctive relief would be more appropriate as a remedy in the context of a class action, there are collateral consequences to denying certification and the *Galvan* doctrine is inapplicable.

the Council of the City of New York who submitted an *amicus* brief in support of plaintiffs "disagree[] strongly with this assertion."[163]  It is rather audacious of the NYPD to argue that if it were possible to protect "the right of the people to be secure in their persons" from unlawful searches and seizures *by the NYPD*, then the legislature would already have done so and judicial intervention would therefore be futile.  Indeed, it is precisely when the political branches violate the individual rights of minorities that "more searching judicial enquiry" is appropriate.[164]

   *Third*, if the NYPD is engaging in a widespread practice of unlawful stops, then an injunction seeking to curb that practice is not a "judicial intrusion into a social institution" but a vindication of the Constitution and an exercise of the courts' most important function: protecting individual rights in the face of the government's malfeasance.

---

[163] Brief of *Amicus Curiae* The Black, Latino and Asian Caucus of the Council of the City of New York in Further Support of Plaintiffs' Motion for Class Certification at 8.

[164]  *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938). "If we were to accept the State's argument, we would be enshrining the rather perverse notion that traditional rights are not to be protected in precisely those instances when protection is essential, *i.e.*, when a dominant group has succeeded in temporarily frustrating exercise of those rights. We prefer a view more compatible with the theory of this nation's founding: rights do not cease to exist because a government fails to secure them. *See* The Declaration of Independence (1776)." *Mescalero Apache Tribe v. New Mexico*, 630 F.2d 724, 730 (10th Cir. 1980), *vacated*, 450 U.S. 1036 (1981), *aff'd*, 462 U.S. 324 (1983).

## V.   CONCLUSION

Because plaintiffs have satisfied the requirements of Rule 23, their

motion for class certification is granted.  The clerk is directed to close this motion

[Docket No. 165].  A status conference is scheduled for May 29, 2012 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      May 16, 2012
            New York, New York

56

**- Appearances -**

**For Plaintiffs:**

Darius Charney, Esq.
Sunita Patel, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6464

Jonathan C. Moore, Esq.
Jennifer Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 277-5850

Eric Hellerman, Esq.
Philip Irwin, Esq.
Gretchen Hoff-Varner, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, New York 10018
(212) 841-1190

**For Defendants**:

Heidi Grossman
Linda Donahue
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-8084