## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

DAVID FLOYD, et al.,

                    Plaintiffs,

          - v -

THE CITY OF NEW YORK, et al.,

                    Defendants.

No. 08 Civ. 1034 (SAS)

*The Clerk is directed to docket this amicus brief.*

*So Ordered!*

*May 16, 2012*

*Shira A. Scheindlin*
*U.S.D.J.*

## BRIEF OF *AMICUS CURIAE* THE BLACK, LATINO AND ASIAN CAUCUS OF THE COUNCIL OF THE CITY OF NEW YORK IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/16/12

Dated:  February 2, 2012

## INTEREST OF *AMICUS CURIAE*
## THE BLACK, LATINO, AND ASIAN CAUCUS OF THE
## COUNCIL OF THE CITY OF NEW YORK

The Black, Latino and Asian Caucus ("BLAC") of the Council of the City of New York (the "Council") is composed of 27 Council Members, with at least one member from each of the five boroughs in the City of New York (the "City"). Each member of the BLAC represents a City Council District with approximately 155,000 constituents. In all, the BLAC represents over 4 million New Yorkers, approximately 73% of whom are Black or Latino. The BLAC convenes to ensure that the City Council addresses issues of particular concern to the City's Black, Latino and Asian communities.

Members of the BLAC work closely with the New York Police Department ("NYPD") to fight crime and address safety and quality of life issues in their communities. They greatly appreciate the NYPD's commitment to ensuring that residents in the City's many diverse neighborhoods are safe. They also understand the tremendous challenges that the police face in this work. At the same time, from their work serving residents in their districts and as legislators and overseers of City agencies, the BLAC has a unique perspective to share on the NYPD's stop and frisk policies.

First, as leaders in their communities and through constituent service activities, members of the BLAC communicate regularly with the public and receive hundreds, if not thousands, of informal complaints every year from constituents about being stopped and frisked by the NYPD without reasonable suspicion. Indeed, because it has become a part of life to be stopped and frisked without reasonable suspicion for many of the BLAC's constituents, the BLAC believes that the number of complaints received by their offices and even by the New York City Civilian

2

Complaint Review Board ("CCRB")[1] may, in fact, dramatically understate the scope of this problem.

Second, as legislators and through their oversight capacity, members of the BLAC have closely examined NYPD's stop and frisk practices. Members of the BLAC participated in joint hearings held by the Council's Committees on Public Safety and Civil Rights on April 30, 2009,[2] and by the Council's Committees on Public Safety, Civil Rights, and Public Housing on September 28, 2010,[3] on the impact and pervasiveness of the NYPD's stop-and-frisk policies and practices throughout the City generally and in the City's public housing developments. These hearings included testimony from, among others: Greg Ridgeway, the author of an NYPD-commissioned study relied on by Defendants in this case; Jeffrey Fagan, an expert cited by Plaintiffs; and representatives from the CCRB.

Through their local leadership and legislative roles, the BLAC has worked to change the NYPD's stop and frisk policies and practices for years. They have also experienced the effects of these practices: the reinforced negative racial stereotypes and a growing distrust of the NYPD on the part of Black and Latino residents. This distrust hampers efforts by the BLAC to bring the community and NYPD together to deal with issues of crime and quality of life. The distrust also spills over to other institutions of government, making it more difficult for the BLAC to engage youth and other constituents to solve persistent community problems.

---

[1] The CCRB is "[a]n independent civilian complaint review board ... with the authority to investigate allegations of police misconduct." *See* New York City Charter § 440.

[2] "Analysis of NYPD Stop and Frisk Encounters," Joint Committees on Public Safety and Civil Rights, City Council, City of New York (Apr. 30, 2009), transcript *available at* http://bit.ly/woOYIA ("2009 Tr."). The Court may take judicial notice of both the April 30, 2009 and September 28, 2010 hearings. *See Schubert v. City of Rye*, 775 F. Supp. 2d 689, 696 n.3 (S.D.N.Y. 2011) (taking judicial notice of City Council meetings).

[3] "Stop and Frisk Practices in New York City Housing Authority Developments," Joint Committees on Public Housing, Civil Rights, and Public Safety, City Council, City of New York (Sept. 28, 2010), transcript *available at* http://bit.ly/A6GGok ("2010 Tr.").

