UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID FLOYD, LALIT CLARKSON,
DEON DENNIS, and DAVID
OURLICHT, on behalf of themselves and all
others similarly situated,

                        Plaintiffs,        08 Civ. 1034 (SAS)

                      -against-

THE CITY OF NEW YORK, *et al.*,

                      Defendants.

---

*[Handwritten order:]* The clerk is directed to docket this amicus brief. So Ordered!

May 16, 2012

Shira A. Scheindlin
U.S.D.J.

**Amicus curiae brief of The Bronx Defenders, Brotherhood/Sister Sol, the
Justice Committee, Picture the Homeless, and Streetwise and Safe in Support
of Plaintiffs' Motion for Class Certification**

*[Stamp: USDC SDNY DOCUMENT ELECTRONICALLY FILED DOC #: _____ DATE FILED: 5/16/12]*

Roger S. Goldfinger
David B. Rankin
Rankin & Taylor, PLLC
350 Broadway, Suite 701
New York, New York, 10013
t: 212-226-4507

*Attorneys for Amici*

## Corporate Disclosure Statement

Pursuant to Federal Rule of Civil Procedure 26.1, counsel for proposed *amici curiae* makes the following disclosures:

(1) *Amici curiae* are all nonprofit organizations whose purposes are to provide social services to disadvantages communities in New York City.

(2) *Amici curiae* are not publicly held entities.

(3) None of the *amici curiae* are parent, subsidiary, or affiliate of, or a trade association representing, a publicly held corporation, or other publicly held entity. No parent companies or publicly held companies have a 10% or greater ownership in *amici curiae*.

**Table of Contents**

I.  Introduction...........................................................................................................................1

II. Statements of Interest..............................................................................................................................1

III. Argument................................................................................................................................7

    a.   The NYPD's SQF Policy is Pervasive...................................................................7

    b.   … and Demoralizing .............................................................................................8

    c.   The NYPD is Completely Unaccountable, and Absent Class-Wide Injunctive Relief There is no End in Sight to the Discrimination and Constitutional Violations ...10

    d.   Rule 23(b)(2) Class Actions are an Essential Tool for the Vindication of Civil Rights ................................................................................................................................12

IV. Conclusion............................................................................................................................13

# Table of Authorities

## Table of Authorities

**Federal Cases**

*Amchem v. Windsor*
521 U.S. 591 (1997) ...................................................................................................12

*Baby Neal ex rel. Kanter v. Casey*
43 F.3d 48, 64 (3rd Cir. 1994) ....................................................................................12

*Covino v. Patrissi*
967 F.2d 73 (2d Cir. 1992) ...........................................................................................8

*Brewer v. W. Irondequoit Cent. Sch. Dist.*
212 F.3d 738 (2d Cir. 2000) .........................................................................................8

*Stauber v. City of New York*
03-CV-9162, 2004 WL 1593870 (S.D.N.Y. 2004) .....................................................8

**Other Authorities**

*Rules Advisory Committee Notes to 1966 Amendments to Rule 23*
39 F.R.D. 102 (1966) .................................................................................................12

Jack Greenberg, *Civil Rights Class Actions: Procedural Means of Obtaining Substance*, 39 Ariz. L. Rev. 575 (1997) ...................................................................................................................12

Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure* (I), 81 Harv. L. Rev. 356, 389 (1967) ................................................................12

Tina Moore, *Panel verified stop-frisk complaints in May, & NYPD didn't discipline any cops*, New York Daily News, July 26, 2008, a*vailable at* http://www.nydailynews.com/news/crime/panel-verified-stop-frisk-complaints-nypd-discipline-cops-article-1.350344, *also available at* http://nydn.us/uWYu9f ..................................................10

## I. Introduction

The Amici write to bring to the Court's attention the pervasive and demoralizing effects of the New York City Police Department's (NYPD) discriminatory "Stop-and-Frisk" (SQF) policy and respectfully ask the Court to grant the plaintiffs' motion for class certification. Put simply the Amici believe there is no other way to address the NYPD's unconstitutional and discriminatory policy than through class-wide systemic relief.

The problems created by the SQF policy are uniquely difficult to solve by looking at one case at a time. The negative effects are diffuse and spread out over a vast portion of the population, but often only involving a brief detention in each case. As current legal structures focus on monetary compensation rather than overall social effects, and have failed to result in any meaningful policy changes, the Amici respectfully urge the Court to take this opportunity to move forward with broad-based institutional reform through injunctive relief.

