UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DAVID FLOYD, *et al.*,

                 Plaintiffs,

          -against-

THE CITY OF NEW YORK, *et al.,*

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

08 Civ. 01034 (SAS)

ECF CASE

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENDANTS' PROPOSED EXPERT, DENNIS SMITH

CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0900

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000

1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-5160

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF FACTS .................................................................................. 2

     A.    Smith's Expert Report ............................................................................ 2

          1.    Smith's Critiques of Fagan's Multivariate Regression Analyses .............. 3

          2.    Smith's Critiques of Fagan's Analyses of Stop-and-Frisk Outcomes ................................................................................... 5

          3.    Smith's Crime Reduction Opinions ............................................ 5

          4.    Smith's Criticism of Fagan's Critiques of the RAND Report .................. 6

          5.    Smith's Opinion that NYPD Does Not Conduct Racially-Biased Stops-and-Frisks ................................................................. 6

     B.    Smith's Declarations ............................................................................ 7

     C.    Smith's Lack of Qualifications ............................................................ 8

II.    THE LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY .......... 9

III.   ARGUMENT ...................................................................................................... 11

     A.    Smith Is Not Qualified to Critique Fagan's Multivariate Regression Analyses or to Testify About His "Alternative" Regression Analysis ................ 11

     B.    Smith's Correlation Coefficient Calculations and "Alternative" Regression Analysis Are Not Reliable and Violate F.R.C.P. 26(A)(2) ................ 15

     C.    Smith's Opinions About the Meaning of Low Stop-and-Frisk Hit Rates Are Not Based on Sufficient Facts or Data ......................................... 17

     D.    Smith's Opinions on Crime Reduction Are Not Relevant and Are Highly Prejudicial ............................................................................. 18

     E.    Smith's Opinion That NYPD Stops-and-Frisks Are Not Racially Motivated Would Impermissibly Usurp the Functions of the Court and the Jury and Is Not Supported by the Data Upon Which It Is Based ......................... 21

IV.   CONCLUSION ................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*251 CPW Hous. Ltd. v. Paragon Cable Manhattan*,
No. 93 Civ. 0944 (JSM), 1995 WL 70675 (S.D.N.Y. Feb. 21, 1995) ....................................16

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ............................................................................................10

*Arista Records LLC v. Lime Grp., LLC*,
No. 06 CV 5936 (KMW), 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ..........................14, 15

*Bazile v. City of New York*,
215 F. Supp. 2d 354 (S.D.N.Y. 2002) ...........................................................................13, 14

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ...............................................................................................17

*Bourjaily v. United States*,
483 U.S. 171 (1987)........................................................................................................11

*Brown v. Texas*,
443 U.S. 47 (1979)..........................................................................................................18

*Bush v. Vera*,
517 U.S. 952 (1996).......................................................................................................19

*Cameron v. City of New York*,
598 F.3d 50 (2d Cir. 2010) .........................................................................................21, 22

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989).......................................................................................................24

*Colon v. BIC USA, Inc.*,
199 F. Supp. 2d 53 (S.D.N.Y. 2001) ...............................................................................13

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) .........................................................................................20

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..................................................................................................*passim*

*EEOC v. Bloomberg L.P.*,
No. 07 Civ. 8383 (LAP), 2010 WL 3466370 (S.D.N.Y. Aug. 31 2010)................................10

*Fund Comm'n Serv., II, Inc. v. Westpac Banking Co.*,
   No. 93 Civ. 8298(KTD)(RLE), 1996 WL 469660 (S.D.N.Y. Aug. 16, 1996) .......................... 2

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................................. 10, 23

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992) ............................................................................................ 22

*In re Fosamax Prod. Liab. Litig.*,
   688 F. Supp. 2d 259 (S.D.N.Y. 2010) .............................................................................. 23

*Johnson v. California*,
   543 U.S. 499 (2005) ........................................................................................................ 24

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ........................................................................ 12, 14

*Mancuso v. Consol. Edison Co. of New York, Inc.*,
   967 F. Supp. 1437 (S.D.N.Y. 1997) ................................................................................. 12

*Maurizio v. Goldsmith*,
   No. 96 CIV. 4332 (RPP), 2002 WL 535146 (S.D.N.Y. April 9, 2002) ................................ 16

*Md. State Conf. of NAACP Branches v. Md. Dep't of State Police*,
   72 F. Supp. 2d 560 (D. Md. 1999) ................................................................................... 19

*Nimley v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ...................................................................................... 10, 11

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
   691 F. Supp. 2d 448 (S.D.N.Y. 2010) .............................................................................. 11

*Pereira v. Cogan*,
   281 B.R. 194 (S.D.N.Y. 2002) ......................................................................................... 22

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) ........................................................................................................ 23

*Stagl v. Delta Air Lines, Inc.*,
   117 F.3d 76 (2d Cir. 1997) .............................................................................................. 12

*State v. Soto*,
   734 A.2d. 350 (N.J. Super. Ct. 1996) .............................................................................. 19

*U.S. Info Sys., Inc. v. Int'l Bhd. of Elec. Workers Union Local No. 3*,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004) .............................................................................. 23

*U.S. v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) ........................................................................21

*Valentin v. New York City*,
  No. 94 CV 3911 (CLP), 1997 WL 33323099 (E.D.N.Y. Sep. 9, 1997) ..................12

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ......................................................................................21

*Wantanabe Realty Corp. v. City of New York*,
  No. 01 Civ. 10137 (LAK), 2004 WL 188088 (S.D.N.Y. Feb. 2, 2004) ..................15

*Wilkins v. Maryland State Police*, CCB-93-468 (D. Md. Apr. 22, 1997)......................20

## STATUTES

Fed. R. Civ. P. 26(a)(2).................................................................................1, 2, 15, 17

Fed. R. Evid. 402 ................................................................................................21

Fed. R. Evid. 403 ........................................................................................*passim*

Fed. R. Evid. 702 ........................................................................................*passim*

Fed. R. Evid. 703 ................................................................................................14

Fed. R. Evid. 704 ................................................................................................21

## OTHER AUTHORITIES

Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be
  Amended*, 138 F.R.D. 631 (1991) ....................................................................11

Nat'l Research Council, *Fairness and Effectiveness in Policing: The Evidence*
  (Washington, DC 2004)....................................................................................17

Samuel R. Gross and Katherine Y. Barnes, *Road Work: Racial Profiling and Drug
  Interdiction on the Highway*, 101 Mich. L. Rev. 651 (2002) ..................................20

Samuel R. Gross, Debra Livingston, *Racial Profiling Under Attack*, 102 COLUM. L. REV.
  1413  (2002)...................................................................................................19

U.S. Dep't of Justice, Civil Rights Div., *Guidance Regarding the Use of Race by Federal
  Law Enforcement Agencies* (2003) ....................................................................19

## I.      INTRODUCTION

Plaintiffs submit this memorandum of law in support of their motion under Federal Rules of Evidence 702 and 403 to preclude Defendants' expert, Dennis Smith ("Smith"), from testifying to certain of his opinions at trial in this case.

