UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

DAVID FLOYD et al.,

                                           Plaintiffs,

             -against-

THE CITY OF NEW YORK, et al.,

                                   Defendants.

**DEFENDANTS'
MEMORANDUM OF LAW
IN OPPOSITION TO
PLAINTIFFS' MOTION TO
EXCLUDE CERTAIN
OPINIONS OF
DEFENDANTS' PROPOSED
EXPERT, DENNIS SMITH**[1]


08 Civ. 01034 (SAS)

------------------------------------------------------------------------ x

---

[1] Defendants proffer Smith's testimony and analyses to rebut those of plaintiffs' expert, Jeffrey Fagan ("Fagan"), whose opinions and analyses are on the record as follows: Report of Jeffrey Fagan, Ph.D., of October 15, 2010 ("Fagan Report") (filed under seal as Dkt #132); the Supplemental Report of Jeffrey Fagan, Ph.D., of December 3, 2010 ("Fagan Supp. Report") (filed under seal as Dkt # 132); Fagan's Affidavit of September 28, 2011 in support of plaintiffs' motion to amend/correct Order on defendants' motion for summary judgment ("09/28/11 JF Aff.") (Dkt # 156); Fagan's Declaration of November 6, 2011 in support of plaintiffs' motion for class certification ("11/06/11 JF Decl.") (Dkt # 168); Fagan's Declaration in opposition to defendants' motion to exclude plaintiffs' proposed expert reports, opinions and testimony of Jeffrey Fagan ("Defs.' *Daubert* Mot." or "Defs.' *Daubert* Motion") ("02/02/12 JF Decl.") (Dkt # 189); the Supplemental Declaration of Jeffrey Fagan in opposition to Defs.' *Daubert* Mot. ("03/14/12 JF Supp. Decl.") (Dkt # 198); and the Transcript of Hearing on Defs.' *Daubert* Motion held on March 8, 2012 ("*Daubert* Hearing") (Dkt # 199). Smith's opinions are set forth in the following: Report of Dennis C. Smith, dated December 19, 2011 (attached as Ex. B to Declaration of Darius Charney, dated June 26, 2012 (Dkt # 217) (hereinafter "Smith Report" or "Report"); Declaration of Dennis C. Smith, dated December 19, 2011 (Dkt #181) (hereinafter "12/19/11 DS Decl."), and the Reply Declaration of Dennis C. Smith, dated February 16, 2012 (Dkt. #193) (hereinafter "02/16/12 DS Reply Decl."). The relevant moving papers on this issue are in the record as follows: Plaintiffs' Notice of Motion to Exclude Certain Opinions of Defendants' Proposed Expert, Dennis Smith ("Pls.' Mot.") (Dkt # 215); Plaintiffs' Memorandum of Law in Support of Pls.' Mot. ("Pls.' Mem.") (Dkt # 216); Declaration of Darius Charney in Support of Pls.' Mot. ("06/26/2012 Charney Decl.") (Dkt # 217). *See also Floyd v. City of New York*, No. 08-Civ.-1034 (SAS), 2012 U.S. Dist. LEXIS 53249 (S.D.N.Y. Apr. 16, 2012).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................... iii

PRELIMINARY STATEMENT ................................................... 1

STATEMENT OF FACTS ....................................................... 1

ARGUMENT .................................................................. 3

POINT I

SMITH IS QUALIFIED TO OPINE ON THE REGRESSION
ANALYSES ................................................................. 3

    A.    Smith's Training and Experience Qualify Him to Opine on
Fagan's Multivariate Regression Analyses
and Smith's Own "Alternative" Regression Analysis ............... 4

    B.    Smith's Critiques and "Alternative" Regression Are
Smith's Own Opinions ........................................... 8

    C.    Smith's Consultation With Other Experts Is Permissible ......... 12

POINT II

SMITH'S CORRELATION COEFFICIENT CALCULATIONS
AND "ALTERNATIVE" REGRESSION ANALYSIS ARE
RELIABLE AND DO NOT RUN AFOUL OF FED. R. CIV. P.
26(A)(2) ................................................................. 12

    A.    Smith's Correlation Coefficient Calculations Are
Admissible ..................................................... 13

    B.    Smith's "Alternative" Regression Is Admissible ................. 15

POINT III

SMITH'S OPINIONS ABOUT THE MEANING OF LOW STOP-
AND-FRISK "HIT RATES," CRIME REDUCTION AND THAT
NYPD STOPS-AND-FRISKS ARE NOT RACIALLY
MOTIVATED ARE ADMISSIBLE ............................................. 17

    A.    Smith's Opinions About the Meaning of Low Stop-and-
Frisk Weapons "Hit Rates" Are Based on Sufficient Facts
and Data ....................................................... 17

B.     Smith's Opinions on Crime Reduction Are Relevant and
Are Not Barred by Fed. R. Evid. 403 ....................................................... 18

C.     Smith's Conclusion That the Statistics Tend to Show That
NYPD Stops-and-Frisks Are Not Based on Race Does Not
Usurp the Functions of the Court and the Jury and Is
Supported by the Data on Which It Is Based ........................................... 20

CONCLUSION ...................................................................................................................... 25

**Pages**

## TABLE OF AUTHORITIES

**Cases**

*Arista Records LLC v. Lime Grp.,LLC,*
    No. 06 Civ. 5936 (KMW), 2011 WL 1674796, 2011 U.S. Dist. LEXIS
    47416 (S.D.N.Y. May 2, 2011)............................................................................ *passim*

*Bazile* v. *City of New York,*
    215 F. Supp. 2d 354 (S.D.N.Y. 2002)................................................................ 5, 6, 7

*Cary Oil Co. v. MG Ref. & Mktg.,*
    No. 99 Civ. 1725 (VM), 2003 WL 1878246, 2003 U.S. Dist. LEXIS
    6150 (S.D.N.Y. April 11, 2003) ............................................................................... 4

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ......................................................................................... *passim*

*Dura Automotive Sys. v. CTS Corp.,*
    285 F.3d 609 (7th Cir. 2002) ................................................................................. 11

*Equal Employment Opportunity Comm'n v. Bloomberg L.P.,*
    No. 07 Civ. 8383 (LAP), 2010 U.S. Dist. LEXIS 92511 (S.D.N.Y.
    Aug. 31, 2010) ........................................................................................................ 21

*Floyd v. City of New York,*
    813 F. Supp. 2d 417 (S.D.N.Y. 2011) ............................................................... 20, 23

*Floyd v. City of New York,*
    No. 08 Civ. 1034 (SAS), 2012 U.S. Dist. LEXIS 53249 (S.D.N.Y.
    Apr. 16, 2012) ..................................................................................... 3, 20, 21, 22

*Gussack Realty Co. v. Xerox Corporation,*
    224 F.3d 85 (2d Cir. 2000) ..................................................................................... 12

*In re "Agent Orange" Prod. Liab. Litig.,*
    611 F. Supp. 1223 (E.D.N.Y. 1985),
    *aff'd,* 818 F.2d 187 (2d Cir. 1987),
    *cert. denied,* 487 U.S. 1234 (1988) ....................................................................... 12

*In re Fosamax Prods. Liab. Litig.,*
    688 F. Supp. 2d 259 (S.D.N.Y. 2010) ............................................................... 13, 20

