**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------ X

DAVID FLOYD, LALIT CLARKSON,
DEON DENNIS, and DAVID OURLICHT,
on behalf of themselves and all others
similarly situated,

        **Plaintiffs,**

   - against -

THE CITY OF NEW YORK, *et al.*,

        **Defendants.**

------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/17/12

**OPINION AND ORDER**

08 Civ. 1034 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

      To support their claims in this class action lawsuit, plaintiffs intend to

rely on the testimony of Jeffrey Fagan, a criminologist with expertise in statistical

analysis.[1]  To rebut Fagan's testimony, defendants seek to offer the opinions of

Dennis Smith, a political scientist with an expertise in police organizations.

Plaintiffs now move to preclude parts of Smith's opinions.  Their motion is granted

---

[1]     Fagan submitted an expert report and supplemental report
(collectively, "Fagan Report") [Docket No. 132].  In an April 16, 2012 Opinion
and Order, __ F. Supp. 2d __, 2012 WL 1344514 (S.D.N.Y. Apr. 16, 2012)
("Fagan *Daubert*"), I assessed defendants' objections to Fagan's qualifications and
methodology under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993),
and the Federal Rules of Evidence.  His expertise in statistical analysis was
documented in Fagan *Daubert*, 2012 WL 1344514, at *2.

in part and denied in part.

## I.     BACKGROUND

Details of this litigation have been extensively covered in my decisions on defendants' motion for summary judgment,[2] defendants' *Daubert* motion challenging Fagan's report,[3] and plaintiffs' motion for class certification.[4] Familiarity with these opinions is assumed.  I include only new background here.

Dennis Smith is an associate professor of public policy at the Robert F. Wagner School of Public Service at New York University.[5]  He is an expert on police organizations and police behavior and has been studying the New York City Police Department ("NYPD") since the 1970s.[6]  His scholarship (some of which has been published in books and peer-reviewed journals and much of which has not) has focused on "performance management" and on evaluating the efficacy of

---

[2]     *See* 8/31/11 Opinion and Order ("SJ Opinion"), 813 F. Supp. 2d 417 (S.D.N.Y. 2011).

[3]     *See* Fagan *Daubert*, 2012 WL 1344514.

[4]     *See* 5/16/12 Opinion and Order ("Class Cert. Opinion"), __ F.R.D. __, 2012 WL 1868637 (S.D.N.Y. May 16, 2012).

[5]     *See* Report of Dennis C. Smith, Ph.D. ("Smith Report"), Ex. B to Declaration of Darius Charney ("Charney Decl.") in support of plaintiffs' Motion to Exclude Certain Opinions of Defendants' Proposed Expert, Dennis Smith, at 1.

[6]     *See* Declaration of Dennis C. Smith ("Smith Decl.") ¶ 2.

public services, with a particular emphasis on police performance.[7]  He is not a

statistician and his only formal study of statistics took place over thirty-five years

ago in graduate school, when he received his Ph.D. in political science.[8]  However,

according to Smith, his policy research has involved extensive collaboration with

experts from other fields, including statistical experts.  "Statistical analyses . . .

have consistently been critical components of [his] studies and publications."[9]

Smith explains that he has "extensive experience critiquing the theories and

assumptions underlying statistical models" and that he is "able to understand and

develop hypotheses regarding specific multiple regression models."[10]

        Since 2006, Smith has collaborated with Robert Purtell on much of his

work regarding the NYPD.  Purtell is an assistant professor of finance and the

director of the Masters in Public Administration Program at the University at

Albany, Nelson A. Rockefeller College of Public Affairs & Policy.[11]  According to

---

[7]      *See* Smith Curriculum Vitae ("Smith CV"), Appendix A to Smith
Report, at 4-8.

[8]      *See* Deposition of Dennis C. Smith, Ph.D. ("Smith Dep."), Ex. C to
Charney Decl., at 300:17-301:25; Smith CV at 1.

[9]      Smith Decl. ¶ 5.

[10]     *Id*. ¶ 9.

[11]     *See* Declaration of Robert M. Purtell in Opposition to Plaintiffs'
Motion to Exclude Certain Opinions of Defendants' Proposed Expert, Dennis
Smith ("Purtell Decl.") ¶ 1.

