CbrWfloC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
DAVID FLOYD, et al.,

                    Plaintiffs,

            v.                              08 CV 1034 (SAS)

THE CITY OF NEW YORK, et al.,

                    Defendants.
------------------------------x
                                            New York, N.Y.
                                            November 27, 2012
                                            3:00 p.m.

Before:

                    HON. SHIRA A. SCHEINDLIN,

                                            District Judge

                          APPEARANCES

BELDOCK LEVINE & HOFFMAN, LLP
     Attorneys for Plaintiffs
BY:  JONATHAN C. MOORE
     JENN ROLNICK BORCHETTA
     -and-
DARIUS CHARNEY
     -and-
COVINGTON & BURLING, LLP
BY:  KASEY L. MARTINI

MICHAEL A. CARDOZO
     Corporation Counsel of the City of New York
     New York City Law Department
     Attorney for Defendants
BY:  HEIDI GROSSMAN
     SUZANNA H. PUBLICKER
     LINDA DONAHUE
     CECILIA A. SILVER
     JOSEPH A.MARUTOLLO
     JUDSON K. VICKERS
          Assistants Corporation Counsel

CbrWfloC

```
 1              (Case called)
 2              THE COURT:  Please be seated.
 3              Mr. Moore, good afternoon.  Ms. Borchetta, good
 4    afternoon.  Mr. Charney, good afternoon.  Ms. Martini, good
 5    afternoon.
 6              Ms. Grossman, good afternoon.  Ms. Publicker, good
 7    afternoon.  Ms. Donahue, good afternoon.  Ms. Silver, good
 8    afternoon.  Mr. Marutollo, good afternoon.  And, Mr. Vickers.
 9              I'm not sure my memory is accurate, but I thought one
10    of the issues we were going to discuss today was the jury
11    versus nonjury issue.  The plaintiffs kind of, I don't know how
12    to say this, sprung that idea at the end of the last
13    conference, and I think that the defense hadn't had time to
14    even begin to think of their position on it, how they wanted to
15    respond.
16              You wanted a little time to talk to people?
17    Ms. Grossman, are you the right person to address it?  Where
18    are you on that issue?
19              MS. GROSSMAN:  Your Honor, with the caveat that the
20    plaintiffs' damages claims are to be dismissed with prejudice
21    and that the plaintiffs are only seeking injunctive relief,
22    based on our review of the case law, I don't know that the city
23    can demand a jury trial.
24              THE COURT:  If you could, would you?
25              MS. GROSSMAN:  We did.
```

1            THE COURT:  You did, in your answer, but you're saying

2      it's only injunctive relief.  You think that the law is such

3      that you're not entitled to a jury?

4            MS. GROSSMAN:  We could not demand it, right.  So if

5      the plaintiffs made a motion, we wouldn't want to burden the

6      Court with a motion and take a position that we don't have case

7      law at this point in time that we understand to exist to

8      support that position.  So that's our position.

9            THE COURT:  Just so I fully understand, in colloquial

10     words, if you could get a jury, you would prefer it, but you

11     can't.  Is that it?

12           MS. GROSSMAN:  That's sort of it.

13           THE COURT:  That's sort of it?

14           Mr. Charney, whoever it is, are you still of the view

15     that you want to go nonjury?

16           MR. CHARNEY:  Yes, your Honor.

17           THE COURT:  All right.  How long a trial is that?

18           MR. MOORE:  Hopefully shorter than a jury trial.

19           MR. CHARNEY:  I mean, obviously, jury selection

20     wouldn't need to happen, which can sometimes take several days.

21     Jury charge conference wouldn't have to happen for your

22     instructions.

23           THE COURT:  There are other factors that make it

24     longer.

25           MR. CHARNEY:  No.  Absolutely.  And having watched

CbrWfloC

| | |
|---|---|
| 1 | part of the trial that you had going a couple weeks ago, |
| 2 | obviously evidentiary objections would not require every single |
| 3 | time a side bar and the jury being taken in and out of the |
| 4 | room. |
| 5 | THE COURT:  I don't do that anyway. |
| 6 | MR. CHARNEY:  Yes.  Given that, we had said four to |
| 7 | six weeks originally.  I mean, hopefully it would be then |
| 8 | closer to four if we don't have a jury, would probably be our |
| 9 | guess. |
| 10 | THE COURT:  The law is the law.  I've expressed my |
| 11 | instinctive reaction, when you first raised this at the last |
| 12 | conference, that it's not the preferrable route because |
| 13 | whatever the outcome, the criticism will be this is one person, |
| 14 | this is that judge, whatever the outcome, in your favor or |
| 15 | against you.  Either way, the judge is attacked as a single |
| 16 | person.  It's not a verdict of the community, which I would |
| 17 | have thought would be helpful in a case like this.  And you |
| 18 | could have had a jury by keeping the damages claims.  So that's |
| 19 | kind of unfortunate.  Now it's just one judge, one person, |
| 20 | whose views, of course, have been expressed a number of times |
| 21 | on motion practice.  So it's not the best of all worlds, but if |
| 22 | that's your decision to dismiss the damages claim, the defense |
| 23 | has said they think, as a matter of law, they don't have the |
| 24 | right to demand a jury.  It's a tactical decision and you've |
| 25 | made it. |

CbrWfloC

1          Was there another item on today's agenda?

2          MS. GROSSMAN:  Your Honor.

3          THE COURT:  Did I misstate the second time?

4          MS. GROSSMAN:  No, but given you what just referred

5  to, expressing your views in the last decision --

6          THE COURT:  I expressed it last time, too, maybe not

7  as strongly.  Remember I said the same thing about the views of

8  the community?

9          MS. GROSSMAN:  That part I absolutely understand.  But

10  it was the reference to your views expressed in some of the

11  previous decisions.

12          THE COURT:  A lot of things have been said in those

13  decisions.  I've written a lot of decisions.  Between Davis and

14  Ligon and Floyd, I can't even count them.  How many do you

15  think I've written over the years?

16          MR. MOORE:  20.

17          THE COURT:  Please, Mr. Moore.

18          MR. MOORE:  I'm going back to Daniels, Judge.

19          THE COURT:  Going back to Daniels, it's possible.  But

20  I don't think it's 20.  Maybe it's ten, but it's a lot.  If

21  each one was 50 pages, I might have written 500 pages.  It's a

22  lot.  One would have liked to have heard more voices; that's

23  all I'm saying.  But it's a tactical decision, and you've made

24  it, and you're entitled to make it under the law.  I obviously

25  will do my best at the trial to be fair and impartial to both

CbrWfloC

1    sides, as we ask a juror to be.  That's what I'll be, but I'm

2    only saying you're not getting many points of view.  But it's a

3    tactical decision that the plaintiffs are entitled to make, and

4    they've made it.  At least for today they've made it.

