```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DAVID FLOYD, ET AL.,

 4                Plaintiffs,

 5         v.                              08 CV 1034 (SAS)

 6   CITY OF NEW YORK, et al.,

 7                Defendants.

 8   ------------------------------x
                                           New York, N.Y.
 9                                         December 11, 2012
                                           4:30 p.m.
10
     Before:
11
                    HON. SHIRA A. SCHEINDLIN,
12
                                           District Judge
13
                           APPEARANCES
14
     BELDOCK LEVINE & HOFFMAN LLP
15        Attorneys for Plaintiffs
     JENN ROLNICK BORCHETTA
16   GRETCHEN ANN HOFF-VARNER

17   MICHAEL A. CARDOZO, Corporation Counsel
     for the City of New York
18        Attorneys for Defendants
     HEIDI GROSSMAN
19   SUZANNA PUBLICKER
     JOE MARUTOLLO
20   BRENDA COOKE
     CECILIA SILVER
21   MORGAN KUNZ

22

23

24

25
```

1            (In chambers)
2            THE COURT:  Good afternoon.
3            COUNSEL:  Good afternoon, your Honor.
4            THE COURT:  Let me just make sure one by one:  Do we
5   have -- is it Ms. Borchetta?
6            MS. BORCHETTA:  Yes.  Good afternoon, your Honor.
7            THE COURT:  Good afternoon.  Ms. Hoff-Varner?
8            MS. HOFF-VARNER:  Yes, your Honor.
9            THE COURT:  That's it for the plaintiffs, right, two
10  lawyers on this call?
11           COUNSEL:  Yes, your Honor.
12           THE COURT:  And for the defense, I heard Ms. Grossman.
13           MS. GROSSMAN:  Yes, your Honor.
14           THE COURT:  Ms. Cooke?
15           MS. COOKE:  Yes, your Honor.
16           THE COURT:  Ms. Publicker?
17           MS. PUBLICKER:  Yes, your Honor.
18           THE COURT:  Mr. Marutollo?
19           MR. MARUTOLLO:  Yes, your Honor.
20           THE COURT:  Ms. Silver?
21           MS. SILVER:  Good afternoon, your Honor.
22           THE COURT:  And Mr. Kunz?
23           MR. KUNZ:  Hi, good afternoon, your Honor.
24           THE COURT:  So I have six Assistant Corporation
25  Counsels on this call?  Six, OK, well, that's a lot.

1          I do have a reporter here, so it's on the record.

2          I have two letters in front of me, I have a December 7th letter from Ms. Publicker asking that I limit the questioning of the officers, Dennis and Korabel, that their depositions be limited to the facts surrounding the stop-and-frisk of a Mr. Devon Almonor, but that the plaintiff's lawyer is not being permitted to -- who joined the call?

8          COUNSEL:  Nobody.  I'm sorry, we're in my office and my Blackberry -- my email just indicated I received a message.

10         THE COURT:  Oh, OK.  Now I probably lost my train of thought, but I think it was that the deposition be limited to the facts of the stop-and-frisk of Mr. Devon Almonor but not be permitted to cover what happened once he was brought into the station house and his parents turned up and there was more to the story of the interaction with the police and the parents at the station house.

17         The argument in favor of limiting the deposition is made in the city's letter of December 7th, which says this is a stop-and-frisk case and while Mr. Almonor and his family might have a 1983 case -- and in fact it seemed from the plaintiff's letters that they do, 11 CV 4121, they have their own case, but the city's point is that in this case this is stop-and-frisk case challenging the police practice of stop-and-frisk, so what happened later in the station house, it just goes beyond stop and frisk.

1            Then I have a response letter dated December 10th from
2   Mr. Borchetta.  And it essentially argues it's all one story
3   and this is what happens to a family, this is the result of a
4   stop-and-frisk, that after a person is stopped, and if they're
5   arrested and if they're taken to a station house, lots more can
6   go on, and it certainly did here.  The parents ended up I guess
7   prosecuted and there was a whole to-do.
8            The plaintiffs say in their letter, this isn't the
9   time for resolving this, this should be done as a motion in
10  limine to preclude the testimony if it's offered, but we should
11  be allowed to have discovery of it.
12           I'm very sympathetic to the Almonors' stories and
13  their problems, but I don't think it's part of this particular
14  case because this is not a case for damages, this is now an
15  injunctive relief case.  If it was a damages case, obviously
16  what happened to this kid and what happened to his parents
17  would be part of assessing whether they're entitled to damages,
18  but it's not a case for damage award any longer, not to mention
19  that they seem to have their own case.  I mentioned that
20  earlier.
21           MS. GROSSMAN:  Your Honor, this is Heidi Grossman.
22  This case has settled, so it's over and has been settled
23  already.
24           THE COURT:  Right, I guess maybe I knew that.  Yes,
25  it's in the footnote of your letter, it's in your first letter.

