UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

JAENEAN LIGON, *et al.*,

                Plaintiffs,

      - against -

CITY OF NEW YORK, *et al.*,

                Defendants.

------------------------------------------------------- X

DAVID FLOYD, *et al.*,

                Plaintiffs,

      - against -

CITY OF NEW YORK, *et al.*,

                Defendants.

------------------------------------------------------- X

**OPINION & ORDER**

**12 Civ. 2274 (SAS)**

**08 Civ. 1034 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

       In a January 14, 2013 letter, defendants request an immediate stay

pending appeal of the Court's January 8, 2013 Opinion and Order ("Opinion") in

*Ligon v. City of New York*.[1]  The Opinion granted the *Ligon* plaintiffs' application for a preliminary injunction, but postponed consideration of the appropriate remedies — with the sole exception of ordering defendants to conform their conduct to the constitutional standards articulated by the Supreme Court of the United States and the United States Court of Appeals for the Second Circuit.[2] Defendants have filed a notice of appeal in *Ligon*.  Defendants also seek a postponement of the *Floyd* trial, currently scheduled to begin in March.[3]

After considering defendants' letters, the January 16, 2013 response letters of plaintiffs in *Ligon* and *Floyd*, and the January 17, 2013 reply letter of defendants, I am granting defendants' request for a stay of the immediate relief ordered in the Opinion.  The stay will take effect immediately, will extend through the consolidated remedies hearing in *Ligon* and *Floyd* ordered in the Opinion,[4] and will end when this Court issues a final decision regarding the appropriate scope of preliminary injunctive relief in *Ligon*.  I am denying defendants' request for a

---

[1]      *See Ligon v. City of New York*, — F. Supp. 2d —, 2013 WL 71800 (S.D.N.Y. Jan. 8, 2013).

[2]      *See id.* at *41–42.

[3]      *See Floyd v. City of New York*, No. 08 Civ. 1034.  *Ligon* was assigned to this Court as related to the earlier filed *Floyd* case.  Both challenge certain stop and frisk practices engaged in by the New York City Police Department.

[4]      *See Ligon*, 2013 WL 71800, at *42.

postponement of the *Floyd* trial.

## II.   DISCUSSION

### A.   Defendants' Request for Stay Pending Appeal

"The four factors to be considered in issuing a stay pending appeal are well known: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"[5] "[T]he degree to which a factor must be present varies with the strength of the other factors, meaning that 'more of one [factor] excuses less of the other.'"[6]

*First*, to the extent that defendants intend to raise on appeal the issues presented in their letters, I am not persuaded that defendants are likely to succeed on the merits of their appeal.  In particular, I find it noteworthy that defendants choose to characterize the holdings of the Opinion not by quoting from the Opinion's holdings, but rather by quoting selectively from a relatively peripheral discussion of an NYPD training manual.  Defendants suggest that this Court

---

[5]      *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987), and citing *Cooper v. Town of E. Hampton*, 83 F.3d 31, 36 (2d Cir. 1996)) (footnote omitted).

[6]      *Id.* (quoting *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006)) (certain quotation marks omitted).

3

"ruled" that "approaching a person, engaging in 'pointed, invasive and accusatory' questioning 'intended to elicit an incriminating response' and 'asking for permission' to search a person constitutes a *Terry* stop of that person."[7]  This Court made no such ruling.  While the paragraph quoted by defendants casts a critical eye on the likely effects of the permissive language in the training manual, the Opinion does not hold that the behaviors described in the training manual would *by definition* constitute a *Terry* stop.  To the contrary, the cited paragraph contains numerous qualifications intended to prevent the very misunderstanding reflected in defendants' January 14 letter.[8]

Similarly, defendants state in their reply letter that "the Court opined that pointed questioning designed to elicit an incriminating response must not take place until *after* an officer has developed reasonable suspicion, because people

---

[7]     1/14/13 Letter from Heidi Grossman *et al.*, Counsel for Defendants, to the Court ("1/14 Grossman Ltr.") at 1.

