D146FLOC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DAVID FLOYD, et al.,

                Plaintiffs,

          v.                          08 CV 1034(SAS)

CITY OF NEW YORK, et al.,

                Defendants.

------------------------------x
                                      New York, N.Y.
                                      January 4, 2013
                                      2:30 p.m.

Before:

                    HON. SHIRA A. SCHEINDLIN,

                                      District Judge

                         APPEARANCES

BELDOCK LEVINE & HOFFMAN, LLP
      Attorneys for Plaintiffs
BY:   JENN ROLNICK BORCHETTA
      JONATHAN MOORE

COVINGTON & BURLING, LLP
      Attorneys for Plaintiffs
BY:   KASEY MARTINI

CENTER FOR CONSTITUTIONAL RIGHTS
      Attorneys for Plaintiffs
BY:   DARIUS CHARNEY

D146FLOC

Appearances (Cont'd)


MICHAEL A. CARDOZO, Corporation Counsel
for the City of New York
     Attorneys for Defendants
BY:  HEIDI GROSSMAN
     BRENDA E. COOKE
     JOSEPH MARUTOLLO
     JUDSON VICKERS
     MORGAN D. KUNZ
     CECILIA SILVER
     LISA M. RICHARDSON
     SUZANNA PUBLICKER
     LINDA DONAHUE

D146FLOC

1          (Case called; in open court)

2          THE COURT:  Please be seated.

3          Mr. Moore, good afternoon.  Mr. Charney, good

4     afternoon.  Ms. Borchetta, good afternoon.  Ms. Martini, good

5     afternoon.

6          Ms. Grossman, good afternoon.  Ms. Cooke, good

7     afternoon.  Who is Ms. Publicker?  Good afternoon, Ms.

8     Publicker.  Good afternoon, Mr. Marutollo and Ms. Donahue.

9          So you are?

10          MS. SILVER:  I am Ms. Silver, your Honor.  Good

11     afternoon.

12          THE COURT:  Mr. Vickers and Ms. Richardson and Mr.

13     Kunz, good afternoon.  That's everyone.

14          We have a lot of work this afternoon.  I have two

15     letters both dated December 28th.  Each party describing the

16     motions in limine that they would like to make.  The plaintiff

17     asked for nine motions in limine.  The defendants raised 10

18     motions in limine.  And then on top of that I have been

19     receiving letters it seems like nonstop -- December 31st,

20     January 2.  I think I didn't bring the third one down with me,

21     but January 3rd.  I think so.  So the City wrote a letter

22     December 31st.  Plaintiff wrote a letter January 2nd and City

23     responded January 3rd.  Those three collectively are as long as

24     all the motions in limine put together.  It is all about one

25     fellow Mr. William Pena and his stop and the City asks that the

D146FLOC

1    plaintiffs not be permitted to call this fellow because the

2    stop occurred inside a New York City Housing Authority

3    building.

4             So that is our agenda to resolve the Pena issue and as

5    many of the motions in limine that I think can be resolved

6    without briefing.  I know of no law that requires me to permit

7    briefing if I don't need it.  So I am going to do what I can to

8    rule without it.  Let's start then with the City's letter

9    because I think that is the one I happened to read first.  The

10   first one says, "Plaintiff should be precluded eliciting

11   evidence of the officers' disciplinary histories, prior

12   lawsuits and settlements."  I will tell you in each instance

13   what I think should be the answer and then will be happy to

14   hear from whoever wants to say more.

15            The officers' disciplinary history or prior lawsuits

16   or settlements are irrelevant unless there is a case about a

17   suspicionless stop.  So if I saw something that there is a

18   history of suspicionless of stops that might be relevant to

19   proving pattern and practice, failure to supervise, failure to

20   train and who knows what.  But I don't know if there will be

21   any such a thing.  Most of these disciplinaries are rude

22   language, late to work, didn't wear his uniform.  All kinds of

23   stuff I have seen over the years.  Sometimes worse than that,

24   but we have to look at whether there is anybody who had a

25   disciplinary history involving suspicionless stops.  That is my

D146FLOC

1    instinct.

2            Does anyone want to be heard?

3            MR. CHARNEY:  Sure.  I will start -- start the ball

4    rolling.  The first answer is there is at least one such.

5            THE COURT:  I will deal with the one such.

6            MR. CHARNEY:  Do you want know describe it or just --

7            THE COURT:  I probably would have review in camera

8    what it is, but quickly tell me.  Was it a CCRB complaint?

9            MR. CHARNEY:  Yes.  Substantiated CCRB complaint for

10   that stop against one of the defendant officers who stopped --

11           THE COURT:  I couldn't hear you.

12           MR. CHARNEY:  One of the defendant officers who

13   stopped plaintiff Deon Dennis and the stop that was the subject

14   of the CCRB complaint was from 2006.  Mr. Dennis' stop was in

15   2008.  The reason we think this is relevant, and your Honor I

16   think sort of agrees with us, is on the Monell issue because

17   failure to discipline is one of our claims here.

18           THE COURT:  Right.  I get the argument.  It was a

19   substantiated CCRB of a suspicionless stop.

20           Let me hear from the City.

21           Is that it?

22           MR. CHARNEY:  Well, no.  The other I think probably

23   easy one is that in many of the stops that our witnesses are

24   going to testify about, the stops they were subjected to, they

25   ended up filing civilian complaints and we think those civilian

1    complaints are clearly relevant to the circumstances of their

2    stops because the officers were interviewed by CCRB.

3        THE COURT:  That is a prior statement of a party

4    opponent.  That is not a problem.  It is the very stop that is

5    being litigated here that is a different issue, too.  If the

6    officer made a statement, if the plaintiff made a statement.

7    Maybe the plaintiff's statement is going to differ from what

8    the plaintiff says on the stand.  Both sides want that.  These

9    are prior statements by the very people involved.

10        MR. CHARNEY:  A third category we think is very

11    important to Monell is when it comes to civilian complaints

12    there are several different agencies that will investigate

13    them.  There is the CCRB, which we know about, but then there

14    are two internal NYPD departments.  There is the Office of

15    Chief of Department and the IAB.  The way that they

16    investigate, the extent to which they investigate, the quality

17    of those investigations we think is very relevant.

18        THE COURT:  Denied.  I am not going to into every

19    disciplinary charge of he was late, he was rude, this and that.

20    I am not interested.  It is a collateral matter, the quality of

21    those investigations.  Not going there.  So the one fellow that

22    you said who may have had a prior suspicionless stop hasn't

23    been substantiated yet.  The prior statements of either side

24    made that the CCRB took by any of the stops being litigated,

25    the plaintiff gave a statement or the officer made a statement

D146FLOC

1    that is always admissible.

2              MR. CHARNEY:  What about lawsuits for similar conduct?

3              THE COURT:  Suspicionless stops or bad stop.

4              MR. CHARNEY:  A false arrest.

5              THE COURT:  Probably based on a bad stop.  I have to

6    do it on a case by case basis.  Filing of a lawsuit doesn't

7    prove anything.  What happened with that lawsuit?  Was there a

8    verdict?  Was there a settlement?  I don't know how many of

9    these you possibly can have.  Individually if it is a bad stop.

10   No all bad arrests have a bad stop.  I have to look at them one

11   by one.

12             MR. CHARNEY:  On that issue, your Honor, we still have

13   a few depositions of officers to take.

14             THE COURT:  That's fine.  One by one.  There is no

15   reason to brief this motion in limine as it stands because the

16   City got what it wanted.

17             MS. GROSSMAN:  Your Honor, if the ruling is that if

18   the officer was indeed disciplined, that the issue that the

19   plaintiffs just raised about a particular officer connected

20   with the Deon Dennis stop, if that is indeed what happened and

21   there was a discipline of that officer --

22             THE COURT:  I don't care.  It was substantiated.

23   There was a substantiated suspicionless stop for one officer

24   one time.  This is not a jury trial.  I am sure I can handle

25   this information.  This is the problem with a nonjury trial.

D146FLOC

1          MS. GROSSMAN:  I haven't committed it to my memory.  I

2    have to go back and confirm --

3          THE COURT:  Sure.

4          MS. GROSSMAN:  And if there is anything --

5          THE COURT:  Of course.

6          MS. GROSSMAN:  -- I need to raise about your ruling.

7    So you are saying if it is a substantiated CCRB for the

8    suspicionless stop --

9          THE COURT:  Stop.  Right.  Not all the other stuff

10   people get disciplined for.  Not interested.  Abusing overtime,

11   that is another very common one you see.  All kinds of things.

12         MS. GROSSMAN:  And then on the -- I just wasn't clear

13   on the second point that the plaintiffs raised regarding

14   statements by officers.

15         THE COURT:  If a very stop in issue here was

16   investigated by any agency -- any agency -- CCRB, grand jury,

17   you name it and if the plaintiff gave a statement or the

18   officers gave a statement that is a prior statement you can

19   use.

20         MS. GROSSMAN:  That is different than the disciplinary

21   history.  It is a prior statement regarding a stop that is

22   going to be testified to.

23         THE COURT:  Correct.

24         MS. GROSSMAN:  I understand that.

25         THE COURT:  Correct.

D146FLOC

1          MR. CHARNEY:  Can I --

2          THE COURT:  We have to get through 20 of these.

3          MR. CHARNEY:  On the second category, the CCRB

4    complaints for the stops that are at issue in this case,

5    several were substantiated.  We I think have the right to

6    inquire whether the officers were disciplined for those

7    substantiated stops.

8          THE COURT:  That's fine.

9          MS. GROSSMAN:  Then just to be clear on the prior

10   lawsuits, you said that you would like to look at this

11   individually?

12         THE COURT:  If there are any prior lawsuits.  How many

13   can there be?

14         MS. GROSSMAN:  There may be lawsuits that ended in a

15   settlement and then --

16         THE COURT:  I have to see what the facts are in the

17   prior lawsuits.  I won't expect there would be a lot to worry

18   about.

19         MS. GROSSMAN:  No.  But when we settle cases on behalf

20   of the City if there is no admission of liability, and there

21   are many reasons why someone might enter into a settlement, so

22   I don't take your ruling to mean right now under those

23   circumstances that type of evidence would be admissible.

24         THE COURT:  I can't rule on the individual lawsuit

25   issue now.  When I see a lawsuit, I will talk about it.

D146FLOC

1           MS. GROSSMAN:  Do we move in limine?

2           THE COURT:  I don't need papers.  Write a letter and

3     say, We looked at all of our officer witnesses and only have

4     two have lawsuits involving stops.  I want to see what the stop

5     was about.

6           MS. GROSSMAN:  If we want to go to trial and make sure

7     the plaintiffs cannot elicit testimony regarding that, we then

8     do have permission move in limine?

9           THE COURT:  Right.  But not move formally.  The same

10     way, a letter, attachment, show me the complaint.  Let me see

11     what it is about.  Maybe it is still pending.  I don't know

12     what lawsuits there are.

13           MS. GROSSMAN:  Okay.

14           THE COURT:  It has to be similar, in other words, a

15     stop.

16           The second motion in limine says, "Testimony

17     concerning plaintiffs and the class members incidents should be

18     limited solely to stop, question and frisk."

19           And I am just extemporizing and not what happened

20     later at the station house, for example, but limited to the

21     immediate consequences of the stop.  Again, I will tell you my

22     leaning and then you can talk.  I think the City is right and

23     that is that.  I think the City is right.  All I am interested

24     in is the stop, the immediate consequences of stop.

25           Ms. Borchetta.

D146FLOC

1          MS. BORCHETTA:  Your Honor, in certain circumstances

2     what happened after the stop goes to the basis of the stop

3     itself.  An example is we have one class member witness who was

4     a juvenile.  After his stop he was taken to the station.

5     Because he was taken to the station, the stopping officer

6     filled out narratives.

7          THE COURT:  Yes, of course.  A prior statement of the

8     officer is coming in.  That is a blanket ruling.  Anyone who

9     made a statement about the stop at issue at any time -- maybe

10    he testified in the grand jury, maybe he testified at trial --

11    anything that the officer had to say about that stop is coming

12    in just like anything that the plaintiff said about the stop is

13    coming in.

14         MS. BORCHETTA:  We also believe that the officers'

15    post-stop conduct goes to impeach the basis for the -- that the

16    officers is giving for the stop itself.

17         THE COURT:  Like?

18         MS. BORCHETTA:  For example, the officer will issue a

19    summons after a stop and he would have said the basis for the

20    stop.

21         THE COURT:  That is a statement by the officer.

22         MS. BORCHETTA:  Okay.

23         THE COURT:  No problem.  What I don't want to hear is

24    at the station house I had I strip search and my parents came

25    and I was crying or they were crying.  That is not my case.  Or

1    then I went to a shrinking for six months.  Not interested.

2    Not a damages case.  That is what it is.  Just the stop.  Any

3    statements about the stop come in written or oral.  Any

4    statements about the stop from both sides.

5            MS. BORCHETTA:  There is also specifically -- with

6    respect to Deon Dennis, who is one of the named plaintiffs,

7    there is an issue that the City is arguing a warrant that

8    was -- that he --

9            THE COURT:  I am going to get to that when I see it.

10           MR. CHARNEY:  We can reserve it until then.

11           THE COURT:  It is coming up.

12           MR. CHARNEY:  When it comes up in the context of our

13   motion, we'll address that.

