D1hWfloC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   DAVID FLOYD, et al.,
3
                   Plaintiffs,
4
              v.                          08 CV 1034 (SAS)
5
   THE CITY OF NEW YORK, et al.,
6
                   Defendants.
7  ------------------------------x
                                          New York, N.Y.
8                                         January 17, 2013
                                          3:00 p.m.
9
   Before:
10
                        HON. SHIRA A. SCHEINDLIN,
11
                                               District Judge
12
                            APPEARANCES
13
   BELDOCK LEVINE & HOFFMAN, LLP
14      Attorneys for Plaintiffs
        JENN ROLNICK BORCHETTA
15      -and-
   DARIUS CHARNEY
16      -and-
   COVINGTON & BURLING, LLP
17 BY:  KASEY L. MARTINI

18 MICHAEL A. CARDOZO
        Corporation Counsel of the City of New York
19      New York City Law Department
        Attorney for Defendants
20 BY:  HEIDI GROSSMAN
        MORGAN KUNZ
21      LINDA DONAHUE
        BRENDA COOKE
22      JOSEPH A.MARUTOLLO
            Assistants Corporation Counsel
23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D1hWfloC

1              (Telephone conference; in chambers)

2              THE COURT:  Hello.  Let me start with the plaintiffs.

3    Mr. Charney.

4              MR. CHARNEY:  Good afternoon, your Honor.

5              THE COURT:  Ms. Martini.

6              MS. MARTINI:  Good afternoon.

7              THE COURT:  Ms. Borchetta.  That's it for the

8    plaintiffs?

9              MS. BORCHETTA:  Good afternoon.

10             THE COURT:  Look, I really wanted this in person.  I'm

11   getting very tired of phone calls with nine or ten voices.

12   It's difficult for me.  I don't think it makes as good a record

13   or as clear a record, and it doesn't really allow the kind of

14   interaction that's needed with the difficult issues, so I was

15   disappointed when the city said that it couldn't send one of

16   its five lawyers that are on the phone, but there's ten lawyers

17   on the appearance sheet by now.  Somebody could have come down

18   here.  I understood that Ms. Grossman and Ms. Cooke were

19   engaged in letter writing, but that left eight more lawyers.

20             In any event, on the phone, I have Ms. Cooke,

21   Ms. Donahue, Ms. Grossman, Mr. Kunz and Mr. Marutollo.  All

22   right.  That's a lot of lawyers.  One of them could have been

23   here.  You need to say your name clearly every time you speak.

24   You know how difficult these phone conferences are.  You know

25   I've explained many times that I can't interrupt, your voice

D1hWfloC

1    cancels my voice, etc.

2           We have two big issues that are on today's agenda.

3    One involves the question of Mr. Pena and his stop.  Is it Lino

4    or Pena?

5           MS. GROSSMAN:  Lino.

6           THE COURT:  Okay.  I'm sorry.  Lino now; it was Pena

7    before.

8           This one involves Mr. Lino's stop, one of his stops, I

9    think the one on August 3, 2008, in the George Washington

10   housing complex on Third Avenue.  I have probably three

11   letters, because I always have three letters.  The so-called

12   moving letter was from the city, dated January 10.  The

13   response letter is January 11, from the plaintiffs' counsel,

14   and the reply letter is January 14.

15          The second issue besides Mr. Lino and whether he

16   should be allowed to testify about that particular stop has to

17   do with the survey that the plaintiffs would like to offer that

18   was authored by Professor Silverman, and then at the end of the

19   city's letter asking for either immediate discovery, or

20   preclusion, there is a short paragraph about one of the many

21   plaintiffs' witnesses, an Ian Provost, complaining that the

22   city does not yet have the releases.  There's a response

23   letter, dated January 17, from the plaintiffs.

24          Actually, I don't think I have a reply letter.  Oh, I

25   do.  The clerk says I do.  Yes, I have it.  I've seen the

D1hWfloC

1    exhibits.

2           Wait a minute.  No, I don't have that.  That's January

3    17; I have that letter.  I'm saying the first letter is January

4    15, the second letter is January 17.  Is there a reply?  No,

5    and this one does not have a reply.  So I have two letters

6    before me on the Silverman issue and replying on the Provost

7    issue also.  So those are the topics for this telephone

8    conference.  As I often try to do, in the hope of some

9    shortcutting of some talking on the call, I try to tell you my

10   initial inclination prior to hearing from you further, and then

11   if you must, I'll hear from you further.

12          With respect to Lino, I do not think he should be

13   permitted to testify to the stop that occurred either in the

14   lobby, on the doorstep, or just outside the door of the housing

15   authority building.  I think, again, that it's too close to

16   involving the Davis issues.  It's unclear where he was stopped.

17   The officers said it was the lobby.  Even if it's the

18   threshold, that's half in, half out.  Even if it's just in

19   front of the door, it seems it was immediately following a

20   vertical patrol based on allegations of narcotics sales.  For a

21   host of reasons, I think it would be inappropriate.

22          That said, it's also far too late for Cruz.  I said

23   last time, on December 19, in no uncertain terms, this has to

24   end.  Even if you find the best plaintiff in the world, it's

25   just too late.  It's a five-year-old case.  You cannot come up

D1hWfloC

with another plaintiff to testify at this point, no matter how

wonderful and how dramatic that testimony might be.  So the

plaintiffs had argued that if you decide to preclude this one

stop by Lino, you should let us substitute Cruz.  I cannot do

that.  That would be absolutely contrary to what I said on

December 19.  So that's my inclination on the first set of

topics.

On the second set of topics, it sounds like the

Provost issue has been resolved.  It sounds like the

plaintiffs' attorneys have gotten the releases and are sending

them off to the city's attorneys and I don't need to say

anything more.

