UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

| | |
|---|---|
| DAVID FLOYD, LALIT CLARKSON, DEON DENNIS, and DAVID OURLICHT, individually and on behalf of a class of all others similarly situated; | **JOINT PRE-TRIAL ORDER** |
| Plaintiffs, | 08 Civ. 01034 (SAS) |
| -against- | |
| THE CITY OF NEW YORK;[1] | |
| Defendants. | |

------------------------------------------------------------------------ x

**Scheindlin, District Judge:**

Having conferred among themselves and with the Court pursuant to Rule 16 of the Federal Rules of Civil Procedure, the parties adopt the following statements, directions, and agreements as the Pretrial Order:

1.   **TRIAL COUNSEL:**

**For Plaintiffs:**

Darius Charney
Sunita Patel
Baher Azmy
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212)614-6464

Jonathan C. Moore
Jenn Rolnick Borchetta
Beldock Levine & Hoffman LLP
99 Park Avenue
New York, NY 10016-1503
(212) 490-0400

---

[1] By stipulation and order, the caption of this case was amended to reflect the only remaining defendant, the City of New York. (Dkt. 270).

Eric Hellerman
Gretchen Hoff Varner
Kasey Martini
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000

**For Defendant:**

MICHAEL A. CARDOZO
Corporation Counsel of the
        City of New York
100 Church Street
New York, New York 10007
(212) 788-0792

Of Counsel:
Heidi Grossman
Brenda Cooke
Linda Donahue
Morgan Kunz
Joseph Marutollo
Suzanna Publicker
Lisa Richardson
Judson Vickers

## 2.   NATURE OF ACTION AND JURISDICTION/VENUE:

**Parties' Joint Contentions**

This is a civil rights action in which named Plaintiffs David Floyd, Lalit Clarkson, Deon Dennis, and David Ourlicht, on behalf of themselves and a certified class of similarly situated individuals, seek declaratory and injunctive relief for Defendant's violation of their rights, privileges, and immunities secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution. The Defendant in this action is the City of New York.

Jurisdiction is conferred upon the Court under 28 U.S.C. §§ 1331 and 28 U.S.C. §1343(a)(3) and (4), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1391 (b) and (c).

There is no dispute concerning the Court's jurisdiction or venue.

**Plaintiffs' Additional Contentions:**

Plaintiffs David Floyd, Lalit Clarkson, Deon Dennis, and David Ourlicht, on behalf of themselves and a certified class of similarly situated individuals, seek declaratory and injunctive relief for Defendants' violation of their rights, privileges, and immunities secured by Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), *et seq.*, and the Constitution and laws of the State of New York, in addition to those listed above.

Supplemental jurisdiction is proper, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

3. **JURY/NON-JURY:**

This trial will be non-jury.

4. **AMENDMENTS/DISMISSALS:**

Plaintiffs' claims against Officer Michael Cousin Hayes were voluntarily dismissed by Plaintiffs on April 2, 2009. (Dkt. 63). Mayor Michael Bloomberg and Commissioner Raymond Kelly were dismissed by Opinion and Order dated Aug. 31, 2011 (Dkt. 153). Plaintiffs' claims against Police Officer Rodriguez, Police Officer Goodman, the individual identified in the Second Amended Complaint as Police Officer Jane Doe, Police Officer Eric Hernandez, Shield # 15957, Police Officer Cormac Joyce, Shield # 31274, Sergeant James Kelly, Shield # 92145, Police Officer Luis Pichardo, Shield # 00794, Police Officer Angelica Salmeron, Shield # 7116, Police Officer Christopher Moran, and the individuals identified in the Second Amended Complaint as Police Officer "JOHN DOES # 1 through #11" were dismissed by Stipulation and Order filed on March 8, 2013. (Dkt. 270). Finally, Plaintiffs' claims for compensatory and punitive damages against all defendants have been voluntarily dismissed by Stipulation and Order filed on March 8, 2013. (Dkt. 270).

5. **UNDISPUTED FACTS:[2]**

    1)     Sergeant Raymond Stukes' voice is on the recordings on PL00093 at the following times. *See* Defs. Resps. & Objections to Pls. 2nd Set of RFA's, No. 1.
           a. WS.310M_12June2008  81  4x12  RollCall  Sgt.Stukes  Lt.Delafuente ACTIVITY at 14:58-16:40;
           b.W  S.310M_1July2008 81 4x12 RollCall Sgt.Stukes ACTIVITY Lt.Delafuente at 6:58-8:00;

---

[2] Pursuant to the Individual Practice Rules of the Honorable Shira A. Scheindlin, U.S. District Judge, counsel stipulate that there is no concession as to the materiality or relevance of the undisputed facts set forth herein.

    c.  WS.310M_23November2008_81_   4x12_RollCall_Sgt.Stukes_SgtWeiss  at 5:46-6:28;

    d.W  S.310M_8December2008_81_4x12_RollCall at 12:23-15:00;

    e.  WS.310M_4February2009       _81_4x12_RollCall_Sgt.Stukes_ACTIVITY _TRAINING_ Lesson Plans at 2:33-3:02;

    f.  WS.310M_28January2009_81_4x12_RollCall_DIMauriello _Lt.Delafuente_ACTIVITY WeDontWantToHurtYou at 23:24-24:10;

    g.13Mar  ch2009 Friday RollCall Sgt.Stukes KeeptheHoundsOff at 4:32-5:20.

    h.8De  cember2008_81_4x12_RollCall at 1:20-1:38

2)    Sergeant Raymond Stukes was present for at least a portion of the roll calls for the 4 X 12 Tours in the NYPD's 81st Precinct which took place on June 12, 2008, July 1, 2008, November 23, 2008, December 8, 2008, January 28, 2009, February 4, 2009, and March 13, 2009. *See* Defs. Resps. & Objections to Pls. 2nd Set of RFA's, No. 2.

3)    Sergeant Raymond Stukes was a patrol squad supervisor in the 81st Precinct during the time period June 1, 2008 through March 13, 2009.

