D3k9flo1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

DAVID FLOYD, et al.,

               Plaintiffs,

         v.                   08 CV 1034(SAS)

CITY OF NEW YORK, et al.,

               Defendants.

------------------------------x

                       New York, N.Y.
                       March 20, 2013
                       10:00 a.m.

Before:

               HON. SHIRA A. SCHEINDLIN,

                       District Judge

                APPEARANCES

BELDOCK LEVINE & HOFFMAN, LLP
    Attorneys for Plaintiffs
BY:  JENN ROLNICK BORCHETTA
     JONATHAN MOORE

COVINGTON & BURLING, LLP
    Attorneys for Plaintiffs
BY:  KASEY MARTINI
     GRETCHEN HOFF VARNER
     ERIC HELLERMAN
     BRUCE COREY

CENTER FOR CONSTITUTIONAL RIGHTS
    Attorneys for Plaintiffs
BY:  DARIUS CHARNEY
     SUNITA PATEL
     BAHER AZMY

D3k9flo1

1                    APPEARANCES (Cont'd)

2

MICHAEL A. CARDOZO
3        Corporation Counsel for the City of New York
         Attorney for Defendants
4   BY:  HEIDI GROSSMAN
         BRENDA E. COOKE
5        JOSEPH MARUTOLLO
         MORGAN D. KUNZ
6        SUZANNA PUBLICKER
         LINDA DONAHUE
7        LISA M. RICHARDSON
         JUDSON VICKERS
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (In open court)

2      THE COURT:  What's the problem with the audiotapes?

3      MS. COOKE:  The plaintiffs have provided to us just a

4   few minutes ago transcripts of audiotapes that they had

5   prepared and available as, according to them, this past

6   weekend.  Some of the transcripts are for audiotapes that are

7   going to be used with the witness who had began testifying

8   yesterday, Officer Polanco.

9      We haven't had an opportunity to review the accuracy

10  of these transcripts.  There were inaudible portions of the

11  audio.  I'm not sure how the transcript has been able to

12  transcribe inaudibles or not.

13      So that the defendants' position is that these are

14  belated.  It's prejudiced us at this point with respect to the

15  cross-examination of the witness who is testifying.

16      THE COURT:  Then don't use them.

17      I'll take them after you've had a chance to verify

18  them.

19      We'll hear the tape without the transcript.  There is

20  no jury.  I won't have the benefit of the transcript.  I'll get

21  the transcript after you compare it to the tape.

22      MR. MOORE:  Just so you understand, we had a court

23  reporter sit down and transcribe them.

24      THE COURT:  That's good but she just got it.

25      I would have loved it.  But I can't do it because they

D3k9flo1

1    haven't had the chance to compare it.  It's that simple.

2          As soon as you've had the chance, I'd like to use it

3    if you find it accurate.  It will make it easier for me.  I

4    have difficulty understanding the tape.

5          Now I came in hoping to talk about Professor

6    Silverman.  I read the affidavit declaration that he wrote

7    yesterday dated March 18.  I found it, generally speaking,

8    offensive.  Essentially he was trying to tell me what to do.

9    He doesn't like my rulings.  They're wrong for this reason that

10   reason.  That's really not his place.  Not his business.  He's

11   not a lawyer.  Not a judge.  And the whole tone of the thing

12   was offensive.

13         The bottomline, however, is I asked you -- I found the

14   transcript of the last conference and I asked you to explain

15   the burden.  That's all.  I didn't really want him to tell me

16   what to do, what's relevant and what's not relevant.  I just

17   wanted for you to tell me the burden.  Remember that.

18         I looked at the transcript.  I said get back to me and

19   tell me what's so burdensome.

20         I received an e-mail that you sent to my clerk last

21   night which said:  Just to be clear the only outstanding data

22   issue between the parties is the Ross survey response data for

23   the responses to questions 1C, D and F in the 2008 survey, and

24   questions 2D and E in the 2012 survey.  And that's right.  I

25   remember that.  There was five questions that I said at the end

D3k9flo1

1  of Thursday's conference that the defense could have the raw

2  data.

3          I really found his arguments not persuasive.  The

4  notion that nobody is going to publish this raw data that's

5  turned over to the defense under a confidentiality order is

6  nonsense.  This is going to make it more publishable because

7  it's going to be testified to at a high profile trial.  So

8  everybody is going to want his article.  That's nonsense.  Not

9  going to prevent his getting an academic publication.  I don't

10 believe it for a minute.

11         Now, I asked you about burden.  Tell me about burden.

12         MR. CHARNEY:  Your Honor, I think the declaration

13 refers to the fact that the data is actually in the possession

14 of Professor --

15         THE COURT:  That's true.  It did mention that.

16         MR. CHARNEY:  And Professor Eterno, it's our

17 understanding, is away this week at a conference in Texas.

18 Professor Silverman doesn't have the data.  That's just the

19 bottomline.

20         We can make efforts when Professor Eterno returns,

21 obviously, to get it as soon as possible.

22         But, again, we're still at a little bit of a loss as

23 to why that can prevent defendants from deposing him or

24 cross-examining him to the fullest extent on all of his methods

25 and all of his results and all his --

D3k9flo1

1           THE COURT:  I don't think it should prevent the

2     deposition.

3           Did you talk to Silverman?

4           MR. CHARNEY:  We spoke to defendants.  We're good to

5     go on Monday morning for the deposition so that can -- we're

6     ready to proceed.

7           THE COURT:  I think you have to.  I think this request

8     is a bit of a collateral matter.  I allowed it.  What I didn't

9     like in his declaration was his telling me I don't intend to

10    testify about that.  He doesn't get a choice.  Once he's on the

11    stand, if something is relevant and the subject of

12    cross-examination, he has to testify about it.  That's the

13    bottomline.  He doesn't get to choose what he testifies to.

14          So he may indeed end up testifying to it because he

15    may be asked about it.  But I can't postpone his deposition.

16    It has to go forward Monday.

17          As far as getting this raw data to the defendant, it

18    is under a confidentiality order, is it not?

19          MR. CHARNEY:  Yes.

20          THE COURT:  So you can't give it away to anybody else.

21    You can't give it to other academics or journals or anybody.

22    Right.

23          And it may never be admitted at a public trial.  So

24    I'm not concerned about that.  You may use it to do your own

25    analyses or run your own regressions or whatever, but I doubt

1    that it's going to be an exhibit.  I don't believe his raw data

2    is going to be an exhibit that's going to somehow leak the

3    article before it's printed.  So I'm not concerned about that

4    in any event.

5          So the order stands, or at least you have to still

6    explain to me the burden, which you haven't, but maybe because

7    you haven't had a chance to talk to Dr. Eterno.

8          This may, in fact, when Silverman testifies, I don't

9    know when you plan, but since I've ordered it turned over, it

10   has to be turned over.

11         So when is he supposed to testify?

12         MR. CHARNEY:  We were hoping to put him on next week,

13   Wednesday, Thursday, or Friday.  But I guess we have to find

14   out when Professor Eterno is going to return.

15         THE COURT:  I don't know that it requires him.  He may

16   be able to instruct an assistant or Dr. Silverman as to how to

17   retrieve this stuff.  I still thought it sounded from the last

18   oral argument -- I did review this transcript -- that it

19   wouldn't be hard to gather.  So I don't know that it requires

20   him coming back.  But you need to look into it.  Because I've

21   ordered it, and I don't change my mind.

22         The deposition has to go forward.  I didn't find

23   anything in his declaration particularly persuasive other than

24   his views as to what's relevant or not, what he's going to

25   testify to or not, the ruling he would make if he were a judge,

D3k9flo1

1    etc.

2              Are we ready for --

3              MR. CHARNEY:  Yes, Officer Polanco, on direct

4    examination.

5              MR. MOORE:  Judge, did you decide what we're doing on

6    the 29th?

7              THE COURT:  No.  I wanted to play it by ear, see where

8    we're up to.

9              MR. MOORE:  How long were you going to play it by ear?

10             THE COURT:  We're finding out who can't be here, and

11   what witnesses it affects.  It may be a particular witness that

12   people can't be here, no problem.

13             MR. MOORE:  Just about scheduling.

14             THE COURT:  That's right.  So talking to each other

15   might help.  Because those who can't be here may not need to be

16   here that day.  I don't know.

17             You've got big teams.  Both sides have big teams.  Big

18   teams.  It may be that, to use the day or half the day --

19             MR. MOORE:  Okay.

20             THE COURT:  You can adjust who it is.

21             MR. MOORE:  It's no shorter than a half day, right?

22             THE COURT:  No shorter than a half day.

23             MR. MOORE:  No longer than a half day?

24             THE COURT:  Correct.  The worst case, we would stop at

25   1:00 for everybody's sake.

D3k9flo1

1       But check it out.  If you can't get a witness for whom

2   certain people are willing to miss something like that, if you

3   can't get that kind of witness, then we can't go.  But I'm

4   hoping we can because I have so many down days coming.  I know.

5   It's a long trial.  I'm still trying to use it.  But, as I

6   said, I'm not going to interfere with anybody's religious

7   practices.

8    ADHYL POLANCO, resumed.

9   DIRECT EXAMINATION CONTINUED

10  BY MR. CHARNEY:

11  Q.  Good morning again, Officer Polanco.

12  A.  Good morning.

13  Q.  I just want to remind you that you're still under oath.

14  A.  I understand.

15      THE COURT:  Would you all speak up.  Everybody.

16  Everybody.

17  Q.  Officer Polanco yesterday you were looking at the second

18  page of Exhibit 419 and it was Bates number NYC_218924.

19      Can I approach the witness and give him a copy?

20      THE COURT:  You don't need to ask.

21      MR. CHARNEY:  Thank you.

22  Q.  Looking at the second page of this.

23      Do you see the categories of information on this

24  document.  I believe yesterday you testified that you hand this

25  form, the monthly officer activity form in to your supervisor

D3k9flo1          Polanco

1   every month; is that right?

2   A.   Into the immediate supervisor, yes.

3   Q.   And what information, again, if you can tell us do you

4   record on this form?

5   A.   Arrests, radio runs, violation, can be parking, moving,

6   criminal.

7   Q.   What information about an arrest would you put on this

8   form?

9   A.   How many, whether it's a felony or it's a misdemeanor.

10  Q.   Does this form include any information about the underlying

11  circumstances of an arrest that you do?

12  A.   No.

13  Q.   Does this form include any information about the underlying

14  circumstances of a stop and frisk that you conduct?

15  A.   No.

16  Q.   So -- I think you testified yesterday that you -- your

17  supervisor does discuss this information on this form with you

18  from time to time?

19  A.   Yes.

20  Q.   When he or she discusses the information on this form with

21  you, does he discuss with you the underlying circumstances of

22  any of the arrests that are notated on this form?

23  A.   No.

24  Q.   Does he or she discuss with you the underlying

25  circumstances of any stops and frisks that are notated on this

D3k9flo1                    Polanco

1    form?

2    A.  No.

3    Q.  Officer Polanco are you familiar with the term checkpoint?

4    A.  Yes.

5    Q.  What does that term mean to you?

6    A.  Checkpoint is -- I'm sorry.

7    Q.  Go ahead.

8    A.  Checkpoint is a -- they will assign supposedly -- like I

9    say, what's in writing and what we do is two very different

10   things.

11        Supposedly, supposed to have a van with constant

12   flares.  You're supposed to have a spot car or a escape car.

13   You're supposed to have a spotter.  And I believe at least

14   three or four officers.

15        That's how it's written.  How we do it is very

16   different.

17   Q.  How do you do it?  When you say how you do it, are you

18   talking about when you were in the 41st precinct?

19   A.  Yes.

20   Q.  How did you do it when you were in the 41st precinct?

21   A.  One of -- going back to the last question.  You also

22   supposed to set out a pattern on which vehicle you're stopping.

23   To prevent profiling or anything like that, you're supposed to,

24   for example, stop every third car or every fourth car.  That

25   way you're not stopping individual based on what they look.

 1  You're just stopping every second or third car.  That's how

 2  it's written.

 3          How we do it, basically we get told by the lieutenant

 4  or the sergeant:  You need X amount of numbers.  I don't care

 5  how you get them, get them.

 6          THE COURT:  Go ahead.

 7          THE WITNESS:  Sometime they put two cops.  Sometime

 8  they put three.

 9          I don't remember ever seeing constant flares that

10  they're supposed to be.  Sometime we have escape car.  Sometime

11  we don't.  And definitely we almost never follow the pattern of

12  stopping every third vehicle.  We are free to stop whoever we

13  want.  And summons whoever we want.  Just to get the numbers

14  that they want.

15  Q.  So are these checkpoints vehicle checkpoints?

16  A.  Vehicle checkpoint, yes.

17  Q.  And what is the -- according to how you did it in the 41st

18  precinct, what was the purpose of the checkpoint according to

19  your supervisors?

20  A.  According to them would be to high incident area.

21          MS. COOKE:  Objection, your Honor.  The witness is

22  referring to speculative testimony about what the supervisor's

23  purpose was.

24          THE COURT:  No.  He said what was the purpose of the

25  checkpoint according to your supervisor.

1          Were you fold?

2          THE WITNESS:  Yes.

3          THE COURT:  Go ahead.

4          THE WITNESS:  We were told that they needed the

5     numbers.  That's what they said.

6     Q.  Did they tell you what they meant by numbers?

7     A.  Summonses or arrests.

8     Q.  So -- summonses or arrest.  Okay.

9          And how often did you -- did you work or did you

10    perform any checkpoints during the time that you were a patrol

11    officer in the 41st precinct?

12    A.  Yes, I did.

13    Q.  How often did you do it, if you recall?

14    A.  At the beginning almost never did it for the first two or

15    three years.  After I reported what I reported to internal

16    affairs, it was a daily thing.

17    Q.  So let's break that down a little bit.  You said after you

18    reported what you reported to internal affairs.  What did you

19    report to internal affairs?

20    A.  Back in 2009 I was extremely bothered with what I was

21    seeing out there.  The racial profiling, the arresting people

22    for no reason, being called to scenes that I did not observe a

23    violation and being forced to write a summons that I didn't

24    observe.

25          Complaint reports manipulation.  Basically a robbery

1   would come in and we would be told not to take it for robbery

2   because the numbers for the week will be too high in order to

3   keep crime as low as they say it is.  And that's what they told

4   us.

5   Q.  So you said that you were bothered by these problems.  And

6   so you reported something to internal affairs?

7   A.  Yes, I did.

8   Q.  When did you do that?

9   A.  I first did it informally.  It was about September 2009.  I

10  wrote a letter and I put it in the integrity control officer,

11  ICO, door.  And the letter I believe we have -- I don't know if

12  you guys have a copy of -- basically expressing my concern

13  about minorities in the community and how we treating them.

14  How I grew up in Washington Heights.  I know what it's like to

15  grow up in the hood.

16          Basically that not everybody who lives in a high crime

17  area is a criminal.  And we were handcuffing kids for no

18  reason.  They would just tell us handcuff them.

19          And boss, why are we handcuffing them?

20          Just handcuff them.  We'll make up the charge later.

21          Some of those kids were not doing anything.  Some of

22  those kids were just walking home.  Some of those kids were

23  just walking from school.

24          I remember one incident where one kid -- and I

25  reported this -- they stopped his brother.  He was 13.  And he

D3k9flo1          Polanco

1    was waiting for him from school at the corner to bring him

2    home.

3              When he came to us, the officer -- Officer, what's

4    wrong with my little brother?  Was he acting out?

5              He wind up with handcuffs too.  For simply asking what

6    was going on with his brother.

7    Q.   Do you remember approximately when this incident occurred?

8    A.   2009.  I did report it to internal affairs.

9    Q.   Know what part of the year it was?

10   A.   No.  I don't recall.

11   Q.   And you said you observed this incident.

12   A.   I was called to the scene, yes.  I was actually the one

13   that transported a group of the kids back to the precinct.

14   Q.   And are you the one that spoke to the brother about this

15   incident?

16   A.   Yes.  He was in the back of my car when he -- when he told

17   me exactly what he did and what happened.

18   Q.   So you reported this incident to internal affairs?

19   A.   That and many others, yes.

20   Q.   What other incidents did you report to internal affairs?

21   A.   I reported that I was being forced to write summonses by

22   the commanding officer and Lieutenant Valenzano.

23             I reported to them specifically that on one occasion I

24   was called to a scene by the captain and I was instructed to

25   write a summons for a person for no dog license.  I reported to

1  internal affairs that under intimidation we have to write these

2  summonses.  But my problem was I did not observe a dog.  And I

3  was bothered by it.  And I reported it.

4  Q.  Now you said you were bothered by it.  Did you actually

5  write the summons?

6  A.  I had to.  I had no choice.

7  Q.  Why do you say you had no choice?

8  A.  He was the commanding officer.  We had been spoken in roll

9  call, as we're going to hear the audios, on what to do when our

10  supervisor comes and tells us when to do something.

11       He is the captain.  He knows that I'm not supposed to

12  be writing a summons for something I didn't observe.  Why is he

13  calling me to the scene?  And why when I get to the scene he's

14  telling me to write a summons?

15  Q.  When did you report these concerns -- first report these

16  concerns to internal affairs?

17  A.  It was in September of 2009.  Informally.

18       Then I make a phonecall in November, I believe.  I

19  made a call to internal affairs with the same allegations,

20  telling that the way we are being treated in the 41st precinct,

21  the way they were manipulating the crime statistics, the way

22  they were treating youth and minorities in the 41st precinct.

23  And that was in November.  And -- yes.  I'm sorry.

24  Q.  So the first time you contacted them in September how did

25  you contact them?

D3k9flo1          Polanco

1   A.  It was a letter.  An anonymous letter that I wrote.  I was

2   afraid.  It's not that easy to report corruption.  This

3   precinct -- this police department is not as black and white as

4   they paint it.  It's not that easy to report corruption.

5   Q.  Why do you say it's not that easy?

6   A.  You seen what happened to Agent Schoolcraft.

7           MS. COOKE:  Objection, your Honor.  The witness is

8   going to be testifying about information that's been precluded

9   from this case by order of the court with respect to Officer

10  Schoolcraft.

11          THE COURT:  I don't know what he meant by what

12  happened to him.

13          Is he fired?

14          THE WITNESS:  Officer Schoolcraft was put in a psych

15  ward for three days.

16          THE COURT:  The discipline that was imposed can come

17  in.  I'm not trying the case as to why it happened, but I can

18  learn what happened.

19          So I'll take that evidence.  He was put on the

20  sidewalk for three days.  Go ahead.

21          THE WITNESS:  Psych ward.

22          THE COURT:  Side what?

23          THE WITNESS:  In the hospital, a mental --

24          MR. MOORE:  Psych ward, Judge.

25          THE COURT:  Psych ward.

1    MR. CHARNEY:  A psychiatric ward.

2    THE COURT:  I'm sorry.  He was assigned to work there?

3    MR. CHARNEY:  He was committed to one.

4    THE COURT:  Then I'm not taking it.  I have no idea

5    why he was committed to a psychiatric ward.  So I'm striking

6    that from the record.  I thought it was a reassignment that you

7    were talking about.

8    MS. COOKE:  Thank you, your Honor.

9    Q.  I'm sorry.  Other than -- let's put Officer Schoolcraft to

10   the side.

11   Is there any other reason why you were afraid to

12   report these concerns that you had to IAB?

13   A.  Retaliation.  I definitely knew that my union was not going

14   to back me up.

15   Q.  And so that -- you sent an anonymous letter.

16   Now the second time you contacted them you said was

17   November 2009?

18   A.  Yeah, I believe in November 2009.

19   Q.  And actually going back in September on the letter, did you

20   address the letter to anyone, any specific person?

21   A.  No.  I -- it was a letter with no date, no name, no

22   anything.  I was afraid that if they found out it was me that

23   they were going to retaliate against me.

24   Q.  So you didn't identify yourself in the letter.

25   Did you identify what precinct you worked in in the

D3k9flo1          Polanco

1  letter?

2  A.  The South Bronx, yes.  Yes, I did.  The 41st precinct.  I

3  did, yes.

4  Q.  Between September and the second time you contacted them in

5  November, did anyone from IAB contact you?

6  A.  Not necessarily.  I don't recall anybody contacting me.

7  No.

8  Q.  And then in November you said you contacted them a second

9  time.  How did you contact them?

10  A.  I made a phonecall actually.

11  Q.  Did you call someone specific?

12  A.  I called the IAB number they gave us.

13  Q.  Did you speak to anybody?

14  A.  I spoke to an investigator, yes.

15  Q.  Do you remember the investigator's name?

16  A.  No, I don't.

17  Q.  After that phonecall in November did you ever communicate

18  with IAB again about these concerns?

19  A.  After my suspension on December 12, yes.

20  Q.  We'll come back to that.

21          Now, in September when you raised concerns with IAB in

22  your letter did you mention UF 250s at all in that letter?

23  A.  Yes.

24  Q.  What is a UF 250 again?

25  A.  Stop, question, and frisk.

D3k9flo1          Polanco

1   Q.  What specifically did you say in the letter about the

2   UF 250s?

3   A.  That we are illegally stopping and we are illegally

4   searching young Blacks and Hispanic for no reason.

5   Q.  Did you give any specifics as to why you believed that was

6   happening?

7   A.  Yes.

8   Q.  What did you say specifically?

9   A.  It was CompStat.

10  Q.  What do you mean by that?

11  A.  It's the numeric system that the police department have to

12  hold police officers and supervisors accountable.

13  Q.  In your view, based on your experience why do you think

14  that CompStat is causing police officers to stop young Black

15  and Latino people illegally?

16  A.  Because they want numbers.  They want numbers at all costs.

17  They want to look good.  Which is hard for me to understand.

18  They want to arrest -- they have arrested more people than ever

19  but at the same time crime is more than ever.

20  Q.  When you worked in the 41st precinct did you ever observe a

21  41st precinct officer make a stop, question, and frisk that you

22  believed did not -- was not based on reasonable suspicion?

23  A.  Many times.

24  Q.  How many times do you think?

25  A.  Many times.  More than 10.  I would say more than 20 times.

D3k9flo1          Polanco

1    Q.  Yesterday we talked about driving with a supervisor.  Do

2    you remember that?

3    A.  Yes.

4    Q.  And I believe you testified -- let me just make sure I

5    don't misstate that.  I can just read this is from yesterday's

6    transcript, your Honor, if your Honor will permit me.

7              This is page 432, line 6.

8    "Q.  Are you familiar with the term driving a sergeant or

9    driving a supervisor?

10   "A.  Yes.

11   "Q.  What does that mean?

12   "A.  That means that whatever it seems like it's going to be.

13   You have no discretion whatsoever.  If you're driving a

14   supervisor, if you're driving the sergeant in the 41st precinct

15   at that time, that means that they are going to drive around

16   and they are going to stop people for you, or tell you to go

17   250 this guy, go summons this guy, go arrest this guy.  You

18   have absolutely no discretion."

19             Do you recall testifying to that?

20   A.  Yes, I do.

21   Q.  So, when you mentioned "or tell you to go 250 this guy," is

22   your recollection that when you drove a supervisor in the 41st

23   precinct a supervisor directed you to conduct a stop and frisk

24   on one or more occasions?

25   A.  Yes.

1  Q.  And how many times do you recall that happening?

2  A.  Many times.  I don't have a number on the top of my --

3  Q.  More than five?

4  A.  More than five, yes, definitely.

5         THE COURT:  Would the supervisor just point to

6  somebody on the street and say go stop that guy?

7         THE WITNESS:  Any group of black kids or Hispanic kids

8  on the corner, in the park, or anywhere, just go grab, go 250

9  them, go summons them.

10        Sometimes they will ask me to summons them.  We will

11 ask the supervisor why.  And they will say unlawful assembly or

12 something like that.

13        THE COURT:  What?

14        THE WITNESS:  Unlawful assembly.  Because there's more

15 than three of them on the corner.  And we will write a

16 summonses at the direction of the supervisor.

17 Q.  Do you recall which supervisor or supervisors gave you

18 these instructions?

19 A.  Sergeant Rodriguez, Lieutenant Valenzano, and Captain

20 McHugh, that was his special, that was what he did almost

21 everyday.

22 Q.  So, did you, in fact, yourself conduct any stop, question,

23 an frisks in the 41st precinct that you did not personally

24 believe you had a reasonable articulable suspicion for?

25 A.  Yes.  But I did not have the discretion not to do it.

1  Q.  So were the only times you did it when -- I'm sorry.

2  Strike that.

3       Why did you believe you didn't have the discretion?

4  A.  Because I had the supervisor next to me.  It wasn't a

5  choice.

6  Q.  Did you report any of these incidents to the internal

7  affairs bureau?

8  A.  Yes, I did.

9  Q.  When did you do that?

10  A.  I did it in the letter in September and I did it in

11  November, again.

12  Q.  Over the phone?

13  A.  Over the phone.

14  Q.  What specifically did you say in the letter about this

15  practice of a supervisor instructing you to conduct a stop,

16  question, and frisk?

17  A.  I told them that they had no basis to stop kids, that kids

18  were just walking up and down the street or coming home, coming

19  home from school or going to school.  With no reason

20  whatsoever, they will direct us to stop them.

21       I also pointed out a summons.  Sometimes they will ask

22  to even summons them.

23       THE COURT:  What did you do with the UF 250 if there

24  was no basis?  What was checked off?

25       THE WITNESS:  They would tell us what to do basically.

D3k9flo1                 Polanco

1              THE COURT:  Check off what?

2              THE WITNESS:  In the police department, your Honor,

3      you do and then you articulate.

4              THE COURT:  Right.  So did you check off things like

5      high crime area?

6              THE WITNESS:  High crime area.  Burglary pattern.

7      Robbery pattern.

8              THE COURT:  Furtive movement?

9              THE WITNESS:  Furtive movement was the special of the

10     day.

11             Anything that can be justified after the stop.  Not

12     before.  After the stop.

13             I remember one of the recordings that I heard of

14     another precinct.  And I heard this, but I didn't record it.

15             MS. COOKE:  Objection, your Honor.

16             THE COURT:  Objection sustained as to what was said.

17             MR. CHARNEY:  You can't talk about -- let's just talk

18     about your precinct and your experience.

19     Q.  Did you -- when you complained about this practice of being

20     told to write 250s to IAB, did you give any specific examples

21     that you can recall?

22     A.  Yes.  I believe I did.

23     Q.  Can you remember any of those specific examples today?

24     A.  Yes.  Like the kids with the brother, that came out to

25     check on his brother.  I gave him the address, the date, even

D3k9flo1          Polanco

1    the person who issued the summonses.

2              One of those kids was actually 13.  And the commanding

3    officer was upset that he couldn't give him a summons.  So he

4    held him in the squad and told the squad to hold him for a few

5    hours to see if he had any information on guns or any drug

6    activity in the community.

7    Q.  So you said who was upset that they couldn't give him the

8    summons?

9    A.  The commanding officer.

10   Q.  Was that Inspector McHugh?

11   A.  Inspector McHugh.

12   Q.  And why couldn't he give him the summons, if you recall?

13   A.  Because he was 13.

14   Q.  So why -- can you tell --

15   A.  The law don't allow you to give a summons to somebody under

16   16, I believe.

17   Q.  So what did the commanding officer do instead?

18   A.  He asked the squad, the detective squad to bring him

19   upstairs and hold him there until he give him information about

20   guns or drugs.

21   Q.  And what would that information -- how would that make a

22   difference?

23   A.  He wanted -- basically wanted him to snitch or to give them

24   information.  That's what he wanted.

25   Q.  Now, you mentioned I think yesterday that, when we were

D3k9flo1          Polanco

1    talking about roll calls, that you had recorded some of the

2    roll calls you attended in the 41st precinct?

3    A.  Yes, I did.

4    Q.  Approximately when did you do that?

5    A.  I believe I started in August, September.  Went through

6    maybe December of 2009.

7    Q.  And how did you record those roll calls?

8    A.  With a digital recorder, small digital recorder.

9    Q.  Do you know what kind of digital recorder it was?

10   A.  I got it at Radio Shack.  It's one of those smaller ones.

11   Q.  Did you know how to operate it when you used it to record

12   the roll calls?

13   A.  Yes, I did.

14   Q.  After you recorded the roll calls, what did you do with the

15   recordings?

16   A.  I kept them in my locker for a while.

17   Q.  You kept them in your locker?

18   A.  For a while, yes.

19   Q.  And how did you store them?

20   A.  I just put it on the shelf on top of my locker.

21   Q.  By -- you mean the recording device?

22   A.  Yes.

23   Q.  At any point in time did you provide copies of the

24   recordings to the police department?

25   A.  Yes, I did.

D3k9flo1          Polanco

1   Q.  When did you do that?

2   A.  I believe it was in December.  I believe it was in

3   December.

4   Q.  Of what year?

5   A.  Of 2009.

6   Q.  And who in the police department did you provide them to?

7   A.  Internal affairs.  There was -- at the time it was Sergeant

8   Carter.  And there was another female sergeant.  I forgot her

9   name.

10  Q.  And in what form did you provide them to the New York

11  police department?

12  A.  They took the actual -- they took an actual recording, the

13  recorder.

14  Q.  So you gave them the actual recorder?

15  A.  Yes.

16  Q.  Did you alter the recordings in any way before you gave

17  them to IAB?

18  A.  No.

19  Q.  I want to show the witness -- show the witness physically

20  the CD that we have marked as Exhibit 284 and I believe

21  defendants have a copy of it.  I have an extra copy if you want

22  to look at it.  Can I show the witness?

23          THE COURT:  Of course.

24  Q.  Officer Polanco, you have a CD in front of you marked

25  Exhibit 284.  Have you ever seen this CD before?

D3k9flo1                    Polanco

1    A.   Yes.

2    Q.   When did you see it?

3    A.   A couple of days ago we reviewed it.

4    Q.   Did you open -- in other words did you listen to the

5    contents of that CD?

6    A.   Yes, I did.

7    Q.   What was on the CD, if you can recall?

8    A.   It was the recording I made on roll call.  It was about

9    three or four of them.

10   Q.   And you listened to the entirety of those?

11   A.   Yes, I did.

12   Q.   Are those recordings true, accurate and complete copies of

13   the recordings that you gave to the internal affairs bureau?

