D3L8FLO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DAVID FLOYD, et al.,

4                    Plaintiffs,

5          v.                            08 CV 1034(SAS)

6   CITY OF NEW YORK, et al.,

7                    Defendants.

8   ------------------------------x
                                      New York, N.Y.
9                                     March 21, 2013
                                      10:05 a.m.
10
    Before:
11
                    HON. SHIRA A. SCHEINDLIN,
12
                                      District Judge
13
                            APPEARANCES
14
    BELDOCK LEVINE & HOFFMAN, LLP
15       Attorneys for Plaintiffs
    BY:  JENN ROLNICK BORCHETTA
16       JONATHAN MOORE

17  COVINGTON & BURLING, LLP
         Attorneys for Plaintiffs
18  BY:  KASEY MARTINI
         GRETCHEN HOFF VARNER
19       ERIC HELLERMAN
         BRUCE COREY
20
    CENTER FOR CONSTITUTIONAL RIGHTS
21       Attorneys for Plaintiffs
    BY:  DARIUS CHARNEY
22       SUNITA PATEL
         BAHER AZMY
23

24

25

D3L8FLO1

1                    APPEARANCES (Cont'd)

2

MICHAEL A. CARDOZO
3       Corporation Counsel for the City of New York
        Attorney for Defendants
4    BY:  HEIDI GROSSMAN
         BRENDA E. COOKE
5        JOSEPH MARUTOLLO
         MORGAN D. KUNZ
6        SUZANNA PUBLICKER
         LINDA DONAHUE
7        LISA M. RICHARDSON
         JUDSON VICKERS
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Trial resumed)

2      PEDRO SERRANO, resumed.

3          MR. MOORE:  Good morning, Judge.

4   DIRECT EXAMINATION (Cont'd)

5   BY MR. MOORE:

6   Q.  Officer Serrano, I remind you you are still under oath.

7   A.  Yes, sir.

8   Q.  If you could keep your voice up so that everybody can hear

9   you.

10          At the end of the day, we were talking about the fact

11   that you believe that there were quotas imposed with regard to

12   your enforcement activity while you have been in the police

13   department, correct?

14   A.  Yes.

15   Q.  We talked about when you believed it started.

16          What I want to ask you now is, how did you learn about

17   the existence of quotas?

18   A.  It was physically imposed on me.

19   Q.  Were there conversations or directives or orders that you

20   received from your supervisors with respect to that?

21   A.  Yes.

22   Q.  What kinds of things would they say to you, your

23   supervisors say to you that would give you the impression that

24   they were requiring a numerical number in terms of your

25   performance activities?

D3L8FLO1                    Serrano - direct

1    A.  One instance that I remember was with Lieutenant Doute, and

2    it was impact overtime, it was forced.  Just having that impact

3    overtime was the retaliation for not meeting my quota.  That

4    day --

5    Q.  Let me stop you there.  Why did you believe that was

6    retaliation?

7    A.  My numbers were low, and I did not want the overtime, and

8    it was physically -- it was verbally told to me that you're

9    going to get this overtime.

10   Q.  When you say your numbers are low, are you referring to

11   your numbers with regard to arrests, summonses and 250s?

12   A.  The 1 and 20, arrests, summonses and 250s.

13   Q.  In terms of your radio runs or other duties you performed

14   as a police officer, did anybody ever tell you your numbers

15   were low in that regard?

16   A.  Never mentioned it.

17   Q.  What did Lieutenant Doute tell you?

18   A.  Well, during roll call, he says that he wanted five, five

19   and five.

20   Q.  Say that again.

21   A.  He wanted five, five and five.

22   Q.  What did that mean to you?

23   A.  What it meant to me is he wanted five C summonses, five

24   verticals and five 250s.

25   Q.  This was for one tour?

1    A.   For one tour.

2    Q.   What are C summonses again?

3    A.   C summonses are criminal court summonses, returnable to

4    criminal court.

5    Q.   What are verticals?  Tell us what verticals are.

6    A.   Verticals is you enter a building, you go to the top floor,

7    the roof, you check the top floor, you check all staircases,

8    every floor, to make sure there is no one hanging out, there is

9    no crime, and when you reach the bottom -- before you go up,

10   most of the time you tell central you're going up.  And when

11   you leave, you tell central you're done.

12   Q.   So that's a vertical, correct?

13   A.   That's a vertical.

14   Q.   Now, you called it an impact roll call.  Is that a roll

15   call that's different from the regular tour roll calls?

16   A.   Yes, it is.

17   Q.   The regular tour roll calls, they happen before you go out

18   on patrol, correct?

19   A.   Yes.

20   Q.   And you typically would patrol in a --

21            MS. COOKE:  Objection.  He is leading the witness.

22            MR. MOORE:  This is foundation.

23            THE COURT:  It is foundation.

24   Q.   How would you typically conduct your tour on a regular

25   tour?

1  A.  The roll call -- there are three roll calls.  There is the

2  midnight roll call, there is the day tour roll call, and there

3  is a 4 to 12 roll call.  I am the 4 to 12 roll call on a normal

4  basis.  For this overtime, it overlaps the midnights and 4 to

5  12s, and that has a separate roll call.  And that roll call is

6  when Lieutenant Doute, during impact overtime, forced impact

7  overtime, told me that I needed to write five, five and five.

8  In fact, he mentioned it about three times, maybe more, and I

9  tried to clarify what he meant.

10  Q.  Well, we actually will play that recording in a minute.

11          Are there any other examples of where you were told or

12  given the impression by your supervisors that they required you

13  to do a certain number of -- achieve a certain number with

14  regard to your enforcement activity?

15  A.  Yes.  The second time was with Lieutenant Barrett.  She is

16  the integrity control officer.  During impact overtime, again,

17  which was forced, I was told to go out there and write five

18  summonses, five criminal summonses, in a specific area, within

19  a specific time and a specific place.

20  Q.  Were you told to do that focusing on only a certain type of

21  event or a certain type of alleged criminal activity?

22  A.  She narrowed it down to, don't write anybody that's a

23  dog -- walking a dog without a leash.  Do not write elderly

24  people, I think she said 65, I can't remember.  She narrowed it

25  down that I couldn't write certain summonses that she did not

1    want, or the department did not want.  And she told me I have

2    to write it within a specific area.

3    Q.  Now --

4    A.  I have something else.

5    Q.  I'm sorry?

6    A.  She said also that, on both occasions, that the supervisors

7    will check up on you to make sure I have that activity.

8    Q.  Let me ask you some questions now with regard to some of

9    the audio recordings you have made.

10            Beginning in 2010, and continuing to the present, did

11   you make audio recordings of statements by your supervisors?

12   A.  Yes.

13   Q.  Why did you do that?

14   A.  Well, I'm a police officer, and if there was something

15   going wrong, and I knew it was wrong, and I knew if I would say

16   something to anyone, they wouldn't believe me, because the

17   person who I am accusing has higher rank.  You have deputy

18   inspectors, you have lieutenants, captains, sergeants, they are

19   all above police officers.  They are asking me to do something

20   that's illegal in my opinion.  And I was worried.  No one is

21   going to believe me.  So I was hoping that with the recordings,

22   with documenting it in my memo book and doing a bunch of

23   things, that someone eventually will believe me.

24   Q.  When you say something illegal, what are you referring to?

25   A.  Stopping people illegally, arresting people illegally,

1   quotas, downgrading felonies.  There's a lot of things that

2   they do -- I mean they, I mean the hierarchy of NYPD -- that

3   puts a police officer, his job in jeopardy.  And if we don't do

4   it, they throw the book at us, the book meaning the patrol

5   guide, and they retaliate.

6   Q.  Did anyone tell you to make those recordings?

7   A.  No.

8   Q.  Did you consult with anybody before you decided to make

9   those recordings?

10  A.  No.

11  Q.  So that's something you decided to do on your own, correct?

12  A.  Yes.

13  Q.  What was, generally, the subject matter of those

14  recordings?

15  A.  Generally, the subject matter of the recordings are illegal

16  quotas -- illegal quotas, which is arrests, summonses, 250s.

17  Q.  With what kind of equipment did you make these recordings?

18  A.  The first two were made on my iPhone.

19  Q.  Your iPhone?

20  A.  My iPhone.  The next one was made on my Galaxy III phone,

21  Samsung.

22  Q.  Were you personally present when those recordings were

23  made?

24  A.  Yes.

25  Q.  Did you alter those recordings in any way after you made

1  them?

2  A.  No.

3  Q.  Other than perhaps sharing them with some attorneys, did

4  you share those recordings, did you give those recordings to

5  anybody else?

6  A.  No, just my attorney.

7  Q.  Were there situations when your supervisors talked to you

8  about quotas and performance standards, however you want to

9  describe it, that you did not record?

10 A.  Many.

11 Q.  Why were there times when you didn't make those recordings?

12 A.  Several reasons.  First, I thought it was just -- you know,

13 people ask for something, and you can ask whatever you want,

14 and if I don't give it to you and you don't retaliate against

15 me, then you can ask whatever you want from me.  When I am on

16 patrol, whatever I see is what I write.  I do my job.  Whatever

17 I have to do, I do it.  If it's not there, I am not going to

18 make it up just because you want a number.  That's one reason.

19      The other reason is after I felt that I was getting

20 retaliated against, and they are coming after my employment,

21 that I needed proof.  So I started recording some of them, and

22 sometimes I didn't have a recorder or the recording was muffed

23 and you couldn't hear anything.  It's a bunch of reasons, but

24 those are the main reasons.

25 Q.  Were you trying to conceal the fact that you were making

1    those recordings?

2    A.   I didn't want anybody to know.

3    Q.   I want to play for you what is the first track on Exhibit

4    297, which is a recording made on June 30, 2010.

5              Why don't we just play that first track.

6              (Audiotape played)

7    Q.   Do you hear voices on that?

8    A.   That's Lieutenant Barrett, and the first number she gave me

9    was the return date.

10   Q.   The other voice was your voice, correct?

11   A.   Yes.

12   Q.   Lieutenant Barret was who?

13   A.   At the time, I believe --

14   Q.   Would you lean closer to the microphone?

15   A.   At the time, I believe she was the integrity control

16   officer of the 40th Precinct.

17             (Audiotape played)

18             MR. MOORE:   What time is that?

19             MS. YOUNG:   1:21

20             MR. MOORE:   Keep playing.

21             (Audiotape played)

22   Q.   Did you hear Lieutenant Barrett say "looking for five"

23   there?

24   A.   Yes.

25   Q.   What did you understand that to mean?

1    A.  Looking for five C summonses.

2              MR. MOORE:  That was at what time?

3              MS. YOUNG:  1:27.

4              MR. MOORE:  Continue to play.

5              (Audiotape played)

6    Q.  St. Mary's Park was a park within the 40th Precinct?

7    A.  Yes.

8    Q.  When you heard her say "go crazy there, write everything in

9    there," what did you understand that to mean?

10   A.  Well, she gave me -- she said, don't write out of the zone.

11   St. Mary's Park is in the zone.  If there is a crime spike

12   concern area, they want the C summonses to reflect the crime

13   spike so they can say, the department, or the deputy inspector,

14   that we addressed the condition.

15             MR. MOORE:  What time is that?

16             MS. YOUNG:  2:13.

17             MR. MOORE:  Continue.

18             (Audiotape played)

19             MR. MOORE:  What time is that?

20             MS. YOUNG:  4:07.

21   Q.  You heard her say looking for fives again?

22   A.  Looking for five again.

23   Q.  What else did you hear of significance on that tape?

24   A.  It shouldn't be a problem, and I will be checking up on

25   you.

D3L8FLO1                   Serrano - direct

1   Q.  What did you understand that to mean?

2   A.  Well, make sure you get five, because I am going to check

3   up on you.  And if you don't, I probably would get another

4   impact overtime, and this time I will be sitting with the boss.

5   Q.  During the tour she would be checking up on you?

6   A.  During the tour.  Somewhere down the line she is going to

7   check up on me.

8   Q.  I want to go to the second track on that Plaintiffs'

9   Exhibit 297.  This is a recording of a conversation on July 31,

10  2010.

11          We will start the tape.  Go ahead.

12          (Audiotape played)

13  Q.  Did you hear the term "five, five and five"?

14  A.  Yes.  He said it twice.

15  Q.  Who is that?

16  A.  That's Lieutenant Doute.  He is retired right now.

17  Q.  Who at the time was Lieutenant Doute?

18  A.  I am not 100 percent sure, but he might have been a

19  midnight platoon commander.  I'm not too sure.

20  Q.  This is an impact overtime roll call, correct?

21  A.  Yes.  This is impact overtime roll call.  Again, forced

22  impact overtime roll call with Lieutenant Doute.

23  Q.  Again, this recording was made with your iPhone?

24  A.  IPhone.

25  Q.  Do you recall how you engaged the iPhone at that point to

1    make the recording?

2    A.  Well, there is an app for that.

3    Q.  Pardon?

4    A.  There is an app for it.  You just open it up.  It's a

5    recording device.  You hit record and it records.

6    Q.  How would you do that?  Would you do that while you're

7    standing there with the other officers or would you go off to

8    the side?

9    A.  You go off to the side somewhere.  As soon as you see that

10   the lieutenant comes in, you hit record, put it in your pocket,

11   and whatever happens happens.

12            MR. MOORE:  What time was that?

13            MS. YOUNG:  28 seconds.

14   Q.  What did you understand the five, five, five to mean?

15   A.  Five C summonses, five verticals, and five 250s.

16   Q.  For that tour?

17   A.  For that tour.

18            MR. MOORE:  You can play it again.

19            (Audiotape played)

20            MR. MOORE:  What time is that?

21            MS. YOUNG:  1 minute, 3 seconds.

22   Q.  Did you hear in that portion of the recording the word

23   "status check"?

24   A.  Yes.  The lieutenant instructed the sergeant to do a status

25   check somewhere during the night.  So he would take the -- he

D3L8FLO1                    Serrano - direct

1    would ask you how many summonses you wrote to make sure you

2    wrote your five, or your five, five, five.

3    Q.  So it was a status check to see if you were getting your

4    numbers, correct?

5    A.  Yes.

6    Q.  Who was the sergeant that the lieutenant instructed, if you

7    recall?

8    A.  At this time, although it was Sergeant Silver, he is

9    actually a decent supervisor and a real good person.

10             MR. MOORE:  I would move the admission of Exhibit 297.

11             THE COURT:  Is that the recording?

12             MR. MOORE:  Yes.  The recording of one exhibit with

13   the two tracks on it.

14             MS. COOKE:  No objection.

15             THE COURT:  297 is received.

16             (Plaintiffs' Exhibit 297 received in evidence)

17   Q.  Now, is it fair to say, Officer Serrano, that you failed to

18   meet the numerical standard that was given to you by some of

19   your supervisors?

20   A.  I failed to meet the quota, yes.

21   Q.  As a result of that, was there any effect on your status

22   within the police department?

23   A.  Yes.

24   Q.  What was the effect?

25   A.  Well, because I failed to meet the quota, starting from

1   2007 on, the retaliation got worse and worse.  It first started

2   off with the -- when I have a day off, they would mandate, they

3   would give me forced overtime.  They would give me low

4   evaluations, yell at me, deny my days off.  So far that is what

5   I remember.

6   Q.  Speaking about the evaluations, did the overall rating on

7   your evaluations begin to fall at that point?

8   A.  Yes.

9   Q.  Within the police department, officers are evaluated on a

10  general number from 1 to 5, is that correct?

11  A.  Correct.

12  Q.  And before you started having the problem with the quotas,

13  what kind of numbers were you getting in your overall

14  evaluation?

15  A.  I was getting 3.5 and 4s.

16  Q.  Afterwards, did those numbers start to go down?

17  A.  Yes.  5 being excellent and 1 being poor.

18  Q.  In 2011, what was your overall rating?

19  A.  3.

20  Q.  What about 2012?

21  A.  3.

22  Q.  Did you appeal that 2011 evaluation?

23  A.  Yes, I did.

24  Q.  What does that involve?

25  A.  When you feel that there is something wrong with your

1   evaluation, you have the right to meet with the rater, and the

2   rater usually is the executive officer or the deputy inspector,

3   because you're being rated by your sergeant and your

4   lieutenant.

5   Q.  So you would meet with the supervisor of those folks,

6   correct?

7   A.  Correct.

8   Q.  That would either be the executive officer of the precinct

9   or the commanding officer, correct?

10  A.  Correct.

11  Q.  Did you meet with either of those two individuals with

12  regard to your 2011 evaluation?

13  A.  Yes, I did.

14  Q.  Do you recall having a conversation with one of those

15  individuals in June of 2011?

16  A.  Yes.

17  Q.  Who was that that you had a conversation with?

18  A.  Captain Materasso, the executive officer.

19  Q.  Do you remember the date that occurred?

20  A.  I don't remember the date.

21  Q.  Is there somewhere where the date would be written down

22  somewhere?

23  A.  Yes.  I submitted some testimonial evidence.

24  Q.  Would it be in your memo book?

25  A.  Yes.

1   Q.  Do you know where your memo books are right now?

2   A.  Right now, IAB has about eight to ten of them.

3   Q.  That would cover the period including the period June 2011?

4   A.  Actually, it's from 2007 all the way to -- up to, I think,

5   January.

6   Q.  Of?

7   A.  2013.  That's an approximation.

8   Q.  At some point you had, in June, you're not sure of the

9   exact date, you had a conversation with Captain Materasso where

10  you were discussing the appeal of your evaluation?

11  A.  Correct.

12  Q.  Who was present besides yourself and Captain Materasso?

13  A.  It was Captain Materasso, Sergeant Monroe and myself.

14  Q.  Sergeant Monroe is who?

15  A.  He is my immediate patrol supervisor.

16  Q.  Where did it take place?

17  A.  It took place inside the executive officer's office.

18  Q.  At the 40th Precinct?

19  A.  At the 40th Precinct.

20  Q.  Why were you appealing your evaluation?

21  A.  Well, several reasons.  Before that I had a 4.0, and as

22  soon as this new regime came in, which is Captain Materasso,

23  Deputy Inspector McCormack, Lieutenant Albin, and Lieutenant

24  Batelli, my evaluation dropped as a result of me not meeting

25  the quota.  So when I saw 3, I knew I had to speak up because

1   the next thing they do, according to the patrol guide, is that

2   they hit you with a 2.5 and that is not good.  Now they can put

3   you on monitoring.

4   Q.  Monitoring?

5   A.  Monitoring.

6   Q.  Performance monitoring?

7   A.  Performance monitoring.  I was worried, and I wanted to

8   make sure exactly what she wanted me to do so I don't go below

9   that number.

10  Q.  So you had a conversation with Captain Materasso about why

11  you got a 3 on that evaluation, correct?

12  A.  Yes.  Essentially, I appealed my evaluation in her office

13  and that was the conversation.

14  Q.  Can you tell us what she said to you about why you received

15  a 3 on your evaluation?

16  A.  She said that -- first of all, on my evaluation there is

17  about 20-something points and it describes my duties as a

18  police officer.  And I discussed all the points that were

19  written on the actual appeal.

20          MS. COOKE:  Objection.  This is nonresponsive to the

21  question.  Move to strike.

22          THE COURT:  He did ask you specifically about what she

23  said about why you received a 3.  I guess you were giving

24  background to that, but you didn't get to what she said.  Could

25  you tell us what she said about why you received a 3?

D3L8FLO1            Serrano - direct

1    A.  She gave me a 3, and she said that 50 percent of my grade

2    or mark was arrests, 250s, and the summonses.  So it was the

3    arrests, 250s and the summonses, which as soon as she said

4    that, I immediately responded that that was a quota and that it

5    wasn't written anywhere.

6    Q.  Did she respond to that when you said that's a quota?

7    A.  Yes.  When I said that was a quota, she responded that she

8    could do that because of the operation order.  I believe it's

9    Operation Order 52.

10   Q.  Had you known at that point about Operations Order 52?

11   A.  I had no idea it existed.

12           MR. MOORE:  One second, Judge.

13   Q.  Did you tell her that you believed that that quota was

14   illegal?

15           MS. COOKE:  Objection, your Honor.  Leading.

16           THE COURT:  I will allow it.

17           Did you happen to say that?

18   A.  I said specifically that it's a quota and it's illegal.

19   Q.  What did she say to you when you said it was a quota and it

20   was illegal?

21   A.  She leaned back, smirked, and said that she can do that.

22   Those were her words.  "I can do that" she said.  And I was

23   perplexed at the time.  I had a stupid look on my face.  She

24   said it is Operation Order 52.  And that's what happened.

25           MR. MOORE:  Can you pull up Exhibit 285?

D3L8FLO1                    Serrano - direct

1   Q.  Officer Serrano, you went -- withdraw that.

2           Did you do anything to try to obtain Operations Order

3   52?

4   A.  Immediately when she said that there was an operation order

5   that gave her permission to do it, after it was over I wanted

6   to leave the evaluation and look up this operation order before

7   I signed my evaluation.  But she said -- she forced me to sign

8   it.  She said, you have to sign it now.  So she is a captain

9   and I didn't -- I am already on her bad side so I didn't want

10  to go too far.  So I signed it, and then I did some research

11  and I found it.

12          MR. MOORE:  Judge, up on the screen is Plaintiffs'

13  Exhibit 285, which is Operations Order 52.  I would move the

14  admission of that exhibit in evidence.

15          THE COURT:  I assume there is no objection to that.

16          MS. COOKE:  No objection.

17          THE COURT:  Exhibit 285 is received.

18          (Plaintiffs' Exhibit 285 received in evidence)

19          THE COURT:  Is there a particular portion you want me

20  to focus on?

21          MR. MOORE:  I am going to direct him to it now.

22  Q.  I want you to focus on the first paragraph for the moment.

23          You read that paragraph when you looked at Operations

24  Order 52, correct?

25  A.  Multiple times.

D3L8FLO1                    Serrano - direct

1    Q.  It refers to the term "proactive enforcement activities."

2    Do you see that?

3    A.  Yes.  It's in bold.

4    Q.  What specific proactive enforcement activities are referred

5    to in this paragraph?  And if I could direct your attention to

6    the last line of that.

7    A.  It says summonses, stopping, questioning of suspicious

8    individuals, and the arrests of criminals.

9    Q.  So the three specific things that are mentioned with regard

10   to proactive enforcement activities are summonses, stop and

11   question, and arrests, correct?

12   A.  That's correct.

13   Q.  If you could focus now on paragraph 3.  If you could look

14   at the second line in paragraph 3.  Can you read that line?

15   A.  Starting with "to provide"?

16   Q.  Paragraph 3, the second line.

17           The second sentence.  I'm sorry.

18   A.  "To provide"?

19   Q.  Yes.

20   A.  "To provide guidance to police officers concerning their

21   duties.  Department managers can and must set performance

22   goals."

23   Q.  Now, as a police officer, how did you interpret that?

24   A.  It says, quota, quota, quota, quota and quota.

25   Q.  Again, following that, there is a mention of arrests,

D3L8FLO1                    Serrano - direct

1  summonses and stops, right?

