D5D8FLO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DAVID FLOYD, et al.,

                    Plaintiffs,

            v.                              08 CV 1034(SAS)

CITY OF NEW YORK, et al.,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        May 13, 2013
                                        10:05 a.m.

Before:

                    HON. SHIRA A. SCHEINDLIN,

                                        District Judge

                         APPEARANCES

BELDOCK LEVINE & HOFFMAN, LLP
        Attorneys for Plaintiffs
BY:   JONATHAN MOORE
        JENN ROLNICK BORCHETTA


COVINGTON & BURLING, LLP
        Attorneys for Plaintiffs
BY:   KASEY MARTINI
        GRETCHEN HOFF VARNER
        ERIC HELLERMAN
        BRUCE COREY

CENTER FOR CONSTITUTIONAL RIGHTS
        Attorneys for Plaintiffs
BY:   DARIUS CHARNEY
        SUNITA PATEL
        BAHER AZMY

D5D8FLO1

1                              APPEARANCES (Cont'd)

2

3    MICHAEL A. CARDOZO
          Corporation Counsel for the City of New York
          Attorney for Defendants
4    BY:  HEIDI GROSSMAN
          BRENDA E. COOKE
5         JOSEPH MARUTOLLO
          MORGAN D. KUNZ
6         SUZANNA PUBLICKER
          LINDA DONAHUE
7         LISA M. RICHARDSON
          JUDSON VICKERS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D5D8FLO1

1          (Trial resumed)

2          THE COURT:  I received a couple of letters over the

3     weekend, naturally.  One has to do with the motion to strike

4     testimony of Professor Smith, and Ms. Cooke responded to that

5     request in an e-mail yesterday night at 10:02 p.m.  I only had

6     the opportunity to see this morning and haven't had a chance to

7     fully check the references that you cited that I need to check.

8     So I don't expect to rule in this first hour and a half.

9          I also have a letter from Mr. Dunn requesting I think

10    some summation time, but I don't know how much.

11         MR. DUNN:  Your Honor, I don't think ours would take

12    more than 15 minutes at most.

13         THE COURT:  That I can do.  We will just do it the

14    same day.  So the order would be -- can he just do his 15

15    minutes first before the Floyd plaintiff summation?  The

16    defense goes first, as we know, since you all have the burden

17    of proof on everything, all plaintiffs, both in this case and

18    Ligon, he gets his 15 minutes, and you get your two and a half

19    hours, and if it goes after 4:30, that's fine.

20         MR. CHARNEY:  Completely fine with us.

21         MS. COOKE:  That's fine.

22         MR. DUNN:  Thank you, your Honor.

23         THE COURT:  So you will be on right after the lunch

24    break, which we roughly start at 2:05 every day, give or take.

25    I can't be exact on that day.

D5D8FLO1

1           So that takes care of that letter.  I am reserving, at

2      least temporarily, I would like to rule maybe during the

3      morning recess -- we are having Dr. Purtell.  So it's not

4      urgent for this morning.  I hope to do it today for sure.

5           That brings us to Dr. Fagan, right?

6           MR. MOORE:  One other thing.  There were several

7      documents produced to us over the weekend regarding the

8      testimony of Chief Hall.  I wanted to raise it with you after

9      lunch.

10          THE COURT:  OK.

11          MR. MOORE:  I didn't want to do it now.  I just wanted

12     to let you know it's on the radar, unless you want to do it

13     now.

14          THE COURT:  No, because Dr. Fagan and Dr. Purtell have

15     schedules that I am trying to respect.

16          MR. HELLERMAN:  Plaintiffs call Dr. Fagan.

17          THE COURT:  For the third or fourth time?

18          MR. HELLERMAN:  Third.

19      JEFFREY FAGAN, recalled.

20          THE COURT:  Dr. Fagan, you have been under oath both

21     times.  You understand you're still under oath.

22          THE WITNESS:  Yes.

23          Mr. Hellerman.

24     DIRECT EXAMINATION

25     BY MR. HELLERMAN:

D5D8FLO1                          Fagan - direct

1   Q.   Professor, do you recall testifying on May 6?

2   A.   Yes, I do.

3   Q.   Do you recall testifying that the practical significance of

4   the findings you reported in table 5 could be shown by

5   comparing a census tract whose population is 55 percent black

6   with a census tract whose population is 15 percent black?

7   A.   Yes, I did that as a hypothetical example.

8   Q.   You recall testifying that the percentage difference in

9   that hypothetical was about 43 percent?

10  A.   Yes.  That's correct.

11  Q.   Do you recall Professor Purtell then testifying that a

12  population average effect can't be applied back to individual

13  cases?

14  A.   Correct.

15  Q.   Do you recall testifying when Ms. Cooke first raised that

16  as an objection during your direct testimony that you disagreed

17  with that?

18  A.   I did disagree, yes.

19  Q.   What is the basis for your disagreement with Professor

20  Purtell's criticism?

21  A.   If the Court will bear with me.  When we construct the

22  kinds of models that we use for testing the questions that we

23  tested, particularly that we addressed in table 5 in the second

24  report and also in the first report, there are really two

25  different ways to go about this.  We're essentially in each

D5D8FLO1                        Fagan - direct

1   model trying to test the effect of one variable to another, the

2   extent to which a change in one variable predicts the change in

3   the other variable, and there are disagreements -- not so much

4   as disagreements as options for conducting these analyses.

5           One approach, and the one that we used in table 5 in

6   both the first and second supplemental reports, is a population

7   average model.  We made note of that.  So we compute the odds

8   of a change in the outcome in the number of stops that take

9   place in a particular tract in a particular month, controlling

10  for what happens in all the other tracts and places around

11  them, and all the other tracts in the city.  And we looked at

12  the previous month, again, compared to what happens to people

13  in those other tracts and other months.

14          So, in other words, we are actually looking here at

15  subpopulation groups.  We are trying to model what happens to

16  groups of people over time, grouping them in the ways we did in

17  our analysis.

18          What we wind up testing and coming up with is the

19  average effect within groups, and that accounts for the

20  differences that we observe in the models that show under the

21  statistics.

22  Q.  In table 5?

23  A.  Yes.

24          The alternative is the subject specific approach, and

25  sometimes we call that the random effects regression.

D5D8FLO1                          Fagan - direct

1              In this approach, it's a little different than a

2      population average model.  Individual differences in each

3      observation, or each tract in this case, and the predictors are

4      included as part of the estimates of the effects of any one

5      variable on another.  So in our case we are looking at a racial

6      composition and the outcome is the number of stops.

7              And these individual effects we call random effects.

8      The regressions, as I mentioned, are what we call random

9      effects regressions.  These are models that we use when we are

10     particularly interested in individual differences, and we are

11     trying to understand or model what is unique to the particular

12     tract over time and what explains that uniqueness.

13             In either example, to try to illustrate the practical

14     effects of any of the predictors, we try and estimate what is

15     called a margin.  The margin is the amount of change in the

16     variable that is unique to a particular level of an independent

17     variable.  So here, for example, we want to compute the effect

18     at exactly, so in our hypothetical, .15 or 15 percent black

19     population in a particular tract.  And we try and identify that

20     margin.  And we can identify the margin at other levels of the

21     independent variable, and then we can proceed to make those

22     comparisons across the different levels of the variables.  And

23     this is true in either example, you can do this with either one

24     of these models.

25             So in the case we looked at last week, my example was

D5D8FLO1                              Fagan - direct

 1   15 percent versus 55 percent.  We compared those two rates of

 2   change and the two differences.  We come up to an estimate of

 3   about 43 percent.  But again, you can take the data from a

 4   subject specific model and come up with essentially the same

 5   kind of marginal estimate.

 6               THE COURT:  What was the 43 percent?

 7               THE WITNESS:  The example that I gave last week.

 8               THE COURT:  What was the 43?

 9               THE WITNESS:  It was the difference in the effect of

10   percent black population on the stop rate at 15 percent

11   compared to 55 percent.  It was 43 percent greater in the tract

12   with 55 percent.

13               THE COURT:  Greater likelihood of being stopped?

14               THE WITNESS:  Greater number of stops, 43 percent

15   higher number of stops.

16               THE COURT:  Assuming the same size population in each

17   tract?

18               THE WITNESS:  Controlling for all other variables.

19               THE COURT:  Which means assuming the same size

20   population in each tract?

21               THE WITNESS:  Yes.

22   Q.  To follow up on the judge's question, what you were doing

23   there is comparing a tract whose population was 55 percent

24   black with a tract whose population was only 15 percent black,

25   is that correct?

D5D8FLO1                        Fagan - direct

 1    A.  Right.

 2              So this is what the margin does.  It gives you an

 3    estimate of the outcome variable, in our case the number of

 4    stops, for a specific value of the predictor.  We can look at

 5    the margin at different levels of the predictor, either at 15

 6    percent, 25 percent, 35 percent, and so on.

 7              THE WITNESS:  Percent black population of that tract.

 8    A.  So we do this and we compare this across the tract and we

 9    can compare over time what happens.

10              The method that you use to compute the marginals is

11    very, very similar whether you use a subject specific model or

12    whether you use a population average model.

13              MS. COOKE:  Is the witness reading from a document?

14              THE COURT:  I didn't think so.

15              THE WITNESS:  I am following notes because when I

16    lecture in class I use class notes.

17              THE COURT:  He does have notes.

18              MS. COOKE:  I would like a copy of the notes.

19              THE WITNESS:  Sure.

20              MR. HELLERMAN:  We will make a copy.  We don't have a

21    copy.  We can make a copy during the break or if you prefer to

22    do it then.

23              THE COURT:  Do it then when we take a break.

24    A.  So as I said, the math to compute the marginal effect is

25    pretty much the same.  But the data that goes into it depends

D5D8FLO1                              Fagan - direct

1    on the way that you have estimated the model.

2              So the data that goes into it for a population average

3    model is somewhat different than the data you would put in for

4    the computation of the marginal effect in the subject specific

5    model.  Again, the subject specific model is taking into

6    account uniqueness or individualism of each of the tracts.  The

7    population average model is combining things looking at broader

8    population groups.

9              We have estimated these.  Professor Purtell, in fact,

10   has suggested that our estimates are somewhat biased by basing

11   them on a population average model and these alternative models

12   would actually produce more reliable results.

13             So I think there is really two responses to this.  One

14   is that it's not the case that our method of computing the

15   marginal effect is wrong.  We in fact use precise methods that

16   hold the particular variable constant, then look at the change

17   in the particular variable, holding all the other variables

18   constant.  And I think you do that with either model, and we

19   can show the results.

20             Can we show the results of these two different

21   versions of that model?

22             MR. HELLERMAN:  I am putting up a demonstrative that I

23   marked for identification as Plaintiffs' 570.

24             THE COURT:  The defendants have seen this?

25             MR. HELLERMAN:  Yes.

D5D8FLO1                              Fagan - direct

1    A.   There's three different things I wanted to show here.   One

2    is just simply, when we actually compute the actual marginal

3    effects, the marginal increase in the number of stops, each

4    compared to a baseline, at each level of the percent black

5    population in the tract, you can see at 15 percent, it's

6    roughly about 12.9, and that's our baseline that we are using

7    for comparisons here.   Again, continuing with the hypothetical

8    from last week.   At 25 percent, it increases to 14.11, and so

9    on.   At 55 percent, the increase is roughly to 18.38, that's

10   the number of stops, or roughly a 42 percent increase over the

11   15 percent rate that we showed the last time.   This is just

12   continuing the hypothetical that we did the last time.

13           THE COURT:   This one is the population average month?

14           THE WITNESS:   Yes.

15   Q.   This one is the population average model?

16   A.   This is the model that we used in table 5.

17           THE COURT:   I hate to do this because of the limited

18   time, but would you just refresh my recollection in the

19   simplest possible way what the population average means because

20   it's been a whole week.

21           THE WITNESS:   It means that we are essentially taking

22   all of the observations and --

23           THE COURT:   You mean the entire city?

24           THE WITNESS:   The entire city, all 63,000 cases in our

25   sample, and we are estimating a regression similar to what we

D5D8FLO1                          Fagan - direct

1    showed in table 5 for the total stops, not for the specific

2    crime stops, and we look at what happens to each population

3    group compared to any other population group.

4              THE COURT:  In other words, black, white, Hispanic?

5              THE WITNESS:  We are comparing to white.

6              THE COURT:  Black, Hispanic.  Was there a third

7    population?

8              THE WITNESS:  Other race.

9              THE COURT:  Black, Hispanic, other, OK.

10   A.  And in the population average model, we simply compare

11   everything to everything else, and we are comparing the

12   outcomes for one group of individuals compared to another, and

13   we hold all the other variables constant and look across the

14   population.

15             We don't consider the fact that there is anything

16   unique that's unobserved or not accounted for about a

17   particular tract.  And that's one of the differences in the

18   models that we use.

19             So this is how we get to 43 percent.  We have shown

20   this in a graph.  Can we put up the other?

21   Q.  Let me just ask a couple of questions about this.

22             What we have on the screen now, Exhibit 570, is the

23   marginal effects model as opposed to the model that you

24   testified about last week, is that correct?

25   A.  Well, we take the regressions from table 5 and convert them

D5D8FLO1                         Fagan - direct

1   into marginal effects.  So this is an exact expression of the

2   hypothetical that we used last week.  And there is a

3   mathematical expression to do that conversion.  We have created

4   that mathematical expression.  And I think we provided it to

5   the city.

6   Q.  Last week's was a hypothetical model and this is?

7   A.  These are actual estimates that we did for each level of

8   the population.

9           MR. HELLERMAN:  I move the admission of Plaintiffs'

10  Exhibit 570.

11          MS. COOKE:  No objection.

12          THE COURT:  570 is received.

13          (Plaintiffs' Exhibit 570 received in evidence)

14  Q.  Professor, just tell us a bit about what the figures in the

15  right-hand column of 570 mean?

16  A.  That's the percent difference from the baseline.  Our

17  baseline estimate here was 15 percent.  We could have set a

18  baseline of 10 percent, but I wanted to construct this chart in

19  a way that conformed to the hypothetical that I gave last week.

20  So we used 15 percent as a starting point.  We could have

21  started earlier.  We could have started later.

22          But what we are showing is the percent difference

23  compared that 12.92 percent reading that we get of the 15

24  percent baseline.  And we look at the percent difference --

25          THE COURT:  Is that a percent?  You said 12.92

D5D8FLO1                        Fagan - direct

 1   percent.

 2               THE WITNESS:  I'm sorry.  12.92 stops.

 3               So the increase from 12.92 to, say, 18.38, which was

 4   our 55 percent example, was 42.3 percent.

 5               THE COURT:  You called it a marginal increase in

 6   number of stops.  What is that an increase over when it says

 7   12.92 stops in a tract that has a population black of 15

 8   percent?  What is that an increase over?

 9               THE WITNESS:  It's an increase beyond the average of

10   all the other tracts.

11               THE COURT:  I don't understand.

12               THE WITNESS:  If you take an average of all tracts

13   across the city, at all population levels, and hold everything

14   out and make everything else constant, we get an increase of

15   12.92 percent.

16               THE COURT:  No, stops.

17               THE WITNESS:  We get an increase of 12.92 stops over

18   what the average would be.  That's why it's called a marginal

19   increase.

20               THE COURT:  Over what the average would be?

21               THE WITNESS:  For the whole city.  We are comparing

22   everybody to everybody.

23               THE COURT:  When a tract happens to be 15 percent

24   black, you would expect 12.92 stops over the average number of

25   stops citywide.

D5D8FLO1                          Fagan - direct

1           THE WITNESS:  Yes.

2    Q.  Am I reading this correct, Professor, that according to

3    your estimated marginal effects chart, Exhibit 570, the percent

4    difference between a 55 percent black tract and a 15 percent

5    black tract is how much?

6    A.  42.3 percent difference, 42.3 greater.

7           Can you put up the next example with the line graph?

8    Q.  I am putting up what is marked as Plaintiffs' Exhibit 571

9    for identification, which has been given to counsel for the

10   city.

11   A.  This, your Honor, simply shows the results from the

12   previous demonstrative.  The green line, which is percent

13   black, it's just simply graphically displaying the same result.

14          I have added on here a line for percent Hispanic,

15   having done the same calculations for the Hispanic population.

16          And I apologize for typo in the label on the vertical

17   axis.  It should say marginal effect, not "martinal" effect.

18          THE COURT:  Sure.

19          That starts at?

20          THE WITNESS:  12.92.

21          THE COURT:  Over the average number of stops citywide

22   that you would predict would happen in a 15 percent black

23   district.  And then it goes up as the percent black population

24   in the district increases to 85.

25          THE WITNESS:  Correct.  And we have done the same set

D5D8FLO1                              Fagan - direct

1    of analyses for the percent Hispanic population.

2                  The data that we used here was from the data provided

3    to us by the city as part of discovery, which is basically the

4    same as our data.

5                  MR. HELLERMAN:  If it would help the Court, I would

6    ask somebody with handwriting better than mine to fix that

7    typo.

8                  THE COURT:  That's OK.

9    A.  Can we go to the next one?

10   Q.  I am putting on the screen what has been marked as

11   Plaintiffs' Exhibit 572 for identification, which has been

12   given to the city.

13                 Professor, what is this?

14   A.  So, your Honor, there is another way of expressing these

15   relationships, which is to actually predict the actual number

16   of stops at each level of the independent variable, in this

17   case, percent black population in the tract.

18                 So as opposed to the last slide, which was the

19   marginal increase in the number of stops, this is the

20   prediction of the actual number of stops.  And you can see the

21   same trend line.  It's going up fairly quite a bit.  So by the

22   time you get to 80 percent or 85 percent, it's quite a bit

23   higher than at 50 percent or 35 percent.  Again, we did the

24   same thing for percent Hispanic and percent black.

25                 THE COURT:  I am not sure I understand the percent

D5D8FLO1                        Fagan - direct

1   Hispanic.  Does that mean the tract is 85 percent Hispanic

2   population?

3              THE WITNESS:  Yes.  There are a small number of tracts

4   that have that demographic.

5              THE COURT:  I just want to make sure it could be

6   either black population or Hispanic.

7              THE WITNESS:  Correct.

8   A.  So the second response -- the first response is essentially

9   computing this and saying that -- we used the same math to

10  estimate marginal effects, but our data came out a little bit

11  differently because we used a population average model compared

12  to a subject specific model.

13  Q.  You said the second response?

14  A.  I am about to talk to the second.

15             The second response to the question that was raised by

16  Professor Purtell was about, again, whether or not you could

17  apply these models.  So he suggested a counterfactual claim

18  that in fact you can't, it's inappropriate.  That's an

19  important question.

20             So one response is to say, OK, fine, it may or may

21  not.  Let's look at the data and see if in fact it does make a

22  difference.  We didn't see any evidence of that, whether or not

23  it does make a difference.  We looked.  We didn't have time to

24  produce this and put it into evidence for the city, but we did

25  look at what happens when you use Professor Purtell's model,

D5D8FLO1                              Fagan - direct

1    and we find pretty much the same.

2              MS. COOKE:  Objection.  To the extent the witness just

3    testified he looked at something and didn't have time to

4    provide it to the city, I move to strike.

5              THE COURT:  Wait a minute.  Maybe he looked at

6    something that was evidence.

7              MS. COOKE:  He said he looked at something and ran

8    something.

9              THE COURT:  Ran something?

10             THE WITNESS:  I looked at the regressions using

11   Professor Purtell's model.

12             THE COURT:  Using tables received from Professor

13   Purtell?

14             THE WITNESS:  No, your Honor.

15             MS. COOKE:  I would move to strike his testimony as a

16   new analysis or opinion that hasn't been provided and therefore

17   is inappropriate testimony at this point.

18             THE COURT:  How can I let him testify about running

19   models that have not been produced?  I was very clear on Friday

20   that everything had to be produced by Saturday at 5.

21             MR. HELLERMAN:  I can't argue with that, your Honor.

22             MS. COOKE:  So the answer is stricken?

23             THE COURT:  The answer is stricken.

24             MR. HELLERMAN:  The portion of the answer that

25   referred to Professor Purtell's model.

D5D8FLO1                              Fagan - direct

1              THE COURT:  Correct.

2    A.   The last point in response is that, were we dealing with a

3    small sample of say a couple hundred subjects in a treatment

4    experiment, where we were very concerned about looking at

5    responses to particular medications over a period of time, we

6    had 100 people in the treatment group and 100 people in the

7    control group, and there might have been some significant

8    differences between people at the outset of their entry into

9    this experiment, then I think the concerns and the questions

10   about using a random effects regression or a subject specific

11   model would be appropriate.

12             But here we are dealing with 2,181 census tracts,

13   observed over 30 months worth of time, with data that has very

14   strong correlations between, say, crime and race and so on and

15   stop rates.  So it's my opinion that the amount of difference

16   that would be detected using the full data set, with a sample

17   that large, between the subject specific approach and the

18   population average approach would be negligible.  It's a huge

19   sample.

20             THE COURT:  That being the 69?

21             THE WITNESS:  63,000.

22             THE COURT:  That's a huge sample.

23             THE WITNESS:  Yes.

24   Q.   Can the negligibleness of the difference be demonstrated

25   from your marginal effects chart?

D5D8FLO1                          Fagan - direct

1    A.  Between the two approaches, no.

2    Q.  So the fact that the difference between 55 and 15 percent

3    in your marginal effects model is 42.3 and in the model you

4    testified to last week was 43 percent is pretty close?

5    A.  We are just using a different computational method.

6    Q.  But that shows that you pretty much get to the same place,

7    right?

8    A.  Using our computational methods.  If you use, for example,

9    a subject specific regression, given the size of the sample,

10   and how strong the correlations are within the sample, it's my

11   opinion there would be extremely little change if we were to

12   estimate these effects using that model.

13            MR. HELLERMAN:  Unless your Honor has any questions

14   about that subject, I will move on.

15            Your Honor, 571 and 572 I move into evidence.

16            MS. COOKE:  No objection.

17            THE COURT:  Received.

18            (Plaintiffs' Exhibits 571 and 572 received in

19   evidence)

20   Q.  I would like to ask you a couple of questions about table 8

21   in Professor Smith and Purtell's joint report, which I will put

22   on the screen just for context.

23            MS. COOKE:  For clarity for the record, this is table

24   8 from Exhibit H13.

25            THE COURT:  Thank you.

D5D8FLO1                                    Fagan - direct

1    Q.   Did you hear Professor Purtell's testimony last week

2    explaining the difference between the 44,686 tract months shown

3    on their table 8 and the 63,249 tract months shown in your

4    table 5?

5    A.   I believe I did.  I can't recall with specificity.

6    Q.   Perhaps it would refresh your recollection if I quoted from

7    a piece of it, which is Professor Purtell testified that there

8    was "a technical problem with the way -- how the algorithm and

9    methodology used to calculate the coefficient works."

10           Do you recall that?

11   A.   Yes.

12   Q.   Did your models have any such technical problem?

13   A.   Well, I didn't understand what the technical problem was,

14   but we used models that, whatever those problems may have been,

15   we were able to avoid them by including all of the census

16   tracts for each of the months in our analysis.

17           THE COURT:  Is this the one where Professor Purtell

18   was talking about he dropped zeros and some ones and twos, and

19   then there were some where he said there was data missing so

20   they dropped those also.

21           THE WITNESS:  Right.

22           THE COURT:  There were really four things dropped, all

23   zeros, some ones, some twos, and then the hybrid tracts that

24   had missing data, right?

25           THE WITNESS:  Right.

D5D8FLO1                        Fagan - direct

 1           THE COURT:  I just wanted to make sure I remembered it
 2   correctly.
 3           MS. COOKE:  Correct, your Honor.
 4   Q.  Professor, your models didn't exclude zero stop tract
 5   months, right?
 6   A.  Right.
 7           THE COURT:  Or any of the other categories he
 8   mentioned.
 9           THE WITNESS:  There is a line of code in Professor
10   Purtell's model, the code that he provided to us, which directs
11   the analysis to exclude any tract where the total number of
12   stops is equal to zero.  And in order to run our models, we
13   eliminated that phrase.  Then once we did that, all of the
14   tracts came back in.  So whatever was being picked up by that
15   particular line of code accounted for the zeros and the ones
16   and the twos and some other things as well.  That's why I
17   didn't quite understand what the other things were.
18           THE COURT:  I tried to explain what he said.
19           THE WITNESS:  It just wasn't obvious to us.
20           So once we eliminated that exclusion restriction, we
21   were able to get everything in.
22           THE COURT:  Right.
23   Q.  Do you have a chart that shows the results?
24   A.  There is a chart comparing the results of the table 8
25   analysis from Professor Smith and Purtell's report with and

D5D8FLO1                          Fagan - direct

1    without the zeros.

2    Q.  With and without --

3    A.  With and without any of those exclusion restrictions that I

4    just mentioned.

5         Your Honor, we highlighted here in yellow --

6    Q.  Excuse me, Professor.

7         MR. HELLERMAN:  Let me just introduce it.  This is 573

8    for identification.

9         THE COURT:  Right.

10   Q.  Can you tell us what this is, Professor?

11   A.  We estimated the left-hand panel modeled with exclusion

12   restrictions --

13        THE COURT:  So is the left hand of this exhibit

14   exactly what we just saw?

15        THE WITNESS:  It's the same data, same analysis.  I

16   just relabeled the variables into common language.

17   Q.  It's the same numbers?

18   A.  The same numbers.

19        THE COURT:  Where is the relabeling?  In the

20   highlighted area, is that where the relabeling is?

21        THE WITNESS:  The labels for the predictors in the

22   left-hand column, I used the actual text, the plain language

23   for each of those variables.

24        THE COURT:  So what is different in the left-hand side

25   of this chart from what he had?

D5D8FLO1                              Fagan - direct

1            THE WITNESS:  Nothing.

2            THE COURT:  If you look back at table 8, it would look

3    exactly the same?

4            What page is table 8 of H13?

5            MR. CHARNEY:  68.

6            THE COURT:  Let me just look at it in hard copy.

7            It doesn't look the same.

8            THE WITNESS:  The difference is that we included the Z

9    score, which is the test statistic.  And instead of asterisk

10   for the P value, we actually included the actual specific P

11   value of the regression return.  And the standard errors are in

12   there too.  Standard errors were in Professor Purtell's report

13   as well.

14           THE COURT:  Am I looking at the right table?  I don't

15   see anything that looks like the left-hand side of the chart.

16           MS. COOKE:  I don't see it either, your Honor.

17           THE COURT:  I don't know what you're talking about.

18           THE WITNESS:  If you look at the column under B, the

19   regression coefficients.

20           THE COURT:  Yes, I do see that.

21           THE WITNESS:  Those numbers should be exactly the same

22   as in Professor Purtell's report where he labels it as

23   coefficient.

24           Can I point it out to you?

25           There is a slight difference here.  He expressed these

D5D8FLO1                          Fagan - direct

 1   as, instead of a raw regression coefficient, something called

 2   an exponentiated coefficient.

 3             THE COURT:  I'm sorry.  I wasn't trained in

 4   mathematics.  I don't know what you're talking about.

 5             The numbers look totally different to a layperson.  I

 6   don't know what is going on.

 7             THE WITNESS:  I understand your frustration, your

 8   Honor.  When you run the regression for this, you can generate

 9   either a raw coefficient or an exponentiated coefficient.  And

10   in this case, what was generated here was the exponentiated

11   coefficient.

12             THE COURT:  In the left-hand column?

13             THE WITNESS:  Yes.

14             THE COURT:  But you have four lines, he has two, or

15   columns.

16             THE WITNESS:  Here, this is the coefficient.

17             THE COURT:  The left-hand column in his chart is

18   coefficient?

19             THE WITNESS:  Right.

20             The standard errors is in parentheses in his chart.

21             The P value is what the asterisks are.  But we instead

22   in our chart, we actually computed the actual P value instead

23   of summarizing them.

24             THE COURT:  Where is the column that reflects the

25   coefficient?

D5D8FLO1                                    Fagan - direct

 1                    THE WITNESS:  The B.

 2                    He calls it coefficient.  We call it B.

 3                    THE COURT:  His is exponential and yours is?

 4                    THE WITNESS:  A raw regression coefficient.

 5                    THE COURT:  What is your SE column?

 6                    THE WITNESS:  Standard error.  That's the same thing

 7      that's in his parentheses here.

 8                    THE COURT:  Does that look the same?

 9                    THE WITNESS:  They look almost the same.  They are a

10      little bit different because he is computing it for the

11      exponentiated coefficient.

12                    THE COURT:  What is the Z column?

13                    THE WITNESS:  That's the test score.

14                    THE COURT:  That's not in his chart?

15                    THE WITNESS:  I added it in because it's more

16      information.

17                    THE COURT:  I don't know what it means though.

18                    THE WITNESS:  The test score is when you divide the B

19      by the standard error to compute --

20                    THE COURT:  That's just the math, dividing B by the

21      standard error.  And P is the?

22                    THE WITNESS:  P is the actual probability.

23                    His probability is in these asterisks here.  My P is

24      the actual computed probability.

25                    THE COURT:  You broke it down as much as you could.

D5D8FLO1                              Fagan - direct

1          So that's the left-hand side.  Then you do the same

2     thing adding back in all the census tracts in your sample?

3          THE WITNESS:  Correct.

4          THE COURT:  What is the change that you noticed by

5     adding all the census tracts back in?

6          THE WITNESS:  If you look at the P value that's

7     highlighted in yellow, with the exclusion restrictions, the

8     statistical significance for the percent black population,

9     percent Hispanic population, percent other race is not

10    significant.  When you add in all of the other cases, the

11    statistical significance for each of the population, the racial

12    composition variable becomes statistically significant.

13         THE COURT:  I know that from the P column?

14         THE WITNESS:  The P column on the right where it says

15    000.

16         THE COURT:  That tells me statistically significant?

17         THE WITNESS:  Highly significant.

18    BY MR. HELLERMAN:

19    Q.  Professor, on your table 5, we looked at asterisks, three

20    asterisks, two asterisks, one asterisk.  If you can explain how

21    that relates to the P values shown on this chart?

22    A.  Usually when people report asterisks, which is very common

23    in the social science literature, if something is significant

24    at the .05 level, meaning it won't happen by chance more than 5

25    percent of the time, they will report that with one asterisk.

D5D8FLO1                          Fagan - direct

1    If it's significant at the .01 level, the one out of 100, they

2    will report that with two asterisks.  And if it's significant

3    at less than .001, one chance in a thousand, it's reported with

4    three asterisks.

5         So we used asterisks here simply because the table

6    would have been very crowded with P values.

7    Q.  Here referring to table 5?

8    A.  Table 5.

9         In the table that we provided with the revision of

10   table 8, we decided to show the exact P values just to make

11   things very clear.

12        THE COURT:  Would you flip back to the new chart?

13        OK.  I have got it.

14        The bottom line, in simple terms, it makes a big

15   difference to add all the census tracts back in?

16        THE WITNESS:  Yes, your Honor.  Things that were not

17   significant with the exclusion restrictions, particularly the

18   racial composition variables, becomes statistically significant

19   when you lift those exclusion restrictions.

20        THE COURT:  Thank you.

21        MR. HELLERMAN:  I move 573 into evidence.

22        MS. COOKE:  No objection.

23        THE COURT:  573 is received.

24        (Plaintiffs' Exhibit 573 received in evidence)

25   Q.  Just to make it absolutely clear, although it already is,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D5D8FLO1                          Fagan - direct

1    had you shown on 573 the exponentiated coefficients rather than

2    the raw coefficients, would the result have been any different?

3    A.  No, not at all.

4            THE COURT:  Why does one use a raw coefficient versus

5    an exponential coefficient?

6            THE WITNESS:  The exponentiated coefficient

7    essentially is what is called an incident rate, which tells

8    you, similar to what we showed in one of our line graphs, the

9    expected change in the number of events, number of stops in

10   this case, relative to a change of one unit in the predictor

11   variable.  So the 1.09 means roughly basically one stop

12   increase for every increase in the percent black population.

13   That's in Professor Purtell's notes.

14           THE COURT:  Thank you.

15           Have we now covered two of the four topics?

16           MR. HELLERMAN:  We have covered three.

17           THE COURT:  We covered the zero tract.  We did the

18   population average.

19           MR. HELLERMAN:  The population average has two

20   aspects.  One is his explanation of his disagreement with

21   Professor Purtell's criticism and the other was the marginal

22   effects charts.

23           THE COURT:  We have the fourth topic left.

24           MR. HELLERMAN:  We have one left.

25   Q.  I am putting up on the screen table 10 from Professor

D5D8FLO1                          Fagan - direct

1    Purtell/Smith's report.  It's on page 70 of Exhibit H13.

2              You have seen this before, Professor, right?

3    A.  Yes, I have.

4    Q.  Does this table 10 report the standard errors?

5    A.  It looks like they are in the parentheses.

6    Q.  That's the P value, right, not the standard errors

7    themselves?

8    A.  Well, the label is a little confusing.  The column is

9    headed P value, but in the footnote just below where it says N

10   on the bottom, it says standard errors in parentheses.  So I

11   assume these are the standard errors, I think.

12             MS. COOKE:  We provided table 10 with an additional

13   column of the standard errors to plaintiffs prior to Professor

14   Fagan's last round of rebuttal testimony on the 6th.

15             THE COURT:  Do we have that?

16             MR. HELLERMAN:  I am about to address that issue right

17   now.

18             THE COURT:  If she has it, I would like to show it to

19   him.  Do you have it?

20             MS. COOKE:  I might have a copy with me.

21             THE COURT:  Can we go back to the previous chart which

22   had those parentheses in the footnote?

