UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DAVID FLOYD, et al.,

Plaintiffs,

v. 08 CV 1034(SAS)

CITY OF NEW YORK, et al.,

Defendants.

------------------------------x

New York, N.Y.
May 14, 2013
10:09 a.m.

Before:

HON. SHIRA A. SCHEINDLIN,

District Judge

APPEARANCES

BELDOCK LEVINE & HOFFMAN, LLP
Attorneys for Plaintiffs
BY: JONATHAN MOORE
JENN ROLNICK BORCHETTA

COVINGTON & BURLING, LLP
Attorneys for Plaintiffs
BY: KASEY MARTINI
GRETCHEN HOFF VARNER
ERIC HELLERMAN
BRUCE COREY

CENTER FOR CONSTITUTIONAL RIGHTS
Attorneys for Plaintiffs
BY: DARIUS CHARNEY
SUNITA PATEL
BAHER AZMY

APPEARANCES (Cont'd)

MICHAEL A. CARDOZO
Corporation Counsel for the City of New York
Attorney for Defendants
BY: HEIDI GROSSMAN
BRENDA E. COOKE
JOSEPH MARUTOLLO
MORGAN D. KUNZ
SUZANNA PUBLICKER
LINDA DONAHUE
LISA M. RICHARDSON
JUDSON VICKERS

(In open court; trial resumed)

THE COURT: Good morning, everyone. Please be seated.

MR. MOORE: Good morning, Judge.

Judge, with respect to Chief Hall.

THE COURT: You know what, I thought we would finish this witness and then I have a number of things I have to talk about.

MR. MOORE: Fine.

CHRISTOPHER McCORMACK, resumed.

CROSS-EXAMINATION

BY MR. MOORE:

Q. Good morning, Inspector McCormack.

A. Good morning.

Q. Do you recall yesterday in your testimony you were discussing a portion of the conversation you had with Officer Serrano about stopping a group of people on the sidewalk?

A. Yes. It was in the transcripts, yes.

Q. And you had indicated to him in the transcript on page 13 of the transcript -- page 15, I'm sorry, you had indicated on line 8, "All right? If you stop somebody -- even if you just say hey, hey come here, I gotta talk to you, that's a stop, that's a stop."

That's what you said at that point, correct?

MS. COOKE: Your Honor, I would just note that there is an unintelligible phrase between the first "hey" and the

"hey come here," for the record.

Q. Further down -- well, Serrano says, "I didn't do that. They were already standing there. I pulled over. I said, excuse me gentlemen, I need you to move."

Then you say, "If you're giving your attention for a second -- hey, how are you doing, come here, you have to move -- that's a stop."

Do you recall -- that's what the transcript says, right?

A. Yes. That's what I discussed yesterday when I said "hey" with the tone of how it could go. It could be a stop. It could be that the person could think that he doesn't have the right to leave. So that would be a stop.

Q. So it would depend on the tone of voice, right?

A. Tone of voice, how he's talking to him, what his stance are.

There's a lot of things, depending what the person feels, if he was being forcibly stopped.

Q. So in this scenario that you're talking about with Officer Serrano, the officer approaching this group says in a loud voice, "Hey, come here, I gotta talk to you; or hey, how are you doing?" That would be a stop, right? Is that what you testified to?

A. It depends. It depends on his tone of voice. His demeanor, there's a lot of different things.

I was trying to find out what he's trying to do. Is he doing forcibly stops --

Q. Officer, that's not my question.

My question is if he raises his voice and says "hey," that's a stop -- says, "hey, come here."

You testified yesterday that the raising of the voice would be a stop, correct?

MS. COOKE: Objection, your Honor. I think --

THE COURT: Either he did or didn't say that yesterday. It's not a matter of objection.

Is that what you said yesterday?

THE WITNESS: That's not how I said it.

It depends if he raises his voice, depends how he's approaching him, what he's saying, depending what his tone is, you know, his demeanor. That's what's going to be, either the person could feel that he's being stopped and doesn't have the right to leave.

Q. Okay. So you have a group of people on the street who the officer believes are maybe blocking pedestrians -- a group of people on the sidewalk who the officer believes are blocking a group of people on the sidewalk. Okay. You accept that?

A. Yeah, he believes that -- yeah, okay.

Q. And you say if he went up there and said, "hey, what you are you doing," with just a regular tone of voice, that wouldn't be a stop, right?

A. "Hey, what are you doing"?

Q. Yeah.

A. Well he's questioning them.

Q. I'm asking you whether that would be a stop.

A. I don't know. Unfortunately, I'm not sure. I'm not there. Depends what the people are understanding it as. So I can't answer that question like that. I'm sorry.

Q. I'm trying to understand what you said to Officer Serrano in this conversation. Because you're talking about a scenario where he's going up to a group of people and he's saying, "Excuse me, gentlemen, I need you to move."

And you say in response to that, "If you're giving your attention for a second -- hey, how are you doing? Come here, you have to move -- that's a stop."

That's what you responded to Officer Serrano when he told you what he was doing, right?

MS. COOKE: Objection.

THE COURT: We've been over that. That is what he said, yes.

Q. I'm just trying to understand why you think that's a stop. Do you think that's a stop because of the tone of voice?

MS. COOKE: Your Honor, I think this is asked and answered as well.

THE COURT: No. He said -- he said, "That's a stop."

What the counsel is trying to find out is what made

you say, "That's a stop."

If the officer just says, "Hey, how are you doing? Come here, you have to move."

THE WITNESS: Again, I would explain it to him. If he's saying "hey" in what kind of tone of voice --

THE COURT: So the only thing you can make from that though is the tone of voice because the only words that you're using there, "If you're giving your attention for a second -- hey, how are you doing? Come here, you have to move -- that's a stop."

The only thing that would affect those facts in that sentence is the tone of voice?

THE WITNESS: If he's saying "come here," that means -- I'm not sure if the people understand that they're allowed to leave or not leave. So it's all -- I'm not really sure how he's saying -- what they're saying or how it's saying. But if the person feels he can't leave, then it's a stop.

Q. So in this scenario if -- if it is a stop, as you say, it would be a suspicionless stop, correct?

A. I'm not sure. Again, I said, "All right. If you stop somebody -- even if you just say hey, hey come here," to me, the way I'm saying it there, if you're telling somebody, "hey, come here," that person doesn't -- I would feel that that person thinks he can't leave.

THE COURT: No. We got that part.

I think what he's asking now is can you tell from that scenario what the basis of the stop is. What's the reasonable suspicion to stop those people?

In other words, now let's assume it's a stop because he raised his voice and they don't feel free to leave. I'm with you that far.

They don't feel free to leave. He raised his voice. But can you figure out from that scenario what was the reason to stop them? Where was the reasonable suspicion?

THE WITNESS: What I'm saying or what he's saying?

THE COURT: What anybody is saying.

In other words, you say based on his tone of voice this could be a stop. So the counsel is saying to you: Okay. Let's accept it as a stop.

Can you tell from this scenario why they were stopped? What's the reasonable suspicion?

THE WITNESS: I don't know. He brought it up. I have no idea why he's stopping.

Again, I have no idea why he's stopping groups of people on the street that are just standing on the corner. I don't know.

Q. Well he explained it to you. He said they were blocking pedestrian traffic.

A. Well he was --

MS. COOKE: Objection. Is that a question?

THE COURT: Yes, it is a question.

Somewhere in this transcript he said, did he not, that they were blocking pedestrian traffic?

THE WITNESS: During this conversation there was discussion how he was handling robberies and grand larcenies and shootings.

THE COURT: No. That's not the case. If you read back over, I think he says at this point they were blocking pedestrian traffic. Does that ring a bell at all?

THE WITNESS: I understand that.

THE COURT: Okay. Then --

THE WITNESS: When we were discussing the whole thing, he was trying to tell me what he was doing about how he was stopping robberies, grand larcenies, and the shootings.

THE COURT: I think what he said this stop, he just asked these people to move on, he said they were blocking pedestrian traffic.

Assume he said that, that is Serrano, are you asking whether that's reasonable suspicion for the stop?

MR. MOORE: That's correct, Judge.

THE COURT: Fine.

If his motive in stopping them was because they were blocking pedestrian traffic, in your view, is that reasonable suspicion to stop somebody?

THE WITNESS: No, it's not.

Q. To do a forcible stop, you need reasonable suspicion, correct?
A. Yes.
Q. Under your understanding?
A. Reasonable suspicion that he's going to commit a penal law misdemeanor or a felony.
Q. So in order to do a stop you need reasonable suspicion?
A. Yes.
Q. Okay. And you can't tell me from this -- what we discussed whether there was reasonable suspicion?

THE COURT: We just did that. He just testified that blocking pedestrian traffic is not reasonable suspicion for a stop.

MR. MOORE: Nothing further, Judge.

Thank you, Inspector McCormack.

REDIRECT EXAMINATION
BY MS. COOKE:
Q. Good morning, Inspector McCormack.
A. Good morning.
Q. You were just testifying that blocking pedestrian traffic in the scenario we were discussing wasn't reasonable suspicion for a stop.

Is blocking pedestrian traffic a violation?
A. Yes, it is.
Q. And what is the enforcement action an officer can take for

an observed violation.

A. He could summons.

Q. And what would you expect an officer to record in their activity log with respect to approaching a group of people on the sidewalk and dispersing them?

A. I would expect them to have the details, the time, the date, what led them to this position, and what he did about it.

Q. Yesterday you testified in response to questions by Mr. Moore with respect to the description you provided of male blacks ages 14 to 20 or 21 as the suspects of shootings -- I'm sorry, grand larcenies and robberies at Mott Haven. Do you recall that testimony?

A. In Mott Haven Housing Authority area.

Q. And you stated that you provided that description at role calls. You said it in the tape, and you said it again here in testimony.

Do you recall?

A. I gave that description at roll calls, community council meetings, community board meetings, without anybody ever saying something to me.

MR. MOORE: Judge, I would ask that that last portion be stricken.

THE COURT: I don't know what it was responsive to. I don't think it was responsive to the question, that's for sure. So I'll strike it.

Q. When you speak at roll calls regarding crime suspect description information, would you provide clothing, height, weight and other information about the suspects if you had it available?

A. Yes, ma'am.

Q. Why would you do that?

A. Because I want them to make sure when we go to a certain location, depending on the area where the crime is, I wanted them to make sure what we're looking and trying to solve the problem and going after the right people at that location, not just people just wandering the streets or walking or could be fit the age description but has nothing to do with it. I want to make sure we got enough details, enough information for the officers to go out there and be prepared to handle their conditions.

Q. Thinking back to the robbery and grand larceny problem you were having in the Mott Haven development in 2012, did you have additional suspect description available for some of those crimes?

A. Yes, we did.

Q. Suspect information beyond male blacks ages 14 to 20 or 21?

A. Yes.

Q. And would you have provided that information to your officers?

A. Yes.

Q. Inspector McCormack, would the description of male black ages 14 to 20 or 21 alone be sufficient for an officer to make a reasonable suspicion stop in Mott Haven?
A. Absolutely not.
Q. Why not?
A. You just need a little more. You're just trying to give the officers enough tools to go out there and see if something develops into possibly leading them to reasonable suspicion to stop them.

MS. COOKE: Thank you, your Honor. I have no further questions.

MR. MOORE: Just one, judge.

RECROSS EXAMINATION

BY MR. MOORE:

Q. So if the officers were told with respect to this condition look for male blacks 14 to 20 to 21, they would then be regarding all male blacks 14 to 21 as suspicious, right?
A. Absolutely not.
Q. They would certainly be focused on male blacks 14 to 21, right?
A. They would be focused on it?
Q. Yes.
A. No. Their idea is to make sure they have enough information to go out there and try to handle their condition.
Q. You're advising these officers that these are the

perpetrators of these grand larcenies and robberies and whatever it was you've said. And you're describing those perpetrators as male black 14 to 21, correct?
A. Yes. At role calls we gave them enough information that male blacks 14 to 20, 21 years old who were robbing, stealing from in and around Mott Haven housing development, we gave them more information about where they would be on Willis Avenue --
Q. I'm asking the description of the perpetrator, Officer.
A. The victims gave us the description of the perpetrators of them being on Willis Avenue. So we gave them a lot of information that was related to these robberies, a ton of information.
Q. But the description of the so-called suspects was simply male black, 14 to 20, 21, right? Not with the location. But the description of the alleged perpetrator?
A. The victims gave us, yes. Between male black 14 --
Q. I'm talking about not what the victims gave. I'm talking about what you told the officers at roll call, which was the perpetrators of this pattern of grand larcenies and robberies are male blacks 14 to 20, 21, correct? Yes or no.
A. Yes. The victims gave me the information. I related it to my officers.
Q. You related it to them.

And are you concerned that your officers, taking that description, would regard every male black 14 to 20, 21 as

suspicious?

A. Absolutely not because the information I gave them at roll call would not do that.

Q. Well the information you gave them at roll call had nothing -- said nothing more about the description of the perpetrator, right?

A. That's not true.

THE COURT: The physical description of the perpetrator?

THE WITNESS: Gave them description. We gave them examples of what was going on.

THE COURT: No, but -- excuse me for a minute.

I know you also provided the areas the alleged suspects were in, where they were going from and to. I understand that.

In terms of the physical description of their person --

THE WITNESS: Yes.

THE COURT: -- is there anything else?

THE WITNESS: No. That's all we had.

THE COURT: Thank you.

MR. MOORE: That's fine, Judge. Nothing further.

THE COURT: Anything further, Ms. Cooke?

MS. COOKE: No, your Honor.

THE COURT: Thank you. All set.

(Witness excused)

THE COURT: Now we have a number of matters to take up before we continue. I think I'll make a list, there's so many.

There was the issue about striking a portion of Professor Smith's testimony. He gave an opinion and the question was whether that opinion had been previously disclosed. There's been letters about that. That's one.

There is apparently an issue Mr. Moore still wants to raise about Chief Hall and the exhibits on which he will testify.

I wanted to go over the summation schedule which has been e-mailed to you, just to make sure everybody understands. And I wanted to put it on the record.

So on Monday we'll start a little early. It will be 9:45. This isn't right. I thought I had it written out. This isn't what I said -- I'm sorry. This is right.

9:45 to 12:30 with a 15-minute break totals two-and-a-half hours. So that will be the Floyd defendant's summation 9:45 to 12:30 with a break from 11:30 to 11:45.

And then from 12:30 to 12:45 the Ligon defendant's summation, Mr. Zuckerman, fifteen minutes.

Then the lunch break roughly 12:45 to 2:05.

Then 2:05 to 2:20, fifteen minutes for the Ligon plaintiffs that Mr. Dunn requested.

And then 2:25 to 5:05 with a fifteen-minute break at

3:30 for Floyd plaintiffs. That should do it.

So two-and-a-half hours for the major plaintiffs and defendants, fifteen minutes each for Mr. Zuckerman and Mr. Dunn. That's the easiest of the bunch.

Then I wanted to comment briefly on the upcoming testimony. Mr. Stewart. Okay. With respect to the motion regarding Dr. Smith -- sorry to interrupt already. On the agenda of the many things to discuss there's also a discussion about the active retirees versus the retirees in the Silverman testimony or Silverman proffer of rebuttal about the active versus regular retirees.

So in lines 10 through 19 -- I'm not sure I know the page -- of Dr. Smith's testimony. He gave an opinion which was objected to. And in the letter writing Ms. Cooke said the opinion appears at pages 30 and/or 43 of the Smith Purtell report. I have checked both of those pages and I don't find the opinion there whatsoever. On page 43 even less so. It discusses racial breakdown of stops and crime patterns. Doesn't seem to address Dr. Smith's opinion in lines 10 to 19 at all. On page 30 there's a fact scenario given when it doesn't support the opinion or, putting it differently, it certainly doesn't state the opinion. So those nine lines of the transcript, lines 10 through 19 are stricken as not previously disclosed.

With respect to the retiree issue, it is true that I

previously ruled. I've been handed page 2558 of the transcript. And at page 2558, this issue was argued with Mr. Kunz, who is here. And we went back and forth a little bit. And it's clear that the survey was not mailed to all retirees. It was mailed to what's called active retirees. And the breakdown of all retirees by rank is, therefore, not probative of the pool to which the survey was mailed and, therefore, not probative of the representativeness of the response rate. The only thing that would be useful, if at all, would be the breakdown of active retirees by rank to judge, I suppose, whether the responses were representative of that group. It could be actually misleading to have the breakdown of all retirees because that's not the pool to which the surveys were sent. And I've already made that ruling. And I don't intend to revisit it -- I don't intend to revisit it, Mr. Kunz. So I'm not accepting the material on all active retirees. That's my ruling.

So I've now ruled on the ten lines of Dr. Smith, the active retirees issue, the summation schedule.

Does that leave us only with Hall or is there one other?

MS. HOFF VARNER: The Stewart testimony.

THE COURT: Just a quick comment on that.

As you all know, I didn't want to read the entire report to make a determination if it wasn't going to be offered

in evidence in a nonjury trial. But now that it is going to be offered in evidence you all understand, of course, that that doesn't foreclose objections here at trial that an opinion given relates to liability and not to remedies. And I will be watching very closely. I will not have this witness testify on liability. I've made that very clear all along. To this day, I still haven't read his report. I just got the ruling yesterday. But I am the trial judge, of course. And I will accept all objections and make all rulings on objections.

His testimony will be limited to what I perceive to be remedies testimony only; not liability. I hope that's clear to all defense counsel.

All right. Now we're up to, what's the last one?

MR. CHARNEY: Hall.

THE COURT: Okay. What is it, Mr. Moore?

MR. MOORE: I think there's two questions. There are some documents that were given to us in the last couple of days that the city has indicated they intend to use and they have described.

THE COURT: We began to discuss this last night and I said why weren't they given earlier. We didn't even know the dates on them. I asked you to confer with each other.

MR. MOORE: Right.

THE COURT: Well, there was a question somebody called them demonstratives. I said they were not demonstratives.

MR. MOORE: Our position is they're not demonstrative.

THE COURT: I said that already. I said they are police department documents.

Did you find out what the dates are?

MR. MOORE: I know the dates on two of them. They are March 2013.

THE COURT: You did say that yesterday. Do you not know the dates on some others?

MR. MOORE: The only one I don't know the date on, Judge is --

THE COURT: If you don't know the date did you ask your adversary?

MR. MOORE: I did not ask.

THE COURT: I asked you to do that.

MR. MOORE: I know, Judge. We had a discussion about other aspects. We had an e-mail exchange about other aspects of the Hall --

THE COURT: Show them the one you don't know the date and hopefully they will be able to date it.

MR. MOORE: It's E15 and F15 -- actually, no. E15 is March 2013. So -- actually they're all documents that were generated -- three of the four are documents generated in March of 2013.

THE COURT: That's good. Which is the one you don't know the date of?

MR. MOORE: It's a blank document which I don't know really anything about.

THE COURT: If it's a blank document I wonder why it's being offered in evidence.

What does "a blank document" mean?

MS. GROSSMAN: It's just a sample document which is basically a way that an ICO records his activity. It would be similar to the monthly activity reports that you've seen and just in blank form. It's a police department document.

THE COURT: Do you know when it was created or can you find out?

MS. GROSSMAN: I think January 2013.

THE COURT: So let's accept that for now. One of the four is January 2013. The other three are March.

Now go ahead.

MR. MOORE: As you know we've had testimony from ICOs in this case.

THE COURT: Many ICOs.

MR. MOORE: Three or four of them. We were never aware of this document. Nobody testified to this document. You know, even if it's January it's still well past -- and they didn't give it to us until the last couple of days.

THE COURT: What's the big problem with it? It's the form they're now using to record the activity.

That's what Ms. Grossman just proffered.

Is this a big problem to you, that they're now using a form since January to record activity by ICOs?

Is that what you're saying?

MS. GROSSMAN: Yes.

THE COURT: So the ICO fills it out for his or her own activity.

MR. MOORE: The only problem in sort of a general way. We've had no notice. We've had no real time to prepare any questions in response.

THE COURT: I understand.

But in the real world, Mr. Moore it doesn't sound like a difficult document to absorb. It's a blank form that the ICO fills out. This is not hard to prepare. It's not like you had to study data from a study that takes weeks to understand. I mean it's a form. If you want to ask about the form, you'll ask about the form.

Now what about the other three?

MR. MOORE: The other three I mean if you want me to describe them to you generally.

THE COURT: I don't want anything. If you're objecting to using them, you'll have to explain it to me; otherwise --

MR. MOORE: I'm objecting to --

THE COURT: I'd be happy not to discuss it otherwise.

MR. MOORE: I'm objecting to C15, D15, and E15.

C15 is a document from the central personnel index system of the New York City Police Department which I'm not sure exactly why they're being offered other than to I think this goes to the question of the monitoring and discipline of officers. They are actual files from the central personnel index that were generated in March of 2013 concerning a specific event which --

THE COURT: Why is a specific event in March of 2013 of interest?

MS. GROSSMAN: It's not relevant. That's not what we're offering it for.

It's just to illustrate the process that Chief Hall goes through when he evaluates an officer who is up for the CCRB profile and assessment committee review, which we've heard a lot of testimony about, from the Exhibit Z3. We've asked many of the commanding officers about the performance monitoring. And then the CCRB profile and assessment committee. And many of these COs have discussed the fact that they're asked by -- a recommendation whether the officer should continue in his assignment, and that goes through channels. And then ultimately there is a committee that considers officers who are made part of that -- are included in that assessment and review.

Commissioner Schwartz testified about compiling the records so that she could pass them on to the committee for

review.

THE COURT: This is the last step. This is what the committee does?

MS. GROSSMAN: Yes.

THE COURT: It's not this officer? It's used as an exemplar?

MS. GROSSMAN: Exactly.

And the same thing would apply to the D15, which is a similar type of document which has CCRB history and narratives.

It's just not to offer it for those particular -- that particular officer, but just to say this is the type of information the committee is going to consider when it assesses an officer.

THE COURT: Okay.

MS. GROSSMAN: And I think the final -- was there another document?

THE COURT: E15.

MS. GROSSMAN: And E15, another type of document is just the witness will discuss the idea that he receives notice of the statistics regarding which officers have received CCRB complaints. And so it's provided in statistical format just to put the chief of patrol on notice about upward trends, downward trends and per borough on CCRB.

So there has an a wealth of testimony regarding the fact that the CCRBs are tracked.

THE COURT: One at a time, Mr. Moore.

Were you finished, Ms. Grossman?

MS. GROSSMAN: Yes.

MR. MOORE: The last document is a compilation of statistics which I think were put together sometime in March of 2013. So they're offering it, I believe, for the truth of the -- contained in these statistical compilations.

THE COURT: That I don't know. She didn't say that in her proffer. But may be.

I thought she said it was just to show the type of information they received, was to show the notice, something like that.

MS. GROSSMAN: It is to show the notice. It's to show what the -- that the chief of patrol is looking at this information and, obviously, as it relates to all the systems in place and how the checks and balances work, what is the ultimate outcome of that process.

THE COURT: So --

MR. MOORE: Well if it's only offered for notice.

THE COURT: I won't take it for the truth of whether there's a trend up or a trend down, whatever, but to show that all the information funnels to Chief Hall's office; that they are made aware of the numbers, whatever those numbers may be, but they are made aware of it, and it all filters up there. So in the general terms of notice, I would have no trouble with

any of these 15C, D, and E, while expressing some dismay that they weren't turned over until the last minute. They should have been turned over long ago. Putting that aside for the moment, I would take them as relevant.

