D5H8FLO1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    DAVID FLOYD, et al.,

4                   Plaintiffs,

5            v.                              08 CV 1034(SAS)

6    CITY OF NEW YORK, et al.,

7                   Defendants.

8    ------------------------------x
                                        New York, N.Y.
9                                       May 17, 2013
                                        10:30 a.m.
10
     Before:
11
                         HON. SHIRA A. SCHEINDLIN,
12
                                            District Judge
13
                              APPEARANCES
14
     BELDOCK LEVINE & HOFFMAN, LLP
15        Attorneys for Plaintiffs
     BY:  JONATHAN MOORE
16        JENN ROLNICK BORCHETTA

17

18   COVINGTON & BURLING, LLP
          Attorneys for Plaintiffs
19   BY:  KASEY MARTINI
          GRETCHEN HOFF VARNER
          ERIC HELLERMAN
20        BRUCE COREY

21   CENTER FOR CONSTITUTIONAL RIGHTS
          Attorneys for Plaintiffs
22   BY:  DARIUS CHARNEY
          SUNITA PATEL
23        BAHER AZMY

24

25

D5H8FLO1

1                        APPEARANCES (Cont'd)

2

MICHAEL A. CARDOZO
3       Corporation Counsel for the City of New York
        Attorney for Defendants
4   BY:  HEIDI GROSSMAN
        BRENDA E. COOKE
5       JOSEPH MARUTOLLO
        MORGAN D. KUNZ
6       SUZANNA PUBLICKER
        LINDA DONAHUE
7       LISA M. RICHARDSON
        JUDSON VICKERS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D5H8FLO1

1           (Trial resumed)

2           MR. KUNZ:  I think there may be a little bit of

3   housekeeping we wanted to take care of first.

4           The exhibits that I entered into evidence yesterday,

5   mainly, Director Stewart's qualification summary and his

6   exhibits, I inadvertently gave exhibit numbers that are far

7   beyond what they are supposed to be so I would just like to

8   correct that.

9           Exhibit B, which is list of filings and exhibits that

10  he --

11          THE COURT:  We have called it Q16.

12          MR. KUNZ:  Is actually R15.  I have a new copy for

13  your Honor.

14          THE COURT:  It doesn't matter.

15          MR. KUNZ:  And his qualification summary is Q15.

16          THE COURT:  It was Q15.  Is it still Q15?

17          MR. KUNZ:  It is Q15.

18          THE COURT:  R15, Exhibit B, Q15.

19          (Defendants' Exhibit R15 received in evidence)

20          THE COURT:  I also got an e-mail that stated that the

21  portions of Reiter's testimony that the plaintiffs wrote in

22  their e-mail are the appropriate pages to be stricken.

23          MR. MOORE:  And that one line which was the last part

24  of your comment.

25          THE COURT:  Can somebody state for the record what is

D5H8FLO1

1   being stricken?

2           MS. RICHARDSON:  I don't have the list.

3           MR. MOORE:  Do you have the pages?

4           THE COURT:  Hold on.

5           MR. MOORE:  It's in my e-mail.

6           THE COURT:  I know.  One second.

7           MR. MARUTOLLO:  I have the line.  From Mr. Moore's

8   e-mail, the first line -- one moment, your Honor.

9           MS. PATEL:  While we are waiting for that, there are

10  two other small records issues.

11          THE COURT:  I don't want to interrupt.

12          THE DEPUTY CLERK:  I can do it.

13          THE COURT:  Why doesn't my clerk just state it.

14          THE DEPUTY CLERK:  The final lines to be stricken will

15  be page 4905, line 22, through page 4907, line 4.  And page

16  4940, line 2, through page 4941, line 22.

17          MR. MOORE:  That's correct.

18          THE COURT:  Everybody heard that and that's correct?

19          MR. MOORE:  Yes.

20          THE COURT:  What else, Ms. Richardson?

21          MS. RICHARDSON:  We wanted to let the Court know that

22  I checked the exhibits that Ms. Borchetta moved into evidence

23  yesterday.  We have no objection to those.

24          We also have some additional exhibits that we wanted

25  to move through deposition designations, and so I can read you

D5H8FLO1

1    that list now.

2              THE COURT:  Let me state for the record that the

3    exhibit numbers that Ms. Borchetta read at the end of

4    yesterday's session are hereby received in evidence.

5              (Plaintiffs' Exhibits 123, 142 through 143, 148

6    through 151, 185, 243, 252, 257, 301, 317, 336, 469, 470, 474,

7    and 476 through 480 received in evidence)

8              MS. RICHARDSON:  We also move the admission, through

9    Mulligan designations, we move for the admission of Plaintiffs'

10   Trial Exhibit 63, Defendants' Trial Exhibit W12, Defendants'

11   Trial Exhibit G12, and the Mulligan designations themselves we

12   have labeled as Defendants' Exhibit R14.

13             We also move the admission of the Houlahan

14   designations.  There are no exhibits annexed to those

15   designations, but the designations themselves have been labeled

16   as Defendants' Trial Exhibit Q14.

17             And for Provost, I understand that Ms. Publicker

18   submitted for the Court's endorsement the following exhibits to

19   be received under seal, that is, Defendants' Exhibit T9, Z13,

20   and A14.  And we also move the admission of Defendants' Exhibit

21   Y10 for Ian Provost as well.

22             THE COURT:  Can anybody on the plaintiffs' team

23   confirm that these are all to be received without objection?

24             MS. PATEL:  I can only confirm Mulligan and Houlahan.

25   I know there was some issue with Provost.

D5H8FLO1

1                Do you know if there was any objection to Y10?

2                MR. CHARNEY:  Are they all arrest records?

3                MS. RICHARDSON:  I'm not sure what they are.

4                MS. PATEL:  We if we can confirm over the morning

5       break.

6                THE COURT:  I don't know if there is going to be a

7       morning break.

8                MR. CHARNEY:  We will figure it out while the witness

9       is testifying.

10               THE COURT:  Everything that you said is received,

11      except temporarily the Provost designations because Ms. Patel

12      needs to check on those.

13               MS. COOKE:  We just need to check on Y10.

14               THE COURT:  Just Y10, correct.

15               (Plaintiffs' Exhibit 63 received in evidence)

16               (Defendants' Exhibits W12, G12, R14, Q14, T9, Z13 and

17      A14 received in evidence)

18               MS. RICHARDSON:  Finally, your Honor, I understand Mr.

19      Corey sent an e-mail to your Honor's clerk regarding striking

20      pages of testimony from Officer Dang's testimony, and we

21      consent to those pages as well.

22               THE COURT:  Good.  So, again, I would like to state

23      those pages for the record.  I don't know who can find it the

24      quickest.

25               MS. RICHARDSON:  I can find the list.

D5H8FLO1

| | |
|---|---|
| 1 | THE COURT:  My clerk has it.  Why don't you state |
| 2 | those pages? |
| 3 | THE DEPUTY CLERK:  Mr. Corey wrote -- |
| 4 | THE COURT:  This is the e-mail from Mr. Corey. |
| 5 | THE DEPUTY CLERK:  Mr. Corey wrote, "On May 9, the |
| 6 | Court granted plaintiffs' request to preclude Officer Dang from |
| 7 | testifying about the circumstances of specific stops.  Trial |
| 8 | transcript 6419, lines 15 to 25. |
| 9 | "The Court also ruled that it would strike all of |
| 10 | Officer Dang's May 7th testimony starting from when he began to |
| 11 | testify about the first UF-250 shown to him by defense counsel. |
| 12 | Trial transcript page 6420, line 12, through 6421, line 9. |
| 13 | "Accordingly, plaintiffs move to strike Officer Dang's |
| 14 | May 7th testimony starting on page 6386, line 2, through and |
| 15 | including page 6395, line 23." |
| 16 | THE COURT:  Thank you. |
| 17 | All right.  Does that take care of everything? |
| 18 | Ms. Patel. |
| 19 | MS. PATEL:  Plaintiffs' Exhibit 491 was marked for |
| 20 | identification purposes as the Lou Reiter report.  Therefore, |
| 21 | there needs to be a correction for another Exhibit 491A, which |
| 22 | is Officer Conoghan's activity log. |
| 23 | THE COURT:  So 491A will be the activity log.  It will |
| 24 | no longer be known as 491 because that will be the same number |
| 25 | twice. |

D5H8FLO1

1          (Plaintiffs' Exhibit 491A received in evidence)

2          MS. PATEL:  Secondly, 551 was inadvertently moved into

3     evidence under the wrong number.  We would seek the formal

4     admission of Plaintiffs' Exhibit 553 as the vehicle assignment

5     sheet for April 20, 2007 related to the Floyd stop, which was

6     inadvertently moved into evidence as 551.

7          THE COURT:  It should have been 553?

8          MS. PATEL:  Yes.

9          THE COURT:  553 is received.

10          (Plaintiffs' Exhibit 553 received in evidence)

11          MS. PATEL:  Finally, 575, which was the consent decree

12     from yesterday with East Haven, was not received into evidence.

13          THE COURT:  The signed version was 575 and it is

14     received.

15          (Plaintiffs' Exhibit 575 received in evidence)

16          MR. MARUTOLLO:  I just wanted to formally put on the

17     record, for the Ligon designations, the parties have entered an

18     agreement.  I want to make sure that is in the record.  We have

19     the hard copy binders.  We will provide that to the Court this

20     morning.

21          THE COURT:  Thank you.

22          MR. MOORE:  I am looking at Y10, and we have no

23     objection.

24          THE COURT:  All right.  Y10 is received.

25          (Defendants' Exhibit Y10 received in evidence)

D5H8FLO1

1          MR. MOORE:  There was one other.  At the end of Chief

2     Hall's testimony, we were talking about Mayor Bloomberg's

3     speech which we wanted to offer.

4          THE COURT:  I wanted to hear from the city about that.

5          MS. GROSSMAN:  My question is, is Mr. Moore seeking to

6     admit the entire speech or just an excerpt?

7          MR. MOORE:  I guess I would -- it doesn't matter.

8          THE COURT:  I would hope it would be an excerpt.

9          MR. MOORE:  We will just do the excerpts.

10          THE COURT:  That relate to stop and frisk.

11          MS. GROSSMAN:  That would be my objection.

12          THE COURT:  You want the whole?

13          MS. GROSSMAN:  If it's coming in, then the whole

14     speech should come in.

15          THE COURT:  I don't care.  Do you care?

16          MR. MOORE:  I don't care.

17          THE COURT:  Fine.  The whole speech is received.  What

18     is the exhibit number?

19          MR. MOORE:  It would be 582.

20          THE COURT:  How long is it?

21          MS. GROSSMAN:  It's not long.  It's a few pages.

22          MR. MOORE:  583.

23          I have to apologize, Judge.  I left those exhibits at

24     the office.  When I get back today, I will put a label on and

25     scan and e-mail them to your clerk.

D5H8FLO1

1          THE COURT:  583 is received.

2          (Plaintiffs' Exhibit 583 received in evidence)

3    JAMES STEWART, resumed.

4    DIRECT EXAMINATION (Cont'd)

5    BY MR. KUNZ:

6    Q.  Good morning, Director.  Thank you for coming back.

7          I want to start this morning by discussing performance

8    reviews.  And just to set the stage, you were here yesterday

9    and you heard the testimony of Mr. Walker, Professor Walker

10   with regard to performance reviews?

11   A.  Yes, I did.

12   Q.  Have you reviewed the NYPD operation order number 52?

13   A.  I have.

14   Q.  Do you think that operation order 52 is consistent with

15   accepted management practices in police departments?

16   A.  Yes, I do.

17   Q.  Can you tell the Court a little bit about the basis of that

18   opinion?

19          THE COURT:  I don't think this goes to remedies.  The

20   question would be, you heard Professor Walker recommend X, Y,

21   Z.  What is your view of that proposed remedy?  Then he could

22   say, I suppose, it doesn't add anything to what is in place.

23   That would be the whole theme.  But I don't want his opinion on

24   whether operation 52 is good, bad or indifferent because that's

25   liability.  It's not about a remedy.

D5H8FLO1                          Stewart - direct

1           MR. KUNZ:  I am just trying to set the preliminary

2      questions here so that the expert can opine on --

3           THE COURT:  Basically, you asked him to tell me why

4      Operations Order 52 is so good.  That's not what we are doing.

5      We spent a lot of time yesterday straightening this out.  I

6      thought we were going to get a quick start out of the gate.  So

7      let's try again with performance evaluations.

8           I think, if I remember, and I could be wrong, that

9      Professor Walker recommended as a remedy there that it be more

10     qualitative and less quantitative and not just be numbers, and

11     also there not be pat or rote words used.

12          THE WITNESS:  Canned phrases.

13          THE COURT:  Canned phrase is the same as pat or rote.

14     They not be canned phrases and just a number over and over

15     again.  That the evaluations be more qualitative.  I think

16     that's what I recall.  I don't know if that was everything he

17     said, but that's my memory.

18          I guess the only question for you is, do you agree

19     with him that remedy is needed, and if not, why?

20          THE WITNESS:  I don't agree that the narrative is

21     needed because there are, on the current form and the monthly

22     activity reports, there are both qualitative items, I believe

23     that there were 16 of those, and there are behavioral -- there

24     are quantitative items, and there are 12 of those.  And the

25     officers distribute their activity based on the numbers.

D5H8FLO1                          Stewart - direct

1          They also have in the far left-hand column --

2               THE COURT:  Can we put one of these up?

3               THE WITNESS:  That will probably be helpful.

4               THE COURT:  That will be helpful for me to follow what

5     you're saying.

6     Q.  Were you talking about the police officer's monthly

7     conditions impact reports?

8     A.  Yes.  Because that serves as one of the inputs to the

9     annual evaluation.

10              THE COURT:  This is the form you were just describing

11    or not?

12              THE WITNESS:  Yes, it is.

13              THE COURT:  It is.  OK.

14              MR. KUNZ:  Just for the record, we are looking at

15    Bates stamp number ending in 5289.

16              THE COURT:  It would be better to know the exhibit

17    number.

18              MR. KUNZ:  It's from 307.

19              THE COURT:  Let's see the actual words.  It looks

20    good.  So it says overtime, directed patrol, vertical patrol,

21    radio runs, etc., etc.

