08 CV 1034 (SAS)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID FLOYD, et al.,

                                                                    Plaintiffs,

                                   -against-

CITY OF NEW YORK,

                                                                    Defendant.

## DEFENDANT'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Heidi Grossman*
*Tel:  (212) 356-3503*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION ...................................................................................................... 1

FINDINGS OF FACT.................................................................................................. 1

    Individual Incidents ........................................................................................ 1

    The RAND Report ...................................................................................... 13

    NYPD's Policy Prohibiting Racial Profiling .............................................. 14

    Quality Assurance Division ("QAD") Audits.............................................. 15

    Civilian Complaints .................................................................................... 16

        1.      CCRB and DAO .................................................................17

        2.      OCD ...................................................................................19

        3.      Civilian Complaints among the Individual Incidents ................................19

    Performance Monitoring............................................................................... 21

    Training........................................................................................................ 23

    Supervision ................................................................................................. 25

    SQF Documentation..................................................................................... 26

    "Top-Stoppers" ........................................................................................... 27

    March 5, 2013 Memo................................................................................... 28

    Alleged Quotas............................................................................................ 29

    Senator Adams ............................................................................................ 37

    Eli Silverman .............................................................................................. 37

    Expert Analysis........................................................................................... 38

    Remedy ....................................................................................................... 48

CONCLUSIONS OF LAW ....................................................................................... 49

CONCLUSION................................................................................................................... 50

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages**

City of Canton v. Harris,
    489 U.S. 378 (1989) ........................................................................................... 50

Connick v. Thompson,
    131 S. Ct. 1350 (2011) ...................................................................................... 50

Daniels v. City of New York,
    99 CV 1695 (SAS) ........................................................................................ 15,16

Floyd v. City of New York,
    861 61 F. Supp. 2d 274, 296 (S.D.N.Y. 2012) ................................................ 50

U.S. v. Bold,
    19 F.3d 99, 104 (2d Cir. 1994) ......................................................................... 50

United States v. Jaramillo,
    25 F.3d 1146, 1152 (2d Cir. 1994) ................................................................... 50

United States v. Nelson,
    08 Cr. 10264 (RWZ), 2009 U.S. Dist. LEXIS 22541, *12-13 (D. Mass. Mar. 6, 2009) ......... 50


**Statutes**

N.Y. Lab. Law § 215-a ................................................................................................ 29

NYC Admin. Code § 10-133(b) ................................................................................... 3

NYC Admin. Code § 10-133(c) ................................................................................... 3

1.     **Introduction**  Plaintiffs have not met their heavy burden of proof in establishing that there is a widespread pattern of unconstitutional stop, question, and frisk ("SQF") practices caused by any policy or practice of defendant City. The NYPD's training, supervision and monitoring belies any claim of indifference on the NYPD's part.  Plaintiffs' proof fails on every prong of the municipal liability claim and as such, no injunctive relief can issue.

## FINDINGS OF FACT

2.     **Individual Incidents (¶2-¶19) Dominique Sindayiganza.** On February 12, 2010, a Petco employee informed the NYPD that a woman in the store needed assistance. 3091:19-25. P.O. White entered the store, where a woman told him that she was walking with her child when a man began following her and asking her repeatedly for money, which caused her alarm. 3093:3-21. The woman gave White a detailed description, which Sindayiganza fit. 3093:22-25; 3143:1-3; 2587:20-22; 2606:7-16; 2587:23-24; 2605:22-2606:24. White left and immediately stopped and questioned Sindayiganza, because he was the only person in the area fitting the description. 3098:4-7; 3143:11-13; 3101:22-3102:1; 2609:19-2610:1. White believes he had reasonable suspicion to stop Sindayiganza for aggravated harassment based on the fact Sindayiganza matched a victim's description and given his proximity to the crime location. 3103:3-3104:2. White brought the woman outside and she identified Sindayiganza as the man who had been harassing her. 2598:17-21; 3102:11-17; 3105:25-3106:2.[1] White asked the woman what she wanted him to do, and she indicated she wanted Sindayiganza to leave. 3106:19-25-3107:1. It is undisputed that White told Sindayiganza to leave and walk north, but Sindayiganza did not. 2599:18-21; 2615:18-23; 3107:21-3108:4; 2615:24-2616:2; 3145:18-24. Sindayiganza raised his voice and became extremely agitated. 3435:23-3436:4; 2610:21-2611:5. White

_____

[1] Though plaintiffs argued that the woman could not have clearly seen Sindayiganza from 30 feet away at 6:30pm in February, White testified about the number and placement of streetlights in

returned to Petco, told the woman what happened, and the woman said she wanted Sindayiganza arrested. 3112:3-16. It was only after Sindayiganza refused to walk north that he was handcuffed, arrested, and searched. 2600:8-17; 2617:21-23; 2601:22-2602:4; 2620:12-20; 3115:2-9 (frisked as part of search incident to arrest); 3116:4-6 (frisk after woman wanted to press charges). White included this encounter in his memo book. PTE 161; 3128:19-3130:19; 3134:12-17.[2] No testimony was presented to indicate the stop of Sindayiganza was based on his race.

3.      **David Floyd – April 2007**.  Floyd claims he was stopped by police officers sometime in April 2007, but provided a changing account of when this stop occurred. 161:14-16; 196:4-199:21. He was never able to identify the officers, even after a photo array. 203:14–204:4; 5480:10-5509:16.  The incident began as a voluntary police encounter during which a reasonable person would have felt free to leave. 213:6-22 (politely asked if willing to talk to police); 222:14-223:15 (standing in the middle of the sidewalk, not against a wall);223:16-224:11 (Floyd believed he was free not to give his ID to the police);224:12-226:9 (Floyd made decision to stay and not ask the officers why they were speaking to him);231:8-24 (officers never drew guns, threatened him, or physically forced him against wall). The frisk was reasonable and appropriate. 170:15-16 (pat-down), 170:17-171:4 ("bulge of [Floyd's] cell phone" was visible);229:14-20 (officer asked if Floyd had a weapon; when officer felt phone, asked what it was);228:9-22 (officer verified phone was not a weapon, but did not take anything out of any pocket).  Floyd has no reason to think the stop was based on his race. 230:21-231:2.

4.      **Floyd – February 27, 2008.**  P.O.s Joyce, Hernandez and Sgt. Kelly were aware on the date of incident of a pattern of residential burglaries occurring in the same area around 1359

---

the area, and the lights from the businesses in the area. DTE X10; 3144:6-3145:1.

[2] White did not complete a UF-250 form, but upon reflection recognized that he should have completed one. 3127:6-8. White retrieved the woman's identifying information, but discarded it

Beach Ave. 1332:2-1334:12; 1335:4-23; 1359:24-1360:2; 1404:11-16; 1404:23-1412:16; DTE L4;DTE K13;1459:23-1461:16;1467:19-1476:3.[3] The stop of Floyd was supported by reasonable suspicion of burglary.  181:8-14; 245:2-4 (officers told Floyd about burglary pattern); 235:17-19; 1363:7-11;1459:8-22 (Floyd had bag that the officers thought may have contained burglary tools); 237:1-238:12; 1327:9-11; 1391:11-15; 1414:14-22; 1451:15-1452:25; 1497:13-16 (Floyd and neighbor fiddling/jostling/shaking door trying to gain entry for at least one minute), 1360:24–1362:9; 1414:23-1415:9 (Floyd and/or friend acting as a lookout).  The frisk was reasonable and appropriate. 1363:19-21; 1417:11-15; 1496:11-25; 1330:2-1331:22, 1499:2-9; 179:6-20, 1417:18-21; 244:3-5; 179:16-20;1364:12-13; 1417:1-8.  Joyce completed the UF-250 for this stop. DTE X4, 1327:7-1328:24, 1361:21-1362:9, 1330:2-1332:4, 1334:6-12.  There was no evidence that this stop was based on Floyd's race.  247:18-23.

5.    **Ian Provost.**  P.O. Rothenberg testified he stopped Provost because he believed he had probable cause to issue a summons for the crime of having a knife visible in public, in violation of NYC Admin. Code § 10-133(c). 3801:7-9; 3801:17-19(reason for stop); 3805:11-20 (observation of knife); 3805:21-3806:2; 3828:12-16(descriptions of knife). Provost does not deny having a knife in his back pocket when he was arrested. Provost Tr. at 38:24-25; 42:16-17; 43:18-21. After his stop, Provost began shouting at the top of his lungs and caused a crowd to gather, for which he was issued a disorderly conduct summons. Provost Tr. at 60:20-61:6; 3807:12-25; 3808:15-18; 3813:16-23; 3830:1-3; 3830:8-19; Houlahan Tr. at 48:24-49:9; 3814:6-13.  Provost was also issued a summons for possession of a knife with a blade greater than four inches, in violation of NYC Admin. Code § 10-133(b). 3828:24-3829:3; 3814:6-13; 39:12-14;

---

as it was not needed for the summons that Sindayiganza received. 3123:9-3124:7; 3122:3-9.
[3] The blocks of the pattern burglaries (DTE L4) are very similar to Beach Ave.  1493:17-22, N10 (Floyd's block), T13 (Elder Ave), R13 (Ward Ave).  In January and February 2008, there were

44:5-10. Rothenberg testified that Provost was frisked after he was handcuffed, but before being placed in the patrol car, as part of a search incident to lawful arrest. 3829:17-25.[4]   No evidence was presented to indicate that Provost was stopped because of his race.  72:14-23.

6.      **Nicholas Peart – August 5, 2006.** Det. White stopped Peart and his two friends after responding to radio runs[5] of a crime in progress involving three men with a firearm. 6213:24-6314:7; 6215:18-6216:16; 6219:1-4.   Peart and his friends all had suspicious bulges in their waist/pocket areas. 6222:13-19, 6223:2-15.   Peart refused Det. White's orders to show his hands when Det. White first arrived at the scene, and then refused to get on the ground when ordered to do so. 6231:3-18.   Peart admitted the officers told him why he was stopped and played back their radio which demonstrated that he fit the description. 324:25-325:5; 367:17-25; 368:7-13. White prepared three UF-250 forms, and testified at trial about why he checked off certain boxes. Z8, Z9; 6230:15-18; 6231:3-19-21 (suspected of violent crime); 6232:17-22 (proximity to crime location; report from victim/witness). Peart gave statements to the CCRB after this stop, in which he admittedly lied, and stated he split his lip during the stop, even though he sustained no such injury. 348:15-24; 349:3-20; Ex. I-7 (statements to CCRB); 326:6-9; 361:17-362:5 (admissions he lied); 362:11-13 (wanted CCRB to believe he was injured).

7.      **Peart John Doe stops.** Peart claims he was stopped in **Spring 2008**, but doesn't know which month, or what day of the week, and no officers were identified. 370:14-23. Peart gave vague descriptions of the area of the stop, and inconsistent testimony on the direction he was walking. 327:7-12 (location); 372:4-5 (unable to provide cross street); 374:5-25 (testimony

---

62 reported burglaries within 1 mile of Floyd's house, and 28 within 1/2 mile.  6797:16 – 6805:6.
[4] No UF-250 was completed for this stop because Rothenberg believed that he had probable cause to believe Provost was carrying a knife. 3816:22-3817:4.
[5] White did not know whether the caller who provided the information was anonymous at the time he received the radio run. 6218:4-8; 6238:24- 6241:14. Though plaintiffs argued during

change over direction headed). Peart testified that after the stop, the officers explained he was stopped because of a series of burglaries in the neighborhood. 335:3-6; 377:9-14. Peart claims to have been stopped in **September 2010**, but has no idea on which date, or what day of the week, and no officers were identified. 378:22-379:5. Peart's testimony regarding that alleged stop is inconsistent. 337:19-338:2; 380:18-24 (saw officers briskly approaching him, even though they were behind him); 337:13-24; 383:3-8; 383:17-384:2 (heard officers order him to put his hands on wall even though he was wearing headphones and could not hear a thing). Peart claims he was stopped on **April 13, 2011** outside of the NYCHA building where he lived, even though in prior written declarations and under oath, he testified this stop occurred in May. 303:10-24; 303:25-304:2. The front door of his building was replaced the month before his stop, 391:7-10, and tenants had to go through a laborious process to obtain a new key. 391:18-393:7. Peart admitted the officers told him he was stopped because he fit the description of someone who had been ringing a doorbell at that apartment. 397:19-398:5; 400:5-17. No evidence was presented to indicate Peart was stopped because of his race. 368:20-25; 378:16-2; 387:6-8.[6]

8.     **Clive Lino – February 5, 2008.** On the date of the incident P.O.s Arias and Kovall were briefed on a pattern of robberies at the intersection of E. 103rd Street and Lexington Ave. 3061:4-13; 3063:7-3066:1, 3482:2-3489:22; DTE H10K. The pattern consisted of one robbery at a check cashing location and two outside private residences. 3065:2-3066:1.[7] Lino and his friend were standing on the corner of E. 103rd Street and Lexington Ave. 1729:3-1730:20, DTE M10,

---

summation that this was an "anonymous" call, no evidence was presented to that effect.

[6] Peart's description of the officers in the "John Doe" stops changed over time. 376:11-25; 376:11-25; 395:15-22 (no or limited recall of Spring 2008 officers at deposition); 328:6-329:8 (descriptions of Spring 2008 officers at trial); 340:5-10; 381:20-382:6 (limited recall of September 2010 officers at deposition); 340:18-25; 343:3-7 (descriptions of April 2011 officers evolved at trial); 305:11-22 (descriptions of April 2011 officers at trial).

[7] The check cashing location is visible from where Lino was stopped. 3483:7-3484:1, DTE M10.

NYC_2_00028764.  Lino[8] was wearing a beige jacket, and his friend had on a greenish olive

jacket.   1731:2-15.  There was reasonable suspicion to stop Lino on suspicion of robbery.

