08 CV 1034 (SAS)

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID FLOYD, *et al.*,

       Plaintiffs,

               - against -

THE CITY OF NEW YORK,

       Defendant.

---

## DEFENDANT'S POST-TRIAL
## MEMORANDUM OF LAW

---

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Heidi Grossman, Esq.*
*Tel:  (212) 356-3503*
*Fax:  (212) 788-9776*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

I.     NO NAMED PLAINTIFF SUFFERED A 4TH AMENDMENT
     VIOLATION .............................................................................................................. 2

II.    THERE IS NO EVIDENCE TO SUPPORT A WIDESPREAD
     PATTERN OF CONSTITUTIONAL VIOLATIONS CAUSED
     BY A MUNICIPAL POLICY/DELIBERATE INDIFFERENCE ....................... 5

     A.  Lack of a "Widespread Pattern" of Unconstitutional Stops ................... 6

     B.  Lack of Causation/Deliberate Indifference ........................................... 10

III.   THERE IS NO 14Th AMENDMENT VIOLATION .......................................... 17

     A.  Lack of an Underlying Racially-Motivated Stop .................................. 18

     B.  Lack of a Widespread Pattern to Which the City Acquiesced ............. 19

     C.  The City Has Not Acquiesced to Any Widespread Pattern .................. 20

     D.  Express Racial Classification ................................................................. 21

     E.  Adverse Effect and Discriminatory Purpose ....................................... 22

          1.  Adverse Effect ................................................................................ 22

          2.  Discriminatory Purpose or Intent ................................................. 23

IV.   INJUNCTIVE RELIEF IS NOT APPROPRIATE ........................................... 24

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                                                   <u>Page</u>

*Amnesty Am. v. Town of West Hartford,*
    361 F.3d 113 (2d Cir. 2004) ..................................................................... 6, 12-13, 19

*Arlington Heights v. Metropolitan Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ........................................................................................... 23-24

*Board of the County Comm'rs v. Brown,*
    520 U.S. 397 (1997) ................................................................................................ 6

*Brown v. City of Oneonta,*
    221 F.3d 329, 338 (2d Cir. 2000) ...................................................................... 22, 24

*Brown v. Plata,*
    131 S. Ct. 1910, 1955 (2011) .................................................................................. 25

*Cash v. County of Erie,*
    654 F.3d 324 (2d Cir. 2011) .................................................................................... 17

*Chavez v. Illinois State Police,*
    251 F.3d 612 (7th Cir. 2001) ................................................................................... 22

*Chin v. New York City Hous. Auth.,*
    575 F. Supp. 2d 554 (S.D.N.Y. 2008) ...................................................................... 5

*City of Canton v. Harris,*
    489 U.S. 378 (1989) ...................................................................................... 10, 12-13

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000) .................................................................................................... 9

*City of St. Louis v. Paprotnik,*
    485 U.S. 112 (1988) .................................................................................................. 5

*Connick v. Thompson,*
    131 S. Ct. 1350 (2011) ..............................................................................5-6, 8, 12-14

*Cru v. Miller,*
    255 F.3d 77 (2d Cir. 2001) ....................................................................................... 4

*Devenpeck v. Alford,*
    543 U.S. 146 (2004) .................................................................................................. 4

*EEOC v. Bloomberg,*
    778 F. Supp. 2d 458 (2011) ...................................................................................... 6

| Cases | Pages |
|---|---|

*Estes-El v. Dumoulin,*
    2011 U.S. Dist. LEXIS 154788 (E.D.N.Y. Feb. 9, 2011).........................................18

*Florida v. Bostick,*
    501 U.S. 429 (1991)...............................................................................................3

*Florida v. Harris,*
    133 S. Ct. 1050 (2013)........................................................................................4, 8

*Floyd v. City of New York,*
    283 F.R.D. 153 (S.D.N.Y. 2012) ....................................................................16, 17

*Floyd v. City of New York,*
    813 F. Supp. 2d 417 (S.D.N.Y. 2011)........................................2, 16-18, 20, 23

*Floyd v. City of New York,*
    861 F. Supp. 2d 274 (S.D.N.Y. 2012)..............................................................8

*Gelb v. Board of Elections,*
    155 Fed. Appx. 12 (2d Cir. 2005) .........................................................................18

*Graham v. Connor,*
    490 U.S. 386 (1989)..............................................................................................19

*Green v. City of New York,*
    465 F.3d 65 (2d Cir. 2006)......................................................................................5

*Hargroves v. City of New York,*
    411 Fed. Appx. 378 (Feb. 22, 2011) .......................................................................3

*Hazelwood School Dist. v. U.S.,*
    433 U.S. 299 (1977)..........................................................................................6, 20

*International Brotherhood of Teamsters v. U.S.,*
    431 U.S. 324 (1976)...............................................................................................20

*Jenkins v. City of New York,*
    478 F.3d 76 (2d Cir. 2007).....................................................................................12

*Jett v. Dallas Indep. Sch. Dist.,*
    491 U.S. 701 (1989)...............................................................................................19

*Jewish Home v. Centers. for Medicare & Medicaid Servs.,*
    693 F.3d 359 (3d Cir. 2011)...................................................................................18

**Cases**                                                                                   **Pages**

*Johnson v. Artus,*
    2009 U.S. Dist LEXIS 26534 (S.D.N.Y. Feb. 20, 2009) ......................................... 4

*Jones v. Town of East Haven,*
    691 F.3d 72 (2d Cir. 2012)................................................................... 7, 15, 18-19

*Kravtsov v. Town of Greenburgh,*
    2012 U.S. Dist. LEXIS 94819 (S.D.N.Y. July 9, 2012) ........................................ 18

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) ................................................................... 23

*Lewis v. Casey,*
    518 U.S. 343 (1996)................................................................................ 2, 17

*Ligon v. City of New York,*
    *2013 U.S. Dist. LEXIS 22383 (S.D.N.Y. Feb. 14, 2013)* ...................................... 8

*McCleskey v. Kemp,*
    481 U.S. 279 (1987)..................................................................... 18-20, 23-24

*Melendres v. Arpaio,*
    2013 U.S. Dist. LEXIS 73869 (D. Ariz. 2013) ........................................... 19, 22

*Michigan Dep't of State Police v. Sitz,*
    496 U.S. 444 (1990)............................................................................. 9

*Michigan v. Chesternut,*
    486 U.S. 567 (1988)............................................................................. 4

*Muehler v. Mena,*
    544 U.S. 93 (2005).............................................................................. 2

*People v. Arps,*
    293 A.D.2d 260 (1st Dep't 2002) ........................................................... 4

*People v. Fernandez,*
    16 N.Y.3d 596 (2011) .......................................................................... 4

*People v. Hewitt,*
    247 A.D.2d 552 (2nd Dep't 1998)........................................................... 4

*People v. Jenkins,*
    209 A.D.2d 164 (1st Dep't 1994)............................................................ 4

| Cases | Pages |
|---|---|

*People v. Johnson,*
22 A.D.3d 371 (1st Dep't 2005) ..................................................................... 4

*Personnel Adm'r v. Feeney,*
442 U.S. 256 (1979) ..................................................................................... 23

*Peterson v. City of Fort Worth,*
588 F.3d 838 (5th Cir. 2009) ......................................................................... 7

*Pinto-Montoya v. Mukasey,*
540 F.3d 126 (2d Cir. 2008) .......................................................................... 3

*Pyke v. Cuomo,*
567 F.3d 74 (2d Cir. 2009) .......................................................................... 22

*Rahman v. Chertoff,*
530 F.3d 622 (7th Cir. 2008) ....................................................................... 25

*Reynolds v. Barrett,*
685 F.3d 193 (2d Cir. 2012) .................................................................... 18-19

*Reynolds v. Giuliani,*
506 F.3d 183 (2d Cir. 2007) .................................................... 5-6, 10, 13, 19

