UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

DAVID FLOYD, *et al.*,                                08 Civ. 1034 (SAS)

        Plaintiffs

        v.                                        STATEMENT OF
                                                      INTEREST OF THE
THE CITY OF NEW YORK, *et al.*,                       UNITED STATES

        Defendants.
--------------------------------------------------------x


## STATEMENT OF INTEREST OF THE UNITED STATES


      This litigation presents two questions of critical public importance:  whether the stop-and-frisk practices of the New York City Police Department ("NYPD") violate the Fourth or Fourteenth Amendments to the United States Constitution and, if so, what remedial measures are needed to bring NYPD's conduct into constitutional compliance.  The United States takes no position on the fact-dependent first question of whether NYPD's stop-and-frisk practices violate constitutional standards such that Plaintiffs should prevail on the merits of their claims.  The United States files this Statement of Interest only in order to assist the Court on the issue of remedy, and only should it find that NYPD's stop-and-frisk practices are unlawful.  Given that the Court has consolidated the liability and remedy phases of this litigation and has requested simultaneous post-trial briefing on both issues, the United States files this Statement of Interest on the subject of remedy at this time even though liability remains undetermined.[1]  The United

---

[1]     In light of the fact that this Statement of Interest is limited to a narrow remedies issue, the United States would have preferred to file this brief if, and only if, the Court finds that Plaintiffs have met their burden to establish liability.  However, because the Court has denied Plaintiffs' requests to bifurcate the liability and remedy phases of these proceedings, *see* Jan. 4, 2013 Tr. at 76-77, 84-85, and has requested post-trial briefing from the parties on all issues by June 12, 2013, *see* May 20, 2013 Tr. at 8101, the United States makes this filing at this time.  On the issue of remedies, the United States has reviewed the parties' March and April 2013 filings, among other trial documents.

States requests that the Court provide the parties an opportunity to respond to the limited issues raised by this Statement of Interest on an appropriate schedule as determined by the Court.

It is the position of the United States that, should the Court find that NYPD's stop-and-frisk practices are unlawful, the Court has wide discretion to enter injunctive relief aimed at bringing any practices it finds to be unlawful into compliance with the Constitution and other laws. The injunctive relief may include the appointment of an independent monitor for the limited purpose of assisting the Court and the parties to ensure that any remedy related to any adverse findings regarding stop-and-frisk practices is implemented.

The United States has authority to file this Statement of Interest pursuant to 28 U.S.C. § 517, which permits the Attorney General to attend to the interests of the United States in any case pending in federal court. The United States has a broad interest in ensuring that identified unconstitutional police conduct is adequately remedied given that it is responsible for enforcing several federal civil rights statutes that prohibit law enforcement agencies from depriving persons of their rights under the Constitution and other laws. The United States enforces the police misconduct provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, which authorizes the Attorney General to file lawsuits seeking court orders to reform police departments engaging in a pattern or practice of violating citizens' federal rights. The United States also enforces the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which prohibit discrimination on the basis of race, color, sex, or national origin by police departments receiving federal funds. Pursuant to these statutes, the United States has worked to remedy violations of the Constitution and other federal laws and to achieve

---

After conferring with counsel of record for NYPD and the City of New York on June 12, the Department of Justice understands that NYPD and the City maintain the position consistent with their earlier filing.

sustainable reform in numerous law enforcement agencies around the country.  *See, e.g.*, *United States v. Puerto Rico*, 12-cv-2039 (D.P.R. filed Dec. 21, 2012); *United States v. Town of East Haven,* 12-cv-1652 (D. Conn. filed Nov. 20, 2012); *United States v. City of Seattle*, 12-cv-1282 (W.D. Wash. filed July 27, 2012); *United States v. City of New Orleans*, 12-cv-1924 (E.D. La. filed July 24, 2012); *United States v. Territory of the Virgin Islands*, 08-cv-158 (D.V.I. filed Dec. 23, 2008); *United States v. City of Detroit*, 03-72258 (E.D. Mich. filed June 12, 2003); *United States v. City of Los Angeles*, 00-cv-11769 (C.D. Cal. filed Nov. 3, 2000); *United States v. City of Pittsburgh*, 97-cv-354 (W.D. Pa. filed Feb. 26, 1997).

The United States' strong interest in ensuring constitutional policing would be directly and substantially implicated should the Court find that NYPD stops and searches individuals in a manner that violates the Fourth or Fourteenth Amendments.  The Fourth Amendment's protection against unreasonable searches and seizures and the Fourteenth Amendment's guarantee of equal protection of the laws are bedrock constitutional rights that safeguard individuals from unlawful police conduct.  Virtually every police investigation conducted by the Civil Rights Division of the Department of Justice touches on these issues in some way, and the form of the remedies available are critical to this nationwide work.   In light of the United States' clear interest in ensuring that any constitutional deficiencies the Court may find are adequately remedied, the United States files this Statement of Interest on the availability and appropriate scope of injunctive relief.

