UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

DAVID FLOYD, *et al.*,                    :

                 Plaintiffs,        :        08 Civ. 01034 (SAS)

                            :

         -against-                  :        ECF CASE

                            :

THE CITY OF NEW YORK, *et al.,*      :

                            :

                Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SHIRA A. SCHEINDLIN, U.S.D.J.:**


**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0900

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
*Attorneys for Plaintiffs*

TABLE OF CONTENTS

I.  Widespread Pattern and Practice of Suspicionless and Race-Based Stops ............................... 1

    a.  Statistical Evidence: Fourth Amendment ........................................................................ 1

        i.  Hit Rates ............................................................................................................ 1

        ii.  Fagan's Classification Analysis ........................................................................ 1

        iii.  Ineffectiveness of UF250s to Monitor Compliance with the
            Constitution ...................................................................................................... 2

        iv.  Statistical Patterns in Operation with Individual Officers .............................. 3

            1.  Use of UF250 Scripts ............................................................................. 3

            2.  Improper Use of the "High Crime Area" Stop Factor ........................... 3

    b.  Statistical Evidence: Fourteenth Amendment ............................................................... 5

        i.  Minority Population Predicts Stop Rates ........................................................... 5

        ii.  Blacks and Hispanics Are Stopped More Frequently, Are More Likely
          to be Stopped and Are More Likely to be Stopped for Questionable
          Reasons than Are Whites ................................................................................... 5

        iii.  Blacks Are Treated More Harshly than Whites during Stops ......................... 6

    c.  The City's Meritless Critiques of Fagan ........................................................................ 6

        i.  Benchmark ......................................................................................................... 7

        ii.  Practical Significance ....................................................................................... 8

        iii.  Zero Counts ...................................................................................................... 9

        iv.  Remaining Criticisms ...................................................................................... 9

    d.  19 Unconstitutional Stops of Plaintiffs and Class Members ...................................... 10

    e.  John Doe Officers were members of the NYPD ......................................................... 11

II.  The NYPD Targets and Stereotypes Blacks and Latinos in its Stop Activity ...................... 13

    a.  Commissioner Kelly's Unrebutted Admissions .......................................................... 13

    b.  Policy and Practice of Targeting the "Right People" for Stops ................................... 14

III.  Pressure to Conduct Enforcement Activity.................................................................. 16

     a.  CompStat........................................................................................................... 16

     b.  Quotas and Performance or Productivity "Goals" or "Standards ............................. 16

     c.  High-level Officials' Notice of and Acquiescence to the Use of Quotas .................. 19

     d.  Pressure Experienced by NYPD Officers During CompStat Era .............................. 20

     e.  Performance Reviews Based Almost Exclusively on Numbers ................................ 21

IV.  Supervision ........................................................................................................... 22

     a.  Failure to Supervise the Constitutionality of Stop-and-Frisk Activity ..................... 23

     b.  Failure to Meaningfully Review Stop-and-Frisk Paperwork...................................... 25

     c.  Failure of Integrity Control Officers to Monitor Officer SQF Conduct ................... 27

     d.  Failure to Meaningfully Audit Stop-and-Frisk Activity ........................................... 28

V.  Training............................................................................................................... 30

     a.  Police Academy Training on Reasonable Suspicion Is Inadequate ........................... 30

     b.  Training on Racial Profiling Is Inadequate .................................................. 31

     c.  Sergeant Training Is Inadequate.................................................................... 32

     d.  Rodman's Neck Training Materials Are Constitutionally Deficient .......................... 32

     e.  Training on Armed Suspects Is Overly Broad and Racially Stereotypical ................ 32

VI.  Investigations, Discipline, and Monitoring .......................................................... 33

     a.  NYPD Response to CCRB Stop-and-Frisk Complaints ............................................. 33

     b.  Office of Chief of Department Stop and Racial Profiling Complaints...................... 35

     c.  The Department Advocate .................................................................................... 36

VII.  Notice and Deliberate Indifference ...................................................................... 38

     a.  Notice of Racial Bias in Street Encounters Since 1999 ........................................... 38

     b.  Indifference to Complaints About Stop and Frisk and Racial Profiling.................... 39

     c.  The RAND Report ................................................................................................. 41

    d.   Failure to Internally Discuss Racial Profiling............................................................. 44

    e.   Belief that Presence of Reasonable Suspicion Negates Racial Profiling.................... 45

    f.   Failure to Implement the *Daniels* Settlement ............................................................. 45

    g.   Years of Effectively Ignoring Results of Stop-and-Frisk Audits............................... 46

VIII.   Remedy ......................................................................................................................... 47

| FLOYD v. CITY OF NEW YORK: TABLE OF WITNESSES | | | |
|---|---|---|---|
| **NAME OF TESTIFYING WITNESS:** | **DESCRIPTION** (For NYPD personnel, rank and assignment): | **RELATION TO STOP** (if applicable): | **DATE TESTIFIED:** |
| Acevedo, Kristianna | CLASS MEMBER | Stopped on May 27, 2007 | 4/1/2013 |
| Adams, Eric | WITNESS FOR PLAINTIFFS | | 4/1/2013 |
| Agron, Julio | Sergeant in the 28th Precinct from Fall of 2002 - present. (Tr. 977:25-978:7) | January 12, 2008 stop of Plaintiff Deon Dennis | 3/22/2013 |
| Albino, Santos | Detective | John Doe officers involved in the February 21, 2008 and June 6 or 9, 2008 stops of Plaintiff David Ourlicht; the January 2006 stop of Plaintiff Lalit Clarkson | 4/30/2013 |
| Almonor, Devin | CLASS MEMBER | Stopped on March 20, 2010 | 3/18/2013 |
| Arias, Edward | Officer, 23rd Precinct, 2007 - 2012. (Tr. 3478:25-3479:7) | February 5, 2008 stop of Class Member Clive Lino | 4/16/2013 |
| Barrelli, Carlo | Lieutenant, Integrity Control Officer of the 107th Precinct from April 2004 - January 2012. (Tr. 3629:21-24) | January 30, 2008 stop of Plaintiff David Ourlicht | 4/16/2013 |
| Barrett, Stacy | Lieutenant, 40th Precinct, from November 2009 - August 2011. (Tr. 6264: 24-6265:7) Integrity Control Officer | | 5/7/2013 |
| Beirne, John | Deputy Commissioner of Labor Relations since 2001. (Tr. 3354:19-23) | | 4/15/2013 |
| Cassidy, Peter | Deputy Chief. Commanding Officer of Quality Assurance Division, January 2001 - August 30, 2006 (retired). (PTE 154, 12:20-18:22) | | PTE 154 (DESIGNATED DEPOSITION) |
| Cirabisi, Stephen | Deputy Inspector, Commanding Officer of the 107th Precinct from November 2006 - August 2010. Currently Commanding Officer of 114th Precinct since August 2010. (Tr. 5614:8-5615:4) | January 30, 2008 stop of Plaintiff David Ourlicht | 5/1/13 - 5/2/13 |
| Clarkson, Lalit | NAMED PLAINTIFF | Stopped in January 2006 | 4/8/2013 |
| Colon, Jose | Officer, Manhattan IRT Housing Bureau in 2008 (Tr. 4024:12-14) | August 3, 2008 stop of Class Member Clive Lino | 4/18/2013 |
| Cronin, Mary | Inspector, Executive Officer of the Quality Assurance Division (QAD) from March 2001 - May 2006; Commanding Officer of QAD from May 2006 - current. (Tr. 4623:18-4624:3) | | 4/23/13 - 4/24/13 |
| Dale, Thomas | Assistant Chief. As of November 2009 deposition, Commanding Officer, Patrol Borough Queens South, since 2003. (PTE 155, 5:12-6:6) | | PTE 155 (DESIGNATED DEPOSITION) |
| Dang, Kha | Officer, Anti-Crime Unit in 88th Precinct from Spring of 2008 until August 2012. (Tr. 6368:2-5). | | 5/7/13, 5/9/13 |
| DeMarco, Louis | Detective, Narcotics Borough of Queens from 2007 - current. (Tr. 2677:21-2678:1) | May 27, 2007 stop of Class Member Kristianna Acevedo | 4/8/2013 |
| Dengler, Justin | Detective | John Doe officers involved in the April 20, 2007 Stop of David Floyd | 4/30/2013 |
| Dennis, Brian | Officer, 30th precinct, from 1994 - current. (Tr. 1067:11-18) | March 20, 2010 stop of Class Member Devon Almonor | 3/27/2013 |
| Dennis, Deon | NAMED PLAINTIFF | Stopped on January 12, 2008 | 3/19/2013 |
| Diaz, Raymond | Assistant Chief, Former Commander of Patrol Borough Manhattan North from 2002 - June 2009. (Tr. 1023:13-1024:1) | January 12, 2008 stop of Plaintiff Deon Dennis | 3/22/13 and 3/29/13 |
| Downs, Leroy | CLASS MEMBER | Stopped August 20, 2008 | 4/19/2013, 4/22/2013 |
| Eddy, Dennis | Officer, 107th Precinct (PTE 129, 71:9-14) | January 30, 2008 stop of Plaintiff David Ourlicht | PTE 129 (DESIGNATED DEPOSITION) |
| Esposito, Joseph | Chief of Department from August 2000 - March 2013 (Tr. 2793:22-2794:22) | | 4/9/13 - 4/10/13 |
| Fagan, Jeffrey | WITNESS FOR PLAINTIFFS | | 4/3/13-4/5/13, 5/6/13, 5/13/13 |
| Farrell, Michael | Deputy Commissioner of Strategic Initiatives since January 2002. Oversees OMAP and QAD. (Tr. 7082:1-12) | | 5/14/13 - 5/15/13 |

| Figueroa, Edgar | Officer, 23rd Precinct in February 2011 (Tr. 2755:5-6) | February 24, 2011 stop of Class Member Clive Lino | 4/8/2013 |
|---|---|---|---|
| Floyd, David | NAMED PLAINTIFF | Stopped on April 20, 2007 and February 27, 2008 | 3/18/13 - 3/19/13 |
| French, Edward | Officer, Police Service Area (PSA) 9, from January 2005 - August 2011. (Tr. 3740:6-9) | December 19, 2009 stop of Class Member Cornelio McDonald | 4/17/2013 |
| Giacona, Scott | Officer, Brooklyn South Gang Squad as of August 2008. | August 20, 2008 stop of Class Member Leroy Downs | 4/17/13 - 4/18/13, 4/22/13 |
| Giannelli, Robert | Retired. From February 2002 - June of 2007 was Executive Officer of Detective Bureau. In June of 2007 was promoted to Chief of Patrol.  (PTE 157, 37:3-15) | | PTE 157 (DESIGNATED DEPOSITION) |
| Gillespie, Sean | Officer, Midtown South Operation Impact Squad, January 2009 - August 2010. (Tr. 3420:1-16) | February 12, 2010 stop of Class Member Dominique Sindyaganza | 4/15/13 - 4/16/13 |
| Gonzalez, Edgar | Officer, 88th Precinct, Target Unit and Anti-Crime Unit since 2007 (PTE 130, 21:14-25) | | PTE 130 (DESIGNATED DEPOSITION) |
| Guimaraes, Fernando | Special Operations Lieutenant, 43rd Precinct from August 2007 - July 2010. (Tr. 1639:1-7) | February 27, 2008 stop of Plaintiff David Floyd | 4/1/2013 |
| Hall, James | Chief of Patrol from  March 2010 - current. Succeeded Robert Giannelli. (Tr. 7304:6-11) | | 5/15/13 - 5/16/13 |
| Hassan, Mohamed | Officer, Manhattan IRT Housing Bureau in 2008 (Tr. 4017:13-4018:7) | August 3, 2008 stop of Class Member Clive Lino | 4/18/2013 |
| Hawkins, Michele | Detective, Narcotics Borough Queens, from 2001 - current. (Tr. 5452:9-12) | May 27, 2007 stop of Class Member Kristianna Acevedo | 4/30/2013 |
| Hegney, Richard | Sergeant, 107th Precinct from January 2001 - Fall 2008 (Tr. 1939:10-1940:2) | January 30, 2008 stop of Plaintiff David Ourlicht | 4/2/13 - 4/3/13 |
| Hernandez, Eric | Officer, 43rd Precinct. Assigned to anti-crime unit on February 27, 2008. (Tr. 1381:1-3) | February 27, 2008 stop of Plaintiff David Floyd | 3/28/2013 |
| Herran, Angel | Officer, 41st Precinct for the past 18 years. (Tr. 6754:1-4) | | 5/10/2013 |
| Holmes, Juanita | Inspector, Commanding Officer of 81st Precinct (6454:5-7) from July 2010 - current. (6458:13-15). Previously was Commanding Officer at PSA-2 in Brooklyn from June 2008 - July 2010. (6457:24-6458:12) | | 5/9/2013 |
| Houlahan, Daniel | Sergeant, PSA-2 since beginning of 2008. (DTE Q14, 11:5-20) | November 24, 2009 stop of Class Member Ian Provost | DTE Q14 (DESIGNATED DEPOSITION) |
| Hu, Donghai | Officer, PSA-5, from 2006 - current. (PTE 131, 12:15-13:18) | | PTE 131 (DESIGNATED DEPOSITION) |
| Joyce, Cormac | Officer, 43rd Precinct. Assigned to anti-crime unit on February 27, 2008. (Tr. 1312:13-15) | February 27, 2008 stop of Plaintiff David Floyd | 3/28/2013 |
| Kelly, James | Sergeant, 43rd Precinct from August 2005 - current. (Tr. 1427:14-21) | February 27, 2008 stop of Plaintiff David Floyd | 3/29/2013 |
| Korabel, Jonathan | Sergeant, 30th Precinct from July 2007 - June 2012. (Tr. 1145:9-1146:4). Currently Lieutenant in the 48th precinct. (Tr. 1184:12-15) | March 20, 2010 stop of Class Member Devon Almonor | 3/27/2013 |
| Kovall, Brian | Officer, 23rd Precinct in February 2008 - current. (Tr. 3043:15-18) | February 5, 2008 Stop of Class Member Clive Lino | 4/10/2013 |
| Leek, Daniel | Officer, 23rd Precinct in February 2011 - current (Tr. 2695:1-4) | February 24, 2011 Stop of Class Member Clive Lino | 4/8/2013 |
| Lehr, Kenneth | Inspector, Commanding Officer of 67th Precinct from January 2012 - current. (Tr. 5335:9-17). Previously was Commanding Officer of 9th Precinct from January 2010 - January 2012 (Tr. 5335:21-24) and Commanding Officer of Transit District 33 from May 2006 - January 2010. (Tr. 5336:3-6) | | 4/29/13 - 4/30/13, 5/17/13 |
| Lino, Clive | CLASS MEMBER | Stopped February 5, 2008, August 3, 2008 and Februrary 24, 2011 | 4/1/2013 |
| Loria, Michael | Sergeant, PSA 9 from 2000 - 2012. (Tr. 3755:21-3756:5) | December 19, 2009 stop of Class Member Cornelio McDonald | 4/17/2013 |

