UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

DAVID FLOYD, *et al.*,

        Plaintiffs,

    - against -

CITY OF NEW YORK,

        Defendant.

------------------------------------------------------------ X

JAENEAN LIGON, *et al.*,

        Plaintiffs,

    - against -

CITY OF NEW YORK, *et al.*,

        Defendants.

------------------------------------------------------------ X

<u>OPINION AND ORDER</u>

08 Civ. 1034 (SAS)

12 Civ. 2274 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/12/13

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION

        In an Opinion issued today I found the City of New York liable in the *Floyd* case for violating the Fourth and Fourteenth Amendment rights of the plaintiff class because of the way the New York City Police Department ("NYPD") has conducted stops and frisks over the past decade (the "Liability Opinion"). In an Opinion issued in January 2013, I found that the *Ligon* plaintiffs, representing a putative class of people stopped outside buildings participating in

1

the Trespass Affidavit Program ("TAP") in the Bronx, were entitled to preliminary injunctive relief based on violations of their Fourth Amendment rights.

The purpose of this Opinion (the "Remedies Opinion") is to determine what remedies are appropriate in these cases. I address both cases in one Opinion because the remedies necessarily overlap. Each requires that the NYPD reform practices and policies related to stop and frisk to conform with the requirements of the United States Constitution. I stress, at the outset, that the remedies imposed in this Opinion are as narrow and targeted as possible. To be very clear: I am *not* ordering an end to the practice of stop and frisk. The purpose of the remedies addressed in this Opinion is to ensure that the practice is carried out in a manner that protects the rights and liberties of all New Yorkers, while still providing much needed police protection.

## II.     REMEDIES IN *FLOYD*

### A.     The Court Has the Power to Order Broad Equitable Relief

#### 1.     Plaintiffs Satisfied the Requirements for a Permanent Injunction

Plaintiffs seeking a permanent injunction must demonstrate: (1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiffs and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[1] Plaintiffs may satisfy the first two factors by demonstrating that they are likely to be deprived of their constitutional rights in the future by the

---

[1]     *See World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160–61 (2d Cir. 2012) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

acts they seek to have enjoined.[2]  The evidence discussed in the Liability Opinion shows that plaintiffs have suffered violations of their Fourth and Fourteenth Amendment rights, and that the prevalence of the practices leading to those violations creates a likelihood of future injury.[3]  Thus, plaintiffs have satisfied the first two requirements for obtaining permanent injunctive relief.

The balance of hardships tilts strongly in favor of granting a permanent injunction in *Floyd*.  That is, the burden on the plaintiff class of continued unconstitutional stops and frisks far outweighs the administrative hardships that the NYPD will face in correcting its unconstitutional practices.[4]

> The right to physical liberty has long been at the core of our nation's commitment to respecting the autonomy and dignity of each person:  "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."[5]

---

[2]    *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) (deprivation of constitutional rights "cannot be compensated by money damages"); *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998) (the "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

[3]    *See* Liability Opinion at Part V (conclusions of law); *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012) (citing *National Cong. for Puerto Rican Rights, by Perez v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) (later renamed *Daniels*)).  *See also Floyd*, 283 F.R.D. at 160, 178 (certifying plaintiffs' class).

[4]    *See Association of Surrogates & Supreme Court Reporters Within City of New York v. State of New York*, 966 F.2d 75, 79, *modified on reh'g*, 969 F.2d 1416 (2d Cir. 1992) (noting that "state budgetary processes may not trump court-ordered measures necessary to undo a federal constitutional violation," provided that the equitable relief is proportional to the constitutional infraction).

[5]    *Floyd*, 283 F.R.D. at 158–59 (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

Ensuring that people are not seized and searched by the police on the streets of New York City without a legal basis is an important interest meriting judicial protection.

Eliminating the threat that blacks and Hispanics will be targeted for stops and frisks is also an important interest.  In addition to the significant intrusion on liberty that results from any stop, increased contact with the police leads to increased opportunities for arrest, even when the reason for the arrest was not the reason for the stop.  As a result, targeting racially defined groups for stops — even when there is reasonable suspicion — perpetuates the stubborn racial disparities in our criminal justice system.[6]  Although the costs of complying with the permanent injunction in *Floyd* will be significant, they are clearly outweighed by the urgent need to curb the constitutional abuses described in the Liability Opinion.

With regard to the public interest, the City has expressed concern that interference in the NYPD's stop and frisk practices may have a detrimental effect on crime control.[7] However, as previously noted, I am *not* ordering an end to stop and frisk.  Moreover, it has been widely reported that as the number of recorded stops has decreased over the past year, the crime

---

[6]    *See, e.g.*, MICHELLE ALEXANDER, THE NEW JIM CROW 6–7 (2010) ("No other country in the world imprisons so many of its racial or ethnic minorities. . . .  In Washington, D.C., . . . it is estimated that three out of four young black men (and nearly all those in the poorest neighborhoods) can expect to serve time in prison.").  Another collateral consequence of stops was highlighted in the recently settled case of *Lino v. City of New York*, No. 106579/10, 2011 WL 2610501 (Sup. Ct. N.Y. Co. June 24, 2011), in which the NYPD agreed to purge personal information from its stop database.  Plaintiffs — including named plaintiff Clive Lino — had alleged that the NYPD was using personal information from the stop database to conduct criminal investigations.  *See* John Caher, *NYPD Agrees to Purge Stop-Frisk Databank*, N.Y. L.J., August 8, 2013.

[7]    *See* 4/11/13 Defendant['s] Memorandum of Law in Opposition to Plaintiffs' Requested Injunctive Relief ("Def. Inj. Mem.") at 17–18.

rate has continued to fall.[8]  The United States Department of Justice ("DOJ") has pointed out that "there is significant evidence that unlawfully aggressive police tactics are not only unnecessary for effective policing, but are in fact detrimental to the mission of crime reduction."[9]  By strictly adhering to the rule of law, the NYPD will achieve greater cooperation between police officers and the communities they serve.  Fostering trust in the police will "promote, rather than hinder, [the] NYPD's mission of safely and effectively fighting crime."[10]

Furthermore, as in *Ligon*, it is "'clear and plain'" that the public interest in liberty and dignity under the Fourth Amendment, and the public interest in equality under the Fourteenth Amendment, trumps whatever modicum of added safety might theoretically be gained by the NYPD making *unconstitutional* stops and frisks.[11]  This Opinion does not call for the NYPD to abandon proactive policing and return to an earlier era of less effective police practices.  Rather, the relief ordered below requires the NYPD to be *even more* proactive:

---

[8]     *See, e.g.*, Tamer El-Ghobashy & Michael Howard Saul, *New York Police Use of Stop-and-Frisk Drops: Plummet in Disputed Tactic Tracks Overall Decrease in Crime*, WALL ST. J., May 6, 2013 (noting that UF-250s fell 51% in the first three months of 2013 compared to 2012, while crime fell 2.7% and murders fell 30% through April 28 compared to 2012).  I note, however, that the number of *unrecorded* stops may have increased over the same period as a result of misleading training at the NYPD's new stop and frisk refresher course at Rodman's Neck.  *See* Liability Opinion at Part IV.C.5 (citing, *inter alia*, 4/25 Trial Transcript ("Tr.") at 5119–5124 (Shea)); *Ligon v. City of New York,* No. 12 Civ. 2274, 2013 WL 628534, at *38 (S.D.N.Y. Feb. 14,  2013).

[9]     6/12/13 Statement of Interest of the United States ("DOJ Inj. Mem.") at 10.  *See id.* at 10–11 (collecting sources).

