UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID FLOYD, *et al.*,            08 Civ. 01034 (SAS)

    Plaintiffs,

-against-                            DECLARATION

THE CITY OF NEW YORK, *et al.*,

    Defendants.

---

## DECLARATION OF JOO-HYUN KANG IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY

I, Joo-Hyun Kang, pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury, state the following is true and correct:

1. I submit this affidavit in support of Plaintiffs' opposition to Defendants' Motion to Stay the Court's Order Regarding Injunctive Relief. I am not a party to the above-captioned case.

2. I have been the Director for Communities United for Police Reform (CPR) since 2012. Among other responsibilities, in this position I coordinate planning and implementation of the coalition's multiple strategies (including policy, legal, community education, organizing, research, communications) to end discriminatory policing; represent the campaign/coalition in meetings with elected officials; serve as a media spokesperson for CPR; provide strategic direction to the member organizations; meet with, organize, and speak to hundreds of community members impacted by discriminatory police practices, including illegal stops and frisks.

3. I have been involved with police accountability issues in New York City since the mid-1990s. From 1996 to 2003, I served as the Executive Director of the Audre Lorde Project, a

community center for Lesbian, Gay, Bisexual, Transgender communities of color. In this capacity I was a founding member of the NYC Coalition Against Police Brutality (CAPB) which included and worked with a wide range of grassroots community organizations committed to police reform. As a founding member of CAPB, I organized, educated, and advocated to end discriminatory policing within lesbian, gay, bisexual and transgender communities of color, and helped to organize community rallies, events and forums aimed at achieving accountability for various cases of police brutality, including the torture of Abner Louima and death of Amadou Diallo in the late 1990s.

4.     I am the co-author of "Organizing at the Intersections: A Roundtable Discussion of Police Brutality Through the Lens of Race, Class, and Sexual Identities", found in Zero Tolerance: Quality of Life and the New Police Brutality in New York City, editors Andrea McArdle and Tanya Erzen, New York University Press, 2001.

5.     Around the year 2007, I worked with other grassroots organizations to co-found the People's Justice coalition following the killing of Sean Bell and other high profile police shootings. People's Justice is a coalition of grassroots organizations committed to educating communities of color about their rights when interacting with police.

**Communities United for Police Reform ("CPR")**

6.     CPR, launched in 2012, is a non-partisan, multi-strategy campaign and coalition to end discriminatory policing practices in New York City. CPR works for lasting change that promotes public safety and policing practices based on cooperation and respect rather than discriminatory targeting and harassment of particular communities.

7.     CPR includes over 60 organizations from across New York City whose members include community members residing in neighborhoods with high crime rates, lawyers,

researchers, and activists. The organizations in our coalition represent community members from all five boroughs, different walks of life and include individuals with family members who are police officers. The majority of our member organizations are grassroots organizations whose constituencies, memberships or clients are based primarily in low-income communities of color. Members of these communities bear the brunt of the New York City Police Department's ("NYPD") unjust stop and frisk policies. This includes organizations that have been leading work on police reform in African American, Latina/o and immigrant communities; organizations representing lesbian, gay, bisexual, and transgender communities; and youth organizations. Notably, young people of color have been documented as those most often impacted by the NYPD's stop and frisk practices.

8. In addition, CPR partners with a broad range of additional organizations to advance our effort to create a safer New York City for everyone. Many of our partners work on behalf of the communities most unfairly targeted by the NYPD's stop and frisk practices.

9. CPR's work is largely focused on police reform, particularly centering on the experiences of those directly affected by discriminatory NYPD policies and practices. Relevant examples include but are not limited to:

    a. CPR organized a citywide coalition of over 100 community organizations, labor unions, advocacy organizations and others to pass two important pieces of legislation in the City Council directly relevant to increasing NYPD accountability: Intro 1079, a local law to create a clear mechanism for NYPD oversight and increased transparency through establishment of an Inspector General, and Intro 1080, a ban on bias-based profiling. The City Council overrode the Mayor's vetoes on both bills.

    b. Our members hold educational and organizing sessions in local communities, including conducting "Know Your Rights trainings" to increase the safety of community members during police encounters and to educate ourselves around issues related to discriminatory policing.

    c. In collaboration with the Center on Race, Crime and Justice at John Jay College of Criminal Justice, we launched a website, www.stopandfriskinfo.org, compiling academic and public policy research on policing.

10. Members of CPR organizations regularly express the concerns of community members impacted by abusive policing practices in many public arenas and media outlets. For example, members have testified about their discriminatory stop and frisk experiences in front of numerous venues, including the New York City Council, at press conferences, at town hall meetings across the city, and in front of the Congressional Black Caucus (CBC), Congressional Progressive Caucus (CPC), Congressional Hispanic Caucus (CHC), and Congressional Asian Pacific American Caucus (CAPAC) in Washington DC. In addition, CPR members have been quoted on policing, police oversight and police reform in the City of New York in media outlets as diverse as Associated Press, The New York Times, the Staten Island Advance, Black Entertainment Television, and Amsterdam News.

11. At different times CPR or its member organizations have been involved in *Daniels v. City of New York* and *Floyd v. City of New York* and have a strong interest in the outcome of stop and frisk reform efforts. On March 3, 2013, CPR submitted a motion for leave to file an *amicus curiae* brief in support of Plaintiffs' remedial proposals in *Floyd*. On August 13, 2013, the Court granted this motion and accepted the brief as filed. (Dkt. # 377.) In addition, on May 16, 2012, the Court granted a request by members of CPR (Bronx Defenders,

4

Brotherhood/Sister Sol, the Justice Committee, Picture the Homeless, and Streetwise and Safe) to submit an *amicus curiae* brief in support of Plaintiffs' motion for class certification. (Dkt. # 208.) Most recently, members of CPR organizations and our partners attended the historic nine-week trial nearly every day. CPR and several of its member groups are committed to play a role in the joint remedy process the Court ordered as part of the injunctive relief in this case.

