```
D35kflo1
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
DAVID FLOYD, et al.,

                Plaintiffs,

           v.                        08 CV 1034 (SAS)

THE CITY OF NEW YORK, et al.,

                Defendants.
------------------------------x
                                     New York, N.Y.
                                     March 5, 2012
                                     4:30 p.m.

Before:

              HON. SHIRA A. SCHEINDLIN,

                         District Judge
```

*The Clerk of the Court is directed to docket this transcript of the March 5, 2012 conference in Floyd v. City of New York, 08 Civ. 1034.*

*Shira A. Scheindlin, USDJ*
*9/18/13*

```
        D35kflo1
1
1                              APPEARANCES
2
2   BELDOCK LEVINE & HOFFMAN, LLP
3          Attorneys for Plaintiffs
3   BY:  JONATHAN C. MOORE
4        JENN ROLNICK BORCHETTA
4        -and-
5   DARIUS CHARNEY
5   SUNITA PATEL
6        -and-
6   COVINGTON & BURLING, LLP
7   BY:  BRUCE COREY
7        KASEY L. MARTINI
8        ERIC HELLERMAN
8
9
9   MICHAEL A. CARDOZO
10         Corporation Counsel of the City of New York
10         New York City Law Department
11         Attorney for Defendants
11   BY:  HEIDI GROSSMAN
12        SUZANNA H. PUBLICKER
12        LINDA DONAHUE
13        BRENDA E. COOKE
13        MORGAN D. KUNZ
14        LISA M. RICHARDSON
14            Assistants Corporation Counsel
15
15   ALSO PRESENT:
16
16   CHRISTOPHER DUNN, NYCLU
17   ALEXIS KARTERON, NYCLU
17   DAVID B. RANKIN, Law Office of Rankin & Taylor
18   CYNTHIA CONTI-COOK, Stoll Glickman & Bellina LLP
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

D35kflo1

```
 1              (In open court)
 2              THE COURT:  Please be seated.
 3              Mr. Charney?
 4              MR. CHARNEY:  Good afternoon, your Honor.
 5              THE COURT:  Ms. Patel.
 6              MS. PATEL:  Good afternoon.
 7              THE COURT:  Ms. Borchetta?
 8              MS. BORCHETTA:  Yes.  Good afternoon, your Honor.
 9              THE COURT:  OK, yes, Ms. Patel, and then Ms. Martini,
10      yes?
11              MS. MARTINI:  Good afternoon.
12              THE COURT:  Mr. Hellerman?
13              MR. HELLERMAN:  Good afternoon, your Honor.
14              THE COURT:  And are you Mr. Corey?
15              MR. COREY:  Good afternoon, your Honor.
16              THE COURT:  Ms. Grossman?
17              MS. GROSSMAN:  Good afternoon.
18              THE COURT:  Ms. Cooke?
19              MS. COOKE:  Good afternoon.
20              THE COURT:  Ms. Publicker?
21              MS. PUBLICKER:  Good afternoon, your Honor.
22              THE COURT:  Ms. Richardson?
23              MR. RICHARDSON:  Good afternoon, your Honor.
24              THE COURT:  Ms. Donahue?
25              MR. DONAHUE:  Good afternoon.
```

4

D35kflo1

```
 1              THE COURT:  Mr. Kuntz?
 2              MR. KUNZ:  Good afternoon.
 3              THE COURT:  And have we got -- you might as well state
 4   your names for the record.  It's Mr. Dunn and Mr. Karteron?
 5              MR. DUNN:  Yes.
 6              THE COURT:  For the Ligon plaintiffs.
 7              MS. GROSSMAN:  Your Honor, Mark Sugarman, who's on
 8   Ligon, is not here today obviously, but was not aware that he
 9   had to be here, because this was a Floyd trial.
10              THE COURT:  Yes, but the letters raised issues
11   relating that Ligon --
12              MS. GROSSMAN:  We'll try our best.
13              THE COURT:  I'm sure you'll do fine.  You or Ms. Cooke
14   I believe were in the trial.
15              MS. GROSSMAN:  Yes, your Honor, we'll try to address
16   the concerns.
17              THE COURT:  Are there other attorneys here?
18              MR. RANKIN:  Yes, your Honor.
19              THE COURT:  Can you state your name?
20              MS. RANKIN:  David Rankin on behalf of CBR.
21              MS. CONTI-COOK:  Cynthia Conti-Cook on behalf of the
22   Black, Latino and Asian Caucus.
23              THE COURT:  Any other attorneys present?  OK.
24              I'm going to try to deal with what I hope will be the
25   easiest issues first and leave the difficult ones for the end.
```

5

D35kflo1

1   Let me say that I have a letter from the plaintiffs dated
2   February 28th, saying that they're raising a number of matters
3   that they would like the Court to address at the March 5th
4   conference.  I have a letter in response from the city dated
5   March the 4th, and it both responds to plaintiffs'
6   February 28th letter but also raises its own issues that it
7   would like the Court to address at today's conference.
8         I also received a one-page demonstrative exhibit,
9   so-called, from the plaintiffs' side that responds to the
10   city's March 4th letter.  It's not a full response.  Plaintiffs
11   say they would also like to respond orally but that that they
12   think this one-page letter will focus some of the discussion.
13         I received a March 4th letter from the plaintiffs'
14   lawyers in Ligon planning to join in certain objections raised
15   by the Floyd plaintiffs, and I guess we'll get to that as
16   appropriate.
17         Then I received two letters today -- well, one is
18   dated March the 3rd -- I don't think I saw it till today -- and
19   that's from Mr. Rankin, who's here asking to be permitted to
20   file an amicus brief on behalf of organization known as
21   Communities United for Police Reform, which is abbreviated CPR.
22   They would like to submit an amicus brief.
23         And then I received a letter -- again, I received it
24   today, it's dated yesterday -- from Ms. Conti-Cook, who is here
25   on behalf of the Black, Latino and Asian Caucus of the Council

D35kflo1

1    of the City of New York, also asking to submit an amicus brief,
2    but it says "in support of plaintiffs' request to include the
3    community in a collaborative process toward reform."  I don't
4    quite know exactly what issue that is.  Maybe you mean the
5    remedy phase of this trial.
6             So those are the materials I have in front of me.  I
7    always like to list the materials first.  I'd like to start
8    with the question of amicus briefs and see if the city has any
9    position on those briefs.  Let me just look.  The CPR brief, I
10   don't know if it's styled like the other one, something about a
11   collaborative process, but let's see.  Yes, it's also talking
12   about community involvement.  So both of these briefs talk
13   about how nice it would be to have community involvement.
14            What's the city's position with respect to putting
15   these briefs in the record essentially?  And I would of course
16   read them -- they wouldn't just be in the record -- I would
17   read them, but I got the point already; they think the
18   community should be involved.
19            MS. GROSSMAN:  OK, well, we would oppose.  I don't
20   think that it's necessary -- we actually addressed this
21   particular issue at our last conference.
22            THE COURT:  I don't recall.
23            MS. GROSSMAN:  Well, the plaintiffs asked permission
24   to, instead of going into the remedy phase, go into a
25   collaborative process.

D35kflo1

1          THE COURT:  Oh, sure, I remember that, of course.
2     We're not in that position anymore.  You opposed that, and I
3     said I wasn't going to make you.  If you don't want to do it,
4     you don't want to do it.  But this is a different issue now if
5     it's something that I could order as a remedy.  To me, it's now
6     part of the remedies phase.  If these folks want to suggest as
7     a remedy that the Court should order, I don't know what,
8     community involvement in a process or something, I can consider
9     it and in the remedies phase you can oppose that and you can
10    say, for example, you have no power to do it, or you could say,
11    if it's not voluntary, it's not going to be effective.  You can
12    say a lot of things, but I don't have any problem with their
13    asking for me to consider that in the remedy phase.
14         MS. GROSSMAN:  Well, we just got word of this late
15    yesterday.
16         THE COURT:  So did I, actually.  You were ahead of me;
17    I got word today.
18         MS. GROSSMAN:  OK.  And we would like opportunity to
19    address it in writing.  I don't know the jurisdictional --
20         THE COURT:  The permission to submit the brief?  It
21    seems like -- maybe, Ms. Grossman, you have enough to do with
22    your time?  How is it going to hurt me to read these four- or
23    five-page briefs that say we'd like to get a word in if we ever
24    sit down at a table?  It's a no harm done to you.  To
25    reflexively oppose the submission of briefs?  If you want to

8

D35kflo1

1   respond to the brief, that's fine, but to oppose their
2   submitting a brief?  People submit amicus briefs all the time,
3   as you know.
4           MS. GROSSMAN:  Your Honor, we do have a lot of work --
5           THE COURT:  Yes.
6           MS. GROSSMAN:  -- and to be put in a position where we
7   now have to divert our attention to respond --
8           THE COURT:  Only you want to divert your attention.
9   I'm saying, why oppose the request for leave to file the amicus
10  briefs?  Leave.  I'm just saying, you could say, "They can
11  fight it, we would like plenty of time to respond to their
12  briefs, we will respond by April 30th or May something."
13  That's fine.  But to oppose leave to file seems like a waste of
14  your time.  I'm likely to say, I'm going to give them leave.
15  What's the difference?
16          MS. GROSSMAN:  Well, it's really more the substantive
17  response.
18          THE COURT:  Sure.  And that's different.  You can have
19  any date you pick, I would think, through May, to respond
20  substantively, but don't waste time opposing leave.  You don't
21  need to.
22          MS. GROSSMAN:  I'm just saying that, given all that we
23  have to do, to even put in a substantive response when I don't
24  understand why they have jurisdiction at this point --
25          THE COURT:  Amicus people don't need jurisdiction.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D35kflo1

 1    Amicus people write briefs.  Read the Supreme Court docket.
 2    They sometimes get 60 of these things from people who have an
 3    interest.  That's all; it's just an amicus brief.
 4              MS. GROSSMAN:  Your Honor, if that's more reading that
 5    you want to take on --
 6              THE COURT:  It looks short and double-spaced, which
 7    was to its credit.  So I'm going to accept the amicus brief for
 8    reading, but I will allow the city to respond substantively
 9    whenever it gets to it but I would think no later than, say,
10    May 1st.  That seems fair.  There's probably going to be some
11    level of posttrial stuff.  Who knows when this trial will end.
12              MS. GROSSMAN:  Well, your Honor, if we're ending at
13    the end of April, it's not giving us terribly much time, with
14    all the other posttrial briefings to deal with, and that's
15    really my concern, is that --
16              THE COURT:  You have ten people.  If somebody wants to
17    respond to the amicus brief, they can.
18              What is it, Mr. Charney?
19              MR. CHARNEY:  I was just going to say, the defendants
20    already have to respond to our remedies brief which we filed
21    yesterday under your Honor's order.  So --
22              THE COURT:  Does that take some of the same
23    suggestion?
24              MR. CHARNEY:  Yes.
25              THE COURT:  Oh.

D35kflo1

1           MR. CHARNEY:  It seems to me they could respond to
2     both at the same time.
3           THE COURT:  Yes, if it makes the same suggestion.  Is
4     there a due date for them to respond to your remedies brief?
5           MR. CHARNEY:  Currently, it's next week, but I believe
6     they're going to ask for more time.
7           THE COURT:  And I'm sure I'll allow that.  The
8     remedies phase is later.
9           What would you like in terms of that?  He said
10    technically you're supposed to respond to their remedies brief
11    in a week, and you were going to ask for more time.  What would
12    you like?
13          MS. GROSSMAN:  I think we would need 30 days at least.
14          THE COURT:  From?
15          MS. GROSSMAN:  From today.
16          THE COURT:  That's fine.  I'm not going to be able to
17    decide the remedies issue for a long time.  I'm not going to
18    rush you.  So that's done.
19          So you folks don't have to stay unless you wish to.
20          MR. RANKIN:  Thank you very much, your Honor.
21          THE COURT:  You're welcome.
22          I'm going to try to turn to the other issues I thought
23    would be the easier ones and leave the harder ones for later.
24          Here, two that I hope are easy, three even, four.
25    I'll start with the plaintiffs' letter, number 4 through 7.

D35kflo1
 1   Those I thought were relatively easy.
 2           MR. CHARNEY:  Hold on, your Honor.  We have to
 3   remember what we wrote.
 4           THE COURT:  Yeah, I don't blame you.
 5           MR. CHARNEY:  OK.  Points 4 through 7.
 6           THE COURT:  4 through 7.
 7           MR. CHARNEY:  OK, yes, the modification.
 8           THE COURT:  Number 4 has to do with the protective
 9   order.  I read both letters.  The plaintiffs basically say it's
10   now public trial, all bets are off.  The defense says it should
11   be done on a document-by-document and witness-by-witness basis.
12   That's an odd approach to a public trial.  I've tried criminal
13   cases and civil cases for 25 years.  Once you hit the trial
14   stage, there's nothing confidential except maybe a Coca-Cola
15   formula.  We just don't close a courtroom, we don't have
16   confidential trial trumps at all.  What are we going to have to
17   talk about?
18           MS. GROSSMAN:  Well, I think the plaintiffs have in
19   excess of 400 exhibits, maybe above that.  And for us to know
20   what they're actually going to be offering and will ultimately
21   be admitted into evidence, I don't think it's appropriate to
22   just dedesignate as confidential everything on their exhibit
23   list.
24           THE COURT:  No.  When it's used at trial, it's over,
25   it's a public courtroom.  When it's used at trial.  A lot of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

12

D35kflo1

1   cases, a lot of people list a lot of exhibits that they never
2   use.  So I agree with you, I'm not going to dedesignate it
3   because it's listed in the pretrial order.  But once it's used,
4   it's used.
5           MS. GROSSMAN:  Well, your Honor, the protective orders
6   that we negotiated, that you signed, have a process in place to
7   give us advance notice, so that if there are particular
8   concerns that we need to raise with you, they are supposed to
9   give us notice.  And all I'm asking is that they be required to
10  abide by a negotiated protective order --
11          THE COURT:  But they have given you all notice.  All
12  400, they've given you notice that they may use in evidence.
13  Now the only thing that can happen is they actually do it, but
14  the notice is given as to the 400-plus exhibits.  Those are the
15  ones that they have listed in the joint pretrial order that
16  they I guess intend to use, but still at trials people change
17  their expectations and cut back.
18          MS. GROSSMAN:  Well, how about this:  Since we have a
19  six-week trial, perhaps what they can do is, the week before,
20  the first group of witnesses are expected to testify, give us a
21  list of the confidential exhibits a week ahead of time, so that
22  way we can at least assess what's realistically going to be at
23  issue and we can all be efficient and we may not have to raise
24  the issue with your Honor.  But if there's one particular issue
25  that we're concerned about, we want the opportunity to just

D35kflo1
1    make a record, and I think that's a reasonable request.
2              THE COURT:  It may be they know the order of the
3    witnesses.  I read somewhere in these letters you have already
4    said the first 15 witnesses or something.  Is that true?
5              MR. CHARNEY:  15 or 20, although it may be modified
6    now --
7              THE COURT:  What?
8              MR. CHARNEY:  It may be modified, the order, because
9    defendants let us know that one of those witnesses who we
10   wanted is not available till April.
11             THE COURT:  I saw that.  But if you know the first 15
12   witnesses, you should know --
13             MR. CHARNEY:  What exhibits --
14             THE COURT:  Yes, what exhibits you're going to use.
15   All you have to do now is do it by number or something.
16             MR. CHARNEY:  I guess just to be clear, it's one thing
17   to tell them for the first 20 which exhibits may be currently
18   under a protective order, but to have to do it for all 400 by
19   next week is adding a lot of work --
20             THE COURT:  She didn't ask for all 400.  She said a
21   week before the witnesses testified.  So for the first week of
22   trial on March 11th, you would say, during the week of
23   March 18th we expect to offer the following exhibits.  And
24   nobody's going to make you absolutely stick to it.  Trials are
25   fluid things -- things change, things happen -- but at least
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

14

D35kflo1

1   roughly, at least roughly, those are the hundred exhibits that
2   you expect to go in the first week.
3           But I'm warning you, Ms. Grossman, I'm not going to be
4   terribly sympathetic to the notion of confidentiality of a
5   trial exhibit.  We have public courtrooms in this country, open
6   courtrooms.  Read the Second Circuit cases.  It's so, so
7   utterly rare to close a courtroom.  It's usually when an
8   undercover's life is in danger.  That's the best I've seen for
9   a courtroom closure.
10          MS. GROSSMAN:  Your Honor, we're mindful -- we're
11  going to be reasonable, and I just want to be able to make sure
12  we don't make any mistakes with confidential --
13          THE COURT:  Right.  But I'm sort of telling you that
14  the test for confidential is not what it is in the discovery
15  phase.
16          MS. GROSSMAN:  OK, your Honor.
17          THE COURT:  It's a public trial.
18          MS. GROSSMAN:  I understand.
19          THE COURT:  Someone's life would have to be
20  threatened, which is highly unlikely in this case.
21          So I thought that was easy, but we've sort of stalled.
22          MS. BORCHETTA:  Your Honor, can we just have one
23  minute?
24          THE COURT:  Sure.
25          (Pause)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D35kflo1

1           MR. CHARNEY:  That's a good point that Ms. Borchetta
2      made for me.  We understand your Honor's directive.  I guess
3      the part we want to make sure is clear is, we have no problem
4      telling them which exhibits we intend to use during the first
5      week, but in terms of whether or not they are covered by a
6      confidentiality order, we don't think that should be our burden
7      because we're not clear as to what's covered in all times.
8           THE COURT:  OK, tell him what you've got and what you
9      intend to use.  And if they have an issue to raise, they will
10     raise it.
11          MR. CHARNEY:  OK.
12          THE COURT:  Number 5, yes, the trial date is
13     March 18th.  Yes, I always have opening statements in nonjury
14     trials.  I know that's a surprise to you, but I do it in every
15     nonjury trial, because I learn a lot in opening statements.
16     Yes, there can be a time limit:  90 minutes, is that acceptable
17     to the plaintiffs?
18          MR. CHARNEY:  Yes.
19          THE COURT:  I think the defendants suggested not more
20     than 90.  But that's acceptable to plaintiffs too?
21          MS. BORCHETTA:  Yes.
22          THE COURT:  So not more than 90 each.
23          Witness order, there was a little dispute about that.
24     The defendants don't want to agree totally to saying somebody
25     will be called once and only once they sort of say there could

16

D35kflo1

 1   be a need for them to call the same witness in the defense case
 2   or some -- they can't absolutely promise, although I think they
 3   wrote they would make every effort if the witness is here, to
 4   use the witness on their case, so to speak, while the witness
 5   is here.  And I was going to say, had I not ever seen their
 6   letter, that I was hoping you could call the witness once, and
 7   if the plaintiff calls an employee of the city, a police
 8   officer or a high-ranking police officer, that after the direct
 9   is done, you can do the direct and cross together and we'll be
10   done with that person's testimony.  Those people shouldn't have
11   to come twice.
12            MS. GROSSMAN:  Your Honor, that's our hope and our
13   expectation.  However, as you mentioned, trials are
14   unpredictable -- it's hard to know what kind of testimony is
15   going to be elicited -- and if we're not prepared to do our
16   direct at that moment in time, we just want the opportunity, if
17   something new comes up or something we didn't anticipate, that
18   we can call the witness --
19            THE COURT:  I think I'm going to have to say upon a
20   showing of good cause.  In other words, the presumption will be
21   that the person is called once, and for all sides; and you'd
22   have to show good cause to recall the same person.
23            MS. GROSSMAN:  Well, your Honor, in that regard,
24   perhaps the plaintiffs need to give us the documents that
25   they're going to use ahead --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D35kflo1
```
 1              THE COURT:  They are going to.
 2              MS. GROSSMAN:  -- for each witness.
 3              THE COURT:  They are going to.  They just agreed to
 4    that.
 5              MS. GROSSMAN:  Right.  But I'm just saying that each
 6    witness, there will be a series of exhibits that will be
 7    necessary to be used per witness?
 8              THE COURT:  Yes.
 9              MS. GROSSMAN:  So beforehand, if the week before, if
10    they can give us the list, that way, we can make our best
11    efforts to make sure that we call our witness once on those
12    particular documents.  But we just want to know that ahead of
13    time so that we can do our best to anticipate what we need to
14    develop.
15              THE COURT:  I understand.  As long as -- there's no
16    preclusion here.  They will make their best efforts the
17    previous week to say, here are our first ten witnesses and here
18    are the exhibits we intend to offer through each one of them.
19    That said, if we need to offer another exhibit that wasn't on
20    the list, we'll all roll with the flow, so to speak.  It will
21    work out.  So it's not a preclusion but it's a best efforts.
22    So we should do it that way.  You were planning to tell them,
23    pursuant to my last order, what exhibits are coming in next
24    week.  Surely you can do that only by knowing which ones for
25    which witness.  And if they say that will help them get
```

D35kflo1

1   organized to try to only bring that person in once, that's
2   better for me.  I don't want this to be longer than it has to
3   be.
4             MR. CHARNEY:  Yes.
5             THE COURT:  It's hard to focus one's attention for six
6   solid weeks on one case in a nonjury setting.  So, no, I don't
7   want to lose focus.
8             MR. CHARNEY:  Your Honor, we completely agree with
9   you; that makes perfect sense.  I guess the only thing we would
10  ask is that it go both ways, that the defendants --
11            THE COURT:  Yes, when the time comes, they will tell
12  you what exhibits they intend to use with their witnesses.
13            MR. CHARNEY:  So with respect to when the time comes,
14  what does that mean exactly?
15            THE COURT:  That's a fair point.  Let's say a
16  high-ranking police officer, a high-ranking executive, of the
17  police department is called on the plaintiff's case, and
18  because of that person's rank and importance you don't want to
19  trouble him or her twice either, so -- I'm talking to
20  Ms. Grossman, actually.  You're nodding, but I'm talking to
21  Ms. Grossman.
22            MR. CHARNEY:  Sorry.
23            THE COURT:  -- you don't want to trouble this
24  high-ranking person twice if you can help it either, so if you
25  intend to use a different 40 exhibits while you have that

D35kflo1

1  person here, you -- Ms. Grossman, you -- should tell the
2  plaintiffs so that everybody knows what exhibits each other are
3  going to use.
4        MS. GROSSMAN:  Your Honor, this is to accommodate one
5  witness where we're -- on the defense.  So I can't --
6        THE COURT:  Sorry, this is to accommodate what?  Just
7  repeat what you said, please.
8        MS. GROSSMAN:  Let me -- just give me a moment.
9        The approach that we're suggesting is so that we
10 accommodate the Court and the plaintiffs' request to call a
11 witness once.
12       THE COURT:  It's actually beneficial to that
13 high-ranking person.  Believe me, you go around telling me for
14 years that so-and-so is too important to be deposed or too
15 important to be deposed twice or two different days, because
16 they've got very important city business to do, which I
17 respect; they shouldn't be coming to court twice if it can be
18 helped, for their sake too.  So what I'm saying is, if when
19 they're here on the plaintiffs' case you get up and essentially
20 do your direct, so they don't have to come back to court, you
21 should tell the plaintiffs what documents you're going to use
22 on that direct.  That's all.
23       MR. CHARNEY:  And will they do it in advance?  I guess
24 that's the concern.
25       THE COURT:  Sure, in other words, if some deputy

20

D35kflo1

1   inspector is coming in or some borough commander and they're
2   going to be testifying essentially on your direct case,
3   Ms. Grossman, because they're here, it's efficient, I don't
4   want them back and you shouldn't want them back, just tell the
5   plaintiff what documents you intend to offer through that
6   witness.
7           MS. GROSSMAN:  Can you give me a moment?
8           THE COURT:  Sure.
9           MR. CHARNEY:  I guess my only -- I'm sorry --
10          THE COURT:  She asked is for a moment, so we're not
11  supposed to be talking.
12          MS. GROSSMAN:  I can't listen and talk at the same
13  time.
14          THE COURT:  I agree, Ms. Grossman.  I don't need your
15  help.  That's just what I told them.  I said please don't talk
16  because she asked for a moment and she's conferring.  I told
17  him not to talk.
18          MS. GROSSMAN:  OK.
19          (Pause)
20          MS. GROSSMAN:  Your Honor, given that the plaintiffs
21  are going to be calling the city's witnesses on their direct
22  case, and we are not in control of the way that we want to
23  present our defense because we are expected to develop our
24  direct through the order of witnesses that the plaintiffs
25  determine, there may be occasions where the witnesses would be

D35kflo1

1   taken out of order in a way that the documents and exhibits
2   that we want to offer may necessitate us recalling someone back
3   at a later time when we can't anticipate it.
4          THE COURT:  Because you're worried there might be an
5   evidentiary objection that you want to use a document with the
6   witness but the witness can't authenticate that document or
7   something like that?  I suspect if that's your worry,
8   plaintiffs are going to be pretty flexible about that.  If they
9   know it's going come in through another witness and you want to
10  use that document with the current witness, I don't think
11  they're going to say you can't use that document because it's
12  not yet in evidence.  That's crazy.  If they know it's going to
13  come in through a later witness, it's a waste of time.  There
14  is not a jury; we're not going to fool around with that.  Go
15  ahead.
16          (Pause)
17          MS. GROSSMAN:  I just want to clarify.  I think I
18  covered this, but I just want to make sure:  I want to be clear
19  that if something unexpected and that we didn't anticipate does
20  get developed, that we are able to call that witness back on
21  our case in chief.  If we don't want to, we don't have to, but
22  if we --
23          THE COURT:  But I said before, upon a showing of good
24  cause you can, but I think you'd have to make a showing why you
25  couldn't have gotten it done the first time.  And you may be
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

D35kflo1

