```
D1V5dav1                    conference
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
KELTON DAVIS, et al.,

                Plaintiffs,

         v.                          10 Civ. 699 (SAS)

THE CITY OF NEW YORK, et al.,

                Defendants.
------------------------------x
DAVID FLOYD, et al.,

                Plaintiffs,

         v.                          08 Civ. 1034 (SAS)

THE CITY OF NEW YORK, et al.,

                Defendants.
------------------------------x
JAENEAN LIGON, et al.,

                Plaintiffs,

         v.                          12 Civ. 2274 (SAS)

THE CITY OF NEW YORK, et al.,

                Defendants.

------------------------------x

                                     January 31, 2013
                                     4:32 p.m.
Before:

            HON. SHIRA A. SCHEINDLIN,

                                     District Judge

            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300
```

*The Clerk of the Court is directed to docket this transcript of the January 31, 2013 conference in Floyd v. City of New York, 08 Civ. 1034.*

*Shira A. Scheindlin, USDJ*
*9/18/13*

*9/18/13*

1

```
D1V5dav1                    conference
1                           APPEARANCES
1
2   LEGAL AID SOCIETY
2        Attorneys for Plaintiffs in 10 Civ. 699
3   BY:  NANCY ROSENBLOOM
3            -and-
4   NAACP LDF
4   BY:  JOHANNA STEINBERG
5
5   CENTER FOR CONSTITUTIONAL RIGHTS
6        Attorneys for Plaintiffs in 08 Civ. 1034
6   BY:  DARIUS CHARNEY
7
7   BELDOCK
8        Attorneys for Plaintiffs in 08 Civ. 1034
8   BY:  JONATHAN MOORE
9        JENNIFER BORCHETTA
9
10  COVINGTON & BURLING
10       Attorneys for Plaintiffs in 08 Civ. 1034
11  BY:  ERIC HELLERMAN
11       KASEY L. MARTINI
12
12  LATINO JUSTICE PRLDEF
13       Attorneys for Plaintiffs in 12 Civ. 2274
13  BY:  FOSTER MAER
14       ROBERTO CONCEPCION
14
15  SHEARMAN & STERLING, LLP
15       Attorneys for Plaintiffs in 12 Civ. 2274
16  BY:  TIANA PETERSON
16
17  NEW YORK LAWYERS FOR PUBLIC INTEREST
17       Attorneys for Plaintiffs in 12 Civ. 2274
18  BY:  McGREGOR SMYTH
18
19  NEW YORK CIVIL LIBERTIES UNION
19       Attorneys for Plaintiffs in 12 Civ. 2274
20  BY:  ALEXIS KARTERON
20       CHRISTOPHER DUNN
21       DANIEL MULLKOFF
21
22  THE BRONX DEFENDERS
22       Attorneys for Plaintiffs in 12 Civ. 2274
23  BY:  MARIANA KOVEL
23
24
25
```

```
      D1V5dav1                    conference
1                          APPEARANCES (Cont'd)
1
2     MICHAEL A. CARDOZO
2          Corporation Counsel for the City of New York
3     BY:  HEIDI GROSSMAN
3          BRENDA E. COOKE
4          SUZANNA H. PUBLICKER
4          JOSEPH MARUTOLLO
5          LINDA DONAHUE
5          JUDSON VICKERS
6          LISA RICHARDSON
6          MORGAN KUNZ
7          Assistant Corporation Counsel
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

D1V5dav1                    conference

```
 1                (Case called)
 2                THE COURT:  All I can say is that they were on notice
 3      of the conference.  If they choose to absent themselves then I
 4      guess they waived any comments on some of the issues that might
 5      affect them.  There is only one issue that might affect them
 6      and they're not here.  They certainly had fair notice of the
 7      conference.  Mr. Rappaport is not here and there was somebody
 8      who was going to cover.
 9                MS. COOKE:  Donna Murphy.
10                THE COURT:  So, as far as I'm concerned, they've kind
11      of waived their right to be heard on issues we discuss today.
12                This may be the hardest part of the conference.  We
13      have Mr. Moore.
14                MR. MOORE:  Good afternoon, your Honor.
15                THE COURT:  In the Floyd case and we have Mr. Charney
16      in the Floyd case.
17                MR. CHARNEY:  Good afternoon.
18                THE COURT:  We have Ms. Karteron in the Ligon case and
19      Mr. Dunn in the Ligon case.
20                MR. DUNN:  Yes.
21                THE COURT:  We have Ms. Rosenbloom in the Davis case
22      and Ms. Steinberg in the Davis case.
23                I also recognize Mr. Maer.  Which one are you?
24                MR. MAER:  Ligon.
25                THE COURT:  Mr. Maer.
```

D1V5dav1                    conference

1               And you are?
2               MR. HELLERMAN:  Eric Hellerman for Floyd.
3               THE COURT:  Mr. Hellerman.
4               And you are Jennifer Borchetta?  Ms. Borchetta, you
5     are with which case?
6               MS. BORCHETTA:  Floyd, your Honor.
7               THE COURT:  And?
8               MR. WEINGARTEN:  Richard Weingarten for defendants,
9     your Honor.
10              THE COURT:  For defendants.
11              MR. WEINGARTEN:  Correct.
12              THE COURT:  Your last name is what?
13              MR. WEINGARTEN:  Weingarten.
14              Let me start with the defense lawyers I do know.
15              Ms. Grossman, Ms. Cooke; good afternoon.
16              MS. GROSSMAN:  Good afternoon.
17              MS. COOKE:  Good afternoon.
18              THE COURT:  There you are, Mr. Zuckerman.  Good
19    afternoon.
20              MR. DUNN:  Good afternoon, your Honor.
21              THE COURT:  Ms. Donnahue, good afternoon.
22              MS. DONAHUE:  Good afternoon.
23              THE COURT:  Ms. Publicker?
24              MS. PUBLICKER:  Yes, good afternoon.
25              THE COURT:  Mr?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D1V5dav1                    conference
1              MR. KUNZ:  Mitch Kunz, your Honor.
2              THE COURT:  Mr. Kunz, good afternoon.
3              And Mr. Vickers and Ms. Richardson --
4              MS. RICHSON:  Ms. Richardson, your Honor.
5              THE COURT:  Thank you.
6              There are other lawyers here.  I'm sorry I didn't say
7    hello directly but hello.  Wait, there is a Ms. Kovel?
8              MS. KOVEL:  The rest of us are in the back.
9              THE COURT:  You are for the plaintiffs?
10             MS. KOVEL:  In Ligon.
11             THE COURT:  Yes, I see more of you now.  I see
12   Mr. Mullkoff and others.  All right.
13             The reason we're having a conference of all three
14   cases at once is because the Court has been concerned for some
15   time about the overlapping issues raised in the three cases.  I
16   raised this in an off the record chambers conference at the end
17   of one of the matters briefly and then obviously it arose after
18   the preliminary injunction decision in the Ligon matter.  And I
19   decided that the best way to discuss the problem with the
20   overlapping case was to have a joint conference.
21             The issue that overlaps is not liability but remedies.
22   I realize that none of the cases have been tried, so to speak.
23   One case has had a preliminary injunction hearing and the
24   decision on the preliminary injunction.  Even in that decision
25   issued on January 8th I reserved the vast bulk of potential
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D1V5dav1                    conference

1  remedies for what I called a remedies hearing which would be
2  held after submissions -- written submissions on the remedies
3  issue for both sides.  I put in that opinion some supposed
4  remedies, asked for submissions, written submissions from both
5  sides and said there would be a remedies hearing.  I also said
6  that I might as well combine that with the remedies phase of
7  the Floyd trial which was coming up very soon in March.  The
8  plaintiffs in Floyd, I think, have previously requested
9  bifurcation of liability remedies.  I have denied that request
10  to bifurcate and said, no, I might as well just try the case
11  cover to cover and then decide it cover to cover.  Obviously,
12  with no liability, there would never be any remedies, but I
13  didn't want to bifurcate.  Davis wasn't even a part of this
14  discussion.  But, when I realized I was going to combine the
15  Ligon remedies hearing and Floyd remedies proof, I invited the
16  Davis plaintiffs to join too so we could discuss remedies at
17  once.
18          The problem was highlighted in the City's request for
19  a stay of even the very limited relief that I imposed in the
20  preliminary injunction decision -- very, very limited relief.
21  I said most of it is being put off but the one I would grant
22  now is please comply with the Constitution of the United
23  States -- at least as I interpret it -- and the City said,
24  well, it is not that simple to comply with your view of it all
25  and would require retraining and training materials and all the

8

D1V5dav1                    conference
1    rest of it.
2              And I thought the City had a point.  It is not so
3    simple to say just comply, it requires a lot of work.  So, I
4    did in fact grant the stay even with that very limited remedy
5    pending addressing all relief in one big package because we
6    can't do this kind of thing piecemeal, it is difficult.
7              So, here we are.  Now, after I said all of this,
8    recently I received a January 28 letter from the Floyd
9    plaintiffs proposing an alternative to the idea of a
10   consolidated remedies hearing.  Of course that, in effect,
11   renews their request to bifurcate the liability phase and the
12   remedies phase in the Floyd trial, something I'm still not
13   happy about.
14             But, putting that aside for the moment, they proposed
15   a process which they describe as a collaborative remedial
16   process, and they candidly say that their proposal is modeled
17   after a similar process that was ordered in a Southern District
18   of Ohio case titled:  In Re:  Cincinnati Policing.  Apparently
19   in that case there was a procedure where the major stakeholders
20   in the issues such as community organizations, police officers,
21   experts, all sat down together over a period of time with a
22   Court-appointed facilitator, discussed together what could be
23   done, tried to reach consensus in a 90-day hearing.  If
24   consensus couldn't be reached I gather it simply comes back to
25   the Court for the proposed remedies hearing.

D1V5dav1                    conference

1          So, in effect, it does renew that request for
2    bifurcation.  This letter came in only Monday.  I have not yet
3    had a written response from the City.  I know they have an
4    awful lot to do defending these three cases even though their
5    team is large and I have no idea if they're prepared to give me
6    some oral input at least today as to their view, at least the
7    general outline of the idea proposed by the plaintiffs' lawyers
8    in Floyd.
9          I should add I think that I also received a January
10   28th letter from the Ligon plaintiffs' lawyers saying that I
11   think that they agree with a Floyd proposal.  Is that right?
12         MS. KARTERON:  Yes, your Honor.
13         THE COURT:  So, two of the three cases weighed in.
14   Have the Davis plaintiffs put anything in writing.
15         MS. STEINBERG:  We have not put anything in writing
16   but the letter reflected that we agree as well.
17         THE COURT:  So, the three different plaintiffs groups
18   are on board with this process, but obviously I haven't heard
19   anything yet from the City.
20         Who might be willing to address that?  Ms. Grossman?
21         MS. GROSSMAN:  Yes, your Honor.  The City is opposing
22   engaging in this collaborative process.
23         As we highlighted in our stay application, we contend
24   that the Court has taken a very broad view in its
25   interpretation and application of what constitutes a Terry

D1V5dav1                    conference

1  stop, and given that the Court's view is in conflict with the
2  City's interpretation of the Fourth Amendment, we believe this
3  is an impediment to having engaging in this process.  And, in
4  addition, I understand that this was a voluntary process in the
5  Cincinnati case so we don't think it is appropriate to be
6  ordered to engage in that process.
7           We are ready to proceed and we oppose bifurcation.
8           THE COURT:  That is a very short but decisive answer.
9           I think the City is saying if they don't want to do
10  this they shouldn't be ordered to do this.  It may be
11  disappointing that they want to do it, peculiarly disappointing
12  to me because it might be so-called overbroad interpretation of
13  the Fourth Amendment which I think did nothing but quote from
14  Second Circuit and Supreme Court cases back to back to back
15  quotation to quotation to quotation, but maybe you don't like
16  the quotations from the Supreme Court and the Second Circuit.
17  Be that as it may, if you don't wish to engage in it I won't
18  compel you.  Sad though it may be.  It may be a missed
19  opportunity but I'm not going to compel you.  If that's your
20  view that's your view.
21           So, I'm not going to bifurcate.  I already said that
22  we are going to go right from the liability proof into the
23  remedies hearing.  However, I am combining it with the other
24  two cases.  All three cases will do the remedies portion of
25  this trial together.  I can't tell you the day that that

D1V5dav1                    conference

1  portion will be reached, but it seems to me it can't be until
2  April.  It is going to be a couple weeks anyway for the
3  liability proof, wouldn't you agree?
4          MR. MOORE:  Yes.
5          THE COURT:  It is going to be two weeks at least.
6          MR. MOORE:  I would say maybe three or four weeks.
7          THE COURT:  Certainly.  So, when we get to that point
8  you need to confer with each other collectively, figure out
9  witnesses or experts, collectively cross-examine -- that is
10  once, but it can be any of the lawyers, collectively make the
11  proposal what remedies you seek, collectively respond to
12  briefs.  I mean, I just want to do the remedies portion once.
13  I understand, as I said, that nothing is going to happen unless
14  there is a liability finding but it may as well complete the
15  fact record, the evidentiary record all at once.  I do not wish
16  to bifurcate.
17          Yes, Ms. Grossman?
18          MS. GROSSMAN:  Yes.  I guess with the Davis plaintiffs
19  and the Davis case being added I don't -- I mean, if the trial
20  is not about the Davis issues how is it that we are going to be
21  consolidating Davis remedies when -- isn't this the cart before
22  the horse?
23          THE COURT:  Because this is the remedies proof
24  portion.  It is as if I was trying the remedies portion before
25  the liability portion.  It is done all the time in simple

D1V5dav1                    conference

1    little injury cases, they say let's try damages before
2    liability.  It might lead to a settlement.
3             The Court has the power to try any portion of the case
4    before any other portion, so Davis will join in on the remedies
5    phase before there is any trial on liability so that that part
6    of the evidentiary record is done once.  There is no point in
7    trying it three times.
8             MS. GROSSMAN:  Well, we reserve the right to call
9    appropriate witnesses to address the Davis issues.
10            THE COURT:  What does that mean?
11            MS. GROSSMAN:  I don't know what it means until I know
12    what the Davis proof is.
13            THE COURT:  Ms. Grossman, you made the point in your
14    stay application that you can't give a remedy that applies only
15    to police officers who are outside TAP buildings in the Bronx.
16    There is one police force in this City; a big, large police
17    force.  You can't train some officers under one standard and
18    another bunch of officers under a different standard.  They are
19    one City and one police force; one set of training material,
20    one set of supervision, one set of monitoring.  If there is
21    going to be relief it has to be common.  You can't separate it
22    out.
23            The Housing Authority no longer has the Housing
24    Authority Police.  The Transit Police, Housing Police and the
25    regular NYPD were all merged years ago.  We can only do this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1V5dav1                    conference

1   once.  To the extent that they may never prevail on liability
2   then certain parts of the remedy may never take effect, but the
3   general training materials that might explain to the police
4   department the standards for Terry stop, how to conduct a Terry
5   stop, how to conduct an investigatory stop, etc., etc., that's
6   common.  And if there is a remedy and after it's imposed and
7   there is an appeal, you will get the final ruling someday on
8   all of those standards but it is only one standard for all
9   police officers and that's the basis for combining the three.
10           MS. GROSSMAN:  But the issues that will be combined
11   are those that only overlapped with Floyd and Ligon.
12           THE COURT:  Oh yes.  I think that's right.
13           MS. GROSSMAN:  Not anything that is unique to Davis.
14           THE COURT:  I think that's right.  We are not going to
15   get into what goes on in the lobby or the stairwells and all
16   that.  That's not the point.  That's not the point.  I think it
17   is these big generic issues that you pointed out, investigative
18   stops, Terry stops, training on those issues, etc.  We are not
19   going to talk about stairwells and hallways because that
20   wouldn't be a common issue.
21           MS. GROSSMAN:  Or house rules or vertical patrols?
22           THE COURT:  Did I not say vertical patrol?  It was
23   clear.  You have to listen to each word.  I said vertical
24   patrol.  I used that.  I said stairwells, lobbies.  I said
25   vertical patrol, said all of that, so, of course not.  We are

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D1V5dav1                    conference

1  not going to try the unique issues, we are trying the common
2  issues of remedy that apply to the New York City Police
3  Department which is one united department and can only have one
4  standard and that was the basis for your stay application.
5           MS. GROSSMAN:  Well, I just wanted to register our
6  objection to the Davis plaintiffs being part of that,
7  especially before liability is determined.
8           THE COURT:  It is reverse bifurcation.  It is done all
9  the time.
10          MS. GROSSMAN:  I understand that.
11          THE COURT:  And it is being done here.
12          MS. GROSSMAN:  I wanted to make sure the record is
13  preserved.
14          THE COURT:  The record is carefully preserved.
15          MS. GROSSMAN:  Yes.
16          THE COURT:  Now, there is some briefing due on this
17  issue in Ligon, right?
18          MS. KARTERON:  That's right, your Honor.  You asked us
19  to make a submission in February, I believe on the 22nd.
20          THE COURT:  And a response date was also set, is that
21  right?
22          MR. DUNN:  Your Honor, they were simultaneous briefs.
23          THE COURT:  Is that right?  Is that what I said?
24          MR. DUNN:  I believe.
25          MS. KARTERON:  Yes, your Honor.

D1V5dav1                    conference

1               THE COURT:  How does that affect the Floyd and Davis
2      plaintiffs who weren't being asked to make a separate
3      submissions at this time on remedies?  Do you want me to
4      postpone that date somewhat so that you can collaborate and
5      make one submission on behalf of all three cases?  So that it
6      might be that the Ligon plaintiffs write the first draft but
7      the other lawyers want to look at it, comment, revise so that
8      it is one submission on remedies?
9               MR. MOORE:  I think that would make sense, Judge.
10               THE COURT:  You think that makes sense.  So, I'm
11      willing to do it that date.  There is really no rush in the end
12      because I don't think we'll get to remedies proof until
13      sometime in April.
14               MS. GROSSMAN:  Your Honor, what does it mean for the
15      City?
16               THE COURT:  Oh, I'm moving both.  The date moves for
17      both sides.
18               MS. GROSSMAN:  Okay.
19               THE COURT:  Oh sure.
20               What would you propose, Ms. Karteron, instead of
21      February 22nd, so you have time to confer with all of these
22      lawyers?  A lot of lawyers.
23               MS. KARTERON:  Before that I would be concerned about
24      25 pages being shared among the three cases.
25               THE COURT:  I understand.  Why don't you confer and

