```
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   DAVID FLOYD, et al.,
 3
 4              Plaintiffs,
 4
 5        v.                              08 CV 1034(SAS)
 5
 6   CITY OF NEW YORK, et al.,
 6
 7              Defendants.
 7
 8   ------------------------------x
 8                                        New York, N.Y.
 9                                        March 14, 2013
 9                                        10:10 a.m.
10
10   Before:
11
11              HON. SHIRA A. SCHEINDLIN,
12
12                                        District Judge
13
13                         APPEARANCES
14
14   BELDOCK LEVINE & HOFFMAN, LLP
15        Attorneys for Plaintiffs
15   BY:  JENN ROLNICK BORCHETTA
16        JONATHAN MOORE
17   COVINGTON & BURLING, LLP
17        Attorneys for Plaintiffs
18   BY:  KASEY MARTINI
18        GRETCHEN HOFF VARNER
19        ERIC HELLERMAN
19
20   CENTER FOR CONSTITUTIONAL RIGHTS
20        Attorneys for Plaintiffs
21   BY:  DARIUS CHARNEY
21        SUNITA PATEL
22
23
24
25
```

The Clerk of the Court is directed
to docket this transcript of the
March 14, 2013 conference
in _Floyd v. City of New York_, 08 Civ. 1034.

Shira A. Scheindlin, USDJ
9/18/13

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

```
 1
 2    Appearances (Cont'd)
 3
 4    MICHAEL A. CARDOZO, Corporation Counsel
 4    for the City of New York
 5         Attorneys for Defendants
 5    BY:  HEIDI GROSSMAN
 6         BRENDA E. COOKE
 6         JOSEPH MARUTOLLO
 7         MORGAN D. KUNZ
 7         SUZANNA PUBLICKER
 8         LINDA DONAHUE
 8         LISA M. RICHARDSON
 9         JUDSON VICKERS
10
11    Also present:  Christopher Dunn, Esq., for Ligon plaintiffs
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1   D3E6NYC1                    Conference
 2                (In open court; case called)
 3                THE COURT:  So this is our last conference before we
 4   start the trial on Monday.  I want to make sure that everything
 5   is smooth for Monday.  So anything we need to take up, this is
 6   the day to take up.
 7                I do have letters regarding Professor Silverman and
 8   that is detailed and I will turn to it.  But I had another
 9   letter -- it looks like I might have misplaced it -- about
10   sequestration of witnesses and a couple other issues.  I don't
11   know where that letter is, but I read it.  It wasn't too
12   complicated.  There were three issues raised and one of them
13   was sequestration.  So let's take up the three issues in that
14   letter.
15                There was no written response to the March 12th
16   letter, right, from the City?
17                MS. GROSSMAN:  That's correct, your Honor.
18                THE COURT:  So we can just do it.  On the witness
19   sequestration issue, have the parties agreed?
20                MS. GROSSMAN:  I think we have no objection, your
21   Honor.  We have no objection.
22                THE COURT:  So that is agreed, that is, plaintiffs'
23   limited sequestration?  It seems like there is a stop story,
24   the witnesses to that story, whether they are the witnesses of
25   the person stopped, they will not be in the courtroom until
```

4

```
1    they testify, is that correct?
2              MS. VARMER:  Yes, your Honor.
3              THE COURT:  That is your understanding, too, Ms.
4    Grossman?
5              MS. GROSSMAN:  Yes, your Honor.  Other testimony
6    witnesses can sit in, but not in the particular incident in
7    question.  That is fine.
8              THE COURT:  Then was the topic of the sequencing of
9    liability and remedy by the police and I suspect there is a
10   dispute, but again not having heard from the City yet, I don't
11   want to rule until I have.
12             MS. GROSSMAN:  Well, your Honor, we may not have a
13   dispute.
14             THE COURT:  That would be good.
15             MS. GROSSMAN:  Given the request of the plaintiffs, it
16   is tied into the issue that our expert on remedy is going to be
17   out -- is not available for at least a week.  He is on vacation
18   and given the short notice we were not able to work around
19   that.  So we would like an extra week to put in our report.
20   That would mean that -- it is currently due on April 5th.  We
21   would ask until April -- not even a week -- April 11th.
22             Then we would ask since we're basing our brief in
23   response based on the expert report that we just have another
24   week to put in our remedy brief, which would mean that we would
25   extend it from April 4th to April 19th.  We would just ask if
```

1  we could do that then there would be no prejudice to the
2  plaintiffs because the remedy witnesses would go after and we
3  would just ask for that accommodation from the Court.
4         THE COURT:  Let's separate the two issues first.
5  Despite what I may have said at any prior hearing, it
6  absolutely does make sense to have sort of the liability trial
7  so to speak followed by the remedy trial.  I still am not
8  bifurcating.  I don't intend to rule in the middle.  We're
9  going straight from one phase to another.  It makes since to
10 have all the proof on the liability on the record before the
11 person testifies with respect to remedy.  That is first.
12        Second, I think at the last conference, I reiterated
13 that I would not be in Court on the 25th and 26th and then I
14 said that I had something mid-April.  I made a little joke
15 about how they didn't deserve me to speak.  They now remedied
16 that.  I will not be here April 11th or 12th.  So that is two
17 days down in that week.
18        MR. MOORE:  Judge --
19        THE COURT:  So we have five trial days the first week.
20 We have three trial days the next week -- 27, 28, 29.  We
21 talked about Good Friday.  When is that again?
22        MS. COOKE:  March 29th, your Honor.
23        THE COURT:  We were having the debate about a half
24 day.  I didn't want to do anything that was wrong so I wondered
25 if that morning -- given who the witnesses are, maybe you don't

6

```
 1    need to be here.
 2              MS. COOKE:  It is not myself, your Honor.  It is other
 3    members of the team as well who are observant of that holiday.
 4              THE COURT:  You have eight or nine lawyers.  I wonder
 5    if we could know who the witnesses would be for that morning.
 6    We can stop at 1:00.
 7              MS. COOKE:  I think based on the list that the
 8    plaintiffs have provided of their witness order at this point,
 9    they have identified who they expect to go for the first two
10    weeks and that would effect witnesses that Mr. Marutollo was
11    responsible for and several witnesses that day.  So it does
12    still present a conflict for the City.
13              THE COURT:  For that morning.  In other years I know I
14    have used half the day.
15              MS. COOKE:  The difficulty, your Honor, if you would
16    like me to explain, the observant of the holiday service occurs
17    at a time period, which the events occurred and it is an
18    observation of series of events for the Christian holiday.
19    There is not a lot of option.  It is not like the church has
20    multiple services on that day.  So we're not really attempting
21    to be difficult.
22              THE COURT:  I know you are not attempting to be
23    difficult.  I know in other years we worked out morning and
24    afternoon.
25              MS. COOKE:  It doesn't appear that I will have a
```

7

```
 1    witness necessarily.
 2            THE COURT:  It might depend on the witnesses.  Let's
 3    keep playing that by ear.  If we don't do any witnesses that
 4    day, we don't.  That's that.
 5            Then I do intend to work the April 1st week.  Who does
 6    that present a problem for?  1st and 2nd are holidays.  Nobody
 7    is taking those.  I know I should be, but I am not.  Then the
 8    next week is half again, 8th, 9th and 10th.  Every week is
 9    full.
10            So now let's turn to Ms. Grossman's request on those
11    extension.  Is there a problem with the expert report is
12    delivered on April 11th, one week extension?
13            MR. CHARNEY:  Yes, it is.  Your Honor has already
14    given the defendants a three-week extention on their brief.  I
15    think the brief is.
16            THE COURT:  That is why I started with the expert
17    report.  Would it present a problem for you if you received the
18    expert report on April 11th when there is no trial that day or
19    Friday or Saturday or Sunday?
20            MS. PATEL:  I think the concern is that we would need
21    time to work with our expert on the response on the testimony
22    and not having -- this is a long trial.  We're going to be on
23    trial every day.
24            THE COURT:  Actually not.  That is why we went through
25    the calendar.
```

8

```
 1              MS. PATEL:  You are right.  The Court and plaintiffs
 2    didn't object at all to the defendants' having a month to work
 3    with their expert on the report.  It seems that another week
 4    would actually prejudice us.  We would be right up against the
 5    same problem of potentially the witness -- our expert witness
 6    being put on very soon thereafter.
 7              THE COURT:  Soon thereafter, but as the good news has
 8    it you have a four-day recess right there where you and the
 9    expert could work together without you being in trial.
10              Do you think you could have it the morning of the
11    11th, not the close of business, but 10:00 a. m., so they would
12    have all of the 11th, 12th 13th, 14th?
13              MS. GROSSMAN:  If we can have it by noon, 11:59.
14              THE COURT:  You would have three and a half days of no
15    trial.  That is a lot to work with the expert.  He is
16    apparently out of the country.
17              MS. GROSSMAN:  He is out of the state on vacation.
18              MS. PATEL:  Your Honor, I think if it is okay I would
19    like to check with our expert.  We had discussed with him the
20    deadline of the 5th.  He has other things of course that he is
21    also working on if we can just get back to you.
22              THE COURT:  Like I said, though, you are trial on the
23    8th, 9th and 10th.  So you are not available to work with him.
24    He would be reading it.  Then the 11th, 12th, 13th, 14th you
25    would have a good chunk of time.  I don't know that we'll be
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

```
 1    done with the liability case by that time given the on and off.
 2    We have 16 trial days before the 11th.
 3              Do you think that is going to finish the liability
 4    phase?
 5              MS. GROSSMAN:  I don't think the plaintiffs will be
 6    finished by then and the City then has to put on their
 7    witnesses.
 8              THE COURT:  Some of them.  Some of them will be called
 9    in the plaintiffs' case.
10              MS. GROSSMAN:  A fair amount won't.
11              THE COURT:  They will not be recalled except with
12    exceptional circumstances.
13              MS. GROSSMAN:  You are right.  Even the new witnesses
14    who have not been called, we have a fair amount --
15              THE COURT:  How long do you think the plaintiffs'
16    liability case is?  Have you tried to block it out in days?
17              MR. CHARNEY:  20 to 30 days.
18              THE COURT:  I don't see how you are prejudiced.  We
19    only have 16 trial days before the 11th.
20              Did you want to be heard, Mr. Dunn?
21              MR. DUNN:  Yes.  I am sorry to be talking from the
22    cheap seats.
23              THE COURT:  But you are speaking loudly so that is
24    good.
25              MR. DUNN:  You made it quite clear you expect when a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

10

1   witness appears that is the only time he or she will appear.
2            THE COURT:  Hopefully.
3            MR. DUNN:  The plaintiffs have indicated they will
4   call a number of department officials as part of their case.
5   They may well have testimony that relates to remedy,
6   particularly the higher level officials.  So just as the chief
7   of the department on the stand, he likely will have something
8   to say about remedy.  If we have not seen the City's report
9   about remedy or relief about remedy, it will make it difficult
10  for us to think about what questions to be asking him while he
11  is there on the stand that might bear on remedy.
12           THE COURT:  That seems strange to me, Mr. Dunn.  The
13  lawyers at the front table have been living with this case five
14  years.  If they don't know what to ask Chief Esposito, that
15  will be surprising me.  You haven't been living it as long, so
16  you haven't figured out what to ask Chief Esposito but I think
17  you cross-examined him already.  So all of you are well
18  prepared to cross-examine Chief Esposito.  I don't think these
19  expert opinions will affect cross-examination.
20           MR. DUNN:  Only in the following sense:  The expert
21  says, Here are the things that do or don't need to happen for
22  purposes of remedy.
23           THE COURT:  The expert says that.
24           MR. DUNN:  It is a remedy expert.  We have never even
25  seen that report and Chief Esposito or some other high-level

```
 1   official on the stand.  We don't have anyway to think about
 2   cross-examining him vis-a-vis the remedial position taken by
 3   the City.  So all I am saying is that the longer we, the
 4   plaintiffs, in both cases learn what the City's actual position
 5   is about remedy, we cannot factor in their position when we
 6   have our one opportunity to cross-examine a City official who
 7   might be on the stand during the plaintiffs' case.
 8             MS. GROSSMAN:  Your Honor, Chief Esposito is actually
 9   not on the Ligon plaintiffs remedy witness list.
10             THE COURT:  That is not his point.  He didn't say he
11   was calling him affirmatively.  He said when he is called in
12   the plaintiffs' case, people cross-examine witnesses, and he is
13   concerned that there are questions that one might pose to Chief
14   Esposito if they knew what your remedy expert was saying were
15   bad ideas.  He is not going to propose remedies.  He is going
16   to say why remedies are not necessary.  He is saying that might
17   affect the strategy in cross-examining Chief Esposito.
18             The report wasn't due until the 4th, is that what you
19   said?
20             MS. GROSSMAN:  Right.
21             THE COURT:  I don't think it was planned that you
22   would have had that particular example.  I know it was an
23   example, but you probably would not have had the time for
24   Esposito anyway.
25             MR. DUNN:  That's true.  I am focusing on the brief.
```

                                                                    12
 1    You may recall the brief was originally due February 22nd.
 2    Then it was due March 11.  Now we're talking April 9th.
 3              THE COURT:  Are you asking for a month today on the
 4    brief?  I understand the week for the man who is on vacation.
 5    I wasn't happy about, but I understand it.  When is it?  Is it
 6    it due the 4th and you are asking for the 11th?
 7              MS. GROSSMAN:  Yes, for the report.
 8              MR. CHARNEY:  The brief.
 9              THE COURT:  No.  No.  I know.  I am getting to the
10    brief.  The report I think we're done with it.  I think I am
11    going to say 11:59 or earlier on the 11th.
12              MR. MOORE:  Judge, with respect to that would you
13    agree that if there are issues that do arise and the person has
14    already testified before there was time to analyze the report
15    that you would be open to recalling --
16              THE COURT:  I am always open for an application for
17    good cause.  I told the City that the last time.
18              Remember that, Ms. Grossman, we discussed that with
19    high-level officials, if you need to recall, show me good
20    cause?  If something comes up in this remedy or expert report
21    and it really necessitates recalling Chief X, I will listen to
22    your argument.
23              When is the brief due now?  Not the report.  We took
24    care of the report.
25              MS. GROSSMAN:  April 5th.  I have of a proposal.  To
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

