UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :

DAVID FLOYD, *et al.*,                        :

                      Plaintiffs,       :          08 Civ. 01034 (SAS)

                                               :

               -against-                :          ECF CASE

                                               :

THE CITY OF NEW YORK,              :

                                               :

                     Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO INVERENE**

CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0900

COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
*Attorneys for Plaintiffs*

<u>**PRELIMINARY STATEMENT**</u>

*Floyd* Plaintiffs join in *Ligon* Plaintiffs' memorandum of law in opposition to the motion to intervene filed by the PBA, LBA, CEA and DEA in *Ligon* and incorporate it by reference into *Floyd* Plaintiffs' opposition to those unions' and the SBA's (collectively "movants" or "unions") motions to intervene here. This memorandum of law supplements the arguments in *Ligon* Plaintiffs' brief, addresses arguments made by the SBA in its separate motion to intervene only in *Floyd*, and summarizes important facts unique to *Floyd*. For the reasons set forth herein and in the *Ligon* Plaintiffs' memorandum of law, the motions to intervene should be denied.

<u>**BACKGROUND**</u>

**A.**   <u>**The Stipulation of Settlement in *Daniels v. City of New York***</u>

On January 13, 2004, this Court so-ordered a stipulation of settlement in *Daniels v. City of New York*, 99 Civ. 1695 (SAS), requiring the City to: (i) implement stop-and-frisk audits that created new job duties and additional workload for certain sergeants and lieutenants, PTE 89, 114 at 5-6; (ii) expand stop-and-frisk and racial profiling trainings for newly promoted sergeants and lieutenants, PTE 114 at 8; (iii) train all personnel on the NYPD's Racial Profiling Policy; PTE 114 at 6; and (iv) ensure that all stop-and-frisk incidents be documented on a revised UF250 form. PTE 114 at 8, Att. B; PTE 449. The settlement was effective through Dec. 31, 2007, PTE 114 at 16, but at no point prior to that date did any of the unions attempt to intervene. Moreover, there is no indication that the City and the unions collectively bargained any of these reforms.

**B.**   <u>**Procedural History of the Present Case**</u>

   **1.**   <u>**Pre-Trial Proceedings**</u>

Plaintiffs commenced the present action in January 2008, naming the City and several individual members of the unions as defendants,[1] and requesting class-wide injunctive relief, including changes to the NYPD's policies and practices governing training, supervision, discipline and monitoring of officers on stop and frisk and racial profiling. Dkt ## 1, 11, 50. Fact discovery proceeded for two-and-a-half years, during which time dozens of police union members were deposed, but at no point did the police unions seek to intervene as parties.

On August 31, 2011, this Court denied the defendants' summary judgment motion, holding that there was a disputed issue of fact for trial on whether current NYPD policies and practices governing officer training, supervision, monitoring and discipline were adequate to prevent a widespread practice of unconstitutional stops. *See Floyd v. City of New York*, 813 F.Supp.2d 417, 456 (S.D.N.Y. 2011). On March 4, 2013, Plaintiffs filed their brief in support of permanent injunctive relief, in which they asked for (i) specific changes to the UF250 form and the standards for evaluating officer performance, and (ii) the appointment of an independent monitor and creation of a joint remedial process to help develop changes to the NYPD's systems for training, supervising, monitoring, and disciplining officers on to stop-and-frisk and racial profiling. *See* Dkt # 268. At no point prior to or during trial did the police unions respond to Plaintiffs' brief or seek to intervene with respect to liability or remedial issues.

## 2.    Trial

During the nine-week trial, numerous police officers, sergeants, lieutenants, captains, deputy inspectors, and inspectors testified, describing their job duties, responsibilities and workload, practices for documenting stops and reviewing stop documentation, and how officers are trained, supervised, monitored and disciplined with respect to stops, frisks, and racial

---

[1] On March 8, 2013, the Court so-ordered the parties' stipulation withdrawing all of Plaintiffs' claims against the individual police union member defendants. *See* Dkt # 270.

profiling. *See, e.g.*, Pl FOF ¶¶ 86-107, 122-136; City's FOF ¶ 23, 25-33, 43-49. In addition, several senior NYPD officials and the City's remedies expert testified about burdens that would supposedly befall officers if the UF250 is revised to include a narrative section. *See id.* ¶ 94.

