N.Y.S.D. Case #
08-cv-1034(SAS)

13-3123; 13-3088
*In re Reassignment of Cases: Ligon; Floyd et al. v. City of New York, et al.*

# United States Court of Appeals

FOR THE

SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 13th day of November, two thousand thirteen.

Present:

>John M. Walker, Jr.,
>José A. Cabranes,
>Barrington D. Parker,
>
>>*Circuit Judges.*

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 13, 2013

In re Reassignment of Cases

---

Jaenean Ligon, et al.,

>*Plaintiffs-Appellees,*

>v.                                                              13-3123

City of New York, et al.,

>*Defendants-Appellants.*

---

David Floyd, et al.,

>*Plaintiffs-Appellees,*

>v.                                                              13-3088

City of New York, et al.,

>*Defendants-Appellants.*

---

CERTIFIED COPY ISSUED ON 11/13/2013

PER CURIAM

These cases, motions of which were argued in tandem, deal with an issue of great

significance: the constitutional boundaries of practices by the New York City Police Department

("NYPD") that subject citizens to being stopped and frisked.  On August 12, 2013, Judge Shira

A. Scheindlin, a long-serving and distinguished jurist of the United States District Court for the

Southern District of New York, held that the City of New York ("the City") had violated the

plaintiffs' Fourth and Fourteenth Amendment rights, and ordered the City to engage in a variety

of remedial measures and activities.

On August 27, 2013, the City moved in the district court to stay those remedies, pending

an appeal on the merits of the district court's decision.  Judge Scheindlin denied the motions.  On

September 23, 2013, the City moved in this Court to stay the imposition of the district court's

remedies.  By order dated October 31, 2013, we both granted that stay and, because the

appearance of impartiality had been compromised by certain statements made by Judge

Scheindlin during proceedings in the district court and in media interviews, we reassigned the

cases to a different district judge, to be chosen randomly.[1]  We now explain the basis for that

order, which is superseded by this opinion.[2]

## BACKGROUND

We emphasize that the merits of this litigation are not before us and are not at issue here.

Accordingly, we neither express nor intimate any views on the merits of the underlying actions.

---

[1] *See* Appendix A.

[2] On November 8, 2013, Judge Scheindlin moved in this court through counsel for "leave in the nature of an order under Rule 21(b)(4) of the Federal Rules of Appellate Procedure governing mandamus proceedings providing for appellate review of motions for judicial disqualification pursuant to 28 U.S.C. § 455, authorizing counsel to appear on behalf of the District Judge in order to address the factual and legal sufficiency of the Motion Panel's *sua sponte* order of removal."  We address this motion by the district judge to appear in support of retaining authority over these cases in a separate opinion published contemporaneously with this one.

This opinion deals only with our procedural decision to direct the reassignment of the cases and turns on how the cases came before Judge Scheindlin and the media interviews she gave during the pendency of these lawsuits.

For the sake of clarity, we recite the procedural history that has led us to this point. In January 2008, the plaintiffs in *Floyd* filed a class action alleging that the NYPD violated the Fourth and Fourteenth Amendments through a pattern and practice of stopping and frisking without reasonable suspicion. In March 2012, the plaintiffs in *Ligon* filed a class action alleging that the NYPD violated the Fourth Amendment by engaging in a practice of unlawfully stopping, frisking, and arresting persons for trespass because of their presence in or near buildings enrolled by their landlords in an NYPD crime prevention program known as the Trespass Affidavit Program ("TAP").

When filing, the plaintiffs in *Floyd* marked the case on the appropriate form as related to *Daniels v. City of New York*, No. 99-cv-1695, an earlier case over which Judge Scheindlin presided. Likewise, the plaintiffs in *Ligon* marked that case as related to *Davis v. City of New York*, No. 10-cv-699, over which Judge Scheindlin was also presiding.[3] Because *Daniels*, although terminated a month earlier, and *Davis* had been assigned to Judge Scheindlin, *Floyd* and *Ligon* were forwarded to her, pursuant to Rule 13 of the Local Rules for the Division of Business Among District Judges,[4] and she accepted them both as related cases.

---

[3] Prior to *Ligon* being filed, Judge Scheindlin had accepted *Davis* as related to *Floyd*, so in that sense, *Ligon* also descends directly from *Daniels* via *Floyd* and *Davis*.

[4] In relevant part, Rule 13 provides:

(c) Assignment of cases and proceedings that are designated as related.

    (i) Disclosure of contention of relatedness.

In a decision dated January 8, 2013, and amended on February 14, 2013, Judge Scheindlin granted the *Ligon* plaintiffs' motion for a preliminary injunction, holding that they had "shown a clear likelihood of proving that defendants have displayed deliberate indifference toward a widespread practice of unconstitutional trespass stops by the NYPD outside TAP buildings in the Bronx."[5]  In a separate opinion, Judge Scheindlin granted the defendants' motion to stay any remedies until after the "issuance of a final decision regarding the appropriate scope of preliminary injunctive relief, and the appropriate scope of permanent injunctive relief (if any) in *Floyd*."[6]

On August 12, 2013, following a nine-week trial in *Floyd*, Judge Scheindlin held that the City of New York violated the plaintiffs' rights under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment.[7]  The same day, Judge Scheindlin issued an opinion setting forth remedial measures in both *Floyd* and *Ligon*[8] intended to bring the NYPD's use of stop-and-frisk into compliance with the Fourth and Fourteenth Amendments.[9]

---

When a civil case is filed or removed or a bankruptcy appeal or motion to withdraw the reference of an adversary proceeding from the bankruptcy court is filed, the person filing or removing shall disclose on form JSC44C any contention of relatedness.  A copy of that form shall be served with the complaint, notice of removal, appeal or motion.

(ii) Civil cases that are designated as related.

A case designated as related shall be forwarded to the judge before whom the earlier-filed case is then pending who has the sole discretion to accept or reject the case.  Cases rejected by the judge as not related shall be assigned by random selection.

[5] *Ligon et al. v. City of New York et al.*, 925 F. Supp. 2d 478, 485 (S.D.N.Y. 2013).

[6] *Ligon et al. v. City of New York et al.*, Nos. 12-cv-2274, 08-cv-1034, 2013 WL 227654, at *4 (S.D.N.Y. Jan. 22, 2013).

[7] *See Floyd et al. v. City of New York et al.*, __ F. Supp. 2d __, No. 08-cv-1034, 2013 WL 4046209, at *7 (S.D.N.Y. Aug. 12, 2013).

[8] *See Floyd et al. v. City of New York et al.*, __ F. Supp. 2d __, Nos. 08-cv-1034, 12-cv-2274, 2013 WL 4046217 (S.D.N.Y. Aug. 12, 2013).

[9] *Id.* at *13.

On August 16, 2013, the defendants in both cases filed notices of appeal in this court.  On August 27, 2013, the City of New York moved in the district court to stay the remedies in *Floyd* and *Ligon*, pending the outcome of the appeals process.  On September 17, 2013, Judge Scheindlin denied the City's stay motions.  On September 23, 2013, the City moved in this court to stay the district court's August 12, 2013 remedies order.

Following oral argument, this panel, on October 31, 2013, stayed, "the District Court's January 8, 2013 'Opinion and Order,' as well as the August 12, 2013 'Liability Opinion' and 'Remedies Opinion,' each of which may or will have the effect of causing actions to be taken by defendants or designees of the District Court, or causing restraints against actions that otherwise would be taken by defendants."  This panel also concluded "that, in the interest, and appearance, of fair and impartial administration of justice, UPON REMAND, these cases shall be assigned to a different District Judge, chosen randomly under the established practices of the District Court for the Southern District of New York.  This newly-designated District Judge shall implement this Court's mandate staying all proceedings and otherwise await further action by the Court of Appeals on the merits of the ongoing appeals."[10]  We now explain in greater detail the basis for our decision to reassign the cases.

## DISCUSSION

Title 28, United States Code, section 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  This statute embodies the principle that "to perform its high function in the best way justice must satisfy the appearance of justice."[11]

---

[10] *See* Appendix A, at 3.

[11] *In re Murchison*, 349 U.S. 133, 136 (1955) (internal quotation marks omitted).

The goal of section 455(a) is to avoid not only partiality but also the appearance of partiality.[12]  The section does so by establishing an "objective standard 'designed to promote public confidence in the impartiality of the judicial process.'"[13]  The rule functions as a critical internal check to ensure the just operation of the judiciary.  Our Court, sitting *en banc*, has stated that there exists "unusual circumstances where both for the judge's sake and the appearance of justice, an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality."[14]  And as other circuits have correctly noted, "'if the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal.'"[15]

We emphasize at the outset that we make no findings of misconduct, actual bias, or actual partiality on the part of Judge Scheindlin.  Following our review of the record, however, we conclude that her conduct while on the bench, which appears to have resulted in these lawsuits being filed and directed to her, in conjunction with her statements to the media and the resulting stories published while a decision on the merits was pending and while public interest in the outcome of the litigation was high, might cause a reasonable observer to question her impartiality.  For this reason, her disqualification is required by section 455(a).

---

[12] *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988).

[13] *SEC v. Drexel Burnham Lambert Inc. (In re Drexel Burnham Lambert Inc.)*, 861 F.2d 1307, 1313 (2d Cir. 1988) (quoting H.R. Rep. No. 1453, *reprinted in* 1974 U.S.C.C.A.N. 6351, 6354-55).

[14] *United States v. Robin*, 553 F.2d 8, 9-10 (2d Cir. 1977) (en banc) (internal quotation marks and citations omitted).

[15] *In re Boston's Children First*, 244 F.3d 164, 167 (1st Cir. 2001) (quoting *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995)); *see also United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993).

### A.

The appearance of partiality stems in the first instance from comments made by Judge Scheindlin that a reasonable observer could interpret as intimating her views on the merits of a case that had yet to be filed, and as seeking to have that case filed and to preside over it after it was filed. These comments were made in the earlier case of *Daniels v. City of New York*, No. 99-cv-1695, in which the City entered into a settlement agreement requiring it, *inter alia*, to establish policies that prohibited racial profiling. Ten days before Judge Scheindlin's supervisory authority under the settlement agreement was set to expire, she heard argument on a motion brought by the *Daniels* plaintiffs to extend the settlement period.[16] The transcript of the hearing indicates that the City had substantially complied with the relief required by the settlement and that the plaintiffs were seeking information from the City beyond that required to be furnished by the settlement agreement.

Observing that the settlement agreement did not entitle the plaintiffs to the relief they sought, Judge Scheindlin counseled:

THE COURT: [. . .] *why don't you file a lawsuit*

Mr. COSTELLO: We did, we are here.

THE COURT: No, you are struggling with the December 31, 2007 deadline in a 1999 case. *And if you got proof of inappropriate racial profiling in a good constitutional case, why don't you bring a lawsuit? You can certainly mark it as related.*

How could it not be related to this whole long seven or eight years we have lived together in this case? Because you are trying to put a square peg in a round hole. And trying to force yourselves to argue what the settlement means, that it doesn't mean if you have a timely lawsuit -- *you seem to have compiled interesting arguments*[.] Ms. Grossman [attorney for the City] has not rebutted -- maybe she did, that's why we didn't do something, because we didn't want them to write this

---

[16] *See* Appendix B (transcript of hearing).

letter, she -- let's just say she hasn't substantially responded to your letter. *If one had only your letter, it would look like you have a lawsuit. So instead of struggling to telling [sic] me about a stipulation of settlement, why don't you craft a lawsuit?*

(TR 10-11) (emphasis added). She returned to the idea of bringing a suit alleging that the City

had violated their racial profiling policies and suggested a basis for the suit:

> THE COURT: *what I am trying to say - - I am sure I am going to get in trouble for saying it, for $65 you can bring that lawsuit.* You can simply - -
> MR. MOORE: $350
> THE COURT: I knew I had it wrong. *The [C]ity violates its own written policy, the City has a policy that violates -- they have violated their policy, here is the proof of it, please give us the remedy. Injunction or damages, or whatever lawyers ask for in compliance. So for $350 you can bring that lawsuit and it is timely.*

(TR 14, 15) (emphasis added). And again:

> THE COURT: I don't understand why we have to potentially have, you know, months of briefing when it does fit under this stipulation or it doesn't, that Raffo applies or it doesn't that the court has the power to extend the supervision, that we want our immediate appeal to the circuit. *Why do you need that if you have a lawsuit? Bring it. They have a written policy, right*?
> MR. GROSSMAN: *Yes, your Honor.*
> THE COURT: *If you think they are violating their written policy, sue them.*

(TR 15) (emphasis added).

Judge Scheindlin then advised the plaintiffs that if they filed such a suit, they would

successfully obtain relevant documents produced by the government:

> THE COURT: . . . There is enough in the public record to craft the suit.
>
> And then *in that suit simply say, we want produced all that was produced in the 1999 lawsuit. I don't know how you could lose getting it.* It may be a question of whether it is still going to be under protective order or not. *But I can hardly imagine not getting it. You know what I am saying? It is so obvious to me that any Judge would require them to reproduce it to you* in the same format that you have it, that you will have it again. Whether or not it remains confidential.

(TR 18) (emphasis added).  After the plaintiffs indicated their willingness to bring the new suit, she repeated her earlier suggestion that the cases were related and indicated her willingness to keep the newly filed case:

> MR. MOORE: To the extent that some of the materials have already been made public.
> THE COURT: what's public is public, -- If you cite to the Rand study, publicly, nobody can criticize you for that.  If they do, they weren't acting in good faith.  If I can get the Rand study on the internet, it is public --
> MR. MOORE: you can go to the NYPD website, your Honor.
> THE COURT: *There you go, that's public.  You can use that.  And as I said before, I would accept it as a related case, which the plaintiff has the power to designate.*
> I think this current motion is withdrawn.  Thank you.

(TR 42) (emphasis added).

We believe that a reasonable observer viewing this colloquy would conclude that the appearance of impartiality had been compromised. We do not mean to suggest that a district judge can never engage in a colloquy with a party during which the judge advises the party of its legal or procedural options.  However, we think, particularly in combination with the public statements described below, that a reasonable observer could question the impartiality of the judge where the judge described a certain claim that differed from the one at issue in the case before her, urged a party to file a new lawsuit to assert the claim, suggested that such a claim could be viable and would likely entitle the plaintiffs to documents they sought, and advised the party to designate it as a related case so that the case would be assigned to her.[17]

---

[17] The designation by parties, and acceptance by district judges, of cases as related to other pending matters pursuant to Rule 13 of the Local Rules for the Division of Business Among District Judges, is a routine practice that promotes judicial efficiency and economy.  Our decision in this opinion should not be construed as casting doubt on the proper designation and acceptance of cases as "related" in the normal course—that is, when a district judge does not invite the filing of a suit and encourage its direction to their Court.  We also note that, for civil matters, the Rule explicitly anticipates cases being marked as related to "earlier-filed case[s] . . . then pending," *see* Rule 13(c), which is "designed to reduce litigants' costs by informally consolidating proceedings in related cases," *Chase Manhattan*

# B.

This appearance of partiality by Judge Scheindlin at the *Daniels* hearing was exacerbated as a result of interviews she gave to the news media during the course of the *Floyd* litigation. Cases involving public comment by a presiding judge, other than statements in open court, are infrequent.  As the First Circuit has remarked, "[j]udges are generally loath to discuss pending proceedings with the media."[18]  Of course, not every media comment made by a judge is necessarily grounds for recusal.[19]  We note that Judge Scheindlin did not specifically mention the *Floyd* or *Ligon* cases in her media interviews.  However, a judge's statements to the media may nevertheless undermine the judge's appearance of impartiality with respect to a pending proceeding, even if the judge refrains from specifically identifying that proceeding in his remarks to the media.  Because context is always critical, the relevant question at all times remains whether, under the circumstances taken as a whole, a judge's impartiality may reasonably be called into question.[20]  Because there is no *scienter* requirement in section 455,[21] the test is not

---

*Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 347 (2d Cir. 1995).  Here, at the time *Floyd* was filed in January 2008, *Daniels*, to which it was accepted as "related," was closed.

