UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID FLOYD, *et al.*, | |
| Plaintiffs, | **OPINION** |
| | **AND ORDER** |
| -against- | |
| CITY OF NEW YORK, | 08 Civ. 1034 (AT) |
| Defendant. | |
| JAENEAN LIGON, *et al.*, | |
| Plaintiffs, | |
| -against- | |
| CITY OF NEW YORK, *et al.*, | 12 Civ. 2274 (AT) |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:    7/30/2014

ANALISA TORRES, District Judge:

The United States Court of Appeals for the Second Circuit remanded *Floyd* and *Ligon* to the District Court to resolve pending motions to intervene in these actions and to "effectuate a settlement" between "such concerned or interested parties as the District Court deems appropriate." *Floyd*, ECF No. 426; *Ligon*, ECF No. 166. As a result, two motions are now before this Court.

In the first motion, the Patrolmen's Benevolent Association of the City of New York, Inc., the Detectives' Endowment Association, Inc., the NYPD Captains Endowment Association, and the Lieutenants Benevolent Association of the City of New York, Inc., collectively, and the Sergeants Benevolent Association,[1] separately, move to intervene as defendants pursuant to Federal Rule of Civil Procedure 24 for the purposes of (1) appealing three orders issued by the

---

[1] The Sergeants Benevolent Association moves to intervene only in *Floyd*; the other unions move to intervene in *Floyd* and *Ligon*.

Honorable Shira A. Scheindlin:  (a) the first, enjoining the City of New York (the "City") from conducting trespass stops outside of certain Bronx apartment buildings without reasonable suspicion of trespass in *Ligon*; (b) the second, finding the City liable for violating the Fourth and Fourteenth Amendment rights of the plaintiff class in *Floyd*; and (c) the third, ordering remedies in *Floyd* and *Ligon*; (2) participating in the settlement of *Floyd* and *Ligon*; and (3) participating in the remedial phase of the litigation.  Because their motions raise identical issues, the Court addresses them together, referring to all of the proposed intervenors collectively as the "Unions" and noting variations only where relevant.  The *Floyd* and *Ligon* plaintiffs are collectively referred to as "Plaintiffs."  Plaintiffs and the City oppose the Unions' intervention.[2]

In the second motion, Plaintiffs and the City, having reached an agreement to resolve the City's appeals in *Floyd* and *Ligon*, move for an order modifying the remedies order pursuant to Federal Rule of Civil Procedure 54 and the Court's inherent authority, such that the term of the court-appointed monitor is limited to three years, provided that the City shows substantial compliance with its obligations by the end of that term.

The motions to intervene are DENIED for three reasons:  (1) the motions are untimely; (2) the Unions have no significant protectable interests relating to the subject of the litigation that would warrant intervention; and (3) even if their alleged interests were cognizable, the Unions lack standing to vindicate those interests on appeal.

The parties' motion for an order modifying the remedies order is GRANTED.  The modifications shall be set forth in a separate order to be issued forthwith.  The Unions' request to participate in the settlement of *Floyd* and *Ligon* is, therefore, DENIED as moot.

The Unions' request to participate in the remedial phase of *Floyd* is also DENIED as

---

[2] Although the City initially consented to the Unions' September 2013 motions to intervene, *see Floyd*, ECF No. 414; *Ligon*, ECF No. 152, it now opposes them, *see Floyd*, ECF No. 447; *Ligon*, ECF No. 180.

moot because the remedies order already offers "police organizations" the opportunity to participate in the development of reforms to NYPD stop-and-frisk policies and procedures through the "Joint Remedial Process." The Unions' request to participate in the remedial phase of *Ligon* is DENIED for the same reasons the Court denies their motion to intervene for the purpose of appealing the remedies order.

## BACKGROUND

Nearly fifty years have passed since the Supreme Court of the United States endorsed the practice that became known as "stop-and-frisk." *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). There, the Court held that the Fourth Amendment prohibition against unreasonable searches and seizures is not violated when a police officer stops, questions, and frisks a suspect without probable cause if the officer has reasonable suspicion that "criminal activity may be afoot" or a reasonable belief that the person "may be armed and presently dangerous." *Id*. at 30. In the decades since, the contours of *Terry*'s exception to probable cause have been vigorously litigated in the courts.

In this current iteration, two sets of plaintiffs challenge the legality of the New York City Police Department's (the "NYPD") stop-and-frisk tactics. In *Ligon*, after a seven-day evidentiary hearing, on January 8, 2013, the Court issued a preliminary injunction against the City, finding that plaintiffs would likely succeed in proving that the City has a policy of stopping, frisking, and arresting persons for trespass based primarily on their presence in or near Bronx apartment buildings enrolled in the Trespass Affidavit Program ("TAP")—which permits the NYPD to patrol private buildings with their owners' consent—in violation of the Fourth Amendment (the "Injunction Order"). *Ligon v. City of New York*, 925 F. Supp. 2d 478, 486 (S.D.N.Y. Feb. 14, 2013), *amending and superseding*, *Ligon v. City of New York*, 12 Civ. 2274,

2013 WL 71800 (S.D.N.Y. Jan. 8, 2013).  In *Floyd*, after years of litigation culminating in a nine-week trial, on August 12, 2013, the Court issued an opinion holding that the City had a policy of conducting race-based stops-and-frisks that ran afoul of the Fourth and Fourteenth Amendments (the "Liability Order").  *Floyd v. City of New York*, 959 F. Supp. 2d 540, 562 (S.D.N.Y. 2013).  Because of the similarities in the City's constitutional violations in *Floyd* and *Ligon*, the Court issued a second opinion on August 12, 2013, which ordered certain remedial measures to cure the constitutional infirmities identified in both cases (the "Remedial Order").  *Floyd v. City of New York*, 959 F. Supp. 2d 668, 671 (S.D.N.Y. 2013).

Initially, the City appealed the Injunction, Liability, and Remedial Orders.  Several weeks later, the Unions moved to intervene and also filed notices of appeal.  Then, in January 2014, newly-elected Mayor Bill de Blasio announced the City's intention to withdraw the appeals and settle the cases.[3]  The Unions, nevertheless, still seek intervention to prosecute the appeals the City no longer wants to pursue.  The Injunction, Liability, and Remedial Orders are the product of fifteen years of litigation, against the backdrop of decades of public discourse on the issue of stop-and-frisk.  Thus, because a full account of these cases would fill libraries, the Court chronicles only those facts that aid in addressing the Unions' motions to intervene.

I.    *Daniels, Floyd,* and *Ligon*

  A. ***Daniels v. City of New York***

As the Second Circuit observed, the *Floyd* and *Ligon* actions "descend[] directly" from an earlier lawsuit, *Daniels v. City of New York*, 99 Civ. 1695 (SAS) (S.D.N.Y. 1999).  *See Ligon v. City of New York*, 736 F.3d 118, 122, 122 n.3 (2d Cir. 2013), *vacated in part*, 743 F.3d 362 (2d

---

[3] The Court takes judicial notice of the mayor's January 30, 2014 press release, "Mayor de Blasio Announces Agreement in Landmark Stop-and-Frisk Case."  Charney Decl. Ex. L, *Floyd*, ECF No. 450-12; *see also* Carter Decl. ¶ 5, *Floyd*, ECF No. 457 ("If the Court approves the parties' proposed modification, the City will then move to withdraw its appeals in *Floyd* and *Ligon* with prejudice.").

Cir. 2014).  On March 8, 1999, Kelvin Daniels and Robert Roe filed a putative class action

against the City, the NYPD, the mayor, the police commissioner, and John Doe officers, alleging

that the City had a policy, custom, and practice, carried out by the NYPD's Street Crimes Unit,[4]

of suspicionless, racially-motivated stops-and-frisks that violated the Fourth and Fourteenth

Amendments.  Complaint, *Daniels*, ECF No. 1.  The *Daniels* plaintiffs sought injunctive relief

prohibiting the Street Crimes Unit from improperly using race or national origin in conducting

stops-and-frisks and reforming relevant training, supervision, and monitoring procedures.  *Id.*  In

particular, they sought to enforce the requirement that officers complete UF-250 forms[5] for each

stop they conduct, that UF-250s be periodically reviewed for compliance with the Constitution,

and that UF-250s be computerized and maintained in a database.  Am. Compl. 45, *Daniels*, ECF

No. 8.  Over the next five years, the parties engaged in extensive discovery and litigated several

major motions, including a motion to dismiss and a motion for class certification.  *Daniels*, ECF

Nos. 18, 21, 75.

     At the same time *Daniels* was being litigated, the United States Department of Justice

(the "DOJ") conducted an investigation of the NYPD's stop-and-frisk practices.[6]  As part of the

investigation, the DOJ moved to intervene in *Daniels* pursuant to Rule 24(b) in order to access

the UF-250s the City had provided to the *Daniels* plaintiffs during discovery.  *See Daniels*, ECF

Nos. 93, 94.  The court denied the DOJ's motion, reasoning that the proper avenue to obtain the

material was for the DOJ to file its own civil action rather than disrupting *Daniels*.  *Daniels v.*

---

[4] "[A]n elite squad of police officers whose self-proclaimed mission is to interdict violent crime in New York City and, in particular, remove illegal firearms from the streets."  *Daniels v. City of New York*, 200 F.R.D. 205, 206 n.1 (S.D.N.Y. 2001).

[5] The UF-250 is a form police officers use to document stops.  *See Daniels v. City of New York*, 99 Civ. 1695, 2001 WL 228091, at *3 n.1 (S.D.N.Y. Mar. 8, 2001).

[6] The DOJ investigation was conducted pursuant to 42 U.S.C. § 14141, which empowers the Attorney General to investigate and commence civil actions against police departments that have engaged in a pattern or practice "that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."  42 U.S.C. § 14141.

*City of New York*, 200 F.R.D. 205, 210 (S.D.N.Y. 2001).

In September 2003, the parties in *Daniels* reached a settlement. *Daniels*, ECF No. 153. Notice of the settlement was published in three newspapers, *El Diario*, *The New York Post*, and *The New York Amsterdam News*, *see Daniels*, ECF No. 150, and a public hearing was held on December 12, 2003, *see Daniels*, ECF No. 154.  Pursuant to the settlement, plaintiffs released their class claims against the City, and the City agreed to implement stop-and-frisk audit procedures, revise training, ensure that all stops be documented on a revised UF-250 form, conduct joint community forums, and provide class counsel with quarterly updates. *Daniels*, ECF Nos. 151, 152.  The *Daniels* settlement remained in effect through December 31, 2007. *Id.*

## B.  *Floyd v. City of New York*

In January 2008, a month after the *Daniels* settlement period ended, David Floyd and Lalit Clarkson commenced a lawsuit against the City, the mayor, the police commissioner, and several individual NYPD officers.  Compl., *Floyd v. City of New York*, 08 Civ. 1034 (S.D.N.Y. Jan. 31, 2008), ECF No. 1.  The complaint alleged that the City had a policy, custom, and practice of suspicionless and race-based stops-and-frisks and sought city-wide injunctive relief, including changes to the NYPD's policies and practices governing training, supervision, discipline, and monitoring of officers with respect to stop-and-frisk and racial profiling. *Id.*  The New York City Corporation Counsel represented all defendants, including the individual NYPD officers. *See Floyd*, ECF Nos. 43, 44, 51, 54, 111, 172.  A week after filing the complaint, the Court granted the *Floyd* plaintiffs' motion to retain the stop-and-frisk data that had been produced to their counsel in connection with the *Daniels* settlement. *Floyd*, ECF No. 2.  The *Floyd* plaintiffs subsequently amended the complaint to assert a putative class action, add plaintiffs, and name officer defendants. *Floyd*, ECF Nos. 11, 50.

Fact discovery proceeded for nearly three years, during which time dozens of individual NYPD officers were deposed. Charney Decl. ¶ 3, *Floyd*, ECF No. 450. There were numerous discovery disputes and motions to compel. *Floyd*, ECF Nos. 2, 45, 69, 92, 93, 108. The parties moved to exclude one another's experts. *Floyd*, ECF Nos. 201, 224. Defendants sought to exclude the expert report of Jeffrey A. Fagan, a professor of criminology with expertise in statistics, whose report analyzed years of UF-250 and other data. *Floyd*, ECF No. 201. Plaintiffs sought to exclude the rebuttal expert report of Dennis Smith, a political scientist with expertise in police organizations, whose report provided an alternate statistical analysis of similar data. *Floyd*, ECF No. 224. The Court granted in part and denied in part both parties' motions. *Floyd*, ECF Nos. 201, 224. The parties also litigated, and the Court issued published opinions on several major motions, including motions for summary judgment and class certification. *Floyd v. City of New York*, 813 F. Supp. 2d 417, 456, *on reconsideration*, 813 F. Supp. 2d 457 (S.D.N.Y. 2011) (summary judgment); *Floyd v. City of New York*, 283 F.R.D. 153, 164 (S.D.N.Y. 2012) (class certification).

At a November 27, 2012 hearing, plaintiffs stated that they would withdraw their claims for money damages against all individual officers and seek only injunctive relief against the City. Nov. 27, 2012 Hearing Tr. at 4:10-25, *Floyd*, ECF No. 244. On March 8, 2013, the Court so-ordered the parties' stipulation withdrawing plaintiffs' claims against the individual officers, *see* Stipulation and Order, *Floyd*, ECF No. 270, all of whom are union members, *see* Pl. Mem. 5, *Floyd*, ECF No. 448. At a January 4, 2013 pretrial hearing, the Court rejected plaintiffs' request to bifurcate the liability and remedies phases. *See* Jan. 4, 2013 Hearing Tr. at 84:24-25; 85:8-9, *Floyd*, ECF No. 252. Instead, the Court ruled that there would be a single bench trial, where evidence on both liability and remedies would be presented, after which a decision on liability

and, if necessary, remedies would be issued.  *Id.*  On January 31, 2013, the Court held a joint

hearing in *Floyd*, *Ligon*, and *Davis v. City of New York*, 10 Civ. 699 (S.D.N.Y. filed Jan. 28,

2010)—a putative class-action regarding stops-and-frisks in and around New York City public

housing.  *See* Jan. 31, 2013 Hearing Tr. at 6:13-21, *Floyd*, ECF No. 406.  In addition to

reaffirming the decision not to bifurcate the *Floyd* trial, the Court requested that the parties brief

the scope of the remedial injunction, assuming, *arguendo*, that plaintiffs proved liability at trial.

*Id.* at 25:4-26:6.

On March 6, 2013, the *Floyd* plaintiffs requested permanent injunctive relief, including

changes to the UF-250, appointment of an independent monitor, and creation of a joint remedial

process to develop changes to training, supervising, monitoring, and disciplining officers with

respect to stop-and-frisk and racial profiling.  Injunctive Relief Mem. 20-22, *Floyd*, ECF No.

268.  The DOJ also submitted a "Statement of Interest" in which it endorsed the appointment of

an independent monitor should plaintiffs establish liability.  *Floyd*, ECF No. 365.

On March 15, 2013, the parties filed a joint pretrial order.  *Floyd*, ECF No. 272.  The

over 400-page document identified nearly 200 witnesses, many of whom were NYPD officers

whom the parties intended to call or whose deposition testimony would be introduced.  *Id.* at 16.

The parties agreed that the core issue to be tried was "[w]hether the City of New York has an

actionable Policy and/or Practice of stopping and frisking Black and Latino persons on the basis

of race rather than reasonable suspicion . . . ."  *Id.* at 16.

Trial commenced on March 18, 2013 and continued through May 20, 2013.  Thirty police

officers, ten sergeants, ten lieutenants, three captains, four deputy inspectors, and seven

inspectors testified.  *Floyd*, ECF No. 363 ¶¶ 23, 25-33, 43-49; 366 ¶¶ 86-107, 122-136.  In

addition, senior NYPD officials and the parties' liability and remedial experts testified.  After

trial, the parties submitted proposed findings of fact and conclusions of law and post-trial briefs

on liability and remedial issues.  *Floyd*, ECF Nos. 363, 364, 366, 367.

**C.  *Ligon v. City of New York***

On March 28, 2008, Jaenean Ligon filed a putative class action against the City, the

police commissioner, six named officers, and John Doe officers, challenging the NYPD's

practice of stopping, questioning, frisking, summonsing, and arresting people on suspicion of

trespass in and around buildings enrolled in TAP.  Compl., *Ligon v. City of New York*, 12 Civ.

2274 (S.D.N.Y. Mar. 28. 2008), ECF No. 1.  The named plaintiffs also sought compensatory

damages against the individual defendants.  *Id.*  The *Ligon* plaintiffs moved for a preliminary

injunction, and the parties submitted briefs and motions in limine.  *Ligon*, ECF Nos. 42-59.

After a seven-day evidentiary hearing, the parties submitted proposed findings of fact and

conclusions of law.  *Ligon*, ECF Nos. 71-84, 88-91.

The Court granted the preliminary injunction on January 8, 2013, because plaintiffs had

shown a "clear likelihood of proving" that the City, by its deliberate indifference, had a policy of

conducting unconstitutional stops outside TAP buildings. [7]  *Ligon*, 925 F. Supp. 2d. at 485.  The

Court enjoined the NYPD from "performing trespass stops outside TAP buildings in the Bronx

without reasonable suspicion of trespass, in accordance with the law as set forth and clarified in

this Opinion."  *Id.* at 542.  To effectuate the injunction, the Court proposed specific changes to

policies, procedures, supervision, and training and invited the parties to brief "whether the

proposed relief is insufficient or too burdensome or otherwise inappropriate."  *Id.* at 543.  The

City filed a notice of appeal, which it withdrew when the Court granted the City's motion to stay

the injunction.  *Ligon*, ECF Nos. 98, 99, 101.  Over the next several months the parties engaged

---

[7] The Court issued an amended opinion on February 14, 2013, which differs only in the Court's
analysis of the evidence regarding one stop-and-frisk incident.  *Ligon*, ECF No. 105 at 57-60.

in two rounds of briefing and oral argument regarding the proper scope of remedies that should

flow from the Injunction Order.  *See Ligon*, ECF Nos. 108, 109, 112, 117, 118.

II.      The Liability Order and the Remedial Order

On August 12, 2013, the Court issued the Liability Order in *Floyd*, finding that the

NYPD's practice of conducting suspicionless stops-and-frisks was widespread, that the City was

deliberately indifferent to the NYPD's practice, and that the practice was therefore attributable to

the City as an official policy.  959 F. Supp. 2d. at 562.  The Court held that this policy violated

the Fourth Amendment.  *Id*.  The Court also found that the City had adopted a race-based policy

of disproportionately targeting blacks and Hispanics for stops and held that this policy violated

the Equal Protection Clause of the Fourteenth Amendment.  *Id.*  In so doing, the Court made

findings of fact and conclusions of law that evaluated, credited, and discredited the documentary

and testimonial evidence presented at trial, including the testimony of numerous civilians who

were stopped and the testimony of numerous NYPD officers, many of whom were involved in

those stops.  *Id.* at 572-658.

The Court issued the Remedial Order, also on August 12, 2013, directing the City—the

sole remaining defendant—to remedy the violations identified in *Floyd* and *Ligon*.  *Floyd*, 959 F.

Supp. 2d 668.  The Remedial Order mandates immediate and ongoing equitable relief.  *Id.*  With

respect to *Floyd*, the Remedial Order directs the court-appointed monitor to "develop, in

consultation with the parties, . . . 'Immediate Reforms' . . . as soon as practicable," including

changes to "the NYPD's policies, training, supervision, monitoring and discipline" regarding

stop-and-frisk.  *Id*. at 678-84.  The proposed Immediate Reforms are to be submitted to the Court

and implemented upon approval.  *Id.* at 677.  The Remedial Order also requires the City to

conduct a one-year pilot project in which officers in one precinct per borough will wear body

cameras on patrol. *Id.* at 685. In addition, the City and Plaintiffs must engage in a six to nine month "Joint Remedial Process," guided by a court-appointed facilitator, to develop "Joint Process Reforms" in consultation with the monitor and based on input from a variety of stakeholders, including "NYPD personnel and representatives of police organizations." *Id.* at 684-88. The proposed Joint Process Reforms must be submitted to the Court for approval. *Id.* at 688. With respect to *Ligon*, the Remedial Order adopts the approach proposed in the Injunction Order, which requires the NYPD to adopt a court-provided written policy on the legal standard for trespass stops around TAP buildings, to make changes to supervision and training regarding such stops, and, in conjunction with the monitor, to create a system for monitoring the constitutionality of stops and ensuring that all stops are documented on UF-250s. *Id.* at 688-90.

III.    The Proposed Intervenors

The Patrolmen's Benevolent Association of the City of New York, Inc. (the "PBA"), the Detectives' Endowment Association, Inc. (the "DEA"), the NYPD Captains Endowment Association (the "CEA"), the Lieutenants Benevolent Association of the City of New York, Inc. (the "LBA"), and the Sergeants Benevolent Association (the "SBA") are certified employee organizations as defined by § 12-307(4) of the New York City Collective Bargaining Law, N.Y. City Admin. Code §§ 12–301, *et seq.* (the "CBL"). Alejandro Decl. ¶¶ 7-10, Engel Decl. Ex. A., *Floyd*, ECF No. 438-1; Mullins Aff. ¶ 2, *Floyd*, ECF No. 397. Collectively, they represent over 35,000 active members of the NYPD, and they are the exclusive collective bargaining units for contract negotiations with the City. Alejandro Decl. ¶ 6; Mullins Aff. ¶ 2. The PBA represents over 22,000 police officers, the DEA represents approximately 5,000 detectives, the CEA represents over 700 captains, and the LBA represents nearly 1,700 lieutenants on all collective bargaining matters under the CBL. Alejandro Decl. ¶¶ 7, 8, 9, 19. The SBA represents

approximately 13,000 active and retired sergeants.  Mullins Aff. ¶ 2.  The PBA, DEA, LBA, and

CBA's "core mission . . . is to advocate and protect the interests of [their] respective members of

the NYPD."  Alejandro Decl. ¶ 11.  In addition, the PBA purports to "negotiate[] . . . with the

City of New York on matters of policy, terms and conditions of employment, and all matters

relating to police officers' general welfare."  *Id.* ¶ 7.  Similarly, the SBA states that its "central

mission is to advocate for, and protect the interests of, its NYPD police sergeant members."

Mullins Aff. ¶ 3.  According to the District Court's public records in *Floyd* and *Ligon*, the

Unions have not sought any involvement in these actions, as intervenors or amici, prior to filing

their motions to intervene in September 2013.

IV.    Post-Trial Developments

         On August 16, 2013, the City noticed its appeal of the Injunction, Liability, and Remedial

Orders.  *Floyd*, ECF No. 379; *Ligon*, ECF No. 123.  The City also requested that the Court stay

the three Orders, which the Court denied.  *Floyd*, ECF Nos. 380, 402.  On September 12, 2013,

the Unions moved to intervene and filed notices of appeal indicating that they too were appealing

the Injunction, Liability, and Remedial Orders.  *Floyd*, ECF Nos. 388, 390-393, 395-397; *Ligon*,

ECF No. 135.  On October 31, 2013, the Second Circuit stayed the Orders and remanded *Floyd*

and *Ligon* to the District Court for the limited purpose of designating a new District Judge to

"implement this Court's mandate staying all proceedings and otherwise await further action . . .

."  *Ligon v. City of New York*, 538 F. App'x 101, 103 (2d Cir. 2013).  Because the Second Circuit

stayed all proceedings, the Unions' September 2013 motions to intervene remained unresolved.

The Unions then moved to intervene directly at the Second Circuit in November 2013.  *See*

*Ligon v. City of New York*, 743 F.3d 362 (2d Cir. 2014).

         On January 30, 2014, Mayor de Blasio announced that the City and the *Floyd* and *Ligon*

Plaintiffs had reached an agreement to resolve the City's appeals. *See* Charney Decl. Ex. L. Accordingly, the City moved the Second Circuit for a limited remand to the District Court to "permit the parties to explore a resolution," which "the public interest strongly favors." *Ligon*, 743 F.3d at 364. On February 21, 2014, the Second Circuit denied the Unions' motions to intervene, reasoning that the District Court should consider the motions in the first instance. *Id.* at 365. In the same order, the Second Circuit granted the City's motion, remanding the cases "to the District Court for the purpose of supervising settlement discussions among such concerned or interested parties as the District Court deems appropriate, and resolving the motions to intervene." *Id.* On February 25, 2014, this Court issued orders setting a new briefing schedule on the intervention issue, directing the parties to continue settlement discussions, and directing the parties to submit a joint letter to the Court by March 4, 2014, "indicating whether they desire the Court's participation in aid of settlement." *Floyd*, ECF No. 428; *Ligon*, ECF No. 167.

