# ARNOLD & PORTER LLP

Peter L. Zimroth
Peter.Zimroth@aporter.com

+1 212.715.1010
+1 212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

February 6, 2015

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/6/15

**VIA ECF**

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:   *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
           *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT)
           Final Recommendations

Dear Judge Torres,

    Pursuant to the Order Regarding Monitor's Final Recommendations, I am submitting my Final Recommendations concerning the FINEST messages in *Floyd* and in *Ligon*. Counsel for the parties in those cases have informed me that there will not be a challenge to these recommendations.

Respectfully submitted,

Peter L. Zimroth
Monitor

Enclosures

cc:   Counsel of record via electronic filing system

_____
ANALISA TORRES
United States District Judge

The Monitor's Final Recommendations with respect to the FINEST message in *Floyd v. City of New York* are APPROVED.

SO ORDERED.

Dated: February 6, 2015
         New York, New York

**COURT-ORDERED CHANGES TO NYPD PRACTICES AND POLICIES RELATED TO STOPS AND FRISKS**

This FINEST message is being transmitted as directed by the federal district court in the case of *Floyd v. City of New York*, which involves NYPD policies and practices related to stop, question, and frisk. The case is now settled and, with the agreement of the NYPD and the other parties, the Court has issued an order requiring that certain changes be made and has appointed a Monitor, Peter Zimroth, whose tasks include working with the parties to ensure that those changes are made.

This message outlines below some of the actions required by the Court's order.

I. IMMEDIATE REFORMS ORDERED BY THE COURT AND AGREED TO BY THE NYPD

(1) The NYPD is required to revise its policies and training regarding stop and frisk and racial profiling to adhere to the United States Constitution and New York law.

(2) The department form entitled STOP, QUESTION AND FRISK REPORT WORKSHEET (PD 344-151A), commonly referred to as a UF 250 form, must be revised to include a narrative section where an officer must record, in his or her own words, the basis for the stop. The new form must also include a separate explanation of why a frisk was conducted. The checkbox system currently in use must be simplified and improved.

(3) The NYPD must reform its supervisory, monitoring, and disciplinary policies and practices. These reforms include: (i) the adoption of new policies ensuring that NYPD supervisors review the constitutionality of stops conducted by police officers; (ii) changes to the process for imposing discipline on officers following substantiated CCRB findings of misconduct during stops; and (iii) the tracking and investigating of civilian complaints of racial profiling by the NYPD.

(4) Body-Worn Cameras – The NYPD must institute a pilot project in which body-worn cameras are worn for a one year period by officers on patrol in one precinct per borough—specifically the precinct with the highest number of stops during 2012. The current voluntary body-worn camera project, which was launched in November 2014 pursuant to Operations Order No. 48, is not the court-ordered pilot project.

II. JOINT REMEDIAL PROCESS FOR DEVELOPING SUPPLEMENTAL REFORMS

The City and the Plaintiffs must also participate in the Joint Remedial Process under the guidance of a Facilitator appointed by the Court. The purpose of the Joint Remedial Process is to get input from the NYPD, members of the community, and other stakeholders and to see whether other remedial measures can be developed.

## III. BASIC CONSTITUTIONAL STANDARDS GOVERNING STOP AND FRISK

(1) What Is a Stop?

Under the Fourth Amendment, an encounter between a police officer and a civilian constitutes a stop whenever a reasonable person would not feel free to disregard the officer and walk away. A stop may take place even without the threat or use of force by the officer. Encounters involving commands or accusatory questions can rise to the level of a stop, provided that a reasonable person would conclude that he or she is not free to terminate the encounter. Whether an encounter between a police officer and a member of the public constitutes a stop will be judged by all of the facts surrounding the encounter. The officer's conduct towards the individual involved will be a significant factor in determining whether a stop occurred.

(2) When May a Stop Be Conducted?

