# ARNOLD & PORTER LLP

Peter L. Zimroth
Peter.Zimroth@aporter.com

+1 212.715.1010
+1 212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

July 9, 2015

**VIA ECF**

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:   *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
*Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
*Davis, et al. v. City of New York, et al.*, 10-CV-00669 (AT),
First Report of the Monitor

Dear Judge Torres,

I am pleased to submit my first report describing the work done under the court orders in *Floyd v. City of New York*, *Ligon v. City of New York* and *Davis v. City of New York*. These cases challenged the NYPD's stop, question and frisk policies and practices (*Floyd*), and its policies and practices concerning criminal trespass enforcement in and around private buildings enrolled in the Trespass Affidavit Program (*Ligon*) and in New York City Housing Authority buildings (*Davis*). This letter will highlight some of the significant preliminary findings and observations.

This monitorship is beginning at a difficult time in police-community relations. It is also a moment of opportunity. Continued friction between the police and the communities they serve

# ARNOLD & PORTER LLP

Honorable Analisa Torres
July 9, 2015
Page 2

makes both the communities and the police less safe.  The challenge is to repair police-community relations in ways that strengthen public safety.

As Police Commissioner Bratton has acknowledged, the stop, question and frisk practices that led to these three lawsuits have been a factor in exacerbating the friction, especially in minority and immigrant communities.  Getting "stop, question and frisk" right is a vital step in the healing process.

The court orders do not prohibit the use of stop, question and frisk, which, when used lawfully and professionally, can be an important law enforcement tool.  The focus of the monitor's efforts is not on the number of stops or frisks or arrests for criminal trespass, but rather on whether those actions are performed in accordance with federal and New York State law.

My report discusses in detail the requirements of the court orders, the steps taken towards meeting those requirements and my assessment of those steps.  Here I provide only a brief summary of some of what is in the report.

**Training**.  A major focus in this first period was on the training for the recruit class that graduated in early July.  The court orders did not change the federal constitutional law concerning stop, question and frisk.  The orders require that the NYPD training include clearer explanations of the officer's lawful authority.  With respect to profiling, the training emphasizes the difference between "criminal profiling" based on detailed descriptions of suspects (perfectly

# ARNOLD & PORTER LLP

Honorable Analisa Torres
July 9, 2015
Page 3

lawful) and "racial profiling," which violates city, state and federal law and violates longstanding

NYPD policy.  As the student guide for patrol recruits says:

> As police officers, you are required to enforce the law impartially without
> regard to actual or perceived race, class, ethnicity, culture, religion, age, gender,
> sexual orientation, disability, immigration or housing status.  At the same time,
> we are members of a larger society in which bias and discrimination against
> certain groups of people are matters of historical and statistical fact. ... As noted
> in a recent speech by Police Commissioner Bratton, American policing has been
> part of the best of American history, but unfortunately some of the worst parts
> as well.  Understanding this history and how it has shaped perceptions will help
> you become a better, more effective police officer.

Going forward, the Department will be working on many other areas of training that need

to be addressed—for future recruit classes, for field training officers, for supervisors and for the

roughly 35,000 members of the force.

**Policies**.  The court orders require that the NYPD policies state clearly and correctly the

legal requirements governing stops, frisks, and arrests for trespass.  Clarity is important because

officers should have confidence that they understand when it is permissible to make arrests for

trespass or to stop, question and frisk persons and when it is not.  If officers are uncertain about

their lawful authority, they may stop or arrest someone when they should not, or forgo stopping

or arresting someone when it would be lawful and prudent to do so.  Both these outcomes lead to

a diminution of public safety and confidence in the police.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
July 9, 2015
Page 4

As described in more detail in the report, and as acknowledged by the Police Department, the Patrol Guide now in use does not give sufficient guidance to the officers on the street about their lawful authority or to their supervisors about their responsibilities.

The new Patrol Guide section (currently in draft) will recognize that, ordinarily, good-faith mistakes made on the street by officers trying to do their jobs will be dealt with through education, not discipline.

The Department also is piloting a revised form used to document stops.  The new stop report form will include space for officers to write out the circumstances that led the officer to stop a person and a separate space for describing the reasons for a frisk, if conducted.  Although these narrative sections are a change from the current stop report form, similar narratives were included in prior stop forms used by the NYPD; and an officer is currently required to write similar narratives in his or her activity log.

**Supervision.**  The new Patrol Guide section will clarify that supervisors have responsibilities that go beyond simply checking that the paperwork is complete for arrests for trespass in public housing and for stop, question, and frisk encounters.  Different levels of supervisors have different responsibilities.  The point is to ensure that both NYPD officers and their supervisors understand that the lawfulness and professionalism of the encounter will also be the subject of supervisory review.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
July 9, 2015
Page 5

**Auditing**.  The NYPD is currently developing new audit work plans to address the requirements of the court orders.  One challenge for the NYPD is how to identify and then address stops and frisks made by police officers but not documented.  NYPD has conducted several precinct audits and concluded that some stops were made but not documented.  More work needs to be done to determine the extent of the problem and to make sure that there is proper record-keeping.  The monitor team will be working with the NYPD and plaintiffs to ensure a robust program in this regard.

**Pilot program for body-worn cameras**.   The court orders require that a pilot be conducted in five precincts.  For reasons described more fully in the report, I will be recommending an alteration to the court order so that the body-worn camera pilot program can be a randomized controlled trial.  This will allow the NYPD and others to evaluate what impact cameras have on the behavior of the police officer and the person encountered.  The pilot program is expected to involve approximately 1,000 cameras, with about fifty cameras in twenty precincts.  Activities of officers wearing the cameras will be compared to those of officers with similar assignments in twenty control precincts who will not have cameras.  Several steps are needed before the pilot program can begin, including the NYPD procurement process, ensuring sufficient technology infrastructure in the pilot precincts, and developing protocols for camera use, data collection, review and evaluation.  The NYPD anticipates that it could be at least twelve months before the pilot program can begin.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
July 9, 2015
Page 6

It is still early in the remedial process, and there is much to do.  However, given the magnitude and complexity of effecting change in a police department with 35,000 sworn officers, I am satisfied that this effort is moving in a positive direction.

Respectfully submitted,

Peter L. Zimroth

# First Report of the Independent Monitor

# Peter L. Zimroth

# July 9, 2015

*Floyd, et al. v. City of New York*
*Ligon, et al. v. City of New York*
*Davis, et al. v. City of New York*

# MONITOR TEAM

Peter L. Zimroth
Monitor


Richard Jerome
Deputy Monitor


Anthony A. Braga

Edward Davis

Jennifer Eberhardt

John MacDonald

James McCabe

Jane Perlov

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND BACKGROUND ........................................ 1

    A.  The Monitor Team ................................................ 10

    B.  The Monitor's Activities .......................................... 11

II.  THE REQUIREMENTS OF THE COURT ORDERS,
    PRELIMINARY FINDINGS AND OBSERVATIONS ................... 15

    A.  Finest Messages for *Floyd* and *Ligon* ...................................... 15

    B.  Department Policies and Procedures ........................................ 16

        1.  Written Policies Concerning Stops and Frisks .............. 16

        2.  Racial Profiling Policies ................................................ 21

        3.  Trespass Affidavit Program (TAP) Policies ................. 22

        4.  Documenting a Stop on a Stop Report Form ................. 23

        5.  *Davis*/NYCHA Policies ................................................ 28

    C.  Training ................................................................................. 30

        1.  Training on Stop, Question and Frisk ........................... 33

        2.  Training on Racial Profiling .......................................... 36

            a.  Training on Bias-Free Policing ............................... 37

            b.  Training on Implicit Bias and Procedural Justice .... 38

        3.  Training on TAP Policies (*Ligon*) ................................ 40

        4.  Training on Patrols in NYCHA Buildings (*Davis*) ....... 41

        5.  Training for Supervisors ................................................ 42

D.     Supervision.................................................................. 43

E.     Auditing...................................................................... 46

     1.     Quality Assurance Division (QAD).............................. 46

     2.     Early Identification System (EIS)................................. 50

     3.     Bronx TAP Audit............................................................ 54

F.     How NYPD Handles Complaints and Discipline Concerning Profiling, Trespass Enforcement and Stop, Question and Frisk.......................................................................... 55

     1.     Tracking and Investigating Profiling Complaints ......... 55

     2.     NYPD Handling of Complaints Substantiated by the CCRB.......................................................................... 58

     3.     CCRB Investigations ..................................................... 63

G.     Performance Goals, Objectives and Evaluation...................... 64

H.     Body-worn Cameras.................................................... 67

     1.     Design of a Randomized Controlled Trial.................... 71

     2.     Exclusions ..................................................................... 74

     3.     Ranking, Matching and Randomization ........................ 75

III.     MEASURING COMPLIANCE WITH THE COURT ORDERS ..... 78

APPENDIX 1 ............................................................................. 79

APPENDIX 2............................................................................. 84

## INDEPENDENT MONITOR'S FIRST REPORT

## I.    INTRODUCTION AND BACKGROUND

This is the court-appointed monitor's first report regarding the work done pursuant to court orders in three federal lawsuits concerning New York Police Department (NYPD or Department) practices and policies with respect to encounters between the police and civilians.

Specifically, the three cases challenged the NYPD's practices and policies concerning "stop, question and frisk," and also criminal trespass enforcement in and around certain private multiple dwelling buildings enrolled in the Trespass Affidavit Program (TAP) and in New York City Housing Authority (NYCHA) buildings.  *Floyd v. City of New York*, *Ligon v. City of New York*, and *Davis v. City of New York.*  TAP (also known as Operation Clean Halls) is a program in which building owners authorize the NYPD to conduct patrol activities inside and around their buildings, including, in some buildings, floor-to-floor inspections, called interior patrols or vertical patrols.

In 2013, the district court ruled that the NYPD's "stop, question and frisk" practices violated the Fourth Amendment and Fourteenth Amendment, and ordered remedial measures.  The court named a monitor, Peter Zimroth, to develop and implement those remedies in consultation with the NYPD

1

and the plaintiffs and to assess and report to the court on compliance.  The City appealed the district court's actions and obtained a stay of the remedial order.  In early 2014, the City and the plaintiffs resolved the *Floyd* case and part of the *Ligon* case.  The City moved to withdraw its appeal without contesting liability or the court's related findings.

The City and the plaintiffs agreed that the measures set out in the district court's 2013 order would be implemented but with an additional provision removing the monitor's and court's supervision after specified periods of time if substantial compliance is achieved.  The NYPD's five unions moved to intervene to obtain the status of parties and continue the City's appeal.  On October 31, 2014, the Second Circuit Court of Appeals affirmed the district court's denial of the unions' motion to intervene and remanded the case back to the district court, which accepted the parties' resolution.

The monitorship, which had been on hold for more than a year, began its work again in early November 2014.  Judge Analisa Torres is now overseeing the implementation of the *Floyd* and *Ligon* remedies.

The City and the plaintiffs have now settled the *Davis* case, and the court gave final approval to the *Davis* settlement on April 28, 2015.  The *Davis* case is now part of the remedial process underway in *Floyd* and

*Ligon*.  Although there is substantial overlap among the issues raised in *Davis*, *Floyd* and *Ligon*, the *Davis* case also focuses on officers' interactions with residents and guests in public housing and on the interplay between the enforcement of criminal trespass laws and the enforcement of NYCHA's "House Rules."

The measures required by the court orders in *Ligon* and *Floyd* include revisions to NYPD policies, training, supervision, auditing, handling of complaints and discipline, and performance objectives, and a pilot program for body-worn cameras.  Remedies in the *Davis* case are consistent with the remedies in *Ligon* and *Floyd* but also include remedies relating to enforcement of the criminal trespass laws, including a revised NYPD form for trespass arrests and changes in NYCHA's "House Rules."

In addition to these measures, which the court labeled as the "Immediate Reforms," the court included a "Joint Remedial Process" to obtain input from the community and criminal justice stakeholders on additional potential reforms, which is being overseen by Judge Ariel Belen (ret.).

This effort has begun at a difficult and contentious period in police-community relations.  This is also a moment of opportunity.  Police Commissioner William J. Bratton has acknowledged that the NYPD's

overuse and misuse of stop, question and frisk helped to fuel mistrust between the NYPD and minority and immigrant communities, and recognized the need to repair the breach.

Getting "stop, question and frisk" right is a vital step in the healing process.

These are some principles and observations that have guided the monitor's work so far:

1.      The NYPD and the plaintiffs have agreed that certain changes in NYPD policies and practices need to be made.   The roles of the participants in the current remedial process differ from what they would be if these cases were still in litigation. The goal of this process is not to advance adversarial positions.  It is to implement the changes agreed to and incorporated in the court orders and to improve how the police function as guardians in a democratic society.  This is a responsibility shared by the police and all other participants in the remedial process.

2.      As the court orders make clear, the monitor's role is not to displace the police commissioner.  Under the City's charter, one person is charged with running the NYPD—the police commissioner, who is appointed by the City's chief executive officer, the mayor.

3.     Although the monitor and his team are not substitutes for police officials, the team is willing to provide technical support and assistance when desired by the NYPD.  Members of the monitor team have substantial experience in law enforcement, including as police officers and executives. The academic members of the team have worked with police departments throughout the country (including the NYPD) and have expertise in areas related to the court's orders.  Substantive assistance has already been given, for example, in planning for the implementation of the pilot program on body-worn cameras.

4.     Achieving the agreed-upon changes of NYPD policy and practices will not be easy.  The basic outlines of these changes have already been agreed to by the NYPD and have been incorporated in the court orders. The work of the monitor involves filling in the outlines consistent with those orders and in consultation with the parties.  It is primarily the NYPD's responsibility to generate proposals to meet the requirements of the court orders.  The plaintiffs can suggest revisions or generate proposals of their own, as they have already done.

The monitor will seek agreement among the parties, but ultimately it is the monitor's responsibility to decide which recommendations are

submitted to the court for approval.  This task will be informed by what the monitor team has learned and will learn about the organizational and other legitimate needs of the NYPD and its officers, as well as by the comments and insights of plaintiffs.  The monitor will also need to conduct periodic audits and other reviews and advise the court on progress.

