# ARNOLD & PORTER LLP

**Peter L. Zimroth**
Peter.Zimroth@aporter.com

+1 212.715.1010
+1 212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

August 7, 2015

**VIA ECF**

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007-1312

> Re:  *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
> *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
> *Davis, et al. v. City of New York, et al.,* 10-CV-00699 (AT),
> Final Recommendations regarding P.G. 212.11 and P.G. 203.25

Dear Judge Torres,

I am pleased to submit my Final Recommendations regarding the following NYPD

policies.  I believe that each of them meets the requirements set out in the remedial order.

1. Patrol Guide Section 212.11, Investigative Encounters: Requests for Information,

   Common Law Right of Inquiry and Level 3 Stops;

2. Patrol Guide Section 203.25, Department Policy Prohibiting Racial Profiling and

   Bias-Based Policing.

**NYPD Policies on Stop, Question and Frisk**

In focus groups and in conversations with individual officers about stop, question and

frisk, we have heard a consistent message:  the officers want more guidance and instruction

# ARNOLD & PORTER LLP

Honorable Analisa Torres
August 7, 2015
Page 2

about what they can and cannot do under the law; and they want a clearer understanding of what their supervisors expect of them. One of the tools the Department has for communicating these messages is the Patrol Guide, which all officers are expected to read and follow. Unfortunately, as the Department itself acknowledges, the current version of the Patrol Guide section on investigative encounters (Patrol Guide Section 212.11) does not provide sufficient guidance or instruction.

That section focuses almost entirely on the steps officers and superiors should take after what is assumed to be a lawful stop. The current procedures do not describe the legal standards governing stops or the degree of knowledge an officer must have to make a stop lawful. Nor do the procedures give officers any guidance about the degree of knowledge necessary for encounters that are less intrusive than a stop or arrest (for example, a request for information or a common law right of inquiry), which are governed by the New York State Court of Appeals decision, *People v. DeBour*. And the procedures do not distinguish between the legal requirements governing stops and those governing frisks and searches, and give only limited guidance as to the responsibility of supervisors.

The court recognized some of these deficiencies and required specific measures to remedy the defects. The court did not impose new legal requirements, but required only that the legal standards be stated correctly and clearly. Clarity is important because officers should have confidence that they understand when it is permissible to stop, question and frisk people and when it is not.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
August 7, 2015
Page 3

Under the court orders, as agreed to by the City and the Department, the Patrol Guide
must:

(1) state what constitutes a stop, when a stop may be conducted, when a frisk may be
conducted, and when a search may be conducted;

(2) include a definition of "reasonable suspicion," the standard needed for a stop based on
*Terry v. Ohio*;

(3) state clearly that officers must have separate reasonable suspicion that a person is
armed and dangerous in order to conduct a frisk of that person;

(4) require officers to document the stop and reasonable suspicion, and, if conducted, the
frisk, on both a stop report form (formerly called a UF-250) and in their activity logs;

(5) require supervisory review of stops, including review of the constitutionality of the
stop, not just that a stop report form was filled out; and

(6) provide for supervisors to identify officers needing further training and/or potential
discipline.

The NYPD has worked with the monitor and the plaintiffs to develop a revised P.G.
212.11 that deals with the inadequacies of the current Patrol Guide section and meets the
requirements of the remedial order.  The proposed procedures describe the types of encounters a
uniformed member of the service may initiate with a member of the public during the course of
his or her official duties, the level of knowledge required for each type of encounter, the scope of
a police officer's authority for each type of encounter, the measures that are permissible to

# ARNOLD & PORTER LLP

Honorable Analisa Torres
August 7, 2015
Page 4

protect uniformed members of the service from injury while engaged in such encounters, and the procedures to be followed by a member of the service during these encounters.

The proposed procedures also require documentation of all stops and make more explicit the responsibilities of supervising officers up the chain of command. They make clear that officers in need of training or possible discipline should be identified, but they state that, ordinarily, isolated cases of good-faith mistakes made by officers trying to do their jobs will be dealt with by training at the command level and not by discipline. The procedures also require that, absent exigent circumstances, the officer must offer an explanatory "receipt" to a person stopped but not arrested. The receipt the Department proposes to use is attached for information only and not for your approval at this time.

In addition to amending P.G. 212.11 to meet the court's specific requirements, the Department took the opportunity, working with the plaintiffs and the monitor team, to respond to recurring questions raised by officers and supervisors. Thus, by way of example, the proposed P.G. 212.11 instructs officers on protective measures an officer can lawfully take even when there are no lawful grounds for a frisk. The procedures define "objective, credible reason" (the level of knowledge an officer needs to make a request for information), and "founded suspicion" (the level of knowledge an officer must have to ask accusatory questions during a common law right of inquiry). The procedures remind officers that they may ask an individual to identify himself or herself or present an identification document, but that members of the public are not required to possess IDs or present them to police officers when requested, and that refusing to produce an ID alone will not elevate the level of the encounter.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
August 7, 2015
Page 5

## NYPD Policy Prohibiting Racial Profiling and Bias-Based Policing

The NYPD's policy prohibiting racial profiling is set out in Section 203.25 of the Patrol Guide.  The court orders provide that the revised Patrol Guide procedure must include a definition of racial profiling stating that race, ethnicity or national origin may be considered by officers in taking police enforcement action only when it is part of a specific and reliable suspect description.  This is not new law; it is based on the Fourteenth Amendment of the U.S. Constitution.

The NYPD has worked with the monitor and the plaintiffs to prepare a revised P.G. 203.25.  The new procedure states that police action, including stops, frisks, arrests or other law enforcement actions, may not be motivated, even in part, by the actual or perceived color, ethnicity or national origin of an individual.  Race may be used only if it is part of a reliable and specific suspect description that includes not just race, gender and age, but other identifying characteristics or information.

