# ARNOLD & PORTER LLP

**Peter L. Zimroth**
Peter.Zimroth@aporter.com

+1 212.715.1010
+1 212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

February 16, 2016

<u>VIA ECF</u>

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007-1312

> Re:  *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
> *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
> *Davis, et al. v. City of New York, et al.,* 10-CV-0699 (AT),
> <u>Submission of Second Report of the Independent Monitor</u>

Dear Judge Torres,

I am pleased to submit my second report under the court orders and the parties' agreements in the cases of *Floyd v. City of New York*, *Ligon v. City of New York*, and *Davis v. City of New York*.  These cases challenged the NYPD's stop and frisk policies and practices (*Floyd*), and its policies and practices concerning criminal trespass enforcement in and around private buildings enrolled in the Trespass Affidavit Program (*Ligon*) and in New York City Housing Authority buildings (*Davis*).  This report focuses on significant steps since my first report in July 2015 and the challenges that lie ahead.

Let me highlight several findings and observations.  To start, the Department disseminated a new Patrol Guide procedure governing stops and frisks and a new

# ARNOLD & PORTER LLP

Honorable Analisa Torres
February 16, 2016
Page 2

procedure prohibiting racial profiling and bias-based policing. The Department also developed and put in use new training materials for recruit classes and conducted training for Field Training Officers, who work with probationary officers just out of the Police Academy as they move to their assignments in the field. Other steps include the development of reference materials on stop and frisk issues, their placement on the Department's intranet site and dissemination to all officers. A pilot program was conducted in seven commands using a draft stop report form that will be the basis of a new stop form for use throughout the Department, after court approval. Some auditing practices were changed, and an audit work plan for 2016 is in the works. During this period, too, the Department's dealings with the monitorship were put under the control of the Department's second highest official, First Deputy Commissioner Benjamin B. Tucker.

The progress the report details owes much to the hard work of NYPD officials and valuable input from the plaintiffs. All parties worked diligently, collaboratively and in good faith.

The work during this time also brought into sharp focus major challenges ahead. Chief among these is ensuring that written changes in policies are carried out in practice—in the Police Academy, in the precincts and other commands, by supervisors and, ultimately, in encounters between officers and civilians.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
February 16, 2016
Page 3

As you know, the last four years have seen a dramatic decrease in the number of reported stops.  The 685,724 stop reports filed in 2011 compare with 45,787 filed in 2014 and approximately 24,000 in 2015.  However, as my first report stressed, the focus should not be on the number of stops per se, but rather on the lawfulness of the stops and whether the encounters are conducted in accordance with the Department's principles of "courtesy, professionalism and respect."  The NYPD's stop and frisk practices and the related practices regarding trespass enforcement that led to this monitorship exacerbated tensions between the NYPD and some communities the Department serves, particularly minority and immigrant communities.

Getting stop and frisk and related trespass enforcement practices right is important, but that does not mean eliminating the practices.  The court did not rule that they are prohibited.  When conducted lawfully and professionally, they are valuable and legitimate law enforcement tools.  Getting it right means this: that police officers understand their lawful authority and limit their activities to what is permitted by law; that officers do not avoid enforcement activities when appropriate; that they treat the people with whom they interact professionally, with dignity and respect and in ways best designed to protect the safety of civilians and officers; and, finally, that officers document their activities as required by law and Department policy.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
February 16, 2016
Page 4

Those elements, broadly speaking, reflect the goals of the court orders and the parties' agreements, which, notably, overlap with the goals for the Department described by Commissioner Bratton.

Of course, transformation of any large government organization is a difficult undertaking.  It is apparent from focus group sessions and discussions with individual officers throughout the ranks that many police officers, including supervisors, are not well informed as yet about the changes underway or the reasons for them and, therefore, have yet to internalize them.  Many appear not to understand what is expected of them. If, as the Commissioner has stated, the court-ordered changes and agreements among the parties will improve the Department, and advance the safety of both communities and officers, that message needs to be communicated and reinforced better, not just at the top, but throughout the Department.

Ultimately, this is a challenge of leadership, particularly for those who supervise officers engaged day-to-day in enforcement activities—sergeants, their immediate supervisors, and the precinct and unit commanders who set the tone for those under them. The challenge here implicates every aspect of the court orders and the parties' agreements, and it will not be met without changes in policies, training, supervision, and all the ways the NYPD incentivizes good police behavior and discourages unacceptable behavior.  This is a large task that will take time and substantial effort to accomplish.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
February 16, 2016
Page 5

Before closing, I want to underscore a few particular developments and concerns covered in the report.

**Training.**  In my discussions with NYPD executives, they have emphasized that they view training improvements as a high priority.  With respect to the subjects covered by the court orders and the parties' agreements, the Department has revised some of its training for recruits and Field Training Officers.  However, as the Department recognizes, there needs to be training or retraining of all the members of the service, a much more far-reaching undertaking.  The Department is currently drafting new in-service training materials.

**Supervision.**  If the changes required by the court orders and the parties' agreements are to be implemented and take hold, the supervisors who have most to do with the officers on the street must play an increased leadership role.  This includes especially sergeants, who are closest to the officers, and precinct and unit commanders, who set the tone.  These supervisors must ensure that their subordinates are implementing the changes required by the court orders and the parties' agreements—that the stops, frisks and trespass arrests made by their officers are legal and proper and that these activities are correctly documented.  Supervisors must take a more active role in oversight, teaching and, when appropriate, discipline.  The new Department Patrol Guide procedure governing stops and frisks requires, for example, that supervisors, if they are not at the scene, speak to the officer who made the stop to determine whether there was

# ARNOLD & PORTER LLP

Honorable Analisa Torres
February 16, 2016
Page 6

sufficient basis for it, as well as for the frisk or search, if either occurred.  The supervisor must direct that the officer make corrections to the stop report form if it is inaccurate or incomplete, and, if appropriate, instruct the officer or refer him or her for additional training or other remedial action, including disciplinary action if warranted.

A note regarding discipline: although most officers understand that discipline is appropriate for deliberate violations of law or policy, they often express fear they will face serious disciplinary action or not be indemnified in lawsuits over minor or inadvertent mistakes in documentation or for isolated cases of erroneous but good-faith stops or frisks.  Actually, the new Patrol Guide Section 212-11 announces a contrary policy for the Police Department, and, as far as can be determined, officers have not been denied indemnification for minor infractions or reasonable, honest mistakes.  Sergeants and other supervisors need to take an active role in trying to correct these misperceptions, especially as they may affect decisions by some officers to make or refrain from making appropriate stops.

**Body-worn cameras.**  According to the Department, procurement of body-worn cameras for the pilot program ordered by the court will not be completed until late summer 2016, at the earliest.  In the meantime, there is much to do, including the promulgation of policies related to the use of the cameras and production of training materials.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
February 16, 2016
Page 7

Since my first report, there have been two major developments.  First, the court approved, with the consent of the parties, a change in the pilot program's design to allow a controlled experiment, matching officers who will wear cameras with those who will not.   Second, the Department has changed how it will develop body-worn camera policies.  According to the Department's new plans, as described to me in a November 24, 2015 letter (see Appendix 2 to the report), there will be significant outreach to internal and external stakeholders seeking views on alternative policy proposals.  This month, the Department is to begin reaching out to officers of every rank, unions, community members and organizations, criminal justice stakeholders, including the courts, district attorneys and defender organizations, victims' advocacy groups, privacy groups, the City Council, external oversight agencies and other interested parties.  This is a very positive development.  The use of body-worn cameras raises some difficult policy issues and choices, and inevitably not everyone will agree.  But interested parties should have a voice and a way to make their views known.

ARNOLD & PORTER LLP

Honorable Analisa Torres
February 16, 2016
Page 8

Further details on these and other subjects are contained in the report.

Thank you for the court's time and attention.

Respectfully submitted,

*/s/ Peter L. Zimroth*

Peter L. Zimroth
Monitor

Enclosures

# Second Report of the Independent Monitor

# Peter L. Zimroth

# February 16, 2016

*Floyd, et al. v. City of New York*
*Ligon, et al. v. City of New York, et al.*
*Davis, et al. v. City of New York, et al.*

# MONITOR TEAM

Peter L. Zimroth
Monitor

Richard Jerome
Deputy Monitor

Anthony A. Braga

Edward Davis

Jennifer Eberhardt

John MacDonald

James McCabe

Jane Perlov

# TABLE OF CONTENTS

**Page**

I.      Introduction ................................................................................................. 1

II.     The Monitor's Work .................................................................................... 5

III.    NYPD Policies ............................................................................................ 7

    **A.**    SQF Policies ........................................................................................ 7

        1.    Milestones ................................................................................ 7

        2.    Status and Assessment ............................................................ 8

    **B.**    Racial Profiling Policies ................................................................... 11

        1.    Milestones .............................................................................. 11

        2.    Status and assessment ........................................................... 11

    **C.**    Policies Related to the Trespass Affidavit Program (TAP) ..................... 12

        1.    Milestones .............................................................................. 12

        2.    Status and Assessment .......................................................... 13

    **D.**    New York City Housing Authority (NYCHA) Policies ......................... 14

        1.    Milestones .............................................................................. 14

        2.    Status and Assessment .......................................................... 14

    **E.**    Stop Report Form .............................................................................. 15

        1.    Milestones .............................................................................. 15

        2.    Status and Assessment .......................................................... 16

IV.     Training ..................................................................................................... 20

    **A.**    Monitors' Observations of Police Academy Training ........................... 20

        1.    Teaching Quality .................................................................... 21

        2.    Curriculum Development ........................................................ 22

        3.    Course and Teacher Evaluation ............................................. 23

|     |     | 4. | Subject Integration ....................................................................... 24 |

| **B.** | Recruit Training ........................................................................................ 24 |
|     |     | 1. | Stop, Question and Frisk ............................................................... 24 |
|     |     |     | a. | Milestones ........................................................................ 24 |
|     |     |     | b. | Status and Assessment ..................................................... 24 |
|     |     | 2. | Racial Profiling ............................................................................. 25 |
|     |     |     | a. | Milestones ........................................................................ 25 |
|     |     |     | b. | Status and Assessment ..................................................... 25 |
|     |     | 3. | TAP Training ................................................................................. 26 |
|     |     |     | a. | Milestones ........................................................................ 26 |
|     |     |     | b. | Status and Assessment ..................................................... 27 |
|     |     | 4. | *Davis*/NYCHA Training ................................................................ 27 |
|     |     |     | a. | Milestones ........................................................................ 27 |
|     |     |     | b. | Status and Assessment ..................................................... 28 |

| **C.** | In-Service Training .................................................................................... 28 |
|     |     | 1. | Roll Call Training .......................................................................... 28 |
|     |     |     | a. | Milestones ........................................................................ 28 |
|     |     |     | b. | Status and Assessment ..................................................... 28 |
|     |     | 2. | SQF Reference Materials .............................................................. 30 |
|     |     | 3. | SQF In-Service Training at the Academy ..................................... 31 |
|     |     |     | a. | Milestones ........................................................................ 31 |
|     |     |     | b. | Status and Assessment ..................................................... 31 |
|     |     | 4. | *Davis*/NYCHA In-Service Training ............................................. 32 |
|     |     |     | a. | Milestones ........................................................................ 32 |
|     |     |     | b. | Status and Assessment ..................................................... 32 |

5.      Implicit Bias and Procedural Justice ............................................. 32

            a.      Milestones ......................................................... 32

            b.      Status and Assessment ....................................... 32

    D.    Training on Supervision ......................................................... 34

        1.      Milestones ................................................................. 34

        2.      Status and Assessment ............................................... 34

V.    Supervision ........................................................................................ 36

    A.    Milestones ............................................................................... 37

    B.    Status and Assessment ........................................................... 38

VI.    Body-Worn Cameras ......................................................................... 39

    A.    Milestones ............................................................................... 40

    B.    Status and Assessment ........................................................... 41

VII.    Auditing .............................................................................................. 45

    A.    Quality Assurance Division ................................................... 45

        1.      Milestones ................................................................. 45

        2.      Status and Assessment ............................................... 45

            a.      Current Audits for Stop Reports and Activity Logs ......... 46

            b.      Audit of Revised Stop Reports Used in a Pilot Program .. 47

            c.      RAND Audits ................................................... 48

            d.      Audits of Enforcement Activities Initiated by Officers .... 50

            e.      Audits of Self-Inspections by Integrity Control Officers . 51

    B.    Bronx TAP ............................................................................... 53

        1.      Milestones ................................................................. 53

        2.      Status and Assessment ............................................... 53

    C.    Early Identification System (EIS) .......................................... 55

|  |  | 1. | Milestones | 55 |
|  |  | 2. | Status and Assessment | 55 |
| **VIII.** | Complaints and Discipline | | | 57 |
|  | **A.** | Racial Profiling Allegations | | 57 |
|  |  | 1. | Milestones | 57 |
|  |  | 2. | Status and Assessment | 57 |
|  | **B.** | Handling of Complaints Substantiated by the CCRB | | 61 |
|  |  | 1. | Milestones | 61 |
|  |  | 2. | Status and Assessment | 62 |
| **IX.** | Performance Goals, Objectives and Evaluation | | | 67 |
|  | **A.** | Milestones | | 69 |
|  | **B.** | Status and Assessment | | 69 |
| **X.** | Joint Remedial Process | | | 70 |
| **XI.** | Compliance Metrics | | | 72 |

**Monitor's Second Report**

## I.      Introduction

This is the second report of the Independent Monitor overseeing implementation of the court orders and the parties' agreements in the cases *Floyd v. City of New York*, *Ligon v. City of New York* and *Davis v. City of New York*.  Those orders and agreements call for reforms of the NYPD's practices related to stop and frisk, trespass enforcement (i.e., stops and arrests for trespass) and bias-free policing in those areas—specifically, changes in policy, training, supervision, handling of complaints and discipline, auditing and performance measurement as well as a pilot program testing the use of body-worn cameras (BWCs).  The report covers the period from July 1, 2015, through the date of this report.

In the period leading up to the monitor's first report in July 2015, the NYPD was just beginning work on revising its policies relating to stop and frisk and trespass enforcement.  The Department had started the process of changing its Patrol Guide to conform its policies to the requirements contained in the court orders.  A significant focus of the first half of 2015 was on the development of training for a recruit class that started in January 2015.

