# ARNOLD & PORTER LLP

**Peter L. Zimroth**
Peter.Zimroth@aporter.com

+1 212.715.1010
+1 212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

August 9, 2016

<u>VIA ECF</u>

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007-1312

      Re: *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
         *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
         *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
         <u>Monitor's Third Report: Interim Briefing on Body-Worn Camera</u>
         <u>Pilot Program</u>

Dear Judge Torres,

      I am pleased to submit the Monitor's Third Report: Interim Briefing on Body-Worn Camera Pilot Program.  The briefing document, authored primarily by Professor Anthony Braga, a member of the monitor team, describes technical aspects of the research design, including how precincts were chosen for the pilot program.  Identifying the precincts now will provide adequate lead-time for the NYPD to complete preparatory steps, such as site inspections, reconfiguring precinct space as necessary to accommodate equipment, and insuring that precincts have sufficient internet bandwidth to support the video program.

      This letter provides some clarifying details about the program and the NYPD's process for selecting a vendor for the cameras and developing policies for their use.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
August 9, 2016
Page 2

## *Background*

In its Remedies Opinion and Order dated August 12, 2013, the court directed that the NYPD "institute a pilot project in which body-worn cameras will be worn for a one-year period." *Floyd v. City of New York*, 959 F. Supp. 2d 668, 685 (S.D.N.Y. 2013). The court noted the potential benefits of outfitting NYPD officers with body-worn cameras (BWCs). Those potential benefits include: creating objective records of stop encounters; encouraging lawful and respectful police-citizen interactions when both parties know exchanges are recorded; alleviating mistrust between the NYPD and the public; and offering a way to substantiate whether officers have been wrongly or rightly accused of misconduct. The point of the pilot is to provide the public, the NYPD, and the court with pertinent data to analyze those possible gains. Under the order, the monitor is required to establish procedures for, among other things, assessing the effectiveness of BWCs in reducing unconstitutional stops and frisks and, at the end of the one-year pilot, determining whether "the benefits of the cameras outweigh their financial, administrative, and other costs." *Id.*

The monitor team has been working with the NYPD and plaintiffs to plan a pilot randomized controlled trial that will provide data necessary to evaluate the impact cameras have on the behavior of officers and civilians. Under the plan, the NYPD will deploy approximately 1,000 cameras, with about 50 cameras in each of 20 precincts. The activities of officers wearing BWCs will be compared to those of officers with similar assignments in 20 control precincts.

# ARNOLD & PORTER LLP

Honorable Analisa Torres
August 9, 2016
Page 3

**Public and Officer Input on BWC Policies**

As our prior reports recounted, the Department conducted a small voluntary pilot program beginning in December 2014 in which 54 officers in five precincts and one Housing Police Service Area (PSA) volunteered to wear BWCs.  The trial, which ended on March 31, 2016, was intended to test BWC equipment, enhance understand of the information technology infrastructure necessary to support BWCs, and gain some insight on matters of policy and practical implementation.  This effort, it should be noted, is separate from the larger one-year BWC pilot program and monitor evaluation required by the court and the parties' agreement—the subject of this letter and the related Interim Briefing.

In preparation for the larger court-ordered pilot, the Department met with many stakeholders to obtain feedback on its proposed BWC policy, consulting representatives from local elected officials, district attorneys' offices, defense bar organizations, victims' advocacy groups, civil liberties organizations, and police reform advocacy groups.  The monitor team attended most of these meetings.  The NYPD also shared drafts of the proposed BWC policy with representatives of its five unions.

After this initial outreach, the Department worked with the Policing Project at the NYU School of Law, NYU's Marron Institute, the plaintiffs, and the monitor team to obtain input about proposed policies from members of the public and NYPD officers.

On June 29, 2016, the NYPD posted online its proposed BWC policy, a brief fact sheet, and a survey for interested individuals to fill out online to register their views.  Among other issues, the survey asks questions about when cameras should be turned on and off, how

ARNOLD & PORTER LLP

Honorable Analisa Torres
August 9, 2016
Page 4

long video footage should be kept, and the circumstances under which footage should be released to the public.  The proposed policy, the comment portal, and the questionnaire were posted at: http://www.nypdbodycameras.org/.  A similar survey was sent to all members of the service.  The comment period closed on August 7, 2016.

