

**Peter L. Zimroth**
+1 212.836.7316 Direct
Peter.Zimroth@apks.com

June 29, 2017

<u>**VIA ECF**</u>

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007-1312

Re:   *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
*Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
*Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
<u>Sixth Report of the Independent Monitor: The NYPD's Body-Worn
Camera Pilot–Research and Evaluation Plan</u>

Dear Judge Torres:

I am pleased to attach the monitor's sixth report, which describes the methodology used to choose the NYPD officers who will be participating in its one-year body-worn camera pilot program.  The report also describes the current thinking about how the monitor will evaluate the pilot.

Respectfully submitted,

*/s/ Peter L. Zimroth*

Peter L. Zimroth
Monitor

Enclosure

**Sixth Report of the Independent Monitor**

**The NYPD's Body-Worn Camera Pilot: Research and Evaluation Plan**

**Peter L. Zimroth**

**June 29, 2017**

*Floyd, et al. v. City of New York*
*Ligon, et al. v. City of New York, et al.*
*Davis, et al. v. City of New York, et al.*

**MONITOR TEAM**

Peter L. Zimroth
Monitor

Richard Jerome
Deputy Monitor

Anthony A. Braga

Cassandra Chandler

Jennifer Eberhardt

Demosthenes Long

John MacDonald

James McCabe

Jane Perlov

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

I.      The Body-Worn Camera Pilot Program ...................................................... 2

II.     The Design of the Randomized Controlled Trial ......................................... 3

        A.     Precincts Excluded from the Field Experiment ............................... 6

        B.     Choosing the 40 Camera and Control Precincts ............................. 7

        C.     Matching and Randomization ......................................................... 8

        D.     Randomization of Precincts and Assessment of Cluster Balance .......... 9

        E.     Comparability of NYPD Officers in Camera and Control Precincts ........ 12

III.    Outcome Measures for the Body-Worn Camera Pilot ............................. 15

        A.     Impact of Cameras on the Civility of Police-Citizen Interactions ........ 15

        B.     Impact of Cameras on Policing Activity ....................................... 16

        C.     Impact of BWCs on Police Lawfulness ........................................ 17

        D.     Impact of Cameras on Police-Community Relations ...................... 18

IV.    Public Housing ........................................................................................ 19

**INTRODUCTION**

On April 27, 2017, the New York City Police Department (NYPD) launched its body-worn camera (BWC) pilot program, with 57 officers in the third platoon of the 34 Precinct in Manhattan wearing cameras. One month later, the program was extended to a second precinct, the 60 Precinct in Brooklyn, with 49 officers wearing cameras. When the pilot is fully implemented, approximately 1,200 officers in 20 precincts will be wearing cameras for a one-year period pursuant to the requirements of the amended remedial order in *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013) (Remedial Order at *Floyd* Dkt. No. 372, Amended Remedial Order at *Floyd* Dkt. No. 522). The goal of the pilot program is to assess the costs and benefits of deploying cameras and whether deployment results in reducing unconstitutional stops and frisks.

The monitor's research and evaluation design for the BWC pilot program was developed by Professor Anthony Braga of Northeastern University and other members of the monitor team. This report describes that plan, providing details about how the camera and control precincts were selected and matched and how the results of the camera experiment will be judged.

In capsule, Professor Braga identified 20 pairs of precincts, matched in terms of demographics, socio-economic characteristics, crime and police activity. Care was taken to ensure that the officers in each precinct pair were also similar in terms of demographics, length of service, rank and citizen complaints. Then, in each pair, one precinct was randomly assigned to have cameras (the treatment precinct), and the other was assigned to be without cameras (the control precinct).

As for evaluating the cameras' impact, the plan anticipates using four sets of outcome measures: civility of police-citizen interactions, arrest numbers and other policing activities,

police lawfulness, and police–community relations.  To accomplish this, the monitor team will analyze pre-test and post-test data for officers in the camera and control groups collected from the NYPD and the Civilian Complaint Review Board.  Data from community surveys will be used to assess police-community relations.  In the camera precincts, responses from before and after camera deployment will be compared to look for any significant differences.  Data from camera and control precincts will also be compared to ascertain whether any change is the result of some event or circumstance unrelated to the cameras.

## I.       The Body-Worn Camera Pilot Program

The Remedial Order in *Floyd* noted the potential benefits of outfitting NYPD officers with body-worn cameras.  Those possible benefits included creating objective records of stop and frisk encounters, encouraging lawful and respectful police-citizen interaction, alleviating mistrust between the NYPD and the public, and offering a way to help determine the validity of accusations of police misconduct.  The court order directed the NYPD to work with the court-appointed independent monitor to conduct a one-year pilot program to determine whether the benefits of the cameras outweigh their financial, administrative, and other costs and whether the program should be expanded or terminated.  The monitor was charged with establishing procedures for the review of stop recordings by supervisors and senior managers, for preserving stop recordings, and for measuring the effectiveness of body-worn cameras in reducing unconstitutional stops and frisks.

The Remedial Order further called for the one-year camera pilot to be implemented in the NYPD precinct with the highest number of stops reported in 2012 in each of the five boroughs–identified as the 23, 40, 75, 103, and 120 Precincts.  After considerable consultation with

representatives from the NYPD's Risk Management Bureau, the Information Technology Bureau, the Office of the Chief of the Department, and the Office of Management, Analysis and Planning, it was determined that the selection of the five NYPD commands was not the best way to design a rigorous evaluation of the pilot program.  First, the precincts with the highest reported number of stops in 2012 were no longer the precincts with the most stops in 2015 and 2016.[1] Second, dictating which commands would receive body-worn cameras meant that there could not be a rigorous randomized experimental design in which commands would be randomly assigned to treatment and control conditions.[2]  Without a randomized controlled trial design, the monitor and the NYPD would not be able to know for sure the benefits of the cameras.  Thus, the monitor team recommended and the court approved a modification of the remedial order that required a more rigorous randomized controlled trial, the components of which are described below.


## II.      The Design of the Randomized Controlled Trial

Randomized experimental designs allow researchers to assume that the only systematic difference between the control and treatment groups is an intervention, such as the presence of

---

[1] The number of reported stops made by NYPD officers plummeted from 532,911 in 2012 to 22,939 in 2015.  The relative ranks of NYPD precincts also shifted.  In 2012, the 75 Precinct was ranked 1 with 24,408 reported stops, the 40 Precinct was ranked 3 with 18,276 reported stops, the 103 Precinct was ranked 6 with 12,986 reported stops, the 120 Precinct was ranked 7 with 12,368 reported stops, and the 23 Precinct was ranked 10 with 11,095 reported stops. In 2015, the 75 Precinct was ranked 13 with 543 reported stops, the 40 Precinct was ranked 2 with 927 reported stops, the 103 Precinct was ranked 51 with 160 reported stops, the 120 Precinct was ranked 11 with 557 reported stops, and the 23 Precinct was ranked 23 with 340 reported stops.

[2] One of the key benefits of using a randomized experimental design is the ability to produce a high degree of confidence in the observed effects.  This is ultimately achieved through greater control of extraneous factors or threats to validity.  It is important to move from correlation closer to causality: this is what well-executed and high-quality research designs allow.  *See* Donald T. Campbell and Julian C. Stanley. 1966. *Experimental and quasi-experimental designs for research*. Chicago: Rand McNally.

cameras; this permits a clear assessment of effects of the intervention.[3]  The camera pilot is using cluster randomization, a variation of the classic design in which clusters (groups) of subjects, rather than individual subjects, are randomly allocated to treatment and control conditions.[4]  The NYPD experiment calls for officers to be randomly allocated by precinct to the treatment group (with cameras) or comparison group (without cameras).

The cluster design will enable the evaluation to control for treatment "contamination" across individual officers and civilians.  As a body-worn camera experiment in Rialto, California, suggested, officers with body-worn cameras could influence the behavior of officers without cameras if they work simultaneously in the same area and interact with the same people.[5]  Similarly, the exposure to body-worn cameras through a subset of officers in an area could influence how civilians in that area interact with the police more broadly.  Such contamination undermines the ability to detect intervention effects because both treatment and control officers (and civilians) could be modifying their behaviors due to the presence of cameras.  Randomly allocating groups of officers who work in distinct precincts to have cameras or not limits the contamination problem.

The random allocation of units of analysis smaller than precincts, such as sectors within precincts, was considered, but ultimately rejected.  Depending on calls for service and other demands for police service, patrol officers sometimes work in other sectors within precincts, and this cross-sector work would cause contamination issues.

---

[3] William R. Shadish, Thomas D. Cook, and Donald T. Campbell. 2002. *Experimental and quasi-experimental designs for generalized causal inference*. Boston: Houghton Mifflin.

[4] Frederick Mosteller and Robert F. Boruch, eds. 2002. *Evidence matters: Randomized trials in education research*. Washington, DC: Brookings Institution Press; David M. Murray. 1998. *Design and analysis of group-randomized trials*. New York: Oxford University Press.

[5] Barak Ariel, William Farrar and Alex Sutherland. 2015. The effect of police body-worn cameras on use of force and citizens' complaints against the police: A randomized controlled trial. *Journal of Quantitative Criminology*, 31 (3): 509–535.