Today, nearly ten years after the NYPD entered into a settlement stipulation in *Daniels v. City of New York*, 199 F.R.D. 513, 514 (S.D.N.Y. 2001), the NYPD stop and frisk practices continue unabated. A more effective remedy is needed. For the reasons below, members of the BLAC support Plaintiffs' motion to certify the following class for declaratory and injunctive relief:

> All persons who since January 31, 2005 have been, or in the future will be, subjected, to New York Police Department ("NYPD")'s policies and/or widespread customs or practices of stopping, or stopping and frisking, persons in the absence of a reasonable, articulable suspicion that criminal activity has taken, is taking, or is about to take place in violation of the Fourth Amendment, including persons stopped or stopped and frisked on the basis of being Black or Latino in violation of the Equal Protection Clause of the Fourteenth Amendment.

## ARGUMENT

The members of the BLAC seek to participate in this matter first and foremost because they believe their constituents' interests and their own ability to serve their districts will be adversely affected if the Court declines to certify an injunctive class in this case.

## I.   CLASS CERTIFICATION IS WARRANTED BECAUSE THE NYPD'S STOP AND FRISK POLICIES AFFECT RESIDENTS CITYWIDE

Class certification is warranted where the party seeking certification meets the requirements of Federal Rule of Civil Procedure 23(a) and at least one of the three requirements listed in Rule 23(b). *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011). The requirements of Rule 23(a) are that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Id.* Plaintiffs in this case seek to certify a class under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final

4

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Id.* at 2548-49.

In its Opposition Brief, the City argues that "[t]he citywide injunctive relief sought related to the entire NYPD would be inappropriate since the proposed class representatives do not have standing to seek injunctive relief ... and have only been stopped within the confines of six precincts." *See* Opp'n Br. at 23.  However, thousands of Black and Latino youth throughout the five boroughs of the City are similarly subject to suspiconless searches by the NYPD as a result of the agency's stop and frisk policies and/or practices.

Council hearings and the experiences of BLAC members themselves confirm that there are many complaints of unlawful stop and frisk from residents of the 27 districts represented by members of the BLAC and other districts as well.  For example, at the Council's April 30, 2009 hearing on stop and frisk practices, a representative of the CCRB testified that it had received more than 2,400 stop and frisk complaints in 2008 and that stop and frisk complaints comprised 33% of all complaints received by the CCRB in 2008, up from only 19% in 2002. (2009 Tr. at 119).

At the Council's September 28, 2010 hearing on "Stop and Frisk Practices in Public Housing Authority Developments" another member of the CCRB, Bishop Mitchell G. Taylor, stated that nearly one-third of all stop and frisk complaints from patrolled housing encounters were substantiated, meaning that the CCRB found police misconduct had occurred.  (2010 Tr. at 17).  Bishop Taylor further testified that these complaints came from every borough in the City. (2010 Tr. at 80).

BLAC Members also heard of and relayed accounts from young Black and Latino constituents who had been stopped, questioned and/or frisked while riding bicycles on New York

City Housing Authority property, (2010 Tr. at 8, 57-58 (Testimony of Council Member Letitia James)), going to the store for a soda or visiting a neighbor in the building (2010 Tr. at 30-32 (Testimony of Bishop Taylor)). Indeed, Bishop Taylor called this a "common trend." (2010 Tr. at 30). Another member of BLAC, Council Member Melissa Mark-Viverito of Manhattan, stated: "This is a conversation that happens daily in my community. We hear it from our tenant association leaders. We hear it from our residents. We also, unfortunately, know the reality that it's a daily occurrence in the lives of our young people. That this somehow has become a rite of passage that they're going to have these kinds of experiences of being stopped and frisked. The numbers just keep increasing in terms of the number of incidents a year." (2010 Tr. at 65-66).

These suspicionless stops do more than inconvenience the individuals affected. They reinforce negative racial stereotypes and foster distrust of the NYPD. This distrust makes it difficult for members of the BLAC to bring together the community and NYPD , and harder to build the trust in government that these communities need to work effectively as partners to reduce crime, help the jobless, improve housing, and foster community and economic development.