## II. Statements of Interest

The BRONX DEFENDERS is a non-profit criminal defense and civil advocacy organization located in the south Bronx, a predominately African-American and Latina/Latino neighborhood. The BRONX DEFENDERS represents over 28,000 people charged with crimes in the Bronx each year. Many Bronx Defenders clients frequently encounter the police through the SQF policy. The effects of such encounters are consistently harmful to its clients and can lead to severe disruption in their lives. SQFs often lead to arrests for falsified or very minor charges, resulting in its clients spending 24–48 hours waiting to see a judge, and as a result losing employment, losing housing, having children removed by the Administration for Children's Services, and even being deported. Even clients who are given a Desk Appearance Ticket are frequently suspended

1

without pay or terminated from employment while they wait two months and longer for their court appearances.

Just as significant is the psychological impact of the SQF policy. Clients of the Bronx Defenders clients feel they are constantly being targeted because of their race and where they live. They feel nervous walking down the street given the abusive and rampant illegal practices of the police. They want to be able to walk out of their homes, walk in their neighborhoods, without continual fear of harassment by the police. Clients have communicated that this policy makes them feel degraded, lesser—like second-class citizens in their own neighborhoods. They feel hurt by the racist assumptions so clearly implicated by stop-and-frisk practices: that they must be criminals by dint of the neighborhoods where they live and the color of their skin.

A number of Bronx Defenders clients have called the Civilian Complaint Review Board (CCRB), or filed a complaint with the Internal Affairs Bureau (IAB) after being stopped & frisked or arrested. Not a single one of these clients has reported that going to the CCRB or the IAB was actually fruitful. Rather, officers who are repeat offenders— on unlawful stops, excessive force, and false arrests never seem to get disciplined for what they do.

The BRONX DEFENDERS encourages its clients to learn their rights regarding their interactions with the police. But its clients report they are often risking their safety by exercising them. Questioning an officer engaged in unconstitutional activity often leads to a violent physical reaction and criminal charges. As lawyers, the most valuable thing the BRONX DEFENDERS can offer is often validation that what the police do is deeply wrong. And that is simply not enough.

The BROTHERHOOD/SISTER SOL is a non-profit organization located in Harlem providing comprehensive, holistic and long-term support services to primarily African-American and Latina/Latino youth aged eight to twenty-two. The organization focuses on issues such as

leadership development and educational achievement, sexual responsibility, sexism and misogyny, political education and social justice, Pan-African and Latina/Latino history, and global awareness. It provides four to six year rites of passage programming, thorough five day-a-week afterschool care, school and home counseling, summer camps, job training and employment, and college preparation.

The SQF policy is a constant, incessant, and invasive reality for its members and alumni. Virtually every member has been stopped-and-frisked at least once, and many more than once. It has fifteen year-old members who are so resigned to being stopped, who have become so used to the experience, that when they are stopped-and-frisked while walking to its offices from school, they shrug off the experiences, stating that it is a normal part of being a young person of color in New York City.

SQF causes its members to miss school and lose jobs In turn those members come to view the police as a threat and invading force in their community. BROTHERHOOD/SISTER SOL helps its members deal with the traumatic effects of SQFs by first focusing on their emotional well-being, helping them to decompress and process the experience and offering emotional support. It offers these services because it has been able to find no other way to address the problem.

The JUSTICE COMMITTEE is a Latina/Latino-led non-profit organization dedicated to building a movement against police violence and systemic racism in New York City. It engages in leadership development, political education, base-building and direct action, as well as resource development and service provision to meet the immediate needs of victims and their families.

JUSTICE COMMITTEE members of color experience SQFs on a regular basis. Members report experiencing verbal harassment, sexual harassment, inappropriate touching, illegal

3

summonses or arrests, and/or other forms of abuse during SQFs. Mothers fear for the well-being of their sons at the hands of the police. Members of the JUSTICE COMMITTEE express frustration, fear, and a sense of disempowerment as a result of SQFs. Members feel that "the cops just do whatever they want." As a result, they do not consider the police a resource that can be used if they feel unsafe or are victims of crimes. The JUSTICE COMMITTEE condemns the egregious racial disparity of the SQF Policy as experienced by its members.

Other than providing forums for members to share experiences and offer each other support, the JUSTICE COMMITTEE has very little it can do for those who experience SQFs. There are no effective institutional means to make complaints or put an end to unjust SQFs. The CCRB only rarely investigates these claims, and when it does, the findings are turned back over to the NYPD, which fails nearly exclusively to take any corrective measures. Police officers appear to engage in SQFs with impunity.