As described herein, Smith is not qualified to offer statistical critiques of the multiple regression analyses performed by Plaintiffs' expert Jeffrey Fagan in support of Plaintiffs' Fourteenth Amendment claims or to conduct his own "alternative" version of such analyses. His attempt to compensate for his lack of expertise by simply acting as a conduit for the opinions of others with more statistical training and experience is clearly prohibited by the Federal Rules of Evidence. His opinions concerning his own statistical analyses of racial disparities in the New York Police Department's ("NYPD") stop-and-frisk data, produced more than a year after the deadline to submit his Expert Report and more than nine months after his deposition, also lack sufficient information to establish the reliability of his methods and violate the expert disclosure requirements of Fed. R. Civ. P. 26(a)(2).

Smith's opinions about the supposed deterrent effects of the NYPD's Operation Impact, a program which Plaintiffs have not challenged in this litigation, and stop-and-frisk are irrelevant to Plaintiffs' claims and will mislead and confuse the trier of fact if introduced at trial. Moreover, his opinion as to the meaning of the low weapons recovery "hit rates" of NYPD stops-and-frisks lacks any empirical support and is purely speculative. Finally, Smith's opinion that NYPD officers do not make stops on the basis of race will improperly usurp the role of the Court and the jury and is not supported by the data upon which it is purportedly based.

Accordingly, Smith should be precluded from offering any of the aforementioned opinions at trial in this case.

## II.   STATEMENT OF FACTS

The opinions which Professor Smith apparently intends to offer at trial are set forth in his November 15, 2010 Expert Report, *see* Charney Decl., Ex. B (hereinafter "Report," "Smith Report" or "Smith Rpt."), and in two declarations that he submitted in support of Defendants' *Daubert* motion against Plaintiffs' expert Jeffrey Fagan. *See* Declaration of Dennis Smith, dated December 19, 2011 (Dkt # 181); Reply Declaration of Dennis Smith, dated February 16, 2012 (Dkt # 193).[1]

### A.   Smith's Expert Report

In his expert Report, of which he wrote every word, *see* Charney Decl., Ex. C (Transcript of the March 4, 2011 Deposition of Dennis Smith ("Smith Dep.")) at 213:18-215:9, Smith critiques the statistical methods utilized in (i) Professor Fagan's reasonable suspicion (RAS) analysis of the NYPD's UF250 stop-and-frisk data in support of Plaintiffs' Fourth Amendment *Monell* claims, Smith Rpt. at 9-14; (ii) Fagan's multivariate regression analyses in support of Plaintiff's Fourteenth Amendment claims, *id.* at 15-22, 37-39, 41-63; (iii) Fagan's hit-rate and regression analyses of the outcomes of stop-and-frisk encounters in support of Plaintiffs' Fourth and Fourteenth Amendment claims, *id.* at 20-21, 39, 60; and (iv) Fagan's criticisms of the 2007 RAND Report on the NYPD's stop-and-frisk practices, *id.* at 63-70.  Smith also purports to opine, on the basis of two studies he co-authored in 2007 and 2008, respectively, *see* Smith Rep., App. D and E, that the NYPD's Operation Impact program and stop-and-frisk practices have

---

[1] While Defendants originally identified two testifying experts, Professor Smith and Professor Robert Purtell of SUNY Albany, *see* Declaration of Darius Charney, dated June 26, 2012 ("Charney Decl."), Ex. A, they ultimately chose to only submit an expert report from Smith, thereby precluding Purtell from testifying as an expert at trial. *See* F.R.C.P. 26(a)(2)(A),(B), and (D); *Fund Comm'n Serv., II, Inc. v. Westpac Banking Co.*, No. 93 Civ. 8298(KTD)(RLE), 1996 WL 469660, *4 (S.D.N.Y. Aug. 16, 1996) (precluding "any expert evidence at any stage" of the case where plaintiff failed to produce expert report).

contributed to significant reductions in crime in New York City, and that the crime reduction has disproportionately benefitted black and Latino communities in the City. Smith Rpt. at 5, 17, 33-34, 53-54, Exs. D and E. Finally, Smith opines that "there is no compelling evidence that NYPD officers are making stops based on race or ethnicity but instead are pursuing a strategy and using tactics that prevent crime and benefit the City as a whole, and communities of color in particular." *Id.* at 8, 18.

Smith's critiques of Fagan's RAS analysis, though inaccurate, are not a subject of the this motion because of space constraints and the fact that they have already been addressed at length by this Court in its April 16, 2012 decision on Defendants' *Daubert* motion. *See* Dkt # 201. Smith's remaining critiques and opinions should be excluded.

1.     *Smith's Critiques of Fagan's Multivariate Regression Analyses*

Fagan's Fourteenth Amendment multivariate regression analyses provide evidence that the NYPD engages in a pattern and practice of race-based stops-and-frisks. Smith's Report discloses that he would criticize Fagan's analyses in three ways. First, Smith claims that Fagan's analyses are based on an outdated "reactive" theory of policing focused on responding to crime after it is committed rather than the NYPD's current "proactive" policing model of preventing and reducing crime, and that they fail to control for "the impact of evidence-based [police] management practices." Smith Rpt. at 4-5, 15-17. More specifically, Smith contends that Fagan's regression models fail to analyze officer stop activity and crime rates in small enough geographical and temporal units. *Id.* at 5, 18-19, 37-38, 55, 58-59, 62-63; Smith Dep. at 276:4-277:18, 280:22-281:8, 286:11-287:6.