*In re Rezulin Prods. Liab. Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................................... 21

**Pages**

*In re Zyprexa Prods. Liab. Litig.,*
   489 F. Supp. 2d 230 (E.D.N.Y. 2007) ........................................................... 3, 4, 17

*Johnson v. California,*
   543 U.S. 499 (2005) .................................................................................................. 24

*Johnson and Johnson Vision Care, Inc. v. CIBA Vision Corp.,*
   No. 04 Civ. 7369 (LTS), 2006 U.S. Dist. LEXIS 51869, 2006 WL
   2128785 (S.D.N.Y. July 28, 2006) ........................................................................... 6

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................... 3, 5, 9, 11, 12

*Mancuso v. Consol. Edison Co. of New York, Inc.,*
   967 F. Supp. 1437 (S.D.N.Y. 1997) ......................................................................... 5

*McCleskey v. Kemp,*
   481 U.S. 279 (1987) ................................................................................................ 23

*McCullock v. H.B. Fuller Co.,*
   61 F.3d 1038 (2d Cir. 1995) ..................................................................................... 4

*Nimley v. City of New York,*
   414 F.3d 381 (2d Cir. 2005) ................................................................................... 21

*Personnel Adm'r v. Feeney,*
   442 U.S. 256 (1979) ................................................................................................ 24

*Pyke v. Cuomo,*
   567 F.3d 74 (2d Cir.),
   *cert. denied*, 130 S. Ct. 741 (2009) ................................................................... 23-24

*Ricci v. DeStefano,*
   557 U.S. 557 (2009) ................................................................................................ 24

*Richmond v. J.A. Croson Co.,*
   488 U.S. 469 (1989) ................................................................................................ 24

*Sobel v. Yeshiva Univ.,*
   839 F.2d 18 (2d Cir. 1988) ................................................................................ 16, 22

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991) ................................................................................. 21

*United States v. Wexler,*
   522 F. 3d 194 (2d Cir. 2008) .................................................................................... 3

**Pages**

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ......................................................................................... 24

*Wantanabe Realty Corp.* v. *City of New York,*
   No. 01 Civ. 10137 (LAK), 2004 WL 188088, 2004 U.S. Dist. LEXIS
   1225 (S.D.N.Y. Feb. 2, 2004) ....................................................................... 10, 12

*Washington v. Davis*,
   426 U.S. 229 (1976) ......................................................................................... 23

**Pages**

**Other Authorities**

Advisory Comm. Notes on the 2000 Amendments to Fed. R. Evid. 702 ..................................... 3

Fed. R. Civ. P. 26(A)(2)(D) .............................................................................. 12, 13

Fed. R. Evid. 403 ......................................................................................... 1, 18

Fed. R. Evid. 702 ........................................................................................ *passim*

Fed. R. Evid. 703 ....................................................................................... 1, 12

Petra E. Todd, Testing for Racial Bias in Law Enforcement, Univ. of Pennsylvania
     (2006), prepared for the Palgrave Dictionary of Economics, available at
     http://athena.sas.upenn.edu/~petra/papers/profiling.pdf ......................................... 17

## PRELIMINARY STATEMENT

Defendants respectfully submit this memorandum of law in opposition to plaintiffs' motion pursuant to Fed.R.Evid. 702 and 403 to preclude defendants' expert, Dennis Smith, Ph.D. ("Smith") from testifying to certain of his opinions relating to his critique of plaintiffs' expert Jeffery Fagan's opinions about the existence of a statistical relationship between the racial breakdown of persons stopped, questioned and frisked by the NYPD ("SQFs") and whether such stops are based on intentional racial discrimination.  Pursuant to the liberal standards governing admissibility of expert testimony under Fed.R.Evid. 702, 703 and 403, plaintiffs' motion fails in its entirety.

## STATEMENT OF FACTS

By letter to plaintiffs dated August 3, 2009, defendants disclosed as experts Dennis Smith, Ph.D. and Robert M. Purtell, Ph.D.  For a chronology of the defendants' consistent disclosures thereafter, and through the briefing in opposition to Pls.' Mem., defendants respectfully refer the Court to the Declaration of Heidi Grossman, Esq., dated July 24, 2012, ("07/24/12 HG Decl."),  at ¶2, submitted in support of defendants' opposition.[1]

Smith holds a Ph.D. in Political Science and has served on the faculty of the Robert F. Wagner Graduate School of Public Service at New York University since 1973.  Smith Report, 6/26/2012 Charney Decl., Ex. B at 1-2.  He has been studying, performing empirical research on and teaching about urban police policy and management for nearly forty years, and he created the NYU graduate course on evaluation of research methods, which incorporates the use of multiple regression in both quasi experimental and classical experimental designs used to test

---

[1] Defendants also submit in opposition to plaintiffs' motion to preclude Smith, the Declaration of Dennis C. Smith dated July 24, 2012, ("07/24/12 DS Decl."), and the Declaration of Robert M. Purtell, dated July 24, 2012 ("07/24/12 RP Decl.").

whether the evidence supports the assumptions in the program theory.  *Id.*; 07/24/12 DS Decl. ¶¶2-9.  Smith's research career has involved extensive collaboration with statistical experts and employed various statistical analysis methods, including multiple regression.  *See* 07/24/12 DS Decl. at ¶¶2-9.   Statistical analysis has played a central role throughout Smith's career, beginning with his collaborative research in the 1970s with Professor Elinor Ostrom, a political scientist who received the Nobel Prize in Economics in 2010.  Smith conducted the statistical analyses included in several such collaborative studies which were published in peer-reviewed publications, including, *inter alia,* a study of the effects of training and education on police attitudes and performance in twenty nine police departments in the St. Louis metropolitan area published in 1974.  *Id.* at ¶¶2-7.  Statistical analyses are also key components of the following of Smith's studies and publications:   (1) a commissioned analysis of organizational and performance effects of a twenty-five percent reduction in the size of the NYPD in the 1970s; (2) an empirical evaluation of an NYPD police administrative reform involving the consolidation of bureaus in Brooklyn North under the Patrol Commander with the then Senior Economist with the City Board of Trade, in 2005; (3) a 2007 study of the relationship between crime reduction and economic development in New York City; (4) an assessment in 2007 of the NYPD's Operation Impact program in relation to crime reduction; and (5) a 2008 study of the efficacy of stop and frisk practices as crime prevention strategy.  *See id.* at ¶¶5-6; Smith Report at 1-2.  The latter four studies, all of which were presented by invitation at national research conferences, resulted from collaborations between Smith and Purtell, and incorporated multiple regression analyses. 07/24/12 DS Decl. at ¶¶6-7.

**ARGUMENT**

Fed.R.Evid. 702 allows for expert testimony by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education," provided that: " (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), charge the District Court to act as "gatekeeper" in determining the admissibility of expert testimony; the District Court enjoys "broad discretion" in administering this function.  *See United States v. Wexler*, 522 F. 3d 194, 204 (2d Cir. 2008). However, as this Court has noted, "the Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system."[2]  Thus, "the rejection of expert testimony is the exception rather than the rule."  Advisory Comm. Notes on the 2000 Amendments to Fed.R.Evid. 702.