Smith, "[i]n all of my prior collaborative work with Purtell [on policing in New York City], the models tested by his statistical analysis were developed primarily by me based on my knowledge of policing – an area in which Purtell himself lacks expertise and relies upon my guidance."[12]  Purtell uses his expertise in statistics and modeling to construct and implement regressions that will test Smith's theories.[13]  Although Purtell was initially identified as a testifying expert by defendants, he did not produce an expert report.

Plaintiffs' motion seeks to preclude Smith from testifying as follows:

1.    Smith may not critique Fagan's multivariate regression analyses and [Fagan's] critique of the RAND study [that was commissioned by defendants];

2.    Smith may not offer his correlation coefficient calculations and "alternative" regression analysis;

3.    Smith may not opine on the meaning of low stop-and-frisk weapons recovery hit rates;

4.    Smith may not opine on crime reduction in New York City, or otherwise testify about the results of the studies attached as Appendices D and E to his Expert report; and

5.    Smith may not opine that NYPD officers do not conduct stops-and-frisks on the basis of race.[14]

## II.    LEGAL STANDARD

---

[12]    Smith Decl. ¶ 12.

[13]    *See id.* ¶ 18.

[14]    Memorandum of Law in Support of Plaintiffs' Motion to Exclude Certain Opinions of Defendants' Proposed Expert, Dennis Smith ("Pl. Mem.") at 24.

4

The proponent of expert evidence bears the initial burden of establishing admissibility by a "preponderance of proof."[15]  Rule 702 of the Federal Rules of Evidence states the following requirements for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702 and *Daubert*, the district court must determine whether the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand."[16]  The district court must act as "'a gatekeeper to exclude invalid and unreliable expert testimony.'"[17]  However, "the Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as

---

[15]    *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (discussing Rule 104(a) of the Federal Rules of Evidence).  *Accord Daubert*, 509 U.S. at 592.

[16]    509 U.S. at 597.  *Accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999).

[17]    *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999) (quoting *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999)).

5

gatekeeper is not intended to serve as a replacement for the adversary system."[18]  In serving its gatekeeping function, the court's focus must be on the principles and methodologies underlying the expert's conclusions, rather than on the conclusions themselves.[19]  In assessing an expert's methodology, courts may consider (1) "whether [the method or theory] can be (and has been) tested," (2) "whether [it] has been subjected to peer review and publication," (3) "the known or potential rate of error [associated with the technique] and the existence and maintenance of standards controlling the technique's operation," and (4) whether the method has achieved "general acceptance" with the relevant community.[20]

The courts' gatekeeping function applies not only to "scientific" evidence, but also to proffers of "technical, or other specialized knowledge" under Rule 702.[21]  The objective of this function is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the

---

[18]     *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) (citation and quotation marks omitted).

[19]     *See Daubert*, 509 U.S. at 595.

[20]     *Id.* at 592-95.

[21]     *See Kumho Tire*, 526 U.S. at 141.

practice of an expert in the relevant field."[22]  However, recognizing that "there are many different kinds of experts, and many different kinds of expertise," the Supreme Court has emphasized that the reliability inquiry "is a flexible one."[23] Accordingly, the factors "identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[24]  Ultimately, the inquiry "depends upon the particular circumstances of the particular case at issue."[25]  In sum, the trial court has "the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable."[26]

        In addition, Rule 403 of the Federal Rules of Evidence states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in

---

[22]     *Id.* at 152.

[23]     *Id.* at 150.

[24]     *Id.* (quotations omitted).

[25]     *Id.*

[26]     *Id.* at 152.

7

weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses."[27]  Generally, "the rejection of expert testimony is the exception rather than the rule."[28]  "The admission of expert testimony is committed to the broad discretion of the District Court and will not be disturbed on review unless found to be 'manifestly erroneous.'"[29]

## III.   DISCUSSION

Plaintiffs seek to exclude five aspects of Smith's report.  I assess each one in the following discussion.