5            Let me say I won't be disturbed if you change your

6    mind, on further consideration, if you make a different

7    decision promptly, that's okay too.  That said --

8            MS. GROSSMAN:  I just wanted to reserve the right to

9    revisit the issue should the case law that we look at change in

10   some way.

11           THE COURT:  How is the case law going to change?

12           MS. GROSSMAN:  If there is some case that comes out

13   that would support this.

14           THE COURT:  I see.  If a new case comes down from the

15   Second Circuit or the Supreme Court in the next three months?

16           MS. GROSSMAN:  I'm not expecting it, your Honor.

17           THE COURT:  I understand.

18           MS. GROSSMAN:  But we just want to reserve the right

19   to revisit the issue.

20           THE COURT:  Sure.  If the United States Supreme Court

21   or the Second Circuit speaks in the interim, be sure and let me

22   know right away.  I may have missed something.

23           That would be great.

24           MR. CHARNEY:  There were two other issues.

25           THE COURT:  Yes.  What are the other items?

CbrWfloC

1           MR. CHARNEY:  Two other issues.

2           One was the question of the pretrial schedule and when

3    different submissions would be due.

4           THE COURT:  Yes.

5           MR. CHARNEY:  We spoke to the city about that at

6    length earlier today, and I think Ms. Borchetta is happy to

7    address those issues.  And then the last issue was your Honor

8    wanted us to -- let me back up.

9           A couple of the potential class member witnesses we

10   had identified two weeks ago in our disclosures to the city had

11   stops that had taken place in NYCHA buildings, and the city

12   took the position they were different.  I know your Honor was

13   concerned about that.  I am prepared to address that because I

14   think that these particular stops don't necessarily fit in with

15   the Davis universe that is the focus of that case.

16          THE COURT:  Which would you rather take up first, the

17   scheduling or the housing authority overlap?  It doesn't

18   matter.

19          MR. CHARNEY:  Why don't we do the scheduling so

20   someone else can talk.

21          THE COURT:  Sure.

22          MS. BORCHETTA:  Your Honor, when we were here the last

23   time, we had mentioned that we might be interested, if the

24   Court was amenable, in pushing the date for the joint pretrial

25   order, which had been set for January 11, given that the trial

CbrWfloC

1   date is March 18.  And we had also taken under advisement that

2   the Court said that your practice is to have a premotion

3   conference on the motions in limine.

4          THE COURT:  Oh, yes, because I'm afraid each of you is

5   going to think of 20, and I'm not taking 40, so that's that.

6          MS. BORCHETTA:  So we went to the city with proposals

7   for some of the exchanges of the draft joint pretrial order and

8   also to consider dates for that premotion conference on the

9   motions in limine as well as whether they would agree to

10   adjourning the date for filing with the Court the joint

11   pretrial order and the memorandum of law that would be required

12   for the proposed findings of fact.

13          THE COURT:  Let me start by saying I know you have a

14   proposal that you've discussed with the city, I need the lead

15   time on motions -- that is, motions in limine, or if there's

16   anything left of Daubert.  I forgot.

17          The parties are shaking their heads.

18          MS. BORCHETTA:  That might be one thing we're done

19   with.

20          THE COURT:  Maybe.

21          On motions in limine, I need time to consider them,

22   although I think I recently ruled in some trial or another that

23   in a nonjury case there is a more forgiving standard.  It might

24   have been Ligon.  Something recently, without a jury, I started

25   my oral decision by saying the standard is somewhat different

CbrWfloC

1    for nonjury trials.  So think about that when you make the

2    motion when we get into things like 404(b) and 403, things like

3    that.  A judge is presumed to be able to separate things more

4    than a jury.  That may cut some of the motions in limine.

5           But be that as it may, that's what I need briefed with

6    plenty of time to decide.  The time consuming and tedious work

7    of writing a joint pretrial order doesn't really need to be in

8    so early if it's mostly negotiating between the parties; that

9    is, which witnesses, which exhibits.  If it doesn't call for

10   rulings from me, I really don't care as much when that comes

11   in.  Even the brief doesn't really matter because the brief

12   isn't going to be considered by me until the close of all the

13   evidence.  I'm easier about adjourning the date for the

14   submission of the joint pretrial order except where it calls

15   for rulings.  To the extent that it involves motions in limine

16   or to the extent that it involves my needing to make rulings on

17   objections to exhibits, that's the portion I would like

18   earlier.

19          So present your proposal, but you may want to meet and

20   confer further and actually carve out certain sections that

21   should come in earlier and the rest can come in later.  I'm not

22   terribly concerned where I don't have to decide anything.  But

23   each of you has to know what the other is doing.  That's

24   important for each of you to know, but my time isn't at stake.

25          MS. BORCHETTA:  Your Honor, we actually did anticipate

CbrWfloC

1    that would be your hope, that we would get the motions in

2    limine first.

3          THE COURT:  Anything that requires the Court's time.

4    So even evidentiary objections to exhibits, if I have to sort

5    through that or do deposition reading, you know, we object to

6    this portion, or something, anything that I have to rule on, I

7    would like the time to do it in an organized manner and I do

8    have a whole lot of other cases.  It's not like I have two

9    months to do nothing but prepare for the trial.  I have plenty

10   of other things.

11         MS. BORCHETTA:  Your Honor, the date that we had come

12   up with initially was the joint pretrial order to be filed with

13   the memorandum of law on February 25, which would be three

14   weeks prior to the trial date, and the motions in limine would

15   be fully briefed by the week prior to that, on February 18.

16         THE COURT:  Instead of what, January 11?

17         MS. BORCHETTA:  Sorry.  I'm sorry, your Honor.

18         THE COURT:  I thought you earlier said January 11.

19         MS. GROSSMAN:  Moving papers and full submission would

20   be January 31.

21         THE COURT:  I see.  So it's basically a

22   two-and-a-half-week slip.  That's kind of a lot though, for

23   March 18, depending on how many motions in limine there are,

24   which are going to be taken up at the next conference.

25         Do we have that conference scheduled?

CbrWfloC

1              MS. BORCHETTA:  No, your Honor.

2              And that's one issue.  I just want to be clear with

3     the Court that while we raised this proposal with the city, the

4     city did not agree to it.  But we wanted to get some dates on

5     the calendar to the extent we could today, and the date that we

6     had proposed for the premotion conference on motions in limine

7     was January 28.

8              THE COURT:  Definitely not that.  I have in mind

9     December.

10             MS. GROSSMAN:  We proposed December.

11             THE COURT:  Oh, yes.  You're right.

12             MS. GROSSMAN:  And we thought that it would be a way

13    of previewing --

14             THE COURT:  I just did this in another very large and

15    complex case I'm going to try in June.  I made them do it and

16    it was a good exercise and we all began to see how many we were

17    going to have and people gave up on some and we reduced it and

18    talked about page limits, and this and that.  But we need to do

19    that so they can get briefed in January.