1    In the footnote it says, "Has since settled."  So I knew that.

2           But, Ms. Borchetta, you did write the responding

3    letter.  It's hard for me to understand your points about the

4    impact on the family and the terrible consequences of

5    stop-and-frisk.  I really don't understand what that has to do

6    with injunctive relief in a bench trial.  I don't need to be

7    told that if stops are inappropriate people will suffer.  That

8    sort of is like bread goes about butter or horses goes with

9    carriages or something; if it's wrongful, people are going to

10   suffer, I understand that.  But that isn't the point.  The real

11   challenge here is, is it wrongful?

12          So the facts of the stop are relevant and there's

13   going to be this plaintiff and other plaintiffs talking about

14   the stop, but all these sad poststop consequences I don't think

15   are my case.  And I think therefore it's not a good use of

16   time.

17          Yes, Ms. Borchetta?

18          MS. BORCHETTA:  If I may respond to that:  First of

19   all, we indicated in our letter, we anticipate -- we agreed to

20   schedule the depositions each for four hours.

21          THE COURT:  Yes, I know.

22          MS. BORCHETTA:  So they will already be limited.

23          THE COURT:  But why should -- hold on, hold on.  Why

24   should you be allowed to go into material that's not relevant

25   to this case?  I understand four hours or two hours or three

1   hours, but that doesn't give you license to ask the people
2   about their high school records.  Just because you have the cop
3   for three hours doesn't mean you can ask him anything.  What is
4   he eating for Christmas dinner wouldn't be relevant.
5            MS. BORCHETTA:  Your Honor, I appreciate that, but I
6   think that it is relevant to the stop-and-frisk in a few ways.
7            THE COURT:  Why is it relevant to the stop-and-frisk
8   that happened on the street?
9            MS. BORCHETTA:  Because, as I indicated in the letter,
10  your Honor, we understand that Sergeant -- or actually
11  Lieutenant Korabel and Officer Dennis in part say that they
12  took Mr. Almonor to the station in order to release him to his
13  parents.  And in order to impeach that, we should be able to
14  ask them about their actions at the precinct because their
15  actions at the precinct indicate that was not in fact the
16  reason for the stop.  And practically --
17           THE COURT:  No, wait, wait, I don't understand.
18  You're saying that their defense is that the reason for the
19  stop was to hold him safely until his parents could pick him
20  up?  That's their given reason for the stop?
21           MS. BORCHETTA:  They testified in the criminal trial
22  against the Almonor parents.  And in that testimony there was
23  some conflicting reasoning for the stops, but they in part
24  said, yes, that they had brought him -- one excuse that they
25  used was that they were bringing him in order to -- bringing

1     him to the station so his parents could pick him up there.

2             THE COURT:  Right.  I think you're confusing the stop
3     and the reason for going to the station house.  I doubt that
4     that was their reason for the stop.  The reason they proceeded
5     to take him to the station house, apparently, was for
6     safekeeping until the parents could pick him up, or at least
7     that's one of the reasons they gave.  But for the stop, they
8     said, we stopped this young man because we wanted to -- his
9     parents to pick him up at a station house?  That doesn't make
10    any sense.

11            MS. BORCHETTA:  Well, that's exactly why we should be
12    at least permitted to ask about that.

13            THE COURT:  But you have to have a basis.  I doubt
14    that you have that statement that you think you have.  That may
15    be the reason that they took him from the street to the station
16    house but not their alleged reason for the stop.

17            Does anybody have any evidence that they ever gave
18    that reason for the stop, oh, we stopped this young man so we
19    could take him to a station house?

20            MS. COOKE:  Your Honor, this is Brenda Cooke from the
21    city.  I was counsel on the Almonor case which was before you,
22    and I can speak to that with respect to the officers' bases for
23    the stop.  It was absolutely not anything to do with the fact
24    that he was a juvenile, he was returned to the precinct so his
25    parents could retrieve him.  In fact, the bases for the stop