[8]     For example, the paragraph states that the Fourth Amendment "does *not* proscribe all contact between the police and citizens."  *Ligon*, 2013 WL 71800, at *37 (emphasis added).  The paragraph notes that "it is difficult to imagine *many* circumstances in which a reasonable person *being aggressively interrogated* by the police" would feel free to leave, not that there are *no* circumstances in which a reasonable person *being asked accusatory questions* would feel free to leave.  *Id.* (emphasis added).  The paragraph also notes that it is fanciful to say that a reasonable person would "*as a rule*" feel free to leave in the midst of a field interrogation, not that *no* reasonable person *could* feel free to go.  *Id.* (emphasis added).

4

ordinarily feel obliged to answer such questions."[9]  Such a holding appears

nowhere in the Opinion, and in particular does not appear in the simple summary

of Supreme Court precedent with which the Opinion specifically ordered

defendants to comply.[10]  Rather, the summary states:  "Encounters involving

nothing more than commands or accusatory questioning can and routinely do rise

to the level of *Terry* stops, *provided that the commands and questioning would*

*lead a reasonable person to conclude he was not free to terminate the*

*encounter*."[11]  The latter clause makes clear, along with numerous other statements

in the Opinion,[12] that the Opinion does *not* define a *Terry* stop as any police

encounter involving accusatory questioning.

---

[9]     1/17/13 Letter from Grossman *et al.* to the Court ("1/17 Grossman Ltr.") at 2.

[10]     *See Ligon*, 2013 WL 71800, at *41–42.

[11]     *Id.* at *41 (applying the "terminate the encounter" standard from *Florida v. Bostick*, 501 U.S. 429, 436 (1991)) (emphasis added).  To conclude that a practice can and routinely does rise to the level of a *Terry* stop provided that a specific standard is met, is obviously not the same thing as concluding that the practice by definition "constitutes a *Terry* stop," 1/14 Grossman Ltr. at 1, and thus must always be preceded by reasonable suspicion.

[12]     See especially the introductory summary of Fourth Amendment law at *Ligon*, 2103 WL 71800, at *4–5.  More generally, the Opinion invokes the "terminate the encounter" standard for defining *Terry* stops on more than ten occasions.  By contrast, the Opinion never analyzes whether an encounter rose to the level of a *Terry* stop simply by asking whether the encounter involved accusatory questioning.

In addition, defendants now argue, after the conclusion of the hearing and without citation to any evidence, that some or all of plaintiffs' stops were based on consent, and therefore that this Court has improperly redefined consensual encounters as *Terry* stops.[13]  The parties' post-hearing briefing only raised the issue of consent once — and solely in the context of New York state law[14] — and never argued that *any* of plaintiffs' stops were based on consent.  As a result, I did not address the issue of consent in the Opinion.  Because defendants' letters suggest that they intend to challenge the Opinion based on the notion that

---

[13]      *See* 1/14 Grossman Ltr. at 2.  I note that even when the Supreme Court has found consent for a search, it has held that the "terminate the encounter" standard defines a *Terry* stop.  *See, e.g.*, *United States v. Drayton*, 536 U.S. 194, 200–01 (2002) ("The proper inquiry 'is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" (quoting *Bostick*, 501 U.S. at 436)).  *See also* 4 WAYNE R. LAFAVE, SEARCH & SEIZURE § 9.4(a) (5th ed. 2012) ("[I]t does not appear . . . that the *Mendenhall-Royer* ['free to leave'] test is intended to divide police-citizen encounters into their seizure and nonseizure categories by reliance upon the amorphous concept of consent.").