14           THE COURT:  Okay.

15           MR. CHARNEY:  Okay.

16           THE COURT:  Plaintiffs third motion.  Plaintiffs'

17   failure to identify John Doe officers to prevent introduction

18   of trial the testimony regarding these stops at trial.  The

19   short answer:  That is just wrong.  That's just wrong.  The

20   City is quite right you cannot proceed against the John Doe

21   officer.  All the John Doe officers are dismissed if you

22   haven't identified them.  That's easy.  I am not going to

23   preclude the plaintiff from talking about it.  It is

24   credibility.  It may go to the credibility of the plaintiff

25   that they can't give a date or time.  I can't blame the

D146FLOC

1  plaintiffs if the officers cannot be identified because the

2  officer didn't prepare a UF-250.  A lot of time they failed to

3  fill it out from what I have learned.  There is a problem, a

4  continuing problem.  That is the short ruling.  They can

5  testify, but the John Doe officers are dismissed.  The City put

6  in case law correctly so that all of them are dismissed.  You

7  cannot proceed against someone you cannot identify.

8      MS. GROSSMAN:  Here is the statement, your Honor, that

9  these officers supposedly said should not be coming in.  If the

10  plaintiffs are permitted to talk --

11      THE COURT:  No.  That was all part of this one?  I

12  didn't reread it.  Is it part of this one?

13      MS. GROSSMAN:  If it isn't part of this one, it is

14  part of another one.  Yes, it is.  The last paragraph.

15      THE COURT:  Right.  It is the last sentence.

16  "Finally, what any John Doe officer told plaintiff and the

17  class members during the course of the stop is inadmissible

18  hearsay."

19      Mr. Charney.

20      MR. CHARNEY:  The only thing I will say on that, your

21  Honor, again I think it is going to have to be done on a

22  case-by-case basis.  There may be some hearsay exceptions that

23  apply.  If an officer says something that is a statement

24  against interests, they make a racial slur to the person or

25  they tell them that they stopped for a clearly illegitimate

D146FLOC

1   reason.

2   THE COURT:  Give me an example.

3   MR. CHARNEY:  If they use a racial slur.

4   THE COURT:  The other one.

5   MR. CHARNEY:  We stopped you because we didn't like

6   the way your pants are too baggy or why are you wearing that

7   baseball cap so low.  We think that would be a statement

8   against interests because it suggests that the basis for the

9   stop was illegal.  So they're essentially admitting that they

10  committed an illegal stop.

11  THE COURT:  Let's read about it 804(b)(3).  Let's read

12  it, a statement against interests.  "A statement that a

13  reasonable person in the declarant's position would have made

14  only if the person believed it to be true because when made it

15  was so contrary to the declarant's proprietary or pecuniary

16  interests or had so great a tendency to invalidate the

17  declarant's claim against someone or to expose the declarant to

18  similar criminal liability and is supported by corroborating

19  circumstances that clearly indicates trustworthiness if it is

20  offered in a criminal case."  So (b) is not required.  It is

21  not required because it is not a criminal case.  So it is just

22  (a).  It is not.

23  MR. CHARNEY:  The second one.

24  THE COURT:  "Or had so great a tendency to invalidate

25  the declarant's claim against someone else."  I guess the claim

D146FLOC

1   against someone else is the stop or the arrest.

2              "Or expose the declarant to civil or criminal

3   liabilities."

4              MS. GROSSMAN:  Your Honor, I think you need to focus

5   on declarant.  There is no declarant here.

6              THE COURT:  Of course.  Declarant is never here.  That

7   is why it is hearsay.  The declarant is never there.  When the

8   declarant is unavailable as a witness.

9              MS. GROSSMAN:  This is unidentified person.

10             THE COURT:  That makes them unavailable.  I am not

11   sure, but I am not sure the rest of this works anyway.  "A

12   reasonable person in the declarant's position would have made

13   only if the person believed it to be true because when made it

14   was this or that or" -- I don't know when to read the or.

15   Would have made only if the person made it to be true.  I would

16   have to do research into 804(b)(3).  I cannot rule on that.  I

17   will look at 804(b)(3) cases.

18             MR. CHARNEY:  Again, the thing is this is going to

19   have to be -- there may be some where this is true.  There may

20   be other cases where there was no statements against interests.

21             THE COURT:  I am not sure it is a statement against

22   interests.  I am not deciding that now, but I will do some

23   quick research on 804(b)(3) and get back to you.

24             MR. CHARNEY:  The only one I would mention is the

25   present sense impression where someone makes a statement at the

D146FLOC

1    time of the incident.  I think that may also apply in

2    certain -- that is 803.

3            THE COURT:  Thank you.  "Regardless of whether the

4    declarant is available as a witness, present sense impression

5    statement describing or explaining an event or condition made

6    while or immediately after the declarant perceived it."  I

7    don't think it is present sense impression.

8            MR. CHARNEY:  Well, your Honor, if a police officer

9    saw one of the witnesses doing something and then stopped them

10   and immediately upon stopping them said, "Look, I saw you doing

11   this," to me that would be a present sense impression.  In

12   other words, something that they are expressing that they just

13   saw.  I just saw you turn down that alleyway and look back or I

14   just saw you whatever the case may be.  They just saw it,

15   stopped the person and are telling them what they saw.  To me

16   that would be a present sense impression, but obviously your

17   Honor is --

18           THE COURT:  Skeptical.

19           MR. CHARNEY:  Yes.  Again, these are somewhat

20   hypothetical.

21           THE COURT:  Right.  It is similar to what the City

22   said before when they wanted to keep out any lawsuits.  If you

23   really find one of these that you think is either of these

24   exceptions, you can tell me what it is.

25           MS. GROSSMAN:  Your Honor, just to that point.  So I

D146FLOC

1    want to be clear.  So we at this point --

2              THE COURT:  No burden.  No burden is not coming in.

3    Whatever the officer allegedly said to some plaintiff and it is

4    a John Doe officer isn't coming in.  If Mr. Charney finds one

5    that he thinks fits, either present sense impression or

6    statements against interest, he will point it out.

7              MS. GROSSMAN:  Very good.  Just going backwards to

8    number one, I just want to make sure that the plaintiffs

9    identify the lawsuit or substantiated CCRBs they want to use so

10   we don't burden you with a list and any settlements.  We just

11   want them to notify us and if it is one or two, we can then

12   respond.

13             THE COURT:  Have you gotten discovery of CCRBs and

14   lawsuits?

15             MR. CHARNEY:  We have gotten discovery of the CCRB

16   complaints related to the stops our clients will be testifying

17   about.  This actually raises an issue which has come up in some

18   of our depositions and may come up in others, which is the City

19   has objected to us asking questions about officer discipline or

20   lawsuits.

21             THE COURT:  I can't expect Mr. Charney to do it if he

22   doesn't have it.  For every officer that he has listed as a

23   witness if this witness list is not finalized yet, for every

24   single officer the City has the burden of looking at lawsuits

25   and see if any of them are suspicionless stops and if they

D146FLOC

1    are -- if they are -- let the adversary know.

2              MS. GROSSMAN:  Can I have a moment to confer with my

3    colleague?

4              THE COURT:  Sure.

5              MS. GROSSMAN:  Your Honor, let me make a correction or

6    just enhance what Mr. Charney said.  When we objected to -- I

7    am told when we objected at the depositions to these types of

8    questions, we objected to the extent because it goes beyond the

9    scope of this case, which is the stops.  If there were

10   unconstitutional stops --

11             THE COURT:  Allegedly.

12             MS. GROSSMAN:  Allegedly suspicionless stops then the

13   witness would be allowed to testify.  So our view is that we

14   have --

15             THE COURT:  The lawyer has an obligation beyond the

16   witness's recollection.  You need to look at those CCRBs.  You

17   need to investigate the record of that and every officer they

18   name.  Hopefully there are not too many and identify if any are

19   suspicionless stops.

20             MS. GROSSMAN:  Your Honor, when we make those

21   representations, my understanding is that we do look into their

22   histories before.

23             THE COURT:  I thought you were trusting them to answer

24   the question were there any complaints against you regarding

25   suspicionless stops, were there any lawsuits against you

D146FLOC

 1   involving suspicionless stops.  For every officer listed, you

 2   can look wherever you can look -- disciplinary history, CCRB.

 3           MS. GROSSMAN:  So we have done that.

 4           THE COURT:  If you say you have done it, I am not

 5   going to investigate you.  I am telling you it is your

 6   obligation.  If you said you have done it, it is done.

 7           MS. GROSSMAN:  So my point is that the plaintiffs have

 8   gotten all the discovery.

 9           THE COURT:  If they have, they have.  I have ruled

10   before.  Now I am explicitly ruling so it is clear on the

11   record.  You need to look or state that you have looked at the

12   disciplinary history of every officer they list -- CCRBs,

13   internal discipline, IAB, whatever it is.

14           MR. CHARNEY:  OCD.

15           THE COURT:  Whatever it is.  As long as you told me

16   you searched that is all I can direct you to do.  If you

17   haven't, you are directed to.

18           Now can we move on?

19           MS. GROSSMAN:  I want the plaintiffs to now notify us

20   what it is that they believe they want to offer.

21           THE COURT:  Assuming you are competent that you have

22   looked at every single officer that they name as a witness and

23   gone through their disciplinary histories then that is fine.

24   They have to tell you whether they found anything to use.  If

25   you are confident that the City has done that for every single

D146FLOC

1    person, then you should do it.

2                MS. GROSSMAN:  Your Honor, we have to put our papers

3    in by the 15th, a motion in limine, if we're going to or

4    provide you with this list and I want to timely respond given

5    your rulings and dates, the dates that you have set for us, and

6    I want the plaintiff to give us what we need.

7                THE COURT:  They will if they have it.  I don't want

8    to say it for the fourth time.  Please be confident that you

9    have searched each officer's disciplinary history.

10                MR. CHARNEY:  Your Honor, I know we're dragging on

11   with this, but what they have given us with respect to the

12   defendant officers, they have given us --

13                THE COURT:  Every officer witness.  Every officer

14   witness.  Every officer witness.

15                Next.  This one starts with the word "because."  The

16   fourth one says, Because such testimony constitutes

17   inadmissible hearsay, the Court should bar plaintiffs and the

18   class members from testifying about other people's stops."

19                MR. CHARNEY:  Your Honor, I can save a lot of time on

20   this.

21                THE COURT:  I already wrote the word "agreed" in the

22   margin.  I knew they were right and you knew they were right.

23                Recordings of precinct roll calls are inadmissible to

24   support plaintiff's quota theory.  That is the fifth motion in

25   limine.  I wrote in the margin, "Required hearing."  I need a

D146FLOC

1    hearing.  I don't know if they can meet the seven-step

2    authentication process.  You are saying nobody can.  I don't

3    know.  Maybe they can.  They say they recorded it at a roll

4    call.  They can be questioned, cross-examined, I make a

5    finding.  We have to have a pretrial hearing.  That is the

6    answer to that one.  I don't need briefing.  I need a hearing.

7                MS. GROSSMAN:  Your Honor, can I have a moment?

8                THE COURT:  Sure.

9                MS. GROSSMAN:  I just want to say that Schoolcraft was

10   on notice to appear for deposition in the Floyd case and never

11   showed up.

12               MR. CHARNEY:  That is not true, your Honor.

13               MS. GROSSMAN:  So now with discovery closed, I don't

14   know that -- so if he is not willing to appear, then I guess

15   the issue --

16               THE COURT:  Right.  If he doesn't appear at the

17   hearing, then obviously the tapes cannot be authenticated.

18               MR. CHARNEY:  Your Honor, I don't want to argue about

19   this.  I don't recall any such notice.  What I will say is he

20   represented by separate counsel.  They need to subpoena his

21   counsel.  They can't subpoena us.  We don't have any control

22   over a him.  We'll bring him.  I am saying in the past he was

23   notified to appear.

24               THE COURT:  I don't deal much in history.  It is a

25   hobby.  But in real life I deal with the present and future,

D146FLOC

1      not the past.

2                  MR. MOORE:  Judge, what about a situation where on the

3      recording the officer has identified their voice as being on

4      the recording?

5                  THE COURT:  That is what I will find out at the

6      hearing.

7                  MR. MOORE:  You don't have to go through the process

8      of bringing in --

9                  THE COURT:  I do.

10                 MR. MOORE:  If he hears the recording and says that is

11     my voice, those are my words --

12                 THE COURT:  That is what I will do at the hearing.

13                 MR. MOORE:  I am talking about the officer.

14                 THE COURT:  Oh, the officer testifying at trial.  The

15     City has called or you called a police officer and you play the

16     tape for the officer and he says, Yes, that is me.

17                 MR. MOORE:  That's my voice.

18                 MR. CHARNEY:  We already did that in their deposition.

19                 THE COURT:  If they already identified a voice at

20     deposition, I don't see how you should be precluded from using

21     it at trial if they already said it was their statement.

22     Anybody who already acknowledged it was their statement,

23     admitted to making a prior statement.  So you are offering a

24     statement of a party opponent or witness but still a City

25     employee.  If they have already identified their own voice,

D146FLOC

1   those portions of the tape would come in as their statement.

2            MS. GROSSMAN:  I understand that but there are so many

3   hours' worth of audio tapes that whatever was acknowledged are

4   other snippets.  So that is why I think the hearing may get at

5   what the issue is.