That leaves the Silverman issue, and on this one, my

inclination, the opposite of the other inclination, is to

decide with the plaintiffs on this.  It seems to me that the

article itself that the city has, had for a while and has now,

does go into the methodology of the research, enough that he

certainly can be deposed and you can ask him anything more you

want to ask him about methodology.  There's enough there for

your expert to review it.  The raw data will be produced.  The

only issue is whether there should be a confidentiality order,

and I don't see why not.  The raw data is not going to be

introduced at a public trial.

What's going to be introduced at a public trial is the

counting, the statistical analysis, the math, that simply adds

D1hWfloC

1    up that raw data, and you can check that math, but this is

2    someone's research.  It's five years of research, or two

3    someones'.  I'm not sure if Eterno and Silverman did the

4    research together.  But it's their research.  It's proprietary.

5    They are not hired guns, these are professors doing their own

6    study for their own academic purposes.  And the information is

7    information the plaintiffs find useful.  The plaintiffs didn't

8    seek them out and say let's design a study together so we can

9    use it at the Floyd trial.  That's not the genesis of this, as

10   I understand it.  These are independent researchers and they're

11   entitled to keep their raw data protected.  So I think there

12   should be a stipulation and confidentiality order.  Then the

13   raw data will be produced.  It can be analyzed, but basically,

14   as the plaintiffs said, all they'll let you do is redo the

15   math.

16        With respect to the questions, I'm a little bit less

17   certain there because I can't tell what three questions for

18   sure the plaintiffs are referring to in their letters.  They've

19   attached the whole questionnaire as Exhibit A, but they say

20   only three questions are relevant, the other questions aren't

21   relevant.  I didn't print out the entire questionnaire.  There

22   just comes a point where my paper supplies run out, and that's

23   one reason I would have wanted you here so you could hand it

24   up.  So I'm not entirely sure what that limitation argument is

25   about.  I guess I'll have to hear you a little more on that.

D1hWfloC

1          Short of those issues, those are my inclinations on

2     the rulings needed for Silverman.  As soon as this stuff is

3     produced, the sooner a confidentiality order is signed and the

4     raw data is produced and the deposition can be done and

5     defendants' experts can review the same material, that would

6     all be good, and that would end the problem.

7          That's our agenda.  Those are my preliminary thoughts.

8          Who wants to start?

9          MS. GROSSMAN:  I won't to address issue No. 1 on Lino,

10    but on the issue regarding the Silverman --

11         THE COURT:  Before you turn to that, are you satisfied

12    on the Provost issue?

13         MS. GROSSMAN:  Yes, your Honor.  I am.  I believe that

14    the plaintiffs indicated they would give us a release, so as

15    long as we get the release when they said, it will not be a

16    problem.

17         THE COURT:  Of course.  You also have no need to

18    address the Cruz issue any more than you did the Lino issue.

19         MS. GROSSMAN:  Correct.

20         THE COURT:  Go ahead and turn to Silverman.

21         MS. GROSSMAN:  As to the Silverman issue, I just want

22    to be clear.  We made a demand for all the backup.  You ordered

23    at the January 4 conference that the plaintiffs provide us with

24    all the backup, all the electronic database, everything that

25    goes into that report, and that was January 4.  And I asked

1    that we be given that forthwith and you contemplated that by

2    the following week, unless Mr. Silverman is out of the country,

3    we should be able to have it in hand.  And then what happened

4    is we received some letter from the plaintiffs that they are

5    going to first tell us what they're willing to give us and then

6    represent that they are going to limit what it is that they are

7    going to give us, contrary to your order.

8              THE COURT:  Let me try to interrupt.  I'm not troubled

9    by that because when my order is based on less than full

10   information, I'm not too impressed with it myself.  I didn't

11   know what was in that survey, what the actual questions were,

12   which of them might be relevant, which of them might not be

13   relevant, whether there's a need for all underlying data or

14   not.  I'm presented with a sketchy description after a two-hour

15   conference and I say things and then it comes back and there's

16   more information and I have to look at the issue and consider

17   it.  Even now, I say I'm not entirely sure what to do because I

18   haven't looked at the questionnaire.  I looked at it on the

19   screen, but I have not printed out the entire questionnaire, or

20   questionnaires, and I can't quite tell at this point without

21   looking at it a little more carefully what might be relevant,

22   what might not be relevant.

23             So the plaintiffs' position that they want to give

24   less than all I do not consider a violation of my order.  I

25   consider it a request to clarify or reconsider based on more

1    information.  So I'm not too troubled by that, but go ahead,

2    Ms. Grossman.

3              MS. GROSSMAN:  That still presents us with a problem

4    that we are two weeks later.

5              THE COURT:  Right.

6              MS. GROSSMAN:  And we have a trial, I thought that

7    it's still scheduled for the 18th.  I think there's some

8    question as to whether it really would be going forward.

9              THE COURT:  The only question in my mind is whether

10   it's March 11.  I've always said don't rely on that 18th

11   because when it was a jury trial, I scheduled jury selection to

12   begin on the 11th and the evidence to begin on the 18th because

13   I didn't know how complicated the jury selection week might be.

14   Now that it's nonjury, I don't see any point in wasting any

15   time.  I want to start on the 11th.

16             MS. GROSSMAN:  Your Honor, I also have a previous

17   conference, and given all the discovery we have to do, and

18   especially with this unexpected hearing regarding the two

19   issues and the new issue and even two weeks late in terms of

20   getting the Silverman issue addressed, and Mr. Silverman is

21   going to be away in February, it presents a lot of prejudice to

22   us.