4)    Lieutenant Jean Delafuente's voice is on the recordings on PL00093 at the following times. specified *See* Defs. Resps. & Objections to Pls.' 2nd Set of RFA's, No.3.

    a.  WS.310M_12June2008_81_4x12_RollCall_Sgt.Stukes_Lt.Delafuente ACTIVITY at 7:13-8:10 and 12:10-13:28;

    b.W  S.310M_15July2008_81_4x12_RollCall_Lt.Delafuente_Capt.Mauriello at 00:35-00:50;

    c.  WS.310M_30ctober2008_81_4x12_RollCall_Sgt.Stukes_Lt.Delafuente ACTIVITY at 4:20-6:30;

    d.W  S.310M_1November2008_81_4x12_RollCall_Lt.Delafuente ACTIVITY at 2:12-3:50;

    e.  WS.310M_8November2008_81_ 4x12_RollCall_Sgt.Stukes_DI.Mauriello_Lt.Delafuente_WeOwnTheStreetsH ere at 13:09-14:36;

    f.  WS.310M_12December2008_81_4x12_RollCall at 2:20-4:30;

    g.W  S.310M_16December2008_81_4x12_RollCall_LtDe1afuente ACTIVITY Cs 250s at 9:33-9:54;

    h.W  S.310M_21January2009_TrainingSgt._Sgt.Reid_RollCall_Lt.Delafuente ACTIVITY at 4:27-6:40;

    i.  WS.310M_28January2009_81_4x      12_RollCall_DIMauriello _Lt.Delafuente_ACTIVITY WeDontWantToHurtYou at 24:29-25:50;

    j.  WS.310M_29January2009   RollCall  Sgt.Plunkett  SgtWeiss  250s Lt.De1afuente at 6:20-6:48;

    k.27F  ebruary2009_RollCall_  Sgt.Weber_   Lt.Delafuente_ACTIVITY_ MaurielloSpecials at 2:35-6:21.

    l.  13January2009_SgtReid_SignTrainingLog_RollCall at 3:02-4:26.

5)  Lieutenant Jean Delafuente was present for at least a portion of the roll calls for the 4 X 12 Tours in the NYPD's 81st Precinct which took place on June 12, 2008, July 15, 2008, October 30, 2008, November 1, 2008, November 8, 2008, December 12, 2008, December 16, 2008, January 13, 2009, January 21, 2009, January 28, 2009, January 29, 2009, and February 27, 2009. *See* Defs. Resps. & Objections to Pls. 2nd Set of RFA's, No. 4.

6)  Lieutenant Jean Delafuente was a platoon commander in the 81st Precinct during the time period June 1, 2008 through February 28, 2009.

7)  Sergeant Rasheena Huffman's voice is on the recordings on PL00093 at the following times. *See* Defs. Resps. & Objections to Pls. 2nd Set of RFA's, No. 5.

  a. WS.331M_12October2009_RollCall_Sgt.Huffman_Robbery 61s at 5:12-7:00;
  b. W S.331M_24October2009_RollCall Sgt.Huffman Robbery 250s at 3:40-5:30.

8)  Sergeant Rasheena Huffman was present for at least a portion of the roll calls for the 4 X 12 Tours in the NYPD's 81st Precinct which took place on October 12, 2009 and October 24, 2009. *See* Defs. Resps. & Objections to Pls. 2nd Set of RFA's, No. 6.

9)  Sergeant Rasheena Huffman was a patrol squad supervisor in the 81st Precinct during the time period October 1 through 31, 2009.

10) Lieutenant Weiss' voice is on the recordings on PL00093 at the following times. *See* Defs. Resps. & Objections to Pls. 2nd Set of RFA's, No. 7.
  a. WS.310M_29January2009    RollCall    Sgt.Plunkett    SgtWeiss    250s Lt.Delafuente at 6:56-9:03.

11) Lieutenant Weiss was present for at least a portion of the roll call for the 4 x 12 Tours in the NYPD's 81st Precinct, which took place on January 29, 2009. *See* Defs. Resps & Objections to Pls. 2nd Set of RFA's, No. 8.

12) Deputy Inspector Steven Mauriello's voice is on the recordings on PL00093 at the following times:
  a. Track 28October2008_81_4x12_RollCall, at 4:50-5:03
  b. Tra ck 31October2008 81 4x12 RollCall at 6:35-7:26, 9:05-9:50
  c. Track 8November2008_81_4x12_RollCall at 15:34-15:45
  d. Tra ck 8December2008_81_4x12_RollCall at 5:45-6:35, 7:15-7:42
  e. Track 9December2008_81_4x12_RollCall DiMauriello_ACTIVITY
  f. Track28January2009_81_4xI2_RollCall_D!Mauriello_Lt.Delafuente_Activity WeDontWantToHurtYou at 20:25-21:50

13) Deputy Inspector Steven Mauriello was present for at least a portion of the roll call for the 4 x 12 Tours in the NYPD's 81st Precinct, which took place on

October 28, 2008, October 31, 2008, November 8, 2008, December 8, 2008, and December 9, 2008, January 28, 2009.

14)   Officers Michael Noboa, Edgar Gonzalez, and Kha Dang are three of the four NYPD officers who recorded the highest number of stop, question, and frisk encounters in the third quarter of 2009. *See* February 5, 10, and 19, 2010 emails from Linda Donahue to Darius Charney.

15)   On June 6, 2008, Van 9466 was assigned to "truancy" within PSA 5. (*See* June 6, 2008 Van Assignment Sheet, Albino Dec. in Support of Defs. Mtn. for Sum. J., Ex. 1.).

16)   The roll calls for PSA 5 on June 6, 2008 list Officers Negron and Goris on "YUTH"/ "TRUANCY" duty with a hand written note "9466." The roll call lists Delgado as 'CRIM ANALYSIS" with a hand written note "9466." (*See* NYC_2_4531-5.) Officers Negron, Goris, and Delgado were assigned to vehicle 9466.