14   A.   Absolutely, yes.

15           MR. CHARNEY:  One minute, your Honor.

16           (Pause)

17   Q.  Prior to giving your recording device to the internal

18   affairs bureau, did you provide any other person access to that

19   recorder that you know of?

20   A.   Maybe my partner.

21   Q.   When you say you provided him access, how did you provide

22   him access?

23   A.   I played it for him by the locker.

24   Q.   Other than that, did you provide access to anybody else?

25   A.   Maybe my lawyer.  I had a lawyer back then.  Yes, maybe.

D3k9flo1                    Polanco

1    Q.  How did you provide access to your lawyer?

2    A.  We actually review it together.

3    Q.  I think I've already asked you this.  I just want to make

4    sure.

5            Did you alter these recordings in any way before you

6    gave them to internal affairs?

7    A.  No.

8            MR. CHARNEY:  One more minute, your Honor.  Sorry.

9            (Pause)

10           Your Honor we would move for the admission of this

11   exhibit into evidence.

12           THE COURT:  Yes.  Any --

13           MS. COOKE:  No objection, your Honor.

14           THE COURT:  Right.  Received.

15           (Plaintiffs' Exhibit 284 received in evidence)

16           MR. CHARNEY:  We would like to play portions of these

17   recordings.  We've provided the list of the portions to the

18   defendant.  We will obviously announce it before we play each

19   portion, which track number and which portion.

20           So I believe we're going to start with track 1.  And

21   we're going to start at 3 minutes and 3 seconds and play it

22   to --

23           (Audio recording played)

24           Not yet.  We're going to start at 3 minutes and 3

25   seconds and play to 8 minutes and 1 second.

D3k9flo1                    Polanco

1     I apologize, your Honor.  Hopefully this will work

2  better than yesterday.

3          (Audio recording played)

4          MR. CHARNEY:  Your Honor, we think it might be easier

5  if we play portions, stop it.  We'll tell you where we stopped

6  it.  And then ask some questions and continue.

7          THE COURT:  That's fine.

8          MR. CHARNEY:  So we just played from 3:03 to -- where

9  did we stop it -- I'm sorry, 3:03 to I guess 4:26.

10  Q.  Officer Polanco did you hear the recording we just played?

11  A.  Yes, I did.

12  Q.  Do you know who the speaker on that recording is?

13  A.  That is a union delegate from my squad.

14  Q.  Do you know that delegate's name?

15  A.  Officer Herran.

16  Q.  Do you recall being present at that -- first of all, was

17  that a roll call that you recorded?

18  A.  Yes.

19  Q.  Do you recall being present at that roll call?

20  A.  Yes.

21  Q.  Do you -- did you hear Officer Herran mention the term

22  twenty and one in that recording?

23  A.  Yes.

24  Q.  Again, what is your understanding of twenty and one?

25  A.  Twenty summonses and one arrest per month.

D3k9flo1          Polanco

1   Q.  Did you hear Officer Herran say anything about what the

2   union -- in that recording about what the union's position was?

3   A.  He said that the union was backing it up and the trustees

4   were backing it up.

5           MR. CHARNEY:  I'm sorry, your Honor.

6           (Pause)

7   Q.  So we're actually going to go back 10 seconds to 4:16 and

8   then play it through.

9           (Audio recording played)

10  Q.  You heard that portion?

11  A.  Yes.

12  Q.  Did you hear Officer Herran say:  I got to go in there and

13  adjudicate -- and I apologize, your Honor -- fucking CDs on

14  your activity?

15  A.  Yes.

16  Q.  Do you know what that means?

17  A.  That he got to go adjudicate command discipline, if I may

18  explain?

19  Q.  Yes.  Tell us what command discipline is.

20  A.  Command discipline is when an officer get in trouble in the

21  precinct level, not wearing black socks, being late, not

22  showing up to court, any minor little infraction that a cop

23  does, you get basically the command -- your supervisor can

24  write you up for a CD, command discipline, where you can lose

25  vacation days.

D3k9flo1          Polanco

1    Q.  And do you -- what did you understand Officer Herran to

2    mean when he said:  I got to go in there and adjudicate CDs on

3    your activity?

4    A.  Basically the penalty that they're going to take is going

5    to depend on what activity we have.

6    Q.  What do you mean by that?

7    A.  That if we don't have the twenty and one, for example, and

8    I get a CD for X reason, I didn't have black socks on, the

9    penalty can be one and admonish, or it can be three or four

10   vacation days, depending on my activity, how my activity was

11   for the past basically three months.

12   Q.  And how do you know that's, in fact, how they do it, other

13   than what Officer Herran said?

14   A.  That's how the supervisor, that's how all the cops told us

15   they do it.

16          MR. CHARNEY:  Continue.

17          (Audio recording played)

18   Q.  Did you -- that was still Officer Herran?

19   A.  Yes.

20   Q.  Did you hear him referring to a sheet that a platoon

21   commander has?

22   A.  Yes.

23   Q.  Do you know what he was referring to?

24   A.  It's called the daily recap sheet.  The platoon commander,

25   lieutenant most of the time, he will, after every tour or in

D3k9flo1          Polanco

| 1 | the middle of the tour he will call us or he will come up to us |

and ask us what we have done for the day and he will write it

down.

Q.  When you say what you had done for the day, what do you

mean by that?

A.  Specifically he wanted to know how many 250s, how many C

summonses, how many B summonses we have written or how many

people we have arrested.

        MS. COOKE:  Can you just announce the time.

        MR. CHARNEY:  So that was 4:23 to 5:06.

        So now we're going to start at 5:06 and keep going.

Thank you.

        (Audio recording played)

        MR. CHARNEY:  We stopped at 6:30.  So that was 5:06 to

6:30.

Q.  Officer Polanco you heard that portion?

A.  Unfortunately, yes.

Q.  And you heard mention of I believe was it a collar, your

collar is one collar.  What -- do you know what that means?

A.  Yeah, that you have to make one arrest.

Q.  And then I believe he said something about crush the -- and

again pardon my language -- fucking city.  Do you know what

that means?

A.  What he said was make it on your RDO.  Crush the fucking

city.

1    Q.  What does that mean to you?

2    A.  This is shameful that a cop is saying this.

3              When he's saying make it RDO.  If I work Monday to

4    Friday and Saturday will be my next day off, he's asking me to

5    make an arrest on Friday night so whoever I arrest on Friday

6    night for whatever reason, I'm guaranteed overtime the next day

7    and the city will have to pay me time-and-a-half to come in.

8    That's when my daily gets done, yes.

9              MR. CHARNEY:  Continue now from 6:30.

10             (Audio recording played)

11   Q.  Did you on that portion -- you heard that portion?

12   A.  Yes.

13   Q.  Did you hear a reference again to a daily recap?

14   A.  Yes.

15             MS. COOKE:  Can I get the end of that.

16             MR. CHARNEY:  7:26.

17   Q.  And what is the daily recap again?

18   A.  This is the -- a sheet that a platoon commander has that he

19   will go around to every officer under his platoon and ask him

20   what he had done for the day.

21   Q.  So we're at what -- where are we starting.

22             MR. AZMY:  7:26.

23             MR. CHARNEY:  So we got about 30 seconds left.  Start

24   from 7:26.

25             (Audio recording played)

D3k9flo1                    Polanco

1    Q.  Do you remember, Officer Polanco, approximately when this

2    roll call took place?

3    A.  I would say between September and November of 2009.

4    Q.  I think the next -- we're going to play another portion

5    from -- we stopped at 8 minutes and one second, I think.

6            We're going to play another portion on track 1.  This

7    is at 9:47 to 13:17.

8            (Audio recording played)

9    Q.  Can you just tell us first of all, Officer Polanco, who is

10   speaking on this portion of the recording?

11   A.  It's another union delegate.  It's Officer Fundaro.

12   Q.  Can you spell that.

13   A.  F-U-N-D-A-R-O.

14   Q.  Okay.  Thank you.  We're starting at what point?

15           MR. AZMY:  11:11.

16           MR. CHARNEY:  Go ahead.

17           (Audio recording played)

18   Q.  Did you hear mention of somebody named Mandy or Mancy and

19   Angel?

20   A.  Mancy.

21   Q.  Who is Mancy?

22   A.  Mancy is the third union delegate.

23   Q.  Who is Angel?

24   A.  Angel Herran is the person that spoke previously.

25   Q.  Is that the other union delegate?

D3k9flo1          Polanco

1    A.  Yes.

2              MR. CHARNEY:  We're going to start again at -- we're

3    at 10:34 now.

4              (Audio recording played)

5    Q.  Did you just hear Officer Fundaro talk about the one and

6    twenty?

7    A.  Yes.

8    Q.  And did you hear him say that it was going to get a lot

9    worse?

10   A.  Yes.

11   Q.  Did you know what he meant by that?

12   A.  That today it's one and twenty.  That it's going to be more

13   later.  It's going to be more activity that's going to be

14   expected from us.

15   Q.  And then did you hear him refer to DVA?

16   A.  PBA.

17   Q.  PBA?

18   A.  The Patrolmen's Benevolent Association.

19   Q.  I think he said that's why the -- again pardon my

20   language -- the fucking PBA, he spoke to them in regards to

21   activity.

22              Did you hear him say that?

23   A.  Yes.

24   Q.  Based on your experience when you were in the 41st precinct

25   and do you know what, if any, conversations the PBA had with

1    NYPD management about these issues around activity?

2              MS. COOKE:  Object, your Honor.  To the extent it's

3    hearsay.  I'm going to object.  Conversations about the PBA.

4    That's certainly not an admission from the city.

5              THE COURT:  Sustained.

6              MS. COOKE:  Thank you, your Honor.

7              MR. CHARNEY:  So let's continue.  What time are we

8    starting at?

9              MR. AZMY:  10:58.

10             MR. CHARNEY:  10:58.  Okay.

11             (Audio recording played)

12             MR. CHARNEY:  Where did we stop?

13             Well, we'll tell you.

14   Q.  Did you hear Officer Fundaro say there at the end you're

15   fighting against the current?

16   A.  Yes.

17   Q.  Do you know what that means?

18   A.  He's -- I believe he's indirectly talking to me because at

19   that time it was known around the precinct that I called

20   internal affairs protesting about the numbers and the

21   profiling.

22   Q.  So is it your testimony that this particular recording,

23   track 1, was a roll call that took place after you had

24   contacted internal affairs?

25   A.  Yes, either by the letter or by phone, yes.

1   Q.  And how do you know -- what is your basis for believing

2   that he was referring indirectly to you?

3   A.  My belief is that he said that you fighting the current.

4   Basically I'm a single officer, minority officer going against

5   the whole department.

6   Q.  Well let me ask you this.  What is your basis for believing

7   that he or anyone else in the 41st precinct knew that you had

8   contacted internal affairs?

9   A.  Because they in the precinct roster in the cafeteria next

10  to my name they wrote the name rat.

11          THE COURT:  They wrote what?

12          THE WITNESS:  Rat.

13          MR. CHARNEY:  We're starting at.

14          MR. AZMY:  11:31.

15          (Audio recording played)

16          MR. CHARNEY:  So we ended at I guess 13:17.

17  Q.  Officer Polanco, did you ever yourself go to your union

18  either delegate or somebody else in the PBA with these

19  concerns?

20  A.  Yes.

21  Q.  When did you do that?

22  A.  Several times.  In the precinct.  I went to Fundaro.  I

23  went to Herran.  I went to Mancy.

24  Q.  Do you know what period of time this was that you did that?

25  A.  Throughout 2009.

D3k9flo1          Polanco

Q.  And at any point -- I'm sorry.  What did you tell them

specifically?

A.  What's going on here?  What's up with these numbers?

What's up with this quota?

        And I basically was told everything was dealt in the

last contract, that it was part of the contract, and that the

union was backing it up.

        MR. CHARNEY:  I want to listen to track number two

now.  And we're going to go to -- those first two portions we

played were both from track one.  We're going to play from

track two from the beginning to 2:29.

        (Audio recording played)

Q.  Can you just first of all tell us --

        MS. COOKE:  Time.

        MR. CHARNEY:  I'm sorry.  The time?

        MR. AZMY:  Eleven seconds.

Q.  Do you recognize this as -- I'm sorry.  Do you recognize

the speaker on the recording?

A.  Yes, I do.

Q.  Who is that speaker?

A.  Sergeant Mervin Bennett.

Q.  How do you spell the last name?

A.  B-E-N-N-E-T-T.  Bennett.

Q.  I think you told us this yesterday, but who is Sergeant

Bennett?

D3k9flo1          Polanco

1    A.  He was one of the sergeants assigned to the platoon.  Not

2    directly my sergeant but he's a platoon sergeant also.

3    Q.  So it's correct that he does supervise patrol officers or

4    did supervise patrol officers in the 41st precinct in 2009?

5    A.  Yes.

6    Q.  And this recording that we're listening to, is this one of

7    the roll call recordings, to your recollection, that you made?

8    A.  Yes, it is.

9    Q.  And do you recall being present at this roll call?

10   A.  Yes, I do.

11         MR. CHARNEY:  Okay.  Let's continue at eleven seconds.

12         (Audio recording played)

13         MR. CHARNEY:  What time did we stop at.

14         38 seconds, okay.

15   Q.  In the portion we just listened to did you hear Sergeant

16   Bennett referring to the twenty and one?

17   A.  Yes.

18   Q.  Did you hear him refer to any other numbers in that part?

19   A.  Yes.

20   Q.  What other numbers did you hear him refer to?

21   A.  He said it could be thirty-five and one.  It could be

22   forty-five and one.

23   Q.  Did you hear him say anything else on that portion?

24   A.  He said that unless we want to become a Pizza Hut

25   deliveryman we better do as they say.

D3k9flo1          Polanco

             MR. CHARNEY:  Let's continue playing at 38 seconds.

             (Audio recording played)

Q.   In that section did you hear Sergeant Bennett refer to

being a zero?

A.   Yes.

Q.   Do you know what he meant by that?

A.   Being a guy who doesn't do as he said, that doesn't meet

the quota.

Q.   How do you know that's what he meant?

A.   He said it before that if you want to fight the power and

fight the quota and want to be a zero, basically if you don't

do what they ask the one and twenty, you're a zero.  That's how

they consider you.

             MR. CHARNEY:  We stopped at what time?

             1:35.  Okay.  Let's continue at 1:35.

             (Audio recording played)

Q.   So did you hear Sergeant Bennett on that portion say that

if you're a solid cop he will fight for you but if you're a

zero I'm not fighting?

A.   Once again, if you meet his numbers, he will talk for you.

He will stick his head out for you, which he didn't anyway.

But if you don't, then he won't back you up.  He won't

recommend you for anything.

Q.   When you say stick his neck out for you, what do you mean

by that?

D3k9flo1          Polanco

A.  Basically if somebody else comes in with a complaint about

any officer.  And he sees that that officer have his numbers,

he will say:  No, no, this is one of my best cops.  Look at his

numbers.  Can you please leave him alone.  Or on the contrary,

he can say:  Yeah, this cop doesn't meet my numbers.  Do

whatever you want with him.

He doesn't have that power.

Q.  I'm sorry?

A.  He doesn't have that power, as you say.  He's a sergeant.

Q.  How do you know he doesn't have that power?

A.  Because what happens at the precinct level is beyond the

sergeant.  It's lieutenant and captains and inspector who

decide what's going to happen.

Q.  Let's -- we're starting at 2:19.  We're almost done.  So

let's play the last ten seconds.

(Audio recording played)

Q.  Move through this.  We're going to play now track three

starting at 4:50 and going to 8:33.

(Audio recording played)

MR. CHARNEY:  Can we stop a second.  Can we go back to

the beginning.  Start at 4:50.

(Audio recording played)

(Continued on next page)

1   Q.  First of all, do you recognize the voice on this recording?

2   A.  Yes.

3   Q.  Who is this person?

4   A.  At the time it was Captain McHugh.

5   Q.  Who is Captain McHugh?

6   A.  He was the commanding officer at the 41st Precinct.

7          MR. CHARNEY:  I apologize, your Honor.  Can we go back

8   and just start it again at 4:50?

9          (Audiotape played)

10  Q.  Did you hear Inspector McHugh there say, "The summonses are

11  coming full circle again.  The Bronx came in and" -- actually,

12  it says "broadest to the city," but that's not what I heard.

13  Do you understand what he said on that portion?

14  A.  Yes.  He said that the Bronx came lower in the city.

15         THE COURT:  The Bronx came what?

16         THE WITNESS:  Lower.

17  Q.  Do you know what he meant by "the summonses are going full

18  circle again"?

19  A.  A summons is a money generating machine for the city.  So

20  the more summonses were issued, the more money the city

21  generates.

22  Q.  Is that what you understood him to mean by that?

23  A.  That was my understanding.

24  Q.  Do you know what he meant by the Bronx came in worse or was

25  worse than the city?

1   A.  They compare all the boroughs, like all the summonses from

2   the Bronx, from Manhattan, and see which borough is having more

3   than others.  Apparently, the Bronx came out lower.

4   Q.  How do you know that they do that comparison?

5   A.  I used to do crime analysis.  I have a little understanding

6   of how they operate.

7   Q.  When you say "they," who are you speaking about?

8   A.  The chiefs.

9   Q.  Chiefs of?

10  A.  Borough, chief of personnel, chief of patrol.

11  Q.  Now, you said you did crime analysis.  What did you mean by

12  that?

13  A.  I used to be in the precinct where I used to do the audits

14  for the complaint reports.  In that office, they also did the

15  summonses.  I was also in charge of putting the summonses in

16  the system, putting the 250s in the system.

17  Q.  This was in the 41st Precinct?

18  A.  Yes.

19  Q.  What period of time did you do that?

20  A.  It was for a short period of time in 2009, about four, five

21  months.

22  Q.  We are going to continue at 4:57.

23          (Audiotape played)

24  Q.  Did you hear that portion?

25  A.  Yes, I did.

D3K8FLO2                      Polanco - direct

1   Q.  What did you hear Inspector McHugh -- Chief McHugh,

2   although he is now an inspector, correct?

3   A.  Something like that.  Yeah.

4   Q.  We will call him Inspector McHugh.  What did you hear

5   Inspector McHugh say on that portion?

6   A.  Chief Giannelli, who used to be the chief of the

7   department, together with Chief Purtell, Chief Purtell used to

8   be the chief of the Bronx, that he basically screamed at him.

9   That's what I understand.

10  Q.  Just to clarify the record, you said Chief Giannelli was

11  the chief of the department?

12  A.  I'm not sure.  He was not the borough chief.  He was the

13  one on top of Purtell, and Purtell was basically the chief of

14  the Bronx.

15  Q.  Do you know who Inspector McHugh would report to directly?

16  A.  I think borough chief Purtell.

17  Q.  Let's continue at 5:11.

18          (Audiotape played)

19  Q.  Did you hear at the end of that portion Inspector McHugh

20  say, "Headquarters is now yelling at Chief Purtell and he is

21  given the business"?

22  A.  Yes.

23  Q.  Do you know what Inspector McHugh meant by that?

24  A.  Headquarters is the one that control CompStat and the

25  numbers.  So when they don't like the number for certain

1    borough, they will call that chief and scream at him, whatever

2    he said.

3    Q.  Let's continue at 6:05.

4          (Audiotape played)

5    Q.  Did you hear at the end there Inspector McHugh say, "If you

6    don't do it now, I am going to have you work with the boss to

7    make sure it happens"?

8    A.  Yes.

9    Q.  Do you know what he meant by that?

10   A.  He also said it was nonnegotiable.

11   Q.  Yes.

12   A.  We didn't have a choice.  Basically, like I explain before,

13   he will have us drive a supervisor, and when you do that, your

14   discretion is out the door; you have to do what they say.

15   Q.  When you say "do what they say," what are you referring to?

16   A.  If they see a group of kids on the corner, they are going

17   to go summons them, to go 250 them, to go pat them down, to do

18   everything that I would normally not do if they weren't around,

19   if I didn't have reason to do it.

20   Q.  Did you also hear Inspector McHugh say, "What we can do,

21   though, to get some of our people that aren't chipping in to go

22   to some of the locations we are having problems and give them

23   the business, rightfully when they should."  What does "give

24   them the business" mean to your understanding?

25   A.  My understanding is again the summonses.  The business that

1    the city have, and it's a shame they call it a business, is

2    generate money through summonses.  We are supposed to hand them

3    the business.

4    Q.  We are going to start at 6:43.

5          (Audiotape played)

6    Q.  On that portion, did you hear Inspector McHugh say,

7    "Because you know what, they control the overtime too guys.  If

8    they think we are a bad borough, they won't give us overtime."

9    Do you know what he meant by that?

10   A.  Basically, if we don't come up with the numbers, we are not

11   going to get overtime.

12          MS. COOKE:  What is the time?

13   Q.  We are going to start at 7:11.

14          (Audiotape played)

15   Q.  On that last portion, and we stopped at the end 8:33, did

16   you hear Inspector McHugh saying, "But what it does help us is

17   it helps us, they know that we are going to get our fair share

18   of some resources like they have."  Did you hear him say that?

19   A.  Yes.

20   Q.  Do you know what he meant by that?

21   A.  I think, I believe he probably is referring to the

22   overtime.  If I might explain?

23   Q.  Sure.

24   A.  Overtime is one of the biggest thing for most of the

25   officers.  A lot of officers have family, have kids, multiple

1    families, and a lot of officers depends on the overtime.  It

2    will be embarrassing to say that most of the officers that get

3    a lot of arrests, they make a lot of arrests, they make it for

4    the overtime.

5            MS. COOKE:  Objection.  The answer is speculative.

6    A.  Based on my experience --

7            THE COURT:  One moment.

8            Only the sentence will be stricken where he mentions

9    being embarrassing to say those that get a lot of arrests, they

10   make it for the overtime.  That part I will strike, but the

11   previous portion I will allow.  Basically, the previous

12   sentence that the people need overtime for their families.

13   Q.  Officer Polanco, yesterday you made a comment in your

14   testimony that you are not a fan of overtime.  When you worked

15   at the 41st Precinct, did you ever work any overtime tours?

16   A.  Occasionally, yes.

17   Q.  Can you explain what you meant by I am not a fan of it?

18   A.  There are certain types of overtime.  I am a father and

19   have three kids.  Any time I can spend with my kids, I am going

20   home.  But there's different type of overtime.  The one that

21   came most handy was the impact overtime.  The impact overtime

22   where they will assign officers that were supposed to be off

23   their day to high-crime areas.

24           When you assigned to impact overtime, the integrity

25   control officer will be in charge of it most of the time, and

1    there will be a requirement for you to be assigned, to be given

2    the overtime.  Most of the time you have to agree to write five

3    summonses, five 250s, or an arrest in order to get the

4    overtime.

5    Q.  What is your basis for that statement?  How do you know

6    that that was the requirement?

7    A.  This is what the ICO used to call it.  This is what you

8    need to do if you want the overtime.

9    Q.  By ICO, you mean integrity control officer?

10   A.  Yes, a lieutenant.

11   Q.  That person is a lieutenant in the 41st Precinct?

12   A.  Yes.

13   Q.  Is it your testimony that your integrity control officer in

14   the 41st Precinct, in fact, told you that if you want to work

15   impact overtime, you have to either make five summonses, five

16   250s, or one arrest?

17   A.  Yes.

18   Q.  Do you recall when he or she said that to you?

19   A.  Throughout 2009.

20   Q.  What is that integrity control officer's name?

21   A.  Lieutenant Dominguez at the time.

22   Q.  Did you ever actually work an impact overtime tour?

23   A.  I did a few times, yes.

24   Q.  Did you comply with these requirements that Lieutenant

25   Dominguez communicated to you?

1    A.   Sometime I did, sometime I didn't.  Because sometime they

2    assign you the overtime based on whoever wants to do it.

3    Sometime they didn't have the resources so they will force you

4    to do the overtime.

5    Q.   When you say forced you, what do you mean?

6    A.   They will give you a notification you have to show up

7    tomorrow, that you have no choice but to come in.

8    Q.   So you said that there were times when you did fulfill the

9    requirement of five summonses or five 250s or one arrest?

10   A.   Yes.

11   Q.   In any of those occasions, do you recall whether any of the

12   stops you made were without reasonable suspicion?

13   A.   Some of them were not because some of them -- like in

14   impact overtime, I will be driving the sergeant, and you

15   usually go from 6 to 2, 6 p.m. to 2 in the morning.  So if it

16   was like 11, 11:30, and we didn't have the four or five, we

17   will hop in a van or go in a car with a supervisor, and he will

18   just do the same, grab those kids, summons those kids, write

19   this one, 250 this one, and in some of those occasions it was

20   not warranted.

21   Q.   Then when you had finished the tours, impact overtime

22   tours, did you have to provide documentation of your activity

23   to anybody?

24   A.   Yes.

25   Q.   Who did you provide it to?

D3K8FLO2                    Polanco - direct

1   A.  If the ICO was there or the supervisor in charge of the

2   platoon that was doing the overtime.

3   Q.  Let's play track 5 on Exhibit 284.  We are going to play it

4   from the beginning to 1 minute and 9 seconds.

5           (Audiotape played)

6   Q.  We stopped at 13 seconds.

7           Do you recognize the voice on that recording?

8   A.  Yes, I do.

9   Q.  Who is that?

10  A.  Lieutenant Andrew Valenzano.  Now he is a captain.

11  Q.  At the time, this recording was made in the fall of 2009?

12  A.  Yes.

13  Q.  What was his position in 2009, if you recall?

14  A.  He was a platoon commander of the 41st Precinct.

15  Q.  Let's continue from 13 seconds.

16          (Audiotape played)

17          MR. CHARNEY:  Where did we stop?  44 seconds.

18  Q.  That was Lieutenant Valenzano still?

19  A.  Yes.

20  Q.  Did you hear him say, "But if you see people over there on

21  the bikes carrying the bags, you know, that's what we need,

22  good stops"?

23  A.  Yes.

24  Q.  Do you know what he meant by that?

25  A.  To stop them and frisk them, if they were simply on a bike

D3K8FLO2                    Polanco - direct

1    carrying a bag.

2    Q.  Earlier did you hear him refer to certain locations, 165

3    area, Pine Avenue, "those are the areas, we want you guys over

4    there for that reason"?

5    A.  Yeah.

6    Q.  Do you know what he meant by that?

7    A.  No.

8    Q.  So the portion where he said, stop the guys on the bikes

9    carrying the bags, what did you understand him to mean by that?

10   A.  Simple as that.  Stop and frisk anybody who is on a bike

11   carrying a bag.

12   Q.  Did he ever tell you or did any of your supervisors ever

13   tell you why they wanted you to stop people on bikes or people

14   carrying bags?

15   A.  No.

16   Q.  Let's continue from 44 seconds.

17             (Audiotape played)

18   Q.  We stopped at the end, which was 1:09.

19             Can you tell me who that voice was?

20   A.  At the end, it was at the beginning of McHugh's track.

21   Q.  Did you hear him say, "Thank you for cooperating with, you

22   know, making sure we get everyone on board towards depressing

23   conditions"?

24   A.  Yes.

25   Q.  Do you know what he meant by that?

1    A.  By meeting the quota, by writing the amount of summons that

2    he wanted.

3    Q.  Is that what he meant by conditions?

4    A.  Yeah.

5    Q.  So now we are going to play from track 6 on this CD, from 1

6    minute to 2 minutes and 29 seconds.

7               (Audiotape played)

8    Q.  Do you recognize that voice?

9    A.  Yes.

10   Q.  Who is that?

11   A.  Delegate Angel Herran.

12   Q.  Who is Herran again?

13   A.  A union delegate.

14   Q.  You were present for this roll call, if you recall?

15   A.  Yes, I was.

16          MR. CHARNEY:  We stopped at what point in time?

17   Q.  We stopped at 1:39.  So we are going to continue from

18   there.

19              (Audiotape played)

20          MR. CHARNEY:  I apologize, your Honor.  I want to play

21   it from the beginning because I think we need to hear the whole

22   thing.  So we are going to start again from 1 minute.

23              (Audiotape played)

24   Q.  Did you hear Officer Herran say there, "We will pull over

25   the car.  So I pull over the car.  What do you want me to do?

1    Give him a summons.  Well, I didn't observe it."

2    A.   Yes.

3    Q.   Do you know what he was talking about there?

4    A.   He was giving an example of one day that he was driving

5    with Valenzano.

6    Q.   How do you know that's the example he was giving?

7    A.   I was there.  He said one time he was in the car with him,

8    and he asked him to pull the car that made a left, and Herran

9    told him that he didn't see it, and he tell him to write a

10   summons.

11   Q.   Let's continue from 1:13.

12            (Audiotape played)

13   Q.   Did you hear Officer Herran on that portion?

14   A.   Yes.

15   Q.   What did you hear him say?

16   A.   According to Officer Herran, this is how I got in trouble

17   again, when the supervisor do that, when they ask you to write

18   a summons for something they didn't observe, they supposed to

19   scratch off the part they didn't observe and sign it.  That's

20   what he is referring to, that the supervisor is supposed to

21   scratch off the part that say I did observe, and they will sign

22   it.

23   Q.   In other words, the supervisor will sign it?

24   A.   He supposed to do it.

25   Q.   We are going to start at 1:21.

1          (Audiotape played)

2     Q.   Did you hear Officer Herran there say, "You have to show

3     something, you have to show something to your police officer"?

4     A.   Yes.

5     Q.   Do you know what he meant by that?

6     A.   Numbers, you have to show numbers.

7     Q.   And we stopped at 1:38.  We are going to start again.

8          (Audiotape played)

9     Q.   We stopped at 1:55.

10          So did you hear Officer Herran in that section say,

11     "You meant to tell me for 30 fucking days" -- sorry -- "you

12     haven't seen any violations on parking, any violations and any

13     kind of arrests?  If you have 25 to 26 days on patrol, it's

14     impossible.  Show something."  Did you hear him say that?

15     A.   Yes.

16     Q.   What did you understand him to mean?

17     A.   He was talking that maybe some officers were not doing

18     absolutely anything.  That's not possible.  Like somebody turn

19     in a blank activity log, and he said that it's not possible,

20     you have to show something.  But he is not making reference to

21     the 1 and 20.  They want 1 and 20.  30 days of patrol, 25 days

22     of patrol.  For example, in January of 2009, I have five days

23     of patrol, and I am still required to bring the 1 and 20.