2  A.  Correct.

3  Q.  Now --

4  A.  May I add something?

5  Q.  Sure.

6  A.  It says self-initiated arrests, which Deputy Inspector

7  McCormack said over and over again, meaning that if you make an

8  arrest and he doesn't approve of it, and if it wasn't

9  self-initiated, then it doesn't count.

10  Q.  It doesn't count as what?

11  A.  As meeting his quota.  For instance, if there is a security

12  holding, someone stopped somebody in a Rite Aid and got him for

13  shoplifting, a radio run, I show up and arrest him, he did not

14  consider that a self-initiated arrest.

15  Q.  So what does the term "self-initiating arrest" mean, as you

16  understand it?

17  A.  As I understand, it is whatever he feels is a

18  self-initiated arrest is a self-initiated arrest.  It's

19  something that is not given to you through central.  It's

20  something that you go out there and you proactively search for

21  it.

22  Q.  So that would exclude all the arrests following a radio

23  run?

24  A.  Correct.  He doesn't believe that radio runs and other

25  things are --

1          MS. COOKE:  Objection to the extent he is testifying

2     about the belief of another person.

3     A.  These were actual words spoken to me.

4          THE COURT:  Did anybody tell you that responding to a

5     radio run is not part of the performance goals?

6          THE WITNESS:  Specifically told by supervisors that

7     radio runs and domestics and all the paperwork that I do is not

8     what they are looking for.

9     Q.  So they are looking at self-initiated arrests, stops and

10    summonses?

11    A.  Before it was any arrest.  Now it's self-initiated arrests,

12    and stop, question and frisk and summonses.  And even certain

13    summonses don't count also.  I was told specifically by a

14    supervisor certain summonses don't matter.

15    Q.  What summonses matter and what summonses don't based upon

16    what you have been told?

17    A.  You heard the lieutenant, she said that she didn't want any

18    summonses referring to dogs, bicycles on the sidewalk.  She

19    limit the amount of summonses that I could summons.

20    Q.  Meaning the types of activity that she was looking for

21    summonses from?

22    A.  Correct.

23    Q.  As a patrol officer, do you have a sense of how many, on

24    average, how many radio runs you would make in a month?

25    A.  In a month?  I have in a year a thousand -- you have to do

D3L8FLO1                    Serrano - direct

1    the math.

2    Q.  You don't have to do the math.

3              THE COURT:  He was trying to do that.  You

4    interrupted.  What were you saying?

5    A.  2 to 300 a month.  From 100 to 300 a month.  It depends on

6    how many days I am patrolling at.

7    Q.  So the fact that you may not be making self-initiated

8    arrests didn't mean you weren't busy?

9    A.  No.  I was very busy.

10   Q.  Now, if you could go to the second page of this document,

11   paragraph 8.  You see that paragraph 8, Officer Serrano?

12   A.  Yes, I do.

13   Q.  What does this relate to?

14   A.  Police officer's monthly conditions impact measurement

15   report.

16   Q.  Does this relate to the frequency with which officers are

17   supposed to now document their work in these categories?

18   A.  Yes.  It actually tells you how to fold it and where to put

19   it.

20   Q.  When you say how to fold it and where to put it, what do

21   you mean?

22   A.  It says right here, "Uniformed members of service will

23   ensure that the police officer's monthly conditions impact

24   measurement report is folded neatly as to minimize any tears.

25   Uniformed members of service will document the two primary

1   identified conditions to be addressed during the tour on the

2   report."

3   Q.  This document documenting your activity is something you

4   would now be required to carry around with you on a daily

5   basis?

6   A.  Correct.  You must have it with you at all times.

7   Q.  How did you as a police officer interpret that kind of

8   requirement?

9   A.  This is how they check up on you.

10  Q.  Is there anything about the frequency of checking up on you

11  that affected your job in any way?

12  A.  Yes.  It definitely did.

13  Q.  How did it do that?

14  A.  If this is on me all day and I have to keep a running tally

15  of my daily events, what is going to happen is when the boss

16  will show up, look at -- let's say I have a vacation.  So the

17  first week I wasn't present, the second week I was sick.  So I

18  had two more weeks to meet that quota.  That pressure was

19  tremendous, to get that 1 and 20 and the 250s was tremendous.

20  Q.  So this is evidence of a sort of increased pressure on

21  police officers to meet these quotas, correct?

22  A.  Correct.

23  Q.  Now, if you could turn to the fourth page of this document,

24  and I want to direct your attention to paragraphs 14 and 15.

25          Why don't you read those to yourself and then I want

1    to ask you a question about it.

2    A.  OK.

3    Q.  You have looked at paragraph 14 and 15, correct?

4    A.  I'm sorry.  I just did 14.

5    Q.  Look at 15 too.

6    A.  OK.

7    Q.  Is it fair to say that -- well, let me ask you this.  How

8    do you interpret paragraph 14 and 15 in terms of the effect on

9    your work as a police officer?

10   A.  It puts a lot of stress on my job.

11   Q.  Why is that?

12   A.  This is a recipe on how to get me fired.  It starts off

13   with there is a quota, and then afterwards it says that they

14   are going to check up on me, and if they don't, how they are

15   allowed to -- it says here the sergeant is allowed to help you

16   to meet the performance goal.

17   Q.  So if you look at paragraph 15, the first sentence there,

18   it says, "Uniformed members of the service who remain

19   ineffective, who do not demonstrate activities impacting on

20   identified crime and conditions, or who fail to engage in

21   proactive activities, despite the existence of crime conditions

22   and public safety concerns, will be evaluated accordingly and

23   their assignments reassessed," right?

24   A.  Correct.

25   Q.  What did that mean to you?

D3L8FLO1                    Serrano - direct

1    A.  If you don't meet the quota, we can do what we want with

2    you.  We can change your tour.  It says here, if you fail

3    to -- in fact, if you don't do the correct arrests or the

4    correct summons, because it says -- I read this as just crazy.

5    If you continue to fail, then they basically could punish you

6    in many ways.

7    Q.  It was basically a threat of punishment, correct?

8    A.  Yes.

9            MR. MOORE:  One second, Judge.

10           If you could bring up Defendants' Exhibit C10.

11   Q.  Before you, Officer Serrano, is a copy of your 2011

12   evaluation, is that correct?

13   A.  Yes, it is.

14           MR. MOORE:  Judge, this is Defendants' Exhibit C10,

15   which we would move into evidence.

16           THE COURT:  Any objection?

17           MS. COOKE:  No, your Honor.

18           THE COURT:  C10 is received.

19           (Defendants' Exhibit C10 received in evidence)

20   Q.  Is this the evaluation that you were referring to when you

21   say you had an evaluation in your discussions with Captain

22   Materasso?

23   A.  Yes.

24   Q.  Exhibit C10 is, I believe, a two-page document, is that

25   correct?

1    A.  I don't know how many pages it is.  It's probably two

2    pages.

3    Q.  It's two pages.  And this is the normal evaluation that

4    police officers get on a yearly basis, correct?

5    A.  Correct.

6    Q.  If you go back to page 1 for the moment, you see with

7    respect to 28 different categories there?

8    A.  Correct.

9    Q.  There is a rating, correct?

10   A.  Correct.

11   Q.  Is there anything in this exhibit that says, or this

12   evaluation that says how you do in terms of meeting your quota

13   would be 50 percent of your evaluation?

14   A.  No, it's not here.

15   Q.  Were you ever told by anybody in the police department that

16   your ability to meet a quota would constitute 50 percent of

17   your evaluation?

18   A.  No.  I'm sorry.  Before or after?

19   Q.  Before your conversation with Captain Materasso.

20   A.  Before then, no.  She was the first.

21   Q.  In terms of your summons and arrest activity, what

22   performance area would that fall under?

23   A.  It would be number 2, apprehension/intervention.

24   Q.  There are other categories there, like community

25   interaction, correct?

D3L8FLO1                    Serrano – direct

1    A.  Yes.

2    Q.  The first one?

3         Do you understand why you got a rating of 3 in

4    community interaction?

5    A.  I believe most of this is wrong, except the physical

6    fitness, I will accept a 3.

7    Q.  I wasn't going to mention that.

8         How would you judge your community interaction,

9    Officer Serrano?

10   A.  Well, I think I go above and beyond when I deal with the

11   community.  My experience as an officer has led me to be more

12   sympathetic, empathetic, towards the problems that I deal with

13   every day, the people.

14   Q.  If you turn to the second page, there's some comments there

15   with respect to some of those categories that are mentioned on

16   the first page.  Do you see that?

17   A.  Yes.

18   Q.  Under number 13, what does it say?

19   A.  "PO Serrano adheres to the ethics of the department and

20   guidelines."

21   Q.  What about number 21, in terms of your judgment, what does

22   it say?

23   A.  "PO Serrano always demonstrates an ability to sound

24   decisions."

25   Q.  Presuming that would have meant to make sound decisions?

1  A.  Correct.

2  Q.  Category number 26, what does it say?

3  A.  "PO Serrano handles sensitive situations with a care and

4  empathy."

5  Q.  In the section for overall rater's comments, what does that

6  say?

7  A.  "PO Serrano is competent police officer that has the

8  ability to be a leader."

9          MR. MOORE:  Can you scroll down on that document,

10  please?

11  Q.  Who is the reviewer who gave you that evaluation?

12  A.  It's John Bucci.  He is the lieutenant platoon commander

13  who was sent to the day tours.  He was my lieutenant platoon

14  commander.

15          MR. MOORE:  Can you scroll down further, please?

16  Q.  There should be a section there for the reviewer to sign as

17  well, correct?

18  A.  Yes.

19  Q.  It doesn't appear to be there.

20          In other words, this was the evaluation that you were

21  appealing with Captain Materasso, right?

22  A.  Yes.

23  Q.  Now, did anything unusual happen in the course of this

24  conversation with Captain Materasso?

25  A.  Yes.

1  Q.  What happened?

2  A.  Well, I sat there and Sergeant Monroe, who is again another

3  decent person and a good officer, boss, he -- or she received a

4  phone call.

5  Q.  She meaning Captain Materasso?

6  A.  Captain Materasso received a phone call while I was doing

7  the interview.  And she interrupted the interview and she got

8  up and said, I need you to come with me.  First she asked me,

9  Do you want to come with me?  And I said, No.  I have seen

10  certain things that she has done.  I don't want to be around

11  her in any way.  But she said, It is an order, you're coming

12  with me.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D3l9flo2                    Serrano-direct

1   Q.  So did you go with her?

2   A.  I went with her.

3   Q.  Where did you go?

4   A.  I jumped into an unmarked vehicle.  That's a police vehicle

5   that does not say NYPD on it.  It just looks like a regular

6   car.

7   Q.  Who was in the car?

8   A.  It was myself and Materasso.  Captain Materasso.

9   Q.  What happened then?

10  A.  As we were driving there she's explaining that she received

11  a phonecall and that someone was being watched and they need

12  some information.  And so we went to somewhere on 143rd

13  Street between Morris and Alexander.  And there were three

14  black individuals standing there.

15  Q.  When you got to that location what did you observe besides

16  three black men or individuals?

17  A.  Well --

18  Q.  Were they men?

19  A.  From my vision --

20  Q.  I'm sorry.  Were they men or women?

21  A.  Male.

22  Q.  All right.

23  A.  From my point of view, again, it was a while but I believe

24  I was sitting in the passenger's side -- excuse me.

25          I could not see -- I could only see the upper portion

1   of their body, which may be around their chest area because

2   there was a big gray electrical box in front of the housing

3   development.  Plus there was parked cars.  So I really couldn't

4   see the three clearly from head to toe.

5          Well, she stops the car.  We both get out.  I see that

6   she addresses the three individuals.  So my training is to back

7   her up.  I triangulated, which means that the purpose -- the

8   perpetrators are in front of us and the police officers are to

9   the side so we create a triangle.  So we kind of box them in.

10         While she proceeds to talk to them, say how are you

11  doing, and then starts going through their pockets.

12  Q.  Started searching?

13  A.  She went inside their pockets.  She put --

14  Q.  That's a search, right?

15  A.  Yes.

16         She went inside the pockets and pulled everything out

17  of their pockets.  Put it on the gray electrical box -- I don't

18  know what that is -- and she did it to all three individuals.

19         While I'm sitting there I am thinking, Why are you

20  involving me in this.  This is ridiculous.

21         She proceeds to go through each and every one of them,

22  pulls everything out of their pockets.  Doesn't find anything.

23  Asked the questions.

24         While we're there, there's some people from the

25  housing development come down.  I think it's an old couple.

D3l9flo2                    Serrano-direct

1    They start yelling at her:  Why are you harassing them?

2              And then she gets very derogatory and starts saying

3    nasty things about them.

4              And I felt that she was putting them down because of

5    their race and that they were poor.  That's just how I felt.

6    Q.  What's the race of Captain Materasso?

7    A.  She's female white.

8    Q.  What happened then?

9              THE COURT:  These three people?  The three people?

10             THE WITNESS:  The three males were three male black

11   youths.  I would say somewhere between 20, fifteen to twenty,

12   somewhere around there.  And they were all different looking.

13   One of them looked like he was coming from a baseball game.

14   The other one looks like he was just hanging out.  And the

15   other one looked more of a more decent, you know, nicely

16   dressed.

17   Q.  From what you observed, did you at any time in your own

18   mind form any belief that there was any reasonable suspicion to

19   stop, question, or frisk or search those individuals?

20   A.  No.  I didn't see any suspicious bulges, any suspicious

21   activity.  They were three male blacks in front of what we call

22   the projects, housing development, having a conversation and,

23   you know, we ruined their day unfortunately.

24             THE COURT:  What time was this roughly?

25             THE WITNESS:  I'm going to -- I can't tell

D3l9flo2                    Serrano-direct

1    specifically but it's between 4:00 and 7:00 because it was

2    right after we did roll call.  We do --

3              THE COURT:  So late afternoon?

4              THE WITNESS:  Yes.

5    Q.  And that would have been in June, correct?

6    A.  The same day as my evaluation.

7    Q.  Yes.  That was in June of 2012, correct?

8    A.  Yes.

9    Q.  So what happened then, Officer Serrano?

10   A.  We got back in the car.  And, again, I'm shaking my head

11   internally like I don't believe this.

12             We get back and she says they're being watched and

13   they needed some information.  You know, she wrote down some

14   information.  And we just drove away.  Went back to the

15   evaluation where we finished it.

16             That stayed in my head for the rest of the evaluation.

17   Actually it was -- made me a little foggy there.  But I didn't

18   want to sign the evaluation.  Forced me to sign it.  I signed

19   it.  And then I looked up that operation order.

20             MR. MOORE:  One second, Judge.

21             (Pause)

22   Q.  All right.  Officer Serrano, did there come a time in

23   February 2013 that you had a conversation with Deputy Inspector

24   McCormack?

25   A.  Yes.

D3l9flo2                    Serrano-direct

1    Q.  And who is Deputy Inspector McCormack again?

2    A.  He is the commanding officer of the 40 precinct.

3    Q.  What was the purpose -- where did this conversation take

4    place?

5    A.  In his office.

6    Q.  And who was present during that conversation?

7    A.  Deputy Inspector McCormack, Lieutenant Batelli who is the

8    operations lieutenant.  My PBA rep Foster, and myself.

9    Q.  And did you record that conversation?

10   A.  I recorded that conversation on my Galaxy III phone.

11   Q.  And did you do any -- you recorded it yourself?  You

12   engaged the phone yourself?

13   A.  Yes, I did.

14   Q.  And it was in your possession at all times?

15   A.  At all times.

16   Q.  And did you alter that recording in any way?

17   A.  No, I did not.

18            MR. MOORE:  If we could play Plaintiffs' Exhibit 332

19   starting at 6:39.  Actually just tee it up and I want to ask a

20   couple other questions.

21   Q.  Officer Serrano, what was the purpose of your being in

22   Deputy Inspector McCormack's office that day?

23   A.  I got another three on any evaluation.

24   Q.  For 2012?

25   A.  For 2012.  And Captain Materasso said specifically to raise

D3l9flo2                    Serrano-direct

1   your numbers.  And I did.  If you look at my activity, I raised

2   it.  And, again, 28 points.  You know, if anything I was a

3   better officer than last year.

4           I got the same number, same three.  And I was

5   perplexed.  I needed answers why, you know, they're focusing

6   this onslaught on me.

7   Q.  Now, just to set it in context.  This was a conversation

8   you had with Deputy Inspector McCormack last month, correct?

9   A.  Last month, correct.

10  Q.  And this was -- had you done anything with respect to

11  complaining about quotas or how you were being treated prior to

12  this evaluation?

13  A.  I'm sorry.  I wasn't --

14  Q.  Had you taken any step in the police department to complain

15  about these things that you talked about here prior to this

16  evaluation, prior to your conversation with Deputy Inspector

17  McCormack?

18  A.  Yes.  I've taken a lot of steps.

19  Q.  What had you done prior to that point?

20  A.  Prior to that evaluation, I wrote a complaint to EEOC

21  state.  I've contacted IAB several times.  And besides

22  complaining to my supervisors and coworkers about what's going

23  on.

24  Q.  So you filed a complaint with the internal affairs bureau

25  about your -- about the issue of quotas and the fact that they

1    were illegal?

2    A.  Yes.

3    Q.  And in your complaint with the EEOC did you mention also

4    the fact that your quotas were being imposed and you believed

5    they were illegal?

6    A.  Yes.

7    Q.  And so at least with respect to the internal affairs bureau

8    complaint, that was before the evaluation, correct?

9    A.  Yes, yes.  It was before the evaluations, yes.

10   Q.  Let me ask you something.  When an officer files an

11   internal affairs bureau complaint, in your experience, does the

12   command within the precinct you're in find out about it?

13   A.  It's almost immediate.

14   Q.  How is that -- how does that take place in your experience?

15            MS. COOKE:  Objection, your Honor.  He hasn't

16   established -- he said he's filed an IAB complaint other than

17   the one he's talking about.

18            THE COURT:  Well he did say in your experience.  I

19   mean I suppose the experience is one case.

20            It's one case?

21            MR. MOORE:  Right.

22            THE COURT:  So when you file your IAB complaint, what

23   happens within the precinct?

24            MS. COOKE:  Thank you, your Honor.

25            THE WITNESS:  Well what happened was I filed with IAB

1    because he was retaliating with me.  I felt like I was in a

2    shark tank and had multiple stab wounds and I was bleeding and

3    they were circling me.

4          What happened was after I made the complaint I got a

5    notification from the desk officer stating give your memo books

6    to Sergeant Monroe.  And I didn't like that.  I said even

7    though he's a good man, and a good boss, he's mentioned as, you

8    know, forcing me to do the quota.  And so is the captain.  And

9    so is the deputy inspector.  It's all in my book.  Because I

10   wanted to show that I -- I wanted as much proof as possible.  I

11   want you to believe me.  I put it in my book.  I recorded it.

12   I did what I can with what I could.

13         But now you're telling me to give my book to the

14   sergeant that his name is on.  So he's going to -- I can't say

15   what he's going to do but he can look through it.  He gives it

16   to the ICO lieutenant.

17   Q.  To your knowledge is that what would happen -- is that what

18   happened here, that Monroe provided your memo books to the ICO?

19   A.  Yes.  Because I tried to give it to the ICO directly.  He

20   said no, give it to your sergeant.  So -- to your immediate

21   sergeant.  I said fine.  I gave it to Monroe.

22         Before I gave it to him, I also called IAB and

23   explained to IAB that their names are on there.  They're the

24   subject.

25         He said they're your boss.  Whenever they want your

D3l9flo2          Serrano-direct

1   book, you have to just give it to them.

2          And towards the end of that conversation there was a

3   laughter.  Made me feel even worse.  This was IAB, I felt,

4   laughing at me because I'm in some sort of trap.

5          So after I give it to them, it's really over because

6   they went up to the lieutenant.

7          From there, you know, I just kept hearing rumors from

8   people that, you know, they know, they know, what happened,

9   what happened?  How does it get to police officers so quick?

10  So, you know.

11  Q.  So when police officers in a precinct find out that

12  somebody has gone to IAB, what happens?

13          MS. COOKE:  Objection, your Honor.

14          THE COURT:  Again, I think you can --

15          MR. MOORE:  In his experience.

16          THE COURT:  I think he can only talk about his one

17  instance of filing with IAB so what happened to him.

18          MR. MOORE:  Let me withdraw that question.

19          THE COURT:  Okay.

20  Q.  Did anything unusual happen with respect to you after you

21  filed that IAB complaint?

22  A.  Yes.  After I filed it, besides other people walking around

23  and pointing at me and putting their mouths close to their

24  lips, basically saying don't talk about this guy.  And I'm not

25  talking about other police officers.  I'm talking about my

D319flo2                    Serrano-direct

1    situation.  Not anybody else.  It's just what they're doing to

2    me.

3           And anyway -- and also they put rat stickers on my

4    locker.  And they shook it so that the contents were -- it was

5    all messed up.  But at least the stickers, you know, they were

6    cute.

7    Q.  So that's the framework -- that was the lay of the land

8    when you went and had this conversation with Deputy Inspector

9    McCormack in February of 2013, correct?

10   A.  Yes.

11   Q.  Again, this is a conversation where you're appealing your

12   evaluation, correct?

13   A.  Yes the sole purpose for this conversation was to appeal my

14   evaluation.

15   Q.  And what was -- and with regard to that, what were you

16   trying to do or to discuss with captain -- with Deputy

17   Inspector McCormack?

18   A.  I was just trying to show him how I was a better officer,

19   how I met what Captain Materasso told me.  I did exactly what

20   she wanted.  And if you look at it, I almost doubled

21   everything.  I almost doubled everything except the 250s.  I

22   think that month I made the same amount.  But last year, the

23   year before that I think I did five.  I'm not too sure.  And

24   then this month I did five.

25   Q.  This year you mean?

D319flo2                    Serrano-direct

1    A.  This year I also did five.

2            So I mean everything went up.  And the 250s stayed the

3    same but I was only credited for two on that evaluation.

4    Q.  We'll hear the conversation in a minute.  But in that

5    conversation was there any discussion of all these performance

6    areas or -- that are listed in the evaluation form?

7    A.  No.

8    Q.  What was the discussion about?

9    A.  It was -- he briefly said you did -- you had -- he said

10   nine arrests.  That's great.  Or good.  I forgot the word he

11   used.  Then he said you had the summonses, he went through each

12   one of them and praised them and said okay, good, not bad, or

13   whatever.  Didn't like the type of summons that I wrote, the B

14   summonses because they were correctable.  He wanted more

15   hazardous.  So he didn't like the fact that -- I don't like to

16   hurt the public so I -- I try to give them summonses so that

17   they can fix it and it doesn't hurt them.

18   Q.  Officer Serrano, with regard to community interaction,

19   vehicular offenses, handling specific offenses, police

20   interaction, vehicle operations, was there any discussion of

21   those categories?

22   A.  No.

23   Q.  Why don't we start the tape now at 6:38.

24           MR. MOORE:  Hold on one second.  Judge, could I get

25   the witness more water.