23             I assume you would say, Ms. Cooke, that the P value

24   column is not the standard error?

25             MS. COOKE:  I don't know if I can answer that

D5D8FLO1                          Fagan – direct

1    question.

2              THE COURT:  Well, he knows.

3              Dr. Purtell?

4              MR. PURTELL:  It may have been mislabeled.  We did

5    produce the standard errors to clarify.

6              THE COURT:  I know you did.  Is that it in the

7    right-hand column in those parentheses?

8              MR. PURTELL:  I don't recall all the codes.

9              MR. HELLERMAN:  If I could put up a demonstrative that

10   actually does have the standard errors that the city provided

11   to us.

12             THE COURT:  All right.

13             MR. HELLERMAN:  Plaintiffs' Exhibit 574 for

14   identification.

15   Q.  Professor, can you tell us what this is?

16   A.  Yes.  This is table 10 with really the exact same numbers.

17   Q.  But this has standard errors and the other one didn't?

18   A.  We included here the exact standard errors, and we also

19   included the test score, which is the Z score.

20             THE COURT:  What does the test score mean?

21             THE WITNESS:  It's the strength of the association

22   between each of the predictors and the dependent variable.

23             THE COURT:  This is not the one where you divide the

24   coefficient by the standard error?

25             THE WITNESS:  It is.

D5D8FLO1                          Fagan - direct

1   Q.  Is it fair to say, Professor, that this is the chart in

2   which you do the math for the Court?

3   A.  We actually -- well, the computer does the math.  We

4   verified the math with our own calculators.

5           THE COURT:  But this is the one where you divide the

6   coefficient by the standard error.

7           THE WITNESS:  Yes.

8           What we see here, your Honor, is that for the racial

9   composition variables -- percent black, percent Hispanic,

10  percent other race -- the associations are very strong.  They

11  are all significant with 000.  But they are much stronger, or

12  they are stronger than the comparable data at the top of the

13  chart for the suspect data, the racial composition for the

14  suspect data.

15          THE COURT:  Why are they even stronger if the P value

16  is also 000 there?

17          THE WITNESS:  They are all statistically significant.

18  Again, these are fairly large samples so significance is

19  important, but not dispositive.  I think the strength of the

20  association is probably more informative than --

21          THE COURT:  That strength is the Z column?

22          THE WITNESS:  Exactly.  The strength of the

23  association between each of the independent variables and the

24  dependent variable which is the number of stops.

25          THE COURT:  Are you saying that the 15, 14 and 7 are

D5D8FLO1                          Fagan - direct

 1   just higher numbers than the 13, 5 and --

 2           THE WITNESS:  Yes, your Honor.  They are higher

 3   numbers and that signifies a stronger association.

 4           THE COURT:  OK.

 5   Q.  So is it fair to say, Professor, that what 574 shows with

 6   the math is that the magnitude of the statistical significance

 7   for percent black population and percent Hispanic population

 8   are greater than this magnitude of the statistical significance

 9   for the black suspect and Hispanic suspect coefficients?

10   A.  Yes.

11           MR. HELLERMAN:  If I could just consult, your Honor.

12           I just move 574 into evidence.

13           MS. COOKE:  No objection.

14           THE COURT:  574 received.

15           (Plaintiffs' Exhibit 574 received in evidence)

16           MR. HELLERMAN:  Nothing further.  Thank you.

17           THE COURT:  Ms. Cooke.

18   CROSS-EXAMINATION

19   BY MS. COOKE:

20   Q.  Professor Fagan, looking at the last exhibit we were just

21   discussing, Plaintiffs' Exhibit 574, the revised version of

22   Professor Smith and Purtell's table 10 from Exhibit H13, you

23   focused entirely on the statistical significance of the Z

24   scores of suspect description and the racial proportion

25   variables?

D5D8FLO1                          Fagan - cross

```
 1              THE COURT:  I did not follow the question.
 2   Q.  You focused entirely on the statistical significance of the
 3   Z scores for suspect description and the racial proportion
 4   variables in this revised report?
 5              THE COURT:  The stuff that is highlighted in yellow?
 6              MS. COOKE:  Correct.
 7              MR. HELLERMAN:  To the extent that that purports to
 8   characterize his testimony I object to it, but I don't object
 9   to the question.
10              THE COURT:  You're asking him if he focused on the two
11   yellow highlighted areas?
12              MS. COOKE:  Correct.  Which are the suspect
13   description and racial proportion.
14              THE COURT:  That's what you focused on or is it not?
15              THE WITNESS:  That was the explanation for what is in
16   yellow, yes.
17   Q.  You were focused on the statistical significance of those
18   variables, correct?
19   A.  No.  Actually, I was focused on the size of the test score.
20              THE COURT:  He said the statistical significance is
21   similar, but the strength of the association is expressed in
22   the Z column, right?
23              THE WITNESS:  Correct.
24              THE COURT:  I am following this.
25              THE WITNESS:  You're getting pretty good.
```

D5D8FLO1                          Fagan - cross

1    Q.  Taking a look at Plaintiffs' Exhibit 573, which is your

2    comparison of Professor Smith and Purtell's table 8, which

3    excluded zero tract counts, and your model which included them

4    back in, correct?

5    A.  We included everything that was excluded.  It was more than

6    just zero counts.

7    Q.  What was excluded was included and is set forth side by

8    side in Plaintiffs' 573?

9    A.  Yes.

10   Q.  Isn't it true that based on the coding you provided to the

11   city underlying this Exhibit 573, as part of your analysis, you

12   conducted statistical tests to determine whether or not there

13   was a need to model the zero process separately?

14   A.  I didn't testify to that.

15   Q.  In the coding instructions you provided to the city

16   underlying this exhibit, isn't it true that you ran statistical

17   tests to determine if there was a need to model the zero counts

18   separately?

19   A.  I would have to look at the coding that I gave you.  My

20   recollection is that we didn't give it to you.  It's possible

21   that it got in there.

22   Q.  The question is, you ran statistical tests to see if the

23   zero counts should be modeled separately, isn't that correct?

24            THE COURT:  Can I find out when did he allegedly do

25   this?  This past weekend or log ago?

D5D8FLO1                              Fagan - cross

1          MS. COOKE:  I am not sure when it occurred, but the

2     coding instructions underlying this exhibit --

3          THE COURT:  When did you get those coding

4     instructions?

5          MS. COOKE:  This weekend.

6          THE COURT:  In the recently produced coding

7     instructions, the ones produced this weekend.

8          THE WITNESS:  I don't recall.  At one point I did that

9     analysis and looked at that, but I didn't include that in the

10    report here.

11    Q.  But you did do statistical tests to determine if the zero

12    count census tracts should be modeled separately, correct?

13    A.  I looked at it, yes.

14    Q.  In fact, it is your understanding that Professor Smith and

15    Purtell's table 8, in excluding zero count census tracts, plus

16    the ones and the twos and ones which had gaps, the purpose of

17    excluding that was to demonstrate whether or not the zero

18    counts should be modeled separately, correct?

19         MR. HELLERMAN:  Objection.  I don't think Professor

20    Fagan can testify as to what the purpose was.

21         THE COURT:  Do you know if that's what they stated?

22    A.  They claim in their report that it's necessary to see if

23    there is something different about zeros versus the other

24    counts.  That's in the report.

25    Q.  Looking at Plaintiffs' Exhibit 570, which is the estimated

D5D8FLO1                         Fagan - cross

1    marginal effects of increase in percent black population
2    compared to percent white on total stops in tract months based
3    on your table 5 regression models in your second supplemental
4    report, it's true that all of the projections in this
5    demonstrative assume the same level of SES factors, crime,
6    patrol strength, and percent other races, correct?
7    A.   Yes.
8              MR. HELLERMAN:  Same level as what?
9              THE COURT:  Constant level.
10   Q.   Constant.
11   A.   The prediction that comes out of this computation looks
12   specifically at those tracts with .15 or 15 percent population
13   and compares it to all the others.
14   Q.   But all of the levels of SES factor, crime, patrol
15   strength, percent other races, and the other variables in your
16   regression in table 5 remain constant, correct?
17   A.   You're confusing two things.  Are you talking about the
18   computation here or the computation in table 5?
19   Q.   Here, reflected here.
20   A.   The computation in table 5 looks at hypotheticals,
21   estimates what would happen where the percent black population
22   is .15, and because of the exchangeability assumption and the
23   correlation matrix, the appropriate correlations for the other
24   variables to .15 were estimated, and then we compared to
25   everything else, yes.

D5D8FLO1                              Fagan - cross

1            THE COURT:  I am not sure I understand your answer to

2       her simple question.  The other variables --

3            THE WITNESS:  SES.

4            THE COURT:  All the other variables, do they remain

5       constant?

6            THE WITNESS:  They remain constant for the tracts

7       other than the tracts at .15 or at 15 percent.

8            THE COURT:  What happens in that tract?

9            THE WITNESS:  Those values are correlated with the

10      tracts that have a .15 percent.  In other words, we are

11      isolating a group of tracts that look like .15 percent for all

12      the measures of those tracts, and then we compare it to all the

13      other tracts.  So I am not quite sure I completely understand

14      the question.

15           THE COURT:  I thought I did, and I thought you said

16      earlier you held all the other variables constant.  You didn't

17      shift them up or down depending on real tracts, you kept the

18      other constants fixed.

19           THE WITNESS:  That's the computation procedure.

20           (Continued on next page)

21

22

23

24

25

D5d9flo2                          Fagan – cross

1              MR. HELLERMAN:  That's referring to the estimated

2       marginal effects.  Just wanted to clarify it.

3       Q.  Looking at Plaintiffs' Exhibit 572.  This is the first time

4       you've predicted the number of stops, correct?

5       A.  First time?  Well in this case, yes.

6       Q.  In none of your other submissions provided in this case did

7       you ever attempt to predict the number of stops that would

8       result by a change in the percent Black or Hispanic in a census

9       tract, correct?

10      A.  In the first report to the Court, we reported incident

11      ratios, which actually do a similar prediction of change in the

12      number of stops relative to a change in the predictor.

13              But this is the first time we actually did a

14      prediction across the varying levels of percent Black and

15      percent Hispanic.  Sure.

16      Q.  And in this demonstrative you're predicting the number of

17      stops in census tracts according to the various proportions of

18      either the Black or Hispanic population, correct?

19      A.  Yeah.

20      Q.  Did you compare these predictions in Plaintiffs' Exhibit

21      572 to the actual number of stops that occurred in the census

22      tracts with those racial populations?

23      A.  I didn't report it, no.

24      Q.  You did what?

25      A.  I did not report that, no.

D5d9flo2                         Fagan - cross

1    Q.  Did you compare it?  Did you do that comparison?

2    A.  Yeah.

3    Q.  And what did you find?

4           THE COURT:  I thought you didn't want him to testify.

5    You objected to him testifying to anything he had not given to

6    you.  Remember, he wanted to give a report to something he did.

7    You said you object because you hadn't seen it.  Now you're

8    asking him to do that.

9           MS. COOKE:  This is about a table that we have been

10   provided.

11          THE COURT:  I know.  But you're asking for information

12   that he didn't provide you, didn't report on, but that he ran,

13   which is exactly what came up earlier and you said it wouldn't

14   be fair.

15          MS. COOKE:  I'll ask the next question which is --

16          THE COURT:  All right.

17   Q.  Then you're aware that the predicted numbers are

18   substantially different than the numbers you report in your

19   table Plaintiffs' Exhibit 572, aren't you?

20   A.  No.  They're not quite substantially different.

21   Q.  They're different, right?

22   A.  There are small differences.  The line looks a little bit

23   different.  It's a little flat and then it takes off when you

24   get closer to .75, .80.

25   Q.  But predictions aren't accurate to what actually happened,

D5d9flo2                        Fagan - cross

1   correct?

2   A.  They're very close.

3        MS. COOKE:  I have no further questions, your Honor.

4        THE COURT:  Okay.

5   REDIRECT EXAMINATION

6   BY MR. HELLERMAN:

7   Q.  With respect to the issue of zeros being modeled

8   separately, which I don't believe was part of your testimony

9   but just --

10       MS. COOKE:  Your Honor, I object to that statement,

11  the zeros being modeled separately.  His demonstrative, in

12  fact, takes the table eight regression with the zeros removed,

13  therefore, being modeled separately.

14       THE COURT:  That's not what I thought you meant by

15  being modeled separately.

16       I thought that was excluding four categories:  Zeros,

17  ones, twos and gaps, all four of those together were excluded

18  to equal the 44,000.  He compared it to putting all those back

19  in.  That's not, to me, the same as modeling zeros separately,

20  which you asked about.

21       MS. COOKE:  Yes.  Which he acknowledged was the point

22  of his understanding of Professor Smith and Purtell's table

23  eight regression, was to show the difference of the zero

24  counts --

25       THE WITNESS:  Can I respond to that, your Honor?

D5d9flo2                        Fagan - redirect

1          THE COURT:  You can in a minute, after I finish.

2          But it's still not zeros.  It's just a misstatement.

3          Zeros, ones, twos and gaps.  Thank you.

4          Put it that way.  Now you can respond.

5          THE WITNESS:  Can I respond to Ms. Cooke's comment?

6          THE COURT:  Yes.

7          THE WITNESS:  The point about doing a regression where

8    you actually test the effects of zeros is not simply to take

9    all the zeros and whatever else is included and put them in a

10   garbage can.

11         The point of doing the test is to see what happens

12   when you integrate the question of what happens to zeros in the

13   model when they're included but there's a specification that

14   says:  Well there's a lot of zeros here and what happens if you

15   include those zeros?  Those are two entirely different

16   enterprises.

17         Table eight that was produced for the report by

18   Professors Smith and Purtell basically dumped the zeros in the

19   garbage.

20         In our case, I think what Ms. Cooke is alluding to was

21   a line of code -- we actually ran what's called -- in fact, we

22   ran a model similar to what Professors Purtell and Smith

23   recommend called a zero-inflated model.  We actually ran that

24   model.  And you know what --

25         THE COURT:  I think that's what you object to.

D5d9flo2                         Fagan - redirect

1                  THE WITNESS:  She's claiming --

2                  MS. COOKE:  No.  That was my question.

3                  THE COURT:  You want to hear what the results of his

4       run revealed?

5                  MS. COOKE:  This code was provided.

6                  THE COURT:  Fine.

7                  THE WITNESS:  So then I get to tell the result.

8                  MR. HELLERMAN:  Professor, may I just -- if you know

9       that the code was provided.

10                 THE WITNESS:  I don't know the code was provided, but

11      let's assume it was.

12                 THE COURT:  So the result was?

13                 THE WITNESS:  The result was it didn't matter.  We

14      still get exactly the same result.  The percent Black, percent

15      Hispanic, and percent other race figures are statistically

16      significant and positive predictors of the stop rates.

17                 MR. HELLERMAN:  Nothing further.

18                 MS. COOKE:  Nothing further for this witness, your

19      Honor.

20                 THE COURT:  Okay.  Good-bye.

21                 THE WITNESS:  Or until the next time.

22                 (Witness excused)

23                 THE COURT:  Now maybe your group -- you want him at

24      the table?

25                 MR. HELLERMAN:  We'd like him at the table.

D5d9flo2                          Fagan - redirect

1              THE COURT:  That's fine.

2              Mr. Dunn, if you want to see the screen you're welcome

3      to sit in the jury box.

4              MR. DUNN:  Okay.  I'll take you up on that.

5              THE COURT:  I was going to say as long as you don't

6      pull out a notepad.

7              MR. DUNN:  I'm pen-free.

8              MS. COOKE:  Your Honor, I would like to get a copy of

9      those notes that Professor Fagan was reading from during his

10     testimony.

11             THE COURT:  You understand you're still under oath?

12             THE WITNESS:  I do.

13             THE COURT:  Please be seated.

14             MR. HELLERMAN:  Asked for a copy of the notes.  Shall

15     I make a copy now?

16             THE COURT:  Hold on one second.

17             How many copies should my clerk make?  One for the

18     defense counsel, or do you want one too?

19             MR. HELLERMAN:  I'd like one.

20             THE COURT:  Two copies.  As soon as you see the young

21     man walk through the door, tell him two copies.  Thank you.

22             I'm ready.

23             MS. COOKE:  Sorry.  I was waiting.

24             (Continued on next page)

25

D5d9flo2                          Fagan - redirect

1    ROBERT PURTELL, resumed.

2    DIRECT EXAMINATION

3    BY MS. COOKE:

4    Q.  Professor Purtell, looking at Plaintiffs' Exhibit 574,

5    which is a revised version of your table seven from your -- I'm

6    sorry, table ten from your second supplemental report response.

7             How do you interpret the changes that Professor Fagan

8    has made to your table ten?

9    A.  He's added a specific Z value.  And he has added the

10   standard errors.  And the rest of it appears to be essentially

11   the same.  Some changes in titles.

12            THE COURT:  Now, he's testified that the Z column was

13   simply the division of the coefficient by the standard error.

14            THE WITNESS:  That's correct.  That's the normal way

15   to do that.

16            THE COURT:  And you agree?

17            THE WITNESS:  Yeah.  I'd like to disagree, but I'm not

18   that kind of person.

19            THE COURT:  Okay.  Good.

20   Q.  And did you hear Professor Fagan testify that the inclusion

21   of the suspect description data caused the practical

22   significance of the racial proportion to decline?

23            MR. CHARNEY:  He never testified to that.

24            THE COURT:  I don't remember anything like that.

25   Maybe could you either rephrase or say it again.

D5d9flo2                          Purtell - direct

1    Q.  What did you understand Professor Fagan testified with

2    respect to the practical significance?

3    A.  Well, what he said was --

4              MR. HELLERMAN:  Objection.  He didn't testify --

5              THE COURT:  Wait.  I want to hear the end of her

6    question.  One more time.

7    BY MS. COOKE:

8    Q.  What did you understand Professor Fagan testifying with

9    respect to the practical significance of the -- I'm sorry, I

10   can't see the screen -- with the addition of the Z values to

11   the revised table ten?

12             MR. CHARNEY:  Your Honor, he testified to the

13   practical statistical significance.

14             THE COURT:  What he said was there was a stronger

15   correlation to the population figures than to the crime suspect

16   figures.

17             Would that be fair?

18             MS. COOKE:  Correct.

19             THE COURT:  We all agree now.

20             THE WITNESS:  Yes.  I mean that's essentially what he

21   said.

22             THE COURT:  So, she's asking you to comment on that

23   opinion.

24             THE WITNESS:  I don't believe those differences are in

25   any way substantive.  We prepared a demonstrative to show why

D5d9flo2                        Purtell - direct

1    we believe that's the case.

2              THE COURT:  Okay.

3    Q.  With respect to the coefficients in the second column.

4              THE COURT:  In the second column?

5              MS. COOKE:  Yes.

6              I'm sorry.  I guess --

7              THE COURT:  Standard error?  Second column is standard

8    error.

9              MS. COOKE:  The coefficients in the Z column.

10             THE COURT:  In the Z column.  That's not --

11   Q.  Is that a coefficient, Professor Purtell?

12   A.  That's the Z value.  Coefficients are actually in the

13   column marked coefficient.

14   Q.  With respect to the coefficients, I guess the first column

15   but the second column of text.

16   A.  First column of numbers.

17   Q.  With respect to those coefficients, Professor Purtell, what

18   difference do you see between the suspect coefficients and the

19   percent race population coefficients?

20   A.  Well the suspect coefficients are smaller.  But I think the

21   important difference here is that when you look at the percent

22   Black population coefficient here and compare it to his table

23   five, that coefficient has gotten smaller.  It's gone from .883

24   to .7626, which to me suggests that the practical significance

25   in the analysis has gotten smaller.

D5d9flo2                    Purtell - direct

Q.  So just so I understood.  You said that the coefficient

here has gotten smaller from the coefficient even represented

by Professor Fagan in his table 5?

A.  That's correct.

Q.  I'm placing on the screen what's been provided to

plaintiffs' counsel and marked for identification as

Defendants' Exhibit N15.

        Professor Purtell, did you prepare this demonstrative?

A.  We did, yes.

Q.  And what is the purpose of this demonstrative?

A.  Well, we were trying to show that these differences in the

Z scores are really not -- really don't make much difference in

the real world.

        So let me interpret the only one for which I can

actually give you words, the 8.95 Hispanic suspect logged and

lagged Z score is -- the Z score for Hispanic suspects logged

and lagged is 8.95.

        If you remember, your Honor, we talked about the fact

that this is the probability that the result might be a random

event.  Well, the chances of that coefficient being a -- or

that variable being just the result of a random process are

less than four in one hundred quadrillion.

        And the other numbers are smaller zeros.  But they are

all essentially so strong that nobody cared.

        Given these odds, I'd buy a lottery ticket.

D5d9flo2                              Purtell - direct

1              So they are all essentially the same.

2              THE COURT:  So when he said it's a stronger,

3      correlation you just don't agree with that?

4              THE WITNESS:  It is.  But it's not in any meaningful

5      way.  One in less than four in a hundred quadrillion.  That's

6      an enormous number.

7              THE COURT:  So while it looks different to go from

8      nine to fourteen --

9              THE WITNESS:  The way the statistics work, once you

10     get out that far, nothing much happens.

11             THE COURT:  It's meaningless?

12             THE WITNESS:  Yeah.  It's meaningless in a practical

13     sense.

14     Q.  In your opinion, would any well trained analyst interpret

15     those differences represented by the Z scores as indications of

16     practical significance?

17     A.  No.  I think any analyst with reasonable training would say

18     that they're all so strongly significant there's really no

19     difference.

20     Q.  What would a trained analyst use to make a determination of

21     practical significance?

22     A.  A trained analyst would go back and use the coefficient

23     measures themselves -- actually, as I said before, there are

24     necessary and sufficient conditions here.

25             If the variable is not statistically significant, it

D5d9flo2                          Purtell - direct

1    should be ignored.

2            If it is statistically significant -- and these were

3    all essentially the same level -- then I would go back to the

4    coefficient and I would interpret them with respect to

5    practical significance.

6            MS. COOKE:  Your Honor, I'd move the admission of

7    Defendant's N15.

8            THE COURT:  Any objection?

9            MR. HELLERMAN:  No objection.

10           THE COURT:  N15 is received.

11           (Defendant's Exhibit  N15 received in evidence)

12   Q.  Professor Purtell, is the difference between statistical

13   and practical significance documented in statistics literature?

14   A.  There's a classic book actually -- I went back to find the

15   oldest one I could find.

16           There's a classic book that's used in social sciences.

17   It's called Social Statistics, by a man named Blalock.

18           And I went, in fact, back to as far as the first

19   edition which is 1960.

20           And on page, I think it's 126, he talks about the fact

21   that practical significance and statistical significance are

22   very different things.

23           And he cautions against placing too much confidence in

24   statistical significance when samples get very large.  And he

25   argues that when a sample is large, very, very small effects

D5d9flo2                          Purtell - direct

can appear to be statistically significant.  And so he cautions

any analyst, anyone reading the book, to be very careful about

that.

         And that's the situation we have here.

         THE COURT:  My problem is that I'm listening to both

of you and understanding both of you.

         It's all statistically significant.  Both the

population way of looking at it or the suspect way of looking

at it are both statistically --

         THE WITNESS:  All those variables are statistically

significant with respect to stops.

         That's correct.

         THE COURT:  So it's not more one than the other.

They're all significant.

         THE WITNESS:  Yeah, and they're all significant at,

for practical purposes, essentially the same level.

         THE COURT:  But they're all significant?

         THE WITNESS:  Oh, yes.  We agree with that.

Q.  Professor Purtell did any of the materials provided by the

plaintiffs' counsel with respect to Professor Fagan's analysis

regarding your table eight, which dropped zero count census

tracts, one count, two count, and the gaps, did any of that

information change your opinion about the need to model zeros

separately?

A.  No, they did not.

D5d9flo2                          Purtell - direct

1    Q.  Why?

2    A.  Well, the purpose of that chart initially was just to show

3    that the zero process is -- appeared to be very different.

4          And in Professor Fagan's own code he ran something

5    called a Vuong test.  And it's a test to see whether or not

6    modeling the zero count separately would have a statistically

7    significant impact on the results.

8          And the test statistics for that test that he ran says

9    that it -- in fact, you should model the zero counts

10   separately.

11         He tested to see whether the zero process was

12   different, your Honor.  And his test said yes.  And then he

13   ignored it.

14         THE COURT:  I don't really understand what that means,

15   I must say.  Does that mean including?

16         THE WITNESS:  We never said --

17         THE COURT:  You look at them all alone?

18         THE WITNESS:  No.  We never said to include or exclude

19   them.  We said that first you needed to model the question of

20   whether someone was stopped or not stopped.  That's the zero

21   count question.

22         And then once you've done that, the rest of the model

23   would be adjusted for that factor.

24         MS. COOKE:  Professor Purtell --

25         THE COURT:  I don't know what you mean.  I only know

D5d9flo2                         Purtell - direct

1    that if we look at that side-by-side chart he did.

2              THE WITNESS:  Right.

3              THE COURT:  It looks like the results differ when

4    there is no exclusion.

5              THE WITNESS:  That's correct.  And that's exactly what

6    we would argue, that since there are such significant

7    differences -- and the reason we use this approach as opposed

8    to something that's more statistically accurate is that the

9    statistically accurate stuff is very hard to understand.

10             So what -- our claim here is only that when we

11   dropped -- when we excluded the zeros -- and you did that

12   because you can't model just the zeros -- and even accounting

13   for the fact that Stata dropped a number of other cases for

14   reasons we explained, that these coefficients are, in fact,

15   different, which suggests that the zero process is different

16   from the overall process and should be controlled --

17             THE COURT:  I don't know what that means, that the

18   zero process is different.

19             And you seem to refer that he ran something where he

20   just ran --

21             THE WITNESS:  No.  He ran his model on the right-hand

22   side.  With both controlling for the zero process and then not

23   controlling for the zero process.  And then he compared the two

24   models.  And there's a test statistic that can be generated

25   that tells you whether or not you should, in fact, control for

D5d9flo2                         Purtell - direct

1  the zeros or not control for the zeros.  And the test statistic

2  says you must control for the zeros.

3              THE COURT:  I'm obviously going to be completely

4  unable to follow that because I think that's where you objected

5  to his testifying about a run that he didn't give you.  So to

6  have the rebuttal of a run that's not in evidence is too

7  confusing for me.  I don't have both sides of this story.

8              MS. COOKE:  That was not the objection, your Honor,

9  that I had raised was to some -- I'm not sure what he was

10  planning to testify about, but he talked about doing something.

11             THE COURT:  It still sounds like he's discussing a run

12  so to speak that I don't have in evidence.

13             Do I, Mr. Hellerman?

14             MR. HELLERMAN:  No.

15             THE COURT:  So I can't have that happen.

16             I need to have either Dr. Fagan's testimony about that

17  run rebutted by Dr. Purtell or not at all.

18             MS. COOKE:  We believe it is being rebutted, your

19  Honor.

20             THE COURT:  It is being rebutted.

21             What I'm trying to say is I have the rebuttal only.  I

22  don't think I have Dr. Fagan's testimony about this run that

23  now Dr. Purtell is telling me what it means.  I don't have

24  Dr. Fagan's side of that run.  So the evidence in the record is

25  confusing to me now, it will be confusing to me upon review if

D5d9flo2                         Purtell - direct

 1    I don't have both sides of that run.  That's all I'm saying.

 2              MS. COOKE:  Maybe I could add something that might

 3    clarify.  Plaintiffs' Exhibit 573 was provided to the

 4    defendants.

 5              THE COURT:  Yes.

 6              MS. COOKE:  In addition to the exhibit, the underlying

 7    Stata code was provided.

 8              THE COURT:  You mentioned that.  This weekend.

 9              MS. COOKE:  In the code which supports what's

10    purported to be represented in this exhibit was information

11    with respect to the Vuong test that Professor Purtell is

12    referring to that was run by Professor Fagan --

13              THE COURT:  That may be.  But he didn't testify about

14    it.  I thought there was an objection to it.  I need to hear

15    both sides of that run.

16              MS. COOKE:  I didn't object to it.  I asked the

17    question.  And then I think your Honor --

18              THE COURT:  Yeah, I did.

19              MS. COOKE:  -- that was the objection.  But that was

20    not the objection, which I had made to the testimony of

21    Professor Fagan.

22              THE COURT:  True.  But it sounded like you were

23    picking and choosing.  You objected to one run that he didn't

24    give you a report on.  Then you didn't object to another run

25    probably because you liked it better.

D5d9flo2                          Purtell - direct

1            MS. COOKE:  No, because it was provided.  So there was

2      no -- there was a lack of transparency to the defendants.

3            THE COURT:  There's a problem in the court record.  I

4      don't have the record testimony about that run.  I need both

5      sides.  That's all I'm saying.

6            MS. COOKE:  To the extent that Professor Fagan needs

7      to resume the stand to provide that.

8            But I'm saying the transparency issue, and the notice

9      issue.  We were on notice of this Stata code file for this

10     exhibit so.

11           THE COURT:  I just need to hear both sides of what

12     this run was about.  I've heard the rebuttal side.  But I

13     haven't heard essentially the proffered testimony about the

14     run.

15           Do you understand what I just said, Dr. Fagan?

16           He's telling me what's wrong with it.  I don't know

17     what you did and what you say it means.

18           So you're never done.  You're back on, on that one

19     point.  I need to understand what you did.

20           PROF. FAGAN:  This morning?

21           THE COURT:  Do it now.  Sure he could do it from

22     there.  You've got a good microphone.

23           You know this run he's talking about?

24           PROF. FAGAN:  Yes, I do.

25           THE COURT:  So tell me what you think it is.

D5d9flo2                        Purtell - direct

1            PROF. FAGAN:  In the report from Professors Smith and

2    Purtell they make a point that you should model the zeros

3    separately.  It's a separate process, as they call it.

4            THE COURT:  What does that mean?  You just look at

5    those census tracts that had zero?

6            PROF. FAGAN:  There are different ways to do it.

7            One way would be to simply say:  Can we detect

8    differences between tracts that have zero counts and tracts

9    that have other counts, live counts.

10           It's a little complicated in this case because what

11   was excluded in this model was more than just zero counts.

12           THE COURT:  We all know.  It's zeros, ones, twos and

13   gaps.

14           PROF. FAGAN:  So we weren't able to model -- we could

15   look at the zeros versus the others.

16           So that's one approach, is just simply to say is:  How

17   did the zeros differs from others?

18           THE COURT:  But Ms. Cooke says you did something.  You

19   did a run.  You found something.

20           What did you do?

21           PROF. FAGAN:  In their report they suggest using a

22   hurdled model or a zero inflated model, which is a very

23   specific form of regression that it takes into account when you

24   believe there's a lot of zeros and that the zeros somehow are

25   different than the others.

D5d9flo2                          Purtell - direct

1              So we ran -- I privately ran the model and looked at

2       the results.  And it was part --

3              THE COURT:  When you say you ran the model, what does

4       that mean?  You looked only at zero tracts?

5              PROF. FAGAN:  No.  I actually ran a zero inflated

6       regression model.

7              THE COURT:  What does that mean?

8              PROF. FAGAN:  That means it's a model that has a very

9       specific test built in to ask whether or not the effect of the

10      zeros is different.

11             And it takes into account, in estimating the

12      coefficients for all the other variables, the effects of that

13      separate group of zeros.

14             So it's accounting for those in the way that the model

15      is -- in the way that the coefficients are generated.

16             We looked at that.  And the results are exactly the

17      same.

18             THE COURT:  As what?

19             PROF. FAGAN:  As if we had done the regressions, say

20      for example, in that demonstrative.

21             THE COURT:  The right-hand side?

22             PROF. FAGAN:  The right-hand side.

23             The three racial composition variables remained

24      statistically significant and positive.  Coefficients are

25      roughly about the same size.

D5d9flo2                          Purtell - direct

1          THE COURT:  So you say when you did this run it came

2    out pretty much the same as the results on the right-hand side

3    of Exhibit 573.

4          PROF. FAGAN:  Zero inflated negative binomial

5    regression which included a specific test.  You have to tell

6    the computer what the inflation factor is.

7          And the inflation factor we used was zero, that there

8    were no stops.

9          And even including that parameter in the regression

10   and doing a test that's designed specifically to test for that

11   inflation, we come up with exactly the same results.

12         THE COURT:  And you just said --

13         THE WITNESS:  And we disagree.  The test says you

14   should do that when modeling.

15         And when we looked at the coefficients from the zero

16   inflated model they were smaller -- again, smaller than what

17   he's reported on table five, but he's never reported them here,

18   and I don't remember all the numbers offhand.

19         But the fact is --

20         THE COURT:  So you're saying the coefficient is the B

21   column there.

22         THE WITNESS:  That's right.

23         THE COURT:  So where I see B -- percent black

24   population on the right-hand side of the chart, the coefficient

25   is 1.196.  You said when he ran his zero inflated model it was

D5d9flo2                         Purtell - direct

1   less than --

2            THE WITNESS:  It was much smaller than that.

3            THE COURT:  Much smaller?

4            THE WITNESS:  .663, I think.

5            THE COURT:  Point what?

6            THE WITNESS:  .663, I think, if I remember it

7   correctly.

8            PROF. FAGAN:  I actually don't remember.

9            THE COURT:  I'm at a loss.

10           I mean he said it made no difference and it comes out

11   the same.