MS. GROSSMAN: Your Honor, I would just also note that there's been a lot of testimony about the CCRB, there have been reports, and so upward and downward trends are clearly part of the record.

THE COURT: To the extent they are in the record, that is not in issue. That probably went in without objection at the time.

MS. GROSSMAN: This is that same type of information.

THE COURT: I know but this statistical table was not turned over before and cannot be vetted by the plaintiffs' counsel. It can't be offered for the truth at this time. It would only show that the information was compiled and sent to the chief.

MS. GROSSMAN: Thank you, your Honor.

MR. MOORE: Judge, the problem I have is we were never given the opportunity to depose Chief Hall. The argument was always: Well, he's just going to update what Chief Giannelli said, because he replaced Chief Giannelli as chief of patrol in I believe 2010.

THE COURT: He is going to update. He's going to talk about what he's been doing for three years. And bring it

current. That's important.

MR. MOORE: Updating is different than going through a whole analysis of all these different areas.

THE COURT: Not really. To say what he's been doing for the last three years, he has to say what his office receives, what his office does with what they receive, basically what their role in this process is.

MR. CHARNEY: But the issue is, Judge, that Chief Giannelli was never deposed, nor did he ever testify about any of these areas.

He focused on supervision. He talked about impact overtime. He talked about CompStat.

He was never deposed, nor was he ever identified as a witness that would talk about performance monitoring, discipline, any of those things.

MS. GROSSMAN: Your Honor, the plaintiffs noticed Chief Giannelli's deposition. They were free to explore any topics. They chose not to explore those topics.

So I take issue with the fact that the plaintiffs did not have an opportunity to develop this testimony from the hundred -- for the many, many dozens of witnesses who have been deposed.

MR. CHARNEY: Your Honor, he was specifically --

MS. GROSSMAN: And he also produced the document that talks about the profile and assessment committee. That is

Defendants' Exhibit Z3. And that was available to plaintiffs years ago.

MR. CHARNEY: And we heard testimony from five different witnesses about that document. So I don't know why we need a sixth witness to talk about it.

THE COURT: Because this is the highest office which it all funnels off. We have to hear what they're doing to understand what the police department is doing.

I have to hear this. I know that. So if you need time, if you say because we didn't get to depose him, this is all new, I have to take a half-hour now to think about my cross, if that's what it boils down to, we'll get to that when we get to that.

MR. MOORE: A lot of this testimony --

THE COURT: I don't see how I could not hear this.

MR. MOORE: Would it be helpful if I tendered to the Court a copy of our 30(b)(6) notices? You can look at them over the lunch break and that would give you an idea if he goes into areas -- because he was never designated as a 30(b)(6) witness in any of those areas.

I understand he's a high ranking member of the police department. And so -- but, you know, in terms of trying to manage litigation like this, you take a certain approach. And we opted to do 30(b)(6) witnesses in certain areas. He was never offered as a witness in any of those areas.

So perhaps as just a guide when Chief Hall does testify, you might want to refresh your -- or look at these as a guide for when he does testify if we object to certain areas.

THE COURT: All right. So where are we up to? Who is the next witness?

MR. MARUTOLLO: Your Honor, defendants call Inspector Kenneth Lehr.

THE COURT: Why are we doing this?

MR. MARUTOLLO: This is actually a recall witness.

THE COURT: I thought we were going to avoid that.

MR. MARUTOLLO: The parties did meet and confer last evening but we were unable to reach an agreement.

THE COURT: On authentication?

MS. HOFF VARNER: Your Honor, we were willing to stipulate to the authenticity of the document so long as they came in for notice to the 67 precinct only, which we thought was consistent with your prior rulings and with the fact that the documents are in themselves hearsay.

The city was unwilling to stipulate -- to so stipulate and that's what puts us here today.

To the extent that the city is willing to agree that these documents come in for notice only and that they can't show anything beyond the personal knowledge of the witness, then we have no objection.

THE COURT: I don't remember what the documents are.

MR. MARUTOLLO: Your Honor, the documents are office of chief of department documents from January 1, 2013 until April 29 -- or April 30, 2013.

The Court had asked Inspector Lehr to gather these documents to just help in terms of the -- his review and his analysis of these OCD documents.

Our concern, defense concern was that there was no limitation during the Court's request regarding that these documents be used only for notice.

There's some also confusion of just exactly what that means as the inspector does have personal knowledge of other OCD documents. And you know, again, we agree that these documents were not -- we're not saying that the allegations made in the documents are for the truth of the matter asserted, merely that these complaints, compiled together, need to be entered into evidence really without any limitation. Doesn't really seem to make --

THE COURT: These are complaints from?

MR. CHARNEY: Civilians.

MR. MARUTOLLO: From civilians, your Honor.

THE COURT: And I asked them to go find them?

MR. MARUTOLLO: Right.

MS. GROSSMAN: And your Honor, I think the dispute between the parties is that to the extent that this may be representative of what types of complaints Inspector Lehr has

seen as the commanding officer of the 67 precinct, this does represent a snapshot of the type of complaints he's seen. And so while it is only limited to January 2013 through I guess --

THE COURT: April.

MS. GROSSMAN: I don't believe that -- you know we would submit that his -- the purpose of offering this should be limited only for that period of time, that there can be an inference, an appropriate inference can be drawn that if you were to look at the last years, it reflects --

THE COURT: We don't need to be arguing the inferences now. That has nothing to do with it.

MS. GROSSMAN: So that's why my concern is if we argue only for notice and that we can't make that argument later, that is my only concern, is that I don't want to be limited to making argument that this is the type of representative, type of complaints that the inspector receives.

THE COURT: I don't know that there's any basis to infer that the pool of complaints in the four months -- first four months of '13 would in any way reflect complaints in '09, '10, '11, '12, or '08. There is no basis for me to draw that inference. So I'll make that point right now. I don't know. Complaints can differ based on time and space and who knows what conditions out there in the world. I can't draw the inference that they would be similar to complaints in other time periods.

When we talk about sampling, let's say in five years we would draw a sample of 50 complaints per year, it might be that one could draw inferences. But to take the final four-month period of a five-year period and say that's representative of all five years, no, I can't do that.

MS. GROSSMAN: We have Inspector Lehr here and he is -- I understand would be testifying that this -- from his personal knowledge of the OCD complaints that he has reviewed while he was CO of the 67 precinct. This is representative. Based on his knowledge.

THE COURT: That's the problem. Then the plaintiffs' lawyers would say we have a right to look at the universe and contest that. And they can't do it. That would be uncross-examinable. So I can't allow that testimony, that it's representative of all complaints over all time. I can't do that.

So I lost track of what we're really arguing about now. You prefer that he be called and questioned so that you can cross-examine him? That's what it boils down to?

MS. HOFF VARNER: No. If the city insists or if your Honor decides to admit the documents without limitation, then we would insist on cross-examining him. But given what you've just said about the inability to draw inferences.

THE COURT: Right. Of other time periods.

MS. HOFF VARNER: Of other time periods or other

precincts for that matter.

THE COURT: Can't do that.

MS. HOFF VARNER: Then I think that the only issue is whether or not the documents come in for the full truth of the matter or whether they come in for the purpose of showing notice to the 67 precinct. And we would argue that because these documents are hearsay they should only come in for notice to the 67 precinct.

THE COURT: I mean the statements in the complaints, even you, Mr. Marutollo, wouldn't want to necessarily accept as true. If some citizen says this officer swore at me, you don't want to say that's true. You don't know whether the officer swore. Or this officer hit me. You don't want to say that's true. So you don't really vouch for the truth of the complainant's statement.

MR. MARUTOLLO: No. Just the complaints themselves.

THE COURT: But the complaints themselves mean this is what we received and this is what we had notice of. You don't want to agree with the truth of what the complainant said.

MS. GROSSMAN: That was never our concern.

THE COURT: No. More than not your concern. You certainly don't want to agree that the complainant says nothing but the truth in every complaint, right?

MS. GROSSMAN: We didn't have a dispute with plaintiffs' counsel on that point.

THE COURT: So what's really left in dispute?

The documents are taken. And the documents are taken for the purpose of showing the complaints received by the 67 precinct commander in those four months.

MS. HOFF VARNER: Under that limitation, we have no --

THE COURT: Is there anything left?

MS. HOFF VARNER: -- objection to admissibility.

THE COURT: Is there anything left to call him for if that's what they're being taken for?

MR. MARUTOLLO: May I have one moment, your Honor?

THE COURT: Sure.

(Pause)

MS. GROSSMAN: Your Honor, there is just one question we want to ask Inspector Lehr if -- unless the plaintiffs would stipulate there is a reference -- I think there's been testimony regarding civilian complaints that are at times referred to down the chain of command, and there are times when some aspects of the complaint are spun off. So the CCRB will do the investigation. And one aspect of the allegations --

THE COURT: This is too complicated for a proffer. I'd rather hear it from the inspector. That I'd rather hear from him than from you. That's long.

MS. GROSSMAN: That's fine.

MR. MOORE: Just that limited testimony, right, Judge?

THE COURT: Sounds that way. We'll see how things

develop. But it sounds that way. It's too long a story for the counsel to tell me. I'd like to hear what the inspector said. Anyway, he came today, so.

KENNETH LEHR, recalled.

THE COURT: You understand you were placed under oath before. You're still under oath.

THE WITNESS: Yes.

THE COURT: Good. Please be seated. When you're seated again, just state your name. No need to spell it this time.

THE WITNESS: Kenneth Lehr.

MR. MARUTOLLO: Your Honor, we would just offer --

THE COURT: You heard the entire colloquy that I just had between counsel with respect to the documents that you brought, right? You were present in the courtroom?

THE WITNESS: Yes.

THE COURT: You were able to hear all that?

THE WITNESS: Yes.

THE COURT: Go ahead.

MR. MARUTOLLO: Just for the record, we would enter into evidence then what have been premarked Defendants' Exhibit P15.

THE COURT: Did you say P?

MR. MARUTOLLO: P15, which contains documents bearing Bates statements number NYC 200028998 through NYC 200029387.

THE COURT: Again, let's just ask. It would be easy to ask the inspector: What are these documents that you brought with you?

Do you want to see the book or --

THE WITNESS: No. I know what they are.

THE COURT: Could you explain for the record what they are.

THE WITNESS: When I testified on April 29 I was told to provide the office of chief department investigative complaints, the complaints that we recorded so far for 2013.

THE COURT: How do you receive these complaints?

THE WITNESS: They come down through what we call channels. They'll come down from the office of the chief of department, to the chief of patrols office, to the patrol borough, which in my case is patrol borough Brooklyn South. And then from Brooklyn South patrol borough, they go out to the respective commands, which in my case is 67.

THE COURT: So these complaints are not sent to you by citizens?

THE WITNESS: No. Not directly.

THE COURT: I have never seen them. But do they -- what do they look like? It's not a letter from a citizen?

THE WITNESS: It can be.

THE COURT: So some of those are?

THE WITNESS: What happens is within the police

department, there's electronic recordings of the complaint. And it gets a serial number. And then it gets sent down for investigation at the respective command.

THE COURT: So is that whole book full of the electronic record?

THE WITNESS: Yes.

THE COURT: So there is no, like a personal letter saying I have a complaint, I'm not happy, I'm a citizen. It's not a letter?

THE WITNESS: I don't have a physical letter.

THE COURT: So it's always --

THE WITNESS: It would be transcribed onto this electric --

THE COURT: So the whole book is made up of electronic records. How many of those did you find for that period?

THE WITNESS: About a hundred.

THE COURT: About a hundred?

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MR. MARUTOLLO:

Q. Inspector Lehr, about how many of those complaints in that exhibit relate to allegations of stop, question and frisk?

A. About six.

Q. And in that document in those exhibits, Exhibit P15, what does it mean when the complaint comes into the 67 precinct and

is listed as a spinoff?

A. Spinoff is -- it represents -- it's a reference to complaints that would be investigated by CCRB which are specifically what we call FADO allegations: Force, abuse of authority, discourtesy, or obscene language. In the body of the complaint there could be several different complaints within that encounter, police encounter. So stuff that falls under FADO, those specific elements of the complaint will be sent out to Civilian Complaint and Review Board for investigation.

THE COURT: By whom? Sent by whom?

THE WITNESS: When a complaint is called in typically what happens is --

THE COURT: No. No. Sent by whom? Not by you?

THE WITNESS: Internal affairs has a CCRB liaison. It's a subunit of internal affairs.

And what they'll do is in the review process, where they'll review the elements of the complaint. And they'll categorize them in the proper, you know, into categories.

If they're FADO, those elements of the FADO allegations will be investigated by CCRB. And ones remaining, which typically happens is the complaint of an officer not doing his job properly or failing to correct the condition, those elements will be investigated at the command level in this manner, with these reports.

THE COURT: So are you saying that the spinoffs or FADOs don't get sent to you at the 67 precinct?

THE WITNESS: They're not investigated by us.

THE COURT: Are they in the book?

MR. MARUTOLLO: Your Honor, if I may, I can show it to you.

THE COURT: I want to understand.

THE WITNESS: The complaint, they wouldn't redact those elements or those circumstances.

THE COURT: I see.

THE WITNESS: We simply -- but CCRB would simply -- they would be charged with investigating those elements of the complaint.

THE COURT: But you'd get a copy of that complaint in that book?

THE WITNESS: Yes.

THE COURT: The one that you produced?

THE WITNESS: Yes.

In the complaint. You'll see -- the whole complaint will be in there. And then we'll investigate the portions that do not fall under CCRB jurisdiction.

MR. MARUTOLLO: If you'd like, your Honor, I can show you an example of one of the spinoffs.

THE COURT: I think he gave me an answer.

You wouldn't investigate that part of it that falls

under FADO, correct?

THE WITNESS: Correct.

THE COURT: That would go to CCRB.

BY MR. MARUTOLLO:

Q. And Inspector Lehr, approximately how many of the OCD complaints in that exhibit regard allegations that the police were not doing enough to combat crime?

A. About 15.

Q. And what were the nature of these complaints?

A. What happens is people typically want more police presence if they feel like they're not getting enough police presence and they're voicing their concerns that they want more police in maybe their section of the precinct.

MR. MOORE: Judge now I think he's getting into the substance of the complaints he's talking about now.

THE COURT: He is. He gave the general testimony that approximately 15 of the hundred asked for more police presence in their area. I'll take that.

MR. MOORE: Right. But he's now giving an explanation why, which may or may not be in those documents. It's his opinion about why that is and so that's why.

THE COURT: No. What the complaint says is we're not getting enough police presence. We want more.

Right?

THE WITNESS: Correct.

THE COURT: You have the book. You can cross-examine. You have them now. That was the point of calling him so you could see them too. But that's what they say in essence: We want more police in our area.

MR. MOORE: I understand.

But the point of, I thought, this exercise was to simply say these are the complaints we received, this is the notice we -- not to testify as to the anything beyond that, so.

THE COURT: Well, clearly all I wanted the breakout of any complaint about stop and frisk. That was six of the hundred.

Then the next question, obviously, somebody would want to offer that. And how many wanted more police presence in the area? Fifteen. Okay. I know those two numbers now.

MR. MARUTOLLO: May I have one moment, your Honor?

THE COURT: Sure.

MR. MARUTOLLO: No further questions, your Honor.

MS. HOFF VARNER: Just one moment, your Honor.

(Pause)

CROSS-EXAMINATION

BY MS. HOFF VARNER:

Q. Of the complaints that are in Defendants' Exhibit P15, were any of those allegations or potential allegations of racial profiling?

A. There's -- not specifically racial profiling in terms of:

Hey, I was racially profiled. There are some -- there are some incidents where language was used and where race was a part of that.

Q. Do you know how many were -- there were where race was a part of the complaint?

A. I'm aware of at least one.

MS. HOFF VARNER: That's all. Thank you, Inspector Lehr.

THE COURT: Okay. Thank you.

(Witness excused.

THE COURT: I'm sorry. Did you have --

MR. MARUTOLLO: Nothing further, Your Honor. I just wanted to grab the binder.

THE COURT: Okay. Thank you.

MS. GROSSMAN: The city calls Commissioner Michael Farrell.

MICHAEL FARRELL,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. GROSSMAN:

Q. Good morning.

A. Good morning.

Q. Where are you currently employed and what position do you hold?

A. I'm currently employed by the New York City Police Department as deputy commissioner for strategic initiatives.
Q. How long have you served as the deputy commissioner of strategic initiatives?
A. Since January of 2002.
Q. And who appointed you?
A. Police Commissioner Raymond Kelly.
Q. What are your duties and responsibilities as the deputy commissioner of strategic initiatives?
A. I oversee the operations of the office of management analysis and planning and of the quality assurance division, and I provide policy advice to the police commissioner.
Q. Can you -- what is your educational background?
A. I received a Bachelor of Arts Degree in politics from New York University in 1976. And a Master's Degree in public administration, also from New York University, in 1978.
Q. What did you receive your Master's in?
A. It was a focus on urban public policy.
Q. Did you receive any other degrees or did you participate in any other educational programs?
A. Yes. In 1993 I attended the program for senior executives in state and local government at Harvard University's Kennedy School of Government.
Q. Now, did you also -- were you also a member of the executive session on public sector performance management at

Harvard university?

A. Yes. From 1999 through 2001 I participated in that program at the Kennedy School. It was a collection of couple of dozen people from federal, state, local government, the academic world. There were members of Congress, some mayors, all looking at ways to improve performance management in government. This was a follow-on to Vice President Gore's reengineering government initiatives.

(Continued on next page)

Q. Can you give a brief chronology of where you were employed after you received your master's in public administration in 1978?
A. Yes. From July of 1978 to December of 1985, I was employed by the U.S. Department of Justice at the National Institute of Justice.

In December of '85, I came to the New York City Police Department, initially as director of special projects, and stayed with the police department until mid-1999.

At that point, I left to take a position in the governor's office as deputy director of criminal justice for New York State. And then in January of 2002, I returned to the New York City Police Department as deputy commissioner of strategic initiatives.
Q. What position did you hold at the National Institute of Justice and what were your duties and responsibilities?
A. Well, I was initially hired as a presidential management intern. That was a new program designed to bring people in from graduate programs into federal service. And then became a program analyst in the director's office, working on the development of the annual research plan that would be developed each year, then resulting in requests for proposals from researchers to suggest research on a wide variety of criminal justice topics; then the review of proposals that would come in, decisions on funding those research projects; and then,

finally, at the conclusion of the projects, review final reports from them to determine a dissemination strategy for NIJ to pursue.

Q. Could you briefly describe the range of issues that you would cover?

A. Well, the national institute had offices dealing with policing, with adjudication -- that is with prosecution, defense and court matters -- corrections, crime prevention, and some basic criminological research was funded as well.

Q. And what role did you play in terms of exercising your own judgment in terms of contributing to the recommendations -- let me rephrase that.

What role did you play in terms of making recommendations as to the application of some of the research?

A. I served on a research utilization committee, which was charged with reviewing final reports that would come in from researchers, and we would make recommendations to the director about the extent to which the findings from a particular study may have practical implications for the various components of the criminal justice system, and if it appeared that this study would advance the practice, then we would suggest broad dissemination, perhaps publication of the report, sending it to various criminal justice agencies, maybe developing further into users guides for best practice, that sort of thing.

Q. Now, you mentioned before that after your time with NIJ you

then worked for the police department from 1985 to 1999, right?
A. Yes.
Q. What position did you hold and what were your duties and responsibilities in that when you came into the police department?
A. Well, I was hired in 1985 by Police Commissioner Benjamin Ward, who was interested in having somebody who had some familiarity with and background in criminal justice research and who could assist in sort of translating that research into programs, programs designed to reduce crime, improve the efficiency of the department, that sort of thing.
Q. How would you go about making recommendations to Police Commissioner Ward?
A. Oftentimes it would be as a result of partnering with external research organizations. So we had a variety of projects, for example, with the Vera Institute of Justice. We had projects where they did evaluation of the tactical narcotics teams. We had a number of projects to develop the community policing concept and its application in New York. We partnered with the police foundation in Washington, separate from the New York police foundation, to evaluate the police cadet corps.

There were a variety of external projects to look at what the state of the art would be in departments across the country. So we would look and see what was in the field and

try to gather whatever information in terms of what the department is currently doing and what programmatic approaches may be taken to bring about improvements.

Q. Was one of your projects a staffing analysis which served the basis for the Dinkins' Safe Streets, Safe City program?

A. Yes. That was in 1990. We undertook a very extensive analysis of all aspects of the department in order to determine what the appropriate staffing level was for the police department. At the time, crime had reached its peak and Mayor Dinkins was very concerned about making sure that all of the elements of the city's criminal justice system were sufficiently resourced.

Q. Was one of your projects an analysis of the department's internal affairs division?

A. Yes. That came about in 1992 as a result of the Michael Dowd case, which then gave rise to the establishment of the Mollen Commission, and we undertook, under the supervision of then First Deputy Commissioner Raymond Kelly, a review of the department's internal affairs functions, issued a report finding it to be somewhat deficient, and created a new Internal Affairs Bureau, a much more robust function that exists today.

Q. Did one of your projects also include the creation of a new police academy?

A. Yes. That's been a very long and ongoing project, subject to the vagaries of the budget process, and that has ultimately

come to pass, it's under construction, and we expect that will be completed at the end of this year.

Q. Was another one of your projects the development of the executive development program for senior leaders?

A. Yes. We established a police management institute. This was also a concern Commissioner Ward had that we were developing future leaders and giving them the best possible preparation. So we partnered with Columbia University, the Columbia Business School, and they provided an eight week residential program of graduate level study, and that's been going on now for 25 years.

Q. Now, while at the NYPD, did you continue to serve in any capacity with the NIJ?

A. I did. I served as an external peer reviewer for a number of years, reviewing both research proposals and research final reports and providing comments back.

Q. Now, you mentioned you left the police department and you became the deputy director of criminal justice?

A. Yes.

Q. Can you briefly describe your duties and responsibilities in that position?

A. Primarily assisting the director in the oversight of the New York State criminal justice agencies, the state police, the department of corrections, probation, parole, that sort of thing, and working on new initiatives for the governor.

Q. Since you returned to the NYPD in 2002, what other special projects have you worked on?
A. Well, one of the first projects, the commissioner wanted a review of the department's response to the attacks of September 11th. So we worked with McKinsey & Company to do a thorough review of all of the aspects of the response and whether sufficient resources were available and that sort of thing.

Following that, I did quite a number of projects over the last several years. For example, there are six officers who are within my command, who are assigned to Haiti under an agreement with the State Department, at the request of former President Preval, to provide training and technical assistance to the Haitian national police, and we have had them there for the last several years.

We have just undertaken another new program to try to address the problem of -- the growing problem of prescription drug abuse. This is in partnership with former President Clinton and the Clinton global health initiative and a number of both prevention and enforcement type of initiatives.
Q. Have there been any special projects regarding community interaction in New York City?
A. Yes. I have been involved with development of the Brooklyn clergy, NYPD coalition, which is a number of ministers and clergy, from mostly central Brooklyn, who we work with in terms of attempting to deal with their principal concern, the level

of violence, gun violence in particular, within their communities.

Q. Now, have you served on any committees?

A. I have been a member of -- there's two committees of the National Academy of Sciences. The standing committee on social science evidence for use, and that was from 2007 to just this year, 2013. And then there was a sort of a related committee on using social science knowledge and public policy, which the purpose of that was to produce a report, and that report was completed and published this year using social science knowledge and public policy.