22              THE WITNESS:  Those are just merely -- they track the

23    activity, the numbers in that one, and principally what the

24    objection is that there was an overemphasis on the numbers.

25              THE COURT:  All those columns are filled out by

D5H8FLO1                          Stewart - direct

1   numbers.  Can you scroll down right through accident, domestic,

2   field report?  All those titles, one would put a number in,

3   right?

4           THE WITNESS:  That's right.

5           THE COURT:  Did you want to show him more of the form,

6   like the back or below this chart?  He started to want to make

7   comments I thought --

8           THE WITNESS:  I think this is the wrong form.

9           THE COURT:  I think so too.  You're thinking about the

10  one where everybody gets a 3.

11          MR. CHARNEY:  Are we talking the monthly?

12          THE COURT:  He would like to see the one where there

13  is like 28 different boxes to check in and the ones I have seen

14  everybody gets 3.  Can I see one of those?

15          MR. KUNZ:  C10.

16          THE COURT:  Did you mean that one?

17          THE WITNESS:  Yes, I did.

18          THE COURT:  OK.  Let's talk about that form.

19          There are 28 different boxes, do you see that?

20          MR. CHARNEY:  The problem that we have with this

21  testimony is that Professor Walker didn't testify about this

22  evaluation.

23          THE COURT:  That's OK.

24          MR. KUNZ:  I showed this evaluation to Walker.

25          THE COURT:  He is testifying as to why he doesn't

D5H8FLO1                        Stewart – direct

1    think Professor Walker's remedy is necessary, and he needs to

2    rely on the forms that support his opinion.  This is one of

3    them.  It doesn't matter whether Walker testified to it.

4          Anyway, this one has 12 performance areas and then 16

5    behavioral dimensions.

6          MR. CHARNEY:  We have another objection.  His opinion

7    about performance review was confined to the monthly report we

8    were just looking at.  He doesn't opine on the annual

9    evaluations in his report.  We don't know what that opinion is.

10   Today is the first time we are hearing it.  He talks about the

11   monthly in detail, which is what Professor Walker also talked

12   about.

13         THE COURT:  And what we just saw a minute ago?

14         MR. CHARNEY:  Yes.  He did talk about that in detail.

15   So I was anticipating we were going to have questions about

16   that.

17         MR. KUNZ:  We do have questions about that.

18         THE COURT:  I know.  That's fine.  But Mr. Charney is

19   saying there was no opinion in the report about the annual

20   evaluation.

21         MR. CHARNEY:  In Mr. Stewart's report there is not.

22         MR. KUNZ:  This exact exhibit was shown to Mr. Walker.

23         THE COURT:  That's not his point.  Mr. Charney is

24   saying nowhere in Director Stewart's report is there an opinion

25   about this form.

D5H8FLO1                        Stewart - direct

1              MR. KUNZ:  That's not true.  He absolutely talks about

2     it in paragraph 15.

3              THE COURT:  You have got to get together.

4              MR. CHARNEY:  I will take a look.

5              MR. KUNZ:  Page 8.

6              MR. CHARNEY:  OK.  Again, the reason I am unclear is

7     this entire paragraph, the citation for it, is a conversation

8     with the commanding officer of the department of personnel.

9     There is no citation to this document in any way.

10             THE COURT:  What does it say?

11             MR. KUNZ:  "Sergeants prepare annual performance

12    evaluations based on 28 factors, 12 of which" --

13             THE COURT:  That's enough.  He does mention it.  So

14    that supports his opinion.  Go ahead.

15             We are back to the 28 factors.  Why does this make

16    Professor Walker's proposed remedy unnecessary?

17             THE WITNESS:  Because it talks about such things as,

18    for instance, in number 18, it talks about problem recognition;

19    in number 16 it talks about reasoning ability; communication

20    skills is 15.  It talks about police ethics and integrity in

21    13; it talks about judgment on 22.

22             THE COURT:  Let me interrupt you.  I think what

23    Professor Walker said is that's the difference again between

24    policy and operational.  The form may look good, but in fact

25    it's too easy for the evaluator to simply put a 3 in every box,

D5H8FLO1                              Stewart - direct

1    and there may be no thought or review of the officer's

2    performance because all you do is put a number in every box.

3                Do you have a response to that criticism?

4                THE WITNESS:  That's a problem with all forms, and

5    that cuts to the care that the lieutenants spend observing the

6    sergeants, and comparing the sergeant's performance evaluation

7    of their individual officers with the lieutenant's knowledge of

8    the individual officers, based on things like complaints, based

9    on things like decline from prosecution, based on -- the

10   complaints from the community talk to communication skills,

11   talk to the judgment of the officer, talk to adaptability,

12   those kinds of issues.

13               There are places where this system is in place that

14   actually looks at qualitative issues as well as quantitative

15   issues.  The sergeants have completed these where they do talk

16   about the officer's judgment in addition to --

17               THE COURT:  You mean in the narrative?

18               THE WITNESS:  In a narrative form.

19               THE COURT:  There is a portion that allows room for

20   narrative.

21               THE WITNESS:  Now, in this one, this example, I think

22   that it could use more detail because it uses summary

23   statements.  Nonetheless --

24               THE COURT:  You mean the form could use more detail or

25   this reviewer?

D5H8FLO1                          Stewart - direct

1          THE WITNESS:  This reviewer could use more detail.

2     For instance, Police Officer Serrano adheres to the ethics of

3     the department and guidelines.  I would like to see an example

4     of that.  The department is moving towards that.  Clearly, the

5     officers are adding more detail.

6          MR. CHARNEY:  Objection.  I don't know what that is

7     based on.  The department is moving towards that?

8          THE COURT:  What is that based on?

9          THE WITNESS:  That's based on statements by Donna

10    Jones and --

11         MR. CHARNEY:  Has never been called as a witness,

12    never been deposed as a witness.

13         THE COURT:  I have to strike that part.  But that's

14    OK.

15         Are you done with this form yet?

16         THE WITNESS:  I am.

17         THE COURT:  Do you have any more questions about this

18    form?

19         MR. KUNZ:  Just on the striking of that testimony, the

20    expert is allowed to rely on hearsay statements.

21         THE COURT:  So long as it's disclosed.  I am sure that

22    this interview with Donna Jones --

23         MR. CHARNEY:  Never disclosed.

24         MR. KUNZ:  It's cited in his report.

25         MR. CHARNEY:  It just says conversation with.

D5H8FLO1                        Stewart - direct

1          THE COURT:  It has to state what the opinion is, what

2     he is relying on.  You can't just say conversations with Donna

3     Jones and nobody knows what they are.  I am not going to allow

4     the statement of Donna Jones.

5          In any event, he is still giving us plenty about this

6     form.

7          Is there anything more that you want to give us about

8     this form?

9          THE WITNESS:  That it meets the standards of

10    professional evaluation of major city police departments.  Many

11    departments do not have a form that includes these kinds of

12    qualitative issues.

13         MS. PATEL:  Objection.

14         THE COURT:  I will allow it.

15         MR. CHARNEY:  It's not in that report.  None of that

16    stuff about big city departments, what they have or don't have,

17    is in his report.

18         THE COURT:  Now are you done with this form?

19         MR. KUNZ:  I think that is all I need on this form.

20         THE COURT:  Then I have a question that I thought of

21    overnight.

22         Yesterday you said one reason you felt comfortable

23    about the level of supervision is that you went out on a couple

24    of rides yourself and you observed things, right?  Do you

25    remember that?

D5H8FLO1                          Stewart - direct

1           THE WITNESS:  Yes, I do.

2           THE COURT:  I thought it was once.  Then you said it

3   was twice.  And you went and you observed two or three

4   occasions.  Do you think that your presence there could have

5   affected that behavior?

6           THE WITNESS:  I have thought about that myself.  I

7   said, gee whiz, maybe they set this up.

8           THE COURT:  They know I'm here though.

9           THE WITNESS:  There is an artifact that occurs when

10   you have an external observer that enters in whether you are

11   observing laboratory specimens or whether you're observing

12   human conduct.

13           THE COURT:  Absolutely.

14           THE WITNESS:  When you have teachers who are teaching

15   classrooms and the observer comes in and sits down, it does

16   change the performance.

17           THE COURT:  One of the great examples of the debate is

18   cameras in the courtroom.  One of the arguments against is it

19   will affect the behavior of the court or the witnesses if they

20   know that they are being taped.

21           THE WITNESS:  I am aware of that.  I didn't go out on

22   just two runs.  We covered about --

23           THE COURT:  Whatever it was.

24           THE WITNESS:  Like 14 or 15.

25           THE COURT:  I didn't think you said that.

D5H8FLO1                          Stewart - direct

1                    THE WITNESS:  I didn't.  I was party and participated

2        in two separate arrest incidents.

3                    THE COURT:  That's what you said.

4                    THE WITNESS:  But we had a lot of ride-alongs, and we

5        did a lot of patrols.  When we got out of the cars, we walked

6        and observed the interactions of the officers in the community.

7        I don't think the community -- they didn't say, oh, we are

8        waiting for you to come here.  So what my sense with the

9        community was spontaneous.

10                   THE COURT:  But the officers knew you were there.

11                   THE WITNESS:  That's right.

12                   THE COURT:  How many stops did you actually observe,

13       that is reasonable suspicion stops?

14                   THE WITNESS:  We observed two.  I observed two.

15                   THE COURT:  That's what I thought.

16                   THE WITNESS:  Which both led to arrests.

17                   THE COURT:  I understand.  Both times the officers

18       knew you were there?

19                   THE WITNESS:  They knew I was there, right.  I didn't

20       try to be undercover.

21                   I was impressed with what appeared to be the natural

22       routine of things.  That the female sergeant that came up the

23       first time, she was all about business, and it impressed me

24       with the professionalism that she had.

25                   THE COURT:  All I am trying to say is she knew you

```
 1    were there.

 2    BY MR. KUNZ:

 3    Q.  So Professor Walker talked quite a bit about the monthly

 4    conditions impact reports.  Again, this is from 307.  It's

 5    Bates stamped number ending in 5289.

 6              Part of Professor Walker's criticism of this report

 7    was that it tracked numbers on it.

 8              In your experience, does this form need to be remedied

 9    or do you have an opinion on the need for a remedy in regard to

10    this form?

11    A.  This form is actually a step above other police agencies,

12    and I think it follows -- what it says is that you engage in

13    certain activities that correspond to having some impact on

14    line 1 and 2.  That those lines 1 and 2 are items that the

15    officer -- remember, we looked at problem solving, problem

16    identification in the annual --

17              THE COURT:  I'm sorry.  I don't know what you mean by

18    line 1 and 2.

19              THE WITNESS:  In the left-hand column -- I'm sorry.

20    They say 1, 2; 1, 2; 1, 2.

21              THE COURT:  I don't know what you mean.

22              THE WITNESS:  Where he is pointing with the pen.

23              THE COURT:  I forgot what those 1, 2 are.

24              THE WITNESS:  Those 1, 2 are indicating that the

25    conditions have been identified by the officers as specific
```

D5H8FLO1                            Stewart - direct

1    crime conditions or community conditions, quality of life

2    issues, that they are going to focus their tour of duty on,

3    their monthly tour.

4          So they are to select -- Operations Order 52 asked

5    them to identify.  So they asked them to be aware of what is

6    going on in the community.  They asked them to interact and to

7    have community interaction to identify specific issues that

8    they are going to work on that contribute to crime and quality

9    of life.  These officers then nominate these.  They put them

10   down.  The sergeant agrees to them.  Then the officer ties all

11   of his self-initiated activity to ameliorating or impacting

12   these two conditions on the report.

13         THE COURT:  On this particular example, how come there

14   is no Y or M circled anywhere?

15         THE WITNESS:  I don't know.

16         THE COURT:  So again, we may have a disconnect between

17   the form and the appropriate way of completing it, which the

18   witnesses have used the word here operational as opposed to

19   policy.  So the policy looks good to you?

20         THE WITNESS:  Policy looks excellent to me.

21         THE COURT:  But the operational may need improvement?

22   We don't know.

23         THE WITNESS:  We don't know.  Because on this form, on

24   the front I thought it was incomplete.  I thought they could

25   have put more into it.  I think that that's a supervision

D5H8FLO1                           Stewart - direct

1    problem.  But on the back, it says, officer took initiative in

2    correcting conditions, and he gets a rating, the sergeant signs

3    it, and then there is a comment box on here, an additional

4    comment --

5              THE COURT:  Can I see the form?  Did the person get 1,

6    2 or 3?

7              MR. KUNZ:  I believe this is from January, and I

8    believe the quarterlies are March, June, September and

9    December.

10             THE COURT:  The other side still should have been

11   filled out.

12             MR. CHARNEY:  In the interest of time, we had Deputy

13   Commissioner Beirne testify at length about this document and

14   how it works.  Again, I think we are intermingling liability

15   and remedy as well as fact and opinion witness.  They had a

16   30(b)(6) witness talk all about how this form works and what

17   it's supposed to measure and how supervisors are supposed to

18   fill it out.

19             THE COURT:  That's really not what this witness is

20   saying.  He is saying the reason he disagrees with Professor

21   Walker is he finds the form adequate if it's completed in an

22   accurate way.  If the supervisors are using it appropriately,

23   he thinks it's an appropriate form.  That's how I take his

24   opinion.

25   BY MR. KUNZ:

D5H8FLO1                         Stewart - direct

1   Q.   Director, could you tell the Court the differences between

2   performance goals and quotas?

3   A.   Yes.  A quota is a piecemeal that says you have to be able

4   to produce this single item or dozens of these single items in

5   a certain period of time in order to be paid.  A performance

6   goal is an overall expectation that you will have -- you will

7   use your time, your resources, to address specific issues and

8   you will show activities or something towards those general

9   goals.

10           THE COURT:  But dealing with the performance goals,

11   this might be used by a superior in evaluating performance of

12   an officer?

13           THE WITNESS:  Absolutely.  That's the intention.

14           THE COURT:  A meeting of the goal or a failure to meet

15   the goal could be part of the evaluation?

16           THE WITNESS:  It should be part of the evaluation.  In

17   my estimation, the department is asking for compliance from all

18   of its subordinates to achieve certain goals, and that's what

19   they should be focused on.