3045:5-12, 3046:15–3047:4, 3063:21–3064:5; 3469:2-5, 3484:8-16, 3487:25-3488:15.  Arias

recalled the descriptions of the suspects from three robberies as: black males, between 25 and 30,

5'6'' to 6', one wore a beige winter coat and the other wore a blue or black coat. 3063:13 –

3064:2, 3482:24-3483:6; 3066:21-3067:2, 3076:12-3077:5; 3486:9-3487:15, 3489:9-22.[9]  The

officers told Lino he was stopped on suspicion of being involved in the robberies. 1733:11-15.

The frisk of Lino was reasonable. 3048:25-3049:3, 3490:20-3491:2 (robbers reported to have

handgun); 3049:4-25, 3069:9–3070:6 (furtive movements toward waist area); 1734:11-21;

3070:19-3071:5; 3491:3-9. Plaintiff claims he was frisked a second time when a Lieutenant

arrived – which the officers deny. 1735:20-1736:6; 3072:17-24; 3492:5-10.   Lino filed a

complaint with CCRB, which investigated and found Lino's allegations unsubstantiated.

1738:9-10, 3492:18-25. NYPD also investigated the OCD BCATS report indicates the officers

were instructed. DTE N13 and PTE225. Kovall completed a UF-250 for this stop.  PTE 211. No

evidence was presented to indicate that Lino was stopped based on his race.  1774:15–1775:4.

9.     **Lino - February 24, 2011 stop.** P.O.s Leek and Figueroa were given an information-

wanted poster on the date of the incident. 2697:22–2698:11 (Leek); 2769:2–2770:4 (Figueroa);

PTE 187 (poster).  The poster related to a homicide on February 10, 2011, on E. 108th Street and

Madison Ave., 8 blocks from where Lino was stopped.  PTE 187, 2698:17– 2699:5.  The jacket

Lino wore that night closely matched the jacket from the poster.   1738:25–1739:3, 1744:1-6,

1777:11-22, DTE A9; 2722:24–2723:12; 2726:10-21; 2772:8-9, 2772:8 - 20.  Beyond the jacket,

---

[8] In February 2008, Lino was about 5'10'' tall, and weighed about 175 pounds.  1762:7-15.
[9] The first thing that caught Arias's attention was the beige jacket, and he also thought Lino and
his friend closely matched the descriptions of the robbers. 3077:7-18; The location where Lino

Lino matched the age, height and body build of the man in the poster.  2699:6-14, 2722:9–2723:17; 2726:22–2727:4; 2772:10-20.  There was no one else in the area that night wearing a similar jacket.  1778:6-8; 2787:5-15.  The frisk was justified.  2731:12-18 (suspected of bring involved in a murder); 2731:19-23 (bulky jacket); 1742:9-18, 2756:17-21, 2757:5-2759:5 (refusal to put down bag); 2756:22-25 (on a subway platform); 2773:22-2774:10 (aggressive behavior).[10]  The officers explain the frisk was a limited pat-down of outermost clothing and neither officer went inside Lino's pockets. 2730:23 – 2731:11 (Leek); 2756:11-16 (Figueroa).[11]  Leek completed a UF-250 and a detailed memobook entry for this stop.  PTE188, PTE 216, 2735:13 – 2738:2.  CCRB investigated and substantiated allegations of abuse of authority for the stop of Lino. PTE 208,217;2706:24-2709:7.  NYPD also investigated and unsubstantiated the allegations.  2740:23-2741:12; 2761:13-2766:11; 2786:8-2787:4.

10.    **Lino – August 3, 2008.**  One of the officers' personal cell phones' rang with a rap song ring tone and that the officer said to him "Here is a little rap for you, this should calm you down." 1749:18 – 1751:5.  The officers deny this allegation.  4018:2-4, 4021:10-12; 4018:8-10, 4025:8-18;  4018:17-19; 4021:13-16; 4025:19-22.   No evidence was presented to indicate that Lino was stopped because of his race. 1786:24-25;1787:1-5.[12]

11.    **Leroy Downs.** During trial and after detailed Court discussions held in Downs's presence, Downs identified P.O.s Giacona and Mahoney as the officers who conducted the stop.

---

was stopped was experiencing a crime condition of robberies. 3482:24 – 3484:7.
[10] Lino changed his story as to extent of the frisk/search. 1742:24-1743:4; 1780:10-1783:24.
[11] The officers deny Lino's claim that the officers ran his name.  1746:20-25; 2775:5-6.  In any event, the officers provided their names and shield numbers to Lino.  1747:12-1748:2.
[12] Lino's testimony should not be credited.  1787:6-8 (Lino admits his memory of the incidents "is not very good"), 1787:9 – 1790:12 (Lino has many other police interactions, were he received a summonses, but he does not recall the details of those incidents), 1790:22 – 1792:23 (Lino has a bias against the police), 1793:5 – 1794:7, 1797:7-13 (Lino attempting to explain anyway the many changes in his testimony from his deposition in December 2012 to the trial in April 2013).

4338:9-17. In a photo array conducted by the CCRB on January 14, 2010 Downs was not able to identify either officer. PTE 166, 4145:14-24.[13] The encounter began on suspicion Downs was smoking marijuana. 4101:1-3. Downs was holding a small object in his hand and holding his hand up to his mouth, 4146:21–4148:8, PTE 166, NYC_2_00025051, and Downs concedes it was legitimate for the officers to ask him if he was smoking marijuana. 4842:9.[14] Before the officers searched him, Downs had a conversation with officers during which he was frustrated and upset. 4151:12–4152:6. Downs filed a complaint with CCRB. 4157:13-19.[15] There was no evidence that the alleged stop was based on Downs's race. 4163:23 – 4164:9.

12. **Devin Almonor.** Almonor was stopped by P.O. Dennis and Lt. Korabel on March 20, 2010. 1066:25-1067:1; 1145:16-18. The officers were in the vicinity of Hamilton Pl. in response to 911 calls that described a large fight including dozens of youths throwing garbage cans, setting off car alarms, with possible weapons involved. 1082:1-4; 1115:14-1116:2. Despite numerous 911 calls, which the officers confirmed, Almonor denies seeing any evidence of this disorderly group or its aftermath. PTE 22; 119:9-21; 139:6-14; 1116:23-1117:2.[16] Almonor gave inconsistent statements at trial about where he was going to and coming from when he was stopped. 120:16-25; 121:3-4; 121:16-23; 139:23-140:3. When questioned by the Court, Almonor couldn't recall whether he was jaywalking, and at his deposition Almonor admitted that he was *not* in the crosswalk. 141:11-12; 141:18-25. After observing Almonor jaywalk, the officers had

---

[13] Giacona and Mahoney have no memory of interacting with Downs. 3849:25-3850:2; 3894:23-3895:12, 3895:20-3896:1. Downs says incident occurred around 6:45 pm., 4127:16-17; Giacona and Mahoney were 1 mile away, making an arrest at 6:40 pm. 3829:4-18, 3867:22-3868:12.

[14] Downs admits that just blocks from his house there are major crime problems. 4123:15-21.

[15] Mahoney and Giacona received B Command Disciplines and lost 5 vacations day each for improper memobook entries for the day. 3852:9-3853:1; 3895:13-19.Officer Moon also received a command discipline for not taking Downs' complaint that night. PTE 170.

[16] Plaintiffs argue that the officers never saw Almonor with a group of youths, Almonor testified that before his stop, he was with a group of men. 124:4-15; 134:23-135:2.

probable cause to arrest Mr. Almonor. 1151:22-24, 1152:10-19.  When the officers attempted to frisk Almonor, he struggled. 147:10-13; 147:22-148:4; 1089:20-24, 1097:1-4; 1121:8-20. Almonor was handcuffed for the officers' safety and frisked immediately thereafter. 1121:24-1122:4; 1087:15-18; 1089:15-19 (manner of frisk); 1093:8-12; 1150:10-15; 1121:7-14; 1193:7-14; 1162:17-23 (reasons for frisk). The officers were only satisfied Almonor didn't have a weapon after they frisked him following his handcuffing. 1163:9-12. A UF-250 was prepared for this stop, and Dennis included a reference to this stop in his memo book. 1101:20-1102:7; PTE 19.  Almonor admitted the officers made no reference to his race during the stop. 148:11-13.

13.    **Cornelio McDonald.**  On December 19, 2009, Det. French had reasonable suspicion to believe McDonald was in possession of a weapon based on the suspicious bulge in McDonald's left jacket pocket;[17] the suspicious way McDonald was walking and shifting his body; and French's knowledge of patterns regarding a black male with a firearm robbing commercial establishments and a black male burglarizing residences.[18]   3746:8-3749:14; 3687:21-23; 3743:4-17.  After stopping McDonald, French frisked the jacket pocket containing the suspicious bulge based on his reasonable fear for his safety. 3750:7-351:4. French explained the basis for the stop, obtained McDonald's pedigree information, and completed a UF-250 and an activity log entry regarding the stop.  3751:5-25, 3735:4-21, 3725:13-20.[19]

14.    **Deon Dennis.**  On January 12, 2008, P.O.s Salmeron and Pichardo had probable cause to

---

[17] Contrary to plaintiffs' argument at summation, McDonald's cell phone was, in fact, in his left jacket pocket.  *Cf.* 7986:22-24 with 3683:1-4; 3696:13-15.

[18] While French could not remember any further detail about the patterns at trial, he explained that such detail would have been provided at the meeting at the start of his tour. 3743:12-22.

[19] McDonald claims he was stopped because of his race because the police "didn't bother with anybody coming from the bowling alley."  3688:25-3689:4.  McDonald was not stopped coming out of the bowling alley but on the other side of the street. 3701:20-23; 3680:2-20; 3697:2-23; 3745:15-25; DTE L10. McDonald was not sure of the race of the alleged individuals coming out of the bowling alley; he testified they "could have been" Asian or white.  3689:5-7. In any event,

stop Dennis in front of 2034 7th Ave. in Harlem because Dennis was drinking alcohol from an open container with a bottle of Hennessy alcohol next to him.   852:23-853:23 (officer observations); 1296:3-15 (actions taken by Pichardo to determine the liquid was alcohol); 1295:5-24.   The officers had been patrolling the area to address quality of life conditions, including complaints of excessive drinking. 852:20-22; 1294:10-16.   To the extent Dennis was frisked, it was conducted pursuant to a lawful arrest. 854:9-22.[20]   No testimony was presented that indicated that this stop was based on Dennis's race.

15.   **Kristianna Acevedo.**   On May 29, 2007, Dets. Vizcarrondo, Hawkins, and DeMarco were driving  towards a buy-and-bust investigation when they observed Acevedo walking alone on 43rd Street in Queens, a desolate area in the vicinity of known drug transactions.   2660:20-25; 2683:1-16; 5196:22-25; 5454:24-5455:2.   The officers did not reasonably suspect Acevedo of any crime, but approached her in an effort to request information and gain intelligence[21] about drugs in the area.   2659:17-24; 2684:8-13; 5467:25-5468:6.   Once the vehicle slowed down, DeMarco displayed his shield and said, in a calm and friendly tone of voice, "Hi. Police. How are you doing? Can I talk to you?"   2683:21-23; 2684:18-23; 5455:7-19; 2684:1-4.  Acevedo proceeded to curse at the officers, yell "you're not a cop," and ran down the street.   2684:5-7; 5455:23-5456:7.   As there had been media reports of individuals impersonating police officers at the time of the incident, the detectives put their vehicle in reverse to try to speak with Acevedo to explain that she was in no danger.   2685:14-15; 5199:4-11; 5456:8-16.   The detectives again

---

McDonald was by himself at time of his stop.  3680:2-20; 3697:2-23; 3745:15-25; 3746:6-7.

[20] Dennis provided his identification to the officers. 873:12-16. Contrary to plaintiffs' argument at summation, Dennis did not testify about which hand he used to retrieve his identification from his wallet, and the officers did not testify as to whether Dennis's identification was even in his wallet. *Cf.* 8002:3-7 with 271:14-24; 1270:16-18.

[21] The detectives often learned of drug activity by speaking with the public.  5191:23-5193:4.

identified themselves as police officers.[22]   2685:20-24; 5199:17-5200:3. Acevedo remained free
to leave.   2685:16-2686:7;  5457:24-5458:1.[23] Following an investigation by CCRB, the
detectives were disciplined with respect to Acevedo's incident. 2672:14-22; 5201:11-5202:19;
5459:4-19.  There was no evidence this encounter was based on Acevedo's race.

16.   **Lalit Clarkson.**  Clarkson claims he encountered the police sometime in January 2006.
2633:9-22; 2645:5-9.  The encounter began when the officers asked Clarkson, "Hey, come over
here, can I talk to you?"  2651:21 – 2653:7.  Clarkson voluntarily walked over to the officers and
spoke to them.  2653:8-15.[24]  The officers did not display their guns, handcuffs, or nightsticks.
2649:7 – 2650:13.  The officers asked Clarkson if he knew anything about drug activity in a
nearby building.  2641:1-4.  Clarkson claims the officers asked for permission to frisk and/or
search him, and when he said no, the officers did not frisk, search, or touch him in any way.
2654:18-25.  After Clarkson told the officers they could not search him, the officers left.  2655:3-
6.  There was no evidence this one-minute encounter was based on Clarkson's race.  2655:7-13.