*Ricketts v. City of Columbia,*
36 F.3d 775 (8th Cir. 1994) ........................................................................... 8

*Searles v. Pompilio,*
652 F. Supp. 2d 432 (S.D.N.Y. 2009) ......................................................... 16

*Segal v. City of New York,*
459 F.3d 207 (2d Cir. 2006) .......................................................................... 2

*Snowden v. Hughes,*
321 U.S. 1 (1944) .................................................................................... 17-18

*Sorlucco v. New York City Police Dep't,*
971 F.2d 864 (2d Cir. 1992) .......................................................................... 6

*Student Doe 1 v. Lower Merion School District,*
665 F.3d 524 (3d Cir. 2011) ........................................................................ 22

*Terminate Control Corp. v. Nu-Life Constr. Corp.,*
28 F.3d 1335 (2d Cir. 1994) .......................................................................... 6

**Cases**                                                                    **Pages**

*Terry v. Ohio,*
   392 U.S. 1 (1968)..................................................................................... 3, 4

*U.S. v. Bold,*
   19 F.3d 99 (2d Cir. 1994)............................................................................. 2

*U.S. v. Coleman,*
   483 Fed. Appx. 419 (10th Cir. 2012)........................................................ 18

*U.S. v. Drayton,*
   536 U.S. 194 (2002)..................................................................................... 3

*U.S. v. Herring,*
   373 Fed. Appx. 131 (2d Cir. 2010)............................................................. 4

*U.S. v. James,*
   257 F.3d 1173 (10th Cir. 2001) ................................................................ 22

*U.S. v. Jaramillo,*
   25 F.3d 1146 (2d Cir. 1994)......................................................................... 2

*U.S. v. Manuel,*
   64 Fed. Appx. 823 (2d Cir. 2003) .............................................................. 4

*U.S. v. Simmons,*
   560 F.3d 98 (2d Cir. 2009) .......................................................................... 3

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011).................................................................................. 7

*Washington v. Davis,*
   426 U.S. 229 (1976)................................................................................... 24

*Watson v. City of Kansas City,*
   857 F.2d 690 (10th Cir. 1988) ..................................................................... 8

*Wayte v. U.S.,*
   470 U.S. 598 (1985)................................................................................... 23

*Whren v. U.S.,*
   517 U.S. 806 (1996)............................................................................. 18-19

*Young v. City of Providence,*
   404 F.3d 4 (1st Cir. 2005).......................................................................... 13

<u>Cases</u>                                                                                      <u>Pages</u>

*Young v. County of Fulton,*
    160 F.3d 899 (2d Cir. 1998)................................................................... 9

*Zhao v. City of New York,*
    656 F. Supp. 2d 375 (S.D.N.Y. 2009)................................................... 17

*Zieper v. Metzinger,*
    392 F. Supp. 2d 516 (S.D.N.Y. 2005)................................................... 3

<u>**Statutes**</u>

42 U.S.C. § 2000d......................................................................................... 2

N.Y. Labor Law § 215-a ............................................................................ 11

## PRELIMINARY STATEMENT

The public has every right to expect NYPD to justly safeguard life, liberty and property, and NYPD has every right to engage in lawful stop and frisk activity to meet this expectation. To continue to fulfill its mission, though, NYPD cannot be made to follow legions of leaders installed by the predilections of outside political and judicial forces, and without justification. This is exactly what plaintiffs attempted to do for ten weeks of trial and the preceding years of litigation, as they failed to prove their speculation that NYPD must be violating the Constitution because most people who are stopped and frisked are Black and Hispanic males. For years, plaintiffs have employed unsuccessfully a scattershot approach to meet their burden of proof. Plaintiffs disregarded that NYPD deploys most heavily in the areas with the highest crime rates based on crime reports -- generally majority minority neighborhoods where the victims are majority minority -- and that the racial breakdown of NYPD stops and frisks strongly correlates with the racial breakdown of reported crime suspects.

Plaintiffs failed to prove that any City policy or practice has caused any widespread pattern of unconstitutional stop and frisk activity or has been undertaken with any racially discriminatory intent. Instead, plaintiffs mounted a general attack on NYPD's 4.3 million stops since 2004, ignoring the totality of the circumstances integral to any Fourth Amendment analysis and groping to find patterns in stops based on paperwork noting furtive movements or suspicious bulges. Plaintiffs simply had no unified proof of a pattern of unconstitutional stops, and even their expert's opinion shows that most stop activity is supported by reasonable suspicion. Nor did plaintiffs prove a unified theory of causation or deliberate indifference; instead, they latched on to what they argued was an ineffective system of audits, which in actuality did uncover weaknesses in stop documentation that NYPD has sought to remedy continuously, or plaintiffs

seized upon the tabloid exposés of a very few disgruntled police officers who complained that NYPD had quotas that caused unconstitutional stops, although none that they themselves made of plaintiffs. Plaintiffs did not and could not prove their case on the facts presented, and have instead asked this Court to make giant unreasonable inferences that amount to nothing more than mere speculation. Plaintiffs have not proven any basis whatsoever on which this Court can find liability or issue injunctive relief.

## I.   <u>No Named Plaintiff Suffered a 4th Amendment ("4th Am.") Violation.</u>[1]

The City cannot be subjected to 4th Am. *Monell* liability unless at least one plaintiff proves by a preponderance of the evidence a stop and/or frisk without reasonable suspicion. A prerequisite to a *Monell* claim is an underlying constitutional violation, *e.g., Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006), and this requirement is as stringent in class actions. *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Here, none of the four named plaintiffs has proven an underlying constitutional violation:

- Three stops (April 2007 (Floyd), and February and June 2008 (Ourlicht), Findings of Fact ("FOF") 3, 18-19, 20), had such vague and inconsistent descriptions that no officers could be identified. Plaintiffs have not proven that these stops occurred as plaintiffs testified, particularly given NYPD's sufficient efforts to identify any participating officers. *Id.* Even if the Court finds these John Doe stops did occur, they are not representative of stops where officers are identified and cannot support a widespread pattern of similar stops. [2]

---

[1] Plaintiffs withdrew all damages claims, and claims against defendants Bloomberg and Kelly were dismissed, *Floyd*, 813 F. Supp. 2d at 456. There is no basis for plaintiffs to pursue their Third through Tenth Claims, which includes their state law claims. *See* Second Amended Complaint 37-44. Plaintiffs failure to present evidence of the NYPD's receipt of federal funds is fatal to their Title VI claim. *See* 42 U.S.C. § 2000d.

[2] Floyd's April stop and Ourlicht's February stop began as an approach and question, FOF 3, 19, and officers do not need reasonable suspicion to ask a person for identifying information. *Muehler v. Mena*, 544 U.S. 93, 101 (2005). In Ourlicht's June stop, the emergency report of a loose gun between four to five men in a small private location, FOF 18, gave the officers reasonable suspicion to stop the men proximate to that limited area, *U.S. v. Bold*, 19 F.3d 99, 104 (2d Cir. 1994), and frisk them. *U.S. v. Jaramillo*, 25 F.3d 1146, 1152 (2d Cir. 1994).

- One stop (January 2006 (Clarkson), FOF 16) was merely an approach and question not requiring reasonable suspicion, *Florida v. Bostick*, 501 U.S. 429, 434 (1991), and not requiring officers to inform the individual that he is free not to respond.[3] *Zieper v. Metzinger*, 392 F. Supp. 2d 516, 530 (S.D.N.Y. 2005). Further, blocking the path of an individual, *U.S. v. Drayton*, 536 U.S. 194, 205 (2002); accord *Pinto-Montoya v. Mukasey*, 540 F.3d 126, 132 (2d Cir. 2008), or asking incriminating questions, *Bostick*, 501 U.S. at 439, does not render a person "stopped" within the meaning of the 4th Am.