## BACKGROUND

Plaintiffs filed a complaint against the City of New York in January 2008, challenging NYPD's stop-and-frisk program under the Fourth and Fourteenth Amendments.[2]  *See* Complaint

---

[2]        This is not the first case to challenge the constitutionality of NYPD's stop-and frisk conduct.  In 1999, a putative class of plaintiffs filed a complaint against the City of New York, similarly alleging that NYPD's practices

[ECF No. 1]; Second Amended Complaint [ECF No. 50].  The Court granted Plaintiffs' Motion

for Class Certification in May 2012.  *See* May 16, 2012 Order [ECF No. 206].  A bench trial on

both liability and remedy began on March 18, 2013, and concluded on May 20, 2013.

          With regard to remedy, Plaintiffs seek declaratory and injunctive relief, and have

proposed specific remedies that they believe are necessary should the Court find that there exist

constitutional deficiencies within NYPD's stop-and-frisk practices.  *See* Memorandum of Law in

Support of Plaintiffs' Requested Injunctive Relief ("Pls.' Mem.") [ECF No. 268].  The relief

Plaintiffs seek includes both short- and long-term remedial measures.  Specifically, Plaintiffs

request the immediate implementation of several changes to NYPD policies and practices that

govern the documentation, supervision, and evaluation of officer stop-and-frisk activity, as well

as the creation of a joint remedial process—which includes input from NYPD officers and other

members of the New York City community—to identify additional measures that may be

necessary for the Court to order.  *Id.*  At the core of the relief Plaintiffs seek is the appointment

of an independent monitor to facilitate and assess NYPD's implementation of any corrective

measures the Court might order.  *Id.* at 20-27.

          The City of New York ("City") opposes Plaintiffs' request for injunctive relief on two

main grounds.  First, the City broadly challenges the scope of this Court's authority to issue

injunctive relief, even if this litigation reveals that NYPD engages in a pattern or practice of

---

regarding stops and searches violated the Fourth and Fourteenth Amendments.  *See Daniels v. City of New York*, 99-cv-1695 (S.D.N.Y. filed March 18, 1999).  That litigation resulted in a 2003 settlement agreement that required the City to adopt a variety of remedial measures, including the creation of an NYPD policy on racial profiling, the revision of NYPD's reporting practices regarding stops and searches, and regular audits of stop and search reports.  *See* Stipulation of Settlement, 99-cv-1695 [ECF No. 152].  The City gained release from that Agreement in 2007.

          The United States also recognizes the significant reduction in certain crime under Mayor Bloomberg's tenure.  In 2012, for example, the murder rate in New York City fell 18.5% below the previous year, and the rate of shooting incidents fell 8.5%.  *See* Michael Howard Saul, *Homicides Down for 2012*, Wall Street Journal, Dec. 25, 2012.  In all, during Mayor Bloomberg's tenure the murder rate has fallen by roughly 35%.  *See* Historical Citywide Crime Data Archive, New York Police Department, http://www.nyc.gov/html/nypd/html/analysis _and_planning/historical_nyc_crime_data.shtml.

violating the Constitution.  *See* Defendants' Memorandum of Law in Opposition to Plaintiffs'

Requested Injunctive Relief ("Defs.' Mem.") [ECF No. 274] at 5-7.  Second, the City argues that

both the short- and long-term relief Plaintiffs seek is unnecessary given the policies, procedures,

and oversight that NYPD already has in place to safeguard against unlawful stops and searches.

*Id.* at 7-18.  In particular, the City opposes the appointment of an independent monitor on the

basis that NYPD receives ample oversight from its Internal Affairs Bureau, the Chief of

Department Investigations, and the Civilian Complaint Review Board, as well as state and

federal prosecutors and the New York City Council.  *Id.* at 13-15.

## DISCUSSION

It is the view of the United States that it would be lawful and appropriate for the Court to

enter injunctive relief if this litigation reveals constitutional deficiencies in NYPD's stop-and-

frisk conduct.  Where there exists a pattern or practice of police misconduct, a court has broad

discretion to enter injunctive relief aimed at remedying that misconduct.  While it is

unquestionably within this Court's sole discretion to determine the specific scope of injunctive

relief, the experience of the United States in enforcing police reform injunctions teaches that the

appointment of an independent monitor is a critically important asset to the court, the parties, and

the community in cases involving patterns or practices of unlawful conduct by law enforcement

officials.  A court-appointed monitor in this case would help the Court ensure that, if any pattern

or practice is found to exist, it is effectively and sustainably remedied.  In addition, an

independent monitor would provide the Court with necessary information to assess whether any

remedial measures this Court enters are actually resulting in constitutional policing on the

ground.  Moreover, the appointment of an independent monitor would be essential to ensuring

that the New York City community has confidence in the reform process.