| | | | |
|---|---|---|---|
| Mahoney, James | Officer, Brooklyn South Gang Squad, June 2007 - August 2012. (Tr. 3865:21-23) | August 20, 2008 stop of Class Member Leroy Downs | 4/17/2013, 4/22/2013 |
| Marino, Joseph | Sergeant, 88th Precinct from September 2005 - June 2012. (Tr. 5542:2-10) | | 4/30/2013 - 5/1/13 |
| Marino, Michael | Deputy Chief. Commanding Officer of 75th Precinct September 2002-September 2005 (Tr. 876:8-12, 887:19-20) Promoted to Executive Officer of Patrol Borough Brooklyn North in December 2004 (Tr. 888:3-11, 899:6-9) until December 2010, when he became Executive Officer of the borough of Staten Island. | | 3/22/2013 |
| Marrero, Victor | Officer, 41st Precinct from July 2008 - current. (Tr. 592:15-593:4) | | 3/20/2013 |
| Mascol, Rafael | Special Operations Lieutenant, 81st Precinct from 2007 - August of 2012. (Tr. 946:9-12) | | 3/22/2013 |
| Materasso, Martine | Captain, 40th precinct, since January 2012. (Tr. 6640:23-6641:8) Executive Officer and Impact Captain. | | 5/10/2013 |
| Mauriello, Steven | Deputy Inspector. Commanding Officer of the 81st Precinct from December 2007 - July 2010. (Tr. 1829:3-1830:21) | | 4/2/2013 |
| McAleer, Helen | Inspector, Office of Chief of Deparmtent from 1995 - current. (Tr. 3961:3-8) | | 4/18/2013 |
| McCarthy, James | Lieutenant, 107th Precinct in October 2007 - early 2010 (4980:19-25) | | 4/25/2013 |
| McCormack, Christopher | Deputy Inspector, Commanding Officer of 40th Precinct since September 27, 2011. Formerly CO of 20th Precinct, from May 5, 2010 - September 2011. (Tr. 6905:8-10; 6906:14-17) | | 5/13/2013 - 5/14/13 |
| McDonald, Cornelio | CLASS MEMBER | Stopped December 19, 2009 | 4/17/2013 |
| McGuire, Philip | Assistant Commissioner, in charge of the Crime Analysis and Planning (CAPPS) in the Office of Management, Analysis and Planning (OMAP) from 1994 until current (Tr. 4280:3-4) | | 4/22/2013, 5/3/13 |
| McHugh, Donald | Inspector, Commanding Officer of 41st Precinct, February 2008 - Fall 2010. (Tr. 3163:17-22) | | 4/14/13 - 4/15/13 |
| Mohan, Dewkoemar | Lieutenant, Patrol Supervisor of 40th Precinct from 2005 - 2012. (Tr. 5230:20-22) | | 4/29/2013 |
| Monroe, Stephen | Sergeant, 40th Precinct from October 2010 - current. (Tr. 5264:12-23) | | 4/29/2013 |
| Montgomery, Dwayne | Inspector, Commanding Officer of 28th Precinct June 2005 - March 2009 (Tr. 1561:6-14) | January 12, 2008 stop of Plaintiff Deon Dennis | 3/29/2013 and PTE 158 |
| Moran, Christopher | Officer, in the 107th Precinct in January 2008. (Tr. 4076:10-12) | January 30, 2008 stop of Plaintiff David Ourlicht | 4/18/2013 |
| Morris, Williams | Chief, Borough Commander, Patrol Borough Manhattan North. (6558:13-15) From July 2010 - current (Tr. 6599:5-6) | | 5/9/2013 - 5/10/13 |
| Mulet, Tracy | Lieutenant, Supervisor of Geospatial Information and Analysis Group within the Crime Analysis and Program Planning section of the Office of Management Analysis and Planning ("OMAP"). (Dkt. 161, Para. 1) | February 27, 2008 stop of Plaintiff David Floyd | STIPULATION |
| Mulligan, Daniel | Captain, Executive Officer of the Resource Management Section, Patrol Services Bureau, 2005 - time of deposition. Previously a Lieutenant at PSB and the Executive Officer of 123rd Precinct. (DTE R14, 25:23-28:-1) | | DTE R14 (DESIGNATED DEPOSITION) |
| Navaretta, Anthony | Officer, 28th Precinct starting in January 2006. (Tr. 6343:25-6344:12) | | 5/7/2013 |
| Ortiz, Charles | Deputy Inspector, Commanding Officer of 43rd Precinct from February 2008 - August 2012. (Tr. 3499:5-16) | February 27, 2008 stop of Plaintiff David Floyd | 4/16/2013 |
| Ourlicht, David | NAMED PLAINTIFF | Stopped January 30, 2008, February 21, 2008 and June 6 or 9, 2008 | 4/19/2013 |
| Palmieri, Cosmo | Lieutenant, Intergrity Control Officer of 43rd Precinct from September 2008 - current. (Tr. 3651:2-6) | February 27, 2008 stop of Plaintiff David Floyd | 4/17/2013 |
| Peart, Nicholas | CLASS MEMBER | Stopped August 5, 2006, Spring 2008, September 2010 and April 2011 | 3/19/2013 |
| Peters, Enno | Lieutenant, Integrity Control Officer of 28th Precinct from October 1998 - February 2012. (Tr. 3580:25-3581:3) | January 12, 2008 stop of Plaintiff Deon Dennis | 4/16/2013 |

| | | | |
|---|---|---|---|
| Pichardo, Luis | Officer, 28th Precinct from January 2006 - current (Tr. 1255:13 - 1256:11) | January 12, 2008 stop of Plaintiff Deon Dennis | 3/27/13 - 3/28/13 |
| Polanco, Adhyl | WITNESS FOR PLAINTIFFS | | 3/19/13 - 3/20/13 |
| Provost, Ian | CLASS MEMBER | Stopped November 24, 2009 | PTE 584 (DESIGNATED DEPOSITION) |
| Purtell, Robert | DEFENDANTS EXPERT | | 5/2/13 - 5/3/13, 5/6/13 |
| Reiter, Lou | WITNESS FOR PLAINTIFFS | | 4/24/2013 |
| Riley, Terrence | Inspector, Office of Management Analysis and Planning (OMAP) from 2005 - August 2010 (Tr. 3898:6-11; 3905:15-17). Currently assigned as Commanding Officer of Resource Analysis Section. | | 4/18/2013 |
| Rodriguez, Flavio | Sergeant, 28th Precinct from 2007 - present. (Tr. 1215:4-16) | January 12, 2008 stop of Plaintiff Deon Dennis | 3/27/2013 |
| Rothenberg, Jonathan | Officer, Operation Impact in PSA-2 on November 24, 2009. (Tr. 3799:18-3800:5) | November 24, 2009 stop of Class Member Ian Provost | 4/17/2013 |
| Ruggiero, Thomas | Officer, 107th Precinct (PTE 135, 21:21-25) | January 30, 2008 stop of Plaintiff David Ourlicht | PTE 135 (DESIGNATED DEPOSITION) |
| Salmeron, Angelica | Officer, 28th Precinct, from May 2007 - 2011. (Tr. 831:25-832:8) | January 12, 2008 stop of Plaintiff Deon Dennis | 3/22/2013 |
| Schwartz, Julie | Deputy Commissioner, Department Advocate's Office (DAO) from 2005 - current. (Tr. 4454:11-18) | | 4/22/2013 - 4/23/13 |
| Serrano, Pedro | WITNESS FOR PLAINTIFFS | | 3/20/13 - 3/21/13 |
| Shea, James | Commanding Officer of the Police Academy from June 2011 - October 2012 (Tr. 5118:15-25). Currently Deputy Chief of Anti-Crew/Gang Initiative. (Tr. 5017:10-14). | | 4/25/13 - 4/29/13 |
| Silva, Eduardo | Sergeant, 40th Precinct from July 2008 - current. (Tr. 5240:21-5241:3) | | 4/29/2013 |
| Silverman, Eli | WITNESS FOR PLAINTIFFS | | 4/5/13 - 4/8/13 |
| Sindayiganza, Dominique | CLASS MEMBER | Stopped on February 12, 2010 | 4/8/2013 |
| Smith, Dennis C. | WITNESS FOR DEFENDANTS | | 5/6/2013 |
| Stewart, James | WITNESS FOR DEFENDANTS | | 5/16/13 - 5/17/2013 |
| Telford, Charlton | Lieutenant, 88th Precinct, from July 2004 - April 2011 (Tr. 6304:7-10) | | 5/7/2013 |
| Thompson, Joan | Executive Director of Civilian Complaint Review Board (CCRB) from late 2007 - current. (Tr. 3266:15-21) | | 4/15/2013 |
| Trunzo, Sabrina | Officer, 120th Precinct, worked in Operation Impact, Borough Anti-Crime Unit, Street Narcotics Enforcement Unit, Staten Island Gang Squad, from 2004 - current. (PTE 136 Depo. 7:25-15:22) | | PTE 136 (DESIGNATED DEPOSITION) |
| Tzimorotas, Christopher | Officer, worked Anti-Crime and Conditions Units, 107th Precinct. (PTE 137, Depo. 25:13-19) | Concerning February 21, 2008 stop of David Ourlicht by John Doe officers. | PTE 137 (DESIGNATED DEPOSITION) |
| Velazquez, Edward | Officer, 41st Precinct (Tr. 618:1-8) | | 3/20/2013 |
| Vizcarrondo, Damian | Detective, Narcotics Borough Queens from 2005 - 2013 (Tr. 5191:5-16) | May 27, 2007 stop of Class Member Kristianna Acevedo | 4/29/2013 |
| Walker, Samuel | WITNESS FOR PLAINTIFFS | | 5/15/13 - 5/16/13 |
| White, Benjamin | Officer, 24th Precinct from approximately 2005 - 2008 (Tr. 6211:1-14) | August 5, 2006 stop of Class Member Nicholas Peart | 5/7/2013 |
| White, Luke | Officer, Midtown South Operation Impact Squad, January 2009 - Summer 2010. (Tr. 3087:5-12, 3088:22-24) | February 12, 2010 stop of Class Member Dominique Sindayganza | 4/10/2013 |

## PROPOSED FINDINGS OF FACT[1]

I. **Widespread Pattern and Practice of Suspicionless and Race-Based Stops**

    a. **Statistical Evidence: Fourth Amendment**

        i. **Hit Rates**

1.     Only 12% of the 4.43 million stops recorded between 2004 and the second quarter of 2012 resulted in any sanctions (i.e., arrest or summons); over 88% percent of the people stopped were just let go. Tr. (Fagan) 2013:3-2014:14, 2035:4-2039:3, 2316:1-2317:1; PTE 411 at 63 & Tables 14 and 16; PTE 417 at 34-35 & Table 14.  These facts are unrebutted.

2.     Only 0.12% (2004-09) and 0.15% (2010-June 2012) of all stops resulted in the seizure of a gun. The seizure rates for all weapons were 0.94% and 1.18%, and for any other contraband 1.75% and 1.8%. Tr. (Fagan) 2014:17-2015:6, 2039:7-2040:11; PTE 411 at 63-64 & Table 15; PTE 417 at 35 & Table 15. A weapon was found in approximately 1.5% of all frisks. DTE V14-A, C. These facts are unrebutted.

3.     These hit rates are far lower than random chance. The arrest rate resulting from random stops at checkpoints reported in *City of Indianapolis v. Edmonds*, 531 U.S. 32, 35 (2000), was about 9%, versus about 6% for NYPD stops. The random stop contraband seizure rate was about 5%, but only 1.75-1.8% in NYPD stops. Tr. (Fagan) 2016:1-2018:6, 2316:9-13; PTE 411 at 63-65 & Table 14; PTE 415 ¶4i; PTE 417 at 34 & Table 14. These facts are unrebutted.

        ii. **Fagan's Classification Analysis**

---

[1] This post-trial submission is limited to 50 pages. Tr. 8096:2-3. Pursuant to the Court's directive, we exclude specific evidence related to individual stops (Tr. 8093:5-14), and, given the page limit compared to the magnitude of evidence at trial, we necessarily exclude some evidence supporting liability and remedy. The proposed findings of fact are therefore not comprehensive.

4.    Relying on the side 1 and side 2 stop circumstances recorded by NYPD officers on the 4.43 million UF250 forms analyzed, and applying adequately explored legal criteria as to which stop factors alone or in combination constitute a basis for reasonable suspicion, Fagan determined that at least 268,481, or about 6%, of the 4.43 million stops were apparently unjustified, and 518,772 stops, or about 12%, were ungeneralizable. Tr. 2018:7-2025:17, 2042:13-2047:16, 2054:5; PTE 411 at 48-51, 55-58 & Table 12; PTE 415 ¶¶4e-f; PTE 417 21-32 & Table 12c; PTE 417-B, PTE 417-C, PTE 417-D. The City mischaracterizes the percentage of stops Fagan's method assigned to the apparently justified category (which is about 82%, PTE 417-D, not 88 or 90%), but does not dispute any of these figures.

5.    Fagan did not opine and does not believe that the stops he categorized as apparently justified were actually made with reasonable suspicion. Rather, he opined that because hit rates for sanctions and seizures are so low, and for the reasons he stated in support of his opinion that UF250s are ineffective to monitor compliance with the Constitution, *see infra* ¶6, many of the stops his method assigned to the apparently justified category were made without reasonable suspicion and the number of apparently justified stops would decrease substantially if more facts about them were known. Tr. 2040:12-2041:22, 2457:7-2459:9; PTE 411 at 53-55 & Table 11; PTE 412 at 39-48 & Figs. S1-S6, Table S6; PTE 415 ¶4g; PTE 417 at 32-34 & Fig. 13.

### iii.   **Ineffectiveness of UF250s to Monitor Compliance with the Constitution**

6.    As Fagan opined, UF250s do not accurately reflect whether an officer had reasonable suspicion and are ineffective for assessing whether stops are based on reasonable suspicion or otherwise monitoring the constitutionality of stops. Tr. 2040:12-2041:23. He based this opinion on: (A) the low hit rates, *see supra* ¶¶1-3; (B) the increase over time of the number of boxes checked off by officers on UF250s; Tr. 2116:11-2117:5; PTE 412 at 40 Table S6; (C) officers' indiscriminate and increased use in discretionary (non-radio-run) stops of highly

2

subjective UF250 stop circumstances such as Furtive Movements (checked in 54% of discretionary stops), particularly in high minority population areas, and High Crime Area (checked in 61% of discretionary stops), checked roughly the same percentage of times even in areas with average and below average crime rates, Tr. 2068:13-2071:9, 2103:11-2115:13; PTE 411 at 51-55 & Table 11, Fig. 13; PTE 412 at 39-48 & Figs. S2, S5; , PTE 415 ¶¶4h, 19 & Ex. C; PTE 417 at 21-24 & Tables 11, D1, 32-34 & Fig. 13; and (D) the emergence of a script for filling out UF250s. Tr. 2115:8-2118:13; PTE 412 at 39-48 & Figs. S1-S6, Fig. 13 & Table S6.  These facts are unrebutted.

iv.   **Statistical Patterns in Operation with Individual Officers**

1.   **Use of UF250 Scripts**

7.     Officer Gonzalez, among the highest stoppers in the third quarter of 2009 (Dkt. # 272 ¶14), checked off the same four boxes on 98.51% of the UF250 forms for that period: fits description, actions indicative of casing, high crime area, and time of day, day of week, season corresponding to reports of criminal activity. PTE 557, 557-D.

8.     Officer Dang, among the highest stoppers in the third quarter of 2009 (Dkt. # 272, ¶14), checked high crime area" in 82.68% of the stops he made, even though the stop locations were widely dispersed throughout a very racially and socioeconomically heterogeneous precinct. *See* DTE L12; Y8 at NYC_2_24974. He checked "time of day, day of week, season corresponding to reports of criminal activity" in 98 of 127 stops made at different times of the day. *See* DTE L12; PTE 565 at n.2. *Compare* DTE L12 at NYC_2_00015715-16 *with* 15721-22; *compare* 15781-82 *with* 15769-70; *compare* 15775-76 *with* 15771-72. Ninety-five percent of the stops Dang made in that racially diverse precinct were of Blacks. PTE 565; DTE Y8 at NYC_2_24974.

2.   **Improper Use of the "High Crime Area" Stop Factor**

9.     The NYPD officer who stopped Cornelio McDonald and the supervisor of the officers who stopped David Floyd have an unreasonably broad understanding of what constitutes a "high crime area." Tr. (Guimaraes) 1687:9-13; (French) 3717:8-13, 3719:10-3720:25; 3726:4-3727:11; PTE 226; PTE 466.

10.     The burglary pattern sheet that is the purported basis of Floyd's February 27, 2008 stop shows no burglaries in the three weeks preceding the stop, and the burglaries that are listed on the sheet were almost one mile away, lacked a suspect description, and did not occur at a particular time or in a manner consistent with Floyd's actions at the time of his stop. DTE L4; DTE K13; Tr. (Kelly) 1471:4-8, 1472:3-1476:3, 1507:22-1508:24; *Compare* Tr. (Joyce) 1333:5-1334:12, 1335:4-24, 1368:10-1369:3; (Stip.) 6798:4-10.

11.     The NYPD analyzes and responds to crime trends by focusing on small geographic units similar in size and demography to census tracts and relying on crime data that is updated daily, weekly, or at minimum monthly. DTE T8 at 5, 17, 37-38, 58-59; *Compare* DTE S14 (census tract map in the Bronx) to DTE T14 (map of sectors and impact zone in 81P); Dkt. # 171 at 26-27; Tr. (McGuire) 4358:24-4359:13; (Smith) 6169:11-6170:3; (Holmes) 6466:7-6469:4, 6470:21-6471:15, 6518:2-24; (Hall) 7354:19-7355:11.