[10]     *Id.* at 10.  Even NYPD Commissioner Raymond Kelly has recognized that the misuse of stop and frisk can contribute to community mistrust.  In 2000, he criticized "dubious stop-and-frisk tactics" instituted after his first period as Police Commissioner that had "sowed new seeds of community mistrust."  Kevin Flynn, *Ex-Police Head Criticizes Strategies*, N.Y. TIMES, Apr. 5, 2000.

[11]     *Cf. Ligon*, 2013 WL 628534, at *40–41.

5

proactive not only about crime control and prevention, but also about protecting the constitutional rights of the people the NYPD serves.  The public interest will not be harmed by a permanent injunction requiring the NYPD to conform its practices to the Constitution.

## 2.    The Court's Broad Authority to Enter Injunctive Relief

"[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."[12]  At the same time, it is "'the essence of equity jurisdiction' that a court is only empowered 'to grant relief no broader than necessary to cure the effects of the harm caused by the violation.'"[13]  "Discretion to frame equitable relief is limited by considerations of federalism, and remedies that intrude unnecessarily on a state's governance of its own affairs should be avoided."[14]

Nevertheless, as the DOJ notes, "courts have long recognized — across a wide range of institutional settings — that equity often requires the implementation of injunctive relief to correct unconstitutional conduct, even where that relief relates to a state's administrative practices."[15]  "Courts . . . must not shrink from their obligation to enforce the constitutional

---

[12]    *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971).  *Accord Association of Surrogates*, 966 F.2d at 79 ("[F]ederal courts have broad discretion in fashioning equitable remedies for . . . constitutional violations.").

[13]    *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (quoting *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997)).

[14]    *Association of Surrogates*, 966 F.2d at 79.

[15]    DOJ Inj. Mem. at 7 (citing *Brown v. Plata*, 131 S. Ct. 1910 (2011); *Brown v. Board of Educ.*, 349 U.S. 294 (1955)).  *See also id.* at 7 n.3 (criticizing the City's citation of inapposite cases "for the proposition that federal courts should decline to enter injunctive relief that requires operational changes to a State's institutions").

rights of all persons."[16]  This duty is not curtailed when constitutional violations arise in the context of law enforcement.  Rather, where "there is a persistent pattern of police misconduct, injunctive relief is appropriate."[17]

I have always recognized the need for caution in ordering remedies that affect the internal operations of the NYPD,[18] the nation's largest municipal police force and an organization with over 35,000 members.[19]  I would have preferred that the City cooperate in a joint undertaking to develop some of the remedies ordered in this Opinion.[20]  Instead, the City declined to participate, and argued that "the NYPD systems already in place" — perhaps with unspecified "minor adjustments" — would suffice to address any constitutional wrongs that

---

[16]    *Plata*, 131 S. Ct. at 1928 (citing *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (*per curiam*)) (quotation marks omitted).  *Accord Todaro v. Ward*, 565 F.2d 48, 53–54 (2d Cir. 1977) ("'[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution.'" (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974))).

[17]    *Allee v. Medrano*, 416 U.S. 802, 815 (1974).  *Accord* DOJ Inj. Mem. at 8–9 (collecting cases and noting that pursuant to statutory authorities "the United States has itself sought and secured the implementation of remedial measures to reform police misconduct in dozens of law enforcement agencies," including measures that "directly address systemic deficiencies in the way officers conduct stops and searches").

[18]    *See, e.g.*, *Patrolmen's Benevolent Ass'n of City of New York, Inc. v. City of New York*, No. 97 Civ. 7895 (SAS), 2000 WL 1538608, at *3–4 (S.D.N.Y. Oct. 18, 2000) (declining to impose injunction on the NYPD where doing so would have been "an undue intrusion into a matter of state sovereignty").

[19]    *See* Def. Inj. Mem. at 1.

[20]    *See* 1/31 Tr. at 101; 1/28/13 Letter from Jonathan C. Moore et al., Counsel for Plaintiffs, to the Court (proposing collaborative procedure involving all the parties in *Floyd*, *Ligon*, and *Davis*, a court-appointed facilitator, and the views of major stakeholders).  The City rejected this proposal.  *See* 1/31 Tr. at 9–10.

might be found.[21]  I note that the City's refusal to engage in a joint attempt to craft remedies contrasts with the many municipalities that have reached settlement agreements or consent decrees when confronted with evidence of police misconduct.[22]

### B.    Equitable Relief

Federal Rule of Civil Procedure 65(d) requires that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required."[23]  These specificity provisions are "'no mere technical requirements,'" but were "'designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a

---

[21]    6/12/13 Defendant's Post-Trial Memorandum of Law ("Def. Mem.") at 24–25. *Accord* Def. Inj. Mem. at 7–18.  The City also argues that no remedy is required because improper stops can be addressed by individual suits for damages. *See* Def. Inj. Mem. at 6.  The DOJ counters that if individual suits were an effective remedy for police misconduct, courts would not have found it necessary to impose injunctive relief in so many police misconduct cases. *See* DOJ Inj. Mem. at 9 & n.5 (also citing arguments from Daryl J. Levinson, *Making Government Pay: Markets, Politics, and the Allocation of Constitutional Costs*, 67 U. CHI. L. REV. 345, 354–57 (2000)).  I note that individual suits for damages are particularly ineffective as a remedy for unconstitutional stops, where individuals often do not know what the basis for their stop was, and thus cannot know whether the stop lacked a legal basis or was influenced improperly by race.  In addition, while the indignity of an unconstitutional stop is a serious harm, few of those stopped will be motivated to dedicate their time and resources to filing a lawsuit — especially where the standard for recovery may require proof of *Monell* liability.

[22]    *See, e.g.*, *Bailey v. City of Philadelphia*, No. 10 Civ. 5952 (E.D. Pa. June 21, 2011) (consent decree in class action alleging unconstitutional stops and frisks of black and Hispanic men); DOJ Inj. Mem. at 9 (noting DOJ settlement agreements and consent decrees with dozens of law enforcement agencies nationwide).  The City's resistance to reform in this case may reflect a more general skepticism toward judicial interpretation of the Constitution and the limits it imposes on municipalities.  *See, e.g.*, Jill Colvin, *Bloomberg Says Interpretation of Constitution Will "Have to Change" After Boston Bombing*, POLITICKER (Apr. 22, 2013).

[23]    Fed. R. Civ. P. 65(d)(1).

decree too vague to be understood.'"[24]  The specificity provisions also ensure "'that the appellate court knows precisely what it is reviewing.'"[25]

Compliance with the prohibition on the incorporation of extrinsic documents is "'essential,' unless the enjoined party acquiesces to the extrinsic reference."[26]  The City has not acquiesced to any extrinsic reference.  Thus, while the sections below refer to NYPD documents that must be revised, the ordered relief is contained entirely within the four corners of this Opinion.[27]

### 1.    Appointment of a Monitor to Oversee Reforms

Because of the complexity of the reforms that will be required to bring the NYPD's stop and frisk practices into compliance with the Constitution, it would be impractical for this Court to engage in direct oversight of the reforms.  As a more effective and flexible alternative, I am appointing an independent monitor (the "Monitor") to oversee the reform process.  I have chosen Peter L. Zimroth to serve as Monitor.

Mr. Zimroth, a partner in the New York office of Arnold & Porter, LLP, is a

---

[24]     *Mickalis Pawn Shop*, 645 F.3d at 143 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).

[25]     *Id.* at 144 (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 241 (2d Cir. 2001)).

[26]     *Eyewonder, Inc. v. Abraham*, 293 Fed. App'x 818, 820 (2d Cir. 2008) (quoting *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000), and citing *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 809 (2d Cir. 1981)).  *Accord Petrello v. White*, 533 F.3d 110, 114 (2d Cir. 2008) ("Rule 65(d) 'is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden' or required." (quoting *Fonar Corp. v. Deccaid Servs., Inc.*, 983 F.2d 427, 430 (2d Cir. 1993))).