**Background: Floyd Trial and Decisions in the Context of the Police Reform Movement**

12.     *Floyd* and *Daniels* have been linked to police reform efforts since their initial filing. Members of grassroots organizations have served as class representatives in both cases. Community organizations have filed amicus briefs before this Court when several important motions were filed by Plaintiffs' lawyers. CPR and/or its member organizations mobilized to attend the trial and are committed to play a role in the joint remedy process.

13.     Since the notorious death of Amadou Diallo at the hands of the Street Crimes Unit in the late-1990s, grassroots community organizations have sought reform of the NYPD's stop and frisk practices and an end to discriminatory policing. Even though the Justice Committee of the National Congress for Puerto Rican Rights (a grassroots organization that represented the interests of many New Yorkers illegally stopped, frisked and subjected to excessive force) was an original named-plaintiff in the *Daniels* lawsuit, many were skeptical that a court would be able to address this intractable problem.

14.     Yet, fourteen years later, community members impacted by unjust police practices sat in court each day, listening to weeks of trial testimony, hopeful that they, their family members and their communities would finally obtain justice. This chorus of community observers included mothers and family members of young men shot and killed at the hands of police officers. For community members routinely stopped and frisked, for no reason, witnessing the NYPD on trial for abusive conduct was an important moment in our City's history.

5

15. The *Floyd* trial provided a pivotal moment in the decades-long movement for police accountability in New York City. In my various capacities as a long-time police reform advocate in New York City, I have spoken to a diverse array of hundreds of New Yorkers impacted by stop and frisk practices and other police misconduct. I have had the opportunity of meeting and hearing stories first hand from mothers, siblings, children, grandmothers, and partners of community members who have faced abuse from police officers. I have heard from many of them over the years a feeling that nothing will change the discrimination and abuse they face from police.

16. Community members trusted that the evidence presented in court—mirroring the experiences of many friends, family members and themselves—would lead the Court to determine what has become axiomatic in Black and Latino neighborhoods: NYPD officers stop, frisk, search and use force against large numbers of Black and Latino New Yorkers for no reason other than race.

17. The Court's August 12, 2013 decisions were embraced by CPR and its member organizations as a victory for all New Yorkers, especially for our constituents most affected by illegal stop and frisk practices. The fact that the Court not only acknowledged what we have known and experienced for years, but also put into place a collaborative remedial process that will include input from both law enforcement and community members gives community groups the sense that justice is available to them. The Court's decision has built confidence in the federal judiciary and the ability for the court system to make a difference in the lives of real people. For the legal system to protect marginalized communities is an ideal that many have heard about but few of the most affected community members have actually experienced.

18. At the same time, CPR and its members are not blind to the difficulty of reform and have experienced the recalcitrance and stubbornness of the NYPD. The *Floyd* verdict, along with the recent passage of Intro 1079 and 1080, has created guarded optimism that real reform is possible in the next few years. Members of CPR's community based organizations hope that the injunctive relief ordered in *Floyd* will curtail the NYPD's unconstitutional stop and frisk practices, including racial profiling; create meaningful accountability for rights violations; and increase transparency through the joint remedy process. It is the first step in the path to meaningful reform. Our member organizations understand that change on the scale required here doesn't happen overnight. The community members and organizations I represent are committed, willing and able to engage in the joint remedy process. The collaborative reform process the Court ordered will assist people impacted by illegal stops and frisks become part of the solution, and by doing so, help New York City become safer for everyone.

**Years of Delay will Harm Court Ordered Reform Process and the Public's Interest**

19. The City's motion for a stay is against the public interest for two reasons. First, delaying the reform process for years will eliminate the opportunity for CPR to ensure community input into the joint remedy process by building on the current consensus that stop and frisk practices must be reformed. Second, the court system's interest in protecting marginalized members of the community will seem hollow if a stay is granted. I fear that *Floyd* will become a case of justice delayed is justice denied.

20. Granting a stay will break the existing momentum across the city to change the NYPD's stop and frisk practices. Right now, community members are willing to work with the police department to build back public trust and understand that reform may take time. But

7

justice delayed for years while appeals are decided may turn a positive step towards reform into a victory in name only.

21. CPR and its members believe more than a victory on paper is necessary. The decision to use community knowledge has built confidence among groups whose primary experience of the legal system and policing authorities is distrust. A stay would undermine this confidence and therefore make a truly collaborative reform process less likely to succeed. Granting a stay in many ways would reinforce the NYPD's position that it is an intolerable infringement for them even to engage in a meaningful dialogue with the communities they serve.

22. In addition, a stay which delays the reform process and implementation of concrete change, potentially for years, could lead community members impacted by unconstitutional stop and frisk practices to lose confidence in the Court ordered remedies. I am concerned that a stay will cause young Black and Latino New Yorkers, their mothers and our organizers to lose trust and confidence that the NYPD can ever formally be held accountable for unconstitutional practices. The *Floyd* decision marks one of the few moments in years where I can recall hearing grassroots community members say that real change is possible. As a result of the decision, some believe that someday soon young people will not be thrown against the wall to meet a quota. Others believe diverting resources away from stop and frisk will lead to smarter policing and safer communities. And some await a day when a stop by a police officer doesn't lead to sexual harassment or inappropriate physical conduct. For the community members illegally stopped, frisked and searched every day (and their families and communities), a stay signals that unjust practices can continue with no recourse.

23.     For all of the reasons provided above and interest of justice, CPR strongly urges this Court to deny the City's motion for a stay of its August 13, 2013 opinions and orders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 6, 2013

Joo Hyun Kang