```
 1   able to easily.  You may say because their 20th witness raised
 2   something that their first witness, who's now our witness,
 3   couldn't have known was going to get raised.
 4               MS. GROSSMAN:  Exactly.
 5               THE COURT:  So fine.  That's good cause.  But
 6   basically I'd like you to try to bring people in once and not
 7   twice.  I don't want this trial longer than it needs to be, and
 8   I don't want your witnesses inconvenienced.  So let's get back
 9   to the exhibits.
10               Let's say -- I'm going to make up a name, I don't
11   know -- Inspector Jones is going to be the first witness, and
12   they tell you that, and they tell you they're going to use the
13   following 50 exhibits.  If you know that with Jones you want to
14   offer 20 exhibits, tell them which exhibits you want to put in
15   through Jones so that, just like they are telling you the
16   exhibits, you tell them the exhibits.  It's a direct exam, it's
17   a cross and a direct together, and then we're done with Jones
18   hopefully.  But then if the 30th witness raises something that
19   Jones should respond to, I'm sure I'll let you recall Jones.
20               MS. GROSSMAN:  Your Honor, I understand what your
21   ruling is.  I do object, though, because (a) we are --
22               THE COURT:  OK, objection overruled.
23               MS. GROSSMAN:  I need to make a record --
24               THE COURT:  Just do it.
25               No, I cannot let you make a record.  I control the
```

23

D35kflo1

1   record.  It's 5:00 o'clock.  We need to keep moving.  We have
2   many issues to cover.  No, I can't let you do that.  This is
3   what judges do all day; they organize trials, they make
4   rulings, and people get along and they don't object to
5   everything and they don't disagree on everything, and we get
6   through big trials all the time, trial lawyers work together.
7   So I'm just saying, do it, tell them the exhibits that you're
8   going to use on your direct of Inspector Jones, who's a
9   hypothetical person.
10           What is it, Mr. Charney?
11           MR. CHARNEY:  I'm sorry, I know we've got to move on.
12   I want to be clear on the timing.  So if we're at the beginning
13   of a week giving them all the exhibits for the witnesses for
14   that week --
15           THE COURT:  Right, next Monday, the 11th, when you
16   tell them, here are our first ten witnesses and here are the
17   200 exhibits those ten will put in, you know, 72 hours later
18   they should say to you, that's fine, with Jones we're going to
19   put in the following 20 -- I don't want to say "Smith" -- with
20   Brown, with Brown --
21           MR. CHARNEY:  There's a Brown on our list too.
22           THE COURT:  OK.
23           -- with Brown we're going to put in the following 30
24   exhibits and with Red we're going to put in the following 20
25   exhibits.  They need to get back to you what they're going to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

D35kflo1

1      put in with that witness.
2                   MR. CHARNEY:  Your Honor, that cannot being done in
3      that way.
4                   THE COURT:  Well, then you'll be in contempt.  That's
5      the way I've structured this trial.  You are directed to do it.
6      Once you know who the witnesses are next Monday --
7                   MS. GROSSMAN:  We are severely prejudiced by that --
8                   THE COURT:  You know how often you say that,
9      Ms. Grossman?  You really say it every day --
10                  MS. GROSSMAN:  It's true, we are.
11                  THE COURT:  I'm sorry you feel that way.  I need to
12     move on.  I'm sorry you feel that way, deeply sorry.
13                  MS. GROSSMAN:  I know.
14                  THE COURT:  I don't know how it is I manage to try the
15     other 25 years of cases, I really don't.
16                  So we've taken care of number 5.  And now we're up to
17     number 6.
18                  Number 6 involves the declaration of the Civil
19     Liberties Union.  I thought that was easy but it's not,
20     apparently, because the Civil Liberties Union doesn't have a
21     witness who can actually remember sending this to the city.
22     But in the Exhibit B article attached, I thought there was some
23     person from the city who essentially acknowledged it by
24     commenting on it.  Let's see.
25                  Oh, yes, my goodness, it was "Police Commissioner
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

D35kflo1

1  Kelly dismissed the findings yesterday, calling the analysis
2  flawed."  And then other people made comments.  But I don't
3  know how this person could have commented on a report he never
4  saw.  So the only remedy is, I guess we'll have to call
5  Commissioner Kelly to admit that he saw it at or about that
6  time because he says, in a newspaper article, it was flawed.  I
7  guess he saw it.
8          Do you really want to have do that?  Clearly, the
9  police department got it.  They have comments saying it was
10 flawed.
11         MS. GROSSMAN:  Actually, my understanding is that if
12 you read the article --
13         THE COURT:  I did.
14         MS. GROSSMAN:  -- it's not referencing -- apparently
15 this refers to the Civilian Complaint Review Board issued a
16 report and the New York Civil Liberties Union is issuing some
17 sort of criticism based on the CCRB report.  And my
18 understanding is that the comments from the police are more at
19 a press conference, some press person inquired --
20         THE COURT:  I know the quote that they give to Kelly
21 is, "They are going to bash us every chance they get."  Who do
22 you think the "they" is in that sentence?
23         MS. GROSSMAN:  What I'm saying --
24         THE COURT:  Who do you think the "they" is in that
25 sentence?  I don't think it was the CCRB.

D35kflo1

```
 1              MS. GROSSMAN:  I am saying that --
 2              THE COURT:  Could you answer my question:  Who do you
 3    think the "they" is in that particular sentence, "They are
 4    going to bash us every chance they get"?
 5              MS. GROSSMAN:  Well, I don't know what -- the reporter
 6    is issuing this quote.  I don't know that this quote is
 7    accurate --
 8              THE COURT:  I agree with you.  Wait a minute, I agree
 9    with you that quotes from reporters are often not accurate.
10    Assuming for the sake of argument, hypothetically, that the
11    quote is accurate, who do you think the word "they" refers to?
12              MS. GROSSMAN:  I think you could -- I don't know.  I
13    can look at the reading.  The words say, "he said of the civil
14    rights group."  So that I understand if there was any comment,
15    it was based on an inquiry from a press person, not based on
16    the report, just a question that was asked.  And so it doesn't
17    establish notice of a report --
18              THE COURT:  You really don't give an inch.  I ask you
19    who the word "they" refers to in your view, and you don't want
20    to answer me.  So that's OK, Ms. Grossman.  "They" clearly
21    refers to the Civil Liberties Union, not the CCRB.  I'm
22    convinced.  That doesn't mean the reporter got the quote right.
23    I get that.  Reporters often get quotes wrong, but assuming
24    hypothetically the quote is correct, the word "they" refers to
25    the Civil Liberties Union.
```

D35kflo1

1          MS. GROSSMAN:  But that's not referring to the report.
2     It's saying, the Civil Liberties Union bashes the police
3     department all the time, which is what some people perceive to
4     be the case.
5          THE COURT:  That's right.  So it's referring to this
6     report.
7          MS. GROSSMAN:  No, it isn't, it isn't necessarily.
8     It's referring to some comment from a press person.
9          THE COURT:  You're right that is not necessarily the
10    case.  But all the evidence would point to the fact the report
11    was received.  If you want to contest that that report was
12    received, then apparently the commissioner is going to have to
13    come in.  I will allow him to be called by the plaintiffs to
14    say did the police department receive this report at or about
15    this time and comment on it.  I hope -- I'm sure he's going to
16    tell the truth under oath.  So we'll see what he says, and no
17    deposition allowed.  Just bring the man in.  If it's going to
18    be such a big deal to show that this report was received, when
19    obviously the police department is commenting on the report and
20    not happy about it, OK, we'll do what we have to do.
21         MS. GROSSMAN:  I just don't think this meets the rules
22    of evidence in terms of --
23         THE COURT:  Wait a minute.  I told you I agree with
24    you.  But the only remedy left, if you don't wish to just say
25    it's enough for me, here's this news article, if you don't want

D35kflo1