```
         D1V5dav1                    conference
 1    tell me a proposal on both date and length.
 2              (Counsel conferring)
 3              MS. GROSSMAN:  Your Honor, one question?
 4              THE COURT:  Yes, ma'am.
 5              MS. GROSSMAN:  I think it was contemplated in our
 6    February submission in Ligon was to respond to the Court's
 7    proposed relief.
 8              THE COURT:  That's true.
 9              MS. GROSSMAN:  So that is still what we're talking
10    about here, correct?
11              THE COURT:  Maybe, but let's give everybody a moment
12    to confer.  I want to hear plaintiff's view first.
13              MS. GROSSMAN:  Okay.
14              THE COURT:  I don't know that the proposed relief
15    would be all that different.  It was pretty generic but we will
16    see.
17              (Counsel conferring)
18              MS. GROSSMAN:  Your Honor, another question.  Are you
19    contemplating that we submit a response to the proposed relief
20    before the trial starts?  Okay, I just wanted to make sure I
21    understood.
22              MS. KARTERON:  I think I might have missed that
23    exchange.
24              THE COURT:  She said do I want these proposals before
25    the start of the Floyd trial.
```

17

D1V5dav1                    conference

```
 1              MS. GROSSMAN:  Correct.
 2              THE COURT:  And the answer is going to be yes, so it
 3  will be some date that you are going to propose before the
 4  start of the Floyd trial.
 5              MS. KARTERON:  We need one more second.
 6              THE COURT:  Which is still somewhere between March 11
 7  and March 18th, something I expected to discuss today.
 8              MR. MOORE:  Judge, just for clarification, obviously
 9  because Floyd is sort of the global case.
10              THE COURT:  It is.
11              MR. MOORE:  And reaches the entire practice within the
12  NYPD.
13              THE COURT:  It does.
14              MR. MOORE:  Obviously the remedies that we might be
15  discussing would be somewhat unique to that situation.
16              THE COURT:  It might be different than those I put in
17  that opinion.  That was a question that Ms. Grossman raised
18  just a moment ago, were these submissions limited to what I put
19  in the January 8th opinion.  I said, well, I think so, but I
20  want to hear from plaintiff's first.
21              MR. MOORE:  I would think it would have to be broader
22  than that.
23              THE COURT:  Yes.  I'm hearing that.
24              MR. CHARNEY:  We would strongly ask that we --
25              THE COURT:  I'm hearing that.
```

D1V5dav1                      conference

```
 1            I thought of another problem that I want to talk about
 2   with both Ligon and Davis, come to think about it.
 3            Floyd, as you know, is a non-jury trial.  Have you
 4   given thought to whether Ligon or Davis are jury or non-jury
 5   trials?
 6            MS. KARTERON:  We have not yet made, given it any
 7   serious thought, your Honor.  As you know, we are still fairly
 8   early in our case having not conducted discovery on the other
 9   matters.
10            THE COURT:  You are.  I am just concerned that if it
11   is a jury trial you would be deprived of your right to a jury
12   on the remedies proof if it's done collectively and then I say
13   you obviously can't do it all over again.  The whole point was
14   efficiency of doing it once unless you were to either waive the
15   jury on the remedies portion and ask for a jury only on
16   liability.  I think you can do that.
17            MS. KARTERON:  Well, your Honor, given that, as again,
18   we have been in the game significantly less time than the other
19   cases here and have only conducted limited discovery at this
20   point --
21            THE COURT:  I know of that.  I thought of that issue
22   right now as I was sitting here:  Have the Davis plaintiffs
23   thought about the jury versus non-jury issue.
24            MS. ROSENBLOOM:  Your Honor, we have thought about it
25   but would like to have a little more discussion.  Could we let
```

19

D1V5dav1                    conference
1    you know in the next weeks?
2            THE COURT:  You can, but it affects in some ways the
3    entire plan because what I'm saying is if you have a right --
4    if you have a right to a jury I can't deprive you of your right
5    to a jury trial by preventing you from going to the jury.
6    However, I'm not entirely sure that you can't consent to the
7    remedies portion of the case being non-jury -- blah, blah --
8    while a liability verdict is taken which you have to reserve
9    on.  I'm not sure either, but I think you would have to look
10   into that.
11           MS. ROSENBLOOM:  Your Honor, because of the shortage
12   of seating, if the Davis plaintiffs could have 30 seconds to
13   confer with the gallery?  We will get right back to you.
14           MS. GROSSMAN:  Your Honor, just for the City's
15   perspective, the defendants have a right to a jury trial; we
16   have demanded one as well.
17           THE COURT:  But you lost it in Floyd when they waived
18   damages claims, right?
19           MS. GROSSMAN:  Correct in Floyd, but not on Davis and
20   Ligon.
21           THE COURT:  Yes and no.  If there are no damages
22   claims you would be in the same position as Floyd.  Maybe yes,
23   maybe no.  I don't know the answer.  If they were to waive
24   damages claims would you not be in the same position?
25           MS. GROSSMAN:  Possibly.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D1V5dav1                    conference

```
 1              THE COURT:  I don't know any of those answers either.
 2    You are entitled to one, obviously --
 3              MS. GROSSMAN:  Yes.
 4              THE COURT:  -- if there are damages claims.  I
 5    understand that.
 6              MS. GROSSMAN:  But I'm just saying that I wouldn't
 7    favor a waiver for remedy but then we have a jury trial on
 8    liability.  I think that we would argue that we are entitled to
 9    a jury trial on all if you're going -- it is not enough -- if
10    the whole thing is waived a jury trial is waived for all
11    claims.
12              THE COURT:  On damages.
13              MS. GROSSMAN:  If damages claims are waived for
14    liability and remedy then I think we're in the same place as
15    Floyd.
16              THE COURT:  Well, I don't know about that.
17              If the damages claims are waived but the plaintiffs
18    still request a jury which they could I think, I mean, in fact
19    I urge the Floyd plaintiffs to do that so even if they waive
20    the damages claims they could still prefer a jury trial.  I
21    don't know that that gives you a right any longer to a jury
22    trial on the issue of remedies because there would be a damages
23    claim and then we may be able to bifurcate liability and
24    remedies.  But, we're all talking without any research.
25              MS. GROSSMAN:  Correct.
```

21

D1V5dav1                    conference
 1          THE COURT:  Certainly I am.  I haven't looked into the
 2   issue.
 3          MR. DUNN:  Also, Judge, the submission that you would
 4   get because it would be far reaching prospectively because it
 5   involves the Floyd case, whatever Ligon and Davis would submit
 6   along with Floyd counsel on the remedy issue would certainly
 7   aid the Court and aid the parties in trying to figure out the
 8   remedies.  Assuming there is a liability finding in Floyd you
 9   are going to have to deal with remedies and you would have the
10   benefit of that thinking from all the three cases.
11          THE COURT:  Oh, I understand.
12          MR. MOORE:  I mean, you wouldn't necessarily limit
13   their right one way or the other, it seems to me.  I mean --
14          THE COURT:  We are exploring all of that.
15          MR. DUNN:  Your Honor, on the jury issue, if I might,
16   and on the waiver which seems an important concern, one thing I
17   would like to be clear about.  In terms of Ligon, you entered a
18   PI --
19          THE COURT:  Yes.  I know you are entitled to remedy on
20   the PI.  I understand that.
21          MR. DUNN:  We want to make sure whether you anticipate
22   us also making a remedy presentation on the balance of our case
23   outside of the stops at issue in the PI which we thought no.
24          THE COURT:  Oh, I thought yes because I don't think
25   remedies are particularized to eight stops.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

22

D1V5dav1                    conference

1           MR. DUNN:  Well, but as you pointed out, remember the
2  balance of our case is inside the buildings.
3           THE COURT:  Yes, I do understand.
4           MR. DUNN:  Those are the vertical patrol type things.
5           THE COURT:  On that, on the inside situation I agree
6  with what Ms. Grossman raised in the Davis case.  I'm not
7  interested in visiting the technical issues with vertical
8  patrol and inside patrol.
9           MR. DUNN:  That's a big part of our case.
10          THE COURT:  That will have to wait.
11          MR. DUNN:  I understand.
12          THE COURT:  I want to deal with parts that you have
13  proof which overlap best with the Floyd case.  We are going to
14  leave all of this inside stuff which has its own peculiar
15  issues in both Davis and Ligon.
16          MR. DUNN:  Very well.
17          THE COURT:  Did you say you were going to get back to
18  me, Ms. Rosenbloom?
19          MS. ROSENBLOOM:  Your Honor, the problem for us is we
20  would like to consult with our clients.
21          THE COURT:  Sure.
22          MS. ROSENBLOOM:  We do have individual clients with
23  individual damages claims so we don't feel we can waive the
24  right to the jury at this moment.
25          THE COURT:  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1V5dav1                    conference

1         MS. ROSENBLOOM:  We understand that your Honor is
2    speaking about the Monell portions of the remedy being heard
3    together.  Of course we have no objection to combining those
4    presentations, but we do need to have some consultation with
5    our clients.
6         THE COURT:  Right.  I understand.  We are just
7    exploring it for the first time here in terms of all three
8    cases trying to work together on the issues.  It is not easy.
9    But you all sort of created this problem with these three
10   separate cases that raise common issues.  It has not been easy
11   for the defense or the Court.
12        So, now we have to talk about what are the submissions
13   that are being called for.  I agree with what Mr. Worth said,
14   the proposed relief will probably be broader than that which
15   was proposed in the Ligon PI context and, not only broader, but
16   in some ways different because you have certain other issues
17   such as race claims.
18        MR. CHARNEY:  Right.
19        THE COURT:  And -- whatever, you have some different
20   issues.
21        MR. MOORE:  Yes.
22        THE COURT:  So, I do think the broadest possible
23   submission on remedies is the best submission and that may in
24   fact have us fall back on at least two separate submissions
25   because the Ligon submission was really directed at the January

D1V5dav1                    conference
1   8th opinion proposals and you want your relief, it is timely,
2   you got a PI, you're entitled to that relief and when that
3   relief is given, liability relief, it sounds like it is an
4   appealable order.  So the sooner we get to it, the better.
5          So I think in the end this should be two submissions.
6   Where that leaves Davis I can't tell you, but I do think now
7   that we probably should separate the Floyd and the Ligon
8   submissions on remedies -- I mean, I think you should read each
9   others for sure, you don't want to be in conflict.  I do want
10  you to make sure to work together to some extent but I do think
11  there is a reason for separate submissions.  Where this leaves
12  Davis I don't know.
13         MS. STEINBERG:  We would ask just to do a separate
14  submission.  We have overlap with both of cases.
15         THE COURT:  Right.
16         MS. STEINBERG:  So it is hard to figure out how we
17  would have race claims and significant overlap with Ligon so I
18  think it would be simpler to do a separate submission.
19         THE COURT:  But clearly shorter.  Yours, at this point
20  falls third, but just because of where these two are up to in
21  the process of trials and briefing so there needs to be
22  exchange of briefs, there needs to be not repetition.
23         MS. STEINBERG:  Certainly.
24         THE COURT:  Your brief may be at the end of the day
25  after reading the other two we don't have anything to add and
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

25

D1V5dav1                       conference
1    we join in both briefs; or we have very little to add, here is
2    our 10 pages.
3             MS. STEINBERG:  Certainly.
4             THE COURT:  So let's now talk about dates and page
5    limits.
6             Did you confer a little bit on dates?  When do you
7    think this submission can be made?  Because I think it would be
8    very good to have it pretrial.
9             MS. KARTERON:  Your Honor, if you would like it before
10   the trial --
11            THE COURT:  Yes.
12            MS. KARTERON:  -- we propose March 8th.  We need some
13   more time with it.
14            THE COURT:  I think March 4th is the latest we can go.
15   I can't read it over the weekend, neither can anybody.  So,
16   March 4th makes some sense.  In terms of page limits, it is a
17   very important issue, I would think.  Here is -- I'm just
18   throwing this out:  35 for Floyd, 25 for Ligon 10 for Davis
19   with, please, every effort to review one another's briefs and
20   not repeat everything.  You may not need all of those pages
21   when you see the first one.
22            MS. GROSSMAN:  Can you repeat that?  I didn't hear.
23            THE COURT:  The suggestion is, frankly:  35 Floyd, 25
24   for Ligon, 10 for Davis all due on March 4th.
25            MR. CHARNEY:  Your Honor, while we are on this issue,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
D1V5dav1                    conference
```

```
 1   this is a Floyd specific issue but I think it applies here but
 2   i wanted to get it out of the way which I was going to ask you
 3   later.
 4              We also have a lot of pretrial submissions due in the
 5   month of February and one of the ones we were going to ask for
 6   a brief extension on was our proposed findings of fact and
 7   conclusions of law and we were actually going to ask for March
 8   5th, so could we have until March 4th on that stuff?  Because
 9   it was originally due in February.
10              THE COURT:  I don't see a problem.  That is not
11   something that I usually need before trial anyway.
12              MR. CHARNEY:  Could we have longer now that we have
13   this submission?
14              THE COURT:  I don't find it a particularly useful
15   document in advance of the non-jury trial.  It doesn't do much
16   for me.  Everybody asks to annotate it after the trial for the
17   record anyway and I always say yes to that, it is helpful.  So,
18   frankly, why don't you meet and confer with the defendants and
19   pick a joint date.
20              MR. CHARNEY:  Thank you.  That's great, your Honor.
21              THE COURT:  It is not a terribly important document to
22   me pretrial but it may be important to each other in which case
23   you should confer with each other.
24              MR. CHARNEY:  Thank you, your Honor.
25              MR. MOORE:  It is possible we can do it after the
```

```
D1V5dav1                    conference
```