13

```
 1   accommodate Ligon plaintiff concern because there are two
 2   different remedy proposals --
 3              THE COURT:  What is two different?
 4              MS. GROSSMAN:  Well, the Ligon plaintiffs put in their
 5   own remedy brief and the Floyd plaintiffs puts in their own
 6   remedy brief.
 7              THE COURT:  There must be overlap, is there not?
 8              MS. GROSSMAN:  There is some overlap.  But to the
 9   extent there is not, what we can do is respond on the date that
10   we already have to the Ligon plaintiffs.  But my concern is
11   with our expert, we need then to incorporate with the expert is
12   going to say into the brief.  It doesn't make sense to stagger
13   it.  We need that extra time and we hope the Court will indulge
14   us given the truncated schedule that we have to respond to
15   this.  We just would appreciate that that accommodation.
16              MR. MOORE:  Can we respond that?
17              THE COURT:  Ms. Patel is standing.
18              MR. MOORE:  I want to make sure --
19              MS. PUBLICKER:  I see her.  She is not as tall as you,
20   but she is just as visible.  I see her standing, Mr. Charney.
21              MS. PATEL:  I will reiterate what Mr. Dunn said.  This
22   is now the third or fourth continuance sought on this brief.
23   They have had our brief for --
24              THE COURT:  When was your brief filed?
25              MS. PATEL:  We filed February 4th.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              MR. CHARNEY:  No.  March 4th.
 2              MS. PATEL:  March 4th.  Simultaneously we provided the
 3    expert report.
 4              THE COURT:  You did both on March 4th?
 5              MS. PATEL:  Yes, your Honor.
 6              THE COURT:  Ms. Grossman, why does the brief have to
 7    come even later than the expert report?  The plaintiffs were
 8    able to do it simultaneously, the brief and the report, why
 9    cannot that brief be in the 11th, which is again an extension
10    of its due date?  What is the current due date?
11              MS. PATEL:  April 5th, which is an extension.
12              THE COURT:  I understand.  There has been a fair
13    amount of extensions.  It is correct you will have the
14    plaintiffs' brief since March 4th.  It does seem wrong to keep
15    extending the brief day.  Can you not do them both on the 11th?
16              MS. GROSSMAN:  The brief is going to be based on the
17    report.
18              THE COURT:  I know and you will have the report.  It
19    is one thing to turn it over to adversary, but lawyers see it
20    days and days if not weeks and weeks before that.  It is no
21    secret to me that also lawyers talk to the expert, work with
22    the expert.  It is joint effort in every case.  I understand
23    that.  You are not seeing it for the first time that morning
24    that's for sure.  You are working with it and with the expert.
25    It seems to me you can do them simultaneously and that is an
```

15

```
 1    extension and it really is prejudicial to go further.  So I
 2    would say both of them on the 11th at 11:59.  That's enough.
 3    The brief is due at the same time.
 4             MS. GROSSMAN:  Perhaps we can have until the end of
 5    the day on the brief just so we can incorporate.  What it is is
 6    the logistics of when you finalize a report, then you have to
 7    incorporate the final report into the brief.
 8             THE COURT:  Right.  I still say to you are working on
 9    both simultaneously.  You are meshing the two documents.  Both
10    briefs should be in at the same time on the same day.
11             Did we take care of topic two?
12             MS. GROSSMAN:  Yes, your Honor.
13             THE COURT:  That leaves with us with the
14    November 15th, 2010 letter Police Commissioner Kelly.  I
15    understand the City is putting this again on its docket.  I
16    ruled on this.  I really have.
17             MS. GROSSMAN:  Your Honor, the reason why the
18    plaintiffs object to that letter -- it is a very short letter.
19    It is to the Christine Quinn, City Council.  The reason why the
20    plaintiffs objected is because they felt this was an end run
21    around Police Commissioner Kelly coming in to testify.  That is
22    not what our purpose is.  Our purpose is to show notice.  The
23    plaintiffs have put in collaborative process as a piece of this
24    case that community input is required.
25             THE COURT:  That is one of their suggestions?
```

16

```
 1            MS. GROSSMAN:  Yes.  To the extent the City can
 2   demonstrate that there is a communication and a work with the
 3   City Council and notifying the City Council of what it is that
 4   the police department is doing, that part of the democratic
 5   process is something we can redact the Police Commissioner's
 6   name.  This is a letter coming from the City, the Police
 7   Department, saying this is what the Police Department is doing.
 8   I would assure the Court that the City is not relying on one
 9   letter to say this is proof that the City is doing everything
10   that is has itemized in its letter.  We're going to supplement
11   that with proof from other witnesses.  The purpose of the
12   letter is to show the communication between City Council and
13   Police Department that at a certain point in time this is
14   what --
15            THE COURT:  What is the date of the letter?
16            MS. GROSSMAN:  It is November --
17            MR. MOORE:  15th.
18            MS. GROSSMAN:  -- 15, 2010.  So this is a bench trial.
19   I think the Court can take it and use it for its appropriate
20   purpose.
21            THE COURT:  Which is limited to your saying just to
22   show that the --
23            MS. GROSSMAN:  Sure.
24            THE COURT:  -- to show that the Police Department is
25   in communication with the City Counsil on this issue.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

```
 1                MS. GROSSMAN:  Right.
 2                THE COURT:  That's the whole point?
 3                MS. GROSSMAN:  Right.  And notifying this is the plan
 4      or the itemized plans of what it says it has communicated to
 5      the City Council what is being done.  Of course we have to
 6      prove up what we have done if the letter itself doesn't prove
 7      that it was done.  We wanted it for that purpose.
 8                THE COURT:  She is saying it is not offered for the
 9      truth of this.  It is being offered to show those things are
10      being accomplished but merely to show that notice between one
11      city agency essentially another by the government.  I guess you
12      call it the executive branch or legislative branch trying to
13      notify that branch that we are doing these things and not in
14      the context of what we're doing.  Ms. Grossman admits the
15      letter is just to show that they are in communication, that
16      they are keeping those lines of communication open.  That is
17      the sole purpose.  The City would have to prove that the steps
18      allegedly taken are in fact taken.  It cannot be offered for
19      the truth merely to show that the contact is being made between
20      the Police Department and City Counsil.  I don't have a problem
21      with that.
22                MR. CHARNEY:  The part that we're concerned about --
23      well, first, we'll just say we don't understand why that is
24      relevant.
25                THE COURT:  Well, she just told you why it is
```

18

```
 1   relevant.  You are advocating community involvement and all she
 2   is saying is one of our arguments is that we're keeping the
 3   legislative branch of the City notified.  We notified the City
 4   Council.  I hope that is the right title.
 5              MR. CHARNEY:  Speaker.
 6              THE COURT:  What is your title?
 7              MR. CHARNEY:  I don't see how that is community
 8   involvement.
 9              THE COURT:  You don't have to.  That is a merits
10   argument you are welcome to make some other time.  They are
11   saying they are keeping this person -- what is her title?
12              MS. GROSSMAN:  Speaker.
13              THE COURT:  Speaker of?
14              MS. GROSSMAN:  The City Counsil.
15              THE COURT:  All they want it for is to show that they
16   have kept in touch with the Speaker of the City Counsil,
17   period.  You can then argue that is not community involvement.
18   You can argue anything you want.
19              MR. MOORE:  Advocated the collaborative process, which
20   the City rejected out of hand as part of the remedy phase.
21              THE COURT:  Yes, I know.
22              MR. MOORE:  Saying that they are advising the City
23   Council of how they have done something with regard to the RAND
24   report, which is contained letter, doesn't go to --
25              THE COURT:  That is arguing to me about the merits of
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   it, not the procedural niceties.  All she is saying you should
 2   let the letter in for our desire to prove that we stayed in
 3   touch with the City Council.  Then you can make any argument
 4   that it doesn't show anything, they haven't proved up the
 5   things they said anything way.  But if they want to show they
 6   wrote a letter, so what?
 7           MR. CHARNEY:  This is remedy evidence.  This is not
 8   liability evidence.  That is what Ms. Grossman said, we are
 9   using it so show the community involvement issue that we
10   raised.
11           THE COURT:  That is what she said.
12           MR. CHARNEY:  That is the first thing.  To be clear,
13   it does not go to liability.
14           THE COURT:  I don't know.
15           MR. CHARNEY:  When I say "I don't know," I don't know
16   what Ms. Grossman's position is.
17           Ms. Grossman.
18           MS. GROSSMAN:  Well, I believe that there is a lot of
19   overlap between remedy and liability.  I think that is one of
20   the challenges.  So I do believe that could be used on
21   liability as well.
22           THE COURT:  How would you argue that?  How does it
23   affect liability?  Just the sentence.  The only thing you are
24   using it for is just to show that the Police Department kept
25   the City Counsil apprised.
```

20

1          MS. GROSSMAN:  There is also a claim of deliberate
2    indifference and so we believe this goes to that.
3          THE COURT:  You believe that the City staying in touch
4    with City Council proofs that they didn't act with deliberate
5    indifference?
6          MS. GROSSMAN:  That's true.  From a mechanics
7    standpoint, you want us to be efficient in terms of polling
8    witnesses.  Does it make sense for one letter to have someone
9    come back and say on remedy let's call this person and say this
10   letter was sent.
11         THE COURT:  No.  But are we still arguing about the
12   NYCLU report that the City says it never received?  That sounds
13   fantastical to me.  By the sake token, do they need to find the
14   person that put it in the mail or walked it over?  You don't
15   want to concede this report was received when all the evidence
16   seems to point to receipt?  Do you want them to find that
17   witness still?  It seems like a goose and gander approach.  I
18   understand why you want this letter and it is fine with me.
19         MS. GROSSMAN:  Thank you, your Honor.
20         THE COURT:  What is your position on NYCLU report?
21         MS. GROSSMAN:  I stand by the position I took at the
22   last conference.
23         THE COURT:  That the City is not conceding the Police
24   Department ever received it?
25         MS. GROSSMAN:  I have not received any confirmation

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1    that anyone received it and so I reluctant as to lawyer to --
 2              THE COURT:  If your client denies receipt...
 3              MS. GROSSMAN:  So I take the position that -- that is
 4    why I wanted to have the plaintiffs verify.
 5              THE COURT:  No.  I guess they will be able to call any
 6    City witness, hundreds if necessary, to ask about receipt of
 7    the report.  It seems like if someone commented on it, they
 8    must have received it.
 9              MS. BORCHETTA:  Your Honor, if we can have one moment?
10              (Pause)
11              MR. CHARNEY:  Your Honor, on this Kelly letter just so
12    we can --
13              THE COURT:  It is a limited purpose and they are
14    welcome to argue that.  It goes to proving that they did not
15    act with deliberate indifference.  It is still being offered
16    for one sentence, the one sentence is the City Police
17    Department stayed in touch with the City Council at least as of
18    November 2010.
19              MR. CHARNEY:  Just to make sure the substance of
20    letter, in other words, all of the RAND recommendations which
21    the letter sets forth the City has made effort to implement,
22    none of that comes in?
23              THE COURT:  Not as proof.  It comes in to show that
24    the statement was made, but it doesn't prove that the City
25    implemented anything.
```

22

```
 1              MR. CHARNEY:  Okay.
 2              THE COURT:  It cannot be offered for the truth.  The
 3    City would have to prove that it implemented it.  I will not
 4    take it as truth that the City implemented anything.  That the
 5    City told somebody they did, that is the point.  That is not
 6    offered for the truth.  It would could have been a lie, but the
 7    notice was given.  They need to prove that they implemented
 8    something.
 9              MR. MOORE:  I apologize for stringing this out, but it
10    could go to liability because it could show that they were not
11    deliberately indifferent.
12              THE COURT:  They are going to argue that.
13              MR. MOORE:  So that in effect is the same thing they
14    were they prevented from doing before, which is Kelly
15    testifying.
16              THE COURT:  No.  It is not offered for its truth.  I
17    will not accept the letter proves they implemented anything.
18    You have a sophisticated trier of fact.  I get the point.
19              MR. MOORE:  If it is not accepted for the truth, it
20    can never go to the issue of deliberate indifference.
21              THE COURT:  That is a good point.  You can make that
22    argument during summation.  It is not hard for me to understand
23    those legal thoughts.  I do this every day all day for years,
24    for decades.
25              MR. CHARNEY:  Our concern is obviously the trial
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

```
 1  record is important not only for you but if there is an appeal
 2  and our concern is if there a letter in the trial record --
 3          THE COURT:  I said three times.  With all the lawyer
 4  power that you have here somebody should mark this point in the
 5  transcript so you can tell the appellate court it is not
 6  accepted for the truth of it.  It does not prove that anything
 7  was implemented.  I will not accept it for proof that something
 8  was implemented.  So when the City makes a deliberate
 9  indifference argument, you will say, Your Honor, it cannot
10  prove that.  All it can proof is what it purports to prove that
11  the Police Department said something to the Speaker of the City
12  Counsil.  We don't know what they said was true or not.  Put a
13  little mark on the transcript somebody.  So we took care of
14  that.  You can have your letter back.
15          Before we turn to the Silverman Eterno issue are there
16  any other details for Monday's trial that we need to talk
17  about?  By the way, just in case you know my clerk was in touch
18  with you on an overflow room.  Was anybody in touch with you?
19          MS. COOKE:  We received an e-mail from Mr. Brazil that
20  said it was the 26th floor courtroom.
21          THE COURT:  Then the plaintiffs did also?
22          MR. CHARNEY:  Yes.  Thank you.
23          THE COURT:  I think we did that for the first day.
24  Did you need it for more than that?
25          MR. CHARNEY:  Is it possible to have it for the first
```

24

```
 1   week?
 2            THE COURT:  I don't know the resources of the
 3   building.  We have to ask.  We can play it day by day.  If they
 4   can give it to us for the second day and nobody is there.
 5   There are only some courtrooms.
 6            MR. MOORE:  It is like a Broadway show.  If nobody
 7   shows up, it is canceled.
 8            MS. GROSSMAN:  One housekeeping matter.  The City asks
 9   permission to have two attorneys deliver the opening?
10            THE COURT:  Sure.
11            Anything else?  Any small point?
12            MS. GROSSMAN:  Your Honor, we have one small point
13   regarding the exhibits to be used for plaintiffs' opening.  We
14   received it today.
15            THE COURT:  Good.
16            MS. GROSSMAN:  We have one issue with one of the
17   documents, one of the pieces of evidence that we have a problem
18   with and we object to and it is listed on a pretrial order.  So
19   it may be that we wait until we get to that on the list of
20   exhibits that we're talking about rulings.
21            THE COURT:  No.  Today, you mean?
22            MR. CHARNEY:  Yes.
23            MS. GROSSMAN:  I thought at today's conference we were
24   going through some of the issues on the joint pretrial order.
25            THE COURT:  Why don't we take it out of turn and do
```

25

```
 1    it.
 2              MS. GROSSMAN:  Ms. Publicker will address you.
 3              THE COURT:  Do I need the exhibit?
 4              MR. CHARNEY:  I assume you are talking about this one?
 5              MS. PUBLICKER:  Plaintiffs' Exhibit --
 6              MS. BORCHETTA:  16.
 7              THE COURT:  I was handed two different things.
 8              MS. PUBLICKER:  I believe, your Honor, the black and
 9    white copy is what we provided in course of discovery and Ms.
10    Borchetta questioned Lieutenant Korabel about at his
11    deposition.  The color copy we received earlier this week.  The
12    color copy is what they would like to use in their opening
13    statement on Monday.
14              MS. BORCHETTA:  Also to further clarify, this entire
15    document that you have been handed is four pages.
16              THE COURT:  Four pages.  I will state for the record
17    it is PL001003 through 1006 -- no, 1005-A.
18              MS. BORCHETTA:  Yes.  That is the entirety of what is
19    on Plaintiffs' exhibit list as part the JPTO as Exhibit 16.
20              THE COURT:  What is it?
21              MS. PUBLICKER:  So, your Honor, what this is is it
22    appears to be a Facebook posting of alleged T-shirts from the
23    30th precinct.  According to this these pictures were posted
24    between one and six months after the stop of Devin Almonor.
25              THE COURT:  Who.
```

26