### 3. The Liability and Remedies Decisions and the City's and Unions' Appeals

In its August 12, 2013 Liability Decision, the Court found only the City liable for constitutional violations. *See* Dkt # 373 at 192. In its Remedies Order, the Court held that it has the power to order injunctive relief against the City necessary to remedy the widespread practice of unconstitutional stops that it found, and directed the City and Plaintiffs, together with a Court Monitor, to develop and submit to the Court proposed changes to NYPD policies, training, documentation, and supervisory, monitoring and disciplinary systems for stop-and-frisk and racial profiling, and a proposed FINEST message explaining the outcome of this case and need for the aforementioned reforms. Dkt # 372 at 2-8, 13-25. The Remedies Order further requires that the City conduct a 1-year pilot project for body-worn cameras in five NYPD precincts, and that the City and Plaintiffs engage in a Joint Remedial process, guided by a facilitator, to develop a series of supplemental reforms based on input from a variety of stakeholders, including "NYPD personnel and representatives of police organizations." *Id*. at 25-30. The Remedies Order does not require the unions or their members to do anything. On August 16, 2013, the City noticed an appeal the Liability and Remedies Orders. *See* Dkt # 379. On September 11 and 12, respectively, the unions noticed appeals from those same two orders. *See* Dkt ## 388, 391. The City and the SBA have also indicated they intend to raise the exact same legal issues on appeal. *See Floyd v. City of New York*, 13-3088, Dkt # 22 Add. B, Dkt # 94 Add. B (2d Cir.).[2]

---

[2] The other unions voluntarily dismissed their appeal. *See Floyd v. City of New York,* 13-3524, Dkt # 16 (2d Cir. Sept. 25, 2013).

C.    **The City's Recent Voluntary Changes to Stop-and-Frisk Policies and Procedures**

The City has on its own instituted several changes to its stop-and-frisk policies and procedures since the beginning of this case which, although inadequate to remedy widespread unconstitutional stops, have altered the duties, responsibilities, and workload of NYPD personnel at various ranks. These include: (i) revisions to the NYPD Patrol Guide section on stop-and-frisk in 2009 and 2010 requiring officers to provide a stopped civilian with an explanation of the reasons for the stop, and a general information card, PTE 282, 336; (ii) a 2011 revision to the UF250 requiring officers to record the reasons for any force used during a stop, PTE 74, (iii) a 2012 revision to the Patrol Guide section on executive officers (who are captains) requiring them to now conduct the stop-and-frisk self-inspections in each precinct, DTE Z4; and (iv) the March 5, 2013 memorandum from the Chief of Patrol requiring all NYPD patrol officers to provide additional narrative about the reasons for stops in both their activity logs and on the UF250 forms they complete and to staple copies of the activity log entries to each UF250 they submit. DTE J13. In addition, 2011 changes to officer monthly and quarterly performance evaluation procedures significantly increased the frequency with which officers must document the quantity of their stop activity and supervisors must review that documentation. PTE 205, 315, 317-318. Finally, from 2012 through April 2013, the NYPD required more than 6000 police officers to attend an off-site, albeit legally incorrect, stop-and-frisk training. Trial Tr. at 5121. However, there is no indication that the City and unions collectively bargained any of these changes.

## ARGUMENT

A.    **Movants Have Shown No Legal Interest in the Appeal or Remedial Process**

The movants, almost in passing, assert an interest in the liability ruling. Dkt # 392 at 10; #396 at 15, but this is not a basis to intervene. *See Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990). Plaintiffs' claims are against the City, and

not any union members. The liability ruling found that the City's policies and practices violate the Constitution, and the unions do not and cannot establish policies and practices on behalf of the City. The Plaintiffs and unions have no dispute with each other.

Similarly, the unions have no interest in appealing the Court's Remedies Order. The Order does not require the unions or their members to do anything. Moreover, as the unions acknowledge, the only remedial issue on appeal is whether this Court abused its discretion in ordering injunctive relief against the City and establishing the remedial processes, *see Floyd v. City of New York*, 13-3088, Dkt # 94, Addendum B, which turns on (i) the correctness of the Court's weighing of the liability and remedial evidence presented at a trial in which the unions had no interest in participating, and (ii) legal standards for imposing injunctive relief on a municipality—not municipal unions—to remedy constitutional violations. *See Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003); Dkt # 372 at 2-8.