Judge Scheindlin's motion, the subject of the separate opinion we file today, contends that the "District Court's recognition that judicial economy would be served by the invocation of the related case doctrine codified in Local Rule 13 is analogous to the decision of the Motion Panel to issue an order retaining jurisdiction over the appeal herein in the name of judicial economy."  To be sure, both Local Rule 13 dealing with related cases in the district court, and the practice in this court by which a motion panel may choose to hear the appeal on the merits, are designed to conserve judicial resources.  However, in the court of appeals, because *the case is the same case and not just a related case*, and no litigant is involved with the decision, there can be no forum-shopping.

In any event, the gravamen of why reassignment of this case is necessary is not simply the use of Local Rule 13.  It is the appearance of partiality that was created by Judge Scheindlin's conduct throughout the December 21, 2007 hearing in suggesting that the plaintiffs bring a lawsuit, outlining the basis for the suit, intimating her view of its merit, stating how she would rule on the plaintiffs' document request in that suit, *and* telling the plaintiffs that she would take it as a related case, as well as the media interviews she gave during the *Floyd* proceedings.

[18] *In re Boston's Children First*, 244 F.3d at 169.

[19] *See, e.g.*, *United States v. Fortier*, 242 F.3d 1224, 1229-30 (10th Cir. 2001) (superseded by statute on other grounds); *In re Barry*, 946 F.2d 913, 914 (D.C. Cir. 1991).

[20] *See United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007).

10

how a judge intended his remarks to be understood, but whether, as a result of the interviews or other extra-judicial statements, the appearance of impartiality might reasonably be questioned.

In late May 2013, at the conclusion of the evidence in *Floyd*, when public interest from reporting on that trial was high, and months before she had produced a decision, Judge Scheindlin made herself available for interviews by the Associated Press, The New Yorker, and the New York Law Journal.[22] The "lede" of the AP article dated May 18, 2013, read "[t]he federal judge presiding over civil rights challenges to the stop-and-frisk practices of the New York Police Department has no doubt where she stands with the government. 'I know I'm not their favorite judge,' U.S. District Judge Shira A. Scheindlin said during an Associated Press interview Friday." The lengthy profile of Judge Scheindlin in The New Yorker, for which she agreed to be interviewed, was titled, "Rights and Wrongs: A Judge Takes on Stop-and-Frisk." The writer, implying that Judge Scheindlin was aligned with the plaintiffs, wrote,

> [t]he primary outlet for Scheindlin's judicial creativity has been an enduring battle she has fought with the N.Y.P.D. A federal judge since 1994, she has been hearing lawsuits against the police for more than a decade. In decision after decision, she has found that cops have lied, discriminated against people of color, and violated the rights of citizens. Now, in the midst of a mayoral race, with the Democratic candidates united in their opposition to the stop-and-frisk policies of the Bloomberg administration, the Floyd case represents Scheindlin's greatest chance yet to rewrite the rules of engagement between the city's police and its people.

While nothing prohibits a judge from giving an interview to the media, and while one who gives an interview cannot predict with certainty what the writer will say, judges who affiliate themselves with news stories by participating in interviews run the risk that the resulting

---

[21] *See Liljeberg*, 486 U.S. at 859.

[22] Jeffrey Toobin, *Rights and Wrongs: A Judge Takes on Stop-and-Frisk*, The New Yorker, May 27, 2013 (attached hereto as Appendix C); Larry Neumeister, *NY "Frisk" Judge Calles Criticism "Below-the-Belt"*, The Associated Press, May 19, 2013 (attached hereto as Appendix D); Mark Hamblett, *Stop-and-Frisk Judge Relishes her Independence*, N.Y. Law Journal, May 20, 2013 (attached hereto as Appendix E).

stories may contribute to the appearance of partiality. It is perhaps illustrative of how such situations can get out of the control of the judge that, later in The New Yorker piece, the article quotes a former law clerk of Judge Scheindlin: "As one of her former law clerks put it, 'What you have to remember about the judge is that she thinks cops lie.'"

Further, in those two articles, as well as the New York Law Journal article, Judge Scheindlin describes herself as a jurist who is skeptical of law enforcement, in contrast to certain of her colleagues, whom she characterizes as inclined to favor the government. Given the heightened and sensitive public scrutiny of these cases, interviews in which the presiding judge draws such distinctions between herself and her colleagues might lead a reasonable observer to question the judge's impartiality. As the First Circuit put it, "the very rarity of such public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias."[23]

### C.

In our previous order, we referenced the Code of Conduct for United States Judges. We now clarify that we did not intend to imply in our previous order that Judge Scheindlin engaged in misconduct cognizable either under the Code of Conduct or under the Judicial Conduct and Disability Act, 28 U.S.C. §§ 372, *et seq.* No such finding is required under section 455,[24] and we do not find that there was any judicial misconduct or violation of any ethical duty.

"To reassign a case on remand, we need only find that the facts might reasonably cause an objective observer to question the judge's impartiality, or absent proof of personal bias

---

[23] *In re Boston's Children First*, 244 F.3d at 170; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 115 (D.C. Cir. 2001) ("Judges who covet publicity, or convey the appearance that they do, lead any objective observer to wonder whether their judgments are being influenced by the prospect of favorable coverage in the media.").

[24] *See In re Boston's Children First*, 244 F.3d at 168.

requiring recusation [sic], that reassignment is advisable to preserve the appearance of justice."[25]
Even where there is reason to believe that a district judge would fairly conduct further
proceedings on remand, "in determining whether to reassign a case we consider not only whether
a judge could be expected to have difficulty putting aside his previously expressed views, but
also whether reassignment is advisable to preserve the appearance of justice."[26]  Such a decision
"does not imply any personal criticism of the trial judge,"[27] and none is intended here.  Indeed,
for example, in *United States v. Quattrone*, we ordered reassignment because "portions of the
transcript raise[d] the concern that certain comments could be viewed as rising beyond mere
impatience or annoyance" even though there was no "evidence that the trial judge made any
inappropriate statements leading us to seriously doubt his impartiality."[28]

Reassigning a case to a different district judge, while not an everyday occurrence, is not
unusual in this Circuit.[29]  Nor is reassigning a case to a different district judge an unusual
occurrence in our sister Circuits.[30]  Indeed, as noted in our accompanying opinion, reassignment

---

[25] *United States v. Londono*, 100 F.3d 236, 242 (2d Cir. 1996) (internal quotation marks and citations omitted) (abrogated on other grounds).

[26] *United States v. Campo*, 140 F.3d 415, 420 (2d Cir. 1998) (internal quotation marks omitted).

[27] *United States v. Quattrone*, 441 F.3d 153, 192-93 (2d Cir. 2006) (internal quotation marks omitted).

[28] *Id.*

[29] *See, e.g.*, *United States v. Steppello*, 664 F.3d 359, 367 (2d Cir. 2011); *United States v. Hernandez*, 604 F.3d 48, 55-56 (2d Cir. 2010); *United States v. Al-Moayad*, 545 F.3d 139, 178-79 (2d Cir. 2008); *United States v. DeMott*, 513 F.3d 55, 59 (2d Cir. 2008); *United States v. Hirliman*, 503 F.3d 212, 216 (2d Cir. 2007); *Armstrong v. Guccione*, 470 F.3d 89, 113 (2d Cir. 2006); *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 128 (2d Cir. 2003); *Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 146 (2d Cir. 2000); *United States v. Padilla*, 186 F.3d 136, 143 (2d Cir. 1999) ("In view of the district judge's statements, particularly regarding Padilla's counsel, the appearance of justice would best be preserved by reassignment.").  Additionally, it bears noting that in none of these cases was the affected district judge afforded "an opportunity to be heard" prior to the disqualification action of the Court of Appeals, much less did the affected district judge ever seek to participate in the appellate proceedings involving the district judge's decisions.

[30] *See, e.g.*, *United States v. Clawson*, 650 F.3d 530, 539 (4th Cir. 2011); *John v. Goetz*, 626 F.3d 356, 363-65 (6th Cir. 2010); *In re United States*, 614 F.3d 661, 666 (7th Cir. 2010) ("No reasonable person would fail to perceive a significant risk that the judge's rulings in the case might be influenced by his unreasonable fury toward

is simply a mechanism that allows the courts to ensure that cases are decided by judges without even an *appearance* of partiality.

Although the possible recusal of Judge Scheindlin was not raised either by the parties or the judge herself in the district court or this court, there is no barrier to our reassigning the cases *nostra sponte*. Indeed, in numerous cases in recent years, we have found it appropriate to reassign a case without the issue having been raised or briefed by the parties or considered by the district judge.[31] To be sure, in the usual case, "a federal appellate court does not consider an issue not passed upon below."[32] But as Justice Black, writing for the unanimous Supreme Court, recognized more than seventy years ago, "[t]here may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court . . . below."[33] More recently, Justice Souter, writing for the Court, reaffirmed that when an appellate court may consider a legal issue not raised below is a "matter 'left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases,'"[34] and we recently

---

the prosecutors."); *Microsoft Corp.*, 253 F.3d at 107-117; *In re Boston's Children First*, 244 F.3d at 164; *United States v. Tucker*, 78 F.3d 1313, 1324 (8th Cir. 1996) (stating that courts of appeals in the first instance are empowered to reassign cases where, under 28 U.S.C. § 455(a), the district judge's "impartiality might reasonable be questioned"); *United States v. Cooley*, 1 F.3d 985, 992-96 (10th Cir. 1993); *In re School Asbestos Litig.*, 977 F.2d 764, 798 (3d Cir. 1992); *United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989) ("We have the authority to order reassignment of a criminal case to another district judge as part of our supervisory authority over the district courts in this Circuit."); *Brown v. Baden*, 815 F.2d 575, 575 (9th Cir. 1987); *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1120 (5th Cir. 1980).

[31] *See, e.g., Steppello*, 664 F.3d at 367; *Cullen v. United States*, 194 F.3d 401, 408 (2d Cir. 1999); *Londono*, 100 F.3d at 242 (abrogated by statute on other grounds); *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 37 (2d Cir. 1988); *see also United States v. Awadallah*, 436 F.3d 125, 135 (2d Cir. 2006) (noting that in some reassignment cases, the reassignment has been "initiated *sua sponte* by the court on the defendants behalf").

[32] *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).

[33] *Hormel v. Helvering*, 312 U.S. 552, 557 (1941).

[34] *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 (2008) (quoting *Singleton*, 428 U.S. at 121).

reaffirmed the same principle.[35]  Given the importance of maintaining the judiciary's appearance of impartiality, we think that it is well within our discretion to order reassignment in these cases.

### CONCLUSION

This opinion explains the basis for our order of October 31, 2013, directing the reassignment of these cases to a randomly selected district judge and supersedes that order.  To reiterate, we have made no findings that Judge Scheindlin has engaged in judicial misconduct. We conclude only that, based on her conduct at the December 21, 2007 hearing and in giving the interviews to the news media in May 2013, Judge Scheindlin's appearance of impartiality may reasonably be questioned within the meaning of 28 U.S.C. § 455 and that "reassignment is advisable to preserve the appearance of justice."[36]

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[35] *See United States v. Sum of $185,336.07 United States Currency Seized From Citizen's Bank Account L7N01967*, 731 F.3d 189, 195 n.6 (2d Cir. 2013).

[36] *Londono*, 100 F.3d at 242.

15

# APPENDIX A

13-3123; 13-3088
*Ligon, et al. v. City of New York, et al.; Floyd, et al. v. City of New York, et al.*

# United States Court of Appeals

### FOR THE
### SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 31st day of October, two thousand thirteen.

Present:

John M. Walker, Jr.,
José A. Cabranes,
Barrington D. Parker,
*Circuit Judges.*

_____

Jaenean Ligon, et al.,

*Plaintiffs-Appellees.*

v.                                                                        13-3123

City of New York, et al.,                                    (Corrected)

*Defendants-Appellants,*

_____
_____

David Floyd, et al.,

*Plaintiffs-Appellees.*

v.                                                                        13-3088

City of New York, et al.,

*Defendants-Appellants,*

_____

Pending before the Court is a motion filed by Appellants City of New York et al. seeking a stay of the District Court's August 12, 2013 remedial order and preliminary injunction ("Remedies Opinion").

It is hereby ORDERED that the District Court's January 8, 2013 "Opinion and Order," as well as the August 12, 2013 "Liability Opinion" and "Remedies Opinion," each of which may or will have the effect of causing actions to be taken by defendants or designees of the District Court, or causing restraints against actions that otherwise would be taken by defendants, are STAYED pending the disposition of these appeals.

The appeal by defendants in both (consolidated) actions shall continue in the normal course, under the following schedule:

Defendants shall perfect their appeals by January 24, 2014.

Plaintiffs shall file by February 28, 2014.

Defendants shall reply by March 14, 2014.

Oral argument shall be heard on a date after March 14, 2014, to be set by the Court in due course.

The cause is REMANDED to the District Court for the sole purpose of implementation of this Order, and the mandate shall otherwise remain with this Court until the completion of the appeals process.

Upon review of the record in these cases, we conclude that the District Judge ran afoul of the Code of Conduct for United States Judges, Canon 2 ("A judge should avoid impropriety and the appearance of impropriety in all activities."); *see also* Canon 3(C)(1) ("A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . ."), and that the appearance of impartiality surrounding this litigation was compromised by the District Judge's improper application of the Court's "related case rule," *see* Transfer of Related Cases, S.D.N.Y. & E.D.N.Y. Local Rule 13(a),[1] and by a series of media

---

[1] In a proceeding on December 21, 2007 involving the parties in *Daniels v. City of New York*, No. 99 Civ. 1695 (S.D.N.Y. filed Mar. 8, 1999), the District Judge stated, "[I]f you got proof of inappropriate racial profiling in a good constitutional case, why don't you bring a lawsuit? You can certainly mark it as related." She also stated, "[W]hat I am trying to say, I am sure I am going to get in trouble for saying it, for $65 you can bring that lawsuit." She concluded the proceeding by noting, "And as I said before, I would accept it as a related case, which the plaintiff has the power to designate." Two of the attorney groups working on behalf of plaintiffs in *Daniels*, a case

interviews and public statements purporting to respond publicly to criticism of the District Court.[2]

Accordingly, we conclude that, in the interest, and appearance, of fair and impartial administration of justice, UPON REMAND, these cases shall be assigned to a different District Judge, chosen randomly under the established practices of the District Court for the Southern District of New York. This newly-designated District Judge shall implement this Court's mandate staying all proceedings and otherwise await further action by the Court of Appeals on the merits of the ongoing appeals.

In taking these actions, we intimate no view on the substance or merits of the pending appeals, which have yet to be fully briefed and argued.

The mandate shall ISSUE FORTHWITH for the sole purpose of implementation of this Order and shall otherwise remain in this Court.

In the interest of judicial economy, any question, application, or further appeal regarding the scope of this Order or its implementation shall be directed to this panel, which will hear the case on the merits in due course.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk



---

challenging the New York Police Department's stop-and-frisk practices, helped file *Floyd* the next month. *See generally* Joseph Goldstein, *A Court Rule Directs Cases Over Friskings to One Judge*, N.Y. Times, May 5, 2013.

[2] *See, e.g.*, Mark Hamblett, *Stop-and-Frisk Judge Relishes her Independence*, N.Y. Law Journal, May 5, 2013; Larry Neumeister, *NY "Frisk" Judge Calls Criticism "Below-the-Belt*," The Associated Press, May 19, 2013; Jeffrey Toobin, *A Judge Takes on Stop-and-Frisk*, The New Yorker, May 27, 2013.

# APPENDIX B

1

7clPdanC

1  UNITED STATES DISTRICT COURT

1  SOUTHERN DISTRICT OF NEW YORK

2  -----------------------------x

2

3  DANIELS,

3

4            Plaintiff,

4

5       v.

5

6  THE CITY OF NEW YORK,

6

7            Defendant.

7

8  -----------------------------x

8                          New York, N.Y.

9                          December 21, 2007

9                          4:50 p.m.