V.      The Unions' Supplemental Motions to Intervene

Following remand to the District Court, on March 5, 2014, the Unions supplemented their September 2013 motions to intervene. *Floyd*, ECF Nos. 428, 442, 445; *Ligon*, ECF No. 171. As with the original motions, the SBA sought intervention only in *Floyd*, while the other unions moved to intervene in *Floyd* and *Ligon*. *Floyd*, ECF Nos. 442, 445. Plaintiffs and the City opposed the motions. *Floyd*, ECF Nos. 447, 448. The Unions seek intervention pursuant to Rule 24(a) or (b) on the basis of alleged interests that they claim are implicated by the Injunction, Liability, and Remedial Orders. To protect these interests, the Unions argue that they must, after intervening, appeal the Orders. The Unions also seek to intervene in order to participate in the settlement of *Floyd* and *Ligon* and the remedial phase of the litigation.

VI.     The Parties' Motion to Modify the Remedial Order

On March 4, 2014, Plaintiffs and the City filed a joint letter indicating that they had

"reached an agreement in principle for resolving the City's appeals in both *Floyd* and *Ligon*."

*Floyd*, ECF No. 433; *Ligon*, ECF No. 169.  Instead of proposing an entirely new settlement

agreement, the letter indicates that the City intends to accept the Remedial Order with certain

modifications consistent with the mayor's January 30, 2014 announcement.  *Id.*  On April 3,

2014, Plaintiffs and the City filed a joint motion to modify the Remedial Order to reflect the

terms of their agreement.  *Floyd*, ECF No. 456.  The parties request a single modification of the

Remedial Order:  rather than the independent monitor serving for an unspecified period, the

parties propose that the monitor's term be limited to no more than three years, provided that the

City can demonstrate by the end of that term that it has substantially complied with the Remedial

Order.  *Floyd*, ECF No. 458.  Corporation Counsel Zachary W. Carter submitted a declaration

stating that the City will move to withdraw its appeals with prejudice "[i]f the Court approves the

parties' proposed modification."  Carter Decl. ¶ 5, *Floyd*, ECF No. 457; *Ligon*, ECF No. 189.

The Unions oppose the motion, restating their position regarding intervention, complaining that

the proposed modification "includes no mechanism for [the Unions] to present [their] collective

bargaining concerns . . . or otherwise protect their rights," and seeking a role "in aiding or

disputing the City's 'showing' of 'substantial compliance.'"  SBA Mem. 5, *Floyd*, ECF No. 461.

The Court shall first address the Unions' motions to intervene for the purpose of

appealing the Injunction, Liability, and Remedial Orders and then turn to the Unions' other

grounds for intervention and the parties' motion to modify the Remedial Order.

**DISCUSSION**

I.    Motions to Intervene to Appeal the Injunction, Liability, and Remedial Orders

The Unions move to intervene pursuant to Rule 24(a) or (b) to protect two alleged

interests:  (1) the reputation of NYPD officers, which has allegedly been harmed by the Liability

Order's findings of widespread constitutional violations; and (2) the Unions' right to collectively

bargain about the terms and conditions of their members' employment, which is allegedly

threatened by the Remedial Order.  To vindicate these interests, the Unions argue that they must

appeal the Injunction, Liability, and Remedial Orders to "ensure that [they] are reviewed on the

merits and that the NYPD and its members are not burdened and besmirched by findings and

remedies that are legally infirm."  PBA Mem. 3, *Floyd*, ECF No. 445.  The Unions argue that

only after a successful appeal, including appellate repudiation of the Orders, will union

members' reputations and the Unions' collective bargaining rights be restored.  After careful

consideration, the motions are denied for three reasons:  (1) the motions are untimely; (2) the

Unions have no significant protectable interests relating to the subject of the litigation that would

warrant intervention; and (3) even if their alleged interests were cognizable, the Unions lack

standing to vindicate those interests on appeal.

Before turning to each of these issues, the Court shall address a preliminary matter raised

by Plaintiffs.  Plaintiffs argue, and the Court agrees, that the Unions have not adequately

addressed two issues, the timeliness of the Unions' motion and the nature of their alleged

interests in the merits of *Ligon*.[8]  Notwithstanding the fact that *Ligon* raises distinct liability and

remedial issues and has a unique procedural posture, the Unions filed the same intervention

---

[8] In this paragraph, "the Unions" does not include the SBA, which has not moved to intervene in
*Ligon*.

briefs in *Ligon* as they filed in *Floyd*.  However, the briefs discuss only *Floyd*.[9]  When Plaintiffs

pointed out the oversight, the Unions responded with a footnote, "[t]he *Ligon* [Injunction Order],

like the *Floyd* Liability [Order], contains findings of unconstitutional conduct by particular

members of the [Unions] . . . and rests in part on the same expert's analysis of the UF-250 forms

as in *Floyd* . . . The [U]nions' arguments in favor of intervention on remedies and appeal thus

apply to both cases."  PBA Reply Mem. 2, *Floyd*, ECF No. 453.  This footnote concludes what it

presumes; it does not, however, explain why the Unions' motions are timely with respect to

intervening to appeal the Injunction Order, which was issued eight months before the Liability

and Remedial Orders.  Moreover, the Unions offer no explanation of their interest in the merits

of *Ligon*, except to say that it is identical to their concerns in *Floyd*.  Where the Unions do not

see fit to address these issues, the Court will not do their work for them.  Accordingly, the Court

finds that the Unions have failed to meet their burden to justify intervention with respect to

appealing the Injunction Order.  *United States Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2nd

Cir. 1978).  Thus, the Court will not consider the Injunction Order in addressing timeliness, nor

will the Court address the Unions' interests in the merits of *Ligon* separate from *Floyd*.  Instead,

the Court will focus primarily, as have the Unions' motions, on the Liability and Remedial

Orders.

## A.  Legal Standard

Federal Rule of Civil Procedure 24 permits a non-party to intervene in ongoing litigation

as of right or by permission of the court.  The applicant bears the burden of demonstrating that it

meets the requirements for intervention.  *United States Postal Serv.*, 579 F.2d at 191.  Generally,

---

[9] As Plaintiffs observe, the PBA was aware of the Injunction Order, as evidenced by the press
release to their members shortly after it was issued, describing the trespass stops in *Ligon* as
"management's poorly conceived program[]" that resulted from the "City's misguided budget
priorities."  "PBA Reacts to Federal Judge's Stop and Frisk Decision," Charney Decl. Ex. M,
*Floyd*, ECF No 450-13.

the court accepts as true the applicant's well-pleaded, non-conclusory allegations and supporting material.  *See Bay Casino, LLC v. M/V Royal Empress*, 199 F.R.D. 464, 466 (E.D.N.Y. 1999).  Motions to intervene are highly fact-specific and tend to resist comparison to prior cases.  *Id.*  Because "prior decisions are not always reliable guides," courts are guided by practical and equitable considerations in an effort to balance "efficiently administrating legal disputes by resolving all related issues in one lawsuit, on the one hand, and keeping a single lawsuit from becoming unnecessarily complex, unwieldy or prolonged, on the other hand."  *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 69 (2d Cir. 1994).

To seek intervention as of right under Rule 24(a), an applicant must make a four-part showing:  (1) the application is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may practically impair the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest.  *Pitney Bowes*, 25 F.3d at 70.  "The intervention application will be denied unless all four requirements are met."  *Id.*  In applying the Rule, courts must be cognizant that its "various components . . . are not bright lines, but ranges— not all 'interests' are of equal rank, not all impairments are of the same degree, representation by existing parties may be more or less adequate, and there is no litmus paper test for timeliness."  *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 983 (2d Cir. 1984).  "[A]lthough the Rule does not say so in terms, common sense demands that consideration also be given to matters that shape a particular action or particular type of action."  *Id.*

Courts may consider the same factors under Rule 24(b) permissive intervention as with intervention as of right under Rule 24(a).  *See R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.,* 467 F.3d 238, 240 (2d Cir. 2006).

**B. Timeliness**

Under both provisions of Rule 24, the threshold inquiry is whether the application for intervention is timely.  "The timeliness requirement is flexible and the decision is one entrusted to the district judge's sound discretion."  *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 594-95 (2d Cir. 1986); *see also NAACP v. New York*, 413 U.S. 345, 366 (1973).  Whether the Unions' motions are timely depends on:  (1) the length of time the Unions knew or should have known of their interest before making the motion; (2) prejudice to existing parties resulting from their delay; (3) prejudice to the Unions if the motion is denied; and (4) the presence of unusual circumstances militating for or against a finding of timeliness.  *United States v. New York*, 820 F.2d 554, 557 (2d Cir. 1987).  Generally, the Second Circuit disfavors intervention after liability has been adjudged because "it fosters delay and prejudice to existing parties."  *Farmland Dairies v. Comm'r of New York State Dep't of Agric. & Mkts.*, 847 F.2d 1038, 1044 (2d Cir. 1988).

1.  Length of Time Unions Knew or Should Have Known of Their Alleged Interests

The Unions urge that their motions are timely because they were filed by September 12, 2013, within thirty days of the issuance of the Liability and Remedial Orders.  A month earlier, they allege, was the first time they realized that they had interests in *Floyd* and *Ligon* which would not likely be represented by the existing parties.  The Unions also contend that the subsequent election of a new mayor, who no longer intends to pursue an appeal, confirmed for the first time that their interests would not be protected.  Because the *Floyd* trial could have resulted in a finding of no liability against the City, the Unions argue that it was reasonable for them to await the outcome before moving to intervene.  Similarly, with respect to the Remedial Order, the Unions contend that they could not have known that their alleged collective bargaining interests would be threatened until the *Floyd* trial concluded and the Remedial Order

18

issued.  Nor could the Unions, they claim, have predicted the "capacious scope" of the Remedial Order's impact on day-to-day officer responsibilities.  PBA Mem. 12.  The Unions argue, therefore, that their wait-and-see approach to intervention was reasonable.

Plaintiffs respond that to the extent that *Floyd* and *Ligon* might impact union members' reputations, their daily job duties, and the Unions' collective bargaining rights, the Unions knew or should have known months, if not years, before August 2013.  The Liability and Remedial Orders, Plaintiffs contend, could not have come as a surprise given the nature of the pleadings in *Floyd* and *Ligon* and the pretrial publicity.  The complaints in both cases allege that individual officers, all union members, had conducted unconstitutional stops, and the complaints seek the same department-wide changes to policies, training, supervision, monitoring, documentation, and disciplinary procedures that the Unions now criticize.  *Floyd*, *Ligon*, and their precursor *Daniels* generated such high publicity that numerous stakeholders, including members of the New York City Council, civic groups, and the DOJ, filed submissions with the Court before and after the *Floyd* trial.  Plaintiffs argue that the Unions' delay is fatal to their motions.

With respect to the timeliness of the Unions' proposed intervention to appeal the Liability and Remedial Orders, the facts and the law are on Plaintiffs' side.  Assuming, *arguendo*, that the Unions' alleged interests are colorable on a motion to intervene, the intervention clock started to run from the moment the Unions became aware or should have become aware that they had interests in the subject matter of the litigation not otherwise protected by the existing parties to the lawsuit.  *See Farmland Dairies*, 847 F.2d at 1044; *see also League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1307 (9th Cir. 1997) ("[U]nder Rule 24 the timeliness clock begins ticking from the time a proposed intervenor should have been aware its interests would no longer be protected adequately by the parties.") (alterations, citations, and internal quotations

marks omitted).  Even where post-judgment intervention is sought, courts deem these efforts timely only where the judgment itself, or events subsequent to judgment, are the first time that the intervenor learns of its unrepresented interests in the action.  *See, e.g.*, *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977) (Only upon entry of final judgment did "it bec[o]me clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives," after which "she promptly moved to intervene to protect those interests."); *Dow Jones & Co., Inc. v. U.S. Dep't of Justice*, 161 F.R.D. 247, 251-53 (S.D.N.Y. 1995) (Sotomayor, J.) (*United Airlines*' requirement that non-parties seeking post-judgment intervention act "promptly" after the issuance of the judgment supplements, not supplants, the four-part timeliness standard announced in *United States v. New York*, 820 F.2d at 557, which includes among its factors, "the length of time they knew or should have known of their interest before making the motion.").

Here, the Unions offer several explanations for the timing of their motions, each of which is legally or factually inconsistent with the applicable actual or constructive notice standard. After rejecting these unavailing explanations, the Court conducts a detailed review of the record and concludes that the Unions knew or should have known about their alleged interests in *Floyd* and *Ligon* far earlier than August 2013.  The Court turns first to the Unions' explanations.

a.   The Unions' Timeliness Rationale

i.   The "Thirty-day Rule"

First, the Unions contend that the Court need not examine their interests prior to August 2013, because "a motion to intervene . . . filed within the 30-day period for filing a notice of appeal . . . is timely."  SBA Mem. 23, *Floyd*, ECF No. 442; PBA Mem. 10-11.  According to the Unions, "[t]he 'critical inquiry' is not how long the case has been pending, but whether the

intervenor acted 'promptly' after the judgment."  PBA Reply Mem. 1 (citing *United Airlines*, 432 U.S. at 395-96).  This is a fundamental misstatement of the case law on post-judgment intervention, which focuses on actual or constructive notice, not a rigid thirty-day rule.

To arrive at this errant conclusion, the Unions conflate two distinct concepts:  the substantive legal interest Rule 24(a) requires for intervention and the procedural mechanism the applicant intends to employ upon intervening in order to vindicate that interest.  In some circumstances, substantive interest and procedural purpose are aligned:  an applicant becomes aware of an interest by the very issuance of the court order threatening that interest, thus necessitating intervention for the purpose of vindicating the interest by taking an appeal.  *See United Airlines,* 432 U.S. at 394 (unnamed class member, whose interests in class determination only became actionable upon entry of the final judgment, moved promptly thereafter to intervene to appeal the judgment).  Accordingly, in a case cited by the Unions, *Drywall Tapers & Pointers, Local Union 1974 v. Nastasi & Assocs., Inc.*, the Second Circuit held that a prudent applicant moving to intervene in order to appeal an order should do so within the same thirty-day period to appeal the underlying judgment.  488 F.3d 88, 95 (2d Cir. 2007).

In other circumstances, interest awareness and the procedural mechanism are not aligned. For example, where an applicant obtains notice of an unrepresented interest long before the issuance of the order the applicant seeks to appeal, a motion to intervene in order to vindicate that interest on appeal could be untimely even if it were filed within thirty days of the order. *Yonkers Board of Education* is a textbook example.  801 F.2d 594.  There, homeowners moved to intervene to appeal a remedial order designating sites near their homes for public housing. The homeowners opposed the chosen sites and asserted an economic interest in ensuring that proper sites were chosen.  Although they moved to intervene within the thirty-day period for

appealing the judgment, the Second Circuit found the motion untimely because the homeowners should have known of their site designation interest earlier, when the proposed sites were first publicly announced. *Id*. at 597. Thus, contrary to the Unions' position, awareness of the interest, not the thirty-day deadline to appeal, is dispositive as to measuring the length of the applicant's delay.

The Unions also cite several out-of-circuit cases for the fictional thirty-day rule. *See United States v. City of Detroit*, 712 F.3d 925 (6th Cir. 2013); *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091 (10th Cir. 2005); *Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004); *Edwards v. City of Houston*, 78 F.3d 983 (5th Cir. 1996); *Yniguez v. Arizona*, 939 F.2d 727 (9th Cir. 1991); *Hodgson v. United Mine Workers*, 473 F.2d 118 (D.C. Cir. 1972). These cases did not so hold. In each, the filing of a motion to intervene within the thirty-day appeal window was not dispositive as to timeliness. Instead, *City of Detroit*, *Elliott Indus.*, *Acree*, *City of Houston*, *Yniguez*,[10] and *Hodgson* all held a motion to intervene timely where the applicant first learned of its unrepresented interest in conjunction with or after the issuance of the order it sought to appeal. These courts did not apply a rigid thirty-day rule. Instead, they looked to the particular facts concerning delay, prejudice, and notice.

In all cases, whether pre- or post-judgment, Rule 24(a) requires courts to measure timeliness from the moment when the applicant had actual or constructive notice of its unrepresented interest, not from the moment a judgment was issued or from the moment when

---

[10] The Unions fail to mention a subsequent development in *Yniguez*. In a unanimous opinion, the Supreme Court vacated the Ninth Circuit's judgment on the ground that the case became moot when the plaintiff, whose challenge to Arizona's English-only ballot initiative was based on her state employment, left her position. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 (1997). Although the Court "need[ed] not definitively resolve the issue" of whether the Ninth Circuit erred in allowing private parties to intervene in order to vindicate the constitutionality of a state policy on appeal where state officials declined to do so, the Court expressed "grave doubts" about the intervenors Article III standing. *Id*.

the existing parties decided not to appeal that judgment.  Thus, courts have deemed timely a

motion to intervene where the decision of an existing party not to appeal a court ruling provided

the would-be intervenor its first notice of its unrepresented interest in a lawsuit.  *See, e.g.*, *Dow*

*Jones & Co.*, 161 F.R.D. at 252-53; *see also Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d

694, 701 (7th Cir. 2003) ("The relevant inquiry in determining timeliness . . . is not on the time

between the [judgment] and the motion to intervene . . . but instead . . . on the time between

[movant's] knowledge that the suit could impact their interests and the motion to intervene.").

Here, the fact that the Unions filed their initial motions to intervene with thirty days of the

issuance of the Liability and Remedial Orders does not make their motions timely.  Instead, the

Court must look at all the circumstances to determine when the Unions obtained the required

actual or constructive knowledge.

ii.     Waiting for the Unions' Alleged Interests to "Crystallize"

Second, the Unions posit that it was appropriate for them to wait for their alleged

interests to "crystallize" before moving to intervene, SBA Reply Mem. 13, *Floyd*, ECF No. 451,

when "there [could] be no doubt," PBA Mem. 12, that their interests would not be represented by

the City.  Implicitly, the Unions appear to acknowledge that they knew they had interests in

*Floyd* and *Ligon* prior to August 2013, but contend that those interests had not fully matured.  On

this view, "[t]he events that prompted [the Unions] to intervene, and [their] inability to have

foreseen the necessity of [their] involvement in this matter, fully support a finding that the

motion is timely."  SBA Reply Mem. 9-10.  Three purportedly unforeseeable developments

appear to have caused their interests to "crystallize:" (1) the Court's finding of liability against

the City in *Floyd*; (2) the Court's factual findings in the Liability Order; and (3) the election of a

new mayor which led to the City's withdrawal of the prior administration's consent to the

Unions' intervention in *Floyd* and *Ligon* and the announcement that the City would withdraw its appeal of the Injunction, Liability, and Remedial Orders.

The Unions' argument is not supported by intervention case law. Rule 24 does not require that an applicant's interest be "crystallize[d]" or that an applicant wait until there is "no doubt" that his or her interests will be impacted. Instead, Rule 24 encourages applicants to move when it becomes apparent that their interests *might* not be protected. *See Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 182 (2d Cir. 2001) (Non-party should have sought intervention when it realized "that its interests *might* not be adequately represented.") (emphasis added); *see also Heartwood, Inc.*, 316 F.3d at 701 (The relevant inquiry is when the applicant had "knowledge that the suit *could* impact their interests.") (emphasis added); *In re Tribune Co. Fraudulent Conveyance Litig.*, 291 F.R.D. 38, 41 (S.D.N.Y. 2013) (Applicant moved to intervene "as soon as" it realized existing party no longer represented its interests.). The Unions' position, by contrast, would encourage applicants to delay their motions until it is absolutely certain, after judgment, that their interests have been adjudicated. The Second Circuit has emphasized that such dilatory tactics are "disfavored because [they] usually create[] delay and prejudice to existing parties, and undermine[] the orderly administration of justice." *Yonkers*, 801 F.2d at 596 (citations omitted). Moreover, although courts should not encourage premature motions to intervene, *see Stallworth v. Monsanto Co.*, 558 F.2d 257, 265 (5th Cir. 1977), such timing defects are not fatal to subsequent motions. *See, e.g.*, *Yonkers*, 801 F.2d at 597 n.6 (discussing, with approval, the district court's grant of a motion to intervene after denying, without prejudice, an earlier motion as premature when the movant's interests were too speculative); *Pitney Bowes*, 25 F.3d at 71 (suggesting that, although the applicant's interests were uncertain, applicant could have moved to intervene "as an anchor to windward . . . to guard

24

against the possibility" that its interests would be impacted); *Hickerson v. City of New York*, 932 F. Supp. 550, 559 (S.D.N.Y. 1996).  Thus, if prior to August 2013 the Unions knew or should have known that their interests existed but were unprotected, they should have proactively moved to intervene at that time.  Even if the motion had been denied as premature, it would have put the Court and the parties on notice that at a later stage in the litigation the Unions might seek intervention.  Rather than waiting, as the Unions did, until they had "no doubt" that the City would not adequately represent their interests, intervention law required them to move at the first instance that there was some doubt.

It is unclear whether the Unions' view is that their interests did not exist prior to August 2013, or that they did exist but were adequately represented by the City prior to August 2013.  In either case, the Unions claim that pre-August 2013 developments are irrelevant because their interests did not "crystallize" until a series of purportedly unforeseeable developments occurred.  First, prior to August 2013, the Unions assert that they "did not have reason to intervene for purposes of appealing the [Orders] until after the [Orders] were issued," SBA Mem. 25, because "[h]ad the City prevailed at trial, the [U]nions' participation would have remained unnecessary." PBA Reply Mem. 6.  This argument is unavailing.  At its core, the Unions' argument is that they did not intervene beforehand because the City might have won.  Thus, the "unforeseeable" event that caused their interests to "crystallize" is that the City lost the trial.  Trials are adversarial proceedings that usually conclude with a judge or jury pronouncing a winner and a loser, and the loser often has to pay damages or remedy the conduct that initially troubled the winner.  Here, it should have come as no surprise that when the *Floyd* trial ended, there would be a winner and a loser, and it was entirely foreseeable that the winner might not be the party the Unions preferred.

Next, the Unions claim that the refusal of a newly-elected mayor to appeal the decisions

was an unforeseeable event that "crystallized" the necessity of their intervention.  SBA Mem. 18-

20.  This argument is also unavailing.  It should have come as no surprise that, as a risk inherent

in a democratic election, the candidate who supports one's preferred policing policies might not

win.  In fact, in 2009, during the second year of the *Floyd* litigation, a mayoral election occurred.

It was possible that the then-current mayor, Michael R. Bloomberg, would not be re-elected and

that a new mayor might pursue a different litigation strategy.  The risk was heightened when

Mayor Bloomberg, a former co-defendant in *Floyd* and a proponent of the City's stop-and-frisk

policy, could not run in 2013 because he was term-limited, and there was certainty that a new

mayor would take his place.  Accordingly, it should have come as no surprise that, where the

candidates had a range of views on stop-and-frisk, the new mayor might change the City's

litigation strategy upon assuming office.  Although the particular outcome of an election may be

unforeseeable, that elections occur is foreseeable, as is the fact that a new mayor may have

litigation priorities that differ from those of his or her predecessor.

Finally, the Unions claim that they could not have foreseen the Court's factual findings

and the legal reasoning that would support the Court's finding of liability against the City.  In

particular, the Unions claim to have been caught off guard by the breadth of the Liability and

Remedial Orders:

> "[A]n extraordinary pair of erroneously reasoned Opinions that accuse police
> officers, including [union members] of widespread violations of the Constitution
> based on flawed reasoning and insufficient evidence.  The [Unions] could not
> have foreseen that the Opinions would find that, over an eight-year period, at least
> 200,000 stops conducted by NYPD officers were unconstitutional and that
> officers intentionally targeted minorities, based solely on a purported statistical
> analysis of UF-250 forms, and without any consideration of the totality of the
> unique circumstances of each of the 4.4 million stops at issue . . . .  Nor could the
> [Unions] have anticipated a sweeping opinion mandating unprecedented remedies
> . . . ."

SBA Reply Mem. 11-12.  Because the Unions purportedly could not have foreseen the scope of

the Liability Order, they further contend that "[t]he police officers' conduct and reputations are placed at issue only if, in fact, the Liability [Order] can survive appellate scrutiny."  PBA Reply Mem. 18.

This argument is also unavailing for several reasons.  First, months before the *Floyd* trial, the parties vigorously litigated the admissibility of evidence prepared by plaintiffs' expert witness, Jeffrey A. Fagan, who developed a statistical analysis of hundreds of thousands of UF-250s and drew conclusions regarding the role of race in stops-and-frisks.  During these pretrial proceedings, Fagan's methodology and his interpretation of the data were closely and critically examined.  Therefore, the Unions cannot be heard to say that the substantive content of Fagan's research and conclusions concerning the NYPD's stop-and-frisk practices was unforeseeable.  Second, with respect to the Remedial Order, it does not take the issuance of a judicial opinion for a union to realize that the employer is not looking out for the union's collective bargaining interests insofar as they may arise in a lawsuit.  The Unions acknowledge, as they must, that "unions and [their employers] do not have an identity of interests."  SBA Mem. 20.  Similarly, the City observes that "the interests of the City and the Unions may differ on collective bargaining issues."  Letter from the City of New York (Oct. 18, 2013), ECF No. 414.  Third, the view that conduct reviewed at trial is only "at issue" if the district court's verdict is affirmed by the Court of Appeals is contrary to basic principles of federal law.  The district court's orders are final and self-executing; they are not suppositions that require affirmance by a court of appeals before becoming effective.