In order to conduct a stop, an officer must have individualized, reasonable suspicion that the person stopped has committed, is committing, or is about to commit a crime. In addition, the officer must be able to articulate facts establishing a minimal level of objective justification for making the stop, which means more than a mere suspicion or a hunch. "Furtive movements" or mere presence in a "high-crime area," standing alone, are insufficient bases for a stop or a frisk. Moreover, even when used in combination with other stop factors, the stopping officer must be able to specifically describe the suspicious nature of the "furtive movements" that he or she observed, and he or she must not define the "high-crime area" too broadly, such as encompassing an entire precinct or borough. In addition, a person may not be stopped merely because he or she matches a generalized description of a crime suspect, such as an 18 to 25-year-old Black male; if a physical description is the only factor relied on by the stopping officer, it must be more specific than that to form a sufficient basis for a stop.

(3) When May a Frisk Be Conducted?

Having reasonable suspicion to stop does not automatically permit the officer to frisk the person stopped. The officer must have an independent basis to reasonably suspect that a person who has been stopped is armed and dangerous in order to frisk that person. In determining whether a person presents such a danger, an officer may consider all of the relevant factors including the suspect's behavior, prior knowledge that the suspect is known to carry weapons, the type of crime for which the person has been stopped, and any other information that supports the conclusion that the person is armed and poses a danger to the officer.

A frisk is not a search for evidence of a crime, but is instead limited in scope only to what is necessary to protect the safety of the stopping officer during a stop encounter. Thus, a frisk is limited to a pat-down of the outer clothing of the suspect to determine if the suspect has a weapon. If during the course of the pat-down, the officer feels an object that the officer reasonably suspects is a weapon, the officer may take whatever action is necessary to retrieve the object and protect himself or herself, including removing the object from the clothing of the person stopped. When an officer lawfully pats down the outer clothing of a suspect and feels an object whose contour and mass makes its identity as contraband immediately apparent, the

2

officer may seize the contraband. However, an officer may not conduct a general search of the inside of a suspect's clothing or belongings unless the officer has probable cause to believe the suspect is involved in criminal activity or is in possession of illegal materials. Probable cause is a higher standard of proof than the reasonable suspicion required for a stop and frisk.

IV. WHAT IS THE RELATIONSHIP BETWEEN THE STANDARDS DESCRIBED ABOVE AND NEW YORK LAW ON STOP AND FRISK?

The standards described above are the basic federal constitutional standards for conducting a stop and frisk. New York law is and must be consistent with these federal constitutional standards. New York has codified the authority for conducting a stop and frisk in Criminal Procedure Law Section 140.50.

Under New York law, there are additional restrictions placed upon encounters between the police and the public that do not rise to the level of a reasonable suspicion-based stop. The first type of encounter, sometimes referred to as a Level 1 encounter or approach to request information, does not require any suspicion of criminal activity, but must have some objective basis. In a Level 1 approach, the officer must have an objective, credible reason for the approach. At this level, accusatory questions are not permissible, nor may an officer seek consent to conduct a search. At all times during a Level 1 encounter, the person is free to leave. In a Level 1 encounter, the officer may not create a situation (either by words or actions) where the person does not feel free to leave.

If an officer has a founded suspicion that criminal activity is afoot, commonly referred to as a Level 2 encounter, an officer may approach an individual to ask accusatory questions or to seek consent to search. At all times during this type of encounter the person is free to walk away and may refuse to answer questions or otherwise cooperate. In a Level 2 encounter, an officer may not create a situation (either by words or actions) where the person does not feel free to leave. If the officer does create such a situation, that constitutes a Level 3 encounter, which is the same as a stop and requires that the stopping officer have individualized, reasonable suspicion of criminal activity. Officers are reminded, however, that the facts that develop during a Level 1 or 2 encounter can sometimes provide the officer with an appropriate basis to reasonably suspect that the person is committing, has committed, or is about to commit a crime.

V. RACIAL PROFILING

The federal Constitution prohibits the use of race, color, ethnicity, or national origin as a motivating factor for initiating police action. When an officer's decision to initiate enforcement action against a person is motivated *even in part* by the person's race, color, or national origin, that enforcement action violates the Constitution unless the officer's decision is based on a specific and reliable suspect description that includes not just race, but other identifying characteristics. Members of the service are advised that *Department Policy Prohibiting Racial Profiling*, PG 203-25, dated August 1, 2013, is hereby revoked. Individuals may not be targeted for stops and frisks because they are members of a racial or ethnic group that appears more frequently in local crime suspect data. Race *may only be considered* where the stop is based on a specific and reliable suspect description that includes not just race, but other identifying

3

characteristics. When an officer carries out a stop based on reasonable suspicion that a person fits such a description, the officer may consider the race of the suspect, just as the officer may consider the suspect's height or hair color. When a stop is not based on a specific suspect description, however, race may not be used at all as a motivation or justification for the stop.