5.      It is critical as well to obtain input from others who have a stake in the implementation of the changes.  To this end, the monitor and his team have met with union officials, individual police officers and groups of officers, community groups and community leaders, elected and appointed officials, advocacy organizations and their clientele, minority police fraternal organizations, and individuals (and their families) who have had personal experience with the NYPD's "stop, question and frisk" practices and trespass arrests.

6.      The court did not order the cessation of stop, question and frisk. Since at least as early as 1968, the U.S. Supreme Court has permitted this law enforcement technique so long as the officer's actions meet the requirements of the U.S. Constitution.  When used lawfully and wisely, it can be an important tool for police officers.  Nor do the court orders mandate

an end to the City's programs for policing public and some private housing. Although the court orders do require some changes in the way these programs are carried out, the orders have not changed federal constitutional law in these areas.  Rather, the orders require clearer statements of the law so that officers can better understand what is and is not permissible, and call for more robust ways for the Department to oversee those practices.

7.      We are mindful that since 2011 the number of stop, question and frisk encounters as reported by the NYPD has diminished significantly. However, that reported decline in numbers does not "fix" the problem.  The focus should not be on the number of stops per se, but rather on the lawfulness of those stops and whether these law enforcement encounters are conducted in accordance with the Department's principles of "courtesy, professionalism and respect."

It is not the monitor's role to determine whether there are too many or too few stops.   That said, in our work thus far, we have heard two explanations for the decline in numbers that do relate to our work.

First, one concern is that the data being reported may not be entirely accurate because some officers are making stops without appropriately documenting them.  Recent NYPD audit results show that this is happening,

at least to some extent.  (*See* Section II.E.1 below.)  The NYPD recognizes

that undocumented stops are a serious issue and that more work needs to be

done to determine the extent of the problem and ensure proper record-

keeping.  The monitor team will have continued involvement in this matter.

The integrity of the data being reported by the Department is essential to its

credibility and therefore its proper functioning in a democratic society.

Second, in interviews and informal conversations, the monitor and

members of his team have been told by officers at ranks from patrol officer

to supervisor that officers on the street may be declining to stop, question

and frisk when it would be lawful and prudent to make the stop.  Among the

reasons suggested are that officers are not confident or have been

misinformed about, among other things, what they are authorized to do

under the law, what their supervisors expect of them, what their personal

legal liability might be and under what circumstances discipline will be

administered.

We do not know the extent to which officers may be declining to

make lawful, appropriate stops because of these uncertainties.  To the extent

it is happening, though, it is not a healthy state of affairs for police officers

or communities.  One of the goals of the court orders and agreements, and

therefore this monitorship, is to clarify areas of uncertainty so that police

officers can go about their difficult tasks with a clearer understanding of their lawful authority.

8.      Making the necessary changes will take time.  The NYPD is a complex organization with roughly 35,000 sworn officers and 17,000 civilian employees.   The process for making changes in policy can sometimes be difficult and cumbersome.  Implementing new policies in the field is harder still.  Whether written policies actually affect conduct on the street depends on, among other things, how 35,000 officers (plus some civilians) are trained, the incentives and disincentives officers have to follow the new policies and the expectations that their superiors communicate. Then the NYPD needs to find ways to measure implementation: whether the changes are actually being carried out by the officers on the street and by their supervisors.  These are among the significant challenges that the NYPD has committed itself to meet.

This report describes the work thus far, assessing that work and the steps ahead.   Of course, there is still much to be done—accomplishing

change in this sphere is a large and complex undertaking.  It is the monitor's view that this initial period has seen good progress.

### A.     The Monitor Team

The monitor team consists of people with substantial experience in areas directly related to the court orders and the parties' agreement.  Peter Zimroth has been a federal prosecutor in the U.S. Attorney's Office for the Southern District of New York, the chief assistant district attorney in Manhattan and the City's corporation counsel, as well as a defense lawyer. Richard Jerome was the deputy monitor in two police reform settlements in Cincinnati, a deputy associate attorney general in the U.S. Department of Justice and a project manager for the Pew Charitable Trusts for its public safety performance project.  Anthony Braga is Professor of Evidence-Based Criminology at Rutgers University and a senior research fellow in criminal justice policy at Harvard University.   Edward Davis was the police commissioner for the Boston Police Department for seven years and before that was the superintendent of the Lowell Police Department.  In his thirty-five years of policing, Davis rose through the ranks of the Lowell Police Department, holding positions as a patrol officer, detective supervisor, and head of a local, state and federal narcotics and organized crime task force.

Jennifer Eberhardt is a social psychologist at Stanford University and a national expert on implicit bias. John MacDonald is chair of the Department of Criminology at the University of Pennsylvania and previously was at the RAND Corporation. James McCabe held several significant posts in the NYPD, including commanding officer of the Police Academy, and is now a professor at Sacred Heart University. Jane Perlov began her policing career at the NYPD as a patrol officer, commanded two precincts in Manhattan and served as chief of detectives in Queens. After retiring from the NYPD, she served as the Secretary of Public Safety for the Commonwealth of Massachusetts and as the police chief in Raleigh, North Carolina. More complete biographies are in Appendix 1.

### B.     The Monitor's Activities

Soon after beginning his work, the monitor convened a meeting of counsel for the NYPD, the City and the plaintiffs (the first of monthly all-parties meetings). The monitor worked with the parties to agree on milestones to be met to satisfy the requirements of the court orders. The goal was to make sure that the parties and the monitor had the same understanding of those requirements.

The parties also agreed on a process for the development of remedial measures, and the court issued orders dealing with how and when court

approval should be sought.  Drafts of new or modified policies, procedures, training materials or other changes are initially proposed by the NYPD. Those drafts are sent to the monitor and plaintiffs' counsel, who, after consulting their experts, make comments and suggestions or submit proposals of their own.  Sometimes those suggestions are adopted by the NYPD.  When they are not, the monitor decides what to recommend to the court for approval.  Any party then has the right to object to the monitor's recommendation, in which case the court decides.

During this process, the monitor and the parties communicate frequently with one another to make sure that all parties understand why each party has made a suggestion or has not agreed to one. This communication helps to minimize misinformation and lower the level of possible mistrust among the parties.

In addition, it was important to find ways for other stakeholders to provide input without making the process unduly cumbersome and without transforming the remedial process into continued litigation.  With the consent of the monitor and the NYPD, and with appropriate confidentiality assurances, plaintiffs' counsel have been permitted to share draft documents with some of their constituent client groups and then use that input to inform recommendations made to the NYPD and the monitor.  Likewise, under

similar confidentiality provisions, the NYPD may provide drafts to the police unions to seek their input. Independently, the monitor has met with all the police unions and with many advocacy groups, including those consulted by the plaintiffs.

Since the monitor began his work in November 2014, he and the other members of the team have spent significant time with NYPD executives and members of the service at every level, from the police commissioner to patrol officers. In the fall of 2014, the NYPD created a new Risk Management Bureau to establish a centralized compliance and risk assessment function at the Department and identify and correct weaknesses in policies, procedures and practices. The Risk Management Bureau is responsible for coordinating the Department's responses to the monitor's requests and has set up meetings and collected the data and documents needed for the monitoring effort. Meetings with NYPD executives and units have included the First Deputy Commissioner, Chief of Department, Chief of Patrol, Housing Bureau, Police Academy, Internal Affairs Bureau (IAB), Office of Management Analysis and Planning (OMAP), Information Technology, Department Advocates Office (DAO), Trials, Collaborative Policing, Performance Analysis Unit, Community Affairs, Operations, Labor Relations and Legal Bureau, among others.

In addition to the meetings with police executives, the monitor team has visited precincts and spoken to officers at all levels from commanding officer to patrol officer, attended focus groups of police officers to hear their concerns, observed training of recruits and officers as well as training of Police Academy staff, and gone on ride-alongs.  All this has allowed the team to learn more about the operations of the Department and understand how remedial measures might be implemented and their impact on operations.  The monitor has also met with representatives of each of the NYPD's unions, the Civilian Complaint Review Board (CCRB), the Inspector General, the director of the Mayor's Office of Criminal Justice, City Council members and members of the NYPD's Training Advisory Committee.  The monitor and his team, sometimes with Judge Belen, have met with more than 100 community members and organizations, elected officials, district attorneys, public defenders and other stakeholders throughout the city.  The monitor also meets regularly with counsel for the plaintiffs, the NYPD and the City Law Department to discuss progress, address issues and discuss the next steps to be taken.

In addition to these meetings, the monitor team has obtained its information in other ways.  A significant amount of the monitor's work has involved reviewing NYPD policies, procedures, operations orders and

memoranda, forms, reports, files, and other documents and data. The monitor team will be reviewing, among others, the Department's stop reports (previously called UF-250s), memo books and activity logs, trespass crime fact sheets and other data on trespass arrests, reports of citizen complaint investigations, and documentation of any interventions or disciplinary actions taken in response to unconstitutional actions. The monitor team will develop an appropriate sampling methodology for selecting files and reports to review and analyze. The team has also begun reviewing the NYPD's audits and monitoring of its own procedures, files and recordings.

## II.     THE REQUIREMENTS OF THE COURT ORDERS, PRELIMINARY FINDINGS AND OBSERVATIONS

### A.     Finest Messages for *Floyd* and *Ligon*

The NYPD was required to issue a message to all members of the service describing the reforms and the constitutional standards for stops and frisks. The court directed that the NYPD transmit two "Finest" messages, to be read at successive roll calls of officers, describing the changes agreed upon in *Floyd* and *Ligon*. A Finest message is one way the Department communicates with its officers.

The NYPD drafted the two messages and submitted them to the monitor and the parties for review. After a significant number of drafts and

comments from the parties and the monitor, the parties agreed on Finest messages for *Floyd* and *Ligon*, which were approved by the court in February. The NYPD began publishing these messages in early March. The Department reports that each message was read at ten consecutive roll calls so that they were presented to all members of the service. The NYPD also sent the Finest messages to every officer at the rank of captain and above via the NYPD's email system. Members of the monitor team observed the Finest message being read at roll calls in two precincts.

The NYPD has met the requirements for this remedial measure. Having observed the Finest message being read, however, both the monitor and the NYPD recognize that there may be more effective ways of presenting materials to officers at roll calls and in other venues.

### B. Department Policies and Procedures

### 1. Written Policies Concerning Stops and Frisks

In 1968, in *Terry v. Ohio*, the U.S. Supreme Court determined that the police practice of stopping and detaining individuals and frisking them for weapons or other dangerous items was lawful as long as the police met the requirements of the Constitution. That federal constitutional principle is being applied in these cases. Following *Terry*, in *People v. DeBour*, the New York State Court of Appeals adopted standards for police encounters

less intrusive than a stop or an arrest.  The Court of Appeals described the levels of knowledge required by the officer and the amount of interference permissible for a police officer to approach and question a person.  For example, in order to approach a person simply to ask him or her questions (a "request for information"), the officer does not have to suspect criminality but does need an "objective credible reason" (that is, a reason not based on whim or bias).  If the officer wants to ask "accusatory" questions ("common law right of inquiry"), the officer needs further justification—i.e., that there may be "criminal activity afoot."  These guidelines for encounters less intrusive than stops govern situations not addressed in *Terry* and therefore add some complexity.  The Court of Appeals' decision in *DeBour* created the standards by which all investigative encounters in New York are assessed—(1) requests for information, (2) common law right of inquiry, (3) stops, questions and frisks, and (4) arrests.

The court in *Floyd* dealt primarily with "stop, question and frisk," and recognized that it could be an important tool to further public safety. Consistent with *Terry,* the court did not hold that the practice was impermissible or prohibit its use.  The court held that the practice had to meet the requirements of the Constitution.

Thus, the changes required to be made to the NYPD's written policies and procedures are not new legal requirements: the court orders require only that the legal standards be stated correctly and clearly.  Clarity is important because officers should have confidence that they understand when it is permissible to stop, question and frisk people and when it is not.  If officers are uncertain about their lawful authority, they may stop someone when they should not, or forgo stopping someone when it would be lawful and prudent to do so.  Both these outcomes lead to a diminution of public safety and confidence in the police.

### Milestones

The NYPD's policy regarding stop, question and frisk is written in Section 212-11 of the NYPD Patrol Guide (P.G.).  This Patrol Guide section describes the procedures to be followed when an officer stops a person based on reasonable suspicion that the person has committed, is committing or is about to commit a felony or Penal Law misdemeanor.  The current version focuses almost entirely on the steps officers and superiors should take after what is assumed to be a lawful stop.  The procedures do not give guidance about the legal standards or the degree of knowledge an officer must have to make a stop lawful, do not give guidance about the degree of knowledge necessary for the encounters governed by *DeBour*, do not distinguish

between the legal requirements governing stops and those governing frisks and searches, and give only limited guidance as to the responsibility of supervisors.  In short, as the NYPD itself recognizes, the current version of P.G. 212-11 is not sufficiently helpful to officers on the street or their supervisors.

The changes required by the agreed-upon court orders include:

(1) The Patrol Guide must state what constitutes a stop; when a stop may be conducted; when a frisk may be conducted; and when a search may be conducted.

(2) The Patrol Guide must include a definition of "reasonable suspicion," the standard needed for a stop based on *Terry* (that the person has committed, is committing or is about to commit a felony or Penal Law misdemeanor).

(3) The Patrol Guide must state clearly that officers must have separate reasonable suspicion that a person is armed and dangerous in order to conduct a frisk of that person.  The court noted that some officers were not aware of the different standards for a stop and for a frisk, and some officers assumed that reasonable suspicion for a stop automatically provided the basis for a frisk.

(4) The Patrol Guide must require officers to document the stop and reasonable suspicion, and, if conducted, the frisk, on both a stop report form (formerly called a UF-250) and in their activity logs.

(5) The Patrol Guide must require supervisory review of stops, including review of the constitutionality of the stop, not just that a stop report form was filled out. The Patrol Guide must also provide for supervisors to identify officers needing further training and/or potential discipline.