The proposed procedure also includes a description of Section 14-151 of the New York City Administrative Code prohibiting bias-based profiling.  The Administrative Code includes demographic categories in addition to race, color and national origin:  creed, age, alienage or citizenship status, gender, sexual orientation, disability and housing status.

Respectfully submitted,

Peter L. Zimroth

Peter L. Zimroth



# DRAFT INTERIM ORDER

| SUBJECT: | **REVISION TO PATROL GUIDE 212-11, "STOP AND FRISK"** | |
|---|---|---|
| DATE ISSUED: | REFERENCE: | NUMBER: |
| **08-05-15** | **\*P.G. 212-11** | **DRAFT 23** |

1.      In order to ensure members of the service comply with the Department's policy regarding investigative encounters, Patrol Guide 212-11, "Stop and Frisk" has been revised.   In addition, in order to ensure that individuals who are subject to a stop by a uniformed member of the service receive an explanation for the stop, a new Department form entitled, "**WHAT IS A STOP? (PD383-153)**" has been created.

2.      Therefore, effective 0001 hours, September 21, 2015, Patrol Guide 212-11, "Stop and Frisk" is **SUSPENDED** and the following new procedure entitled, "Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops" will be complied with:

| | |
|---|---|
| **PURPOSE** | To describe the types of encounters a uniformed member of the service may initiate with a member of the public during the course of his or her official duties, the level of knowledge required for each type of encounter, the scope of a police officer's authority for each type of encounter, the measures that are permissible to protect uniformed members of the service from injury while engaged in such encounters, and the procedures to be followed by a member of the service during these encounters. |
| **SCOPE** | In accordance with their oath to uphold the law, uniformed members of the service must conduct investigative encounters in a lawful and respectful manner; however, nothing in this section is intended to deter an officer from initiating appropriate inquiries and investigative encounters, including stops, or using any lawful and appropriate tactics to ensure the officer's safety during such investigative encounters.  Moreover, this procedure should not be interpreted to discourage an officer from engaging in voluntary consensual conversations with members of the public.  Members of the service are encouraged to develop positive relationships in the communities they serve.  Such positive interactions with the community foster trust and understanding that will in turn enhance public safety and officer safety. |
| **DEFINITIONS** | <u>INVESTIGATIVE ENCOUNTERS</u> – In the context of this procedure, an investigative encounter is a police interaction with a member of the public/civilian for a law enforcement or investigative purpose. The New York State Court of Appeals in the case of *People v. DeBour* established the types or levels of such encounters and the authority of the police at each level, consistent with federal constitutional standards.  These encounter levels and the authority of the police at each level are outlined in the definitions that follow. |
| | <u>REQUEST FOR INFORMATION (LEVEL 1 ENCOUNTER)</u> – A request for information is an encounter between a civilian and a uniformed member of the service conducted for the purpose of requesting information from the civilian. The uniformed member of the service must have an objective credible reason to approach the civilian.  This type of encounter does not require any suspicion of criminal activity.  The objective is to gather information and not to focus on the |

**DEFINITIONS (continued)**

person as a potential suspect.  A police officer may seek information related to the reason(s) the person was approached, such as the person's name, address and destination if those questions are related to the objective credible reason for the approach.  The officer may not ask accusatory questions. The person may refuse to answer questions and/or walk or even run away. Refusal to answer questions and/or walking or running away does not escalate the encounter. At this level, the officer may not seek consent to search, may not use force, and may not create a situation (either by words or actions) where a reasonable person would not feel free to leave.

<u>OBJECTIVE CREDIBLE REASON</u> - A reason is objectively credible if it is based on more than a hunch or a whim.  The reason to gather more information may relate to a public safety/service function or a law enforcement function, but need not be based on any indication of criminality.

<u>COMMON-LAW RIGHT OF INQUIRY (LEVEL 2 ENCOUNTER)</u> – A common-law right of inquiry is an encounter between a civilian and a uniformed member of the service conducted for the purpose of asking the civilian pointed or accusatory questions because the police officer has a "founded suspicion" that criminal activity is afoot.  "Founded suspicion" is a lower level of suspicion than the "reasonable suspicion" required to conduct a "stop" or Level 3 encounter. Upon a founded suspicion of criminality, the officer may approach a person to ask accusatory questions and may seek consent to search; however, consent must be voluntarily given. During a "Request For Information/Level 1 Encounter," giving innocuous answers does not escalate the encounter, but providing false information may give rise to founded suspicion.  During a Level 2 encounter, force may not be used, the person is free to refuse to answer questions, and is free to leave.  Refusal to answer questions or walking away does not raise the level of suspicion.  The officer may not create a situation (either by words or actions) where a reasonable person would not feel free to walk away.

<u>FOUNDED SUSPICION</u> – Founded suspicion of criminal activity arises when there is some present indication of criminality based on observable conduct or reliable hearsay information.

<u>LEVEL 3 STOP (LEVEL 3 ENCOUNTER)</u> – A level 3 stop is any encounter between a civilian and a uniformed member of the service in which a reasonable person would not feel free to disregard the officer and walk away.  A Level 3 stop may take place even without the threat or use of physical force by the officer; whether an encounter amounts to a stop will be judged by the facts and circumstances of the encounter. A stop may be conducted only when a police officer has an individualized reasonable suspicion that the person stopped has committed, is committing, or is about to commit a felony or Penal Law misdemeanor.  The police officer may ask questions and detain the person while an expeditious investigation is conducted to determine if there is probable cause to arrest the person.  The police officer may seek consent to search.  The consent must be voluntarily given.  Reasonable force may be used to stop a person. The type and amount of force used must be objectively reasonable under the circumstances.

**INTERIM ORDER NO.  DRAFT 23**

**DEFINITIONS (continued)**

<u>REASONABLE SUSPICION</u> - Reasonable suspicion exists when the information known to the member of the service would make an ordinarily prudent and cautious police officer under the circumstances believe criminal activity is at hand.  The officer must have a particularized and objective basis for suspecting the person stopped of the criminal conduct.  The officer must be able to articulate specific facts establishing justification for the stop; hunches or gut feelings are not sufficient.