This report discusses progress in several key areas since then and the challenges that lie ahead.  Chief among the challenges is ensuring that written changes in policies and training material are carried out in practice—in the Police Academy, in the precincts and other commands, by supervisors, and, ultimately, in encounters between officers and civilians.

**I. Introduction**

**Significant Steps Since the Last Monitor's Report**

As of the end of 2015, the NYPD has, among other things:

- Published and disseminated a new Patrol Guide procedure governing stops and frisks;

- Published and disseminated a new Patrol Guide procedure prohibiting racial profiling and other bias-based policing;

- Developed training materials for recruits at the Police Academy and presented those materials to three recruit classes (those beginning in January, July and October 2015);

- Conducted training for Field Training Officers (FTOs), who work with probationary officers just out of the Police Academy as they move to their assignments in the field;

- Developed reference materials on stop and frisk issues, put them up on the NYPD intranet site and disseminated them to all members of the service;

- Conducted a pilot program in which officers in seven commands (five precincts, a Transit District and a housing Police Service Area (PSA)) used a revised stop report form that will be the basis of a new stop report form for use throughout the Department, after court approval;

- Changed some of its auditing practices and begun developing an audit work plan for 2016; and

- Reorganized the way in which the Department deals with the monitorship by placing the Risk Management Bureau (RMB) under the control of the First Deputy Commissioner, Benjamin B. Tucker.

I. Introduction

**Significant Challenges**

The last four years have seen a dramatic decrease in the number of reported stops. The 685,724 stop reports filed in 2011 compares with 45,787 reported in 2014 and approximately 24,000 in 2015. However, as the monitor's first report stressed, the focus should not be on the number of stops per se, but rather on the lawfulness of the stops and whether the encounters are conducted in accordance with the Department's principles of "courtesy, professionalism and respect." The NYPD's stop and frisk practices and the related practices regarding trespass enforcement that led to this monitorship exacerbated tensions between the NYPD and some communities the Department serves, particularly minority and immigrant communities.

Getting stop and frisk and related trespass enforcement practices right is important, but it does not mean eliminating the practices. The court did not rule that they are prohibited. When conducted lawfully and professionally, they are valuable and legitimate law enforcement tools. Getting it right means at least this: that police officers understand their lawful authority and limit their activities to what is permitted by law; that officers do not avoid enforcement activities when appropriate; that they treat the people with whom they interact professionally, with dignity and respect and in ways best designed to protect the safety of civilians and officers; and, finally, that officers document their activities as required by law and NYPD policy.

Those elements, broadly speaking, reflect the goals of the court orders and the parties' agreements, which overlap with the goals for the NYPD. Commissioner William J. Bratton has stated repeatedly that officers should be concerned with the quality of their enforcement activities—including stop and frisk and trespass enforcement—rather than

**I. Introduction**

quantity.  The monitor's team has heard similar statements by those leading Compstat sessions, a key part of NYPD's crime management system (described more fully on pages 67-68 below).

Of course, transformation of any large government organization is a difficult undertaking.  It is apparent from focus group sessions and discussions with individual officers throughout the ranks that many police officers, including supervisors, are not well-informed as yet of the changes underway or the reasons for them and therefore have yet to internalize them.  Many appear not to understand what is expected of them.  If, as Commissioner Bratton has stated, the changes required by the court orders and the parties' agreements will improve the NYPD and advance the safety of both communities and police officers, that message needs to be communicated and reinforced better, not just at the top, but throughout the Department.

Ultimately, this is a challenge of leadership, particularly for those who supervise officers engaged in day-to-day enforcement activities—sergeants, their immediate supervisors, and the precinct and unit commanders who set the tone for those under them.  This challenge implicates every aspect of the court orders and the parties' agreements, and it will not be met without changes in policies, training, supervision, and all the ways the NYPD incentivizes good police behavior and discourages unacceptable behavior.  This is a large task that will take time and substantial effort to accomplish.

**II. The Monitor's Work**

**Report Format**

Like the monitor's previous report, this update sets out what is required by the court orders and the parties' agreements in the relevant cases (milestones), the status of the NYPD's remedial efforts, and the monitor's assessment of compliance to date.

**II.      The Monitor's Work**

During the six months from July to December 2015, the monitor and his team continued to meet with members of the NYPD and its units, such as the Police Academy, Quality Assurance Division (QAD), Risk Management Bureau, Information Technology Bureau and others.  The team observed Compstat meetings, conducted focus groups and had conversations with officers and supervisors, made site visits to precincts and borough commands, and observed training at the Police Academy and disciplinary trials in the NYPD trial room.  A member of the monitor team toured each precinct in the city in preparation for a controlled pilot study of body-worn cameras, described in Section VI below.  The team reviewed voluminous NYPD documents, including audits, stop report forms, complaint investigation files and NYPD data.  The monitor and his team have also met with plaintiffs' counsel, community organizations, the Civilian Complaint Review Board (CCRB) and other entities.

Significant time has been spent working with both the plaintiffs and the NYPD in developing training materials and policy.  Whenever possible, the monitor has sought to find common ground, with the goal that the parties agree on a final document for approval.  Both the NYPD and the plaintiffs have been working with the monitor diligently, collaboratively and in good faith to develop the reforms to be implemented.  In the process, cooperation and trust has increased among those involved—an important

5

development for accomplishing revisions of police practices and enhancing police-community relations.

In addition, the monitor has worked with the parties and the court on developing a process to determine which documents should be submitted to the court for approval and which can be approved by the monitor without further court action.  Many documents, certain training materials for example, are being updated and changed as the Department, the parties and the monitor learn from seeing these materials in use.  In general, once the court approves materials or written policies, further changes or additions to those materials or policies are approved by the monitor and not submitted to the court when the new material does not make significant substantive alterations to language the court has already cleared.  Any party that disagrees with the monitor's determination not to submit a document to the court may seek court redress.

There is now a website for following the monitoring efforts (www.nypdmonitor.org).  The site went live on October 31, 2015.  Visitors to the website can access the following: monitor reports, court opinions and orders, revised NYPD policies, training materials, information on the body-worn camera pilot, information on the Joint Remedial Process, links and resources related to the monitoring effort, and an opportunity for the public to provide feedback to the monitor.  A translation application available on the website allows users to access some material in languages other than English. Appendix 1 provides a list of documents currently on the website with links to those documents.

**III.    NYPD Policies**

  **A.    Stop and Frisk Policies**

    **1.    Milestones**

The NYPD's policies and procedures governing stops and frisks are set out in the Department's Patrol Guide.  This is one way that the Department communicates guidance and instruction about what officers can and cannot do under the law and what their supervisors expect of them.  In its opinion, the court found that the Patrol Guide did not adequately describe the legal standards governing stops or the degree of knowledge an officer must have to make a stop lawful.  The Patrol Guide procedures also did not state the legal requirements for a frisk or search, which are separate from the requirement for a stop.  The court did not require changes in these legal standards, only that they be stated correctly and clearly.

Under the court orders, as agreed to by the City and the Department, the Patrol Guide must:

1. State what constitutes a stop, when a stop may be conducted, when a frisk may be conducted and when a search may be conducted;

2. Require officers to document stops and frisks and the reasonable suspicion for each, both on a stop report form and in officers' activity logs; and

3. Have procedures for supervisory review of stops, including an assessment of the constitutionality of the stop and not just that a stop report form (previously called a UF-250) was completed.

2.        **Status and Assessment**

The monitor submitted to the court the NYPD's new procedures on stop and frisk, Patrol Guide (P.G.) 212-11, *Investigative Encounters: Requests for Information, Common Law Inquiry and Level 3 Stops*, which the court approved on August 24, 2015.  The NYPD issued an Interim Order on September 16, 2015, and disseminated the procedures to all members of the service.  The effective date of the procedures was September 21, 2015.

The revised Patrol Guide meets the requirements of the court orders and the parties' agreement.  It states when an officer may make a *Terry* stop and includes a definition of reasonable suspicion.  It states that reasonable suspicion for a stop does not give an officer the authority to make a frisk; an officer must have reasonable suspicion that the person stopped is armed and dangerous to frisk that person.

Prior to issuance of the new P.G. 212-11, there were no procedures in the Patrol Guide that addressed encounters between officers and civilians that were less intrusive than a stop or an arrest.  All such encounters are governed by the New York State Court of Appeals decision in *People v. DeBour*, which sets out four levels of encounters, establishing the standards for each.[1]  For a simple Request for Information (Level 1), the officer must have an "objective, credible reason" to make the approach and request; for a Common Law Right of Inquiry (Level 2), where an officer can ask accusatory questions, the officer must have a "founded suspicion" of some criminality; to stop and detain a person to investigate (Level 3), an officer must have "reasonable suspicion" that the individual committed, is committing or is about to commit a felony or Penal Law

---

[1]    40 N.Y.2d 210 (1976).

misdemeanor; for an arrest (Level 4), an officer must have probable cause.  P.G. 212-11 provides guidance to officers about the distinction between voluntary investigative contacts (Level 1 and Level 2 encounters) and forcible stops (Level 3 *Terry* stops), which must be based on reasonable suspicion.  The procedures define "objective, credible reason," "founded suspicion" and "reasonable suspicion."

The approved procedures in the new Patrol Guide section require documentation of all stops and make more explicit the responsibilities of supervising officers up the chain of command.  An officer's immediate supervisor should respond to the scene when feasible.  The supervisor is also required to discuss the circumstances of the stop with the officer who made the stop, and then review the stop and any frisk and search, if conducted, and determine whether the officer's actions were appropriate.

If a stop report is inaccurate or incomplete, the supervisor must direct the officer to make the necessary corrections.  Supervisors also have the responsibility of identifying officers who need instruction, additional training or other remedial action, including, if appropriate, discipline.  However, the procedures are clear that the goal is to make improvements to ensure compliance.  Isolated cases of good-faith mistakes made by officers trying to do their jobs will be dealt with by training at the command level and not by discipline.  As stated in the procedures:

> In most instances, instruction and training should be accomplished at the command level.  The application of the law in this area can be complicated, and investigative encounters are fluid situations in which one event or observation can alter the level of suspicion or danger.  A single erroneous judgment will not generally warrant referral to the Legal Bureau for training. However, members who evince a lack of comprehension of the core concepts of the law governing this procedure should be referred to the Legal Bureau.

**III. NYPD Policies**
**A. Stop and Frisk Policies**

Of course, officers should be disciplined when they engage in deliberate or repeated violations of the Patrol Guide.  But the above statement in the Patrol Guide is important because it addresses a commonly expressed fear of officers—that they will be harshly penalized for minor mistakes of documentation, or in isolated cases of good-faith mistakes by officers trying to do their jobs.  Many officers do not appear to be aware of this provision in the new Patrol Guide.

Another important change to this Patrol Guide section relates to providing the person stopped with an explanation for the stop.  In its remedial order, the court said that the NYPD should consider providing a form or card to people stopped that would provide them with the badge numbers of the officers and some information about why they were stopped, and about agencies that handle complaints from civilians.  The new Patrol Guide section states that, absent exigent circumstances, officers should provide people stopped but not arrested with an explanation of the reasons for the stop and an information card. In connection with this requirement, the Department created a new "tear-off receipt" and instituted a pilot program in seven commands to test this form.  Because this was a pilot program, the court was not asked to approve the contents of the tear-off receipt.  The pilot program began in July 2015.  When the new P.G. 212-11 went into effect in September, the NYPD began using the pilot tear-off receipt citywide.  This receipt contains the following information: the officer's name, command and badge number, a link to the NYPD website, the CCRB and Internal Affairs Bureau (IAB) phone numbers, and

checkboxes for the factors contributing to the officer's suspicion that led to the stop.  The Department is analyzing lessons learned from the pilot program and exploring alternative ways to provide information to people stopped but not arrested.

Approval of P.G. 212-11 was an important step.  However, as noted in the Introduction, ensuring that the Patrol Guide is followed in practice will require effective changes in training, supervision, auditing and incentives.

### B.        Racial Profiling Policies

#### 1.        Milestones

The court orders and the parties' agreements require the NYPD to revise its Patrol Guide prohibition on racial profiling.  The new procedures must state that race, ethnicity or national origin may be considered by officers in taking police enforcement action only when it is part of a specific and reliable suspect description, and that racially defined groups may not be targeted for stops in general simply because they appear more frequently in local crime suspect data.

#### 2.        Status and assessment

The NYPD's policy barring racial profiling and other bias-based policing, P.G. 203-25, was submitted to the court and approved on August 24, 2015.  The policy was then published and distributed by the NYPD.  The new procedure states that police action, including stops, frisks, arrests or other law enforcement actions, may not be motivated, even in part, by the actual or perceived color, ethnicity or national origin of an individual.   Race may be used only if it is part of a reliable and specific suspect

description that includes not just race, gender and age, but other identifying characteristics or information.

The procedures also include a description of Section 14-151 of the New York City Administrative Code prohibiting bias-based profiling. The Administrative Code includes demographic categories in addition to race, color and national origin: creed, age, alienage or citizenship status, gender, sexual orientation, disability and housing status.

Training on the new policy is in its early stages. Assessment of the policy's implementation must wait until training is further along. Moreover, determining whether the NYPD is in compliance with the new policy and the related requirements of the Fourteenth Amendment is complicated and may involve several yardsticks, including both qualitative and statistical measures. The monitor has asked the parties to suggest compliance measures (see Section XI below). The plaintiffs have provided some preliminary suggestions, the NYPD has responded and the monitor will be discussing these issues with the parties.

### C.     Policies Related to the Trespass Affidavit Program (TAP)

#### 1.     Milestones

In *Ligon v. City of New York*, the court issued a preliminary injunction against certain NYPD practices related to stops outside buildings enrolled in the Trespass Affidavit Program (TAP) in the Bronx and ordered specific changes to P.G. 212-59 governing interior patrols in TAP buildings applicable to stops in the Bronx.[2] The new policy must state: (1) the circumstances in which it is permissible to stop a person

---

[2]     *Ligon v. City of New York*, 925 F. Supp. 2d 478 (S.D.N.Y. 2013) (preliminary injunction); *Floyd v. City of New York*, 959 F. Supp. 2d 668, 689 (S.D.N.Y. 2013) (remedies decision).

outside a TAP building on suspicion of trespass; (2) that stops inside and outside TAP buildings must comply with the new stop and frisk policies; and (3) that "mere presence" in a TAP building, and entry into or exit from a TAP building, do not constitute an "objective credible reason" for a *DeBour* Level 1 approach and request for information.