Even though these surveys cannot be scientifically validated (because there is no way to ensure the respondents are representative of the City's population), the Department believes it can learn from them.  At the end of the process, the Policing Project will prepare a report for the NYPD summarizing the feedback from the public survey, and the Marron Institute will do the same for the survey of NYPD officers.  The NYPD then will prepare a public document, responding to comments and explaining its reasons for accepting or rejecting proposed changes.  Once the Department considers the surveys and finalizes its proposed policies, they will be submitted for approval by the monitor and the court.

The court's primary focus in ordering the pilot program was to reduce unconstitutional stops and frisks.  But as the monitor team, the NYPD, and the other parties recognized, it made sense to design the court-ordered pilot to allow the Department and the public to learn about additional issues arising from a wider deployment of cameras.  As a result, some of the policies and procedures ultimately proposed by the Department will fall within the monitor's assigned area of responsibility and some will not.  Thus, on some issues, the monitor will have a deciding voice, and on others, the Department's preferences will receive more deference.  To the extent that there are grey areas where it is not clear whether a proposed policy is

# ARNOLD & PORTER LLP

Honorable Analisa Torres
August 9, 2016
Page 5

covered by the court order, they will be discussed and resolved as they arise after discussion

with the parties.

**BWC Procurement**

The BWC procurement process is taking longer than the NYPD initially anticipated.

The Department currently foresees choosing a vendor in mid- to late August 2016.  It then

estimates an additional four to six months before a contract is officially registered.  I am

attaching as Attachment A the Department's written explanation of these estimates.  Once a

contract is in place, delivery will not be instant, as the vendor will have to prepare and deliver

cameras and software to meet NYPD specifications.

In addition to choosing a vendor, completing the contracting process, and finalizing a

BWC policy, the Department also will need to draft training materials for the officers who

will be wearing the cameras and their supervisors, and for the maintenance of the cameras and

the footage.  Training sessions will then need to be provided, overall implementation plans

devised, and auditing procedures created to track compliance with the BWC policies.

The parties understand the importance of getting the pilot program underway and are

committed to moving expeditiously once a vendor is chosen.

Respectfully submitted,

*/s/ Peter L. Zimroth*

Peter L. Zimroth
Monitor

Attachments:

(A) NYPD Description of Procurement Process for BWCs, submitted July 18, 2016
(B) Monitor's Third Report: Interim Briefing on Body-Worn Camera Pilot Program

# Attachment A

ATTACHMENT A

**NYPD Description of Procurement Process for Body-Worn Cameras, submitted July 18, 2016**

The City's procurement process to acquire body-worn cameras ("BWCs") for the second pilot project is progressing. More than 50 technical proposals were received in September 2015. While the typical timeline from that point until registration of the contract is 6-9 months, this procurement has been unusual in several respects. First, the number of technical proposals was significantly greater than expected. This is likely due to the fact that BWCs have become a product that many companies are seeking to manufacture and/or sell.  Given the complex issues surrounding the information technology component of the solicitation (e.g. data storage), each proposal took significantly longer to review than anticipated. It was also necessary to conduct demonstrations of the BWCs in order to ensure that the solutions met the NYPD's requirements. Second, BWCs are a rapidly evolving market with new technologies and capabilities being introduced constantly. The procurement rules require that all capabilities that NYPD intends to utilize be contemplated in the procurement documents (including the solicitation, technical proposal, and price proposal) as the scope of the agreement cannot be expanded once this process is completed. The term of the contract will be for several years; therefore, NYPD has had to consider all potential, future needs when evaluating the proposals.  It should also be noted that the pricing component of this solicitation has also been very complex.  Due to the complex and new nature of this procurement, it has taken a significant amount of time to make sure that the NYPD (1) gets pricing applications from the finalist vendors that completely meets the NYPD's needs and (2) gets pricing applications from the finalists which are readily comparable on a fair "apples to apples" basis.

1

Finally, the NYPD's BWC program has received national attention. NYPD holds itself to the highest standards of integrity with respect to the procurement process. Thus, it has been critical that we proceed prudently and give appropriate attention and consideration to each of the vendors seeking to do business with us. We also have a fiscal responsibility to the citizens of New York City to enter into a cost-effective agreement and have to review vendors' pricing models with that responsibility in mind.