For the NYPD pilot program, rather than eligible precincts being ranked by the number of stop reports in each precinct, they were ranked according to the 2012-2015 mean yearly counts of complaints handled by New York City's Civilian Complaint Review Board (CCRB). This was thought to be a better way to rank precincts because of the dramatic decline in reported stops between 2012 and 2015.  Moreover, a 2012 study by the CCRB showed that the police precincts with the highest number of civilian complaints against officers had the highest stop rates.[6]  The top-ranked 40 precincts were then matched into 20 pairs based on CCRB counts, crime, police activity, and neighborhood characteristics.  In each pair, one precinct was randomly assigned to the group receiving cameras and one to the comparison group.  By the pilot's conclusion, it is anticipated that at least 1,200 NYPD officers in the treatment group will have worn cameras (20 precincts x 60 officers per precinct), having been paired with 1,200 officers in the control group not wearing them.

Ensuring an "apples to apples" comparison of officers in the treatment and control groups required identifying a well-defined group of officers—here, by selecting all officers assigned to a specific shift or unit.  Specifically, cameras will be provided to all uniformed patrol officers working the third platoon (3:00 pm to midnight shift) in the treatment precincts.  On average, each platoon has approximately 45 patrol officers.  In addition, there will be approximately 15 other officers wearing cameras—plainclothes officers from the specialized anti-crime units and traffic enforcement officers.  The comparison group in the control precincts will likewise be composed of patrol officers working the third platoon and plainclothes officers in the anti-crime units and traffic enforcement officers.

---

[6]   *See*   http://www.nydailynews.com/new-york/brooklyn/complaints-cops-mirror-stop-and-frisk-numbers-article-1.1388735.  (Accessed May 30, 2015.)  For all NYPD precincts, 2012 precinct CCRB counts and 2012 precinct stop counts were highly correlated (Pearson's r = .84, $p<.000$).

## A.      Precincts Excluded from the Field Experiment

Six precincts were excluded from the randomized field experiment.  Prior to this court-ordered pilot program, the NYPD conducted a small-scale voluntary body-worn camera program (not ordered by the court) that began in December 2014, in which 54 officers in five precincts and one housing Police Service Area (PSA) volunteered to wear cameras.  This trial run, which ended on March 31, 2016, was intended to test body-worn camera equipment, enhance understanding of the information technology infrastructure necessary to support camera use, and gain insight on other matters of policy and practical implementation.  The NYPD ran this small pilot in the 23, 40, 75, 103, and 120 Precincts.  Prior use of cameras in those precincts excluded them from the experiment, owing to contamination concerns.  Finally, the 22 Precinct serving Central Park was excluded because it has relatively low levels of police activity and an almost non-existent residential population.  There is also no natural comparison precinct for Central Park.

As Table 1 shows, all five boroughs have at least one precinct eligible for inclusion in the randomized field experiment.

**Table 1.      Eligibility of NYPD Precincts for Inclusion in BWC Experiment**

|  | Eligible | Not Eligible | Total |
|---|---|---|---|
| Manhattan | 20 | 2 | 22 |
| Bronx | 11 | 1 | 12 |
| Brooklyn | 22 | 1 | 23 |
| Queens | 15 | 1 | 16 |
| Staten Island | 3 | 1 | 4 |
| Total | 71 | 6 | 77 |

### B.      Choosing the 40 Camera and Control Precincts

Seventy-one precincts were ranked according to 2012-2015 mean yearly counts of CCRB complaints (mean = 61.1, median = 50.5, range = 17.8 to 160.3).[7]  The 2012-2015 mean CCRB complaint rate per 100,000 residents was considered as a possible ranking metric of the 71 eligible precincts.   Ultimately, this measure was not used because precincts with lower residential populations and higher levels of commercial and recreational activity often had artificially high ranks.  It was decided to use raw complaint *counts* instead of complaint *rates*.

For 2012-2015 CCRB mean yearly counts, the top 40 precincts chosen for inclusion in the trial had a mean = 80.9, median = 76.5, and range = 49.0 to 160.3.[8]  The 31 precincts omitted from the trial had a mean = 35.6, median = 36.8, and range = 17.8 to 48.8.  In sum, CCRB complaints were a little more than two times higher in the top 40 precincts selected for the trial relative to CCRB complaints in the 31 precincts excluded.  As Table 2 shows, all five boroughs had at least one eligible precinct in the top 40 precincts ranked by yearly mean CCRB counts.

**Table 2.      The Inclusion of Eligible NYPD Precincts in Top 40 CCRB Yearly Mean Counts by Borough**

|  | Top 40 | Not Top 40 | Total |
|---|---|---|---|
| Manhattan | 10 | 10 | 20 |
| Bronx | 9 | 2 | 11 |
| Brooklyn | 13 | 9 | 22 |
| Queens | 7 | 8 | 15 |
| Staten Island | 1 | 2 | 3 |
| Total | 40 | 31 | 71 |

---

[7] Work on the design for the randomized control trial was completed over the course of 2016.  Precincts within matched pairs were randomized in July 2016 so that planning for officer training, information technology upgrades in the selected precincts, and other implementation requirements could proceed.  The ranking used 2012-2015 full-year CCRB data.  However, as presented below at pages 10-11, full-year 2016 CCRB data were included in the assessment of treatment and control group balance prior to the roll-out of the cameras in April 2017.

[8] In July 2013, the 121 Precinct was formed from areas in the 120 and 122 Precincts in Staten Island.  Unfortunately, data for the newly formed precinct were not available in 2012 and 2013.  CCRB complaints in these areas were included in the 120 and 122 Precinct counts in 2012 and 2013.  Therefore, only 2014-2015 CCRB counts were considered for these three precincts rather than the mean 2012-2015 CCRB counts.

### C.        Matching and Randomization

Simple, but deliberate, matching exercises ensure that any peculiarities found in one sample will most likely occur in the other as well.[9]

Precincts were matched into pairs within boroughs by first comparing mean yearly CCRB counts to ensure that treatment and control groups would be balanced on this key outcome measure.  Other relevant variables were then considered.  These variables included 2012-2015 mean yearly arrest counts, 2012-2015 mean yearly arrest counts where force was used, 2012-2015 mean yearly major crime counts,[10] 2012-2015 mean yearly counts of sworn officers, 2014-2015 mean 911 calls for service counts,[11] 2016 New York City Housing Authority resident population data, and an overall concentrated disadvantage index for the neighborhoods that comprised the precincts, based on census block data from the 2013 U.S. Census Bureau's American Community Survey.[12]

This data was supplemented by information regarding neighborhood characteristics and dynamics that might not appear in the data.  With the support of the NYPD, Professor Braga,

---

[9] Hubert Blalock. 1979. *Social statistics*. Revised second edition. New York, NY: McGraw-Hill; Peter H. Rossi, Mark Lipsey, and Howard Freeman. 2006. *Evaluation: A systematic approach.* Seventh edition. Newbury Park, CA: Sage Publications.

[10] The seven major crime categories reported by the NYPD are: murder, rape, robbery, felony assault, burglary, grand larceny, and grand larceny auto.

[11] The NYPD 911 call center transitioned to a new computer-aided dispatch (CAD) system in May 2013.  The new CAD system changed the 911 calls for service counting procedures.  Due to inconsistent counts over time, the monitor team was limited to using 2014 and 2015, the most recent two years of calls for service data available.

[12] The concentrated disadvantage index is a standardized index composed of the percentage of residents who are Black, the percentage of residents receiving public assistance, the percentage of families living below the poverty line, the percentage of female-headed households with children under the age of 18, and the percentage of unemployed residents (as measured by the percentage of men over age 16 who did not work in the previous year). For instance, *see* Robert J. Sampson, Stephen W. Raudenbush, and Felton Earls. 1997. Neighborhoods and violent crime: A multilevel study of collective efficacy. *Science,* 277: 918–924.

who led the design effort for the monitor team, visited all 77 precincts to develop qualitative information relevant to the matching.

The matching process yielded 20 similar pairs.[13]

### D.      Randomization of Precincts and Assessment of Cluster Balance

A randomization algorithm was used to determine randomly which precinct within each pair would receive the body-worn cameras.  The precincts not selected from each of the pairs are control precincts.  Table 3 presents the camera (treatment) precincts from each of the matched pairs.  All five boroughs have at least one precinct included in the camera group.  Manhattan has five camera precincts (13, 18, 25, 30, and 34), Bronx has five camera precincts (42, 43, 44, 47, and 48), Brooklyn has six camera precincts (60, 63, 67, 71, 79, and 83), Queens has three camera precincts (102, 105, and 115), and Staten Island has one camera precinct (121).

**Table 3.          List of Camera Precincts in the Matched Pairs**

**Bold = Camera Precinct**

| | |
|---|---|
| Pair 1 – Precinct a, **Precinct 13** | Pair 11 – **Precinct 60**, Precinct k |
| Pair 2 – Precinct b, **Precinct 18** | Pair 12 – Precinct l, **Precinct 63** |
| Pair 3 – **Precinct 25**, Precinct c | Pair 13 – **Precinct 67**, Precinct m |
| Pair 4 – **Precinct 30**, Precinct d | Pair 14 – Precinct n, **Precinct 72** |
| Pair 5 – Precinct e, **Precinct 34** | Pair 15 – **Precinct 71**, Precinct o |
| Pair 6 – Precinct f, **Precinct 42** | Pair 16 – **Precinct 79**, Precinct p |
| Pair 7 – **Precinct 43**, Precinct g | Pair 17 – **Precinct 102**, Precinct q |
| Pair 8 – **Precinct 47**, Precinct h | Pair 18 – **Precinct 105**, Precinct r |
| Pair 9 – **Precinct 48**, Precinct i | Pair 19 – Precinct s, **Precinct 115** |
| Pair 10 – **Precinct 44**, Precinct j | Pair 20 – Precinct t, **Precinct 121** |

---

[13] In general, the most appropriate precinct matches were found within boroughs.  There were two exceptions.  One Bronx precinct was matched to a precinct in Brooklyn, and one precinct in Queens was matched to a precinct in Staten Island.