## II.   INJUNCTIVE RELIEF IS APPROPRIATE TO REMEDY CONSTITUTIONAL VIOLATIONS ASSOCIATED WITH THE NYPD'S STOP AND FRISK POLICIES OR PRACTICES

The City objects to certification of a 23(b)(2) class, arguing that injunctive relief is inappropriate and unnecessary here under the principles set forth in *Galvan v. Levine*, 490 F.2d 1255 (2d Cir. 1973). Opp'n Br. at 25-26. The *Galvan* doctrine is applicable where certification of an injunctive class is unnecessary because of the defendant's willingness to voluntarily withdraw or stop enforcing a problematic policy. *Blecher v. Dep't of Housing Preservation & Dev.*, No. 92 Civ. 8760, 1994 WL 144376 at *6 (S.D.N.Y. Apr. 19, 1994). As this court recognized in *Daniels*, what matters under *Galvan* when deciding whether to grant injunctive

6

relief is "the level of commitment expressed by the defendants." *Daniels v. City of New York*,
198 F.R.D. 409, 421 (S.D.N.Y. 2001).

The BLAC's experience dealing with the NYPD on the stop and frisk issue over the
course of many years shows that defendants have not shown a willingness or commitment to
voluntarily improve its stop and frisk policies and practices. To the contrary, in the experience
of the BLAC, the NYPD has not addressed the concerns expressed by the Black and Latino
community, members of the BLAC, other elected officials or the broader public. Accordingly,
an injunctive class should be certified.

As set forth above, since the date of the *Daniels* settlement, and continuing through the
date of filing this brief, BLAC members and the CCRB continue to receive regular complaints
from their constituents about the NYPD's stop and frisk practices. Indeed, testimony at the
Council's 2009 hearing suggested that the number of complaints has risen since the date of that
settlement. (2009 Tr. at 67:11-13 (Testimony of Council Member Julissa Ferreras that "there's
been a rise of reports to my office in particular with the stop and frisk.")); (2009 Tr. at 119-121
(Testimony from the CCRB on the increase in the number of complaints and substantiated claims
relating to stop and frisk from 2002 to 2008)).

Rather than address concerns about its stop and frisk practices, the NYPD has limited its
stop-and-frisk-related communications with the City Council, members of the BLAC, and the
communities they represent. For example, the NYPD refused to participate in the Council's
April 30, 2009 Hearing, instead submitting a written statement reiterating the Department's
belief that it does nothing wrong. (2009 Tr. at 9-10). In addition, the NYPD refused the
Council's request for its stop and frisk data, which the Council only obtained after a court
ordered the NYPD to produce the database in response to an outside organization's request under

the Freedom of Information Law (2009 Tr. at 88-89 (Testimony of Chris Dunn, New York Civil Liberties Union)).[4] In short, the NYPD has failed to demonstrate the necessary commitment to curing the problems associated with it stop and frisk policies and practices.

Finally, the City argues against class-wide certification on the theory that were it possible to fashion an injunctive remedy that would improve the NYPD's compliance with the Fourth Amendment, *"then it is likely that lawmakers would have already passed laws to the same effect*[.]" Opp'n Br. at 24-25 (emphasis added). As a group of legislators, the BLAC disagrees strongly with this assertion. There are many reasons for a legislative body to act or not act and many ways a legislative body can take action on a particular issue. Here, the City Council and its Members have taken steps to identify the extent of the stop and frisk problem through oversight hearings, advocated on behalf of individual constituents, and worked with agencies to advocate a change in current practice. It is the province of the courts to remedy constitutional violations. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 407 (U.S. 1971) (Harlan, J. concurring) (noting "that the judiciary has a particular responsibility to assure the vindication of constitutional interests such as those embraced by the Fourth Amendment"). Accordingly, this Court should exercise its full authority to fashion appropriate and permanent relief.

---

[4] *See Matter of New York Civil Liberties Union v. New York City Police Dep't*, 2008 N.Y. Slip Op. 51279U (Sup. Ct. New York County 2008).

## CONCLUSION

For the foregoing reasons, *amicus curiae*, the Black, Latino, and Asian Caucus of the

Council of the City of New York, respectfully request that this Court grant Plaintiffs' motion for

class certification.

Dated:  New York, New York
        February 2, 2012

By:                  

      MORRISON & FOERSTER LLP
      Jamie A. Levitt
      Adam J. Hunt
      1290 Avenue of the Americas
      New York, New York 10104-0050
      Tel: (212) 468-8000
      Fax: (212) 468-7900
      jlevitt@mofo.com
      adamhunt@mofo.com

      *Of Counsel to the Black Latino and*
      *Asian Caucus of the Council of the City*
      *of New York*

      ELIZABETH FINE
      General Counsel

      JAMES W. CARAS
      JEFFREY P. METZLER
      The Council of the City of New York
      250 Broadway, 15th floor
      New York, New York 10007

      *Attorneys for the Black Latino and Asian*
      *Caucus of the Council of the City of New*
      *York*