PICTURE THE HOMELESS is a grassroots, non-profit organization, founded and led by homeless people. It organizes for social justice around issues like housing, police violence, and the shelter-industrial complex. Its members are subjected to SQFs on a near daily basis, as police look for any excuse to harass them, or meet quotas. The homeless African-American and Latinas/Latinos that PICTURE THE HOMELESS represent feel doubly targeted for their membership in two classes that the police routinely focus SQF efforts on.

It is not uncommon for someone to have an open warrant after being unable to pay the fine for a quality of life ticket, resulting in being taken to Central booking and held for twenty-four to forty-eight hours. But frequently, when they actually appear in front of the judge, the warrant never existed, and he or she is released. Members of PICTURE THE HOMELESS, when asked about SQFs, will often laugh and say: "of course that happens all the time."

STREETWISE AND SAFE (SAS) is a community-based organization working with Lesbian, Gay, Bisexual, Transgender, Queer, and Questioning (LGBTQQ) youth of color living in New York City who have experienced homelessness and contact with the criminal legal system. One in four LGBTQQ teens in the United States either runs away or is thrown out of their home at some point, and 40-50% of teenagers living on the streets self-identify as LGBTQQ. As a result, LGBTQQ youth are particularly vulnerable to profiling and abusive policing practices in the context of "quality of life" policing and the policing of low-income communities. SAS conducts intensive "know your rights" trainings aimed at providing LGBTQQ youth of color with information about their rights that will reduce the harm of contact with law enforcement and is tailored to their specific experiences, and offers spaces where LGBTQQ young people can develop individual and collective strategies for promoting and protecting their rights that are rooted in their realities. It works to create opportunities for LGBTQQ youth of color to claim a seat at policy discussion tables as full participants, speak out on their own behalf, act collectively to protect and advance their rights, and demand choices that allow them to maximize their safety, self-sufficiency, and self-determination.

The members of STREETWISE AND SAFE are impacted by the SQF policy in many of the same ways as other African-American and Latina/Latino New Yorkers — being unable to walk freely in their neighborhoods without being stopped, questioned and frisked by police officers on their way to and from school, the train, the corner store, and their homes. They also describe being ordered to empty their pockets by officers who had no lawful basis for doing so. Young women describe frequent sexual harassment by officers who "try to talk to" them, asking them for their numbers and make suggestive and inappropriate comments to them before and during such stops. In some cases, officers have sought to extort sexual favors in exchange for not

5

issuing a summons or placing them under arrest. They also describe being subjected to more frequent and intrusive stops and searches when they appear gender nonconforming or are "dressed like a guy."

Transgender people report they experience harassment in the form of demands for identification and transphobic responses when they produce identification – including questions regarding their "real" name or gender, as well as intrusive and inappropriate questions about their anatomy such as "you're not a real girl/man," "are those implants?", and "have you had surgery?" In some instances police officers ask transgender people to lift their shirts or open their pants on the street, or inappropriately grope their chest or genital areas during frisks. LGBTQQ youth of color also report that when police officers find condoms in their possession during stops they are often charged with "loitering for the purposes of prostitution" and they fear carrying condoms as a result because of the high frequency of stops and frisks in their neighborhoods.

Members of STREETWISE AND SAFE youth report feeling violated, disrespected, and humiliated after being subjected to an illegal stop, question and frisk. They also describe feeling more unsafe afterwards, especially if the interaction with police involved sexual harassment, homophobic or transphobic remarks or called attention to their sexuality or gender identity in public. "They make it clear that the cops aren't out there to protect us," one member emphasized at a public forum. Many of them state that they are unlikely to call the police if they are in fear for their safety because of previous interactions with NYPD officers during street stops.

LGBTQQ youth are reluctant to make complaints to the CCRB because they fear being subjected to additional homophobia and transphobia during the complaint process, and feel that doing so would be pointless in light of the lack of discipline imposed on officers against whom complaints are made and substantiated, and the failure of complaints to produce any systemic

change. Private police misconduct attorneys are unlikely to bring suit on their behalf based on a relatively brief detention if the individual is released without charge and does not experience any physical injury.

## III. Argument

### a. The NYPD's SQF Policy is Pervasive...

A class of fourteen African-American and Latina/Latino males started a program with BROTHERHOOD/SISTER SOL when they were twelve. All but two went on to college, and one became a corporal in the Marine Cops. Not one has a criminal record. But by the time they were 18, each had been subjected to an illegal SQF at least once.