Second, Smith criticizes Fagan for using what he characterizes as the wrong benchmark—precinct-level population racial demographic and crime data—to analyze racial

disparities in NYPD stop-and-frisk patterns. Smith says Fagan should instead have used data on the citywide racial demographics of known criminal suspects. *See* Smith Rpt. at 49-51, 57, 62. Smith does not even suggest that his professed belief in the superiority of the crime suspect benchmark is based on his own prior experience, specialized training, or research. Rather, Smith's opinion that Fagan used the wrong benchmark is based entirely on opinions expressed to him by two outside sources: (i) Professor Robert Purtell ("Purtell"), who does not have a criminology background and has never studied racial disparities in policing or any context, and (ii) an article on benchmarking by the authors of the 2007 RAND study on the NYPD's stop-and-frisk practices. *See* Smith Dep. at 216:9-219:22, Dkt # 193 ¶ 20; Dkt # 180 (December 19, 2011 Declaration of Heidi Grossman), Ex. H; Dkt # 194 (Reply Declaration of Robert Purtell), Ex. A.

Third, Smith would also opine that Fagan: (i) improperly used precinct crime counts instead of crime rates to create his crime benchmark; (ii) used "weak operational definitions" of the race and socioeconomic status (SES) variables; (iii) omitted variables for unemployment, gender, and age; (iv) combined racially-mixed and predominately white precincts in his sensitivity analyses; (v) improperly used a "principle components factor analysis;" and (vi) inaccurately and incompletely presented the results of his regression analyses. Smith Rpt. at 47, 54-62. Importantly, the critiques of the omitted unemployment variable, improper factor analysis, and the presentation of the regression results are not Smith's own opinions but were communicated to him by two SUNY Albany Professors, Erika Martin and Kathleen Doherty, neither of whom has education, or training or experience in criminology or urban policing.[2] *See* Smith Dep. at 60:7-19, 61:17-63:4; 65:12-67:10.

---

[2] Martin is a professor of epidemiology and Doherty is a professor of public policy with a focus on national security issues. *See* Smith Dep. at 63:5-12, 63:17-18, 85:4-15.

    2.     *Smith's Critiques of Fagan's Analyses of Stop-and-Frisk Outcomes*

Smith's first professed basis for criticizing Fagan's hit-rate analysis is his own "proactive policing/evidence-based management" argument. He suggests that the low hit-rates for arrests and contraband recovery in NYPD stops do not indicate an absence of reasonable suspicion but, rather, demonstrate that the NYPD's stop-and-frisk practices have successfully caused many would-be criminals to leave their illegal weapons at home. *See* Smith Rpt. at 20, 39; Smith Dep. at 281:22-282:9, 286:11-287:6. Smith does not cite to any data or study providing any empirical support for this conclusion.

Smith also criticizes Fagan's use of a multilevel logistic regression model to analyze the disparate stop outcomes of black, Hispanic, and white pedestrians, opining that, "according to standard statistical practice," Fagan "should have tested alternative specifications, such as relative risk regressions, or probit models." Smith Rpt. at 60. Despite his lack of training and experience using complex statistical methods, *see* Part II(C) *infra*, Smith claims he came up with this critique entirely on his own, *see* Smith Dep. at 293:16-294:10.

    3.     *Smith's Crime Reduction Opinions*

Attached as Appendix D and repeatedly referenced throughout Smith's Report is a 2007 study that Smith did together with Purtell that expressed the conclusion that the NYPD's Operation Impact Program, an officer deployment strategy that assigns large numbers of rookie NYPD officers to patrol selected high-crime pockets of certain NYPD precincts known as "Impact Zones", contributed to crime reduction in New York City. *See* Smith Rpt., Ex. D, at 20-48. This study, titled "An Empirical Assessment of NYPD's 'Operation Impact': A Targeted Zone Crime Reduction Strategy," has not been published in any peer reviewed or other scholarly journals. It did not examine at all the extent to which NYPD stops are based on reasonable

5

suspicion and/or race, nor did it examine the extent to which use of stop-and-frisk, as opposed to officer presence, contributed to crime reduction in Impact Zones. *Id.*

Similarly, Exhibit E to Smith's Report is a 2008 statistical study he did with Purtell in which they concluded that the NYPD's aggressive use of stop-and-frisk also contributed to crime reduction, although to a much lesser degree than Operation Impact. *See* Smith Rpt., Ex. E at 49-79. This paper also has not been published in any peer reviewed or other scholarly journal, and it expressly did not examine the extent to which NYPD stops are based on reasonable suspicion and/or race. *Id.*; Smith Dep. at 200:22-201:13.

Throughout his Report, Smith also references NYPD crime statistics that he claims show large decreases in the crime rates in majority black and Hispanic neighborhoods in New York City over the last two decades. Smith Rpt. at 5, 17, 33-34, 53-54.

### 4. *Smith's Criticism of Fagan's Critiques of the RAND Report*

Like his critique of Fagan's multivariate regression analyses, the basis for Smith's disagreement with Fagan's critiques of RAND's external benchmarking analysis is the opinion that Smith took from Purtell and the RAND study authors that the benchmark used by RAND— citywide known violent crime suspect race data—is superior to Fagan's local population and crime benchmark for the purpose of analyzing racial disparities in NYPD stop-and-frisk patterns. Smith Rpt. at 63-67, 69-70.

### 5. *Smith's Opinion that NYPD Does Not Conduct Racially-Biased Stops-and-Frisks*

Finally, on the basis of his studies on the supposed crime deterrent effects of Operation Impact and stop-and-frisk and the NYPD data showing reductions in crime over the past twenty years, Smith concludes that NYPD officers are not making race-based stops but are instead "pursuing a strategy and using tactics that prevent crime and benefit the City as a whole, and

communities of color in particular," and that "the central motivating factor in police policy and practice at the street level is crime reduction, not harassment of Blacks and Hispanics." *See* Smith Rpt. at 8, 18.