**I.       SMITH IS QUALIFIED TO OPINE ON THE REGRESSION  ANALYSES**

"Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert."  *Arista Records LLC v. Lime Grp.,LLC,* No. 06 CV 5936 (KMW), 2011 WL 1674796, 2011 U.S. Dist. LEXIS 47416 at *9 (S.D.N.Y. May 2, 2011) (collecting cases).  *See also In re Zyprexa Prods. Liab. Litig.,* 489 F. Supp. 2d 230, 282 (E.D.N.Y. 207) ("In keeping with the liberal thrust of the Federal Rules [of Evidence] and their general approach of relaxing the traditional barriers to opinion testimony, the standard for qualifying expert witnesses is liberal." (internal quotation omitted)).  The *Arista*

---

[2] *Floyd*, 2012 U.S. Dist. LEXIS 53249, at *27 (*quoting Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) (Scheindlin, J.)).

*Records* court stressed that a witness may be qualified as an expert based on the "totality of the witness's background" and "based on "any one or more of the qualities listed in *Rule 702* -- knowledge, skill, experience, training or education."   2011 U.S. Dist. LEXIS 47416 at *7-8. Likewise, courts in this circuit have held that:   "Assertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of [the] testimony.'''   *In re Zyprexa Prods. Liab. Litig.,* 489 F. Supp. 2d 230, 282 (E.D.N.Y. 207) (*citing McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).  *See also Cary Oil Co.,* No. 99 Civ. 1725 (VM), 2003 WL 1878246, 2003 U.S. Dist. LEXIS 6150, at *8-9 (S.D.N.Y. April 11, 2003) ("The fact that a witness's qualifications are not unassailable does not mean the witness is incompetent to testify; rather it is for the jury, with the assistance of vigorous cross-examination, to measure the worth of the opinions.") (internal citation omitted)).

A.    **Smith's Training and Experience Qualify Him to Opine on Fagan's Multivariate Regression Analyses And Smith's Own "Alternative" Regression Analysis**

Defendants have proffered Smith to address, among other things, whether Fagan has properly interpreted the statistical correlation between race and SQFs.   Smith's extensive academic training and research experience qualify him to opine on the statistical analyses at issue in this case.  *See* Statement of Facts, *supra*; 07/24/12 DS Decl. at ¶¶2-9, 12.   It is Smith's experience in policing and investigatory research that enabled the evaluation of Fagan's regression analysis, including Fagan's choice of variables and his failure to consider other reasonable explanations for the relationship between variables, *e.g.*, Fagan's failure to consider suspect race data (despite his acknowledgment that this is the most reliable benchmark for such a study).[3]  Smith's expertise will clearly aid the jury in assessing Fagan's opinions.

_____

[3] 07/24/12 RP Decl. at ¶¶2,4, 5; 07/24/12 DS Decl. at ¶¶10-11. *See*, *e.g.*, 12/19/11 DS Decl. at ¶15 ("By omitting data on rates of criminal participation by race, Fagan's analysis does not

The cases plaintiffs cite to disqualify Smith are easily distinguished. *See* Pls.' Mem. at 12-14. Unlike the expert whose opinion based on a regression analysis conducted by an unproduced statistician was excluded in *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 644 (S.D.N.Y. 2007) (Scheindlin, J.), Smith has clearly made significantly more than "occasional use of statistics in his daily life." To the contrary, Smith has spent his lengthy career studying and quantifying the effects of various policing strategies, tools, and practices on particular communities, and particularly in New York City. He has conducted various statistical analyses with statistical experts to incorporate multivariate regression analyses into his research.

This is also a far cry from the expert at issue in *Mancuso v. Consol. Edison Co. of New York, Inc.,* 967 F. Supp. 1437, 1443 (S.D.N.Y. 1997), who was retained to testify that plaintiffs had suffered medical ailments as a result of exposure to the chemical PCB, but who had no "specialized knowledge," either through training or experience, "regarding the effects of PCBs on living creatures". The *Mancuso* court noted that "extensive practical experience" could qualify an individual as an expert in the absence of formal training. *Id.* at 1444. Smith's career is the epitome of "extensive practical experience" in applying statistical analyses to police behavior.

Likewise, plaintiffs' reliance on *Bazile* v. *City of New York,* 215 F. Supp. 2d 354 (S.D.N.Y. 2002), is misplaced. Plaintiffs argue that "Smith's research on urban policing, which has never addressed issues of racial bias and has not involved the kinds of regression analyses conducted by Fagan, is too far afield from the statistical concepts and questions of racial bias implicated by Fagan's multivariate regression analyses to qualify Smith to offer critiques of those

---

consider the rival hypothesis that police are acting in a way that reflects the actual patterns of criminal behavior and in terms of what is known about the racial characteristics of offenders."). *See also* n.10, *infra*.

analyses at trial or to testify about the 'alternative' version of Fagan's regression model that Smith conducted and summarized vaguely in his December 19, 2011 declaration."   *See* Pls.' Mem. at 13-14.  Here, plaintiffs attempt to create a false distinction – Smith's prior research has overwhelmingly focused on the effects of various policing strategies and tools on particular communities.  This experience is directly on point and more than qualifies Smith to address the central issue of whether Fagan has properly interpreted the statistical correlation between race and SQFs by the NYPD.   The fact that none of Smith's prior studies happened to focus specifically on discerning whether racial animus existed is irrelevant; to hold otherwise would require far more than *Rule 702* or *Daubert* standards do for expert qualification.  *See supra; see also Arista Records*, 2011 U.S. Dist. LEXIS 47416 at **9-10 ("[C]ourts in this circuit have noted that an expert 'should not be required to satisfy an overly narrow test of his own qualifications.'") (internal citation omitted).  *See also Johnson and Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04 Civ.,* 2006 U.S. Dist. LEXIS 51869, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) ("In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." (internal citation and quotation marks omitted)).  Furthermore, the *Bazile* court's finding that the proffered expert had "no particular expertise that would qualify [him] to assess whether a discriminatory animus motivated the NYPD in this case," (215 F. Supp. 2d at 365), is inapposite here.  *Bazile* concerned the question of whether the internal investigation and imposition of discipline with respect to an individual police officer was conducted in a racist manner.  It did not involve the interpretation of patterns of large amounts of statistical data, as does the expert testimony at issue here, which Smith is more than qualified by

- 6 -

training and experience to address.  Rather, in *Bazile*, the question of whether the individuals involved in the particular incident at issue were motivated by racism largely turned on a credibility assessment of those particular individuals.  For this reason the court found that the so-called "expert's" opinions largely consisted of his own, inadmissible subjective beliefs.  *Id.*

In addition to his incorporation of statistical methods in his research, Smith's expertise in urban policing uniquely qualifies him to critique Fagan's regression analyses which purport to show that the racial pattern of SQFs by the NYPD is motivated by discrimination.  Smith's main criticism of Fagan's analyses is that Fagan misinterprets the statistics regarding racial patterns in SQF, due to Fagan's lack of knowledge or understanding of the policing practices and strategies in question, and to his failure to consider alternative explanations for the patterns observed -- both of which are manifested in Fagan's flawed multiple regression model.  *See* 07/24/12 DS Decl. at ¶¶8-16.