### A.   Smith's Critique of Fagan's Multivariate Regression Analyses

Fagan conducted various regression analyses in order to evaluate plaintiffs' allegation that defendants are conducting stops and frisks on the basis of race, in violation of the Fourteenth Amendment.[30]  Among many other findings, Fagan's regression analyses show that "NYPD stops-and-frisks are significantly more frequent for Black and Hispanic residents than they are for White residents, even after adjusting for local crime rates, racial composition of the local

---

[27]     *Id.* (quotation marks omitted).

[28]     Advisory Committee Note to the 2000 Amendment to Fed. R. Evid. 702.

[29]     *United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008).

[30]     *See* Fagan *Daubert*, 2012 WL 1344514, at *3-4, *10-11.

population, police patrol strength, and other social and economic factors predictive of police enforcement activity."[31]   Notably, however, Fagan's regression analyses do not account for the racial distribution of the perpetrators of crime in New York City.

In his report, Smith argues that this is a major flaw in Fagan's analysis.[32] Smith believes that by comparing the racial distribution of stops to the racial distribution of the population, instead of to the racial distribution of criminal suspects, Fagan is using the wrong "benchmark."[33]   As an analogy, Smith notes that the NYPD stops women, children, and senior citizens at rates far below their share of the population.[34]   These groups of people are stopped at low rates, he argues, because they commit a disproportionately small number of crimes.   Like the disparity in stops on the basis of gender and age, Smith argues, the disparity in stops on the basis of race and ethnicity is driven by the disparity in the commission of crime, not by unconstitutional discrimination.   This dispute over "benchmarking" constitutes the

---

[31]   *Id*. at *4.

[32]   *See* Smith Report at 42, *et seq*.

[33]   *See id.* at 6.

[34]   *See id.*

parties' central disagreement regarding Fagan's analysis of discrimination.[35]

Plaintiffs argue that Smith is not qualified to make this benchmarking critique because he "has never conducted a statistical study to assess the racial bias of stop-and-frisk or any other law enforcement program, practice, strategy or tactic, or claims of racial discrimination in any other governmental or private institution" and that, prior to his work on this case, Smith had done very little research into the question of racially-biased police stops.[36]

Plaintiffs' point is better suited for cross-examination and closing argument than a *Daubert* motion. As an expert in police practices, Smith has the necessary expertise to evaluate Fagan's hypotheses and the assumptions that Fagan used to build his model and he has the expertise to make his central "benchmark" criticism. Fagan explains that he chose not to use the crime suspect data in his benchmark because the data is incomplete; "race" is only known for approximately sixty percent of crimes and extrapolating that information to the remaining forty

---

[35] As defendants put it, "[i]n an analysis concerned with whom the police are stopping, a reliable benchmark must take into account who is committing the crime." Fagan *Daubert*, 2012 WL 1344514, at *4 (quoting Memorandum of Law in Support of Defendants' Motion to Exclude Plaintiffs' Proposed Expert Reports, Opinions and Testimony of Jeffrey Fagan at 12).

[36] Pl. Mem. at 8.

percent of crimes might not be appropriate.[37]  Whether such an extrapolation would

be sound is as much a question of social science as technical statistics and the answer

turns largely on the investigator's assumptions about the characteristics of the relevant

populations and about the accuracy of alternative metrics (such as the regression

analysis used by Fagan).  Smith is therefore qualified to critique Fagan's decision on

this issue.[38]

B.     **Smith's Alternative Regression Analysis and Correlation Coefficient Calculations**

In order to highlight what he believed was the central flaw with Fagan's

benchmark decision, Smith devised (and Purtell constructed) an alternative regression

analysis based on arrest and crime complaint reports.[39]  Plaintiffs correctly point out

---

[37]     *See* Fagan *Daubert*, 2012 WL 1344514, at *4, *10.  Notably, Fagan did perform such extrapolations in previous studies.

[38]     This was also the central issue in Fagan's critique of the RAND study and Smith is likewise qualified to opine on that question.  The other criticisms of Fagan's regressions described in paragraph fifteen of Smith's declaration (regarding temporal assumptions, smoothing of crime spikes, and the lack of detail in Fagan's presentation) are relatively minor and may be more likely to confuse the jury than to clarify the issues; if necessary, the admissibility of these criticisms will be determined at trial.
        Smith is not qualified to make technical critiques regarding the types of regression functions (negative binomial, multilevel logistic, etc.) that Fagan chose to use.  As with the alternative regression analysis discussed below, however, Purtell will be permitted to address these topics.