20             MS. GROSSMAN:  Your Honor, what we had proposed, the

21    plaintiffs came up with some proposed dates that some we could

22    agree with, but we wanted your guidance in terms of where we

23    would go in terms of a premotion conference because if you

24    agreed with the plaintiffs that we should do it in January, we

25    would have worked with the plaintiffs.

CbrWfloC

 1          THE COURT:  If they had said January 5, that's one

 2    thing.  But they said January 28.  That's out.  I agree with

 3    you, it should be December.  But if it's very, very early in

 4    January, I'm not going to quibble between December 27 and

 5    January 3.  I want it sooner than later.  If it slips a few

 6    days, that's okay.

 7          MS. GROSSMAN:  Our view is that in the next few weeks,

 8    you expect the plaintiffs and defendants should be exchanging

 9    letters so that we can have a meaningful discussion.

10          THE COURT:  Correct.

11          MS. GROSSMAN:  And we can have a court conference, and

12    we're hoping that the court conference can happen in December.

13          THE COURT:  I agree.

14          MS. GROSSMAN:  So that we can do efficient work.

15          THE COURT:  I fully agree with you.  You're preaching

16    to the choir.

17          MR. CHARNEY:  Your Honor, could we respond briefly?

18          MS. BORCHETTA:  I'm sorry.

19          I'd just like to raise our concern about the December

20    date, which is that we have, as your Honor knows, a number of

21    police officer depositions and depositions of class member

22    witnesses, and we're concerned that we'll have to come back to

23    the Court with additional motions because of something that

24    comes up.  That's my first concern.

25          THE COURT:  Those are not real motions in limine.

CbrWfloC

1    Those might be minor evidentiary objections that somebody

2    raised in objections at depositions to a question or answer.

3    An evidentiary objection that I mentioned earlier in terms of

4    reading depositions or ruling on objections, I do that all the

5    time.  Those are not real motions in limine.

6              MS. BORCHETTA:  Let me, if I may.

7              MR. CHARNEY:  There is another very important issue.

8              MS. BORCHETTA:  Our second issue is that we believe

9    that in order to do the motions in limine we need to understand

10   the witnesses that they might be designating and also the

11   exhibits that they might be using.  At this point we've

12   proposed a date for exchanging drafts of those lists and those

13   exhibits in early January.  So to the extent we could at least

14   have the motions in limine date, the premotion conference after

15   that exchange.

16             THE COURT:  It's just too late.  It won't give enough

17   time to get a full briefing on decisions.  It won't give me

18   enough time.

19             MS. BORCHETTA:  Your Honor, but --

20             THE COURT:  Anyway, these additional depositions,

21   isn't this all about additional incidents of new plaintiffs?

22             MS. GROSSMAN:  And, your Honor, may I just say that

23   there are certainly in limine motions that I would expect the

24   parties to make on the previous plaintiffs, so we'll get

25   guidance from your rulings.

CbrWfloC

1           THE COURT:  I agree.

2           MS. GROSSMAN:  If they're hearsay objections, we

3   should all act like adults and apply the rulings.

4           THE COURT:  That's a good thought.  I like that.

5           MS. GROSSMAN:  I'm sure if something urgent comes up

6   and something no one can contemplate, I'm sure we can bring it

7   to the Court's attention.

8           THE COURT:  Correct.

9           MS. GROSSMAN:  I think it moves the case forward and

10  we can all understand what we have to spend our time on.

11          MS. BORCHETTA:  I'm just not sure how we can do a

12  motion in limine that's tailored to certain evidence that

13  they're going to be using or certain witnesses if we don't have

14  any idea of the body of witnesses.

15          THE COURT:  You're putting on the case.  It seems to

16  me the additional depositions have to do with adding incidents.

17          MS. BORCHETTA:  I'm not referring to the additional

18  incidents.  I'm referring to ordinarily by the time you get, at

19  least in my limited experience of doing joint pretrial orders,

20  you have some period where you're exchanging drafts with each

21  other of your proposed witnesses, the body of documents that

22  you're talking about, so you have some idea when you're making

23  the motions in limine of what you should be raising.  There are

24  obviously issues that are on our radar.

25          THE COURT:  Right.

CbrWfloC

1          MS. BORCHETTA:  But there might be issues that aren't.

2     What we're concerned about is if we have a premotion conference

3     at the end of December, if we could just put it off a week, or

4     so, into January, two weeks into January, let us get an

5     exchange of draft witness list and draft exhibit list with each

6     other.

7          THE COURT:  Is there a date now for exchanging?

8          MS. BORCHETTA:  No, there is not, and that's what we

9     raised with the city.

10          We originally raised it because we wanted to exchange

11    that in early January.  That's why we proposed this premotion

12    conference on the date we did in early January because we

13    wanted to exchange with each other, after exchanging this

14    initial draft list of witnesses and exhibits for trial, to

15    confer about what we intend or what we believe from those lists

16    we'll be making motions in limine on.

17          THE COURT:  I guess where we're not seeing eye to eye

18    is the difference between evidentiary objections and a motion

19    in limine.  They're different, to me.  I have been doing this

20    forever, and I've seen, I don't know, a hundred motions in

21    limine.  It's not the evidentiary objection to the actual

22    document or Q & A at the deposition.  That is a separate

23    problem.

24          MS. BORCHETTA:  And I'm not talking about -- I'm sorry

25    if I'm not being clear.  I'm not talking about these

CbrWfloC

1   depositions.

2           THE COURT:  No, no.  I know.  But even them

3   designating depositions or designating documents, that all

4   comes later.  That's not what I mean by motion in limine.  It

5   is usually a bigger issue, "so-and-so should be precluded from

6   offering any evidence of X."  That's a motion in limine, not "I

7   object to this document that's hearsay."  That's the

8   difference.

9           MS. BORCHETTA:  And I understand that, your Honor.

10          I think what I'm concerned about is that there could

11   be a witness that they identify, for example, on their list, on

12   their draft list.

13          THE COURT:  Right.

14          MS. BORCHETTA:  Someone who maybe currently isn't on

15   our radar, for whatever reason.  It's a long case, a lot of

16   discovery.  You're well aware of that.

17          THE COURT:  Right.

18          MS. BORCHETTA:  We know some of the issues that might

19   come up, and those we can address.  But there might be someone

20   they put in their draft list that they exchange with us who is

21   new who suddenly we realize has a motion in limine, not an

22   evidentiary objection, but some motion in limine we didn't

23   foresee.  And we're simply saying that we should build in a

24   short period of time.

25          THE COURT:  You're wasting your breath.  I think

CbrWfloC

     1   Ms. Grossman has anticipated that and said if something new

     2   comes up she's confident the Court will hear you anyway, which

     3   is true.  So we get the bulk of the work done on the proposed

     4   schedule at the end of December.  And then if you haven't

     5   finished the exchange and the exchange finishes and you see a

     6   couple more, call up or write and say, We did the bulk, but we

     7   need to see you on two more.  That's all.  We'll discuss them.