1  were that there were complaints, numerous complaints, 911 calls
2  in and around the area, of disorderly conduct and fighting and
3  people with weapons of some kind, sticks and other things,
4  overturned trashcans, car alarms going off, and these officers
5  responded to the area and stopped Devon Almonor on the basis of
6  thinking that he was one of the people that was of the 911 --
7           MS. BORCHETTA:  Your Honor, if I may, because there
8  are other reasons that we believe this is a relevant area of
9  inquiry, and while we are going to focus in our inquiry on the
10 circumstances that Ms. Cooke has just gone at length into, it
11 is also relevant how people experience these stop-and-frisks,
12 and it is relevant, the damage to people.
13          THE COURT:  No, I'm sorry, wait, wait, excuse me.  It
14 is not.  This is not a damages case.  The plaintiffs chose to
15 forego requests for damages in Floyd.  It's solely injunctive
16 relief.
17          MS. BORCHETTA:  Your Honor, I appreciate that.
18          THE COURT:  Well, good.  Then I'm not taking any
19 damages evidence as to any plaintiffs in this case.
20          MS. BORCHETTA:  Your Honor, but that neuters in part
21 why this policy has an impact on the public, which we --
22          THE COURT:  That was your choice.  The plaintiffs
23 chose to dismiss their damages claims.  The plaintiffs chose to
24 move --
25          MS. BORCHETTA:  But, your Honor --

1            THE COURT:  We can't both talk at once.  The
2   plaintiffs chose to move solely for injunctive relief and
3   dismiss their damages claims.  So I can't allow damages proof.
4            MS. BORCHETTA:  But, your Honor, then our class member
5   witness is not going to be permitted to testify how they felt
6   when they were stopped?  I mean that's something that I believe
7   that these people should be permitted to testify about, how
8   they experienced the stop.
9            THE COURT:  Yes, I think that's right, but not the
10  consequences.  They can't then say, "And I had nightmares for
11  the next six months."  That's not how they experienced the
12  stop; that's the consequence of the stop, that's the way they
13  were damaged.  So there's a difference.  How they felt at the
14  time of stop, yes, "I was scared," you know, "I was humiliated,
15  I felt demeaned and insulted," I've heard that testimony
16  before, and I would allow it.  But "I couldn't sleep for the
17  next six months" or "I started getting headaches on a regular
18  basis," no, that's damages proof.
19           MS. BORCHETTA:  Well, your Honor, this to me seems
20  like a broader limitation than just on the Almonor stop.  And
21  it raises questions of, for example, if the city -- we haven't
22  gotten here yet because we haven't had the motions in limine,
23  but to the extent the city is putting forward evidence of the
24  effectiveness of the program and considerations of the impact
25  on the community, for example, we should be permitted to

1    counter that in that way.  And the evidence to counter that
2    policy would be evidence of how people are experiencing it.
3             So it seems to me that's a broader limitation --
4             THE COURT:  But I thought I've already written on this
5    and said -- and it's been quoted -- that I'm not here to try
6    the effectiveness of the policy, I'm here to try the
7    constitutionality of the policy.  So I'm not a policymaker, and
8    I'm not saying whether it's effective in reducing crime or
9    effective in getting guns off the street or ineffective in
10   getting guns off the street and there's a very low rate of
11   seizure and this and that.  I thought I wasn't going into
12   policy.  I thought I was doing the judicial side of this case,
13   which is constitutionality.
14            MS. BORCHETTA:  Your Honor, then I would only say
15   that, again, concerning going into the questioning and having
16   this limit, that there could be something relevant.  For
17   example, what if Officer Dennis does say he stopped him in
18   order to bring him to the --
19            THE COURT:  OK, that's different.
20            MS. BORCHETTA:  I know it sounds ridiculous --
21            THE COURT:  No, it doesn't.
22            MS. BORCHETTA:  -- but we don't know what he's going
23   to say.  If he says --
24            THE COURT:  You're right, you're right.  I can't rule
25   on every strange possibility.  If he said, "The reason I

1  scooped up this 13-year-old is so I could safely bring him to a
2  precinct so his parents could get there," that changes
3  everything, because then when the parents got there, according
4  to the letters, the cops were insulting and wouldn't let them
5  deal with the kid and all the rest of it, so that would impeach
6  that reason, but let's cross that bridge if you get there.  I
7  don't think that's what the police are going to testify to.
8  It's probably what Ms. --
9          MS. COOKE:  That's correct, your Honor.  This is
10 Ms. Cooke from the city.  And Officer Korabel and the
11 plaintiff -- already in their presence testified to the grand
12 jury with respect to the parents and testified at the parents'
13 criminal trial.  So twice he's on record already under oath,
14 sworn statement, and neither time did he make that statement.
15 Is there a remote possibility that he might make that?  It's a
16 ruling for a later date.
17         MS. BORCHETTA:  But, your Honor, one more point that
18 I'd just like to make on this is that we do believe that the
19 consequences, not in the damages sense but in the practice
20 sense of a stop-and-frisk resulting in the numbers of arrests
21 or the numbers of bringing people into the station, we do
22 believe that that has a bearing on the pattern and practice.
23         THE COURT:  I agree, I agree.  It's certainly fair
24 grounds here to say to the officer, "And after you stopped him,
25 what did you do with him?"  "We took him to the station house."