[14]      *See* Defendants' Proposed Findings of Fact and Conclusions of Law ¶ 42 n.19 ("First, not every police encounter requires reasonable suspicion and may be consensual.  Contrary to plaintiffs' counsel's assertions during closing arguments . . ., New York Law applies.").  This is the only reference to consent in defendants' post-hearing brief.  I also emphasize, as I did in the Opinion, that defendants' argument that "New York Law applies" does not address the United States Supreme Court's clear holding that any question of the reasonableness of a search or seizure must be governed by the Fourth Amendment to the Constitution of the United States.  *See Ligon*, 2013 WL 71800, at *39 & n.430 (citing *Sibron v. State of New York*, 392 U.S. 40 (1968)).

plaintiffs consented to their police encounters, however, I will briefly address this issue now.  With the possible exception of Letitia Ledan's stops — the second of which Ledan initiated by approaching a police officer and asking questions[15] — there was no evidence at the hearing that any of plaintiffs' stops were consensual. Thus, for the same reasons that I found a reasonable person would not have felt free to terminate plaintiffs' encounters with the police, I also find that none of the plaintiffs consented to being stopped — with the possible exception of Ledan.  It is wishful thinking, at best, to suggest that plaintiffs, who were neither asked for consent nor gave it, and who did not feel free to terminate their encounters, willingly consented to the encounters that left them feeling "violated," "disrespected," "angry," and "defenseless."[16]

Defendants also argue that the Opinion misinterprets *Florida v. Bostick*.[17]  It is peculiar to hear defendants defend the NYPD's current practices by suggesting that this Court is ordering a departure from *Bostick*, because the "Immediate Relief" section of the Opinion *quotes* the *Bostick* definition of a *Terry*

---

[15]     *See Ligon*, 2013 WL 71800, at *17, *29 n.345.  Ledan's first stop is discussed below.

[16]     *Id.* at *2.

[17]     *See* 1/14 Grossman Ltr. at 2.

7

stop and orders defendants to comply with it.[18]  Indeed, one of the central, often

repeated principles of the Opinion is that the NYPD must comply with *Bostick*'s

definition of a *Terry* stop, and not only with New York state law.[19]  It is reassuring

that defendants now agree that a police officer must have reasonable suspicion to

initiate any encounter in which a reasonable person would not feel free "to decline

the officers' requests or otherwise terminate the encounter,"[20] as *Bostick* states.[21]  If

defendants endorse these principles, however, it is puzzling that defendants

continue to defend the NYPD's training materials, which make little reference to

the "terminate the encounter" or "free to leave" standards, and instead base the

officers' training almost entirely on the ambiguous, overlapping, and problematic

stop standards contained in *De Bour* and its progeny.  As the Opinion recognizes,

the extent to which *De Bour* conflicts with or complements the Fourth Amendment

---

[18]     "To summarize: as the Fourth Amendment has been interpreted by the
U.S. Supreme Court and the Second Circuit, an encounter between a police officer
and a civilian constitutes a *Terry* stop whenever a reasonable person would not feel
free to '"terminate the encounter."'"  *Ligon*, 2013 WL 71800, at *41 & n.454
(quoting *Drayton*, 536 U.S. at 202 (quoting *Bostick*, 501 U.S. at 436)).

[19]     Again, I note that the Opinion invokes *Bostick*'s "terminate the
encounter" standard on more than ten occasions.

[20]     *Bostick*, 501 U.S. at 436.

[21]     *See* 11/14 Grossman Ltr. at 2 (citing *Bostick*).

8

is unclear.[22]  But it is obviously no defense of practices that violate the Fourth

Amendment to say that they resulted from training based on New York state law,

as defendants continue to argue.[23]

　　　　　To the extent that defendants criticize my *application* of the Fourth

Amendment standards articulated in *Bostick*, I recognize that opinions may differ

regarding when a reasonable person would feel free to terminate an encounter.[24]  I

---

[22]　　*See Ligon*, 2013 WL 71800, at *6, *38 n.422 (discussing *People v. De Bour*, 40 N.Y.2d 210 (1976)).