6            THE COURT:  Yes.  But since Mr. Charney asked if

7   somebody acknowledged -- or Mr. Moore -- if someone

8   acknowledged their own statement that is their prior statement.

9            The next one is number six Lou Rider expert testimony

10  about police practices.

11           Who is Lou Rider?

12           MR. CHARNEY:  Your Honor, we identified Lou Rider in

13  2009 as one of our police practices experts.  He was deposed.

14  He did an expert report.

15           THE COURT:  Who is he?

16           MR. CHARNEY:  A former LAPD deputy chief.  He spent

17  more than 20 years in the Los Angeles Police Department.  He

18  has been studying police departments around the country.

19  Studying their training, their monitoring systems, doing

20  consultations with them.  He wrote a report based on his 49

21  years in law enforcement using that experience as his basis to

22  opine --

23           THE COURT:  Here is what the City wrote:  "Rider

24  cannot serve as an expert in this case because he is deficient

25  in all three areas.

D146FLOC

1          "One:  He lacks the background vital to ensuring his

2     opinions are credible, reliable and would assist the

3     fact-finder.

4          "For his methodology he stated explicitly in his

5     opinion he did not reference law enforcement accreditation

6     industry standards."

7          What is that?

8          MS. GROSSMAN:  Well, in terms of the training he is

9     giving opinions about our training, but he never looked at what

10    is accredited elsewhere and didn't compare our training to

11    other training.  Didn't even know our training is CALEA

12    certified.

13         THE COURT:  How do you spell CALEA?

14         MS. GROSSMAN:  It is an acronym, C-A-L-E-A.

15         THE COURT:  Thank you.

16         MS. GROSSMAN:  And I think obviously you are going

17    through it in order, but more importantly on the point of Rider

18    is that he is offering opinions that are not -- that supplant

19    your role as fact-finder.

20         THE COURT:  So far you just said he is not credible,

21    reliable and lacks the background.  Well, that is a surprise

22    phrase, "lacks the background."  Apparently he has 40-some-odd

23    years of background.  "He didn't reference law enforcement

24    accreditation industry standard."  Then it goes on to say, "In

25    fact, besides from reviewing materials associated with this

D146FLOC

1    case, he does not cite any independent basis for his supposed

2    knowledge of an expertise in NYPD policies and practices.  As

3    such, he's testimony is patently unhelpful and more critically

4    usurps the role of the fact-finder."

5         Well, to pause there for a minute, he is not saying he

6    is an expert in NYPD policies and practices.  He says he is an

7    expert in police practices.  He has 40-odd years of being an

8    expert in policing.

9         Do you folks want to confer?

10        MS. GROSSMAN:  Sorry.  Yes.

11        THE COURT:  He is saying he is an expert in police

12   practices.  He is not saying I grew up and spent 30 years with

13   NYPD.  He is saying I have been a deputy chief of a major urban

14   police force, I am experienced in police practices and I want

15   to share my experience and knowledge and expertise of police

16   practices.

17        Now, you know you can be an expert not only by

18   training but by experience.  These are in the federal rules.

19   Should I read you the rule?  It says experience or training.

20   So he is clearly a highly experienced senior police officer.

21        MS. GROSSMAN:  But I don't know that he has experience

22   in stop, question and frisk.

23        THE COURT:  I assume he does.  I didn't read the

24   report, but I don't know how you can be a high-level urban

25   policeman in a department and not understand the law of stop,

D146FLOC

1    question and frisk.  After all, the law of stop, question and

2    frisk is not limited to New York.  The Supreme Court has

3    repeatedly written about stop, question and frisk.

4              MR. CHARNEY:  Terry was decided into 1968.  He retired

5    in the '80s.

6              MR. MOORE:  Also, Judge, he spends a great deal of his

7    time as trainer.

8              THE COURT:  Really?

9              MR. MOORE:  For police departments.

10             THE COURT:  Since he retired from the active duty at

11   the LAPD, he became a trainer at other police departments?

12             MR. MOORE:  He does that in addition to being an

13   expert for both plaintiffs and defendants in police cases.  It

14   is not as if he was a police officer 30 years ago --

15             THE COURT:  And stopped.

16             MR. MOORE:  -- and stopped.  He has been doing

17   training for police departments.  I think the City's objections

18   really go to the weight of his evidence.

19             THE COURT:  I think so, too.  He sounds qualified to

20   give an opinion and it is for me to weigh whether that opinion

21   influences me at all.

22             MS. GROSSMAN:  Not on stop, question and frisk, which

23   is what this case is about.

24             THE COURT:  How can you do a police training without

25   talking about what it takes to stop someone, what it takes to

D146FLOC

 1   arrest someone, reasonable suspicion.

 2              MS. GROSSMAN:  That is what he testified to at his

 3   deposition, that he did not provide training, had not trained

 4   on stop, question and frisk.

 5              MR. CHARNEY:  Can I respond?

 6              THE COURT:  Of course.

 7              MR. CHARNEY:  What the City always seems to leave out

 8   when we start talking about this training issue is supervision,

 9   monitoring, discipline, which are also our Monell claims, and

10   he has extensive experience in how officers are supervised --

11              THE COURT:  If he is going to give me an opinion as to

12   when it is appropriate to stop someone, question someone and

13   frisk someone, I don't need it.  I have been reading these

14   cases for months now.

15              MR. CHARNEY:  He is going to talk about how there are

16   supervisory mechanisms, there are monitoring mechanisms.

17              THE COURT:  Well, he is not going to teach me the law.

18              MR. CHARNEY:  No.  Sorry for raising my voice.  He is

19   going to talk about based on his 49 years of experience why in

20   his opinion the way they supervise oversee what officers do is

21   insufficient.  That is what he is going to testify about.  Even

22   if he was an expert in the Fourth Amendment, he couldn't -- you

23   are more of an expert than he is so he couldn't offer you an

24   opinion on that.

25              THE COURT:  Well, he is going to be talking about how

D146FLOC

1    a police department should supervisor or monitor officers in

2    the field or discipline officers.  I haven't read this report,

3    but that is what I am told is the subject.  So I find based on

4    this conversation certainly he is qualified to testify as an

5    expert to these practices.  He may be qualified to testify

6    about how large urban police departments should supervise.  I

7    feel I will be able to sustain objections to questions as they

8    come up.  The guy should come in, start talking.  When he

9    strays from the area I think he should testify about or what

10   you think he should testify about, I am sure I will be able to

11   deal with it just fine then and there.

12        MS. GROSSMAN:  Well, what about if we can move in

13   limine not on the qualifications but of the substance of his

14   opinion.  For example, we know no training so we will not touch

15   that subject.

16        THE COURT:  I didn't really understand that.  I think

17   he is going to talk about the proper way to train in general.

18        MR. CHARNEY:  Yes.

19        THE COURT:  Such as role playing, written materials,

20   do you train refresher courses.  I thought it was going to be a

21   generality this is the right way to train.

22        MR. CHARNEY:  Exactly.

23        THE COURT:  Such role playing, videos, refresher.

24        MS. GROSSMAN:  That is not in his report, your Honor.

25        THE COURT:  I haven't seen the report.  My problem in

D146FLOC

1   a nonjury trial is if I read the report and pass on the

2   exclusion, I have read the whole report.  It is really better

3   to come in and then have you object to questions and I can

4   sustain it and never hear.  If I read the report cover to cover

5   now, too bad.  I read it and I can't get it out of my brain.  I

6   thought about this yesterday to make this ruling on exclusion,

7   but then I realized I would read the whole report.  He will be

8   here, you will object to a particular question and I will have

9   rule one by one.  I don't have any choices left.  If it was a

10  jury trial of course I would read the report.

11          MS. GROSSMAN:  Right.

12          THE COURT:  Really it doesn't make a lot of sense to

13  do that because then I would know everything that he says.  I

14  rather say he is qualified to give opinions but certain

15  opinions may be inappropriate.  It is also well established

16  that an expert cannot testify outside of the four corners of

17  the report.  I am a great believer in that.  If you object and

18  you say, "That is nowhere in his report," I will say to the

19  plaintiffs, "Show me the page."  If it is not there, it is not

20  there.

21          MR. CHARNEY:  That's absolutely fair, your Honor.

22          THE COURT:  He is limited to the four corners of his

23  report.  He cannot give an opinion on anything that is not in

24  the report.  I rule that in every trial.

25          Now, Eli Silverman should be precluded from offering

D146FLOC

1    survey evidence on hearsay grounds and he starts out by telling

2    me he is a professor at of John Jay College and he is going to

3    opine on two surveys he performed, and I am quoting, "That

4    query a fraction of retired NYPD officers regarding perceived

5    pressure that officers felt and supervised to increase stop and

6    frisk activity."  Page 8 of the City's letter.

7            I wrote some notes here and I said, "What fraction?"

8    You said a fraction.  What fraction did he talk to?  How did he

9    select who to talk to?  How will I know it is not selection

10   bias.  We usually deal with surveys and intellectual cases and

11   all the judges become expert on handbags and shoes and jewelry

12   and all the things I am not interested in, but I know there are

13   a lot of issues.  Bias, selection, percentages.  How did he do

14   this?

15           MR. CHARNEY:  I don't know if I can explain it as well

16   as the surveys themselves, which lay it out very specifically.

17   These surveys were mailed to several thousand recently retired

18   NYPD employees of different rank.

19           THE COURT:  How were they selected?

20           MR. CHARNEY:  A list was given to them from the unions

21   and they literally mailed them to everybody.

22           THE COURT:  No selection.  So they took all the people

23   retired, let's say, '07 and '08 and mailed it to all of them?

24           MR. CHARNEY:  It was a wider time period.

25           THE COURT:  Everybody who retired in certain years?

D146FLOC

1          MR. CHARNEY:  Yes.

2          THE COURT:  So no selection?

3          MR. CHARNEY:  Of course not everybody returned them.

4          THE COURT:  Of course.  There is a lot of scholarship

5     about response rates.

6          MR. CHARNEY:  And they were anonymously returned so

7     they didn't know which officer was returning them.

8          THE COURT:  Right.  Do we know what the response rate

9     was of the 10,000 mailed?  For example --

10          MR. CHARNEY:  I believe--

11          THE COURT:  Mr. Charney, will you let me finish each

12    sentence.  Of the 10,000 mail were 2,000 returned?  Or of the

13    5,000 mailed were 1,000 returned?  Do you know the response

14    rate?

15          MR. CHARNEY:  On the second survey, which is the 2012

16    survey, I believe there were 5,000 roughly mailed out and I

17    think something like 1900.

18          THE COURT:  That's 40 percent.  Close to 40 percent.

19          MR. CHARNEY:  I think so.

20          THE COURT:  That's a high response rate.  What about

21    the other survey?

22          MR. CHARNEY:  That confess I don't recall right now.

23          THE COURT:  That is something I have to understand is

24    who this was mailed to, was there any selection, and the answer

25    seems to be no.  What is the response rate, and one you might

D146FLOC

 1    know is around 40 percent and the other one you don't know.  So

 2    that was helpful.

 3              The next problem is that the City says --

 4              MS. GROSSMAN:  Your Honor, on that point.

 5              THE COURT:  On what point?

 6              MS. GROSSMAN:  On the issue about the 5,000 --

 7              THE COURT:  His memory, which could be wrong, was

 8    5,000 were mailed and 1900 were returned.

 9              MS. GROSSMAN:  There are more than 5,000 officers

10    retired.

11              THE COURT:  In what year?

12              MR. CHARNEY:  This was from the period 2002 to the

13    present I believe for the second survey.

14              THE COURT:  On the second survey, she is saying that

15    in 2002 to 2012 -- Mr. Moore, I cannot work this way.

16              MR. MOORE:  Sorry.

17              THE COURT:  You are saying 2002 to 2012, a 10-year

18    period?

19              MR. CHARNEY:  I believe so.

20              THE COURT:  What Ms. Grossman is questioning is in 10

21    years there were only 5,000 retirements.

22              MR. CHARNEY:  I confess I wouldn't know that because I

23    don't work for the police department.

24              THE COURT:  We need Mr. Silverman to come in for a

25    brief hearing also and explain how many mailings, response

D146FLOC

1    rates.

2              The next problem is doesn't it say that the plaintiffs

3    assure the defendants Silverman would not be called as an

4    expert at trial?

5              MR. CHARNEY:  Yes.

6              THE COURT:  So he wasn't deposed.

7              MS. GROSSMAN:  Right.  That is what we objected to the

8    last time they notified us and this is the result of your

9    suggestion that we move in limine.

10             THE COURT:  Did you assure them that he wouldn't be a

11   witness?

12             MS. GROSSMAN:  An expert.

13             MR. CHARNEY:  That is not true.  He is not an expert,

14   your Honor.

15             THE COURT:  He isn't an expert --

16             MR. CHARNEY:  No, your Honor.

17             THE COURT:  He is not an expert in surveys.

18             MR. CHARNEY:  He is an expert in surveys.

19             THE COURT:  He is offering a survey.

20             MR. CHARNEY:  On November 16th we came here.  They

21   raised this issue on November 16th.  Professor Silverman

22   completely on his own without any involvement --

23             THE COURT:  I understand he is not retained.  I get

24   that.  If he is going to --

25             MR. CHARNEY:  But --

D146FLOC

1          THE COURT:  Mr. Charney, if he is going to proffer a

2     survey and defend the survey and the techniques of doing the

3     survey, then to me he is an expert in conducting surveys and

4     should be prepared to defend both to the defense counsel and

5     then to the Court the survey technique, how it was conducted,

6     response rates, writing of the questions, are the questions

7     biased, are they open or closed.  I learned all these things

8     from shoes and handbag cases that I have had to do.  So that is

9     what he has to defend.  I understand you didn't retain him.  I

10    understand is he not a retained expert.  I got that.  However,

11    if you wish to offer these surveys, he has to defend his

12    techniques of doing the survey.