23             THE COURT:  It's not easy, but there are ten assistant

24   Corporation Counsel listed on the appearance sheet and

25   sometimes things just have to be accomplished because, in your

D1hWfloC

```
1    view, some unreasonable judge said so.  I am starting a
2    two-month trial on May 5.  I think I've told you that.  I have
3    two big blockbusters back to back and I want to be sure I have
4    plenty of time to finish this.  The worst thing in the world
5    would be to start it and be unable to finish it, something that
6    happens in arbitrations and lawyers are always upset, and then
7    the judge says come back in August.  I don't want to do that.
8    I want to start this trial and finish this trial.  It's long
9    enough that if certain proof has to come in towards the end,
10   later, or in the middle, that's all fine.  We're not going to
11   sit more than five days a week.  I'm convinced you can get this
12   done in time to start.  This may not be the best moment to turn
13   to that.  But go ahead, that's the real point.
14        MS. GROSSMAN:  All I'm saying is if it is going to
15   start March 11, the two-week delay is even further reason why
16   it shouldn't come in because of the prejudice that we will
17   suffer from it, and I think you acknowledged that on January 4
18   when you expected the plaintiffs to forthwith provide us with
19   what we needed.  Even if we're disputing what it is the
20   plaintiffs should have provided us, they should have provided
21   us whatever they were willing to give us immediately.
22        THE COURT:  Right, and they still are.  There is a
23   quarreling over this protective order business.  For some
24   reason, you somehow don't want to sign one with respect to this
25   raw data.  That seems wrong to me.  All academics who write
```

D1hWfloC

surveys have a proprietary right in their raw data.  You can

have it, but all they're saying is you don't have the right to

disseminate it, and I think that's fair.  This is the research

product of two independent professors.  They need to make a

living, too.  They need to write their articles, too.  And I

don't think their raw data should be disseminated further than

the case.

MS. GROSSMAN:  Your Honor, I looked at some of your

rulings when you've relied on information in a public trial,

it's no longer confidential.  So according to your previous

rulings, even in Ligon, I just thought that that would be the

way you'd rule and that would be the position, that there's a

balance.

THE COURT:  I don't know what you're referring to, but

you may be referring to what I call hired experts who prepare

something in anticipation of litigation.  I think that's very

different.  Their time and efforts were purchased for that

case, and I think the need to disclose there is quite

different.  These people are researchers, like any other

scientist, gene therapy, or something, and they're doing their

research.  And it happens to be relevant here and, yes, they're

willing to testify and share their conclusions and give you

their articles and give you this raw data.

All they're saying is the plaintiffs are not planning

to offer this as an exhibit, the raw data.  To the extent that

D1hWfloC

1    you need to use a page of raw data to cross-examine, it will be

2    part of the trial record.  But that doesn't mean that all their

3    raw data has somehow entered the public domain when they have a

4    proprietary interest in their research.  The answer to it, it's

5    all going to be waived at trial, I'll have to see that when the

6    time comes.  I'll have to see what he's asked, who offers what

7    exhibits, whether I allow the exhibit in.  I can put that off.

8    But right now, if I were you, I would sign the protective

9    order, get the raw data, and get busy.  Obviously I can

10   reconsider all that at trial because you're right a public

11   trial is a public trial.  If it's going to come in, that's the

12   end of it.  It becomes public.

13          We have that issue in national security cases, and

14   sometimes the case goes away if a judge says it's going to have

15   to be public at that time.  Sometimes the government drops the

16   case.  I mean, it just depends, but I can't do this pretrial in

17   a sense because I don't know what use will be made of the raw

18   data at the actual trial.  I have a guess that it won't be

19   relevant, but we'll see.

20          MS. GROSSMAN:  Your Honor, if there are questionnaires

21   and surveys and there are responses by anonymous respondents,

22   of course, that's the raw data that would be relevant to

23   impeach and cross the witness with.

24          THE COURT:  Maybe.

25          MS. GROSSMAN:  I understand what you're saying.

D1hWfloC

```
1          THE COURT:  Yes.  I said we'll reach that at the
2   trial.  Right now, sign on.  As long as it says, obviously, if
3   used at a public trial, that changes everything, but for now
4   you can't disseminate it.  I don't know why you would anyway,
5   but you can't.  Then you can get it, I gather, tomorrow.
6          Mr. Charney, is this stuff ready to go over once we
7   decide what has to go over and the protective order is signed?
8          MR. CHARNEY:  Yes, it is, tomorrow.
9          THE COURT:  That's all I needed to know.  Prepare to
10  produce it tomorrow.  Go ahead.
11         MR. CHARNEY:  Will be in --
12         THE COURT:  I'm sorry?  Wait.  Wait, Mr. Charney.
13  Mr. Charney, Mr. Charney, stop.  Nobody heard you.  It's going
14  to be in the what format?
15         Stop.  We can't hear you.  Let's just do this really
16  slow and loud.
17         MR. CHARNEY:  SPSS.
18         THE COURT:  Let me hear if I got it right SPSS, is
19  that right?
20         MR. CHARNEY:  Yes.  SPSS.
21         THE COURT:  Right.  SPSS format.  What does that stand
22  for?
23         MR. CHARNEY:  It's a logistical program.  I don't know
24  what it stands for.  It's commonly used by --
25         THE COURT:  We just wanted to make sure that the
```

D1hWfloC

```
 1    record reflects what you said.

 2              MR. CHARNEY:  I will speak more slowly.

 3              THE COURT:  And louder.

 4              MR. CHARNEY:  Sorry about that.

 5              We are prepared to produce it tomorrow.  I won't

 6    address the timing issue unless your Honor feels it's

 7    necessary.  We, in no way, tried to --

 8              THE COURT:  I don't want to address the timing issue

 9    any further.  I think the important issue left is what has to

10    be produced.  You want to limit it to those questions you say

11    are relevant.  The city says that's not for you to decide.

12    There may be other parts that are relevant or all of it is

13    relevant.  The city, I assume, has the same exhibit I have and

14    can see the entire questionnaire.

15              My problem, and it may have been a foolish one, I

16    didn't print it and I don't have it in front of me.  I can pull

17    it up on the screen and go through it question by question, but

18    I don't have it in front of me physically.

19              MR. CHARNEY:  Your Honor --

20              THE COURT:  Only if we can hear you, Mr. Charney.  And

21    we are having difficulty.

22              MR. CHARNEY:  I don't know what the problem is.  I'm

23    right by the phone and I'm screaming.  I'll try to talk louder.

24              THE COURT:  I don't know why either.  I'm not

25    criticizing you.  I'm only telling you the fact.  One second.
```

D1hWfloC

1   Let me pull it up.  What exhibit was it, B or A?

2            MR. CHARNEY:  Exhibit A.

3            THE COURT:  I'm pulling it up on my screen now, but

4   that causes me to turn my back to the speakerphone.