17)   On July 16, 2010, New York Governor David Paterson signed into law an amendment to New York Criminal Procedure Law § 140.50, which now includes the following text: "In cities with a population of one million or more, information that establishes the personal identity of an individual who has been stopped, questioned and/or frisked by a police officer or peace officer, such as the name, address or social security number of such person, shall not be recorded in a computerized or electronic database if that individual is released without further legal action; provided, however, that this subdivision shall not prohibit police officers or peace officers from including in a computerized or electronic database generic characteristics of an individual, such as race and gender, who has been stopped, questioned and/or frisked by a police officer or peace officer." NY CLS CPL § 140.50(4) (2013).

6.   **CONTENTIONS OF THE PARTIES:**

**Plaintiffs' Contentions**

Plaintiffs contend that named Plaintiffs David Floyd, Lalit Clarkson, Deon Dennis, and David Ourlicht, along with hundreds of thousands, if not millions, of members of the certified class of Plaintiffs, have been stopped, questioned, and/or frisked on the basis of their race and/or without reasonable articulable suspicion by New York City police officers one or more times since January 2005 and/or are at risk of being stopped, questioned, and/or frisked on the basis of their race and/or without reasonable articulable suspicion in the future.

With respect to the named Plaintiffs in particular, Plaintiffs contend that:

i.   David Floyd was stopped, questioned, and frisked without reasonable articulable suspicion and on the basis of his race by unidentified NYPD

6

officers in April 2007, and by Defendant officers Eric Hernandez, Cormac
Joyce, and James Kelly on February 27, 2008;

ii.    Lalit Clarkson was stopped and questioned without reasonable articulable
suspicion and on the basis of his race by unidentified NYPD officers in
January 2006;

iii.    Deon Dennis was stopped, questioned, and frisked without reasonable
articulable suspicion and on the basis of his race by Defendant officers
Angelica Salmeron and Luis Pichardo on January 12, 2008; and

iv.    David Ourlicht was stopped, questioned, and frisked without reasonable
articulable suspicion and on the basis of his race by Defendant officer
Christopher Moran on January 30, 2008 and by unidentified NYPD officers
on February 21, 2008, or a weekday evening in February 2008 (Ourlicht
Affidavit, Ex. 5 to 11/7/11 Charney Decl. at ¶11), and June 6 or 9, 2008.

Plaintiffs also contend that Plaintiff Floyd was searched without probable cause by
Defendants Joyce, Hernandez, and James Kelly on February 27, 2008, and that Plaintiff Ourlicht
was searched without probable cause by Defendant Moran on January 30, 2008, and by
unidentified NYPD officers on February 21, 2008.

Plaintiffs further contend that the suspicionless and race-based stops-and-frisks of the
named Plaintiffs and Plaintiff class members are the result of policies and/or widespread customs
and practices of the City of New York that encourage, sanction, and/or fail to prevent such
unconstitutional stops-and-frisks. These practices include but are not limited to:

i.    A widespread practice of suspicionless stops-and-frisks to which senior
NYPD officials have constructively acquiesced or which is so permanent and
well settled as to constitute a custom or usage with the force of law;

ii.    A *de facto* policy and/or widespread practice of intentionally targeting the
NYPD's stop, question, and frisk activity to black and Latino New York City
residents and majority black and majority Latino New York City
neighborhoods;

iii.    A failure to implement the NYPD's formal policy against racial profiling;

iv.    A *de facto* policy and/or widespread practice of imposing quotas and/or
productivity standards on, or pressuring NYPD officers to increase, stop-and-
frisk activity; and

v.    A deliberately indifferent failure to adequately train, supervise, monitor, and
discipline officers to ensure that they conduct stops-and-frisks in compliance
with the Constitution.

### Defendant's Contentions

Defendant contends that plaintiffs are unable to meet their burden of proof that named
Plaintiffs David Floyd, Lalit Clarkson, Deon Dennis, and David Ourlicht, along with hundreds of
thousands, if not millions, of members of the certified class of Plaintiffs, have been stopped,
questioned, and/or frisked on the basis of their race and/or without reasonable articulable
suspicion by New York City police officers one or more times since January 2005 and/or are at

risk of being stopped, questioned, and/or frisked on the basis of their race and/or without reasonable articulable suspicion in the future.

With respect to the named Plaintiffs in particular, defendant contends that plaintiffs are unable to meet their burden of proof that:

    i.    David Floyd was stopped, questioned, and frisked without reasonable articulable suspicion and on the basis of his race by unidentified NYPD officers in April 2007, and by Police Officers Eric Hernandez, Cormac Joyce, and James Kelly on February 27, 2008;

    ii.    Lalit Clarkson was stopped and questioned without reasonable articulable suspicion and on the basis of his race by unidentified NYPD officers in January 2006;

    iii.    Deon Dennis was stopped, questioned, and frisked without reasonable articulable suspicion and on the basis of his race by Police Officers Angelica Salmeron and Luis Pichardo on January 12, 2008; and

    iv.    David Ourlicht was stopped, questioned, and frisked without reasonable articulable suspicion and on the basis of his race by Police Officer Christopher Moran on January 30, 2008 and by unidentified NYPD officers on February 21, 2008, or a weekday evening in February 2008 (Ourlicht Affidavit, Ex. 5 to 11/7/11 Charney Decl. at ¶11), and June 6 or 9, 2008.

Defendant also contends that that Plaintiff Floyd is unable to meet his burden of proof that he was searched without probable cause by Police Officers Joyce, Hernandez, and James Kelly on February 27, 2008, and that Plaintiff Ourlicht is unable to meet his burden of proof that he was searched without probable cause by Police Officers Moran on January 30, 2008, and by unidentified NYPD officers on February 21, 2008 or on a weekday evening in February 2008.