24     Q.   Was it your experience that, regardless of how many days

25     you worked in a given month, the numbers were the same?

1    A.   Exactly, 20 and one.

2    Q.   How do you know that?

3    A.   That's what they said.  They didn't say get 20 and one if

4    you have ten days of patrol, if you have 15 days of patrol.

5    They basically say you have to get 20 and one.

6    Q.   Let's continue at 1:55.

7              (Audiotape played)

8              MR. CHARNEY:  Where did we stop?  2:06.

9    Q.   Did you hear Officer Herran in that portion refer to a

10   bible you have?

11   A.   Yes.

12   Q.   Do you know what he is referring to there?

13   A.   As I said before, the bible is the book with every officer

14   individual activity that a commanding officer holds in his

15   office.  It usually go back three months when you have to

16   adjudicate a command discipline.

17   Q.   When Officer Herran said they are going back to the bible

18   you have, do you know what he meant by that?

19   A.   Your CD is going to be adjudicated according to how the

20   book looks.

21   Q.   What do you mean by according to how the book looks?

22   A.   If you have been doing your numbers, you will be all right.

23   If you haven't, then you're going to have a problem.

24   Q.   Did you hear him say it's coming from IR?

25   A.   Higher up.

1    Q.   Higher up?

2    A.   Yes.

3           MR. CHARNEY:  Can we play that portion again just so I

4    can hear it.  We are going to play the same portion we just

5    played.

6           (Audiotape played)

7           MR. CHARNEY:  That's the end at 2:29.

8    Q.   So did you hear on that portion Officer Herran say, "It's

9    not coming from me, it's coming from higher up"?

10   A.   Yes.

11   Q.   Then he mentioned the unions agreeing to it?

12   A.   Yes.

13   Q.   Do you know what he meant by that?

14   A.   That the union trustees and the union president all

15   acknowledge what is going on and they agree with it.

16   Q.   Just so we are clear, when you say "it," what are you

17   referring to?

18   A.   The quota.

19   Q.   I want to ask you again about some of the timing of when

20   you went to IAB.

21           You said you first went to them or you wrote to them

22   in September of 2009, is that right?

23   A.   Yes, around September.

24   Q.   When did you provide the recordings to them?

25   A.   I believe it was in December after my suspension.

1   Q.  Why did you wait until December to provide the recordings

2   to them?

3   A.  I wasn't sure if I wanted to give it to IAB.  I didn't

4   trust them.

5   Q.  Why didn't you trust them?

6   A.  They have no independency.  They are a police department.

7   They have no independency.  I didn't think they wanted to hear

8   me.

9   Q.  Then how come after your suspension you did decide to turn

10  over the tapes?

11  A.  They came to my lawyer's office, and for some reason I felt

12  like I had to explain to them why I got suspended and listening

13  to the recording would help them understand what happened.

14  Q.  Let's talk about why you got suspended.

15          Can you tell me when you got suspended?

16  A.  It was December 12, 2009.

17  Q.  What happened on December 12, 2009?

18  A.  On that date I was assigned to a checkpoint again because

19  they knew that I had reported it.

20          MS. COOKE:  Objection, your Honor.  The witness said

21  "they knew."

22          THE COURT:  Sustained as to that part.  That is

23  stricken.

24  Q.  Let's just talk about what you were doing, not why you were

25  doing it.

D3K8FLO2                    Polanco - direct

1    A.  I was assigned to a checkpoint again.  It was about 6:00.

2    They wanted numbers.  The lieutenant wanted ten summonses from

3    me and my partner each.  So he assigned us to a checkpoint.

4    Once again, no cones, no flares, no safeguard, no pattern to be

5    followed, nothing.  The sergeant just told us the lieutenant

6    want ten summonses from you guys, let's get them and get out of

7    here.

8    Q.  Which sergeant was it?

9    A.  Rodriguez.

10   Q.  Which lieutenant was he referring to, if you remember?

11   A.  Andrew Valenzano.

12   Q.  So you were doing the checkpoint.  They told you that you

13   needed ten summonses.  What happened?

14   A.  It was a cold night and nothing was coming by.  We had a

15   few.  But then the lieutenant came like 40 minutes later to

16   check on what we had, and he wasn't satisfied with what we had.

17   So he started putting his driver to stop everybody that came

18   down the street, any car that came he asked for license and

19   registration.

20       While we were doing that, I notice that my partner,

21   Officer Pete Rodriguez, who I had been working for the past

22   five years, was pale.  He called me over and said, Polanco, I

23   am not feeling well.  I immediately called the sergeant.  I

24   took his jacket off.  He told me that his chest was killing

25   him, that he had very strong chest pain.  I was concerned

1   because about a month or two before that an officer dropped

2   dead in the Bronx from a heart attack.  I lost my father four

3   months prior to that.

4           I proceeded -- we call an ambulance.  I proceeded to

5   the ambulance.  At no point was I told to go with my partner.

6   I went in the ambulance.  When the ambulance came, I got in the

7   ambulance.  About two minutes in, Lieutenant Valenzano asked me

8   to get out, and I did.  I wasn't too happy about it, but I

9   wasn't verbal or confrontational.  I asked the lieutenant, is

10  there any reason why I can't go with my partner?  He told me,

11  keep writing summonses, I will have the sector go.  OK.  I

12  walked out of the ambulance.  At no point I scream to him.  At

13  no point I say racial slurs or anything like that.  I just

14  walked out.

15          About five minutes later, I looked into the back of

16  the ambulance, between three and five minutes, and I saw my

17  partner on an oxygen mask.  He look even worse than what he

18  looked before.  He was really out of color.  I tried to call

19  his uncle.  I couldn't get in touch.  He told me not to call

20  his wife or his five daughters yet.

21          MS. COOKE:  Objection.

22          THE COURT:  It doesn't matter.

23          It's really time for the break so I am going to

24  interrupt him anyhow.  It's 11:30.  We will reconvene at 20 to

25  12.

1        (Recess)

2    BY MR. CHARNEY:

3    Q.  Officer Polanco, before the break we were discussing an

4    incident on December 12, 2009, involving you and your partner,

5    and I guess Lieutenant Valenzano.  I wanted to continue with

6    that discussion.  I believe you left off with your partner in

7    the back of the ambulance?

8    A.  Yes.  I approached the back of the ambulance on the

9    outside.  I saw his condition.  He was worse.  He had an oxygen

10   mask.  He was turning a little blue.  When I saw his condition,

11   I was extremely worried.

12        At that point, I approached the lieutenant and I told

13   him, lieutenant, you can do as you please, I am going with my

14   partner.  And he asked me again, what?  I said, you can do what

15   you please, I am going with my partner.  At that time, the

16   lieutenant grabbed me by the chest, twist me around, asked me

17   for my gun and shield and suspended me on the spot.

18   Q.  Did you in fact give him your gun and shield?

19   A.  Later on, yes.

20   Q.  Did you at any point in time say any derogatory remarks to

21   him?

22   A.  No, not at all.

23   Q.  Did you threaten him?

24   A.  No.

25   Q.  Did you physically assault him?

1  A.  No.  I simply, when he grabbed me, after he grabbed me, I

2  simply push his hands off my chest.

3  Q.  After that, did you make any other physical contact with

4  him?

5  A.  Not at all, no.

6  Q.  This incident was December 12, 2009?

7  A.  Yes.

8  Q.  Earlier you testified about how you had seen the word rat

9  next to your name in the precinct cafeteria?

10  A.  Yes.

11  Q.  Do you know approximately what point in time you saw that?

12  A.  Mid-November, mid to late November 2009.

13  Q.  So is it correct that you saw that word written next to

14  your name before this incident with Lieutenant Valenzano?

15  A.  Yes.

16  Q.  Do you know whether or not any of your supervisors in the

17  41st Precinct were aware you had gone to Internal Affairs with

18  your complaints prior to this incident on December 12, 2009?

19  A.  Yes.

20  Q.  How do you know that?

21  A.  Sergeant Rodriguez told me to look out, that they were

22  looking to hurt me, that they know that I reported it, that I

23  went to IAB.

24  Q.  When did he tell you that?

25  A.  This was -- he told me a few time.  He told me I think a

1   couple of hours before the checkpoint.  But also in the month

2   of November he told me the same thing.

3   Q.  Now, prior to this incident on December 12, 2009, had you

4   ever been disciplined by the NYPD when you worked as a patrol

5   officer in the 41st Precinct?

6   A.  Disciplined, I was in an off duty incident where I was

7   modified for four months.  It was a domestic incident where

8   somebody made allegations.  The allegations went nowhere.  They

9   were unsubstantiated.  I did not get any time taken off.  I did

10  not get -- I didn't even have to see the -- anything.  It was

11  unsubstantiated.  But I was modified for four months until the

12  investigation was being conducted.

13  Q.  During that modification, what were you doing?

14  A.  I was doing crime analysis.

15  Q.  Where?

16  A.  In the 41st Precinct.

17  Q.  So you were not reassigned to a different precinct during

18  that time?

19  A.  No.  The inspector actually wrote a letter to personnel to

20  keep me in the precinct.

21  Q.  Which inspector was that?

22  A.  McHugh.

23  Q.  Other than that four-month modification, did you receive

24  any other discipline prior to December 2009?

25  A.  The only thing I remember, again, I went to court because

1    after they put me back on the four months, I was doing the job

2    of two officers.  They didn't have nobody to do crime analysis

3    so I used to do the crime analysis job and then jump on patrol.

4    I used to do both.  So one day I had court, and when you do

5    crime analysis administrative, you don't have to wear your vest

6    or your uniform to court.  I show up to court without the vest.

7    My lieutenant told me that it was OK.  And when I show up to

8    court, the sergeant send me back to put my vest on.  When I

9    came back to the court section, he issued me a command

10   discipline for not having the vest.  That's the only thing

11   other than that.

12   Q.  So other than that command discipline and the four-month

13   modification, did you receive any other discipline prior to

14   December 2009 when you worked in the 41st Precinct?

15   A.  No.

16   Q.  During your work as a patrol officer in the 41st Precinct,

17   did you ever receive a negative quarterly performance

18   evaluation?

19   A.  No.

20   Q.  Did you ever receive a negative annual performance

21   evaluation?

22   A.  No.

23   Q.  Officer Polanco, at any point in time, did you provide

24   copies of those recordings we listened to earlier to anybody

25   outside of the police department other than your lawyer?

1   A.  I don't recall.

2   Q.  Did you ever provide it, for example, to any members of the

3   media?

4   A.  I think I did.  I think -- or my lawyer did.  I'm not sure.

5   He provided them to Channel 7.

6   Q.  Do you know when that was?

7   A.  Actually, we were talking to Channel 7 in September of that

8   year.  Three months before my suspension we were looking to

9   expose everything.  We were just waiting for the right moment

10  and the right time to do it.

11  Q.  Why did you want to go to the press with these issues?

12  A.  Because the department is not willing to listen to me.

13  They are still not willing to listen to me.  They don't want to

14  hear it.

15  Q.  You mentioned earlier that one of the reasons why you

16  waited until you did to actually report a lot of this stuff is

17  you were worried about retaliation?

18  A.  Yes.

19  Q.  Are you worried about retaliation today?

20  A.  I cannot say I don't.  I'm not in fear, but I do worry

21  about what they are going to do next.

22  Q.  Why did you decide to testify as a witness in this case?

23  A.  The reason I decided to testify and come forward when I

24  did, I'm a father, I have three kids.  I grew up in the

25  Heights.  I grew up in the hood.  I come from a very poor

1  country.  I know what it's like when it's 95 degrees in an

2  apartment on the fifth floor and you go downstairs because you

3  had a fight with your sister because it's simply too hot.  And

4  for you to go downstairs and get arrested in your own building

5  for trespassing, as we have seen, get summons, get pat down,

6  get harassed by police, I don't believe that's why I joined the

7  police department.

8  Q.  Why did you join the police department?

9  A.  I joined the police department to help.  I was a baseball

10  coach in high school for about four years.  I worked with

11  youths.  I joined the police department because I wanted to

12  interact with my community.  Before the 90s, minority cops were

13  not abundant in the department.  It was in the early 90s, late

14  80s that they decided that it would be a good thing to

15  integrate the police department so we can help our own

16  community.  What was happening before that is my question.

17         So, unfortunately, a lot of us that come into the

18  police department forget where we come from.  I don't want my

19  kids to be harassed by anybody.  I don't need my kid to get

20  shot by any cop who was chasing him to fill out a 250.  And the

21  problem that we have is a lot of us, when we think of a male

22  black, a male Hispanic, we think of a third person.  I don't.

23  When I see an unarmed man get shot, I think of my kid.  My

24  scenario is coming home to my kid and finding my kid with a

25  bullet to the chest.

1      Unfortunately, a lot of us have the luxury to live in

2  different communities, and when we hear of a male shot because

3  he was running from police, the law allows him to run from

4  police, but not when you're black or Hispanic, unfortunately.

5  When you hear of teenagers that get beaten by police.  When you

6  hear a cop testify that he --

7      MS. COOKE:  Objection.  I don't think this is any

8  longer responsive to the question.

9      THE COURT:  It's responsive, but it's a long speech,

10  and a courtroom is not a place for a long speech.  I think you

11  have made the point.  I think that's probably sufficient.

12  Q.  Officer Polanco, do you believe that stop, question and

13  frisk is an appropriate tool for police officers to use?

14  A.  Absolutely, yes.  Absolutely.  It's a great tool.

15      THE COURT:  Sorry?

16      THE WITNESS:  It is a great tool.

17  A.  We need it because I have no problem harassing criminals.

18  I have no problem harassing those that are committing the crime

19  or about to commit the crime.  I am not in denial that Hispanic

20  and blacks are the ones that are committing the crime.  I am

21  not in denial.  And we need help.  And I am here asking for

22  help.  How can we help this minority people drop the gun?  How

23  can we make them not carry the gun?  How can we help them?  I

24  am not in denial that we need help.  But my understanding is

25  that when somebody commit a crime, you don't bring the whole

1   family to court.  So why should we bring the whole culture and

2   hold the whole culture accountable for --

3           MS. COOKE:  Objection.

4           THE COURT:  That's responsive to the question because

5   this one, I think, Mr. Charney would argue goes to the remedies

6   question.  He is explaining his point of view.

7   A.  What I was saying was that when somebody commit a crime in

8   a family, you don't bring the whole family to court.  You bring

9   the criminal.  So if some black or the majority of blacks are

10  committing the crime, we cannot hold the whole culture

11  responsible for what some of them are doing.

12          MR. CHARNEY:  One minute, your Honor.

13  Q.  Officer Polanco, you said you were suspended on December

14  12, 2009, correct?

15  A.  Yes.

16  Q.  Are you currently still suspended?

17  A.  I am on modified assignment still, three and a half years

18  later.

19  Q.  Where is your modified assignment?

20  A.  I'm in the VIPER unit in the 77th precinct on Utica Avenue.

21  Q.  Do you know whether or not any formal disciplinary charges

22  were filed against you?

23  A.  Yes, they did.

24  Q.  Do you know what the status of those charges are?

25  A.  My trial was done about two weeks ago.  Several people came

1   to testify contrary of what the lieutenant allege I did.

2              MS. COOKE:  Objection.  He is testifying to hearsay.

3              THE COURT:  Sustained.

4   Q.  Has there been a finding or a ruling in that trial yet?

5   A.  No.  Three and a half years later, no.

6   Q.  Do you have any idea why it has taken three and a half

7   years since the incident to finish the trial in your

8   disciplinary case?

9   A.  It's very contradictory.  For example, the lieutenant gave

10  a story about what happened, not knowing that I had a recording

11  in my pocket.  When he gave the story, he say X, Y and Z.

12             MS. COOKE:  Objection.

13             THE COURT:  Sustained as to what he said.

14  Q.  Let me ask the question a little more narrowly.  Do you

15  know why it has taken three and a half years to finish the

16  disciplinary trial in your case?

17  A.  They know I am innocent.  That's my belief.

18  Q.  I want to show another exhibit.  This has been marked as

19  Plaintiffs' 98.

20             MR. CHARNEY:  Is there any objection to this exhibit,

21  the patrol guide section?

22             MS. COOKE:  No.

23             MR. CHARNEY:  This is the NYPD patrol guide section on

24  stop, question and frisk.  We would move for it to be admitted

25  in evidence.  We can pull it up on the screen so your Honor can

1    see it.

2            THE COURT:  Is there any objection before you put it

3    on the screen?

4            MS. COOKE:  No objection.

5            THE COURT:  What is the exhibit number?

6            MR. CHARNEY:  Plaintiffs' 98.

7            THE COURT:  98 is received.

8            (Plaintiff's Exhibit 98 received in evidence)

9            MR. CHARNEY:  Can I give a copy to the witness?

10           THE COURT:  Yes.  Sure.

11   Q.  Officer Polanco, do you recognize this document Exhibit 98?

12   A.  Yes, I seen it.

13   Q.  What is this document?

14   A.  This is the patrol guide referring to stop, question and

15   frisk.

16   Q.  If you can look at the bottom of the first page.  Next to

17   paragraph number 9, you see where it says, "Submit stop,

18   question and frisk report work sheet to desk officer, precinct

19   of occurrence."  Do you see that?

20   A.  Yes.

21   Q.  Was that your practice when you worked as a patrol officer

22   in the 41st Precinct?

23   A.  No, not all the time.

24   Q.  Who, if anyone, did you submit the stop, question and frisk

25   report work sheet to when you completed it?

1    A.   Sometime the desk officer, most of the time the platoon

2    commander when he is doing his recap sheet, and sometime our

3    immediate supervisors.  At some point, even to the crime

4    analysis person who was in charge of putting it in, we hand it

5    directly to that person.

6    Q.   I'm sorry.  The crime analysis person was in charge of

7    putting it into what?

8    A.   The system.

9    Q.   What do you mean by the system?

10   A.   Type it into the system.

11   Q.   Moving to the second page, see at the top it says,

12   paragraph number 10 next to "desk officer" it says, "Review

13   each stop, question and frisk report work sheet and (a)

14   instruct member preparing work sheet if necessary."

15         We already know the desk officer was not always the

16   person you handed it in to, but as a general matter, whether it

17   was the desk officer or a sergeant or a crime analysis person,

18   in your experience, did that person instruct you on what was on

19   the work sheet?

20   A.   Never, no.  If I might, the only thing they will make sure

21   is that your name, your tax number, the address is legible,

22   that they can read what was in it, the name is legible.  That's

23   what they will care about.

24   Q.   At any point when you worked in the 41st Precinct, were you

25   ever asked by a supervisor to explain the factual basis for a

1   stop, question and frisk that you had conducted?

2   A.  Never.

3   Q.  Officer Polanco, do you keep in touch with any officers in

4   the 41st Precinct?

5   A.  Not really.  Not really.

6   Q.  You said that your supervising sergeant was -- who was your

7   supervising sergeant?

8   A.  Sergeant Padilla, Edgar Padilla.

9   Q.  I can't remember, but you testified earlier about several

10  supervisors who had talked about the numbers.  Was he one of

11  those?

12  A.  Not really.  He would rarely mention it.  He wouldn't

13  mention it that much.

14          MR. CHARNEY:  One minute, your Honor.

15          No further questions, your Honor.

16          THE COURT:  All right.  Ms. Cooke.

17          MS. COOKE:  Yes.  Thank you.

18  CROSS-EXAMINATION

19  BY MS. COOKE:

20  Q.  Good afternoon, Officer Polanco.

21  A.  Good afternoon.

22  Q.  Prior to your report to IAB the first time, I believe you

23  said it happened in September 2009, is that correct?

24  A.  Yes.

25  Q.  Let me clarify first.  The report to IAB in September 2009,

1   that was the anonymous letter you posted on the ICO tour at the

2   41st precinct?

3   A.   Yes.

4   Q.   So it was the ICO of the precinct, not to Internal Affairs?

5   A.   Because it's my understanding that he have no choice but to

6   forward it to Internal affairs.

7   Q.   But you yourself didn't contact Internal Affairs when you

8   posted the anonymous letter?

9   A.   No.

10  Q.   And then the second time you contacted IAB was in November

11  of 2009?

12  A.   I believe, yes.

13  Q.   That was a telephone call?

14  A.   Yes.

15  Q.   It was an anonymous call, you didn't provide your name or

16  information of who you were, correct?

17  A.   I believe.

18  Q.   You believe it was anonymous?

19  A.   Yes.

20  Q.   So as of your second contact with IAB in 2009, you were

21  still remaining anonymous, as far as you were concerned,

22  correct?

23  A.   Yes.

24  Q.   But your call that you made to IAB on September 14, 2009,

25  after your incident with Lieutenant Valenzano on September 12,

1    you identified yourself to IAB in that call?

2    A.  Yes, I did.

3    Q.  In addition to repeating claims that you had made in your

4    anonymous letter, in your anonymous call in September and

5    November of 2009, in addition to repeating claims about quotas

6    and improper stops, you also added claims of retaliation by

7    Lieutenant Valenzano against you, correct?

8    A.  Yes.

9    Q.  That was because of the incident that had happened on

10   December 12?

11   A.  I'm sorry?

12   Q.  That was because of the incident that happened on December

13   12, 2009?

14   A.  Yes, and other stuff.

15   Q.  It's fair to say what prompted your call on September 14

16   was the incident on December 12?

17   A.  Yeah.

18   Q.  Let's talk a minute about that incident on December 12.

19         You were upset about your partner having chest pains

20   on December 12, 2009, right?

21   A.  Did I use the word upset?

22   Q.  I am asking, were you upset?

23   A.  No.  I wasn't upset.

24   Q.  Were you worried?

25   A.  I was worried, yes.

1   Q.  You were upset with the lieutenant when the lieutenant

2   asked you to step out of the ambulance?

3   A.  I did not use the word upset.

4              THE COURT:  Were you upset?

5              THE WITNESS:  No.

6              THE COURT:  How did you feel when he asked you to step

7   out of the vehicle?

8              THE WITNESS:  I was confused.

9   Q.  You testified on direct that you were asked to surrender

10  your gun and your badge while on the scene on December 12,

11  correct?

12  A.  Which time frame is this?  There's two versions of the

13  evidence.

14  Q.  I am asking if you testified on direct that you were asked

15  while at the scene to surrender your gun and your badge?

16  A.  Yes.

17  Q.  And you said you didn't do it at that time?

18  A.  Yes.

19  Q.  But you surrendered it later?

20  A.  Yes.

21  Q.  In fact, you were asked several times to surrender your gun

22  and badge at the scene, weren't you?

23  A.  No.

24  Q.  You in fact were angry with Lieutenant Valenzano when you

25  were at the scene, correct?

1   A.  At one point I was.

2   Q.  You were yelling?

3   A.  At one point I was.

4   Q.  You were yelling at Lieutenant Valenzano?

5   A.  At one point, yes.

6   Q.  You shoved Lieutenant Valenzano with your hands onto his

7   chest?

8   A.  I think you're skipping a point.  The reason I was

9   yelling --

10  Q.  If you can answer my questions as I ask them.  You shoved

11  Lieutenant Valenzano with your hands onto his chest?

12  A.  I push him away from me, yes.

13  Q.  Your hands onto his chest?

14  A.  Yes, to take his hands away from me.

15          THE COURT:  Why did you do that?

16          THE WITNESS:  Because he had his hands on me.

17          THE COURT:  Did he have his hands on you before you

18  pushed him away?

19          THE WITNESS:  The only reason I push him was to take

20  his hands away from me.

21          THE COURT:  So he put his hands on you first?

22          THE WITNESS:  Yes.

23  Q.  The reason that Lieutenant Valenzano put his hands on you

24  was to stop you from getting back into the ambulance he ordered

25  you out of, isn't that right?

1    A.  I want to make sure I understand this question before I

2    answer it.

3              THE COURT:  The question is, this occurred after he

4    told you to get out of the ambulance, but you tried to get back

5    in, so he put his hands on your chest to stop you from going

6    back into the ambulance.

7              THE WITNESS:  That's not correct because that's not

8    what I testified to.  I never went back in the ambulance.

9              THE COURT:  Did you try to?

10             THE WITNESS:  I tried to get back in the ambulance.  I

11   wasn't allowed to.

12             THE COURT:  Did you try to?

13             THE WITNESS:  I made an attempt to go back in the

14   ambulance.

15             THE COURT:  Is that when he put his hands on your

16   chest?

17             THE WITNESS:  Yes.

18             THE COURT:  To stop you from going back in the

19   ambulance?

20             THE WITNESS:  Yes.

21   Q.  After he attempted to stop you from getting back in the

22   ambulance is when you shoved him with your hands on his chest?

23   A.  Yes.

24   Q.  And it was after that time you were asked to surrender your

25   gun and badge, correct?

1   A.  It was while he have his hands on me that he was asking me

2   for my firearm.

3   Q.  And you didn't give it to him at that time?

4   A.  Why should I?

5   Q.  In fact, you told him he didn't have the authority to do

6   that?

7   A.  He didn't have the authority to have his hands on me.

8   Q.  Then you were asked by additional officers at the scene to

9   surrender your gun and badge, correct?

10  A.  By who?  No.

11  Q.  By other officers at the scene you were not asked to

12  surrender your gun and badge?

13  A.  Can you give me the name of which officer?

14  Q.  I am asking you if other officers at the scene asked you to

15  surrender your gun and badge?

16  A.  The only person that asked me at the end was ESU, and I did

17  give them the firearm, yes.

18  Q.  So there were other officers who made the request at the

19  scene?

20  A.  They were carrying an order through the lieutenant.  The

21  lieutenant gave the ESU officer an order to treat me as an

22  emotionally disturbed person and remove my firearm, yes.

23  Q.  You also shouted slurs at Lieutenant Valenzano with respect

24  to his ethnicity, isn't that correct?

25  A.  That's not correct.

1    Q.  You were shouting at Lieutenant Valenzano at the scene for

2    several minutes, correct?

3    A.  Shouting what?

4         THE COURT:  Shouting anything.  Excuse me.  Were you

5    shouting at all?

6         THE WITNESS:  I was shouting, why do you have your

7    hands on me?  Why the F are you touching me?

8    Q.  Why the what?

9    A.  Why the F are you touching me.

10   Q.  You were using foul language, curse words?

11   A.  He touched me, yes.

12   Q.  You testified on direct examination that you had been in

13   contact with the television, the news, Channel 7 I think?

14   A.  Yes.

15   Q.  Beginning in September, early September 2009?

16   A.  Yes.

17   Q.  Before your suspension.  It was because you wanted to get

18   the story out, is that right?

19   A.  Yes.

20   Q.  So that was before you contacted the ICO with your

21   anonymous letter, is that right?

22   A.  It was actually after.

23   Q.  I thought you contacted the ICO in October of 2009?

24   A.  No.  The letter went out in September.

25   Q.  So you issued an anonymous letter and then you contacted

1    the television?

2    A.   Yes.

3    Q.   And ultimately you spoke with a reporter Jim Hoffer from

4    Channel 7, ABC News?

5    A.   Yes.

6    Q.   You spoke to him several times between September and when

7    the television interview aired in March 2010?

8    A.   A few times, yes.

9    Q.   The television interview aired in March of 2010 on Channel

10   7, correct?

11   A.   Yes.

12   Q.   In that interview, you discussed your allegations of quotas

13   and unlawful stops, is that correct?

14   A.   Yes.

15   Q.   And Channel 7 played audio of roll calls from the 41st

16   Precinct during that interview, isn't that correct?

17   A.   Yes.

18   Q.   Those were the audios that you had recorded at the 41st

19   Precinct?

20   A.   That I recorded, yes.

21   Q.   Some of the ones we heard today?

22   A.   Yes, I believe.

23   Q.   Because you had provided those audio recordings to Channel

24   7, correct?

25   A.   It might have been my lawyer.  I don't remember doing it

1   myself.

2   Q.  You provided them to your lawyer, correct?

3   A.  Yes.

4   Q.  Then your lawyer provided them to Channel 7?

5   A.  I would be speculating if I said.  I don't know what he

6   did.  He might have.

7   Q.  Are you aware that anyone else made those recordings that

8   were played with your interview on Channel 7?

9   A.  No.

10  Q.  So they were your recordings?

11  A.  The best of my belief, yes.

12  Q.  Is it fair to say that at the time you contacted Channel 7

13  in September 2009, you were dissatisfied with several of your

14  supervisors at the 41st precinct?

15  A.  The system, not only the supervisors.  It was the system,

16  the whole system itself.

17  Q.  Specifically, the supervisors, individual people, you were

18  dissatisfied with several people at the 41st Precinct?

19  A.  It wasn't particularly towards people once again.  It was

20  towards the system, the way the whole precinct was operating.

21  Q.  Inspector McHugh came to the 41st Precinct sometime in

22  2008, isn't that correct?

23  A.  I believe, yes.

24  Q.  Do you recall when?

25  A.  No, I don't.

D3K8FLO2                    Polanco - cross

1    Q.  I believe your testimony at your deposition was, when

2    Inspector McHugh arrived, that's when the quotas were imposed

3    at the 41st precinct?

4    A.  They had numbers, but the 1 and 20 came when McHugh

5    arrived, later after his arrival.

6    Q.  The 1 and 20, meaning one arrest, 20 summonses?

7    A.  Yes.

8    Q.  Was the quota ever something lower, 1 and 10, 1 and 15?

9    A.  They used to -- it was not mandatory before.  It was with

10   McHugh.

11   Q.  So prior to Inspector McHugh, you're saying that there were

12   also quotas?

13   A.  There were numbers, but they were not mandatory.  So I

14   wouldn't call them quotas.

15   Q.  You actually knew Inspector McHugh from the 46th precinct,

16   didn't you?

17   A.  Not that I knew him.  I seen him.

18   Q.  You had worked at the 46th precinct prior to the 41st?

19   A.  Yes.

20   Q.  And Inspector McHugh was the commanding officer at the 46th

21   precinct?

22   A.  No.  He was executive officer for impact.

23   Q.  You aren't making any complaints that Inspector McHugh had

24   quotas while he was the executive officer at the 46th precinct

25   for impact?

1    A.  That was not his precinct.

2    Q.  You testified earlier today that actually Inspector McHugh

3    wrote a letter for you on your behalf when you had had the

4    domestic dispute incident?