D319flo2                    Serrano-direct

1              THE COURT:  Sure.

2              THE WITNESS:  I'm sorry to interrupt.

3              THE COURT:  That's okay.

4              MR. MOORE:  Go ahead.

5              (Audiotape played)

6              MS. BORCHETTA:  Sorry, your Honor.

7         We've misplaced the proper CD.  That was the CD

8    related to another witness, if we could just have one moment.

9              THE COURT:  Okay.

10             MR. MOORE:  While they look for it, I'll go on.

11             THE COURT:  Okay.

12             MR. MOORE:  Sorry, Judge.

13   Q.  Let's -- we're going to get back to that, Officer.  I

14   apologize to the court.  While we look for that disk.

15             Let me ask you about a -- communications in any other

16   forms directing you to fulfill quotas.

17   A.  Yes.

18   Q.  Beside what we've talked about so far.

19   A.  Yes.

20   Q.  Can you give me an example?

21   A.  Sergeant Monroe -- well he said he lost my monthly sheet

22   and to text him my activity.  So I text him how many radio runs

23   and summonses.  And he texted back, after I texted him -- I

24   wrote my activity for him.  He texted me back.  He said you

25   need more 250s.

D319flo2          Serrano-direct

1    Q.  And that was a?

2    A.  Text on my iPhone.

3    Q.  On your -- was it on your iPhone or on your Galaxy?

4    A.  My iPhone.

5    Q.  And he texted you and then you responded to him?

6    A.  He texted me.

7    Q.  And then you responded and he responded?

8    A.  Exactly.

9            MR. MOORE:  Can you pull up Plaintiffs' Exhibit 296.

10   Q.  Before you, Officer Serrano, is Plaintiffs' Exhibit 296.

11   Can you identify this.

12   A.  That is -- that's the text message Sergeant Monroe sent me.

13   Q.  How did you -- how were you able to get a picture of this

14   text message?

15   A.  The iPhone has a nice little thing where you hold the

16   control button and the top button, you squeeze them at the same

17   time, it will take a picture of your screen.  It doesn't take a

18   picture of, you know, what came before or after, but whatever

19   you have on that screen, it will take a picture of it.

20   Q.  And you did that on November 5, 2012, correct?

21   A.  Yes.

22   Q.  Or sometime after presumably 9:51 p.m., right?

23   A.  Yes.

24   Q.  And Sergeant Monroe was your squad supervisor, correct?

25   A.  Correct.

D319flo2                    Serrano-direct

1    Q.  And did you -- before you took a picture of it did you

2    alter the screen in any way?

3    A.  No.

4              MR. MOORE:  Judge, move the admission of Plaintiffs'

5    Exhibit 296.

6              MS. COOKE:  No objection, your Honor.

7              THE COURT:  296 received.

8              (Plaintiffs' Exhibit 296 received in evidence)

9    Q.  The first text there, can you just read that?

10   A.  Upper right-hand corner?

11   Q.  Yes.

12   A.  Fourteen days on patrol.  109 radio runs.

13             THE COURT:  Who wrote that?

14             THE WITNESS:  I wrote that.

15             THE COURT:  You wrote that?

16             THE WITNESS:  Yeah.  The colorful one, the greenish,

17   that would be what I put and --

18             THE COURT:  Did you send that?

19             THE WITNESS:  Yes.

20             THE COURT:  You sent it to?

21             THE WITNESS:  I sent it to him, to Sergeant Monroe.

22             THE COURT:  On that same day and time?

23             THE WITNESS:  Yes.

24             THE COURT:  And then he responded with "you need to do

25   more 250"?

D319flo2                    Serrano-direct

1            THE WITNESS:  That's correct.  In fact above it, you

2       can't see it, but it's more of my activity.  And I think I left

3       out the radio runs so I text him -- I texted him again.  That

4       that's what I did.  And then he put you need more 250s.

5       Q.  So is this for October presumably or some month before

6       November, correct?

7       A.  No.  It's -- it says it right there, November 5.

8       Q.  But the 14 days on patrol, 109 radio runs, is that for the

9       month before?

10      A.  Previous month.  October.

11      Q.  And so on that day -- on that month you were 14 days on

12      patrol, correct?

13      A.  That's proximate only because I was going through memory --

14      my memory just --

15      Q.  But it says 14 days on patrol?

16      A.  I wrote 14 days on patrol.  109 radio runs.  It was an

17      approximation because he lost my monthly and I was doing this

18      just out of the top of my head.

19      Q.  From your memory?

20      A.  Right.

21      Q.  And his response was you need to do -- to do more 250,

22      right?

23      A.  Yes.

24      Q.  And a 250 meaning stop and frisk?

25      A.  Stop, question, and frisk.

D319flo2                    Serrano-direct

1   Q.  And you responded okay?

2   A.  Okay.

3           MR. MOORE:  I think we're ready to play that tape,

4   Judge.

5           Beginning at 6:38.

6           (Audio recording played).

7           MR. MOORE:  Stop.  What time is that?

8           MS. YOUNG:  6:38.

9   Q.  Whose voice is that?

10  A.  Deputy Inspector Christopher McCormack.

11  Q.  He's saying we're here for the appeal?

12  A.  Correct.

13  Q.  And that's the appeal of your evaluation, right?

14  A.  Correct.

15          (Audio recording played)

16          MR. MOORE:  Stop there.

17  Q.  That's your voice, right?

18  A.  That's me speaking.

19  Q.  You're referring to the conversation you had had with

20  Captain Materasso in June of 2012, correct?

21  A.  Correct.

22          MR. MOORE:  What time is that?

23          MS. YOUNG:  7:27.

24          MR. MOORE:  Go ahead.

25          (Audio recording played)

D319flo2                     Serrano-direct

 1              MR. MOORE:  Stop it there.  What time.

 2              MS. YOUNG:  9:33.

 3    Q.  You heard a third individual speak.  Who is that?

 4    A.  That is the Lieutenant Batelli operation coordinator.

 5    Q.  For the 40th precinct?

 6    A.  For the 40th precinct.

 7              MR. MOORE:  Go ahead.  Continue.

 8              (Audio recording played)

 9              MR. MOORE:  What time?

10              MS. YOUNG:  10:07.

11    Q.  Now you heard Deputy Inspector McCormack say the XO talked

12    to you about your conditions, not your activity?

13    A.  Yeah, I heard it.

14    Q.  Is that correct?

15    A.  No.  She spoke to me specifically about my activity.  She

16    did mention, which at the time I didn't remember, she did

17    mention precinct conditions also.

18    Q.  But was -- how much of that was part of that conversation,

19    the conditions?

20    A.  Precinct conditions, it was just quick.  She just mentioned

21    it.  But the bulk of it was my activity.

22              MR. MOORE:  Continue again.

23              (Audio recording played)

24              MR. MOORE:  Stop.  What time is that?

25              MS. YOUNG:  11:38.

D319flo2                    Serrano-direct

1   Q.  Now what did you mean when you said that you would talk to

2   them first and not just -- what did you mean by that?

3   A.  I meant that everyone should be treated as human beings.

4   And I see that they're blocking the pedestrian traffic.  I see

5   people trying to exit the store.  And they're in the way.  So I

6   go up to them and I ask them:  Fellows, I need you to leave.

7   And I tell them why I need to you leave.  I give them that

8   choice of leaving or being summonsed.  So they leave.

9           And I say further that I leave, I go around the block

10  a couple of times, and I come back to see if they actually did

11  what I asked them to do.  As a human being.  With respect.  And

12  most of the times -- almost all the time they do it.  They just

13  move.  Or they go somewhere else.

14  Q.  And so that's how you approach your activities on the

15  street as a police officer, correct?

16  A.  That's correct.

17  Q.  In the community you're working in, right?

18  A.  That's correct.

19          MR. MOORE:  Continue.

20          (Audio recording played)

21          MR. MOORE:  Stop there.

22          THE COURT:  I think we're going to take our recess

23  now.  Can you pick up there or do you want to ask one or two

24  more questions about what you just heard?

25          MR. MOORE:  I can pick up there.

D319flo2                    Serrano-direct

1          THE COURT:  So let's take a ten-minute recess,

2     reconvene just after 20 of on that clock.  Thank you.

3          (Recess)

4          MR. MOORE:  Can you just go back like a minute and

5     start there and then I'll resume at that point.  Just tell us

6     what time you're starting.

7          MS. YOUNG:  I'm starting at 11:36.

8          (Audio recording played)

9          MR. MOORE:  Judge if you're having difficulty hearing

10    just let me know.

11         THE COURT:  It's not about volume.  It's just

12    sometimes difficult to make out what people are saying.

13         (Audio recording played)

14         MR. MOORE:  Stop there.  What time?

15         MS. YOUNG:  13:33.

16    Q.  Did you hear Deputy Inspector McCormack use the term

17    proactive?

18    A.  Yes.

19    Q.  And what did you understand that to mean, what he was

20    saying?

21    A.  What he wants you to go to these high crime locations and

22    look for C summonses, arrests, and 250s, to be proactive at it.

23    Don't let it come to you.  Go get it.

24         MR. MOORE:  All right.  I won't editorialize it

25    further.  Why don't you keep playing.

D319flo2                    Serrano-direct

1              (Audio recording played)

2              MR. MOORE:  What time?

3              MS. YOUNG:  15:37.

4    Q.  Officer Serrano, did you hear Deputy Inspector McCormack

5    say one summons, one 250 at that location does not cut it,

6    right?

7    A.  Yes.

8    Q.  What did you understand that to mean?

9    A.  He wanted more.

10   Q.  And in your experience why would he want more at that

11   particular location?

12   A.  That particular location is a -- has a spike in crime.  And

13   CompStat lists all that information.  And in order for them to

14   look good, he needs to show that he did work or summonses,

15   arrests, and 250s in that area.  So that when -- he can defend

16   himself at CompStat.

17   Q.  Continue.

18              THE COURT:  Just before he continues.  I really do

19   have a question.

20              Do you have a problem with the notion of proactive

21   policing?  Is there something wrong with that?

22              THE WITNESS:  No.  If -- I actually agree with some of

23   the stuff that he says.  It's just that, you know, when you're

24   extremely busy with all these radio runs, you only have but so

25   much time.  Because I actually, I get the call, I park the car.

D3l9flo2                    Serrano-direct

 1   I have to get into the building.  Got to wait for somebody to

 2   buzz me in.  Go upstairs.  Do the paperwork.  Do it properly.

 3   Give this person the time that he needs.  Come back down do the

 4   next one, the next one, the next one.  And then back people up

 5   because it's high crime.  You got someone stopped, you got to

 6   help another officer.  Running back and forth, running back and

 7   forth.  Sometimes you don't have the time to do it.

 8           So I expressed that when I do have the time I go to

 9   these high crime areas and I do look and I do verticals.  And I

10   do directives.

11           Directives basically is just I tell central that I'm

12   purposely circling a certain area looking, you know, for crime.

13   And I have no problem with that.

14           I do have activity and I am -- if you look at my

15   activity on paper it's -- and my memo books I'm very active.

16   It's just that I'm not a hero.  I'm not a very busy, busy top

17   of the guy cop.  And I'm not a zero.  I'm somewhere in the

18   middle.

19           THE COURT:  Anyway, my question was:  You don't have a

20   problem with the idea of proactive policing?

21           THE WITNESS:  No, no, not at all.

22   Q.  Just to follow up on the judge's question, is your concern

23   that proactive -- when it comes to quotas leads to illegal

24   activity?

25   A.  Yes.  It's highly interpretive, proactive performance.

1          If you're telling me to go out and look.  If you find

2    it, you find it.  If you don't, you don't.  I agree.

3          If you're telling me to go out there and look for it

4    and you better find it, and that's how I interpret it because

5    of the retaliation, then it's a problem.  It's not good to tell

6    cops:  Make sure you find it.  Because if they don't find it,

7    what's left?  If the bad guy is not there, who is left?  The

8    good people.  And you got to hammer them.  And that's just not

9    good.

10          MR. MOORE:  Go ahead.

11          Thank you, Judge.

12          (Audio recording played)

13   Q.  You heard the deputy inspector mention 20, 100, 200.  What

14   did you understand him to be referring to there?

15   A.  Activity.  He's trying to say that either arrests or

16   summonses.  Basically when you go to these high crime

17   locations, the only way that you can prove that you did

18   something, it's not a vertical, it's not a directive.  It's

19   summonses, arrests, or 250.

20          So he wants a number.  He's not saying what number.

21   But he doesn't know what the number is.  It's a very high

22   number to him.  He says it's not a hundred.  It's not two.

23   It's not three.  He doesn't know what it is.

24          And, you know, basically telling us that if you don't

25   get the number he doesn't accept it.

D319flo2                    Serrano-direct

1    Q.  And we'll talk more about this later when we play the

2    remaining part of the tape.  But do you recall him saying:  And

3    it's the right kids, in the right place, at the right time.

4              Did you hear that language?

5    A.  Yes, I heard it.

6    Q.  We'll talk about that in a minute.

7              MR. MOORE:  Go ahead.

8              (Audio recording played)

9              MR. MOORE:  What time?

10             MS. YOUNG:  16:21.

11             MR. CHARNEY:  Go back to 16:04.

12             (Audio recording played)

13   Q.  You hear the deputy inspector referring to the kind of Bs

14   you are writing.  What did you understand him to be talking

15   about there?

16   A.  He's going to explain it.  But it was that I wasn't writing

17   the correct ones.  The correct ones are the ones that the city

18   can make money on.  If you give someone a correctable, let's

19   say the light is busted or it's not working.  And to me it's

20   hazardous at night to -- lights that are not working.  I will

21   give you a summons.  But you have about a 24-hour grace period

22   to fix it and not pay the summons.  You'll be able to correct

23   it without financially coming out your pocket.

24             He wants hazardous.  Hazardous has a fine and makes

25   the city money.

D319flo2                    Serrano-direct

1          MR. MOORE:  Continue.  What time is it?

2          MS. YOUNG:  16:42.

3          (Audio recording played)

4    Q.  Did you hear the deputy inspector talk about what a stop

5    is.

6    A.  Yes.

7    Q.  Basically what did he say?

8    A.  He said see a crowd that's blocking pedestrian traffic,

9    that's what I said, and he said if you see them and you say

10   hey, you get their attention, that's a stop, and you have to

11   put it on paper.

12   Q.  When you say a stop, that would lead to a 250, correct?

13   A.  Correct.

14   Q.  At a minimum?

15   A.  Minimum, yes.

16   Q.  Is that how you were trained in the police department to

17   understand what a stop is?

18   A.  I was trained several times and no, that is not a stop.

19   You don't stop for a violation.  You only stop and question and

20   frisk for a criminal misdemeanor or a felony.  And blocking

21   pedestrian traffic, as I said specifically several times, is a

22   violation.

23   Q.  Setting aside whether there's a -- pedestrian traffic.  If

24   an officer goes up to somebody and says, "Hey, you over there,"

25   in your understanding of how you were trained in your duties as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D319flo2                    Serrano-direct

1   a police officer and your understanding of the law, is that a

2   stop?

3   A.  That is not a stop.

4              MR. MOORE:  You can continue.

5              What time?

6              MS. YOUNG:  18:42.

7              (Audio recording played)

8              MR. MOORE:  Stop it there.

9   Q.  When you say there you made a lot of points, "Can I cover

10  the points," what are you referring to?

11  A.  I'm referring to me, my evaluation, and I'm trying to speak

12  about my evaluation.  And all they're talking about is stop,

13  question, and frisk.

14             MR. MOORE:  Continue.  What time?

15             MS. YOUNG:  20:32.

16             (Audio recording played)

17  Q.  Now you heard the deputy inspector say, "We go out there

18  and we summons people, and we 250 people, the right people at

19  the right time and the right location."

20             Did you hear that?

21  A.  Yes.

22  Q.  What did you understand the deputy inspector to be telling

23  you, Officer Serrano?

24  A.  Well, he's telling me to stop the right people, in my

25  opinion and, in fact I believe this, he meant Blacks and

D319flo2                    Serrano-direct

1    Hispanics.

2              At the right location, the places where the crimes are

3    spiking.

4              At the right time -- I don't know, maybe they're

5    spiking at a specific time and he wants me to write it at that

6    specific time.

7              And I would like to apologize but I start getting a

8    little loud because I am Hispanic.  I grew up in the Bronx.

9    And I've been stopped multiple, multiple times.  So I try to

10   respect people so they can give the respect back.

11   Q.  Now, when he said, "We summons people and we 250 people,"

12   what did you understand him to be saying there or meaning?

13   A.  I'm sorry?

14   Q.  When he said, "We go out there, we summons people, we 250

15   people, the right people at the right time, the right

16   location," focusing on the first part of it.

17   A.  Summons Blacks and Hispanics.  I think it's ages between 14

18   and 21.  At crime locations.

19   Q.  So, in other words, he's telling you to go out and write

20   summonses, write 250s, correct?

21   A.  Correct.

22              MR. MOORE:  Continue.  What time?

23              MS. YOUNG:  22:01.

24              (Audio recording played)

25              MR. MOORE:  It's getting a little heated there,

D3l9flo2                    Serrano-direct

1    obviously.

2    Q.  But what did you understand the inspector to say when he

3    refers to male blacks 14 to 20, 21.

4    A.  Summons and arrests in Mott Haven, male blacks 14 to 21.

5    Q.  So to be fair --

6    A.  I'm sorry and 250.

7    Q.  The Mott Haven, that community is made up of mostly black

8    and Hispanic individuals, correct?

9    A.  I've worked in that precinct almost nine years,

10   approximately.  And yes.

11   Q.  Who is he saying are the right people at the right time at

12   the right location?

13   A.  He specifically said Blacks, black males between 14 and 21.

14           THE COURT:  Which precinct is Mott Haven in?

15           THE WITNESS:  The 40.

16           THE COURT:  Just want to be sure.

17           MR. MOORE:  There's just another minute or so, Judge.

18   Go ahead.  What time?

19           MS. YOUNG:  24:16.

20           (Audio recording played)

21   Q.  That was the end of that appeal interview, right?

22   A.  That was the end.

23   Q.  And other than stop and frisk and summons activity, was

24   there any of those other categories on your evaluation that

25   were really discussed?

1  A.  From 1 to 28, no.  The only one that basically says it's

2  apprehension and that's, you know, when you arrest somebody and

3  paperwork.  And I've never been complained about that.  I don't

4  have any complaints about that.  Not that I know of.

5  Q.  And following this meeting, this appeal meeting in -- last

6  month.  Were you directed to go somewhere?

7  A.  Well, as a result of my appeal he said I didn't know what I

8  was doing.  I don't know what a stop, question, frisk is.  And

9  he sent me for training, sent me for 250 training.

10  Q.  Where was that?

11  A.  That was in the Bronx, Robbins Neck.  That's where we do

12  our shooting -- the shooting range.

13      So as a result of him telling me that I didn't know

14  what I was doing, he sent me to be retrained because I didn't

15  know what I was doing.  And he told Lieutenant Albin.  And then

16  a couple weeks later I was sent.

17  Q.  To retraining?

18  A.  To retraining.

19      There was another one also he sent me for performance

20  enhancement training because, again, I didn't know what I was

21  doing.

22      And if you read article 52, operation order 52, it

23  says, it's actually listed on how they will retaliate against

24  you.  And it says there that you will be sent, if you fail to

25  meet, in my opinion if you fail to meet the quota, you're going

1   to be sent to performance enhancement monitoring.  I have to go

2   there in about two weeks.

3   Q.  When you went for retraining on stop and frisk, was there a

4   discussion of what a stop is?

5   A.  Yes.

6   Q.  And was that discussion consistent with what -- was that

7   training about what a stop is consistent with what -- with how

8   Deputy Inspector McCormack described what a stop is?

9   A.  No.  It was contrary.  The opposite.  Sorry.

10  Q.  Have you heard about the results of your appeal of the

11  evaluation?

12  A.  I appealed it to the next level, as per patrol guide, it

13  says to make a 49 and go to the bureau.  And I was

14  instructed -- Lieutenant Batelli said -- I don't know if you're

15  going to play it -- but he says he's going to help me write the

16  49.  When I went for his help, I knocked on his door and he

17  handed me a piece of paper and it had the patrol guide

18  procedure number -- I don't know what the number is -- but he

19  just handed me the piece of paper and just pointed me out the

20  door.  And I thought he was going to help me write it but he

21  just gave me the procedure.

22          I went to the procedure.  It doesn't have any sample

23  on how to write it.  I did the best I can or the best I could.

24  And when I went to the bureau, it was like talking to -- I

25  think it was inspector -- the name will come to me --

1   Harrington.  I think it's Inspector Harrington.  It's like

2   speaking to Deputy Inspector McCormack all over again.

3           The appeal didn't take place.  It was just for me to

4   drop off the paperwork.  But I guess he just wanted to get a

5   feel of who I was.  And from what I got, it's not going to go

6   well whenever I go there.  Because he's also the CO of the

7   bureau.

8           So basically he's -- what I'm asking him to do is to

9   contradict -- I got the word right -- contradict exactly what

10  McCormack said.

11          I don't think it's going to happen.

12  Q.  Did -- was it -- did you believe that prior to your

13  interview with Deputy Inspector McCormack that he knew about

14  your involvement in this lawsuit?

15  A.  Yes.

16  Q.  What do you base that on?

17  A.  The minute the deputy inspector -- actually before he, the

18  deputy inspector, came in through the door with other bosses,

19  the rumors started to fly.  People just started to tell me be

20  careful.  He's coming after you.  He knows about the lawsuit.

21          And that's -- I was like -- I was what?  Once I heard

22  that, I was like, Oh boy, the cat's out the bag.  I'm in

23  trouble.

24  Q.  Well did he do anything in specific -- he meaning McCormack

25  or anybody at that meeting -- do anything specific that led you

1   to believe that he was aware of your involvement in this

2   lawsuit?

3   A.  At the end of the tape he calls me over after -- after I

4   apologize for raising my voice.  He says I know about the

5   lawsuit.  Don't think anything about the memo books.  They're

6   going to take them from you.  So don't think anything about it.

7   Basically he just told me:  I know what you did.  I know the

8   allegations.  And -- he just wanted to let me know that he

9   knows.

10          MR. MOORE:  At what point did you end the tape?

11          MS. YOUNG:  24:41.

12  Q.  Do you continue to go to work in the 40th precinct,

13  Officer Serrano?

14  A.  Yes.

15  Q.  And how has your treatment been since -- in the last couple

16  of months?

17  A.  Not too good.

18  Q.  Can you tell us why.

19  A.  Well --

20  Q.  How -- can you tell us how.

21  A.  Well immediately after the -- remember, I'm a patrol

22  officer.  And I do patrol almost every time I'm there.  I have

23  seniority.  So they put me out on patrol.  They put the people

24  that know what they're doing out there first.

25          Immediately I was sent to a fixed post.  It's called a

D319flo2                    Serrano-direct

1    strike post.  That just means -- they were striking at the time

2    with the bus drivers.  So he sent me to that post, me and my

3    partner, to that post just to sit, you know, just stand on the

4    corner, just look at the fence, make sure that -- there's

5    nothing there, but just make sure that nothing goes on.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3L8FLO3                    Serrano - direct

1    Q.  Now, that is still important police work, correct?

2    A.  Yes.  It's part of my job.

3    Q.  Based on your seniority, is that the kind of assignment you

4    would typically get had you not started making these

5    complaints?