12           He says the coefficient is much smaller.

13           If the coefficient is much smaller, then when it's

14   divided by the standard error the Z score --

15           THE WITNESS:  The Z score will change too, your Honor.

16           As with the standard errors.  They all change.

17           So it's going to be statistically significant.

18           THE COURT:  What's going to be statistically --

19           THE WITNESS:  The coefficients were still

20   statistically -- but in a practical sense, they were smaller.

21           MS. COOKE:  If I could ask Professor Fagan when he

22   says the results were the same, in fact, he doesn't mean the

23   same number.

24           THE COURT:  No.

25           MS. COOKE:  He means statistically significant numbers

D5d9flo2                          Purtell - direct

1   but smaller as Professor Purtell is reporting.

2           PROF. FAGAN:  I'm not agreeing that they're smaller.

3   I'm just saying they were still statistically significant.

4           MS. COOKE:  But they weren't the same numbers.

5           THE COURT:  He did say --

6           PROF. FAGAN:  I can't testify.  I don't have the

7   results in front of me.

8           THE COURT:  Okay.

9           But you do say, Professor Purtell, that no matter what

10  they still end up statistically significant?

11          THE WITNESS:  Oh, yeah.  That's because of the

12  enormous size of the sample, your Honor.

13  BY MS. COOKE:

14  Q.  And Professor Purtell and you took the Z scores from

15  Professor --

16  A.  That's in the other --

17  Q.  -- Professor Fagan's revision to table 10, the Z scores

18  here, and reflected them in Defendant's Exhibit N15 --

19          THE COURT:  I saw that.

20          THE WITNESS:  That's correct.

21  Q.  -- which reflects --

22          THE COURT:  He explained all that already.  That I

23  got.

24  Q.  Looking at Plaintiffs' Exhibit 570, Professor Purtell.

25  A.  Yes.

D5d9flo2                          Purtell - direct

1    Q.  Can the impact measures in Professor Fagan's regression

2    analysis be used to reflect large changes in each of the

3    variables that he claims and also then reflects in the

4    demonstrative 571?

5              THE COURT:  I'm sorry.  I found that question

6    confusing.  Could you try it again.

7    Q.  Looking at Plaintiffs' Exhibit 571, there's a large change

8    reflected between the marginal effect of the stop count as the

9    percent race census tract population changes, correct?

10   A.  That's correct.

11   Q.  Do you agree that Professor Fagan can represent those

12   changes using the regression analysis in table 5?

13   A.  No.  My problem is that --

14             MR. HELLERMAN:  Objection.  That mischaracterizes the

15   testimony.

16             MS. COOKE:  It wasn't his testimony.  I'm asking about

17   what the demonstrative reflects, which is a large change in the

18   stop count from 15 above to 27 or eight or whatever this is.

19             THE COURT:  So we can all see that.  And then.

20             MS. COOKE:  Over the rate of percent change in the

21   racial composition.

22             THE COURT:  We can all see 571.

23             Then your question was.

24             MS. COOKE:  Was whether or not Professor Purtell

25   agrees that Professor Fagan can establish this reflected change

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    based on his regressions in table 5.

 2              THE COURT:  His original table 5?

 3              MS. COOKE:  Correct.

 4              MR. HELLERMAN:  That mischaracterizes Professor

 5    Fagan's testimony.

 6              THE COURT:  Doesn't purport to characterize it at all.

 7    It's not characterizing his testimony.  She's just saying can

 8    you get from table five to that.  That's a question.  That's a

 9    fair question.  He can say whatever he wants.

10              MR. HELLERMAN:  So phrased, I have no objection.

11              THE COURT:  Okay.

12              MS. COOKE:  This chart purports to be the effects

13    based on table five.  And I'm asking Professor Purtell if he

14    agrees that you can report those results as a result of table

15    5.

16              THE WITNESS:  I'd agree you can do it mathematically.

17              But in a practical sense, when you go from a census

18    tract with a low Black population to one with a very high Black

19    population, SES factors change, crime levels change,

20    unfortunately, and the other racial make-up of the census tract

21    would change.

22              THE COURT:  What do you mean, other?

23              THE WITNESS:  Well the other races would not be -- if

24    I'm 85 percent Black something must have gotten smaller.

25              And these results are based on population average

D5d9flo2                          Purtell - direct

1   numbers.  So a percentage change in Black would be a percentage

2   change in the Black population across the city proportionately

3   distributed to each of the census tracts.

4          So my short answer is no, you can't do this.  Not and

5   draw any meaning from it.

6   Q.  So looking at Plaintiffs' Exhibit 570, which identifies, in

7   the far left column, percent Black population in tracts, from

8   15, in increments of five or ten up through 85, can the results

9   of Professor Fagan's impact measures for the impact of change

10  in the percent Black population be interpreted for his

11  hypothetical census tracts in this way?

12  A.  Only if you can assume that absolutely nothing happened in

13  terms of the other factors in the model.

14         And, in fact, Professor Fagan's code very specifically

15  fixed all of them at the average value from the regression.

16  So, I don't see how it can happen.

17         In the percent difference column, although I'm not

18  quite sure I understand what he's trying to do, you would have

19  to normalize that.

20         So there would be a 9.2 percent increase in the stops

21  versus the baseline between 15 and 25 percent.  But that's for

22  a ten percent increase in population.  So if I divide that by

23  ten percent --

24         THE COURT:  Not a ten percent increase in

25  population --

D5d9flo2                        Purtell - direct

1              THE WITNESS:  Well, he's got --

2              THE COURT:  I understand.  Ten percent increase in

3    the --

4              THE WITNESS:  -- in the Black percentage.  So that

5    increase is larger than his percentage increase in the stop

6    numbers.

7              He'd have to do something to normalize this.  I'm not

8    quite sure what that is supposed to represent.

9              THE COURT:  Okay.  So you have a problem that it's not

10   ten?

11             THE WITNESS:  I have a problem that he hasn't given me

12   any basis, any denominator for it.

13             So I have to look at that compared to the increase in

14   population.  So a 9.2 percent increase in stops against a

15   10 percent increase in the Black population is the way I would

16   look at it.

17             But this is somewhat misleading to me.  I would never

18   have presented it this way.  I would have normalized it by

19   dividing by the percent of change in the population.  So that I

20   know what the change in the stops is for each percent change in

21   the population.

22   Q.  In your opinion, Professor Purtell, do the analyses in

23   Plaintiffs' Exhibit 570 provide any evidence of practical

24   significance?

25   A.  No, for the reasons I've just stated.

D5d9flo2                          Purtell - direct

1          SES factors and all of the other elements do change

2     with the racial make-up of census tracts.  So you'd have to

3     control for all of those factors at the same time.

4     Q.  In your opinion, is the assumption that nothing else would

5     change as the racial mix of a census tract changed realistic?

6     A.  No.  Professor Smith and I both testified to the fact, and

7     the data supports the claim, the assertion that there is --

8     there are substantial differences.

9     Q.  In your opinion, does the second column, which is titled

10    marginal increase in number of stops, fairly reflect the

11    isolated impact of increases in the percent Black population?

12    A.  Not in any real world sense, no.

13    Q.  Did you do any analysis to test the impact of holding all

14    these other factors equal?

15    A.  We did something that, frankly, I would have expected

16    Professor Fagan to do and report on, which is that we went back

17    to the original data and we looked at those precincts that had

18    between 85 and a hundred percent Black population, and we

19    calculated the average number of stops in those precincts.  And

20    it was 18.8 stops.  So he's claiming --

21          MR. CHARNEY:  Your Honor, I don't believe they've

22    provided --

23          THE COURT:  I was just going to ask you that.

24          Did you get information on this analysis?

25          MS. COOKE:  We were not provided this until the

D5d9flo2                              Purtell - direct

1    exchange at 5:00 on Saturday evening.

2              MR. CHARNEY:  But then --

3              THE COURT:  Right.  I had said nobody can report or

4    testify on material that the other side hasn't seen.

5              That was your first objection, which I sustained, when

6    Professor Fagan was testifying.  You said we have not seen this

7    data and I agreed with you.

8              I can't have this testimony.

9              MS. COOKE:  But it's in response to data that was only

10   provided to us on Saturday.

11             THE COURT:  I had to have a cutoff at some point.  I

12   can't take this testimony.  It's not been seen.  It's not been

13   reviewed.  This was the whole point.  So it's -- so all -- he's

14   permitted to rebut what he saw.  Remember I said he gets the

15   last word and there has to be an end.  This would be new.  Then

16   they'd have to look at it.  Then Dr. Fagan could come back.

17             MS. COOKE:  Your Honor, to the extent --

18             THE COURT:  I can't do this forever.

19             MS. COOKE:  To the extent that what Professor Purtell

20   is testifying to is the actual number of stops in the data

21   that's the actual data that Professor Fagan has been provided

22   for the census tracts, he's just merely reporting the data of

23   the actual number of stops of the 85 percent Black tract versus

24   the prediction.  He's comparing the actual data, which

25   Professor Fagan has long been in possession of, and he's

D5d9flo2                          Purtell - direct

1    reporting the difference as to whether or not the prediction is

2    or isn't consistent.

3          MR. CHARNEY:  Your Honor, he's doing a comparison that

4    we don't have any ability -- we haven't had the chance to

5    verify because this is the first time we're hearing about this

6    comparison.  So I think back to your Honor's --

7          MS. COOKE:  And in fact I asked --

8          THE COURT:  He is speaking.

9          MR. CHARNEY:  And as your Honor said already today and

10   last week, there had to be a cutoff of when new analyses would

11   have to be disclosed to the other side.  And this is a new

12   analysis.  It's a new comparison that was done sometime between

13   5:00 on Saturday.

14         THE COURT:  She's trying to say when she receives the

15   chart from you at 5:00 and there's information already in the

16   record that would be -- that could be used to rebut what you

17   produced at 5:00, what's she to do?

18         Now the only thing I can think of is not introduce it

19   at 11:30 today but send it over Sunday with a letter saying

20   this is simple math, these were statistics you've had all

21   along, all we did was look at the actual figures which show the

22   increase or decrease in stops, and here it is, so you won't see

23   it at 11:30 Monday for the first time, even though I understand

24   it's after the 5:00 hard stop, but it would have given you some

25   notice.  This creates a problem when you walk in the door with

D5d9flo2                          Purtell - direct

1   something like this at 11:30.

2              I understand your point.  It's based on data they've

3   had for years.  But he did the math for the first time, and

4   they need to now check the math and assess the accuracy.

5              MS. COOKE:  I did ask Professor Fagan if he was aware

6   if his predictions were --

7              THE COURT:  You did ask that today, yes.

8              MS. COOKE:  And he reported that they were.

9              THE COURT:  I don't remember that answer.

10             MR. CHARNEY:  He said they were similar and there was

11  a jump in regard to the 80 to 85.

12             THE COURT:  He said it was flatter, then it took off.

13  He did say that.

14             MS. COOKE:  I submit that the information is known to

15  Professor Fagan.  He's familiar with the data.  He's been

16  analyzing the data and producing reports on it for years.  He

17  was been analyzing in the geographic area of census tracts, the

18  number of stops in census tracts, the percent Black --

19             THE COURT:  I get it.

20             What are you asking him?

21             MS. COOKE:  I'm asking him whether or not these

22  predictions are consistent with what actually happened

23  according to the actual data.

24             THE COURT:  For how many census tracts?  For what

25  census tracts?

D5d9flo2                          Purtell - direct

1              MS. COOKE:  For the ones that --

2              THE COURT:  These are hypothetical.

3              MS. COOKE:  But these are census tracts with

4      hypothetical.

5              THE COURT:  I know.  But don't you see now we'd have

6      to know which census tracts he did this math on.  They'd have

7      to have the opportunity to go back and look at those census

8      tracts, doublecheck the data.

9              It's creating a continuing dialogue that will just not

10     end.

11             You want to do it, I'll tell you what I'm going to do,

12     I'm going to let them check all the data and rebut it.  I've

13     got to know which census tracts he looked at.

14             How many did you look at?

15             THE WITNESS:  I didn't count them.  Every census tract

16     with 85 percent or more in Black population.

17             THE COURT:  How many was that?

18             THE WITNESS:  I just don't remember.

19             THE COURT:  Twenty, 30, 40, a hundred?

20             I mean I've got to have -- we've got to have data.  It

21     has to be checked.  It's otherwise not fair.

22             I'm willing to let you do it, but we're never going to

23     end.  Then they get to look at those 40 or 50 or a hundred

24     tracts, do the math also, decide whether they were selected

25     appropriately.

D5d9flo2                          Purtell - direct

```
 1              It's new.  I can't help but tell you it's new.

 2     Because I don't know which tracts he selected.  I don't know

 3     their percent populations.  You know, I don't even know if he

 4     can tell us which tracts he selected.

 5              MS. COOKE:  That's my point, your Honor.  It was not

 6     to provide point by point, you know, some data or analysis but

 7     an understanding --

 8              THE COURT:  But it is.  You want him to testify to his

 9     conclusion based on the review of the actual stops in those

10     tracts on a comparative basis, I guess, over time.

11              THE WITNESS:  Over the entire time period, your Honor.

12     Which is what these numbers are.  These are population

13     averages.

14              THE COURT:  Well, yes.  But they're averages.  And

15     these are hypothetical tracts.  You looked at actual.  That's

16     her point.  You moved away from hypothetical to actual.

17     Nothing wrong with that.

18              THE WITNESS:  They should line up, yes.

19              THE COURT:  Nothing wrong with it.  Except they need

20     an opportunity to check what you did.  And you're telling them

21     now for the first time what you did, which tracts you used.  I

22     don't even know if he can find the data back in the office,

23     back in Albany.

24              THE WITNESS:  We have Stata code for it.

25              THE COURT:  You have?
```

D5d9flo2                          Purtell - direct

1           THE WITNESS:  We have code to do the calculation.

2           THE COURT:  You said Stata?

3           THE WITNESS:  That's the statistical package we're all

4    using.

5           THE COURT:  I know.

6           That's the problem.

7           MS. COOKE:  Your Honor, my --

8           MR. CHARNEY:  Can I just also correct the record, that

9    this chart to which they are responding to.

10          THE COURT:  The one on the board?

11          MR. CHARNEY:  This, which the testimony which

12   Professor Purtell was about to give.  This was actually

13   disclosed to the defendants on Wednesday.  So for them to say

14   we didn't get it until Saturday at 5:00 we didn't have time to

15   give you something.

16          MS. COOKE:  In fact, your Honor, there were charts --

17          THE COURT:  One at time.

18          MS. COOKE:  -- that were provided on Wednesday in

19   anticipation.  Some of which weren't used.  And some of which

20   were added.  So it was not until Saturday at 4:50 that the

21   final identification of exhibits that the plaintiffs intended

22   to use were --

23          THE COURT:  Now it seems true that you had this chart

24   since Wednesday.  You must have asked your expert to now take

25   the hypothetical and compare it to the actual --

D5d9flo2                         Purtell - direct

 1                 MS. COOKE:  Your Honor, I represent to the Court --
 2                 THE COURT:  Do you want me to ask him?  I'm going to
 3       do it under oath.
 4                 So when did you do this run of the real census tracts
 5       where you isolated those of whatever 80 or 85 and you ran an
 6       analysis with this program, this Stata program, when did you --
 7                 THE WITNESS:  We ran them late Saturday because the
 8       total number --
 9                 THE COURT:  When were you asked to do it?
10                 THE WITNESS:  We weren't asked to do it.
11                 We did it because that's the standard part of
12       analysis, your Honor.
13                 THE COURT:  Nobody asked you to do it?
14                 THE WITNESS:  No.  It's -- when we saw these
15       numbers --
16                 THE COURT:  When did you see them?
17                 THE WITNESS:  I first saw them because of my schedule
18       late Saturday evening.
19                 THE COURT:  And then you ran it Saturday evening?
20                 THE WITNESS:  Yes.  We ran them Saturday evening.
21       It's a very simple analysis.
22                 THE COURT:  I understand.  But once we know what
23       census tracts.
24                 THE WITNESS:  We ran them in response to another of
25       his exhibits which claim that for a census tract with -- a

D5d9flo2                          Purtell - direct

1     graph, a census tract with 85 percent Black, the total number

2     of stops would be in excess of one hundred.  And that just

3     seemed -- that's the -- I'm sure we can put that one up.

4             MS. COOKE:  This one or the other one?

5             THE WITNESS:  No.  It's the other one.  The other

6     graph.

7             THE COURT:  Exhibit 572.

8             MS. COOKE:  And this was only provided on Saturday at

9     4:50.

10            THE WITNESS:  This didn't make sense to us.  We just

11    didn't recall seeing any census tract with that count of stops

12    in a single month.  So it immediately triggered -- our response

13    was to see whether or not this made sense.

14            So we had -- you know, the other marginal number

15    originally came to us with a title saying that that was, in

16    fact, the total stops.  And that was changed in the last

17    submission.

18            So, to suddenly go from what we thought were total

19    stops at 23.96 for 85 percent Black to a hundred, over a

20    hundred, that really triggered a thought process for us.  These

21    numbers just don't make sense, given what we know about the

22    data.

23            THE COURT:  All right.  We'll take our afternoon --

24    I'm sorry, our morning recess now and reconvene at five of

25    twelve.

D5d9flo2                        Purtell - direct

1            (Recess)

2            THE COURT:  Please be seated.

3            I need to wait until Mr. Hellerman and Dr. Fagan come

4     back.

5            I thought about this issue over the break.  And in an

6     effort to resolve it without more discovery, more testing, and

7     more testimony, I'm going to ask your indulgence while I ask

8     Dr. Fagan a few questions from there and that may resolve the

9     problem.

10           Dr. Fagan, what you were doing in the chart on the

11    screen, 572, was a sort of statistical projection based solely

12    on change in percentage of population that is minority, right?

13           PROF. FAGAN:  Yes.

14           THE COURT:  So, does it or doesn't it matter to you

15    what the actual figures show for the actual number of stops in

16    various census tracts of various population percentage

17    minority?  Does that interest you in terms of the projection

18    you were doing that was a statistical projection?  Is it

19    important to know what the actual numbers are?

20           PROF. FAGAN:  Yes, your Honor.

21           THE COURT:  It is important?

22           PROF. FAGAN:  Yes.  You want to be able to look at the

23    projected values, the predicted values.  These are the

24    predicted values versus the actual values.

25           THE COURT:  You do want to know that?

D5d9flo2                    Purtell - direct

1          PROF. FAGAN:  Yes.

2          And I did not show the actual values.  But as I think

3    I mentioned when I was testifying, the actual values are --

4          THE COURT:  No.  I remember the sort of -- little

5    flatter.

6          PROF. FAGAN:  They go up very slightly, and then all

7    of sudden they shoot up right around 50 to 55 to 75 percent.

8    Then they actually dip down a bit, when you get to the higher

9    percentage populations.

10          THE COURT:  The actual figures?

11          PROF. FAGAN:  Yeah, the actual figures.

12          THE COURT:  When Dr. Purtell just testified when he

13    saw the numbers approaching 120 stops, he knew that was way off

14    the actuals because he never heard of such a high number.  He

15    thought earlier you said something about 23.  And this is

16    enormously different from that.

17          So does that concern you if the projection is so

18    different from actual -- assuming he's correct.  I know you

19    haven't had a chance to check the tracts he used, but assuming

20    he's correct, would that concern you if that projection looks

21    so different than the actual?  Because there is no census tract

22    that actually had 120, for example.

23          PROF. FAGAN:  There are a couple that do have 120.

24    They are very high stop rates.

25          Putting that aside, I wanted to make this point based

D5d9flo2                              Purtell - direct

1    on extrapolating -- I probably should have shown the actual

2    versus the predicted.  That probably would have been helpful.

3          But because they were -- they followed roughly the

4    same shape and distribution, I thought that showing a very

5    simple chart which was based on a simple calculation would make

6    the point fairly clearly.

7          THE COURT:  But you didn't answer my question.

8          PROF. FAGAN:  I'm sorry.  Go ahead.

9          THE COURT:  That was fine.  But you didn't answer my

10   question.

11         What I said was what caught his attention, we just

12   heard, was that, for example, the blue line on this chart went

13   as high as 120.  And, in fact, that's Hispanic, not Black.  And

14   he said that caught his attention because there is no such real

15   tract in real life.  And it was way higher than numbers you had

16   talked about, which he said something about 23 was the more

17   likely number.  And that's an enormous difference.

18         Then I said does that concern you?

19         PROF. FAGAN:  It concerns me in the sense that, yes,

20   it would be nice if the fit of the predicted to the actual was

21   closer at that one end of the distribution.  It's fairly close

22   before you get to that -- other than at the extreme end.

23         Second, I suppose it's a situation where you really

24   can't have it both ways.  On the one hand, you want to be able

25   to show what your statistical prediction would be given the

D5d9flo2                        Purtell - direct

1   simultaneous effect of all other variables.

2           On the other, we can make a descriptive chart that

3   simply says well given the population of this chart in this

4   tract and this tract and this tract, it looks a little bit

5   different.  But that wouldn't have any of the kinds of

6   statistical controls built into it.

7           So I thought because we were trying to make a

8   point about simultaneously controlling for all the variables,

9   this is what you get after you introduce those controls.  So

10  this is the statistical prediction.  And, you know, again --

11          THE COURT:  That's why I'm asking you the relationship

12  between the statistical prediction and actual real world

13  events.

14          PROF. FAGAN:  Up to about 80 percent, it's pretty

15  close.  But again the shape of the curve is a little bit

16  different.  At the low end, it goes up gradually instead of

17  that way.  And at the higher end, it actually spikes up petty

18  high when you get to 65, 75.

19          THE COURT:  Which one spikes up?

20          PROF. FAGAN:  The actual stop rate.

21          THE COURT:  And then you said it dips a little?

22          PROF. FAGAN:  Dips down a little bit after 85 percent.

23          THE COURT:  So I guess the final question is:  So, do

24  you see much of a disconnect between the actual stop per census

25  tract when you look at population in those tracts and your

D5d9flo2                          Purtell - direct

1   statistical projection?

2          PROF. FAGAN:  Up to 80 percent, no.

3          THE COURT:  Then you see a disconnect?

4          PROF. FAGAN:  After 80 percent, yeah, because then

5   you're dealing with a small number of cases which are what we

6   call outliers.  And that's the tail wagging the dog.

7          THE COURT:  I'm going to leave it at that then and not

8   require any further production on which tracts he looked at and

9   everything else because I understand what I think the rebuttal

10  would have been had he seen the work that was done.  So with

11  that you can continue your examination.

12         MS. COOKE:  I actually have no further questions.

13         THE COURT:  Then we're up to Mr. Hellerman.

14         MR. CHARNEY:  It's going to be me, another voice for

15  you to hear today.

16  CROSS-EXAMINATION

17  BY MR. CHARNEY:

18  Q.  Good morning, Professor Purtell.

19  A.  Good afternoon.

20  Q.  It is afternoon.  You're right.

21         THE COURT:  There we can agree.

22         THE WITNESS:  We finally agree.

23         THE COURT:  No.  I agree with a lot of things.

24         THE WITNESS:  No.  I'm talking about us.

25         THE COURT:  I'm teasing.  Okay.

D5d9flo2                        Purtell - cross

1   Q.  I want to go back to, this is Plaintiffs' Exhibit 574.

2   It's the revised table 10 from your report which now includes

3   the standard errors.

4          THE COURT:  Let's call it Dr. Fagan's revised report.

5   Q.  Dr. Fagan's revised version of your table 10.

6          THE COURT:  Right.

7   Q.  First question is, is you testified that the difference in

8   the Z scores, you said, were not meaningful, right?  There are

9   differences, but they're not meaningful?

10  A.  They wouldn't cause an analyst to look at one as more

11  significant than the other in a practical sense.

12         THE COURT:  N14, is that the number, shows it that.

13         MS. COOKE:  15.

14         THE COURT:  15 showed us that.

15         THE WITNESS:  Yes.  That's correct.

16  Q.  But you would agree though that, in fact -- first of all,

17  the Z score measures the strength of association between the

18  predicter variable and the outcome variable, right?

19  A.  Conditioned on all other variables in the model in the

20  covariant structure, correct.

21  Q.  Given that we agree on what the Z score measures, it is

22  true though that these Z scores do tell us that whether or not

23  you think the difference is meaningful, the percent Black

24  population has a stronger association to stops than does Black

25  suspects, right?

D5d9flo2                          Purtell - cross

1   A.  Well I don't think you can rule out the fact that they're

2   all at essentially the same statistical level of significance.

3   Q.  My question was the strength of association.

4   A.  I would agree that the Z scores are different.

5   Q.  And that the strength of the association between percent

6   Black and stops is higher than the strength of association

7   between Black suspects and stops?  Whether or not you think

8   that difference is meaningful, it is -- I'm not asking --

9            THE COURT:  If you're only asking him whether 15 is

10  higher than 13, he has to say yes.

11           THE WITNESS:  I have to agree.  And I agree that 15 is

12  higher than 3 too.

13           THE COURT:  But you think it's absolutely meaningless

14  from the statistical perspective you showed us.

15           THE WITNESS:  Yes.  From a practical perspective

16  they're all the same.

17  Q.  But isn't it true that in your report, Exhibit H13, you and

18  Professor Purtell state that the suspect race is more strongly

19  correlated with stops than is the percent Black population?

20  A.  I'm not sure.

21           MR. CHARNEY:  If you want I can --

22           THE COURT:  It would be helpful.

23           MR. CHARNEY:  It's page 71.

24           THE COURT:  I was right there.  71.  You have it in

25  front of you.

D5d9flo2                     Purtell - cross

1            THE WITNESS:  I'll see on it the screen.

2    Q.  So looking here, the last paragraph -- and you're speaking

3    about your scatter plots.  But don't you say that, "The scatter

4    plot of the stops by race plots are much more dispersed,

5    showing the machine weaker correlation than relationship

6    between racial pattern in stops and racial patterns in the

7    suspects."

8            So isn't that what you said?

9    A.  It's a radically different concept.

10           This is within a simple correlation analysis, a simple

11   scatter plot, not conditioned on everything else.  There is no

12   Z score.  It's -- it's apples and pineapples.

13   Q.  But wouldn't you agree that in order to really figure out

14   the statistical relationship between, for example, percent

15   Black and stops, the more variables you control for, the

16   better, right?

17   A.  Not necessarily.  Just the sheer inclusion of more

18   variables tends to make things look more significant.

19   Q.  But you would agree that looking at the correlation when

20   you're controlling for crime, for example, to look at the

21   correlation between percent Black and stops, controlling for

22   crime is a more accurate measure of the correlation than if

23   just looked at percent Black and stops with no other controls,

24   right?

25   A.  We talked up front about the need to generate a model that

D5d9flo2                          Purtell - cross

1    accurately reflected the real world.  And we've made any number

2    of comments about why we don't believe Professor Fagan's models

3    do that.

4    Q.  That's not my question.

5    A.  Sure.

6            What you just showed is called preliminary data

7    analysis.  It's what you do before you run the analysis.

8    Q.  I understand.

9            But you would agree, and I think you've already

10   testified to this, that after you run an analysis where you do

11   control for these other factors, the strength of association is

12   actually higher for the percent Black than it is for Black

13   suspects, right?

14   A.  But not in any meaningful way.

15   Q.  But it is higher, right?

16   A.  Yes.  I believe the number 15 is larger than the number 13.

17   Q.  It's higher when you actually control for some of those

18   other important variables, right?

19   A.  It's higher in the model as structured by Professor Fagan.

20   The number 15 is higher than the number 13.

21   Q.  And that model does control for other variables that could

22   affect stops, right?

23   A.  It controls for some of the other variables which we would

24   argue are improperly specified and improperly measured.

25           We argue that the patrol strength measure is

D5d9flo2                         Purtell - cross

1  endogenous making all of those measures meaningless.

2  Q.  And your scatter plot, which is also trying to show

3  correlation, doesn't control for anything, right?

4  A.  No.  It's a preliminary data analysis.

5        It's an attempt to see what we should put in the model

6  before we run it.

7  Q.  But the answer is it doesn't control for anything, right?

8  A.  Nor does it portend to.

9  Q.  Now, the other testimony you gave on direct was that this

10  is again Professor Fagan's revised table 10 from your report.

11        And I think it was your testimony that, for example,

12  the coefficient for percent Black which here is .726, right --

13  I'm sorry .7626, was lower than the coefficient for percent

14  Black in Professor Fagan's table five.

15  A.  Yeah.  According to my recollection that was .883.

16  Q.  And it's your testimony that because the coefficient was

17  smaller that tells you that the practical significance of

18  percent Black was lower?

19  A.  Yes.  I mean that's pretty standard theory in every

20  statistical textbook you can ever possibly read.  It's the

21  coefficient that talks about practical significance.

22        And, again, there are necessary and sufficient

23  conditions.  It is a necessary condition that they be

24  statistically significant.  But in a practical sense it's

25  meaningless unless you look at the size of the coefficient and

D5d9flo2                         Purtell - cross

1   it's likely impact on the outcome variable.

2   Q.  So it's your testimony that you can determine the magnitude

3   of practical significance solely by looking at a regression

4   coefficient in a statistical test?

5   A.  Assuming the regression coefficients are statistically

6   significant, the answer is that is the factor you look at.

7   Q.  In other words, the only thing you need to determine is

8   whether or not the coefficient goes up or down?  That will tell

9   you whether a practical --

10  A.  No.  I need the order of magnitude and I need to be able to

11  do some additional analysis.

12          THE COURT:  So that's what I was going to ask you.  If

13  it went from .83 to .76 what do I make of that?

14          THE WITNESS:  Well it means that that is -- is likely

15  to have less of an impact on stops for .7626 than for .883.

16          And as we've testified, your Honor, they're all

17  incredibly small results that are supported by the sheer size

18  of the sample.  So every test we run, every issue we've looked

19  at has made that coefficient smaller.

20  Q.  But my question is, is the decrease from .883 to .7626, is

21  that decrease meaningful with respect to practical

22  significance?

23          THE COURT:  That would be my question.

24          THE WITNESS:  Yes.

25          THE COURT:  You say it is?

D5d9flo2                          Purtell - cross

1              THE WITNESS:  It is, yes.

2              THE COURT:  How do you know that?

3              THE WITNESS:  Well because a smaller number says that

4    the -- for a one percent increase in the Black population, the

5    log odds ratio or the numbers of stops, depending upon how you

6    work with the data, the relative number of stops will get lower

7    until finally you're at zero.  Remember if that value was zero,

8    there is no impact on stops.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D5D8FLO3                          Purtell - cross

1          THE COURT:  So all you're really saying is .88 is

2     larger than .76.  You're not saying really that .76 is

3     meaningless.

4          THE WITNESS:  No.  I am saying it's smaller.

5          THE COURT:  Earlier you said 15 is more than 13, but

6     it had no meaning.  Now you're saying .88 is larger than point

7     .76, but point .76 still has meaning.

8          THE WITNESS:  It still has meaning, but this model

9     says that the impact of the change in the black population is

10    not as great as the other model said.

11         THE COURT:  I understand.  It may still be of

12    significance.

13         THE WITNESS:  It is statistically significant, but as

14    we argue, we don't think it is practically significant.

15    Q.  My question is, is that decrease, as her Honor asked, is

16    that meaningful?  You also testified that the difference

17    between 15 and 13 was not meaningful.  But your testimony is

18    the difference between .883 and point .7626 is meaningful?

19    A.  Yes.

20    Q.  And you can determine that solely by looking at those

21    numbers?

22         THE COURT:  Now we are getting lost in what is

23    meaningful.  We are into semantics.  He did also say, you can

24    correct me, that .76 is statistically significant.  It's just

25    less significant than .88 was.

D5D8FLO3                        Purtell - cross

1            THE WITNESS:  It has less of an impact.

2            THE COURT:  But it still has an impact.  It's not

3    zero?

4            THE WITNESS:  I agree.

5            MR. CHARNEY:  But what I am trying to focus on is the

6    testimony about practical significance.

7            THE COURT:  He doesn't think it has practical

8    significance.

9            THE WITNESS:  I don't believe it has practical.  I

10   don't believe either coefficient has practical significance.

11           THE COURT:  Either .88 or .76.

12   Q.  I am trying to understand, is it your testimony that the

13   practical significance of .7626 is lower in a meaningful way

14   than the practical significance that .88 is?

15           THE COURT:  The answer has to be no because you don't

16   think either has practical significance.

17           THE WITNESS:  I believe either.  But if they did --

18           THE COURT:  Why bother?

19           THE WITNESS:  I don't believe either one has any

20   practical significance.

21           THE COURT:  That's the answer.  To me, that's my

22   takeaway.  He doesn't believe either has practical

23   significance.  So to say one has less practical significance is

24   not really fair if he thinks neither has practical

25   significance.

D5D8FLO3                        Purtell - cross

1    Q.  Your basis for your opinion that neither has practical

2    significance is the analysis that you testified about last week

3    where you ended up with the 50.22 percent?

4    A.  That's correct.

5    Q.  There is no other basis for that opinion, right?

6    A.  No.  I don't need one.

7             THE COURT:  That's the one that satisfied you.  There

8    is no practical significance.

9             THE WITNESS:  Based on our analysis, your Honor.

10            THE COURT:  Right.

11   Q.  Now, with respect to, I guess it's the zero count issue, we

12   can look real quick at -- actually, I don't think I need a

13   table for this.

14            Your testimony was that the coding which Professor

15   Fagan provided to you which had the results of the -- I think

16   you called it a Vuong test?

17   A.  Vuong test.

18   Q.  That told you that in fact the zeros were significant,

19   right?

20   A.  It told us that the zeros needed to be controlled for and

21   modeled separately.

22   Q.  And you're also aware, based on the coding that you

23   received, that in fact Professor Fagan did run a zero inflated

24   negative binomial regression?