Q. Did you serve on any other committees?

A. Well, I serve on the research advisory committee for the International Association of Chiefs of Police.

Q. Have you presented on any panels concerning the NYPD's policies on stop documentation?

A. I have. In October of last year, I had been invited by the Defender of Rights, which is an agency, a new agency of the French government. They were assembling a meeting, a conference on the question of whether or not to create a form to document, as they described it, stop and search for police in France, and were interested in hearing from me about the current documents and procedures regarding stops in New York.

Q. Now, did there come a time when you became familiar with the report issued by the attorney general on December 1, 1999,

the report entitled "The New York City Police Department Stop and Frisk Practices"?
A. Yes. I had been aware of that effort while I was working in the governor's office, and did in fact read that report once it was issued in December of '99.
Q. What were your thoughts about the report?
A. Well, I thought it was -- it wasn't a fair representation of the issue with regard to assessing the NYPD's stop practices.
Q. What was your view about the suspect description?
A. My principal concern is that it didn't include suspect description as a benchmark for comparison.
Q. At the time that the AG's report was published, were you aware of similar studies conducted?
THE COURT: You mean in New York or anywhere?
MS. GROSSMAN: Anywhere.
THE COURT: OK.
A. There have been relatively few. There had been some work done, particularly with regard to traffic enforcement. I think a lot of this followed issues regarding the New Jersey state police and the throughway. So there had been in a traffic context, but because there really had been, and still, relatively little data available from police departments about pedestrian stops, there had not been, that I was aware of, many other studies of that sort.

Q. When you learned about the AG's report, you had not been working for the NYPD at that time, correct?

A. No. I was in the governor's office.

Q. Now, as deputy commissioner of strategic initiatives and in the role of giving advice to the police commissioner, are you concerned that about one out of every ten stops results in an arrest or a summons?

THE COURT: I'm sorry. That only one out of ten?

MS. GROSSMAN: About one out of every ten stops results in an arrest or a summons.

Q. You have heard the discussion of the stops, one may result in an arrest or a summons; out of ten stops, one may result in an arrest or a summons?

A. No, I am not particularly concerned with that because the standard for a stop, of course, is reasonable suspicion, which is lower than the standard for an arrest which is probable cause.

I would note that even in the attorney general's report that you referenced, there is a note of that that suggests that with -- I think at that time, it said one in nine stops resulting in arrests should not be surprising because of the difference in the standard required.

Q. Referring to Plaintiffs' Exhibit 333, which is the AG's report, at Roman numeral 8.

THE COURT: You can show him a hard copy if you want.

Q. Do you see the reference to what you just mentioned?
A. I see in that final paragraph, "Overall, only about one out of nine stops resulted in an arrest, an unsurprising outcome given the purpose of the stop and the lower level of suspicion required to justify a stop as opposed to an arrest."
THE COURT: That is limited to arrest, right?
THE WITNESS: That's correct.
THE COURT: I meant as opposed to a summons.
THE WITNESS: As opposed to a summons.
Q. What prompted the NYPD to request the police foundation to commission a study of stop, question and frisk data?
A. When the department provided the 2006 stop data to the City Council in, I guess it was January of 2007, there were a number of questions raised concerning it by members of the council and others, and the police commissioner wanted to have an independent objective analysis of that data to attempt to answer some of those questions.
Q. Why was RAND selected to conduct the study?
A. They were selected because they had just previously been selected to undertake a study for the department of our firearms discharge -- firearms training and our firearms discharge review process, and that was following the shooting of Sean Bell in late 2006. So we had essentially a contract underway with RAND at the time.
Q. Commissioner, going back just briefly to the attorney

general's report and the reference to the one in nine, is it your understanding that a summons is also -- is it your understanding that a summons requires probable cause?

A. Yes.

Q. Now, you mentioned the firearm study?

A. Right. So RAND had been commissioned to undertake the study of firearms training in early 2007.

Q. So what about that relationship led you to retain RAND to conduct the study on stops?

A. Well, at the outset of the firearms study, one of the researchers that was going to be involved in that was Dr. Greg Ridgeway, who I first met in the context of the firearms study, and came to understand that he had quite extensive experience in researching racial disparities in stops and had done so in Cincinnati and I believe Oakland, California.

Q. Do you know where he is currently working?

A. He is currently the acting director of the National Institute of Justice at the Justice Department.

Q. At the time that you decided to commission the study, were there many researchers available to undertake the analysis?

A. Again, I don't believe there were a lot of researchers who had engaged on work with regard to pedestrian stops. Some had done work with regard to traffic stops, but again, there was very little data available for researchers to use in this area.

Q. Was Cincinnati subject to a consent decree, to your

knowledge?

A. I believe it was, yes.

Q. Why was RAND selected for the firearm study?

A. Well, RAND Corporation has a 50-some year history of providing very high quality research with independence and integrity. A lot of it has been done for the federal government, but they also do studies for a wide range of government and non-governmental organizations.

Q. Does RAND have a particular division that has expertise in policing?

A. Yes. They had had prior to this time established a center on quality policing and so had invested in building a capacity to research police issues as well.

Q. Why didn't the police department put out a request for proposals?

A. Well, we had, as I mentioned, the contract with RAND underway for the firearm study, and so it would be -- it was very fortuitous that we would have had a procurement mechanism that would make it very quick and easy to get the new study underway and also have somebody of national prominence on the issue. Had we gone through the traditional city procurement RFP process, that would have been taken considerably longer, and we probably would just be issuing a contract by the time we actually got the report.

Q. Once the decision was made to have RAND conduct this

analysis, what did you see your role in terms of making recommendations to the police commissioner?

A. With regard to the study -- to the conduct of the study or to the results of the study?

Q. To the results of the study.

A. The results of the study, would be interpreting the findings of the study, and along with presentations from the researchers, informing the commissioner about the implications of it and how we might respond to it.

Q. Now, as the deputy commissioner of strategic initiatives, what was your role with respect to advising the police commissioner on the proper benchmark for assessing police stop patterns related to race or ethnicity contained in the RAND analysis?

A. Well, we would have reviewed with him the range of benchmark approaches that had been used in other studies and the ones that were examined in the RAND study and provide my advice as to what I think the most appropriate benchmarks to use would be.

Q. Now, what is your understanding of the conclusions contained in the RAND analysis regarding the proper benchmark for assessing police stop patterns related to race or ethnicity which provided the basis for your recommendations to the police commissioner?

A. The RAND analysis considered basically three benchmark

approaches. The first of which is use of residential census information, and they largely rejected that as unreliable and inappropriate to use. They also considered an arrest benchmark, arrestee benchmark, which they noted certainly improvement over a census, but had the potential drawback of not being able to disentangle racial bias, if racial bias existed in the decision to make the arrest, so that might not be completely reliable as a benchmark. But the third benchmark, suspect descriptions, as provided by victims and witnesses, would be the most reliable of the three.

Q. Now, given your years of experience in public policy research and analysis, how do you define a benchmark?

A. Well, a benchmark is a standard against which some activity or thing can be measured or judged, and the benchmark should be as closely related to the thing that's being measured as possible.

Q. Since reasonable suspicion stops are intended to stop people who have committed, are committing, or may about to commit a crime, what is your understanding of the appropriate benchmark to measure stops?

A. The most appropriate benchmark would be the offending population, that is, those who are in fact engaged in behavior for which a stop would be an appropriate response. And the offending population, of course, would need to have a surrogate measure of that, and the best measure certainly available is

the description of suspects as provided independently by victims and witnesses.

Q. Can you provide an example?

A. Well, if for example you were interested in knowing the characteristic of robbers in a particular area, you would look to the reports from robbery victims and witnesses to the characteristics of those robbers that they encountered.

Q. Now, how would you then assess the appropriateness of police stops for a robbery?

A. You would take the characteristics of the robbers as described by the victims or witnesses, that is the suspects of those robberies, and you could compare that to the characteristics of the persons who were stopped on suspicion of robbery by the police, and that would be a very close comparison and use of a benchmark.

Q. Why do you believe general information like census data on the resident population is not appropriate?

A. Well, census information obviously describes the distribution of people residing in an area that the census bureau is aware of at a particular point in time, yet crime, as we know, is not evenly distributed across the population.

Q. Now, what characteristics -- by what characteristics does crime vary for offenders of victims?

THE COURT: I'm sorry? Can you rephrase that?

Q. How does crime characteristics vary for offenders?

A. Well, it's clear from criminological research that crime varies. It's experienced by both victims and as offenders, it varies by age, by gender, by race, ethnicity, by income, by neighborhood, a whole host of social variables.

Q. So, in your view, what would be the appropriate benchmark for assessing the stop patterns related to race or ethnicity?

MR. CHARNEY: I am going to object. This is really venturing into expert opinion testimony. This is supposed to be a fact witness to testify about various practices of the police department.

THE COURT: That is true. I have been sitting here thinking that. Aren't we getting a second set of opinions, which we already have from your retained experts? He is supposed to be talking about reports that are commissioned or prepared by the police department, but not to be giving his own expert opinion about anything. Your last question called for his opinion.

Q. In your role as the deputy commissioner for strategic initiatives and communicating your understanding to the police commissioner, what is your understanding about the appropriate benchmark?

MR. CHARNEY: Same objection.

THE COURT: Sustained. You can say, did you recommend a benchmark that RAND should follow, or did you recommend a benchmark that the police department in some study should

follow? But to say what is your opinion on this really does make him a second or third or fourth expert.

Q. Now, in terms of other sources of information on the availability of the offending population at a particular place and time, are you aware of any other reliable source of information on the availability of the offending population at a particular place and time?

THE COURT: I think I understand. It was complicated. But she is saying, is there any way to get at the characteristics of the offending population other than suspect description?

MS. GROSSMAN: Yes.

THE COURT: I will allow it.

MS. GROSSMAN: Thank you, your Honor.

A. That kind of information is rarely available. It's available in the context of some of the traffic enforcement studies I mentioned where one can measure, say, the number of motorists who were speeding by race in a particular area and time, and then measure that against the distribution of people stopped for speeding by race, and so you have an ability to judge the availability.

THE COURT: Is there any subjective factor in the first half of that? You said the number of people who are speeding. Is that tracked by a machine that measures the speed of every driver that also sees the race, or is that the one

that police are noticing is speeding?

THE WITNESS: What makes it easier to do in the traffic context is that you can use technology, you can use speed measurement devices.

THE COURT: True. But would those tell you the race of the driver?

THE WITNESS: No. That requires observers, and it's not always easy. That's why some of the studies --

THE COURT: Especially with somebody speeding, it may be hard to catch their race. And that could, theoretically, be subjective.

THE WITNESS: It is. That's why these sort of studies, when you're relying on observers, it has a level of subjectivity.

There is another one with regard to -- there was a study again in Paris the open society justice initiative did to try to measure the existence of bias in police decisions to stop in train stations. There were several train stations in Paris, and they had research staff essentially taking counts of people passing through the train station providing sort of their estimates of the demographic distribution of it.

THE COURT: Just the people in the train station?

THE WITNESS: First as a benchmark for who is in the train station, which would be the availability to be stopped issue. And then they would observe the police stops and see

whether or not there were disparities that would be unexplained.

So in that case, it's somewhat easier to do because in an enclosed area you get a sense of who is available to be stopped, but it does suffer from the potential subjectivity of the observers, both ascribing race or ethnicity to a particular person but also their inability to know necessarily what the reason for the stop was. But there have been these kinds of studies that try to get at this issue of having --

THE COURT: Back to her original question, the easiest source is the suspect description source, is that right?

THE WITNESS: Exactly. From the victim and witness who is independent.

BY MS. GROSSMAN:

Q. Now, when the RAND study was finalized, did the NYPD receive a draft press release from the RAND Corporation?

A. We did.

THE COURT: Received that before the release?

THE WITNESS: Yes, that's correct.

Q. Was this press release ever issued?

A. No, it was not.

Q. Why not?

A. Well, our view was that the report should stand on its own. The report also had an executive summary and the plan was to release the report at a press conference, where the RAND

researchers would join the police commissioner and be available for questions from the media, and at the same time the report was posted on the police department's Web site, and I believe RAND's Web site as well.

Q. Did you believe that the draft press release fairly and completely represented the findings of the study?

A. No, I didn't. I believe that it did not.

Q. How come?

A. Well, there were a number of terms, choice of words, that I felt were not consistent with the findings.

THE COURT: Who prepared the draft?

THE WITNESS: The RAND press office.

THE COURT: Let's take our morning recess now and reconvene at a quarter of 12 so about 12 minutes.

(Recess)

BY MS. GROSSMAN:

Q. So you're aware that the RAND Corporation made six recommendations which are enumerated in the RAND report, correct?

A. Yes, I am.

Q. Did you consider those recommendations?

A. Yes, we did.

Q. Did you report your proposal to the police commissioner?

A. Yes. We provided both an update on the status of our actions and on proposals for ways to implement recommendations.

Q. Showing you what has been marked for identification as Plaintiffs' Exhibit 320. Is this document familiar to you?
A. Yes, it is.
Q. What is it?
A. It's a memo that was prepared for my signature to the police commissioner, April 25, 2008, describing and presenting proposals for responses to various RAND recommendations.

MS. GROSSMAN: Defendants move to admit, your Honor.

MR. CHARNEY: No objection.

THE COURT: 320 received.

(Plaintiffs' Exhibit 320 received in evidence)

Q. Now, looking at the memo, we see it has the bolded -- there are six recommendations and each response is bolded at the very top of the page. 1 reflects one of the recommendations and the response by the police department?
A. That's correct.
Q. And moving on down, then you see paragraph 2 represents one of the recommendations and your office's recommendations to the police commissioner, correct?
A. That's right.
Q. Now, referring to paragraph 1, it states that officers should clearly explain to pedestrians why they are being stopped, right?
A. That's correct.
Q. What did the police department do in response to the first

RAND recommendation?
A. There were two initiatives undertaken to implement that recommendation. The one mentioned as item A there is the development of what is called street encounter information cards, which are cards that officers can provide to stop subjects that provide information and background on common reasons for stops. And that was implemented initially as a pilot project in three precincts, and then ultimately some months later established as a citywide project.
Q. What about the second initiative?
A. The second was a revision to the department's patrol guide procedure, which provided direction to officers to provide an explanation for the reason for the stop absent exigent circumstances.
Q. So paragraph A refers to the card that you just spoke about?
A. Yes.
Q. And paragraph B refers to explaining the reason for the stop?
A. The revised patrol guide procedure, yes.
Q. Did the NYPD revise the patrol guide procedure to include the new requirement that officers explain the reason for the stop absent exigent circumstances?
A. Yes. That change was implemented.
Q. Showing you what has been -- I don't know if 282 has been

offered into evidence, but just to be clear, I am showing you Plaintiffs' Exhibit 282.

MR. CHARNEY: It's not in evidence. Do you have an extra copy for me?

MS. GROSSMAN: Yes, I do.

MR. CHARNEY: Oh, it is in evidence. Sorry about that.

MS. GROSSMAN: No problem.

Q. What is this document?

A. This is an interim order revision to the patrol guide, Section 212-11, stop and frisk. And it provides the additional direction that I mentioned earlier, which is for uniformed members of the service to provide the suspect with an explanation for the reason for the stop, question or frisk encounter absent exigent circumstances.

Q. That is looking at paragraph 2(a)5, and you see the bolded and underlined portion of the document?

A. Yes.

Q. This was issued on April 23, 2009?

A. Yes. That's correct. This also describes, in the following paragraph, a pilot project with regard to the information card.

Q. So paragraph 3 refers to the pilot project?

A. Yes, that's right.

Q. Now, did there come a time when a decision was made to

expand the pilot project citywide?

A. Yes, there was.

Q. Showing you what has been marked as Defendants' Exhibit A8. What is this document?

A. This document displays the two sides of the tear-off card that was part of that pilot project and provided to officers for providing that to stop subjects.

MS. GROSSMAN: I move to admit.

MR. CHARNEY: No objection.

THE COURT: A8 is admitted.

Did we already admit 282?

MR. CHARNEY: That was already admitted.

THE COURT: A8 is admitted.

(Defendants' Exhibit A8 received in evidence)

Q. There you see the front of the card and the back is reflected on the document?

Do you see the front where it says front, that's the front of the card?

A. Yes. That's the front of the card.

Q. And where it says back is the back of the card?

A. Yes.

Q. Was the card ultimately distributed department-wide?

A. Yes, it was. At the conclusion of the pilot project, it was citywide implementation.

Q. So looking at this interim order patrol guide, this interim

order issued May 18, 2010, is this the patrol guide that -- or the interim order that constitutes the revision to the patrol guide requiring that the cards be distributed citywide?

MR. CHARNEY: I just want to note this is not yet in evidence.

THE COURT: I thought we decided.

I am mixed up. What exhibit is this one?

MS. GROSSMAN: This is Plaintiffs' Exhibit 336.

THE COURT: You're right.

MR. CHARNEY: We don't object to it coming in.

THE COURT: 336 is received in evidence.

(Plaintiffs' Exhibit 336 received in evidence)

Q. So what does this document represent?

A. If I could see the following paragraphs.

Q. What does this document represent?

A. This document expands citywide and makes permanent the pilot project on the distribution of the information cards.

Q. Now, returning to Plaintiffs' Exhibit 320, paragraph 3 of the April 2008 memo recommends that the stop and frisk worksheet should be revised to capture data on the use of force?

THE COURT: You didn't go over number 2, right?

MS. GROSSMAN: No.

THE COURT: I just wanted to make sure I didn't miss it. Go ahead.

Anyway, you see number 3, that the worksheet should be revised?

THE WITNESS: Yes.

THE COURT: What did you do to implement that?

THE WITNESS: Yes. That recommendation that the worksheet should be revised, that was implemented and the current version of the worksheet does capture those use of force options.

Q. This worksheet, this stop question worksheet is the same as the UF-250?

A. Yes. That is correct.

Q. Now, paragraph 4 of the memo, the April 25, 2008 memo, also recommended that new officers should be fully conversant with stop, question and frisk documentation, right?

A. Yes.

Q. What, if anything, did the NYPD do in response to this recommendation?

A. I believe the field training program, the guide for officers, contained a new separate stand-alone section on stop, question and frisk. In addition, the probationary police officers, their stop, question and frisk forms were required to be reviewed and signed off on by their assigned supervisors so there would be some continuity in terms of that oversight.

MS. GROSSMAN: Your Honor, I would just note that the field training unit guide has been admitted through deposition

designations of Daniel Mulligan, I think at least one.

THE COURT: OK.

MS. GROSSMAN: We have remaining field training unit guides for other years that we will admit at another time.

THE COURT: It's helpful to have it in the transcript.

A. In addition, as a continuing effort with regard to this, the revised refresher training that was undertaken last spring at the outdoor range at Rodman's Neck is part of a continuing effort to make sure that this particular recommendation is continued to be implemented.

Q. What, if anything, did the NYPD do in response to -- paragraph 5 makes reference to modifying the audits of the 250s. Do you see that?

A. Yes.

Q. What, if anything, did the NYPD do in response to this recommendation?

A. Yes. A new audit was developed to be conducted by the quality assurance division, which would essentially review Sprint records, which is records on radio runs, calls for assistance from the public, in order to locate instances where it would appear that a stop, question and frisk report would be completed. Then they would listen to those radio transcripts and look at other documentation to see if in fact a 250 was required and then whether in fact one was completed. And that was developed, I believe, in 2009.

MS. GROSSMAN: Your Honor, I just also want to remind you that the radio run audit is in evidence as Defendants' Exhibit C11.

THE COURT: Thank you.

Q. Did RAND find one way or the other that officers were not documenting stops?

A. No. As a matter of fact, I pointed out that I think there were no organizational disincentives for officers to complete it. And so they didn't have concerns in that regard, but felt that just as a procedure going forward, kind of abundance of caution, that in addition to the audit protocols that we had in place, that we include one that could at some way get at that question whether or not forms are being completed when they are supposed to be.

Q. Now, RAND also recommended that the NYPD identify, flag and investigate officers with out-of-the-ordinary stop patterns, right?

A. That's right.

Q. What, if anything, did the police department do in response to this recommendation?

A. Well, at the conclusion of the study, there were follow-up meetings with RAND to attempt to determine how we could do that, and the software that had been developed for that purpose by RAND was acquired by the department and was run then against the stop data for 2007.

Q. Now, referring to Defendants' N6, which is in evidence, this is the internal benchmark report concerning 2007 data.

So the police department ran the -- they conducted an analysis of the stop patterns pursuant to the RAND recommendation?

A. Yes, that's correct.

Q. What is your understanding of what the internal benchmarking analysis showed?

A. Well, the benchmarking was run in two ways, and you will see the first table on page 2 is a listing of officer tax numbers and related information regarding the benchmark for black stop subjects, and then the second table is with regard to Hispanic --

Q. The second table is on page 2?

A. Hispanic stop subjects as well.

Q. So how many officers were identified as outliers?

A. There are a total of 14 officers identified in that way as outliers. Ten with regard to Hispanic stop subjects and four with regard to black stop subjects.

Q. So as to the 14 officers identified as outliers, were any identified as under-stopping minorities?

A. All of them are identified as under-stopping.

Q. Of the four officers, are you able to determine from this how many were identified as under-stopping blacks and under-stopping Hispanics?

A. Yes. At the 80 percent confidence level, there were four identified as under-stopping blacks and ten identified as under-stopping Hispanics.

Q. Were any officers identified as over-stopping black or Hispanics?

A. Not at the 80 percent confidence level.

Q. Why did the NYPD choose not to conduct another internal benchmarking analysis?

A. Well, in reviewing the results of this effort, in combination with the results from the RAND analysis, we believed that this was not a particularly productive exercise. There were also a lot of difficulties in terms of the actual use of the software and implementing that.

Q. Did you see any substantial differences in the stop patterns of similarly situated officers?

A. No. This is an analysis by virtue of the fact that --

MR. CHARNEY: I am going to object to the question and move to strike the answer. I object to the form as vague.

THE COURT: Could you ascertain stop patterns of officers from this report?

THE WITNESS: When you consider the number of officers that were looked at in the analysis, and I think with regard to the running of this software it can't be all officers, it has to be those who have at least 50 in a year, so it's in the order of 2 to 3,000 whose patterns are looked at.

THE COURT: What do you mean by pattern? Do you mean who they are stopping?

THE WITNESS: Who they are stopping -- it controls for the circumstances, their assignment, location, and attempts to see whether a particular officer has a pattern that varies considerably from his or her peers.

THE COURT: I think he has a basis to answer the original question, which was, did you see any substantial differences in the stop patterns of similarly situated officers?

A. The answer would be no because of the small number of outliers that are present, and in this instance for 2007, all of the outliers were under-stopping black and Hispanic stop subjects.

Q. Why didn't the NYPD rerun the 2006 data against the internal benchmarking software that was studied in the RAND analysis?

A. Well, by the time we were doing this, of course, this was well into 2008, so 2006 data would reflect stops by officers two years in the past. But, also, there is a question of, my view, of the propriety of the undertaking in an effort to identify the officers, where it was very clear that the basis under which the RAND research was taken was under the limits of the institutional review board and the protection of human subjects for research purposes. And so, essentially, we would

be looking to undo those privacy protections that were present in the research.

Q. Now, the identification that was made of the individuals who were deemed to have over-stopped in the 2006 RAND study, does that mean that the stops were based on bias?