20   Q.   That was actually my next question.  What is the purpose of

21   setting performance goals?

22   A.   Setting performance goals is to ensure that the resources

23   are being channeled and being addressed to the areas in which

24   the strategic plan and mission of the agency is.

25   Q.   Do you believe that performance goals are a necessary part

D5H8FLO1                          Stewart - direct

 1    of monitoring and supervision?

 2    A.   Absolutely.

 3    Q.   Could you tell the Court a little bit about why you believe

 4    that?

 5    A.   In policing, there are disincentives to engaging in some

 6    activities, because they are dangerous, they are in unsterile

 7    conditions and chaotic conditions, and the officers may not

 8    engage in that but yet spend their time on random patrol.  They

 9    are not out there doing what the department wants them to do,

10    but they do show up and they show up in uniform.

11              The reason that you need to be able to have

12    supervision and you have to count the activities is to ensure

13    that those officers do respond, as I talked about in Chicago

14    and other places, they do respond to the calls for assistance

15    of help, they do address the community issues, and that they

16    are careful in ensuring that they adhere to the rule of law,

17    that they follow constitutional compliance, and that they

18    follow the rules, regulations, procedures and policies of the

19    department when they are carrying that out.

20    Q.   My next question was, in your work in helping to reform the

21    Chicago and D.C. police departments, did your work there

22    involve performance goals?

23    A.   Yes.  And also the enforcement of performance goals.  The

24    performance goals in the past had been not followed and the

25    officers were not responding to the calls in the community and

D5H8FLO1                          Stewart - direct

1    addressing the conditions of crime and violence.

2    Q.  Now, we spoke a little bit -- we started to speak about

3    this morning Professor Walker's opinion of the need for a

4    narrative section on the UF-250 form?

5    A.  Yes.

6    Q.  Are you familiar with the NYPD's UF-250 form?

7    A.  I have reviewed it.

8    Q.  What is your understanding of the purpose of the form?

9    A.  The purpose of the form is to track officer activity

10   regarding pedestrian stops, vehicle stops and the activities

11   regarding to stop, question and frisk.

12   Q.  Now, in discussing supervisory review, Mr. Walker has

13   recommended -- Professor Walker has recommended that the UF-250

14   form be changed to include a narrative portion.  Do you agree?

15   A.  I don't agree.

16   Q.  Why not?

17   A.  Narrative forms have a series of difficulties with them,

18   mainly that they can be illegible, that they suffer from having

19   rote language --

20              MR. CHARNEY:  Objection.  This is not in the report.

21   This is definitely not in his report.

22              THE COURT:  Mr. Kunz, there was plenty of time to

23   address UF-250s in this report.  Is it there or not?

24              MR. CHARNEY:  There is something about a tear-off

25   form, but I didn't see anything about a narrative or the

D5H8FLO1                          Stewart - direct

1    problems he sees with the narrative form.

2            MR. KUNZ:  I believe that there are discussions about

3    his opinion of the narrative form.

4            THE COURT:  Would you try to locate it, please?

5            MR. KUNZ:  Yes, your Honor.

6            The other thing I would observe here is that Professor

7    Walker discussed this at length.

8            MR. CHARNEY:  It was in his report.

9            THE COURT:  Right.  I understand Professor Walker

10   discussed this.  I also understand that Director Stewart had

11   access to Professor Walker's report when he prepared his

12   report.  So of course he understood that 250s were at issue.

13   If he wanted to give an opinion, that was the time to give it.

14           All sides understood that experts were limited to

15   their report.  It's either there or it's not.  If it's not, I

16   am not going to take his views on the 250 form.

17           MR. KUNZ:  I believe in Professor Walker's report, he

18   does mention conclusorily that he believes a narrative form

19   should be included, but I don't think he went into nearly as

20   much detail --

21           THE COURT:  He gave the opinion that a narrative

22   should be used in tracking stop and frisks.  That is the

23   opinion.  So he was allowed to explain the basis of his

24   opinion.  But this opinion that narratives are inappropriate is

25   not in Director Stewart's report.

D5H8FLO1                          Stewart - direct

1            MR. KUNZ:  I will just need a second here.  I believe

2       it is.

3            MS. PATEL:  Paragraph 16 of Stewart's report, but it

4       just refers back to, the current form and the current system is

5       sufficient, which again is liability testimony consistent with

6       yesterday's ruling.

7            MR. KUNZ:  Here it is.  Director Stewart on page 9 of

8       his report does say, "Walker is also critical of the UF-250

9       form because he states the lack of room for a narrative

10      prevents officers' supervisors from fully and accurately

11      reviewing the officer's rationale for a stop."

12           Then he goes on to explain how in his view that

13      this --

14           MR. CHARNEY:  We should read the first sentence.

15           THE COURT:  Of course you should read it.

16           MR. KUNZ:  "A holistic review of NYPD guidance and

17      policy and SQF documentation obviates his critique because,

18      whether or not there is adequate space on the UF-250 form

19      itself, officers have a separate requirement to describe the

20      circumstances leading to a stop in their activity logs."

21           THE COURT:  That's fine.  He can give that opinion.

22           MR. CHARNEY:  He didn't say anything about the problem

23      with them.

24           THE COURT:  I understand, Mr. Charney.

25           It's your opinion that there doesn't need to be a

D5H8FLO1                         Stewart - direct

1    fuller narrative on the 250 because that fuller narrative will

2    appear in the memo book if the officer is doing it

3    appropriately?

4              THE WITNESS:  That's right.

5              MR. KUNZ:  We will continue to look, your Honor,

6    because I do believe there are other references.

7              THE COURT:  That's fine.

8    Q.  Can you tell the Court generally what are some of the

9    strengths with a check box format?

10   A.  Yes, I can.  The check box format is concise, it's quick to

11   do, it lays out a format for the officers to follow to guide

12   them in terms of constitutional appropriateness of the action.

13   It can be quickly reviewed by the supervisor.

14             MR. CHARNEY:  Objection.  Move to strike.

15             THE COURT:  Can I tell you something, Mr. Charney?

16   It's getting dragged out.  There are certain things that the

17   Court knows from experience.  I know the handwriting is

18   illegible for example.  I suspect that if I had to read the

19   handwriting of all ten of you, seven of them would be illegible

20   for me where I would have to work very hard to figure out what

21   your hand wrote.  I don't need an expert to tell me that

22   handwriting is often illegible.  Nor do I need an expert to

23   tell me that it's easier to check boxes, it's fast.  Common

24   sense tells me it's fast.  So I just wouldn't be so excited

25   about testimony that's pretty commonsensical.  It doesn't take

D5H8FLO1                          Stewart - direct

1    the designing of a rocket, a rocket scientist to know that a

2    check box could be completed quickly.

3              MR. CHARNEY:  Understood.  But in the interest of

4    time, if it's not assisting your Honor --

5              THE COURT:  That's true too.  But it's taking more

6    time to discuss the objection than to listen that check boxes

7    are easily completed.  I understand that.

8              Also, common sense tells me, if you're going to make a

9    database, it's very easy to count check box answers.  That's

10   common sense.

11             THE WITNESS:  And that they are easy to code.

12             THE COURT:  That's what I just said.  I didn't say it

13   as well.  I said it's easy to create a database from check

14   boxes.  That's what I meant.  It's easily coded.

15   BY MR. KUNZ:

16   Q.  So one of Professor Walker's opinions in his report and in

17   his testimony was that community input is necessary for the

18   NYPD, a court monitor, and the court to develop an effective

19   plan for reforming the NYPD?

20             THE COURT:  You put a lot into that.  Did you mix up

21   two things, community input and a court monitor?

22             MR. KUNZ:  I was quoting from Professor Walker.

23             THE COURT:  Is that two or one?

24             MR. KUNZ:  He said community input is necessary for

25   the NYPD, a court monitor, and the court to consider.

D5H8FLO1                          Stewart – direct

1          THE COURT:  That the court monitor and the court

2     should have the benefit of the community input?

3          MR. KUNZ:  Right.

4          THE COURT:  That's an opinion he gave as to remedy.

5     If there is court monitor or if the court is doing monitoring,

6     either way, they would benefit from community input.  That was

7     Professor Walker's opinion.

8          Now, what do you want to ask this witness?

9     Q.  Do you agree with that assessment?

10    A.  Yes.  But it's compounded.  There's two parts to that

11    assessment.

12    Q.  Tell the Court a little bit about what you mean by that.

13    A.  Much of the issues that are at stake here are highly

14    technical and the community are not constitutional scholars.

15    They don't understand management principles.  There is a lot of

16    operational requirements, tactical requirements, etc.  Those

17    are more appropriately reserved to experts, police experts,

18    constitutional experts, like that.  I don't think the community

19    can function appropriately in that.

20          However, the community has a role in monitoring and

21    providing feedback.  The community can say, I'm not sure what's

22    going on here, it may be legal, it may not be, but I don't like

23    it.  And I think that that's something that the top command

24    needs to be able to hear and to either educate the community or

25    to make some changes in the policy.

D5H8FLO1                          Stewart - direct

1          So the community input ultimately helps the police

2     because the police rely on the community to be stakeholders.

3     They need them to be co-producers of security and safety in

4     their community, help control disorder and those issues, so

5     that any kind of intervention ought to involve the community.

6     But there are very technical aspects to this, that the

7     community is inappropriate and it would be confusing to have

8     their input on those things.  So I think that's why I said it

9     needed to be separated.

10    Q.  Thank you.

11         Another topic that was discussed at length with

12    Professor Walker was his opinion that a court appointed monitor

13    is necessary to implement reforms in this case.  Are you

14    familiar with court appointed monitors and the role they play

15    in reforming police departments?

16    A.  I am.

17    Q.  How did you gain this experience?

18    A.  I gained this experience through my work with police

19    departments, the Department Of Justice civil rights division,

20    and consulting with some court monitors.

21    Q.  What is your opinion of Mr. Walker's recommendation that

22    the court appoint a monitor in this case?

23    A.  In this case, I don't think it rises to the level of

24    requiring a court monitor and there are a number of downsides

25    to a court monitor that ought to be considered.

1            THE COURT:  You want him to explain what these

2   downsides are?

3            MR. KUNZ:  I do.  I was just trying to think if there

4   was another thing I wanted before we got into that.

5   Q.  If a department does need to implement reforms, what would

6   be an example of an alternative to a court appointed monitor?

7   A.  The Department of Justice, its civil rights division, and

8   the community policing services office has used an alternative

9   with the Las Vegas police department.

10  Q.  In that example with the Las Vegas police department, which

11  I want to talk about in more detail later, was the change

12  organic from the inside as opposed to from the outside?

13  A.  It was.  It relied on the independent action of the police

14  department, supplemented by technical assistance that they did

15  not have, and also a series of analyses that were conducted on

16  the department.

17           THE COURT:  By outside consultants?

18           THE WITNESS:  By outside -- actually, by myself,

19  that's right.

20  Q.  Now, could you help explain to the Court what are some

21  downsides that you see in a court appointed monitor?

22  A.  Some of the downsides are that they --

23           MR. CHARNEY:  Objection.  Move to strike.  It's not in

24  the report.

25           THE COURT:  There is nothing in the report --

D5H8FLO1                              Stewart - direct

```
 1              MR. CHARNEY:  About the downsides.

 2              THE COURT:  Does he comment on the recommendation of

 3    appointing a court monitor?

 4              MR. CHARNEY:  There are discussions, but the only

 5    discussion about it is that the problems in New York are not as

 6    widespread or as serious as in other cities.

 7              THE COURT:  He doesn't explain why?

 8              MR. CHARNEY:  He doesn't explain the downsides.

 9              THE COURT:  Of using a court monitor.

10              MR. CHARNEY:  Yes.

11              THE COURT:  So his opinion in his report says what?

12              MR. CHARNEY:  They don't need one because the problems

13    in New York are not as bad as in other cities that have had

14    monitors.

15              MR. KUNZ:  In his discussion of the court appointed

16    monitors that have been imposed in other cities, he explains

17    why he doesn't think they apply and what their downsides are.

18              MR. CHARNEY:  Where does he discuss downsides?

19              THE COURT:  Why don't we look right at it?  It's

20    really easier.

21              MR. KUNZ:  For example, in paragraph 42 --

22              MR. CHARNEY:  What page?

23              MR. KUNZ:  27.  He cites to several different police

24    departments that have had consent decrees and outside monitors

25    and have been reformed.  Then in the following pages he goes
```

D5H8FLO1                          Stewart - direct

1    into detail about Los Angeles police department and the

2    problems there, the Seattle police department, and the problems

3    there.

4              THE COURT:  Does that explain the problems caused by

5    the appointment of a court monitor?

6              MR. KUNZ:  He talks about the difficulties that those

7    cities faced under the supervision of a court monitor.

8              THE COURT:  Let's read it right from the report then.

9    Just read it slowly into the record.  If you think that that's

10   the opinion he gave about the downsides of using a court

11   monitor, go ahead and read it.

12             MR. KUNZ:  I will go to page 28, paragraph B.

13             THE COURT:  I'm sorry.  Paragraph 28, paragraph what?

14             MR. KUNZ:  B as in boy.  From paragraph 42, page 28,

15   subparagraph B as in boy.

16             "The consent decree with the Seattle police department

17   primarily focused on rampant use of force issues, not the

18   constitutionality of stops.  In addition to the incongruity in

19   the subject matter and scope between the SPD consent decree and

20   the remedies requested in this case, the SPD consent decree was

21   necessary to address --"

22             THE COURT:  So far you haven't mentioned a thing about

23   why it's difficult to have court monitors, why there is

24   downsides to having court monitors.  You are just

25   distinguishing why one might have been needed there but not

D5H8FLO1                         Stewart - direct

here, which really isn't the question you asked him.  You said,

Why would there be downsides to using a court monitor in New

York?  And I would like to hear that, if he gave that opinion.

Unfortunately, if he didn't, he can't add a new opinion now.

Both sides have played by the same rules and you have objected

vigorously when any question was asked of an expert that wasn't

found in the report.

          MS. GROSSMAN:  I think I remember, but yesterday when

Professor Walker testified, there were times when he supported

his opinion based on his personal experience.

          THE COURT:  That's different.  The opinion was there.