17.   **David Ourlicht – January 2008.**  In January 2008, Sgt. (then P.O.) Moran had
reasonable suspicion to stop Ourlicht because he observed a suspicious bulge in Ourlicht's right
waist area and Ourlicht was walking in a manner consistent with hiding a weapon in that same
area.  4051:25-4053:13, 4054:4-11; 4062:3-10, 4079:23-4080:4.  Ourlicht conceded he was
carrying at least one five-subject spiral notebook,[25] keys, wallet, phone, and a video iPod in his
jacket pockets at the time of the stop.  4224:2-4225:18.  Moran frisked Ourlicht because he

---

[22] Det. Hawkins showed Acevedo her NYPD badge in one hand and her NYPD Police ID in the
other hand.  5456:17-5457:6.
[23] No detective ever physically touched Acevedo, and Acevedo failed to mention any purported
search or use of force allegation at her CCRB interview only months after the incident.  2657:12-
22; 2686:18-2688:4; 5201:6-7; 5458:2-24.
[24] When he approached the officers, Clarkson positioned himself next to a wall.  2638:20-22.
The officers were about three feet away from him when they were talking to him.  2654:8-17.

reasonably suspected his safety was in danger. 4080:18-25. Moran subsequently had probable cause to issue Ourlicht a summons for disorderly conduct because Ourlicht was threatening to fight Moran and his unreasonably loud behavior was causing a crowd to gather. 4081:1-4082:22. Moran completed a UF-250 and an activity log entry for this stop.  4065:8-22; 4082:23-25.  No evidence was presented by plaintiffs that indicated this stop was based on Ourlicht's race.

18.    **Ourlicht's June 2008 John Doe stop.** Ourlicht could not definitively identify the officers involved in this stop[26] or the month it occurred.   4263:17-4264:5; 4268:24-4269:9. Ourlicht claims officers approached him and three to four other men in the private, fenced-in, "enclosed area of his [friend's] building" and informed them there were emergency reports of a gun right around them.  4205:13-18; 4265:10-4266:18. Ourlicht and the other men were briefly stopped, patted down, but not searched.   4265:10-4266:18.   Ourlicht admits the officers apologized at the end of the stop, and reiterated they were responding to a report of a gun in their area. 4266:24-4267:4.  There was no evidence this stop was based on Ourlicht's race.

19.    **Ourlicht's February 2008 John Doe stop.** Ourlicht was wearing a Black Marmot jacket with six pockets, which contained his keys, wallet, passport, phone, and Advil.  4234:4-4235:9; 4254:8-21.  The jacket's pockets were large enough to fit a five-subject notebook in one of the pockets.  4254:15-17.  Ourlicht conceded officers asked him, not Anthony, to come near their car, and Ourlicht freely decided to walk to the vehicle. 4257:21-25; 4261:15-4263:16. The officers asked Ourlicht for identification, which Ourlicht provided. 4258:11-15.  As soon as Ourlicht handed the officers his identification, they simultaneously and immediately exited the vehicle.  4198:23-24.  The officers patted Ourlicht down, and went into his pockets.  4259:4-8.

---

[25] Ourlicht previously testified that the notebook was in his right jacket pocket.  4225:3-18.
[26]  Ourlicht claimed Police Van #9466 was at the incident. 4211:4-5. Contrary to plaintiffs' argument at closing, there was no evidence this van was at the incident. Det. Albino investigated

While Ourlicht was being searched, he observed his white friend Anthony "face-to-face" with another police officer.  4200:19-21.  Ourlicht heard the officer ask Anthony for identification, which Anthony provided.  4200:22-4201:1.  Ourlicht could not hear the entire conversation between the officer and Anthony.   4200:22-4201:1.  Ourlicht, however, could hear the officer tell Anthony he "smell[ed] like weed" and observed the officer reach into Anthony's pocket and pull out a little bag of marijuana.  4201:2-9.  Upon learning Anthony had marijuana on him, the officer approached Ourlicht, who was searched more extensively.  4201:10-17.   According to Ourlicht, Anthony was stopped, searched, and not free to leave.  4261:7-14.   Ourlicht could not definitively identify any officer involved in this purported stop.  4261:15-4263:15.

20.    **The RAND Report** (¶20-¶22) In 2007 RAND was retained by the New York Police Foundation to conduct a study on racial disparities in pedestrian stops and frisks (PTE K6; 4291: 2-6), because of an already-existing contract, and RAND's expertise in police practices. 7093: 18-24; 7094: 5-15; 7095: 9-24. Commissioner McGuire testified that he provided data to RAND to use in its study, including arrest data on violent crime, weapons offenses, property crime and drug offenses, as well as crime suspect data on violent crimes. 4298:15-4299:1.  The Rand study did not reveal any racial profiling on the part of the NYPD.  4307:14-25.

21.    In conducting its study, RAND compared three benchmarks: one using residential census data; one using an arrest benchmark; and one using suspect description. 4305:18-4306: 7; 7096: 20-7097:10. The RAND Report made six recommendations to the NYPD, all of which were considered and five of which were implemented. 7103:17-21; 7104:12-7123:14.  The recommendations were implemented in a variety of ways including two revisions to the NYPD Patrol Guide (including direction to officers to provide explanations for the basis of stops absent

---

and learned the officers working in the van were not present for the incident. 5474:15-5475:14.

exigent circumstances), a pilot program encouraging the distribution of street encounter information cards, and a citywide expansion of that pilot program. 2805:8-13; 2807:1-4; 7103:17-7115:18. PTE 282, PTE 320.[27]

22.     Plaintiffs' police practices expert Lou Reiter believes the NYPD should have done more to follow the RAND Report's conclusions, but was unaware of many efforts the NYPD made to address those recommendations. 4903:17-19. The first RAND Recommendation was that the NYPD should explain to pedestrians why they were stopped. 4903:23-25. Part of the recommendation included the suggestion that the NYPD should give out cards when they stop citizens. 4904:1-3. Reiter could not identify a single law enforcement agency in the country that did that, 4904:7-10, and there are no CALEA or IACP standards on that issue. 4904:11-15. Reiter was unaware of any testimony from class member witnesses regarding whether they were told why they were stopped. 4904:20-23. He was unaware that every class member witness who testified recounted at least one stop where officers told them why they were stopped. 4904:24-4905:3. Even though Reiter's central premise was that the NYPD refused to address RAND recommendations, Reiter stated that testimony from witnesses that the NYPD *had* implemented this recommendation would not change his opinion. 4905:15-17.[28]

23.     **NYPD's Policy Prohibiting Racial Profiling.**   (¶23) The NYPD has a strong policy against racial profiling.   PTE 183 (current policy); PTE 184 (prior policy).   Officers and supervisors receive extensive training on racial profiling and policing in a multicultural society at the academy and in roll call training.  5061:6-5063:13; 5069:20-5085:10, 5098:3-5100:3 (Shea),

---

[27] The Rand report considered suspect description to be the superior description benchmark. 7188:3-10.

[28] Another RAND recommendation addressed by Reiter was that NYPD conduct additional training to ensure officers are fully conversant with SQF documentation. 4907:5-9. Reiter was unaware of any efforts the NYPD has undertaken since 2009, including the new Rodman's Neck

R3, P3, M5, T5, S11, V11.  Officers and supervisors recall their training on this issue, are aware of the policy, and implement it in their work.[29]  C.O.s talk to their supervisors and officers about the policy and work to ensure it is followed.  3508:10-3509:23(Ortiz); 1527:11-1528:12(Diaz); 5409:2-5410:1, 5435:5-22(Lehr); 6508:6-12 (Holmes), 6636:16-6637:20 (Morris).  The NYPD has self inspections to ensure compliance with the policy. 4629:8-4629:24 (Cronin); 5694:2-5695:15 (Cirabisi).  Civilian complaints related to SQF are about the manner in which stops are made or the lack of an explanation; not about racial profiling. 3024:3-8,3025:2-3027:13 (Esposito),7607:1-4(Hall);6508:6-6511:11 (Holmes); 5409:2–5414:1, 5427:19–5435:4, 7080:22-7081:6 (Lehr), P15; 6583:25-6584:4, 6632:14-6633:12(Morris); 6985:9 - 6986:16 (McCormack).

24.     **Quality Assurance Division ("QAD") Audits**[30]  **(¶24)** The parties in *Daniels v. City of New York*, 99 CV 1695 (SAS), entered into a Stipulation of Settlement dated September 24, 2003.  PTE 114.  The NYPD's Policy Regarding Racial Profiling, attached as Exhibit A to the settlement,[31] required commands to establish self-inspections to ensure compliance with the policy.  PTE 114; 184. QAD, a unit within NYPD responsible for monitoring compliance with Department procedures, was required to audit compliance with the self–inspection.  2815:10-17.

---

training on UF-250s and memo book entries, or any interim orders since 2009. 4907:10-4908:9.
[29]  649:8-650:1(Serrano);  861:2-11(Salmeron);  1003:7-1007:2,  1015:16-1016:13  (Agron); 1203:16-1204:16(Korabel);  1251:5-10(Rodriquez);  1300:10-  1301:1  (Pichardo);  1504:5-1505:7(Kelly);  1674:25-1675:19(Guimaraes);  2099:5-12  (Hegney);  2674:1-2677:6,  2689:6-2690:3(DeMarco);  2713:18-25,  2744:5-16  (Leek);  3454:4-19  (Gillespie);  3753:16-3754:2(French);  3818:18-3820:3(Rothenberg);  4030:21-4032:16,  4085:2-8(Moran);  4991:1-13(McCarthy);  5227:25-5228:13(Vizcarrondo);  5553:13-5554:18(Marino);  6306:25-6307:10 (Telford); 6348:3-7(Navaretta); 6376:21-6378:4(Dang).
[30] A third RAND recommendation discussed by Reiter was the suggestion that the NYPD look at radio transmissions where a stop was likely to occur and have QAD audit to find out whether a 250 was filled out. 4909:8-12. Even though Reiter claimed to have listened to Chief Cronin's testimony, he was unaware that such a QAD audit is currently conducted. 4909:13-4910:10.
[31] The Department Policy Regarding Racial Profiling (Operations Order Number 11 dated 03-13-02) was implemented prior to the settlement.  PTE 184; 2-24-11 56.1 at ¶17.

QAD conducts audits[32] that, at minimum, address the following issues:

a. Whether, and to what extent documents (e.g., UF250s, officer activity logs) filled out by officers to record SQF activity have been completed in accordance with NYPD regulations; and
b. Whether, and to what extent, the audited SQF activity is based upon reasonable suspicion as reflected in the UF250 forms.

PTE 114, ¶D1.   Although the *Daniels* settlement ended around December 2007, the NYPD continues to conduct audits of SQF.   7141:13-19.   These include the 802  (4762:16-4763:16) and 802-A (4763:22-4764:12) , which began in 2003, the 803, which began in 2008, and their companion command self-inspections. 4629:15-24.   There is the quarterly RAND audit of paperwork linked to 911 calls, which began in 2008. 4702:17-21. QAD continues to conduct an annual citywide audit of officer activity logs to determine, among other things, if an officer has completed a detailed narrative entry in his activity log when he conducts a SQF.   3256:3-12; 4625:8-14; DTE E14, DTE F14.   QAD conducts a monthly self-inspection which does the same. 4625:15-23.   As of 2011, QAD conducts a quarterly survey of three commands of the highest increase in UF-250s compared to the same period in the prior year. 4768:2-6; 4790:5-15. As of 2012, the 802 self-inspections are conducted by the executive officer of each precinct.  4787:6-14; DTE Z4.  Further, the NYPD improved training related to activity logs through these audits. DTE L11; 4763:17-21; 4788:4-4789:20.[33]

25.    **Civilian Complaints** (¶25-¶35) Complaints of alleged misconduct against NYPD officers may be made by anyone through a variety of sources, such as the CCRB, 3-1-1, or the NYPD itself, and by any means of communication, including in-person, mail, or phone.  3309:1-14.  All complaints, even those made anonymously, are referred for investigation.  2-24-11 56.1

---

[32] As noted in the *Daniels* stipulation, "[m]unicipal defendants have provided Class Counsel with an audit outline that includes these protocols." PTE 114, ¶D1.
[33] QAD alerts commands to deficiency notices, which are raised through the chain of command. 4770:2-4772:3; 5721:19-23.

¶306. IAB can open investigations into incidents based on media reports.  7344:7-11. The NYPD refers complaints alleging excessive force, abuse of authority,[34] discourtesy or offensive language (FADO) to CCRB;[35] allegations of corruption or serious misconduct are referred to IAB,[36] and the remainder of the complaints are referred to the Investigative Review Section of the Office of the Chief of the Department. 3308:6-25; 3961:18-3962:25; 3987:13-3988:9; 5067:5-16; 5348:5-5349:16; 7076:24-7079:3.   The Command and Inspectors themselves are notified when civilian complaints are brought against police officers.  4563:4-10 (Schwartz); 5638:1-7 (Cirabisi); 5372:7-15 (Lehr); 6503:9-16 (Holmes).

26.     **CCRB and DAO (¶26-¶30).**  CCRB investigators interview complainants, witnesses, and officers and determine whether allegations are substantiated, unsubstantiated, exonerated, or unfounded.  3272:1-24.  When the investigation is complete, a panel of three members of the CCRB will read the case, review all of the evidence, and vote on the disposition of every allegation raised by the complaint.  3272:1-24.  When the CCRB substantiates a complaint, it forwards the case to the NYPD's Department Advocate's Office (DAO).  3275:23-25.[37]

27.     The NYPD engages in progressive discipline, using increasingly severe steps or measures to deal with substandard work or misconduct, where varying levels of disciplined can be imposed.  4590:7-12; 6335:3-16.  When officers are disciplined, NYPD matches the misconduct with the necessary training, which may result in formal instructions given by a commanding

---

[34] Search and seizure allegations relating to stop, question, and frisk fall under the CCRB's abuse of authority jurisdiction. 3284:7-17.

[35] The CCRB became an all-civilian agency in 1993. See 2-24-11 56.1 ¶ 312.

[36] Approximately 1,000 officers are assigned to IAB and the disciplinary process. 2-24-11 56.1 ¶ 355.   Dispositions of IAB investigations are generally noted on an individual officer's Central Personnel Index ("CPI"). 7339:1-3; 4589:1-4589:25.