- One stop (January 12, 2008 (Dennis), FOF 14) was based on probable cause to issue a summons for an open container of alcohol.

- Two stops (January 30, 2008 (Ourlicht) and February 27, 2008 (Floyd), FOF 4, 17) were supported by reasonable suspicion. Ourlicht's because the officer observed a suspicious bulge and Ourlicht engaged in furtive movements, FOF 17, and Floyd's because of his fiddling with the door for at least one minute and looking up and down the street, his possession of a bag and a large ring of keys, and the known burglary pattern,[4] FOF 4. *Terry v. Ohio*, 392 U.S. 1 (1968). These frisks were justified given the violent nature of the crimes suspected (burglary and criminal possession of a weapon), Floyd's inconsistent answers to officers' questions, and Ourlicht's bulge. *Id.*

Plaintiffs' anecdotal evidence from eight class member witnesses regarding 12 stops also fails. Three of Peart's stops were John Doe stops (*see* discussion, *supra*).[5] FOF 7. All of the other stops also fail to prove a constitutional violation:

- Four stops (February 5, 2008 and February 24, 2011[6] (Lino), February 12, 2010 (Sindayiganza), and August 5, 2006[7] (Peart), FOF 2, 6, 8, 9) were based at least in part on

---

[3] This was also a John Doe stop (*see* discussion, *supra*).

[4] Reasonable suspicion existed even without knowledge of a known burglary pattern.

[5] Peart's April 13, 2011 stop appears to be supported by reasonable suspicion as Peart testified that the unidentified officers who stopped him informed him that he matched the description of someone who had been ringing a doorbell attempting to gain entry to a building. FOF 7.

[6] Lino's jacket at his February 24, 2011 stop, was of the same distinct brand, color, material and baggy fit as in the wanted poster. FOF 9. This close resemblance supports reasonable suspicion, especially given Lino's close proximity to the crime location. *Cf. Hargroves v. City of New York*, 411 Fed. Appx. 378 (Feb. 22, 2011) (objectively reasonable to perceive red and navy blue jacket as orange and black given the time of night, and close proximity to the crime scene.)

[7] Although plaintiffs argued in closing that the 911 call was anonymous, they did not present any evidence of this at trial. Even assuming an anonymous call, the officers also observed additional suspicious behavior, including bulges, and Peart refused to comply with the officers' orders, FOF 6, leading to reasonable suspicion. *See, e.g., U.S. v. Simmons*, 560 F.3d 98, 101 (2d Cir. 2009) (man matching description from anonymous call refused to remove hands from pockets); *U.S. v.*

a suspect description known to the officers through a citizen complainant, surveillance video, or wanted poster, and thus were all supported by reasonable suspicion. *People v. Johnson*, 22 A.D.3d 371 (1st Dep't 2005); *see also*, *Johnson v. Artus*, 2009 U.S. Dist. LEXIS 26534 (S.D.N.Y. Feb. 20, 2009) (report and recommendation) *adopted*, 2009 U.S. Dist. LEXIS 44839 (S.D.N.Y. May 28, 2009)).

- Cornelio MacDonald's December 19, 2009 stop, FOF 13, was based on the officers' observation of him with a suspicious bulge in his pocket, walking as if carrying a weapon in an area with two active crime patterns for burglary and robbery. *U.S. v. Herring*, 373 Fed. Appx. 131 (2d Cir. 2010) (high crime area, engaged in furtive movements, with a suspicious bulge in jacket).

- Almonor's March 10, 2010 stop was based on his proximity to a radio run for disorderly youths, looking over his shoulder, grabbing his waistband when stepping off the curb and jaywalking), FOF 12.[8] Likewise, officers had reason to approach Downs for smoking marijuana on August 20, 2008 based on how he held his hand up to his mouth. Coupled with his behavior when the officers asked him about their suspicion of drug use and with the major crime problems in the blocks near his house, FOF 11, officers had reasonable suspicion for the stop. *Terry*.[9]

- Acevedo's May 29, 2007 stop, FOF 15, was an approach and question, *Bostick*, 501 U.S. at 434, and that the officers followed her in a van after she ran away does not rise to the level of a stop requiring reasonable suspicion. *Michigan v. Chesternut*, 486 U.S. 567, 574-75 (1988); *Cru v. Miller*, 255 F.3d 77, 84 (2d Cir. 2001).

- Provost's November 24, 2009 stop, FOF 5 was based on probable cause for possession of a knife in plain view. Moreover, the observation of several inches of what an officer knew, based on his training and experience to be a knife, at a minimum provided reasonable suspicion to conduct a stop. *See People v. Fernandez*, 16 N.Y.3d 596 (2011) (officer observed the head of knife clipped to and sticking out of the defendant's pocket); *People v. Arps*, 293 A.D.2d 260 (1st Dep't 2002) (officer observed a bulge and saw what appeared to be the handle of a gun sticking out of the defendant's pocket).

---

*Manuel*, 64 Fed. Appx. 823, 826-827 (2d Cir. 2003) (anonymous 911 call, bulge in waist area, and proximity to crime scene).

[8] *Terry v. Ohio*, 392 U.S. 1 (1968); *see also People v. Hewitt*, 247 A.D.2d 552 (2d Dep't 1998) (officers responding to radio transmission observed individual who did not match the description, but was committing a minor violation (open container), and making furtive movements towards a bulge in his waistband); *People v. Jenkins*, 209 A.D.2d 164 (1st Dep't 1994) (when officers made eye contact with defendant he turned away, began to behave nervously, reached into his waistband and removed an object and tossed it away). As probable cause existed for jaywalking, Almonor's detention was justified even though he was not ultimately charged or summonsed for jaywalking. *See Devenpeck v. Alford*, 543 U.S. 146 (2004).

[9] The CCRB substantiated Downs' complaint against two officers who did not recall the stop; NYPD disciplined them for failing to make memobook entries for the day. FOF 11.

II.   **There Is No Evidence to Support a Widespread Pattern of Constitutional Violations Caused by a Municipal Policy/Deliberate Indifference**

In order to support *Monell* liability, an actionable municipal practice/pattern must itself cause <u>constitutional</u> violations on a widespread basis. *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006). Put another way, "*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). The constitutional violations must be sufficiently widespread and of a similar type by improperly trained, supervised, monitored or disciplined employees. *See Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). The alleged pattern must be sufficiently specific to the violation claimed by a named plaintiff; broadly setting forth evidence of a pattern, widespread or otherwise, of 4th Am. violations (or even a subset of 4th Am. violations, such as *Terry* stops and/or frisks) is insufficient. *See Id.* (rejecting pattern related broadly to *Brady* violations and not sufficiently specific to the type of claimed *Brady*). Only if the pattern is sufficiently widespread have courts held that the municipality is on constructive notice of the alleged constitutional deprivations. *E.g., City of St. Louis v. Paprotnik*, 485 U.S. 112, 127 & 130 (1988); *Chin v. New York City Hous. Auth.*, 575 F. Supp. 2d 554, 564 (S.D.N.Y. 2008).