I.      **If the Court Finds that NYPD's Stop-and-Frisk Practices Violate the Constitution, the Court has Broad Authority to Enter Injunctive Relief**

If Plaintiffs prevail on the merits of their claims, this Court has broad authority to order injunctive relief that is adequate to remedy any identified constitutional violations within NYPD's stop-and-frisk program.  In order to secure permanent injunctive relief, Plaintiffs must not only prevail on the merits of their claims.  They also must demonstrate:  (1) that they have suffered irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships between Plaintiffs and Defendants weighs in favor of granting a remedy in equity; and (4) that the public interest would not be disserved by the issuance of a permanent injunction.  *ebay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Given that the question of whether Plaintiffs have satisfied this standard is intertwined with the fact-dependent question of whether Plaintiffs should prevail on the merits, the United States does not opine on whether Plaintiffs have satisfied this four-prong test.

However, if the Plaintiffs have met their burden, it is well established that "the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies."  *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *see also Ass'n of Surrogates v. New York*, 966 F.2d 75, 79 (2d Cir. 1992) ("[F]ederal courts have broad discretion in fashioning equitable remedies for . . . constitutional violations."); *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir. 1983) ("A district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct."); *Thomas v. County of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1992) (noting that courts have power to issue "broad injunctive relief" where there exist specific findings of a "persistent pattern of [police] misconduct").  While broad, a court's equitable discretion is not without limits, and a court must tailor injunctive relief to the specific constitutional violations

6

that the relief is meant to correct.  *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d

114, 144 (2d Cir. 2011); *Todaro v. Ward*, 565 F.2d 48, 54 n.7 (2d Cir. 1977).  Nonetheless,

district courts have wide latitude to fashion comprehensive relief that addresses "each element

contributing to the violation" at issue.  *Hutto v. Finney*, 437 U.S. 678, 687 & n.9 (1978); *see also*

*Milliken v. Bradley*, 433 U.S. 267, 282 (1977) ("[W]here . . . a constitutional violation has been

found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition

that offends the Constitution.'").

When crafting injunctive relief that requires state officials to alter the manner in which

they execute their core functions, a court also must be mindful of federalism concerns and should

avoid "remedies that intrude unnecessarily on a state's governance of its own affairs."  *Ass'n of*

*Surrogates*, 966 F.2d at 79.  Citing this case law, the City asserts that the Court's authority to

issue injunctive relief in this case is limited, and that the Court is "not well-suited to inject itself

into the internal operations of NYPD."[3]  *See* Defs.' Mem. at 5.  However, courts have long

recognized—across a wide range of institutional settings—that equity often requires the

implementation of injunctive relief to correct unconstitutional conduct, even where that relief

relates to a state's administrative practices.  *See, e.g.*, *Brown v. Plata*, 131 S. Ct. 1910 (2011)

(upholding injunctive relief affecting State's administration of prisons); *Brown v. Bd. of Educ.*,

349 U.S. 294 (1955) (upholding injunctive relief affecting State's administration of schools).

---

[3]       The City cites a number of cases for the proposition that federal courts should decline to enter injunctive relief that requires operational changes to a State's institutions.  *See* Defs.' Mem. at 5-6.  These cases are inapposite, as they involve circumstances in which plaintiffs either lacked standing to pursue their claims, or failed to demonstrate that the standard governing the availability of equitable relief had been met.  *See, e.g.*, *Miller v. Silberman*, 951 F. Supp. 485, 491 (S.D.N.Y 1997) (plaintiffs lacked standing due to lack of "sufficiently real and immediate threat of future injury"); *PBA of N.Y. v. City of New York*, 97-cv-7895, 98-cv-8202, 2000 U.S. Dist. Lexis 15179, at *9-13 (S.D.N.Y. Oct. 13, 2000) (plaintiff failed to establish need for equitable relief given that likelihood of unlawful conduct repeating was slim).  As stated *supra*, the United States takes no position on whether Plaintiffs have made the requisite showing that equitable relief is available given that the issue is intertwined with the fact-dependent issue of liability.  However, if Plaintiffs make that requisite showing, the Court has broad discretion in fashioning the scope of relief.  *See Swann*, 401 U.S. at 15 ("Once invoked, the scope of a district court's equitable powers . . . is broad . . . .").