12.     The NYPD's crime complaint report data indicates that in the month preceding the Floyd stop there were no reported burglaries in either Floyd's census tract or the neighboring census tract, i.e., a 32 square block area, and in the two months prior there was only one. PTE 413 ¶14, Ex. D; DTE S14; Tr. (Fagan) 2035:1-15, 2273:18-2278:9; Tr. (Stip.) 6803:19-6804:17. Defendant's evidence is entirely consistent with these numbers. DTE S14 (crimes reported across a much larger geographic area around Mr. Floyd's home); DTE Y14 (crimes that were reported across a much larger geographic area and over a much longer time period).

b.   **Statistical Evidence: Fourteenth Amendment**

i.   **Minority Population Predicts Stop Rates**

13.     The NYPD's explanation for the undisputedly large racial disparities in stop-and-frisk rates is that most stops occur in high crime areas of the City, where a disproportionately large share of the Black and Hispanic population lives. DTE T8 at 5-6; Tr. (Esposito) 3027:14-3030:20; (Smith) 6144:12-19.

14.     As Fagan determined from his negative binomial regression analyses, the racial composition of a precinct, neighborhood, or census tract predicts the stop rate *above and beyond* the crime rate, *even after* controlling for local crime rates, patrol strength, and other local social and economic characteristics associated with crime. The results were the same whether Fagan used calendar quarters or months and regardless of the spatial unit of analysis. These findings are robust. Tr. 2029:11-2030:4, 2131:15-2135:18, 2204:10-2237:14, 2248:23-25, 2279:6-11, 2281:7-2282:7, 6004:7-6005:19; PTE 411 at 3-4 30-39 & Tables 5 and 6; PTE 412 at 15-20 & Tables S1-S3; PTE 415 ¶4a; PTE 417 at 16-21 & Table 5; PTE 411B.  The City does not contest that Fagan's Table 5s show these results.

ii.   **Blacks and Hispanics Are Stopped More Frequently, Are More Likely to be Stopped and Are More Likely to be Stopped for Questionable Reasons than Are Whites**

15.     As Fagan determined from his hierarchical Poisson regression analyses,  Blacks and Hispanics are more likely to be stopped and are stopped more frequently than whites, after controlling for the racial composition, local crime rate, patrol strength, and other local social and economic characteristics of the precinct or census tracts associated with crime, and this is the case even in areas where there are low crime rates and where the populations are racially heterogeneous or predominantly white. These findings are robust. Tr. 2030:5-18, 2127:16-2128:15; 2131:15-2135:18, 2239:17-2248:18-2248:25, 2279:12-2282:7, 2409:23-2410:21; PTE

411 at 4, 40-45 & Tables 7-10; PTE 415 ¶¶4b, 4c; PTE 417 at 19-21 & Table 7. These findings are unrebutted.

### iii.  **Blacks Are Treated More Harshly than Whites during Stops**

16.     As Fagan determined from his multilevel logistic regression analysis, in stops that resulted in any sanction (arrest or summons), Black suspects were 31.4%, and Hispanics about 6%, more likely than whites to be arrested, as opposed to merely receiving a summons, for the same offense. He also found and opined that the likelihood of a stop resulting in any sanction decreases significantly as the percent Black population in an area increases, suggesting that Blacks are targeted for suspicionless stops. Tr. 2030:19-2033:4, 2118:14-2126:11; PTE 411 at 4, 62-69 & Tables 14, 16 and Fig. 14; PTE 415 ¶ 4d; PTE 417 at 34-35 & Table 14. These facts are unrebutted.

17.     As Fagan also concluded, after controlling for the suspected crime, Blacks who were stopped were about 14%, and Hispanics about 9.3%, more likely than whites who were stopped to be subjected to use of force, and the use of force during a stop is significantly higher as the percentage of the Black population in an area increases. Tr. 2019:2-2127:15, 2032:1-5, 2129:25-2032:1; PTE 411 at 4, 66-69 & Tables 14 and 16; PTE 417 at 35 & Table 14. These facts are unrebutted.

### c.  **The City's Meritless Critiques of Fagan**

18.     Before their work in this case and *Davis v. City of New York*, neither Smith nor Purtell had ever conducted a statistical study that assessed the constitutionality of stop-and-frisk or any other police practice or analyzed racial disparities in stops, other policing practices, or in any other context. Tr. (Purtell) 5842:9-12; (Smith) 6121:8-16, 6123:9-16.

i. **Benchmark**

19.     Fagan's decision to use local population and crime rate, and not crime suspect race, as a benchmark has no bearing on the outcome of his analysis because when Smith and Purtell's regression model that used crime suspect race as a variable was run with the standard errors, it did not change the results Fagan obtained, and in fact showed that the associations between minority population of an area and the local stop rate are actually stronger than those between crime suspect race and the stop rate. DTE H-13 at 70 (Table 10); Tr. (Smith) 6172:25-6174:10; Tr. (Fagan) 6837:25-6841:14; PTE 574.  The results of Smith's "alternative" regression analysis, DTE O8 at Ex. I, are entitled to no weight because that analysis omitted critical variables, failed to specify a reference group, and used a biased data set. Tr. (Smith) 6087:8-10; (Fagan) 2251:13-2253:10.

20.     Fagan chose not to use NYPD crime suspect race data, including the Merge File, as a benchmark in part because the suspect's race was missing or unknown in nearly 70% of crime complaints reported to the NYPD in 2005-06, and almost 40% in 2010-2011. Tr. 2148:7-2150:18, 2157:10--2189:1; PTE 411 75-77 & Table 18; PTE 417, App. B at 1-3 & App. Tables 1-3; DTE H13 at 34. Extrapolating or imputing the suspect race information from the cases where it was known to such a large number of cases where it is unknown would result in sample selection bias. Tr. (Fagan) 2150:21-2152:17; PTE 411 at 17-18, 75-77 & n.112; PTE 415 ¶27; PTE 417 at 7.

21.     Smith testified that he did not know of a single statistical study on racial disparities that used a benchmark in which nearly 40% of the data were missing and did not cite to any support in the social science literature for doing so. Tr. 6160:9-6162:16.

22.     Defendant and its experts believe that the crime suspect population is the best "surrogate" or "proxy" for the people most likely to be stopped-and-frisked by NYPD officers.

Tr. (McGuire) 4310:3-7; (Smith) 6151:5-11; DTE O8 ¶¶12, 20; PTE 583 at 3. However, given that almost 90% of persons stopped by the NYPD are not engaged in criminal activity when stopped, the NYPD has no reasonable basis to assume that there is much if any overlap between the pool of stopped pedestrians and the crime suspect population, without which crime suspects cannot be a good proxy. Tr. (McGuire) 4310:17-4312:12, 4313:23-4314:7.

ii.   **Practical Significance**

23.     The practical significance of Fagan's finding that the level of stop activity in a precinct or census tract is a function of the racial composition of that precinct or census tract is demonstrated by the descriptive statistics contained in both his original and second supplemental expert reports, which show that the rate of stops per crime complaint in the quartile of precincts and census tracts with the highest percent Black population was 30-200% higher than in the quartile with the lowest percent Black population. Tr. (Fagan) 2196:11-2200:4; PTE 411 at 25-27 & Figs. 1-8; PTE 417 at 12-16 & Figs. 2-9. Fagan's Table 5 regression analysis confirms these disparities.

24.     Fagan refuted Purtell's "practical significance" opinion by showing, using the same data that Purtell used, that there would be a 43% increase in the rate of stops between a tract with 15% Black population and a tract with 55% Black population Tr. (Fagan) 6014:13-6016:9, 6021:22-6026:10; PTE 566.

25.     Fagan's marginal effects analysis, which takes into account the uniqueness of each tract and controls for differing crime and SES factors between tracts with different percentages of minority population, showed that the difference between the predicted number of stops in a tract whose Black population is 15% and one that is 55% Black is 42.3%. Tr. (Fagan) 6814:24-6825:12, 6827:26828:12; (Purtell) 6900:9-19; PTE 570, PTE 571, PTE 572. In addition, the predicted stop numbers from Fagan's marginal effects analysis were very close to actual stop

counts in the City's census tracts, other than with respect to a small number of outliers at the extreme end of the spectrum. Tr. (Fagan) 6847:16-6849:2, 6883:5-6887:6.

26.     Purtell misunderstood the outcome that Fagan's Table 5 analysis tested: First he testified that it measured odds of a Black person being stopped and then changed his mind, explaining that he was thinking of Fagan's Table 7 which, unlike Table 5, addresses likelihood of a Black person being stopped. *Compare* Tr. (Purtell) 5764:2-5765:7 *with* Tr. (Purtell) 5903:3-9.

27.     The City did not challenge the practical significance of the results of the regression analyses reported in Fagan's Tables 7-10, nor could they, in light of the following facts, which are undisputed: Blacks and Hispanics together made up 53.11% of the City's population during in 2004-09, but 81.52% of the persons stopped in 2004-2009 and 83.96% of persons stopped in 2010-June 2012. PTE 411 at 22 & Table 3; PTE 414 Table 4; PTE 417 at 11, Table 3.

       iii.   **Zero Counts**

28.     After initially claiming to have run Fagan's Table 5 regression model without the zero count census tract-months, Tr. 5784:12-13, 5911:15-16, 5916:4-8; DTE H13 at 68 & Table 8, Purtell finally admitted in sur-rebuttal testimony that his model also excluded tract-months with one or two stops as well as several thousand others because of a "technical problem with … the methodology." Tr. 6047:9-6048:12.

29.     In response to Smith and Purtell's critique, Fagan ran a zero-inflated regression model and found that the racial composition of a census tract remained a highly statistically significant predictor of the stop rate.  DTE H13 at 67-70;Tr. (Fagan) 6865:18-6869:3.

       iv.   **Remaining Criticisms**

30.     The City's critique that Fagan should have accounted for changes in population and SES-related variables over time are mere conjecture because its experts did not actually test what effect, if any, controlling for such changes may have had on the results of Fagan's analyses. DTE H13. The critique is further undermined by Purtell's testimony that the City's population changed by only 0.6 to 1% from 2004 through 2012, his inability to quantify changes in the racial distribution of the City's population or unemployment rates, his highly impractical suggestion that Fagan account for such changes by re-running his models monthly, and the fact that Fagan's regression models did include an autoregressive control. Tr. (Purtell) 5801:19-5803:20, 5860:13-5861:6, 5879:1-24; PTE 411 at 13-14.

31.     Smith and Purtell's claim that census data does not accurately measure the population available to be stopped is undermined by Smith's testimony that the people stopped in the high stop census tracts are most likely the people who live there, the racial demographics of these tracts do not change much throughout the day, and that most stops occur in the evening or early morning hours. Tr. (Smith) 6140:6-6143:24; 6147:8-6150:19.

d.   **19 Unconstitutional Stops of Plaintiffs and Class Members**

32.     The 12 named plaintiffs and testifying class members were stopped, frisked, and in some instances searched, without reasonable suspicion or probable cause and on the basis of race in 19 encounters with NYPD officers in all five boroughs of New York City over a 5 year period. Tr., *inter alia*, (Acevedo) 1694:4-9, 1697:23-1700:21, 1701:22-25; (Almonor) 115:16-17, 20, 125:16-131:15; (Clarkson) 2640:24-25, 2643:2-10, 2637:23-2640:25, 2642:21-2643:10, 2653:5-6, 2656:16-24; (Dennis) 268:5-6; 270:13-21, 272:15-274:2, 287:18-21; (Downs) 4093:4093:16-17, 4095:2-4106:25, 4116:6-17, 4335:8-4338:17, 4166:6-19, 3874:12-3877:15; (Floyd (4/20/2007 stop)) 161:14-174:6, 251:6-12, 252:15-256:20, 259:10-14, 261:6-19; DTE I10; (Floyd (2/27/2008 stop)) 174:7-182:9, 248:5-251:5; (Lino (2/24/2011 stop)) 1739:18-1742:

23, 1745:13-1746:2; (Lino (2/5/2008 stop)) 1729:3-13, 1732:14-22, 1733:6-10; 1734:11-21, 1736:4-8; (McDonald) 3679:23-3680:6, 3683:14-3684:4, 3688:16-3689:7; (Ourlicht (1/30/2008 stop)) 4131:22, 4174:22-4176:20, 4178:8-9, 4180:10-4185:19, 4186:7- 4187:10, 4191:3-23, 4192:1-18, 4224:22-4225:14; (Ourlicht (2/21/08 stop)) 4193:1-13, 4195:2-4198:1, 4199:4- 4200:12, 4201:2-4202:44203:7-21, 4257:15-17, 4272:18-4275:2; (Ourlicht (6/2008 stop)) 4204:3-4, 4205:15-4206:24, 4207:5-4209:9, 4267:2-4; (Peart (4/13/2011 stop)) 303:10-318:25, 388:23-390:3, 408:5-409:1; (Peart (9/2010 stop)) 336:24-344:13; (Peart (Spring 2008 stop)) 327:4-336:23; (Peart (8/5/2006 stop)) 319:2-327:3; (Sindayiganza) 2587:10-2604:13, 2628:15-2630:8; PTE 584 (Provost Dep.) 41:24-42:12; 45:6-46:7; 46:14-50:1, 57:13-58:16, 72:14-20.

33.     The stopping officers were not credible. *E.g.*, Tr., *inter alia*, (Joyce) 1363:22-1364:13, 1369:4-1370:25, 1373:11-16, 1376:23-1377:20; (Stip.) 1466:3-8; (Kelly) 1478:4-18, (Hernandez) 1384:16-1385:8; (White, L.) 3094:15-3097:22, 3103:3-3105:9, 3113:7-3119:25, 3123:3-3125:24, 3127:9-3128:1, 3135:9-21, 3136:12-3138:6; (Gillespie) 3423:6-15, 3431:9-3432:5, 3435:14-22, 3447:12-3449:16; DTE T7; PTE 161; (DeMarco) 2666:4-2668:25; (Hawkins)     5462:2-5464:13;     (Vizcarrondo)     5209:2-8,     5205:14-5206:4,     5210:7-5212:7; (Rothenberg) 3803:8-16, 3805:20-3806:15, 3807:4-7; (Leek) 2703:17-2706:14; 2722:24-2723:5 (White, B.) 6245:18-6252:3; PTE 569, at 6; PTE 569 at 3, 5; Z8-T (1:6-9); (Salmeron) 865:5:22-873:20. *Compare* Tr. (White, B.) 6222:20-24 *with* PTE 569, at 6.

e.   **John Doe Officers were members of the NYPD**

34.     Photo arrays created for Ourlicht and Clarkson used hundreds of (primarily filler) photographs. Plainclothes officers assigned to borough wide commands were excluded from Clarkson's arrays and investigation. "Latino" in Clarkson's description led the NYPD's search and photo arrays to exclude officers of another race but appearing Latino. *See e.g.* Tr. (Stip) 5476:9-5477:13; (Dengler) 5501:14-5502:8; (Albino) 5510:18-5517:6, 5530:5-10; DTE F3, D3.

35.     Floyd's photo-arrays contained photographs of officers who were assigned to precincts outside the area of Floyd's stop and not on duty at the time of his stop. DTE C3; *e.g.,* Tr. (Dengler) 5494:16-6497:15. Dengler did not search or investigate the whereabouts of dark colored marked or unmarked NYPD vans assigned to the area of Floyd's stop. PTE 551; Tr. (Dengler) 5487:16-5488:6. Based on the limited known documentation, at least one officer was within blocks of Floyd's stopping area around the time of Floyd's stop. Tr. (Dengler) 5497:16-5501:6; PTE 550, 519.

36.     Three officers with the surname "Rodriguez" were not included in the photo array for Floyd's April 20, 2007 stop. The UF250 database search conducted for this stop was limited to the potentially false names and shield numbers the Doe officers provided to Floyd. No UF250 search was conducted generally for this stop date and location. Memobooks for several officers Floyd recognized in the photo array were not produced in discovery. Tr. (Stip) 5480:10-5484:16.

37.     Ourlicht identified one officer multiple times in photo arrays for his June 2008 stop. Defendant presented no evidence of any further investigation into this officer's activity (i.e. vehicle assignment, command log entries). DTE F3, D3. Tr. (Stip) 5473:7-5474:14; PTE 497, 498; Tr. (Albino) 5517:7-5529:23.