[27]     The remedies ordered below are largely drawn from submissions by plaintiffs and the DOJ.

former Corporation Counsel of the City of New York, and the former Chief Assistant District

Attorney of New York County.  In both of these roles, Mr. Zimroth worked closely with the

NYPD.  A graduate of Columbia University and Yale Law School — where he served as Editor

in Chief of the Yale Law Journal — he also served as a law clerk on the Supreme Court of the

United States and a federal prosecutor.  He taught criminal law and criminal procedure as a

tenured professor at the New York University School of Law.

       Mr. Zimroth has also been appointed to many positions in public service.  The

Chief Judge of the New York Court of Appeals appointed him as one of three directors of New

York's Capital Defender Office.  He has also served on the Mayor's Committee on the Judiciary,

and on the boards of two schools for children with special needs.  He has been a member of the

House of Delegates of the American Bar Association, the Executive Committee of the New York

City Bar Association, and the Board of Directors of the Legal Aid Society.

       It is within the power of a district court to order the appointment of a monitor to

oversee judicially ordered reforms.[28]  The DOJ recommended the appointment of a monitor in

this case, in the event that the Court found the City liable.  Based on "decades of police reform

efforts across the country," the DOJ concluded that "the appointment of a monitor to guide

implementation of . . . injunctive relief may provide substantial assistance to the Court and the

parties and can reduce unnecessary delays and litigation over disputes regarding compliance."[29]

In addition, the DOJ noted:

---

[28]     *See, e.g.*, *United States v. City of New York*, 717 F.3d 72, 97 (2d Cir. 2013).

[29]     DOJ Inj. Mem. at 11.  *Accord* 5/15 Tr. at 7435 (plaintiffs' remedies expert
Professor Samuel Walker testifying that if liability is found, the appointment of an independent
monitor is "necessary").

> [T]he experience of the United States in enforcing police reform injunctions teaches that the appointment of an independent monitor is a critically important asset to the court, the parties, and the community in cases involving patterns or practices of unlawful conduct by law enforcement officials.  A court-appointed monitor in this case would help the Court ensure that . . . any pattern or practice . . . is effectively and sustainably remedied.[30]

The appointment of a monitor will serve the interests of all stakeholders, including the City, by facilitating the early and unbiased detection of non-compliance or barriers to compliance.  By identifying problems promptly, the Monitor will save the City time and resources.[31]

I also note that the Monitor will have a distinct function from the other oversight entities identified by the City, such as the NYPD's Internal Affairs Bureau, federal prosecutors, the Civilian Complaint Review Board, and "the public electorate."[32]  The Monitor will be specifically and narrowly focused on the City's compliance with reforming the NYPD's use of stop and frisk — although this will inevitably touch on issues of training, supervision, monitoring, and discipline.  Finally, the Monitor will operate in close coordination with this

---

[30]     DOJ Inj. Mem. at 5.

[31]     *See id.* at 16 ("Without an independent monitor, the Court will be forced to depend on motions practice between the parties to assess progress; a costly, contentious, inefficient, and time-consuming process.").

[32]     *Id.* at 18 (citing Def. Inj. Mem. at 13).  In particular, as the DOJ notes, "it is not realistic to ask 'the public electorate' to monitor the police department to ensure that the department's stop-and-frisk practices are consistent with the Constitution."  *Id.* at 20 (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)).  If it is true that 76% percent of black voters in New York City disapprove of stop and frisk, as found in a recent Quinnipiac University poll, then the persistence of this policy in heavily black communities might indicate the failure "of those political processes ordinarily to be relied upon to protect minorities," and thus might justify "more searching judicial inquiry."  *Carolene Prods.*, 304 U.S. at 152 n.4; Quinnipiac University, *New Yorkers Back Ban on Take-Out Foam More Than 2-1*, at 8 (Feb. 28, 2013), http://www.quinnipiac.edu/images/polling/nyc/nyc02282013.pdf/ (19% of blacks approve and 76% disapprove of "a police practice known as stop and frisk, where police stop and question a person they suspect of wrongdoing and, if necessary, search that person").

Court, which retains jurisdiction to issue orders as necessary to remedy the constitutional violations described in the Liability Opinion.[33]

I now specify the Monitor's role and functions:

1.    The Monitor will be subject to the supervision and orders of the Court.

2.    The Monitor will not, and is not intended to, replace or assume the role or duties of any City or NYPD staff or officials, including the Commissioner.  The Monitor's duties, responsibilities, and authority will be no broader than necessary to end the constitutional violations in the NYPD's stop and frisk practices described in the Liability Opinion.

3.    The Monitor's initial responsibility will be to develop, based on consultation with the parties, a set of reforms of the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk.  These reforms (the "Immediate Reforms") are outlined below in Part II.A.2.  They will be developed as soon as practicable and implemented when they are approved by the Court.

4.    After the completion of the Joint Remedial Process, described below in Part II.A.4, the Monitor will work with the Facilitator and the parties to develop any further reforms necessary to ending the constitutional violations described in the Liability Opinion. These reforms ("Joint Process Reforms") will be implemented upon approval by the Court.

5.    The Monitor will inform the City of the milestones the City must achieve in order to demonstrate compliance and bring the monitoring process to an end.

6.    The Monitor will regularly conduct compliance and progress reviews to assess the extent

---

[33]    The Monitor's role will also be distinct from the broad advisory role of the NYPD Inspector General envisioned in N.Y. City Council Introductory No. 1079 of 2013.

to which the NYPD has implemented and complied with the Immediate and Joint Process Reforms.

7. The Monitor will issue public reports every six months detailing the NYPD's compliance with the Immediate and Joint Process Reforms. The Monitor will also file these reports with the Court.

8. The Monitor will work with the parties to address any barriers to compliance. To the extent possible, the Monitor should strive to develop a collaborative rather than adversarial relationship with the City.

9. The Monitor may request the Court to modify the Immediate and Joint Process Reforms, if evidence shows that such modifications are warranted.

10. The Monitor may request technical assistance from outside experts. He may also employ staff assistance as he finds reasonable and necessary.

11. The City will be responsible for the reasonable costs and fees of the Monitor, his staff, and any experts he retains.

12. The Monitor's position will come to an end when the City has achieved compliance with the Immediate and Joint Process Reforms.

### 2. Immediate Reforms Regarding Stop and Frisk

Ending the constitutional violations inherent in the NYPD's current use of stop and frisk will require reforms to a number of NYPD policies and practices. It would be unwise and impractical for this Court to impose such reforms at this time, prior to input from the Monitor and the participants in the Joint Remedial Process ordered below.[34] Instead, as noted

---

[34] In particular, the City has not yet provided input regarding specific reforms. *See* Def. Inj. Mem. at 18 (declining to offer a remedy "other than to respectfully direct the Court to

above, the development of reforms will take place in two stages.  *First*, the Monitor will develop, in consultation with the parties, an initial set of reforms to the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk (the "Immediate Reforms").  These reforms will be developed and submitted to the Court as soon as practicable, and implemented when they are approved.  *Second*, the Facilitator will work with the parties and other stakeholders to develop, through the Joint Remedial Process, a more thorough set of reforms (the "Joint Process Reforms") to supplement, as necessary, the Immediate Reforms. The development of the Joint Process Reforms is discussed below in Part II.A.4.