```
 1  to say that voluntarily, then bring in -- I'm going to allow
 2  the plaintiffs to subpoena the police commissioner or whoever
 3  else at the department, to say that they saw the report at or
 4  about the time and basically didn't agree with a word of it,
 5  but saw it.  Somebody there can say so, and it seems like it's
 6  the commissioner.
 7             MS. GROSSMAN:  Well, if I can just tell you that -- if
 8  I can put something in that the police commissioner did not see
 9  the report, is that going to resolve this issue and then --
10             THE COURT:  I doubt it.
11             MS. GROSSMAN:  -- and then we don't have a piece of
12  evidence that is a newspaper article?
13             THE COURT:  The newspaper article is not good.  It
14  doesn't do the trick, in terms of the rules of evidence.  I
15  can't accept a newspaper article.  I thought you might -- when
16  you read the article, it's apparent that the police department
17  is commenting on the report.  But you're right, from a legal
18  evidentiary perspective, that won't work.
19             So if you don't wish to accept it -- you could go back
20  to your client and say, read this newspaper article, you know
21  you received it, didn't you, but if you don't want to agree
22  that it was received by the police department, then I have to
23  allow them to call anybody they want from the police department
24  to prove that they got the report at or about the time.
25  Because it seems to me, commonsensically, somebody there got
```

29

D35kflo1

1  the report.  Not because I'll receive that as a matter of
2  evidence law.  I have to agree with you, as evidence law, I
3  can't take that.  But if you want to be convinced by it and
4  just agree they received it, that's fine.  If you don't, then
5  we'll waste time calling high-level police people.  I don't
6  know whether it's the press department or the commissioner or
7  the deputy commissioner -- I don't know how many witnesses
8  we're going to have to call to find out -- but it seems to me
9  obvious they received the report.  If it's not obvious to you,
10 it's not obvious to you.
11          MS. GROSSMAN:  That's not the case, your Honor.
12          THE COURT:  What's not the case?
13          MS. GROSSMAN:  I do not believe that is the case.
14 And --
15          THE COURT:  Wait a minute.  You don't believe it was
16 ever received by the police department?
17          MS. GROSSMAN:  This is about the --
18          THE COURT:  Forget the article.  Do you really not
19 believe this report was received by the police department and
20 somebody forwarded it to them sooner or later?  Whether it was
21 the CCRB the ACLU, you don't think it got to the police
22 department, the report?
23          MS. GROSSMAN:  This issue came up because we objected
24 to it, and you asked for an affidavit --
25          THE COURT:  I did.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D35kflo1

1               MS. GROSSMAN:  -- simply, and they can't produce it.
2               THE COURT:  They can't produce it.
3               MS. GROSSMAN:  And now that should be the end of this
4       issue.
5               THE COURT:  No, not at all.  They can try to prove up
6       the receipt.  Why is it the end of the issue?  They can try to
7       prove up the receipt.  All I'm doing is agreeing with you, they
8       can't do it through this article.  But you could be
9       commonsensical and look into it and decide that of course
10      somebody in the police department received it.
11              MS. GROSSMAN:  Well, your Honor, if a low-level
12      person -- I don't even know if this is the case, but if a
13      person who happened to at a low level received it --
14              THE COURT:  I assume that low-level person, if that's
15      the case, forwarded it to the proper people.  Whether it's the
16      legal department, the commissioner, I have a funny feeling this
17      is much ado about nothing, but if they want to spend weeks
18      trying to prove this receipt up, they can.  I can't stop them.
19      All I do is agree with you that they can't do it through this
20      newspaper article.  I only read it to say, common sense tells
21      me it had to be received by the police department since they're
22      commenting on it.  But if you don't think so, you don't think
23      so.  I'm not going to take judicial notice through a newspaper
24      article.
25              MS. GROSSMAN:  OK, your Honor.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

D35kflo1

1          THE COURT:  No, I already told you that, but I'm not
2     going to prohibit the plaintiffs from work on this issue and
3     figure it out.
4          And that goes for you, Mr. Dunn:  If you can track
5     down somebody at the Civil Liberties Union, after all, who
6     knows it was sent there, keep looking, because it would save
7     time.  If you can't, you can't.  If you can, you can.
8          Otherwise, Mr. Charney and your crew, you're going to
9     have to find a way to prove that the police department received
10    it, and it can't be this news article.  I agree, this news
11    article is generalities and vague and confusing and la-la, OK.
12         All right?  So we've taken care of that issue.
13         Now, incorporation of the Ligon record:  The
14    plaintiffs want to incorporate the entire record.  Defendants
15    oppose that.  I will look at the exact part of that.  Hold on.
16    Yes, there was.
17         You write, "Some of the evidence is irrelevant and
18    inadmissible and therefore prejudicial."  And you drop a
19    footnote saying, "Here, the testimony by plaintiffs' witnesses
20    concerning experiences of their friends should not be admitted
21    in Floyd."  And I will stop quoting.
22         So I agree with you, but that doesn't mean that most
23    of that record shouldn't come in.  If there's any part that
24    should be excluded as inadmissible hearsay, fine, but there's
25    an awful lot of it that should come in.  Surely the hours and

D35kflo1
```
 1   hours spent by your high-level police people defending the
 2   policy shouldn't have to be repeated.  It's a nonjury trial,
 3   it's there, I remember some of them.  In fact, it's all over
 4   the letters that we've just received.  I don't know who they
 5   were.  I guess it was -- oh, it was Catalina, Lehr, McCarthy,
 6   O'Keefe, and Sweet.
 7            Why would you object to their Ligon testimony being
 8   incorporated here?
 9            MS. GROSSMAN:  It may be that we can incorporate that
10   piece, but we shouldn't be precluded from calling those
11   witnesses on our case in chief.
12            THE COURT:  Not if they're going to repeat what I have
13   heard.  I have a transcript, I heard it.  Can you imagine if
14   you took the transcript and asked the same question and got the
15   same answer?  Why would you do that?
16            MS. GROSSMAN:  No, your Honor, clearly there is -- the
17   Ligon case was very narrow --
18            THE COURT:  Yes.
19            MS. GROSSMAN:  -- and this is a lot larger.
20            THE COURT:  I agree.
21            MS. GROSSMAN:  So we don't have --
22            THE COURT:  Wait, wait, I agree with you.  You can ask
23   more questions, but I would ask you not to repeat what's in
24   black and white in the transcripts but instead agree with
25   plaintiffs that, "Inspector Sweet, the testimony you already
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D35kflo1

```
 1  gave is in the record, so I want you to understand that.  Now
 2  I'm going to ask you additional questions that were not asked
 3  of you then.  Do you understand that?"  And you can also say,
 4  "Did you review your testimony there?  Are you familiar with
 5  what you said?"  And he will hopefully say yes.  And you can
 6  say, "Now I want to ask you a whole series of questions that
 7  weren't asked there but I do want you to understand that what
 8  you were asked and answered there is part of this record."  I
 9  don't want to sit here and hear him say the same question and
10  answer.  Neither should you want to.
11             MS. GROSSMAN:  Well, then that goes for the
12  plaintiffs.  They need to look at the testimony and not
13  redevelop and cross our witnesses on some --
14             THE COURT:  Nobody should ask the same questions and
15  answers that were already in the record.  But obviously if you
16  asked a half hour of new material of Inspector Sweet, that's of
17  course fair ground for cross-examination, but I don't want to
18  repeat questions and answers that I have in front of me on
19  paper black in white.
20             MS. GROSSMAN:  Well, your Honor, as to the witnesses
21  that will be called in Floyd who also testified in Ligon, we
22  can try to figure out a plan with respect to those witnesses.
23             THE COURT:  Right.
24             MS. GROSSMAN:  But the documents and the other
25  witnesses relating to Ligon that are not witnesses identified
```

34

D35kflo1

 1    in Floyd should not be --
 2             THE COURT:  You mean like the individual plaintiffs;
 3    is that what's bothering you?
 4             MS. GROSSMAN:  That, among other things.  There were
 5    the district attorney testimony, the decline-to-prosecute.  I
 6    don't see where that belongs in this case.  And the individual
 7    plaintiffs and --
 8             THE COURT:  Let's talk about the individual plaintiffs
 9    first before we get to the district attorney --
10             MS. GROSSMAN:  Can I just have one moment to confer?
11             (Pause)
12             MS. GROSSMAN:  Your Honor, just so that the Court
13    knows, the witnesses Shea and Hall, who testified -- Chief Shea
14    and Chief Hall, who testified in Ligon, the plaintiffs are not
15    opposing because --
16             THE COURT:  Are not opposing?
17             MS. GROSSMAN:  They don't object --
18             THE COURT:  Oh.
19             MS. GROSSMAN:  -- to a limitation.
20             MS. BORCHETTA:  Your Honor, if I may interject quickly
21    to clarify something:  We object to the five witnesses who
22    testified in Ligon that you have just mentioned --
23             THE COURT:  Right.
24             MS. BORCHETTA:  -- on other grounds, which I believe
25    is the issue that your Honor is leaving for later in the

D35kflo1
```
 1   comments.
 2              THE COURT:  Correct.
 3              MS. GROSSMAN:  What I'm saying is that --
 4              THE COURT:  Well, actually you wrote, "Plaintiffs seek
 5   to limit, not preclude, the following."
 6              MS. BORCHETTA:  We're limiting them to the Ligon
 7   testimony.
 8              THE COURT:  Oh, that's your theory?  Well, I won't do
 9   that.  We'll get to that, but I won't be doing that.  But go
10   ahead, Ms. Grossman.
11              MS. GROSSMAN:  Well, if you're not limiting --
12              THE COURT:  Because you already made the point.  You
13   may have more questions that didn't come up in Ligon that
14   should come up in Floyd, because this is a street stop case,
15   it's not limited to trespass.  Lots of differences.  I don't
16   want you to take the transcript and ask the same questions and
17   answers that we already have.
18              MS. GROSSMAN:  So the same should apply to other
19   witnesses who testified in Ligon -- Chief Shea and Chief
20   Hall -- where the plaintiffs, when they present, should rely on
21   the testimony --
22              THE COURT:  Right, they should say the same thing.
23   They should say, "You testified in this other action, I assume
24   you've reviewed your testimony, I'm now informing you that that
25   testimony is in this record in full, but I have some more
```

36

D35kflo1

```
 1  questions for you."  And that's fine.
 2              MS. GROSSMAN:  OK.
 3              THE COURT:  Now, let's go back to the individual
 4  plaintiff.  Let's turn to the individual plaintiffs who
 5  testified in Ligon.
 6              What's the problem with them, with their testimony
 7  being part of this record?  Those are street stops, all outside
 8  stops --
 9              MR. CHARNEY:  And they're also members of our class.
10              THE COURT:  Yes, they're outside stops.  You remember
11  the day, Mr. Willet or some plaintiff I precluded here because
12  it was in the building and I didn't want to get involved with
13  rules of what goes on in housing authority buildings, so I said
14  no to that particular fellow.  I don't remember his name, but
15  these were all outside stops.
16              MS. GROSSMAN:  Well, a lot of testimony came in by
17  these plaintiffs about arrests.  And you precluded and narrowed
18  this case to the circumstances surrounding the stop, not the
19  arrests and events that occurred post stop.  You've narrowed
20  the trial here to what gave rise to the stop, not for events
21  that occurred after.
22              And there's a lot of -- then there was talk about the
23  emotional effect.  This was testimony developed in Ligon?
24              THE COURT:  I thought I took that out of Ligon too.
25              MS. GROSSMAN:  No, there was testimony elicited and
```

                                                                    37
          D35kflo1
  1    developed that goes to the impact that this had.
  2             THE COURT:  Well, this is not a damages case.  That's
  3    why we don't have a jury.  So you're right, that any emotional
  4    impact isn't part of this case; we don't have a damages claim
  5    anymore.  So what you need to do with that transcript is say,
  6    we are offering all of the testimony of the individual
  7    plaintiffs except for pages 30 through 40 of this plaintiff or
  8    50 through 70 of that plaintiff.  Get rid of those pages.
  9    That's all.
 10             MS. GROSSMAN:  Well, your Honor, may I just make a
 11    suggestion:  The amount of time that it will take to now comb
 12    through these transcripts and register the right objections, I
 13    don't know that it's essential that we have this done in the
 14    next two weeks.
 15             THE COURT:  That's fair too, but I'm going to be
 16    taking those individual plaintiffs' pages eventually once
 17    there's time for them to do it.  I don't want these people
 18    coming in here live again.  I saw them once; I don't want to
 19    see them again.  So the pages that just describe the street
 20    stop will come in.  I agree with you, you don't need to figure
 21    out the pages now when you're busy.  Not important.
 22             MS. GROSSMAN:  I guess the question --
 23             THE COURT:  Before the record closes.
 24             MS. GROSSMAN:  What's the value of adding this to
 25    Floyd when you already had a Ligon hearing?  What's the
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

D35kflo1
1    purpose?
2              THE COURT:  They're street stops.
3              MS. GROSSMAN:  I know, but the street stops were
4    covered in another proceeding --
5              THE COURT:  So what?
6              MS. GROSSMAN:  Why add the same record to this?
7              THE COURT:  Ms. Grossman, I don't need to answer your
8    questions.  That's the difference in our role:  You need to
9    answer every one I ask you but I don't need to answer the ones
10   you ask me.
11             I have decided they're street stops, they're coming
12   in.  But you don't need to figure out the pages now.  I agree
13   with you on that.  There's plenty of time down the road to add
14   the pages in, but these are street stops?  Nothing wrong with
15   them.  They don't have to trot in 11 more individuals that I
16   don't need to see them.  I saw them and practically memorized
17   what they said in writing the findings of fact.  So I know
18   these people, I don't need to hear that again.  So you can do
19   it whenever you get around to doing it.  There's no rush.
20             Now, the DA, Mr. Charney, why is she relevant to this
21   case or the decline-to-prosecute?  Because that was trespass,
22   and she had a particular thing about trespass affidavit
23   program, trespass buildings, and explaining to the police that
24   it wasn't enough just to be entering or exiting a TAP building.
25   That's not what this case is about, so why should we take her
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D35kflo1
 1   here?  Why should that part of the transcript not be excluded?
 2           MR. CHARNEY:  I'll tell you why we think it's
 3   relevant.  It's relevant to a very discrete issue in this case
 4   around -- actually, you may be interested in Professor Fagan.
 5   The reason we think it's relevant is, there is a big dispute,
 6   which you are going to hear a lot about at trial between the
 7   experts, over which benchmark to use in this case.  And in
 8   terms of that benchmark, the city is going to put in evidence
 9   in which they are using arrest data along with reported crime
10   data to try to figure out the identity of criminal suspects.
11   And part of that arrest data includes arrests for trespass.
12           And one of Professor Fagan's critiques, which you're
13   going to hear about as to why that's an unreliable way to
14   determine who the criminal suspects are, is because of this
15   exact issue that the DA testified about, which is that in
16   trespass arrests there is a very high level of
17   decline-to-prosecutes because those arrests were, in the DA's
18   view, invalid.
19           So we think that particular issue is germane to part
20   of his critique.  Again, we don't have to call the DA to say
21   it.  We wanted to rest on her testimony --
22           THE COURT:  I think just the opposite.  If it's for a
23   very limited purpose, to make the argument you're making, then
24   I would let her come in again and just limit it.  But to let
25   her say all that she said, which doesn't relate to this case,

D35kflo1

1  and put it in this record is really padding the record
2  unfairly.  It's just nothing --
3          MR. CHARNEY:  Alternatively --
4          THE COURT:  Call her, call her for the limited purpose
5  that you're explaining -- and you would do that after this
6  expert dispute -- just to say what you said, that it's not
7  reliable because in her view trespass arrests were invalid
8  arrests or something.  It should take her ten minutes.  But I'm
9  not going to put in her 200 pages.
10         MR. CHARNEY:  I agree with you.  We were wondering if
11 the portion of her testimony that dealt specifically --
12         THE COURT:  You can try to identify those pages and
13 show it to the city.  If you both agree that those pages
14 encapsulate your single point, and I don't need to see her live
15 and all that -- I certainly don't need to judge her credibility
16 again -- that's fine if you can agree.  If not, call her live,
17 and hopefully ten minutes.  But I don't want the 200 pages in
18 that are not part of this case.
19         MS. GROSSMAN:  Your Honor, frankly, this is the first
20 we're hearing of this.  So we now reserve the right to call a
21 witness that's going to rebut that.
22         THE COURT:  That's fine.  That's fine.  Call a witness
23 to rebut it, that's fine.  You're welcome to do that.  No
24 problem.
25         MS. GROSSMAN:  If I need to find documents that refute

D35kflo1

1  that, then I'm going to have to do that too, and I can't be
2  accused of late production.
3          THE COURT:  Don't worry about what you're going to be
4  accused of.  Just deal with today.
5          In any event, try to figure out what pages, if you
6  can; and if not, you'll call her.  But I don't want her whole
7  testimony, because I don't think it's relevant to this case.
8          MR. CHARNEY:  Of course.
9          THE COURT:  We talked about her, we talked about the
10  individual plaintiffs, we talked about the city witnesses.
11          Anything else that was in that transcript?
12          MS. GROSSMAN:  The experts were in the transcripts --
13          THE COURT:  They don't need them because they're
14  calling them here.
15          MS. GROSSMAN:  Right.
16          THE COURT:  So they don't need to put that portion of
17  the transcript in for either side.
18          MS. GROSSMAN:  We'd have to determine on a
19  case-by-case basis --
20          THE COURT:  I don't think there's anybody else.
21          MS. GROSSMAN:  Plaintiffs would need to show us --
22          THE COURT:  Yes, but I think we've covered the
23  categories -- the individual plaintiffs, Rucker, the experts,
24  and the police officers and higher-level police people.  That's
25  what the trial was.  And I have ruled on all of them one by