 1   trial.
 2            THE COURT:  Why don't you confer with each other
 3   because it may be more important to the adversary than it is to
 4   me pretrial.  Frankly, as I said, I don't usually turn to those
 5   until post-trial when they're annotated to the record.  That's
 6   been my experience in non-jury trials.  I don't study the
 7   proposed findings of fact in advance but the adversary may want
 8   them.  You may want theirs.  You may not.  Why don't you please
 9   talk to each other on that.  It may be that you jointly decide
10   it is one less thing to do and you want to put it off.
11            MS. GROSSMAN:  So, you're open to that.
12            THE COURT:  I am hopeful that after you confer with
13   each other.  But it may be that you want to see each others'
14   for tactical reasons.  You have to talk to each other on that
15   point.
16            Now, assuming that -- You want to confer?
17            MS. GROSSMAN:  No.  I want to make sure this doesn't
18   adjust the pretrial order date.
19            THE COURT:  No, it shouldn't do that.  You need to get
20   that in.  I want to see witnesses and exhibits and continuing
21   ideas of length.
22            Now, assuming I stick with this idea of 35, 25 and 10
23   it is still all about, I assume, about things such as training
24   and supervision and guidelines and all the rest of it.  It does
25   seem to me -- tell me if I'm wrong -- that the City should be

<div align="center">SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300</div>

28

D1V5dav1                    conference

1   able to make one submission in response.  It may be longer than
2   usual but I don't see why it can't be consolidated.
3           MS. GROSSMAN:  Your Honor, if we can consolidate it
4   that would be our preference.
5           THE COURT:  Of course.
6           MS. GROSSMAN:  But can we wait until we see the
7   submissions?
8           THE COURT:  You don't need to wait.  I have to give
9   you some notion of the length now.  The date is the -- oh,
10  these weren't responsive, these were simultaneous, right?
11          MR. MOORE:  Right.
12          MS. GROSSMAN:  I don't know if it makes sense, I --
13          THE COURT:  You know, I'm not sure that can work
14  anymore because the City has seen the Ligon proposal made by
15  the plaintiffs' lawyers before the trial -- before the PI
16  hearing, then they saw my January 8th opinion so they're
17  reacting to something.  This way they don't know what Floyd is
18  going to write in the March 4th submission.  It is kind of hard
19  for them to respond after all they're not proposing relief,
20  they're responding to --
21          MR. MOORE:  Their relief would be dismiss the case.
22          THE COURT:  Quite seriously that is more than exactly
23  right.
24          So, they're not making a proposal brief, they're
25  responding to a proposal.  They could do that in Ligon but they

29

D1V5dav1                    conference
1   have no way to do it in Floyd when they haven't seen your 35
2   pages.
3           So, since they do know exactly what is on the table in
4   Ligon now they can certainly start drafting but another week
5   wouldn't hurt, so March 11th for the joint submission?  But I
6   surely wouldn't wait until March 4 to start writing.  You know
7   what they're going to say in Ligon, it is in my January 8 order
8   and in their briefs before trial.  They made their remedies
9   proposal in their brief.
10          MS. GROSSMAN:  Your Honor, I have no problem with the
11  March 11 but we do have a trial that is supposed to be starting
12  March 11.
13          THE COURT:  I know, but we have been floating between
14  the 11th and 18th.
15          MS. GROSSMAN:  Okay.  If you can tell me that you are
16  even open to the 18th maybe?
17          THE COURT:  I have always been open.  Doubtful, but
18  open all along.
19          MS. GROSSMAN:  I'm still advocating for the 18th.
20          THE COURT:  I know, but we need to talk about length.
21  There are still many issues we will get to by the end of the
22  day.  Anyway, I see you need the week delay because you have to
23  see what Floyd writes but, please, don't leave the drafting
24  until then because you do know I said allot about the Ligon.
25          MR. CHARNEY:  We will be talking a lot, the three
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

30

```
        D1V5dav1                    conference
 1   cases.
 2              THE COURT:  I know, but from the defense perspective
 3   they have seen the January 8th opinion and they've seen the
 4   Ligon plaintiffs submissions before the hearing.
 5              MS. GROSSMAN:  May I have a moment to confer?
 6              THE COURT:  Sure.
 7              (Counsel conferring)
 8              MS. GROSSMAN:  Your Honor, I understand that on Ligon
 9   since we have some proposed findings, proposed relief --
10              THE COURT:  Correct.
11              MS. GROSSMAN:  That is we can start addressing that.
12              THE COURT:  Yes.
13              MS. GROSSMAN:  But the problem I have is I think if
14   you're suggesting March 4th, that all parties for the
15   plaintiffs, Davis, Ligon and Floyd --
16              THE COURT:  Yes.
17              MS. GROSSMAN:  -- and then we have to respond by March
18   11, I understand that we can do that for Ligon.
19              THE COURT:  Well, you could do that on March 4.  These
20   were supposed to be simultaneous but since they're
21   consolidated --
22              MS. GROSSMAN:  I understand.  My chief concern is that
23   to give us a week to respond Floyd and Davis is, given the
24   broad -- I have no idea of what --
25              THE COURT:  I agree.  I agree that you didn't have an
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

31

D1V5dav1                    conference

1   idea.  After you see it you may come to court and explain that
2   it is vastly different than what Ligon said and much, much more
3   than you expected and quite different, but it may be that it's
4   quite similar and there is really no problem.  You won't know
5   until you see it.  So, if need be, you will come rushing to
6   court I'm sure.
7                (Continued on next page)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

D1vzlig2                    Conference
1                 MS. GROSSMAN:  Okay, as long as we understand that if
2        it's not similar that --
3                 THE COURT:  That's right.
4                 MS. GROSSMAN:  We need the time.
5                 THE COURT:  I suspect it should be similar.
6        Identical, I doubt, but similar.
7                 Now, we did talk about page limits.
8                 MS. GROSSMAN:  Well, It's --
9                 THE COURT:  I know, it's 70 pages from them, but that
10       doesn't mean you need 70 pages.
11                MS. GROSSMAN:  I don't want to write 70 pages.
12                THE COURT:  Right, I agree.
13                MS. GROSSMAN:  I mean --
14                THE COURT:  Guess what, I don't want to read them
15       either.
16                MS. GROSSMAN:  I know, but I really do think we should
17       at least have a chance to look at what --
18                THE COURT:  I have to set a number today, total of 50
19       pages, 50 pages.  Maximum.  Nobody has to use the pages
20       allocated.  Please remember that in all the three cases.  If
21       you don't need 35 and 25, please don't use them.  There is no
22       need to over write.
23                are you folks conferring?
24                MR. CHARNEY:  Sorry.
25                THE COURT:  That's okay.  I just, the City seems to
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

D1vzlig2                    Conference

1   learned so well to say could we have a moment, it helps if you
2   want.
3              MR. CHARNEY:  No, we're okay.
4              THE COURT:  No.  Okay.  Look, the reason to do this in
5   part is to call witnesses once, to make an evidentiary record
6   once.  That's what I'm trying to achieve.  It's not only for me
7   to have briefing once.  But it's just wrong to put people
8   through the same exercise three times.  Well --
9              MR. MOORE:  I'm just concerned, Judge, and I've
10  expressed this before with respect to the remedial phase,
11  that --
12             THE COURT:  Yes.
13             MR. MOORE:  -- given how the case has progressed with,
14  you know, coming down to a bench trial and --
15             THE COURT:  Your choice.
16             MR. MOORE:  No, I understand.  But --
17             THE COURT:  Yes, I know.
18             MR. MOORE:  -- and that there may be a necessity to
19  provide input from people that we have not as, of this date,
20  identified as our expert witnesses on remedies or experts on --
21             THE COURT:  I don't know why.  I denied your request
22  to bifurcate more than a month ago.  Denied.  Surely you heard
23  the words.
24             MR. MOORE:  No, I understand that.
25             THE COURT:  All right.  Well, then that's your

34

D1vzlig2                       Conference
1   problem.
2              MR. MOORE:  And, well, it's not just our problem.
3   It's really -- it should be everybody's concern.
4              THE COURT:  Well --
5              MR. MOORE:  And that's why we put some effort into
6   this.  When you said consult, we put some effort into trying to
7   come up with what we thought was a fairly innovative and we
8   thought productive approach to try and resolve an issue that's
9   important to everybody in the --
10             THE COURT:  I may have thought so too, but the City
11   opposes it.  I'm not their lawyer.  I'm a neutral Judge.  If
12   they oppose it, they oppose it.
13             MR. MOORE:  I understand.  I think that, as I said,
14   and I'm just repeating myself, this is an important case, it
15   raises important issues.
16             THE COURT:  I'm sure you're aware I know it's an
17   important case.
18             What is the new point you're making, Mr. Moore?  I'm
19   aware it's important.
20             MR. MOORE:  The Court should have the benefit of much
21   input on the remedial stuff as they can.
22             THE COURT:  Okay.
23             MR. MOORE:  And if that means there is a witness who
24   has not yet been identified that we think should be identified
25   for you that we would talk about in our brief and then perhaps
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

D1vzlig2                    Conference

1   put on at the end of the trial, I think the Court should be
2   open to allowing us to do that.
3           THE COURT:  It may be the case.  I don't know yet who
4   you have in mind, and why they aren't identified before.  I
5   don't know -- maybe there's no such person, maybe there is.  I
6   can't deal with maybes.  When you have a problem, tell me about
7   it.
8           MR. MOORE:  Right.  All right, Judge.
9           THE COURT:  All right.
10          MS. GROSSMAN:  I would absolutely object at this
11  point.  I've objected to these late productions and late
12  identifications of other witnesses, and this would be highly
13  inappropriate and prejudicial to us.
14          THE COURT:  Well, I do have two other cases that are
15  being asked to partake in the remedies phase and they were not
16  a part --
17          MR. MOORE:  Right.
18          THE COURT:  -- of the date cutoffs that were set
19  earlier, so let's see if there is an issue.  I don't know what
20  potential witnesses he's talking about.  I don't know potential
21  experts he's talking about.  I will cross bridges when they
22  come.  When they look it over, there may be nobody else.  We
23  don't know.
24          MS. GROSSMAN:  But, your Honor, I mean this has been
25  raised more than once and you've shut him down more than once,

D1vzlig2                    Conference
1    and now he's raising it again.
2                THE COURT:  I have enough problems here, I don't shoot
3    anybody, but go ahead.  Yes, I'm just saying I don't like the
4    words.
5                MR. MOORE:  I'm ducking, Judge.
6                THE COURT:  Yes.
7                MS. GROSSMAN:  Right.  Well, the bottom line is that
8    the plaintiffs are clearly interested in adding to their
9    witness list, and that's obvious, and for us to not have notice
10   of that is not right and --
11               THE COURT:  Who said you don't have notice?  Today is
12   January 31st.  We're going to reach remedies in April.  I don't
13   know that you have don't have notice.  Let's see if and when
14   you get notice of a witness in any one of these three cases on
15   the remedies phase.  It's two full months off.
16               MR. MOORE:  Right.
17               THE COURT:  Full.
18               MS. GROSSMAN:  But we're supposed to know the case
19   before so that we can mount a defense and --
20               THE COURT:  I understand.
21               MS. GROSSMAN:  And to do this last minute, this is not
22   right.
23               THE COURT:  Well, all right, Ms. Grossman, I've got
24   your view on the record.
25               MS. GROSSMAN:  Okay.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D1vzlig2                    Conference
1              THE COURT:  Okay.
2              MS. COOKE:  Could we have one second?
3              THE COURT:  Sure.
4              MS. GROSSMAN:  So, your Honor, if the plaintiffs are
5      expected to identify new witnesses --
6              THE COURT:  I didn't say they're expected.
7              MS. GROSSMAN:  I'm sorry, and dates in Ligon, if
8      they're going to be identifying witnesses -- we have a joint
9      pretrial order due very shortly.
10             THE COURT:  What's the date?
11             MS. GROSSMAN:  What's the date that they're going
12     to --
13             THE COURT:  What is the date of the joint pretrial?
14             MS. GROSSMAN:  February 19th.
15             THE COURT:  Is that right?
16             MS. GROSSMAN:  And we need to discuss, the plaintiffs
17     have to give us their joint pretrial order probably next
18     Thursday in order for us to be able to respond and produce one
19     the following week.  So we need to know, you know, who the
20     witnesses are so that --
21             THE COURT:  Right.  Look, to make things very very
22     clear, if there's going to be an expert that you haven't
23     already identified with respect to this remedial phase -- and
24     you did know your request to bifurcate was denied a month ago,
25     you must come up with this name immediately so they can respond
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
     D1vzlig2                  Conference
 1   to it.
 2              MR. MOORE:  We will, Judge.
 3              THE COURT:  Okay.
 4              MS. GROSSMAN:  When?  I mean, we're supposed to start
 5   in five weeks and the joint pretrial order -- we were supposed
 6   to get notice of any additional witness by December 30.  It is
 7   so late that we shouldn't have to deal with this.  But I want
 8   to know what I'm dealing with, so I can register my objections
 9   and oppose, and I think we should know it sooner rather than
10   later.  If they know who they have in mind right now, they
11   should give it to us tomorrow.
12              THE COURT:  Mr. Moore, by when can you do this?
13              MR. MOORE:  Can I consult, Judge?
14              THE COURT:  Sure.
15              (Conferring)
16              MR. CHARNEY:  Sorry about that, your Honor.
17              The reason we wanted to confer with the other
18   plaintiffs is because we want to make it clear that the date
19   we're talking about here applies only to the Floyd case,
20   because these folks --
21              THE COURT:  I understand.  They were only recently
22   added into the notion of this particular particularly Davis,
23   but well Ligon has known since the opinion came out, but okay.
24              MR. CHARNEY:  So I guess just on the Floyd issue, we
25   would ask that we have I guess, what did we say, two weeks?
```