```
 1              MS. PUBLICKER:  Devin Almonor, the first witness on
 2      plaintiffs' witness list.  He was stopped in the 30th precinct.
 3      These photos were not uploaded to Facebook until one month and
 4      six months.
 5              THE COURT:  I am sorry.  Whose Facebook page?
 6              MS. BORCHETTA:  Your Honor, if I may provide some
 7      background on what these documents represent.   These represent
 8      T-shirts that were sold by -- T-shirts sold with the 30th
 9      Precinct Club.  One of our witnesses that we're calling is
10      Lieutenant Korabel.  He is one of the police officers who
11      stopped Devin Almonor, who is a class member witness.
12      Lieutenant Korabel, who is the supervisor in the 30th
13      precinct --
14              THE COURT:  Still?
15              MS. BORCHETTA:  Now he is a lieutenant elsewhere.  At
16      the time of the stop of Almonor he was a supervisor in the 30th
17      precinct and he testified that he saw the pages that are
18      stamped PL001004 and 5, the second and third pages.  He saw
19      pictures that looked like this on the back and front of a
20      T-shirt that was sold by 30th Precinct Club.
21              THE COURT:  What is the 30th Precinct Club?
22              MS. PUBLICKER:  It is not affiliated with the police
23      itself.  It an organization that the police officers form on
24      their own to collect money for when police officers, family
25      members dies or become ill and they distribute the funds for
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

```
 1    those officers.  Ms. Borchetta questioned Lieutenant Korabel
 2    about this.  He was not a member of the 30th Precinct Club.  He
 3    did not have any of these T-shirts.  He has never bought one.
 4    So to the extent that plaintiffs are using this to try and show
 5    poor character on the part of Lieutenant Korabel when he has
 6    never admitted to own one or they are using the 30th precinct
 7    to impugn the character of Lieutenant Korabel, it is
 8    irrelevant.
 9            MS. BORCHETTA:  Your Honor, that is not the basis on
10    which we're submitting this document.
11            THE COURT:  I am having trouble understanding still
12    what this document --
13            MS. BORCHETTA:  The page that is stamped PL1005 is an
14    you unclear copy of the top 10 statements made by perps.
15            THE COURT:  The top 10 statements made by?
16            MS. BORCHETTA:  Perps, p-e-r-p-s.  The last page of
17    the exhibit, which is 1005-A is a better copy of that.
18            THE COURT:  Right.  I don't what this document is.
19            MS. BORCHETTA:  These are pictures of a T-shirt that
20    Lieutenant Korabel saw and he testified that he saw it while he
21    was working at 30th precinct, sold by 30th precinct officers.
22    The purpose of this document is not at all to impugn Korabel's
23    character, but it is to show that we believe these statements
24    on this T-shirt both make fun of stop victims and also
25    perpetuate stereotypes about the communities we allege are
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

```
 1   being targeted for this stop and frisk tactic.  We believe that
 2   that shows two things:  Both bias by some police officers and
 3   also notice to the City that they are needed to be action to
 4   address potential bias by police officers in conducting stops
 5   and frisks.  That is the purpose.
 6             THE COURT:  Does Lieutenant Korabel say when these
 7   words, the top 10?
 8             MS. BORCHETTA:  He said that while he could not recall
 9   the exact date, it was prior to 2012.
10             MS. PUBLICKER:  However Devin Almonor was stopped in
11   March 2010.
12             MS. BORCHETTA:  It is separate and apart from the
13   stop.
14             THE COURT:  I realize that.  He couldn't date it.  He
15   said he saw it sometime before 2012?
16             MS. BORCHETTA:  Yes, your Honor.
17             THE COURT:  We don't know when.
18             MS. PUBLICKER:  He could not recall.
19             THE COURT:  It could be December 2011.
20             MS. BORCHETTA:  Right.  He said it could have been
21   before the stop.
22             THE COURT:  It could have been as late of December of
23   2011 because all he would say it was before 2012.
24             MS. BORCHETTA:  Right.
25             THE COURT:  Your strongest argument is that as of no
```

29

```
 1    later than December 2011 at least some high-ranking officers in
 2    the 30th precinct saw this T-shirt message and therefore should
 3    have been aware that there may have been biases by some
 4    officers.  That is the most general way you can put it.
 5              MS. BORCHETTA:  Also, your Honor, I asked him whether
 6    he as a supervisor in the 30th precinct upon seeing this
 7    T-shirt addressed it in any way with any of the officers under
 8    his supervision and he said no.
 9              THE COURT:  Did he say where?
10              MS. BORCHETTA:  He said he did not remember where.  He
11    knew it was being sold by the 30th Precinct Club and he
12    couldn't remember whether or not it was within the precinct
13    property.
14              MS. PUBLICKER:  He did testify that he did not believe
15    it would be appropriate for officers to wear that T-shirt when
16    they were on duty and in the 30th precinct.
17              MS. BORCHETTA:  But --
18              THE COURT:  You cannot interrupt.  It is not going to
19    work that way.  She is speaking, you are not.
20              MS. PUBLICKER:  However, he stated that -- he did
21    state that if they were on their private time that they did
22    have a constitutional right to express their free speech.
23              THE COURT:  That is true.  No one is quarreling with
24    that.  So I understand it the limited purpose of allowing this
25    at all would be for argument that at some point in time no
```

30

```
 1   later than 2011 he saw this, not sure where or when, and didn't
 2   take any action or it didn't cause him to have any training
 3   session or meeting of the precinct and discussions about it.
 4   That is all they can prove, that he saw it and it didn't
 5   trigger any reaction, official reaction on his part to do
 6   anything having seen it.  That is the only use, period.
 7           Again it is not offered for the truth.  It is not
 8   offered to show that some police officer wrote this.  I don't
 9   know who wrote this.  It could be someone in the community
10   wrote in.  He saw it.  Your only point is he didn't do anything
11   about it.
12           MS. PUBLICKER:  Well, he testified, your Honor, that
13   there was -- at some point after Lieutenant Korabel seen these
14   T-shirts, there was a change in the Police Department policy
15   disallowing the creation of these T--shirts.
16           THE COURT:  That is fine.  You can offer that.  I am
17   taking it solely for the limited purpose again not for the
18   truth of the statement -- I haven't read it yet.  It is not
19   terribly important that I do -- but that he saw the words
20   written on it and according to plaintiffs his testimony is he
21   did nothing about it officially at or about the time he saw it.
22   That's the only purpose which I take it.
23           MS. PUBLICKER:  There is an issue, however, your
24   Honor, because when plaintiffs showed the version to Lieutenant
25   Korabel, he said that he could not read the back.
```

```
 1              THE COURT:  Could not?
 2              MS. PUBLICKER:  Could not read the back.  He didn't
 3   know what it said.  He said that he saw something like this.
 4              MS. BORCHETTA:  We would submit we put them together
 5   as exhibits because it is obviously the same document and we'll
 6   have to ask him about it.
 7              THE COURT:  If he said he couldn't read the words that
 8   eliminates the notice point.
 9              MS. BORCHETTA:  He said he saw a shirt that looks like
10   this, the back of the shirt.  And then if you look at the next
11   page, if you overlay it, it is the same.
12              THE COURT:  I am missing your points.
13              MS. BORCHETTA:  When he saw on the T-shirt which would
14   have been clear, our point is he identified.  I showed him the
15   two pictures and he said the one with the skull is the front
16   and the one with the list was the back.  I saw that.
17              THE COURT:  That's true.  I past hundreds of T-shirts
18   and I can't read most of the words.  Sometimes I am curious,
19   but I can't read the words because I pass them fast.
20              MS. BORCHETTA:  What I would submit, though, is that
21   these -- we believe these are obviously the same documents.
22              THE COURT:  That is true.  I am not sure if he saw the
23   words.  Let's say I am walking to work, right?  I am going to
24   give you an example.  I am walking down the street and I see a
25   T-shirt with words and I am actually interested.  I try to read
```

32

1    the words, but too late, the person is gone and I never figure
2    out what it said.  I saw the shirt, but I don't know what the
3    message was.
4              MS. BORCHETTA:  He didn't testify that he didn't see
5    the shirts.  He said he couldn't clearly read the copy.
6              THE COURT:  I don't know that he saw these words.  He
7    recognizes the skull and the 30th precinct and he also saw
8    there were words on the back.  I don't know that he knows what
9    those words were.
10             MS. BORCHETTA:  Now that we have a better copy --
11             THE COURT:  He saw it.  Seeing it and reading the
12   words are completely different.  Usually a person is moving in
13   a T-shirt.  I don't know if the T-shirt is being worn.  I don't
14   know if the T-shirt was hanging.  The long and short is I don't
15   think this should be used on opening.  If you want to use it
16   for Korabel, I will listen to the testimony.  It is giving a
17   list of things as if the Police Department had notice of this
18   list and I don't think there is any proof of that yet.  I will
19   not allow it for openings.  Good luck with Korabel.  That is my
20   ruling.  That is Exhibit 16.
21             Now, anymore smaller items before we turn to the
22   Silverman situation?
23             MS. BORCHETTA:  Can we clarify?  I think we understood
24   that we might be raising some of the issues around objections
25   that are in the GPTO that we submitted on Monday.  I think we

33

```
 1   just want clarification whether the Court wants us to raise
 2   certain things now or wait until --
 3           THE COURT:  I would try to do it now.  Although, I
 4   don't have that material in front of me.
 5           MS. BORCHETTA:  So I suppose my question is whether
 6   you want us to do that before or after Silverman?
 7           THE COURT:  We'll do it after Silverman.  We'll take a
 8   quick break so I can get the papers in front of me.
 9           This Silverman situation is getting troubling.  There
10   are a lot of letters back and forth late in the day of this
11   trial.  I think in short that he should be deposed.  I don't
12   know why he has to be the fifth witness.  There is nothing holy
13   with the order.  Why can can't he be pushed back so there is
14   time to do this deposition?  Surely not everybody is taking off
15   Monday and Tuesday.  Some of us are and some of us are not.
16   Ms. Cooke, for example, is taking Good Friday but not Passover.
17   She is available to take Silverman -- Oh, he is probably not
18   come to think about it.  I don't know.  Surely something can be
19   worked out somewhere to get his deposition done.  Why does he
20   have to be the fifth witness as opposed to tenth or fifteenth
21   witness.  There is nothing holy about that.  I think he should
22   be deposed.  I think that will stop a lot of the wrangling.
23           Unlike criminal litigation, nobody wants an undeposed
24   witness.  People get so nervous.  They think the world will
25   come to an end if they don't depose every single witness.  I
```

34

```
 1    said long ago that if a witness is listed on the exhibit list,
 2    even if they weren't deposed in the discovery period, under the
 3    pilot project rules they would be deposed even if they are a
 4    late-named witness.  I think he should be deposed.  That will
 5    stop some of the wrangling.
 6             MR. CHARNEY:  A couple requests on that.  Where your
 7    Honor was going on the dates, I think that that would work
 8    better for us.  In other words, maybe do it on one of those
 9    trial days we're not on trial.
10             THE COURT:  I don't know about Silverman.
11             MR. CHARNEY:  Assuming he is available, we would
12    ask --
13             THE COURT:  That's an assumption.
14             MR. CHARNEY:  I understand.  We're going to talk to
15    him.  If he is available, we will ask the deposition be held
16    then and not at some point during the trial.
17             THE COURT:  I agree.  He is more likely to be
18    available Monday because Monday isn't the holiday, that is for
19    the people who cook.
20             MR. CHARNEY:  The second request, your Honor, is if we
21    can limit the time.  As we said over and over again in our
22    letters, his testimony is going to be very limited.  He did the
23    surveys and he is only go to testify about very narrow portions
24    of that.
25             THE COURT:  That is the plaintiffs' position that they
```

1  don't seem to appreciate the defense position.  Once you put
2  the witness up, you cannot control in fairness the
3  cross-examination.  So while you want to offer him only for the
4  three of the questions, if they want to talk about three other
5  questions, I think they should be allowed to do it.  What he is
6  being really called for is his survey, the results.  They can
7  ask about different questions on the survey as long as it is
8  relevant.  As I said all along the efficacy of stops and frisks
9  is not an issue for me or any court.  The only issue for the
10  Court is constitutionality, not efficacy.  I am not a
11  policymaker.
12          MR. CHARNEY:  We agree with that.
13          THE COURT:  Whether it is effective or not, I don't
14  think that was the question.  He asked the police officers to
15  pressure to reduce crime, which is a little different than
16  efficacy.  I know you are only offering it for a limited
17  purpose, but you are offering the survey.
18          MR. CHARNEY:  I understand that.  There are obviously
19  free to ask questions about the results of the survey.  I guess
20  our concern is his methodology is set forth clearly in his
21  articles.
22          THE COURT:  I understand that.
23          MR. CHARNEY:  And as far as I can tell, the deposition
24  is to really get into that stuff to figure out what he did, how
25  he did it, how he analyzed it, and to make him sit there for

36

```
 1   eight hours to talk about one very narrow methodology, and
 2   we're not talking about Jeff Fagan with 10 different --
 3           THE COURT:  I understand.  The City doesn't have time
 4   to waste either.  I am sure they will not take eight hours if
 5   they don't need eight hours.  They are not going to do it to
 6   run the clock out.  They are busy those days.  Everybody is
 7   busy.  They are in the middle of trial and holiday prep.  They
 8   are not going to fool around.  They are going to get what they
 9   need and go home.  I don't know why it would take eight hours,
10   but I am not going to limit it either.  I am going to count on
11   people's common sense and good faith to get it done.
12           MR. CHARNEY:  Are there certain --
13           THE COURT:  I suggest to you the best possible day is
14   Monday.
15           MR. CHARNEY:  I guess then on that same topic are
16   there certain issues that they shouldn't be allowed to go into.
17   This is a prolific writer.  I don't know how many questions
18   they are going to go into with him, none of which have to do
19   with the survey keep in mind, but obviously have to do with the
20   larger issues that are relevant in this case.
21           THE COURT:  Well, since the efficacy of the stop and
22   frisk program -- I don't think the City likes that phrase -- if
23   there is such a program, the efficacy of it is not an issue at
24   this trial.  To ask him questions about that would be
25   irrelevant.  The relevance objection should be pressed.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1                MR. CHARNEY:  What about issues he has written about
 2      in terms of how the com set is structured, the way they analyze
 3      crime data?  Again, possibly relevant to this case, but not
 4      what he would testify about at all, not even a subject of the
 5      survey.
 6                THE COURT:  Then I would say, no, the subject of his
 7      direct testimony is the survey, the results of the survey.  If
 8      it is not part of the survey, then it is not appropriate.
 9                MR. CHARNEY:  Okay.
10                MR. KUNZ:  I think there may be questions that can get
11      towards Mr. Silverman's bias and how he constructed the survey.
12      For example, the many articles he has written on his opinion on
13      com stat, I may at his deposition may want to ask questions
14      about those to flush out his opinion and to the extent that
15      made its way into --
16                THE COURT:  He is not an expert.  The letter the City
17      wrote, The issue of this new expert witness -- and I circled
18      that.  He is not an expert witness.  He is not a new expert
19      witness.  He is a fact witness because he did this survey and
20      the survey results the plaintiffs think is relevant.  He didn't
21      prepare this survey at their requests.  They didn't help design
22      it.  He is a researcher who was doing his own thing.
23                MR. KUNZ:  Your Honor, I do think there was some
24      discussion about whether or not he was an expert in the survey
25      construction and phrasing --
```

38