The movants suggest they have the right to bargain over the use of body worn cameras, but then concede such use would fall within the City's managerial discretion as "methods, means and technology of performing [officers'] work," Dkt # 392 at 7, which are not bargainable. NYCCBL §12-307(b); *see also LEEBA v. City of New York*, 3 OCB2d 29, at 48 (BCB 2010) (holding that changes to New York City Environmental Police Officers' equipment, including body armor, was management prerogative and not subject to "mandatory bargaining").

Future changes to the UF250 form or other documentation of stop-and-frisk encounters also do not create a mandatory collective bargaining issue. Such changes will not require NYPD officers, first line supervisors or middle managers to work longer tours, answer more service calls, patrol larger geographic areas, conduct more arrests, stops and frisks or other enforcement actions, or perform additional job duties that they do not already perform on a daily basis (i.e.,

incident report writing and review). Changes like this, "which impinge only indirectly or tangentially upon employment condition, will generally be treated as exempt from mandatory collective bargaining." *Levitt v. Bd of Collective Bargaining*, 531 N.Y.S.2d 703, 706 (N.Y. Sup. Ct. 1988), *aff'd*, 79 N.Y.2d 120 (1992); *see also W. Irondequoit Teachers Ass'n v Helsby*, 35 N.Y.2d 46 (1974) (finding that changes in class size fall under management prerogative despite their incidental effect on teacher working conditions).  As for new stop-and-frisk trainings that may be required, "the establishment of training procedures, in most circumstances, is a matter of management right and not a mandatory subject of bargaining," *Uniformed Firefighters Ass'n*, Decision No. B-43-86, at 15 (BCB Sept. 25, 1986), and the narrow exception to which the unions point—namely, a situation where employees must get training necessary to obtain a certification required for continued employment, *id*.—does not apply here.  Moreover, as discussed *supra*, the City has over the past decade made several changes to stop and frisk documentation procedures, instituted new mandatory stop and frisk training, imposed new stop and frisk auditing duties on certain sergeants, lieutenants and captains, and significantly altered the monthly and quarterly officer performance evaluation procedures, yet none of these reforms were ever the subject of collective bargaining.[3]

## B.  Adequacy of Representation

Movants do not criticize the City's presentation of evidence at trial, explain the legal arguments the City should have raised but did not, illustrate what movants would have raised if

---

[3] Movants also feign an interest in assuring union members' safety will be considered during the remedial process and providing "valuable insight" to the Court and Monitor on how the reforms will work in practice. Dkt # 392 at 10; Dkt #396 at 8. Movants' true intent—to pursue an appeal if the City changes course—shows this is disingenuous. Nothing prevents them from assuring that officers who follow the Constitution will not be put at risk, and they need not be a party to do so. *See* Charney Decl., Ex. A. ¶¶5-12, Ex. B ¶¶7, 9, 11, Ex. C ¶¶5-6. And this Court has already provided an opportunity for stakeholders to give "insight" or information regarding the "practical impact" of reforms developed in the remedial process. *See* Dkt # 372 at 29.

they were a party at an earlier phase in the litigation; or provide the points they would raise on appeal not already addressed by the parties. Supposed safety risks and confusion for officers and supervisors, Dkt # 396 at 14-15, is the same argument the City has repeatedly made. Dkt # 380 at 2; *Floyd v. City of New York*, 13-3088, Dkt # 72, MOL at 2, 29 (2d Cir. Sept. 23, 2013). Movants demonstrate no reason to doubt the City will continue to raise (as it has throughout this case) concerns about public safety or the administrative burden of increased supervision or changes in the documentation of stops and frisks. *See United States v. City of New York*, 2012 U.S. Dist. LEXIS 12085, *8-9 (E.D.N.Y. Feb. 12, 2012). The suggestion that the City may drop these concerns is ahistorical given the last the 14 years of this case and *Daniels*.