10

10  Before:

11

11            HON. SHIRA A. SCHEINDLIN,

12

12                          District Judge

13

13

14

15

16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

2

7clPdanC

1    (In open court)

2    MS. GROSSMAN:  Your Honor, may I just bring one issue

3  to your attention?

4    THE COURT:  Not until I reach you.

5    Good afternoon, Mr. Moore.

6    MR. MOORE:  Good afternoon, Judge.

7    THE COURT:  Good afternoon, Ms. Costello.

8    MS. COSTELLO:  Yes, good afternoon, your Honor.

9    THE COURT:  Mr. Franklin.

10    And who is the person in between all of you?

11    MS. COSTELLO:  Your Honor, this is Garrett Wright, he

12  is a recent law graduate from our office.

13    THE COURT:  And good afternoon, Ms. Grossman and Ms.

14  Donahue.

15    Yes, what is it?

16    MS. GROSSMAN:  There may be some reference to some

17  confidential material during our conference, and I just wanted

18  to bring that to the Court's attention, in that we believe the

19  courtroom might have to be sealed for a very brief moment.  For

20  now, plaintiff's counsel is not prepared to raise those issues

21  while we have other people here in the courtroom.

22    I think we are fine to keep the courtroom open.

23    THE COURT:  I know who two of the people are, they are

24  here on the criminal case.  Who are the other people?

25    A VOICE:  We are with the Center for Constitutional

    SOUTHERN DISTRICT REPORTERS, P.C.       (212) 805-0300

7clPdanC

1    Rights.

2          THE COURT:  Are you both attorneys?

3          A VOICE:  I am an attorney.

4          I am a paralegal.

5          THE COURT:  They are -- I understand your point.  As

6    soon as I can, I'd be happy to get the criminal case out of the

7    courtroom.  As soon as I can.

8          Let me get started on this matter of Daniels versus

9    The City of New York.

10          I have a letter from the plaintiffs dated December 14,

11    2007.  And they are seeking a number of things.  But I suppose

12    on the most immediate basis they are seeking some kind of an

13    order extending the Court supervision by no less than a few

14    months, for the sole purpose of letting them fully brief the

15    request for relief in this letter.  So there is no rush.

16          So they are saying, the best way to have no rush and

17    have no air is to have the defendant consent to a two-or-three

18    month adjournment minimally, just so everybody can get these

19    issues fully briefed and on the table.  And if the Court denies

20    all the relief, so be it.

21          But rather than have them work it out in eight or nine

22    days, you are saying just to get some kind of interest of

23    justice extension or something.

24          So I won't go into the rest of the relief they seek,

25    more in terms of summarizing the letters, but the largest

          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

4

7clPdanC

1   overall summary is that there has been a lack of compliance in

2   various ways with the stipulation of settlement. And so the

3   Court should modify the stipulation of settlement order,

4   specific performance of certain aspects of the stipulation of

5   settlement.

6        And then they ask for the third point of relief, which

7   is what I think you were referring to, where they think there

8   should be a modification of the protective order as to some of

9   the terms that have been declared confidential.

10       One reason is they say the Court will have to use some

11   of the confidential information to determine what to do with

12   the motion. But, secondly, they are saying some of it has been

13   disclosed by the defendant in another context, and it is

14   already much discussed, and you should withdraw the

designation

15   if it has been publicly disclosed.

16       Then I received a letter in response dated December

17   19, but actually received in chambers December 20, which was

18   yesterday. And yesterday was a relatively busy day on the

19   bench. So the long and short of it, I haven't had a chance to

20   study the attachments carefully. But I did have the

21   opportunity to read the letter, which itself was long, I guess,

22   the pages aren't numbered so I can't tell how many, there is a

23   lot of single-spaced pages, five or six. And I did read them.

24       And the quick summary of the defense letter is that

25   plaintiffs want to pretend that the settlement agreement says

        SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

5

7clPdanC

1   things it doesn't say.  So the alleged breaches aren't breaches

2   at all, because the settlement doesn't require the defendant to

3   do what the plaintiffs say is a breach.

4        And defendants write a number of times in the letter,

5   plaintiffs may have wanted the stipulation of settlement to say

6   these things, but it doesn't.  And there were intense and

7   detailed settlement negotiations.  And if they didn't get what

8   they didn't get, they can't complain about it now.

9        And so the defendant opposes all the requests for

10  relief, opposes any modification of the stipulation, opposes

11  any order for specific performance, opposes any extension of

12  the December 31 deadline, and opposes the modification of the

13  protective order.

14        All of that said, it would nonetheless be helpful to

15  the Court and all the parties, in the nine days remaining

16  between now and the 31st of December, to be -- deny this in an

17  orderly fashion by extending the deadline.

18        If the defendant refuses to do that, then the city is

19  will write briefs every day for the next nine days.  And if

20  that's how you want to spend your Christmas and New Year's,

21  that's up to you.

22        You may have the better of all the arguments, but I

23  need to get enough of a record to figure it out.  And if you

24  want to do that much all through Christmas and New Year's.

25        Who is carrying the lead?

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

6

7clPdanC

 1       MR. MOORE:  Ms. Costello.

 2       THE COURT:  Well, Ms. Costello, I think you have

 3  sought of the burden to make your oral argument the equivalent

 4  of a reply letter.  I think you need to answer all the points

 5  that Ms. Grossman made in her very thorough submission point

by

 6  point.  Because her points, as you notice, stay closely away

 7  from the merits, so to speak.  And they try not to tell me

 8  about whether or not, you know, there is a policy of

 9  discrimination, or whether your statistics show discrimination.

10  They want to talk procedure and they want to talk about what is

11  or isn't in the stipulation.  What rights you have or don't

12  have in the stipulation.

13       And I understand that is a contract and they are

14  saying, no matter how bad things may be, that's not part of

15  this lawsuit.

16       Do you have another lawsuit to bring?

17       But they placed some interesting alliance on the

18  Latino Officers Association of The City of New York, where they

19  quoted the Court as denying any further relief.  And they

20  thought that was a pretty good precedent for them.  And it did

21  seem to be a pretty good precedent for them.

22       For example, at one point the Court -- now there is no

23  guarantees in discrimination in the settlement document, and

24  that Court said, quote, even a convincing demonstration of

25  persistent discrimination would not mean that the defendants

    SOUTHERN DISTRICT REPORTERS, P.C.    (212) 805-0300

7clPdanC

1  are violating the provisions of the settlement agreement.

2      That, sort of, is exactly the situation I may be in.

3  You may be sort of seeing problems that are all very

4  interesting but not part of this settlement agreement. So I

5  think you need to give me a reply brief, if you wish, orally.

6      MS. COSTELLO: Yes, your Honor. I can try my best.

7      One point that the city raises about just the fact

8  that there are no in substantial remedies in the consent

9  decree.

10     THE COURT: I have the consent decree. I think

11  somebody attached it as Exhibit A.

12     MS. GROSSMAN: Yes, your Honor.

13     THE COURT: So you are going to have to show me, don't

14  tell me you disagree, show me the language.

15     MS. COSTELLO: In section C1, your Honor, in section

16  C1.

17     Let me just back up one second, your Honor. I think

18  there were two ways, and this is part of what we would like to

19  brief for the Court, there are two ways that the Court could

20  extend the life of the consent decree and also grant our

21  request for modification. One is within the Court's equitable

22  powers and the second is standard under Ruffo for modification.

23     I think what Ms. Grossman's letter focuses on is the

24  straight reading, the non-compliance and specific performance

25  and contempt proceeding that would result, flow from that
which

SOUTHERN DISTRICT REPORTERS, P.C.    (212) 805-0300

8

7clPdanC

1  the dispute resolution mechanism in the agreement itself, if
2  you look at the standard under Ruffo, a much more flexible
3  standard that takes into account the public interest and the
4  change in circumstances. The city doesn't address that at all.

5      THE COURT: No, they never cite Ruffo, I don't think
6  they did. I read it fairly quickly.

7      MS. COSTELLO: Under the standard in Ruffo, we think
8  that the modification would be appropriate.

9      Putting that aside for the moment, and just looking at
10  the language of the consent decree, section C1 of the
11  stipulation requires that the NYPD shall have a written policy
12  regarding racial or ethnic or national origin profiling, that
13  complies with the United States Constitution and the New York
14  State Constitution.

15      And I think that we have shown that there is evidence
16  of racial profiling going on.

17      THE COURT: Even if there is evidence of racial
18  profiling, that paragraph doesn't have anything to do with
19  that.

20      It says that the NYPD shall have a written policy that
21  complies with the Constitution of both the United States and
22  New York State. Okay, that's what they have to have.

23      Do they have -- let me give you an example, let's say
24  they had a written policy that complies with it, and that they
25  violated it all the time. They wouldn't have violated

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

7clPdanC

1  paragraph 1.  Paragraph 1 says you have to have a written
2  policy that complies with the --

3      MS. COSTELLO:  -- if you read paragraph C1 in
4  connection with, which requires training on the policy,
5  training on the officers in stop and frisk procedures, in
6  section E there is a provision in there for palm cards which go
7  out to individuals in the community.  If they believe they have
8  been improperly stopped and frisked they can file a complaint
9  with the Civilian Complaint Review Board.

10      We think that all of that means there was an
11  implication of this policy --

12      THE COURT:  -- you are asking me to rewrite your
13  settlement agreement.  This is hypothetical, it is not a fact.

14      I don't want anybody to be confused by reading the
15  record.  I am saying hypothetically if they have a written
16  policy that complies with the Constitution of the United States
17  and of New York State, regarding racial and ethnic origin
18  profiling, they satisfied number 1, paragraph C1.

19      Even if there were evidence that they were violating
20  their own policy, they still say that.

21      Number 1 only requires them to have appropriate
22  written policy.

23      That seems to be the whole point of this notion that
24  there is no guarantees in this agreement.  Nowhere in the
25  agreement is the city guaranteed that it will not have an

7clPdanC

1  inappropriate racial profiling. There is no guarantee in here.
2  It is exactly the same thing that Judge Kaplan was trying to
3  say.
4        MS. COSTELLO: If you look at section C2, which says
5  that the NYPD may alter the policy --
6        THE COURT: -- let me read that.
7        It says: (Reading) The NYPD may alter the racial
8  profiling policy at any time in compliance with paragraph C1.
9        That just means if they have the policy that isn't in
10  compliance, and they want to make a written policy that is in
11  compliance, I don't see that number 2 provides you the
12  guarantee that you seem to be talking about.
13        MS. COSTELLO: I think number 2 also relates to
14  altering the policy. And I think that the intent of this
15  agreement was not to bargain for a policy that meant nothing
16  that the NYPD could just go out and violate people's Fourth
17  Amendment rights and Fourteenth Amendment rights with no
18  recourse to plaintiffs. I think that would --
19        THE COURT: -- maybe it is an -- why don't you file a
20  lawsuit?
21        MS. COSTELLO: We did, we are here.
22        THE COURT: No, you are struggling with the December
23  31, 2007 deadline in a 1999 case. And if you got proof of
24  inappropriate racial profiling in a good constitutional case,
25  why don't you bring a lawsuit? You can certainly mark it as
      SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

7clPdanC

 1  related.

 2      How could it not be related to this whole long seven
 3  or eight years we have lived together on this case?  Because
 4  you are trying to put a square peg in a round hole.  And trying
 5  to force yourselves to argue what the settlement means, that it
 6  doesn't mean if you have a timely lawsuit -- you seem to have
 7  compiled interesting arguments Ms. Grossman has not rebutted
--

 8  maybe she did, that's why we didn't do something, because we
 9  didn't want them to write this letter, she -- let's just say
10  she hasn't substantially responded to your letter.  If one had
11  only your letter, it would look like you have a lawsuit.  So
12  instead of struggling to telling me about a stipulation of
13  settlement, why don't you craft a lawsuit?

14      MS. COSTELLO:  We could, but the only other issue
15  is --

16      THE COURT:  That's what would I like to turn to.

17      Can we talk about the noncompliant?

18      MR. MOORE:  Judge, could I just say a few things,
19  before we do that?  About the notion that what we were
20  bargaining for was simply a piece of paper that had no
21  substance to it.

22      THE COURT:  I didn't say it had no substance.  But it
23  didn't have the word guarantee.  Didn't she write in her letter
24  there were no guarantees?  And Judge Kaplan talked about that
25  in his settlement.  I didn't have time to read his decision, I

12

7clPdanC

1  only read these two letters.  Sometimes a Judge has some time
2  and sometime not.  I didn't have a lot of time, especially the
3  city's letter just came in yesterday.

4        MR. MOORE:  To the extent that given my involvement
5  with the case in the beginning, I can shed any light on that,
6  on what our understanding was, about what we were bargaining
7  for.

8        We believed that we were getting a policy that the
9  city would put into effect.  That was, it is reason why we
10  brought the lawsuit.  And certainly as Ms. Costello said, there
11  were not just -- they didn't just agree to change the written
12  policy, they agreed to do several things.

13        THE COURT:  But we have to find them chapter and
14  verse, because their argument -- I'd like to interrupt you just
15  for a minute, and take this criminal case.

16        (Recess)

17        THE COURT::  I think you were speaking, Mr. Moore.

18        MR. MOORE:  I had been making a general observation
19  about my understanding in the course of our negotiating this
20  decree.

21        I find it hard to believe that The City of New York
22  would, in effect, say to this Court, or to anybody, well, we
23  have a policy, but we don't have to follow it.

24        THE COURT:  I was saying as a hypothetical.  I didn't
25  say they said --

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

13

7clPdanC

1       MR. MOORE:  -- I think they say that in their letter,

2  that we can change the policy -- we can -- as long as we have a

3  written policy, we can essentially do whatever we want.

4       I just think that if that's, in fact, what the

5  position of the city of New York is, it is a significant

6  difference from what we understood we were getting, which was

a

7  policy that had some substance to it.  Not just a policy on

8  paper.

9       It's sort of like passing the Thirteenth Amendment

10  abolishing slavery as long as we have an amendment that you

11  can't have slavery.  But in practice we still have slavery.

12      It seems to me it is a hyper technical interpretation

13  of the words in the decree.  The decree was meant to address

14  what we believed was a serious issue with respect to racial

15  profiling which, apparently, has not gone away.  And even their

16  own Rand study that they commissioned, suggests that at least

17  with respect to the frisks, maybe not the stops, but even the

18  frisks, that there is a racial disparity, that's their own

19  expert's testimony, their own expert's report.

20      So I just find the notion that we were tying to

21  basically engage in a law school exercise of getting a policy

22  that had no substance --

23      THE COURT:  -- well --

24      MR. MOORE:  -- contrary to my understanding and

25  contrary --

THE COURT: -- I will quote from page 4 of the letter, the first full paragraph.

(Reading) In conclusion, it is important to state that plaintiffs vigorously bargained for a provision which would create for an obligation on the part of the defendants to guarantee that there would be no racial profiling. The city refused to agree to such a term for reasons here are negotiated.

MR. MOORE: I don't know, there is no citation to that, there is no -- it is sort of, in a way, it was -- maybe it was by being silent they hoped that we wouldn't say to you, say to the city, and you are going to comply with that, you are going to actually implement the policy.

I don't think -- I mean, a municipality that agrees to adopt a policy should be then saying, now that we have adopted a written policy, we don't have to implement it in practice. When, in fact, they were making -- they were, you know, there was information sent out that there was a racial --

THE COURT: -- what I am trying to say -- I am sure I am going to get in trouble for saying it, for $65 you can bring that lawsuit. You can simply --

MR. MOORE: $350.

THE COURT: I knew I had it wrong.