In sum, the Unions' position that its motions are timely because they were filed either within thirty-days of the Liability and Remedial Orders or when their alleged interests "crystallized" is inconsistent with relevant case law.  Moreover, the Unions' contention that

certain post-trial developments were unforeseeable is implausible.  Because the Court rejects the
Unions' various explanations for the timing of their motions, the Court endeavors to determine
when the Unions obtained actual or constructive notice that their alleged interests in *Floyd* and
*Ligon* were not represented by the existing parties.  A review of the facts reveals that the alleged
interests that the Unions claim were unforeseeable until August 2013 were actually ascertainable
far earlier.  The Court now turns to that issue.

        b.   Measuring the Delay Between Notice and the Unions' Motions

     "Delay is not measured solely subjectively because, if that were the test, a putative
intervenor could always claim it did not know it needed to intervene until the eve of its motion."
*Butler, Fitzgerald & Potter*, 250 F.3d at 182.  Delay is measured from when the applicant had
actual notice or constructive notice of an unrepresented interest, which may be implied from a
variety of circumstances.  *See NAACP*, 413 U.S. at 366-67 (notice implied from newspaper
article, public comment by community leaders, size and astuteness of membership and staff of
organizational appellant, and questioning of two individual appellants by lawyers with the DOJ
regarding the subject matter of the litigation).  Courts in this circuit have recognized that a
variety of case developments, similar to those in *Floyd* and *Ligon*, may provide actual or
constructive notice:  (i) the filing of a complaint or the initiation of related litigation, *see, e.g.*,
*D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001); *Catanzano by Catanzano v. Wing*,
103 F.3d 223, 232-33 (2d Cir. 1996); *Pitney Bowes*, 25 F.3d at 71; *Citizens Against Casino
Gambling in Erie Cnty. v. Hogen*, 704 F. Supp. 2d 269, 282 (W.D.N.Y. 2010), *aff'd*, 417 F.
App'x 49 (2d Cir. 2011); (ii) class certification, *see, e.g.*, *Hnot v. Willis Grp. Holdings Ltd.*, 01
Civ. 6558, 2006 WL 3476746, at *3-4 (S.D.N.Y. Nov. 30, 2006), *aff'd*, 234 F. App'x 13 (2d Cir.
2007); (iii) the litigating of major or dispositive motions, *see, e.g.*, *MasterCard Int'l Inc. v. Visa*

*Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 390 (2d Cir. 2006); (iv) the resolution process, *see, e.g.*, *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 198 (2d Cir. 2000); and (v) publicity about the lawsuit, *see, e.g.*, *In re Bank of New York Derivative Litig.*, 320 F.3d 291, 300-01 (2d Cir. 2003); *Authors Guild v. Google, Inc.*, 74 Fed. R. Serv. 3d 1488 (S.D.N.Y. 2009).  Here, numerous developments in the course of *Floyd* and *Ligon* and their related precursor *Daniels* should have provided the Unions with notice of the pendency of their alleged interests.

          i.    Filing of a Complaint and Related Litigation

Numerous courts have found that, among other factors, the initiation of a lawsuit where the complaint addresses the would-be intervenors' interests may trigger constructive notice.  *See, e.g.*, *Pitney Bowes*, 25 F.3d at 71 (plaintiff's public filing of the action in the Federal Register alerted proposed intervenors to their interests); *Catanzano,* 103 F.3d at 233 (home health service providers who asserted an interest in not being forced to provide care should have known from the initiation of the lawsuit that plaintiffs sought to require such care); *D'Amato*, 236 F.3d at 84 (among other factors, the motion was denied as untimely because it was made more than a year after the complaint was filed).  Movants may also obtain notice based on the commencement of related litigation.  *See, e.g.*, *Farmland Dairies*, 847 F.2d at 1044 (affirming district court finding that applicants could have moved as soon as they "were aware of this and related litigation"); *Citizens Against Casino Gambling*, 704 F. Supp. 2d at 282 (prior filing of two related lawsuits predicated on similar assertions and proposed remedies against similar parties provided notice).

The *Daniels* complaint, filed on March 8, 1999, the *Floyd* complaint, filed on January 31, 2008, and the *Ligon* complaint, filed on March 28, 2012, each contained allegations and sought relief that should have put the Unions on notice of their alleged reputational and collective

bargaining interests.  In each of the three complaints, plaintiffs alleged *Monell* liability[11] against the City through the conduct of its agency, the NYPD, for encouraging officers to carry out unconstitutional stops-and-frisks.  As is typical in such claims against municipalities, the plaintiffs alleged that individual officers engaged in unlawful conduct and that the City's deliberate indifference to this behavior gave rise to a *de facto* City policy.  From the complaints in each case, it was foreseeable that factual allegations regarding union member conduct would be litigated, that a judge or jury might conclude that the conduct was unlawful, and that city-wide remedies could follow.  Therefore, the Unions should have learned of their alleged interests by 2008 when *Floyd* was filed.

Foreseeability is heightened for several reasons.  In all three lawsuits, union members were among the individual officers named as defendants.  Each complaint specifically requested department-wide changes to stop-and-frisk policies, training, supervision, monitoring, documentation, and disciplinary procedures.  The remedial measures sought by plaintiffs in *Daniels*, *Floyd*, and *Ligon* are quite similar to the relief contained in the Remedial Order.  Thus, the foreseeability of a potential clash with the Unions' alleged interests dates back to March 1999, January 2008, and March 2012.  In fact, *Floyd* and *Ligon* were filed as related to *Daniels* and formally assigned to the same district judge.  *See Ligon*, 736 F.3d at 122 (discussing the relationship between *Daniels*, *Ligon*, and *Floyd*).  Thus, the filing of *Floyd* as related to *Daniels* only a month after the *Daniels* case ended, and *Ligon*, as related to both, equally provided notice.

The Unions reject the notion that the initiation of these lawsuits conveyed notice, arguing that "the time that the would-be intervenor first became aware of the pendency of the case is not relevant to the issue of whether his application was timely."  SBA Reply Mem. 6 (citing

---

[11] Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-91 (1978) and its progeny, municipalities can sued for monetary, declaratory, and injunctive relief under 42 U.S.C. § 1983 for unconstitutional policies or customs.

*Stallworth v. Monsanto Co.*, 558 F.2d 257, 265 (5th Cir. 1977)).  The Unions' argument obscures

the holding of this out-of-circuit case.  In *Stallworth*, the Fifth Circuit rejected a *per se* rule that

the filing of a complaint provides a proposed intervenor with notice.  558 F.2d at 264-65.

Instead, in following the constructive knowledge standard from *United Airlines* and *NAACP*, the

Fifth Circuit reversed the district court's finding of untimeliness because it "used an unspecified

time when it supposed that the appellants must have learned of the pendency of the action rather

than the time when they knew or should have known of their interest in the action as its starting

point in assessing whether they acted promptly to protect themselves."  *Id*. at 267.  The court

reasoned that the filing of a complaint is not always sufficient to notify a would-be intervenor of

its interests because interests unapparent when a complaint is filed may reveal themselves later in

a lawsuit.  *Id*.  Thus, *Stallworth* supports Plaintiffs' constructive notice argument.  Plaintiffs do

not argue that the filing of the complaints, *per se*, should have triggered notice.  Instead,

Plaintiffs contend that the complaints' substantive allegations and prayers for relief provided

notice.

The Unions rely heavily on another out-of-circuit case, *United States v. City of Los

Angeles*, 288 F.3d 391 (9th Cir. 2002), to buttress other aspects of their intervention motions.

With regard to timeliness, however, that case also supports the proposition that a complaint can

provide notice.  There, the Los Angeles Police Protective League (the "PPL") "submitted the

motion to intervene within weeks of the filing of the complaint and before any orders regarding

the Proposed Decree ha[d] been entered."  Order Denying PPL's Mot. to Intervene at 7, *United

States v. City of Los Angeles*, 00 Civ. 11769 (C.D. Cal. Jan. 5, 2001), Docket No. 58.  Although

no individual officers were named as defendants, the PPL was motivated to seek intervention by

the complaint's inclusion of allegations of police misconduct and the possibility of a threat to

collective bargaining rights by the proposed consent decree. *City of Los Angeles*, 288 F.3d at

399.  Thus, the district court found the motion to be timely, which was "not challenged on

appeal." *Id.* at 397.  Unlike *Floyd* and *Ligon*, the PPL moved to intervene when misconduct was

merely alleged in the complaint, rather than after the allegations had been proven at trial.  The

PPL also did not await the district court's issuance of a remedial order and instead sought

intervention the moment remedies were proposed.  Rather than supporting the Unions' position,

*City of Los Angeles* underscores their untimeliness—unlike the diligent PPL, the Unions here

neglected their alleged interests until after they were adjudicated.

> ii.   Class Certification

Class certification has been held to provide notice given the public nature of that process.

*See, e.g.*, *D'Amato*, 236 F.3d at 84 (where parties sought to certify a settlement class, district

court's order that notice be sent to class members and pending fairness hearing alerted proposed

intervenors of their interests); *Hnot*, 2006 WL 3476746, at *3 (district court's class certification

order notified potential class member seeking to alter the class definition of her interests).

*Daniels*, *Floyd*, and *Ligon* each produced published opinions on class certification that

were the subject of extensive briefing.  In *Daniels*, the Court certified a class on January 25,

2001 and found that the "named plaintiffs are seeking money damages for themselves but are

only seeking declaratory and equitable relief for the class they wish to represent."  *Daniels v.*

*City of New York*, 198 F.R.D. 409, 416 (S.D.N.Y. 2001).  Similarly in *Floyd*, after extensive

briefing, the Court granted class certification on May 16, 2012, approving of plaintiffs' objective

to "seek equitable relief in the form of (1) a declaration that defendants' policies, practices,

and/or customs violate the Fourth and Fourteenth Amendments, and (2) a class-wide injunction

mandating significant changes in those policies, practices, and/or customs."  *Floyd v. City of New*

*York*, 283 F.R.D. 153, 159 (S.D.N.Y. 2012).  The Court certified a class consisting of

> [a]ll persons who since January 31, 2005 have been, or in the future will be,
> subjected to the New York Police Department's policies and/or widespread
> customs or practices of stopping, or stopping and frisking, persons in the absence
> of a reasonable, articulable suspicion that criminal activity has taken, is taking, or
> is about to take place in violation of the Fourth Amendment, including persons
> stopped or stopped and frisked on the basis of being Black or Latino in violation
> of the Equal Protection Clause of the Fourteenth Amendment.

*Id.* at 160.  The class definition dictates that evaluating police behavior would form a large part

of plaintiffs' case.  Furthermore, the Court noted that there was an issue of "[w]hether the

'performance goals' are accurately characterized as 'quotas' under the New York Labor Law"

which "is surely important to the NYPD and to police officers and their union."  283 F.R.D. at

164.  Thus, the Court explicitly recognized what the Unions should have—that stop-and-frisk

policies that might affect the Unions' alleged interests were under consideration.  In *Ligon*, on

February 11, 2013, in a published opinion, the Court certified a class consisting of

> [a]ll individuals who have been or are at risk of being stopped outdoors within the
> vicinity of Bronx apartment buildings enrolled in the NYPD's Trespass Affidavit
> Program (commonly referred to as "Operation Clean Halls") without legal
> justification by NYPD officers on suspicion of trespassing in said buildings.

*Ligon v. City of New York*, 288 F.R.D. 72, 83 (S.D.N.Y. 2013).  The opinion signaled the

existence of the same remedial issues that concern the Unions now.  Class certification is a

public exercise intended to notify individuals that their rights are being adjudicated.  In certifying

a class in each case, the Court put the City and its residents on notice of what was at stake.  Yet,

the Unions offer no explanation for how they remained unaware of these significant events.

    iii. Litigating Important Motions and Issues

   The litigation of important motions and other significant case developments have also

been held to provide notice.  *See, e.g.*, *MasterCard Int'l*, 471 F.3d at 390 (motion for preliminary

injunctive relief "publicly available for anyone to access" should have alerted proposed

intervenor of its interest); *Catanzano*, 103 F.3d at 233 (district court's publication of its preliminary injunction order, which contained the remedy the would-be intervenors sought to challenge, provided sufficient notice to them of their interest).  The Unions argue that they were caught off-guard by the factual findings and legal analysis in the Liability and Remedial Orders. However, as demonstrated in the discussion that follows, the substantive issues therein were raised and disputed by the parties long before August 2013.

(a) *Daniels*:  the DOJ's Attempt to Intervene

Amongst the numerous published decisions on substantial motions in *Daniels*, on April 12, 2001, the court denied the DOJ's motion to intervene in order to access discovery for its own investigation of NYPD stop-and-frisk practices.  *Daniels*, 200 F.R.D. at 210.  The investigation began in March 1999 after the widely publicized shooting death of Amadou Diallo, "an unarmed and law-abiding African immigrant . . . [who] was killed when four members of the SCU fired 41 bullets at him in the vestibule of his Bronx apartment building, striking him 19 times." *Daniels* Compl. ¶ 40; Shudofsky Decl. ¶ 2, *Daniels*, ECF No. 93-1.  In conjunction with the investigation, the City had voluntarily provided the DOJ several years of UF-250 data. Shudofsky Decl. ¶¶ 3-4.  However, the City ceased providing such data for stops that occurred after March 2009.  *Id.* ¶ 5.  In denying the motion, the court reasoned that the DOJ could obtain the discovery through its own lawsuit against the City.  *Daniels*, 200 F.R.D. at 209.  Although the DOJ's motion was unsuccessful, its attempt to intervene demonstrates that non-parties were aware of the stakes and, unlike the Unions, actively sought to be involved.

(b) *Floyd* Discovery

The Unions claim that it was unforeseeable that the Court would find that "over an eight-year period, at least 200,000 stops conducted by NYPD officers were  unconstitutional and that

34

officers intentionally targeted minorities, based solely on a purported statistical analysis of UF-250 forms, and without any consideration of the totality of the unique circumstances of each of the 4.4 million stops at issue . . . ."  SBA Reply Mem. 12.  In addition, the Unions allege that is was unforeseeable that the Court would find that "several specific members of the [Unions] had committed unconstitutional stops and/or frisks."  PBA Mem. 14.  The Unions ignore the fact that during pretrial proceedings the parties vigorously litigated (1) the admissibility of plaintiffs' expert's statistical data and conclusions and (2) plaintiffs' allegations that particular stops-and-frisks were unlawful.  That these issues would be addressed during trial and that the Court would be tasked with making definitive rulings on them cannot be described as unexpected.  In essence, the Unions' real complaint is that they simply could not foresee the Court disagreeing with the City's position on these issues.

In *Floyd*, fact discovery proceeded for more than two-and-a-half years and included numerous extensive discovery disputes, production of voluminous material, and dozens of depositions.  Based upon the discovery produced and the parties' pretrial filings, it was entirely foreseeable that at trial plaintiffs would present wide-ranging statistical evidence based on Fagan's analysis of UF-250s and that plaintiffs would introduce evidence regarding particular stops-and-frisks.  With respect to the statistical evidence, on April 16, 2012, in a published opinion the Court granted in part and denied in part the *Floyd* defendants' motion to exclude Fagan's expert report and testimony (the "April 16 Order").  *Floyd v. City of New York*, 861 F. Supp. 2d 274, 304 (S.D.N.Y. 2012).  The nature and content of his proposed testimony were addressed in what the Court described as "voluminous" briefing leading up to the April 16 Order. *See Floyd*, 283 F.R.D. at 160.  The April 16 Order ruled admissible Fagan's (1) opinions about the process by which officers complete UF-250s and about the outcomes of the stops; (2)

analysis of UF-250s to determine whether millions of stops were justified; and (3) conclusions

regarding the significance of race and ethnicity. *Floyd*, 861 F. Supp. 2d at 289-90, 292-93, 304.

With respect to the individual stops analyzed in the Liability Order, that such analysis

would occur was also entirely foreseeable.  Dozens of union members were deposed during

discovery where they were likely questioned about allegations of unlawful conduct, training,

supervision, and other topics in the lawsuit.  Presumably, plaintiffs' purpose in deposing police

witnesses was to gather information about specific stops in order to prove plaintiffs' claims at

trial.  Thus, it was unsurprising that in the Court's summary judgment opinion, as with the

Liability Order, the Court evaluated specific stops to determine whether they were indicative of a

city-wide policy.  *Floyd v. City of New York*, 813 F. Supp. 2d. 417, 443-46 (S.D.N.Y. 2011).

Finally, based on the parties' pre-trial submissions, it was clear that plaintiffs intended to

introduce at trial information regarding particular stops as evidence of a city-wide policy.

Although the Unions could not have predicted how the Court would rule on Fagan's testimony or

on the individual stops, the Unions simply cannot claim to be surprised by the evidence

presented by plaintiffs and relied upon by the Court.  *See* PBA Mem. 5-6, *Floyd,* ECF No. 445

(criticizing the Court's reliance on Fagan's trial testimony).  Given that plaintiffs' evidence was

vetted well before trial, the Unions' delay appears to have been based on their gamble that the

City's position on these issues would prevail.

(c) *Floyd* Summary Judgment

On August 31, 2011, in a published opinion, the Court granted in part and denied in part

defendants' (some of whom were union members) motion for summary judgment, finding that

there existed genuine issues of material fact as to whether there were NYPD policies governing

officer training, supervision, monitoring, and discipline that enabled a widespread practice of

suspicionless and race-based stops-and-frisks attributable to the City.  *Floyd*, 813 F. Supp. 2d. at 417.  In particular, the Court found "that the questionable constitutionality of 30 percent of stops is sufficient to allege that the custom [of suspicionless stops-and-frisks] is widespread."  *Id.* at 446.  Moreover, in evaluating plaintiffs' claims that the NYPD mandated quotas to encourage officers to perform otherwise suspicionless stops-and-frisks, the Court considered evidence that in May 2004, the PBA filed a labor grievance on behalf of six officers and one sergeant who were transferred for allegedly failing to meet a ten summons-per-month quota.  *Id.* at 426.  The Court noted that in January 2006, a labor arbitrator found that the NYPD had imposed summons quotas in violation of New York labor laws.  *Id.*  This observation is significant not only because it was a public acknowledgment of the Unions' potential interest in this litigation, but also because it suggests that the Unions were aware of the substantive issues in *Floyd* as early as 2004.  Yet, even when the Court highlighted the 2006 labor arbitrator's finding as *Floyd* was headed to trial, the Unions did not seek to intervene.

### (d) *Ligon* Injunction Order

Less than a month after the complaint was filed in *Ligon*, plaintiffs informed the Court that they would seek a preliminary injunction to halt unconstitutional trespass stops around TAP buildings in the Bronx.  The parties submitted briefs and motions in limine, and the Court held a multi-day evidentiary hearing, after which the parties submitted proposed findings of fact and conclusions of law.  Over the course of seven days in October and November 2012, the Court considered a variety evidence including (1) testimony from a Bronx assistant district attorney who concluded that the NYPD frequently made trespass stops outside TAP buildings for no reason other than that the officer had seen someone enter and exit or exit a building; (2) "a sample of 'decline to prosecute' forms prepared by the Bronx District Attorneys' Office which

revealed the alarming frequency of unlawful trespass stops in the vicinity of TAP buildings in the Bronx;" (3) testimony from eight plaintiffs and a non-party witness who "described remarkably similar encounters with the police when stopped in the vicinity of TAP buildings in the Bronx;" (4) an analysis by Fagan of trespass stops outside TAP buildings in the Bronx; and (5) evidence from NYPD training materials that misstated the minimal constitutional standards for making stops. *Ligon*, 925 F. Supp. 2d at 485. The Court granted plaintiffs' motion for a preliminary injunction on January 8, 2013, finding that they had shown a "clear likelihood of proving" that the City, by its deliberate indifference, had a policy of conducting unlawful stops outside of TAP buildings. *Id.* The Injunction Order prohibited the NYPD from "performing trespass stops outside TAP buildings in the Bronx without reasonable suspicion of trespass, in accordance with the law as set forth and clarified in this Opinion." *Id.* at 542. By its terms, the Injunction Order directly addressed officer conduct and many of the same issues that were adjudicated in the *Floyd* trial. Yet, despite the imposition of injunctive relief, in part on the basis of union member conduct, the Unions did not move to intervene or otherwise express any concerns about how the relief might affect their members.

(e) Dismissal of Individual Defendants in *Floyd*

As the *Floyd* trial neared, the parties agreed to resolve an issue that is critical to the Unions' proposed intervention to protect its members' alleged reputational interests. On March 8, 2013, the parties stipulated to dismiss all claims against the remaining individual officer defendants with prejudice. *Floyd*, ECF No. 270. This event stands apart because it signaled that the conduct of individual NYPD officers would be adjudicated at trial with no remaining defendant necessarily protecting those interests. Prior to March 8, 2013, the Corporation Counsel represented all *Floyd* defendants, from the individual officers to the police

commissioner and the mayor.  The Corporation Counsel is the "attorney and counsel for the city and every agency thereof and shall have charge and conduct of all the law business of the city and its agencies."  N.Y.C. Charter § 394(a).  Appointed by the mayor, the Corporation Counsel is the only office holder authorized to represent the legal interests of the City.  *Id.* §§ 6, 391.  In civil actions where both the City and its employees are named as defendants, the Corporation Counsel must represent the City, and it may elect to represent individual employees, so long as the Corporation Counsel is satisfied that the employees were acting within the scope of their employment and there is no ethical conflict of interest in representing co-defendants.  N.Y. Gen. Mun. Law § 50-k; *see also Mercurio v. City of New York*, 758 F.2d 862, 864-65 (2d Cir. 1985); *Lamberti v. Metro. Transp. Auth.*, 170 A.D.2d 224, 225 (1st Dep't 1991).

The Second Circuit has observed the inherent conflict of interest in 42 U.S.C. § 1983 lawsuits where plaintiffs seek recovery against both a municipality and individual municipal employees.  *See Dunton v. Suffolk Cnty.*, 729 F.2d 903, 907 (2d Cir. 1984), *amended*, 748 F.2d 69 (2d Cir. 1984); *Patterson v. Balsamico*, 440 F.3d 104, 114 (2d Cir. 2006).  The conflict exists "because a municipality may avoid liability by showing that the employee was not acting within the scope of his official duties while the employee, by contrast, may partially or completely avoid liability by showing that he was acting within the scope of his official duties."  *Patterson*, 440 F.3d at 114 (alternations, citations and internal quotation marks omitted).  However, where the Corporation Counsel represents both the City and individual officers pursuant to its discretion under N.Y. General Municipal Law 50-k, "it would not be in the City's interest to . . . place blame on" the individual employees.  *Mercado v. City of New York*, 08 Civ. 2855, 2010 WL 3910594, at *4 (S.D.N.Y. Sept. 30, 2010).  Here, in agreeing to represent both the City and the individual officers, the Corporation Counsel was presumably satisfied that the officers were

acting within the scope of their employment and that there was no ethical conflict that would have required the appointment of separate counsel.  N.Y. Gen. Mun. Law § 50-k; *see also Mercurio*, 758 F.2d at 864-65.  The Corporation Counsel could not simultaneously represent these municipal employees and repudiate their conduct.

Thus, the Corporation Counsel's decision to represent Officers Rodriguez, Goodman, Hernandez, Joyce, Pichardo, Salmeron, Hayes, Moran and Sergeant Kelly in *Floyd* signals that at least until March 8, 2013, the City believed that the officer conduct at issue—allegedly unconstitutional stops-and-frisks—was lawful conduct within the scope of the defendant officers' employment.  Moreover, by agreeing to represent these officers, the City implicitly sanctioned all similar NYPD officer conduct as part of its *Monell* litigation strategy.  In addition to the ethical incentive to protect the named officer defendants, the Corporation Counsel had a strategic incentive to protect the interests of all officers who were acting pursuant to their municipal employer's directives.  However, after March 8, 2013, when the officer defendants were dismissed from *Floyd*, the City was no longer compelled to look after the interests of any officers, named or unnamed.  Instead, the City could concede officer misconduct and argue that it did not evidence a widespread pattern or practice attributable to City policy.  Any such misconduct, the City could argue, would be attributable to rogue officers acting contrary to City policy.  Thus, when plaintiffs agreed to withdraw their claims against the remaining officer defendants, the Unions' alleged interest in protecting NYPD officers' reputations became, in the Unions' terms, "crystallize[d]."  SBA Reply Mem. 13.  As of March 8, 2013, the Corporation Counsel was not obligated to represent anyone's reputational interests other than the City's.