## VI. CONCLUSION

Members of the service are directed to immediately comply with the standards discussed in this FINEST message and to cooperate with the Monitor and his staff. Commanding Officers of all precincts, PSAs, and Transit Districts are directed to ensure that this FINEST message is read at ten consecutive roll calls. In addition, a copy of this message shall be posted conspicuously in all such commands and provided to all officers. Additional training on the standards discussed herein will be provided to all members of the service. Questions concerning this FINEST message may be directed to Deputy Chief Kerry Sweet, Commanding Officer Legal Bureau, at (646) 610-5400 or by email to: Kerry.Sweet@nypd.org. Additionally, members of the service may confer with a department attorney between 0700 and 2300 hours, Monday through Friday, either in-person at the Legal Bureau (One Police Plaza, Room 1406A, New York, NY 10038) or by telephone to (646) 610-5400. During other times, contact the Operations Unit at (646) 610-5580 to be put in touch with a department attorney.

## COURT-ORDERED CHANGES TO NYPD PRACTICES AND POLICIES RELATING TO THE TRESPASS AFFIDAVIT PROGRAM (TAP)

This FINEST message is being transmitted as directed by the federal district court in the case of *Ligon v. City of New York*, a companion case to *Floyd v. City of New York*. The *Ligon* case concerns the NYPD practices and policies relating to the Trespass Affidavit Program.

Parts of the *Ligon* case are now settled and, with the agreement of the NYPD and the other parties, the Court has issued an order requiring that certain changes be made and has appointed a Monitor, Peter Zimroth, whose tasks include working with the parties to ensure that those changes are made.

**Changes Ordered by the Court and Agreed to by the NYPD**

Specifically, the Department was ordered to amend Interim Order 22/2012 (PG 212-59, Vertical Patrol) by deleting the paragraph labeled "NOTE" on page 2, and substituting the following paragraphs in its place:

> A uniformed member of the service may approach and ask questions of a person (that is, conduct a Level 1 request for information under *De Bour*) if the uniformed member has an objective credible reason to do so. However, mere presence in or outside a building enrolled in the Trespass Affidavit Program is not an "objective credible reason" to approach. A uniformed member of the service may not approach a person merely because the person has entered or exited or is present near a building enrolled in the Trespass Affidavit Program.

> Under the Fourth Amendment to the United States Constitution, a person is stopped (temporarily detained) if under the circumstances a reasonable person would not feel free to disregard the police and walk away. A uniformed member of the service may not stop a person on suspicion of trespass unless the uniformed member reasonably suspects that the person was in or is in the building without authorization.

> Mere presence near, entry into, or exit out of a building enrolled in the Trespass Affidavit Program, without more, is not sufficient to establish reasonable suspicion for a stop on suspicion of trespass.

Members of the service are directed to immediately comply with the standards discussed in this FINEST message and to cooperate with the Monitor and his staff. Commanding Officers of all precincts, PSAs, and Transit Districts are directed to read this FINEST message at ten consecutive roll calls. In addition, a copy of this message shall be posted conspicuously in all such commands and provided to all officers. Additional training on the standards discussed herein will be provided to all members of the service. Questions concerning this FINEST message may be directed to Deputy Chief Kerry Sweet, Commanding Officer Legal Bureau, at (646) 610-5400 or by email to: Kerry.Sweet@nypd.org. Additionally, members of the service may confer with a department attorney between 0700 and 2300 hours, Monday through Friday,

either in-person at the Legal Bureau (One Police Plaza, Room 1406A, New York, NY 10038) or by telephone to (646) 610-5400. During other times, contact the Operations Unit at (646) 610-5580 to be put in touch with a department attorney.