### Status and Assessment

The NYPD has drafted a revised P.G. 212-11, and the monitor and plaintiffs have reviewed the draft and worked with the NYPD to reach an agreed-upon procedure. The revised P.G. 212.11 is close to being completed as a final recommendation of the monitor and submitted to the court for approval. Once the new procedure is approved, it will be published and disseminated to members of the service, and officers will be trained on the new policy. There will be additional training for all of the new procedures developed by the NYPD and approved by the court.

The draft P.G. 212-11 currently under review deals with the inadequacies of the current Patrol Guide section and provides guidance about the degree of knowledge necessary for the different levels of

investigative encounters governed by *DeBour*.  It requires documentation of all stops and makes more explicit the responsibilities of supervising officers up the chain of command.  And it makes clear that officers in need of training or possible discipline should be identified, but also states that, ordinarily, isolated cases of good-faith mistakes made by officers trying to do their jobs will be dealt with by training at the command level and not by discipline.

## 2.        Racial Profiling Policies

### Milestones

The NYPD's policy prohibiting racial profiling is set out in Section 203-25 of the Patrol Guide.  The court orders provide that the revised Patrol Guide procedure must include a definition of racial profiling stating that race, ethnicity or national origin may be considered by officers in taking police enforcement action only when it is part of a specific and reliable suspect description.  This is not new law; it is based on the Fourteenth Amendment of the U.S. Constitution.

### Status and Assessment

The NYPD has prepared a revised P.G. 203-25 and the parties and monitor have provided comments.  The Patrol Guide procedure prohibiting racial profiling is close to being completed and submitted to the court for

approval as a final recommendation of the monitor.  The revised P.G. 203-25 currently under review addresses the requirements of the court's orders.  The new procedure will state that police action, including stops, frisks, arrests or other law enforcement actions, may not be motivated, even in part, by the actual or perceived color, ethnicity or national origin of an individual.  Race may be used only if it is part of a reliable and specific suspect description that includes not just race, gender and age, but other identifying characteristics or information.

The new procedure will also include a description of Section 14-151 of the New York City Administrative Code prohibiting bias-based profiling. The Administrative Code includes demographic categories in addition to race, color and national origin:  creed, age, alienage or citizenship status, gender, sexual orientation, disability and housing status.

### 3.    Trespass Affidavit Program (TAP) Policies

**Milestones**

The court orders require a revised NYPD procedure that specifies the circumstances in which it is permissible for an officer to stop a person outside a building enrolled in the TAP on suspicion of criminal trespass. Stops inside and outside TAP buildings must comply with the revised stop, question and frisk policies noted above (P.G. 212-11).   The orders also

require the NYPD to amend its procedures to state that "mere presence" in a TAP building, or entry into or exit from a TAP building, does not constitute an "objective credible reason" for a *DeBour* Level 1 approach and request for information. Section 212-59 is the Patrol Guide section that governs stops in and around TAP buildings.

### Status and Assessment

The current P.G. 212-59 does not include the language required by the court orders and the parties' agreements. The NYPD has prepared a revised P.G. 212-59 to address this requirement, and the plaintiffs have provided the monitor with their comments and suggested edits to the procedures. The revised Patrol Guide will apply not just to the Bronx—the borough to which the preliminary injunction issued in *Ligon* was limited—but citywide.

The court's decision on the preliminary injunction in *Ligon* applied only to criminal trespass stops outside TAP buildings in the Bronx. The *Ligon* plaintiffs and the City and NYPD are still in negotiations over other issues not yet resolved by the court's orders. The completion of a new P.G. 212-59 may be deferred while those negotiations are ongoing.

### 4.    Documenting a Stop on a Stop Report Form

The court orders require changes to the documentation of stops by NYPD officers. The current P.G. 212-11 requires officers to complete a stop

report form every time a person is stopped.  The current form contains a series of checkboxes used to describe the basis for the stop.  The court found that these checkboxes, standing alone, did not provide sufficient information to determine whether a stop was based on reasonable suspicion.  In particular, the court found the checkboxes for "furtive movement" and "high crime area," which had been used excessively, do not provide that information.

The court orders require the NYPD to revise the stop report form to address the deficiencies identified at trial, including the addition of a narrative section on the form where the officer must record, in his or her own words, the basis for the stop and a separate narrative section supporting the basis for the frisk, if one was conducted.  Although these narrative sections are a change from the current stop report form, similar narratives were included in prior stop forms used by the NYPD; and the officer is currently required to write similar narratives in his or her activity log.

Documenting an officer's actions in making a stop is important for several reasons.  Proper documentation provides detail so that an officer will have sufficient information to refresh his or her memory if called to testify about the incident.  It enables the officer's direct supervisor and others in the NYPD to review the stop and assess whether the officer had sufficient

justification for his or her actions; it provides the NYPD important data for both investigative and other law enforcement purposes and for analysis of patterns or trends; it is an opportunity for training officers and reinforcing the standards and requirements of a stop; and it allows the NYPD a way to aggregate information to report to the public—for example, by reporting the number of stops in particular periods and locations.

Designing a form for reporting stops necessarily involves trade-offs among competing goals.  For example, requiring more information has benefits for review and analysis; but that will make the form more difficult for officers to use in the field—the form will take more time to complete and perhaps need to be larger, which, in turn, might create logistical challenges for officers using it on patrol.  Compliance with the court orders is essential, but there is no one right way to design a stop report form, and it should not be more complicated than necessary.

### Milestones

In accordance with the court orders and the parties' agreements, the new stop report form must include space for narratives describing (1) the reasons for the stop, (2) the reasons for the frisk, if conducted, and (3) the reasons for the search, if conducted.  The court orders also require that the checkboxes for "Reasons for the Stop" be simplified and improved and that

the check boxes "furtive movement" and "high crime area" be eliminated. These boxes did not describe in any detail the reasons why the officer found the person's movement suspicious or what "area" was referred to. The form will provide other places for the officer to record his or her observations concerning these factors—for example, in the narrative sections. In addition to revising the stop report form, the NYPD must also require officers to include in their activity logs the reasons for the stop and, if conducted, the frisk.

The court also urged the NYPD to consider a receipt or card to provide a person stopped with the reason for the stop and the officer's badge number, and information about how and where to file a complaint. The NYPD currently has a receipt form, but it does not include the officer's name or badge number and does not provide the specific reason for the stop. It states only "common reasons for a stop." This form began as part of a pilot program in 2009 and was implemented citywide in 2010. All precincts are supposed to have these forms available for officers, but it is not required that officers use them and it is not clear to what extent they do.

### Status and Assessment

Two versions of a new stop report form have been drafted and will be piloted in seven commands: five precincts, one housing police service area

(PSA) and one transit district (TD).   Both forms include the same information, but they are different sizes.  One is the same size as the existing form and fits into an officer's memo book without being folded.  The larger version is 8 x 14 inches and will need to be folded into four to fit in the memo book.  It has more space for the narratives and contains detailed instructions on the back of the form, but it may be more difficult for officers to use.  (The two stop report forms are attached as Appendix 2.)

The pilot program will evaluate which size works best, how the forms are completed, whether one format or the other is easier to use, and whether officers are more likely to use one form or the other.  The evaluation will include officer surveys, focus group discussions, review of the reports for accuracy, legibility and completeness, and an analysis of the description of the basis for the stop and any frisk.

The pilot started  in July and is expected to last for ninety days.  The NYPD has conducted training in the pilot precincts for officers, supervisors, data entry staff and staff of the Quality Assurance Division (QAD).  QAD will use this pilot to test ways in which it can perform more robust audits.  The training for the pilot includes a refresher on the law of stop, question and frisk, as well as instruction on the completion and processing of the form.

The NYPD also has prepared a revised "tear-off receipt."  Under the current NYPD stop procedures, P.G. 212-11, officers are given the option of providing the receipt to persons stopped; after the new P.G. 212-11 is approved, officers will offer the form to persons stopped who are not arrested or given a summons (absent exigent circumstances).  Officers in the pilot precincts testing the new stop report form will also pilot the new receipt.

The NYPD's stop report pilot will assess whether the current draft of the new stop report form should be revised in any way before it is finalized. A final version of the new stop report will be proposed to the monitor and plaintiffs' counsel and ultimately submitted to the court for approval.  Once the court approves a new form, the NYPD will use it throughout the Department.

### 5. *Davis*/NYCHA Policies

In the *Davis* settlement, the City, the NYPD and the plaintiffs agreed that residents of NYCHA buildings and their authorized visitors have the same legal rights as the residents and visitors of any other residential building in New York City.  The parties agreed that developing cooperative and trusting relationships between NYPD officers and NYCHA residents advances effective policing.

### Milestones

The *Davis* settlement requires a new Patrol Guide provision for the interior patrol of NYCHA buildings (P.G. 212-60) that promotes constitutional interactions between NYPD officers and persons encountered during interior patrols.  The new provision deals with encounters governed by *DeBour* (described in Section II.B.1).  Among other things, the new provision states that, without more, entering, being in or exiting a NYCHA building is not an "objective credible reason" justifying an officer's approach and request for information.  The settlement also requires a new form documenting all trespass arrests in NYCHA buildings (the Trespass Crimes Fact Sheet).  The agreed-upon order also modifies certain NYCHA rules requesting residents' cooperation with police inquiries and defining "lingering," which NYCHA rules prohibit in its buildings.[1]

### Status and Assessment

The language of P.G. 212-60 was agreed to as part of the settlement and has been approved by the court.  The NYPD and the plaintiffs in *Davis, Ligon* and *Floyd* all agree that the procedures for NYCHA patrols (P.G. 212-60) should align when possible with procedures for patrol of TAP buildings (P.G. 212-59) and should be consistent with the stop procedures applicable

---

[1]   NYCHA was also a defendant in *Davis* and reached a settlement with the *Davis* plaintiffs.

to all street encounters (P.G. 212-11).  Because the submission of a final recommendation for a revised P.G. 212-59 has been deferred while the parties in *Ligon* continue their negotiations, the publication of P.G. 212-60 may also be deferred so both procedures can be issued at the same time.

### C.    Training

An important focus of attention for the parties and monitor in the first months of this remedial effort has been training for the current police recruit class that started in January 2015 and recently graduated.  The monitor, the NYPD and the plaintiffs recognized that a new class of approximately 890 recruits could not be trained at the Police Academy using materials that the court and the NYPD had determined to be inadequate.  The parties worked to develop new student guides, lesson plans, PowerPoint presentations and scenarios for several subjects, including Policing Legally—Street Encounters; Policing Impartially; and Patrolling Housing Facilities.

The revisions to training materials do not reflect any changes in federal constitutional law.  Much of the recruit training materials were the same as those used in prior classes.  Changes were made to the extent required by the court orders, and there were additional revisions that the NYPD wanted to make.  Recruit training may undergo further review and modifications for future recruit classes.

Recruit training is just one piece of the larger training effort needed for this remedial effort.  All 35,000 NYPD members of the service will need to be trained on the new policies and procedures to be put into place.  This will require significant time, coordination and resources.  The Department will be developing roll-call training for precincts, PSAs and TDs, and more in-depth annual in-service training that will include lectures, discussions and role-play scenarios.   In addition to recruit training, revisions to training required by the court orders and parties' agreements include the following elements:

- Changes to the Field Training Officer (FTO) guide and training for the field training officers who will be working with the newly graduated recruits in July;

- Roll-call training on the following topics:

  o  New Patrol Guide procedures on stop, question and frisk (P.G. 212-11);

  o  New procedures prohibiting racial profiling (P.G. 203-25);

  o  New procedures on interior patrols in NYCHA housing (P.G. 212-60);

  o  New procedures on interior patrols in TAP buildings (P.G. 212-59);

- o New Stop Report Form (formerly UF-250);

- o New Trespass Crimes Fact Sheet, to be completed for each trespass arrest;

- Training on changes to NYCHA House Rules, including the definition of lingering;

- Promotional training for supervisors; and

- In-service training for all NYPD members of the service.

Separate from the court orders, the NYPD recognizes that its training, both recruit and in-service, is due for comprehensive review. The NYPD wants to move to a curriculum that relies more on scenarios and interactive training. The Department has opened a new Police Academy building in College Point, Queens, which is a consolidated training campus for new recruits, officers and civilians. The Department established a civilian Training Advisory Committee to assist the NYPD in reviewing and observing training.

The NYPD also has identified the need for more in-service training in addition to the training needed for this remedial effort. In 2015, the NYPD began a new three-day training curriculum on use of force and de-escalation tactics for all officers. This training focuses on how an officer can avoid a physical confrontation when dealing with a suspect, and how to take a

suspect into custody safely while minimizing the possibility of harm to the individual and the officer.  The training is designed to reinforce skills and tactics to maintain safety in often difficult and dangerous situations. Although much of this training goes beyond what is required by the court orders in these cases, there are elements that are relevant to the court orders, including material relating to procedural justice.

Training is essential to the success of the remedial efforts.  Officers at every level should feel comfortable that they understand what the law and NYPD policy require and permit.  Unless that happens, the Department will find it difficult to ensure that stop, question and frisk and trespass arrests are used when they should be and not used when they shouldn't be.

### 1. Training on Stop, Question and Frisk

**Milestones**

A recruit training class entitled "Policing Legally—Street Encounters" covers the legal standards governing when an officer may stop, question and frisk a person.  The  court orders require that this course underscore that officers need to articulate specific facts describing why they had reasonable suspicion, so that they avoid using boilerplate language or "scripts" in describing the basis for a stop.  The training should also emphasize that the legal authority for a stop does not automatically provide the authority for a

frisk.  To frisk a person, the officer must have reasonable suspicion that the person stopped is armed and presently dangerous.  The court also found that the description of "furtive behavior" in the prior training materials was vague, and that the language on "unusual firearms" was misleading.  The new training materials will also include scenarios involving self-initiated stops in addition to stops based on radio runs.