<u>FRISK</u> - A carefully limited running of the hands over the outside of a person's clothing feeling for a deadly weapon or any instrument, article or substance readily capable of causing serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons. A frisk is authorized when the member of the service reasonably suspects the person is armed and dangerous. This includes situations in which the officer reasonably suspects that the person has committed, is committing, or is about to commit a violent crime or when the officer observes something on the person that she/he reasonably suspects is a weapon.  A frisk may not be conducted to discover evidence or the proceeds or instrumentalities of a crime.  A police officer cannot "frisk" a bag or item of personal property unless the officer has a reasonable suspicion that the person is armed and dangerous and the bag or item could contain a weapon and is within the person's reach.

<u>SEARCH AFTER FRISK</u> - In the context of the investigative encounters described in this section, a search occurs when the officer places his/her hands inside a pocket or other interior portions of a person's clothing or personal property to remove an object that the member felt during a frisk and reasonably suspects is a weapon or dangerous instrument.

**PROCEDURE**

When a uniformed member of the service engages in an investigative encounter with a civilian:

<u>CONDUCTING A LEVEL 1 ENCOUNTER – A REQUEST FOR INFORMATION</u>:

**UNIFORMED MEMBER OF THE SERVICE**

1.   Approach the person if there is an objective credible reason to do so.
2.   If not in uniform, identify yourself as a police officer verbally and by displaying your shield in a conspicuous manner, if practicable.
3.   You may seek information and ask general, non-threatening questions related to the reason for the approach.  However, accusatory questions are not permitted.
4.   The person may refuse to answer questions and is free to leave.
5.   You may inform the person that she/he is free to leave, but you are not required to do so unless she/he specifically asks.
6.   When feasible and consistent with personal safety, provide the individual with an explanation for the encounter.
7.   DO NOT detain the person, use or threaten the use of force, or request consent to search.

**INTERIM ORDER NO.  DRAFT 23**

CONDUCTING A LEVEL 2 ENCOUNTER – THE COMMON LAW RIGHT
OF INQUIRY:

**UNIFORMED**
**MEMBER OF**
**THE SERVICE**

8.    Approach the person if you have a founded suspicion of criminality.
9.    If not in uniform, identify yourself as a police officer verbally and by displaying your shield in a conspicuous manner, if practicable.
10.   You may seek information and ask questions, including pointed and accusatory questions.
11.   The person may refuse to answer questions and is free to leave.
12.   You may request consent to search; the consent must be voluntarily given.
13.   You may inform the person that she/he is free to leave, but you are not required to do so unless she/he specifically asks.
14.   When feasible and consistent with personal safety, provide the individual with an explanation for the encounter.
15.   DO NOT detain the person or use or threaten the use of force.

*NOTE*

*During a Level 1 or Level 2 encounter, an officer may not create a situation (either by words or actions) where a reasonable person would not feel free to walk away. A person may be detained only if a properly conducted Level 1 or Level 2 encounter yields information to support a reasonable suspicion that the person committed, was committing, or was about to commit a felony or Penal Law misdemeanor.*

CONDUCTING A LEVEL 3 ENCOUNTER - A LEVEL 3 STOP:

**UNIFORMED**
**MEMBER OF**
**THE SERVICE**

16.   Upon reasonable suspicion that the person has committed, is committing, or is about to commit a felony or Penal Law misdemeanor, stop and detain the person for the purpose of conducting a criminal investigation.
    a.    If not in uniform, identify yourself as a police officer verbally and by displaying your shield in a conspicuous manner, if practicable.
    b.    Question the suspect to the extent necessary to determine whether there is probable cause to make an arrest.
    c.    You may ask pointed and accusatory questions related to the reason for the stop. Refusal to answer questions or produce identification does not establish probable cause.
    d.    You may seek consent to search. Consent must be voluntarily given.
    e.    Reasonable force may be used to stop a person.
    f.    If you have a reasonable suspicion at any point before or during the stop, that the person is armed and dangerous, you may conduct a "frisk." [See "Conducting a Frisk" below.]
    g.    The suspect may be detained only as long as necessary to confirm or dispel your suspicion that she/he was committing, committed, or was about to commit a felony or Penal Law misdemeanor. Authority to detain the suspect ends when the tasks tied to the reason for the stop are completed or reasonably should have been completed.

**INTERIM ORDER NO.  DRAFT 23**

**UNIFORMED MEMBER OF THE SERVICE (continued)**

    h.    When feasible and consistent with personal safety, provide the individual with an explanation for the encounter.

    i.    Obtain the suspect's name, address, and any additional information that will be required to complete the **STOP, QUESTION AND FRISK REPORT WORKSHEET (PD344-151A)**.

    j.    Do not transport or otherwise move the suspect from the location where she/he is stopped unless she/he voluntarily consents or there is an exigency necessitating relocation (e.g., hostile crowd, threat to safety, hospital show-up, etc.).

17.    Release the person immediately after completing the investigation if probable cause to arrest does not exist.

    a.    Provide the person stopped with an explanation for the stop, question and or frisk encounter, absent exigent circumstances.

    b.    Offer the person stopped a **WHAT IS A STOP? (PD383-153)** tear-off information card, absent exigent circumstances.

<u>CONDUCTING A FRISK, AND WHEN APPROPRIATE, A SEARCH</u>:

**UNIFORMED MEMBER OF THE SERVICE**

18.    If a police officer develops a reasonable suspicion that a person is armed and dangerous, the officer may frisk the person for a deadly weapon or any instrument, article or substance readily capable of causing serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons. Reasonable suspicion that a person is armed and dangerous may arise from the officer's observations or the facts and circumstances of the encounter including:

    a.    Reasonable suspicion that the suspect has committed, is committing or is about to commit, a violent crime (e.g., assault with a deadly weapon, burglary, rape, robbery, etc.)

    b.    Observation of something on the person that the officer reasonably suspects is a weapon

    c.    A statement by the suspect stopped that she/he is armed

    d.    Information known by the officer that the suspect may be carrying a weapon, such as statements from a victim or witness.