### 2. Status and Assessment

The NYPD prepared a revised draft P.G. 212-59 for review by the plaintiffs and the monitor.   The *Ligon* plaintiffs have made suggested edits, and subsequent draft versions of the policy have been exchanged.   The parties have not yet reached an agreement on a final version of P.G. 212-59.

The *Ligon* plaintiffs and the City and NYPD continue to negotiate a settlement on issues that were not addressed in the *Ligon* preliminary injunction and related order.  This settlement, if reached, will likely include additional modifications to P.G. 212-59.  For this reason, the monitor has not made any final recommendations to the court for approval of a new P.G. 212-59.  Should negotiations be completed, a new P.G. 212-59 for interior patrols of TAP buildings will be finalized, adopted and implemented.  If a settlement is not reached, the monitor will work with the parties to revise P.G. 212-59 so it meets the requirements of the preliminary injunction and related remedial order.

**D.**     **New York City Housing Authority (NYCHA) Policies**

**1.**     **Milestones**

On April 28, 2015, the court in *Davis v. City of New York* gave final approval to the settlement between the City and the plaintiffs.  The settlement requires revisions to P.G. 212-60, which concerns interior patrols of NYCHA buildings.  The settlement also requires changes to related NYPD training materials and the use of a revised Trespass Crimes Fact Sheet, an NYPD form used by officers to describe the circumstances leading to or supporting an arrest for trespass.  The court-approved policy states that officers must have an objective, credible reason to approach a person in or around a NYCHA building, and that simply entering, being in, or exiting a NYCHA building is not an objective credible reason for an approach.

**2.**     **Status and Assessment**

The language of P.G. 212-60 was agreed to as part of the *Davis* settlement and has already been approved by the court in *Davis*, so further revision or submission for approval is unnecessary.  With the consent of the other parties, the NYPD postponed publication of P.G. 212-60 owing to three factors, only the third of which remains relevant.  First, the parties thought it appropriate to defer publication until the policy for stops and frisks (P.G. 212-11) was approved and disseminated.  This has now been done.  Second, it was agreed that the procedures for NYCHA interior patrols should align whenever possible with the procedures for patrol of TAP buildings.  There have been ongoing negotiations between the parties in *Ligon* over P.G. 212-59 (TAP).  However,

the parties have now agreed that any revisions to P.G. 212-59 will not hold up the publication of P.G. 212-60.

Third, there is ongoing discussion among the parties about the creation of a new Trespass Crimes Fact Sheet that would cover criminal trespass arrests in both NYCHA and TAP buildings.  In that fact sheet, officers document and provide information about trespass arrests.  The plaintiffs and the Department agree that it does not make sense to have one form for trespass arrests in NYCHA buildings and a different form for trespass arrests in TAP buildings.  The Department and the *Ligon* and *Davis* plaintiffs have shared drafts of a Trespass Crimes Fact Sheet that could be used in either type of building.  The Department has shared drafts with the city's five district attorneys and heard their concerns.  Once the Department has reviewed these concerns, it will propose a draft Trespass Crimes Fact Sheet for consideration by the *Ligon* and *Davis* plaintiffs and the monitor.

### E.   Stop Report Form

#### 1.   Milestones

The court orders and the parties' agreements require that the NYPD develop and implement a new stop report form to be used by officers every time a person is stopped. The new form must document an officer's stop and be used by supervisors to evaluate whether the stop, and the frisk and search, if conducted, was done properly and in accordance with law.  A stop report form is also a teaching tool that can be used both for training and as part of operations to reinforce for officers the applicable standards for stop and frisk.

The new form must have a narrative section for describing the reasons for the stop as well as a separate narrative section for describing the reasons for the frisk and the search, if conducted.  The court found that without narrative sections, the current version of the stop form, which has only checkboxes for the factors leading to the stop, did not provide sufficient information to determine whether a stop was based on reasonable suspicion.  The court required simplified and improved checkbox categories and a place on the form for the officer to record, in his or her own words, the basis for the stop and, separately, for the frisk and search, if conducted.  Documenting an officer's actions when making a stop provides details so that an officer can refresh his or her memory if called to testify about the incident; and it enables the officer's direct supervisor and others in the NYPD to review the stop and assess whether the officer had sufficient justification for his or her actions.

### 2.       Status and Assessment

A new stop report form designed by the NYPD has been in use in a pilot program since July 2015.  That pilot form includes a narrative section for the officer to describe the basis for a stop and a separate narrative section to describe the basis for a frisk and search, if conducted.   It eliminates "furtive movement," "high crime area" and "suspicious bulge" as checkbox categories.  The pilot form also has a new section that requires the officer's supervisor to confirm that he or she reviewed the constitutionality of the stop and discussed the facts of the stop with the officer.  The supervisor must check a box indicating whether or not:  (1) the basis of the stop was reviewed with the officer; (2) the report was accurate and complete; (3) the supervisor was present on the scene; (4) the corresponding activity log entry was reviewed; (5) there was a sufficient basis for the

16

stop; and (6) there was a sufficient basis for the frisk or search, if conducted.   The supervisor must also note whether any corrective action was taken, if appropriate.

The pilot program ran in five precincts, a Transit District and a housing PSA for 90 days, from July 1, 2015 through September 30, 2015.   There were two versions of the stop report form used for the pilot.   A smaller version of the form was designed to fit into an officer's memo book without being folded.   Instructions for completing the form were printed on a separate document that also fit into the officer's memo book.   A larger version of the stop report form was printed on an 8½ x 14 sheet of paper, with the instructions on the back of the form.   The two stop report forms differed in size and format only—the content was identical.   Four commands started with the smaller form and three commands started with the larger one.   After 45 days, the pilot commands switched forms so that each command used both forms.   Almost 600 stop reports were prepared during the pilot.

The Risk Management Bureau (RMB) oversaw the pilot program, conducting training on the new forms for the members of the pilot commands, monitoring use of the forms, conducting focus groups of officers and supervisors, and administering surveys. Training regarding the pilot program also was provided at promotional classes for sergeants, lieutenants and captains.   Surveys were distributed to officers in the seven pilot commands to elicit feedback about the content of the stop forms and the ergonomics and clarity of the two versions.   In addition, the Quality Assurance Division (QAD) reviewed the stop forms from the pilot commands for potential deficiencies, including whether the stop report form articulated reasonable suspicion for the stop and, if conducted, the frisk and search.

The RMB analyzed the data as well to determine whether there were qualitative differences between the two versions of the report form when completed, whether the officers expressed a preference and, if so, whether using the preferred form increased the likelihood that the report would be filled out accurately.  The Department has made recommendations for revising the new form and the plaintiffs have made additional suggestions.  The monitor will work with the parties to finalize the form and submit it to the court for approval.

Once the new stop report form is approved, the Department will need to change its SQF (stop, question and frisk) database to conform to the new form, provide in-service training on the new form, and revise existing procedures and training materials as needed.  The NYPD is also developing a new online records management system that will incorporate the new stop report form.  When the new records management system is completed, police officers will be able to access and prepare the stop report on their smartphones and tablets.

The Department is continuing to analyze the information from the pilot program.  However, it has shared several observations.  The NYPD found that there was a 20 percent greater reduction in reported stops in the commands that were using the new forms, compared to other commands throughout the city that were using the current form (formerly known as the UF-250).  The NYPD noted, however, that whenever a new procedure or form is rolled out, there is generally a temporary decrease in activity or use of the form.  The stop report form also documents whether a tear-off receipt was given to persons stopped but not arrested.  In the pilot, absent exigent circumstances, the officers were required to offer the tear-off receipt to persons stopped but not arrested.  For the

pilot, the NYPD found that in a significant number of stops, officers did not give the tear-off receipt to persons stopped but not arrested.  There are several possible reasons for this.  For example, the officer might not have offered the receipt because of exigent circumstances; or the person stopped might have walked away before the receipt was offered; or, contrary to policy, the officer might not have offered the receipt.

The Quality Assurance Division also reviewed the forms to assess whether officers appropriately articulated reasonable suspicion for the stops, reasonable suspicion that the person stopped was armed and dangerous for those stops where a frisk was conducted, and an appropriate basis for the search, if conducted.  QAD found that 28 percent of the stop report forms analyzed did not properly articulate reasonable suspicion for the stop, 27 percent of the forms documenting a frisk did not properly articulate reasonable suspicion for the frisk, and 16 percent of the forms documenting searches did not show an appropriate basis for the search.  In almost every case in which QAD found insufficient basis for the stop, frisk or search, the supervisor in that command nonetheless had signed off on the report and noted there was sufficient basis for the stop, frisk or search.

Although the pilot was conducted before the new stop and frisk policies were issued, QAD's analysis does illustrate the gaps in knowledge among officers, reinforcing the importance of new in-service training on the revised stop and frisk policies and the

new stop report form, and of the role of supervisors in evaluating the constitutionality of stops and frisks. These are matters of concern on which the monitor will be reporting in the future.

## IV.     Training

### A.     Monitors' Observations of Police Academy Training

In the monitor's discussions with NYPD executives, they have emphasized that they view training improvements as a high priority and want to make significant changes. For example, the Department has embraced the concept of experiential training. It has dedicated a group of excellent instructors to develop scenarios that can be used in the mock environments at the new Police Academy and elsewhere. Beginning in October 2015, recruits were sent to precincts for twelve days where they partnered with officers, met with members of the community and were oriented to what they would face upon graduation. All this was to give the recruits more context for their classroom training. In the period covered by this report, the Department has produced new training material and is in the process of developing more substantial changes. In doing so, it has retained well-respected outside experts, reached out to other police departments, and welcomed the advice of experts on the monitor team and those retained by the plaintiffs.

The Department recognizes that more work needs to be done and, as stated, has welcomed suggestions. To that end, and as part of the monitor's role, the monitor team spent many hours at the Police Academy observing classes and role-play scenarios on the subjects relevant to the monitor's mandate—stop and frisk, racial profiling, and housing and interior patrols. The team saw classes for recruits in the January 2015 recruit class and then again for the June and October recruit classes. The team saw many instructors,

sometimes observing the same teacher present the same material to different classes, and often seeing the same material taught by different teachers. Based on these observations, the monitor provided the NYPD with the team's views and recommendations for improvements in Academy training. Written training materials are important, and the recruit training materials discussed in the sections below were developed after thoughtful review and revisions. However, written materials are just one piece of effective training. Unless the materials are communicated effectively, they will not be as useful as they should be.

### 1.      Teaching Quality

The quality of the instruction at the Police Academy is mixed. The monitor and his team observed some excellent teaching and some poor teaching. This unevenness suggests the Academy should develop a more rigorous program of instructor development. Although instructors must now attend a course on Methods of Instruction focused on adult learning techniques, Academy instructors could use additional training to help them become more effective teachers. For example, strong teachers could be partnered as mentors with new teachers or weaker teachers to help them improve their teaching skills. If the performance of weak teachers does not improve, consideration should be given to removing them from the classroom.

Instructors would also profit from additional training in the substantive areas relevant to their teaching duties; for example, advanced seminars in social psychology, history and law. There is a substantial literature that relates these disciplines to police work, and instructors should be familiar with this literature. It was evident from observing lessons delivered by some instructors that simply providing a lesson plan,

student guide and a two-week course in Methods of Instruction on top of their own experiences is not sufficient to deliver quality instruction for officers in the increasingly complex and changing world of 21st-century policing.

### 2.  Curriculum Development

As for the court-approved lesson plans, student guides and PowerPoint slides, they are a good start.  However, the curriculum should use other teaching methods as well; for example, developing more videos, assigning more independent readings and using more scenarios of realistic policing situations.  Instructors could then draw upon a more varied and interesting set of tools than PowerPoint slides.

The Academy is in the process of developing a more robust scenario-based instruction platform.  The instructors dedicated to this effort are among the best the monitor team has seen in the Academy.  The scenario sessions the team observed were very effective.  The Academy should, however, more closely integrate these scenarios into the broader instructional goals of the curriculum.  For example, the staff developing the courses should work with the scenario team to develop the scenarios; and the scenario team should provide feedback and be involved in the development of the courses.  Most of the lesson plans for the role-play scenarios the monitor team has seen do not include instructor notes and other material that would make the instructional goals clear and facilitate quality control in the implementation of scenarios when they are passed on to other instructors.

**3.     Course and Teacher Evaluation**

The monitor team's observations also suggest that the Police Academy should develop a more comprehensive plan for evaluating both the quality of instructors and the content of the curriculum.  Such a plan could include:  (1) Academy evaluators observing classes more closely; (2) asking recruits for their evaluations immediately after the end of the subject area—for example, when the class completes "Policing Legally" (see below at pages 23-25), recruit officers could complete an evaluation of the sessions on this topic; and (3) evaluating certain training, for example in-service training, by surveying officers' knowledge and attitudes both before and after the training to see whether the training accomplished its goals, and, if not, what could be improved.

One specific recommendation regarding the content of the Policing Legally sessions is to provide recruits with more instruction on how to prepare a stop report form and activity log.  Greater emphasis should be put on developing, articulating and writing reasonable suspicion for stops and frisks.  Recruits should be required to prepare stop reports based on scenarios they observe.  More experienced officers and supervisors have said that they too would benefit from this kind of training once the new stop report is approved.

As for evaluating instructors, it would be useful if they were evaluated early in an instructor's assignment.  Instructors with poor evaluations could then be identified early and given the support they need.  This support could include more intensive training or more supervision.  Performance by recruits on trimester exam questions relating to Policing Legally, Policing Impartially and Policing in a Multicultural Society could be

used as one way to obtain feedback concerning how well the instructor communicates the curriculum.

### 4.      Subject Integration

Street encounters and trespass enforcement are critical areas of police operations, and training would be enhanced if the legal and other principles in those areas were integrated into other relevant areas of instruction (e.g., car stops, use of force, racial bias, and search and seizure). This integration should focus on both the timing of the blocks of instruction and the ways in which the areas of instruction relate to each other. Universities often use "teaching teams" to handle complex multi-disciplinary topics, and the Academy could benefit from a similar approach.

### B.      Recruit Training

#### 1.      Stop, Question and Frisk

##### a.      Milestones

Training for recruits on stop, question and frisk must provide recruits with the standards for what a stop is, when a stop may be conducted and when a frisk may be conducted.