NYPD anticipates making a vendor selection in the coming weeks. Once a selection is made, the contract must be negotiated, drafted, and executed. The City procurement rules also require oversight approvals of the recommended award by numerous entities including: the Law Department, Mayor's Office of Contract Services, Mayor's Office of Management and Budget, Department of Investigation, Deputy Mayor, Financial Control Board, and the Comptroller's office. In addition, a public hearing must be held to give notice of the intended award. Many of these approvals are contingent on one another and must be conducted in a linear fashion. Thus, a realistic estimate of the timeline from selection to registration is 4-6 months.

# Attachment B

# Third Report of the Independent Monitor

# Interim Briefing on Body–Worn Camera Pilot Program

## Peter L. Zimroth

## August 9, 2016

*Floyd, et al. v. City of New York*
*Ligon, et al. v. City of New York, et al.*
*Davis, et al. v. City of New York, et al.*

# MONITOR TEAM

Peter L. Zimroth
Monitor

Richard Jerome
Deputy Monitor

Anthony A. Braga

Edward Davis

Jennifer Eberhardt

John MacDonald

James McCabe

Jane Perlov

**MONITOR'S THIRD REPORT: INTERIM BRIEFING ON BODY–WORN CAMERA PILOT PROGRAM**

*Introduction*

The court initially provided that body-worn cameras (BWCs) must be worn for a one-year period by officers on patrol in one precinct per borough—specifically, the precinct with the highest number of stops in that borough during 2012. These NYPD commands were identified as the 23rd, 40th, 75th, 103rd, and 120th Precincts. As we noted in our prior reports, this order needed to be altered to ensure that the program yielded robust information sufficient to make the required assessments. First, those five precincts were no longer those with the highest number of recorded stops. Second, the *a priori* selection in the remedial order of the five precincts in which the cameras would be deployed raised difficulties because that choice would make a randomized controlled experiment impossible.[1] The monitor recommended, and on December 8, 2015 with the consent of all the parties, the court modified, the remedial order to require the NYPD to use a randomized experimental design for the BWC one-year pilot program. The randomized experimental design will maximize the usefulness of the pilot. The basic components of the proposed randomized control trial of BWCs are described below.

*Randomized Controlled Trial Design*

Randomized experimental designs allow researchers to assume that the only systematic difference between the control and treatment groups is the presence of the intervention; this

---

[1] One of the key benefits of using a randomized experimental design is the ability to produce a high degree of confidence in the observed effects. This is ultimately achieved through greater control of extraneous factors or threats to validity. It is important to move from correlation closer to causality; this is what well–executed and high quality research designs allow. *See* Donald T. Campbell and Julian C. Stanley. 1966. *Experimental and quasi–experimental designs for research.* Chicago: Rand McNally.

permits a clear assessment of effects of the intervention.[2]  A cluster-randomized experiment is a variation of the classic randomized controlled trial (RCT) design in which clusters (groups) of subjects, rather than individual subjects, are randomly allocated to treatment and control conditions.[3]  In the proposed cluster RCT, NYPD officers will be randomly allocated by precinct to the BWC treatment group or non-BWC comparison group.

The cluster RCT will enable the evaluation to control for treatment "contamination" across individual officers and civilians.  As suggested by the Rialto BWC experiment,[4] officers with BWCs could influence the behavior of officers without BWCs if they simultaneously work in the same area and interact with the same people.  Similarly, the exposure to BWCs through a subset of officers in an area could influence how civilians in that area interact with the police more generally.  This contamination undermines the ability of experimental analyses to detect intervention effects because both treatment and control officers (and civilians) would be modifying their behaviors due to the presence of BWCs.  Randomly allocating groups of officers who work in distinct precincts to treatment and control conditions limits the treatment contamination problem.  The random allocation of smaller units of analysis, such as sectors within precincts, was considered but ultimately rejected.  Depending on calls for service and other demands for police service, patrol officers do sometimes work in other sectors within precincts.  These cross-sector work patterns would cause treatment contamination issues.

---

[2]        William R. Shadish, Thomas D. Cook, and Donald T. Campbell.  2002.  *Experimental and quasi–experimental designs for generalized causal inference*.  Boston: Houghton Mifflin.

[3]        Frederick Mosteller, and Robert F. Boruch, Eds. 2002.  *Evidence matters: Randomized trials in education research*. Washington, DC: Brookings Institution Press; David M. Murray. 1998. *Design and analysis of group–randomized trials*. New York: Oxford University Press.