Table 4 compares the treatment and control precincts based on selected police, crime, and neighborhood characteristics.[14]  The results of these comparisons (using the means of these characteristics), presented below in Table 4, show that the treatment and control precincts are similar.[15]  An examination of the distribution of the data from the two groups (treatment and control) also indicates that the distribution of the data in the two sets of precincts is similar.[16]  This suggests that the matching and randomization procedure generated balanced treatment and control clusters.  Although conditions vary within precincts, the balanced clusters help ensure that the camera and control officers will be working in broadly similar neighborhood, crime, and policing contexts.

---

[14] Table 4 provides a comparison of treatment and control group that includes 2016 data for arrests, arrests where force was used, major crimes, precinct sworn officers, calls for service, and CCRB complaints.

[15] It is important to note that caution should be used when interpreting the *t*-test results due to the small sample size (total N=40, 20 cases in each group).

[16] Treatment and control precincts were compared using two-sample Kolmogorov-Smirnov (K-S) tests for equality of distribution functions.  K-S tests are used to compare the characteristics of the distributions of two samples of data to determine whether the samples are significantly different from each other.

**Table 4.        Comparison of Treatment and Control Precinct Characteristics**

|  | Treatment Mean | Control Mean | Std. Mean Difference | _t_ | _p>/t/_ |
|---|---|---|---|---|---|
| Population | 115,557.2 | 102,705.1 | .143 | 0.90 | 0.376 |
| NYCHA population | 4,986.2 | 4,609.2 | .031 | 0.19 | 0.848 |
| Concentrated disadvantage | .247 | .409 | -.077 | -0.48 | 0.637 |
| Officers | 206.5 | 202.8 | .042 | 0.26 | 0.797 |
| Major crimes | 1,636.1 | 1,548.7 | .090 | 0.56 | 0.580 |
| Arrests | 5,682.8 | 5,821.1 | -.031 | -0.19 | 0.848 |
| Arrests w/force | 104.7 | 112.8 | -.076 | -0.47 | 0.638 |
| 911 calls | 69,396.3 | 67,500.2 | .052 | 0.32 | 0.747 |
| CCRB complaints | 78.3 | 77.6 | .012 | 0.08 | 0.940 |

N= 40 (20 treatment precincts, 20 control precincts)

Notes: The standardized mean differences are Beta coefficients generated by ordinary least squares regressions of each precinct characteristic on group assignment.  A "$t$-test" is used to determine if two sets of data are significantly different from each other on a selected variable or characteristic.  The $t$-test values reported here represent the test statistic results for comparisons of the difference between the control and treatment groups on specific variables.  The $t$-test results are based on a standardized normal distribution; larger values represent larger differences between the two samples on selected characteristics.  An absolute value of $t$ ("|$t$|") in excess of 1.96 would indicate that the two sets of data were significantly different.  The $p$-value represents the probability that the differences between the two groups could occur by chance.  By social science convention, $p$-values less than .05 indicate statistically significant differences, showing that there is less than a 5 percent chance that the observed differences occurred by chance.  The $t$-values and $p$-values in Table 4 all indicate that the treatment and control precincts are not different from each other across the variables measured.  Significant differences between treatment and control groups would also be noted by standardized mean differences in excess of |.20|.  As Table 4 indicates, no standardized mean differences exceeded this benchmark.

Implementing a body-worn camera pilot program in a very large police department that provides services to citizens in a diverse set of communities across a sprawling metropolitan area is a very complex process.  For the NYPD, it required coordinating the training of line-level officers and supervisors in the policies governing the camera program and technological operations, ensuring the appropriate information technology resources were available in each precinct to facilitate uploading acquired video from cameras, and addressing other matters of implementation.  To accommodate these needs, the NYPD plans a staggered roll-out of the

cameras over seven months.  Despite varying start dates, all treatment precincts will be using the cameras for one full year.[17]

### E.    Comparability of NYPD Officers in Camera and Control Precincts

Part of ensuring the validity of the randomized control design entails testing whether officers involved in the camera and control groups possess similar characteristics.  That test was conducted by Professor Braga with data provided by the NYPD as of December 31, 2016.  Because assignments will shift in the course of the experiment, so too will the number of officers actually wearing cameras.

All patrol officers assigned to the third platoon in the treatment and control precincts will be participating in the pilot program.  In addition, anti-crime and traffic officers working a majority of their shift on the third platoon (*i.e.*, tours of duty beginning between 12:00 pm and 8:00 pm) will participate.

Table 5 presents the distribution on December 31, 2016, of officers in the camera and control precincts whose assignments would make them eligible to participate in the pilot.  Combining the third platoon patrol, anti-crime and traffic officers yields N=1,275 officers who would be wearing cameras and N=1,273 officers without cameras.  The most recent estimate (as of mid-June, 2017) is that there are approximately 2400 officers in these assignments.[18]

---

[17] The 34 Precinct received cameras in April 2017.  In May 2017, the NYPD followed with the 60 Precinct.  The plan is to continue with the 72 Precinct in June 2017; the 42, 47, and 48 Precincts in July 2017; the 25, 43, 71, and 79 Precincts in August 2017; the 44, 63, 105, 115 Precincts in September 2017; the 13, 18, 30, and 102 Precincts in October 2017; and the 67 and 121 Precincts in November 2017.

[18] Preliminary analyses suggest that the NYPD trial with 40 clusters of roughly 2,400 subjects is more than adequately powered to detect very modest treatment effects.  See Mark W. Lipsey. 1990. *Design sensitivity: statistical power for experimental research.* Thousand Oaks, CA: Sage Publications.

**Table 5.      Distribution of Officers by Assignment in Treatment and Control Precincts (As of 12/31/16)**

|                      | Treatment | Control | Total |
|----------------------|-----------|---------|-------|
| Third platoon patrol | 1,131     | 1,114   | 2,245 |
| Anti-Crime           | 100       | 114     | 214   |
| Traffic              | 44        | 45      | 89    |
| Total                | 1,275     | 1,273   | 2,548 |

Comparisons of group characteristics (Table 6) did not reveal any statistically significant differences in officer rank, sex, race/ethnicity, age, years on the job, and CCRB complaint rate per year of service[19] for officers included in the treatment and control groups.  An examination of the distribution of the data from the two groups of officers (treatment and control) also indicate that the distributions of the two sets of precincts are similar.[20]  Taken as a whole, these analyses suggest that randomization was achieved, as the process generated balanced clusters and units of analysis.

---

[19] The NYPD provided the monitor team with the CCRB complaint counts per officer for the length of their careers.  Treatment officers had a total mean of 1.31 CCRB complaints with a range of 0–17 complaints.  Control officers had a total mean of 1.54 CCRB complaints with a range of 0–25 complaints.  Since career lengths vary (see Table 6), the number of complaints was divided by time of service to estimate each individual officer's CCRB complaint rate per year of service.

[20] Officers in the treatment and control precincts were compared using two-sample K-S tests for equality of distribution functions.  K-S tests are used to compare the characteristics of the distributions of two samples of data to determine whether the samples are significantly different from each other.

**Table 6.        Comparison of Characteristics of NYPD Patrol Officers Working the Third Platoon, Anti-Crime and Traffic in Treatment and Control Precincts**

| | Treatment (mean) | Control (mean) | Std. Mean Difference | _t_ | _p>|t|_ |
|---|---|---|---|---|---|
| _Officer rank_ | | | | | |
| % Police officer | 92.6 | 92.0 | | | |
| % Sergeant | 7.4 | 8.0 | -.0120 | -0.61 | 0.545 |
| | | | | | |
| _Officer sex_ | | | | | |
| % Male | 87.4 | 87.7 | | | |
| % Female | 12.6 | 12.3 | .0044 | 0.22 | 0.707 |
| | | | | | |
| _Officer race / ethnicity_ | | | | | |
| % White | 47.8 | 49.3 | -.0156 | -0.79 | 0.429 |
| % Hispanic | 30.1 | 27.3 | | | |
| % Black | 13.7 | 14.2 | | | |
| % Asian / other | 8.4 | 9.2 | | | |
| | | | | | |
| _Officer age_ | | | | | |
| Mean years | 31.2 | 31.5 | -.0203 | -1.03 | 0.304 |
| Range | 21–61 | 21–59 | | | |
| | | | | | |
| _Officer years on the job_ | | | | | |
| Mean years | 5.20 | 5.49 | -.0282 | -1.42 | 0.155 |
| Range | <1–37 | <1–34 | | | |
| | | | | | |
| _Officer CCRB complaint rate_ | | | | | |
| Mean yearly rate | 0.224 | 0.239 | -.0213 | -1.08 | 0.281 |
| Range | 0–3.0 | 0–3.5 | | | |
| | | | | | |
| _Officer assignment_ | | | | | |
| % Third platoon patrol | 88.7 | 87.5 | .0184 | 0.93 | 0.351 |
| % Anti-Crime | 7.8 | 9.0 | | | |
| % Traffic | 3.5 | 3.5 | | | |

N = 2,548 (1,275 treatment officers, 1,273 control officers)

Notes: The NYPD reports both white Hispanic officers and non-white Hispanic officers as "Hispanic" officers. The data did not allow race by ethnicity classifications. The standardized mean differences are Beta coefficients generated by ordinary least squares regressions of each precinct characteristic on group assignment. For the rank and sex dummy variables, police officer and male were the reference categories, respectively. For the white dummy variable, non-white was the reference category.