Stories like this are all too common in predominately African-American and Latina/Latino communities in New York City, where SQF has become a pervasive, daily reality. In these targeted communities, people are stopped walking to and from work, school, the train, or in and out of their homes. SQF is so pervasive in targeted communities that many have not only become accustomed to being stopped, but *have come to expect it.*

The Amici have found through their experience that youths of color are far more likely than other demographics to experience SQF. There is also a distinct gender component to the stops, as women and transgender and gender nonconforming people often experience sexual, homophobic, and transphobic harassment and abuse during stops. In some cases, women and transgender and gender nonconforming people are reluctant to set foot outside for fear of being subjected to profiling and sexual harassment in the context of a stop. One mother who is a member of the Amici reported she will send only her daughter out to get a carton of eggs at night, rather than have her sons risk another encounter with the police.

7

Stops can be pervasive in neighborhoods of color, but occur far less often in adjacent, more Caucasian neighborhoods. For example, the Amici's members report being stopped for jogging in a park in Harlem at night, while jogging in nearby Central Park has no such risk.

Notably it is not just the members and clients of the Amici who experience this. It is also the staff — specifically the African-American and Latina/Latino staff — who experience constant interactions with the police through SQFs. The stops occur regardless of having attended Ivy League colleges, but notably not regardless of race: white staff members seem to be largely exempted from the policy.

One twenty-seven year-old alumni of BROTHERHOOD/SISTER SOL is a student at the New School, and has traveled extensively around the country to present his award-winning poetry. He has been subjected to SQFs twenty seven times.

### b.   ... and Demoralizing

The existence of a pervasive threat of SQF in affected areas leads to both constitutional and social harms. It is black letter law that even brief Fourth Amendment violations constitute irreparable harm. *Stauber v. City of New York*, 03-CV-9162, 2004 WL 1593870 (S.D.N.Y. 2004) (Sweet, D.J.); *see also Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992). But beyond the constitutional violation, the Amici are primarily concerned about the profoundly negative social effects the SQF policy has on youth of color in affected communities.

Victims of the policy often feel degraded and demoralized by the racist and classist assumptions behind the NYPD's use of SQF. They report feeling like criminals because of the neighborhoods in which they live and the color of their skin. The fact that being stopped is

8

simply a part of life for a young person of color in New York City can only have profound psychological an economic impacts on already disadvantaged communities.

When a SQF leads to criminal charges — which, in many cases is for falsified or very minor violations — it inevitably leads to severe disruptions in victims' lives. Victims miss work and school, lose jobs and housing, have children removed by the Administration for Children's Services, and are even deported. Many victims have been suspended from work for the months it takes to get baseless charges resolved.

Victims often report verbal, physical, or sexual abuse by officers during a SQF. Complaints range from verbal or sexual harassment, to inappropriate touching, and sometimes physical abuse. Even in an absence of clear misconduct, the experience of SQF itself — being thrown against a wall and searched in public — is an indignity and a form of abuse.

The Amici have held numerous "Know Your Rights" workshops in effected communities, which has helped to reduce the sense of helplessness that pervades many communities. But this approach has sometimes backfired, as individuals exercising their rights during a SQF, such as by asking why they were stopped, have been subject to beatings and criminal charges. Many participants in such workshops experience frustration and anger at the vast gulf that separates their rights and the realities they face on the street every day, telling trainers that their theoretical legal rights have little to do with their daily experiences.

Members of affected communities often come to view the NYPD as a threat, and an invading force. The resulting mistrust and fear with respect to the police creates a reluctance to go to the police with real problems, and contributes to the sense of insecurity that the SQF policy creates. Lesbian, gay, bisexual, and transgender youth and adults of color who may already face

homophobia and hostility as they navigate the streets of New York City often see the police as an additional threat to their safety rather than as protectors based on their experiences of SQF. Women and LGBTQ youth are sometimes reluctant to carry condoms for fear that they will be stopped, frisked, and profiled as being engaged in prostitution-related activities.

The most effective means the Amici have found for dealing with the reality of stop-and-frisks is to offer emotional support, and opportunities to engage in story-telling and dialogue with other victims of the policy — but can offer little more than to try to mitigate the damage SQF does to effected communities. This is simply not enough to counter the serious and profound effects SQF has on areas where it is pervasive.

### c. The NYPD is Completely Unaccountable, and Absent Class-Wide Injunctive Relief There is no End in Sight to the Discrimination and Constitutional Violations

The Amici urge the Court to grant class certification because every other mechanism for reform has failed. The experience of the Amici has shown the NYPD to be an unaccountable organization, one not susceptible to any outside pressure to reform, and unable or unwilling to even acknowledge the existence of a problem.