## B.    Smith's Declarations

Smith's two declarations in support of Defendants' motion to exclude the testimony of Professor Fagan repeat many of the critiques contained in his Expert Report, but assert some new critiques of Fagan's multiple regression analyses. Dkt # 181 ¶¶11-26, 30-31; Dkt # 193 ¶¶ 20-28.[3]

First, using amended 2009 NYPD arrest-report and crime-complaint data where suspect race is known, which was produced to Plaintiffs more than a year after Professor Fagan submitted his expert report, Smith supposedly (working in collaboration with Purtell, *see* Dkt # 194 ¶ 2) made a table of correlation coefficients which, Smith contends, shows that police stops by race in a given precinct are more highly correlated with the proportion of criminal suspects and arrestees by race in that precinct than with the overall crime rate in that precinct. Smith then uses this table as a basis to again criticize Fagan's choice of the local population-crime benchmark over the crime suspect benchmark. Dkt # 181 ¶ 15, Ex. E. Smith does not, however, provide the equation or even a general description of the statistical model on which these calculations were based. *Id.*

Smith also asserts for the first time in his Declaration that Fagan's choice of independent variables for his multivariate regression models "creates a multicolinearity problem," that Fagan improperly aggregated crime statistics across crime categories in contravention of FBI crime

---

[3] Smith's declarations also offer new critiques of Fagan's RAS analyses but, for reasons explained above, *see* Part A *supra*, they are not the subject of this motion, although Plaintiffs strenuously disagree with them.

reporting guidelines, and that the NYPD patrol strength data Fagan used for his patrol strength

control variable in his regressions were unreliable. Dkt # 181 ¶¶ 21, 24, 25.

This Declaration also states that Smith, supposedly in collaboration with Purtell,

"conducted an alternative analysis using Fagan's regression model but adding data on suspect

race aggregated from crime complaints and arrest reports" as the independent variable instead of

total logged crime complaints by precinct which Fagan used as his independent variable, and

found that the correlation between the racial composition of a precinct and its level of stop-and-

frisk activity was no longer statistically significant and was in fact negative. *Id.* ¶ 30, Dkt # 181-

9; Dkt # 194 ¶ 2. However, in his Reply Declaration, Smith admits that he and Purtell did not use

all of the control variables which Fagan had used, and Smith does not specify which control

variables, beyond crime suspect race, he and Purtell did use. Dkt # 193 ¶ 22.

### C.    Smith's Lack of Qualifications

While Smith claims to have studied policing for the last 40 years, *see* Smith Dep. at

37:10-11, his research has focused on analyzing the effectiveness of various police department

management practices and law enforcement strategies, *see* Smith Rpt. at 1-2, Ex. A at 2-8.  He

has never conducted a statistical study to assess the racial bias of stop-and frisk or any other law

enforcement program, practice, strategy or tactic, or claims of racial discrimination in any other

governmental or private institution. *See* Smith Dep. at 113:6-125:11, 128:8-13, 129:-10, 132:12-

134:5.  Prior to his work in this case, Smith's "research" of the issue of racially-biased police

stops consisted entirely of reading five published studies on the issue—two of Professor Fagan's

studies of the NYPD's stop-and-frisk practices, the RAND study, and two studies of police

traffic and pedestrian stops in Los Angeles—and attending one conference and a single New

York City Council hearing at which Professor Fagan and the author of the RAND study

discussed their analyses. *Id.* at 13:23-21:2, 28:5-31:7.

Smith also admits that he is "not a statistician." Smith Dep. at 129:9-10. He has little to no professional experience with the statistical methods used by Professor Fagan, he has never conducted a study using a multilevel logistic regression, which Fagan used to analyze racial disparities in stop outcomes, nor has he conducted a study using negative binomial or multilevel poisson regressions, which Fagan used to analyze the racial disparities in stop patterns between NYPD precincts and between pedestrians of different racial groups citywide. *Id.* at 126:17-127:7, 128:8-13, 129:5-10. He admits that Purtell, not he, was "the statistician" on their crime reduction studies attached as Appendices D and E to his Report, and that Purtell, not he, "took the lead" in deciding on and running any statistical models used in the two studies. *Id.* at 36:25-37:7, 37:16-37:21, 40:4-12, 128:19-129:4.

Smith has practically no formal education or training in statistics. He does not have a degree in statistics, has not taken a statistics course since he was in graduate school more than 35 years ago, and has never taken courses in any of the advanced statistical methods used by Fagan in this case. See *id.* at 300:17-301:19. His only informal training in statistics has consisted of attending his academic colleagues' job-talks at NYU, referring occasionally to his statistics textbook from graduate school, and reading some statistics-related articles on the Internet. *Id.* at 301:23-302:25.

## II.   THE LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

Under Federal Rule of Evidence 702, a witness "who is qualified as an expert by knowledge, skill, experience, training or education" may offer expert opinion testimony at trial if the testimony will (a) assist the trier of fact to understand the evidence or determine a fact in issue, (b) is based on sufficient facts or data, (c) is the product of reliable principles and methods,

and (d) is the product of a reliable application of the expert's principles and methods to the facts of the case. Fed. R. Evid. 702.

To be admissible under Rule 702, expert testimony must be both reliable and of assistance to the trier of fact. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590-91 (1993); *Nimley v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). While the focus of the reliability inquiry is usually on the "principles and methodology, not on the conclusions they generate," *Daubert*, 509 U.S. at 595, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also* Fed. R. Evid 702 Advisory Committee Notes ("The trial court's gatekeeping function requires more than simply taking the expert's word for it.") (internal quotations and citation omitted). "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Rule 702 requires that the expert's testimony will assist the trier of fact. This is primarily a relevance inquiry. *Daubert*, 509 U.S. at 591; *EEOC v. Bloomberg L.P.*, No. 07 Civ. 8383 (LAP), 2010 WL 3466370, *6-7 (S.D.N.Y. Aug. 31 2010). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotations and citation omitted). Moreover, expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it [] does not aid the jury in making a decision," but instead

"undertakes to tell the jury what result to reach and thus attempts to substitute the expert's judgment for the jury's[.]" *Nimley*, 414 F.3d at 397 (internal quotations and citations omitted).

The admissibility of expert testimony also is subject to Fed. R. Evid. 403 and should be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimley*, 414 F.3d at 397 (quoting Fed. R Evid. 403). Because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it[,]" the trial court "in weighing possible prejudice against probative force under Rule 403 [] exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).

The burden is on the proponent of the proffered expert testimony to establish its admissibility by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171 (1987), Fed. R. Evid. 702 Advisory Committee Notes.