Only an expert such as Smith with substantial knowledge of and experience studying policing tactics and their effects – which plaintiffs do not dispute[4] -- could be equipped to interpret and critique Fagan's model in this way.  *See* 07/24/12 RP Decl. at ¶¶2, 4, 5.  It is axiomatic that the first step in developing a reliable multiple regression model is to start with the correct assumptions.  *See* 07/24/12 Smith Decl. at ¶11; *see also* 02/16/12 DS Reply Decl. at ¶20.  Fagan's model is based on certain assumptions, as reflected in his choices of variables and benchmark, which Smith is qualified to challenge based on his training and experience studying police organizations and behavior.[5]  *See id.;* 07/24/12 RP Decl. at ¶¶2-5.

---

[4] *See* Pls.' Mem. at 8.

[5] *See, e.g.*, 12/19/11 DS Decl. at ¶15 ("Fagan's statement that his multiple benchmarking strategy using both precinct-level population and crime rates adequately accounts for race in his model is inaccurate.  Supp. Report at 10.  Combining population and a crime as a benchmark assumes that

This situation is akin to that addressed by the *Arista Records* court, where plaintiffs argued that defendants' proffered technology and computer science expert, Professor Sirer, was not qualified to opine on the statistical analysis submitted by plaintiffs' statistical expert. 2011 U.S. Dist. LEXIS 47416 *16-17. The court found that, while Professor Sirer was not qualified as an expert in statistical methods, *id.* at *18, he was nonetheless qualified to critique the plaintiff's expert's statistical conclusions. It held: "[The statistical expert]'s conclusions, though ultimately arrived at through statistical analysis, are dependent upon several underlying assumptions about technological issues that are well within the scope of Professor Sirer's expertise." *Id.* at *20-21; *see also id.* at *23-24 ("Thus, Professor Sirer will be permitted to testify about technological matters within his area of expertise, even if his testimony implicates Plaintiffs' statistical conclusions.") Likewise, Smith is more than qualified on the basis of his policing expertise to opine on Fagan's underlying assumptions about factors which might influence the NYPD's SQF activity, as reflected in the choices Fagan made in constructing his regression model.

### B.   Smith's Critiques And "Alternative" Regression Are Smith's Own Opinions

Plaintiffs' attempt to dismiss Smith's opinions regarding regression analysis as mere "parroting" of other experts' opinions is a mischaracterization of the facts. *See* Pls.' Mem. at 4, 9, 14-15. All of Smith's opinions as presented in his Expert Report, his declarations, and his deposition, are his own. *See* 07/24/12 DS Decl. ¶10. Smith drew upon his extensive expertise in policing practices and his substantial experience studying the impacts of policing on communities, in order to form his opinions on Fagan's analyses, including Fagan's multiple regression analysis model. *Id.* at ¶10-11. In the process, he consulted experts from other

---

local residents commit crimes in equal proportion; it also ignores the fact that residents may travel to other precincts to commits crimes. Contrary to Fagan's assumptions, crime is not evenly distributed throughout or within precincts in the city.").

disciplines in order to confirm, test and provide further support for his opinions.  *Id.* at ¶13.  For example, he called upon Purtell's specialized expertise in statistics to assist him by providing mathematical verification of and support for his opinions.  *See generally* 07/24/12 RP Decl.  The fact that Purtell assisted in testing and statistically demonstrating the validity of Smith's own critiques of Fagan's multiple regression analysis model does not take away from the fact that Smith's critiques were and remain his own opinions.

Again, the cases cited by plaintiffs are easily distinguished.  In excluding the proffered expert's opinions based on a multiple regression analysis, this Court in *Malletier* cited the facts that the purported expert had "nothing to do with" the regression analysis in question, which was performed by one of the expert's unproduced employees, and that the regression analysis was the only evidence presented in support of the "crux" of the expert's opinion.  525 F. Supp. 2d at 664.  Neither of these concerns is implicated here.  First, unlike in *Malletier*, Purtell's contribution to Smith's analyses cannot be characterized as "complete reliance" by Smith on Purtell's opinions.  *See id.* at 573.  Smith did not rely on Purtell to independently develop and conduct the alternative multiple regression analysis presented in the 12/19/11 DS Decl.; nor did Smith rely exclusively on input from Purtell or others in formulating his own opinions and critiques of Fagan's multiple regression analysis.  Smith analyzed Fagan's multiple regression model.  Smith then formed his own critiques of Fagan's model, which he was able to confirm through consultation with other experts such as Purtell; this process included Purtell's implementation of the alternative multiple regression model employing the benchmark devised by Smith.  *See* 07/24/12 DS Decl.; 07/24/12 RP Decl.  Second, Smith provides numerous bases for and sources of evidence supporting his key critiques of Fagan's regression model -- choice of benchmark and omission of key variables

-- apart from and in addition to the alternative multiple regression model developed and tested by Smith and Purtell.  *See* Smith Report at 22-35.

Smith's situation also differs from that of the damages expert whose testimony was excluded by the court in *Arista Records*.  Plaintiffs proffered testimony by the expert, an economist, that declines in music industry sales were not caused by file-sharing programs such as the defendant's software.  *Arista Records*, 2011 U.S. Dist. LEXIS 47416 at *28.  However, the proffered expert had no expertise "in the music industry and technology spheres," and he conceded that his opinion consisted of "summarizing what I have read and what others have said."  *Id.* at *31.  He further conceded that he had not "studied the issue specifically."  *Id.*  The court excluded those portions of the expert's testimony which it found "rel[ied] almost entirely on an uncritical review of others' views."  *Id.* at *32.  The court noted that the expert:

> [did] not appear to apply his own economics expertise in reaching his conclusions on this issue.  He appears to have little empirical basis for much of his testimony beyond the reports that he read.  This failure alone would not necessarily render his testimony about causation inadmissible, so long as he applied some of his own analysis.  But here, Mr. Strong's failure to perform any independent analysis results in an opinion that is only a summary of what other experts have said, without application of his own expertise. This is not an appropriate type of expert testimony.

*Id.* at *33-35 (internal citations omitted).[6]  This situation is clearly distinct from that of Smith, who relied on and applied his own experience and expertise in policing practices in his critiques of Fagan's analyses.

In this case, the "crux" of Smith's opinion is that Fagan misinterprets the statistics regarding racial patterns in SQF, due to Fagan's lack of knowledge and understanding of the

---

[6] Proffered expert testimony in *Wantanabe Realty Corp.* v. *City of New York,* No. 01 Civ. 10137 (LAK), 2004 WL 188088, 2004 U.S. Dist. LEXIS 1225, *9-10 (S.D.N.Y. Feb. 2, 2004), another case relied upon by plaintiffs, was also excluded because the purported expert did not apply any of his own expertise or analysis, or even form his own opinion, in relying upon an opinion supplied by a third party.

policing practices and strategies in question, and due to Fagan's failure to consider alternative explanations for the patterns observed, both of which are manifested in his flawed multiple regression model.  *See* 07/24/12 DS Decl. at ¶¶11-16, 17, 20.  Smith's extensive expertise, both in terms of training and experience, in the study of police practices, gave rise to these opinions, including the critiques that Fagan used an inappropriate benchmark and omitted key variables from his regression model.  Only an expert such as Smith with substantial knowledge of and experience studying policing tactics could be equipped to interpret and critique Fagan's model in this way.  Smith did not rely on any other experts in forming these critical opinions, nor would any of the experts in other fields whom he consulted be capable of this insight, due to their lack of expertise in urban policing.[7]  *See* 07/24/12 RP Decl. at ¶¶2,4, 5; 07/24/14 DS Decl. at ¶12.  Contrary to plaintiffs' assertion, *see* Pls.' Mem. at 15, Smith is not simply a "conduit" for Purtell's or anyone else's opinions on Fagan's regression analysis; to the contrary, Purtell and the others acted as the conduits in assisting Smith to develop and provide mathematical support for Smith's own critiques of Fagan's model.