[39]     *See* Smith Decl. ¶¶ 17-25.

that because he is not an expert in statistics, Smith is unable to "establish that both the choice of variables *and* the actual running of the model were methodologically sound."[40]  Without these verifications, Smith's testimony is inadmissible.

However, given the importance of presenting otherwise admissible information to the jury in this case and given the lack of prejudice to plaintiffs, the appropriate solution is to permit Purtell to testify about the technical aspects of the alternative regression analysis and the correlation coefficient calculations.  If he agrees with it, Purtell may therefore "adopt" Smith's expert report, be deposed by plaintiffs, and testify at trial regarding technical aspects of Smith's report.  This late alteration to the expert schedule is appropriate because discovery and motion practice has taken many years, one additional deposition will not delay the trial date, and in a case of such significance involving complicated social science data it is important that the jury be permitted to fully consider both parties' admissible arguments about what the data shows.

Plaintiffs argue that Purtell, like Smith, is not qualified to offer critiques of Fagan's regressions because he has never conducted racial disparity studies or researched appropriate benchmarking techniques.  But this argument goes to weight,

---

[40]     Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion to Exclude Certain Opinions of Defendants' Proposed Expert, Dennis Smith ("Pl. Rep. Mem.") at 6.

not admissibility; even if Purtell has not previously conducted regression analyses on these particular topics, he has conducted many regressions on other topics and he is qualified to point out what he perceives as errors in Fagan's methodology and explain the technical aspects of Smith's alternative regression model.

After Purtell establishes the methodological soundness of the alternative regression analysis, Smith may testify regarding the qualitative theories and assumptions that went into its construction and to the conclusions that he believes it supports. Although the regression was disclosed belatedly, fairness requires its admission.[41]

### C.   Smith's Crime Reduction Studies and Opinions

Smith devotes a significant portion of his report to discussing the central role that he believes the NYPD's stop and frisk program (and the related Operation Impact) has had in "the historic crime decline achieved by New York City."[42]  One of Smith's central critiques is that "[t]he Fagan analysis does not explicitly confront the

---

[41]   The alternative regression was disclosed on December 19, 2011, as part of defendants' *Daubert* attack on Fagan's testimony, which was more than a year after the deadline for submission of expert rebuttal reports.  I permitted plaintiffs and Fagan to submit a new and tardy analysis when seeking partial reconsideration at the summary judgment stage, *see* 813 F. Supp. 2d at 462, and permitted Fagan to make corrections to his findings in February 2012 after Purtell and Smith pointed out major errors in his calculations, *see* Fagan *Daubert*, 2012 WL 1344514, at n. 36.

[42]   Smith Report at 41.

historic shift at NYPD away from a primary mission of responding to crime to a mission of preventing crime through proactive and crime targeted police vigilance."[43] Included as appendices to Smith's report are two studies that he and Purtell wrote about reduced crime rates resulting from Operation Impact and the NYPD's stop and frisk program.

Plaintiffs argue that "Smith's crime reduction opinions" should be excluded because they "are irrelevant to the questions posed by Plaintiffs' Fourth and Fourteenth Amendment claims: (1) Do NYPD officers conduct stops-and-frisks without reasonable suspicion?; (2) Do they stop civilians on the basis of their race?"[44] Defendants respond by arguing that Smith's opinion on the crime deterrent effects of these programs "are indeed relevant, as they represent alternative, race-neutral explanations for the racial patterns in [stops and frisks] which Fagan failed to consider in his analysis of the data" and that "[e]xcluding Smiths opinions would be highly prejudicial by forcing the jury to accept Fagan's word unchallenged . . . when such strong evidence of methodological problems exists."[45]

Defendants are conflating two different aspects of Smith's report: his

---

[43]     *Id.* at 4.

[44]     Pl. Mem. at 18.

[45]     Def. Mem. at 18-19.