     8           MS. BORCHETTA:  Just to be clear that we understand

     9   your ruling then, this initial conference would not be with

    10   prejudice to any additional motions in limine that arise for

    11   some reason.

    12           THE COURT:  I can't say that.  You have a burden to

    13   show that you didn't know about it at that time, something new

    14   has happened and there's really an urgent need to meet with the

    15   Court.  You can't go backwards and say now we see 30 more that

    16   there were there all along.

    17           MS. BORCHETTA:  To the extent something was put in

    18   their list.

    19           THE COURT:  That's what she said.  To the extent a new

    20   witness turns up that you didn't anticipate that raises new

    21   issues, that's fine.  It's sort of an escape clause if you need

    22   to come back.  That's all.

    23           MR. MOORE:  Can I just offer an observation?

    24           There's no date on the record by which the defendants

    25   have to identify their witnesses at trial.

CbrWfloC

1          THE COURT:  And we'll do that today.

2          MR. MOORE:  That's all we're saying.

3          That date, to the extent that we can put it into the

4  schedule, should be before the pretrial conference, premotion

5  conference on the motion in limine so that we could try to deal

6  with as much as we can in that motion in limine process.

7  That's all we're saying.  They should have a date when they

8  have to tell us who their witnesses are.  There is no such

9  date.

10          THE COURT:  They should.  They should.  But we're not

11  going to have this conference at the end of January.

12          MR. MOORE:  We accept that.  We accept it's going to

13  be earlier.

14          THE COURT:  Okay.

15          MR. MOORE:  But before that conference, we should at

16  least know who their witnesses are.  Now, if they have another

17  witness that comes up sometime later, we'll deal with it.

18          THE COURT:  Okay.

19          MR. MOORE:  But we've identified who our witnesses

20  are.  They should identify who theirs are.

21          THE COURT:  When?

22          MS. GROSSMAN:  They did not.

23          MR. MOORE:  We have a date by which we have to do

24  that.

25          MS. GROSSMAN:  The plaintiffs proposed, we had an

CbrWfloC

```
 1   original --
 2            MR. MOORE:  I'm sorry, Judge.  I misspoke.
 3            THE COURT:  You're in disarray today.
 4            MS. GROSSMAN:  The Court actually ordered an exchange
 5   of witness lists and exhibit lists way back in late August, I
 6   understand, for January 11.  So that was when we were supposed
 7   to exchange, or we were supposed to provide the joint pretrial
 8   order on January 11.  Now, the plaintiffs have proposed that we
 9   first exchange the witnesses and exhibits on the 14th of
10   January.  I think that if the plaintiffs are on board with that
11   and we all need the time to identify the witnesses and
12   especially with all the 16 depositions that have to happen, and
13   you mentioned at the last conference that we don't have to rush
14   to get that done by the end of December, that we have until
15   sometime in February to finish that, then there's no harm in
16   trying to preview the motions in limine in December without
17   directing both parties to now come up with their final witness
18   and exhibit list.
19            THE COURT:  Fine.  How about your preliminary witness
20   and exhibit list?  All they're trying to say is without it
21   being final, it's pretty hard to know where your motions in
22   limine are if you don't have a sense of what the other side
23   intends to offer in evidence.
24            MS. GROSSMAN:  Let me just say, your Honor, we
25   submitted summary judgment motions in this case so you probably
```

CbrWfloC

1    remember all the very hefty submissions.

2              THE COURT:  Yes.

3              MS. GROSSMAN:  And there are witnesses that were

4    deposed in this case.

5              THE COURT:  Yes.

6              MS. GROSSMAN:  We have over 60 witnesses, could be up

7    to a hundred with the new submissions or the new notice that

8    the plaintiffs provided us.  We certainly have a starting point

9    for December.

10             THE COURT:  Oh, yes.  There's no point in doing

11   unnecessary work.  For example, if you look at the 50, 60

12   witnesses that have been deposed and you know that you're not

13   going to call 20 of them for some reason, why should they do

14   any work on those 20?  That's all.  They're saying if you could

15   exchange at least preliminary drafts of the witness and exhibit

16   lists, that helps to focus their attention on what needs to be

17   done in motions in limine.  That sounds right.  I don't have

18   time to do it on this slower schedule of January 14 to exchange

19   the lists and then January 28 for the premotion conference.

20   It's too late.

21             MS. GROSSMAN:  No.  We're the ones that are suggesting

22   December.

23             THE COURT:  I know that.  But you want to disengage it

24   from the list, and that doesn't make a lot of sense either.

25   You're pointing out that the lists aren't due.  You mentioned

CbrWfloC

1    January 11 and 14th, but it doesn't matter; it's only three

2    days apart.  Their point is only the conference doesn't make a

3    lot of sense without receiving something in the way of a

4    preliminary draft.

5              MS. GROSSMAN:  This is the first time I'm hearing the

6    plaintiffs want to exchange that together.  So, of course, you

7    would not mean that it's one-sided.  You would mean that the

8    parties have to exchange.

9              THE COURT:  Sure.

10             MS. GROSSMAN:  But let me just suggest this, your

11   Honor.  It's very hard for the city.  We're rebutting.  The

12   plaintiffs have the burden of proof.

13             THE COURT:  Correct.

14             MS. GROSSMAN:  And I know your rules require

15   simultaneous exchange.  If the plaintiffs are dropping out some

16   of the plaintiffs or some of the witnesses --

17             THE COURT:  Actually, I don't need to do simultaneous

18   exchange.  Most of my joint pretrial orders say plaintiff must

19   give defendant their draft by X date.  Then defendant supplies

20   its draft X days later.  That makes a joint order.  I don't

21   usually have simultaneous.

22             MS. GROSSMAN:  That's what I raised with the

23   plaintiffs.

24             THE COURT:  Yes.

25             MS. GROSSMAN:  That I would like to have their lists

CbrWfloC

1  first, and then we are in a better position to respond.

2           THE COURT:  It's my standard scheduling order.  You

3  could look at that a hundred times.  It's always the same.

4           MS. GROSSMAN:  If the plaintiffs can give us their

5  lists, we can respond.  We can look at their lists and then

6  we're in a better position to respond.

7           THE COURT:  Yes, of course.

8           MS. GROSSMAN:  But I don't know if the plaintiffs are

9  anticipating that they're ready to give us their witness lists

10  and exhibit lists in December so that we can have this

11  conference in December.

12           THE COURT:  No.  I think they were starting out with

13  depositions.  That's why they asked for January 28 because they

14  don't think they're ready to do that.  But I have a problem.  I

15  don't like January 28 or anywhere near it.  It's too late for a

16  premotion conference.  It's not the filing date.  It's the

17  discussion date.  By the time we get it scheduled, I wouldn't

18  get them until two weeks before trial, which wouldn't be fair

19  to the Court.  There's no reason to do that.

20           MR. CHARNEY:  Could we then have a conference date

21  maybe the first week of January so we can exchange the witness

22  list sometime in the second half of December so that we have at

23  least a realistic amount of time.