1    Good.  You've got the evidence that he was taken in.

2            You can also do that statistically:  Of the half
3    million stops, X number are arrests, X numbers involved station
4    house, X number involved desk appearance tickets, X number were
5    let go on the street.  That's all right.  That's the immediate
6    consequence of the stop.  Did it result in an arrest, did it
7    result in a frisk, did it result in being taken to the station
8    house?  I have no problem with that.  But to get into the how
9    the parents were treated at the precinct is just far afield.

10           If it's true, it was not a nice thing.  That's not my
11   point today.  I'm not judging whether it was nice or not nice;
12   it's whether it relates to the Floyd case.  And I ask you to
13   keep perspective on that.  You don't have a jury -- you're not
14   trying to get sympathy here -- it's me.  I think I understand
15   what I'm trying.

16           MS. BORCHETTA:  And, your Honor, we did not intend to
17   go into the peripheral of the parents; we intended to keep it
18   limited.  And I think --

19           THE COURT:  Limited to what?

20           MS. BORCHETTA:  -- what your Honor is saying is in
21   line what we intended to do at first.  In other words, for
22   impeachment purposes, if they open a door, that means that we
23   need to ask them about what happened at the precinct.  Then
24   we're permitted to ask them at the precinct.  That's all that
25   we want.

1          THE COURT:  If they open that door.  I can see I'm

2    going to get a call from this deposition, but you've heard what

3    I have had to say on this record, and it's here, the record, so

4    you know what I think.  To the extent it relates to the stop

5    and the immediate consequence of the stop, how the kid felt,

6    fine, but I'm not getting into what happened to the parents.

7    Their arrest or their handcuffs or all of rest of it is not a

8    street stop.

9          OK?  Do we have any more questions on these upcoming

10   depositions?

11         There's a lot of silence, so I guess --

12         MS. BORCHETTA:  Well, I'm sorry, your Honor -- no, go

13   ahead, Heidi.

14         MS. GROSSMAN:  Well, we wanted to make sure it's a

15   four-hour deposition.

16         THE COURT:  I think they agreed to that, I think

17   plaintiffs have agreed to that.

18         MS. GROSSMAN:  OK, as long as we all agree that these

19   depositions will be four hours, we're fine.

20         MS. BORCHETTA:  And that includes the class member

21   witnesses?

22         MS. GROSSMAN:  No, it doesn't, because the class

23   member witnesses have numerous stops to talk about and the

24   officer depositions have one stop, and so there really is no

25   reason why an officer, who's involved in one stop that might

1   last a few minutes, should be deposed for four hours where a
2   plaintiff, who is asserting that there are numerous stops that
3   they were subjected to could -- the depositions could go
4   longer.
5           But that being said, your Honor, we have taken some
6   depositions, and we have been very respectful of the time and
7   we hadn't used the full seven hours.  So it's just that we have
8   about 21 defendant officers that we have to produce and the
9   Court's been very generous about giving us time in January, but
10  with every day spent, it's impossible to -- we need to put
11  aside the four hours so that we can double up and accomplish
12  these --
13          THE COURT:  Well, you have six lawyers on this phone
14  call, so you have an awful lot of lawyers on the case, but in
15  any event, if all six of them would be at deposition defenses,
16  that would be good.
17          So, it seems to me that Ms. Grossman is right again,
18  that officers who are involved in a single stop, surely you can
19  get the facts out about a single stop in four hours but a
20  plaintiff who says he's been stopped ten times, it takes time
21  to get through ten incidents.  So I can't rule in the abstract.
22  If somebody has been stopped three times, it's three; somebody
23  stopped ten times, it's going to be ten.  It's going to take
24  longer to question about ten than three.
25          MS. BORCHETTA:  Your Honor, I'll represent some

1   witnesses have only been stopped once.
2              THE COURT:  That's fine.  That's my point.  Common
3   sense prevails.  I have experienced and reputable Assistant
4   Corporation Counsel on this call.  Common sense says if it's
5   one stop it's not going to take seven hours.  The whole
6   argument Ms. Grossman just made is, it could take seven hours
7   if there are multiple stops, she has common sense; if it's one
8   stop, it's the same as the cop with the one stop.  So please
9   use your common sense.  One is one, three is three, seven is
10  seven, and ten is ten.  Now, that's been my best ruling of the
11  day.
12             Anything else?
13             No?  Have a good evening.
14             COUNSEL:  No.  Thank you, your Honor.
15                              * * *