[23]　　*See, e.g.*, 1/17 Grossman Ltr. at 1 (stating that it would be "an impossible burden" to require the NYPD to conduct training that "contradicts well established, long standing New York State case law as set forth in *People v. De Bour*").  On the primacy of the U.S. Constitution over New York state law, see *Ligon*, 2013 WL 71800, at *1 & nn.3–7 (quoting *Sibron*, 392 U.S. at 61).  If defendants accept that *Bostick*'s view of the Fourth Amendment governs the NYPD, then the NYPD should train its officers in accordance with that standard. The message delivered in training would be simple:  without reasonable suspicion, a police officer may not treat someone in such a way that a reasonable person would not feel free to terminate the encounter.  It is unclear why this lesson, instead of forming the core of NYPD training on the legality of stops, appears to play almost no role.

[24]　　Specifically, defendants question my ruling that the two encounters described by Ledan and the second encounter described by Abdullah Turner were, in fact, *Terry* stops, rather than merely constitutionally permissible "pointed questioning designed to elicit an incriminating response."  1/17 Grossman Ltr. at 2. *See also* 1/14 Grossman Ltr. at 2.
　　　　　Based on my best judgment, as informed by Supreme Court and Second Circuit precedent, I made a good faith effort to determine whether a reasonable person would have felt free to terminate the encounters described by plaintiffs.  *See Ligon*, 2013 WL 71800, at *36 nn.408–09 (citing *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009); *Brown v. City of Oneonta, N.Y.*, 221

find it highly unlikely, however, that defendants could prevail in their attempt to

defend the NYPD's current training regime simply on the basis of marginal

disagreements with my application of the Fourth Amendment's "free to leave"

standard to the specific facts described by one or two plaintiffs. There can be little

doubt that most of the plaintiffs experienced *Terry* stops; and even if there were

such doubt, there can be no doubt that the stops recorded in UF-250 forms were

---

F.3d 329, 340 (2d Cir. 2000)). Defendants are correct that Turner's second stop
was one of the least intrusive described at the hearing. I note, however, that the
officer in Turner's second stop did not simply ask pointed questions designed to
elicit an incriminating response. The officer's patrol car pulled in front of the exit
to the building as Turner was attempting to leave; the officer stopped Turner from
leaving by asking him pointed questions designed to elicit an incriminating
response, asked for Turner's ID and took it, and told Turner and the others that
they could not stand in front of their own building; and the encounter unfolded in
such a way that Turner, whose subjective state is not dispositive but may shed light
on the objective tenor of the encounter, did not feel free to leave. *See id.* at
*13–14, 28. I again conclude that no reasonable person would have felt free to
leave under these circumstances, particularly once the police had possession of the
ID.

       On the other hand, defendants' newly articulated criticisms have
persuaded me that I should have refrained from identifying Ledan's first encounter
as a *Terry* stop. *See id.* at *16. The Opinion never explicitly analyzed Ledan's
first encounter under the *Bostick* test, but in the "deliberate indifference" section, I
wrote: "each of plaintiffs' encounters with the police rose to the level of *Terry*
stops." *Id.* at *28. I now conclude based on Ledan's limited testimony that a
reasonable person would probably have felt free to leave under the circumstances
of her first encounter, especially if the officers treated Ledan politely rather than in
an aggressive, coercive, or threatening manner. *See id.* I also emphasize, as I did
in the Opinion, that further evidentiary development may affect my factual
findings. *See id.* at *44 ("I stress that my conclusions in this Opinion are based on
the limited evidence presented at the preliminary injunction hearing.").

*Terry* stops.[25]  Standing alone, the UF-250 forms indicate that hundreds or even thousands of violations of constitutional rights have occurred outside TAP buildings in the Bronx.  This suit is a putative class action.  Setting aside Ledan's stops and Turner's second stop, there is more than enough proof that a large number of people have been improperly stopped as a result of NYPD practices.  These facts warrant an injunction.