13          MR. CHARNEY:  Of course.

14          THE COURT:  He has to be deposed.

15          MR. CHARNEY:  We never objected to that.  Your Honor,

16    we disclosed him on our witness list.  It was with the

17    understanding that the recently disclosed witness who were

18    deposed at the end of fact discovery --

19          THE COURT:  Would be deposed.  Why don't you depose

20    Silverman about how he did these surveys.  He wasn't retained

21    by plaintiff.  He didn't do it at their behest.  He did them

22    independently for some other research purpose or scholarly

23    purpose.  Depose him and then you may have more objections or

24    less.  I don't know any of the facts about how he did the

25    survey.  I am looking for selection, bias, leading questions,

D146FLOC

1    response rates.  We'll have to find out more about what he did.

2              MR. CHARNEY:  So, your Honor, in light of that, which

3    I think is a much more efficient way to proceed, do we need to

4    have a separate hearing?

5              THE COURT:  Maybe not.  After they get a full

6    opportunity to depose him, they will know more about their

7    objections if any.  I have no idea what he is going to say.  I

8    thought there was selection, a lower response rate.  I don't

9    know how the questions were phrased.  I don't know anything.

10             MS. GROSSMAN:  Well, that is why I was somewhat

11   outraged at the last conference that the plaintiffs are first

12   identifying this person at this late date and we're in this

13   position with a trial right around the corner.  It is not

14   right.

15             THE COURT:  Two months, but okay.

16             MS. GROSSMAN:  It is not right given all we have to do

17   that this is tantamount to -- this is like an expert.  I know

18   they didn't retain him, but we're treating him now like an

19   expert.  There was no notice to us at any time --

20             THE COURT:  I don't think you need him for a report.

21   There is a survey.  You have that.

22             MS. GROSSMAN:  We have a blank copy.  I don't know

23   that we have the whole survey.

24             THE COURT:  Stop.  Stop.  You don't know what the

25   results of his survey were?

D146FLOC

 1            MS. GROSSMAN:  We have an article.  We don't have the

 2    backup.

 3            THE COURT:  You do have the article that is the result

 4    of his survey, is that it?

 5            MS. GROSSMAN:  A short article.  The article doesn't

 6    give the details.  Maybe you can look at it.

 7            THE COURT:  Here we go again, it's nonjury trial.

 8            MS. GROSSMAN:  Either way the work that is involved in

 9    having to attack this witness with all that we have to do, we

10    may need to get our own expert to deal with this.

11            THE COURT:  Yes, to attack the survey.

12            MS. GROSSMAN:  Yes.  To put us in this position, this

13    is not a year ago.

14            THE COURT:  When did you first mention the Silverman

15    survey?

16            MR. CHARNEY:  In February of 2011, your Honor.  His

17    survey was an exhibit to our summary judgment.

18            THE COURT:  You had two years before the trial.

19            MS. GROSSMAN:  Your Honor, it was referred to

20    generally in a summary judgment motion after discovery was

21    closed.

22            MR. CHARNEY:  It was an exhibit.

23            THE COURT:  An exhibit?

24            MS. GROSSMAN:  So do you think that every article that

25    the plaintiffs attached as an exhibit and that we attached now

D146FLOC

1   becomes the subject of expert testimony?

2              THE COURT:  No.  I think it becomes a possible trial

3   exhibit.  You were on notice of these exhibits.

4              MS. GROSSMAN:  The 2012 survey hadn't occurred when

5   they made the summary judgment motion.  Why should we deal with

6   that?

7              MR. CHARNEY:  That is more relevant because it is even

8   more recently retained officers.  How can we be at fault for

9   not disclosing it during discovery?  We had no control over

10  this witness.

11             MS. GROSSMAN:  Now we're not learning about this

12  until -- if it came out August 2012, we're learning about it

13  just recently.  That is not right.

14             THE COURT:  Did you say November?

15             MR. CHARNEY:  November.

16             MS. GROSSMAN:  Your Honor, I really highly respect

17  your rules.  When you say discovery is closed and no more, no

18  more, no more I respect that and I follow that.  But if gets to

19  the point where the plaintiffs just give -- they continuously

20  put -- notify us of new witnesses years after discovery.

21             THE COURT:  Silverman is not a new witness.  The 2012

22  survey is new.  It wasn't completed until August.  It was an

23  exhibit in the summary judgment in 2011.  That is when you

24  first heard of Silverman.  That is when you heard of this

25  survey.  I assume it was a similar technique.  He sent the

D146FLOC

1    survey to retired officers and he got results.

2            What year was that one conducted?

3            MR. CHARNEY:  In 2010.

4            THE COURT:  He did this in 2010.  They used it in

5    2011.  You knew about his surveys.  You didn't know about the

6    August 2012 because he didn't complete it until August.  When

7    they knew about it, they told you about it and we've been

8    discussing it ever since.

9            MR. MOORE:  Plus, Judge, the NYPD has known about

10   these surveys, they have read them and they have analyzed them

11   within NYPD.  Maybe Corporation Counsel hasn't done this.  This

12   is not fair to say it is a big surprise.  In fact, his

13   co-author on one of the reports is a retired captain in the

14   NYPD who was involved at some point with the issue of stop and

15   frisk.  So this is not news to them.

16           MS. GROSSMAN:  Well, we're looking to move in limine.

17           THE COURT:  I think you will be better off taking his

18   deposition and finding out what he has to say.  Again, I am in

19   a difficult position if I read the article I know what he has

20   to say.  You may yet be able to preclude him when you take the

21   deposition.  There may be things that you find out that are

22   troubling in terms of survey technique that will be stricken

23   anyhow.

24           MS. GROSSMAN:  Your Honor --

25           THE COURT:  There is a lot of literature on surveys.

D146FLOC

1          MS. GROSSMAN:  Well, we need time to give some thought

2     on that.

3          THE COURT:  You can have all the extra time you need

4     on this survey guy because it is in an area that we haven't

5     worked in.  So this one will be exempt from the time limit.

6          MS. GROSSMAN:  And we need all the backups now that

7     supports all of those surveys and we don't have them.  I would

8     like them tomorrow.  I know it is Friday, but if they are

9     looking to pull these witnesses --

10         THE COURT:  I wouldn't say these witnesses.  It is

11    just this witness.  I don't know if you can contact this guy.

12    I guess you are in contact with him.

13         MR. CHARNEY:  Yeah.

14         THE COURT:  Does he have the return surveys?

15         MR. CHARNEY:  I can inquire and get back to the City.

16         THE COURT:  As soon as you can.  He is a professor.  I

17    assume he has all the backup.  I would think he has it in one

18    file, electronic or hard copy.

19         MS. GROSSMAN:  We need a date certain.

20         THE COURT:  Do you have the blank form?  Do you know

21    the questions that were asked?

22         MR. CHARNEY:  Yes.

23         THE COURT:  He must have backup.  He has had to have

24    kept it.  He is a professor.  It has to be photocopied and

25    shipped out.

D146FLOC

1          MS. GROSSMAN:  And any electronic data.

2          THE COURT:  I agree.

3          MS. GROSSMAN:  I don't want to get something and

4   determine that it is not right.

5          THE COURT:  Ms. Grossman, I agree with you.  They have

6   to contact him and get what he has and turn it over.

7          MS. GROSSMAN:  Well, I guess --

8          THE COURT:  You don't have a time limit on that

9   motion.  You can make it the last week for all I care.

10          MS. GROSSMAN:  Can we have a date certain that the

11   plaintiffs will get back to us?

12          THE COURT:  What if he is on an African safari?  Mr.

13   Charney --

14          MR. CHARNEY:  I will advise him by the end of the day

15   on Monday.

16          THE COURT:  Right.  By the end of the day Monday

17   advise us if Silverman can get this copied or you might find he

18   is out of the country and you can't find him.  You can e-mail

19   him.  Let's see where he is.

20          Number eight, "Because they are both hearsay and

21   outdated, the Court should not admit plaintiffs' various

22   reports."

23          There seems like there are two reports.  One is a

24   report from the New York Civil Liberties Union and Advocacy

25   Group.  One is the 1999 AG report.  The City opposes both, but

D146FLOC

1   I don't know what the basis is for the New York City Liberties

2   report.  How could that come up?  Under what exception is that?

3             MR. CHARNEY:  We're not going to submit it for the

4   truth.  We're not submit on the issue of notice relevant to

5   deliberate indifference.  In 2006 when the report was

6   published, we say that was putting the city on notice that

7   there may be potentially be problems with their civilian

8   complaint investigation process.  Similarly the AG's report,

9   which I think you are more familiar with, was a study of their

10  stop and frisk practices, a statistical study done by the same

11  person who is going to be testifying in this case for the

12  plaintiffs.

13            THE COURT:  Who is that?

14            MR. CHARNEY:  Jeffrey Fagan.

15            THE COURT:  Oh, him.

16            MR. CHARNEY:  So it is our view that the City has been

17  on notice for now more than a decade that there were problems

18  with their stop and frisk.

19            THE COURT:  With both reports neither is offered for

20  the truth but to say that the City had notice and if they had

21  notice and didn't do anything about it, it would be deliberate

22  indifference?

23            MR. CHARNEY:  Yes.

24            THE COURT:  Ms. Grossman.

25            MS. GROSSMAN:  Well, I don't know.  An advocacy group

D146FLOC

1   on the NYCLU putting their own spin on civilian complaints.  I

2   don't see how --

3          THE COURT:  All they are saying is it is not offered

4   for its truth.  I don't read it and say, Oh, my goodness, look

5   at these terrible goings on.  I say, Oh, the NYPD received it.

6   To the extent that they thought it was credible, they should

7   have acted.  If they thought it was pure fiction, they didn't

8   act on it.

9          MS. GROSSMAN:  I don't know that they received it.  If

10  the NYCLU posts something on their website --

11         THE COURT:  I don't know how they prove it was

12  "received" by NYPD or the higher-ups in the City.  I would have

13  thought that it would have been mailed to the police

14  commissioner.

15         MR. MOORE:  I am sure it was.

16         THE COURT:  Can you prove it?

17         MR. MOORE:  I can bring in Chris Dennon.

18         THE COURT:  Find out.  If it can be proved that it was

19  indeed mailed to the police commissioner, which I think it

20  would be.  You don't write a report like that to not send it to

21  the police department.  You want them to take action.  You say,

22  You should know these are our findings.  He is saying he is not

23  offering it did for me to believe those findings.  It is simply

24  to say this landed on the police commissioner's desk and the

25  police commissioner did nothing to address the problem.  The

D146FLOC

 1    City can say, We thought this report was junk.  We didn't

 2    credit it.  We read it.  We didn't think it was accurate.  So

 3    we didn't address it.  That's fine.  That may be your position.

 4    I as the fact finder would have to weigh all that.  All they

 5    want to do is say, The City higher-ups in the police department

 6    received this thing and didn't do anything about it.  That's

 7    all.

 8            MR. MOORE:  Is an affidavit sufficient from someone in

 9    the NYPD.

10            THE COURT:  Sure.

11            MS. GROSSMAN:  Well, this is the way on a trial we're

12    going to accept an affidavit from someone?

13            THE COURT:  Just that he mailed it to the police

14    department.  You want to put him under oath.  If he said he

15    sent it, he sent it.  I trust you, Ms. Grossman, in all or

16    representations.  If Mr. Dunn says, We forwarded it to the

17    chief the police or mayor, whatever he says, he says.  I have

18    no reason to doubt that.  Just like if you said, We put a memo

19    out to all of our ACCs once a year saying X, Y, X, I would

20    believe you.

21            MS. GROSSMAN:  Can we have a moment, your Honor?

22            THE COURT:  Sure.

23            (Pause)

24            THE COURT:  Are you going to make the same argument

25    with respect to the newspapers?

D146FLOC

1           MR. CHARNEY:  Yes.  What we're going to do with that

2     is not even for notice.  It is to refresh witness's

3     recollection about certain events that are discussed in the

4     article.  We are not trying to put them in of course for the

5     truth.

6           MS. GROSSMAN:  Well, I understand your ruling on the

7     NYCLU.  On the AG report, it is an old report.  It is from

8     1999.  Methodologies have changed.  Even Professor Fagan

9     testified to that.

10          THE COURT:  All he said again was this report was

11    sent.  They knew at least according to the AG's office there

12    was a problem and they didn't address it.  That is the only

13    argument.

14          MS. GROSSMAN:  I understand.  Notice as of when?

15          THE COURT:  Whenever that was sent.

16          MS. GROSSMAN:  1990.

17          THE COURT:  They are trying to prove this is a long

18    running --

19          MS. GROSSMAN:  Your Honor, we had the Daniel case --

20          THE COURT:  I have to address a footnote in some pages

21    back.  I saw a footnote at page 3.  Footnote 3, page 3:  "Stops

22    before 2004, which fall outside the statute of limitations and

23    class period should not be considered."  I wrote in the margin,

24    "Wrong."  Statute of limitations control causes of action.