5            MR. CHARNEY:  I will speak louder.

6            THE COURT:  No, no.  I hope you can hear me is what

7   I'm saying.

8            MR. CHARNEY:  I can hear you fine.

9            THE COURT:  I'm now looking at Exhibit A.

10           MR. CHARNEY:  Exhibit A, you'll see the first survey.

11           THE COURT:  Yes.

12           MR. CHARNEY:  This is the 2012 survey.

13           THE COURT:  Question No. 1 says, "Based on your

14   personal experience, are you confident that major crime has

15   decreased 80 percent since 1990 in New York City?"  We agree

16   that's the first question?

17           MR. CHARNEY:  Yes.  And our position is that question

18   is, the answer to that question is not relevant in any way to

19   pressure on NYPD personnel, arrest and summons.  This question

20   does not address that issue nor does the question --

21           THE COURT:  I can't hear you.  The next question I

22   have is the same one.

23           MR. CHARNEY:  Yes, exactly.  So we would say again

24   that question does not relate to Professor Silverman's

25   anticipated trial testimony.

D1hWfloC

1          THE COURT:  Go ahead.

2          MR. CHARNEY:  Then if you go to the third page --

3          THE COURT:  Right.  This one says, "With respect to

4     the following criteria and based on your personal

5     experience/knowledge, on a scale of one to ten, with one being

6     the least and ten the most, how much pressure did precinct

7     (patrol) personnel receive from management/supervisors to," and

8     then there's a whole list of things, starting with "increase

9     summonses," next, "increase stop and frisk," and then going on

10    and on.

11         MR. CHARNEY:  Yes.

12         THE COURT:  I didn't count how many.

13         MR. CHARNEY:  Your Honor, it is our view that the

14    responses to this question are relevant to Professor

15    Silverman's testimony and we would produce the raw data for all

16    the responses in this particular survey question.

17         THE COURT:  I see.  So all of them.  Not just stop and

18    frisk, but to summons, arrest --

19         MR. CHARNEY:  Arrest.  Not to the first three.  None

20    of those questions have anything to do with --

21         THE COURT:  That's what I'm asking you.  So you would

22    not produce for "decrease index crime," "decrease other crime,"

23    "downgrade index crime to nonindex crime," "accurately report

24    crime statistics," or how about "obey legal/constitutional

25    rules"?  I certainly would think the last one is somewhat

D1hWfloC

1  relevant.

2          MR. CHARNEY:  It's relevant, but Professor Silverman

3  was not planning to testify about that question.  We would like

4  to hear him testify about it.  I could ask him to produce that

5  data.  He was not planning to testify about responses to that

6  last question.

7          THE COURT:  It seems to me pressure and Constitution

8  are issues here.

9          MR. CHARNEY:  Would you like to hear testimony from

10  him on the responses?

11          THE COURT:  I would think.  I would think it's the

12  same as the first three, in a sense.

13          MR. CHARNEY:  Okay.

14          THE COURT:  But, anyway, let's go on from that page.

15          MR. CHARNEY:  We can go through each of them.  There

16  are several pages.

17          THE COURT:  I think we'd better.  Your view on the

18  next one?

19          MR. CHARNEY:  Not relevant.

20          THE COURT:  And that one says, "Do you have personal

21  knowledge of any instances in which crime reports were changed

22  to make crime numbers look better?"

23          MS. GROSSMAN:  Your Honor, if I could just say that

24  when you're looking at a report like this, and we need to be

25  able to, given the purpose that this report was written and

D1hWfloC

1    what the hypothesis was that was really being studied because

2    to pull out a little piece of the whole is not giving us the

3    opportunity to fully explore in discovery how it is that we

4    could attack the reliability of this report.  And I would just

5    note that the focus of the entire report is really the impact

6    that Compstat had on the way crime is classified when it's

7    reported.

8            For example, if the police department reported grand

9    larceny in one way, the officers, in looking at the crime

10   recorded, may have classified it as a petty larceny, it's a

11   study that gets at that particular issue, and so to take out

12   and cherry-pick one aspect of a study, which is really not

13   appropriate for us to not be able to get all the data and the

14   backup when this influences the data that the plaintiffs want

15   to admit into evidence.

16           THE COURT:  I'm sorry, but I actually don't understand

17   the argument, Ms. Grossman.  Had you come into court, I think

18   we could have had a better discussion.  But I don't really

19   understand what you're saying.  I can't turn this trial into a

20   trial of all the issues that Silverman and Eterno were

21   studying.  It would be a circus, and you don't want that circus

22   either.  It's not my business to worry about whether they were

23   overreporting some kind of crimes or underreporting other kinds

24   of crimes.  I've got enough problems with my case.

25           MS. GROSSMAN:  Your Honor, I agree with you on that.

D1hWfloC

1           THE COURT:  Right.  So I don't want to go there.  If

2     you want to ask general questions, you have a lot of

3     information, I'm not going to stop you.  You have his report.