Defendant further contends that plaintiffs are unable to meet their burden of proof that there is a policy and/or widespread custom and practice of the City of New York that encourages, sanctions, and/or fails to prevent unconstitutional stops-and-frisks and that the stops of the plaintiffs and plaintiff-class members are the result of such practices.

    i.    Defendant further contends that plaintiffs are unable to meet their burden of proof that the City of New York has a widespread practice of suspicionless stops-and-frisks to which senior NYPD officials have constructively acquiesced or which is so permanent and well settled as to constitute a custom or usage with the force of law;

    ii.    Defendant further contends that plaintiffs are unable to meet their burden of proof that the City of New York has a *de facto* policy and/or widespread practice of intentionally targeting the NYPD's stop, question, and frisk activity to black and Latino New York City residents and majority black and majority Latino New York City neighborhoods;

    iii.    Defendant further contends that plaintiffs are unable to meet their burden of proof that the City of New York has failed to implement the NYPD's formal policy against racial profiling;

    iv.    Defendant further contends that plaintiffs are unable to meet their burden of proof that the City of New York has a *de facto* policy and/or widespread practice of imposing quotas and/or productivity standards on, or pressuring NYPD officers to increase, stop-and-frisk activity; and

    v.    Defendant further contends that plaintiffs are unable to meet their burden of proof that the City of New York has been deliberately indifferent by failing to adequately train, supervise, monitor, and discipline officers to ensure that they conduct stops-and-frisks in compliance with the Constitution.

**7.**    **ISSUES OF LAW:**[3]

**Plaintiffs' Contentions:**

1)    Did Police Officer Joyce, Police Officer Hernandez and Sergeant James Kelly lack reasonable articulable suspicion that Plaintiff Floyd had committed, was committing, or was about to commit a crime when they stopped and questioned him on February 27, 2008?

2)    Did the unidentified NYPD Officers who stopped Plaintiffs Floyd in April 2007 lack reasonable articulable suspicion that he had committed, was committing, or was about to commit a crime?

3)    Did Police Officer Joyce, Police Officer Hernandez, and Sergeant Kelly lack reasonable articulable suspicion that Plaintiff Floyd was armed and dangerous when they frisked him on February 27, 2008?

4)    Did Police Officer Joyce, Police Officer Hernandez, and Sergeant Kelly stop, question, frisk, and search Plaintiff Floyd on the basis of his race?

5)    Did the unidentified NYPD Officers who stopped and questioned Plaintiff Clarkson in January 2006 lack reasonable articulable suspicion that he had committed, was committing, or was about to commit a crime?

6)    Did the unidentified NYPD officers who stopped and questioned Plaintiff Clarkson in January 2006 do so on the basis of his race?

7)    Did Police Officers Salmeron and Pichardo lack reasonable articulable suspicion that Plaintiff Dennis had committed, was committing or was about to commit a crime at the time they stopped and questioned him on January 12, 2008?

8)    Did Police Officers Salmeron and Pichardo lack reasonable articulable suspicion that Plaintiff Dennis was armed and dangerous when they frisked him on January 12, 2008?

---

[3] The parties will address the legal issues in greater detail in the post-trial conclusions of law and trial memorandum.

9)   Did Police Officers Salmeron and Pichardo stop, question, and frisk Plaintiff Deon Dennis on the basis of his race on January 12, 2008?

10)   Did Police Officer Moran lack reasonable articulable suspicion that Plaintiff Ourlicht had committed, was committing, or was about to commit a crime when Moran stopped and questioned Plaintiff Ourlicht on January 30, 2008?

11)   Did Police Officer Moran lack reasonable articulable suspicion that Plaintiff Ourlicht was armed and dangerous when Moran frisked him on January 30, 2008?

12)   Did Police Officer Moran have probable cause to believe Plaintiff Ourlicht had a weapon or other contraband when Moran searched Plaintiff Ourlicht on January 30, 2008?

13)   Did Police Officer Moran stop, question, frisk, and search Plaintiff Ourlicht on the basis of his race on January 30, 2008?

14)   Did the unidentified NYPD officers who stopped and questioned Plaintiff Ourlicht on February 21 or a weekday evening in February 2008 and June 6 or 9, 2008 and June 6 or 9, 2008 lack reasonable, articulable suspicion that Plaintiff Ourlicht had committed, was committing, or was about to commit a crime? Did these officers lack reasonable, articulable suspicion that Plaintiff Ourlicht was armed and dangerous when they frisked him?

15)   Did the unidentified officers who searched Plaintiff Ourlicht on February 21, 2008 or a weekday evening in February 2008 and June 6 or 9, 2008 have probable cause to believe that Plaintiff Ourlicht had a weapon or other contraband when they searched him?

16)   Did the unidentified NYPD officers who stopped, questioned, and frisked Plaintiff Ourlicht on February 21 and June 6 or 9, 2008 stop, question, and frisk Plaintiff Ourlicht on the basis of his race?

17)   Is the practice of suspicionless stops by NYPD officers so manifest as to imply constructive acquiescence on the part of senior NYPD officials or so permanent and well settled as to constitute a custom or usage with the force of law?

18)   Does the NYPD engage in a pattern and practice of stopping and frisking individuals on the basis of race?

19)   Does the NYPD have a *de facto* policy and/or widespread practice of imposing quotas or productivity standards on NYPD officers, or pressuring NYPD officers to increase stop-and-frisk activity that has caused officers to engage in suspicionless stops-and-frisks?

20) Are the NYPD's policies and practices for training, supervising, monitoring, and disciplining NYPD officers with respect to stop, question, and frisk so inadequate as to amount to deliberate indifference on the part of senior NYPD officials to the risk of suspicionless and race-based stops by NYPD officers?

**Defendant's Contentions:**

I.     Contentions of Law Related to Plaintiff David Floyd
February 27, 2008

1) Did Police Officer Joyce, Police Officer Hernandez, and Sergeant James Kelly have a reasonable articulable suspicion that Plaintiff David Floyd had committed, was committing, or was about to commit a penal law misdemeanor or felony when they stopped and questioned him on February 27, 2008?

2) Did Police Officer Joyce, Hernandez, and James Kelly have "knowledge of some fact or circumstance that supported a reasonable suspicion that Plaintiff David Floyd was armed or posed a threat to safety" when they frisked him on February 27, 2008?[4]

3) If the stop lacked reasonable suspicion, did Police Officer Joyce, Police Officer Hernandez, and Sergeant James Kelly stop, question, and frisk, Plaintiff David Floyd on the basis of his race in violation of the 14th Amendment?