5    A.  Yes.

6    Q.  To keep you at the command?

7    A.  Yes.

8    Q.  Because, in fact, you could have been transferred out of

9    the command at that point?

10   A.  Yes.

11   Q.  You testified that the supervisor of the 41st Precinct,

12   including the commanding officer, which would be Inspector

13   McHugh, would come to roll call and address the officers and

14   speak about quotas, is that right?

15   A.  Yes.  We heard it, yes.

16   Q.  But none of the audio recordings that we heard today had

17   Inspector McHugh discussing numbers and quotas on the

18   recordings, did they?

19   A.  Did you listen to the recording?

20   Q.  I am asking you.

21   A.  When he spoke about the summonses and how we are not going

22   to get overtime if we don't do the summons, he is talking about

23   quotas.

24   Q.  Did you hear Inspector McHugh on those audio recordings

25   saying one and twenty, or one and five, or one and ten, or

D3K8FLO2                    Polanco - cross

1    issuing a quota in the form of a number on those audio

2    recordings?

3    A.  No.

4            THE COURT:  Now, that's the audio recordings.  Did you

5    hear him do it at all?  Forget the audio.

6            THE WITNESS:  The inspector and the captain washed

7    their hands in the police department and they send a message

8    through channels.  They don't say it themselves.  They will say

9    it to the lieutenant.  The lieutenant will tell it to the

10   sergeant and the sergeant will come to us.

11           THE COURT:  So you never heard McHugh use the actual

12   numbers?

13           THE WITNESS:  No.  But if I may explain?  The delegate

14   said that he met with the CO and this is what he wanted.

15   That's how they communicated it.

16           THE COURT:  Thank you.

17   Q.  So none of the recordings we listened to included Inspector

18   McHugh making a statement with respect to numbers being a quota

19   that the officers were supposed to achieve, correct?

20   A.  I wouldn't agree with that, no.

21   Q.  Inspector McHugh wasn't on the audios discussing a number,

22   was he?

23   A.  Yes.  Indirectly he was, yes.

24   Q.  Did he use a number?

25           THE COURT:  We have already covered that.  He didn't

D3K8FLO2                    Polanco - cross

1   use a number, and he didn't use a number even if it wasn't

2   recorded.  He said that.  He didn't use numbers.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3k9flo3                    Polanco - cross

1    Q.  Other than the recordings we've listened here to today, do

2    you have other recordings where Inspector McHugh does use a

3    number?

4    A.  No.

5            THE COURT:  And he told you McHugh never used numbers.

6            MS. COOKE:  Thank you, your Honor.

7            THE COURT:  Okay.

8    Q.  You also stated that there was a quota for UF 250s that was

9    imposed sometime in late 2009?

10   A.  Yes.

11   Q.  And that quota was five per month, right?

12   A.  Five per month.

13   Q.  You testified that Lieutenant Valenzano told you about that

14   quota?

15   A.  Many of them.  Lieutenant Valenzano, McHugh.  I said McHugh

16   not directly.  Through the -- Sergeant Rodriguez, Sergeant

17   Bennett, the PBA delegates.  Yes.

18   Q.  So Lieutenant Valenzano, we didn't hear him on any of the

19   audio recordings we listened to this morning?

20           MR. CHARNEY:  That's not true.  We did.

21           THE COURT:  Let me hear the question.

22   Q.  You did not hear Lieutenant Valenzano on any of the audio

23   recordings we heard this morning?

24           MR. CHARNEY:  That's not --

25           THE COURT:  Please, please.  Now we're going to do it

1   a third time because I didn't hear the question.

2   Q.  We didn't hear Lieutenant Valenzano on any of the audio

3   recordings this morning discussing a quota of five UF 250s, did

4   we?

5   A.  No.

6   Q.  You testified that on several occasions a supervisor would

7   direct you to write a UF 250 for a stop that you didn't

8   observe; is that correct?

9   A.  Yes.

10  Q.  And in those situations you didn't observe the

11  circumstances leading up to the stop, correct?

12  A.  Yes.

13  Q.  But you didn't ask the supervisor what happened leading up

14  to the stop, did you?

15  A.  We're not allowed to do that.

16  Q.  So you didn't?

17  A.  No.  We're not allowed to question the supervisor.  That's

18  what they told us.  Don't question us.

19  Q.  Did you ever try asking the question?

20  A.  I remember sometime in October Lieutenant Valenzano came up

21  to me -- I was in the car with him.  And he said Polanco

22  whenever we call you to a scene to give you numbers it's

23  because you're not taking care of your own.  So don't put

24  inform by because if we give you a summons we are not going to

25  go testify on your behalf.

1    Q.  I'm asking you about 250s here.

2    A.  Or 250s.  It's the same, yes.

3    Q.  It's the same?

4    A.  Not the same because you don't testify for a 250.  But they

5    said don't question us.  Just do what we said.

6    Q.  You never asked the supervisor what the crime suspected to

7    be on the 250 you wrote for a stop you didn't observe?

8    A.  Sometime he say put anything.

9         THE COURT:  Sometime what?  I'm sorry.

10   A.  He will say put anything.  Fit the description.  Or

11   burglary pattern.  Whatever.  He say just put something in.

12   Q.  But the question was you never asked.

13   A.  Maybe a few times.  Basically we were told what to put.

14   Q.  And you don't have copies of these 250s that you were

15   directed to write by a supervisor for a stop you didn't

16   observe, do you?

17   A.  We don't keep copies of 250s.

18   Q.  Are you not allowed to keep copies?

19   A.  It's not our policy to keep copies.

20   Q.  But you don't have copies?

21   A.  No, I don't.

22   Q.  So you can't tell us the dates that these stops occurred or

23   the locations?

24   A.  I did give a few of them to internal affairs.  And I don't

25   know what they did with them up to this date.

1   Q.  You gave them copies of UF 250s?  I thought you said you

2   don't keep them?

3   A.  I gave them locations and times of 250s.  I also gave them

4   copies for summonses that --

5   Q.  We'll get to the summonses in just a minute.

6          You also -- during -- do you recall giving a

7   deposition in this case?

8   A.  Yes.

9   Q.  And in that deposition you testified that there were also

10  quotas for anticrime cops; is that correct?

11  A.  Yes.

12  Q.  And the anticrime cop quota was what?

13  A.  How many pages was the deposition?

14  Q.  Several.

15  A.  How many questions?  It would be impossible for me to

16  remember everything.

17  Q.  If I told you that you said that the quota for anticrime

18  cops was higher than patrol officers, would you agree with

19  that?

20  A.  Yes.

21  Q.  You also had claimed the conditions teams cops had had

22  higher quotas; is that correct?

23  A.  Yes.

24  Q.  You never worked on anticrime or conditions at the 41, did

25  you?

1    A.  No.

2    Q.  I believe you also at your deposition identified the school

3    unit had quotas; is that correct?

4    A.  Yes.

5    Q.  And their quota, you identified, was arresting five people

6    a month or summonsing 25?

7    A.  Yes.

8    Q.  You never worked in the school unit, did you?

9    A.  No.

10   Q.  You never looked at the monthly activity reports for any of

11   those units, did you?

12   A.  No.

13   Q.  So you wouldn't actually know the activity of the

14   anticrime, conditions or school units?

15   A.  In a precinct like at 41 that would have a hundred cops, we

16   talk to each other, yes.

17   Q.  You didn't review their monthly activity reports, did you?

18   A.  It's not my job to review any officer's activity report.

19   Q.  You didn't review the monthly activity reports of officers

20   in your own unit, did you?

21   A.  It's not my job to do that, no.

22   Q.  So but you didn't review it?

23   A.  It's not -- no, I didn't.

24   Q.  So you only know about your activity when you were at the

25   41st precinct; is that correct?

1    A.  I only know about my activity, no.  I only review my own

2    activity.  But is, as cops, we speak.  And yes, I know

3    people -- yes, I know officers in the school unit.  Yes, I know

4    officers in anticrime.  And yes, I know officers in the

5    conditions unit.  And I was offered these positions a couple of

6    times.  And one of the supervisors told me that that's what

7    they wanted.

8    Q.  But at your deposition you couldn't recall a single name of

9    an anticrime officer who told you what the quota is; isn't that

10   correct?

11   A.  Up to today, I can't recall it.

12   Q.  At the time of your deposition you couldn't recall it

13   either, correct?

14   A.  Yeah.

15   Q.  You couldn't -- likewise, you couldn't recall the name of a

16   conditions officer who told you of a quota, correct?

17   A.  No.

18   Q.  And you couldn't recall the name of a school unit officer

19   who told of a quota, correct?

20   A.  There was a few of them.

21   Q.  You couldn't recall a name though, correct?

22   A.  No.

23   Q.  You couldn't recall the name of a supervisor from any of

24   those units who told you about quotas, correct?

25   A.  Like I said, it's a long deposition with a lot of answers.

1           MS. COOKE:  I'm handing the witness a copy of his

2     deposition from March 29, 2010.

3     Q.  Directing your attention to page 144, line 16.  I'll read

4     the following questions and answers.

5     "Q.  So when did they tell you about their quotas?

6     "A.  Did they tell me -- they offered me conditions.  They

7     offered me crime.  In order for you to go there, you know what

8     the numbers are.

9     "Q.  Who told you the numbers?

10    "A.  Supervisors.

11    "Q.  Which supervisors?

12    "A.  I don't recall.

13    "Q.  Who is the supervisor of conditions?

14    "A.  Sergeant Rafter R-A-F-T-E-R.

15    "Q.  Did Sergeant Rafter tell you what the quotas are for

16    conditions?

17    "A.  No.

18    "Q.  A different supervisor did?

19    "A.  No.

20    "Q.  Did a supervisor tell you what the quotas were for

21    conditions?

22    "A.  No.

23    "Q.  I'm not trying to be difficult.  I just don't understand

24    how you came to learn if a supervisor didn't tell you and none

25    of the officers on conditions team told you, who told you?

1    "A.  Why is it so hard for you to believe that there's a quota.

2    I don't understand."

3              Did you give those answers to those questions at your

4    deposition?

5    A.  Yes, I did.

6    Q.  So you didn't provide the name of a supervisor who

7    identified the quotas for the conditions team at your

8    deposition in March of 2010?

9    A.  No.

10   Q.  When you were an officer at the 41st precinct would you

11   consider it to have been a busy precinct?

12   A.  Busy as of what?

13   Q.  In terms of numbers of jobs, 911 calls?

14   A.  On and off.

15   Q.  And you worked four to twelve the entire time you were

16   there?

17   A.  Yes.

18   Q.  Is four to twelve a busy tour?

19   A.  Yeah, can be considered busy.

20   Q.  More busy than a day tour?

21   A.  It depends.  Everyday.  Crime don't have happen on a

22   schedule.  Sometime it happen at night.  Sometime it happen at

23   day.  It depends.

24   Q.  Were you aware of gang activity in the 41st precinct when

25   you worked there?

1    A.   There might have been, yes.

2    Q.   Do you recognize gang names MOB, a Block, Avenue St. John's

3    Boys, Moneymakers.

4         Do you recognize any of those gang names?

5    A.   It's been three-and-a-half years later.  I do not recall

6    any of those.

7    Q.   Were there drug dealing conditions in the 41st precinct?

8    A.   Probably yes.

9    Q.   Probably?

10   A.   Yeah, there were.

11   Q.   Did you ever make a drug arrest?

12   A.   Yes, I did.

13   Q.   Were there chop shops in the 41st precinct?

14   A.   What are chop shops?

15   Q.   Illegal car -- selling car parts?

16   A.   As a patrol officer, for me to know this illegal activity,

17   it's almost impossible.

18   Q.   You don't know about illegal activity in the 41st precinct

19   as a patrol officer?

20   A.   Not illegal activity.  About they're selling car parts.

21   Where I'm answering radio runs, it's hard to find out.  Yes.

22   Q.   So you weren't aware of that as a condition in the 41st

23   precinct?

24   A.   No, I wasn't.

25   Q.   What about burglaries and robberies?

1    A.   There is plenty of those.

2    Q.   What about domestic violence incidents?

3    A.   A lot of those, yes.

4    Q.   Shootings?

5    A.   Yeah, there were shootings.

6    Q.   What about problems with prostitution and pimps?

7    A.   We did the three to eleven.  From where I started to what

8    it is, it's not much.  It's not much of a problem like it used

9    to be.

10   Q.   What do you mean "like it used to be?"  Are you referring

11   to time period?

12   A.   When I was there in 2007, 2006 there was a lot of

13   prostitutes.  With time going by, I don't know whether they die

14   or whatever, but it's not the same.

15   Q.   Were there problems with strip clubs and the violence

16   attendant with strip clubs?

17   A.   I do three to eleven.  The clubs usually open after eleven.

18   I don't know.

19   Q.   What about commercial truck violations?  Speeding?  Trucks

20   speeding?

21   A.   Trucks speeding.  As a patrol officer, I would have to look

22   up to the highway to see the trucks, yes.  I wouldn't know

23   about that.

24   Q.   And you were expected to do work each day that you came to

25   the 41st precinct for your tour, correct?

1   A.   What is your definition of work?

2   Q.   I'm asking you.  Were you expected to do work?

3   A.   What work are we talking about?

4   Q.   A police officer.  Law enforcement?

5   A.   A police officer's job starts when they leave their house.

6   Q.   So you worked then for, during your tour, while you were at

7   the 41st precinct?

8   A.   Yes.

9   Q.   Because you weren't getting paid for doing nothing; isn't

10  that right?

11  A.   What is your definition of nothing?  That's what I want to

12  understand.

13  Q.   You have duties and responsibilities as a police officer,

14  correct?

15  A.   Yes, I do.

16  Q.   I believe we looked at an exhibit yesterday.  Counsel

17  showed you an exhibit.  The duties and responsibilities of a

18  police officer; is that correct?

19  A.   Yes.

20  Q.   Would you like to look at that exhibit again?

21  A.   I remember it.

22  Q.   So those are some of your duties and responsibilities,

23  right?

24  A.   Yes.

25  Q.   Because you said, in fact, that list wasn't entirely

1    complete, I believe -- there was other things as an officer you

2    would do?

3    A.  Yes.

4    Q.  And those were the kinds of things you were getting paid

5    for when you came to work to perform your job as a police

6    officer, right?

7    A.  I don't understand your question at all.

8              Let me just clarify to you.  The definition of work --

9              THE COURT:  Wait.  Wait.  If you don't understand the

10   question, let her rephrase it.

11             What are you asking, Ms. Cooke?

12             THE WITNESS:  I'm sorry.

13             THE COURT:  Would you rephrase.

14   Q.  You received a paycheck while you were an officer at the

15   41st precinct, correct?

16   A.  Yes.

17   Q.  And that paycheck was for the time you worked as an officer

18   in the 41st precinct, correct?

19   A.  Yes.

20   Q.  And you were expected to perform certain job duties and

21   responsibilities when you were working as an officer in the

22   41st precinct; is that correct?

23   A.  Yes.

24   Q.  And your tour was 8 hours and 35 minutes; is that correct?

25   A.  Yes.

D3k9flo3          Polanco - cross

1    Q.  And would you work approximately 20 days a month?

2    A.  Sometime, yes.  But not all the times.

3    Q.  Not all the times because you would have vacation days or

4    sick days?

5    A.  Court.  Vacation.  Sent to another borough for other

6    details.  There was many reasons, yes.

7    Q.  But on the days when you are in court or you get sent to

8    another precinct, you were working those days?

9    A.  Not necessarily.

10   Q.  You were getting paid?

11   A.  If, for example, I have to go to court, that day I don't go

12   on patrol.

13   Q.  I'm distinguishing I suppose between RDOs, vacation days,

14   or sick days and days on patrol, days on assignment outside of

15   the command, days in court.

16           So the total number of days you would be on patrol, or

17   on assignment in another command, or in court would be an

18   average of about 20 days a month?

19   A.  Yes.

20   Q.  Would you say that more often than not you were on patrol

21   those 20 days?

22   A.  Yes.

23   Q.  In fact, in 2009 there were days where -- or there were

24   months where you had no 250 activity or no arrest activity for

25   the month, correct?

1    A.  Yes.

2    Q.  And some days you wouldn't issue any summonses when you

3    were on patrol, correct?

4    A.  Yes.

5    Q.  You each day you arrived at work you would receive an

6    assignment as patrol officer; isn't that right?

7    A.  I'm sorry?

8    Q.  Each day you arrived at work you would receive an

9    assignment as patrol officer, right?

10   A.  A sector, yes.

11   Q.  Well not necessarily a sector, correct?

12   A.  Most --

13   Q.  Might be the telephone switchboard operator in the

14   precinct?

15   A.  Sometime, yes.

16   Q.  Or you might guard a prisoner at the hospital?

17   A.  Sometime, yes.

18   Q.  Guard a prisoner in the cells?

19   A.  Yeah, sometimes.

20   Q.  Or you might be driving a supervisor?

21   A.  In my case I didn't -- I did not do that much.

22   Q.  But you did sometimes drive a supervisor?

23   A.  But -- sometime but not too often.

24   Q.  But that's an assignment that an officer can receive?

25   A.  I'm sorry?

1  Q.  That's an assignment an officer can receive for their tour,

2  drive a supervisor?

3  A.  Yes.  Yes.

4  Q.  You could also work a footpost; isn't that correct?

5  A.  Yes.

6  Q.  And, as you mentioned, you could be sent outside of the

7  command on some special assignment, correct?

8  A.  Yes.

9  Q.  Like CRV?

10  A.  Yes.

11  Q.  Critical vehicle response?

12  A.  Yes.

13  Q.  Critical response vehicle.  I'm sorry.

14       Or parade?

15  A.  Yes.  Details.

16  Q.  Some special detail.  Yes.

17  A.  Yes.

18  Q.  All and all these things we've just discussed, these are

19  assignments that need to be covered by a police officer; isn't

20  that correct?

21  A.  Yeah, but if I might explain when you're on patrol,

22  90 percent of the time that you come to the precinct you be on

23  patrol.

24  Q.  But these are all other assignments that you conducted

25  yourself as a police officer, correct?

1    A.   Yes.

2    Q.   But you consider several of these assignments punishments;

3    isn't that right?

4    A.   Yes.

5    Q.   Particular footpost.  You consider that a punishment?

6    A.   Yes.  It's considered a punishment yes.

7    Q.   You consider it a punishment?

8    A.   Many officers consider it a punishment.

9    Q.   Well we're just talking about you.

10   A.   Okay.

11   Q.   You consider driving a supervisor a punishment?

12   A.   Depends.

13   Q.   Depends on which supervisor?

14   A.   No.  Depends on every supervisor have their own drivers.

15   They choose who drive them permanently.

16           If you are driving a supervisor for one day and one

17   purpose, yes, it's a punishment.

18   Q.   The supervisor needs a driver; isn't that correct?

19   A.   Yes.

20   Q.   You also consider working a checkpoint a punishment; isn't

21   that correct?

22   A.   Yes.

23   Q.   As a police officer is one of your responsibilities

24   enforcing the law?

25   A.   Yes.

1  Q.  And issuing summonses is a means of enforcing the law;

2  isn't that correct?

3  A.  Sometime, yes.

4  Q.  Sometimes.  Is there a time when issuing a summons isn't

5  enforcing the law?

6  A.  When you break the law to issue a summons it's not

7  enforcing the law.

8  Q.  But -- and you've, in fact, issued summonses without

9  probable cause; isn't that correct?

10  A.  I might have.

11  Q.  You might have?

12  A.  I was called to scenes to write summons by supervisors --

13  other supervisors, yes.

14  Q.  Didn't you just have a department trial in which two

15  summonses you wrote lacked probable cause and the charges for

16  false statements?

17  A.  Would you like the details of that?

18          MR. CHARNEY:  Objection, your Honor.

19          THE COURT:  Would you like what did you say?

20          THE WITNESS:  The details.  I can give her the details

21  of those two summonses.

22          THE COURT:  You object to that?

23          MR. CHARNEY:  Because we tried --

24          THE COURT:  If you do, that's that.

25          MR. CHARNEY:  -- to ask questions about the details of

1    the trial.

2           THE COURT:  Mr. Charney, if you object, I'm going to

3    sustain it.

4           MR. CHARNEY:  We do.

5           THE COURT:  If you don't object, he wants to provide

6    the details.

7           MR. CHARNEY:  I object.  I think the question should

8    be stricken.

9           THE COURT:  Nevermind.  Do you want the details or

10   not?

11          MR. CHARNEY:  I don't.

12          THE COURT:  You don't.  All right.

13          Objection sustained.

14          MS. COOKE:  If I may, it goes to false statements.

15          THE COURT:  You made the point already.  You said did

16   you participate in a trial for writing false summonses.  And I

17   thought you said, and you were found to write false summonses.

18   Then he said yes, but would you like the details.  There was an

19   objection to the details.  I sustained it.

20          MR. CHARNEY:  No.  My objection is to the question.

21   If you're going to allow the question, then I want the witness

22   to have the right to explain.

23          THE COURT:  That's what I thought.

24          MR. CHARNEY:  So you're not going to sustain the

25   objection to the question?

D3k9flo3          Polanco - cross

1          THE COURT:  Correct.  I'm not going to sustain the

2     objection to the question.

3          MR. CHARNEY:  Well then I would like him to answer.

4          THE COURT:  He can explain what happened.

5          Go ahead.

6          THE WITNESS:  Early when I started testifying, when I

7     report to internal affairs with a letter, in that letter

8     there's an incident of the no dog license that was I was forced

9     to write that I provided to internal affairs.

10          When I anonymously called internal affairs, I provided

11    the same sample of the same no dog license that I was forced to

12    write and for them to please do something about it.

13          When I got interviewed with them in December I gave

14    them the copy of those two summonses saying yes, I wrote them

15    under intimidation because the boss called me over.  I was not

16    there.  I did not observe a dog.

17          A year later they took care of the investigation by

18    charging me with perjury for writing the summons and promoting

19    the supervisor.

20          THE COURT:  And promoting the supervisor?

21          THE WITNESS:  Promoting the supervisor.

22          THE COURT:  Oh, and they promoted.

23          THE WITNESS:  And they promoted, and charged me with

24    perjury, yes, the summons that I reported, yes.

25    Q.  So the first summons, the one for the lack of a dog

1  license, you testified about that on your direct examination as

2  well; is that correct?

3  A.  Yes.

4  Q.  And you identified Inspector McHugh, the individual who

5  stopped and called you to the scene?

6  A.  Yes.

7  Q.  And when you arrived Inspector McHugh asked you to write a

8  summons for someone not having a dog license?

9  A.  Yes.

10  Q.  But he didn't give you anymore specifics about how to write

11  that summons up?

12  A.  Nope.

13  Q.  And you claim you did not see a dog, right?

14  A.  I did not see a dog.

15  Q.  But you wrote the summons for the person not having a dog

16  license?

17  A.  I was instructed by McHugh to write them a summons for no

18  dog license, yes.

19  Q.  And when you wrote that summons, you read the summons

20  carefully, and you knew that it indicated that if you did not

21  observe what you were recording you observed, you shouldn't

22  sign that summons; isn't that correct?

23  A.  I'm an officer.  Yes.  I knew that.

24          He was a captain.  He should have known better.

25  Q.  But you signed the summons; is that correct?

1  A.  He asked me to write it, yes.

2  Q.  Did you ask the person where their dog was?

3  A.  I told the person to fight it and bring it to court and I

4  will see him there.

5        No, I didn't.

6  Q.  Officer Polanco my question is:  Did you ask the person you

7  were writing a summons for lack of a dog license where their

8  dog was?

9  A.  He said he didn't have no dog.

10 Q.  Did you ask him where his dog was?

11 A.  I asked him about the dog.  He said he didn't have one.

12 Q.  Did you ask Inspector McHugh where the dog was?

13 A.  Nope.

14 Q.  For the second summons that's the subject of your

15 department trial, that's what Inspector McHugh also called you

16 to the scene when he had individuals stopped?

17 A.  It was the same scenario.

18 Q.  It's not the same scenario.  It's not a dog license.

19        Isn't that correct?

20 A.  But it's the same scenario.

21 Q.  It's not a dog license, correct?

22 A.  No, it's not.

23        THE COURT:  What do you mean by the same scenario?

24        THE WITNESS:  It's the same incident.  There was two

25 individuals in the same incident.  That's what I'm trying to

D3k9flo3                    Polanco - cross

1    say.

2    Q.  This one was a disorderly conduct summons; is that correct?

3    A.  Yes.

4    Q.  You claim the only reason that Inspector McHugh stopped

5    these people was because they were black?

6    A.  Yes.  Absolutely, yes.

7    Q.  But you weren't there at the time of the stop, were you?

8    A.  But I was there after, yes.

9    Q.  But you weren't there at the time of the stop, right?

10   A.  No, I wasn't.

11   Q.  And you don't know what the circumstances Inspector McHugh

12   observed leading to the stop, do you?

13   A.  He told me he saw a dog with no license.  That's why he

14   stopped him.  Supposedly.

15   Q.  You didn't know if there had been a radio run; is that

16   right?

17   A.  No.  Because that was my sector.  No radio runs.

18   Q.  You don't know if the person fit the description of a

19   perpetrator for crime, do you?

20   A.  That's not how they put it out over the radio, no.

21   Q.  You don't know that, do you?

22   A.  If, in fact, it would be a description of somebody of a

23   crime or anything like that, then he would have asked me to

24   write a 250 or something for it.

25   Q.  You don't know that those individuals that were stopped

1    didn't fit the description of perpetrators of a crime, do you?

2    A.  I don't know it.  And I was not told by the commanding

3    officer, no.

4    Q.  You don't know if the people that were stopped were

5    identified by victims of a crime, do you?

6    A.  No.

7    Q.  And you wrote and signed that summons as well, correct?

8    A.  Yes.

9    Q.  You're aware that pursuant to department policy, summonses

10   are to be recorded in your memo book; isn't that correct?

11   A.  Yes.

12   Q.  But you don't always record the fact you've issued a

13   summons in your memo book, do you?

14   A.  Sometime I did.  Sometime I didn't.

15   Q.  You were trained on how to issue a summons when you were at

16   the police academy, correct?

17   A.  I'm sorry?

18   Q.  You were trained on how to issue a summons at the police

19   academy?

20   A.  Maybe.  I don't recall.

21   Q.  Trained on memo book entries?

22   A.  Probably, yes.

23   Q.  That would include memo book entries for the summons?

24   A.  Probably, yes.

25   Q.  And you understand, as we discussed, the summons has a

1    statement at the bottom that says:  I personally observed the

2    commission of the offense charged; is that correct?

3    A.  Yes.

4    Q.  And then you, as the officer, would sign as the

5    complainant, as the person who observed the offense, correct?

6    A.  Yes.

7         If I may, do you have a copy of those summonses?

8    Q.  I don't have a copy of summonses.

9         There are instances in which the officer who fills out

10   the summons is not the complainant who signs the summons; isn't

11   that right?

12   A.  Yes.

13   Q.  In those instances the patrol guide instructs the officer

14   to draw a line through the phrase "I personally observed."

15   Isn't that correct?

16   A.  No.

17   Q.  No?

18   A.  No.

19   Q.  You're not familiar with the patrol guide section which

20   instructs an officer to do that?

21   A.  I'm not familiar with putting a line through an official

22   document, no.

23   Q.  So you've never reviewed patrol guide section 209-11?

24   A.  What I was told --

25   Q.  My question is if you've ever reviewed patrol guide section

1    209-11?

2    A.  I don't remember reviewing it.

3    Q.  Signing the summons as the complainant when you don't

4    personally observe the violation is considered a false

5    statement under the law; isn't that right?

6    A.  Yes.

7    Q.  And only uniformed members of service below the rank of

8    captain are required to carry books of summonses; isn't that

9    correct?

10   A.  To carry the books of summonses.

11   Q.  To carry.

12   A.  Not to issue them.  To carry them.  Yes.

13   Q.  Yes.

14           So then if a captain or a deputy inspector or an

15   inspector or someone of higher rank wanted to issue a summons,

16   they would need to find an officer who does carry a book of

17   summonses; isn't that correct?

18   A.  Yes.

19   Q.  No supervisor at the 41st precinct ever told you to sign

20   the summons when you didn't personally observe it, did they?

21   A.  Lieutenant Valenzano a week before, yes.

22   Q.  Did a supervisor ever refuse to sign a summons that you

23   completed that you had not personally observed?

24   A.  They never asked for it.

25   Q.  My question is did a supervisor ever refuse to sign a

D3k9flo3                    Polanco - cross

1    summons that you wrote out for a summonable offense you did not

2    observe?

3    A.  No.

4    Q.  You testified that you have observed officers making stops

5    in the 41st precinct that lacked reasonable suspicion; is that

6    correct?

7    A.  Yes.

8    Q.  But you never raised this issue with supervisors at the

9    41st precinct?

10   A.  Yes, I did.

11   Q.  Which supervisor?

12   A.  Sergeant Bennett.

13   Q.  Did you report the misconduct to IAB?

14   A.  Excuse me?

15   Q.  Did you report that misconduct to IAB?

16   A.  Yes.  In September and November and December.

17   Q.  Prior to September of 2009 in -- you joined the police

18   department in 2005, correct?

19   A.  Yes.

20   Q.  Between 2005 and 2009 you observed officers make stops

21   without reasonable suspicion; is that correct?

22   A.  Yes.

23   Q.  And you never reported that conduct until 2009; is that

24   correct?

25   A.  Yes.

1  Q.  In these stops that you observed officers making stops

2  without reasonable suspicion, were you there at the time of the

3  stop?

4  A.  Some of them, yes.

5  Q.  So some of them you were not?

6  A.  Some of them I wasn't.

7  Q.  So some of them you weren't aware of the circumstances that

8  led to the stop?

9  A.  Some of them, no.  But I will hear.  I will listen to both

10  sides.

11  Q.  You weren't the partner of the officer making each of those

12  stops, were you?

13  A.  Maybe at some point, yeah.  Maybe.  I don't know.

14  Q.  You didn't record these suspicionless stops in your memo

15  books, did you?

16  A.  No.

17  Q.  The stops thank you weren't present for the circumstances

18  leading up to the stop, you weren't aware that there wasn't a

19  radio run prompting the stop, were you?