6    A.  Only if you ask.  Usually senior cops, they ask them, what

7    do you want to do?  And with me, I have a partner, and we go

8    out there, and I need activity.  Activity means I have to meet

9    this quota, so I have to go out there, and if I am not out

10   there, because I'm not as aggressive as other cops, it takes me

11   a little bit longer to get that activity, so I want to be out

12   there.  But yes, this is a punishment for me, send me to the

13   strike post.  And while I was there, I got scratched, that

14   means a supervisor inspected me, I think, five or six times.

15   That's unusual.

16   Q.  At that fixed post?

17   A.  At any time.  If you look at my memo book, I don't think I

18   recall being scratched five times in one day.

19   Q.  Tell us what you mean when you say being scratched.

20   A.  Inspected by a supervisor.  They grab your book, and they

21   write in it that they were there, they visited and there was no

22   violations observed, or there were violations observed.

23          Well, between him knowing and him telling me that he

24   has the book, and then he and Deputy Inspector McCormack and

25   Captain Materasso in the same car, in an unmarked, screech up

1    to me at top speed, pull up next to me and says, Hi, how you

2    doing?  I attempted to get out of the car.  He said, No, stay

3    there.  I handed my book.

4         But as he approached, what he didn't know is at that

5    moment I called IAB and I put it in my book.  I was afraid he

6    would see that so I scratched it out.  I am not supposed to,

7    but it was either that or have him look directly at it and say,

8    Hey, you called IAB?  And I put exactly who I called, what I

9    said, just to make a notation, when he comes and the lieutenant

10   comes and scratches me, then my sergeant scratches me, and then

11   inspection scratches me.  So they just constantly keep coming.

12   I wasn't feeling well.  Again, I felt claustrophobic, like they

13   were circling me.

14   Q.  Just a few more questions, Officer Serrano.

15        In your experience in the 40th Precinct, you have been

16   there almost nine years, right?

17   A.  Correct.

18   Q.  Have you ever had any discussions with any of your

19   supervisors regarding the underlying facts that relate to a

20   stop and frisk that you did?

21   A.  No.  All they worry about is the number, give me the 250.

22   They look at the end to make sure your name is on there, and

23   they sign it.  They never explained to me whether -- there is

24   no discussion about it, just activity, give it to them.

25   Q.  Have you ever written out a 250 based upon a stop for which

1    you did not have reasonable suspicion?

2    A.  Yes.

3    Q.  Have you seen others in your precinct do that?

4    A.  Yes.

5    Q.  Why have you done that?  You understand that that is

6    not --

7             THE COURT:  Lawful.

8             MR. MOORE:  Lawful, yes.

9    A.  Yes.  Well, what I did was --

10   Q.  Why have you done that?

11   A.  What I did was, when ordered to by a supervisor, you get

12   into that gray area.  He can suspend you for not following a

13   lawful order.  He is going to articulate it was lawful.  I am

14   going to articulate it's not.  So what I do is I fill out the

15   paperwork, but I don't sign it.  I hand it to him, and I ask

16   him to sign it.  Usually, he will yell at me and bad things

17   will happen.  The next day I will have a foot post.  For a

18   whole week -- there was a whole entire summer where I ended up

19   at 152 and Jackson, around that area, it's a high-crime

20   location, on foot, and I had seniority.  There were rookies

21   driving around doing patrol.  I don't really mind, but that's

22   just not how it's done.

23   Q.  Can you give us an example of when you were asked to stop

24   some people by your supervisor that you objected to and what

25   you did about that?

1    A.   Sergeant Ramirez.  I don't know who he was but -- I don't

2    know if it was -- he was a sergeant.  I don't know which

3    platoon he was in.  I didn't have enough activity so he put me

4    in his car.  We drove around.  There were two minorities.  I

5    don't remember which one was which, but there were two

6    minorities against a wall and they were talking.  He stopped

7    and said, 250 them -- no, he said, stop, and he said, summons

8    those two.  I said, for what?  He goes, blocking pedestrian

9    traffic.  I said, they are leaning against the wall.  He said,

10   summons them for 250.  I said, OK, you want to do this.  As I

11   walked to them, I explained to them that I am violating their

12   rights and to take my name down, and if they were to sue, they

13   can use me as a witness.  I filled out the C summons for both

14   individuals, I gave them the summons, and I scratched out I

15   observed, and I put the sergeant's name on it.

16        Well, I did that for four summonses that night because

17   he made me write some Bs also.  He didn't realize that I put

18   his name on it until the end of the day when he collected it.

19   Then he paraded around the 40 with it held high yelling, this

20   son of a bitch put my name on it, and everybody knew about it.

21   And again, more retaliation, more retaliation, more

22   retaliation.  I attempted to do the right thing, to the best of

23   my ability, and he told me to do it, I did it.  I just don't

24   want to perjure myself.

25   Q.   You said you were driving with a supervisor.  You heard

1   Officer Polanco's testimony about that, correct?

2   A.   It's common.  If you do not meet the quota, they will put

3   you in a car with a supervisor, the supervisor will say, this

4   is what I see, write it.  And then you have that choice right

5   there to sign it or not.  And it's difficult.  It's high

6   pressure.  Mind you -- it's orders coming from the top.  So it

7   goes from the top and goes all the way down.  There's a lot of

8   pressure on the sergeant to make sure that you get your

9   activity, because on that Operation Order 52, if you read it,

10  it says that the same -- the way they scrutinize police

11  officers, they scrutinize lieutenants and sergeants.  They have

12  performance goals also.  So they are under high pressure to

13  make us, and you have people like myself, which I will only do

14  what I see.  And, you know, people like me will get put into

15  the car and forced to write it.

16          I definitely agree with Officer Polanco with what

17  happened, and he was extremely brave, because to come out back

18  then --

19          MS. COOKE:  Objection to the extent he is now

20  editorializing.

21          THE COURT:  You are correct.

22  Q.   Is it your practice when you do a 250 to also make an entry

23  in your memo book?

24  A.   As patrol guide procedure, you are supposed to, and yes,

25  it's what I normally do.

1  Q.  When you make an entry in your memo book, is it simply

2  replicating what you have checked off on the 250 or is it

3  something in addition to that?

4  A.  Yeah.  You copy the entire thing and then you add, if

5  you're myself, which I am doing now more so, you add little

6  things, anything that adds up to a 250.  So a stop.  So if the

7  person when you speak to him blades himself, he turns away from

8  you, whatever weapon that is, he might be twisting it so you

9  can't see it.  Then he might tap it.  There is a habit that

10  people with weapons, we tap the gun or we tap our wallet to

11  make sure it's there.  Every morning I count five items.  I

12  have got my cell phone, my keys.  I go one, two, three, four.

13  It's just a habit.  It's tapping.  So that's another

14  indication.  Also, the weather.  The weather might be an

15  indication.  If it's 80 degrees and he is wearing a goose down

16  coat, it's a little strange.  So you put everything together

17  and it's like a big puzzle, and then you articulate in court

18  why you stopped that individual.

19  Q.  So you would put those additional details in your memo

20  book, correct?

21  A.  You're supposed to.

22  Q.  And that's how you're trained?

23  A.  That's how I am trained.

24  Q.  Has any of your supervisors ever had a discussion with you

25  about the details in your memo book about a 250 you wrote?

1   A.  As far as I recall, no supervisor has ever inspected my

2   book and looked for those details.

3   Q.  Or had a discussion with you about it, correct?

4   A.  Exactly.

5   Q.  Finally, Officer Serrano, can you the judge why you have

6   come forward to testify in this case?

7   A.  Well, Judge, it's very simple.  I have children.  I try to

8   be a decent person.  You have got to excuse me.  Whenever I

9   talk about my kids --

10  Q.  It's all right.

11  A.  As a Hispanic, walking in the Bronx, I have been stopped

12  many times.  It's not a good feeling.  I promised as an officer

13  I would respect everyone to my abilities.  I just want to do

14  the right thing.  That's all.

15          MR. MOORE:  Nothing further, Judge.

16          THE COURT:  Thank you.

17          Ms. Cooke.

18          MS. COOKE:  Yes.  Thank you.

19  CROSS-EXAMINATION

20  BY MS. COOKE:

21  Q.  Good afternoon, Officer Serrano.

22  A.  Good afternoon.

23  Q.  You claim that quotas have existed in the 40th Precinct

24  since 2007, is that correct?

25  A.  You said quotas existed since 2007?  Quotas have existed

1   from the moment I got there.  Unfortunately, like I said

2   before, they were soft quotas.  There's numbers, one and four.

3   They want numbers.  Unfortunately, you know, they are just a

4   quota, and if you don't meet them, they weren't really going to

5   hurt you about it.  2007 is where it started getting really bad

6   for me, and that's when I started to really notice it.  So

7   that's why I use that 2007.

8   Q.  Just to be clear, do you recall serving an affidavit in

9   this case a couple of weeks ago, a signed affidavit?

10  A.  Yes.

11  Q.  In the affidavit you included content regarding the subject

12  matter of your testimony, intended testimony here at this

13  trial?

14  A.  Yes.

15  Q.  In that affidavit, you indicated that since approximately

16  2007, quotas were at the 40th Precinct, is that correct?

17  A.  Yes.

18  Q.  It's your testimony here today that quotas existed prior to

19  2007?

20  A.  I said approximately for a reason.  Because it started from

21  day one, but they weren't retaliating against.  So it didn't

22  affect me.  You could ask whatever you want.  If I don't give

23  it to you, and you don't do anything to me, then I can just

24  continue my job.  But 2007 is when the quotas started where I

25  felt retaliation.  I felt that the department was coming after

1    me because I did not meet the quota.

2    Q.  Did you receive a negative performance evaluation in 2007?

3    A.  I received a 3.  I perceive that as a negative.

4    Q.  Did you appeal your 2007 performance evaluation?

5    A.  2007?

6    Q.  Yes.

7    A.  You have got to show me what I got.  I don't know what I

8    got in 2007.

9    Q.  I am asking if you recall appealing your 2007 performance

10   evaluation?

11   A.  I don't recall anything about 2007, in terms of appeals and

12   what I got.

13   Q.  Do you recall appealing any performance evaluation prior to

14   2011's performance evaluation?

15   A.  To my knowledge, I appealed two of them.

16   Q.  Those were what years?

17   A.  I think they are 2010, 2011.

18   Q.  Didn't you just appeal 2012?

19   A.  Then it's 2011 and 2012.

20   Q.  Those are the two years' performance evaluations you recall

21   appealing?

22   A.  Yes.

23   Q.  You appealed them because you were dissatisfied with the

24   performance evaluation you received?

25   A.  Yes.

1   Q.  So in any year between approximately 2007 and 2010, where

2   you state quotas existed, you didn't appeal a performance

3   evaluation, is that correct?

4   A.  No, I did not appeal.

5   Q.  That's because you were satisfied with your reviews?

6   A.  No, I was not.  But it wasn't to the point where I could

7   get hurt.  I always believed that if I got a 3.5, they gave

8   me -- if I got a 4 and 3.5, it's not really a big deal, because

9   of the patrol guide, the way it was written, you really

10  couldn't hurt me.  Since 2007, when I read what they can do to

11  me, I had to make sure that my evaluation really reflected the

12  type of officer that I am and was.

13  Q.  Well, I believe you testified on direct that you weren't a

14  hero and you weren't a zero, you were somewhere in the middle,

15  is that right?

16  A.  Yes.

17  Q.  You received a 3 on your performance evaluation in 2011, is

18  that correct?

19  A.  That's correct.

20  Q.  That's on a scale of 1 to 5, is that correct?

21  A.  Yes.

22  Q.  You received a 3 on your performance evaluation in 2012, is

23  that correct?

24  A.  That's correct.

25  Q.  Again, the same scale of 1 to 5?

D3L8FLO3                    Serrano - cross

1    A.   Correct.

2    Q.   And 3 meets expectations, isn't that right?

3    A.   Not in my opinion.

4    Q.   According to the performance evaluation, is 3 satisfactory,

5    meets expectations?

6    A.   That's according to the patrol guide.  That's not how I

7    feel.

8    Q.   That's according to the patrol guide for evaluations for

9    police officers, correct?

10   A.   That's correct.

11   Q.   Officer Serrano, it's your claim that you were repeatedly

12   told with respect to these quotas in the 40th Precinct that

13   they involved summonses, am I correct?

14   A.   Repeat, please.

15   Q.   The quotas addressed summonses in the 40th Precinct?

16   A.   The quota, it changes from period to period.  It's not

17   specific.  Right now, 2007 on, it was arrests, summonses and

18   250s.

19   Q.   I believe you also testified that you were ordered to do a

20   certain amount of vertical patrols, is that correct?

21   A.   Certain times, yes.

22   Q.   And you considered an order to do a certain number of

23   vertical patrols a quota?

24   A.   Yes.

25   Q.   So it's your understanding that a supervisor's expectation

1    that you conduct a certain number of vertical patrols would be

2    in violation of the labor law?

3    A.   It's possible.

4    Q.   So you disagree that it's appropriate for a supervisor to

5    ask you to conduct a certain number of vertical patrols in a

6    tour?

7    A.   Well, again, it's not a yes or no answer.  Do you want the

8    answer?

9    Q.   I just asked --

10           THE COURT:  Excuse me.  I want the answer.

11           THE WITNESS:  Sorry, Judge.

12   A.   The way I feel is you can ask me whatever you want.  If you

13   ask me to get five verticals, and during that time someone

14   passes away and I have to watch them, that's what we do.

15   Someone passes away, I have to stay at the door.  The entire

16   tour I can't do anything.  So you can ask me to do five, you

17   can ask me to do ten, but I could only do one, or what I did up

18   to that point.  So you can ask me, you can tell me to do it,

19   but I have an explanation why I don't.

20           THE COURT:  I understand that.  But why do you

21   consider being told to do five vertical patrols a quota?  Why

22   is that a quota?

23           THE WITNESS:  It's just numbers.  I just feel that to

24   give me a specific number --

25           THE COURT:  I can understand your point with respect

1    to arrests, summonses and 250s.  But to be sent out on a

2    certain number of patrols per day, why is that a quota?

3              THE WITNESS:  It's just how I feel.  I am not going to

4    object to it.  I am going to do the best I can.  If I look at

5    it, it's a number.  You're not allowed to give me a specific

6    number.  It's like going out there and make sure you write five

7    complaint reports.

8              THE COURT:  Five what?

9              THE WITNESS:  Five complaint reports.  They might not

10   be there.

11             THE COURT:  That's exactly the difference.  Being sent

12   out on five patrols, that just means --

13             THE WITNESS:  To go up and down five times, which I

14   will do it, and I won't fight it.  I just think that, when I

15   read the labor law, it says a specific task and a specific -- I

16   don't know the wording on it, but I think a specific number, I

17   just thought they couldn't ask.  Whether I was right or wrong,

18   I don't know.  Again, verticals I don't see as a problem.  I

19   just do them.

20   BY MS. COOKE:

21   Q.  Again, referring to the affidavit you submitted in advance

22   of your testimony in this case, you indicated that verticals

23   were one of the items you believe were inappropriate quotas at

24   the 40th Precinct, is that correct?

25   A.  It's what he asked me to do, and I try to stay as accurate

1   as I can.  So I put it down, yes.

2   Q.  You understand vertical patrols, as you were just

3   discussing, are entering either a Housing Authority building or

4   a private building, is that correct?

5   A.  Yes.  Entering a building.

6   Q.  Entering a building?

7   A.  Going from the top and patrolling it all the way down to

8   make sure there is no crime.

9   Q.  And the reason for entering the building to do patrols

10  inside the building is to address crime inside the building?

11  A.  That's correct.

12  Q.  And this is helpful to the people in the community in the

13  40th Precinct, isn't that correct?

14  A.  It's helpful to everyone, yes.

15  Q.  You testified on direct examination with respect to raising

16  complaints with respect to the quotas, but you didn't give a

17  lot of dates so I would like to set some dates and the

18  timeline.

19          You filed your EEOC complaint with the New York State

20  Department of Human Rights in August of 2012, is that right?

21  A.  I don't know the date, but I did file it.

22  Q.  Would you like to look at your affidavit to refresh your

23  recollection as to when --

24  A.  You can look at it and tell me.

25  Q.  If I told you it was August 12, 2012, you would agree?

1    A.   That's fine.

2    Q.   That was the first time you made any formal complaint with

3    respect to the quotas existing in the 40th Precinct, is that

4    right?

5    A.   I'm going to say yes.  Formal, did I write it up and send

6    it somewhere?

7    Q.   Correct.

8    A.   I think possibly, yes.

9    Q.   Where do you think possibly you wrote something up and sent

10   it before August of 2012?

11   A.   I say possibly because when things go wrong, I go to the

12   computer and I write.

13   Q.   Did you provide any writing regarding your complaint about

14   quotas in the 40th Precinct prior to August of 2012?  Did you

15   provide a writing to anyone?

16   A.   Prior to 2012?  Like I said before, all I know is I

17   contacted IAB.  I called them and then I faxed them

18   information.  I contacted --

19   Q.   Let's stop right there.

20        MR. MOORE:  Hold on.  Can he finish the answer?

21   Q.   My question was if you recall prior to August 2012

22   providing a writing.  You just identified IAB.

23   A.   I apologize, but when it comes to dates, I can't be 100

24   percent positive.  I don't want to give you a date and then

25   you're going to tell me it's wrong.  I don't know.

D3L8FLO3                    Serrano - cross

1   Q.  You didn't provide any other information regarding

2   providing written complaints about quotas at the 40th Precinct

3   prior to August 2012 when you signed this affidavit, did you?

4            MR. MOORE:  I don't understand that.  The question is

5   a confusing question.

6            THE COURT:  The witness also doesn't understand it.  I

7   would ask you to rephrase.

8            He says he doesn't understand either so she is going

9   to rephrase it.

10  Q.  In your affidavit that you signed on March 11, 2013, you

11  provided information with respect to your EEOC complaint that

12  was filed in August of 2012 and your complaint made to IAB in

13  February of 2013?

14  A.  That's correct.

15  Q.  Other than those two formal complaints identifying

16  complaints of quotas in the 40th Precinct, you did not provide

17  any other information in this affidavit about complaints,

18  correct?

19  A.  I made -- I tried to contact the union of civil liberties I

20  guess -- I tried to contact the union, I faxed it to them.  I

21  probably didn't put it there, but I think I gave it to my

22  lawyer.  I attempted several -- I contacted several people in

23  regards to this, some lawyers, some civil liberties union, I

24  faxed them.  I made several calls.

25           THE COURT:  You considered those to be complaints?

1          THE WITNESS:  I made those -- I needed someone to help

2     me.

3     Q.   When did you attempt to contact the Civil Liberties Union?

4     A.   I don't have the date.

5     Q.   What year?

6     A.   I don't know.

7          THE COURT:  Was it 2012 or before that?

8          THE WITNESS:  No.  It might be in the paperwork.  It

9     was one of the first things I did.

10          THE COURT:  What is the earliest it could have been,

11    what year?

12          THE WITNESS:  2007 to 2012.

13          THE COURT:  2007, as far back as that?

14          THE WITNESS:  Yes.  Again, I don't know the date, but

15    I had been having problems for a long time.

16          THE COURT:  So you might have contacted them years

17    ago?

18          THE WITNESS:  I was trying to find someone to help me.

19          THE COURT:  OK.

20    Q.   Between 2007 and 2013, February 2013, when you contacted

21    IAB, did you contact IAB at the NYPD regarding complaints of

22    quotas?

23    A.   No.  Just once.

24    Q.   Did you contact the EEO office of the NYPD, the equal

25    employment office, regarding your workplace concerns and quotas

1   at the 40th Precinct ever?

2   A.  No.

3   Q.  Did you ever file a labor related grievance with the labor

4   division under the collective bargaining agreement regarding

5   your allegations of improper quotas at the 40th Precinct?

6   A.  No.

7   Q.  You're aware of the collective bargaining agreement as a

8   police officer, aren't you?

9   A.  I am aware of it.  I don't know the details.

10  Q.  You have PBA delegates -- I think we have had some

11  testimony about them today -- PBA delegates at the 40th

12  Precinct, correct?

13  A.  I did contact them with reference to it.  I filled out an

14  affidavit, I got it notarized, and I handed it to the trustees.

15  Q.  What affidavit are you referring to?

16  A.  It's an affidavit.  It's not here because I gave it to

17  them.

18  Q.  When did you give an affidavit to the PBA?

19  A.  It was during an election for PBA delegate.  They were

20  present.  So I walked up to them.  I explained to them what was

21  happening, that I was being subjected to stop, question and

22  frisk, summonses and arrest quotas, and I was being retaliated

23  against.  I wasn't the only one.  There was other people

24  present, and we gave it to him in his hand.  He turned around

25  and said, just give them what they want, and he laughed.

1   Q.  What year was that?

2           THE COURT:  And he?

3           THE WITNESS:  And he laughed.  He chuckled.

4   Q.  What year?

5   A.  Again, the years -- PBA delegate is a couple of years ago.

6   I don't know.

7   Q.  Who is your PBA delegate?

8   A.  Well, PO Montanez is the person that won the election.

9   Q.  The person you handed the affidavit to.

10  A.  I don't know his name.  It's two of them for the Bronx,

11  Bronx trustees.  If you allow me to go on the Web, I will give

12  you the names.

13  Q.  You don't recall sitting here today the name of the person

14  you attempted to hand this affidavit to?

15  A.  No.

16  Q.  You don't recall the year?

17  A.  Not specifically, no.

18  Q.  You said we.  Do you recall other officers handing

19  affidavits to this delegate?

20  A.  I believe it's Officer Baez.  There were several people,

21  but I don't know.  I know that we both handed it to him.  It

22  could have been someone else.  There were several people.

23  Q.  Handed separate affidavits?

24  A.  Separate affidavits, different people.  We all handed it to

25  him.

1    Q.  Is this the year you ran for PBA delegate and lost?

2    A.  That is correct.

3    Q.  Did anything contained in your affidavit have to do with

4    your running for PBA delegate and losing?

5    A.  No.  Actually, the two people that I lost to were decent

6    people.  Louie Rodriguez was a colorful guy.  He was energetic.

7    And Montanez was a little more calm.  He was bald, short, like

8    myself.

9    Q.  With respect to your EEOC complaint that you filed in

10   August of 2012, did you have a lawyer at the time you filed

11   that?

12   A.  Again, the times --

13              THE COURT:  She is saying when you filed the EEOC

14   complaint this past August, did you do it yourself or did you

15   have a lawyer help you?

16   A.  I did it myself.

17   Q.  After you filed your EEOC complaint in August 2012, did you

18   retain a lawyer?

19   A.  I believe so, yes.

20   Q.  Who was that lawyer?

21   A.  It's Jonathan Moore.  Well, it's because -- yes, Jonathan

22   Moore.

23   Q.  When did you retain Mr. Moore as your lawyer after August

24   2012?