25   A.  He tested that against the one without it and his results

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D5D8FLO3                          Purtell - cross

1   said he should have used the zero inflated model.

2   Q.  But the results of the zero inflated model that he did give

3   you the coding for, don't those results also show that again

4   the results for percent black, percent Hispanic are

5   statistically significant?

6   A.  Again, I thought you couldn't enter this into evidence.  If

7   I can't testify -- the answer was that they are still

8   significant, but they are even smaller.

9   Q.  Do you have any sense of how much smaller?

10  A.  I can't remember the exact coefficients because we don't

11  have a chart on it and it wasn't entered into evidence.

12  Q.  I understand.  But again, you remember that we are not the

13  ones objecting to this stuff.

14  A.  I think it was something like .66, or something like that,

15  versus .762 versus .883.  They are all -- they are just getting

16  smaller and smaller.

17  Q.  But, again, you can't testify -- when it comes to whether

18  the difference is meaningful or not, you don't have any basis

19  to say --

20          MS. COOKE:  Objection to the term meaningful.  I think

21  we are talking statistical significance and practical.

22          MR. CHARNEY:  The witness used meaningful when we

23  talked about the 1.5 and 1.3.  So I am simply using his

24  language.

25          THE COURT:  I will allow it.

D5D8FLO3                         Purtell - cross

1   A.  I don't believe any of his coefficients have practical

2   significance.  I don't know how many times we are going to go

3   over this.

4   Q.  Isn't it also correct that you believe -- one of your

5   opinions is that, when you make these changes to the model, the

6   results change in a meaningful way, right?

7   A.  They get smaller and smaller.

8   Q.  But your opinion is that because there are changes, it

9   means that the models are not -- I think the term you used is

10  robust to changing things, right?

11  A.  That's correct.

12  Q.  But in order for that opinion -- the basis for that opinion

13  would have to be based on the fact that the differences are

14  meaningful, right?

15  A.  No.

16  Q.  In other words, small changes, when you change things about

17  the model, are not necessarily going to mean that the models

18  are not robust, right?

19  A.  That's not necessarily true.  Remember, we are looking at

20  very small effects to start out with, small changes and small

21  effects are meaningful.

22          MR. CHARNEY:  One moment, your Honor.

23          (Pause)

24  Q.  Last couple of questions.

25          So with respect to, this is Plaintiffs' Exhibit 570

D5D8FLO3                          Purtell - cross

1  and the analysis Professor Fagan did, the marginal effects

2  analysis, and your testimony about how his model is assuming

3  that some of the other predictor variables, like SES factor and

4  crime, are remaining constant when you increase the percent

5  black population.  Do you remember that?

6  A.  That's exactly what his code specifies.

7  Q.  Are you familiar with the concept of exchangeability?

8  A.  Yes.

9  Q.  Are you aware that his model uses exchangeability to in

10  fact control for the fact that there are going to be changes in

11  SES, in crime, when you move from a 15 percent black census

12  tract to, for example, a 50 percent black census tract?

13  A.  Yes.  It's not a perfect -- in fact, it's not even a

14  reasonable correction.  I would never use it.

15  Q.  Have you ever done a marginal effects analysis in a

16  situation where you're using census tracts and racial

17  demographics and crime and anything like that?

18  A.  I have done marginal analyses in a number of contexts, but

19  not in this context.

20            MR. CHARNEY:  No further questions, your Honor.

21            MS. COOKE:  No further questions, your Honor.

22            THE COURT:  You're free to go.

23            MS. COOKE:  One or two housekeeping issues on the

24  point of experts.  I have copies that I have labeled V14-A

25  through D, which are the charts of the tallies of the number of

D5D8FLO3

1    frisks and searches that we spoke about last week.  We e-mailed
2    to your clerk in response to your question about the counts of
3    the number of frisks in the data and the number of searches in
4    the data.
5                THE COURT:  Yes, I think I remember.
6                MS. COOKE:  It's reflected in Professor Fagan's
7    cross-examination and you wanted a precise accurate number.
8                I applied an exhibit sticker to them.  So I would move
9    V14-A through and D into evidence.
10               THE COURT:  V14-A through D received.
11               (Defendants' Exhibits V14-A through V14-D received in
12   evidence)
13               MR. HELLERMAN:  Subject to them being the same things
14   that they sent us last week.
15               THE COURT:  He said they are so they are.
16               On another note, Judge Keenan has overruled Judge
17   Pitman and has said that the Walker report comes in, and I
18   guess the testimony.
19               MS. COOKE:  The Stewart report.
20               THE COURT:  Stewart report.  He said in part, but I
21   don't see the in part.  I think it's just we have him for
22   planning purposes.
23               MS. COOKE:  One more housekeeping matter.  With
24   respect to Professor Purtell's prior testimony, we had moved to
25   admit him as an expert.  Mr. Charney had objected.

D5D8FLO3

1          THE COURT:  Obviously, I have accepted him as an

2     expert.

3          MS. COOKE:  I am just confirming that for the record.

4          THE COURT:  So the next witness?

5          MS. GROSSMAN:  I have two housekeeping matters to

6     raise.  One has to do with the OCD reports that Inspector Lehr

7     testified to a week or two ago.  The defendants provided the

8     plaintiffs with the OCD complaints, at the Court's direction,

9     and we now want to recall Inspector Lehr just to authenticate

10    and admit those documents into evidence.

11         THE COURT:  I don't know that that needs to be done.

12    If the plaintiffs stipulate to their admissibility, why do I

13    have to hear this?

14         MS. GROSSMAN:  That's true.  If the plaintiffs

15    stipulate.

16         THE COURT:  You will find out at the luncheon recess.

17         What is the other point?

18         MS. GROSSMAN:  The other item is way back when

19    Professor Silverman testified.  We attempted to admit a

20    demonstrative exhibit which set out the retirees from the

21    police department, and we have produced the document that sets

22    out the retirees since the time that, I think back in the -- I

23    don't know, 1940s to present.  It's laid out in a chart.  And

24    we want to admit that as well, but we would like to have

25    plaintiffs consent rather than have a witness come in and

D5D8FLO3

1    authenticate.

2              THE COURT:  I don't know that it's an authentication

3    issue.  It may be a relevance issue.  Who cares about 1940?

4              MS. GROSSMAN:  It's actually --

5              MR. CHARNEY:  It's a relevancy issue.

6              THE COURT:  You will have to talk to your adversary.

7              MR. CHARNEY:  We object.

8              THE COURT:  In full?

9              MR. CHARNEY:  We object in full because your Honor has

10   already ruled on this as irrelevant.  There was an authenticity

11   issue, but you said separate and apart from verifying the

12   accuracy, it's irrelevant because Professor Silverman, the pool

13   from which he drew his sample was active retirees, and they are

14   trying to essentially compare apples and oranges.

15             THE COURT:  What is active?

16             MR. CHARNEY:  An active retiree is there is a database

17   where people register basically saying, if you have an

18   emergency, you can call me.

19             THE COURT:  I vaguely recollect the difference.

20             MR. CHARNEY:  That's what his survey, the pool was

21   drawn from.  They are trying to say you should look at all

22   retirees, and you have already ruled, and I can cite the

23   transcript.

24             THE COURT:  I will wait until you cite the transcript.

25   So I am reserving.

D5D8FLO3

```
 1              Now can we have the next witness, Ms. Cooke?

 2              MS. COOKE:  The city calls Deputy Inspector

 3    Christopher McCormack.

 4              MR. MOORE:  The city has decided not to call Catalina.

 5    He was actually the next person on the list.

 6              MS. GROSSMAN:  We are in the process of designating.

 7    He testified in the Ligon proceeding.

 8              MR. CHARNEY:  We were notified he wasn't going to

 9    testify, but they never told us they were going to designate.

10              THE COURT:  Now they are telling you they are going to

11    designate.

12              MR. CHARNEY:  I will go back and look.  I don't know

13    if any of his testimony was relevant.

14              THE COURT:  When they designate, you will look.  There

15    is plenty of time to object after you look.

16     CHRISTOPHER J. McCORMACK,

17         called as a witness by the defendants,

18         having been duly sworn, testified as follows:

19              THE COURT:  State your full name, first and last,

20    spelling both for the record.

21              THE WITNESS:  Deputy Inspector Christopher J.

22    McCormack, M-C-C-O-R-M-A-C-K.  My command is the 40th Precinct.

23    DIRECT EXAMINATION

24    BY MS. COOKE:

25    Q.  Good afternoon, Deputy Inspector McCormack.
```

D5D8FLO3                          McCormack - direct

1          Describe your educational background for the Court,

2     please.

3     A.   I have a graduate from New York State SUNY college, and I

4     have master's from Seton Hall University in human resources,

5     and I have a business certificate from Columbia University.

6     Q.   When were you first employed by the NYPD?

7     A.   July 5, 1989.

8     Q.   You're presently the commanding officer of the 40th

9     Precinct?

10    A.   Yes, ma'am.

11    Q.   Where is the 40th Precinct located?

12    A.   Mott Haven section of the Bronx.

13    Q.   Could you please briefly describe the assignments you have

14    held in the NYPD since graduating from the police academy?

15    A.   Yes.  There's numerous assignments.  I started off in the

16    Bronx in training at FTU 9.

17          I was transferred to the 34th Precinct in Manhattan,

18    from 1990 to 1996.

19          I was transferred to the warrant division from '96 to

20    2000.  I was promoted to sergeant -- I'm sorry, from 1996 to

21    2000 I was a detective.

22          From 2000, I was promoted to sergeant and transferred

23    to the 25th Precinct.

24          In 2002, I was transferred to the 44 Precinct to be a

25    conditions sergeant there.

D5D8FLO3                          McCormack - direct

1              In 2004, I was transferred to the 47 detective squad.

2       In 2005, I was assigned to Bronx homicide task force as a

3       sergeant.

4              August of 2005, I was promoted to a lieutenant and

5       transferred to the 43, special operations lieutenant.

6              In 2006, I was transferred to Bronx narcotics to

7       become the 46 module lieutenant.

8              In 2008, September of 2008, I was promoted to captain

9       and transferred back to Manhattan, where I was the executive

10      officer of the 30th Precinct.

11             Sometime early in 2009, I was transferred to be the

12      commanding officer of Patrol Borough Manhattan North impact

13      response team.

14             May 5, 2010, I was transferred to be the commanding

15      officer of the 20th Precinct.

16             And I believe on September 27, 2011, I was promoted

17      and then transferred to the 40th Precinct.

18      Q.   That promotion was to the title of deputy inspector?

19      A.   I was promoted to deputy inspector in September of 2011.

20      Q.   What did you think about becoming the commanding officer of

21      the 40th Precinct in the Bronx in 2011?

22      A.   I was very excited to get back to the Bronx, being born and

23      raised in the Bronx, going to school in the Bronx, my family is

24      still in the Bronx.  I spent 38 years of my life in the Bronx.

25      I was very excited about going back to the Bronx and assisting

D5D8FLO3                          McCormack – direct

1    them in getting back to where it should be with no violence.

2    Q.  When you arrived at the 40th Precinct in late 2011, what

3    did you do to familiarize yourself with the crime conditions

4    affecting that precinct?

5    A.  I first sat down with my supervisors that were still left

6    in the command to discuss what they thought was going on in the

7    command.  I sat down with some of the community activists in my

8    precinct just to find out what's going on.  Community council,

9    I sat down with them, community board, to find out what their

10   concerns were.  And then I formulated a plan.

11   Q.  Did you make any assessments of crime conditions in the

12   40th Precinct after you arrived?

13   A.  Yes.  It was an extremely violent location and crime was on

14   the rise there.

15   Q.  Did you develop a strategy to begin addressing crime

16   conditions that you observed in the 40th Precinct?

17   A.  Yes.  My first week there I sat down and had put together a

18   monthly meeting of my -- I call it the 40 crime strategy

19   meeting, where I had the detective squad present, Bronx

20   narcotics, Bronx gang, my field intelligence officer there,

21   patrol borough commander, the executive officer, just to sit

22   there and discuss what they felt would be the right direction

23   of where we can go and formulate a plan, which we did after the

24   first month.

25   Q.  What was that plan?

D5D8FLO3                                    McCormack - direct

1   A.   That plan was to go after the best targets that were

2   committing the most violent acts in the 40th Precinct.  Those

3   targets were Mott Haven Patterson housing development, the

4   Moore Houses housing development, and the Maria Lopez private

5   houses.

6   Q.   Generally, what are your responsibilities as the commanding

7   officer of the 40th Precinct?

8   A.   It's numerous.  I am in charge of the overall operation of

9   the command.  I am in charge of the administrative part,

10  resource and allocation of all of my officers, administratively

11  to look over paperwork, to review paperwork I should say, I'm

12  sorry, to go over complaint reports, to go over communications.

13  And as a commanding officer, it's also to be a psychiatrist to

14  my police officers, it's to be a motivator for my police

15  officers.  Part of it is also to go out and speak to the

16  community, to go out and find out what their concerns are, and

17  see if I can meet their concerns.  It's extremely broad.

18  Q.   Could you describe what tasks you might complete in a

19  typical day as the commanding officer?

20  A.   Usually a typical day for me would be to walk in, sign in

21  to the desk, speak to the desk officer, see what is going on

22  immediately now, and if there was anything reported usually

23  from the late tour.  I usually get in at about 11:00 or so, so

24  find out what is going on in the beginning of the day tour, and

25  find out what is related to the day tour from the midnight.

D5D8FLO3                           McCormack - direct

1          After that I would usually go upstairs, speak to the

2     operations lieutenant.  He is the one that is going to do most

3     of my administrative work in the precinct.  We go over

4     communications.  We go over complaints.  We go over movement of

5     personnel, any kind of details that are coming up that we need

6     to allocate personnel for.

7          After that I usually go to the detective squad to sit

8     down and talk about what is going on crime wise in some of the

9     investigations, some of the shootings, some of the homicides.

10    Their investigations sometimes can give me -- their

11    investigators could give me information which can help me help

12    stop the violence before it happens.

13         After speaking to them for a while, I go down and I

14    speak to the field intelligence officer, their team, because

15    it's the one sergeant and three police officers.  They do most

16    of the briefings in the precinct, tell me what's going on.

17    They have a bunch of confidential informants that could let us

18    know what is going on.  I take that information again and it

19    helps me put a plan together.

20         After that I usually walk into the special operations.

21    I usually talk to the domestic violence officers to see how

22    it's going, any concerns they have.  Are they going out and

23    doing their visits?  Looking over some of their paperwork while

24    I am there.  I usually visit the conditions team to talk to the

25    conditions team before they go out.

D5D8FLO3                              McCormack - direct

 1          After that I usually go down and speak to my community

 2     affairs to find out what's going on, any concerns with the

 3     community, and again, any details that they are relaying to the

 4     operations lieutenant.

 5          Then I sit down at my desk finally, after about three

 6     or four hours, and I go through my administrative parts.  As I

 7     am monitoring the radio, I usually go through my complaint

 8     reports for the previous 24 hours.  I look through

 9     communications that come in, any other mail that is coming in

10     for me.  That usually takes a couple of hours in between trying

11     to the monitor radio and running out to different crimes that

12     are in progress.

13          That's usually basically a general day.  Maybe a

14     community visit once a day, or at nighttime a community

15     meeting.

16     Q.  What about supervisors meetings, do you hold any regular

17     meetings with your supervisors?

18     A.  Yeah.  Usually I hold a monthly supervisors meeting.  It's

19     in the basement of the precinct in my meeting office

20     downstairs.  We usually go through some of the issues that are

21     going on in the police department, domestic violence.  We go

22     through some training issues with them.  We are starting to see

23     in domestic violence some issues with the police officers

24     writing refused on the second page.  Those are some of the

25     issues that will come up during the meeting, that we have to

1   make sure the victims are writing out that statement.  Any

2   issues that are going on, crime issues that are going on, how

3   we are able to put our resources out there.  We do a large

4   range of administrative operational issues there.

5   Q.  What supervisors attend this meeting generally, sergeants,

6   lieutenants?

7   A.  Sergeants and lieutenants generally meet.  Once in a while

8   I will get a midnight guy, but it's almost always a day tour, 4

9   to 12.

10  Q.  Can you describe the current crime conditions in the 40th

11  Precinct?

12  A.  Current crime conditions in the 40th Precinct right now,

13  thank God it's not violent.  We are doing very good with that.

14  But we are getting, I'd say, beat up on a lot of different

15  crimes.  Burglaries right now, we are struggling with right

16  now.  Grand larcenies, we are extremely struggling over the

17  last two years.  Grand larceny auto, we are struggling this

18  year, which we never had a problem; we have seen a big uptake

19  on that.  And felony assaults are starting to come up.

20  Q.  You said you're struggling in grand larcenies, and you have

21  been since you have been at the 40th Precinct?

22  A.  Yes, ma'am.

23  Q.  What steps have you taken as commanding officer to try and

24  address that crime condition?

25  A.  We break down -- we analyze the grand larcenies.  Are they

D5D8FLO3                        McCormack – direct

1   identity theft?  Are they from banks or from a person?  The

2   thing that concerns us is grand larceny of a person.  That is

3   something I can physically try to stop.  It's hard in my

4   position to stop cyber grand larcenies over computers.  But to

5   be able to put my resources where they are taking property from

6   people on the street, that's what I usually do with that.

7   Q.  So what are you expecting your officers to do at the 40th

8   Precinct in order to address this persistent grand larceny

9   condition?

10  A.  I expect them to listen at roll call to either me when I

11  address roll call or the supervisors when they address roll

12  call regarding crime conditions inside their sectors.  If they

13  have a grand larceny problem in their sector, I hope they are

14  listening, and they are going to try to combat that crime.

15  Q.  Other than instruction at roll call, what other ways are

16  officers at the 40th Precinct made aware of crime conditions?

17  A.  There's a crime informational center that's in the precinct

18  that has all the crimes that are going on.  It has wanted

19  criminals that are wanted for grand larcenies.  And we have a

20  book that we put out that the officers want to read.

21  Q.  Would that be ways in which officers could obtain

22  information about crimes in addition to grand larceny as well?

23  A.  Yes.

24  Q.  What do you expect your supervisors to do with respect to

25  making their officers aware of crime conditions in the 40th

D5D8FLO3                          McCormack - direct

1   Precinct?

2   A.  I expect -- I take my information that I analyze daily, and

3   I put it out to my supervisors.  I text it to them.  I talk to

4   them.  And I expect them to relay this message down to their

5   officers.  It's very important that for safety reasons the

6   officers know what they are out there doing.

7   Q.  How are you able to tell if officers at the 40th Precinct

8   are addressing the crime conditions in the 40th Precinct?

9   A.  We look at, if it's grand larcenies, are they combating

10  grand larcenies?  If we have a grand larceny problem, are they

11  making stops for grand larceny?  Or if not, if they are making

12  stops for different reasons, we have to try to direct them back

13  to where we need their resources.

14  Q.  Are you familiar with something called a violence reduction

15  tour?

16  A.  Yes, ma'am.

17  Q.  What is a violence reduction tour?

18  A.  In, I believe, July or August of 2010, Chief Hall put

19  out -- gave us overtime to put out foot posts, specifically, in

20  specific locations that I have to pinpoint and I have to get

21  approval to put these officers there.  Violence reduction is

22  from 1600 hours to --

23  Q.  What time is that?

24  A.  4 p.m. to 6 in the morning.  It's a seven day a week

25  operation.

D5D8FLO3                          McCormack – direct

1    Q.  You said that the officers are deployed on foot, is that

2    correct?

3    A.  Yes, ma'am.

4    Q.  How many officers are assigned per tour to this violence

5    reduction overtime?

6    A.  Every precinct is different.  From my precinct, it's eight

7    police officers.

8    Q.  Is there a supervisor assigned?

9    A.  Yes, ma'am.

10   Q.  Are those eight officers working that violence reduction

11   tour answering jobs over the radio?

12   A.  The only job they will answer if it's happening on their

13   post in the street.  We don't want them inside the buildings.

14   We want them out in front being visible.

15   Q.  The officers you said are on post.  How big is the

16   geographic area of each officer's post assignment?

17   A.  It's generally one block.

18   Q.  How do you determine the staffing for those officers on a

19   violence reduction tour?

20   A.  We use our resources that we have, which could be impact

21   officers.  We use straight time foot posts.  And we also use

22   the over time that the chief patrol's office gives us.

23   Q.  If an officer on a violence reduction tour foot post were

24   to make an arrest and then bring that arrest back to the 40th

25   Precinct, what happens to the coverage of that foot post?

D5D8FLO3                        McCormack – direct

1    A.  That coverage is immediately replaced.

2    Q.  Why?

3    A.  We need to have somebody out there because of the violence

4    that happens at these intersections, and we do not want to lose

5    that for one minute.

6    Q.  Is that different than when officers in a sector car on

7    patrol make an arrest and bring the arrest back to the

8    precinct?

9    A.  Yes, it is different.  Sometimes they are replaced in a

10   sector.  We try to get the cars out there as quick as possible.

11   But if they make an arrest, they will just come into the house

12   and that will be it for them.

13   Q.  What has been the effect of this violence reduction tour

14   deployment that you mentioned since last July or August?

15              MR. MOORE:  I don't know how the effect of it is

16   relevant.  In fact, a lot of this testimony is very repetitive

17   of what we have heard from other police commanders, in terms of

18   its effect.  Once again, it goes to the issue of the

19   effectiveness of a policy.

20              THE COURT:  Not entirely because this has to do with,

21   I think, crime patterns and what is specified at the roll calls

22   and whether they are trying to address the crime patterns.  So

23   in a general sense I will allow it.

24   A.  Can you repeat the question?

25   Q.  What has been the effect of this violence reduction tour

D5D8FLO3                          McCormack – direct

1    deployment you mentioned began late last July or August?

2    A.  It has been fantastic for the 40th Precinct.  The city

3    overall has been phenomenal, but the 40th Precinct, we have had

4    a drastic decrease in violence, in shootings and homicides.

5    Q.  Are you familiar with an officer Andrew Serrano from the

6    40th Precinct?

7    A.  Yes, I am.

8    Q.  When do you first recall meeting Officer Serrano?

9    A.  The first time I recall meeting Officer Serrano was

10   February 14, 2013.

11   Q.  Were you aware --

12            THE COURT:  Did you say February 14, 2013?

13            THE WITNESS:  Yes, ma'am.

14   Q.  Were you aware that Officer Serrano worked in the 40th

15   Precinct prior to February 2013?

16   A.  I recognized the name, but I didn't know who the person

17   really was.

18   Q.  Do you recall that you had any meetings with Officer

19   Serrano prior to February 2013?

20   A.  No, ma'am.

21   Q.  How many officers are assigned to the 40th Precinct under

22   your supervision?

23   A.  Approximately 235.

24   Q.  Did you have an understanding prior to February 2013 of how

25   Officer Serrano was performing at the 40th Precinct as a police

D5D8FLO3                        McCormack - direct

1   officer?

2              MR. MOORE:  That would be hearsay if he had an

3   understanding.

4              THE COURT:  It would be.

5              MS. COOKE:  He is the commanding officer, to the

6   extent he has an understanding of how an officer is performing

7   as a police officer.

8              THE COURT:  I really couldn't take that.

9              Did you happen to review his performance evaluations?

10             THE WITNESS:  I review everybody's monthly evaluation.

11             THE COURT:  For example, did you see his evaluation

12  for 2011 or '12?

13             THE WITNESS:  I saw his evaluation for 2011, yes.

14             THE COURT:  Are those in evidence?

15             MS. COOKE:  The annual 2011 evaluation is in evidence.

16             THE COURT:  I will allow that.

17             Do you know what the annual evaluation in 2011 was?

18             THE WITNESS:  Yes.

19             THE COURT:  What was it?

20             THE WITNESS:  3.0.

21             THE COURT:  Is that kind of average?

22             THE WITNESS:  That is average.

23             THE COURT:  He had an average evaluation in 2011?

24             THE WITNESS:  Yes.

25             THE COURT:  Did you see 2012?

D5D8FLO3                              McCormack – direct

 1                  THE WITNESS:  Yes, ma'am.

 2                  THE COURT:  That's not in evidence?

 3                  MR. MOORE:  I provided a copy of his 2012 evaluation

 4      to the city this morning.  I just got it last night from

 5      Officer Serrano.

 6                  THE COURT:  Have you seen it?

 7                  THE WITNESS:  Yes.

 8                  THE COURT:  What did he get in 2012?

 9                  THE WITNESS:  3.0.

10                  THE COURT:  And that's average?

11                  THE WITNESS:  Average again.

12                  THE COURT:  You knew that?

13                  THE WITNESS:  Yes.

14      BY MS. COOKE:

15      Q.  Do you also review officers' monthly command conditions

16      reports?

17      A.  Yes.

18      Q.  For what officers?

19      A.  For all my officers.

20                  MR. MOORE:  If they are going to talk about that,

21      those documents have never been produced to us.

22                  MS. COOKE:  There is an October 2012 monthly command

23      condition report for Officer Serrano.

24                  THE COURT:  You can go over that one.

25      Q.  Did you review Officer Serrano's monthly activity report

D5D8FLO3                          McCormack - direct

1   for October of 2012?

2   A.   Yes, ma'am.

3   Q.   What is your role in officers' at the 40th Precinct annual

4   performance evaluations?

5   A.   My role is very important.  I sit down and I go over every

6   single evaluation of everybody in my command.

7   Q.   Who do you go over every single evaluation with?

8   A.   For the police officers, I sit down with platoon commanders

9   and the squad supervisors.

10  Q.   What is the purpose of sitting with the platoon commander

11  and the squad supervisor to review their officers' performance

12  evaluations?

13  A.   It's important that we try to make everything as fair

14  across the board and not have one person who might be liked

15  more than someone else get a higher evaluation that shouldn't

16  get that higher evaluation.

17  Q.   Did you follow that process with respect to the annual

18  performance evaluations that officers received for the 2011

19  year at the 40th Precinct?

20  A.   Yes, ma'am.

21  Q.   Was that the first year of annual performance evaluations

22  you reviewed for officers at the 40th Precinct?

23  A.   Yes, ma'am.

24  Q.   What was your understanding of how prior annual evaluations

25  had been conducted at the 40th Precinct?

D5D8FLO3                         McCormack – direct

1            MR. MOORE:  That's based on hearsay.

2            THE COURT:  One moment.

3            That's his job to know how they were conducted.  Not

4    anybody's in particular.  I will allow that.

5            How were prior annual evaluations done at the 40th

6    Precinct?

7    A.  In reviewing the 2010 evaluations, officers received

8    extremely high evaluations for doing a lot less work.

9            THE COURT:  That's not responsive.  I am going to

10   strike that answer.

11           The question was, how were the annual evaluations

12   conducted?  Do you know how they were done, the process?

13           THE WITNESS:  The process was that the sergeant gave

14   the officers whatever he felt, the supervisor felt, was his

15   opinion of the officer.

16           THE COURT:  His opinion of the officer.  And do you

17   know what that person based the opinion on?  You don't know

18   really?

19           THE WITNESS:  No.

20           THE COURT:  You weren't there?

21           THE WITNESS:  Right.

22           MR. MOORE:  Then how does he know how it was done?

23           THE COURT:  He must have looked into it and found out

24   it was the opinion of the -- did you say supervisor?

25           THE WITNESS:  Supervisor.

D5D8FLO3                          McCormack - direct

1          THE COURT:  But he doesn't know what that person

2     reviewed to form the opinion.

3          MR. MOORE:  The problem is I don't know what the

4     source of that information is.

5          THE COURT:  Neither do I.  That's my point.  It has

6     what weight it has.  He knows it's the opinion of the

7     supervisor, but he doesn't know on what the supervisor based

8     the opinion.  So it doesn't tell us too much.

9     BY MS. COOKE:

10    Q.  Was the process you described where you sit down with the

11    platoon commander and the supervising sergeant different than

12    what had been done previously, based on your understanding, at

13    the 40th Precinct?

14    A.  Yes, it is.

15         THE COURT:  Was that a change you implemented?

16         THE WITNESS:  Yes.  I did that in my previous command

17    too.

18         THE COURT:  So your change was to do what that was

19    new?

20         THE WITNESS:  My change was that I was going to

21    evaluate -- sit down with the platoon commanders and squad

22    supervisors and evaluate everybody on an equal basis.

23         THE COURT:  The platoon commander and?

24         THE WITNESS:  Which is a lieutenant, and a squad

25    supervisor, which is a sergeant.

D5D8FLO3                            McCormack - direct

1    Q.  So you would be reviewing the evaluations of an entire

2    squad and an entire platoon at the same time in essence?

3    A.  I would actually sit down with the platoon commander and go

4    through him, and, unfortunately, not every sergeant is there at

5    the same time, so I would have to sit down with each squad

6    sergeant and go through their evaluation.

7    Q.  Were there times -- first of all, was the same process

8    followed in 2012 that you just described for 2011?

9    A.  Yes, ma'am.

10   Q.  Thinking of 2011, were there any times you recall you

11   changed an officer's evaluation, modified it in some way based

12   on your review with the platoon commander or the sergeant?

13   A.  Absolutely.  I have sat down with the platoon commander and

14   what his opinion was and what my opinion, we would talk about,

15   and then I would go to the patrol sergeant, and he can either

16   boost it up, something I don't know, personal thing, what's

17   going on, and I did raise numerous officers' evaluations.

18   Q.  What about thinking to the process you underwent in 2012

19   for those 2012 evaluations, were there instances you can recall

20   you modified an officer's annual performance evaluation after

21   this process with the platoon commander and sergeant?

22   A.  Yes, it is.

23   Q.  I am handing you what has been introduced into evidence as

24   Defendants' Exhibit C10.

25            MS. COOKE:  We will also put it on the screen.  It's

D5D8FLO3                            McCormack - direct

1   Officer Serrano's performance evaluation from 2011.

2           THE COURT:  You had no role in this evaluation, right?

3           THE WITNESS:  Not true, ma'am.

4           THE COURT:  Not true?

5           THE WITNESS:  I did have a role in this.

6           THE COURT:  What was your role in this evaluation?

7           THE WITNESS:  Even though I got there in September of

8   2011, he is being evaluated from December of '10 to December of

9   '11.  So I was there at December '11.  So my job is to sit down

10  and go through everybody's evaluations.  So I actually went

11  over this person -- everybody's, I believe, in January of '12.

12          THE COURT:  You went over it with whom?

13          THE WITNESS:  With the platoon commanders and the

14  squad supervisors.

15          THE COURT:  So would that be this person Stephen

16  Monroe who is the rater?

17          THE WITNESS:  Yes.

18          THE COURT:  What is he?

19          THE WITNESS:  He is a squad supervisor for Officer

20  Serrano.

21          THE COURT:  So you would have met with Stephen Monroe?

22          THE WITNESS:  Yes, ma'am.

23          THE COURT:  Before this was signed off?

24          THE WITNESS:  I meet him before the evaluation is

25  done.

D5D8FLO3                             McCormack – direct

1          THE COURT:  Does this have a date?

2          THE WITNESS:  Just a rating period that's on it.

3          THE COURT:  That doesn't tell us the date that it's

4    signed off, so to speak.

5          Who is the reviewer?  Who is this John Bucci?

6          THE WITNESS:  Lieutenant Bucci is the person who

7    reviews it after Sergeant Monroe signs off on it.

8          THE COURT:  We don't know when that was.  Did you also

9    discuss it with Lieutenant Bucci?

10          THE WITNESS:  Yes.  Lieutenant Bucci was the platoon

11    commander at that time.

12          THE COURT:  You would have sat down with both of them?

13          THE WITNESS:  Yes.

14    Q.  Would you have sat down with each of them after the

15    numerical values were assigned by the rater, Sergeant Monroe?

16    A.  I'm sorry?

17          THE COURT:  Would you look at it after all these 3s

18    were in place?

19          THE WITNESS:  No.  I sit down first with the platoon

20    commander and the squad supervisor.  We discuss what the

21    ratings will be.  And then after that, I don't look at it after

22    that.

23          THE COURT:  When you sat down with them, this wasn't

24    filled out yet?

25          THE WITNESS:  It was not filled out.

D5D8FLO3                        McCormack – direct

1         THE COURT:  Did you know the recommendation at the

2    time you sat down with them?

3         THE WITNESS:  Yes.  We discussed the recommendation,

4    what we are going to give him.

5         THE COURT:  I mean the recommendation, it says,

6    continue in present assignment.

7         THE WITNESS:  Yes.  We discussed that, ma'am.

8    Q.  Officer Serrano received an overall evaluation of 3 in his

9    2011 performance evaluation, correct?

10   A.  Yes, ma'am.

11   Q.  What is the overall evaluation score that triggers an

12   officer to be placed on performance monitoring?

13   A.  2.5 and below.

14   Q.  Are you aware of whether you assigned an overall evaluation

15   of 2.5 or below to an officer in 2011 in the 40th Precinct?

16   A.  Yes, I did.

17   Q.  How many officers?

18   A.  I believe it was three or four.

19   Q.  Did you also give an overall evaluation of 2.5 or below to

20   officers in 2012 at the 40th Precinct?

21   A.  Yes.  I believe it was one.

22   Q.  In 2011, did you switch any officers' assignments as a

23   result of their overall performance evaluation score?

24   A.  No, ma'am.

25   Q.  Did you switch anyone's assignment in 2012 as a result of

D5D8FLO3                          McCormack – direct

1    their overall annual evaluation score?

2    A.  No, ma'am.

3    Q.  You described the process where you meet with the squad

4    sergeant and the platoon commander, the lieutenant, prior to

5    the completion of the numerical assignments for these

6    performance and behavioral dimensions.  Do you see the

7    performance evaluation after its been completed?