A. No. All that tells you is that these identified officers have stop patterns that differ from their peers. It says nothing about the propriety of any particular stop. It just identifies that there seem to be differences at a certain confidence level.

Q. Now, referring to the RAND recommendation which proposes that the NYPD should review the borough with the largest racial disparities in stop outcomes, what did the NYPD do in response to this recommendation?

A. Well, we took a very careful look at the data presented in the RAND report. I believe that appears in tables 5.2 and 5.3 of their report, which lays out the post stop outcomes along several dimensions.

Q. Now, referring to Defendants' Exhibit K6, which is the RAND report already in evidence.

THE COURT: In the question that Ms. Grossman posed, she talked about the recommendation that proposes that the NYPD should review the borough with the largest racial disparities in stop outcomes. What does that mean, racial disparities in stop outcomes?

THE WITNESS: They calculate and present in the tables the rates of the post stop outcome, which would be either summons, arrest, potential use of force. There are, I think, five stop outcomes. So there would be a rate at which that happened for stops by each racial group --

THE COURT: I see.

THE WITNESS: -- in an area. So the difference between say the white and black rate would be looked at.

THE COURT: I see.

MS. GROSSMAN: Your Honor, on the elmo we have table 5.2 which Commissioner Farrell just testified about.

You see right over here --

THE COURT: I need the top to see the columns. White, black, Hispanic. All right.

Pull it up to the yellow. There you go.

Force used. OK.

MS. GROSSMAN: Then, your Honor --

THE COURT: I am done with that.

MS. GROSSMAN: That's table 5.2.

Then I am going to flip over to table 5.3 -- I'm sorry. 5.2, I am continuing on just to the next table. There you see there is a reference to Staten Island. And the stop outcome that's referenced in the RAND report is highlighted over here, the Staten Island frisks.

THE COURT: Right. OK. Thank you.

Q. Commissioner, when you look at this Staten Island frisk, the highlighted portion, look at 20.3, that means that out of 100 white individuals, 20.3 are stopped, right -- I mean, frisked?

A. That's correct.

THE COURT: Actually, that means out of 100 stopped, 20.3 are frisked.

THE WITNESS: That's correct.

Q. Then when you move on to black, it indicates out of 100, 29.2 are frisked?

A. Yes.

THE COURT: Out of 100 blacks that were stopped.

THE WITNESS: That's right.

Q. Then moving over to the category of Hispanics, it indicates out of 100 individuals who were stopped 24.5 --

THE COURT: Out of 100 Hispanic people stopped, 24.5 were frisked.

MS. GROSSMAN: Correct.

Q. Then in the category of all non-White, the same holds true?

A. That's correct.

THE COURT: What are those three footnotes?

Are those footnotes after black, Hispanic, and all non-White? Are they asterisks or footnotes?

MS. GROSSMAN: A is a footnote. Right over here is the A, corresponds with 29.2.

THE COURT: And it says?

MS. GROSSMAN: Figures that differ statistically from the rate for black pedestrians.

THE COURT: Do you know what that means?

THE WITNESS: Yes. He is saying that this rate and the difference, when calculated statistically, had statistical significance. It's an actual difference essentially.

Q. Then referring to table 5.3, this represents -- what does this represent, this table?

A. Well, this table compares the stop outcomes for blacks to those of other races who are similarly situated to stopped black pedestrians. So this differs -- it's sort of a companion table to 5.2, which is a comparison of stop outcomes for white pedestrians to those others who are stopped in similar situation to white pedestrians. So the two tables look at the same issue from two different perspectives.

THE COURT: What is the problem, Mr. Charney?

MR. CHARNEY: This table actually says at the top comparison of stop outcomes for black pedestrians, and I think the witness said for white pedestrians.

THE COURT: I didn't think he misspoke, but the transcript will reflect if you are right.

MR. CHARNEY: Table 5.2 --

THE COURT: He said blacks.

MR. CHARNEY: Then I think if you go back to table

5.2, that's actually the one that compares the stop outcomes for white pedestrians.

THE COURT: I wasn't confused because the heading on the top makes it clear anyway. But thank you.

MR. CHARNEY: The other thing I just want to make sure is clear for the record that all of this information that is coming in is not coming in for the truth because the RAND report has only been admitted for notice. So I just want to make sure, to the extent that the city is trying to offer these statistics for the truth, we would object.

THE COURT: That's kind of troubling. The last few questions were for the truth. They did want me to note these disparities such as they are.

MR. CHARNEY: I would ask that they only be accepted, to the extent they are being offered, to show what the police department was told or not told by RAND.

THE COURT: That's fine, but I have to change my thinking. OK. This is what the police department was told the disparities were.

MR. CHARNEY: Yes.

THE COURT: I will take it for that.

BY MS. GROSSMAN:

Q. Table 5.3, there is a highlight on Brooklyn South?

A. Yes.

Q. This reflects the disparity in force used?

A. That's right.
Q. Again, can you explain what the 28.6 --
THE COURT: I think I have got it. It's out of 100 stopped.
THE WITNESS: Yes.
THE COURT: I understand.
Q. Moving on to the continued table 5.3.
THE COURT: Can I see that?
OK. Go ahead.
Q. Then we have Staten Island regarding the frisk outcome. And you see the numbers represent the same 37.7 out of 100?
A. Yes.
Q. So in evaluating the results of tables 5.2 and 5.3, what does that tell you in terms of what should be done in response to the RAND recommendations?
A. Well, I think there are two observations. The recommendation makes note of reviewing where the largest disparities, and the report pointed out the two that you had highlighted. When we review the tables, what becomes clear though is when you look at the companion table, because one of them is highlighted on table 5.2, the other is highlighted on table 5.3, that for each of those, when you look at their companion analysis on the other table, the disparities diminish quite considerably. So the point was even the largest of all of them are not consistent across the two analyses.

Further, I would say that there are a total of 90 comparisons that are available from these two tables. There are the five stop outcomes -- frisk, search, summons issued, arrest and force used -- for each of eight patrol boroughs, plus one for citywide, and there are the two tables. So it is 45 on one and 45 on the other. So there are 90 possible sort of candidates, if you will, for judging how large a disparity there may be in the stop outcomes by race. Of those 90, I believe 72 of them, or 80 percent, had differences of less than 3 percent.

THE COURT: Actually, I think this falls into the prior objection. This is going way beyond the idea of notice.

Did you draw all of these conclusions at that time and notify your, I guess, superiors and it affected your outcomes at the time?

THE WITNESS: No. At the time, taking the recommendation, looking at all of the data in the report, understanding what the actual level of differences were --

THE COURT: As reported to you?

THE WITNESS: As reported to us, it was our conclusion that the differences that did exist were quite small.

THE COURT: That's what you concluded. How did that affect your response?

THE WITNESS: That there were no large disparities that could be discerned and further examined.

In addition, though, we did take a look at CCRB patterns with regard to the borough to see whether or not there were significant differences in that regard, and at that time there were not.

Q. Now, when you did the analysis, you made mention of the 90 comparisons?

A. Yes.

Q. Would it be fair to say that from your analysis 88 of the 90 comparisons showed no more than a 6 percent difference in stop outcomes?

MR. CHARNEY: Objection. Leading.

THE COURT: It is.

MS. GROSSMAN: It's based on what is in here.

MR. CHARNEY: Then the report speaks for itself and it can't come in for the truth anyway.

THE COURT: Again, I don't think that it matters. It just matters what you noticed at the time and what you did with it.

I have to just strike the question and say, is there anything else that you noted in this report that affected your report to your superiors or the response to the data?

THE WITNESS: I would say that we noted that the magnitude of the differences were certainly all less than 10 percent where they existed.

(Continued on next page)

THE COURT: Did that lead you to conclude that no action was necessary?

THE WITNESS: That's correct.

THE COURT: Okay.

BY MS. GROSSMAN:

Q. Now what did you conclude about Brooklyn South?

A. Well, similarly the -- when you looked at the highlighted force used, I believe on table 5.3, where there's a difference of 6.5, between the two rates, the white rate and the black rate, that 6.5 difference becomes a difference of 1.7 on table 5.2.

THE COURT: The only issue is did you note that at the time of the report.

THE WITNESS: Yes, your Honor.

Q. Now is the NYPD required to report to the city council on stop, question and frisk?

A. Yes, we are.

THE COURT: Say that again.

One second, please.

Go ahead.

Q. Is that requirement set out in the administrative code of the City of New York section 14-150?

A. Yes, it is.

I believe that was enacted in 2001.

Q. Does the NYPD provide quarterly reports to the city council

concerning the information contained on the UF 250?

A. Yes, we do.

Q. Has the NYPD informed the city council about how it has addressed the RAND recommendations contained in its report?

A. There have been occasions where that information has been provided to the council.

Q. And has the NYPD also responded to inquiries by the city council concerning its respond to the RAND recommendations?

A. Yes, we have.

Q. And was one such occasion in or about November 2010?

A. Yes.

Q. Showing you what's been marked as Defendants' Exhibit V8 for identification.

MR. CHARNEY: No, your Honor. It's not in evidence yet.

We need to sort this out before it goes into evidence.

THE COURT: So you object to V8?

MR. CHARNEY: Let me explain our objection.

Our objection, which your Honor has already ruled on I believe at the motion in limine conference in January and then again in March before the trial started, was that this document which is a letter from Commissioner Kelly to speaker of the city council cannot come in for its truth.

And the only reason -- the only purpose it can come in for is to show that the fact that the police department

communicates in writing with the city council. The substance of this letter, nothing in it, is supposed to be admitted into evidence for any purpose.

THE COURT: Maybe what we should just have is the date, the inside address, and the signature.

MR. CHARNEY: Dear Speaker Quinn, and then the signature. That's it.

That would be our position.

THE COURT: That's the only way I could avoid reading the content; which, again, I'd rather not do if it shouldn't be admissible.

So if it's sole purpose is to show that there are written communications between the commissioner and the city council, then the substance should be redacted and it should just have the inside address and the signature.

Your response to that is.

MS. GROSSMAN: Your Honor, you ruled on this already.

THE COURT: Both sides agree on that.

MS. GROSSMAN: You ruled that the content could come in but only for notice.

MR. CHARNEY: That's not true.

THE COURT: You'll have to find it then. "No, not true" is not helpful to me.

MR. CHARNEY: We will find it.

THE COURT: There's eight thousand pages in the

transcript. So you'll find it.

You'll have to hold off on this until it's found.

Q. Commissioner Farrell did the NYPD report to the city council on the efforts at the NYPD to implement the RAND recommendations?

A. Yes, we did.

MS. GROSSMAN: Your Honor just -- this is the letter that just memorializes that.

THE COURT: If I've ruled previously, I'd like to see what I ruled.

Q. Are you aware of staffing data that the NYPD has provided to plaintiffs' counsel in Floyd?

A. Yes.

Q. Is OMAP responsible for compiling staffing data generally for the NYPD?

A. Yes. That's correct.

Q. For what purpose?

A. For also reporting to the city council under that same provision of the administrative code, quarterly reporting.

Q. The staffing data is provided in the city council in quarterly snapshots?

A. Yes, it is.

Q. And do these quarterly snapshots reflect the total staffing at each of the precincts?

A. Yes, they do.

Q. Are these numbers limited to officers who are out on patrol, or does it also include officers assigned to administrative duties and other functions in the command?
A. Both. It includes all officers assigned to a command.
Q. What crime categories are tracked by NYPD?
A. The seven major felonies are the ones most routinely tracked. And they are murder, rape, robbery, felony assault, burglary, grand larceny, and grand larceny auto.
Q. Are these the seven major felonies under the New York state penal law?
A. Yes, they are.
Q. Does the NYPD maintain statistics on these seven major felonies mentioned above?
A. Yes, we do.
Q. How often are the statistics run?
A. For a variety of purposes, they are run on a weekly basis.
Q. Are the statistics made available to the public as well.
A. Yes, they are. They are posted on the police department's website every week.
Q. Of the seven major felonies tracked which represent the violent crime felonies?
A. That would be murder, rape, robbery, and felony assault.
Q. And that does not include burglary, grand larceny, and grand larceny auto, correct?
A. No.

Q. Correct?
A. That's correct.
Q. Do these four major felonies, murder, rape, robbery, and felony assault also represent all violent crime?
A. No. They don't.
Q. What other violent crime is not represented in these four major felonies?
A. There would be other felonies, sex crimes. There would be misdemeanor sex crimes. And there would be misdemeanor assaults.
Q. What about weapons possession?
A. Weapons possession would also not be included in the seven major.
Q. And when you mentioned felony sex crimes, did you mean felony sex crimes other than rape?
A. Other than rape. That's correct.
Q. Now referring to the reasonable suspicion reports for 2011 and 2012, which are at Defendants' Exhibit Y8 and B14. The four major violent -- the known violent crime suspect -- I'm sorry.

The known violent crime suspect categories in the 2011 and 2012 reports only include the four major violent crimes?
A. That's correct.
Q. That's murder, rape, robbery and felony assault, correct?
A. Yes.

Q. Now you're familiar with Professor Fagan's second supplemental report, right?
A. Yes, I am.
Q. That's at Plaintiffs' Exhibit --
THE COURT: I don't know what she's going to ask. You're standing too early.
MR. CHARNEY: I'll stand up and wait.
THE COURT: All right.
Q. And that's referring to table four of Professor Fagan's report --
A. Yes.
Q. -- which says that violence represents 23.90 percent of the stops and weapons represents 25.08 percent of the stops.
You're familiar with that?
A. Yes, I am.
Q. Now even though the weapons is not one of the four major violent crime types, for example, murder, rape, robbery and felony assault, does the NYPD consider a criminal possession of a weapon stop to be related to violence?
A. Yes. I would say almost by definition that those stops are intended to address violence.
Q. So when you add those two categories together, what percentage of the stops was based on violence?
A. That would be 49 percent, 48.98.
THE COURT: Well except in your own language you don't

classify the weapons violations as violence. You have separate categories for those.

THE WITNESS: Well not with -- right. Not with respect to crime reporting, which are typically reports from victims.

THE COURT: Right. You said there are seven major categories. Four of them we've gone over a number of times. The other three were mentioned. You did not mention criminal possession of a weapon as one of the seven violent crimes.

THE WITNESS: Right.

MR. CHARNEY: Your Honor, I was going to read to you the portion of the March 14 conference transcript related to the --

THE COURT: Oh, thank you. Sure.

MR. CHARNEY: So this is the Court, your Honor speaking, "It is limited --

MS. COOKE: What page?

MR. CHARNEY: This is page 21, line 13.

THE COURT: Page 21?

MR. CHARNEY: This is before trial. This is way back in the good old days.

"It is a limited purpose --

THE COURT: You'll have to read very slowly.

MR. CHARNEY: "It is a limited purpose and they are welcome to argue that. It goes to proving that they did not

act with deliberate indifference. It is still being offered for one sentence. The one sentence is: The city police department stayed in touch with the city council at least as of November 2010," which is the date of the letter is November 2010.

So I mean our -- again, our position is that the fact that a letter was sent from Commissioner Kelly to the speaker of the council, that's really the only purpose it should be offered for. It shouldn't be offered for any of the content of the letter, the substance of the letter.

Obviously not only -- not just for the truth but beyond that, that the substance of the letter is not --

THE COURT: I think there may have already been one question and one answer about the topic of the letter, I think. Did you manage to ask one question about what the subject matter of the letter addressed? If not, I will.

What's the subject matter of that letter, do you know?

THE WITNESS: The letter was an update to the speaker on the steps we had taken to implement the RAND recommendations.

THE COURT: That's all I'm going to allow.

MS. COOKE: I just ask that I be able to read the remainder of the conversation, your ruling on that issue.

THE COURT: Sure.

MS. COOKE: So picking up with line 19 on page 21.

Mr. Charney stated, "Just to make sure the substance of the letter, in other words, all of the RAND recommendations which the letter sets forth from the city -- forth the city has made effort to implement, none of that comes in.

"The Court: Not as proof. It comes in to show that the statement was made but it doesn't prove that the city implemented anything.

"Mr. Charney: Okay.

"The Court: It cannot be offered for the truth. The city would have to prove that it implemented it. I will not take it as truth that the city implemented anything. That the city told somebody they did, that is the point. That is not offered for the truth. It would good have been a lie, but the notice was given. They need to prove that they implemented something."

THE COURT: I understand from what your last answer to my question is it summarizes the recommendations and the steps taken according to the commissioner.

THE WITNESS: That's correct.

THE COURT: There is no need to read it. I understand that's what it is. And I have seen the recommendation. We've had it on the screen, one through six, earlier. And he's testified about the steps taken. So that's that.

I won't take the -- Exhibit J in evidence. I take notice that the commissioner wrote to the city council, was

it --

MR. CHARNEY: November 15, 2010.

THE COURT: November 15, 2010. And the subject matter was the recommendations and the responses.

BY MS. GROSSMAN:

Q. Now commissioner you're aware of the Daniels settlement agreement, correct?

A. Yes. That's correct.

Q. Now were the QAD audit protocols referenced in the Daniels agreement approved by you?

A. Yes, they were.

Q. Were those audit protocols adhered to over the period of the Daniels settlement agreement?

A. Yes, they were.

Q. And do they continue to be adhered to, to this day?

A. They do. They've all been continued.

Q. Now referring you to Defendants' Exhibit D1.

MR. MOORE: Is it in evidence? If it's not, it shouldn't be on the screen.

MS. GROSSMAN: I think audit protocols like this have been.

MR. CHARNEY: I haven't seen this. Since you won't give me a copy, I can't verify it.

MS. GROSSMAN: It's not in evidence. You can look at it and then I just need it back. Sorry.

MR. CHARNEY: We have no objection to this coming in.
Q. What is this document, Commissioner?
A. This document describes audit protocols that were taken in December of 2002 regarding the stop, question and frisk worksheets.
Q. And so you have a cover memo here dated December 23, 2002, correct?
A. Yes. That's correct.
Q. And it identifies the audit protocols, correct?
A. Yes. That's correct.
Q. And then on the third page which is Bates number NYC 037892, that contains the worksheet for the 802 audit?
A. Yes. That's right.
Q. And that continues for a few pages. And then you see on the last page of Defendants' Exhibit D1, you see at the very top left-hand corner it says 802-A police initiated enforcement?
A. Yes.
Q. That reflects the audit protocol for the 802-A police initiated enforcement, right?
A. Yes. That's correct.
Q. And that actually starts on the preceding page, Bates number NYC 037895?
A. Yes.
Q. An is it your understanding that this audit protocol was

provided to plaintiffs' counsel prior to the Daniels settlement agreement?

A. Yes.

MR. MOORE: Judge let me object to that because this a document dated 2002. The Daniels settlement was 2004. To the extent that they are trying to make this argument that somehow we agreed to it, it was already in place in 2002.

MS. GROSSMAN: No. This wasn't in place in 2002. The witness will testify to that.

THE COURT: When was this adopted?

MR. CHARNEY: The date of the document says December 23, 2002 on the first page.

THE COURT: I'm sorry?

MR. CHARNEY: December 23, 2002 is the date of the memo signed by Commissioner Farrell.

THE COURT: You do see that?

THE WITNESS: Yes, I do.

MS. GROSSMAN: Can you explain what that means? Can you explain the genesis of this document and why it's dated December 23, 2002.

THE WITNESS: This was a -- looks like this document is from me to the chief of department. So I would assume it's a proposal. It's what the proposed methodology would be for the self-inspection, which would then request for comments and recommendations back from chief of department and others.

So it would be sort of an early step in the process to have something complicated --

THE COURT: Do you know the adoption date?

THE WITNESS: I don't offhand.

THE COURT: We'll pause there until 2:05. They can find it out if it's documented, sobeit. Okay. 2:05.

(Luncheon recess)

AFTERNOON SESSION

2:08 p.m.

THE COURT: Please be seated.

Michael Farrell, resumed.

DIRECT EXAMINATION CONTINUED

BY MS. GROSSMAN:

Q. Before the break, Commissioner, you were talking about the QAD audits back in December -- or the audit protocols back in December of 2002?

A. Yes.

Q. Let me just take a step back to the Daniels agreement first, referring to Plaintiffs' Exhibit 114 in evidence.

Here is the Daniels settlement agreement. Do you see that, Plaintiffs' 114?

A. Yes.

Q. And the date of the Daniels settlement agreement is September 24, 2003.

Do you see that?

A. Yes, I do.

Q. Referring to the portion of the Daniels settlement agreement that refers to NYPD quality assurance division audits.

MR. MOORE: I'm not sure that's the date it was signed off by the Court.

MS. GROSSMAN: It's the date that the parties signed

the agreement.

MR. MOORE: Well it's not an agreement until it's approved by the Court.

THE COURT: Is this critical, which date it was? Is it?

MR. MOORE: No, Judge.

THE COURT: Okay.

Q. So referring to paragraph (d), supervision and monitoring.

Do you see that, Commissioner?

A. I do, yes.

Q. It says that, "The NYPD quality assurance division has developed protocols necessary to integrate review of stop, question and frisk practices into its existing audit cycle of NYPD commands, including determinations as to what material shall be reviewed and what standards shall be applied."

Do you see that?

A. Yes, I do.

Q. And "Municipal defendants have provided class counsel with an audit outline that includes these protocols."

Do you see that?

A. Yes.

Q. And then you see that "QAD shall conduct audits that at a minimum address the following issues."

Do you see that under category (a) and (b) it sets forth the topics that are supposed to be audited?

Do you see that?
A. Yes.
Q. Now the racial profiling policy was issued in or about March 2002, correct?
A. Yes. That's right.
Q. And we know that -- from Plaintiffs' Exhibit 184 already in evidence, we see that there is a reference -- here's the racial profiling policy, March 13, 2002.
Do you see that?
A. Yes.
Q. And then moving to paragraph four, it says here, "Commanding officers will establish a self-inspection protocol within their command to ensure that the contents of this order are complied with. The Quality Assurance Division will include compliance with this directive in all of its command inspections. Performance in this area will also be included in CompStat review."
Do you see that?
A. Yes.
Q. Now, in accordance with this March 2002 racial profiling policy did QAD establish audit protocols?
A. Yes, they were established.
Q. And showing you what's been marked -- which is already in evidence, Plaintiffs' Exhibit 89.
Do you see that?

A. Yes.

Q. And do you see that's a December 23, 2002 memo, right?

A. Correct.

Q. And on the back of the memo you see your signature?

A. Yes.

Q. Are these the audit protocols that have been used by the NYPD pursuant to the racial profiling policy?

A. Yes, they are.

Q. Did you notify chief of department of the establishment of command self-inspections in or about December 2002?

A. Yes, I did.

Q. Was the 802 and 802-A command self-inspection communicated to the commands by a Finest message dated December 26, 2002?

A. Yes, it was.

MS. GROSSMAN: Sorry, your Honor. I have one copy but showing you what has been marked as Defendants' L5. Is this the Finest message that you just testified about.

THE WITNESS: Yes, it is.

MR. CHARNEY: I think this is already in evidence as plaintiffs' 350 but we obviously have no objection.

MS. GROSSMAN: Okay. Great.

Q. And so this is the Finest message that communicates to the commands that there is an 802 -- an 802-A self-inspection requirement, correct?