I need to find the opinion that putting in a court monitor

would be a negative here.  As I said, I actually would have

liked to have known that.  But if it's not in the report, it's

not appropriate.  I have held both sides carefully to opinions

expressed in the report.  If it's nowhere there, if he doesn't

tell me here is why it would be detrimental for you to take

that step, it would actually be a negative, that I would like

to hear, but I can't if he didn't give that opinion.

          MR. KUNZ:  The problem is that his opinion here is

interwoven throughout his report.

          THE COURT:  His opinion seems to be why one isn't

necessary.  It's distinguished from other police departments

that had other issues like abuse of force, not stop and frisk.

I understand that.  So he would say there is no need for a

D5H8FLO1                         Stewart - direct

 1    monitor.  But that wasn't the question you asked.  You said,

 2    what would be the downsides of appointing a monitor?  That's

 3    what I won't take because it's not in the report.

 4             MS. GROSSMAN:  Your Honor, I would just say on

 5    paragraph 41, for example, in a different section of the report

 6    which addresses concerns about de-policing --

 7             THE COURT:  What is de-policing?

 8             MR. KUNZ:  De-policing is the concept that --

 9             THE COURT:  You shouldn't tell me.  If you want to ask

10    him what the word de-policing is, he is your expert, not you.

11    Go be a policeman for a few years and come back.

12             What is de-policing?

13             THE WITNESS:  De-policing is when police officers,

14    like in Chicago, do not go in and do not answer the calls, and

15    they can do that for a variety reasons.  One of the reasons is

16    resistance to outside change, resistance to departmental

17    policies that they don't agree with or that they have informal

18    organizational rules and values that are opposed to it, that

19    their own history of the department is engaged in insularity

20    and a strong sense of separation from the community.

21             THE COURT:  Where did this term come from you?

22             THE WITNESS:  It's not me.  But it has come from --

23    there was a couple of reasons why.  De-policing came because

24    some of the officers were restricted.  I think it came, quite

25    frankly, under the Miranda results and under Mapp v. Ohio,

D5H8FLO1                         Stewart - direct

1   there was speculation that when the police are handcuffing they

2   won't be able to do that.

3           I don't agree that that occurred.  I think that

4   because of those court cases that the policing is much more

5   professional today.  But there are distinct de-policing issues

6   that are attached to consent decrees.

7           THE COURT:  My only question is, do you know where the

8   term originated from?

9           THE WITNESS:  It was the idea you want your police to

10  be in the community.

11          THE COURT:  You don't know where the term originated

12  from?

13          THE WITNESS:  Not exactly.

14          MS. GROSSMAN:  My point is that in the section of the

15  report that deals with that particular issue, the statement

16  from Mr. Stewart is that Walker cites the general decrease in

17  crime in Los Angeles and Washington, D.C. during the period of

18  the respective consent decrees as proof that a consent decree

19  would not result in de-policing.  And then our expert goes on

20  to say, however, an analysis of the rates of violent crime in

21  those two cities, in addition to the rate in Cincinnati between

22  2002 and 2007, both operated under a consent decree.  And our

23  expert has an opinion about the consent decree's effect.

24          MR. CHARNEY:  It's not in this report.

25          THE COURT:  That doesn't relate to a monitor.  It

D5H8FLO1                          Stewart - direct

1    relates to the entire consent decree from what you're

2    proffering.  The question is, what is the impact of a consent

3    decree given the experience in some other city.  That's still

4    not this question about what are the downsides of appointing a

5    monitor.

6           I have heard enough to know I am sustaining objection

7    to what are the downsides of appointing a monitor.  It wasn't

8    even addressed in the report.

9    BY MR. KUNZ:

10   Q.  You worked personally in the Oakland police department, is

11   that correct?

12   A.  I did.

13   Q.  Then in your consulting work you have also gone back and

14   done consulting work for the Oakland police department?

15   A.  I have.

16   Q.  In your consulting work, can you describe to the Court a

17   little bit about the consulting work you did in the Oakland

18   police department and what brought you there?

19   A.  They asked me to look at ways to improve the functioning

20   and the effectiveness of the inspector general that was

21   established as a result of the monitors and the consent decree.

22          THE COURT:  Can I interrupt?

23          When was this, roughly, the date?

24          THE WITNESS:  I think 2010.

25   Q.  What reforms were going on in Oakland at the time that you

D5H8FLO1                              Stewart – direct

1    came in in 2010?

2    A.   The reforms were that the officers had to complete stop

3    forms that could be coded and checked and followed, that there

4    was training underway, that they had to check in and check out

5    the number of tear gas canisters that were issued.  There was a

6    whole catalogue of items, and that the Oakland police

7    department had a very spotty record of achieving those and

8    showing that they were in compliance, and they asked me if

9    there was a way they could improve their system to record

10   compliance in a much more effective way that would represent

11   the progress that had been underway.

12   Q.   Now, at the point that you came in in 2010, was Oakland

13   under a consent decree?

14   A.   Yes, it was.

15   Q.   How long had it been under that consent decree?

16   A.   I believe it was under the consent decree for five or six

17   years at that time.

18   Q.   Was part of the reason you were brought in to help

19   implement the changes?

20   A.   Yes, it was.  Because the monitors had had a difficult

21   experience in terms of getting compliance.  Most of

22   the -- there was a very strong resistance in the Oakland police

23   department towards just even recording anything about the stops

24   in terms of ethnicity.  There was not strong compliance and

25   there was not much discipline and there was people not being

D5H8FLO1                          Stewart - direct

1   held accountable.

2   Q.  So what did you do to help them get in compliance with the

3   consent decree?

4   A.  I interviewed the officers.  I talked to the unions.  I met

5   with community people.  I talked to the command group.  I

6   examined the procedures that they had.  I made a series of

7   recommendations that they needed to change the procedures.

8   Effectively, their inspectors were also the same people

9   responsible for carrying out the tasks.  I said that had to be

10  changed because it was a built in conflict of interest.  And I

11  issued a report that had a series of changes for that.  And one

12  of the difficulties that was occurring is that the monitors

13  themselves only came in to the city once -- they only had a

14  meeting once a month, and so they were unaware of how the

15  department operated, and the activities in which the department

16  was engaged in, and they had difficulty identifying how to

17  remove the roadblocks that were stopping the effectiveness of

18  the inspections.

19  Q.  Now, was part of your work in Oakland bringing the Oakland

20  supervisors into the reform process?

21  A.  Yes, it was.

22  Q.  Tell the Court a little bit about that.

23  A.  The supervisors were not being held responsible and did not

24  follow their officers, essentially gave them passing grades

25  when they weren't in compliance.  They did not -- many times

D5H8FLO1                          Stewart – direct

1    they were not on the street with the officers.  One of my

2    recommendations was to have the lieutenants actually on the

3    streets and engaged personally in spot checks.

4              (Continued on next page)

D5h9flo2                          Stewart - direct

1    Q.  Now how many -- do you know how many monitors, how many

2    individual monitors were in place in Oakland?

3    A.  There were three.

4    Q.  And why did -- in your opinion why did Oakland go through

5    three different monitors?

6    A.  Oh, no.  That's a different question.  I'm sorry.  I was

7    thinking how many were on that team.

8           But they have gone through three different sets of

9    monitors and three chiefs of police over a period of eleven

10   years.  And they're now into a unique situation where that

11   the -- that city has just had to hire because of the federal

12   court -- excuse me, the Superior Court for a compliance

13   director because of the lack of performance by the City of

14   Oakland.

15   Q.  And did you form an assessment about why the monitoring

16   process in place in Oakland?

17          MR. CHARNEY:  Not in the report, your Honor.

18          MR. KUNZ:  He does talk about Oakland in his report.

19          THE COURT:  I've heard a lot about Oakland.  I

20   probably don't need this opinion.

21          MR. CHARNEY:  He also doesn't give his opinion as to

22   why it didn't work.  That's not in the report.

23          THE COURT:  I understand.

24          MR. KUNZ:  Your Honor has to eventually think -- may

25   have to eventually think about remedies.  And I would think

D5h9flo2                          Stewart - direct

1    that, as Mr. Moore made the argument when we first got into

2    these experts in the first place, that the Court would benefit

3    from expertise.

4              THE COURT:  I understand.

5              All I'm asking that it be in the report.  I can't

6    start fresh today with opinions that weren't in the report.

7    It's an objection that you've made repeatedly when plaintiffs'

8    expert has been on the stand.  You've held them strictly and

9    effectively to their opinions in the report, Mr. Kunz.  So I

10   have to stick with that.

11             But he's given me a good picture, I think, of Oakland.

12   I pretty well get it, I think.

13             I think overall he's sort of saying it didn't work.

14   They had to replace the monitors so often and the compliance

15   was so poor.

16             Anyway, you've also gone 45 minutes.  Do you have much

17   more, Mr. Kunz?  Because I'm really --

18             MR. KUNZ:  I'll speed along, your Honor.

19             THE COURT:  I gave everybody two hours and there's

20   going to be no time left.

21             MR. KUNZ:  Yes, your Honor.

22   Q.  So Professor Walker opined -- talked about some of the

23   specific factors that the Court should consider in determining

24   if a court-appointed monitor is necessary, one of those factors

25   being whether or not the department is resistant to change, if

D5h9flo2                          Stewart - direct

1   the department is resistant to outside oversight, and if the

2   department is unable to work with the community.

3           Generally speaking, do you agree that those factors

4   should be considered?

5   A.   Yes.  I think those factors should be considered and

6   there's probably other factors that should be considered as

7   well.

8   Q.   What are some of the other factors that you think --

9   A.   Such as the ability to implement the rule of law.  The

10   ability to control the police department in terms of achieving

11   strategic goals.  The ability to work with the community in

12   terms of partnerships.

13           MR. KUNZ:  Now, your Honor, just one more point on

14   this issue is that Director Stewart absolutely said in his

15   report that he did not think a monitor is needed.

16           MR. CHARNEY:  Generally.

17           THE COURT:  What are you saying?

18           MR. CHARNEY:  I'm saying he says that generally.  But

19   then the only opinion he gives -- the only specificity he gives

20   is this department, the problems here are not as extensive as,

21   and he lists a few other departments.

22           MR. KUNZ:  Experts should be allowed to talk about the

23   basis of their opinion.

24           THE COURT:  Would you please stop lecturing me as to

25   what they should or shouldn't be able to do.  Just ask your

D5h9flo2                              Stewart – direct

1    questions and I'll rule on objections.  Thank you.

2         The question is:  Do you think a monitor should be

3    appointed here?  Apparently, you opined on that in your report.

4         THE WITNESS:  In this particular case, I think it's

5    premature.  I think it would be inappropriate to appoint a

6    monitor at this time.

7         THE COURT:  When you say premature, what do you mean

8    by that?  Because for your testimony and the testimony of

9    Professor Walker, you're assuming for the moment that liability

10   is found.  This is solely remedy.  So you have to assume that,

11   even though I understand you don't want to.

12        THE WITNESS:  Yes, your Honor.

13        THE COURT:  Let's assume you didn't mean that by

14   premature, there is no finding, did you?

15        THE WITNESS:  No.

16        I meant that the department is making progress in a

17   variety of fronts in terms of their policy changes, in terms of

18   meeting with the community, in terms of their training.  They

19   have made extraordinary changes in the last two years.  They

20   are making progress that, in other departments, there was no

21   progress being made at all.

22        THE COURT:  When you say extraordinary, what are a

23   couple of examples of extraordinary progress?

24        THE WITNESS:  Extraordinary would be that they retrain

25   14,000 officers.  That requires a big effort.

D5h9flo2                          Stewart - direct

 1              THE COURT:  We can leave it at that.  Training is one

 2   example of extraordinary.

 3              What else?

 4              THE WITNESS:  That they have an entire bureau devoted

 5   to community affairs.

 6              THE COURT:  Is that new in the last couple years?

 7              THE WITNESS:  It's new since 2006.

 8              THE COURT:  Seven years.

 9              THE WITNESS:  It's grown from -- I think in 1996 is

10   when they started.  That's the first time they had a community

11   affairs division.  So they have -- they've done it.

12              And they've appointed the chief of department from the

13   community affairs bureau.

14              THE COURT:  What does that mean?

15              THE WITNESS:  That means that the person in community

16   affairs is considered to be very important for the way the

17   department conducts its business.

18              MR. KUNZ:  Chief Banks, the new chief of the

19   department.

20              THE COURT:  Came from?  Is that what your saying?

21              THE WITNESS:  Yes.

22              THE COURT:  That was his immediate prior post.

23              THE WITNESS:  Right.  And usually you appoint the

24   chief of department from places like patrol and operational

25   bureau.  So this is a major change.

D5h9flo2                         Stewart - direct

```
 1                THE COURT:  Okay.
 2    Q.  So in your opinion in what types of cases is a
 3    court-appointed monitor appropriate?
 4    A.  I think as a last resort.  I think it's where the
 5    departments have shown --
 6                THE COURT:  I'm going to allow this, Mr. Charney.
 7    Please be seated.
 8                THE WITNESS:  It's where departments have shown an
 9    inability like, for instance, New Orleans is a good example.
10    There are others that are also a good example.  To bring
11    constitutional law to the streets of the cities.  And to be in
12    the communities and operate under the rule of law.  I think
13    where there's corruption.  I also think that where there is
14    rampant and use of force that is illegal and improper and that
15    the department has refused to take action, like in Las Vegas.
16                There are a whole series of things to which, yes, I
17    think as a last resort.  But the reason I say that is because
18    consent decrees are very slow to really make any change, and
19    the changes typically are unstainable.  And so it's better to
20    get the changes to come in the department where the consent
21    decree is held in abeyance as a possibility for future
22    enforcement if they don't --
23                MR. CHARNEY:  Your Honor --
24                THE COURT:  A consent decree by definition is with the
25    consent of the department.  That's not imposed by a Court.
```

D5h9flo2                          Stewart - direct

 1    That's on consent.  The two sides negotiate a settlement, a

 2    decree together.  So that's not the Court ordering anything.

 3              THE WITNESS:  The departments themselves view them as

 4    an imposition, direct imposition.

 5              THE COURT:  I guess that opinion isn't there.

 6              MR. CHARNEY:  That and also the opinion about being

 7    slow and taking too long.  None of that's in his report.