[37] If the DAO disagrees with CCRB's findings of substantiation, they conduct further investigation. 3276:19-25.  In the first half of 2012, that number of complaints that the CCRB actually substantiated was only 11%.  DTE V13.

officer or a requirement that the officer attend additional training at the Legal Bureau, or even termination of employment. 4590:13-4594:22. With respect to improper memobook entries, the NYPD increased the discipline given to officers from an 'A' command discipline to a 'B' command discipline, which means officers could lose up to 10 vacation days and the discipline stays on the officer's CPI. 4593:7-16. The DAO also looks at civil lawsuits in determining discipline on a case-by-case basis. 4568:1-6.

28.     CCRB executive director Thompson indicated there is a strong dialogue between the DAO and the CCRB,[38] which has resulted in increased confidence in the quality of CCRB investigations. 3314:1-8. CCRB investigators receive training from CCRB attorneys and from the NYPD, including lectures, trips to the academy, a ride-along with a police officer, and a trip to the firing range. 3315:7-24. CCRB attorneys are now prosecuting cases that have been substantiated by the CCRB board in the NYPD trial room. 3312:14-17.

29.     The CCRB is authorized to mediate claims by civilians. These mediations typically stem from complaints of verbal disputes and street stops, and these mediation sessions are a helpful tool for the community. 3322:10-19. The CCRB's research shows that officers who participate in mediation are less likely to receive complaints in the future. 3322:4-12.

30.     The rate at which NYPD disciplined officers for substantiated CCRB allegations increased every year from 2008 through 2011. DTE U-13. While the percentage of disciplined officers decreased in 2012 (largely because of delays in receiving CCRB cases, as well as CCRB's office's displacement following Hurricane Sandy), in absolute numbers, disciplinary actions were actually at their highest level in 2012. 4606:8-4607:19; DTE U-13.

---

[38] CCRB currently assigns 117 staff members to investigate complaints made by civilians of police misconduct. 3307:22-24.

31.   **OCD (¶31-¶32).**  When OCD receives a complaint, it logs the complaint in a central database, and then sends it out to the commanding officer of the bureau in which that officer currently works for investigation. 2-24-11 56.1  ¶ 373. Inspector Cirabisi of the 114th Precinct testified that his operations coordinator oversees the OCD investigations and noted that precinct supervisors may lead the investigations.  5644:14-17. Cirabisi indicated that when his precinct's supervisors are not directly involved in the disputed incident at issue, these supervisors may conduct the OCD investigation into officers under their supervision. 5644:18-5645:14.   The supervisor would "know that officer by working directly with him [and] would know if there are prior incidents" involving that officer.  5645:3-15.  Inspector Holmes testified that she personally reviewed 90% of the complaints at the 81st Precinct.  6496:10-6500:25.  Inspector Lehr testified that he or his executive officer reviews OCD complaints.  5348:17-24.

32.   Out of approximately 100 OCD[39] complaints made to the 67th Precinct from January 1, 2013 to April 29, 2013, only 6 complaints featured allegations related to SQF. 7076:14-23. Approximately 15 complaints sought *more* police presence in the area.  7079:5-18.

33.   **Civilian Complaints among the Individual Incidents (¶33-¶35).**   Almost three-quarters of witnesses (Sindayiganza, Provost, Peart, Dennis, Acevedo, Ourlicht, Downs, Lino) or their friends/family filed a complaint with CCRB through a variety of means regarding their purported stops.  91:22-25;  348:15-24;  1229:2-7;  1230:9-10;  2095:16-2096:9;  2620:12-20; 2672:14-22;  5201:11-5202:19;  5459:4-19;  3492:18-25;  PTE 166.  Reiter criticized Ourlicht's CCRB complaint, but Reiter never so much as read Ourlicht's deposition. 4941:23-4942:2.[40]

---

[39] Though plaintiffs argued a sample of 100 complaints was insufficient to make a determination about the representativeness of complaints received by NYPD, Reiter only reviewed *two* OCD complaints to then issue an expert opinion about police department practices as a whole.

[40] Sgt. Hegney investigated a CCRB complaint made by Ourlicht and his mother regarding his January 30, 2008 stop, whereby he reviewed the UF-250, P.O. Moran's activity log, and spoke to

Reiter provided flawed criticisms of the Dennis complaint as well. 4884:21-4887:10.[41]

34.    Reiter also stated he was not aware of who investigated the Dennis incident. 4943:6-11. However, plaintiffs were well aware of who investigated the Dennis incident, and deposed Sgt. Rodriguez, the investigator during discovery (and before Reiter's deposition).[42] 4943:12-16. Reiter could not recall whether or not he ever read that deposition. 4943:15-16. Reiter also never read Dennis's deposition transcript and was unaware Dennis handed the phone to his girlfriend when investigators called Dennis to discuss his allegations. 4943:25-4944:8.

35.    Reiter has conducted many audits of other agencies internal investigations wherein he reviews a random sampling of the agencies' investigations. 4950:19-22; 4950:23-25. For example, in Pittsburgh, where there were 800 administrative investigation files, Reiter reviewed every eighth one, reviewing a total of 100 case files. 4951:1-9. Here, on the other hand, Reiter reviewed two OCD cases, one CCRB case, and not a single IAB case, in contravention of the methodology that he uses when he is asked to audit the operation of the administrative investigation process. 4951:10-19; 4953:23-4954:11.[43]

---

Moran and Ourlicht's mother.   2092:21-2093:2.   Despite reaching out to Ourlicht twice, Ourlicht's mother refused to let Hegney speak to Ourlicht and would not provide Ourlicht's contact information. 2093:21-2094:7.   As such, the complaint was unfounded. 2095:16-2096:4.

[41] Reiter for example, testified that he found it interesting that the officer indicated that the liquor or the liquid he was drinking was Hennessy, because he believed that the officers had so identified the brand on the smell alone. 4884:21-4887:10.   Reiter was not aware of trial testimony that the officers who observed Dennis drinking a cup of brown liquid actually observed a bottle next to Dennis that indicated the brand was Hennessy. 4943:17-21.

[42] Sgt. Rodriguez testified that when he contacted Dennis on the phone and asked to speak about complainant Ms. Edward's allegations related to his incident, Dennis repeatedly stated, "I don't know" numerous times.  1247:2-18.  As Sgt. Rodriguez testified, he understood Mr. Dennis's "I don't know" comments to mean that Dennis was not making any allegations about the stop itself, since Dennis would obviously "know" what happened during the stop, but would not know what transpired between officers and Ms. Edwards at the precinct. 1247:2-1248:7.

[43]   Reiter testified it is his opinion that the NYPD should investigate withdrawn investigations. 4944:24-4945:1. However, Reiter accepted that the fact a complainant refuses to participate in an investigation can be used as a factor in the final adjudication of that investigation. 4945:15-18.

36.   **Performance Monitoring**   (¶36-¶42) The number of substantiated or unsubstantiated CCRB complaints received by an officer are tracked by the department and are one of the ways an officer can be placed on performance monitoring.  There are three progressive levels of monitoring.  On the first level, the Commanding Officer must interview the officer and develop and implement a plan to address the officer's performance issues.  The officer is then evaluated after the 10th month of monitoring to determine whether monitoring needs to continue.  At the second level, the commanding officer is responsible for preparing quarterly evaluations of the officer, which are to include both positive and negative conduct.  At this level the commanding officer or the performance analysis section can recommend additional training for the officer.  At the third and most serious level, commanding officers are responsible for reviewing the officer on a monthly basis.  5375: 3-5378: 23; 5638: 16-5644: 10; 6502: 24-6503: 8; 6505: 2-6506: 1.

37.   Each officer's CPI contains a wide-range of information including whether the officer has ever been placed on monitoring of any kind, any civil lawsuits in which he was been named as a defendant, IAB cases, any charges and specifications or discipline, certain types of training, his sick record, and any departmental vehicle accidents. 7317: 16-7321: 5.

38.   Chief of Patrol Hall is made aware of any officer within Patrol who is eligible for monitoring through the Employee Management Division. Officers are automatically eligible for monitoring when they reach 20 points on their CPI. The EMD reviews CPIs daily and the CCRB database monthly to identify any officers who have qualified for monitoring.  7335: 12-7336: 16.

39.   Commanding Officers have access to the CCRB database and officers' disciplinary and complaint history. 7321: 12-14;  Inspector Lehr, Inspector Cirabisi and Inspector Holmes speak with their respective ICOs on a weekly basis to discuss CCRB complaints, and they receive monthly reports detailing the officers under their command who have received CCRB

complaints. 5372: 7-18; 5638: 1-7; 6503: 9-18.[44]   CCRB complaints are also tracked at the borough level, as the borough will notify that officer's precinct's CO, who is required to provide a report including an analysis of the complaints against the officer, conduct a meeting with the officer, and include an assessment of the officer.  The borough adjutant receives this repot and conducts another interview with the officer.   The report is then forwarded to the borough commander who will review it and have a meeting with the adjutant. 6584:20-6587:1.[45]

40.     The CCRB Profile and Assessment Committee meets quarterly, and is chaired by the first deputy commissioner and includes members of the highest ranks of the NYPD including Chief Hall.  Officers will automatically be reviewed for possible remedial action in one of three criteria are met: (1) an officer has three or more CCRB complaints in the past 12 months; (2) an officer has six or more CCRB complaints in the past five years; or (3) an officer has two or more substantiated CCRB complaints in the past five years. 7311:5-15; 7313: 9-7314:15.

41.     The Profile and Assessment Committee reviews the officer and his entire employment history to determine whether the officer needs training, targeted integrity testing, change in assignment, or transfer to a new command.   7315:3-7317:7 The Committee could recommend that the officer attend Tactical Communication, otherwise known as Tac-Com, which is a three-day course run by the police academy designed to teach officers with a high number of CCRB complaints to communicate better with the public. 7327: 19-24; 7328:19-7329:1.  Other

---

[44] Lehr is aware of times when officers' promotions have been held up due to being on performance monitoring.  When an officer is placed on monitoring, the CO will meet with the officer to discuss the reasons why the officer is being placed on monitoring, what the monitoring program entails, and what is expected of the officer.  They will also discuss the officer's career goals and the way CCRB complaints can impede the officer's career. 5393: 4-5395:11.

[45] Chief Morris testified that each borough has an investigations unit that investigates complaints referred to them through the Chief of Patrol, conducts patrol monitoring, and conduct self-initiated investigations.  6590:21-6592:21. Borough investigations investigators receive training by IAB and can adjudicate command disciplines against officers.  6595:2-10. These investigators

recommendations may include closer supervision, or transferring the officer from his current position. 7329:7-7331:8.   The subject officer will also continue to be monitored by the Committee to determine if and when the identified issues have been remedied.[46]

42.     The NYPD's Career Advancement Review Board is composed of the deputy commissioner of personnel and two bureau chiefs.  Officers who are eligible for a discretionary promotion or civil service promotion to the rank of sergeant or lieutenant are brought before CARB when the officer has had either a B level command discipline, charges and specifications that resulted in a penalty of ten or more days, or a history of CCRB complaints. CARB will request the officer go over his disciplinary history and explain how the incidents occurred and what he has done to change or prevent additional incidents from happening. 7331:9-7333:14.

43.     **Training (¶43-¶46)** The NYPD employs an extensive training program. 5020:18-5118:2. The NYPD's written training materials are certified and in line with accepted police practices. 4908:10-21, 4914:3-10, 4914:11-15(Reiter). Recruits and Impact officers receive training on, *inter alia*: reasonable suspicion; when a person objectively may not feel free to leave a police encounter; the tone of voice to be used during different levels of street encounters; the nature and extent of permissible questioning; Penal laws (including trespass crimes) and Constitutional Law (both NYS and Federal); the Debour levels of street encounters; the NYPD Policy Prohibiting Racial Profiling; Policing in a Multicultural City (including a multi-day immersion course with participation of community leaders and citizens); tactics; suspicious bulges/firearms; and Activity logs/entries. *See* Q11/PTE 76 (Police Student Guide re: Street Encounters); L1 (Field

---

also interview complainants, witnesses, and the officers where appropriate.   6590:21-6592:21.

[46] The CCRB Profile and Assessment Committee and the NYPD's other performance monitoring programs are not mutually exclusive.  Rather, there is a built-in redundancy in the NYPD so that officers who are eligible for the Committee will also be placed on performance monitoring if they meet those thresholds as well, so that the NYPD can catch all those officers who may be

Training Unit guide); S11 (Police Student Guide re: Policing in a Multicultural Society); R3(Lesson Plan re: Sergeants Leadership Course; P3 (Lesson Plan re: Multicultural Immersion Course); O3 (Lesson Plan re: Proper Preparation of SQF Reports);  W3/C8 (Lesson Plan re: Armed Suspects); 3753:1-15; 5073:12-5080:3; 5129:6-21; 5130:25-5132:2; 5178:14-5189:24.

44.     Officers are trained to complete a UF250 whenever they intend that an individual is not free to leave, regardless of what the individual may believe.  Q11; 5185:5-5186:8.

45.     The NYPD trains officers on SQF and related issues[47] at the academy, during roll calls, at annual in-service training, promotional training, refresher courses (such as courses at Rodman's Neck), special reinforcement training programs; through legal bulletins, and through informal on-the-job training.[48]  Newly promoted officers receive training on how to supervise. 5220:23-5221:1 (Vizcarrondo); 5240:22-24 (Silva); 5264:17-19 (Monroe); 5390:25-5391:10, 5448:19-5449:22 (Lehr); 5542:12-24 (Marino); 6497:4-6 (Holmes); 6595:7-11 (Morris).