However, even if a sufficiently widespread pattern of similar violations exists to put the municipality on notice, plaintiffs must prove that the City was *deliberately indifferent* to the need to train, supervise, monitor or discipline its police officers and that the lack of such training, supervision, monitoring or discipline *actually caused* the plaintiff's alleged violation. *See Connick*, 131 S. Ct. at 1358. Deliberate indifference requires a *deliberate choice* to retain a program of training, supervision, monitoring or discipline despite actual or constructive notice

- 5 -

that a *particular omission* in such program *causes* constitutional violations.  *Id.*; *see also Bd of Cnty Comm'rs v. Brown*, 520 U.S. 397, 412 (1997) (culpability "must depend on a finding that th[e] officer was highly likely to inflict the *particular* injury suffered by the plaintiff").[10]

A.   **Lack of a "Widespread Pattern" of Unconstitutional Stops**[11]

Anecdotally, the named plaintiffs' stops were diverse and had no common threads. FOF 3-4, 14, 16-19.  Three had identified officers, whereas four were John Doe stops; one was based in part on an ongoing burglary pattern; one was based on a 911 call; one was an approach and question, whereas another was based on probable cause; three were based on a suspected violent crime such as criminal possession of a weapon, and four were either non-violent offenses or the suspected crime could not be determined. *Id.*  Combining the named plaintiffs' stops, *id.*, with the stops of the class member witnesses, FOF 2, 5-13, 15, only further dilutes any indicia of pattern:  overall, four stops involved radio runs, one involved a direct citizen complaint, and the others involved a variety of observations by the officers; one involved a wanted poster; one involved a surveillance video; and five incidents had multiple persons stopped, whereas the other 14 involved a single person.  The myriad circumstances of the 19 stops illustrate the wide variety

---

[10]  Existence of a widespread pattern of constitutional violations is not a conclusive presumption of municipal liability or deliberate indifference, or proof of an unofficial custom through acquiescence, particularly where a municipality has attempted to address the causes of the pattern. *See Reynolds*, 506 F.3d at 192 & 197; *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *Terminate Control Corp. v. Nu-Life Constr. Corp.*, 28 F.3d 1335, 1349-50 (2d Cir. 1994).  In *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870-71 (2d Cir. 1992) deliberate indifference was not addressed because the discriminatory practices were so entrenched as to imply municipal acquiescence and there was no evidence that City sought to address misconduct at issue).

[11]Both anecdotal and statistical evidence is necessary to prove a pattern and practice. *Sorlucco*, 971 F.2d at 872; *see also EEOC v. Bloomberg*, 778 F. Supp. 2d 458, 469 (2011) (systemic practice of discrimination ordinarily established by using strong statistical and anecdotal evidence).  Further, each plaintiff must show a pattern of constitutional violations similar to the one he or she experienced. *Connick*, 131 S. Ct. at 1360.  Alone, plaintiffs' statistical evidence is insufficient to establish the "gross statistical disparities" necessary to establish a widespread pattern. *Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 307-08 (1977).

- 6 -

of situations faced by the officers on the street at the times of the stops. This miniscule self-selection of stops is simply insufficient a basis from which any reasonable inferences can be made about the 4.43 million stops or any subset thereof -- it is too small to be probative of a widespread pattern within the City when compared to the size of the allegedly affected group. *See Jones v. Town of East Haven*, 691 F.3d 72, 82-83 (2d Cir. 2012) (six incidents insufficient to show the necessary widespread pattern of abuse by police); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851-52 (5th Cir. 2009) (size of police department relevant to "widespread pattern" inquiry); *cf., Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011).

But, it is not just the paucity of 19 stops from the millions of stops at issue that renders the anecdotal evidence insufficient to support a finding of pattern, it is the very nature of the totality of the circumstances inquiry that must be made to determine if a constitutional violation exists.[12] Plaintiffs' case is not saved by combining the anecdotes with Fagan's various statistical analyses and no reasonable inferences can be drawn to shore up the deficiencies in this proof. FOF 69-89. First of all, the UF250 database simply cannot support the conclusions Fagan tries to draw from it. A UF250 alone provides no basis to conclude here that a stop was impermissible; the form was not designed to support such a finding in a court of law, and no factfinder would ever rest on a form to conclude that a stop was unlawful. And if a single form does not establish that a stop was unlawful, thousands of forms do not establish that thousands of stops were unlawful. Moreover, it cannot be held against any officer—much less tens if not hundreds of thousands of officers in the aggregate—that the form uses conclusory terms to describe a host of possible bases for a stop. Fagan cannot have it both ways—either he accepts

---

[12] The nature of this inquiry is also the very reason why this case has been improperly certified as a class action. Perhaps if the stops at issue were all for a crime suspected that had been declared unconstitutional, there could be some weight to the stops as supportive of a pattern, but that is not the case alleged, let alone proven.

the credibility of the form, and that "furtive movement" means "furtive movement" giving rise to reasonable suspicion or he does not. *See Ligon v. City of New York*, 2013 U.S. Dist. LEXIS 22383 at 135 (S.D.N.Y. Feb. 14, 2013) ("It is possible to imagine scenarios in which an officer observing behavior that would probably give rise to reasonable suspicion might reasonably record that behavior by checking nothing more than 'Furtive Movements.'"), or he cannot rely on the database at all and must supplement his analysis with information from sources other than the form. Even accepting Fagan's reliance on a database full of checkboxes, Fagan's conclusion that only 6% of the 4.43 million stops are apparently unjustified on its face is hardly a widespread pattern. Moreover, Fagan does not link these 6% to the 19 anecdotal stops and cannot, particularly with the John Doe stops or the fact that none of the UF250 stops fall into Fagan's self-made classifications. As for combining the 6% with the approximately 12% of stops that Fagan declares ungeneralizable, this 18% portion of the 4.43 million stops once again is not necessarily a widespread pattern, as Fagan does nothing to link these stops in patterns of similar constitutional violations.[13] FOF 85; *see also Connick*, 131 S. Ct. at 1360. In fact, Fagan acknowledged     that     under     his     analysis     the     apparently     unjustified     stops     are

---

[13] To the extent that the ungeneralizable UF250s fall in to the small sub-category of the 62,437 for 2004-2009 having "furtive movement" checked, with nothing else checked on the back, neither Fagan nor plaintiffs offer any link between those UF250s to the 19 anecdotal stops. Firstly, they cannot link these stops to the John Doe stops, which do not have UF250s by definition; secondly, they cannot do so with the UF250 stops that have different permutations of checkboxes and information; and thirdly, they cannot do so with the UF250 stops at all because, as the testimony exemplified, the totality of the circumstances of a stop indicative of reasonable suspicion can go well beyond the markings on a UF250. *Floyd v. City of New York*, 861 F. Supp. 2d 274, 291 & 293 (S.D.N.Y. 2012); *see also Florida v. Harris,* 133 S. Ct. 1050, 1056 (2013) (rejecting reliance on error rates in the context of dog sniffs for drugs—affirming that the totality of circumstances analysis under the 4th Am. cannot or should not be reduced to a mathematical formula); *Ricketts v. City of Columbia*, 36 F.3d 775, 781-82 (8th Cir. 1994) ("not all of the differences that enter into the discretionary decision of whether to arrest can be properly assessed and quantified through statistics"); *Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir. 1988) ("Whether or not probable cause exists is not susceptible to statistical quantification"). What cannot be done based on a single form cannot be done in the aggregate, either.

not evenly distributed across New York City at the borough, precinct, neighborhood or even census tract level. FOF 85.

Nor does the notion of the 1 in 10 "hit rate" – or "dry stops," as the Court has termed stops that do not result in an arrest or summons, or the recovery of a weapon – establish a widespread pattern of suspicionless stops or notice thereof. FOF 88-91.[14] The wide gulf of legal justification between reasonable suspicion to stop and probable cause to arrest or summons in and of itself makes the hit rate irrelevant.[15] This is the same reasoning that the Court used when it precluded defendant from adducing evidence of effectiveness of stop and frisk practices in reducing crime because of its irrelevancy to the 4th Am. analysis.[16]

Serving both as notice of no widespread pattern of constitutional violations, and as a lack of deliberate indifference are the indisputable facts that: on its own NYPD enabled Rand to study its stop practices; Rand concluded that there was no systemic constitutional problem and did so relying on suspect description as the best of the three known benchmarks in the field (which

---

[14] Since 1999, Fagan has admitted that a 1 in 9 hit rate for arrests is not problematic. Since summonses, like arrests, require probable cause, the undisputed and consistent NYPD 12% hit rate for arrests and summonses combined likewise cannot be problematic.