Indeed, while courts "must be sensitive to the State's interest[s]," courts "nevertheless must not shrink from their obligation to 'enforce the constitutional rights of all persons . . . .'" *Plata*, 131 S. Ct. at 1928 (quoting *Cruz v. Beto,* 405 U.S. 319, 321 (1972)); *see also Swann*, 402 U.S. at 15 (recognizing State's interests in sovereign administration of its functions, but finding that if "authorities fail in their affirmative obligations . . . judicial authority may be invoked"); *Todaro*, 565 F.2d at 53 ("'[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution.'" (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974))).[4]

Despite the long line of precedent endorsing injunctive relief to cure constitutional deficiencies in the way that states operate their basic systems, the City maintains that the Court's discretion to fashion injunctive relief is narrow here given that the misconduct Plaintiffs allege occurs within the law enforcement context.  *See* Defs.' Mem. at 6 n.2.  However, adequately remedying ongoing constitutional violations is no less urgent or appropriate in the policing context—and given their deep involvement in the criminal justice system, courts are perhaps better equipped to fashion injunctive relief in this context than in cases involving other public institutions.  Indeed, courts have consistently held that, where a law enforcement agency suffers from a "persistent pattern of police misconduct, injunctive relief is appropriate."  *Allee v. Medrano*, 416 U.S. 802, 815 (1974); *see also Hague v. Comm. for Indus. Org.* 307 U.S. 496, 517-18 (1939) (upholding injunction restricting police conduct); *Build of Buffalo, Inc. v. Sedita*,

---

[4]       Courts have sometimes held that, when issuing injunctive relief that affects a state's administration of its executive functions, state officials should be given an opportunity to propose their own remedial measures for correcting the identified constitutional violations. *See, e.g.*, *Schwartz v. Dolan*, 86 F.3d 315, 319 (2d Cir. 1996) (vacating injunctive relief largely because district court failed to allow state agency an opportunity to devise an adequate plan to remedy unlawful conduct).  Setting aside the question of whether such an opportunity is required, here the City was explicitly given the opportunity to offer its views on an appropriate remedy should Plaintiffs prevail on the merits of their claims but declined to set forth any such proposal and rejected Plaintiffs' proposal for a joint-remedial process that would contemplate an extensive role for the City in formulating the parameters of injunctive relief.  Rather, the City has consistently maintained that, even if Plaintiffs prevail at the liability stage, NYPD's current policies and practices are adequate. *See* Defs.' Mem. at 7-18.

441 F.2d 284, 289 (2d Cir. 1971) (acknowledging that "deliberate, purposeful activity resulting in widespread police abuses" can constitute "an appropriate occasion for injunctive relief"); *Spring Garden United Neighbors, Inc. v. City of Philadelphia*, 614 F. Supp. 1350, 1352-55 (E.D. Pa. 1985) (granting preliminary injunction restraining police from certain stop, search, and arrest conduct).[5]

Pursuant to 42 U.S.C. §§ 14141, 3789d, and 2000d, the United States has itself sought and secured the implementation of remedial measures to reform police misconduct in dozens of law enforcement agencies nationwide. *See, e.g.*, *United States v. Puerto Rico*, *supra*; *United States v. Town of East Haven, supra*; *United States v. City of Seattle*, *supra*; *United States v. City of New Orleans*, *supra*; *United States v. Territory of the Virgin Islands*, *supra*; *United States v. City of Detroit*, *supra*; *United States v. City of Los Angeles*, *supra*; *United States v. City of Pittsburgh*, *supra*. Several of the remedies that the United States has obtained directly address systemic deficiencies in the way officers conduct stops and searches. *See, e.g.*, Settlement Agreement, *City of Seattle* [ECF No. 3-1] at 39-41; Consent Decree, *City of New Orleans* [ECF No. 159-1] at 38-46; Consent Judgment, *City of Detroit* [ECF No. 22] at 14-17; Consent Decree, *City of Los Angeles* [ECF No. 4] at 26-28, 39-44; Consent Decree, *City of Pittsburgh* [ECF No. 3] at 4-5. These agreements can be found at http://www.justice.gov/crt/about/spl/findsettle.php. While these measures stem from consent decrees rather than contested litigation, courts nonetheless sanction and oversee the implementation of those measures pursuant to their equitable powers, and the Court has equal authority to do so here. Additionally, the Civil Rights

---

[5]     That courts have so often found injunctive relief necessary to bring police conduct into compliance with the Constitution belies the City's assertion that, unlike other official misconduct, police misconduct can be adequately remedied through individual suits for damages alone. *See also* Daryl Levinson, *Making Government Pay: Markets, Politics, and the Allocation of Constitutional Costs*, 67 U. Chi. L. Rev. 345, 354-57 (2000) (arguing that imposing financial costs on municipalities is an ineffectual method for incentivizing government actors to reduce misconduct); Marshall Miller, Note, *Police Brutality*, 17 Yale L. & Pol. Rev. 149, 155-57 (1998) (noting evidence that civil suits for damages often fail to correct unconstitutional police practices given that departments frequently decline to monitor the amount of damage awards issued or modify practices as a result of those damage awards).

Division cannot be expected to remedy every pattern or practice of unconstitutional conduct in law enforcement across the nation.  It is thus important to ensure that private litigants who have been victims of police abuse are able to vindicate their rights effectively pursuant to contested litigation.