38.     Two vehicles meeting Ourlicht's descriptions were assigned to Queens commands on February 21, 2008, around the time of his stop. Tr. (Stip) 5470:17-22; DTE F3, D3.

39.     Ourlicht identified van 9466 as on the scene of his June 2008 stop. It was assigned to officers patrolling close to the stop location. Tr. (Stip) 5474:15-5475:12; PTE 553, 500, 501.

40.     Clarkson provided detailed, consistent descriptions of the dates, location and two officers who stopped him; he described badges, and indicated that the officers identified themselves as police. Tr. 2633:16-2640:18, 2647:8-2650:5, 2652:15-2653:7.

41.     Ourlicht provided consistent, detailed descriptions of the four officers who stopped him on February 21, 2008, including descriptions of clothing, hair, hats, ages and builds, vehicle, and police badges. Tr. 4195:13-4198:1.

42.     Ourlicht provided consistent, detailed descriptions of the officers who stopped him on June 6 or 9, 2008, including their uniforms, skin color, hair color, size, guns, and the vehicle that back-up officers drove. Tr. 4206:11-24, 4207:5-25, 4211:4-8, 4267:24-4268:3.

43.     Floyd provided consistent, detailed descriptions of the officers who stopped him on April 20, 2007, including descriptions of police uniforms, guns, and a police radio. Tr. (Floyd) 165:25-166:18, 167:19-174:6, 258:9-259:9.

44.     Peart provided consistent, detailed descriptions of the actions, uniforms, weapons, and police equipment of the officers who stopped him during his April 13, 2011 stop. Tr. (Peart) 305:7-318:15, 328:15-329:8, 337:19-344:13, 381:2-382:6, 394:2-395:22, 407:11-25.

45.     The search for officers stopping Peart was limited to searching and reviewing UF250s for only one of the potential officers. No search was conducted for the date April 13, 2011 once the date of that stop was discovered. Tr. (Stip) 5477:22-5480:9.

46.     Memobooks of officers in photo arrays, including officers the plaintiffs recognized, were not located, and included redacted and/or illegible entries. Tr. (Stip) 5473:7-5477:21; Tr. (Dengler) Tr. 5501:14-5502:8; (Albino) Tr. 5519:1-24, 5530:11-15.

47.     Clarkson identified officers for whom the City never located memobooks. DTE F3, D3; Tr. (Stip) 5476:9-5477:13; (Dengler) 5501:14-5502:8, (Albino) 5530:5-10.

II.   **The NYPD Targets and Stereotypes Blacks and Latinos in its Stop Activity**

   a.   **Commissioner Kelly's Unrebutted Admissions**

48.     In July 2010, NY State Senator Eric Adams expressed to Commissioner Kelly his belief that the NYPD's stop and frisk practice disproportionately and unlawfully targets young

Blacks and Latinos. Tr. (Adams) 1585:20-1586:25, 1588:12-24. In response, Kelly said that the NYPD targeted or focused its stop and frisk practice on young Blacks and Latinos to instill fear in them that every time they leave their homes they could be stopped in order to deter them from carrying weapons. Tr. (Adams) 1588:12-1589:9. These facts are unrebutted. Kelly reiterated these statements at a meeting at Medgar Evers College later that year. Tr. (Adams) 1615:8-23. This was challenged by only one City witness.  The Court should infer from Commissioner Kelly's failure to appear at trial that he made these statements.

     b.  **Policy and Practice of Targeting the "Right People" for Stops**

    49.     The NYPD command structure exerts pressure on officers to produce numbers that show stops of the right people at the right time and place: they do not want just any numbers; they want numbers reflecting activity directed at certain people in certain geographic areas. Tr. (Marino) 925:1-15; (Esposito) 2867:22-2868:18, 3006:2-12, 3034:9-18; Tr. (Cirabisi) 5696:22-5697:3; (Diaz) 1511:4-1513:22; PTE 157 (Giannelli Dep.) at 268:5-269:12. *See also* Tr. (Hall) 7354:19-7355:11, 7623:3-7626:13.

    50.     Officers are expected to conduct stops of "the people that are committing crimes," *e.g.*, "young men of color in their late teens, early 20s." Tr. (Esposito) 3028:3-3030:8, 3034:9-18; (Diaz Dep.) 1518:14-1519:15. The NYPD wants "to see if [ ] we're stopping the right people." (Diaz Dep.) 1514:25-1515:20. This view was publicly endorsed by Mayor Bloomberg in a speech to NYPD leadership during the course of this trial. PTE 583 at 3.

    51.     Inspector Christopher McCormack, commanding officer of the 40th Precinct, told Officer Pedro Serrano in February 2013 that "we summons people and we 250 people, the right people the right time, the right place" and that officers should be stopping "male blacks 14 to 20, 21." PTE 332 (PTE 332-T 20:20-22, 23:20-24:6); Tr. (McCormack) 7014:17-25, 7015:6-

14

7016:25. When Officer Serrano appealed his low performance evaluation, Inspector McCormack told him he had to get his activity up in the right places. Tr. (McCormack) 7011:18-7012:3.

52.     In class member stops that were, according to the stopping officers, motivated by suspect descriptions, the description was either merely "Black male" or a description of a Black male so general and vague as to amount to merely "Black male." *E.g.*, Tr. (Dennis) 1084:1-121085:2-4 (Almonor stop: 911 description in which the only suspect description related to a man was "male Black"); (French) 3743:4-7 (McDonald stop: descriptions of supposed robber and burglar merely "male Black."); *see also* (Arias) 3484:12-3486:8 (Lino stop: Black males roughly between 5'6 and 6'0).[2]

53.     During a stop in 2008, an officer made a racially stereotypical comment to Lino; the officer's denial is not credible. Tr. (Lino) 1749:18-1751:5; (Hassan) 4021:5-4022:7.

54.     Lt. Delafuente instructed officers in the 81st Precinct that they weren't "working in Midtown Manhattan . . . . You're in Bed-Stuy where everyone's probably got a warrant." PTE 289T, Track 1NOVEMBER2008 81 4x12 RollCall at 2:12-3:50. Bed-Stuy is a predominately Black neighborhood. Tr. (Holmes) 6458:23-6459:2; DTE B14 at NYC_2_28946.

55.     Officer Gonzalez, a 2009 high-stopper (Dkt. # 272, ¶ 14), checked "fits description" in 132 of 134 of UF250s, 128 of the 134 people stopped in a very racially diverse precinct were Black or Latino, and the descriptions were male Hispanic, 5'8-5'9 in his 30s; 4-5 male Blacks 14-19; and male Black in his 20s. Tr. (Telford) 6327:7-13; 6328:22-25; 6340:14-6341:19; PTE 557, 557D; DTE Y8 at NYC_2_24974.

---

[2] Though Arias claimed Lino's jacket fit the description, Arias and Kovall offered contradictory testimony regarding this point and it is not credible. Tr. (Arias) 3487:1-2; (Kovall) 3045:3-8.

III.   **Pressure to Conduct Enforcement Activity**

    a.   **CompStat**

56.    The purpose of CompStat meetings is to address crime trends and spikes and determine whether officers are conducting activity at locations and times that match them. Tr. (Mauriello) 1834:22-1836:15; (Hall) 7623:3-7626:13; (Diaz Dep.) 1511:4-1512:23.

57.    At CompStat meetings, NYPD chiefs discuss the number of C-summonses, arrests, and 250s conducted by officers to evaluate the command's performance. Tr. (Esposito) 2868:20-23; 2883:11-21; (Ortiz) 3541:4-17; (Mauriello) 1837:2-1838:16; (Diaz Dep.) 1030:1-1031:13; PTE 158 (Montgomery Dep.) 201:23-202:8; PTE 281, 283.

58.    At CompStat, a decrease in UF250 numbers generally raises concerns whereas an increase in numbers is viewed positively. Tr. (Diaz Dep.) 1553:23-1555:11; PTE 157 (Giannelli Dep.) 268:5-269:12; PTE 281, 283.

59.    CompStat does not examine whether stops were based on reasonable suspicion. Tr. (Esposito) 2894:6-9; (Ortiz) 3544:3-13; (Mauriello) 1838:17-22; (Hall) 7623:3-7626:13; (Diaz Dep.) 1518:14-16; PTE 155 (Dale Dep.) 139:14-140:24; PTE 281.

60.    The dramatic increase in stops from approximately 97,000 in 2002 to 685,000 in 2011 was all during Chief Esposito's tenure as the highest ranking uniformed member of the NYPD. Tr. (Esposito) 2807:13-2808:12, 2793:22-2794:22.

    b.   **Quotas and Performance or Productivity "Goals" or "Standards**

61.    *De facto* quotas have been imposed in the 28th, 40th, 41st, 75th, 81st and 115th Precincts, including requirements that officers issue, make or fill out a certain number summons, arrests, and 250s within specified time periods, as a result of directives and pressure from NYPD brass. Tr. (Serrano) 652:21-655:21, 656:9-23, 665:17-666:4, 667:20-668:7; (Polanco) 420:14-19, 421:9-17, 423:17-425:22, 466:8-25, 471:11-474:12; (Silva) 5255:11-5256:13, 5259:11-20;

16

(Mohan) 5235:2-25l; (McHugh) 3193:19-3195:10; (Marino) 876:14-877:18, 883:18-884:8; (Marrero) 597:21-599:9; (Mauriello) 1847:24-1848:24; PTE 158 (Montgomery Dep.) at 32:5-33:8, 202:9-203:17; Tr. (Agron) 1021:2-4; (Pichardo) 1261:17-20; (Figueroa) 2766:17-2767:12; (Herran) 6764:11-22, 6782:13-25, 6785:19-6787:21, 6791:20-6794:2; (Barrett) 6272:1-7, 6278:2-5, 6290:8-15, 6302:4-11; PTE 131 (Hu) 93:8-13, 94:21-95:2. *See also* (White) 6236:7-9; (Arias) 3477:1-21; (Leek) 2709:11-23, 2748: 6-16. PTE 296, 297; PTE 284 Track 1 at 3:03-8:01, 9:47-11:31, 11:31-13:1 (PTE 284-T at 1, 4-7); PTE 289, 12June2008 81 4x12 RollCall Sgt.Stukes Lt.Delafuente at 12:10-13; 12June2008 81 4x12 RollCall at 7:13-8:10; 15July2008 81 4xl2 RollCall at 00:35-00:50; 8December2008_81_ 4x12_Ro11Call at 5:45-6:39, at 1:20-1:38, at 7:07-7:42; 12December2008_ 4x12_RollCall at 2:20-4:30; 240ctober2009_RollCall at 4:41-5:30; 12October2009_RollCall_Sgt.Huffman at 5:57-7:00; 29January2009  RollCall  at 6:20-6:48,   at   6:56-9:03;   310ctober2008-81-4x12-RollCall   at   6:35-7:26,   9:05-9:50; 8November2008_81_ 4x12_RollCall at 15:34-15:45; 23November2008_81_ 4x12_RollCall at 5:46-6:28; 13March2009_Friday_ RollCall at 4:32-5:20; 27February2009_RollCall at 2:35-6:21; 300ctober2008 81 4xl2 RollCall  at 4:20-6:30; 1JULY2008 81 4x12 RollCall at 6:58-8:00; 16December2008 81 4x12 RollCall at 9:33-9:54; 13 January 2009_Sgt. Reid at 3:02-4:26; 28January2009_81_4x 12_RollCall at 20:25-21:50, at 24:29-25:50.

62.    Officers are warned that failure to comply with numerical activity standards will result in adverse employment actions. Tr. (Polanco) 428:20-429:18, 431:14-20, 467:12-471:5, 491:2-493:18; (McHugh) 3197:7-12; (Marrero) 602:23-603:25; (Velazquez) 623:8-625:9; (Serrano) 679:22-680:9, 688:1-8, 723:15-725:15; (Marino) 934:3-935:17; (Mauriello) 1847:24-1848:24; PTE 284 (284-T pp. 1-3, 23); PTE 284, Track 1 at 3:03-8:01, 6 at 1:21-2:29; PTE 289, Track 28October2008_81_4x12_RollCall at 4:07-5:05; 8DECEMBER2008_81_4X12_RollCall

at 12:20-15:00; 12December2008_81_ 4x12_RollCall at 2:20-4:30; 28January2009_81_4x

12_RollCall at 23:24-24:10, at 24:29-25:50; 1NOVEMBER 2008 81 4x12 RollCall at 2:12-

3:50; 12June2008 81 4x12 RollCall at 7:13-8:10; 12JUNE2008 4x12 RollCall at 14:58-16:40;

4FEBRUARY2009_81_4X12_RollCall at 2:33-3:02.

63.     Officers who fail to meet performance requirements are sometimes required to

patrol with sergeants or conduct checkpoints to generate activity, and their discretion to conduct

UF250s is removed. Tr. (Polanco) 432:6-433:13, 448:3-19, 459:3-5, 449:4-7; (Mascol) 962:2-10,

965:9-17; PTE 137 (Tzimoratas Dep.) 125:15-126:23.

64.     According to the NYPD, requiring a certain number of enforcement activities

such as arrests, summons, and 250s under threat of adverse consequences is a "performance

goal." Tr. (Marino) 877:5-878:13; (Silva) 5256:2-17, 5258:12-19; Tr. (Herran) 6765:24-6766:2,

6795:12-6796:12; (Barrett) 6281:2-4, 6293:10-15.

65.     According to the NYPD, "productivity standards" are levels of summons, arrest,

and 250 activity that officers are expected to meet or they will face adverse employment

consequences. Tr. (Mauriello) 1847:24-1848:24; (Silva) 5256:2-17, 5258:12-19, 5258:12-19;

(Marino) 884:24-885:4. It is common for commanding officers to ascribe numerical

requirements to productivity standards. Tr. (Marino) 907:18-908:2, 909:23-910:2, 911:6-12; PTE

158 (Montgomery Dep.) at 32:5-33:8, 202:9-203:17.

66.     The NYPD requires officer to be proactive, and an officer demonstrates that he is

being proactive by issuing summons, conducting arrests, and engaging pedestrians in stops. Tr.

(Mascol) 975:12-977:16; (Monroe) 5307:1-9; (Korabel) 1180:9-24, 1183:18-1184:4; PTE 136

(Trunzo Dep.) 86:19-95:24. *See also* Tr. (Mauriello) 1866:24-1868:8. The NYPD wants quantity

of activities without regard to the constitutionality of those activities. Tr. (Polanco) 423:1-16; (Serrano) 726:15-24; (Agron) 984:5-985:2.

67.     Officers Pichardo and Salmeron were attempting to achieve a goal of five quality of life summonses per Impact Overtime tour in the 28th precinct when they illegally stopped Deon Dennis to issue him a quality of life summons. Tr. (Pichardo) 1216:25-1269:9.

68.     It is required and appropriate under current NYPD policy, including Operations Order No. 52/Quest for Excellence, issued in October 2011, for supervisors to set performance goals for enforcement activity, including arrests, summonses, and stops-and-frisks, and such goals can be numerical. Tr. (Barrett) 6293:16-19, 6295:14-22; (Hall) 7638:25-7640:11; (Marino) 880:8-12; (Esposito) 2957:14-16; (Korabel) 1181:7-1182:17; (Beirne) 3399:13-20; PTE 285 ¶ 3.

69.     Under Op. Order 52, officers are subject to adverse employment actions if they fail to meet performance goals. PTE 285; Tr. (Marino) 881:12-18; (Korabel) 1207:20-1208:10.

70.     Both quotas and numerical performance goals without respect to quality are inconsistent with generally accepted police practices and could lead to unlawful police activity to get numbers. Tr. (Reiter) 4956:23-4957:17.

c.  **High-level Officials' Notice of and Acquiescence to the Use of Quotas**

71.     High-ranking NYPD officials have had notice of the use or enforcement of quotas in commands throughout the City since at least 2004, but have consistently failed to take steps to discipline the supervisors and commanders involved. Tr. (Esposito) 2954:9-16, 2960:10-25; (Marino) 886:6-18, 889:5-9, 911:23-912:2, 912:10-913:9, 939:18-943:14; (Mauriello) 1829:25-1831:11, 1849:22-1851:10; (McHugh) 3200:13-17, 3201:20-22, 3201:23-3203:19; (Polanco) 451:23-452:25; 460:19-461:6; PTE 298, 299.