If the parties, together with the Monitor, are unable to develop agreed-upon Immediate Reforms, the Court will order the parties to draft proposed revisions to specific policies and training materials, as the parties have already done quite effectively in *Ligon*.[35] Indeed, the remedies proposed in *Ligon* may provide a useful model for some aspects of the Immediate Reforms.[36]

Based on the liability and remedies evidence presented at trial, the Immediate Reforms must include the following elements:

### a.   Revisions to Policies and Training Materials Relating to Stop and Frisk and to Racial Profiling

*First*, the NYPD should revise its policies and training regarding stop and frisk to adhere to constitutional standards as well as New York state law.  The constitutional standards

---

the trial record for an assessment of the remedies evidence"); 6/12/13 Defendant's Post-Trial Memorandum of Law at 24–25 (declining to propose remedies).

[35]     *See* 7/8/13 Defendants' Proposed Remedial Relief ("*Ligon* Def. Rem.").

[36]     *See Ligon,* 2013 WL 628534, at *41–44.

include the standards for: what constitutes a stop, when a stop may be conducted, when a frisk may be conducted, and when a search into clothing or into any object found during a search may be conducted.[37]  Although the standards may sometimes require the informed use of discretion, they are not complicated and should be stated in policies and training as clearly and simply as possible.

   To summarize: an encounter between a police officer and a civilian constitutes a stop whenever a reasonable person would *not feel free to disregard the officer and walk away*. The threat or use of force is not a necessary or even typical element of stops.  Encounters involving nothing more than commands or accusatory questions can and routinely do rise to the level of stops, provided that the commands and questions would lead a reasonable person to conclude that he was not free to terminate the encounter.[38]

   In order to conduct a stop, an officer must have *individualized*, reasonable suspicion that the person stopped has committed, is committing, or is about to commit a crime. The officer must be able to articulate facts establishing a minimal level of *objective* justification

---

[37]  *See* Liability Opinion at Part III.B; *Ligon*, 2013 WL 628534, at *41–42.

[38]  There could be a simple way to ensure that officers do not unintentionally violate the Fourth Amendment rights of pedestrians by approaching them without reasonable suspicion and then inadvertently treating them in such a way that a reasonable person would not feel free to leave.  Officers could, for example, begin *De Bour* Level 1 and 2 encounters by informing the person that he or she is free to leave.  There is no constitutional requirement for officers to inform people that they are free to leave.  *Cf. Ohio v. Robinette*, 519 U.S. 33, 35 (1996) (holding that the Fourth Amendment does not require "that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").  Nevertheless, the Constitution does not prohibit a police department from adopting this policy or a court from ordering it as a *means* of avoiding unconstitutional stops, where — as here — officers have been incorrectly trained on the definition of a stop.

for making the stop, which means more than an inchoate and unparticularized suspicion or hunch.  "Furtive movements" are an insufficient basis for a stop or frisk if the officer cannot articulate anything more specific about the suspicious nature of the movement.  The same is true of merely being present in a "high crime area."  Moreover, no person may be stopped solely because he matches a vague or generalized description — such as young black male 18 to 24 — without further detail or indicia of reliability.

   To proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is *armed and dangerous*.  The purpose of a frisk is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.  Thus, the frisk must be strictly limited to whatever is necessary to uncover weapons that could harm the officer or others nearby.  When an officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity as contraband *immediately apparent*, the officer may seize the contraband.  If an officer reasonably suspects that a felt object in the clothing of a suspect is a weapon, then the officer may take whatever action is necessary to examine the object and protect himself, including removing the object from the clothing of the stopped person.

   The erroneous or misleading training materials identified in the Liability Opinion must be corrected, including the Police Student Guide's overbroad definition of "furtive behavior;" the misleading training on "unusual firearms" implying that the presence of a wallet, cell phone, or pen could justify a frisk, or search; the complete lack of training on the constitutional standard for a frisk — reasonable suspicion that a stopped person is "armed and dangerous;" and the failure to include self-initiated stops (which make up 78% of street stops) in

the role-playing at Rodman's Neck.[39]  These training reforms will be in addition to those discussed below in the section of this Opinion relating to *Ligon*.[40]

      *Second*, the NYPD should revise its policies and training regarding racial profiling to make clear that targeting "the right people" for stops, as described in the Liability Opinion, is a form of racial profiling and violates the Constitution.[41]  Racially defined groups may not be targeted for stops in general simply because they appear more frequently in local crime suspect data.  Race may only be considered where the stop is based on a specific and reliable suspect description.  When an officer carries out a stop based on reasonable suspicion that a person fits such a description, the officer may consider the race of the suspect, just as the officer may consider the suspect's height or hair color.  When a stop is not based on a specific suspect description, however, race may not be either a motivation or a justification for the stop. In particular, officers must cease the targeting of young black and Hispanic males for stops based on the appearance of these groups in crime complaints.  It may also be appropriate to conduct training for officers on the effect of unconscious racial bias.

      *Third*, it is unclear at this stage whether Operations Order 52 ("OO 52"), which describes the use of performance objectives to motivate officers, requires revision in order to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments.  The evidence at trial showed that OO 52's use of "performance goals" created pressure to carry out stops, without any system for monitoring the constitutionality of those

---

[39]      *See* Liability Opinion at Part IV.C.5.

[40]      *See infra* Part III.

[41]      *See* Liability Opinion at Parts IV.C.3, V.B.1.

stops.  However, the use of performance goals in relation to stops may be appropriate, once an effective system for ensuring constitutionality is in place.[42]  Because the perspective of police officers and police organizations will be particularly valuable to clarifying the role of performance goals in the reform of stop and frisk, these issues should be addressed as part of the Joint Remedial Process rather than the Immediate Reforms.

Finally, I note that where legitimate uncertainty exists regarding the most efficient means of reform, and the parties have differing views, it may be feasible for the Monitor to test the alternatives by applying them in different precincts and studying the results. In some contexts, the size of the NYPD makes it possible, and desirable, to resolve practical disagreements through the rigorous testing and analysis of alternatives at the precinct level before applying these reforms to the department as a whole.

### b.  Changes to Stop and Frisk Documentation

Both the trial record and the Liability Opinion document, in detail, the inadequacy of the NYPD's methods of recording *Terry* stops.  The UF-250, used by officers in the field to

---

[42]     Plaintiffs' policing expert Lou Reiter testified that "there are circumstances where productivity goals are consistent with generally accepted [police] practices."  4/24 Tr. at 4917. The City's policing expert, James K. Stewart, testified that performance goals are a necessary part of monitoring and supervision:

> In policing, there are disincentives to engaging in some activities, because they are dangerous, they are in unsterile conditions and chaotic conditions, and the officers may not engage in that but yet spend their time on random patrol.  They are not out there doing what the department wants them to do, but they do show up and they show up in uniform.  The reason that . . . you have to count the activities is to ensure that those officers do respond . . . to the calls for assistance of help, they do address the community issues . . . .

5/17 Tr. at 7756.

record the basis for stops, is flawed and must be revised.[43]  Officers are also required to record

stop and frisk activity in memo books, otherwise known as activity logs.  Quarterly audits of

these memo book entries have revealed significant deficiencies in record keeping practices in

virtually every precinct throughout the City.[44]  The proper use of activity logs to record stop and

frisk activity must be emphasized in training, as well as enforced through supervision and

discipline.  I first address the UF-250 and then the activity logs.

### i.   UF-250

As described in the Liability Opinion, the current UF-250 consists mainly of

checkboxes that officers can and often do check by rote,[45] thus facilitating post-hoc justifications

for stops where none may have existed at the time of the stop.  The UF-250 must be revised to

include a narrative section where the officer must record, in her own words, the basis for the

stop.  The narrative will enable meaningful supervisory oversight of the officer's decision to

conduct the stop, as well as create a record for a later review of constitutionality.