42

D35kflo1

1    one.
2              MS. GROSSMAN:  There might have been, on attempts to
3    identify --
4              THE COURT:  Oh, that one witness -- yes, OK, there's
5    one other witness.  I remember this fellow.  There was a police
6    witness who said he tried to locate officers on stops.
7    Remember that?
8              MS. GROSSMAN:  Yes.
9              THE COURT:  No, no, they're talking without asking to.
10   It's very disconcerting.  I've asked you to say can we have a
11   moment.
12             But in any event, there was a person who said, "I
13   tried to identify police officers who might have been present
14   at the stop, and here's why I couldn't."  And I wrote about
15   that in my opinion.  Do you want that guy?
16             MS. PATEL:  Can we have a moment, your Honor?
17             THE COURT:  Sure.
18             MS. GROSSMAN:  Your Honor --
19             THE COURT:  Now they're conferring.
20             (Pause)
21             MR. CHARNEY:  I think where we come down on this, your
22   Honor, is -- and, again, I confess I don't know the name of
23   this witness because --
24             THE COURT:  That's not important.  But, actually, I
25   believe -- I'll help you in one way -- I believe it was the

43

D35kflo1

1   city who proffered that witness, because they said they were
2   harmed by not putting in their side of the stop.  We heard only
3   from a plaintiff.  We didn't hear from the officers on a number
4   of the stops, so they called this fellow to say, he tried to
5   identify them, how he tried and how he was unable to and all
6   that.  And he was cross-examined, et cetera.
7               MR. CHARNEY:  Yes.
8               THE COURT:  So it was their witness.  They may well
9   want to do the same thing with respect to the stops that you
10  described.  The stops that you're putting in, you may not
11  always have police witnesses.  The city will again say, we're
12  prejudiced because you're hearing only one side of the stop
13  story, you're not hearing from the police officers.  Then they
14  would call the same witness I guess to say, here is how I
15  tried.
16              So, actually, it's the city who should save this guy's
17  time and say it's the same testimony.  What more is there to
18  say?  He told me how he -- now I'm addressing Ms. Cooke -- he
19  told me how he tried, but that wouldn't differ from Ligon to
20  Floyd, "Here's how I tried, I did this, I did that."  It should
21  be the identical testimony.
22              MS. COOKE:  With respect to your Honor -- it would be
23  the same process?
24              THE COURT:  Yes.
25              MS. COOKE:  But these are totally different

44

D35kflo1

1   plaintiffs.
2            THE COURT:  True, but he did the same steps with the
3   same --
4            MS. COOKE:  The results would still need to be
5   reported --
6            THE COURT:  The results would be obvious, because if
7   you found the police officers, they will probably get called.
8            MS. GROSSMAN:  Your Honor, what I think is, once we
9   see the testimony that will be designated --
10           THE COURT:  No, no, no, you're missing it.  On this
11   fellow, we're talking about just this fellow.  There's no
12   designation now with respect to this fellow.  This is Floyd.
13   So you get new plaintiffs telling their story.  If those
14   plaintiffs -- if we can't identify the police officers involved
15   in the particular stop that the plaintiff is talking about, the
16   city will want to call the same fellow.
17           MS. GROSSMAN:  I don't know that's the case.
18           THE COURT:  OK, that's up to you.
19           MR. CHARNEY:  That's actually the reason --
20           MS. GROSSMAN:  The issue that I just want to address
21   is if the plaintiffs expect to use the testimony from the
22   plaintiffs in Ligon --
23           THE COURT:  Oh, well, for that, sure, for that he can
24   come in wholesale.  He said what he tried to do, and it is what
25   it is.  But I'm talking about Floyd.  There are new stops here.

45

D35kflo1

1    Maybe you can just tell me:  Are police identified on every one
2    of the new stops?
3            MR. CHARNEY:  No, there's a few that aren't, your
4    Honor, and the reason --
5            THE COURT:  OK, so this fellow is going to say he
6    tried.
7            MS. GROSSMAN:  It wouldn't necessarily be the same
8    person.  And we've identified witnesses --
9            THE COURT:  That's fine.  You can call all the people
10   who made --
11          MS. GROSSMAN:  Your Honor, I would just want to finish
12   up on this particular issue so it's neat in the record.
13          THE COURT:  Right.
14          MS. GROSSMAN:  As to any plaintiffs from Ligon who the
15   plaintiffs want to use their testimony for Ligon, we may want
16   to now offer the testimony from the witness who testified on
17   behalf of the city --
18          THE COURT:  Sure.
19          MS. GROSSMAN:  -- from Ligon.
20          THE COURT:  Who my clerk informs me was Sergeant
21   Musick?
22          MS. GROSSMAN:  Right.  So I just wanted to make that
23   clear.
24          THE COURT:  That's fine.  But I don't want you to call
25   Musick live.  I've got his testimony.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

46

D35kflo1

 1                 MS. GROSSMAN:  From Ligon, right, we wouldn't want to.
 2                 THE COURT:  Oh, good.  So if they're offering the
 3      Ligon plaintiffs' testimony from the record, you've got Musick
 4      from the record, no problem.
 5                 MS. GROSSMAN:  Yes, we understand.
 6                 THE COURT:  But I'm saying, in addition, for the Floyd
 7      plaintiffs who come in here live -- if it was Musick who made
 8      the effort, or somebody else, to identify the police
 9      officers -- any of them are welcome to come in and explain what
10      they did.
11                 MS. GROSSMAN:  Yes, thank you.
12                 THE COURT:  So I think we have covered the entire
13      Ligon transcript now.
14                 So that was numbers 4 through --
15                 MS. GROSSMAN:  Your Honor, just on process with the
16      Ligon transcript:  I do think we just want to make sure that as
17      the plaintiffs go through the -- I think of this as designating
18      deposition testimony.
19                 THE COURT:  Right, similar.
20                 MS. GROSSMAN:  So as long as they can give us their
21      designations, that we can look and it doesn't have to be done
22      in the next week or two, because we have a six-week trial.
23                 THE COURT:  No, with one exception.  For those
24      higher-up police people, they're designating all of that.  I
25      can't imagine that they're not somebody like Sweet.  It's all

47

D35kflo1

1   of it.  You shouldn't object to that.  He defended what he
2   does, so, for all those folks, it's all of it.  The only ones
3   that are going to be cut back is Rucker for sure, who's going
4   to be a small portion; individual plaintiffs, they're just
5   going to cut out anything that sounds like damages, you know,
6   "I couldn't sleep, I was sick," whatever, that's --
7           MR. CHARNEY:  And arrests I think also.
8           THE COURT:  Right, and the poststop whatever, that's
9   right, that goes.  We just went through all this.
10          MS. GROSSMAN:  Right.
11          THE COURT:  And Musick will come in whole because the
12   plaintiffs are coming in with respect to the stop, and that's
13   it.  No experts.  And no experts are being designated, so
14   that's that.
15          MS. GROSSMAN:  "We are sifting through" has to be
16   done --
17          THE COURT:  Yes, "we are sifting through" has to be
18   very limited.  It's the individual plaintiffs and Rucker.
19          MS. GROSSMAN:  OK.  And then we just want the
20   opportunity to have something to say about it in response.
21          THE COURT:  Sure.  Although I don't know what that
22   means, but sure, but sure --
23          MS. GROSSMAN:  We want to designate --
24          THE COURT:  -- sure.
25          Number 8 in your letter -- that is, the city's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

D35kflo1

1    letter -- should be OK.  This is Chief Esposito.  They want to
2    do it after April 2nd when he retires, so that he doesn't have
3    to be interrupted in his last month on the job.  I only wrote a
4    note in the margin that you promise you'll produce him, he
5    won't suddenly say now I'm retired, you can't get me.  You
6    promise?
7              MS. GROSSMAN:  Yes, your Honor.
8              THE COURT:  So they said, yes, your Honor.  You're
9    covered.
10             MS. BORCHETTA:  We already let them know, your Honor,
11   that we would agree to that.
12             THE COURT:  OK, so that's done.  Number 8 from their
13   letter is done.
14             Now, the date of the JPTO and what it should cover:
15   The defendants don't object to the final due date for that
16   being March 11th, so it's OK with me too.  But defendants seem
17   to agree that counterproposals for sections 2 and 7 are OK if
18   you can't agree.  That's what you wrote.  If the two sides
19   can't agree, you agree each side would submit their own version
20   of those sections?
21             MS. GROSSMAN:  Yes.
22             THE COURT:  I'll live with that too.
23             Now, the only dispute left seems to be defendants want
24   to include the motion in limine rulings.  What's wrong with
25   that?  Why are plaintiffs against that?

49

D35kflo1

1              MS. BORCHETTA:  Your Honor, I'm sure you're aware that
2      your individual rules do not require the inclusion of --
3              THE COURT:  Well, so what?
4              MS. BORCHETTA:  Our problem, your Honor, is it's pages
5      of their summaries of your Court's rulings, and we disagree
6      with them.  We do not believe that we are going to come to an
7      agreement and --
8              THE COURT:  So don't do it as summaries.  Put in the
9      transcript pages.  These are all oral rulings?
10             MR. CHARNEY:  Yes.
11             THE COURT:  I didn't have a written decision for once,
12     thankfully, on motions in limine, but there's a transcript.
13             MS. BORCHETTA:  Your Honor, if we could simply state
14     the date of the transcript --
15             THE COURT:  Well, include the pages.  But nobody
16     should summarize, because I can see the problem with
17     summarizing -- people summarize wrong.  Either side is prone to
18     do that; you're advocates.  Forget that.  Just put in the
19     pages.  Say, the following pages reflect the Court's rulings on
20     the motions in limine.
21             MS. BORCHETTA:  Your Honor, that was going to my --
22             THE COURT:  Excuse me one second.
23             MS. BORCHETTA:  Your Honor, I just want to make sure I
24     understand what we need to include.  So we'll include just that
25     the Court had motions in limine rulings on the following
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D35kflo1
```
 1    transcript pages?
 2             THE COURT:  Yes.
 3             MS. BORCHETTA:  But we don't have to say the substance
 4    of what --
 5             THE COURT:  I don't want you to.  I don't want you to
 6    paraphrase what I said.  That's a bad idea.  Just put in what I
 7    said.
 8             MS. BORCHETTA:  Thank you, your Honor.
 9             MS. GROSSMAN:  I'm sorry, put the quote in of what you
10    said?
11             THE COURT:  The pages.
12             MS. GROSSMAN:  The pages, not the actual text?
13             THE COURT:  No, no, the actual text, those pages
14    including the pages themselves.
15             MR. CHARNEY:  Attach?
16             THE COURT:  Attach the pages from the transcript but
17    characterizing, no summarizing, OK.
18             Does that leave any questions about the joint pretrial
19    order in either of the two letters?  Did I cover all the joint
20    pretrial issues now?
21             MS. BORCHETTA:  I believe so, your Honor.
22             THE COURT:  OK.
23             The next least hard is the deposition designation
24    issue.  What the city wrote is they would be willing to do
25    witnesses 1 through 15 by March 12th.  Is that what you wrote?
```

51

D35kflo1
1    No?
2              MS. GROSSMAN:  No, your Honor.  I think that --
3              THE COURT:  What you wrote is -- I'm going to quote
4    from your letter -- "Since plaintiffs have listed retired
5    Borough Commander Raymond Diaz as the 15th witness they intend
6    to call at trial, defendants will make best efforts to review
7    any designated testimony by March 12th, 2013."
8              MS. GROSSMAN:  Yes.
9              THE COURT:  Is that just him or the first 15
10   witnesses?
11             MS. GROSSMAN:  No, just that one witness, because
12   he --
13             THE COURT:  He's the only one of the first 15 being
14   called by deposition?
15             MS. GROSSMAN:  Correct.
16             THE COURT:  Oh.  The other 14 are the first 15 are
17   live?
18             MR. CHARNEY:  Yes.
19             MS. GROSSMAN:  Correct.
20             (Continued on next page)
21
22
23
24
25

52

D35kflo1

1           MS. BORCHETTA:  Your Honor, if I may, I spoke to
2   Ms. Grossman earlier today about this, and we have a proposal,
3   which is that it's actually five witnesses that we would now
4   like to put on through deposition designations.  Again, this is
5   in addition to deposition designations we've already included
6   in a draft joint pretrial order to defendants.  This is just
7   five new people.  And for those people, we will get to the city
8   our designations tomorrow.  And then we would ask, for three of
9   them, which is Thomas Dale, Raymond Diaz, and, Dwayne
10  Montgomery, by March 13, because we believe that those
11  witnesses are going to be early in our witness order.  And then
12  the other two, which is Peter Cassidy and -- I'm sorry, no,
13  yes -- Robert Gianelli, by March 27th.
14          THE COURT:  And do you have a response to that
15  proposal?
16          MS. GROSSMAN:  Well, actually, this is a little
17  different than what plaintiff's counsel and I discussed today.
18  I am learning for the first time that Thomas Dale and Dwayne
19  Montgomery are actually early in the witness list.  I didn't
20  know that.  And so I think what plaintiffs plan to do, I think,
21  is, best effort, next Tuesday or Wednesday give us the
22  remaining witnesses in sequential order, and from there I can
23  look at who the priorities are and I can try my best to get
24  them on a staggered basis, prioritizing in the order that they
25  want the designations.

53

D35kflo1

1             THE COURT:  OK.  It sounds to me like counsel can work
2     together on this like they do at all my other trials.  I don't
3     need to rule.  Everybody should make best efforts to cooperate
4     on deposition designations in a timely fashion.
5             MS. GROSSMAN:  Yes.  It's just, mindful of the fact
6     that one of the witnesses is going the first week, we're going
7     to make our efforts to look at the designations and give
8     counter-designations.
9             THE COURT:  Is Diaz the only one the first week?
10            MS. BORCHETTA:  Your Honor, if I could clarify, we
11    already provided the defendants with our anticipated first 20
12    witnesses, of course reserving the right to amend it.  One of
13    those witnesses was Chief Esposito, who now they have told us
14    has to move.  So as I explained to Ms. Grossman earlier today,
15    we believe we can get them our entire witness order potentially
16    next Tuesday, but our list has changed because of Chief
17    Esposito's movement.  We don't know whether it will alter it a
18    lot or not.  We have to make that decision.  We just found out
19    that Chief Esposito needs to be moved.  So we just need some
20    time to figure out the remaining lists.  So we'll get it to
21    them.
22            THE COURT:  By when will you get it to them?
23            MS. BORCHETTA:  By next Tuesday.  And that's our
24    entire witness order.
25            THE COURT:  For the whole trial.