D1vzlig2                    Conference

1          THE COURT:  No, that's impossible.  It's impossibly
2     late now.  I would think maximum would be a week from today.
3          MR. CHARNEY:  Okay.
4          THE COURT:  And that's the 7th of February, that's the
5     maximum.  And when I see that or when the City sees it, there
6     may be much to talk about.  I don't know what you're going to
7     say.  I'll see it when I see it, but no later than the 7th.
8          MR. CHARNEY:  Got it.
9          THE COURT:  All right, so --
10         MS. GROSSMAN:  So I'm still unclear, your Honor --
11         THE COURT:  Yes.
12         MS. GROSSMAN:  -- I'm sorry --
13         THE COURT:  Yes.
14         MS. GROSSMAN:  -- about Davis and Ligon and whether
15    there are going to be others and we need to know.
16         THE COURT:  So I think that anybody who has ideas on
17    witnesses for this remedies hearing, certainly Ligon has had
18    long time to think this, February 7th.
19         MS. STEINBERG:  For Davis?
20         THE COURT:  Well --
21         MS. STEINBERG:  We haven't had an opportunity to -- I
22    would ask for more time for Davis, because we really haven't
23    until today.
24         THE COURT:  That's not true, it's not today.  I put
25    that into --

```
         D1vzlig2                 Conference
 1                MS. STEINBERG:  Into the, yes.
 2                THE COURT:  One of the opinions, maybe the stay
 3       opinion or one of the opinions I said, and Davis is more than
 4       invited to participate here too.  So it's not today at all.
 5       When was the stay opinion issued?
 6                MS. GROSSMAN:  January 8th.
 7                MS. COOKE:  I think it was in the January 8th
 8       decision, your Honor.
 9                THE COURT:  Oh, I mentioned it even in the January 8th
10       opinion?
11                MS. COOKE:  Yes.
12                THE COURT:  So you've been in this three weeks
13       already.  So I really think February 7th is it.  Everybody
14       better scurry on this issue of remedies.
15                MS. STEINBERG:  Can I just clarify whether you're
16       asking for experts or all of our witnesses that we're
17       proposing?  Because it's witness experts, I think.
18                THE COURT:  Certainly experts I would think it's
19       common, it's common, there isn't going to be one in this case,
20       one in this case and one in this case.  This was the point of
21       doing it this way; get together if you have an expert and
22       that's it.
23                MS. STEINBERG:  I think.
24                THE COURT:  Now, as far as other kinds of witnesses, I
25       don't know what other kinds there would be, if we're not going
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

D1vzlig2                    Conference
1    into the specific issues of vertical patrols that relate solely
2    to Housing Authority buildings.  We're trying to talk about the
3    police department and basically stop and frisk policy in
4    general, not the specifics of what they can or can't do inside
5    a Housing Authority building.  That was one of the earliest
6    points Ms. Grossman made and I agreed with her.  I don't want
7    to make this more confusing than it already is.
8         So I would say all the common witnesses.  This would
9    not limit your right when we get around some day to trying the
10   case on liability, and see if there are more people on the
11   specific issues relating to your specific concerns of Housing
12   Authority buildings, because that's not part of this
13   consolidated hearing.
14        That would be true of Ligon too and the end of the day
15   when there's a full trial on all issues, there may be other
16   people on remedies then, because they're peculiar to inside
17   stops, in town buildings, which is not part of this.
18        MS. KARTERTON:  We understand, your Honor.  We just
19   like to note that we had not considered putting on additional
20   witnesses until we received your opinion earlier this month,
21   and so we feel like identifying additional witnesses within one
22   week would be short notice.
23        THE COURT:  You may not need any, you may have been
24   satisfied as it was.  We tried the case then, the PI hearing
25   and I called for submissions on February 22nd directed to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

42

D1vzlig2                    Conference
1   remedies.  Nobody's asking you to call any additional
2   witnesses.  You may say, look, this poor Judge, we don't want
3   her suffer any more; she'll hear what she hears in Floyd, it's
4   all the same, we don't have to burden her.  But I want you all
5   to have a big meeting in somebody's conference room and get
6   this done once.  Not necessarily any additional witnesses.
7   We'll see.
8            MS. GROSSMAN:  Your Honor, I note on the joint
9   pretrial order, since we're just on the topic.
10           THE COURT:  Yes.
11           MS. GROSSMAN:  I would just ask that the plaintiffs
12  provide us that next week so that we can then --
13           THE COURT:  When were they due to provide it to you?
14           MS. GROSSMAN:  You didn't order, but I think it was
15  contemplated it can be staggered we need at least a week to
16  look at their, you know, joint pretrial order.
17           THE COURT:  So the date was February 19th?
18           MS. GROSSMAN:  To the Court.
19           MR. CHARNEY:  Your Honor, we --
20           THE COURT:  So then I'll move the date a week that
21  way.  In other words, they can produce theirs on the 19th,
22  usually it's staggered, usually the plaintiffs give their
23  version to the defense, and then defense adds theirs to the
24  plaintiff's version.  That's the way I do it in every other
25  case.  So that can just wait till the 26th.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

43

D1vzlig2                    Conference
1               MS. GROSSMAN:  Okay.
2               THE COURT:  So the 19th comes from plaintiffs, the
3    26th comes the joint, and you add your portions.
4               MS. GROSSMAN:  Your Honor, I would just ask if we have
5    till the 27th.
6               THE COURT:  Sure.
7               MS. GROSSMAN:  It's one extra day.
8               THE COURT:  Sure.  It's no makes no difference to the
9    Court.
10              Okay.  Is there more we should talk about in the
11   remedies portion of this conference, because the remainder of
12   the conference relates solely to discovery disputes in Floyd,
13   with one exception, the Ligon plaintiffs asked for a schedule.
14   Yes, I will do that first, so hopefully the other two cases can
15   feel free to go away.
16              MS. GROSSMAN:  Your Honor, just in terms of the page
17   limits and the submissions on remedy.
18              THE COURT:  Yes.
19              MS. GROSSMAN:  Are you expecting declarations or any
20   submission that we're -- we think would.
21              THE COURT:  I would actually hope not.  We're going to
22   have a trial and it's non-jury.  I don't see why I need a
23   declaration.  I'm not deciding a motion.
24              MS. GROSSMAN:  Okay.
25              THE COURT:  Just the people want to brief the law or
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

44

D1vzlig2                    Conference
 1  just give their ideas or their oppositions to ideas, that's
 2  fine.
 3              MS. GROSSMAN:  Okay.
 4              THE COURT:  That helps the Court.  But I don't know
 5  why I would need a declaration now.  I'm going to hear live
 6  from these people, especially on the defense side we're going
 7  to call people to talk about I guess the burdens and other such
 8  things.  All right.
 9              Is there more on remedies, before I turn to scheduling
10  in Ligon, and then excuse the Ligon and Davis plaintiffs, at
11  least from the table?  If they want to stay in the room they're
12  welcome, it's a public courtroom, but let's do the schedule.
13  What are you proposing Mr. Ms. Karterton, have you talked to
14  the defense?  Usually there is a meeting conferring on
15  schedule.
16              MS. KARTERTON:  Yes, I did confer with Mr. Zuckerman
17  yesterday and he indicated that he was not yet ready to advise
18  or position on dates.
19              THE COURT:  I can't do that, Mr. Zuckerman.  In every
20  other case I set a scheduling order.
21              MR. ZUCKERMAN:  Well, I talked to Ms. Karterton.
22  We're okay with the June 30th discovery cut off.
23              THE COURT:  Okay, good.  I order June 30th fact
24  discovery cut off.  What else?
25              MS. KARTERTON:  I would note June 30th is actually a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D1vzlig2                    Conference
1   Sunday.  June 28 perhaps?
2           THE COURT:  June 28, perhaps.  Fine, June 28 fact
3   discovery cut off.  Is there a date for expert discovery?  You
4   had a proposal, I think.
5           MS. KARTERTON:  Yes, we propose September 27th.
6           THE COURT:  Really, you need --
7           MS. KARTERTON:  90 days?
8           THE COURT:  90 days for expert discovery.  Mr.
9   Zuckerman, what's your view of that?  It seems long to me.
10          MR. ZUCKERMAN:  Well, it wasn't clear on whether the
11  plaintiffs were going to make their disclosures first and then
12  we would have rebuttal disclosures?
13          THE COURT:  I guess so.  But the point is that it
14  would make them, they produce reports, and there would be
15  deposition, you might have experts reports.  So if you also
16  agree that 90 days is not too long, I guess I'll live with it.
17          MR. ZUCKERMAN:  No, 90 days is fine.  It's fine.
18          THE COURT:  I think it's long.  Anyway,
19  September 27th.
20          MS. KARTERTON:  Yes, your Honor.
21          THE COURT:  That is very long.
22          MR. ZUCKERMAN:  I just want to be clear, is that for
23  plaintiff's experts?
24          THE COURT:  No, no that's all expert discovery.
25          MR. ZUCKERMAN:  All expert discovery.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

D1vzlig2                    Conference
1              MS. GROSSMAN:  Your Honor, may I just be heard on the
2     expert -- as you have seen with Davis and Floyd, I mean there
3     is similarities with the type of expert reports.
4              THE COURT:  Well, certainly Dr. Fagan, always seem to
5     get him, yes.
6              MR. CHARNEY:  And Professor Smith.
7              THE COURT:  What?
8              MR. CHARNEY:  We always get Professor Smith too.
9              THE COURT:  That's true too.
10             MS. GROSSMAN:  So when you look at the breadth of the
11    analysis, I don't know that 90 days is necessarily
12    unreasonable.
13             THE COURT:  Oh, I wasn't objecting to it.  I didn't
14    love it, but -- I said I was going to live with it.  I said I
15    was going to live with it.  I wasn't fond of it.
16             MR. ZUCKERMAN:  I just wants to be clear on when the
17    plaintiff's disclosures are due.
18             THE COURT:  I hadn't set the dates within the 90
19    because you haven't met and conferred.  I want to ask you to
20    try to do that yourselves by giving you the outside date and
21    ask you if you could please try to work out interim dates of
22    when they disclose and when the reports are exchanged, when the
23    deposition, et cetera.  All I care about is the cut off.
24             MS. KARTERTON:  Your Honor, the other thing we would
25    ask for is a date for initial disclosures.  As odd as it may
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

47

D1vzlig2                     Conference

1    see, we have not actually formally exchanged --
2              THE COURT:  Yes, that is odd.  What do you propose?
3              MS. KARTERTON:  No rushing, maybe February 28.
4              MR. ZUCKERMAN:  Your Honor, the issue that we have
5    with initial disclosures, I mean, everybody's been disclosed
6    and deposed and all the documents have been produced.
7              THE COURT:  We did have a preliminary injunction.  It
8    seems like this is a case where 26(a) could be waived.
9              MS. KARTERTON:  Well, your Honor, we'd be concerned in
10   part because there are numerous incidents at issue in the case
11   that were not part of the PI hearing and other witnesses that
12   now the City they may be aware of that we don't know the
13   identity of yet.
14             THE COURT:  Maybe it's a really good thing that you
15   make initial disclosures, and when the defendants see your
16   initial disclosures, they can figure out if they have
17   disclosures under the rules that should be made, but the status
18   of case now I don't know what they would disclose they the
19   haven't already disclosed.  There has been a lot of water under
20   the bridge in the Ligon case.  So why don't you make additional
21   disclosures by February 28.  So he's got a lot to do.  And
22   after they receive it, Mr. Zuckerman, would you make a proposal
23   as to what when you should make initial disclosures and
24   response, because it may actually put you on notice of some
25   specifics where you should disclose witnesses with knowledge,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

D1vzlig2                    Conference
1    they may give you a particular incident you could figure out
2    who the officers were, whatever maybe appropriate to disclose
3    them.  So just make a proposal after you get it.
4                MR. ZUCKERMAN:  Sure.  I would think that our proposal
5    would be things that are new, though.
6                THE COURT:  Correct, of course.
7                MR. ZUCKERMAN:  Yes.
8                THE COURT:  But pick a date after you see what you
9    get.  I don't know if it's going to be voluminous or not
10   voluminous.  When you get it, please make a proposal.
11               MR. ZUCKERMAN:  Sure.
12               THE COURT:  Don't forget a lot to do.
13               All right, what else in Ligon?  We have class cert.
14   motion pending now.  Do we expect summary judgment motion
15   practice?  You don't.
16               MR. MOORE:  Not any time soon.
17               THE COURT:  Not from the defense, but -- the
18   plaintiffs -- what about the defendants?
19               MR. ZUCKERMAN:  It would certainly be a possibility.
20   There are a lot of individual claims, you know, that --
21               THE COURT:  Right.  We've been down the road on two
22   other cases now.
23               MR. ZUCKERMAN:  I mean we haven't totally considered
24   that at this point, but there are a lot of individual --
25               THE COURT:  Put it this way, it doesn't depend on fact
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D1vzlig2                    Conference
1   discovery, I mean -- sorry -- expert discovery.  Motion
2   practice doesn't depend on expert discovery.  So we should have
3   a premotion conference on summary judgment in July after, well
4   after the close of fact discovery.  I'm just going to pick a
5   date in July to see you on that case.  This is obviously a
6   random choice.  Tuesday, July 23rd at 4:30.
7               MR. ZUCKERMAN:  It's fine, your Honor.
8               THE COURT:  All right.  That will be -- I guess
9   summary judgment premotion conference, usual rules apply.  You
10  have to get a letter in, that's why I gave you several weeks
11  after the close of discovery, one doesn't have to wait till the
12  last day at the end of discovery to start thinking about their
13  letter.
14              All right, is there any other scheduling issue should
15  be done in Ligon, or does that give you broad outlines of what
16  you need?
17              MS. KARTERTON:  That's everything we want to raise,
18  your Honor.
19              THE COURT:  All right.  Anything about Davis peculiar
20  at this time?  Where are we up in Davis?
21              MS. KUNZ:  Your Honor, we are awaiting a decision on
22  the Monell summary judgment motions by both defendants and our
23  cross motion for summary judgment, partial summary judgment,
24  then --
25              THE COURT:  Is that all fully submitted?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D1vzlig2                    Conference
 1              MS. KUNZ:  I'm sorry, yes, as of the 18th, your Honor.
 2              THE COURT:  Oh, of January.
 3              MS. KUNZ:  Yes.
 4              THE COURT:  All right.
 5              MS. KUNZ:  And then, as your Honor knows, you ordered
 6    that we not proceed to class certification until after those
 7    motions were decided.  We are prepared to do so right after
 8    those are decided.
 9              THE COURT:  And then you'd be looking for a trial
10    date.
11              MS. KUNZ:  That's correct.
12              MR. MOORE:  How about March 18th, Judge?
13              THE COURT:  No, no.  I don't wish to consolidate
14    liability phase of the two trials, okay.
15              All right, so Ligon and Davis are excused, at least
16    counsel table so that the rest of the Floyd lawyers can join