```
 1              THE COURT:  He is not being offered as one.  He may be
 2    one in some other trial about, who knows what, copyright
 3    infringement and he can explain how to design surveys.  He is
 4    not an expert in my opinion.
 5              MR. KUNZ:  We may have questions about particular
 6    phrasing of questions.
 7              THE COURT:  You probably do.
 8              MR. KUNZ:  Indeed.
 9              THE COURT:  He is not being called as an expert.  He
10    didn't have to produce an expert report.  His report on survey
11    is a report, but I am going to allow the deposition because
12    civil litigation lawyers break out in hives if they don't get
13    deposition before they testify.  We tried criminal cases where
14    freedom is at stake but not without depositions.  You folks
15    think you cannot have a witness on the stand who wasn't
16    deposed.  That is the way it is these days.
17              MR. KUNZ:  I appreciate that ruling, your honor.  The
18    other aspect of the defendants' motion here was data.
19              THE COURT:  I am not sympathetic to the data point.  I
20    will tell you why:  You have the results.  The results are in
21    front of you.  The only reason for the underlying data is to
22    basically check the math or something to see if it is honest.
23              MR. KUNZ:  And to do different math, your Honor.
24              THE COURT:  Basically it is to do that.  They gave you
25    underlying data on three or four or five questions that is
```

39

 1    subject of his direct.  If his math was inaccurate, you already
 2    can cross-examine and show that he jiggered the numbers or
 3    something.
 4            MR. KUNZ:  I will give you an example how we're
 5    limited.  The 2012 survey broke down the respondents in three
 6    categories:  Three com stat, ostensibly the Giuliani years and
 7    ostensibly Bloomberg years.  We only have for the 2012 survey
 8    the earlier dividing line, pre1995, post1995.  We don't have
 9    the dividing line later on.
10            THE COURT:  I don't understand.  Can you help me?  I
11    have the survey in front of me.  Show me what you are talking
12    about.
13            MR. KUNZ:  Well, on the 2012 survey Questions 15, I
14    lay out the specific numbers in the letter.
15            THE COURT:  Question 15:  What year did you retire?
16    You you don't have --
17            MR. KUNZ:  No, we don't have that.
18            THE COURT:  What do you have?
19            MR. KUNZ:  The professor has created a field that says
20    did the person retire before 1995 or after 1995.  We don't have
21    the specific year that the people retired.
22            MR. CHARNEY:  Can I respond?
23            THE COURT:  No.  No.  Because I would like to follow
24    what is on the survey and understand what the defendants have
25    already.  That is what I would like to know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1                So when it says what year did you retire, the person
 2   writes a year in?
 3                MR. KUNZ:  Yes.  I believe so.  This is a web survey.
 4   There is a drop-down menu.
 5                THE COURT:  So the person puts the year in.  What do
 6   you have?
 7                MR. KUNZ:  I have a yes or no did the person retire
 8   before --
 9                THE COURT:  How can you have a yes or no?
10                MR. CHARNEY:  Your Honor, can I respond?
11                THE COURT:  Yes.
12                MR. CHARNEY:  Just to clarify, the way the results
13   were analyzed is they didn't actually -- Silverman and Eterno
14   did not take the retirement year and factor it into their
15   analysis.  What they did is based on the retirement year, they
16   divided the respondents into three groups -- pre-'95, '95 to
17   '01, and '02 to the present.  So for each person once they gave
18   the year, they were put into that group and they created a data
19   set in which every single response was put into either pre-'95
20   and that dataset we gave to the defendants because with that
21   dataset they can then run the numbers that Silverman and Eterno
22   ran to see if they get the same results.  So Silverman and
23   Eterno never used the year in any way to analyze the data.
24   That was not part of their analysis.  So it is not correct to
25   say we need the year they retire to be able to replicate the
```

1   analysis.
2           THE COURT:  Because they know which of the three
3   buckets?
4           MR. CHARNEY:  Right.  They put everyone into a bucket
5   and assigned them pre'95, '95 to '01, '02 to the present.
6           THE COURT:  How many respondents were there in 2012?
7           MR. CHARNEY:  1900.  They have every single response.
8           THE COURT:  What do you mean every single response?
9           MR. CHARNEY:  Sorry.  They have data on every single
10  respondent.  For every respondent, whether they are pre'95--
11          THE COURT:  Right.  So they know the breakdown.  They
12  know there are 500 in one bucket, 200 in another bucket.
13          MR. KUNZ:  That is not correct, your Honor.  If
14  Mr. Charney is representing that the plaintiffs are willing to
15  give us each of those three buckets that helps all the dispute.
16          THE COURT:  You don't know how many are in each of the
17  three buckets?
18          MR. KUNZ:  I know pre-1995 bucket and post-1995
19  bucket.
20          THE COURT:  You don't know how many are in the three
21  buckets?
22          MR. KUNZ:  Yes.
23          MR. CHARNEY:  That was not my understanding.
24          MR. KUNZ:  If they are willing to give that to us,
25  great.  We need that.  I would posit that just because these

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

1  professors did not look at the dates of retirement doesn't mean
2  that we can't cross-examine them.
3          MR. CHARNEY:  Of course.
4          THE COURT:  It does.  He is presenting the results of
5  the survey.  This is not a retained expert.  Would you please
6  get the numbers, raw numbers.  500 or 600 or 1200, whatever
7  equals 19.
8          MR. CHARNEY:  Yes.
9          MR. KUNZ:  The only other issue here, your Honor, was
10 the additional questions having to do with pressure.
11         THE COURT:  I am in the survey.
12         MR. KUNZ:  Question 2.  So we have A, B and C.  I
13 believe I want -- and H.  And I believe we want D and E, which
14 has to do with pressure to decrease crime.
15         MR. CHARNEY:  This goes back to the point you made,
16 your Honor, which was the only reason they need the raw data is
17 to replicate the analysis.
18         THE COURT:  Yes.  That is what I think, too.  You have
19 the results.  You know how many checked box one through nine or
20 ten, right?
21         MR. CHARNEY:  They have that percent of the
22 respondents.
23         THE COURT:  It goes to one, the least pressure, and 10
24 is the most pressure.  So the 1900 you know basically is the
25 breakdown.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

 1             MR. KUNZ:  Well, we do know the professors' analysis,
 2   the progression analysis, on the raw numbers.  But, no, we
 3   don't note raw numbers for those particular values.
 4             MR. CHARNEY:  That is not true.  They actually put the
 5   percent.  In other words, this percent of respondents said it
 6   was high pressure.  They have more than just the regression
 7   analysis.
 8             THE COURT:  Of course.
 9             MR. KUNZ:  The problem here too is that the two
10   surveys changed.  The professors changed their methodology
11   between the 2010 article and 2012 article.  For 2010 article we
12   don't have three buckets.  The professors didn't look at the
13   three buckets; they only looked at two.  So I think it is fair
14   for us to go into the data, create the three buckets and see if
15   it changes.
16             THE COURT:  Actually, it is not.  If this person was a
17   retained experts, I would understand turning over the data.  I
18   have big environmental cases and I have scientists and I do
19   make them produce raw data and they are not happy about it.
20   This is a totally different thing.  These folks did what they
21   did.  It is a limited purpose.  You do have the statistics.  It
22   says, 37 percent of 1900 checked great pressure.  You can do
23   the math yourself.  What is 37 percent of 1900?  Figure it out.
24             MR. KUNZ:  That is another issue, your Honor.  The
25   professors break it down.  It is one to ten, one being low and

44

```
 1    10 being high.  The professors break it down as eight, nine and
 2    10 being high pressure.  If you move that down to seven, eight,
 3    nine and 10, it will change the results.  Six seven, eight and
 4    nine will change the results.  This goes into what weight your
 5    Honor should put into the survey.  I cannot do that when they
 6    are withholding the data.
 7              MR. CHARNEY:  They can cross and point out what they
 8    call methodological flaws.  They can say, Why didn't you use
 9    year as opposed to period of time?  Why did you group the
10    pressure answers?
11              THE COURT:  That is the point.  That is why I think
12    you are entitled to a deposition.  I am not going to have him
13    produce all this data at this point.  I did have a question
14    before I make that final ruling.  The City's letter says it is
15    very easy and there is no burden at all.  I have a marginal
16    note saying, Is that true, somewhere in the City's letter.
17              MR. KUNZ:  I believe that is the case, your Honor.
18              THE COURT:  Hold on.  Hold on a minute, please.  There
19    it is.  There is a sentence that says, "Moreover since the data
20    is kept electronically on SPSS software, which can easily be
21    produced and which requires no redaction, there is no burden to
22    plaintiffs or to the professors who conducted the survey for
23    production of the data."  Is that true?  Is it that easy?
24              MR. CHARNEY:  That I don't know because this isn't my
25    retained expert.
```

45

```
 1              THE COURT:  Well, with respect to D and E if it means
 2    that much to them and it is so easy that won't affect the
 3    confidentiality point that you raised.
 4              MR. CHARNEY:  Pressure to decrease crime.
 5              THE COURT:  The two questions about pressure to reduce
 6    crime.  If it means that much to them to massage it and said it
 7    should have been seven through 10 or six through 10 and if it
 8    is that easy and it doesn't affect anonymity, you can figure
 9    out who is who and there is danger in that.  I am not going
10    there.  For D and E you could find out from Silverman or
11    Eterno.
12              MR. CHARNEY:  Eterno has the data.
13              THE COURT:  Eterno has the data and Silverman may be
14    free on Monday.  Go ahead and give them D and E if it is not
15    burdensome.
16              MR. KUNZ:  The corresponding ones from the 2008.
17              THE COURT:  Yes.  Just for that pressure question.
18    Fine.
19              Now I think we're ready for a very short break and I
20    will see what we can do.
21              MR. KUNZ:  I am available on March 26th that Monday to
22    take his deposition.  Do we have a date for the production of
23    data.
24              THE COURT:  He hasn't made the phone call yet.  We can
25    only go so far.
```

```
 1              MR. KUNZ:  Thank you, your Honor.
 2              THE COURT:  Today is the 14th.  The phone call hasn't
 3    been made.  I hope that will work out.
 4              We'll reconvene in three minutes.
 5              Did we get a hard copy of the joint pretrial order
 6    that was filed Monday?  My clerk didn't think we got a hard
 7    copy.
 8              MR. MOORE:  I have a hard copy.
 9              THE COURT:  Was one delivered?
10              MS. BORCHETTA:  We did not know that was part of
11    the --
12              THE COURT:  A hard copy would be good.
13              MR. MOORE:  Can I have a word with you?
14              THE COURT:  It's not related to this case?
15              MR. MOORE:  It is related to my availability.
16              THE COURT:  Personal matter, maybe a personal issue,
17    health or something?
18              MS. GROSSMAN:  If that is what it is, that's fine.
19              MR. MOORE:  That's what it is.
20              THE COURT:  Fine.
21              (Recess)
22              THE COURT:  Please be seated.
23              Now, I have to say I thought we had worked on this
24    problem, but we need to work on it more.  In the first half of
25    this morning's session many of you fell back on your older bad
```

47

```
 1   habits of conferring while I am speaking and that makes it
 2   difficult for me and makes it difficult for the court reporter.
 3   I asked you and asked you and some of you got very good at it
 4   for a while and say, May we have a moment, and I say, Sure, and
 5   everyone confers.  I think Mr. Charney you are singled out.
 6            MR. CHARNEY:  I am a bad offender.
 7            THE COURT:  You are a bad offender.
 8            MR. MOORE:  Repeat offender.
 9            THE COURT:  That too.  When you do that it is
10   disturbing for the record and for me.  If he want to talk to
11   your colleagues, all you have to do is say is, May I have a
12   moment.  I thought we got that all figured out.
13            The other thing is, Ms. Borchetta, you were the
14   biggest offender on this one, you cannot interrupt each other.
15   When one attorney is on her feet as much as you want to say,
16   That is not true, you have to wait your turn.
17            MS. BORCHETTA:  Yes, your Honor.  Sorry.
18            THE COURT:  I think both sides of course.
19            Now, on this joint pretrial order, I did say I would
20   try to rule as much as possible to make the trial smoother but
21   because a courtesy copy was not provided we missed a beat.  I
22   am not prepared, but I will do it on the spot.
23            Where should I start, or where can I start?
24            MR. CHARNEY:  Your Honor, we thought a good way to
25   start is to start with Plaintiffs' exhibits.
```

48

1           THE COURT:  That's fine.  You are first.
2           MR. CHARNEY:  There are several kind of buckets, in
3    other words, objections that come up.
4           THE COURT:  Should I start with Exhibit A?
5           MS. BORCHETTA:  Yes, your Honor.
6           MR. CHARNEY:  Yes, your Honor.
7           MS. BORCHETTA:  B.
8           MR. CHARNEY:  Are you looking at Exhibit B?  Ours are
9    numbered, 1, 2, 3 and so forth.
10           THE COURT:  I think so.  Plaintiffs' witness list with
11    defendants' objections.
12           MR. CHARNEY:  We can start there.
13           THE COURT:  Is that a good place?
14           MR. CHARNEY:  That's fine.  I thought we were going to
15    do exhibits.  Exhibit B is the witness list.  Sorry, exhibit
16    lists.  Exhibit B is the exhibit list.
17           THE COURT:  Let me try to find that.  Okay, Exhibit B.
18    You are trying to say groupings.
19           MR. CHARNEY:  So one of the broad objections that
20    comes up over and over again is defendants' objection to the
21    admission of records relate to CCRB investigations and findings
22    and we disagree with that objection and Ms. Borchetta can tell
23    you why we disagree with that objection.
24           MS. BORCHETTA:  We thought that would be a good place
25    to start since it applies to a lot of the documents and defense
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

49

```
 1    objections.  So the defendants are objecting to CCRB findings
 2    letters and I know the Court has seen a lot of CCRB documents,
 3    but these are letters froms CCRB saying to either an officer or
 4    to someone who has submitted a CCRB complaint, We have
 5    conducted an investigation and we have done a thorough
 6    investigation and we have come to the following findings.  Then
 7    it lists out, for example, abuse of authority and then it says
 8    exonerated, unsubstantiated or substantiated as the finding.
 9    Those are what we are calling CCRB findings letters.  I have an
10    example if the Court would like to see it.
11            THE COURT:  Yes.  What is your theory?
12            MS. BORCHETTA:  So our theory of admissibility is that
13    this is an exception to hearsay as a public record because it
14    states under 803(8)-- we believe they are public record
15    exceptions because these are regularly created by the CCRB and
16    sent out as a matter of course once the board of CCRB has voted
17    after an investigation.
18            THE COURT:  Let's start by reading the rule.  808(8):
19    A record or statement of a public office if:  A.  It sets out
20    the office's activities, a matter observed while under a legal
21    matter to report but not a criminal case a matter observed by
22    law enforcement personnel or in a civil case or against the
23    government in the criminal case factual findings from a legally
24    authorized investigation and neither the source of information
25    nor other circumstances indicate a lack of trustworthiness.
```

50

1          So are you relying on (a)(3) in a civil case factual
2    findings from a legally authorized investigation?
3          MS. BORCHETTA:  Your Honor, I think it could be either
4    one or three to the extent --
5          THE COURT:  One is the office's activities.
6          MS. BORCHETTA:  To the extent that it's in setting out
7    that this was a CCRB investigation and these are our
8    conclusions in that way it is setting out the activity of the
9    investigation and the results of it.
10          THE COURT:  Let me see one of those while we're
11    talking.
12          MS. BORCHETTA:  Sure.  In a previous case, your Honor,
13    you have ruled that CCRB findings would come in under 808(8)
14    exception and there is a witness on our list, Joan Thompson,
15    who is or was the executive -- is the executive director of the
16    CCRB and if I can explain what I handed to the Court this is
17    Plaintiffs' Exhibit 5.  The defendants have objected to this on
18    hearsay and relevancy and prejudice grounds, the entire
19    document.  As the Court will see the first page is a letter
20    from the Police Department and Deputy Commissioner Julie
21    Schwartz regarding the outcome CCRB complaint and then the next
22    three pages are the CCRB findings letter.
23          THE COURT:  So this cover letter tells the citizen, I
24    guess, Ms. Acevedo, this is how we disposed of the CCRB case
25    number whatever.  Well, actually it doesn't say that.  It says