Moreover, federal courts presume adequacy of representation when a government is acting on behalf of a constituency. *See Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003); *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 987 (2d Cir. 1984). Movants fail to point to one specific difference of opinion or conflict in the interests the City has or will represent. *See* Ex. D, *United States v. City of New Orleans*, No. 12-1924, at 21-22 (E.D.La. Aug. 31, 2012) (denying police union's intervention even though government and union "may have some disagreements" where none were articulated).[4]

Movants' citation to *The Vulcan Society of Westchester County v. Fire Department of the City of White Plains*, 79 F.R.D. 437 (S.D.N.Y. 1978), is inapposite. That case involved intervention by a firefighter union concerned about changes to the city's firefighter hiring and promotion practices in an employment discrimination action. *Id.* Those legal issues put the antagonistic employer-employee relationship squarely at the center of the legal and factual issues in the case. *Id.* at 441. Here, in contrast, the City's and Movants' bargaining process is outside

---

[4] Movants seem to suggest their interests regarding quotas may be different than the City's. But this is irrelevant because the Plaintiffs agree that quotas should be abolished. Dkt # 268 at 17-18.

the instant litigation. Movants have not cited any provisions of their collective bargaining agreements they seek to protect if permitted to become parties. Without any specific contractual terms at issue, the City and Unions' employer-employee relationship is irrelevant for purposes of the remedy process or the pending appeal.[5]

To suggest the City will be "less focused and informed," than the SBA on the "discrete details of their supervisory and field work;" Dkt # 396 at 20-21, or that the unions have a "unique perspective" on their job duties, *id*. at 20; Dkt # 392 at 13, is vague and unspecific and therefore insufficient for mandatory intervention. What happens in the field during stops and frisks, particularly in the context of supervision, has been a central part of this case for years; both parties presented evidence at trial on precisely these types of details.[6] Moreover, to the extent the unions would raise new arguments or concerns not previously raised by the City prior to or during the trial in the District Court, Plaintiffs would be severely prejudiced, having shaped their presentation of trial evidence based on the City's arguments to this Court. *See infra*.

**C.**    <u>**Movants' Motions to Intervene in the Appeal and Remedies Process Are Untimely**</u>

Post-judgment intervention is disfavored "because it fosters delay and prejudice to existing parties." *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 596 (2d Cir. 1986); *Bass v. World Wrestling Entm't*, 2010 U.S. Dist. LEXIS 27648, *4 (E.D.N.Y. Mar. 4, 2010). Belated attempts to intervene after hearings on the scope of relief should be denied. *See Yonkers*, 801

---

[5] Movants' citation to *Acree v. Republic of Iraq*, 370 F.3d 41, 50 (D.C. Cir. 2004), is unavailing for the reasons described *infra*: movants' were aware their interest arose prior to the appellate proceedings and any intervention would significantly prejudice the parties.

[6] The SBA's cite to *Natural Resources Defense Council v. Costle*, 561 F.2d 904 (D.C. Cir. 1977), is also not helpful to them. The intervenor in *Costle* did not seek to prosecute an appeal or disturb a process designed to reach an agreement between the parties, but rather, to assist in implementation and monitoring of the agreement. The analogous intervenor would be a neighborhood organization from, for example, Bushwick, Brooklyn, not the movants, who only seek to preserve the status quo and resist reforms aimed at complying with the Constitution.

F.2d at 596. Denial is appropriate where the movants "knew at an early stage in the proceedings that their rights could be adversely affected." *United States v. Jefferson Cnty*, 720 F.2d 1511, 1516 (11th Cir. 1983); *see also Catanzano v. Wing*, 103 F.3d 223, 233 (2d Cir. 1996).

### 1.    The Movants Have Not Acted Promptly to Intervene in the Appeal

Timeliness for purposes of intervening in the appeal hinges on when the movants knew or should have known they had an interest. *Cf. In re NASDAQ Market-Makers Antitrust Litig.*, 184 F.R.D. 506, 513-514 (S.D.N.Y. 1999) *citing Catanzano*, 103 F.3d. at 233. Movants have known since the filing of Plaintiffs' complaint in 2008 that the NYPD's stop-and-frisk-related discipline, training, supervision, and monitoring, policies and practices were being challenged, and have known since this Court's highly publicized Summary Judgment Decision in August 2011[7] that the adequacy of those policies and practices would be adjudicated at a trial. *See Floyd*, 813 F.Supp.2d. at 456. The nine-week trial also involved extensive presentation of evidence on these issues, and the attendant publicity generated by these events should have alerted the movants that the litigation could potentially impact the interests of their members long before they filed their motion for intervention. *See NAACP v. New York,* 413 U.S. 345, 366-67 (1973) Plaintiffs would also be severely prejudiced by intervention at this juncture because they were not permitted to tailor their factual presentation at trial to address the movants' remedial concerns or any new arguments they may raise on appeal.