The city violates its own written policy, the city has a policy that violates -- they have violated their policy, here

7clPdanC

1  is the proof of it, please give us the remedy.  Injunction or
2  damages, or whatever lawyers ask for in compliance.
3      So for $350 you can bring that lawsuit and it is
4  timely.
5      I don't understand why we have to potentially have,
6  you know, months of briefing when it does fit under this
7  stipulation or it doesn't, that Ruffo applies or it doesn't
8  that the Court has the power to extend the supervision, that we
9  want an immediate appeal to the circuit.  Why do you need that
10  if you have a lawsuit?  Bring it.  They have a written policy,
11  right?
12      MS. GROSSMAN:  Yes, your Honor.
13      THE COURT:  If you think they are violating their
14  written policy, sue them.
15      MS. COSTELLO:  Your Honor, just two quick points.  One
16  is about the point your Honor's raising about just filing a new
17  lawsuit.
18      The one issue for us in that particular scenario is
19  that the protective order is still in effect.  Once this case
20  ends, we have to give back all of the data.  So unless the
21  Court is prepared to modify the protective order and lift it,
22  we would not have the benefit of that data until we filed a new
23  case and engaged in discovery and battles with the city to get
24  that same information again, and then another battle over a
25  protective order again.

SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

16

7clPdanC

1      So we see it in the interests of judicial economy, if
2   the Court would lift the protective order in this case, since
3   under the language of the stipulation -- and we pointed, if the
4   information is otherwise made publicly available.
5      THE COURT:  That's something I do want to talk to the
6   city about.
7      If it is publicly available, then I don't understand
8   why you can't use publicly-available information in drafting
9   your suit, or for whatever other purpose.  If something is
10   publicly available and I can get it and anybody who is in the
11   public library can get it, or using the Internet can get it, if
12   anybody calls the city's green book office, can get it, then it
13   is public.
14      Can you do this from public information or not?
15      MS. COSTELLO:  It is not that publicly available.
16      THE COURT:  You can't have it both ways.  If it is
17   public you can use it and I don't think the city can ever argue
18   that you can't.
19      Once you backtrack and say it is really not public,
20   then you are making their argument.
21      MS. COSTELLO:  It is public.  The only problem is that
22   the information that the city has put out, just as Ms.
23   Grossman's letter said, it is our data, we can use it however
24   we would like to.  The information that's been put out by the
25   Rand Corporation, and we have a copy of the study, is that the
     SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

17

7clPdanC

1  Rand Corporation and the NYPD's spin using magic wands about

2  what the data means, our analysis and conversation with an

3  expert shows us different things, that the Rand information has

4  used benchmark and other statistical methods to explain away.

5  So it is publicly available in the sense that the NYPD and the

6  Rand publication has written details in the Daily News and

7  otherwise made that information available. But in the sense

8  the data that we have that may differ from what the city has

9  put out, is not publicly available. Because that's our

10 analysis and that's our impressions and our statisticians and

11 numbers of what the patterns show.

12      So our information is different than what the city

13 has, some of which is the same.

14      Rand reached some of the same conclusions about the

15 data. But they have also ignored some of the other

16 information, particularly racial disparities and the frisks

17 leading to arrests and the weapons recovery that we think are

18 indicative of racial profiling.

19      MR. FRANKLIN: Your Honor, in terms how the data is

20 collected, we have the data on discs from the city, which makes

21 it that much easier to compute.

22      This information is public, but it is public in hard

23 copies. And so it is public not only through the Rand study,

24 but also through the study that they, the city, gave to the

25 city counsel. But they are both access to the data is here,

7clPdanC

1  but it is in a format which is highly unusable in terms of

2  making statistical analysis and breaking down data, which would

3  take us months to recompile.

4       THE COURT:  As I was saying earlier, Ms. Costello

5  responded with how difficult it would be to get the material

6  again.  There is enough in the public record to craft the suit.

7  And then in that suit simply say, we want produced all that was

8  produced in the 1999 lawsuit.

9       I don't know how you could lose getting it.  It may be

10  a question of whether it is still going to be under protective

11  order or not.  But I can hardly imagine not getting it.  You

12  know what I am saying?  It is so obvious to me that any Judge

13  would require them to reproduce it to you in the same format

14  that you have it, that you will have it again.  Whether or not

15  it remains confidential.

16       MR. FRANKLIN:  We'll have it again, but we have to go

17  through the same process we have gone through.  We have to turn

18  everything back to the city under this protective order.  So if

19  we get it back we have to again recalculate the same

20  information that we already have.

21       THE COURT::  You have to go through recalculating?

22  Why would that be?

23       MR. FRANKLIN:  Because under the protective order we

24  have to give them back that information.

25       THE COURT:  Not just what they gave you?

7clPdanC

1      MR. FRANKLIN: If my reading is correct, it's what
2  they gave us and --
3      MS. COSTELLO: -- everything derived from the UF250
4  database. So it is the actual physical discs that the data is
5  contained on, which are thousands and -- tens -- hundreds of
6  thousands of entries, as well as any information that we
7  derived. So any of the work that our statistician has done
8  with coding, would have to be given back to the city. We
9  couldn't retain that information.
10     THE COURT:: Your attorney work product and published
11  material, all that stuff would have to go back?
12     That seems odd to me. I don't know why it can't be
13  stored under the terms of confidentiality. This is not
14  practical.
15     MS. COSTELLO: Your Honor, if I could, I am just going
16  to take one minute and look at the protective order to make
17  sure.
18     MR. FRANKLIN: Unless the city disputes that.
19     THE COURT: We aren't getting too far off the
20  substance, are we?
21     MR. MOORE: Judge, the protective order --
22     THE COURT:: -- where is that? Do I have that?
23     MR. MOORE: I don't think you have a copy.
24     THE COURT: Do you have that, Ms. Grossman? Is that
25  attached --

SOUTHERN DISTRICT REPORTERS, P.C.    (212) 805-0300

20

7clPdanC

1          MS. GROSSMAN:  -- your Honor --

2          MR. MOORE:  -- I can hand you up a copy, Judge.

3          THE COURT::  This is June 31, 2000 -- I'm sorry --

4    January 31, 2000.  Yes, it will be eight years this January.

5          MR. MOORE:  Paragraph 7, I think, is the provision

6    that is at issue here.

7          THE COURT::  Let's read it.  (Reading)  Within 30 days

8    after the termination of this case, including any appeals, the

9    confidential materials, including all copies, notes and other

10   materials containing or referring to information derived

11   therefrom, shall be returned to the producing party's

12   attorneys, or upon their consent, destroyed.  And all persons

13   who possess such materials shall verify their return or

14   destruction by affidavit furnished to the producing party's

15   attorneys.  And paragraph 8 says: (Reading)  The terms of this

16   order may be modified by further order of the Court.

17          So obviously 30 days after termination of this case is

18   January 30, 2008, right?  If the case terminates December 31 --

19          MS. GROSSMAN:  -- I think, your Honor, the termination

20   date was the termination when we entered into the effective

21   date of the agreement.

22          THE COURT:  It couldn't be, because -- they would have

23   owed this stuff back to you years ago.

24          MS. GROSSMAN:  They did.  They returned all documents

25   they were required to return when the agreement was executed,

          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

7clPdanC

1   and when it was finalized by the Court.

2       So the agreement incorporates the protective order and
3   basically says that the plaintiffs need to return the
4   documents, maintain the confidentiality, and return them after
5   the agreement sunsets. That's expected after the agreement
6   terminates.

7       The protective order was, the plaintiffs were subject
8   to the protective order, to maintain the confidentiality,
9   but --

10      THE COURT:  -- I am not following you at all.

11      I still say they don't have to return all that they
12  now still retain until January 30, 2008, thirty days after the
13  termination of this case.

14      I am still supervising this case, that's why you are
15  worried about my extending it even one day, because my
16  supervision runs out on December 31, '07. So I still have this
17  case. So, therefore, it is not 30 days after the termination
18  of this case. They are talking about the very material they
19  have --

20      MR. MOORE:  We got material --

21      THE COURT:  -- as recently as October. So, of course,
22  you didn't return it 30 days after the case number was closed.
23  Obviously it is not due back till January 30 or 31st of 2008.

24      All I am saying is, by then if you have a lawsuit
25  pending and need the very same material, and I have the

 SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

22

7clPdanC

1   authority to modify the terms of this order by a further order
2   of the Court, which the city agreed to, then I will, and I will
3   say, you have the material, hold on to it, remains
4   confidential, somebody says otherwise, and use it as you need
5   to use it in your new lawsuit.
6          I don't want to play games here, if there is a
7   violation of the city's racial profiling policy -- that's not
8   what it is called,.
9          MR. MOORE:  That's what it is called.
10         THE COURT:  Okay.  Strange.  Kind of a --
11         MR. MOORE:  -- it should be nonracial.
12         THE COURT:  Yes.  If there is a violation of it, there
13  is a violation, and that's a lawsuit, and that's that.
14         It still strikes me as making it more difficult, a
15  square peg in a round hole, to force it into this stipulation
16  of settlement, and got into all these questions about you tried
17  to get a guarantee.
18         You didn't get a guarantee, you fought for it, but
19  they stood firm and they didn't get it to you.  La, la, la.
20  But okay, this is only the beginning.  We can go through their
21  whole letter and respond to all their points.  We didn't get
22  too far.  You were going to -- we started with C1.
23         MR. MOORE:  Just one second, Judge.
24         THE COURT:  Yes.
25         (Discussion off the record)

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

7clPdanC

1       MS. GROSSMAN:  Your Honor, if I may just address the
2 issue of the confidentiality.
3       THE COURT:  Yes.
4       MS. GROSSMAN:  If you were to look at paragraph 4 --
5 I'm sorry, H4.
6       THE COURT:  What stipulation of settlement, A4?
7       MS. GROSSMAN:  H4.
8       THE COURT:  Yes, okay.
9       MS. GROSSMAN:  If you would bear with me, your Honor.
10 If I could just walk you through the first and explain what it
11 refers to.  The first on paragraph 4 page 11 it says, all
12 confidential documents --
13       THE COURT:  -- wait a minute, I am on page 11 -- oh,
14 H, okay.
15       MS. GROSSMAN:  (Reading) All confidential documents
16 subject to the January 31, 2000 protective order, and copies
17 made thereof, produced to plaintiffs by defendants prior to the
18 effective date, shall be returned to the Corporation Counsel's
19 office upon the effective date.  Unless prior to that date
20 defendants have expressly authorized the retention of specific
21 documents itemized in writing by plaintiffs until, at the
22 latest, the termination of the stipulation.
23       Now, let me just take a break.  That information was
24 all the documents provided during the litigation.  The
25 plaintiffs complied with that provision in the agreement and
     SOUTHERN DISTRICT REPORTERS, P.C.    (212) 805-0300

7clPdanC

1 returned all the documents to the city with the exception of a

2 few items that they wrote -- put in writing, and they were

3 allowed to maintain.

4     Now we move on to all documents provided to plaintiffs

5 in any form by defendants under the terms and during the course

6 of this stipulation shall be deemed confidential, and

7 plaintiffs shall return to the Corporation Counsel's office all

8 such documents, and any copies made thereof, upon the

9 termination of this stipulation.

10     So at the very least we know that posteffective date

11 of the agreement, the plaintiffs, under the terms of this

12 agreement, which they contracted for, which we all agreed to,

13 are to be returned to the city.

14     THE COURT: Well, that's good, but I don't think it is

15 good enough. Because I think the Court's order is ambiguous or

16 contradictory to that by saying that it extends to 30 days

17 after the termination of this case.

18     Now, you want to interpret the phrase termination of

19 this case differently than I do. I don't have it in front of

20 me, I will find it. Actually it is attached to this in the

21 protective -- the protective order --

22     MR. FRANKLIN: -- it's the last attachment.

23     THE COURT: I have it dated January 31, 2000. Is that

24 part of the stipulation of settlement -- yes, it must be,

25 Exhibit C to the stipulation of settlement. And the exhibit

    SOUTHERN DISTRICT REPORTERS, P.C.       (212) 805-0300

7clPdanC

1  itself says, the very date of the termination of this case.  So
2  I have essentially two clauses of the same stipulation of
3  settlement that disagree.  And --
4       MR. MOORE:  -- essentially what we are talking about
5  is 30 days.
6       THE COURT:  Oh, I understand.  But the city does not
7  want you to have these to be able to craft this complaint.  And
8  it also seems childish to me.  It is in your letter, it is all
9  there already.
10       As I say, I have got two conflicting clauses in front
11  of me, they are both part of the settlement,.
12       MS. GROSSMAN:  I believe, your Honor, if you were to
13  look at paragraph 4, the plain meaning --
14       THE COURT:  -- 4?
15       MS. GROSSMAN:  -- the same --
16       THE COURT:  -- H4.
17       MS. GROSSMAN:  H4.
18       THE COURT::  I know what H4 said, I don't even argue
19  that it is wrong, but it conflicts with Exhibit C.  Exhibit C
20  tells me that within 30 days of termination of the case, and I
21  say this case is open until the Court's supervision ends on
22  December 31 of 2007 --
23       MR. MOORE:  -- Judge --
24       THE COURT:  -- and it says that I have the power to
25  modify that protective order at any time.
    SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

7clPdanC

1          In terms of this -- by further order of the Court.

2          So I certainly have the power to modify that

3    protective order until December 31 of '07.

4          And so to that extent, I surely would modify it to my

5    own reading of it, which is 30 days after the case terminates,

6    which is January 30, '08.

7          I am happy to keep going with your letter if you want

8    to go through chapter and verse, and try to still make your

9    points in your letter, try to convince me. I don't like the

10   idea of having to work on it in the next eight days under that

11   gun. But that's what it is coming to. It does not seem to me

12   that would be.

13         MS. COSTELLO: Your Honor, putting aside the issue of

14   the modification as it relates to the racial profiling issues.

15         THE COURT: Let's turn to something else then.

16         MS. COSTELLO: The specific performance issues other

17   than that which would include the training.

18         THE COURT:: Let's talk about it. The city wrote

19   about that too. I don't see a subheading actually called

20   training.

21         Ms. Grossman can tell me where in this letter it is?

22         MR. MOORE: Subsection C.

23         THE COURT: Subsection C. There it is, training,

24   okay.

25         MS. COSTELLO: Basically under the agreement section,
           SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

7clPdanC

1  and I will point the Court to C5, and actually section E, of
2  the stipulation --
3      THE COURT:  -- E is the one they refer to?
4      MS. COSTELLO:  Yes.
5      THE COURT:  Training.
6      MS. COSTELLO:  We've had several conversations with
7  the city through letters and verbally about the fact that there
8  has never been any verification that the training specified in
9  section E has occurred.
10      The city's position is, as I understand it, is that we
11  are not entitled to it.  And we would disagree with that.
12      THE COURT:  Let's look at the plain language of the
13  settlement agreement.
14      I don't know how much we are going to have to read,
15  but we will read as much as we have to.
16      1:  The NYPD has conducted in-service training
17  regarding the racial profiling policy, which has been presented
18  to NYPD commands.  The NYPD shall provide annual in-service
19  training regarding the racial profiling policy.
20      2:  The NYPD shall maintain that portion of the police
21  academy curriculum that pertains to training regarding the
22  racial profiling policy.
23      3:  The NYPD shall continue to train police officers
24  about the legal and factual bases for conducting and
25  documenting stop, question and frisk activity.  Continue to
     SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

7clPdanC

1  implement the police academy curriculum for training police
2  officer recruits about the legal and factual bases for
3  conducting and documenting stop, question and frisk activity.
4  And continue to provide training for police academy
5  instructors.
6      MR. MOORE:  -- Judge --
7      THE COURT:  -- about the legal and factual bases for
8  conducting for and -- and then all I can say is that paragraph
9  4 says, the NYPD shall continue to train, and 5 says the NYPD
10  shall continue to provide training.
11     Number 6 says, the police academy will continue to
12  consider informally, factual incidents brought to its attention
13  for use in training.
14     7 says, the NYPD is reviewing the recruit curriculum
15  and is part of the process, the Commissioner will conduct a
16  review.
17     8 says, the NYPD will continue to provide full
18  promoted sergeants and lieutenants with training,
19     9:  The municipal defendants have provided to -- and
20  10 says:  The NYPD shall continue to document training provided
21  for in this stipulation in the same manner and consistent with
22  existing practices and procedures employed by the NYPD.
23     Now, I have read it all.  Nowhere does it say they
24  will turn anything over to class counsel or report to class
25  counsel.