A review of the City's post-trial filings demonstrates that the possibility of the City adopting this strategy was genuine.  In their post-trial briefs, the City repeatedly argued that the

evidence of officer wrongdoing was sparse and "anecdotal," repudiating plaintiffs' claim that it was widespread.  Additionally, the City argued that plaintiffs had failed to show a systemic pattern or practice of unconstitutional behavior and that evidence of such a pattern or practice was based on unreliable information contributed by "a very few disgruntled officers."  Def. Post-Trial Mem. 9-10, *Floyd*, ECF No. 364.  Given their purported status as protectors of police officer interests generally, the Unions should have recognized that at the moment the named officer defendants were no longer represented by the Corporation Counsel, the City would no longer protect their interests.  The Unions, after all, "are not poor, ignorant people whose rights have to be protected."  *Farmland Diaries*, 847 F.2d at 1044.  When the officer defendants were dismissed from *Floyd*, it should have been obvious to the Unions that plaintiffs' *Monell* claims would necessarily implicate union member conduct with no guarantee that the sole remaining defendant, the City, would safeguard union members' reputational interests.

iv.   Resolution Process

The Second Circuit has repeatedly emphasized that an intervenor's awareness of the process of negotiating a resolution of a case is an important factor in determining notice.  *See, e.g.*, *In re Holocaust Victim Assets Litig.*, 225 F.3d at 198 (affirming denial of intervention as untimely when proposed intervenors knew of extensive negotiations leading up to settlement agreement and had submitted written objections to the settlement but waited until eight months after preliminary approval to intervene); *Pitney Bowes*, 25 F.3d at 71 (affirming denial of intervention, in part, because movant had notice that the parties had negotiated for eight months before reaching the final agreement the movant sought to challenge).

(a)  *Daniels* Settlement

Although the settlement in *Daniels* is not dispositive as to the timing of the Unions'

motions to intervene in *Floyd* and *Ligon*, it is noteworthy for the fact that the Unions never

sought intervention in *Daniels* when the settlement was negotiated, entered, or implemented.  On

January 13, 2004, the Court approved a stipulation of settlement.  Stipulation, *Daniels*, ECF No.

152.  Plaintiffs agreed to release their class claims, and the City agreed to (1) implement stop-

and-frisk audit procedures and apprise class counsel of the results on an ongoing basis; (2) revise

supervisory trainings for new sergeants and lieutenants to address racial profiling concerns and

maintain that as part of the Police Academy curriculum; (3) provide annual training on the

NYPD's racial profiling policy; (4) ensure that all stop-and-frisk incidents would be documented

on a revised UF-250 and provide class counsel with quarterly results; and (5) conduct joint

community forums and workshops at select high schools to educate the public about the NYPD's

racial profiling policy and the rights of citizens.  *Id.*  The *Daniels* settlement was published in

three newspapers and remained in effect through December 31, 2007.  Aff. of Publication,

*Daniels*, ECF No. 150.  Although the settlement implicated the same day-to-day job duties now

at issue, the Unions never moved to intervene.  Tellingly, the Unions have given no indication to

the Court that implementation of the *Daniels* settlement adversely affected their members'

reputations or the Unions' ability to collectively bargain with the City.

(b) Remedial Relief Ordered in *Floyd* and *Ligon*

Although not a settlement or consent decree, the Remedial Order was the product of

months of input from the parties and other stakeholders.  *See Floyd*, ECF Nos. 268 (Pl.

Permanent Injunctive Relief Mem.), 276 (Def. Opposition to Permanent Injunctive Relief), 364

(Def. Post-Trial Mem.), 365 (DOJ Statement of Interest), 367 (Pl. Post-Trial Mem.); *Ligon*, ECF

Nos. 108 (Pl. Post-Hearing Br. on Remedial Relief), 109 (Def. Br. on Remedial Relief), 112

(Def. Proposed Remedial Relief), 117 (Pl. Br. Concerning Def. Remedial Proposals), 118 (Def.

42

Reply Mem. on Remedial Relief).  In the Injunction Order, the Court proposed specific changes

to policies, procedures, supervision, and training and invited the parties to brief "whether the

proposed relief is insufficient or too burdensome or otherwise inappropriate."  925 F. Supp. 2d at

543.  The parties briefed the issues over the next several months, and in a filing dated April 11,

2013, the City indicated that although it intended to appeal the Injunction Order, it did not object

to the remedial measures.  Def. Br. on Remedial Relief, *Ligon*, ECF No. 109.

　　　Because of "overlapping [remedial] issues raised in the three cases," on January 31, 2013,

the Court held a joint hearing in *Floyd*, *Ligon*, and *Davis v. City of New York*, 10 Civ. 699

(S.D.N.Y. filed Jan. 28, 2010)—another putative class action challenging stop-and-frisk tactics

in and around New York City public housing.  Jan. 31, 2013 Hearing Tr. at 6:13-21, *Floyd*, ECF

No. 406.  In addition to affirming the decision not to bifurcate the *Floyd* trial, the Court

requested that the parties brief the scope of any remedial injunction that would follow, assuming

plaintiffs proved liability at trial.  *Id.* at 23:6-24.  Thus, with respect to *Floyd*, the Court made

clear that the liability and remedial issues would be tried together and that the *Floyd* and *Ligon*

remedies would similarly be bound together.

　　　Although the Unions seemed to have missed the Court's cue that remedies were actively

being considered as early as January 2013, another stakeholder got the message.  On June 12,

2013, the DOJ submitted a "Statement of Interest" in *Floyd*.  *Floyd*, ECF No. 365.  The DOJ

outlined the legal basis for and endorsed the appointment of a monitor if plaintiffs prevailed at

trial.  *Id*.  The DOJ noted that while it "would have preferred to file this brief if, and only if, the

Court finds that [p]laintiffs have met their burden to establish liability" in the *Floyd* trial, it

recognized that "because the Court has denied [p]laintiffs' requests to bifurcate the liability and

remedy phases" of the *Floyd* trial, "the United States makes this filing at this time."  *Id.* at 1 n.1.

This footnote speaks volumes.  First, it shows that non-party stakeholders were aware that the Court was considering liability and remedial issues simultaneously and that the time to speak up had arrived.  Second, it shows that earlier than August 2013, other stakeholders were aware that the appointment of an independent monitor was a significant possibility.  Although the Unions now take issue with the appointment of a monitor, they do not explain why they sat on the sidelines while the parties and non-parties discussed this and other remedies.

>           v.      Publicity

It is uncontroverted that publicity surrounding a lawsuit may provide notice to potential intervenors that their interests are at issue.  *See NAACP*, 413 U.S. at 366-67; *see also In re Bank of New York Derivative Litig.*, 320 F.3d at 300 (shareholder-intervenors had notice of their interests where the lawsuit had been pending for more than two years and had "garnered no small amount of media attention"); *Authors Guild v. Google, Inc.*, 74 Fed. R. Serv. 3d at 1488 (extensive media attention alerted intervenors of their interest in being included in the class).

There is no dispute that the issues at the heart of *Floyd* and *Ligon* are matters of broad public concern that have generated significant media attention.  Their predecessor, *Daniels*, and the DOJ's investigation of the City at that time, were both triggered by the extensively publicized shooting death of Amadou Diallo, "an unarmed and law-abiding African immigrant . . . [who] was killed when four members of the [Street Crimes Unit] fired 41 bullets at him in the vestibule of his Bronx apartment building, striking him 19 times."  Compl. ¶ 40, *Daniels*, ECF No. 1; Shudofsky Decl. ¶ 2, *Daniels*, (Feb. 1, 2001), ECF No. 93.  Once *Daniels* settled, the notice of settlement was widely published, and a public hearing was held at which no objections were made.  *Daniels*, ECF No. 150; Dec. 12, 2003 Hearing Tr. at 5:22-24, *Daniels*, ECF No. 154.

Similarly, the pretrial publicity surrounding *Floyd* and *Ligon* should have provided the Unions sufficient notice that their alleged interests might be implicated, as evidenced by the fact that several other non-party stakeholders requested to be heard by the Court. *See, e.g.*, Charney Decl. Exs. J, K, M (news articles reporting on events in the *Floyd* and *Ligon* actions). For example, during the class certification debate, five non-profit groups and twenty-seven New York City Council members signed on to amicus briefs. As noted above, the DOJ submitted a Statement of Interest two months prior to the issuance of Liability and Remedial Orders to explain its views on the appointment of an independent monitor. *Floyd*, ECF No. 365. If these various stakeholders had sufficient notice of these cases, it is implausible that the Unions did not.

A highly publicized trial in *Floyd* occurred over the course of two months in which thirty police officers, ten sergeants, ten lieutenants, three captains, four deputy inspectors and seven inspectors testified regarding their job duties, workload, method of documenting and reviewing stops, and other subjects such as how officers are trained and supervised in stops-and-frisks and racial profiling. Def. Findings of Fact ¶¶ 23, 25-33, 43-49, *Floyd*, ECF No. 363; Pl. Findings of Fact ¶¶ 86-107, 122-136, *Floyd*, ECF No. 366. There was also testimony presented at trial that from 2010 to 2013, the Unions filed nine grievances against the NYPD alleging that officers were subject to adverse employment actions as a result of their failure to meet the same performance quotas that the *Floyd* plaintiffs were litigating. *Floyd* Trial Tr. 3399:21-3402:17; 6790:25-6791:3. Yet, at no point prior to or during the trial did the Unions move to intervene.

c. Conclusion: Constructive Notice Predates August 2013

In sum, the Unions should have known for years—but by March 8, 2013, at the latest— that their members' alleged reputational interests and the Unions' collective bargaining interests were being litigated by parties who were not invested in protecting those interests. Although

courts generally accept as true an applicant's well-pleaded, non-conclusory allegations on a motion to intervene, *see Bay Casino, LLC*, 199 F.R.D. at 466, this does not permit courts to turn a blind eye where the allegations are contradicted or unsupported by "credible" proof, *see United Parcel Serv. of Am., Inc. v. The Net, Inc.*, 225 F.R.D. 416, 422 (E.D.N.Y. 2005), or are unproven by a "clear showing," *see United States v. Int'l Tel. & Tel. Corp.*, 349 F. Supp 22, 27 n.4 (D. Conn. 1972). The Unions' claim that they first learned of their unrepresented interests in these actions in August 2013 is unconvincing because "there is evidence that [the Unions] should have known the suit[s] could impact [their] interests" long before. *See Heartwood*, 316 F.3d at 701. The Unions did not move to intervene when the *Daniels* settlement was proposed or implemented in 2004, and they did not request amicus status in order to provide comment. With regard to *Floyd*, the Unions did not move to intervene when the complaint was filed seeking the same relief the Unions now wish to place at issue, when the class was certified, or when the summary judgment motion was decided. The Unions also ignored the proceedings in *Ligon* and the pretrial proceedings in *Floyd,* where, as early as January 2013, the Court discussed the scope of the remedies under consideration for both cases and stated that the evidence related to remedies in *Floyd* would be presented at trial alongside liability evidence. Finally, the Unions let pass without comment March 8, 2013, the date when the City ceased representing the individual officers and was no longer required to consider their interests. The recitation of the histories of *Daniels*, *Floyd*, and *Ligon* demonstrates that the Unions' delay should not be measured from August 2013, but rather from many months, if not years, earlier.

2.   Prejudice to Existing Parties

Although notice of an applicant's unrepresented interest is important, it is not dispositive. *See NAACP*, 413 U.S. at 365-66. Rather, "[i]t is firmly established that the most

significant criterion in determining timeliness is whether the delay in moving for intervention has prejudiced any of the existing parties." *United States v. Int'l Bus. Machines Corp.*, 62 F.R.D. 530, 541-42 (S.D.N.Y. 1974) (citations omitted); *see also Citizens for an Orderly Energy Policy, Inc. v. Suffolk Cnty.*, 101 F.R.D. 497, 501 (E.D.N.Y. 1984).

The Unions claim that Plaintiffs and the City will suffer no prejudice because the Unions only seek to participate in future proceedings, such as an appeal to the Second Circuit.  Plaintiffs contend that intervention at this stage would be severely prejudicial, emphasizing a need for finality after five years (or fifteen counting *Daniels*) of resource-intensive litigation and the harm of delaying remediation of longstanding constitutional violations.

The prejudice to the *Floyd* plaintiffs and the City is self-evident.  Plaintiffs have invested significant time and resources in these cases.  After years of pretrial proceedings and a two-month trial in *Floyd*, liability has been established against the City.  Now the City has agreed to implement, in large part, the very reforms plaintiffs have been fighting for.  Having prevailed to this extent, plaintiffs face significant prejudice if previously uninterested late-comers are permitted to prolong the legal wrangling and further delay plaintiffs' hard-won relief.

For the City, the prejudice that may result from the Unions' proposed intervention is twofold.  The Unions seek an appeal the City no longer wants to pursue in order to vindicate a policy the City no longer wants to implement.  The right to decide whether to settle a lawsuit against the City or to prosecute an appeal is vested in the City's chief lawyer, the Corporation Counsel, and its chief executive, the mayor.  Both have indicated that the City is poised to "end the years-long legal battle"[12] and reform the NYPD's stop-and-frisk practices that the Court found unconstitutional.  Granting intervention would permit the Unions to infringe upon the

---

[12] Press Release, "Mayor de Blasio Announces Agreement in Landmark Stop-and-Frisk Case," Jan. 30, 2014, Charney Decl. Ex. L, *Floyd*, ECF No. 450-12.

City's prerogative to determine policing policy as manifested in its litigation strategy.

Finally, both plaintiffs and the City are prejudiced to the extent the Unions seek to represent the interests of officers who were previously defendants in *Floyd*. Some of the officers mentioned by name in the Liability Order were also defendants in this action. As discussed, these officer defendants consented to their dismissal from *Floyd* with prejudice. Thus, it would be highly prejudicial to allow the Unions to resurrect the alleged interests of officers who have already left the lawsuit. Rule 24 was not intended to create a revolving door where parties can come and go as litigation strategies shift.

3. Prejudice to Proposed Intervenors

The Court finds no tangible prejudice to the Unions in denying their motions to intervene. As discussed below, the Unions assert no legally colorable interest, and even if they were allowed to intervene, they lack standing to appeal the Injunction, Liability, and Remedial Orders.

4. Conclusion: the Motions to Intervene are Untimely

In light of the length of the delay, the Unions' failure to offer any reasonable explanation, the significant prejudice to the *Floyd* plaintiffs and the City, and the lack of prejudice to the Unions, "intervention on the part of late-arrivers must yield" to the existing parties' desire for finality. *Farmland Diaries*, 847 F.2d at 1044-45 (internal quotation marks omitted). Accordingly, the Unions' motions to intervene are denied as untimely.[13] Although the motions' untimeliness is sufficient to justify denial of intervention, the Court also finds that the Unions lack any significant protectable interests in these actions, and even if they had such interests, the Unions lack standing to pursue the appeals they seek. The Court now turns to each of these issues.

---

[13] For the same reasons, the Unions' motions to intervene for the purpose of appealing the Injunction, Liability, and Remedial Orders are also denied as untimely under Rule 24(b). *See NAACP*, 413 U.S. at 365; *United States v. New York*, 820 F.2d at 557-58.

**C.  Significant Protectable Interest**

Rule 24(a)(2) provides for intervention as of right where the applicant "claims an interest relating to the property or transaction that is the subject of the action."  Fed. R. Civ. P. 24(a).  Although the applicant "need not have an independent cause of action," *United States v. Palermino*, 238 F.R.D. 118, 121 (D. Conn. 2006), the interest must be "a legal interest as distinguished from interests of a general and indefinite character."  *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir. 1995) (internal quotation marks omitted).  "An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule."  *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001) (citation and internal quotation marks omitted).  Instead, it "must be direct, substantial, and legally protectable."  *Bridgeport Guardians v. Delmonte*, 602 F.3d 469, 473 (2d Cir. 2010) (citation and internal quotation marks omitted).

Here, the Unions allege interests in the liability phase of *Floyd* and the remedial phase of *Floyd* and *Ligon*.  Although the *Floyd* liability phase ended when the Court issued the Liability Order, the Unions argue that they can vindicate their reputational interests by appealing the Liability Order.  Similarly, although the Remedial Order has been issued, the Unions argue that their interests therein can also be vindicated on appeal.  The Court turns first to the Unions' interests in the merits, *i.e.*, intervention for the purpose of appealing the Liability Order.

1.  The Unions' Alleged Interests in the Merits

Plaintiffs in *Floyd* set out to prove the following at trial:  (1) that each of the named plaintiffs had been stopped, questioned, and/or frisked on the basis of their race and without reasonable articulable suspicion, or would be in the future; and (2) that the stops that were or

would be experienced by plaintiffs and all class members were the result of policies, customs, and practices of the City that encourage, sanction, and fail to prevent unconstitutional stops-and-frisks.  Joint Pre-trial Mem. 6-7, *Floyd*, ECF 271.  To prove or disprove these claims, plaintiffs and the City called many witnesses, including civilians, NYPD officers, senior NYPD officials, and experts and introduced volumes of documentary evidence.  In particular, plaintiffs introduced evidence concerning nineteen individual stops, statistical evidence regarding the scope and pattern of 4.4 million stops during the relevant time period, and evidence concerning the NYPD's awareness of and response to unconstitutional stops.  On August 12, 2013, the Court issued the Liability Order in *Floyd*, holding that the City had a policy of conducting race-based, suspicionless stops-and-frisks that violated the Fourth and Fourteenth Amendments.  In so doing, the Court made findings of fact and conclusions of law that assessed, credited, and discredited the testimonial and documentary evidence presented, including evidence regarding numerous NYPD officers, many of whom were involved in the nineteen stops.  The Court also analyzed evidence with respect to plaintiffs' claim that the NYPD was deliberately indifferent to the racial disparities in the 4.4 million stops discussed at trial and to the suspicionless nature of thousands of stops.  The Court made no findings of liability against individual officers, but instead evaluated their testimony and conduct in the context of determining that the City had violated the Constitution.

The Unions claim an interest in the merits of *Floyd* based on alleged reputational harm to their members resulting from the Court's findings that officers participated in, or contributed to, unconstitutional stops-and-frisks.  The Unions argue that the Court erred in three ways:  (1) in concluding that over an eight-year period, NYPD officers made at least 200,000 stops without reasonable suspicion; (2) in concluding that blacks are likely targeted for stops based on a lesser

degree of objectively founded suspicion than whites; (3) and in relying "exclusively" on expert

Jeffrey A. Fagan's statistical analysis of UF-250 forms in finding that stops lacked reasonable

suspicion.  *See* PBA Mem. 5; SBA Reply Mem. 12.  As a consequence, the Unions contend, the

Liability Order "ha[s] chilled lawful and proactive police conduct" and "unfairly undermine[d]

public confidence" in the NYPD.  PBA Mem. 14.

Although the Court found only the City liable for the unconstitutional conduct, the

Unions insist that the Court's mere mention of incidents involving individual officers and its

analysis of their behavior "impugned the integrity of thousands" of union members.  PBA Reply

Mem. 2.  As such, the Unions urge that the Second Circuit must correct these errors and

vindicate the reputation of all NYPD officers, especially those identified by name.  Unless and

until this happens, the Unions contend, public safety and officer safety will remain compromised

because officers will be "uncertain[]" and "hesitant" in policing the streets.  Alejandro Decl. ¶

26; *see also* SBA Mem. 13-14.  On appeal, the Unions will seek to invalidate the Injunction,

Liability, and Remedial Orders in order to vacate the allegedly offensive findings.

Plaintiffs argue that the Unions' alleged reputational interests are not cognizable on a

motion to intervene.  The purported reputational injury that might result from the Court's

finding that union members committed unlawful stops-and-frisks, Plaintiffs contend, is remote.

Moreover, Plaintiffs note that the Liability Order lays blame for widespread unconstitutional

stops on the City and the NYPD's institutional indifference, not on the malice or intentional

racism of individual officers.  *See Floyd*, ECF No. 373 at 60-117, 177-92; *Ligon*, ECF No. 105

at 118-34.  Plaintiffs argue, therefore, that to the extent reputations have been besmirched, it is

the reputation of the City and the NYPD, not the Unions' or their members'.  Plaintiffs maintain

that the Unions have no right to litigate the reputational interests of the City or its agency, the

NYPD, where the City declines to do so on appeal.  Furthermore, Plaintiffs contend that the Unions are incorrect in their claim that Plaintiffs' pursuit of "injunctive relief against their members" creates a legally protectable interest.  The *Floyd* plaintiffs' claims for money damages against individual officer defendants were dismissed long ago, and plaintiffs seek only injunctive relief against the City.  *See Floyd*, ECF No. 270.

With respect to the Unions' interests in the merits, the Court agrees with Plaintiffs.  The alleged reputational interests are not legally protectable, do not belong to the Unions, or are too conclusory and speculative to be colorable on a motion to intervene.  *Brennan*, 260 F.3d at 129.

a.   The Applicant's Burden

The burden to demonstrate a right to intervene, including a cognizable interest, is at all times on the applicant.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 490 (S.D.N.Y. 1998); *Diduck v. Kaszycki & Sons Contractors, Inc.,* 149 F.R.D. 55, 58 (S.D.N.Y. 1993).  Here, the Unions frame their members' alleged reputational interests in variety of ways:

- Court ordered "injunctive relief against . . . officers" provides an interest in the merits.  PBA Mem. 13.

- The "allegations" or "findings" that officers "broke the law" impugns their integrity.  SBA Mem. 13.

- Findings in the Liability Order that there was inadequate supervision, insufficient record-keeping, and a "culture of hostility," "derogates the general practices and performance of" officers.  *Id.*

- "[F]actual allegations of unconstitutional conduct that have already tarnished [officers'] careers."  SBA Reply Mem. 1.

- "[H]ighly injurious finding[s] that . . . officers had engaged in intentional racial discrimination."  PBA Mem. 2.

- Findings of "widespread constitutional violations, including intentional racial discrimination, impose upon them serious reputational harm."  *Id.* 22.

- If findings of wrongdoing against sergeants mentioned by name–Sergeants Korabel, Kelly, Houlahan, Stukes, Telford, and Loria–are "conceded by the City on behalf of the NYPD and its officers," it "would adversely affect the careers and lives of these SBA members, and cast doubt on the ability of other members to perform their duties effectively while avoiding similar accusations in the future, which in turn affects officer and public safety." SBA Mem. 13-14.

In all variations listed, the Unions offer only conclusory allegations without any supporting factual details. *See Hobson v. Hansen*, 44 F.R.D. 18, 25 (D.D.C. 1968) ("[P]etitioners have an obligation to set forth their interest with clarity."). Although courts generally accept as true an applicant's well-pleaded, non-conclusory claims on a motion to intervene, *see Bay Casino, LLC*, 199 F.R.D. at 466, this does permit courts to turn a blind eye where the allegations are contradicted or unsupported by "credible" proof, *see The Net*, 225 F.R.D. at 422, or are unproven by a "clear showing," *see Int'l Tel. & Tel. Corp.*, 349 F. Supp. 27 n.4. *See also Sch. Dist. of Philadelphia v. Pennsylvania Milk Mktg. Bd.*, 160 F.R.D. 66, 68 (E.D. Pa. 1995) (denying intervention where applicant did not sufficiently explain its interest beyond conclusory statements).

The Unions present no evidence of the "serious reputational harm" that their members have suffered or an explanation of how the findings are "highly injurious." Nor do the Unions provide examples of how their members' careers have been "tarnished," "adversely affect[ed]" or how officer integrity has been impugned. Such bare allegations fail to provide an adequate description of the nature of the interests, making a meaningful Rule 24 analysis by the Court impossible. *See Flynn v. Hubbard*, 782 F.2d 1084, 1093 (1st Cir. 1986) ("[C]onclusory allegations do not entitle [a movant] to intervention as of right under Rule 24.") (Coffin, J. concurring). The Unions, therefore, have not met their burden of propounding non-conclusory allegations regarding their interests. For this reason alone, their motions should be denied.

Setting aside these insufficiencies, the Unions' claim of protectable reputational interests in this litigation also fails because (1) they assert interests that do not belong to them or their members; and (2) to the extent the alleged interests do belong to their members, the interests are too indirect to be colorable on a motion to intervene.  The Court addresses each issue in turn.

      b.   Interests that Belong to the City, Not the Unions or their Members

The Unions contend that they have interests sufficient to warrant intervention because the Court ordered "injunctive relief against their members."  PBA Mem. 13.  They are legally and factually mistaken.  In truth, the Court found that the City violated the law by turning a blind eye to police officers' use of unconstitutional stop-and-frisk tactics.  Moreover, the court-imposed injunction runs against the City, which must change its policy; it does not run against the Unions or their members apart from their employment with the City.  *See Perry v. Schwarzenegger*, 630 F.3d 898, 903-04 (9th Cir. 2011) (injunctive relief against government employer does not automatically give government employee right to intervene because injunction ran only against employer).