### Status and Assessment

The NYPD worked with the monitor and the plaintiffs in revising the recruit training materials.  The revisions were designed to clarify this area of the law and expand the discussion of the constitutional standards.  The training materials stress that an encounter between a civilian and an officer is considered a "stop" under the law when a reasonable person would not feel free to disregard the officer and walk away.  Such an encounter requires the officer to have reasonable suspicion that the person was engaged in or is about to be engaged in criminal conduct.  The course covers *Terry* and the four levels of *DeBour* encounters.

The revised training materials for this subject included a student guide and PowerPoint presentation, an instructors' lesson plan, scenarios and workshops involving encounters at each of the levels of *DeBour* encounters, and exam questions.

On April 24, 2015, the court approved the monitor's final recommendations on the training materials submitted, and training began on May 11, 2015. The monitor team has observed training classes; one of the plaintiffs' experts accompanied the monitor team in observing some of the training classes.

Although the NYPD has made changes to the written recruit training materials required by the orders, the parties agree that it was not possible for the NYPD to rewrite and restructure the recruit curriculum completely in the short time available for preparing the materials for this recruit class. The NYPD, the monitor and the plaintiffs will learn from the training of this first recruit class, and revisions to training for future classes can incorporate the lessons learned.

In conducting its evaluation, the monitor team sat in on many recruit classes and participated in "train the trainer" sessions, which also were focus groups about how the curriculum could be better taught. We spoke to individual teachers and had many conversations and meetings with those concerned with training—including the First Deputy Commissioner, the commanding officer of the Police Academy, many of the staff in charge of particular aspects of training, the civilian Training Advisory Committee, and outside consultants to the NYPD whose tasks include providing advice about

training.  Members of the monitor team have had substantial experience in education and in training police officers, and we shared with the Department some preliminary impressions and thoughts about how training could be improved.  These comments related to increasing and improving teacher training, increasing the use of hands-on training, and rethinking how teachers are chosen for the Academy and how they are evaluated once there.

## 2.   Training on Racial Profiling

As the student guide for the "Policing Impartially" course states: "As a police officer, you are required to enforce the law impartially without regard to actual or perceived race, class, ethnicity, culture, religion, age, gender, sexual orientation, disability, immigration or housing status.  At the same time, we are members of a larger society in which bias and discrimination against certain groups of people are matters of historical and statistical fact….   As noted in a recent speech by Police Commissioner Bratton, American policing has been part of the best of American history, but unfortunately some of the worst parts as well.  Understanding this history and how it has shaped perceptions will help you become a better, more effective police officer."

### a.  Training on Bias-Free Policing

**Milestones**

The court orders require new training on the NYPD's prohibition of racial profiling.  Under that policy, officers may not use race as a motivating factor, even in part, for law enforcement action, unless the action is based on a reliable and specific suspect description.  A general suspect description, such as "young, black male," is not sufficient; in addition, the fact that a particular group may appear more frequently in local crime statistics is not enough information for there to be reasonable suspicion for a stop.

**Status and Assessment**

The NYPD prepared a student guide and PowerPoint presentation for the "Policing Impartially" recruit course and the plaintiffs provided their comments.  The monitor submitted and the court approved these materials for this recruit class.  These written materials included what was required by the court orders and the parties' agreements.  In addition, the NYPD worked with the plaintiffs and the monitor to prepare the instructors' lesson plan, scenarios, workshops and exam questions.  The material includes information regarding bias and police history and how knowledge of this history can help officers be more effective.  Most of the training material in this course was previously included in prior recruit training classes and was

prepared by the NYPD. The topic of this training is an important area of focus for the NYPD. The monitor team observed that the recruit class benefited greatly from the diversity of the class itself and their personal experiences with police encounters.  Further changes may be made for future classes based on experience from this training class and from the comprehensive review of training materials being undertaken by the NYPD. In-service training for officers in the field also will be conducted after the Patrol Guide procedure on racial profiling is approved by the court.

### b.      Training on Implicit Bias and Procedural Justice

**Milestones**

Training on implicit bias and procedural justice are two important areas of education.  The Department has recognized that police officers will be much more effective and safer if they are aware of their own unconscious biases as well as those of others with whom they interact—e.g., community residents, witnesses and complainants, prosecutors, lawyers and judges. Incorporating training on implicit bias into the NYPD training curriculum will inform new recruits and officers about how stereotypes and unconscious attitudes (some developed during police work) can sometimes improperly influence their perceptions.

The Department has committed itself to "procedural justice" training, a well-known training tool.  The U.S. Justice Department describes the core values of procedural justice as "(1) fairness and consistency in rule application, (2) impartiality and unbiased decision making, (3) providing voice and representation, and (4) demonstrating transparency and openness." www.cops.usdoj.gov/pdf/taskforce/Procedural-Justice-and-Legitimacy-LE-Review-Summary.pdf.  A benefit of procedural justice is that voluntary compliance is furthered when individuals believe they are being treated fairly, respectfully and within the law.  Police officers will be more effective and safer when civilians comply voluntarily with law enforcement directives.  Another tenet of procedural justice is that police officers are more effective when they believe they are being treated by their superiors fairly, respectfully and within the law.

### Status and Assessment

Preparing training on implicit bias and procedural justice will take time.  The monitor and parties agree that it should be included for the recruit class starting in July 2015, if possible, or for the following 2016 recruit class.  The NYPD is hiring consultants with expertise in policing, implicit bias and procedural justice to assist in reviewing NYPD training and NYPD policies, and in developing revised training materials.

### 3.    Training on TAP Policies (*Ligon*)

**Milestones**

The agreed-upon orders require the NYPD to revise its training regarding how officers conduct interior patrols (sometimes called "vertical patrols") inside or near apartment buildings enrolled in TAP. The training must emphasize that mere presence in, entry into or exit from a TAP building is not sufficient to stop an individual on suspicion of criminal trespass; nor is it an "objective credible reason" to approach a person to request information.

**Status and Assessment**

The court has approved the study guide and PowerPoint presentation on TAP policies for the current recruit class. The NYPD worked with the plaintiffs and the monitor to develop the instructors' lesson plan, exams and scenarios. The training covers stops both outside and inside TAP buildings and is not limited to buildings in the Bronx. The written TAP training materials include the changes required. The monitor team will continue to observe NYPD training on this topic. In-service and roll-call training on this topic will be reviewed after the Patrol Guide procedures are approved by the court.

### 4.      Training on Patrols in NYCHA Buildings (*Davis*)

**Milestones**

As part of the *Davis* settlement, the NYPD and plaintiffs have developed an instructors' lesson plan for recruits on interior patrols in NYCHA buildings, which has been approved by the court.  In-service and roll-call training also will need to be developed.

**Status and Assessment**

The court-approved lesson plan was incorporated into the Police Academy recruit training for the January 2015 recruit class.  The NYPD also developed a student guide, PowerPoint presentation and other materials consistent with the lesson plan.

The NYPD incorporated the court-approved training materials two weeks after the April 28 approval of the *Davis* settlement, although it was not required for the January–July 2015 recruit class.  The monitor has observed recruit training on this topic.  The monitor also will be observing in-service and roll-call training on this topic when they are developed.

## 5. Training for Supervisors

### Milestones

One of the significant changes to NYPD procedures is that front-line supervisors will be responsible for reviewing the legality of stops and trespass arrests. NYPD supervisors must be trained on these new responsibilities. Promotional training for each of the ranks from sergeant to captain must be revised to include training on the new responsibilities of supervisors and the chain of command. In addition, the officers who will be partnering with the recruits who graduated in July 2015 under the FTO program also must be trained so that they are familiar with the training provided to the recruits. The FTO Field Guide also must be revised with respect to stops and interior patrols of NYCHA buildings and buildings enrolled in TAP.

### Status and Assessment

The NYPD has prepared revisions to the FTO Field Guide and drafted training materials for FTOs. The parties have not agreed on whether any additional revisions to the Field Training Guide are needed to meet the requirements of the court orders, and the monitor will be reviewing this issue. Additional training materials will be prepared after court approval of new stop, question and frisk Patrol Guide procedures. These materials will include roll-call training for supervisors on the Patrol Guide procedures, in-

service training and training for newly promoted members of the service. Revised training materials will be prepared for the next in-service training classes, which are now being planned for September. The monitor will report on training for supervisors after the revised NYPD procedures are approved by the court and training is developed.

### D.     Supervision

One of the findings of the court in *Floyd* was that NYPD supervisors did not review the constitutionality of the stops made by officers under their supervision. Under the existing Patrol Guide procedures, officers submit their stop report forms to the desk sergeant, not to their direct supervisor (usually the patrol sergeant). In addition, to the extent that the desk sergeant or any other supervisor in the NYPD chain of command reviews an officer's stop report form, it is only to assess whether the form is fully completed— that is, whether all the captions are filled out. Furthermore, there is little review of an officer's activity log, and no assessment of whether the activity log describes a constitutional stop and/or frisk, based on appropriate reasonable suspicion.

Front-line supervision was emphasized by the court because there is consensus among police agencies that these supervisors play the most important role affecting the culture of the organization. An engaged

supervisor who actively intervenes at the scene and reviews reports sets the tone.   Misfeasance is best identified and corrected, and good conduct recognized and rewarded, at this level of the organization.

### Milestones

The court orders require that front-line supervisors review officers' stop report forms and activity logs not just for their completeness but also for the constitutionality of the stop, the constitutionality of the frisk and/or search, if conducted, and the reasonableness of any use of force.   The procedures must also include a description of supervisory actions taken or to be taken if an officer's actions are not appropriate.   In the *Ligon* case, the court orders require that the NYPD implement a system for reviewing the constitutionality of stops for criminal trespass outside TAP buildings in the Bronx, consistent with the supervisory reforms ordered in Floyd.   Under the *Davis* settlement, the NYPD must ensure that supervisors review their officers' interactions with NYCHA residents and guests when making arrests for trespass, when making stops and when enforcing NYCHA rules. The review will be to ensure the lawfulness of the interaction and that officers prepare the appropriate documentation.

### Status and Assessment

One of the most significant changes in the daily operations of the NYPD relating to stops and frisks will be the new responsibilities of supervisors in ensuring that their officers' actions are lawful. The draft revised Patrol Guide procedures for stops (P.G. 212-11) include supervisory review and responsibility for taking appropriate action. An officer's immediate supervisor (usually the patrol sergeant) will conduct a substantive review of the constitutionality of the stop and, if conducted, the frisk or search. In addition, the procedures provide for the sergeants' reviews of stops to be assessed by the precinct's Integrity Control Officer (ICO) and the Executive Officer.

These responsibilities will be included in the new Patrol Guide sections and will also be documented on the new stop report form. The revised stop report form (now in draft) requires supervisors to document whether the stop was supported by reasonable suspicion and, separately, whether the frisk, if conducted, was supported by reasonable suspicion. If not, the supervisor must then document what action, if any, was taken: whether the report was corrected or the officer was instructed, referred for training or disciplined. The monitor also will review the NYPD procedures covering supervisory actions relating to trespass enforcement.

### E.      Auditing

Under the court orders, the monitor will "regularly conduct compliance and progress reviews" to assess the extent to which the NYPD has implemented the required remedial measures.  It is even more important, however, that the NYPD itself monitor and audit its conduct to ensure that the reforms are carried out.

There are several ways the NYPD audits and monitors its officers' actions.   At the precinct level, each command has an ICO, who must perform inspections and reviews to identify misconduct by officers.  QAD is responsible for ensuring that the Department complies with its written policies and procedures.  With respect to NYPD stop and frisk practices, the court found that the Department's monitoring and audit procedures were inadequate.  Supervisors, ICOs and QAD reviewed the paperwork to assess how the stop report forms were filled out but did not conduct reviews to ensure that the stops were lawful.

### 1.      Quality Assurance Division (QAD)

**Milestones**

The court orders require that the NYPD develop auditing protocols for stops and frisks that ensure compliance with legal standards, not just documentation requirements.   In addition, the NYPD must develop

46

procedures to review supervisory actions taken in response to improper stops and improper trespass arrests in NYCA housing.

### Status

The Department has moved QAD to the Risk Management Bureau to consolidate areas of risk management and to ensure early identification and centralized reporting of issues uncovered during the course of audits. QAD evaluates compliance in many different performance areas: stop, question and frisk is one of them.

Currently, QAD is continuing to conduct audits of stops and oversee self-inspections mostly as it did before the court orders, without the changes the NYPD understands need to be made, because neither the Patrol Guide section governing stop, question and frisk nor the stop report form has yet been revised to reflect the requirements of the orders. In anticipation of the appropriate changes to the Patrol Guide and stop report form, however, the NYPD is in the process of developing new audit work plans. The NYPD has stated that audits undertaken pursuant to the new plans will focus on assessment of the lawfulness of the stop (and frisk, if conducted) and evaluate the supervisor's review of those actions. The work plans also will analyze data to identify citywide, borough-wide, and precinct-level patterns and trends of potentially problematic stops. The new audit program will also

include a revised sampling approach that will increase the number of stops analyzed by QAD.   NYPD staff have visited the Los Angeles Police Department to review its audit system and are collecting information on auditing from other large city police departments.  The NYPD has also hired a CPA with extensive auditing experience who was previously employed by a  major accounting firm.

One major challenge for the NYPD is how to identify and then address stops and frisks that are made by police officers but not documented. Without accurate reporting, it will be impossible for the Department's supervisors to make informed judgments about what is actually happening on the street.   Without that knowledge, it will be difficult for the Department's policy-makers to account for and perhaps respond to what communities are in fact experiencing.   And finally, it is essential in a democratic society that the public have confidence in what is being reported by the police.

Before 2008, QAD did not conduct any audits to determine whether stop forms were in fact completed every time a person was stopped.  After a study by the RAND Corporation in 2008, the NYPD developed an audit program using radio transmissions to identify instances in which a stop was made and a stop report should have been prepared.   The audit required

48

listening to a sample of hours of radio transmissions, however, so only a limited number of evaluations were completed each year.