19.    The purpose of the frisk is to ensure the safety of the officer and not to locate evidence of a crime, such as drugs.

20.    There is no requirement to question a suspect prior to conducting a lawful frisk.

21.    Conduct the frisk by carefully running your hands down the outside of the person's clothing.

22.    Where the frisk reveals an object that the member of the service reasonably suspects may be a weapon, the member of the service may search only those interior portions of the stopped person's clothing to remove the weapon.

**INTERIM ORDER NO.   DRAFT 23**

| | | |
|---|---|---|
| **UNIFORMED MEMBER OF THE SERVICE (continued)** | 23. | An officer may not frisk a person's bag or other item of personal property unless the officer has reasonable suspicion that the person is armed and dangerous and that the bag or item of personal property could contain a weapon and is within the person's reach.  If the bag/item is soft, the officer should run her/his hands down the outside of the bag/item and open it only if she/he feels the contours of what she/he believes is a weapon.  If the bag/item is rigid and unlocked, the officer may open it to ensure it does not contain a weapon. |
| ***NOTE*** | | *The guidelines in step "23" do not apply to mass transit system checkpoint type inspections of backpacks, containers and other carry-on items that are capable of containing explosive devices.* |
| | | *Protective measures: Even if an officer does not have reasonable suspicion that a person is armed and dangerous, there are tactics for officer safety that an officer may use short of a frisk when the officer perceives her/his safety is at risk.  These include ordering the individual to take her/his hands out of her/his pockets, put down or step away from an otherwise lawful object that could be used as a weapon, grabbing the person's hands if the circumstances suggest the person may be grabbing a weapon, or forcibly removing the person's hands from her/his pockets if the individual refuses to remove them from her/his pockets.  Any lawfully possessed article that is removed/safeguarded by a member of the service during an investigative encounter should be returned to the individual at the conclusion of the encounter (unless probable cause is developed and the individual is arrested).* |
| | | *Requesting identification documents:  At any level, an officer may ask an individual to verbally identify herself/himself or present an identification document to verify that person's identity and/or address.  During Level 1 or 2 encounters, when performing this task, the officer must not create a situation where the person does not feel free to leave.  Other than the operator of a motor vehicle/motorcycle, members of the public are not required to possess identification documents or present identification documents to police officers when requested.  Refusal or inability to produce identification alone will not elevate the level of the encounter.  Absent probable cause that the person committed an offense, she/he may not be arrested or removed to a Department facility for further investigation merely because she/he refused to produce identification.* |

<u>REQUIRED DOCUMENTATION</u>:

| | | |
|---|---|---|
| **UNIFORMED MEMBER OF THE SERVICE** | 24. | For all Level 3 stops, prepare a **STOP, QUESTION AND FRISK REPORT WORKSHEET** for EACH person stopped. |
| | a. | Complete all applicable captions and follow the directions printed on the form. |
| | b. | Check "REFUSED" in the appropriate space if the person stopped refused to identify herself/himself. |
| | (1) | Request the patrol supervisor to respond to verify refusal. |
| | (2) | Do not detain the person, however, if the investigation is complete and there is no probable cause to make an arrest. |
| | c. | Select all relevant check boxes if more than one descriptive term applies. |

**INTERIM ORDER NO.  DRAFT 23**

**UNIFORMED MEMBER OF THE SERVICE (continued)**

    d.    Describe in plain language (rather than numeric Penal Law section) the specific felony or Penal Law misdemeanor you suspected the person had committed, was committing or was about to commit.

*NOTE*

*The **STOP, QUESTION AND FRISK REPORT WORKSHEET** is <u>not</u> prepared for Level 1 and Level 2 encounters unless the encounter escalates to a Level 3 stop. Similarly, the **STOP, QUESTION AND FRISK REPORT WORKSHEET** is <u>not</u> prepared when an officer makes a summary arrest for an offense/crime or issues a summons for an observed violation <u>unless</u> the suspect was initially detained for investigation in a Level 3 stop.*

25.    Enter details in **ACTIVITY LOG (PD112-145)** or **INVESTIGATOR'S DAILY ACTIVITY REPORT (PD439-156)**, as appropriate, and include the following information in the entry:
    a.    Date, time and location of stop
    b.    Pedigree information, unless refused, and detailed description of the person stopped
    c.    Identify in plain language, the suspected felony or Penal Law misdemeanor
    d.    ICAD number, if applicable
    e.    Disposition including the time the encounter was concluded
    f.    Precinct serial number assigned to **STOP, QUESTION AND FRISK REPORT WORKSHEET**, if available
    g.    Describe in your own words all of the facts and information relied upon to conclude that there was reasonable suspicion that the person stopped had committed, was committing or was about to commit a felony or Penal Law misdemeanor
    h.    If the person is subsequently frisked, describe in your own words all of the facts and information relied upon to conclude that there was reasonable suspicion that the person stopped was armed and dangerous
    i.    If a search is conducted, describe the basis for the search, the specific area searched, what was felt and whether a weapon or other contraband was recovered.
26.    Prior to the end of your tour, submit the **STOP, QUESTION AND FRISK REPORT WORKSHEET** and **ACTIVITY LOG** or **INVESTIGATOR'S DAILY ACTIVITY REPORT** to the patrol supervisor/unit supervisor for review.
27.    Inform the patrol supervisor/unit supervisor of facts of the stop and, if conducted, frisk, and/or search.