##### b.      Status and Assessment

In April 2015, the court approved training materials—Policing Legally: Investigative Encounters—for the recruit class then at the Academy. The training materials included a student guide and a PowerPoint presentation. The NYPD also prepared an instructor lesson plan, exam questions and role-play scenarios. The course covers *Terry* stops and the four levels of *DeBour* encounters; what constitutes a stop;

when a stop may be conducted; when a frisk may be conducted; and when a search may be conducted.

Training on stops and frisks for the January class of recruits began in May 2015, and the monitor team observed training, as did one of the plaintiffs' experts.  Slight revisions were made to the Policing Legally course for the June 2015 and October 2015 recruit classes.  These revisions were reviewed by the parties and approved by the monitor.  The Academy also expanded the use of scenarios for its recruit courses.  This expanded scenario-based training uses the mock environments (e.g. subway stations, streetscapes) at the new Academy and provides recruits with additional experiential training.  The NYPD has begun a new field orientation program for recruits.  They are taken out of the classroom for approximately two weeks during their six-month Academy training and placed in precincts, transit districts and housing PSAs to get hands-on experience and a practical context for their classroom training.

## 2. Racial Profiling

### a. Milestones

The NYPD's training regarding racial profiling must clearly state the difference between the constitutionally permissible use of race in a stop based on a specific, reliable suspect description and the constitutionally impermissible targeting of racially defined groups for stops.

### b. Status and Assessment

In April 2015, the court approved training materials for the Academy's Policing Impartially course, including a student guide and PowerPoint presentation.  The NYPD also prepared an instructor's lesson plan, exam questions and scenarios, which were

reviewed by the parties and approved by the monitor.  These materials address the Department's prohibition against racial profiling and other forms of bias-based policing, as well as the impact of unconscious bias on the exercise of discretion.  They also include information on police history and bias, and how knowledge of this history can help officers be more effective.  The Academy also provides recruits with a course on Policing in a Multicultural Society.

Based on experience from the January training class, changes to the training on racial profiling were made for the July and October 2015 Academy classes.  These included additional scenarios to make recruits more aware of issues regarding bias and how to avoid it.  These changes have been reviewed by the parties and approved by the monitor.  The NYPD anticipates additional revisions to its recruit training on racial profiling as it develops in-service training on implicit bias and procedural justice, described below in Section IV.C.5.  In addition, the NYPD, the plaintiffs and the monitor are discussing development of a training scenario to address the NYPD's revised racial profiling policy (P.G. 203-25) that prohibits the targeting of racially defined groups for stops simply because they appear more frequently in local crime suspect data.

### 3.      TAP Training

#### a.      Milestones

Training regarding stops outside TAP buildings must be included in Police Academy recruit training.  The training must instruct officers that mere presence near, entry into or exit from a TAP building is not an "objective credible reason" to approach a person to request information.

**b.        Status and Assessment**

In April 2015, the court approved training materials for Academy recruits regarding TAP policies (a student guide and PowerPoint presentation).  The NYPD also prepared instructor lesson plans, exam questions and scenarios that were reviewed by the parties and approved by the monitor.  These materials cover stops both outside and inside TAP buildings and are not limited to TAP buildings in the Bronx.

In October 2015, the NYPD combined the TAP recruit materials with the training materials approved by the court in *Davis* governing housing patrols in and around NYCHA buildings.  These materials were reviewed by the parties and were approved by the monitor.  They meet the requirements of the court's orders.

**4.        *Davis*/NYCHA Training**

**a.        Milestones**

On April 28, 2015, the court in *Davis* approved the settlement relating to trespass enforcement in NYCHA buildings, including a lesson plan for training recruit officers on interior patrols.   The lesson plan included discussions of hypothetical situations in NYCHA buildings featuring NYPD officers engaging in both appropriate and inappropriate conduct.  The court also approved a lesson plan for officers assigned to the Housing Bureau dealing with enforcement of the NYCHA house rules. (See Section IV.C.4 below.)

**b.      Status and Assessment**

The NYPD incorporated the court-approved lesson plan on interior patrols into Academy training for its January 2015 recruit class.  For the July and October 2015 recruit classes, the NYPD combined the chapters on TAP and NYCHA interior patrols so that the lesson plan included court-approved materials from the TAP lesson plan and the NYCHA lesson plan.  The student guide and the PowerPoint also combined TAP and NYCHA materials.  Some of the hypothetical examples from the *Davis* lesson plan were revised to feature TAP situations.  These materials were reviewed by the parties, finalized in November 2015 and approved by the monitor.  They meet the requirements of the *Davis* settlement and the *Ligon* preliminary injunction.

**C.      In-Service Training**

**1.      Command Level Training**

**a.      Milestones**

In-service training is conducted at several venues, one of which is at the officer's command.  There, the training sergeant or others can and often do conduct brief training sessions.  The most common time for command training is at roll call.  Roll call is at the beginning of the officer's shift; it is a time when supervisors give assignments and alert officers to relevant information.

**b.      Status and Assessment**

The NYPD decided to produce short videos regarding P.G. 212-11 for roll call training to ensure that the training and information provided to NYPD members is uniform.  The first of these videos has already been produced and played at roll call for all officers.  In this video, the Chief of the Department, James O'Neill, introduced the

new policy for investigative encounters and briefly explained its contents. The Department is producing four additional videos: a video explaining (1) Level 1 Requests for Information; (2) Level 2 Common Law Right of Inquiry; (3) Level 3 *Terry* stops; and (4) documentation requirements and supervisory responsibilities for Level 3 stops. The scripts for Chief O'Neill's introductory video and the three videos for each *DeBour* level were drafted by the NYPD, reviewed and commented on by plaintiffs, and, after editing, approved by the monitor. The Levels 1, 2 and 3 videos are expected to be shown at roll calls starting in February 2016. The script for the video dealing with documentation and supervisory responsibilities will await the approval of the new stop report form (see Section III.E above).

The video for Level 3 stops will also address one of the issues discussed in the court's opinions. In 2012, the NYPD produced a video on stop and frisk (SQF Training Video #5) that described what constituted a stop requiring reasonable suspicion. The narrator in the video states:

> Usually just verbal commands, such as STOP, POLICE!!!, will not constitute a seizure. However, a verbal command, plus other actions may be considered a seizure—other actions, such as: using physical force to subdue a suspect; physically blocking a suspect's path; grabbing a suspect by the arm, shirt or coat; pointing a gun at a suspect; using an ASP or baton to contain a suspect; or placing a suspect against a wall or on the ground.

In the *Ligon* preliminary injunction opinion, the court ruled that this misstates the law and that if an officer yelled "STOP, POLICE!!!" and the person stopped, the result would "usually" constitute a *Terry* stop. "Indeed, it is difficult to imagine many contexts in which an officer shouting this command, followed by the person stopping, would not

constitute a *Terry* stop."[3]  In accordance with this ruling, the Level 3 video that will be used for roll call corrects the earlier error.  The script for the video says:

> The question of whether the circumstances create a situation where a reasonable person would not feel free to leave typically involves a consideration of all the facts, such as whether the officer's gun is drawn and visible, whether the individual was prevented from moving, the location of the encounter, how many officers were involved in the encounter, whether verbal commands were given, and the content and tone of the commands.  Tone really matters.  You may have the impression from earlier materials that when an officer yells "STOP, POLICE!" and the person stops, that would not usually constitute a stop.  That is not the case.  If an officer is approaching someone from behind and says, "Hey, can you hold up for a second?" that may not be a stop, but if an officer yells forcefully "Stop!" and the person stops, a court would likely find that a reasonable person would not feel free to leave.

The Department also issued a training memorandum, reviewed by the parties and approved by the monitor, on the NYPD's revised policy prohibiting racial profiling and bias-based policing, P.G. 203-25.  The memo summarized the new policy, defined racial profiling and included text from Administrative Code Section 14-451 prohibiting bias-based profiling based on several enumerated categories.  This training memo was sent to all training personnel on October 30, 2015 and was read in its entirety at roll call trainings during the month of November 2015.

### 2.  SQF Reference Materials

When the Department issued its revised procedures on stop and frisk in September 2015, it also prepared reference materials for an online intranet library (Investigative Encounters Resource Center).  These materials include a detailed reference guide, a PowerPoint presentation, summary charts and an at-a-glance booklet regarding

---

[3]   *Ligon*, 925 F. Supp. 2d at 535.

investigative encounters that summarize the new procedures and the applicable legal standards under *DeBour* and *Terry*.  The library also contains relevant forms (including the stop report form and tear-off receipt used in the pilot described in Section III.E above), legal bulletins and videos.  The Department has created a new activity log insert summarizing the four levels of investigative encounters outlined in *DeBour*, as well as a police officer's authority and limitations under each.

### 3.        SQF In-Service Training at the Academy

#### a.        Milestones

Training for current members of the service is critically important and the most time-consuming of the NYPD's training tasks.  A central part of in-service training is when officers are assigned to locations outside their precincts (e.g., to the Police Academy) and trained in concentrated blocks of time devoted to particular subjects. Thirty-six thousand members of the service must go through the training to reinforce the proper legal standards and new policies and address any prior misunderstandings that may have developed.  The in-service training should include materials on:  stop and frisk; trespass enforcement; proper documentation of stops; the Department's policy on racial profiling and bias-based policing; and new supervisory responsibilities under P.G. 212-11.

#### b.        Status and Assessment

The Department is currently drafting a curriculum for a Department-wide in-service training on stop and frisk, and invited the plaintiffs and their experts to review and comment on an early draft.  The one-day program will include a classroom session on the law and policy, as well as scenario-based exercises for members of the service.

31

The scenarios will include examples of self-initiated stops and radio runs.  The current plan is for supervisors to be trained in the same sessions as patrol officers, and there will be materials addressing their role in supervising and reviewing stops.  The monitor will assess the NYPD's in-service training after the training is approved by the court and the monitor team has observed the training sessions.  These training materials, once approved, will likely include changes that should be incorporated into the recruit training.

### 4.   *Davis*/NYCHA In-Service Training

#### a.   Milestones

The court-approved settlement in *Davis* includes a module on NYCHA house rules for officers patrolling public housing.

#### b.   Status and Assessment

The NYPD plans to conduct a separate day of in-service training for the Housing Bureau and other members of the service who patrol NYCHA buildings.  That training will include a module on NYCHA house rules approved by the *Davis* court, as well as other training related to public housing.

### 5.   Implicit Bias and Procedural Justice

#### a.   Milestones

In its remedial order, the court noted that it might be appropriate to conduct training for officers on the effect of unconscious racial bias.  The NYPD has recognized the importance of teaching officers about the concept of implicit bias and the related concept of procedural justice.

#### b.   Status and Assessment

The NYPD is committed to including training on implicit bias and procedural justice as part of its in-service training.  It currently plans to add at least one day to its in-

**IV. Training**
**C. In-Service**

service training curriculum for these topics.   The Department has retained Professor Tracey Meares and Professor Phillip Atiba Goff to serve as consultants as it develops this training.   Professors Meares and Goff have expertise in policing and in providing training on implicit bias and procedural justice.   The Department expects these new training materials to be created in the next several months.   The NYPD plans to incorporate implicit bias and procedural justice concepts into its training in many areas of enforcement beyond stop and frisk, such as issuing summonses, dealing with victims and making arrests.   The monitor will assess the Department's efforts on these topics after new training materials are developed and incorporated into the curriculum and the monitor team has observed the training.

**D.      Training on Supervision**

**1.      Milestones**

Under the new NYPD stop and frisk procedures, supervisors will be responsible for reviewing the legality of stops.  Current and newly promoted supervisors and field training officers must be trained on these new responsibilities and on their responsibilities for reviewing trespass arrests.  In addition, the leadership training for NYPD executives must be revised to incorporate training on the responsibilities of supervisors relating to the court orders and the parties' agreements.

**2.      Status and Assessment**

The NYPD plans to train supervisors in several ways on their new responsibilities under revised P.G. 212-11.  Initially, they will view roll call videos, including a video on documentation requirements and supervision responsibilities.  They will then receive stop and frisk training during the upcoming Department-wide in-service training.  Training for supervisors will deal with their new duties and responsibilities under the revised procedures.  The monitor will assess compliance for this area after the in-service training is conducted.  With respect to housing patrols, supervisory responsibilities regarding stops will be part of the stop and frisk in-service training.  Beyond this training, the parties will be discussing any additional training that may be necessary relating to trespass enforcement.

Newly promoted supervisors also need training in their promotional classes. Since the publication of the NYPD's new stop and frisk procedures, P.G. 212-11, the Department has promoted new classes of sergeants, lieutenants and captains.  The first promotions were of captains in October 2015.  Although the NYPD had prepared an

34

"SQF refresher" module, the materials dealt with supervisory responsibilities only in a cursory way.  There was not enough time before the class began for rewriting the materials to address the supervisory responsibilities more completely.  Therefore, the module was not used for this class of new captains.

New sergeants and lieutenants also were promoted, and materials regarding the new stop and frisk policies and supervisory responsibilities were included in classes for the new sergeants and lieutenants in November and December.  The monitor team observed the sergeants' and lieutenants' training.  Although some aspects of that training were useful, the materials were not sufficient.  Among other things, the training needs to include a fuller discussion of what leadership means in the NYPD and of the changes to NYPD policies and practices, why they are being made and why they are important for the NYPD.

The Department has agreed that further work needs to be done on promotional training and additional materials will be prepared based on the in-service training that is now being developed.

The Field Training Officer (FTO) Field Guide was revised in June 2015 with respect to stops and frisks and trespass stops outside TAP buildings.  The Department prepared a new section of the FTO Field Guide entitled "Investigative Encounters" and a refresher training module for FTOs, which includes a legal review of the prohibition against racial profiling and the policies that govern housing interior patrols.  These materials were reviewed by the parties and approved by the monitor.  In June 2015, FTOs

had one day of in-service training at which they were provided presentations on several topics, including the new stop and frisk training that the new recruits had received at the Academy. A second FTO in-service training session was conducted in October 2015.

In addition, in September 2015, the Academy delivered stop and frisk training to the training sergeants who serve in the Department's many commands. This training module provided training sergeants with an overview of the new Patrol Guide procedures regarding investigative encounters and racial profiling, the law of investigative encounters and the contents of the NYPD's new online Investigative Encounters Resource Center. The training sergeants will be responsible for retraining officers who have been identified by supervisors as needing retraining. Going forward, the monitor will be examining how well this retraining is being implemented.