[4]        Barak Ariel, William Farrar, and Alex Sutherland.  2015.  The effect of police body–worn cameras on use of force and citizens' complaints against the police: A randomized controlled trial.  *Journal of Quantitative Criminology*, 31 (3): 509–535.

In the proposed RCT, eligible NYPD precincts will be ranked according to the 2012–2015 mean yearly counts of complaints investigated by the Civilian Complaint Review Board (CCRB) in New York City.[5]   As described further below, the top 40 precincts will then be matched into pairs based on CCRB counts and crime, police, and neighborhood characteristics. Precincts in the 20 matched pairs will then be randomly allocated to the BWC treatment group and non-BWC comparison group.   It will be important to identify a well-defined group of officers to ensure an "apples to apples" comparison of officers in the treatment and control groups.   It is also important to include both uniformed officers and plainclothes officers working specialized units, who have different levels of SQF activities.

According to the court order, there will be approximately 1,000 NYPD officers in the treatment group (20 precincts with 50 officers per treatment precinct) and 1,000 NYPD officers in the control group.[6]  One way to ensure a well–defined group of officers would be to select all patrol officers assigned to a specific shift.   For instance, BWCs could be provided to all patrol officers working the third platoon in the treatment group (there are approximately 35 patrol officers in each platoon). An additional approximately 15 officers can be selected from

---

[5]     Given the significant change in officer stop and frisk behavior between 2012 and 2015, NYPD data on reported stops and frisks will not be used to determine the NYPD precincts to include in the RCT.  Instead, we will be looking at the number of CCRB complaints to make this determination.  CCRB complaints correlate well with stop and frisk activity.   A 2012 study by the Civilian Complaint Review Board in New York City shows that the police precincts with the highest number of civilian complaints against officers had the highest SQF rates (*see* http://www.nydailynews.com/new–york/brooklyn/complaints–cops–mirror–stop–and–frisk–numbers–article–1.1388735.  Accessed May 30, 2015).  We found that, for all NYPD precincts, 2012 precinct CCRB counts and 2012 precinct stop counts were highly correlated (Pearson's r = .84, $p<.000$).

[6]     Since outcomes for individuals within clusters may be correlated, standard sample sizes need to be inflated for cluster randomized controlled trials.  Using the "Optimal Design" software available from the University of Michigan (http://sitemaker.umich.edu/group–based/optimal_design_software), a total sample size of 2,000 (40 clusters of 50 subjects each) will provide statistical power at the .78 level to detect a standardized effect size of .20 and statistical power at the .99 level to detect a standardized effect size of .40, depending on assumptions about the intra class correlations in the outcome measure. Stephen W. Raudenbush, et al. (2011). *Optimal design software for multi–level and longitudinal research* (Version 3.01) [Software].  Available from www.wtgrantfoundation.org.

specialized units, such as anti-crime.  The comparison group would then be composed of patrol officers working the third platoon and officers in the same specialized units as the BWC precincts.

*Exclusions*

Six NYPD precincts will be excluded from the randomized field experiment.  The NYPD piloted the BWC camera technology in the 23rd, 40th, 75th, 103rd, and 120th Precincts.  The presence of the BWC technology excludes these precincts from serving as comparison areas due to treatment contamination considerations.  As such, these precincts cannot be matched into pairs and randomly allocated to treatment or control conditions.  Finally, the 22nd Precinct serving Central Park will be excluded because it has relatively low levels of NYPD activity and an almost non-existent residential population.  There is also no natural comparison precinct for Central Park.

As Table 1 reveals, all five boroughs have at least one precinct eligible for inclusion in the randomized field experiment.

**Table 1.  Eligibility of NYPD precincts for inclusion in BWC experiment**

|  | Eligible | Not Eligible | Total |
|---|---|---|---|
| Manhattan | 20 | 2 | 22 |
| Bronx | 11 | 1 | 12 |
| Brooklyn | 22 | 1 | 23 |
| Queens | 15 | 1 | 16 |
| Staten Island | 3 | 1 | 4 |
| Total | 71 | 6 | 77 |

4

*Ranking*

Seventy-one precincts were ranked according to 2012–2015 mean yearly counts of CCRB complaints (mean = 61.1, median = 50.5, range = 17.8 to 160.3).[7]  The 2012–2015 mean rate of CCRB complaints per 100,000 residents was considered as a possible ranking metric. We determined that the number of complaints (mean yearly count) is a better metric than the rate of complaints because precincts with lower residential populations and higher levels of commercial and recreational activity often had artificially high ranks when rates were used.