14

### III.   Outcome Measures for the Body-Worn Camera Pilot

As previously noted, the randomized controlled trial of the body-worn camera pilot will measure the impact of the cameras using four sets of outcome measures: civility of police-citizen interactions, policing activity, police lawfulness, and police-community relations.   With the exception of police-community relations metrics, the data for the study's outcome measures will be available through official data systems of the NYPD and the Civilian Complaint Review Board.  The primary analyses of these outcomes for the treatment and control groups will involve comparison of data from the 12-month pre-implementation (pre-test) and 12-month implementation (post-test) time periods.[21]

### A.   Impact of Cameras on the Civility of Police-Citizen Interactions

The available research suggests that having cameras on officers will improve the civility of police-citizen interactions by deterring undesirable behaviors—neither officers nor civilians want to be recorded on video doing something inappropriate or illegal—and prompting desirable, respectful behaviors.[22]  For officers in the treatment and control groups, pre-test and post-test data will be collected and analyzed for the following "civility/de-escalation" outcomes:

- CCRB complaints

- Officer arrest reports listing force

- Officer use of force reports

- Officer injury reports

---

[21] Because certain outcomes involve rare events (*e.g.*, CCRB complaints), supplemental experimental analyses of longer pre-test periods will be conducted for all official data metrics.  Therefore, the current plan is to collect NYPD and CCRB measures for treatment and control officers for a three-year time period prior to BWC implementation.

[22] Barak Ariel, William Farrar, and Alex Sutherland. 2015. The effect of police body-worn cameras on use of force and citizens' complaints against the police: A randomized controlled trial. *Journal of Quantitative Criminology*, 31: 509–535.

- Resisting arrest data

- Disorderly Conduct and Obstructing Government Administration arrests and summonses

Variables in these datasets will be analyzed to determine whether cameras influence the types of CCRB complaints filed, lawsuit settlement amounts (if data is available), the types of force used (hand strike, baton, etc.), and other relevant subcategories for camera officers and control officers over the course of the study period. The monitor team will also examine the impact of cameras on the CCRB complaint process and outcomes, looking, for example, at dispositions, time-to-disposition of complaint, and disciplinary actions taken. The aim is to gauge differences in post-complaint experiences of treatment officers relative to control officers.

### B.       Impact of Cameras on Policing Activity

In the NYPD pilot, police officers with and without cameras will be compared over pre-test and post-test periods to determine whether cameras affect policing activity.[23] Metrics will include:

- Monthly number of responses to citizen calls for service (data available by unit only rather than by individual officer)

- Monthly number of officer-initiated calls (data available by unit only rather than by individual officer)

- Monthly number of complaints by citizens of crime

- Monthly number of domestic incident reports

- Monthly number of arrests

---

[23]   Some observers suggest that wearing cameras might cause officers to be less active or more reluctant to initiate citizen contacts, instead focusing most of their time on dispatched calls. However, one recent evaluation suggests that officers wearing cameras are *more likely* to initiate encounters and issue citations than their counterparts without cameras. Justin Ready and Jacob Young. 2015, The impact of on-officer video cameras on police–citizen contacts: findings from a controlled experiment in Mesa, AZ. *Journal of Experimental Criminology*, 11:445–458.

- Monthly number of summons

- Monthly number of stop reports

- Monthly number of interior patrols

The data will be further analyzed to assess whether the cameras affect the likelihood that crime complaints will result in arrests or summonses.

### C.     Impact of BWCs on Police Lawfulness

Stop reports provide an opportunity to examine whether cameras affect the lawfulness of police interactions with citizens.  Each quarter, the monitor team will be reviewing stop reports to assess whether NYPD officers comply with the Constitution and provisions of the *Floyd*, *Ligon*, and *Davis* orders and to compare whether the level of compliance differs between camera and non-camera precincts.  Random sampling techniques are being used to select for review a target number of stop reports each quarter, to ensure that after four quarters, a sufficient number of reports will have been reviewed to be representative of stop reports made in the 20 pairs of precincts in the experiment.  The monitor team will be looking at whether the presence of cameras influenced the officers' justifications for the stops, frisks and searches and also whether wearing cameras affected the demographic makeup of those stopped, such as their race, gender and age.

The monitor team will also be examining trespass enforcement in treatment precincts and control precincts.  This examination will depend in part on the availability of data in a readily accessible format.  Accounting for this caveat, the plan is to compare officers with and without cameras to see whether there are differences, for example, in whether their trespass arrests in NYCHA and TAP buildings were lawful and whether the officers completed the required arrest and stop reports.

17

### D.      Impact of Cameras on Police-Community Relations

To evaluate whether cameras affect police-community relations, two sets of surveys of New York City residents will be used:  one set conducted prior to the introduction of the cameras and the other set to be conducted after the cameras have been in use for a period of time.  The first set of surveys were conducted in March and April of this year, and the second series of surveys are expected to be fielded 12 to 18 months afterwards.

The survey methodology will be the same for both sets of surveys, with interviews divided equally between treatment precincts and control precincts, allowing the monitor team to assess whether the cameras affect civilian interactions with the NYPD and public attitudes towards the police.  Control precincts were included in the survey design so the monitor team can determine whether any changes in survey results in camera precincts are a result of the introduction of cameras, as opposed to other citywide factors.

To conduct the surveys, the monitor has brought on two organizations, Hart Research Associates and the CUNY Institute for State and Local Government.  Hart Research Associates conducted a telephone survey of residents in the 20 treatment precincts and the 20 control precincts.  Recognizing that the persons most impacted by past NYPD stop and frisk activities, particularly young minority men, are not always easy to reach in telephone surveys, the monitor team also assigned the CUNY Institute of State and Local Government to conduct a more targeted in-person survey in five treatment and five control precincts.

Detailed descriptions of both the telephone and in-person pre-treatment survey methodology are included in Attachment 1 (Hart) and Attachment 2 (CUNY).  Copies of the survey instruments used are included in Attachment 3.

## IV.     Public Housing

Because Public Housing Police Service Areas (PSAs) overlap with the 40 precincts in the randomized control trial, the pilot experiment does not include NYPD Housing officers assigned to PSAs.  The monitor team will be devising a separate evaluation plan for the use of cameras by NYPD officers working in PSAs.  There are only nine PSAs in New York City—too few for a randomized controlled experiment.  For this reason, a quasi-experimental research design is currently being considered.

# Attachment 1



**TO:**     **Peter Zimroth and Richard Jerome, NYPD Monitor**

**FROM:**   **Hart Research Associates**

**DATE:**   **May 31, 2017**

**RE:**     **BWC Pilot Program Research Methodology**

## Overview

Our evaluation of the impact of the body-worn camera (BWC) program involves two surveys of New York residents, one conducted prior to the introduction of the BWCs (pre-treatment) and one conducted after the BWCs have been in use for a period of time (post-treatment). The pre-treatment survey was conducted in March and April of this year, and the post-treatment survey is expected to occur 12 to 18 months later.

The survey methodology will be the same for both surveys, with interviews divided equally between treatment precincts and control precincts, allowing us to assess the impact of the BWCs on public attitudes toward and civilian interactions with the NYPD. The inclusion of the control precincts in the survey design is to allow us to determine whether any changes we may find in the post-treatment survey in treatment precincts are a result of the introduction of BWCs, as opposed to other city-wide factors.

A detailed description of the pre-treatment survey methodology follows.

## Pre-Treatment Survey Methodology

The pre-treatment survey involved live telephone interviews with 6,000 residents: 3,000 in treatment precincts and 3,000 in control precincts. In order to reach a statistically robust number of respondents who likely have had relevant personal interactions with the NYPD, we substantially oversampled 18- to 34-year-old men in both the treatment and control precincts. However, the two subsamples (treatment and control) each were weighted by age and gender to reflect the actual demographics of these precincts, so that the views and experiences of young men are not over-represented in the results we will report for all adults.

| Survey Samples | | | | | | |
|---|---|---|---|---|---|---|
| | **Control** | | | **Treatment** | | |
| | **Men 18-34** | **Other Adults** | **TOTAL** | **Men 18-34** | **Other Adults** | **TOTAL** |
| **Total interviews** | | | | | | |
| Number of interviews | 1,722 | 1,278 | 3,000 | 1,714 | 1,286 | 3,000 |
| Population proportion (weighted) | 18% | 82% | 100% | 17% | 83% | 100% |

# Hart Research Associates

The samples were designed to be representative of the adult populations in the control and treatment precincts, including hard-to-reach residents such as young men of color. We developed a sample frame from a list of NYC residents provided by TargetSmart, a list vendor with 6.2 million names in its NYC database. TargetSmart was given shape files of all of the current NYPD police precincts and the New York City Housing Authority Districts, and selected samples from the precincts comprising the control and treatment areas.

The 2010 American Community Survey was used in conjunction with the shape file data to set quotas by age and gender for the control and treatment samples. TargetSmart provided a sufficient number of randomly selected records to meet the targeted number of interviews within each quota group. Additional telephone numbers, including contract and prepaid cell phone numbers, were supplied by Link2Tek. This allowed us to complete substantial numbers of interviews with cellphone users in all samples (82% of interviews with young men were conducted by cell, as were 58% of interviews with other adults).

The interviewing firm American Directions fielded the survey in English and Spanish (by respondent choice) from March 21 to April 25. The data for the control and treatment samples were weighted separately by age and gender to correct for the impact of the oversampling of young men. In addition, modest weights were applied to race, education, and precinct to ensure that the two samples were representative of the larger populations in each of these areas. A profile of the four main samples (using weighted data) is shown in the following tables.