Their experience has shown the CCRB and IAB processes to be completely ineffective. CCRB complaints are barely investigated, if at all, and almost always fail to result in findings of misconduct even in the most egregious circumstances. In the rare cases where there is a finding of misconduct, the NYPD often fails to take any disciplinary measures, let alone implement needed reforms. *See, e.g.,* Tina Moore, *Panel verified stop-frisk complaints in May, & NYPD didn't discipline any cops,* New York Daily News, July 26, 2008, available at http://www.nydailynews.com/news/crime/panel-verified-stop-frisk-complaints-nypd-discipline-cops-article-1.350344, *also available at* http://nydn.us/uWYu9f ("No punishment was meted out

10

in all eight complaints in which the city Civilian Complaint Review Board substantiated allegations of police misconduct during stop-and-frisks").

IAB is viewed as even less effective, and complaints sent there are rarely heard from again. Officers with long histories of unlawful stops, excessive force, and false arrests never seem to get disciplined.

Individual civil lawsuits are rarely available to redress harms created by SQF. The law effectively devalues and ignores indignities such as being asked for identification while walking down the street, having one's identity questioned or mocked, or being stopped and questioned for no reason. Victims have no access to lawyers or advocacy organizations when the monetary value of the harm is so small. Even when monetary damages are awarded, the City does nothing to discipline or control the offending officer, let alone review problematic policies.

This is the fundamental difficulty the Amici faces in their efforts to combat the discriminatory SQF policy. Harms are diffuse, spread out over vast portions of the population of New York City. While an individual SQF constitutes only a brief constitutional violation, the policy as a whole creates unquantifiable social ills. Existing mechanisms look only towards monetary compensation for past losses and have failed to result in any institutional reform. Without other effective legal or institutional means to make complaints about unjust SQFs, the Amici support this action as seemingly the only way to effect critical institutional reform to protect the civil rights of their staff, members, and alumni.

The Amici respectfully encourage the Court to certify the proposed class to ensure that any relief granted is broad-based and system wide, and achieves the necessary institutional reform.

### d.   Rule 23(b)(2) Class Actions are an Essential Tool for the Vindication of Civil Rights

Rule 23(b)(2) class actions, such as the plaintiffs seek to have certified here, are an important and often essential tool for the vindication of civil rights through institutional reform. Subdivision (b)(2) was created out of the courts' experience with class actions in civil rights cases. Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure* (I), 81 Harv. L. Rev. 356, 389 (1967) (subdivision (b)(2) "build[s] on experience mainly, but not exclusively, in the civil rights field"). The Advisory Committee Notes for (b)(2) specifically reference civil rights cases as an example of when a class action under this subsection is appropriate. *Rules Advisory Committee Notes to 1966 Amendments to Rule 23*, 39 F.R.D. 102 (1966). "Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." *Id.* "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of cases wherein Rule 23(b)(2) can be used to obtain declaratory or injunctive relief. *Amchem v. Windsor*, 521 U.S. 591 (1997); *see also* Jack Greenberg, *Civil Rights Class Actions: Procedural Means of Obtaining Substance*, 39 Ariz. L. Rev. 575 (1997).

The Amici respectfully submit that this case presents exactly the wrongs and necessary remedies that subdivision (b)(2) was designed for. As the Third Circuit stated, "[t]he writers of Rule 23 intended that subsection (b)(2) foster institutional reform by facilitating suits that challenge widespread rights violations of people who are individually unable to vindicate their own rights." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 64 (3rd Cir. 1994). Absent wide-scale institutional reform, the City's discriminatory conduct and willful blindness stand to continue unabated, and without remedy.

12

IV.     **Conclusion**

The Amici understand that the police have an uncommonly difficult mandate. However, the NYPD's stubborn refusal to even acknowledge that there is an issue does a disservice to the good and vital work that it does. To continue to allow this unconstitutional policy to does a disservice to the NYPD, and the people of the city of New York.

For the forgoing reasons, the Amici respectfully request that the Court grant class certification to the plaintiffs in this action.


Dated:    New York, New York
          November 14, 2011

                                              Respectfully Submitted,


                                       By:    _____
                                              Roger S. Goldfinger
                                              David B. Rankin
                                              Law Office of Rankin & Taylor, PLLC
                                              *Attorneys for Amici*
                                              350 Broadway, Suite 701
                                              New York, NY 10013
                                              t: 212-226-4507