## III.    ARGUMENT

### A.    Smith Is Not Qualified to Critique Fagan's Multivariate Regression Analyses or to Testify About His "Alternative" Regression Analysis

Given his lack of formal training in or practical experience with the multivariate regression analyses conducted by Professor Fagan, Smith is not qualified to offer critiques of such analyses or to testify about his own "alternative" version of Fagan's regression analysis at trial.

While it is true that "[c]ourts within the Second Circuit have 'liberally construed expert qualification requirements[,]'" *Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, 691 F. Supp. 2d 448, 457 (S.D.N.Y. 2010) (Scheindlin, J.) (citing cases), "a district court may properly conclude that witnesses are insufficiently qualified

despite the relevance of their testimony because their expertise is too general or too deficient." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) (Scheindlin, J.) ("An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited[.]"). In addition, while an expert can be qualified based on either formal education and training or practical experience in the relevant subject matter, *see Valentin v. New York City*, No. 94 CV 3911 (CLP), 1997 WL 33323099, *14-15 (E.D.N.Y. Sep. 9, 1997), an expert who lacks both cannot be qualified to testify under Rule 702, *see Mancuso v. Consol. Edison Co. of New York, Inc.*, 967 F. Supp. 1437, 1443-45 (S.D.N.Y. 1997).

Defendants have failed to—and cannot—establish that Smith has formal education or training in the multivariate regression models used by Fagan. Smith admits that he holds no degree in statistics, is "not a statistician," has never taken courses on many of the complex statistical methods and concepts involved in Fagan's analyses, and has not taken a statistics course of any kind since he was in graduate school more than 35 years ago. Smith Dep. at 129:9-10, 300:17-301:19; Smith Rept., App. A. As this Court has noted, "no good faith argument can be made that 30 year-old course study is a sufficient qualification to testify as a statistician." *Malletier*, 525 F. Supp. 2d at 664. The "informal" training Smith claims to have obtained from attending some of his academic colleagues' job-talks, referring to his graduate school statistics textbook, and Internet research, *see* Smith Dep. at 301:23-302:25, did not make him an expert; despite this purported education, he could not identify what a multilevel poisson regression is. *Id.* at 129:5-10; *see also Mancuso*, 967 F. Supp. at 1443-44 (finding that expert was not qualified where, despite his claim that he "had read 40 to 50 articles over the course of fifteen years" and

12

"subsequently performed approximately 14-15 hours of library research and review" on the chemical about which he would testify, he "was unable to answer critical questions regarding [the chemical]").

Smith also clearly lacks practical experience with the statistical analyses about which he seeks to opine. He has never conducted a statistical study analyzing racial disparities in police stop-and-frisk practices, other law enforcement programs or practices, or, for that matter, any governmental or private sector institution. Smith Dep. at 113:6-125:11, 128:8-13, 129:-10, 132:12-134:5, Smith Rpt., App. A. His only disclosed exposure to such studies is reading a handful of actual statistical scholars' studies on racial disparities in police stops—two of which were conducted by Fagan—and attending one conference and a New York City Council hearing where Fagan's and RAND's studies were discussed. Smith Dep. at 13:23-21:2, 28:5-31:7.  He has never conducted a statistical study using any of the three multivariate regression models used by Fagan and had only minimum input into the statistics-related methodological decisions made in the two studies he did with Purtell using general estimating equations. *Id.* at 36:25-37:7, 37:16-21, 40:4-12, 127:3-7, 128:8-13-129:10.

Thus, while "an expert's training need not narrowly match the point of dispute in the case[,]" *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 73 (S.D.N.Y. 2001) (Scheindlin, J.), Smith's 40 years of experience studying urban policing generally does not qualify him as an expert on the methodological soundness of Fagan's multivariate regression analyses. In *Bazile v. City of New York*, 215 F. Supp. 2d 354 (S.D.N.Y. 2002), the trial court excluded the testimony of plaintiff's expert who, despite his extensive experience in drug enforcement and supervision of law enforcement personnel, lacked the "expertise that would qualify [him] to assess whether discriminatory animus motivated" the NYPD's disciplinary action against the plaintiff NYPD

13

police officer. *Id.* at 365. Like the expert in *Bazile*, Smith's research on urban policing, which has never addressed issues of racial bias and has not involved the kinds of regression analyses conducted by Fagan, is too far afield from the statistical concepts and questions of racial bias implicated by Fagan's multivariate regression analyses to qualify Smith to offer critiques of those analyses at trial or to testify about the "alternative" version of Fagan's regression model that Smith conducted and summarized vaguely in his December 19, 2011 declaration.

In an attempt to overcome Smith's clear lack of expertise, Defendants submitted a declaration from Purtell in support of their motion to exclude Professor Fagan's testimony. *See* Dkt # 194. It states that Purtell conducted the statistical analyses contained in Smith's Expert Report and two declarations "in collaboration with" Smith. *Id.* ¶ 2. The fact that Smith may have relied on Purtell, who appears to have more statistical knowledge and experience than Smith (although no experience or training in policing or analyzing claims of racial discrimination), to conduct the alternative regression analysis summarized in Smith's December 19, 2011 Declaration does not qualify Smith, who is not qualified to conduct such analysis himself, to testify about Purtell's statistical analysis. As this Court has previously ruled, an expert unqualified to testify about a regression analysis cannot circumvent Rule 702's requirements by simply acting as "a conduit for the opinion of an unproduced expert" who conducted that regression analysis. *Malletier*, 525 F. Supp. 2d at 664-66. While Federal Rule of Evidence 703 does permit an expert "to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field[,]" the testifying expert "must in the end be giving his own opinion[,]" *id.* at 664, and not merely "summar[izing ] what other experts have said, without application of his own expertise." *Arista Records LLC v. Lime Grp., LLC*, No. 06 CV 5936 (KMW), 2011 WL 1674796, *10 (S.D.N.Y. May 2, 2011). Because Smith

14

lacks expertise in conducting the "alternative" Fagan regression analysis described in his Declaration, his testimony about it would not be based on his own expert opinion but would instead necessarily be just a report on the work done by Purtell and his team. This Smith cannot do under Rule 702.