---

[7] The *Malletier* court also took issue with the fact that the regression analysis in question was conducted by an expert who was not produced, *see Malletier*, 525 F. Supp. 2d at 573, while in the instant matter defendants disclosed Dr. Purtell as an expert upon whom they intended to rely early in the litigation (*see* defendants' 08/03/2009 letter to plaintiffs , 06/26/12 Charney Decl., Ex. A).  *See also Malletier*, 525 F. Supp. 2d at 666: "We note also that the *Dura* court grounded any permissible reliance on other experts on the guarantees that the opposing party can (1) depose the underlying experts in order to make sure they performed their tasks competently, and (2) ask the testifying expert whether he supervised them carefully and whether his relying on their assistance was standard practice in his field…" (*citing Dura Automotive Sys. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002)).  In this case, because Purtell was timely disclosed as an expert, plaintiffs were on notice and had opportunity to depose him if they so chose.  Additionally, as set forth in the 07/24/12 HG Decl. at ¶2, analyses co-authored by Purtell and Smith were included in Smith's Report submitted during the course of expert discovery; Smith discussed at length his collaboration with Purtell during his own deposition; and Purtell himself submitted a declaration regarding his collaboration with Smith in support of Defs.' *Daubert* Motion.

### C.    Smith's Consultation With Other Experts Is Permissible

To the extent that Smith consulted experts in other disciplines in order to inform his opinions, such reliance is permissible under Fed.R.Evid. 703.  *See, e.g., Malletier*, 525 F. Supp. 2d at 644 ("It is true that experts are permitted to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field. *Fed.R.Evid. 703*."); *accord Wantanabe Realty Corp.* v. *City of New York,* No. 01 Civ. 10137 (LAK), 2004 WL 188088, 2004 U.S. Dist. LEXIS 1225 at *9 (S.D.N.Y. Feb. 2, 2004).  *See also Gussack Realty Co. v. Xerox Corporation,* 224 F.3d 85 (2d Cir. 2000) (expert testimony properly admitted even though expert relied on data provided by another); *In re "Agent Orange" Prod. Liab. Litig.,* 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985), aff'd, 818 F.2d 187 (2d Cir. 1987), *cert. denied,* 487 U.S. 1234 (1988) (expert may rely on hearsay, provided that data is reasonably relied upon by experts in the field).  Collaboration among researchers from different academic disciplines is standard practice in policy research; consultation with statistical experts in order to develop practical models to test, develop and demonstrate underlying policy theories is particularly common, such that multiple regression forms a "routine part of the discourse" in Smith's field.  07/24/12 DS Decl. at ¶¶9, 10, 13.

## II.    SMITH'S   CORRELATION   COEFFICIENT   CALCULATIONS   AND "ALTERNATIVE" REGRESSION ANALYSIS ARE RELIABLE AND DO NOT RUN AFOUL OF FED. R. CIV. P. 26(A)(2)

Plaintiffs' criticisms that certain of Smith's analyses are unreliable because he has not supplied sufficient information regarding his methodologies are unfounded.  *See* Pls.' Mem. at 15-17.  Smith submitted correlation coefficient calculations and an "alternative" regression model to illustrate the unreliability of Fagan's analyses by demonstrating the effects of Fagan's failure to consider alternative explanations other than intentional discrimination for racial

patterns in SQFs.  07/24/12 DS Decl. at ¶¶17-18, 20, 26.  "An expert must demonstrate that he has adequately accounted for obvious alternative explanations in order for his testimony to be reliable." *See Arista Records*, 2011 U.S. Dist. LEXIS 47416, at *53 (internal citation omitted); *see also In re Fosamax Prod. Liab. Litig.,* 688 F. Supp. 2d 259, 268 (S.D.N.Y. 2010) ("While an expert need not rule out every potential cause in order to satisfy *Daubert,* the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant.") (internal quotations and citation omitted).  Any challenge to Smith's methodology must be considered in this context. *See, e.g., Arista Records*, 2011 U.S. Dist. LEXIS 47416 at *23 ("[A]s other courts have recognized, a defendant's experts often 'have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts.'") (internal citation omitted)).  Moreover, Plaintiffs' assertion that Smith's correlation coefficient calculations and "alternative" regression analyses are inadmissible under Fed.R.Civ.P. 26(A)(2)(D) is disingenuous and must fail.  *See* Pls.' Mem. at 17.

### A.  Smith's Correlation Coefficient Calculations Are Admissible

Plaintiffs claim that Smith presented "new critiques" of Fagan's multivariate regression model in the 12/19/11 DS Decl., including "a table of correlation coefficients which, Smith contends, shows that police stops by race in a given precinct are more highly correlated with the proportion of criminal suspects and arrestees by race in that precinct than with the overall crime rate in that precinct."  Pls.' Mem. at 7.  However, Smith's analysis of correlation coefficients was presented in part in response to new analyses submitted by Fagan in support of class certification (11/06/11 JF Decl. at ¶16), which concluded, *inter alia*, that "the finding of significant higher stops of Black and Hispanic and persons during the period of 2004-2009 is evident in all parts of

the City, regardless of their racial composition, or their crime, or other social condition." *See* 07/24/12 DS Decl. at ¶¶26-28.[8]   Furthermore, Smith's use of the correlation coefficients to further challenge Fagan's choice of benchmark in his regression model cannot be considered "new" analysis or opinion; Smith had previously criticized Fagan's choice of benchmark at length.  Smith Report, at 6-7, 26-31, 49- 51, 62, 65-70.  Moreover, Fagan had opportunities to defend his choice of benchmark and to evaluate and respond to the "alternative" suspect race benchmark proposed by Smith and Purtell in his 2/02/12 Decl. (*see* ¶¶ 23-27), as well as at the *Daubert* Hearing ((Dkt # 199), at 70:22-74:8)).  As for plaintiffs' claim that their expert was unable to determine the reliability of Smith's correlation coefficients analysis without the equation on which it was based, Smith's analysis was based on the same basic equation used by Fagan in his analysis, simply testing different variables.  *See* 07/24/12 DS Decl. at ¶¶26-28. (providing the equation).  Fagan's purported expertise should have enabled him to interpret and test Smith's equation based on the information provided in the 12/19/11 DS Decl.