14

benchmarking critique and his separate conclusion that the NYPD's programs are a proven strategy to combat crime and increase safety, particularly in minority neighborhoods.  As I explained above, Smith's benchmarking critique challenges Fagan's finding that Blacks and Hispanics are stopped at disproportionately higher rates; it is a descriptive claim about the nature of racial disparities that is probative of the truth or falsity of plaintiffs' Fourteenth Amendment claim, and it is therefore admissible.

However, Smith's opinions about the deterrence and crime reduction impacts of the NYPD's programs are inadmissible.  Defendants argue that "Smith's opinion that increased [stop and frisk] activity reduces neighborhood crime provides further evidence for his alternative hypothesis that [stops and frisks] are driven by where the crime occurs rather than by racial discrimination."[46]  But there are only two ways in which the *effectiveness* of the stop and frisk program can be probative of its legality.  First, defendants could argue that they have adopted a program that discriminates on the basis of race but nevertheless survives strict scrutiny because it is narrowly tailored to achieve a compelling governmental objective.[47]  But defendants

---

[46]     *Id.* at 19.  Plaintiffs point out that Fagan's regressions show that racial disparities persist even when he controls for "where the crime occurs," but this is a reasonable ground for disagreement given the benchmarking dispute.

[47]     *See Johnson v. California*, 543 U.S. 499, 505 (2005).

15

explicitly disclaim any such defense.[48]  The only other way in which "Smith's opinion that increased [stop and frisk] activity reduces neighborhood crime" could be probative of the activity's legality is by bolstering the defense that NYPD policymakers and officers have the intent only of reducing crime and are not deciding whom to stop on the basis of race.[49]  But Smith is not qualified to provide this testimony.  Both in their court filings and in public comments, defendants regularly state that the intent behind the program is to reduce crime, not to discriminate. Defendants and their representatives may testify about why the City has adopted and pursued the stop and frisk program; on the basis of that testimony and the testimony of plaintiffs' witnesses, the jury will determine whether defendants are discriminating on the basis of race, either when making individual stops or as a matter of policy or custom.  Defendants clearly believe that the program has been effective in reducing crime.  Whether or not Smith agrees with defendants' assessment is irrelevant. Moreover, admitting Smith's testimony – and permitting the parties to delve into the question of whether the stop and frisk program actually reduces crime – would risk

---

[48]      "The strict scrutiny inquiry is unnecessary in the present case because the City will establish, based on the evidence provided by Smith and others, that there is no discriminatory purpose on the part of the NYPD."  Def. Mem. at 24.

[49]      Both parties agree that in order to prevail on their Fourteenth Amendment claims in this case plaintiffs are required to prove racially discriminatory intent or purpose.  *See* Pl. Mem. at 21.

16

turning the trial into a policy debate over the wisdom of the program rather than a judicial proceeding that assesses plaintiffs' constitutional claims.

### D.    Smith's Hypotheses on Hit Rates

According to Fagan, the NYPD's data shows that approximately five percent of stops result in an arrest, six percent of stops result in a summons, guns are seized in 0.15 percent of stops, and contraband of any kind is seized in 1.75 percent of stops.[50]  I found these statistics powerful evidence of a widespread pattern of unlawful stops: In "eighty-eight percent of cases [where no arrest was made or summons given], although they were required by law to have objective reasonable suspicion that crime was afoot when they made the stop, police officers ultimately concluded that there was no probable cause to believe that crime was afoot. That is to say, according to their own records and judgment, officers' "suspicion" was wrong nearly nine times out of ten."[51]

In rebuttal, defendants seek to admit Smith's opinion that "the test of success in a proactive, prevention-focused program is not the same as in an assessment of a reactive program" and that if  "the goal of NYPD is to pursue

---

[50]     *See* Fagan *Daubert*, 2012 WL 1344514, at *7.  According to numbers obtained by the New York Post, the gun recovery hit rate in the second quarter of this year was 0.14 percent, almost identical to the rate over previous years.  *See* David Seifman, *NYPD Less 'Frisk'y*, N.Y. Post, Aug. 3, 2012.