24           THE COURT:  Yes.  I think that's reasonable.

25           Probably the best we're going to get out of this whole

CbrWfloC

1    discussion is that if the plaintiffs give their lists by

2    December 19, let's say, and the defendants give their lists,

3    let's say, by December 27, so the first one was December 19,

4    the second one was December 27 and then if we try to meet on

5    the fourth -- and I haven't even looked at my calendar --

6    that's pretty good.  Everybody will have exchanged and have had

7    time to look it over.  It's not final.  It's just a letter

8    saying here's an outline of the motions we're thinking of

9    making.  It's not the briefs.  It's not the final decision.

10         It would be helpful, I'll even given you the letters

11   in other cases, it's securities fraud, but they laid out the

12   kinds of motions they anticipate they'll be making, all

13   without, I might add, any exchange of witnesses or exhibits.

14   They knew what the issues were going to be, big issues.  You

15   shouldn't allow any proof of X, Y, Z.  It's not what this case

16   is about.  It's outside the time frame, or this or that.

17         MS. GROSSMAN:  Your Honor, just so that maybe working

18   backwards what's most convenient for you, when would you like

19   to see the motions in limine fully briefed so that you have the

20   time you need to make the decisions?

21         THE COURT:  Right.  Good question.

22         MS. GROSSMAN:  Maybe then the parties can work

23   backwards and figure out the date.

24         THE COURT:  I think we're there.  If we have the

25   premotion conference, and I'm pulling my calendar up, if we had

CbrWfloC

1   it around January 4, or so, by the time it gets briefed after

2   that, I don't think it's going to get fully briefed until

3   January 31.  By the time there's a moving brief, response

4   brief, reply brief, that would give me close to six weeks to

5   get them.  But you don't want the decision the day before

6   trial.  You need to know the decision.  So it doesn't give you

7   six weeks.  It gives me four weeks so you have a couple weeks

8   to work with those decisions.

9           MS. GROSSMAN:  When would you like --

10          THE COURT:  January 31.

11          MS. GROSSMAN:  January 31, you want final --

12          THE COURT:  Reply briefs are in.

13          MS. GROSSMAN:  Your Honor, that's actually what the

14   original schedule was, I think.  It was close.  What we had

15   originally contemplated was we're going to move early January

16   and have the time to oppose and reply and have the full

17   submission by the end.

18          THE COURT:  That's what's going to happen.

19          MS. GROSSMAN:  I think what happens is if we now have

20   the pretrial conference in now early January, we're kind of

21   backed up a lot with the back and forth and the amount of time

22   we need to actually make the motions and get the briefs done.

23   That's why we thought December.

24          THE COURT:  Not really.  You do some work on the

25   letter exchange.  That helps you focus your motions right away.

CbrWfloC

1    Then you get the Court's reactions to your letters on January

2    4, you're ready to file on, let's say, January 14, response

3    January 22, reply January 31.

4            These aren't summary judgments all over.  In fact, I

5    have to make that point.  I'm not turning this into summary

6    judgment.  A lot of lawyers misuse motions in limine to reargue

7    every point in their summary judgment motion, and I'm not doing

8    it.  These are the dates I propose:  14, 22, 31.

9            MS. GROSSMAN:  Can you say the dates again?

10           THE COURT:  14, 22, 31.

11           MS. GROSSMAN:  January?

12           THE COURT:  Correct.  Moving, response, reply.

13           MS. GROSSMAN:  Your Honor, I'm going to ask if you

14   could put it on the 24th instead of the 22nd, actually, if

15   that's okay with you.

16           THE COURT:  That's fine.  14, 24, 31.  Replies for

17   both sides, of course.  Both sides are making motions.  The

18   moving papers come in from both sides.

19           Now, let's see if I can actually do this on January

20   24.  I can.

21           MS. GROSSMAN:  Your Honor, I hate to be difficult, but

22   I just hate Mondays.

23           THE COURT:  You what?

24           MS. GROSSMAN:  I hate Mondays.

25           THE COURT:  You hate Mondays?

CbrWfloC

1          MS. GROSSMAN:  I hate having to submit papers on a

2     Monday.  So could we perhaps, I think the plaintiffs might be

3     amenable to either moving it to the 11th or pushing it to the

4     15th as the moving date, and then adjust.  And then we'd have

5     the 24th, we could keep.

6          THE COURT:  I don't care if it's the 15th as long as

7     the next two dates stand, the 24th and 31st.  What do I care?

8     I'm not turning to it until it's fully submitted.  If you want

9     to cut the time by two days, that's fine.

10          MR. CHARNEY:  The 15th is fine with us.

11          THE COURT:  15, 24, 31.

12          MS. GROSSMAN:  Could we have the first, February 1, as

13     the final date?  It's just the next day.  It's the Friday.

14          MR. MOORE:  You mean February 1?

15          MS. GROSSMAN:  Yes.  February 1, instead of January

16     31.

17          THE COURT:  That's fine, too.  15, 24, February 1.

18          As far as Friday, January 4 goes, what time would you

19     like?  It looks like I'm not on trial, so any time of the day

20     is fine.

21          MS. GROSSMAN:  I'm sorry, your Honor.  You're going to

22     think I'm crazy.  If we could just keep it back to the 31st.

23     We have a date conflict.  I'm sorry.  We'll keep it back to the

24     31st.

25          THE COURT:  Sure.

CbrWfloC

1              Now, what time would you like to come on Friday, the

2      fourth?

3              MR. CHARNEY:  2:00?

4              THE COURT:  2:30.

5              MR. MOORE:  It could take a while.

6              THE COURT:  That's true.  It could.  It seriously

7      could.  I won't book anything until 4:30.

8              MR. CHARNEY:  So -- I'm sorry.  I'll let you finish

9      typing.  I was going to ask one other scheduling question.

10             THE COURT:  I need to do that.  Have I not set some

11     dates for the preliminary exchange of the witnesses and

12     exhibits?

13             MR. CHARNEY:  You did.

14             THE COURT:  I'm not sure I wrote those down.  What did

15     I say?

16             MR. CHARNEY:  December 19 and 27th.

17             THE COURT:  That's true.  That's what I did say.

18             MR. CHARNEY:  The only outstanding thing is when would

19     you like those premotion conference letters?

20             THE COURT:  That's good.  So the conference is on the

21     fourth and the preliminary exchange ends on the 27th.  Not to

22     quote Ms. Grossman too carefully, you're going to think I'm

23     crazy, but how about December 31, before the party?  Before the

24     party?  5:00?