Despite my reservations regarding the likelihood of defendants' success on appeal, however, I recognize that reversal is always a possibility.  The Opinion acknowledges at the outset that many of the questions raised by stop and frisk are not easily answered,[26] and that "it may be difficult to say where, precisely, to draw the line between constitutional and unconstitutional police encounters."[27]

*Second*, defendants argue that they would suffer irreparable injury in the absence of a stay.  Defendants state that "[f]or the NYPD to ensure compliance with the 'Immediate Relief' ordered by the Court . . . at least some form of

---

[25]     Officers are required to fill out a UF-250 ("Stop, Question and Frisk Report Worksheet") after each *Terry* stop, and only then.  *See* Transcript of Preliminary Injunction Hearing ("Tr.") 10/15 at 69:24–70:6 (testimony of plaintiffs' expert witness Dr. Jeffrey Fagan); Tr. 10/23 at 1110:5–8 (testimony of Officer Miguel Santiago); July 2012 Chief of Patrol Field Training Unit Program Guide, Defendants' Exhibit N, at 24.

[26]     *See Ligon*, 2013 WL 71800, at *1.

[27]     *Id.* at *3.

notification to and/or training of thousands of NYPD officers and their supervisors would be necessary."[28]  Plaintiffs question this assertion, arguing that "the NYPD routinely sends out notifications to members of the department instructing them about changes in practice in response to lawsuits."[29]  Plaintiffs provide evidence that the NYPD could use, and has used in similar cases, the "FINEST" messaging system to notify officers and supervisors of court orders.[30]

After review of the parties' letters, I conclude that effective compliance with the immediate remedy ordered in the Opinion will likely require steps beyond the circulation of FINEST messages, and that these steps may impose significant burdens on the NYPD.  It was for this reason that I refrained from ordering the "Proposed Additional Relief" in the Opinion.[31]  I am now persuaded that the immediate relief ordered cannot be effectively implemented without the sorts of significant steps I proposed.

I am also cognizant of the possibility that administrative inefficiencies

---

[28]     1/14 Grossman Ltr. at 2.  *See also* 1/17 Grossman Ltr. at 2–3 (describing the extensive changes to training that would be required to comply with the immediate relief ordered in the Opinion).

[29]     1/16/13 Letter from Christopher Dunn *et al.*, Counsel for Plaintiffs, to the Court ("1/16 Dunn Ltr.") at 2.

[30]     *See* Exs. A, B to 1/16 Dunn Ltr.

[31]     *See Ligon*, 2013 WL 71800, at *41–44.

may result from ordering certain remedies now and potentially ordering different remedies after the completion of the consolidated remedies hearing in *Floyd* and *Ligon*.[32]  Because any unnecessary administrative costs imposed on the NYPD will be in some sense irreversible, the risk of irreparable harm weighs in favor of granting the stay.

       *Third*, with regard to whether issuance of a stay will substantially injure other parties, it is likely that a stay will cause some injury to those who are at risk of being subject to unconstitutional trespass stops outside TAP buildings in the Bronx.  If the stay is granted, a certain number of unconstitutional stops are likely to take place that would not have taken place in the absence of a stay.  I take seriously the cost of these unconstitutional stops, as the Opinion makes clear.[33]

       On the other hand, allowing a longstanding unconstitutional practice to persist for a few months while the parties present arguments regarding the appropriate scope of a remedy is quite distinct from allowing such a practice to persist until the completion of trial.  In the Opinion, I granted a preliminary injunction in part based on the risk that a final resolution of plaintiffs' case might lie years in the future, as the protracted course of the *Floyd* litigation has

---

[32]    *See id.*

[33]    *See id.* at *39–40 (balance of equities analysis).

illustrated.[34]  The likely cost of granting a brief stay in the present case is far smaller — though it is a source of concern that such a cost must be borne at all.