25    Nobody can sue outside the statute of limitations.  It is too

D146FLOC

1    late to sue.  You cannot recover damages, can't bring a

2    lawsuit.  But evidence is not limited.  You are talking about

3    pattern and practice.  It can go back 20 years, 30 years when

4    you look at discrimination cases, pay cases.  There is no claim

5    left because the statute has run, but you can go back as long

6    as you have to go back to prove the pattern and practice.  I

7    don't know if that is to say where you are going now, but I

8    would allow evidence of stops.  There is no claim for it.  You

9    were saying something else about 1999 and this report.

10            MS. GROSSMAN:  Right.  You are aware of the Daniels

11   case and there was a settlement.  We know that that settlement

12   predates -- there was a period of time where the police

13   department agreed to do certain things and that sunset at a

14   certain time.

15            THE COURT:  That --

16            MS. GROSSMAN:  That agreement sunset.  The information

17   that is part of the AG's report predates these --

18            THE COURT:  Isn't that your response to it, that we

19   didn't ignore it at all, that we got it, we did take action and

20   we made certain accommodations or responses to receiving that

21   report by settling the Daniels case.  We agreed, for example,

22   to allow these forms for every stop.  It doesn't prove

23   deliberate indifference.  Quite the contrary, we got it, we

24   acted, we did what was right.  That will be the end of 1999

25   report.  It is all part of the trial record.  You have an

D146FLOC

1    answer.  Indeed, you did respond and it is not deliberate

2    indifference or at least that doesn't prove it.

3           MS. GROSSMAN:  Right.  So there comes a time where

4    every little piece of evidence shouldn't come into evidence at

5    this trial when you want to talk about efficiency, economy of

6    time.

7           THE COURT:  There is no time.  The report is received.

8    That is all they point out and that the report in summary says

9    there is a problem with stop and frisk.  You come back and say,

10   Yes, indeed, and we settled the Daniels lawsuit.  We acted and

11   we did take it seriously.  That can't prove deliberate

12   indifference.  That will take two and a half minutes of the

13   trial.

14          MR. CHARNEY:  Your Honor, we would then ask certain

15   NYPD officials what their responses were.

16          THE COURT:  Of course.  Some of them may have very

17   strong answers that they did take it seriously, they did

18   respond, changed the training, gave notices, filled out the

19   UF-250s.  They may make a case there was anything but

20   deliberate indifference.

21          MR. MOORE:  Can I have a moment, Judge?

22          THE COURT:  Sure.

23          MR. MOORE:  Judge, there is also the issue in order

24   to -- the issue of stop and frisk didn't arise in a vacuum.

25   You can take it back to 1999 with the Diallo thing.  And then

D146FLOC

1    there was an AG report.  The response to that may in fact have

2    been evidence that they weren't deliberately indifferent.  The

3    response to the AG report may be that they were.

4            THE COURT:  That is right.  That is something that I

5    will have to decide.  I am not prejudging.  I was giving the

6    City the script, their side of it that they did respond and you

7    will say they didn't.  I will eventually decide whether the

8    plaintiffs have succeeded in proving deliberate indifference.

9            MS. GROSSMAN:  Right.

10            MR. MOORE:  Excuse me.  I wasn't finished.

11            One of the things that -- one of the aspects of this

12    development was that it's the plaintiffs' allegations that they

13    didn't live up to the terms of Daniel's settlement.  In order

14    for this to have any meaning contextually, you have to tell the

15    story from when it began.

16            THE COURT:  Yes.  I am not disagreeing with you.  I

17    was telling the City why it is not inefficient.  It is not

18    taking a lot of time.  It is what it is.  Here are the

19    documents that the New York Police Department received such as

20    this AG report, Civil Liberties report or New York Times.  It

21    is just saying here is what they received.  How seriously did

22    they treat it?  What was their response?  What did they do or

23    not do?  That's all.  It is not a matter of the truth of

24    anything in either report at this point.  It is only to say the

25    City was alerted to an issue.  I wouldn't call it a problem.

D146FLOC

They were alerted to an issue and then they responded as they

responded.  I have to evaluate in the end whether it was

deliberate indifference or not deliberate indifference.

Then we get to the Rand report, which the City does

want to admit to counteract the other evidence of deliberate

indifference.  Again, they say they are not offering it for its

truth either but rather to show that the City did evaluate its

stop, question and frisk practices to disprove deliberate

indifference.  So it does sound a little goose and gander.  If

these other reports are brought in to show notice of an issue

or problem and what was done and not done and the Rand report

not offered for its truth is brought in to show some actions

that were taken to disprove deliberate indifferent.

MR. CHARNEY:  Your Honor, a question I would have and

this might help us narrow this even further is it is unclear

from the City's letter when they say they are going to use it

on this deliberate indifference issue, how they are going to

use it.  Are they merely going to say the fact that we hired

Rand to do a study shows that we weren't deliberately

indifferent?  Or are they going to say the findings of that

study gave us a basis to think we did not have the problem.  If

it is the latter, then we would ask that Professor Fagan who

has already done a critique of the Rand report and produced

that critique to the City should have the opportunity to then

rebut those findings if in fact what they are trying to find is

D146FLOC

1   the substance of the findings in the report were enough of a

2   basis for us to say we don't have to make any changes.

3            THE COURT:  That goes to their state of mind.  In

4   other words, without my believing in the accuracy of the Rand

5   report, let's say, I don't know whether it is accurate or not,

6   if that is true, then in my mind it could be accurate or not

7   accurate.  It doesn't matter what I think.  What they are

8   saying is we believed it was accurate.  We believed it so we

9   didn't think we have to do more.

10           MR. CHARNEY:  If that is the issue, we should have the

11  opportunity to show that their belief was not reasonable.

12           THE COURT:  Right.  Not to prove to me that the

13  conclusions of Rand were right or not right because that is not

14  the issue of why it is being offered.  They are saying they

15  reasonably believed it and thought they cured a problem.  If

16  you show their belief was not reasonable because the study was

17  so flawed that any higher ranking official should have known

18  that, then I would find their belief not reasonable.

19           MR. CHARNEY:  I guess the question is:  If they are

20  trying to use it to show they had a reasonable belief, we

21  should have the opportunity to --

22           THE COURT:  To show that belief was not reasonable.

23  That makes sense.

24           MS. GROSSMAN:  Well, your Honor, I don't know that

25  plaintiffs had the Rand report and they even made commentaries

D146FLOC

1  in the Fagan report.  So whatever is in the four corners of his

2  report --

3        THE COURT:  Correct.  That is what Mr. Charney just

4  said.

5        MS. GROSSMAN:  Likewise, the professor should be able

6  to say the same thing.

7        THE COURT:  Is it Dr. Smith and Mr. Fagan?

8        MR. CHARNEY:  I think they are both Ph.D's.

9        MR. MOORE:  One second, Judge?

10        THE COURT:  Yes.

11        (Pause)

12        MR. MOORE:  I can understand how the Rand report would

13  in the mind of policymakers of the police department arguably

14  say there is not a problem so therefore we're not deliberately

15  indifferent.

16        THE COURT:  Right.

17        MR. MOORE:  But Ms. Grossman just referred to

18  Dr. Smith and Professor Smith referring to the Rand report.

19        THE COURT:  Only to rebut Dr. Fagan's testimony that

20  no reasonable person relied.  Fagan comes back and said, I

21  think it is quite reasonable for the police commissioner to

22  have relied.

23        MR. MOORE:  That bootstraps the Rand report.

24        THE COURT:  What can I do about that?  If Fagan is

25  allowed to say, No one should reasonably rely, surely their

D146FLOC

1    expert can say the opposite.

2            MR. MOORE:  Well, he is not going to say that if it is

3    not part of the case.  They will be introducing the Rand

4    report.

5            THE COURT:  Correct.

6            MR. MOORE:  As a piece of evidence.

7            THE COURT:  Offered only to show that there was a

8    basis for the police department to believe that they solved a

9    problem and didn't have a problem and therefore their behavior

10   was no longer, if it ever was, deliberately indifferent.  Mr.

11   Charney says, If that is the purpose for offering it, I want my

12   expert to say no reasonable police commissioner could have

13   relied on this flawed report.  Smith comes back and says, I

14   totally disagree.  It was perfectly reasonable.  He relied

15   personally on the methodology and conclusions.  It makes a lot

16   of sense.  The finding was for the police commissioner to

17   believe so.

18           MR. MOORE:  You recall there was all this discussion

19   early on in the case about being able to depose the people.

20           THE COURT:  Right.

21           MR. MOORE:  We were unable to do that.

22           THE COURT:  Correct.  And they are not coming in here.

23   It is not offered for the truth.

24           MR. MOORE:  So Dr. Smith cannot rely on it for the

25   truth.

D146FLOC

1          THE COURT:  Of course not.  He is going to rebut

2     Dr. Fagan and say, I think the police commissioner's reliance

3     was reasonable.

4          MR. MOORE:  We'll see how it plays out.

5          THE COURT:  Fine.  The other letter, the plaintiff's

6     letter.  Number one, "Plaintiff's trial questioning of NYPD and

7     CCRB employee witnesses."  They want to be able to ask leading

8     questions when current and former NYPD and CCRB employees who

9     they call as trial witnesses who are obviously under the

10    control or closely aligned with the defense and thereby are

11    considered hostile witnesses.  I have no problem with leading

12    questions.  Again, this is a nonjury trial.  I don't care

13    whether it is nonleading or leading.  I will get it.  That is

14    what it is.

15         MS. GROSSMAN:  Your Honor, I understand.  I just want

16    to note that in this the Newton case for example you ruled

17    opposite.

18         THE COURT:  It was a jury trial.  It was a jury trial

19    is all I can say.

20         MS. GROSSMAN:  I think the rules --

21         THE COURT:  Do you know what ruling you are referring

22    to?

23         MS. GROSSMAN:  September 21st, 2010.  It's on page 23.

24         THE COURT:  Of the trial transcript?

25         MS. GROSSMAN:  The motion in limine ruling.

D146FLOC

1          THE COURT:  The plaintiff wanted to lead?

2          MS. GROSSMAN:  To treat all City witnesses as adverse

3   and your ruling was that for the defendants if they are called

4   as witnesses, yes.  But if other witnesses who are City

5   employees, you don't necessarily know they are adverse or

6   hostile and I am not going to rule on it at this point in time.

7   You reserved until the trial.

8          THE COURT:  I have no problem here.  This is a case

9   about police practices against the whole police department and

10  the way it does business in the stop and frisk area.  It seems

11  to me a lot different.

12         MS. GROSSMAN:  They are investigating civilian

13  complaints.

14         THE COURT:  Yes.  Why would you lead the CCRB people?

15  Just ask them what you have to ask them.  I can see a former

16  police officer or current police officer.

17         MR. CHARNEY:  To the extent that we're challenging the

18  sufficiency of their system, their ability to hold officers

19  accountable, it seems they would be adverse to our questions.

20         THE COURT:  Well, maybe not.  Who is on the CCRB these

21  days?

22         MR. CHARNEY:  Executive director.

23         THE COURT:  I know.  Who appoints them?

24         MR. MOORE:  The City.

25         MR. CHARNEY:  It is a mayoral agency.  It is under the

D146FLOC

| | |
|---|---|
| 1 | mayor's jurisdiction.  It is independent from the police |
| 2 | department but not from the mayor. |
| 3 |      THE COURT:  Right.  I don't think you should lead the |
| 4 | CCRB witnesses.  Just ask them the usual questions that you ask |
| 5 | on direct.  Don't lead them.  Now we are -- |
| 6 |      MR. CHARNEY:  Your Honor -- I am so sorry.  I am so |
| 7 | sorry the only other thing we said in the last sentence of that |
| 8 | section of our letter, we just ask that for all these City |
| 9 | witnesses that the defendants use their best efforts to make |
| 10 | them available. |
| 11 |      THE COURT:  Certainly current police officers.  That's |
| 12 | for sure.  As far as former, they may have to give you last -- |
| 13 |      MR. CHARNEY:  Yes. |
| 14 |      THE COURT:  -- known addresses for subpoenas.  As far |
| 15 | as CCRB if they are current and therefore employed by the City |
| 16 | of New York, the City should try to accommodate you. |
| 17 |      MS. GROSSMAN:  Your Honor, we've always accommodated |
| 18 | whenever we can.  This is not a one-week trial.  And the |
| 19 | plaintiffs are doing something -- it's their prerogative, but |
| 20 | they are calling they're our witnesses in their case in chief. |
| 21 |      THE COURT:  That's very common.  I have that in every |
| 22 | trial. |
| 23 |      MS. GROSSMAN:  Four to six weeks of a trial, I need to |
| 24 | know ahead of time. |
| 25 |      THE COURT:  I agree. |

D146FLOC

1              MS. GROSSMAN:  Not the week before.  I need to be able

2     to plan with enough notice to get people set up.

3              THE COURT:  That would be good.

4              MS. GROSSMAN:  So I just think that in terms of

5     logistics the sooner the better.

6              THE COURT:  I agree.

7              MS. GROSSMAN:  We can make a proposal when we think we

8     need them.

9              THE COURT:  Number two says, "The Rand report and

10    testimony about the Rand report."