4     You know the questionnaire, the report being the article.  You

5     have the article, you have the questionnaire.  You certainly

6     could do this any way you want on cross-examination based on

7     what you have.  You could say, What was your motivation in the

8     first place in doing this kind of survey?  You were asked a lot

9     of questions about this and that.  Isn't it true that you were

10    really trying to show that Compstat caused this effect and that

11    effect?

12           I'll give you a lot of range to cross-examine.  But to

13    require the production of the raw data when you have the

14    statistical analysis on these questions that do not -- I have

15    to be careful the way I say it for the record, but do not

16    interest me for the purpose of this trial, I might be

17    interested as a citizen, but I'm not interested in these other

18    questions for the purpose of this trial.  As I say, I have

19    enough on my hands, I don't need to worry about this.

20           MS. GROSSMAN:  Your Honor, I understand what you're

21    saying.

22           THE COURT:  Right.

23           MS. GROSSMAN:  What we're suggesting is that for the

24    city to be able to get the discovery, they need to know what it

25    is that we want to impeach because I don't want to get into all

D1hWfloC

1    that, but until we know what we're dealing with --

2            THE COURT:  But you do know.  You have the article

3    that analyzes the data.  You have the underlying questionnaire

4    that shows you the questions asked, and you'll be able to

5    depose the guy and learn a lot there.  I do not think --

6            I'm sorry.  I'm still speaking.  I do not think the

7    raw data for these questions that don't relate to my case need

8    to be produced.  I will be happy to revisit this issue after

9    everything else has been studied, the article's been studied

10   the questionnaire's been studied, the deposition has been taken

11   fully, we're on the eve of trial, if you want to make some

12   argument, I'll listen all over again.  But at this time I think

13   it would be overbroad, overburdensome, irrelevant, all the

14   usual words in the federal rules that make this not

15   discoverable at this time.

16           MS. GROSSMAN:  Your Honor, I've been trying to speak

17   with experts and they say the first thing they need to obtain

18   is all of that data to assess the reliability and credibility

19   of even the little piece.

20           THE COURT:  They're going to have to do it with less

21   than the desired amount.  They have the article and they have

22   the questionnaire.

23           MS. GROSSMAN:  We don't have the questionnaire for

24   2010.

25           THE COURT:  Hold on.  You need to have that.

D1hWfloC

1     Obviously, you need the questionnaire.

2           Please, I can't hear you anyway, Mr. Charney, but you

3     need to give them all questionnaires.  Do you agree,

4     Mr. Charney?

5           MR. CHARNEY:  Your Honor, they have it.  It's attached

6     as Exhibit A to this letter.

7           THE COURT:  Yes, I think so.  I think so, too.

8           MR. CHARNEY:  2010 questionnaire is at the end of his

9     exhibit.  They now have it.  We would give it to them tomorrow,

10    but, of course, they wrote to you earlier to raise this issue.

11          THE COURT:  Okay.  Fine.

12          MR. CHARNEY:  They now have it.

13          THE COURT:  Ms. Grossman, you do have the

14    questionnaires.

15          MS. GROSSMAN:  If we just received it, I have no idea.

16    Obviously, I have to now look at it.

17          THE COURT:  Of course.

18          MS. GROSSMAN:  But we didn't have it before, so okay.

19    If plaintiffs' counsel says he has given it to us --

20          THE COURT:  Correct.  You have the questionnaire.  You

21    have the equivalent of a report because his statistical

22    analysis of the responses is in the article.

23          MS. GROSSMAN:  Your Honor --

24          THE COURT:  Hold on.  Let me finish.

25          These questionnaires are done by filling in with a

D1hWfloC

```
 1    black pen a multiple-choice choice.  There's no narrative here.

 2    You answer yes or no.  I happen to be looking at one question:

 3    "Yes or no?  If yes, how often?  Rarely, sometimes, or often?"

 4    That's the data.  Then it's just a matter of math.  There's no

 5    narratives that could be misanalyzed.  And I want to turn to

 6    that in a munite, by the way.

 7                MS. GROSSMAN:  Oh, there is.

 8                THE COURT:  No.  I know.  I want to turn to the ten

 9    interviews.

10                MS. GROSSMAN:  The questions, your Honor, we're not

11    moving on to the issues because the questions, there are

12    ambiguous questions.

13                THE COURT:  That's good.  You can cross-examine on

14    that.  But you have the question.  Seeing the raw data doesn't

15    change that.  If you think the question's ambiguous, good, let

16    your expert tell me in his testimony, I'm sure I'll enjoy

17    listening, why it's a bad question, why it's a leading

18    question, why it's a weighted question, why it's a biased

19    question.  I'm familiar with all that.  That's fine.

20                MS. GROSSMAN:  Question 19 calls for a narrative.

21                THE COURT:  Let me look.  Hold on, Ms. Grossman.  I've

22    got to turn to question 19.  That's going to take some clicking

23    to get there.  What number did you say besides 19?

24                MS. GROSSMAN:  I'm sorry.  The 2012, question 19.

25                THE COURT:  I'm trying to get there.  I'm only up to
```

D1hWfloC

1    11.

2            MS. GROSSMAN:  It says, "Please make any comments that

3    you feel are important to understand how the NYPD, based on

4    your experience, please do not indicate your name or other

5    identifying information in your response."

6            THE COURT:  Yes, I now have it on the screen.  I now

7    have it on the screen.

8            Mr. Charney, there, the person might have said

9    something that is relevant.

10           MR. CHARNEY:  Your Honor, may I respond to that.  Can

11   you hear me, first of all?  It's very important that you hear

12   me.