April 2007

4) If Plaintiff Floyd was subject to an encounter sometime in April 2007 and it occurred with NYPD officers, did it take place in accordance with the Fourth Amendment?

5) If April 2007 police encounter described by Plaintiff Floyd did not take place in accordance with the 4th Amendment, did the unidentified officers who initiated the encounter do so on the basis of Plaintiff Floyd's race in violation of the 14th Amendment?

II.     Contentions of Law Related to Plaintiff Lalit Clarkson
January 2006

6) If Plaintiff Clarkson was subject to an encounter sometime in January 2006 and it occurred with NYPD officers, did it take place in accordance with the Fourth Amendment?

7) If the January 2006 police encounter described by Plaintiff Clarkson did not take place in accordance with the 4th Amendment, did the unidentified officers who initiated the encounter do so on the basis of Plaintiff Clarkson's race in violation of the 14th Amendment?

---

[4] Ligon v. City of New York, 12 Civ. 2274 (SAS), 2013 U.S. Dist. LEXIS 22383, 44-45, n.104 (S.D.N.Y. 2013) (quotation marks and citation omitted)

III.    Contentions of Law Related to Plaintiff Deon Dennis
January 12, 2008

8)    Did the January 12, 2008 police encounter between Plaintiff Deon Dennis and Police Officers Salmeron and Pichardo take place in accordance with the Fourth Amendment?

9)    Did the search procedure conducted on Plaintiff Deon Dennis during the January 12, 2008 police encounter take place in accordance with the Fourth Amendment?

10)   If the January 12, 2008 police encounter did not take place in accordance with the Fourth Amendment, did Police Officers Salmeron and Pichardo initiate the police encounter of Plaintiff Deon Dennis on the basis of his race on January 12, 2008 in violation of the 14th Amendment?

IV.    Contentions of Law Related to Plaintiff David Ourlicht
January 30, 2008

11)   Did Police Officer Moran have a reasonable articulable suspicion that Plaintiff David Ourlicht had committed, was committing, or was about to commit a penal law misdemeanor or felony when Police Officer Moran stopped and questioned Plaintiff David Ourlicht on January 30, 2008?

12)   Did the search procedure conducted on Plaintiff David Ourlicht during the January 30, 2008 police encounter take place in accordance with the Fourth Amendment?

13)   If the stop lacked reasonable suspicion, did Police Officer Moran stop, question, frisk, and search Plaintiff David Ourlicht on the basis of his race on January 30, 2008 in violation of the 14th Amendment?

February 21, 2008 or a weekday evening in February 2008

14)   If Plaintiff David Ourlicht was subject to an encounter sometime on February 21, 2008 or a weekday evening in February 2008 and it occurred with NYPD officers, did it take place in accordance with the 4th Amendment?

15)   If the February 21, 2008 or weekday evening in February 2008 police encounter described by Plaintiff David Ourlicht did not take place in accordance with the 4th Amendment, did the unidentified officers who initiated the encounter do so on the basis of Plaintiff David Ourlicht's race in violation of the 14th Amendment?

June 6 or 9, 2008, or early June 2008

16)   If Plaintiff David Ourlicht was subject to an encounter sometime on June 6 or 9, 2008 or in early June 2008, and it occurred with NYPD officers, did it take place in accordance with the 4th Amendment?

17) If the June 6 or 9, 2008 or early June 2008 police encounter described by Plaintiff David Ourlicht did not take place in accordance with the 4th Amendment, did the unidentified officers who initiated the encounter do so on the basis of Plaintiff David Ourlicht's race in violation of the 14th Amendment?

V.   Contentions of Law Related to Class Member Witness Clive Lino
February 5, 2008

18) Did Police Officer Brian Kovall and Police Officer Edward Arias have a reasonable articulable suspicion that Class Member Witness Clive Lino had committed, was committing, or was about to commit a penal law misdemeanor or felony when they stopped and questioned him on February 5, 2008?

19) Did Police Officer Brian Kovall and Police Officer Edward Arias have "knowledge of some fact or circumstance that supported a reasonable suspicion that Class Member Witness Clive Lino was armed or posed a threat to safety" when they frisked him on February 5, 2008?

20) If the February 5, 2008 stop lacked reasonable suspicion, did Police Officer Brian Kovall and Police Officer Edward Arias stop, question, and frisk, Class Member Witness Clive Lino on the basis of his race in violation of the 14th Amendment?

February 24, 2011

21) Did Police Officer Edgar Figeroa and Police Officer Daniel Leek have a reasonable articulable suspicion that Class Member Witness Clive Lino had committed, was committing, or was about to commit a penal law misdemeanor or felony when they stopped and questioned him on February 24, 2011?

22) Did Police Officer Edgar Figeroa and Police Officer Daniel Leek have "knowledge of some fact or circumstance that supported a reasonable suspicion that Class Member Witness Clive Lino was armed or posed a threat to safety" when they frisked him on February 24, 2011?

23) If the February 24, 2011stop lacked reasonable suspicion, did Police Officer Edgar Figeroa and Police Officer Daniel Leek stop, question, and frisk, Class Member Witness Clive Lino on the basis of his race in violation of the 14th Amendment?

VI.   Contentions of Law Related to Class Member Witness Devin Almonor
March 20, 2010

24) Did Sergeant Korabel and Officer Dennis have a reasonable articulable suspicion that Class Member Witness Devin Almonor had committed, was committing, or was about to commit a penal law misdemeanor or felony when they stopped and questioned him on March 20, 2010?

25) Did Sergeant Korabel and Officer Dennis have "knowledge of some fact or circumstance that supported a reasonable suspicion that Class Member Witness

Devin Almonor was armed or posed a threat to safety" when they frisked him on March 20, 2010?

26) If the March 20, 2010 stop lacked reasonable suspicion, did Sergeant Korabel and Officer Dennis stop, question, and frisk, Class Member Witness Devin Almonor on the basis of his race in violation of the 14th Amendment?