20  A.  Some of them.

21      Not some of them, no.  I'm sorry.

22  Q.  For the stops that you weren't present leading to the

23  circumstances, you weren't aware if there was a radio run?

24  A.  Some -- no.

25  Q.  You weren't aware whether or not the person stopped fit a

D3k9flo3                    Polanco - cross

1  description, were you?

2  A.  No.

3  Q.  You weren't aware of whether the person stopped was

4  suspected of carrying a weapon?

5  A.  No.

6  Q.  You weren't aware of whether the person stopped was

7  identified by a victim of a crime?

8  A.  No.

9  Q.  So your belief that these persons were stopped,

10  suspicionless stopped in the 41st precinct is because the

11  communities in which these stops took place are largely black

12  and Hispanic; isn't that right?

13  A.  Yes.  Absolutely.

14          MR. CHARNEY:  Objection.

15          THE COURT:  And it was also your own experience, is

16  that not right?

17          THE WITNESS:  Yes.  And I work in all the communities

18  where we don't interact with people that way.  We interact in

19  the Bronx.

20          THE COURT:  You've made those stops and filled out

21  those forms yourself --

22          THE WITNESS:  Some of them.

23          THE COURT:  -- like you're supposed to do; is that

24  right?

25          THE WITNESS:  Yes, some of them.

1          THE COURT:  So that's part of your experience also,

2    right?

3          THE WITNESS:  Yes, your Honor.

4    Q.  During your time you worked in the 41st precinct, you were

5    aware that the residents of the 41st precinct were largely

6    black and Hispanic; is that correct?

7    A.  Yes.

8    Q.  And you would agree that at the same time the majority of

9    complainants of crime in the 412 precinct were also black and

10   Hispanic?

11   A.  The majority.  Not all of them.

12   Q.  The majority?

13   A.  Yes.  The majority I agree.

14         THE COURT:  Let me interrupt now.  It's 12:45.

15         I'm going to stop now for the luncheon recess and

16   reconvene at 2:00.  But I have a request.

17         Off the record.

18         (Discussion off the record)

19         (Luncheon recess)

20

21

22

23

24

25

D3k9flo3                    Polanco - cross

1                    AFTERNOON SESSION

2                         2:05 p.m.

3          (Trial resumed)

4          THE COURT:  Please be seated.

5          Ms. Cooke.

6   BY MS. COOKE:

7   Q.  Officer Polanco?

8   A.  Yes.

9   Q.  Unlike the summons paperwork, there is no place on a UF 250

10  for an officer to sign that they personally observed the stop;

11  is that correct?

12  A.  I believe not.

13          THE COURT:  I can't hear you.

14          THE WITNESS:  I believe not.

15  Q.  I'm handing the witness what has been introduced into

16  evidence as Plaintiffs' Exhibit 19 -- 419 into evidence and

17  marked for identification Plaintiffs' Exhibit 420 and

18  Defendants' Exhibit X-11.  Three documents we're going to be

19  using.  Your Honor, paper copies for you.

20          THE COURT:  Is there any objection to receiving these?

21          MR. CHARNEY:  No.

22          THE COURT:  They're all received; 419, 420.  What's

23  the other one.

24          MS. COOKE:  Defendants' X-11.

25          THE COURT:  All right.  Those are the three that are

1    received.

2              (Plaintiffs' Exhibits 419 and 420 received in

3    evidence)

4              (Defendants' Exhibit X-11 received in evidence)

5    Q.  Officer Polanco, do you recognize these documents?

6    A.  The top one, it's not one that I usually see because that

7    one is done by a supervisor.

8    Q.  Are you looking at Plaintiffs' Exhibit 419 when you're

9    saying the top one?

10   A.  The top one is 923?

11   Q.  Yes.

12   A.  419, yes.  That's filled out by a supervisor.

13   Q.  Then if you turn the page.  On the second page of this

14   exhibit, Plaintiffs' 419, the Bates stamp ending 924, that's

15   your monthly performance report for January 2009.  I think we

16   discussed yesterday with your counsel.

17   A.  I believe so, yes.

18   Q.  And the other documents that I've handed you that have been

19   admitted into evidence, Defendants' X-11, are these similar

20   documents for different months?

21   A.  Yes.

22   Q.  And Plaintiffs' 420, the third document, are those again

23   similar documents for different months?

24   A.  420?

25   Q.  Yes.  The one that says Bates stamp ending 944?

D3k9flo3             Polanco - cross

1   A.  Yes, I believe so.

2   Q.  We're going to start with Plaintiffs' Exhibit 419 and the

3   Bates stamp the second page that begins -- that ends Bates

4   stamp 924.

5           That's your January 2009 monthly performance report,

6   correct?

7   A.  Yes.

8   Q.  And in January of 2009 what were the quotas for arrests,

9   summonses, and 250s at the 41st precinct?

10  A.  I don't recall -- for that particular -- I don't recall

11  exactly.

12  Q.  You don't recall?

13  A.  For that month.  For that particular month, no.

14  Q.  Were there quotas for arrests, summons, and 250s in January

15  of 2009?

16  A.  Yes, I believe so.

17  Q.  What's the first month that you do recall in 2009 that

18  there was a number for a quota?

19  A.  I don't recall a specific month.  But I will probably guess

20  February, March, maybe.

21  Q.  Okay.  You think February?

22  A.  To the best of my recollection.

23  Q.  Okay.  Let's turn to the Bates stamp in the same document

24  Bates stamp 18926 which is your February 2009 monthly

25  performance report; is that correct?

D3k9flo3                    Polanco - cross

1    A.  Yes.

2    Q.  And what is it you recall were the quotas in February of

3    2009 at the 41st precinct?

4    A.  I believe it's 21.  I'm not sure.

5    Q.  Twenty-one?

6    A.  I believe.  I'm not --

7    Q.  All right.  And how -- 20 was for the number of summonses

8    for the month, correct?

9    A.  Yes.

10   Q.  And looking at this NYC_2_0018926 Bates stamped page of

11   Plaintiffs' Exhibit 419.  I see that you make zero arrests for

12   the month; is that correct?

13   A.  Yes.

14   Q.  And you issued zero summonses?

15   A.  According to this paper -- this is not a paper I've been

16   holding so I don't know what's been done to this paper.

17   Q.  You haven't been holding it but is this your handwriting on

18   this document?

19   A.  I couldn't even attest to that.  I'm sorry.

20   Q.  You don't believe you completed this paper?

21   A.  I might have.  I might have not.  I've been out of the

22   department for almost four years.  I don't know who wrote this.

23   Q.  Do you recognize your name at the top?

24   A.  It's definitely my name, yes.

25   Q.  Do you not believe you wrote this piece of paper?

1    A.  I'm not saying I didn't.  I'm not say I did.

2          I'm saying this document was out of my hands for more

3    than four years.  So I don't know what's been done to it.  I

4    cannot testify to it.

5    Q.  Is there a document in here that you do recognize your

6    handwriting?

7    A.  No.  Not really.

8    Q.  Turning to Bates stamped page 8929 which is the March 2009

9    monthly performance report for Officer Polanco.

10          Do you see that page?

11   A.  Yes.

12   Q.  And you see for March 2009 you recorded one arrest?

13   A.  Like I said, I cannot testify to what's here.  This

14   document been out of my hands for almost four years.  I don't

15   know whether, through a warrant, if they did --

16   Q.  Does the document reflect one arrest for the month of

17   March?

18   A.  (No response).

19   Q.  As you look at it here?

20   A.  Yes, it does.

21   Q.  Does it reflect four summonses?

22   A.  Yes.  I believe that's what it reflects.

23   Q.  Turning to Bates stamped page 18931 -- I'm sorry.  18932

24   which is the April 2009 officer monthly performance report.

25   A.  Yes.

1    Q.  Do you see that page?

2    A.  Yes.

3    Q.  Is this your handwriting?

4    A.  I cannot secure whether it is my handwriting.  I'm not

5    sure.

6    Q.  Is your name at the top?

7    A.  That's my name, yes.

8    Q.  Does this document reflect one arrest on a warrant for the

9    month?

10          MR. CHARNEY:  Which page is this?

11          MS. COOKE:  The Bates stamp is cut off but it's

12   189350.

13          THE COURT:  Well it says April 2009 on the upper

14   right-hand corner.  April 2009.

15   Q.  Does this April 2009 monthly performance report for you,

16   Officer Polanco, reflect one arrest made on a warrant?

17   A.  It reflects that, yes.

18   Q.  And it reflects 14 summonses?

19   A.  Where?

20   Q.  If you total, in the summons column, I see parking

21   violation, there's a total of one.

22          That's a summons, correct?

23   A.  Yes.  Like I said --

24   Q.  Moving violation.  There's a three?

25   A.  Yes.

1   Q.  And criminal court, you see summonses, there's a 10?

2   A.  That's what the paper says.

3   Q.  So that would total 14, correct?

4   A.  Yes.

5   Q.  And UF 250s for the month of April 2009 on the performance

6   report for Officer Polanco, it's four, correct?

7   A.  According to this paper, yes.

8   Q.  Do you have any reason to believe you had more activity for

9   the month of April 2009 than is reflected on this report?

10  A.  I know how capable this department is of doing wrong stuff

11  that I don't honestly put it past them that they just threw

12  numbers in here.  It's a possibility.

13  Q.  Do you recall filling out a monthly performance report for

14  each month you were at the 41st precinct?

15  A.  Yes.

16  Q.  Finally, the last page of this document, from May of 2009.

17  The Bates stamp is 18934.

18  A.  Yes.

19  Q.  Do you see that there are two arrests reflected on this

20  performance report for you, Officer Polanco, for May of 2009?

21  A.  According to this paper, yes.

22  Q.  Do you see there are ten -- a total of ten summonses and it

23  is hard to read.  I apologize.

24  A.  According to the paper, yes.

25  Q.  And three UF 250s for the month of May 2009?

1    A.  Yes.

2    Q.  So for none of those months we just reviewed, January,

3    February, March, April, or May of 2009 did you have 20

4    summonses; is that correct?

5    A.  According to this paper, no.

6    Q.  Turning to Defendants' Exhibit X-11, Officer Polanco?

7    A.  Yes.

8    Q.  And the second page of the document which is Bates stamped

9    18936.  It's a monthly performance report for you for June 2009

10   with your name at the top.  Do you see that?

11   A.  Yes.

12   Q.  Do you recognize this handwriting?

13   A.  No.

14   Q.  On this document do you see that it reflects one arrest for

15   you for the month of June 2009?

16   A.  Yes.

17   Q.  And do you see five summonses for the month?

18   A.  Yes.

19   Q.  And do you see one UF 250?

20   A.  Yes.

21   Q.  And that month you had eight days on patrol, correct?

22   A.  I'm going to speak according to the paper.  Yes.

23   Q.  The document reflects that this is monthly activity for

24   Officer Polanco and it indicates eight days on patrol.  That's

25   what the document reflects, correct?

1    A.   That's what the document reflects, yes.

2    Q.   Turning to the fourth page of this document or fifth page

3    Bates stamp 18938.  I'm sorry.  Wait.  Hold on.  18939.

4              18939.  I'm sorry.  August 2009.

5    A.   Yes.

6    Q.   Just one second.  Do you see that this has your name at the

7    top, Officer Polanco?

8    A.   Which one are we talking about?

9    Q.   August 2009.

10   A.   Yes.  Yes.

11   Q.   Do you recognize this handwriting?

12   A.   No.

13   Q.   You don't believe it's your handwriting?

14   A.   It can be.  It could be.  I'm not -- I cannot affirm that

15   it is.  No.

16   Q.   Do you recall filling out a monthly performance report for

17   August 2009 at the 41st precinct?

18   A.   Possible, yes.

19   Q.   Do you see that this document reflects had you seven days

20   on patrol this month?

21   A.   Yes.

22   Q.   And one arrest?

23   A.   Yes.

24   Q.   And four summonses?

25             They were all criminal court summonses?

1   A.  Yes.

2   Q.  And zero UF 250s?

3   A.  That's what the paper says.

4   Q.  So you didn't satisfy a summons quota of twenty in the

5   month of August 2009 according to this paperwork?

6   A.  According to this paper.

7              THE COURT:  What?

8              THE WITNESS:  According to the paper, no.

9   Q.  You didn't have any 250s.  So you didn't reach a quota for

10  the 250s for August 2009?

11  A.  According to this paperwork.

12  Q.  If I could direct your attention to Bates stamped page

13  18938 which is the squad supervisor's recapitulation for August

14  of 2009.

15             Was Sergeant Edgar Padilla your squad supervisor?

16  A.  Yes, he was.

17  Q.  Is that his name at the top of this document?

18  A.  I believe, yes.

19  Q.  And at the bottom of the document do you see a comment in

20  the section it says comments by squad supervisor?

21  A.  I can roughly see it.  Yes.

22  Q.  Do you see the handwriting appears to read, and I'll read

23  it out loud, 7 MOS.  What is MOS?

24  A.  Member of service.

25  Q.  So members of service in squad.  No SQFs.  Impossible with

1    a car break pattern.

2              Do you see that?

3    A.  I cannot make it out just by seeing it.  I can't.  It's not

4    legible.

5    Q.  Okay.  Do you have a reason to think it doesn't read

6    "impossible with a car break pattern"?

7    A.  I cannot make it out.  I don't know how you can, but.

8    Q.  So the comment indicates that there was seven members of

9    service in this squad this month who had no UF 250s; is that

10   correct?

11   A.  Yes.

12   Q.  And you were one of those seven members of the squad with

13   no 250s this month, correct?

14   A.  According to the paper, yes.

15   Q.  I'd like to play track five of your audio recording roll

16   call.  It's one minute and nine seconds in total.  I'm going to

17   play the entire track.

18              MR. KUNZ:  I'll hit play right now.

19              (Audio recording played)

20              MS. COOKE:  What time did we stop that?

21              MR. KUNZ:  We stopped at 48 seconds.

22   Q.  The speaker you identified this morning that was Lieutenant

23   Valenzano, correct?

24   A.  Yes.

25   Q.  Did you hear Lieutenant Valenzano in that recording say:

1  We're still having problems with car break-ins, guys.  If you

2  see people over there on bikes carrying bags, you know, good

3  stops?

4  A.  Yeah.

5  Q.  Did you hear that?

6  A.  Yeah.

7  Q.  Do you believe this recording was made -- you believe these

8  recordings were made after September of 2009, correct?

9  A.  Yes.

10 Q.  Do you recall a car break-in pattern in the 41st precinct

11 in the fall of 2009?

12 A.  It's been a long time.  I don't recall, no.

13 Q.  Do you ever recall that there was a car break-in pattern in

14 the 41st precinct when you were there?

15 A.  Not to my recollection, no.

16 Q.  You don't recall a car break-in pattern focused in sectors

17 Frank and Charlie in late 2009?

18 A.  I don't recall.

19 Q.  Did you ever patrol in sectors Frank and Charlie?

20 A.  Frank and Charlie are not two sectors.  He doesn't even

21 know what he's talking about.

22         THE COURT:  Say that again.

23         THE WITNESS:  In the 41, sector Frank and Charlie

24 doesn't exist.

25         THE COURT:  Doesn't exist?

D3k9flo3                    Polanco - cross

1          THE WITNESS:  Nope.  He's talking out of I don't know

2    where.  It doesn't exist.

3    Q.  I said Frank and Charlie.

4    A.  He said Frank and Charlie also.  He did.  He's wrong.

5    Because it doesn't exist.

6    Q.  So there is no sector F and there is no sector C in the

7    41st precinct?

8    A.  No F and C.  There's Eddie, Frank, Ida.  And there's Boy

9    and Charlie.  There's no Frank -- F and C.

10   Q.  You mean that multiple alphabet letters are combined and

11   they form a sector.  Is that what you're telling us?

12   A.  Yes.  And he combined F and C, which they don't.

13   Q.  F and C geographically are not adjacent to each other?

14   A.  No.

15   Q.  But they exist.  They just are grouped E, F and G.  And

16   then B and C.  Correct?

17   A.  Yes.

18   Q.  You testified that one of the punishments for failing to

19   meet a quota would be driving a supervisor; is that right?

20   A.  There's two terms of driving a supervisor, yes.

21   Q.  But one of them you considered a punishment, correct?

22   A.  The one where you driving for that day, for one solely

23   purpose, yes, it's a punishment.

24   Q.  Looking at Plaintiffs' Exhibit 419, Bates stamped page

25   18926, which is your February 2009 -- well the February 2009

1   monthly performance report for Officer Adhyl Polanco.

2            Do you see the assignments listed down the left-hand

3   column of the page?

4   A.  I'm still looking for it.

5   Q.  I'm sorry.  February 2009.

6   A.  Yes.

7   Q.  Do you see on the twenty -- am I correct that the numerical

8   column on the far left represents each day of the month.  So

9   one would indicate the first day; two the second day of the

10  month.  Correct?

11  A.  Yes.

12  Q.  And so down on 24 that would be the 24th day of February,

13  2009?

14  A.  Yes.

15  Q.  And it says there's SGT OP is that sergeant's operator?

16  A.  Yeah.

17  Q.  Is that your assignment for the day?

18  A.  According to this paper, yes.

19  Q.  And according to this paperwork on this day as sergeant's

20  operator you made ten radio runs?

21  A.  What was the date?  I'm sorry.

22  Q.  The 24th.

23  A.  Yes.

24  Q.  And no -- you issued -- you made no arrests?

25  A.  According to the paper, no.

D3k9flo3                    Polanco - cross

1    Q.   And issued no summonses, according to the paper?

2    A.   According to the paper.

3    Q.   And you conducted three stop and frisks, correct?

4    A.   Yes.

5    Q.   In fact, turning to March 2009 in the same document Bates

6    stamped page 18929, the monthly performance report for

7    Professor Polanco -- sorry, Officer Polanco.

8    A.   I wish.

9    Q.   March 2009?

10   A.   Yes.

11   Q.   Do you see on the fourth day of the month you have

12   assignment for sergeant operator?

13   A.   Yes.

14   Q.   And also on the 25th day of the month you were a

15   sergeant's operator; is that correct?

16   A.   Yes.

17   Q.   And looking at the fourth day of the month.  There were six

18   radio runs conducted as the sergeant's operator?

19   A.   According to this paper.

20   Q.   According to this paper.

21        And no other activity under any column on this report.

22   So that would be no arrests, no summons, and no UF 250s.

23        Is that correct?

24   A.   According to this paper, again, yes.

25   Q.   And down on the 25th day of the month, you were also the

1    sergeant's operator.

2              There was no radio runs, correct?

3    A.  No.

4    Q.  No arrests?

5    A.  Nope.

6    Q.  One summons.

7              And no UF 250s.  Is that correct?

8    A.  According to this paper, again.

9    Q.  Officer Polanco, you were never denied a day off for

10   failure to meet a quota, were you?

11   A.  Very often.

12   Q.  Very often?

13   A.  Mm-hmm.

14   Q.  How many times?

15   A.  Plenty of times.  We were told simply not to put in for the

16   day if we didn't have the numbers.

17   Q.  Did you make a request for a day off that was denied?

18   A.  I asked the supervisor.  And he said don't -- if you don't

19   have the numbers, don't even bother.

20   Q.  To receive a day off, you have to complete a piece of

21   paper?

22   A.  Most of the time we'll ask the supervisor if we can put in

23   for it.

24   Q.  But to put in for a day off, there's a document you have to

25   submit?

1    A.  Sometime, most of the time, in patrol before we even bother

2    with the paper we will ask the supervisor first.

3    Q.  But did you ever submit a piece of paper completed for a

4    day off and were denied because --

5    A.  I might have.  I might have.

6    Q.  You've never had a shift change because failure to meet a

7    quota, have you?

8    A.  Myself, no.

9    Q.  You do claim, though, that other officers were transferred

10   from the 41st precinct because of failure to meet quotas; is

11   that correct?

12   A.  I know of at least one, yes.

13   Q.  And the one you're referring to is Officer Velazquez?

14   A.  Yes.

15   Q.  In fact, you claim that he was sent to the firearms tactic

16   section because he failed to meet quotes; isn't that right?

17   A.  Yes.

18   Q.  But, in fact, Officer Velazquez wasn't transferred because

19   of failure to meet quotas; isn't that right?

20   A.  How would I know?

21   Q.  Well Officer Velazquez was transferred because he was on

22   restricted due to a line-of-duty injury; isn't that right?

23        MR. CHARNEY:  Objection, your Honor.  She's

24   testifying.

25        THE COURT:  Sustained.

D3k9flo3            Polanco - cross

1   Q.   While you were at the 41st precinct, you never put in for

2   a recommendation and were denied, did you?

3   A.   Recommendation as of -- that's a poor question.  What is a

4   recommendation?

5   Q.   Well you've testified in this case in a deposition in

6   March 2010, correct?

7   A.   Yes.

8   Q.   So directing -- do you still have your deposition, correct?

9   A.   Yes, I do.

10  Q.   Directing your attention to page 156 of the deposition

11  transcript.

12  A.   What page are we looking at?

13  Q.   156.

14  A.   Yes.

15  Q.   Line 12.

16  "Q.   Was there ever an occasion where -- actually I couldn't

17  understand what you -- I wasn't sure what you were saying

18  earlier, whether you were saying that you need to show your

19  commanding officer your activity when you need a recommendation

20  signed or did you say an accommodation?

21  "A.   Accommodation -- or accommodation, if anything, if you're

22  applying for a unit, if you're applying to go to another

23  precinct, or if you're applying to get an off-duty job, if

24  you're applying to pay detail, those things he has to sign in

25  order for you to get.

1    "Q.  Have you ever put in for a recommendation and been denied

2    the recommendation?

3    "A.  No.

4    "Q.  Have you ever put in for an accommodation and been denied

5    the accommodation?

6          "No.

7    "Q.  Have you ever put in for paid detail and been denied the

8    paid deal.

9          "No.

10   "Q.  Have you ever put in for off duty work and been denied off

11   duty work?

12   "A.  No."

13          Were you asked those questions and did you provide

14   those answers during your deposition?

15   A.  Yes.

16   Q.  I believe you testified this morning that you never

17   received a low performance evaluation at the 41st precinct;

18   is that correct?

19   A.  Not to my knowledge, no.

20   Q.  That was either on quarterly evaluation or an annual

21   evaluation?

22   A.  Not to my knowledge, no.

23   Q.  And you testified yesterday that you didn't ever seek

24   overtime and were denied because of failure to meet quotas?

25   A.  Seek?

1    Q.  Request?

2    A.  I don't remember giving those exact words, no.

3    Q.  You said you weren't much of an overtime person?

4    A.  That I said.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Do you recall requesting overtime and getting denied

2  because of low activity?

3  A.  They basically told us, this is what you have to do, and if

4  you're not willing to do it, don't ask for it.

5  Q.  Did you ever ask for overtime and get denied?

6  A.  I didn't bother to ask for it.

7  Q.  So you never asked?

8  A.  Sometime, but like I said, they told me this is the

9  numbers, and if you don't agree to do these numbers, you don't

10  get it, simple as that.

11  Q.  Do you recall a time where you requested overtime and were

12  denied the opportunity to work overtime?

13  A.  No.  Overtime is not usually requested.

14  Q.  I understand.  But my question is, do you recall a time you

15  requested to work overtime and you were denied?

16  A.  No.

17  Q.  You did work impact overtime tours occasionally?

18  A.  Yes, I did.

19  Q.  During those tours, you didn't necessarily always meet the

20  quota for the tour, correct?

21  A.  I believe in some of them I didn't.

22  Q.  Some of them you did not?

23  A.  Yes.

24  Q.  But you still were able to work an overtime tour again

25  after that, correct?

D3K8FLO4                    Polanco - cross

1    A.  After I don't do the five I have to wait till they forget

2    about it to get it again.

3    Q.  But you did work overtime again after you worked a tour

4    where you failed to meet a quota?

5    A.  I can't knowledgeably respond to that.  I don't recall

6    that.

7    Q.  Do you recall that there was a time you failed to meet a

8    quota on overtime and then were never allowed to work overtime

9    again?

10   A.  Never?  No.

11   Q.  Every time that you worked an overtime tour you were

12   compensated for the overtime, correct?

13   A.  There is a law for that, yes.

14   Q.  Officer Polanco, you testified yesterday that you didn't

15   think supervisors at the 41st Precinct cared about your

16   activities as an officer unless they involved a UF0-250, a

17   summons, or an arrest, is that right?

18   A.  Of course, yes.

19   Q.  You said supervisors don't care about how many radio runs

20   you conduct?

21   A.  They don't.

22   Q.  Or domestic violence calls you would go on?

23   A.  They don't.

24   Q.  But radio runs and domestic violence incidents are counted

25   on all those monthly activity reports we just reviewed,

1  correct?

2  A.  They are posted.

3  Q.  They are counted.  There is a box and a line and a column

4  and they are totaled for the month?

5  A.  Yes.

6  Q.  You don't know what kind of review takes place of this

7  monthly activity report after you submit it to your supervisor,

8  do you?

9  A.  They only want to know of one thing and one thing only.

10  Q.  My question, Officer Polanco, is, you don't know what

11  review takes place of this document after you submit it to your

12  supervisor, do you?

13  A.  To my knowledge and my experience, the review that takes

14  place is about the quantity of arrests, summonses, and 250s

15  that you write.

16  Q.  You don't know who looks at this document and for what

17  purpose, do you?

18  A.  The sergeant and the platoon commander and the CO.

19  Q.  In fact, isn't it true, Officer Polanco, that there are

20  some domestic violence situations where you can't, in fact,

21  mediate the incident, you must arrest?

22  A.  Yes, of course.

23  Q.  So, in fact, even if you wanted to use your discretion and

24  not take law enforcement action in a situation, you would be

25  required to take law enforcement action, isn't that correct?

D3K8FLO4                    Polanco - cross

1  A.  Yes.

2              MS. COOKE:  I have no further questions at this time.

3              THE COURT:  Mr. Charney.

4              MS. COOKE:  One moment.

5              A couple of more questions

6  Q.  Looking at Defendants' Exhibit X11, Officer Polanco.

7              This is the August 2009 monthly performance report?

8  A.  Yes.

9              MS. COOKE:  18939.

10 Q.  Looking at the column on the far left, which has your

11 assignments or absences for the month, do you see the beginning

12 on August 9, you were RDO, which means regular day off,

13 correct?

14 A.  Yes.

15 Q.  RDO means you're not working?

16 A.  Yes.

17 Q.  So you were RDO the 9th, the 10th, and the 11th, correct?

18 A.  Yes.

19 Q.  And then it says VAC, that's vacation?

20 A.  Yes.

21 Q.  You had vacation the 12th, the 13th, the 14th, the 15th,

22 the 16th, correct?

23 A.  Yes.

24 Q.  And then on the 17th, I believe that says RDO again?

25 A.  Yes.

D3K8FLO4          Polanco - cross

1   Q.  And the 18th, RDO?

2   A.  Yes.

3   Q.  Then the 19th, it says VAC, so it's vacation again?

4   A.  Yes.

5   Q.  The 19th, the 20th, the 21st, the 22nd, the 23rd, correct?

6   A.  Yes.

7   Q.  Then the 24th and 25th say RDO, is that correct?

8   A.  Yes.

9   Q.  So according to this document, from the 9th to the 25th of

10  August 2009, you were out of the command and not working either

11  because of RDO or vacation day, correct?

12  A.  Yes.

13  Q.  So you weren't denied those days off in the month of August

14  2009?

15  A.  Those days cannot be denied.  That's my annual vacation.

16  Q.  Thank you.

17          THE COURT:  Mr. Charney, redirect.

18  REDIRECT EXAMINATION

19  BY MR. CHARNEY:

20  Q.  Officer Polanco, you testified earlier that you considered

21  getting foot post to be a punishment.  Do you remember that?

22  A.  Yes.

23  Q.  Why do you consider it to be a punishment?

24  A.  If you're a patrol officer who is used to a car for so many

25  years, and all of a sudden they want you to do a foot post,

1    when you have people with less seniority than you on the

2    command, it's because something is not right.

3    Q.  You also testified earlier that doing checkpoints you

4    considered to be a punishment.  Why is that?

5    A.  Because the checkpoints that we were doing were not legal.

6    They were checkpoints solely to get numbers and following

7    absolutely no legal pattern.

8    Q.  You also testified earlier that you believe that driving

9    the supervisors when you're doing it just on an assigned day,

10   that that was a punishment.  Why do you consider that to be a

11   punishment?

12   A.  Because if you are driving him -- there's occasion where

13   you're driving just because you're driving.  It happens once or

14   twice a month.  But there is occasion when you're driving him,

15   McHugh said that he will have you drive a supervisor, when he

16   does it under those terms, it's solely to get numbers.

17   Q.  We also heard defense counsel ask you whether or not

18   Officer McHugh referred to any specific numbers on the

19   recording that we heard him speak on.  Do you recall that?

20   A.  Yeah.

21   Q.  And you said he did not, right?

22   A.  Directly, I don't think he mentioned 20/1 directly, no.

23   Q.  Did you hear him use any language on that recording that

24   made you think that the numbers that you had heard from other

25   supervisors were mandatory?

1   A.  Of course.

2   Q.  What language was that?

3   A.  When he said it was nonnegotiable.

4   Q.  You also testified, I think on cross-examination, that you

5   waited until September 2009 to report your concerns to Internal

6   Affairs?

7   A.  Yes.

8   Q.  Can you tell us why you waited till September 2009 to

9   report your concerns?

10  A.  I fear retaliation, and up to this day I do.

11  Q.  Why do you fear retaliation?

12  A.  Today or then?

13  Q.  Then.

14  A.  Then because every time a cop step out of the blue wall, as

15  they call it, we are considered rats.  That's what they call us

16  around the precinct.  They want you to see and be quiet; they

17  don't want you to open your mouth.

18  Q.  You also testified on cross-examination that the first two

19  times you spoke to IAB you did not identify your name, you

20  spoke to them anonymously.  Do you recall that?

21  A.  Yes.

22  Q.  At any point in time, did you speak to IAB and actually

23  give them your name?

24  A.  Yes.  In December 2009.

25  Q.  Did you speak to them at any point after that?

1   A.  I believe it was the day after the Channel 7 stuff aired.

2   All of a sudden IAB group one show up to my house, supposedly

3   they needed to help me.  It was the day after the news aired.