25   A.  It's not official.  We didn't sign any papers.  I just

1   contacted him.  So right now there is no official paper that

2   says you're my lawyer, you know, but I believe him to be my

3   lawyer.

4   Q.  When did you contact Mr. Moore after August 2012?

5   A.  Repeat that, please.

6   Q.  When after August 2012 did you contact Mr. Moore?

7   A.  I don't know how many times I have to ask you, but I don't

8   know dates.

9   Q.  Was it in 2012?

10  A.  I think so, yes.

11  Q.  You were identified as a witness in this case on December

12  31, 2012, isn't that right?

13  A.  Yes.

14  Q.  So it was prior to December 31, 2012?

15  A.  I believe so.

16  Q.  That was before you contacted IAB to make complaints about

17  the quotas, correct?

18  A.  I'm sorry.  It was before?

19  Q.  You identified yourself as a witness in this case prior to

20  contacting IAB to make complaints about quotas at the 40th

21  Precinct?

22  A.  I don't know.  If you want it chronologically, I can try to

23  tell you what I did.

24  Q.  I am asking you if you --

25  A.  I don't know.

Q.  If you were identified as a witness in this case on

December 31, 2012?

A.  You have to tell me.  Do you have the paperwork that says

it?

Q.  If you were, would you agree with that?

A.  Yes.

Q.  You didn't contact IAB until February of 2013, correct?

A.  It's a date.

            THE COURT:  If that's what the record shows, he

accepts it.

            We are going to have to stop now for the luncheon

recess.  We will reconvene at 2:00.  Thank you.

            (Luncheon recess)

D3L8FLO3                    Serrano - cross

1                          AFTERNOON SESSION

2                              2:05 p.m.

3    PEDRO SERRANO, resumed.

4    BY MS. COOKE:

5    Q.  Good afternoon, Officer Serrano.

6    A.  Good afternoon.

7    Q.  You testified on direct examination about Operations Order

8    52.  Do you recall?

9    A.  Yes.

10   Q.  In Operations Order 52, your testimony was that it was

11   focused on self-initiated law enforcement activity, is that

12   correct?

13   A.  There was part of that, yes.

14   Q.  Self-initiated, when you were looking at Operations Order

15   52, because it was talking about proactive enforcement of

16   arrests, stop and question, and summonses, is that correct?

17   A.  Correct.

18   Q.  Self-initiated means keeping your eyes open, and when you

19   observe behavior on your own, you take appropriate enforcement

20   action.  Would you agree?

21   A.  That's not what I believe he meant.

22   Q.  I am asking you if you would agree.  That was my

23   definition.  Self-initiated means keeping your eyes open,

24   observing suspicious behavior on your own, and taking

25   enforcement action?

1    A.   I don't know how to comment on that.

2    Q.   You testified that what you see you write, and you're not

3    going to make it up, is that right?

4    A.   That's correct.

5    Q.   So regardless of quotas, you wouldn't make up arrests or

6    summonses or 250s, is that right?

7    A.   I don't make them up, no.

8    Q.   You testified also on direct examination about overtime.

9    Do you recall that testimony?

10   A.   About forced overtime?

11   Q.   Yes.  You described it as forced.

12   A.   Yes.

13   Q.   You were compensated for that overtime, weren't you?

14   A.   Yes.

15   Q.   You were paid time and a half for those overtime tours?

16   A.   That's correct.

17   Q.   These overtime tours, these were impact overtime violence

18   reduction tours, isn't that right?

19   A.   That's correct.

20   Q.   And the two roll calls that you recorded and we listened to

21   this morning were from June and July of 2010, is that correct?

22   A.   If it's all right with you, every time you mention a date,

23   I am just going to assume that you're telling me the truth.

24   Q.   June and July of 2010 were the dates of the recordings.

25   A.   Is that OK?

Serrano - cross

1    Q.  Yes.

2    A.  Those were the dates.

3    Q.  Those were, in fact, overtime roll calls, correct?

4    A.  Yes.

5    Q.  Those were violence reduction tours, yes?

6    A.  Yes.

7    Q.  That's because the 40th Precinct had a high incidence of

8    criminal violence in 2010, isn't that right?

9    A.  Yes.

10   Q.  Those impact overtime tours have to be staffed by officers,

11   isn't that right?

12   A.  Correct.

13   Q.  And there is not officers that are regularly, permanently

14   assigned to impact overtime, isn't that right?

15   A.  Repeat that.

16   Q.  It's not a permanent assignment for an officer to do impact

17   overtime?

18   A.  It's just for that one day.

19   Q.  Some people volunteer for overtime, isn't that right?

20   A.  Yes.

21   Q.  So not all police officers would think overtime is forced,

22   isn't that correct?

23   A.  No.  I'm sorry.  It is correct.

24   Q.  In fact, officers seek out overtime, isn't that right?

25   A.  Correct.

1    Q.  So some people will volunteer for these impact overtime

2    tours, correct?

3    A.  Yes.

4    Q.  But if not enough people volunteer, people have to be

5    assigned to staff it, isn't that right?

6    A.  Correct.

7    Q.  Are you aware that there are restrictions or limits on the

8    amount of overtime an officer can receive in a given period

9    such as a month?

10   A.  Yes, there is a cap.

11   Q.  Anyone who has already reached the cap for overtime for the

12   month wouldn't be permitted to work another overtime tour that

13   month, right?

14   A.  Correct.

15   Q.  Anyone who is already working a regular tour for their

16   regular assignment wouldn't be eligible to work that impact

17   overtime tour, correct?

18   A.  Incorrect.

19   Q.  If your impact overtime tour was occurring at the same time

20   as your regular patrol tour you could work both?

21   A.  Yes, you can.  I will explain if you want.

22   Q.  That's OK.  Anyone on vacation would not be available to

23   work the impact overtime tour, correct?

24   A.  Incorrect.

25   Q.  If you are out of town on vacation, you would be present

1    for an impact overtime tour?

2    A.  You want me to explain?

3    Q.  If you were out of town on vacation, would you also be

4    present to work an impact overtime tour?

5    A.  The way you're depicting it, if you're out of town, you

6    won't be there, then I agree with you.

7    Q.  If you were out sick and not working, you wouldn't be

8    present and available to work an impact overtime tour, would

9    you?

10   A.  If you're out sick, you cannot work, no.

11   Q.  It's fair to say that by the end of the month, there is a

12   smaller pool of people available to be assigned an impact

13   overtime tour than at the beginning of the month, is that

14   right?

15   A.  Yes.

16   Q.  You didn't volunteer for either impact overtime tour in

17   June or July of 2010, is that right?

18   A.  I cannot tell you if I volunteered or not because there

19   were times when I did volunteer.  But the ones I specified were

20   forced.

21   Q.  The ones you specified that you recorded the roll calls,

22   those two?

23   A.  Yes, to the best of my knowledge.

24   Q.  Those occurred, and I am representing for you, the

25   recordings were June 30, 2010 and July 31, 2010?

1    A.  Yes.

2    Q.  Those were the last day of the month for both June and July

3    2010, right?

4    A.  Yes.

5    Q.  You claim you have been making recordings of officers and

6    superiors in the 40th Precinct ordering you and other officers

7    to meet these enforcement activity quotas since sometime in

8    mid-2010, is that right?

9    A.  You said something there that I don't agree with.

10   Q.  What is that?

11   A.  You said I was recording officers.  My intent was not to

12   record other police officers.  My intent was to record the

13   supervisor who was talking to me and giving me --

14   Q.  Officers are captured on some of your recordings, isn't

15   that right?

16   A.  They were, yes.

17   Q.  Regardless of who you were capturing in addition to

18   supervisors, your intent was to capture supervisors at the 40th

19   Precinct discussing these quotas beginning in mid-2010, is that

20   right?

21   A.  Yes.

22   Q.  But you have only provided two audio recordings of these

23   such roll calls, isn't that right?

24   A.  Yes.

25   Q.  These roll calls that took place in 2010 that we have

1    listened to today, that was more than a year before Deputy

2    Inspector Christopher McCormack became the commanding officer

3    at the 40th Precinct, isn't that right?

4    A.  Yes.

5    Q.  He didn't arrive at the 40th Precinct until September of

6    2011, isn't that right?

7    A.  Correct.  Remember, I am trusting you with these dates.

8    Q.  My representation is it was late September of 2011.

9    A.  I agree.

10   Q.  The recordings of June 30, 2010 and July 31, 2010, those

11   aren't complete recordings of the entire roll call each day,

12   are they?

13   A.  They are not complete, but I didn't alter them.

14   Q.  No.  The question was, you didn't capture the entire

15   conversation that occurred at each roll call on the 30th of

16   June and the 31st of July?

17   A.  You know, I believe I did.  If you want me to explain I

18   will.

19   Q.  I am going to ask you some questions about what is not on

20   those recordings.

21          I didn't hear any discussion of color of the day on

22   either of those recordings, is that correct?

23   A.  I don't remember.

24   Q.  Would you like me to replay the recordings?

25   A.  No.  I agree with you.

1   Q.  You agree the color of the day was not captured on those

2   recordings?

3   A.  Yes.

4   Q.  That's something that's regularly, routinely discussed at

5   each roll call, isn't that right?

6   A.  It's supposed to be, but not always.

7   Q.  What I didn't hear on either of those roll calls were the

8   assignments for the officers for those tours, am I correct?

9   A.  Yes.

10  Q.  So the assignments handed out to the officers for their

11  tour on this impact overtime were not included on the

12  recording?

13  A.  Yes.

14  Q.  That would have been discussed at roll call, correct?

15  A.  Not all the time.

16  Q.  How many roll calls have you been to where you haven't been

17  provided an assignment?

18  A.  During roll call?

19  Q.  Yes.

20  A.  Many.

21  Q.  How many?

22  A.  If you want me to estimate, I can estimate 50, 100.

23  Q.  I didn't hear discussion with respect to partners, who was

24  going to be partnered with whom for the tour in those roll call

25  recordings, am I correct?

1    A.  Correct.

2    Q.  I didn't hear any discussion about crime patterns or

3    criminal activity that had been going on in the precinct in the

4    prior tours or prior days, am I correct?

5    A.  Correct.

6    Q.  With respect to the first roll call recording, June 30,

7    2010, that was the roll call with Lieutenant Barrett, is that

8    right?

9    A.  Yes.

10   Q.  Lieutenant Barrett said she was looking for five?

11            THE COURT:  Could you speak a little more slowly?

12   It's giving me a headache.

13   Q.  She said she was looking for five, is that correct?

14   A.  Yes.

15   Q.  You understood that to mean five C summonses?

16   A.  Yes.  I believe somewhere along that recording she actually

17   says the word summonses, not just five.  In the beginning she

18   says five, and somewhere down the line she will say summonses.

19   She actually said, I don't believe that you're going to have a

20   problem getting it.

21   Q.  Did you get five summonses for that tour?

22   A.  I don't recall.

23   Q.  Would you have recorded all of those summonses in your memo

24   book?

25   A.  Hopefully I did, yes.

1   Q.  Do you recall being punished for failing to meet a quota

2   following this impact overtime tour?

3   A.  I don't recall.

4   Q.  Lieutenant Barrett also said on that roll call recording

5   that anyone -- she asked if anyone was looking for a collar or

6   not looking, is that right?

7   A.  Yes.

8   Q.  And not looking is anyone who was not looking to have to

9   process an arrest, isn't that right?

10  A.  Correct.

11  Q.  Because that's a fairly typical circumstance, when an

12  officer might have a personal commitment following their tour,

13  and they don't want to spend the time processing an arrest,

14  correct?

15  A.  Yes.

16  Q.  So another officer will take that arrest and be assigned as

17  the arresting officer?

18  A.  Yes.

19  Q.  There is nothing improper about that, is there?

20  A.  No.

21  Q.  Lieutenant Barrett didn't say anything captured on that

22  roll call audio with respect to punishment for officers who

23  failed to write five C summonses that night?

24  A.  I disagree.

25  Q.  You heard Lieutenant Barrett say something with respect to

1    a punishment?

2    A.   What I heard was that the supervisor will be checking on

3    us, and because of other impact overtimes that I have attended,

4    that meant that the sergeant will ask you several times during

5    the night, how many you got, how many you got.  And then when

6    you don't reach that number, you're going to be -- they will

7    find a collar, call you over to the scene, and you will process

8    it.  That will be a punishment.  That's one of punishments.

9    Q.   What you just described, that wasn't discussed on the audio

10   in the roll call, correct?

11   A.   No.  But you just asked me.

12   Q.   I am asking about what is reflected in the roll call, and I

13   am confirming it's not reflected.

14          MR. MOORE:  I object.  Part of it was, part of it

15   wasn't.

16          MS. COOKE:  The conversation --

17          THE COURT:  What is your objection, Mr. Moore?

18          MR. MOORE:  The objection is that it misstates what he

19   just testified about.  He testified why he --

20          THE COURT:  OK.  I will sustain your objection and ask

21   her to rephrase.

22          I don't know if you remember what your question was

23   that was objected to, but you said, "I am asking about what is

24   reflected in the roll call, and I am confirming it's not

25   reflected."  Maybe you can rephrase it.

D3L8FLO3                    Serrano - cross

1    Q.  The roll call does not reflect a conversation with respect

2    to, if you do not have a certain number of summonses at a

3    certain appointed tour, you would be assigned an arrest,

4    correct?

5    A.  Those specific words, no.

6    Q.  Any conversation with respect to being assigned an arrest

7    is not present as punishment on that roll call, correct?

8    A.  That's not how she states it.

9    Q.  There is no threat of receiving a poor evaluation if you

10   don't achieve those five summonses, is that correct?

11   A.  At that roll call?

12   Q.  Yes.

13   A.  No.

14   Q.  There is no threat of a denial of a day off if you don't

15   achieve those five summonses, is that correct, in the roll call

16   reflected on the recording?

17   A.  On that day, no.

18   Q.  There is no threat that you would be made to drive a

19   supervisor if you didn't achieve five summonses in that roll

20   call tour?

21   A.  With those words, no.

22   Q.  In fact, you didn't receive a poor performance evaluation

23   in 2010, did you?

24   A.  I don't know the number.

25   Q.  You didn't appeal that 2010 performance evaluation?  I

D3L8FLO3                    Serrano - cross

1    think we discussed that.

2    A.  No.

3    Q.  With respect to supervisors checking on you during the

4    tour, officers often have a supervisor scratch their book,

5    isn't that correct?

6    A.  It's usually once a night.

7    Q.  It's part of the supervisor's responsibility?

8    A.  Yes, ma'am.

9             THE COURT:  You said it's usually once a night?

10            THE WITNESS:  Usually once a night the supervisor,

11   whoever is out there, the patrol sergeant or patrol boss, to

12   show that they have been checking up on you, they write in your

13   book and inspect you.  It's usually once a night.

14   Q.  There are circumstances where you see a supervisor more

15   than once a night, aren't there?

16   A.  Yes, ma'am.

17   Q.  Like if you made an arrest and had to call a supervisor to

18   the scene?

19   A.  Yes, ma'am.

20   Q.  Or if you needed assistance and your supervisor responded?

21   A.  Yes.

22   Q.  And in each of those instances, that would be potentially

23   in addition to them arriving to scratch your book at some point

24   during the tour?

25   A.  Yes.

D3L8FLO3                    Serrano - cross

1              MR. MOORE:  I am sitting close, but sometimes I can't

2        hear the words being said by counsel.

3              THE COURT:  She is speaking so quickly.  I have asked

4        her to slow down.

5              MS. COOKE:  Sorry.

6        Q.  The July 31, 2010 roll call has the references to five,

7        five, five.  Do you recall that?

8        A.  Yes.

9        Q.  You identified that meant to you five summonses, five

10       verticals, and five UF-250s, is that right?

11       A.  Yes.

12       Q.  Did you achieve those numbers during that impact overtime

13       tour?

14       A.  I would guess no.  They were very high, unusual numbers.

15       Q.  But you would have recorded your activity for that tour in

16       your memo book?

17       A.  I try to record all of my activity in my memo book to the

18       best of my ability.

19       Q.  You identified the speakers on that roll call as Sergeant

20       Silver and Lieutenant Doute, is that correct?

21       A.  Yes.

22       Q.  And neither Sergeant Silver or Lieutenant Doute are

23       captured on that audio articulating a punishment for officers

24       who failed to meet five, five and five, is that correct?

25       A.  The way you word it, you're correct.

1  Q.  There was no threat of a poor performance evaluation if you

2  didn't come back with five summonses, five verticals, and five

3  UF-250s?

4  A.  Again, it's the way it's worded.

5  Q.  There was no threat of a denial of a day off?

6  A.  Correct.

7  Q.  No threat of driving a supervisor, is that correct?

8  A.  Correct.

9  Q.  If an officer observed reasonable suspicious behavior on

10  five occasions during the course of a tour and made five stops,

11  would that be fine with you?

12  A.  Yes.  As long as it's not -- it could be five, ten,

13  whatever.  It just has to be, you know, lawful.

14  Q.  The same would be true for C summonses, as long as they

15  were lawful that would be fine with you regardless of the

16  number?

17  A.  All the activity, yes.

18  Q.  You testified earlier with respect to a text message that

19  you said was between yourself and your direct supervisor,

20  Sergeant Monroe.  Do you recall?

21  A.  Yes.

22  Q.  In the text message you claim Sergeant Monroe told you that

23  you needed to do more 250s, that was his text you said?

24  A.  Yes.

25  Q.  I believe you testified that was regarding your activity

D3L8FLO3                    Serrano - cross

1  from the month of October 2012, is that correct?

2  A.  Correct.

3          MS. COOKE:  If we could put up Defendants' Exhibit

4  B10.

5  Q.  Officer Serrano, do you recognize this document?

6  A.  It is a police officer's monthly conditions impact

7  measurement report.

8  Q.  Whose monthly measurement report is it?

9  A.  It says it is mine.

10  Q.  For what month?

11  A.  October 2012.

12  Q.  If you could look at the bottom of the last page.

13          Do you recognize the handwriting on this document?

14  A.  I don't think so.  I mean, it could be mine.

15  Q.  Do you see a signature next to your name?

16  A.  That looks like my signature.

17  Q.  Do you have any reason to think it isn't your monthly

18  activity report for August 2012?

19  A.  May I explain?

20  Q.  Yes.

21  A.  What happens with this is, this month was supposedly lost.

22  This activity is not supposed to exist.  The reason I texted my

23  activity is because it was lost.  So now it reappears.  I don't

24  know if someone altered it or doctored it or added numbers.

25  It's very easy to put a number somewhere and change my number,

1   put a one to a seven, you add another one it will be 131.  They

2   can mess with it so many ways.  But the reason I texted him my

3   activity is he did not have this document.  So now you're

4   producing it, I am a little suspicious, because if you're the

5   supervisor and you have this in front of you, why do you text

6   me, what is your activity?  And I estimated my activity

7   because, again, it came from my mind.  It's not that chart.  I

8   tried the best I can.

9   Q.  In the box it says 20 car stops.  Do you see that box above

10  your signature?

11  A.  Yes, ma'am.

12  Q.  Is that your handwriting?

13  A.  It appears to be.

14          MS. COOKE:  Scroll up a little.

15  Q.  In the column that has the assignments for the day, RDOs,

16  shootings, robberies, is that your handwriting?

17  A.  It appears to be.

18  Q.  And the numbers that are reflected in the columns next to

19  it, does that appear to be your handwriting?

20  A.  Again, I think so.

21          MS. COOKE:  I would ask that this exhibit be admitted

22  as Defendants' B10.

23          MR. MOORE:  No objection.

24          THE COURT:  Exhibit B10 is received.

25          (Defendant's Exhibit B10 received in evidence)

1  Q.  Looking at the total number of days on patrol, how many

2  days on patrol does it indicate there?

3  A.  13.

4  Q.  And in your text message it said 14, right?

5  A.  I estimated.

6  Q.  Yes.

7  A.  Yes.  That's correct.

8  Q.  So the 13 days on patrol, those are 8 hour and 35 minute

9  tours?

10 A.  Yes.

11 Q.  If we look over at the total of stop and frisk reports for

12 the month of October, how many are indicated on this form?

13 A.  Zero.  Nothing.  Blank.

14 Q.  And Sergeant Monroe's text message was you need to do more

15 UF-250s, is that right?

16 A.  Yes.

17        MS. COOKE:  If we could just scroll slowly back to

18 page 1.

19 Q.  Shootings and robberies appear as your condition on the

20 days you were on patrol, is that correct?

21 A.  Yes.

22 Q.  Shootings and robberies, I believe in the performance

23 evaluation conversation that you had recorded, you identified

24 as crimes, high crimes in the 40th Precinct, is that correct?

25 A.  They were the condition that I attempted to address.

1    Q.  But not once in the entire month of October 2012 did you

2    observe suspicious behavior of a person about to commit,

3    committing, or having committed a penal law, felony or

4    misdemeanor that you had reasonable suspicion to make a stop?

5    A.  I can't go back and answer that, but I did not do a 250.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3L9FLO4                    Serrano-cross

1    Q.  And for the year of 2012 you only completed two UF 250s;

2    isn't that correct?

3    A.  I'm not clear because I remember I said that one of them

4    was incorrect and I put it in my memo book and they were

5    clearly on the side labeled 250s and I think it was four or

6    five but I don't know for what year.

7    Q.  You understand that two UF 250s are recorded for you in the

8    official police department system cog notes for the year 2012?

9    A.  Paperwork gets lost a lot.

10   Q.  And looking at -- still looking at Exhibit B-10 on

11   October 10, which is on the first page, the 10th day down,

12   correct, each number indicates the day of the month.

13           October 10 your assignment was lieutenant operator; is

14   that correct?

15   A.  Yes, I was.

16   Q.  And on that day your activity reflected on this form is a

17   total of two radio runs; is that correct?

18   A.  Yes.  That's what it says here.

19   Q.  There are no summonses reflected on this form, correct?

20   A.  No.

21   Q.  No UF 250s?

22   A.  Nothing.  Just --

23   Q.  And no arrests?

24   A.  Two radio runs.

25   Q.  No domestic violence reports?

D3L9FLO4                    Serrano-cross

1    A.  Nothing.  Blank.

2    Q.  And just to be clear, driving supervisor was a punishment,

3    correct?

4    A.  It's -- sometimes it is.  Sometimes it isn't.  But, again,

5    it's -- if he asked me to drive him for the night because your

6    partner is not in, then you do so.  And that's not a

7    punishment.  But if your partner is in or if you got

8    specific -- and they split you off on purpose just to make you

9    write, which has happened to me, then it is punishment.

10   Q.  But you didn't, according to the form, you didn't write

11   anything on the day you were driving the supervisor, correct?

12   A.  No.

13   Q.  After you received your 2011 performance evaluation that

14   you appealed your assignment wasn't switched as a result of the

15   evaluation, was it?