8    A.  The only time I get it back to me to look at is if someone

9    has a 5.0 or someone has a 2.5 or below.

10             THE COURT:  I am sure this is not particularly

11   convenient, but we are going to stop now for lunch and

12   reconvene at 10 after 2 instead of 5 after 2.

13             (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

D5D8FLO3                         McCormack – direct

1                          AFTERNOON SESSION

2                               2:10 p.m.

3   CHRISTOPHER MCCORMACK, resumed.

4   BY MS. COOKE:

5   Q.  Deputy Inspector McCormack, before we left for the luncheon

6   recess, we were discussing Defendants' Exhibit C10, which is

7   Officer Serrano's 2011 performance evaluation.

8          Did Officer Serrano appeal his 2011 evaluation?

9   A.  No, ma'am.

10  Q.  Not with you, but did he appeal it?

11  A.  I apologize.  Yes, he did appeal it.

12  Q.  Who heard that appeal?

13  A.  Captain Materasso, my executive officer.

14  Q.  Why did Captain Materasso hear the appeal rather than you?

15  A.  I wasn't available at the time so she stood in for me.

16  Q.  Did you receive a report about the results of that appeal

17  meeting?

18  A.  Yes.

19  Q.  What did you receive was the report?

20  A.  Speaking to Captain Materasso regarding Officer Serrano's

21  appeal, she stated that he needed to concentrate on more

22  handling his conditions on his tour and in his sector.

23  Q.  Did you have understanding as to whether or not Officer

24  Serrano was appealing his performance evaluation to the next

25  level of the borough?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D5D8FLO3                          McCormack – direct

1   A.  No.

2   Q.  No, he was not, or no, that was my understanding?

3   A.  That was my understanding.  He was not appealing it.

4   Q.  I am handing you what has been marked for identification as

5   Defendants' Exhibit O15.

6           Do you recognize this document?

7   A.  Yes, ma'am.  It's Police Officer Serrano's 2012 performance

8   evaluation.

9           MS. COOKE:  I move Defendants' O15 in evidence.

10          MR. MOORE:  No objection.

11          THE COURT:  All right.  O15 is received.

12          (Defendants' Exhibit O15 received in evidence)

13  Q.  Who was the rater for this 2012 performance evaluation?

14  A.  Sergeant Steve Monroe.

15  Q.  Was that the same sergeant who reviewed the 2011

16  performance evaluation for Officer Serrano?

17  A.  Yes, ma'am.

18  Q.  Directing your attention to the second page, the back, the

19  overall evaluation score.  What was the overall evaluation

20  Officer Serrano had received in 2012?

21  A.  A 3, ma'am.

22  Q.  That was the same score as 2011?

23  A.  Yes, ma'am.

24  Q.  Who was the reviewer for this 2012 evaluation?

25  A.  Lieutenant Rich Mack.

D5D8FLO3                          McCormack - direct

1   Q.  Do you know why it wasn't Lieutenant Bucci as it was in

2   2011?

3   A.  Lieutenant Bucci was assigned to the second platoon at the

4   time.

5   Q.  So Lieutenant Mack was Officer Serrano's platoon commander

6   for this period?

7   A.  Yes, ma'am.

8   Q.  Did Officer Serrano appeal this 2012 performance

9   evaluation?

10  A.  Yes, ma'am.

11  Q.  Who heard that appeal?

12  A.  I did, ma'am.

13  Q.  When did that appeal meeting take place?

14  A.  I believe it was February 14, 2013.

15  Q.  Who attended the appeal meeting?

16  A.  My operations lieutenant, Lieutenant Batelli, Police

17  Officer Serrano, and his PBA delegate, Officer Foster.

18  Q.  Why didn't Sergeant Monroe attend the appeal meeting?

19  A.  He wasn't available at the time.

20  Q.  You're aware that Officer Serrano secretly tape-recorded

21  that meeting, aren't you?

22  A.  Yes, ma'am.

23  Q.  Have you reviewed the audio recording of that meeting?

24  A.  Yes, ma'am.

25  Q.  I am handing you what has been marked in evidence as

D5D8FLO3                        McCormack – direct

1    Plaintiffs' Exhibit 332T.  This is the transcript of that audio

2    recording.  Have you reviewed the transcript 332T?

3    A.  Yes, ma'am.

4    Q.  Directing your attention to page 3, lines 8 through 11 of

5    332T, Officer Serrano mentions that something was written by

6    somebody on his 2012 evaluation that he needs supervision.  Do

7    you see that?

8    A.  Yes, ma'am.

9    Q.  Can an officer appeal the comments included on an annual

10   performance evaluation?

11   A.  No, ma'am.

12   Q.  Why not?

13   A.  Once it's written, the comments written by the supervisor

14   cannot be appealed.

15   Q.  On what basis can an officer appeal an annual performance

16   evaluation?

17   A.  It could be factual, it could be an error, it could be

18   bias.  The officer has to state what it is.

19   Q.  Referring to pages 2 and 3, generally, you began the

20   meeting by asking Officer Serrano on page 2, line 6, by telling

21   him you needed to know the reason for his appeal?

22   A.  Yes, ma'am.

23   Q.  Then Officer Serrano explained the basis for his appeal on

24   pages 2 carried over to 3, correct?

25   A.  Yes, ma'am.

D5D8FLO3                         McCormack - direct

1    Q.  What did Officer Serrano identify as the basis for his 2012

2    performance evaluation appeal?

3    A.  He said it was factual.

4    Q.  What were the facts that Officer Serrano raised?

5    A.  He spoke that -- he spoke that his activity warranted a

6    better score than 3.0.

7    Q.  When you say activity, are you referring to enforcement

8    activity, such as arrests, summonses and UF-250s?

9    A.  Yes, ma'am.

10   Q.  Would that be a factual basis on which an officer could

11   appeal an evaluation?

12   A.  Yes, ma'am.

13   Q.  Was the fact that Officer Serrano raised with respect to

14   his performance of enforcement activity in 2012, in your

15   opinion, a factual basis for you to consider changing his

16   evaluation?

17          MR. MOORE:  Object to the form of the question.

18   A.  Yes, ma'am.

19          THE COURT:  I will allow it.

20          Was that a basis?

21          THE WITNESS:  Yes, ma'am.

22   Q.  What information did Officer Serrano provide to you that

23   was the factual basis for his enforcement activity that was the

24   basis for an appeal?

25   A.  He said he had more activity, more summonses, more arrests

D5D8FLO3                          McCormack - direct

1   from the previous year.  That's why he was appealing it.

2   Q.  Did Officer Serrano, in fact, state that he had doubled his

3   arrests?

4   A.  Yes.  He said he doubled the arrests, and I corrected him

5   saying he didn't have double arrests, he went from five to

6   eight.  He actually lowered his arrests during the appeal.

7   Q.  What do you mean he lowered his arrests?

8   A.  We had eight and he actually said, yeah, I have eight, not

9   nine, something to that effect.

10  Q.  When you said "we," you mean the department records had

11  reflected nine arrests?

12  A.  Yes.

13  Q.  What about UF-250s, what did Officer Serrano identify with

14  respect to his UF-250 enforcement activity in 2012 as the basis

15  for his appeal?

16  A.  Yes.  He said he had more 250s from the previous year,

17  which the department computer showed he actually had less 250s.

18  He went from three to two.

19  Q.  When you say he went from three to two, that's three in

20  2011?

21  A.  Yes.

22  Q.  And two in 2012?

23  A.  Yes, ma'am.

24  Q.  What did Officer Serrano say his UF-250 activity in 2012

25  should have been?

D5D8FLO3                        McCormack – direct

1  A.  He said it was incorrect, that he did not have two; he said

2  he had at least five or six.

3  Q.  Would an adjustment of someone's UF-250 activity from two

4  to five or six be a reason for you to increase their

5  performance evaluation score?

6  A.  Absolutely not.

7  Q.  Why not?

8  A.  It was so minute that it didn't really matter.

9  Q.  What did you think about the fact that Officer Serrano was

10  reporting that the department's database documenting UF-250s

11  was reportedly missing three or four of his UF-250s for 2012?

12  A.  It was put in doubt in my mind if he was actually doing

13  them or if he was submitting the paperwork correctly while

14  doing them.

15  Q.  Directing your attention to Exhibit 332T, page 3, lines 21

16  through 24, where Lieutenant Batelli requests Officer Serrano

17  to make two logs, handwritten and computerized, of these

18  missing UF-250s.  To your knowledge, did Officer Serrano ever

19  provide Lieutenant Batelli that information?

20  A.  No, ma'am.

21  Q.  Directing your attention to page 4, lines 4 through 6,

22  Officer Serrano states he improved his activity from 2011 and

23  doesn't understand why he still received a 3.0.  What role does

24  an officer's enforcement activity play in their annual

25  performance evaluation score?

D5D8FLO3                          McCormack - direct

1   A.   It plays a part, but not a large part.

2   Q.   What do you mean?

3   A.   When we evaluate somebody, we take everybody's -- a lot of

4   things into mind, his judgment, knowledge, how he works with

5   other officers.  It's an accumulation of a lot of things.

6   Q.   What about Officer Serrano's identification of additional

7   arrests and additional summonses in 2012 from 2011.  In your

8   opinion, were those changes significant enough to warrant an

9   increase in his 2012 performance evaluation score?

10   A.   No, not at all.  It was very minute so it didn't really

11   matter.

12   Q.   Are you aware of what kind of summonses Officer Serrano had

13   issued in 2012?

14   A.   We are talking about a B mover summonses?

15   Q.   Any of the summonses that Officer Serrano identified he had

16   increased his activity for in 2012.

17   A.   The summonses that he was issuing were not handling his

18   conditions on his tour.

19   Q.   How so?

20   A.   They did not make an impact on what we specifically

21   identified for him to handle.  It wasn't making any impact at

22   all on what was going on.

23   Q.   What kind of summonses was Officer Serrano issuing that

24   weren't impacting conditions in the command?

25   A.   He was issuing criminal court summonses for offenses that

D5D8FLO3                          McCormack - direct

1   were not related to his conditions at all that he specified on

2   his reports.

3   Q.   Why is that important that an officer's activity address

4   the conditions on their monthly activity reports?

5   A.   The officer identifies the two items that he is supposed to

6   address, and he was not -- those summonses he was issuing was

7   not addressing those conditions.

8   Q.   I am handing you what has been admitted in evidence as

9   Defendants' Exhibit B10.  It's Officer Serrano's October 2012

10  monthly activity report.

11          Have you seen this before?

12  A.   Yes, ma'am.

13  Q.   Were these the kinds of monthly officer activity reports

14  you testified before the luncheon recess you reviewed?

15  A.   Yes, ma'am.

16  Q.   When you reviewed those officers' monthly conditions impact

17  measurement reports, do you also review the supervisor recap

18  reports?

19  A.   Yes, ma'am.

20  Q.   How often do you review these documents, the recaps and the

21  monthlies, of the officers?

22  A.   Every month, ma'am.

23  Q.   So looking at Defendants' Exhibit B10, does anything jump

24  out at you?

25          MR. MOORE:  Object to the form.

D5D8FLO3                          McCormack – direct

 1          THE COURT:  I will allow it.

 2   A.   What jumps out at me is that Officer Serrano was not

 3   documenting his days on patrol correctly.

 4   Q.   How do you mean?

 5   A.   He shows that he has 13 days on patrol.  In fact, he had 17

 6   days on patrol.

 7   Q.   How do you get to 17?

 8   A.   He miscounted some of his days on patrol.  Take, for

 9   example, on the 11th of October, CRV he did not check off as a

10   day on patrol.

11          THE COURT:  How do you check off a day on patrol?

12          THE WITNESS:  There is a box, a little X, if you see

13   on the first paragraph going down.

14          THE COURT:  The first column.  Got it.

15   Q.   So you're indicating that there should have been an X, in

16   your opinion, for the 11th day of October as indicating a day

17   on patrol?

18   A.   Yes.

19          THE COURT:  What does CRV mean?

20          THE WITNESS:  Critical response vehicle.  Those are

21   the vehicles that drive through the city.

22          THE COURT:  Did he check off any of the CRVs?  I guess

23   he did.

24          THE WITNESS:  Yes, he did.  The next day on the 12th.

25   Q.   Do you see activity listed for Officer Serrano on the 11th

D5D8FLO3                          McCormack - direct

1    that would be activity of an officer conducting patrol?

2    A.  Yes, ma'am.  He responded to two radio runs.

3    Q.  In addition to that missing check, is it your testimony

4    that -- how does the 13 become -- what was your testimony?

5    A.  17.

6    Q.  Is it a math error?

7    A.  Yes.  It's a math error.  It's an error that he purposely

8    downgraded his days on patrol.

9              THE COURT:  Sustained.  I was going to strike the

10   answer.

11             How do you know he purposely did that?

12             THE WITNESS:  This is something that's been going on

13   in the precinct for a while that I have been correcting ever

14   since I got there.  I started this in the 20th Precinct and

15   it's gone into the 40th Precinct.

16             THE COURT:  I don't think I understand.  If you don't

17   put the check, a little X in patrol, you still put CRV, which

18   is obviously patrol, how do you know he intentionally or

19   willfully tried to limit the number of days on patrol?

20             THE WITNESS:  We found out in the precinct that the

21   officers were downgrading their days on patrol so that their

22   patrol days would look less.  So when their activity was so

23   little, it would look better with a small amount of days on

24   patrol.

25             THE COURT:  Is that the only missing X on this one?

D5D8FLO3                              McCormack – direct

1                THE WITNESS:  No, ma'am.

2                THE COURT:  Where is the other missing X?

3                MR. MOORE:  I would ask that that testimony be

4     stricken because there is no personal knowledge of it.  He is

5     making assumptions based upon generality of people at the

6     precinct.

7                THE COURT:  I agree with that.  I don't think that

8     answer can stand so I am going to strike it.

9                Show me all the mistakes on this.  So the first one is

10    the 11th?

11               THE WITNESS:  The first one is on the 11th.  It's hard

12    to read my copy.

13               THE COURT:  I have got the same copy you do.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

D5d9flo4                          McCormack - direct

1          THE COURT:  As long as he can identify.

2     BY MS. COOKE:

3     Q.  Inspector McCormack --

4          THE COURT:  I'm sorry.  I'm in the middle of asking a

5     question.  He's looking for other errors at my request.

6          THE WITNESS:  Go up on the second day.  I don't know

7     if that says Beekman auto or not.

8          MS. COOKE:  Would Beekman auto be a day on patrol?

9          THE WITNESS:  That would be a day on patrol.

10         THE COURT:  He's not sure it says that.

11         MR. MOORE:  I think it's Bronx criminal court.

12         THE COURT:  There's a thought.  I think it's BXCC

13    myself.  That's right.  Which would not be a day on patrol when

14    you're in court, right?  Right, Inspector?

15         THE WITNESS:  Yes, ma'am.

16         THE COURT:  You're in court --

17         THE WITNESS:  Well, it depends.  They come back early

18    or not.

19         THE COURT:  But if you're in court all day you're not

20    on patrol.

21         THE WITNESS:  Of course not.

22         THE COURT:  So besides the 11, what do you have?

23         THE WITNESS:  Just hard to see through this copy.

24    Q.  When you add the Xs up how many do you count?

25         THE COURT:  I think he was still studying the form.

D5d9flo4                              McCormack - direct

1          MS. COOKE:  I was -- with respect to those Xs.

2          THE COURT:  You think you found --

3          MS. COOKE:  When he adds them up.

4          THE WITNESS:  When you add up the Xs, the days on

5    patrol, he wrote down 13.  What should have been, if you add up

6    his Xs, it should have said 16.  But we added the CRB, which is

7    17.

8          MS. COOKE:  Your Honor, on the screen there's a total

9    at the bottom of the.

10         THE COURT:  I see the 13.

11         THE WITNESS:  If you count the Xs, that comes out to

12   16.

13         THE COURT:  Well maybe but -- you're counting the

14   28th, right?

15         THE WITNESS:  If you count his Xs on that first

16   column.

17         THE COURT:  You're counting the 25th and the 28th,

18   for example?

19         THE WITNESS:  25, 26, 27, 28, and the 29 he has

20   checked off as on patrol.

21         THE COURT:  I wasn't certain.

22         THE WITNESS:  That comes out to 16 days on patrol.

23   And of course we added the one for CRB, which comes out to 17.

24   Q.  What other errors, if any, did you identify with the

25   information recorded on Defendant's B10?

1              MR. MOORE:  Can we have a time when he did this.  Is

2     this at the time he was doing the evaluation or --

3              THE COURT:  When did you first notice these errors?

4              THE WITNESS:  After this was brought into evidence

5     here at the trial.

6     Q.  So what, if anything, else did you identify as an error?

7     A.  Looking at his radio runs, jumped right off the top.  The

8     round numbers are 20, 25.  Twenty a couple times.  Fifteen.

9     161 jumps right off the page at me.

10    Q.  Why?

11    A.  Reviewing the activity reports of my entire command since

12    I've been there since September of 2011, radio runs for a

13    person who has worked a complete month, not taking vacation,

14    usually they average 17 or 18 days on patrol, and they'll

15    average anywhere 85 to 115 radio runs per month.

16             Looking at 161 is just, you know, my opinion something

17    I have to look into further because that's -- could be

18    extremely exaggerated.

19             MR. MOORE:  Judge, this is all testimony based on

20    hypotheticals and assumptions and predictions.

21             THE COURT:  I don't think so.  He's saying he reviews

22    all these regularly since he's been there and he knows that the

23    average patrol officer works either 17 or 18 days a month.  And

24    he knows the radio runs for such average number of days

25    fluctuate between about I think you said --

D5d9flo4                              McCormack - direct

 1              THE WITNESS:  Eighty-five to about 115.

 2              THE COURT:  Eighty-five to 115.  So the figure 161

 3    jumped off the page.  I'll allow that.

 4              MR. MOORE:  He said he didn't review this until --

 5              THE COURT:  So what.  This is what now jumps off the

 6    page.  He's seen an average of 80 to 115 for an average 17 to

 7    18 days on patrol.  This one according to him is 17, right

 8    where it's supposed to be.  But he thinks 161 is sort of an

 9    outlier number, way outlier.

10              MR. MOORE:  Well I don't think that's -- whatever.

11    We'll explore that.

12    Q.  Did you, in fact, add up the figures that Officer Serrano

13    indicated for the number of radio runs in this report?

14    A.  His radio runs, he noted, went to 161.  I came up with 171

15    radio runs instead of 161.

16    Q.  Are you aware that Officer Serrano has testified in this

17    trial that he responds to two to three hundred radio runs a

18    month?

19    A.  Yes.  I'm aware that he said that.

20              THE COURT:  I'm sorry.  What?

21              MS. COOKE:  He testified he responds to two to three

22    hundred radio runs a month on patrol in the 40th precinct.

23    Q.  Are you aware of any officer in the 40th precinct that

24    responds to two to three hundred radio runs in a month?

25    A.  Absolutely not.  That's extremely exaggerated by Officer

D5d9flo4                          McCormack - direct

1    Serrano.

2    Q.  What about the summons activity listed in this October 2012

3    monthly activity report?

4    A.  After looking at his summons activity, his six parkers, his

5    one mover, and one criminal court summons, reviewing our

6    department records, we show zero for his --

7              THE COURT:  I'm sorry.  You're referring on the six to

8    one.

9              THE WITNESS:  Six to one, yes.

10             THE COURT:  I can't read the top of the column.  What

11   is the six?

12             THE WITNESS:  The six is A, which is parkers.

13             THE COURT:  Parkers.

14             THE WITNESS:  Parking and summonses.

15             The one is a B, which is a moving violation.

16             And the next one, one would be a C, criminal court

17   summons.

18             THE COURT:  He puts six, one, one.  But you couldn't

19   find what?

20             THE WITNESS:  We came up, in our department records,

21   of zero activity at all.

22             MR. MOORE:  Once again, here we have another review of

23   records which we've not --

24             MS. COOKE:  It's a zero.

25             THE COURT:  One second.  Could he finish, Ms. Cooke,

D5d9flo4                          McCormack - direct

 1   without interruption.

 2           MR. MOORE:  That we were ever advised of or been able

 3   to see those documents.

 4           So I would ask that that testimony be stricken.  It's

 5   also hearsay.

 6           THE COURT:  I don't know about any of that.  I don't

 7   know what records yet he reviewed.

 8           What records do you go through to come up with the

 9   zero?

10           THE WITNESS:  For the C summons, criminal court

11   summonses, those are kept in the department's computer.  You

12   can run a person's tax number and come up with that number.

13           But the As and Bs, the movers and the parkers, you

14   actually have to do a hand count of them.

15           So going through the month of October, going through

16   all our summonses, we found zero for him.

17           THE COURT:  The way they're filed, you can look in all

18   of October 2012?

19           THE WITNESS:  Yes.

20           THE COURT:  All of the summonses issued in your

21   precinct for both A and B?

22           THE WITNESS:  Yes, ma'am.

23           THE COURT:  And how are they stored, by date?  Does it

24   go from the first of October --

25           THE WITNESS:  We keep them of boxes per month.  And we

D5d9flo4                          McCormack - direct

1    went through every single summons for the month of October.

2              THE COURT:  How do you keep it in the box, October 1,

3    October 2, October 3?

4              THE WITNESS:  I'm not a hundred percent sure.  I had

5    my officers do it.

6              THE COURT:  So you didn't do it?

7              THE WITNESS:  No.

8              MR. MOORE:  I renew my objection, Judge.

9              THE COURT:  Right.  I don't know that -- I don't know

10   who did it.  I don't know if it was done accurately.

11             THE WITNESS:  I had the trained sergeant that's

12   usually in charge.

13             THE COURT:  I understand, but he's not here under

14   oath.

15             THE WITNESS:  Of course.

16             THE COURT:  So you only know what he told you.  So

17   that does make it hearsay.  It's not the person who conducted

18   the search.  So I don't know if it's accurate.

19             Is it your experience there is a copy for each

20   summons?

21             THE WITNESS:  There is a copy.  Absolutely.  You have

22   to hand in your copy to us.

23             THE COURT:  Well I can't take the six.  I certainly

24   can take the one where you said it was a computerized search.

25             THE WITNESS:  The computerized search.  That's the

1   last one, the criminal court one.  We can actually put the

2   person's tax number in the computer.

3              THE COURT:  Who did that?

4              THE WITNESS:  I did.

5              THE COURT:  You did that one yourself and found

6   nothing under his tax ID number?

7              THE WITNESS:  Yes.

8              THE COURT:  How about the one in between, the V.

9              THE WITNESS:  It's the number one.  It's the six and

10  the one.

11             THE COURT:  They are the ones --

12             THE WITNESS:  You got to hand count.  Yes, ma'am.

13  Q.  What, if anything, are you doing with respect to police

14  officers' monthly activity reports -- well, the reporting of

15  numbers on officers' monthly activity reports after reviewing

16  October 2012 for Officer Serrano?

17             THE COURT:  I'm sorry.  I didn't -- it got long and I

18  missed it.

19             I guess she's saying as a result of reviewing this and

20  seeing these discrepancies, what action have you taken?

21             THE WITNESS:  Seeing these discrepancies in Officer

22  Serrano's monthly activity reports I'm definitely -- I have my

23  ICO now doing a check -- a spot check of one activity report

24  from each squad to verify the information the days on patrol

25  are correct, the radio runs are correct, and the activity given

D5d9flo4                          McCormack - direct

1    is correct.

2                THE COURT:  I was going to ask you that because I see

3    it's signed off by Sergeant Monroe.

4                THE WITNESS:  Yes, ma'am.

5                THE COURT:  And wondering, it does say he also checked

6    off:  Discussed with member of service, he checked off yes.  So

7    are you saying that Sergeant Monroe didn't have this 161 figure

8    jump out at him?

9                THE WITNESS:  No.  He didn't.  Most of them will take

10   a look at it and hopefully the officer has given the right --

11               THE COURT:  Yes.  But you said 161 is such an outlier

12   radio run number that it should have jumped out at Sergeant

13   Monroe.

14               THE WITNESS:  It should have.

15               THE COURT:  And obviously Sergeant Monroe didn't go

16   back and check the six, one, one either?

17               THE WITNESS:  No.

18               THE COURT:  But now you want them to do that on a spot

19   check basis.

20               THE WITNESS:  I'm going to have my integrity control

21   officer do that.

22   Q.  Directing your attention back to Exhibit 332T which is the

23   transcript of the evaluation appeal meeting.  Page 5, lines 16

24   through 18.

25               You asked Serrano to identify his biggest crime

D5d9flo4                          McCormack - direct

condition on his four to twelve tour.  Why did you do that?

A.  It's my job duties and responsibility as a commanding

officer to quiz my officers on conditions that are in the

precinct on their tours.

Q.  Directing your attention to lines 24 to 25 of the same page

5, you responded Officer Serrano was right on the money when he

identified shootings and robberies as the primary crime

conditions for the four to twelve tour in the 40th precinct.

Why did you say that?

A.  Because he was correct.  And I wanted to see if he actually

knew what was going on in his tour, so I can properly evaluate

him.  Possibly there may have been a different problem --

reason why he wasn't handling his conditions.  But he knew what

was going on.

Q.  Directing your attention to page six, lines seven and

eight.  You asked Officer Serrano what he was doing to help

prevent that and the that being the robberies, shootings, and

sometimes grand larcenies.  Why did you ask Officer Serrano

that question?

A.  I wanted to see if he could make a judgment, what he --

what he's doing related to the crime, the conditions that he's

been handling, if he knows if he can -- what he was doing

actually equals out and helps out the robberies and shootings

on the four to twelve.

Q.  And what was Officer Serrano's response about his activity

D5d9flo4                          McCormack - direct

1    he was conducting to help prevent those robberies, shootings

2    and grand larcenies?

3    A.  He said that he does verticals and directives and he stops

4    groups of people on the street.

5              MR. MOORE:  Judge, to be fair, he says, "I do

6    verticals.  I do directives.  And I interact with the public.

7    I do -- you know, if there's a crowd, I ask them to move,

8    there's --" and then he was interrupted in that answer.  And

9    then the discussion goes on to how he interacted with the crowd

10   on the street.  So that answer was interrupted by Inspector --

11   Deputy Inspector McCormack.

12   Q.  What did you think about Officer Serrano's answer with

13   respect to what he does to help prevent the robberies,

14   shootings and grand larcenies?

15   A.  I understood the verticals and directed patrols.  But

16   stopping groups of people on the street, I was very concerned

17   with why he was doing that.

18   Q.  Why?

19   A.  Well, I'm not sure if he was lawfully stopping people on

20   the street.  I don't know if it was a 250 situation, that he

21   had reasonable cause to believe that somebody was going to

22   commit a penal law misdemeanor or a felony.  I wasn't sure the

23   legality, if he was documenting these stops, or the reason why

24   he was doing it.

25   Q.  Directing your attention to page 7, beginning on line 24,

D5d9f1o4                          McCormack - direct

1   through page 8, ending on line 4.

2           You responded to Officer Serrano by addressing the

3   rate of robberies, grand larcenies and shootings in the 40th

4   precinct in 2012.  And mentioned Officer Serrano had only

5   stopped two people.

6           Why did you do that?

7   A.  Because I was pretty shocked with the amount of violence we

8   had and that -- we had, in a two-year period, we had about 133

9   people shot, over a thousand robberies, or a thousand grand

10  larcenies that, you know, to stop two people, I just thought it

11  was unfair to the public.

12  Q.  On page 8, lines 6 through 9 and again on page 9, lines 14

13  through 18.  You made statements to the effect that it appeared

14  Officer Serrano was not doing his job or not purposely doing

15  his job.

16          What did you mean by that?

17  A.  I meant with all the violence in the command, with so many

18  people getting shot, with him warning and admonishing everybody

19  in the command, as he said, he likes to warn and admonish

20  everyone.  I just completely thought it was unfair to the

21  public that he would take his discretion and abuse it like

22  that.

23  Q.  Directing your attention to page 9, lines 2 through 13.

24  You discuss with Officer Serrano taking a proactive approach.

25  What did you mean when you were describing a proactive

D5d9flo4                                McCormack - direct

1    approach?

2    A.   It means that he would go out and look, to look at the

3    situation of robberies and shootings and grand larcenies on his

4    door, and be proactive against understanding who's doing these

5    robberies, what the location is, and take a proactive approach

6    of going to those locations and trying to do something about

7    it.

8    Q.   What is the responsibility of a patrol officer in the

9    40th precinct with respect to areas they know are prone for

10   certain crime conditions?

11   A.   Could you repeat that.  I'm sorry.

12   Q.   What is the responsibility of a patrol officer in the

13   40th precinct with respect to areas in the command that they

14   know are prone for certain crime conditions?

15   A.   Their responsibility is to stay in that location, identify

16   what the problem is before they go in there.  And when they're

17   in there, to see if they can try to correct that condition.

18   Q.   Why do you think taking a proactive approach to policing in

19   the 40th precinct is necessary?

20   A.   Throughout my entire career I was very -- I've been

21   proactive.  And wherever I've been, being proactive has helped

22   the community, assisted the community in lowering crime and

23   lowering violence.  And that's what I brought to the 40th

24   precinct when I went there; if we took a proactive position,

25   that we can lower the violence.

D5d9flo4                              McCormack - direct

1    Q.  Directing your attention to page 10, line 21 through page

2    11, line 10 where you discuss having struggled dramatically in

3    Mott Haven last year?

4              MR. MOORE:  What page was that?

5              MS. COOKE:  Page 10, line 21 through page 11, line 10

6    where you discuss having struggled dramatically in Mott Haven

7    last year and the violence having calmed after the takedown.

8    What were you referring to?

9              THE WITNESS:  I was talking about the crime had

10   disappeared after the narcotics federal takedown inside Mott

11   Haven Patterson housing developments.

12   Q.  What was that narcotics operation?

13   A.  It was a one-year long operation where it took out numerous

14   drug dealers and shooting perpetrators.

15   Q.  Why did you bring that narcotics takedown up during this

16   performance evaluation appeal meeting?

17   A.  Because what I was describing whatever it takes to solve a

18   problem, if it's 250s, it's summonses, it's arrests.  In this

19   situation where Mott Haven was driving my crime, driving my

20   violence from 2011 into 2012, what finally took care of the

21   problem was a federal case takedown.

22   Q.  Directing your attention to page 11, lines 11 through 13

23   where you state the numbers or you state the statement, "I

24   don't know if it's 20, 100, 200."

25             What are you referring to when you repeat those

D5d9flo4                        McCormack - direct

1   numbers?

2   A.   I was talking about the 250s, C summonses, arrests,

3   whatever it took to take care of that problem, that's what we

4   needed to do.

5   Q.   What problem are you referring -- were you referring to

6   when you made that statement?

7   A.   I was referring to the Mott Haven housing development, Mott

8   Haven, Patterson which are right nextdoor.  That's the problem.

9   I was talking about the robberies and grand larcenies that were

10  completely out of control over there and the violence and

11  shootings that were going on.

12  Q.   Were you aware of particular crimes occurring in Mott Haven

13  and Patterson when you made that statement?

14  A.   Yes, I was.

15  Q.   Directing your attention on page 11, lines 13 through 22

16  where you state "the right people, in the right place at the

17  right location."

18          What did you mean by that?

19          MR. MOORE:  I think it says, "the right kids, in the

20  right place, at the right time."

21          THE WITNESS:  Do you want to repeat?

22          MS. COOKE:  I guess I was specifically referring to

23  page -- page 11, line 20 --

24          THE COURT:  Anyway, look, it's at both line 14 and

25  line 21.  One says kids.  One says people.  But otherwise the

D5d9flo4                        McCormack - direct

1    phrase is the same.

2              MS. COOKE:  The right place, location.  What were you

3    referring to?

4              THE WITNESS:  I was referring to my resources that I

5    have.  I don't have a lot of resources and I want to put my

6    resources in the right location.

7              And at that time Mott Haven housing development area

8    is where I needed to put my resources to stop the robberies,

9    grand larcenies and shootings that were going on.

10   Q.  And when you were mentioning "the right kids" or on line 20

11   to 21 "the right people" what were you referring to?

12   A.  I was referring to the victims' descriptions of the

13   perpetrators who were committing these crimes.

14   Q.  Directing your attention to page 12, lines 3 through 7

15   where you address Officer Serrano's B summonses in 2012 from

16   2011.  And you ask him what kind of B summonses he's issuing.

17   Why are you asking that question?

18   A.  It's important to know what kind of summonses the officer

19   is writing because it impacts on a lot of different levels of

20   traffic safety.

21   Q.  Would Officer Serrano's explanation as to what summonses he

22   was issuing provide information to you in considering his

23   performance evaluation appeal?

24   A.  I'm sorry.  Repeat that.

25   Q.  Would Officer Serrano's answer with respect to what B

D5d9flo4                              McCormack – direct

1    summonses he was issuing provide information to you to use in

2    the performance evaluation appeal?

3    A.   Yes.  He said he had a pretty good idea what the hazardous

4    were.

5    Q.   Was he able to identify the hazardous B summons conditions

6    for you?

7    A.   He identified a couple of them, but that was about it.

8    Q.   Directing your attention to page 13, lines 11 through 12.

9    Officer Serrano states he reserves the right to warn and

10   admonish everybody.

11          What did you think about that statement?

12   A.   I'm shocked and amazed that he would say something like

13   that in such a violent, violent location where the citizens

14   need our help, he wants to go around and warn and admonish

15   every single person is just absolutely ridiculous.