A. Yes. That's right.

Q. And this was disseminated December 26, 2002?
A. Right.
Q. Now, does the -- QAD does citywide audits of 250s, does it not?
A. Yes.
Q. And was the review of the first quarter of the 2003, the first of these 802 citywide QAD audits?
A. Yes. That's right.
Q. To your knowledge did the 802 or 802-A audits change between December 2002 and September 24, 2003, the date the Daniels agreement was signed?
A. I don't believe so, no.
Q. So you're aware that the Daniels settlement ended in or about December 2007, correct?
A. Yes.
Q. Under the terms of the Daniels settlement agreement, the NYPD was under no obligation to continue conducting the QAD audits of stop, question and frisk; is that right?
A. Yes.
Q. Did the NYPD continue to audit stop, question and frisk?
A. Yes, we did. We continue it to this day.
Q. Did the NYPD develop new audits?
A. Yes. There were new audits developed as well.
Q. Just briefly, what are the audits?
A. The RAND-recommended Sprint audit that we discussed earlier

was one of them. And another is an audit of activity log entries, which included an examination of those regarding 250s.
Q. Now, turning our attention to Plaintiffs' Exhibit 73 in evidence which is the draft audit, a draft audit protocol. It's a November 6, 2002 memo. And it has Peter Cassidy's signature on the back of the page. So show this -- this is Plaintiffs' Exhibit 73 in evidence.

So is this a draft of the audit protocol to your understanding?

Do you want to take a look at this?
A. I would like to take a look at it, yes.
Q. Turning your attention to the second page under paragraph 3 it says police initiated enforcement, (b).

So it's 3(b). "The ICO/assistant ICO will respond to and observe officers' actions at five radio runs where police initiated enforcement is likely. They will monitor these runs to ensure that any actions taken are based on the standards required by the Fourth Amendment of the U.S. Constitution or other applicable law. Particular attention will be paid to those incidents requiring the preparation of a stop, question and frisk report."

Do you see that?
A. Yes.
Q. That is not the final QAD audit protocol?
A. No, it is not.

Q. Is that a draft proposal?

A. I see that it's not signed.

I don't recall having seen it at that time. But I would assume it would be a draft, obviously. That was not what was ultimately promulgated.

Q. Well referring to paragraph 3(b), why didn't the NYPD include this proposal in the 802 QAD audit?

MR. CHARNEY: Actually, your Honor, this is for the 802-A.

MS. GROSSMAN: I'm sorry. 802-A.

I'm sorry, your Honor. This -- I believe this argument -- this document is part of Plaintiffs' 89.

MR. CHARNEY: This is actually Plaintiffs' 73 if you look at the first page of the document.

MS. GROSSMAN: Plaintiffs' 73. Sorry.

Then I'm not sure if this is in evidence.

MR. CHARNEY: It is in evidence, your Honor. It was admitted through Mary Cronin on I believe -- I don't know what date it was.

MS. GROSSMAN: If it's admitted in evidence, that's fine. I just wanted to make sure.

Q. Referring to paragraph 3(b), can you explain why --

A. Yeah. I don't think that's a practical approach to conducting a self-inspection. It would require the integrity control officer or his or her assistant to attempt to respond

to radio runs -- it says five in a period -- in order to observe a stop. But we know that the overwhelming majority of radio runs don't result in a stop. So for the ICO to be able to try to determine in advance the high probability of a stop for a particular radio run, that seemed to be a little impractical.

Similarly, it would require the ICO to travel to the location of the radio run and be there in time to witness the interaction. And, obviously, given the size of many of the precincts, the ability to get there and observe it where a stop typically only takes two or three minutes, that it just seemed like it was unlikely that that was going to be able to be accomplished.

Q. Why did the NYPD decide against including an interview of the stop subject in the QAD audit?

A. Well, firstly there would be the challenge of being able to get in touch with stop subjects. Presumably it would be by telephone and a callback survey.

And there are sort of two possibilities. The stop subject would either have been involved in criminal activity and so a call from a member of the police department supervising the quality assurance division would seem that that wouldn't be very productive in terms of attempting to determine whether or not there was reasonable suspicion. And to have the person who we're calling on the phone provide information would

be -- would somehow implicate themselves in that.

On the other hand, if the person had not been involved in criminal activity, a follow-up phonecall from the police department may not be welcomed. But more importantly, the person would often likely not be in a position to have known the nature and basis of the reasonable suspicion by the officer.

Q. And what about the contact information? Is that -- could that factor in -- the reliability or correct and accurate contact information, could that also factor into --

A. Yes. I mentioned earlier --

MR. CHARNEY: Objection. Leading.

THE WITNESS: I think I had mentioned at the beginning of my comment.

MR. CHARNEY: Move to strike.

THE COURT: It was leading but there's not much I can do. So go ahead.

THE WITNESS: I thought I did reference that at the beginning where I said I thought it would be difficult in many cases to be able to make that contact when there may or may not be sufficient contact information available.

Q. Now, how is this different than interviewing a complainant in an OCD complaint or CCRB complaint?

A. Well in those instances people have come forward to make complaints and to clearly be willing to provide information

that then results in further investigation.
Q. Now, when QAD audit conducts 802 audits, does it require greater detail in the memo book than what is required in the 250?
A. No, it does not.
Q. Why did the QAD -- why did QAD decide to establish an 803 activity log audit?
A. There were concerns in several areas about the adequacy of activity log entries. There were concerns with regard to the 250s as a result of previous audits looking at activity logs. But there were also from other -- in other areas. The Civilian Complaint Review Board I believe had expressed some concerns about seeing incomplete activity log entries in their investigations. And I think Internal Affairs Bureau similarly had some concerns that they just weren't being as complete as they would like them to be.
Q. Now how long has the NYPD relied upon violent crime suspect description as a benchmark for stops and how come?
A. Well --
MR. CHARNEY: Your Honor, I'm going to object to this because I don't really understand the context of the NYPD relying on violent crime suspects as a benchmark. That suggests that the NYPD has been conducting statistical analyses which I know RAND did.
THE COURT: No. No. No.

MR. CHARNEY: But I don't know about the NYPD.

THE COURT: Let's find out.

Has the NYPD ever conducted some kind of a study using violent crime suspects as a benchmark?

THE WITNESS: I believe in 1999, before I left the department, there was -- there was some analysis of comparing stops to violent crime suspects. And this gave rise, I believe, to the -- with the passage of the bill in the city council which created the administrative code requirement for quarterly reporting. Within the quarterly reports to the council on 250s, in addition to the information contained in the 250s, the categories that get tabulated, there is also a requirement for us to provide the council with specification of violent crime suspects.

So the violent crime suspect benchmark is in that sense adopted by the city council in that legislation. And that information has been provided to the council since 2002.

MR. CHARNEY: Your Honor, I'm going to object and move to strike that.

THE COURT: I'm going to strike only the part that the city council adopted the benchmark. But short of that, everything he said can stand.

MR. MOORE: Judge, the question was --

THE COURT: I asked whether the police department has ever done a study using the suspect race as a benchmark.

MR. CHARNEY: Violent crime suspect.

THE COURT: Okay. He answered he thought so, he didn't know, but the bottomline is it resulted in a quarterly reporting.

THE WITNESS: So there's some subsequently as well.

THE COURT: You said you thought, you weren't sure, you used some qualifying --

THE WITNESS: I did for 1999. I was trying to get to the earliest possible time.

THE COURT: When did they do such a study?

THE WITNESS: Then the routine tabulation of that began with the requirement to provide to the council.

And then further, in 2008, with the initiation of the crime and enforcement activity reports that are published twice a year, that includes the violent crime suspect as a benchmark.

MR. CHARNEY: Your Honor, I'm going to object to that. Benchmark as has been referred to in this trial has a very specific meaning with respect to statistical analyses.

THE COURT: And he didn't use the word statistical analysis. He said in this last thing, in 2008, initiation of the crime and enforcement activity reports that are published twice a week. That includes the violent crime suspect as a benchmark. I think what he meant by that, it's included and a comparison was made.

THE WITNESS: Exactly.

THE COURT: You're not doing a statistical analysis yourself? That's not your expertise?

THE WITNESS: No.

THE COURT: He's using it for comparison purposes.

Q. Why is violent crime suspect benchmark important to consider potential racial disparities in stops?

THE COURT: I'm not going to allow that at all. Why were there comparisons made between the violent crime suspects and those who were stopped, if you know?

THE WITNESS: Yes, there are.

THE COURT: Why did they compare those two numbers or two categories?

THE WITNESS: Right. Because the -- a substantial number percentage of the stops are related to violence and the -- addressing problems of violence is -- carries heavy weight and priority in strategic deployment decisions in much of what the department does as compared to the wider range of property and other offenses that are more numerous.

THE COURT: Okay.

Q. Now referring to the reasonable suspicion stop reports for 2011 and 2012 at Exhibits Y8 which is for 2011 and B14 which is for 2012, is that the same reason why the benchmarks for violent crime is included in these reports as well?

MR. CHARNEY: Objection. Leading.

THE COURT: Sustained.

MR. CHARNEY: I'm also going to put an objection on the record for use of the word benchmark. Your Honor more accurately described it as a comparison.

THE COURT: I think he's comfortable with that and I'm comfortable with that. This is not a statistical analysis based on benchmark.

Can you rephrase that question. It was leading. And I agree with the plaintiffs' lawyers with the way benchmark is being used. It was certainly used for comparative purposes.

THE WITNESS: Right.

THE COURT: Go ahead. Would you rephrase.

BY MS. GROSSMAN:

Q. Referring to B14, the 2012 reasonable suspicion stop report which is already in evidence. Looking at 891.

THE COURT: I'm there. Okay.

You see that there's categories. It says race, residential population, all known crime suspects, known violent crime suspects, and persons stopped.

THE WITNESS: Yes.

THE COURT: And those statistics can be compared.

THE WITNESS: On a comparative basis. That's right.

Q. So why did you include those categories?

THE COURT: First of all, I don't know if it was you. Did you decide which categories to put in this?

THE WITNESS: I did.

THE COURT: Then why did you include these categories?

THE WITNESS: Thought that this would give a broader presentation of relevant statistics to answer questions that have been raised in a number of quarters.

Again, city council had raised questions. We do provide them with this report.

It gives -- while you see the known violent crime suspects which, as I said, have been used previously by the department. This includes the all known crime suspects to provide a broader perspective on it to also include crimes other than violence.

The stop percentages, of course, are what's particularly relevant.

And wanted to provide the residential population as context since quite often direct comparisons are drawn between stops and residential population which, as we talked about, some of the research is considered not to be the comparison that should be made.

So this was to give a fuller perspective. And one could go through this report and look precinct-by-precinct and in a very straightforward way be able to get an understanding of how the distribution of stops line up against suspect description, both for violence and for all crime.

Q. Have you made any observations about the share of crime suspects correlating with the race of those who are stopped?

A. As you go through these reports you'll see that there's a very high degree of correlation between the distribution of stop subjects by race and the distribution of suspects, both violent and known crime. What the pattern you see most often is kind of somewhere in the middle very often, that the percentage of persons stopped would be somewhere between the all known crime and the violent crime.

Q. And does this observation also apply to whites and Asians, this comparison?

A. Yes, it does. And what you see is if you -- as you go through it and you find areas of the city where there is a, say, a large percentage or a dominant percentage of the suspects as white or Asian, you will also see that the percentage of persons stopped in those commands is very close and also dominates.

(Continued on next page)

THE COURT: Can I ask a question that is not on this topic at all?

Where it says all activity, I never focused on it, but it says that there are 4.1 million stops that are radio runs?

THE WITNESS: Radio runs. So 911 calls that result in a police dispatch.

THE COURT: Somehow I thought it was exactly the opposite. So most stops are based on what the radio run made?

MR. CHARNEY: This is just listing how many radio runs in general were called in. It's not specific to stops for radio runs.

THE COURT: Most stops I thought were reasonable suspicion stops and only about 15 percent were based on radio runs.

THE WITNESS: That's right. This is to give a context of the volume of other police activity, total crime, the radio runs. I don't see what else is under there.

THE COURT: Thank you for clarifying that for me.

BY MS. GROSSMAN:

Q. So did you prepare a summary which shows the top five precincts for each racial group where that group --

THE COURT: I'm sorry. I lost the question. The top five what?

Q. The top five precincts, as represented in the 2012 report, for each racial group, where that group has its highest share

of described suspects?

A. Yes, I did.

THE COURT: I am not following it. Where that group has its highest share of suspects?

MS. GROSSMAN: Looking at these two categories, known stops and then known crime suspects.

THE COURT: Known stops?

MS. GROSSMAN: A comparison of the difference between --

THE COURT: Between all known crime suspects and persons stopped?

MS. GROSSMAN: Yes. So, for example, your Honor, if you look at all known crime suspects on this chart, 50.7 percent of the individuals who are known to commit crime.

THE COURT: I got that. You want to know the five precincts that have the greatest disparity?

MS. GROSSMAN: The top five precincts of all crime suspect descriptions showing the largest difference between the two categories.

THE COURT: You do mean the ones with the highest disparity between those two categories.

MS. GROSSMAN: Perhaps the witness can just explain.

MR. CHARNEY: The witness is shaking his head no.

THE COURT: What is the type five, top five what?

THE WITNESS: It is for each racial group, the five

precincts that for that group are their highest -- where they have their highest share of suspects.

So, for example, on the citywide, you see whites representing 13.8 percent of all known crime suspects. But there are, I believe, five precincts where they represent more than 50 percent of the crime suspects.

So we do that for Asian suspects. They are 3.9 citywide. But there are precincts where their share is higher.

So then it's comparing what the stop proportion is in those places, because it differs considerably from the citywide.

THE COURT: OK.

Q. Showing you what has been marked as Defendants' L15. Is this the demonstrative which represents what you just testified?

A. Yes, it does.

MR. CHARNEY: Can I see a copy?

THE COURT: I understand it.

MS. GROSSMAN: We move to admit.

MR. CHARNEY: I don't know what the relevance is.

MS. GROSSMAN: It's to interpret -- basically, it's a tally of what the 2012 report demonstrates.

MR. CHARNEY: It's a very selective tally, your Honor, because there are 76 precincts in the city, and they have picked for each racial group the five where I guess that racial

group make up the highest percentage of crime suspects. I would argue it's misleading.

MS. GROSSMAN: We are not trying to mislead. We are saying very clearly what it is. This is just the five. And Mr. Charney asked Commissioner McGuire when he testified about how many of the 76 precincts represented higher numbers of stops compared to their participation in crime. This is just a tally of what the 2012 report means in terms of the --

THE COURT: I am not sure this is what it means, but this is data drawn from that report. You can argue what it means. And you can argue that it doesn't mean that. But the chart is accurate I assume.

MR. CHARNEY: It's accurate, I guess, if you're limiting it to the five precincts where each of these racial groups --

THE COURT: Right. The five precincts where, for example, Asians were suspected the most compared to other --

THE WITNESS: For Asians, where were they more often the crime suspect.

THE COURT: So what it means is an argument.

MR. CHARNEY: That's fine. I just want to clarify for the record what I asked Commissioner McGuire had to do with all 76 precincts. I wasn't trying to limit it.

THE COURT: I understand. But it's all drawn from this larger Exhibit V14 for 2012.

THE WITNESS: Yes, your Honor.

MS. GROSSMAN: Your Honor, I move to admit L15.

THE COURT: I received it.

(Defendants' Exhibit L15 received in evidence)

Q. Commissioner, can you explain --

THE COURT: I don't think I need an explanation. I am looking right at it. You want him to explain what he thinks this shows?

MS. GROSSMAN: I wanted to make sure it is clear.

THE COURT: It is totally clear to me. If you want to ask him what he concludes from this, you can.

MS. GROSSMAN: Before I get there, the first page of this exhibit is top five precincts for all crime suspect descriptions by race.

THE COURT: That's what it says, Ms. Grossman. And the other one is for violent crime suspects. I see that. It's in the title.

Q. Are there any differences that you have observed when you compare all crime suspects to violent crime suspects?

A. Suspects to stop subjects?

Q. Yes.

A. Yes. I think what this demonstrative shows is that throughout the city, in different precincts where different racial or ethnic groups may predominate in share of suspect, that they also predominate to a similar degree in stop subjects

as well.

Q. Now, are you aware of the plaintiffs' criticism that the percent of unknown suspects is too high for the suspect description benchmark to be reliable?

MR. CHARNEY: This is clearly an expert issue that we have heard testimony from Professor Smith about.

THE COURT: Sustained.

Q. You're aware that the total known crime suspects is about 63 percent, correct?

A. Yes.

Q. You're also aware that the total unknown crime suspects is about 37 percent?

A. Yes.

THE COURT: I missed the first one.

That's just the math. 63 and 37.

That's all crime suspects, right?

THE WITNESS: That's right.

Q. Out of the 37 percent unknown crime suspects, what crimes contribute most to the number of unknown suspects?

A. There are three offense types: grand larceny, petit larceny and criminal mischief. Those three alone account for 61 percent of all of the unknowns.

Q. Now, did you prepare a pie chart which demonstrates the different categories of crime related to unknown suspects?

A. I did.

Q. I am showing you what has been marked as Defendants' Exhibit M15 for identification. Is this familiar to you?
A. Yes, it is.

THE COURT: Just to make sure, the copy I am holding of L15, that is my copy?

MS. GROSSMAN: Yes.

Q. What is the source of the information in the three pie charts represented in this exhibit?
A. The two pie charts on the top of the page, the source is the 2010 to 2012 merged file for crime complaints and suspects. And the pie chart on the bottom on the left is the stop, question and frisk database.

MS. GROSSMAN: Now, your Honor, I move to admit.

MR. CHARNEY: Your Honor, a couple of objections to this chart, but I will let your Honor finish.

THE COURT: I have got to first try to figure it out.

MS. GROSSMAN: It's an illustration of what the witness just testified to.

THE COURT: Can both of you let me finish studying it? I will tell you when I am done.

OK. Go ahead. What is the argument about?

MR. CHARNEY: A, it's misleading.

Secondly, apparently the witness has gone to the crime complaint data and run some numbers, calculations, which we haven't had the opportunity to check the accuracy of since we

just received this on Sunday I believe. We have that data. We could try to run the numbers to determine if this is accurate.

I will note that in Professor Fagan's most recent report, he has a table in appendix B which actually sets forth more completely for each of the crime categories what percentage of suspect race is unknown and also what portion of the overall suspect pool that particular crime category would fit into. So I would submit that this is, again, a very partial picture. It's leaving out again almost 40 percent of those crimes where the suspect race is unknown.

THE COURT: What do you mean leaving out?

MR. CHARNEY: If you look at the second table, the top right, you see it says, grand larceny, petit larceny and whatever -- what is it, mischief?

THE COURT: Criminal mischief.

MR. CHARNEY: -- make up 61.3 percent of those crimes where the suspect race is unknown. The other almost 39 percent of crimes in which the suspect race is unknown are not included here.

THE COURT: They are included; they are just not named.

MR. CHARNEY: We don't know what categories they are.

THE COURT: He can tell us in two seconds.

THE WITNESS: It's everything else.

THE COURT: Not just the violent ones?

THE WITNESS: It's everything else, your Honor.

MR. CHARNEY: We don't know the breakdown.

THE COURT: Including the violent ones?

THE WITNESS: That's correct.

MR. CHARNEY: We would submit that a large portion of that 38.7 percent are things like burglary and grand larceny auto, which are also property crimes where they oftentimes don't know the race of the suspect. And if you added grand larceny auto and burglary to these three categories, it would make up a much larger percentage of stops than the 9.8 percentage they are suggesting in the bottom lower left corner. So we think this a very misleading --

THE COURT: That may make the bottom pie chart misleading, but I don't know that the upper two are misleading.

MR. CHARNEY: It's just incomplete.

THE COURT: The blue isn't.

MR. CHARNEY: The red could be broken down much more specifically.

THE COURT: It could, but I don't know what I would learn from that.

MR. CHARNEY: I just would submit that the bottom left pie chart is extremely misleading. And because we are missing, again, missing data on almost 40 percent of the reported crimes in the top right corner pie chart, I think this causes more confusion than it is probative, I guess would be my argument,

kind of a 403 objection.

THE COURT: I don't feel that way about the top two pie charts. I think they are self-explanatory and not misleading. But I understand your concern about the bottom left.

MS. GROSSMAN: Your Honor, I think Mr. Charney is making argument about what it is --

MR. CHARNEY: I am arguing an evidentiary issue.

THE COURT: If the prejudice outweighs the probative value, I don't take the evidence. That's an old one. That's Rule 403. I have no such problem with the top two pie charts, but I have concerns about the bottom left, and I think I will hold off on the admissibility of that pie chart till after the cross-examination, which in effect will be a voir dire on that chart. So I am not accepting the bottom left-hand chart at this time. At this time, you would have to redo the exhibits to redact that out. But after I hear more about it, I may revisit that.

BY MS. GROSSMAN:

Q. Commissioner, do you have an understanding of the percentage of stops that are for grand larceny, petit larceny, and criminal mischief?

THE COURT: All stops?

MS. GROSSMAN: Right.

THE COURT: Of the 4.4 million that this case is

about.

We have that from some exhibit, don't we?

A. In the period 2010 to 2012, 9.8 percent.

MR. CHARNEY: This is where my objection comes in.

THE COURT: 9.8 percent for what?

THE WITNESS: Of all of the stops during that period.

THE COURT: Are what?

THE WITNESS: Are grand larceny, petit larceny or criminal mischief.

THE COURT: Did you ask that?

MS. GROSSMAN: Yes.

THE COURT: That's right on the chart.

MR. CHARNEY: What we have in some of the other submissions in this case are percentage of stops for all property crimes. What we are leaving out here is grand larceny auto and burglary, which are huge categories, and that's left out of this pie chart again.

THE COURT: I understand that. That's why I am not admitting the lower left-hand pie chart. I thought you were asking whether he knew grand larceny auto and burglary.

Q. Why was grand larceny auto not included in the chart?

A. The numbers are considerably smaller.

THE COURT: Than what?

THE WITNESS: Than the grand larceny, petit larceny, and criminal mischief.

THE COURT: How about burglary?

THE WITNESS: Burglary is also smaller. So they contribute less to the unknown problem.

THE COURT: I don't know that because you have lumped grand larceny, petit larceny and criminal mischief together. So I need it for grand larceny, petit larceny, criminal mischief, grand larceny auto and burglary. If I saw all five, I might notice something.

MR. CHARNEY: What I am not clear on, is the witness talking about with respect to stops or with respect to the suspect description?

THE COURT: Suspect description in the upper two charts, right?

THE WITNESS: The chart in the upper right is suspect description. And the point is that high volume crimes that also have relatively low volumes of known are driving the unknown suspect issue, and if you subtract those three offense types, the knowns go from the 63 percent to 78 percent. And since those three only account for less than 10 percent of the stops, one could do an analysis of the known suspects with greater confidence than had been done with the lesser amount that Professor Fagan was concerned about.

MR. CHARNEY: What we don't know is, again, with respect to reported burglaries or reported grand larcenies, what percentage of those reported crimes is the suspect race

unknown in.

THE COURT: I agree. And then we don't know what percentage of the stops are based on those two crimes.

By the way, when it says 9.8 percent of the stops, you mean that's where the officer writes down the suspected crime?

THE WITNESS: Crime suspected.

THE COURT: You do know now, if you added in burglary and grand larceny auto, how that 9.8 would change?

THE WITNESS: Those are a larger share.

THE COURT: What are?

THE WITNESS: Grand larceny auto and burglary.

THE COURT: A larger share of the stops?

THE WITNESS: They are than of these three.