 8              THE COURT:  Certainly going to strike only the last

 9    part, that departments view them.  It's interesting.  But it's

10    not in the report.

11              But I get the point that you don't -- you think the

12    word consent is a little misleading, the word consent as part

13    of consent decree.

14              MR. CHARNEY:  But I also took issue with the opinion

15    that consent decrees take too long to implement and the reform

16    is slow.  That's not in his report anywhere.

17              I'm sorry for making the same objections over and over

18    again but this is the problem.

19              THE COURT:  It's fair to point out what is or isn't in

20    the report.  However, I could if I wanted to take judicial

21    notice some consent decrees around the country go on for 20

22    years.

23              MR. CHARNEY:  That's true.

24              THE COURT:  Courts are still running the California

25    prisons as far as I know.

D5h9flo2                          Stewart - direct

 1              MR. CHARNEY:  And the Oakland police department.

 2    Q.  So moving on to an area that absolutely is in your report

 3    which is namely in your experience can procedures used in one

 4    police department be copied and used to reform a different

 5    police department?

 6    A.  There are occasions when there's a fit.  But each

 7    department is different and it has a different context of

 8    operating.  And there are instances where they've taken the

 9    remedies of one consent decree and put them in another place

10    where they have not worked at all.

11    Q.  So, now in your report you talk about some of the

12    differences between some cities that are under consent decrees

13    and sometimes court monitoring and the situation here in

14    New York.

15              So I want to ask you specifically about in the case of

16    L.A.P.D.  Could you explain why you think that the L.A.P.D.

17    situation is different than the situation here in New York

18    City?

19    A.  It was borne out of a case of corruption from the Rampart

20    division.  And they recommended that they create as a remedy

21    the early intervention system; that they also put in place an

22    incident -- a whole system that revises the way you document

23    incidents and you review those incidents.  It also required an

24    independent -- I mean a new independent auditing system as an

25    example.

 1          Those systems exist currently in the City of New York.

 2     They did not exist in L.A.  L.A. did not do anything that

 3     resembled that and required this kind of sweeping change.

 4     Q.  How about the Seattle police department?  Could you tell

 5     the court what differences you see between the situation in

 6     Seattle and the situation here in New York City?

 7     A.  The Seattle police department was based on rampant force.

 8          MR. CHARNEY:  I'm not going to object to him talking

 9     about Seattle, but to the extent he is then going to talk about

10     New York.  Your Honor has heard eight weeks of testimony on

11     what's done here.  I have no problem with him telling us what

12     happened in L.A., what happened in Seattle.  But then to come

13     back and say New York has these things, I think that's

14     completely inappropriate.  It goes to liability.  And your

15     Honor has already heard that.

16          THE COURT:  I've got a bigger worry.  It's now 20 of

17     twelve.  You told me 45 minutes.  I'm going to have to cut off

18     direct.  I can't have a permanent trial.  I've told everybody

19     it was 10:30 to 12:30.  We weren't even supposed to be here

20     Thursday and Friday.  If you want to go on talking about

21     Seattle --

22          MR. KUNZ:  No, your Honor.  I would like to use my

23     last five or ten minutes.

24          THE COURT:  I'm not giving you ten minutes.  I can't

25     give you ten minutes.  There are limits in life.  I told

D5h9flo2                          Stewart – direct

1    everybody yesterday 10:30 or 12:30.  We used up the first

2    fifteen minutes talking about exhibit numbers.  Not a wise

3    decision.

4              MR. KUNZ:  Setting aside what's going on in Seattle.

5    Q.  I'd like you to tell the court a little bit about the

6    collaborative reform process in Las Vegas and anything from

7    that process that you think is relevant to the Court in

8    considering remedies in this case.

9    A.  The Las Vegas police department was the subject of a news

10   story, a five-part news story that exhibited the use of -- the

11   police officers shooting suspects at a higher levels than any

12   place else in the country or major cities.  And the NAACP and

13   the ACLU filed a patterns and practices complaint with the U.S.

14   Attorney and asked the Civil Rights Division to conduct an

15   independent investigation.

16             The Department of Justice, through the cops office,

17   for reasons that -- for policy reasons wanted to try a

18   different kind of way that would be more -- what they felt

19   might be more effective in terms of speeding it up in getting

20   change where a department is willing to make sweeping changes

21   according to an outside expert.  So the department had to say

22   we're willing to make these changes or changes to correct the

23   problem of excessive shootings.

24             So we provided technical assistance in terms of -- we

25   met with communities and all these -- in addition, we did a

D5h9flo2                          Stewart - direct

1   quick analysis.  We were able to present the evidence to the

2   police department.

3         And the two contentions that were the most serious was

4   the community basically said that in 20 years there has never

5   been a finding by the police department that an officer did

6   anything wrong.  They also complained about the coroner's jury

7   and the fact that the D.A. never issued a letter of declination

8   or issued a criminal file.  So that was the problem.

9         Serious and sweeping.  The quick fix, which took us

10  about six months to begin to start to get done, was that the

11  department, when they had their shooting boards where they

12  reviewed the circumstances of the shooting, they used to look

13  at it as either justifiable or nonjustifiable at the time the

14  weapon was discharged.

15        I was able to point out that that was an inappropriate

16  way of looking at it.  That was a decision that should be made

17  by the district attorney and the courts.  And what should be

18  made by the department is whether it's following the policies

19  the tactics, the training, and the judgment of the police

20  department in terms of were they following their own

21  procedures.

22        We were able to get that change made.  And for the

23  first time in 20 years they convened -- they changed the way

24  that they looked at it.  And they found two officers out of

25  compliance.  Only they changed it from out of compliance to

D5h9flo2                          Stewart - direct

1    call it departmental disapproval.

2    Q.  Not to cut you off.  We have a time constraint here so I

3    just want to ask a quick follow-up question, yeah, which is

4    that --

5    A.  It made a difference right away.

6    Q.  In your opinion, was that sort of -- were the reforms in

7    Las Vegas effective at getting change?

8    A.  Yes, they were.

9    Q.  How long did it take?

10   A.  It took seven months.  And now we're into a period of just

11   documenting the changes.  And we're ready to issue the first

12   six-month report in June.

13   Q.  So in your opinion is that sort of model of inside change

14   better than in some cases than outside court-appointed

15   monitoring change?

16   A.  Yes, I am.  And Professor Walker was quoted in the

17   newspaper as also agreeing with it.

18              MR. CHARNEY:  Your Honor, I think the question was --

19              THE COURT:  You mean there?

20              THE WITNESS:  Yes.  There.  Quoted --

21              THE COURT:  There in that context.

22              THE WITNESS:  There in that context he thought this

23   was the way to go.

24              MR. CHARNEY:  I don't have any problem with

25   Mr. Stewart's testimony.  I think the question mischaracterizes

D5h9f1o2                      Stewart - direct

1    his testimony.  He didn't talk about inside change.  He talked

2    about collaborative change.  He talked about his organization

3    working with the Las Vegas police department.

4              THE COURT:  You're certainly not a member of the

5    police department?

6              THE WITNESS:  That's exactly right.

7              THE COURT:  You were an outside consultant.

8              THE WITNESS:  What we did is we helped the department

9    to make the change.

10              THE COURT:  I understand.

11              THE WITNESS:  We didn't mandate the change.  But we

12   made it inevitable that the change had to happen.

13              MR. KUNZ:  So two final issues here, your Honor.  We

14   would like you to reconsider your decision not to allow the

15   director here to talk about some of the downsides of a monitor.

16              THE COURT:  I can't do that.  I told you candidly that

17   I'd be interested in it, but I can't do it.  I can't have a new

18   opinion added during testimony that's not in the report.  Both

19   sides have made that objection repeatedly and I've upheld it.

20   I said where is that in the report.

21              MR. KUNZ:  I totally understand it.

22              THE COURT:  You spent time looking for it.  You said

23   you would continue to look and all of that.  I'll let you read

24   into the record anything you find that says that.  Whether he's

25   here or not you can read it from the report.

D5h9flo2                         Stewart - direct

1            MR. KUNZ:  In the interest of time then, we initially

2       objected to the admission of these expert reports because we

3       wanted to do it through live testimony but since we're in this

4       situation we would withdraw our objection to Mr. Walker's

5       report in exchange of putting in --

6            THE COURT:  You can talk to the plaintiffs about that.

7       If you both agree --

8            MR. CHARNEY:  No, we don't agree.

9            THE COURT:  Well, you think about it.

10           Anyway, are we ready for the cross?  It's only fair.

11      I mean I'm going to stop at 12:30.

12           MR. KUNZ:  Yes, your Honor.  One second.

13           (Pause)

14           MR. KUNZ:  So my last area, your Honor, in fashioning

15      a remedy is the risk that changes could cause de-policing.  Is

16      that something that the Court should consider in fashioning a

17      remedy?

18           THE WITNESS:  Yes.

19           THE COURT:  Thank you.  Now, Mr. Charney.

20           I think we need to go on.  I understand the list of

21      things I should consider.  Okay.

22      CROSS-EXAMINATION

23      BY MR. CHARNEY:

24      Q.  Good morning, Director.

25      A.  Good morning.

D5h9flo2                          Stewart - cross

1    Q.  You stated that you did some work with the Oakland police

2    department while it was under consent decree?

3    A.  Yes, I did.

4    Q.  Is that the portion of your CV that talks about the police

5    use of lethal force in Oakland?

6              THE COURT:  Of what?

7              MR. CHARNEY:  Police use of lethal force.  It's on

8    page -- the page number at the bottom is 38.

9              THE COURT:  Okay.  I'm turning to 38 also.

10             Do you see where it says police use of lethal force?

11   You see it, though, don't you?

12             THE WITNESS:  I don't have it.

13             THE COURT:  You don't have the exhibit in front of

14   you?

15             MR. CHARNEY:  Is this the work you did in Oakland?  Is

16   this the description you did right here?

17             THE WITNESS:  No.  That is not the description.

18   Q.  So this is a separate --

19   A.  I'm sorry.  You're exactly right.

20             They had a series of shootings that they have asked me

21   to come in to chair to be the board that investigated it and

22   make some recommendations, which we did.

23             THE COURT:  But that's not what you're referring to?

24             THE WITNESS:  That's right.

25             THE COURT:  What are you referring to in Oakland?  Is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D5h9flo2                          Stewart - cross

1   that on the resume?

2           MR. CHARNEY:  I didn't see it.

3           THE COURT:  Maybe it's not on the resume.  I don't

4   know.

5           Here you go.

6           MR. CHARNEY:  This is a summary of your experience.

7           THE COURT:  I gave it to him.  If he finds it, that's

8   fine.

9   Q.  Now you said that you have -- do I have it right that in

10  preparation for your testimony today and yesterday you reviewed

11  a few of the consent decrees in other police pattern and

12  practices cases; is that right?

13  A.  Yes, sir.

14  Q.  So you reviewed Cincinnati, correct?

15  A.  Briefly.

16  Q.  You reviewed --

17  A.  Seattle, Portland, Los Angeles, Cincinnati, New Orleans.

18  Q.  Let me just list them off.  You tell me if I've missed any.

19  Cincinnati, Los Angeles, Portland, Seattle, and New Orleans,

20  right?

21  A.  I think that's right.  You know, I've looked at others.

22  But, yes.

23  Q.  Have you ever reviewed the one for the New Jersey state

24  police?

25  A.  No, I have not.

D5h9flo2                         Stewart - cross

1    Q.  And you're aware that that case dealt primarily with

2    allegations of racially biased traffic stops, right?

3    A.  Yes.

4    Q.  And you're aware that in that case there was a monitor

5    appointed?

6    A.  Yes.

7    Q.  Have you ever reviewed the consent decree that was signed

8    in 2011 in the class action lawsuit challenging stop and frisk

9    in Philadelphia Police Department?

10   A.  I think I did some time ago, but.

11   Q.  Are you aware that in that case a monitor was also

12   appointed?

13   A.  Yes, I am.

14   Q.  Are you aware that that case, like New York, was actually a

15   second class action lawsuit challenging stop and frisk

16   following a prior one from the late 1990s?

17   A.  Yes.

18   Q.  And am I correct that you've actually never done research

19   on how the consent decrees in New Jersey or Philadelphia turned

20   out?

21   A.  I have not done it.  I'm familiar with some research that

22   has to do with how they turned out.

23   Q.  Now Mr. Kunz asked you on direct about the monthly

24   conditions impact reports that the police department currently

25   uses, right?

D5h9flo2                          Stewart – cross

1    A.  Yes, sir.

2    Q.  And you said that this form does -- make sure I have your

3    testimony correct -- your testimony is that this form does

4    assess officer performance qualitatively?

5    A.  Is that the monthly activity report?

6    Q.  This is the one he showed you, right?  This one.

7    A.  That's the one that compares the activity with the

8    conditions on the beat.

9    Q.  Do you think that this form does measure officer

10   performance qualitatively?

11   A.  Let me see the back, please.

12         MS. GROSSMAN:  Can you show the bottom.

13         THE WITNESS:  The bottom of the back.

14         Those seven categories where it has additional

15   comments and etc. I do believe that that is the qualitative

16   aspects of -- what it does is it asks the supervisor, one,

17   whether the officer was effective.

18         You see up earlier it says the officer's impact was

19   whether it was effective or not.  Not just the amount of

20   activity he's written but whether it has anything to do with

21   the conditions -- the crime conditions and the quality of life

22   conditions.

23         And then he has a comment here that he can elaborate

24   on.

25         And then subsequently below, one through seven, has

D5h9flo2                          Stewart - cross

1    assessments of the quality of his work and the quality of his

2    conduct as a police officer.  So it's qualitative.

3    Q.  So your testimony is that it is these dimensions here are

4    the ones that assess the quality of the officer's work?

5    A.  And the effectiveness up above.

6    Q.  So you're saying this also assesses the quality of his

7    work?

8    A.  Yes.

9              THE COURT:  I'm sorry.  This for the record is where

10   it says --

11             MR. CHARNEY:  I'm sorry.  Where it says officer's

12   impact on declared conditions.

13             THE WITNESS:  He has to say whether it's effective or

14   ineffective.  And then describe what he thinks -- what the

15   sergeant's opinion of that effectiveness is, and then below,

16   yes.