46.     The NYPD has training sergeants in each precinct. 4981:2-22 (McCarthy).  Officers are sent for retraining when problems are identified.  720:7-18 (Serrano); 959:21 – 961:18 (Mascol); 1547:20-23 (Diaz); 1667:16-1669:10, 1685:12-18 (Guimaraes); 3213:8-18, 3223:5-14, 3240:20 – 3241:9 (McHugh); 3343:6-15 (Thompson); 3531:11-20 (Ortiz); 4076:16-22 (Moran); 4788:4 – 4789:20 (Cronin); 5223:23 – 5224:7 (Vizcarrondo); 5396:14-21 (Lehr); 5630:5-15, 5637:2 – 16,

---

exhibiting early signs of trouble. 7337: 23-7338: 2.
[47] Related issues include, but are not limited to: reasonable suspicion, UF-250s, truthfully filing out reports, racial profiling,
[48] 648:13-649:7, 791:19-792:3 (Serrano); 856:24-859:9 (Salmeron); 1051:1-10 (Agron); 1043:23-1044:16 (Diaz); 1250:1-12 (Rodriquez); 1298:3-21 (Pichardo); 1940:25-1941:16, 2096:5-2097:3 (Hegney); 2679:16 – 2680:3, 2688:21 – 2689:5 (DeMarco); 2744:11-16 (Leek); 3073:13-3074:12 (Kovall); 3150:9-19 (White); 3452:14-3453:16 (Gillespie); 3752:11-3754:2 (French); 3817:13-3818:6 (Rothenberg); 4029:24-4032:23, 4032:6-23; 4083:1-12 (Moran); 4986:11-4988:17 (McCarthy); 5193:19-5194:7, 5214:14-5215:18(Vizcarrondo); 5547:20 – 5548:2 (Marino); 6305:7-15, 6312:10-6313:20 (Telford); 6346:15-18(Navaretta); 6372:18-25(Dang). Downs attended the citizens police academy, received training similar to what officers receive,

5655:6-13 (Cirabisi); 6487:21 – 6488:11 (Holmes); 6643:10-25 (Materasso); 7109:16 – 7110:10 (Farrell); 7328:11-18 (Hall).   Retraining is given to officers as part of the NYPD's progressive discipline strategy.   4558:17 – 4559:5, 4590:7 – 4591:10 (Schwartz); Training records are tracked.   7320:25 – 7321:11 (Hall)

47.   **Supervision (¶47-¶48)** The NYPD relies on a chain of command of supervisors, namely, sergeants, lieutenants, and precinct commanding officers so that all police activity, including stop, question and frisk, is properly being conducted. 7356:10-7357:20, 7364:5-20 (Hall overview); 3572:4-25 (Ortiz); 53357:9-5339:16 (Lehr); 5617:16-5619:1 (Cirabisi); 6459:3-6460:1 (Holmes).   Chief Hall and his staff review UF-250s prior to CompStat meetings and raise issues or concerns about the UF-250s with COs at the meetings.   7348-7-7351:2; 7351:8-7352:13.   Borough commanders meet with platoon commanders regularly and CompStat meetings now include platoon commanders, as they are part of the precinct management team. 7369:17-7370:8. Borough commanders also hold CompStat meetings with COs. 6567:16-6568:19(Morris).   Lieutenants "command the platoon" and supervise the sergeants, which includes annual evaluations and quarterly assessments. 7361:1-7362:3; 7364:5-20. Sergeants are entrusted to "hand[le] conditions that are going on within the area that they work."   7359:21-7360:8.   Sergeants testified that they routinely witness stops made by officers (3790:20-25; 3790:20-25); routinely monitor the radio (particularly for a person who fits suspect description)(1186:23-1187:8, 3790:6-19; 5267:5-7; 5294:21-5295:9); speak to officers during roll call about training and ongoing crime conditions for a given tour (117:12-23; 5621:8-17; 7355:17-7356:1(Chief Hall)); review their officers' UF-250s and frequently discuss the underlying facts of stops with officers to determine whether an officer is able to articulate a

---

found it "very practical" and described it as "excellent" and "wonderful." 4124:10 – 4127:6.

proper basis for the stop (5267:14-19; 4084:19-4085:8); and when they have an officer drive them during a tour, they use this assignment as an opportunity to train the officer (1187:9-17, 1011:7-20). For anticrime units, squads are very small and sergeants are usually present in the field – which allows for the sergeant to continually assess an officer's understanding of the propriety of any enforcement, including any stops. 1351:16-1352:11; 1486:16-23; 3014:12-24; 1555:12-19; 3752:22-25; 5242:1-7. For Impact officers, officers will work in a small geographic area with their sergeants readily available. 1555:12-19; 6356:4-10; 6461:20-6462:20. Further, supervisors will verify arrests at the scene. 5628:21-25.[49]

48.    In addition to monitoring overtime usage, ICOs monitor officer behavior and performance by reviewing their memobooks, speaking with officers, responding to radio runs, visiting officers on foot posts and in the hospital, visiting corruption prone locations, and observing officers testifying in court. 3581: 8-25; 3626: 7-3627: 13; 3655: 17-3656: 21; DTE F5. Lt. Peters testified that part of the ICOs duties included debriefing prisoners, and if the prisoner had a complaint, such as about racial profiling, he would take a complaint for the prisoner. 3612: 19-3615: 22.   ICOS attend biweekly meetings with the other ICOs assigned to their respective boroughs, and also attending meetings with their commanding officer. 3602: 11-13; 3604: 14-17; 3656: 22-3657: 8. Lt. Palmieri testified that incomplete memobook entries has come up at the borough ICO meetings, and as a result he has been inspecting supervisors' memobooks to ensure they are reviewing their officers' memobooks. 3674: 10-21.

49.    **SQF Documentation (¶49)**  Reiter could not identify a single police department that uses memo books. 4924:4-6. Reiter couldn't recall the forms used by any agency other than

---

[49] Rothenberg believed he may also have had probable cause to arrest Provost because he thought that the knife was a gravity knife; however, at the precinct, Houlahan instructed Rothenberg that it was not a gravity knife. 3832:6-3833:1.  White called the detail supervisor to explain what had

Pittsburgh to document SQF encounters. 4929:3-4930:19. Reiter could not testify to the percentage of police agencies that document SQF encounters. 4931:24-4932:3. One of Reiter's main complaints with the UF-250 form is that it requires officers to speak to the stopping officer in order to determine the exact facts of the stop; however, an investigator looking into the facts of a stop would have to speak to the stopping officer regardless of whether or not a UF-250 was completed or the quality of a completed UF-250. 4933:1-11. Proper supervisory review of stops requires a supervisor to either be present for a stop or to conduct a substantive review of the 250 form and memo book. 4935:14-18. However, Reiter admits he doesn't expect every supervisor to conduct an in-depth review of every single stop officers conduct. 4935:19-22. According to Reiter, sufficient supervision could simply be the presence of a supervisor at the scene of a stop-question-frisk encounter even if that supervisor does not conduct a substantive review of the paperwork. 4935:23-4936:2. One of Reiter's proposed remedies is quality control callbacks of individuals who have been stopped. 4948:19-21. However, Reiter could not identify a *single* police agency that conducts quality control call backs for stop and frisk. 4949:8-11.

50.     **"Top-Stoppers"** (¶50-¶52) Police Officer Dang utilized a multitude of intelligence resources, including the ability to track known gang members[50] and convicted felons, crime maps, confidential informants, and information gathered from the 88th Precinct's Detective Squad, to conduct SQF.[51] 6428: 21-6249:16.

---

happened during the stop and the detail supervisor authorized the arrest. 3138:24-3139:2.

[50] Dang monitored known gang members being released from prison and reestablishing their turf within the Ingersoll-Whitman Development, leading to violent crime. 6429:17-6430:9.

[51] Dang marked "High Crime Area" and "Time of day, day of week, season corresponding to reports of criminal activity" for specific reasons. For example, Dang testified these boxes would be checked for stops occurring in/around Fort Greene Park, an area traditionally known for robberies, as well as stops related to a burglary pattern in another area of Brooklyn. 6434:4-13; 6434: 23-6436:7. Patterns are groups of crimes similar in nature, be it by the time of day, the dates the crimes are occurring, the type of victim, or the MO of the perpetrator. 6368:21-6369: 7.

51.     Dang's familiarity with suspected gang members would help him to identify when those individuals were engaged in furtive movements.[52]

52.     As Dang's supervisor, Sgt. Marino often patrolled with Dang and had the opportunity to observe Dang conducting stops. 5610: 1-12.  When Lt. Telford was a Sergeant supervising an anti-crime team, he would personally drive with each new officer assigned to his team to help train[53] them as they transitioned into their new assignment.

53.     **March 5, 2013 Memo** (¶53-¶54) Chief Hall discussed the fact that the Patrol Services Bureau had been failing the QAD audit on memobook entries at numerous borough commander meetings and following CompStat meetings. 7382:20-7383:5.  In January of 2013, Hall attended a meeting with all of his borough commanders, where he learned of a memo that Chief Pizutti had issued to the precincts under her command regarding memobook entries. 7384:15-7385:9.  On March 5, 2013, Hall, using Pizutti's memo as a model, issued a citywide memo instructing that when an officer conducts a SQF, he must attach a photocopy his memobook entry to the copy of the UF-250 turned in to the desk officer at the precinct. The memo further instructed that officers should be including more detail in their memobooks, including descriptions of any furtive movements, as is required by the NYPD's Patrol Guide. 7382: 23-7383:15; 7386: 8-23.

54.     Following the March 5, 2013 memo, borough commanders issued memos of their own, notifying all their respective commands of the new procedure.  Assistant Chief Morris required his borough training officers to instruct the Commanding Officers of each precinct to train their

---

[52] What constitutes "furtive movements" varies depending on the crime suspected. 6433: 8-14. For example, if the crime suspected is robbery, then the furtive movement contributing to reasonable suspicion could be walking up and down a small area of a street, looking left and right as if looking for something or someone to target.  6433:15-25.

[53] This training included enhancing officers' observation skills, discussing whether there was reasonable suspicion to conduct a stop, and how to approach people at the lower levels of suspicion. 6312: 10-6313: 20.

officers regarding compliance with the new procedures. 6576: 6-6577: 8; 6580: 16-22.  Hall issued instructions to his borough commanders to follow up on the compliance with the March 5, 2013 memo. 7387: 19-7388:2  In performing this check, Morris learned that all of the 40 UF-250s he checked had a copy of the memobook attached, and that more than half had a proper entry with sufficient detail regarding the circumstances of the stop. 6578: 19- 6580: 14. Borough Commanders will perform additional spot checks in the future to ensure compliance. 7390: 1-7.

55.    **Alleged Quotas**    **(¶55-¶66)** When the "Quota Law," N.Y.S. Labor Law § 215-a, was changed in 2010 to prohibit additional enforcement activity, the NYPD Legal Bureau drafted a memorandum explicitly prohibiting quotas and explaining both the impact of the Quota Law and the appropriate use of performance goals. PTE 290. Chief Hall testified about how he received that memorandum and distributed it to all 76 commanding officers in the NYPD.  7642:12-23.[54]

56.    Plaintiffs and their experts have muddied the water by conflating the terms "quota" and "performance goal." 4917:15-17. However, both legally and practically, there is a significant difference between the two concepts.  As Deputy Commissioner John Beirne testified, a performance goal, even when expressed in a numerical value, is an acceptable means of motivating staff and providing expectations for their work. 3360:9-19; 3399:13-20. In contrast, a quota is a numerical goal that must be achieved in a specified period of time, which would lead to adverse employment action if not achieved. N.Y.S. Labor Law § 215-a.

57.    Even Reiter opined that productivity goals can be both an acceptable police practice **and** consistent with generally accepted practices in the field, particularly when they are assessed against the performance of similarly situated officer peers. 4917:18-4918:6; 4923:2-8; 4923:14-

---

[54] While plaintiffs played roll call recordings from only three of the 76 NYPD precincts during this trial: the 40th, 41st, and 81st, plaintiffs have not produced a single recording of that nature that was made since the Quota Law was changed.

4924:2. Further, according to defendants' police practices expert, James K. Stewart, performance goals are an absolutely necessary part of monitoring and supervision because "in policing, there are disincentives to engaging in some activities because they are dangerous." 7756:3-6. Indeed, officers are frequently assigned to locations that are chaotic and rife with criminal activity. While Operations Order 52 expressly encourages the use of performance goals, plaintiffs have not presented credible evidence of the existence of a City-wide quota, or any evidence of causation between an alleged quota and the stop of a single individual.

58.     In 7 of the 19 stops described by plaintiffs, stopping officers could not be identified. *See*, *generally* 5509-5541 (Albino), and 5485-5509 (Dengler). If these 7 stops actually occurred, and even if the Court finds they were unconstitutional, these stops logically could not have been motivated by a quota. Since the John Doe officer(s) involved in each of these 7 stops did not complete a UF-250, the officer was obviously not motivated by a quota, or else he would have completed a UF-250 form, and accepted "credit" for the stop.

59.     For the other 12 stops where officers were identified, plaintiffs have not shown any evidence of a quota that in any way motivated the stops of those individuals. As an initial matter, if plaintiffs' theory is correct that quotas motivated any of those officers' stops, the monthly activity numbers for officers in the same command in the same assignments should be nearly identical.  Plaintiffs, however, made no showing that officers conducted the same number of stops, summonses, or arrests on a monthly basis.  Fifteen officers' monthly activity reports prove that the amount of activity officers performed on a daily and monthly basis was ever-changing and based on the crime conditions in the precincts of those officers.[55]  For the officers involved

---

[55] B10 (Serrano); X11 (Polanco); Z10 (Moran); M12 (Dang); P13 (L. White); Q13 (Gillespie); PTE 15 (Dennis); PTE 123 (Salmeron); PTE 178 (Hernandez); PTE 215 (Arias); PTE 219 (Leek); PTE 222 (Figueroa); PTE 228 (Nacelewicz); PTE 229 (French); PTE 419 (Polanco);

in plaintiffs' individual incidents, no two partners had the same activity and they testified that they were never punished or rewarded based on their different activity levels. *Cf.* Q13; 3456:3-3463:9 (Gillespie); *with* P13; 3154:10-3158:13 (Luke White); *Cf.* PTE 229; 3741:3-3742:9 (French); *with* PTE 228 (Nacelewicz); *Cf.* PTE 219; 2709:24-2712:23 (Leek); *with* PTE 222; 2787:16-2789:8 (Figueroa).  Even if that were not the case, none of the officers involved in any of the stops at issue testified that they ever felt pressure to perform *unlawful* stops.[56]

60.     Plaintiffs also attempted to argue that pressure for "numbers" comes from Compstat and works its way down.  However, testimony at trial demonstrated that the focus at Compstat is on quality, not quantity. 925:1-15 (Marino); 2881:2-8 (Esposito). This focus on quality trickles down to supervisors and finally, to officers in the field. 1844:18-20 (Mauriello). In fact, high ranking officials at Compstat ensure that the focus is on quality and not quantity by checking to confirm that the UF-250s being issued by the Precinct presenting are being written for the 'right time, right location[,] right individual.' 7348:19-7349:7; 7353:10-25. For example, if the description provided by victims describe the perpetrator as a teenaged Hispanic male, Chief Hall would be concerned if the 250s indicated that middle-aged Hispanic men were the ones being

---

PTE 420 (Polanco); PTE 555 (Gonzalez); PTE 556 (Noboa). Also in evidence are months worth of Squad Supervisor Recapitulations and Monthly Activity Reports for officers in the Anti-Crime teams of Manhattan North (PTE 309) and Queens South (PTE 310). These recapitulations compare the activity for all officers on the Anti-Crime team for a specified month. A review of these records indicates that with minor exceptions, officers on the same assignment routinely conduct a different numbers of stops on a monthly basis, and that the number of individuals stopped by officers varies considerably on a monthly basis.