[15] Plaintiffs rely heavily on *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), for the proposition that the NYPD's "hit rate" is no better (or even worse) than random results. Apart from being factually dissimilar cases, the stops in *Edmond* were far from random. *See* 531 U.S. at 35-36 (noting the use of crime conditions and narcotics dogs to search vehicles, which would serve to increase the amount of contraband recovered and the corresponding hit rate because vehicles can store more contraband than a person). More analogous to random hit rates are the 0.12-1.5% hit rates noted in *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 454-55 (1990).

[16] To the extent, however, that the Court seeks to impute some knowledge about the legality of the stops based on the hit rate, this is a novel analysis, heretofore unknown in the case law, and, at a minimum, the City cannot be held to be on notice of a phenomenon that had not been previously identified as constitutionally suspect. *See Young v. County of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998) ("[t]o be deliberately indifferent to rights requires that those rights be clearly established"). *Young* involved a failure to train claim, which could not be maintained since the right at issue was not "clearly established" at the time of the violation. *Id.* at 903-4. The reasoning of *Young*, however, would apply equally to a "custom or practice" claim since the required state of mind – "deliberate indifference" – is the same.

NYPD continues to rely on today); despite a lack of a problem, NYPD implemented five of the six Rand recommendations, and gave thoughtful reasons for not implementing or continuing all of them.   FOF 20-21.   Plaintiffs' criticisms of the City's implementation of the Rand recommendations are without merit, and plaintiffs' expert Reiter's central premise that the NYPD *refused* to address the RAND recommendations is absurd.   FOF 22.   Moreover, "second-guessing" NYPD is not a basis for *Monell* liability. *City of Canton v. Harris*, 489 U.S. 378, 391-92 (1989); *Reynolds*, 506 F.3d at 198.   Clearly the NYPD's efforts to address the concerns raised at the time of the RAND report were not "patently inadequate", "severe" or "quite deficient". *Reynolds*, 506 F.3d at 192-93.

### B.   Lack of Causation/Deliberate Indifference

**Quotas.**   Plaintiffs specifically allege – and fail to prove – pressure that NYPD puts on its officers to meet quotas for arrests, summonses and UF250s causes a widespread pattern of unconstitutional stops.   First, there is no evidence whatsoever linking any of the 19 anecdotal stops to an officer who made the stop, with or without reasonable suspicion, to meet a quota and avoid negative employment action.   FOF 55-66.   There is not even evidence that an officer made such a stop to fulfill a quota or a productivity goal regardless of any fear of negative employment actions.   *Id.*   Among the officers who *were* involved in the named plaintiffs' individual incidents, no two partners had the same activity, and no officer was punished, rewarded or "pressured" based on activity levels.   FOF 59.   Even with respect to those officers who asserted that they were required to meet specific enforcement levels earlier in their careers, plaintiffs were unable to establish that these officers (or any officers) were punished as a result of their failure to reach such levels.   FOF 59, 63-66.   This is a sideshow.   There is overwhelming evidence that no quotas exist and that officers do not believe that they will be punished if they do not meet a numerical

threshold.  FOF 59-61.  A performance goal – an acceptable personnel tool, *see* FOF 56-57 – is not a quota.  Operations Order 52 legitimately expressly encourages performance goals *in relation to addressing identified crime conditions.  See* FOF 57 (performance goals as informal guidance and relating to summons and arrest activity).

Further proof of the lack of quotas is the aggregate numerical data.  There are approximately 19,000 uniformed officers working in patrol functions in the NYPD.  *See* FOF 62.  In 2011, NYPD officers conducted approximately 685,000 stops.  *Id.*  Using simple math, that means that officers average three stops *per month*, which average is less when using simple math for the other years between 2004-2012.  Moreover, officers typically work 20-25 tours on patrol per month, each with an 8 hour and 35 minute shift; therefore, officers average one stop every sixth to seventh day on patrol.  *Id.*  These calculations cannot be a basis to infer that officers are pressured to make unconstitutional stops.  FOF 62 ('impossible not to see violation when work 25 days on patrol').

Finally, the tape recordings of the self-selected snippets of roll calls from three commands in which numbers are spoken of by supervisors is not a basis to believe that they were threatening negative employment action if the numbers were not met – and it would be rank speculation to determine that such negative action had actually occurred.[17]  The recordings provide no basis whatsoever from which any reasonable inference can be drawn that quotas or pressure for activity existed that drove officers to make unconstitutional stops. FOF 60, 66. Moreover, since N.Y. Labor Law § 215-a was changed in 2010 to prohibit additional "quota" enforcement activity, the NYPD explicitly prohibited quotas in Operation Order 52 and explained the appropriate use of performance goals.  FOF  55.  None of the purported roll call

_____

[17] None of the plaintiffs' alleged encounters occurred within these three precincts.

recordings (from only three of 76 precincts) were made since that time. *Id.*

**Deliberate Indifference/Specific Deficiencies.** Plaintiffs also have failed to prove any specific deficiencies in the City's training, supervision, monitoring or discipline and that such deficiencies *actually caused* their alleged constitutional deprivations – were the moving force behind a widespread pattern of constitutional violations. *E.g., Harris,* 489 U.S. at 391; *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007); *see also Amnesty, supra,* 361 F.3d at 130 (*plaintiffs'* burden to rule out causes of the alleged 4th Am. violations that would not support City liability, such as negligent program administration or officers' negligent or intentional disregard of training). Causation cannot be inferred from evidence of a need for training, supervision, monitoring or discipline by itself or proof of deliberate indifference. *Connick,* 131 S. Ct. at 1358 n.5.

Plaintiffs have always seemed hard-pressed to identify any *specific* flaws in any of the City's policies. *Connick*, 131 S. Ct. at 1365 (deliberate indifference requires *specified* flaw and "highly predictable" incorrect officer decisions). In fact, along with the red herring of their empty quota theory and misperceived flaws in auditing and command self-inspection policies addressed *infra*, plaintiffs launch a scattershot attack at all levels of NYPD's managerial operations, hoping to hit upon a theory or deficiency that glues together their *Monell* theory of liability. But they simply do not have the evidence to pull it all together, and they are resigned to arguing – notwithstanding a lack of proof, FOF 36-48 – that there is (or must be) some sort of problem with the City's officer-oversight practices that has resulted in the number of stops of minorities, and/or that the City simply needs more or better training, supervision, monitoring and/or discipline.

*Harris* recognized that deliberate indifference exists where "the need for more or

different training is *so obvious*, and the inadequacy *so likely* to result in the violation of constitutional rights." 489 U.S. at 390. Broad, unspecific suggestions of more or better training do not satisfy a plaintiff's *Monell* burden. *Connick*, 131 S. Ct. at 1363-64 ("showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability"); *Young v. City of Providence,* 404 F.3d 4, 27 (1st Cir. 2005) ("the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing"). Rather, plaintiffs must prove that the City was deliberately indifferent with respect to an identified "specific deficiency" in the City's training, monitoring, supervision or discipline program. *Amnesty*, 361 F.3d at 129. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick,* 131 S. Ct. at 1360.

As the *Reynolds* court emphasized, the measure of the adequacy of a municipality's conduct and its systems is not "ultimate success." *See* 506 F.3d at 196 ("the extent of state defendants' ultimate success in averting injury cannot be the legal measure of its efforts to do so, as such a standard is tantamount to vicarious liability"). Plaintiffs' burden to show a deficiency is particularly heavy where the issue is the City's response to a potential policing problem. *See id. at* 192-93. Where, as here, the City's "policy incorporates [its] deliberate efforts to protect plaintiffs' rights, it cannot, at the same time, be deemed deliberately indifferent to those rights." *Id.* at 197 ("[a] natural presumption arises in such cases that any supervisory inadequacies are the result of negligence rather than deliberate choice"); *see Harris*, 489 U.S. at 391-92 (the importance of fault and causation to avoid *de facto respondeat superior* liability and "second-guessing [of] municipal employee-training programs [that] federal courts are ill-suited to undertake [and which] would implicate serious questions of federalism").