If there is any identified constitutional violation within NYPD's stop-and-frisk practices, the Court's broad power to fashion injunctive relief is not at odds with robust efforts to protect the public.  To the contrary, where there exists a systemic pattern of police misconduct, the entry of injunctive relief to correct that conduct inures to the benefit of safe and effective policing, not to its detriment.  The City has argued that implementing Plaintiffs' requested relief will negatively impact NYPD's capacity to combat crime.  In the experience of the United States, however, reform through a court-ordered process improves public confidence, makes officers' jobs safer, and increases the ability of the department to fight crime.  *See, e.g.*, Christopher Stone *et al.*, *Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD* 6-10 (Harvard Kennedy School Program in Criminal Justice Police and Management), May 2009, (showing crime rates falling more in Los Angeles than in surrounding regions for the duration of the injunctive relief ordered in *United States v. City of Los Angeles*, *supra*).  In addition, there is significant evidence that unlawfully aggressive police tactics are not only unnecessary for effective policing, but are in fact detrimental to the mission of crime reduction.  Officers can only police safely and effectively if they maintain the trust and cooperation of the communities within which they work, but the public's trust and willingness to cooperate with the police are damaged when officers routinely fail to respect the rule of law.  *See* Stephen Schulhofer *et al.*, *American Policing at a Crossroads: Unsustainable Policies and the Procedural Justice Alternative*, 101 J. Crim. L. & Criminology 335, 346-74 (2011); Tom Tyler & Jeffrey Fagan,

*Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231, 233-67 (2008); Jason Sunshine & Tom Tyler, *The Role of Procedural Justice and Legitimacy in Shaping Public Support for Policing*, 37 Law & Soc'y Rev. 513, 534-36 (2003); *see also* Institute on Race and Justice, Northeastern University, *COPS Evaluation Brief No. 1:  Promoting Cooperative Strategies to Reduce Racial Profiling* 20-21 (U.S. Dep't of Justice, Office of Community Oriented Policing Services), 2008 ("Being viewed as fair and just is critical to successful policing in a democracy.  When the police are perceived as unfair in their enforcement, it will undermine their effectiveness.").  As systematic violations of civil rights erode public trust, policing becomes more difficult, less safe, and less effective.  Therefore, if the Court finds any constitutional deficiencies exist in NYPD's stop-and-frisk practices, the implementation of injunctive relief would promote, rather than hinder, NYPD's mission of safely and effectively fighting crime.

## II.    If the Court Finds that NYPD's Stop-and-Frisk Practices Violate the Constitution, the Appointment of an Independent Monitor Is An Appropriate Form of Relief

Should the Court find liability, it is within the Court's authority to order injunctive relief that includes an independent monitor.  The United States takes no position on whether, pursuant to the Court's wide latitude to fashion appropriate relief, the Court should enter other elements of the injunctive relief Plaintiffs seek.  However, if the Court orders injunctive relief, it is the view of the United States, based on decades of police reform efforts across the country, that the appointment of a monitor to guide implementation of that injunctive relief may provide substantial assistance to the Court and the parties and can reduce unnecessary delays and litigation over disputes regarding compliance.

### A.    An Independent Court-Appointed Monitor Helps Ensure that Court-Ordered Relief is Credibly Implemented and Sustained.

An independent monitor can be essential to ensuring that complex institutional reform is achieved.  The implementation of an injunction to address structural deficiencies in a law enforcement agency where those deficiencies contribute to a pattern of constitutional violations is a complex and difficult task.  A monitor provides the independence and expertise necessary to conduct the objective, credible analysis upon which a court can rely to determine whether its order is being implemented, and that gives the parties and the community confidence in the reform process.  Should non-compliance be identified, early and objective detection by the monitor, as well as the identification of barriers to compliance, allows the parties to undertake corrective action, which saves the parties, the Court, and, importantly, the City precious time and resources.

The authority of the Court to appoint a monitor is well established.  *See Ex Parte Peterson,* 253 U.S. 300, 312-13 (1920) (acknowledging inherent power of courts to "appoint persons unconnected with the court to aid judges in the performance of specific judicial duties," and noting that courts have long exercised this power "when sitting in equity by appointing, either with or without the consent of the parties, special masters, auditors, examiners, and commissioners"); *see also United States v. City of New York*, Nos. 11-cv-5113, 12-cv-491, 2013 WL 1955782, at *19 (2d Cir. May 14, 2013) (holding that the "District Court was entirely warranted in ordering significant affirmative relief . . . including appointing a Monitor to oversee the FDNY's longawaited progress toward ending discrimination"); *Benjamin v. Fraser*, 343 F.3d 35, 46 (2d Cir. 2003) (noting "long-recognized principle that Article III courts may appoint agents to engage in a variety of activities essential to the performance of judicial responsibilities"), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2008); *Juan F. v. Weicker*, 37 F.3d 874, 876, 880 (2d Cir. 1994) (upholding injunctive order that

included appointment of monitor with authority to, *inter alia*, oversee implementation and compliance with consent decree, obtain information from defendants, and issue compliance reports).[6]

Our experience bears out the value of a monitor.  In 1997, the United States entered into a consent decree with the City of Pittsburgh to address findings that Pittsburgh police engaged in patterns or practices of excessive force and violations of the Fourth Amendment in connection with searches and seizures, among other claims.  The consent decree entered as an injunction of the federal court included the appointment of an independent monitor.  The City came into compliance with the decree in 1999, and the injunction was lifted in 2002.  *See United States v. City of Pittsburgh*, *supra*.