72.     It is known to high-ranking NYPD officials, including the architects of Op. Order 52 and Quest for Excellence, that NYPD officers sometimes believe that numerical standards

19

associated with enforcement directives are quotas. Tr. (Marino) 927:5-6; (Materasso) 6725:23-6726:11; (Hall) 7637:12-7638:10; (Beirne) 3358:4-3359:24, 3361:1-3363:6; PTE 290.

73.     Nevertheless, the high-ranking official responsible for establishing Quest for Excellence is not concerned with the establishment of numerical performance goals or that officers will interpret numerical goals for stops as a quota. Tr. (Beirne) 3359:25-3360:19; 3367:12-3369:13; 3379:15-3381:4.

74.     Since 2010, nine grievances have been filed against the NYPD by the police officer union alleging negative employment action as a result of failure to meet quotas. Tr. (Beirne) 3399:21-3402:17; Tr. (Herran) 6790:25-6791:3.

d.  **Pressure Experienced by NYPD Officers During CompStat Era**

75.     In 2008, Professors Eli Silverman and John Eterno sent a pre-tested and Institutional Review Board-approved survey instrument to 1,197 members of the Captain's Endowment Association (retired NYPD officers with the rank of Captain or above) to measure whether and to what extent the implementation of CompStat in and since 1994 caused since-retired police officers to feel an increase in pressure, to increase summonses, arrests and stop and frisks. Tr. 2470:16-2471:12, 2473:12-17, 2478:10-23; PTE 300. 491 individuals responded, which is a 41% response rate. Tr. 2481:8-12.

76.     The mean response (on a Likert scale of 1 to 10) of individuals who felt pressure to stop and frisk increased 2.25 points across the pre- and post-CompStat eras, which is a highly statistically significant number. Tr. 2493:6-2495:7; PTE 291 (Table 1).

77.     Silverman tabulated the results of the survey in three demonstrative exhibits, charting feelings of low, medium and high pressure across the pre- and post-CompStat era. PTE 441-443. Feelings of high pressure to increase stop and frisks activity increased nearly six fold across periods, from 5.1% to 28.3%, at the same time that low pressure to increase stop and

frisks decreased from 54.7% to 22.5% across the periods. Tr. 2500:23-2501-20; PTE 443. Similar results were obtained regarding feelings of pressure to increase summonses, Tr. 2496:14-2498:20 & PTE 441, and arrests, Tr. 2499:1-2500-22; PTE. 442.

78.     In 2012, Professors Silverman and Eterno constructed another pre-tested and IRB approved survey measuring respondents' feelings of pressure to increase summonses, arrests, and stop and frisks as well as pressure to obey constitutional rules, Tr. 2504:4-2504-14, 2504:15-2504-22; the survey divided the post-CompStat era into those who served (1) between 1994 and 2002, and (2) after 2002, i.e. the Bloomberg/Kelly era. Tr. 2503:1-2504-3.

79.     The survey was sent anonymously to 4,069 individuals, Tr. 2506:2-25, who were "active" retired members of the NYPD, Tr. 2505:1-13. The 1,962 individuals who responded were from all ranks of the NYPD. Tr. (Silverman) 2507:8-21, 2508:19-2509:2.

80.     Respondents who felt high pressure to increase stop and frisks increased nearly four-fold over time: 9.1% pre-CompStat, to 19.1% in the 1994-2002 era, to 35.1% in the Bloomberg/Kelly era, *id.*; those feeling low pressure to increase stop and frisks decreased significantly: 57.8% pre-CompStat, to 36.7% in the 1994-2002 era, to 24.4% in the Bloomberg/Kelly era. Tr. 2517:24:2518-13; PTE 446. Similar results were recorded relating to feelings of high pressure to increase summonses and arrests over time. PTE 444, 445.

81.     While pressure to increase summonses, arrests, and stop and frisks increased significantly over time, feelings of high pressure to obey constitutional rules *decreased*: 44.6% in the pre-CompStat era to 35.7% in the Bloomberg/Kelly era. Tr. 2518:14-2519:15; PTE 447.

e.   **Performance Reviews Based Almost Exclusively on Numbers**

82.     Officers complete on a monthly basis, and are evaluated on a monthly and quarterly basis using, police officer monthly performance reports, now known as police officer monthly conditions impact measurement reports. Tr. (McHugh) 3173:5-3175:8, 3251:18-3252:2,

3258:1-3259:6; (Beirne) 3372:23-16, 3383:7-3385:23; (Serrano) 651:12-652:3; (Agron) 984:5-985:2; PTE 205; PTE 285 ¶8; PTE 315; DTE X11.

83.     These monthly activity reports show only the numbers of various enforcement activities performed and, in the case of the monthly conditions impact measurement reports, whether such activities addressed crime conditions; they do not include substantive information about whether officer enforcement activity complies with the constitution. Tr. (Mascol) 977:1-12; (Polanco) 446:20-447:2; (Serrano) 652:14-20; (Materasso) 6716:19-23, 6719:20-6721:4, 6722:25-6724:2, 6748:23-6749:3; (Dennis) 1098:10-18; PTE 15; (Korabel) 1177:11-1178:23; (Leek) 2710:6-2711-3, 2713:11-14; (Beirne) 3374:2-3370:25; 3385:24-3386:25; PTE 178, 219, 205, 234, 236, 315. Supervisors thus evaluate officers strictly on the basis of the numerical levels of enforcement activity. PTE 234, 236.

84.     Commanding officers are required to track compliance with performance goals by reviewing officers' monthly activity reports, and officers who fall below the performance goal according to their monthly activity reports are told to get their numbers up, Tr. (Marino) 892:10-893:10; (Mascol) 947:25-951:1, 965:18-966:5, and even receive negative performance evaluations. PTE 158 (Montgomery Dep.) 32:5-33:8, 202:9-203:17.

85.     An officer's failure to engage in enforcement activity will reflect negatively in his or her monthly and quarterly reviews, which are themselves a significant part of the annual performance evaluation. Tr. (Beirne) 3369:25-3372:22, 3410:5-12; PTE 285 ¶¶ 13,15; PTE 240.

IV.  **Supervision**

86.     The NYPD relies mainly on supervision within the chain of command to ensure constitutional stops and frisks. Tr. (Esposito) 2845:20-25, 2914:6-9, 2919:13-18, 2929:25-2930:10; (Morris) 6604:17-22; (Hall) 7356:11-7357:3; (Hegney) 1942:1-9; (Diaz Dep.) 1044:17-

1046:6; PTE 155 (Dale Dep.) 68:24-69:15, 90:12-16; PTE 157 (Giannelli Dep.) 181:24-182:12, 208:11-23.

87.     The NYPD's only mechanism for identifying questionable stop patterns by officers is supervisory review. Tr. (Esposito) 2841:3-2842:13. *See also* Tr. (Ortiz) 3504:21-3505:7; (Diaz Dep.) 1528:6-12. In practice, supervisors do not do this. Tr. (McCarthy) 4972:6-9; (Telford) 6314:13-20, 6314:24-6315:3; (J. Marino) 5556:1-6; (Agron) 989:4-991:24; (Diaz Dep.) 1534:20-1535:19.

88.     When the first level supervisor fails to ensure officers are engaging in constitutional policing consistent with department policies, and when supervisors are not held accountable for implementation of those requirements, an operational policy markedly different from the official policy develops. Tr. (Reiter) 4834:5-4836:1, 4845:23-4846:1.

a.   **Failure to Supervise the Constitutionality of Stop-and-Frisk Activity**

89.     High-level managers fail to determine whether sergeants are ensuring subordinate officers' stops are constitutional and not based on race. *E.g.*, Tr. (Ortiz) 3554:19-5; (Mauriello) 1839:2-1840:9; (Cirabisi) 5662:1-11; PTE 157 (Giannelli Dep.) 203:17-205:7.

90.     The NYPD's written guidelines do not require supervisors to evaluate the constitutionality of stops and frisks; mid-level supervisors are directed to merely review stop paperwork. Tr. (Beirne) 3385:24-3390:6; 3396:10-19; PTE 315, 205. *See also* PTE 157 (Giannelli Dep.) 165:6-168:13.

91.     The legal requirements applicable to stop and frisk, and whether stops and frisks are being constitutionally conducted, is not meaningfully discussed, if at all, in the chain of command. Tr. (Ortiz) 3505:22-3507:16; (Mauriello) 1839:2-1840:9; (Lehr) 5423:13-5424:23; (Loria) 3785:16-20, 3781:23-3782:8, 3782:13-20; (Dennis) 1105:15-19; (Rothenberg) 3817:13-16, 20, 3818:9-14, 3820:4-7; (Palmieri) 3659:25-3660:3, 3666:23-3667:1, 3669:18-3670:6,

3672:10-21; PTE 581 (Barrelli Dep.) 81:14-81:25, 101:14-101:20, 107:11-108:5; (DeMarco) 2674:3-14; (French) 3738:16-3739:2 (McDonald stop); (Agron) 1000:18-1002:4; (Pichardo) 1266:2-1267:2; (Moran) 4036:17-4037:11, 4084:19-25 (Ourlicht stop); (Guimaraes) 1653:17-1655:22; (Hegney) 1940:18-1941:24; (Joyce) 1342:16-1343:2; PTE 137 (Tzimoratas) 14-19; (McCarthy) 4972:6-9; PTE 134 (Navaretta Dep.) 17:4-16, 18:10-19, 22:21-23:12, 21:20-22:11, 29:6-11; PTE 136 (Trunzo Dep.) 19:16-19, 21:16-19, 23:17-20, 26:19-21, 29:9-12, 30:7-10, 31:15-25, 35:19-36:2, 40:18-20; *see also* DTE Q14 (Houlahan Dep.) at 54:14-56:4; 58:7-59:4; 60:9-16; 61:6-15. 69:24-70:18, 84:6-9, 81:15-83:6, 85:20-24 (Op. Impact Sgt. failed to meaningfully ask about circumstances of Provost stop despite memobook entry undermining the supposed basis for the stop).

92.    For example, Sgt. Michael Loria,[3] who reviewed and signed the UF250 for McDonald's stop and was not present for that stop, did not believe reasonable suspicion could be gleaned from the 250, and yet did not ask French, the stopping officer, about the stop. PTE 226; Tr. (Loria) 3766:23-3767:11, 3771:12-22. In 21 years as a sergeant, he never discussed a 250 he reviewed with the officer who completed it, Tr. (Loria) 3777:14-25; never told an officer under his supervision in sum or substance that he should not have conducted a stop that he observed or reviewed, Tr. (Loria) 3778:18-22; does not recall ever giving an officer under his supervision instructions about stop and frisk, Tr. (Loria) 3780:10-19; and does not recall ever discussing with an officer a concern about whether reasonable suspicion existed after reviewing a UF250. Tr. (Loria) 3780:4-8.

---

[3] After consultation with counsel, after Plaintiffs made a proffer in court, and when he knew that he would be called as a witness, Sgt. Loria submitted an Errata reversing answers to clear questions about his supervision practice on the basis that his memory was different than at the time of his deposition *one month prior*. Tr. (Loria) 3772:4-14, 3773:12-16, 3774:4-6, 3774:18-25; 3775:24-3776, 3778:1-16, 3787:8-15. To the extent Sgt. Loria's trial testimony differed from his deposition testimony, this Court should credit his deposition testimony only.

93.    Several of the NYPD supervisors who were out in the field with the officers who stopped plaintiffs and class members themselves participated in or failed to prevent these unconstitutional stops. *See, e.g.*, Tr. (Kelly) 1433:5-8 (Floyd stop); (Korabel) 1145:16-18, 1147:7-15 (Almonor Stop); (Leek) 2704:16-2706:11 (Lino Stop).

b.    **Failure to Meaningfully Review Stop-and-Frisk Paperwork**

94.    Supervisors in practice do not review UF250s to determine whether reasonable suspicion for the stop existed, but instead check only whether the form is filled out. Tr. (Loria) 3763:2-19, 3767:16-3768:2; (Korabel) 1169:4-17; (Velazquez) 634:3-23; (Agron) 986:12-987:7, 989:18-22; (Hegney) 1948:19-25, 1949:25-1950:18; (Moran) 4038:2-21; (Guimaraes) 1653:17-1655:22; (Kelly) 1429:4-1430:14; (Giacona) 3869:9-13; PTE 129 (Eddy Dep.) 262:14-2-263:22; PTE 136 (Trunzo Dep.) 32:2-8; (Diaz Dep.) 1526:19-1527:10; (Rodriguez) 1244:12-14; *see also* Tr. (Telford) 6320:13-6322:9; PTE 557-D, 557; Tr. (Navaretta) 6319:2-5, 6320:8-12, 6363:10-6365:8; DTE 012.

95.    Supervisors in practice either do not discuss at all, or do not meaningfully discuss, completed UF250s with their subordinate officers. Tr. (Korabel) 1169:18-20, 1170:9-17, 1171:14-15; PTE 581 (Barrelli Dep.) 79:2-79:5; (Marrero) 606:15-607:7, 610:18-22; (Velazquez) 634:3-23; (DeMarco) 2674:3-10; (McCarthy) 4972:1-5; (Kelly) 1489:1-8; PTE 134 (Navaretta Dep.) 33:24-34:4, 30:17-24, 38:7-20; PTE 137 (Tzimoratas Dep.) 59:3-9, 15-21; PTE 135 (Ruggiero Dep.) 21, 161:4-23; DTE Q14 (Houlahan Dep.) 38:14-22, 81:8-14. For example, one of Gonzalez's 250 indicated that a Black person stopped said "Why don't you/ why can't you stop other people," yet this did not raise a concern for his supervisor about racial profiling. PTE 557 at NYC_2_15999-16000; Tr. (Telford) 6332:1-6333:18.

96.    Supervisors accept furtive movements as a basis for reasonable suspicion when it is checked on the UF250 form and without further information on what constituted the furtive

movement. Tr. (Ortiz) 3519:16-3520:25; (Hegney) 1956:3-12; (Dang) 6445:18-6445:19; (Kelly) 1485:23-1486:5; (Diaz Dep.) 1531:14-1534:12; PTE 155 (Dale Dep.) 85:14-17.

97.     In practice, officers do not include in their activity logs the circumstances leading to stops, supervisors do not discuss activity log entries or deficiencies in those entries with officers, and officers are not disciplined for deficient entries. Tr. (Rothenberg) 3815:18-3186:1; (Loria) 3795:13-3797:12; (Dennis) 1100:12-16-1101:6, 1102:24-1103:13, 1141:21-1142:4; (Arias) 3475:5-3476:5; (Korabel) 1175:22-1176: 7; (Palmieri) 3657:20-3658:8; 3669:1-13; (Salmeron) 842:20-22, 862:24-863:3; (Agron) 1019:20-23, 989:4-991:24; (Pichardo) 1283:14-1284:17, 1286:2-4, 1286:22-1287:24; (Joyce) 1346:5-7; (Hegney) 1956:3-12, 2089:15-17; (Guimaraes) 1645:5-1646:6; (Hernandez) 1388:21-23; (Kelly) 1440:25-1442:7; (White) 3129:5-3136:9, 3139:12-14; (Gillespie) 3436:24-3439:6; PTE 581 (Barrelli Dep.) 63:14-63:25; PTE 134 (Navaretta Dep.) 17:4-16, 18:10-19, 22:21-23:12, 53:11-14; PTE 137 (Tzimoratas Dep.) 108:4-10; PTE 157 (Montgomery Dep.) 143:14-21; PTE 136 (Trunzo Dep.) 69:16-23; DTE Q14 (Houlahan Dep.) 80:4-16, 88:2-14. *E.g.* PTE 19, 161, 214, 581. *See also* Tr. (Diaz Dep.) 1522:25-1523:20; (Kelly) 1433:17-1440:16, 1467:7-1486:5; (Joyce) 1337:25-1342:13; DTE X4, G6; PTE 98, 179-181.

98.     On March 5, 2013, on the eve of trial, Chief of Patrol Hall issued a memo requiring certain commands to provide narrative details about stops in the UF250 form and memobook. Tr. (Hall) 7656:3-7661:6; DTEJ13. This is an admission that narrative details are necessary to ensure the constitutionality of stop and frisk.