As an independent monitor of the New Orleans Police Department ("NOPD")

recently noted, "the overwhelming belief of experts [is] that a narrative field in which the

officers describe the circumstances for each stop would be the best way to gather information

that will be used to analyze reasonable suspicion" and, relatedly, "prevent[] racially biased

---

[43]     *See* 5/16 Tr. at 7457 (Walker).

[44]     *See* Pl. Findings ¶ 197 (citing Plaintiffs' Trial Exhibit ("PX") 450; Defendant's
Trial Exhibit ("DX") G6).

[45]     *See, e.g.*, Liability Opinion at Part IV.B.2.

policing."[46]  The NOPD monitor noted that the City of Oakland recently revised its data

collection system to include "a narrative field in which officers are required to state, in their own

words, their basis for having reasonable suspicion for a stop."[47]  The Oakland Police Department

added this narrative field "because it was the best way to evaluate whether individual officers

possessed the requisite reasonable suspicion for a *Terry* stop."[48]  The Philadelphia Police

Department has also included a narrative field in its stop form.[49]  Similarly, Professor Walker, a

nationally recognized authority on police accountability, opined that a form for recording stops

must contain a sufficiently detailed narrative that a reviewer can determine from the narrative

alone whether the stop was based on reasonable suspicion.[50]

        The UF-250 should also be revised to require a separate explanation of why a pat-

down, frisk, or search was performed.  The evidence at trial revealed that people were routinely

subjected to these intrusions when no objective facts supported reasonable suspicion that they

were armed and dangerous.  It is apparent that some officers consider frisks to be a routine part

of a stop.  Because this misconception is contrary to law, the revised UF-250 should include a

separate section requiring officers to explain why the stopped person was suspected of being

---

[46]     SUSAN HUTSON, INDEPENDENT POLICE MONITOR, REVIEW OF THE NEW ORLEANS POLICE DEPARTMENT'S FIELD INTERVIEW POLICIES, PRACTICES, AND DATA: FINAL REPORT 45 (Mar. 12, 2013) (footnote omitted).

[47]     *Id.* at 46.

[48]     *Id.*

[49]     *See id.*

[50]     *See* 5/16 Tr. at 7456–7458 (Walker).  Professor Walker testified that a description of reasonable suspicion for a stop will generally require no more than three lines of text.  *See id.* at 7458.

armed and dangerous.

Furthermore, both the DOJ and plaintiffs recommend that the UF-250 contain a tear-off portion stating the reason for the stop, which can be given to each stopped person at the end of the encounter.[51]  A 2007 RAND report, commissioned by the NYPD, similarly recommended that "[f]or a trial period in select precincts, the NYPD could require that officers give an information card to those stopped pedestrians who are neither arrested nor issued a summons."[52]  Any form or card given to stopped persons should provide the stated reasons for the stop, the badge numbers of the stopping officers, and information on how to file a complaint.

Finally, the UF-250 should be revised to simplify and improve the checkbox system used to indicate common stop justifications.   It may also be necessary to reduce the number of "stop factor" boxes in order to permit easier analyses of patterns in the constitutionality of stops.[53]

In addition to changing the UF-250, officers should be further trained in its use. As discussed in the Liability Opinion, some officers check certain boxes (or combinations of boxes) reflexively as part of "scripts," including "Furtive Movements" and "Area Has High

---

[51]    *See* Pl. Rem. Br. at 19 (citing Deborah Ramirez, Jack McDevitt & Amy Farrell, *A Resource Guide on Racial Profiling Data Collection Systems: Promising Practices and Lessons Learned* 38 (United States Department of Justice 2000), and noting that a tear-off form has been used in Great Britain for more than a decade).

[52]    GREG RIDGEWAY, RAND, ANALYSIS OF RACIAL DISPARITIES IN THE NEW YORK POLICE DEPARTMENT'S STOP, QUESTION, AND FRISK PRACTICES 44 (2007), DX K6.

[53]    *See* Report of Jeffrey Fagan, Ph.D. (Oct. 15, 2010), PX 411 ("Fagan Rpt.") at 49 (describing the analytical difficulties created by the number of possible combinations of stop factors and suspected crimes).

Incidence of Reported Offense of Type Under Investigation."[54]  Officers must understand that if

a stop is based on these factors, the officer must provide additional detail in the narrative field —

for example, what was the specific nature of the furtive movement, and why was it suspicious?

What was the geographic scope of the "high crime area," and what was the officer's specific

basis for believing it has a high incidence of the suspected crime?

### ii.    Activity Logs

All uniformed officers are required to provide narrative descriptions of stops in

their activity logs whenever a UF-250 is prepared.[55]  In practice, this does not take place.

Evidence at trial showed that throughout the class period, officers consistently failed to record

stops in their logs, or provided insufficient detail for a supervisor to meaningfully review the

constitutionality of the stop.  This problem is best addressed through training, supervision, and

monitoring.[56]

---

[54]    Suspicious Bulge is another factor — albeit less often used than Furtive Movements and High Crime Area — that should require greater specificity or a narrative description.

[55]    *See* Operations Order 44 (9/11/08), PX 96.  In addition, the Chief of Patrol recently directed all officers in the patrol borough to include nine categories of information in every activity log entry for a stop.  The categories include: the date, time and location of the stop; the name and pedigree of the person stopped; the suspected felony or penal law misdemeanor; an explanation of the suspicion that led to the stop (such as "*looking into windows,*" or "*pulling on doorknobs*"); whether the suspect was frisked; the sprint or job number, if applicable; and the disposition of the stop.  The Chief of Patrol's memo also requires officers to elaborate the basis for a stop in the "Additional Circumstances/Factors" section of the UF-250, to photocopy every activity log entry for a stop, and to attach the photocopy to the UF-250 before submitting it to a supervisor.  *See* DX J13.

[56]    *See infra* Part II.B.2.c.  I recognize the risk of inefficiency if officers record the same information on UF-250s and in their activity logs.  Professor Walker argued in favor of requiring both, but also expressed concerns regarding inefficiencies.  *See* 5/16 Tr. at 7458, 7480. If the parties can agree upon an improved procedure during the Joint Remedial Process described below, those improvements can be included in the Joint Process Reforms.

### iii.        Specific Relief Ordered

The NYPD, with the assistance of the Monitor, is directed to revise the UF-250 to address the criticisms expressed in the Liability Opinion and the direction given in this Opinion, and to provide training with respect to the new form.  The NYPD is further ordered, again with the assistance of the Monitor, to ensure that activity logs are completed with the required specificity, and to implement measures to adequately discipline officers who fail to comply with these requirements.

### c.        Changes to Supervision, Monitoring, and Discipline

An essential aspect of the Joint Process Reforms will be the development of an improved system for monitoring, supervision, and discipline.  Professor Walker testified that comprehensive reforms may be necessary to ensure the constitutionality of stops, including revisions to written policies and training materials, improved documentation of stops and frisks, direct supervision and review of stop documentation by sergeants, indirect supervision and review by more senior supervisors and managers, improved citizen complaint procedures, improved disciplinary procedures, department-wide audits, and perhaps even an early intervention system based on a centralized source of information regarding officer misconduct. According to Professor Walker, "[a] comprehensive approach is absolutely essential, because if any one of the components is absent or weak and ineffective, the entire accountability system begins to collapse."[57]

--------

[57]        5/15 Tr. at 7440.  The National Institute of Justice, which the City's policing expert, James K. Stewart, directed from 1982 to 1990, notes that "the management and culture of a department are the most important factors influencing police behavior."  National Institute of Justice, *Police Integrity*, *available at* http://www.nij.gov/topics/law-enforcement/legitimacy/integrity.htm#note2. Ultimately, ending unconstitutionality in stop and frisk may require changing the culture of the NYPD so that officials and officers view their

In light of the complexity of the supervision, monitoring, and disciplinary reforms that will be required to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments, it may be appropriate to incorporate these reforms into the Joint Remedial Process negotiations described below.  However, to the extent that the Monitor can work with the parties to develop reforms that can be implemented immediately, the Monitor is encouraged to include those reforms in the proposed Immediate Reforms.