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

54

D35kflo1

```
 1              MS. BORCHETTA:  Yes.  And the issue with respect to
 2    getting Montgomery by next week, again, I didn't -- we believe
 3    that Montgomery will now be moved up on the list because of
 4    Chief Esposito's movement farther down.  So their list did not
 5    have Montgomery in the beginning.  But I believe it will be
 6    soon.
 7              THE COURT:  So what she's trying to tell is that Diaz
 8    and Montgomery have been the first two to start with.
 9              MS. GROSSMAN:  Sure.  And we'll look at those two
10    first.
11              MR. CHARNEY:  But I guess --
12              MS. BORCHETTA:  Could we have one moment, your Honor.
13              MS. GROSSMAN:  Your Honor, if this is designation, I
14    don't know why there's a -- I mean, we'll do what we can, but
15    if they're going to designate, usually leave that after --
16              MR. CHARNEY:  That's true.
17              MS. GROSSMAN:  So I don't know that there's
18    necessarily a rush while we're trying to get the other
19    witnesses prepared, but we'll make efforts to work with the
20    plaintiffs.
21              THE COURT:  OK.
22              MS. BORCHETTA:  Your Honor, that goes to another point
23    that we raised with the Court that we'd like to address, which
24    is that we did want the option of reading some discrete
25    portions of deposition designations into the record, and two of
```

D35kflo1

1  the ones we would like to do that for would be Diaz and
2  Montgomery.  And we would like to do it in this order.
3          THE COURT:  I thought I knew that, that's what you
4  were talking about, that you would be reading portions of the
5  deposition into evidence.
6          MS. BORCHETTA:  Right.  So that's the reason that we
7  would need them, though, if they're in our first week.
8          THE COURT:  Yes.  Aren't we getting repetitive here?
9  I understand.  You want to read Diaz and Montgomery into the
10  record, so you would like them to cross-designate so it can be
11  read at once for my benefit.  I would like that.  I would like
12  it all read at once.  Like in every other trial over the last
13  24 or something years.  I understand.  I'd like it read.
14          MR. CHARNEY:  I guess the only question is timing,
15  your Honor.  So if we get them all -- we're going to get them
16  these tomorrow.
17          THE COURT:  I thought you said next Tuesday.
18          MR. CHARNEY:  No, no.  We're going to get them the
19  designations tomorrow.  We're going to get them our whole
20  witness list by next Tuesday.  So if we give them the witness
21  designations tomorrow it seems to me they should be able to get
22  us their counter-designations by next week.
23          THE COURT:  They're going to try to do that by Monday
24  next week.
25          MS. GROSSMAN:  I'm going to try.  I just want to know
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

56
D35kflo1
 1    that these are retired officers.
 2              THE COURT:  What does that have to do with designating
 3    from a deposition transcript?  Whether they're active or
 4    retired or dead, God forbid, just look at the transcript and
 5    designate what you want.
 6              MS. GROSSMAN:  We'll make our best efforts, your
 7    Honor.
 8              THE COURT:  Thank you.  But they're looking for me to
 9    set a date, so how about by March 15, no later than March 15?
10    Now, did you want that for everybody or for Diaz and
11    Montgomery?
12              MR. CHARNEY:  Diaz and Montgomery is fine.
13              THE COURT:  OK.  So for Diaz and Montgomery.  So just
14    redesignate by March 15 so it's ready to be read consecutively
15    for me.
16              OK.  Now we're up to expert testimony.  The city
17    writes that with respect to this guy Samuel Walker you have not
18    submitted expert reports.
19              MR. CHARNEY:  We did, your Honor.
20              THE COURT:  When?
21              MR. CHARNEY:  This morning.
22              THE COURT:  This morning.
23              MR. CHARNEY:  Yes.  It's only 29 pages double-spaced.
24    There's no data.  There are no statistical analyses.  There's
25    no computer code.  This is a very straightforward police
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

57

D35kflo1
```
 1   practices report just on remedy, just on remedy, which of
 2   course goes to the problem we have.
 3             THE COURT:  Yes, just on remedy?
 4             MR. CHARNEY:   Just on remedy, which goes to the issue
 5   that we raised about the city's expert.
 6             THE COURT:  Yes.  I'm going to do that.  I want to
 7   make sure, just on remedy.
 8             MR. CHARNEY:  Yes, your Honor.
 9             THE COURT:  But they're seeing the report for the
10   first time.
11             MR. CHARNEY:  Yes, of course.
12             THE COURT:  And how they read these 29 double-spaced
13   pages, they are maybe not so sure that it doesn't overlap
14   liability.  I don't know because I haven't seen it at all.
15   They just got it this morning.
16             MR. CHARNEY:  Yes, your Honor.
17             MS. GROSSMAN:  11:30, your Honor.
18             THE COURT:  I haven't seen it at all.  You're ahead of
19   me.  But the point is, has anybody from the city read these 29
20   pages yet?
21             MS. GROSSMAN:  Your Honor, I've been skimming through
22   it and trying, with everything else.  We're trying.  But I can
23   say that the plaintiffs already identified a police practices
24   expert.  His name is Lou Reiter.
25             THE COURT:  Yes, but supposedly this is not on that.
```

58

D35kflo1
1   This is on remedy, I'm told.  I'm told.
2           MS. GROSSMAN:  If you looked at the substance.
3           THE COURT:  I can't do that because I don't have it.
4           MS. GROSSMAN:  I know, but I will tell you, I'll make
5   a representation as what I -- there is significant overlap
6   between the report of Louis Reiter and this expert.
7           THE COURT:  That's unacceptable.  I don't have time
8   for cumulative expert testimony.
9           MR. CHARNEY:  Of course.
10          THE COURT:  I don't allow it in any trial.  This trial
11  is no different.  I do not wish to hear the same thing twice.
12  He has to say something completely different than Reiter.  He
13  can't repeat Reiter.  He can't bolster Reiter.  He has to have
14  his own testimony, whatever that is.
15          MR. CHARNEY:  Of course.  And I think the way it will
16  be handled, I can represent to you, we will focus only on
17  remedy.  If we were to ask a question at trial and the city
18  felt that that overlapped with Reiter, they could object to
19  that question.  We're not trying to waste the Court's time.
20  We're not trying to repeat what Reiter would say.
21          THE COURT:  Well, apparently the report does.
22          MR. CHARNEY:  We would disagree with that
23  characterization.
24          THE COURT:  Well, I haven't seen it.
25          MR. CHARNEY:  Yes, of course.  But I guess that that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

59

D35kflo1
```
 1  remains to be seen.  We disagree.  Our intention is to ask him
 2  about what changes should the NYPD make, given that we expect
 3  to prove that their current practices are unconstitutional,
 4  what changes should they make and what process should they use
 5  to make these changes.
 6              THE COURT:  That's their ground.
 7              MR. CHARNEY:  That's what we intend to ask him.
 8              THE COURT:  The person you want, Ms. Grossman,
 9  Stewart?
10              MS. GROSSMAN:  Yes.
11              THE COURT:  Do I have the name right?  Because the
12  plaintiff's counsel wrote a letter about Stewart also.  I just
13  want to make sure I'm talking about the right person.
14              Were you planning to produce a report?  Because,
15  again, if he's an expert witness, he has to produce a report.
16              MS. GROSSMAN:  Your Honor, at the last conference, you
17  directed the plaintiffs to identify -- we objected to anyone
18  being identified, but you said if they are going to propose
19  someone, they should do it by a date certain.  And we only just
20  got the name of that person the week before.  So in response,
21  or shortly before the report came in, we were somehow on notice
22  of "Walker," and then in response to that we tried to find
23  someone that we could at least identify.
24              THE COURT:  I think all I asked you is, are you
25  planning to produce a report?
```

60

D35kflo1

1                MS. GROSSMAN:  I don't know. I haven't had a chance.
2                THE COURT:  I know.  Rule 26 says that if there's
3    going to be an expert, there has to be a report.  You have made
4    that point yourself, with respect to Walker.
5                MS. GROSSMAN:  We just got it today.
6                THE COURT:  I'm not complaining that it's not in.  But
7    I'm telling you that if you wish to call this person named
8    Stewart, I have to have a report.  He's an expert.  The rule
9    requires a report.  I didn't say it was late.  I'm not
10   complaining.  I'm just telling you, you have to have a report.
11               MS. GROSSMAN:  Well, I object to this report from
12   Walker coming in.  It's not 90 days.  The rule says we're
13   supposed to get a report 90 days before to start a trial.  Our
14   trial starts in less than two weeks.  Our trial is expected to
15   be over within -- earlier than 90 days.  We should not be in
16   this position at this late date.  The plaintiffs had years to
17   identify police practice experts, and they knew they were
18   seeking remedial relief.
19               THE COURT:  You're calling it a police practices
20   expert.  They're disavowing that.
21               MS. GROSSMAN:  He did.  He did.
22               THE COURT:  No.  No.  I thought he said it was going
23   to be testimony about the way to remediate a problem.
24               MR. CHARNEY:  Yes.
25               THE COURT:  Of course, but that doesn't make him a

D35kflo1

1  liability expert.  That's Reiter's job.  That's Reiter's job.
2  This fellow is going to give his ideas based on his expertise,
3  his rsum, about how this could be remediated.
4          MS. GROSSMAN:  But that was the purpose of Reiter, to
5  talk about that aspect of the case.  They had all this time.
6          THE COURT:  I thought he was going to say that the
7  city shouldn't be liable, how it failed; not how it did stuff,
8  but how it failed.
9          MS. GROSSMAN:  He was identified as -- the plaintiff
10 didn't say when they notified them of their initial experts,
11 this is liability or remedy.
12         THE COURT:  I know.  But they weren't thinking at that
13 time, I think, about the separate idea between the two.  And
14 there is a difference.  One says there's been a failure.
15 Right.  I think the city should be liable if there's been a
16 failure.  The other one says, I have creative ideas about how
17 to fix this failure, I have theories or ideas about how to
18 retrain or monitor or, I don't know what he's going to say,
19 whatever he says.  But theoretically there's a fine-line
20 difference between a failure and a remediation.  Now, why it's
21 late, why it's not 90 days I don't know.  I could check the
22 rule, but most dates in the federal rules can be changed by the
23 court.  The court always has the power to lengthen or shorten
24 deadlines.
25         MS. GROSSMAN:  Well, your Honor, you shortened the

D35kflo1

1   deadline years ago and you had dates by which the plaintiffs
2   were supposed to provide a --
3              THE COURT:  What do you mean I shortened the deadline?
4              MS. GROSSMAN:  You gave us a date certain by which the
5   parties were to exchange expert discovery.
6              THE COURT:  That wasn't shortened.
7              MS. GROSSMAN:  It's shorter than today.
8              THE COURT:  I'm talking about 90 days.  Most of the
9   federal rules do not tie a judge's hand in shortening or
10  lengthening a time period.  So while the rules may say 90 days,
11  that doesn't mean the judge can't say, but I'll take it in 45
12  days or in 30 days.  But I understand your point is somewhat
13  different.  I had a deadline.  There was a deadline for
14  submitting expert names and expert reports, whatever that
15  deadline was.
16             MS. GROSSMAN:  And my point is that there was no
17  distinction between remedy and liability.  The plaintiff was
18  always seeking injunctive relief and remedy from day one and
19  it's disingenuous --
20             THE COURT:  So why can't Reiter handle it?  Why do you
21  need a different person?  If Reiter is an expert in police
22  practices.  Excuse me.  If Reiter is an expert in police
23  practices, why can't he give his ideas on how to fix the
24  problem?
25             MS. GROSSMAN:  Depose him.

D35kflo1

```
 1              MR. CHARNEY:  A couple reasons.  Well, first of all,
 2     they didn't depose him on how it would be fixed.  But the first
 3     thing is, you actually did give us a new deadline.  On January
 4     31st, you said identify someone by February 7th, which we do,
 5     so they have actually had Walker's name for almost a month.
 6     But that's beside the point.  The question that you asked is,
 7     why can't he opine on that, because he's never dealt with a
 8     case like this.  We're talking about the largest police
 9     department in the country.  We're talking about very broad
10     injunctive relief we're asking for, as you know.  We've made
11     that very clear from the beginning.  Professor Walker, as you
12     will find out at trial, that's something he's been doing for
13     the last 30 years.  He's been working with police departments
14     to do major changes, L.A., Chicago, Washington D.C., big, big
15     city police departments, talking about how to make reforms to
16     bring their standards into compliance with the Constitution.
17     That's what he's going to testify about.
18              THE COURT:  And Reiter doesn't have that experience.
19              MR. CHARNEY:  He has experience on many of the police
20     practices that are relevant.  And he will talk about what the
21     NYPD does now.
22              THE COURT:  I understand.  But he hasn't worked on --
23              MR. CHARNEY:  On these huge kind of broad injunctive
24     kind of pattern and practice consent and free type things, he
25     hasn't done that.  And so we are not going to have Walker
```

D35kflo1

1    repeat what Reiter says about why what they do now is bad.
2    He's not going to talk about that.
3            THE COURT:  Right.  And I did say at some point we
4    have until February 7th to name a remedies expert.
5            MR. CHARNEY:  January 31.
6            MS. GROSSMAN:  Your Honor, what happened was, they
7    objected and they intimated that they wanted to identify a
8    remedy witness back in December.  And you were not happy about
9    that then.  And then they waited until January 31st and made
10   vague references.  And I said, you know, we can't be stuck with
11   a witness the day of and it's not right, we object.  And then
12   you said, well, if you have someone, give them what you need,
13   the report and the name, the name by the 7th.  Your Honor, when
14   we went down this road when Professor Fagan supplemented his
15   report and we had Daubert motions, in your decision, you said,
16   look, we're a year away from trial.  If we were on the eve of
17   trial, I would agree with the city that Fagan's new opinions
18   and corrections should be precluded as prejudicial to the city.
19   We are in a worse situation now.  And it is not right.  We are
20   prejudiced.  The plaintiffs were disingenuous to say that the
21   plaintiffs are first figuring this out.  They had years to find
22   the appropriate police practices witness on remedy that could
23   have the breadth of experience to deal with this issue.
24   They've been complaining about this for years and it's not
25   right.

65

D35kflo1

```
 1              THE COURT:  The last argument was a good one.  So
 2    what's new?  I understand now why you want a different one than
 3    Reiter.  But why couldn't you do this --
 4              MR. CHARNEY:  A couple of ones are new.
 5              THE COURT:  What's new?
 6              MR. CHARNEY:  We have two new cases that have come
 7    before this Court, one of which have is going to be
 8    consolidated for remedies purposes.  We have a huge, as
 9    demonstrated by these amicus briefs, we have a huge group of
10    people in the New York City community that want to be part of
11    this process.  And one of Professor Walker's opinions is going
12    to be around that particular issue.  That was not true even a
13    year ago.
14              THE COURT:  But even so, you certainly knew you were
15    going to ask remedies, you just said.  You've always known,
16    Judge, we were asking for broad remedial relief.
17              MR. CHARNEY:  Part of the -- yes.
18              THE COURT:  Excuse me, I was speaking, Mr. Charney.
19              MR. CHARNEY:  I'm sorry.
20              THE COURT:  I believe that was a quote.  You just said
21    you knew we were always asking for the broadest remedial
22    relief.  You certainly knew that.  If you wanted to find
23    somebody who had experience in this remedy idea, why didn't you
24    do it long ago?  Why is it so late?  Putting aside that we
25    discussed this January 31, I said identify February 7, putting
```

66

D35kflo1

1   all that aside, what is the answer to Ms. Grossman's argument?
2   Why didn't you name this guy long ago?  What's really changed?
3   I haven't heard a good answer to what's changed.  The fact that
4   the Ligon and Davis case were filed, I don't see that as a
5   change.
6            MR. CHARNEY:  Part of it is the problem with trying to
7   develop prospective injunctive relief is you have to get a list
8   of what is currently going on, and the challenge with these
9   kinds of cases is always that the ground is shifting under your
10  feet as the case goes.  We are in 2013 and the case was filed
11  in 2008.
12           THE COURT:  And the city has in fact made a lot of
13  changes.
14           MR. CHARNEY:  Yes, exactly.
15           THE COURT:  And they're proud of that.  I recognize
16  that, in the opinion.  That they have done a lot.  I just said
17  it was early for me to evaluate how effective.  I even said in
18  that opinion, I believe I said if they can come back and show
19  the effectiveness of some of those changes, I would consider
20  them.  This is only a preliminary injunction.  When we get
21  around to permanent injunction, I said you can reraise that
22  issue, that we've already cured the problem, look at the staff.
23  So it is true that from the time this was filed until now, five
24  years, the city's practices have changed, or so they say.
25           MR. CHARNEY:  And I would go further and say their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D35kflo1

1  practices have changed within the last two years.  And
2  Mr. Reiter hasn't put in any evidence in this case in over two
3  years.  So, again, since we're focusing on remedy looking
4  forward, that's what Professor Walker would testify about, I
5  think that's one of the main reasons why things have changed in
6  terms of the remedial outlook between now and, say, even two
7  years ago.
8        THE COURT:  So if he were to take as his fact basis
9  the current lay of the land, he would say, I'm aware of all
10  that the police department has done in the last year or two, I
11  know what they've done, and that's admirable, but it's not
12  enough or it's still wrong or whatever he wants to say.  But he
13  will sort of bring it to date and explain why there is still a
14  need for remedy.
15        MR. CHARNEY:  Absolutely.  I mean, he would, I think,
16  rely on what Mr. Reiter said.  Mr. Reiter found this -- to the
17  extent those practices are still in existence.
18        THE COURT:  Right.  But some have changed.
19        MR. CHARNEY:  Yes, some have changed of course.  The
20  ones that are still in existence from the time that Mr. Reiter
21  opined, he would simply rely on what Mr. Reiter said.  He would
22  not add to it.  He would not repeat what Mr. Reiter said.  But
23  so you know, I am relying on this opinion based on practices
24  that are still in existence that were in existence two years
25  ago.  And with respect to the new ones, I will opine on whether

68

D35kflo1

1   or not they are sufficient to address the big constitutional
2   problems here.
3           THE COURT:  But I will say that, as I suspected, Rule
4   26(b), which is called "Time to Disclose Expert Testimony,"
5   does say, "The party must make these disclosures at the times
6   and in the sequence that the court orders.  Absent a
7   stipulation or a court order, the disclosures must be made at
8   least 90 days before."  So as I thought, the court can always
9   override the 90 days -- it says so -- after the stipulation or
10  a court order.
11          MS. GROSSMAN:  But there was a previous court order.
12          THE COURT:  Yes.  What are you talking about?  I
13  understand.  The court can then override its order too, and
14  apparently on January 31 I said, you may name this remedy
15  person.
16          The bottom line is, I will watch very carefully.  I
17  will not allow him to repeat Reiter.  He has to talk about the
18  current situation with the city.
19          I don't know why you're shaking your head,
20  Ms. Grossman.  There are changes you made that you like and you
21  defend and you think there's no need for remedy because you've
22  already done the good work.
23          MS. GROSSMAN:  Well, your Honor --
24          THE COURT:  So let's see -- I'm talking -- how he
25  responds to the good work you've already done.  You may