17    their colleagues.  You of course are welcome to stay.
18              All right, let's see if I know who are at counsel
19    table.  I forget a lot of names so obviously Mr. Moore,
20    Mr. Charney, Ms. Borchetta, and I forgot
21              MS. PATEL:  Miss Patel.
22              THE COURT:  Patel.
23              MS. MARTINI:  Kasey Martini from Covington & Burling.
24              THE COURT:  Ms. Martini.
25              MR. CHARNEY:  Yes.  All right.

                                                                    51
        D1vzlig2                    Conference
 1              THE COURT:  All right.
 2              There have been a couple of letters exchanged with
 3      regard to discovery disputes.  I have a plaintiff's
 4      January 29th letter, defendant's January 29th letter.  I don't
 5      think I've written responses to either side's letter, is that
 6      right, which is fine?
 7              MR. CHARNEY:  Your Honor, defendant's letter did
 8      respond to ours, but you told us that you didn't want a
 9      response from us.
10              THE COURT:  Right, that's right.
11              MR. CHARNEY:  So.
12              THE COURT:  That's right.
13              Okay.  Let's start with the request for -- the request
14      that plaintiffs have made of defendants to provide information
15      concerning unsubstantiated Internal Affairs Bureau and Office
16      of the Chief of Department Investigation that concerned alleged
17      suspicionless stops.  The theory of this is that this is
18      relevant to the plaintiff's deliberate indifference issue.
19              The defendants point out that I dealt with the CCRB
20      issue before, and with respect to CCRB I only allowed limited
21      discovery of substantiated claims.  But if I understand
22      correctly, IAB and OCD are part of the police department.  Is
23      that not true?
24              MR. CHARNEY:  Yes.
25              THE COURT:  Yes.  And the CCRB is not part of the
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

52

D1vzlig2                    Conference

1   Police Department, it's independent of the police department.
2   So in terms of the claim of deliberate indifference, the
3   plaintiffs are concerned with what the police department does
4   or says not, with what some independent body does or says.  And
5   their point is that the adequacy of investigations by the
6   police department of its own behavior is very much a part of
7   deliberate indifference.  That's the first point.
8           Second point is I had made a statement in discussing
9   CCRB where I said, I'm not going into every disciplinary charge
10  or things like he was late, he was rude, et cetera.  But this
11  is -- this request relates only to alleged suspicionless stops,
12  not complaints about particular officers, you know, I don't
13  know what, being late, being rude or pointing their gun when
14  they shouldn't or firing it.  It's not about that.  It's about
15  alleged suspicionless stops.  I have no idea over what period
16  of time this request is made for, why it's being made now.  Is
17  this the first time it's being made?  No.  What is it -- who
18  wants to speak, Ms. Borchetta.
19          MS. BORCHETTA:  Your Honor, I think part of the issue
20  is that we recently had discovery on additional officers, so
21  that we had previous discovery on IAB and OCD investigation
22  related to officers who were previously disclosed, but the City
23  was now both updating the information we had regarding those
24  previous officers, and also for the first time providing it
25  with respect to new officers.  And so we would want it, again,

53

D1vzlig2                    Conference
1  both updated information on unsubstantiated IAB and OCD
2  investigation arising from allegations of a suspicionless stop,
3  whatever --
4              THE COURT:  But are you talking about the entire New
5  York City Police Department over ten years or are we talking
6  about only the officers?
7              MS. BORCHETTA:  Your Honor, only the officers that are
8  involved in the stops that we're challenging.
9              THE COURT:  I see.  So how many?
10             MS. BORCHETTA:  Over a ten year period.
11             THE COURT:  10 year period.
12             MS. BORCHETTA:  Correct, your Honor.
13             THE COURT:  How many such officers are there, roughly.
14             MS. BORCHETTA:  I could count them right now, your
15  Honor.  I believe it's approximately 15.
16             MS. PUBLICKER:  Your Honor, if I may, I believe the
17  number is closer to 40.
18             THE COURT:  It's an interesting dispute right there,
19  15 or 40.  Ms. Borchetta?
20             MS. BORCHETTA:  I think it's like --
21             MR. CHARNEY:  I guess -- one of the parts we're
22  confused about is, are you asking all the officers that we
23  already received information for or just the newly --
24             THE COURT:  All the officers who you would like the
25  City to search for IAB and OCD investigations of alleged
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

54

D1vzlig2                    Conference

1    complaints of suspicionless stops, all the ones you want them
2    to look for.
3              MS. GROSSMAN:  Your Honor, while the plaintiffs are
4    looking, can I just make one -- just address the court?
5              THE COURT:  Sure.
6              MS. GROSSMAN:  Remember where this came up.  This came
7    up in the context of the motions in limine when we, in January,
8    on January 4th we had a conference, and we asked the Court and
9    we moved in limine on disciplinary related documents like CCRB,
10   IAB.
11             THE COURT:  I certainly know we've covered CCRB.
12             MS. GROSSMAN:  And IAB and other disciplinary related
13   documents.  Our argument to you, when we were arguing
14   admissibility, is that we'd like to move in limine, and in
15   consideration of past rulings that you've made of
16   unsubstantiated CCRB complaints and IAB has not generally --
17             THE COURT:  But this information, as I understand it,
18   is not about the officers.  It's about the quality of the
19   police department investigating claims of suspicionless stops.
20   So it's quite a different thing.  In terms of the motion in
21   limine you're saying police officer shouldn't have to explain
22   away, so to speak, or be challenged by unsubstantiated
23   allegations, and I agree with that then, I agree with it now.
24   It's not part of cross-examination of the police officer, you
25   know, isn't it true you did this on this, this date.  These are

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

D1vzlig2                    Conference
1    unsubstantiated allegations.
2           What they want to talk about here is, there's an
3    allegation of a suspicionless stop, what did the IAB or OCD do.
4    Maybe they did a lot, maybe they did nothing, maybe they did
5    something in between.  It's a non-jury trial.  I'm not worried
6    about the prejudicial overflow in terms of the officer not
7    worried about the complaint being made.  I think I can separate
8    that.  I know what un-substantiate is.  But they want to see
9    what were the investigative steps that were undertaken as part
10   of their proof of deliberate indifference.  So what I really
11   don't know yet is the burden part.  I don't know if these
12   records are electronically maintained?  Ms. Publicker, do you
13   know that?  Are they electronically retained, are they
14   searchable by name?  Can the IAB and OCD records be searched,
15   you know, somebody has a unique name like Borchetta, can you
16   search a data base to see if IAB or OCD has a file on an
17   Officer Borchetta, which is at least a unique name, unlike
18   Smith or Jones, but we'll get to that, there may be Smith and
19   Jones.  But can it be searched, do you know?
20          MS. PUBLICKER:  I can't speak to --
21          THE COURT:  All right, so that's the first thing you
22   should find out, the burden portion of this.  I don't know if
23   it's easy or hard.  When you get the list of names and I think
24   the first thing you need to do, maybe Borchetta, first thing
25   you should do is produce the list of names that you want the

D1vzlig2                    Conference
 1  City to search, then we'll figure out if it's 15 or 40, produce
 2  the list of names tomorrow.  There is no reason to take longer
 3  than over night to produce the list of names.  Then when you
 4  get that, Ms. Publicker, you'll find out if it's electronically
 5  searchable, if so, over what period of time they maintain
 6  records electronically.  Maybe it only became electronically
 7  maintained five years ago, not ten years ago.  The older
 8  records are not searchable in that way.  When I know that
 9  answer, you know, I'll figure out what I can do.  I can always
10  see you on short notice.
11          But I can say for the sake of argument, that if it's
12  electrically searchable, I would ask you to find records, IAB
13  or OCD investigations, as to the list of names they give and
14  we'll take it step by step from there.  But I don't have enough
15  information now to rule.
16          MS. GROSSMAN:  Your Honor, I'd just like to add that
17  this is exactly what was briefed in the motions in limine.
18          MR. CHARNEY:  No, it's not.
19          THE COURT:  Mr. Grossman, I've answered you twice,
20  this does not go to cross examining the officers.  They're not
21  going to be asked to explain these stops, not at all.
22          MS. PUBLICKER:  Your Honor --
23          THE COURT:  The issue is what did IAB or OCD do,
24  because they are the police department.
25          MS. GROSSMAN:  I know you, but you -- Mr. Charney made
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

57

D1vzlig2                    Conference

1   that argument at the January 4th conference, I have it right
2   here.  The third category we think is important to Monell is
3   when it comes to civilian complaints, there are several
4   different agencies that will investigate them, CCRB which we
5   know about, but then there are two internal NYPD departments.
6   There is the Office of Chief of Department and the IAB, the way
7   that they investigate, the extent to which they investigate,
8   the quality of those investigations.  We think this is
9   relevant.  Court:  Denied.  I am not going into every
10  disciplinary charge.  That's what you had said.
11          THE COURT:  I'm not going into every disciplinary
12  charge with the officers.  I still say that.  This is a
13  different issue that I'm hearing now.  If I was wrong then, the
14  good thing about motions in limine is that the Federal Rules of
15  Evidence say this, explicitly or is it civil procedure?
16          MR. CHARNEY:  I --
17          THE COURT:  One or the other.  It says can be
18  revisited any time, all rulings on MILs are preliminary, all
19  could be revisited any time throughout the trial.  It's in the
20  rule itself.  I'll read it to you if you wish me to once I
21  figure out if it's in criminal or civil procedure.  I guess
22  it's civil procedure, but it says it flat out.
23          MS. BORCHETTA:  Your Honor, also the portion of the
24  record that they're repeating here today, we submit is not the
25  entirety of your decision.  The entirety of your decision did

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

58

D1vzlig2                    Conference

 1  not preclude this finding here and is not inconsistent with it.
 2          THE COURT:  Who is going to help me find the rule?  I
 3  know the rule.  I know it says -- it may be to say -- that's
 4  why I think civil procedure --
 5          MS. COOKE:  May we have a moment, your Honor?
 6          THE COURT:  It doesn't matter, because I know it says
 7  that, but I like to find it.
 8          MR. CHARNEY:  Your Honor, I don't know if this will
 9  help, but I --
10          THE COURT:  I just want to find it.  I know exactly
11  what I said.
12          MR. CHARNEY:  I think you're right, but --
13          THE COURT:  I know I'm right.  I just want to read the
14  language into the record.  I know I'm right.  Nobody wants to
15  help me find it.
16          MR. CHARNEY:  We didn't bring our books.  Sorry.
17          THE COURT:  Oh, I have lectured and lectured that
18  people need to bring their books.
19          MR. CHARNEY:  They will definitely be here for trial
20  for sure.  But I don't know about now.
21          THE COURT:  So embarrassing.
22          MS. GROSSMAN:  Your Honor, I'd just like to say that
23  in light of your ruling on January 4th, it seems like this was
24  a non-issue in terms of witnesses who may need to --
25          THE COURT:  Well, this is getting counter productive
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

until I can read the rule to you, unless you agree that I know exactly what it says. MIL rulings are never final, can be revisited through the trial at any time, any time. Nobody knows how to find -- I'm having trouble finding it. I know it says that. So actually, I'm not going to say another word about it until I can read the rule into the record. We're all going to have to sit here while I find it.

All right, I failed. I cannot find the text right now, but I know what the rule says, and that's the end of it. I will find it. It won't be in the record today.

MS. GROSSMAN: Your Honor --

THE COURT: But the short answer is I said the word denied. I changed my mind. I want to see what there is in terms of IAB and OCD with respect to these officers. Send the names over, find out if this is electronically searchable. I will address Burton when I here more about it. I don't know if there is five of these or 100 of these. I just don't know what we have till I gain the information. So that's the end of this for now.

MS. GROSSMAN: Your Honor, I understand your ruling.

THE COURT: Good.

MS. GROSSMAN: I just want to make one point; that is, because we understood your ruling to be different than it is today, we may need to reserve the right to call, you know, identify another witness that might address that, so I just

D1vzlig2                    Conference
1    don't want to be precluded.
2              THE COURT:  That's true.
3              MS. GROSSMAN:  Or --
4              THE COURT:  That's fair.
5              MS. GROSSMAN:  Yes.
6              THE COURT:  I'll be happier when I find the rule.
7    Yes?
8              MS. BORCHETTA:  Your Honor, we would just ask for some
9    deadline by which we would receive from them information about
10   the burdens so we can move this forward, because we do have to,
11   if there are additional documents --
12             THE COURT:  You're going to give them the names
13   tomorrow?  Is there any reason you can't write a letter, Ms.
14   Publicker, by the end of Tuesday just answering the questions
15   about just answering the questions about whether the records
16   are maintained and searchable electrically, that's the big
17   question.  And, therefore, what the burdens would be in finding
18   this material?
19             MS. PUBLICKER:  That shouldn't be a problem, your
20   Honor.
21             THE COURT:  Okay.  So I'll know at least the answer,
22   then I can always convene a telephone conference or some other
23   way to continue this conversation.  I'm sure I'll locate the
24   rule by then too.
25             MR. MOORE:  I think they are -- in my experience, I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

61

D1vzlig2                    Conference
1   think it is electronically maintained.  There is a central
2   personnel index file on all police officers that list
3   disciplinary actions, both from IAB and CCRB and I believe OCD.
4   So, to the extent that helps the City direct their search.
5           THE COURT:  Okay.
6           The second issue.  The plaintiffs want a 30(b)(6)
7   witness to testify about the NYPD's recent development
8   implementation of operations order 52, and three other recently
9   enacted policies that the plaintiffs believe are relevant to
10  the issue of quotas.  The plaintiffs say this is timely -- even
11  though it doesn't sound timely -- because documents related to
12  these policies were first produced in June.  Plaintiffs tried
13  to obtain information they seek from very recent depositions of
14  police officers who apparently didn't have the information.  So
15  I don't remember what operation order 52 is.  What is this?
16          MS. GROSSMAN:  Your Honor, this was a subject of an
17  in-camera review that you conducted in June, and it was
18  operations order regarding performance activity that documented
19  what officers were doing and conditions that they were
20  addressing as they went out to do their job, and so --
21          THE COURT:  What did I do after I looked at it
22  in-camera?
23          MS. GROSSMAN:  You, basically, grant -- you issued a
24  protective order saying that the discovery of deliberative
25  process documents shouldn't be turned over, but you -- but the