51

```
 1    that the CCRB has referred the case to the Police Department.
 2    An review of the CCRB file will be conducted and you will be
 3    advised of the final action taken.
 4              Is it attached?  Does the citizen get this?
 5         MS. BORCHETTA:  Yes, your Honor.  This was sent to
 6    Ms. Acevedo.
 7              THE COURT:  Then Ms. Acevedo gets from the CCRB the
 8    findings?
 9              MR. CHARNEY:  Yes.
10              THE COURT:  The board reviewed the evidence and I am
11    now writing to you to inform you of the board's findings.  It
12    summarizes the allegation and it gives the board's findings.
13    There is also attached an explanation report defining the words
14    "substantiated," "unsubstantiated," "exonerated," "unfounded,"
15    "officers unidentified" and "miscellaneous."
16         MS. BORCHETTA:  Your Honor, so if a few preliminary
17    points.  These largely I believe come from Ms. Thompson who is
18    a witness on our list.
19              THE COURT:  Who is Ms. Thompson?
20         MS. BORCHETTA:  She is the executive director of the
21    CCRB.
22              THE COURT:  Right.
23         MS. BORCHETTA:  We would like to admit these records
24    in order to establish that the NYPD was informed of the CCRB
25    finding's because then that prompts or doesn't prompt certain
```

52

```
 1   actions by the NYPD that we then will have witnesses to
 2   testify.
 3              THE COURT:  Let me understand this.  It is twofold
 4   purpose I guess.  Ms. Thompson is actually going to testify?
 5              MS. BORCHETTA:  Yes, your Honor.  We would like to
 6   avoid her having to look at every one of these.
 7              THE COURT:  She will testify to the procedure and she
 8   will say it is the practice that when a citizen makes a
 9   complaint to send the citizen the letter with the findings.
10              MS. BORCHETTA:  Correct, your Honor.
11              THE COURT:  She will also say I gather that she sends
12   it to the Police Department?
13              MS. BORCHETTA:  Yes, your Honor.
14              THE COURT:  That is what the cover letter says.
15   Please be advised that the CCRB has referred the case to the
16   Police Department.  She will say it is the practice to send a
17   copy to the Police Department.
18              MS. BORCHETTA:  Yes, your Honor.
19              THE COURT:  I think I understand.  Who wants to be
20   heard from the City of why shouldn't I accept these?  I think
21   by the way 803(6) also works, business records.  I think they
22   are business records and public records.
23              Go ahead.
24              MS. GROSSMAN:  I think the first question is is being
25   purpose in terms of the plaintiffs' claim that this is being
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53

```
 1   offered for --
 2              THE COURT:  Relevance.
 3              MS. GROSSMAN:  -- the relevance.
 4              THE COURT:  I think we should hear from Ms. Borchetta.
 5   I can guess, but it is not my place to make the argument.
 6              MS. BORCHETTA:  Your Honor, as I was saying we believe
 7   that once the CCRB informs the NYPD that, for example, an abuse
 8   of authority for a stop has been substantiated that that is a
 9   relevant fact that is putting the NYPD on notice.  These are
10   all letters relating to class member stops.  These are class
11   member witnesses who were stopped and its finding letters about
12   their stop.
13              THE COURT:  So, Ms. Grossman, that certainly sounds
14   relevant that the CCRB found and substantiated the charge of
15   abuse of authority with respect to Detective Hawkins having
16   stopped Christina Acevedo or Detective DeMarco having stopped
17   Christina Acevedo or Detective Esperanza having stopped
18   Christina Acevedo.  All of those are substantiated as abuse of
19   authority.  The point the Police Department is made aware of
20   the CCRB findings.  Again, it doesn't make the finding
21   necessarily "truthful," but it means the Police Department knew
22   that the CCRB knew that it was substantiated.
23              MS. GROSSMAN:  Well, your Honor, that is one concern I
24   had had is that it should be offered for the truth because you
25   are the fact finder about whether or not the stop was based on
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54

```
 1   reasonable suspicion.
 2            THE COURT:  You are right.  All it shows is that the
 3   City is on notice of the CCRB's findings.  There is no question
 4   that they received the CCRB's finding.
 5            MS. GROSSMAN:  Well, I guess the point is that the
 6   City does not dispute that it has received --
 7            THE COURT:  Good.
 8            MS. GROSSMAN:  -- this letter so there is no need to
 9   offer it into evidence.
10            THE COURT:  Well, there is a need.  If the City
11   doesn't dispute that it receives all of the CCRB reports,
12   right, so it would say as a blanket matter we have received all
13   these point.  That isn't the point.  What they have to show is
14   that they received notice that the CCRB concluded that certain
15   activity was an abuse of authority.  It doesn't make it abuse
16   of authority.  It just means again that the City is on notice
17   that the CCRB reached that conclusion.  So I have to see the
18   conclusion.
19            Do you understand that it doesn't mean it is true, but
20   the City knew that the CCRB was told that there was an abuse of
21   authority by three police officers by stopping this person
22   named Acevedo.  That is all
23            MS. GROSSMAN:  May we have a moment to confer, your
24   Honor?
25            THE COURT:  Sure.
```

1              (Pause)
2              MS. GROSSMAN:  Your Honor, subject to the limitations
3      that you've just expressed, we have no objection on Exhibit 5,
4      but not all the CCRB related documents that the City has
5      objected to are of the same quality.  It is not the exact same
6      document.  So we have other objections regarding other CCRB
7      related documents.
8              THE COURT:  How can we do them as a bucket?  How can I
9      say that X number of these are in?  So all of those that look
10     like this --
11             MS. GROSSMAN:  I would say all letters that were sent
12     to the civilian complainant by Julie Schwartz which attaches
13     the findings from the letter that was sent by CCRB to the
14     civilian complainant, we have no objection to.
15             THE COURT:  They are all in.
16             MS. GROSSMAN:  We can allow that to come in.  That's
17     one bucket.
18             MS. BORCHETTA:  Your Honor, I have a point on that
19     which is that I don't know that every single one of the
20     findings letters that we have contains the cover letter like
21     this one does.
22             THE COURT:  I guess that is what we're going to turn
23     to.  All of those in this format are in.
24             What is the next objection?  In other words, is there
25     a different format that you are concerned about?

56

```
 1              MS. BORCHETTA:  Your Honor, if I may.
 2              THE COURT:  I am trying to talk to Ms. Grossman.
 3         Now that all the ones look like this is are in, what
 4    does the next one look like?
 5              MS. GROSSMAN:  If I may have a moment, please?
 6              (Pause)
 7              MR. KUNZ:  Your Honor, with your permission we could
 8    show you the exhibit on the screen.
 9              THE COURT:  That would be great.
10              MS. GROSSMAN:  I think we're talking about Plaintiffs'
11    Exhibit 8, 11 and 14.  I think generally the issue with these
12    exhibits is that these are letters that were sent by the
13    Civilian Complaint Review Board to the officer who was subject
14    of the investigation and at deposition some of the officers did
15    not believe that they received the actual letter.  However,
16    they don't dispute that they were aware that the charges were
17    substantiated or what the outcome of the charges were.  So to
18    offer these exhibits when the witness said that he or she did
19    not receive it --
20              THE COURT:  They didn't exactly say that.  They said
21    they didn't remember receiving it.  That is what you first
22    said.
23              MS. GROSSMAN:  I don't know the exact details.  One of
24    the members of the team has further details.
25              THE COURT:  Right.
```

1          MR. KUNZ:  Your Honor, on this issue with respect to a
2    officer who received it, all the officers with respect to
3    Exhibits 8, 11 and 14, Esperanza, Hawkins and DeMarco, each of
4    them indicated they were aware of these charges that were
5    substantiated against them and a supervisor spoke to them.
6    They were not 100 percent sure if they received the document in
7    this form.
8          THE COURT:  The purpose of offering this is to show
9    that the Police Department was aware of the CCRB finding.
10   You said they knew it was substantiated and that their
11   supervisor spoke to them.  So clearly the Police Department as
12   a corporate entity was aware of the CCRB finding.
13         MS. GROSSMAN:  No.  I think it is the police officer.
14         THE COURT:  No.  No.  No.  He said and their
15   supervisor spoke to them about it.  That is what Mr. Marutollo
16   just said.
17         MS. GROSSMAN:  Right.  But the letter that is --
18         THE COURT:  I am not worried about the letter.  I am
19   still saying since the sole purpose of the letter is to show
20   notice to the Police Department of the CCRB finding and the
21   finding doesn't bind me at all but just notice and Mr.
22   Marutollo said the supervisor spoke to the officer about it, of
23   course the Police Department, the entity, knew about the CCRB
24   findings.
25         MS. GROSSMAN:  I knew they knew.  You are right they

58

```
 1   did know.  It is about misuse of a particular letter that is
 2   limited because it was directed to a particular officer and to
 3   impute that the supervisor received that particular letter --
 4           THE COURT:  No.  The supervisor received notice that
 5   the CCRB found the charges substantiated.  It is not really
 6   contested because the supervisor spoke to the officer about it.
 7   So I will take the letter for that limited purpose.
 8           Remember, I am not taking it to say, Gee, the CCRB
 9   found it; I have to find it.  I am not doing that.  You point
10   out that is for this Court to decide whether the stop was a
11   good stop or bad stop.  I am only saying that the Police
12   Department had notice of the CCRB finding.
13           MS. GROSSMAN:  But this particular piece of evidence
14   doesn't establish that.
15           THE COURT:  No.  I know, but it is the quickest way to
16   get there because Mr. Marutollo conceded that the supervisor
17   spoke to the officer about the findings so of course the Police
18   Department knew.
19           MS. GROSSMAN:  I am saying the officers' testimony is
20   going to establish that.
21           THE COURT:  Overruled.  I am taking the letter.
22           What is the third bucket, if any?
23           MR. MARUTOLLO:  Your Honor, there is a third bucket
24   list area.  Specifically one as example, Exhibit 7, which is
25   Officer DeMarco's CCRB interview on plaintiffs' exhibit list.
```

```
 1    I can explain basically what it is.  It is the interview notes
 2    made by a CCRB investigator related to this investigation.
 3    However, the defendants submit that this is completely hearsay
 4    because it is all the CCRB's investigator's notes.  In this
 5    particular example, the exact language is very significant
 6    because the CCRB investigator writes that Ms. Acevedo informed
 7    Officer DeMarco that he was a cop, when in fact the issue is,
 8    and according to Officer DeMarco, she said he was not a cop.
 9    There are important discrepancies between CCRB investigator's
10    recap of the notes and as a result it seems it would not only
11    be hearsay but confusing to witnesses and to the Court.
12            MS. BORCHETTA:  Your Honor, as a category of documents
13    there were some officers who accepted the accuracy and
14    truthfulness of the statements.  To the extent that they accept
15    the --
16            THE COURT:  Then it is their own statement once they
17    adopt the statement.  That is easy enough.
18            MR. MARUTOLLO:  Your Honor, respectfully at these
19    depositions, the officers have never said unequivocally the
20    entire document.
21            THE COURT:  She said some.
22            MR. MARUTOLLO:  Parts.
23            THE COURT:  Fine.  That is very limited.
24            MR. KUNZ:  I understand that, your Honor, but the
25    overlay here is that actual audio recordings of these
```

```
 1   interviews are in plaintiffs' position so there is no reason to
 2   rely on a summary of a third person when they have the actual
 3   audio.
 4           THE COURT:  It is good they have it.  I would need it
 5   transcribed if it is offered in evidence.  I am not going to
 6   listen to it.
 7           MR. KUNZ:  It would only be impeachment, your Honor.
 8           THE COURT:  I understand.  No.  No.  If it is a
 9   statement of the officer and if the officer finds the Police
10   Department or if the officer is a defendant, then it is a prior
11   statement and I would take it.  It doesn't have to be
12   impeachment.  It is a prior statement of a party.
13           MR. KUNZ:  Right.  In most cases the officers are
14   going to make the exact same statement on the stand.
15           THE COURT:  That's fine.
16           MR. KUNZ:  So why go and show a document that
17   summarizes the exact same document.
18           THE COURT:  Only if it contradicts it.
19           MR. KUNZ:  They have the audiotapes.
20           THE COURT:  I understand.  That's fine.  It is just
21   that is probably technically hard to do.  I don't know how to
22   impeach with audiotape.
23           MR. KUNZ:  If they want to transcribe the tapes, they
24   can.  We arranged to have a speaker here.  They'll be using
25   audio.
```