The movants assert that "[t]he prospect that the City may not pursue the Appeal further supports a finding that the motion is timely," Dkt # 396 at 13, but, as cited in *Ligon* Plaintiffs'

---

[7] *See* Larry Neumeister, Huffington Post, *Lawsuit: NYPD's Stop-And-Frisk Program Discriminates Against Blacks, Hispanics* (Aug. 31, 2011) http://www.huffingtonpost.com/2011/09/01/lawsuit-nypds-stopandfris_n_944718.html; Basil Katz, Reuters, *Judge Allows challenge to New York "stop and frisk"* (Aug. 31, 2011), http://www.reuters.com/article/2011/08/31/us-usa-newyork-stopandfrisk-idUSTRE77U7D220110831.

memorandum of law, the movants lack standing to pursue such an appeal. Moreover, when a party should have known of its interest but failed to act upon it, a motion to intervene will not be found timely simply because a party "moved to intervene promptly after learning that a [government entity] would not appeal the district court's injunctive order." *See Farmland Dairies v Comm'r of the N.Y. State Dep't of Agric. & Mkts*, 847 F.2d 1038, 1044 (2d. Cir. 1988).

**2.      Movants Have Not Acted Promptly to Participate in the Remedial Process**

The scope of the remedial order was based on the Court's findings with respect to the liability and remedial evidence presented at trial and on the parties' March 2013 remedies briefs. Any omission of the movants' interests from the remedial processes ordered by the Court is occasioned by the movants' failure to timely intervene in those earlier processes. *See Mass. Sch. of Law v. United States*, 118 F.3d 776, 783 n.5 (D.C. Cir. 1997) (neglect to intervene "at a time when notice of their arguments would have enabled the district court to avert the alleged errors" is untimely and "post-judgment intervention for the purpose of challenging those supposed defects on appeal would rightly be denied."). The Court may deny intervention for the purpose of intervening in relief orders where, as here, the issue was "clearly present in the litigation from the very beginning." *Catanzano*, 103 F.3d. at 233; *see also S.H. v. Stickrath*, 251 F.R.D. 293, 299-300 (S.D. Ohio 2008) (Denying as untimely juvenile prison employee union's motion to intervene in stipulated injunction where plaintiffs' allegations of systemic constitutional violations "at the outset" of the case put union on notice that any remedy would alter duties, training and supervision of union members). If movants were permitted to intervene and litigate issues related to their CBA's, substantial delays would result, irreparably harming plaintiffs and the public. *See* Dkt # 402 at 10.[8]

---

[8] Movants assert that courts permit intervention "when a yet to be determined remedy will affect

## CONCLUSION

For the reasons set forth above and in the *Ligon* Plaintiffs' Memorandum of Law in

Opposition to the PBA, LBA, CEA and DEA's motion to intervene in *Ligon*, those unions' and

the SBA's motions to intervene should be denied.

Dated: New York, New York
      October 11, 2013

                                 Respectfully submitted,

By:                               
                                 DARIUS CHARNEY

                                 Darius Charney
                                 Sunita Patel
                                 Chauniqua Young
                                 CENTER FOR CONSTITUTIONAL RIGHTS
                                 666 Broadway, 7th Floor
                                 New York, New York 10012
                                 (212) 614-6464
                                 dcharney@ccrjustice.org
                                 spatel@ccrjustice.org

                                 Jonathan Moore
                                 Jennifer Rolnick-Borchetta
                                 BELDOCK LEVINE & HOFFMAN, LLP
                                 99 Park Avenue, Suite 1600
                                 New York, New York 10016
                                 (212) 490-0900
                                 jmoore@BLHNY.com
                                 jborchetta@BLHNY.com

                                 Eric Hellerman
                                 Kasey Martini
                                 Bruce Corey
                                 COVINGTON & BURLING LLP
                                 The New York Time Building

---

the rights of the intervening third parties," Dkt. # 396 at 10, and "courts have expressly
recognized as timely post-judgment intervention for the purpose of having a voice in shaping the
relief to be granted." *Id.* However, such intervention is only permitted when parties acted
promptly. *See, e.g. Spirt v. Teachers' Ins. & Annuity Ass'n,* 93 F.R.D. 627, 635 (S.D.N.Y. 1982)

New York, New York 10018-1405
(212) 841-1000
pirwin@cov.com
ehellerman@cov.com
*Attorneys for Plaintiffs*