7clPdanC

1    MR. MOORE:  To verify, the word verification does not
2  appear.
3    THE COURT:  Or report or turn over --
4    MR. MOORE:  -- if you look at subsection C5 of the
5  agreement.
6    THE COURT:  Okay, let me now turn to C5.
7    The NYPD shall supervise, monitor and train officers
8  regarding the racial profiling policy as set forth below.
9    MR. MOORE:  So that's an affirmative duty on the NYPD.
10    THE COURT:  That's true.
11    MR. MOORE:  To supervise, monitor and train officers
12  regarding the racial profiling.
13    In order to determine whether they are fulfilling
14  their duty, whether they have lived up to the terms of this
15  agreement, we would argue that they should tell us what they
16  are doing.
17    THE COURT:  Why didn't you get that into the
18  agreement?  Why didn't you say, shall produce on a quarterly
19  basis its training materials for counsel's review?
20    There is nothing in there.  There are no obligations
21  other than to do it.  But not to let you know through
22  documentation.
23    MR. MOORE:  But if they are not doing it, the only way
24  we can know if they are not doing it is by asking them if they
25  are doing it.

SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300

7clPdanC

1       THE COURT: I understand.

2       MR. MOORE: It seems to me that that's an inherent

3  obligation on the part of the city.

4       THE COURT: But this thing was signed January 9, 2004.

5  I mean, that's almost four years ago. Did you ever write them

6  a demand letter and say, please document that you are doing

7  training? Or we believe you are -- or we believe you are not

8  doing training, we are worried about that, please send us

9  copies --

10      MS. COSTELLO: -- we did --

11      THE COURT:: -- why are we doing this on December 21

12  of '07?

13      MS. COSTELLO: We did, your Honor, we asked in April,

14  and some of those letters were provided to the Court.

15      THE COURT: '07?

16      MS. COSTELLO: Yes, this year. We asked them in

17  February, in April.

18      THE COURT: For what?

19      MS. COSTELLO: For proof that they were conducting the

20  training in accordance --

21      THE COURT: -- and their response was?

22      MS. COSTELLO: That they did not read the stipulation

23  to require it.

24      THE COURT: Why didn't you come to court then? It is

25  nine days before December 31.

SOUTHERN DISTRICT REPORTERS, P.C.     (212) 805-0300

7clPdanC

1    MS. COSTELLO:  Part of this, your Honor, is that we
2  were attempting to work it out with the city.  Ms. Grossman and
3  I, in September, were --
4    THE COURT:  -- I hear you.  But the position you put
5  me in is to have some kind of real brief motion, you would like
6  to brief these issues, you would like to brief Ruffo and its
7  progeny orally.  You want your brief due on 10 a.m. on the 26th
8  and their brief at 10 on the 28th, and the reply on the 31st?
9    MS. COSTELLO:  That's what we proposed, there be six
10  months of extension.
11    THE COURT:  Haven't we been down that road once?
12    MS. COSTELLO:  Yes, we have, your Honor.  Some of the
13  cases that we cited before we would still say that the
14  equitable power of the Court --
15    THE COURT::  Didn't I do it and undo it?
16    MS. COSTELLO:  You did undo it.
17    THE COURT:  And wrote an opinion too.
18    MS. COSTELLO:  Part of that, your Honor, was that we
19  had not followed the dispute resolution in the decree and we
20  have --
21    THE COURT:  -- they wrote you didn't.  Didn't you
22  write that, Ms. Grossman, they didn't follow the dispute
23  resolution again?
24    MS. GROSSMAN:  That's right.
25    MS. COSTELLO:  We disagree.
    SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

32

7clPdanC

1  THE COURT:  But I am not being given much time to
2  understand that.  They are saying you didn't, they are saying
3  something about 30 days.  In what way didn't they file a
4  dispute resolution --
5  MS. GROSSMAN:  -- they were supposed to wait until 30
6  days to seek relief from the Court.
7  THE COURT:  Wait until 30 days from what?
8  MS. GROSSMAN:  From the date that they have, gave
9  notification to us.  The notification that they are required to
10  give is by fax and hand service.
11  THE COURT:  And they faxed you a letter.
12  MS. GROSSMAN:  Friday evening.
13  THE COURT:  December what?
14  MS. GROSSMAN:  November 30, Friday evening, 7:03 p.m.
15  And they did not deliver a document by hand Friday for us to
16  have notice.  And it wasn't until Monday, December 3, there was
17  no by hand delivery at all.  So they haven't complied with the
18  terms of the agreement in terms of giving proper notice, which
19  then would bring us beyond the December 31 sunset provision
in
20  terms of when they would be able to seek relief from the Court.
21  The first time they raised the issue about the racial
22  profiling was on November 30.
23  MR. MOORE:  Judge --
24  MS. GROSSMAN:  -- the first time they raised an issue
25  about another item concerning joint community forums was on
SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

7clPdanC

1  November 30.

2       THE COURT:  Which falls within the 30 days.  But you
3  are saying out of the technicality, the reason that it is
4  important was because, that's important because you weren't in
5  the office at 7:03 on a Friday night and didn't see it until
6  Monday.

7       The city is saying it didn't have actual notice on
8  November 30, but on December 3.

9       MR. MOORE:  We were before you in April, and we were
10  raising the issues about the fact that they hadn't produced the
11  database.  And, you know, we didn't get that until October.

12       THE COURT:  I know --

13       MR. MOORE:  -- that sort of sidetracked us a little
14  bit.  And I think, though, that now that we have had the
15  data --

16       THE COURT::  -- but that didn't relate to things like
17  not having proof of training, and proof of community forum,
18  which you didn't think was going on.  There were other
19  complaints that you could have raised in time to get some real
20  rulings on violations or not.

21       I might have still said at the end of the day, with
22  respect to training, they undertook no obligation to report to
23  you, you would argue back, no, but they took on an obligation
24  to do it, how are we supposed to judge compliance if we can't
25  get discovery.  But discovery is different than a reporting
   SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

34

7clPdanC

1  requirement.

2       MR. MOORE:  I guess it brings me to my other point
3  which if, in fact, the city is of the opinion that all they
4  have to do is have a written policy, and they have a written
5  policy, what harm is there to the city in agreeing to extend
6  this for two months, three months, whatever it may be, if in
7  fact, as they say, are all that it requires them to do is have
8  something on paper that says we won't engage --

9       THE COURT:  -- you don't know if they have a written
10  policy?

11       MR. MOORE:  I do know that they implemented a written
12  policy.  There was -- I haven't looked at it in the last few
13  weeks.  But I do believe there is a written policy.

14       My point is that if, in fact, all they are required to
15  do under this settlement agreement is to have a written policy,
16  what harm is there in extending this agreement for a couple of
17  months, for us to resolve these issues and decide, for
18  instance, decide whether we want to just put this thing to bed
19  and, you know, start another case.  If that's what we want to
20  do.

21       If we believe that that evidence of racial profiling
22  is there, you make a very strong point about trying to put a
23  square peg in a round hole, whatever that might be.  But my
24  point is, what harm would there be -- I guess the answer is,
25  it's a common-sense argument.  It is not a lawyerly argument.

     SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

35

7clPdanC

1   That's the problem.

2         THE COURT: Unfortunately we all chose this
3   profession, and some days we ask yourselves why.

4         Lawyers have the right to stand on technicalities.
5   The Supreme Court issued some opinion last year that said, yes,
6   the federal Judge -- that -- the Supreme Court said you are
7   time barred, you have to file an appeal ten days after
8   judgement, telling your attorney you want an appeal is not
9   enough. You should have listened to that Federal Judge.

10        The consenting Justices were outraged, but there you
11   have it. The other justices thought it was a fine thing to say
12   it on the technicality. The District Judge told the prisoner
13   you have that time. A career prisoner should have known better
14   than a federal Judge. The law is full of technicalities.

15        Why doesn't the city agree to extend it? Because they
16   don't want to. And if they don't have to, they don't want to.

17        What am I going to do? Tell them, practically
18   speaking, he's right, why don't you give us all time to brief
19   this and decide this? They could say, that's very nice, but we
20   decline.

21        You want me to get it on the -- would you agree to
22   extend this two to three months? We can get a briefing
23   schedule.

24        MS. GROSSMAN: Your Honor, I am not authorized to
25   agree to that.

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

36

7clPdanC

1        MS. COSTELLO:  I have one point on the training issue,
2  Exhibit 1 to our letter, the December 4 letter that I wrote to
3  Ms. Grossman.  If you look at the third page -- page 2 at the
4  bottom --
5        THE COURT:  -- I got a problem, the November 30
6  letter --
7        MS. COSTELLO:  -- no, I'm sorry, the letter that we
8  delivered to the Court last Friday.
9        THE COURT::  Oh, yes.
10       MS. COSTELLO:  Exhibit 1 to that.
11       THE COURT::  Exhibit 1 is the November 30 letter.
12       MS. COSTELLO:  Maybe it is Exhibit 2, your Honor.
13       THE COURT:  Exhibit 2 is the February 16 letter.
14       MS. COSTELLO:  There should be a September 4 letter,
15  your Honor.
16       THE COURT:  That's Exhibit 3.  Page 2 at the bottom.
17       MS. COSTELLO:  On the next page we explain to the city
18  that we think they are not in compliance with the training
19  requirements, just as we thought they were not in compliance
20  with the auditing of the training requirements.
21       THE COURT:  But you didn't bring it to my attention,
22  is all I am trying to say.  Of course, now what you are saying
23  is you did satisfy the dispute resolution mechanism.  Is that
24  your argument, that by the September 4 letter you did, in fact,
25  satisfy the dispute resolution requirement?
      SOUTHERN DISTRICT REPORTERS, P.C.     (212) 805-0300

7clPdanC

1          MR. MOORE: Yes.

2          MS. COSTELLO: As Ms. Grossman and I had conversations

3    in which we were attempting to see if the city would give us

4    some documentation showing that the training had occurred.

5          THE COURT: Ms. Grossman, did the plaintiff satisfy

6    the dispute resolution by raising the issue on September 4?

7          MS. GROSSMAN: On the training?

8          THE COURT: In writing.

9          MS. GROSSMAN: The one piece on the training, yes.

10   But when I mentioned that the issue about the racial profiling

11   was first -- first --

12         THE COURT: -- but we got lots of issues. Let's deal

13   with training.

14         So they satisfied the dispute --

15         MS. GROSSMAN: -- yes.

16         THE COURT: What flows from the fact that they said

17   the dispute resolution mechanism on the training point? And

18   you raised some kind of defense.

19         MS. GROSSMAN: I'm sorry, your Honor, were you

20   addressing me?

21         THE COURT: I said, what flows from the fact that they

22   satisfied the dispute resolution mechanism.

23         MS. GROSSMAN: Our response to that, your Honor, was

24   that they misinterpreted the agreement, that they are rewriting

25   the agreement.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

38

7clPdanC

1      THE COURT:  Meaning procedurally, if they satisfied
2  the dispute resolution mechanism by giving you 30 days, what
3  flows from that, they are allowed to come to court.
4      MS. GROSSMAN:  Yes.
5      THE COURT:  So they alluded to come to court on that
6  one because they satisfied the dispute -- and they want to say
7  because of, in their view, of the training requirement being
8  violated, that is a basis for this Court to extend supervision,
9  and/or compel specific performance.
10      MS. GROSSMAN:  Your Honor, the agreement is very
11  specific.  It permits specific performance.  And then I would
12  submit, your Honor, that they have to provide sufficient notice
13  to the Court to enable all parties to perform.  And to give
14  seven days.  And to give notice on this schedule is not what I
15  believe is contemplated by the agreement.
16      THE COURT:  Well, I don't know.  They satisfied the
17  dispute resolution mechanism, we all agree with that, on this
18  issue, and they, then they have the right to come to court.
19  And they have come to court.
20      I can say, based on their complaint regarding
21  training, I need to have full briefings in order to give the
22  Court an appropriate amount of time to decide whether there
has
23  been a violation.  I have to extend the deadline to decide the
24  motion properly.
25      MS. GROSSMAN:  We would submit, your Honor, that
       SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

1  that's not the dispute -- that is not a remedy available under
2  the agreement.
3      THE COURT:  The remedy you agreed to is, they can
4  bring a dispute to court after giving you 30 days notice.
5      MS. GROSSMAN:  But there is no --
6      THE COURT:  -- inherent power.  I can't decide a
7  motion that's not briefed.  It is timely, it was brought before
8  the expiration of this agreement, they satisfied the dispute
9  resolution mechanism, the Court has the power to operate its
10  own docket.  I can't decide a motion, an important one, that's
11  not briefed.
12      Is there any other exhausted issue, so to speak,
13  besides the training one?  Should we continue with the letter
14  since they agreed that you -- what's the next one?
15      MS. GROSSMAN:  Your Honor, I would just add on the
16  training piece, there is no good-faith belief given.  What we
17  just walked through of the verification that there was an
18  absence of language --
19      THE COURT:  -- but Mr. Moore makes some practical
20  point.  There is no point in the city agreeing to do something,
21  there is no way to find out whether they did comply.  Otherwise
22  you have a right without a remedy.  You have a meaningless
23  agreement.
24      That cannot be the intent of the parties to say, we
25  will provide training but ha, ha, if we don't, you can't find

SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

7clPdanC

1   out and you can't take us to go task for it. That can't make
2   sense.
3           MS. GROSSMAN: Your Honor --
4           THE COURT: -- but I am going to run out of time and
5   patience shortly. I would like to move right past the training
6   to the next exhaustive claim. Is there another --
7           MS. GROSSMAN: -- may I just be heard once on the
8   training?
9           THE COURT: No.
10          MS. GROSSMAN: To talk -- we had negotiations on the
11  document being --
12          THE COURT: -- no.
13          MS. GROSSMAN: -- bank added to the agreement and we
14  rejected it --
15          THE COURT: -- no --
16          MS. GROSSMAN: -- the plaintiffs wrote --
17          THE COURT: -- no, I don't want to hear anymore about
18  training. I want to hear other issues that are ready for the
19  Court.
20          What other issues have you exhausted?
21          MS. COSTELLO: We are going to concede the other two
22  issues, they are minor. We think the training is the --
23          THE COURT: -- the city says they have a right to
24  stand on the technicality on the violation of the racial
25  profiling policy, you didn't give them the notice till December
          SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

7clPdanC

1  3, so you can't bring that one to court in time for the
2  stipulation of settlement to expire. So the only one that's
3  live is the training.
4        If that's all we have to do between now and the 31st,
5  maybe we can brief it and decide it. It is one issue not five,
6  not four, not six.
7        I still say, putting a square peg in a round hole and
8  all you have to do is bring a lawsuit, my interpretation of
9  that protective order is that you have the documents till the
10 end of January.
11       MR. FRANKLIN: Your Honor, can we take two minutes?
12       THE COURT: Please.
13       (Recess)
14       THE COURT: Mr. Moore.
15       MR. MOORE: Judge, after consulting with my
16 colleagues, I think we have come to a position that if we
17 have -- if the Court is willing to permit us to hold the data
18 that we have until the end of January, 30 days after the
19 expiration of this agreement, we would be willing to withdraw
20 this motion at this point. And engage in this process of
21 bringing another lawsuit or not.
22       THE COURT: I think I said it many times on this
23 record, that that's my interpretation of this agreement. And
24 that is the way I am ruling, that's what it said, 30 days after
25 the termination of this case, which to me it finally
        SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

7clPdanC

1  terminates, termination December 31, '07, they remain
2  confidential.  But that doesn't mean you can't use them.
3       MR. MOORE:  To the extent that some of the materials
4  have already been made public, --
5       THE COURT:  -- what's public is public.  If you cite
6  to the Rand study, publicly, nobody can criticize you for that.
7  If they do, they weren't acting in good faith.  If I can get
8  the Rand study on the Internet, it is public --
9       MR. MOORE:  -- you can go to the NYPD website, your
10 Honor.
11       THE COURT:  There you go, that's public.  You can use
12 that.  And as I said before, I would accept it as a related
13 case, which the plaintiff has the power to designate.
14       I think this current motion is withdrawn.  Thank you.
15       ALL COUNSEL:  Thank you, your Honor.
16
17                           o0o
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

# APPENDIX C

11/11/13
Case: 1:08-cv-01034 - A Trial Judge Takes On and the Stop-and-Frisk Police Tactic : The New Yorker
Case: 1:08-cv-01034 Document #: 520 Filed: 11/13/19 Page 65 of 87

# THE NEW YORKER

ANNALS OF LAW

ANNALS OF LAW

# RIGHTS AND WRONGS

*A judge takes on stop-and-frisk.*

BY JEFFREY TOOBIN

MAY 27, 2013

- Print
- More

## Share

Close

- 
- Reddit
- Linked In
- Email
- 



Has New York City deprived citizens of their constitutional rights or created one of the great law-enforcement success stories? Photograph by Antonio Bolfo.