It is uncontroverted that the interest Rule 24(a) requires "must be based on a right which belongs to the proposed intervenor rather than to an existing party to the suit."  *Vazman v. Fidelity Int'l Bank*, 418 F. Supp. 1084, 1086 (S.D.N.Y. 1976) (internal quotation marks omitted); *see also United States v. South Fla. Water Mgmt. Dist.*, 922 F.2d 704, 710 (11th Cir. 1991) ("What is required is that the interest be one which the *substantive* law recognizes as belonging to or being owned by the applicant.") (citation and internal quotation marks omitted); *Walker v. Jones*, 82 Civ. 2723, 1988 WL 73866, at *2 (D.D.C. July 1, 1988) (To justify intervention as a matter of right, the movant's interest must be an independent right which belongs to the intervenor rather than an existing party to the action.).  Vindicating the legality of City policy

and City employee conduct is an interest that belongs to the City.  That City employees happen

to be members of a labor union does not alter or extinguish the City's exclusive right to pursue

its chosen litigation strategy.  *See, e.g.*, *Orange Env't Inc. v. County of Orange*, 817 F. Supp.

1051, 1061 (S.D.N.Y. 1993), *aff'd*, 2 F.3d 1235 (2d Cir. 1993) (disagreement with an existing

party's litigation strategy does not confer a right for a non-party to intervene).

The Unions' contention that all NYPD officers are besmirched by the Liability Order

rests on the flawed assumption that anonymous officers who have not taken part in this litigation

have a reputational interest arising from the Court's finding against their employer.  As a general

matter, employees suffer no legally protectable reputational harm merely because their employer

is found liable in a lawsuit.  *See, e.g.*, *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 68 (D.D.C.

2011) ("[T]hat an employer has violated a law says nothing about the character or reputation of

any particular employee.") (internal quotation marks omitted).  This principle derives from the

law of agency, where an agent cannot suffer actionable injury based on a finding of liability

against the principal.  As articulated by the First Circuit, the mere fact "that Party A, in a suit

against Party B, intends to introduce evidence that will indicate that a non-party, C, behaved

improperly does not, by itself, make C a necessary party."  *Pujol v. Shearson Am. Exp., Inc.*, 877

F.2d 132, 136 (1st Cir. 1989) (Breyer, J.).[14]  The court reasoned that, "[g]iven the vast range of

potential insults and allegations of impropriety that may be directed at non-parties in civil

litigation, a contrary view would greatly expand the universe" of parties.  *Id.*

*Pujol* relied in part on the Seventh Circuit's decision in *Pasco International (London)*

*Ltd. v. Stenograph Corp.*, 637 F.2d 496 (7th Cir. 1980).  In *Pasco*, the complaint alleged that

defendant conspired with plaintiff's employee to induce a breach of contract with a potential

---

[14] The *Pujol* court analyzed the agency issue on a Rule 19 joinder motion.  However, as
discussed above, the analyses required for Rule 24 intervention and Rule 19 joinder "mirror each
other."  *MasterCard*, 471 F.3d at 390.

customer and that plaintiff's employee had "falsely disparage[ed]" plaintiff's financial condition

to the potential customer.  *Id.* at 499.  Defendant moved to dismiss on the ground that plaintiff

failed to join an indispensable party—plaintiff's own employee.  The district court granted the

motion, but the Seventh Circuit reversed.  The *Pasco* court held that even though the action may

potentially impact the employee's business reputation, the employee was not an indispensable

party under Rule 19 because "[a]ny agent will suffer some adverse consequences when his

principal is held vicariously liable on account of the agent's conduct, but this is not a sufficient

interest."  *Id.* at 502; *see also Milligan v. Anderson*, 522 F.2d 1202, 1203-05 (10th Cir. 1975)

(Although the "gist of the complaint was that [the absentee], acting as an agent for [the

defendant], made false and fraudulent representations to the three plaintiffs," the absentee was

not indispensable because he "had no personal interest, as such, in the contract."); *Wylain v.

Kidde Consumer Durables Corp.* 74 F.R.D. 434, 436 (D. Del. 1977) ("Whenever a judgment is

entered against the principal on account of his agent's conduct, some adverse consequences to

the agent may reasonably be expected, but it is clear, as a general matter, that the agent is not a

necessary party under Rule 19(a)(2)(i)."); *Household Retail Servs., Inc. v. CVS Sys., Inc.*, 95 Civ.

2862, 1996 WL 411497, at *4 (N.D. Ill. July 18, 1996) ("The ultimate wrongdoing to be proven

is the wrongdoing as alleged by plaintiffs against [defendant].  The fact that in proving that

ultimate issue plaintiffs will produce evidence of wrongdoing by non-parties . . . is not enough to

necessitate [their] presence in the case.").

 Applied here, in the § 1983 context, the employee reputational harm problem is

amplified.  Under § 1983, a municipality may be liable not only for an official written policy

but also for an unwritten policy.  *See Monell*, 436 U.S. at 690-91; *Cash v. Cnty. of Erie*, 654

F.3d 324, 334 (2d Cir. 2011).  Where, as here, the § 1983 claims are based on an unwritten

policy owing to the City's deliberate indifference to its employees' conduct, liability

necessarily turns on an analysis of that conduct.  A court has no choice but to assess police

officer behavior in *Floyd*, *Ligon*, and any other species of deliberate indifference *Monell* claim.

The Unions maintain that their members, in their capacity as employees of the NYPD, have

been disparaged and have had their integrity impugned by the finding of liability against their

employer.  But NYPD officers, as employees, are agents of the City, who do not automatically

have a reputational interest in a judgment against their principal.  The stigma they allege—

having their conduct evaluated in a judicial opinion—is not actionable on a motion to intervene

because it is a necessary consequence of proving liability against the principal, the City.  To

hold otherwise, as then-Circuit Judge Breyer observed, "would greatly expand the universe" of

parties entitled to intervention.  *Pujol*, 877 F.2d at 136.

By asserting, as the Unions have, that the Court's injunction runs against union members,

separately and distinctly from the City, the Unions presume that police officers have authority or

discretion to conduct stops-and-frisks independent of the directives of their employer, the NYPD.

That is incorrect.  To be sure, police officers are unique among municipal employees in that their

daily interactions with the public require them to make split-second decisions that implicate the

Constitution.  However, these decisions are based on training and guidance provided by their

municipal employer, not the officers' personal views or analysis of the law.  Because officers

have no authority or discretion independent of that which the City delegates to them, it cannot be

said that they have been enjoined, separately and apart from the City.  *See Vives v. City of New

York*, 524 F.3d 346, 357 n.9 (2d Cir. 2008) ("When an official's discretionary decisions are

constrained by policies not of that official's making, those policies, rather than the subordinate's

departures from them, are the act of the municipality.") (quoting *St. Louis v. Praprotnik*, 485

U.S. 112, 127 (1988)).  When the City makes the changes to supervision, training, and

monitoring required by the Remedial Order, NYPD officers will, as a practical matter,

implement the injunction because they will be prohibited from engaging in conduct held to be

unconstitutional.  This does not, however, give the officers or their Unions an interest in

defending that conduct on appeal; that interest belongs to the City alone.

Finally, with respect to the "safety interests" asserted by the Union, they also belong

exclusively to the City.  The Unions argue that the concession of liability "by the City on behalf

of the NYPD and its officers would adversely affect the careers and lives of these [union]

members, and cast doubt on the ability of other members to perform their duties effectively while

avoiding similar accusations in the future, which in turn affects officer and public safety."  SBA

Mem. 14.  Public safety and effective policing are the prerogatives of the City.  *See Pennsylvania*

*v. Rizzo*, 530 F.2d 501, 505 (3d Cir. 1976) (There is a presumption of adequate representation of

interests where a governmental body charged by law with representing the interests of the

absentee is present in the lawsuit.).  The only evidence offered by the Unions of the alleged

connection between reputational harm and officer and public safety consists of the September 27,

2013 affidavit of Officer Joseph Alejandro, a twenty-nine -year veteran of the NYPD and the

treasurer of the PBA.  Alejandro states that the Liability and Remedial Orders have caused

"substantial confusion" and "many officers are hesitant to initiate stops . . . [,] even if the

circumstances suggest potential criminal activity[,] in light of the uncertainty created by the

district court's decision . . . . Given the realities of day-to-day field work, police officers second-

guessing themselves during the stop, question and frisk procedure threatens the public and their

safety."  Alejandro Decl. ¶¶ 25-27.  Alejandro is expressing the understandable concern that until

the NYPD introduces the remedial measures officers may be temporarily unsure of the rules

governing street encounters with civilians.  As with any court decision that interprets and clarifies the law applicable to police procedures, it is the obligation of the City, through its agency the NYPD, to provide the training that will resolve questions that officers may have about how to handle stops.  Thus, "officer safety" is really a restatement of the Unions' generalized interest in effective policing shared by all New Yorkers.  That interest belongs to the City, not the Unions, and union members have no independent interest in these issues separate from their municipal employer.

   c.   Indirect Interests Alleged by the Unions

Next, even assuming the Unions could assert reputational interests on behalf of their members, these interests are too far removed from "the property or transaction that is the subject of the action" to support intervention.  *Pitney Bowes*, 25 F.3d at 70.  The central issue in this litigation is whether the City had an unconstitutional stop-and-frisk policy; that the Unions or their members feel demeaned by having been mentioned in court proceedings regarding that topic is insufficient to support their intervention because it is too detached from the subject of the actions.  Absent allegations of detriment arising from the subject matter of the lawsuit, courts are generally skeptical of allowing intervention based on such indirect reputational harm.  *See, e.g.*, *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 798, 798 n.10 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1026 (2014) (expressing skepticism that the Rule 24 applicant's asserted interests—his personal and professional reputation, his ability to earn a living as a financial advisor, and his CFA credential—are direct, significant legally protectable interests); *Flynn*, 782 F.2d at 1093 (a Rule 24 applicant who "merely claims a generalized injury to reputation, but identifies no legal detriment arising from a default judgment" should not be permitted to intervene) (Coffin, J. concurring); *Edmondson v. Nebraska*, 383 F.2d 123, 127 (8th Cir. 1967)

(holding that injury to reputation does not constitute legal detriment necessary to justify

intervention); *Morgan Keegan & Co., Inc. v. Garrett*, 848 F. Supp. 2d 691, 693 (S.D. Tex. 2012)

(non-party reputational harm from district court's findings is insufficient grounds to permit

intervention because the non-party "was not punished by the court[,] . . . [the court] imposed no

obligation on him . . . [and] [e]valuation of testimony is not a sanction."); *Mac Sales Inc. v. E.I.*

*Dupont de Nemours*, 89 Civ. 4571, 1995 WL 581790, at *2-3 (E.D. La. Sept. 29, 1995) (same);

*Calloway v. Westinghouse Elec. Corp.*, 115 F.R.D. 73, 74 (M.D. Ga. 1987) (same).

In the Rule 19 mandatory joinder context, courts have similarly held that reputational

harm is insufficient to make an absent party necessary to an ongoing action.[15]  *See, e.g.*, *Pujol*,

877 F.2d at 136 ("[C]ases interpreting Rule 19 consistently hold that such "slandered outsiders"

need not be joined.") (citing *Challenge Homes, Inc. v. Greater Naples Care Center, Inc.*, 669

F.2d 667, 668-71 (11th Cir. 1982)); *Milligan*, 522 F.2d at 1203-05; *Wylain*, 74 F.R.D. at 436-37;

*Willis v. Semmes, Bowen & Semmes*, 441 F. Supp. 1235, 1245 (E.D. Va. 1977).

Where Second Circuit courts have addressed reputational harm as a basis for intervention

under 24(a), they have also rejected it when the reputational harm was not directly related to the

underlying action.  *See, e.g.*, *Sierra Club v. U.S. Army Corps. of Eng'rs*, 709 F.2d 175, 176 (2d

Cir. 1983) (intervenor's interest in professional reputation not related to merits of underlying

action); *New York News Inc. v. Newspaper & Mail Deliverers' Union of New York*, 139 F.R.D.

291, 293 (S.D.N.Y. 1991), *aff'd sub nom. New York News, Inc. v. Kheel*, 972 F.2d 482, 486 (2d

Cir. 1992) (same).

In this case, the Unions allege no detriment to their members, legal or otherwise, flowing

---

[15] The parallel between the interest required by Rules 19 and 24 is widely recognized.
*MasterCard*, 471 F.3d at 389-90.  If a party is not "necessary" under Rule 19, then it cannot
satisfy the test for intervention as of right under Rule 24, because "[t]hese rules are intended to
mirror each other." *Id*.

from the purported reputational harm.  Although they state generally that officers' "careers have been tarnished," there are no examples of officers having been fired, demoted, denied promotions, reprimanded, disciplined, or having lost pay or pensions.  SBA Reply Mem. 1.  Similarly, the Unions claim that the reputational injury has undermined officers' ability "to perform their duties effectively," but provide no description of how police interaction with the public has been altered or hampered.  SBA Mem. 14.

In addition, the officers identified by name will suffer no future adverse legal consequences arising from the Liability Order.  First, as for the following former individual defendants in *Floyd*, Officers Rodriguez, Goodman, Hernandez, Joyce, Pichardo, Salmeron, Hayes, Moran, Sergeant Kelly, and the Jane and John Doe officers, plaintiffs are barred from bringing lawsuits against them because plaintiffs "withdr[e]w the [i]ndividual [d]amage [c]laims, with prejudice, against all defendants against whom such [c]laims were asserted or could have been asserted."  Stipulation and Order ¶¶ 1, 4, *Floyd*, ECF No. 270.[16]  Second, with respect to all officers identified by name, because over five years have passed since the events described in the Liability Order occurred, the statute of limitations has already run.  *See Murphy v. Lynn*, 53 F.3d 547, 548 (2d Cir. 1995) (the statute of limitations for § 1983 actions in New York is three years).  Even if the time to sue had not expired, to the extent an officer would face any legal proceeding arising from the behavior mentioned, that proceeding would be based on the conduct itself, not the Liability Order.  Thus, it is implausible that officers mentioned by name in the Liability Order, or NYPD officers more generally, have suffered or will suffer any legal detriment.

---

[16] To the extent the Unions seek to protect the reputational interests of Officers Rodriguez, Goodman, Hernandez, Joyce, Pichardo, Salmeron, Hayes, Moran, Sergeant Kelly, they are barred from doing so.  The Unions cannot argue for the reinstatement of individuals who were once defendants in the action (represented by counsel) and who consented to their own dismissal with prejudice.  *See Floyd*, ECF No. 270.  Dismissal with prejudice would be meaningless if courts were to permit dismissed parties to rejoin the case under Rule 24.

Moreover, even if named non-party officers could assert a legal detriment, their status as participants in the judicial process also prohibits the Unions from intervening on their behalf. Courts have uniformly held that the reputational interests of non-party participants, such as witnesses, cannot support the witness' intervention in the case as a party. *See, e.g.*, *Grochocinski*, 719 F.3d at 798 n.10; *Garrett*, 848 F. Supp. 2d at 693; *Mac Sales Inc.*, 1995 WL 581790, at *2-3; *Calloway*, 115 F.R.D. at 74. In each case, a witness sought to intervene as a party in order to correct a reputational injury suffered as a result of the court's review of their testimony. In *Grochocinski*, the Seventh Circuit reasoned that "[j]udges and juries must often evaluate the conduct and credibility of people and institutions that are not parties. Judges' findings and comments are often critical of non-parties, not gratuitously but as a necessary part of deciding the cases properly before them." *Grochocinski*, 719 F.3d at 798 n.10. *Garrett* reasoned similarly that, "[i]n the course of a case, the court is obliged to decide things, and these decisions may reflect poorly on the parties, witnesses, and other people who were part of the factual basis for the suit. Crisp rulings that displease the object of them are a necessary friction of litigation." *Garrett*, 848 F. Supp. 2d at 693. A person cannot intervene "because their testimony is found to have been anything from weak to false . . . whether the witness is a party, observer-participant, or after-the-fact technician." *Id.* "To hold otherwise would transform every proceeding that involved a determination of a witness's credibility into an invitation to intervene." *Mac Sales Inc.*, 1995 WL 581790, at *3. "Rule 24(a)(2) was not designed to provide a forum for witnesses in the underlying action to protect their reputation in the community." *Calloway*, 115 F.R.D. at 74. Moreover, "[t]o hold that the prospect of a judge's adverse finding or comment could support intervention as a party, with rights to appeal, for example, even if the original parties are satisfied with the outcome, would amount to a stunning expansion of standing

and would invite prolonged and even endless litigation." *Grochocinski*, 719 F.3d at 798 n.10.

The reasoning of these cases applies with equal, if not greater, force here. To resolve the § 1983 *Monell* claims raised in *Floyd* and *Ligon*, the Court was required to evaluate the behavior and credibility of NYPD officers, including their testimony and other evidence presented about their conduct. As in *Grochocinski*, the original parties are satisfied with the outcome, but instead of witnesses proposing intervention, the unions to which those witnesses belong are asserting their alleged interests. Thus, intervention under these circumstances would lead to an even more stunning outcome. Any NYPD officer whose testimony is discredited or criticized in a judicial opinion could play the reputational-harm card and intervene as of right. Consider the interests of those officers who testified in support of plaintiffs' claims. Given that an appellate court might undo the Liability Order's findings that credited their testimony and vindicated their behavior, on the Unions' theory, should not these officer-witnesses enjoy the right to ensure that the Liability Order is not reversed? More disturbing yet, if the Unions are permitted to intervene based on an amorphous "reputational harm" or "tarnished career" theory, the Court would be inviting endless litigation whenever the City is sued for police misconduct. The Court would be handing the Unions an unprecedented bargaining chip and a limitless check on elected officials' prerogative to control the City's litigation strategy.[17] The City would have to seek union approval, or risk

---

[17] The Court takes judicial notice of two news reports cited in Plaintiffs' opposition papers, in which the presidents of the CEA and SBA state that they would consider dropping their efforts to appeal if Mayor de Blasio were willing to make a suitable offer in their ongoing contract negotiations. *See* Charney Decl. Exs. N, O. The CEA president is quoted as saying that the CEA's involvement in the stop-and-frisk litigation is "something that you bring to the bargaining table." Charney Decl. Ex. N. On a motion to intervene, the Court has a duty to review not only the movant's allegations, but also the opposition's. *See Stadin v. Union Elec. Co.*, 309 F.2d 912, 917 (8th Cir. 1962). The Unions do not dispute the reports and instead urge that they demonstrate that change to policing policy should occur "not through a collusive agreement between the City and Plaintiffs" but through bargaining that includes the Unions. PBA Rep. 9 n.6. This, of course, ignores that fact that the Remedial Order is a court order resulting from protracted litigation during which the Unions made no effort to assert their views, not a

prolonged litigation, in order to settle § 1983 lawsuits.  Such a result cannot be justified.

        d.   *United States v. City of Los Angeles*

     When examined closely, the primary case relied upon by the Unions, *United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002), provides no refuge.  The Unions cite *City of Los Angeles* for the proposition that allegations of misconduct against police officers give police unions a right to intervene on their behalf in the merits of an action.  This is a misreading of its holding.  There, the DOJ commenced a civil suit against the City of Los Angeles, the Board of Police Commissioners of the City of Los Angeles, and the Los Angeles Police Department (the "LAPD"), alleging they had engaged in a pattern or practice of depriving individuals of constitutional rights in violation of 42 U.S.C. § 14141.  *Id.* at 396.  The lawsuit focused on the LAPD's Rampart Division and, in particular, the anti-gang unit known as Community Resources Against Street Hoodlums ("CRASH"), which, according to the testimony of a former LAPD officer, had engaged in widespread misconduct and corruption.[18]  *Id.*  Although no individual officers were named as defendants, the complaint alleged that LAPD officers had "subject[ed] individuals to uses of excessive force, false arrests, and improper searches and seizures."  Compl. at 2, *United States v. City of Los Angeles*, No. 00 Civ. 11769 (C.D. Cal. Nov. 3, 2000), Docket No. 1.  Before initiating the formal lawsuit, the DOJ and the City of Los Angeles negotiated a resolution to address the underlying violations.  *City of Los Angeles*, 288 F.3d at 396.  Thus, a "Joint Application to Enter Consent Decree" was filed alongside the complaint.[19]

---

negotiated settlement between Plaintiffs and the City.

[18] The officer's testimony led to the "Rampart Scandal," which exposed system-wide constitutional violations that "ultimately implicated scores of police officers, overturned dozens of convictions, and generated intense media scrutiny."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1015 (9th Cir. 2008); *see also Rodriguez v. Gates*, 99 Civ. 13190, 2002 WL 1162675, *2 (C.D. Cal. May 30, 2002) ("To date, more than 150 suits have been filed alleging civil rights violations connected to the Rampart Division scandal.").

[19] It is not uncommon for 42 U.S.C. § 14141 cases to commence with the filing of a complaint

Within weeks, the PPL, the designated bargaining unit for rank and file LAPD officers, moved to intervene alleging an interest in both the merits and remedial phases.  Order Denying Mot. to Intervene at 8-9, *City of Los Angeles*, No. 00 Civ. 11769 (C.D. Cal. Jan. 5, 2001), Docket No. 58.  The PPL argued that it had an interest in the merits of the case because, by ordering officers to "refrain from engaging in a pattern or practice of conduct including excessive force, false arrests, and improper searches and seizures[,]" the proposed consent decree subjected PPL members "to potential contempt of Court if the prospective injunction is violated."  *Id.* at 8 (alteration in original) (internal quotation marks omitted).  The district court disagreed, holding that the injunction, by its plain language, ran only against the City of Los Angeles, not the PPL or its officers.  *Id.* at 8-9.  Thus, once approved, only the City could be punished for violating its terms.  *Id.* at 8 n.3.  The district court also held that the PPL had a significant protectable interest in the remedial phase, "to the extent the Proposed Decree would modify or invalidate the [collective bargaining agreement]," but determined that the Proposed Decree did not actually threaten those rights because of certain procedural safeguards.  *Id.* at 10-11.

The Ninth Circuit disagreed.  Although generally, the injunction in the proposed consent decree ran against the City alone, the conclusion that officers themselves could face no liability under it presumed that the proposal would actually be approved without changes.  *City of Los Angeles*, 288 F.3d at 399.  This presumptiveness marred the district court's intervention analysis, and the Ninth Circuit instead emphasized that the complaint's allegations of misconduct against officers could continue to be litigated, exposing those officers to future liability.[20]  Not only was the consent decree merely a proposal, but the federal government plaintiff did not "unequivocally

---

and a consent decree.  *See* Marshall Miller, *Note: Police Brutality*, 17 Yale L. & Pol'y Rev. 149, 186 (1998) ("[T]he Justice Department appears to have adopted an initial § 14141 strategy of investigation and negotiation, opting to pursue consent decrees rather than litigated judgments.").
[20] In all likelihood, many officers did face subsequent criminal or civil liability in connection with the underlying behavior covered by the complaint's allegations.  *See* note 18 *supra*.

and completely disclaim the remedies sought in its complaint against the [PPL's] member officers," rather, it had only agreed that those officers would not be subject to liability if the court were to approve the consent decree.  In addition, the consent decree contained a provision allowing the United States to seek its dissolution in certain circumstances and litigate the action on the merits.  Thus, there remained the possibility that individual officers, who were not named defendants but whose conduct was placed at issue by the complaint, could face liability. Moreover, because there was a "marked divergence of positions concerning . . . underlying theories of liability," the existing parties, particularly the City of Los Angeles, which presumably wanted to distance itself from the "Rampart Scandal," could not be counted on to adequately represent the officers' interests.  *Id*. at 402.

Although the Unions reduce *City of Los Angeles* to the proposition that allegations of police misconduct give police unions the right to intervene, the holding is more nuanced.  The Ninth Circuit held that a police union had a right to intervene in the merits on behalf of its members where members had been accused of misconduct, they could still face liability based on that misconduct, and the existing municipal defendant had no interest in defending the conduct. *Id.* at 399-402.  The circumstances of the Unions' proposed intervention in *Floyd* and *Ligon* bear little resemblance to *City of Los Angeles*.  The Ninth Circuit did not mention abstract reputational harm as a justification for intervention.  Nor did the Ninth Circuit discuss the right of unions to protect their members' reputations that may be implicated in the course of a lawsuit where they were witnesses.  Instead, the PPL's intervention was based on the real possibility that, although they were not named as defendants and no existing party was looking out for their interests, the PPL's members could face liability down the road.