In October 2014, the NYPD obtained technology that does keyword searches on the Department's new computer-aided dispatch system (ICAD). QAD uses keywords including "Stopped," "Show-up," "Holding" and "Warrant Check" to identify possible stop encounters; then QAD reviews the radio transmissions and NYPD records to determine if a corresponding stop report form was prepared.  If not, further investigation is done to determine whether one should have been prepared.  QAD performs this audit based on ICAD in five commands each month.

### Assessment

The NYPD has acknowledged that the current ICO self-inspections and QAD audits are not sufficient, and the Risk Management Bureau is preparing new audit work plans to meet the requirements of the court orders. The new audit work plans also should include protocols for monitoring and auditing stops and arrests for criminal trespass in NYCHA housing.

Some audits that QAD is now conducting, however, do identify issues that need to be addressed.  The NYPD provided the monitor with recent audits of nineteen precincts based on reviews of radio transmissions (ICAD audits).  For seven of these precincts, the audit looked at three-day periods.

 For five precincts, the audit was for seven-day periods.  In total, these twelve audits concluded that there were seventeen instances in which stops were conducted when there should have been a stop report form but none was made.  For seven additional precincts, QAD identified a number of instances in which it appeared likely that a stop was conducted but there was no or improper documentation.  The NYPD is currently conducting further investigation of those events.   The monitor has asked for additional information about the outcomes of these audits.

The monitor team will be working with the NYPD and the plaintiffs to identify additional methods for determining whether stops are being made but not documented and will be reviewing the results of the audits.

## 2.      Early Identification System (EIS)

### Milestones

The court highlighted the benefits of an Early Identification System (EIS) (sometimes called an "Early Intervention System" or "Early Warning System"), a centralized database to collect and analyze information relating to behavior that might put the Department or its officers at risk.  Many major police departments use an EIS to support the supervision and management of their officers, supervisors and units.   It is not meant to be a tool for discipline; it is used to identify at-risk employees and patterns of at-risk

behaviors so that they can be addressed and corrected before more serious misconduct occurs.   As part of the remedial efforts, the NYPD has committed itself to implementing an effective EIS system.

### Status

The NYPD has described an EIS that it has had in place for some time.  The Performance Analysis Section of the Risk Management Bureau tracks officer performance using several databases to identify officers and supervisors who display at-risk behavior.  Officers flagged in the system are then candidates for a monitoring program.   The data reviewed include disciplinary actions, evaluations that are below standards, civil lawsuits, CCRB complaints, use of force complaints, referrals by supervisors and personnel information collected in the Department's Central Personnel Index (CPI).   Personnel from the Performance Analysis Section then interview officers that were identified for placement into a monitoring program.   A monitoring program is then put in place with a plan for remediation, which may include re-training or mentorship.

The NYPD has committed itself to upgrading its technology to integrate more of its databases and to creating an alert system that identifies officers and units for potential intervention.   As part of this effort, the Department has moved its Enterprise Liability Assessment Unit (ELAU) to

the new Risk Management Bureau.  ELAU's task is to analyze notices of claims and lawsuits filed against the City and officers to identify patterns or trends.  ELAU has begun creating an internal database, the Risk Assessment Information Litigation System (RAILS), for this purpose.  The NYPD plans to expand the RAILS database to create a single, integrated database for both officer performance analysis and department-wide risk assessment.  This expanded database would provide the Performance Analysis Section, as well as supervisors and others in the Department, with up-to-date data regarding officers and squads.  The New York City Comptroller's Office has approved a new "scope of work" and registered the contract for expanding RAILS.

As described to the monitor, once it is in operation, the expanded RAILS will include information on complaints against officers, civil lawsuits, uses of force, discipline, sick leave and overtime, traffic accidents, IAB investigations, criminal proceedings against officers and other data relating to at-risk behavior.  The NYPD also hopes to incorporate positive information on officers, including commendations, letters of reference and promotions, among other items.  RAILS will use "triggers," or thresholds, to identify when officers need additional review by supervisors; these triggers will be both quantitative (e.g., if an officer has been named in a certain number of lawsuits) and comparative (e.g., if an officer has used force

significantly more often than officers with similar assignments and patrols). The NYPD plans to use the RAILS system to evaluate individual officers and also as a tool to analyze patterns for squads and units to encourage and audit supervisory accountability.

### Assessment

The monitoring program overseen by the Performance Analysis Section is an avenue for evaluating officer performance, but it has limitations. The section uses data from the CPI, performance evaluations and some data from the CCRB, but it does not include other information that would be useful, such as data on stops, as well as trespass arrests in public housing.

The NYPD's proposals to expand RAILS are encouraging. If it is put into place, RAILS can be a formidable early identification system. Some of the challenges the NYPD faces in getting this system up and running include: completing the procurement process; obtaining data from all the appropriate sources, including the CCRB and the City Law Department; and training supervisors on using the data and analysis. The NYPD agrees that it should use RAILS or another methodology to analyze and assess patterns and trends of officers' stops.

### 3.      Bronx TAP Audit

The remedies agreed to by the NYPD in *Ligon* require it to develop procedures to ensure that officers are completing a stop report form for every criminal trespass stop made outside a TAP building in the Bronx.  The QAD audits described in Section II.E.1 above should include trespass stops outside TAP buildings in the Bronx, so that the NYPD can implement procedures to ensure proper documentation of those stops.  In addition, the NYPD has proposed a draft Operations Order for a pilot program to examine the supervisory review of criminal trespass stops outside TAP buildings in the Bronx.  The draft pilot program requires the ICO in each Bronx command to review a percentage of stop reports each month.  The procedure will include supervisory reviews focusing on assessing the constitutionality of stops in addition to ensuring the forms have been completed correctly. The monitor has reviewed the draft audit protocol and will be sending the parties proposed revisions to the draft Operations Order.  After reviewing additional input from the parties, the monitor will submit a final recommendation for court approval.

### F.     How NYPD Handles Complaints and Discipline Concerning Profiling, Trespass Enforcement and Stop, Question and Frisk

A fair, accurate and prompt disciplinary system is central to the court orders, the parties' agreements and also to improving relations between police officers and their superiors and between the police and the community.  The system should be seen as legitimate by the police and the community being policed.

### 1.     Tracking and Investigating Profiling Complaints

**Milestones**

Until the fall of 2014, the NYPD did not have a separate category for allegations of racial or other prohibited profiling, and therefore could not know how many of these complaints had been made.  Profiling allegations that came into the Department most often were sent to be investigated at the precinct where the alleged conduct occurred, and the NYPD did not track the outcome of the complaints—whether the allegation was substantiated and, if so, whether any remedial or disciplinary action was taken.  The court orders require the NYPD to begin tracking and investigating complaints it receives related to profiling.

### Status

The NYPD has changed the way it processes, tracks and responds to profiling complaints.  In October 2014, the NYPD upgraded the case management system used by the Internal Affairs Bureau (IAB) and added a "profiling" category with nine subcategories: race, color, ethnicity, national origin, religion, age, gender, gender identity and sexual orientation.  These complaints can now be tracked.

The NYPD also changed by whom profiling allegations are investigated.  Previously, allegations of profiling were categorized as "Outside Guidelines" or "OG" complaints, and the Investigative Review Section of the Office of Chief of Department would determine where the allegations were sent to be investigated.  Usually, the investigations were sent to the officer's precinct, where the officer's supervisor often did the investigation.  Now, profiling complaints are categorized as more serious "Misconduct" or "M" cases.  These M cases are logged into the IAB's case management system and the IAB tracks the complaint.  The allegations are no longer investigated in the command where the officer is assigned.  Instead, the Office of Chief of Department determines where the allegation will be investigated, and forwards the case to one of the investigation units

of the relevant borough or bureau command.  The IAB reviews both the quality and the outcome of these M case investigations.

According to the NYPD, as of April 30, 2015, there have been ninety-three allegations of profiling received by the NYPD since October 2014, when the IAB case management system began tracking profiling complaints (fourteen in 2014 and seventy-nine in 2015).  The fourteen 2014 cases were classified as OG cases and investigated at the precinct level.  Of the 2015 cases, however, seventy-eight have been classified as M cases, with one case classified as a "C" (Corruption) case.

The NYPD has stated that with the changes to its database, which separately categorizes profiling allegations, IAB and the Risk Management Bureau will now be able to analyze the data to determine whether there are trends, patterns or other indications of problematic behavior within a precinct, borough or bureau, or by a single officer.  These analyses would be more complete if the NYPD included allegations of profiling that are received at the CCRB.  Although the CCRB does not have a category of complaints for profiling allegations, if profiling is alleged in a complaint or during the investigation of the complaint, the CCRB does note those allegations in its database.  The Department does not obtain that data routinely and regularly, and the NYPD is not currently using the CCRB

complaint data (whether related to profiling or to stops, frisks and searches) for any analysis of trends and patterns of complaints.

### Assessment

Having complaints of profiling investigated by the IAB or a borough investigation unit improves the NYPD process because a supervisor of the subject of the complaint will no longer investigate the complaint. When the NYPD begins completing investigations and dispositions of these cases, the monitor will review a sample of those investigations and report on that review. The monitor also will review the NYPD's intake procedures, investigative protocols and training materials for these investigations. The Department has made improvements in how it categorizes and tracks complaints of profiling. It is too early to assess how the Department investigates these complaints or how it uses and analyzes the data it collects.

### 2.     NYPD Handling of Complaints Substantiated by the CCRB

### Milestones

The court found inadequacies in how the NYPD handled complaints relating to stops, frisks or searches that were substantiated by the CCRB. The CCRB has jurisdiction to investigate complaints against officers alleging use of excessive or unnecessary force, abuse of authority, discourtesy or the use of offensive language (collectively known as FADO

complaints).  Improper stops, questions, frisks or searches fall under the category of abuse of authority.  Under the agreed-upon court orders, the NYPD's Department Advocates Office (DAO) must revise its procedures for dealing with cases in which the CCRB has substantiated an allegation.  The NYPD must give increased deference to credibility determinations by the CCRB and not favor an officer's word simply because he or she is an officer.

### Status

There are several levels of discipline that can be imposed on NYPD members of the service.  The most serious discipline recommendations, called "charges and specifications," are prosecuted in the NYPD's trial room before an administrative law judge, under the supervision of the NYPD's deputy commissioner of trials.  There are other cases in which less serious discipline is recommended.  The discipline recommended can be a loss of five or fewer days of vacation, or ten or fewer days of vacation (known as "command discipline A" and "command discipline B," respectively), retraining or instructions from a supervisor.

At the time of the *Floyd* trial, all complaints that were substantiated by the CCRB were sent to the Department Advocates Office (DAO) in the NYPD.  The DAO could proceed with the case or decide not to go forward

with the CCRB's findings or recommended discipline.  For cases in which a

CCRB panel substantiated an allegation of an unconstitutional stop and

recommended serious discipline (i.e., charges and specifications), the DAO

would decide whether or not to prosecute the case in the NYPD trial room.

The DAO reviewed the case, considered the recommendations of the CCRB

and made its own recommendations to the police commissioner.

In April 2012, the NYPD and the CCRB executed a Memorandum of

Understanding (MOU) giving the CCRB authority to prosecute in the trial

room complaints that have been substantiated by the CCRB and in which it

has recommended that charges and specifications be brought.  The CCRB

has established its own Administrative Prosecution Unit (APU) to prosecute

these cases.  The police commissioner still has the final authority over the

disposition of the case and the discipline imposed, if any, if the trial results

in a plea or finding of guilt.

Another change in NYPD's handling of cases substantiated by the

CCRB is the "reconsideration process" used by the DAO.  If the DAO

disagrees with the CCRB's determination to substantiate a case with charges

and specifications, or disagrees with the CCRB's recommendation of

discipline, the DAO may request in writing that the CCRB reconsider the

case, and state why the NYPD disagrees with the CCRB's decision.  The

CCRB can agree to reconsider the case or decide not to reconsider.  If it does reconsider the case, the CCRB panel that made the initial decision can modify its decision to substantiate the complaint or its recommendation for discipline; or it can determine that its original decision was correct, in which case the APU continues with its prosecution in the trial room.   The reconsideration process was formalized by a CCRB vote in December 2014.

For cases in which the CCRB substantiates the allegation and recommends discipline less serious than charges and specifications, the DAO continues to review CCRB's determination.  The DAO can agree with the CCRB's determination, decide not to go forward with the complaint (Department Unable to Prosecute, or DUP), or change the CCRB's recommendation by recommending less severe or more severe discipline. These cases are also subject to reconsideration by the CCRB.

The NYPD has developed a process it calls the penalty review process for cases in which the NYPD disagrees with the CCRB's determination in these less serious cases.   If the DAO determines that the discipline recommended by the CCRB is too harsh, is not harsh enough or does not apply to the type of conduct in which the officer engaged, the DAO sends an email to the CCRB stating its reasons for disagreeing with the CCRB's recommendation.  The CCRB can reconsider its recommendations before the

DAO's decision on the complaint and the recommended discipline is forwarded to the police commissioner's office for final disposition.

### Assessment

Under the MOU between the CCRB and the NYPD, the CCRB now prosecutes in the trial room cases in which complaints have been substantiated by the CCRB and charges and specifications recommended. That is an important change that addresses some of the concerns expressed by the court. However, this change does not deal with cases in which the CCRB recommends discipline at the command level. In addition, further study is needed of other parts of the NYPD's disciplinary process to determine whether, as a whole, this process meets the requirements of the court orders.

The plaintiffs have raised concerns that the reconsideration and penalty review processes will undermine the reforms incorporated in the MOU. Plaintiffs are concerned that the new procedures might delay the process so long that cases could not be prosecuted because the statute of limitation had run. They also have expressed concerns that the procedures would allow the DAO to impose its legal analysis, factual findings and penalty recommendations on the CCRB. In its 2014 annual report, the CCRB states that the new spirit of collaboration between the NYPD and the

CCRB has increased the percentage of cases in which the NYPD has given

officers the discipline recommended by the CCRB.  However, the monitor

team has not yet had the chance to assess fully the plaintiffs' concerns and

possible responses by the NYPD or to take into account the data underlying

the CCRB's 2014 report.