<u>SUPERVISORY AND ADMINISTRATIVE FUNCTIONS</u>:

**PATROL SUPERVISOR/ UNIT SUPERVISOR**

28.    Respond to the scene of stops when feasible.
29.    Review the **STOP, QUESTION AND FRISK REPORT WORKSHEET** and the member's **ACTIVITY LOG** or **INVESTIGATOR'S DAILY ACTIVITY REPORT** entry for the stop and:
    a.    Discuss the circumstances of the stop with the member of the service

**INTERIM ORDER NO.  DRAFT 23**

**PATROL SUPERVISOR/ UNIT SUPERVISOR (continued)**

    b.    Determine whether all captions are completed and all relevant check boxes are checked

    c.    Confirm that the **STOP, QUESTION AND FRISK REPORT WORKSHEET** states in plain language a specific suspected felony or Penal Law misdemeanor

    d.    Determine whether the officer's narrative in the officer's **ACTIVITY LOG** or **INVESTIGATOR'S DAILY ACTIVITY REPORT** includes the relevant information regarding his/her reasonable suspicion that the person stopped had committed, was committing, or was about to commit a felony or Penal Law misdemeanor

    e.    If the person was frisked, determine whether the officer's **ACTIVITY LOG** or **INVESTIGATOR'S DAILY ACTIVITY REPORT** includes the relevant information regarding the officer's belief that the person was armed and dangerous and, if a search was conducted, the basis for the search, the area searched and whether a weapon or other contraband was recovered

    f.    Determine whether the stop was based upon reasonable suspicion of a felony or Penal Law misdemeanor; if the person was frisked determine whether those actions were supported by a reasonable suspicion that the person was armed and dangerous; if searched, determine whether the search was reasonable; and if force was used, determine whether the use of force was reasonable under the circumstances of the encounter. In making these determinations, consider whether the facts and information as conveyed by the member and recorded on the **STOP, QUESTION AND FRISK REPORT WORKSHEET** and in the **ACTIVITY LOG** or **INVESTIGATOR'S DAILY ACTIVITY REPORT** reasonably support the conclusion that the member's actions were based upon reasonable suspicion

    g.    If appropriate, instruct member of the service and/or refer for additional training and/or other remedial action, including, if appropriate, disciplinary action

    h.    Direct the member to make necessary corrections to the **STOP, QUESTION AND FRISK REPORT WORKSHEET** if the report is inaccurate or incomplete

    i.    Complete and sign the **STOP, QUESTION AND FRISK REPORT WORKSHEET**.

30.    Prior to the end of tour, return signed **STOP, QUESTION AND FRISK REPORT WORKSHEET** and **ACTIVITY LOG** or **INVESTIGATOR'S DAILY ACTIVITY REPORT** back to member upon completion of the review.

*NOTE*

    *If the patrol supervisor/unit supervisor is unavailable, the uniformed member of the service will submit the **STOP, QUESTION AND FRISK REPORT WORKSHEET** and **ACTIVITY LOG** or **INVESTIGATOR'S DAILY ACTIVITY REPORT** to the desk officer/designee. The desk officer/designee will comply with steps "29" and "30."*

**INTERIM ORDER NO.  DRAFT 23**

| | | |
|---|---|---|
| **UNIFORMED MEMBER OF THE SERVICE** | 31. | Make a photocopy of the **ACTIVITY LOG** or the **INVESTIGATOR'S DAILY ACTIVITY REPORT** entry for the stop. |
| | 32. | Submit the original **STOP, QUESTION AND FRISK REPORT WORKSHEET** and the photocopy of the **ACTIVITY LOG** or **INVESTIGATOR'S DAILY ACTIVITY REPORT** entry to the desk officer/designee. |

**DESK OFFICER/ DESIGNEE**

33. Ensure that the **STOP, QUESTION AND FRISK REPORT WORKSHEET** is entered into the Department's Automated Stop, Question, and Frisk System for generation of the next sequential precinct serial number within forty-eight hours from the time of occurrence.

    a. Ensure that the next sequential serial number is entered in the appropriate caption on the **STOP, QUESTION AND FRISK REPORT WORKSHEET**.

34. Electronically "sign-off" and administer any necessary supervisory functions of the Department's Automated Stop, Question, and Frisk System for those **STOP, QUESTION AND FRISK REPORT WORKSHEETS** that are awaiting sign off in the queue.

    a. Ensure that the **STOP, QUESTION AND FRISK REPORT WORKSHEETS** are electronically "signed–off" within forty-eight hours from the time of occurrence.

    b. Ensure that a separate precinct serial number is assigned to each **STOP, QUESTION AND FRISK REPORT WORKSHEET**.

35. Have the **STOP, QUESTION AND FRISK REPORT WORKSHEET**, with the sequential serial number entered in the appropriate caption, photocopied.

    a. Attach the photocopy of the member's **ACTIVITY LOG** or **INVESTIGATOR'S DAILY ACTIVITY REPORT** to the photocopy of the **STOP, QUESTION AND FRISK REPORT WORKSHEET** and file in the command's **STOP, QUESTION AND FRISK REPORT WORKSHEET** binder.

    b. Submit the original **STOP, QUESTION AND FRISK REPORT WORKSHEET** to the command clerk/designated member.

**COMMAND CLERK/ DESIGNATED MEMBER**

36. Print out computer generated copy of the Department's online **STOP, QUESTION AND FRISK INDEX COVERSHEET (PD344-152)** <u>daily</u> during the first platoon, utilizing the Department's Automated Stop, Question, and Frisk System.

    a. Ensure computer generated **STOP, QUESTION AND FRISK INDEX COVERSHEET** is filed with photocopies of original **STOP, QUESTION AND FRISK REPORT WORKSHEET** in command binder.

37. Forward original **STOP, QUESTION AND FRISK REPORT WORKSHEET** to the Criminal Records Section on a daily basis.

*NOTE*      *Commanding officer/designee will designate a member to perform the command clerk duties listed above, if the command clerk is not available.*

INTERIM ORDER NO.  **DRAFT 23**

**INTEGRITY CONTROL OFFICER**

38. Personally conduct, in conformance with the Quality Assurance Division self-inspection program, the command self-inspection of **STOP, QUESTION AND FRISK REPORT WORKSHEETS**.