## V.        Supervision

If the changes required by the court orders and the parties' agreements are to be implemented and take hold, the supervisors who have most to do with the officers on the street must play an increased leadership role. This includes, especially, sergeants, who are closest to the officers, and precinct and unit commanders, who set the tone. These supervisors must ensure that their subordinates are implementing the changes required by the court orders and the parties' agreements—that the stops, frisks and trespass arrests made by their officers are legal and proper and that these activities are properly documented. Supervisors must take a more active role in supervision, oversight, teaching and, when appropriate, discipline.

On the question of discipline, although most officers understand that discipline is appropriate for deliberate violations of law or policy, they often express fear that they will face serious disciplinary action or not be indemnified in lawsuits over minor or

inadvertent mistakes in documentation or for isolated cases of erroneous but good-faith stops or frisks.  The newly approved P.G. 212-11 announces a contrary policy for the Police Department.  And, as far as can be determined, officers have not been denied indemnification for minor infractions or reasonable, honest mistakes.  Sergeants and other supervisors need to take an active role in trying to correct these misperceptions, especially as they may affect decisions by some officers to make or refrain from making appropriate stops.

These observations about the supervision necessary to implement the changes required by court orders and agreements do not conflict with the goals and needs of the Department.  They are, in fact, similar to many comments that Commissioner Bratton and others at the NYPD have made about the need more generally to increase supervisory responsibility for sergeants and other supervisors and to push decision-making down the command structure.

### A. Milestones

The court orders and the parties' agreements require that supervisory review of stop report forms and activity logs include a review not just of the completeness and accuracy of the forms, but of the constitutionality of the stop and, if conducted, the frisk and search.  If an officer's actions are improper, the officer's supervisor must take corrective action.  The *Ligon* remedy also requires the NYPD to develop procedures for supervisors to ensure that a stop report form is prepared for every trespass stop outside a TAP building in the Bronx.  The *Davis* settlement provides that any additional reforms regarding supervision of officers engaged in trespass enforcement in or around NYCHA residences will be addressed by the monitor in consultation with the parties.

### B.        Status and Assessment

The new NYPD Patrol Guide procedures governing stops and frisks, P.G. 212-11, requires supervisors to respond to the scene of stops when feasible, discuss the circumstances of the stop with the officer making the stop before the end of the officer's tour, and review the officer's stop report form and activity log.  The supervisor must determine whether the stop was based on reasonable suspicion of a felony or Penal Law misdemeanor; if a frisk was conducted, whether the frisk was supported by reasonable suspicion that the person was armed and dangerous; if a search was conducted, whether it was reasonable; and if force was used, whether the use of force was reasonable.  The supervisor must direct the officer to make corrections to the stop report form if it is inaccurate or incomplete, and, if appropriate, instruct the officer or refer the officer for additional training or other remedial action, including, if appropriate, disciplinary action.

The NYPD has stated that the review and discussion with the officer who made the stop is intended to be an occasion for teaching, rather than an attempt to catch an officer in a minor mistake of the law or policy.  As noted in P.G. 212-11, instruction and training to correct isolated mistakes will generally take place in the officer's command.  However, officers who show a consistent lack of understanding of the law in this area should be referred to the Legal Bureau for retraining.  The new stop report form will require supervisors to document their review and whether they took or directed any follow-up action, if appropriate.

The NYPD's new written policies meet the requirements of the court orders and the parties' agreements.  However, the limited review of supervisory actions based on the approximately 600 stop report forms completed during the pilot program described above in Section III.E suggests that more needs to be done before supervisors understand and exercise their new responsibilities.  In future reports, the monitor will assess compliance by looking at whether the supervisory policies relating to stop and frisk and trespass enforcement are being effectively implemented in practice.  The monitor team will do so by, for example, reviewing the Department's own auditing and self-inspections on these subjects and by undertaking an independent review of a sample of stop report forms and other documentation.

## VI.    Body-Worn Cameras (BWCs)

Beginning in December 2014, the NYPD instituted a small voluntary pilot program in which 54 officers volunteered to wear body-worn cameras (BWCs). The purpose was not to replace or circumvent the larger pilot program that had been ordered by the court.  The purpose was primarily to learn about the technological challenges that might be faced in what the Department announced as its ultimate goal—to equip most of the members of the service with BWCs.  The issues raised by equipping much of the police force with cameras include, but also go beyond, what the court stated as the primary focus of the pilot program it ordered—reducing unconstitutional stops and frisks. Nonetheless, the monitor team, the NYPD and the other parties recognized that it made sense for the court-ordered pilot to be designed so that the Department and the public could learn about other issues that would accompany a wider deployment of cameras. That is one reason the monitor recommended, and the court ordered, with the consent of the parties, that the pilot be restructured so that a controlled experiment could be done.

However, using the court-ordered pilot to educate the Department and the public about issues that go beyond the subject matter of the court's order raises additional challenges for both the monitor and the parties.   Before a BWC program can be implemented, policies and procedures must be in place.   Some of these will be within the monitor's area of responsibility and some will not, which means that on some issues, the monitor will have a deciding voice, and on others, more deference will be given to the Department's preferences.   There certainly may be grey areas where it is not clear whether a policy is covered by the court order.   Those will be discussed and resolved as they arise after discussion with the parties.

### A.      Milestones

The court orders and the parties' agreements require the NYPD to conduct a one-year pilot program for body-worn cameras.   The purpose of the pilot is to assess whether the benefits of the cameras relating to stop and frisk and trespass enforcement outweigh their financial, administrative and other costs, and whether the program should be expanded or terminated.   The monitor will work with the parties to evaluate the pilot. The court ordered that the monitor establish procedures for reviewing stop recordings by supervisors and senior managers, preserving stop recordings and measuring the effectiveness of BWCs in reducing unconstitutional stops and frisks.   The court required that BWCs must be worn for a one-year period by officers on patrol in one precinct per borough—specifically, the precinct with the highest number of stops in that borough during 2012.   These NYPD commands were identified as the 23rd, 40th, 75th, 103rd and 120th Precincts.

### B.       Status and Assessment

As noted in the monitor's first report, requiring officers in these five precincts to wear the cameras might not provide the best information regarding the benefits and costs of body-worn cameras, including whether they will be effective in reducing unconstitutional stops and frisks.  The precincts with the highest counts of stop reports in 2012 were no longer the ones with the highest number of reported stops in 2014 or in 2015.  In 2012, the 75th Precinct had the greatest number of reported stops in the city; in 2014, the 75th Precinct was down to sixteenth place (and in 2015, it appears likely to be around twentieth).  Also, the selection of precincts in advance prevents the use of a rigorous randomized experimental design, because it precludes a random selection of commands matching those that had cameras with those that did not.

The monitor team examined and discussed with the parties how to design a pilot that will yield more robust and useful information.  The monitor recommended to the court that a randomized experimental design should be implemented.  Such a design allows researchers to assume that the only systematic difference between the "control" group (here, those without cameras) and the "treatment group" (those with cameras) is the presence of the intervention (i.e., use of cameras).  This approach permits a clearer assessment of causes and effects.  The monitor is currently considering that the NYPD use a variant of the classic randomized controlled trial called "cluster" randomization.  In these trials, clusters (groups) of subjects, rather than individual subjects, are randomly allocated to treatment and control conditions.  In a cluster-randomized controlled trial, NYPD officers would be randomly allocated by precinct to the body-worn camera treatment group or non-body-worn camera comparison group.

In December 2015, the court ordered, with the consent of the parties, that the NYPD use a randomized experimental design for the one-year pilot program. It is anticipated that roughly 1,000 officers will be equipped with body-worn cameras. The use of a randomized experimental design for the body-worn camera pilot will ensure that the pilot will provide the parties, the monitor, the court, and the public with better information to evaluate the effectiveness of body-worn cameras in reducing unconstitutional stops and frisks and to assess the costs and benefits of the body-worn cameras.

The City's procurement process to acquire BWCs is underway. More than 50 proposals were submitted to the NYPD by September 3, 2015. The NYPD created a committee to review these proposals. The procurement committee is in the process of reviewing and evaluating technical proposals and on-site demonstrations from potential vendors. Vendors achieving a satisfactory evaluation will be invited to submit a pricing proposal.

In November 2015, the NYPD informed the monitor that the Department's plans for the research and development of the BWC pilot have changed since the start of this monitorship in 2014. These plans now include outreach to other police departments that use BWCs, review of BWC policies from other jurisdictions and model policies, consideration of other ongoing Department pilots and operational and technical constraints, and outreach to obtain input from community and other interested groups.

The NYPD created an internal BWC working group, which has plans to: revise and expand its body-worn camera policy with input from internal and external stakeholders, including community members; develop training materials for the personnel

who will use and maintain the cameras and handle video footage; and assist in devising implementation and audit plans.  In November and December 2015, members of the internal BWC working group made calls to other police departments that have implemented body-worn camera programs.  In December, members of the working group visited three departments (Los Angeles, Las Vegas and Oakland) that have implemented BWC programs to learn about their programs.

In January 2016, the NYPD shared a draft outline of BWC policies with internal stakeholders, plaintiffs' counsel and the monitor.  The draft outline does not necessarily state the Department's position on what the final policies should be, but is intended to begin discussions with the monitor and the plaintiffs and with external stakeholders.  The draft outline covers issues such as when the cameras should be recording, data retention, accessing and reviewing footage, privacy concerns and the use of footage as evidence, among other things.  The Department plans to engage in outreach to external stakeholders to get feedback and input on the draft outline.  This outreach will include:  officers of every rank; unions; community members and organizations; criminal justice stakeholders, including the courts, district attorneys and defenders' organizations; victims' advocacy groups; privacy groups; the City Council; external oversight agencies; and other interested parties and organizations.  The NYPD expects to develop a final BWC policy in March 2016.

The Department will also need to draft the necessary training materials to train the officers who will wear the cameras and the personnel who will maintain the cameras and the footage; deliver the required trainings; complete the pilot design; devise

implementation plans; and devise auditing procedures to track compliance with BWC policies.

In the current reporting period, the monitor team continued to test the feasibility of designing and implementing a rigorous cluster-randomized controlled trial.  With the assistance of the NYPD, the monitor team collected data on policing, crime and neighborhood conditions in the 77 NYPD precincts and on officers assigned to work in those precincts.   The monitor team's preliminary analyses indicate that matching precincts into pairs and randomizing precincts within each pair yields balanced treatment of control clusters (precincts) and units of analysis (officers).  To ensure that the best precinct matches are made for inclusion in the BWC randomized experiment, one member of the monitor team, Professor Anthony Braga, toured all 77 precincts with members of the NYPD Risk Management Bureau to examine relevant community dynamics within and across the precincts.  Professor Braga noted important qualitative variations such as the rapid gentrification of certain neighborhoods, the presence of street crews and gangs, and variations in the physical environment.  These and other factors will be considered before the appropriate randomization strategy is chosen.

**VII.    Auditing**

**A.    Quality Assurance Division**

**1.    Milestones**

As part of the remedial measures, the NYPD must maintain an effective auditing system for ensuring the constitutionality of stops and frisks and trespass arrests. The NYPD's Quality Assurance Division (QAD) is responsible for evaluating compliance with the Department's policies and procedures, including those relating to stop and frisk and trespass enforcement. QAD evaluates each precinct, transit district and housing PSA commands, as well as borough task forces, the Detective Bureau, the Organized Crime Control Bureau, the School Safety Division and the Traffic Enforcement Division. The audit procedures must assess both compliance with constitutional standards and whether the paperwork has been properly prepared. The Department must also perform audits to assess the extent to which stops and frisks are being conducted but not documented.

**2.    Status and Assessment**

The NYPD recognizes that its auditing practices need to be revised to meet the requirements of the court orders and the parties' agreements, and it has begun the process of doing so as part of the Department's efforts to improve auditing more generally. A CPA with extensive auditing experience who previously worked at a major accounting firm now directs QAD. QAD is developing new audits to evaluate compliance with the new Patrol Guide sections on investigative encounters (P.G. 212-11) and the new stop report form, upon its approval.

The monitor requested that QAD draft an audit plan for stop and frisk and trespass enforcement that would state the audits that QAD plans to conduct in 2016, the audit

procedures and methodology to be used for each audit, including the number of samples to be tested and the sampling methodology for the audits, and the frequency of the audit and the audit period to be tested.  The monitor recently received a draft audit plan.  The NYPD has been discussing possible audit protocols with members of the monitor team and will be discussing the draft audit plan with the monitor and the plaintiffs in the near future.  Described below are some of the recent audits that QAD has conducted.

### a.   Current Audits of Stop Reports and Activity Logs

The NYPD has reported that QAD audited more than 6,000 stop report forms and associated activity logs from January 1, 2015, to September 30, 2015, but that these reviews used the prior approach, which did not focus on the constitutionality of the stops, frisks and searches.  However, the Department states that in November 2015, QAD revised its SQF audits to evaluate the officer's description of an encounter to assess whether the description stated a lawful basis for the stop, and for the frisk and search, if these were conducted.  The revised audit methodology, as described by the NYPD, also assesses whether supervisors effectively performed their responsibilities in reviewing the basis for stops and frisks, or whether they instead signed and approved forms that did not articulate reasonable suspicion or that were missing information.

The NYPD has reported some of its findings and recently provided these audit reports, which the monitor team has not yet had the opportunity to review.  The NYPD states that from November 5, 2015 (when the revised SQF audits began), to December 10, 2015, QAD evaluated 859 activity log entries made in 62 commands for compliance with the new Patrol Guide procedure.  QAD determined that officers articulated individualized reasonable suspicion for the stop in 81 percent of those activity log entries.

QAD found that officers articulated the basis for the frisk in 64 percent of the activity logs documenting a frisk and the basis for the search in 71 percent of the activity logs documenting a search.

These results reported by the NYPD should not be taken as conclusions about the Department's compliance with the mandates of the court orders and the parties' agreements, because the audits were not done on the stop report form that is now being developed for approval. That form will include more informative check boxes and spaces for narrative descriptions. And the audits were done before the Department provided significant training for the members of the service. However, the audits, together with other information reported elsewhere in this report (see subsections below), suggest that the Department faces substantial challenges in educating its officers and supervisors on the requirements of its new policies, including the requirements of documentation and supervisory review of stops.