For 2012–2015 CCRB mean yearly counts, the top 40 precincts to be included in the BWC RCT had a mean = 80.9, median = 76.5, and range = 49.0 to 160.3.  The 31 precincts that will be excluded from the RCT had a mean = 35.6, median = 36.8, and range = 17.8–48.8.  In sum, CCRB complaints were a little more than two times higher in the top 40 precincts selected for the RCT relative to CCRB complaints in the 31 precincts that were excluded.  As Table 2 reveals, all five boroughs had at least one eligible precinct in the top 40 precincts ranked by yearly mean CCRB counts.

**Table 2. Inclusion of eligible NYPD precincts in top 40 CCRB yearly mean counts by borough**

|               | Top 40 | Not Top 40 | Total |
|---------------|--------|------------|-------|
| Manhattan     | 10     | 10         | 20    |
| Bronx         | 9      | 2          | 11    |
| Brooklyn      | 13     | 9          | 22    |
| Queens        | 7      | 8          | 15    |
| Staten Island | 1      | 2          | 3     |
|               |        |            |       |
| Total         | 40     | 31         | 71    |

---

[7]     In July 2013, the 121 Precinct was formed from areas in the 120th and 122nd Precincts on Staten Island. Unfortunately, data for the newly formed precinct was not available in 2012 and 2013.  CCRBs in these areas were included in the 120 and 122 Precinct counts in 2012 and 2013.  As such, only 2014–2015 CCRB counts will be considered for these three precincts rather than the mean 2012–2015 CCRB counts.

*Matching and Randomization*

Simple but deliberate matching exercises ensure that any peculiarities found in one sample will most likely occur in the other as well.[8]   The matching method was primarily a qualitative exercise informed by simple quantitative analyses of administrative data.   With the support of the NYPD, Professor Anthony Braga, a member of the monitor team, toured all 77 precincts to develop qualitative information on neighborhood characteristics and dynamics that might not be apparent when reviewing official data.   This information was considered when finalizing matched pairs.

Precincts were matched into pairs within boroughs by first comparing mean yearly CCRB counts to ensure that treatment and control groups would be balanced on this key outcome measure.   Other relevant variables were then considered during the matching process.   These variables included: 2012–2015 mean yearly arrest counts, 2012–2015 mean yearly arrest counts where force was used, 2012–2015 mean yearly major crime counts,[9] 2012–2015 mean yearly counts of sworn officers, 2014–2015 mean 911 calls for service counts,[10] and an overall concentrated disadvantage index for the neighborhoods that comprised the precincts based on census block data from the 2013 U.S. Census Bureau's American Community Survey.[11]

---

[8]      Hubert Blalock. 1979.  *Social statistics*.  Revised second edition. New York, NY: McGraw–Hill; Peter H. Rossi, Mark Lipsey, and Howard Freeman.  2006.  *Evaluation: A systematic approach.*  Seventh edition.  Newbury Park, CA: Sage Publications.

[9]      The seven major crime categories reported by the NYPD include: Murder, Rape, Robbery, Felony Assault, Burglary, Grand Larceny, and Grand Larceny Auto.

[10]      The NYPD 911 call center transitioned to a new computer–aided dispatch (CAD) in May 2013.  The new CAD system changed the 911 calls for service counting procedures.  Due to inconsistent counts over time, we were limited to using 2014 and 2015, the most recent two years of calls for service data available.

[11]      The concentrated disadvantage index is a standardized index composed of the percentage of residents who are black, the percentage of residents receiving public assistance, the percentage of families living below the poverty line, the percentage of female–headed households with children under the age of 18, and the percentage of

Professor Braga and the monitor met with NYPD officials and reviewed the matching process and an initial set of matched precincts.  Based on the NYPD's familiarity with conditions in certain precincts, appropriate adjustments were made to create the best matches.  The matching process yielded 20 pairs of NYPD precincts that were eligible for randomization to treatment and control conditions.