The margin of error for results among all adults in each sample is ±2.4 percentage points. The margin of error for results among men age 18 to 34 in each sample is ±2.4 percentage points. The margin of error for smaller subgroups will be larger.

## Pre-Treatment Survey Samples

The two samples for the pre-treatment survey—control and treatment—proved very representative of the populations in their respective precincts.  As the tables on the next page indicate, the demographic distributions in the survey samples closely match those reported for adults in these precincts by the Census Bureau's 2010 American Community Survey (ACS).   While this in part reflects the statistical weights applied after interviewing, the unweighted samples were already a close match to the ACS data and required only modest weights (except for adjusting the young male oversamples).

## Hart Research Associates

| Demographics of All Adults | | |
|---|---|---|

| Demographics of Control Adults | | |
|---|---|---|
| | Survey Sample % | Census (ACS 2010) % |
| Men | 46 | 46 |
| Women | 54 | 54 |
| Ages 18-34 | 36 | 37 |
| Ages 35-49 | 26 | 27 |
| Ages 50-64 | 21 | 22 |
| Ages 65/older | 16 | 14 |
| Don't know/refused | 1 | - |
| Whites (non-Hispanic) | 27 | 27 |
| African Americans | 30 | 35 |
| Hispanics | 30 | 30 |
| Asians | 8 | 9 |
| Manhattan | 14 | 15 |
| Bronx | 20 | 21 |
| Queens | 28 | 27 |
| Brooklyn | 38 | 37 |
| **Demographics of Treatment Adults** | | |
| | Survey Sample % | Census (ACS 2010) % |
| Men | 46 | 46 |
| Women | 54 | 54 |
| Ages 18-34 | 36 | 36 |
| Ages 35-49 | 25 | 26 |
| Ages 50-64 | 22 | 23 |
| Ages 65/older | 16 | 15 |
| Don't know/refused | 1 | - |
| Whites (non-Hispanic) | 22 | 22 |
| African Americans | 31 | 36 |
| Hispanics | 33 | 33 |
| Asians | 9 | 9 |
| Manhattan | 18 | 18 |
| Bronx | 25 | 26 |
| Queens | 21 | 22 |
| Brooklyn | 31 | 30 |
| Staten Island | 5 | 5 |

The demographics of the two populations — control and treatment — are also similar in most respects.  The tables on the next two pages report the survey sample demographics for control and treatment side-by-side, first for all adults and then for men 18-34.

# Hart Research Associates

|  | Control % | Treatment % |
|---|---|---|
| Men | 46 | 46 |
| Women | 54 | 54 |
| Ages 18-34 | 37 | 36 |
| Ages 35-49 | 26 | 25 |
| Ages 50-64 | 20 | 22 |
| Ages 65/older | 16 | 16 |
| Don't know/refused | 1 | 1 |
| Whites (non-Hispanic) | 27 | 22 |
| African Americans | 30 | 31 |
| Hispanics | 30 | 33 |
| Asians | 8 | 9 |
| All others | 5 | 5 |
| HS or less | 33 | 34 |
| Some college | 29 | 29 |
| College graduates | 37 | 36 |
| Manhattan | 14 | 18 |
| Bronx | 20 | 25 |
| Queens | 28 | 21 |
| Brooklyn | 38 | 31 |
| Staten Island | - | 5 |

| Demographics of Men 18-34 | | |
|---|---|---|
|  | Control % | Treatment % |
| Ages 18-24 | 40 | 41 |
| Ages 25-29 | 32 | 31 |
| Ages 30-34 | 28 | 28 |
| Whites (non-Hispanic) | 26 | 21 |
| African Americans | 26 | 25 |
| Hispanics | 34 | 40 |
| All other | 14 | 14 |
| HS or less | 28 | 28 |
| Some college | 38 | 36 |
| College graduates | 33 | 35 |
| Not sure/refused | 1 | 1 |
| Manhattan | 16 | 18 |
| Bronx | 21 | 26 |
| Queens | 26 | 20 |
| Brooklyn | 37 | 31 |
| Staten Island | - | 5 |

## Experience with Police Stops

To identify those who have had a personal interaction with the NYPD, respondents were asked if they had either of two kinds of police stops over the preceding 12 months: 1) have been stopped by police officers while the respondent was in a car in their neighborhood, or 2) have been stopped by police officers while the respondent was walking or standing on the street, in their building, or in some other place or building in their neighborhood.

The following tables shows the frequency of each type of reported stop among different demographic groups, first for car stops and then for street stops.

# Hart Research Associates

| Percentage of Adults with a Car Stop | Control % | Treatment % |
|---|---|---|
| All Adults | 13 | 12 |
| Men | 18 | 16 |
| Women | 9 | 8 |
| Ages 18-34 | 16 | 15 |
| Ages 35-49 | 16 | 15 |
| Ages 50-64 | 9 | 10 |
| Ages 65/older | 7 | 4 |
| Whites (non-Hispanic) | 10 | 8 |
| African Americans | 17 | 13 |
| Hispanics | 12 | 11 |
| Asians | 11 | 17 |
| White men | 12 | 12 |
| African American men | 25 | 21 |
| Hispanic men | 17 | 13 |
| White women | 5 | 4 |
| African American women | 12 | 7 |
| Hispanic women | 7 | 9 |
| Manhattan | 8 | 8 |
| Bronx | 13 | 13 |
| Queens | 15 | 12 |
| Brooklyn | 14 | 12 |
| Staten Island | N/A | 23 |
| Men 18-34 | 18 | 19 |
| Men 35/older | 17 | 14 |
| Women 18-34 | 13 | 11 |
| Women 35/older | 6 | 7 |

# Hart Research Associates

| Percent with a Street Stop | Control % | Treatment % |
|---|---|---|
| All Adults | 5 | 6 |
| Men | 7 | 8 |
| Women | 3 | 4 |
| Ages 18-34 | 8 | 9 |
| Ages 35-49 | 4 | 8 |
| Ages 50-64 | 2 | 4 |
| Ages 65/older | 2 | - |
| Whites (non-Hispanic) | 3 | 5 |
| African Americans | 7 | 8 |
| Hispanics | 4 | 6 |
| Asians | 3 | 3 |
| White men | 4 | 5 |
| African American men | 11 | 12 |
| Hispanic men | 5 | 9 |
| White women | 2 | 4 |
| African American women | 3 | 5 |
| Hispanic women | 3 | 4 |
| Manhattan | 5 | 8 |
| Bronx | 5 | 8 |
| Queens | 4 | 4 |
| Brooklyn | 5 | 5 |
| Staten Island | N/A | 4 |
| Men 18-34 | 12 | 12 |
| Men 35/older | 3 | 6 |
| Women 18-34 | 4 | 6 |
| Women 35/older | 2 | 3 |

# Attachment 2

**CUNY Institute for State and Local Governance**

**Methods: In-person Surveys**

**Sampling Framework**

In-person surveys were conducted to capture the perspectives of New York City (NYC) residents on law enforcement and public safety, with a particular interest in residents who are most likely to be affected by New York City Police Department (NYPD) stop, question, and frisk practices (i.e., Black/African American and Hispanic/Latino young men).[1] The Institute for State and Local Governance (ISLG) employed a three-tiered sampling approach that included selection of police precincts, sites within those precincts, and residents within those sites.

Selection of precincts. In-person surveys were carried out in 10 precincts (five matched pairs) selected from the pool of 40 participating in the body-worn camera (BWC) pilot.[2] The five matched pairs of precincts included one pair in each of the five NYC boroughs, so that within- and across-borough comparisons could be made between the two experimental groups. The five matched pairs were selected from the 20 matched pairs in the BWC pilot based on racial/ethnic composition, presence of NYCHA developments, police activity and crime patterns, among other variables.

Selection of sites. Within each of the 10 survey precincts, ISLG selected five to seven specific sites where surveys would be administered. The goal was to select sites where populations affected by NYPD stop and frisk practices would be likely to be included as participants. Toward that end, selection was informed by spatial analyses of three features: (1)

---

[1] It was anticipated that these residents might be underrepresented in the telephone survey, and thus, the in-person survey sampling methodology was developed to ensure adequate representation of this population of interest.

[2] These 40 pilot sites were selected by the Monitor team because they had the highest number of complaints from 2012-2015 to the Civilian Complaint Review Board (CCRB), an independent entity that reviews and investigates reports of officer misconduct.

stop reports in 2010 and 2015; (2) crime complaints to 311 in 2016; and (3) locations of NYCHA developments and public transportation stops/stations. Based on this analysis, ISLG selected sites that had higher concentrations of reported stops and 311 complaints; some were near NYCHA developments and/or public transportation locations as well. Each of the sites was approximately four blocks long and one to three blocks wide.

Selection of potential participants. Finally, within each site a probability sampling design was employed to engage potential survey participants. Specifically, every third person and every third group containing someone who appeared as though they could be age 18 or older was approached and asked to participate in the study. The number of individuals and group members who agreed and declined to participate was recorded. The estimated overall response rate was 15.1%, reflecting the proportion of people who agreed to participate in the study among the estimated total number of people who were approached.

In total, 1,181 respondents completed in-person surveys across the 10 NYPD precincts. An additional six surveys were submitted but discarded due to substantial incompleteness (i.e., with fewer than 25% of items completed by the respondent).