The same holds true for Smith's critiques of Fagan's choice of benchmark, omission of an unemployment variable, factor analysis, and presentation of the results of his regression analyses, all of which Smith bases not on his own training or experience—as he has none—but solely on the opinions of others. *See* Smith Dep. at 60:7-19, 61:17-63:4; 65:12-67:10,216:9-219:22, Dkt # 193 ¶ 20; Dkt # 180 Ex. H. Smith cannot be a conduit for the opinions of Martin, Doherty, and Purtell and cannot relay the contents of an article written by others to the factfinder under the guise of his so-called "expert" testimony. *See Arista Records*, 2011 WL 1674796, at *10; *Wantanabe Realty Corp. v. City of New York*, No. 01 Civ. 10137 (LAK), 2004 WL 188088, *2 (S.D.N.Y. Feb. 2, 2004).

Accordingly, Smith should be precluded from offering at trial his opinions about Fagan's multivariate regression analyses listed in Parts A(1)-(2) and B of the Statement of Facts, *supra*, Fagan's critiques of the RAND Report listed in Part A(4) of the Statement of Facts, *supra*, or his own "alternative" regression analysis discussed in his December 19, 2011 Declaration, February 16, 2012 Reply Declaration and Part B of the Statement of Facts, *supra*.

**B.**   **Smith's Correlation Coefficient Calculations and "Alternative" Regression Analysis Are Not Reliable and Violate F.R.C.P. 26(A)(2)**

In addition to Smith's lack of qualifications to testify about his "alternative" version of Fagan's regression analysis, Defendants have failed to establish that this analysis or the calculations of the correlation coefficients described in Smith's December 19, 2011 Declaration are reliable, as required by Rule 702. Neither his December 19, 2011 Declaration nor his

February 16, 2012 Reply Declaration specify what other control variables, if any, besides crime suspect race Smith used in his "alternative" Fagan regression analysis.  In his December 19 Declaration, Smith claims that he "added" a control variable not included in Fagan's original analysis, but then acknowledges in his Reply Declaration that he did not include all of the control variables which Fagan had used in his analysis. Dkt # 181 ¶ 30; Dkt # 193 ¶ 22. Moreover, in neither declaration does Smith specify whether the "aggregated" 2009 and 2010 crime suspect data that he used pertained to violent crime suspects or suspects from all crime categories, despite the fact that Defendants produced "aggregated" data for both kinds of suspects. Dkt # 181 ¶¶ 12-13, 15, 30, Exs. B-C; Dkt # 193 ¶ 22.   As for the correlation coefficient calculations reported in his Declaration, Smith did not provide information on the equation or the statistical methods he used to generate those calculations. *See* Dkt # 181 ¶ 15, Ex. E.

Without the missing information, Plaintiffs cannot replicate either of these two analyses, which weighs heavily against their methodological reliability under *Daubert*. 509 U.S. at 593 ("[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested."); *see also Maurizio v. Goldsmith*, No. 96 CIV. 4332 (RPP), 2002 WL 535146, *4 (S.D.N.Y. April 9, 2002) (holding that "since [plaintiff's expert's report] does not set forth the data or information upon which the expert bases his opinion, it cannot be tested."); *251 CPW Hous. Ltd. v. Paragon Cable Manhattan*, No. 93 Civ. 0944 (JSM), 1995 WL 70675, *4 (S.D.N.Y. Feb. 21, 1995) (precluding plaintiff's experts from testifying where experts' reports were "so inadequate that it is impossible for defendant to ascertain any of the specifics to which plaintiffs' experts will testify or any of the bases from which they derived their conclusions").

Smith's failure to fully explain in his two Declarations the data and statistical methods he

used also violates Federal Rule of Civil Procedure 26(a)(2). *See* Fed. R. Civ. P. 26(a)(2)(B)

(requiring testifying expert to submit a written report that "must contain: (i) a complete statement

of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or

data considered by the witness in forming them[.]").  Finally, because Smith did not disclose

these correlation coefficient calculations and "alternative" multiple regression analyses until

December 19, 2011, more than a year after the November 15, 2010 deadline set by the Court for

Defendants to submit their expert report, and more than nine months after his March 4, 2011

deposition, these two analyses also run afoul of Fed. R. Civ. P. 26(a)(2)(D).

Accordingly, Smith's correlation coefficient calculations and "alternative" multiple

regression analysis are inadmissible at trial.

### C.   Smith's Opinions About the Meaning of Low Stop-and-Frisk Hit Rates Are Not Based on Sufficient Facts or Data

Smith's opinion that the extremely low weapons hit rate of NYPD stops-and-frisks

suggest that the NYPD's stop-and-frisk practices have encouraged would-be gun carriers to leave

their weapons at home, *see* Smith Rpt. at 39, is not supported by sufficient facts and data as

required by Fed. R. Evid. 702(b). Smith does not cite to any data, statistical study, or any other

empirical support for his view that aggressive use of street stops deters illegal weapons

possession, nor could he.  As the National Research Council concluded in its 2004 report

surveying more than thirty years of research on policing strategies and practices around the

country, the empirical evidence on the crime deterrent effects of street stops is inconclusive at

best. *See* Nat'l Research Council, *Fairness and Effectiveness in Policing: The Evidence* 214-16

(Washington, DC 2004). Lacking "a sufficient factual foundation," Smith's opinion is

"speculative or conjectural," and therefore inadmissible under Fed. R. Evid. 702. *See Boucher v.*

*U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (2d Cir. 1996).

### D.     Smith's Opinions on Crime Reduction Are Not Relevant and Are Highly Prejudicial

Smith's opinions on the crime deterrent effects of the NYPD's Operation Impact and stop-and-frisk programs and their supposed crime reduction effect in black and Latino New York City neighborhoods are not relevant to the legal and factual issues in this case.

To begin with, Plaintiffs are not challenging Operation Impact, which involves the deployment of officers to majority black and Latino neighborhoods, but the conduct of officers once they get to those neighborhoods, i.e., illegal stops-and-frisks, *see* Dkt # 132 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment) at 14, and Smith acknowledged that his Operation Impact study did *not* assess the unique effect that officer stop activity, separate and apart from officer presence, had on crime reduction in various neighborhoods of New York City. Smith Dep. at 244:10-20.