To the extent plaintiffs seek to challenge the admissibility of the "2009 NYPD arrest-report and crime-complaint data where suspect race is known which was produced to Plaintiffs more than a year after Professor Fagan submitted his expert report," (*see* Pls.' Mem. at 7), this argument fails.  Defendants produced the merged database once it became available; it was not available prior to the submission of either expert's reports or their depositions.  *See* Reply Declaration of Heidi Grossman, dated February 16, 2012  (Dkt # 192) at ¶¶9-11.  Defendants produced the merged data set to plaintiffs on 11/04/11, prior to defendants' 12/19/11 *Daubert* motion to exclude Fagan and prior to Fagan's 02/02/12 declaration in opposition to defendants'

---

[8] *See also* 07/24/12 HG Decl. at ¶¶2,7 for a chronology of defendants' expert submissions which were responsive to expert submissions by plaintiffs which post-dated the close of expert discovery.

*Daubert* motion in which he addressed Smith's critiques of his multiple regression analysis including choice of benchmark.  *See* Fagan 2/02/12 Decl. at ¶¶21-37.  In fact, Fagan admitted that he had opportunity to review the data, as evidenced by his critique presented in the same paragraph.  *Id.* at ¶25.  Moreover, it is clear from Fagan's published works that Fagan was aware at least as early as 2007 that data on suspect description from crime complaints existed and could be combined with suspect description data from arrest reports to create a more complete data set.  *See* 02/16/12 DS Reply at Decl. at ¶25. Fagan confirmed his prior awareness of this potential source of data during his deposition on February 9, 2011, and admitted that such data could be used to construct the ideal benchmark for his regression.[9]  Yet, Fagan did not seek this data in formulating his opinions in this case.

### B.  Smith's "Alternative" Regression Is Admissible

Plaintiffs also assert that the "alternative" regression model presented in the 12/19/11 Smith. Decl. constitutes "new" analysis.  Pls.' Mem. at 8.  However, the alternative regression

---

[9] *See* Defs.' Mem. of Law in support of Defs.' *Daubert* Mot. ("Defs.' Mem.") at 11-13.  The Fagan Report at 15 concluded that "for this analysis of police stop activity, a valid benchmark requires estimates of the supply of individuals of each racial or ethnic group who are engaged in the targeted behaviors and who are available to the police as potential targets for the exercise of their stop authority."  However, Fagan testified that data on the population of individuals engaging in the "targeted behaviors" did not exist. *See* Fagan deposition transcript excerpt, attached as Ex. B to the 12/19/11 HG Decl. (Dkt # 180) ("JF Dep.") at 213:22-214:1. Instead, he used crime rate data as a proxy for "the supply of individuals engaged in the targeted behaviors." *Id.* at 213:12-21. The Fagan Report at 17 also stated that the ideal proxy for the "offending population" would include "measures of the race-specific crime rates in each precinct (or other social area) in order to help construct precise benchmarks based on the participation in the behavior of interest by persons of each race and ethnicity."  Fagan further acknowledged that suspect race information contained in crime reports and arrest data could function as a measure of "the race-specific crime rates in each precinct." *Id.* at 17-1 8. However, he declined to use this data (JF Dep. at 144: 14-145: 13, 152:23-154:28), claiming the data was not available in enough cases to be relied upon and understating the proportion of crimes for which such data was available.  *See* Fagan Report at 17-18; Fagan Supp. Report at 12; JF Dep. at 121 : 1 1-23, 134-140; 12/19/11 DS Decl. at ¶ 12.

was submitted simply to illustrate some of Smith's critiques of Fagan's regression model which Smith had previously raised in his 11/15/10 Report.[10]   *See* 07/24/12 DS Decl. at ¶¶17-25. Again, Smith's criticisms of Fagan's models was responsive at least in part to new multiple regression analyses submitted by Fagan in his 11/07/11 Decl., and,  Fagan had opportunities to evaluate and respond to the alternative regression analysis.   As for plaintiffs' contention that Smith did not provide enough detail for defendants to test his methodology, Smith and Purtell did not seek to fully  replicate Fagan's regression, but sought only to demonstrate the effect of incorporating the omitted, appropriate benchmark into a basic regression model similar to Fagan's.  As such, the "alternative" regression did not include the control variables used by Fagan but included only the variables that were key to his conclusion of racial discrimination (percentage Black and percentage Hispanic stopped, along with crime suspect description).  *See* 07/24/12 DS Decl. at ¶¶21, 24-25.

Furthermore, both of these so-called "new" analyses by Smith were appropriately presented in the context of defendants' *Daubert* motion as evidence challenging the reliability of Fagan's analyses.  In particular, Smith's "alternative" regression model demonstrates the effect of incorporating the variable of suspect race into a basic regression model similar to Fagan's, in keeping with Second Circuit caselaw.  *See Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988) ("…a party challenging the validity of a regression analysis, claiming variables were omitted that

---

[10] *See*, *e.g.*, Smith Report at 43 (observing with respect to Fagan's choice of benchmark that "[t]he Rand approach substantially reduced the Fagan finding of disparate results correlated with race of persons stopped"); Smith Report at 57-58 ("A major issue is the likelihood that there are omitted variables in Fagan's analysis.").

should have been included, has to make a showing that the factors it contends should have been included would weaken the analysis.").[11]

## III.   SMITH'S OPINIONS ABOUT THE MEANING OF LOW STOP-AND-FRISK "HIT RATES," CRIME REDUCTION AND THAT NYPD STOPS-AND-FRISKS ARE NOT RACIALLY MOTIVATED ARE ADMISSIBLE

Smith submitted his opinions regarding the rate of weapons recovered in the context of SQFs (referred to by plaintiffs as the weapons "hit rate") and that SQFs are not driven by race to challenge the reliability of Fagan's analyses by demonstrating Fagan's failure to consider and disprove alternative explanations for the statistical patterns observed; any challenges to the reliability of Smith's analyses must be considered in this context. *See* 07/24/12 DS Decl. at ¶¶ 14, 20, 26, 33; *see also Arista Records*, 2011 U.S. Dist. LEXIS 47416 at *23; *In re Zyprexa Prods. Liab. Litig.,* 489 F. Supp. 2d at 285.

### A. Smith's Opinions About the Meaning of Low Stop-and-Frisk Weapons "Hit Rates" Are Based on Sufficient Facts and Data

Plaintiffs claim that "Smith's opinion that the extremely low weapons hit rate of SQFs suggest that SQFs have encouraged would-be gun carriers to leave their weapons at home, *see* Smith Report at 39, is not supported by sufficient facts and data as required by Fed.R.Evid. 702(b)." Pls.' Mem. at 17.[12]   This argument overlooks the fact that Smith is offering an alternative explanation for the same empirical observations reported by Fagan. As is clear from

---

[11] *See also* 07/24/12 HG Decl. at ¶7 regarding analyses submitted by Fagan following the close of expert discovery, which have been deemed admissible by the Court.