[51]     *See* Class Cert. Opinion, 2012 WL 1868637, at *8.

practices that convince would be gun carriers to leave their guns at home, why would the fact that over time fewer guns are found in suspicion-based stops be a sign of failure?"[52]  Defendants argue that Smith should be permitted to opine that the low rate of gun recoveries "may be explained in part by the deterrent effect of increased [stops and frisks]," because he is simply offering a "plausible alternative explanation" that will "challenge the reliability of Fagan's conclusion" about the significance of this statistical pattern.[53]

> Defendants are wrong.  Fagan is proposing hypotheses about the *objective* circumstances that immediately precede stops on the basis of those stops' outcomes: if police officers only arrest or give summonses to twelve percent of the people they stop, then perhaps their initial "suspicion" that crime was afoot was in fact not reasonable; if guns are rarely recovered, then perhaps the "suspicious bulges" that police identify are not really suspicious.  Smith, on the other hand, offers a hypothesis about the class members' *fears* and *motives*: perhaps New York City residents are not carrying guns, he says, because they know that they will be stopped and frisked.  Smith cites no evidence for this hypothesis.  This theory about the reasons that so few stopped people are carrying weapons is too speculative to be admitted at trial,

---

[52]     Smith Report at 39.

[53]     Def. Mem. at 18.

particularly through the testimony of an expert.

I also note that Smith's hypothesis is not even couched as a rebuttal of Fagan's hypothesis that the low hit rates suggest a lack of reasonable suspicion; instead, Smith appears simply to attempt to *justify* stops on the basis of their deterrent impact, regardless of their legality.[54]   Thus, the opinion is also irrelevant, and it is surely not based on any scientific methodology.

### E.   Smith's Opinion that NYPD Stops-and-Frisks Are Not Racially Motivated

Plaintiffs seek to exclude Smith's opinion that "there is no compelling evidence that NYPD officers are making stops based on race or ethnicity, but instead are pursuing a strategy and using tactics that prevent crime and benefit the City as a whole, and communities of color in particular."[55]   As stated above, Smith will be permitted to testify that, because of the benchmarking dispute and other more minor critiques, he does not believe Fagan's report presents compelling evidence that NYPD

---

[54]   Smith compares street stops with airport security and asks, "[i]f the security checks at airports find an infinitesimal number of weapons or bombs would any reasonable person assess this as a failure of this deterrence practice?" Smith Report at 39.  This flawed analogy highlights the analytical shortcoming of Smith's persistent focus on deterrence rather than on the law of reasonable suspicion.  People go through airport security as a condition of their voluntary choice to board an airplane; the class members have been stopped and frisked involuntarily while sitting on their stoops or walking down the street, which implicates an entirely different legal analysis.

[55]   Pl. Mem. at 21 (quoting Smith Report at 8).

officers are making stops based on race or ethnicity.

But, as plaintiffs argue, "Smith did not conduct a study through which he determined that crime deterrence, rather than race, was a statistically significant and robust predictor of stop and frisks, nor did he conduct a statistical analysis that identified crime deterrence as the motivating factor in NYPD stops and frisks."[56] Smith will not be permitted to testify regarding his opinion that the NYPD's policies "prevent crime and benefit the City as a whole, and communities of color in particular."   As explained above, although his crime reduction opinions may be relevant as a policy matter, they will not help the jury answer the constitutional questions posed by this lawsuit.   Neither expert will be permitted to speculate about the intent of NYPD policymakers or the efficacy of those policies, although defendants and their representatives may testify as to their intent.

## IV.   CONCLUSION

Plaintiffs' motion is granted in part and denied in part.   The Clerk of the Court is directed to close the motion [Docket No. 215].   A status conference is scheduled for August 27 at 3:30 p.m.   Defendants are directed to make Robert Purtell available for deposition as soon as practicable.

---

[56]   Pl. Rep. Mem. at 9.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      August 17, 2012
            New York, New York

**- Appearances -**

**For Plaintiffs:**

Darius Charney, Esq.
Sunita Patel, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6464

Jonathan C. Moore, Esq.
Jennifer Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 277-5850

Eric Hellerman, Esq.
Philip Irwin, Esq.
Gretchen Hoff-Varner, Esq.
Daniel A. George, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, New York 10018
(212) 841-1000

**For Defendants**:

Heidi Grossman
Stephanie M. Breslow
Judson Vickers
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, New York 10007
(212) 788-0792