25             MR. CHARNEY:  Fine with us.

CbrWfloC

```
 1                THE COURT:  December 5.

 2                MR. MOORE:  That's a Monday.  She's going to object to

 3      that.

 4                THE COURT:  I know, but --

 5                MS. GROSSMAN:  I mean, that's what we were hoping to

 6      avoid.  There are a lot of holidays at that time.

 7                THE COURT:  I know.  But he's right.  I have to have

 8      the letters to read them.  You might as well get them out of

 9      the way before you go to the first party.  When else are you

10      going to do it?

11                MS. GROSSMAN:  It's not the parties.  I don't plan on

12      going to the parties.

13                THE COURT:  Oh.

14                MS. GROSSMAN:  Family.

15                THE COURT:  Okay.  Have a happy one anyway, but the

16      point is we have to do it sometime after the preliminary

17      exchange.

18                MS. GROSSMAN:  Maybe we can push up the preliminary

19      exchange a few days.

20                THE COURT:  And have the letter due on the 28th, to

21      avoid the weekend before New Year's?  The problem is you have

22      Christmas, the 24th, 25th, and 26th, all three days.

23                MS. GROSSMAN:  That's why I just thought that we could

24      actually get this letter out.

25                THE COURT:  I understand.
```

CbrWfloC

1          MS. GROSSMAN:  The ship has sailed.

2          THE COURT:  The problem is that the 24th, 25th, and

3     26ths are considered by most people to all be the holiday.  So

4     I don't know how to push up the city's submission unless the

5     plaintiffs can --

6          Are the plaintiffs not already well along on their

7     preliminary witness and exhibit lists?  If you could do that

8     more like the tenth of December --

9          MR. CHARNEY:  How about the 14th?

10         THE COURT:  You think you could do it by the 14th?

11         MR. CHARNEY:  Yes.

12         THE COURT:  That might be good because the city could

13    respond by the 21st, exactly, and have the letter in by the

14    28th, both sides, so that nobody's working over the New Year's

15    weekend, except me.  But that's fine.

16         MS. GROSSMAN:  I'm sorry.  Can you go over the dates

17    again?

18         THE COURT:  The 14th for the plaintiffs to submit what

19    I will call preliminary, it can be amended, but as much as you

20    can do, preliminary witness list and exhibit list, the response

21    from the city the 21st, and the letters by the 28th, the

22    premotion letters, which describe the anticipated motions in

23    limine, in ten double-spaced pages.

24         MS. GROSSMAN:  Oh, we have ten pages?

25         THE COURT:  Double spaced.  Each side has a total of

CbrWfloC

1    ten.

2              MS. GROSSMAN:  And just pretty much a general --

3              THE COURT:  Would you like to see the ones in the

4    other case that were helpful to me on securities law?

5              MS. GROSSMAN:  Yes.

6              THE COURT:  It's securities law.  You'll be bored to

7    tears, but you'll get an idea of why I found them helpful.

8              MS. GROSSMAN:  Where would we find them?

9              THE COURT:  I'll have to find them.  They're not

10   docketed.

11             MS. GROSSMAN:  Okay, your Honor.

12             THE COURT:  I better write down those new dates, 14th,

13   21st, 28th.

14             While we're on the schedule -- we have a schedule for

15   making the motions in limine -- the question is when the joint

16   pretrial order should come in, which really is the final,

17   drop-dead moment for listing witnesses or exhibits, and,

18   according to the federal rules, if it's not there, then there

19   could be preclusion.  There has to come a time when it's fixed.

20   The federal rules anticipate 30 days before trial, and trial is

21   March 18.  I could say the final joint pretrial order should be

22   February 18, subject to, there is one subject to, subject to

23   final rulings on the motions in limine because that could

24   affect, that might amend, that might cause it to be amended.

25   But let's say February 18 the joint pretrial order is due with

CbrWfloC

1    the briefs and everything else, subject to any amendment

2    necessitated by my rulings on the motions in limine.

3            MS. GROSSMAN:  I think that's a holiday.  Can we do

4    the 19th?

5            THE COURT:  Sure.

6            MS. GROSSMAN:  Or we can do the 15th.

7            THE COURT:  That's fine.

8            MR. MOORE:  It's Martin Luther King.

9            THE COURT:  No.  It's President's Day.  That was

10   January, Mr. Moore.

11           Anyway, the 19th.  In fact, I think it was going to be

12   the inauguration, or something.  It's all very complicated.  I

13   was reading about it in the paper, the King day and

14   inauguration all came together because one of them fell on a

15   Sunday, or something.  Whatever.  But I did read it in the

16   newspaper.

17           February 19.  That's fine.

18           MS. GROSSMAN:  When are the plaintiffs supposed to

19   give us their proposed joint pretrial order and lists that we

20   then respond to?

21           THE COURT:  I think you could work that out like

22   everybody else does.

23           MR. CHARNEY:  We'll work it out.

24           MS. GROSSMAN:  Right.  Okay.

25           THE COURT:  In advance of the date that the joint

CbrWfloC

```
 1   submission is due, obviously.

 2              MS. GROSSMAN:  But the plaintiffs are going to give it

 3   to us first?

 4              THE COURT:  Yes, of course.

 5              MS. GROSSMAN:  Then it's staggered.

 6              THE COURT:  Standard scheduling order in every other

 7   case always says the plaintiffs first.

 8              Are we ready for your issue, Mr. Charney?

 9              MR. CHARNEY:  Yes.  I guess it actually was the city's

10   issue, but you wanted us to address it because you had raised

11   concerns.

12              THE COURT:  What was that?

13              MR. CHARNEY:  On the list of additional class

14   member --

15              THE COURT:  The housing authority people.

16              MR. CHARNEY:  Yes.

17              So there was one witness who had two stops that were

18   coming in or out of the housing building.  Then there's another

19   witness who has many stops, one of which occurred coming out of

20   the housing building.  He also has many stops that did not

21   occur in housing.  And the city had, I guess, suggested that

22   those witnesses would not be proper in this case.

23              THE COURT:  Right.

24              MR. CHARNEY:  And I guess part of what I'm confused

25   about is we brought this case to challenge a citywide policy
```

CbrWfloC

1    and practice.

2              THE COURT:  Sure.

3              MR. CHARNEY:  We've presented evidence that we believe

4    shows it's a citywide practice.  Your Honor found in the class

5    cert. decision that whether or not the policy is legal, on the

6    question of whether it's centralized and uniform, you ruled

7    that it was.  So it's our position that regardless of where in

8    the city somebody was stopped, they're a member of our class.

9              Our class definition, which is laid out very

10   specifically in your order, doesn't make any reference to

11   housing or not housing or the street or walking into a

12   building.  So the first thing is we believe they're clearly

13   class members.  We believe that their stops and what happened

14   to them during their stops is directly related to the

15   centralized policy that we are challenging.

16             THE COURT:  Right.  I think Ms. Grossman's point was

17   only that if you read the Davis decision, there were issues

18   raised about signage.

19             MR. CHARNEY:  Yes.

20             THE COURT:  In the housing authority buildings.

21             MR. CHARNEY:  Absolutely.

22             THE COURT:  Or housing authority regulations and

23   whether the regulations were clear.  That's what she doesn't

24   want to litigate here.  That's the Davis case.