Fourth, with regard to the public interest, the analysis from the Opinion largely applies.[35]  There is a conflict between the liberty and dignity of those who may be stopped as a result of a stay, and the public safety interest in conserving the NYPD's resources.  Both interests are significant.

Weighing the factors above, I conclude that the balance tips in favor of granting a brief stay.  In essence, now that I am persuaded that compliance with the immediate ordered relief in the Opinion would in practice require taking some or all of the burdensome steps presented as *proposed* relief, the same reasoning that led me to propose that relief rather than ordering it now leads me to favor granting a limited stay.  The inefficiency of immediately implementing reforms that may require alteration after the *Floyd-Ligon* remedies hearing, the public safety interest in conserving the NYPD's scarce resources, and the short duration of the stay I am ordering, outweigh the benefits to plaintiffs' putative class of immediately ordering compliance with the Opinion.  I am thus granting a stay of the immediate relief ordered in *Ligon* pending the issuance of a final decision regarding the appropriate

---

[34]     *See id.* at *39 (emphasizing the likely magnitude of unconstitutional stops "between now and the completion of trial if this Court does not act").

[35]     *See id.* at *40–41 (public interest analysis).

14

scope of preliminary injunctive relief, and the appropriate scope of permanent injunctive relief (if any) in *Floyd*.  At that time, defendants may move for a stay of all remedies ordered if they are so inclined.

        Finally, it is my understanding that the decision to stay the immediate relief ordered in the Opinion moots defendants' appeal.  No relief is now in effect, and there has been no final decision as to the appropriate scope of the relief to be ordered.[36]

## B.    Defendants' Request for a Postponement of the *Floyd* Trial

        Defendants argue that the trial in *Floyd* should be postponed because "[i]t makes little sense . . . to try the *Floyd* case under a view of the law that is incorrect."[37]  In their reply letter, defendants cite a five-factor test adopted by the district court for determining whether to enter a stay pending an appeal in a related case.[38]  The factors are:  "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation . . . (2) the private interests of and burden on

---

[36]    *See Lynch v. City of New York*, 589 F.3d 94, 98 n.1 (2d Cir. 2009) ("[T]he courts of appeals have general appellate jurisdiction only over 'final decisions of the district courts.'" (quoting 28 U.S.C. § 1291)).

[37]    1/14 Grossman Ltr. at 2.

[38]    *See* 1/17 Grossman Ltr. at 4 (citing *Estate of Heiser v. Deutsche Bank Trust Co. Ams.*, No. 11 Civ. 1608, 2012 WL 2865485, at *3 (S.D.N.Y. July 10, 2012)).

the defendants; (3) the interests of the courts; (4) the interests of persons not parties

to the civil litigation; and (5) the public interest."[39]  These factors overlap in some

respects with the four factors for determining a stay pending appeal.  Without

repeating elements of the analysis offered above, I note that the following

considerations argue against postponing the *Floyd* trial:

>    *First*, plaintiffs in *Floyd* filed their case on January 31, 2008.  Unlike

*Ligon*, *Floyd* is a certified class action challenging the constitutionality of stop and

frisk practices in all contexts throughout the City of New York.[40]  After five years

of preparation, the trial is scheduled to begin in less than two months.  It would be

unfair and inappropriate to delay the case any further.

>    *Second*, many of the legal issues in *Floyd* are different from those

dealt with in the Opinion in *Ligon*.[41]  As the *Floyd* plaintiffs note, their case

addresses, among other things, "whether minorities are stopped at an

unconstitutionally disproportionate rate, and whether there is a failure to monitor,

supervise, and discipline officers who fail to meet the NYPD's reporting

---

[39]    *Heiser*, 2012 WL 2865485, at *3 (quoting *LaSala v. Needham & Co.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005)).