11             Have we done this?

12             MR. CHARNEY:  I think we resolved this one.

13             THE COURT:  Number three, "Evidence of the purported

14    crime control effects of stops and frisks."

15             I wrote one word in the margin.  I agree with

16    plaintiffs on this.

17             MS. GROSSMAN:  Your Honor, let me just remind you.

18             THE COURT:  Go ahead and remind me, but I know my

19    views on this.  I am not here to judge the effectiveness of

20    policy.  I am here only to deal with Constitution.  That is

21    what a federal court can do.

22             MS. GROSSMAN:  Right.  I understand that.  In your

23    ruling, the Daulbert ruling regarding Professor Smith, you

24    specifically says in your opinion and order of August 17th,

25    2012, page 20, "Neither expert will be permitted to speculate

1        about the intent of the NYPD policymakers or the efficacy of

2        those policies.  Although, defendants and their representatives

3        may testify as to their intent."

4                On page 16 you also said, referring to the reduced

5        neighborhood crime, "While Smith is not qualified to provide

6        this testimony, both in their court filings and public comments

7        defendants regularly state that the intent behind the program

8        is to reduce crime, not to the discriminate.  Defendants and

9        their reps may testify about what the City adopted and

10       understood the stop, question and frisk program."

11               THE COURT:  If I said that then I say it again, but

12       they have not prove the effectiveness.  The reason we do this

13       is to reduce crime.  Don't give me the statistics on the

14       homicide rate or burglaries or robberies or subway pushings on

15       the tracks or anything else.  I cannot deal with the

16       effectiveness.  My sole role is the Constitution.  Does it

17       violate the Fourth Amendment or not?

18               MR. CHARNEY:  We'll not stipulate to that.

19               THE COURT:  I can't care whether it is effective.

20       Let's take hypothetical.  This is a hypothetical, Ms. Grossman.

21       I want you to realize I will be saying the word hypothetical

22       five times.  Let's assume the City decides to do something

23       unconstitutional, which is highly effective.  That is not my

24       business.  My business is always the Constitution.  I don't

25       care if it is effective.  I can't.  That is not for me.  My

1    role is to say whether it is constitutional or not

2    constitutional.  So there can be the most effective thing in

3    the world, maybe we can tap everybody's phone every day.  In

4    terms of law enforcement that would be good, but it would be

5    unconstitutional.  And you would agree with that.

6          Now, if terms of their intent as you pointed out to

7    rebut the charges, again it is di liberate indifference or

8    other charges of discrimination.  Again, they can say the

9    intent of this program is to reduce crime.  Fine.  Then next

10   question can't be and hasn't it worked because it is not part

11   of the constitutional analysis.  If hypothetically the City

12   said we're going to violate the Constitution from this day

13   forth and coerce confessions for everybody we arrest, it might

14   be good for stopping crime but it would be unconstitutional and

15   you know that.  Clearly that is a hypothetical.  I won't say

16   you would think about doing that.  My point is I can't care

17   whether it is effective.  I can only care if it is

18   constitutional.

19         MS. GROSSMAN:  Well, the plaintiffs claim that we

20   target black and Hispanics in certain neighborhoods and that

21   we're going in there to stop black and Hispanic people without

22   any basis.  That is a race-based reason why we go into

23   certain --

24         THE COURT:  And your people can testify as I said

25   before that their intent in this program is to reduce crime,

D146FLOC

```
 1   not this discriminate.  I will not take the crime statistics in
 2   this trial.  Whether it reduces crime or not is not my concern.
 3   I just said that.  I gave you two hypotheticals.  You can beat
 4   people to get confessions.  So what.  Wrong.  Unconstitutional.
 5   When people ask for lawyers you can say, No, I am not going to
 6   give you lawyers.  Unconstitutional.  It may help you find
 7   information, but it is unconstitutional.  So I don't deal with
 8   that that is unconstitutional.
 9              MS. GROSSMAN:  Can I have one moment, please?
10              THE COURT:  Surely you see that point.
11              (Pause)
12              MS. GROSSMAN:  This ruling would not prohibit the City
13   from talking about why we send officers into certain areas.
14              THE COURT:  What is the answer?  We did it to reduce
15   crime.
16              MS. GROSSMAN:  Is it also to address specific crime in
17   an area.  If there is a spike in crime in a particular area and
18   if we're looking at the City as a whole, where we want to bring
19   our officers --
20              THE COURT:  I can't deal that level of generality.  I
21   think it sounds fine.  I am not going to take the result of the
22   work.  That would be wrong.  If it is unconstitutional
23   behavior, I don't care if it works.  I can give you five more
24   examples.  We can have preventative detention all over town.
25   It might be great for law enforcement, but it would be
```

D146FLOC

1    unconstitutional.  I can reasonably fucus on a neighborhood

2    that has a high crime rate.  The reason we put a lot of

3    attention to that borough is that it has a high crime rate.

4    Fine.  I don't want to hear evidence that it works because that

5    is not part of the constitutional analysis.  It either complies

6    or it doesn't with the Constitution.

7          MS. GROSSMAN:  Well, if you are going to allow the

8    assessing of the intent of the City, then are you going to

9    accept that it is credible?

10         THE COURT:  I will listen to the cross-examination.

11         MS. GROSSMAN:  Right.  But then the backup of what it

12   is that in terms of why we do what we do and our intention, you

13   need to see that to give full flavor.

14         THE COURT:  There will be no back door here.  I am not

15   taking any statistics on the efficacy of the program.  Either

16   the program meets the level of constitutionality or it doesn't.

17   I am only a Court.  I am not a policymaker.

18         MS. GROSSMAN:  This is not a program.  This is a

19   technique.  So to assume this is a program --

20         THE COURT:  Fine.  I take back the word program.  I

21   take back the word program.  It's policing.  Stop, question and

22   frisk.  It is a tactic.  It is either done constitutionally or

23   not.  It's allowed.  Read the Supreme Court.  It is allowed,

24   but you have to meet certain qualifications to do it.  The

25   Supreme Court told us what a Terry stop was in 1968 as somebody

D146FLOC

1    already said here and they went on from there.  They told us

2    what they thought about New York too in Sibron.  So it is out

3    there.  That was all part of 1968, companion, Peters, Sibron,

4    Terry.

5              MS. GROSSMAN:  I understand.

6              THE COURT:  Good.

7              MS. GROSSMAN:  The reason we stop people is because of

8    race and we say the reason why we stop people is because there

9    is reasonable suspicion and --

10             THE COURT:  We're going to assess that on a case by

11   case basis the reasonable suspicion.  So I think I ruled on MIL

12   number three.

13             MIL number four, "Witnesses prior conduct, habits and

14   unrelated stops and frisks."

15             Do you have a response to this before I tell you my

16   instinct?

17             MS. GROSSMAN:  Yes.

18             THE COURT:  What is it?

19             MS. GROSSMAN:  First of all, I do believe that all of

20   this information and at least some of it is relevant to the

21   reliability of the testimony of these witnesses.

22             THE COURT:  I wrote a big note in the margin "check."

23   They said a witness's drug use is not admissible impeachment

24   evidence under Federal Rules Evidence 608(b) because drug use

25   is not probative of the character of the truthfulness.  Hango

D146FLOC

 1    v. Roy, (2d Cir. 2012).  I didn't have a chance to look at that

 2    case.  If that is what the case says, it is over.

 3              MS. GROSSMAN:  Let me say I am not necessarily

 4    offering it for the truth of the matter or character or

 5    truthfulness.  What I am offering a lot of this for is first of

 6    all many of the witnesses -- it is about their perception and

 7    their memory.

 8              THE COURT:  Then it goes on.  Nor is a witness' drug

 9    use admissible to impeach their memory of the events at issue.

10    Sixth Circuit, Eighth Circuit, Southern District of New York.

11    Three cases cited.  That is why I asked if you had a response

12    because there is a lot of case law.

13              MS. GROSSMAN:  I haven't had a chance to go through

14    all the cases.

15              THE COURT:  Me neither.  If the cases say what the

16    plaintiffs say they say, I wouldn't allow evidence of their

17    prior acts, habits, conduct and all the rest.

18              MS. GROSSMAN:  I am offering for a different purpose

19    because many of the witnesses will come in and talk about all

20    these stops that occurred.

21              THE COURT:  Yes.

22              MS. GROSSMAN:  We know that some of the cases -- we

23    contend that the stops didn't happen and many of them don't

24    remember if they were arrested.  Many of them don't remember

25    when they were arrested if they were.  So in terms of their

D146FLOC

1   memory and perception --

2           THE COURT:  You can impeachment with an arrest.

3           MS. GROSSMAN:  Sure.

4           THE COURT:  If you can say, Do you recall that you

5   were ever arrested?  No, I can't recall ever being arrested.  I

6   show you Document X, does that refresh your recollection that

7   you were arrested on June 10th --

8           MR. MOORE:  Judge, why is that --

9           THE COURT:  Only --

10          MR. MOORE:  I am sorry.  Isn't it the mirror image of

11  your ruling with respect to limiting the plaintiffs to their

12  testimony about the stop and nothing that happened afterwards?

13          THE COURT:  No.  If someone denies ever being arrested

14  and it is proveable that they were, this may go to their

15  memory, their truth telling.  It is not the fact that they were

16  arrested.  It is not the alleged crime that they were arrested

17  for but that they claim they can't remember being arrested and

18  then there is proof they were arrested five times.

19          Surely, Mr. Moore, if you were arrested five times,

20  you would remember.  I know I would.  That is all I am saying.

21  It goes to credibility.  If someone says, I can't remember ever

22  being arrested and she walks into cross-examination with five

23  arrests.

24          MR. MOORE:  I don't --

25          THE COURT:  There may not be any such case; but if

D146FLOC

1    there is, I will allow them to show that they are not being

2    truthful or they have a very bad memory.

3           MR. MOORE:  That -- I agree with that.  I am not sure

4    if there is any specific instances like that.

5           THE COURT:  That's right.  So we don't have to worry

6    about it.

7           MR. MOORE:  I am concerned that the City wants to

8    rummage into the past of all these plaintiffs in a way that

9    goes beyond the issues in the case which is was there --

10          THE COURT:  Look, I can understand this whole

11   discussion a lot more if it was a jury trial, that they would

12   want to paint for the jury the fact that this person was a drug

13   user or had a drug conviction.  That is not the case with this

14   highly experienced judge.  It depends on everything.  It is all

15   circumstantial.  I think I can separate all that.  The purpose

16   I am being told here is to show -- and I am making this up --

17   who has five arrests and denies ever being arrested might not

18   be an honest person.  That is what she says she is using it

19   for.

20          MS. GROSSMAN:  Well--

21          MR. MOORE:  On the same token, Judge, a police officer

22   who has five substantiated complaints and denies ever having

23   any --

24          THE COURT:  Do you have that situation?

25          MR. MOORE:  I don't know, but I am sure --

```
 1              THE COURT:  I don't know that you have that.  I doubt
 2      you have it because the way the objections work, if they
 3      weren't disclosed to you because they were similar to this and
 4      they didn't allow the question were you disciplined because
 5      then we're down to the overtime abuse or the uniform was dirty
 6      or saying nasty words.
 7              I think we should move on.  It is a very limited
 8      purpose.  These cases say what they say.  The use of illegal
 9      drugs has nothing to do with character for truthfulness and
10      drug use is not admissible to impeach memory.
11              MS. GROSSMAN:  I understand --
12              THE COURT:  It is to show this is an obvious in your
13      opinion lie.  I am talking about an obvious lie which shows
14      they shouldn't be entitled to belief.
15              MS. GROSSMAN:  It doesn't have to be a lie.
16              THE COURT:  I think so.  No.  No.  No.  I am trying to
17      get through to you.  If you don't have somebody close to a real
18      lie that you can then argue, Judge, you shouldn't believe this
19      person because when I asked a question were you ever convicted
20      of a crime, the person said, No, and I have five convictions
21      here.  Or I asked him at deposition, Were you ever arrested,
22      and he said, I don't remember, and I have five arrests here.
23      It will have to be close to a lie or forget it.
24              MR. CHARNEY:  On that issue, your Honor, with respect
25      to other stop and frisk incidents, we have some plaintiffs who
```

D146FLOC

1   have been stopped 20, 30 times in their life.

2           THE COURT:  So they say.

3           MR. CHARNEY:  They are not planning to testify

4   about --

5           THE COURT:  I know.

6           MR. CHARNEY:  -- all 20 or 30.

7           THE COURT:  I know.

8           MR. CHARNEY:  For example, one man is going to testify

9   about three.  He has probably been stopped 20 or 30 times.  He

10  complained about those to the CCRB.  He has no intention of

11  offering specific testimony about any other stops but those

12  three.

13          THE COURT:  And?

14          MR. CHARNEY:  Defendants are indicating they want to

15  be able to ask him about all of these other stops, many of

16  which he will be able to remember.  The question is:  Are they

17  trying to use --

18          THE COURT:  You can't worry about every little thing.

19  I am trying the case.  I will have to see how it impacts.  I

20  have been doing this a while.