13           THE COURT:  I hear you.

14           MR. CHARNEY:  Your Honor, Dr. Silverman is intending

15   to testify at trial about the quantitative analysis of the --

16           THE COURT:  I'm sorry, Mr. Charney.  I don't know what

17   telephone instrument you're on --

18           MR. CHARNEY:  Can you hear me better now, your Honor?

19           THE COURT:  Yes.

20           MR. CHARNEY:  I'm sorry.  I took you off speaker

21   phone.

22           THE COURT:  That was the problem.

23           MR. CHARNEY:  Very important.

24           THE COURT:  You were breaking up.

25           MR. CHARNEY:  You need to understand --

D1hWfloC

```
1          THE COURT:  Yes.  You were breaking up.  That's the
2     problem.  We heard every other syllable.
3          MR. CHARNEY:  Can you hear me better now?
4          THE COURT:  Perfectly.
5          MR. CHARNEY:  This is something that's very important
6     to understand.  We tried to communicate this to the defendants
7     and they do not apparently understand this.
8          Professor Silverman intends to testify at trial only
9     about the quantitative statistical analysis related to the data
10    on the responses to those three questions that I mentioned
11    earlier, the question about pressure to increase the stop and
12    frisk, the pressure to increase arrests, and the pressure to
13    increase summons activity.  He has no intention of testifying
14    about qualitative data, in other words, open-ended responses
15    where there's descriptive answers.
16         THE COURT:  Okay, Mr. Charney.  Mr. Charney,
17    Mr. Charney.
18         MR. CHARNEY:  Yes.
19         THE COURT:  I'm sorry, but that is no fair.  That's
20    the short way to answer that.  No fair.  No. 19 says, "Make any
21    other comments you think are important."  It's important to
22    know whether respondents expressed biases there or something
23    that might in some way affect the whole survey.  I don't know,
24    without reviewing all the responses to 19, whether there's gold
25    there or nothing, or a dry well.  But I don't know whether
```

D1hWfloC

1    there's gold or a dry well; I should say oil or a dry well,

2    because I don't know what's in the response to 19.  But that

3    invites the respondent to comment.  I know that he's not

4    offering that in his direct.  He's offering the quantitative

5    analysis of the fill-in-the-blank questions.  Very nice.

6           How many responses are there, by the way, to this one

7    I'm looking at, this 2012 survey?

8           MR. CHARNEY:  There were, I think, about 1,900.

9           THE COURT:  All right.  1,900.  It would be

10   interesting if, of the 1,900, let's say, and I'm just making

11   this up, 1,700 are blank on No. 19 and 200 say we had more

12   pressure to inflate the crime or deflate the crime, and nothing

13   more.  Then we'd all know that there's basically a dry well

14   there for this case.  But, if there's 1,900 comments all saying

15   nothing but "we hate stop and frisk," that's important to know.

16   It does relate to the three questions he's talking about

17   because it might show you what the respondents were thinking

18   and they were self-selecting.  You never get 100 percent

19   response rate when you mail it.  I know there were 1,900

20   responses.  How many received this thing?

21          MR. CHARNEY:  How many received, something like 4,100.

22          THE COURT:  Right.  So it would be interesting if the

23   50 percent, or so, a little less, the 45 percent who responded,

24   have some kind of a thing about stop and frisk, and probably

25   not, but it would be interesting to see all the responses to 19

D1hWfloC

1    because that invites the respondent to say whatever they have

2    to say, and as long as there's a confidentiality order, the

3    responses to 19 should be produced along with the raw data to

4    the ones that you've selected.

5         Wait, wait.  Ms. Grossman, what else calls for a

6    narrative.

7         MR. CHARNEY:  Your Honor, I need to respond to that.

8         THE COURT:  You do not.  Look, Mr. Charney, this does

9    not go on forever.  Judges make -- excuse me.  You're

10   interrupting me.  I'm sorry.  I can't tolerate that.  If you

11   were in the courtroom, you would see it.  That's why I didn't

12   want to do this on the phone.  If I'm speaking, I'm speaking

13   and the answer is if you don't like this ruling, then don't

14   call Silverman.  I have ruled.  I have ruled that the responses

15   to 19, that the city is entitled to review them.  It may be a

16   dry well.  It may strike oil.  I don't know.  I don't know, but

17   that's my ruling.  I've often said, I've been doing this 19

18   years, I'm not saying all my rulings are right.  There's a

19   percentage that's wrong, but we do the best we can.  This is my

20   ruling.

21        Mr. Charney, please, I'm not even hearing you because

22   I'm asking Ms. Grossman a question.

23        Ms. Grossman, is there another question that calls for

24   a narrative, so I can look at it?

25        MS. GROSSMAN:  Yes.  For the 2010 survey, it is

D1hWfloC

 1    question No. 24, and it is Bates No. TL-001211.

 2                THE COURT:  I see it.  It says, "Please make any

 3    comments that you feel are important to understanding the NYPD

 4    based on your experiences as a manager.  Attach others, if

 5    necessary."  I think that's the same as the one I just ruled on

 6    and it should be produced.  It may lead to nothing or it may

 7    lead to something.

 8                Now that I've ruled, what is it, Mr. Charney?

 9                MR. CHARNEY:  Sorry.  The only thing I was going to

10    say, your Honor, there are actually -- by Mr. Silverman a lot

11    of narrative responses actually include names.

12                THE COURT:  He can redact them.  He can redact the

13    names.

14                MR. CHARNEY:  I was just going to say, your Honor,

15    since we're talking about several thousand --

16                THE COURT:  No, we're not.  There were 1,900.  Oh, for

17    that one, 2012, how many?

18                MR. CHARNEY:  1,900, and that one I think there were

19    about 500 and about 2,500 surveys, and unlike the city, we

20    don't have a staff of people who can go through it and redact

21    all this stuff.  I will, of course.  It may take a little time.