VII.   Contentions of Law Related to Class Member Witness Dominigue Sindayiganza
February 12, 2010

27) Did Officer Luke White have a reasonable articulable suspicion that Class Member Witness Dominigue Sindayiganza had committed, was committing, or was about to commit a penal law misdemeanor or felony when they stopped and questioned him on February 12, 2010?

28) Did the search procedure conducted on Class Member Witness Dominigue Sindayiganza during the February 12, 2010 police encounter take place in accordance with the Fourth Amendment?

29) If the February 12, 2010 stop lacked reasonable suspicion, did Officer Luke White stop, question, and frisk, Class Member Witness Dominigue Sindayiganza on the basis of his race in violation of the 14th Amendment?

VIII.   Contentions of Law Related to Class Member Witness Leroy Downs
August 20, 2008

30) If Class Member Witness Leroy Downs was subject to an encounter on August 20, 2008 and it occurred with NYPD officers, did it take place in accordance with the 4th Amendment?

31) If the August 20, 2008 police encounter described by Class Member Witness Leroy Downs did not take place in accordance with the 4th Amendment, did the unidentified officers[5] who initiated the encounter do so on the basis of Class Member Witness Leroy Downs's race in violation of the 14th Amendment?

IX.   Contentions of Law Related to Class Member Witness Ian Provost
November 24, 2009

32) Did the November 24, 2009 police encounter between Class Member Witness Ian Provost and Police Officer Jonathan Rothenberg take place in accordance with the Fourth Amendment?

33) Did the search procedure conducted on Class Member Witness Ian Provost during the November 24, 2009 police encounter take place in accordance with the Fourth Amendment?

---

[5] It should be noted that the CCRB identified the officers who initiated this alleged encounter as Officer Giacona and Officer Mahoney.  The officers, however, have no memory of the stop and have reason to believe that they were not involved in the alleged encounter.

34)   If the November 24, 2009 police encounter with Class Member Witness Ian Provost did not take place in accordance with the Fourth Amendment, did Police Officer Jonathan Rothenberg initiate the police encounter on the basis of Class Member Witness Ian Provost's race in violation of the 14th Amendment?

X.   Contentions of Law Related to Class Member Witness Cornelio McDonald
December 19, 2009

35)   Did Officer French have a reasonable articulable suspicion that Class Member Witness Cornelio McDonald had committed, was committing, or was about to commit a penal law misdemeanor or felony when he stopped and questioned him on December 19, 2009?

36)   Did the pat-frisk and subsequent search procedure conducted on Class Member Witness Cornelio McDonald during the November 24, 2009 police encounter take place in accordance with the Fourth Amendment?

37)   If the December 19, 2009 stop lacked reasonable suspicion, did Officer French stop, question, and frisk, Class Member Witness Cornelio McDonald on the basis of his race in violation of the 14th Amendment?

XI.   Contentions of Law Related to Class Member Witness Kristianna Acevedo
May 29, 2007

38)   Did the police encounter between Detectives Hawkins, DeMarco, and Vizcarrando and Class Member Witness Kristianna Acevedo of May 29, 2007, take place in accordance with the Fourth Amendment?

39)   If the May 29, 2007 police encounter described by Class Member Witness Kristianna Acevedo did not take place in accordance with the 4th Amendment, did Detectives Hawkins, DeMarco, and Vizcarrando initiate the encounter on the basis of Class Member Witness Kristianna Acevedo's race in violation of the 14th Amendment?

XII.   Contentions of Law Related to Class Member Witness Nicholas Peart
August 5, 2006

40)   Did Officer Benjamin White have a reasonable articulable suspicion that Class Member Witness Nicholas Peart had committed, was committing, or was about to commit a penal law misdemeanor or felony when he stopped and questioned him on August 5, 2006?

41)   Did Officer Benjamin White have "knowledge of some fact or circumstance that supported a reasonable suspicion that Class Member Witness Nicholas Peart was armed or posed a threat to safety" when he frisked him on August 5, 2006?

42)   If the August 5, 2006 stop lacked reasonable suspicion, did Officer Benjamin White stop, question, and frisk, Class Member Witness Nicholas Peart on the basis of his race in violation of the 14th Amendment?

Spring 2008
43)   If Class Member Witness Nicholas Peart was subject to an encounter in the Spring 2008 and it occurred with NYPD officers, did it take place in accordance with the 4th Amendment?

44)   If the Spring 2008 police encounter described by Class Member Witness Nicholas Peart did not take place in accordance with the 4th Amendment, did the unidentified officers who initiated the encounter do so on the basis of Class Member Witness Nicholas Peart's race in violation of the 14th Amendment?

September 2010
45)   If Class Member Witness Nicholas Peart was subject to an encounter on September 2010 and it occurred with NYPD officers, did it take place in accordance with the 4th Amendment?

46)   If the September 2010 police encounter described by Class Member Witness Nicholas Peart did not take place in accordance with the 4th Amendment, did the unidentified officers who initiated the encounter do so on the basis of Class Member Witness Nicholas Peart's race in violation of the 14th Amendment?

May 2011
47)   If Class Member Witness Nicholas Peart was subject to an encounter on May 2011 and it occurred with NYPD officers, did it take place in accordance with the 4th Amendment?

48)   If the May 2011 police encounter described by Class Member Witness Nicholas Peart did not take place in accordance with the 4th Amendment, did the unidentified officers who initiated the encounter do so on the basis of Class Member Witness Nicholas Peart's race in violation of the 14th Amendment?

XII.   Contentions of Law Related to Plaintiffs *Monell* Allegations
49)   Whether the City of New York has an actionable Policy and/or Practice of conducting stops and frisks without reasonable suspicion under *Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658 (1978), and its progeny?

50)   Whether the City of New York has an actionable Policy and/or Practice of stopping and frisking Black and Latino persons on the basis of race rather than reasonable suspicion under *Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658 (1978), and its progeny?[6]

---

[6] Defendants will address the legal issues in greater detail in the post-trial conclusions of law and trial memorandum.

**8.   SEPARATE TRIAL OF THE ISSUES:**

There will not be any separate trial of the issues. The Court denied Plaintiffs' request pursuant to Fed.R.Civ.P. 42(a) to bifurcate the trial into liability and remedial phases. *See* 1/4/13 Hr'g Tr. at 76.