4   Q.  You had a meeting with them then?

5   A.  Yeah.  They came to my lawyer's office.

6   Q.  Do you remember what you discussed with them in that

7   meeting?

8   A.  I discussed with them all the evidence that I had provided.

9   I told them that I was suspended based on an allegation that I

10  called racial slurs to our lieutenant, that I refused to leave

11  an ambulance.  And I provided them with an audio of the

12  incident, and they listened for themselves that such accusation

13  never happen.  I gave that to Internal Affairs also.

14  Q.  When you say that accusation, which accusation are you

15  referring to?

16  A.  The retaliation for me reporting corruption.  That's what I

17  believe I got suspended for.

18  Q.  What was on the recording that you provided IAB?

19  A.  It was the actual incident I had, the incident when the

20  ambulance happened, the lieutenant did not know that I had a

21  recorder in my pocket.  So he went and gave his version of what

22  happened without knowing it was recorded.

23  Q.  In your recollection, what did that recording in your view

24  and your recollection indicate about that incident?

25  A.  Basically --

1        MS. COOKE:  Objection, your Honor.  To the extent that

2    he is going to be testifying about hearsay about a recording,

3    about statements from people.

4        MR. CHARNEY:  I am not asking what was said on the

5    recording.  I am asking for his recollection of what was

6    depicted.  He testified that what was on the recording

7    contradicted what the lieutenant told IAB, and I am trying to

8    get an understanding of why he believes that.

9        THE COURT:  Doesn't that inevitably call for him to

10   say what the lieutenant said on the recording?

11       MR. CHARNEY:  There were things that were said and

12   things that were done during that incident by various people.

13       THE COURT:  Things that were done he can describe.

14   It's not a statement.

15   Q.  So you provided them with this recording you said -- when

16   was this that you provided IAB with this recording?

17   A.  With that particular recording, they came in -- I believe

18   it was right after the media.  It might have been before.  It's

19   been a long time.  I don't want to give you false information.

20   It might have been before.

21   Q.  Is it fair to say it was in March of 2010?

22   A.  Around that time, yes.

23   Q.  After March of 2010, did IAB ever speak to you about again

24   about the allegations you had made?

25   A.  They did.  And what they did was they brought me to ask me

1  about the summonses that I reported; they asked me for a copy

2  of them.  And that's when a year later IAB charged me with

3  perjury.

4  Q.  These are the two summons you testified about on

5  cross-examination?

6  A.  Yes.

7  Q.  So, to your knowledge, does the Internal Affairs Bureau

8  have a copy of the audio that you say was taken during the

9  incident between you and Lieutenant Valenzano?

10 A.  Yes, they do.

11 Q.  Is it your testimony that there are statements made by

12 Lieutenant Valenzano on that recording?

13 A.  Yes.

14        MR. CHARNEY:  Your Honor, we believe that that's an

15 admission of a party opponent.  He is a pretty high-ranking

16 NYPD official making statements on a recording.  So it seems to

17 me that we should be allowed to ask what those statements are.

18        MS. COOKE:  That has to do with an incident involving

19 a partner in an ambulance.

20        THE COURT:  That's the point.  It's a statement of a

21 party opponent.  The question is, is that sufficient?

22        One minute.

23        801(d)(2), "A statement is offered against a party and

24 was made by the party in an individual or representative

25 capacity."  So it doesn't have to be an issue raised in this

1  lawsuit.  Of course, all evidence has to be relevant under 403,

2  but I think this has become relevant because we have heard a

3  lot of testimony about this incident.  You brought out who

4  pushed who first.  He stopped him from getting into the

5  ambulance.  I think it's relevant.  And since there is no

6  qualification under 801(d)(2)(A), it has to be about an issue

7  in the suit, then I can turn to 403, and under 403 it is

8  relevant, or 401.

9          MS. COOKE:  I still object.  I do believe it is

10 hearsay.

11         THE COURT:  It can't be.  Wait.  It's not hearsay.  I

12 just read you the rule.  Definitions that apply to this

13 article.  Exclusions from hearsay, right?  801(d), statements

14 that are not hearsay.  (d)(2)(A), opposing party statement.  "A

15 statement is offered against an opposing party and was made by

16 the party in an individual or representative capacity."  He was

17 being questioned about incident.

18         Then one just has to look at that point at 401.  It

19 says test for relevant evidence.  "Evidence is relevant if it

20 has a tendency to make a fact more or less probable than it

21 would be without the evidence."

22         MS. COOKE:  Respectfully, I disagree that it's an

23 admission by a party.

24         THE COURT:  It doesn't say the word admission.  Do you

25 want to hear it for a third time or do you want to pull out

1    your copy?  801(d)(2).  A statement is offered against opposing

2    party, and it is, and was made by the party in an individual or

3    representative capacity.  And that's true.  He is a lieutenant.

4    That's all.  Of course it's not hearsay.  Bring it out because

5    I am allowing it.

6              Mr. Charney, let's go.

7    BY MR. CHARNEY:

8    Q.  On that recording, what did Lieutenant Valenzano say that

9    contradicts his version of the events?

10             MS. COOKE:  At this point is he testifying about a

11   document that is not in evidence or a recording that is not

12   before the Court?

13             THE COURT:  It's what the lieutenant said.  It happens

14   that it is also on a recording, but he probably remembers it

15   because he was there when he said it and he recorded it.  He is

16   testifying to what the lieutenant said.  It's just helpful that

17   it happens to be on a recording, but he also knows what he

18   said.

19             Do you remember what he said?

20             THE WITNESS:  Absolutely.

21             THE COURT:  What did he say?

22             THE WITNESS:  When I was in the ambulance, the

23   lieutenant said, Polanco, I have the sector going.

24             THE COURT:  Polanco what?

25             THE WITNESS:  I have the sector going.

1          THE COURT:  I have the sector going?

2          THE WITNESS:  Meaning the sector car.

3          THE COURT:  Sector car?

4          THE WITNESS:  I have the sector.  That's how we

5     understand.  He has the sector car going.

6          He was outside the ambulance.  I was inside.  So as I

7     was coming out he said, Polanco, I have the sector going.  I

8     said, What was that, lieutenant?  I got the sector going.  OK.

9     Lieutenant, is there any reason why I can't go with my partner?

10    He said, No, I told you I have the sector going.  He wrote the

11    summons.  So I walk away.

12         At that point there was no interaction, there was no

13    pushing, there was no racial.  How am I going to scream racial

14    if I have a recorder in my pocket?  That was what happened.

15         Five minutes later is when I came back to him and I

16    ask him, you can do as you please, I am going with my partner.

17    I am outside the ambulance.  This is when he assaulted me, a

18    criminal charge.  He put his hands on me.  And that's why I

19    push him.  I didn't punch him as I should have.  I didn't kick

20    him.  I push his hands off my chest because he assaulted me.

21    He gave me a reason for me to strike him.

22    Q.  Was this recording played at the disciplinary hearing you

23    concluded a couple of weeks ago?

24    A.  Yes.  Absolutely.

25    Q.  I want to ask you about Defendants' Exhibit X11.  Is that

1    still on the screen?  Do you have that in front of you X11, the

2    monthly report?

3    A.  Yes, I do.

4    Q.  I want to turn to page 18939, which was the August 2009 one

5    that we were looking at?

6    A.  Yes.

7    Q.  Do you see on the second page --

8          THE COURT:  What do you mean second page?

9    Q.  The page after that, where it says 18940.

10         THE COURT:  OK.

11   A.  Yes.  The last page.

12   Q.  Can you read what it says under number 7, additional

13   supervisory comments?

14   A.  "PO Polanco activity was low due to his administrative

15   assignment in crime analysis."

16   Q.  Do you know what that means?

17   A.  I was doing crime analysis work and that's why my --

18   administrative work.  I was working inside.

19   Q.  Was that as opposed to doing something else?

20   A.  Opposed to going on patrol.

21   Q.  How many days on patrol do you have for August according to

22   page 18939?

23   A.  I had seven.

24   Q.  In your experience as a patrol officer in the 41st

25   Precinct, if an officer is working full time as a patrol

1    officer and not doing administrative duties, typically how many

2    days on patrol would he have?

3    A.  20, 25.  I'm sorry, if I could explain.  This is what I

4    doubt the legibility of this paperwork, because nowhere here it

5    says I do crime analysis.

6    Q.  What about again on page 18940, do you see what is written

7    under number 3 on that page?

8    A.  Yes.

9    Q.  What is written under that?

10   A.  "PO Polanco activity was low due to his administrative

11   assignment in crime analysis."

12           THE COURT:  That was number 7.  He said number 3.

13   A.  "PO Polanco is always courteous and respectful."

14   Q.  Earlier I think you were asked on cross-examination whether

15   or not you recorded how many radio runs you did in a month on

16   your monthly activity report, and I think you said yes.

17           My question is, when your supervisors would review

18   these monthly activity reports with you, did they ever discuss

19   with you your radio run activity for a month?

20   A.  No, absolutely not.

21           MS. COOKE:  Objection.  I don't believe the witness

22   ever testified he reviewed these reports with the supervisor.

23           MR. CHARNEY:  He did on direct, and I have the

24   transcript which I can read from.

25           THE COURT:  Did your supervisors review the monthly

1    activity reports with you?

2              THE WITNESS:  Yes.

3              THE COURT:  Go ahead.

4              So when they did, did they ever discuss with your

5    radio run activity for a month?

6              THE WITNESS:  Yes.

7    Q.  They did discuss your radio run activity?

8    A.  Repeat the question.

9    Q.  When your supervisors would review your monthly activity

10   reports with you, when you were in the 41st Precinct, did they

11   ever discuss your radio run activity that was on those forms?

12   A.  No.

13   Q.  Did they ever discuss the number of domestic incidents you

14   responded to?

15   A.  No.

16   Q.  Did they ever discuss the number of crime victims you

17   assisted during a tour or a month?

18   A.  No.

19   Q.  Which, if any, categories of activity on the monthly

20   activity report did your supervisor discuss with you when he

21   would review this form with you?

22   A.  Specifically, the daily recap did not include domestic, did

23   not include radio runs.  The daily recap is what they ask for

24   us to fill out.  It include activity on summonses, activity on

25   250, and activity on arrests solely.

1    Q.  That's daily.  I am talking about the monthly activity

2    report.

3    A.  It's the same.  That's what they would be looking for.

4    They would be looking for summonses, arrests, 250.

5    Q.  Just to be clear, when your supervisors discussed with you

6    the monthly activity reports, other than arrests, summonses and

7    stop and frisks, did they discuss any other activity categories

8    from those monthly reports?

9    A.  No.

10   Q.  On cross you were asked about the patrol guide section on

11   summonses.  Do you remember that?

12   A.  Yes.

13   Q.  I believe there is a provision in there that says you are

14   not to sign the summons saying you observed the incident if in

15   fact you didn't observe it?

16   A.  Yes.

17   Q.  But you also testified, right, that there were cases where

18   you did sign summonses for things you didn't observe?

19   A.  Yes.

20   Q.  Why did you do that?

21   A.  Because they trying to say that the reason captains don't

22   carry -- don't write them is because they don't carry them.  So

23   when McHugh called me to the scene, he should have asked me for

24   a blank summons for him to write it.  He shouldn't have told me

25   write the summons.  That's what he told me, write the summons.

1  Q.  You would agree that patrol guide procedure prohibits you

2  from actually signing a summons saying you observed something

3  if you didn't observe it, right?

4  A.  Yes.  That's why I report it.

5  Q.  Why did you do it if you knew that it was in fact against

6  patrol guide procedure?

7  A.  It's intimidation.  I had nowhere to go.  I am a police

8  officer.  He is a captain.  If I go against his words, I can

9  promise you I probably will drown.

10 Q.  What do you mean by that?

11 A.  They are going to look for any reason to get me in trouble.

12 They are going to look for any reason to suspend me, like they

13 did, or for any reason to even suspend me with pay.  They

14 suspended me with pay for three years.

15        MR. CHARNEY:  One minute, your Honor.

16 Q.  A couple of more questions.

17        Turning to Exhibit X11.  Do you see that again?

18 A.  Give me one second, please.  Yes.  It's in front of me.

19 Q.  If you turn to the second page, 18936.  Do you see that?

20 A.  Yes.

21 Q.  If you go to the bottom of the page, can you tell me,

22 according to this document, how many patrol tours you did in

23 that month?

24 A.  According to them, eight.

25 Q.  How many radio runs did you conduct in that month?

1    A.  54.

2            MR. CHARNEY:  One more second.

3    Q.  Turning back to Plaintiffs' Exhibit 419.  If you look at

4    the second page.  Again, it's 18926.

5    A.  419.  What month is that?

6    Q.  The second page of the document, which is Bates stamp

7    18926.

8    A.  Is this February?

9    Q.  Yes.

10   A.  I have it in front of me.

11   Q.  According to this document, how many patrol tours did you

12   work that month?

13   A.  Four.

14   Q.  How many radio runs did you do?

15   A.  36.

16   Q.  How many stop and frisks did you conduct?

17   A.  Five.

18           MR. CHARNEY:  One more minute, your Honor.

19           No further questions.

20           THE COURT:  Thank you, Mr. Charney.

21           Any recross?

22           MS. COOKE:  Just one minute, your Honor.

23   RECROSS-EXAMINATION

24   BY MS. COOKE:

25   Q.  Officer Polanco, you don't think a checkpoint is punishment

1   if it's a legal checkpoint, correct?

2   A.  At least, yes.  It depends.  If there is a need for the

3   checkpoint, it's absolutely OK to do it.

4   Q.  If it's conducted in the manner as you described as legal,

5   it's not a punishment, correct?

6   A.  It could be a punishment.  But like I said, what is the

7   reason for the checkpoint?  Are we addressing a situation or

8   are we accumulating numbers?  Which one are we doing?  It

9   depends.

10  Q.  If the checkpoint is conducted legally and the summonses

11  are issued at the checkpoint, the summonses are legal, correct?

12  A.  Like I said, it depends.

13  Q.  Based on my question, if you can't answer my question, you

14  just need --

15          THE COURT:  He said it depends.  You could ask, it

16  depends on what?

17          MS. COOKE:  No further questions.

18          THE COURT:  I guess we are done with this witness?

19          OK.  Thank you.

20          Your next witness, Mr. Charney.

21          MS. BORCHETTA:  We are next going to have some

22  deposition designations, and as per the Court's stated

23  preferences, we are going to have an attorney from the

24  plaintiffs reading the questions from the transcript and an

25  attorney from the defendants representing the witness.

1      The first witness we will be doing in this matter is

2  Victor Marrero, and we have transcripts that are marked with

3  plaintiffs' designations in pink and defendants' designations

4  in yellow.  There are some designations that the defendants

5  have objected to and one of defendants' attorneys will object

6  when that question is posed to address to that objection.

7      MR. CHARNEY:  For the context, this witness is related

8  to Officer Polanco.  He worked in the same precinct.

9      THE COURT:  Why can't he be here live?

10      MS. BORCHETTA:  Pursuant to our request to the Court,

11  we are seeking to do some testimony through deposition

12  designations in the hopes of --

13      THE COURT:  Taking less time?

14      MS. BORCHETTA:  Yes.  Thank you.

15      THE COURT:  Remind me of the color code, Ms.

16  Borchetta.

17      MS. COOKE:  The pink is plaintiffs and the yellow is

18  defendants' designations.

19      THE COURT:  Ms. Martini.

20  "Q.  You said you joined the NYPD in 2007, is that right?

21  "A.  Yes.

22  "Q.  Why did you decide to join the New York Police Department?

23  "A.  I wanted to continue my professional law enforcement.

24  "Q.  What was your first -- "

25  "Q.  Could you please state your name for the record?

D3K8FLO4                    "Marrero"

1              MS. RICHARDON:  My real name or the witness's name?

2              THE COURT:  This is Victor Marrero.

3              MS. RICHARDON:  This is from Victor Marrero's

4    transcript.

5              MS. MARTINI:  Thank you.

6    "Q.  What was your first assignment when you joined the NYPD?

7    "A.  Besides the academy, impact.

8    "Q.  Were you assigned to a particular precinct?

9    "A.  Yes.

10   "Q.  Which one?

11   "A.  52.

12   "Q.  How long did you work in the 52?

13   "A.  Six months.

14   "Q.  Then what was your next assignment after that?

15   "A.  I was transferred to the 41.

16   "Q.  Do you remember the month and the year of that transfer?

17   "A.  July 2008.

18   "Q.  July 2008?

19   "A.  Yes.

20   "Q.  Are you still assigned to the 41st Precinct?

21   "A.  Yes.

22   "Q.  What was your position when you were first assigned to the

23   41st Precinct?

24   "A.  Patrol.

25   "Q.  What is your position now?

1    "A.  Still in patrol.

2    "Q.  So have you had the same job title and position since you

3    have been in the 41st Precinct?

4    "A.  Yes.

5    "Q.  Have you been assigned to the same patrol squad the entire

6    time you have been in the 41st Precinct?

7    "A.  Yes.

8    "Q.  So, Officer Marrero, I assume you know an officer by the

9    name of Adhyl Polanco?

10   "A.  Yes.

11   "Q.  Did he at one point work with you in the 41st Precinct?

12   "A.  Once.

13   "Q.  Was he in a patrol squad?

14   "A.  Not the same squad, but we rotate days, yes.

15   "Q.  When you say that you rotate days, what do you mean by

16   that?

17   "A.  He's in a different squad.

18   "Q.  But are you guys in the same platoon, I guess?

19   "A.  Yes.

20   "Q.  So you guys usually work the same tour?

21   "A.  Yes.

22   "Q.  So then would it be fair to say that you were usually at

23   the same roll calls as Officer Polanco?

24   "A.  Yes.

25   "Q.  Who was your squad supervisor in the fall of 2009?

1    "A.  Sergeant Rodriguez.

2    "Q.  Who was your platoon commander at that time?

3    "A.  Lieutenant Valenzano.

4    "Q.  Is Lieutenant Valenzano still your platoon commander?

5    "A.  No.

6    "Q.  When did he stop being your platoon commander?

7    "A.  I believe the month of June.

8    "Q.  June of this?

9    "A.  This year.

10   "Q.  So about a month ago?

11   "A.  Yes.

12   "Q.  Did you know why he stopped being your platoon commander?

13   "A.  No.

14   "Q.  Is he still a platoon commander in the 41st Precinct?

15   "A.  Yes.

16   "Q.  Does he now work a different tour?

17   "A.  Yes.

18   "Q.  Let me just go back.  In the fall of 2009, what tour?  Did

19   you generally work the same tour?

20   "A.  I didn't understand your question.

21   "Q.  So in the fall of 2009, did you generally work the same

22   tour every day that you worked?

23   "A.  Yes.

24   "Q.  What tour was that?

25   "A.  1500 by 2335.

D3K8FLO4                    "Marrero"

1    "Q.  So it's a 3 p.m. to 11:30 p.m. approximately?

2    "A.  3 p.m. to 11:35 p.m.

3    "Q.  Do you still work that tour now?

4    "A.  Yes.

5    "Q.  Have you always worked that tour since you have been in

6    the 41st Precinct?

7    "A.  Yes.

8    "Q.  I am going to mark this as Marrero Exhibit 1.  I'm most

9    interested in pages 4 through 6.

10           "Officer Marrero, have you had a chance to review the

11   document?

12   "A.  Yes.

13   "Q.  This document appears to be -- is it fair to say that it

14   appears to be a news story which discusses statements made by

15   Officer Polanco?

16   "A.  Yes."

17           MS. COOKE:  This is the section of an objection from

18   the defendants with respect to this designation on the grounds

19   that it's hearsay.  It's a news article and asking about

20   statements contained therein by Officer Polanco and asking the

21   witness whether or not the statements are accurate.  So it's a

22   newspaper recording on an audio interview and then asking this

23   witness if statements by another person are accurate.  That's

24   the nature of the objection with respect to the next two pages.

25           MS. MARTINI:  We are not moving the article into

1    evidence for now at this time.  Additionally, the article is

2    not offered for the truth of the matter asserted therein.  They

3    are only offered as background and context for the next

4    question that has been asked in the deposition, which I have

5    not yet asked.

6              THE COURT:  It purports to tell me Officer Polanco's

7    statements.

8              MS. MARTINI:  I don't believe Officer Polanco's

9    statements are in this section.

10             MS. COOKE:  I believe they are.

11             THE COURT:  If you look down at lines 24, 25.

12             MS. COOKE:  This witness is being asked about the

13   accuracy.

14             THE COURT:  I realize that.

15             MS. MARTINI:  Officer Polanco's statements are not

16   coming in for their truth, but I would submit that witness

17   Marrero's response would be coming in for the truth, and he is

18   on the stand.

19             THE COURT:  But he can't say what Officer Polanco

20   said.

21             MS. MARTINI:  He can say whether he believes it to be

22   true or not.

23             MR. CHARNEY:  That is what he is being asked.

24             THE COURT:  I understand that.  To do that, you would

25   have to put in Officer Polanco's statement, and that seems

1    unfair.

2            MR. MOORE:  I don't know that you would have to put in

3    his statement because it's simply a way of asking him questions

4    about whether he agrees with certain positions Polanco had

5    taken, whether it be here today or a statement in the

6    newspaper.  So it's a fair of facilitating the search for his

7    knowledge, his belief about what was going on in the 41st

8    Precinct.

9            MS. COOKE:  The way the questions are asked in the

10    deposition is using a news article reporting on an videotaped

11    interview on a television program and asking this witness about

12    the accuracy of someone else's statements.  That's

13    inadmissible.

14            THE COURT:  I think you are going to have to skip to

15    page 42, line 21.

16            MS. MARTINI:  Would I be permitted to read page 41,

17    line 16 through 21.  The defendants did not object to that

18    section, beginning with "in this article"?

19            THE COURT:  Yes.  You could read that.

20            MS. MARTINI:  Thank you.

21    "Q.  In this article, the term or the phrase 1 and 20 is used.

22    Have you ever heard that term before?

23    "A.  Yes.

24    "Q.  What does that term mean to you?

25    "A.  One arrest and 20 summonses."

1          THE COURT:  Then you can go to line 21 on page 42.

2    "Q.  Let's go back to the one and 20 then.  So this one arrest

3    and 20 summonses, how long, to your knowledge, has that been a

4    requirement for officers in the 41st Precinct?

5    "A.  A couple of months now.

6    "Q.  Just a couple of months?

7    "A.  Yeah.  Stemming from last year.

8    "Q.  So from 2009 at some point?

9    "A.  Yes.

10   "Q.  How is this 1 and 20 requirement communicated to officers

11   in the 41st Precinct, if you can recall?

12   "A.  Roll call.

13   "Q.  Were there particular NYPD personnel who communicated this

14   requirement at those roll calls?

15   "A.  Patrol supervisors.

16   "Q.  What about platoon commanders?

17   "A.  Yes.

18   "Q.  So patrol supervisors.  Do you remember the names of any

19   of those patrol supervisors?

20   "A.  Yes.

21   "Q.  Was one of them Sergeant Bennett?

22   "A.  Yes.

23   "Q.  Were there other patrol supervisors that you can recall

24   the names of who communicated the 1 and 20 requirement?

25   "A.  Sergeant Bennett.

1    "Q.  What about Sergeant Rodriguez?

2    "A.  No.

3    "Q.  What about Sergeant Padilla?

4    "A.  No.

5    "Q.  What about Lieutenant Valenzano?

6    "A.  Yes.

7    "Q.  What about the precinct commander, Inspector McHugh?  Did

8    he ever discuss the 1 and 20 requirement at a roll call?

9    "A.  Yes.

10   "Q.  I guess when I say the 1 and 20 requirement, how, if at

11   all, did supervisors or platoon commanders or commanding

12   officers in the 41st Precinct, how did they check to determine

13   if officers were meeting those requirements?

14   "A.  Monthly reports.  Monthly police officers' reports.

15   "Q.  So, in other words, the monthly activity reports that you

16   patrol officers fill out every month?

17   "A.  Yes.

18   "Q.  I am going to mark this as Marrero Exhibit 2.

19           "Officer Marrero, you have had a chance to review

20   Exhibit 2?"

21           MS. COOKE:  The defendants have an objection to page

22   45, line 7, through 46, line 6, because these questions are

23   about a document which is a supervisor's recapitulation.

24   Officer Marrero is not a supervisor and there is a lack of

25   foundation of personal knowledge for him to be testifying about

1    the document.

2              MS. MARTINI:  If you look at the next several lines of

3    the designated testimony, the witness's attention is focused on

4    the second page of the exhibit, which I believe a similar

5    document was just introduced as an exhibit.  The second page of

6    the document is the monthly performance report, which is the

7    document that the officers fill out.

8              THE COURT:  There is nothing of substance here.  I

9    think we can skip all of this.

10             Where should you pick up?

11             MS. MARTINI:  I will pick up at --

12             THE COURT:  I think you should pick up at page 68,

13   line 2.

14             MS. MARTINI:  Perfect, your Honor.

15   "Q.  Have you ever personally been ordered by Inspector McHugh

16   or Lieutenant Valenzano to write a summons for an incident that

17   you personally did not observe?

18   "A.  No.

19   "Q.  But you are aware of them doing it to other officers in

20   the 41st Precinct?

21   "A.  Yes.

22   "Q.  How did you become aware of those other officers being

23   forced to do that?

24   "A.  Inspector McHugh or the lieutenant would come over the

25   radio requesting a sector or a patrol car, administrative only,

1    85 them, not emergency to their location.

2    "Q.  What does 85 mean?

3    "A.  Meet them to the location.

4    "Q.  When you say meet them, meaning the officer would have to

5    meet either Inspector McHugh or Valenzano at a particular

6    location?

7    "A.  Whichever one is calling over the air.

8    "Q.  When the officer would meet them there, that is when, to

9    your knowledge, that officer would be ordered to write the

10   summons for whatever it was that Inspector McHugh or Lieutenant

11   Valenzano had stopped the person for?

12   "A.  Yes.

13   "Q.  Did you ever discuss with your fellow officers in the

14   precinct whether or not anybody had a problem or objection with

15   being ordered to do that, to write a summons for something they

16   didn't actually see?

17   "A.  Discuss with someone?

18   "Q.  Yes.

19   "A.  No.

20   "Q.  What is your personal view of that?  Would you feel

21   comfortable writing a summons for an alleged violation or a

22   misdemeanor or felony that did you not actually personally

23   observe?

24   "A.  Would I feel uncomfortable?  Yes.

25   "Q.  Do you know the names of any of the officers in the 41st

D3K8FLO4                    "Marrero"

1    Precinct who were, to your knowledge, ordered to write

2    summonses for incidents they didn't observe?

3    "A.  No.

4    "Q.  Have any of your squad supervisors ever told you either in

5    roll calls or in meetings with you or your squad that the

6    summons activity of officers in the 41st Precinct was too low?

7    "A.  Excuse me.  No.

8    "Q.  Have you ever been told, either in a roll call or -- have

9    you ever been told by supervisors at a roll call or in meetings

10   or individually one on one that the UF-250 activity of officers

11   in your precinct is too low?

12   "A.  No.

13   "Q.  Has Inspector McHugh ever said at a roll call that you

14   have been at that the summons activity of officers in your

15   precinct was too low?

16   "A.  No.

17   "Q.  Has Inspector McHugh ever said at a roll call that you

18   have been at that UF-250 activity in your precinct was too low?

19   "A.  No.

20   "Q.  Has anyone in the 41st precinct ever told you individually

21   that your summons activity was too low in any given month?

22   "A.  No.

23   "Q.  Has anyone in your precinct ever told you individually

24   that your UF-250 activity in a given month was too low?

25   "A.  Yes.

1    "Q.  When was that?

2    "A.  I believe in the month of October of 2009.

3    "Q.  Who told you that?

4    "A.  Lieutenant Valenzano.

5    "Q.  Do you remember, was that something he did on a one-on-one

6    meeting with you?

7    "A.  One-on-one.

8    "Q.  So does he regularly meet with you one-on-one to discuss

9    your activity?

10   "A.  No.

11   "Q.  So he specifically sought you out and said, 'I want to

12   meet with you or discuss this with you privately'?

13   "A.  He did not specifically seek me out, no.

14   "Q.  So how did it come to be that you met with him to discuss

15   the activity from that month?

16   "A.  Me and my partner were separated so I asked him if we

17   could work together.

18   "Q.  You and your partner had been separated so you asked

19   Lieutenant Valenzano if you could work with your partner?

20   "A.  Yes.

21   "Q.  What was Lieutenant Valenzano's response?

22   "A.  You're lacking 250s.  Pick them up.

23   "Q.  Did he say that if you picked them up, you could then work

24   with your partner again?

25   "A.  No.  He didn't say that, but we did work that night.

1  "Q.  So you had -- I am trying to understand.  You had a -- as

2  a patrol officer, you have the same partner who you usually

3  patrol with, is that right?

4  "A.  Yes.

5  "Q.  Who was your partner at the time in October of 2009?

6  "A.  Officer Gomez.

7  "Q.  What is Officer Gomez's first name?

8  "A.  Joel.

9  "Q.  How do you spell that?

10  "A.  J-O-E-L.

11  "Q.  How long had Officer Gomez been your partner at the time

12  that you had this conversation with Lieutenant Valenzano?

13  "A.  Since August of 2008.

14  "Q.  So he had been your partner for over a year, is that

15  right?

16  "A.  Yes.

17  "Q.  Do I have it right that at some point in October 2009, you

18  were told you couldn't -- he wasn't your partner anymore?  I

19  don't understand this thing about how you were separated.  If

20  you can explain to me what that means.

21  "A.  He was placed with another officer to work that night and

22  so was I.

23  "Q.  Just for that one night?

24  "A.  That one night.

25  "Q.  So at that point -- was it that same night that you went

D3K8FLO4                    "Marrero"

1   to Lieutenant Valenzano and said, I'd like to be placed back

2   with Officer Gomez?

3   "A.  Yes.  That's before we turned out for roll call, yes.

4   "Q.  And in response that is when Lieutenant Valenzano said,

5   You need to pick up your 250 activity?

6   "A.  Yes.