16   A.  You got to clarify.  Was I still doing patrol?

17   Q.  Yes.

18   A.  Yes.

19   Q.  Were you still doing the same tour, four to twelve?

20   A.  Yes.

21   Q.  Were you still working with the same partner?

22   A.  I think so.

23   Q.  Had you been separated from your partner?

24   A.  I had been threatened.

25   Q.  Had you been separated?

1  A.  Back then -- no, I hadn't been separated, no.

2  Q.  And, in fact, if we could look at Defendants' C-10 which I

3  believe was admitted into evidence on direct.

4          MS. COOKE:  On the top, Morgan, recommendation.

5  Q.  Does it indicate over on the far right top box

6  recommendation continue in present assignment; is that correct?

7  A.  Yes.

8  Q.  And to your knowledge was that also the recommendation on

9  your 2012 performance evaluation?

10  A.  I don't know.

11  Q.  Do you recall that your recommendation was to not continue

12  in your present assignment?

13  A.  I have no idea.  In fact, until you told me now I didn't

14  even know that it says -- you know, continue in present

15  assignment.  I didn't know that was there.

16  Q.  This performance evaluation here Defendants' C-10, does the

17  performance evaluation for 2011 that was the first year that

18  Sergeant Monroe was your direct supervisor; isn't that correct?

19  A.  2011?

20  Q.  Mm-hmm.

21  A.  Yes.  I don't think he was there for the whole year.

22  Q.  So he definitely wasn't there either in 2010?

23  A.  I wouldn't -- I don't know.

24  Q.  You had a different direct supervisor in 2010; isn't that

25  correct?

1   A.  I think so, yes.

2   Q.  Sergeant Lim?

3   A.  Yes, briefly.

4   Q.  Looking -- you testified earlier with respect to your

5   performance evaluation in -- meeting in 2013 with Inspector

6   McCormack.  Do you recall?

7   A.  Yes.

8   Q.  And you testified about the items, the performance areas

9   that you wanted to discuss.  I think you said there were --

10  there was 20 of them; is that correct?

11  A.  Twenty-eight at the time.  I estimated.

12  Q.  Do you have any reason to believe that they're different on

13  your 2012 performance evaluation than the items that are listed

14  here on this 2011?

15  A.  From what I remember, from the two years, the only

16  difference is police ethics and integrity.  I believe it's a 4.

17  And then --

18  Q.  I'm sorry.  I wasn't clear.  I meant difference in the

19  categories, in the description of those categories, whether

20  there were substantive changes to these 28 items that --

21  A.  I assume it's the same.

22          MR. MOORE:  I'm confused.  Is she saying whether the

23  categories are different on 2012?

24          MS. COOKE:  The category.  Not the rating.

25  Q.  Generally, do you recall the same categories were --

D3L9FLO4                    Serrano-cross

1    A.  To my knowledge, I think they're the same.

2    Q.  Roughly these 28 were the items you were referring to in

3    your direct examination when you said you were focused in

4    wanting to discuss these in the meeting with Inspector

5    McCormack; is that correct?

6    A.  That's correct.

7    Q.  So looking at item number 2, just the category, I'm talking

8    2012.  Evaluation in the 2013 meeting about the evaluation.

9    Item 2 says apprehension and intervention; is that correct?

10   A.  Correct.

11   Q.  So it's your testimony that apprehension and intervention

12   weren't discussed during the 2013 performance evaluation

13   meeting with Inspector McCormack?

14   A.  I believe that might be the only one that was discussed.

15   Q.  Because apprehension and intervention has to do with taking

16   law enforcement action, arrests, summons, and that thing?

17   A.  Yes.

18   Q.  Well looking at number 12, report and clerical duties.

19   It's your testimony that report and clerical duties weren't

20   discussed during the meeting with Inspector McCormack in

21   February of 2013?

22   A.  I believe not.

23   Q.  You didn't discuss the fact you only had two UF 250s for

24   2012?

25   A.  Yes.

D3L9FLO4                    Serrano-cross

Q.  And isn't that a report, a UF 250 form, a report that

you're required to fill out as an officer?

A.  Yes.  It's one of them.  Yes.

Q.  And didn't you identify during that recording you listened

to that you believed the number 2 was inaccurate?

A.  Correct.

Q.  Because you filled out additional reports?

A.  Correct.

Q.  So you would agree with me that reports and clerical duties

were discussed in your performance evaluation meeting in 2013?

A.  Specifically 250, yes.

Q.  Looking at number 14.  Comprehension skills.  It's your

testimony that comprehension skills weren't discussed during

the performance evaluation meeting in February of 2013 with

Inspector McCormack?

A.  I can't answer that because he never -- we never went one

by one.  You know when they tell you police -- we're going to

discuss police ethics.  And then he'll explain.  And I know

he's discussing that.  We never went down that avenue.

Q.  Well is it your testimony that you did not discuss

comprehension of law enforcement activities during your

performance evaluation meeting in 2013?

            MR. MOORE:  Judge, that's not --

            THE WITNESS:  That's not what it says.

            MR. MOORE:  Excuse me.  I object.

D3L9FLO4                          Serrano-cross

1          I think that's a mischaracterization of the category.

2     It says comprehension skills.  It doesn't say with respect to a

3     particular activity.

4          THE COURT:  Objection sustained.

5          MR. MOORE:  It's confusing because --

6          THE COURT:  That's okay.  I've sustained the

7     objection.

8     Q.  Officer Serrano, would you agree that comprehension skills

9     when you're being evaluated as a police officer for your

10    comprehension skills with respect to your job duties as police

11    officer?

12    A.  Again if you would specify, I would be able to answer it.

13    It's very general.

14    Q.  Do you recall discussion on the recording regarding your

15    comprehension of stops, summonses, and 250s?

16    A.  There was discussion about that, yes.

17    Q.  So that item would have been covered during the discussion

18    of your evaluation appeal, correct?

19    A.  I don't want to be difficult, but I don't know.

20    Q.  Okay.  Number 15.  Communication skills.  Is it your

21    testimony that communication skills weren't discussed during

22    your evaluation appeal in 2013?

23    A.  It's the same answer as the one before.  I don't know.

24    Q.  Do you not recall discussing during your performance

25    evaluation meeting in 2013 that you liked to approach people

1  and speak to them like human beings and reserve the right to

2  warn and admonish.  Do you recall those statements by yourself?

3  A.  I said something to that.  Yes.

4  Q.  Would you not agree that that's you discussing your

5  communication skills as a police officer performing your duties

6  in the 40th precinct?

7  A.  That's very vague.  I could say yes.

8  Q.  What about number 16.  Reasoning ability.  Is it your

9  testimony that your reasoning ability wasn't discussed during

10 the performance evaluation appeal in 2013?

11 A.  I don't think so.  I mean I expressed what I was taught.

12 And he disagreed with it.

13 Q.  You don't recall discussing your reasoning as to why you

14 would take or not take with your, using discretion, certain law

15 enforcement activity?

16 A.  Yes.  But discretion is on my part.  It's not on his.

17 Q.  Number 18.  Problem recognition.  Is it your testimony that

18 problem recognition was not covered during your 2013

19 performance evaluation appeal?

20 A.  Maybe.

21 Q.  Maybe?

22 A.  Maybe.

23 Q.  Problem recognition.  Did you not recall Inspector

24 McCormack asking you to identify crime conditions you're aware

25 of in the 40th precinct?

1          MR. MOORE:  I'm sorry.  I didn't hear the --

2     Q.  Did you not recall Inspector McCormack asking you if you

3     could identify crime conditions in the 40th precinct?

4     A.  Going to give you a maybe.  It's possible.

5     Q.  It's possible.  Would you like to hear that portion of

6     the --

7     A.  No.

8     Q.  Do you recall having a conversation --

9     A.  I'll say yes this one.

10    Q.  I'll ask you a different question.

11    A.  I'm sorry to interrupt.

12         MR. MOORE:  Officer Serrano, do your best to answer

13    the question.  You don't have to necessarily agree.

14         MS. COOKE:  Your Honor, Mr. Moore is coaching the

15    witness.

16         THE COURT:  I picked up on that also, Mr. Moore.  So

17    I'm here listening to it.  I'll make my own determinations.  I

18    saw that.  Seem to be a tired okay, whatever you say, I want to

19    get off the stand.

20         I understand.

21         THE WITNESS:  I apologize.

22         THE COURT:  That's what happened on that last answer,

23    didn't seem like you were giving it a lot of thought.

24         THE WITNESS:  I apologize.

25         THE COURT:  Do you want to hear that question again?

1      THE WITNESS:  Yes.  Repeat it, please.

2      THE COURT:  That last one.

3   Q.  With respect to problem recognition, do you recall

4   Inspector McCormack asking you if you could identify crime

5   conditions you were aware of in the 40th precinct?

6   A.  I would say no.  To the best of my ability.

7   Q.  If we could -- Plaintiffs' Exhibit 332, the audio.

8   Starting at 9:30.  Actually, I'm sorry.  10:25.

9      MR. KUNZ:  Okay.  I'm going to start it.

10      MS. COOKE:  10:25.

11      (Audio recording played)

12   Q.  Officer Serrano, does that refresh your recollection that

13   Inspector McCormack asked you about the crime conditions you

14   were aware of in the 40th precinct during that performance

15   evaluation?

16   A.  Yes.

17   Q.  And you identified shootings and robberies?

18   A.  Yes.

19   Q.  And crime in general.  So just a lot of crime in general?

20   A.  Yes.

21   Q.  Do you also recall during that performance evaluation

22   meeting Inspector McCormack asking you what you were doing to

23   address those conditions?

24   A.  Yes.

25   Q.  So you agree with me that problem recognition, number 18,

D3L9FLO4                    Serrano-cross

1    was discussed during your performance evaluation meeting?

2    A.   I'm sorry.  Repeat that.

3    Q.   Would you agree with me then that problem recognition,

4    number 18, was discussed during your performance evaluation

5    meeting?

6    A.   When he asked me what my condition, what the precinct

7    conditions were.

8    Q.   And what you were doing to address it?

9    A.   And that was covering which one?

10   Q.   Problem recognition.

11   A.   Oh, yes.

12   Q.   Number 22.  Judgment.  Is it your testimony that judgment

13   was not covered during your discussion -- your performance

14   evaluation appeal in 2013?

15   A.   Yes.  I expressed my judgment.

16   Q.   So judgment was covered?

17   A.   Yes.

18   Q.   And with respect to number 25, drive and initiative.  Is it

19   your testimony that drive and initiative wasn't discussed

20   during your performance evaluation meeting in 2013?

21   A.   Yes.

22   Q.   Yes.  It's your testimony it was not discussed?

23   A.   It was discussed.

24   Q.   It was discussed.

25            Specifically when Inspector McCormack stated that two

D3L9FLO4                    Serrano-cross

1    UF 250s for the entire year seemed to -- were purposely not

2    doing your job.  That was drive and initiative discussion,

3    correct?

4    A.  Yes.

5    Q.  You testified in direct examination that in 2012 all of

6    your numbers were up; is that right?

7    A.  Yes.

8    Q.  And that you were probably a better officer then in 2012;

9    is that right?

10   A.  Correct.

11   Q.  Did you mean that by doing more enforcement activity you

12   were a better officer than when you did less activity the year

13   before?

14   A.  No.  That's not what I mean.

15   Q.  During your performance evaluation appeal meeting in

16   February of 2013 you -- you knew that you were tape recording

17   that meeting but no one else did; is that correct?

18   A.  Yes.

19   Q.  You didn't ask anyone's permission to tape record the

20   meeting prior to the meeting?

21   A.  No.

22   Q.  You didn't inform anyone at the beginning of the meeting

23   that you were tape recording?

24   A.  No.

25   Q.  So during the performance evaluation appeal you were trying

D3L9FLO4                    Serrano-cross

1    to get Inspector McCormack to say the department only cares

2    about numbers; isn't that right?

3    A.  I disagree.

4    Q.  You tried get Inspector McCormack to say he was telling you

5    to stop all Blacks and Hispanics; isn't that right?

6    A.  I disagree.

7    Q.  Inspector McCormack never said to you during that

8    performance evaluation meeting that he wanted you to stop all

9    Blacks and Hispanics; isn't that right?

10   A.  Those specific words, those specific words, no.

11   Q.  And when Inspector McCormack identified Mott Haven as a

12   location within the 40th precinct with crime problems,

13   specifically robberies and grand larceny, you were the one who

14   responded that Mott Haven was full of Blacks and Hispanics;

15   isn't that right?

16   A.  Yes.  And then I corrected right after and said mostly

17   Black and Hispanic.

18   Q.  And then you responded to Inspector McCormack that what you

19   were supposed to do then was stop every Black and Hispanic in

20   Mott Haven, right?

21   A.  I believe I said what do you want me to do, stop every

22   Black and Hispanic, meaning is that what you want me to do.

23   Q.  And Inspector McCormack did not agree with that, did he?

24   A.  I believe he did not.

25   Q.  Because Inspector McCormack responded by describing the

1    suspects of robberies and grand larceny in Mott Haven as

2    identified by crime victims; isn't that right?

3              MR. MOORE:  Object to the form.  It's both

4    argumentative and a mischaracterization.  And compound.

5              THE COURT:  One second.

6              It's not a question.  It's really not a question.  I

7    have to strike it and ask you to rephrase.

8    Q.  During the performance evaluation meeting when you were

9    discussing the crime problem in Mott Haven, Inspector McCormack

10   provided a description of suspects of robberies and grand

11   larcenies; isn't that correct?

12   A.  Yes.

13   Q.  And that description was male, black, ages 14 to 20 or 21,

14   correct?

15   A.  Correct.

16   Q.  In your direct testimony you discussed focus by superior

17   officers on the right summonses that's you issue as a police

18   officer.  Do you recall that testimony?

19   A.  Repeat that, please.

20   Q.  Discussed during your direct testimony that there's a focus

21   on the right kind of summonses you issue as a police officer?

22   A.  Yes.  What they considered the right summonses.

23   Q.  The ones that make the city money; is that right?

24   A.  Yes.

25   Q.  Isn't it true that the summonses that are hazardous that

D3L9FLO4                    Serrano-cross

1    are the ones that make the city money, those are the ones you

2    identified, the hazardous ones?

3    A.   Those are the ones he wants.

4    Q.   Those are identified as hazardous because they can cause

5    traffic accidents; isn't that right?

6    A.   Yes.

7    Q.   Like talking on a cellphone is a hazardous condition and

8    that would receive a hazardous summons, correct?

9    A.   Actually at one point it was on the other side.

10   Q.   Presently.

11   A.   Presently they moved it to hazard, yes.

12   Q.   So issuing hazardous summonses corrects potential traffic

13   and accident conditions; isn't that correct?

14   A.   Potentially, yes.  Theoretically.

15   Q.   Turning to your meeting with Captain Materasso in June of

16   2012 regarding your appeal of your performance evaluation from

17   2011.  Do you recall your testimony with respect to that

18   meeting?

19   A.   Do I recall --

20   Q.   Testifying with respect to that meeting?

21   A.   Yes.

22   Q.   And you testified that Captain Materasso received a

23   telephone call while you were meeting with her about your

24   evaluation?

25   A.   That's correct.

1   Q.  And you don't know what was said to Captain Materasso

2   during that telephone call, do you?

3   A.  No.

4   Q.  You believe you testified that she told you some people

5   were being watched?

6   A.  She told me that, yes.

7   Q.  And she asked you to come with her to 281 East 143rd; is

8   that correct?

9   A.  Well -- you're saying that's the address, yes.

10  Q.  You provided that address in written document to IAB; is

11  that correct?

12  A.  Yes.

13  Q.  And 281 East 143rd is in the Patterson houses in the 40th

14  precinct; is that correct?

15  A.  Yes.

16  Q.  And that's a NYCHA development?

17  A.  Yes.

18  Q.  And it's your testimony that you and Captain Materasso went

19  to 281 East 143rd in an unmarked police vehicle; is that

20  correct?

21  A.  I'm going to say in a police vehicle.  I'm not a hundred

22  percent sure it's unmarked.  But it's possible.

23  Q.  I believe you testified on direct it was unmarked.  It

24  could have been a marked police vehicle?

25  A.  Yeah, it could have been, yeah.

D3L9FLO4                    Serrano-cross

1    Q.  Who drove?

2    A.  I'm not a hundred percent sure but I think she drove.

3    Q.  Was Captain Materasso on the phone on the way there?

4    A.  I don't remember.

5    Q.  When you arrived at 281 East 143rd you both got out of the

6    vehicle, right?

7    A.  When I arrived at what?

8    Q.  You both got out of the vehicle?

9    A.  Yes.

10   Q.  And you approached the three men who were standing on the

11   sidewalk?

12   A.  Yes.

13   Q.  And one of the men was carrying a baseball bat; isn't that

14   right?

15   A.  Yes.

16   Q.  And actually you removed the baseball bat from the

17   immediate vicinity?

18   A.  Yes.

19   Q.  You put the baseball bat down next to the curb?

20   A.  Yes.

21   Q.  And you were in uniform that day, right?

22   A.  Correct.

23   Q.  And Captain Materasso was wearing an NYPD jacket?

24   A.  I don't recall.

25   Q.  Do you recall that she was in uniform?

D3L9FLO4                    Serrano-cross

1    A.  I don't recall.

2    Q.  Do you recall that she had her badge?

3    A.  I don't know.

4    Q.  Do you recall if she had her weapon?

5    A.  I don't recall.

6    Q.  Did you have your weapon?

7    A.  Yes.

8    Q.  You claim that in Captain Materasso was stopping these

9    three men illegally; is that right?

10   A.  From my vantage point yes.

11   Q.  And that she searched them, as you said, at 281 East

12   143rd?

13   A.  I observed her going through their pockets.  Yes.  She

14   searched them.

15   Q.  It's your belief that Captain Materasso didn't have

16   reasonable suspicion to make that stop?

17   A.  Not from her desk while we're doing our evaluation, no.

18   And we drove up exactly to a location.  We got out.  I don't

19   think so.  Very difficult.

20   Q.  But she received a phonecall, right?

21   A.  Yes.

22   Q.  And you don't know what that phonecall -- what information

23   that phonecall provided her?

24   A.  No, I do not.

25   Q.  But you know that in response she drove to a specific

1    location; is that correct?

2    A.   Yes.

3    Q.   So it's not your understanding that this stop was related

4    to an undercover narcotics operation?

5              MR. MOORE:  Object to the form, Judge.

6              THE COURT:  I know it's got a double negative.

7    Q.   Is it your understanding that this stop was related to an

8    undercover narcotics operation?

9              MR. MOORE:  Objection to the form.  No foundation.

10             THE COURT:  I'll allow it.

11             Is that your understanding?

12             THE WITNESS:  My understanding is that I don't know

13   who was calling her, but someone called her and gave her some

14   information which led her to go to that location.

15   Q.   So you don't know if the stop was prompted by an undercover

16   narcotics operation?

17   A.   No.  I don't know.  It's possible.

18   Q.   And you don't know whether those three individuals that you

19   and Captain Materasso stopped had just sold crack to an

20   undercover officer, do you?

21             MR. MOORE:  Totally speculative and I would note that

22   Captain Materasso is not on their witness list.

23             MS. COOKE:  Yes, she is.

24             MR. MOORE:  I apologize.

25             THE COURT:  Have you ever known that information?

D3L9FLO4                    Serrano-cross

1              THE WITNESS:  No.

2              THE COURT:  And you don't know right now whether it's

3    true or not?

4              THE WITNESS:  No.

5              THE COURT:  Okay.

6    Q.  Are you aware of a narcotics takedown in the 40th

7    precinct in the Patterson houses in December of 2012?

8    A.  No.

9    Q.  You aren't aware of warrants that were issued for 45

10   individuals for a crack distribution operation?

11   A.  No.

12   Q.  You weren't familiar with this as a year-long investigation

13   in the 40th precinct into narcotics?

14   A.  No.

15             THE COURT:  By the way, those three individuals who

16   were stopped and searched, were they arrested?

17             THE WITNESS:  No.  They were just searched.  That's

18   it.

19             THE COURT:  And then that was it?

20             THE WITNESS:  That's it.  I do remember one of them

21   looked like he was playing baseball.

22             THE COURT:  Do you know if a UF 250 was filled out?

23             THE WITNESS:  I didn't see anything filled out.

24   Q.  You didn't prepare a UF 250?

25   A.  I didn't do the stop.  No, I did not.

D3L9FLO4          Serrano-cross

1  Q.  You were present at the stop, correct?

2  A.  Yes.

3  Q.  And I believe in addition to making the stop and allegedly

4  searching these individuals Captain Materasso you testified on

5  direct she took down their pedigree information; isn't that

6  correct?

7  A.  She took down some information, yes.

8          THE COURT:  But do you know if she filled out a 250?

9          THE WITNESS:  No, I don't.

10          THE COURT:  You don't know?

11          THE WITNESS:  I don't know.

12          THE COURT:  But you know they weren't arrested?

13          THE WITNESS:  They were not -- not right then and

14  there while I was present, they were not arrested.

15  Q.  Patterson houses and Mott Haven houses are adjacent to each

16  other; is that correct?

17  A.  Yes.

18  Q.  Both in the 40th precinct?

19  A.  Yes.

20  Q.  And this stop we just identified at 281 east 143rd is near

21  Patterson, correct?

22  A.  Near Mott Haven.

23  Q.  I'm sorry.  Mott Haven?

24  A.  Yes.

25  Q.  And Inspector McCormack actually discussed a narcotics

D3L9FLO4                    Serrano-cross

1    takedown in Mott Haven during your performance evaluation

2    meeting in 2013; isn't that correct?

3    A.   Correct.  But we were in Patterson.

4    Q.   But 281 you just said was Mott Haven?

5    A.   Mott Haven.  Where this actually happened was Patterson.

6    Mott Haven was a block up and across the street.

7    Q.   So they're adjacent?

8    A.   They are -- yes.  They're adjacent.

9    Q.   And Inspector McCormack when he discussed this narcotics

10   takedown in 2012 in the 40th precinct, he said it had an

11   impact on crime in the 40th precinct; isn't that right?

12   A.   Yes.

13            THE COURT:  By the way, Ms. Cooke, just to jump ahead,

14   do you know if there's a UF 250 for this particular stop?

15            MS. COOKE:  I do not know if there is a UF 250 for

16   this particular stop.

17            THE COURT:  Thank you.

18   Q.   You claim that you've been assigned to unusual posts in

19   retaliation for complaints about quotas in the 40th precinct;

20   is that right?

21   A.   Yes.

22   Q.   And some of these unusual posts were posts outside of the

23   40th precinct; is that right?

24   A.   Yes.

25   Q.   Like the Rockaways?

1    A.  Yes.

2    Q.  Was -- weren't you sent to the Rockaways after Hurricane

3    Sandy?

4    A.  Yes.

5    Q.  So that was an unusual post to be sent out of 40th

6    precinct?

7    A.  It was multiple.  And --

8    Q.  But being sent to the Rockaways specifically that was an

9    unusual post in retaliation for your complaint about quotas?

10   A.  The way it's normally done -- yes, it was unusual -- is

11   that the guys with less time, the rookies, would go first and

12   then the people -- the officers that paid their dues and a

13   little seasoned would stay in the precinct and do precinct

14   work.