16          MR. MOORE:  Judge, to be fair, there's a long

17   discussion of what warn and admonish means.  For him to suggest

18   from that one statement all that he said is just objectionable

19   and I'd ask that it be stricken.

20          THE COURT:  No.  That's his reaction to what Serrano

21   said.  It may not be based on the entire transcript.  It may

22   not even be appropriate.  But it's this witness's reaction.

23          When Serrano says I reserve the right to warn and

24   admonish everybody, you were troubled by that statement; is

25   that right?

D5d9flo4                          McCormack - direct

1              THE WITNESS:  Yes, ma'am.

2              THE COURT:  Okay.  That's his reaction.

3    Q.  Do officers have discretion when issuing summonses to warn

4    and admonish someone instead?

5    A.  Yes, ma'am.

6    Q.  Do you encourage officers in the 40 precinct to exercise

7    discretion?

8    A.  Yes, ma'am.  I do it at roll call.  I talk about it at roll

9    call all the time.

10   Q.  Directing your attention to page 13, beginning on line 19.

11   Why did you ask Officer Serrano whether he was stopping people

12   blocking pedestrian traffic?

13   A.  I was worried about why is he -- you know, why is he

14   stopping people?  Is he forcibly stopping people?

15             THE COURT:  He says, of course, I'm not stopping them.

16   I'm walking up to them and I'm saying, excuse me, you're

17   blocking this, I need you to disperse.

18             THE WITNESS:  Yes.  It depends how you say it.  Is it

19   forcibly?  Is it forcibly stopping if he's saying, you know,

20   how he's talking.  That's important because I don't know -- he

21   should be documenting these stops in his memo book, which he

22   wasn't.

23             THE COURT:  Doesn't it depend if, really, all he does

24   is say:  Excuse me.  You're blocking this, or this

25   intersection, I need you to disperse, does that require a 250?

D5d9flo4                          McCormack - direct

1                THE WITNESS:  No.

2                It does require a memo book entry of him doing it.

3                And, again, our resources are very limited.  And, you

4        know, I try to put my resources in the best places possible.

5        And the locations -- I don't know where he's doing it.  There

6        is no documentation he's doing it.  So I don't know if he

7        really is doing it.

8                THE COURT:  Okay.  But in your view if he walks up to

9        a group at an intersection and says:  Excuse me.  You're

10       blocking the entrance or the intersection and I need you to

11       disperse, you think that should be in the memo book?

12               THE WITNESS:  Yes.

13               THE COURT:  Okay.

14               THE WITNESS:  And I'm not sure what it has to do with

15       stopping robberies and grand larcenies and shootings, which are

16       the conditions that he's supposed to be handling.

17               THE COURT:  That's a different question.  And the

18       question was not asked of you.

19               The real question was to look over this transcript.

20       And when he said I reserve the right to warn and admonish

21       everybody, she asked your reaction to that.  You've told us.

22       And then he says, the blocking, I need you to disperse.  Then

23       you explained that that should be documented.  So the rest of

24       your answer is stricken.

25               THE WITNESS:  Okay.

D5d9flo4                              McCormack - direct

 1          THE COURT:  Because it's not responsive to any
 2   question.
 3   Q.  What robbery or shooting or grand larceny condition are you
 4   aware of that Officer Serrano's activity of moving groups of
 5   pedestrians blocking an entrance would be preventing?
 6          MR. MOORE:  Judge --
 7          THE COURT:  Sustained.  It's just an effort, I
 8   suppose, to get the last answer in as responsive to a question,
 9   but it's not a good question.
10   Q.  How can moving crowds of pedestrians on a sidewalk address
11   a robbery, grand larceny, or shooting?
12          THE COURT:  Well, you could try that.  It's weak but
13   you could try it.
14          Are there times when moving pedestrians who are
15   blocking an entrance or a sidewalk have any relationship to
16   what's the --
17          MS. COOKE:  Shootings, robberies, grand larcenies.
18          THE WITNESS:  I don't see any connection to it.
19          THE COURT:  You couldn't imagine one?
20          THE WITNESS:  No.
21          THE COURT:  Okay.
22   Q.  Directing your attention to page 14, lines 4 through 11,
23   where you address Officer Serrano's documentation of these
24   encounters with crowds.  What was your concern with respect to
25   the documentation?

D5d9flo4                          McCormack - direct

1   A.  My concern was that he wasn't documenting.  I'm not sure,

2   again, if these were 250 situations.

3            THE COURT:  Well, you've said that.  Didn't you say:

4   Listen to me.  It's called stop, question, frisk.  If you stop

5   someone, you have to put it on paper.

6            THE WITNESS:  Yes.  If you're forcibly stopping

7   people --

8            THE COURT:  For sure.

9            THE WITNESS:  Even if it's verbally stopping people on

10  the corner.  I'm not sure if he's going up to every single

11  person saying, excuse me, you know.  But if you got out of your

12  car, or you say from your car, Hey, everybody off the street;

13  or, Hey, get over here, that's a forcible stop.

14           THE COURT:  So you don't know which it was?

15           THE WITNESS:  I don't know.  And I'm afraid that he's

16  not documenting any of these forcible stops.

17  Q.  Directing your attention to page 19, lines 1 through 4.

18  You address the number of shootings the 40th precinct had in

19  2011, 71 or 72; and 2012, 51.

20           Why did you do that?

21  A.  Because I wanted to let him know that we had, again, 133

22  people shot.  And I was very worried that, with his actions,

23  that he was not handling his condition and it was not fair to

24  the community what he was doing on patrol.

25           MR. MOORE:  Judge, I'd ask that that be stricken

D5d9flo4                           McCormack - direct

1    because he said 133.  I don't see 133.

2              THE COURT:  She's adding up 72 and 51, 123.

3              MR. MOORE:  It's two years though.

4              THE COURT:  I know.  But he's still saying -- isn't

5    that 123?

6              THE WITNESS:  I'm sorry.  I apologize.

7              THE COURT:  That's okay.  Anyway, you were just saying

8    in the last two years there was 123 shootings, right?

9              THE WITNESS:  Yes, ma'am.

10   Q.  You asked Officer Serrano on page 19, lines 3 to 4 if he

11   thought warn and admonishing everybody is the way to go.

12             Why did you ask him that?

13   A.  Because I wanted him to get -- to see if his judgment of

14   just -- his judgment of approaching people and of warning and

15   admonishing people is helping fight crime, violent crime in the

16   40th precinct, in Mott Haven.

17   Q.  Did Officer Serrano's response affect your concerns you

18   just articulated about his judgment?

19   A.  Yes.  It actually -- it showed that his judgment is

20   completely off.

21   Q.  How so?

22   A.  To -- again, to sit there and say 123 people were shot, you

23   know, we had 33 homicides, you know, a thousand robberies, a

24   thousand grand larcenies, you know, approximately ten thousand

25   crimes in one year reported, to sit there to warn and admonish

D5d9flo4                              McCormack - direct

1   everybody in Mott Haven is completely not fair to the public.

2   Q.  Directing your attention to page 20, lines 14 and 15.

3   Officer Serrano responded to you, "So you're saying, what?

4   Summons everybody for whatever reason?"

5          Did you say that?

6   A.  I didn't say that.

7          THE COURT:  He said that.  Is that Serrano speaking?

8          MS. COOKE:  Yes.  Serrano said that to you.

9   Q.  Did you -- you indicated to Serrano he should summons

10  everybody for whatever reason?

11  A.  Absolutely not.

12  Q.  What did you think about that statement by Officer Serrano?

13          MR. MOORE:  Object, Judge.

14          Now?  Then?

15          MS. COOKE:  At the time.

16          MR. MOORE:  There's a recording of what he thought

17  about it.

18          THE COURT:  Yes, there is a recording.

19          THE WITNESS:  I'm sorry.  Am I supposed to --

20          THE COURT:  No.  I'm not allowing the answer.

21          MS. COOKE:  I'm not allowed to ask what he thought

22  about the statement by Officer Serrano, summons everybody for

23  whatever reason?

24          THE COURT:  No.  Because it's in a context -- you'd

25  have to read the two pages before, the two pages after, and

D5d9flo4                         McCormack – direct

1   then ask it.  There's an ongoing conversation, which I have the

2   full text in front of me.  I can see how he reacted.

3          For him to say how many months later what his reaction

4   was, February 2013, three months later, I have his reaction

5   right here.  They were having a conversation.

6   Q.  What did that statement by Officer Serrano indicate to you

7   about his knowledge and ability to do his job?

8          MR. MOORE:  Objection, Judge.  What statement?

9          MS. COOKE:  "Summons everybody for whatever reason."

10         THE COURT:  That was a question.  That wasn't a

11  statement.  According to the transcript, Serrano is questioning

12  the inspector.

13         "So you're saying what?  You're saying I should

14  summons everybody for whatever reason?"

15         He's asking him that.

16         I mean that's the problem with taking words out of

17  context without the question mark.

18         The way I read this is Serrano thinks he said that,

19  the inspector said that.

20         So he's saying, "You're saying what?  Summons

21  everybody for whatever reason?"

22         So that's the way to read it.

23         It's a dangerous thing to just take some words out of

24  context.

25         So, therefore, I'm going to sustain an objection to

D5d9flo4                          McCormack - direct

1    that question.

2                 What would you like to ask next, so I could get some

3    continuity here.

4    Q.  What had been your instruction to Officer Serrano with

5    respect to issuing summonses in the 40th precinct during this

6    meeting?

7                 MR. MOORE:  Judge --

8                 THE COURT:  Let's back up.  Had you given him

9    instructions regarding summonsing people?

10                THE WITNESS:  Yes.

11                THE COURT:  When had you done that?

12                THE WITNESS:  During this conversation.

13                THE COURT:  During the conversation?

14                THE WITNESS:  Yes.

15                THE COURT:  Then you could point to it.

16                THE WITNESS:  Yes.

17                THE COURT:  Can you point to it?

18                THE WITNESS:  I'm not sure what page it's on.

19                MS. COOKE:  Directing your attention I think to page

20   21; beginning on line 1, ending on line 16.

21                THE COURT:  That's where he says, "Again, again, for

22   the right place, the right time, the right location.  And,

23   again, that's not summonsing everybody.  I don't need, you

24   know -- give you a perfect example of what we have here, we,

25   you know, it was a rookie mistake.

D5d9flo4                              McCormack – direct

1          "A 40-something-year-old lady, a 48-year-old lady was

2    walking through St. Mary's Park when it was closed.  She got

3    stopped and summonsed.  We do a check about it.  She made a

4    complaint about it.  We do a check on it.

5          "The lady's never had police contact in her life,

6    ever.

7          "She was at 10:00 at night, or 10:30 at night,

8    something to that effect, she was getting on a train, taking a

9    shortcut through St. Mary's Park to go to work.  Is that the

10   right lady we should be stopping?"

11   Q.  Why did you use that example with Officer Serrano with

12   respect to issuing summonses in the 40th precinct?

13   A.  Because of the fact that we had such violence inside that

14   park between two young groups of people.  And for us to stop a

15   female in her late 40s and give her a summons for being in the

16   park for a minor violation is just the wrong resources at the

17   wrong time.

18         MR. MOORE:  First of all, Judge, I don't think he's

19   accusing Serrano of stopping that person.

20         THE COURT:  No.  He's asking --

21         MR. MOORE:  I don't know if that existed.

22         THE COURT:  It sounds like he's asking a hypothetical.

23   He's saying to Serrano:  Is this the right thing to do?

24   Because he says, "Is that the right lady we should be

25   stopping?"

1            Serrano responds, "I wasn't there.  I can't make that

2     call."

3            The inspector says, "Absolutely positive.  I'm just

4     saying.  Let me ask you.  In your opinion, a 40-year-old lady

5     going to work at 10:30 at night, making a minor violation

6     through a park, and you think that's the right people?"

7            And Serrano says, "I cannot make the call.  I have to

8     be there.  I have to see."

9            And the inspector says, "You cannot make that call?"

10           Serrano says, "No, I cannot.  I have to be there."

11           They go on.

12           "In your professional opinion," the inspector says, "a

13     lady who's --"

14           Serrano says, "I can't make the call.  Why are we

15     doing this?  I understand the 250s."

16           The inspector says, "No, no, no.  This is very

17     important."

18           Serrano says, "I understand that.  I'm addressing it

19     next year."

20           Then it goes on.  So they're having a

21     continuing conversation about this.

22     Q.  Why were you having this conversation with Officer Serrano

23     about a hypothetical situation as to who he should be stopping?

24     A.  Because it's very important that he understands our --

25     resources are limited, our time is limited.  We want to go, you

know -- approach the right people who are committing the crimes

at certain locations.  That certain location was the St. Mary's

Park.  We had two young groups of people shooting and robbing

each other inside park.  And I just felt the 48-year-old lady,

to give her a summons, that's a very simple question to give to

somebody and unfortunately in his judgment he could not make

that judgment.

Q.   Directing your attention to page 23, lines 11 to 13.

Officer Serrano stated, "So what am I supposed to do?  Is it

stop every black and Hispanic?  I told you that I have to be

there.  I must be there."

        Had you instructed Officer Serrano during this meeting

to stop every black and Hispanic?

A.   No, never.

        MR. MOORE:  Judge, I mean.

        THE COURT:  I understand.  While the question was

being posed, I was reading along in the transcript.  And,

again, it's hard to jump around.  But if you want to back up.

On page 22, line 15 the inspector says, "Because it's the right

people, the right time, the right location."

        And Serrano says, "And who are the right people?"

        The inspector says, "The right people."

        Serrano again says, "Who are the right people?"

        Inspector says, "Depends where you are."

        Serrano says, "All right.  Then see, so you have to be

D5d9flo4                         McCormack - direct

1    there.  It depends where I am, what I see, what I do."

2              The inspector says, "Okay.  Again, Mott Haven."

3              Serrano says, "Mott Haven.  Full of black and

4    Hispanics.  Okay.  So who are the right people?  Tell me."

5              The inspector says, according to this, "Black and

6    Hispanic."  And then brackets, "Unintelligible phrase."

7              Serrano says, "Yes.  They're all black and Hispanic."

8              And the inspector says, "They're all, all,

9    unintelligible phrase."

10             Serrano says, "Most of them.  Most of them are."

11             The inspector says, "Listen, this is not -- this is

12   not -- this is not -- this is not -- this is not."

13             Then Serrano says, "What am I supposed to do?  Stop

14   every black and Hispanic?  I told you that I have to be there.

15   I must be there."

16             And it goes on.  "Listen.  Again, again -- listen to

17   me.  Again, you're telling me you're going to stop everybody?

18   You want to stop all black and Hispanic?  It's not -- this is

19   not --"

20             Serano says, "I'm not going to do that.  You want to

21   do that.  I'm -- I don't want to do that."

22             The inspector says, "This is about stopping the right

23   people, the right place, the right location."

24             Serrano says, "Okay."

25             The inspector says, "Again take Mott Haven where we've

D5d9flo4                         McCormack - direct

1    had the most problems, and the most problems we had, these was

2    robberies and grand larcenies."

3           Serrano, "And who are those people robbing?"

4           Inspector, "The problem was, what, male blacks.  And I

5    told you at roll call, and I have no problem telling you this,

6    male blacks 14 to 20, 21.  I said this at roll call."

7           So there's context.

8           MS. COOKE:  There is context, your Honor.

9           My question was in light of the conversation and the

10   statement on page 22, 23, the question was to the inspector as

11   to whether or not he had -- there are unintelligible phrases.

12          THE COURT:  There are unintelligible phrases, two of

13   them.  But the transcript is what it is.  And it seems to me I

14   have to figure out who said what.

15          MS. COOKE:  So my question was whether or not the

16   inspector had ever instructed Officer Serrano during this

17   meeting to stop all blacks and Hispanics.

18          THE COURT:  I think it's a matter of interpretation

19   from the transcript.  That's for me to decide.  I've got the

20   transcript right in front of me with only two brackets in it.

21          I guess I should have finished that interchange

22   because it's almost over.  Picking up on page 24, line 3.

23          "The problem was, what, male blacks.  And I told you

24   at roll call and I have no problem telling you this, male

25   blacks 14 to 20, 21.  I said that at roll call."

D5d9flo4                          McCormack - direct

1          Serrano, "So, what am I supposed to do?  Male blacks,

2    14 to 20 wearing dark clothing, what do you want me to do

3    specifically?"

4          Inspector, "Wearing dark clothing, who said that?"

5          Serrano, "What do you want me to do?"

6          I guess that sort of ends that sequence.

7          MR. MOORE:  I think actually it goes on to the

8    beginning of the next page, Judge, in terms of the full

9    context.

10         THE COURT:  I don't see it.

11         MR. MOORE:  On line 23, where the inspector says --

12         THE COURT:  23?

13         MR. MOORE:  Of page 24.

14         THE COURT:  No.  I don't agree.  I read that to myself

15   already.  I don't think that's part of the same colloquy.

16         All right.  Anyway.

17         MS. COOKE:  So with respect to the question, if I can

18   ask the inspector, ask the inspector if he ever stated during

19   this meeting to Officer Serrano that Officer Serrano should

20   stop all blacks and Hispanics.

21         THE COURT:  Okay.  And I already said that's a matter

22   of interpreting what the transcript shows he did say, and

23   that's my job.

24         MS. COOKE:  He was present at the meeting.

25         THE COURT:  I know.  I've got it on tape.  I know what

D5d9flo4                              McCormack - direct

1    he said.

2              MS. COOKE:  There are unintelligible phrases.

3              THE COURT:  There are two unintelligible phrases, both

4    of which were read into the record.  They weren't skipped.  One

5    was on page 23, line 2.  One was on page 23, line 6.

6              Based on what is intelligible, I will decide what a

7    reasonable person would have understood him to say.

8              MS. COOKE:  So your Honor's ruling is that I'm not

9    permitted to ask him whether or not in the statement on line

10   23 -- page 23, lines 2 to 3, that that was a statement that

11   Officer Serrano should stop all blacks and Hispanics?

12             THE COURT:  That one line where he says, "Black and

13   Hispanic," bracket "unintelligible phrase"?

14             MS. COOKE:  Yes.

15             THE COURT:  I suggest to you that he cannot tell us

16   word for word what the missing unintelligible phrase is.

17             Do you honestly under oath think you know every word

18   that is missing where it says unintelligible phrase?

19             THE WITNESS:  I'm not sure, ma'am.

20             THE COURT:  I wouldn't think so.  It's really -- it's

21   impossible now.  We have the transcript.  Some words are not

22   intelligible.  Without a record, nobody would know what the

23   exact words were that were said there.  There's just no point.

24   I've got what I've got.  And that's it.  I'll make a judgment

25   what a reasonable person would have thought was said from what

D5d9flo4                          McCormack – direct

1   is on the transcript, not guessing at the unintelligible

2   portion.

3   Q.  Have you ever instructed officers in the 40th precinct to

4   stop all blacks and Hispanics?

5   A.  Absolutely never.

6   Q.  Directing your attention to page 24, lines 3 through 6.

7   The portion your Honor read which was the description of, "male

8   blacks, and I told you this at roll call, and I have no problem

9   telling you this, male blacks, 14 to 20, 21.  I said this at

10  roll call."

11          What roll call were you referring to?

12  A.  I was describing, addressing the roll call in the 40th

13  precinct during 2012, while this condition was going on inside

14  Mott Haven.

15  Q.  What condition were you referring to?

16  A.  The numerous -- the hundreds of robberies and grand

17  larcenies that were occurring in and around Mott Haven and

18  Patterson housing developments.

19  Q.  How did you know that it was male blacks, ages 14 to 20 and

20  21?

21  A.  From the victims' statements of who the perpetrators were.

22  That's who they were describing to us as the perpetrator.

23  Q.  What was the description of the individuals you knew the

24  40th precinct had arrested for robberies and grand larcenies

25  in 2012 in Mott Haven?

D5d9flo4                              McCormack - direct

1          MR. MOORE:  Objection.  Unless he has personal

2     knowledge of that.

3          THE COURT:  He does as the supervisor.  He knows who

4     was arrested for these two crimes.

5          THE WITNESS:  We made numerous arrests of robberies

6     and grand larcenies in and around Mott Haven housing

7     development, male blacks between 14 and 21.

8          THE COURT:  Do you know the racial composition of the

9     population of Mott Haven houses?

10         THE WITNESS:  No, I don't, ma'am.

11         THE COURT:  How about just from experience?

12         THE WITNESS:  No, I don't, I'm sorry.  I have 14

13    housing developments.

14         THE COURT:  I know.  But Mott Haven.  Pretty well

15    known area for you?

16         THE WITNESS:  Yeah.  It's a pretty violent area.

17         THE COURT:  I understand.

18         THE WITNESS:  I don't know the breakdown.

19         THE COURT:  Is it primarily one race or another?

20         THE WITNESS:  I can't give you a professional opinion.

21    I don't want to give you a wrong answer.

22         MS. COOKE:  Can you bring up Exhibit B14 that's

23    already in evidence.  Bates stamped page --

24         THE COURT:  Which one are you bringing up now?

25         MS. COOKE:  B14.  It's the chart.  You'll recognize

D5d9flo4                          McCormack - direct

1    it.  It's Bates stamped page 28916.  We'll look at the racial

2    composition of the precinct.

3              THE COURT:  The precinct.

4              MS. COOKE:  Not necessarily --

5              THE COURT:  That wouldn't be Mott Haven houses.

6              MS. COOKE:  For context.

7              THE COURT:  I understand.  Which precinct are we

8    talking about?

9              MS. COOKE:  The 40th.

10             THE COURT:  I'll get to that page in a second.

11             This says that the population of the 40th precinct

12   is 26.2 percent black and 71 percent Hispanic and 1.6 percent

13   white.

14             THE WITNESS:  Yes, ma'am.

15             THE COURT:  Does that help you know who's not living

16   in Mott Haven houses.

17             THE WITNESS:  Well, I would say that all my housing

18   developments are basically somewhat in that direction of, you

19   know, 71 percent or 26 percent are blacks and Hispanics.

20             THE COURT:  So they are basically black and Hispanic?

21             THE WITNESS:  Yes.

22             THE COURT:  That's what I was asking before.  I

23   thought you knew that.

24             THE WITNESS:  I didn't know the numbers off the top --

25             THE COURT:  I thought you knew it was primarily black

D5d9flo4                         McCormack - direct

1    and Hispanic.

2                 THE WITNESS:  Yes, ma'am.

3                 THE COURT:  Okay.

4    Q.  Directing your attention back to the transcript, page 25 at

5    the top, lines 2 to 3.

6                 You ended the appeal at that point?

7    A.  Yes, ma'am.

8    Q.  Why was the appeal over?

9    A.  Because I felt that the officer was starting to be

10   disrespectful to me as the commanding officer.  And we went

11   through a couple of the 28 points during the evaluation.  And I

12   felt that he didn't deserve the increase in points.

13                MR. MOORE:  Judge, to suggest that they went through

14   the 28 points, given that we've just read -- we have the entire

15   transcript avail --

16                THE COURT:  I'm sorry.  Who said they went through the

17   28 points?  Did he just say that?

18                MR. MOORE:  He just said that.

19                THE COURT:  Hold on.  Let me reread it.

20                THE WITNESS:  He said we went through a couple of the

21   28 points.  That's what the transcript on my screen said.

22                MR. MOORE:  I just heard the 28 points.

23                THE COURT:  I understand what you heard.  But I'm

24   reading what the reporter, "We went through a couple of the

25   28."  That's why I wanted to check.

D5d9flo4                          McCormack – direct

1    Q.  Were you finished with your answer?

2    A.  I'm not sure, I hate to say.

3          THE COURT:  You said anyway, "We went through a couple

4    of the 28 points during the evaluation.  I felt that he didn't

5    deserve the increase in points."

6          THE WITNESS:  Yes, I'm finished.

7    Q.  What was the next step with respect to Officer Serrano's

8    2012 performance evaluation?

9    A.  He had to make a decision if he wanted to appeal it to the

10   borough.  And he was told how to do that by Lieutenant Batelli.

11   And I think it's in the borough's hands right now.

12   Q.  Officer Serrano claims that in order to force him to

13   increase his numbers he was identified as an arresting officer

14   for an arrest he did not make, for an arrest he did not

15   observe.  Is it a violation of department policy to process the

16   arrest in those circumstances?

17   A.  No, it's not.

18   Q.  When an officer acts as the arresting officer, does he

19   complete paperwork indicating information may be learned from

20   other officers?

21   A.  Yes, ma'am.

22   Q.  When an officer is assigned an arrest which the officer did

23   not observe, can he take personal steps to gain personal

24   knowledge about the circumstances of the arrest?

25   A.  Yes, ma'am.

D5d9flo4                    McCormack - direct

1   Q.  Could you give an example.

2   A.  If he was assigned a DWI arrest he could -- you know,

3   another officer can observe the person actually driving the

4   vehicle.  The officer can then assign someone else to take the

5   arrest.  That officer can come over and take a look at the

6   driver, put him through some of the steps for the test and see

7   if in his opinion if the person is intoxicated or not.

8   Q.  Officer Serrano claims in order to force him to increase

9   his numbers -- enforcement numbers at the 40th precinct he

10  was required to ride with a supervisor.

11          Is that the reason an officer at the 40th precinct

12  rides with a supervisor?

13          MR. MOORE:  Going to object to the preface of that

14  question.  Officer Serrano said a lot of things.  To suggest

15  that it's only what she claims he said.

16          THE COURT:  She didn't say that's the only thing he

17  said.  He said a lot of things.  But that's one of the things

18  he said.  The only question is -- how did you phrase it?

19  Q.  Is that a reason --

20          THE COURT:  Is that, I guess, one of the reasons an

21  officer is assigned to ride with a supervisor?

22          THE WITNESS:  It could be a reason that he was

23  assigned to ride with a supervisor, yes.

24  Q.  Did you ever assign Officer Serrano to ride with a

25  supervisor at the 40th precinct?

D5d9flo4                          McCormack - direct

1    A.  Never.

2    Q.  Officer Serrano has also claimed in order to increase his

3    numbers he's been forced to write illegal summonses.  Have you

4    ever ordered Officer Serrano to write an illegal summons?

5    A.  Never.

6    Q.  Are you aware that any other officer at the 40th precinct

7    has ever ordered Officer Serrano to write an illegal summons?

8    A.  No.  I'm not aware of that.

9    Q.  Officer Serrano also has claimed in order to increase his

10   enforcement numbers he's been forced to work checkpoints.

11           Have you ever ordered Officer Serrano to work a

12   checkpoint in the 40th precinct?

13   A.  Never.

14           THE COURT:  Do you know if he was ordered to work at

15   checkpoints?

16           THE WITNESS:  We do safety checkpoints.  We did DWI

17   checkpoints.  I do put that out to my supervisors.  Who they

18   pick, that's --

19           THE COURT:  So he may well have been assigned --

20           THE WITNESS:  Yeah.

21           THE COURT:  But not by you?

22           THE WITNESS:  But not by me.

23           THE COURT:  Because you don't do those assignments?

24           THE WITNESS:  No.  I just put it out to my supervisors

25   and whoever they have available --

D5d9flo4                          McCormack – direct

 1              THE COURT:  So they do the assignments.

 2              THE WITNESS:  Yes, ma'am.

 3    Q.  Officer Serrano alleges he's been subjected to adverse

 4    employment action because he didn't make quotas in place at the

 5    40th precinct.

 6              Have you ever taken an adverse employment action

 7    against Officer Serrano for failure to meet a quota?

 8    A.  Never.

 9    Q.  Are there quotas for enforcement activity at the 40th

10    precinct?

11    A.  Absolutely positively not.

12    Q.  Have you ever directed anyone else at the 40th precinct

13    to take adverse employment action against Officer Serrano?

14    A.  Absolutely never.

15    Q.  Officer Serrano claims that this adverse employment action

16    included poor performance evaluations in 2011 and 2012.

17              Do you believe Officer Serrano received poor

18    performance evaluations in those years?

19              MR. MOORE:  Object to the form of that.

20              THE COURT:  Let me reread that one.

21              If the question is only:  Do you think a three, 3.0 is

22    a poor performance evaluation?  That's all I'll take.

23              THE WITNESS:  Absolutely not.

24    Q.  Officer Serrano claims that in or around November of 2012

25    you threatened to switch his shift.  Did you ever make such a

D5d9flo4                          McCormack – direct

1    threat?

2    A.   Absolutely not.

3    Q.   Did you ever have any conversations with Officer Serrano

4    regarding switching his shift?

5    A.   Absolutely not.

6    Q.   Did you ever have any conversations with anyone else in or

7    around November of 2012 regarding switching Officer Serrano's

8    shift?

9    A.   Absolutely not.

10   Q.   Officer Serrano claims that he's been assigned unusual

11   posts in retaliation for the complaints he's made about quotas

12   at the 40th precinct.  When did you first learn about Officer

13   Serrano's complaints about quotas in the 40th precinct?

14   A.   This year.  Part of this year.  After it came out in the

15   paper.

16   Q.   Since that time have you assigned Officer Serrano to any

17   unusual posts?

18   A.   Absolutely not.

19   Q.   Officer Serrano has claimed that one of those unusual posts

20   was outside the precinct in the Rockaways.  Were you aware

21   officers from the 40th precinct were sent to the Rockaways?

22   A.   Yes.  Numerous -- numerous.  I believe almost everybody in

23   the precinct was sent out to the Rockaways at some point for

24   the last couple of months after the storm.

25   Q.   What is unusual about the police department redistributing

D5d9flo4                              McCormack - direct

1   resources following a storm such as Hurricane Sandy?

2   A.   What is unusual about it?  It's not.  It's something that

3   we do.  Wherever the resources need to be, the NYPD will put

4   them there.

5   Q.   Officer Serrano has also claimed that another unusual post

6   is a footpost.  Are footposts in the NYPD unusual?

7   A.   Absolutely not.

8            THE COURT:  Are footposts ever assigned based on

9   seniority?  In other words, the more junior members of the

10  precinct get assigned footpost and the more senior people are

11  in patrol cars?

12           THE WITNESS:  Absolutely not.  The junior cops that

13  come out, they are assigned to footposts as rookies, and they

14  do get some car tours.  Then eventually they do move into the

15  precinct squads.  But anybody in any squad at any time can be

16  required --

17           THE COURT:  I understand they can.  But I'm asking

18  whether there are more footposts for junior and less for

19  seniors because the seniors are in the car, right?

20           THE WITNESS:  Well juniors are probably, I'm sorry, on

21  footpost more than senior officers.

22           THE COURT:  But senior officers do go out on footposts

23  too?

24           THE WITNESS:  Absolutely.  A hundred percent.

25  Q.   Aside from impact officer posts, what are some of the

D5d9flo4                              McCormack - direct

1   footpost assignments that appear in the 40th precinct as
2   potential assignments for officers?
3   A.   We have violence reduction footpost.  We have conditions
4   post that I address.  And we also have operation all out which
5   addresses -- the borough chief tells us where to go and those
6   are the footposts that they have to address.
7   Q.   What is operation all out?
8   A.   It's all the people who do administrative work, one day a
9   week they have to go out and walk a footpost.  It's every week.
10  Q.   Earlier when we were looking at Officer Serrano's
11  October 2012 monthly activity report you mentioned something
12  about a Beekman auto?
13  A.   Yes.
14  Q.   What's the Beekman auto assignment?
15  A.   Beekman auto is a vehicle that I created when I got there.
16  There was a steady sky watch tower.  That's one of those things
17  that go up in the air.  And one cop stays down.  One cop stays
18  at the top.  I asked the borough chief if I could have that
19  removed and make it an auto, to address conditions up and down
20  the streets.  So far, it's helped dramatically.
21  Q.   What about the school bus driver strike?  Did you have
22  footposts in the 40th precinct in early 2013 for that
23  purpose?
24  A.   Yes.  We had two strike posts in the confines of the 40
25  precinct.

D5d9flo4                          McCormack - direct

1    Q.  And what officers were assigned to work those strike posts

2    generally?

3    A.  All patrol officers were assigned to that.

4    Q.  And what hours did you at the 40th precinct have to have

5    officers covering the strike post?

6    A.  Twenty-four hours a day, seven days a week.

7    Q.  For approximately how many weeks?

8    A.  I apologize.  I don't know how long.  It was a couple

9    months.  Almost two months, I believe.

10   Q.  What about overtime?  Officer Serrano has claimed he had to

11   work overtime that he didn't request since making complaints

12   about quotas.

13        Is overtime punishment?

14   A.  Absolutely not.

15   Q.  Are officers compensated for overtime work?

16   A.  Yes, they are.

17   Q.  Officer Serrano has also complained that he was sent to

18   additional training in retaliation for his complaints about

19   quotas.

20        Did you send Officer Serrano to additional training in

21   retaliation for those complaints?

22   A.  No.

23        MR. MOORE:  Object to it.

24        THE COURT:  I'm sorry.  One second.

25        What's the objection?

D5d9flo4                          McCormack - direct

1          MR. MOORE:  The question was did he send him for

2     retraining.

3          THE COURT:  Right.  In retaliation --

4          MR. MOORE:  All right.  I mean he did go to

5     retraining.

6          THE COURT:  I'm sorry?

7          MR. MOORE:  He was sent for retraining.

8          THE COURT:  But the officer denies it's in retaliation

9     for the complaints.  He said no.

10         Yes.  He said no.

11    Q.  Officer Serrano also claims he's been picked apart for

12    command disciplines since making complaints about quotas at the

13    40th precinct.

14         Have you picked Officer Serrano apart with command

15    disciplines since learning of his complaints?