THE COURT: Those two together is more than 9.8 percent of the stops?

THE WITNESS: I believe so, yes.

MR. CHARNEY: If you add those two in, according to Professor Fagan, it comes up to like 30 percent.

THE COURT: I see the problem that Mr. Charney is raising, which is why I am not admitting the lower left-hand chart. I don't have a problem with the two upper charts. They say what they say.

BY MS. GROSSMAN:

Q. Is it true that of the 76 precincts reported in the 2012 reasonable suspicion report, 66 precincts show the share of

black and Hispanic stops is somewhat higher than the share of known crime suspects described as black and Hispanic?

THE COURT: I cannot follow that. It's hard. You have got it written out. I can't keep all those variables straight. Is that in the chart L15?

MS. GROSSMAN: I am going to show you another chart.

THE COURT: Maybe I can follow it better with the chart.

Q. Let me show you what has been marked for identification as Defendants' J15.

MS. GROSSMAN: I will try it again, your Honor.

Q. Is it true that of the 76 precincts, and that's derived from the 2012 report, that 66 precincts show the share of black and Hispanic stops is somewhat higher than the share of all known crime suspects described as black and Hispanic?

MS. GROSSMAN: So when you look at this, it is a comparison, your Honor.

THE COURT: For 66 of the 76 precincts, there are more stops of blacks and Hispanics than in the crime suspect data.

MS. GROSSMAN: Right. Somewhat more. And this chart is designed to show the magnitude of that.

MR. CHARNEY: I am going to object. I think that question is misleading. What this chart shows, and what this report shows, is that in 66 of the 76 precincts, either you're going to have blacks are being stopped at a lower rate than

their crimes or Hispanics.

THE COURT: Higher.

MR. CHARNEY: But it's not to suggest that in 66 of the 76 both are being under-stopped.

THE COURT: Higher.

MR. CHARNEY: Higher. But what I am saying is --

THE COURT: They are stopped more often than in the crime suspect.

MR. CHARNEY: I thought she was saying it the other way around.

THE COURT: Higher. In 66 of the 76 precincts, blacks and Hispanics are being stopped at a higher rate than they are reflected in the crime suspect data.

MS. GROSSMAN: Somewhat higher.

THE COURT: It's not a lot, but you did use the word higher.

MS. GROSSMAN: Yes.

MR. CHARNEY: I thought she was saying the opposite.

THE COURT: No.

Q. Did you tally the number of precincts where the percent of black and Hispanic stopped subjects is higher than the percent of black and Hispanic all known crime suspects?

A. Yes.

Q. What is your observation based on that tally?

A. That the differences between the percentage of black and

Hispanic stopped subjects and their share of all crime suspects, that the difference is generally quite small. I believe in 44 of the precincts, that difference is less than 5 percent.

THE COURT: In 44?

THE WITNESS: In 44 of the 66 precincts.

THE COURT: The difference is less than 5 percent. In 22 of those 66, it would be more than 5 percent?

THE WITNESS: That's correct.

THE COURT: And that's for all crimes?

THE WITNESS: For all crime.

THE COURT: Then this changes for the violent crime suspects.

THE WITNESS: Right.

THE COURT: There it's exactly the opposite.

THE WITNESS: It's the opposite.

MS. GROSSMAN: So then on page 2, which reflects the violent crime suspects, your Honor --

THE COURT: I think I may have just covered your question.

MS. GROSSMAN: I move to admit.

MR. CHARNEY: No objection.

THE COURT: J15 is received.

(Defendants' Exhibit J15 received in evidence)

Q. So can you just explain to the judge what is represented on

the Y axis and what is represented on the X axis?

THE COURT: I don't think the judge needs any explaining. In J15 we just covered it.

Q. And the blue line represents what?

THE COURT: It says in the key.

MS. GROSSMAN: Very good, your Honor.

Q. Have you made any observations about the number of precincts which reflect that black and Hispanics are stopped at a lower rate compared to their known participation in crime?

THE COURT: You mean in the first page of J15?

MS. GROSSMAN: Generally.

A. In all crime, I believe that's the case in nine precincts and in one it's even.

THE COURT: It had to be ten because 76 minus 66 is ten.

A. In the second graph, with regard to violent crime, it's 69 precincts where the stops are lower than the suspect description percentage.

Q. What significance does this have to the NYPD?

A. When looking at these two comparisons together, with reference to the distribution of stops, you see that there is an extremely high degree of correlation between stops and crime suspects throughout the city.

Q. Now, are you aware that the data the NYPD provided to RAND on 2005 and 2006 violent crime suspects contained errors?

MR. CHARNEY: Objection, your Honor. On May 3, we heard testimony from Commissioner McGuire on this issue, and you stated, and I can quote from the transcript, that unless and until Dr. Ridgeway shows up in this courtroom, you're not taking any more evidence on this issue. I can cite to you the portion of the transcript.

THE COURT: I also thought he explained what the errors were.

MR. CHARNEY: So we know what the errors were. So it's cumulative on one end. And to the extent they are going to try to explain why it doesn't make a difference, you have explicitly foreclosed that.

THE COURT: I did. I remember he also explained what the errors were. He did that. It is cumulative. We have been over that. It's in the transcript.

Q. Since the testimony, have you become aware of a public statement provided by the RAND Corporation?

MR. CHARNEY: Objection. Hearsay.

THE COURT: I won't allow any public statement from RAND to come into this courtroom. That's hearsay. If somebody from RAND wants to testify, I will hear it that way. I can't take it from this witness.

Q. Do you have any concerns about relying on the benchmark analysis RAND described in the RAND report based on the error that --

THE COURT: I am not allowing that. He is not here for this purpose. He is a percipient fact witness. You are turning him into an expert. I won't allow that.

MS. GROSSMAN: Your Honor, the purpose of the question is, as we sit here today, and whether there remains confidence, or there continues to be a lack of confidence in the report moving forward, especially in terms --

THE COURT: I don't need it. I am not going to allow it. She is making a record. That's fine.

MS. GROSSMAN: The purpose of asking these questions is because this witness, in his role as the deputy commissioner of strategic initiatives, is in a position of evaluating the reliability of the RAND organization, the RAND report.

THE COURT: What date was the RAND report?

MR. CHARNEY: 2007.

MS. GROSSMAN: In terms of the study and the conclusions on the viability of the suspect description benchmark, I think that in terms of addressing whether this witness has doubts about the reliability of the report --

THE COURT: That would be an opinion and that opinion was not before in an expert report. I can't have that opinion now for the first time. I am not taking that opinion testimony.

Q. Without getting into the details, are you aware that RAND made a public statement on its Web site?

MR. CHARNEY: Objection.

THE COURT: Which I am not going to allow in. If he says yes, I am aware, fine. Or, no, I'm not aware, fine. But I wouldn't allow the statement. I wouldn't allow the statement unless you find a hearsay exception in which it fits.

Q. Well, I just want to ask this last question then.

As a result of the public statement, without stating what it is, by RAND, does the NYPD see any reason not to continue to rely on the benchmark analysis RAND describes in the RAND report?

A. No.

THE COURT: I am striking the question and the answer.

MS. GROSSMAN: Can I have one moment, your Honor?

THE COURT: Yes. Sure.

MS. GROSSMAN: Your Honor, I appreciate your ruling, but I just wanted to also state that we are not offering it for the truth. The report was never offered for the truth of the matter asserted. It was offered for purposes of notice.

THE COURT: Sure. What would be the purpose of the statement RAND made on the Web site a week ago? I can't call that notice. In April or May 2013, that doesn't go to notice. So I can't see an exception.

Q. Commissioner, you weren't aware about this data error until Commissioner McGuire's testimony in this trial?

A. That's correct.

THE COURT: That I will allow.

Q. So you had no reason back in 2007 to doubt the veracity of that report, correct?

MR. CHARNEY: Objection. Leading.

THE COURT: He was making decisions based on it in 2007.

Did you doubt the veracity?

THE WITNESS: No, I did not.

THE COURT: That's fine.

They were acting on it. They were passing on recommendations. They were responding to recommendations. That's perfectly fair.

MS. GROSSMAN: I have no further questions.

MR. CHARNEY: One minute. I have to organize.

THE COURT: Mr. Charney, one second. OK.

CROSS-EXAMINATION

BY MR. CHARNEY:

Q. Good afternoon, Commissioner.

A. Good afternoon.

Q. Now, you testified on direct that since 2001, the police department has been required under city law to provide stop and frisk data to the City Council on a quarterly basis, is that right?

A. That's correct.

Q. The responsibility within the police department for doing

this falls to OMAP, correct?
A. Yes.
Q. And OMAP is under your supervision?
A. Yes.
Q. Isn't it true that from mid-2003 through the end of 2006, the city did not provide quarterly data to the City Council?
A. I am not certain of the dates, but I think that's roughly correct.
Q. Then in early 2007, the NYPD provided the 2006 data for all four quarters to the City Council, correct?
A. That's correct. That was following the establishment of a new database.
Q. I think you testified on direct that this production of data happened shortly after the NYPD's shooting of Sean Bell, correct?
A. That's correct.
Q. Is it true that at that point in time, early 2007, there were concerns raised by members of the public that the NYPD may be engaging in racially biased policing?
A. Some had raised those concerns.
Q. So it would be fair to say that at that point in time, when the NYPD had produced this data to the City Council, that the NYPD was aware that there could be questions raised about racial profiling with respect to this stop and frisk data, correct?

A. There would be questions raised about racial disparities, yes.
Q. So that's why the police department decided to commission the RAND study, correct?
A. That's correct.
Q. Is it fair to say that what the police department hoped the RAND study would do would be to assure the public that in fact the police department was not engaged in racial profiling, correct?
A. No, I wouldn't say that.
Q. That's not what you hoped the RAND study would show?
A. We asked the RAND Corporation to do an objective independent analysis of the data, and whatever the results of that analysis happened to be, we would take it from there.
THE COURT: But his question was, did you hope? Would it have been your hope that there was no racial profiling going on in the police department?
THE WITNESS: It would be my personal hope and expectation that that was the case.
THE COURT: That's I think what he asked.
Q. So in March of 2007, the New York police foundation on behalf of the NYPD entered into a contract with RAND to do this stop and frisk study, right?
A. That's correct.
Q. Isn't it true that RAND was paid $120,000 to conduct this

study?
A. That was in addition to the contract for the firearms study, that's right.
Q. The firearms contract -- the firearms study contract actually paid RAND $500,000, right?
A. Something in that order of magnitude.
Q. So as of March 2007, RAND had contracted with the NYPD to perform over $600,000 worth of work, right?
A. Yes, that's correct.
Q. Now --
A. I should just say the contract actually with the police foundation rather than the police department.
Q. But it's correct to say that when the police foundation enters the contract, it enters it on behalf of the police department, correct?
A. Perhaps not in all cases, but in this case, that's true.
Q. In fact, under the contract with RAND, is it not true that under that contract that RAND would provide drafts of the stop and frisk study to the police department and the police department would have the ability to make comments on those drafts, which RAND was then required to consider in drafting its final report?
A. A provision for comments would be the case in any commissioned research. So, yes, that was the case in this one as well.

Q. In fact, with respect to this particular report, the RAND study on stop and frisk, yourself and Commissioner McGuire actually did provide comments to Dr. Ridgeway on two separate drafts of the report, is that right?
A. I think so.
Q. I am going to show you what has previously been admitted in evidence as Plaintiffs' Exhibit 323. This is an e-mail, it looks like, from Greg Ridgeway to you and Terry Riley, dated September 20, 2007, correct?
A. Yes.
Q. And according to this e-mail, it says, "Commissioner Farrell, please find attached a draft of the stop and frisk report," right?
A. Right.
Q. So is it fair to say this is one of the drafts of the RAND study that you reviewed and commented on?
A. I believe so.
Q. I would also like to show you what has been previously admitted in evidence as Plaintiffs' Exhibit 327.

This is an e-mail from Terry Riley back to Dr. Ridgeway.

Incidentally, Terry Riley worked in OMAP at that time, right, in October of 2007?
A. Yes, I believe he did.
Q. And the title of the e-mail is "Comments on 250." And then

it says an attachment called "Comments on 250 final doc."

According to this e-mail, is it fair to say that what is attached to this e-mail are your comments on that draft of the RAND report that we just looked at?

A. I'd have to see what they are, but that's what is being represented.

Q. Let's turn to the second page of the document. It looks like at the top it says, "Comments on analysis of stop, question and frisk in New York drafts, dated September 19, 2007." Do you see that?

A. Yes.

Q. So based on the title of this table here, would you agree that the comments set forth herein are your comments to that September 19, 2007 draft of the RAND report?

A. I'm not certain they would be only my comments. They may have been comments by Commissioner McGuire as well. I am not certain whether they were a consolidated list of comments.

Q. Would you agree that this does include your comments and possibly other people's comments as well?

A. I think that's likely the case, yes.

Q. I want to turn to the third page of the document, which is Bates numbered NYC_2_3043.

You see here next to comment 23, it has a Roman numeral, which I believe is the page of the draft report. Then it says, "First paragraph, fourth and sixth sentences. There

are references to 'innocent pedestrians' in these two sentences. How does one reconcile the term 'innocent' when pedestrian stops are based upon reasonable suspicion of committing a felony or penal law misdemeanor?"

Do you see that?

A. Yes, I do.

Q. Is that your comment?

A. It may be a restatement of a comment that I would have made, but yes, I think that's probably right.

Q. Is it fair to say that you did not believe that it was appropriate for Dr. Ridgeway to use the term "innocent pedestrians" when referring to people who were stopped and frisked but maybe not arrested or given a summons?

A. I think ascribing the term "innocent," when in fact virtually everybody the police encounter are innocent until proven guilty in a court of law, that attempting to make that differentiation, especially when you're dealing with reasonable suspicion as opposed to probable cause, it's a distinction that seems to be not particularly helpful.

Q. Let me ask you this. If a police officer stops somebody on reasonable suspicion and they don't discover any evidence of a crime which would then lead to an arrest or a summons, is it your testimony that that person at that point in time is not innocent of any criminal activity?

A. I wouldn't be able to conclusively determine that the

person was innocent. They may or may not be. There simply is not sufficient probable cause for an arrest.

Q. So it's your testimony that if there is not sufficient probable cause to arrest the person, you don't consider that person at that point in time to be innocent of criminal wrongdoing?

A. I'm not able to make that determination. They could be, and there are circumstances they may not be.

Q. Is it fair to say that your comment to Dr. Ridgeway was to change that language, to not use the term "innocent pedestrian"?

A. My view was that characterization wasn't particularly illuminating in this context.

Q. Isn't it true that in fact Dr. Ridgeway complied with your comment and, in fact, in the final version of the RAND report, took the term "innocent pedestrian" out of the report?

A. He may have. I'd have to look at the report again. I think that's probably the case.

Q. We can do that.

Going back to the draft, I just want to make sure we have the context. It was referring to page Roman numeral 49. So I am going to turn it to Roman numeral 49. This is Bates number 2939.

So this is the draft you commented on. You see here it says, "Is the value of one arrest worth the cost of nine

stops of innocent pedestrians?" Do you see that?
A. Yes, I do.
Q. So is it fair to say that's what you were referring to when you commented that the term innocent pedestrians was not particularly illuminating?
A. I would just say using that descriptor of participants, not necessarily in the context of that sentence, but using the term innocent, it has legal connotations and other connotations that make it hard for one to determine conclusively.
Q. But you would agree that from Dr. Ridgeway's perspective, and he was the one reviewing the data, this was the term he at this point thought was appropriate to use, right?
A. At that point, I imagine it was.
Q. So this particular language fell under the section conclusions and recommendations, right? And this is the September 2007 draft of the report.

Now, I want to show you what has been admitted as Defendants' Exhibit K6, which is the final version of the RAND report.

Again, I just want to make sure we are looking at the correct language here.

Again, looking at the sentence we were talking about, "Is the value of one arrest worth the cost of nine stops of innocent pedestrians?" That's what the original draft said.

Now I want to show you K6, right?

Now, if we look at the sentence here, "Is the value of one arrest worth the cost of nine stops," but it doesn't say innocent pedestrians anymore, right?

MS. GROSSMAN: What page?

MR. CHARNEY: This is page 28830 of the RAND report.

Q. Now it says, "Nine stops" -- not of innocent pedestrians -- "of suspects who have committed no crime and are not arrested." Do you see that?

A. I do.

Q. Is it your testimony that that's, in the police department's view, a more accurate description of the people that the police department is stopping, but not arresting or summonsing?

A. I think that's a more clear presentation of the point he was trying to make there.

Q. Going back to the draft again that we were looking at, Plaintiffs' Exhibit 323, the same page 2939, you see how Dr. Ridgeway used innocent pedestrian a second time in that same paragraph? He said, "To the innocent pedestrians stopped in New York, the cost may be too high depending on how the police handled their situation." Do you see that?

A. Yes, I do.

Q. And that was the last sentence of the opening paragraph in the draft, right? In the conclusion section of the draft, right, the last sentence of the first paragraph of the

conclusion section, right?
A. Yes.
Q. The next paragraph starts with the sentence, "The racial disparities of the stops have generated," right? Isn't that the next sentence of the draft?
A. Yes, it is the next sentence.
Q. Going back to page 28830 of Exhibit K6, and looking again at the first paragraph, the sentence that we just looked at about the cost being too high to the innocent pedestrians is no longer in here, right?
A. It frames it as "who have committed no crime and are not arrested."
Q. But there is also no discussion of the cost being too high depending on how the police handled their situation, that's not in here, right?
THE COURT: That phrase is not there. One can see it.
Q. Going back to -- again, I am sorry for going back and forth -- to the comments, Plaintiffs' Exhibit 327. We were looking at that and we were looking at page 3043.
We just looked at the comment about innocent pedestrians. Do you see the next comment -- I'm sorry, comment 25, which is on Roman numeral page 50 of the draft of the report. You see here there is a comment about the second paragraph, fourth sentence, "While we found some disturbing evidence of unequal treatment across race groups." Then the

comment says, "This statement seems to be conclusive and is particularly striking when considered with the analysis present throughout the report. If the disturbing evidence is based upon the outliers discussed in the paper, then inclusion of the associated qualifications should be considered."

Do you see that?

A. I do.

Q. Do you remember, is this your comment?

A. I don't recall specifically.

Q. But you do remember that the NYPD had a concern with the use of the term "disturbing," right?

A. It would be more helpful to see it in the context of the draft itself.

Q. So let's look at the draft, and this is page 2940.

I want to show you, in the second full paragraph on the page, it says, "Again, while we found some disturbing evidence" -- do you see that -- "of unequal treatment across race groups, our analysis estimates that the problem is not of a massive scale but rather one that police management can address with effective supervision, monitoring of police activity, and effective interventions when problems are identified." Do you see that?

A. Yes.

Q. Is it your recollection that this is the sentence where the police department took issue with the term "disturbing"?

A. If that's the page that's referenced in the summary, then that would be it.

Q. Then let's close the loop.

So this is from page Roman numeral 50, right, L of the draft. The prior page is 49, right?

Then on the comments, which is Exhibit 327, the comment we were talking about, the page number is L, right?

A. Yes.

Q. So that's the same language that is referred to in this comment, right, the use of the word "disturbing" with respect to evidence of unequal treatment?

A. Right.

Q. You would agree that the use of the word "disturbing" was something that the police department took issue with, right?

A. It seemed not to be consistent with the totality of the findings of the report.

Q. And you recall that Dr. Ridgeway also took that word out of the final version of the RAND report?

A. I don't recall that specifically.

Q. Then let's look again at Exhibit K6.

This is page 28831, which is page 44 of the RAND report. Here it says, "Again, while we found" -- this time it doesn't say disturbing, it says -- "some evidence of unequal treatment across racial groups," right?

A. Yes.

Q. So you would agree that Dr. Ridgeway did comply with your request and take the term "disturbing" out of the final version of the report?
A. I wouldn't characterize it that way at all.
MS. GROSSMAN: Objection.
THE COURT: He can defend it.
Q. How would you characterize it?
A. When comments are offered on a draft research report, it's not a request to do anything. They are literally providing an opinion and a perspective on it that encourages the author to go back and consider that. The decision for all of the language in the report is the author's.
Q. Are you also aware that when RAND was conducting the study, it was also subjecting the drafts to independent peer review by subject matter experts?
A. Yes, as is their practice.
Q. So they were getting comments not only from the police department, but from other scholars?
A. That's correct.
Q. Would you agree with me though that those other scholars were not paying them $600,000, right?
A. I don't follow you.
MS. GROSSMAN: Objection.
THE COURT: I think it's obvious.
A. I assume they weren't, yes. I assume they were getting

paid.
Q. Would you agree with me that given the relationship, the contractual relationship between RAND and the police foundation, would it be fair to say, in your opinion, that your comments meant more to RAND than these peer reviewers' comments?
MS. GROSSMAN: Objection.
THE COURT: Sustained.
A. I do not agree.
THE COURT: It calls for speculation.
Q. Now, you reviewed a second draft of the report that was done in October --
THE COURT: For the record, his answer on that was stricken. He would be speculating.
Q. You reviewed a second draft of the report that was sent to you in October of 2007, right?
A. If you have that. I'm not certain.
Q. This is also in evidence as Exhibit 324.
Again, it's an e-mail from Dr. Ridgeway to you and Terry Riley and somebody from RAND. It's dated October 18, 2007, right?
It says, "Revision to the SQF report," right?
A. Yes.
Q. If we look here, the second page, it looks like it is a draft, right, of the RAND report dated October 18, 2007,

correct?
A. Right.
Q. Now, one of the things you testified to on direct was that -- do I have this right, that you testified that RAND considered the suspect description benchmark to be superior to the others, is that your testimony?
A. Yes, it is.
Q. So it's your testimony that was RAND's opinion, not the NYPD's?
A. Yes.
Q. I want to show you, this is Exhibit 324, and I want to show you page -- this is page 3085, it's Roman numeral 12. Do you see that?
A. Yes.

(Continued on next page)

Q. There is a discussion here of the results of the external benchmarking analysis?
A. Yes.
Q. And I just want to read you what it says.
It says, "Evaluating racial disparities in pedestrian stops using external benchmarks is highly sensitive to the choice of benchmark and analysis based on any of the external benchmarks developed to date are questionable."
Then it says, "Rather than claim the superiority of any of them, we provide comparisons with several benchmarks to demonstrate the sensitivity of the external benchmarking and hence argue that results of external benchmarking should be interpreted with caution."
Do you see that?
A. I do.
Q. So isn't it fair to say that according to this draft none of the benchmarks are superior to the others, right?
A. That's what that sentence says. And this is in a draft?
Q. Yes.
But it's still your testimony that it was RAND's opinion that crime suspect was a superior benchmark to the others?
A. I believe that's in the final report.
Q. Okay. Well let's get to that.
Now you also provided comments on this version,

correct, of this draft, you also provided comments on this draft of the report?
A. I may have.
Q. Do you recall having a conference call with Dr. Ridgeway shortly after you received this draft on which you discussed with him the police department's concerns about the way that each of the benchmarks were portrayed in this draft of the report?
A. I don't recall specifically the content of a conversation like that.
Q. But you did have a conference call to discuss that issue?
A. I believe so.
Q. And isn't it true that in that conversation you and/or Commissioner McGuire told Dr. Ridgeway that you believed that the crime suspect benchmark was clearly superior to the other two?
A. I may have expressed that opinion prior to that phonecall.
Q. So -- but you agree that you did express to him that you believe that the crime suspects benchmark was superior to the other two, right?
A. I don't recall that I expressed it in that phonecall.
I am certain that I expressed that view at some point during the study.
Q. And it was before the final version of the report came out, right?