17             THE COURT:  Can you read what it says actually

18   anybody?

19             THE WITNESS:  It looks like it says the officer is

20   advised to address the conditions better, I think is what it

21   says.  You have to slip it over so we can read it.

22             THE COURT:  I don't think so.  I'm talking about right

23   under effective and ineffective, the two boxes.  What is under

24   that?

25             MS. PATEL:  Comments.  Describe in detail why --

D5h9flo2                         Stewart - cross

1           MR. CHARNEY:  -- member of service was effective or

2     ineffective.

3           The comment here is officer advised to address

4     conditions better.

5           THE COURT:  Right.

6           MR. CHARNEY:  Is it your testimony that that is an

7     assessment, a sufficient assessment of the qualitative nature

8     of the officer's performance.

9           THE WITNESS:  I think that is a qualitative

10     assessment.  And the question is whether it's sufficient.

11           I would prefer to see some additional, you know,

12     description.  But I don't know the customs and the issues, the

13     way that the New York police department does it.

14           But the sergeant is familiar -- see, that's what the

15     deal is.  The sergeant knows what the officer is doing.  So he

16     doesn't have to or she doesn't have to put down the full story.

17           And the lieutenant who supervises the sergeant is also

18     aware of the conditions because he talks to the community, like

19     that.

20           So to focus only on the words does not pick up the

21     whole picture.

22           THE COURT:  Can I ask somebody to read what's to the

23     right of the 1, 2, 3, if anybody can.

24           MR. CHARNEY:  It says questions one to five.  And then

25     it says -- explains what the one, two, three means.  One means

D5h9flo2                         Stewart - cross

1    below standard.  Two means competent.  And three means above

2    standard.

3              THE COURT:  Thank you.

4              MR. CHARNEY:  I don't know what happens with number

5    six -- number six says that -- the one means no and the two

6    means yes.

7              THE COURT:  Thank you.

8    Q.  Now director are you aware -- I think you reviewed in

9    your -- listed in Exhibit B to your report, you reviewed the

10   guidelines for how supervisors are supposed to fill out this

11   form.

12   A.  I did.

13   Q.  So you're aware that they are supposed to use the

14   information that's on the form as the basis for this evaluation

15   of the officer's impact on declared conditions?

16   A.  Yes.

17   Q.  But you would agree with me that the information on the

18   form is numbers, right?  And there's not -- there's nothing

19   else.  Just numbers and a list of crime conditions, right?

20   A.  Well a list of both crime conditions and -- I thought it

21   was supposed to also include conditions -- quality of life

22   conditions as well.

23   Q.  By that you just mean what's written in these column --

24   A.  That's right.

25              But it's part of a process that the sergeant is

D5h9flo2                          Stewart - cross

1   engaged, and the officer has to do some analysis to come up

2   with what he's going to put in.  That's what the system says.

3   Q.  I'm going to show you another example.  This has been

4   previously admitted into evidence as Plaintiffs' Exhibit 236.

5   I'm going to show you Bates number NYC_2_21252?

6            THE COURT:  Is this from exhibit what?

7            MR. CHARNEY:  This is an exhibit that was admitted

8   through Commissioner Beirne.

9            THE COURT:  Anybody know the exhibit number?

10           MR. CHARNEY:  236.

11           MR. KUNZ:  What page?

12           MR. CHARNEY:  21252.

13           This is a monthly report for an officer from the

14  anticrime unit in the 107 precinct for March 2012, right?

15           THE WITNESS:  Right.

16  Q.  And, again, you see --

17  A.  The anticrime unit does a functionally different job than a

18  patrol officer does.

19  Q.  I understand.

20  A.  Okay.  Good.  Thank you.

21  Q.  But, again, on this form the officer is again writing down

22  in numerical fashion the different categories in enforcement

23  activity he or she took in the month, right?

24  A.  Right.

25  Q.  And then on the left-hand side they're writing the

D5h9flo2                          Stewart – cross

1    conditions that they were trying to address with that

2    enforcement activity, right?

3    A.  Yes, sir.

4    Q.  And then going to the second page I want to look at the

5    comment which you said is a qualitative -- it's supposed to be

6    a qualitative assessment of their performance.

7           Do you see here where it says officer's impact on

8    declared conditions and it says -- it says police officer did

9    not have an arrest for the month, although he did have 17

10   UF 250s in target locations.

11          Do you see that?

12   A.  Yes, I do.

13   Q.  Do you consider that to be a sufficiently qualitative

14   assessment of the officer's performance?

15   A.  No, I don't.

16   Q.  And then this form actually does have the quarterly review

17   because this is from March.  So we actually have this portion

18   filled out here.

19          And if you see here -- so we have some twos circled

20   for some of the dimensions.  We have some threes circled.  And

21   then there's an additional comment there.  And it says police

22   officer overall activity is consistent with the rest of his

23   team.

24          Do you see that?

25   A.  Yes, I do.

D5h9flo2                          Stewart - cross

1   Q.  So that, again, is just an assessment of the level of

2   enforcement activity he engaged in, right?

3   A.  I believe that it is.  I don't know because I haven't

4   talked to them.

5          They may talk about activity in broader terms.  They

6   may talk in activity of the engagement with the community,

7   ability to get information from the public and to get

8   cooperation.

9          I don't know fully.  But it appears to be that is

10   saying that it follows the peers in terms of the amount of work

11   that that officer is doing.

12   Q.  So would you interpret this as the supervisor of this team

13   looking at the activity numbers of all the people on the team

14   and then making an assessment:  It looks like this person is on

15   level with them or below or above?

16   A.  I would say it looks like he's on level with them, but he

17   does say at the bottom he doesn't perform to the highest, what

18   does it say, the highest quality.

19          MR. MOORE:  Potential.

20          THE WITNESS:  Potential, thank you.

21          And it says something here, I don't -- I can't read

22   the bottom, which talks about the difficulty with reading it.

23          MR. CHARNEY:  I understand.

24          THE WITNESS:  There too.

25   Q.  I guess another question I have is:  Isn't, again, the

D5h9flo2                        Stewart – cross

basis for these quarterly reviews would be the three months

worth of these monthly impact reports, right?  That would be

the basis of information that the supervisor would use?

A.  I believe that's one of the bases -- according to the

training literature and the guidance, it's one of the factors

that they're supposed to do.

They also have to use direct observation.  They have

training that goes into this.  They have a whole series of

things that are in addition.  So it's not just limited to the

monthly activity report.

Q.  Well let me ask you this.

A.  Yes, sir.

Q.  You said you've reviewed some of the procedures and

policies that the sergeants are trained on when they fill out

these monthly and quarterly reviews.

You'd agree that those training materials don't say

anything about a sergeant assessing the constitutionality or

legality of the officer's enforcement action, right?

A.  I'm -- I don't recall specifically whether it addresses

that in that specific location.  However, when I was reviewing

the material I was quite frankly impressed that they had

written language that was emphasized by italics and in bold

that they have to articulate the reasonable suspicion for the

stop, they should follow that.

The largest part of the field training guide for which

D5h9flo2                          Stewart - cross

1    the sergeants are responsible goes to constitutionality.  It is

2    embedded in virtually -- sorry.

3              MR. CHARNEY:  No, I understand.  I think we might be

4    talking about two different things.

5              THE WITNESS:  Okay.

6    Q.  I'm not talking about the field training manual which I

7    know you reviewed.

8              I'm talking about the training materials for sergeants

9    on these new monthly conditions reports and how to evaluate

10   officer performance.

11             You've reviewed those materials?

12   A.  I have.

13   Q.  And wouldn't you agree with me that in those materials

14   there is no discussion of officers evaluating the

15   constitutionality of officer enforcement action, right?

16   A.  There was one place -- and I can't point to it -- but I

17   recall seeing one place, it says the officer -- the sergeant

18   should use the comment box to indicate that he is being -- what

19   is that -- that he's following the constitutional requirements

20   and permissible -- or constitutional requirements for the stop

21   and frisks.

22             MR. CHARNEY:  You're saying that that's in the

23   training for sergeants on how to evaluate officer performance?

24   Actually let me show this to you.  This is Exhibit --

25             THE WITNESS:  I think it was.  That's what I'm saying.

D5h9flo2                              Stewart – cross

 1              THE COURT:  You're about to state for the record what

 2    you're showing him.

 3              MR. CHARNEY:  I want to show the witness what's been

 4    marked as Exhibit 240.

 5              THE WITNESS:  Okay.

 6    Q.  Is this the training material for sergeants on how to do

 7    these evaluations that you've looked at?

 8    A.  It seems familiar to me.

 9    Q.  Okay.

10              Is it your testimony that somewhere in there there's a

11    discussion of using the comment box to describe or to assess

12    officer constitutional behavior?

13    A.  No.  I don't see it here.

14              "We emphasize do not use quotas," etc. but it does

15    not, that I can see.

16              But I do remember something about the sergeants should

17    use the comments box in which to put that in.  And that may be

18    some recent training.

19              MR. CHARNEY:  Your Honor, we would move to admit

20    Plaintiffs' Exhibit 240.

21              MR. KUNZ:  So, we object to this unless the plaintiffs

22    also agree to admit A4, which is the sergeant's performance

23    evaluation guide that I believe the confusion before was the

24    director was talking about that guide and not the one that

25    Mr. Charney --

D5h9flo2                        Stewart – cross

 1           MR. CHARNEY:  Well the reason we object to that, your

 2    Honor, is that guide refers to how sergeants -- first of all,

 3    it's evaluating sergeant performance.  And it talks about

 4    sergeants doing the annual evaluation.

 5           THE COURT:  I don't think it's a basis for an

 6    objection to say unless I get what I want, I object.

 7           You have to give me a basis for the objection to the

 8    proposed exhibit.  What's the objection to the proposed

 9    exhibit?

10           MR. KUNZ:  It doesn't provide the full context of the

11    material.

12           THE COURT:  That's not so.  The other form apparently

13    is a guide to evaluating sergeants.  This is a guide to

14    evaluating police officers.  So they are apples and oranges.

15           MR. KUNZ:  I don't believe they are.

16           THE COURT:  I'm admitting this one.  I don't find a

17    basis for an objection to it.  It's a city document.  It's

18    training material.  It talks about how to do evaluations.  It

19    sounds relevant.  It sounds admissible.

20           What's the number.

21           MR. CHARNEY:  240.

22           THE COURT:  240 is received.

23           (Plaintiffs' Exhibit 240 received in evidence)

24           MS. GROSSMAN:  Your Honor, the sergeants are evaluated

25    on how to evaluate their officers.  That's the point.

D5h9flo2                    Stewart - cross

1       THE COURT:  But the training is on how to evaluate

2   sergeants.

3       MR. CHARNEY:  The document they're talking about is a

4   guide on how to evaluate sergeant performance.

5       THE COURT:  I heard that.

6       MR. CHARNEY:  It's also from 1996.

7       THE COURT:  I've already ruled that 240 is received.

8   That's what's offered.  That's what's received.

9       MR. CHARNEY:  Okay.

10  Q.  Now -- I believe you did say in -- you did give the opinion

11  with respect to narratives -- a narrative 250 form, that you

12  think it's unnecessary, right?

13  A.  Yes.

14  Q.  And the reason you think it's unnecessary is because in

15  your view NYPD policy already requires officers to put details

16  in their memo books, right?

17  A.  That's one reason.

18  Q.  Now --

19  A.  I have others.

20  Q.  Would you agree with me that one thing that police officers

21  don't like to have to do is too much writing?

22  A.  They're not William Shakespeare.  That's right.  That's

23  universally that officers --

24      THE COURT:  I could take judicial notice of that.

25  Q.  Now you're aware that the current policy as of March 5 of

D5h9flo2                              Stewart - cross

this year requires officers to fill out a 250, write a very

detailed activity log entry, photocopy that activity log entry,

and then staple it -- staple that photocopy to the 250, right?

A.  Yes.  I just became aware of that, yes.  It's not in my

report but I am aware of it.

Q.  So based on your experience as a police officer and manager

and consultant and the fact that you just agreed with me that

officers don't like to write so much, wouldn't you agree that

having a narrative in one place would be a much more efficient

and effective way to document the stop than the numerous pieces

of paper that is now the current policy?

          MS. GROSSMAN:  Can you just read that question back.

I'm sorry.

          (Record read).

          THE WITNESS:  Am I waiting for anything?

          THE COURT:  No.

          THE WITNESS:  Okay.  We can play through.  All right.

          Basically I think that it's clunky.  I mean I could

agree with you that that's the case.  On the other hand, since

officers don't like to write, I still favor the checkboxes.

But they do have the -- since they have to keep it in two

places, I believe that the -- although I don't know what the

work flow is.

          THE COURT:  You don't know what?

          THE WITNESS:  What the work flow is, whether they fill

D5h9flo2                              Stewart - cross

1    out the memo book first.

2              THE COURT:  Funny, I asked that questions twice.  I

3    got two different answers on it.

4              THE WITNESS:  I mean I'm a little bit unsure of that.

5    But I will say that I -- I think it's cumbersome to do it in

6    two places.

7    Q.  Would you also agree that you at least have to have the

8    narrative detail in one place, right?  You've got to have it

9    somewhere, right?

10   A.  Not necessarily.  Because a stop is a very fleeting

11   engagement.  And the tracking of the stop was required because

12   of the ethnicity.  And that's included.  And they do establish

13   on the entire form a series of checkboxes which the officers

14   can check which describe the uniqueness of that particular

15   occurrence.

16             THE COURT:  So you don't think there needs to be a

17   narrative at all?

18             THE WITNESS:  That's right.

19             THE COURT:  Okay.

20             THE WITNESS:  For the use of the form.  As a tracking

21   device for the ethnicity and of the officers, you know, the

22   stop, to get the memos.  I mean that was the intent of the

23   form.

24   Q.  Let me ask you this, Director.  Separate and apart from

25   using it for data analysis purposes, don't you think it's also

D5h9flo2                       Stewart - cross

1     important to document the stop to make sure that the officer

2     acted constitutionally and appropriately?

3     A.   I actually do think that's a good idea.  I would encourage

4     that.

5     Q.   Don't you need the narrative information to make that

6     assessment?