[56] Moreover, of the small amount of officers who testified that their experiences with performance goals included being given a target number of stops officers were expected to conduct, plaintiffs failed to prove that any officers were punished as a result of failure to reach those goals. For example, P.O. Pichardo testified that while he was given a numerical goal in years past, he was never punished for failing to meet these goals. 1298:22-1300:9.  P.O. Figueroa explained he had performance goals, but these goals were very easy to meet and that nothing would happen if he came in below, or exceeded, said goals. 2766:20 – 2767:12, 2775:24 – 2776:17, 2788:5- 2789:8.  Even plaintiffs' own witnesses, Serrano and Polanco, could not

stopped in that area, and would question the Commanding Officer about the discrepancy. 7624:19-7625:7. From the Chief of Patrol down to officers straight out of the Police Academy, the message is clear: address conditions, not "numbers for numbers sake". 858:9-14 (Salmeron); 925:1-15, 881:12-18 (Chief Marino); 948:8-15 (Mascol); 1008:15-18, 1013:18-1014:5 (Agron); 1178:10-13 (Korabel); 1187:9-17 (Korabel); 1246:18-20 (Rodriguez); 2957:2-13 (Esposito); 3237:12-21 (McHugh); 3366:8-14 (Beirne); 3793:19-25 (Loria); 5235:2-9 (Mohan); 5275:2-16 (Monroe); 5627:24-5628:6 (Cirabisi); 6268:20-6269:2 (Barrett); 6653:4-6654:5, 6725:2-15 (Materasso); 6981:14-20 (McCormack); 7361:1-7362:3 (Hall); 3541:11-14 (Ortiz). The recordings made by P.O.s Polanco and Serrano support this sentiment.[57] 488:21-24; 709:11-21; 773:23-774:9; 775:3-24. Moreover, the officers who testified at trial, including Serrano, repeatedly stated that there are many ways to address crimes conditions in a precinct, beyond enforcement activity such as arrests, summonses, or even stops. 802:6-16(Serrano);881:19-882:5 (Marino); 948:24-949:17 (Mascol); 1201:2-8 (Korabel); 1665:25-1666:6 (Guimaraes); 3157:11-21,3158:3-13(L.White); 3446:24-3447:14 (Gillespie); 3456:3-23 (Gillespie); 3537:6-3539:11 (Ortiz); 3741:15-20 (French); 5243:312 (Silva); 5269:5270:20 (Monroe); 6533:11-20 (Holmes).

61.     Further, officers at trial overwhelmingly testified that they had never been subject to a quota or numerical goal. 859:22-861:1 (Salmeron); 966:18-967:7 (Mascol); 1011:21:1013:12 (Agron); 1676:5-18 (Guimaraes); 3153:16-3154:6 (L.White); 3454:20-3455:5 (Gillespie); 3495:22-3496:5 (Arias); 3834:8-19 (Rothenberg); 6235:8-6 (B.White). Supervisors also

---

demonstrate that they had ever been punished for failing to meet a numerical goal.

[57] In the 81st Precinct, there was never a specific number of UF-250s that officers must conduct, beyond one statement in dozens of recordings that Lt. Delafuente "want[ed] a couple of 250's out there, please" following the discovery of a gun hidden in a hole in a wall. PTE 289, PTE 289-T at 15JULY2008 81 4x12 Roll Call Lt.Delafuente Capt.Mauriello at .35-.50. In context, it is clear that Delafuente was asking officers to be alert for any individuals who went to that hole in the wall looking for the hidden gun. Importantly, this recording has no reference to any

repeatedly denied subjecting their officers to a quota. 967:8-968:10 (Mascol); 1011:21:1013:12 (Agron); 1503:14-24 (Kelly); 1676:19-1677:14 (Guimaraes); 1847:17-23 (Mauriello); 3578:4-8 (Ortiz); 3793:6-25 (Loria); 5268:13-15 (Monroe); 6480:11-12 (Holmes); 6657:16-6658:25 (Materasso); 6978:9-11 (McCormack); 6571:9-19 (Morris). Supervisors elaborated that they do not institute quotas not just because they are frowned upon publicly or because of the New York State "Quota Law," but that "numbers for numbers sake" does nothing to address crime, and merely "fosters hostility" between the NYPD and the communities it serves. 3543:1-3544:2 (Ortiz); 6273:5-15 (Barrett); 926:24-928:7 (Marino).

62.     Additional proof of the lack of quotas in the NYPD is the aggregate numerical data, as there are approximately 19,000 uniformed officers working in patrol functions in the NYPD. 7306:17-18. In 2011, NYPD officers conducted approximately 685,000 stops. 2807:18-21. Officers therefore average three stops *per month*. Moreover, officers typically work 20-25 tours on patrol per month, each with an 8 hour and 35 minute shift. 584:24-585:3; 533:24-25.  Using simple math, officers average one stop every sixth to seventh day on patrol.  As noted by PO Herran, "[y]ou have to show something, you're a police officer.  You mean to tell me for 30 . . . days you haven't seen any violations on parking, any . . . moving violation, and any kind of arrest? If you have 25-26 days on patrol.  It's impossible." PTE 284(1:38-1:55).

63.     Serrano testified that "quotas" existed, which included having his supervisors ask him to conduct vertical patrols in housing developments. 735:19-738:14.[58] Serrano did not receive any punishment deriving from his perceived quotas. 5225:18-21; 5226:15-23 (Mohan); 5248:1-5

punishment or retaliation if officers do not conduct the requested stops.
[58] Serrano felt that the NYPD punished him by asking him to help others in the Rockaways in the aftermath of Superstorm Sandy, even though he concedes that other officers from his precinct and every other precinct in the City were also assigned to this detail.  788:2-789:3; 849:2-23 (Officer Salmeron testimony regarding same detail).  He even felt it was punishment to be

(Silva); 5269:6-5270:20 (Monroe); 6272:12-6273:14 (Barrett); 6678:13-24 (Materasso).  Serrano testified he was not a "hero" and was not a "zero," but was somewhere in the middle; and indeed, he received the satisfactory score of 3 (on a scale of 1 to 5) on his performance evaluations in 2011 and 2012. 734:13-735:1; 5271:8-5272:17 ("mediocre" officer). Serrano's supervisor, Sgt. Monroe, considered Serrano's decision-making ability to be poor and felt Serrano did not address crime conditions while on patrol. 5272:18-5273:23; 5284:12-5286:3; 5272:10-17. With respect to Serrano's October 2012 monthly impact measurement report,[59] Monroe criticized Serrano for being ineffective in addressing his assigned conditions because, based on Monroe's personal experience and his supervision of other officers, it was inconceivable that Serrano would be unable to conduct a single stop in the entire month, particularly as many of the radio runs to which Serrano allegedly responded contained detailed descriptions of suspects that should have yielded greater investigation.  DTE B-10; 5277:14-22; 5286:4-5297:16.

64.    Contrary to Serrano's allegations, Captain Materasso did not illegally stop and search three black men while Serrano was present. 6659:10-14; 6727:13-16.  Rather, Materasso was given information that undercover narcotics officers had purchased crack from two dealers as part of a large-scale federal investigation.[60]  6659:15-19.  This stop only took place after the Captain Materasso received a detailed description of the two crack dealers, including what they were wearing and where precisely they were standing.  6661:19-6662:3; 6664:15-24.[61]

---

[59] Serrano had 161 radio runs and zero UF-250s in October 2012. 5293:19-5294:17.  Serrano worked 13 days on patrol, which amounted to over 100 hours. 5286:4-5297:16.
[60] Materasso was aware of this year-long narcotics investigation through monthly strategy meetings with the narcotics investigation team. 6664: 8-14. She was asked to identify the crack dealers, so when the case "take-down" would occur, arrest warrants would be issued.  6662:4-17.
[61] While Materasso frisked the two crack dealers out of fear for her safety, at the time they were frisked, Materasso had probable cause to arrest these men based on the drug sale to the undercover officer.[61]  6663:2-6; 6666:19-23; 6667:21-6668:7.

supervised in the completion of his work and his activity logs. 725:3-15; 767:2-9.

65.     Contrary to Serrano's allegations, Inspector McCormack never told Serrano he should stop all black and Hispanic people. 6966:8-14; 6971:3-5. On an audio secretly recorded by Serrano, McCormack explained he encouraged Serrano to lawfully stop the "right people" (namely, "the victims' descriptions of the perpetrators…committing" robberies, grand larcenies, and shootings during that time) at the "right place" and the "right location" (the sector where the condition needs to be addressed), particularly in light of the limited resources available at the 40th precinct. 6954:4-13.  Although Inspector McCormack made a general comment on Officer Serrano's secretly-recorded audiotape regarding stopping "male blacks, 14 to 20, 21" during a 2012 roll call,  Inspector McCormack explained that lawfully stopping the right people meant stopping individuals only if individualized reasonable suspicion exists, i.e. not merely stopping African-American males age 14-21.  7052:1-9.  Moreover, Inspector McCormack was referring to conditions of "hundreds of robberies and grand larcenies that were occurring in and around Mott Haven and the Patterson housing developments." 6971:12-18.  Inspector McCormack was made aware of the suspect descriptions for this crime condition from the victims of the perpetrators.  6971:19-22. Further, during roll calls, Inspector McCormack would provide sufficient detail regarding crime suspect description information to his officers, including clothing, height, weight, and any other information about the suspects available.  7051:1-5. Indeed, with respect to the Mott Haven robbery and grand larceny condition, Inspector McCormack provided such suspect descriptions to his officers at roll call.  7051:16-25.

66.     Adhyl Polanco made recordings of roll calls from September to November 2009. 471:1-3. He alleged that the imposition of quotas only began in 2009, though he gave conflicting answers about in which month they began. 421:9-17; 423:17-24 (Summer 2009); 553:17-20 (February-March 2009). When that quota was allegedly first set, the number was 20 summonses and one

arrest.[62] 424:24-425:7. Though Polanco also alleged he was told to conduct five SQFs in a month, 426:23-427:8, and at times to conduct one SQF per tour, 427:18-24, none of these alleged numbers are found on the recordings provided by Polanco. Polanco claimed that consequences for not meeting the quota would result in a tour change, low evaluations, and performance monitoring. 429:11-18. However, Polanco admitted he did not meet the alleged quota for certain months, but did not allege he was punished with low evaluations, a tour change,[63] or performance monitoring as a result. 429:19-22; 500:16-22. The Squad Supervisor Recapitulations for Polanco's squad for an eight month period includes the summary activity for the other officers on the same squad as Polanco. PTE 491; DTE X11. For half of the months, not a **single** officer on Polanco's squad met the alleged 20 summonses per month quota. And nearly half of the officers failed to meet the alleged five 250s per month quota alleged by Polanco. Therefore, it's clear that even if a quota was in place in the 41st Precinct, officers did not feel any pressure to meet those numbers through unconstitutional stops or summonses, since more than half of the time, the officers never met those numbers.[64]

---

[62] Polanco admitted he never once heard Inspector McHugh give any numbers to officers. 519:24-520:15.

[63] While Polanco also claimed that he was denied days off because of his low numbers, he could not come up with a single date on which that happened. 431:12-25.

[64] Testimony during trial indicated that in other instances where numbers were heard on recordings, officers had set those numbers for themselves. PBA delegate Angel Herran testified that in his experience, officers set a target number of summonses and arrests they should reach on a monthly basis, without input from supervisors. 6764:11-22. Although officers no longer agree on numbers, Herran explained the rationale for officers setting their own numbers in the past was the desire to know what the average is, and to know how the officers rated compared to their peers. 6766:19-24; 6764:24-6765:5; 6768:19-6769:2. Herran stated that stops or UF-250s were never part of that calculus, and Polanco never recorded any evidence to the contrary. 6768:10-15. Chief Marino, when he was the Commanding Officer of the 75th Precinct, noticed this same behavior when he saw that the approximately 400 officers assigned to patrol all issued exactly 5 summonses per month. 918:21-919:4. Marino testified supervisors had not instituted any sort of summons, and that the 5 summons per month number appeared to have been a quota set by the officers themselves. 919:3-4. It is telling that such evidence of a quota, whether

67.    **Senator Adams. (¶67)** Plaintiffs' witness, State Senator Adams, provided utterly implausible, false, baseless, and wholly uncorroborated testimony alleging that Police Commissioner Kelly told Adams, Governor David Paterson, Senator Martin Golden, and Assemblyman Hakeem Jeffries that Kelly "targeted" black and Hispanic young people because he "wanted to instill fear in them," so that "every time they leave their home, they could be stopped by the police." 1588:25-1589:6. Adams even claimed at trial that Kelly repeated these comments while at a round-table discussion at Medgar Evers College in August 2010, which included 50 African-American officials and the Central Brooklyn Black Legislative Coalition. 1615:8-18; 1617:1-3. Adams's testimony was unequivocally rebutted by the testimony of Inspector Holmes, who was present at this discussion and who totally rejected the implication that it was the NYPD's policy to target black and Hispanic young people in order to instill fear in them. 6511:12-25; 6512:10-6513:10; 6515:13-6516:7.  Further, Chief Esposito explicitly rejected Sen. Adams's preposterous claim, and made it clear that he has never communicated any such practice to police personnel or down the NYPD chain of command.  3021:19-3023:3.