***Training.***   Plaintiffs have not proven any deficiency in training that can be responsible for impermissible suspicionless stops in which individuals do not feel free to leave.  Recruits and impact officers receive extensive training on reasonable suspicion, including when a person objectively may not feel free to leave, trespass crimes, Penal laws and Constitutional Law (both NYS and Federal); Characteristics of Armed Suspects; NYPD Policy Prohibiting Racial Profiling; Impartial Policing; Discretion; Policing a Multicultural City; Tactics; and Memobook entries/Activity logs.  FOF 43-44.  Training continues throughout officers' careers with roll call training, legal bulletins, informal on the job training, formal annual in service training, promotional training, and even special reinforcement training programs, like the recent Rodman's Neck training.  FOF 45-46.  While it may be debatable after the fact to determine if any one encounter may rise to the level of a 4th Am. detention – that's what juries are for -- the training explains the various  factors that may lead a person to objectively believe that they have been detained.[18]  Given the quality of the substance of NYPD's training, any finding of liability or remedy based on it would be an inappropriate intrusion into local governance.  *Connick*, 131 S. Ct. at 1363 ("The statute does not provide plaintiffs or courts carte blanche to micromanage local governments throughout the United States.").

***Supervision.***[19]   The NYPD relies on a chain of command of supervisors, namely,

---

[18] The taped exchange between McCormack and Serrano illustrates a supervisor's attempt to train an officer on when a person is stopped and exemplifies how changes in tone and inflection may morph an encounter into a reasonable suspicion stop.  FOF 65.  Further, on the recording, McCormack reiterated that officers can only stop individuals based on reasonable suspicion, while also noting that officers must pay attention to suspect descriptions and known crime conditions during their given tour.  FOF 65.

[19] NYPD's multi-layered supervisory hierarchy and accountability, coupled with the lack of evidence of a widespread practice, makes any liability finding for failure to supervise speculative at best. *Cf., Jones v. Town of East Haven*, 691 F.3d 72, 82 (2d Cir. 2012) (*Monell* liability may exist where there is a widespread pattern of constitutional abuses sufficient to support the conclusion that such abuses were a custom among police officers, and that supervisory personnel

sergeants, lieutenants, and precinct commanding officers so that all police activity, including stop, question and frisk, is properly being conducted. The Chief of Patrol and his staff review UF-250s prior to CompStat meetings and raise issues or concerns about the UF-250s with COs at the meetings. Borough commanders meet with platoon commanders (lieutenants) regularly and CompStat meetings now include platoon commanders, as they are part of the precinct management team. Borough commanders also hold CompStat meetings with COs. Lieutenants "command the platoon" and supervise the sergeants, which includes annual evaluations and quarterly assessments. Sergeants are entrusted to "hand[le] conditions that are going on within the area that they work." Sergeants testified that they routinely witness stops made by officers; routinely monitor the radio (particularly for a person who fits suspect description); speak to officers during roll call about training and ongoing crime conditions for a given tour; review their officers' UF-250s and frequently discuss the underlying facts of stops with officers to determine whether an officer is able to articulate a proper basis for the stop; and when they have an officer drive them during a tour, they use this assignment as an opportunity to train the officer. It is of course not necessary to utter the words "reasonable suspicion" during every one of these teachable moments, as that legal requirement is as obvious as the requirement of probable cause for an arrest. Anticrime units are very small and sergeants are usually present in the field – which allows for the sergeant to continually assess an officer's understanding of the propriety of any enforcement, including any stops. Impact officers work in a small geographic area with their sergeants readily available. Supervisors also verify arrests at the scene. FOF 47. Individual police officers also testified about how sergeants patrolled with them during tours to observe stops; discussed the merits of a stop with a supervisor prior to an arrest; and even had

must have been aware of such custom but failed to take adequate corrective or preventive measures (or both)).

supervisors correct them regarding arrest charges.  FOF 47, 52.[20]

   ***Monitoring.***   Plaintiffs have not proven any flaw in the auditing and command self-inspection protocol procedures that "demonstrate a deliberate indifference to the need to monitor officers".  *Floyd,* 283 F.R.D. at 174 n.138; *see also Floyd*, 813 F. Supp. 2d at 431-34, 448-49 (which, other than quotas, is the only theory of causation/deliberate indifference that they relied on for class certification).  NYPD has a comprehensive system to monitor officer compliance with stop and frisk policies with audits both within the commands and from above by QAD. These include the 802 and 802-A audits, begun in 2003, and the 803 audit (begun in 2010), and their companion command self-inspections.  In addition, there is the quarterly Rand audit of paperwork linked to 911 calls (begun in 2008), and the quarterly surveys of the three commands with the highest increase in UF250s (begun in 2011). FOF 24. Plaintiffs make much of admittedly consistent failures of the activity log caption of the of the 802 audits, despite the long-standing almost perfect pass rate for the overall audit.  FOF 24.  Contrary to being a deficiency indicative of deliberative indifference, the fact of these audits, the knowledge of the results and the myriad ways that NYPD has tried to increase compliance with its own policy (with notable improvement) – not a constitutional requirement[21] -- of making detailed memo book entries is the antithesis of deliberate indifference.  FOF 53-54 (detailing the NYPD's continuing efforts to increase memobook entries); 27 (discipline for improper memobooks).  While one may infer deliberate indifference where constitutional violations are obvious, one may only do so where there is inaction or a failure to make meaningful efforts to address the misconduct.  *Cash v.*

---

[20] Plaintiffs challenge the lack of supervision while at the same time seeking to characterize officer-supervisor patrols as a punishment.  FOF   63-64.  They cannot have it both ways. Plaintiffs' expert was not substantively critical of NYPD's supervision.  FOF 49.

[21] *See Searles v. Pompilio*, 652 F. Supp. 2d 432, 444 (S.D.N.Y. 2009) (lack of police officer paperwork insufficient basis to infer deliberate indifference).

*County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011).

 ***Discipline.*** Neither have plaintiffs highlighted any problems with the NYPD's processes for disciplining officers. *See* FOF 25 (civilian complaints generally); 26-30 (CCRB and DAO); 31-32 (OCD); 36-42 (performance monitoring); 25, 39-41 (borough-level CCRB monitoring and the Profile and Assessment Committee); 42 (Career Advancement Review Board). Though it is by no means a required defense to *Monell* liability, the evidence established that disciplinary actions effectively increased from 2008 through 2012. FOF 30; *see also* FOF 32 (2013 OCD stop and frisk complaints). Reiter's discipline criticisms can be rejected *in toto* given his lack of familiarity with the underlying incidents, FOF 33-34, as well as his cursory analysis of NYPD disciplinary practices. FOF 35. None of the individual dispositions indicate the City was deliberately indifferent to the need for discipline. *See Zhao v. City of New York*, 656 F. Supp. 2d 375, 396 (S.D.N.Y. 2009).

## III. THERE IS NO 14Th AMENDMENT ("14[th] Am.") VIOLATION

 A *Monell* claim requires an underlying constitutional violation. *See Lewis*, 518 U.S. at 357. Accordingly, at least one of the plaintiffs had to, but did not, prove an impermissibly race-based suspicionless stop and/or frisk, which includes discriminatory intent.[22]

 That a stop and/or frisk violated the 4th Am. is not evidence that such stop and/or frisk was racially motivated. *See Snowden v. Hughes*, 321 U.S. 1, 8 (1944) ("[A]n erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws."); *accord Gelb v. Board of Elections*, 155 Fed. Appx. 12, 14 (2d Cir. 2005); *see also Jewish Home v. Centers for Medicare & Medicaid Servs.*,

---

[22] Plaintiffs' individual equal protection claims are a subset of their 4th Am. claims in that they contend that that race, rather than reasonable suspicion, was the "determinative factor" in their stops and/or frisks. *Floyd*, 813 F. Supp. 2d at 450; *Floyd*, 283 F.R.D. at 168-69.