The Office of Community Oriented Policing Services ("COPS") of the Department of Justice studied the implementation of the Pittsburgh decree and published its findings in an effort to guide other police departments undertaking a reform initiative or facing the implementation of an injunction.  COPS found five essential elements for effective reform, one of which was the "critical role of the court-appointed monitor."  The COPS report found:

> The selection of the monitor by city and Department of Justice officials was a critical choice and, by all indications, the successful candidate facilitated the reform process.  The monitor played an early, vital role after the signing of the decree by helping officials to develop [a] plan of action.  He produced a compliance manual that gave city officials an exact idea of what milestones he

---

[6]     In addition to a court's inherent equitable authority to appoint an independent monitor, a court also has the discretion to appoint a special master pursuant to the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 53; *see also N.Y.S. Ass'n for Retarded Children v. Carey*, 706 F.2d 956, 962-63 (2d Cir. 1983) (holding district court did not abuse discretion in appointing special master to oversee remedial measures at state-operated health facility).  The roles of an independent monitor and a special master are closely related, and courts often use the terms interchangeably.  *See, e.g.*, *Juan F.*, 37 F.3d at 880 (finding "monitor" to be "a special master, albeit by another name").  However, in contrast to court-appointed monitors who generally are limited to serving exclusively a monitoring function, special masters can serve as "quasi-judicial officers" with the authority "to convene and to regulate hearings, to rule on the admissibility of evidence," and to issue findings that are entitled to deference.  *Benjamin*, 343 F.3d at 45; *see also Collins v. Foreman*, 729 F.2d 108, 118 (2d Cir. 1984) (analogizing special masters to magistrate judges).  In any case, it is beyond question that—whether pursuant to a court's equitable powers or Fed. R. Civ. P. 53—a court has broad authority to appoint an individual to assist, oversee, and report on the implementation of injunctive relief.

expected them to achieve at each stage to meet his standard of compliance.  His early meetings with community leaders helped reassure them that real reform was afoot.  He developed a relationship with city officials that was more collaborative than adversarial, making it easier for them to accept some of the more difficult terms of the decree.

Robert C. Davis *et al.*, *Federal Intervention in Local Policing:  Pittsburgh's Experience with a Consent Decree* 36 (U.S. Dep't of Justice, Office of Community Oriented Policing Services), 2005.  That same research found that two key factors enabled the City to quickly and effectively comply with the terms of the decree:  the leadership of a talented police chief and guidance from the federal monitor.  *See* Robert C. Davis *et al.*, *Can Federal Intervention Bring Lasting Improvement in Local Policing:  Pittsburgh Consent Decree* 3 (Vera Institute of Justice), 2005.

The experience in Pittsburgh is consistent with the experience of the Civil Rights Division in other large systemic reform cases, including police matters.  Just last month, a federal court closed a case involving a consent decree regarding the police department of the City of Los Angeles that was entered in 2000.[7]  *See* Joel Rubin, *Judge Formally Ends LAPD Consent Decree*, L.A. Times, May 16, 2013, at AA1; *see also* Jim Newton, Op-Ed., *Newton:  After 12 Years, a Better LAPD*, L.A. Times, May 27, 2013, at A15.  The injunction required widespread reforms, including increased accountability of search and arrest practices in a department of more than 12,000 employees.  Throughout the litigation, the monitor played a critical role, issuing 30 reports to the Court, helping to establish internal mechanisms of accountability, including helping to strengthen the independence of the Office of Inspector General, and ending the case with a 150-page report finding substantial compliance and recommending that the injunction be lifted.  *See* Andrew Blankstein, *Independent Monitor Says LAPD Consent Decree*

---

[7]     Most provisions of the consent decree regarding the Los Angeles Police Department were terminated in 2009, with a few remaining under court supervision pursuant to a Transition Agreement which expired on its terms in 2012.  *See United States v. City of Los Angeles*, 00-cv-11769 (C.D. Cal. filed Nov. 3, 2000).

*Should be Lifted*, L.A. Times, June 12, 2009, at A13; *see also* Office of the Independent Monitor, LAPD, Final Report (June 11, 2009), *available at* http://www.keypoint.us.com/Content/Public Reports/LAPD_FINAL-REPORT_06-11-2009.pdf.  The monitor's reports provided transparency and critical assessments of the department's progress.  While there were many factors that contributed to the success of the reform efforts in Los Angeles, the independent monitor was a central figure. *See* Stone *et al.*, *supra* at 2.