99.     Until this memo issued, which is most of the class period, the NYPD in practice did not require officers to include in their activity logs pertinent details about the circumstances leading to stops. Tr. (Esposito) 2912:5-21; (McHugh) 3209:22-3210:5; (Navaretta) 6360:5-6361-

22; (Hegney) 1957:14-1960:12, 2100:15-18; (Diaz Dep.) 1059:25-1060:2; PTE 157 (Giannelli

Dep.) 197:23-199:13; 209:21-210:13; PTE 134 (Navaretta Dep.) 59:4-10, 55:11-15; PTE 158

(Montgomery Dep.) 107:6-108:7; DTE R14 (Mulligan Dep.) 106:24-107:7; DTE N12.

100.    Supervisors are not required to review activity logs concurrent with their review

of UF250s. *E.g.*, Tr. (Ortiz) 3522:6-20; (McHugh) 3210:19-22; (McCarthy) 4976:20-4977:12.

### c.    Failure of Integrity Control Officers to Monitor Officer SQF Conduct

101.    Integrity control officers ("ICOs") are supposed to serve as the "eyes and ears" of

the precinct commander and conduct inspections and checks to identify any possible misconduct

by officers in the precinct. PTE 157 (Giannelli Dep.) at 47:11-19.

102.    One of the inspections ICOs are expected to do regularly is an inspection of

officers' completed UF250 forms to determine if stops are based on reasonable suspicion. PTE

157 (Giannelli Dep.) 48:23-49:12, 50:9-18, 106:3-17; 170:23-171:10. This inspection instead

simply looks at whether the forms are filled out. Tr. (Cirabisi) 5692:24-5693:3.

103.    In practice, ICOs do not do anything to address sub-standard scores on the portion

of the audit related to recording stops in memobooks. Tr. (Palmieri) 3658:9-3659:19; (Barrelli)

3631:5-15; PTE 463.

104.    In practice, ICOs do not discuss 802-A (*see infra* ¶109) with the NYPD's Quality

Assurance Division ("QAD") personnel and never discuss reports on stops, questions, and frisks

with anyone. PTE 581 (Barrelli Dep.) 80:16-80:19; 85:14-85:21.

105.    In practice, stop, question, and frisk, 250s, and racial profiling are not discussed at

regular ICO meetings. Tr. (Palmieri) 3656:23-3657:4; (Peters) 3605:10-3606:5; PTE 581

(Barrelli Dep.) 32:25-33:5, 36:19-36:21, 37:2-37:24.

106.   In practice, ICOs do not discuss with commanding officers stop, question, and frisk, UF250s, and racial profiling. Tr. (Palmieri) 3657:5-19; (Peters) 3606:6-3608:4; PTE 581 (Barrelli Dep.) 36:11-36:14, 37:5-37:24.

107.   Patrol Guide Section 202-15 requires ICOs to make integrity control recommendations, DTE F5, yet in practice ICOs do not make recommendations regarding stop, question, and frisk, activity logs, or UF250s. Tr. (Palmieri) 3667:22-3668:24; (Peters) 3609:14-3611:13; PTE 581 (Barrelli Dep.) 56:2-56:16.

d.   **Failure to Meaningfully Audit Stop-and-Frisk Activity**

108.   QAD is responsible for evaluating officer compliance with various NYPD policies and procedures, including the Patrol Guide section on stop, question, and frisk and the NYPD's racial profiling policy. Tr. (Cronin) at 4624:10-4626:15.

109.   The only two audit and command-level self-inspection processes developed by QAD to evaluate whether NYPD officer stop-and-frisk activity is based upon reasonable suspicion and complies with the NYPD's racial profiling policy are reflected on the Worksheet 802 and Worksheet 802-A. Tr. (Cronin) at 4629:4-4630:15, 4727:19-4728:6, (Farrell) 7278:5-13; PTE 89, PTE 154 (Cassidy 6/29/10 Dep.) at 92:2-93:20; PTE 350.

110.   Protocols for Worksheet 802 & 802-A were issued in Dec. 2002, and the NYPD has followed these protocols since the 1st quarter of 2003. PTE 89, 350; PTE 154 (Cassidy 6/29/10 Dep.) 52:12-54:3; Tr. (Farrell) 7133:9-16, 7139:20-7141:12.

111.   As set forth in these protocols, both the Worksheet 802 and Worksheet 802-A audits and self-inspections involve only a review of stop-and-frisk and arrest paperwork completed by officers, namely U250 forms and activity log entries for the Worksheet 802, and arrest reports and any corresponding UF250 forms for the Worksheet 802-A. PTE 58, 71, 89; Tr. (Cronin) 4637:6-16, 4650:1-23, 4660:8-4662:8; (Farrell) 7278:10-18.

112.   Worksheet 802 and 802-A do not involve any meetings with or interviews of stopping officers or stopped pedestrians or field observations of officers conducting stops. Tr. (Cronin) 4637:17-4638:9, 4664:19-4665:1, 4675:14-4676:2, (Farrell) 7278:19-7279:2.

113.   High-level NYPD policymakers have been aware since 1999 that it is not possible to determine from a purely paperwork audit like Worksheet 802 & 802-A whether stops and frisks are based on reasonable suspicion and comply with the NYPD's racial profiling policy. PTE 46 (testimony of former NYPD Commissioner Safir) at 48; 154 (Cassidy 10/25/05 Dep.) 103:20-105:24, (Cassidy 6/29/10 Dep.) 69:14-71:7; Tr. (Diaz Dep.) 1053:16-1054:10.

114.   Chief Peter Cassidy—CO of QAD when the Worksheet 802 and 802-A protocols were first developed and implemented—acknowledged that Worksheet 802 does not assess whether stops are based on reasonable suspicion and that he does not know how the Worksheet 802 or 802-A audits assess whether stop activity complies with the NYPD's racial profiling policy. PTE 154 (Cassidy 10/25/05 Dep.) 103:20-105:24, (Cassidy 6/29/10 Dep.) 15:7-10; 52:12-54:13, 69:14-71:7.

115.   QAD conducts audits in other areas that involve speaking to civilians who have interacted with police officers and observing officer-civilian interactions. Tr. (Cronin) 4792:1-8, 4796:1-22; (Farrell) 7291:25-7293:6.

116.   The November 2002 draft of the Worksheet 802-A protocols included a field observation component, but Deputy Commissioner Farrell decided to remove that component from the final version of the protocols. PTE 73; Tr. (Farrell) 7297:14-7298:9.

117.   When conducting the Worksheet 802 audits and reviews of commands' 802-A self-inspections, QAD reviewers attempt to determine whether officers' stops and frisks are

based on reasonable suspicion solely on the basis of information recorded on the UF250 forms. Tr. (Cronin) at 4639:18-4642:11.

118.    NYPD supervisors testified at trial that they cannot determine if a stop was based on reasonable suspicion solely from the information contained on a completed UF250 form. Tr. (McHugh) 3207:9-3208:19; (Lehr) 5440:24-5441:2; (Loria) 3767:16-3768:2.

119.    QAD's substantive review of completed UF250s is so superficial that QAD reviewers often fail to flag stops and frisks that facially appear to lack reasonable suspicion. DTE B11; Tr. (Cronin) 4640:8-4642:11, 4720:6-4723:6, 4725:15-4727:5.

120.    The activity log portion of the Worksheet 802 audit and self-inspection requires that an officer's entry concerning a stop and frisk include only the same level of detail regarding the reasons for a stop that is contained on the UF250 form itself. Tr. (Cronin) 4644:24-4646:2.

121.    The stop and frisk portion of the QAD Worksheet 803 audit and self-inspection uses the same standards for assessing the sufficiency of activity log entries as are used in the Worksheet 802. Tr. (Cronin) 4688:23-4689:13.

V.   **Training**

    a.   **Police Academy Training on Reasonable Suspicion Is Inadequate**

122.    The Police Student's Guide does not provide detailed or objective standards on most of the UF250 factors included in an officer's assessment of reasonable suspicion, including suspicious bulge or high crime area. Tr. (Shea) 5155:16-19; DTE Q11.

123.    The NYPD does not provide adequate training on reasonable suspicion and training on reasonable suspicion is so overly broad as to encompass any form of behavior. Tr. (Moran) 4042:6-9, 4044:21-4046:3; (Velazquez Dep.) 633:4-11; PTE 129 (Eddy Dep.) 229:18-231:25. For example, Dennis, who stopped Almonor, recognizes that a stop is defined as "temporarily detain a person for questioning," but believes he can stop a pedestrian at any level,

for any reason. Tr. 1104:13-22, 1105:11-13. Members of the NYPD assess whether a pedestrian encounter rises to the level of a *Terry* stop based on their level of suspicion, *e.g.*, Tr. (Vizcarrondo) 5212:16-19; (McCarthy) 4971:20-25, rather than on whether a reasonable person would feel free to leave. *See* PTE 332 (PTE 332-T at 15:8-16 (McCormack instructing Serrano that "hey come here, I gotta talk to you" is a stop that should result in 250)).

124.    NYPD officers, including those that stopped plaintiffs and class members, do not know when a frisk is permitted. Tr. (Mahoney) 3867:4-7. For example, the officers who frisked Floyd on February 27, 2008 did so despite not even being in fear for their safety. Tr. (Kelly) 1428:14-18; 1508:25-1509:13; (Joyce) 1363:19-23; *see also* (White, L.) 3117:1-3119:25

125.    Officers are not given sufficient training in the Police Academy on how to complete a UF250: the sum total of the training on the form's "circumstances which led to the stop" field is contained on just one page (page 26) of Exhibit Q11. DTE Q11.

126.    The NYPD relies on scenarios and role plays to instruct officers about reasonable suspicion and stop and frisk, but none of the scenarios and role plays are based on self-initiated stops, Tr. (Shea) 5161:24-5162:2; DTE N3, Q11, Q3; PTE 387, despite the fact that the overwhelming majority of stops (77.9%) by the NYPD are self-initiated. PTE 417D.

b.  **Training on Racial Profiling Is Inadequate**

127.    The City provides inadequate training on racial profiling and does not train officers on what they should do if someone makes an accusation of racial profiling, does not train officers on how to recognize racial profiling in their own actions, and does not instruct officers on what to do if they see racial profiling in the actions of others. DTE S11; Tr. (Moran) 4030:25-4031:24; (Hegney) 1960: 22-1962:4; PTE 129 (Eddy Dep.) 195:11-19; (Leek) 2714:1-2715:1.

128.    NYPD training materials instruct officers to not take racial profiling accusations personally. DTE S11 at 31. Instead of training officers on how to recognize racial profiling, the NYPD trains officers that they need to explain their actions, presuming that the stop is legal and characterizing accusations of racial profiling as "a myth." DTE P3, V11.

c.  **Sergeant Training Is Inadequate**

129.    The lesson plan covering stops and frisks for the sergeant promotional training does not instruct sergeants to review UF250s or otherwise review street stops to determine if there was reasonable suspicion for the stop. DTE R3; Tr. (Shea) 5168:19-5170:22; (Hegney) 1939:7-10, 1951:24-1953:23.

d.  **Rodman's Neck Training Materials Are Constitutionally Deficient**

130.    6000 members of the service have already been trained on stop and frisk using the Rodman's Neck training materials. Tr. (Shea) 5129:1-3. This Court has already identified substantial constitutional problems with the Rodman's Neck training materials, DTE C4, O3, and with Training Video #5, PTE 368-69. *See Ligon v. City of New York*, No. 12 Civ. 2274 (SAS), Feb. 11, 2013 (SDNY).

131.    The Rodman's Neck training was specifically designed to correct the so-called problem of the UF250 form being "overused," despite the fact that almost no research or data supported the conclusion that it was being overused. Tr. (Shea) 5153:16-5154:1; (Moran) 4039:19-24, 4040:4-25. Accordingly, the fact that the number of UF250s dropped in 2012 is not, in any way, probative of a lower number of forcible stops.

e.  **Training on Armed Suspects Is Overly Broad and Racially Stereotypical**

132.    The NYPD training on the characteristics of armed suspects is so overly broad that it trains NYPD officers that common, ordinary objects can be weapons and that ordinary factors like wearing a hooded sweatshirt can be characteristics of armed suspects.  DTE C8, W3,

D4. The NYPD training on furtive movements is also so overly broad as to encompass any form of behavior. Tr. (Moran) 4047:1-4049:15; (Pichardo) 1260:1-2; (Dang) 6431:24-6433:5.

133.    Despite the fact that unusual firearms (e.g., mobile cell phone guns) are rare, the NYPD trains officers that they should always be alert to these devices, thus resulting in stops and frisks without constitutional basis. Tr. (Shea) 5040:24-5046:20, 5176:9-5178:6; DTE C8; W3; D4. Officer French, who attended this training, unreasonably believed that McDonald's hands and cellphone in his coat pocket on a winter night looked like a weapon. Tr. (French) 3729:1-20; 3746:19-3747:20; 3753:1-15.

134.    The NYPD trains officers that Hispanics and Blacks might have distrust or fear of the police and that these groups might avoid interacting with police officers, avoid eye contact, or get nervous at the sight of an officer. DTE S11. The NYPD also trains officers that these are characteristics of armed suspects. DTE D4.

## VI.  **Investigations, Discipline, and Monitoring**

135.    NYPD investigations of civilian complaints regarding stop-and-frisk are perfunctory. Tr. (Reiter) 4878:12-4880:8.

136.    In practice, commanding officers do not issue command discipline for improper stops or racial profiling. Tr. (Morris) 6595:2-6, 6600:18-25; PTE 155 (Dale Dep.) 34:21-35:8. *See also* PTE 135 (Ruggiero Dep.) 161:4-23.

### a.  **NYPD Response to CCRB Stop-and-Frisk Complaints**

137.    The CCRB profile and assessment committee monitors officers with a certain number of CCRB complaints, but only a fraction of officers who qualify for monitoring are brought before the committee. Tr. (Schwartz) 4558:14-24, 4559:17-21, 4561:20-4562:3, 4562:13-15, 4569:24-4570:22. *See, e.g*., DTE D15, C15.

138.   The NYPD may recommend instructions for an officer who is the subject of repeated substantiated CCRB complaints, and does not routinely track whether an officer who has had a substantiated CCRB complaint later has an unsubstantiated CCRB complaint. Tr. (Schwartz) 4544:22-25, 4564:11-21. Only those substantiated CCRB complaints that result in penalties are in the CPI, and the CPI includes no substantive information. Tr. (Hall) 7440:8-14, 7604:3-23. There is no requirement that supervisors monitor officers who have been the subject of one CCRB complaint. Tr. (Lehr)[4] 5445:4-19. *See also* Tr. (Lehr) 5447:22-5448:5. Even when monitoring is required, it can be meaningless. *E.g.* Tr. (Figueroa) 2761:16-21, 2761:19-2764:1.

139.   CCRB substantiated Lino's complaint and recommended charges against Figueroa and Leek, PTE 208, 217, but neither officer received any discipline as a result. Tr. (Figueroa) 2764:2-2766:3-11, 2790:14-19 (Leek) 2707:5-2709:13.

140.   CCRB substantiated as abuse of authority Acevedo's complaint against the detectives for stopping her (PTE 5), yet none were told that they did anything wrong in conducting the stop. Tr. (DeMarco) 2669:23-2673:19; (Hawkins) 5459:4-19, 5465:18-5467:19; (Vizcarrando) 5203:16-23, 5213:23-13. Hawkins was thereafter the subject of an OCD stop complaint, yet no one discussed it with her or interviewed her regarding it. PTE 433; Tr. 5468:10-5469:5.

141.   Salmeron was never spoken to or disciplined for a substantiated CCRB complaint for an improper stop two years before she stopped Dennis. Tr. 845:9-846:1, 846:10-20; PTE 104. There are numerous concerns about the investigation and treatment of that complaint based on best practices. Tr. (Reiter) 4889:24-4891:14.

---

[4] Inspector Lehr's testimony regarding performance monitoring and investigation of civilian complaints is limited to his personal experience in the 66P and 67P. Tr. (Lehr) 5364:17-5365:10, 5373:5-17, 5436:5-5437:4, 5441:16-5442:9.

b. **Office of Chief of Department Stop and Racial Profiling Complaints**

142.    The NYPD fails to adequately investigate complaints about stop and frisk that come through OCD. Tr. (Reiter) 4881:2-4882:18; 4884:21-4888:14; (Hegney) 2076:13-15, 2082:8-2085:5, 2086:19-8, 2088:20-2089:10; PTE 135 (Ruggiero Dep.) 128:19-130:18; PTE 129 (Eddy Dep.) 130:13-18; 177:11-178:2; *see also* PTE 168, 251, 432.