For example, based on the findings in the Liability Opinion, there is an urgent need for the NYPD to institute policies specifically requiring sergeants who witness, review, or discuss stops to address not only the effectiveness but also the *constitutionality* of those stops, and to do so in a thorough and comprehensive manner.[58]  To the extent that Integrity Control Officers witness or review stops, they too must be instructed to review for constitutionality.[59]  The Department Advocate's Office must improve its procedures for imposing discipline in response to the Civilian Complaint Review Board's ("CCRB") findings of substantiated misconduct during stops.  This improvement must include increased deference to credibility determinations by the CCRB, an evidentiary standard that is neutral between the claims of complainants and officers, and no general requirement of corroborating physical evidence.  Finally, the Office of the Chief of Department must begin tracking and investigating complaints

---

purpose not only as policing effectively, but policing constitutionally as well.  If so, the NIJ's first recommendation for improving the integrity of a department is to "[a]ddress and discipline minor offenses so officers learn that major offenses will be disciplined too."  *Id.*

[58]     *See* Liability Opinion at Part IV.C.4.b.

[59]     *See id.*

it receives related to racial profiling.[60]

### d.     FINEST Message

As soon as practicable, the NYPD should transmit a FINEST message explaining the outcome of the *Floyd* litigation and the need for the reforms described above.[61]   The FINEST message should summarize in simple and clear terms the basic constitutional standards governing stop and frisk, the constitutional standard prohibiting racial profiling, and the relation between these standards and New York state law.   The message should order all NYPD personnel to comply immediately with those standards.

### 3.     Body-Worn Cameras

The subject of police officers wearing "body-worn cameras" was inadvertently raised during the testimony of the City's policing expert, James K. Stewart.  The following discussion took place:

> A. . . . But what happens is the departments a lot of times may not have . . . expertise and they may need some technical assistance like body worn cameras is an example and how much technology and where you store the information and stuff like that.  They may not have it.  And there may be other issues like psychological ideas about —
> THE COURT: What do you think of body worn cameras?
> THE WITNESS: I think it's a good idea.  We recommended it in Las Vegas. And we're doing it in Phoenix as well.
> THE COURT: Thank you.
> . . .
> A. But I have no opinion in this case with respect to body worn cameras.[62]

---

[60]     *See id.* at Part IV.C.6.

[61]     The NYPD's "FINEST" messaging system allows the transmission of legal directives to the NYPD's commands.  *See, e.g.*, 5/10/12 Finest Message Regarding Taxi/Livery Robbery Inspection Program, Ex. 1 to 7/24/13 Plaintiffs' Brief Concerning Defendants' Remedial Proposals ("*Ligon* Pl. Rem.").

[62]     5/17 Tr. at 7817–7818.

The use of body-worn cameras by NYPD officers would address a number of the issues raised in the Liability Opinion.  In evaluating the constitutionality of individual stops, I explained the difficulty of judging in hindsight what happened during an encounter between a civilian and the police.[63]  The only contemporaneous records of the stops in this case were UF-250s and short memo book entries — which were sometimes not prepared directly after a stop, and which are inherently one-sided.  Thus, I was forced to analyze the constitutionality of the stops based on testimony given years after the encounter, at a time when the participants' memories were likely colored by their interest in the outcome of the case and the passage of time.  The NYPD's duty to monitor stop and frisk activity is similarly hamstrung by supervisors' inability to review an objective representation of what occurred.[64]

Video recordings will serve a variety of useful functions.  *First*, they will provide a contemporaneous, objective record of stops and frisks, allowing for the review of officer conduct by supervisors and the courts.  The recordings may either confirm or refute the belief of some minorities that they have been stopped simply as a result of their race, or based on the clothes they wore, such as baggy pants or a hoodie.[65]  *Second*, the knowledge that an exchange is being recorded will encourage lawful and respectful interactions on the part of both parties.[66] *Third*, the recordings will diminish the sense on the part of those who file complaints that it is

---

[63]     *See* Liability Opinion at Part IV.D.

[64]     *See id.* at Part IV.C.4.

[65]     By creating an irrefutable record of what occurred during stops, video recordings may help lay to rest disagreements that would otherwise remain unresolved.

[66]     If, in fact, the police do, on occasion, use offensive language —  including racial slurs — or act with more force than necessary, the use of body-worn cameras will inevitably reduce such behavior.

their word against the police, and that the authorities are more likely to believe the police.[67] Thus, the recordings should also alleviate some of the mistrust that has developed between the police and the black and Hispanic communities, based on the belief that stops and frisks are overwhelmingly and unjustifiably directed at members of these communities. Video recordings will be equally helpful to members of the NYPD who are wrongly accused of inappropriate behavior.

Because body-worn cameras are uniquely suited to addressing the constitutional harms at issue in this case, I am ordering the NYPD to institute a pilot project in which body-worn cameras will be worn for a one-year period by officers on patrol in one precinct per borough — specifically the precinct with the highest number of stops during 2012. The Monitor will establish procedures for the review of stop recordings by supervisors and, as appropriate, more senior managers. The Monitor will also establish procedures for the preservation of stop recordings for use in verifying complaints in a manner that protects the privacy of those stopped. Finally, the Monitor will establish procedures for measuring the effectiveness of body-worn cameras in reducing unconstitutional stops and frisks. At the end of the year, the Monitor will work with the parties to determine whether the benefits of the cameras outweigh their financial, administrative, and other costs, and whether the program should be terminated or expanded. The City will be responsible for the costs of the pilot project.

It would have been preferable for this remedy to have originated with the NYPD, which has been a leader and innovator in the application of technology to policing, as Compstat illustrates. Nevertheless, there is reason to hope that not only civilians but also officers will

---

[67]    *See* Liability Opinion at Part IV.C.6.

benefit from the use of cameras.  When a small police department in Rialto, California introduced body-worn cameras, "[t]he results from the first 12 months [were] striking.  Even with only half of the 54 uniformed patrol officers wearing cameras at any given time, the department over all had an 88 percent decline in the number of complaints filed against officers, compared with the 12 months before the study."[68]  While the logistical difficulties of using body-worn cameras will be greater in a larger police force, the potential for avoiding constitutional violations will be greater as well.

### 4.    Joint Remedial Process for Developing Supplemental Reforms

A community input component is increasingly common in consent decrees and settlements directed at police reform.[69]  The DOJ has recognized the importance of community input in its recent consent decrees and other agreements with police departments.[70]  The landmark Collaborative Agreement approved in 2002 by Judge Susan J. Dlott of the Southern District of Ohio as the settlement of class claims against the Cincinnati Police Department has been widely recognized as a successful model for other police reform.[71]

Although the remedies in this Opinion are not issued on consent and do not arise

---

[68]    Randall Stross, *Wearing a Badge, and a Video Camera*, N.Y. TIMES, Apr. 7, 2013, at BU4.

[69]    *See* 5/16 Tr. at 7521 (Walker).

[70]    *See* Memorandum of Law in Support of Plaintiffs' Request for Injunctive Relief ("Pl. Inj. Mem.") at 15 (collecting agreements).