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

69

D35kflo1

1    cross-examine him and say, but, you know, Mr. Whatever, Dr.
2    Stewart, you are aware, of course, that the city now does this
3    or that, you are aware of course that the city does ABC, DEF,
4    you know, etc., etc.  And we'll see.  But the point is, he's
5    the one who now brings it current, so to seek, and has these
6    ideas on remedy.
7         So let's go past Walker and talk now about Stewart.
8         MS. GROSSMAN:  I just want to say about Walker, a
9    whole significant portion of his opinion talks about the
10   collaborative process and community input.
11        THE COURT:  That's his idea of remedy?
12        MS. GROSSMAN:  I know, but that doesn't, that's not
13   relevant to the constitutionality and tailoring relief to
14   the --
15        THE COURT:  No, but you couldn't be more right.
16   That's why he's not their liability expert.  That's liability.
17   If liability is found, I turn to remedy.  He has ideas on
18   remedy, as an expert, somebody with experience.  One of his
19   ideas is everybody should sit down at a table.
20        MS. GROSSMAN:  Well, your Honor, the idea on community
21   input and collaborative process, that's about, when you look at
22   what I've seen in the reports about trying to get community
23   satisfaction and getting input to see if they're satisfied with
24   the changes or any reform.  And I believe your Honor has said
25   on numerous occasions, you're not here to assess the policy

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D35kflo1

1    reasons, it's only about the "constitutionality."
2            THE COURT:   Correct, but when it comes to remedy --
3    let's say that the constitutional violations stop, even today
4    when had there have been changes by the city.  If I get that
5    far, at the end of the day, and I say, even with the changes,
6    there's still a constitutional violation, then I, the Court,
7    have to address how to remediate that.  If you look at remedial
8    opinions all over the country, prison systems and bus
9    transportation systems, school systems, the court does get
10   involved at that point as to how to right what it perceives as
11   the wrong.  And if you'll look at those remedy processes in the
12   various areas I mentioned -- bus transportation, schools,
13   prisons -- you'll see the breadth of the remedies that courts
14   have imposed.  It's huge, the courts' power to impose a remedy.
15   So all he's saying is, this local expert on remedies will
16   suggest that one way to go about remediating a problem is to
17   have community involvement.  I suspect, if you look at opinions
18   in all these other areas, in many, many federal courts around
19   the country in the last 60 or 70 years, in the last 60 or 70
20   years, you'll see ideas just like that in the prison cases, in
21   the transportation cases, the education cases.  You'll probably
22   see remedies just like that.  The courts have broad powers when
23   it comes to remedy.  I'm not there yet.  All we want to do is
24   have this guy make the suggestions he makes.
25           MS. GROSSMAN:   I just don't know how we can be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

71

D35kflo1
1   expected to address this new report, with all the different
2   proposals that he raises, when trial is starting in less than
3   two weeks.
4           THE COURT:  Because that's the end of the trial and he
5   said the trial is going to last six weeks.  So two and six is
6   eight.  I don't suppose that's coming up till seven weeks from
7   today.  You know.
8           MS. GROSSMAN:  We're going to be in court every day.
9           THE COURT:  I know.  There's a lot of you.  I've seen
10  ten names on some of these submissions from the city.  Somebody
11  will take up the remedies.  You're going to divide the labor.
12  One of these many attorneys.  Maybe Ms. Donahue, who knows,
13  she's pretty senior.  Somebody is going to take on remedy.  And
14  she'll put her energy into dealing with what -- what's this
15  guy's name again?
16          MR. CHARNEY:  Samuel Walker.
17          THE COURT:   -- Walker has to say and lining up maybe
18  Stewart to take issue with it.
19          So let's return to Stewart.  So I'm not against
20  Stewart.  It's just we need a report and it has to be limited
21  to the remedial part.  He can't start rebutting Reiter now.
22  That's not right.  There's plenty of time to deal with Reiter's
23  testimony.  So I'm not going to allow Stewart to rebut Reiter.
24  He can rebut this new person, Walker.  That should be that.
25          MS. GROSSMAN:  Your Honor, this whole separation of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

72

D35kflo1

 1  remedy and liability, there's so much overlap, I don't know how
 2  it is that this is going to proceed.  It's not like there's a
 3  break in the trial.  It's going right into --
 4          THE COURT:  If I recall, you proposed bifurcation.
 5          MR. CHARNEY:  We did, but you didn't want us to do it.
 6          MS. BORCHETTA:  They opposed.
 7          MR. CHARNEY:  Oh, they opposed.  Yes, they did oppose.
 8  I'm sorry.  I thought you said "propose."
 9          THE COURT:  No, they opposed it.  I agreed with that.
10  So it's going right into remedy, yes.  But anyway, do your
11  best.  That's my ruling.  Stewart can be an expert.  He should
12  submit an expert report and needs to rebut Walker.
13          MS. BORCHETTA:  May we have a date by which they have
14  to submit?
15          MS. GROSSMAN:  This is just, I can't even express
16  the --
17          THE COURT:  There should be a date.
18          MS. GROSSMAN:  I'm sorry?
19          THE COURT:  There should be a date.  I haven't even
20  set the date.  You're already worked up.
21          MS. GROSSMAN:  I am.
22          THE COURT:  Was I going to say next week?  Was I going
23  to say two weeks?  No.  It can't be rushed.  You had time.  You
24  have said you had from February 7 to March 7 to get Walker to
25  submit a report.  Sounds like the day should be April 5 for

D35kflo1

1    Stewart's report.
2              MS. GROSSMAN:  Your Honor, this is just --
3              THE COURT:  All right.  Well, that's what it is, Ms --
4    Grossman.
5              MS. GROSSMAN:  My name is Ms. Grossman.
6              THE COURT:  I know, and I get that.  Ms. Grossman,
7    you've really got to stop taking issue with every ruling out of
8    my mouth.  It's time I don't have.  April 5.
9              MS. GROSSMAN:  And we don't have the time either.
10             THE COURT:  Sit down.  I'm going to tell you you can't
11   talk anymore.  I can say I order you not to say anything if
12   you're going to do that.
13             April 5th is the due date for the Stewart report.
14   That's my ruling.  Today is March 5.  April 5th is the due date
15   for Stewart's report.
16             MS. GROSSMAN:  The plaintiffs have had years to do
17   this.
18             THE COURT:  OK.  Stop talking.  Now you did it.  I
19   will not hear from you further, Ms. Grossman, at this hearing.
20   You're done.  I'm sorry.  Lawyers have got to show respect for
21   the court.  You lack that respect.  This has been going on for
22   years.  If this continues, you won't be permitted to try the
23   case.  So watch it.
24             Now, that's the due date for the rest of you.  April
25   5.  For those of you who are respectful, the report is due

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

74

D35kflo1

1   April 5th, and Stewart is allowed to rebut Walker.  And that's
2   that.
3          Now, we finally got to the only part that I thought
4   was fairly complicated.  Maybe the good news is, this won't be
5   so complicated.  Just because of this one-page thing.  So on
6   this one-page thing, the plaintiffs say they are not seeking to
7   preclude or limit eight witnesses.  You have that letter.
8   Beirne -- I'm going to get the report itself.  Beirne, Byrne,
9   Delafuente, Huffman, McMahon, Mohan, Sallie, and Weiss.  We
10  don't have to discuss those, right?
11         MR. CHARNEY:  Yes.
12         THE COURT:  Right.  OK.  Then they ask for affidavits
13  from Barrett and Silva.  What is the city's response to
14  requests for affidavits?
15         MS. COOKE:  Well, your Honor, we would oppose
16  affidavits from Barrett and Silva on --
17         THE COURT:  Isn't that faster than depositions?
18         MS. COOKE:  We don't believe that the plaintiffs are
19  entitled to depose these two people.  The plaintiffs have been
20  in possession of information, audio recordings specifically.
21  They identified police witnesses who would testify on the
22  plaintiffs' behalf on December 31, 2012.
23         THE COURT:  That was Serrano?
24         MS. COOKE:  Serrano.  They indicated when they
25  identified Serrano that Serrano had audio recordings of roll

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

75

D35kflo1

1   calls he had made at the 40th Precinct.  We didn't receive
2   those audio recordings until the middle of January.  We then
3   undertook efforts to identify the voices on the audio.  The
4   plaintiffs provided no information, although they're witnesses
5   on their list and they're presumably speaking with officers
6   while we are not.
7           THE COURT:  What do you mean "we are not"?  You are
8   the police department.  If you know this roll call is in a
9   certain precinct --
10          MS. GROSSMAN:  Yes, the 40th Precinct.
11          THE COURT:  I didn't hear you.  The what precinct?
12          MS. COOKE:  The 40th.  I have spoken with officers at
13  the 40th Precinct to determine the roll call between 2010 --
14  the roll call audio has hearsay statements that haven't been
15  authenticated, unlike the other audios in this case with
16  respect to Officers Polanco or Schulcraft where the speakers
17  have identified, yes, that's my voice, there's been a request
18  to admit and the like.
19          The plaintiff included the audio recording which they
20  had in their possession from sometime prior to December 31,
21  2012.
22          THE COURT:  I don't know why you refer to it as
23  unauthenticated.  The person who made the audio can
24  authenticate it.  All he has to do is say, I was there, I wore
25  a device, I turned it on, I turned it off, it was on this date,

D35kflo1
1    I preserved it.
2              MS. COOKE:  They are hearsay statements on the roll
3    call.
4              THE COURT:  Well, they're out-of-court statements.
5              MS. COOKE:  Yes.
6              THE COURT:  Any statement on the recording is an
7    out-of-court statement.  But it's also an admission.  They are
8    statements of a party opponent.
9              MS. COOKE:  If we could identify the speaker.
10             THE COURT:  Well, yes.  You also said a roll call of
11   police officers.
12             MS. COOKE:  Yes.
13             THE COURT:  I don't think the plaintiffs who were
14   stopped were there.
15             MS. COOKE:  The names of the police officers are not
16   said on the roll call.
17             THE COURT:  Right.  Of course not.
18             MS. COOKE:  So we undertook efforts to identify.  The
19   plaintiffs have had the tapes longer than us.  They had a
20   witness who heard the tapes who they're speaking to to tell
21   them the identity of the speakers on the report which he was
22   present at.  The plaintiffs put the audio recordings on the
23   JPTO draft that was provided to us on February 19.  In response
24   we provided our JPTO draft the following week and identified
25   Lieutenant Barrett and Sergeant Silva as witnesses in rebuttal

77

D35kflo1
1    of Officer Serrano's allegations --
2              THE COURT:  To rebut what?
3              MS. COOKE:  Officer Serrano's claims to quotas in the
4    40th Precinct.
5              THE COURT:  OK, not to rebut the authenticity of the
6    tape.
7              MS. COOKE:  No, but there are speakers they have been
8    able to identify on the tape.  If the plaintiffs had wanted to
9    seek the deposition or affidavits from speakers on these tapes,
10   they have had months to do so.  They have been in possession of
11   the tapes longer than us.
12             THE COURT:  I must say, I don't understand this.  Why
13   is this case so unique of all my cases?  You've read the
14   Southern District pilot project, right?  I asked you to.  One
15   of the stipulations in the pilot project is that all parties
16   agree to depose witnesses who are on the witness list for the
17   first time, including who's been identified or weren't
18   identified earlier, so that everybody gets along.  It's called
19   trial by agreement.  It's the latest thing.  We practice it all
20   over the country.  What's the problem?  You identify these two
21   now.  They're willing to forgo depositions, which are
22   time-consuming.  Why can't they present an affidavit?
23             MS. COOKE:  The plaintiffs had a phone call with
24   Ms. Grossman.  I wasn't on the phone call.  I'll represent what
25   I understand from the phone call.  We said to the plaintiffs,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

D35kflo1

1    would you provide an affidavit from Officer Serrano about his
2    statements with respect to the tape because these witnesses are
3    offered in rebuttal, whatever Officer Serrano is going to say.
4              THE COURT:  You want an affidavit about the statement
5    on the tape?
6              MS. COOKE:  Whatever Officer Serrano would be offering
7    his testimony with respect to the tapes and the court
8    allegations thereto.
9              THE COURT:  Well, hold on.  I'm not sure he is.
10   Because it was Polanco, somebody who's a magistrate judge, he
11   decided that the person would just authenticate the tape and
12   get out.  Is that what this guy is going to do?
13             MR. CHARNEY:  The answer to that is, no, he's going to
14   testify about matters other than what's on the tape.
15             THE COURT:  Stop.  Has he been deposed?
16             MS. COOKE:  No, your Honor, he has not.
17             THE COURT:  Well then, it's goose and gander.
18             MR. CHARNEY:  But they have never asked for him.
19             THE COURT:  I'm sorry, Mr. Charney.  It's goose and
20   gander.  Just listen.  Please, please.  Just listen.
21             MR. CHARNEY:  OK.
22             THE COURT:  If he's going to testify beyond the tape,
23   and here you're asking Barrett and Silva to do an affidavit,
24   then Serrano should do it too.
25             MR. CHARNEY:  OK.

D35kflo1

```
 1              THE COURT:  OK.  All right.  That's taken care of.  So
 2    he will do an affidavit.  Go ahead, Ms. Cooke.  He will do an
 3    affidavit.
 4              MS. COOKE:  They will provide the affidavit.  They
 5    will provide the testimony, affidavit in response.
 6              THE COURT:  Sure.  OK.  So we should be done with
 7    those three.
 8              MS. COOKE:  We should be done, but they weren't
 9    willing to do that.
10              THE COURT:  Well, now he is.
11              MS. BORCHETTA:  Your Honor, if I may just interject
12    there about the timing.  If they know that these people have
13    knowledge and testimony that they want to put on, which they do
14    because they put the people on their witness list, then they
15    know now what these people are going to say.
16              THE COURT:  Not there.  Not there.  It's responsive to
17    whatever it is that Serrano says.  Serrano should go first.  If
18    he's going to testify beyond the affidavit and he hasn't been
19    deposed and to avoid three more depositions on the eve of
20    trial, you give him the affidavit first, period.  They respond.
21    It's your case they're responding to.  Serrano first.
22              MS. BORCHETTA:  We don't object to the staggering, OK,
23    of Serrano doing it first.  However, because Serrano, we have
24    told the city already, we anticipated would be the first week
25    of our trial, my concern would be being able to get it to them
```

D35kflo1
1    in enough time for them to get it back to us.  I mean, it just
2    creates --
3              THE COURT:  They don't need to get it back to you.
4    They don't need to call Barrett and Silva then.  It may be
5    weeks away.
6              MS. BORCHETTA:  One of the prejudices, though, your
7    Honor, to not knowing what these people might say is to the
8    extent that they're going to impeach Officer Serrano with
9    knowledge that you don't have.
10             THE COURT:  Don't you know that criminal cases are
11   tried every day without any depositions or affidavits?  People
12   get by.  We have great criminal trials here with no depositions
13   and no affidavits.  It works out.  Just get it in.  You want me
14   to set a deadline, Ms. Cooke?  What would you like as a
15   deadline for their affidavit of Serrano?
16             MS. COOKE:  No later than a week from today, your
17   Honor.
18             THE COURT:  I agree.  Today is March 5th?
19             MS. COOKE:  March 5th.
20             THE COURT:  All right.  The 12th.  Get your affidavit
21   of Serrano in on the 12th.  Then what would you like, two weeks
22   for yours?
23             MS. BORCHETTA:  I mean, one week.
24             THE COURT:  Well then, don't rush.  They're not
25   getting the defense case overnight.  Two weeks.