```
        D1vzlig2                    Conference
 1      plaintiffs did have the operation order back in June.
 2                  THE COURT:  They do?
 3                  MS. GROSSMAN:  They had it back then, and they had
 4      documents related to that that we turned over that were not
 5      subject to deliberative process privilege.
 6                  THE COURT:  Okay.
 7                  MS. GROSSMAN:  They have known about this issue for --
 8                  THE COURT:  Right.  But they said they tried to ask
 9      the questions of police officers who didn't have the
10      information that they requested.
11                  MS. GROSSMAN:  What we represented to the plaintiffs
12      is that the detectives who were deposed, they're not subject to
13      this operations order, and so we represented, and that's why
14      the detectives who were deposed, did not --
15                  THE COURT:  Okay.
16                  MS. GROSSMAN:  -- have information to add.
17                  THE COURT:  Okay.
18                  MS. GROSSMAN:  Now, there were other officers who I
19      believe were asked questions, and apparently the plaintiffs
20      believe that there's some confusion about what the officers had
21      to say at their deposition, but that was in December.
22                  THE COURT:  Confusion or they didn't have the
23      information?
24                  MR. CHARNEY:  Your Honor, can I respond?
25                  MS. GROSSMAN:  There was some confusing testimony, as
```

63

D1vzlig2                    Conference
1      I understand it.
2                  MR. CHARNEY:  Let me just --
3                  THE COURT:  What do you want to ask?  Let's say you
4      had this witness now on the stand, what would you ask him?
5                  MR. CHARNEY:  We want to ask how this order has been
6      implemented.  Just so your Honor recalls --
7                  THE COURT:  How it's been implemented.  Wait.
8      Nobody's answered you yet, how it's been implemented?
9                  MR. CHARNEY:  No.  Because when we asked the officers
10     who are subject to it --
11                 THE COURT:  Right.
12                 MR. CHARNEY:  -- their testimony is, once we hand in
13     the form, we don't know what happens to it, our supervisors
14     never talk to us about it even though the order specifically
15     says the supervisor should talk to them about it, said they
16     don't know what is done with it, they don't know how it's used.
17                 THE COURT:  So it would be a higher up person to talk
18     about --
19                 MR. CHARNEY:  Just explain how this whole process
20     works.
21                 And the other thing which Ms. Grossman left out, your
22     Honor, is your Honor cited to this order in her class cert.
23     decision.  It's a very important order, this is highly
24     relevant.
25                 THE COURT:  I know.  It's all very vague in my memory
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

D1vzlig2                    Conference
1   but what about you said also more recent, three other recent --
2           MR. CHARNEY:  They were all implemented around the
3   same time, which was in the fall of 2011 after discovery had
4   closed.  We asked for this information.  We actually asked for
5   information related to quotas four years ago.  But in any
6   event, they produced the documents in June.  We have tried to
7   use these officer depositions to ask about this to, you know,
8   because -- you know, as your Honor has said, we don't want to
9   have 100 deposition.  So we thought we'd try to use the ones we
10  already had.  Problem is these officers, either some of them
11  aren't subject to the order, others who are don't really know
12  anything other than I filled out the form, I handed it in, I
13  don't know what happens to it.
14          THE COURT:  You already said that.  So you want
15  somebody who is knowledgable about how the order's implemented.
16          MR. CHARNEY:  Yes.
17          THE COURT:  How it's carried out.  But does that apply
18  to all these orders, 52 and the three -- it could be all one
19  person.
20          MR. CHARNEY:  Because they're all related.
21          THE COURT:  Could be all one.
22          MR. CHARNEY:  The reason we know they're all related
23  is because operations 52 makes reference.
24          THE COURT:  You agree it could be all one person.
25          MR. CHARNEY:  Well, I don't know if the City's going
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D1vzlig2                    Conference
1    to say they can -- just one witness knows everything.  I think
2    it can probably be one person, but that's not my decision to
3    make.  That's the City's.
4              THE COURT:  Wouldn't it be some higher --
5              MR. CHARNEY:  I think it would be.
6              THE COURT:  -- person?
7              MR. CHARNEY:  I think it would be, yes, it would be.
8    But as your Honor knows --
9              THE COURT:  Who do you suspect would be somebody who
10   would know that?
11             MR. CHARNEY:  I think it could, for example, be the
12   Chief of Patrol, the Chief of Department.  It could be someone
13   from Chief of Department's Office or the Chief of Patrol's
14   Office, the.  Documents that Mr. Grossman was referring to that
15   were subject to in-camera review included a list of people who
16   were on this committee that really devised this order.  And so
17   I'm sure any of those individuals should be able to tell us how
18   it's supposed to be implemented.
19             THE COURT:  And you really haven't had anybody clearly
20   tell you that yet.
21             MR. CHARNEY:  No, because the only higher ups that we
22   deposed were deposed in 2010 before this order came out.
23             THE COURT:  Nobody higher up has been deposed since
24   these were issued.
25             MR. CHARNEY:  Exactly.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

66

D1vzlig2                    Conference

1      MS. GROSSMAN:  Your Honor, they've had sergeants and
2  lieutenants that they've deposed and when --
3      THE COURT:  I'm sure.  They think said nobody's higher
4  has been deposed since these were implemented?
5      MS. GROSSMAN:  No, no.  They have recently deposed
6  sergeants and lieutenants.
7      THE COURT:  I don't know sergeant, there is lots of
8  sergeants, I don't know the sergeant is high enough up to say
9  how these new directives are being implemented by the New York
10  City Police Department across the board.
11      MS. GROSSMAN:  Implemented.  What the operations order
12  requires is that a sergeant after seven days they look at the
13  activity of an officer, they have -- they engage with the
14  officer.  They determine what is it that it is the officer --
15  what condition is the officer going to be addressing on his
16  tour.  And then the expectation is that the officer is going to
17  tailor his activity to the condition that's going to be
18  addressed; for example, if there is a shooting spree or if
19  there is a robbery pattern, the activity, there is discretion
20  given to the officers to go out and tailor their enforcement to
21  address that condition.  And so what happens is it's a
22  variation of procedure that was -- I'm sorry.  So implementing
23  is what is the sergeant doing and what is the Lieutenant doing,
24  and then --
25      THE COURT:  So you got to get higher than the sergeant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1vzlig2                    Conference
 1   and lieutenant, so one person speaks for the entire department.
 2               MS. GROSSMAN:  What happens is that like, like other
 3   activity and documents, it's then sent up the chain of command
 4   and then --
 5               THE COURT:  It sounds like a Chief of Patrol should
 6   testify.
 7               MS. GROSSMAN:  No.
 8               THE COURT:  Well, look, it sounds to me like someone
 9   higher in the department for two hours should simply explain
10   the implementation of these group of orders and be done with
11   it.  And, again, a higher up will speak for the whole
12   department as to implementation of these procedures.  Surely
13   you can get this done in two hours.
14               MS. GROSSMAN:  Well, your Honor, I would just ask --
15               THE COURT:  Is that not right, Mr. Cherney?
16               MR. CHARNEY:  If that's --
17               THE COURT:  It can't go on forever.
18               MR. CHARNEY:  I understand.
19               THE COURT:  These cases have to come to conclusion
20   I'll give you two hours.  You should produce a Chief of patrol
21   Or higher.
22               MS. GROSSMAN:  I don't know who would be best to
23   answer.
24               THE COURT:  Look into it.  If you start too low, there
25   will be another dep and another dep and another dep.  Pick
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D1vzlig2                    Conference
1   somebody who understands it from the top down.  Even you said
2   the sergeant, the lieutenant tells somebody.  Pick a high
3   enough person, probably Chief of Patrol, that's what his guess
4   was, you can talk about implementation across the department of
5   these new orders, for two hours and be done, in and out.
6             MS. GROSSMAN:  Your Honor, I do want to ask one thing
7   on that.
8             THE COURT:  Yes.
9             MS. GROSSMAN:  I would ask the plaintiffs at least
10  give me some of the questions --
11            THE COURT:  I agree.
12            MS. GROSSMAN:  -- so that --
13            THE COURT:  This is so late in the game.
14            MS. GROSSMAN:  -- and so --
15            THE COURT:  It's a 30(b)(6) and they're supposed to do
16  that in the notice.
17            MR. CHARNEY:  Your Honor, we --
18            THE COURT:  There is no reason to play games.  Give
19  them the questions, write them out and send them over so they
20  know what you're going after.  There is no reason to hide the
21  ball.  Write out the questions.  They're right.
22            all right.  Now, number three says permission to use
23  designated deposition testimony --
24            MS. GROSSMAN:  I'm sorry, I'm sorry.
25            THE COURT:  That's all right.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

69

D1vzlig2                    Conference

1           MS. GROSSMAN:  In order to get this date done, I need
2    to have the questions by date certain so then I know I can roll
3    around and find a witness, so I won't know until I get the
4    questions.
5           THE COURT:  Correct.  When can you have the questions?
6           MR. CHARNEY:  Your Honor, could we have until --
7           THE COURT:  At least, the least number of days
8    possible.
9           MR. CHARNEY:  Your Honor, I guess the problem is that,
10   you know, I mean -- well --
11          THE COURT:  It is not a preclusion.
12          MR. CHARNEY:  No, I understand.
13          THE COURT:  Obviously there are follow-up questions.
14          MR. CHARNEY:  Okay.
15          THE COURT:  Obviously if a question is not on the list
16   doesn't mean you can't ask it, but write out as many as you can
17   so they can tell the person what you're really looking for.  It
18   doesn't mean you can't ask a questions not on the list.
19          MR. CHARNEY:  One week, your Honor?
20          THE COURT:  One week from today.  You'll have the list
21   by February 7th.
22          Now, plaintiffs seek permission to use designated
23   deposition testimony of non-party witnesses in their
24   affirmative case, rather than live testimony.
25          MS. GROSSMAN:  You know, your Honor, I think that

70

D1vzlig2                    Conference
 1  first of all if we want to call those witnesses --
 2              THE COURT:  That's different.  They want to use it on
 3  their case.  I don't see why they can't.
 4              MS. GROSSMAN:  Absolutely.  If they want to use it
 5  on -- we'd like to see the designation.
 6              THE COURT:  Yes, sure.
 7              MR. CHARNEY:  Of course.
 8              MS. GROSSMAN:  But our view is that we are probably
 9  going to call those witnesses, so I don't know there a.
10              THE COURT:  You know lawyers like to use deposition
11  testimony because it's pinned down.  They know what it says.
12              MS. GROSSMAN:  I understand that, but --
13              THE COURT:  I think the rules support that.  They can
14  offer.
15              MR. MOORE:  We're trying to figure out a way to make
16  it more efficient to.
17              THE COURT:  I can't do that, because if they wish to
18  call, they have the right to call them.
19              MR. MOORE:  No, I understand.
20              THE COURT:  And you can do it.
21              MR. MOORE:  Presumably --
22              THE COURT:  But you --
23              MR. MOORE:  -- what's happening in most cases, if you
24  can designate the testimony of certain witnesses, both sides
25  designate, that makes it easier for everybody.  That's --

D1vzlig2                    Conference
 1             THE COURT:  Good point, Mr. Moore, but they can't be
 2    compelled.  They can call --
 3             MR. MOORE:  Nobody is trying to compel --
 4             THE COURT:  That's right.  So if they wish to call
 5    them live, they will.  But yes, the answer is you won the
 6    motion.  You may offer the deposition testimony.
 7             MS. GROSSMAN:  But, your Honor, I can say if they give
 8    us the designation --
 9             THE COURT:  They will.
10             MS. GROSSMAN:  And then identify who the witnesses
11    are, we will give due consideration to that.
12             THE COURT:  Thank you.  That's what Mr. Moore was
13    suggesting.
14             MS. GROSSMAN:  When will we get that?
15             THE COURT:  That's exactly what he suggested, that you
16    consider counter designating and being done Gene with those
17    people.
18             MS. GROSSMAN:  We just need a date certain to get that
19    to us to be able to --
20             MS. BORCHETTA:  Your Honor, ordinarily deposition
21    designations would be a part of the JPTO, so we submit.
22             THE COURT:  February 19th.
23             MS. BORCHETTA:  Yes.  Thank you, your Honor.
24             THE COURT:  That takes us to defendant's January 29th
25    letter.  They seek an order precluding plaintiffs from calling

72

D1vzlig2                    Conference

1  at deposition or trial the four police officers who defendants
2  are telling you can not recall the Nicholas perp stop on
3  August 5, 2006.  If they don't recall it, then what is the
4  point?  We had years of discovery, why depose them?
5          MS. BORCHETTA:  Your Honor, we have a very good
6  answer, which is that we don't want to.  If the plaintiff --
7  the defendant did not come to us about this with sufficient
8  time before coming to the court.  We would agree not to depose
9  or call the following people related to the perp stop on the
10  condition we get an affidavit, no personal knowledge.  Diana
11  Fontanez.  But with respect to Officer Fontanez, we had
12  previously said to the City that we would accept an affidavit
13  on the condition that it also includes a statement from her
14  that certain CCRB statements that she's provided were accurate.
15  And they agreed to do that if we weren't calling her.  So we
16  would ask with respect to Officer Fontanez an affidavit both
17  that she has no personal knowledge and that her statements to
18  CCRB were accurate.  And then a statement of no personal
19  knowledge from Officers Lantigua, Frykberg.
20          THE COURT:  What was the --
21          MS. BORCHETTA:  I believe it's Frykberg, Frykberg.
22          MR. CHARNEY:  Frykberg.
23          MS. BORCHETTA:  Frykberg.
24          THE COURT:  Wait, wait.  I'm sorry.  We did not get
25  the name.  You said Frykberg?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

73

D1vzlig2                    Conference
1              MS. BORCHETTA:  F-r-y-k-b-e-r-g.
2              THE COURT:  Okay.  And then?
3              MS. BORCHETTA:  And Condon, C-o-n-d-o-n.
4              THE COURT:  Okay.  Is that acceptable to the City?
5              MS. GROSSMAN:  I didn't -- she spoke very quickly and
6    I could not hear.  Sorry.  I think I heard Fontanez.
7              THE COURT:  She wants three affidavits of no
8    knowledge, with the fourth person she wants an affidavit of no
9    knowledge and that the CCRB statement was truthful.
10             MS. GROSSMAN:  I just need to hear her say the names
11   again.
12             THE COURT:  Oh.
13             MS. BORCHETTA:  Your Honor, I'll speak more slowly,
14   Fontanez, we want the affidavit saying --
15             THE COURT:  We got that.  She wants to hear the four
16   names.
17             MS. BORCHETTA:  Lentigua, L-a-n-t-i-g-u-a, Frykberg,
18   which I previously spelled, and Condon, C-o-n-d-o-n.
19             THE COURT:  All right, that was half the City's
20   letter.  The other half said they want an order precluding
21   plaintiffs from calling four supervisors of officers involved
22   in class member witnesses stops.  Why is that?  And what's
23   your -- well, you're right, let me hear from you first.
24             MS. BORCHETTA:  Your Honor, if I may, because I think
25   we can dispose a lot of this as well --

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

74

D1vzlig2                    Conference

 1              THE COURT:  Okay, good.
 2              MS. BORCHETTA:  -- quickly.  We would agree not to
 3     call the following, and I'll say it slowly Michael Lee;
 4     Lawrence Hammond, H-a-m-m-o-n-d., and Vernon Lewis.  The fourth
 5     officer that the City is asking to be precluded from the trial
 6     we would not agree to, that is Michael Loria, and as we have
 7     previously said to the City, the reason for that is that his
 8     testimony is centrally relevant.  And it is centrally relevant
 9     because Sergeant Loria was the supervisor who not only was
10     responsible for supervising an officer who conducted what we
11     challenge as an unconstitutional stop, but also was the
12     supervisor who reviewed and signed off on the 250 that was
13     prepared for that stop.  We've already received testimony from
14     Sergeant Loria, that in reviewing the 250, he would not be able
15     to conclude there was reasonable suspicion, and this is exactly
16     one of the ways that we challenge the City's policy of relying
17     on supervisors.
18              THE COURT:  So before they asked about, you agree on
19     three and you want to call the fourth.  Sounds reasonable.
20              MS. GROSSMAN:  Well, on the last -- first of all, this
21     is an officer I think he's retired.  He -- this is regarding --
22     I believe that he has no personal knowledge of the stop.  He
23     wasn't present.
24              THE COURT:  Apparently, he already testified he
25     reviewed the 250 and found no reasonable suspicion.  That's

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

75

D1vzlig2                         Conference
1    what she just represented.
2              MR. BARTOLO:  Your Honor that's incorrect.
3              THE COURT:  Who are you?
4              MR. BARTOLO:  Joseph Bartolo.  Sergeant Loria did have
5    his deposition taken in this case.  He did not indicate there
6    is reasonable suspicion.  However, the only thing he indicated
7    was that he reviewed the 250, but that was the extent of it and
8    basically --
9              THE COURT:  Where did you get this idea, Ms.
10   Borchetta?
11             MR. BORCHETTA:  Your Honor, I got this idea because I
12   took the deposition and I heard the testimony.
13             THE COURT:  Well --
14             MS. BORCHETTA:  He signed.
15             THE COURT:  Mr. Bartolo, were you there?
16             MR. BARTOLO:  Yes, I was at the deposition.
17             THE COURT:  You can't both be right, folks.  I'm not
18   going to read the transcript.  I'm going to go with the proper,
19   he can be a witness.  The other three can't.  So that's
20   resolved.
21             Now, then the plaintiffs want the defendant -- I'm
22   sorry -- the defendants want the plaintiffs to provide
23   defendants with information regarding Professor Fagan's
24   methodology in how he selected a random sample.  That seems
25   right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1vzlig2                    Conference

1           MR. CHARNEY:  Yes.  Your Honor, we have been going
2    back and forth on this for a few days, myself and the City
3    trying to I guess from our perspective understand what it is
4    exactly they want.
5           THE COURT:  They want to know how he selected the
6    random sample.
7           MR. CHARNEY:  Yes.  So we've changed some e-mails,
8    then yesterday we've been provided with an additional file.  We
9    also provided several files.
10          THE COURT:  I'm sure you're going to tell them how he
11   selected his random, he could have used --
12          MR. CHARNEY:  Exactly.  The part --
13          THE COURT:  Things up and down the stairs, how did he
14   make the random sample.
15          MR. CHARNEY:  So I guess the part we struggle with is
16   we feel we've already done that.  We don't know what additional
17   information it is they need.
18          THE COURT:  Well, his book will tell you at another
19   time, offline.  The answer is, you have to do it.
20          MR. CHARNEY:  Of course, and we just don't understand
21   why what's --
22          THE COURT:  Fine.  Then the City wants to cancel the
23   February 12th hearing on admissibility of the recordings made
24   by Officers Polanco and Schoolcraft, but instead they want to
25   depose officer Schoolcraft at the same time they would have

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D1vzlig2                    Conference

1   been here in court.  I favor that, so I will have more time in
2   court on the trial I start on February 11th.
3           MR. CHARNEY:  I understand, your Honor.  We strongly
4   object to his deposition for three reasons.  Your Honor, no
5   this is important that you understand.
6           THE COURT:  It's all important.  But you have to see,
7   Mr. Charney, how many depositions you continually ask for, the
8   City said it's not fair it's too late, and when I think you
9   deserve to find information out, I nonetheless say yes.  By the
10  same token, this is an important trial witness --
11          MR. CHARNEY:  It is.
12          THE COURT:  The City should be permitted to depose
13  this person.  I don't need to hear more.
14          MR. CHARNEY:  I --
15          THE COURT:  I'm going to allow the deposition.
16          MR. CHARNEY:  I understand.  I want to make the record
17  clear.
18          THE COURT:  You know I'm going to allow the
19  deposition.
20          MR. CHARNEY:  The first thing is the City has already
21  been provided with a detailed affidavit.
22          THE COURT:  Fine.  It doesn't matter.  I'm going to
23  allow the deposition.
24          MR. CHARNEY:  Okay.  Well, then the last part I need
25  to make clear is, your Honor, we don't have control over this

D1vzlig2                    Conference
1    witness.
2              THE COURT:  All right.
3              MR. CHARNEY:  The witness is represented by separate
4    counsel.
5              THE COURT:  Okay.
6              MR. CHARNEY:  In order to get him to come to the