61

```
 1              THE COURT:  The bottom line is I cannot take these
 2    investigator's notes for the reason that Mr. Marutollo said,
 3    they are hearsay.  But if the person adopts the statements or
 4    that portion of the statement they adopt, then I take that
 5    statement or portion of the statement.  Otherwise they can be
 6    used to impeach if it contradicts what the witness says from
 7    the stand.  If the person says something like, I never said
 8    that, that officer's summary is erroneous, that is the end of
 9    it unless it can be proved with extrinsic evidence, which will
10    be the tape.  I think we're on the same page.
11              MR. KUNZ:  Yes.  So then these documents are not
12    needed for any reason.
13              THE COURT:  Why do I have to do this twice?  It
14    depends.  If the person adopted the statement, in haec verba,
15    that paragraph two, I agree I said that.  They can offer
16    paragraph two if they wish.  It can also be used for
17    impeachment.  If the person on the stand says, I never said
18    that, that is the end of the matter unless it can be proved by
19    extrinsic evidence, which would be the audiotape.
20              MR. KUNZ:  I think that works.
21              THE COURT:  So they are not coming in wholesale
22    because they are hearsay.
23              MR. MARUTOLLO:  Your Honor, on the same CCRB area
24    there is one other bucket and one particular issue that I
25    wanted to bring to the Court's attention.
```

```
 1              THE COURT:  Okay.
 2              MR. MARUTOLLO:  It is an objection that defendants
 3    made to Exhibit 101 which is a CCRB complaint report written by
 4    Ms. Kendra Edwards.
 5              THE COURT:  Sorry.
 6              MR. MARUTOLLO:  Ms. Kendra Edwards, who was the former
 7    girlfriend of one of the plaintiffs Deon Dennis in this case.
 8    Our objection to this particular exhibit is that again this
 9    exhibit is hearsay.  Ms. Edwards is not testifying at trial.
10    She is actually the person who made this complaint and frankly
11    it is not clear that this complaint narrative was written by
12    her or more likely by the CCRB investigator.  On top of all
13    that it is not really related to the stop at issue.  It is
14    related to more what took place afterwards.
15              THE COURT:  The best argument is it is hearsay.  Why
16    should I take this?
17              MS. VARMER:  Your Honor, this document was a CCRB
18    complaint that was referred to Officer Fabio Rodriguez, who is
19    from the office of the chief of the department within the
20    precinct and who investigated the complaint.  In his
21    investigation, he reviewed this exact complaint.  His
22    deposition makes clear that he knew from this complaint that
23    Mr. Dennis was stopped by Officer Salmeron and Pichardo.  We
24    intend to introduce this not for the truth of the matter but to
25    show that Officer Rodriguez began his investigation of this
```

```
 1    incident with this complaint.
 2            THE COURT:  So now as I understand it, the plaintiffs
 3    are not offering it for the truth of it but solely to show
 4    Sergeant Rodriguez received this and so it was on notice of its
 5    contents and being on notice of its contents conducted an
 6    investigation.  That is the limited purpose.
 7            MR. MARUTOLLO:  Your Honor, this goes to a separate
 8    but related point related to Sergeant Rodriguez's testimony
 9    because we have objected to Sergeant Rodriguez being a witness
10    at all in this trial because as your Honor clearly stated at
11    the January 4th conference, the stop of Deon Dennis related
12    just to the stop and not to anything that happened after the
13    stop, the precinct and all that.
14            THE COURT:  That's true.
15            MR. MARUTOLLO:  This investigation and the allegations
16    made by Ms. Edwards relate to what happened after the stop.  In
17    fact, Mr. Dennis conceded at his deposition that Ms. Edwards
18    was not present for the initial stop.  So really any of her
19    allegations are moot.  As a result of Sergeant Rodriguez's
20    investigation here --
21            THE COURT:  Was it the same officer who stopped who is
22    being complained about?
23            MR. MARUTOLLO:  No.  That is the thing.  The target of
24    this investigation is Officer Hayes who was not present for the
25    stop, he was nearly the arresting officer.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              THE COURT:  If this officer is being investigated by
 2     the CCRB and therefore by Sergeant Rodriguez was it part of the
 3     stop why it is relevant?
 4              MS. VARMER:  May I be heard?
 5              THE COURT:  Well, of course.
 6              MS. VARMER:  Part of our point is that based on the
 7     complaint it is clear that Ms. Edwards was complaining both
 8     about the stop and about the arrest and about the disrespectful
 9     behavior.
10              THE COURT:  I am not interested right now about
11     anything but the stop.  Was she a present or not?
12              MS. VARMER:  She was present.  She was not present at
13     the time that Mr. Dennis was stopped, but she came on to the
14     scene when the officers were standing there and had detained
15     Mr. Dennis.
16              MR. MARUTOLLO:  She was present at time he was
17     arrested.
18              THE COURT:  I cannot tell that.  I cannot tell whether
19     she came on the scene when he was detained but not yet
20     arrested.
21              MR. MARUTOLLO:  Well, Mr. Dennis concedes that point.
22     The plaintiff admits she was not present for the initial stop.
23              THE COURT:  I got that.  There is a continuum.  You
24     are stopped, you are sort of detained and then you are
25     arrested.  That could take a minute and a half or 10 minutes.
```

```
 1     I don't know.  From the moment of stop until the moment of
 2     arrest, there is an interim where you are detained sometimes
 3     for questions, sometimes to show me your ID, sometimes don't
 4     move, sometimes people reach into the pocket, all kinds of
 5     things happen but you are not yet arrested.  I don't know when
 6     she came on the scene.  Whether it was post-stop or pre-arrest
 7     and that is the point that during this detention period he is
 8     free to leave or to go.  It is a standard the United States
 9     Supreme Court writes about so therefore I did, too.  In any
10     event, it depends when she came across the scene.
11              This is an out-of-court statement.  I cannot take it
12     for its truth anyway.  I am trying hard not to read it.  I
13     really don't want to read it until I decide it is or is not
14     admissible.  It would not be for its truth unless she wants to
15     come forward and testify.  All it can be used for is to show
16     that Sergeant Rodriguez received it and based on whatever
17     complained of he conducted an investigation or didn't
18     investigated.  It is like the CCRB complaints, I cannot take it
19     for its truth if she is not showing up and being subjected to
20     cross-examination.  Unless Deon concedes exactly when she came,
21     and he says he was already stopped.  He don't know whether he
22     was already arrested
23              MR. MARUTOLLO:  Mr. Dennis indicates that she only
24     came when the officers were checking for the warrant and as a
25     result it seems as if the plaintiffs are using this warrant
```

66

```
 1   issue as both a sword and a shield because we're not allowed to
 2   talk about the warrant and the reason--
 3            THE COURT:  The point I gather from your statement he
 4   wasn't yet under arrest so it was the detention, that interim
 5   period where you are stopped.
 6            MR. MARUTOLLO:  I believe he was in handcuffs.  So I
 7   believe he was under arrest.
 8            THE COURT:  I don't know.  They are saying, No, he
 9   wasn't in handcuffs.  You are saying, Yes.  I don't really need
10   to get into this level of detail.  The sole purpose of this
11   document is to say that Sergeant Rodriguez received and
12   conducted an investigation.  Not the contents, not the truth of
13   it.  If she is not here whatever she has to say about someone
14   being rude is irrelevant to me.  I don't want to know.  I am
15   talking about the notice issue.
16            MS. VARMER:  Your Honor, we just reserve the right to
17   review it and make appropriate redactions so it is not going
18   to --
19            THE COURT:  Right.  Prejudice you.  I am trying not to
20   read it, but just understand the time line.  The real purpose
21   is not what she has to say because she is not coming in here
22   and subjecting herself to cross-examination but that Sergeant
23   Rodriguez was given notice of something and then acted or
24   didn't act or what he did or didn't do.
25            MS. GROSSMAN:  May I have a moment to confer, your
```

67

```
 1   Honor?
 2              THE COURT:  Sure.
 3              (Pause)
 4              MR. CHARNEY:  Your Honor, may I make a suggestion with
 5   respect to kind of how we deal with all is this stuff?
 6              THE COURT:  Yes.
 7              MR. CHARNEY:  This is taking a long time and I know
 8   you are a busy person as are we, so we were wondering if we can
 9   just do the first week's worth of plaintiffs' exhibits.
10              THE COURT:  Sure.  We'll use all the time we have.
11              MR. CHARNEY:  Okay.  The first week and then the only
12   other issue will be reports related to experts.
13              THE COURT:  I forgot how we planned today.  Are we
14   coming back after the luncheon recess, or did I say the
15   morning?
16              MS. GROSSMAN:  Morning.
17              MR. CHARNEY:  We have a lot to do as you do.
18              THE COURT:  Well, I don't.  I can continue this from
19   2:00 to 4:00.  You don't all have to stay.  You can point to
20   members of the team and we can keep going from 2:00 to 4:00.  I
21   do have the time.  I have many other things to do, but I don't
22   have court.
23              MS. GROSSMAN:  Your Honor, the defense would propose
24   we finish with the Deon Dennis so we don't have to revisit that
25   and if we can prioritize with the first week's worth of
```

 1    witnesses and exhibits.
 2              THE COURT:  Fine.
 3              MR. MARUTOLLO:  A few other points related to the
 4    witnesses first and then discussing the remainder of the Deon
 5    Dennis exhibits.  First, I guess a clarification with respect
 6    to Sergeant Fabio Rodriguez, again we still assert our
 7    objection based on the fact his investigation was related more
 8    to alleged behavior at the precinct.
 9              THE COURT:  They are not going to talk about what
10    happened at the precinct.  If they are talking about what he
11    investigated in terms of the street conduct, even if it
12    post-stop, pre-arrest, interim detention, that is the only part
13    of the case that is mine.  In other words, up until the arrest.
14    After the arrest, we've talked about that.  That is not a case
15    where we're going into damages for what happened at the
16    precinct.  That was waived when the jury was waived.
17              MR. MARUTOLLO:  Just a point of clarity.  If the
18    investigation related to only allegations at the precinct and
19    the arrest, what is the purpose --
20              THE COURT:  I already answered that.
21              MS. VARMER:  Your Honor, the point of introducing the
22    testimony about the investigation is that despite being on
23    notice that the stop was an issue, Sergeant Rodriguez never
24    spoke to the stopping officers.  He spoke to Mr. Dennis for I
25    think less than two minutes.

```
 1              THE COURT:  I got it.
 2              MS. VARMER:  It was a deficient investigation.
 3              THE COURT:  That is going on the point they didn't
 4    look into the stop.
 5              MR. MARUTOLLO:  Your Honor, Sergeant Agron is listed
 6    as one of the witnesses for I believe next week.  He was
 7    related to the Deon Dennis incident.  Sergeant Agron was not
 8    physically present for the stop.  He did not investigate
 9    anything related to the stop.  There is no indication he was
10    the supervisor of the officers, the two officers who stopped
11    Mr. Dennis.  And even if the plaintiffs contend that there is a
12    roll call, which there is that indicates that he may have been
13    working that night, it was an impact overtime session that he
14    was working.
15              THE COURT:  Why don't we get an offer of proof?  Why
16    is this person here?
17              MS. VARMER:  Your Honor, Sergeant Agron was a
18    supervisor in the same precinct as Officer Pichardo and
19    Salmeron.  He was the one who organized the roll call that
20    night.  He was also the sergeant who signed off on the arrest
21    of Mr. Dennis, which is the only paperwork we have because the
22    officers did not complete UF-250s.  He also provides valuable
23    Monell testimony about the chain of command and failures in
24    supervision and training in his precinct.  His testimony for
25    example --
```

70

```
 1            THE COURT:  It doesn't relate to this stop at all.
 2  You want to talk to him about precinct training.
 3            MR. CHARNEY:  Your Honor, it is our belief, and we
 4  think the documents show this, that he was the assigned
 5  supervisor of the unit that the two stopping officers were
 6  working in on the night of the stop.  It was a special overtime
 7  tour that they both worked.  The sergeant overseeing that tour,
 8  it is our belief based on our exhibits and we plan to put in a
 9  document that he was the sergeant overseeing that tour.  We
10  believe he has relevant testimony.  Has Ms. Hoff Varmer
11  mentioned, he signed off on the arrest report.
12            THE COURT:  That doesn't interest me.
13            MR. CHARNEY:  I understand, but we believe the impact
14  overtime documents do establish that he was the sergeant
15  overseeing those officers on that tour that night.
16            THE COURT:  If it was, then what?
17            MR. CHARNEY:  Well, if he is the supervisor then he is
18  responsible for their actions and how they behave on the
19  street.
20            THE COURT:  He may be technically responsible.  What
21  is he going to say in his testimony?  That is of interest to
22  me.
23            MS. VARMER:  One of the things he will say is that he
24  has never had a meaningful conversation with one of his
25  subordinates about whether there was reasonable suspicion to
```

```
 1   make a stop.
 2            THE COURT:  Any stop?
 3            MS. VARMER:  Any stop.
 4            THE COURT:  Now I understand that is he being called
 5   as a general witness on precinct training and supervision
 6   practices.
 7            MS. VARMER:  And also to show that Officer Pichardo
 8   and Salmeron who stopped Mr. Dennis that night never had
 9   adequate supervision of that stop.
10            THE COURT:  What do you mean never had adequate
11   supervision of that stop, he never talked to them about the
12   facts after the stop?
13            MS. VARMER:  Yes.
14            THE COURT:  Right.  He is going to say that about any
15   stop.
16            MR. MARUTOLLO:  I agree, your Honor.  Considering the
17   plaintiffs have 102 witnesses, including many sergeants, it
18   seems most effective to not have this person --
19            THE COURT:  I don't think he can add much, but maybe
20   they don't have anybody else in that precinct to talk about
21   training or supervision and reporting and all that.
22            MR. MOORE:  Your Honor, the issue of supervision is
23   obviously the critical --
24            THE COURT:  Yes, it is.  Is there anything anybody
25   else --
```

```
 1              MR. MOORE:  To the extent the City is not complaining
 2    about more supervisors are necessary --
 3              THE COURT:  Right.  Cumulative.
 4              MR. MOORE:  -- we'll hear at the end there were not
 5    enough supervisors.
 6              THE COURT:  I am asking you whether you have another
 7    supervisor talking about practices in that particular precinct?
 8              MR. CHARNEY:  Not at the sergeant level.
 9              THE COURT:  Fine.  You can have one sergeant.  What
10    can I do?  He was the supervisor in that precinct.  He has no
11    knowledge of this stop.  I am not going to let him wonder off
12    into something that happened afterwards in the precinct.  It is
13    not going to happen.  I don't have the time to waste.  If they
14    want to ask him about practices as a supervisor in that
15    precinct, Mr. Marutollo, the question is going to be something
16    like that, Was it your practice after stops were made when you
17    were the supervisor of the tour was it your practice to debrief
18    the officers and find out their basis of the stop.  And he will
19    say, No, I never did that.  Done.  Thanks for coming in.
20    Good-bye.  If that is the testimony, that is the testimony.
21              MS. GROSSMAN:  May I have a moment, your Honor?
22              THE COURT:  Yes.
23              (Pause)
24              MS. GROSSMAN:  Your Honor, I think what we need to do
25    is confer amongst ourselves and not delay on the other items
```

73

```
 1   because one of the concerns I have about the adequacy of the
 2   investigation argument in terms of these documents having to do
 3   with the investigation is that if the investigation includes an
 4   aspect of the warrant issue or the --
 5            THE COURT:  You can parse it.  I am not going to
 6   listen to that.
 7            MS. GROSSMAN:  Right.  What I am saying is if the
 8   plaintiffs are going to claim that our investigation was
 9   inadequate, then it becomes important for the Court to know
10   what was the part and the focus of the investigation and why it
11   is that the investigation ran a certain course as opposed to
12   the course that plaintiffs believe it should have taken.  So we
13   need to just caucus on our end and let the Court know whether
14   we do have objections or we don't.  And then my apologies I
15   thought if this wasn't coming in, if no part of the post-arrest
16   information was coming into evidence, then it was not an issue.
17   Now that some of it may be coming in, I am concerned.
18            THE COURT:  I don't think it is.  I think it is one
19   question and one answer.  Agron guy is not going be on the
20   stand long.  He is going to asked as a sergeant in the what
21   precinct?
22            MS. VARMER:  28th.
23            THE COURT:  Was it your practice when stops were made
24   while you were the subject in charge of that tour, did you
25   debrief the officers when they made a stop?  Did you go over
```

74

```
 1    it?  Did they complete a 250?  Did you look at the arrest
 2    report?  After a series of no answers, he will leave the
 3    courtroom.
 4            MS. GROSSMAN:  With Agron I was actually, because this
 5    is all related to the same plaintiff, Deon Dennis, going back
 6    to the Rodriguez issue.
 7            THE COURT:  Oh.
 8            MS. GROSSMAN:  My apologies.  I am just concerned if
 9    the plaintiffs are allowed to offer in some of this information
10    and to go to their claim that our investigations were
11    inadequate --
12            THE COURT:  Investigations of the stop.  You have to
13    have some faith.  The Court does not want to sit here for four
14    months.  I want to City here for the two months and not a day
15    more.  I am going to limit it.  I am only interested in an
16    investigation, if any, about the circumstances of the stop.  I
17    don't want to know if they looked to whether people were rude
18    at the precinct.
19            MS. GROSSMAN:  I understand that.  Whatever the
20    investigation into the stop was --
21            THE COURT:  Or wasn't.
22            MS. GROSSMAN:  -- or wasn't you will hear.  But to
23    that end we would like the opportunity to at least explain that
24    the reason why the Police Department did not look into the
25    circumstances of the details of the stop is that from their
```

```
 1    perspective the focus of the complaint was really the warrant.
 2              THE COURT:  That doesn't take very long.
 3              MS. GROSSMAN:  That's fine, your Honor.  As long as
 4    we're free to develop that.
 5              THE COURT:  Briefly.
 6              MS. VARMER:  Your Honor, one point on that.  There are
 7    a host of documents on defendants' exhibit lists and actually I
 8    handful of documents on plaintiffs' exhibit list that I think
 9    are only on the list to the extent that the warrant and the
10    adequacy of the arrest is at issue.  To the extent that --
11              THE COURT:  I don't think it is.  This is about a
12    stop, when the stop was made.  Was the officer trying to
13    enforce a warrant?
14              MR. CHARNEY:  No.
15              MS. VARMER:  No.
16              THE COURT:  Then it is of no interest.
17              MR. MARUTOLLO:  That is not accurate, your Honor.
18    Sorry to interrupt.  During the course of the stop that is when
19    the warrant was learned of.
20              THE COURT:  I understand that.  The basis for stopping
21    someone -- it was not like they were sending the squad out
22    looking for people who run on warrants.  We have that.  The
23    marshals here have a warrant squad and they go out and look for
24    John Doe on an outstanding warrant.  They are looking.
25              MS. VARMER:  Your Honor --
```