"I don't love trials," Judge Shira Scheindlin said recently. "They are not a good way to tell a story. They are not efficient. And they are often so tedious—you saw that today." Scheindlin was sitting at a conference table in her chambers in the

Daniel Patrick Moynihan building, off Foley Square, in lower Manhattan, after a long day of presiding in Floyd v. City of New York, which is the latest legal challenge to the stop-and-frisk practices of the New York Police Department. "What I really like to do is write opinions," the Judge said. "There you get to do what you think is right, what you believe in. You're pushing the margins of the envelope, being willing to be creative."

It was after seven o'clock in the evening, and the courthouse was nearly empty. At sixty-six, Scheindlin is renowned for her work ethic and her demands on her staff. Her clerks work from 9 A.M. until 8 P.M. every weekday. They can get lunch at the courthouse cafeteria but must eat it in chambers. They are also expected to work six hours over the weekend. (They can choose which day.)

In her office, Scheindlin was relaxed and expansive, especially when she talked about her two children, a son who is a violist with the Metropolitan Opera orchestra and a daughter who is a political consultant and pollster in Israel. (Her husband, Dr. Stanley Friedman, is an associate dean at SUNY-Downstate Medical Center.) On the bench, though, she is unflaggingly rigorous. She listens to testimony, reads the transcript on her computer in real time, e-mails her clerks, and sips endless cups of Diet Coke. Lawyers who appear before her often describe her as opinionated and brusque. ("I've heard enough." "Move along." "I've ruled, counsel.")

The primary outlet for Scheindlin's judicial creativity has been an enduring battle she has fought with the N.Y.P.D. A federal judge since 1994, she has been hearing lawsuits against the police for more than a decade. In decision after decision, she has found that cops have lied, discriminated against people of color, and violated the rights of citizens. Now, in the midst of a mayoral race, with the Democratic candidates united in their opposition to the stop-and-frisk policies of the Bloomberg administration, the Floyd case represents Scheindlin's greatest chance yet to rewrite the rules of engagement between the city's police and its people. David Floyd, the lead plaintiff, is an African-American medical student who had been stopped and searched twice. The core allegation in the case is that the N.Y.P.D. is systematically violating the rights of its citizens with unlawful stop-and-frisks, particularly by targeting minorities. The questions before Scheindlin are profound. Crime has declined in New York in recent years, as it has in other cities around the country. But why? And at what cost to the civil liberties of its people? Has New York City conducted a long-term, racially motivated campaign to deprive thousands of its citizens of their constitutional rights? Or, as Mayor Bloomberg and others maintain, has the city created one of the great law-enforcement success stories in recent American history?

The concept behind stop-and-frisk, which is sometimes also called "stop, question, and frisk," is a simple and venerable one. Police officers may arrest a suspect only if they have probable cause to believe that he committed a crime. What can they do if they suspect that someone is involved in criminal activity but lack sufficient grounds to make an arrest? The Supreme Court

addressed the subject in Terry v. Ohio, in 1968. According to Chief Justice Earl Warren's opinion, a stop is permissible only when "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." In other words, the level of certainty needed for an officer to make such a stop is less than probable cause; the standard is often described as "reasonable suspicion." According to the Terry decision, the judgment by the officer must be made on the basis of "specific reasonable inferences" from the evidence, not "inarticulate hunches." By and large, this remains the law today. Stop-and-frisk encounters are also known as "Terry stops."

"Stop, question, and frisk has been around forever," William Bratton, a former police commissioner in Boston, New York, and Los Angeles, told me. "It's a basic tool. It's the most fundamental practice in American policing. It is done every day, probably by every city force in America. If the police are not doing it, they are probably not doing their job." Bratton served as Mayor Rudolph Giuliani's first commissioner of the N.Y.P.D., from 1994 to 1996, and is widely credited with changing the orientation of the police from responding to crime to preventing it.

Through much of the second half of the twentieth century, crime and disorder, in forms ranging from graffiti to murder to a crack epidemic, plagued New York. The police appeared powerless to address these scourges. "Around 1960, New York City basically stopped policing," Bratton told me. "The police were no longer engaged in controlling behavior in the streets. We changed that. If people are drinking cans of beer on the corner, you stop that behavior. If somebody is urinating against a building, or if you suspect somebody is casing a building for a burglary, you stop them. Of course police should be doing that. You make the streets safe, and, besides, a lot of these people committing these minor crimes turn out to have warrants out against them for more serious things." The approach is known as Broken Windows, after a 1982 article in the *Atlantic* by James Q. Wilson and George L. Kelling. Bratton's interpretation of the Broken Windows approach called for vigorous police enforcement of minor crimes like fare-beating and intrusive panhandling as a tool to preserve public order and, at the same time, to catch criminals. In addition, the N.Y.P.D. under Bratton began to make extensive use of data to identify crime-prone areas and focus resources on them—an approach sometimes called "hot-spot policing." Along the way, especially in high-crime neighborhoods, cops stopped people not just in the act of committing minor crimes but also for suspicious behavior.

Stop-and-frisk—indeed, aggressive policing generally—presents significant challenges for judges. Months, or even years, after a confrontation between a cop and a suspect, the judge must determine if the stop was legal and thus whether the evidence gathered can be used in court or should be suppressed. "Most judges are reluctant to grant suppression motions," Erin Murphy, a professor at the New York University School of Law, said. "It's hard for judges to look a police officer in the eye and say he didn't follow the law. And of course it's only defendants who look

guilty who file suppression motions. It's every judge's worst nightmare that a released defendant will show up in the newspaper the next day for committing some horrible crime. If you suppress evidence, you are making it hard or impossible to prosecute a guilty person. That's a really difficult emotional and political decision for a judge to make."

The matter of Antonio Fernandez presented such a dilemma for Judge Scheindlin. On May 12, 1995, police received a 911 call reporting a gang meeting in progress at a small park in the Bronx. The caller said that one member, a Hispanic man wearing a white-and-black jacket, had a gun. The officers who responded found about fifty or sixty men, all Hispanic, milling around. The police frisked one man, who had no contraband. Then they followed a group of three or four men who had been standing to the side of the main group. One of them was Fernandez, who was stopped, frisked, and found to have a small amount of marijuana. At the station house, he was frisked again, and police said that he had a fully loaded .38-calibre revolver hidden in his crotch.

Fernandez was charged with illegal possession of a handgun, and the case was assigned to Scheindlin, who was in her early days on the federal bench. Fernandez argued that the Terry stop was illegal, and that the gun should be suppressed as illegally obtained evidence. Scheindlin agreed, writing in an opinion that, "based on the facts presented here, the police did not have reasonable suspicion to stop Defendant and his companions." In part, Scheindlin said, the stop-and-frisk was illegitimate, because the anonymous tip was too vague to lead to Fernandez, but her opinion reflected a disbelief in the officers' testimony. According to the officers, Fernandez's first frisk produced a small amount of marijuana, but the second yielded a large handgun. As Scheindlin wrote, "It is extremely difficult to believe that the same officer could have missed a bulky .38 caliber revolver hidden in Defendant's pants."

The case might have passed without notice, but Antonio Fernandez was not an ordinary defendant. He was better known as King Tone, the leader of the Latin Kings, one of the most notorious drug gangs in the United States, and he was being charged as part of a huge crackdown on the group by the United States Attorney's office for the Southern District of New York. "Scheindlin is one of the very few judges who would have had the guts to toss out a case like that one," a former prosecutor familiar with the case said. (Three years later, Fernandez was prosecuted for heroin and cocaine trafficking and sentenced, by a different judge, to twelve years.) Scheindlin's ruling in the Fernandez case set a template for her handling of criminal cases. As one of her former law clerks put it, "What you have to remember about the Judge is that she thinks cops lie."

According to a study prepared by the Mayor's office, Scheindlin suppresses evidence on the basis of illegal police searches far more than any of her colleagues—twice as often as the second-place judge. This may mean that Scheindlin is uniquely courageous—or that she is uniquely biased against cops. (Scheindlin has said that the study is misleading, because it reflects only her written opinions, rather than bench rulings, in which she almost invariably rejects motions to suppress.)

Still, she embraces her maverick status. Many judges in the Southern District previously worked as prosecutors in the U.S. Attorney's office there, but she was not among them. "Too many judges, especially because so many of our judges come out of that office, become government judges," Scheindlin told me. "I don't think I'm the favorite of the U.S. Attorney's office for the Southern District. Because I'm independent. I believe in the Constitution. I believe in the Bill of Rights. These issues come up, and I take them quite seriously. I'm not afraid to rule against the government."

Scheindlin grew up in Detroit. Her mother was a schoolteacher, and her father, who emigrated from the Soviet Union, ran a Jewish civic organization. "We were a political family," she told me. "My father was the official Jew for many committees in the state." For a time, the family lived in a house once owned by a brother of Walter Reuther, the United Auto Workers labor leader. "The house had a bullet hole, from where someone had taken a shot at him," she said. "It was a tough town."

At the University of Michigan, Scheindlin majored in Chinese history, then continued her studies for seven years at Columbia. She never received her doctorate. "The language defeated me," she said. "The prospect of reading original documents in Chinese was just too difficult." Scheindlin drifted into law school, graduating from Cornell in 1975. She spent her final year of law school at Columbia, where she took a class with Ruth Bader Ginsburg, who became a mentor. Ginsburg introduced her to the legal side of the women's-rights movement, and, while still a student, Scheindlin played a role in a case that brought equal pay to female academics at the City University of New York.

For the next two decades, Scheindlin did a little bit of everything in the law. She was in private practice, a federal prosecutor in Brooklyn, general counsel to the New York City Department of Investigation, and a magistrate (a lower-level federal judge), also in Brooklyn. In 1994, at the recommendation of Senator Daniel Patrick Moynihan, who had been encouraged by Ginsburg, President Clinton nominated Scheindlin to the federal bench in Manhattan. Her professional roots in Brooklyn, which is known as the Eastern District of New York, separated her from the start from the clubby world of the Southern District.

A defining event of Scheindlin's tenure as a federal judge took place on February 4, 1999. On that day, four plainclothes officers shot and killed Amadou Diallo, an unarmed African immigrant, who was in the vestibule of his apartment building, in the Soundview section of the Bronx. (The officers, who thought Diallo was reaching for a gun, were charged with manslaughter. They were acquitted by a jury in Albany, where the case had been moved because of pretrial publicity in the Bronx.) The Diallo case suggested a dark side of Giuliani-era policing. The same aggressiveness that led New York cops to arrest minor offenders could turn, in certain circumstances, into a predatory approach to non-offenders, especially racial minorities. Crime rates (for whatever

reason) had fallen dramatically during the Giuliani administration, but the Diallo case raised concerns about the N.Y.P.D.'s new tactics. "The idea behind proactive policing was to get guns off the street, which was fine as far as it went, but what it meant on the street was the cops tossed every young black man that they saw," Jonathan Moore, a veteran civil-rights lawyer, said. "That's what led to Diallo."

In response to Diallo's death, Moore and the Center for Constitutional Rights, a legal-advocacy group, filed the first class-action lawsuit challenging the city's stop-and-frisk policies. The case, Daniels v. City of New York (Kelvin Daniels was the lead plaintiff), was randomly assigned to Judge Scheindlin, and years of legal skirmishing followed. The parties settled in 2004. The city agreed to establish a written policy governing its stop-and-frisk practices and to improve the training of officers in conducting legal Terry stops.

In retrospect, though, the most important part of the Daniels settlement may have involved record-keeping. The city agreed to create a kind of checklist, which police officers would complete each time they conducted a stop-and-frisk. During the next decade, the police filled out more than four million of these forms, which served as indispensable evidence for the Center for Constitutional Rights and others in lawsuits against the city.

Scheindlin has a bright and airy courtroom, one floor below her chambers, and the Floyd trial, now in its third month, has settled into a routine. In jury trials, judges avoid signalling their views, so as not to influence the jurors; but in bench trials there's less reason for judges to be reticent. By this point, Judge Scheindlin's views seem etched on the faces of the lawyers before her. Moore and his colleagues bound in and greet the Judge with confident half-smiles; the team from the city's law department already look like disaster survivors, just trying to hang on. Moore and his team linger after court, chatting with spectators; the city's lawyers, led by Brenda Cooke, scurry for the door, avoiding eye contact. (Closing statements are expected this week; Scheindlin will probably render her decision within sixty days.)

The plaintiffs' key witness was Jeffrey Fagan, a criminologist and statistician, and a professor of law at Columbia, who has spent much of the past decade scrutinizing the city's vast database of stop-and-frisk reports. The stop-and-frisk form, known as the UF-250, contains boxes for police officers to check to explain why a suspect was stopped. Some of the boxes refer to specific behavior: a suspicious bulge in clothing, or a refusal to comply with an officer's directions. More than half of the four million UF-250 forms included checks in the box labelled "Furtive movements." In his report, Fagan concluded that the furtive-movement box, without more evidence, suggested an unconstitutional Terry stop—that is, one not supported by reasonable suspicion of a crime. According to an algorithm that Fagan devised, eighty-two per cent of the stops were justifiable, twelve per cent were ambiguous, and six per cent appeared to be unjustified. Projecting that ratio over a decade, Fagan concluded that the N.Y.P.D. had made more than two hundred and

sixty thousand illegal stop-and-frisks.

The plaintiffs have emphasized that only six per cent of stops led to arrests, just two per cent yielded seizures of contraband, and only a tenth of one per cent led to seizures of guns. According to Moore, "What this means is that the stops are unjustified more than ninety per cent of the time." Moreover, the plaintiffs used Fagan's findings to support a claim that the police engaged in racial discrimination. According to Fagan's analysis, N.Y.P.D. stop-and-frisks are significantly more frequent for black and Hispanic residents—constituting eighty-four per cent of the stops—than they are for white residents, even after adjusting for local crime rates, the racial composition of the local population, and other social and economic factors. "Statistics is a big part of how we are proving racial discrimination by the police," Darius Charney, who is a co-lead counsel, with Moore, in the Floyd case, said. "We don't need to find blatant racial animus. It doesn't have to be motivated by hatred of black or Hispanic people. We are looking at evidence of stereotypical thinking. We're looking for cops using race as a factor to make these decisions in a law-enforcement context. It's using race as a proxy for crime."

In public, police officials have a clear answer to these accusations. "We have had tremendous success," Raymond Kelly, the police commissioner since 2002, told me. "Crime is down, and stop-and-frisk is an important reason why." Civil libertarians say that other factors (such as changing inner-city demographics and the end of the crack epidemic) are involved, and dispute any clear correlation between more aggressive police behavior and the falloff in crime. What is indisputable is that since Bloomberg took office, in 2002, murders have dropped twenty-eight per cent, to four hundred and nineteen in 2012, the lowest number since the city began keeping records, in 1963. Even compared with other cities where crime has also declined, New York has experienced dramatic changes. Since 2002, major crimes across the country have declined fourteen per cent; in New York, they have declined thirty-four per cent. The contrast is even more striking between New York and other big cities. If New York had Detroit's murder rate last year, there would have been forty-five hundred murders in the city—more than ten times the actual number.

Lawyers for the city tried to make the argument before Scheindlin about the effectiveness of stop-and-frisk, but she shut them down before they had the chance. In order to rebut Fagan's analysis of the UF-250 forms, they sought the testimony of Dennis Smith, a professor of public policy at New York University who is an expert on police management. In particular, the city lawyers wanted Smith to testify about his view that the stop-and-frisk policy was an important factor in what they termed "the historic crime decline achieved by New York City."