Union members here face no possibility of liability based on their conduct having been

evaluated in the Liability Order.  As discussed, the *Floyd* plaintiffs, who were certified to

represent a class, gave up their claims for damages "against all defendants against whom such

[c]laims were asserted or could have been asserted," when the Court dismissed the individual

officer defendants from the case on March 8, 2013.  Stipulation and Order ¶ 1, *Floyd*, ECF No.

270.  In addition to the plain language of the order of dismissal, any future § 1983 claim based

on findings in the Liability Order would be barred by the three-year statute of limitations.  *See*

*Owens v. Okure*, 488 U.S. 235, 251 (1989) (applying the three-year statute of limitation found at

N.Y. C.P.L.R. § 241(5) to § 1983 claims in New York).  Moreover, any potential lawsuit would

be based on the officers' underlying behavior, not on the fact that the Court wrote about it in the

Liability Order.  Unlike *City of Los Angeles* where the existing municipal defendant had every

reason to distance itself from the officers' conduct, here, there was no such divergence of

interests between the City and the individual officer defendants prior to the date when they were

dismissed as defendants in *Floyd*.[21]

> e.   Conclusion:  the Unions Have No Cognizable Interests in the Merits

In sum, the abstract reputational harm asserted by the Unions is not a significant

protectable "interest relating to the property or transaction that is the subject of the action."  Fed.

R. Civ. P. 24(a).  The Unions' allegations are conclusory, and the interests alleged do not belong

to the Unions to protect or vindicate.  Where the alleged reputational injury does belong to a

union member, the detriment flowing from that harm is too speculative or remote.  Based on the

circumstances here, where the Unions purport to represent the interests of individuals who were

witnesses, deponents, or otherwise participants in the judicial process, they cannot assert a

---

[21] As discussed *supra*, the Corporation Counsel may represent the City and an individual officer as co-defendants, as in *Floyd*, only if it is satisfied that their positions are aligned, *i.e.*, that the officers were acting within the scope of their employment and there is no conflict of interest in the representation.  N.Y. Gen. Mun. Law § 50-k; *see also Mercurio*, 758 F.2d at 864-65.

reputational injury arising from the Court's evaluation of their testimony or conduct.  Similarly, as employees, union members have suffered no actionable reputational harm arising from the fact that their employer was found to have broken the law.  Having determined that the Unions' motions are untimely and that the Unions lack an interest in the merits of this litigation, the Court need not address the balance of the Rule 24(a) analysis—whether the disposition of the litigation may practically impair the Unions' ability to protect their members' interests or whether the existing parties adequately represent them.  *Pitney Bowes*, 25 F.3d at 70.

2.   The Unions' Alleges Interests in the Remedies

The Remedial Order directs the City to remedy the violations identified in *Floyd* in two phases:  immediate reforms and ongoing equitable relief.  *Floyd*, 959 F. Supp. 2d 668.  During the first phase, the court-appointed monitor must develop "Immediate Reforms," in consultation with the parties, including changes to "the NYPD's policies, training, supervision, monitoring and discipline" regarding stop-and-frisk.  *Id*. at 678-84.  The Remedial Order also requires the City to conduct a one-year pilot project in which officers in one precinct per borough will wear body cameras on patrol.  *Id.* at 685.  After the Immediate Reforms are approved by the Court, the City and Plaintiffs must engage in a six to nine month "Joint Remedial Process," guided by a court-appointed facilitator, to develop "Joint Process Reforms" in consultation with the monitor and based on input from a variety of stakeholders, including "NYPD personnel and representatives of police organizations."  *Id*. at 684-88.

In *Ligon*, the Remedial Order largely adopts the approach proposed in the Injunction Order.  In particular, the NYPD must create and disseminate to officers a court-provided written policy on the legal standard for trespass stops around TAP buildings.  *Id.* at 688.  The NYPD, in conjunction with the *Ligon* plaintiffs, the City, and under the supervision of the monitor, must

develop a system for monitoring the constitutionality of TAP stops, and for ensuring that UF-250s are completed for each stop.  The NYPD must also make changes to departmental training regarding TAP stops.  *Id.* at 688-90.

The Unions assert an interest in the possibility that the Remedial Order will "set employment practices that would otherwise be subject to bargaining under state law."  PBA Mem. 14.  In particular, the Unions are concerned that the Remedial Order contemplates the introduction of body cameras for some officers, changes to police training, changes to the UF-250 form and other mandatory paperwork, and changes to disciplinary and supervisory policies regarding stops-and-frisks.  Thus, the Unions seek intervention in order to vindicate those interests by appealing the Remedial Order to the Second Circuit.

Plaintiffs respond that the Unions' alleged interest rests on their misapprehension of the CBL.  In particular, Plaintiffs dispute the Unions' claim that the matters covered by the Remedial Order are within the scope of the mandatory bargaining topics under the CBL.  Plaintiffs argue that none of the relief spelled out in the Remedial Order infringes upon the Unions' bargaining rights.  They argue, therefore, that the Unions have no direct, substantial, and legally protectable interest in the Remedial Order.

The Court agrees that the Unions have failed to demonstrate a significant protectable interest in appealing the Remedial Order.  There are two problems with the Unions' position.  First, the Unions' allegations regarding their collective bargaining interests are so conclusory as to evade any meaningful court analysis.  Second, the Unions overstate their rights and misapply the CBL to those rights.

   a.   The Applicant's Burden

"[P]etitioners have an obligation to set forth their interest with clarity."  *Hobson*, 44

F.R.D. at 25.  Here, the Unions' general claim is that provisions of the Remedial Order involve "mandatory subject[s] of collective bargaining."  SBA Mem. 1.  As such, they object generally to the changes in "existing policies, training, discipline, equipment, and supervision" because "[t]hose matters will directly affect the Unions' members in their day-to-day activities and collective bargaining rights."  PBA Mem. 18.  To the extent there are any specifics allegations, the Unions assert that their rights will be impacted by:

- Changes to the UF-250 form to the extent they will (1) require officers to fill-out a narrative explaining why they stopped and/or frisked someone; (2) require officers to fill out revised check boxes to account for why they stopped and/or frisked someone; (3) require officers to provide a copy of the form, their names and badge numbers, and information on how to file a complaint to individuals who are stopped and/or frisked but let go; (4) require supervisors to review stops and address their effectiveness and constitutionality; and (5) require additional training, supervision, and monitoring that will come with the introduction of the revised forms.  *See* PBA Mem. 16-17.

- Introduction of body cameras to be worn, implicating officer safety, public safety, privacy and discipline.  *Id.* 17.

- Changes to the "procedural aspects" of the NYPD's Quest for Excellence Program.  *Id.* 16.

- Introduction of a court-appointed monitor and a facilitator who will likely make decisions that generally touch upon training, supervision, monitoring and discipline.  *Id.* 7-8.

- A directive to improve procedures for disciplining officers in response to CCRB findings of substantiated misconduct.  *Id.* 17.

However, the Unions fail to explain how any of the listed changes will impact the scope of their CBL rights or any provision of a current collective bargaining agreement.

The relevant question is what could the Unions bargain over the day before the Remedial Order was issued that they will no longer be able to bargain over once it is implemented?  The answer to that question demands more particularity than providing a list of changes.  *See*

*Sheppard v. Phoenix*, 91 Civ. 4148, 1998 WL 397846, at *5 (S.D.N.Y. July 16, 1998) (denying

intervention where movants, who alleged that their collective bargaining rights were harmed,

"neither refer to any specific provision of their labor contract with the City nor attach a copy of

the contract, or any portions of it, to their papers").  The Court does not doubt that the Remedial

Order will change daily practices related to stops-and-frisks; change, after all, was the point of

ordering the NYPD to remedy the unconstitutional violations identified by the Court.  But the

Unions fail to explain how the Remedial Order will prevent or limit them from doing something

they currently have the right to do.  "Such conclusory allegations . . . do not entitle [a movant] to

intervention as of right under Rule 24."  *Flynn*, 782 F.2d at 1093.  It is the Unions' burden to

demonstrate a right to intervene, and having put forth only conclusory allegations regarding their

collective bargaining rights, they have not met their burden.[22]

> b.   Scope of the CBL

The Unions' have also failed to identify any state law demonstrating that they have a

right to bargain over the listed changes.  In New York, the Taylor Law governs public

employment labor relations.  N.Y. Civ. Serv. Law § 200 *et seq.*  Section 212 of the Taylor Law

provides that localities may enact their own public labor relations statutes and create their own

administrative bodies to administer their statutes.  The City has created a tri-partite

administrative body composed of labor, management, and the New York City Board of

Collective Bargaining (the "BCB").  New York City Charter, Chapter 54, § 1171.  The BCB

interprets and administers the City's local public labor relations statute, the CBL (N.Y.C. Admin.

---

[22] The Court notes that excerpts from "the most recent" collective bargaining agreement between the City and the PBA are attached to the PBA's reply brief.  Engel Decl. ¶ 3, Ex. A, *Floyd*, ECF No. 454-1.  The Unions, however, offer no explanation about how the Remedial Order would affect the agreement.  The portions of the agreement attached cover procedures for employees to file grievances against the NYPD for labor law violations and death benefits, neither of which are the subjects of the Remedial Order.

Code §§ 12–301 *et seq.*), as well as applicable provisions of the Taylor Law.

CBL § 12-309(a)(2) authorizes the BCB to determine whether a matter is within the scope of collective bargaining. The BCB may find: (1) that the matter is a mandatory subject of collective bargaining, meaning the employer and union must bargain in good faith regarding the matter; (2) that the matter is a permissive subject of collective bargaining, meaning the parties may, but are not required to, negotiate concerning the matter; or (3) that the matter is a prohibited subject of collective bargaining, meaning that the parties are not permitted to negotiate over the matter. *See Incorporated Vill. of Lynbrook v. N.Y. State Pub. Empl. Relations Bd.*, 423 N.Y.S.2d 466, 467 n.1 (1979). The BCB has exclusive, primary jurisdiction to make this determination, although its decisions are subject to judicial review. *See Uniformed Firefighters Ass'n of Greater New York v. City of New York*, 581 N.Y.S.2d 734, 735 (1992).

In determining whether a matter is a mandatory subject of bargaining, the BCB must consider the "management rights" provision of the Administrative Code:

> a. Subject to the provisions of subdivision b of this section . . . public employers and certified or designated employee organizations shall have the duty to bargain in good faith on wages . . . hours . . . working conditions and provisions [regarding union dues] . . . .

> b. It is the right of the city, or any other public employer, acting through its agencies, to determine the standards of services to be offered by its agencies; determine the standards of selection for employment; direct its employees; take disciplinary action; relieve its employees from duty because of lack of work or for other legitimate reasons; maintain the efficiency of governmental operations; determine the methods, means and personnel by which government operations are to be conducted; determine the content of job classifications; take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and the technology of performing its work. Decisions of the city or any other public employer on those matters are not within the scope of collective bargaining, but, notwithstanding the above, questions concerning the practical impact that decisions on the above matters have on terms and conditions of employment, including, but not limited to, questions of workload, staffing and employee safety, are within the scope of collective bargaining.

N.Y.C. Admin. Code § 12–307(a), (b).  Thus, matters covered by § 12–307(a) are generally

mandatory subjects of collective bargaining about which the parties must negotiate, whereas

matters covered by the "management rights" provisions of § 12–307(b) are generally either

permissive subjects (about which the parties may, but are not required to, negotiate) or prohibited

subjects (about which the parties may not negotiate).

  As is evident from the plain language of the statute, the contested changes brought on by

the Remedial Order are covered by the management rights provisions of § 12–307(b), which

include, changes to training, discipline, equipment, and supervision.  In fact, when read in its

entirety, the CBL delegates to the City broader powers with respect to the Remedial Order than

the Unions acknowledge.  On the one hand, the CBL limits the scope of collective bargaining to

the "terms and conditions of employment."  *Id.*  On the other hand, with no input from the

Unions, the City has the power to "determine the standards of services to be offered," "direct its

employees," "take disciplinary action," "maintain the efficiency of governmental operations,"

"determine the methods, means and personnel by which government operations are to be

conducted," "determine the content of job classifications," and "exercise complete control and

discretion over its organization."  *Id*.  Accordingly, "[d]ecisions of the [C]ity or any other public

employer on those matters are not within the scope of collective bargaining."  *Id.*  As interpreted

by the New York Court of Appeals, "decisions are not bargainable as terms and conditions of

employment where they are inherently and fundamentally policy decisions relating to [its]

primary mission."  *In re County of Erie v. PERB*, 12 N.Y.3d 72, 78 (2009) (citation and internal

quotation marks omitted).  For police departments in particular, "[a]s long ago as 1888," the New

York Court of Appeals, "emphasized the quasi-military nature of a police force, and said that 'a

question pertaining solely to the general government and discipline of the force . . . must, from

the nature of things, rest wholly in the discretion of the commissioners.'" *In re PBA v. PERB*, 6

N.Y.3d 563, 576 (2006) (citation omitted).

> c.   Application of the CBL to the Remedial Order

Here, the changes to stop-and-frisk policies, procedures, supervision, training, and

monitoring outlined in the Remedial Order are precisely the kind of management prerogatives

courts have held are not subject to collective bargaining.  *See, e.g.*, *Sheppard*, 1998 WL 397846,

at *7-9 (denying union's application for intervention where settlement provisions were covered

by management rights provisions of § 12-307(b)); *City of New York v. MacDonald*, 201 A.D.2d

258, 259 (1st Dep't 1994) (finding that police discipline, "including the right to determine guilt

or innocence of breach of disciplinary rules and the penalty to be imposed upon conviction," is

committed to NYPD commissioner and that City cannot be forced to bargain on this subject).

The Unions have pointed to no contrary authorities which suggest that the City's implementation

of the Remedial Order risks straying into mandatory bargaining territory.

The Unions respond that even though they have no right to bargain over policy, under §

12-307(b) they do have the right to bargain over the "practical impact" that the Remedial Order's

policy changes will have on the terms and conditions of their employment.  *See* N.Y.C. Admin.

Code § 12-307(b).  This argument misses the mark.  Even assuming the policy changes in the

Remedial Order have a practical impact on terms and conditions, such as hours and wages—the

explanation of which is absent from the Unions' papers—nothing in the Remedial Order

prevents the Unions from bargaining over these impacts.  Moreover, the Unions provide no legal

authority for the proposition that because a managerial policy change has practical impacts,

unions have the right to bargain over the policy itself.  If that were true, it would defeat the

statute's purpose in delineating management prerogatives as distinct from collective bargaining

topics; every managerial policy change might have an attenuated "practical impact" on terms and conditions of employment, and thus, all managerial policy changes would be subject to collective bargaining.

Plaintiffs provide an instructive example.  In the public education context, the fixing of class size falls within managerial prerogatives, but because it impacts teacher workload, the impact on teachers (*e.g.*, whether compensation should vary according to class size) is subject to negotiation.  *West Irondequoit Teachers Ass'n v. Helsby*, 35 N.Y.2d 46, 49-50 (1974). The same is true here.  The CBL does not give the Unions the right to bargain over changes to stop-and-frisk policies, procedures, supervision, and training.  Those decisions are managerial prerogatives.  The Unions do, however, have the right to bargain over practical impacts, such as workload and pay that may result from the changes set forth in the Remedial Order.

### d.   The Unions' Additional Objections

The Unions raise several additional objections to the Remedial Order.  They contend that "[w]ithout formal intervention, the [Remedial Order] would provide the [Unions] with no forum to ensure that they might object to any changes that would contradict the [collective bargaining agreement] or existing procedures subject to bargaining."  PBA Mem. 18.  The Unions also argue that they "have a right to ask the [BCB] to make determinations regarding any of the myriad subject matters contemplated by the Remedi[al] Order and to appeal that determination where necessary, through the state courts or to the [PERB]."  PBA Reply Mem. 7.  Further, "because there is no finalized stipulation or consent decree regarding remedial measures before the Court, this Court cannot decide as a matter of law that the measures eventually implemented will not have collective bargaining ramifications."  SBA Reply Mem. 6.  These collateral arguments, again, miss the mark.

First, as discussed, the CBL does not give the Unions a right to decide which policy changes are on the menu, but rather, the authority to bargain over the prices.  Second, there is no basis in law—and the Unions cite none—for the proposition that the Unions have a right to have a federal court's remedial order vetted by the BCB before it is issued.  In fact, the opposite is true.  Federal courts have broad remedial powers to fix constitutional violations.  *Swann v. Charlotte–Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971); *Association of Surrogates & Supreme Court Reporters Within the City of New York v. New York*, 966 F.2d 75, 79 (2d Cir. 1992) ("[F]ederal courts have broad discretion in fashioning equitable remedies for . . . constitutional violations.").  Finally, although the Unions repeatedly refer to the Remedial Order as a "consent decree," "proposed settlement," or "prospective consent decree," *see, e.g.*, PBA Reply Mem. 13; SBA Reply Mem. 8, it is none of those things.  The Remedial Order is a binding court order; it is not hypothetical, and it is not a negotiated settlement or consent decree where the parties have voluntarily ended their legal dispute.  *See Floyd*, 959 F. Supp. 2d at 686.

To the extent the Unions' actual objection is that they did not have an opportunity to shape the terms of the Remedial Order before it was issued, that is a problem of their own making.  They chose to file an untimely motion in September 2013, rather than (1) when the Court made clear in January 2013 that a remedial order would be issued following any finding of liability in *Floyd*, and (2) when the Court invited input on the scope of such a remedial order as early as March 2013.  *See, e.g.*, Jan. 4, 2013 Hearing Tr. at 84:13-85:20, *Floyd*, ECF No. 252 (oral order declining to bifurcate *Floyd* trial into separate liability and remedial phases); Injunction Order, 925 F. Supp. 2d at 543 (inviting the parties to brief "whether the proposed relief is insufficient or too burdensome or otherwise inappropriate.").  Thus, if the Unions were concerned that between January and August 2013 the parties or other stakeholders might

recommend to the Court remedial measures that would practically impact the terms and conditions of employment, rather than relate only to managerial prerogatives, the Unions should have timely moved to intervene.  That process, however, produced a Remedial Order that covers only policy changes.

The Unions lack of a significant protectable interest in the remedies is further illustrated by the fact that they have pointed to no provision in the Remedial Order that prevents or threatens to prevent their ability to collectively bargain over the practical impact of these changes.  Moreover, the Unions neither filed motions to intervene nor sought leave of the court to file amicus briefs in connection with the *Daniels* settlement.  That settlement was in place from 2004 through 2007, during which time the NYPD implemented changes to monitoring, supervision, training, and the paperwork associated with stops-and-frisks, and no objection from the Unions is reflected in court records.  Furthermore, beginning in 2009, the City implemented the following changes to its stop-and-frisk policies and procedures that altered the duties and responsibilities of union members:  2009 and 2010 revisions to the NYPD Patrol Guide section on stop-and-frisk requiring officers to provide a stopped civilian with an explanation of the reasons for the stop, and an information card entitled, "What is a Stop, Question, and Frisk Encounter," Charney Decl. Exs. E, F; a 2011 revision to the UF-250 which requires officers to provide the reason(s) for any force used during a stop-and-frisk, *id*. Exs. C, G; a 2012 revision to the Patrol Guide section on the duties and responsibilities of captains, requiring them to conduct stop-and-frisk inspections in each precinct, *id*. Ex. H; and a March 5, 2013 memorandum from the NYPD Chief of Patrol requiring all NYPD patrol officers to provide additional narrative details about the reasons for a stop in both their activity logs and on the UF-250 and to staple a copy of the requisite activity log entry to each UF-250 they submit.  *Id*. Ex. I.  Additionally, in

2012 and 2013, 6,000 officers attended a stop-and-frisk training course. *Floyd* Trial Tr. at 5121. Plaintiffs point out these voluntary changes in their opposition briefs, yet the Unions offer no explanation for why the changes triggered no collective bargaining issues. Although the Unions' failure to react to the *Daniels* settlement and the NYPD's voluntary policy changes listed is not dispositive, their inaction is certainly circumstantial evidence that the Remedial Order's changes will have no discernable impact on the Unions' CBL rights or their collective bargaining agreements.

The cases cited by the Unions do not compel a contrary conclusion. Citing *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 760-61 (1983), *Brennan*, 260 F.3d 123, *City of Los Angeles*, 288 F.3d 391, *EEOC v. AT&T Co.*, 506 F.2d 735 (3d Cir. 1974), and *United States v. City of Portland*, 12 Civ. 2265 (D. Or. Feb. 19, 2013), the Unions maintain that federal courts routinely grant intervention to unions where their collective bargaining rights may be undermined. These cases are inapposite. In each, it was acknowledged that the implementation of the relief at issue interfered with the statutory or contractual rights of the would-be intervenors. *See, e.g.*, *W.R. Grace*, 461 U.S. at 759, 771; *Brennan*, 260 F.3d. at 129-30; *City of Los Angeles*, 288 F.3d at 399-400; *AT&T*, 506 F.2d at 738-39; Order at 7-8, *City of Portland*, No. 3:12-cv-02265, Docket No. 32. Here, the Remedial Order concerns only policy changes not subject to mandatory collective bargaining under New York law. *See also California ex rel. Lockyer v. United States*, 450 F.3d 436, 443 (9th Cir. 2006) (explaining that in *City of Los Angeles*, the Ninth Circuit "granted intervention to the bargaining unit because the proposed consent decree in the case purported to give the district court authority to override the officers' collective bargaining agreement"). Moreover, in two of these cases, the proposed intervenor-union cited specific statutory or contractual provisions that would be impacted by the consent

decrees.  *See, e.g.*, Intervenor-Appellant PPL Mem. at *20, *City of Los Angeles*, No. 01-55182, 2001 WL 34093539 (9th Cir. May 8, 2001) (explaining that consent decree conflicted with several specific provisions of collective bargaining agreement and would trigger "meet and consult" requirements under California law, and citing two declarations describing, on a section-by-section basis, key inconsistencies between collective bargaining agreement and consent decree); Intervenor-Def. Portland Police Ass'n Mem. at 12-26, *City of Portland*, No. 3:12 Civ. 2265 (D. Or. Dec. 18, 2012) (explaining that proposed consent decree conflicted with numerous sections of the collective bargaining agreement).  Here, the Unions merely provide a list of policy changes contemplated by the Remedial Order and claim that unspecified state law rights are implicated.

The Unions' final argument is that they need not specify the rights interfered with, but need only show a "possibility" that the Remedial Order "may" interfere with their collective bargaining rights.  PBA Mem. 14; SBA Mem. 15-16.  The Unions contend that they have a right to intervene where there is even the slightest dispute that collective bargaining rights may be implicated.  *See City of Los Angeles*, 288 F.3d at 400 ("[T]o the extent that it is disputed whether or not the consent decree conflicts with the [collective bargaining agreement], the [PPL] has the right to present its views on the subject to the district court.").  To generate a dispute, the Unions cite several BCB and PERB decisions to show that certain terms in the Remedial Order are debatably within the scope of topics that must be bargained over under the CBL.  In particular, they assert that the introduction of new training and monitoring policies and body-worn cameras are disputed topics.  The cases they cite, however, do not support the Unions' position.

With respect to changes in training, the Unions cite two BCB decisions, *Uniformed Fire Officers, Local 854, IAFF, AFL-CIO v. City of New York*, Decision No. B-20-92, 49 OCB 20

(BCB 1992), and *City of New York v. Uniformed Firefighters Ass'n*, Decision No. B-43-86, 37

OCB 43 (BCB 1986), for the proposition that training is subject to mandatory bargaining "to the

extent the City requires [it] as a qualification for continued employment." PBA Mem. 17. In

both cases employees were required to obtain new licenses or certifications as a condition of

their continued employment. *See, e.g.*, *Uniformed Fire Officers, Local 854, IAFF, AFL-CIO v.

City of New York*, 49 OCB 20 at 7-9 (holding that a newly established requirement that

firefighters obtain CPR certifications as a condition of employment would be subject to

mandatory collective bargaining); *City of New York v. Uniformed Firefighters Ass'n*, 37 OCB 43

at 16 (The amount of firearms training the City provided to fire marshals was not subject to

mandatory bargaining, because even though the City required fire marshals to pass an annual

test, there were no adverse employment consequences alleged for failing.). The Unions do not

allege that the Remedial Order contemplates imposing a licensing or certification scheme.

Moreover, according to both BCB decisions, "the establishment of training procedures, in most

circumstances, is a . . . management right and not a mandatory subject of bargaining." *Id.* at 15.