### 3.    CCRB Investigations

The CCRB is an independent agency and was not party to the lawsuits

or the agreements among the parties, and the court orders did not require the

CCRB to change its procedures.  Nonetheless, it is an important part of the

disciplinary process.  The success of some of the reforms agreed to by the

NYPD may be affected by whether the CCRB's processes are perceived by

police officers and the public to be, and are in fact, fair and effective.  The

CCRB has reorganized its investigative units, and changed how it trains its

investigators and coordinates with the NYPD.  Its investigative units are

now smaller and have more direct supervision.  It has developed new

benchmarks for how long it should take to interview complainants, officers,

and witnesses and to complete investigations.  The NYPD also has assigned

IAB officers to work at the CCRB, which significantly enhances the

CCRB's ability to obtain NYPD documents (such as crime reports and stop

report forms) and to help identify NYPD members who might be the subject of a CCRB complaint.

According to the 2014 CCRB Annual Report, http://www.nyc.gov/html/ccrb/downloads/pdf/Annual%20Report%202014-Rev4Final.pdf, these and other changes have reduced the time it takes to complete CCRB investigations, the number of days it takes before NYPD officers are interviewed and the backlog of cases.

### G.    Performance Goals, Objectives and Evaluation

In many meetings with NYPD officials and officers at every rank and from many different units, the Department has acknowledged, as the court found, that an excessive focus on "numbers" led to the overuse and misuse of "stop, question and frisk."  This emphasis was included in the evaluation of officers as part of periodic reviews and in less formal ways.  The push for more and more stops (along with other enforcement activities) was ingrained in the expectations of supervisors at every level and of officers on the street. The result was less focus on the lawfulness and effectiveness of individual stops and more on increasing the number of stops.  This also had the collateral consequence of creating or exacerbating rifts between the police and the communities being policed, which, among other things, adds to the danger and difficulty of an officer's job and makes the communities less

safe.  Union officials also criticized the emphasis on numbers as diminishing the discretion of police officers and effectively pushing them into behavior that officers did not always think was appropriate.

The point here is not to participate in the debate about the pros and cons of this emphasis on numbers or the policing strategies that led to it.  It is that performance evaluation was one of the most important elements leading to the court's opinions, the court orders and the agreements.  It is therefore an important part of the remedial process.  Unless officers on the street see evidence and believe that they will be rewarded and supported for doing their jobs well—for quality, not just quantity—and not just disciplined for unacceptable behavior, change will be slow and reforms may be fleeting.

Deciding how to change performance measures and evaluations and putting them into effect in the NYPD is, however, difficult and complex. Here are a few of the many challenges:

First, the NYPD needs to decide what officer behavior or characteristics it wants evaluated.  Whatever else is going to be evaluated, the Department believes that "activity" of some sort will have to be part of the evaluation.  Otherwise it will be difficult for supervisors to learn which officers are doing their jobs and which are slacking off.  In a department the size of the NYPD, moreover, it is understandable that activity has to be

judged to some extent by quantifiable numbers.  So the NYPD's challenge is to devise a system that recognizes "quality" (which would include lawfulness), but also has metrics by which officers' activity and their supervisors' review of that activity can be judged without having those metrics become a system of unlawful quotas.  In addition, certain activities do not lend themselves to metrics that could be applied easily in such a large department.  For example, the Department is committed to more engagement with communities, but determining what is a productive engagement and what is just going through the motions is not simple.

Second, as anyone knows who has had to deal with this question in a large organization, it is not so easy to get those doing the evaluations to take them seriously and do them honestly.  No system—no matter what the metrics—is useful if superiors, out of loyalty or laziness or something else, give everyone terrific grades.

Third, as stated above, the system has to be felt on the street—in both the discipline being handed out and in the rewards.  With respect to the rewards, the Department has tools, but those tools are limited by civil service rules.

The NYPD understands both the importance and complexity of changing its performance evaluations.   The police commissioner has

announced that there will be changes in the "Quest for Excellence" program of evaluation, but has not yet announced what those changes will be.

The monitor team also understands the importance and complexity of performance evaluations and will be working with the NYPD and the plaintiffs, and will report progress in the future as appropriate.

### H.    Body-worn Cameras

The court noted the potential benefits of outfitting NYPD officers with body-worn cameras (BWCs).  These potential benefits include creating objective records of stop encounters, encouraging lawful and respectful police-citizen interactions when both parties know exchanges are recorded, alleviating mistrust between the NYPD and the public, and offering a way to substantiate whether officers have been wrongly or rightly accused of misconduct.

As described below, the monitor team is working with the NYPD to plan a BWC pilot program that will be a randomized control trial so that the NYPD and others will be able to evaluate the impact cameras have on the behavior of officers and civilians.  The pilot is expected to involve approximately 1,000 cameras, with about fifty cameras in twenty precincts. The activities of officers wearing BWCs will be compared to those of officers with similar assignments in twenty control precincts.

### Milestones

The court orders require the NYPD to conduct a one-year pilot BWC program.  The purpose of the pilot is to assess whether the benefits of the cameras outweigh their financial, administrative and other costs, and whether the program should be expanded or terminated.  The monitor will work with the parties to evaluate the pilot.

The court ordered that the monitor establish procedures for reviewing stop recordings by supervisors and senior managers, preserving stop recordings, and measuring the effectiveness of BWCs in reducing unconstitutional stops and frisks.  The court provided that BWCs must be worn for a one-year period by officers on patrol in one precinct per borough—specifically, the precinct with the highest number of stops in that borough during 2012.  These NYPD commands were identified as the 23rd, 40th, 75th, 103rd , and 120th Precincts.

### Status

The NYPD is currently conducting its own small-scale BWC pilot program in the five commands identified in the remedial order and in one housing PSA (PSA 2) to test different BWC equipment, understand the IT infrastructure necessary to support BWCs, and gain insight on matters of policy and practical implementation.   Nine officers in each command

volunteered to wear BWCs and have now been trained and equipped (fifty-four in all).  In collaboration with the NYPD, the Marron Institute of Urban Management at New York University is conducting an evaluation of the NYPD small-scale pilot program.  This effort is separate from the larger one-year pilot BWC program and monitor evaluation required by the court orders and the parties' agreement.

With respect to the pilot program required by the court orders, the monitor team has begun to work with several units within the NYPD to plan the design and implementation of the court-mandated pilot program.  We have met with representatives from the NYPD's Risk Management Bureau, Information Technology Bureau, the Office of the Chief of Department, and the Office of Management Analysis and Planning.

The monitor team appreciates that there are many important issues that need to be discussed, such as training, policy, technology, outreach to other stakeholders, privacy concerns and possible legal issues such as those raised by the state's Freedom of Information Law; and we have had very preliminary conversations on these subjects.  However, most immediately, the monitor team has been focusing on a design for a rigorous evaluation of the court-mandated pilot program.

The a priori selection of the five NYPD precincts for the BWC program is problematic for several reasons. First, some of the precincts with the highest counts of stop reports in 2012 were no longer the precincts with the highest number of reported stops in 2014. For example, in 2012 the 75th Precinct had the highest number of reported stops in the city; it was down to sixteenth in 2014. Second, the selection in advance prevents the use of a rigorous randomized experimental design, since it would be impossible to have a random selection of commands matching those that had cameras with those that did not. The advantage of a randomized experiment is the relatively high degree of certainty that any observed differences between the precincts with cameras and those without would be attributable to the cameras, not to chance or other causal factors. Third, requiring that every officer in a precinct wear a BWC creates significant IT and logistical challenges for the NYPD.

For all these reasons, the monitor will be recommending to the court that it modify its orders. We describe below the outlines of a randomized controlled trial (RCT), but emphasize that we are still in the process of designing the program and that further changes may be made after consultation with the NYPD, the plaintiffs and others.

# 1.    Design of a Randomized Controlled Trial

Randomized experimental designs allow researchers to assume that the only systematic difference between the "control" group (here, those without cameras) and the "treatment group" (those with cameras) is the presence of the intervention (i.e., use of cameras).  This design permits a clearer assessment of causes and effects.[2]  We plan to use a well-recognized variant of the classic randomized controlled trial called "cluster" randomization.  In these trials, clusters (groups) of subjects, rather than individual subjects, are randomly allocated to treatment and control conditions.[3]  In the proposed cluster randomized controlled trial, NYPD officers will be randomly allocated by precinct to the BWC treatment group or non-BWC comparison group.

The cluster randomized experimental design will allow better control of "contamination" across individual subjects.  As suggested by the study on BWCs done in Rialto, California, officers with BWCs could influence the behavior of officers without BWCs if they simultaneously worked in the

---

[2]    William R. Shadish, Thomas D. Cook, and Donald T. Campbell. *Experimental and quasi-experimental designs for generalized causal inference*.  Boston: Houghton Mifflin. 2002.

[3]    Frederick Mosteller and Robert F. Boruch, eds. *Evidence matters: Randomized trials in education research*. Washington, DC: Brookings Institution Press, 2002; David M. Murray. *Design and analysis of group-randomized trials*.  New York: Oxford University Press.  1998.

same area and interacted with the same people.[4]  This contamination undermines the ability of analyses to detect the effects of using cameras because both treatment and control officers might be modifying their behaviors due to the presence of BWCs.  Randomly allocating groups of officers who work in distinct precincts to treatment and control conditions limits this problem of contamination.

In the proposed trial, eligible NYPD precincts will be ranked according to the 2012-2014 mean yearly counts of complaints handled by the CCRB in New York City.  We picked this measure because the number of CCRB complaints is highly correlated to the highest rates of reported stop activity and because the number of stops reported in each precinct in 2012 no longer reflects the stops now being reported.  Using the number of CCRB complaints as the measure, the top forty eligible precincts will be matched into pairs based on those counts as well as other measures—specifically, the crime rate, arrests, calls for service, use of force, number of police officers in the precinct and neighborhood characteristics, such as racial composition and poverty level.  Precincts in the twenty matched pairs will then be

---

[4]   Barak Ariel, William Farrar, and Alex Sutherland.  2014.  The effect of police body-worn cameras on use of force and citizens' complaints against the police: A randomized controlled trial. *Journal of Quantitative Criminology*, http://link.springer.com/article/10.1007%2Fs10940-014-9236-3 (last visited  May 30, 2015).

randomly allocated to the BWC treatment group and non-BWC comparison group.

We are also discussing which officers within the treatment precincts will be required to wear BWCs.  Identifying a well-defined group of officers ensures an "apples to apples" comparison of officers in the treatment and control groups.  One possibility is to select all officers assigned to a specific shift.  For instance, BWCs could be provided to all patrol officers working the third platoon (4:00 p.m.–midnight shift) in the treatment group (there will be approximately fifty patrol officers in each platoon).  The comparison group will consist of patrol officers working the third platoon in the non-BWC precincts.  Thus, there will be approximately 1,000 patrol officers in the treatment group (twenty precincts and fifty officers per precinct) and 1,000 patrol officers in the control group.  This is roughly the same number of cameras as would have been required under the terms of the court orders.[5]

---

[5]     For the more technically minded reader:  since outcomes for individuals within clusters may be correlated, standard sample sizes need to be inflated for cluster randomized controlled trials.  Using the "Optimal Design" software available from the University of Michigan (http://sitemaker.umich.edu/group-based/optimal_design_software), a total sample size of 2,000 (40 clusters of 50 subjects each) will provide statistical power at the .78 level to detect a standardized effect size of .20 and statistical power at the .99 level to detect a standardized effect size of .40, depending on assumptions about the intra-class correlations in the outcome measure.  Stephen W. Raudenbush, et al. (2011). *Optimal design software for multi-level and longitudinal research* (Version 3.01) [Software]. Available from www.wtgrantfoundation.org.

## 2.    Exclusions

Ten NYPD precincts will be excluded from the randomized experiment.  The NYPD is currently piloting the BWC camera technology in five precincts—the 23rd, 40th, 75th, 103rd, and 120th Precincts.  If one of these precincts were to be in a pair and randomly selected as the control, this would compromise the experiment because the use of BWCs in that precinct might already have affected behavior.  The NYPD is also piloting a "neighborhood-based policing" program in the 33rd, 34th, 100th, and 101st Precincts.  These precincts will be excluded because it would be difficult to distinguish the effects of the BWC technology on key outcome measures from the effects of the community engagement reforms implemented as part of the neighborhood-based policing program.  Finally, the 22nd Precinct serving Central Park will be excluded because it has relatively low levels of NYPD activity and an almost non-existent residential population.

All five boroughs have at least one precinct eligible for inclusion in the randomized field experiment (see Table 1 below)

74

Table 1.  Eligibility of NYPD precincts for inclusion in BWC experiment

|  | Eligible | Not Eligible | Total |
|---|---|---|---|
| Manhattan | 18 | 4 | 22 |
| Bronx | 11 | 1 | 12 |
| Brooklyn | 22 | 1 | 23 |
| Queens | 13 | 3 | 16 |
| Staten Island | 3 | 1 | 4 |
| Total | 67 | 10 | 77 |

## 3.    Ranking, Matching and Randomization

Sixty-seven precincts were ranked according to 2013–2014 CCRB

mean yearly counts.  The top forty precincts are distributed throughout the

city in all five boroughs (see Table 2 below).

Table 2.  Eligible NYPD precincts in Top 40 CCRB yearly mean counts
by borough

|  | Top 40 | Not Top 40 | Total |
|---|---|---|---|
| Manhattan | 11 | 7 | 18 |
| Bronx | 8 | 3 | 11 |
| Brooklyn | 14 | 8 | 22 |
| Queens | 6 | 7 | 13 |
| Staten Island | 1 | 2 | 3 |
| Total | 40 | 27 | 67 |

The matching process should yield twenty similar pairs of NYPD

precincts that can then be randomized to treatment and control conditions.  A

member of the monitor team will flip a coin to determine randomly which of

the precincts within the pair will receive the BWCs.  The precincts not

selected from each of the pairs will serve as controls. The monitor team will then assess the randomization process by determining whether balanced treatment and control groups were created. The monitor team will first compare treatment and control precincts on selected police, crime and neighborhood characteristics. Balanced clusters help to ensure that the treatment and control officers will be working in similar neighborhood, crime and policing contexts. The monitor team will then analyze data on treatment and control officers to determine whether the units of analysis (e.g., NYPD officers working the third platoon) systematically differ in the treatment and control groups. The officer comparison will include important information such as age, sex, race, rank and years on the job.