39. Ensure that the patrol supervisor/unit supervisor reviews the **STOP, QUESTION AND FRISK REPORT WORKSHEETS** and **ACTIVITY LOGS** and that appropriate actions are taken where necessary.

    a. In assessing the patrol/unit supervisor's review of officers' Level 3 encounters, determine whether the supervisor appropriately reviewed the stop and, if conducted, the frisk and search, and any force used. In making these determinations, consider whether the supervisor examined the information recorded on the **STOP, QUESTION AND FRISK REPORT WORKSHEET** and **ACTIVITY LOG** and appropriately evaluated whether the information reasonably supports the conclusion that the member's actions were based upon reasonable suspicion.

    b. Take appropriate remedial action if warranted, including discipline if appropriate.

    c. Inform commanding officer and training sergeant of any matters of importance including deficiencies or patterns of deficiencies in regards to the bases of stops and/or frisks conducted or in the preparation of **STOP, QUESTION AND FRISK REPORT WORKSHEETS** and **ACTIVITY LOGS**.

**EXECUTIVE OFFICER**

40. Personally conduct, in conformance with the Quality Assurance Division self-inspection program, the command self-inspection of "POLICE INITIATED ENFORCEMENT."

**COMMANDING OFFICER**

41. Assume responsibility for the integrity of the administration of this procedure.

42. Consult with the executive officer, integrity control officer, platoon commanders, special operations lieutenant, training sergeant, patrol supervisors/unit supervisors to ensure the constitutionality and effectiveness of stops.

    a. Identify training needs and necessary remedial or disciplinary actions required.

    b. Prepare a report on **Typed Letterhead** addressed to the Commanding Officer, Legal Bureau requesting remedial training for any members of the service identified as having a deficient understanding of the law pertaining to street encounters.

*NOTE*

*In most instances, instruction and training should be accomplished at the command level. The application of the law in this area can be complicated, and investigative encounters are fluid situations in which one event or observation can alter the level of suspicion or danger. A single erroneous judgment will not generally warrant referral to the Legal Bureau for retraining. However, members of the service who evince a lack of comprehension of the core concepts of the law governing this procedure should be referred to the Legal Bureau.*

INTERIM ORDER NO. **DRAFT 23**

**TRAINING SERGEANT**

43.  Conduct command level training to help ensure compliance with the Department's policy regarding investigative encounters.

    a.  Periodically review and identify command-wide and individual training needs and necessary remedial actions.

    b.  Record training sessions in the command training log indicating the subject of the training as well as the identities of the participating members of the service.

    c.  Identify members who have been referred for training in **STOP, QUESTION AND FRISK REPORT WORKSHEETS** and ensure that the training is conducted.

        (1)  Track, record and report such training to the commanding officer on a quarterly basis.

**ADDITIONAL DATA**

*There are many facts and circumstances that may lead a police officer to conclude that there is reasonable suspicion that a person has committed, is committing or is about to commit a felony or Penal Law misdemeanor. Such factors may include information received from third parties as well as the actions of the suspect, the suspect's physical and temporal proximity to the scene of a crime, the suspect's resemblance to the specific description of a perpetrator of a crime (based on more than just race, age and gender) and information known to the officer about the suspect or particular location, among other factors. Each situation is unique and the information available to members of the service will vary.*

*"Furtive movements" or mere presence in a "high crime area," standing alone, are insufficient bases for a stop or frisk. Moreover, even when used in combination with other stop factors, the stopping officer must be able to specifically describe the suspicious nature of the "furtive movements" which she/he observed, and she/he must not define the "high crime area" too broadly, such as encompassing an entire precinct or borough. In addition, a person may not be stopped merely because he or she matches a generalized description of a crime suspect, such as an 18-25 year old male of a particular race. If a physical description is the only factor relied on by the stopping officer, it must be more specific to form the basis for a stop. Individuals may not be targeted for stops and frisks because they are members of a racial or ethnic group that appears more frequently in local crime suspect data. Race may only be considered where the stop is based upon a specific and reliable suspect description that includes not just race, age and gender, but other identifying characteristics and information. When a police officer carries out a stop based on reasonable suspicion that a person fits such a description, the officer may consider the race of the suspect, just as the officer may consider the suspect's height or hair color.*

*Commanding officers of commands other than patrol precincts, PSAs and transit districts (e.g., OCCB, Strategic Response Group, etc.) will designate a supervisor to perform the desk officer duties listed above. The desk officer/designee in other than a patrol precinct who has received a completed **STOP, QUESTION AND FRISK REPORT WORKSHEET** will ensure that the data is entered into the Department's Automated Stop, Question, and Frisk System for generation of the next precinct of occurrence serial number within forty-eight hours from the time of occurrence. The desk officer/designee in other than a patrol precinct will ensure that the **STOP, QUESTION AND FRISK REPORT WORKSHEETS** are forwarded to the Criminal Records Section on a daily basis. Photocopies of the **STOP, QUESTION AND FRISK REPORT WORKSHEETS** will be sent via Department mail to the precinct of occurrence daily. The precinct of occurrence will then place the photocopies in sequential order in their **STOP, QUESTION AND FRISK REPORT WORKSHEET***

**INTERIM ORDER NO.  DRAFT 23**

| | |
|---|---|
| **ADDITIONAL DATA** *(continued)* | *command binder. In addition, the desk officer/designee will utilize the Department's Automated Stop, Question, and Frisk System and ensure those **STOP, QUESTION AND FRISK REPORT WORKSHEETS** completed by members of their command are signed off within <u>forty-eight hours from the time of occurrence</u>.* |

*Desk officers/designees in other than patrol precincts will maintain a standardized **STOP, QUESTION AND FRISK REPORT WORKSHEET** command binder with photocopies of **STOP, QUESTION AND FRISK REPORT WORKSHEET** prepared by their respective command. Additionally, a corresponding computer generated **STOP, QUESTION AND FRISK INDEX COVERSHEET** for the command will be printed out daily and will likewise be maintained in the command binder.*