### b.    Audit of Revised Stop Reports Used in a Pilot Program

Revised stop report forms were used in a pilot program in seven commands, as described in Section III.E above. QAD audited the forms from the pilot and found that 28 percent of the stop report forms did not properly articulate reasonable suspicion for the stop, 27 percent of the forms documenting frisks did not properly articulate reasonable suspicion for the frisk, and 16 percent of the forms documenting searches did not state an appropriate basis for the search. Even though QAD found these deficiencies, it also found that in almost all cases supervisors did not note the deficiencies on the stop report form, and did not direct changes in the stop report or require any other corrective action. The NYPD acknowledges a need for improvement in this area; it says it expects

compliance to improve once officers and supervisors have more training on the procedure and the law.

### c.      RAND Audits

In the monitor's first report, the question of under-reported stops was highlighted. These are situations in which stops were made but no corresponding stop report was filed.  There are several reasons why a stop might have occurred without the appropriate documentation.  The officer might not have understood when the report was required; or perhaps, more seriously, the officer did know the report was required but deliberately decided not to file one.

One way the Department attempts to measure under-reporting is through what it calls a "RAND audit."  This is an audit methodology recommended to the Department in 2007 in a report done by the RAND Corporation at the request of the NYPD.  In a RAND audit, the Department looks at radio transmissions.  QAD uses keyword searches of the NYPD's dispatch system (ICAD) to identify events that likely involved a stop encounter. These keywords include "stopped," "show-up," "holding" and "warrant check."  Once an event that looks like it might have been a stop is identified through reviewing dispatch transcripts and/or listening to the corresponding radio transmissions, QAD looks through NYPD records to determine if a corresponding stop report was prepared.  QAD then forwards the audit to the command for investigation and follow-up.  The commanding officer determines if the encounters identified by QAD were in fact *Terry* stops, for which a stop report was required to be completed, or instead are "false positives."  A "false positive" might occur, for example, when the radio transmission used the word "stopped" but was describing a stop of an automobile based on probable cause that a

VII. Auditing
A. Quality Assurance Division

traffic infraction was committed.  If, however, it is determined that a stop was made and a stop report was required but not filed, the officer is directed to prepare a report retrospectively.  The command may also take corrective action, such as providing the officer with instructions regarding stop and frisk documentation requirements, directing additional training for the individual or, if appropriate, the command or recommending disciplinary action.  QAD now performs RAND audits in seven commands every month, an increase since June 2015 (when five commands were audited each month) and since 2014 (when two commands were audited each quarter).

In the first half of 2015, QAD conducted RAND audits in 36 commands and identified 53 instances in which it appeared a stop might have been made and a stop report should have been prepared.  The audits were forwarded to the commands for investigation.  In 27 of the 53 cases, the precinct determined that a stop report was not required, either because the officer had probable cause to arrest at the beginning of the street encounter, it was a car stop with probable cause, or it was not a stop at all.  In another eight cases, the stop report was either prepared and on file, or prepared by the officer and not entered into the NYPD database. In one case, the command has not submitted a response.  In 17 other cases, the precinct investigations concluded that a *Terry* stop occurred but was not documented.  In 11 of the 17 cases, the officers were given instructions on stop and frisk documentation requirements.  In five cases, an entry was made in the log at the precinct in which minor infractions are recorded; these minor violations do not go into the officer's personnel file.  In one case, an officer was disciplined and as a penalty lost four hours of compensation time, which can be used as vacation time or as pay.

**VII. Auditing**
**A. Quality Assurance Division**

In the second half of 2015 (through November 2015), QAD conducted RAND audits in 35 commands.  QAD identified 69 encounters in which it appeared a stop report should have been completed but was not, and forwarded that information to the commands for investigation.  According to the NYPD, those investigations determined that 41 of the 68 encounters required a stop report, but that a report had not been completed.  For the 41 stops without a stop report, the commands had the officers involved complete a stop report retrospectively.  QAD is awaiting responses from several commands regarding the remaining encounters.  The monitor does not yet have information on corrective actions taken with respect to these encounters.

> **d.**     **Audits of Enforcement Activities Initiated by Officers**

Another audit that QAD uses to identify stops that are missing the required stop report form is its "police-initiated enforcement audit."  This is an audit of arrests when there is no radio run or individual complainant, but the officer makes an arrest based on his or her observations and investigation—for example, an arrest for criminal possession of a controlled substance or criminal possession of a weapon when the officer sees the controlled substance or weapon.  QAD audits up to 25 arrests that result from "police-initiated enforcement" in each command quarterly.  When it is determined that a stop led to the arrest, QAD reviews arrest documents and court affidavits to determine whether the officer prepared a stop report.  For arrests made in the second quarter of 2015, QAD found 310 that resulted from a *Terry* stop, but only 18 stop reports were prepared, a 5.8 percent compliance rate.  In a more recent police-initiated enforcement audit, QAD audited approximately 1,400 arrests made between November 5, 2015 and December 10,

2015, and identified 50 arrests that resulted from a *Terry* stop.  However, only six stop reports were prepared for the 50 arrests (a 12 percent compliance rate).

One possible reason for these low compliance rates may be that some officers believe it is not necessary to prepare a stop report if an arrest is made, since other forms related to the arrest are prepared.  If that is the reason, this belief does not comport with NYPD policy.

Another source of information about undocumented stops is the CCRB.  In its 2015 Semiannual Report, the CCRB noted that 16 percent of all stop and frisk complaints for which a full investigation was completed in the first half of 2015 were referred to the Department for failure to fill out the required stop report form.  The CCRB referred 18 percent of the stop and frisk complaints investigated in 2014 to the Department for failure to complete a stop report.

The monitor will be conferring with the NYPD and the other parties to determine whether there are reliable methods using these and perhaps other sources of information to estimate more systematically the total number of stops made, including those that were not documented.

### e.      Audits of Self-Inspections by Integrity Control Officers

QAD has added another audit relevant to the remedial efforts.  Each precinct has an Integrity Control Officer (ICO) whose responsibilities include performing "self-inspections," which are reviews of precinct activities to identify violations of Department procedures.  One of those self-inspections is a review of stop reports.  The court noted that the ICO's review of stops as part of the precincts' self-inspections was insufficient

because it involved only a cursory review of the paperwork and not a substantive review of the reasons for the stop and frisk.

In July 2015, at the recommendation of the monitor, QAD began reviewing the precincts' self-inspections.  In its review, QAD determines whether the monthly self-inspections are on file, whether they have been prepared and approved by the appropriate supervisor (Commanding Officer, Executive Officer or ICO), and whether the findings of the self-inspection for the stop reports and arrests are consistent with QAD's findings. The monitor has not yet received the results of these audits.

The NYPD will also be forming an Audit Advisory Committee consisting of five auditing professionals with expertise in internal audits, external audits, forensic investigations, risk management and compliance.  The NYPD has stated that the Audit Advisory Committee will perform an initial assessment of the Department's existing

52

auditing procedures, identify areas for improvement and make recommendations in those areas.  Once constituted, the committee will advise on all future audit procedures and audit plans before they are implemented by QAD.

In sum, the monitor will be evaluating NYPD's 2016 audit plan, following up on open questions and information requested about audits already being done, and monitoring the results of new audits once they are instituted.

### B.      Bronx TAP

#### 1.      Milestones

Under the remedial orders in *Ligon,* the NYPD must develop procedures for ensuring that stop report forms are completed for every trespass stop outside a TAP building in the Bronx and that the constitutionality of those encounters is reviewed.  Stop report forms for criminal trespass stops outside TAP buildings in the Bronx must be provided to *Ligon* counsel.

#### 2.      Status and Assessment

The NYPD is examining ways to assess whether trespass stops and arrests in TAP buildings (and also in NYCHA buildings) were properly conducted and recorded.  First, the NYPD is developing an audit program for trespass stops and arrests.  Second, the Department is considering precinct self-inspections, in which ICOs review the stop reports and activity log entries of trespass stops and also examine the sergeants' review of those reports.

Currently, the Department is using self-inspections to monitor criminal trespass stops at TAP locations in the Bronx.  Since March 2015, the ICO in each Bronx precinct reviews the trespass stops at TAP locations in that precinct (both inside and outside the

TAP building) and prepares a spreadsheet with the date of the stop, the stop report serial number, the tax ID of the reporting officer, the date the ICO conferred with the reporting officer (if applicable), the date the ICO conferred with the officer's supervisor (if applicable), the findings for the stop and any corrective action taken.  These assessment reports, along with the stop reports and activity logs, are sent to the Office of the Chief of Patrol, which collects and combines them into a monthly survey report.

The monitor and *Ligon* plaintiffs' counsel were provided these survey reports for the months of March through September 2015.  Based on these reports, there were only 29 stop report forms prepared for criminal trespass stops either inside or outside TAP buildings in the Bronx for these seven months.  There were no trespass stops reported at TAP buildings in the Bronx in July, August or September 2015.  After reviewing these trespass stops, the precinct ICO instructed the officers on how to improve their actions for 11 of the 29 stops and gave verbal warnings to the officers for two stops.  These corrective actions were usually in response to an incomplete stop report form or because the officer's activity log was insufficient.  The monitor team reviewed these 29 stop reports and activity logs and found that many of them did not articulate reasonable suspicion for the stop; likewise, when there was a frisk, many of the reports did not articulate reasonable suspicion that the person frisked was armed and dangerous.  These reports highlight the need for additional training and supervision relating to these types of stops and the need for clear descriptions of the basis for the stops and frisks.  To address these issues, the NYPD has drafted, and the *Ligon* plaintiffs and the monitor have

reviewed, an operations order that would establish a system for monitoring and assessing stops for criminal trespass at TAP buildings in the Bronx. The monitor will submit the operations order for court approval.

### C.      Early Identification System (EIS)

#### 1.      Milestones

As part of its remedial efforts, the NYPD has committed itself to upgrading its current performance monitoring system and implementing an effective Early Identification System to foster the goals of the Department and the remedial reforms. An EIS is a centralized database to collect and analyze information relating to behavior that might put the Department or its officers at risk. Many major police departments use an EIS to support the supervision and management of their officers, supervisors and units. It is used to identify at-risk employees and patterns of at-risk behaviors so that they can be addressed and corrected before more serious misconduct occurs.

#### 2.      Status and Assessment

The Performance Analysis Section (PAS) of the Risk Management Bureau currently tracks the performance of officers using several databases and behavioral indicators to identify officers and supervisors who display at-risk behavior. To identify members of the service who need to be placed in a monitoring program, the PAS tracks disciplinary actions, substandard evaluations, civil lawsuits, complaints to the CCRB, use of force complaints, supervisor recommendations and other negative personnel actions.

The Department is currently creating a program that it hopes will improve the EIS process and make it more useful. The system in development will use more databases and sources of information to populate an alert system. In 2013, the Enterprise Liability

Assessment Unit, now part of the Risk Management Bureau, proposed the development of the Risk Assessment Information Liability System (RAILS).  RAILS was originally designed to analyze lawsuits and claims against the City and to identify patterns and trends of liability or risky behavior.  The project was approved in January 2014.  The NYPD has now expanded the original scope of RAILS so that it will use other data in addition to lawsuits and claims, and will be used to analyze the performance of officers and Department-wide risks.  This new "scope of work" was approved in August 2015. The NYPD expects that work on the expansion of RAILS will begin by February 2016.

The Department has created a working group to discuss how the Department will use the newly expanded RAILS program and identify all of the databases that should be included.  So far, the Department plans to include information on officer complaints, civil lawsuits, use of force, discipline, sick leave and overtime, traffic accidents, investigations by the IAB and criminal proceedings against officers.  The NYPD has stated that it also plans to incorporate positive information on officers, including promotions, commendations and letters of reference.  In addition to containing information from CCRB complaints involving stops, an EIS system could track instances in which supervisors took corrective action after their review of stops.

If developed as planned, RAILS could be an important tool in supervision and management.  EIS systems often use triggers to identify when officers need review by their supervisors, and these triggers can be both quantitative (e.g., if an officer has a certain number of vehicle accidents) and comparative to an officer's peers (e.g., if an

officer has used force significantly more than other officers with similar assignments). Some systems can also analyze information for trends and patterns of squads and units, not just individual officers, so supervisors can be reviewed as well.  However, an EIS system like RAILS will affect the behavior of officers only if supervisors use the RAILS analyses to review officers and act when appropriate.

## VIII.   Complaints and Discipline

The court orders and the parties' agreements require that the NYPD improve the way it deals with discipline and complaints relating to stop and frisk and trespass enforcement.  A fair, accurate and prompt disciplinary system is central to the court orders and also to improving relations between police officers and their superiors and between the police and the community.  The system should be seen as legitimate by the police and the community being policed.

### A.      Racial Profiling Allegations

#### 1.      Milestones

The court found that the NYPD did not effectively track and investigate allegations of racial profiling.  The NYPD did not have a separate category for allegations of racial or other prohibited profiling, and therefore did not know how many of these complaints had been made.  It also did not track the outcome of the investigations of these complaints—whether the allegation was substantiated and, if so, whether any remedial or disciplinary action was taken.  The court orders and the parties' agreements require the NYPD to begin tracking and appropriately investigating complaints it receives related to profiling.

#### 2.      Status and Assessment

The NYPD has changed the way allegations of racial profiling and bias-based policing are categorized, processed, tracked and investigated. All profiling allegations, no matter how they are made to the NYPD (e.g., in a 311 or 911 call, by a call or visit to the IAB, or at a precinct), are now referred to IAB. IAB's Command Center logs the complaint into its case management system—the Internal Case Information System (ICIS). In October 2014, a "profiling" category was added to that system, including nine subcategories: race, color, ethnicity, national origin, religion, age, gender, gender identity and sexual orientation. Subsequently, additional subcategories of creed, alienage, citizenship status, disability and housing status were added to track the categories listed in the New York City Administrative Code and in the NYPD's racial profiling policy, P.G. 203-25.

The Department also changed how and by whom profiling allegations are classified and investigated. Before January 2015, these complaints were classified as "OG" or "outside guidelines," a classification for cases considered less serious than those categorized as "M" or "misconduct" cases, which are tracked and reviewed by IAB. An allegation of police corruption is categorized as a "C" case and investigated by IAB. As of January 2015, allegations of racial or other prohibited profiling are classified as the more serious "M" cases. After the allegation is logged into the IAB case management system, the complaint is assigned for investigation. Previously, complaints of profiling were investigated by supervisors assigned to the same precinct or bureau where the subject of the investigation worked. Since January 2015, these investigations have been assigned to investigative units attached to the borough (not precinct) command or to the relevant bureau command (e.g., the Transit Bureau command). If a complaint also

includes an allegation of corruption, the investigation will be done by IAB.  Pending investigations are reviewed at monthly meetings among IAB and investigative unit supervisors, and the resulting dispositions are reviewed and tracked in IAB's case management system.