### Randomization of Precincts and Assessment of Cluster Balance

A randomization algorithm was used to determine randomly which of the precincts within the pair would receive the body-worn camera treatment.  The precincts that were not selected from each of the pairs were control areas.  Table 3 presents the treatment precincts that resulted from the randomization outcomes.  All five boroughs have at least one precinct included in the treatment group.  Manhattan has five treatment precincts (13th, 18th, 25th, 30th, and 34th), the Bronx has five treatment precincts (42nd, 43rd, 44th, 47th, and 48th), Brooklyn has six treatment precincts (60th, 63rd, 67th, 71st, 79th), Queens has three treatment precincts (102nd, 105th, and 115th), and Staten Island has one treatment precinct (121st).

### Table 3.  List of treatment precincts

| | |
|---|---|
| Precinct 13 | Precinct 60 |
| Precinct 18 | Precinct 63 |
| Precinct 25 | Precinct 67 |
| Precinct 30 | Precinct 71 |
| Precinct 34 | Precinct 72 |
| Precinct 42 | Precinct 79 |
| Precinct 43 | Precinct 102 |
| Precinct 44 | Precinct 105 |
| Precinct 47 | Precinct 115 |
| Precinct 48 | Precinct 121 |

---

unemployed residents (as measured by the percentage of men over the age 16 who did not work in the previous year).  For instance, *see* Robert J. Sampson, Stephen W. Raudenbush, and Felton Earls.  1997.  Neighborhoods and violent crime: A multilevel study of collective efficacy.  *Science,* 277: 918–924.

Table 4 presents a comparison of the treatment and control precincts on selected police, crime, and neighborhood characteristics. Simple comparisons of group means (Table 4) and distributions (Table 5) reveal that the treatment and control precincts are similar on average and in their joint distributions.[12] This suggests that the matching and randomization procedure generated balanced treatment and control clusters. While conditions do vary within precincts, the balanced clusters help to ensure that the treatment and control officers will be working in broadly similar neighborhood, crime, and policing contexts.

**Table 4.  Comparison of treatment and control precinct characteristics**

|  | Treatment Mean | Control Mean | Std. Mean Difference | _t_ | _p>|t|_ |
|---|---|---|---|---|---|
| Population | 115,557.2 | 102,705.1 | .143 | 0.90 | 0.376 |
| Concentrated disadvantage | .247 | .409 | −.077 | −0.48 | 0.637 |
| Officers | 200.8 | 198.1 | .035 | 0.21 | 0.833 |
| Major crimes | 1,643.6 | 1,576.0 | .067 | 0.42 | 0.678 |
| Arrests | 5,885.1 | 6,068.7 | −.038 | −0.24 | 0.814 |
| Arrests w/force | 114.6 | 124.3 | −.083 | −0.52 | 0.608 |
| 911 calls | 68,553.6 | 66,669.7 | .054 | 0.33 | 0.743 |
| CCRB | 81.2 | 80.7 | .009 | 0.06 | 0.954 |

N= 40 (20 treatment precincts, 20 control precincts)

Note: The standardized mean differences are Beta coefficients generated by ordinary least squares regressions of each precinct characteristic on group assignment.

---

[12]   It is important to note that caution should be used when interpreting the t–test results due to the small sample size (total N=40, 20 cases in each group).

**Table 5.  Comparison of treatment and control precinct characteristic distributions**

|  | Combined K–S D | p–value |
|---|---|---|
| Population | 0.250 | 0.560 |
| Concentrated disadvantage | 0.250 | 0.560 |
| Officers | 0.250 | 0.560 |
| Major crimes | 0.200 | 0.819 |
| Arrests | 0.150 | 0.978 |
| Arrests w/force | 0.300 | 0.329 |
| 911 calls | 0.250 | 0.560 |
| CCRB | 0.150 | 0.978 |

Note: Treatment and control precincts were compared using two-sample Kolmogorov-Smirnov tests for equality of distribution functions.

### *Selection of NYPD Officers and Assessment of Unit of Analysis Balance*

The NYPD provided data on N=4,942 officers working the third platoon (squads C1, C2, C3) and assigned to anti-crime, traffic, and conditions units in the 77 precincts, so the units of analysis could be examined to determine whether they systematically differed in the treatment and control groups.   The NYPD provided the monitor team information regarding the assignments of officers working the third platoon and selected specialized units in all 77 precincts as of December 31, 2015.  It is important to note that this represents a snapshot of NYPD officer assignments, as individual officers change assignments over time due to transfers, promotions, retirements, and other employment changes.  A total of 2,618 officers were assigned to the third platoon, anti-crime and conditions units in the 40 precincts to be included in the proposed RCT.