**Recruitment of Participants**

Surveys were administered by 39 students enrolled in associate's, bachelor's, and master's degree programs at the City University of New York (CUNY). Most students were also members of the Service Corps, a professional development and experiential learning program offered by CUNY. Students were assigned in teams of two to administer surveys in one or more sites per day, according to a schedule created by ISLG. All surveys were completed between the hours of 11am and 6pm, in April 2017. The schedule and site assignments were designed with

the goal of minimizing bias in the survey work—by having the surveys administered during the same time of the day, for example, and ensuring adequate representation of all targeted sites within a precinct. Each shift lasted between two and six hours. Before beginning the work, students were required to participate in a three-hour training covering the project background, research ethics, the study protocol, and tips for safe and effective fieldwork (many also had prior fieldwork experience).

Once on site, team members assumed one of two unique roles to recruit participants in accordance with the sampling framework. One member was responsible for counting passers-by and recording acceptances and declinations to participate, and the other was responsible for approaching potential respondents and requesting their participation in the survey. In general, teams assigned to sites in precincts with higher concentrations of Hispanic/Latino residents included at least one Spanish speaker, to increase the likelihood of a representative survey sample.

Potential respondents who informally agreed to participate were read a consent protocol in English or Spanish, and asked to verify that they were 18 or older and a resident of New York City. To maintain anonymity, participants were only asked to provide verbal consent, and were not asked to provide any other identifying information. Once consent was given, each participant was provided with an English or Spanish version of the survey (depending on their preference) to complete, along with a clipboard and a pen. The survey questionnaire generally took between 10 and 15 minutes to complete, and all participants were provided with a $10 gift card when they returned the completed survey to the team. The last page of the survey contained contact information for the study and a list of resources that participants could access if they became upset as a result of participating.

3

**Survey Instrument**

The survey questionnaire consisted of 26 close-ended items, including questions on specific experiences of being stopped by police or other interactions with police occurring in the prior year. The in-person survey instrument was nearly identical to the telephone instrument, with minor variations in introductory wording due to the more sophisticated skip logic possible on a telephone survey.

**Demographics of Respondents**

The demographics of the survey respondents indicate that the sampling approach achieved the two primary goals of the survey: (1) to broadly reflect the population of the precincts in which they were conducted, with a particular focus on young Black/African American ("Black") and Hispanic/Latino men; and (2) to have comparability between treatment and control groups. With respect to the first goal, the survey results show that:

- Almost one-fifth (17.5%) of survey respondents were Black or Hispanic/Latino males age 34 or younger—approximately five percentage points higher than the 11.8% of the general adult population in those precincts estimated to reflect Black or Hispanic/Latino males between the ages of 20 and 34.

- The proportion of Black and Hispanic/Latino respondents in the sample was higher than the proportion of these racial/ethnic groups in the general precinct population (79.6% vs. 68.5%, respectively). The representation of Black individuals was substantially higher in the sample than in the general population (40.1% vs. 29.1%); Hispanic/Latino respondents, in turn, were only slightly overrepresented (39.5% vs. 38.9%).

- Nearly half (45.8%) of respondents were age 34 or younger, including 21.0% who were age 18-24.  There are not comparable statistics for the precinct population, age 18-24, but only 11.1% of the general population of adults in the study precincts (with adults defined as individuals 20 years and older) fell into the 20-24 age bracket.

- More than one fifth of the sample (22.0%) consisted of NYCHA residents, compared to 7.5% of the general population.

The survey results also show comparability between treatment and control precincts at an aggregate level:

- In each set of precincts, nine in 10 respondents identified as a race/ethnicity other than White (91.0% of control respondents and 90.1% of treatment respondents).

- Slightly under half in each group identified as male (44.5% in control, 45.8% in treatment precincts), and around one quarter of each group (22.4% of control and 22.9% of treatment precincts) was comprised of males age 34 of younger, with 17.3% and 17.6% of control and treatment respondents, respectively, identifying specifically as Black or Hispanic/Latino young men.

# Attachment 3

# SURVEY OF COMMUNITY PERCEPTIONS OF LAW ENFORCEMENT



**CUNY INSTITUTE FOR STATE & LOCAL GOVERNANCE**

DO NOT FILL IN—FOR INTERVIEWER USE ONLY
Date: _____
Precinct: _____

1.  In what year were you born?

    _____

2a.  Do you currently live in New York City?
     ***Mark one.***

     ☐  Yes
     ☐  No

---

**IF YOU ANSWERED "NO" IN Q2a, PLEASE HAND THE QUESTIONNAIRE IN TO THE INTERVIEWER. THANK YOU FOR YOUR TIME.**

---

2b.  Are you of Hispanic, Latino, or Spanish origin, or not?
     ***Mark one.***

     ☐  Yes
     ☐  No

2c.  And could you please indicate if you are white, black or African American, Asian, biracial or multiracial, or something else?
     ***Mark one.***

     ☐  White
     ☐  Black/African American
     ☐  Asian
     ☐  Biracial or multiracial
     ☐  Other

3.  When it comes to the problem of crime, how safe do you feel in your neighborhood--very safe, somewhat safe, somewhat unsafe, or very unsafe?
    ***Mark one.***

    ☐  Very safe
    ☐  Somewhat safe
    ☐  Somewhat unsafe
    ☐  Very unsafe

**The next section of this questionnaire asks about NYPD police officers who patrol in your neighborhood.**

4.  Overall, how would you describe your feelings about the NYPD officers in your neighborhood? Do you feel very favorable, somewhat favorable, neutral, somewhat unfavorable, or very unfavorable?
    *Mark one.*

    ☐  Very favorable
    ☐  Somewhat favorable
    ☐  Neutral
    ☐  Somewhat unfavorable
    ☐  Very unfavorable

5.  How would you rate the job that NYPD officers are doing in your neighborhood--would you say they are doing a very good job, a good job, a fair job, a not so good job, or a poor job?
    *Mark one.*

    ☐  Very good
    ☐  Good
    ☐  Fair
    ☐  Not so good
    ☐  Poor

6.  Below are a few statements about police officers. Thinking about NYPD officers in your neighborhood, please indicate if you strongly agree, somewhat agree, somewhat disagree, or strongly disagree with each statement.
    *Mark one X for each statement.*

|  | Strongly agree | Somewhat agree | Somewhat disagree | Strongly disagree |
|---|---|---|---|---|
| If I needed police assistance, I would feel comfortable seeking help from police officers in my neighborhood. | | | | |
| I respect the police officers in my neighborhood. | | | | |
| Police officers in my neighborhood respect people's rights. | | | | |
| Police officers in my neighborhood treat people fairly, regardless of race or background. | | | | |
| Police officers in my neighborhood often abuse their authority. | | | | |
| I sometimes feel nervous when I see police officers in my neighborhood approach me. | | | | |
| Police officers stop and frisk too many people in my neighborhood. | | | | |
| Police officers in my neighborhood use more force than necessary. | | | | |

3

7.   If you or someone in your neighborhood filed a complaint against a police officer for unfair treatment, do you think the complaint would be investigated fairly and objectively? Would you say it definitely would, probably would, probably would not, or definitely would not be investigated fairly and objectively? **Mark one.**

☐   Definitely would
☐   Probably would
☐   Probably would not
☐   Definitely would not

8.   In the past 12 months, have you been stopped by police officers in your neighborhood while you were in a car? Were you stopped one time or multiple times? Your answers are completely confidential, and we are asking only for research purposes. **Mark one.**

☐   Yes, one time *(Continue to Q9)*
☐   Yes, multiple times *(Continue to Q9)*
☐   No *(→ Skip to Q12)*

---

**ANSWER Q9, Q10, AND Q11 <u>ONLY</u> IF YOU ANSWERED "YES" IN Q8. IF YOU ANSWERED "NO" TO Q8, PLEASE SKIP TO Q12 ON PAGE 6.**

---

9.    Thinking about the last time you were stopped by police officers in your neighborhood while you were in a car, how satisfied were you with the way the officers handled that situation--very satisfied, somewhat satisfied, somewhat dissatisfied, or very dissatisfied?
***Mark one.***

☐   Very satisfied

☐   Somewhat satisfied

☐   Somewhat dissatisfied

☐   Very dissatisfied

10.    And thinking about this same stop, please tell me whether the following happened or did not happen.
***Mark one X for each statement.***

|  | <u>Yes</u>, did happen | No, did <u>not</u> happen | Don't remember |
|---|---|---|---|
| The police officers explained the reason for the stop. | | | |
| The police officers used physical force during the stop. | | | |
| You were patted down on the outside of your clothing. | | | |
| The police officers searched the inside of your clothing, your bag, or other personal belongings. | | | |
| You were given a ticket or a summons for a moving violation. | | | |
| You were arrested. | | | |

11.    Still thinking about this same stop, please indicate whether you strongly agree, somewhat agree, somewhat disagree, or strongly disagree with each of the following statements.
***Mark one X for each statement.***

|  | Strongly agree | Somewhat agree | Somewhat disagree | Strongly disagree |
|---|---|---|---|---|
| The police officers treated you with respect. | | | | |
| The police officers had a good reason for stopping you. | | | | |
| The amount of time you were stopped was reasonable | | | | |
| The police officers used language that you found threatening or abusive. | | | | |
| You felt the police officers stopped you because of your race or ethnicity. | | | | |
| The police officers used more force than necessary | | | | |

12.     In the past 12 months, have you been stopped by police officers in your neighborhood while you were walking or standing on the street, in your building, or in some other place or building in your neighborhood? Were you stopped one time or multiple times? Your answers are completely confidential, and we are asking only for research purposes.
***Mark one.***

☐  Yes, one time *(Continue to Q13)*

☐  Yes, multiple times *(Continue to Q13)*

☐  No *(→ Skip to Q16)*

---

**ANSWER Q13, Q14, AND Q15 <u>ONLY</u> IF YOU ANSWERED "YES" IN Q12. IF YOU ANSWERED "NO" TO Q12, PLEASE SKIP TO Q16 ON PAGE 8.**