More importantly, Smith's crime reduction opinions are irrelevant to the questions posed by Plaintiffs' Fourth and Fourteenth Amendment claims: (1) Do NYPD officers conduct stops-and-frisks without reasonable suspicion?; and (2) Do they stop civilians on the basis of their race?  As to the first question, the United States Supreme Court and this Court have both stated unequivocally that "even assuming [crime prevention] is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it." *Brown v. Texas*, 443 U.S. 47, 52 (1979); Dkt # 201 at 65 ("Deterrence is of course a crucial aspect of law enforcement (and criminal justice policy in general) and it may lawfully be pursued in many different ways – more cops walking their beats, better detective work, etc. But it may not be accomplished through the use of unlawful stops.").  Thus, Smith's crime reduction opinions are irrelevant to Plaintiffs' Fourth Amendment claims, and the defense they would be offered to

support—that Defendants' stop-and-frisk program "works" because it prevents crime—is no defense to those claims as a matter of law but is instead calculated to mislead and confuse the trier of fact.

As to the second question, whether the goal of the NYPD's stop-and-frisk program is crime prevention, the program violates the Equal Protection clause of the Fourteenth Amendment if officers make race-based stops to achieve that goal. Legal scholars, courts and other legal authorities have long recognized that law enforcement tactics targeting particular racial groups, even when undertaken in the name of crime control rather than racial animus, amount to racial profiling. *See, e.g.*, Samuel R. Gross, Debra Livingston, *Racial Profiling Under Attack*, 102 COLUM. L. REV. 1413, 1415 (2002) ("'[R]acial profiling' occurs whenever a law enforcement officer questions, stops, arrests, searches, or otherwise investigates a person because the officer believes that members of that person's racial or ethnic group are more likely than the population at large to commit the sort of crime the officer is investigating."); U.S. Dep't of Justice, Civil Rights Div., *Guidance Regarding the Use of Race by Federal Law Enforcement Agencies* 3 (2003) ("Put simply, 'to the extent that race is used as a proxy' for criminality, 'a racial stereotype requiring strict scrutiny is in operation.'") (quoting *Bush v. Vera*, 517 U.S. 952, 968 (1996); *State v. Soto*, 734 A.2d. 350, 361 (N.J. Super. Ct. 1996) (finding *de facto* State Police policy of targeting blacks for investigation and arrest in violation of the Equal Protection Clause and noting that "[t]he eradication of illegal drugs from our State is an obviously worthy goal, but not at the expense of individual rights."). This is so even when the race-based law enforcement tactic at issue has a demonstrable crime control benefit. *See Md. State Conf. of NAACP Branches v. Md. Dep't of State Police*, 72 F. Supp. 2d 560, 564 (D. Md. 1999) ("[F]or a period of time prior to April 1997, the plaintiffs 'clearly have made a reasonable showing that

there was a pattern and practice of stops by the Maryland State Police based upon race'")

(quoting Order Granting Mot. for Further Relief, *Wilkins v. Maryland State Police*, CCB-93-468

(D. Md. Apr. 22, 1997)); Samuel R. Gross and Katherine Y. Barnes, *Road Work: Racial*

*Profiling and Drug Interdiction on the Highway*, 101 Mich. L. Rev. 651, 660 (2002) (finding in

statistical study of Maryland State Police highway stop data that "racial profiling seems to

increase the probability of finding large hauls of drugs.")

 In other words, determining whether NYPD officers conduct stops-and-frisks to prevent

crime, or whether their conduct does prevent crime, will not answer the question of whether they

make such stops on the basis of race in violation of the Equal Protection Clause. Thus, Smith's

studies and statistics on crime reduction will not assist the trier of fact to resolve Plaintiffs'

Fourteenth Amendment claims and should therefore be excluded as irrelevant.

 Even if these studies and statistics had any relevance to Plaintiffs' claims, which they do

not, their probative value would be far outweighed by the potential prejudicial effect of

misleading and distracting jurors to believe that this case is a referendum on whether or not

Defendants' stop-and-frisk program makes them safer on the streets of New York, rather than

whether that program violates class members' constitutional rights.  This, without more, makes it

inadmissible.  *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir.

1995) (noting that federal courts "must therefore exclude proffered [expert testimony] under

Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in

dispute in the case, and that it will not mislead the jury"). Thus, Smith's opinions about the

alleged crime-reducing effect of Defendants' stop-and-frisk program, as well as the studies and

statistics on which his opinions are based, are inadmissible under FRE 403.[4]

### E.   Smith's Opinion that NYPD Stops-and-Frisks Are Not Racially Motivated Would Impermissibly Usurp the Functions of the Court and the Jury and Is Not Supported by the Data Upon Which It Is Based

Smith's opinion that "there is no compelling evidence that NYPD officers are making stops based on race or ethnicity[,] but instead are pursuing a strategy and using tactics that prevent crime and benefit the City as a whole, and communities of color in particular," Smith Rpt. at 8, is inadmissible for two additional reasons.

First, Smith's opinion that crime prevention rather than race or ethnicity is the motivating factor states the answer to *the* ultimate legal issue and improperly tells the jury what conclusion to reach on Plaintiffs' Fourteenth Amendment claims. For that reason, it is inadmissible. While under Federal Rule of Evidence 704 "[a]n opinion is not objectionable just because it embraces an ultimate issue," an expert opinion is inadmissible, however, where, as here it would tell jury how to apply facts to law. *See U.S. v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."); *see also Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010) (probable cause testimony excluded because "[s]uch testimony . . . tell[s] the jury what result to reach").

To prove their Fourteenth Amendment claims in this case, Plaintiffs are "required" to provide "[p]roof of racially discriminatory intent or purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Whether Defendants' stop-and-frisk

---

[4] While arguing here that Smith's opinions should be excluded as irrelevant and prejudicial expert testimony under *Daubert* and Rules 702 and 403, Plaintiffs expressly reserve the right to make a *motion in limine* under Federal Rules of Evidence 402 and 403 to exclude any other non-expert evidence, from any source, that Defendants may seek to introduce at trial concerning the crime deterrent effects of the NYPD's stop-and-frisk policies and practices.

conduct is racially motivated is the ultimate legal issue on Plaintiffs' Fourteenth Amendment claims. Smith's opinion is tantamount to an ultimate legal conclusion that Defendants have not violated the class members' Fourteenth Amendment rights.  For that reason alone it is inadmissible.  *See, e.g.*, *Cameron*, 598 F.3d at 62 (precluding probable cause opinion in false arrest case); *Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) (opinion about the justified use of force precluded in excessive force case); *Pereira v. Cogan*, 281 B.R. 194, 198-99 (S.D.N.Y. 2002) (*inter alia* precluding an expert's opinion that a board of directors "failed to discharge its fundamental oversight responsibilities and duty of care").