[12] Pls.' Mem. at 17 claims: "Smith does not cite to any data, statistical study, or any other empirical support for his view that aggressive use of street stops deters illegal weapons possession, nor could he." *But see,* Petra E. Todd, *Testing for Racial Bias in Law Enforcement*, Univ. of Pennsylvania (2006), prepared for the Palgrave Dictionary of Economics, available at http://athena.sas.upenn.edu/~petra/papers/profiling.pdf, (at 3, 11) (". . . the hit rate test fails as a test of the unbiasedness of the police chief, because, in the equilibrium of such a model, an unbiased police chief will allocate searches to equate the deterrence effect, and not the hit rates, across groups).

the Smith Report at 39, Smith's opinion that low SQF "hit rates" may be explained in part by the deterrent effect of increased SQF activity is based on the same set of facts and data as Fagan's suggestion that the low weapons "hit rate" from SQFs indicates that the majority of SQFs by the NYPD lack reasonable suspicion (s*ee* Fagan Report at 65). 07/24/12 DS Decl. at ¶¶29-31. Smith's opinion offering a plausible alternative explanation for Fagan's statistics cannot be held to a higher reliability standard under *Daubert* than Fagan's own opinion, which itself consists of nothing more than an unsupported logical leap from data exhibiting a statistical correlation to a purported explanation for the correlation, without considering any alternative explanations. *See* 07/24/12 DS Decl. at ¶¶14, 20, 29-31, 33.  At a minimum, just as Fagan has been permitted by the Court to offer his opinion on the significance of this statistical pattern, so must Smith be permitted to challenge the reliability of Fagan's conclusion by offering his opinion as to a plausible alternative explanation.  It is for the trier of fact to weigh all of the evidence on the issue and determine which explanation to accept.

### B.  Smith's Opinions On Crime Reduction Are Relevant And Are Not Barred By Fed. R. Evid. 403

Contrary to plaintiffs' assertions, and certainly at least to the extent that the Court allows Fagan to testify about hit rates, Smith's opinions on "the crime deterrent effects of the NYPD's Operation Impact and stop-and-frisk programs and their supposed crime reduction effects in black and Latino New York City neighborhoods," Pls.' Mem. at 18, are indeed relevant, as they represent alternative, race-neutral explanations for the racial patterns in SQFs which Fagan failed to consider in his analysis of the data.[13]  Plaintiffs describe Operation Impacts as "involv[ing] the deployment of officers to majority black and Latino neighborhoods."  *Id.*  Smith's opinion

---

[13] Defendants do not concede the relevancy of Fagan's hit rate-related opinions and reserve their right to move *in limine* to exclude all such related testimony.

regarding the motivation for deployment of greater numbers of officers to majority-minority neighborhoods in conjunction with Operation Impact – *i.e.,* as a proven strategy to combat elevated levels of crime in such neighborhoods relative to other neighborhoods within the City – is relevant to the case at hand.  *See* 07/24/12 DS Decl. at ¶¶32-34.  It offers an alternative explanation for the statistical pattern observed by Fagan[14] that greater numbers of stops take place in neighborhoods with higher populations of minorities, and in Smith's opinion, helps explain the higher number of stops of minorities relative to non-minorities in the City.  *See* 07/24/12 DS Decl. at ¶¶32-34.  Plaintiffs' assertion that they are not challenging the deployment of officers to majority-minority neighborhoods, "but the conduct of officers once they get to those neighborhoods," *id.*, underscores the relevance of Smith's opinions regarding the crime reduction benefits of SQF as well.   Smith's opinion that increased SQF activity reduces neighborhood crime provides further evidence for his alternative hypothesis that SQFs are driven by where the crime occurs rather than by racial discrimination, and that racial patterns in SQFs are explained by higher number of crime perpetrators among the minority communities rather than by discriminatory policing practices.  *See id.*   The fact that Fagan failed to take these plausible alternative explanations into account in his analyses makes them strongly probative of infirmities in Fagan's methodology and thus in his opinions and conclusions based on the same.  Excluding Smith's opinions would be highly prejudicial by forcing the jury to accept Fagan's word unchallenged by rebuttal expert testimony when such strong evidence of methodological problems exists.

As for plaintiffs' concern that the probative value of these opinions by Smith "would be far outweighed by the potential prejudicial effect of misleading and distracting jurors to believe

---

[14] Fagan Report at 39.

that this case is a referendum on whether or not Defendants' stop-and-frisk program makes them safer on the streets of New York, rather than whether that program violates class members' constitutional rights," Pls.' Mem. at 20, any such danger could be cured by a limiting instruction. *See, e.g., Floyd*, 2012 U.S. Dist. LEXIS 53249 at *48-49.

### C. Smith's Conclusion That The Statistics Tend To Show that NYPD Stops-and-Frisks Are Not based on Race Does Not Usurp The Functions of the Court and the Jury and is Supported By the Data on Which it is Based

Smith's opinion that racial patterns in SQFs are driven by crime-prevention strategies rather than racial discrimination is offered to rebut Fagan's opinion that only racial discrimination can explain the statistical patterns observed in SQFs.[15]   To aid the jury in assessing Fagan's analysis, Smith is simply offering a plausible alternative explanation for the empirical phenomenon described by Fagan – an explanation which Fagan failed to take into account in conducting his analyses, and which therefore seriously undermines the reliability of his conclusions.[16]   *See Arista Records*, 2011 U.S. Dist. LEXIS 47416, at *53; *see also In re Fosamax Prod. Liab. Litig.*, 688 F. Supp. 2d at 268.   Smith cites to numerous reliable data sources supporting his argument that Fagan should have considered the race of crime perpetrators in his regression analysis attempting to isolate the reason for the racial patterns of

---

[15] *Compare* Fagan Report, *with* Smith Report at 4 ("The Fagan analysis does not ask, and therefore cannot answer, the question of whether police practices are consistent with a pattern of policing by NYPD aimed at crime reduction and increasing public safety.").

[16] This is similar to Fagan's failure to *exclude* from his Equal Protection analysis more than 80% of the SQFs, which he acknowledges are supported by reasonable suspicion based on the UF250 forms and for which plaintiffs do not have a Fourth Amendment claim.  That is, Fagan failed to control for reasonable suspicion, and failed to consider the most obvious alternate explanation for the stop patterns.  As this Court has noted, presence of reasonable suspicion eliminates an Equal Protection claim. *Floyd v. City of New York*, 813 F. Supp. 2d 417, 444 (S.D.N.Y. 2011) (Scheindlin, J.).  On this basis alone, Fagan's conclusion that racial discrimination explains the statistical racial patterns of the SQFs is unreliable.

SQFs.[17]   Additionally, Smith's "alternative" regression model, an illustration of Smith's contention that incorporating suspect race as a variable into a model such as Fagan's changes the conclusion, employs a basic, unassailable methodology, which Fagan acknowledges as most appropriate.  *See* 07/24/12 DS Decl. at ¶¶17-25; *see also* n. 10, *supra*.

Plaintiffs' assertion that Smith's opinion that "there is no compelling evidence that NYPD officers are making stops based on race or ethnicity[,] but instead are pursuing a strategy and using tactics that prevent crime and benefit the City as a whole, and communities of color in particular" (Pls.' Mem. at 21), is an inadmissible legal conclusion, is without merit.  Smith is simply offering an alternative interpretation of the evidence offered based on the application of his policing expertise, without drawing any legal conclusions.  *See* 07/24/12 DS Decl. at ¶34. Smith does not reference any legal standards, he does not tell the jury how to apply the governing law to the facts at hand, and he does not tell the jury what conclusion to reach.[18]  As plaintiffs concede, Fed.R.Evid. 704 provides that "[a]n opinion is not objectionable simply because it embraces an ultimate issue" of the case.  *See* Pls.' Mem. at 21.  The Court has defined the "ultimate issue" in this case as "whether defendants have a policy and/or practice of conducting suspicionless stops."  *Floyd*, 2012 U.S. Dist. LEXIS 53249, at *46.  Smith's analyses and opinions in no way attempt to decide this issue; to the contrary, they will properly assist the jury to understand and assess the significance of the evidence before it, a role made all the more crucial in cases such as this involving expert testimony on complicated statistical and technical issues with strong potential to confuse and mislead a jury.  Just as this Court ruled that Fagan is

---

[17] *See* Smith Report at 22-35.