25             MR. CHARNEY:  We completely understand.

CbrWfloC

1          THE COURT:  One fellow you described has multiple

2    stops where only one is in the housing authority area.

3          MR. CHARNEY:  Yes.

4          THE COURT:  Obviously, if he is or she is a witness

5    anyway -- it's a he?

6          MR. CHARNEY:  It's a he.

7          THE COURT:  All the times he's been stopped to show

8    how often this happens to him, he doesn't have to leave out the

9    housing authority issue.

10         MR. CHARNEY:  Okay.

11         THE COURT:  The other one I don't know whether it's

12   going to get into the issues of inside and stairwells and

13   signage and regulations.  That's what I don't want to try.

14         MR. CHARNEY:  We completely understand that, and I

15   agree with your Honor.  And I know the Davis case specifically

16   addresses those.

17         We don't believe that these two stops implicate those

18   two issues like vertical patrol.  We don't believe they

19   implicate the NYCHA house rules, the checkpoints.

20         THE COURT:  Congregating in the stairwell.

21         MR. CHARNEY:  Yes.

22         These are stops, simply.  In one case he's walking out

23   of the building; in the other case he's walking in.  He's

24   stopped.  We believe it was without reasonable suspicion.

25   There are some CCRB records that we will produce by the end of

CbrWfloC

1   the week which we believe support our position, so we're not

2   going to be pursuing those issues around the signage or NYCHA

3   relationships with the NYPD or the vertical patrol policy.

4           THE COURT:  The NYCHA regulations about congregating.

5           MR. CHARNEY:  Yes.  Yes.

6           THE COURT:  Let's hear again from Ms. Grossman.

7           Obviously these people are class members here.  I

8   realize the classes overlap because Floyd is a broad case of

9   street stops and those stops could occur on the street that

10  borders a housing authority building, obviously.  The streets

11  are the streets of the City of New York.

12          MS. GROSSMAN:  First of all, we're at a disadvantage

13  because we don't know all the details the plaintiffs know.

14          THE COURT:  Right.  For sure.  But I don't think he

15  said these are in-the-building stops.

16          Right?

17          MS. GROSSMAN:  No.  Some of them were.

18          THE COURT:  Let's find out.

19          MR. CHARNEY:  They're coming in and coming out of.  It

20  wasn't where he was congregating, where you're standing out in

21  a hallway where you shouldn't be.

22          THE COURT:  But the one that's coming out, the stop is

23  outside the building?

24          MR. CHARNEY:  I don't know if he's technically in the

25  doorway versus in the courtyard versus heading towards the

CbrWfloC

1   doorway.  But the point is that these stops don't implicate

2   those very NYCHA-specific policies that I know are very much

3   front and center in Davis.

4           THE COURT:  Isn't your case a street-stop case?

5           MR. CHARNEY:  Our case is illegal stop, pedestrian

6   stop, and frisk case.

7           THE COURT:  All right.  Pedestrian.  What does

8   pedestrian mean?

9           MR. CHARNEY:  Pedestrian, in our view, is somebody who

10  is not driving a car.

11          THE COURT:  Yes, but pedestrian usually means feet.

12  It comes from the word foot.

13          MR. CHARNEY:  This person is walking, traveling by

14  foot.

15          THE COURT:  Yes.

16          MR. CHARNEY:  And they're being stopped on their way

17  traveling to somewhere, whether it's coming home from

18  something, going out.  In one case, it was going out to the

19  store.  In another case, it was going home after visiting his

20  mother.

21          THE COURT:  Right.

22          MR. CHARNEY:  They're going somewhere.  They're not

23  hanging out.

24          THE COURT:  That's right.  Correct.  That's what

25  Ms. Grossman is saying.  She doesn't know the details of each

CbrWfloC

1  of these stops, but if they are what you described just now, it

2  should be fine.  But I don't want to repeat the Davis case, and

3  neither does Mr. Charney.

4           MS. GROSSMAN:  I don't either.

5           THE COURT:  Yes, of course.

6           MS. GROSSMAN:  And the problem is that we may have to

7  offer evidence that gives context to why the officers were

8  there, and that gets us into the house rules.  I mean, one of

9  these stops, I understand there was someone on, maybe someone

10  was stopped because the dog was off a leash or issued a

11  summons.

12           THE COURT:  They're all saying no.  They're shaking

13  their heads, which wouldn't show on the record.

14           MS. GROSSMAN:  Someone's stop.  That was what, I

15  think, we received from the plaintiffs.

16           But in any event, the context of these stops may

17  require us to put in evidence that brings us back to Davis-type

18  issues.  The plaintiffs put out thousands of mailings.  They

19  have class representatives who are here for the purpose of a

20  class representatives to represent the interests of the class.

21  To now go into a NYCHA-type stop --

22           THE COURT:  It's not a NYCHA-type stop.  That's an

23  unfair characterization.  It doesn't involve vertical patrols.

24           MS. GROSSMAN:  How do they know?  How do they know

25  that the officer wasn't doing a vertical and came upon -- I

CbrWfloC

```
 1    don't know enough, and I'm at a disadvantage.
 2              THE COURT:  I know you are.  When you learn more, you
 3    can come back.  But he's representing now that it will not
 4    implicate the house rules, the vertical patrols, the
 5    regulations, all the things that are peculiar to the Davis
 6    case.
 7              MS. GROSSMAN:  And I do, your Honor.
 8              THE COURT:  Right.  And come back.
 9              MR. CHARNEY:  Make a motion in limine.
10              MS. GROSSMAN:  Maybe the plaintiffs can give us a very
11    short, one-page letter that gives a very basic description of
12    the circumstances.
13              THE COURT:  I think that would be wise.
14              How many are there that involve NYCHA stops?  How many
15    are there?  Three?  Four?  How many are there, Mr. Charney?
16              MR. CHARNEY:  Three stops.
17              THE COURT:  Could you write a one-page description for
18    each?
19              MR. CHARNEY:  We can do that.  What we can also
20    provide, and the defendants already have one of them, there are
21    CCRB complaints for all three of these stops with very lengthy
22    summaries of the plaintiffs' versions of what happened.  It
23    also lists who all the officers are.
24              THE COURT:  Okay.
25              MR. CHARNEY:  We could write them a letter and take
```

CbrWfloC

```
 1    our word for it, or they could, on their own, I think, very
 2    easily get the details.
 3             THE COURT:  It sounds like a one-page letter, not a
 4    three page letter, which just says the plaintiffs are Jones,
 5    Smith, and Brown.  Each one has a CCRB complaint.  If you don't
 6    have copies, here they are.
 7             MS. GROSSMAN:  To the extent we don't have that, just
 8    say the plaintiff claims that they were outside.
 9             THE COURT:  Oh, if that's not in the CCRB summary?
10             MS. GROSSMAN:  Right, whatever we might not have a
11    CCRB file or case on.
12             THE COURT:  No.  He said you do.  He's going to send
13    it to you, in case you can't find it.  He's going to say,
14    Here's the CCRB summary of all three attached to my one-page
15    letter, which does nothing but refer you to the CCRB.  And if
16    the CCRB summary doesn't state where they were stopped --
17             MS. GROSSMAN:  I understand.  First of all, I think we
18    only have the one, but not four.
19             MR. CHARNEY:  We will give you the other two by
20    Friday.
21             THE COURT:  There you go.  He's going to give you the
22    other two by Friday.  To the extent that the summary doesn't
23    say where the stop occurred, if you know that from interviewing
24    the client, put it in your one-page letter.
25             MS. GROSSMAN:  Okay.  Then, your Honor, we can revisit
```

CbrWfloC

1     this if it becomes an issue?