[40]    *See Floyd v. City of New York*, 283 F.R.D. 153, 159 (S.D.N.Y. 2012) (granting class certification).  The *Ligon* preliminary injunction hearing dealt only with stops based on suspicion of trespass outside TAP buildings in the Bronx.

[41]    *See Ligon*, 2013 WL 71800, at *1 n.1.

16

requirements for stop-and-frisks."[42]

       *Third*, to the extent that some of the legal issues in *Floyd* and *Ligon* are the same, appellate review of those issues will be aided by proceeding with the *Floyd* trial without delay. Counsel in *Floyd* have not yet been heard on the issues defendants wish to raise on appeal. By allowing the *Ligon* preliminary injunction hearing to proceed before the *Floyd* trial,[43] this Court recognized that it might be necessary to reach certain generally applicable legal conclusions on the basis of a preliminary injunction hearing concerning a relatively narrow range of facts. I concluded that such a course was appropriate given the long delays in the *Floyd* litigation and the *Ligon* plaintiffs' request for preliminary relief.[44] Now that the *Floyd* trial is imminent, there is no reason for the Second Circuit to operate under similar constraints. Indeed, if defendants are correct, and the Opinion leads the parties in *Floyd* to pose questions and develop a record that focuses in part on the nature of a stop,[45] this can only aid review of the very issues that defendants

---

[42]    1/16/13 Letter from Darius Charney, Counsel for *Floyd* Plaintiffs, to the Court at 2 (footnote omitted).

[43]    *See Ligon v. City of New York*, No. 12 Civ. 2274, 2012 WL 3597066, at *1 (S.D.N.Y. Aug. 21, 2012).

[44]    *See id.* at *3.

[45]    *See* 1/17 Grossman Ltr. at 3.

contest.[46]

## III.   CONCLUSION

Defendants' request for a stay is granted pending a final decision regarding the appropriate scope of preliminary injunctive relief in *Ligon*.

Defendants' request for a postponement of the *Floyd* trial is denied.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      January 22, 2013
            New York, New York

---

[46]      The *Floyd* plaintiffs also argue that if the remedy phase of the *Ligon* litigation is stayed pending appeal, the consolidated *Floyd-Ligon* remedies hearing should be bifurcated from the *Floyd* trial, or the *Floyd* remedy phase should be separated from the remedy hearing in *Ligon*. *See id.* at 2.  Because I have not stayed the remedy phase of the *Ligon* litigation, but have only stayed the immediately ordered relief in *Ligon* pending the completion of the *Floyd-Ligon* remedies hearing, I reject the *Floyd* plaintiffs' suggestion.

- **Appearances** -

**For *Ligon* Plaintiffs:**

Christopher Dunn, Esq.
Alexis Karteron, Esq.
Taylor Pendergrass, Esq.
Daniel Mullkoff, Esq.
New York Civil Liberties Union
125 Broad Street, 19th floor
New York, NY 10004
(212) 607-3300

J. McGregor Smyth, Jr., Esq.
Mariana Kovel, Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, NY 10451
(718) 508-3421

Juan Cartagena, Esq.
Foster Maer, Esq.
Roberto Concepcion, Jr., Esq.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

John A. Nathanson, Esq.
Tiana Peterson, Esq.
Mayer Grashin, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-5222

**For *Floyd* Plaintiffs:**

Darius Charney, Esq.
Chauniqua Young, Esq.
Sunita Patel, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Philip A. Irwin, Esq.
Eric Hellerman, Esq.
Gretchen Hoff Varner, Esq.
Kasey L. Martini, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1155

Jonathan C. Moore, Esq.
Jennifer Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0400

**For *Ligon* and *Floyd* Defendants:**

Brenda Cooke
Linda Donahue
Heidi Grossman
Morgan Kunz
Joseph Marutollo
Suzanna Publicker
Lisa Richardson
Cecelia Silver
Judson Vickers
Richard Weingarten
Mark Zuckerman
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1300