21          It says, and I am quoting to be sure we're on the same

22  page, "None of the class member witnesses have been convicted

23  of a crime punishable by death or imprisonment of more than one

24  year."  So you cannot use this prior record to argue that they

25  are not entitled to belief.  It is not for credibility.  It

1    says, "Third:  Evidence of a witness' conduct unrelated to the

2    circumstances surrounding the stops and frisks that the

3    plaintiffs are challenging are not admissible under 404(b) for

4    the purpose of proving the stopping officer acted reasonably

5    under the Fourth Amendment."  That certainly is true because

6    the only issue is what the officer knew at the time of the

7    stop.  If the officer didn't know about other stops or other

8    arrests, then it couldn't affect his decision to make this

9    stop.

10          MS. GROSSMAN:  Well, your Honor, some of the

11   encounters with police, prior encounters with police, prior

12   arrests show a bias against the police.  I think also if there

13   are a number of stops that the individual has been subjected to

14   or police encounters that they are not contesting and we would

15   be able to argue that they were appropriate stops.

16          THE COURT:  What is the purpose of that testimony?

17          MS. GROSSMAN:  Well, if the plaintiffs are showing

18   that they are subject to a pattern and practice isn't it

19   probative to know there are other stops that they are subjected

20   to that were unconstitutional?

21          THE COURT:  No.  No.  What if there were 100 stops

22   last month and 70 are perfectly good.  Good stops.  Reasonable

23   basis to do it and 30 are bad.  70 good does not cancel out 30

24   unconstitutional stops in my hypothetical.  No way.  You cannot

25   go around 30 times stopping people who shouldn't be stopped.

1          MS. GROSSMAN:  Statically if you look at the framework

2     and the context --

3          THE COURT:  I missed that.

4          MS. GROSSMAN:  If you look at the framework and

5     context, if you look at a whole picture over time that there

6     are X number of encounters and we're talking about the stops

7     that the plaintiffs are actually contesting represents a

8     miniscule portion of the whole.  That is --

9          THE COURT:  No.  You can't prove that by showing that

10    this person claims that they were stopped 20 times but only

11    contesting three today.  That doesn't give you a miniscule

12    portion of the whole.  This is not the argument that there

13    where are 2.8 million stops and of those 2.8 million stops

14    Fagan only finds, I don't know --

15         MR. CHARNEY:  180,000.

16         THE COURT:  -- 180,000 were bad stops.  That means we

17    made 2.6 million good stops.  First of all, you have that

18    argument.  We made 2.6 million good stops because they are only

19    contesting 200,000 and that is a miniscule percentage of 2.8

20    million.  It is less than 10 percent.  You have that evidence

21    anyway.  92 percent of our stops is good even according to

22    Fagan.  180,000 bad was stops is too many unconstitutional

23    stops.

24         MS. GROSSMAN:  Statistics is not the only thing you

25    are relying on.  If you are going accept Fagan's report to that

 1   extent the similar type of evidence --

 2          THE COURT:  I thought you would want to tell me that,

 3   he is contesting only 8 percent of all the stops.  You do what

 4   you have to do.  No, I am not going to allow these people to be

 5   questioned about other stops.  It is impermissible 404(b).

 6          I am turning now to Commissioner Kelly's out-of-court

 7   statements on stop and frisk.  I am not sure what I meant, but

 8   I wrote "Can't have it both ways.  Either he is in or he is

 9   out."  It says, "Plaintiffs want to prevent the defendant from

10   offering out-of-court statements that Commissioner Kelly made

11   including a letter from the Commissioner to the city council on

12   November 15th, 2010, responding to Rand's recommendation."  It

13   is clearly an out-of-court statement.  He clearly can't be

14   cross-examined on it.

15          The letter goes on to say, "The defendants do not list

16   Kelley as a trial witness and they told us two years that he

17   wasn't going to be a trial witness and therefore he was never

18   deposed."  You cannot have Kelly and not have Kelly.  Either

19   we're having Kelly at this trial or not.  We're not having him

20   by one letter that cannot be cross-examined.

21          MS. GROSSMAN:  Your Honor, this letter is just a

22   summary of the efforts that the police department has made in

23   response to the Rand recommendations.  There is a whole group

24   of people who carry out and implement --

25          THE COURT:  None of the witnesses at this trial can

D146FLOC

1   testify to that?

2               MS. GROSSMAN:  Of course.

3               THE COURT:  Good.  Someone else will.

4               MS. GROSSMAN:  So other witnesses should be able to

5   testify about what happened and --

6               THE COURT:  Not the Kelly letter.

7               MR. CHARNEY:  Why do they need the letter?

8               THE COURT:  Thank you for your echo.  If people are

9   going to testify to the Rand report, they can.  As long as they

10  are here, they can be cross-examined.  I will not have

11  Commissioner Kelly testify by not showing up.  It will be put

12  in as his testimony, no cross-examination, out-of-court

13  statement, pure hearsay.  Nobody else who is here at trial is

14  welcome to say how the City responded to the Rand report.

15              MS. GROSSMAN:  You know, your Honor, I understand you

16  are willing to accept an affidavit from Mr. Dunn so we don't

17  have to bring someone in to say something very simple, which

18  is --

19              THE COURT:  If you really are not happy about that,

20  we'll bring him in tomorrow.

21              MS. GROSSMAN:  I am trying to be efficient.

22              THE COURT:  You really are not.  Bring him in Monday.

23  Have him take the stand.  Have him say whether the report was

24  mailed so I can never hear this again, please.  Bring in

25  Mr. Dunn on Monday.  I don't want to waste time talking about

D146FLOC

1      something so silly as this.  Ask whether he has first-hand

2      information whether the Civil Liberties report was sent to the

3      police report.  We will do it in court on the record and then

4      you can't accuse me of that again.

5                MS. GROSSMAN:  I am not trying to accuse --

6                THE COURT:  Bring him in, Mr. Moore.  I am willing to

7      believe Dunn and not Kelly.  That is totally false.  This was

8      not evidence at trial.  It was simply to show you that the

9      report was mailed.  I don't want to do it that way anymore.

10     Bring Dunn in.  Whatever day he is free, I am free.

11               MR. MOORE:  I was going to say not on Monday.

12               MS. GROSSMAN:  Your Honor --

13               MR. MOORE:  It may be done --

14               THE COURT:  Whoever knows it was sent to the police

15     department, bring that person is.  The City has nine lawyers

16     here today.  Any one of the nine can be present so they can

17     hear it live.

18               MS. GROSSMAN:  Your Honor, I was not accusing --

19               THE COURT:  Ms. Grossman, sit down.

20               MS. GROSSMAN:  I wanted to apologize.

21               THE COURT:  Sit down.  I am done with that.

22               Turning to evidence of Deon Dennis' arrest warrant.

23     "The plaintiffs say the defendant should be precluded from

24     presenting evidence or argument concerning any outstanding

25     arrest warrants because that is irrelevant."  It is already

D146FLOC

```
 1    said here that the police officers were unaware of any warrant.

 2    So of course it shouldn't come in because the police officers'

 3    behavior is judged by facts they knew when they made a stop,

 4    not what they learned a month later or six months later or two

 5    years later.  That doesn't go into what caused them to make the

 6    stop at the time.  It doesn't matter that there were

 7    outstanding arrest warrants unless they were aware of it and

 8    apparently they will testify they were not.

 9            MS. GROSSMAN:  So, your Honor, on that point first of

10    all we believe that this is a subject of a prior ruling, which

11    is that anything to do with Deon Dennis should be limited to

12    the circumstances of the stop.

13            THE COURT:  Correct.

14            MS. GROSSMAN:  So that includes steps that were taken

15    after --

16            THE COURT:  We already covered that.  If statements

17    were made after the stop that described the stop -- if the

18    officer wrote a narrative summary in his memo book or summons

19    or complaint -- that is a statement of the officer.  If

20    Mr. Dennis gave a statement somewhere, that's a prior

21    statement.  So we already covered that an hour and a half ago.

22            MS. GROSSMAN:  What I want to bring us back to is that

23    in this -- a little bit of detail will be helpful -- Mr. Dennis

24    was approached for public consumption of alcohol or having an

25    open container and the officer was going to give him a summons.
```

D146FLOC

```
 1    That is not even a stop situation under the Terry.  We had a

 2    basis to issue a summons.  For that reason we think it should

 3    not be part of this case.  Assuming that the Court believes

 4    that he should testify, at the very least the basis for the

 5    stops should be all that is covered.  However, what happens is

 6    after we stop him and we are going to issue a summons, we learn

 7    after we check his ID and a warrant comes up.  It is at that

 8    moment in time that the police department decides to arrest

 9    him.

10              THE COURT:  Is this not an arrest case?

11              MS. GROSSMAN:  As long as there is no testimony that

12    goes -- there are seven witnesses that are attached to this

13    Deon Dennis incident, which has to do with an investigation

14    that took place later at the command because the plaintiffs

15    complained about the warrant being issued.  As long as we don't

16    have to get into testimony about all that--

17              THE COURT:  We shouldn't.  I don't see where these

18    plaintiffs are going to the post-stop issues.  The arrest is

19    not part of it.  Either the stop was good or bad.  You are

20    defining the stop differently.

21              MR. CHARNEY:  Yes.

22              THE COURT:  When does the stop occur is one of the

23    biggest issues in the case.  I know what the Supreme Court

24    said, When a reasonable person would feel free to leave.

25              MS. GROSSMAN:  I understand there are witnesses that
```

D146FLOC

1    are on the existing -- the list that the plaintiffs provided to

2    us that relate to those witnesses that I don't think should be

3    testifying given this ruling.

4              THE COURT:  Mr. Charney, I don't--

5              MR. CHARNEY:  Absolutely.

6              THE COURT:  -- any --

7              MR. CHARNEY:  The reason those people were on our

8    initial list is because we didn't know if this warrant was

9    going to be an issue.

10              THE COURT:  Now that you know they are off --

11              MR. CHARNEY:  Some will be off.

12              THE COURT:  Then we move on.

13              MS. GROSSMAN:  It was also part of the Rider report,

14    this whole investigation.  We don't want Rider to be giving

15    testimony on this.

16              THE COURT:  He shouldn't be testifying about this

17    anyway.  I was going to take him as a general expert on police

18    practice.

19              MR. CHARNEY:  There was a CCRB compliant about this

20    stop and investigation --

21              THE COURT:  Statements were taken.

22              MR. CHARNEY:  Statements were taken and we believe the

23    investigation was inadequate.  We don't care about the warrant.

24              THE COURT:  What issue does that go to?

25              MR. CHARNEY:  The failure to discipline an officer of

D146FLOC

 1  a bad stop.  If the warrant is out, we're not going to put in

 2  evidence about the warrant.

 3          MS. GROSSMAN:  You cannot have it both ways.  The

 4  investigation was into why the warrant was issued.

 5          THE COURT:  I don't want that part.  I want to find

 6  out about the stop.  If they investigated the stop, they

 7  investigated it.

 8          MR. CHARNEY:  It was both.

 9          MS. GROSSMAN:  Your Honor, I have a copy.

10          THE COURT:  Redact it, disentangle it, Mr. Charney.

11          MR. CHARNEY:  We can do that.

12          THE COURT:  Motion in limine seven:  "Class member

13  witness testimony about neighborhood crime.  Plaintiffs will

14  seek to exclude this."  I will wrote in the margin "Would

15  allow."  So I already wrote, "Would allow."

16          Why should I exclude this?  Look, high-crime area is

17  checked off all the time on UF-250s.  So I know it is given as

18  a justification that it is a high-crime area.  If the plaintiff

19  witness was asked, Do you think your own neighborhood is a

20  high-crime area and he says, Yeah, so be it.  I already stated

21  the law.  If all is checked off is high-crime area is that a

22  basis for a stop?  No.  We already covered that in the summary

23  judgment motion practice I believe.

24          MS. BORCHETTA:  Your Honor, I think it goes to the

25  witnesses -- whether the witness' understanding of crime in the

D146FLOC

1    neighborhood has anything to do with officers basis for

2    reasonable suspicion.

3              THE COURT:  It is not for that purpose.  It is to

4    substantiate that there are other people besides a police

5    officer who thinks this is a high-crime area.  In the end so

6    what.  If all you checked off was "high-crime area," would that

7    justify a stop?  Have I not written on that?

8              MR. CHARNEY:  Yes.

9              THE COURT:  The answer was no.  It is not --

10             MS. BORCHETTA:  Because they are asking all of the

11   class --

12             MR. MOORE:  You have to slow down.

13             MS. BORCHETTA:  -- we anticipate they will do the same

14   at trial.

15             THE COURT:  I do, too.

16             MS. BORCHETTA:  I believe it is not relevant.

17             THE COURT:  It is relevant to me.  It shows somebody

18   besides the police believes it is a high-crime area.  If that

19   is all the police officer can tell me, it is a bad stop.

20             MS. BORCHETTA:  The UF-250 does not check off

21   high-crime area.  If the police officers didn't say that it was

22   high-crime area, why does it matter whether the witness --

23             THE COURT:  I didn't think of that.  I figured these

24   were high-crime areas.  A lot of these stops are in what is

25   known to be high-crime areas.  This is no surprise to me.  I

D146FLOC

1    cannot turn myself into someone being born yesterday.  I have

2    been here for a long time in this city and on this bench.  I

3    know where the high-crime areas are instinctively, don't you?

4    This is a nonissue.

5            Now a big issue.  Bifurcation of trial into liability

6    and remedial phases.