22                THE COURT:  I understand.  You can produce the raw

23    data with respect to the three questions right away because

24    they're ready to do that and you can start a team.  Hopefully,

25    Dr. Silverman will let your staff do it.  You can put together

D1hWfloC

 1    a team, through all the good people who have been assisting you

 2    in this case, and start looking for names to redact.  That's

 3    all.  If that's the big concern, you can redact.  I don't see.

 4              MR. CHARNEY:  Would your Honor be amenable to in

 5    camera review?

 6              THE COURT:  You mean I should look at 2,500?  I don't

 7    think I have the staff to do it.  I don't have the staff to do

 8    it.  I don't think it would be appropriate.  I'm looking at the

 9    appearance sheet in Floyd.  I see at least eight attorneys,

10    there's probably more, that have assisted in this case, but

11    there are eight on my last appearance sheet, one of which is a

12    big law firm, Covington & Burling, and maybe their paralegals

13    can help out on this and simply redact names at least so that

14    photocopies can be made, and then it needs to be turned over.

15    And they can look and there may be nothing there and there may

16    be something there.  But I don't think it's fair to eliminate

17    that just by saying he's only going to talk about the

18    quantitative.  I understand that.

19              MR. CHARNEY:  I guess what I would like from the city

20    because the last -- get these things and I would really ask as

21    a matter of courtesy that they give us a little time.

22              THE COURT:  Yes and no.  On the responses to the one

23    through three questions, they're ready now.

24              MR. CHARNEY:  That we'll give them tomorrow.

25              THE COURT:  Good.

D1hWfloC

```
 1              MR. CHARNEY:  If they sign the confidentiality
 2     agreement.
 3              THE COURT:  If they sign up, you'll give that to them
 4     tomorrow.  With respect to looking through 2,500 and redacting,
 5     just proper names, nothing else, how long do you ask for before
 6     you have to turn those over?
 7              MR. CHARNEY:  I guess the first thing is I need to
 8     call Professor Silverman.
 9              THE COURT:  Right.
10              MR. CHARNEY:  Again, he's not --
11              THE COURT:  I understand.  He's not your retained
12     expert.
13              MR. CHARNEY:  I can call him and find out how long
14     it's going to take for them to get this together because I
15     don't know if it's in electronic format.  It may be just paper
16     somewhere.  I don't know.
17              THE COURT:  I hope it is paper.
18              MR. CHARNEY:  I can try to get an answer by tomorrow.
19              MS. GROSSMAN:  Your Honor, once again --
20              THE COURT:  I was speaking.  I hope it is paper
21     because paper is easier to redact.
22              What were you saying, Ms. Grossman?
23              MS. GROSSMAN:  If we have a confidentiality order,
24     then that shouldn't be an issue.
25              THE COURT:  No.  That's not true.  People are afraid
```

D1hWfloC

```
 1    of reprisals.  I'm sorry.  Officers have their concern.  They
 2    were promised anonymity, they're going to get anonymity.
 3    That's out.
 4              MS. GROSSMAN:  Your Honor.
 5              THE COURT:  I don't care.  They worry.  They worry
 6    about their pension.  I don't know what they're worried about,
 7    but they're entitled to the anonymity they were promised.
 8              MS. GROSSMAN:  We could do an attorney's eyes only.
 9              THE COURT:  No.  They are entitled to the anonymity
10    they were promised.  That's that.  I've ruled.
11              Mr. Charney, tomorrow, let Ms. Grossman know -- if you
12    want to, you can write the Court so we're copied on it -- your
13    best estimate as to when these 2,500 can be reviewed and
14    redacted.  I don't think it's as time consuming as you think.
15    I think most people don't write much in the narrative part of
16    surveys.  I never do; I'm too busy.  I fill in the blanks and
17    that's it.  I send it out.
18              MR. CHARNEY:  A lot of people apparently took an
19    interest in it.
20              THE COURT:  Maybe so.  That's exactly why these
21    narratives should be reviewed.  We'll see how many there are
22    there may be less than you think.  I doubt that all 2,500
23    filled in those numbers, strong doubt, and then the ones that
24    did, that's the first thing, to collect them, and then it's
25    redacting proper names.  That's pretty easy.
```

D1hWfloC

1          All right.  I think I've gotten through all the

2     issues.

3          MS. GROSSMAN:  Your Honor, could I just add one thing?

4     I just want to have an opportunity to review the first

5     questionnaire, the questionnaire to the first survey that we

6     just got, and just study the second one again for any further

7     narratives I may have overlooked.

8          THE COURT:  That's fine.

9          MS. GROSSMAN:  I think your ruling contemplates that

10    anything that calls for narratives --

11         THE COURT:  Not anything.  I have to look at the

12    question.  The two I looked at, I've ruled.  I have to look at

13    them one by one.

14         Do the plaintiffs feel the need to say more about

15    Lino/Cruz?

16         MR. CHARNEY:  Just one brief thing, your Honor.  I

17    don't know if your Honor addressed this.

18         One of the reasons why the loss as to Mr. Lino's

19    testimony as well as the loss as to Mr. Pena's testimony, your

20    Honor, on January 4, is troubling to us and prejudices us is

21    both of those witnesses were going to provide testimony on

22    direct anecdotal evidence of racial bias on the part of the

23    officers that stopped them.  We submit that that kind of

24    evidence is not in any way -- it's also very important evidence

25    to prove discrimination in these kinds of cases, and it's rare

D1hWfloC

1    that you actually have direct evidence.

2            THE COURT:  Mr. Lino is testifying anyway as to two

3    other stops, right?

4            MR. CHARNEY:  The racial remarks that these officers

5    who made the stops --

6            THE COURT:  Let me ask you this.  Without discussing

7    whether it was a bad stop or a good stop -- in other words, the

8    stop won't be analyzed; that's what brings in the Davis issues.