**9.   LIST OF PROSPECTIVE WITNESSES:**

The parties' list of prospective witnesses is annexed hereto as Exhibit A.

**10.   EXPERT WITNESSES:**

**For Plaintiffs:**

Jeffrey Fagan: Dr. Fagan will discuss the results of his statistical analyses of the NYPD's UF250 Stop, Question, and Frisk data for years 2003 through first half of 2012. The results of Dr. Fagan's analyses are probative of the NYPD's widespread pattern and practice of suspicionless and race-based stops-and-frisks. Dr. Fagan will also provide evidence that the RAND Corporation's 2007 report on the NYPD's stop, question, and frisk practices is methodologically unreliable and contains scientifically invalid results, to rebut evidence of Defendants' reliance on it as a basis to conclude that the NYPD does not engage in a widespread pattern and practice of race-based stops-and-frisks. Finally, Professor Fagan will provide statistical evidence of the absence of a burglary pattern in the vicinity of Plaintiff David Floyd's home at or near the time of his February 27, 2008 stop-and-frisk, to rebut evidence that Defendants Joyce, Hernandez, and James Kelly's stopped and frisked Plaintiff Floyd based on crime conditions.

Lou Reiter: Mr. Reiter, a police practices expert, will testify about the inadequacy of the NYPD's current policies and practices for training, supervising, monitoring, and discipline of police officers with respect to their stop-and-frisk activity, as well as how such inadequacies can and do lead to unconstitutional stops-and-frisks.

Sam Walker: Dr. Walker will address the contours, breadth, and scope of the remedial measures necessary to cure the pattern and practice of suspicionless and racially discriminatory stops-and-frisks on the part of Defendant City of New York.

**For Defendant:**

Dennis Smith: In conjunction with Dr. Purtell, Dr. Smith will be called as a rebuttal witness to Dr. Fagan, and will discuss the results of his and Dr. Fagan's statistical analyses of the NYPD's UF250 Stop, Question, and Frisk data for years 2003 through the first half of 2012.

Robert Purtell: In conjunction with Dr. Smith, Dr. Purtell will be called as a rebuttal witness to Dr. Fagan, and will discuss the results of his and Dr. Fagan's statistical analyses of the NYPD's UF250 Stop, Question, and Frisk data for years 2003 through the first half of 2012.

<u>James K. Stewart</u>: Mr. Stewart will be called as a rebuttal to the testimony of Dr. Walker.

<u>Other</u>:  Defendant reserves the right to identify and call additional witnesses in response to Sam Walker's expert report and testimony.  Plaintiffs reserve the right to object to any such witnesses.

**11.   EXHIBITS:**

The parties' list of prospective exhibits is annexed hereto as Exhibit B.

**12.   SUBSEQUENT AMENDMENT OF WITNESS OR EXHIBIT LISTS:**

Absent the subsequent consent of all the parties hereto, or the issuance of a subsequent Order by this Court so permitting, no witnesses or exhibits shall be presented at the trial of this case other than those listed in paragraphs 9, 10, and 11 hereof.

**13.   ESTIMATE OF TRIAL TIME:**

Plaintiffs estimate that the presentation of plaintiffs' witnesses and evidence will require twenty to thirty (20-30) court trial days.

As Defendant intends to conduct their direct examination of most witnesses when that witness is called during Plaintiffs' case, Defendant estimates that the presentation of defendant's witnesses and evidence will require three to five (3-5) additional court trial days.

**14.   PREVIOUS SUBSTANTIVE MOTIONS:**

<u>Summary Judgment</u>
Defendants' Motion for Partial Summary Judgment (Dkt. 134), granted in part and denied in part by Opinion and Order, Aug. 31, 2011(Dkt. 153).

Plaintiffs' Motion to Amend/Correct Order on Motion for Summary Judgment with respect to David Floyd's claim (Dkt. 154), granted by Opinion and Order, Nov. 23, 2011(Dkt. 171).

<u>Class Certification</u>
Plaintiffs' Motion for Class Certification (Dkt. 165), granted by Opinion and Order dated May 16, 2012 (Dkt. 205).

<u>Daubert Motions</u>
Defendants' Motion in Limine to exclude Plaintiffs' proposed expert reports, opinion and testimony of Jeffrey Fagan. (Dkt. 178), granted in part and denied in part by Opinion and Order dated April 16, 2012 (Dkt. 201).

Plaintiffs' Motion to Exclude Certain Opinions of Defendants' Proposed Expert (Dkt. 215), granted in part and denied in part by Opinion and Order dated Aug. 17, 2012 (Dkt. 224).

<u>Motions *in Limine*</u>:[7]

**Evidentiary Rulings Made on at January 4, 2013 Conference:[8]**

Defendants' Motion to Preclude Eliciting Evidence of the Officers' Disciplinary Histories, Prior Lawsuits and Settlements, (Defendants December 28, 2012 letter). (Jan. 4, 2013, Dkt. 252, 4:15-17; 5:7-19; 6:3-21; 8:12-23; 7:5-11; 9:9 – 10:13).

Defendants' Motion that testimony concerning Plaintiffs and the class members incidents should be limited solely to stop, question and frisk (Defendants December 28, 2012 letter). (Jan. 4, 2013, Dkt. 252, 10:16 – 12:4).

Defendants' Motion to Exclude Testimony Regarding John Doe Stops. (Defendants December 28, 2012 letter). (Jan. 4, 2013, Dkt. 252, 12:16 – 13:7).

Defendants' Motion to Preclude Plaintiffs' from eliciting testimony concerning alleged statements of John Doe Police officers. (Defendants December 28, 2012 letter). (Jan. 4, 2013, Dkt. 252, 13:15 – 17:6).

Defendants' Motion to Preclude Plaintiffs and Class Member Witnesses from Testifying About Other People's Stops. (Defendants December 28, 2012 letter). (Jan. 4, 2013, Dkt. 252, 20:15 – 20:22).