7   "Q.  The officer -- were you then immediately allowed to go

8   patrol with Officer Gomez that same night now?

9   "A.  Yes.

10  "Q.  I am going to shift gears a little bit.  I want to ask you

11  about the procedures that you follow when you do a stop and

12  frisk and fill out a UF-250 form.

13          "Mark this exhibit 4.  And I want to mark this as

14  Exhibit 5.

15          "So if you want to review both of those and let me

16  know when you're ready.

17          "Have you reviewed both Exhibits 4 and 5, Officer

18  Marrero?

19  "A.  Yes.

20  "Q.  Do you recognize Exhibit 4?

21  "A.  Yes, the patrol guide procedure.

22  "Q.  This is a patrol guide procedure on what exactly?

23  "A.  Stop and frisk.

24  "Q.  Based on your review of Exhibit 4 and your own experience

25  as a New York City police officer, is it fair to say that

1  Exhibit 4 accurately sets forth the procedures that you're

2  required to follow when you stop, question and frisk somebody?

3  "A.  Yes.

4  "Q.  If you notice then on -- starting on the top of the second

5  page, which is Bates number 5422, do you see where it says

6  paragraph number 10?

7  "A.  Yes.

8  "Q.  Is it correct that paragraph 10 lists the responsibility

9  of the desk officer when they review a UF-250 form that's

10  filled out by an officer?

11  "A.  Yes.

12  "Q.  In your experience in the 41st Precinct, when you complete

13  a UF-250 form, who do you normally submit it to you?

14  "A.  The desk sergeant.

15  "Q.  And the desk sergeant, is it correct that that job rotates

16  between different sergeants in the 41st Precinct?

17  "A.  Yes.

18  "Q.  So it could sometimes be your squad supervisor?

19  "A.  Yes.

20  "Q.  And sometimes it's not, right?

21  "A.  Yes.

22  "Q.  Paragraph 10 says that the desk officer will review the

23  stop, question and frisk report work sheet and then it says,

24  'A, instruct member preparing work sheet if necessary.'

25          "In your experience, when you hand in a UF-250 to the

1    desk sergeant, are you present when they review the UF-250?

2    "A.  Yes.

3    "Q.  Do they typically ask you questions about the UF-250 when

4    you submit it?

5    "A.  They ask me the time of the occurrence.

6    "Q.  Anything else?

7    "A.  That's about it.

8    "Q.  When the desk officer reviews your UF-250, does he or she

9    also check your activity log to make sure you enter the

10   information about the stop in your activity log?

11   "A.  No.

12   "Q.  Do you typically enter the stop, question and frisk

13   information in your activity log?

14   "A.  Yes.

15   "Q.  What information about a stop do you normally put in your

16   activity log?

17   "A.  The information and description of the person that is

18   stopped.

19   "Q.  When you say the information of the person that is

20   stopped, what do you mean by that?

21   "A.  Basically my 250s, the ones I put in my memo book, are

22   based off of radio runs.

23   "Q.  So what information would you include in your activity log

24   about 250?

25   "A.  I'm sorry.  The radio run is all about why he was stopped

1    pertaining to the stop.

2    "Q.  So let's look at Exhibit 5 for a second.  Am I correct in

3    saying Exhibit 5 is an example of a UF-250 form, right?

4    "A.  Yes.

5    "Q.  So the information that you put in your activity log, is

6    it taken from the UF-250 form itself?

7    "A.  Yes.  The person's name, date of birth, height and weight.

8    "Q.  Do you put any other information in your activity log with

9    respect to a stop and frisk that you do?

10   "A.  The reason why the person was stopped.

11   "Q.  So then talking about the reasons, when you say you put

12   the reason the person was stopped, do you write down the reason

13   that you checked off on the UF-250 form?

14   "A.  Yes.

15   "Q.  So, for example, if you stop a person and the reason you

16   check for the stop is wearing clothes disguised as commonly

17   used in the commission of a crime, are you saying that that is

18   what you would then write in your activity log?

19   "A.  No.  It's based off the radio run that central put over

20   the air.

21   "Q.  So you would write in the activity log that the reason for

22   the stop is that you received a radio run?

23   "A.  No.  The description of the particular person that is

24   about to commit or committing a crime in progress.

25   "Q.  So you say that all UF-250s you do are based on radio

1    runs, is that right?

2    "A.  Yes.

3    "Q.  So does that mean every UF-250 you do, the reason you

4    check the stop is it fits the description?

5    "A.  If the description was put over the air.

6    "Q.  So then I want to focus on those stops.

7              "So in situations where you fill out a UF-250 based on

8    things you personally observed, do you record those stops in

9    your activity log?

10   "A.  Yes.

11   "Q.  What information do you typically put in your activity log

12   about the reason for the stop when it's a stop that's based on

13   your own personal observances rather than a radio run?

14   "A.  Then I will put down what I stopped them for.

15   "Q.  So if you checked on the UF-250 suspicious bulge, that's

16   what you would write in your activity log?

17   "A.  Correct.

18   "Q.  What if you checked just furtive movements, would you

19   write that in your activity log?

20   "A.  Furtive movements plus whatever made him move, any

21   indications.

22   "Q.  You would write furtive movements plus -- I'm sorry, what

23   else would you write?

24   "A.  He moved his hand, he or she.

25   "Q.  Have you ever been either trained in the police academy or

D3K8FLO4                    "Marrero"

1   instructed by anyone in the 41st Precinct that it is legally

2   permissible to stop someone solely because of furtive movements

3   you may have observed?

4   "A.   No.

5   "Q.   Have you ever stopped anybody where the reason you stopped

6   them is only furtive movements?

7   "A.   The only reason why I stopped them was for furtive

8   movements?  No.

9   "Q.   How often do your squad supervisors check your activity

10  logs?

11  "A.   If there's not a busy night, once or twice.

12  "Q.   And when they check them, do they ever ask you

13  about -- I'm sorry.  Does your squad supervisor ever -- on a

14  night where your squad supervisor is not the desk sergeant, so

15  you wouldn't be submitting your UF-250s to your squad

16  supervisor?

17  "A.   No, it would be the desk sergeant.

18  "Q.   So on those nights where your squad supervisor is not the

19  desk sergeant, do they ever, to your knowledge, ever ask to see

20  the UF-250s you completed to review them separately from the

21  desk sergeant?

22  "A.   No.

23  "Q.   Have there ever been times when you failed to record stops

24  in your activity log?

25  "A.   Once or twice.

D3K8FLO4                    "Marrero"

1    "Q.  And has a squad supervisor or a platoon commander who has

2    reviewed your activity log ever noted that or told you, you

3    know what, you failed to note a stop in here?

4    "A.  Yes.

5    "Q.  Were there any consequences for that when you failed to do

6    that?

7    "A.  No.

8    "Q.  Do you know of officers in the 41st Precinct who have been

9    disciplined for failing to record their stops in activity logs?

10   "A.  I don't know.

11   "Q.  Have you ever been disciplined for that?

12   "A.  No.

13   "Q.  Is it fair to say that your activity log should include

14   the same level of detail about a stop that's on the UF-250

15   form?

16   "A.  Yes.

17   "Q.  The last thing I want to ask you about is going to be

18   Exhibit 6.

19            "Take your time obviously.  Exhibit 6, Officer

20   Marrero, have you ever seen this document before today?

21   "A.  Before today?  Yes, in the academy, the patrol guide

22   procedures.

23   "Q.  In the patrol guide procedures.  OK.  What is this

24   document?

25   "A.  It's an operations order of department policy regarding

1   racial profiling.

2   "Q.  This operations order, has it ever been reviewed with you

3   during a roll call in the 41st Precinct?

4   "A.  No.

5   "Q.  Has this policy, this department policy regarding racial

6   profiling, ever been discussed at roll calls in the 41st

7   Precinct, to your knowledge?

8   "A.  Not that I remember.

9   "Q.  Has your squad supervisor ever discussed this policy with

10  you and the officers in your squad?

11  "A.  No.

12  "Q.  Has your platoon commander ever discussed this policy with

13  you and your fellow officers in your platoon?

14  "A.  No.

15  "Q.  Have you ever received training on this policy either at

16  roll call or in some other form since you have been assigned to

17  the 41st Precinct?

18  "A.  Training before roll call, yes.

19  "Q.  So this was the training sergeant in the precinct?

20  "A.  Yes, the training officer.

21  "Q.  What did that training entail?

22  "A.  He explained the department policy again on racial

23  profiling.

24  "Q.  So he read this policy to you?

25  "A.  Yes.

D3K8FLO4                    "Marrero"

1    "Q.  Did he do --

2    "A.  To all.

3    "Q.  To all the officers in the precinct?

4    "A.  Roll call.

5    "Q.  Do you remember when this training officer trained you on

6    this racial profiling policy?

7    "A.  No, I do not.

8    "Q.  Was it within the last year?

9    "A.  Yes.  Last year.

10   "Q.  It was only one time that he's --

11   "A.  That I can remember, yes.

12   "Q.  Other than reading the policy to you, did the training

13   officer do anything else to train you on this racial profiling

14   policy?

15   "A.  That I can remember, no.

16   "Q.  Has Inspector McHugh ever discussed the racial profiling

17   policy with you or any other officers in the 41st Precinct?

18   "A.  No.

19   "Q.  So I have a couple of more questions and hopefully we will

20   be done in a few minutes.

21          "Officer Marrero, I just want to go back quickly to

22   the 1 and 20 requirement you were talking about earlier.  Do

23   you know of any consequences for officers who fail to meet that

24   1 and 20 requirement?

25   "A.  No, no consequences.  There are no requirements, but there

1  are no officers that I know of that had any consequences.

2  "Q.  I know there's no officers that have had consequences, but

3  I guess what I am saying or asking is, have you ever been told

4  by any of the supervisors or the platoon commanders or anybody

5  what the consequences would be if an officer fails to meet the

6  1 and 20?

7  "A.  No.  There are none.

8  "Q.  The other thing I want to ask you about quickly is you

9  mentioned earlier that you did not agree with Officer Polanco's

10  claim that there was a requirement that each officer do five

11  UF-250s a month.  Is there another number that is required in

12  your experience for UF-250s?

13  "A.  No, there is not.

14  "Q.  So if an officer did zero UF-250s in a month, would that

15  be OK with their supervisors, in your experience?

16  "A.  I don't know.

17  "Q.  Have you ever done zero UF-250s in a month?

18  "A.  No.

19  "Q.  What is the least you have ever done, to your

20  recollection?

21  "A.  One.

22  "Q.  And were you ever told that that one was not enough for

23  that month?

24  "A.  That one time with Lieutenant Valenzano.  That's it.

25  "Q.  Beyond the one, what is the next least you have ever done

1   in a month?

2   "A.   Five.

3   "Q.   So other than that one month, the minimum you have ever

4   done is five, and the only time you were ever told you didn't

5   do enough is when you did less than five, is that right?

6   "A.   I don't know if I did less than five that month.  I don't

7   remember.

8   "Q.   I thought you just said when Valenzano told you that your

9   activity was too low, it was the month you only did one?

10  "A.   It wasn't that month.

11  "Q.   But it's your testimony that there is only one month where

12  you did just one UF-250, is that right?

13  "A.   One month?  That was the question?

14  "Q.   My question now is --

15  "A.   What was the least --

16  "Q.   The least you have ever done in a month is one and how

17  many times have you ever done one in a month?

18  "A.   I don't remember.

19  "Q.   Was it more than one time?

20  "A.   I don't know.

21  "Q.   The month that Valenzano complained or not complained, the

22  month that he told you you had too low UF-250 activity, do you

23  remember how many UF-250s you did that month?

24  "A.   I do not recall.

25  "Q.   And then is it right that other than the months or month

D3K8FLO4                    "Marrero"

1    where you did one, the next lowest number you have ever done in

2    a month is five?

3    "A.  Yes."

4            MS. MARTINI:  No further questions.

5            THE COURT:  Now you're going to read Edward Velazquez?

6    Is that another police officer?

7            MS. BORCHETTA:  Yes, your Honor.

8    "Q.  Can you say your name for the record?

9    "A.  Edward Velazquez.

10   "Q.  When did you join the NYPD?

11   "A.  June 30, 1998.

12   "Q.  Was that 1998?

13   "A.  1998.

14   "Q.  Was that the year you graduated from the academy?

15   "A.  I graduated from the academy in February '99.

16   "Q.  Did you graduate from high school?

17   "A.  Yes.

18   "Q.  Was that in New York?

19   "A.  Yes.

20   "Q.  What high school was it?

21   "A.  James Monroe High School.

22   "Q.  When did you graduate from high school?

23   "A.  1991.

24   "Q.  What did you do after high school?

25   "A.  I went to college.

D3K8FLO4                    "Velazquez"

1    "Q.  What college did you go to?

2    "A.  City College of New York.

3    "Q.  Did you get a degree from there?

4    "A.  Yes.

5    "Q.  What was that?

6    "A.  Bachelor's.

7    "Q.  Bachelor's in what?

8    "A.  Latin American and Caribbean studies.

9    "Q.  When did you graduate?

10   "A.  1998.

11   "Q.  So was the police department your first job out of

12   college?

13   "A.  Yes.

14   "Q.  Why did you decide to become a police officer?

15   "A.  I decided to become a police officer because in the

16   neighborhood I grew up in, there was crime and drug dealers,

17   and I joined to try to improve, make improvements in the

18   community.

19   "Q.  What neighborhood was that?

20   "A.  In the Bronx, Soundview.

21   "Q.  So after you graduated from the academy, what was your

22   first assignment?

23   "A.  My first assignment was field training.

24   "Q.  How long was the field training?

25   "A.  I think it was six months.

D3K8FLO4                    "Velazquez"

1      "Q.  Where was that?

2      "A.  In the 41st Precinct.

3      "Q.  What was your assignment after that?

4      "A.  Patrol.

5      "Q.  Was that in the 41st Precinct as well?

6      "A.  Yes, ma'am.

7      "Q.  How long were you on patrol in the 41st Precinct?

8      "A.  Until August 2008.

9      "Q.  Where did you go in August of 2008?

10     "A.  I went to where I'm at now, firearms tactics section.

11     "Q.  The firearms tactics section?

12     "A.  Yes.

13     "Q.  That's where you are now?

14     "A.  Yes, ma'am.

15     "Q.  Did you ask for that transfer?

16     "A.  No, ma'am.

17     "Q.  Do you know why you were transferred?

18     "A.  Yes.

19     "Q.  Why was that?

20     "A.  That was because a precinct is not supposed to have a

21     certain amount of people that are restricted, meaning they

22     can't go out on patrol, so you just get transferred to

23     somewhere where they can use you, utilize you for

24     administrative duties.

25     "Q.  So you were restricted when you were transferred?

1    "A.   Yes.

2    "Q.   Why was that?

3    "A.   That was due to a line of duty injury.

4    "Q.   When did that happen?

5    "A.   August 18, 2008.

6    "Q.   What were the circumstances of that injury?

7    "A.   What do you mean by the circumstances?

8    "Q.   What led to you being injured?

9    "A.   I was in the process of effecting an arrest and I had to

10   struggle with the defendant and out of that came the injury.

11   "Q.   What kind of injury did you have?

12   "A.   I suffered a back, herniated disk injury.

13   "Q.   Are you still suffering from that injury?

14   "A.   Yes.

15   "Q.   Are you still restricted?

16   "A.   Yes.

17   "Q.   Was there any other reason that you know of for your

18   transfer to the firearms tactical unit?

19   "A.   No.

20   "Q.   I'm sorry, I think I got the name wrong.

21   "A.   That's OK.

22   "Q.   So your answer was no?

23   "A.   No."

24             THE COURT:  We will take our afternoon recess now and

25   pick up on the next page, page 30, when we get back.  And we

D3K8FLO4                    "Velazquez"

1    will break till 20 of 4.

2              (Recess)

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Trial resumed)

2        THE COURT:  Picking up on page 30.

3    "Q.  I think you told me you transferred in 2008?

4    "A.  No.  It was 2009.  June I was transferred.

5    "Q.  Okay.  So earlier you had testified that it was 2008.  But

6    it's 2009 that you were transferred?

7    "A.  2008 was when I got the injury to be restricted.  I was

8    transferred in -- that was 2008.  And then in 2009, in June of

9    2009 is when I got transferred out to go to the firearm tactic

10   section.

11   "Q.  Have you heard that phrase before 1 and 20?

12   "A.  In the news.

13   "Q.  Where did you hear it in the news?

14   "A.  In that report with Officer Polanco.

15   "Q.  Other than hearing it in the news, have you ever heard

16   that phrase used before?

17   "A.  No.  I don't recall ever hearing that phrase before.

18   "Q.  You never heard it in a roll call?

19   "A.  I don't recall hearing it in a roll call.

20   "Q.  Do you have any understanding of what that phrase means?

21   "A.  From that news report, yes.

22   "Q.  So your understanding of 1 and 20 comes totally from the

23   news report?

24   "A.  From the news report.

25   "Q.  What is your understanding of what it means?

1    "A.  One arrest and 20 summonses.

2    "Q.  Was there ever a requirement for officers in the 41st

3    precinct to get 1 arrest and 20 summonses a month?

4    "A.  By requirement do you mean something they have to do?

5    "Q.  Yes.

6    "A.  Recognized as a productivity goal.  A requirement, no.

7    "Q.  What is the difference to you between a productivity goal

8    and a requirement?

9    "A.  That would be something that you could try to reach.  It

10   doesn't mean that you have to be doing it.

11   "Q.  So there was a productivity goal for you to do 1 arrest

12   and 20 summonses while you were in the 41st precinct?

13   "A.  By that do you mean like you throughout the year?

14   Monthly?

15   "Q.  Per month?

16   "A.  Per month?  Can you repeat the question again?

17   "Q.  Was there a productivity goal for you to do 1 arrest and

18   20 summonses a month while you were in the 41st precinct?

19   "A.  While I was there, no.

20   "Q.  Have you heard that since you left that productivity --

21   "A.  Yes.

22   "Q.  Let me finish the question.

23       "Have you heard that since you left that that

24   productivity goal has been instituted in the 41st precinct?

25   "A.  Yes.

D3k9flo5                    "E. Velazquez"

1    "Q.  And you say it's a productivity goal and not a

2    requirement; is that right?

3    "A.  Yes.

4    "Q.  And how do you know about that goal?

5    "A.  From the news report.

6    "Q.  Do you know about it from any other source?

7    "A.  No.

8    "Q.  While you were at the 41st precinct, was there any

9    productivity goal for you?

10   "A.  There was one for four arrests during the year.

11   "Q.  Four arrests per year?

12   "A.  Yes.  That's like one per quarter.

13   "Q.  And how did you find out about that?

14   "A.  That's for like evaluation purposes.

15   "Q.  But who told you that you needed to do four arrests per

16   year?

17          MS. COOKE:  Your Honor, I'm going to raise an

18   objection to -- series of these similar questions where it's

19   not an identified supervisor by name.  The witness actually

20   cannot recall who it was.  So I would object on the grounds of

21   hearsay.

22          THE COURT:  Well, no.  But the witness says at line 13

23   it was a supervisor and -- she was -- he was at the 41st

24   precinct.  So while we don't know which supervisor, we do know

25   which precinct, we do know it was a supervisor, we do know this

1    witness heard it.  So I'm going to allow it.

2              MS. COOKE:  Thank you.

3              THE COURT:  So let's pick up with the answer at line

4    7.

5    "A.  I'm trying to think back.  That's something -- once I got

6    out of field training, I may have heard it.  But as far as

7    which supervisor told me, I can't recall who it was.

8    "Q.  Was it a supervisor in the 41st precinct?

9    "A.  A supervisor.

10   "Q.  Did he tell you that at a roll call?

11   "A.  Whether it was in roll call or training, I don't recall.

12   "Q.  Did you only hear it once or did you hear it multiple

13   times?

14   "A.  I've heard it multiple times.

15   "Q.  When you say it was for evaluation purposes, what do you

16   mean?

17   "A.  By that I mean they don't want you just doing nothing.

18   You had to -- the reason why you're there is eventually as an

19   officer you have to make arrests and write summonses to uphold

20   the law.

21   "Q.  So if you didn't make those four arrests per year, what

22   would that mean in terms of your evaluation?

23   "A.  You wouldn't meet the minimum requirement or standard.

24   "Q.  Would there be any repercussions for that?

25   "A.  I don't know because I didn't -- I don't know of any that

1    I've ever gotten.

2    "Q.  Do you know of anyone else who didn't make that?

3    "A.  No.

4    "Q.  Did you believe there would be a consequence if you didn't

5    make those four arrests?

6    "A.  Yes.  A bad evaluation.

7    "Q.  What happens if you have a bad evaluation?

8    "A.  A bad evaluation, you can get like -- if you get a bad

9    evaluation you could get like special monitoring or --

10   "Q.  Anything else?

11   "A.  They might think you need more supervision.

12   "Q.  Anything else?

13   "A.  I was just thinking you might eventually get fired.

14   "Q.  But you always made those four arrests per year while you

15   were in the 41st precinct?

16   "A.  I would try and do the best I could.  I can't recall if I

17   exactly made four like every year or what the amount was that I

18   did a year.

19   "Q.  Did you ever get a bad evaluation?

20   "A.  No.

21   "Q.  All right.  So that's what you said the productivity goal

22   was for arrests.  Were there any for summonses?

23   "A.  Not that I recall.

24   "Q.  No goals for summonses?

25   "A.  No.  I can't remember what the number was.

1  "Q.  But there was a number?

2  "A.  Yes.

3  "Q.  Could the number have been 20?

4  "A.  I don't recall what the number was prior to -- prior to

5  like around 2008 when I got injured.  I don't recall what the

6  number was.

7  "Q.  How did you find out what the number was when you knew it?

8  "A.  What do you mean by that?

9  "Q.  At some point did you know what the number was while you

10 were in the 41st precinct?

11 "A.  Yeah.

12 "Q.  When did you know that?  Who communicated that number to

13 you?

14 "A.  The supervisor.

15 "Q.  Do you know what supervisor?

16 "A.  We've had so many.  I can't recall which one said what.

17 But that always comes from a supervisor.

18 "Q.  If you didn't reach that number, would that also affect

19 your evaluation?

20 "A.  No.  Because other things are also taken into account.

21 "Q.  Okay.  But would that be taken into account on your

22 evaluation?

23 "A.  That's something that is taken into account.

24 "Q.  Would it reflect negatively on your evaluation if you

25 didn't reach that number?

1    "A.  Again, you have to take other things into account not just

2    that.

3    "Q.  In terms of that particular factor in your evaluation,

4    would it be reflected negatively on your evaluation if you

5    didn't reach the number of summonses?

6    "A.  By that do you mean if that's the only thing that they

7    look at to give an evaluation.

8    "Q.  No.  But you testified that they would look at that to

9    give you an evaluation; is that right?

10   "A.  Yes.

11   "Q.  And if you hadn't reached the number, would that be

12   reflected in your evaluation.

13   "A.  It could.  I don't know -- I don't think it has been

14   reflected in mine.

15   "Q.  I understand.  But did you always reach the number while

16   you were in the 41st precinct?

17   A.  No.

18   Q.  And when you didn't reach that goal -- number, what

19   happened?

20   "A.  I just tried next month.

21   "Q.  Did anyone ever talk to you about it?

22   "A.  You get supervisors who talk to you about it.

23   "Q.  What supervisors talk to you?

24   "A.  It could be your immediate supervisor, platoon commander.

25   "Q.  Specifically in your case who talked to you about not

D3k9flo5                    "E. Velazquez"

1    doing enough summonses?

2    "A.  I don't recall.  The sergeant or lieutenant.

3    "Q.  A sergeant or lieutenant?

4    "A.  A sergeant or lieutenant.

5    "Q.  What did they say?

6    "A.  Try and do better next month.

7    "Q.  When they said better, did you understand them to mean

8    more summonses?

9    "A.  Yes.

10   "Q.  What about UF 250s?  Was there a goal for the number of

11   UF 250s?

12   "A.  No.

13   "Q.  Would it be okay for you got no UF 250s in a month?

14   "A.  Yes.

15   "Q.  Do you know an Inspector McHugh?

16   "A.  Yes.

17   "Q.  Did Inspector McHugh ever tell you that you needed to do a

18   certain number of arrests or summonses or 250s?

19   "A.  No.

20   "Q.  Did he ever say anything about that at roll call?

21   "A.  No.

22   "Q.  I'm going to play an audio track.

23   "A.  Before you do that, I just remembered.  Inspector McHugh

24   got there like maybe '07, '08.  And I was out of there from

25   June of '08 on so.

1   "Q.  So you wouldn't necessarily hear a lot from Inspector

2   McHugh?

3   "A.  Yes.  Especially because I was on midnights and then

4   line-of-duty injury.

5   "Q.  While you were at the 41st precinct, were you ever

6   assigned to a footpost or to a night tour because your summons,

7   arrest, or 250 activity was considered to be too low?

8   "Q.  So again that was a no?

9   "A.  That's a no.

10  "Q.  Do you know of any other officers who have?

11  "A.  No.

12  "Q.  While you were at the 41st precinct were you ever denied

13  an overtime shift because your summons, arrest, or UF 250

14  activity was considered to be too low?

15  "A.  No.

16  "Q.  Do you know of any other officers who were?

17  "A.  No.

18  "Q.  Have you ever been transferred or reassigned because your

19  summons, arrest, or 250 activity was considered to be too low?

20  "A.  No.

21  "Q.  Officer Polanco testified at his deposition that he

22  believed that you were transferred to your current assignment

23  for not meeting productivity goals.  Is that accurate?

24  "A.  That comes from the medical division.  And if you can't do

25  patrol at the command because you're restricted, that's

D3k9flo5                    "E. Velazquez"

1    something that -- yeah, you have to be moved to another

2    location where you could be used.

3    "Q.  So Officer Polanco testified that at least one of the

4    reasons that you were transferred is because your productivity

5    was too low.  Do you agree with that statement?

6    "A.  I don't agree with that statement because, as I said, the

7    reason why I'm at the current place, the current assignment is

8    because of the line-of-duty injury.  And that's all from the

9    medical division.

10   "Q.  Have you ever had any conversation with Officer Polanco

11   about your transfer?

12   "A.  Not that I recall.

13   "Q.  Do you have any knowledge of why Officer Polanco would say

14   that he would -- would say that that was the reason for the

15   transfer.

16   "A.  Maybe he would think that's the reason why.

17   "Q.  Did you ever give him any reason to think that was the

18   reason for your transfer?

19   "A.  No.

20   "Q.  Did you ever complain to him about being transferred?

21   "A.  No.  I didn't complain to him that I was being

22   transferred.  No.

23   "Q.  Do you know of any other officers who were reassigned to a

24   different command because they didn't meet productivity goals?

25   "A.  Nope.

1    "Q.  Did Inspector McHugh ever order you to write a C summons

2    for someone that he had stopped?

3    "A.  Yes.  That I do recall.  It was for a beer.

4    "Q.  So this just happened once?

5    "A.  That's the one occasion I can remember, yes.

6    "Q.  When you say it was for a beer, was that person getting a

7    summons for open container?

8    "A.  Yes.

9    "Q.  Did you see the person with the open container?

10   "A.  No.

11   "Q.  So how did you come to write the summons?

12   "A.  Well the CO saw it so he called us over, like that he

13   needed an additional unit.  And we met him at the location and

14   that's when he told us:  This one has open container, write him

15   a summons.

16   "Q.  And on the summons did you write that you had personally

17   observed him with the container or that McHugh had?

18   "A.  I don't recall how I wrote it.

19   "Q.  Would you have felt comfortable writing that had --

20   writing that you had seen it?

21   "A.  Could you repeat that again?

22   "Q.  Would you have felt comfortable writing that you had

23   personally observed the person with the open container.

24   "A.  No, I wouldn't.

25   "Q.  But did Inspector McHugh ever ask you to do that, to write

D3k9flo5                    "E. Velazquez"

1    a summons for something that they had personally observed and

2    you had not?

3    "A.  Yes.

4    "Q.  Did he ever ask you to write that you were the one who had

5    personally observed it on the summons?

6    "A.  No.  He just ordered me to write the summons for open

7    container.

8    "Q.  So he didn't specify what language to use?

9    "A.  Yes, he didn't.

10   "Q.  I'll read it back.  Officer Polanco testified in his

11   deposition that because of what he felt was the 1 and 20 quota

12   in the 41st precinct people, officers, felt pressured to

13   issue summons and make arrests even when they didn't have a

14   legal justification to do so.

15        "Is that accurate?

16   "A.  That sounds general.  I didn't do it.

17   "Q.  He said that officers felt pressured to do so.  Do you

18   believe officers felt pressured to do that?

19   "A.  I could tell you what I felt about it.  I can't tell you

20   what the other ones felt about it.  I didn't feel any pressure.

21   "Q.  Did you ever issue a C summons or make an arrest without

22   probable cause?

23   "A.  No.

24   "Q.  Did you ever stop and frisk somebody without reasonable

25   suspicion?

D3k9flo5                    "E. Velazquez"

1    "A.  No.

2    "Q.  Have you ever witnessed any officer do that?

3    "A.  No.

4    "Q.  Did you receive any training in the police academy or on

5    the job about when it's legal to stop someone, question them,

6    or frisk them?

7    "A.  Yes.

8    "Q.  When did you receive that training?

9    "A.  In the academy.

10   "Q.  Did you receive any training about that since?

11   "A.  Not that I recall.

12   "Q.  When you stopped, questioned or frisked someone, is there

13   any paperwork you're required to fill out?

14   "A.  Yes.  It's called the UF 250.

15   "Q.  And what do you have to do to fill out the 250?

16   "A.  You have to ID the person, get like an identification,

17   standard identification.  You have to write down the clothing

18   description, the location of where you stopped them at, if it

19   was -- the reason why you stopped them, what type of crime you

20   suspected them of.  You've got to give a height description,

21   approximate weight description, pedigree information, and the

22   factors that made you believe that you had to stop this person.

23   "Q.  And once you filled out the UF 250 form, what do you do

24   with it?

25   "A.  You put it in the -- there's a UF 250 basket.  I don't

1  know how other commands are run.  But we have to put it in --

2  turn it into the desk and it will go to crime analysis.