15   Q.  So you think based on your, is it, eight-and-a-half years

16   with the police department that you were entitled to stay in

17   the precinct and not go to the Rockaways following Hurricane

18   Sandy?

19   A.  Normally they would just ask me.

20   Q.  You didn't volunteer to go?

21   A.  No.  Not that I remember.

22   Q.  And you weren't the only officer sent to the Rockaways for

23   Rockaway detail following the hurricane, were you?

24   A.  No.  I wasn't the only one.

25   Q.  Several officers from the 40th precinct were sent?

D3L9FLO4                    Serrano-cross

1    A.  Yes.

2    Q.  And every precinct practically in the city probably, right?

3    A.  I would assume, yes.

4    Q.  You claim that another retaliatory action is an unusual

5    post like a footpost; is that correct?

6    A.  Yes.

7    Q.  So footposts are also punishment?

8    A.  Again, footposts are usually for the people with less time.

9    Q.  Isn't it true that the NYPD regularly has officers on

10   footpost?

11   A.  Almost everyday, yes.

12   Q.  So everyday officers are being punished?

13            THE COURT:  He said it has to do with seniority.

14            When you say less time, you mean seniority?

15            THE WITNESS:  Seniority.

16            THE COURT:  So footpost people have the least

17   seniority; is that right?

18            THE WITNESS:  That's correct.

19            THE COURT:  And the more senior you get, you ride

20   around in your cars?

21            THE WITNESS:  That's correct.

22            THE COURT:  So what you found unusual was you were

23   assigned there given your seniority?

24            THE WITNESS:  Yes.

25            THE COURT:  It's not unusual to be on footpost?

1          THE WITNESS:  Yes.

2          THE COURT:  But it's unusual given your seniority.

3          THE WITNESS:  Correct.  Unless you want that.

4          THE COURT:  I understand.

5   Q.  Isn't it true that the commanding officer or even a borough

6   commander may make a determination to employ a footpost when

7   necessary to address a crime condition?

8   A.  Yes.

9   Q.  For example following a shooting?

10  A.  Yes.

11  Q.  Officers will be deployed on foot in order to have a

12  presence and prevent a retaliatory shooting?

13  A.  That would be one thing that they do, yes.

14  Q.  And you identified your post -- strike post.  It was the

15  school bus driver union strike, strike post as a retaliatory

16  punishment for speaking about quotas?

17  A.  The way it was done, yes.

18          THE COURT:  What do you mean by that, the way it was

19  done?

20          THE WITNESS:  Usually a strike post, because it's a

21  strike post.  It's almost like a face-to-face.  They don't

22  want -- they want a cop always there.  They don't want any time

23  lapse in between.  So what would happen is immediately after

24  your roll call you get over there quickly.  In my case it was

25  sent out about an hour later, maybe two.  It was after my

1 evaluation.  And then that's when they proceeded to inspect on

2 me, inspect on me, multiple times.

3 Q.  The strike post is an important post though; isn't that

4 right?

5 A.  Yes.

6 Q.  And it has to be covered, as you said, 24 hours a day for

7 the duration of the strike; isn't that right?

8 A.  Yes.

9 Q.  That's because they're trying to keep peace and prevent

10 vandalism and allow workers who are crossing union lines to go

11 to work; isn't that right?

12 A.  Correct.

13 Q.  And supervisors are required to visit the strike post;

14 isn't that right?

15 A.  Yes.

16 Q.  And, in fact, supervisors visited the strike post while you

17 were on that post?

18 A.  Yes.  They visited it, yes.

19 Q.  You identified the Rodman's Neck stop and frisk training

20 that you recently attended as additional training that was in

21 retaliation for your filing complaints about quotas; isn't that

22 right?

23 A.  Correct.

24 Q.  The Rodman's Neck course is a refresher course on stop,

25 question, frisk; is that right?

D3L9FLO4                    Serrano-cross

1    A.   Yes.

2    Q.   And it includes both classroom portions and role playing

3    portions, correct?

4    A.   Yes.

5    Q.   You're not the only officer from the 40th precinct to

6    have attended that course; isn't that right?

7    A.   As far as that I know, at the time I was the only one.

8    Q.   You're aware of intact requirements, intact training for

9    officers; is that right?

10   A.   Yes.

11   Q.   And that's an annual training that each officer is required

12   to go to?

13   A.   I might have to disagree with the annual.  I don't go to

14   intact every -- once a year.

15   Q.   When was the last time you attended intact?

16   A.   I don't remember.  I mean if you say intact where we use

17   paint ball simulations, it's been a while.

18   Q.   Annually do you go to Rodman's Neck for a tactical

19   training?

20   A.   To requalify my weapon I go annual.  Actually twice a year.

21   Q.   You claim our memo books have been scrutinized in

22   retaliation for your making complaints about quotas; is that

23   right?

24   A.   Yes.

25   Q.   But you also identified that you have improperly redacted

1  content from your memo book; isn't that right?

2  A.  Yes.

3  Q.  And that's, in fact, one of the scrutiny that has occurred

4  of your memo book was the fact you violated patrol guide

5  procedure by redacting lines in the memo book; isn't that

6  right?

7  A.  Yes.  I'm sorry.  I crossed it out.  That's a big word.  I

8  blanked it out so that nobody could read it.

9  Q.  You blacked it out?

10 A.  Yes.

11 Q.  Completely?

12 A.  Yes.

13 Q.  And you're aware that the patrol guide procedure provides

14 that to remove a line from your memo book you're to draw a line

15 through it and initial it?

16 A.  Yes.  I had -- actually a supervisor from IAB gave me some

17 advice.

18 Q.  Gave you some advice with respect to how to properly

19 redact?

20 A.  Specifically she said don't let them know -- don't put it

21 in your book.  Don't let anyone know you called me.  And it was

22 too late.  I already put it in the book.  And at that point

23 within five minutes the captain was coming I panicked and I

24 blocked it out.

25 Q.  Who was this person in IAB?

1    A.   I don't know the name.  I have it somewhere.  I originally

2    called -- in IAB there was I guess a police officer had his

3    name was on the memo book somewhere.  Then after that a

4    sergeant called me, a female sergeant called me back to

5    re-clarify because it was a little confusing.  That's -- all

6    this happened while I was on strike post.

7              Then she ordered me.  She says I am ordering you not

8    to tell nobody and do not -- and do not write this in your

9    book.  She didn't say cross it out.  She said don't write it.

10             I made a mistake.  I put it in there.  But that was

11   after she told me.  Then I panicked because I thought they're

12   coming, it's in my memo book and it's clear, and they're going

13   to know what happened.  And I took the chance.  And if they're

14   going to discipline me for that then, you know, I am guilty of

15   blocking it out.

16   Q.   So if you received discipline it's not in retaliation for

17   your complaint about quotas it's for your conduct in violation

18   of the patrol guide?

19             MR. MOORE:  Object to the form.

20             THE COURT:  Seems more like a statement than a

21   question.  Do you have a question?

22   Q.   In your -- is it your understanding that a command

23   discipline for the redaction you made from your memo book would

24   be because you violated the patrol guide?

25             MR. MOORE:  Same objection.

1           THE COURT:  No.  I'll allow it.

2           THE WITNESS:  I haven't received a command discipline

3    for it.  But if they issue it, that's what they do.  But I

4    haven't received a command discipline that specifically states

5    that I crossed it out or blocked it out.

6    Q.  And that call you made to IAB, that was on or about

7    February 7, 2013; is that correct?

8    A.  Yes.

9    Q.  You claim that after you made that call to IAB on or about

10   February 7, 2013 that officers at the 40th precinct knew that

11   you had made a complaint?

12   A.  Very quickly.  I -- I can't tell you the timeframe.  But

13   somehow they knew because they were telling me the story.

14   Q.  Could it be that police officers knew you had been

15   surreptitiously tape recording conversations at the 40th

16   precinct?

17           MR. MOORE:  Object to the form, Judge.

18           THE COURT:  Sustained.  It calls for speculation.

19   Q.  Did you tell anyone you were tape recording conversations?

20   A.  I might have.  Yes.

21   Q.  At -- other officers at the 40th precinct?

22   A.  Yes.

23   Q.  Following your performance evaluation appeal meeting in

24   2013 Assistant ICO Sergeant Gomez asked for a series of your

25   memo books; is that correct?

1   A.  Yes.

2   Q.  And at the time you informed Sergeant Gomez that your memo

3   books were in your house; isn't that right?

4   A.  Yes.

5   Q.  And when you say in your house, you didn't mean the station

6   house, you meant your home; isn't that right?

7   A.  Yes, my home.

8   Q.  You received training regarding memo books and memo book

9   entries at the police academy; isn't that right?

10  A.  Yes.

11  Q.  And there's a parole guide section on how to maintain

12  activity logs?

13  A.  Yes.

14  Q.  An activity log is a memo book; is that right?

15  A.  Yes.

16  Q.  It's true that all memo books, both active and completed,

17  must be stored in your locker and available for inspection at

18  all times; isn't that correct?

19  A.  Yes.

20  Q.  So your memo books were not in your locker and available

21  for inspection on February 14, 2013?

22  A.  No, but for a reason.

23  Q.  When they were requested by Sergeant Gomez and you informed

24  Sergeant Gomez they were in your home, Sergeant Gomez

25  accompanied you to your locker to check; isn't that correct?

D3L9FLO4                    Serrano-cross

1    A.  Yes.

2    Q.  So your locker wasn't searched on February 14, 2013, was

3    it?

4    A.  No.  They told me to open it.  I opened it.  I stepped

5    back.  They looked in.  But they didn't rummage.

6    Q.  And, in fact, this next day, February 15, 2013 you called

7    IAB and asked them if you had to give over your memo books;

8    isn't that right?

9    A.  Yes, and I explained why.

10            Can we take a break?  I have to use the restroom.

11            THE COURT:  Okay.  Go ahead.

12            (Witness excused)

13            THE COURT:  While we're waiting, what's the status of

14   the transcripts?  Have we had a chance --

15            MS. COOKE:  Daily, you mean?

16            THE COURT:  No, the recordings.

17            I'd like to review them.  But I don't want to do it

18   until you've confirmed that you've had the chance.

19            MS. COOKE:  As we've gone, I've been able to read them

20   here in court.  But as your Honor -- I've been busy in here the

21   last couple days with these witnesses.  So I know as I've been

22   reading I've been identifying words that I think are audible

23   and intelligible that weren't recorded and then words that are

24   obviously inaccurate.  I think portions of the Polanco tapes

25   actually weren't even transcribed portions so the transcript is

1    not complete for the --

2              THE COURT:  Maybe by next Wednesday.

3              MS. COOKE:  To the extent --

4              THE COURT:  With the two days off, maybe you can

5    confer.

6              MS. COOKE:  I don't know that we're going to be able

7    to add to the transcripts.

8              THE COURT:  You can confer.  You give your proposed

9    version, and they listen to the tape and can hear it, that's

10   fine.  I'd like to have one agreed-upon transcript if possible.

11             MS. COOKE:  Could you all have the additional pieces

12   transcribed that are missing.  I think it's tracks five and

13   something else.

14             MS. BORCHETTA:  Your Honor, we can work it out with

15   the defendant.

16             THE COURT:  Try because the sooner I can read them

17   because some of them are --

18             MS. BORCHETTA:  We'll work with defendants.

19             THE COURT:  I'd like to have them by next Wednesday if

20   I can.

21             Okay.

22             (Witness resumed)

23   Q.  Officer Serrano, you also claim you've been denied days off

24   in retaliation for your making complaints about quotas; is that

25   right?

D3L9FLO4                    Serrano-cross

1    A.   Yes.

2    Q.   In particular, you claim you were denied a day off when you

3    were in an accident on a snowstorm; is that right?

4    A.   Correct.

5    Q.   What snowstorm was that?

6    A.   I don't recall.  It was big snowstorm.

7    Q.   Was it recently?

8    A.   Recently.

9    Q.   In the last six months?

10   A.   Yes.

11   Q.   Who was your supervisor at that time?

12   A.   Monroe.  Sergeant Monroe.

13   Q.   Did you contact Sergeant Monroe to let him know you had

14   been in an accident and needed the day off?

15   A.   He wasn't there.  No.

16   Q.   Do you speak to a supervisor and request the day?

17   A.   I spoke to the desk officer and I requested the day.

18   Q.   Who was the desk officer?

19   A.   I wrote it down somewhere.  I don't know her name.

20   Q.   You believe he denied you the day off in retaliation for

21   you speaking out about quotas?

22   A.   That's what I believe, yes.

23   Q.   Are you aware that police officers are frequently needed

24   during snowstorms to address emergency services and accidents?

25   A.   Yes.

D3L9FLO4                    Serrano-cross

1   Q.  Isn't that the reason that days off are denied?

2   A.  Yes.

3   Q.  For snowstorms?

4   A.  One of the reasons, yes.

5   Q.  Officer Serrano, you claim that other people, in particular

6   white officers, received higher evaluations than you for the

7   same amount of work; is that right?

8   A.  For the same or less.

9   Q.  The same or less.  When you say work are you referring to

10  UF 250s, summonses, and arrests?

11          MR. MOORE:  Judge I would just note that I didn't go

12  into this on the direct because I -- although he has made that

13  claim, it does open up a whole area of examination.  If they're

14  going to go into it, I'm going to -- I just -- I don't think

15  it's relevant to the issue before this court right now but.

16          THE COURT:  Is it relevant to compare disciplines

17  between white officers and nonwhite officers in the precinct?

18          MS. COOKE:  Your Honor, in this instance I believe so

19  because Officer Serrano is making allegations --

20          THE COURT:  I know but it's pretty collateral to what

21  we're doing here.  We're not trying his, I guess, I don't know

22  what, discrimination case or whatever it is he's going to bring

23  or has brought.  We're carefully not doing that.  I have issues

24  in this case, and they are not the issues of whether officers

25  have been discriminated against based on race.  I've got enough

1    problems.  So I would like to not try that case here.

2         I really think it's a collateral matter to compare the

3    disciplines between white and nonwhite officers in the 40th

4    precinct.  And I'd like not to go into it.  So, therefore, I'm

5    going to sustain the objection.

6         That's for another day in another court.  I've

7    sustained the objection.  No more questions on that.

8         MS. COOKE:  I just want --

9         THE COURT:  -- on that issue.

10         MS. COOKE:  I want to confirm then with respect to

11   Inspector McCormack, who the plaintiffs are calling, they won't

12   be addressing with Inspector McCormack issues of Inspector

13   McCormack's racially motivated treatment of officers in the

14   40th precinct.  Because this is my opportunity right now with

15   Officer Serrano on the stand to address that allegation and

16   claim.  So that's my understanding, then I have no further

17   issue with that question.

18         THE COURT:  Mr. Moore.

19         MR. MOORE:  We're not going to ask him about the

20   allegation in Mr. Serrano's EEOC complaint about that, so.

21         THE COURT:  So disparity between disciplines?

22         MR. MOORE:  Right.

23         THE COURT:  Between black and white officers?

24         MR. MOORE:  That's not -- I may look into it now that

25   she mentioned it.

1          No.  We're not going to go into it, Judge.

2    Q.  Officer Serrano, evaluations as a police officer are based

3    on more than just your enforcement activity, correct?

4    A.  Enforcement activity specifically.  What is that?  I need

5    you to be specific.

6    Q.  In addition.  Your evaluations are not based solely on

7    enforcement activity; isn't that correct?

8    A.  If you if you say enforcement, arrests, 250s, summonses?

9    Q.  Correct.

10   A.  Yes.  It's not solely on that.

11   Q.  Included in your evaluation is how well you're addressing

12   conditions in your command; isn't that right?

13   A.  Yes.

14   Q.  And that addressing of conditions might not involve

15   enforcement activity; isn't that right?

16   A.  Yes.

17   Q.  Or if it does involve enforcement activity it's how well

18   that enforcement activity matches to the conditions you're

19   addressing; isn't that right?

20   A.  Repeat that.

21   Q.  If it -- if it's assessing your enforcement activity, it

22   matters how well your enforcement activity addresses the

23   conditions; isn't that correct?

24   A.  I'm confused.

25   Q.  If you have enforcement activity, it should address the

D3L9FLO4                    Serrano-cross

1    condition, correct?

2    A.  I'm still confused.

3    Q.  That's fine.

4              THE COURT:  You mean the crime conditions.  Is that

5    what you're saying?

6              MS. COOKE:  Yes.

7              THE COURT:  Maybe that would have made it clearer.

8              Should the enforcement activity relate to the alleged

9    criminal activity in the area?  Should there be a correlation?

10             THE WITNESS:  What I'm confused about when she says

11   enforcement, there's many ways of enforcing stuff.  I just want

12   to be more specific.

13             If you're telling me that arresting -- if you're

14   talking about arrests and summonses and 250s, if you're talking

15   about that only, then I would say no because it's everything.

16   It's community policing.

17             THE COURT:  Well when should the enforcement activity

18   match the alleged criminal activity?

19             THE WITNESS:  Well I believe that you just deal with

20   it the way -- every cop is different and they just deal with

21   that situation during a specific situation and if it requires

22   police enforcement -- and, again, what I do with is summons.

23   I'll ask them to leave.  So I address the condition.  They

24   move.  If they don't, I summons them because they didn't.  If

25   they do something that needs -- that I must arrest, then I

1    arrest, so.

2    Q.  Officer Serrano, you said you didn't -- you said that if

3    you didn't have the numbers that they would find you a collar;

4    is that correct?

5    A.  A collar, yes.

6    Q.  Is it your view that the collars they would find for you

7    would be an illegal arrest?

8    A.  It would be an unwanted arrest, a difficult arrest.

9    Q.  Unwanted illegal or just unwanted undesirable by you as the

10   officer?

11   A.  Part of it would be illegal if you ask me to lie.

12           I have the actual case point, if you want.

13   Q.  I'm asking if --

14           THE COURT:  I'd be interested in that example.

15           THE WITNESS:  I had impact one day -- one day.  I

16   don't remember.  And I believe it was Sergeant Mohan.  And

17   obviously go out there, get the five summonses.  I only had two

18   when he called me.  He checked up on the numbers.  He called

19   me.  I only had two.  Maybe three.  I don't remember.

20           I know that PO Checco was my -- was working with me

21   that day.  Towards the end we didn't have anything.  I wasn't

22   feeling well.  Actually that week before that I found out that

23   I had diabetes.  And one of the things that was affected was my

24   vision.  So I was thinking for me to do eight hours of

25   paperwork wouldn't be good because I couldn't read.  But they

D3L9FLO4                    Serrano-cross

1    wouldn't believe that.  So I didn't use it as an excuse.  But I

2    did tell Checco that, that, you know, they're going to try to

3    find a collar for me because, you know, I didn't get the

4    numbers.

5          Well, I get the phonecall.  Meet me at somewhere near

6    Grand Course and 138.  I believe it's Walton.  And there was a

7    DWI.  There was a driving while intoxicated.

8          Well the sergeant says 85 into that location.  So I

9    went.

10         When we got to that location he says, This is your

11   collar.  And I look at him, and I'm like:  What is this?  He

12   was driving while drunk.  And then I said:  Who observed it?

13   And he said you.  And I said not me.  I said you observed it

14   but it wasn't me.

15         But the Sergeant Popovich came out of nowhere and said

16   I observed it.  I said okay.  So I took his information down.

17   I put the perpetrator in my car.  And we were debating on who

18   is going to take it because I didn't feel well, but Checco has

19   more time on.  He's more of a senior cop.  I think it's maybe

20   six months to a year.  But I try to respect that.  Even though

21   I wasn't feeling well, I still did the paperwork.  It was

22   difficult, but I did it.

23         And I put that the sergeant observed it.  But I felt

24   as if they want me to leave the sergeant out of it so that, you

25   know -- and also it was like maybe half an hour before the end

1    of tour.  We were going to go home.  And you know this is a

2    common punishment.  If you don't meet the quota, then you get

3    punished.

4              THE COURT:  You called this an unwanted collar.  Why

5    is this an unwanted collar?

6              THE WITNESS:  Because again at the time I couldn't

7    read.  I wasn't feeling well.

8              THE COURT:  That's you.  This is described as an

9    unwanted collar.  Nobody really wanted this one.  Why?

10             THE WITNESS:  It can take 24 hours to process.  You've

11   got to -- first, the person is intoxicated.  He might end up in

12   the hospital.  It will take forever.  You got to voucher his

13   car.  The whole time you're responsible for this prisoner.  And

14   you can get in trouble if he dies or if something happens to

15   him.

16             Well, so you got that.  You got to voucher the car

17   meticulously, go through every single piece, voucher one by

18   one.  People have a lot of things in their cars.

19             Besides that you got all the paperwork.  You got to go

20   to the 45.  In the 45 you got to meet highway.  Highway tests

21   them.  By breathing -- they videotape it.  And they say do you

22   want a breathalyzer.  They refuse or not refuse.  That process

23   could take eight hours because --

24             THE COURT:  So I understand that's why it's an

25   unwanted collar, because it could go a lot of hours.

D3L9FLO4                    Serrano-cross

1          THE WITNESS:  Exactly.  But the way I was feeling I

2     definitely don't want to do that.

3     Q.  That wasn't an illegal arrest though, was it?

4     A.  No.  But the part where they want me to put my name as the

5     arresting officer that to me is illegal because I didn't

6     observe it.

7     Q.  It's not a violation of department policy to process the

8     arrest made by another officer, is it?

9     A.  No.  That would be that I would be the assigned officer,

10    not the arresting.

11         THE COURT:  But what you thought was illegal was

12    saying that you saw something that you didn't see.

13         THE WITNESS:  Exactly.

14         THE COURT:  I understand.

15    Q.  But you didn't say you saw something you --

16         THE COURT:  He said he was asked to do that; is that

17    right?

18         THE WITNESS:  That's correct.  I was asked to do it

19    and, you know, I immediately said no, that's not what I'm going

20    to do.

21         MS. COOKE:  No further questions at this time, your

22    Honor.

23         THE COURT:  Thank you, Ms. Cooke.

24         Mr. Moore, any redirect?

25         MR. MOORE:  Just a few.

1           Leave that up, please.  Or maybe we'll just put it up.

2   What is it, D-10?

3           MR. KUNZ:  C.

4           MR. MOORE:  Can you actually bring up the tape.  It

5   was I think 332.  Can we play Plaintiffs' Exhibit 332 beginning

6   at 17:41.

7           THE COURT:  I don't know if they got what you wanted.

8           MR. MOORE:  Pardon?

9           THE COURT:  I don't think your team got what you

10  wanted.

11          MR. MOORE:  While you're getting that I'll ask

12  something else.

13  REDIRECT EXAMINATION

14  BY MR. MOORE:

15  Q.  Officer Serrano, Ms. Cooke asked you some questions about

16  your evaluation being based on enforcement activity.  Do you

17  recall that?

18  A.  Yes.

19  Q.  And when you were discussing your evaluation with Captain

20  Materasso, what did she say about the weight to be given to

21  your ability to produce summonses, 250s, or arrests?

22  A.  Well from what I remember she told me that it was half my

23  score.