16    A.  No.

17    Q.  Are you aware that Officer Serrano redacted lines in his

18    memo book in February of 2013 in violation of department

19    policy?

20    A.  Yes.

21    Q.  What punishment can be imposed for redaction in violation

22    of department policy?

23    A.  A command discipline could be given.

24    Q.  Officer Serrano has also claimed that supervisors were

25    checking on him unusual numbers of times during his tour

D5d9flo4                          McCormack - direct

1    following his complaints about quotas.  Are you aware that

2    supervisors were doing such activity?

3    A.  No, I'm not aware of it.

4    Q.  Since you've been at the 40th precinct have you received

5    complaints from individuals who have been stopped?

6    A.  Yes.

7    Q.  And in what context?

8    A.  I get office from the chief department memos, reports

9    saying that somebody made a complaint, and it's come down

10   through the chain to my office on people who are upset that

11   they've been stopped.

12   Q.  What were CCRB complaints?  Do you also receive

13   notification of CCRB complaints against officers at the 40th

14   precinct?

15   A.  Yes, I do receive them through communications.

16   Q.  Are you aware of whether or not any CCRB complaints have

17   included an allegation of someone complaining about a stop?

18   A.  Yes, ma'am.

19   Q.  With respect to the office of chief of department

20   communication complaints, what do you do with those?

21   A.  I read every single one of them before they're -- before it

22   gets to anybody.  I assign it to my operations lieutenant who

23   then distributes it to usually a lieutenant to complete the

24   investigation.

25   Q.  What, if anything, do you find out about the results of the

D5d9flo4                          McCormack - direct

1    investigation?

2    A.   Before it's sent back out to the borough I get the report.

3    I overlook the report, make sure that what I believe should be

4    done is done.   And after it's signed off by me, we send it to

5    the borough.

6    Q.   When you say you make sure what should be done is done,

7    what are you referring to?

8    A.   That the investigation is complete and accurate.

9    Q.   At the 40th precinct have you ever received complaints

10   from individuals regarding racial profiling by officers at the

11   40th precinct?

12   A.   No, I haven't.

13   Q.   How often do you attend community meetings?

14   A.   I attend numerous community meetings per month.   Committee

15   council meetings.   Committee board meetings.   Many social group

16   meetings.   Church meetings.   I attend a lot of them.

17   Q.   What is your policy with respect to access of community

18   members to you as the commanding officer at the 40th

19   precinct?

20   A.   My door is always opened.   Everybody has my e-mail that if

21   they have any complaints, if they have any issues, any

22   concerns, they can e-mail me.   They have my phone number.   They

23   can walk in.   They all know my door is open at all times if

24   they want to come in and talk.

25   Q.   Has stop-and-frisk activity by the 40th precinct police

D5d9flo4                          McCormack - direct

1    officers been discussed at any of the community meetings you've

2    attended?

3    A.  I've never heard it come up.

4    Q.  What about racial profiling?  Has racial profiling concerns

5    been raised at any of the community meetings in the 40th

6    precinct you've attended?

7    A.  No.  It has never come up.  I brought it up to my local

8    officials and to my community regarding racial profiling

9    because of what came out in the papers regarding the statements

10   that Officer Serrano made.

11   Q.  Why did you do that?

12   A.  Because I thought it was important that the community and

13   my elected officials and my representatives know exactly what

14   happened, know exactly what I was talking about.  And we've

15   discussed it, sat down with them all, and it's great to have

16   the support of all of them regarding this.

17           MS. COOKE:  I have no further questions for the

18   witness at this time, your Honor.

19           THE COURT:  All right.  Mr. Moore.

20   CROSS-EXAMINATION

21   BY MR. MOORE:

22   Q.  Inspector McCormack, who is the sitting councilperson or

23   persons who cover the 40th precinct?

24   A.  Ms. Herrara.

25   Q.  What's her first name?

1    A.   Maria.

2    Q.   And who is the state senator or senators who cover the 40th

3    precinct?

4    A.   Senator Serrano, sir.

5    Q.   Who is the state senator --

6            THE COURT:  He said Senator Serrano.

7            MR. MOORE:  Sorry.  I thought you -- I got tripped up

8    with the names.

9    Q.   What about the state rep?

10   A.   I'm not sure off the top who that is.

11   Q.   When you used the term Mott Haven, you're not just

12   referring to the Mott Haven houses, are you?

13   A.   Depends what you're talking about, sir.

14   Q.   When you started out in the beginning of your testimony

15   describing where you're now, the precinct, you mentioned that

16   you're at the precinct, the 40th precinct, and that's Mott

17   Haven?

18   A.   Yes.

19   Q.   That's what the area is called, right?

20   A.   There's a lot of different areas.  It's mostly known as

21   Mott Haven.  It's also called Fort Wash.  Port Morris.  There's

22   a couple of different names.  SoBRO, or something to that

23   effect.

24            (Continued on next page)

25

D5D8FLO5                          McCormack - cross

1    Q.  But Mott Haven doesn't just refer to the Mott Haven houses,

2    correct?

3    A.  No, sir.

4    Q.  That's not how you understand it, right?

5    A.  I understand what, sir?

6    Q.  You understand the term Mott Haven to be describing the

7    area in general?

8    A.  Usually that's what I consider, when people ask me where

9    the 40th Precinct is, I say we cover the Mott Haven area.

10   Q.  On direct Ms. Cooke showed you this chart for the

11   demographics of the 40th Precinct.  You described that,

12   correct?

13   A.  Yes, sir.

14   Q.  You will note there on this particular page, which is Bates

15   stamp number 916, that at least in 2012 the black population of

16   the 40th Precinct was 26.2 percent, right?

17   A.  Yes, sir.

18   Q.  But they made up 51.7 percent of the persons stopped,

19   correct?

20   A.  That's what it says, sir.

21   Q.  Now, this says total reasonable suspicion stops.  But you

22   don't know whether the 18,276 stops done in the 40th Precinct

23   were based on reasonable suspicion or not, do you?

24   A.  I don't know where you see that.  I apologize.

25   Q.  Look at the top of the page.  It says, 40th Precinct, total

D5D8FLO5                           McCormack – cross

1   reasonable suspicion stops.  It says 18,276?

2            THE COURT:  Right.

3   Q.  You don't have any personal knowledge that all 18,276 stops

4   were based on reasonable suspicion, do you?

5   A.  No, sir.

6   Q.  It also says the top crime suspected was weapons

7   possession, right?

8   A.  Yes.  On the top of the page, yes.

9   Q.  In your testimony, you mentioned grand larceny auto and

10  robbery as the crimes that Serrano should have been focusing

11  on, right?

12           MS. COOKE:  Objection.  It misstates the witness's

13  testimony.  He didn't say grand larceny auto.

14           THE COURT:  He said grand larcenies and robberies.

15           MS. COOKE:  And shootings.

16  Q.  He didn't mention weapons possession, right?

17  A.  When you mention weapons possession, it goes with the

18  shootings, with the 123 people shot in the 40th Precinct over a

19  two-year period.  CPW is the 250.

20  Q.  When it says top crime suspected, that means that the crime

21  that's listed on the UF-250, right?  Over 50 percent of the

22  stops in 2012, the top crime was weapons possession, right,

23  CPW, right?

24  A.  That's what it says, sir.

25  Q.  Let's take a look at Exhibit B10, which is the copy of the

D5D8FLO5                          McCormack - cross

1    October 2012 monthly performance report for Officer Serrano,

2    correct?

3    A.  Yes, sir.

4    Q.  The one that you testified you had several problems with,

5    right?

6    A.  Yes, sir.

7    Q.  One of the things you said is that he claimed he was only

8    on patrol -- his tours on patrol were 13, right?

9    A.  That's what it says, sir.

10   Q.  You believe it was more than that, it was 16, it should

11   have been 16 or 17?

12   A.  If you count the X, it should have been 16.  But if you add

13   the CRV, it should have been 17.

14   Q.  CRV, what does that stand for?

15   A.  Critical response vehicle.

16   Q.  That's where you see all of these police cars driving

17   around together in a row, right?

18   A.  That's a piece of what they do.

19   Q.  That's not even in the 40th Precinct.  That could be down

20   in Manhattan, mostly in Manhattan, correct, that part of it,

21   right?

22   A.  I'm not going to testify mostly where it is.  It's

23   throughout the city.

24   Q.  But that's not patrol in the precinct, right?

25   A.  Patrol in my command, no.  It's patrol in the city.

D5D8FLO5                         McCormack - cross

1    Q.   The purpose of that -- what is the purpose of CRV?

2    A.   Critical response vehicle, if you want me to define what

3    that is, I think you would have to ask the police department.

4    Critical response vehicle has to do with terrorism.

5    Q.   It's to have a presence on the street, correct?

6    A.   Again, you would have to ask somebody else what the -- I

7    know it's critical response vehicle.  It deals with terrorism.

8    To identify the exact cause of it, I'm not going to answer

9    that.

10   Q.   I am asking you what your understanding of it is.

11           THE COURT:   I don't think it's important for this

12   trial.  He says it's related to terrorism, and I am sure there

13   are reasons he rather not speculate or answer what the purpose

14   of it is.

15           MR. MOORE:   The reason it's important, Judge, is

16   because I think it's not patrol.

17           THE COURT:   The officer checked other CRV dates as

18   patrol you will notice.

19           MR. MOORE:   I understand.

20           THE COURT:   At least twice he checked CRV.

21   Q.   There are three, on the 4th of October, 11th and 12th of

22   October, Officer Serrano was on CRV duty?

23   A.   Yes.  He was assigned to critical response vehicle.

24   Q.   So that's not patrol within the precinct, right?

25   A.   Within the confines of the 40th Precinct, no.

D5D8FLO5                          McCormack – cross

1           THE COURT:  But on the 12th, he checked as patrol,

2    right?

3           THE WITNESS:  Yes.

4           MR. MOORE:  I understand.

5           THE COURT:  And on the 4th he checked as patrol?

6           THE WITNESS:  Yes, ma'am.

7           THE COURT:  But not the 11th?

8           THE WITNESS:  Yes, ma'am.

9    Q.  If you take those CRV days away, you get 13 days an patrol,

10   at least what is checked on this form, correct?

11   A.  If that's your math, yes.

12          THE COURT:  16 minus 3 is 13.

13          THE WITNESS:  That's correct.

14   Q.  That's what he put on his form, his tours on patrol was 13,

15   right?

16   A.  That's what he wrote then, yes.

17   Q.  Before you were the commanding officer of the 40th Precinct

18   you were the commanding officer of the 20th Precinct, correct?

19   A.  Yes.

20   Q.  What dates were you the commanding officer there?

21   A.  Cinco de Mayo, May 5, 2010, to I believe September 27,

22   2011.

23   Q.  September?

24   A.  I think it's 26 or 27.

25   Q.  2011?

D5D8FLO5                              McCormack – cross

1    A.  Yes, sir.

2    Q.  So you were there about 16 months, right?

3    A.  Approximately, yes.

4              THE COURT:  Where is that?

5              THE WITNESS:  The 20th precinct is the Upper West

6    Side, 59th Street to 86th Street, from Central Park West to the

7    river.

8    Q.  While you were there an allegation was brought against you

9    that as the commanding officer you maintained illegal quotas in

10   the 20th Precinct, right?

11             MS. COOKE:  Objection.  To the extent that Mr. Moore

12   is going to get into the nature of those allegations, those are

13   not relevant to this proceeding.

14             THE COURT:  It's relevant that the accusation was

15   illegal quotas.

16             MS. COOKE:  My objection is it goes to notice only and

17   notice of whether the deputy inspector is aware of.

18             THE COURT:  I think we are in agreement.  I am only

19   going to allow the allegation of quotas.

20   Q.  There was an arbitration that was brought about it,

21   correct?

22             MS. COOKE:  It's yet concluded.

23             THE COURT:  The arbitration is still ongoing?

24             THE WITNESS:  I have absolutely no idea.

25             THE COURT:  You don't know that there is an

D5D8FLO5                           McCormack - cross

1   arbitration over this issue?

2              THE WITNESS:  I am not aware of anything at all.

3              THE COURT:  That's that for the record.

4   Q.  During the time you were in the 20th Precinct, the quality

5   assurance division would audit your precinct to determine

6   whether officers were properly filling out their memo books

7   with the details of their stop, correct?

8   A.  We do the report and we give it to QAD, yes.

9   Q.  QAD would audit whether that's being done, correct?

10  A.  Yes, sir.

11  Q.  In 2010, do you know what the score was on your audit for

12  that portion of the audit?

13             THE COURT:  In 2010.

14  A.  I'm not aware of it.

15             MS. COOKE:  For the record, Mr. Moore is referring to

16  Exhibit G6.

17             MR. MOORE:  I will do it.  Give me an opportunity.

18             MS. COOKE:  You have put it on the screen.

19  Q.  Looking at Exhibit G6, which we have seen numerous times

20  already in this case, looking just at -- for the record, I will

21  indicate that the 2010 audit begins at Bates stamp number 741.

22  It's for the third quarter of 2010.  And it shows that in 2010,

23  in the 20th Precinct, the score on the audit for whether

24  members' activity logs have entries with respect to their stop

25  and frisk activity, your score was a 2.0, correct?

D5D8FLO5                          McCormack - cross

1          THE COURT:  I can't see where it says 20th Precinct.

2          MR. MOORE:  You see on left-hand side --

3          THE COURT:  Now I see it.

4          Do you see it?

5          THE WITNESS:  I see it.

6          THE COURT:  It says 2.0 for the filling out of the

7   memo books?

8          THE WITNESS:  Yes, ma'am.

9   Q.  Your score for 2010 was a 2.0.  That's a failing score,

10  correct?

11  A.  What is the date?

12         THE COURT:  It's the third quarter 2010.

13  A.  Third quarter of 2010.  When they do their reports, it's

14  always a couple of months behind.  As I said, I was there in

15  May of 2010.  I'm not exactly sure the time period they are

16  evaluating.

17  Q.  In any event, you don't dispute that that's the score that

18  the precinct received for the 2010 audit?

19         THE COURT:  It's right there on the screen in black

20  and white.  That's what it says, 2.0.

21  Q.  After that you moved to the 40th Precinct, correct?

22  A.  That's right, sir.

23  Q.  We will get to the 40th Precinct in a minute.

24         So you started in the 40th Precinct as the deputy

25  inspector, commanding officer of the 40th Precinct in September

D5D8FLO5                          McCormack - cross

1   of 2011?

2   A.  Yes.  Late September.

3   Q.  If there was a 2011 audit, you weren't there long

4   enough -- did you know what the score on the 2011 audit by QAD

5   of that particular aspect of filling out memo books was?

6   A.  No, I don't know.

7   Q.  Nobody has ever told you what that score was?

8   A.  I'm not aware of it.  I may have been told in the past, but

9   I'm not sure.  Unfortunately, we failed a lot of things, a lot

10  of QAD tests in 2011.

11  Q.  You see here on Bates stamp 186, for the 40th Precinct,

12  this is the 2011 audit?

13          THE COURT:  It's the first line.

14          For that period, it got a 2.0 in that category, right?

15          THE WITNESS:  Again, I don't know what period this is.

16  It says 2.0 on it.  So I'm not really sure.

17          THE COURT:  You don't know what time period?

18          THE WITNESS:  No.

19          THE COURT:  Can you point out the time period?

20  Q.  The 2011 audit, the fourth quarter of 2011 was reviewed.

21  A.  Which I wasn't assigned yet.

22          MS. COOKE:  The sample UF-250s were commencing in

23  August 2011 which predates.

24          THE COURT:  He said he wasn't there.

25  Q.  Were you aware, though, that the precinct got a 2.0 audit

D5D8FLO5                          McCormack – cross

1   on that aspect of the audit for 2011?

2   A.  I was aware that we failed numerous things in the command

3   when I arrived there.

4   Q.  Well, you were there for all of 2012 though, right?

5   A.  Yes, sir.

6   Q.  Looking at the 2012 audit, which begins on Bates stamp

7   number 27856, which is for the third quarter of 2012, you were

8   the commanding officer of the 40th Precinct in that quarter,

9   correct?

10  A.  Yes, sir.

11  Q.  Showing you what is the results for Patrol Borough Bronx,

12  which is Bates stamp number 859, you see that the 40th Precinct

13  for 2012, for whether officers are filling out their activity

14  logs with details of their stop and frisk, the precinct scores

15  a 1.0, correct?

16  A.  We were just slightly below the average of 1.3.  I see

17  that.

18  Q.  1.0 is the worst you can do on that audit?

19  A.  Yes, sir.

20  Q.  And the average of 1.3 for the borough is a failing

21  average, right?

22  A.  Yes, sir.

23  Q.  Have you taken any steps, Inspector, to remedy that?

24  A.  Yes.  We are in the middle of inspecting memo books,

25  crossing over between the 250s, the memo book entries, making

D5D8FLO5                          McCormack - cross

1    sure that all the captions are filled out.  Everything on that

2    sheet that they check off we are doing now.

3    Q.  Deputy Inspector McCormack, you testified you did an appeal

4    hearing of Officer Serrano's evaluation for his 2012

5    evaluation, correct?

6    A.  Yes, sir.

7    Q.  That appeal hearing was done in February of 2013, right?

8    A.  Yes, sir.

9    Q.  Did I understand your testimony to be that as of that date,

10   you had never seen Officer Serrano?

11   A.  I don't think I said that.

12        THE COURT:  I thought you told us earlier the first

13   time you met him, I thought you said February.

14        THE WITNESS:  I don't believe I interacted with him.

15   I may have seen him.  He was just a person --

16        THE COURT:  The first time you interacted?

17        THE WITNESS:  I may have said hello to him.  I don't

18   recall ever talking to him at all.

19        THE COURT:  You testified earlier the first time you

20   recall talking to him was February 13.

21        THE WITNESS:  Yes, ma'am.

22   Q.  When you sat to do the evaluation in February of 2013, you

23   knew that he had appealed his evaluation from 2011 as well,

24   right?

25   A.  Yes, sir.

D5D8FLO5                          McCormack - cross

1    Q.   Because you knew that he had had a conversation with

2    Captain Materasso, right?

3    A.   Yes, sir.

4    Q.   Now, did I understand you correctly that you meet with the

5    sergeant and the lieutenant before they do the evaluation of

6    the officer to discuss the evaluation?

7    A.   Yes, sir.

8    Q.   During that meeting, do you discuss what numbers are going

9    to be put in the categories?

10   A.   We discuss the officer in general, the conditions he's

11   handling, if there are any personal problems going in the

12   personal life.  We discuss a lot of things in that room.

13   Q.   Do you have a recapitulation of the officer's yearly

14   activity in that meeting?

15   A.   Can you rephrase that?

16   Q.   Do you have any kind of sheet that captures the officer's

17   yearly activity, enforcement activity, at that meeting?

18   A.   Yes.

19   Q.   So at that meeting in February 2013, you would have had a

20   document that showed not just October, but the entire year's

21   activity for Officer Serrano in 2012, correct?

22   A.   The supervisor who is supposed to come to the meeting is

23   supposed to be prepared to discuss all his subordinates.

24   Q.   Do you recall looking at that yearly sheet?

25   A.   Yes.

D5D8FLO5                         McCormack – cross

1    Q.   You knew he had a 3 on the 2011 evaluation, right?

2    A.   Yes.

3    Q.   Did you know that he had a higher score in 2010 and in 2009

4    than what he got in 2011?  Did you just know that generally?

5    A.   I knew that.

6    Q.   Would it be fair to say that when an officer sees his

7    evaluation rating going down, that might be a reason why they

8    would want to do an appeal, right?

9              MS. COOKE:  Objection, to the extent it calls for

10   speculation.

11             THE COURT:  I will allow that.

12             That could be a reason?

13             THE WITNESS:  Absolutely.  When I first got to the

14   precinct, I discussed with the officers, the delegates, how I

15   do my evaluations and what was going to go on it.

16             THE COURT:  Thank you.

17   Q.   That meeting with Officer Serrano in February of 2013, from

18   beginning to end is captured on that tape recording, correct?

19   A.   I believe so.

20   Q.   You have listened to the tape recording, correct?

21   A.   Yes, sir.

22   Q.   It's your voice on that tape?

23   A.   Yes, sir.

24   Q.   Now, I am not going to go over the whole thing, but there

25   are a few questions I have, and particularly since we have read

D5D8FLO5                          McCormack - cross

1    a lot of it in the direct, I am not going to repeat a lot of

2    that, but there are a few things I want to ask you about.

3              First, it's clear that Serrano told you the reason he

4    wanted to appeal the evaluation was factual, right?

5    A.  Yes.

6    Q.  And he explained to you, did he not, what had transpired

7    with Captain Materasso the year before, correct?

8              MS. COOKE:  Objection, your Honor, to the extent Mr.

9    Moore is characterizing portions of the entire transcript or

10   meeting.  If he wants to ask questions --

11             THE COURT:  I will allow that.

12             MS. COOKE:  Whether or not Officer Serrano explained

13   the entirety of what had transpired or a portion of it, he

14   explained something.

15             THE COURT:  I want him to answer that.

16             Did he discuss with you what transpired with Captain

17   Materasso the year before?

18             THE WITNESS:  I am not sure exactly what it says.  He

19   said he discussed it and something about his activity and

20   summonses had doubled, something to that effect.

21   Q.  Let's look at page 2 of the transcript.  He says here,

22   beginning at page 9 --

23   A.  Page 2 or page 9?

24   Q.  I'm sorry.  Page 2, on line 8.

25             You ask him, What is the reason for your appeal?

D5D8FLO5                            McCormack - cross

1              He says, "Factual.  I was instructed by Captain

2        Materasso that when I -- I appealed it last year.  I walked in

3        and told her, why am I getting a 3.0?  I told about the

4        20-something points, and I expressed myself on each one of

5        them.  And she basically said that my activity was for, was

6        half of that score and that I have to get my activity up."

7              Do you recall that that's what Serrano told you

8        Materasso had told him?

9        A.   That's what is written in the transcript that allegedly

10       Captain Materasso said to him.

11       Q.   But that's clearly what Serrano told you at the hearing?

12       A.   That's what he told me.  I don't know if it's factual.

13              THE COURT:  But that's what he told you?

14              THE WITNESS:  Yes.

15       Q.   At that point, you didn't tell him -- because you had

16       talked to Materasso, right?

17       A.   I spoke to Captain Materasso --

18       Q.   Before this appeal hearing, right?

19       A.   I spoke to Captain Materasso after the 2011 appeal.

20       Q.   When you heard Serrano say, she told me I have to get my

21       activity up, you don't respond to what he said there in terms

22       of getting his activity up, do you?

23              MS. COOKE:  Objection.

24              For completeness, the deputy inspector responds on

25       page 4, line 18, "Yeah.  Well, first of all, I believe, because

D5D8FLO5                         McCormack – cross

1   I spoke to the XO about this, and by the way, Inspector

2   McCormack, Lieutenant Batelli's here, your delegate Foster.  I

3   know the XO spoke to you about handling your conditions, not

4   about activity."

5           So he might not have responded immediately after on

6   page 3, but that's the response that appears on page 4.

7           THE COURT:  OK.

8   Q.  In any event, it's clear Officer Serrano is saying,

9   Materasso told me to get my activity up, and he is saying, I

10  got my activity up, correct?

11  A.  Again, I don't know what is factual with Captain Materasso.

12          THE COURT:  He is not asking you whether it's true.

13  A.  That's what he said.

14  Q.  You agreed with him to some extent that he did get his

15  activity up, right?  In some categories, his activity was up,

16  right?

17  A.  In some categories, yes, sir.

18  Q.  He also complained to you that the current evaluation said

19  he needed supervision, right?

20  A.  That's what the written statement said.

21  Q.  He complained to you that in 2011, the reviewing officer

22  didn't say that, the rater didn't say that, but in 2012, they

23  are saying that he needs supervision, right?

24  A.  That's what it states.

25  Q.  In 2011, were you aware of the statement in the evaluation

D5D8FLO5                        McCormack - cross

1    by Stephen Monroe, the sergeant who did the rating, which said,

2    "Serrano is a competent police officer that has the ability to

3    be a leader," right?  Do you see that?

4    A.  I apologize.  "PO Serrano is a competent police officer

5    that has the ability to be a leader."

6    Q.  Then in the 2012 evaluation, the same sergeant is saying

7    that he requires some supervision, right?  You see under number

8    25 there?

9    A.  OK.  That's not the overall statement.  That's one of those

10   drive/initiative that he is making a comment on.  What you read

11   before was an overall rater's comments.

12   Q.  Also, both of these evaluations --

13            MS. COOKE:  Objection.  I think for completeness,

14   there is a comment below the reviewer's box on Defendants'

15   Exhibit O15 on the screen, if Mr. Moore can move it up.  There

16   is a comment that also includes a statement about being leader.

17            THE COURT:  Where is that?

18            MS. COOKE:  "PO Serrano has shown he has the

19   capability to achieve great things --"

20            THE COURT:  Wait.

21            "Police Officer Serrano has shown he has the

22   capability to achieve great things if he chooses to apply

23   himself.  He does possess street smarts and his leadership

24   qualities that the younger officers could look up to and learn

25   from."  You see that, right?

D5D8FLO5                        McCormack - cross

1          THE WITNESS:  Yes, ma'am, I see it.

2     Q.  You have said a lot of things where you have basically

3     questioned Officer Serrano's judgment in your testimony,

4     haven't you?

5     A.  Yes, sir.

6     Q.  At least the rater in both these evaluations says that he

7     has and possesses leadership qualities, right?

8     A.  If he chooses so, yes, that's what it says.

9     Q.  In fact, on both year 2011 and 2012, looking at 2011 first,

10    the rater says, "Serrano adheres to the ethics of the

11    department," right?

12    A.  Yes.

13    Q.  "And he also demonstrates an ability to" -- I think it's

14    supposed to say make, but it says "to sound decisions."  Do you

15    see that?

16    A.  Yes.

17    Q.  That's just that he has good judgment, right?

18    A.  He demonstrates it, yes.

19    Q.  In fact, it's in the category for judgment?

20    A.  Yes.

21    Q.  And that he handles situations with care and empathy?

22    A.  Yes.

23    Q.  Then in 2012, the rater is also again saying that Serrano

24    maintains high standards of ethics when doing his job, right?

25    A.  Yes, sir.

D5D8FLO5                              McCormack – cross

1   Q.  So he is a person of integrity would you say, right?

2            MS. COOKE:  Objection, to the extent that he asking

3   the witness to speculate or characterize.  The document speaks

4   for itself.

5            THE COURT:  It says high standard of ethics.  That's

6   what it says.

7   Q.  In your opinion reading that, would you say that's an

8   officer of high integrity?

9            THE COURT:  I will allow it.  It does say "police

10   ethics/integrity."

11            If all you knew was that comment, "Police Officer

12   Serrano maintains high standard of ethics when doing his job,"

13   would you think that was a person of high integrity?

14            THE WITNESS:  If I only knew that, and only that, I

15   would say yes.

16   Q.  Now, you said you had a discussion with Materasso after the

17   2011 evaluation, right?

18   A.  Yes.

19   Q.  Did she tell you that she discussed with Officer Serrano

20   that he needed to get his activity up?

21   A.  No.  Captain Materasso told me that they spoke about him

22   handling his conditions and him not handling his conditions.

23   Captain Materasso instructed him to concentrate on the

24   conditions on his tour and to address those conditions.

25   Q.  So you don't recall her talking to him about the need to

D5D8FLO5                              McCormack - cross

1    get his activity numbers, his enforcement activity numbers up?

2            MS. COOKE:  Objection.  He wasn't present at the

3    meeting.

4            THE COURT:  I realize that.  It's what she told him.

5            Did she tell you that she told him to get his numbers

6    up?

7            THE WITNESS:  She never mentioned that.

8    Q.  It's your testimony that she didn't talk about that.  But

9    you talked about that in your evaluation in 2013, right, in

10   your appeal hearing in 2013, right?

11   A.  What do you mean I spoke about it?

12   Q.  You talked about him getting his activity numbers up,

13   right?

14   A.  I don't believe I did that, unless you can show it to me

15   somewhere so I can read it.

16   Q.  You talked to him about the number of his arrests and you

17   didn't think his arrests were high enough, right?

18           MS. COOKE:  Objection.  It mischaracterizes.

19           THE COURT:  Where are you taking this from, Mr. Moore?

20           MR. MOORE:  He just testified on direct, Judge, that

21   Serrano said, I had eight or nine arrests and I had five the

22   year before.  He testified on direct that was nothing.  That

23   activity is very low.  So I am only asking him whether, in

24   fact, he recalls discussing with Serrano getting his activity

25   up.

D5D8FLO5                        McCormack - cross

1          THE COURT:  I will allow that.  He either did or

2     didn't have that discussion.

3          MS. COOKE:  That question is rephrased.

4          THE COURT:  We are in the present.

5          MS. COOKE:  He was suggesting that deputy inspector

6     raised the issue --

7          THE COURT:  That's over.  That question is over.

8          The question now is, did you discuss with him getting

9     his enforcement activity up?

10          THE WITNESS:  Police Officer Serrano addressed me

11     saying that his activity was up.  I never addressed him at all

12     about his activity.

13          THE COURT:  You didn't tell him eight or nine was low?

14          THE WITNESS:  I said eight or nine are low.

15          THE COURT:  Did you say you needed to get that

16     activity up?

17          THE WITNESS:  I don't think I said that.

18          THE COURT:  You told him eight or nine are low?

19          THE WITNESS:  I told him eight or nine are low.

20     Q.  Did you tell him that his 250s were low?

21     A.  Again, he told me what he had.

22     Q.  If you could just answer yes or no.  Did you tell him his

23     250s are low?

24          MS. COOKE:  If Mr. Moore is pointing to a specific

25     point in the recording --

D5D8FLO5                               McCormack - cross

1          THE COURT:  He doesn't need to.  If he just wants to

2     ask a question, he can.

3          MS. COOKE:  I asked questions about whether or not

4     statements were made by the deputy inspector.

5          THE COURT:  This is not part of this transcript.

6          Did you tell him that his 250s were low at any time,

7     did you ever tell him his 250s were low?

8          THE WITNESS:  I don't recall what exactly I said.  If

9     there is something he can read off to me --

10         THE COURT:  Do you ever remember telling him his 250s

11    were low?

12         THE WITNESS:  I think I recall saying that if he had

13    four or five more, it would be insufficient.

14    Q.  So you were concerned that his enforcement activity numbers

15    were low?

16         MS. COOKE:  Your Honor, is he referring to the

17    meeting, because we have been talking about the meeting.

18         THE COURT:  I don't know.

19         MR. MOORE:  Presumably, he has an independent

20    recollection.  There is a transcript, but I think I am entitled

21    to ask him, as he sits here, what his recollection is.

22         THE COURT:  From the same meeting, which was taped

23    beginning to end?  I just went through that with Ms. Cooke and

24    I didn't allow her.  Because the transcript says what it says.

25    There are two brackets on one page that say unintelligible, and

D5D8FLO5                                     McCormack - cross

 1   that's it.  Otherwise I said I will read the transcript and

 2   figure out what a reasonable person would think was said.

 3            MS. COOKE:  I move to strike the prior question and

 4   answer on the basis that Mr. Moore was in fact asking --

 5            THE COURT:  If he was limiting himself to this very

 6   conversation, which the testimony is it was taped from

 7   beginning to end, then I agree with you.  Those questions and

 8   answers should be stricken.

 9            MR. MOORE:  I think we certainly should have some

10   leeway beyond the transcript.

11            THE COURT:  We just went through that when the defense

12   was asking questions.

13            MR. MOORE:  I think he did answer a lot of questions

14   where he was asked to characterize what was on the transcript

15   and to give his opinion.  He gave his opinion.

16            THE COURT:  If it was there, if you had found the

17   actual words.  There were times that he was asked, what did you

18   mean by the right people, at the right place, at the right

19   time?  I recall that and I allowed him to answer.  I didn't

20   allow him to answer when there were brackets because he said he

21   couldn't remember everything said in those brackets.

22            In any event, I did let him say what he meant by this

23   phrase or that phrase.  If there is a particular phrase that

24   you want to ask him what that meant, you can.

25   BY MR. MOORE:

D5D8FLO5                        McCormack - cross

1   Q.  Look at page 8, line 6 to 9.

2              THE COURT:  Hold on.  Page 8, line 6 through 9.

3              You say there, "And to stop two people, you know, to

4   see only two things going on, that's almost like you're

5   purposely not doing your job at all."

6              So I guess what he wants to ask you is, isn't that an

7   indication that two stops is just not enough?

8              THE WITNESS:  In a violent prone location of the 40th

9   Precinct, with 123 people shot, thousands of robberies,

10  thousands of grand larcenies, 10,000 crimes being reported --

11             THE COURT:  That's telling him it's not enough.

12             THE WITNESS:  It's by far not enough.

13  Q.  That's also sending the message to the officer that he

14  needs to get his activity up, right?

15  A.  Activity up?

16  Q.  His enforcement activity.

17  A.  I don't want enforcement activity just for activity.

18             THE COURT:  You just told me that no way two stops is

19  enough in such a high crime busy area?

20             THE WITNESS:  Absolutely.

21             THE COURT:  So you would have been telling him

22  increase your enforcement activity.

23             THE WITNESS:  Increase enforcement activity at the

24  right place.  My resources are very limited, and I need him to

25  be in the right location.

D5D8FLO5                           McCormack - cross

 1              THE COURT:  You were saying increase your enforcement

 2     activity in the right place?