A. Yes.
Q. And it was after you saw this draft, Exhibit 324, where none of the benchmarks is portrayed as superior to the others?
A. That would have been before? Before this version? Is that your question?
Q. No. My question is did you convey to Dr. Ridgeway that you felt the suspect benchmark was superior after this version and before the final version came out?
A. I'm suggesting I may have expressed that before this draft version came out. So it --
Q. But do you recall whether you also expressed it to him after this draft but before the final?
A. I may have, yes.
Q. I'm going to show you what's been previously marked as Plaintiffs' Exhibit 326.

THE COURT: You said previously marked, in other words, this is not --

MR. CHARNEY: It's not yet in evidence.

Q. This is an e-mail chain between Terry Riley who is an inspector in OMAP, Dr. Ridgeway, and also Commissioner Farrell. It's dated October 24, 2007, discussing the draft that the RAND report that we just looked at, Exhibit 324, and we would move for the admission of this e-mail.

I haven't put it up.

I'm saying that the e-mail chain discusses this draft.

It actually discusses the benchmarking issue and I would move for the admission of Exhibit 326.

MS. GROSSMAN: Can I just have a moment, your Honor?

MR. CHARNEY: Just so your Honor knows, Exhibit 325 which is already in evidence is the same e-mail chain. The only addition on this version is an e-mail between Riley and Farrell.

THE COURT: That's helpful. The only additional is between Riley and Farrell.

MR. MOORE: It's not on the screen.

THE COURT: I understand. Both are at the NYPD?

MR. CHARNEY: Yes.

THE COURT: Then there shouldn't be a problem.

MS. GROSSMAN: We don't have a problem your Honor.

THE COURT: So it's 326?

MR. CHARNEY: Yes.

THE COURT: 326 is received.

(Plaintiffs' Exhibit 326 received in evidence)

Q. The top e-mail is an e-mail from Inspector Riley to you dated October 24, 2007, correct?

A. Yes.

Q. According to this e-mail he's telling you that Greg and you would -- do you agree he's referring to Dr. Ridgeway?

A. Yes.

Q. Is available any time today, tomorrow or Friday to discuss

the revisions as indicated in his e-mail below, which we will get to in a second. He does not plan on another visit prior to the final presentation. Based on his comments he does seem amenable to moving the paper's position somewhat closer to where it was.

Do you recall -- does this e-mail refresh your recollection that you did have a conference call with Dr. Ridgeway to discuss the benchmarking issue?

A. Well it suggests that we were planning to have one so I assume that we did.

Q. And then with respect to what Dr. Ridgeway said in his below e-mail, and I think we discussed this with both Commissioner McGuire and Inspector Riley.

This is an e-mail from earlier that same day from Dr. Ridgeway to Inspector Riley. And -- actually you know what, to make this easier let's turn to the second page to go in chronological order.

So turning to the second page, which is Bates number 83. The first e-mail in the chain is an e-mail from Inspector Riley to Dr. Ridgeway on the morning of October 24, right?

A. Yes.

Q. And according to this e-mail it looks like Inspector Riley is telling Dr. Ridgeway that the NYPD -- when he says "we" I'm assuming -- well, let's see. When he says "we" do you understand that to mean he's talking about himself and you and

Commissioner McGuire?

A. Yes.

Q. It says, "We would like to discuss the reasoning behind the decision to not assert any particular benchmark as being superior to the others. Commissioners Farrell and McGuire are unclear as to why there was such a departure from draft one's acceptance of crime suspect description as being superior, although admittedly less than perfect, to utilizing the census. The paper does not seem to cite any specific reasons why suspect description is unreliable to the same degree as the census benchmark -- which does have more specific explanations."

Do you see that?

A. Yes, I do.

Q. So, is that a fair summary of the concerns you raised with Dr. Ridgeway about his not having asserted crime suspect as the superior benchmark?

A. I think it refers to the fact that he had described the three benchmarks in the first draft in a way that made clear, as I recall, of the superiority of the suspect benchmark and the complete unreliability of the census benchmark.

The second draft, which is what this refers to, is raising questions about the change in language that seemed contrary to the conclusion in the first draft and which, in reflection of other conversations and citation of other

research literature, that the use of the census in and of itself is unacceptable.

So the language appearing to have them seem like well, you could do any one of the three was -- raised questions in my mind about whether that's what he, in fact, meant.

Q. And you expressed, the concerns you just raised here today, you did express those to Dr. Ridgeway on or about this date, October 24?

A. I would assume so.

Q. And then going to the next e-mail in the chain which is later that same day and it's from Dr. Ridgeway to Inspector Riley, do you see here where it says -- well he says, "I didn't intend for the document to suggest that all of the benchmarks were equally flawed, though I see sentences that indicate that."

And then he says, "I can tidy up that part to indicate that census is really ridiculous, arrest is highly problematic, and suspect description is more promising but still has issues."

Do you see that?

A. Yes, I do.

Q. Now he goes on here to tell Inspector Riley some of the criticisms that peer reviewers had of the crime suspect benchmark, right?

Do you see that?

A. There are comments about the crime suspect benchmark that I think suggests ways in which it can be refined if data are available.
Q. But, again, these are criticisms that are being raised by subject matter experts, right, independent subject matter experts?
A. That's right.
Q. And having read these comments, do those give you any concern that maybe the crime suspect benchmark that Dr. Ridgeway used in the RAND report maybe undermine the reliability or the validity of his findings?
A. Not at all.
Q. Now this language here which I guess Dr. Ridgeway -- the explanation for why the crime suspect benchmark does have problems. This -- none of this language is in the final version of the RAND report, is it?
A. I think what that is is Dr. Ridgeway quoting one of the reviewers.
Q. I understand.
But no language similar to this -- in other words, this example that's given here about why suspect description does have problems, that doesn't appear anywhere in the RAND report, does it, the final version?
A. I think the point that this is making does.
It gets to, as I described earlier, the refinement of

the suspect description benchmark by having the ability to determine the population that are visible to the police and available to be stopped.

This is related to that study in Paris with regard to the train stations. If you had information like that available. And I think that's what the reviewer is referring to here. If you had information about the availability of suspects, that improves the suspect description benchmark.

Q. Well let me ask you this.

In terms of trying to measure the availability of people what you're talking about is the people who are present in a particular geographic area, right? That's what you mean by availability, right?

A. For --

Q. For stops?

A. Suspects, suspects who are available to be stopped.

Q. But by availability to be stopped you're talking about presence in an area where they might encounter police, right?

A. Yes. That's right.

Q. And so you do need some kind of measure of the number of people who are going to be in a particular area that you're looking to analyze, right?

A. If you're going to refine the suspect description benchmark beyond the data that you do have which is largely the only data that is available.

Q. So you would agree then that a more refined version would measure both the population that's in the area that would be available to be stopped, right? That would be one part of it? Correct?

A. It would be the subset of the offending population that is available to the police to be stopped.

Q. But what I'm saying is you do have to measure who is present in the area, right?

A. Right.

Q. And then secondly you said you have to have some measure of the number of people who are engaging in criminal activity, right, that would draw police attention, right?

A. I would be helpful to have that information as well.

Q. So those are really the two pieces that you would need to have a more refined benchmark, correct?

A. A more refined benchmark, yes.

Q. But you would agree that in the final version of the RAND report crime suspect is described in more favorable terms than it was in the draft we just looked at in Exhibit 324, right?

A. I think described -- yes, it is. And similar to the way it was described in the first draft.

Q. And your -- in your view that is -- was it described as clearly superior to the other two?

A. That's my view, yes.

THE COURT: You said your view was it described as?

MR. CHARNEY: We can look at it.

THE COURT: No. He didn't ask your view.

THE WITNESS: I'm sorry.

THE COURT: I thought you misunderstood the question.

MR. CHARNEY: Let me ask a better question.

THE COURT: No. He just misunderstood it.

Q. In your view, based on your review of the RAND report, do you consider the description of crime suspect to be -- in the final version of the RAND report, to be superior to the other two benchmarks described?

A. Yes, I do.

Q. So you would agree that after you discussed your concerns with inspector -- I'm sorry not inspector -- Dr. Ridgeway, he did change the language to make crime suspect -- to describe crime suspect more favorable than the other two, correct?

A. The language was changed to reflect that view that he expressed in this e-mail saying that he didn't intend it, for them to be considered equally.

Q. Now, with respect to crime suspects, I want to ask you a question.

And I'm going to use the term comparison because I think her Honor was more correct, than using the term benchmark. Because I'm talking with respect to how the NYPD assesses the racial disparities in the stops.

I think you testified that the reason you believe that

crime suspect is the best comparison group is because you believe it provides the best surrogate for the group of people that is most likely to engage in those behaviors that would cause officers to stop people, right?

A. I believe it's the best benchmark because it's the population that the stops is intended to intercept or to deal with.

Q. I understand.

But I think -- I just want to make sure I understand that your testimony on direct was that the crime suspect population, in other words people who are offending, committing illegal acts in New York City, are, in the police department's view, that's the best surrogate available for the group that would be most likely to engage in suspicious behavior, right, that would lead to stops?

MS. GROSSMAN: Can I have that question read back please.

(Record read)

THE WITNESS: The population that may engage in any behavior that may appear to be suspicious, may or may not be precisely the offending population.

But a view of the -- to judge the distribution of the people stopped, one would have to know what the distribution of the offending population is.

Q. My question is: Why is that so? Right? Why do you think

that is?

And I just want to understand your reasoning. And I thought your reasoning was that because the crime suspect population is the best surrogate for the population most likely to engage in those behaviors that would cause officers to make stops, right?

A. There may be people engaged in certain crimes who manage to engage in those crimes without exhibiting any suspicious behavior.

Q. Okay.

A. And rarely get caught. So I'm not -- I think there's a distinction between the two.

Q. Okay.

A. The example I gave earlier with regard to -- to get to your question about why I think it's an appropriate benchmark, if you want to judge the appropriateness of let's say the racial or age or gender distribution of people stopped on suspicion of robbery, you would want to know who are committing robberies. And our view is the best information about that comes from people who are robbed and who report those descriptions. And you can make that comparison and judge whether or not there's congruence or disparity.

Q. Doesn't that assume then that the police department when they do make stops are actually stopping people who did commit robberies?

A. The standard for the stop is that they're engaged in -- that there's reasonable suspicion that they have committed, are committing or are about to commit a crime.
Q. Would you agree with me that law-abiding black New Yorkers are no more likely to act suspiciously than law-abiding white New Yorkers?
A. I would agree with that.
Q. We also know that 90 percent of all stops do not result in any discovery of criminal activity, right?
A. I wouldn't say any indication of criminal activity. They don't result in a level of probable cause.
Q. Which means that the officer did not discover that, in fact, the person was engaged in criminal activity when they were stopped, right?
A. That's correct.
Q. So as an empirical matter you can't assume that the people that are being stopped were, in fact, engaged in illegal activity when they were stopped, right?
A. I can't conclude definitively. They haven't reached the level of probable cause.
Q. So do you have any concerns that a large portion of those 530,000 stops last year were stops of people that were actually law abiding New Yorkers?
A. They may well have been. I'm sure a portion were.
I would refer back to the statement in the Attorney

General's report that Dr. Fagan worked on which made clear that one should not be surprised that one in nine stops doesn't result in an arrest because of the different standards of reasonable suspicion.

Q. I understand that.

But I guess my question is, is if, in fact, nine out of ten people who are being stopped are not engaged in criminal activity -- and as you've testified earlier you don't have any reason to think that law-abiding black people are more likely to engage in suspicious activity than law-abiding white people -- are you concerned at all that simply using crime suspect as a benchmark may be inappropriate?

A. No. I'm not concerned.

Q. You used to work for the Department of Justice, correct?

A. Yes. That's right.

Q. Are you aware that the civil rights division of the Department of Justice put out a policy guidance on the use of race by law enforcement officers?

A. I think I have seen their documents.

Q. I just want to ask you if you agree with the following statement.

MS. GROSSMAN: Can I see a copy of this?

MR. CHARNEY: I'm not trying to impeach him with it. I'm not trying to refresh his recollection. I simply want to ask him if he agrees with this statement.

MS. GROSSMAN: I haven't seen a copy to be able to get context.

MR. CHARNEY: Your Honor, it's not being offered into evidence. I can show it to her if she wants to look at it now. But I don't really understand the concern about -- I'm also not showing it to him to refresh his recollection.

MS. GROSSMAN: Why can't he just ask a question instead of making a reference to the document.

MR. CHARNEY: Because I want to read a statement.

MS. GROSSMAN: It's not in evidence.

THE COURT: I'm getting confused too. One second.

MR. CHARNEY: I won't read it then, your Honor. I'll paraphrase it, which I'm sure is more objectionable than actually reading it, but.

THE COURT: I don't understand what the purpose of this is.

MR. CHARNEY: Let me just ask you a question.

THE COURT: Do you want to know if he agrees with the following statement.

BY MR. CHARNEY:

Q. So do you agree with the following statement: Even if there were overall statistical evidence of differential rates of commission of certain offenses among particular races, the affirmative use of such generalized notions by law enforcement officers in routine spontaneous law enforcement activities is

tantamount to stereotyping.

Do you agree with that?

A. I do.

THE COURT: You do agree with that?

Q. Since you do agree with that, are you concerned that using crime suspect descriptions to measure or to compare to the racial demographics of who's being stopped in situations where nine out of the ten people being stopped were not engaged in criminal activity, do you have any concern that what the NYPD is doing is actually tantamount to stereotyping, as I just described?

A. No. I would not agree with that.

Q. Now, you also mentioned that you think violent crime suspect is a better comparison point than overall crime suspects, right?

A. Actually I think when I was describing the most recent precinct-based reports, I think there's value in looking at the stop subject distribution in the context of both of those.

Q. Now, you're aware that Dr. Ridgeway in 2010 and in a published article that he wrote and which Dr. Smith cited in his report in this case actually criticized the use of violent crime suspects as too narrow of a benchmark because officers make stops for large numbers of nonviolent offenses.

You're aware of that criticism?

A. Not specifically from that article but it wouldn't surprise

me.
Q. And in 2006, the year that RAND was analyzing the NYPD's stop data, are you aware that stops on suspicion of violent crime constituted only fifteen percent of all stops the police did that year?
A. No. I don't think that's accurate.
Q. In 2006. I'm not talking about 2010 or '11 or '12.
In 2006 are you aware that?
A. No. I'm not aware of that.
THE COURT: Do you still want to say I don't think that's accurate, now that he said it's 2006.
THE WITNESS: It would be helpful to see if there was a document that described that, that I could react to.
THE COURT: Sure.
BY MR. CHARNEY:
Q. Well let me ask you a follow-up question.
Are you aware that if you combine violent crime and weapon stops for 2006, the percentage is about 35 percent of all stops?
A. I'm not, off the top of my head, prepared to say what the distribution was in 2006.
Q. Well then let's look at -- did you review Dr. Fagan's first report in this case?
A. I'm sure I did some time ago.
Q. You're aware for that report he covered the periods 2004 to

2009, right?

A. That sounds right.

Q. You're aware that he also, for that report, he provided a critique of the RAND analysis, right?

A. I believe so.

Q. Are you aware of that?

Are you aware that in his report he looked at the UF 250 data that the police department provided to him for those years '04 to '09?

A. Yes.

Q. Are you aware he did an analysis of what the suspected crime was in each of the stops reported in the database?

A. I believe so.

Q. So are you aware that based on his review of that data that was provided to him by the police department, he found that only fifteen percent of the stops were -- had a violent crime listed as the suspected crime?

A. I would like to see the graph or table that shows that.

Q. This is Exhibit 411, appendix C.

MS. GROSSMAN: I would just note that what Dr. Fagan did in terms of running the data and the results, I don't know that this witness can talk to that. He can say what's in a table. But in terms of what he did to populate the tables, I don't know that that is --

THE COURT: Well, it depends. If Dr. Fagan testified

that he drew that from police documents as the source, just for what crimes were suspected, then it's just a source to show the witness because he said he'd like to see it.

I don't remember, however, if Dr. Fagan said he drew -- I thought he did. I thought he said he drew it from the police department documents.

MS. GROSSMAN: I know but --

THE COURT: Go ahead.

MR. CHARNEY: It's appendix C5 of Exhibit 411.

And it's a bar graph which, as you can see, it says frequencies of crimes suspected in SQF activity '04 to '09.

THE COURT: So it's drawn from the UF 250s. Because the officer has to write down the suspected crime.

THE WITNESS: That's right.

MS. GROSSMAN: Your Honor, if you notice, there's an error, it's 18 percent that says error.

THE COURT: I'm sorry. I can't see or hear what you're saying.

MS. GROSSMAN: In the third bar.

MR. CHARNEY: Your Honor --

THE COURT: Let her finish for a minute.

MS. GROSSMAN: 18.2 percent says error. So what that might suggest is that the distribution for the violent crime might be different. So I'm saying -- I'm suggesting that this is.

THE COURT: I don't recall if anybody explained what error means.

MR. CHARNEY: I can read you from the report. Error means that either the person didn't write a suspected crime or wrote something so illegible that it wouldn't be able to -- because, again, he's taking it from the database.

THE COURT: I understand. He's taking it all from the database.

MR. CHARNEY: So that's the police department's database, the same database --

THE COURT: I understand.

I still have trouble reading. What's the first one?

MR. CHARNEY: The first one says property crime. It actually says 20 percent.

The second one says weapons related, which is 19 percent.

THE COURT: And then 18 percent are essentially unknown.

MR. CHARNEY: And then we get to violent crime, which says 14.6 percent.

THE COURT: So there's a significant portion, 18 percent, which is essentially unknown.

MR. CHARNEY: Yes.

THE COURT: But what is your question now?

MR. CHARNEY: So my question -- I originally asked him

did he agree that during the period that RAND studied violent crime was the suspected crime in only about fifteen percent of all stops. He said he did not agree with that. He thinks the number is significantly higher.

THE COURT: Right.

MR. CHARNEY: What is your understanding of what that number is for 2006?

THE COURT: Is this 2006 data on the screen?

MR. CHARNEY: It includes five years worth, but it includes the period that would cover '06.

THE COURT: What five years is it?

MR. CHARNEY: '04 to '09.

THE COURT: Thank you.

THE WITNESS: The fact that this -- this data is not for 2006.

THE COURT: '04 to '09.

THE WITNESS: What it includes, you may recall, that the police department implemented a new stop, question and frisk database in 2006. Prior to that, there were problems with data entry which is what gave rise to the delay in provision to the city council. Those forms had to be sent to a private vendor in India, actually, for data entry. And the receipt back of the data for I believe 2004 and 2005 that they had worked on had, for some technical reason, had fields missing in some number of the cases. So the presence of that

18 percent unknown expresses the share of all the others.

THE COURT: So you don't accept necessarily that 15 percent of the stops in 2006 were for violent crimes?

THE WITNESS: That's right.

THE COURT: It could be more, it could be less, but we don't know, right?

THE WITNESS: We don't know from this graph.

THE COURT: Right. From this graph.

Q. Do you have any basis to know what that number actually was?

A. I don't know off the top of my head. But I do know that as we've looked at these over the past number of years, probably not to '06, that the proportions by offense suspected changed very little.

THE COURT: So you think that percent of violent crime stops was what?

THE WITNESS: As we discussed earlier, the violence and weapons is 49 percent.

THE COURT: That's together. You can't separate out for violent crimes?

MR. CHARNEY: Violent crime I think is about 24 percent.

THE COURT: Where are you getting that from? You're not testifying.

MR. CHARNEY: From Dr. Fagan's most recent report.

I think we looked at that actually. Ms. Grossman showed the table from Dr. Fagan's most recent report on direct which said violent crime 24 percent.

THE COURT: All right.

MR. CHARNEY: Weapons about 25 percent.

Q. So it's your testimony that's always been the case?

A. My testimony is it has appeared stable over time. Over recent years at least.

Q. So would that mean this 18 percent error was disproportionately weighted towards the violent crime?

THE COURT: He doesn't know. You're asking him to speculate. That's unknown.

MR. CHARNEY: But the only way for this number to jump from 14 to 24 would mean that most of these unknowns would have to go into the --

THE COURT: Maybe there's coding errors. Maybe a lot of things.

MR. CHARNEY: That's a petty big jump. That's the only thing I would say.

Q. Let me ask you this.

If, in fact --

MS. GROSSMAN: Objection. Move to strike.

THE COURT: All right. Fair enough.

Q. If, in fact, the violent crime stops only made up about a quarter of all the stops the police department does each year,

does that give you any -- and based on what I just told you about Dr. Ridgeway's critique of the violent crime suspect benchmark, does that give you any concern about the police department using violent crime as your reference point when looking at racial disparities in stops?

MS. GROSSMAN: Can I have that question read back.

(Record read)

THE WITNESS: No, it doesn't.

Q. Okay. But didn't you testify that the reason you want to use crime suspect is to get a -- figure out what the best surrogate would be for the people that are engaging in suspicious behavior, right?

A. Yes.

Q. So if only a quarter -- so isn't violent crime only going to tell you essentially 25 percent of the story about who's engaging in --

A. No.

Q. -- criminal behavior?

No, it's not?

A. While the violent crime category in Professor Fagan's table 4 is limited to the four major felonies, that there are other -- there are other violent crimes --

MR. CHARNEY: Your Honor I'm going to move to strike that because that's just not accurate and I can show the portion of Professor Fagan's.

MS. GROSSMAN: Your Honor --

THE COURT: One second. Let me reread the answer first. Why don't you -- I know you said that. But let's just check table 4.

MR. CHARNEY: What I'm going to say --

THE COURT: Without saying anything, just show him table 4 because if he misspoke I'm sure he wants to correct it right away.

MR. CHARNEY: The table we were just looking at?

THE COURT: He said while the violent crime category in Professor Fagan's table 4 is limited to the four major felonies, and then you interrupted saying it wasn't accurate.

MR. CHARNEY: I don't know what table 4 --

THE WITNESS: In the second supplemental.

MS. GROSSMAN: Table 4. Second supplemental.

MR. CHARNEY: I will show him table 4 and then I want to show him another document that -- let me see if I can find table 4 here.

Q. So you're saying that this one?

A. Yes.

Q. Now you're saying that his violence category is only limited to murder, rape, robbery and what's the fourth one?

A. (No response).

Q. What is the fourth one you say it's limited to, felonious assault?

A. Probably felonious assault.
Q. Where in this table does it say that those are the only four crimes that are included in his violent crime category?
A. Well the footnote.
Q. Well the footnote says, includes felony violence such as murder, rape and robbery.

He doesn't say it only includes murder, rape and robbery, right?
A. He goes on to say stops for minor violence and property offenses are included in other.
Q. What about -- felonious assault isn't included here?
A. I don't see it listed there.
Q. Have you looked at appendix C3 of his -- C3 of his first report, Exhibit 411, where he actually defines each of those crime categories?
A. I don't recall.
Q. This is appendix C3. And here he's actually including more than just murder, assault, rape and robbery in violent crime, right?

MS. GROSSMAN: This is which report?

MR. CHARNEY: This is the first report, Exhibit 411.

MS. GROSSMAN: Different reports --

MR. CHARNEY: So you're saying he defined them differently in each report?