7     A.   Have you seen officers' narratives?  I have seen that

8     officers -- I've read lots of officers' narratives, a lot of

9     different departments.  So it's not just New York department.

10    They can be confusing.  They can lack the elements.  They --

11          THE COURT:  Well let me give you a very clear example

12    that I think came from Professor Walker but it may have come

13    from others.  One of the most commonly checked boxes is furtive

14    movement.

15          THE WITNESS:  I think that needs to be explained.

16          THE COURT:  I believe Professor Walker said that we

17    don't know whether that means looking over your shoulder a lot,

18    fingering your waistband a lot, whatever else it might be,

19    moving rapidly away from the police officer.  There are a lot

20    of different kinds of furtive movement.

21          Without some narrative, any reviewer is in the dark as

22    to what the furtive movement was.  So the sergeant or the

23    lieutenant can't evaluate that stop without knowing what the

24    furtive movement was.

25          So either Professor Walker or maybe even Chief Hall

D5h9flo2                          Stewart - cross

1     testified --

2             THE WITNESS:  Chief Hall did as well.

3             THE COURT:  Testified as to why there should be a

4     narrative about what that furtive movement was.

5             Do you agree now that a narrative is needed or are you

6     still comfortable with checkboxes only?

7             THE WITNESS:  I think that there was two checkboxes in

8     the UF 250 that have a small area for an additional.

9             THE COURT:  That's true.

10            THE WITNESS:  I think that you change the furtive

11    movement to do the same thing.  I am not -- the quality of the

12    narratives, you tend to fall into rote language.  This is what

13    the professor talked about.  You tend to end up with avoidance,

14    and the compliance goes down.  It takes more time.  So the

15    officers quit doing it.  And I saw a narrative, for instance,

16    from Philadelphia the other day.  Had two words in it.

17            THE COURT:  Let me interrupt.  That may be so, but it

18    would be less if you only had the box.  It's very easy to check

19    furtive movement, high crime area.  Those are the two we see

20    the most.  Talk about rote, that's easy to do too.

21            THE WITNESS:  In the narrative, they can say, and this

22    happens to testimony all the time.  High crime area.  Gang

23    activity.  Boom.  That's it.

24            So, it's harder to code.  And it's also harder on the

25    supervisor because the supervisor, instead of going through and

D5h9flo2                         Stewart - cross

1    quickly going through it, has to try to figure out what the

2    narrative is.

3              Now the supervisor's job ought to be to say:  Can you

4    describe to me the furtive movement?

5              THE COURT:  If you're sitting across the desk.

6              THE WITNESS:  Or if I look at the 250 and I see you're

7    my supervisor you say, you know, Chip, I heard on the radio you

8    have a UF 250 today and you haven't had one in two weeks.

9    Let's review it.

10             THE COURT:  And I think Professor Walker, again, said

11   if the reviewer has some questions or doubts about that stop he

12   should sit with the person and talk to them.

13             THE WITNESS:  Right.

14             THE COURT:  And you agree with that?

15             THE WITNESS:  I do.

16   BY MR. CHARNEY:

17   Q.  Now said that --

18   A.  But I also think that the narrative does not mean that

19   you're going to be able to have enough details to form a

20   conclusion.  I think -- it's not a panacea.  It's not a magic

21   pill.  I'm not opposed to narratives categorically.

22   Q.  You're aware that Philadelphia, which we mentioned earlier,

23   is under a consent decree that went into place in 2011

24   currently uses a narrative form for stop and frisk, right?

25   A.  Yes.  I saw an example of one or two.

D5h9flo2                          Stewart - cross

1   Q.  Did you hear yesterday during Professor Walker's testimony

2   the consent decree language from three very recent consent

3   decrees in New Orleans, Puerto Rico, and East Haven?

4   A.  I did.

5   Q.  They talked about how it's very important how not to use

6   canned or pat language?

7   A.  I did.

8   Q.  Are you concerned that having the checkboxes which use very

9   common terms such as furtive movements and suspicious bulge and

10  things like that, isn't that the kind of canned language

11  that -- in your view, is that the kind of canned language that

12  shouldn't be used?

13  A.  No.  I thought it was specific requirements in what would

14  constitute a constitutionally permissible stop.  And it said --

15  guided the officer that you need to have one or more of these

16  items in which -- you have factored into your decision to make

17  a stop.

18          And the difficulty with the -- one of the difficulties

19  with the rote language idea is how many ways can you describe a

20  bulge in your jacket?  I mean you can say that the outer

21  garment somehow has a curvation to it and the contour is

22  different.  Eventually after, I don't know how long, but after

23  trying to sit down at the table, we might come up with like ten

24  or fifteen different ways to say it, but then I'd have to go to

25  a thesaurus to beginning to figure out different and more

D5h9flo2                          Stewart - cross

1    unique ways to describe it.  Because what allows us to say that
2    there's suspicious conduct --
3              THE COURT:  Let me interrupt.  It might give us a
4    location.  It might say suspicious bulge in front pocket.
5    Suspicious bulge in back pocket.  Well back pockets maybe more
6    typically are wallets.
7              THE WITNESS:  And cellphones on the waist.
8              THE COURT:  For sure.  But it could at least give us
9    that information.
10              THE WITNESS:  Yes, it could.
11              MR. CHARNEY:  I'm going to move on in a second.  I
12    just want to ask one last question though.
13    Q.  Do you not believe that a term like furtive movements is
14    canned language, shorthand for a lot of different things?
15    A.  Furtive movement is a summary term and you may need to know
16    what sort of goes into the -- the conclusion that forms the
17    furtive movement.  I think that's a reasonable expectation.
18    However, police officers have to quickly work their way -- I
19    mean the police environment is not sterile.  It is a messy
20    chaotic and sometimes very dangerous environment.  And so the
21    police officers are -- it's a pretty frightening place to be
22    sometimes.  I mean you're essentially checking for weapons and
23    the suspect or the subject who is being stopped may not want to
24    give you the weapon because he knows he's going to jail and you
25    may end up getting killed.  That's a serious situation.  And as

D5h9flo2                        Stewart – cross

1   a result, the officers are very cautious when they're dealing

2   with that.

3           I think that the officers have to have an articulable

4   suspicion.  And I think that it needs to be recorded.  And I

5   think the checkboxes are the quickest, easiest way to do that.

6   I think a narrative of two or three lines would not ruin the

7   day for the officers.

8   Q.  Now I want to talk a little bit about your opinions about

9   monitors being the last resort.  And you said that when you

10  were asked to describe what you meant by that you talked about

11  how when a department is not making meaningful changes on its

12  own, right?

13          Is that your testimony?

14  A.  It characterizes my testimony.  Yes.

15  Q.  And you also said in the situation where a department is

16  resistant to efforts to changes that are coming from the

17  outside, right?

18  A.  Yes.

19  Q.  Are you aware that the NYPD has for the last

20  year-and-a-half been opposed to a bill in the city council that

21  would create an inspector general's office for the police

22  department?

23  A.  I think I've read an article in the New York Times about it

24  a while ago.

25  Q.  Does that change your opinion as to whether the NYPD is

D5h9flo2                         Stewart – cross

1    resistant to reforms to its practices?

2    A.  This is very complex.  Departments are a very complex

3    organisms.  I mean you have essentially a huge organization

4    that's here.  They may feel they're competent to make those

5    professional judgments.  And they may think that the additional

6    paperwork at the hearings that they do and the legal

7    confrontations may not be worth the benefit.  I'm not sure you

8    know what their thinking is.  But I think it deserves to be

9    investigated so that you understand it.

10          THE COURT:  Let me ask you one thing I don't know if

11   you know the answer.  Do you know an inspector general concept

12   would mean someone within the police department becomes the

13   inspector general or someone outside the department?

14          THE WITNESS:  In Oakland it was inside the department.

15          In many other cities it's outside.

16          THE COURT:  So it can be either?

17          THE WITNESS:  Yes.

18          THE COURT:  The phrase doesn't have one meaning?

19          THE WITNESS:  Right.  But in many places where there's

20   these accusations, that they would like to have it attached to

21   city hall or as an independent body.

22          THE COURT:  It could be either though?

23          THE WITNESS:  It could be either.

24   Q.  Are you familiar with -- on this same topic of resistance

25   to efforts to change from the outside, you're aware that the

D5h9flo2                         Stewart - cross

1   NYPD did commission that study from RAND, right?

2   A.  I am.

3          THE COURT:  You said did or didn't?

4          MR. CHARNEY:  Did.

5          THE COURT:  Go ahead.

6   Q.  Are you aware that one of RAND's recommendations was to

7   incorporate into their early warning system this benchmarking

8   analysis that would identify officers who may have over-stopped

9   pedestrians of certain race?

10         MS. GROSSMAN:  Your Honor, I would object to this

11  question and it's beyond the scope of all the reports.  And

12  we've been cabined in terms of what it is that the witness is

13  able to talk about and this is beyond anything.  This is

14  Walker --

15         THE COURT:  It's not beyond, because I think it has to

16  do with the topic of resistance to change, which he raised, and

17  which is being discussed.  And so he's going to say, simply

18  pose a question, say:  If you knew that the police department

19  didn't accept a recommendation in the RAND report to do X, Y,

20  Z, would that affect your opinion as to whether or not the

21  department is resistant to change.  That's all he's trying

22  to --

23         MS. GROSSMAN:  I think it's an unfair question because

24  the witness hasn't looked at the RAND report.

25         THE COURT:  He can state the recommendation.  If he

D5h9flo2                        Stewart - cross

 1    misstates it, that's a objection you can come up with.  It's

 2    right there.

 3              MS. GROSSMAN:  You know --

 4              THE COURT:  I'm allowing his question.  You can look

 5    at the recommendation and then the hypothetical is posed to

 6    you:  If you learned that the police department declined to

 7    accept this recommendation, would it change your opinion about

 8    whether or not this department was resistant to change?

 9              Could we get the recommendation on the screen?  Is it

10    possible?

11              MR. CHARNEY:  I know what page it is.  We just need

12    to -- do you want me to keep asking questions in the meantime?

13              THE COURT:  I think so.

14              MR. CHARNEY:  So we'll come back to that issue.

15              THE COURT:  As soon as it's on the screen.

16    Q.  So I want to ask you about Las Vegas.

17              Now, your work in Las Vegas, isn't it correct that the

18    Las Vegas police department agreed to have the Department of

19    Justice and your organization come in to help it implement

20    these reforms?

21    A.  Yes, it did.

22              And I did talk about willingness to accept that was an

23    important criteria.  There are some departments that say we

24    don't want anybody and we don't want to cooperate.  That was

25    not the case with Las Vegas.  They were very mature about it.

D5h9flo2                          Stewart - cross

1    Q.  So given that.  If you learned that the NYPD had refused

2    overtures to have outside experts come in to help reform its

3    stop-and-frisk practices, would that change your opinion about

4    whether a monitor was needed here?

5              THE COURT:  That's a hypothetical question.  Nobody is

6    asking you whether it's true or not true.

7              But if you were to learn that, as a hypothetical,

8    would that change your view as to whether or not they are

9    resistant to change?

10             THE WITNESS:  The question is what were the reasons

11   they were resistant to change.  It may be that they don't agree

12   with the assessment of the problem.

13             In our case, in Las Vegas, which is an actual case,

14   they did.

15             THE COURT:  I don't want to go back to Las Vegas.

16             I'm just saying if you were to learn hypothetically

17   that the New York police department declined -- I forgot,

18   Mr. Charney, declined an overture to do what?

19             MR. CHARNEY:  In other words, if there were overtures

20   from outside.

21             THE COURT:  Okay.

22             If you were to learn hypothetically that the New York

23   police department had declined to have expert assistance from

24   outside the department in certain areas, would that affect your

25   view about whether or not the department was resistant to

D5h9flo2                          Stewart - cross

1    change?

2             THE WITNESS:  I would say that the criteria was they

3    had to be willing to accept the technical assistance that's

4    offered.  And if they said that they weren't willing, and that

5    happened to come from the Department of Justice or it came --

6    that changes the tenor because if I was --

7             THE COURT:  That was his only question.  But it's

8    hypothetical.  I'm not asking you whether they did or didn't do

9    that.  But if you were to learn that.

10            THE WITNESS:  Right.

11            THE COURT:  Now we found it.

12            So there was a recommendation from RAND, which we can

13   see on the screen, that says "The NYPD should identify, flag

14   and investigate officers with out-of-the-ordinary stop

15   patterns."  That was the recommendation of an outside entity.

16            If you were to learn that the NYPD declined to

17   implement that particular recommendation, would it affect your

18   view as to whether or not the department was resistant to

19   change?

20            THE WITNESS:  I'd have to ask why they declined.  And

21   they may have reasonable, you know --

22            THE COURT:  So you can't answer whether it would

23   affect your view.

24            THE WITNESS:  Right.  I've only got a piece of the

25   problem.

1           THE COURT:  For sure.  I'm just saying you can't

2     answer whether it would affect your view as to their

3     willingness to accept change?

4           THE WITNESS:  That's right.  I do know --

5           THE COURT:  Okay.  That's your answer.  That's fine.

6           You can take that down.  Thank you.

7     Q.  Are you aware, Director, that prior to this trial

8     commencing the plaintiffs in this case proposed a collaborative

9     approach to trying to remedy the stop and frisk practices?

10          THE COURT:  It really wouldn't matter.  Your question

11    would be, it's a hypothetical question, if you were to learn.

12    That's the way it's to be phrased.  It's not important that he

13    knew or didn't know or heard or didn't hear.

14          If you were to learn that there was a proposal to sort

15    of sit at a table with lots of elements of people from the

16    communities, the plaintiffs' lawyers.

17          MR. CHARNEY:  Police union.

18          THE COURT:  The unions, a whole bunch of different

19    constituencies, and that was declined, would that affect your

20    view as to the department's willingness to accept change or to

21    interact with the community in furthering change?  That's the

22    only question.

23          THE WITNESS:  Again, I don't think there's enough -- I

24    don't have enough information about why they didn't want to do

25    that.  I just know that in other -- the willingness of the

D5h9flo2                              Stewart — cross

1   department was a factor.  And that was important in deciding

2   this.

3              THE COURT:  That's helpful.  Thank you.

4   Q.  So based on your experience in Las Vegas, would you agree

5   that a police department working collaboratively with outside

6   experts to address patterns of unconstitutional behavior is a

7   good approach to remedying that unconstitutional behavior?