68.    **Eli Silverman. (¶68)** The 2008 survey is not reliable or representative.  2522:16-21 (2008 survey was limited to managerial retirees); 2525:5-15 (included only retirees who opted to join union mailing list), 2525:16-21 (no idea what percentage of retired managerial were surveyed); 2526:12-2529:3 (questions were worded in confusing way); PTE 300 (survey asked for pressure to increase stop and frisk reports, not stop and frisks themselves); 2533:1-10 (survey is subjective); 2533:11-24 (survey had no option for a respondent to indicate feeling no pressure); 2534:5 – 2535:13 (survey asked only about limited categories of police activities); 2537:12 – 2539:19 (professor did consider the possible bias of survey respondents).  The 2012

---

officer-imposed or supervisor-imposed, in any precinct has not been presented by plaintiffs.

survey is likewise not reliable or representative.  2540:2-13 (2012 survey limited to only retired members who opted into volunteer system); 2540:15 – 2542:13 (survey went out to very small percentage of actual retirees); 2544:16-18 (survey was not random); 2544:19 – 2548:22, 2556:18 – 2558:22 (survey was not representative of all retires and professor doesn't know if the survey is representative of active retirees, but professor thinks his "generally parallels" and that "no survey is perfect").  Very little can be drawn from the results of either survey. 2534:5-8 (survey says nothing about the quality of the police activity); 2559:20-2561:3 (survey was limited to two snap shots in time, and do not show changing opinions over time); 2561:4-2564:23, 2568:8-2569:6 (large numbers of people left questions blank, and depending on their intent, the results would be very different).  In any event, for the 2008 survey, by far the greatest increase in pressure was to decrease index crimes. 2569:7-2570:20, PTE 291.  The 2012 survey likewise shows that the increase in pressure reported in the survey was to address index crime.  PTE 292.

69.    **Expert Analysis. (¶69-¶91)** There is no prevailing benchmark for racial disparity regression analysis (2140:15-24; 2366:1-25; 2369:1-2370:2; 4305:18-4306:7; 6075:1-24; 7096:20-7097:10; PTE K6), but the evidence supports defendants' position that crime suspect data is the better, more appropriate benchmark.  4305:18-4306:7; 5790:19-5791:12; 6065:18-6069:6-11; 6070:13-6074:25; 6078:4-6079:2; 6131:9-20; 6151:5-6151:11; 7096:20-7097:10; 7260:7-7263:13; PTE K6.  Professor Fagan agrees.[65]  2372:6-14.

70.    Crime suspect description data estimates the available pool of <u>persons exhibiting suspicious behavior</u> that could be observed by the police (6065:25-6066:9) – while population

---

[65] Fagan's stated concern with using crime suspect description data in his analysis in this case is the fact that some percentage of suspect descriptions are unknown (2148:11-23; 2372:22-2373:2), but was unable to identify the percentage of known data that would be would required to allay that concern.  2459:17-2460:11.  Regardless, Fagan does not offer any evidence that the description of a suspect's race supplied by the victim of a crime is unreliable.

merely estimates the potential number of persons in a given area.  2138:19-2139:1; 5799:17-23; 6083:35-6087:7.  Suspect description is also much more closely correlated with stops by race and ethnicity than is population.  *See* DTE H13, Figs. 7-10; Y8 and B14; 6088:8-6091:19.  In 2011 and 2012, approximately 83% of all *known* crime suspects and approximately 90% of all *violent* crime suspects were Black and Hispanic, and Blacks and Hispanics represented 87% of persons stopped.  *See* DTE Y8 (NYC_2_00024916) and B14 (NYC_2_00028891).

71.     Fagan has previously used arrestee race data in racial disparity regression analysis (2192:19-22;  2370:15-2372:10;  2374:21-2375:5), acknowledging that the "more relevant comparison is the number of crimes committed by each ethnic group." (2372:6-10), however, he did not do so in this case.  2372:11-14.  Despite the fact that Professors Dennis Smith and Robert Purtell ran several alternate regressions which included suspect race data and the results revealed that the evidence of racial discrimination either disappeared or the size of the impact was reduced (DTE O8, Ex. I and DTE H13, Tables 8-10; 2363:20-2364:18; 5782:16-25; 5787:9-23; 5788:9-5790:17; 6086:11-6088:6), Fagan did not even test the effect of the inclusion of suspect race data in his model.  2377:23-2378:4.  Fagan's only argument in opposition was that in defendants' alternate regression (DTE H13, Table 10), looking at the Z scores, the magnitude of the statistical significance of percent black and percent Hispanic population are greater than the magnitude of the statistical significance for black and Hispanic suspect coefficients.  6840:8-6841:10; PTE 574.  However, as Purtell testified and illustrated in DTE N15, notwithstanding Fagan's claim of statistical significance and strength of association for the Z scores Fagan added to defendants Table 10 alternate regression (PTE 574; 6840:8-6841:10), there was no practical significance to Fagan's racial disparity analysis.  6855:17-6857:19; DTE N15.

72.     When confronted with his prior use of suspect (arrestee) data in disparate impact analyses, Fagan failed to offer any convincing justification for his departure in this case. 2377:23-2380:12.  Fagan's claim that because the race of suspects is only known in 63% of all crimes, too much data was missing to be reliable (2148:11-23; 2372:22-2373:2), is without merit (6084:6-10) and undermined by Fagan's own prior work which relied on arrest data where there was also a significant percentage of known race missing, yet he was able to reach what he believed were valid, reliable conclusions.[66]  6188:2-5.  Second, the impact of any missing data is not equally problematic for all crimes because suspect race is known for a **very high percentage** of **most crimes**.  *See* PTE 417, Appx. B, Table 2.  Fagan ran regression analysis by crime category.  *See id*. at Table 5 (p. 18).  Therefore, Fagan could have incorporated into his analysis known suspect description data for the 7 of 9 non-property crime categories, for which the percentages known are very high (73-98%, depending on the category).  *See id*. at Table 5 (p. 18); Appx. B, Table 2; 2379:12-2380:12; 5814:6-5815:10.  Doing so would have revealed what impact that suspect description data had on the regression analysis results.  2380:5-12.

73.     Fagan's claim that of confidence issues with the crime suspect data in "merged data files" provided by the NYPD is meritless since the only way the 37% unknown could threaten the reliability of the 63% known would be if the unknowns were dramatically different, but as Assistant Commissioner McGuire testified the proportions seen in that data are very consistent year to year, across the city and across precincts, so there is additional confidence that there is not some unknown population out there committing crimes.  4314:19-4315:2; DTE Y8 and B14.  For example, in the 73rd Precinct in 2012 there were 11,679 crime complaints.  DTE B14, at

---

[66] Fagan's missing data concern is undermined by the fact that his socioeconomic factors, population data and race measures in his regression analyses were all frozen in time from the year in which they were drawn, and therefore significant percentages of actual data was missing.

NYC_2_00029840.  Therefore, for approximately 4300 crimes (37% of 11,679) suspect race is unknown.  *Id*.  Blacks and Hispanics comprise nearly 98% of the residential population in the 73rd Precinct and 98% of all known crime suspects.  *Id*.  Asians/whites comprise 1.7% (1480 persons) of the 73rd Precinct's residential population and 2% of all known crime suspects.  *Id*. To believe the 63% of known suspects is unreliable measure of the 37% unknown suspects, you would have to believe that the unknown suspects are overwhelmingly made up of the Asian/white suspects – a result that requires the unreasonable conclusion that the approximately 4300 crimes with unidentified suspects were committed either by the 1480 Asian/white residents, or by an influx of Asian/white visitors to the 73rd Precinct.

74.    The results of Fagan's regression analyses are only reliable if the model reflects the scenario he is trying to test, which in this case is the existence of racial bias in NYPD stop activity.  5780:20-25.  Fagan's model does not reflect reality because he omitted key variables and the variables he included are improperly specified, operationalized, and estimated.  5742:20-5473:17; 5790:19-5791:12; 5794:22-5795:23; 5819:2-5820; 5821:7-.5827:11.  Due to the flawed manner in which Fagan structured his racial disparity regression analyses he cannot separate the effects of race from other components of crime patterns.  5810:4-14; 5821:7-5822:12.

75.    Data was fixed at a point in time and not trended over the period under review, which means Fagan's model ignores the reality that population, racial composition, gender, education level, unemployment, and other relevant socioeconomic factors can all vary across time in a census tract – i.e., hour to hour, day to day, month to month, season to season, year to year. 2389:22-2396:13; 5799:17-5805:11.  Fagan's static approach is **inconsistent** with the practices of most criminologists to use trended variables for demographic factors.  6070:13-6071:11.

76.     Census tracts are used as the geographical unit of measurement, despite the fact that they are not used by the NYPD as a unit of management including to report or track crime, to deploy resources, or to define patrol sectors.  3246:22-3247:8; 6108:22-6109:2; 6460:11-6462:12; DTE T14.  Fagan is aware of this reality.  2401:10-21.

77.     Crime data is logged to smooth or "iron out" the "noise" of the ups and downs of daily crime data (2411:8-2412:4; 2427:5-2428:1), but that process eviscerates from the regression model the reality of how the NYPD uses crime data to make policing decisions.  6093:18-6096:18.  The observation of a spike in crime matters to the NYPD.  1646:21-1648:8; 3244:1-10; 3479:19-3480:5; 3567:10-16; 5235:2-5; 5545:18-5546:3; 6096:19-6097:16..  The "noise" drives deployment decisions and stop activity.  *Id*. and 6082:25-6083:19.  Fagan admitted that he could have used crime rates in his analysis, which would obviated the need for logging, but he did not. 2428:2-8.

78.     Crime data is lagged by calendar month, which can result in the use of data up to 7 weeks old while ignoring the 3 most current weeks of crime data.  2428:12-2429:6; 5819:2-19; DTE O14.  The record is replete with testimony from NYPD witnesses of all ranks and assignment supporting the fact that the NYPD uses real crime in real time. 5338:23-5340:7; 6572:18-6573:3.

79.     Crime is aggregated into crime categories, which falsely assumes that the police response - in terms of stops conducted – is the same regardless of the specific crime.  2412:8-14; 2413:14-21; 2421:1-15; 5811:6-24; 6082:25-6086:10; 6182:25-6183:16.

80.     Fagan neither excluded nor controlled for the 78% and 88% of the stops that he found were apparently justified by reasonable suspicion in the data set for his 14th Amendment regression analysis.  2407:5-2408:9; 2408:21-2409:9; 5815:11-15.

81.     Fagan's patrol strength measure – intended to control for the probability of an officer encountering someone exhibiting behavior justifying a stop – was fatally flawed.  5791:13-5792:24; 6109:7-6113:25.  In his First Report Fagan used quarterly precinct staffing numbers (2400:14-18), and in his Second Supplemental Report he created his own calculation of patrol strength based on whether an officer made a single stop in a census tract in a calendar month, not accounting in any way for the potential presence of partners, supervisors, or specialty unit teams.[67]  2396:14-2397:22; 2400:22-25; 5792:3-24; 6110:22-6113:25; and PTE 412 and 417; DTE O8 and H13.  A police officer walking a beat or driving through a patrol sector is likely to see hundreds of people each day, and over a twenty-day work month may see thousands.  DTE H13, p. 9.  Yet a typical officer chooses to stop an average of 2 to 3 people per month, so there are many more observed individuals who do not exhibit behavior that warrants a stop.  5896:23-5897:5; 6165:1-13; DTE H13, p. 9.  Therefore, defendants' experts argued that since there was strong evidence that the processes were different, that difference – termed "zero counts" needed to be addressed in the regression models.  DTE H13, pp. 66-70; 5787:14-5788:7.  Purtell explained that the "zero counts" defendants removed in order to test their hypothesis (represented in DTE H13, Table 8) included census tracts which had zero stops in a calendar month as well as tracts which had only one or two observations, and cases in which there were large gaps in the data set.  6047:14:6047.  Defendants experts found that not controlling for "zero counts" was likely to inflate the impact coefficients for all of the variable in Fagan's regression

---

[67]  Fagan's claim of confidence in his calculation of patrol strength because of a "high correlation" between the two measures used in each report (2399:1-7; 6041:3-10) is unsupported (5888:2-9; 5891:2-14) and meaningless, because as Purtell testified, while there may be a correlation between two sets of numbers, it does not establish that either are accurate measurements.  5796:3-5797:5, 5797:22-5798:6; 5888:10-5889:6.  Fagan also conceded that defendants were correct in their criticism of Fagan's patrol strength measure as endogenous.  6007:11-17.

analyses. DTE H13, pp. 66-70; 5825:5-15; 5934:2-5935:15. Defendants' experts never suggested or opined that zero counts should be permanently removed or dropped from the analysis – only that they should be controlled for in the model, which is a standard accepted statistical practice. 5824:19-5826:5; 5918:17-5919:2; 6844:14-24; DTE H13, pp. 66-70.

82.     Fagan agreed that regression coefficients can be affected by "zero counts" (2381:23-2382-7), and acknowledged his awareness of statistical methods to control for zeros in a regression model. 2385:24-2386:8. In fact, Fagan conducted a test to determine whether there was a need to model the "zero process" and the results of that test strongly supported defendants' hypothesis that there was a need to control for the zero process. 6843:15-23; 6844:8-13; 6859:19-6860:13. Nevertheless, Fagan failed to control for "zero counts" in his regression analysis.