693 F.3d 359, 363 (3d Cir. 2011).  In addition, a plaintiffs' subjective belief that he or she was

stopped because of his or her race is not probative of discriminatory intent.  *Jones*, 691 F.3d at;

*see also Kravtsov v. Town of Greenburgh*, 2012 U.S. Dist. LEXIS 94819 at 49-50 (S.D.N.Y. July

9, 2012); *Estes-El v. Dumoulin*, 2011 U.S. Dist. LEXIS 154788 at 12 (E.D.N.Y. Feb. 9, 2011).

Also, mere rude and/or disrespectful behavior does not constitute evidence of racial animus.

*Jones*, 691 F.3d at 84;  *Kravtsov*, 2012 U.S. Dist. LEXIS 94819 at 50.

Nor can Fagan's regression analysis impute intent to an individual officer.  *Reynolds v.*

*Barrett*, 685 F.3d 193, 204 (2d Cir. 2012) ("statistics showing entity-level discrimination shed

little light on whether a particular individual defendant engaged in purposeful discrimination");

*see also U.S. v. Coleman*, 483 Fed. Appx. 419, 421 (10th Cir. 2012).

Thus, to answer the Court's inquiry during trial, even if there were a widespread pattern

of suspicionless stops, an inference cannot be drawn that race was the determinative factor for

any individual stops (or that a deficiency in the City's systems caused the stops to be made on an

impermissible race basis).

### A.    Lack of an Underlying Racially-Motivated Stop

The named plaintiffs failed to prove individual equal protection claims against known or

unknown NYPD officers by proving discriminatory purpose against and discriminatory effect

upon at least one of the named plaintiffs.  *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).  First,

the named plaintiffs failed to prove that their stops were not supported by reasonable suspicion;

therefore, the necessary discriminatory effect is lacking.  *Floyd*, 813 F. Supp. 2d at 444; *see also*

*Whren v. U.S.*, 517 U.S. 806, 814 (1996) (4th Am. reasonableness does not depend on subjective

intent).[23]  Fagan's statistics purporting to show citywide racial disparities for stops and/or frisks

---

[23] A §1983 claim must be analyzed with reference to "the specific constitutional right allegedly

cannot be used to show that a *particular individual officer* engaged in purposeful discrimination. *See Reynolds*, 685 F.3d at 204.[24] Ourlicht is the only named plaintiff who even arguably raised a claim of discriminatory treatment. He claims he was treated differently from his white friend Anthony, but even his own testimony established this was not the case.[25] FOF 19. The other named plaintiffs offered nothing more than speculations and subjective beliefs as to why they were stopped. FOF 3-4, 14, 16; *Jones*, 691 F.3d at 83 (belief as to officer's racial motivation "unsupported speculation" to which witness "was not competent to testify").

### B.   Lack of a Widespread Pattern to Which the City Acquiesced

Even assuming a finding that one or more of the stops and/or frisks were unreasonable and discriminatory, there is insufficient evidence of (a) a widespread pattern of racially motivated stops and/or frisks and/or (b) City acquiescence thereto. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Reynolds*, 506 F.3d at 192; *Amnesty*, 361 F.3d at 126.

Plaintiffs also have failed to prove a widespread pattern of suspicionless stops, and consequently cannot prove a widespread pattern of race-based stops. Not even Fagan properly constrains his 14th Am. analysis to those stops where reasonable suspicion was apparently lacking; he improperly looks at all 4.43 million stops and decides that race is the determinative

---

infringed" and must be judged by that standard. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Plaintiffs fashioned their claims as first being violative of the 4th Am. as suspicionless stops and only secondarily being based on race  and therefore can proceed only pursuant to the 4th Am. *Cf. Melendres v. Arpaio*, 2013 U.S. Dist. LEXIS 73869 at 8-9 (D. Ariz. 2013) (race as *a factor* rather than the *determinative factor*).

[24] *See also McCleskey v. Kemp*, 481 U.S. at 294 (inappropriate to draw an inference from the general (*i.e.,* blacks were more likely state-wide to receive the death penalty) to the specific (*i.e.,* that the decision-makers in McCleskey's death penalty case acted with discriminatory purpose).

[25] Clive Lino (who is not a plaintiff and therefore cannot support *Monell* liability) alleged that a police officer *of color* received a call on his personal cell phone during his stop and that the cell phone had a rap-music ring tone. FOF 10. It strains credulity to assume that anyone, including a police officer of color, is a racist because he or she has a rap music ringtone.

variable that leads to a greater likelihood of being stopped in NYC but fails to control for reasonable suspicion. FOF 80. Alone, plaintiffs' statistical evidence fails to establish the "gross statistical disparities" necessary to establish a widespread pattern. *E.g., Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 307-08 (1977).

Assuming the accuracy of Fagan's statistics - which the City disputes - Fagan's analysis only purports to show that (1) blacks and Hispanics are more likely to be stopped than whites, and (2) the odds of an increase in stops given a 1% increase in the proportion of black or Hispanic population versus a 1% increase in the white population is a virtual coin toss. FOF 83-84. Fagan's results are, however, not practically significant. FOF 83. Had Fagan properly analyzed the statistical data, however, such a likelihood would have been statistically insignificant or reduced in significance. FOF 69-84. Professor Fagan's numbers do not show statistical disparities arguably found sufficient in *Teamsters v. U.S.*, 431 U.S. 324, 337-38 (1976) (respectively, blacks and Hispanics roughly 11 and 15 times less likely to hold a better position within the company and 39-44% more likely to hold lower paying jobs). *See also McCleskey*, 481 U.S. at 297 ("Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious."). Furthermore, the class member anecdotal evidence is equally as slender. These class members cannot establish that any of their officers acted with discriminatory purpose (even assuming individual 4th Am. violations).[26]

## C.     <u>The City Has Not Acquiesced to Any Widespread Pattern</u>

Finally, even if plaintiffs' evidence were sufficient to make out a *prima facie* case of a widespread pattern of racially motivated stops, the evidence showed that the City did not acquiesce to any such pattern. "[P]laintiffs do not assert that the City has an express policy that

---

[26] And as noted in Point I, *supra*, their number is too small to be probative of a widespread pattern within the City when compared to the size of the allegedly affected group.

people of color are to be stopped at a greater rate". *Floyd*, 813 F. Supp. 2d at 449-50.  In fact, the City's policy is the opposite.  *See* FOF 23.  The same systems in place to detect and handle 4th Am. violations detect and handle the 14[th] Am. violations.  Moreover, evidence from the Commanding Officers to the Chief of the Department shows it is rare that a complaint is made about a race-based stop.  Complaints are usually about non-racial bases for the disputed stops. FOF 23. [27]

The Court has asked if there is a self-fulfilling prophecy indicative of impermissible race motivations because the racial breakdown of stoppees matches the racial breakdown of known crime suspects such that officers assume that minorities are committing crimes and substitute that assumption for reasonable suspicion.  Plaintiffs adduced no evidence whatsoever about whether the multitude of officer witnesses were even aware of the symmetry of these events; nor did plaintiffs adduce any evidence about any officer witness's subjective intent when making stops.  No expert testimony addressed the viability of this psychological principle in the context of stop and frisk practices.[28]   Whatever the Court may understand about self-fulfilling prophecies, there is no basis in this record whatsoever from which a reasonable inference may be drawn to support that any one suspicionless stop, let alone a widespread pattern of suspicionless stops, is impermissibly based on race.  Any such conclusion would be fanciful speculation.