Monitors continue to provide courts with invaluable service in other Civil Rights Division police reform injunctive cases in cities large and small across the Nation, including: Seattle, Washington; Detroit, Michigan; East Haven, Connecticut; and the Territory of the Virgin Islands.  *United States v. Town of East Haven, supra*; *United States v. Seattle*, *supra*; *United States v. Territory of the Virgin Islands*, *supra*; *United Stares v. City of Detroit, supra*.  In each of these cases, in our experience, the independent monitor improves efficiency in implementation, decreases collateral litigation, and provides great assistance to the court.

The routine use of monitors is not confined to cases filed in court.  Monitors provided critical assistance to the parties in an out-of-court settlement with the Metropolitan Police Department in Washington, D.C., that focused on use of force, and in another, broader non-court agreement with the City of Cincinnati, Ohio.  *See* Mem. of Agreement Between United States and District of Columbia (2001); Mem. of Agreement Between United States and City of Cincinnati, Ohio (2002).  The United States recently agreed to out-of-court settlements with the City of Missoula, Montana, and the University of Montana concerning reforms solely to their police practices related to handling allegations of sexual assault and rape.  *See* Mem. of Agreement Between United States and City of Missoula, Montana (2013); Mem. of Agreement Between United States and University of Montana (2013).  Both agreements will be

independently monitored.  Similarly, the United States entered into a comprehensive out-of-court settlement with the Juvenile Court in Shelby County, Tennessee.  *See* Mem. of Agreement Regarding the Juvenile Court of Memphis and Shelby Counties, Tennessee (2012).  The agreement requires reforms to address equal protection and due process violations.  Again, the agreement will be subject to independent monitoring.  These agreements can be found at http://www.justice.gov/crt/about/spl/findsettle.php.

If the Court finds here that a pattern or practice of civil rights violations has occurred, it faces substantially similar considerations as judges handling other police reform matters: measuring compliance; early detection of any non-compliance; and entry of relief to correct any barriers to implementation of the order.  Without an independent monitor, the Court will be forced to depend on motions practice between the parties to assess progress; a costly, contentious, inefficient, and time-consuming process.  An independent monitor, by contrast, gives the Court access to necessary information to ensure that its injunction, and the underlying goal of constitutional policing, is being met.  Equally important is the monitor's ability to diagnose and explain barriers to implementation of any remedial measures the Court may order. In this case, for example, should the Court order a remedy, a monitor can assess whether the policies adopted to prevent unconstitutional stops and frisks are adhered to in actual practice, and whether any required training is being delivered in a manner that is likely to be effective.  This may be particularly important here to the extent that the City asserts that the policies and practices already in place ensure that officers act in accordance with the law.  *See* Defs.' Mem. at 7-18.  A finding of liability would suggest that the asserted policies and practices were not effective at doing so, thus necessitating the diagnostic insight that a monitor would bring.

In the briefing between the parties, there is a dispute about whether existing accountability systems adequately protect the community from routine civil rights violations. *See* Pls.' Mem. at 16-20; Defs.' Mem. at 7-13. This dispute highlights why independence in monitoring is critical. That independence allows a monitor to effectively provide credible assessments of whether the review and accountability systems within a police department are effectively promoting constitutional policing. To the extent that any injunctive relief includes more stringent requirements than are already in place for supervision and review of stop-and-frisk practices, a monitor can measure more credibly than the parties whether these supervisory and internal oversight mechanisms are implemented consistently and effectively. Without robust systems of internal accountability, any changes to policies, training, and practices required by an injunction are not likely to take hold.

The appointment of an independent monitor also can serve to provide the public confidence in the reform process. With allegiance only to the Court and its order for relief, alongside a duty to report its findings accurately and objectively, the monitor's assessments not only provide the Court with the information it needs to determine whether injunctive relief has been effectively implemented, but assure the public that the police department will move forward in implementing the Court's order—and will not escape notice if it does not. Moreover, the police department's progress towards implementing the Court's order will be more readily accepted by a broader swath of the public, including officers, if that progress is affirmed by an independent monitor who has the responsibility of confirming each claim of compliance asserted by the department.

**B.      An Independent Court-Appointed Monitor Serves a Distinct Function from Other External and Internal "Oversight" Entities.**

Defendants identify existing internal (e.g., Internal Affairs Bureau and Chief of Department Investigations) and external (e.g. federal prosecutors, Civil Complaint Review Board, and "the public electorate,") "oversight" entities, and suggest that a court-appointed monitor to guide implementation of any injunctive relief ordered here would be superfluous. Defs.' Mem. at 13. In fact, it is neither unusual nor inapt for a monitor to be appointed to oversee implementation of a court order even where other types of oversight already exist.