143.    Complaints alleging racial profiling go to OCD, yet OCD does not track racial profiling or stop complaints. Tr. (McAleer) 3926:23-25, 3964:11-3965:7, 3966:13-16, 3968:10-13, 3980:13-19, 3981:11-19, 4013:6-10; (Thompson) 3271:12-14; Def. Ex. Z12.

144.    Investigations should go beyond the complaint's four corners, Tr. (Reiter) 4884:21-4889:23, but this does not happen. *E.g.* Tr. (Dennis) 277:8-17; (Rodriguez) 1222:21-1226:10; (Pichardo) 1260:13-16, 1288:14-20; PTE 421.

145.    Sergeants are commonly responsible for investigating allegations against subordinate officers that come through OCD, even if they signed off on the UF250 at issue. Tr. (Mauriello) 1832:20-1834:6, (Lehr) 5359:21-5360:3, 5360:16; (Cirabisi) 5645:3-7, 5710:22-24; (Rodriguez) 1216:5-7; (Hegney) 1962:12-17, 1970:6-1971:7, 2073:19-25. *See also* Tr. (Reiter) 4882:10-18; PTE 250. For example, Ourlicht's OCD complaint was investigated by Sergeant Hegney, who signed off on the related UF250. Tr. (Cirabisi) 5712:1-24, 5715:1-7.

146.    OCD staff does not receive training on how to handle racial profiling or stop-and-frisk allegations. Tr. (McAleer) 3970:12-18. OCD refers allegations to other units but does not send instructions on conducting the investigation, and it does not conduct a review of the sufficiency of the investigation after a disposition has been received. Tr. (McAleer) 3971:21-3973:16, 3976:4-16. Many of the people who will be investigating OCD complaints have no training or guidelines on conducting the investigation. Tr. (Lehr) 5442:10-5443:6; 5449:9-5450:20; (Rodriguez) 1231:15-1238:18. This is problematic. Tr. (Reiter) 4882:19-4883:6.

147.    Rothenberg was the subject of an OCD allegation that he stopped someone based on race the year prior to his stop of Provost. PTE 279; Tr. (Rothenberg) 3822:20-23. He was never questioned about it and no one informed him of a concern that he engaged in racial profiling. Tr. (Rothenberg) 3825:4-6, 3820:8-15. The NYPD is unable to determine whether this was even investigated. Tr. (Stip.) 5385:12-15.

c.    **The Department Advocate**

148.    The Department Advocate is indifferent to the large percentage of CCRB complaints alleging improper stops each year. Tr. (Schwartz) 4548:12-25, 4481:17-23.

149.    Despite that CCRB investigations are subject to four levels of review including by an attorney, the NYPD declined to pursue punishment at a rate of 16-34 percent since 2007. Tr. (Thompson) 3272:16-3274:2, 3275:14-15, 3350:17-21, 4483-4484:9; DTE P12 at 17.

150.    The Department Advocate knows that race could be a motivating factor in a stop where racial profiling is not mentioned, and that complainants simply allege baseless stops. Tr. (Schwartz) 4550:19-23, 4553:1-20. Yet she believes that this and the fact that Black people have been a majority of victims in CCRB complaints and a large majority of complainants in stop-and-frisk cases has "nothing to do" with a concern about racial profiling. Tr. (Schwartz) 4550:19-23, 4553:1-20, 4554:5-9, 4555:8-16. *See also* Tr. (Hall) 7620:23-7621:4.

151.    The Department Advocate does not believe the law of search and seizure is clearly established; has a narrow view of what constitutes a stop; and sometimes recommends no discipline in substantiated CCRB cases because she believes CCRB misapplied law. Tr. (Schwartz) 4514:13-17, 4516:18-4517:2, 4522:16-4528:5; DTE W13 at NYC_2_000736.

152.    The Department Advocate discredits civilians over members of the NYPD. Tr. (Schwartz) 4484:16-4487:10, 4508:2-12, 4512:2-9. Though the Department Advocate is supposed to apply the same preponderance of the evidence standard as the CCRB, Tr. (Schwartz)

4484:10-15, in fact, the NYPD does not pursue discipline unless there is evidence to corroborate a civilian's account beyond the civilian's testimony. Tr. (Schwartz) 4484:16-4487:10. The Department Advocate has heard criticism that the NYPD is biased in favor of officers and the criticism is not a concern for her. Tr. (Schwartz) 4512:23-24, 4513:2-5.

153.    Since at least 2007, when the CCRB finds misconduct, the NYPD averts discipline by declining to pursue discipline and issuing instructions, the least serious form of discipline, in the majority of cases. Tr. (Thompson) 3289:13-21, 3294:11-20; (Schwartz) 4468:10-13, 4496:18-21; DTE P12 at 17, 18. The rate at which the NYPD declines to pursue punishment excludes cases in which the statute of limitations had expired. *See* DTE P12 at 17.

154.    The NYPD downgrades the level of punishment recommended by the CCRB. DTE P12 at Table 30 & 18; Tr. (Schwartz) 4503:10-13. From 2007 to 2011, CCRB recommended charges and specifications most often and instructions least often. Tr. (Schwartz) 4501:1-7; DTE P12 at Table 30. In that same period, the NYPD did the reverse. DTE P12 at 18.

155.    The Department Advocate averts discipline despite being aware since 2007 of a concern, voiced both by CCRB and others, that doing so would undermine civilian confidence in the CCRB, and she is indifferent to the possibility that averting punishment sends a message that CCRB complaints will not be taken seriously. Tr. (Thompson) 3295:7-3297-6; (Schwartz) 4491:19-4493:18, 4504:9-15; PTE 111 at NYC-7676; PTE 112. The NYPD dismissed CCRB's concerns. Tr. (Thompson) 3296:2-6. The NYPD has since almost doubled the number of cases in which it issued instructions, and 2010 and 2011 *increased* the number. Tr. (Thompson) 3297:7-14, 3296:22-25; (Schwartz) 4499:21-4500:1. *See also* Tr. (Reiter) 4878:12-4880:8.

156.    The NYPD's agreement permitting CCRB attorneys to prosecute cases is meaningless. The CCRB can only prosecute charges and specifications—a fraction of CCRB cases—with Commissioner Kelly's authorization. Tr. (Thompson) 3345:6-3345:22; PTE 458.

## VII.   **Notice and Deliberate Indifference**

### a.   **Notice of Racial Bias in Street Encounters Since 1999**

157.    In 1999, McGuire and Farrell reviewed the report from the Office of the NY State Attorney General on the NYPD's stop, question, and frisk practices ("AG report"). Tr. (McGuire) 4279:13-4280:17, 4281:6-4282:1, 4284:3-12; (Farrell) 7082:8-12, 7090:24-7091:5. The AG reported its statistical analyses of 15 months of NYPD stop data, covering about 175,000 stops recorded between January 1, 1998 and March 31, 1999. PTE 333 at v-vi.

158.    The results revealed that, after controlling for differing crime rates between racial groups and police precincts, as measured by 1997 New York City arrests for violent, property, drug, and weapons crimes: (i) Blacks were stopped 23% more often than whites; (ii) Hispanics were stopped 39% more often than whites, (iii) precincts with high percentages of minority populations had much higher stop rates, and majority white precincts had much lower stop rates, than would be predicted by their crime rates; and (iv) these racial disparities were statistically significant. PTE 333 at ix-xii, 119-135; Tr. (McGuire) 4284:14-22.

159.    The AG analyzed the factual bases for stops written on a sample of about 15,000 UF250s, and found about 1 of every 7 lacked reasonable suspicion. PTE 333 at xiii-xiv, 160-64.

160.    The AG report recommended that the NYPD engage in a dialogue about what if any changes to the NYPD's stop practices might be appropriate. PTE 333 at xv-xvi, 175-177.

161.    Despite the obvious import of the AG report, Chief Esposito never read it. Tr. (Esposito) 2804:6-7.

162.    NYPD officials testified that they disagreed with the AG report's findings primarily because (1) the report used arrestee rather than crime suspect data as a benchmark, and (2) the arrestee data was from the year prior. Tr. (Farrell) 7091:10-12, 7258:13-23; (McGuire) 4299:14-19, 4320:12-19. However, the concern with the arrestee benchmark was that it could potentially *hide*, rather than exaggerate, racial bias by police officers, Tr. (Farrell) 7259:7-14, and the NYPD's arrest and crime suspect data shows that the racial demographics of the arrestee and crime suspect populations do not change much from one year to the next. PTE 321; PTE 411 at 76 Table 18; Tr. (McGuire) 4314:12-21, 4317:15-4318:3.

b.    **Indifference to Complaints About Stop and Frisk and Racial Profiling**

163.    The NYPD is aware of complaints by community and legal groups, from officers and class members, and in the media about baseless and racially motivated stops and frisks, which would provide any reasonable police department notice of a concern. Tr. (Esposito) 3023:20-3024:5, 3026:7-14, 3027:10-13; (Farrell) 7174:17-20, 7276:4-7277:11; (Marino) 931:13-23; (Lehr) 5410:2-10, 5412:25-5413:19; 5429:20-5430:5, 5434:8-5435:4; (Morris) 6633:23-6634:9; (Holmes) 6510:1-6512:24, 6538:14-6540:8; 5081:1-5082:12; (Shea) 5081:1-5082:12; (Cirabisi) 5697:24-5698:5; (Polanco) 449:18-19, 450:5-13; 450:24-451:22; 452:18-23; (Hernandez) 1390:6-25, 1396:3-10, 1397:3-4, 1398:1-10, 1397:17-21, 1423:11-1425:6; (Sindayiganza) 2606:18-22; (Acevedo) 1704:18-19; (Peart) 326:2-23, 344:14-345:1; (Downs) 4108:4-9, 4114:1-21, 4116:18-4119:1; (Reiter) 4877:16-4878:6; (Diaz Dep.) 1054:24-1055:10; PTE 5, 166, 171, 172, 451-455. *See also* Tr. (Esposito) 2794:21-2796:1, 2800:8-2801:6 (notice of complaints of bias in street encounters since Diallo shooting).

164.    Prior to their stop of Floyd, civilian complaints arising from stops and frisks were filed against Kelly and Hernandez. Tr. (Kelly) 1440:25-1442:7; (Hernandez) 1397:3-1398:10, 1423:11-1425:6;  PTE 451-454.

165. Prior to his stop of Downs, several civilian complaints were filed against Mahoney for illegal stops, frisks and/or searches. PTE 432; PTE 168.

166. Prior to his stop of Downs, civilian complaints were filed against Giacona. Tr. (Giacona) 3879:2-3881:22; PTE 168, 453. He was found incredible by the CCRB. PTE 166.

167. Prior to his stop of Floyd, Joyce was the subject of a CCRB investigation during which CCRB reported that Joyce said, "that's half the Bronx" when shown a photograph of a Latino person who filed a civilian complaint against him for an improper stop, frisk and use of force. Tr. (Joyce) 1348:12-1349:24. The CCRB interviewer made an adverse credibility determination against Joyce. PTE 455.

168. Quality control callbacks should be used when there is public criticism of a police practice, but there is no evidence the NYPD does this. Tr. (Reiter) 4963:19-4964:12.

169. The NYPD receives stop complaints primarily through CCRB. Tr. (Schwartz) 4456:15-20, 4460:4-12. The NYPD is aware that every year a majority of CCRB cases are truncated, *i.e.* closed without full investigation. Tr. (Thompson) 3276:25-3280:10, 3281:2-4. Truncated cases likely include a large number of stop complaints due to witness unwillingness to give sworn statements during the pendency of criminal proceedings. Tr. (Thompson) 3283:3-25. Despite knowing this, the City relies on civilian complaints to alert it to racial and unlawful stops. Tr. (Esposito) 3025:6-8; (Diaz Dep.) 1047:22-1048:3, 1054:13-1056:10.

170. The NYPD knows that since at least 2005 a large percentage of CCRB complaints allege improper stop and frisk and that Black people have made up a large majority of the complainants. Tr. (Thompson) 3284:1-23, 3285:14-18, 3286:12-3287:8, 3288:2-3289:2; PTE 111 at NYC-7679-80; PTE113 at 15; DTE P12 at 8. Despite this, the NYPD has never approached the CCRB to discuss retraining. Tr. (Thompson) 3352:11-15.

171.    Chief Esposito says he never heard a complaint of racial profiling, Tr. (Esposito) 3025:6-3026:21, yet his office received at least 30 such complaints in 2012 alone, Tr. (McAleer) 4007:14-22, and on average received two per month each year, Tr. (McAleer) 4012:1-3. The actual numbers could be larger given that OCD does not track racial profiling complaints, *supra* ¶143.

172.    The OCD's failure to track racial profiling complaints, *supra* ¶143, evidences indifference: the NYPD relies on civilian complaints to alert it to a problem, Tr. (Esposito) 3025:6-8; (Diaz Dep.) 1047:22-1048:3, 1054:13-1056:10, yet does not pay attention when it receives those complaints.

173.    Chief Esposito's disregard of racial profiling complaints is especially egregious because the NYPD primarily receives claims of racial profiling through his office. Tr. (Thompson) 3268:7-9, 3271:12-14 (racial profiling generally not within CCRB's authority); Tr. (McAleer) 3926:23-25 (racial profiling complaints generally go to OCD).

c.   **The RAND Report**

174.    The data the NYPD provided to RAND to conduct its external benchmarking analysis only included data on suspects in reported violent crimes. PTE 321; Tr. (McGuire) 4298:24-4299:1, 4301:2-25; Tr. (Riley) 3914:3-10. The NYPD is aware that less than one quarter of all stops conducted each year by NYPD officers are on suspicion of violent crimes. PTE 411, App. C5-C6; PTE 417, App. B, Table 2; Tr. (McGuire) 4302:3-6. The RAND study author has himself criticized the violent crime suspect benchmark as too narrow because so many stops are based on suspicion of non-violent crimes. Tr. (Smith) 6182:20-24.

175.    The 2006 violent crime suspect data that the NYPD provided to RAND was disaggregated at the precinct level. PTE 321; Tr. (McGuire) 4358:16-19; (Riley) 3916:16-19. The City has contended for several years that using precinct as the spatial unit of analysis to

41

measure racial disparities in stop patterns is methodologically unreliable. DTE T8 at 5, 17, 37-38, 58-59; Tr. (McGuire) 4358:24-4359:13. The RAND report itself noted that "the racial mix of the population and law enforcement practices can vary substantially within a precinct." DTE K6 at 22; Tr. (Riley) 3917:13-20. The 2006 violent crime suspect data which the NYPD provided to RAND was missing the data on all reported violent crimes where the suspect race was unknown. PTE 321; Tr. (McGuire) 4317:13-14, 4348:16-4352:19, 5952:8-5954:2, 5957:24-25; DTE S15. Suspect race was in fact unknown in almost 50% of all violent crimes reported to the NYPD in 2006. PTE 411 at 76, Table 18; Tr. (McGuire) 4305:8-17. Fagan opined that a reasonable NYPD policy analyst familiar with the NYPD crime complaint data would have known about the large amount of missing violent crime suspect race information and realized that one could not reliably impute anything from the known violent crime suspect race data to the large percentage of violent crimes where suspect race was unknown. Tr. 2266:3-2268:10; PTE 411 at 75-77.

176.    In the 2006 violent crime suspect data provided to RAND by the NYPD, which excluded all the violent crimes where suspect race was unknown, Blacks comprised over 69% of the violent crime suspects, which is the figure that is reported in the RAND Report. PTE 321, DTE K6 at 18-19; Tr. (McGuire) 5968:5-5970:1. When the large number of violent crimes where suspect race is unknown are included in the violent crime suspect data, Blacks comprise only 38% of all violent crime suspects in 2006. PTE 411 at 76 & Table 18. According to RAND, Blacks comprised approximately 53% of all pedestrians stopped by the NYPD in 2006. DTE K6 at 18-19.