[71]    *See In re Cincinnati Policing*, 209 F.R.D. 395, 397 (S.D. Ohio 2002) (discussing development of Collaborative Agreement through a collaborative procedure); *Tyehimba v. City of Cincinnati*, No. C-1-99-317, 2001 WL 1842470 (S.D. Ohio May 3, 2001) ("Order Establishing Collaborative Procedure"); Pl. Inj. Mem. at 14; GREG RIDGEWAY ET AL., POLICE-COMMUNITY RELATIONS IN CINCINNATI (2009).

from a settlement, community input is perhaps an even more vital part of a sustainable remedy in this case.  The communities most affected by the NYPD's use of stop and frisk have a distinct perspective that is highly relevant to crafting effective reforms.  No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety.

It is important that a wide array of stakeholders be offered the opportunity to be heard in the reform process: members of the communities where stops most often take place; representatives of religious, advocacy, and grassroots organizations; NYPD personnel and representatives of police organizations; the District Attorneys' offices; the CCRB; representatives of groups concerned with public schooling, public housing, and other local institutions; local elected officials and community leaders; representatives of the parties, such as the Mayor's office, the NYPD, and the lawyers in this case; and the non-parties that submitted briefs: the Civil Rights Division of the DOJ, Communities United for Police Reform, and the Black, Latino, and Asian Caucus of the New York City Council.

If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful.[72]  Neither an independent Monitor, nor a municipal administration, nor this Court can speak for those who have been and will be most affected by the NYPD's use of stop and frisk.[73]  The 2007 RAND report, relied on by the City at

---

[72]   *Cf.* 5/16 Tr. at 7522 (Professor Walker discussing the legitimacy of reforms).  As a general matter, police departments "depend upon public confidence, public trust, and public cooperation."  *Id.* at 7520.  This principle applies no less in the context of stop and frisk.

[73]   *Cf. United States v. City of Los Angeles*, 288 F.3d 391, 404 (9th Cir. 2002) (remanding to the district court for a hearing on the permissive intervention of community groups in a DOJ lawsuit against the Los Angeles Police Department, and emphasizing the importance of not "marginalizing those . . . who have some of the strongest interests in the

trial, recognized the importance of "ongoing communication and negotiation with the community about [stop and frisk] activities" to "maintaining good police-community relations."[74]  It is surely in everyone's interest to prevent another round of protests, litigation, and divisive public conflicts over stop and frisk.

Drawing on this Court's broad equitable powers to remedy the wrongs in this case,[75] I am ordering that all parties participate in a joint remedial process, under the guidance of a Facilitator to be named by the Court.  I hereby order the following specific relief:

1.    All parties shall participate in the Joint Remedial Process for a period of six to nine

months to develop proposed remedial measures (the "Joint Process Reforms") that will

supplement the Immediate Reforms discussed above.  The Joint Process Reforms must be

no broader than necessary to bring the NYPD's use of stop and frisk into compliance

with the Fourth and Fourteenth Amendments.

2.    The Joint Remedial Process will be guided by the Facilitator, with such assistance as the

Facilitator deems necessary and in consultation with the Monitor.

3.    The initial responsibility of the Facilitator will be to work with the parties to develop a

time line, ground rules, and concrete milestones for the Joint Remedial Process.  The

Cincinnati Collaborative Procedure and subsequent DOJ consent decrees and letters of

---

outcome").

[74]      RAND Report at 44.

[75]      The equitable power of district courts to order processes involving community input is well-established.  *See, e.g.*, *United States v. Yonkers Bd. of Educ.*, 635 F. Supp. 1538, 1545 (S.D.N.Y. 1986), *aff'd*, 837 F.2d 1181 (2d Cir. 1987) (ordering the Yonkers public school system to organize "community meetings with minority groups and organizations to solicit support and assistance in the dissemination of magnet program availability"); Pl. Inj. Mem. at 11–13 (collecting cases and scholarship).

intent may be used as models.[76]

4.     At the center of the Joint Remedial Process will be input from those who are most

        affected by the NYPD's use of stop and frisk, including but not limited to the people and

        organizations noted above.  Input from academic and other experts in police practices

        may also be requested.

5.     The Facilitator will convene "town hall" type meetings in each of the five boroughs in

        order to provide a forum in which all stakeholders may be heard.  It may be necessary to

        hold multiple meetings in the larger boroughs in order to ensure that everyone will have

        an opportunity to participate.  The Facilitator will endeavor to prepare an agenda for such

        meetings, through consultation with the various interested groups prior to the meeting.

        The Monitor will also attend these meetings to the extent possible.

6.     The NYPD will appoint a representative or representatives to serve as a liaison to the

        Facilitator during the Joint Remedial Process.

7.     The Facilitator may receive anonymous information from NYPD officers or officials,

        subject to procedures to be determined by the parties.

8.     When the parties and the Facilitator have finished drafting the Joint Process Reforms,

        they will be submitted to the Court and the Monitor.  The Monitor will recommend that

        the Court consider those Reforms he deems appropriate, and will then oversee their

        implementation once approved by the Court.

---

[76]        *See Tyehimba*, 2001 WL 1842470; Pl. Inj. Mem. at 15.  In the interests of
conserving resources and speeding the development of the Joint Process Reforms, the Joint
Remedial Process will not involve the development of an independent analysis by a panel of paid
experts, as proposed by plaintiffs in Pl. Inj. Mem. at 10.  The participants in the Joint Remedial
Process may rely on any sources of facts deemed useful by the Facilitator, including this Court's
findings in the Liability Opinion.

9.      In the event that the parties are unable to agree on Joint Process Reforms, the Facilitator will prepare a report stating the Facilitator's findings and recommendations based on the Joint Remedial Process, to be submitted to the parties, the Monitor, and the Court.  The parties will have the opportunity to comment on the report and recommendations.

10.     The City will be responsible for the reasonable costs and fees of the Facilitator and the Joint Remedial Process.

## III.   REMEDIES IN *LIGON*

In a January 8, 2013 Opinion and Order, amended on February 14, 2013, I granted the *Ligon* plaintiffs' motion for a preliminary injunction, and proposed entering several forms of preliminary relief.[77]  I postponed ordering that relief until after a consolidated remedies hearing could be held in *Ligon* and *Floyd*.[78]  That hearing has now concluded.  The defendants in *Ligon* have submitted drafts of the documents discussed in the proposed relief section of the February 14 Opinion, the *Ligon* plaintiffs have proposed revisions to those drafts, and the defendants have responded to the proposed revisions.[79]

Having reviewed the parties' submissions, I am now imposing the final order of preliminary injunctive relief in *Ligon*.  The reasons for the ordered relief, which must be stated pursuant to Federal Rule of Civil Procedure 65(d)(1)(A), are the reasons stated in the February

---

[77]     *See Ligon*, 2013 WL 628534, at *41–44; *Ligon v. City of New York*, No. 12 Civ. 2274, 2013 WL 227654 (S.D.N.Y. Jan. 22, 2013) (staying the sole immediate relief ordered in the January 8 Opinion).

[78]     *See Ligon*, 2013 WL 628534, at *42.

[79]     *See* 7/8/13 Defendants' Proposed Remedial Relief ("*Ligon* Def. Rem."); *Ligon* Pl. Rem.; 8/2/13 Defendants' Reply Memorandum of Proposed Remedial Relief ("*Ligon* Def. Reply").

14 Opinion.

As set forth in the February 14 Opinion, the relief falls into four categories: policies and procedures; supervision; training; and attorney's fees. Attorney's fees and costs will be rewarded as appropriate on application. With regard to policies and procedures, I am ordering the proposed relief from the February 14 Opinion as elaborated below.