81

D35kflo1

```
 1              MS. BORCHETTA:  Your Honor, civil cases --
 2              THE COURT:  Please, Ms. Borchetta, be seated.  Yes,
 3   you have two weeks.  So the 12th and 14th is 26?
 4              MS. COOKE:  Yes.
 5              THE COURT:  All right.  On that subject, on that
 6   subject, that reminds me, I must break.  We are not sitting on
 7   the 25th or 26th.
 8              MR. CHARNEY:  We know that, your Honor.
 9              THE COURT:  Oh, you did?
10              MR. CHARNEY:  You said that back in December, I think.
11              THE COURT:  Both of those days?  I didn't know --
12              MR. CHARNEY:  You said there was a half day on the
13   29th.  That's Good Friday.
14              THE COURT:  Oh, yes, because it's Good Friday.  There
15   might be people --
16              MS. COOKE:  If we could have the day for Good Friday
17   because of the observance of people who observe.
18              THE COURT:  We usually do half days.  The whole court
19   is always on half days.  I've asked people, it's not my
20   religion, but I've asked people, and I'm told half a day is
21   enough.  You don't have to go in the morning.  You have to go,
22   but not in the morning.  So I usually try to work half a day.
23              MS. COOKE:  The timing of services for some people who
24   observe is affected by the appearance in court in the morning.
25              THE COURT:  You mean they would not be able to go?
```

82

D35kflo1

```
 1              MS. COOKE:  Correct, your Honor.
 2              THE COURT:  Aren't there services throughout the day
 3    so that everybody gets accommodated?
 4              MS. COOKE:  I don't want to -- know of any --
 5              THE COURT:  I've had this in other cases over the
 6    years and I've been assured that it can go throughout the day.
 7              MS. COOKE:  I have a three-hour observance, your
 8    Honor, and it's a progressive service, so I --
 9              THE COURT:  So we have to start at a certain time and
10    end.  It can't be like 2 to 5.
11              MS. COOKE:  Correct.  It's actually 12 to 3 on the
12    Upper West Side.
13              THE COURT:  And that's the only one that day.
14              MS. COOKE:  Yes.
15              THE COURT:  So the whole day.  Is it possible that
16    they could cope without you from 11 to 1?  Because I'm only
17    going to sit half a day.
18              MS. COOKE:  We don't have the witnesses for that week.
19              THE COURT:  Why don't we revisit as we go.  I would
20    like to sit until 1, but I won't do that if you are the
21    necessary person, because a religious observance is more
22    important to the trial -- that is, your personal religious
23    observance.  But if we can do without you from 11 to 1, that
24    would be better, because it's a long trial and I want to get
25    through it.  So we'll have to see.  But I'll revisit it because
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83

D35kflo1

1   religious observance comes first.  So we will see.
2              MS. COOKE:  Thank you, your Honor.
3              THE COURT:  All right.  So that one we'll see.
4              All right.  I think we've taken care of Barrett and
5   Silva and Serrano.  So let's go on.  We took care of Stewart.
6   That's good.  He was number 11 on their list.  So now we've got
7   up to numbers 12 through 16.  Didn't we sort of take care of
8   that earlier when Ms. Grossman said this is a broader case and
9   while Kerry Sweet testified we're going to have more questions?
10             MS. COOKE:  Correct.
11             THE COURT:  OK.  And I said that's fine.  That's
12  right.  You can have stuff beyond the --
13             MS. COOKE:  Yes.  We'll go beyond.
14             THE COURT:  I don't want to repeat.  But you can go
15  beyond it.
16             All right.  So that should have dealt with 12 through
17  16.  That leaves the fighting over 17 through 25 on their list
18  and we need to, I guess, do that one by one.
19             MR. CHARNEY:  Well, your Honor, there are a couple
20  that might be easy, actually.  You'd be surprised.  Number 22,
21  Mr. Mulet, we would be willing to allow, to drop our opposition
22  to him testifying -- I'm assuming it's a he.  I don't know if
23  he's a he or she.
24             MS. COOKE:  It's a she.
25             MR. CHARNEY:  I'm sorry.  -- to Ms. Mulet testifying
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

84

D35kflo1

1   if her testimony would be limited to the matters raised in the
2   affidavit she submitted about a year and a half ago related to
3   a motion in this case.
4           THE COURT:  I remember the motion.
5           MR. CHARNEY:  Yes.
6           THE COURT:  It was written about in the city.  I don't
7   know.  You can limit it to that?  I don't know who she is.
8           MS. COOKE:  Just one moment.
9           THE COURT:  Sure.  I know you wrote about it.
10          MS. COOKE:  Yes, your Honor, that's fine.
11          THE COURT:  OK.  You got it.
12          MS. COOKE:  Limited to the testimony, scope of the
13  affidavit.
14          THE COURT:  Well, OK.  That's fine with me too.  But
15  then do you need that person live at all?  Or could the
16  affidavits just come in, if it's limited to what's in the
17  affidavits?  A lot of judges here take direct by affidavit.
18  You know that, don't you?  Do you know that?  I haven't been
19  one of those, but a lot of judges think it's the best way to
20  go.
21          MS. COOKE:  One minute.  Your Honor, I apologize.
22  Part of the problem, Mr. Mariculo, this is his witness, who is
23  very ill.
24          THE COURT:  Who is this?
25          MS. COOKE:  Mr. Mariculo.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

85

D35kflo1

```
 1                THE COURT:  He is?
 2                MS. COOKE:  Yes, he is very sick, so he is keeping his
 3      germs away from all of us.
 4                THE COURT:  Oh, that kind of ill.
 5                MS. COOKE:  Very under-the-weather ill.  So we believe
 6      it would be appropriate to limit the affidavit and testimony by
 7      affidavit, but I would like to confer with Mr. Mariculo.
 8                THE COURT:  OK.  Because what I was thinking is, I've
 9      had many judges in the building take all direct in non-jury
10      cases by affidavit.  It would also be the direct.  And they
11      could do the cross and you could do the redirect.  So you'll
12      also have time to do live stuff.  But it would save time if the
13      direct is by affidavit, because you'll agree that it would be
14      limited to what's in the affidavit.
15                MS. COOKE:  OK, so with confirmation from
16      Mr. Mariculo, and we'll let the plaintiffs know, he would
17      testify by affidavit and then live cross and live redirect.
18                THE COURT:  Right.  OK.  Now we have all the others to
19      do.
20                MR. CHARNEY:  We have one other one which might also
21      be resolvable, which is Mr. Pfister, no. 23.  Pfister.  I think
22      our issue with this witness is we just have no idea what he
23      would testify about.  They described him as testifying about
24      the procedures of the Internal Affairs Bureau, which is
25      obviously a very broad topic.
```

86

D35kflo1

```
 1              THE COURT:  That's important.  They have said, look,
 2      this is another one of those last-minute things and the
 3      accusation is that they didn't do adequate investigation, which
 4      somehow shows that the city, whatever, hasn't done what it's
 5      supposed to do or something.  So if you want to offer evidence
 6      that these are inadequate responses by the city, I guess you
 7      want to talk about the process of the OCD and IAB.
 8              MR. CHARNEY:  We just want to be clear that he's going
 9      to testify specifically about civilian complaints of bad stops,
10      because that's what we are complaining they don't do well.  IAB
11      is obviously a huge office.  They do a lot of things.
12              THE COURT:  I don't have times for that.  I don't
13      think they're going to tell me how IAB determines discipline or
14      how IAB handles other, you know, drunkenness of police officers
15      or addiction of police officers.  We aren't going there.  They
16      are of course responding to the notion that you are putting in
17      evidence that they don't handle complaints of bad stops well.
18      You will rebut that.  But you're going to have to talk about
19      the process.  You're going to have to say, here's the process
20      we use.  So some of it will be general and some will be
21      specific.  But anyway, I'm going to allow him, of course.  So
22      how do you want to proceed with him?
23              MR. CHARNEY:  I guess just, you know, we reserve the
24      right to object to questions that we feel are far afield.
25              THE COURT:  Of course.  I guess what I really meant
```

87

D35kflo1

1   is, I hate to even use the word, I really was worried about
2   depositions.  I hate to raise that word.  But, yes, what about
3   him?
4           MR. CHARNEY:  I'm sorry.  I was just -- I mean, is it
5   too much to have just a declaration of the topics he would
6   testify about?
7           THE COURT:  I think we just did that.  He's going to
8   rebut the evidence that you plan to offer that the city didn't
9   properly investigate alleged bad stops.
10          MR. CHARNEY:  That's fine, your Honor.
11          THE COURT:  What's fine?
12          MR. CHARNEY:  What you just described is fine with us.
13  We're not going to object to his testifying about that.
14          THE COURT:  No, I know that.  I raised the D word.
15          MR. CHARNEY:  Oh, I'm sorry.  You mean the
16  declarations?
17          THE COURT:  Depositions.
18          MR. CHARNEY:  Oh, deposition.  I don't think we need a
19  deposition.
20          THE COURT:  Oh, good.  Good, good.  All right.  So
21  that takes care of Pfister.
22          Now, what about these other people?  Seven more.
23          MR. CHARNEY:  These are the tough ones, your Honor.
24  You've received our letter and I don't want to repeat --
25          THE COURT:  Actually I was going to look at the city's

D35kflo1

1  letter because the city's letter gave me more information on
2  who they are.  Here they are.  Let's see.  No, haven't found it
3  yet.  Hold on.  Here it is.  I'm quoting from page 4.  "The
4  remaining eight individuals identified by defendants on
5  February 27 are not accurately characterized as new.  In fact,
6  five of these names are current commanding officers with
7  commands that succeeded the retired members of service.  And
8  they will testify about current practices."  So what they're
9  saying is, they have taken over -- they used the word
10  "successor."  Yes.  These are successors to people you did
11  depose, but they're current.  And they give you their titles.
12  Secreto is assistant chief of something called PBQS.  I don't
13  know what that stands for.
14          MS. COOKE:  That's Patrol Borough Queens South, your
15  Honor.
16          THE COURT:  Thank you.  And Morris is assistant chief
17  of Patrol Borough Manhattan North.  And Holmes is 81st
18  Precinct, and Williams is 28th Precinct, and Green is 33rd
19  Precinct.  The point is, you did depose the then current person
20  in those positions but they've retired, these are their
21  successors.
22          MR. CHARNEY:  So I guess we would say, then, given
23  that these are new people that we didn't get a chance to depose
24  and they were not disclosed until after the end of discovery,
25  we should get to take their depositions.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89

D35kflo1

1          THE COURT:  You really want to?  Or could they do an
2     affidavit -- let me finish -- that would update to simply say,
3     I accept everything that's in my predecessor's deposition, I
4     add only the following to bring it current.
5          MS. BORCHETTA:  Your Honor, could we have a moment.
6          THE COURT:  Do you want a moment to talk?
7          MR. CHARNEY:  Yes, could we have one...
8          (Pause)
9          MR. CHARNEY:  Your Honor, we have, I guess, a hybrid
10    proposal.  Of the seven, if we could depose three of them and
11    the other four could be done by declaration, we would be happy
12    with that.
13         THE COURT:  Let me hear the four that you might be
14    willing to do by declaration and then I'll talk with the city
15    about whether they are willing to do that.  It would be
16    hopefully brief.  It would update the predecessor's testimony
17    and otherwise adopt it.  And who are the ones you would be
18    willing to do by declaration?
19         MR. CHARNEY:  The ones we would be willing to do by
20    declaration would be Carlos Gomez, Rodney Harrison, Juanita
21    Holmes, and William Morris.
22         THE COURT:  Let's start with that.  Who do I address?
23    Ms. Cooke?
24         MS. COOKE:  Yes, your Honor.  May I just have one
25    minute.  These aren't my witnesses.  I apologize.

D35kflo1

```
 1              (Pause)
 2              MS. COOKE:  That's fine, your Honor.  Just one point
 3    with respect to the declarations for those four people.
 4    Obviously we'll make our best efforts to identify --
 5              THE COURT:  What I'd like them to do is to be able to
 6    say in the first paragraph, I have read the deposition of my
 7    predecessor so and so, I am prepared to adopt that testimony as
 8    mine.  In addition, I would like to address the following
 9    subjects.
10              MS. COOKE:  OK.
11              MS. GROSSMAN:  Your Honor, may I be heard?  I don't
12    know that they can adopt, because they weren't commanding
13    officers at the time that their predecessors were.
14              THE COURT:  OK.  But they can say, there's nothing
15    there I contest or something like that.  I have no reason to
16    differ from that testimony.
17              MS. GROSSMAN:  They may not have knowledge.  It may be
18    that they lack knowledge about it.
19              THE COURT:  All right.  They can say to the extent I
20    don't have knowledge I can't say one way or the other but to
21    the extent I have knowledge I don't disagree with it.
22              Now, here's what I need to address.  And we can do the
23    same procedure we did with Barrett and Silva, use this
24    declaration as the direct, go to the cross, go to the redirect,
25    hopefully.
```

91

D35kflo1

1          MS. COOKE:  I think that was the procedure with
2     respect to Mulet.  Barrett or Mike Serrano --
3          THE COURT:  Yes, I know.  OK.  Fine, fine.
4          MS. COOKE:  With Tracey Mulet.
5          THE COURT:  That's fine.  We could do that.  So they
6     would update it, essentially.  You would use that as the
7     direct.  You would have a cross.  You would have a redirect.
8     And those people would be on and off.
9          What are you going to do with the predecessor as
10    deposition testimony?  Do you have an officer in there?
11         MR. CHARNEY:  Are you talking to me or to the city?
12         THE COURT:  I was talking to the city.
13         MR. CHARNEY:  Oh, I'm sorry.
14         THE COURT:  But it could be you.  I don't know.  Does
15    anybody wish to offer the predecessors' testimony for those
16    four commands, so to speak?
17         MS. GROSSMAN:  That's up to the plaintiffs.
18         MR. CHARNEY:  Two of them yes.  Actually, let me check
19    here.  So with respect to the ones we've just --
20         THE COURT:  The four?
21         MR. CHARNEY:  Yes.  We just did Gomez, Green,
22    Harrison --
23         THE COURT:  Now, you didn't do Green.  You said Gomez,
24    Harrison, Holmes, and Morris.
25         MR. CHARNEY:  I'm sorry.  So for Harrison there

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D35kflo1

1    actually is no predecessor, because Harrison, they identified
2    him as the 32nd Precinct commander.  We never took the
3    deposition of a 32nd Precinct commander.  I don't really know,
4    I'm a little curious as to why they want to use Mr. Harrison
5    given that none of the named plaintiffs were stopped.  But I
6    understand there's obviously a citywide case, so --
7              THE COURT:  Where is the 32nd Precinct?
8              MR. CHARNEY:  Upper Manhattan, I believe.  But I don't
9    know.
10             With respect to the 43rd Precinct, which would be
11   Mister -- I'm sorry.  Again, Mr. Gomez, we actually also never
12   took the deposition of his predecessor.  Ms. Holmes, we did
13   take the deposition of that predecessor, but we were going to
14   call that person as a live witness.  That would be Steven
15   Mauriello.  And he's actually going to be, I believe, in our
16   first 20.
17             THE COURT:  OK.  And then you want to call him live.
18             MR. CHARNEY:  Yes.
19             THE COURT:  OK.
20             MR. CHARNEY:  Now, Mr. Morris, that actually is one of
21   the five deposition depositions we mentioned, which is Raymond
22   Diaz.  We were thinking of putting him in just on depositions.
23             THE COURT:  OK, good.  Now let's talk about the last
24   three.  Green, Secreto, and Williams.
25             MR. CHARNEY:  Yes.

D35kflo1