7    hearing, we have had to subpoena him.  He lives more than a
8    hundred miles away from here.  The only reason his lawyer
9    waived objection was because it was under the understanding he
10   would only have to testify about the authenticity of the tapes.
11   I cannot guarantee and I don't have any control over his
12   appearance or the objections his lawyer may raise.  So I don't
13   think -- it would be extremely prejudicial to the plaintiffs to
14   suffer the burden of a decision made by a lawyer who we have
15   absolutely no control over.
16             THE COURT:  Who is this lawyer?
17             MR. CHARNEY:  Richard Gilbert.  He is a private
18   attorney here in Manhattan.  I can give the contact information
19   to the defendants.  But my concern is --
20             THE COURT:  A hundred miles away?
21             MR. CHARNEY:  No, no.
22             THE COURT:  Schoolcraft.
23             MR. CHARNEY:  Mr. Schoolcraft lives in Albany, New
24   York.
25             THE COURT:  Okay.  I can tell you right now, you may
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D1vzlig2                         Conference
1   have to go to Albany.  I can't compel him to come to New York.
2           MS. GROSSMAN:  Then what happens on the day of the
3   trial?
4           THE COURT:  Well, he has to be here.
5           MS. GROSSMAN:  He can be compelled?  I mean, I just
6   submit your Honor that this is --
7           THE COURT:  Excuse me.  I cannot and will not compel
8   him to travel to New York for deposition.  The plaintiff's
9   lawyers don't control him.  I will allow the deposition.  You
10   may have to go to Albany.  That's between him and his lawyer.
11   Obviously, he can't testify at trial if he doesn't walk in the
12   courtroom.
13           MS. GROSSMAN:  Well, your Honor, I guess he was
14   supposed to be here for --
15           THE COURT:  I understand that.  I made my ruling.  I
16   will allow this deposition.  You may have to go to Albany.  He
17   may prefer to come to New York.  Maybe he's got something to do
18   here that -- we have good theater in this town, we do and we
19   have other things that are attractive.  So he may choose to
20   come.  He was planning to be here on the 12th any way.
21           MR. MOORE:  Judge, can I also say something about
22   this?  And I know it's late and I know you've made your ruling,
23   I'm not asking you to change it.
24           THE COURT:  Good.
25           MR. MOORE:  Mr. Schoolcraft has made some very
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D1vzlig2                    Conference

1  important allegations of misconduct against his employers.
2  He's currently involved in his own lawsuit.  I don't want --
3           THE COURT:  Wait a minute, who is he suing?
4           MR. CHARNEY:  Police Department.
5           MR. MOORE:  He's a police officer.
6           THE COURT:  He's currently?
7           MR. CHARNEY:  No.  He was suspended.  He may have been
8  terminated.  He has a wrongful termination lawsuit.
9           THE COURT:  I understand he's suing the City.  So he
10 has a pending lawsuit.
11          MR. MOORE:  There is a pending lawsuit and there is a
12 very hotly contested lawsuit --
13          THE COURT:  Okay.  Does Mr. Gilbert represent him in
14 that one?
15          MR. CHARNEY:  Yes, he does.
16          MR. MOORE:  He just recently changed lawyers, so.
17          THE COURT:  Away from Gilbert or to Gilbert?
18          MR. MOORE:  To Gilbert.
19          THE COURT:  Okay, go ahead.
20          MR. MOORE:  I'm concerned they're going to use that,
21 this deposition for discovery in their other case and I don't
22 want that to happen.
23          THE COURT:  I agree.
24          MR. MOORE:  And they say here, limited scope of his
25 expected testimony at trial.  I would ask that the Court direct

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

81

D1vzlig2                    Conference
1   that the City limit it that way and limit the amount of time
2   they can do this deposition.
3              MR. CHARNEY:  And --
4              THE COURT:  I agree with all of that.
5              MR. CHARNEY:  And, your Honor, we can provide
6   guidance --
7              THE COURT:  It may be that he wants to come to New
8   York if I tell him that it could be a supervised deposition and
9   we'll have the Magistrate Judge supervise it to make sure it
10  doesn't veer off course.
11             MR. MOORE:  Thank you.
12             THE COURT:  Who is the Magistrate Judge and who is the
13  Judge in the case he has?
14             MR. CHARNEY:  That I can find that out, I'm --
15             MS. PUBLICKER:  Judge Sweet, your Honor.
16             THE COURT:  Do we know the magistrate judge?
17             MS. PUBLICKER:  There is no magistrate.
18             THE COURT:  There isn't in the wheel.  Actually, Judge
19  Sweet may not have referred it, but a name, both names are
20  always drawn when the case is filed.  So I just need a docket
21  number and I can find that out.
22             MS. PUBLICKER:  It's 10 CV 6005.
23             THE COURT:  I don't think anybody on my side wrote
24  that down.  10--
25             MS. PUBLICKER:  10 CV 6005.

82

D1vzlig2                    Conference

1          THE COURT:  We'll look it up and figure out the
2    Magistrate Judge then it can be supervised.  That may be
3    attractive to Mr. Gilbert and him.  So it does not veer off
4    course, and relates only to his testimony in this case and is
5    not used as an end round to get discovery ahead of time in this
6    case.
7          MS. GROSSMAN:  Your Honor, I just don't -- I mean the
8    plaintiffs have called him, listed him as a witness on their
9    case.  I don't know that it's limited to or what, you know --
10         MR. CHARNEY:  Can I respond to that?
11         THE COURT:  Yes.
12         MR. CHARNEY:  The response is we have, as I said, a
13   very detailed affidavit.  It was produced to them in 2011 in
14   opposition to summary judgment.  There is a very detailed list
15   of the matters he will testify about.  We ask that the
16   deposition be limited to these matters.
17         MS. GROSSMAN:  Your Honor, I just want to make sure
18   the if he doesn't appear for deposition in Albany, that he's
19   precluded from testifying at trial.
20         THE COURT:  No, I didn't say that.  I said he may
21   choose to come to New York for a supervised deposition.  I
22   don't know anything about --
23         MS. GROSSMAN:  Okay right.
24         THE COURT:  What I'll probably do is contact Gilbert,
25   see how wants to handle it.  He has a choice of Albany, has a

D1vzlig2                    Conference
1   choice of New York.  But if it's New York I can get him the
2   Magistrate Judge to supervise.  It should be a limited number
3   of hours, should not stray off the topics that are in the
4   affidavit declaration that he submitted, you know.
5              MS. GROSSMAN:  Well --
6              THE COURT:  That's the scope of his testimony.
7              MR. CHARNEY:  Exactly, your Honor.
8              MS. GROSSMAN:  Right, well, the propriety, you know,
9   the -- whatever goes on with the audio tapes, the whole purpose
10  of having the hearing --
11             THE COURT:  That's why I was willing to have a
12  hearing.
13             MS. GROSSMAN:  Right.  So it's the scope of what would
14  be covered in why we're having a hearing is what we want to
15  cover at the deposition.  But all I want to say is whatever the
16  decision is, whether he's ordered to come down to appear for
17  deposition --
18             THE COURT:  Not order.  That would be his choice.
19             MS. GROSSMAN:  Right.  If he volunteers to come down
20  here under supervision or we go to Albany, if he fails to
21  appear in either situation, we want preclusion because he
22  shouldn't then be able to come to testify at trial.  So that's
23  all that I would like.
24             MR. CHARNEY:  Your Honor, just to be clear, are
25  defendants going to have to go through the normal course in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

84

D1vzlig2                    Conference
1   other words, subpoena him?  Because, you know, again we don't
2   have any control over this witness.
3            THE COURT:  I got that.
4            MR. CHARNEY:  It seems to me they should have to
5   subpoena him, they should have to make the proper attempts to
6   actually secure his deposition.  I understand if he doesn't
7   cooperate, but again I just want to make it clear that the
8   plaintiffs are not expected to try to obtain --
9            THE COURT:  Just provide the Court with the name of
10  the attorney.
11           MR. CHARNEY:  Of course.
12           THE COURT:  And contact information.  I'll take it
13  from there.
14           MS. GROSSMAN:  And we would just ask that he get a
15  court order, rather than us having to go issue a subpoena, then
16  move to compel him we know that we just need to be expedient
17  here.
18           THE COURT:  I got it.  As soon as I get the contact
19  information, I'll work on it.
20           MR. CHARNEY:  I can give you that tomorrow, your
21  Honor.
22           THE COURT:  Thank you.
23           Where are we up to?  Oh, yes.  That's the last one on
24  my list.
25           MS. GROSSMAN:  We also have the Provost release.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D1V5dav3                    conference
1               THE COURT:  The last one, here you are.
2               In order to require plaintiffs to provide executed
3    release of class member Ian's provost record.  Plaintiff's
4    promised it would be given weeks ago.  What is the problem?
5    Today is -- January 17th; today is the 31st, two weeks ago.
6               MS. BORCHETTA:  Your Honor, I will respond.
7               We have -- I have a copy of the provost release right
8    here that I can give to the City.  The problem is that because
9    of a miscommunication, he sent me the copy rather than the
10   original.  Again, he is in North Carolina, he has now sent me
11   the original, I believe, so I have told him to send the
12   original and he said he will.  I have a copy to give to the
13   City
14              THE COURT:  Give them a copy and the original should
15   be coming.  All right.
16              MS. BORCHETTA:  And there is one additional issue that
17   was raised in the defendant's letter that we didn't respond to
18   in writing and that is that the City --
19              THE COURT:  Oh good.  The Magistrate Judge in the
20   other case is Judge Freeman.  I will speak to her about
21   supervising.
22              Go ahead.  Is this a holiday?  Is February 12th a
23   holiday?
24              MR. CHARNEY:  It is Lincoln's birthday.
25              MR. MOORE:  He was the president, yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

86

D1V5dav3                    conference

1            THE COURT:  A good president.
2            MS. BORCHETTA:  The City, on Tuesday --
3            MR. MOORE:  Also Mardi Gras, but.
4            MS. BORCHETTA:  The City, on Tuesday, identified for
5   the first time an Officer Lumia L-U-M-I-A, that is related to
6   the Nicolas Pert stop --
7            THE COURT:  Yes.  I saw that.
8            MS. BORCHETTA:  -- because they did not seek to
9   preclude his testimony based on lack of knowledge along with
10  the other Nicholas Pert officers.
11           THE COURT:  Right.
12           MS. BORCHETTA:  That leads us to believe that he does
13  have personal knowledge.
14           THE COURT:  Actually, I thought that was White and
15  Lumia.
16           MS. BORCHETTA:  White we have deposed, your Honor.
17           THE COURT:  So you want to depose Lumia?
18           MS. BORCHETTA:  We want to depose Lumia.
19           THE COURT:  If he has knowledge, yes.  All right, now
20  we are done?
21           MS. GROSSMAN:  No, your Honor.  I have a few
22  housekeeping matters.
23           First of all, we submitted, with the plaintiffs, a
24  stipulation of withdrawal of the damages claims and there is a
25  dispute over the language of the stipulation.  All we want is

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D1V5dav3                    conference
1    an agreement in the stipulation that says that all the damages
2    claims are dismissed with prejudice against all the defendants.
3    Very simple.
4              THE COURT:  That sounds right.  Who objects to that,
5    Mr. Hellerman?
6              MR. HELLERMAN:  Your Honor, this is the first we hear
7    there was a dispute.  We sent them a draft on Monday, we
8    haven't heard from them.  We will be glad to meet and confer
9    with the City.
10             THE COURT:  We will get it done.
11             MS. GROSSMAN:  But, if we can get --
12             THE COURT:  The guidance is what you said sounds right
13   but work it out with Mr. Hellerman.
14             MS. GROSSMAN:  Hopefully we can get that language and
15   subpoena and stipulation it will be good.
16             THE COURT:  Hopefully.
17             MS. GROSSMAN:  Also, we want to renew the motion on
18   NYCLU's report.  The last time we raised this issue you
19   expected to have a declaration from the NYCLU and we haven't
20   seen one.
21             THE COURT:  What did I want them to write?  I did want
22   something.
23             MS. GROSSMAN:  It was sent to the City of New York and
24   you said Mr. Dunn or someone from the NYCLU --
25             THE COURT:  That it was actually sent there, that the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
        D1V5dav3                    conference
 1   City had notice of it.
 2              MS. GROSSMAN:  We asked for an affidavit and we didn't
 3   get one.
 4              THE COURT:  I agree.
 5              MS. GROSSMAN:  And it has been weeks.
 6              THE COURT:  I agree.
 7              Where are we up to on that, Mr. Charney.
 8              MR. CHARNEY:  The NYCLU is here right now.
 9              THE COURT:  Was this report sent?  I need a
10   declaration.  The report was sent to the City, it is a matter
11   of notice.  It is a notice issue.  Does anybody know if it was
12   sent to them?
13              MR. CHARNEY:  The mission failure report?
14              MR. DUNN:  I believe that we do know.  I was not the
15   person personally responsible for that.
16              THE COURT:  Can you track down that person and get a
17   declaration.
18              MR. DUNN:  By when?
19              THE COURT:  ASAP, thank you.  I suspect they can do
20   it, they just have to get it done.  They're busy too.
21              MS. GROSSMAN:  Okay.  Then another issue on
22   Mr. Silverman, the questionnaires.  As you may recall, the
23   survey questions --
24              THE COURT:  That's the guy who doesn't work for
25   anybody and is doing his own research?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89

D1V5dav3                    conference
 1            MS. GROSSMAN:  Yes.
 2            THE COURT:  Okay.
 3            MS. GROSSMAN:  I understand that the Court ruled that
 4    we are supposed to get the questionnaires and with certain
 5    questions you ordered to be produced in along with some
 6    narrative fields that should be redacted.
 7            THE COURT:  Everything is on the record.  I must have
 8    said it.
 9            MS. GROSSMAN:  Yes.  We have not received that yet and
10    we understand that we want the actual hard copies of those
11    questionnaires with the narratives married up to whatever the
12    questions were asked so that we can look at it and do our own
13    analysis.
14            THE COURT:  If there is an expense in the photocopying
15    the City will pay for it.
16            MS. GROSSMAN:  I'm sorry?
17            THE COURT:  If there is an expense in the photocopying
18    the City will pay for it.  Silverman is not under the
19    plaintiff's control.  It is a small point, I'm sorry.
20            MS. GROSSMAN:  It is a small point.  We produced
21    hundreds of thousands --
22            THE COURT:  He is not a party.  He is not controlled
23    by a party.  If that is an issue you will pay for the paper.
24            MR. CHARNEY:  Your Honor, can I respond?
25            THE COURT:  If you want hard copy you will pay.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

D1V5dav3                    conference
1              MS. GROSSMAN:  Yes, we will pay for a hard copy.
2              MR. CHARNEY:  First of all, here is the issue:  It is
3    not true that we haven't given them the data.  We have given
4    them the data to the responses -- the non-narrative responses
5    that you ordered.
6              THE COURT:  Okay.
7              MR. CHARNEY:  The narratives we are prepared to
8    produce, we have them redacted.
9              THE COURT:  Good.
10             MR. CHARNEY:  The problem is the City has not agreed
11   to the protective order that you also ordered had to be
12   finalized before we produced anything.  So, that is the issue.
13             THE COURT:  Ms. Grossman?
14             MS. GROSSMAN:  For attorneys' eyes only --
15             THE COURT:  The court reporters are trained only to
16   take the Judge, Mr. Charney, if one voice is talking over the
17   over.  I always win.  So, just a moment, please?
18             MR. CHARNEY:  Okay.
19             THE COURT:  So, Ms. Grossman, if that's the delay,
20   please try to finalize the required protective order so you can
21   get the data you want?
22             MS. GROSSMAN:  That's not the delay, though, because
23   we agreed that we will look at it attorneys' eyes only.  We
24   asked for it to have the law department to have it attorneys'
25   eyes only so we can negotiate the exact terms of the mechanics.

D1V5dav3                    conference

1              THE COURT:  And if they agreed to it it is like the
2      arguments you make.  I can't compel them.  Agreements are
3      voluntary.
4              MS. GROSSMAN:  They did.
5              THE COURT:  If they agreed to --
6              MS. GROSSMAN:  Yes, agreed.
7              THE COURT:  -- turn it over, Mr. Charney --
8              MS. GROSSMAN:  So, let me be clear.  They provided
9      some statistical summaries statistics but what we want is the
10     hard copies.
11             THE COURT:  I heard that you want the hard copies.
12             MS. GROSSMAN:  We don't want the narratives separated
13     from the questionnaire.
14             THE COURT:  I agree.  It has to be photocopied and the
15     City will pay for it.  It is not Silverman's problem.
16             MR. CHARNEY:  Your Honor, we can give all the raw data
17     first.  They have the responses, they don't have the summaries.
18             THE COURT:  Is it --
19             MR. CHARNEY:  Your Honor, we are talking about 25,000
20     pages.
21             THE COURT:  That's why I'm saying they can pay for it.
22             MR. CHARNEY:  We have to redact it first.
23             The reason we gave it to them in electronic form is it
24     was a lot easier to redact.  We can take out the portions of
25     the answers, give them the answers they were entitled to.

D1V5dav3                    conference
1              THE COURT:  Mr. Charney, I made a decision.
2              MR. CHARNEY:  When do we give them the hard copies
3    that needed to be redacted?  We were under no notice we had to
4    give them hard copy responses.
5              THE COURT:  You tell me how long it will take to do
6    these redactions.
7              MR. CHARNEY:  This is 25,000 pages.
8              THE COURT:  Not all pages need redactions.
9              MR. CHARNEY:  Your Honor, because the vast majority of
10   responses, as we talked about with you a couple weeks ago, were
11   not relevant, we are only talking about four answers out of 24
12   on a survey.
13             THE COURT:  So it is not 25,000 pages that need
14   redacting.
15             MR. CHARNEY:  Four fifths of that is 20,000 pages.
16             THE COURT:  Those don't need redacting, it is the
17   opposite.  You mean taking out?  You just don't photocopy those
18   pages.  You don't redact them, you don't photocopy them.
19             MR. CHARNEY:  The problem is the answers that are
20   relevant are on the same pages as answers that are not
21   relevant.
22             The other reason, your Honor, the reason you ordered
23   us to turn this data over is so they could reasonably indicate
24   the analysis.  We gave it to them in electronic format.  In
25   terms of the matching --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

D1V5dav3                    conference
```
 1              THE COURT:  I have no idea why Ms. Grossman wants this
 2     in hard copy.  I have no idea.  I have no idea.
 3              MR. CHARNEY:  In terms of the burden --
 4              THE COURT:  There must be a reason.  It can't just be
 5     to go over the edge of despair.  It can't be the only reason.
 6     There must be a real reason.
 7              Why do you want this all in paper if you have it
 8     already electronically?
 9              MS. GROSSMAN:  I don't have it all electronically and
10     I don't know what is in the writing like who is going to be
11     typing -- is it typed?  I want the hard copies so that I can
12     know --
13              THE COURT:  Take a sample and see if it does a lot for
14     you.  Why don't you produce a hundred of these?  How many are
15     there?
16              MR. CHARNEY:  There is 2,500.
17              THE COURT:  2,500.
18              MR. CHARNEY:  A hundred survey responses.
19              THE COURT:  Wait.  I lost you now.
20              There are 2,500 survey responses.
21              MR. CHARNEY:  Yes.
22              THE COURT:  And then there is a hundred what?  2,500
23     responses?  You said the word a hundred.
24              MR. CHARNEY:  I didn't mean that.
25              THE COURT:  Of the 2,500 respondents pick the first
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1V5dav3                 conference
1   100, produce them in hard copy, the redactions, one week.  And
2   then, after you see the hundred, tell us if this exercise is
3   worth it and you need all 2,400 more now that you see what it
4   looks like.  Maybe if you have seen a hundred you have seen
5   them all.
6           MS. GROSSMAN:  The reason why I want it --
7           THE COURT:  I understand, but look at the first
8   hundred you get and you will know whether you need the rest.
9           MS. GROSSMAN:  But I know that, why I will need it
10  now, and if I wait for next week or two weeks now or two weeks
11  I will be delayed in analyzing it.  I need to see of the
12  officers who actually checked off whatever pressure or lack of
13  pressure they felt when they were issuing a summons or 250 or
14  arrest.  I also want to know from that particular officer who
15  responded because we also know when they retired and what kind
16  of experience they had with the police department.  I also want
17  to know --
18          THE COURT:  When they retired.
19          MS. GROSSMAN:  Hired; because if they were not
20  present, if they retired back before 2002 -- before 1994, that
21  is something that we can impeach.
22          MR. CHARNEY:  They have it.
23          MS. GROSSMAN:  Just listen --
24          THE COURT:  I am listening.  That was rude.
25          Can you get that off the electronic version?
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