76

```
 1              MR. MARUTOLLO:  Just two points.  On plaintiffs'
 2    exhibit list, they still include a decline to prosecute form, a
 3    prisoner roster form.  These are clearly irrelevant.
 4              THE COURT:  They are clearly relevant?
 5              MR. MARUTOLLO:  Irrelevant.
 6              MS. VARMER:  They are relevant to the extent the
 7    defendants are allowed to introduce evidence of the warrant.
 8              THE COURT:  Please, I am trying to make this simpler.
 9    The warrant is of no interest to me.  It is not the basis for
10    the stop, period.  As I said we have a warrant squad here, the
11    marshals, if somebody has an open warrant, they send out a
12    squad looking for him or her -- well, never her -- looking for
13    him to close the open warrant.  That wasn't the case here.
14    They made a street stop.  The only issue is the basis for the
15    stop.  I understand that once he was stopped, the warrant
16    information is developed.  Maybe that goes to the free-to-leave
17    issue when in that stop did they realize there was an
18    outstanding warrant up until that time there was a basis for
19    the stop, was he free to leave.  Once they figured out the
20    warrant, he was not free to leave but for a different reason.
21    Now they have an open warrant.
22              MS. GROSSMAN:  Our officers stopped him because they
23    had probable cause to issue a summons for open container.  It
24    wasn't even a reasonable suspicion stop.
25              THE COURT:  Good.
```

```
 1              MS. GROSSMAN:  From our standpoint when we then check
 2     for a warrant and then we arrest him, we bring him into the
 3     precinct.  So the investigation is focused on the warrant.
 4              THE COURT:  I got it.
 5              MS. GROSSMAN:  It is hard to know how this is going to
 6     play out next week.  So we just want to reserve the right to
 7     address any claim that the investigation was inadequate if that
 8     is where this is going.
 9              THE COURT:  Obviously the plaintiffs disagree with the
10     reason for the stop is the open container.
11              MS. VARMER:  Your Honor, to the extent that they are
12     reserving the right to introduce documents about the warrant,
13     then I would also reserve the right to introduce documents
14     about the invalidity of the warrant.
15              THE COURT:  Look, I don't want to go into this
16     warrant.  I don't think I am.
17              MS. VARMER:  Neither do we.  We would prefer to strike
18     the whole lot of these documents, but to the extent they are
19     allowed to talk about why he was arrested, we should be able to
20     talk about why it was completely pointless.
21              THE COURT:  I don't think they are allowed to talk
22     about why he was arrested.  The only reason that comes up
23     Ms. Grossman argues is that your complaint that the
24     investigation is inadequate.  They need to defend the
25     investigation by saying he was arrested on a warrant,
```

78

```
 1  rightfully arrested or rightfully held and rightfully brought
 2  to the precinct all based on the warrant.  I don't want to go
 3  there.  It depends on how much you focus on the adequacy of the
 4  investigation.  If you never say that, they will never say the
 5  word "warrant."  We'll just look at the stop circumstances,
 6  period.  If you want to go into the adequacy of the
 7  investigation, they have to point out eventually he is arrested
 8  on a warrant.
 9            MS. VARMER:  Your Honor, two points.
10            THE COURT:  We're not moving very quickly if this is
11  going to take us a half hour per exhibit.  We'll be here for
12  months pretrial.
13            MS. VARMER:  Your Honor, the first is that the
14  investigation is easily decided between the warrant and the
15  stop.
16            THE COURT:  That's what I am hoping.
17            MS. VARMER:  We'll be happy to redact --
18            THE COURT:  Good.  Do it.  Limit your exhibits and
19  documents and let's see what you offer.
20            Now what are we doing?
21            MR. CHARNEY:  Can we address the expert exhibits, and
22  Mr. Hellerman is going to do that.  Hopefully it will be quick.
23            MR. HELLERMAN:  Thank you, your Honor.  We're on
24  plaintiffs' exhibits so I will address Officer Fagan's reports
25  and declarations.  Admitting them we believe with appropriate
```

79

```
 1   redactions, because there are parts of his proposed opinions
 2   that your Honor has ruled cannot give, we think will streamline
 3   the trial.
 4              THE COURT:  Admitting what?
 5              MR. HELLERMAN:  Admitting Professor Fagan's reports
 6   and declarations that he has put in that express his various
 7   opinions.
 8              THE COURT:  You oppose all reports and declarations,
 9   even portions of them?
10              MS. COOKE:  No, your Honor.  We were the first party
11   to put in expert reports on our exhibit list.  That was based
12   on my involvement in the Ligon and you said, Of course the
13   expert reports are coming in.  The expert reports were
14   indicated as exhibits.  The objections were made to improper
15   designation of the expert report and all reference materials
16   cited therein as the exhibit.  So we think the report, the
17   analysis of the report, the opinions in the report and
18   certainly appendixes to the report, but not for the truth of
19   the matter or into the evidence, every article cited and
20   footnote and reference source.  That seems overly broad and
21   inappropriately designated.
22              MR. HELLERMAN:  Your Honor, I think perhaps our
23   exhibit description could have been written better.  We're not
24   asking the Court to admit every reference that Professor Fagan
25   cited.
```

1                 THE COURT:  Good.
2                 MR. HELLERMAN:  We're asking for the admission of the
3     reports and everything in the reports, other than that that
4     should be redacted.
5                 THE COURT:  And not by incorporation of references?
6                 MR. HELLERMAN:  No.
7                 THE COURT:  If he cites an artical, the article is not
8     in evidence.
9                 MR. HELLERMAN:  That's right.  If it is in the report
10    or appended to the report --
11                THE COURT:  Yes.  It seemed you are in agreement.
12                MS. COOKE:  If I may further add.  One additional
13    thing the defendants in preparing for this conference I noticed
14    that we had inadvertently deleted the second supplemental
15    report of Smith and Patel in response to Professor Fagan's last
16    report.  So I will add that to the end of our exhibit list.
17                THE COURT:  You should follow that up with a letter.
18                MS. COOKE:  We will.
19                THE COURT:  Saying what you just said.
20                MS. COOKE:  Yes, your Honor.
21                With respect to several of the plaintiffs' objection
22    to defendants' exhibits report with reference to declarations
23    filed by Professor Smith and/or Professor Patel, those
24    declarations contain substantive analysis.  They were in
25    response to the Daulbert motions.  Those are regression in

81

```
 1   opinions and analysis and we believe those are just as
 2   appropriate as exhibits as the reports.
 3            MR. HELLERMAN:  I think that the Smith materials are a
 4   little bit different from the Fagan materials.  So much of what
 5   professor Dr. Smith put in his expert report had been ruled out
 6   that --
 7            MR. CHARNEY:  By you.
 8            MR. HELLERMAN:  -- by you, your Honor, that what is
 9   left is mostly hearsay statements about police practices, which
10   he cannot testify is the truth.
11            THE COURT:  Well, no, but experts often rely on
12   statements of others to form their experts opinions.  That
13   happens in every case.  I am sure you worked with many experts
14   in many other kinds of cases.  So experts rely on other
15   people's statements.  When you take that for what they
16   considered, they say I considered this and this in reaching my
17   opinion.  Everyone understands those are out-of-court
18   statements, but the expert is saying this is the basis of my
19   opinion.  I will take that.
20            Your first point is a better point, which is saying if
21   I ruled out, for example, Smith's testimony about how effective
22   this program is for lowering crime, that is not an issue in
23   this trial.  I explained why.  You can do a lot of bad things
24   to stop crime and they wouldn't be constitutional but they
25   would work but we don't do that.  That is not something I am
```

82

```
 1    going to allow.  If some of this Smith declaration material
 2    goes to how wonderful the program is -- I am not supposed to
 3    say "program" -- practice, how wonderful it is in reducing
 4    crime, that part is out.  So you need to redact these
 5    declarations so that the portions I have said are not coming in
 6    are not coming in.
 7              MS. COOKE:  Right.  With respect to Professor Smith's
 8    ability to be testify with respect to his expertise and
 9    experience in police practice that was not the subject of your
10    Daulbert ruling.
11              MR. HELLERMAN:  I am not addressing the efficacy
12    issue.  I am addressing Professor Smith's statements about what
13    the police do.  He may have expertise in this, but the
14    statements in his report are without attribution.
15              THE COURT:  They come from him.  That's his expertise.
16              MR. CHARNEY:  He doesn't work for the NYPD.
17              THE COURT:  He doesn't need to.  He is an expert in
18    police practices.
19              MR. CHARNEY:  He is, but he is not saying generally
20    this is what the police do.  He says the NYPD does this
21    specific thing.
22              THE COURT:  He is a professor.
23              MS. COOKE:  He studied, your Honor, operations impact
24    extensively.
25              THE COURT:  I am allowing it.  I am allowing it.
```

83

```
 1              MR. HELLERMAN:  We will work with the defendants on
 2   redactions.
 3              THE COURT:  Okay.
 4              MR. HELLERMAN:  Just to clarify, your Honor, once the
 5   expert report comes in, you don't need a separate exhibit, for
 6   example, the Professor's CV and data and sources.  It is all in
 7   the report.
 8              THE COURT:  If it is in the report, that's fine.
 9              MS. COOKE:  I would propose that Mr. Hellerman and I
10   will work it out and exchange proposed redactions.  They are
11   not on for many, many weeks.  Fagan will be much earlier.  So
12   we'll work on Fagan first.
13              The other point I would note, and I don't know how
14   this will be dealt with in redactions, but as your Honor may
15   recall in the course of the Daulbert that the defendants made
16   with Professor Fagan to his report, there were corrections and
17   errors of significant quantities -- hundreds of thousands of
18   stops -- so his report is inaccurate in those representations
19   and we've had a series of subsequent reports from Professor
20   Fagan but the original report with the errors your Honor ruled
21   in the Daulbert motion with respect to those, but I don't know
22   if we can redact that.  I don't know how your Honor will prefer
23   to do that.
24              THE COURT:  Maybe you can mark it with a red marker,
25   circle that paragraph and say "conceded that it needed
```

84

```
 1   corrections," or "conceded to be erroneous, corrected later,"
 2   or something in the margin so that when I review it, it helps
 3   me to recall that he conceded he had to redo that portion based
 4   on my ruling.
 5            MS. COOKE:  Yes.
 6            MR. HELLERMAN:  Your Honor, with respect to the extent
 7   that that an error that he omitted pertained to an opinion that
 8   you later ruled that he cannot give, we would propose to redact
 9   that.
10            THE COURT:  That's better.  That's fine, too.  If he
11   didn't correct it but withdrew it, that's fine.
12            MS. COOKE:  Well, I think the mistakes I am referring
13   to by Professor Fagan was with respect to classification for
14   reasonable suspicion analysis and then the numbers and the
15   quality of certain few hundred thousand stops were erroneously
16   included.
17            THE COURT:  But you redid the figures at a later
18   version?
19            MR. HELLERMAN:  Which he did, your Honor.
20            THE COURT:  Yes.  As I said mark it off.
21            MS. COOKE:  Identified in the original.
22            THE COURT:  Yes.  Refer me to the revised.
23            MS. COOKE:  Mr. Hellerman will do that for Fagan and
24   then we'll exchange.
25            THE COURT:  Good.
```

85

```
 1                 Now what?
 2                 MR. CHARNEY:  So I think maybe the most efficient is
 3      to do -- if there are any other objections that the defendants
 4      have to the first week's worth of exhibits.
 5                 THE COURT:  Let's do it.
 6                 MS. COOKE:  I have an objection, your Honor.
 7                 THE COURT:  Okay.
 8                 MS. COOKE:  To a Exhibit 332.
 9                 THE COURT:  One second.  332, audio recording by
10      Officer Serrano.
11                 MS. COOKE:  Your Honor, let me explain this exhibit.
12      We were in court on May 5th for a conference and on the
13      evening --
14                 THE COURT:  May 5th?
15                 MS. COOKE:  March 5th.  On the evening of March 7th
16      the plaintiffs notified us by e-mail that they were producing
17      what is now Exhibit 332.  So for the first time on March 7th we
18      became aware of this recording.
19                 THE COURT:  What is this recording?
20                 MS. COOKE:  It is a recording of Officer Serrano, who
21      is an officer at the 40th precinct made of a conversation that
22      he had at the 40th precinct that occurred on February 14th,
23      2013.  The date is important.  So we were informed our
24      March 7th that we were getting this recording.  On March 12
25      per your Honor's direction Officer Serrano provided the
```
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

86

```
 1   defendants with an affidavit with respect to recordings.  In
 2   the affidavit Officer Serrano states that he provided that
 3   recording to plaintiffs' counsel on March 1st.  Plaintiffs'
 4   counsel didn't identify the March 5th conference when we talked
 5   about an affidavit on the other two audio recordings that they
 6   were in possession of a third they intended to use.
 7            THE COURT:  Third what?
 8            MS. COOKE:  Third audio recording that they intended
 9   to use.  We provided notice on March 7th.  I received the
10   affidavit on the 12th, which indicated when they provided it,
11   March 1st and on I believe also on March 12th the plaintiffs
12   identified by the affidavit that actually a second version of
13   that audio recording was going to be provided or replacement
14   copy.  The replacement copy is substantively different than the
15   original copy I received on March 7th.  That is because the
16   original copy as I understand from Officer Serrano's affidavit
17   he played the audio from a device and recorded it that way.
18   Then the second time he actually downloaded the audio from his
19   device.  There are substantive differences in the recordings.
20            THE COURT:  When you say "substantive," you mean the
21   quality?
22            MS. COOKE:  Content.  There is content.  There is dead
23   air and some content at the beginning of the original recording
24   I received plus about six minutes of what sounds like traffic
25   noise and a baby crying and some other things at the end.  The
```

87

```
 1   second recording I received is a downloaded version.  So it
 2   doesn't include the noise.
 3            THE COURT:  So that is good.  We're all saved from
 4   listening to the noise.
 5            MS. COOKE:  My point is, your Honor, I was not able
 6   until yesterday when I received the recording to start matching
 7   up the plaintiffs' intended use and designation portions of
 8   this exhibit.  I believe it was untimely produced by the
 9   affidavit the plaintiffs had it on March 1st.  We were in court
10   on March 5th.  It was produced late on March 7th.  It is not
11   even one they intended to use.
12            THE COURT:  Does he say when he gave them the other
13   versions?
14            MS. COOKE:  On march 11th.
15            MS. BORCHETTA:  May I?
16            THE COURT:  You got it on March 12th.
17            MS. BORCHETTA:  Your Honor, there were technical
18   difficulties here.  He provided us something on March 1st I
19   believe but we couldn't -- there were technical problems in our
20   receipt of it.  We provided it to the defendants.
21            THE COURT:  You received it six days later.
22            MS. BORCHETTA:  Sorry.  As soon as we were able to get
23   the recording, we provided it.
24            THE COURT:  As soon as you were able to make it work
25   so to speak, listen to it?
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

88