In a pretrial ruling, Scheindlin excluded much of Smith's proposed testimony. She said that "permitting the parties to delve into the question of whether the stop-and-frisk program actually reduces crime would risk turning the trial into a policy debate over the wisdom of the program rather than a judicial proceeding that assesses plaintiffs' constitutional claims." Still, as the trial has

unfolded, city lawyers have continued to argue that stop-and-frisk has been a success—to Scheindlin's mounting irritation. When Brenda Cooke, the city's lead attorney, who was cross-examining Fagan, tried to make that point, Scheindlin cut her off.

"I got to put a stop to this," the Judge said. "It is not a good use of my time. For one thing, I've said repeatedly that one issue that is not present here is the effectiveness of this policy, because that's not for this court. This court is only here to judge the constitutionality. . . . We could stop giving Miranda warnings. That would probably be exciting for reducing crimes. But we don't allow that. So there are a number of things that might reduce crime, but they're unconstitutional. This court is only concerned with the Constitution, not with the effectiveness of the policy. I've tried and tried to explain that. This is my third or fourth try."

Even then, the city's witnesses persisted in defending stop-and-frisk as a sure means to reduce crime. In a way, the entire conflict in the case came down to a single exchange between Moore and Joseph J. Esposito, who had just stepped down, after thirteen years, as the chief of department in the N.Y.P.D., the highest-ranked uniformed officer in the force. Chief Espo, as he is known, was a renowned figure in the N.Y.P.D., and his demeanor on the stand suggested that he was more accustomed to giving orders than to answering questions. Esposito poorly concealed his contempt as Moore, shambling but relentless, pursued him about the propriety of stop-and-frisk. Moore noted that the number of stop-and-frisks had increased from approximately ninety-seven thousand, in 2002, to almost six hundred and eighty-five thousand, in 2011.

"So that increase is all on your watch, correct?" Moore asked.

"Yes, it is," Esposito said, plainly seething. After a slight pause, he volunteered, eyes flashing, "As is the forty-per-cent decrease in crime during my time—as is the eighty-per-cent decrease in the last twenty years."

In the Southern District, plaintiffs in civil cases can designate new cases as related to old ones and thus guarantee that the same judge presides. Ever since the Daniels case, civil-rights and civil-liberties groups have continued to challenge the stop-and-frisk policies of the N.Y.P.D. Each time, the plaintiffs have made sure that the cases went before Judge Scheindlin, who currently has three such class actions on her docket. The Floyd case challenges the practice citywide; Davis v. City of New York, which will go to trial later this year, involves stops at city-owned housing projects; and Ligon v. City of New York, which is farthest along in the process, concerns searches at privately owned properties around the city.

The Ligon case was initiated by the Bronx Defenders, a nonprofit organization that represents indigent defendants in the borough. The lawsuit was based on the experience of, among others, Charles Bradley, a fifty-year-old security guard from the South Bronx who went to visit his fiancée at her apartment building, in the Parkchester neighborhood, on May 3, 2011. When he went upstairs, she didn't answer her doorbell at first—she is deaf in one ear—so Bradley went

downstairs to wait. "An officer got out of an unmarked van and came up to me," Bradley recalled. "I just accommodated the officer to the best of my ability, and, in turn, what happened was, he went into my pockets. . . . There was nothing in my pockets except my house keys, my cell phone, my wallet. The thing about it that was so appalling was that I had spent my last dollar to see my loved one. And then he said, 'Fuck that, you're going in.' " Bradley was arrested for trespassing, a misdemeanor, and strip-searched.

At the local precinct, Bradley was given a Desk Appearance Ticket, a common first step in the legal process for minor offenses in New York City. He was instructed to appear in criminal court on July 19th, but he faced a more immediate problem. "There was a domino effect from being arrested," Bradley said. The arrest would be reported to a New York State licensing agency for security guards, and that might mean the loss of Bradley's job. "I need a license to be a security guard, and I would have lost it if they pressed charges," he said. "If I lose my license, I lose my income. I could have been put into homelessness for all this."

Bradley took the ticket to the offices of the Defenders, who have pioneered what they call "holistic defense," a method based on recognizing that, for criminal defendants like Bradley, deportation, eviction, or the loss of parental rights may be more ruinous than conviction or jail. Bradley met with two lawyers—an employment specialist and a criminal-defense attorney. "Charles was freaking out," Molly Kovel, the employment lawyer, said. "We had seen it before. Many of our clients are security guards or cabdrivers, and both are licensed by the government. For a lot of minor crimes, the bigger threat to their lives is losing their jobs, rather than getting convicted." Kovel kept the licensing authorities at bay while a colleague, Cara Suvall, dealt with the criminal case. "I had the problem of how to prove his innocence," Suvall said. "So we went and got a notarized letter from his fiancée saying that he really was visiting her. I took it to the district attorney, and they agreed to drop the charges."

Still, the experience of Bradley and others prompted the Bronx Defenders to file a class-action suit against the city. The case focussed on the N.Y.P.D.'s Operation Clean Halls program, through which private landlords give the police advance permission to patrol their property. This led to Ligon v. City of New York, in which the Defenders were joined by the New York Civil Liberties Union, the public-interest group Latino Justice, and the law firm of Shearman & Sterling. (Jaenon Ligon, the lead plaintiff in that class action, had also claimed to be the victim of an unlawful stop-and-frisk.) They charged that the police were using Operation Clean Halls to conduct unconstitutional stop-and-frisk searches of innocent citizens like Bradley.

At a hearing in October, 2012, Scheindlin listened to testimony from both Bradley and Miguel Santiago, the officer who placed the cuffs on him. Santiago testified that Bradley was in a "drug-prone location" in a high-crime neighborhood and was "suspiciously walking back and forth" outside the building. Santiago said that he approached Bradley by saying, "Excuse me, sir, could you

come over here?" and that Bradley could not tell him his girlfriend's name or produce any identification. But Judge Scheindlin noted that Santiago's paperwork contradicted his account in several ways—he had written, for example, that he approached Bradley inside the building.

In a hundred-and-fifty-seven-page opinion, handed down on January 8th this year, Scheindlin gave the Defenders a resounding victory. "Officer Santiago claimed that he was able to see Bradley's suspicious behavior even though he was inside a police van parked across the street, twenty or thirty feet from the door, separated from Bradley not only by the street but by the windows of the front door, a vestibule, the windows of an inner door, and the hallway," Judge Scheindlin observed. "I find Bradley's account credible." She was especially moved by Bradley's story. "If an unjustified stop happens to lead to an unjustified arrest for trespassing, as it did in Charles Bradley's case, not every overburdened public defender will have the wherewithal to obtain a notarized letter from the defendant's host explaining that the defendant was invited, as Bronx Defender Cara Suvall did on behalf of Bradley," she wrote. "When considering the relative hardships faced by the parties, it is important to consider the potentially dire and long-lasting consequences that can follow from unconstitutional stops." Scheindlin concluded that a "very large number of constitutional violations took place" as a result of Operation Clean Halls.

Scheindlin had found the city liable in the Ligon case, but what was the remedy? Here the Judge sprang a surprise. She wrote that she was going to decide the city's punishment in the Ligon case (which the city had already lost) at the end of the Floyd trial (which had not even taken place). In other words, it looked as though Scheindlin were scheduling her remedies hearing as if she had already ruled against the city in Floyd. In a footnote, Scheindlin added, "I emphasize that this ruling should in no way be taken to indicate that I have already concluded that plaintiffs will prevail in Floyd." But the city lawyers in the Floyd case are skeptical that the Judge's mind is open. "It's like she has scheduled our sentencing before she's even found us guilty," one said.

Politically, the verdict on stop-and-frisk seems already clear. The Democratic mayoral candidates running to succeed Michael Bloomberg all criticize stop-and-frisk, differing only in the intensity of their complaints. Christine Quinn, the City Council speaker, said recently, at Barnard College, "I want to leave it as a tool in police officers' toolboxes," but she noted, "We need to put an infrastructure of reform around stop-and-frisk." Bill de Blasio, the public advocate, said at a mayoral forum, "We need to send a message to every young man of color that they are beloved, they are valuable, they are our future. You can't do that if you're constantly treating people as suspects." John Liu, the comptroller, has gone even further. "Stop-and-frisk doesn't have to be amended, it has to be ended," he said at the forum.

In response, Bloomberg took the unusual step last month of giving a speech to the leadership of the N.Y.P.D. in which he both celebrated his record in reducing crime and addressed the allegations in the Floyd case. "As the ongoing federal court case is now demonstrating for any objective

observer to see," the Mayor said, "the N.Y.P.D. conducts stops based on seeing something suspicious, or witnesses' descriptions of suspects, not on any preconceived notions, or on demographic data that would have you stopping old women as often as you stop young men." Commissioner Kelly, for his part, is dismissive of the mayoral candidates' criticism. "This is just pandering. This is what goes on in New York politics," he told me. "They try and get as far left as they can for the primary, where it's just a tiny number of people who are voting. Then the challenge is to get to the center for the general election. That's all that's going on here."

In the courtroom, before Judge Scheindlin, the city is attempting to put on a defense. The lawyers are pushing back on the plaintiffs' most incendiary claim—that the stop-and-frisk policy has been applied in a racially discriminatory manner. "It's close to a perfect correlation between who is committing crime and who is being stopped," Celeste Koeleveld, the deputy Corporation Counsel who is supervising the defense, said. "That's true in minority neighborhoods, and also in predominantly white areas, like Staten Island." She noted that more than half of the N.Y.P.D. consists of racial minorities. Kelly goes further, asserting that stop-and-frisk protects, rather than oppresses, the African-American community. In a speech last month before Al Sharpton's National Action Network, Kelly said, "African-Americans, who represent twenty-three per cent of the city's population, made up sixty-four per cent of the murder victims and seventy-one per cent of the shooting victims in this city last year." He added, "African-American men between the ages of sixteen and thirty-seven, who are just four per cent of the city's population, comprise forty per cent of those murdered citywide; eighty-two per cent of these young men were killed with a firearm. As a city, as a society, we cannot stand idly by in the face of these facts." He said, "I believe that this tactic is lifesaving," and, referring to Terry v. Ohio, he added, "It is also lawful and constitutional as upheld by the U.S. Supreme Court in 1968."

Nevertheless, it appears that public criticism—and Scheindlin's rulings—has already changed the behavior of the police. In March, just as the Floyd trial was beginning, the N.Y.P.D. revised its instructions to officers in filling out the stop-and-frisk reports, demanding that they provide narrative details on their reasons for the confrontations. More significant, perhaps, in the first quarter of this year the number of police stops dropped by fifty-one per cent.

In both the Floyd and the Ligon cases, the plaintiffs are asking for Scheindlin to appoint an independent monitor, to make sure that the police comply with the Constitution. They want the Judge to impose a sort of receivership on the police, creating a dual internal authority as a check on the existing leadership. As a model, the plaintiffs' lawyers cite a case in Cincinnati a decade ago, in which the city agreed to fund an independent monitor who filed regular reports on the local cops' compliance with the law. (Bloomberg called this notion a recipe for chaos.) The idea of the independent monitor, like the lawsuits themselves, is rooted in the hope that a single judge can diagnose a complex problem and reform a huge organization like the New York Police Department

based on the imperfect medium of trial testimony. Scheindlin's dedication to protecting citizens' rights is beyond question; it is less clear that she has the wisdom, or even the ability, to impose her vision in the real world of New York.

Scheindlin's confidence in her understanding of the Constitution remains unshaken. Back in her chambers, after a long day of testimony from a plaintiff's expert on police procedures, Scheindlin talked about another celebrated case of hers. Shortly after the terrorist attacks of September 11, 2001, investigators found the name and phone number of Osama Awadallah on a scrap of paper in a car rented by one of the hijackers. On September 21, 2001, F.B.I. agents in California arrested Awadallah. He was not charged with any crime but was held as a material witness. On October 10th, he testified before a grand jury in New York that he was acquainted with one of the hijackers but denied knowing another who lived in the San Diego area. He was indicted for perjury, but on April 20, 2002, before the trial had even begun, Scheindlin threw out the case against him.

In a pair of lengthy opinions, Scheindlin said that the government had violated the material-witness law, by holding Awadallah too long and under unduly harsh conditions. She quoted the famous Supreme Court case of Ex Parte Milligan, in 1866: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." The Court of Appeals reversed Scheindlin's ruling and ordered her to bring Awadallah to trial. The trial ended in a hung jury; in a second trial, he was acquitted.

"That case was just an enormously satisfying experience," Scheindlin told me. "What I did was gutsy, because it was so close to 9/11. For me to suppress that evidence stunned people, because there was no question that he did know the hijackers. You saw the world changing in how each jury saw the case. The first jury was eleven-to-one to convict. But by the time of the second trial the Bush policies were unpopular, and he was acquitted. That was a vindication."

Each day, before Scheindlin goes to court, the last thing she sees in her chambers is a framed copy of an article she co-wrote with Brian Lehman, a former law clerk, in the *New York Law Journal*. Headlined "ONE DAY IN SEPTEMBER," and published in September of 2006, it was, like many stories published around that time, a commemoration of an anniversary. "It was a day in September that changed America forever," she wrote. But her story wasn't about September 11, 2001. It was about September 25, 1789, the day that Congress passed the Bill of Rights. Thanks to that document, the authors wrote, "If a judge decides that a defendant's rights have been violated and the case is dismissed, a remarkable thing happens: the government bows to the rule of law." ♦

PHOTOGRAPH: REPORTAGE BY GETTY IMAGES

- Print
- More

# Share

Close
- Reddit
- Linked In
- Email

**Subscribe now** to get more of *The New Yorker's* signature mix of politics, culture, and the arts.

# APPENDIX D

# NY 'frisk' judge calls criticism 'below-the-belt'

**AP**

By **LARRY NEUMEISTER** May 19, 2013 2:44 PM

NEW YORK (AP) — The federal judge presiding over civil rights challenges to the stop-and-frisk practices of the New York Police Department has no doubt where she stands with the government.

"I know I'm not their favorite judge," U.S. District Judge Shira A. Scheindlin said during an Associated Press interview Friday. It was another moment of candor for a judge known for her call-it-as-she-sees-it manner and willingness to confront government lawyers in a courthouse where many judges — former federal prosecutors themselves — seem less inclined.

"I do think that I treat the government as only one more litigant," she said during the interview that proceeded with a single rule: no questions about the trial over police tactics that reaches closing arguments Monday.

The trial has put the NYPD and City Hall on the defensive as they justify a long-running policy of stopping, questioning and frisking some residents to deter crime. Critics say it discriminates against blacks and Hispanics. Scheindlin is not being asked to ban the tactic, since it has been found to be legal, but she does have the power to order reforms in how it is implemented.

During the trial, she's shown an impatience with lawyers on both sides when they stray from the topic at hand, and a willingness to directly question witnesses — including police supervisors — about the nuts and bolts of trying to keep streets safe.

"I don't think they're entitled to deference," she said of government attorneys. "I think some of the judges are a little more timid to maybe disagree with the U.S. attorney's office. ... They have to prove their case like anybody else. I don't give them special respect. Maybe some judges do because they came from the office, they know the people there, whatever. I try not to do that."

Scheindlin, 66, appointed by President Bill Clinton, has had plenty of high-profile cases in 19 years in federal court, including three trials of John "Junior" Gotti, the son of the late legendary mob boss John Gotti, two trials of a California student who knew two of the Sept. 11 hijackers and the trial of international arms dealer Viktor Bout.

The AP interview came after a New York Daily News article revealed that the staff of Mayor Michael Bloomberg had reviewed her record to show that 60 percent of her 15 written "search-and-seizure" rulings since she took the bench in 1994 had gone against law enforcement.

The judge called it a "below-the-belt attack" on judicial independence. She said it was rare when any judge grants a request to suppress evidence in a law enforcement case and that inclusion of the numerous times when she rejected the requests with oral rulings from the bench would likely reduce the total to less than 5 percent.

She said reports that the mayor's office was behind the study made it worse.