With respect to body cameras and performance evaluation procedures, the Unions cite

two cases in support of their argument that these topics "might" be subject to mandatory

bargaining. *See* PBA Mem. 16-17. These cases are inapposite. In *Patrolmen's Benevolent

Ass'n of the City of New York, Inc. v. City of New York*, 6 OCB2d 36 (BCB 2013), the BCB

held that bargaining over the procedural aspect of evaluations is mandatory (*i.e.*, the frequency

of evaluations), but the substance of evaluations (*i.e.*, the actual criteria therein) "fall within an

employer's rights under § 12-307(b) to determine the 'methods, means and personnel' by which

government operations are conducted." *Id.* at 15. Here, the Remedial Order addresses only

substantive policy changes, not any of the related procedural aspects. *Floyd*, 959 F. Supp. 2d at

675-86.  In *In re the City of New York*, 40 PERB ¶ 3017, Case No. DR-119, (PERB Aug. 29, 2007), the PERB held that although the decision to provide officers with bullet proof vests was a managerial prerogative, practical impacts, such as the frequency of updating the vests, were bargainable topics.  In so holding, the PERB reiterated that equipment, such as body cameras, "relate[s] directly to the manner and means that police services are provided, thereby constituting a managerial prerogative."  *Id.*

More broadly, the Unions' complain that by conceding liability and dropping the appeals, the City is violating CBL § 12-306(5), which does not permit the City "to unilaterally make any change as to any mandatory subject of collective bargaining or as to any term and condition of employment established in the prior contract."  N.Y.C. Admin. Code § 12-306(5).  As discussed, the Remedial Order does not implicate any interest subject to collective bargaining.  More importantly, the Union's rights under this subsection are only triggered, according to the plain language of the statute, if the City attempts unilateral changes.  Here, the source of the changes is a court order, not a unilateral City decision.  Thus, the Unions' rights under this provision are not at issue here.

Furthermore, it is well established that "there are prohibited subjects about which the parties may *not* negotiate, because to do so would be contrary to public policy, statute or decisional law."  *Sheppard*, 1998 WL 397846, at *7.  The Injunction, Liability, and Remedial Orders, finding the City liable for its unconstitutional stop-and-frisk policy constitute decisional law.  And "there is no more compelling public policy than compliance with the mandates of the United States Constitution."  *Id.* at *8.  "[R]esponsibilities conferred upon the City of New York (and all other state and local governments), by the federal courts," such as those at issue here, "for safeguarding the constitutional rights of" citizens, "cannot be delegated, abnegated or

surrendered through collective bargaining." *Id.*

In sum, the Unions have not demonstrated a significant protectable interest in the Remedial Order sufficient to merit intervention for the purpose of appealing that Order. They have not asserted their alleged interests with particularity and where they have, they have misstated the relevant law and misapplied it. To the extent they claim an interest in a state law bargaining process between the Unions and the City, that process is not implicated where the unilateral changes at issue arise from a court order. Moreover, even assuming the Remedial Order does infringe on the Unions' collective bargaining rights, the Court's power to remedy constitutional violations cannot be constrained by PERB or BCB decisions or the Unions' state law rights. Here, however, the Unions' collective bargaining rights are not at issue, and the Court's exercise of its remedial powers has not, therefore, infringed upon those rights. Having found that the Unions lack a legally protectable interest in the Remedial Order, the Court need not address the other factors courts apply under Rule 24(a).[23] The Court shall, however, next address an issue tied to Rule 24(a)'s interest requirement; assuming, *arguendo*, the Unions' interests are cognizable on a motion to intervene, whether the Unions would have standing to vindicate those interests on appeal.

### D. Standing

"We have never before upheld the standing of a private party to defend the constitutionality of a state statute when state officials have chosen not to," wrote Chief Justice Roberts, and "[w]e decline to do so for the first time here." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2668 (2013). Despite this guidance, and even though the lone municipal government

---

[23] For the same reasons, the Court denies the Unions' request for permissive intervention under Rule 24(b) because the Court finds that the Unions have not asserted "a claim or defense that shares with the main action a common question of law or fact" with respect to both the Liability and Remedial Orders. Fed. R. Civ. P. 24(b)(1)(B); *see also NAACP*, 413 U.S. at 365; *United States v. New York*, 820 F.2d at 557-58.

defendant no longer wishes to defend the constitutionality of its policy, the Unions insist they have standing to appeal the Liability, Remedial, and Injunction Orders (collectively, the "Orders"). They do not. The Unions are not bound by the Orders nor have their members suffered any concrete or particularized harm caused by them.

1. District Court Consideration of Appellate Standing

Before explaining why the Unions lack appellate standing, the Court should clarify why a district judge is even considering this issue in the context of a Rule 24 motion. Plaintiffs raise appellate standing in their opposition papers, and the Unions address it in their replies, but neither explains why they are arguing the issue in the District Court rather than the Court of Appeals. Standing is jurisdictional, and courts always have jurisdiction to decide their own jurisdiction. *See In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 374 (2d Cir. 2005). Recognizing this Court's limited jurisdiction and exercising restraint and deference, ordinarily this Court would not opine on the Second Circuit's jurisdiction to hear an appeal. *See American Elec. Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527, 2540 (2011) ("[F]ederal district judges, sitting as sole adjudicators, lack authority to render precedential decisions binding other judges . . . ."). But, acknowledging the importance of the issue to the parties, the Court endeavors to determine why appellate standing is relevant to adjudicating the motions to intervene.

There is a conflict among the circuits as to whether Article III standing is required for a non-party to intervene at the district court level. *See Diamond v. Charles*, 476 U.S. 54, 68-69, 68 n.21 (1986) (observing that "[t]he Courts of Appeals have reached varying conclusions" on the issue, but declining to resolve the conflict). The Second Circuit seems not to require a would-be plaintiff-intervenor to satisfy Article III standing. *See United States Postal Serv.*, 579 F.2d at 190 ("The existence of a case or controversy having been established as between the United

States Postal Service and the Brennans, there was no need to impose the standing requirement upon the proposed intervenor."). However, the intervenor-plaintiff in *United States Postal Service* sought to assert the same claims as the existing plaintiff. Here, the intervenor-defendants seek to pursue an agenda in conflict with the existing defendant. In fact, adding to the complexity, the existing defendant, the City, seeks to terminate the case or controversy and the proposed intervenor-defendants seek to continue it.[24] Thus, it is unclear that *United States Postal Service* neatly disposes of the instant situation. *Cf. Hoblock v. Albany Cnty. Bd. of Elections*, 233 F.R.D. 95, 97 (N.D.N.Y. 2005) (reading *United States Postal Service* as exempting an intervenor from the Article III standing requirement if there is already a case or controversy in existence between the original parties).

Putting aside the circuit split, there is a different rationale for why an applicant's Article III standing on appeal is relevant to deciding a motion to intervene in the district court. Rule 24(a) requires that an intervenor have an interest that is "direct, substantial, and *legally protectable.*" *Bridgeport Guardians*, 602 F.3d at 473 (citation and internal quotation marks omitted) (emphasis added). Generally, a legally protectable interest is one which the law "accord[s] some degree of legal protection." *Diamond*, 476 U.S. at 75 (O'Connor, J. concurring). In particular, a Rule 24(a) applicant must be authorized to enforce that interest, and the interest must be capable of being enforced through the law. *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463-64 (5th Cir. 1984). If, for example, a would-be intervenor were to assert an interest in pursuing a claim that is barred by the statute of limitations, then the interest would not be legally protectable; although the non-party's interest

---

[24] *See* Matthew I. Hall, *Standing of Intervenor-Defendants in Public Law Litigation*, 80 Fordham L. Rev. 1539, 1542 (2012) (Because traditional standing analysis focuses on the plaintiff's stake in the case or controversy, "volunteer" defendants' attempts to intervene in cases that concern important issues of public law have been "under-theorized" by the courts.).

might otherwise be viable, the law does not afford it an avenue to vindicate that interest.  *See Ceribelli v. Elghanayan*, 91 Civ. 3337, 1994 WL 529853, at *2 (S.D.N.Y. Sept. 28, 1994) (Where the plaintiff-intervenor's claims are time-barred, intervention would be an exercise in "legal futility.").[25]  Logically, from the plain meaning of the term "legally protectable," the same reasoning extends to appellate standing:  to the extent that a post-judgment intervention applicant contends that it must appeal a court order to protect its interest, then the applicant's appellate standing is highly relevant to the issue of whether the interest is legally protectable.  If Article III's standing requirement would not afford an avenue for the applicant to legally protect its interest, allowing a non-party to intervene would be an exercise in legal futility.[26]

In similar contexts, other district courts have reasoned that it would be futile to permit a non-party who lacks appellate standing to intervene for the express purpose of appealing the district court's judgment.  *See, e.g.*, Order at 15, *Perry v. Schwarzenegger*, 99 Civ. 2292 (N.D. Cal. Aug. 4, 2010), Docket No. 709 (denying motion to intervene because Imperial County's lack of Article III standing to defend California's same-sex marriage ban on appeal "weigh[]ed

---

[25] Although the *Ceribelli* court analyzed the futility issue in the context of permissive intervention under Rule 24(b) and the broader issue of timeliness, the legal futility logic is no less applicable to Rule 24(a)'s legally protectable interest requirement for intervention as of right.  *See Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, 08 Civ. 1713, 2011 WL 6182090, at *1 (E.D.N.Y. Dec. 13, 2011) (Under Rule 24, "though not mentioned in the rule itself, 'futility is a proper basis for denying a motion to intervene.'") (quoting *In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*, 02 Civ. 1484, 02 Civ. 8472, 2008 WL 2594819, at *5 (S.D.N.Y. Jun. 26, 2008)).

[26] Some circuits have also held that where a party lacks a "significant protectable interest" under Rule 24(a), "it necessarily follows that they lack Article III standing . . . ."  *See Perry*, 630 F.3d at 906; *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003); *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 946 (7th Cir. 2000).  Thus, inquiring about Article III standing after holding that an applicant does not have a significant protectable interest, as this Court has just done, would be "purely academic," *Roeder*, 333 F.3d at 233, and redundant "[f]rom a pragmatic standpoint," *Sokaogon*, 214 F.3d at 946.  The Second Circuit, however, has not expressly adopted this rule.  Accordingly, although analyzing standing invites redundancy, the Court declines to hold that the Unions automatically lack standing because they lack an interest under Rule 24(a).

against permitting" it to intervene in the district court), *aff'd*, 630 F.3d 898, 906 (9th Cir. 2011);

*Tummino v. Hamburg*, 260 F.R.D. 27, 30 (E.D.N.Y. 2009) (holding that on a post-judgment

intervention motion, would-be intervenors seeking to intervene to appeal must establish that they

have "standing to intervene" when the party on whose side intervention could have been sought

during the course of the litigation has decided not to appeal); *see also* Transcript of Oral Order at

49:15-21, 50:10-12, *Geiger v. Kitzhaber*, 13 Civ. 1834 (D. Or. May 14, 2014), Docket No. 115

(denying a motion to intervene by a group opposed to same-sex marriage because they failed to

show they would have standing to appeal the judgment after the state refused to defend its same-

sex marriage ban).  Persuaded by these authorities that Rule 24(a)'s "legally protectable interest"

requirement compels a court to consider whether certain proposed intervenors have standing to

appeal in the absence of the originally aggrieved party, the Court now turns to the issue of

whether the Unions have standing to pursue the City's appeal.

    2.  Standing to Appeal the Liability Order

The Unions assert that they have standing to appeal the Liability Order "because the

Court in that opinion made specific factual findings regarding individual [union members],

accusing them of violating the Constitution, not telling the truth, and other disparaging

conclusions based on limited and unreliable evidence."  SBA Reply Mem. 16.  More broadly, the

Unions claim to have standing because the "Court's findings that the NYPD, through its officers,

have engaged in systematic racial discrimination and have made at least 200,000 unlawful stops

are premised upon fundamental legal errors that have caused serious reputational harm to the

officers and should be reviewed by the Second Circuit."  PBA Reply Mem. 18.  Although the

City initially appealed, the Unions complain that "the City now has turned its back on the

officers of the NYPD, requesting a remand for the avowed purposes of leaving the highly

prejudicial findings of the Court unreviewed." PBA Mem. 2. Thus, the Unions wish to step into the City's shoes and "continue the appeal that the City has" abandoned. PBA Reply Mem. 6.

Although standing cases typically address whether a plaintiff has satisfied the requirement when commencing a lawsuit, Article III requires an "actual controversy" throughout all stages of litigation. *Hollingsworth*, 133 S. Ct. at 2661. Accordingly, standing "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). The same requirement applies where an intervenor seeks to "continue a suit in the absence of the party on whose side intervention was permitted." *Diamond*, 476 U.S. at 68; *see also Schulz v. Williams*, 44 F.3d 48, 52 (2d Cir. 1994).[27] The intervenor-appellant has standing to appeal only if it has "suffered an injury in fact that is fairly traceable to the challenged action and that is likely to be redressed by the relief requested." *Schulz*, 44 F.3d at 52. To suffer an "injury in fact," an intervenor must have more than an "abstract concern" or "a mere interest in the problem." *Diamond*, 476 U.S. at 67 (internal quotation marks omitted). Rather, it must have experienced "an invasion of a legally-protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). The party seeking to appeal must have a "direct stake in the outcome of a litigation," *Schulz*, 44 F.3d at 52 (citation and internal quotation marks omitted), such that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). "The presence of a disagreement, however sharp and acrimonious it may be, is

---

[27] The SBA contends that the correct legal standard to apply here is from *Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 77-79 (2d Cir. 2006). That case did not address the Article III questions now before the Court; it discussed whether a non-party in the district court, who otherwise met Article III's standing requirements, could intervene at the Second Circuit to appeal the judgment. *Id.* at 77 (citation omitted).

insufficient by itself to meet Art. III's requirements."  *Diamond*, 476 U.S. at 62.

From the Unions' allegations it is clear that they do not claim to have suffered any direct reputational injury from the Liability Order.  The Unions do not allege, for example, that the Court made "injurious findings" against the Unions, as unions.  Instead, the Unions' theory of standing is based on the claim that their members have suffered or will suffer reputational harm. In particular, the Unions appear to allege two distinct reputational injuries on behalf of two categories of their members.  *See* PBA Mem. 3 (stating that the Unions' purpose is "to appeal the District Court's prior Orders, so as to ensure that the Orders are reviewed on the merits and that *the NYPD* and *its members* are not burdened and besmirched by findings . . . that are legally infirm") (emphasis added).  The first alleged reputational harm is with respect to individual officers identified in the Orders, "whose conduct was directly placed at issue," and who are injured by the Court's specific findings about them, *i.e.*, because "[t]he Liability [Order] identifies [officers] by name, asserts that they are untruthful, and concludes that numerous stops that they supervised, approved, or conducted broke the law," the findings "adversely affect the careers and lives of these [officers]."  SBA Mem. 1, 13-14.  The second alleged reputational harm is with respect to *all* NYPD officers whose reputations are injured by the Court's general findings of widespread unconstitutional conduct, *i.e.*, the anonymous officer is harmed by the finding that "the men and women of the NYPD had purportedly committed more than 200,000 constitutional violations" and the "highly injurious finding that the NYPD officers had engaged in intentional racial discrimination."  PBA Mem. 1-2.

Although not mentioned in their papers, the Unions invoke the doctrine of associational standing, "under which an organization may sue to redress its members' injuries."  *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996).

Whereas Article III generally requires the participation of the party who is directly harmed, an association is permitted to rely on its members' injuries to satisfy Article III because, in certain circumstances, the interests of the association and "its members are in every practical sense identical." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958). Thus, even where it has suffered no direct harm from the challenged action, an association has standing to litigate on behalf of its members where "(a) its members would otherwise have standing . . . in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food*, 517 U.S. at 553 (citations and internal quotations marks omitted).[28]

With respect to both categories—the individually identified officers and all NYPD officers—the threshold question for associational standing is whether a union member in either category "would otherwise have standing to sue in [her] own right." *Id.* Thus, the Court undertakes to apply the Article III standing test—injury-in-fact, causation, and redressability—to both groups in order to make this determination, beginning with the individual officers identified in the Orders.

---

[28] The PBA's reply memorandum appears to argue that the PBA has standing, independent of any injury to its members, because it has suffered a reputational "taint" from the Liability Order's findings. *See* PBA Reply Mem. 17. The PBA does not explain how findings against the NYPD, the City, or even its members, taint the reputation of the PBA as a union. Citing *NCAA v. Governor of N.J.* ("*NCAA*"), 730 F.3d 208, 218, 220 (3d Cir. 2013), the PBA claims it has standing on its own because of the "unwanted association with an activity they and large portions of the public disapprove of." PBA Reply Mem. 17. In *NCAA*, the Third Circuit held that sports leagues had standing to challenge a law that would permit gambling on the leagues' games because, in part, their games might suffer a "taint" by the mere association with legalized gambling. *NCAA*, 730 F.3d at 218, 220. This argument warrants scant attention. Nowhere does the Liability Order attribute objectionable conduct to the Unions. To the extent that union members claim they are tainted, that would suggest an associational injury, not an injury to the Unions *as unions*.

a.   Officers Identified by Name

i.   Injury-in-Fact

The Unions argue that officers mentioned by name "whose conduct was directly placed at issue" may claim reputational injury arising from the Liability Order.  PBA Mem. 2.  The Unions contend that these officers who testified, were deposed, or whose behavior was evaluated by the Court should have an opportunity to protect their reputations, which the City is refusing to do by not pursuing an appeal.  PBA Mem. 7.

There is no dispute that, as a general matter, reputational harm may be an injury-in-fact. *See, e.g.*, *Meese v. Keene*, 481 U.S. 465, 473 (1987) (having his films labelled "political propaganda" by the government could cause a cognizable injury to a litigant's "personal, political, and professional reputation" sufficient to establish an injury-in-fact).  The Unions cite several additional cases where reputational harm constituted an injury-in-fact.  *See, e.g.*, *NCAA v. Governor of New Jersey* ("*NCAA*"), 730 F.3d 208 (3d Cir. 2013); *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 161-62 (2d Cir. 2003).[29]  Whereas the reputational harm in each of these cases was asserted with some specificity, here, the Unions do not explain how individual officers experience reputational injury from having been identified by name in the Liability Order.  The Unions do not, for example, attached affidavits or declarations from any officers stating that their reputations have been harmed and describing the repercussions—such as losing promotions or benefits, or suffering the scorn of their peers or the community.

The Unions respond that they do not need to explain how the findings in the Liability

---

[29] On June 20, 2014, the SBA submitted a letter to the Court noting a recent Supreme Court, New York County decision in *Patrolmen's Benevolent Association v. City of New York*, Index No. 652550/13 (N.Y. Co. Sup. Ct. June 18, 2014), holding that police unions have standing under New York law to challenge a municipal ordinance.  Letter, *Floyd*, ECF No. 463.  That standing exists under state law is not determinative as to whether federal standing exists under Article III.  *See Hollingsworth*, 133 S. Ct. at 2667 ("[S]tanding in federal court is a question of federal law, not state law.").

Order cause reputational injury because it is "self-evident." SBA Reply Mem. 16 (citing *Gully*, 341 F.3d at 161-62). This is not consistent with the law. Claiming reputational harm is not an exception or loophole that excuses litigants from satisfying Article III's injury criteria. The issue, as with any alleged harm, is whether it is also "concrete and particularized," and "actual or imminent," as opposed to "conjectural or hypothetical." *Lujan*, 504 U.S. at 960. In *Gully*, the plaintiff suffered a tangible reputational injury, described by the Second Circuit as a "death knell" for her career, when a regulatory agency made findings of professional misconduct and unfitness. *Gully*, 341 F.3d at 162. Unlike here, Gully was a party to the action, and the harm did not arise from a vicarious, attenuated claim. In fact, in *NCAA*, *Gully*, and *Meese*, the litigants had little trouble asserting a concrete and particularized reputational injury because, unlike here, the harmed party was either a plaintiff or defendant in the district court.[30]

The Unions' papers offer no information as to how the City's unwillingness to continue the appeals produces anything but hypothetical reputational injuries. In fact, the only place the Unions provide specificity is in the SBA's papers, where it observes that the Liability Order identifies Sergeants Jonathan Korabel, James Kelly, Daniel Houlahan, Raymond Stukes, Charlton Telford, and Michael Loria by name and, according to the SBA, finds variously that they were "untruthful," "broke the law," conducted improper stops-and-frisks, inadequately

---

[30] The Unions' also cite to *Camreta v. Greene*, 131 S. Ct. 2020 (2011), for the proposition that "a government official has standing to appeal a finding that his actions were unconstitutional . . . because the 'judgment may have a prospective effect,' and 'the official regularly engages' in the acts found unconstitutional." PBA Mem. 12 (citing *Camreta*, 131 S. Ct. at 2029). Their reliance on *Camreta* is misplaced. In holding that a prevailing party may nonetheless have standing to appeal in some limited circumstances, the Supreme Court expressly confined *Camreta*'s holding regarding prospective relief to the qualified immunity context in which a named defendant may prevail, even though the court finds that his or her behavior was unconstitutional. *Camreta*, 131 S. Ct. at 2032-33. Contrary to the Unions' reading, the Supreme Court did not hold or even suggest that, in an entirely different context—municipal liability under *Monell*—a non-party may appeal findings of liability against her employer merely because she regularly engages in the behavior at issue.

supervised stops-and-frisks, bungled record-keeping, and created a "culture of hostility."  SBA
Mem. 13.  First, the SBA's description of the Court's findings is inaccurate:  the Court held the
City, not any of these officers, liable for breaking the law.  Second, it is important to remember
that the Liability Order discusses each of these sergeants in their capacity as employees of the
City, in order to determine whether the City should be held liable for violating the Constitution.
The Court credits or discredits their testimony and makes findings that they properly applied or
misapplied the Constitution in this very specific *Monell* liability context where Courts must
analyze the behavior of non-party municipal employees.  These sergeants are no different from
any other government employees whose position regularly requires that they properly apply the
law.  Such employees would understandably feel aggrieved if a court determines that they
violated the law, but the Second Circuit has made clear that "[t]o suffer a judicially cognizable
injury in fact an intervenor must have a direct stake in the outcome of a litigation rather than a
mere interest in the problem."  *Schulz*, 44 F.3d at 52 (citation and internal quotation marks
omitted).  Thus, having asserted nothing more than general, unspecified reputational harm based
on dissatisfaction with the Court's opinion rather than a direct stake in the litigation, the Unions
have failed to state an injury-in-fact on behalf of the officers identified by name.

   Even assuming that the Unions had provided specificity, the named officers all share a
common characteristic that makes it difficult to assert a reputational harm sufficient to confer
standing—they are all non-party participants in the judicial process.  Their status as non-party
witnesses or deponents does not convert them from "concerned bystanders" into injured Article
III litigants.  *Diamond*, 476 U.S. at 62 (citations and internal quotation marks omitted).  In fact,
allowing non-party trial participants to claim harm from court findings raises serious concerns.
"[I]f injury to reputation is the guiding precept . . . there is no principled basis for distinguishing

between a chastised attorney and any other participant in the judicial process who becomes the target of the presiding judge's opprobrium." *In re Williams*, 156 F.3d 86, 91 (1st Cir. 1998).  As one distinguished jurist noted, under such a regime, "[l]awyers, witnesses, victorious parties, victims, bystanders—all who might be subject to critical comments by a district judge—could appeal their slight if they could show it might lead to a tangible consequence." *Bolte v. Home Ins. Co.*, 744 F.2d 572, 573 (7th Cir. 1984) (Posner, J.).

Taken to its logical conclusion, the Unions' reputational injury theory extends beyond those officers whose conduct was held to have violated the Constitution.  Officers found by the Court to have complied with the law could arguably suffer reputational harm if the Second Circuit were to reverse the trial court's positive ruling about them.  In fact, on this theory, all participants would have a reputational investment in a lawsuit:  the lay witness whom the court credited will have a higher standing in the community, whereas the one who was not believed might be shunned by neighbors and employers; the expert witness the court sided with will garner acclaim and prosper, whereas the one whose testimony the court rejected will lose business; the lawyer whose line of reasoning the court adopted will attract clients and move up the ladder while the lawyer whose arguments the court rejected will not make partner.  The policy implications of this view are stunning:  a judge's opinion could not discuss non-party participants without inviting endless litigation.