### Assessment

There are many issues to be addressed in the development of a pilot program for BWCs. The monitor will be consulting with the NYPD, the plaintiffs and others on these issues.

The monitor team needs to devise an evaluation plan for the implementation of BWCs on NYPD officers working in PSAs. The characteristics of PSAs are too different from precincts for them to be included in the design described above. Also, there are too few PSAs to do a cluster randomized design. Therefore, we are currently considering a quasi-

experimental research design comparing PSA 2 (treatment area) to the other

PSAs (control areas).

In addition, the monitor team needs to develop outcome measures

based on official data sources such as officer use of force incidents, officer

injury and resisting arrest information, and CCRB complaints.  We are also

considering the practicalities and cost of using officer surveys, community

surveys, surveys of enforcement action subjects (e.g., arrested individuals,

stop and frisk subjects) and videos of police-citizen interactions.

The monitor team is working with the NYPD to develop a plan to

implement the BWC technology that will consider the time and resources

required to acquire the cameras, wire the precincts to transfer videos via

secure internet connections, train officers and supervisors on policy and

procedures, and undertake other important steps.  The NYPD has published

a Request for Proposal.  The NYPD anticipates a requirements contract that

would allow for the purchase and installation of up to 5,000 BWCs.  The

monitor has begun to identify, but not yet fully discuss or resolve, the legal

and policy issues mentioned earlier.

Several important steps are needed before a BWC pilot can begin.

These include moving forward on the NYPD procurement process, ensuring

sufficient technology infrastructure in the pilot treatment precincts, and

developing protocols for camera use and data collection, review and evaluation. The NYPD anticipates that because it needs to decide which technology suits its purposes best and to have an infrastructure plan in place to meet the requirements of a pilot of this magnitude, it could be as long as twelve months before the pilot is started. Once the cameras are in place, there would be a one-year trial period.

## III.    MEASURING COMPLIANCE WITH THE COURT ORDERS

The monitor will be working with the parties to establish baselines from which to measure progress, set milestones for accomplishing reform, and assess the Department's compliance with the court-ordered and agreed-upon remedial measures. We will be using both quantitative and qualitative measures. The monitor has asked both the NYPD and the plaintiffs for recommendations for measuring success. The hope is that these measures will also be useful for the Department and will support its needs to assess its own success and that of its officers.

# APPENDIX 1

## MONITOR TEAM

**Peter L. Zimroth (monitor)** is currently senior counsel at Arnold & Porter LLC and has been a lawyer for more than forty years.  He has served as an assistant U.S. attorney for the Southern District of New York, the chief assistant District Attorney in Manhattan and New York City's corporation counsel.  The corporation counsel is the City's chief lawyer and is in charge of, among other things, representing all the City's agencies including the NYPD and its officers.  At the time Mr. Zimroth served, there were about 500 lawyers in the Law Department, which the corporation counsel heads.  Earlier in his career, Mr. Zimroth was a professor at NYU Law School, where he is currently an adjunct professor and director of its Center on Civil Justice.

Mr. Zimroth has served on many boards and committees, among which are the executive committee of the New York City Bar Association, the board of the Legal Aid Society and the boards of two schools for children with learning disabilities.  He was appointed by the chief judge of New York State to serve as one of the three directors of the now defunct Capital Defender's Office, which had the responsibility of ensuring legal representation for indigents charged with capital offenses.

Mr. Zimroth is a lifelong resident of New York City.  He is a graduate of Abraham Lincoln High School, Columbia College and the Yale Law School.  Upon graduation from Yale, he served as law clerk to Chief Judge David Bazelon of the U.S. Court of Appeals for the District of Columbia Circuit and to U.S. Supreme Court Justice Abe Fortas.  He was the 2014 recipient of the Interfaith Center of New York's James P. Morton Interfaith Award for his work in public service and private practice.  Also in 2014, he received one of the New York Law Journal's Lifetime Achievement Awards for Lawyers Who Lead by Example.

**Richard Jerome (deputy monitor)** is a lawyer who has spent most of his career working on criminal justice issues with law enforcement agencies and private foundations.  Most recently, he was project manager of the public safety performance project of the Pew Charitable Trusts. This project helps states advance fiscally sound sentencing and corrections policies that protect public safety, hold offenders accountable and control corrections costs.

79

Prior to joining Pew, Mr. Jerome served for six years (2002–2008) as Deputy Monitor and court-appointed Special Master for two police reform settlements in Cincinnati, Ohio.   Other projects included reviews of the Denver Police Department's and Portland, Oregon, Police Bureau's officer-involved shootings (both with the Police Assessment Resource Center (PARC)); reviews of police oversight systems in Farmington, NM, Milwaukee, WI, and Albuquerque, NM (also with PARC); and assistance to the District of Columbia Council on police department responsibilities and standards for handling First Amendment demonstrations and other assemblies.   Mr. Jerome also served as a consulting expert for the City of Oakland and the Detroit Police Departments.

From 1997 to 2001, he was Deputy Associate Attorney General in the U.S. Department of Justice, overseeing the work of the Civil Rights Division and the Community Relations Service, as well as coordinating the Justice Department's efforts to promote police integrity, including its publication of "Principles for Promoting Police Integrity."   Mr. Jerome has been a senior trial lawyer in the Civil Rights Division and has worked on Capitol Hill and in private practice.

**Anthony A. Braga** is the Don M. Gottfredson Professor of Evidence-Based Criminology in the School of Criminal Justice at Rutgers University and a Senior Research Fellow in the Program in Criminal Justice Policy and Management at Harvard University.  He is also a member of the University of Chicago Crime Lab. He is the immediate Past President and an elected Fellow of the Academy of Experimental Criminology.  Dr. Braga's research involves collaborating with criminal justice, social service and community-based organizations to address illegal access to firearms, reduce gang and group-involved violence, and control crime hot spots.  Dr. Braga's work on controlling and preventing violent crime has received many awards.  He was a recipient of the U.S. Attorney General's Award for Outstanding Contributions to Community Partnerships for Public Safety (2009), the U.S. Department of Justice Project Safe Neighborhoods' Distinguished Service by a Research Partner Award (2010) and the International Association of Chiefs of Police Excellence in Law Enforcement Research Award (2011).

Dr. Braga has published numerous scholarly papers and his work has been published in top criminology and criminal justice journals such as *Criminology*, the *Journal of Quantitative Criminology*, *Journal of Research in Crime and Delinquency*, and *Criminology & Public Policy*.  His work has also appeared in important medical and public health journals such as the *New England Journal of Medicine*, the *Journal of the American Medical Association*, and the *American Journal of Public Health*.  With colleagues, he has authored and edited several

books such as *Policing Problem Places: Crime Hot Spots and Effective Prevention* (Oxford University Press, 2010), *Problem-Oriented Policing and Crime Prevention* (Criminal Justice Press, 2008), *Legitimacy and Criminal Justice: A Comparative Perspective* (Russell Sage Foundation Press, 2007) and *Police Innovation: Contrasting Perspectives* (Cambridge University Press, 2006).

**Edward Davis** is a thirty-five year veteran police officer. He rose through the ranks of the Lowell Police Department holding positions in patrol, as detective supervisor and leader of a local, state and federal narcotics and organized crime task force. In 1994, Mr. Davis was promoted to Superintendent of the Lowell Police Department and led that agency for thirteen years. During his tenure, he introduced a community policing philosophy that led to a more than 60% reduction in serious crime. Lowell was recognized by Attorney General Janet Reno for its leadership in forming close relationships with the community that drive crime reduction.

In 2006, Mr. Davis was appointed by Mayor Thomas Menino to lead the Boston Police Department. Davis worked to bring the BPD closer to the community. He was a constant presence in Boston's troubled neighborhoods. This community policing philosophy led to a reduction of serious crime in Boston of more than thirty percent. During the same period, there was also a reduction in arrests of thirty percent. Davis is an accomplished lecturer in police leadership. He completed a fellowship at Harvard's Institute of Politics in 2014. After managing several high–profile cases, including the Boston Strangler, the Craigslist Killer and the tragic Boston Marathon bombing, Davis stepped down in 2013. He is the founder and president of Edward Davis, LLC, a security consulting firm located in Boston's North End.

**Jennifer Eberhardt** is an Associate Professor in the Psychology Department of Stanford University. Her area of expertise is the ways that individuals racially code and categorize people, with a particular focus on associations between race and crime. She is currently working with the Oakland Police Department to design ways to improve policing and to help build and maintain the trust of the communities it serves. She is also working with that Department to study the implementation of its program of body-worn cameras.

Professor Eberhardt received a B.A. (1987) from the University of Cincinnati and an A.M. (1990) and Ph.D. (1993) from Harvard University. From 1995 to 1998, she taught at Yale University in the Departments of Psychology and African American Studies and was a research fellow at the Center for Race, Inequality, and

Politics. She joined the Stanford University faculty in 1998. Professor Eberhardt was one of twenty-one people who received a fellowship from the John D. and Catherine T. MacArthur Foundation in 2014 (a MacArthur "genius grant").

**John MacDonald** is Professor of Criminology and Sociology and Chair of the Department of Criminology at the University of Pennsylvania. Professor MacDonald focuses primarily on the study of crime, race and ethnic disparities in criminal justice, and the effect of public policy responses on crime. In 2012, Dr. MacDonald won the Association of Public Policy and Management's David N. Kershaw Award, established to honor individuals younger than forty who have made significant contributions to the field of public policy analysis and management. He has served as a principal investigator and co-principal investigator on health, injury prevention, and crime research projects through funding provided by the American Statistical Association, the National Institute of Justice, the Centers for Disease Control and Prevention, the Robert Wood Johnson Foundation and the National Institutes of Health. He was awarded the Young Experimental Scholar Award by the Academy of Experimental Criminology for significant contributions to experimental research.

Dr. MacDonald's research publications include numerous studies using rigorous quantitative methods to examine the effects of social policies on crime and of institutional social justice reforms on criminal justice practices. His recent work on racial disparities in criminal justice has appeared in the *American Journal of Public Health* and the *Journal of Legal Studies*.

**James McCabe** is an Associate Professor, Department Chair and Director of the Graduate Program in Criminal Justice at Sacred Heart University in Fairfield, CT. He joined the faculty at Sacred Heart after completing twenty-one years with the New York City Police Department. In the NYPD, he held numerous–command level assignments, including Commanding Officer of Labor Relations, Commanding Officer of the Training Bureau, Commanding Officer of the Police Academy and the Commanding Officer of the 110th Precinct in Elmhurst/Corona, Queens. He was also assigned as the Executive Officer of the Police Commissioner's Office and the 113th Precinct in South Jamaica. He retired in 2006 from the NYPD with the rank of Inspector to assume a new career in academia at Sacred Heart.

Dr. McCabe has a B.A. in Psychology from Queens College, an M.A. in Labor Studies from Empire State College, an M.A. in Criminal Justice from John Jay

82

Appendix 1

College, and a Ph.D. in Criminal Justice from the CUNY Graduate Center.  He is a graduate of the 189th Session of the FBI National Academy, and of the Executive Programs at Columbia University's Police Management Institute and the JFK School of Government at Harvard University.  He has published numerous scholarly articles and book chapters on the subject of police effectiveness and has been the principal investigator in more than forty studies examining police operations in twenty-six states and in every region of the country.  He has lectured around the country to both police and academic audiences about organizational behavior, leadership, supervisory communications, and the impact of police operations on public safety and neighborhood satisfaction with police services.

**Jane Perlov** has an extensive background in risk management and a distinguished career in law enforcement, public safety and corporate security.  She served more than twenty-five years in law enforcement, starting in 1981 as a police officer in the New York City Police Department.  She rose through the ranks, ultimately commanding the 20th and 30th Precincts in Manhattan and serving as Chief of Detectives for the Borough of Queens. In late 1998, while in that position she was invited by Governor Cellucci of the Commonwealth of Massachusetts to join his Cabinet as Secretary of Public Safety.  There, she managed policy and fiscal oversight for twenty-one agencies, boards and commissions, such as the State Police and the Corrections Department.

In 2001, Ms. Perlov was sworn in as Chief of Police for the capital city of Raleigh, North Carolina.  Under her leadership, the Department initiated a decentralized district policing model that fostered strong bonds between police officers and the neighborhoods they served, and placed both opportunity and accountability in the hands of district commanders.

From 2009 to 2011, Ms. Perlov served as Global Corporate Security Director of Bank of America.  She was responsible for developing and implementing strategies and programs that provided a safe and secure environment for employees, customers and assets worldwide.  Born and raised in New York City, Ms. Perlov is now an independent consultant and resides in Asheville, North Carolina.