*Commanding officers will ensure that photocopied **STOP, QUESTION AND FRISK REPORT WORKSHEETS** maintained in the command binder are removed and filed in the command by year of occurrence every January 1st and quarterly thereafter (April 1st, July 1st and October 1st).*

*All uniformed members of the service below the rank of Captain are required to carry **ACTIVITY LOG** insert **STREET ENCOUNTERS – LEGAL ISSUES (PD344-153)** when performing patrol duties in uniform.*

| | |
|---|---|
| **RELATED PROCEDURES** | *Activity Logs (PG 212-08)*<br>*Department Policy Prohibiting Racial Profiling (PG 203-25)*<br>*Executive Officer (PG 202-10)*<br>*Interior Patrol of Housing Authority Buildings (212-60)*<br>*Interior Patrol of Multiple Dwelling Buildings Enrolled in the Trespass Affidavit Program (212-59)* |
| **FORMS AND REPORTS** | ***ACTIVITY LOG (PD112-145)***<br>***INVESTIGATOR'S DAILY ACTIVITY REPORT (PD439-156)***<br>***STOP, QUESTION AND FRISK REPORT WORKSHEET (PD344-151A)***<br>***STOP, QUESTION AND FRISK INDEX COVERSHEET (PD344-152)***<br>***STREET ENCOUNTERS - LEGAL ISSUES (PD344-153)***<br>***WHAT IS A STOP? (PD383-153)*** |

    3.    Commands will immediately requisition the new Department form from the Quartermaster Section using the following information:

| **INDEX** | **PD NUMBER** | **TITLE** |
|:---:|:---:|:---:|
| **XXXX** | **383-153** | **WHAT IS A STOP?** |

    4.    Department form, "**WHAT IS A STOP, QUESTION AND FRISK ENCOUNTER? (PD344-111)**" is hereby <u>**REVOKED**</u>.

    5.    <u>**REVISE**</u> references to Department form **WHAT IS A STOP, QUESTION AND FRISK ENCOUNTER? (PD344-111)** wherever it appears in the Department Manual to read:

    "<u>**WHAT IS A STOP? (PD383-153)**</u>"

**INTERIM ORDER NO.  DRAFT 23**

6.      **REVISE** references to Patrol Guide 212-11, "Stop and Frisk" wherever they appear in the Department Manual to read:

"**Patrol Guide 212-11, 'Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops'** "

7.      Upon publication, this Interim Order has been incorporated into the On-Line Patrol Guide and the On-Line Administrative Guide.

8.      Any provisions of the Department Manual or other Department directive in conflict with the contents of this Order are suspended.

**BY DIRECTION OF THE POLICE COMMISSIONER**

**DISTRIBUTION**
**All Commands**

INTERIM ORDER NO.   **DRAFT 23**

### What Is A Stop?
PD 383-153 (06-15)

When a police officer reasonably suspects that a person has committed, is committing or is about to commit a felony or a Penal Law misdemeanor, the officer is authorized by NYS Criminal Procedure law § 140.50 to **stop, question and possibly frisk that person for a weapon.**

The Police Officer stopped you because the officer had information requiring further investigation. The following factor(s) contributed to the officer's suspicion:

☐ Concealing or Possessing a Weapon      ☐ Acting as a Lookout
☐ Engaging in a Drug Transaction          ☐ Casing Victim or Location
☐ Proximity to the Scene of a Crime       ☐ Other (*Specify*)
☐ Matches a Specific Suspect Description

| Rank/Name | Cmd. | Shield No. |
|-----------|------|------------|
|           |      |            |

---

### What Is A Stop?
PD 383-153 (06-15)

When a police officer reasonably suspects that a person has committed, is committing or is about to commit a felony or a Penal Law misdemeanor, the officer is authorized by NYS Criminal Procedure law § 140.50 to **stop, question and possibly frisk that person for a weapon.**

The Police Officer stopped you because the officer had information requiring further investigation. The following factor(s) contributed to the officer's suspicion:

☐ Concealing or Possessing a Weapon      ☐ Acting as a Lookout
☐ Engaging in a Drug Transaction          ☐ Casing Victim or Location
☐ Proximity to the Scene of a Crime       ☐ Other (*Specify*)
☐ Matches a Specific Suspect Description

| Rank/Name | Cmd. | Shield No. |
|-----------|------|------------|
|           |      |            |

---

### What Is A Stop?
PD 383-153 (06-15)

When a police officer reasonably suspects that a person has committed, is committing or is about to commit a felony or a Penal Law misdemeanor, the officer is authorized by NYS Criminal Procedure law § 140.50 to **stop, question and possibly frisk that person for a weapon.**

The Police Officer stopped you because the officer had information requiring further investigation. The following factor(s) contributed to the officer's suspicion:

☐ Concealing or Possessing a Weapon      ☐ Acting as a Lookout
☐ Engaging in a Drug Transaction          ☐ Casing Victim or Location
☐ Proximity to the Scene of a Crime       ☐ Other (*Specify*)
☐ Matches a Specific Suspect Description

| Rank/Name | Cmd. | Shield No. |
|-----------|------|------------|
|           |      |            |



For more information • Para mas informacion • Per ulteriori informazion •

更多信息 • Pour plis informacion • 자세한 내용을 보려면 •

За дополнительной информациейцией

**www.nyc.gov/nypd**

**$1,000 REWARD** for information leading to the arrest of anyone
who possesses an ILLEGAL HANDGUN:1-866 GUN-STOP
**NEW YORK CITY'S CUSTOMER SERVICE CENTER: CALL 311**

**To Report Police Misconduct Contact:**
Civilian Complaint Review Board (CCRB) 1-800-341-2272
NYPD Internal Affairs Bureau (IAB) 1-212-741-8401