The changes in classification, intake, assignment and investigation of profiling complaints have been made through internal memoranda and orders rather than formal changes in NYPD procedures.  The NYPD is currently examining relevant Patrol Guide, Administrative Guide and Detective Guide procedures, as well as IAB's procedures, to determine whether it believes any changes in those documents should be made.  IAB is also drafting guidelines for profiling investigations and training for its Command Center, IAB investigators and the borough investigations units.  The material will cover the new policies for racial profiling and bias-based policing and investigative techniques to be used regarding profiling complaints.  This training, when approved, will be conducted by the IAB training unit.  These changes in procedures, training and investigative guidelines have been distributed to the parties for review and comment, and will be reviewed by the monitor.

One issue identified by the monitor is that allegations of racial or other profiling allegations made to the CCRB but not the NYPD are not being investigated by either the CCRB or the Department.  The CCRB does not believe that profiling complaints are within its authority to investigate complaints of force, abuse of authority, discourtesy or offensive language (FADO), and so does not investigate them.  If a complainant alleges that an improper stop was made and that the officer made the stop because of the complainant's race, the CCRB will investigate whether there was an appropriate basis for

the stop, but will not separately investigate the racial profiling allegation.  It does, however, note these allegations of profiling in its database.  CCRB personnel populate an on-line form that includes a "Reason for Initial Contact."  A drop-down menu states "C/V [complainant/victim] believes racially profiled (Do not ask C/V this question. Check only if C/V volunteers this info)."

Although the CCRB has captured information about racial profiling as a reason for initial contact since 2004, it has not referred these allegations to the NYPD for investigation.   At a meeting with the monitor, the CCRB chair and staff, and IAB personnel, the Department and the CCRB agreed that the CCRB would now notify IAB when the complainant/victim states that he or she was profiled.  IAB and the CCRB will work together on any procedures or protocols necessary to effectuate this agreement and will examine whether there are any practices or protocols that should be established for situations in which there are parallel investigations (the CCRB investigating the FADO allegation and NYPD investigating the profiling allegation), so that duplication and/or potential disruption for complainants, witnesses and officers can be diminished.

The Department states that with profiling allegations separately categorized in the IAB's database, IAB and the RMB will be able to analyze the data to determine trends, patterns or other indications of problematic behavior within a precinct, borough or

bureau, or by an individual officer. Any analysis should also include the CCRB cases in which a complainant or witness believes that he or she was subject to profiling.

In 2014, there were 15 allegations of profiling made to the Department after it began tracking profiling allegations. These cases were investigated as "outside guidelines" cases at the subject officers' commands. Of the 15 cases, the Department reported that eight allegations were unsubstantiated and five were unfounded; in two cases, the officers were exonerated.[4]

During 2015, IAB received 335 profiling cases containing 478 allegations of profiling. Of those 478 allegations, 345 are open, 83 were determined to be unfounded and 39 were determined to be unsubstantiated; with respect to nine allegations, the officers were exonerated. The most cited category of profiling is "color" (155 allegations). The monitor has asked for the full investigative files for a sample of these cases. When received, the monitor will review them to assess the thoroughness of the investigations.

###### B.      Handling of Complaints Substantiated by the CCRB

####### 1.      Milestones

The court orders and the parties' agreements require that the Department Advocate's Office (DAO) improve its procedures for handling CCRB findings of substantiated misconduct during stops. This improvement must include increased deference to credibility determinations made by the CCRB and an evidentiary standard that is neutral between the claims of complainants and officers. If the CCRB has

---

[4]      Unfounded means there is sufficient credible evidence to believe that the officer did not commit the alleged act. Unsubstantiated means the available evidence is insufficient to determine whether the officer did or did not commit misconduct. Exonerated means the officer was found to have committed the act alleged, but the officer's actions were determined to be lawful.

substantiated a complaint based on the statements and credibility of the complainant, the Department cannot impose an additional requirement of corroborating physical evidence.

### 2.     Status and Assessment

The court found that the NYPD failed to impose meaningful discipline when officers engaged in unconstitutional stops and frisks.  In particular, it found that even when the CCRB determined that a complaint was substantiated, the DAO conducted its own review and rejected the CCRB's findings if the CCRB based its decision on credibility determinations in favor of civilian witnesses as against police officers.  If the CCRB decision was based only on the testimony of the complainant, the court found that the DAO required additional corroborating evidence.  The court cited the percentage of cases in which the DAO declined to pursue discipline in substantiated cases in the years 2007-2012, and noted that in cases in which discipline was pursued, DAO "consistently downgraded the discipline" recommended by CCRB and recommended instructions, the least severe form of discipline, in the majority of cases in most years.

Several changes have been made in the way the NYPD handles cases in which allegations have been substantiated by the CCRB.  First, as the result of a memorandum of understanding (MOU) between the CCRB and the Department in 2012, the CCRB now prosecutes more serious cases—those involving charges and specifications—when it substantiates the allegation.  These cases are tried in the trial room of the NYPD in front of an administrative law judge; the judge's ruling is forwarded to the police commissioner, who makes the final decision regarding both disposition and penalty.  Before the MOU was put in place, the DAO prosecuted cases involving charges and specifications, and could decline to proceed in the trial room on an allegation

substantiated by the CCRB.  The DAO can no longer decide not to prosecute those cases.  Under the MOU, the police commissioner does retain the authority to direct that a case not be prosecuted.

The MOU does not apply to cases in which the CCRB recommends discipline less serious than charges and specifications.  The DAO continues to review the CCRB's determination in those cases.  The DAO can agree with the CCRB's determination, decide not to go forward with the complaint (Department Unable to Prosecute, or DUP), or recommend less or more severe discipline to the police commissioner.  Unlike more serious cases in which a trial is held in the NYPD trial room, there is no trial for cases in which the discipline recommended is losing up to five days of vacation (command discipline A), losing up to ten days of vacation (command discipline B), retraining or instructions.

A second change in the complaint process was the establishment of a method for the DAO to request that the CCRB reconsider its determination and recommended discipline.  This reconsideration process was approved by the CCRB in December 2014.  Prior to the establishment of the reconsideration process, if the DAO disagreed with a CCRB disposition, it would not send the substantiated allegation to the police commissioner for a final decision, but would decline to proceed with the case (DUP); if the DAO disagreed with the CCRB's suggested penalty, DAO would send its recommended penalty to the police commissioner.  With the new reconsideration process, if the DAO disagrees with the CCRB's determination that an allegation was substantiated or with the CCRB's recommended discipline, the DAO may request in writing that the CCRB reconsider the case and state why the NYPD disagrees.  If the CCRB agrees to

reconsider the case, the CCRB panel that made the initial decision can modify its decision that the allegation was substantiated or its recommendation for discipline, or it can determine that its original decision was correct.   Although the DAO may seek a change in CCRB's decisions, the DAO no longer unilaterally decides whether or not to pursue the case.  If the CCRB does not agree with the DAO's request for reconsideration and maintains its original decision, both the DAO's recommendations and the CCRB's recommendations are sent to the police commissioner.

The CCRB and the DAO are agreeing more often than in prior years about when an allegation is substantiated and what penalties are appropriate.   According to the CCRB's 2015 Semiannual Report, "During the first half of 2015, the DAO pursued discipline in 92% of CCRB cases, up from 89% during September to December 2014, 62% from January to August 2014, and 57% in 2013."[5]

The DAO provided the monitor team with data regarding complaints in which allegations relating to stops, questions, frisks or searches were substantiated by the CCRB and sent to the NYPD in 2014 and 2015.  The DAO requested that the CCRB reconsider twelve of the cases sent to the NYPD in 2014.   In two of these twelve cases, the DAO recommended that the disposition of the case be changed.   In both cases, after reconsideration, the CCRB changed the disposition from "substantiated" to "exonerated," and the NYPD agreed and closed the cases administratively.   In ten cases, the DAO requested that the CCRB change its penalty recommendation.   The CCRB agreed with the DAO's recommendation in one of the ten cases.   In six cases, the CCRB agreed to reduce the penalty, but not as much as the DAO had recommended, and in three cases,

---

[5]   CCRB 2015 Semiannual Report, p. 28, http://www.nyc.gov/html/ccrb/downloads/pdf/2015-Semi-Annual-Report.pdf.

the CCRB disagreed with the DAO and did not change its penalty recommendation.  In those nine cases, the police commissioner agreed with the final recommendation of the DAO.

In 2015, CCRB substantiated and sent to the NYPD 255 cases involving stops, questions, frisks or searches and one case involving an allegation of an improper trespass arrest.  The DAO has reviewed 160 of these cases; 96 are still under review.  Of the 160 cases reviewed, the DAO agreed with the CCRB's recommendations in 142 cases (89 percent) and requested that the CCRB reconsider eighteen cases (eleven percent).  In one case, the DAO requested that the penalty recommended by the CCRB be increased, and it was.  In five cases, the DAO requested that the CCRB change its disposition from "substantiated" to "unsubstantiated"; the CCRB agreed in two of the five cases, but maintained its determination in the other three cases.  In those cases, the police commissioner agreed with the CCRB in two and imposed training, and agreed with the DAO in the third and imposed no discipline.  In twelve cases, the DAO requested that the CCRB reduce the penalty it recommended.  In one of these twelve cases, the CCRB agreed to reduce its recommended penalty.  In three cases, the CCRB agreed to reduce its recommended penalty, but not as much as the DAO had requested.  In eight cases, the CCRB disagreed with the DAO and maintained its penalty recommendations.

VIII. Complaints and Discipline
    B. Handling of Complaints Substantiated by CCRB

**Figure 1–2015 SQF CCRB Cases (N=256)**



With respect to complaints involving stops, frisks and searches, one reason the NYPD is agreeing more often with the CCRB may be that the CCRB has changed its approach to discipline in these cases.  As stated in the CCRB's 2014 annual report:

> The CCRB has historically always adhered to the strict letter and spirit of the laws that elucidate what is constitutional. The CCRB has also historically recommended the most serious discipline when the Board substantiated allegations of improper search—administrative charges, which result in disciplinary trials.  This was the normal outcome during the stop-and-frisk era until 2014.
>
> Given the changed policing landscape, the Board began, with the appointment of its new Chair, to take a different approach in its disciplinary recommendations. The Board has begun to make recommendations that move away from severe punishment to less serious discipline and, most importantly, to formalized training. This approach … acknowledges the pressure officers were under to conduct unconstitutional frisks, which often morphed into

improper searches.   It also acknowledges the lack of adequate and clear training, and the complexities of the law. Thus, the CCRB is recommending formalized training and command discipline more often than not for frisk and search misconduct, especially when the stop itself was lawful. The Board's evaluation of misconduct has not changed, and remains consistent with constitutional and legal principles.[6]

The monitor will undertake a more in-depth review of the cases in which reconsideration was requested and will work with the parties to address any concerns.

## IX.    Performance Goals, Objectives and Evaluation

The Department's development of a robust system for evaluating officers is central to the monitor's mission because evaluations affect many of the incentives that can improve or worsen officer behavior.  The evidence at trial, bolstered more recently by observations of focus groups and numerous conversations the monitor's team has had with members of the service, was that in the past, officer evaluations were based largely on "numbers" to show enforcement activity.   Officers felt pressure to produce these numbers in order to receive a positive evaluation.  Otherwise, they feared, they would be disadvantaged in many ways—for example, in assignments, promotions, overtime, time off and transfers.

These expectations were communicated through the Compstat process, a key component of the NYPD's crime management system.  Regularly, precinct commanders are called upon at Compstat meetings to explain the crime conditions in their commands, as well as what their personnel are doing in response to these crimes.  In previous years, commanding officers returned to their precincts from Compstat meetings with a heightened focus on quantifiable activities, including the number of stops and frisks.  A

---

[6]  CCRB 2014 Annual Report, at 46, *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/2014-annual-report-rev2layout.pdf.

high number of stops reported became a common "defense" at Compstat sessions by precinct commanders wishing to demonstrate they were responding to crime conditions.

The court also identified the NYPD's performance objectives, incorporated in Operations Order 52 (Use of Performance Objectives), as another illustration that the evaluation and measurement of officers was based predominantly on enforcement activity.  Officers report their activities, including stop reports, weekly, monthly and quarterly (the Department's activity reporting system is known as the "Quest for Excellence," or "Quest").  The quality of those reports was not evaluated, just the number of reports submitted.

As described to us by many officers, the pressure for numbers caused by these evaluations and performance objectives affected stop-related activity in two ways.  First, there were stops of people who should not have been stopped because the officers did not have the required reasonable suspicion for the stop.  Second, officers would complete a stop report for encounters that were not stops at all, but voluntary encounters or Level 1 or 2 encounters, or even create fictitious reports purportedly documenting encounters that had not happened.  It is not possible to determine how many of the stops reported in prior years were either improper or not stops at all; nor is that the monitor's role.  However, the findings of the court and what the monitor has heard more recently from numerous officers throughout the ranks suggest that there was a substantial amount of both.  That history provides a caution going forward.  It is critical to implement a new evaluation system that promotes both good police work and the integrity of reporting stop, frisk and trespass enforcement activity.  That task includes clearing up any remaining

misunderstanding among officers about when it is appropriate and lawful to engage in stops, frisks or trespass enforcement and also about when reports must be filled out.

### A.      Milestones

NYPD performance measures and objectives should include an assessment of the constitutionality of an officer's stops, frisks and trespass arrests.  Performance measures and objectives for a supervisor should include the supervisor's review of his or her subordinates' activities in these areas and whether the supervisor adequately addressed any insufficiencies.   Evaluations of Department members, including incentives the Department uses in managing its personnel, such as its criteria for discretionary promotions, should take into account the constitutionality of stops, frisks and trespass arrests engaged in or supervised by members of the service.

### B.      Status and Assessment

In addressing stop and frisk and also in explaining his vision for policing in New York City, Commissioner Bratton has said clearly that what matters is the quality of stops, not the quantity.  Quality means that stops should be made when appropriate and that they should be done lawfully and professionally.  That message has been reinforced at Compstat sessions.  In the sessions observed by the monitor team, the commanding officers have not been asked about the number of stops in their commands.  Many officers do report that they feel less pressure to produce "numbers" of stops, and this is reflected in the drop in the number of reported stops.  But in focus groups, a few officers report—and these may be isolated instances—that "numbers" of stops still are being used to reward or withhold rewards from them.  Many others say that they (or other officers) sometimes avoid making legitimate stops, or make them without documentation, because

"it's just not worth it."  As explained by these officers and as described at pages 36-37 above, this attitude is based on the belief that they will be severely disciplined for even minor errors in documentation or on fear of being sued for these errors and not being indemnified by the City.  The monitor's first report raised concerns that this may be happening, and more recent evidence does not dispel them.