Table 6 presents the distribution of officers assigned to the third platoon, anti-crime, and conditions units in the 40 precincts by treatment and control groups. The precincts randomly allocated to the treatment group have larger numbers of officers staffing third platoon and

conditions assignments, while the control precincts have a higher number of anti-crime officers. As previously noted in Table 4, the treatment precincts had slightly larger numbers of officers relative to the control precincts, but this size difference was not statistically significant.

As part of its strategy for the Department (the "neighborhood policing" plan), the NYPD will be discontinuing the conditions units and reassigning these officers to patrol functions. We therefore did not include conditions unit officers in the current RCT design. It is likely that the number of patrol officers on the third platoon will increase as the NYPD continues to implement its neighborhood-policing plan. Combining the third platoon patrol and anti-crime officers yields N=1,138 treatment officers and N=1,126 control officers (again, these numbers represent a snapshot of staffing levels as of December 31, 2015 and are subject to change).

**Table 6.  Distribution of Officers by Assignment in Treatment and Control Precincts**

|                      | Treatment | Control | Total |
|----------------------|-----------|---------|-------|
| Third platoon patrol | 927       | 892     | 1,819 |
| Conditions           | 178       | 176     | 354   |
| Anti-crime           | 211       | 234     | 445   |
| Total                | 1,316     | 1,302   | 2,618 |

Simple comparisons of group means (Table 7) and joint distributions (Table 8) did not reveal any statistically significant differences in officer rank, sex, race/ethnicity, age, years on the job, or CCRB complaint rate per year of service for officers included in the treatment and control groups.[13] Taken as a whole, these analyses suggest that randomization was achieved as the process generated balanced clusters and units of analysis.

---

[13]     The NYPD provided the monitor team with the CCRB complaint counts per officer for the length of their careers. Treatment officers had a total mean of 1.8 CCRB complaints with a range of 0–9 complaints. Control officers had a total mean of 1.9 CCRB complaints with a range of 0–29 complaints. Since career lengths vary (see Table 7), the number of complaints was divided by time of service to estimate each individual officer's CCRB complaint rate per year of service.

**Table 7.  Comparison of characteristics of NYPD patrol officers working the third platoon and anti-crime units in treatment and control precincts**

| | Treatment | Control | Std. Mean Difference | _t_ | _p>\|t\|_ |
|---|---|---|---|---|---|
| *Officer rank* | | | | | |
| % Police officer | 89.7 | 89.9 | | | |
| % Sergeant | 10.3 | 10.1 | .0026 | 0.12 | 0.902 |
| | | | | | |
| *Officer sex* | | | | | |
| % Male | 88.4 | 89.1 | | | |
| % Female | 11.6 | 10.9 | .0106 | 0.51 | 0.611 |
| | | | | | |
| *Officer race/ethnicity* | | | | | |
| % White | 50.9 | 53.7 | −.0285 | −1.36 | 0.175 |
| % Hispanic | 29.6 | 25.1 | | | |
| % Black | 13.4 | 14.5 | | | |
| % Asian/other | 6.2 | 6.7 | | | |
| | | | | | |
| *Officer age* | | | | | |
| Mean years | 32.1 | 31.8 | .0197 | 0.94 | 0.348 |
| Range | 21–62 | 21–58 | | | |
| | | | | | |
| *Officer years on the job* | | | | | |
| Mean years | 6.1 | 6.1 | −.0027 | −0.13 | 0.896 |
| Range | <1–36 | <1–33 | | | |
| | | | | | |
| *Officer CCRB complaint rate* | | | | | |
| Mean yearly rate | 0.243 | 0.275 | −.0275 | −1.31 | 0.190 |
| Range | 0–3.0 | 0–3.7 | | | |
| | | | | | |
| *Officer assignment* | | | | | |
| % Third platoon patrol | 81.5 | 79.2 | | | |
| % Anti-crime | 18.5 | 20.8 | −.0281 | −1.34 | 0.180 |

N = 2,264 (1,138 treatment officers, 1,126 control officers)

Notes: The NYPD reports both white Hispanic officers and non-white Hispanic officers as "Hispanic" officers.  The data did not allow race by ethnicity classifications.  The standardized mean differences are Beta coefficients generated by ordinary least squares regressions of each precinct characteristic on group assignment.  For the rank and sex dummy variables, police officer and male were the reference categories, respectively.  For the white dummy variable, non-white was the reference category.