---

---

**The next section of this questionnaire asks about the last time you were stopped by police officers in your neighborhood and were not in a car.**

---

13.    Thinking about the last time you were stopped by police officers while you were on the street, in your building, or some other place or building in your neighborhood, how satisfied were you with the way the officers handled that situation--very satisfied, somewhat satisfied, somewhat dissatisfied, or very dissatisfied?
***Mark one.***

☐  Very satisfied
☐  Somewhat satisfied
☐  Somewhat dissatisfied
☐  Very dissatisfied

14.    And thinking about this same stop, please indicate whether the following happened or did not happen.
***Mark one X for each statement.***

|  | Yes, did happen | No, did not happen | Don't remember |
|---|---|---|---|
| The police officers explained the reason for the stop. | | | |
| The police officers gave you a receipt or information card after the stop. | | | |
| You were patted down on the outside of your clothing. | | | |
| The police officers searched the inside of your clothing, your bag, or other personal belongings. | | | |
| The police officers used physical force during the stop. | | | |
| You were arrested or given a summons. | | | |

15.    Still thinking about this same stop, please indicate whether you strongly agree, somewhat agree, somewhat disagree, or strongly disagree with each of the following statements.
***Mark one X for each statement.***

|  | Strongly agree | Somewhat agree | Somewhat disagree | Strongly disagree |
|---|---|---|---|---|
| The police officers treated you with respect. | | | | |
| The police officers had a good reason for stopping you. | | | | |
| The amount of time you were stopped was reasonable. | | | | |
| The police officers used language that you found threatening or abusive. | | | | |
| You felt the police officers stopped you because of your race or ethnicity. | | | | |
| The police officers used more force than necessary. | | | | |

7

16.     In the past 12 months, have you spoken to or contacted any police officers in your neighborhood for help, such as asking a police officer on the street for assistance, reporting a crime or an accident to an officer, or having an officer respond to your 911 call? To be clear, this means any contact with a police officer other than the stop situations described earlier.
        **Mark one.**

☐   Yes *(Continue to Q17)*

☐   No *(→ Skip to Q19)*

---

**ANSWER Q17, AND Q18 <u>ONLY</u> IF YOU ANSWERED "YES" IN Q16. IF YOU ANSWERED "NO" TO Q16, PLEASE SKIP TO Q19 ON PAGE 9.**

---

17.     Thinking about the last time you spoke to or contacted police officers in your neighborhood, how satisfied were you with how the officers handled that situation--very satisfied, somewhat satisfied, somewhat dissatisfied, or very dissatisfied?
        **Mark one.**

☐   Very satisfied

☐   Somewhat satisfied

☐   Somewhat dissatisfied

☐   Very dissatisfied

18.     And still thinking about the last time you spoke to or contacted police officers in your neighborhood, please indicate whether you strongly agree, somewhat agree, somewhat disagree, or strongly disagree with each of the following statements.
        ***Mark one X for each statement.***

|  | Strongly agree | Somewhat agree | Somewhat disagree | Strongly disagree |
|---|---|---|---|---|
| The police officers treated you with respect. |  |  |  |  |
| The police officers clearly explained where you could get the help or information you needed. |  |  |  |  |
| The police officers took your problem or question seriously. |  |  |  |  |

19.     Some police departments require officers to wear body cameras that provide an audio and video recording of an officer's interactions with the public. Do you strongly favor, somewhat favor, somewhat oppose, or strongly oppose having NYPD police officers wear body cameras?
*Mark one.*

☐ Strongly favor
☐ Somewhat favor
☐ Somewhat oppose
☐ Strongly oppose

20.     What is the last grade that you completed in  school?
*Mark one.*

☐ Some high school or less
☐ High school graduate
☐ Some college, no degree
☐ Vocational training/2-year college
☐ 4-year college/bachelor's degree
☐ Some postgraduate work, no degree
☐ Postgraduate or professional degree

21.     In the past twelve months, has anyone in your household, not counting yourself, been stopped by police officers in your neighborhood?
*Mark one.*

☐ Yes
☐ No

22.     Do you have a family member who is an NYPD officer?
*Mark one.*

☐ Yes
☐ No

23.     Do you know any of the police officers that work in your neighborhood by name?
*Mark one.*

☐ Yes
☐ No

24.     Do you currently live in NYCHA housing?
*Mark one.*

☐ Yes
☐ No

25.     How often do you go out in your neighborhood, outside your home, in the evening? Do you do that frequently, sometimes, just a little, or rarely?
        ***Mark one.***

        ☐  Frequently
        ☐  Sometimes
        ☐  Just a little
        ☐  Rarely

26.     And do you identify as male, female, or another gender?
        ***Mark one.***

        ☐  Male
        ☐  Female
        ☐  Another gender

# ENCUESTA DE LAS
# PERCEPCIONES COMUNITARIAS DE LA
# APLICACIÓN DE LA LEY



**CUNY INSTITUTE FOR STATE & LOCAL GOVERNANCE**

NO LLENAR SOLAMENTE PARA EL USO DEL ENTREVISTADOR
Date: _____
Precinct/Location: _____

1.   ¿En que año nacio?

   _____

2a.   ¿Vive actualmente en la ciudad de Nueva York?
     ***Marque solamente una cajilla.***

     ☐   Sí
     ☐   No

---

**SI RESPONDIÓ "NO" EN LA PREGUNTA 2a, POR FAVOR DEVUELVA SU CUESTIONARIO AL ENTREVISTADOR. GRACIAS POR TU TIEMPO.**

---

2b.   ¿Es usted de origen hispano o latino?
     ***Marque solamente una cajilla.***

     ☐   Sí
     ☐   No

2c.   ¿Y podría usted por favor decirme si es blanco, Moreno /a Afro-Americano/a, asiático/a, biracial o multiracial, o algo diferente?
     ***Marque solamente una cajilla.***

     ☐   Blanco/a
     ☐   Moreno/a /Afro Americano/a
     ☐   Asiático/a
     ☐   Biracial o multiracial
     ☐   Otro

3.   Cuando se trata del problema de la delincuencia, ¿qué tan seguro se siente en su barrio—muy seguro/a, algo seguro/a, algo inseguro/a, o muy inseguro/a?
     ***Marque solamente una cajilla.***

     ☐   Muy seguro/a
     ☐   Algo seguro/a
     ☐   Algo inseguro/a
     ☐   Muy inseguro/a

**El próximo grupo de preguntas es sobre los policías de la NYPD que patrullan en su barrio**

4.   En general, ¿cómo describiría sus sentimientos acerca de los policías de la  NYPD en su barrio? ¿Se siente muy favorable, algo favorable, neutral, algo desfavorable o muy desfavorable? *Marque solamente una cajilla.*

☐   Muy favorable

☐   Algo favorable

☐   Neutral

☐   Algo desfavorable

☐   Muy desfavorable

5.   ¿Cómo calificaría el trabajo que los agentes del NYPD están haciendo en su barrio - ¿diría que están haciendo: un trabajo muy bueno, bueno, regular, no tan bueno, o malo? *Marque solamente una cajilla.*

☐   Muy bueno

☐   Bueno

☐   Regular

☐   No tan bueno

☐   Malo

6.   A continuación se enumeran algunas declaraciones sobre los policías. Pensando en los policías del NYPD en su barrio, por favor, dígame si está muy de acuerdo, algo de acuerdo, algo en desacuerdo o muy en desacuerdo con cada declaración.
     *Para cada declaración, marque un X.*

|  | Muy de acuerdo | Algo de acuerdo | Algo desacuerdo | Muy desacuerdo |
|---|---|---|---|---|
| Si necesitara la asistencia de la policía, me sentiría cómodo buscar ayuda de  policía en mi barrio. | | | | |
| Respeto a los policías de mi barrio. | | | | |
| Policías en mi barrio respetan los derechos de las personas. | | | | |
| Los policías de mi barrio tratan a las personas de manera justa, independientemente de raza u origen. | | | | |
| Los policías de mi barrio abusan de su autoridad. | | | | |
| A veces me dan nervios en mi barrio cuando veo policías acercarse a mí en mi barrio. | | | | |
| Los policías paran y registran demasiadas personas en mi barrio. | | | | |
| Los policías en mi barrio utilizan más fuerza de la necesaria. | | | | |

3

7.  Si usted o alguien de su barrio presentara una queja contra un agente de policía por un trato injusto, ¿cree que la queja sería investigada de manera justa y objetiva? ¿Diría usted que definitivamente sería justa y objetiva, probablemente sería, probablemente no sería, o definitivamente no sería investigado de manera justa y objetiva?
    ***Marque solamente una cajilla.***

    ☐  Definitivamente sería

    ☐  Probablemente sería

    ☐  Probablemente no sería

    ☐  Definitivamente no sería


8.  En los últimos doce meses, ¿ha sido parado por policías en su barrio mientras estaba en un automóvil? ¿Y esto fue una vez, o varias veces? Le prometo que sus respuestas son completamente confidenciales, y estamos preguntando sólo para propósito de una investigación académica.
    ***Marque solamente una cajilla.***

    ☐  Sí—me pararon una vez *(Continue a la 9)*

    ☐  Sí—me pararon más de una vez *(Continue a la 9)*

    ☐  No *(→ Salte a la 12)*

**RESPONDA A LAS PREGUNTAS 9, 10 Y 11 <u>SOLAMENTE</u> SI USTED RESPONDIÓ "SÍ" EN LA PREGUNTA 8. SI RESPONDIÓ "NO" A LA PREGUNTA 8, POR FAVOR, SALTE A LA PREGUNTA 12 EN PÁGINA 6.**