Plaintiffs' position is entirely consistent with this Court's earlier ruling related to Plaintiffs' expert Jeffrey Fagan.  In ruling that he was qualified to testify and that his opinions are admissible in this case, this Court explained that Professor Fagan's expert testimony will "help a jury of lay people understand the significance of 2.8 million stops and the 56 million boxes describing the indicia of suspicion that led to those stops," but that Professor Fagan will not provide any opinions on the meaning of applicable laws or, more importantly here, answer the ultimate legal question of whether Defendants "have a policy and/or practice of conducting suspicionless stops."  *See* Dkt. #201, at 38-39.  Indeed, this Court specifically said that "Fagan . . . will not be allowed to express an opinion on that [ultimate] question."  *Id.* at 38.  The same should be true for Professor Smith. Because his opinion that "NYPD officers are [not] making stops based on race or ethnicity but instead are pursuing a strategy and using tactics that prevent crime" answers the Fourteenth Amendment question in this case, it must be excluded.  *See* Smith Rep. at 8, 18.

Second, there is "simply too great an analytical gap" between Smith's questionable

evidence that NYPD stops-and-frisks deter crime[5] and his conclusion that such stops cannot be

race-based. *Gen. Elec.*, 522 U.S. at 519. As discussed in Point IV *supra,* legal scholars and courts

have long recognized that law enforcement agencies often racially profile in the service of crime

control. Smith's failure to even consider the very real possibility that NYPD officers are stopping

people on the basis of their race and with the goal of deterring crime renders his conclusion

unreliable. *See In re Fosamax Prod. Liab. Litig.*, 688 F. Supp. 2d 259, 268 (S.D.N.Y. 2010)

("While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's

testimony must at least address obvious alternative causes and provide a reasonable explanation

for dismissing specific alternate factors identified by the defendant.") (internal quotations and

citation omitted); *U.S. Info Sys., Inc. v. Int'l Bhd. of Elec. Workers Union Local No. 3*, 313 F.

Supp. 2d 213, 238 (S.D.N.Y. 2004) ("An expert must demonstrate that he has adequately

accounted for obvious alternative explanations in order for his testimony to be reliable.").

 Smith's conclusion is also based on an overly restrictive understanding of discriminatory

intent as equivalent to racial animus. *See* Smith Rpt. at 18 ("[T]he central motivating factor in

police policy and practice at the street level is crime reduction, not harassment of Blacks and

Hispanics."). But this view is clearly contrary to law. It is well established that governmental

actors are liable for Equal Protection violations when taking race-conscious action in the service

of benign, and often laudable, public policy goals. *See, e.g.*, *Ricci v. DeStefano*, 557 U.S. 557

(2009) (City's decision to throw out results of fire department promotional civil service exam on

which white candidates scored better than blacks in order to avoid liability for disparate impact

discrimination against black candidates constituted intentional racial discrimination under Title

---

[5] As set forth in detail in the December 3, 2010 Supplemental Expert Report of Jeffrey Fagan, there are numerous methodological flaws in Smith and Purtell's statistical analyses in their Operation Impact and Stop-and-Frisk studies which severely undermine the validity of those studies' results. *See* Fagan Supp. Rpt. (Dkt # 132) at 20-34.

VII); *Johnson v. California*, 543 U.S. 499 (2005) (state correctional department policy of segregating all new prison inmates by race for first 60 days of incarceration in order to prevent violence by racial gangs was a suspect racial classification subject to strict scrutiny under the Equal Protection Clause); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (City's "set-aside" plan requiring 30% of dollar amount of all municipal construction contracts to be subcontracted to minority-owned businesses historically underrepresented in City's construction industry violated Equal Protection Clause). Thus, Smith's conclusion, if he is allowed to testify to it, will not assist, but will instead greatly mislead the trier of fact on the question of discriminatory intent that is central to Plaintiffs' Fourteenth Amendment claims. Smith's conclusion is therefore inadmissible under Rules 702 and 403.

## IV.    CONCLUSION

Based on the foregoing, this Court should preclude Professor Dennis Smith from testifying as follows:

i.      Smith may not critique Fagan's multivariate regression analyses and critique of the RAND study;

ii.     Smith may not offer his correlation coefficient calculations and "alternative" regression analysis;

iii.    Smith may not opine on the meaning of low stop-and-frisk weapons recovery hit rates;

iv.     Smith may not opine on crime reduction in New York City, or otherwise testify about the results of the studies attached as Appendices D and E to his Expert report; and

v.      Smith may not opine that NYPD officers do not conduct stops-and-frisks on the basis of race.

Dated:      New York, New York
            June 26, 2012

By: _____
        GRETCHEN HOFF VARNER

            Darius Charney
            Sunita Patel
            CENTER FOR CONSTITUTIONAL RIGHTS
            666 Broadway, 7th Floor
            New York, New York 10012
            (212) 614-6439
            dcharney@ccrjustice.org
            spatel@ccrjustice.org

            Jonathan Moore
            Jenn Rolnick Borchetta
            BELDOCK LEVINE & HOFFMAN, LLP
            99 Park Avenue, Suite 1600
            New York, New York 10016
            (212) 490-0900
            jmoore@BLHNY.com
            jborchetta@BLHNY.com

            Philip A. Irwin
            Eric Hellerman
            Gretchen Hoff Varner
            Kasey Martini
            COVINGTON & BURLING LLP
            The New York Time Building
            620 Eighth Avenue
            New York, New York 10018-1405
            (212) 841-1000
            pirwin@cov.com
            ehellerman@cov.com
            ghoffvarner@cov.com
            kmartini@cov.com

            Daniel A. George
            COVINGTON & BURLING LLP
            1201 Pennsylvania Avenue, N.W.
            Washington, D.C. 20004
            (202) 662-6000
            dgeorge@cov.com

            *Attorneys for Plaintiffs*

25