[18] *See*, *e.g.*, *Nimley v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *Equal Employment Opportunity Comm'n v. Bloomberg L.P.*, No. 07-Civ-8383 (LAP), 2010 U.S. Dist. LEXIS 92511 at *13 (S.D.N.Y. Aug. 31, 2010); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004).

permitted to present his view that the racial patterns in NYPD SQFs suggest that SQFS are motivated by racial discrimination, *see Floyd*, 2012 U.S. Dist. LEXIS 53249, at *39-40, so should Smith be permitted to present his opinion that an alternative theory explains the patterns. Smith's alternative explanation for the statistical pattern no more infringes upon the "ultimate issue" in this case than does Fagan's analysis of the same.

Further, plaintiffs challenge the reliability of Smith's opinion that the evidence supports that stop patterns are reflective of a strategy and tactics that prevent crime and benefit the City, rather than being reflective of intentional racial discrimination, by arguing that "there is 'simply too great an analytical gap' between Smith's questionable evidence that SQFs deter crime and his conclusion that such stops cannot be race-based."  Pls.' Mem. at 22-24.  Again, plaintiffs' argument simply misstates Smith's opinion about what the evidence tends to show from a law enforcement perspective and improperly characterizes it as a legal conclusion.  Plaintiffs then further mischaracterize Smith's opinion, as being unreliable since it does not consider the possible alternative explanation that NYPD officers are stopping people based on their race and with the goal of deterring crime.  Pls.' Mem. at 22-23.  Notably, plaintiffs do not indicate that Fagan considered this hybrid explanation for stops, nor do they show that actually including these dual factors in an analysis would have yielded results to weaken Smith's opinions.  *See Sobel,* 839 F.2d at 34.  It is Fagan who has failed to consider and rule out obvious alternative explanations such as that proffered by Smith, which undermines the reliability of Fagan's conclusions.

To the extent that plaintiffs argue that Smith is applying a legal standard which holds that valid law enforcement purpose answers the legal question of whether there is an Equal Protection violation, plaintiffs do so without basis and by conflating his expert opinion about what the

statistical evidence tends to show about policing strategies with a legal conclusion – which Smith never espouses.  *See* Pls.' Mem. at 23; *see* 07/24/12 DS Decl. at ¶34.  Nonetheless, Smith's view that the City's policies do have a valid law enforcement purpose is directly relevant to the issue of discriminatory purpose and will aid the jury in determining whether there is an Equal Protection violation, *see Pyke v. Cuomo*, 567 F.3d 74, 77-78 (2d Cir.) (no violation of the Equal Protection Clause where the government had a law enforcement purpose, rather than a racially motivated one, when policing an Indian reservation), *cert. denied*, 130 S. Ct. 741 (2009), and further serves to negate any inference that the City is discriminating on the basis of race.  *See Washington v. Davis*, 426 U.S. 229, 246 (1976) (evidence of the police department's non-discriminatory conduct held to sufficiently negate any inference of discriminatory motivation).[19] The cases cited by plaintiffs are inapposite and reflect their lack of understanding of the distinction between determining the discriminatory purpose behind a particular governmental action and the concept of "strict scrutiny", whereby an established discriminatory action can nevertheless be upheld if the government's interest is "compelling" and its policies are "narrowly tailored".  Determining racially discriminatory purpose involves an assessment of whether the government adopted, affirmed or maintained a particular course of action *because of* (and not merely *in spite of*) an adverse effect on a particular race.[20]  *See, e.g., McCleskey v. Kemp*, 481

---

[19] Illustrative of the interplay between valid law enforcement purpose and discriminatory intent is this Court's ruling that a stop made on the existence of reasonable suspicion – a valid law enforcement goal, precludes an Equal Protection violation.  *Floyd,* 813 F. Supp. 2d at 444.

[20]  It is unclear what plaintiffs mean by their assertion that Smith believes "discriminatory intent [is] equivalent to racial animus".  If plaintiffs are asserting that Smith and/or defendants believe discriminatory intent is present only where there is evil intent or hostility towards a particular race, they are grossly misreading and misunderstanding Professor Smith's submissions.  Given their invocation of the concept of dual motivations by NYPD officers when making stops – *i.e.*, "stopping people on the basis of their race and with the goal of deterring crime", *see* Pls.' Mem. at 23 – it also is unclear whether plaintiffs are confusing the concept of determining the purpose

U.S. 279, 298 (1987); *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979).  Where a court determines that a city had a law enforcement purpose rather than a discriminatory purpose, there is no liability pursuant to the Equal Protection Clause.  *See, e.g., Pyke*, 567 F.3d at 77-78.  Strict scrutiny only comes into play after it is determined that such discriminatory purpose is present. *Id.*  The strict scrutiny inquiry is unnecessary in the present case because the City will establish, based on the evidence provided by Smith and others, that there is no discriminatory purpose on the part of the NYPD in the first instance.  In the cases cited by plaintiffs, discriminatory purpose was not at issue as it was patent that the defendants' decisions were based on racial considerations.  At issue in those cases was whether the discrimination could be justified pursuant to a strict scrutiny analysis, *Johnson v. California*, 543 U.S. 499 (2005) (strict scrutiny applicable to prison officials' decision to segregate prisoners based on race); *Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (strict scrutiny applicable to city's decision to require its non-minority-owned prime contractors to award a certain percentage of subcontracts to minority-owned businesses), or could be excused pursuant the "strong-basis-in-evidence" standard adopted by the Court to resolve, as a matter of statutory construction, the tension in Title VII between "disparate impact" and "disparate treatment".  *Ricci v. DeStefano*, 557 U.S. 557 (2009) (the city's refusal to certify employment test results based on race not excused based on concerns the test would violate Title VII's prohibition again disparate impact).

---

behind the City's allegedly discriminatory action or inaction with an assessment of whether such purpose was the causative factor for the NYPD stops.  *See, e.g., Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-270 n.21 (1977) (where evidence that the government's decision was motivated in part by a racially discriminatory purpose is rebutted by with a showing that the same result would have occurred without the impermissible purpose, "the complaining party . . . no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose").

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court deny in full

plaintiffs' motion to preclude the expert testimony and opinions of defendants' expert Dennis

Smith, together with such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       July 24, 2012

                                      MICHAEL A. CARDOZO
                                      Corporation Counsel of the City of New York
                                      Attorney for Defendants
                                      100 Church Street
                                      New York, New York 1007
                                      (212) 788-0792

                          By:    _____
                                      Heidi Grossman
                                      Assistant Corporation Counsel
                                      Special Federal Litigation Division


*Of Counsel*
Stephanie M. Breslow, Esq.
Judson Vickers, Esq.