2              THE COURT:  If it becomes an issue.  Right.

3              All right.  That takes care of the NYCHA problem.  Is

4     there anything else?

5              MR. CHARNEY:  Not from us, your Honor.

6              THE COURT:  All right.  So I'm seeing you next January

7     4?  We don't have a meeting before then?  Are you the folks

8     who --

9              Yes, Ms. Grossman?

10             MS. GROSSMAN:  Yes.  Back on the scheduling.

11             I just want to make sure that what you want is a joint

12    pretrial order, we understand, proposed findings of fact and

13    conclusions of law and a trial memo of law?

14             THE COURT:  Yes.

15             MS. GROSSMAN:  I just wanted to confirm that.

16             THE COURT:  That's fine.  If you need more time on the

17    memorandum of law, take it because I'm not going to do anything

18    with it just then.  If I don't get that by February 19, that's

19    the one I would prefer to slip more than the others.

20             MS. GROSSMAN:  Okay.

21             THE COURT:  The brief.

22             MS. GROSSMAN:  The trial memo of law?

23             THE COURT:  Correct.

24             MS. GROSSMAN:  We have more flexibility?

25             THE COURT:  If you're having trouble getting it all

CbrWfloC

1    done on time and you want an extra week on that, just say so.

2              MS. GROSSMAN:  Okay.  But the proposed findings of

3    fact and conclusions of law, it's critical that you have that

4    before the trial starts.

5              THE COURT:  Yes, but it's not critical I have it by

6    February 19.  The most critical for that date is witnesses and

7    exhibits and objections to those exhibits.  All that stuff is

8    important.  If the other stuff slips a bit, that doesn't matter

9    much.

10             MS. GROSSMAN:  Okay.

11             THE COURT:  Are you folks at the front table the four

12   I would expect to see at trial?  Are there others?

13             MR. CHARNEY:  Probably one other lawyer from

14   Covington, Gretchen Hoff Varner, who I know has appeared here.

15             THE COURT:  Yes.

16             MR. CHARNEY:  And Eric Hellerman, both of whom have

17   appeared before you on previous conferences in the case.

18   They're both in the very lengthy docket.

19             THE COURT:  They're both at your firm?

20             MS. MARTINI:  At Covington & Burling, yes.

21             THE COURT:  What are the names again?

22             MS. MARTINI:  Eric Hellerman and Gretchen Hoff Varner.

23             THE COURT:  That's fine.  You're not committed anyway.

24   I just wanted to get an idea.

25             For your office, Mr. Charney, you're by yourself?

CbrWfloC

1          MR. CHARNEY:  Perhaps Ms. Sunita Patel.

2          THE COURT:  Perhaps.

3          Mr. Moore, you and Ms. Borchetta?

4          MR. MOORE:  Correct, Judge.

5          THE COURT:  And for the city, it's the folks I see

6     here today pretty much?

7          MS. GROSSMAN:  Pretty much, and Brenda Cooke will also

8     be at trial.

9          THE COURT:  I'm sure she wouldn't miss the chance to

10    cross-examine Dr. Fagan.

11         MS. GROSSMAN:  Oh, we have one other attorney.  Morgan

12    Kunz may be part of it as well.

13         THE COURT:  It wasn't critical.  I just wanted to get

14    an idea.  All right.  My last question is, to make a full

15    circle of the conference today, is there any possibility the

16    plaintiffs are going to reconsider this jury/nonjury issue, or

17    are you pretty well finalized?

18         MR. CHARNEY:  Your Honor, I think the answer is

19    probably no, and I wanted to put this on the record because I

20    think it's very important that you understand our position

21    here.

22         THE COURT:  Sure.

23         MR. CHARNEY:  Your Honor did mention it was a tactical

24    decision, which I think is true.  However, I think we take

25    exception a little bit with the characterization that the

CbrWfloC

1   public interest or the public is not going to have the

2   opportunity to weigh in on this issue.

3        I think what's been going on in the city over the past

4   several years and has really, I think, reached a critical point

5   now is that there has been a lot of public debate about the

6   wisdom of stop and frisk, whether it's a good crime-fighting

7   strategy and how it impacts communities.  And the political

8   branches of the city government have taken that issue on

9   head-on, and there have been a number of city council hearings

10  on this over the past several months, including public hearings

11  in different communities throughout the city, where hundreds,

12  if not thousands, of members of the public have had the

13  opportunity to weigh in on this and will continue to do so.

14  And we, of course, think that's a great thing.

15       But when it comes to the issues in this case, which

16  are squarely whether the policies and practices around stop and

17  frisk are constitutional or not, your Honor has already said, I

18  think, and was absolutely right in your class cert. decision,

19  that when we're talking about Fourth Amendment rights, the

20  vindication, protection of Fourth Amendment rights, it's really

21  the federal judiciary's role to rule on those issues.

22       We completely agree with you, and that's one of the

23  reasons why we think because now we're just talking about

24  injunctive relief and whether or not there have been

25  constitutional violations, why we think it's absolutely

CbrWfloC

1    appropriate for the Court to be the arbiter, the adjudicator,

2    of these issues.  Whether or not stop and frisk is a good

3    policy or an effective policy, absolutely the public has a say

4    in that and should have a say in that.  But that's not what we

5    are litigating in this case, and your Honor addressed this in

6    the Daubert decision around Professor Smith in August, this

7    question of the relevance of whether or not evidence around

8    whether or not stop and frisk reduces crime is relevant to the

9    issues here.  So I just wanted to put that on the record.

10           The other thing I will say is this is going to be a

11   very public trial.  We hope that the public comes and observes

12   this and takes in everything.

13           The last thing I'll say is that one of the advantages

14   of the Court being the fact finder is you're actually going to

15   issue findings of fact and conclusions of law which explain the

16   reason for your decision whereas a jury verdict doesn't do that

17   so in some ways it's actually more transparent for the public

18   to have a bench trial on these issues.

19           I just wanted to put that on the record, your Honor.

20           THE COURT:  Thank you, Mr. Charney.

21           Is there anything further today?

22           Okay.  Then have a good bunch of holidays.

23           MR. CHARNEY:  Thank you, your Honor.

24           (Proceedings adjourned)

25