7            What is your position on this?

8            MS. GROSSMAN:  Your Honor, this is a first time --

9            THE COURT:  What is your position?

10           MS. GROSSMAN:  I don't understand what they mean and

11   what they want.  I don't understand what it means to bifurcate.

12           THE COURT:  Do you have a position?

13           MS. GROSSMAN:  I don't think we should.

14           THE COURT:  Good.  Either do I.  I want to make sure

15   if you agreed with them, I would kind of be in a difficult

16   position.  I don't need to bifurcate.  I want to get this trial

17   tried.  One trial.

18           MR. CHARNEY:  I know your Honor also doesn't want to

19   have a third stop-and-frisk class action.

20           THE COURT:  I have three now.

21           MR. CHARNEY:  There was Daniels and then Floyd.  And I

22   think the concern here is that the remedies that we're seeking

23   in this case are very complex, very affirmative and there needs

24   to be a lot of thought put into it.  That was not the case in

25   Daniels.  Both sides were at fault for that.  Five years later

D146FLOC

1    we were in front of you again.  This time we want to get it

2    right.

3              THE COURT:  Good.  Get it right, but it is all the

4    same trial.

5              MR. CHARNEY:  But to have us put in all that evidence,

6    we're burdening you --

7              THE COURT:  No, you are not.  Let's get one record,

8    one decision and one appeal from one side or the other.

9              MR. CHARNEY:  We may need to add exhibits and

10   witnesses.

11             THE COURT:  Okay.  Because you anticipate that I was

12   going to ruling in your favor?

13             MR. CHARNEY:  No.  No.

14             THE COURT:  Get it done.

15             Now Mr. Pena.

16             MS. BORCHETTA:  The last one.

17             THE COURT:  The last one says, "The plaintiffs want to

18   preclude defense counsel from communicating with witnesses once

19   the witness has been sworn."  I believe the law is not until

20   the witness is on cross.  Once the person is on cross, they

21   cannot do that and you can't either.  Once your witness is on

22   cross, you cannot talk to them.

23             MS. GROSSMAN:  I think we're all professionals here.

24             THE COURT:  Didn't I just state so.

25             Let's go to Mr. Pena.  There are a lot letters, pages,

D146FLOC

```
 1    exhibits.  It will save time once again for me to tell you
 2    where I am leaning and then you can talk for a while.  I don't
 3    think Pina should testify here.  It is a Housing Authority
 4    stop.  It is inside the building.  It is not on the street.
 5    Plaintiffs -- and I say that collectively.  I know there are
 6    slightly different counsel in all three cases.  They chose to
 7    bring three different cases.  I'm burdened with that.  Let's
 8    keep them as separate as we can.  We cannot make it perfect.
 9    If these had been out in the street, I would have to do it.  If
10    it is inside of the building, it raises a host of issues.  Even
11    though you say it doesn't, it raises the the local rules, the
12    rules of the Housing Authority.  The House Authority assigned
13    it there.  The Housing Authority has certain rules and
14    regulations that are bound to come up.  It is a mistake.  I am
15    not going to try the Davis case in the Floyd case.  I don't buy
16    the argument you need him because he is the only Hispanic in
17    the Bronx.  You have other Hispanics in other boroughs.  If you
18    want to make the point, no.  I will listen to you, but no.
19          MR. CHARNEY:  Your Honor, I guess this issue is a
20    particular -- I don't know how to put this.
21          THE COURT:  Importance to you.
22          MR. CHARNEY:  Importance to us but also -- and again I
23    don't want to get on a soapbox and talk here because I know
24    your time is precious, but we're talking about a class action
25    lawsuit against the largest police department in North America.
```

D146FLOC

```
 1            THE COURT:  And there are two other pending cases.

 2            MR. CHARNEY:  I understand that, your Honor.

 3            THE COURT:  Which raises many of the same issues.

 4            MR. CHARNEY:  This case is about suspicionless and

 5   raced-based stops.

 6            THE COURT:  And the other two?

 7            MR. CHARNEY:  Suspicionless and race-based stops and

 8   policies having to do with enforcement of housing regulations,

 9   having to do with trespass affidavit program.  I understand

10   that.

11            THE COURT:  A lot less than you think.  Those are

12   street stops, too.

13            MR. CHARNEY:  What we're concerned about are

14   pedestrians.

15            THE COURT:  I know and the Legon case.  The Legon case

16   unfortunately is exactly that.  They just happened to be in the

17   vicinity.  They are essentially street stops.  The whole point

18   in that case, which I don't think you are counsel, but it is

19   all about being on the street.  They stress 100 times it is

20   outside the building, outside the building, outside the

21   building.  I have problems as it is.

22            MR. CHARNEY:  I understand, your Honor.

23            THE COURT:  No you don't.

24            MR. CHARNEY:  I understand you are busy.

25            THE COURT:  It is not that.  It is the roll-over
```

D146FLOC

1   effect from one case to another that is truly troubling.

2              MR. CHARNEY:  I gotcha.  What we have challenged all

3   along is a policy and practice of suspicionless and race-based

4   stops.  We have no interest in litigating the NYCHA regulations

5   or how they enforce them.

6              THE COURT:  I know, but they would inevitably come up

7   during Pena's testimony from either Pena or the stopping

8   officer.

9              MR. CHARNEY:  He didn't testify that he had been

10  hanging out, that he had a problem with patrols.

11             THE COURT:  He is not inside the building.  The

12  officers will raise issues about Housing Authority rules and

13  regulations.  He doesn't have to be the one to raise it.  They

14  will.

15             MR. CHARNEY:  We don't know that yet because they

16  haven't been deposed.

17             THE COURT:  I know.  They are stopping inside a

18  Housing Authority building.

19             MR. CHARNEY:  Your Honor, is your position that if a

20  person is stopped inside a NYCHA building --

21             THE COURT:  Yes.

22             MR. CHARNEY:  -- not only are they not a member of our

23  class, any remedy will not apply to stops inside the NYCHA.

24             THE COURT:  No.  Well, don't worry about that.  When

25  the time for remedy comes, it will cover any suspicionless

D146FLOC

1    stop.  If we get to remedy and that is the remedy.  Look,

2    remedy will have to do with training if there is a remedy,

3    right?

4              MR. CHARNEY:  It will have to do a lot more than

5    training.

6              THE COURT:  Let's take training.  It applies to all

7    police officers making stops anywhere in any circumstance

8    whether it is Deon outside a building, whether it is Davis

9    inside a NYCHA building or street stops in Floyd.  Once you say

10   the police department doesn't understand what the basis should

11   be for a stop, when you have reached that point, then you have

12   to retrain and supervise and monitor and all the rest of it.

13   Of course it will apply to everybody.  I am not saying that.  I

14   am just saying to put that into the trial and have Pena testify

15   and all the officers testify.  Inevitably it gets into the

16   Davis case.  It is just a mistake.  We have enough plaintiffs.

17             MR. CHARNEY:  For the record, your Honor, we only 12.

18             THE COURT:  Now you have 11?

19             MR. CHARNEY:  Now we have 12.  Legon they had 11.

20   That was a case about the Bronx.  We have a citywide case with

21   12 witnesses.  I don't think by any means we're trying to be

22   duplicative.

23             THE COURT:  Nor did I say that.  12 is a lot and 13 is

24   no better.  I don't want to get into the NYCHA inside the

25   building stops.

D146FLOC

1          MS. COOKE:  I would like to quash the subpoenas

2     plaintiffs issued for those officers.

3          THE COURT:  Right.  If I am not having Pina, I don't

4     have the officers.  I think that covered everything.  Where

5     does that leave us?

6          MS. COOKE:  There was one more issue, your Honor, with

7     respect to the refusal to provide conflict information.

8          THE COURT:  Lino.  I saw that.  I read about this and

9     I am a little bit troubled.  If they are not eyewitnesses to

10    the stop, why would you be allowed to contact them, call them,

11    depose them?  It is all a waste of time.  You have been

12    complaining about having to do all these depositions on the eve

13    of trial.  Why should I let you sort of roam around look for

14    things that are not there.  If any of these were eyewitnesses

15    they should tell you.

16         Mr. Charney, Mr. Moore, if you know of any of these

17    people they would like to find actually who witnessed stop, I

18    think that is fair.  If they are friends who later had a

19    conversation --

20         MS. COOKE:  Mr. Lino filed a number of CCRB complaints

21    and he identified in fact particularly Darwin Baris as someone

22    who was present.

23         THE COURT:  Present at the stop?

24         MR. CHARNEY:  No, your Honor.  This goes back to our

25    motion in limine about unrelated stops.  Mr. Lino, and we

D146FLOC

1   disclosed him in November, and we identified three stops that

2   he would testify about in this case.  Mr. Baris was not present

3   at any of those three stops.  Mr. Lino testified too that

4   effect in his deposition.  Mr. Baris was at a stop.  Mr. Lino

5   has been stopped 20 or 30 stops.  He was present at another

6   stop that Mr. Lino was not intending to testify about in this

7   case.  So if those other stops are not going to be testified

8   about to specifically, I don't understand the relevance of

9   Mr. Baris' testimony.

10          THE COURT:  Ms. Cooke, did you know that, that the

11   fact that this fellow saw the stop that is not one of the stops

12   that they are putting forth?

13          MS. GROSSMAN:  In part, your Honor.  A deposition of

14   Mr. O'Neil was ended without completion.  So with respect to

15   that, I can't confirm that my understanding is the same as Mr.

16   Charney.

17          THE COURT:  If it turns out that way, if this person

18   Baris, or whatever his name is, observed a stop that is not

19   going to be tried so to speak in this case --

20          MS. COOKE:  With respect to your Honor's ruling

21   earlier if in fact the other stops are not relevant, the

22   plaintiffs would not be allowed to pick the stops they will be

23   presenting then if the person wasn't a witness, we wouldn't

24   have an interest in deposing them.

25          THE COURT:  It has to bear out to be the case.

D146FLOC

1              Now I think we have gone through all these MILs.

2              MS. GROSSMAN:  Your Honor, we presented the plaintiffs

3    with a stipulation of dismissal with prejudice of the

4    plaintiffs' damages claims.  I wanted to make sure we get an

5    order that officially --

6              THE COURT:  Have I gotten the signed stipulation yet?

7              MS. GROSSMAN:  We just gave it to them.

8              THE COURT:  As soon as I get a signed stip and

9    proposed order, I am sure I will act.

10             MR. CHARNEY:  One second.

11             THE COURT:  Sure.

12             (Pause)

13             MR. MOORE:  Judge, can I go back to this issue of the

14   remedial aspect of --

15             THE COURT:  Yes.  The bifurcation?

16             MR. MOORE:  I am not sure bifurcation captures it.  I

17   would assume that given that this is now just an injunctive

18   case that there -- in order to have any entitlement to any kind

19   of remedy, we would have to establish a constitutional

20   violation.

21             THE COURT:  Of course.

22             MR. MOORE:  So I am assume that we would do that.

23   There would be a decision by the Court.

24             THE COURT:  No.  Wrong.  One trial, one decision.

25   That's it.

D146FLOC

1              MR. MOORE:  You want witnesses to talk about what

2     could be done?

3              THE COURT:  Absolutely.  One trial.

4              MR. MOORE:  That is going to take some considerable

5     effort and that may lengthen the trial.

6              THE COURT:  There's a threat.

7              MR. MOORE:  Well --

8              THE COURT:  I know it is more work for me and I made a

9     decision.

10             MR. MOORE:  I think it would be more efficient --

11             THE COURT:  Well, when you have this job, I think you

12    will bifurcate.

13             MR. MOORE:  Pardon?

14             THE COURT:  When you have my job, you will bifurcate.

15             MR. MOORE:  And I don't want you job.

16             THE COURT:  I don't blame you.

17             MR. MOORE:  When you have my job, you can make the

18    same argument.

19             THE COURT:  Maybe some day I will have your job.

20             MR. MOORE:  I hope so.

21             THE COURT:  Anything further?

22             I think given the extraordinary amount of work going

23    on on a number of issues, we should set up a date for another

24    conference for anything that percolates up.  We can always

25    cancel.

D146FLOC

1            MR. CHARNEY:  Two weeks.

2            THE COURT:  Two weeks.  I am looking for one.

3            MS. GROSSMAN:  Your Honor, I have a personal--

4            THE COURT:  I am not picking a date.  Tell me what you

5    like.

6            MS. GROSSMAN:  Three weeks is the earliest given all

7    that we're doing.

8            Can I have a moment?

9            THE COURT:  Of course.

10            (Pause)

11            MS. GROSSMAN:  How about the 25th?

12            THE COURT:  I am out of town.

13            MS. GROSSMAN:  29th.

14            THE COURT:  I am on trial.  So it would be late in the

15    day.

16            MS. GROSSMAN:  29th or 30th.

17            MR. CHARNEY:  29th will be better for us.

18            THE COURT:  That is a bad one.  I have my MDL that

19    afternoon.

20            MR. MOORE:  How about Friday the 1st.

21            THE COURT:  The 1st is real good.

22            MS. GROSSMAN:  We have conflicts on the first.

23            MR. CHARNEY:  How about the 31st?

24            THE COURT:  The 31st is really the next best for me.

25    In fact it is the best.  31st at 3:30.

D146FLOC

1            Now, is there anything else?

2            No.

3            Can I have two lawyers per side -- Ms. Grossman,

4    Ms. Cooke, Mr. Moore and Mr. Charney -- in the robing room.

5                              o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25