9    Without that, can he say just on another occasion when I was

10   stopped, the officer said, quote, A, B, C, and we'll never know

11   whether it's a good or bad stop.  But it seems to me even if

12   it's a good stop, the officer is not supposed to say bad racial

13   things.

14           MR. CHARNEY:  That's true, your Honor, but I guess,

15   and I think you've ruled before that you were oftentimes --

16           THE COURT:  That may be, but life isn't perfect.  And

17   I've ruled out the analysis of the stop because I'm not going

18   to get involved with some of the issues that come up in Davis.

19   However, I would not bar him saying, And there was a third stop

20   at this and this location -- and it's nonjury -- I'm not

21   allowed to go into the facts of the stop, but I will say that

22   the arresting officer or the stopping officer said to me, you

23   so-and-so.  I'll allow that.

24           MS. GROSSMAN:  Your Honor, can I just say that we

25   dispute that that's the case, and we cited to --

D1hWfloC

1          THE COURT:  Disputing that it was actually said is

2    fine.  That's what cross-examination always is.  There's not a

3    trial I have, criminal or these kinds, civil rights, where the

4    person said he said X, Y, Z, and the person says I never said

5    that.

6          MS. GROSSMAN:  No, no.  I'm not disputing that.  I

7    think the statement the plaintiffs are referring to is a

8    reference to a ring tone.

9          THE COURT:  To what?

10         MS. GROSSMAN:  It's not anything that's a racial slur.

11         THE COURT:  That's fine, too.  That's for me, the fact

12   finder, to decide.  I don't even know what the statement is,

13   Ms. Grossman.

14         MR. CHARNEY:  Your Honor, it's a weight question, I

15   believe.

16         THE COURT:  It's a Wade question?

17         MR. CHARNEY:  In other words, as you correctly pointed

18   out, how much weight you give to Lino's testimony on that is a

19   question of the weight.

20         THE COURT:  I'll hear it, whatever it is.  I may

21   decide that, as you said, Ms. Grossman, it's not racial at all.

22   But I'll hear whatever it is.  All he has to say is there was

23   another stop, which, given this Court's ruling, I'm not allowed

24   to talk about, but I am allowed to say the stopping officer

25   said to me, quote, quote, quote.  That's all.

D1hWfloC

1           MS. GROSSMAN:  Right, but, your Honor, I just want the

2   record to be clear because we still want to quash the subpoenas

3   to the officers related to this stop and not have to subject

4   them deposition.

5           MR. CHARNEY:  They shouldn't be allowed to call them.

6           MS. GROSSMAN:  Lino claims that one of the officers

7   suggests that plaintiff might like hip hop music during the

8   stop.  We say, in footnote three of our January 14, 2013,

9   letter, that plaintiff asserts the alleged comment had

10  something to do with Mr. Lino's skin color.  I mean, that's

11  what they're using as a pretext to let somebody talk about a

12  stop that is a NYCHA stop.

13          THE COURT:  Ms. Grossman, clearly, you have lost faith

14  in the Court.  I'm not going to hear the facts of the stop.

15  But I am going to let him say what he alleges the officer said.

16  That's it.  And the officer, if he knows the name, can either

17  deny saying it or say it had no intent other than being

18  friendly.  I don't know.

19          MS. GROSSMAN:  As long as we don't have to produce

20  them for deposition in this case because to produce everyone

21  and documents and everything else that goes along with it --

22          THE COURT:  Let me ask you this question.  Do you know

23  from interviewing this officer whether he's going to deny

24  making the alleged statement?

25          MS. GROSSMAN:  He does deny it.

D1hWfloC

1          THE COURT:  Okay.  So his first line is I never said

2     it anyway.

3          MS. GROSSMAN:  I'm sorry?

4          THE COURT:  His first position is I never said it.

5     Forgetting about what implication it might have, he's going to

6     say I never said it.

7          MS. GROSSMAN:  Right.

8          THE COURT:  Okay.

9          MR. CHARNEY:  Where does that leave us, your Honor, if

10    he's going to testify at trial?

11         THE COURT:  He's only going to testify to one

12    sentence:  The direct examination is Mr. Lino was the previous

13    witness.  During a stop, which he was not allowed to describe,

14    he says that you said X, Y, Z, did you say that?

15         No, I didn't.

16         All right.  What are you going to ask next?

17         Pardon me?

18         MR. CHARNEY:  They should be limited to that, your

19    Honor.

20         THE COURT:  Correct.  That's the only purpose to call

21    him, to deny the statement.  What am I going to do?  You're the

22    one who is saying you need to have that kind of statement in

23    the record.  Fine.  I would let him say it without going into

24    the stop because, frankly, to me, it doesn't matter whether

25    it's a good or bad stop.  Let's say the comment was something

D1hWfloC

1   nonambiguous.  The one you're describing sounds somewhat

2   ambiguous.  But let's say that an officer said, and I'll take

3   it out of the race context, You lousy Muslim bastard, or

4   something.  Let's say the police said that.  It doesn't matter

5   whether the stop was good or bad, the officer shouldn't have

6   said that.  Now, that's not this case and, therefore, I used it

7   as an example.  But that's all I'm allowing it for.  Mr. Lino

8   is say it was said, this fellow can deny it, and I do what I do

9   with it.  It may be that I end up agreeing with Ms. Grossman

10  that it has no racial overtone anyway, or I decide which one is

11  credible.  That's it.

12         I think we are done after 51 minutes and 46 seconds.

13         MS. GROSSMAN:  The subpoenas are quashed, your Honor,

14  I take it, right?

15         THE COURT:  I think so.  I think you all have enough

16  to do.

17         MR. CHARNEY:  Thank you, your Honor.

18         THE COURT:  All right.  Bye-bye.

19         (Proceedings adjourned)

20

21

22

23

24

25