Defendants' Motion that Roll Recordings are inadmissible to support the Plaintiffs' quota theory. (Defendants December 28, 2012 letter). (Jan. 4, 2013, Dkt. 252, 20:23 – 23:8).

Defendants' Motion to Exclude Lou Reiter. (Defendants December 28, 2012 letter). (Jan. 4, 2013, Dkt. 252, 23:9 – 29:24; 73:13 – 73:18).

Defendants' Motion to Preclude Eli Silverman from offering survey evidence. (Defendants December 28, 2012 letter). (Jan. 4, 2013, Dkt. 252, 29:25 – 40:19).

Defendants Motion to Exclude the New York Civil Liberties Union report and the New York State 1999 Attorney General Report. (Defendants December 28, 2012 letter). Plaintiffs' motion concerning the Rand report. (Jan. 4, 2013, Dkt. 252, 40:20 – 52:4).

Defendants' Motion to Exclude William Pena from trial (Jan. 4, 2013, Dkt. 252, 77:25 – 82:5).

---

[7] The transcript pages for each of the conferences cited within this section are annexed hereto as Exhibit C (January 4, 2013 Conference), Exhibit D (January 17, 2013 Conference), Exhibit E (January 31, 2013 Conference), and Exhibit F (March 5, 2013 Conference).

[8] By identifying motions herein, the parties to not make any representations regarding the Court's rulings.

Plaintiffs' Motion to Use Leading Questions with CCRB and NYPD Witnesses. (Jan. 4, 2013, Dkt. 252, 52:5 – 54:5).

Plaintiffs' Motion to Preclude Testimony Concerning the Effectiveness of Stop, Question, Frisk. (Jan. 4, 2013, Dkt. 252, 55:12 – 60:12).

Plaintiffs' Motion to Preclude Questioning of Plaintiffs and Class Member Witnesses on Witness Prior Conduct, Habits, and Unrelated Stop and Frisks. (Jan. 4, 2013, Dkt. 252, 60:13 – 64:23).

Plaintiffs' Motion to Preclude Defendants from questioning Plaintiffs or Class Member Witnesses as to stops which they have not put at issue. (Jan. 4, 2013, Dkt. 252, 64:24 – 68:5).

Plaintiffs' Motion to Exclude Letter Of NYPD Commissioner Kelly. (Jan. 4, 2013, Dkt. 252, 68:6 – 69:14).

Plaintiffs' Motion to Exclude Evidence of Deon Dennis' Arrest Warrant. (Jan. 4, 2013, Dkt. 252, 73:1-25; 74:1-10).

Plaintiffs' Motion to Preclude Questioning of Plaintiffs and Class Member Witnesses concerning neighborhood crime. (Jan. 4, 2013, Dkt. 252, 74:12 – 76:4).

Plaintiffs' Motion to Preclude Defendants from communicating with witnesses once the witness is sworn. (Jan. 4, 2013, Dkt. 252, 77:16 – 77:22).

**Evidentiary Rulings Made on at January 17, 2013 Conference:**

Defendants' Motion to Preclude Class Member Witness Clive Lino from testifying about his stop which occurred on August 3, 2008 inside a NYCHA development. (Jan. 17, 2013, Dkt. 254, 4:12 – 5:7; 31:16 – 36:16).

**Evidentiary Rulings Made at January 31, 2013 Conference:**

Discussion by Court concerning extent to which <u>Davis v. City of New York, et al.</u>, issues will be discussed in the trial of this matter. (Jan. 31, 2013, transcript not yet docketed, 13:10-20).

Discussion by Court concerning IAB and OCD records may be used at trial. (Jan. 31, 2013, transcript not yet docketed, 59:12 - 60:2).

Plaintiffs' motion to use designated deposition testimony of non-party witnesses in their affirmative case. (Jan. 31, 2013, transcript not yet docketed, 69:22 - 71:23).

Defendants motion to preclude trial testimony of four supervisors related to class member witness stops. (Jan. 31, 2013, transcript not yet docketed, 73:20 - 75:20).

**Evidentiary Rulings Made at the March 5, 2013 Conference:**

Plaintiffs' Motion to incorporate record from Ligon et al., v. City of New York et al., preliminary injunction hearing.  (March 5, 2013, transcript not yet docketed, 31:12 - 47:14.

**15.    REQUESTED EVIDENTIARY RULINGS:**

The parties informally and simultaneously moved for evidentiary rulings in pre-motion letters to the Court submitted on December 28, 2012. The Court made evidentiary rulings during the January 4, 2013, January 17. 2013, January 31, 2013, and March 5, 2013, conferences with the parties. Any additional requested evidentiary rulings shall be raised informally, via letters to the Court, if in advance of trial, or orally, if during trial.

**16.    JURY VERDICT:**

This is a non-jury trial.

**17.    VOIR   DIRE   QUESTIONS,   REQUESTS   TO   CHARGE,   AND   TRIAL MEMORANDUM OF LAW IN A JURY TRIAL:**

This is a non-jury trial.

[The Rest Of This Page Intentionally Left Blank]

18.   **TRIAL MEMORANDUM OF LAW AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN A NON-JURY TRIAL:**

The parties propose simultaneous submission of findings of fact, conclusions of law, and post-trial briefs to be submitted three weeks after the close of evidence.

**SO ORDERED:**
Dated: New York, New York

_____
SHIRA A. SCHEINDLIN
United States District Judge

**CONSENTED TO:**

_____
By: Darius Charney
Sunita Patel
Baher Azmy
CENTER FOR CONSTITUTIONAL RIGHTS

Jonathan C. Moore
Jenn Rolnick Borchetta
BELDOCK LEVINE & HOFFMAN LLP

Eric Hellerman
Gretchen Hoff Varner
Kasey L. Martini
COVINGTON & BURLING LLP

*Attorneys for Plaintiffs*

_____
By: Heidi Grossman
Brenda Cooke
Linda Donahue
Suzanna Publicker
Joseph Marutollo
Judson Vickers
Morgan Kunz
Lisa Richardson
NEW YORK CITY LAW DEPARTMENT

*Attorneys for Defendant*