3  "Q.  Once you turned it into the desk, do you ever review your

4  UF 250 with anyone else?

5  "A.  The 250s I filled out -- well, like if you forget to put

6  the date down, they'll kick it back to you, and then you would

7  have to go over it.  But my 250s I don't review with anybody.

8  "Q.  Did that ever happen to you with forgetting to put the

9  date on it and getting it kicked back to you?

10  "A.  Probably happened.  I might have forgot to put something

11  down.

12  "Q.  Any other reason that you've ever -- that it's ever gotten

13  kicked back to you other than forgetting to put something down?

14  "A.  No.

15  "Q.  Has anyone ever questioned you about the circumstances of

16  a stop based upon your UF 250?

17  "A.  What do you mean by if anyone ever questioned me?

18  "Q.  Has any supervisor in the 41st --

19  "A.  No.

20  "Q.  Let me just finish the question.

21        "Has any supervisor in the 41 ever reviewed your

22  UF 250 and then asked you about the circumstances of the stop?

23  "A.  No, ma'am."

24        THE COURT:  All right.  That completes that reading.

25  What do we have next?

1          MR. MOORE:  The plaintiffs will call Pedro Serrano.

2    Officer Pedro Serrano.

3      PEDRO SERRANO, 40th precinct,

4          called as a witness by the Plaintiffs,

5          having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MR. MOORE:

8    Q.  Good afternoon, Officer Serrano.

9          Could you tell us a little bit about yourself.  Where

10   were you born?

11   A.  I was born in Quanto, Puerto Rico.

12   Q.  How old are you now?

13   A.  I'm 43.

14   Q.  And how far have you gotten in school?

15   A.  I have about 90 credits.  I have an associates degree in

16   liberal arts.

17   Q.  Where is your associate degree from?

18   A.  LaGuardia community college.

19   Q.  Are you currently in school?

20   A.  No.

21   Q.  Are you married?

22   A.  Yes.

23   Q.  What's your wife's name?

24   A.  Annabel Serrano.

25   Q.  Do you have any children?

1    A.   Four.

2    Q.   Boys, girls?

3    A.   Two boys, two girls.

4    Q.   And are you presently employed?

5    A.   Yes.

6    Q.   Where are you employed?

7    A.   New York City Police Department.

8    Q.   And how long have you been a New York City police officer?

9    A.   Approximately nine years.

10   Q.   When did you first join?

11   A.   '04.  2007.  I did six months in the police academy and the

12   rest in 40 precinct to current.

13   Q.   The rest has been in the 40th precinct?

14   A.   Yes.

15   Q.   So you became a police officer in July of 2004,

16   approximately?

17   A.   Yes.

18   Q.   You spent six months in the academy.  Then you went to the

19   40th precinct?

20   A.   Yes.

21   Q.   Where is that located?

22   A.   257 Alexander Avenue, Bronx, New York.

23   Q.   In what capacity were you assigned to the 40th precinct?

24   A.   I have different capacities but right now I'm patrol.

25   Q.   When you first got there what were you?

1    A.  I was first -- I was the first impact class in the 40

2    precinct.

3    Q.  When you say the first impact class, what do you mean by

4    impact?

5    A.  Impact is when a certain precinct gets a spike in crime,

6    they get about --

7    Q.  Actually Officer Serrano, if you could move a little closer

8    to the mic, because I'm having a hard time hearing you.

9    A.  How about now?

10   Q.  That's better.  If you could pull it towards you it

11   might -- don't pull it out of the thing.

12        Go ahead.  Tell us what operation impact is.

13   A.  Operation impact is when a precinct has a spike in crime.

14   It could be anything.  They request the bureau for some people,

15   for some officers.  The precincts -- the police academy usually

16   sends about 50 to 80 cops to a precinct.  They flood the zone

17   with police officers and try to lower the crime in that area.

18   I was the first one in the 40 precinct.

19   Q.  And were you doing your impact work just in the 40th

20   precinct?

21   A.  Yes.

22   Q.  Now, how long did you do the impact work?

23   A.  Approximately a year.  A year to two.

24   Q.  And then you became a regular patrol officer in the 40th

25   precinct?

1    A.  Well, first -- about one to two years in impact.  Then I

2    went to the midnights.

3            And then from the midnights I went to a detail which

4    was a summons auto.

5            And then from there I became a transport auto, which

6    all you do in transport -- you're transporting prisoners from

7    the precinct to the 40 because we had so many prisoners.

8            Then from there I went to four to twelves.

9    Q.  Four to twelve tour.  When you say -- after you left

10   impact, you went to the midnight tour, correct?

11   A.  Yes.

12   Q.  And what was the one in between that and the transport

13   auto?

14   A.  I was the summons auto.

15   Q.  What's that?

16   A.  Get in the car.  You drive around and you write summonses.

17   Q.  For vehicular violations?

18   A.  Mostly movers.  For cars.

19   Q.  So, how long have you been on the four to twelve tour?

20   A.  Approximately -- I think since 2006 maybe.  I'm not too

21   sure.

22   Q.  And do you have a -- on the four to twelve tour have you

23   had a regular partner?

24   A.  I had several.  The current --

25   Q.  Typically you have a regular partner, correct?

1    A.  Yes.

2    Q.  And who's your partner at present?

3    A.  Arroyo Perez.

4    Q.  And he's a police officer?

5    A.  Yes.

6    Q.  Patrol officer.

7            And how long has he been your regular partner?

8    A.  About a year to two.

9    Q.  And before that, did you have a regular partner?

10   A.  Officer Chae.

11   Q.  And that's spelled C-H-A-E?

12   A.  C-H-A-E.

13   Q.  What's his first name?

14   A.  Hyon.  I don't know how to spell-

15   Q.  H-Y-O-N?

16   A.  Something like that, yeah.

17   Q.  And how did it come that you left Officer Chae and became

18   Officer Perez's --

19   A.  I'm sorry.  Officer Chae passed the sergeant exam.  Became

20   a sergeant in Manhattan.

21   Q.  Okay.  So, would you say that you're pretty familiar with

22   the 40th precinct?

23   A.  Very.  Yes.

24   Q.  So, in fact, for the eight-and-a-half years that you've

25   actually been out of the academy you've been working in the

1    40th precinct, correct?

2    A.   Yes.

3    Q.   What is your present assignment in the 40th precinct?

4    A.   Patrol.

5    Q.   On the four to twelve, correct?

6    A.   Yes.  Four to twelve patrol.

7    Q.   And can you tell us what your main function is as a patrol

8    officer on the four to twelve shift?

9    A.   Okay.  Well as a patrol officer your main function is to

10   provide service.  And what I mean -- what I mean by saying that

11   is it's a very busy precinct.  And whenever you dial 911, the

12   911 operator contacts our central.  And then our central, via

13   two-way radio, contacts the sector in concern.

14          And just to give you a little more background on the

15   40, they -- when you have boundaries in the 40 they create a

16   grid.  And every square has a letter.  So there will be an Adam

17   or a Charlie.  Then there -- that's one sector.

18   Q.   Those are called sectors, right?

19   A.   Yes.  Exactly.  Then there's a David, Eddie, Frank.  Henry,

20   Ida, John, etc.

21   Q.   So you were here when Officer Polanco testified, correct?

22   A.   Yes.

23   Q.   And he -- let me just show you what -- a document that he

24   discussed which is Plaintiffs' Exhibit 355 which is in evidence

25   which sets out, in the patrol guide, the duties of a police

D3k9flo5                    Serrano - direct

1    officer.

2              Do you see that?

3    A.   Yes.

4    Q.   You're familiar with that document?

5    A.   Yes.

6    Q.   And with respect to the duties of a police officer, they

7    would be set forth in some general detail in this document,

8    correct?

9    A.   Yes.

10   Q.   And you heard Officer Polanco testify to what those general

11   duties are and you agree with that?

12   A.   Yes.

13   Q.   One of the provisions directs that -- number one, it says,

14   "Perform duty in uniform as indicated on roll call or as

15   directed by a competent authority."

16             Do you see that?

17   A.   Correct.

18   Q.   That's number one.

19             What does that mean, "competent authority"?

20   A.   That is a lawful order, the way I interpret it.

21   Q.   That means the lawful order given by a ranking officer?

22   A.   Correct.

23   Q.   Any officer above -- sergeant and above, correct?

24   A.   Yes.

25   Q.   Police department is sometimes referred to as a

1    paramilitary organization, correct?

2    A.  Yes.

3    Q.  And when your supervisors tell you to do something, patrol

4    officers or police officers are expected to do it, right?

5    A.  Yes.

6    Q.  That's how you were trained?

7    A.  Yes.

8    Q.  Both in theory and in practice, correct?

9    A.  Yes.

10   Q.  And you see number eight it says, in this document, it

11   says, "Render all necessary police service in assigned area and

12   as otherwise directed."

13          Can you give us an example of the type of service you

14   render as a patrol officer in the 40?

15   A.  Well, in the 40 it's very busy, like I said.  A lot of

16   people dial 911.  And when you -- when you're in the sector you

17   get calls.  You get about 20 to 40 jobs a night in my precinct.

18   And it goes from backing up a -- or helping out a person who is

19   injured, car accident, deal with a car accident.  An emotional

20   disturbed person.  Some people have called me because their cat

21   was stuck in a pool table.  That actually happened.

22          It ranges.  Anything.  There are calls for everything.

23   And we go and we try our best to help them.  And if we can't

24   help them we give them -- we give them information to the

25   people that can help.

D3k9flo5                    Serrano – direct

1    Q.  And --

2    A.  I'm sorry.  That takes about 90 percent of my time.

3    Q.  And so that would -- so that would be 90 percent of your

4    time is spent responding to radio runs?

5    A.  That is correct.

6    Q.  That would be typical of the duties of a patrol officer

7    patrolling in a police car, correct?

8    A.  That is correct.

9    Q.  And along the way in performing your duties are you asked

10   to on occasion make arrests -- not asked but do you have

11   occasion to make arrests?

12   A.  Yes.  I do make arrests.

13   Q.  And do you have occasion to issue summons?

14   A.  Yes.

15   Q.  And do you have occasion to write what are known as

16   UF 250s?

17   A.  Yes.

18   Q.  Tell us what a UF 250 is.

19   A.  UF 250 is a document that we fill out when we have a --

20   when a person is -- there's reasonable cause to suspect that a

21   person has committed, is committing, or will commit a crime.

22           And when I say "crime" I mean penal law misdemeanor

23   and felony.  Does not include violations.  And does not include

24   narcotics that's not out in the open.

25   Q.  Let me show you on the screen the first page of Plaintiffs'

1    Exhibit 98 which I believe is in evidence, Judge.

2              And have you ever seen this patrol guide provision

3    before?

4    A.   Yes.

5    Q.   And this -- the patrol guide provision applies to stop and

6    frisk, correct?

7    A.   Correct.

8    Q.   And is there a portion of this document that talks about

9    how stop and frisk applies to a felony or a misdemeanor?

10             If you look on the third section it says procedure.

11   A.   Procedure.  Yeah.  "When a uniformed member of the service

12   reasonably suspects --"

13   Q.   Read slowly for the court reporter.

14   A.   I am so sorry.

15             "When a uniformed member of the service reasonably

16   suspects a person has committed, is committing or is about to

17   commit a felony or a penal law misdemeanor."

18   Q.   There's a definition section up there for a stop and frisk

19   and there's a definition of stop.  Can you read that for the

20   court.

21   A.   "To temporarily detain a person for questioning."

22   Q.   So if you walk up to individuals on the street to ask them

23   a question, is that a stop, according to what your

24   understanding is of the patrol guide?

25   A.   Just to ask them a question, no.

1   Q.  Is it fair to say that to be a stop you have to intend to

2   temporarily detain a person for questioning.

3   A.  That's correct.

4   Q.  And there's also a definition for search.  Can you just

5   read that?

6   A.  "Search.  To place hands inside pockets or other interior

7   parts of clothing to determine if object felt is a weapon."

8   Q.  Now is it fair to say when you're doing a stop and frisk

9   that you can only do a search of a person if the frisk that you

10  conduct gives you some reason to believe the person has a

11  weapon?

12  A.  Yes.

13  Q.  And how sensitive of a search can you do if in frisking

14  somebody you come upon something that you believe is a weapon?

15  A.  Well it's supposed to be that area only.

16  Q.  Okay.

17  A.  So if there's a bulge on the right side of his waist and I

18  believe it to be a weapon, I search that area only.

19  Q.  If there is -- if in searching the individual you find a --

20  something that -- a bulge in the jacket, does that give you

21  permission to go through pockets of somebody?

22  A.  No.  Definitely not.

23          THE COURT:  I may have missed it but when did you say

24  you could do the frisk?

25          THE WITNESS:  The frisk.  He didn't ask me that.

1          THE COURT:  I guess I am.

2          THE WITNESS:  Well the frisk is -- I frisk people when

3    there is a bulge.  And only in that area.  So if there is a

4    bulge on his right waist and I believe it to be a weapon, I

5    frisk that area only.

6          THE COURT:  So you wouldn't routinely frisk somebody

7    who is stopped for questioning?

8          THE WITNESS:  No.  Definitely not.

9    BY MR. MOORE:

10   Q.  So you would only frisk somebody when you have reason to

11   believe that the person might have a weapon?

12   A.  Yes.

13   Q.  And, in fact, the definition reads, "A running of the hands

14   over the clothing feeling for a weapon," correct?

15   A.  That is correct.

16   Q.  So it refers specifically to a weapon?

17   A.  Yes.

18   Q.  So simply stopping somebody does not give you the

19   permission to frisk somebody, correct?

20   A.  That's correct.

21         THE COURT:  The next paragraph says -- see where it

22   says, "Number two.  Frisk, if you reasonably suspect you or

23   others are in danger of physical injury."

24         THE WITNESS:  Right.

25         THE COURT:  And that's what you just said, right?

1          THE WITNESS:  Right.

2    Q.  And the third -- the one right below that it says "Search,

3    if frisk reveals object may be a weapon," correct?

4    A.  Correct.

5          THE COURT:  So in the frisk part you don't go inside

6    the pocket?

7          THE WITNESS:  No.

8          THE COURT:  That's when you go outside?

9          THE WITNESS:  Only time when you go in --

10         THE COURT:  That's the search.

11         THE WITNESS:  Right.  The only time you go in is if I

12   feel it and it's a gun.  Then I go in and I pull it out.  Or a

13   knife.  A weapon.

14   Q.  Now, over the course of your career as a police officer in

15   the New York City Police Department you've had occasion to

16   arrest people, correct?

17   A.  Yes.

18   Q.  And when do you believe you have the authority to arrest

19   somebody on the street?

20   A.  Probable cause.  When I have probable cause to believe that

21   they committed a crime.

22   Q.  And have you had occasion during your -- the time you've

23   been a police officer to issue summonses?

24   A.  Yes.

25   Q.  And when do you believe you have the authority to issue

1    somebody a summons?

2    A.   Same thing.  Probable cause that they committed the

3    violation.

4    Q.   And you've had occasion to conduct stop and frisks of

5    individuals, correct?

6    A.   Yes.

7    Q.   When do you believe that you have the authority to stop

8    somebody?

9    A.   When you have reasonable cause to believe they committed a

10   criminal misdemeanor or felony.

11   Q.   Is that also referred to sometimes as reasonable suspicion?

12   A.   Yes.

13   Q.   And have you received training on when you can make stop,

14   questions, and frisks?

15   A.   Multiple trainings.

16   Q.   You received training on that at the academy, correct?

17   A.   I received the first one in the academy and then others

18   following that.  One -- a couple at the precinct level.

19   Q.   And from time to time do you receive bulletins within the

20   police department about stop and frisk issues?

21   A.   At roll call we have a training officer who approaches us,

22   gives us a form just like this, shows us a bulletin here and

23   there, gives us a piece of paper, explains it short, you know,

24   briefly.  And that's the extent of that training.

25   Q.   Have you recently been sent, Officer Serrano, for

1    retraining on stop and frisk?

2    A.  Yes, I have.

3    Q.  When did that occur?

4    A.  Don't know the exact date, I'm sorry.  But it was within --

5    maybe like the last month.

6    Q.  We'll get to that in a minute.  I just want to bring up

7    that you did have the retraining.

8            Are you aware that the New York City Police Department

9    has a policy against racial profiling?

10   A.  Yes.

11   Q.  Have you ever received any training in the New York City

12   Police Department on that policy?

13   A.  Yes.

14   Q.  What was the extent of the training you received on that?

15   A.  Same like the 250.  At the academy they had a class on the

16   250.  They gave you bulletins and papers.  And had a speech

17   about it.  And then at the -- every now and then it pops up at

18   roll call with the training supervisor and hands out bulletins,

19   gives a quick description of the training and that's it.

20   Q.  When you say a description of the training, do you mean

21   that the training officer reads the policy against racial

22   profiling?

23   A.  Yes.  He reads it off the --

24   Q.  And beyond that, have you ever received any training beyond

25   just the reading of the policy?

D3k9flo5                    Serrano - direct

1    A.  Not that I remember.

2    Q.  Tell us what the command structure of the 40th precinct

3    is.

4    A.  Well at the top is the commanding officer, Deputy Inspector

5    McCormack.

6    Q.  He's currently the commanding officer, Deputy Inspector

7    Christopher McCormack?

8    A.  Yes.  Christopher McCormack is the commanding officer.

9            Then right under him is the executive officer, which

10   is -- don't know her first name, but she's Captain Matarasso,

11   the executive officer.

12           After her is the admin lieutenant, which is Lieutenant

13   Patelli.

14           And after him is the integrity control officer,

15   Lieutenant Alba.

16           And then after them would be the lieutenant platoon

17   commanders.  The only one I know of is two of them which is

18   Lieutenant Bucci.  He's the -- he's in day tours.

19           And my lieutenant platoon commander is Lieutenant

20   Mack.

21   Q.  What's that last one?

22   A.  Mack M-A-C-K.  Like the Big Mack.

23   Q.  And then there are platoon commanders for the three tours

24   of duty?

25   A.  Yes.  I don't know who the midnight.

1   Q.  Below that would be sergeants who are squad supervisors

2   within each platoon?

3   A.  Yes.  I'm sorry.  After the lieutenant there's the squad

4   supervisors.  They are sergeants.  There's one for every

5   platoon.

6   Q.  Let me ask you --

7   A.  Squad.

8   Q.  Who is your current supervisor?

9   A.  Sergeant Monroe.

10  Q.  And how long has he been your supervisor?

11  A.  Approximately two years.

12  Q.  Are you evaluated by the New York City Police Department?

13  A.  We -- right now -- if I may, I saw a monthly sheet there.

14  It has changed from -- since Officer Polanco has been active, I

15  guess, it's now -- that was a monthly.  Now they evaluate us on

16  a daily, weekly, monthly, quarterly, yearly level.  So they are

17  constantly monitoring us.

18  Q.  And on a monthly basis does the evaluation consist of

19  simply putting down numbers and requests for excellence report?

20  A.  That's it.  You put down what you did for that day, how

21  many complaints you wrote, how many ADA cards you wrote, how

22  many car accidents, how many summons, arrests, how many 250s.

23  It's just a bunch of numbers on a piece of paper depicting what

24  I did all day long.

25  Q.  Who gets that report?

1  A.  On a weekly basis, the sergeant is supposed to -- every

2  seven days he's supposed to look at it.  And I think grade it

3  and see if I was an effective officer for that week.

4  Q.  And is the exchange with the -- with your squad supervisor,

5  is there any substance to it in terms of going through the

6  actual nature of an arrest or a stop and frisk or a summons or

7  is it just an evaluation of the numbers?

8  A.  What he normally does, he looks at it.  If I don't have a

9  specific amount of activity -- usually the first week he's not

10  going to bother you, because you have the whole month to catch

11  up.  But he will look at it and sign it.  And if it gets

12  towards the end, he'll let you know if you're lacking in

13  activity.

14  Q.  My question though is -- I appreciate that.  But my

15  question is:  Do you ever discuss with your squad supervisor,

16  say for instance, the underlying facts regarding a particular

17  stop and frisk?

18  A.  No.

19  Q.  That's not part of the process?

20  A.  No.

21  Q.  Let me ask you this directly, Officer Serrano.  To your

22  knowledge, has the NYPD imposed quotas for enforcement activity

23  on you and your fellow officers?

24  A.  Yes.

25  Q.  And can you tell us what kind of things that they say to

1   you about your activity?

2   A.  Well it's not enough.  It's too low.

3   Q.  So essentially if your numbers are not high enough bring

4   your numbers up?

5   A.  Well if I'm going to be specific I was told once by

6   lieutenant -- I'm trying to remember his name -- but he told --

7   I had a real good month.  I had about three arrests, about 20

8   summonses.  And you know A, B, C, a mixture.  And I didn't have

9   any 250s.  And he mentioned it.  You know.  I had a very busy

10  week.  I answered a lot of jobs.  Did a lot of work.  And I

11  thought I was going to get praise that month.  And he came up

12  to me and said you need more 250s.  I was like really.

13  Q.  Who was that?

14  A.  I'm trying -- I don't know.  It's a lieutenant.  He

15  retired.  This happened a while ago.

16  Q.  Okay.  All right.  But while in the 40th precinct, right?

17  A.  Yes.

18  Q.  What is your basis for your knowledge that the NYPD, in

19  your judgment, imposes quotas for enforcement activity on you

20  and your fellow officers?  What's your basis for your knowledge

21  of that?

22  A.  The basis is they tell you to your face.  They tell you at

23  roll call.  They pull you to the side and tell you.  Also you

24  get retaliated against.  I've gotten retaliated against because

25  I didn't meet the quota.  Again, I might have enough arrests,

1    but I might not have enough C summonses for them.  So they go

2    after that.

3           But again it's -- they do retaliate.  And they tell

4    you that I need the specific number.

5    Q.  Is that also something that's reinforced by your union

6    delegates?

7    A.  Yes.  There were two trustees during an election.  And I

8    wrote an affidavit depicting that they were forcing me to --

9           MS. COOKE:  Objection, your Honor, to the extent the

10   witness is testifying about a written affidavit.  That's a

11   hearsay statement.

12          THE COURT:  Sustained.

13          MR. MOORE:  I'm sorry.

14          THE COURT:  She's objecting to his out-of-court

15   statement.

16          MR. MOORE:  To his out-of-court statement?

17          THE COURT:  Yes.

18   Q.  Leave out what you wrote and tell us what you -- tell us

19   what this example is.

20   A.  Okay.  Well I told him that I was being --

21          MS. COOKE:  No.

22          THE COURT:  Still the same thing.

23          MR. MOORE:  It's what he says, Judge.

24          THE COURT:  I know.  That's an out-of-court statement.

25          MR. MOORE:  They can cross-examine.

1           THE COURT:  I understand that.  But it's still a

2      hearsay statement.

3           MR. MOORE:  All right.  Fine.

4      Q.  Can you tell me who of your supervisors that you mentioned

5      have told you that in sum and substance that there are quotas

6      within the New York City Police Department?

7      A.  Many.  I'm sorry.

8      Q.  Present squad supervisor, has he told you that?

9      A.  Sergeant Monroe.  Sergeant Bradway.  Sergeant Bloom --

10     lieutenant -- that name is going to come to me.

11     Q.  Dutae?

12     A.  I'm sorry.  Lieutenant Dutae.

13     Q.  I thought that was the one that was -- I don't mean to --

14     A.  There's another -- there's Lieutenant Dutae.  There's

15     lieutenant -- the ICO Lieutenant Barrett.  They have given me

16     specific numbers in a specific area within a specific

17     timeframe.  And if I don't write them I will be retaliated

18     against.

19     Q.  And when they talk to you -- does that also include Captain

20     Matarasso and Deputy Inspector McCormack?

21     A.  Yes.

22     Q.  When they talk to you about your numbers, is it other than

23     that or is it just basically your numbers?

24     A.  It's --

25     Q.  Do they go into the substance of what your activity is?

1  A.  No.  They just -- they tell you exactly what you -- you

2  don't have enough of.

3          Can I speak about evaluation?

4  Q.  I'm sorry?

5  A.  I had the evaluation with Captain Matarasso.

6  Q.  Right.  We'll get to that in a minute.

7  A.  Well, yeah, they tell you specifically what you're lacking

8  in.

9  Q.  So, when do you believe that these -- when did you first

10 become aware that NYPD was, in your judgment, imposing quotas

11 on your -- for your enforcement activity?

12 A.  (No response).

13 Q.  When did you first become aware of that?

14 A.  Well it's immediately.  It shows up immediately when you

15 come out of the police academy.  But I would call that a soft

16 quota.  I wasn't really retaliated against.  They just give you

17 a number.  I remember the four and -- one arrest a quarter, and

18 20 summonses.  But they really didn't come after me then.

19          2007 is when the 1 and 20 came into play, which is one

20 arrest, twenty summonses.  And, again, the twenty summonses

21 were not anything.  They are specific.  They would say I need

22 five C summonses, which are criminal court summonses.  I need

23 five B summonses, which are movers.

24 Q.  When you say movers, what do you mean?

25 A.  When you're in a car and you have a cellphone and they give

1  you a summons for that.  Anything in a car is basically -- when

2  I write a summons it's called a B summons, which in traffic

3  court is where you have to answer it.  And the other summons is

4  A summons which is a parker.  And they would say five, five,

5  and five.  And then the other five would be up to us.

6          But it would definitely be those summons, the 250s,

7  and the arrests.

8  Q.  So in addition to the summonses and arrests there's also --

9  you believe there's also a quota with respect to your 250

10  activity, correct?

11  A.  Yes.

12  Q.  Now, Officer Serrano, are you -- do you have any concern

13  about testifying here today?

14  A.  Oh, definitely.

15  Q.  What's that concern?

16  A.  Retaliation which it has already started.  And I fear that

17  they're going to try to set me up and get me fired somehow.

18  Q.  Why do you believe that?

19  A.  Again, it already started.  The minute -- 2007, again, I

20  was scared.  But I knew that certain things were wrong so I

21  started taking notes and just recording stuff.  But, again, too

22  scared to come out.

23          And recently when I finally mentioned something and I

24  called IAB, the minute -- I'm sorry.  The minute I made it, I

25  guess, known that I was going to testify in this court,

1    captain -- Deputy Inspector McCormack when he came back from

2    CompStat started to just do things.  And one of the things that

3    he did was he immediately called me into his office and -- I

4    appealed my evaluation.  So he said that that -- under the

5    pretense of appealing my evaluation, he called me into his

6    office with -- can I go into that?

7    Q.  You can tell us who it was.  We'll get into your

8    evaluation, some of which is on an audio recording but --

9    A.  Well he did a lot of things to retaliate.

10   Q.  Okay.  My question really goes to you have some fear of

11   getting up here and testifying and the way you're testifying

12   about what's going on in the New York City Police Department,

13   correct?

14   A.  Yes.  I have fear to go -- my first day starts in three

15   days.  I can imagine what my first day is going to be like.

16   Q.  Your first what?

17   A.  My first day at work.

18   Q.  Your first day back at work?

19   A.  From my regular day off.

20   Q.  When you say that you have been retaliated against, can you

21   tell us in what ways you've suffered retaliation for --

22   withdraw that.

23        Have you expressed your opinion to your supervisors

24   that you believe that using quotas are illegal?

25   A.  Yes, I have.

D3k9flo5          Serrano - direct

1   Q.  And when did you first begin to do that?

2   A.  I've been protesting 2007, 2008.  I've been verbally

3   telling my supervisors that this is wrong, this is wrong, this

4   is wrong, and they're constantly telling me:  Hey this is the

5   way it is.  It's been done this way forever.  You can't fight

6   that losing battle.

7   Q.  And as a result of your coming forward and having that

8   discussion with your supervisors, do you feel that you've been

9   retaliated against?

10  A.  Yes.  Definitely.

11  Q.  In what ways?

12  A.  Well someone took my locker and they moved it so all the

13  contents were tossed everywhere.  They put a lot of stickers of

14  rodents on my locker.

15  Q.  What did that mean to you?

16  A.  That I was a rat.

17  Q.  And what's the significance of being labeled a rat when

18  you're a member of the New York City Police Department?

19  A.  Usually if you call IAB in reference to another police

20  officer, you're called a rat.  But the inspector has a lot of

21  friends.  And they are very upset about what I did.

22          MS. COOKE:  Objection, your Honor.  To the extent he's

23  testifying about --

24          THE COURT:  To the extent he's just describing they

25  were very upset.

1          How do you know that?  Did you see the upset?  Did you

2     see it yourself?

3              THE WITNESS:  Yes, yes.

4              THE COURT:  What did you see?

5              THE WITNESS:  My, what do you call it, my PBA rep,

6     he -- we used to be good people.  Now he talks to me -- he

7     yells at me.  He has very smart -- smart -- as soon as it was

8     known that I did this, he's just -- doesn't even want to look

9     in my direction.

10             THE COURT:  I'll allow that.  That's what he observed.

11    Q.  So once you came forward you believe the -- at least

12    certainly the atmosphere for you within that precinct changed,

13    correct?

14    A.  Definitely.

15             MR. MOORE:  Judge, I notice it's 4:30.  It would be a

16    good point to --

17             THE COURT:  Okay.  Good.  We're done for the day.  See

18    everybody tomorrow at 10:00.  Thank you.

19             (Adjourned to March 21, 2013 at 10:00 a.m.)

20

21

22

23

24

25

1                   INDEX OF EXAMINATION

2    Examination of:                        Page

3    ADHYL POLANCO

4    Direct By Mr. Charney . . . . . . . . . . . 445

5    Cross By Ms. Cooke . . . . . . . . . . . . . 508

6    Redirect By Mr. Charney . . . . . . . . . . 575

7    Recross By Ms. Cooke . . . . . . . . . . . . 589

8     PEDRO SERRANO

9    Direct By Mr. Moore . . . . . . . . . . . . 635

10                   PLAINTIFF EXHIBITS

11   Exhibit No.                          Received

12    284  . . . . . . . . . . . . . . . . . . . 465

13    98   . . . . . . . . . . . . . . . . . . . 506

14    419 and 420  . . . . . . . . . . . . . . . 552

15                   DEFENDANT EXHIBITS

16   Exhibit No.                          Received

17    X-11 . . . . . . . . . . . . . . . . . . . 552

18

19

20

21

22

23

24

25