24  Q.  50 percent?

25  A.  50 percent.

1   Q.  Of your evaluation, right?

2   A.  Yes.

3   Q.  And when she was saying that, was she speaking about it in

4   the terms of whether this was related to your comprehension

5   skills?

6   A.  (No response).

7   Q.  Did she speak about it in those terms?

8   A.  She didn't mention any of these 128 -- again, she might

9   have, by looking at it, was the arrests.  The things she

10  discussed was arrests, summonses and 250s.

11  Q.  It wasn't your reasoning ability and your problem

12  recognition and those categories that Ms. Cooke went through,

13  right?

14  A.  No.  When I explained it, I used it.  I said communication

15  interaction, then I explained myself.  Then I went to the next

16  one, apprehension, and I explained myself.  Prisoner -- victim

17  or prisoner interaction.  I explained myself.  I clearly said

18  each one and then I gave a reason to why this is incorrect.

19  Q.  And with respect to your enforcement activity, would you

20  agree that simply being pressured to comply with quotas is not

21  legitimate enforcement activity?

22  A.  That's correct.

23  Q.  And that's what you felt the pressure was in the 40th

24  precinct that you're talking about, right?

25  A.  Yes.  And I made it clear to her.  And I said, when she

1   described the quota, my words were that's a -- I think that

2   sounds like a quota.  I'm not -- I'm paraphrasing.  I can't

3   remember the exact words.  But that's a quota and it's illegal.

4   Q.  Ms. Cooke asked you about the day you asked to take off

5   because of the snowstorm.  Do you remember that?  And it was

6   denied?

7   A.  Yes.

8   Q.  You were trying to come into work, correct?

9   A.  I live up in Westchester County Cortlandt Manor.  And I was

10  taking Bear Mountain Expressway.  At certain -- the answer to

11  that is yes, I was trying to go to work.

12  Q.  Tell us about that.  How you tried to get into work.

13  A.  I was on Bear Mountain Expressway.  I got to the top of the

14  hill that it comes up to a hill.  When it got to the bottom, I

15  was doing maybe around 20, 15 miles an hour.  The ice was so

16  thick and so strong that it took me down the hill, crossed over

17  two lanes, went up into the grass, down a ditch.  And the whole

18  time I'm just using my ELOC skills to the best of my knowledge.

19  And thank God I had anything.  I went -- then I crossed over

20  another, because the exit comes around, I crossed over that,

21  barely missing a pole and some lady that was parked -- I mean

22  was waiting for the light.  I barely missed hitting her.  I

23  ended up in another grassy place that was full of snow.  And I

24  finally came to a stop.  After about -- after about, I don't

25  know, five minutes of just composing myself and checking my

1    underwears, I called them up and I begged.  And I don't think

2    it was her fault, but she said -- I said can I have the day

3    because I almost got into an accident, etc.  And the desk

4    called the TS.  The person who picked up the phone told the

5    desk sergeant, the desk sergeant to give me one second.  I

6    don't know who she asked or what happened.  Came back and said

7    I'm sorry but there is no excusals.  And I said okay.  I just

8    sucked it up and went to work.  I don't know -- I got there --

9    I don't know what time I got there.  But when I got there I --

10   I realized that somebody lived in Mahopac and she was --

11   Q.  I'm sorry.  Say that again?

12   A.  Mahopac.  Mahopac.  That's right next to Cortlandt.

13              THE COURT:  Mahopac.

14              THE WITNESS:  Mahopac.  There you go.  I'm sorry.

15   It's the next one right after me.

16              And when I found out that someone was given the day

17   off --

18              MS. COOKE:  Your Honor, I'm going to object because

19   this is actually testimony with respect he believes white

20   officers.

21              MR. MOORE:  I'm not going into the race of the

22   officer.

23              THE COURT:  Nobody brought up race except you.

24              MS. COOKE:  I know where this answer is going.

25              THE COURT:  I think he was saying he found out

1  somebody got the day off and he didn't.  I don't know that he

2  was going to bring up race.

3          MS. COOKE:  I would prefer that we keep the line that

4  I was limited to on cross --

5          THE COURT:  I said I don't know that he was going to

6  say a word about race.  You're the only one who said it.

7          Anyway so you found out somebody else got the day off.

8          THE WITNESS:  I found out that someone got a day off.

9          THE COURT:  And you didn't.  Okay.

10          THE WITNESS:  And they live in Mahopac, and I live

11  Cortlandt Manor.

12  Q.  You were trying to come into work but you felt it was too

13  dangerous, correct?

14  A.  It was extremely dangerous.  I almost hurt myself and many

15  other people.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1   Q.  When you were told to come into work, that you wouldn't be

2   excused, you went to work?

3   A.  I went to work.

4           THE COURT:  You were told there would be no excusals.

5           THE WITNESS:  They told me no excusals.  It's written

6   on the roll call.  And I said, OK.  Again, I sucked it up, I

7   went.  And every now and then I drive by the same location to

8   see my tire marks on the road, on the grass.

9   Q.  You also were asked some questions --

10          THE COURT:  Can you identify that day?

11          THE WITNESS:  Right now I cannot, but it was during

12  one of the big storms.

13          THE COURT:  Could you go back and figure out which day

14  it was?

15          THE WITNESS:  Yes.  Yes.

16          MR. MOORE:  We will do that, Judge, and advise you of

17  the day.

18  Q.  You also were asked some questions about your memo books

19  and why you called IAB.  Ms. Cooke wasn't really interested in

20  the explanation as to why you called IAB.  Why did you call

21  IAB?

22  A.  That day when I found out, right after the evaluation, he

23  called me over and whispered in my ear, it's on the tape, and

24  it says, I know about the lawsuit and someone is going to take

25  my memo book.  I forgot who he said, but someone is going to

1    take my memo book.  That's it.  So he made it known that he

2    knows about the lawsuit.  So that confirmed the rumors that

3    were flying around and people were telling me this.  When he

4    told me, I put two and two together because now my whole

5    evaluation was like I was in court.  All he talked about was

6    250s, 250s, 250s.  Even when he himself was incorrect, in my

7    opinion, he said it was a stop, I think, with all due respect,

8    maybe he should attend the 250 course.

9    Q.  When you wrote over that portion in your book, are you now

10   subject to disciplinary proceedings because of that?

11   A.  If they choose to, yes.  I did it at my own free will, but

12   I was definitely under a lot of pressure, and I was in fear

13   that Captain McCormack -- Deputy Inspector McCormack and

14   Captain Materasso, in the same vehicle, in the unmarked, at

15   that moment would find out, and then I would be in trouble.

16   And I hoped that because the sergeant from IAB told me, do not

17   let them know, that somebody would be reasonable and understand

18   why I did it.

19   Q.  Do you know if there are disciplinary proceedings against

20   you right now for that?

21   A.  No, I don't.

22   Q.  Now, you testified as to foot posts and that sometimes it's

23   appropriate for officers to be on foot posts.  Can you explain

24   why you believed your assignment to foot posts was retaliation?

25   A.  There are multiple times when I can describe it.

1    Q.  I'm sorry?

2    A.  There are multiple times when that actually happened.  One

3    of them was the whole entire summer, I don't remember the date

4    but it's in my memo book, I was assigned literally for the

5    whole summer.  I can't say it was every single day, but it was

6    an unusual amount of foot posts, at 152 and Jackson, in the

7    area, high crime, by myself.  And it's because I refused

8    to -- because I complained that there was a felony and it was

9    downgraded to a misdemeanor.

10            MS. COOKE:  Objection, your Honor.  I am going to ask

11   that this testimony be stricken.  The issue of downgrading

12   crimes is not a claim in this lawsuit and the testimony is not

13   relevant.

14            MR. MOORE:  It's relevant to answering this question

15   about why the foot posts were punishment.  It actually has some

16   relevance.

17            THE COURT:  We have heard already a fair amount about

18   downgrading felonies to misdemeanors.  I am not entirely sure

19   what the relevance of that is, but it's come up many times

20   already in the few days we have been on trial.

21            MS. COOKE:  It was the subject of a motion in limine

22   ruling.

23            MS. GROSSMAN:  It was the subject of some motion

24   practice from last year, and you made rulings, and we can get

25   them for you.

1    THE COURT:  I don't remember anything about it.  What

2    was it about?

3          MS. GROSSMAN:  It was a motion for a protective order

4    and you granted our motion for a protective order as being not

5    relevant.

6          THE COURT:  What being not relevant, the whole

7    question of downgrading?

8          MS. GROSSMAN:  Yes.  You also commented through many

9    of our proceedings that you don't want to get into that.  This

10   is about quotas in this particular case and the influence that

11   quotas have with respect to enforcement activity.

12         THE COURT:  I have no recollection of downgrading from

13   felonies to misdemeanors.

14         MR. MOORE:  Let me rephrase the question.

15         THE COURT:  I don't remember that whole topic.  I have

16   listened to it the last three days and I don't really know what

17   it means and what the relevance is, but I have heard the words

18   over and over again.

19         MR. MOORE:  Let me try to rephrase it so we can get

20   back to the central issues here.

21         THE COURT:  OK.

22         MR. MOORE:  Without necessarily agreeing.  And we will

23   look and see.

24         THE COURT:  I really don't know what she is referring

25   to.

1  BY MR. MOORE:

2  Q.  Without going into the downgrading issue, why did you

3  consider some of your assignments to foot posts, even though

4  it's legitimate law enforcement activity, why did you consider

5  it, in the context of your experience in the 40th Precinct, to

6  be a retaliation?

7  A.  Well, again, if you don't follow the quota, arrests,

8  summonses, 250s, and if you don't do what they want you to do,

9  they meaning the bosses, then they retaliate.  How do they

10  retaliate?  They give you things that you don't want.  Who

11  wants to be standing in the street when it's extremely cold?

12  And they want you to stand there and not go inside and warm up.

13  They want you outside.  It's dangerous, and I don't know what

14  human being should be treated that way.  But that's what they

15  want you to do.  It's retaliation for not following the quota.

16  Q.  You also were attempting to explain how officers even on

17  vacation can be called in to work on overtime; not vacation out

18  of the country, but on vacation.  Can you explain that?

19  A.  Yes.  Some people call it "stay-cation."  They stay home.

20  They are on vacation, but they don't go anywhere; they stay in

21  the house.  While they are there, they don't mind making a

22  couple of bucks so they will offer their services.  I might say

23  every now and then, if you have overtime, I wouldn't mind doing

24  it.  It's one day, you make some overtime, and catch up with

25  some bills.

1   Q.  Do you believe your relationship with the community was a

2   positive one in terms of your enforcement activities?

3   A.  As my career moved on, it became better and better and

4   stronger, to the point where right now it's -- that's the first

5   thing I think about.  The first thing is my safety, my family.

6   Then the public.

7   Q.  Now, also, you recall Ms. Cooke asked you about your

8   interview with Deputy Inspector McCormack, and she went over

9   all these categories that appear on C10 with respect to report

10  writing and apprehension and comprehension and communication

11  skills.  Do you believe that in that conversation you had with

12  McCormack that he was talking about those categories?

13  A.  No.  And again, the only thing that I observed -- here it

14  is -- talking about the arrest processing.  I'm sorry.

15  Q.  I am talking about the other ones.  He was talking about

16  your apprehension abilities, your report writing, your

17  comprehension, your communication.  Do you think that is what

18  he was talking about?

19  A.  No.  He was just talking about 250s.  He kept explaining

20  250s to me, to the point where I got exhausted and I said, OK,

21  fine, I will take care of it.  And I was going to do my

22  research again to make sure that I was correct, but it's very

23  difficult to argue with a deputy inspector, a captain.  I mean,

24  it's just difficult.  Nothing good could happen from that.  He

25  could say whatever he wants.  He could say you're suspended,

1    and that's it, I'm done.  Who is going to believe me?  I'm an

2    officer.  He's a deputy inspector.

3           And no, I don't believe he covered most of this.  I

4    believe he was just talking about 250s.  In fact, he said -- he

5    brushed over it.  Your collar is good, move on.  You have got

6    summonses.  He moved on.  When he got to the B summonses, he

7    stopped, and then he said, specific B summonses, you improved

8    it but -- I said, most of them were correctable.  He didn't

9    like that because they weren't hazardous.

10   Q.  Hazardous conditions?

11   A.  But I don't think he covered any of this stuff.  I believe

12   it was just to interrogate me on 250s.

13   Q.  What he did tell you was that he didn't like your numbers

14   in terms of your 250s and your summonses?

15   A.  Correct.

16   Q.  He said there is enough crime out there, you should be

17   going out there and getting more 250s and more summonses,

18   right?

19   A.  Correct.

20   Q.  He actually identified the portion of the population that

21   he wanted you to focus on, right?

22   A.  Correct.

23   Q.  Who were the right people at the right location and the

24   right time that he identified?

25   A.  Male blacks, 14 to 21.

1          Just to reiterate, I apologize for doing what I did

2     with this, when I was skipping over it.

3     Q.  You mean raising your voice?

4     A.  No.  I was answering, I was getting tired.

5          THE COURT:  You went and got the tape.  Are you

6     planning to use it?

7          MR. MOORE:  I don't think I am going to use it now.  I

8     just wanted to see if they can find it.

9          I have nothing further.

10         THE COURT:  Ms. Cooke, any recross?

11         MS. COOKE:  No, your Honor.

12         THE COURT:  You're done.  Thank you.

13         It's late, but we still could take a short afternoon

14    recess.  Maybe we will just try to do seven minutes till 10 of

15    4.

16         (Recess)

17         THE COURT:  Your next witness.

18         MR. CHARNEY:  Our next witness is a recording.  We are

19    going to play the recordings from the 81st Precinct that the

20    parties have stipulated to with respect to not only which

21    recordings will be played, but also the identity of the

22    speakers on these recordings.  We discussed with you that a

23    particular witness would not have to testify.  And I believe

24    that the stipulated information is in the joint pretrial order,

25    and I believe it's section 5 under undisputed facts.

1          So what I was going to do, I actually have a

2    demonstrative here which lists the recordings, and on the

3    left-hand side it has the identity of the speaker, and then it

4    has the name of the track and then the portion of the track

5    that we are going to play.  I thought we would just try to go

6    in order.

7          THE COURT:  These speakers, are they at a certain

8    precinct?

9          MR. CHARNEY:  These are all individuals that worked in

10   the 81st Precinct at the time that the recording was made.  I

11   can tell you what their rank was, what their position was in

12   the precinct.

13         THE COURT:  Are you going to have any transcripts of

14   these?

15         MR. CHARNEY:  We are working on those as well.

16         THE COURT:  Is that going to take the remainder of the

17   day?

18         MR. CHARNEY:  I think it may, unfortunately.

19         THE COURT:  It's so much easier with transcripts.

20         MR. CHARNEY:  We want to make sure you have good ones.

21         The sound quality on these is very good.

22         The first recording, the name of the track is 12

23   December 2008, 81, 4x12 roll call.  We are going to play 2

24   minutes and 20 seconds to 4 minutes and 30 seconds.  The name

25   of the speaker that you will hear is Jean Delafuente who is a

D3L8FLO5

1    lieutenant and platoon commander in the 81st Precinct between

2    June of 2008 and February of 2009.  And he was also present at

3    the roll call on 12 December 2008.

4              THE COURT:  What did you say the rank was?

5              MR. CHARNEY:  He is a lieutenant and he was a platoon

6    commander.

7              THE COURT:  OK.

8              (Audiotape played)

9              MR. CHARNEY:  That was the first one.

10             We are going to try to go in order here.  The second

11   one, the track is 12 June 2008, 81, 4 by 12 roll call, Sergeant

12   Stukes, Lieutenant Delafuente activity.  We are going to play

13   the portion from 7 minutes and 13 seconds to 8 minutes and 10

14   seconds.  And, again, the speaker you will hear is Lieutenant

15   Delafuente.

16             (Audiotape played)

17             MR. CHARNEY:  The third track, 12 June 2008.  It's

18   actually the same track, but we are playing a different

19   portion.  12 minutes and 10 seconds to 13 minutes and 28

20   minutes.  And again, this is Lieutenant Delafuente who is

21   speaking.

22             (Audiotape played)

23             MR. CHARNEY:  Moving along, the next track is 13

24   January 2009, Sergeant Reid, sign training log, roll call.  We

25   are going to play from 3 minutes and 2 seconds to 4 minutes and

D3L8FLO5

26 seconds.  Again, the speaker is Lieutenant Delafuente.

(Audiotape played)

MR. CHARNEY:  The next track is 15 July 2008, 81, 4 by 12 roll call, Lieutenant Delafuente, Captain Mauriello.  We are going to play just a short 35 second to 50 second portion.  And again, the speaker is Lieutenant Delafuente.

(Audiotape played)

MR. CHARNEY:  Next one is track 16, December 2008, 81, 4 by 12 roll call, Lieutenant Delafuente, activity Cs, 250s, at 9:33 to 9:54.  Again, this is Lieutenant Delafuente on the recording.

(Audiotape played)

MR. CHARNEY:  The next one is track 1 November 2008, 81, 4 by 12 roll call, Lieutenant Delafuente activity.  We are going to play 2 minutes and 12 seconds to 3 minutes and 50 seconds.  And again, Lieutenant Delafuente is the speaker.

(Audiotape played)

MR. CHARNEY:  The next one is 21 January 2009, training sergeant, Sergeant Reid, roll call, Lieutenant Delafuente activity.  We are going to play from 4 minutes and 27 seconds to 6 minutes and 40 seconds.  And again, it is Lieutenant Delafuente on the recording.

(Audiotape played)

MR. CHARNEY:  The next one is 27 February 2009, roll call, Sergeant Weber, Lieutenant Delafuente activity, Mauriello

1    specials.  We are going to play from 2 minutes and 35 seconds

2    to 6 minutes and 21 seconds.

3            MR. MOORE:  What date is that?

4            MR. CHARNEY:  27th of February.  It's Lieutenant

5    Delafuente again who is speaking on the recording.

6            (Audiotape played)

7            MR. CHARNEY:  The next track is 28 January 2009, 81,

8    4x12, roll call, DI Mauriello, Lieutenant Delafuente activity,

9    we don't want to hurt you.  And we are going to play it from

10   24:29 to 25:50.  And again, it's Lieutenant Delafuente

11   speaking.

12           (Audiotape played)

13           MR. CHARNEY:  The next one is 29 January 2009, roll

14   call, Sergeant Plunkett, Sergeant Weiss, 250s, Lieutenant

15   Delafuente.  We are going to play 6 minutes and 20 seconds to 6

16   minutes and 48 seconds.  And again, the speaker is Lieutenant

17   Delafuente.

18           (Audiotape played)

19           MR. CHARNEY:  The next track is 30 October 2008, 81, 4

20   by 12 roll call, Sergeant Stukes, Lieutenant Delafuente,

21   activity.  We are going to play from 4 minutes and 20 seconds

22   to 6 minutes and 30 seconds.  Again, the speaker is Lieutenant

23   Delafuente.

24           (Audiotape played)

25           MR. CHARNEY:  The next track is 8 November 2008, 81, 4

1    by 12 roll call, at 13 minutes and 9 seconds to 14 minutes and

2    36 seconds.  And the speaker again is Lieutenant Delafuente.

3              (Audiotape played)

4              MR. CHARNEY:  The next track is 29 January 2009, roll

5    call, Sergeant Plunkett, Sergeant Weiss, 250s, Lieutenant

6    Delafuente.  We are going to play it from 6 minutes and 50

7    seconds to 9 minutes and 3 seconds.  And the speaker on this

8    one is actually a Lieutenant Weiss, although he may have been a

9    sergeant at the time.  He worked in the 81st Precinct and was

10   present for a roll call on January 29, 2009.

11             (Audiotape played)

12             MR. CHARNEY:  The next track is 12 October 2009, roll

13   call, Sergeant Huffman, robbery 61s.  We are going to play from

14   5 minutes and 12 seconds to 7 minutes.  The speaker on this

15   recording is Sergeant Rasheena Huffman, who was a sergeant in

16   the 81st Precinct in October of 2009.  And she was present for

17   a roll call on 12 October 2009.

18             (Audiotape played)

19             MR. CHARNEY:  The next one is 24 October 2009, roll

20   call, Sergeant Huffman, robbery 250s.  We are going to play it

21   from 3 minutes and 40 seconds to 5 minutes and 30 seconds.  And

22   again the speaker is Sergeant Huffman.

23             (Audiotape played)

24             MR. CHARNEY:  The next track is 12 June 2008, 81, 4 by

25   12 roll call, Sergeant Stukes, Lieutenant Delafuente activity,

D3L8FLO5

1    at 14 minutes and 58 seconds to 16 minutes and 40 seconds.  The

2    speaker on this recording is Sergeant Raymond Stukes, who was a

3    sergeant in the 81st Precinct between the period June of 2008

4    through March 13, 2009, and he was present at a roll call in

5    the 81st Precinct on the 12th of June of 2008.

6            (Audiotape played)

7            MR. CHARNEY:  The next recording 13 March 2009, Friday

8    roll call, Sergeant Stukes, keep the hounds off, at 4:32 to

9    5:20.  And again, the speaker is Sergeant Stukes.

10           (Audiotape played)

11           MR. CHARNEY:  The next is 1 July 2008, 81, 4 by 12

12   roll call, Sergeant Stukes, activity, Lieutenant Delafuente, at

13   6:58 to 8 minutes.  And again, the speaker is Sergeant Stukes.

14           (Audiotape played)

15           MR. CHARNEY:  Did your Honor want to stop for the day?

16           THE COURT:  I think that would be wise.  But more than

17   that, I don't think I should hear any more of the tapes until

18   you have the transcripts ready.  I am not sure it's the best

19   use of my time.  I am hearing some words, not all words.  When

20   you have the transcripts ready, then you will put in the tapes

21   so I can look at the transcripts and listen at the same time,

22   which is what is usually done in trials with tapes.  So

23   tomorrow let's start with a live witness.

24           Same time tomorrow.  Thank you.

25           MR. MOORE:  One question about that.  Some of the

1   witnesses tomorrow will be the people on these tapes.

2           THE COURT:  I have heard from all of them, except for

3   Mauriello.

4           MR. CHARNEY:  That is who will be testifying.

5           THE COURT:  Then you will have to play one or two.  I

6   am not picking up enough.

7           MR. MOORE:  Maybe we should delay --

8           THE COURT:  You talk about that.

9           I have got a couple of other matters.

10          (Adjourned to March 22, 2013, at 10:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

PEDRO SERRANO

Direct By Mr. Moore . . . . . . . . . . . . . 664

Cross By Ms. Cooke . . . . . . . . . . . . . 731

Redirect By Mr. Moore . . . . . . . . . . . 808

PLAINTIFF EXHIBITS

Exhibit No.                               Received

 297   . . . . . . . . . . . . . . . . . . . 675

 285   . . . . . . . . . . . . . . . . . . . 681

 296   . . . . . . . . . . . . . . . . . . . 706

DEFENDANT EXHIBITS

Exhibit No.                               Received

 C10   . . . . . . . . . . . . . . . . . . 688

 B10   . . . . . . . . . . . . . . . . . . 763