 3              THE WITNESS:  Yes, ma'am.

 4     Q.  Again, on page 9, if you look at it, page 9, line 14 to 18,

 5     you say --

 6              THE COURT:  Which page?

 7              MR. MOORE:  Page 9, line 14.

 8              THE COURT:  Line 14 through 18, you say, "And, you

 9     know, two UF-250s for a year and handling such a violent place,

10     violent shootings, violent robberies, violent grand larcenies,

11     it's not fair to the public that you're not doing your job."

12              I guess his question is, again you're telling him

13     that's just too low, is that right?

14              THE WITNESS:  Yes, ma'am.

15     Q.  So you gave him some advice as to how he can get his

16     numbers up, right?

17              MS. COOKE:  Objection, your Honor.

18              MR. MOORE:  I will withdraw that.

19     Q.  You instructed him on how he could do his job better,

20     right?

21     A.  I'm not aware of that.  If you could show me exactly where

22     I instructed him.

23     Q.  You told him --

24              THE COURT:  Isn't that what you just said in court, to

25     make appropriate stops in the right place?

1              THE WITNESS:  To handle the conditions, to make sure

2      we are putting our resources in the right location at the right

3      time, and not to waste our energy on stuff that's not

4      important.

5              THE COURT:  But that's your instruction to him?

6              THE WITNESS:  Yes.

7      Q.  To look for the right kids in the right place at the right

8      time, right?

9              THE COURT:  You said that at one point.  I think it's

10     line 11 and 12.

11     A.  Regarding Mott Haven housing development, during the

12     robberies, that's exactly what I was talking about, yes.

13     Q.  Look at page -- actually, begin on page 10.  You're not

14     talking about -- if you look at the bottom of page 10, where

15     you say, "I mean, they were killing us.  And in robberies.  Not

16     even that.  In shootings, but shootings and grand larcenies,

17     and one summons or one 250 at that location doesn't do it.  You

18     know, the Mott Haven community, the violence came down after

19     the takedown."

20              So you're not speaking there about the Mott Haven

21     houses, you're talking about the Mott Haven community, right?

22     A.  I am talking about the Mott Haven housing authority.

23     Q.  You didn't say that though, you said community, right?

24     A.  Yes.

25              MS. COOKE:  I would object.  He wasn't reading a

D5D8FLO5                          McCormack – cross

1   complete answer.  On page 10, beginning on line 21, "But

2   unfortunately, you know, just take for example Mott Haven

3   because that was where we struggled dramatically last year."

4            THE COURT:  You're reading way too fast.

5            So you started with, "Unfortunately, you know, just

6   take for example Mott Haven because that was where he struggled

7   dramatically last year.  I mean, they were killing us.  And in

8   robberies.  Not even that.  In shootings, but shootings and

9   grand larcenies, and one summons and one 250 at that location

10  doesn't do it.  You know, the Mott Haven community, the

11  violence calmed down after the takedown."

12           THE WITNESS:  Yes.

13  Q.  So the record is clear, you don't mention Mott Haven

14  houses, you mention Mott Haven community?

15  A.  I was speaking regarding the Mott Haven housing

16  development.

17  Q.  The phrase there on page 11, where you say, "We need to go

18  out there and –– I don't know what it is."

19           Page 11, beginning on line 11, "We need to go out

20  there and –– I don't know what it is.  I don't know if it's 20,

21  100, 200, whatever it is to make sure that the kids –– and it's

22  the right kids in the right place at the right time."

23           The 20, 100 and 200 is referring to summonses, arrests

24  and 250s, right?

25  A.  Yes, sir.

D5D8FLO5                              McCormack - cross

1   Q.   Then you testified, and I think the Court read a lot of the

2   testimony already so I am not going to repeat it, but you say

3   here that, "The problem was, what, male blacks.  And I told you

4   at roll call --"

5   A.   One second.

6   Q.   Page 24, line 3.  "The problem was, what, male blacks.  And

7   I told you at roll call, and I have no problem telling you

8   this, male blacks 14 to 20, 21.  I said this at roll call."

9            So you not only told Serrano this in this appeal

10  hearing, what you're saying there is this is what you told all

11  the officers at roll call, correct?

12  A.   I have discussed this at community council meetings.  I

13  have discussed this at community board meetings.

14            THE COURT:  The question is, did you do it at roll

15  call?

16  A.   I discussed talking about male blacks, 14 to 20, 21 years

17  old, in and around the Mott Haven housing development, at the

18  time they were killing us with robberies and grand larcenies.

19            THE COURT:  All he asked you is, did you tell them

20  that at roll call?

21            THE WITNESS:  I mentioned that at roll call,

22  absolutely.

23  Q.   No further description, just male blacks, 14 to 20, 21,

24  right?

25            MS. COOKE:  Objection, your Honor.  Is he referring to

D5D8FLO5                              McCormack - cross

1    there is no further description in the transcript or at the

2    statements at roll call?

3              THE COURT:  The transcript speaks for itself.  He just

4    said male blacks, 14 to 20 and 21.

5              Is that what you said at roll call?

6              THE WITNESS:  If you read the transcript, he cut me

7    off, and didn't allow me to finish what I was talking about.  I

8    discussed this again at community council meetings --

9              THE COURT:  The attorneys are both asking you right

10   now, did you say anything more in the way of description at the

11   roll call, or was the description limited to male blacks, 14 to

12   20 or 21?

13             THE WITNESS:  I gave more description.

14             THE COURT:  Do you remember what it was?

15             THE WITNESS:  Robberies and grand larcenies, in and

16   around the Mott Haven housing development, male blacks, 14 to

17   20, 21 years old, robbing people like it's free out there.

18             THE COURT:  Right.  But the description of those

19   perpetrators.

20             THE WITNESS:  We got into further descriptions of

21   where they were running, exact buildings, and we got this from

22   911 callers.  It was very detailed of what we were looking for.

23             THE COURT:  But the description of people were male

24   blacks 14 to 20?

25             THE WITNESS:  Yes.  And we got those from the victims

D5D8FLO5                              McCormack – cross

1    that were being robbed.

2             THE COURT:  I understand where you got it.  But that

3    was the description?

4             THE WITNESS:  Yes.

5    Q.  How many male blacks, 14 to 20 to 21, live in the Mott

6    Haven section of the 40th Precinct?

7             MS. COOKE:  Objection.

8             THE COURT:  If he knows.

9    Q.  Do you have any idea?

10   A.  I have no idea.

11   Q.  Were you concerned by giving a description at roll calls,

12   and wherever you talked about it, that the targets of your

13   enforcement activity were male blacks, 14 to 20, were you

14   concerned that that would be misunderstood by your officers out

15   on the street?

16   A.  No.  I address roll calls on numerous occasions.  My

17   descriptions of what is going on, keeping officers updated at

18   all times, crimes that are moving, crimes that are at different

19   locations.  Sometimes even the descriptions change at the same

20   location at the same time.

21             I will give you an example.  151 Street and Cortlandt,

22   we had a description of male blacks beating up Mexicans late at

23   night on the midnights.  We addressed that.  I went to roll

24   call.  I spoke, we had male blacks beating up Mexicans on the

25   late tour.  They addressed the issue.  Then all of a sudden it

D5D8FLO5                              McCormack - cross

1    changed.  The male Hispanics, the Mexicans, started beating up

2    the blacks.  So we had to address roll call again and change

3    what's going on and make sure we were addressing those

4    conditions.

5    Q.  So the change was from male blacks, 14 to 20, 21, to male

6    Hispanics, 14 to 20, 21?

7    A.  I didn't say that.  The description I just gave of 151 and

8    Cortlandt, I never gave an age.  It was just male blacks

9    beating up Mexicans, and then it changed to Mexicans beating up

10   the male blacks, and it led to, unfortunately, a stab and

11   homicide.

12   Q.  After you have this discussion with Serrano, you then say

13   to him, looking at page 24, "The problem is that you don't know

14   who to stop and how to stop."  Do you see that?

15   A.  Which line?

16           THE COURT:  Line 24, at the end, you say to Serrano,

17   "Listen to me.  The problem is that you don't know who to stop

18   and how to stop.  And you know what?  Make sure we put him in

19   for retraining because he obviously doesn't know what he's

20   doing, OK?  This is over with.  Your appeal is done.  That's

21   it.  Thank you."

22           Do you see that?

23           THE WITNESS:  Yes, ma'am.

24           THE COURT:  What is your question about it?  He sees

25   it.  Do you have a question, Mr. Moore?

D5D8FLO5                              McCormack – cross

1              MR. MOORE:  I do have a question about it.

2      Q.  One of the things you wanted Serrano to get retraining

3      about was what a stop is, right?

4      A.  Yes.

5      Q.  There is actually a lot of discussion on the tape about

6      what a stop is, right?

7      A.  I'm not really sure.

8              THE COURT:  There is.

9              THE WITNESS:  It wasn't read.

10             THE COURT:  It's there.

11             Do you have a point, Mr. Moore?

12             MR. MOORE:  Yes, Judge.

13     Q.  Do you recall a discussion on the tape where Serrano says,

14     as an example of stopping, there is a group of people who are

15     obstructing pedestrian traffic, and that he would go up to them

16     and ask them to move, right?

17     A.  Yeah.  He says, Excuse me, please move.

18     Q.  That's appropriate for an officer to say excuse me to

19     citizens on the street, right?  Do you have a problem with

20     that?

21     A.  No.  It's very polite and, unfortunately, I had a problem

22     with what condition he was addressing at that time.  Again, my

23     resources are very limited, and I need to put my resources in

24     the right place.

25     Q.  Fair enough.  But in discussing that, you were concerned

D5D8FLO5                          McCormack - cross

1    that -- withdraw that.

2              In your discussion of that, you said to him, Just

3    going up there and saying hey, that that was a stop, right?

4              MS. COOKE:  Objection.  Is he referring to a specific

5    portion?

6              THE COURT:  I am sure he is.  I remember.

7              Where are you, Mr. Moore?

8              MR. MOORE:  I will show you, Judge.

9              THE COURT:  I remember going over this.

10             Here it is.  You're on page 13, where he talks about

11   warn and admonish in the middle.

12             Serrano says at line 16, "Well, again, there are

13   people standing there, and they're blocking the pedestrian

14   traffic.  And I explained it."

15             And you say, "Are you stopping them?"

16             Serrano says, "I'm not stopping them.  I'm walking up

17   to them and I'm saying, excuse me, you're blocking this.  I

18   need you to disperse."

19             The inspector says, "So that's a stop.  So that's a

20   stop -- stop, question and frisk.  It's a stop, question,

21   frisk."

22             That's the part you wanted to read, Mr. Moore?

23             MR. MOORE:  Yes, Judge.  On page 15.

24             THE COURT:  On 14, line 7, you say, "Listen to me.

25   Listen to me.  It's called stop, question frisk.  If you stop

D5D8FLO5                          McCormack - cross

1   someone, you have to put it on paper."

2           Serrano says, "I did not stop him, in my opinion."

3           You say, "It's not your opinion."

4   Q.  If you look at page 15, this exchange with Serrano goes on.

5   And then you say, beginning on line 8, you say, "All right.  If

6   you stop somebody -- even if you just say hey, hey come here, I

7   gotta talk to you, that's a stop.  That's a stop."

8           That's what you said to Serrano on that day, correct?

9   A.  Yes.  That could be a forcible stop.  If you say, "Hey,"

10  depending on the way you say it, that could be a forcible stop.

11  The person could understand that he doesn't have the right to

12  leave.

13  Q.  Then you go on to say:

14          "Serrano:  I didn't do that.  They're already standing

15  there.  I pulled over.  I said, excuse me, gentlemen, I need to

16  you to move."

17          You say, "If you're giving your attention for a

18  second -- hey, how are you doing?  Come here, you have to

19  move -- that's a stop."

20          Right?

21  A.  Depending on how you're saying it.

22  Q.  It depends on your tone of voice, right?

23  A.  Your tone of voice, your demeanor, what's going on.

24  Q.  So if you just say, Hey, how you doing, that's a stop?

25  A.  No.

D5D8FLO5                          McCormack - cross

1    Q.   That's what you say, "Hey, how are you doing?"

2    A.   What he is saying --

3              THE COURT:   At line 14 you say, "If you're giving your

4    attention for a second -- hey, how are you doing?  Come here,

5    you have to move -- that's a stop."

6              THE WITNESS:   When you say, "Hey, how are you doing?

7    Come here," it depends how you say it, "what's going on?"

8    There could be some issues on that.

9    Q.   Going back to page 13 on this issue of what is a stop, you

10   say beginning on page 13, line 14, you say, "Well, when you say

11   warn and admonish, what do you mean by warn and admonish?"

12             Serrano says, "Well, again, there are people standing

13   there, and they're blocking the pedestrian traffic.  And I

14   explained it.

15             "INSPECTOR:   Are you stopping them?

16             "SERRANO:   I'm not stopping them.  I'm walking up to

17   them and I'm saying, excuse me, you're blocking this.  I need

18   you to disperse.

19             "INSPECTOR:   So that's a stop.  So that's a stop --

20   stop, question, frisk.  It's a stop, question, frisk."

21             So simply going up to them and saying, excuse me,

22   you're blocking the sidewalk, that's a stop, right?

23   A.   No, it's not a stop.  Again, it's depending how he is

24   approaching it, how his voice is, what his commands are.

25   Q.   I guess you would have to be there, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D5D8FLO5                        McCormack – cross

1    A.  I guess you'd have to be there.

2    Q.  Somebody blocking a pedestrian traffic, like a group of

3    people in front of a store or something, that's not grounds for

4    a stop, right?

5    A.  No.  We have groups of people standing in front of stores a

6    lot, bus stops, it could be anything.  There's a lot of people

7    hanging out.

8    Q.  Even if they are blocking pedestrian traffic, that's not a

9    felony or penal law misdemeanor, which is the basis for a stop,

10   right?

11   A.  No, it's not.

12   Q.  Did you ever at any point in this hearing discuss any of

13   the 28 points on the evaluations which have a rating for 3 on

14   each of them?

15   A.  I think I testified I did go through some of them.

16   Q.  I think you said two of --

17   A.  I didn't say two.  I did say some.  If you want to read it

18   back, that will be fine.

19           THE COURT:  Your testimony was a couple.

20   Q.  Tell me which ones you discussed with him.  Look at O15,

21   which is the 2012 evaluation.

22   A.  Community interaction, apprehension intervention, victim

23   prisoner interaction, vehicle accidents, offenses.

24   Q.  What was the victim prisoner interaction?

25   A.  He didn't have much of it.  Did he go out and be proactive

D5D8FLO5                          McCormack - cross

1   and try to make any arrests?  He never initiated one arrest.

2   Q.  What about the community interaction, what is that?

3   A.  We discussed him stopping people on corners.

4   Q.  Officers are told to exercise their discretion, right?

5   A.  They are told to exercise it.  It's one of the tools --

6   Q.  Can you answer me yes or no?

7   A.  They are allowed to use discretion.

8   Q.  They are trained on exercising their discretion?

9   A.  They are trained.  I guess you would say trained or taught.

10  They do have discretion, yes.

11  Q.  Officer Serrano told you he doesn't assume everybody is

12  guilty who is just on the street, and so he goes up to them and

13  shows them respect, right?

14          MS. COOKE:  Objection, your Honor.  I believe Mr.

15  Moore is trying to refer to something in the transcript and the

16  phrase guilty is not used.

17          THE COURT:  Do you recall where you're thinking of,

18  Mr. Moore?

19  Q.  Do you recall a point in the discussion where he said, I

20  don't assume everybody is guilty, I don't assume everybody is

21  doing something wrong, or whatever the phrase was, do you

22  recall that?

23          MR. MOORE:  I don't have it with me right now, Judge.

24          THE COURT:  Can somebody else on your team find it?  I

25  remember it too so I know it's there, but I don't know where.

D5D8FLO5                          McCormack – cross

1    Q.  Look on page 19.  This is in the middle of this discussion

2    you're having with Serrano about his use of the term "warn and

3    admonish," right?

4            THE COURT:  So he says at line 10, that is Serrano,

5    "Here's the problem.  You're not there with me.  While I'm

6    going job to job and I see a crowd, I don't automatically

7    assume that everybody in that crowd is bad.  No, I don't."

8            What is your question?

9    Q.  That's a good exercise of discretion by an officer under

10   your command, right?

11   A.  I don't know what he is describing in that.

12           THE COURT:  He just told you.  "I see a crowd, I don't

13   automatically assume that everybody in that crowd is bad."

14           THE WITNESS:  I don't know who looks at a crowd and

15   says who is bad and who is not bad.  Again, it's resources

16   available that we need.  I don't understand why he was

17   discussing stopping or even looking at the crowds if he didn't

18   think anybody was bad.

19           THE COURT:  He told you earlier in this transcript

20   that he had broken up a group of people standing together in an

21   intersection or a pedestrian crosswalk.  Do you remember that?

22           THE WITNESS:  He allegedly makes that statement with

23   no documentation at all.

24           THE COURT:  He tells you that at this meeting?

25           THE WITNESS:  Yes.

D5D8FLO5                      McCormack – cross

1         THE COURT:  A little later he says, "While I'm going

2   job to job and I see a crowd, I don't automatically assume that

3   everybody in that crowd is bad."

4         It's an exercise of judgment, is it not?

5         THE WITNESS:  Yes, it is.

6   Q.  Since you have been at the 40th Precinct, was Lieutenant

7   Barrett working in the 40th Precinct?

8   A.  No.

9   Q.  Have you seen the transcript that's in evidence here of

10  Serrano taping comments made by Lieutenant Barrett?  Have you

11  seen that transcript?

12  A.  No, sir.

13  Q.  Let me show you what has been marked previously as 297T.

14        MS. COOKE:  I would object.  Lieutenant Barrett wasn't

15  at the 40th Precinct during Deputy Inspector McCormack's time.

16  He hasn't seen the transcript.

17        THE COURT:  Why do you want to go over the transcript

18  of Lieutenant Barrett?

19        MR. MOORE:  I simply want to lay a foundation.  Let me

20  do it without the transcript.

21  Q.  Lieutenant Barrett testified in court that she thought it

22  was appropriate to tell officers at the roll call that they

23  should get five Cs and five 250s on a tour.  Is that something

24  you have ever told officers at roll call?

25        MS. COOKE:  I object.  That mischaracterizes

D5D8FLO5                          McCormack – cross

1   Lieutenant Barrett's testimony.

2              THE COURT:  I don't know if it does or it doesn't.

3              The real is question, have you ever told anybody that

4   at roll call?

5              THE WITNESS:  I have never told anybody at roll call,

6   not roll call, not personally, not ever.

7   Q.  Why is that?

8   A.  It's not my philosophy.  My philosophy is whatever we need

9   to do to take care of the situation, to take care of that

10  simple problem, is what we need to do.

11  Q.  Would it ever be appropriate in your judgment as a

12  commanding officer to tell officers at a roll call that we need

13  five Cs or we need five 250s or a certain number of arrests on

14  this tour?  Would that ever be appropriate in your judgment?

15  A.  Absolutely not.

16  Q.  Why is that?

17  A.  Again, in my approach, it's never been something I brought

18  up.  I don't know what five C summonses or five 250s does or

19  five arrests.

20             THE COURT:  Why don't you think that's appropriate to

21  say that?

22             THE WITNESS:  Because I don't know if that corrects

23  the condition.

24             THE COURT:  OK.

25  Q.  Do you know if doing that is permitted by the police

D5D8FLO5                          McCormack - cross

1   department?

2   A.  If what is permitted?

3   Q.  Giving a numerical number to officers at a roll call in

4   terms of what the supervisor expects their activity to be on

5   that roll call?

6   A.  No, it's not.

7   Q.  Do you know who Lieutenant Doute is?

8   A.  No.

9   Q.  Are you familiar with Operations Order 52?

10  A.  Yes, sir.

11  Q.  Operations Order 52 speaks about proactive enforcement,

12  right?

13  A.  Yes, sir.

14  Q.  It mentions proactive enforcement, specifically mentions

15  summonses, stops and arrests.  Do you recall that?

16          Do you want me to show it to you?

17  A.  If you don't mind, sir.  I appreciate it.

18  Q.  It's Exhibit 285 in evidence.

19          You see the first paragraph there?

20  A.  It hasn't focused in yet.  That's better.

21          Where am I looking, sir?

22  Q.  The first paragraph there.  It says, "The mission of the

23  New York police officer is through use of self-initiated and

24  team led efforts to" -- I don't have to say that.

25          It speaks about proactive enforcement activity.  Do

D5D8FLO5                          McCormack - cross

1   you see that in the bold there about six lines, seven lines

2   down?

3   A.  Yes, I see that.

4   Q.   It describes proactive enforcement activity as including

5   but not limited to summonses, stops and questioning of

6   suspicious individuals and the arrest of criminals.  Do you see

7   that?

8   A.  Yes, sir.

9   Q.   Further on in paragraph 3, it directs department managers

10  that they can and must set performance goals.  Do you see that?

11  A.  Yes, sir.

12  Q.   You're a department manager, right?

13  A.  Yes, sir.

14  Q.   This operations order applies to you, correct?

15  A.  Yes, sir.

16  Q.   So in setting performance goals with respect to a

17  particular type of proactive enforcement activity, doesn't that

18  generally involve numbers, setting numbers?

19  A.  No.  A department manager can and must set performance

20  goals.  My performance goal is to reduce the violence in the

21  Mott Haven community, and whatever that takes to stop it,

22  especially the shootings and the homicides, whatever necessary

23  means in enforcement to establish that, that's what I need.

24  Q.  So in looking at whether your officers are addressing those

25  conditions, you would want to look at the level of their

D5D8FLO5                          McCormack - cross

1     activity, right?

2     A.   The quality of their activity.  I don't need numbers for

3     numbers.  I don't need -- again, I said it in the recording.  I

4     don't need unnecessary summonses at all.  I don't need old men

5     stopped in parks for minor park violations.  That does

6     absolutely nothing for me.  It does absolutely nothing to stop

7     the violence in the community.

8     Q.   That's different.  I am talking about the numbers with

9     respect to arrests, summonses and 250s.  You were concerned

10    with Serrano that his numbers, his 250 numbers were too low,

11    right?

12    A.   No.  Officer Serrano brought that to my attention.  I said,

13    do I believe it's low?  Yes, I believe it's low in reducing the

14    violence inside the command, absolutely.  On the 4 to 12s, in

15    the 40 Precinct, I believe that's definitely too low.

16    Q.   You didn't think he issued enough of the right summonses?

17    A.   I don't think he made an effort into trying to get the

18    right summonses or the right 250s or stop the right people.

19    Q.   You decided that by looking at the numbers of his

20    enforcement activity on his performance report, right?

21    A.   No.  By looking at his numbers and reading into what his

22    numbers were.

23    Q.   So you never look at the numbers an officer generates to

24    determine whether they are actually fulfilling what you believe

25    to be their mission to deal with conditions?

D5D8FLO5                              McCormack – cross

1    A.  I do look at the numbers.  I look at the quality of the

2    criminal court summonses.  I look at what we are writing in the

3    C summonses.  I look at what kind of 250s we are doing.  A

4    quick example, if I see for a month a crazy amount of,

5    inordinate amount of GLA 250s in 2012, that concerns me that we

6    are not addressing the right condition.

7              MR. MOORE:  Just one more question.

8    Q.  With respect to Operations Order 52, it also sets forth

9    that if officers don't take enough proactive enforcement

10   activity, it could have adverse consequences on their career,

11   correct?

12   A.  It could, yes.

13             THE COURT:  Were you done or done for today?

14             MR. MOORE:  I think I am done.  I am definitely done

15   for today.

16             THE COURT:  You have more questions for tomorrow?

17             MR. MOORE:  I think so.  Maybe after looking at it I

18   don't.

19             THE COURT:  You will have some redirect anyway?

20             MS. COOKE:  I hate to bring him back.  I might have a

21   question or two.

22             THE COURT:  Right now it sounds like you have to come

23   back at 10:00.  So you're excused.

24             What is the schedule tomorrow?  Do we have this person

25   Commissioner Farrell?

D5D8FLO5

1          MS. GROSSMAN:  Yes.

2          THE COURT:  Do we have Chief Hall?

3          MS. GROSSMAN:  Yes.

4          MR. MOORE:  There is a question with Chief Hall on

5    some of the exhibits.

6          THE COURT:  Is there anybody else on for tomorrow?

7          MS. GROSSMAN:  We haven't had a chance to confer with

8    plaintiffs' counsel on the OCD files.  If they are willing to

9    stipulate, we don't need to call Inspector Lehr.  But if they

10   are unwilling to --

11         THE COURT:  This is the authenticity.

12         MR. CHARNEY:  We will let them know by 6 p.m. today.

13         THE COURT:  They will let you know.

14         After we finish with Farrell and Hall, we have only

15   Walker and Stewart left and that's it?

16         MR. MOORE:  Yes.

17         MS. GROSSMAN:  Right.  Unless we can revisit the issue

18   with the retirees, which I understand your ruling, your Honor.

19         THE COURT:  The plaintiffs said I ruled.  They were

20   going to show me where.

21         MR. CHARNEY:  I can show you now.

22         THE COURT:  Just state it so my clerk can write it

23   down.

24         MR. CHARNEY:  I will point to pages 2557 through 2558

25   of the transcript.

D5D8FLO5

1          THE COURT:  All right.  Is that it?

2          MR. CHARNEY:  That's it.

3          THE COURT:  Do we think that Farrell and Hall could

4     take the whole day, with a little bit of McCormack at the

5     beginning?

6          MS. GROSSMAN:  Possibly.

7          THE COURT:  Then do we think that Walker and Stewart

8     could take the whole day?

9          MS. GROSSMAN:  I think so.

10          No, I'm sorry.  Let me confer with my colleagues.

11          I understand that there has been some conferral with

12     plaintiffs' counsel that if we are able to end tomorrow with

13     the two witnesses, Commissioner Farrell and Chief Hall, that

14     perhaps we can have the experts go the following day.

15          THE COURT:  That's what I said.  You said you predict

16     that McCormack, Farrell and Hall will take all day anyway.  But

17     you're saying if it's 3:30, you don't want to start with

18     Stewart and Walker.  They are on for Wednesday.  And that's the

19     last two witnesses.

20          Have you finished your designations for everybody?

21          MR. MOORE:  I think so.

22          (Continued on next page)

23

24

25

D5d9flo6

1          MR. CHARNEY:  We haven't seen their designations.

2          THE COURT:  You have to do that because you may either

3     object or want counter their --

4          MS. PUBLICKER:  We're still waiting for plaintiffs to

5     finalize Ian Provost.  Your Honor had ruled on that at the end

6     of last week.  We had designated about a month ago.  But I

7     still haven't received that from plaintiffs finally.

8          MS. MARTINI:  I believe all the designations for

9     Provost are completed.  I think it's just a matter of turning

10    in hard copies of those documents to the court and the

11    defendants so I can confer after court about that.

12         THE COURT:  Okay.  Talk to each other after court.

13         So we very much think that we still have Thursday and

14    Friday off; is that right?

15         MR. MOORE:  That's the way it looks.

16         MS. GROSSMAN:  Your Honor, I just want to make sure

17    that plaintiffs' counsel, they are to tell me by 6:00 today --

18         THE COURT:  They just said that.

19         MS. GROSSMAN:  We have to bring a witness in and we

20    don't want to inconvenience the witness.

21         THE COURT:  I understand.  He just said that.

22         Now do you want me to hear this issue about the

23    documents for Chief Hall?  You alluded to it earlier this

24    morning.

25         MR. MOORE:  Yes.  They designated some documents, some

D5d9flo6

1  from the personnel index, some from the CCRB, another document

2  which appears to be some kind of a compilation of complaints.

3  These are all -- these have never been produced to us.  And

4  they've been described by counsel for the city as demonstrative

5  exhibits.  But they're actual documents generated by the NYPD

6  in the course of CCRB investigations.

7          THE COURT:  You mean long ago?

8          MR. CHARNEY:  Some of them have no dates on them.

9  Some of them were in March.

10          MS. GROSSMAN:  Your Honor, the witness is going to be

11  testifying about performance monitoring.  And what is it that

12  the documents -- what are the documents that the witness looks

13  at.  And it's not offered for the truth of the matter asserted.

14  It's just to facilitate --

15          THE COURT:  There wasn't a hearsay objection.  The

16  objection was that they had never been produced before, and

17  Mr. Moore is questioning why.

18          MS. GROSSMAN:  It's a three-page CPI index that the

19  plaintiffs have had.

20          THE COURT:  I understand.  That it's short or long is

21  of no interest to me.  All he is asking is why was it not

22  produced before.

23          MR. MOORE:  The city designated other witnesses as the

24  30(b)(6) witness for this issue, not Chief Hall.  They've all

25  testified, Schwartz, McAleer, Beirne, Thompson.  They've all

D5d9flo6

1      testified about this.

2              In addition to not -- to us getting this in the last

3      couple of days, it's duplicative.  It's already been testified

4      to.

5              MR. CHARNEY:  Your Honor, remember we've been asking

6      for this proffer for weeks and we were told --

7              THE COURT:  This is the one you've been asking for.

8              MR. CHARNEY:  We were told two things.  We were told

9      he testified in Ligon.  Look at his Ligon testimony.  And he

10     will also update Chief Giannelli's deposition testimony.

11             They are now identifying a whole new set of topics

12     that he neither testified to at Ligon, nor did Chief Giannelli

13     ever testify about it at his deposition.  So proffer is also a

14     problem for us.

15             THE COURT:  This is true.  This is inappropriate.

16             If there were 30(b)(6) witnesses on this topic, such

17     as Schwartz, McAleer and others, and if they did not make a

18     proffer that Hall will testify as to these topics, and if these

19     topics have been covered by the witnesses I just mentioned,

20     then it's cumulative and shouldn't be done.  The proffer is

21     late, and the documents have never before been produced.  This

22     is not appropriate.

23             MS. GROSSMAN:  Your Honor I understand that -- first

24     of all, the 30(b)(6), that topic, I don't understand that to be

25     the case.  But if the plaintiffs show me the 30(b)(6) notice to

D5d9flo6

1    see that that was covered, I would like to see it.

2           But notwithstanding Commissioner Schwartz talked about

3    performance monitoring generally and she talked about

4    particular -- and she talked about gathering documents, so that

5    it could be provided to a committee who can do a CCRB profile

6    and assessment review of officers who are identified for an

7    assessment.  And so the documents that we're looking to use are

8    simply demonstrative in terms of facilitating testimony.

9           THE COURT:  They're not demonstrative at all.

10          Do you know what demonstrative exhibit is.  They're

11   not demonstrative.  A demonstrative exhibit is created for a

12   trial, usually by one of these companies that makes up

13   demonstrative exhibits.  It summarizes evidence or clever for a

14   jury.

15          These are not demonstratives.  These were created by

16   the police department in the course of their business at some

17   point or other.  I don't know if it was a year ago.  I don't

18   know if it's a half year ago.  I don't know if it was last

19   week.  But they're not demonstratives.  They're regular records

20   of the police department.

21          But they were not disclosed apparently to the

22   plaintiffs' lawyers.  I don't know what the dates are.  They

23   don't either.  I don't know whether it's cumulative or not, but

24   there's an allegation that it is.

25          This proffer could have been, should have been made

D5d9flo6

1    before.  The documents should have been exchanged before.  Why

2    is this always happening at the last minute?  The city is

3    turning over documents for the first time after a ten-week

4    trial and after years of discovery.  I don't understand.

5          So I agree with you, Ms. Grossman, that they should

6    show you the 30(b)(6) notice they're talking about.  That's

7    fine.  But I don't agree so far with anything else that I've

8    heard.  You're going to have to figure this out amongst

9    yourselves whether this is cumulative or not cumulative, what

10   these documents are, what their dates are.

11         There is no way I can go through all of this at 20 of

12   five.

13         So we'll work on Thursday.  It doesn't bother me at

14   all.  It's sad for you folks.  But if we can't get this

15   resolved in time for Hall, we won't have Hall tomorrow.

16         That's all.  I'm going on to my next case now.  You do

17   the best you can to talk to each other.  If you would only

18   produce things not the night before these things wouldn't

19   occur.

20         MR. MOORE:  They documents were generated in March of

21   2013 too.

22         THE COURT:  I understand.  That's two months ago.

23         (Adjourned to March 14, 2013 at 10:00 a.m.)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1                     INDEX OF EXAMINATION

2    Examination of:                              Page

3    JEFFREY FAGAN

4    Direct By Mr. Hellerman  . . . . . . . . . .6812

5    Cross By Ms. Cooke . . . . . . . . . . . . .6841

6    Redirect By Mr. Hellerman  . . . . . . . . .6849

7    ROBERT PURTELL

8    Direct By Ms. Cooke  . . . . . . . . . . . .6853

9    Cross By Mr. Charney . . . . . . . . . . . .6887

10   CHRISTOPHER J. McCORMACK

11   Direct By Ms. Cooke  . . . . . . . . . . . .6904

12   Cross By Mr. Moore . . . . . . . . . . . . .6986

13                     PLAINTIFF EXHIBITS

14   Exhibit No.                               Received

15    570  . . . . . . . . . . . . . . . . . . .6821

16    571 and 572  . . . . . . . . . . . . . . .6828

17    573  . . . . . . . . . . . . . . . . . . .6836

18    574  . . . . . . . . . . . . . . . . . . .6841

19                     DEFENDANT EXHIBITS

20   Exhibit No.                               Received

21    N15  . . . . . . . . . . . . . . . . . . .6858

22    V14-A through V14-D  . . . . . . . . . . .6901

23    O15  . . . . . . . . . . . . . . . . . . .6928

24

25
```