THE COURT: Please don't do that, speak to each other,

especially in anger.

But anyway at this time he defined murder and violent crimes with the following suspected offenses, right?

THE WITNESS: I see.

THE COURT: Okay.

Q. So is it still your testimony that he only included four categories in his violent crime definition?

A. If this list is what table 4 is based on, rather than what's in the footnote to table 4, then I would accept this as being what he included.

Q. All right. I guess the bottomline is you are not concerned that using violent crime as your comparison point for analyzing racial disparities in stops is an incomplete comparison, right?

A. As I described earlier, the production of the new precinct-based reports includes the comparison with all crime suspects as well as violent crime suspects.

So in the evolution of our work on this, I would see that the presentation of the two of them provides a more comprehensive picture.

Q. We're going to get to those reports but I wanted to ask you first about the results and the recommendations in the RAND report.

Now one of the recommendations -- again, I think you talked about this on direct was the recommendation that the NYPD should review the boroughs with the largest racial

disparities in stop outcomes, right?
A. Yes.
Q. And there was a lot of testimony by you about the tables 5.2 and 5.3, right?
A. That's correct.
Q. Now I want to look at table 5.2 of the RAND report. This is page 28824.
You see here I'm looking at the borough of Staten Island, right. And in the borough of Staten Island for 2006 RAND found that black pedestrians who were stopped were frisked 29.2 percent of the time while white pedestrians were only frisked who were stopped were only frisked 20.3 percent of the time, right?
A. Yes.
Q. That's a nine percent difference, correct?
A. 8.9.
Q. And the little (a) footnote means that it was a statistically significant difference, right?
A. Right.
Q. But your testimony is that that difference did not concern the police department enough to actually take any action to see what was going on in Staten Island?
A. My testimony was, is that one needs to look at the results on both of the companion tables. And that the same element, frisks in Staten Island, show a disparity that's half that

magnitude.

THE COURT: What table shows half that?

MR. CHARNEY: 5.3.

THE COURT: I understand. I can't recall the difference between the two tables.

THE WITNESS: One was looking at white pedestrians compared to nonwhite pedestrians who were stopped in similar circumstances. And the other is for black stops compared to others similarly situated to the black stops. It's a little complicated.

THE COURT: Can I see the title of the two pages.

MR. CHARNEY: Let me go back to 5.2.

5.2 says comparison of stop outcomes for white pedestrians with those for nonwhite pedestrians. And then it breaks it down into four different groups, white, black Hispanic and other nonwhite or all nonwhite, I guess.

And then 5.3 says comparison of stop outcomes for black pedestrians with those of other races.

So I guess they're kind of switching the reference group or I don't know what you call that.

But I guess my question is I'm looking here at -- since we're on 5.3, I'm looking at the force in Brooklyn South, force used, right?

Do you see that?

THE WITNESS: Mm-hmm.

Q. This is page 28825. It says Hispanics -- blacks had force used 28.6 percent of the time they were stopped. Hispanics 29.9. But whites are only 22.1.

Do you see that?

A. Yes.

Q. So that's almost an 8-point difference between Hispanics and white and more than a seven percentage difference between black and white, right?

A. No.

Q. That's not true?

A. 6.5.

Q. 6.5 percent between black and white?

A. Right.

Q. And those disparities which -- those disparities did not give the police department any concern that would motivate them to look into what was going on in Brooklyn South?

A. Well, once again when you go to the companion table which is 5.2 you see that for that exact same comparison that the difference is not 6.5 but 1.7.

Q. Here's the part I'm confused about. Because when we were looking at frisks for Staten Island we looked at 5.2 and at that point you said we have to go look at 5.3?

A. Right.

Q. Now you're saying when we look at 5.3 we have to go back and look at 5.2.

A. Right.
Q. So?
A. My view is that these tables -- this analysis was done to assess poststop outcomes and that one needs to look at both tables and not cheery pick from one or the other.
Q. But RAND -- first of all, when you commissioned the RAND report you said you wanted to get an independent analysis of the NYPD's stop and frisk practices, right?
A. That's correct.
Q. And so RAND itself in this report specifically cites the Staten Island frisk disparity as something that the police department should take a look at, right?
A. That's the recommendation.
Q. Do you remember that?
A. I do, yeah.
Q. But it's your testimony that even though RAND said you should take a closer look at it, the police department decided they didn't have to take a closer look at it?
A. We took a much closer look at these tables, at the data. And, for example, the -- you made reference to the frisk rate in Staten Island.
Q. It was 29 to I think -- sorry about that. It was 29 for black and 20.3 for white?
A. Right. So in a broader context you look at the black frisk rate of 29.2. And that's actually lower than the overall white

frisk rate for the city, which you see just below that.

Q. Yeah, but the overall rate for blacks is thirty-three-and-a-half. So I don't understand why that matters, the overall rate.

A. It matters when you're trying to get to the question of whether or not there are significant disparities.

THE COURT: Can I see that table again.

MR. CHARNEY: Yes.

THE COURT: Where is the overall?

MR. CHARNEY: Whites are 29.3 overall. Blacks are thirty-three-and-a-half. Which by the way they also found was statistically significant, right?

THE COURT: And Hispanic is 32.

MS. GROSSMAN: Objection, your Honor. This is testimony from the attorney.

THE COURT: No, it's not. He's reading off the chart in evidence. Anybody is allowed to do it. I do it. You do it. We all do it. That's okay. That's not testifying. That's reading off a document in evidence.

But the question is you said in the overall that blacks were actually frisked at a lower rate -- no, I'm sorry.

THE WITNESS: The Staten Island.

THE COURT: Staten Island.

THE WITNESS: The black Staten Island is lower than the white citywide.

THE COURT: So, is lower than white citywide.

MR. CHARNEY: Yeah, he's comparing -- I'm not going to say it because then I'll be accused of testifying.

THE COURT: I don't see -- if you want to look at the whole city you look across. You look horizontally, right?

THE WITNESS: For sections of the city, that's correct.

THE COURT: No. If you want to look at the whole city, then look horizontally. And you'll see whites were frisked 29.3 percent of the time, blacks 33.5, Hispanics 32.8 and the citywide -- all nonwhites, I see, 32.6. Which is, you know, three points higher than 29.3.

So if you want to look at citywide, it's still higher for nonwhites, right?

THE WITNESS: Right.

THE COURT: Okay. But I know. But you just went to Staten Island.

THE WITNESS: Because the Staten Island one had been mentioned as an outlier.

THE COURT: You have to read it horizontally.

Q. That's my question. Because you're saying that RAND said you should take a closer look at Staten Island. Your closer look was to look at these tables? Is that what you're saying?

A. For the most part, yes.

Q. So that's what you understood RAND to mean by take a closer

look at Staten Island?

MS. GROSSMAN: No. Objection. That's not what he said.

Q. What did you understand RAND to mean by saying you should take a closer look at Staten Island?

A. Just that. Take a look, a closer look at the -- what they've observed in these tables.

THE COURT: So you didn't think he meant you should look at what police activity is being conducted in Staten Island, you should investigate that? You don't think he meant that?

THE WITNESS: I don't believe there was any particular specificity about how we would go about looking at that.

THE COURT: Okay.

Q. So, going to page -- this is page 287 --

THE COURT: Anyway as far as you know the police department never did investigate why there was almost a nine percent disparity in frisk by race in Staten Island?

THE WITNESS: No.

THE COURT: Okay.

MS. GROSSMAN: Well, your Honor, there was testimony about the inquiry to CCRB on his direct.

THE COURT: Thank you.

MR. CHARNEY: We're going to get to that in a second.

THE COURT: I don't know about a second. Seconds are

not happening too fast. It looks like we're not going to get to Chief Hall today.

MS. GROSSMAN: Do you think you can let him --

THE COURT: Go, oh, I do.

So we now have three witnesses for tomorrow, right? We have Chief Hall and the two experts; is that true?

MS. GROSSMAN: Yes.

THE COURT: Is that all?

MR. MOORE: Yes.

MR. CHARNEY: That's it. No other witnesses that I know of.

MS. GROSSMAN: We just have to correct the data error from -- that Commissioner McGuire testified about. So I don't think we need to call him as a witness. But once we turn over that --

THE COURT: Better talk to your adversaries so there's not any last minute fussing about that.

MS. GROSSMAN: Yes.

THE COURT: Clearly if you don't finish all three of those, direct, cross, redirect, we will do it Thursday. Everybody is prepared to know we have to go right into Thursday.

MR. CHARNEY: Sorry, your Honor.

THE COURT: No. That's okay. It's as bad for you as it is for me. It's probably worse for you.

MS. GROSSMAN: Can I ask you one. Is it possible, given that our expert is in from out of town, that we can call Chief Hall on Thursday possibly?

MR. MOORE: That will not work, Judge, because I have a court appearance that's going to last all morning on Thursday.

MR. CHARNEY: In addition, the experts need the full record of the fact witnesses to be able to opine on things because Chief --

THE COURT: I would have thought their opinions are pinned down already in their reports and they're not allowed to testify outside their report. That's been an objection by both sides. So I don't know why they need to hear Chief Hall in order to give their opinions.

MR. CHARNEY: I guess to the extent Chief Hall is going to testify about some of the policies and procedures, like the changes, for example, the March 5 memo, which clearly goes to remedies.

THE COURT: Some of the most recent changes.

MR. MOORE: That's one of the most important aspects of his testimony.

THE COURT: Yeah, to say whether the remedy has already been achieved. One of the experts may take that position.

I mean I would have done it, Ms. Grossman. But

they're making an argument: A. that Mr. Moore is not available to do the cross-examination or the direct for that matter of one of the two experts on Thursday -- vice versa. You're not available Thursday to do Chief Hall and were you the one who is going to cross-examine Chief Hall?

MR. MOORE: I am, Judge.

I don't know how long I'm going to be on Thursday but I have a very long settlement conference with the city in a very big class action case. And I just think -- and it was set --

THE COURT: I think they should settle one or the other of the cases.

MR. MOORE: It would make my life a lot simpler.

THE COURT: That would be a good idea, but anyway.

So what did you start to say about the afternoon, Ms. Grossman. Were you going to say could Chief Hall be done in the afternoon of Thursday? Is that what you were going to say?

MS. GROSSMAN: That was what I suggested.

THE COURT: How is the afternoon for you?

I'm just asking. Are you free in the afternoon on Thursday?

MR. MOORE: I don't know how long I'm going to be on Thursday. I don't know how long it's going to extend. We're at the end stage of trying to settle. I'm not going to say

what the case is.

THE COURT: No. That's all right. It's one long settlement conference.

MR. MOORE: It's not just me. It's like a whole slew of lawyers and you know so.

And more importantly I think that what Chief Hall says about these changes, these last minute changes --

THE COURT: Let me ask one last thing. Friday instead of Thursday for Chief Hall, if that would accommodate the out-of-town expert. Take Thursday off and switch to Friday.

MS. GROSSMAN: No. I'm sorry. That's a problem.

THE COURT: Then I can't help anybody. I tried. There is no difference to me between Thursday and Friday.

BY MR. CHARNEY:

Q. So let me ask you then about -- stay on Staten Island for a second. You said that one of the other reasons -- I'm sorry.

Ms. Grossman just mentioned, and I know you testified on direct that beyond looking at those tables in the RAND report you looked at was it CCRB complaints from Staten Island?

A. CCRB complaints regarding stop, question and frisk for -- for each of the boroughs citywide.

Q. Now you're aware that in 2007 and 2008 Staten Island precinct -- first of all, the 120 precinct is in Staten Island, right?

A. Yes, it is.

Q. And you're aware that in 2007 and 2008, according to the CCRB annual reports, that the 120 precinct was amongst the highest in the city in terms of the number of CCRB complaints for that year?
A. I would have to see a report.
Q. Let me show you. This has been previously admitted as Plaintiffs' Exhibit 113. This is the 2008 --
MS. GROSSMAN: Is this for the same year?
MR. CHARNEY: I can show 2007. We don't have 2006.
Q. First of all, the RAND report didn't come out until the end of '07?
A. That's correct.
Q. Was it in early '08 that the police department met to discuss the recommendations?
A. That's likely, late '7, early '08.
Q. Let me show you the 2007 -- this is Exhibit 111 which is in evidence. It's at page 7681.
This is the 2007 CCRB annual report. You see here it says "complaint filing density, by precinct."
The dark color is over 150 complaints, right, which would be the ones with the highest number.
You see that one of those precincts with the highest number was the 120, right?
A. Yes.
Q. So do you have a -- concerns that, again, even using CCRB

as a measure which the police department did, that maybe you should have taken a look at Staten Island in the poststop outcome disparities?
A. Not based on that.
That chart is showing the end, the frequency, the number of complaints; not proportions and not in relation to anything else.
Q. Now you're aware that in 2007 that complaints for stop, question, frisk or search were -- made up the highest portion of total CCRB complaints for any year going back to 2003?
A. Are you referring to allegations?
Q. Yes.
A. As opposed to complaints?
Q. Yes.
A. Again, I'd have to look at a table. I think that's probably in the ballpark.
Q. So this is Exhibit 111, the 2007 CCRB annual report. And you see here it has each year, '03, '04, '05, '06, '07 and for each of those years it has the complaints for stop and frisk and then the complaints for all other allegations.
And you see how the stop and frisk number keeps going up. The all others is kind of back and forth.
But it looks like for '07 stop and frisk makes up the -- more than 50 percent or more than a third. I don't know how they're doing it.

But it makes up the highest percentage of the complaints of any of these five years, right?
A. It's an increasing proportion to the total.
Q. Yes.

Does this fact in combined with the fact we just saw of Staten Island, the 120th precinct being amongst the highest number of complaints in any precinct, did those two facts together give you any concern that maybe you should have taken a closer look at the poststop outcome disparities in Staten Island?
A. No. Because you would have to look at the -- what you showed there is the total number of complaints with allegations about stop, question and frisk distributed across the city and see what proportion Staten Island accounted for.

It's my recollection that Staten Island's share of the total was stable over time.
Q. Now let me ask you this.

Why is it that you think that using CCRB complaints is a good measure of whether or not the racial disparities in Staten Island were evidence of racial bias?
A. I don't say it necessarily is a good measure of it. It is a measure that had data easily available for it.
Q. Shouldn't the police department -- when you are told by the independent expert that you hired to look into racial disparities, shouldn't the police department make that decision

separate and apart from whether civilians complain about the issue?

A. In deciding what response to that recommendation, after having looked at the totality of the information on the two tables, that including in that, the CCRB trends by borough, figured into our decision.

Q. Now you're aware that in 2008, I believe, the chairman of the CCRB told the city council, this is Franklin Stone, that because of the low rate prosecution of substantiated CCRB complaints that she was concerned the public would lose confidence in the CCRB.

Are you aware of that testimony?

A. I am aware that she testified. I'm not quite certain exactly what she said. But if you have a transcript for me.

Q. Well if, in fact, that is what she said, would that give you any concern that maybe using CCRB complaints in Staten Island was not a good measure of whether or not the poststop racial disparities were evidence of racial bias?

A. I would say so long as the CCRB complaints were increasing, that wouldn't show any indication of a decreased willingness to file complaints.

Q. But that wasn't my question.

My question was did Chairman Stone's testimony give you any concern that using CCRB complaints to determine whether the poststop racial disparities were a problem was maybe not

the best measure to use for that purpose?
A. I would say it was an available measure. And likely the only available measure.
Q. Okay. Now one of the other recommendations that RAND made, and you talked about this on direct, was the NYPD should identify, flag and investigate officers with out-of-the-ordinary stop patterns, right?
A. Yes.
Q. And in here it says, right, under this recommendation, I'm looking again at Defendants' K6, it says that, "We recommend that the NYPD review these flagged officers and incorporate into their early warning system a component that flags officers with extreme deviations from their colleagues. These measured disparities are evidence that these officers differ substantially from their peers; however, they are not necessarily conclusive evidence that these officers practice racially biased policing. Supervisors may then investigate and address the disparities."
Do you see that?
A. Yes, I do.
Q. And you would agree that RAND, when they ran their internal benchmarking analysis on the 2006 data, found fifteen officers from the NYPD who, according to their analysis, had over-stopped pedestrians of color as compared to similarly situated officers, right?

A. I believe out of the nearly 3,000 they looked at they found 15 had that stop rate higher and 13 had stop rates lower.
Q. And it's your testimony also that the police department, even after you acquired the RAND software, never ran the software on the 2006 data to figure out who those 15 officers were, correct?
A. That's correct.
Q. Now, you're also aware that when RAND did this analysis they identified the outliers using the 50 percent probability level, right? In other words, anyone who was above the 50 percent probability level, right?
A. Right.
Q. And the reason they did that, right, according -- this is page 28813 of the RAND report.

The reason they used 50 instead of 80 is because they said, "We believe that such a choice using 80, would undervalue the cost of failing to identify a problem officer."

Right?
A. I see that.
Q. Now, the NYPD did run the RAND software on the 2007 data, correct?
A. That's correct.
Q. And isn't it true that the results of your analysis on the 2007 data identified 23 officers who over-stopped pedestrians of color at the 50 percent or higher probability level?

A. I'd have to check and see what the number is.

Q. Let's look at Exhibit N6 which we looked at I believe on direct examination. This is already in evidence.

These are the results of the NYPD's run on the 2007 data, right?

A. Yes.

Q. So if we scroll down here on page one and go to page two.

So here we're looking -- this is the summary of the results for those officers with respect to black pedestrians, right?

A. Yes, it is.

Q. And if you look there, I guess it's the 6th row down, it's officer number 1965, it looks like there we have an officer who over-stopped black pedestrians by 30 percent and that that was at the .58 probability, right?

A. Correct.

Q. So that's one officer who over-stopped black pedestrians at a probability rate of .58, right?

A. Right.

Q. And then if we go to the next page. Now we're looking at Hispanics, right?

This is officers who may have over-stopped Hispanics, correct?

A. Yes.

Q. And here if you go down, starting with the bold on the

left-hand column, it looks like, starting with officer number 0896, we have one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen -- how many -- how many bold ones do we have there? Looks like we have fourteen on this page, right? If we keep going, looks like we have another eight on this page, right?

Is that correct?

A. Yes.

Q. So according to your analysis, using the RAND software of the 2007 stop and frisk data, the NYPD identified one officer who over-stopped black pedestrians at a .58 probability level and 22 officers who over-stopped Hispanics at a .51 or higher probability level, right?

A. Right.

Q. So did you ever go and identify and look into what those officers were doing, how they were being supervised, how they were being trained?

A. No.

Q. Now I want to turn back one second to my favorite borough today, which is Staten Island.

You're aware, Commissioner, that in 2011 there was an officer in the 120th precinct who was indicted on federal civil rights charges for a stop and false arrest that he made?

MS. GROSSMAN: Objection, your Honor.

Q. Of a black man in Staten Island?

THE COURT: I don't know where this is going but whether he's aware or not is harmless.

Did you know about that?

THE WITNESS: I believe I heard about that.

THE COURT: So now what's the point?

Q. Now that was in the 120th precinct, correct?

A. I don't know.

Q. But it was on Staten Island?

THE COURT: He said that.

Right?

THE WITNESS: Yes.

Q. And you're also -- so you don't have any concerns that that, in combination with what RAND said about the poststop racial disparities, that maybe the NYPD should be looking into what's going on in Staten Island?

You don't have any concerns that maybe --

A. Well you've included two things.

THE COURT: You already have testified you had no concerns based solely on RAND that you, the police department, needed to investigate in Staten Island, the police activity in Staten Island. Now he's just adding this arrest.

Now you have the RAND report and the arrest. Does that change your view, a single arrest?

THE WITNESS: Well there would be some concern and looking into the circumstances surrounding that arrest.

THE COURT: That one case.

THE WITNESS: Right.

THE COURT: Would that change your view that there was a need to investigate police activity in Staten Island generally?

THE WITNESS: The reference in the RAND report was related to poststop outcomes. I'm not certain whether this case was about a decision to stop --

THE COURT: I don't know either but --

THE WITNESS: So I'm not certain they're related, your Honor.

THE COURT: For sure.

But he's asking you if it would change your view that there was a need to investigate police activity in Staten Island.

THE WITNESS: The existence of one case of potential misconduct would not necessarily change my view.

Q. Now I want to show you what's already in evidence as B14 which, again, is the 2012 reasonable suspicion stops report. And I want to show you the 120th precinct which is Staten Island, correct?

A. Yes.

Q. So if we look here at the 120th precinct.

First of all, 12,000 stops, would you agree with me, this is one -- not the highest, but one of the higher stopping

precincts?
A. It's also one of the higher crime precincts.
Q. So you would agree it's one of the higher stopping precincts?
A. I believe so.
Q. Now if we look here at the black set of bar graphs -- actually let's look at the time table down here. So blacks make up about 22.5 percent of the population in the precinct, right?
A. Right.
Q. They are 51.5 percent of all known crime suspects, right?
A. Right.
Q. They are 59.3 percent of the people stopped, right?
A. Right.
Q. Whites are --
A. And 61 percent of the known violent crime suspects.
Q. Whites are 40.6 percent of the population in the precinct, right?
A. Right.
Q. 21.7 percent of the known crime suspects?
A. Correct.
Q. And 14.4 percent of the people stopped, right?
A. And 13.7 percent of the violent crime suspects.
Q. So the answer is yes, they are 14-point --
A. Yes. That's correct.

Q. So would you agree with me that in the 120th precinct last year blacks were stopped at a higher rate than their representation amongst all known crime suspects, right?

A. Somewhat, yes.

THE COURT: Well that's just math. It's about eight percent difference, right?

THE WITNESS: Yes.

(Continued on next page)

Q. And whites were stopped at a rate more than 7 percent lower than their representation amongst all known crime suspects, right?

A. That's correct.

Q. So does this information, combined with what RAND told you, give you any concern that maybe the police department should be looking in to stop and frisk activity in Staten Island?

A. No.

THE COURT: Are you done with your cross or not quite?

MR. CHARNEY: I probably have maybe 20 minutes.

THE COURT: For planning purposes, to the extent that helps you.

So we pick up tomorrow at the usual time.

MR. MOORE: Thank you.

THE COURT: Thank you.

You have to come back. I'm sorry.

(Adjourned to May 15, 2013, at 10:00 a.m.)

INDEX OF EXAMINATION


Examination of: Page

CHRISTOPHER McCORMACK

Cross By Mr. Moore . . . . . . . . . . . . . . . .7042

Redirect By Ms. Cooke . . . . . . . . . . . . . .7049

Recross By Mr. Moore . . . . . . . . . . . . . . .7052

KENNETH LEHR

Direct By Mr. Marutollo . . . . . . . . . . . . .7076

Cross By Ms. Hoff Varner . . . . . . . . . . . . .7080

MICHAEL FARRELL

Direct By Ms. Grossman . . . . . . . . . . . . . .7081

Cross By Mr. Charney . . . . . . . . . . . . . . .7173


PLAINTIFF EXHIBITS


Exhibit No. Received

320 . . . . . . . . . . . . . . . . . . . . .7104

336 . . . . . . . . . . . . . . . . . . . . .7108

326 . . . . . . . . . . . . . . . . . . . . .7192


DEFENDANT EXHIBITS


Exhibit No. Received

A8 . . . . . . . . . . . . . . . . . . . . .7107

L15 . . . . . . . . . . . . . . . . . . . . .7157

J15 . . . . . . . . . . . . . . . . . . . . .7168