8   A.  Yes, I would.

9   Q.  And would you agree that it's beneficial to bring in

10  outside expertise to help address police departments' patterns

11  of unconstitutional behavior?

12  A.  What we've done is we've reduced it to a really simple

13  equation.  And it's not that simple.  But what happens is the

14  departments a lot of times may not have the expertise and they

15  may need some technical assistance like body worn cameras is an

16  example and how much technology and where you store the

17  information and stuff like that.  They may not have it.  And

18  there may be other issues like psychological ideas about --

19              THE COURT:  What do you think of body worn cameras?

20              THE WITNESS:  I think it's a good idea.  We

21  recommended it in Las Vegas.  And we're doing it in Phoenix as

22  well.

23              THE COURT:  Thank you.

24  Q.  Couple more questions.

25  A.  But I have no opinion in this case with respect to body

D5h9flo2                          Stewart - cross

1    worn cameras.

2    Q.  With respect to community input and interaction between the

3    community and the police department, you agree -- and I think

4    you've written in some of your prior work -- that it's very

5    important for the police department's ability to successfully

6    do its job to maintain the trust of the community, right?

7    A.  Absolutely.

8            And, in fact, it's part of Robert Peel's principles

9    back in 1867 --

10   Q.  How did you --

11   A.  -- that way today.

12   Q.  Agreed.

13           And you've also described the community as an

14   important external partner in terms of working with the police

15   department to solve problems, right?

16   A.  That's right.

17           But police departments went through this phase of

18   professionalism back in the '60s where they said:  No, leave it

19   all to us.  And we found that that did not work well.  So

20   there's been an evolution of thinking amongst the police as

21   well regarding --

22   Q.  So given your belief, which I happen to agree with,

23   wouldn't it also be important then when a police department is

24   now tasked with reforming a particular practice that has been

25   found to be unconstitutional to involve the community as a

D5h9flo2                         Stewart - cross

1   partner in that reform?

2   A.  Well, two things.

3         One is that they currently are working like with the

4   safety and security task force here in the city.  I mean that

5   they are talking about reforms.

6         When you talk about the constitutional -- reforming

7   constitutional behavior, that is a fairly technical question

8   that resides in the law.  And I think you've said several times

9   as this case has been going on for --

10  Q.  Fourteen years.

11  A.  -- eight to ten weeks.  And we're deciding about whether

12  there's sufficient reason to stop.  I mean it's a complex legal

13  issue.

14  Q.  I understand.

15  A.  Well, the community I don't think has much that they can

16  say about that.  I think there's a lot of things they can talk

17  about.  They can talk about how they feel about the police in

18  the community and the qualities of the stops.

19        So I think it's fair that the community could be

20  involved in that aspect but not in the determination whether a

21  stop is constitutional or not.

22  Q.  Well I'm asking you about the remedies.  Because,

23  obviously, the person who gets to decide whether the stops are

24  constitutional or not is sitting next to you.

25        My question is once that's been decided and we're

D5h9flo2                        Stewart - cross

1  talking about the types of changes that have to be made and how

2  the police are conducting themselves, you don't think it's

3  important to involve the community --

4          THE COURT:  That would be mischaracterizing.  He did

5  say in terms of, for example, the conduct of the police, are

6  they polite, are they informative --

7          THE WITNESS:  Are they responsive.

8          THE COURT:  Yeah.  Do they tell the person why they're

9  stopped, are they rude.

10          THE WITNESS:  That's right.

11          THE COURT:  In those things, you feel the community

12  should have a role to play.

13          THE WITNESS:  Yes.

14          And they should be involved with the police in terms

15  of how -- what the priorities are in their particular

16  neighborhoods regarding the enforcement levels.

17  Q.  Now you've said you've reviewed the Cincinnati -- we'll

18  call it a consent decree but really it was called collaborative

19  agreement?

20  A.  It was.  I think there are two instances now.

21  Q.  You're aware that the collaborative agreement, the private

22  litigation that led to that was actually a litigation that was

23  challenging racial profiling on the part of the Cincinnati

24  police department, right?

25  A.  I believing that's the case, yes.

D5h9flo2                          Stewart – cross

1   Q.  Are you also familiar with the process that --

2   A.  There was also one that had to do with use of force.

3   Q.  Are you aware that the -- that the process which led to the

4   finalization of that collaborative agreement, are you familiar

5   with how that process worked?

6   A.  Only vaguely.

7   Q.  So are you aware that a component of that process was a

8   very structured court supervised process which actually

9   solicited community input into the development of the remedies

10  in that case?

11  A.  I'm not aware of that.

12          MR. CHARNEY:  One minute, your Honor.

13          THE COURT:  That's about what's left.

14  Q.  Last question.  So based on your experience in Las Vegas

15  and I guess Oakland and some other cities, do you agree that it

16  is a good idea for police departments to bring in outside

17  experts to help them address problems in particular policies or

18  practices that they have?

19  A.  I think where they have a specific issues where they have

20  gaps in their expertise, skills, and knowledge, I think it's a

21  good idea to have outside experts to come in that are qualified

22  that can help them.

23          I do think it's not the experts who make the change.

24  It's the police department that has to make the change.

25          THE COURT:  So the real final question is:  Will you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D5h9flo2                          Stewart - cross

1   accept the job if offered?  Yes or no?

2              THE WITNESS:  I think this is an important assignment.

3              THE COURT:  I see.

4              THE WITNESS:  I think it demands the best.

5              THE COURT:  I thought you said you were done.

6              MR. CHARNEY:  I have no more questions.  I have an

7   exhibit that I would like to offer.  It's another publicly

8   filed consent decree from Philadelphia.

9              THE COURT:  One more.  From yesterday, where we did

10  three.

11             MR. CHARNEY:  This would be four.

12             THE COURT:  I took those three.  I'll take this

13  fourth.  What's the exhibit number?

14             MR. CHARNEY:  582.

15             (Plaintiffs' Exhibit 582 received in evidence)

16             THE COURT:  Mr. Kunz, three minutes is all I have.

17  That's it.  If you have a few questions you want to ask on

18  redirect.

19  REDIRECT EXAMINATION

20  BY MR. KUNZ:

21  Q.  So, Director, on cross-examination you were asked if you

22  believe that the UF 250 form -- that supervisors should assess

23  whether or not officers had reasonable suspicion based on the

24  UF 250 form.

25             Do you remember being asked that question?

D5h9flo2                         Stewart – redirect

1    A.  Yes, I do.

2    Q.  In your expert opinion are there other ways that

3    supervisors can evaluate whether or not their subordinates have

4    reasonable suspicion for stops?

5    A.  Absolutely.  Direct observation, for example, talking to

6    the peers.  Also talking to the subjects that were stopped.  I

7    think those are all personal observations that need to be done.

8    Q.  Do supervisors need to do that for every single time that a

9    stop is conducted?

10   A.  No.  It's my experience that in most human organizations

11   that about 80 percent of the people perform competently; that

12   20 percent may have problems in terms of their ability to do

13   the job competently and need to have extra attention and extra

14   help and extra supervision.

15          So if you spend time with all the people equally over

16   each stop, then you don't have the time available to correct

17   the difficulties or the challenges of some good officers who

18   don't quite get it.  They're --

19   Q.  Thank you.

20   A.  I'm sorry.

21   Q.  Now in affirming -- in forming your opinions in this case

22   did you read and review the performance evaluation guide for

23   sergeants?

24   A.  I did.

25          MR. KUNZ:  Your Honor, we'd move this into evidence.

D5h9flo2                         Stewart - redirect

 1              THE COURT:  For what purpose did you review that

 2      particular -- scratch that.

 3              For what opinion was that document useful?

 4              THE WITNESS:  It had to do with this idea of whether

 5      you have a robust evaluative system.  This is what Walker

 6      talked about.

 7              THE COURT:  Okay.

 8              MR. CHARNEY:  As long as it doesn't come in for

 9      liability, we don't have any objection.

10              THE COURT:  Exhibit number?

11              MR. KUNZ:  A4.

12              THE COURT:  A4 is received.

13              (Defendant's Exhibit  A4 received in evidence

14              MR. KUNZ:  To be clear then the exhibit that

15      defendants put in through the experts 240 and the ones

16      yesterday for Walker --

17              THE COURT:  They both have to do with evaluating the

18      evaluative process so to speak.

19              MR. KUNZ:  And not for the liability.

20              THE COURT:  No.

21              MR. CHARNEY:  Your Honor actually I just realized the

22      documents we put in yesterday were supposed to go in through

23      Commissioner Beirne who is a liability witness.  You had asked

24      us, in the interests of efficiency -- so I think that those,

25      which is the conditions reports, do come in for liability.

D5h9flo2                    Stewart - redirect

1            THE COURT:  That's different.  That's part of Beirne's

2    testimony.  Today when you offered 240 --

3            MR. CHARNEY:  240 is fine.

4            MR. KUNZ:  That's fine, your Honor.  We'll just move

5    on.

6    Q.  In New York City here, are you familiar with the reasons

7    why the NYPD is against the outside IG position?

8    A.  I am not.

9    Q.  And do you know -- are you familiar with what the New York

10   City Police Department did with the RAND recommendations?

11           THE COURT:  Recommendations -- only one that was

12   discussed.

13           MR. KUNZ:  With the RAND recommendation that was

14   discussed.

15           THE COURT:  With that particular one that we looked

16   at?

17           MR. KUNZ:  Right.

18           THE WITNESS:  No, I don't.

19           THE COURT:  He doesn't anyway.

20           MR. KUNZ:  One second, your Honor.

21           THE COURT:  Okay.

22           (Pause)

23           MR. KUNZ:  We would have liked to have your Honor

24   benefit from the expertise with a little more time but we're

25   done.

D5h9flo2                          Stewart – redirect

1            THE COURT:  Such is life.

2            Okay.  Thank you very much.

3            Now thank you all.  Evidentiary stage --

4            MR. MOORE:  I found the copy of the speech.

5            THE COURT:  Show it to your adversary.  Mark it as a

6       exhibit.

7            MS. GROSSMAN:  Your Honor, there's the corrected data

8       from Commissioner McGuire we're still working out with the

9       plaintiffs' counsel and we will e-mail.

10           MR. CHARNEY:  Hopefully today.

11           MS. GROSSMAN:  End of the day.

12           THE COURT:  That's fine.

13           MR. MOORE:  I've marked it as Plaintiffs' Exhibit 583.

14           THE COURT:  582 is received.

15           MR. MOORE:  583, Judge.

16           THE COURT:  583.

17           MR. CHARNEY:  I have 582.  He has 583.

18           THE COURT:  Hold on to 582, 583.

19           All right.  The evidentiary stage of this trial is now

20      closed.  Thank you all for the last ten weeks of work and the

21      ten months before that and the ten years before that.

22           So now we go to summations on Monday at 9:45.

23           9:45 we agreed on?

24           MR. CHARNEY:  Yep.

25           THE COURT:  Who is speaking?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D5h9flo2                        Stewart - redirect

 1              MR. CHARNEY:  For us we're going to have three.  We're

 2      going to have myself, Mr. Moore and Ms. Hoff Varner.  We're

 3      going to split it up.

 4              THE COURT:  You.

 5              MS. GROSSMAN:  Myself and Ms. Cooke.

 6              MS. COOKE:  Last night the plaintiffs sent to us

 7      identified demonstratives that they have used in their

 8      openings.

 9              THE COURT:  If there are any objections, I'm here all

10      afternoon and available by e-mail all weekend, whatever.

11              MS. COOKE:  My point is your Honor had set a deadline,

12      I believe it was this morning, for the exchange of any

13      demonstratives, new demonstratives to be used during closings.

14      None have been identified by either side.  I know we've been

15      using exhibits that are part of the record.

16              THE COURT:  So nobody has identified?

17              MS. COOKE:  Nothing new.

18              But there was a reservation of rights in an e-mail

19      last night.  The plaintiffs said they reserve the right to

20      identify new demonstratives after yesterday evening.

21              THE COURT:  In case something happened today?  Is that

22      it?

23              MR. CHARNEY:  That and I guess your Honor just, as

24      your Honor is well aware, we've been trying very hard to get

25      this done so -- your Honor probably harder than us.  But, you

D5h9flo2                    Stewart – redirect

1    know, we think that by the end of the day –– I mean it doesn't

2    look like we're going to have anything else, but to the extent

3    could we have ––

4              MS. COOKE:  We need a deadline, your Honor.

5              THE COURT:  Of course you do.  I agree with you.

6              4:00 p.m. today.

7              MR. CHARNEY:  All right.  Thank you, your Honor.

8              THE COURT:  Absolutely.  Absolutely.  Thank you.

9              MR. MOORE:  Thank you, Judge.

10             (Adjourned to May 20, 2013 at 9:45 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2     Examination of:                            Page

 3     JAMES STEWART

 4     Direct By Mr. Kunz . . . . . . . . . . . . .7741

 5     Cross By Mr. Charney . . . . . . . . . . . .7787

 6     Redirect By Mr. Kunz . . . . . . . . . . . .7822

 7                          PLAINTIFF EXHIBITS

 8     Exhibit No.                                Received

 9      123, 142 through 143, 148 through 151,  . .7736

10               185, 243, 252, 257, 301, 317,

11               336, 469, 470, 474, and 476

12               through 480

13      63  . . . . . . . . . . . . . . . . . . . .7737

14      491A  . . . . . . . . . . . . . . . . . . .7739

15      553  . . . . . . . . . . . . . . . . . . . .7739

16      575  . . . . . . . . . . . . . . . . . . . .7739

17      583  . . . . . . . . . . . . . . . . . . . .7741

18      240  . . . . . . . . . . . . . . . . . . . .7801

19      582  . . . . . . . . . . . . . . . . . . . .7822

20                          DEFENDANT EXHIBITS

21     Exhibit No.                                Received

22      R15  . . . . . . . . . . . . . . . . . . . .7734

23      W12, G12, R14, Q14, T9, Z13 and A14  . . . .7737

24      Y10  . . . . . . . . . . . . . . . . . . . .7739

25      A4  . . . . . . . . . . . . . . . . . . . .7824
```