83.     There is no practical significance to Fagan's claims that after controlling for effects of crime complaint rates on the volume of stops, he observes a statistically significant contribution of the racial contribution of the police precinct to the overall stop rates. *See* DTE H13 at Table 12, and N14; PTE 412 and 417, at Tables 5 and 7; 5776:14-5777:3; 5929:20-5932:17; 6873:22-6874:3. Fagan's attempt to deny the lack of the practical significance of his regression analysis as reported by defendants is meritless because the odds ratio listed in the third line of DTE N14 is 1.00887 and Fagan agreed that with respect to the values in the third line a number equal to 1.0 would be "even odds." 6040:3-11). As Purtell testified, the practical significance of Fagan's regression analysis is that the odds of an increase in stops given a 1% increase in the proportion of the black population versus a 1% increase in the white population is 50.22% -- **a virtual coin toss**. *See* DTE H13 at Table 12, N14; 5762:24-5764:25; 5903:16-5906:5; 5908:17-5909:3;

5950:11-14.[68]   Therefore, no meaningful inferences regarding racial disparate impact can be drawn from the results Fagan reports.  5827:3-11.

84.     The population average results from Fagan's regression analysis cannot be used to predict the number of stops that would occur in a specific census tract.  5821:7-5822:12; 5906:6-5907:7; 5907:11-5908:9;  5909:4-18;  6045:9-6047:3.   Fagan's use of population average regression results in this manner abandoned all standards of statistical practice and he provided no proof of an exception that justified his behavior.  6870:24-6873:21.  Fagan admitted it would be important to know the actual values when considering his projected values (6883:10-6884:11) and conceded that he was aware of, but failed to report, those actual values to the Court with his predictions.  6884:12-6885:6.  Further, Fagan's newly claimed stop predictions were not consistent with the underlined actual stop numbers.  6874:13-20; 6885:9-6887:6.  Fagan's claim that the predicted stops and the actual number of stops followed roughly the same shape and distribution except for a small number of "outliers" at 80% and above was demonstrably false.  6848:17-6849:2; 6874:13-20; 6886:11-6887:6.   A review of PTE 566 – which reflects in graduated colors the census tracts and their relative percentage black, with the darkest color representing the 80% black and higher census tracts – makes clear that there are not a "small number of cases" for which Fagan's predictions were meaningfully disconnected from the actual numbers of stops, as Fagan claimed.[69] 6886:23-6887:6.

_____

[68] Fagan agrees that Purtell accurately stated how to interpret a regression coefficient in DTE N14 (6001:14-17), and that the legend on the last line of N14 accurately stated what Fagan was measuring in his Table 5 regression analyses.  6009:14-25; 6039:18-24.

[69] No exhibit similar to PTE 566 was offered by plaintiffs that mapped, by color-shaded census tracts, the distribution of percentage Hispanic census tracts in the City, nor is there any evidence to support Fagan's claim that there are only a small number of tracts with a demographic of 85% Hispanic or greater.  6824:25-6825:4; PTE 572.  Regardless of whether Fagan is addressing stops of blacks or Hispanics, defendants' maintain that Fagan's "predictions" of stops in census tracts

85.     Fagan's 4th Amendment analysis and opinions reflect that NYPD officers had apparent reasonable suspicion to make stops between January 2010 and June 2012 almost 90% of the time.  2023:19:23; PTE 417, Table 12C; PTE 417B; and PTE 417C.  A figure which, between January 2004 and June 2012, has **steadily increased** while the number of stops which are apparently unjustified by reasonable suspicion has **steadily decreased**.  *See* DTE H13, Table 4 and Figure 5, (page 50); PTE 411, Table 12; PTE 417, Table 12C; PTE 417B and PTE 417C; 2295:17- 2298:5; 2435:1-2436:17; 6103:8-6105:2; 6120:3-20.  Fagan did not provide any evidence about the appropriateness of any inference that the stops that are either "unable to be generalized" or "apparently unjustified" under his analysis support plaintiffs' claim of widespread unconstitutional conduct by the NYPD.  In fact, Fagan acknowledged that under his analysis the apparently unjustified stops are not evenly distributed across New York City at the borough, precinct, neighborhood or even census tract level.  2431:9-2436:17

86.     Fagan has admittedly conducted his 4th Amendment analysis without speaking to any NYPD officers to find out what they intend when they fill out the form and without considering any information *outside* of the UF250.  2320:18-2321:24.  Fagan's "High Crime Area" and Furtive Movement checkbox criticism and "census tract quintile analysis" (PTE 411, Fig. 13 and 417, Fig. 13) lack merit.  First, Fagan admitted that the "High Crime Area" checkbox can be referring to a geographic area smaller than a census tract area.  2359:15-2361:2; 6434:4-6435:6; 6467:1-8; PTE 42.  Second, of the 2.8 million stops between 2004-2009, only 62,437 had only Furtive Movement checked.  *See* DTE O8.  Therefore, even if the checking of 'furtive movement' alone were a cause for concern, the form alone cannot establish that a stop is illegal.

---

(PTE 570, 571, 572) using a population average regression model is inappropriate   and unsupported by accepted statistical practices.  6870:24-6873:21.

87.     Fagan admitted that analysis of handwritten narratives under "Other" on the UF250 "would invite a host of potential biases and errors," and would render any conclusions statistically meaningless."  2322:8-17; 2323:4-2324:8; PTE 415, ¶¶9-13.  Fagan's analysis of the "Other" text strings is statistically unreliable because Fagan failed to utilize accepted sampling methodology when conducting his analysis to ensure his sample was representative in all material aspects of the population of UF250s from which it was drawn, nor did Fagan compare his sample to the overall pool of data to demonstrate it had the same characteristics such that it closely represented the pool of data from which it was drawn.   2334:23-2337:6; 5828:14-5836:24; 5837:17-5838:2.

88.     Out of 4.43 million stops, 51.5% (2.28 million) were frisked and only 8.3% (approximately 367,000) were searched.  *See* DTE V14 (A-D); 2308:12-2310:16.  Of those approximately 367,000 searched, weapons were recovered 9.2% of the time and contraband was recovered 14% of the time.  *Id*.  Arrests were made approximately 6% of the time and summonses were issued approximately 6% of the time.  2316:1-23.  The fact a gun or weapon or contraband is not found does not vitiate reasonable suspicion for the stop, nor does it determine the legality of the stop.  In fact, Fagan previously acknowledged that a hit rate of 1 arrest for 9 stops would not raise concerns because the basis for a stop - reasonable suspicion - is lower than probable cause required for an arrest.  *See* Pl.  Ex. 333 at page 111.  Various witnesses testified, including former Chief of Department Joseph Esposito, that many stops interrupt a crime from occurring, for example an individual casing a location or stalking an individual late at night. 2883:1-2884:13; 2915:21-25; 2983:17-2984:11.

89.     Fagan has not conducted empirical research to support his opinion that the NYPD's "hit rate" suggests stops are lacking in reasonable suspicion (*see, e.g.*, PTE 417), and plaintiffs' police practices expert raised no concerns about the 1 and 10 hit rate.

90.     Multiple stops can easily occur in connection with a single event, which can explain the 1 and 10 hit rate.   6426:20-6427:22; 6446:11-6447:11.   Inspector Juanita Holmes testified that multiple people could be stopped in connection with the description provided in a single radio run, and further, that complaints involving descriptions of multiple suspects can also generate stops of multiple people.  6474:10-6476:19.  A complaint concerning disorderly groups of people can also generate multiple stops.  6477:10-25.

91.     Numerous Commanding Officers and high level officials testified that a hit rate of about 10-12 % does not raise concerns about whether the stops are based on reasonable suspicion. 2983:17-2984:11; 6473:5-16; 6601:10-6602:5; 7092:4-7093:9; 7678:9-15; PTE 333.   Only one Inspector voiced any concern whatsoever and that was assuming that the arrests and summonses together were 4% of the stops (5472:1-18), but that concern was in relation to a single 3-month period of stops in 2012 in that Inspector's precinct, in which the hit rate was significantly less than the citywide average.  5426:14-21.

92.     **Remedy (¶92-¶94)** The remedies described by Plaintiffs' expert are generic descriptions of policing systems and are not specific to the NYPD. 7548:12 – 7549:13 (generic); 7550:4 -16 (largely generic); 7434:17 -  7435:20 (general outline of a "comprehensive system"); 7529:7 – 7533:4; 7560:2-5 (not specific to NYPD).  Walker's chief opinion is that a different expert determine what changes, if any, are needed.   7542:2-6; 7496:16 – 7497:13; 7546:22-25 (Performance Reviews); 7510:18 – 7511:10 (Early Intervention System); 7542:18 – 7543:13 (Supervisory Review).    But, the NYPD already has in place all the elements of the

comprehensive approach.   7551:3-7552:10 (written policies); 7552:11-7554:5 (performance assessment system); 7554:6-7558:10 (training program); 7558:11-7560:1 (close supervision); 7560:8 – 7561:23; 7712:5 – 7715:23 (early intervention system); 7561:2-7563:1 (investigation and discipline); 7563:6-20 (citizen complaint process).   The NYPD's current system comports with accepted practices. 7576:14-7582:23 (Quest for Excellence is qualitative); 7582:24-7586:10 (yearly evals are qualitative); 7589:12-7591:19 (monitoring officer activity important); 7586:11-7588:1 (quantitative measures needed); 7752:3-7754:24 (current monthly conditions impact reports are quantitative and qualitative); 7741:12-7749:14 (current yearly evaluation are qualitative); 7588:2-7589:10; 7755:1-7757:1 (goal setting is an accepted police practice).

93.     A monitor is not needed.   7567:22 – 7570:25 (not resistant to change); 7571:2 – 7572:14 (not resistant outside oversight); 7572:15 – 7576:13 (not resistant to community input); 7763:11 – 7763:25 (monitors have downsides); 7770:10 – 7775:15 (experiences of other cities counsels against a monitor); 7777:2 – 7778:25 (court monitor is premature); 7779:2-22 (monitors should be the last resort, they are very slow and not sustainable, and internal changes are better).   Cities with monitors were very different than NYC and the needed remedies where much broader. 7592:14 – 7594:23 (specific remedial changes vary); 7593:3 – 7594:23 (size of department matters); 7783:5 – 7786:12 (Las Vegas shows that inside is better and faster).

94.     A narrative section on the UF 250 is not needed.   7757:2 – 7761:15; 7804:7-19 (a narrative section is not needed); 7805:5 – 7807:4 (narratives are often rote).   7822:21 – 18 (it is important that supervisors review their officers stops for constitutionality, but not needed for every stop).   The Court should consider the possible de-policing. 7787:14-18.

## CONCLUSIONS OF LAW

95.     The nineteen individual incidents at issue were lawful encounters consistent with the

Fourth and Fourteenth Amendment.[70]

96.    "[A] city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need."  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  No evidence was adduced to establish an unconstitutional policy or practice by the City, nor did the evidence establish a pattern of misconduct or acquiescence or tacit authorization of subordinates' alleged unlawful conduct by the City.  *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011).

97.    **Conclusion**  For the foregoing reasons, the Court should render a verdict in favor of defendant City.

_____

[70] For ¶18, given that there was an emergency report of a loose gun between four-to-five men in a small private, fenced-in location, officers had reasonable suspicion to stop these men proximate to that limited area. *U.S. v. Bold*, 19 F.3d 99, 104 (2d Cir. 1994) ("Where the tip concerns an individual with a gun, the totality-of-the-circumstances test for determining reasonable suspicion should include consideration of the possibility of the possession of a gun, and the government's need for prompt investigation.").  In *United States v. Jaramillo*, 25 F.3d 1146, 1152 (2d Cir. 1994), the Second Circuit held that "a Terry-type patdown is permissible with respect to persons who are believed, on the basis of specific and articulable facts, to have behaved suspiciously or with respect to persons who own, occupy, or enter upon *private premises* on which the officers have the right to conduct a search or make a security check."(emphasis added).  Here, it is reasonable that officers, acting on a report that a gun was in a private area of a building, believed that the four-to-five men present in this private area had a connection and therefore, that these men may have been carrying the gun. *See Jaramillo*, 25 F.3d at 1152.  For ¶19, Anthony's search was justified at least in part because he smelled like marijuana. *See, e.g., Floyd v. City of New York*, 861 F. Supp. 2d 274, 296 (S.D.N.Y. 2012)("[T]he narrative 'smoking cigarette strong smell of marijuana' would be strong evidence of reasonable suspicion").  The fact that Ourlicht's friend – in close proximity to Ourlicht at this point – was found to have drugs on his person led the officers to  reasonably suspect that Ourlicht may also be carrying drugs, which would thereby necessitate a continued search of Ourlicht.  Indeed, the Second Circuit, in *Jaramillo*, "suggests that an individual's proximity to another whom the police suspect of criminal activity can be a relevant consideration when there is a connection between the two individuals." *United States v. Nelson*, 08 Cr. 10264 (RWZ), 2009 U.S. Dist. LEXIS 22541, *12-13 (D. Mass. Mar. 6, 2009).  Regardless, the second search of Ourlicht was precipitated by the officer's discovery of the drugs on Anthony;  it was no longer proximately connected to the initial stages of the encounter and whatever safety reason caused the initial search.

Dated:        New York, New York
              June 12, 2013

                        MICHAEL A. CARDOZO
                        Corporation Counsel of the
                          City of New York
                        *Attorney for Defendant City*
                        100 Church Street, Room 3-158
                        New York, New York 10007
                        (212) 356-3503

              By:       *Heidi Grossman*
                        Heidi Grossman
                        Brenda Cooke
                        Linda Donahue
                        Morgan Kunz
                        Joseph Marutollo
                        Suzanna Publicker
                        Lisa Richardson
                        Judson Vickers

51