D.      **Express Racial Classification**

The express policies in evidence in this case – *i.e.*, the NYPD's racial profiling policy and

---

[27] Plaintiffs may suggest that this evidence is not credible, but they conflate individual complaints of race-based stops, which are few and far between, with their own concerns, and those of other advocates, about racial disparities in stops, as measured against the population.  The two concerns are of course not the same.

[28] Fagan would employ suspect description data in his regression analysis, assuming no selection bias. FOF 69.  Furthermore, a "suspect description" is provided by a victim or witness, not a police officer.

related evidence – are the antithesis of a facially discriminatory policy.  Plaintiffs have offered

no evidence of an express racial classification.  The present case is unlike cases like *Melendres v.*

*Arpaio*, 2013 U.S. Dist. LEXIS 73869 at 222 (D. Ariz. 2013), where the court found "saturation

patrols" intentionally directed at Hispanics and indiscriminate use of race as a basis for

reasonable suspicion.  The NYPD makes deployment decisions based on where crime occurs, not

racial demographics, *see Pyke v. Cuomo*, 567 F.3d 74, 77-79 (2d Cir. 2009), and once deployed

officers develop reasonable suspicion based on a variety of factors (*e.g.*, observations and crime

complaints).   Race is used in the reasonable suspicion calculus only when constitutionally

permissible. *Brown v. City of Oneonta*, 221 F.3d 329, 338 (2d Cir. 2000).[29]

### E.   **Adverse Effect and Discriminatory Purpose**

#### 1.    **Adverse Effect**

It is undisputed here that the percentage of blacks and Hispanics stopped in the City

exceeds their population percentage.  There is a *disproportionate* impact but not the *adverse*

*discriminatory* impact necessary for 14th Am. liability.  *Student Doe 1 v. Lower Merion School*

*District*, 665 F.3d 524, 549 (3d Cir. 2011); *see also U.S. v. James*, 257 F.3d 1173, 1179 (10th

Cir. 2001).  To determine whether an adverse discriminatory impact exists, there must be reliable

data on the relevant population in the relevant area (*i.e.*, those who should be stopped).  *See*

*Chavez v. Illinois State Police*, 251 F.3d 612, 638 & 644-45 (7th Cir. 2001) ("[t]he statistics

proffered must address whether one class is being treated differently from another class that is

---

[29] Plaintiffs may argue that Senator Eric Adams' incredible testimony, FOF 67, shows discriminatory intent and/or that Kelly's purported non-public statements constitute an "express policy".  However, there was no evidence that the alleged statements were communicated to supervisors or officers in the field and/or the statements guided day-to-day operations of the NYPD. *See Melendres*, 2013 U.S. Dist. LEXIS 73869 at 250-51.  Chief Esposito and Inspector Holmes testified directly contrary.  FOF 67.

otherwise similarly situated", and population benchmarks could not answer the question). Fagan's statistics suffer from the same benchmarking flaw and cannot be used to predict the number of stops that would occur by race and in the absence of reasonable suspicion. FOF 69-71, 83-84.  In short, he has not shown that race is a predictor of a stop.  FOF 74, 83-84.

## 2.    **Discriminatory Purpose or Intent**

Even assuming plaintiffs' statistics indicate a discriminatory impact, plaintiffs cannot establish discriminatory purpose.  As the Court in *McCleskey* reaffirmed, discriminatory purpose is more than "awareness of consequences".  It implies a particular course of action "because of" not merely "in spite of" adverse effects.  481 U.S. at 298.  As in *McCleskey*, plaintiffs in the present case cannot prove that the City established or maintained its stop and frisk program "*because of* an anticipated racially discriminatory effect".  *Id.* (emphasis added).   Mere knowledge of a discriminatory effect is insufficient.  *See Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979); *accord* McCleskey, 481 U.S. at 298; *see also, Wayte v. U.S.*, 470 U.S. 598, 610 (1985); *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001).  NYPD deploys its officers to high crime areas based on independent crime reports and such deployment occurs with greatest frequency in majority minority neighborhoods.  But the deployment is to address crime conditions – nothing more.   Adverse discriminatory impact alone is insufficient to establish discriminatory purpose except in an extreme case not present here.  *See Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *McCleskey*, 481 U.S. at 293 n.12; *Floyd*, 813 F. Supp. 2d at 452.  In addition, none of the *Arlington* factors support plaintiffs' case.  The purported history of discrimination at best consists of allegations by the NY State Attorney General in 1999 (based on flawed and outdated statistical analyses prepared by Fagan) and the *Daniels* settlement.  These matters hardly constitute "a series of official actions taken for

invidious purposes." *Arlington Heights,* , 429 U.S. at 267.  In any event, the City's actions in seeking to monitor stop activity since 1999 negate discriminatory intent inferences.[30]  *See Washington v. Davis*, 426 U.S. 229, 246 (1976) (affirmative efforts negated inference of discrimination).  Furthermore, the record establishes the City always has been motivated by law enforcement purposes with respect the establishment of its policies relating to stop and frisk. Any attack by plaintiffs on the efficacy of the City's law enforcement methods is irrelevant.[31] *Brown,* 221 F.3d at 339; *see also McCleskey*, 481 U.S. at 298-99 & n.21.

## IV.    **Injunctive Relief is Not Appropriate**

Plaintiffs failed to prove that any injunction is necessary or appropriate.  Notwithstanding the speculative nature of proof of remedy before any defined wrong has been found, plaintiffs' remedy expert broadly and wrongly opined that a bevy of other experts, plus a monitor and various other stakeholders, and a significant outlay of public funds to them, are needed to determine what the remedy should be. FOF 92-94. Plaintiffs failed to prove that the NYPD systems already in place, including its early intervention monitoring, might require more than minor adjustments, as opposed to wholesale creation or re-creation of systems which monitors have overseen. *Id.* Plaintiffs offered no concrete evidence to prove that third-party imposed measures would be more effective than internally created ones, or to prove that de-policing and threat to public safety would not result from outside interference.  *Id.*

Plaintiffs failed to address the effect of a federal court injunction, and any concomitant specter of contempt, particularly when NYPD is already significantly monitored by various

---

[30] In addition, there is no evidence in the record that the City has ever negatively departed from its processes for addressing stop and frisk issues. *Arlington Heights*, 429 U.S. at 267.

[31]  The Court precluded the City from offering rebuttal evidence supporting the effectiveness of the NYPD's stop and frisk practices in reducing and preventing crime, which the City contends enhances its claim that it had a law enforcement rather than a discriminatory purpose.

federal and state entities, and faces the possibility that the NYC Council will subject it to an Inspector General.   Instead of being a pawn for the varying interests of the other branches of government, NYPD should be left to investigate and fight crime as it alone is expert in doing in this metropolis, and continue to be accountable for any legal errors through individual lawsuits for damages – not by a structural injunction crafted in a courtroom, far from the realities of everyday policing. *See Rahman v. Chertoff*, 530 F.3d 622, 626 (7th Cir. 2008); *see also Brown v. Plata*, 131 S. Ct. 1910, 1955 (2011) (Scalia, J., dissenting) ("But structural injunctions do not simply invite judges to indulge policy preferences. They invite judges to indulge incompetent policy preferences. Three years of law school and familiarity with pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions.").

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in favor of Defendant City of New York in all respects.

Dated:   New York, New York
         June 12, 2013

Respectfully submitted,

MICHAEL A. CARDOZO
Corporation Counsel of the City of
  New York
*Attorney for Defendant*
100 Church Street
New York, New York 10007
(212) 356-3505

By: _____

Heidi Grossman
Assistant Corporation Counsel

*Of Counsel:*
Brenda Cooke, Esq.
Linda Donahue, Esq.
Morgan Kunz, Esq.
Joseph Marutollo, Esq.
Suzanna Publicker, Esq.
Lisa Richardson, Esq.
Judson Vickers, Esq.