A court-appointed monitor serves a distinct function from these other types of oversight. New York's Civilian Complaint Review Board is the entity whose function most closely aligns with that of an independent court-appointed monitor, but this comparison is also inapposite in important ways. The court-appointed monitor would have the responsibility of carrying out intensive and focused review of whether and how the requirements of an injunction related to NYPD's stop-and-frisk functions are implemented, and not, more generally, how NYPD conducts its other functions. Its role would be focused and relatively short term. By contrast, the Civilian Complaint Review Board is meant to provide ongoing oversight that is not focused on stop-and-frisk practices.

Given the distinct roles between civilian oversight and a court-appointed monitor, it is not unusual for a police department to be subject to both. In Pittsburgh, the Citizen Police Review Board has been in existence since 1997, the same year the police consent decree there was signed and a consent decree monitor was put in place. *See* City of Pittsburgh, Pa., Home Rule Charter §§ 228-30 (1997); Consent Decree, *City of Pittsburgh, supra*. In the City of Los Angeles, a Board of Police Commissioners is made up of five civilian members and was in existence before, during, and after the Los Angeles Police Department's consent decree monitoring term. *See* City of Los Angeles, Ca., Charter and Administrative Code § 501 (1999). In addition, the Inspector

18

General and the Office of Independent Monitor worked closely throughout the implementation of the consent decree in Los Angeles. *See id.* § 573 (defining responsibilities of Inspector General); Consent Decree, *City of Los Angeles, supra,* at 65-71 (addressing roles of Inspector General). The Monitor described the Inspector General in its final report "as a full partner throughout the period of the Consent Decree."  Office of the Independent Monitor, LAPD, Final Report, *supra* at 5.  The County of Los Angeles has an Office of Independent Review that was in place even while an MOA between the Department of Justice and the County had been monitored by others. *See* Office of Independent Review—Mission, http://laoir.com/mission.html (last visited June 4, 2013).  Cincinnati's Citizen Complaint Authority was created by the Collaborative Agreement that was part of the resolution of the United States' investigation of the Cincinnati Police Department and has remained in existence after that consent decree monitor ended its tenure. *See* Mem. of Agreement, City of Cincinnati, *supra* at 19.  Oakland's Citizens' Police Review Board has been in existence before and throughout the term of a federal consent decree regarding the Oakland Police Department that has been monitored by a separate monitoring team. *See* Citizens' Police Review Board, http://www2.oaklandnet.com/government/o/cityadministration/ (last visited June 4, 2013).  Similar bodies exist in Seattle and Detroit where independent monitors have been appointed by courts. *See* City of Seattle, Wa., Municipal Code § 3.28.800 (establishing Office of Professional Accountability, which receives and investigates complaints of police misconduct), as well as Settlement Agreement, *City of Seattle*, *supra* at 6-8 (establishing Community Police Commission to provide recommendations regarding implementation of Decree); City of Detroit, Mi., City Charter §§ 7-802, 7-803 (establishing Board of Police Commissioners, which receives and investigates complaints of police misconduct).  These and other systems of focused, court-appointed monitoring alongside more

institutionalized civilian oversight underscore the separate, complementary roles of these parallel forms of oversight.

Moreover, many of the "oversight" entities cited by the City, such as federal prosecutors, the State Attorney General, and District Attorneys, when focused on officer misconduct at all, are focused primarily on prosecuting individual instances of criminal misconduct by officers. These entities have neither the institutional focus nor the resources to review whether police officers are routinely complying with the Constitution in conducting stops and searches.  The burden of showing that officer misconduct constitutes a crime is very high, thus making criminal prosecution a poor tool for structural changes in a department.  Nor can they be expected to ensure that the terms of a specific court order are implemented or that an injunction effectively results in constitutional policing.

Finally, it is not realistic to ask "the public electorate" to monitor the police department to ensure that the department's stop-and-frisk practices are consistent with the Constitution.  The public does not have the time, resources, or access necessary to properly monitor a police department.  *Cf. United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938) (casting doubt upon capacity of political process to protect "discrete and insular minorities" and suggesting need for "more searching judicial inquiry" in cases implicating rights of such individuals).

## CONCLUSION

Should the Court find a pattern or practice of constitutional violations, it has broad powers to issue injunctive relief.  That power includes the authority to appoint an independent monitor who would assist the Court's efforts to ensure that any remedies ordered are effective, efficiently implemented, and achieve the intended result.

Respectfully submitted,


THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

ROY L. AUSTIN, JR.
Deputy Assistant Attorney General
United States Department of Justice
Civil Rights Division

_____/s/ Jonathan M. Smith_____
JONATHAN M. SMITH (DC 396578)
Chief
Civil Rights Division
Special Litigation Section

CHRISTY E. LOPEZ
Deputy Chief
Civil Rights Division
Special Litigation Section

JUDE VOLEK
Trial Attorney
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC  20530
Telephone:  (202) 353-1077
Facsimile:  (202) 514-0212


Attorneys for the United States of America