177.    RAND's external benchmarking analysis found that (i) Hispanic pedestrians were stopped at rates 5-10% higher than their representation in the violent crime suspect population would predict; (ii) Black pedestrians were stopped for weapons possession at a rate 8% higher

than their representation in the weapons arrestee population would predict, and (iii) White pedestrians were stopped for weapons possession at a rate 11% lower than their representation in the weapons arrestee population would predict. DTE K6 at xii, 17-19.

178.   RAND's external benchmarking results did not raise concerns for NYPD policymakers about racial profiling. Tr. (Farrell) 7265:10-7267:2. From 2007 to the present, NYPD has continued to claim that the results of the RAND Report show that the NYPD does not engage in racial profiling with respect to stop, question, and frisk. Tr. (McGuire) 5970:2-6.

179.   RAND's internal benchmarking analysis found that there were 15 NYPD officers who appeared to have overstopped minority pedestrians in 2006 at an outlier probability level of above 50%, and when the NYPD ran RAND's internal benchmarking software on the 2007 UF250 data, it found 23 officers had overstopped minorities at a 50% or higher outlier probability level. DTE K6 at xiii, 28-30; Tr. (McGuire) 4377:7-9; (Farrell) 7233:23-7235:14.

180.   RAND indicated that using the 50% probability level was preferable to using the 80% probability level because using 80% "undervalues the cost of failing to identify a potential problem officer." DTE K6. at 26.

181.   RAND recommended that the NYPD identify and review the 15 officers who overstopped minorities in 2006 and incorporate a component into its early warning system that flags officers whose racial distribution of stops deviate sharply from their fellow officers. DTE K6 at 46.

182.   The NYPD has never identified the 15 officers who overstopped minority pedestrians in 2006 or the 23 officers who overstopped minorities in 2007, nor has it incorporated into its early warning system a method for identifying officers who overstop minorities. Tr. (McGuire) 4376:17-23, 4377:2-15; (Farrell) 7233:3-7, 7235:15-18, 7248:2-5.

183.    RAND's post-stop outcome analysis found significant racial disparities in frisks and searches in Patrol Borough Staten Island and in use of force in Patrol Borough Brooklyn South. DTE K6 xiii-xiv, 37-38, 42.

184.    RAND recommended that the NYPD take a closer look at those boroughs to determine if changes in training, policies or practices may be necessary. DTE K6 at 44-45. NYPD failed to follow this recommendation and instead concluded that the racial disparities were not large enough to require action. Tr. (Esposito) 2830:14-25; (Farrell) 7115:11-18, 7120:13-7121:25, 7220:6-7223:19, 7235:19-7240:8, 7256:12-7258:12. Fagan opined that a reasonable NYPD policy analyst, when presented with the results of RAND's post-stop outcome analysis, would not have reached the opposite conclusion. Tr. at 2270:15-2273:9.

185.    The NYPD's own analyses of its stop-and-frisk and crime data in 2012 indicated Black pedestrians comprised over 59% of the persons stopped but only about 51% of all known crime suspects in the 120th Precinct in Staten Island, and Hispanic pedestrians comprised over 76% of the persons stopped but just under 61% of all known crime suspects in the 72nd Precinct in Patrol Borough Brooklyn South. DTE B14 at NYC_2_28939, 28970; Tr. (Farrell) 7251:9-23.

d.    **Failure to Internally Discuss Racial Profiling**

186.    Chief Esposito never discussed with Commissioner Kelly the toll that stop and frisk was taking on Black and Latino youth. Tr. (Esposito) 2965:3-7.

187.    After 4 years as Department Advocate, Schwartz never discussed with anyone in the NYPD racial profiling or how to combat it. Tr. 4557:22-25, 4558:1-8.

188.    Though the NYPD's paper policy on racial profiling required CompStat to address racial profiling (PTE 184), in fact racial profiling is not discussed at CompStat. Tr. (Esposito) 2871:19-2872:5, 2873:22-2874:10; (Ortiz) 3511:17-21; (McHugh) 3220:23-25; (Guimaraes) 1655:23-1656:4; PTE 156 (Diaz Dep.) 112:11-14.

189.    Though the NYPD's paper policy on racial profiling required commanders to ensure that its contents were brought to the attention of officers within their commands (PTE 184), this was often not done. Tr. (McHugh) 3220:1-17; (Mulligan Dep.) 107:21-108:6; PTE 158 (Montgomery Dep.) 124:9-25, 125:14-24, 126:7-128:3, 130:14-16, 136:12-138:5.

190.    In practice, supervisors do not discuss racial profiling with their subordinates. (Palmieri) 3666:23-3667:1, 3669:18-3670:6; (Marrero) 611:23-613:18; (DeMarco) 2675:20-22, 2677:4-6; (McCarthy) 4979:18-20; (Guimaraes) 1639:1-1645:1; (Agron) 999:21-1000:17; (Hegney) 1941:17-24; (Kelly) 1487:9-1488:18, 1504:5-24; PTE 581 (Barrelli Dep.) 107:11-108:5; PTE 158 (Montgomery Dep.) 124:9-25, 125:14-24, 126:7-128:3, 130:14-16, 136:12-138:5; PTE 136 (Trunzo Dep.) 73:19-23; DTE Q14 (Houlahan Dep.) 111:8-19; DTE R14 (Mulligan Dep.) 41:1-7, 44:7-45:6; (Leek) 2714:1-2715:1.

### e.   **Belief that Presence of Reasonable Suspicion Negates Racial Profiling**

191.    The NYPD believes that whether reasonable suspicion for a stop existed can be determined solely by looking at a completed 250, and that there is no racial profiling if 250s are properly completed. Tr. (Esposito) 2824:20-2853:14; (Ortiz) 3513:8-17; (Hall) 7625:24-7623:2.

### f.   **Failure to Implement the *Daniels* Settlement**

192.    The Parties executed the Stipulation of Settlement in *Daniels v. the City of New York*, 99 Civ. 1695 (SAS) ("Settlement"), on September 24, 2003. PTE 114.

193.    Section D.1 of the Settlement required QAD to conduct audits of NYPD officer stop activity which addressed whether, and to what extent, the audited stop activity is based on reasonable suspicion as reflected in UF250 forms. PTE 114 at 6.

194.    The Settlement also required the NYPD to train and supervise officers on, and monitor their compliance with, the written racial profiling policy. PTE 114 at 5-6.

195.    The only two audits which the NYPD developed to assess whether officer stop activity is based on reasonable suspicion and complies with the NYPD's written racial profiling policy are the Worksheet 802 and 802-A, *see supra* ¶109*, which the NYPD designed and implemented prior to the execution of the Settlement. PTE 154 (Cassidy 6/29/10 Dep.) 52:12-54:3, (Farrell) 7133:9-16, 7139:20-7141:12 PTE 89, 350.  As set forth in paragraphs 113-114 *supra*, high-level NYPD policymakers have long been aware that these audits do not assess whether stops are based on reasonable suspicion or comply with the racial profiling policy.

196.    As set forth in paragraphs 127-128 and 186-190 *supra*, the NYPD does not adequately train officers on or supervise their compliance with its written racial profiling policy.

### g.   Years of Effectively Ignoring Results of Stop-and-Frisk Audits

197.    The NYPD is aware that documenting stops is important to establish the legality of stops, PTE 155 (Dale Dep.) 72:11-73:6, yet for a decade, every patrol borough has failed that portion of the annual QAD audit that looks at whether officers are adequately documenting stops in their activity logs. PTE 450; DTE G6; Tr. (Reiter) 4845:8-4846:1.

198.    Chief Dale admitted that if officers are not adequately completing memobook entries related to stops for an extended period of time, "it's a serious problem," yet he was aware that his patrol borough, Queens South, failed the annual QAD audit on memobook documentation three consecutive years and took no corrective steps. PTE 155 (Dale Dep.) 93:19-94:4, 118:10-120:4. Commanding officers in the 28P, 41P, 43P, 81P, and 107P and Patrol Borough Manhattan North similarly failed to correct audit failures despite knowing of persistent failures for years. Tr. (McHugh) 3213:12-3214:5; 3216:16-3218:17; (Ortiz) 3527:3-3531:2, 3548:16-3553:1; (Cirabisi) 5665:17-5668:2, 5680:13-22; (Morris) 6597:12-2, 6629:14-6630:22; PTE 158 (Montgomery Dep.) 120:20-121:18, 122:22-123:9; PTE 450; DTE G6 at NYC_2_770, NYC_2_21741, 21746, 22183, 22188, 27856, 27861, NYC 60031, NYC 4289, NYC 4307.

VIII.   **Remedy**

199.   A comprehensive approach to the remedy is required to cure the constitutional problems with the NYPD's stop-and-frisk practices. Tr. (Walker) 7434:17-7435:11, 7440:3-20.

200.   Change to stop documentation alone is insufficient; sergeants need to critically review documentation to determine whether the officer had grounds for reasonable suspicion. Tr. (Walker) 7748:15-7449:5; 7456:17-7457:6, 7458:21-7749:18, 7486:16-18, 7459:9-7468:2; PTE 577 ¶ 123; PTE 576 ¶¶61-62; PTE 575 ¶¶46, 64, 66; PTE 583. Supervisors who find that a stop lacked reasonable suspicion should take corrective measures. Tr. (Walker) 7455:17-7456:6. Recent consent decrees include separate provisions for documentation of stops for purposes of data collection and for purposes of supervisory review. *Compare id. with* PTE 577 ¶¶149-154; PTE 576 ¶¶60, 64-70; PTE 575 ¶¶64-65; PTE 582 at 3-4.

201.   The UF250 form should include space for a narrative with clear direction to officers that they must explain the facts or behavior that led to a stop, frisk and/or search. Tr. (Walker) 7747:1-7748:8, 7457:12-7458:16. *See also* Tr. (Hall) 7391:9-22. Defendant's expert materially agrees. Tr. (Stewart) 7804:24-7809:13-17, 7725:22-7726:5, 7803:6-23. The NYPD previously used a UF250 form with a narrative section. Tr. (Esposito) 2906:15-17; PTE 449.

202.   The Quest for Excellence monthly and quarterly officer evaluation is inadequate: the supervisor's comment language is repetitive and rote and the emphasis is on high activity numbers. Tr. (Walker) 7483:9-7483:23, 7491:9-7501:17; DTE H6, E11; PTE 437, 308-310. A modified evaluation system should track unjustified stops, utilize more robust evaluative indicators, and should be based on an audit of the current process for monthly and quarterly performance evaluations. Tr. (Walker) 7496:16-7497:13, 7502:9-7503:12; PTE 577 ¶295-301, PTE 576 ¶¶145-46. Defendant's expert materially agrees. Tr. (Stewart) 7747:4-23, 7753:13-7754:4, 7793:9-12; DTE C10.

203.     The NYPD must develop a department-wide command level review system, a.k.a. Early Intervention System ("EIS"), based on an expert evaluation that incorporates existing data. Tr. (Walker) 7504:11-21, 7511:24-7513:13. The EIS should include a centralized database that tracks officer performance based on at least 15 indicators to allow supervisors at all levels to assess officer performance and spot problematic patterns; the current CPI is inadequate. Tr. (Hall) 7318:1-7321:7, 7340:4-7, 7341:11-7432:14, 7440:8-14; (Walker) 7504:11-7508:15, 7509:1-19; DTE C15. Similar large police departments use such EIS systems. Tr. (Walker) 7509:20-7510:16; *e.g.*, PTE 576 ¶¶147-153, PTE 577 ¶316-326.

204.     A court appointed monitor is necessary as a remedy in this case because: (a) the case involves a systemic unconstitutional practice; (b) the remedies needed are complex; (c) the Department is resistant to change in the face of public controversy and official reports about the alleged misconduct. Tr. (Walker) 7435:19-23, 7517:1-7519:4. This monitor should provide at least the following: technical assistance to the Department to facilitate implementation of the remedies; soliciting and incorporating community input, reporting to the public and the Court on the state of implementation; and developing and implementing an EIS. Tr. (Walker) 7435:24-25; 7437:9-12 (training); 7437:6-9 (auditing) 7436:3-12, 7437:1-6, 7438:1-24; 7513:14-23, 7520:14-7523:5; PTE 577 ¶¶444-461; PTE 576 ¶¶225-229; PTE 575 ¶¶186-200; PTE 582 at 5-6. Defendant's expert materially agrees. Tr. (Stewart) 7779:6-12; 7775:22-7776:12.

205.     Community input into the remedies process is essential to any remedy and should occur at the initial stages in developing the remedy and as the remedies are implemented. Tr. (Walker) 7520:14-7523:5; *see e.g.*, PTE 577 ¶¶432-439; PTE 575 ¶¶179-185. Defendant's expert materially agrees. Tr. (Stewart) 7762:4-7763:9, 7818:2-17, 7783:5-7786:12.

206.    Recent changes to documentation and officer evaluations are inadequate and do not obviate the need for remedial measures. DTE J13; Tr. (Walker) 7469:5-7479:16, 7481:11-7482:6, 7520:6-13.

207.    Hall's March 5, 2013 memorandum regarding documenting stops did not include directives about supervising or training officers on compliance; it applies only to personnel in the Patrol Services Bureau, thereby excluding more than 6,700 officers from other bureaus who conduct stops. Tr. (Morris) 6609:1-16, 6613:20-6614:16; (Hall) 7649:25-7652:25. There is no accountability attached to the memorandum. Tr. (Hall) 7666:3-7672:22; DTE J13, M13.

208.    The process for documenting stops outlined in the Hall memorandum is cumbersome for officers and inefficient. Tr. (Stewart) 7802:25-7804:6.

209.    Hall's memorandum is not consistently being followed. Tr. (Hall) 7626:21-7628:7, 7649:14-7651:18. A recently conducted review of 40 UF250s and corresponding activity log entries completed in four different precincts in Manhattan North since March 5, 2013 found that 40% failed to comply. Tr. (Morris) 6578:13-6580:5, 6623:10-6624:5; *see also* Tr. (McCarthy) 4992:3-19; PTE 249. A 40% error rate on the annual QAD stop-and-frisk audit would result in that precinct failing the activity log entry item on the audit. PTE 62.

210.    The force of Hall's memo is questionable because the NYPD had memos dating back to 2008 directing officers to include details about circumstances leading to stops in activity logs (*e.g.* PTE 96, 348), but in practice this was not done and was not mandatory despite those directives. Tr. (Esposito) 2912:25-2913:24, 2915:1-9; PTE 155 (Dale Dep.) 27:23-28:17; (Korabel) 1175:22-1176:7. In addition, the memorandum is not an operations or interim order approved by the police commissioner or an amendment to the NYPD Patrol Guide, Tr. (Hall) 7649:14-24, which means procedures contained therein can be changed at any time.

## PROPOSED CONCLUSIONS OF LAW

1.      The nineteen stops and frisks of the named plaintiffs and testifying class member witnesses were made without reasonable articulable suspicion in violation of the Fourth Amendment.

2.      The nineteen stops and frisks of the named plaintiffs and class member witnesses were made on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.

3.      The searches of Plaintiffs David Floyd, David Ourlicht, and Cornelio McDonald were made without probable cause in violation of the Fourth Amendment.

4.      The searches of Plaintiffs David Floyd, David Ourlicht, and Cornelio McDonald were made on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.

5.      The NYPD has a de facto policy and a widespread custom, pattern and practice of suspicionless stops and frisks in violation of the Fourth Amendment.

6.      The NYPD has a de facto policy and a widespread custom, pattern and practice of race-based stops and frisks in violation of the Equal Protection Clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.

7.      Plaintiffs are entitled to classwide permanent injunctive relief to remedy the constitutional and statutory violations set forth in the preceding six paragraphs.

8.      The Court shall order a Joint-Remedy Process and appoint a monitor to assist with implementation and monitoring of the permanent injunctive relief ordered by the Court.

Dated: New York, New York
       June 12, 2013

By:           s/ Darius Charney
      DARIUS CHARNEY (consent obtained)

Darius Charney
Sunita Patel
Baher Azmy
Rachel Lopez
Ghita Schwarz
Chauniqua Young
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439
DCharney@ccrjustice.org

By:           s/ Kasey Martini
      KASEY MARTINI

Philip A. Irwin
Eric Hellerman
Gretchen Hoff Varner
Kasey Martini
Bruce Corey, Jr.
COVINGTON & BURLING LLP
The New York Time Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
kmartini@cov.com

Jonathan Moore
Jennifer Borchetta
BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0900

*Attorneys for Plaintiffs*