With regard to the remaining two categories of relief — supervision and training — I am ordering the proposed relief from the February 14 Opinion, as restated below, and I am also appointing the Monitor from *Floyd*, Mr. Zimroth, to oversee the detailed implementation of these orders. I am delegating the oversight of the *Ligon* remedies regarding supervision and training to the Monitor because there is substantial overlap between these remedies and the injunctive relief concerning supervision and training in *Floyd*. For example, both sets of remedies will require alterations to supervisory procedures for reviewing stops, as well as the revision of the NYPD Legal Bureau's slide show at Rodman's Neck.

The purpose of consolidating the remedies hearings in *Ligon* and *Floyd* was to avoid inefficiencies, redundancies, and inconsistencies in the remedies process.[80] This purpose can best be fulfilled by placing both the preliminary injunctive relief in *Ligon* and the permanent injunctive relief in *Floyd* under the direction and supervision of the Monitor.

For the foregoing reasons, the Monitor is directed to oversee the City's compliance with the following orders.

A.     **Policies and Procedures**

*First*, as proposed in the February 14 Opinion, the NYPD is ordered to adopt a

---

[80]     *Ligon*, 2013 WL 227654, at *4.

formal written policy specifying the limited circumstances in which it is legally permissible to stop a person outside a TAP building on a suspicion of trespass.  Specifically, the NYPD is ordered to amend Interim Order 22 of 2012 ("IO 22") by deleting the paragraph labeled "NOTE" on page 2 of IO 22,[81] and inserting the following paragraphs in its place:

> A uniformed member of the service may approach and ask questions of a person (that is, conduct a Level 1 request for information under *DeBour*) if the uniformed member has an objective credible reason to do so.  However, mere presence in or outside a building enrolled in the Trespass Affidavit Program is not an "objective credible reason" to approach.  A uniformed member of the service may *not* approach a person merely because the person has entered or exited or is present near a building enrolled in the Trespass Affidavit Program.

> Under the Fourth Amendment to the United States Constitution, a person is *stopped* (temporarily detained) if under the circumstances a reasonable person would not feel free to disregard the police and walk away.  A uniformed member of the service may not stop a person on suspicion of trespass unless the uniformed member *reasonably suspects* that the person was in or is in the building without authorization.

> Mere presence near, entry into, or exit out of a building enrolled in the Trespass Affidavit Program, without more, is *not* sufficient to establish reasonable suspicion for a stop on suspicion of trespass.

The NYPD is ordered to draft a FINEST message explaining the revisions to IO 22 and the need for those revisions.  The FINEST message attached as Exhibit 1 to the *Ligon* Plaintiffs' Brief Concerning Defendants' Remedial Proposals will serve as a model.  The draft will be provided to the Monitor and then to the Court for approval prior to transmission, with a copy to plaintiffs' counsel.

### B.    Remaining Relief

The Monitor is directed to oversee the City's compliance with the remaining

---

[81]     *See* Exhibit A to *Ligon* Def. Rem.

orders discussed below.  Plaintiffs do not object to many of the draft revisions submitted by the City in response to the proposed orders.[82]  Where the parties disagree, the Monitor is authorized to resolve the dispute by submitting a proposed order for the Court's approval.

As a model for resolving the parties' disputes, the Monitor may use this Court's revision of IO 22, as presented above.[83]  In arriving at a compromise between the parties' proposed language, I aimed to articulate the relevant legal standards as *simply* and *clearly* as possible.  The goal must be to communicate the law to officers in a way that will be understood, remembered, and followed.  In general, plaintiffs' proposed revisions to the City's draft materials make the achievement of this goal more likely.[84]  I note that the Monitor may depart from the City's draft materials even when they do not contain legally erroneous language, if doing so would decrease the likelihood of constitutional violations.

### 1.    Supervision

*First*, the City is ordered to develop procedures for ensuring that UF-250s are completed for *every* trespass stop outside a TAP building in the Bronx.  A "stop" is defined as any police encounter in which a reasonable person would not feel free to terminate the encounter.

*Second*, the City is ordered to develop and implement a system for reviewing the constitutionality of stops outside TAP buildings in the Bronx.  Needless to say, any system

---

[82]    *See Ligon* Def. Rem. at Exs. B–F; *Ligon* Pl. Rem. at 4–16.

[83]    For the materials used in drafting the Court's revision, see *Ligon* Def. Rem. at Ex. A; *Ligon* Pl. Rem. at 1–4; *Ligon* Def. Reply at 2–4.

[84]    *See, e.g.*, *Ligon* Pl. Rem. at 7–8 (proposing revisions to the City's draft slide show for officer training at Rodman's Neck to emphasize the "free to leave" standard, where confusion might otherwise arise).

developed must not conflict with the supervisory reforms ordered in *Floyd*. To the extent that supervisory review reveals that a stop has not conformed with the revised version of IO 22 described above, the supervisor will ensure that the officer has a proper understanding of what constitutes a stop and when it is legitimate to make a stop. Copies of all reviewed UF-250s shall be provided to plaintiffs' counsel.

### 2.    Training

The City is ordered to revise the NYPD's training materials and training programs to conform with the law as set forth in the February 14 Opinion. The instruction must be sufficient to uproot the longstanding misconceptions that have affected stops outside of TAP buildings in the Bronx. It must include, but need not be limited to, the following reforms: (1) The revised version of IO 22 described above must be distributed to each Bronx NYPD member, and then redistributed two additional times at six-month intervals. (2) The stop and frisk refresher course at Rodman's Neck must be altered to incorporate instruction specifically targeting the problem of unconstitutional trespass stops *outside* TAP buildings. Training regarding stops outside TAP buildings must also be provided to new recruits, as well as any officers who have already attended the Rodman's Neck refresher course and are not scheduled to do so again. (3) Chapter 16 of the Chief of Patrol Field Training Guide must be revised to reflect the formal written policy governing trespass stops outside TAP buildings described above. (4) SQF Training Video No. 5 must be revised to conform with the law set forth in the February 14 Opinion and must be coordinated with the relief ordered in *Floyd*. The revised video must state that the information contained in the earlier video was incorrect and explain why it was incorrect.

## IV.    CONCLUSION

The defendant in *Floyd* and the defendants in *Ligon* are ordered to comply with the remedial orders described above.  The Clerk of the Court is directed to close the *Ligon* defendants' motion regarding proposed remedies. [No. 12 Civ. 2274, Dkt. No. 112]

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       August 12, 2013
             New York, New York

37

**- Appearances -**

**For *Ligon* Plaintiffs:**

Christopher Dunn, Esq.
Alexis Karteron, Esq.
Taylor Pendergrass, Esq.
Daniel Mullkoff, Esq.
New York Civil Liberties Union
125 Broad Street, 19th floor
New York, NY 10004
(212) 607-3300

Mariana Kovel, Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, NY 10451
(718) 508-3421

Juan Cartagena, Esq.
Foster Maer, Esq.
Roberto Concepcion, Jr., Esq.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

John A. Nathanson, Esq.
Tiana Peterson, Esq.
Mayer Grashin, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-5222

**For *Floyd* Plaintiffs:**

Darius Charney, Esq.
Sunita Patel, Esq.
Baher Azmy, Esq.
Rachel Lopez, Esq.
Ghita Schwarz, Esq.
Chauniqua Young, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439

Philip I. Irwin, Esq.
Eric Hellerman, Esq.
Gretchen Hoff Varner, Esq.
Kasey Martini, Esq.
Bruce Corey, Jr., Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

Jonathan Moore, Esq.
Jenn Rolnick Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0900

**For *Ligon* and *Floyd* Defendants:**

Brenda Cooke
Linda Donahue
Heidi Grossman
Morgan Kunz
Joseph Marutollo
Suzanna Publicker
Lisa Richardson
Cecilia Silver
Judson Vickers
Richard Weingarten
Mark Zuckerman
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1300