```
 1              THE COURT:  Green is from the 43rd Precinct.  Secreto
 2   is Queens South.  And Williams is 28th.  So why do you want to
 3   depose these three in particular as opposed to use the same
 4   procedure with the declarations?
 5              MR. CHARNEY:  Well, these three, first off, are all
 6   from commands where three of our named plaintiffs were stopped.
 7   We think these are highly, highly relevant witnesses.  We think
 8   that given that, as you mentioned earlier, current policies and
 9   practices are highly relevant in this case, we believe -- and
10   these commanders have obviously a lot of responsibility and are
11   a big part of our presentation of evidence, the precinct and
12   borough commanders, we think that these witnesses are extremely
13   important and we have a lot to ask them.
14              THE COURT:  You're sure they have predecessors?
15              MR. CHARNEY:  Let's see.  Yes, I believe we did depose
16   each of the three predecessors.  But, again, most of those
17   depositions, I believe, were more than two or three years ago.
18              THE COURT:  So the updating is extensive.
19              MR. CHARNEY:  Yes.
20              THE COURT:  They would say what the current practices
21   are.
22              MR. CHARNEY:  There's a lot.
23              THE COURT:  That's two or three years.
24              MR. CHARNEY:  Yes.  There's a lot to catch up.  For
25   example, the 28th Precinct, which is Mr. Williams --
```

94

D35kflo1

1              THE COURT:  OK.  Let me ask you a question.  When were
2    you first notified of Green, Secreto, and Williams?
3              MR. CHARNEY:  Last week.
4              THE COURT:  Why so late, Ms. Cooke, or Ms. Grossman?
5    I mean, obviously you knew that these predecessors were long
6    gone.
7              MS. GROSSMAN:  We actually didn't.  As we've been
8    working on every part of the case trying to respond to the
9    discovery, respond to all the depositions, my apologies, but I
10   didn't really know until the week that we notified the
11   plaintiffs that we were going to need to call them.  And I
12   wasn't sure if I could locate --
13             THE COURT:  Well then, I think this classically does
14   fall under the pilot project, and you should have briefed the
15   depositions.  The whole point of what we put in there is
16   because counsel from other kinds of cases urge us to put that
17   in.  There are times when somebody dies.  There are times when
18   people retire.  There are times when you have to replace a
19   witness with a different witness and someone doesn't just brief
20   and depose each other's substitutions.  That's the reason.
21   This is classic.  The reason they're be named late, so to
22   speak, is because somebody has retired and they did a
23   replacement and you want to replace them.  So they should be
24   allowed to depose them before they testify.  They're going to
25   talk about two years' worth of the current practice.  That's

D35kflo1

1  pretty big.  And they've been reasonable.  They went with six
2  of them without that.  Six of these nine.  So I think they
3  should be allowed to do the three.
4         MS. GROSSMAN:  Can we just at least have it limited in
5  terms of time to about two hours?
6         THE COURT:  I don't know.  Two years' worth of
7  practice.  I don't think I can in fairness say that --
8         MS. COOKE:  Excuse me.
9         (Pause)
10        MS. GROSSMAN:  I'm sorry.  I don't have exact
11 information in terms of exactly when each of these successors
12 replaced --
13        THE COURT:  I don't need that.
14        MS. GROSSMAN:  I understand.  They would obviously be
15 limited to their time at the current command.  But I guess what
16 I would say is that the subject matter, in terms of the audits
17 that are done, the procedures that are in place, there's a lot
18 of similarity that hasn't changed much.  There are other -- so
19 I don't know that they need to replicate and go through, other
20 than to say what's currently done or to say that this is what's
21 currently done in a declaration.  But I understand what the
22 Court is saying.
23        THE COURT:  Well, really I haven't studied yet because
24 I don't know what limitations if any I should put in terms of
25 time.  I do think that they're entitled to depose them because,

96

D35kflo1

1   as I said, this is the classic purpose of the filing project
2   when people retire or die and need to be substituted.  That's
3   the common occurrence in all kinds of cases.  And they fit that
4   idea.  So what do you think, Mr. Charney?  How long -- there's
5   no time to waste now.
6             MR. CHARNEY:  Of course.
7             THE COURT:  No time to waste.  So how long do you
8   think you need to depose --
9             MR. CHARNEY:  I think we need at least four hours for
10  each, your Honor.
11            THE COURT:  That's four hours per each of these three.
12            MS. GROSSMAN:  May I just ask that, similar to what
13  was done with Commissioner Beirne, a 30(b)(6) witness who we
14  are producing on Wednesday, if the plaintiff could just give us
15  some of the questions or --
16            THE COURT:  I don't think that's necessary.  You've
17  heard so many depositions of precinct commanders and borough
18  commanders, you know exactly what they're going to cover.
19  These are substantive because somebody retired.  So it's the
20  same kind of questions you heard from their predecessors, so
21  four our limitations all three.  Does that finish us?
22            MS. BORCHETTA:  Your Honor, we have a few minor
23  administrative things.
24            THE COURT:  I hope they are minor.
25            MS. BORCHETTA:  They're absolutely minor.  One is, we

D35kflo1
```
 1   just have a question of the presentation of exhibits, if it's
 2   acceptable to your Honor to present them on discs with PDFs.
 3              MR. CHARNEY:  As opposed to binders.
 4              MS. BORCHETTA:  As opposed to binders.
 5              THE COURT:  No.  It's not acceptable.  I'm sorry.
 6   I'll tell you why.  I think you might be interested in why.  It
 7   actually relates to the sequester.  We can no longer afford
 8   paper, I'm told.  They are rationing paper for the judges'
 9   chambers.  Rationing.  We are going to be in the middle of a
10   trial.  I'm supposed to look at an exhibit.  I might want to
11   write on it or underline it.  I can't do it on a computer.
12   It's just not going to work.  We no longer have money for
13   paper.  That's what the federal courts have come to.  But then
14   again, we're not furloughing anybody, if you read in the paper,
15   Southern District is very proud it's not furloughing any
16   employees, but to achieve that, we're rationing paper.  So I'm
17   afraid I need the paper.  You're going to tell me you're
18   rationing paper too?
19              MS. COOKE:  We're always rationing paper in the city.
20   But I was going to ask you, so, your Honor, if we provided, if
21   the parties provided you with a hard-copy set of exhibits...
22              THE COURT:  I'll take one because I'm sure my clerk
23   can do it from the CDs and PFDs, just so I will be able to pull
24   it up.
25              (Continued on next page)
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D35kflo3

1           MS. COOKE:  I think we -- and Mr. Kunz would know more
2  about this -- we had a conversation about it today, but we're
3  intending to have the monitors put in here for your Honor and
4  the witness stand.
5           THE COURT:  Yes.
6           MS. COOKE:  So we will be publishing as we go
7  electronically, but we will provide --
8           THE COURT:  Just one set, because I will try to save
9  paper for you too -- one set is enough -- but I do need it.  Go
10  ahead.
11           MS. BORCHETTA:  Your Honor, we're wondering whether
12  the Court anticipates certain hours that we would be going each
13  day.
14           THE COURT:  OK, yes.  All my trials are the same,
15  10:00 to 4:30, five days a week.  I do it all the time.
16           MR. CHARNEY:  And the last question -- I guess
17  actually we may have two more administrative ones.  One is with
18  respect to overflow.  We anticipate there may be a pretty big
19  audience, at least the first week of the trial.
20           THE COURT:  Right, certainly the opening statements
21  are going to draw an overflow.  My chambers will contact
22  Ms. Cirkovich, our public -- I forget what we call it -- our
23  media person, our media interface anyway.  She deals with the
24  press.  We'll talk to Ms. Cirkovich about getting overflow room
25  for the first day.  I don't know if you'll hold anybody's

D35kflo3

1   attention for a whole week.  Especially if the cannibal cop is
2   still on trial, you can forget about it.
3           MS. BORCHETTA:  And three minor things I think we can
4   tick off:  We need to set up technology for the presentation of
5   evidence, and we're wondering whether it's possible to have
6   access to the --
7           THE COURT:  The answer is you call Mr. Reily.  I never
8   deal with it.
9           MS. BORCHETTA:  OK.
10          THE COURT:  He does this in every case in every case.
11  I suspect he'll suggest Wednesday the 13th, because I'm out of
12  town.
13          MS. BORCHETTA:  We also were wondering whether we
14  needed one last court conference before the date.
15          THE COURT:  I was wondering that too, for a different
16  reason.  It's generally my practice to try to rule on all
17  evidentiary objections in advance of trial so that just
18  everything goes in that's been ruled on.  And I don't need to
19  stop and start.  It's more important in a jury trial clearly; I
20  don't want at sidebars to start talking about hearsay or
21  authentication.  So usually in the pretrial order, next to the
22  exhibit you have to state your objection.  I like to try to
23  rule on as many of those as I can.  I'm only in two days,
24  though, next week Thursday and Friday, so I need to check my
25  calendar for a moment.

D35kflo3

```
 1              The 14th is better for me than the 15th, the 14th the
 2      is better than the 15th.  I could meet with you at 10:00
 3      o'clock, the entire morning?
 4              MR. CHARNEY:  That's fine for us, your Honor.
 5              THE COURT:  The city?
 6              MS. COOKE:  That's fine, your Honor.
 7              MS. BORCHETTA:  Your Honor, I'm sorry, one more thing
 8      has been brought to my attention.  We made an application to
 9      bring in certain technology that the Court so ordered, but we
10      actually had a separate application to bring in cellphones
11      because regrettably --
12              THE COURT:  If you gave me the order, I signed it.
13              MS. BORCHETTA:  What happened, your Honor, is we gave
14      a letter --
15              THE COURT:  Do it again, do it right.  Talk to
16      Mr. Reily, please.
17              MS. BORCHETTA:  OK.
18              THE COURT:  He'll arrange all this tomorrow with you.
19      Just call him.
20              MS. BORCHETTA:  OK.
21              THE COURT:  Just call him.  He's a whiz and he knows
22      all this.
23              MS. GROSSMAN:  In terms of exhibits and delivering
24      them, maybe Friday?
25              THE COURT:  Sure.
```

D35kflo3

 1              MS. GROSSMAN:  Is that something we should speak to
 2    Mr. Reily?
 3              THE COURT:  Sure.  He's the man, as they say.
 4              MS. GROSSMAN:  Your Honor, one more issue:  The
 5    plaintiffs provided just recently some emails concerning one of
 6    their witnesses, Senator Eric Adams.
 7              THE COURT:  Who is Senator Eric Adams?  Is he a state
 8    senator?  We don't have --
 9              MS. GROSSMAN:  I'm sorry, then we made a demand for
10    documents, and the plaintiffs are now representing that they
11    don't have any notes of a meeting with Senator Adams.
12              THE COURT:  OK.  I'm still curious:  A state senator?
13              MR. CHARNEY:  Yes.  He's going to testify about a
14    meeting he had with Commissioner Kelly.  You'll hear all about
15    it at trial, your Honor.
16              THE COURT:  OK.  Anything further?
17              So, on that morning on the 14th, I would like to try
18    to make evidentiary rulings.  So to the extent you're going to
19    be claiming hearsay or there's an issue on authentication --
20    that's even worse -- I'd like to hash out as much as of that as
21    I can.  In most cases, lawyers don't have authentication
22    objections -- they don't want to bring in people to
23    authenticate things that obviously can be authenticated -- so
24    hopefully you'll cooperate on that.
25              Hearsay is different -- we might have to really hash
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

D35kflo3

1    it out -- but hopefully we won't have to spend too much time on
2    authentication.
3              Relevance I'm willing to put off because you just
4    don't know how things develop, but for the other more technical
5    objections, I'd like to be able to do it.
6              MR. CHARNEY:  OK, your Honor.
7              THE COURT:  If you intend to use any exhibits in
8    opening statements, they should be exchanged with each other so
9    there's no objection in the middle of the opening.  You may not
10   intend to in this kind of case, again, there not being a jury
11   but, again, you may want to put something on the screen.  If
12   you are going to use an exhibit during opening, please, you
13   must show it to each other by that Thursday morning, by the
14   14th, so both sides are ready to open.
15             Are you going to ask for -- again, I hate to use this
16   word -- sequestration of witnesses?  Are you going to ask that
17   each other's witnesses be excluded or not?  Because we'll do it
18   goose-and-gander approach to this; either you don't care if
19   witnesses are in the courtroom or if one side cares, it's the
20   same for both.
21             MS. BORCHETTA:  Can we have one minute?
22             THE COURT:  Sure.
23             (Pause)
24             MS. BORCHETTA:  Your Honor, would it be possible for
25   us to let you know at the conference next Thursday whether

D35kflo3

```
 1   there are any particular objections to particular witnesses
 2   being present?  We generally think we don't have a problem with
 3   witnesses being present, but we want to make sure, because
 4   there might be some that we would have a concern.
 5              THE COURT:  OK.  Let's take it on Thursday.  The city
 6   also?
 7              MS. GROSSMAN:  Yes, your Honor.
 8              THE COURT:  Let me know then.
 9              THE COURT:  OK.  Now I've thought of the things I can
10   think of.  Is there anything else anyone can think of that we
11   haven't covered?  I would like this to go smoothly once it
12   goes.  Were there any other dates I told you I couldn't sit,
13   other than Monday, Tuesday and Friday?
14              MR. CHARNEY:  I think you said April 11th and 12th you
15   had a speaking engagement.
16              THE COURT:  Let me just double-check that.
17              Oh, it's true.  Yes, that's true.
18              MR. KUNZ:  Sorry, your Honor, just to raise one more
19   substantive issue, but since we are going through some
20   problems, to avoid a letter that we were planning to submit --
21              THE COURT:  Oh, yeah, I know, I agree.  Go ahead.  I
22   don't want letters.
23              MR. KUNZ:  We have had in some previous conferences
24   about plaintiffs' witnesses, Professor Silverman and a survey
25   he took of retired NYPD plaintiffs.  The plaintiffs,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D35kflo3

1  Mr. Charney and myself, have going back and forth attempting to
2  hash out an agreement in regard to some additional survey raw
3  data that the city believes is relevant to the Court's
4  consideration of this witness.
5              At this juncture, I think we are not able to reach an
6  agreement.  There's additional data that the city does want
7  that Mr. Charney has represented the plaintiffs are not willing
8  to produce.  So we would make a motion to compel production of
9  that data.
10             THE COURT:  Oh, don't make a motion.  Write your
11 letter but --
12             MR. KUNZ:  It's written.
13             THE COURT:  Is it double-spaced?
14             MR. KUNZ:  I will double space it, your Honor, yes.
15             THE COURT:  Thank you.  You can submit that letter.
16 How long is it?
17             MR. KUNZ:  Right now, single-spaced, at a page and a
18 half, two pages.
19             THE COURT:  Oh, that's reasonable.  So up to five
20 pages double-spaced for both sides.
21             MR. KUNZ:  OK.
22             MR. CHARNEY:  Can we have until --
23             MR. KUNZ:  I'll submit ours tomorrow.
24             THE COURT:  So it's coming tomorrow, which is
25 March 6th.

D35kflo3

1          MR. CHARNEY:  Can we have until Monday to respond?
2          THE COURT:  Yes.  Monday is fine.  Let me just check
3   the calendar for any other possible dates.
4          MR. CHARNEY:  Thank you, your Honor.
5          THE COURT:  I'll probably be out for two hours in the
6   middle of the day on May 1st, if you just want to note it down,
7   if we're still on trial.
8          Somebody tells me I have to go to Pittsburgh for
9   something, but I don't know what it is.  I'll find it.
10         All right, Ms. Carteron?
11         MS. CARTERON:  Yes, your Honor.  To the extent there
12  are witnesses that the city is going to put on in their case
13  and we might have some questions, I just want to make sure I
14  understood the system that was in place for notification of
15  when witnesses would be called.  And I gather that there's some
16  arrangement in place already among the parties?
17         THE COURT:  I'm not sure of that.  I think the
18  plaintiffs will put on their entire case.  And you're
19  interested in the remedies phase?
20         MS. CARTERON:  Exactly, your Honor.
21         THE COURT:  So it would be rather late that the city
22  would reach the rebuttal to the remedies proof, so to speak,
23  because first if the plaintiffs will rest, the city will then
24  probably be calling liability witnesses, so to speak, and I
25  would think it would be rather late in the game, like late

D35kflo3

1  April.
2           MS. CARTERON:  OK.
3           THE COURT:  But the idea is to give the Ligon
4  plaintiffs' counsel notice.
5           So when does the city have to say the order of their
6  witnesses?
7           MR. CHARNEY:  You haven't set a date, your Honor.
8           THE COURT:  Well, for good reason.  It's aways off
9  but --
10          MS. GROSSMAN:  I don't know who we're going to have
11  left.
12          THE COURT:  That's right, I agree.  Many of them will
13  be called in the plaintiffs' case and you'll use them for
14  direct, but at some point, shall we say after four weeks of
15  trial, I must know the order of what you think is remaining?
16          MS. GROSSMAN:  I think that sounds reasonable.
17          THE COURT:  So we start on March 18.  By April 12th,
18  the city should give the order, list of all their remaining
19  witnesses.
20          MS. CARTERON:  Thank you, your Honor.
21          THE COURT:  And then you'll know.
22          Now, of course when the Floyd plaintiffs reach the
23  remedies stage of the trial, Ms. Carteron, that's when you have
24  to join in.  If you have a witness that they are not calling
25  that you want to use, you'll have to give the city notice.

D35kflo3

1           So, Mr. Charney, when are you giving your final notice
2   of all your witnesses?
3           MS. BORCHETTA:  Next Tuesday, your Honor.
4           THE COURT:  So by next Tuesday, Ms. Carteron, I think
5   you'd have to name any affirmative so-called remedies witness
6   if it's not already on Mr. Charney's --
7           MS. COOKE:  They've already provided a list of their
8   remedy witnesses, which are all police department witnesses,
9   which are already on the Floyd plaintiffs and --
10           THE COURT:  If there are any others for any reason
11   that you come up with that you want to call that Floyd
12   plaintiffs are not calling on the remedies issue, do it by next
13   Tuesday, period.
14           MS. CARTERON:  Thank you, your Honor.
15           MR. CHARNEY:  Last question:  To clarify the schedule
16   with respect to the remedy portion of the trial, are we
17   expected to put -- we have Professor Walker as a remedy
18   witness.  Are we expected to put him on before the city puts on
19   any of their liability witnesses?
20           THE COURT:  Yes.  I think you finish your case and
21   rest.
22           MR. CHARNEY:  OK.
23           THE COURT:  Finish your case and rest.  I suspect it
24   will be your last witness.
25           MR. CHARNEY:  Yes, he will be.  I just didn't know if

108

D35kflo3

1   he was going to come after their liability witnesses.
2              THE COURT:  No.  You put on your case and finish.
3              MS. GROSSMAN:  Your Honor, just one -- Ligon -- we
4   received a remedy brief yesterday from the Ligon plaintiffs.
5   The current due date for the city's response on that is -- I
6   think we're able to fold it in the 30 days.  We have 30 days to
7   respond to the Floyd brief on remedy.  So can we also fold in
8   the Ligon piece as well?
9              THE COURT:  Sure.  I don't see a problem with that,
10  and I'm not going to be deciding this thing until after the
11  close of the trial.
12             Do you have any objection Ms. Carteron?
13             MS. CARTERON:  No, your Honor.
14             THE COURT:  That's fine.
15             Anything else?  I think we're done.
16             COUNSEL:  Thank you.
17                              * * *
18
19
20
21
22
23
24
25