D1V5dav3                    conference

1           MS. GROSSMAN:  No.  The electronic version does not
2     have the narrative in it.
3           MR. CHARNEY:  That's the point, we are going to give
4     it to them tomorrow, all the narratives.
5           THE COURT:  Will they know which it goes with?
6           MR. CHARNEY:  Yes, because every single narrative
7     answer has a case number which corresponds to the responses of
8     the electronic data so they will be able to match up every
9     single response with every narrative.  They don't need the hard
10    copies.
11          THE COURT:  This is beginning to sound silly.  When
12    you get them tomorrow is that hard copy?
13          MR. CHARNEY:  Yes.  It is PDFs, the narratives, and
14    every single one has a number that matches to the answers for
15    the other non-narrative.
16          MS. GROSSMAN:  Then I do want a sampling of the 100.
17          THE COURT:  Okay.
18          MS. GROSSMAN:  Because I want to test that whatever I
19    did get is accurate.
20          THE COURT:  That we will do.  Tomorrow you will give
21    her the PDFs of all 2,500 narratives.  A week from now you give
22    her 100 of these in hard copy and I see if there is any
23    other --
24          MR. CHARNEY:  By hundred you mean hard copy
25    narratives?

D1V5dav3                  conference
1           THE COURT:  You are giving all hard copy narratives
2    tomorrow, 100 complete questionnaires redacted.
3           MR. CHARNEY:  What is the purpose of that?
4           THE COURT:  That is not an appropriate question,
5    Mr. Charney.  If the Court orders something at some point you
6    do it.
7           MR. CHARNEY:  I understand.  I didn't understand --
8           THE COURT:  You give her 100.
9           MR. CHARNEY:  Got it.
10          THE COURT:  Because she says she needs them to test
11   what you gave her electronically in PDF and see if she can work
12   with it.  Give her the full hundred out of 2,500.
13          MS. GROSSMAN:  We want them to have the narratives in
14   it.
15          THE COURT:  Of course.
16          MR. CHARNEY:  We still don't have the confidentiality
17   order agreed to.
18          THE COURT:  But she says you agreed to produce that in
19   advance of that for attorneys' eyes only so the confidentiality
20   order could then be fully negotiated.
21          MR. CHARNEY:  I guess that to be clear that means
22   nobody outside of the Law Department is allowed to see any of
23   this information until we have a confidentiality order in
24   place.
25          THE COURT:  I think that's correct; right,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D1V5dav3                    conference
1   Ms. Grossman?  You said attorneys' eyes only in the Law
2   Department.
3              MS. GROSSMAN:  Right.  What we worked --
4              THE COURT:  You cannot share it with your expert until
5   you sign the confidentiality order.
6              MS. GROSSMAN:  Right.
7              THE COURT:  She says right.
8              MS. GROSSMAN:  My understanding is, in principle, the
9   plaintiffs are on board.
10             MR. CHARNEY:  No, we --
11             THE COURT:  Only after there is an executed copy.
12             MS. GROSSMAN:  Yes.  Whatever the terms of a
13  confidentiality order we expect it will include that we can
14  share it with an expert.
15             THE COURT:  That's why confidentiality orders are
16  entered but, until then, attorneys' eyes only.
17             MS. GROSSMAN:  We would also expect that we can share
18  it with certain people in the police department who can help us
19  analyze.
20             THE COURT:  One would think, but only after the
21  signing of a confidentiality order.
22             MS. GROSSMAN:  Yes.
23             THE COURT:  Until that time, Law Department only.
24             MS. GROSSMAN:  Right.
25             THE COURT:  Right.  All right.

98

D1V5dav3                      conference
1           MR. CHARNEY:  In terms of the hundred hard copies
2    which will have to be redacted, when do we have to provide
3    those by?
4           MR. MOORE:  One week.
5           MR. CHARNEY:  One week, February 7.  Got it, your
6    Honor.
7           MS. GROSSMAN:  Your Honor, my last item is I raised
8    this when, back in January, it's notice from the plaintiffs of
9    the sequence of their witnesses given that we have a four to
10   six week trial, we really do need to know the first 20
11   witnesses that the plaintiffs are expecting to call so that we
12   can get -- we can schedule our witnesses, make sure they're
13   available.
14          THE COURT:  I got it.  When do you think you should
15   get that?  Or did I already set a date?
16          MS. GROSSMAN:  You didn't set a date.
17          THE COURT:  I agreed with you that they should tell
18   you an order.  I mentioned in criminal cases even the
19   government does it a week or so in advance but when do you?
20          MS. GROSSMAN:  Given -- for example, if the plaintiffs
21   are expecting to call the first 20 witnesses and high-level
22   police officials are going to be included, I need to know that
23   now.
24          THE COURT:  You don't need to know it now.  Now is six
25   or seven weeks before trial.  There has to be a date that is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
            D1V5dav3                    conference
 1   realistic.  It is not now.  That's not realistic.
 2              MS. GROSSMAN:  I think in the next two weeks it would
 3   be fair so that I can figure out --
 4              THE COURT:  I don't see why.  Can I talk to you about
 5   something else?  Because this will help me with this long
 6   floating date.  What do we really realistically think is the
 7   length of this trial including now this combined remedies
 8   hearing?  What do we really think is the total length of this
 9   trial?
10              MS. GROSSMAN:  Your Honor, I don't know that it
11   changes much but I can say that there are a whole host of the
12   witnesses that plaintiffs have listed who have been retired
13   that haven't been in the police department for a while, and I
14   can't tell if the plaintiffs are really pressing to have those
15   witnesses attend and give testimony or if they're willing to
16   forego that.  And it would be helpful to know.
17              THE COURT:  Well, you will know on February 19th.
18              MS. GROSSMAN:  Well, you asked the question.  I'm
19   trying to respond and help.
20              THE COURT:  I did.  I appreciate that.
21              MS. GROSSMAN:  So, if you wait to wait until February
22   19th.  There is 112 witnesses now --
23              THE COURT:  Jointly.
24              MS. GROSSMAN:  -- jointly.
25              THE COURT:  Jointly.
```

D1V5dav3                    conference

```
 1              MS. GROSSMAN:  We may be cutting some of them given
 2    what your rulings were today, but.
 3              THE COURT:  Anybody want to take a stab at what they
 4    really think the length of this trial is?  I'm serious.  I'm
 5    trying very hard to see if I can fit in a criminal trial before
 6    yours.  That's the only reason I am thinking about the 18th.
 7              MR. MOORE:  I'm thinking we have said, Judge --
 8              THE COURT:  I think we sort of said four to six weeks
 9    but that is a bit floating, and if it is worse than that I have
10    to know.
11              MR. MOORE:  One of the things -- I can't say.  I mean,
12    every time I have predicted the length of a trial I have been
13    wrong.  I think we can move it quickly.  I think one of the
14    things we are trying to do is expedite it by providing excerpts
15    of depositions rather than having to call the person to the
16    stand.
17              THE COURT:  I understand.
18              MR. MOORE:  We are trying the best we can to try to
19    reduce the number of witnesses.  I guess we really couldn't say
20    at this point.  We may be in a position to tell you in a week
21    or two how long we think our part of the proof will be but I
22    don't think we can really say that at this point.
23              THE COURT:  Okay.
24              MR. MOORE:  I wish I could say more.
25              THE COURT:  Okay.
```

D1V5dav3                    conference

1          MR. MOORE:  Which is one of the reasons I thought the
2    collaborative process was a good idea to try to resolve this
3    case.
4          THE COURT:  I understand it.  I would have gone along
5    if the City would have gone along.  I would have given up my
6    remedies phase hearing, just had a liability trial, I would
7    have paused for the 90 days despite my indication to have done
8    it.  But, it sounded beneficial and interesting to all
9    participants but I won't compel it; certainly not when there is
10   not even a liability finding.
11         MR. MOORE:  We will see what happens.  If we get to
12   that point we will see what happens.
13         THE COURT:  Correct.
14         MR. MOORE:  But I think I have to say that -- we are
15   much more willing to try to enter into that process now if
16   there is a liability ruling.
17         THE COURT:  I understand.  It just would have made the
18   planning for this trial much easier had the City thought that
19   that was a wise idea.  All they were being asked to do in that
20   so-called collaborative process was discuss things.  Nobody was
21   saying they had to agree to anything.  It was going to be a
22   mediated discussion.  I wonder why they were so opposed to
23   mediated discussion.
24         MR. MOORE:  To discuss it in the context of an issue
25   that clearly is important to a lot of people in the City.  It

D1V5dav3                    conference
1   is not like this is some obscure case involving some incident.
2   This is about something that's very important.
3          THE COURT:  I understand that.  I might have thought
4   the City would have said:  Good idea and less work for us.  We
5   would try the liability phase and have a 90-day time out to sit
6   with a neutral and discuss ideas.  We don't have to agree to
7   anything.  It is a big discussion around the table with lots of
8   players and a good mediated discussion.
9          MR. MOORE:  I appreciate the thought.  It was a good
10  idea.
11         THE COURT:  I thought they would say it was a great
12  idea and less worry for them now than to get ready for the
13  so-called remedies hearings.
14         MS. GROSSMAN:  Your Honor, don't forget, we engaged in
15  settlement discussion with a magistrate a long time ago and the
16  parties were so far apart then it does not appear --
17         THE COURT:  I think it is a very different case now
18  and things have changed over the years, I must say.  I think it
19  is a very different case today than it was whenever you last
20  discussed it.  And different players would be -- I wouldn't
21  even call it a settlement discussion in a way, it is a mediated
22  discussion of the issues and the possible ways to remedy what
23  some people see as problems and others don't and what is to be
24  done.  I am probably preaching to the wrong person -- you're
25  the lawyer not the client -- but I'm sure your client has

D1V5dav3                    conference
1    guided but it is kind of a shame the police department doesn't
2    want to sit down with all these different constituencies in a
3    mediated discussion to discuss this issue.
4              MS. GROSSMAN:  Understand the City Council and there
5    is other processes that has been going on and so, you know,
6    we --
7              THE COURT:  Nobody would compel you to agree to
8    anything.  It would be, as I said before, a mediated discussion
9    of all the issues; the pros, the cons.  I have certainly read a
10   lot of commentary from all kinds of sources in the community,
11   I'm sure you follow the online nonsense but -- one reads it, it
12   is out there -- there are many different viewpoints.  Even in
13   the community, there are some who like this practice, some who
14   don't.
15             MS. GROSSMAN:  I think that's where litigation is not
16   the place to engage in that process.
17             THE COURT:  That is what Mr. Moore is saying.  That's
18   what his suggestion is saying, is take it out of the
19   courtroom --
20             MR. MOORE:  Thank you.
21             THE COURT:  -- and into a conference room with all
22   different kinds of players, have a mediated discussion and talk
23   things through.  You might get somewhere that you will never
24   get to in a litigation context.  He agrees with you.  You just
25   don't hear the agreement.

D1V5dav3                    conference
1           MS. GROSSMAN:  Oh, I understand, and I understand that
2    at the end of the day there is a consent decree in Cincinnati
3    and so that's litigation and that's a consent order and so that
4    isn't just having a nice conversation with people in the
5    community.
6           THE COURT:  No, but apparently as a result of the
7    conversations all sides wanted to enter into that consent
8    order.  That's what resulted in a consent order.
9           All right.  I can only ask you to read this portion of
10   the transcript again and maybe show it to your clients.
11           In any event, where are we up to?  I lost track.
12           MS. BORCHETTA:  Your Honor, we were discussing the
13   possible date.
14           THE COURT:  Oh, the day.  So, I'm leaning toward the
15   18th because I know you all want the time and it might allow me
16   to squeeze in this criminal trial before.  It will be madness
17   but we will see, but I'm leaning there but still not willing to
18   commit to it until I hear more, which I guess I will hear no
19   later than February 19th.  If you all really want that date
20   work hard to cut back your 112.
21           MR. MOORE:  All right, Judge.
22           THE COURT:  And then I will probably do it.
23           MS. GROSSMAN:  And, your Honor, you mentioned you have
24   another trial starting May 5th?
25           THE COURT:  I do.  That's the problem.  That's seven
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

105

D1V5dav3                      conference

1   weeks later.
2           MS. GROSSMAN:  Okay, just in terms of how we plan.
3           THE COURT:  Well, you know, look.  Nobody gets a
4   contract.  If they slip to the 12th they slip to the 12th, but
5   that's the date on that one.  It is a very big case also.
6           MR. MOORE:  Is it about thermometers?
7           THE COURT:  It is about rating agencies.  You know you
8   have heard of the rating agencies S & P, Moodies.
9           MR. MOORE:  Yes.  I know.
10          THE COURT:  Very big case.  All right.  All right, I
11  think you get to go for now.
12          One more thing.  We probably should calendar another
13  meeting for sure, the question is when.  Would it be after
14  February 19th or you see the plaintiff's joint pretrial order?
15  Should we keep the hearing on the 12th that we already have
16  scheduled?
17          MS. GROSSMAN:  The 12th we would look to do the
18  depositions so perhaps we could -- at least the 12th wouldn't
19  be -- we could work around that but the 12th we are looking to
20  do the deposition.
21          THE COURT:  I know you are looking to.
22          MR. MOORE:  I think it makes sense to do it after the
23  pretrial order.
24          THE COURT:  After the 19th.  Or both sides after the
25  26th.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

106

D1V5dav3                      conference
1              MS. GROSSMAN:  27th.
2              THE COURT:  Obviously if you think you need my time
3    before then you will ask for it, but in terms of picking a date
4    let's look at the 28th of February.  But, I wouldn't be shocked
5    if one side or the other said we need you.
6              MR. MOORE:  What about the 28th?
7              THE COURT:  I'm looking at it.  I'm out of town the
8    28th and the 1st of March.
9              MS. GROSSMAN:  Is March 5th an option?
10             THE COURT:  It will have to be March 5th at 4:30.
11   Okay.  March 5th at 4:30.
12             All right, are we done?  I think we're done, yes?
13             MR. MOORE:  Thank you, Judge, for your patience.
14             MS. GROSSMAN:  Thank you, your Honor.
15             MS. BORCHETTA:  Thank you, your Honor.
16                            oOo
17
18
19
20
21
22
23
24
25