```
 1            MS. BORCHETTA:  Right.  Thereafter, as your Honor
 2   directed us to do preparing his affidavit, which included
 3   authenticating these recordings, we learned that he had played
 4   his cell phone recording, which is how he recorded this
 5   conversation, and then with another hand recorded it with
 6   another device.  We anticipated that the defendants might
 7   object on authenticity grounds so we brought him in on Monday,
 8   got the technology person to figure out how to get it off the
 9   phone and put it onto a disk and we immediately hand-delivered
10   it to the defendants.
11            We also provided when the defendants yesterday
12   indicated there were some delivery issues on their end with
13   their mailroom, we went through the designated portions on that
14   recording and gave them descriptions so they could find them on
15   the recording they already have.  We were addressing an
16   authenticity issue.  We resolved it.  It is not that much time
17   in total.
18            THE COURT:  The one you received on the 11th, how long
19   is that whole recording?
20            MS. BORCHETTA:  The whole recording, your Honor, is
21   about 30 minutes.  It is about 15 minutes of dead air or people
22   talking in the hallway.  It is about 15 minutes of substance.
23            MS. COOKE:  Your Honor, further to my objection to the
24   late production of this exhibit, the recording is of a meeting
25   that occurred on February 14th.  This witness is listed as, I
```

89

```
 1   believe, their seventh or eighth witness testifying at trial.
 2   This witness was, as you recall, a witness that was not
 3   identified until the very last day of 2012 per your Honor's
 4   direction.  So this entire issue with respect to this witness
 5   and the number of witnesses I have had to identify to defend
 6   against, we're prejudiced by the untimely production of an
 7   audible that was in the plaintiffs' possession for at least six
 8   days provided.
 9            THE COURT:  I can't really find that the plaintiffs
10   did anything wrong.  When they got it, it wasn't apparently in
11   usable workable condition due to technical problems.  By the
12   time they got it to work so to speak, they turned it over
13   immediately.  Then when authentication was raised, they figured
14   they better try to get the closest to the original.  They
15   talked to the fellow and he said, Well, this is how I did it, a
16   cell phone here, other device here, so I am giving you
17   everything, the originals, the best, you figure out that what
18   to do with it.  It sounds like they gave it to you the next
19   day.  They got it the 11th and gave it to you the 12th.  It is
20   not like it has been in existence three years.  It only
21   occurred a month ago today.  It is 15 minutes of substance.
22   Get your technical people, get a transcript and that's it.
23            MS. COOKE:  Your Honor, to that the witness is being
24   called in the first week of trial, I would raise that again.
25   To the extent that there are people identified, there are
```

90

1   others speakers, I dispute the characterization that most of
2   the tape or half of the tape is not of substance.  There is
3   content and speaking the entirety of the tape.  It is a long
4   meetings with respect to Professor Serrano's --
5              MR. MOORE:  Officer.
6              MS. COOKE:  Sorry.  Officer Serrano's performance
7   evaluation.  There are several speakers on the tape, some of
8   which the plaintiffs have identified, some of which they have
9   not.  I reserve the right, your Honor, to call additional
10  witnesses.
11             THE COURT:  If you have to call additional witnesses,
12  that's fine.
13             MS. COOKE:  I note for the record, your Honor, the
14  defendants object to the inclusion of this as evidence.
15             THE COURT:  It was late-breaking evidence that is for
16  sure.
17             MS. GROSSMAN:  Your Honor, for next week Plaintiffs'
18  Exhibit 25.
19             THE COURT:  Wait.  I have a lot of pages to go through
20  to get back to 25.
21             MS. GROSSMAN:  I am sorry, your Honor.  Just to stay
22  focused on Serrano-related issues, Ms. Cooke is going to
23  address another thing.
24             MS. COOKE:  One more, your Honor.  I am trying to find
25  the number.  It is 294.

91

```
 1                THE COURT:  294?
 2                MS. COOKE:  Yes.
 3                THE COURT:  Arbitration order?
 4                MS. COOKE:  The plaintiffs have indicated they intend
 5     to use this exhibit of Officer Pedro Serrano from the 40th
 6     precinct.  This is an arbitration decision and order with
 7     respect to Deputy Inspector McCormick from when he was the 20th
 8     precinct in Manhattan with respect to a grievance made by an
 9     Officer Rajinder Singh.  Officer Singh filed a grievance
10     against the Police Department with respect to his captain at
11     the time, Deputy Inspector McCormick at the 20th precinct.
12     Inspector McCormick is now the commanding officer at the 40th
13     precinct.  This arbitration decision and order with respect to
14     Rajinder Singh's grievance is not a substantive decision on the
15     merits.  It is a decision on the issue of the arbitrability of
16     Rajinder Singh's claim under the collective bargaining
17     agreement.  It is not dispositive.
18                THE COURT:  Why is this here?  I don't want this.
19                MS. BORCHETTA:  Your Honor, in abundance of caution
20     put this on our exhibits for the first week.
21                THE COURT:  In abundance of kindness will you withdraw
22     it?
23                MS. BORCHETTA:  No, no.  With respect to Officer
24     Serrano, but we believe we should be able to use it with
25     Captain McCormick, who is a later witness.
```

92

```
 1              MS. COOKE:  Inspector.
 2              THE COURT:  Why?
 3              MR. CHARNEY:  A grievance about quotas was filed
 4    against him.
 5              THE COURT:  It is a grievance.
 6              MR. CHARNEY:  It goes to notice, your Honor.  If the
 7    same precinct commander who --
 8              THE COURT:  This decision is a decision about
 9    arbitrability by some arbitrator.  I am not interested in
10    reading it.  It shouldn't be included in the record.  Is there
11    not another way that you can produce evidence that somebody
12    filed a grievance?
13              MS. COOKE:  Your Honor, we produced a grievance file
14    of Rajinder Singh, which includes endorsements from the Police
15    Department.
16              THE COURT:  If you want to prove notice that the
17    Police Department had notice that somebody was complaining
18    about Inspector McCormick, you have done it.  She said you gave
19    the evidence to do it.  This arbitration decision should not be
20    cluttering my record.
21              MR. CHARNEY:  Well, if they are going to object to
22    that--
23              THE COURT:  Just for the purpose of notice that the
24    Police Department knew that somebody complained about this
25    inspector.
```

```
 1              MR. CHARNEY:  For this exact same thing that Officer
 2    Serrano is complaining about just to make it clear.
 3              THE COURT:  It is okay to show the notice of what the
 4    complaint was.  It doesn't have any validity or truth with me,
 5    but the notice issue I have ruled three different times today
 6    and three different contexts that, yes, you can show that the
 7    City knew that a complaint saying X, Y, Z was made.  It doesn't
 8    make it true but they knew.  Whatever the complaint says, it
 9    says in terms of the notice issue.  Let's get rid of the
10    arbitration.
11              MR. CHARNEY:  We have the right to supplement our
12    exhibit lists with some of these notices.
13              THE COURT:  If you didn't put them in, yes.  They are
14    allowed to show that somebody made a complaint.
15              MS. COOKE:  I agree with your Honor's characterization
16    by Mr. Charney that they were the same claims not to be
17    determined.  We're not conceding that.
18              THE COURT:  Of course not.
19              And now Exhibit 25?
20              MS. GROSSMAN:  Yes.  That a May 4th --
21              THE COURT:  One second.  NYPD tapes?
22              MS. GROSSMAN:  No.
23              THE COURT:  Yes.
24              MS. GROSSMAN:  May 4th, 2010 article.
25              THE COURT:  Yes, village Voice article.  It says
```

94

```
 1   May 3rd, 2010 here.  It is a newspaper article.
 2            MS. GROSSMAN:  Yes, your Honor.  The newspaper article
 3   concerns quotes from audio tapes that are on the plaintiffs'
 4   exhibit list and will be played the first week of trial.
 5            THE COURT:  What do I need the newspaper article for?
 6            MR. CHARNEY:  The article does more than quote the
 7   recordings.  It talks about the different players involved in
 8   those recordings.
 9            THE COURT:  The article itself is hearsay.
10            MR. CHARNEY:  Exactly.  Your Honor ruled in January
11   and we made it clear at that point that we're not offering it
12   for the truth.
13            THE COURT:  What are you offering it for?
14            MR. CHARNEY:  For notice?
15            THE COURT:  Notice to whom about what?
16            MR. CHARNEY:  To certain witnesses who will testify
17   about what happened in the 81st precinct, their knowledge of
18   it, what their response to it was.
19            THE COURT:  To the article?
20            MR. CHARNEY:  Well, because, yes.  The article came
21   out and it caused a great sensation in the media circles in the
22   City.  The Police Department was asked about these allegations.
23   We're not offering it for the truth.  We have always said we're
24   not offering any newspaper articles for truth of the matter
25   asserted in there.  We'll use it solely for notice.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              THE COURT:  Notice -- finish the sentence.
 2              MR. CHARNEY:  Notice to high-ranking New York Police
 3     Department officials including commanders.
 4              THE COURT:  How do we know the commanders saw this
 5     article because they responded?
 6              MR. CHARNEY:  Well, the matter asserted therein, we
 7     can ask them if they have knowledge of it, does this refresh
 8     your recollection of what happened back in May.
 9              THE COURT:  You can use anything to refresh
10     recollection.  We all learned that in law school.  I remember
11     that.  A tree trunk, papyrus, does it refresh your
12     recollection.  The witness can say, No, or, It doesn't refresh
13     me.  Sure you can use it to refresh recollection.
14              MR. CHARNEY:  To the extent certain officials are
15     quoted in those articles, we think we should be allowed to ask
16     them about it generally.
17              THE COURT:  That is cross-examination.  Did you say
18     this, and the person can say, Never.
19              MR. CHARNEY:  On the issue of notice to the extent
20     that certain statements are attributed -- not the statements on
21     the recordings, statements about the NYPD learning of this
22     situation in the 81st precinct, what their response to it was.
23              THE COURT:  If they responded to article, they surely
24     received the article.
25              MS. GROSSMAN:  Your Honor, I think the reason why this
```

```
 1    is coming to my attention now is this is one of the exhibits
 2    where Inspector Mauriello, who will be testifying next week --
 3    so Inspector Mauriello was deposed.  There are audio tapes that
 4    are going be played so to the extent that this article is
 5    giving Inspector Mauriello notice about what he said on the
 6    audio tapes, that purpose doesn't make sense.
 7            MR. CHARNEY:  That's not why we are offering it.
 8            MS. GROSSMAN:  If the plaintiffs are saying they want
 9    to use it for another witness to show notice, that may be.  But
10    for this witness coming up next week, which is what I am
11    focusing on, this article should not be used for that purpose
12    because we have the tapes.  The plaintiff has been deposed.
13            THE COURT:  I think it would be cumulative to use it
14    for the point of saying he had notice.
15            MS. GROSSMAN:  Right.
16            MR. CHARNEY:  We will not use it to try to show he had
17    notice of what was said on the tapes.  We would use it to show
18    whether or not he had notice that there was outcry about what
19    had happened.
20            THE COURT:  Why don't you just ask him.
21            MR. CHARNEY:  We will.  We are trying to protect
22    ourselves in a situation where he denies it.  At his
23    deposition -- his notice of these things was a lot -- seemed to
24    us seemed be to be a lot smaller than we would have expected
25    given what we heard on the recording.
```

```
 1              THE COURT:  Basically he is saying he is holding it in
 2     reserve for impeachment if the person denies knowing.
 3              MR. CHARNEY:  Yes, your Honor.
 4              THE COURT:  I think we should stop now.  Now the
 5     question is should we reconvene?
 6              MR. CHARNEY:  One last issue about first week
 7     witnesses?
 8              MS. PATEL:  I think this will take one minute.
 9              THE COURT:  I hope so.
10              MS. PATEL:  It is really to clarify an evidentiary
11     issue that came up on January 4th in the motion in limine
12     conference.  The defendants raised the issue that they wanted
13     to exclude the testimony of plaintiffs where officers were
14     unidentified and what they wrote in their letter was how they
15     were told about the basis of their stops.  There was an
16     argument around that issue.  I want to clarify that the
17     plaintiffs are not intending to offer those statements by and
18     large for the truth of the matter asserted.  We don't actually
19     think that there is a hearsay issue here.  For example, when
20     the officer says, Put your hands against the wall, it is to
21     give context and explain the action of the plaintiff.  I wanted
22     to clarify that we don't actually think -- there may not be
23     disagreement and I wanted to make sure the defendants --
24              THE COURT:  It may depend on what the alleged
25     statement is.  If the alleged statement was, Put your hands
```

98

```
 1    against the wall, there is no truth in that anyway.  It is an
 2    assertion or command.  If the statement is a racial epithet or
 3    something like that or bad words, I don't know what that is,
 4    but we don't know the speaker and the attribution made.  It is
 5    hard to contest that.  I don't know what you are asking me
 6    honestly.
 7             MS. PATEL:  Well, at the conference your Honor
 8    suggested that we raise with you any statements that we believe
 9    would fit within this motion in limine so that you could have
10    time in advance to rule or research.
11             THE COURT:  Why give me any specific other than put
12    your hands against the wall?
13             MS. PATEL:  In general none of them are being asserted
14    for the truth of the matter.  So put your hands against the
15    wall, they asked me for ID, they asked me where I was going,
16    they asked me if I had drugs or weapons in my pocket -- none of
17    these are for the truth of the matter asserted.
18             THE COURT:  For the fact that the statement was made.
19             MS. GROSSMAN:  Your Honor, it is very hard to respond
20    without knowing.  I need something in writing so I can figure
21    out -- if this is the representation, these three statements,
22    we need time to caucus.  If there are any other statements, I
23    want to know that immediately because I want to be able to
24    address it and to the delay the trial.
25             THE COURT:  Right now the statements that she gave,
```

                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

99
```
 1    and she gave it was more than three, four or five questions,
 2    those are for the fact that the statement was made or assertion
 3    was made, not for the truth of it.
 4              MS. GROSSMAN:  I don't know the difference between
 5    that.
 6              THE COURT:  It is a verbal act.  It is an act.  That
 7    is all it is.  In other words, do you have any guns or drugs.
 8              MS. GROSSMAN:  The witness can say, I had to put my
 9    hands against the wall instead of saying an officer told me to
10    put my hands against the was.
11              THE COURT:  No.  I will allow it, The officer told me
12    to put my hand against the wall.
13              Do you want to came back at 2:00 or not?
14              MR. CHARNEY:  No.
15              THE COURT:  I didn't mean it was enjoyable.  Are we
16    doing something effective or should we stop for today and I
17    will see you Monday morning?
18              MS. GROSSMAN:  We have other issues that are going to
19    be --
20              THE COURT:  See you at 2:00.
21              MS. PATEL:  Would it be possible to clarify that?
22              THE COURT:  No.  I can't right now.  I am now late to
23    meet someone.
24              (Luncheon recess)
25
```

D3E8FLO2

```
 1                        AFTERNOON SESSION
 2                           2:10 p.m.
 3              THE COURT:  Where should we pick up?
 4              MS. BORCHETTA:  Actually, we have been able to work
 5      out the remaining objections for the next week's exhibits.  We
 6      just didn't want to leave, since you had said you were coming
 7      back to speak with us, in case there was anything additional
 8      you wanted to address.
 9              THE COURT:  No.  Do you want to put any agreements on
10      the record or somebody was seeking some clarification when I
11      had to leave.  If you don't need me, I am ready to leave the
12      bench.
13              MS. BORCHETTA:  We're fine.
14              MS. GROSSMAN:  The city is fine.
15              THE COURT:  OK.  Thank you.
16              See you Monday.
17              Who is doing the openings?
18              MS. BORCHETTA:  Darius Charney is doing it for
19      plaintiffs.
20              MS. GROSSMAN:  Myself.
21              THE COURT:  OK.  Thanks.
22              (Adjourned)
23                              o0o
24
25
```