"If that's true, that's quite disgraceful," Scheindlin said. "It was very discouraging and upsetting. I can't say it has no toll."

Of such criticism, she said: "It's very painful. Judges can't really easily defend themselves. ... To attack the judge personally is completely inappropriate and intimidates judges or it is intended to intimidate judges or it has an effect on other judges and that worries me."

A Bloomberg spokesman said Saturday, "We did a simple search of publicly available written decisions, as the media is also free to do."

The New York County Lawyers' Association called the report meaningless because it sampled so few Scheindlin rulings.

Scheindlin has faced heat before, most notably a decade ago when she presided over the trials of Osama Awadallah and one newspaper labeled her "Osama's best friend," a reference that some could misinterpret to refer to Osama bin Laden.

"You could be in danger, physically," she said.

The Awadallah case is memorable to Scheindlin for how it reflected the mood of the attitude across the country after the Sept. 11 attacks. Awadallah, born in Venezuela and raised in

Jordan, was a young immigrant in San Diego who was picked up as a material witness after his telephone number was found in a car that one of the hijackers drove to the airport on Sept. 11. Prosecutors agreed he was no terrorist but claimed he intentionally misled grand jurors about how well he knew one of the terrorists. Defense attorneys said he was left confused after 20 days in detention.

She said she learned in talking to jurors after Awadallah's first trial that they came within one vote of convicting him of false statements. At the next trial, he was exonerated.

"Same evidence. Same prosecutor. Same defense lawyers. Jury goes from 11-to-1 to 12-zip," she recalled. "So I asked what happened. The answer is the country had turned in a new direction."

She said immediately after Sept. 11, "people were so worried and so terrified that the next attack was around the corner that they were willing to cede many of their civil liberties."

She added: "The second half of the (President George W.) Bush term, Bush policies were not popular any longer. People were much more distant from the event of 9/11. Now they were more concerned with civil liberties and less concerned with the security threat. ... I thought it was dramatically shown by what happened in that case."

In choosing law clerks, Scheindlin looks for varied experience like her own. She has been a prosecutor and a defense lawyer and was once politically active.

"I don't want a kid who's just done seven straight years of A's at Harvard," she said. "I want to know that they've done something, worked somewhere. Some experience. Some work. Some life. That makes for a rounded person."

And should they someday become a judge, it makes them well prepared for the rare case of impact.

"That's the day you live for, to do something that you believe is right and that is upheld as right and has a national impact, that's great," Scheindlin said. "That's why people want to be judges, I think, so they can make a difference."

\_\_\_

Associated Press writers Tom Hays and Colleen Long contributed to this report.

# APPENDIX E

# New York Law Journal

**ALM Properties, Inc.**
Page printed from: _New York Law Journal_

Back to Article

---

# Stop-and-Frisk Judge Relishes Her Independence

Mark Hamblett

New York Law Journal

2013-05-20 00:00:00.0

The judge presiding over one of the most politically charged cases in recent New York City history says her 20 years on the bench have taught her to "appreciate more than ever the words 'judicial independence.'"

Shira Scheindlin, in a recent interview during the nine-week bench trial over the constitutionality of the New York City Police Department's anti-crime stop, question and frisk policies, said there are too many judges who don't want to take chances and deliver controversial rulings.

"They are fearful or they want a promotion or whatever it is, they don't exercise the independence they should have. State court judges of course face re-election, which is a terrible thing, but federal judges, who are appointed for life, don't appreciate how much independence they have—many of them are a little cautious, more cautious than they should be."

Few court observers would describe Scheindlin as cautious and the judge spoke freely when she sat down recently with the Law Journal to discuss some of her prior decisions and her views on being a federal judge. The only subject off the table was the ongoing trial, expected to wrap up on May 20 with closing arguments.

The judge, who already has made some rulings critical of the city for stop-and-frisk, has not been reluctant to make controversial decisions in the realm of civil liberties and constitutional law that have drawn the ire of police and prosecutors.

"I do think judges have a duty to protect individual rights because that's what the Bill of Rights is all about," she said. "It's the responsibility of the judiciary to protect those rights granted by our Founders. Now, does that make me an activist? No. Some people have said I'm conservative because I go back to what the Founders wrote and what they meant. I see it as abiding by my constitutional duty and our oath."

Among her other matters, Scheindlin (See Profile) has issued a series of groundbreaking opinions on e-discovery in _Zubulake v. UBS Warburg,_ which she regards as her most significant case. (See, for example, NYLJ, May 13, 2003, and July 25, 2003).

She has presided over multi-district litigation on conflicts of interest at investment banks in initial public offerings, and has presided over the trials of mobster John Gotti Jr. and Police Officer Francis Livoti in the use of a deadly chokehold on Anthony Baez.

Scheindlin has held parts of New York's anti-harassment statute unconstitutional; found police in contempt for continuing to enforce a law against loitering for the purposes of begging for money or cruising for sex that had long been ruled unconstitutional; held the National Football League was violating the antitrust laws by preventing underclassman Maurice Clarett from participating in the league draft (later reversed); and compelled the Metropolitan Transportation Authority to reinstate subway advertising that mocked Mayor Rudolph Giuliani.

"What I've learned is do what you think is right, follow the law, do what you think you can do," she said. "Sometimes there is no precedent that constrains you and you can really strike out and write what you think is the right answer."

Scheindlin, 66, has earned a reputation as a hard-working judge and has kept up a full docket since taking senior status last year. She takes an average of 15 new cases a month and has a pending caseload of 132, not including related cases in multidistrict litigation. Her workload is in the upper half of senior judges in the district.

She sets a quick pace in her courtroom, with little tolerance for lawyers who obfuscate or belabor a point. She often asks questions herself when things slow down, although she said, "I don't think I've committed the sin of taking over trials."

"She is a judge who runs a very, very strong courtroom and has a clear idea of how she wants to do it," said one veteran Southern District practitioner.

"I think sometimes people can be critical of her because she can sometimes be sharp to litigants, put people down and be critical. But from my experience, when she comes on the bench, she's prepared, she has strong views and she has the courage of her convictions," he added. "Her ideas can sometimes be idiosyncratic. She's not afraid to think independently."

Scheindlin "runs a very orderly courtroom, dignified, and as a jurist she's not only smart but she's creative," said Robert Swift of Kohn Swift & Graf in Philadelphia, who has appeared before her. "She asks good questions and is polite to counsel, but, by the same token, she doesn't let counsel argue silly motions or make silly requests—she's well in control of her courtroom. She's certainly been reversed, but that's also indicative of a judge being certain of what the law should be—not just what it is."

Like other judges, Scheindlin said she expects lawyers who appear before her to be well prepared.

"They need to be familiar with the facts and the law on the spot and not say, 'Oh sorry, I have to go look that up, or 'I'm sorry, I have to ask a colleague,'" she said.

**Unusual Path to the Law**

Scheindlin was born in Washington, D.C., raised in Detroit, and educated at the University of Michigan, Columbia University and Cornell Law School.

She was working at Columbia as a graduate student in Far Eastern studies, but she said the language requirements were so rigorous—years of Chinese and Japanese included—"that I knew I would never finish my dissertation. So I said, 'What's next?'

"I really didn't know much about the law but I knew it offered a broad education that gives you lots of possibilities of what you might do with it afterward," she said.

"I think at that point I thought I was going to be doing divorces and house closings and DWIs," she said. "I thought I'd be a local town lawyer married to a professor on the campus."

After graduating from Cornell in 1975, she spent a year at Stroock & Stroock & Lavan, then clerked for Southern District Judge Charles Brieant and was hired by David Trager, who was then the U.S. attorney in the Eastern District. She rose from general prosecutions to handling political corruption cases before being named deputy chief of the Economic Crimes Unit while working as Trager's administrative assistant U.S. attorney.

Scheindlin counts Trager, along with Brieant and Eastern District Judge Jack Weinstein, as mentors.

Trager, she said, "was funny, he would speak in the imperative—'you *will* get a clerkship, you *will* apply to be a magistrate."

She spent a year as general counsel at the New York City Department of Education and then returned to the Eastern District as a magistrate judge from 1982 to 1986, where she was also appointed as special master by Weinstein in the Agent Orange cases and litigation over asbestos.

Scheindlin returned to private practice in 1986 as a partner with Budd, Larner, Gross, Rosenbaum, Greenberg & Sade and then Herzfeld & Rubin, where she worked as a commercial litigator until she was named a federal judge by President Bill Clinton in 1994, part of a wave of new judges who sometimes refer to themselves as the "Class of '94."

It is rare for magistrates to be promoted to Article III judgeships, and Scheindlin said her experience as a special master and magistrate —the first woman magistrate judge or district judge in the Eastern District—helped her hit the ground running when she took the bench in Manhattan.

"I just took that bench and I knew what I was doing," she said. "And I got feedback right away like, 'Boy you look like you've been doing this forever' and I would make a joke, 'Well, that's because I have.'"

She added,"I was incredibly fortunate—it is not easy for those who have not had any judicial experience."

Scheindlin said she never had any interest in moving to the U.S. Court of Appeals for the Second Circuit because cases are built at the district court level.

District judges "have a much more exciting job than the Court of Appeals, because we shape the case in the first instance. We shape the issue—the case comes in the door and we are the first judge on the line, with the first crack at giving an answer and shaping a ruling, shaping the whole future of that case, right?

"The Court of Appeals has to use what we've done—we have the tough job—all they can do is review it and say 'You got it right or you got it wrong.'"

Scheindlin said the problem with the appellate court is that "there you've got to negotiate and get votes and there's three of you and you can end up in dissent when you really don't want to. To me, this is the best of all worlds."

One case where the circuit said Scheindlin "got it wrong" was an opinion she remains proud of—her ruling that the government had abused the material witness statute by detaining Osama Awadallah in the 9/11 investigation and then prosecuting him for perjury. Awadallah had known two of the 9/11 hijackers in California (NYLJ, April 30, 2002).

Scheindlin dismissed the charges, calling it a "perjury trap" and holding the material witness statute was intended to be used only for trial witnesses, not people being interviewed in connection with an investigation.

The Second Circuit reversed and sent it back for trial (NYLJ, Nov. 10, 2003). The first jury hung 11 to 1 for conviction. The second, the judge recalled, "was 12-zip for acquittal."

"What happened in between?" Scheindlin asked. "It was exactly the same evidence, the same lawyers, and it was word for word the same trial record. What happened is that, it was later in the Bush administration and his policies were no longer as popular and people had pulled back…and were now looking at some of the consequences of the event that they didn't really like."

But the judge also said that the jury in the second trial was subjected to a "much stronger voir dire."

"The second questionnaire worked much harder to probe bias—'did you know anybody even indirectly, who was injured that day?'"

"We know that the first jury was in tears, people were crying, telling about their neighbor who had lost a son, which was not at all the point of the prosecution."

**'Judges Are Human Beings'**

Scheindlin's ruling in the Awadallah case drew criticism that she said found hard to take.

"Judges are human beings and it always hurts to be attacked when you can't defend yourself—that's a very painful thing," she said. "Over the years I have read editorials such as the famous 'Osama's Best Friend' after the Awadallah decision, it was hurtful.

"I would have liked to have been able to explain the decision so that the public understood it so I was not wrongly attacked but a judge doesn't have that ability," she said. "In recent years the bar associations have really stepped up to the plate and tried to defend judges, not on the merits of their decisions but by explaining their job, that the judge is a neutral and does the best they can. To attack them personally when it's not a matter of dishonesty, just disagreement, is a terrible thing."

With her involvement in the stop-and-frisk litigation Scheindlin has had to cope with sharp criticism from city officials like Police Commissioner Raymond Kelly, who has accused her of being in the thrall of a few civil rights lawyers.

The New York County Lawyers' Association wrote to the New York Daily News on May 15 to protest an article reporting that an "internal report" by the mayor's office purporting to show that Scheindlin is biased against law enforcement because she has ruled against the police in nine of 15 written search-and-seizure opinions she has issued since 1994.

In its letter, NYCLA argued that the report was misleading because it did not consider her suppression decisions from the bench. Moreover, NYCLA wrote, "Judges are not supposed to grade on the curve. They are supposed to decide cases on their merits," and the report didn't consider the merits of Scheindlin's rulings.

"I think it's inappropriate to label any judge as liberal or conservative," Scheindlin said in the interview. "I like to think of myself as a fair-minded neutral who calls the case outcomes the way that the law and justice require."

**Improved Atmosphere**

Scheindlin said she thinks Americans' attitude toward civil liberties has changed since the Sept. 11, 2001, terrorist attacks.

"I think it's better—I think the worst time was around 9/11. People just didn't want to hear about the rights of anybody when they felt their security was threatened—so I think, actually its been slowly better for the last decade as 9/11 has receded," she said. "One worries again, though, with the Boston Marathon bombers and whether public opinion shifts back, but I don't think anybody was particularly outraged [the surviving suspect] wasn't read Miranda rights."

"It's events like this that test people's commitments to civil liberties…I think the atmosphere has been much better because more of the population has been critical of what I might call the Bush-era policies—the torture memo, the Guantanamo issue, the military courts, the detention without charges."

She said she thinks that President Barack Obama would like to close the detention center at Guantanamo but cannot get Congress to go along.

"It's deeply troubling to hold people in perpetuity without charging them," Scheindlin said. "We like to think we don't do that."

Scheindlin said that politics influences the selection of federal judges, but that is mainly on the appellate court level.

"Let's be realistic, these are political appointments and the makeup of the circuit judges in this circuit is slowly changing now that President Obama has been here five years," she said.

But she said that the Southern District had been "extraordinarily lucky" in avoiding political polarization.

"I'm saying that it's not partisan, she said. "All through the Bush years, all through the Obama years we have had really high quality people. We are so lucky here we don't have political hacks. We have well-qualified judges virtually across the board."

Scheindlin said that she was disappointed in the U.S. Supreme Court's ruling last month on the Alien Tort Claims Act, _Kiobel v. Royal Dutch Petroleum,_ 569 U.S. — (2013), determining that there was no extraterritorial application of the law.

In 2009, Scheindlin had recognized aiding and abetting liability for corporations on human rights violations in South Africa, the case along with _Awadallah_ that has given her the greatest pride _(NYLJ, April 9, 2009)._ But her ruling was put on hold while the Supreme Court considered the issue.

Scheindlin said Justice Samuel Alito "reached out" and skirted the aiding and abetting question just to strike down the law on extraterritoriality grounds, and "that was sad."

Scheindlin observed that new technologies had changed the law since she joined the bench, as evidenced by her own e-discovery rulings in _Zubulake_ and other cases.

"This is what lawyers really talk about—social media, GPS, cell sites, data collection, technology-assisted review," she said. "The biggest change in the law is that all these issues that have arisen out of the new world we live in.

"Now, the civil side is very advanced, the criminal side is just beginning to catch up, but all data is electronic data, all discovery is e-discovery," she said.

And, like many judges, she worries about the impact of social media on juries.

In the case of arms trafficker Viktor Bout, she made the jury sign a "pledge" not to go on Facebook, Twitter, LinkedIn or other outlets and promise they would not communicate that way, and if they did, "they understood they would be subjected to prosecution which was supposed to be an in terrorem effect," she said.

They signed, but one juror in the whole selection process said, "'I can't sign that' and I said ' Well, thank you for telling me, you're off," Scheindlin said. "It really is threatening to the jury system—the ease of obtaining evidence outside the courtroom. This has happened again and again."

Scheindlin has been married for almost 30 years to Stanley Friedman, the associate dean of education at SUNY Downstate Medical Center. She has two grown children.

She admits to having virtually no outside interests.

"I love to work," she said. "The only other way I know how to enjoy myself is exercise. Otherwise, I'm a great reader. I love audio books."

She said she's at the courthouse most days from 10 a.m to 8 p.m., "really living here." She also works all weekend and requires her clerks to work one weekend day.

"This is sort of my home away from home," she said.

*@|Mark Hamblett can be contacted at* [mhamblett@alm.com](mailto:mhamblett@alm.com).

---

Copyright 2013. ALM Media Properties, LLC. All rights reserved.