In sum, because the Unions' theory of reputational injury to non-party participants in the judicial process is not supported by factual details and lacks any limiting principle, the Unions have failed to state that an individual union member in the identified officer category suffered an injury-in-fact under Article III.  Accordingly, the Unions fail to meet the first element required to assert associational standing.

ii.   Causation

Even if the subset of officers identified by name in the Liability Opinion could assert reputational harm arising from the Liability Order, they would lack standing because they cannot satisfy the causation element under Article III.  To establish causation, the intervenor-appellant must show an "injury caused by the judgment rather than [an] injury caused by the underlying facts."  *Tachiona v. United States*, 386 F.3d 205, 211 (2d Cir. 2004) (citation and internal quotation marks omitted).  Although the Second Circuit has not had occasion to explain the difference between an injury caused by the judgment and one owing to the underlying facts, other circuits have.  *See, e.g.*, *Nisus Corp. v. Perma-Chink Sys., Inc.*, 497 F.3d 1316, 1321 (Fed. Cir. 2007) (non-party lacked standing to challenge "subsidiary findings made in support of the court's ultimate . . . legal conclusion that [plaintiff's] patent was unenforceable"); *Horizon Bank & Trust Co. v. Massachusetts*, 391 F.3d 48, 53 n.1 (1st Cir. 2004) (litigant lacked standing where his injury related to "only [to] subsidiary issues, and not the judgment itself"); *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1199-1200 (9th Cir. 1999) ("[T]he district court's comments alone are not sanctions, but rather are merely its factual findings made in support of the Order. [Therefore, w]e find no basis independently to review the allegedly derogatory statements about [appellant] . . . . [B]ecause the words themselves do not constitute sanctions, we conclude that they are not independently reviewable."); *Warner/Elektra/Atl. Corp. v. Cnty. of DuPage*, 991 F.2d 1280, 1282 (7th Cir. 1993) ("If an appellant is complaining not about a judgment *but about a finding* . . . the appeal does not present a real case or controversy.") (emphasis added).

The Federal Circuit's ruling in *Nisus Corp.* is instructive.  Nisus sued Perma-Chink for patent infringement.  497 F.3d at 1318.  Perma-Chink responded that the patent itself was invalid because Nisus had obtained it through "inequitable conduct."  *Id.*  The district court agreed,

holding that the underlying inequitable conduct rendered the patent unenforceable, and entered

judgment in favor of Perma-Chink.  Nisus and Perma-Chink settled all other aspects of the

lawsuit and both disclaimed any interest in appealing the judgment.  Michael Teshner, an

attorney who assisted Nisus in obtaining the patent, moved to intervene.  Because he had helped

Nisus obtain the patent and his conduct was determined to be "inequitable," Teshner sought

intervention in order to clear his name by appealing the judgment.  The district court denied his

motion and the Federal Circuit affirmed, finding that the district court did not err because even if

Teshner had intervened, he would have lacked standing to appeal.  Teshner's injury, the court

reasoned, arose not from the judgment but from the underlying findings regarding his conduct.

The same is true in this case.  Assuming the named officers could identify a reputational

injury-in-fact, such an injury would flow from the Court's findings, not the Orders.  Looking no

further than the Unions' papers, the Unions repeatedly state that their quarrel is with the findings:

- "The [Unions] seek to intervene . . . to ensure that . . . its members are not burdened and besmirched by *findings* . . . that are legally infirm."  PBA Mem. 3 (emphasis added).

- "The [Unions] have a vital interest in challenging these erroneous and damaging *findings* about their members conduct, *findings* that have chilled lawful and proactive police conduct . . . and that would unfairly undermine public confidence in their work."  *Id.* 14 (emphasis added).

- "[T]he SBA should be permitted to defend its members against . . . *findings* made by this Court [] that they violated the Constitution."  SBA Mem. 1-2 (emphasis added).

- "SBA members also have interests affected by the Liability Opinion, because the Court . . . made *specific factual findings* regarding individual sergeants, accusing them of violating the Constitution, not telling the truth, and other disparaging conclusions based on limited and unreliable evidence."  SBA Reply Mem. 16 (emphasis added).

Likewise, the Second Circuit's remand characterizes the Unions' intervention motion as an effort

"to contest *findings* by the District Court the [U]nions believe to be unwarranted."  *Ligon*, 743

F.3d at 364-65 (emphasis added).  Moreover, the Unions acknowledge that the City, not the officers, was the subject of the judgment, stating, "[o]n August 12, 2013, following a nine-week bench trial, the Court issued and entered the Liability Opinion, *finding the City liable* for violating plaintiffs' Fourth and Fourteenth Amendment rights."  SBA Mem. 8 (emphasis added).

Although the Liability Order contains findings regarding identified officers, the Court did not rely exclusively on these findings to support its holding that the City is liable for violating the Constitution.  The Court evaluated plenty of evidence not involving named officers that could have formed the basis for establishing liability against the City.  Consider an alternative scenario:  if the Court had made identical factual findings but held that the City was *not* liable because it was not deliberately indifferent to the unlawful stops-and-frisks, then the City would have no adverse judgment against it, but union members would nonetheless be confronted with the purportedly injurious findings.  In this scenario, it is clear that the identified officers would be appealing findings, not a judgment.  Put differently, just because the Court's overall judgment of liability incorporates the supposedly injurious findings does not mean that those findings and the judgment are one and the same.  Accordingly, the Unions also fail the associational standing test because they cannot show causation, which is required for any of the identified officers to "have standing . . . in their own right" to appeal.  *United Food*, 517 U.S. at 553.

iii.    Individual Participation Required

With regard to identified officers, the Unions also fail the third prong of associational standing, *i.e.*, neither "the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Id.*  The Supreme Court has explained that associations do not have standing under this prong when "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require

individualized proof." *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975).  Instead, the harm must be "common to the entire membership" and "shared by all in equal degree."  *Id.* at 515.

The Liability Order mentions numerous officers by name because numerous officers testified at trial, were deposed during discovery, or otherwise participated in the *Floyd* trial.  To the extent any has suffered reputational injury, it arises from the specific findings made about the particular officer, *e.g.*, an officer whose testimony was rejected as untruthful would suffer a different reputational harm compared to an officer who was found to have failed to properly supervise a subordinate's stop-and-frisk.  There is no singular reputational injury that all the named officers share in common.  Accordingly, associational standing is not available to vindicate this purported harm because the injury to this category of union members is so specific that it would require the participation of individual union members.

   b. All NYPD Officers:  No Injury-in-Fact

The Unions also claim associational standing on behalf of all NYPD officers, whom they allege are harmed by general findings of widespread constitutional violations and by the finding of liability against the City.  *See* PBA Mem. 1-3 (findings that "the men and women of the NYPD had purportedly committed more than 200,000 constitutional violations" and the "highly injurious finding that the NYPD officers had engaged in intentional racial discrimination" besmirch the reputations of the "NYPD and its members").  Whether the Unions have standing to appeal the Liability Order on behalf of this second, broader category of officers depends on whether an individual officer in that category would have standing to appeal in his or her own right.  Thus, the question is whether an anonymous officer would be able to assert an injury-in-fact caused by the Orders sufficient to confer standing.

Although officers mentioned by name in the Orders may feel that their reputations have

been harmed due to the public evaluation of their conduct, it is less clear how anonymous officers with no connection to this litigation might suffer reputational injury from a finding that their employer's policy violates the Constitution.  The Unions offer no explanation other than to state the conclusion that such officers are in fact harmed.   In the absence of an explanation, the Court construes two alternative theories of injury from a close reading of the Unions' papers.

Under the first theory, the Unions assert that they must be permitted to defend their members, "who were unfairly accused of violating and found to have violated the Constitution, against further harm to their reputations and livelihoods that would result from the City's concession of liability on their behalf."  SBA Mem. 11-12.  Although the City initially indicated it would appeal, "the City now has turned its back on the officers of the NYPD, requesting a remand for  the avowed purposes of leaving the highly prejudicial findings of the Court unreviewed."  PBA Mem. 2.  On this view, the reputational injury that has befallen or will befall an anonymous officer is a consequence not of the Orders alone but of the City's acquiescence to them.  In other words, the Court's findings cause harm to the anonymous officer because the City is leaving the findings "unreviewed."  SBA Reply Mem. 16.

This theory of injury amounts to a generalized grievance about how best to interpret and apply the Constitution.  *Lujan*, 504 U.S. at 573-74.  The Supreme Court has warned that Article III standing "is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of" their interests.  *Diamond*, 476 U.S. at 62 (citations and internal quotation marks omitted).  The hypothetical, anonymous NYPD officer would be claiming reputational harm based on a disagreement with the Court and the City about how to follow the law.  This is not a "concrete and particularized injury" but rather a generalized interest in ensuring the City's adherence to constitutional norms, albeit according to the Unions' point of

view.  *Hollingsworth*, 133 S. Ct. at 2662; *Lujan*, 504 U.S. at 573-74.  The Unions do "not state

an Article III case or controversy" because they raise "only a generally available grievance about

government—claiming only harm to [their] and every citizen's interest in proper application of

the Constitution and laws, and seeking relief that no more directly and tangibly benefits [them]

than it does the public at large."  *Lujan*, 504 U.S. at 573-74.

      The second way to construe the Unions' position is that the anonymous officer suffers a

reputational injury as an employee whose reputation is tainted by her association with her

employer or fellow officers against whom negative findings were made.  On this view, the

anonymous officer's purported injury is narrower than the general bystander's because she is the

employee who previously implemented the City's tainted policy.  Stated differently, the

anonymous officer's reputation is tied to that of her employer, and she is injured because her

employer is injured.  However, construing reputational injury as a kind of taint owing to a

finding of liability against an employer has been rejected as too generalized.  *See Perry*, 630 F.3d

at 903-04.

      In *Perry*, the trial court denied motions to intervene by Imperial County and an employee

in the county clerk's office, who were concerned that the State of California would not appeal

the court's decision holding California's same-sex marriage ban unconstitutional.  *Id.* at 902.

The would-be intervenors alleged a "direct interest in the same-sex marriage debate" because, as

employees, they performed "practical, day-to-day responsibilities relating to new marriages."

Order at 5, *Perry*, 99 Civ. 2292 (N.D. Cal. Aug. 4, 2010), Docket No. 709 (citation and internal

quotation marks omitted).  Moreover, as employees, they argued that they needed to ensure

appellate review in order to avoid "significant confusion in the performance of their legal

duties."  *Id.* at 9 (citation and internal quotation marks omitted).  The district court denied the

motion, and the Ninth Circuit affirmed, reasoning that government employees are agents, endowed only with the power given to them by their principal—the government employer. *Perry*, 630 F.3d at 903-04.  Such employees are not free to adopt their own view of the law; instead, they implement their employer's policies based on their employer's legal analysis.  *Id.* Thus, "[w]hile being bound by a judgment may be a[] concrete and particularized injury sufficient to confer standing to appeal . . . the injury" owing from the injunction, "if any, would be to the [government employer], not [an employee]."  *Id.* at 904 (citation and internal quotation marks omitted).  Accordingly, the Ninth Circuit concluded that the employee "may not rely upon the [employer]'s injury to assert her own . . . standing to appeal."  *Id.*

The same reasoning applies here.  The Court determined that the City, not its employees, violated the Constitution, and it enjoined the City, not its employees, from engaging in unlawful stops-and-frisks.  The Court directed the City to remedy the illegality by revising its training, supervision, monitoring, and other policies.  Like the deputy clerk in *Perry*, NYPD officers are affected by the Orders in a sense:  they were the ones implementing the City's unlawful policy, and they will be the ones to implement the corrective measures required by the Remedial Order. However, as with the deputy clerk in *Perry*, the NYPD officers are not bound in their individual capacities because they have no independent authority to conduct stops-and-frisks based on their own analysis of the Fourth and Fourteenth Amendments.  Instead, they rely on their employer, the City, to provide instruction, training, and authorization.  Thus, like the deputy clerk, they have suffered no injury-in-fact as employees who perform the daily municipal tasks at issue. The anonymous officer cannot rely on the purported reputational harm to his employer to assert an injury-in-fact.  Accordingly, the anonymous officer lacks standing, and the Unions, therefore, cannot satisfy the first element of the associational standing test—which requires that a member

have standing in her own right—for this category of NYPD officers.

3.  Standing to Appeal the Remedial Order

The Unions' alleged collective bargaining injuries owing to the Remedial Order fare no better under Article III.  As discussed, *supra*, the "Immediate Reforms" ordered in *Floyd* and the remedies ordered in *Ligon* cover topics that are not subject to mandatory bargaining under New York law.  With respect to the ongoing consultative process in *Floyd*, the Unions are invited but are not required to participate in the development of the "Joint Process Reforms."  In the language of *Hollingsworth*, the Unions have "not been ordered to do or refrain from doing anything."  133 S. Ct. at 2662.  Moreover, these additional remedies have yet-to-be developed. Thus, an argument that unknown provisions harm collective bargaining rights is speculative at best.  It is well-established that "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citations and internal quotation marks omitted).  Article III standing cannot be based upon "theories that require guesswork as to how independent decision makers will exercise their judgment." *Id.* at 1150 (citations and internal quotation marks omitted).

4.  Conclusion:  the Unions Lack Article III Standing

In sum, because Rule 24 requires that an intervenor have a "direct, substantial, and legally protectable" interest, a would-be intervenor seeking to pursue an appeal that the originally aggrieved party has disclaimed must show that it has Article III standing to maintain the appeal. *Bridgeport Guardians*, 602 F.3d at 473 (citation and internal quotation marks omitted).  Otherwise, the proposed intervenor's interest is not "legally protectable."

The Unions lack associational standing because they cannot show that any of their members would have standing in their own right.  Neither the officers identified by name in the

Liability Order nor the anonymous NYPD officers have suffered an injury-in-fact arising from the Liability Order.  The Unions assert injuries to their members that are speculative, abstract, and amorphous.  Assuming the alleged injuries occurred, they were not caused by the Court's Orders, but by the Court's findings.  In particular, their members' status as non-party participants in the judicial process and as municipal employees who have suffered no injury apart from their municipal employer present substantial hurdles to standing.  Moreover, with respect to the subset of union members identified by name, their hypothetical injuries would be too individualized to support associational standing.  The Unions lack standing in their own right to challenge the Remedial Order because they have not been ordered to "do or refrain from doing anything." *Hollingsworth*, 133 S. Ct. at 2662.  Any future participation in the Joint Remedial Process is voluntary, and any injury based on not-yet-developed reforms is speculative.

Although framed as a concern over reputational harm and collective bargaining rights, the gravamen of the Unions' motions is that they disagree with the Court for ruling against the City and the City for refusing to appeal.  Faced with a similar situation in which a private group moved to intervene to defend Oregon's ban on same-sex marriage when the state no longer would, the district court commented, "[i]t would be remarkable, following the *Hollingsworth* opinion, for a court to substitute the Executive Branch of government with a private interest organization simply because the organization disagrees with the legal interpretation of [the state's] elected official."  Transcript of Oral Order at 52:1-5, *Geiger*, 13 Civ. 1834 (D. Or. May 14, 2014), Docket No. 115.  It would be no less remarkable here.  The Unions seek to force the City into another round of litigation that the City does not want to pursue in order to vindicate on appeal a policy the City does not want to implement.  In such public law cases, a federal court may be especially "eager . . . to tell everyone its view of the legal question at the heart of this

case." *United States v. Windsor*, 133 S. Ct. 2675, 2698 (2013) (Scalia, J. dissenting).  However, Article III sometimes requires federal courts to "put aside the natural urge to proceed directly to the merits of [an] important dispute and to 'settle' it for the sake of convenience and efficiency." *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (footnote omitted).

Having concluded that the Unions lack standing to appeal, the Court also finds that the Unions lack an avenue to vindicate their purported interests under Rule 24.  Granting leave to intervene in the district court knowing well that the appellate courts will turn the Unions away would be an exercise in futility.[31]

II.     <u>Other Grounds for Intervention; the Parties' Motion to Modify</u>

Having addressed the Unions' motions to intervene for the purpose of appealing the Injunction, Liability, and Remedial Orders, the Court now turns to three remaining matters:  (1) the Unions' request to intervene for the purposes of (a) participating in "court-supervised settlement discussions" and (b) opposing the parties' motion to modify the Remedial Order; (2) the merits of the parties' motion to modify the Remedial Order; and (3) the Unions' request to participate in the implementation of the Remedial Order.

**A.  The Unions' Request to Participate in the Settlement of *Floyd* and *Ligon***

On February 21, 2014, the Second Circuit remanded *Floyd* and *Ligon* "to the District Court for the purpose of supervising settlement discussions among such concerned or interested parties as the District Court deems appropriate, and resolving the motions to intervene."  *Ligon*, 743 F.3d at 365.  Accordingly, on February 25, 2014, this Court directed the parties to indicate "whether they desire the Court's participation in aid of settlement."  *Floyd*, ECF No. 428; *Ligon*, ECF No. 167.  By letter dated March 4, 2014, Plaintiffs and the City stated that they had already

---

[31] In exercise of the Court's discretion, the Court also denies the Unions' request for permissive intervention under Rule 24(b) on the ground that they lack appellate standing.  *See United States Postal Serv.*, 579 F.2d at 191 (permissive intervention is wholly discretionary in the trial court).

"reached an agreement in principle for resolving the City's appeals in both *Floyd* and *Ligon*."

*Floyd*, ECF No. 433; *Ligon*, ECF No. 169.  Apparently, the parties did not need the Court's

assistance.  Thus, to the extent the Unions' seek intervention to participate in "court-supervised

settlement discussions," that issue is moot.

After reaching their agreement, Plaintiffs and the City filed a joint motion to modify the

Remedial Order to reflect the terms of their proposed resolution of the appeals, which is now

before the Court.  Thus, the only remaining settlement-related process in which the Unions might

request a role is the Court's consideration of the parties' motion to modify the Remedial Order.

However, the Unions have already participated in that process by filing two briefs in opposition,

both of which have been carefully considered by the Court.  *See* PBA Mem., *Floyd*, ECF No.

459; SBA Mem., *Floyd*, ECF No. 461.  Therefore, it would be futile to permit the Unions to

intervene in order to participate in a process in which they have already participated.

Accordingly, the Unions' request to intervene for the purpose of opposing the parties' motion to

modify the Remedial Order is also denied as moot.

### B.  Modification of the Remedial Order

In remanding *Floyd* and *Ligon* to this Court, the Second Circuit vacated its stay of these

cases "insofar as is necessary to effectuate a settlement."  *Ligon*, 743 F.3d at 365.  Plaintiffs and

the City have reached a settlement of the City's appeals and now move, pursuant to Federal Rule

of Civil Procedure 54(b) and the Court's inherent authority, for an order modifying the Remedial

Order such that the term of the court-appointed monitor is limited to three years, provided that

the City shows substantial compliance with the Remedial Order by the end of that term.  Joint

Mem., *Floyd*, ECF No. 458.  The Unions oppose the motion.

"The power of a court of equity to modify a decree on injunctive relief is long-

established, broad, and flexible." *Brown v. Plata*, 131 S. Ct. 1910, 1946 (2011) (citation and

internal quotation marks omitted).  The district court derives this power in part from Federal

Rule of Civil Procedure 54(b), which provides that such injunctive orders "may be revised at any

time."  Fed. R. Civ. P 54(b).  More broadly, the district court has inherent authority to revise or

modify such orders.  *See United States v. LoRusso*, 695 F.2d 45, 53 (2d. Cir. 1982).  In

exercising its discretion to modify an injunctive order, a court should not impose modifications

that "thwart[] the purpose behind the injunction."  *Sierra Club*, 732 F.2d at 257 (citation and

internal quotation marks omitted).

The parties contend that this modification—a three-year cap on the monitor's term

provided the City shows substantial compliance—will enable the Remedial Order to be

implemented more quickly, that it is consistent with the purpose of the Remedial Order, and that

it is in keeping with other cases in which courts have appointed monitors to oversee institutional

changes to police departments.  In opposing the motion, the Unions reiterate their position on

intervention and complain that the proposed modification "includes no mechanism for [the

Unions] to present [their] collective bargaining concerns . . . or otherwise protect their rights."

SBA Mem. 5, *Floyd*, ECF No. 461.  Also, because they allege that the City and Plaintiffs are no

longer adversarial, the Unions contend that the Court would benefit from the Unions' perspective

as a "counterweight" to the parties' views when deciding whether the City has substantially

complied.  *Id.*

The Unions' arguments, though not without merit, are premature.  To the extent that the

Joint Remedial Process could produce reforms that implicate collective bargaining, the Unions,

should they choose to participate in that process, will be free to voice their concerns.  Also, when

the issue of substantial compliance arises at the conclusion of the three-year monitorship, the

Unions will have an opportunity to address that issue with the monitor and, by requesting amici status, the Court.

The parties' proposed modification is sensible and fair in light of the purpose of the Remedial Order.  Placing a limit on the monitor's term that is tied to the City's compliance with the Remedial Order will help narrow the parties' focus and timeline, and encourage swift implementation of the forthcoming reforms.  Accordingly, the Court finds that the modification is equitable to the parties and promotes the public interest.  The modification is approved and shall be memorialized in a separate order to be issued forthwith.

### C.  Participation in the Remedial Phase

The Unions also generally request "to intervene at the post-judgment remedy phase" of *Floyd* and *Ligon*.  SBA Mem. 23.  Because the Unions provide no details, the Court undertakes to construe their application as broadly as possible.  First, the Unions state that they "seek[] the right to participate only in shaping the reforms to be approved by this Court."  SBA Mem. 25. To the extent this implies that the Unions want a role in designing the Remedial Order, as discussed in detail *supra*, that request is untimely, and the Unions have failed to show that the Remedial Order implicates collective bargaining rights.  The reforms outlined in the Remedial Order are the result of months of pre-trial proceedings, a nine-week trial in *Floyd*, a seven-day evidentiary hearing in *Ligon*, and substantial briefing by the parties and non-party stakeholders, who proposed concrete remedial measures while *the Unions* sat silently on the sidelines. Moreover, the Remedial Order is not "issued on consent and do[es] not arise from a settlement." *Ligon*, 959 F. Supp. 2d at 686.  The time to shape its contents has passed.  The Unions' request to intervene for this purpose is also denied.

To the extent the Unions' motions may be construed as a request to intervene in the

implementation of the Remedial Order, that request is also moot in *Floyd*.  The Remedial Order

contemplates a two-stage process in *Floyd*:  an initial stage during which the Court will order a

set of "Immediate Reforms," and an ongoing phase, called the "Joint Remedial Process":

> *First,* the Monitor will develop, in consultation with the parties, an initial set of
> reforms to the NYPD's policies, training, supervision, monitoring, and discipline
> regarding stop and frisk (the "Immediate Reforms"). These reforms will be
> developed and submitted to the Court as soon as practicable, and implemented
> when they are approved.  *Second,* the Facilitator will work with the parties and
> other stakeholders to develop, through the Joint Remedial Process, a more
> thorough set of reforms (the "Joint Process Reforms") to supplement, as
> necessary, the Immediate Reforms.

*Id.*  The Court explicitly offers "police organizations" the opportunity to participate in the "Joint

Remedial Process," along with a variety of other "stakeholders."  *Floyd*, 959 F. Supp. 2d at 686.

Again, the Unions seek to intervene in a process where they have already been permitted to

participate.  Whether the Unions are labeled "intervenors" or "stakeholders" their "particularly

valuable" perspective will be considered by the facilitator and monitor when crafting the reforms

to be proposed for the Court's approval.  *Id*. at 681.

   With respect to *Ligon*, as discussed, the Remedial Order covers topics, including the

adoption of a written policy regarding TAP-related stops, and changes to supervision, training,

and monitoring of TAP-related stops, which do not implicate collective bargaining rights.  Thus,

the Unions' request to participate in the remedial phase of *Ligon* is denied.

   In sum, the Unions' requests to participate in the remedial phase are moot, and where

they are not, they are denied for the same reasons the Court denies the Unions' motions to

intervene in order to appeal the Remedial Order.

## CONCLUSION

   The Unions' motions to intervene are DENIED for three reasons:  (1) the motions are

untimely; (2) the Unions have no significant protectable interests relating to the subject of the

litigation that would warrant intervention; and (3) even if their alleged interests were cognizable, the Unions lack standing to vindicate those interests on appeal.

The parties' motion for an order modifying the Remedial Order is GRANTED.  The modification shall be set forth in a separate order to be issued forthwith.  The Unions' request to participate in the settlement of *Floyd* and *Ligon* is, therefore, DENIED as moot.

The Unions' request to participate in the remedial phase of *Floyd* is also DENIED as moot because the Remedial Order already offers "police organizations" the opportunity to participate in the development of reforms to NYPD stop-and-frisk policies and procedures through the "Joint Remedial Process."  To the extent the Unions request to participate in the remedial phase of *Ligon*, that request is DENIED for the same reasons the Court denies their motion to intervene for the purpose of appealing the Remedial Order.

Having resolved the motions to intervene, and having approved the terms of the parties' proposed resolution of the City's appeals, the Court has continuing jurisdiction only "insofar as is necessary to effectuate a settlement."  *Ligon*, 743 F.3d at 365.  Accordingly, by **August 6, 2014**, the City shall submit a letter to the Court indicating the status of its pending appeals.  This Court shall take no further action unrelated to effectuating the parties' settlement unless and until the Court of Appeals dissolves the stay or otherwise returns jurisdiction to the District Court.

The Clerk of Court shall terminate the motions at ECF Nos. 436 and 441 in *Floyd* and ECF No. 171 in *Ligon*.

SO ORDERED.

Dated: July 30, 2014
       New York, New York

_____
ANALISA TORRES
United States District Judge