# APPENDIX 2

DRAFT 05 - 12 - 2015   **(COMPLETE ALL CAPTIONS)**

**STOP REPORT**
PD XXX-XXX (05-15)

| Pct. Serial No. | ICAD No. | Date | Pct. of Occ. | ☐ Inside ☐ Outside | ☐ Transit ☐ Housing ☐ Trespass Affidavit Program |
|---|---|---|---|---|---|

| Time of Stop | Period of Observation Prior To Stop | | Officer in Uniform? ☐ Yes ☐ No | If no, how Identified? | ☐ Shield ☐ Verbal ☐ I.D. Card |

Address/Intersection or Closest Cross Streets of Stop

| Type of Location (Describe:) | Crime Suspected (e.g., Robbery, Burglary, Trespass, etc.) | Duration of Stop |
|---|---|---|

Narrative (Describe the Circumstances That Led to the Stop)

**Contributing Factors That Led to Stop** *(Check All that Apply and Explain in the Narrative Section)*

☐ Concealing or Possessing a Weapon  ☐ Acting as a Lookout  ☐ Matches a Specific Suspect Description
☐ Engaging in a Drug Transaction  ☐ Casing Victim or Location  ☐ Proximity to the Scene of a Crime
☐ Identified Crime Pattern (Pattern No. _____)  ☐ Other (Specify)

| Name of Person Stopped | Nickname/Alias/Preferred Name | Date of Birth |
|---|---|---|

| Address | Apt. No. | Tel. No. |
|---|---|---|

| Identification: ☐ Verbal ☐ Photo I.D. ☐ Refused ☐ Other (Describe) | Sex: ☐ Male ☐ Female | Race: ☐ White ☐ White Hispanic ☐ Asian/Pacific Islander ☐ Black ☐ Black Hispanic ☐ American Indian/Alaskan Native ☐ Middle Eastern/Southwest Asian |
|---|---|---|

| Age | Height | Weight | Hair | Eyes | Build | Other (Scars, Tattoos, etc.) |
|---|---|---|---|---|---|---|

| Did Officer Explain Reason for Stop? ☐ Yes ☐ No | Tear-off Receipt Given to Person Stopped? ☐ Yes ☐ No | If You Answered no to Either of the Previous Two Questions, Explain the Reasons in the Narrative Section |
|---|---|---|

| Were Other Persons Stopped/ Questioned/Frisked? ☐ Yes ☐ No | Total Number Stopped | Pct. Serial Nos. |
|---|---|---|

| Did a Body-Worn Camera (BWC) Capture the Event in Whole or in Part ☐ Yes ☐ No | Body-Worn Camera was Worn by: ☐ Reporting Officer ☐ Another MOS | Body-Worn Camera Serial Number |
|---|---|---|

Actions Taken to Stop and/or Detain:  ☐ Drawing/Pointing Firearm  ☐ Impact Weapon  ☐ O.C. Spray  ☐ Physical Force/Restraint
☐ Handcuff Suspect  ☐ Verbal Command  ☐ Other (Describe in "Narrative" section)

Was Person Frisked? ☐ Yes ☐ No  **IF YES, INDICATE BASIS FOR SUSPICION:**  ☐ Object Observed Suspected of Being a Weapon
☐ Statement by Suspect  ☐ Suspect Known to Carry Weapons  ☐ Violent Crime  ☐ Other (Describe Below)

Was Person Searched? ☐ Yes ☐ No  **IF YES, INDICATE BASIS FOR SEARCH:**  ☐ Hard Object Resembling Weapon
☐ Admission Of Weapons Possession  ☐ Outline of Weapon  ☐ Other (Describe)

| Was Weapon Found? ☐ Yes ☐ No | If Yes, Specify: ☐ Firearm ☐ Knife/Cutting Instrument ☐ Other (Describe) |
|---|---|

Was Other Contraband Found? ☐ Yes ☐ No  If Yes, Describe Contraband and Location

Describe the Circumstances That Led to the Frisk and/or Search, If Conducted. Include Area Searched:

| Was Suspect Arrested? Offense ☐ Yes ☐ No | Arrest No. |
|---|---|

| Was Summons Issued? Offense ☐ Yes ☐ No | Summons No. |
|---|---|

| Demeanor of Person After Being Stopped | Remarks Made by Person Stopped |
|---|---|

| Reporting MOS (Rank, Name Printed) | Tax No. | Command |
|---|---|---|

| Signature | Date | |
|---|---|---|

**Supervisory Action (Must Comment):**
Basis of Stop Reviewed With Officer? . . . ☐ Yes ☐ No    Corresponding Activity Log Entry Reviewed? . . . ☐ Yes ☐ No
Report Accurate and Complete? . . . . . . ☐ Yes ☐ No    Sufficient Basis for Stop? . . . . . . . . . . . . . ☐ Yes ☐ No
Present on Scene During Stop? . . . . . . . ☐ Yes ☐ No    Sufficient Basis for Frisk/Search? . . . . . . . . ☐ Yes ☐ No

**Corrective Action (If Appropriate):**
Report Corrected? . . . . . . . . . . . . . . . . ☐ Yes ☐ No    Instruction? . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No
Referred for Training? . . . . . . . . . . . . . ☐ Yes ☐ No    Disciplinary Action? . . . . . . . . . . . . . . . ☐ Yes ☐ No

| Reviewing Supervisor (Rank, Name Printed) | Tax No. | Command |
|---|---|---|

| Signature | Date | Time |
|---|---|---|

Appendix 2

**Supplemental Instructions for Preparation of STOP REPORT:**

The information fields on the front of this form are generally self-explanatory. Supplemental instruction for certain sections are provided below. Additional guidance may be found in Patrol Guide section 212-11.

The STOP REPORT is prepared anytime a Uniformed Member of the Service stops a person.  A stop occurs anytime, during an encounter with the police, that a reasonable person would not feel free to disregard the officer and leave. Prepare a separate STOP REPORT for each person stopped.

The STOP REPORT is not prepared for Level 1 "Request for Information" and Level 2 "Common Law Right of Inquiry" encounters unless the encounter escalates to a stop/level 3 encounter. Similarly, the STOP REPORT is not prepared when an officer makes a summary arrest for an offense/crime or issues a summons for an observed violation unless the suspect was initially stopped for investigation based upon reasonable suspicion that the person had committed, was committing or was about to commit a felony or Penal Law misdemeanor.

Include all police action related to the stop on the STOP REPORT: There may be situations in which more than one Member of the Service participates in the stop of an individual.  Document all actions taken by or against the individual stopped even though another member on the scene may have taken the action (e.g. the reporting officer was not wearing a body-worn camera but another member of the service on the scene was and recorded the encounter – the reporting officer would check "yes" in the body-worn camera caption and list the camera serial number).

*Transit/Housing/Trespass Affidavit Program* checkboxes: In addition to checking the appropriate box for a stop occurring inside one of these locations, also check the appropriate box if the crime suspected occurred within one of these locations even though the person was stopped outside of the location (for example, if a person is stopped on the street on suspicion of Criminal Trespass that occurred inside a public housing building, check the "outside" box and the "Housing" box).

*"Felony or Penal Law Misdemeanor Suspected"* caption – describe the relevant crime suspected in plain language (e.g. "Robbery", "Burglary", etc.). Do not use statutory section numbers.

*"Narrative (Describe the Circumstances That Led to the Stop)"* section – Describe in your own words, all of the facts and information relied upon to conclude that there was a reasonable suspicion that the person stopped had committed, was committing or was about to commit a felony or Penal Law misdemeanor.  This includes a detailed explanation for each box checked in the *"Contributing Factors That Led to Stop"* section (do not merely repeat the check box caption(s)).  There are many facts and circumstances that may lead a police officer to establish reasonable suspicion.  Such factors may include information received from victims/witnesses, identified 911/311 callers, and informants as well as the actions of the suspect, the suspect's physical and temporal proximity to the scene of a crime, the suspect's resemblance to the description of a perpetrator of a crime and information known to the officer about the suspect or particular location, among other factors.  Each situation is unique and it is important to accurately describe all of the information known to the officer at the time of the stop.

*"Describe the Circumstances That Led to the Frisk and/or Search, If Conducted. Include Area(s) Searched:"* section – Describe in your own words, all of the facts and information relied upon to conclude that there was reasonable suspicion that the person stopped was armed and dangerous. In addition, if a search was conducted, describe the basis for the search, the specific area searched, and whether a weapon or other contraband was recovered.

*"Supervisory Actions"* section – The Patrol/Unit Supervisor (or Desk Officer if Patrol/Unit Supervisor is not available) must review the completed STOP REPORT and related ACTIVITY LOG entry and discuss the basis for the stop/frisk/search with the Member of the Service completing this report.  Determine whether the stop was based upon reasonable suspicion of a felony or Penal Law misdemeanor, and, if the person was frisked and or searched, whether those actions were supported by a reasonable suspicion that the person was armed and dangerous.  In making this determination, consider whether the facts and information as conveyed by the member and recorded on the STOP REPORT, based upon training and experience, reasonably support the conclusion that the member's actions were based upon reasonable suspicion.  If the STOP REPORT is incomplete or requires additional information, return to the submitting member for corrections and indicate such in the appropriate space on the STOP REPORT.

Reporting Officer: Submit the completed STOP REPORT and your ACTIVITY LOG containing a detailed entry describing the stop encounter to the Patrol/Unit Supervisor for review.  Upon completion of the review, submit the original STOP REPORT and a photocopy of your ACTIVITY LOG entry to the Desk Officer.

Additional Narrative Space if Needed: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

85

**Appendix 2**

**D R A F T   05 – 12 – 15**

**(COMPLETE ALL CAPTIONS)**

**STOP REPORT**
PD XXX-XXX (05-15)

| Pct. Serial No. | ICAD No. |
|---|---|
| Date | Pct. Of Occ. |

| Time Of Stop | Period Of Observation Prior To Stop | Duration Of Stop |
|---|---|---|

Address/Intersection Or Cross Streets Of Stop

| ☐ Inside   ☐ Transit   ☐ Housing | Type Of Location (Describe:) |
|---|---|
| ☐ Outside   ☐ Trespass Affidavit Program | |

| Officer in Uniform? | If no, how Identified? | ☐ Shield | ☐ I.D. Card |
|---|---|---|---|
| ☐ Yes   ☐ No | | ☐ Verbal | |

Crime Suspected (e.g., Robbery, Burglary, Trespass, etc.)

---

**Contributing Factors That Led to Stop**
*(Check All that Apply and Explain in the Narrative Section)*

☐ Concealing or Possessing a Weapon    ☐ Casing Victim or Location
☐ Engaging in a Drug Transaction    ☐ Matches a Specific Suspect Description
☐ Acting as a Lookout    ☐ Proximity to the Scene of a Crime
☐ Identified Crime Pattern (Pattern No._____)   ☐ Other (Specify)

| Name Of Person Stopped | Nickname/Alias/Preferred Name | Date Of Birth |
|---|---|---|

| Address | Apt. No. | Tel. No. |
|---|---|---|

| Identification:   ☐ Verbal   ☐ Photo I.D.   ☐ Refused |
|---|
| ☐ Other (Describe) |

| Sex: ☐ Male   Race: ☐ White   ☐ Black   ☐ White Hispanic   ☐ Black Hispanic |
|---|
| ☐ Female   ☐ Asian/Pacific Islander   ☐ American Indian/Alaskan Native |
| ☐ Middle Eastern/Southwest Asian |

| Age | Height | Weight | Hair | Eyes | Build |
|---|---|---|---|---|---|

Other (Scars, Tattoos, Etc.)

| Did Officer Explain Reason For Stop | Tear-off Receipt Given to Person Stopped? |
|---|---|
| ☐ Yes   ☐ No | ☐ Yes   ☐ No |

If You Answered No to Either of the Previous Two Questions, Explain the Reasons in the Narrative Section on the Rear Side.

| Were Other Persons Stopped/ ☐ Yes | Total No. Stopped | Pct. Serial Nos. |
|---|---|---|
| Questioned/Frisked?   ☐ No | | |

| Did a Body-Worn Camera (BWC) Capture ☐ Yes | Body-Worn Camera was Worn by: |
|---|---|
| the Event in Whole or in Part   ☐ No | ☐ Reporting Officer   ☐ Another MOS |

Body-Worn Camera Serial Number

---

| Actions Taken to Stop and/or Detain: | ☐ Drawing/Pointing Firearm |
|---|---|
| ☐ Impact Weapon   ☐ O.C. Spray | ☐ Physical Force/Restraint |
| ☐ Handcuff Suspect   ☐ Verbal Command | |
| ☐ Other (Describe in "Narrative" Section) | |

| Was Suspect Arrested?   Offense | Arrest No. |
|---|---|
| ☐ Yes   ☐ No | |

| Was Summons Issued?   Offense | Summons No. |
|---|---|
| ☐ Yes   ☐ No | |

| Demeanor of Person After Being Stopped | Remarks Made by Person Stopped |
|---|---|

**Appendix 2**

Narrative (Describe the Circumstances That Led to the Stop):

| | | | |
|---|---|---|---|

Was Person Frisked?  ☐ Yes  ☐ No   **IF YES, INDICATE BASIS FOR SUSPICION:**   ☐ Object Observed Suspected of Being a Weapon
☐ Statement by Suspect                    ☐ Suspect Known to Carry Weapons           ☐ Violent Crime                        ☐ Other *(Describe Below)*

Was Person Searched?  ☐ Yes  ☐ No   **IF YES, INDICATE BASIS FOR SEARCH:**           ☐ Hard Object Resembling Weapon
☐ Admission Of Weapons Possession           ☐ Outline of Weapon                  ☐ Other *(Describe)*

Was Weapon Found?   If Yes, Specify: ☐ Firearm  ☐ Knife/Cutting Instrument   Was Other Contraband Found?  If Yes, Describe Contraband and Location
☐ Yes        ☐ No        ☐ Other *(Describe)*                                   ☐ Yes        ☐ No

Narrative (Describe the Circumstances That Led to the Frisk and/or Search, if Conducted. Include Area Searched):

| Reporting MOS *(Rank, Name Printed)* | Signature | Tax No. | Command | Date |
|---|---|---|---|---|

| **Supervisory Action *(Must Comment)*:** | | **Corrective Action *(If Appropriate)*:** | |
|---|---|---|---|
| Basis of Stop Reviewed With Officer? ☐ Yes ☐ No | Corresponding Activity Log Entry Reviewed? ☐ Yes ☐ No | Report Corrected? . . . ☐ Yes ☐ No | |
| Report Accurate and Complete? . . . . ☐ Yes ☐ No | Sufficient Basis for Stop? . . . . . . . . . . . . . . . ☐ Yes ☐ No | Disciplinary Action? . . ☐ Yes ☐ No | |
| Present on Scene During Stop? . . . . ☐ Yes ☐ No | Sufficient Basis for Frisk/Search? . . . . . . . . . ☐ Yes ☐ No | Instruction? . . . . . . . . . ☐ Yes ☐ No | |
| | | Referred for Training? ☐ Yes ☐ No | |

| Reviewing Supervisor *(Rank, Name Printed)* | | Tax No. | Command |
|---|---|---|---|
| Signature | | Date | Time |

87