— — — — — — — — — — — — — — — — — —

For more information • Para mas informacion • Per ulteriori informazion •

更多信息 • Pour plis informacion • 자세한 내용을 보려면 •

За дополнительной информациейцией

**www.nyc.gov/nypd**

**$1,000 REWARD** for information leading to the arrest of anyone
who possesses an ILLEGAL HANDGUN:1-866 GUN-STOP
**NEW YORK CITY'S CUSTOMER SERVICE CENTER: CALL 311**

**To Report Police Misconduct Contact:**
Civilian Complaint Review Board (CCRB) 1-800-341-2272
NYPD Internal Affairs Bureau (IAB) 1-212-741-8401

— — — — — — — — — — — — — — — — — —

For more information • Para mas informacion • Per ulteriori informazion •

更多信息 • Pour plis informacion • 자세한 내용을 보려면 •

За дополнительной информациейцией

**www.nyc.gov/nypd**

**$1,000 REWARD** for information leading to the arrest of anyone
who possesses an ILLEGAL HANDGUN:1-866 GUN-STOP
**NEW YORK CITY'S CUSTOMER SERVICE CENTER: CALL 311**

**To Report Police Misconduct Contact:**
Civilian Complaint Review Board (CCRB) 1-800-341-2272
NYPD Internal Affairs Bureau (IAB) 1-212-741-8401



# DRAFT INTERIM ORDER

| SUBJECT: | **REVISION TO PATROL GUIDE 203-25, "DEPARTMENT POLICY PROHIBITING RACIAL PROFILING"** | |
|---|---|---|
| DATE ISSUED: | REFERENCE: | NUMBER: |
| **08-05-15** | **\*P.G. 203-25** | **DRAFT 16** |

     1.    In order to ensure that members of the service comply with the Department's policy prohibiting racial profiling and other forms of bias-based policing, Patrol Guide 203-25, "Department Policy Prohibiting Racial Profiling" has been revised.

     2.    Therefore, effective immediately, Patrol Guide 203-25, "Department Policy Prohibiting Racial Profiling" is **SUSPENDED** and the following new procedure entitled, "Department Policy Prohibiting Racial Profiling and Bias-Based Policing" must be complied with:

     3.    Members of the service are reminded that the New York City Police Department is committed both to the impartial enforcement of law and to the protection of constitutional rights. To reinforce these commitments and to ensure that all members of the service engage only in constitutionally sound policing practices, the Department prohibits the use of racial and bias-based profiling in law enforcement actions. Conducting enforcement activities in an unbiased manner fosters and strengthens relationships between police officers and members of the community, and inspires confidence in, and support for, policing efforts.

     4.    Police-initiated enforcement actions, including, but not limited to, arrests, Level 3 Terry stops, frisks, searches, summonses, and motor vehicle stops, must be based on the standards required by the Fourth and Fourteenth Amendments of the U.S. Constitution, Sections 11 and 12 of Article I of the New York State Constitution, Section 14-151 of the New York City Administrative Code, and other applicable laws.

     5.    Race, color, ethnicity, or national origin may not be used as a motivating factor for initiating police enforcement action. When an officer's decision to initiate enforcement action against a person is motivated even in part by a person's actual or perceived race, color, ethnicity or national origin, that enforcement action violates Department policy unless the officer's decision is based on a specific and reliable suspect description that includes not just race, age, and gender, but other identifying characteristics or information.

     6.    The law confers on police officers the authority to stop, question, and if warranted, frisk an individual whom an officer reasonably suspects has committed, is committing, or is about to commit a felony or Penal Law misdemeanor. Police officers must be able to articulate the factors which led them to take enforcement action, in particular those factors leading to reasonable suspicion for stopping, questioning, and, if appropriate, frisking a person, or probable cause for arresting or issuing a summons to a person. Individuals may not be targeted for any enforcement action, including stops, because they are members of a racial or ethnic group that appears more frequently in local crime suspect data. Race, color, ethnicity, or national origin may only be considered when the stop is based on a specific and reliable suspect description that includes not just race, gender, and age, but other identifying characteristics or information. When an officer carries out a stop based on reasonable suspicion that a person fits such a description, the officer may consider the race, color, ethnicity, or national origin of the suspect, just as the officer may consider the suspect's height or hair color. In accordance with Department policy, when a stop is not based on a specific suspect description, however, race, ethnicity or national origin may not be used at all as a motivation or justification for the stop.

7.      Section 14-151 of the New York City Administrative Code and Department policy prohibit bias-based profiling and include demographic categories in addition to race, color, and national origin.  The Administrative Code and Department policy prohibit the Department and individual officers from intentionally engaging in bias-based profiling, which is defined as "an act of a member of the force of the police department or other law enforcement officer that relies on actual or perceived race, national origin, color, creed, age, alienage or citizenship status, gender, sexual orientation, disability, or housing status as the determinative factor in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that links a person or persons to suspected unlawful activity."  With respect to race, color, ethnicity and national origin, the standards of conduct described in paragraphs "5" and "6" must always be met by the Department and its officers.

8.      Commanding officers will continue to ensure that self-inspections are conducted within their commands regarding stop, question, and frisk activity. The Quality Assurance Division will continue to monitor compliance with self-inspection protocols in all of its command inspections and will continue to audit stop, question, and frisk activity Department-wide.

9.      Commanding officers will ensure that members of their command comply with the Department's policy regarding investigative encounters as per Patrol Guide 212-11, "Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops."

10.      **REVISE** references to Patrol Guide 203-25, "Department Policy Prohibiting Racial Profiling" wherever they appear in the Department Manual to read:

"**Patrol Guide 203-25, 'Department Policy Prohibiting Racial Profiling and Bias-Based Policing'** "

11.      Upon publication, this Interim Order has been incorporated into the On-Line Patrol Guide.

12.      Any provisions of the Department Manual or other Department directive in conflict with the contents of this Order are suspended.

**BY DIRECTION OF THE POLICE COMMISSIONER**

**DISTRIBUTION**
**All Commands**

**INTERIM ORDER NO.   DRAFT 16**