The challenge for the NYPD, as noted earlier in this report, is for supervisors to ensure that officers are making stops and frisks when appropriate, that they do so constitutionally and professionally, and that they document the stops and frisks they make.  Evaluation measures that reflect these goals are essential.

The NYPD has stated that it is committed to making substantive changes to its performance and evaluation criteria.  It notes that these changes are part of the larger cultural change that the NYPD is attempting, including empowering sergeants and decentralizing authority, measuring problem-solving instead of activity only, and making training more relevant.  The Department has created a working group to examine how to evaluate performance, and many ways are being explored.  Whatever methods are chosen, however, if they do not incorporate the goal of constitutional policing that serves the communities, these methods will not support the changes required by the court orders and the parties' agreements or the vision for the NYPD announced by Commissioner Bratton.

## X.      Joint Remedial Process

A "Joint Remedial Process" was ordered by the court and agreed to by the parties. It is a process by which the facilitator (Justice Ariel Belen (ret.)) seeks input from stakeholders and affected communities to see whether there are possible reforms in addition to those already required.  At the end of the process, Justice Belen will prepare a

report with potential recommendations for the consideration of the monitor and the court. Under the court order, these proposed remedial measures must be no broader than necessary to bring the NYPD's use of stop and frisk and trespass arrests into compliance with the Fourth and Fourteenth Amendments.

As currently planned, the Joint Remedial Process has several phases, starting with focus groups of those most affected by the NYPD's stop and frisk and trespass arrest practices. Focus groups began in October 2015 and are scheduled to continue through February 2016. Thirty-eight focus groups have been conducted to date. Questions for the focus group were prepared in consultation with the parties and an advisory committee comprised of community organizations, NYPD leadership, police union representatives, religious leaders and academics. Each focus group has approximately eight to ten residents of New York City. Participants have predominantly included young black and Latino men, though there has also been substantial representation of women and LGBTQ youth, homeless people and NYCHA residents. The facilitator expects to conduct additional focus groups comprised of NYCHA housing residents to discuss issues pertaining to policing in and around residential buildings, and a session on Staten Island.

The facilitator then plans to meet with community leaders, advocates and the NYPD to discuss possible additional reforms that they may want the facilitator to consider. The next phase will be a series of community forums around New York City. These will be structured, and the discussions will be based in large part on the information gathered during the focus groups and subsequent meetings. Although the community forums will be primarily to collect community input about possible reforms,

they may also serve as opportunities to develop further dialogue between the NYPD and the communities they serve.

The facilitator will share the information gathered from the process described above with stakeholders and the parties, seek their feedback, and prepare a report with possible recommendations for additional reforms to the monitor and the court.

## XI.    Compliance Metrics

Ultimately, the monitor must report to the court his assessment of whether the NYPD is in "substantial compliance" with the requirements of the court orders and the parties' agreements.  In doing so, the monitor will evaluate compliance with specific remedial measures required by the court and the agreements, such as the promulgation of new policies, new training and a new stop report form, the institution of new audits, and the completion of a pilot program for body-worn cameras.  But the monitor must also assess whether all of these changes and programs result in stops, frisks and trespass arrests that are consistently constitutional under the Fourth and Fourteenth Amendments. Beginning very early in this monitorship, the parties have been asked to express their views on how compliance with all the requirements of the court and the agreements should be measured.  The monitor has recently received preliminary views from the plaintiffs and the NYPD.  In the future, the monitor will report on these compliance measures.  To the extent possible, the NYPD should have benchmarks against which it and others can judge progress.

# Appendix 1

**Appendix 1**
**Selected Documents on Monitor Website**

**Home Page** (http://nypdmonitor.org/)
**Overview** (http://nypdmonitor.org/overview/)
**First Report of Independent Monitor** (http://nypdmonitor.org/resourcesreports/monitor-reports/)

**Court Opinions and Orders**
(http://nypdmonitor.org/resourcesreports/court-opinions-and-orders/)
　　　　*Floyd v. City of New York* Remedial Order
　　　　*Floyd v. City of New York* Liability Opinion
　　　　*Floyd v. City of New York* Modification of Remedial Order
　　　　*Ligon v. City of New York* Preliminary Injunction
　　　　*Davis v. City of New York* Settlement and Exhibits
　　　　Modification of Order with respect to Body-Worn Camera Pilot

**Policies**
(http://nypdmonitor.org/resourcesreports/policies/)
　　　　Revised Policy on Stop and Frisk (P.G. 212-11)
　　　　Revised Policy Prohibiting Racial Profiling and Bias-Based Policing (P.G. 203-25)
　　　　Davis Letter on Policy
　　　　Floyd Letter on Policy
　　　　Ligon Letter on Policy

**Training**
(http://nypdmonitor.org/resourcesreports/training/)
　　　　**Stop and Frisk**
　　　　Investigative Encounters-Policing Legally, Recruit Student Guide
　　　　Investigative Encounters-Policing Legally, Recruit Student Guide-Updated
　　　　Investigative Encounters-Policing Legally, Recruit PowerPoint Presentation
　　　　FTO Guide-Investigative Encounters
　　　　FTO Training-Investigative Encounters, PowerPoint Presentation

　　　　**Racial Profiling and Bias-Based Policing**
　　　　Policing Impartially, Recruit Student Guide
　　　　Policing Impartially, Recruit Student Guide-Updated
　　　　Policing Impartially, Recruit PowerPoint Presentation
　　　　Policing Impartially, Recruit PowerPoint Presentation (part 2)
　　　　Policing Impartially, Recruit PowerPoint Presentation (part 3)

　　　　**Housing**
　　　　Trespass Affidavit Program (TAP), Recruit Student Guide
　　　　Trespass Affidavit Program (TAP), Recruit PowerPoint Presentation
　　　　NYCHA and TAP Housing Interior Patrol, Recruit Lesson Plan
　　　　NYCHA and TAP Housing Interior Patrol, Recruit Student Guide
　　　　NYCHA and TAP Housing Interior Patrol, Recruit PowerPoint Presentation
　　　　NYCHA Rules and Regulations, In-service Lesson Plan

**Body-Worn Cameras**
([http://nypdmonitor.org/resourcesreports/body-worn-cameras/](http://nypdmonitor.org/resourcesreports/body-worn-cameras/))
       Summary of Body Worn Camera Pilot Design
       Monitor's Recommendation to Modify Remedial Order
       Modification of Order on Body-Worn Camera Pilot
       NYPD letter Outlining Plan for Body Worn Camera Policies


**NYPD Reference Materials**
([http://nypdmonitor.org/resourcesreports/nypd-reference-materials/](http://nypdmonitor.org/resourcesreports/nypd-reference-materials/))
       Investigative Encounters Reference Guide
       Investigative Encounters At a Glance Booklet
       Investigative Encounters Chart A
       Investigative Encounters Chart B
       Investigative Encounters Memo Book Insert

# Appendix 2



POLICE DEPARTMENT

November 24, 2015

Peter L. Zimroth, Esq.
Arnold & Porter, LLP
399 Park Avenue
New York, New York 10022-4690

Re: NYPD's Body-Worn Camera Pilot II

Dear Mr. Zimroth:

We write to summarize the plans the Department has discussed with you and with Plaintiffs' counsel in recent meetings regarding the Department's next body-worn camera pilot program.

Our plans for the research and development of our next, larger pilot have evolved since we first began a dialog on this topic with you, your team, and Plaintiffs' counsel. In recent months, we have benefited from digesting information from a number of valuable sources, including national resources,[1] other police departments around the country and around the world that have shared their experiences with implementing body-worn camera programs with us, and experts in the field, such as Jonathan Stewart of NYU's Marron Institute of Urban Management, who has worked with the NYPD on its first 54-camera pilot, and Anthony Braga of Harvard University, who is a member of your team.

As all parties are aware, in the *Floyd/Ligon* Remedial Order, Judge Scheindlin found that the use of body-worn cameras by NYPD officers could address a number of the issues raised in the Liability Opinion, and ordered the NYPD to institute a pilot project in which body-worn cameras would be worn for a one-year period by officers on patrol in five particular precincts (one precinct from each county with the highest number of stops in 2012).[2]  At that time, the

---

[1] *See*, Bureau of Justice Assistance (BJA) National Body-Worn Camera Toolkit (https://www.bja.gov/bwc) and the 2014 report released by the Department of Justice's Community Oriented Policing Services (COPS) and the Police Executive Research Forum (PERF), *Implementing a Body-Worn Camera Program Recommendations and Lessons Learned.*

[2] See the August 12, 2013 Opinion and Order (the Court's "Remedial Order") in *Floyd/Ligon v. the City of New York*, 959 F. Supp. 2d 668, 684-86.  Also, we note that you have recommended, and all parties have agreed, that the particular pilot design set forth in the Court's Remedial Order should be modified.  That modification is not

NYPD was not using body-worn cameras and had no plans to deploy them, absent the Court's Order.

After the appeal process was completed, the work on the Court-ordered "Immediate Reforms" began. The procurement process for the body-worn cameras for the pilot has commenced, but the pilot has not yet started. And much has changed in the world of policing, and within the New York City Police Department, since the Court ordered a body-worn camera pilot in 2013.

It has been reported[3] that more than 4000 law enforcement agencies around the world have either deployed or are planning to deploy body-worn cameras to their officers. As you know, the NYPD initiated its own voluntary body-worn camera pilot almost a year ago. This initial pilot is small (54 cameras), and is meant to inform the Department primarily on technological issues, however, it is a first step toward the goal of bringing body-worn cameras to NYPD officers. Our Department is now, independent of the Court's order, committed to exploring the use of body-worn cameras because we believe, based upon the experiences of other departments and the experiences gleaned from our own small voluntary 54-camera pilot, that body-worn cameras will not only serve one of the primary goals originally envisioned by the Court's order – that is, to enhance your ability and the ability of NYPD supervisors to assess the constitutionality of *Terry* stops – but we believe they will also enhance officer safety, provide evidence for criminal prosecutions, foster transparency, and help resolve civilian complaints.

At this time, the municipal procurement process to acquire up to 5,000 body-worn cameras is underway. Members of our Department have reviewed more than 50 submissions from vendors. The procurement process, from selection to contracting to roll out, will take several more months, and the earliest we can expect cameras to be in the hands of officers would be in or around the late summer of 2016.

From now until the cameras are acquired, our internal working group has plans to: revise and expand our body-worn camera policy[4] with input from internal and external stakeholders, including community members; develop training materials for the personnel who will use and maintain the cameras and handle video footage; and assist in devising our implementation and audit plans. We acknowledge that aspects of our policy, training, implementation plan, and auditing procedures will intersect with your Court-ordered mission and the Remedial Process. We are confident that we can work in tandem with you and the

---

addressed here. We understand that it will be the subject of a letter and proposed Order that you will submit to the Court.

[3] See BJA's Body-Worn Camera Toolkit "Research – FAQs" page (https://www.bja.gov/bwc/Topics-Research.html).

[4] The NYPD has a policy that governs the current 54-camera pilot, but we recognize that we need to revise and expand some aspects of the policy for the next larger pilot.

parties on the areas of intersection, and we will certainly obtain your (and when required, the Court's) approval for aspects of our policy, training materials or implementation plans that impact your mission.

This month and next, members of our internal body-worn camera working group will be scheduling telephonic conferences with members of other police departments that have implemented body-worn camera programs. In December, certain members of the working group hope to also do some on-site visits to selected departments that have implemented body-worn camera programs to learn about their programs.

The full working group plans to then reconvene in mid-December to share the information the members gathered from other police departments and use that information to make preliminary recommendations on core issues for our Department's revised policy, such as recording protocols, data retention, accessing and reviewing footage, releasing footage, privacy concerns, and evidentiary issues, among other things. In or around January 2016, the working group will then share a draft revised policy with internal stakeholders, you, and Plaintiffs' counsel. Thereafter we will receive and review feedback and, where appropriate, revise the draft policy based on that feedback.

In January and February, the Department then plans to engage in a comprehensive outreach campaign in order to get feedback and input on our draft revised policy. Our outreach will include but not be limited to: officers of every rank; our unions; community members; criminal justice stakeholders, including the courts, District Attorneys, and defender organizations; victims' advocacy groups; privacy groups; the City Council; our external oversight agencies, and other interested parties and organizations. As we have mentioned in our recent meetings, the Department is certainly open to attending additional community meetings facilitated by your team, the Facilitator's team, and/or Plaintiffs' counsel.

We expect to have our policy informed and revised by this outreach campaign. In or around March of 2016, we hope to provide you with a final draft policy for review and approval. We will also provide this final draft to Plaintiffs' counsel.

Starting in or around April of 2016 until the time the cameras are actually acquired, the Department will: draft the necessary training materials to train the officers who will wear the cameras and the personnel who will maintain the cameras and the footage; deliver the required trainings; complete the pilot design; devise implementation plans; and devise auditing procedures to track compliance with our policies. To the extent that aspects of these plans or tasks will impact your mission or the purpose of the Court-ordered pilot, they will be planned and executed in accordance with the process for drafting, commenting, and approval in which the parties have engaged under your supervision. Once pilot precincts are selected, the Department will plan for additional community meetings in those precincts to inform the public about the implementation of the body-worn cameras.

The steps and timeframes above represent our current thinking for our implementation plans, and may be revised based on our ongoing discussions.

Thank you for your consideration.

Respectfully submitted,

Nancy Hoppock
Assistant Deputy Commissioner & General Counsel
New York City Police Department
Risk Management Bureau

cc:    Ariel Belen (Court Appointed Facilitator)
       Richard Jerome (Deputy Monitor)
       Michael Young (Deputy Facilitator)
       Celeste Koeleveld (NYC Law Department)
       Amatullah Booth (NYC Law Department)
       Alexis Karteron (Ligon Plaintiffs)
       Joshua Moskovitz (Floyd Plaintiffs)
       Somalia Samuel (Floyd Plaintiffs)
       Rachael Kleinman (Davis Plaintiffs)
       Steven Wasserman (Davis Plaintiffs)