**Table 8.  Comparison of treatment and control officer characteristic distributions**

|  | Combined K-S D | p-value |
|---|---|---|
| Sergeant | 0.0016 | 1.000 |
| Female | 0.0068 | 1.000 |
| White | 0.0285 | 0.747 |
| Age | 0.0254 | 0.859 |
| Years on the job | 0.0261 | 0.834 |
| Anti-crime | 0.0224 | 0.939 |
| CCRB complaint rate | 0.0328 | 0.578 |

Note: Treatment and control precincts were compared using two-sample Kolmogorov-Smirnov tests for equality of distribution functions.

### *Remaining Program Implementation and Evaluation Issues*

The NYPD is in the process of moving towards a "neighborhood policing" plan that will move officers from the conditions units into patrol positions.  This will impact the number of officers working the third platoon over time.

The proposed design safeguards against the diffusion of treatment into the comparison group; in other words, the impact of cameras will be limited to the treatment precincts and should not affect the outcomes in the control precincts.  However, the allocation of cameras to patrol officers in one platoon will allow us to analyze contamination impacts across patrol officer work shifts within precincts.  It could be that the presence of BWCs in the precinct being worn by officers in the third platoon will have an influence on the behaviors of close colleagues working in the first and second platoons in that precinct, thus generating a desirable "halo effect" on those not wearing BWCs.  Similarly, civilians who may anticipate being captured on film may act more courteous to officers in routine interactions.  In the real world, contamination impacts are desirable because the presence of BWCs could have larger area-level impacts on officer and civilian behavior beyond those who actually wear the cameras.

On a similar note, it is important to recognize that anti-crime officers (211 treatment, 234 control) work varying tours of duty depending on the specific needs of the precincts assigned. Thus, anti-crime officers in the treatment precincts will be wearing cameras during some hours that do not match the hours of patrol officers in the third platoon.   As a result, there may be two types of diffusion effects of the BWC in the treatment precincts:  a direct effect on officers not wearing cameras but who work the same shift as specialized unit officers (e.g., anti-crime), and an indirect effect on patrol officers who work on a different shift than officers with BWCs.

|  | Anti-crime (N=445) |
|---|---|
| More than half of tour is on third platoon | 23.8% |
| More than half of tour is before third platoon | 33.6% |
| More than half of tour is after third platoon | 41.1% |
| Tour does not intersect with third platoon | 1.5% |

We will conduct the experimental analysis in a single blind manner.  Professor John MacDonald, a member of the monitor team, will analyze the resulting experimental data blinded to which officers are in the treatment and control groups.  Braga will provide MacDonald with fictionalized precincts and experimental groups simply listed as group 1 v. group 2.  MacDonald will not know which group was the treatment group and will analyze the main outcomes blind to assignment.

There are other issues that still need to be addressed in the development of an evaluation plan that satisfies the requirements of the court order.  Working with the NYPD and the parties, the monitor team will develop key outcome measures based on official data sources. These official data measures will include "civilizing/de-escalation" outcomes, such as CCRB complaints, officer use of force incidents, and officer injury and resisting arrest information; officer activity outcomes such as counts of arrests, summons, and stop report forms; outcomes of CCRB complaints, such as complaint dispositions, time-to-complaint disposition, and lawsuits

filed; and outcomes to measure whether the lawfulness of stops was impacted (such as reviews of narratives on stop report forms and activity logs).  Other outcome/process measures are also being considered, such as officer surveys, community surveys, surveys of enforcement action subjects (e.g., arrested individuals, stop and frisk subjects), and review of videos of police-citizen interactions.

The monitor team also will need to devise a rigorous evaluation plan for the implementation of the BWCs on NYPD officers working in Police Service Areas (PSAs).  We are currently considering a quasi-experimental research design comparing PSA 2 (treatment area) to the other PSAs (control areas).

Finally, the monitor team is working with the NYPD to develop a plan to implement the rollout of BWC deployment in a way that accounts for the need to wire precincts so that video footage can be uploaded via secure internet connections.