9.  Pensando en la última vez que fue parado por policías en su barrio mientras estaba en un automóvil, ¿Qué tan satisfecho/a estaba con la manera en que los oficiales manejaron esa situación, -- muy satisfecho/a, algo satisfecho/a, algo insatisfecho/a o muy insatisfecho/a?
*Marque solamente una cajilla.*

☐ Muy satisfecho/a

☐ Algo satisfecho/a

☐ Algo insatisfecho/a

☐ Muy insatisfecho/a

10.  Y pensando en este mismo incidente, por favor dígame si ocurrió o no ocurrió lo siguiente.
*Para cada declaración, marque un X.*

| | Sí, <u>ocurrió</u> | No, <u>no</u> <u>ocurrió</u> | No estoy seguro/no recuerda |
|---|---|---|---|
| Los policías explicaron el motivo de la parada. | | | |
| Los policías utilizaron la fuerza física durante el incidente. | | | |
| Le registraron exteriormente, por encima de su ropa. | | | |
| Los policías revisaron el interior de su ropa, su bolso u otras pertenencias personales. | | | |
| Se le dio una multa o una citación por violación de transito. | | | |
| Usted fue arrestado. | | | |

11.  Todavía pensando en este mismo incidente, por favor dígame si está totalmente de acuerdo/a, algo de acuerdo/a, algo en desacuerdo/a o en total desacuerdo/a con cada una de las siguientes afirmaciones.
*Para cada declaración, marque un X.*

| | <u>Muy</u> de acuerdo | <u>Algo</u> de acuerdo | <u>Algo</u> desacuerdo | <u>Muy</u> desacuerdo |
|---|---|---|---|---|
| Los policías le trataron con respeto. | | | | |
| Los policías tenían una buena razón para pararle. | | | | |
| La cantidad de tiempo que duro la parada fue razonable. | | | | |
| Los policías usaron un lenguaje que le pareció amenazante o abusivo. | | | | |
| Siente que los policías le detuvieron por su raza u origen étnico. | | | | |
| Los policías utilizaron más fuerza de la necesaria. | | | | |

12.   En los últimos doce meses, ¿ha sido parado por policías en su barrio **mientras estaba caminando o de pie en la calle, en su edificio, o en algún otro lugar o edificio en su barrio**? ¿Y esto fue una vez, o varias veces? Prometo que sus respuestas son completamente confidenciales, y estamos preguntando sólo para fines de estudios.
      ***Marque solamente una cajilla.***

☐   Sí—parado una vez *(Continue a la 13)*

☐   Sí—parado más de una vez *(Continue a la 13)*

☐   No *(→ Salte a la 16)*

---

**RESPONDA A LAS PREGUNTAS 13, 14 Y 15 <u>SOLAMENTE</u> SI USTED RESPONDIÓ "SÍ" EN LA PREGUNTA 12. SI RESPONDIÓ "NO" A LA PREGUNTA 12, POR FAVOR, SALTE A LA PREGUNTA 16 EN PÁGINA 8.**

---

**El próximo grupo de preguntas es sobre la última vez que fue parado por policías en su barrio y no estaba en un automóvil.**

13.  Pensando en la última vez que fue parado por policías mientras estaba en la calle, en su edificio, o en algún otro lugar o edificio en su barrio, ¿cuán satisfecho estaba con la forma en que los policías manejaron esa situación-- muy satisfecho/a, algo satisfecho/a, algo insatisfecho/a o muy insatisfecho/a?
*Marque solamente una cajilla.*

☐ Muy satisfecho/a

☐ Algo satisfecho/a

☐ Algo insatisfecho/a

☐ Muy insatisfecho/a

14.  Y pensando en cuando fue parado, por favor dígame si ocurrió o no ocurrió lo siguiente.
*Para cada declaración, marque un X.*

|  | Sí, ocurrió | No, no ocurrió | No estoy seguro/no recuerda |
|---|---|---|---|
| Los policías explicaron la razón de la parada. |  |  |  |
| Los policías le dieron un recibo o tarjeta de información después de la parada. |  |  |  |
| Le registraron exteriormente por encima de su ropa. |  |  |  |
| Los policías revisaron el interior de su ropa, su bolso u otras pertenencias personales. |  |  |  |
| Los policías utilizaron la fuerza física durante la parada. |  |  |  |
| Usted fue arrestado o dado una citación. |  |  |  |

15.  Todavía pensando en este mismo incidente, por favor dígame si está totalmente de acuerdo/a, algo de acuerdo/a, algo en desacuerdo/a o en total desacuerdo/a con cada una de las siguientes afirmaciones.
*Para cada declaración, marque un X.*

|  | Muy de acuerdo | Algo de acuerdo | Algo desacuerdo | Muy desacuerdo |
|---|---|---|---|---|
| Los policías le trataron con respeto. |  |  |  |  |
| Los policías tenían una buena razón para pararle. |  |  |  |  |
| La cantidad de tiempo que duró la parada fue razonable. |  |  |  |  |
| Los policías usaron un lenguaje que le pareció amenazante o abusivo. |  |  |  |  |
| Siente que los policías lo detuvieron por su raza o etnia. |  |  |  |  |
| Los policías utilizaron más fuerza de la necesaria. |  |  |  |  |

16.     En los últimos doce meses, ¿ha hablado o contactado algún policía de su barrio para pedir ayuda, como por ejemplo para solicitarle asistencia en la calle, reportar un crimen o un accidente o que un policía haya respondido a su llamada al nueve-uno-uno? Que quede claro, me refiero a cualquier contacto con un policía distinto de la situación de la parada que  le pregunté antes.
**Marque solamente una cajilla.**

☐   Sí *(Continue a la 17)*

☐   No *(→ Salte a la 19)*

---

**RESPONDA A LAS PREGUNTAS 17 Y 18 <u>SOLAMENTE</u> SI USTED RESPONDIÓ "SÍ" EN LA PREGUNTA 16. SI RESPONDIÓ "NO" A LA PREGUNTA 16, POR FAVOR, SALTE A LA PREGUNTA 19 EN PÁGINA 9.**

---

17.     Pensando en la <u>última vez</u> que habló o contactó a  policías en su barrio, ¿cuán satisfecho estuvo con la forma en que los oficiales manejaron esa situación-- muy satisfecho/a, algo satisfecho/a, algo insatisfecho/a o muy insatisfecho/a?
**Marque solamente una cajilla.**

☐   Muy satisfecho/a

☐   Algo satisfecho/a

☐   Algo insatisfecho/a

☐   Muy insatisfecho/a

18.     Y aún pensando en la última vez que habló o contactó a policías en su barrio, por favor dígame si está totalmente de acuerdo/a, algo de acuerdo/a, algo en desacuerdo/a o muy en desacuerdo/a con cada una de las siguientes declaraciones.
**Para cada declaración, marque un X.**

|  | <u>Muy</u> de acuerdo | <u>Algo</u> de acuerdo | <u>Algo</u> desacuerdo | <u>Muy</u> desacuerdo |
|---|---|---|---|---|
| Los policías le trataron con respeto. | | | | |
| Los  policías explicaron claramente dónde podía obtener la ayuda o la información que necesitaba. | | | | |
| Los policías tomaron su problema o pregunta en serio. | | | | |

8

19.   Algunos departamentos de policía requieren que los oficiales usen cámaras corporales que proporcionan una grabación de audio y video de las interacciones de un oficial con el público. Usted esta fuertemente a favor, algo a favor, se opone algo, o se opone fuertemente a que oficiales de la policía usen cámaras corporales?
      ***Marque solamente una cajilla.***

      ☐   Fuertemente a favor
      ☐   Algo a favor
      ☐   Opone algo
      ☐   Opone fuertemente

20.   ¿Cuál fue el último grado que completó en la escuela?
      ***Marque solamente una cajilla.***

      ☐   Llegué a la escuela secundaria/bachillerato pero no se graduó
      ☐   Me gradué de secundaria o bachillerato
      ☐   Llegué a la universidad pero no se graduó
      ☐   Obtuve un entrenamiento técnico o vocacional
      ☐   Se graduó de la universidad
      ☐   Llegué a una maestría pero no se graduó
      ☐   Se graduó de una maestría o grado profesional

21.   En los pasados doce meses, alguien en su hogar, sin contarse a usted, ¿ha sido parado por agentes de la policía en su barrio?
      ***Marque solamente una cajilla.***

      ☐   Sí
      ☐   No

22.   ¿Tiene un miembro de la familia que es un oficial NYPD?
      ***Marque solamente una cajilla.***

      ☐   Sí
      ☐   No

23.   ¿Conoce por su nombre alguno de los policías que trabajan en su barrio?
      ***Marque solamente una cajilla.***

      ☐   Sí
      ☐   No

24.   ¿En la actualidad vive en una vivienda de NYCHA?
      ***Marque solamente una cajilla.***

      ☐   Sí
      ☐   No

25.     ¿Con qué frecuencia sale por su vecindario, fuera de su casa, por la noche? ¿Lo hace con frecuencia, a veces, sólo un poco, o rara vez?
        ***Marque solamente una cajilla.***

        ☐ Frecuentemente
        ☐ A veces
        ☐ Solo un poco
        ☐ Rara vez

26.     ¿Y se identifica como hombre, mujer, o de otro género?
        ***Marque solamente una cajilla.***

        ☐ Hombre
        ☐ Mujer
        ☐ Otro género