**APPENDIX C**

# NYPD CHANGE AGENDA

## The Way Forward at the NYPD (2014-Present)

### Introduction

The NYPD values innovation and historically has set the standards for policing nationwide.  The past four years have been a transformative time at the NYPD. The Department has embarked on a journey rejecting what were once conventional norms and facilitating a paradigm shift towards neighborhood policing. To accomplish this, the Department has reimagined what it means to engage the community, provide oversight, train personnel and incentivize the workforce. The NYPD has moved forward with this series of initiatives that have touched virtually every aspect of its operations in a deliberate and coordinated way. In so doing, the Department has set the baseline for policing in the 21st century. The Department is committed to continuing to advance this agenda.

We are grateful for the work of the Court-appointed Monitor and the Court-appointed Facilitator, Judge Ariel Belen.  They have fostered frequent and open communications among the parties, and as a result, valuable information that was gathered during the Facilitator's outreach was shared with the Department as the Joint Remedial Process progressed, enabling the Department to consider and include JRP feedback as it developed and implemented the new initiatives outlined in this report.

While many of the suggestions offered by the Court-appointed Facilitator, Judge Belen, are extremely thoughtful and meritorious, the Department declines to consent to these reforms formally as "court-ordered Joint Remedial reforms" because the majority of them – in some form – are already underway in the Department.  We hope this summary makes that clear.

The overall thrust of these initiatives has been to increase and enhance the police Department's engagement in local communities while pushing crime down to 50-year lows, and in some cases 60-year lows, even as the gross number of enforcement actions – arrests, summonses, and stops – has declined sharply. These initiatives were conceived as parts of an overarching plan with each component supporting the others, and they were implemented in concert. What follows below are descriptions of each initiative. They should be read with the understanding that, while the separate initiatives appear to stand on their own, they are a collection of parts in a comprehensive approach to operational, organizational and cultural change

### Remedial Process

In addition to the transformative changes that have been engineered in the Department since 2014, the Court-appointed Monitor has overseen the implementation of many other important reforms.  Several policies and trainings have been created or improved under his supervision, including the following:  the Stop Report was revised to provide for greater supervisory oversight of stops, body

1

cameras have been launched, and a robust Investigative Encounters in-service training program is underway, among other things. A timeline including these activities is attached as appendix "B".

**Neighborhood Policing**

Neighborhood Policing is the centerpiece of the changes in the NYPD. It is designed to provide sector[1] or neighborhood-centric policing in New York City. Each precinct has been realigned internally to establish four to five sectors within the precinct, and the borders of each sector have been selected to conform as much as possible to the boundaries of actual neighborhoods as they have developed organically. Groups of police officers have been identified and assigned to provide police service within each sector. New York City precincts contain, on average, 110,000 people, the population of mid-size American city. Sector policing breaks down the precinct into more manageable increments of 20,000 people or so grouped into their actual neighborhood.

As the gap between police and some communities widened and became a national issue, the need for deeper relationships has never been more urgent. With this in mind, the NYPD has been systematically restructuring how it patrols. The first principle of Neighborhood Policing is sector integrity: officers are regularly assigned to a sector and do not leave the sector except in cases of serious emergencies. Historically, police officers on patrol have spent most of their tours "chasing the radio" – in other words, answering 911 calls for assistance. Police officers ran from job to job outside their assigned sector, making it difficult, if not impossible, to develop deeper relationships with citizens—the kind of relationships sought by cops and community alike. Neighborhood policing is helping New York City residents get to know their cops in a brand new way.  As a result, officers' capacity to establish ongoing meaningful working relationships with the community and to engage community members to work at problem solving has been strengthened.

Neighborhood Policing provides an around-the-clock team of officers who patrol the same sector each day and gain a working knowledge of the sector, its people, its problems, and its perpetrators of criminal acts. If the call volume in the sector becomes too heavy for the sector team, or if they are engaged in another call for service, precinct-wide response cars pick up the extra calls.  The sector teams are afforded approximately one-third of their shifts "off-radio" time enabling them to work more intensively within the neighborhoods where they are assigned. This more intensive work includes various kinds of community contact, targeted problem solving activities, and preliminary investigations of past crimes. Grounded in a particular sector, sector officers on the three daily shifts (day, evening and midnight shifts) communicate across shifts about current problems and conditions. This is in contrast to past practice when the three daily shifts were often isolated

---

[1] A sector is a geographically defined subdivision within a precinct boundary. Sectors are delineated in order to organize precinct resources and manage workflow more efficiently.

from each other because they did not share a sense of responsibility for a particular sector.

Supporting the sector officers and filling out each sector team are two officers designated as the neighborhood coordination officers (NCOs). The NCOs are liaisons between the police and the community, and also key crime fighters and problem solvers in the sector. The NCOs immerse themselves in the community by attending meetings with community leaders and clergy, visiting schools and businesses, following up on previous incidents, and using creative techniques and adaptive skills to fight crime and address quality-of-life conditions unique to their particular sectors. The NYPD, the NCOs, and the sector officers are implementing the community-policing ideal in a large and densely populated city.

This past summer, in addition to the NCOs regular contact with local stores, schools, community organizations, and people on the street, the NYPD organized community meetings with NCOs at the sector level all across the city, the first in a series of like meetings to be held quarterly.  The meetings are run by the NCOs themselves, usually without the presence of higher-ranking officers, and are conceived as working sessions in which neighbors raise concerns and challenges in the neighborhood and discuss possible solutions with the officers who are actually responsible for the sector in which they live. The NYPD promotes these community engagement initiatives through the Department's social media platforms. The Department also established the "Build the Block" website (https://buildtheblock.nyc/) where people can learn more about the program, find their next local meeting and sign up for informational emails.

The NYPD has achieved remarkable public safety successes in recent decades, and as Commissioner James P. O'Neill has said, the police have a moral obligation to maintain and improve on those successes. Keeping people safe is what police officers do, but they don't, and can't, do it alone. Public safety is a shared responsibility. Neighborhood policing acknowledges that fact and builds upon it.

Previous community policing-style programs, including the NYPD's C-POP program in the early 1990s, limited the community outreach to a team of specialists, who were too few in number to sustain ongoing initiatives or respond consistently to neighborhood problems.  With a team of 10 sector officers in each sector complemented by two NCOs, Neighborhood Policing provides a layered support system that can sustain problem-solving efforts from shift to shift, week to week, and month to month.

As the Neighborhood Policing initiative was put in place, the NYPD eliminated "impact zones", the higher crime areas that had been designated for intensive street enforcement and where many of the police stops took place at the height of an era that placed too much emphasis on enforcement activity.

**Recruit and In-Service Training**

NYPD training has been recast to support Neighborhood Policing and to provide more compelling training for recruits as well as tenured officers. Working out of the new Police Academy in College Point, Queens, with its array mock environments, the Training Bureau has built a curriculum that includes more hands-on, experiential learning for recruits. The recruits also go into the field during the course of their six-month recruit training to gain exposure to policing on the streets. The Impact program, which formerly assigned Academy graduates to high-crime zones upon graduation, has been eliminated. The Impact program focused the efforts of new officers too heavily on stops and other enforcement actions rather than exposing them to the full range of police work, and consequently did not serve either the officers or the city's communities well. Since July 2014, Police Academy graduates participate in a six-month field training program with experienced officers who mentor them and expose them to every facet of police service in their assigned neighborhoods.

Veteran officers are now given recurring training, not only in firearms proficiency, but in the tactical and communications skills necessary to manage street encounters effectively, as well as deescalate conflicts and gain voluntary compliance from suspects. This kind of recurring training had not been provided in prior years. In November 2014, the NYPD Training Bureau designed and implemented a "20K" training curriculum with the objective of training 20,000 NYPD service members within approximately six months. The training initiative was divided into three component parts, each taught on a separate day: Day 1, Foundations of Policing; Day 2, Smart Policing; and Day 3, Physical Tactics.

The overarching goal of this training curriculum was to reorient members in the proper use of force during contentious police-citizen interactions. Participating members received refresher training in physical tactics, crisis and conflict communication, controlling adrenaline and excessive force, abuse of authority, and levels of resistance. Other instruction included recognition and identification of potential adversarial conflicts, de-escalation techniques, and empathizing with individuals in crisis situations. The 20K program concluded in June 2015 with more than 22,000 officers trained. Recognizing the need to build upon this training and constantly refresh police officers' skills, the Department has expanded the current annual in-service training curriculum to five days for a net increase of three days. This includes two days of firearms proficiency and tactics training as well as three days dedicated to improving a wide array of community engagement and policing skills.

Since 2013, allegations of unnecessary force reported to the Civilian Complaint Review Board have declined both in overall number and as a percentage of the total number of civilian complaints filed. From 2013 through 2016, complaints about force declined by 1,477 complaints for a 29% reduction. For 2017, force complaints are on track to show another significant decline. Overall, civilian complaints are down again for the first half of 2017 as compared to the first half of 2016.

Beginning in February 2018, the NYPD will commence a training program addressing fairness and due process in policing as well as the potential effects of unconscious bias for all members of the Department. Social psychologists have shown that "implicit" or "unconscious" bias can impact what people perceive and do, even in people who consciously hold non-prejudiced attitudes. Well-intentioned humans may manifest biases at the subconscious level that can impact on their perceptions and behavior. Training will raise officer awareness and provide some tools for individuals to deal with this phenomenon. Specific training sessions are tailored to senior executives, mid-level managers, supervisors and police officers. Each one-day training session will be delivered at the Police Academy and the Department estimates that it will take two years to complete the training.

The NYPD has expanded the range of first aid skills it is imparting to our officers. In a full day of both recruit and in-service training, officers are now receiving AED training in the use of defibrillators, CPR training, training in administering naloxone, which can suspend the impact of a heroin overdose, and training in applying tourniquets. The Police Academy class that graduated in January 2016 was the first class so trained and the first equipped with belt trauma kits that enable them to render aid to bleeding people until medical personnel arrive.

New neighborhood coordination officers receive training in a wide range of skills in support of their role. Subjects include the Detective Bureau's course for newly assigned investigators and such topics as accident prone locations, CCTV cameras, crime prevention, domestic violence, subway policing, mediation, working with community residents, organizational skills, public speaking, crime analysis, and managing social service resources through social service agencies and contractors.

The NYPD also created the Community Partners Program.  The Community Partners Program helps rookie officers get to know the neighborhoods they will be serving by connecting newly graduated police officers with volunteer community members and leaders. Since its inception as a field-training component, the program has grown to be an integral part of neighborhood policing, and the veteran neighborhood officers now routinely leverage the community partners for their insight on local issues. Connectivity is key to forging trust and maintaining healthy police/community relationships.

**Crisis Intervention**
The NYPD responds to over 150,000 calls regarding emotionally disturbed individuals each year, so it is critical that its officers are better equipped to contend with these situations and increase the likelihood of bringing them to successful and safe conclusions.

All members of the NYPD receive a basic course of instruction regarding the Department's policy for dealing with emotionally disturbed individuals. The Department has provided officers with an array of less-lethal options for those situations in which it becomes necessary to restrain an individual. Such options

include more effective oleo capsicum spray (pepper spray), protective shields and conducted electrical weapons (Tasers). Additionally, the members of the NYPD Emergency Services Unit receive more advanced training and have specialized equipment for addressing such situations.

Crisis Intervention Training (CIT) is now being provided in a four-day class that teaches active listening skills among other techniques. Officers learn how to demonstrate empathy and build rapport with subjects, slowing down situations and de-escalating the subject's negative emotions. The training is supported by interactive scenarios and role-play situations to impart a better understanding of mental illnesses that will help officers assist a person in crisis and gain voluntary compliance. The Department launched its first wave of CIT in June 2015. Since its inception, more than 6,400 police officers have received this training. The training has been expanded to include Sergeants and Lieutenants.

**Enhanced Community Outreach**
The Department engages with community in a variety of forums. Community connection is fostered by the NYPD's use of social media. The Department uses Facebook, Twitter, Instagram, Snapchat, and www.NYPDnews.com to facilitate transparent two-way communication and tell stories about what police really do and what impact they have on New York City neighborhoods. The NYPD has begun to establish Facebook pages for individual commands to engage the surrounding community and provide swift police response to problems identified by local residents. Information about many of these initiatives and local community meeting is available at the NYPD's website (http://www1.nyc.gov/site/nypd/index.page).

**Use-of-Force Policy**
The NYPD has long had effective policies governing the police use of firearms, including clear rules on when firearms can be used, full reporting about firearms use, and recurring semi-annual training with the firearm itself. These policies had a highly positive impact, reducing the number of firearm discharges, the number of people shot, and the number of people killed all by about 90 percent since 1971. It is the goal of the new NYPD Use-of-Force Policy to bring the same degree of oversight, reporting, and training that has been characteristic in NYPD firearms discharges to all uses of force. In the past three years, the NYPD has made significant progress toward achieving this goal, improving both training and oversight and establishing a clear operational framework for reporting and investigating uses for force including firearms discharges.

The NYPD introduced a new use-of-force policy in June 2016 that clarifies definitions, establishes levels of appropriate force, and mandates reporting and review procedures for each level of force used while emphasizing the sanctity of life and the grave responsibilities vested in police officers. This policy established the Threat, Resistance or Injury (T.R.I.) Report for documenting uses of force by and against police officers. The policy does not change what officers are legally empowered to do in force situations, but it does ensure that officers, and the NYPD

as a whole, take responsibility for and justify police actions in every case. The new policy requires the application of de-escalation techniques when feasible, rendering aid to persons subjected to force if necessary and intervention in the event of unnecessary or excessive force.

T.R.I. Reports are prepared by the police officers involved in any reportable use of force incident, anytime unnecessary force is suspected or alleged, incidents in which any person sustains an injury relating to police action or in police custody, and when prisoners commit or attempt suicide. The T.R.I. Worksheet is also prepared when force is used against officers. The responsible supervisor makes a determination whether the use of force in question was in compliance with Department procedures and makes recommendations as to whether further investigation is necessary. To ensure compliance with the policy and overall quality of the reporting and investigation of force incidents, there are various levels of organizational review and oversight. The Department convenes monthly oversight meetings during which T.R.I. Reports are reviewed, the quality of the supervisors' investigations are evaluated, and commanders are held accountable for the process.

In July 2015, the NYPD established a new Force Investigation Division (FID) to investigate all officer-involved shootings, all deaths in custody, and all deaths related to police activity.  In past practice, these reviews were decentralized and performed at the borough level in each of eight patrol boroughs.  Borough personnel would handle policy issues, the Detective Bureau handled the criminal aspects of the cases, and the Internal Affairs Bureau evaluated police misconduct.

The new FID, with citywide jurisdiction, reports to the office of the First Deputy Commissioner and handles all aspects of each firearms discharge incident, including building cases against armed criminals who have fired on police officers as well as investigating possible police misconduct. The divisions' 64 experienced detectives and supervisors conduct high-quality investigations with an eye toward extracting tactical lessons from each incident that can be used to strengthen training and prevent future tactical errors.

**Body-worn Cameras**

The court order in the *Floyd v. City of New York* case, directed the NYPD to conduct a one year, 1000 camera, body-worn camera (BWC) pilot under the supervision of the Court-appointed Monitor.  The scope of the pilot was limited to stops and the stated purpose was to assess whether BWCs are effective in reducing unconstitutional stops. This pilot is currently underway but even before the pilot began, the NYPD announced that BWCs would be issued to all officers on patrol by 2019. The rollout of BWCs will continue over the coming months resulting in the deployment of over 20,000 BWCs.  While the focus of the court order was on stops, the NYPD voluntarily exceeded the minimum requirements of the court order and instituted a BWC policy that goes well beyond stops to cover all police investigative, custodial and enforcement actions.  In developing the policy, the NYPD engaged in extensive research of other police department policies and solicited input from stakeholders

as well as the public and officers by means of online questionnaires. The NYPD BWC policy and report describing the development of that policy has been made publicly available.  The report and FAQ videos about BWCs in several languages as well as sign language are available on the NYPD's website (http://www1.nyc.gov/site/nypd/index.page).

**Police Officer Evaluation System**
As the NYPD reduced its emphasis on the sheer number of enforcement activities, the Department has developed a new police officer performance evaluation system that evaluates officers on a range of skills, placing less emphasis on quantitative measures and more on abilities and accomplishments.

One procedural component of the former system included the use of performance objectives for police officers based upon quantifiable enforcement activity and stated that supervisors "can and must set performance goals for proactive enforcement."  The court in *Floyd v. City of New York* noted that this provision "made clear that supervisors must evaluate officers based on their activity numbers, with particular emphasis on summonses, stops, and arrests, and that officers whose numbers are too low should be subjected to increasingly serious discipline if their low numbers persist." The NYPD has revoked the policies that placed this emphasis on enforcement activity.

The new evaluation system considers 12 dimensions that are essential to quality policing including problem identification, adaptability, judgment, integrity, responsiveness, application of law and procedures, community interaction, departmental interaction, quality and timeliness of written reports, initiative, and leadership. Only one dimension – implementation of proactive policing strategies – considers enforcement.  The NYPD supervisor's guidebook for preparing the evaluations unequivocally states, "[t]he overall message from the 12 performance dimensions is clear: it is about the quality and effectiveness of our work.  It's not purely about quantitative metrics."

In the past, important aspects of police service, like problem solving and community engagement, were not captured in an organized way and generally not considered during the evaluation process. The new system provides officers with the opportunity to self-report their problem-solving work, their community interaction and engagement, and their notable accomplishments. A notable accomplishment might be an exceptional enforcement action, a medical intervention, a missing person found, a conflict de-escalation, or innovative use of technology.

The system also provides supervisors with the opportunity to prepare positive or corrective Feedback Forms for tasks performed by their subordinates in the 12 different dimensions or categories of skills and activities upon which officers are evaluated. The supervisor's Feedback Form replaces the Minor Violations Log, where supervisors could only record misconduct by officers but could not enter commendations.  The Self Report and Feedback Forms appear in an officer's

8

monthly Profile Report along with other data points about the officer's work providing a more complete picture of the officer.  Supervisors then evaluate their subordinates in the same 12 categories or dimensions on a quarterly basis.

As the NYPD establishes Neighborhood Policing across the Department, it is essential that the Department evaluate its officers on the kinds of skills necessary to make this approach work effectively. The Department has prioritized its set of expectations for patrol officers in line with neighborhood policing, and the new performance evaluation system is designed to measure the success of officers in meeting those expectations.

**Investigative Strategies**
As it implemented Neighborhood Policing, the NYPD also retooled its investigative structures and strategies. The NYPD has pioneered "precision policing." The fight against crime is unending, but tactics shift to adapt to emerging challenges. The NYPD is preventing crime and disorder with greater interagency and community collaboration, employing less intrusive tactics, and fostering a renewed sense that public safety means pursing security and public approval in tandem.

The Detective Bureau, responsible for investigating crime, has significantly expanded, absorbing all the investigatory components formerly under the Organized Crime Control Bureau (OCCB), including the gang, vice, and narcotics divisions. This major restructuring created the unified investigation strategy and has improved coordination among all the investigative assets in each geographic borough, in order to develop cases faster and bring them to successful conclusions.

One component of the reorganized Detective Bureau is the Gun Violence Suppression Division which oversees a relentless effort against gun crime. Its violence reduction task forces bring together teams of local precinct detectives and patrol officers with gang detectives, narcotics officers, Juvenile Justice Division investigators, and others. The approach melds local knowledge and expertise with specialty investigative skills to target violent groups and organize comprehensive investigations. The division also initiates major interstate gun trafficking cases and works with local detective squads in enhancing all gun arrests. Because successful policing requires precision prosecutions, detectives are now assigned to assist prosecutors with gathering the evidence needed to bring the strongest possible firearms cases to court. At the same time, field intelligence officers assigned to each precinct have coordinated investigations at the precinct level resulting in the seizure of over 1,000 guns in 2016 and are on track to seize more than 1,000 again this year.

Beginning in March 2016, when the OCCB was merged with the Detective Bureau, the NYPD has mounted 241 long-term investigations and arrested 2,115 of the most prolific offenders including many involved in violent crimes and narcotics trafficking. We believe that these arrests have been a major contributing factor in the dramatic decline in shootings, which are down 46 percent year-to-date from five

years ago, and down 23 percent just this year. This year we expect shootings to fall below 900 for the first time since shooting records have been kept.  Murders may fall below 300 for the first time since 1951.

**Improved Coordination at the Local Level**

At the precinct level, there is greatly enhanced cooperation and coordination between precinct detective squads, field intelligence officers, and sector officers, as the neighborhood coordination officers feed more intelligence and leads to the detective squads. As officers learn more about their sectors under Neighborhood Policing, they are developing a substantial quantity of good information about local crime and local criminals. The Neighborhood Policing structure facilitates this information flow and teamwork.

Neighborhood policing and unified investigations are driving down murders and shootings, even as enforcement encounters—arrests, summonses and stops—have declined sharply. Compared to the ten year average for 2003 to 2012, the average number of shootings for the past four years is 26 percent lower and the average number of homicides for the past four years is 36 percent lower. At the same time, enforcement encounters have declined by more than one million actions from their ten-year highs.

**Oversight through Compstat**

The NYPD provides strategic oversight of its decentralized patrol commands and investigative units through the process we call Compstat.  The Compstat process brings together precinct and investigative unit commanders each week from one of the eight patrol borough commands for intensive strategy sessions that review current and emerging crime conditions and work to develop plans and tactics to address them.

The Compstat process prior to 2014 placed too great an emphasis on general enforcement activity –– arrests, summonses and stops –– and not enough on the targeted enforcement strategies that the NYPD has come to call "precision policing."

Done right, Compstat is a precision instrument that helps precincts and the various support commands coordinate and focus their efforts on important cases, patterns, and conditions while simultaneously promoting best practices and a high level of professional policing skill. Today, the emphasis on general enforcement activity has been entirely removed[2] from Compstat, replaced by a focus on addressing specific problems in effective ways. When arrests and summonses are discussed at Compstat, the focus is whether such enforcement was necessary and effective in

---

[2] In his recent recommendation to the court regarding the Department's new evaluation system, the Court-appointed Monitor reported that the pressure on officers to make stops irrespective of their lawfulness has been removed from Compstat. The Monitor's recommendation noted that, "[o]ne or more members of the monitor team have watched almost all the Compstat meetings from April 2016 through mid-July 2017.  There is seldom any mention of stops, and never criticism of the number of stops or lack of stops."

addressing a particular crime problem. Partly as a consequence, year-to date, arrests are down 30 percent compared with five years ago, and summonses are down 63 percent.  Significantly, stops are down in excess of 90 percent.

**Counterterrorism Readiness**
The NYPD has built the most effective counter-terrorism capabilities of any city in the country, including participation in the Joint Terrorist Task Force (JTTF) with the FBI, the Intelligence Bureau with officers stationed in 20 foreign locations, and the Domain Awareness System, one of the world's premier technology systems for monitoring and protecting a dense urban environment. In the past four years, the Counterterrorism Bureau and the Intelligence Bureau have renewed and strengthened the NYPD's relationships with all of its federal and local partners, including the FBI, Secret Service, regional state police, and others.

Attacks in Mumbai, Paris, and Brussels underscored the need for a swifter and more potent response to terror incidents in which the perpetrators attack on multiple fronts, seeking to kill as many people as possible and engaging responding police officers with sophisticated weapons and military tactics. The NYPD decided to supplement the Emergency Service Unit, which had been the Department's primary terrorism response unit.  The Critical Response Command, a team of over 500 dedicated counterterrorism officers, was established within the Counterterrorism Bureau and is ready for immediate dispatch to any breaking terror or active shooter incident. Counterterrorism response was further bolstered by the Strategic Response Group, a citywide command of more than 700 officers trained in disorder control and active shooter situations, whose primary functions are crowd control and crime suppression, but who would also be deployable in the event of a large-scale terror attack. The NYPD now has nearly 1,700 officers with counterterrorism and active shooter training and can swiftly bring a strong presence to any developing incident or series of incidents.

**Collaborative Policing**
The NYPD is engaged in broader collaborative policing efforts, building partnerships with city agencies, non-profits, community-based organizations, the faith community, and other community stakeholders on a wide variety of public safety initiatives.

The NYPD Office of Collaborative Policing, which was established in 2014, has been actively pursuing opportunities for cross-agency collaboration in city government and collaboration with public interest and service organizations on a wide variety of public safety initiatives. This is a major departure from the past practice of the Department working largely on its own. One example of these initiatives includes working with the Department of Health and Mental Hygiene (DOHMH) in developing the concept of co-response cars in which DOHMH clinicians accompany police officers to calls involving mentally ill persons who have shown a propensity for violence. Another example is the NYC Ceasefire program in Brooklyn and the

11

Bronx, in which a group of agencies and service providers collaborate to intervene in the cycle of retaliatory violence among young gang members.

The Office of Collaborative Policing has worked on number victim assistance initiatives, like the effort to provide reliable transportation for disabled crime victims who are asked to attend interviews and court proceedings as complaining witnesses.

The Crime Victim Assistance Program (CVAP) is the most far reaching of the NYPD's crime victim assistance initiatives, financed by the Department and staffed by the non-profit Safe Horizon organization, New York City's largest and most comprehensive victim services provider. By next summer, the program will have assigned two victim advocates in every precinct, a domestic violence victim advocate and a general crime victim advocate, as well as two advocates in every Housing Bureau police service area. The program builds on a domestic violence program that has operated in a handful of precincts and in all nine public housing police service areas since the mid-1980s, but for the first time under the new program, the NYPD will be providing advocates to victims of any kind of crime, in every precinct and every police service area citywide.

Crime can leave its victims confused, angry, and feeling isolated. These victims frequently are unaware of the services and resources available. CVAP works to ease the stress of victims, providing crisis intervention, referrals to community-based service programs, and advocacy to support victims' interactions with the police and other parts of the criminal justice system. It helps victims feel safe again, recover from trauma, regain a sense of control, and ultimately, participate in the criminal justice process.

The CVAP is currently up and running in two thirds of the NYPD precincts in all five of the geographic boroughs. Advocates sort through crime complaints each morning and reach out to victims by mail and telephone calls. They address police roll calls to better inform officers about the services available and how to connect with them. Advocates adapt services to each victim's unique needs, whether counseling for trauma, advice about navigating the legal processes of the criminal justice system, or help in applying for financial compensation.  This effort will be the largest and the most comprehensive victim services program in the country.

**Technological Support**
Technology has been harnessed in a variety of ways in the NYPD, including the construction of a new data center, the installation of fiber optic cable connecting NYPD facilities, the replacement of the radio and telephone systems, and the development of a series of new applications supporting police service. From the operational perspective, perhaps the most important technological initiative was the NYPD mobility platform and the distribution of smartphones to 35,000 police officers and tablets to 2,500 patrol vehicles. These phones and tablets provide officers with immediate field access to a variety of NYPD databases and direct lines

of contact –– by phone or email –– to community members. This capability contrasts sharply with the situation four years ago when police officers didn't even have email addresses or any ability to receive phone calls in the field.

With their Department phones, officers can now access real-time 911 data, including the history of previous emergency calls made from a location they are responding to and any wanted individuals associated with the address. They often receive the 911 call information faster on their phones than they do from the radio dispatcher. Officers also have full access to the NYPD Crime Information Center, where they can check warrants, search for information about wanted or missing persons, and view all Crime Stoppers information. Using a smartphone application called Translator, officers can translate 50 of New York City's most prevalent foreign languages, whether spoken or written to facilitate communication with a diverse population.

The phones support neighborhood policing, not only by making officers more accessible to the public, but also by enabling more effective communication and collaboration among the officers themselves. Under the Neighborhood Policing model, at least 12 officers share responsibility for a sector within a precinct: five two-officer teams working each of the three daily shifts with coverage for days off, and two neighborhood coordination officers. In the past, officers tended to focus only on their own shifts and could not readily communicate with officers on other shifts, especially since most officers did not have email addresses or phones. Now these officers, who all have a vested interest in their shared sectors, can be in continual contact. Their work as a crime-fighting and problem-solving team is greatly facilitated by regular email and phone communication among all 12 team members.

## Conclusion

The last four years in particular have been a transformative time at the NYPD during which the Department has reimagined holistically the way police services are provided to the city. Beginning in 2014, the NYPD has moved forward with a series of complementary initiatives that have touched virtually every aspect of its operations, including its patrol model; its operational oversight; its accountability through Compstat and Risk Management; its investigative strategies; its counterterrorism and intelligence readiness; its recruit,  in-service training, and executive development; its technological support; its use-of-force policy; its evaluation system for police officers; and its community outreach and assistance to victims of crime. The result is a model of police service for the 21st century that has been institutionalized throughout the Department.

We are grateful for the work of the Court-appointed Monitor and the Court-appointed Facilitator, Judge Ariel Belen.  While many of the suggestions offered by the Court-appointed Facilitator are extremely thoughtful and meritorious, the Department declines to consent to these reforms formally as "court-ordered Joint Remedial reforms" because the majority of them – in some form – are already

underway in the Department. Additional details and responses to a series of proposals put forth during the Joint Remedial Process follow in the attached appendix "A".



*Appendix A*

# The Joint Remedial Process

During the Joint Remedial Process, several issues have been presented to the NYPD for consideration. To the extent they are not already addressed above, the following is a brief analysis of the issues presented.

## Immediate Reforms and Joint Process Reforms

As originally conceived by the court, the Court-appointed Monitor would preside over a process under which the "immediate reforms" enumerated in the Court's "Remedies Opinion" would be developed and implemented.  That process began in earnest in early 2015 with the drafting of a "milestones" document that identified the specific tasks required to be accomplished as part of the "immediate reforms." The process contemplated final recommendations by the Court-appointed Monitor to the court (e.g. submission of revised patrol guide procedures or a new stop report), with the NYPD proposing initial drafts, the plaintiffs' counsel responding with comments, and the Monitor determining what his final recommendation to the court would be.  That process rapidly evolved to become a collaborative consensus building process among the parties that was facilitated by the Court-appointed Monitor.  The result is that policy, auditing, evaluation and training materials, among other remedial topics, were created in a cooperative atmosphere with input from all.  Consequently, the reforms have become more robust than the requirements initially set out as "immediate reforms" in the court order. For example, rather than correct the deficiencies identified in training materials (e.g. training video # 5, misleading content regarding unusual firearms and the absence of a self-initiated stop scenario in the in-service training), the parties undertook to draft entirely new curricula for recruit, field training, plain clothes, command level, promotional and in-service training. This entailed the incorporation of material that heretofore had not been specifically addressed by the court. In essence, the parties have incorporated the spirit if not the structure of the JRP into the remedial process itself yielding many positive results.

Additionally, the court was explicit that the "Joint Process Reforms must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments." The ideas for discussion as well as other proposals raised by counsel do not meet this threshold and are not necessary within this context given the transformation described in this report, other measures already in place and the expanded remediation role undertaken in collaboration with the Court-appointed Monitor and the parties. These topics exceed the subject matter of the court order and the scope of the JRP.

The court contemplated input from the "communities most affected by the NYPD's use of stop and frisk" and referenced a "wide array" of stakeholders representing diverse points of view (e.g. NYPD personnel, district attorneys' offices, advocacy groups, groups concerned with public housing, etc.) and not just a single advocacy group or ideological perspective.  Engagement with the communities most affected by stops is occurring through many of the initiatives described in the report above.

i

*Appendix A*

Although the Facilitator solicited input from a broad array of stakeholders, the proposals do not necessarily reflect these diverse perspectives.

**Targeted Education Campaign**

The NYPD currently distributes public education cards addressing many topics, such as:  an awareness campaign about the appropriate usage of the IDNYC card; an awareness campaign regarding the Department's marijuana enforcement policy; and, specifically in the context of Stop, Question, and Frisk, the "What is a Stop" information card that is required to be offered to every individual stopped except in exigent circumstances.  The NYPD is in the process of developing additional public education cards and pamphlets regarding the following issues:  an awareness campaign about the ability to obtain a language interpreter whenever needed; an awareness campaign regarding the regulations of Street Vendors in New York City; and a communication card for people who are deaf or hard of hearing to enhance communication during a traffic stop.   Several of these cards were developed in collaboration with outside agencies, including, for example, the Mayor's Office, the Legal Aid Society, and the street vendors' union.

Moreover, the NYPD currently has several programs available to civilians that provide information regarding the NYPD generally, and stop and frisk specifically, such as the following:

a.  The Citizen's Police Academy is a training program open to any interested community member that meets once a week for ten weeks. The Academy takes civilians through an experiential training curriculum similar to the NYPD recruit training experience.  Attendees participate in hands-on and classroom instruction in various law enforcement and policing topics, such as Investigative Encounters, Crisis Intervention, driver training, officer safety, and use of firearms.  Civilians can register through their local precinct and through the Police Academy.  Each class consists of approximately 200 people. This training is held twice a year in the Fall and the Spring.

b.  The Citizen's Police Academy International is a variation of the Citizen's Police Academy that is both language and neighborhood specific.  The Academy International addresses basic interactions between law enforcement and the community, including issues such as Investigative Encounters and immigration issues.  These are done in collaboration with the local precinct and other providers, such as the local District Attorney's Office.

c.  The People's Academy is a program for police officers in which they receive a community orientation from community leaders and members of a specific neighborhood.  Officers learn about

*Appendix A*

the history of the neighborhood, historical neighborhood issues, current neighborhood issues, and have an opportunity for authentic dialogue and community engagement.

The NYPD publishes its operations manual, the Patrol Guide, on the Department's website where it is available for public inspection. The Patrol Guide includes polices related to investigative encounters, interior patrols and other topics related to the monitorship. The Department also publishes important data on its website including crime data, stop data, and quality of life enforcement data. Additionally, all of the policy reforms and training materials completed with the Court-appointed Monitor and parties, are posted on the Monitor's website ([http://nypdmonitor.org/](http://nypdmonitor.org/)).

The Civilian Complaint Review Board engages in broad public outreach and distributes the following information brochures, "What to Do if a Police Officer Stops You" and "What can you do if you think you've experienced or witnessed police misconduct".  This material is also available on their website: ([http://www1.nyc.gov/site/ccrb/about/outreach/publications.page](http://www1.nyc.gov/site/ccrb/about/outreach/publications.page)).  CCRB publishes extensive information and data about complaints and their outcomes on their website as part of their data transparency initiative. This information is updated weekly. The CCRB also publishes comprehensive aggregate complaint information, including outcomes in their semi-annual and annual reports.

**Community Input into Training**

The Department agrees that community input regarding interacting with special populations can be a valuable component in the development of policies, procedures, and trainings. The Department already engages in outreach to community members, experts, and organizations in order to obtain such input.  The Deputy Commissioner of Collaborative Policing is responsible for working with members of the community to develop and implement policies and programs for any interested population.

Additionally, the Community Partners program is one such method of collaborating and engaging with community members to bridge the gap between the police and the community.  The NYPD understands that the members of these communities are uniquely situated to provide input into how officers can engage effectively with their community members.  As a result, the Department has developed new policies, procedures, and trainings in order to communicate these needs to our officers. Specifically, with respect to the mentally disabled, the LGBTQ, and homeless populations, the Department has the following special training and policies regarding interaction with members of those communities:

*Appendix A*

    a.  <u>Mentally Disabled:</u>
The Department has had extensive collaboration with mental health professionals, mentally disabled individuals, and others to develop policies and training to increase officer awareness and understanding of mental health issues and to implement de-escalation techniques for interacting with such individuals.

As described previously in this report, the NYPD has several initiatives for dealing with individuals with mental disabilities including a basic course of instruction for all officers, less lethal equipment options, the expertise of the Emergency Services Unit and the comprehensive four-day Crisis Intervention Training (CIT) program. The CIT training incorporates lessons regarding symptomology, mental health diagnoses and reactions, scenario-based trainings, and a live panel of civilians that represent the mental health spectrum, including people with mental health issues.  The curriculum was developed in collaboration with the Department of Health and Mental Hygiene and Center for Urban Community Services.  The curriculum is based on a national mental health model and customized for the NYPD based on community partner meetings.  There are currently more than 6,000 members of the service who have already been trained.

    b.  <u>LGBTQ Communities</u>:
The Department currently has an LGBTQ liaison assigned to the Police Commissioner's Office who is responsible for addressing issues specifically related to the LGBTQ community. The Liaison is familiar with Department policy regarding LGBTQ issues, as well as with recent federal, State and local laws affecting the LGBTQ community when dealing with the Department. The liaison maintains regular contact with local leaders, community groups, advocacy groups and service providers that represent and serve the LGBTQ community in New York City.

In 2012, the Police Commissioner assembled an LGBTQ Advisory Board which developed new patrol guide procedures regarding engaging with the LGBTQ public.  Community advocates were brought into train police officers at the police academy on the new procedures.  This Advisory Board still exists.

The Department has promulgated policies and conducted training on such issues as respecting gender identity and recognizing preferred gender when it comes to certain

*Appendix A*

enforcement decisions (e.g. recording identity, searching and lodging of prisoners). The Department conducts outreach to encourage LGBTQ crime victims to report abuse and hate crimes, and promotes LGBTQ services at specified Department of Homeless Services shelters.

Additionally, since 1982, the NYPD has had an official fraternal organization for LGBTQ law enforcement members, the Gay Officers Action League, that assists on addressing LGBTQ matters for employees in the workplace and serves as a bridge between the law enforcement community and the LGBTQ community at large.

c.  <u>Homeless Population:</u>
The NYPD designed a four-day advanced training curriculum for Department of Homeless Services' peace officers for protecting homeless shelter residents.  This program is currently being run and developed by a team from the NYPD under the direction of an NYPD Chief.

In addition, the NYPD has worked with other city agencies and community organizations to put in place policies for addressing important issues related to the homeless population such as encampments, extreme weather situations, and available services. Working with these city agencies, community organizations and other non-governmental organizations (NGOs), the NYPD supports intervention in order to facilitate the appropriate services at the precinct level. The Department established the Crisis Outreach and Support Unit to enhance its outreach and ability to provide essential services to homeless populations.

d.  <u>Other Special Populations:</u>
There are other special populations about whom the NYPD has sought and obtained advice from various community groups and NGOs including, but not limited to, domestic violence victims, hearing impaired individuals, and sex workers.

For example, the Department works with Safe Horizons and the Family Justice Centers in each County to address domestic violence issues and ensure that victims are receiving appropriate services.  Additionally, the Department conducts "DV Stat" meetings to examine patterns of domestic violence, troubleshoot concerns and hold police commanders accountable for the domestic violence service and intervention programs under their stewardship.

*Appendix A*

To enhance the Department's services to the hearing impaired, the Police Academy has partnered with the National Action Network Deaf Club to develop scenario-based training and to review the curriculum for recruits in dealing with the deaf community.

The NYPD partners with several Non-Governmental Organizations (NGOs) to rescue victims of sex trafficking. The NYPD Vice Enforcement Division focuses enforcement on the criminality of pimps and "Johns" rather than routinely arresting sex workers. Through a coordinated response after an enforcement action, the partner NGO provides education and services to potential sex trafficking victims. The Department also promulgated a policy whereby condoms possessed by prostitutes are no longer invoiced as arrest evidence.

e.  Illuminate NYPD:
    Illuminate NYPD is a Police Academy initiative that was created to assist the community in gaining a better understanding of the NYPD training process, and to ensure that community concerns can be better addressed and served. Illuminate NYPD facilitates this goal by keeping the community informed on the training programs and curricula currently taught and utilized by the Academy during recruit and in-service training. It also seeks to gather input from the community to help shape NYPD training by hosting small community-feedback discussions about the training objectives of select NYPD curricula. Additionally, the Academy is incorporating "team teaching" opportunities that allow instructors to work hand-in-hand with the community in a classroom setting. The goals of Illuminate NYPD are to produce community-informed curricula; build community trust through training; make police officer training as transparent as possible; and to educate police officers on how to better serve the community.

**Judicial Determinations and Civilian Complaints**
There is a system in place for tracking and reviewing declinations of prosecution (DPs) from prosecutors. The Criminal Justice Bureau of the NYPD has five court sections (one in each borough) that are responsible for collecting the DPs and entering them into the Online Prisoner Arraignment Database ("ZOLPA"). The DP's are classified by category related to the reason why the case was declined. That data is compiled into a report in order to make the data available for future analysis. This data can be sorted by category of DP or police officer, in order to observe

trends and determine whether additional training is needed. In addition, the DP's themselves are ultimately sent to the arresting officer's commanding officer for review and determination whether further action is required.

The Department is working with the District Attorneys, US Attorneys, Special Narcotics Prosecutor and NYC Law Department to identify and address adverse credibility findings with respect to police officer testimony.  These offices forward information formally about an officer's testimony in a particular case to the NYPD Legal Bureau where the findings are evaluated to determine, on a case by case basis, if the officer in question warrants re-training, consideration for re-assignment, or, a referral for investigation and discipline. The NYPD's Performance Analysis Section is also made aware of the information so that they may appropriately consider it, in conjunction with other factors, to determine whether an officer may require special monitoring.

**Litigation**
The Department is in continuous communication with the NYC Law Department about all manner of civil litigation, whether or not the initial incident was the result of a stop encounter.  Much of that communication is subject to attorney-client privilege, however, the Law Department generally alerts the NYPD to any potential malfeasance by members of service. The NYC Law Department may elect to defend or settle a lawsuit based upon a variety of factors. The NYPD confers with the Law Department regarding case strategy and outcomes. With respect to settlements, the Department typically weighs in on the propriety of the proposed settlement. The NYPD is made aware of any denial of indemnification, judgment, or verdict that occurs involving a member of the Department. Litigation is a factor considered by the NYPD regarding the placement of a member of the Department in a special monitoring program or other appropriate remedial action such as a change of assignment.

Finally, an officer's complete CCRB history (including allegations and outcomes) is included in his/her personnel record for the duration of the officer's employment. The personnel record is consulted and considered anytime an officer is evaluated or seeks a transfer, is eligible for promotion or a scholarship, or other Department personnel action. The Department is rolling out a new online dashboard for executives this month called the Risk Analytics Information and Liability System (RAILS). RAILS will aggregate in one place personnel data as well as other negative performance indicators such as civilian complaints, discipline, stop reports rejected by a supervisor, and transfers for cause. Commanders can actively query an individual's record as well as receive automatic alerts anytime one of these triggering events occurs. This will facilitate timely intervention by the commander.

**Community Engagement**
Significant community engagement initiatives are described previously in this report. The Department also convenes monthly "Precinct Community Council Meetings" at a designated location and time. The commanding officer of the precinct,

*Appendix A*

as well as key staff, attends the meeting which is chaired by an elected community member and is open to all residents of the community.  This meeting is designed to provide an opportunity to discuss the concerns of the community as it relates to crime conditions, community-police engagement, quality of life, crime prevention, and other issues.   These meetings are publicized through various forms of social media including the NYPD website, precinct Twitter and Instagram pages, and on the Facebook pages for those precincts that have one.

The Department routinely participates in various community-based meetings at the local, borough and citywide levels, including Block Association Meetings, Tenant Meetings, NYCHA Tenant Meetings, Community Board Meetings, and meetings convened by religious institutions and elected officials, to name a few.

**Community Engagement Metrics**

The Department began to research and develop a new officer evaluation system more than two years ago.  Plaintiffs' counsel and the Court-appointed Monitor's team provided input and recommendations. That input was helpful in shaping the new evaluation system.  The new system stresses quality over quantity and measures an officer for performance that is much more aligned with the goals of our Neighborhood Policing Program.

Specifically, the new system has mechanisms to evaluate officers' community engagement.  As discussed previously, the system is based on 12 rating dimensions.  One of the 12 dimensions, Community Interaction, is designed to measure the nature of an officer's community engagement, such as whether the officer engages the community in a proactive and positive manner, treats others with courtesy and professionalism, is an active listener, and refers community members to appropriate services when needed. Other dimensions support the goal of community engagement as well.  One example is the "Problem Identification/Solving" dimension which evaluates an officer's initiative and innovative thinking with respect to appropriately identifying and addressing the needs of the command and community effectively and efficiently. The system includes officer self-report entries, enabling officers to report acts of meaningful community interaction.  It also includes the ability for supervisors to submit comment forms regarding a subordinate's positive or negative community interaction.  These self-report and supervisory feedback forms feed into an officer's monthly profile report and are considered during the officer's quarterly evaluation.

**Community Surveys**

The Department has been working with ELUCD, a data analytics group, to conduct surveys and analyze responses in order to measure community sentiment at the micro-neighborhood level (sector level).  The ELUCD founders have extensive experience in public opinion research and data analytics.

In 2014, ELUCD began working with the Department by developing and conducting an in-depth survey of roughly 17,500 residents in each of the 77 precincts about

attitudes toward the NYPD and policing in general.  They continued to collaborate with the Department and in 2015, conducted a survey of 4,500 residents in the sectors where the Neighborhood Policing program was being deployed in order to take baseline measurements of attitudes toward the NYPD prior to the program being rolled out in those sectors.  At the same time, they were working on technologies to collect public opinion data on an ongoing basis in real time.  The Department was looking for a regular, ongoing measurement of sentiment to be used as another management metric to augment the current Compstat process.  In 2016, this process developed into the Sentiment Meter.

The Sentiment Meter collects "sentiment data" around three key dimensions from residents of each of the 303 sectors.  The three dimensions are trust, satisfaction, and perception of safety.  The trust dimension measures "do you trust the police and officers in your neighborhood?"  The satisfaction dimension measures "how you would rate the job that the NYPD officers are doing."  The perception of safety dimension measures "how safe do you feel in your neighborhood?" and is not necessarily based on objective measures.  ELUCD has developed a multi-modal data collection model that allows them to reach all segments of the population and collect data based on a representative sample for a specific neighborhood's demographics.  These survey responses are used to develop indexes around those three key dimensions which are similar to FICO credit scores for each neighborhood and are currently being produced monthly.  This information is not intended to predict an outcome (such as a specific percentage of people who are satisfied with NYPD); rather, it is intended to be utilized as a means to observe trends over time and what drives those dimensions of sentiment up or down.  This data will be analyzed in relation to other data such as the crime data that the Department already collects to see what factors may affect sentiment. This analysis is meant to be used as a tool for police executives and commanding officers to understand what is going on in their sectors, commands, and the city overall.  It is also meant to elucidate the areas where commanding officers can impact sentiment through their actions.  At some point there will be added input regarding understanding media influence, on both a national and local level, and how it impacts sentiment at the sector level.

**Anonymous Complaints Regarding Police Misconduct**
There are various mechanisms in place that permit the anonymous reporting of officer misconduct.  Complaints pertaining to unnecessary force, abuse of authority, discourtesy and offensive language (commonly referred to as FADO complaints) are within the purview of the Civilian Complaint Review Board (CCRB). Allegations of corruption and other non-FADO misconduct are investigated by the NYPD Internal Affairs Bureau (IAB). Depending upon the subject matter, allegations can also be reported to the NYC Commission to Combat Police Corruption, NYC Civil Rights Commission and, for potential criminal matters, the District Attorney Offices. Additionally, civilians can make anonymous complaints about police misconduct or the NYPD's operations, policies, programs and practices to the Office of the Inspector General – NYPD ("OIG-NYPD").

*Appendix A*

Civilians can call CCRB and IAB direct or they can call 911 or 311 to make a complaint and the matter will be referred to IAB or CCRB depending upon the nature of the allegation. Complaints may also be submitted by letter. The CCRB also accepts complaints online. CCRB conducts extensive public outreach. The CCRB currently investigates alleged misconduct with respect to stops and investigative encounters as a potential abuse of authority, and analyzes trends to determine if there are any patterns or consistent problems.

If an individual calls in a complaint anonymously to the NYPD IAB, a confidential number is provided to the individual making the allegation.  The Department tracks and investigates all anonymous allegations that are made, but if they are truly anonymous, there is limited ability to assess the credibility of the claim, due to an inability to contact or interview the complainant.  In addition to tracking and analyzing data collected by IAB, the Department receives and analyzes data from the CCRB on a regular basis as well. The CCRB does not currently investigate anonymous allegations.

The telephone numbers and websites of both the CCRB and IAB are available on numerous websites, posters and flyers and are included on the back of the "What is a Stop?" Information Card, provided during Level 3/*Terry* Stops.

**Stop Receipts and Reports**

The NYPD's Quality Assurance Division (QAD) has developed a means of evaluating compliance with the requirement to offer the "What is a Stop?" information card during a Level 3 investigative encounter.  QAD reports compliance based upon an analysis of Stop Reports.  Utilizing Stop Report data, the report evaluates whether an information card was given, and if not, whether there was a documented explanation for failure to provide the card.  This report is generated on a quarterly basis with the goal of addressing any issues or trends with compliance.  With the advent of body-worn cameras, the Department has begun to review samples of video to assess the officer's performance to include offering the receipt.

Each Stop Report is assigned a unique identifying report number once it is entered into the Department's online records management system.  If an individual who is stopped would like the Stop Report number, they will have to wait until the officer has input the information so that a number is generated. If it is not feasible to generate the Stop Report at the time of the encounter, or the individual does not want to wait, then the individual can come to the precinct at a later date to obtain the Stop Report number. This will facilitate identification of the incident and fulfillment of any future FOIL request.  Acquisition of a Stop report is governed by state laws regarding freedom of information requests as well as criminal and civil procedure. These laws must be complied with as they contemplate due process, fairness and privacy concerns.

*Appendix A*

**Police Radio – Suspect Description**

The Department already instructs officers to replay the radio run from the dispatcher, whenever feasible, to allow the civilian to hear the description relayed to the officer so that they can understand the reason for the stop.  This is addressed in our training materials and is encouraged as a method to explain the reason for the stop.

**Disciplinary Process**

The NYPD Department Advocate prosecutes NYPD internal disciplinary cases. The Department Advocate applies the "preponderance of the evidence" standard of proof for internal Department disciplinary cases. This is established law in New York but the Department will be publishing a policy statement that articulates this standard in the near future. Beyond applying the standard of proof for each element of an offense, each case is evaluated on its own merits with the individual officer's past history and other factors taken into consideration when recommending and imposing discipline. The Department Advocate also evaluates the proposed penalty with respect to established precedent for consistency with similar cases. Having guidelines for a review of disciplinary cases, including, but not limited to, "sentencing guidelines" or a disciplinary table would run contrary to the due process rights afforded all employees in an administrative hearing and potentially run afoul of established law and collective bargaining agreements.  Furthermore, it divests the Police Commissioner of his statutory authority under the NYC Charter to make decisions in each case based on the totality of the circumstances and eliminates his ability to exercise discretion.

**Documenting Certain Public Encounters in Addition to Stops**

This recommendation is neither practical nor feasible.  Documenting encounters that do not rise to the level of reasonable suspicion would be overly burdensome, unnecessary, and potentially have a chilling effect on community engagement. Furthermore, such a practice could effectively turn every consensual encounter into a *de facto* Level 3 *Terry* stop because, by asking for an individual's name and pedigree information, the officer necessarily interferes with the individual and unnecessarily prolongs the encounter.  The NYPD participates in over 4 million service calls and public engagements annually. Many of these involve some type of investigative encounter. Typical examples include asking a person encountered if they called the police, if they know who called the police, if they are okay, if they need an ambulance, if they know the crime victim lying on the ground, or if they saw what happened.  A police officer may respond to the scene of a shooting and walk among the large crowd that has gathered to ask if anyone saw anything or knew what happened. Each of those brief encounters or conversations, amount to a Level 1 Request for Information. It's not practical to document each of these encounters especially when time is of the essence such as when dealing with a victim or crime in progress. State law, including CPL § 160.50, may prohibit documenting certain public encounters.  Additionally, documenting these encounters does not serve any operational, public safety or quality control purpose.

*Appendix A*

**Additional Recommendations**

During the course of the JRP, counsel to plaintiffs in *Floyd* and *Davis* have submitted additional proposals and ideas for consideration. While some of these concepts have been addressed elsewhere in this report, the following are brief responses to the proposals raised:

  a. Discipline Standards:
  The breadth of this recommendation goes far beyond "stop and frisk" to discipline in general and is not necessary[3] to bring the use of *Terry* stops into compliance with the Fourth and Fourteenth Amendments. As described above, disciplinary recommendations are complex analyses that require consideration of many variables including aggravating and mitigating factors as well as recent precedent and judicial and administrative determinations. The imposition of standards would be impracticable, raise due process concerns and likely run afoul of civil service law as well as collective bargaining agreements. Similar concerns prompted the U.S. Supreme Court in 2005 to find the mandatory application of the federal sentencing guidelines unconstitutional.

  b. Community Board:
  The breadth of this recommendation also goes beyond stop and frisk and is not necessary to bring the use of *Terry* stops into compliance with the Fourth and Fourteenth Amendments. The recommendation usurps the authority of the Police Commissioner to manage and administer the Department and as such violates the NYC Charter. There is already a Court-appointed Monitor in place in addition to the ultimate oversight imposed by the Court. This proposal, as described by the Plaintiffs' counsel and some of the stakeholders, is tantamount to creating a second monitor. Such a proposal is unnecessary, would consume valuable resources, undermine the monitor and actually impede progress. Moreover, this proposal also contravenes the language of the court order. The Court contemplated input from the communities most affected by stop and frisk and referenced a list of stakeholders that represented diverse points of view (e.g. NYPD personnel, district attorneys' offices advocates, etc.) and not just a single advocacy group or ideological point of view. Finally, there are other oversight entities available to review matters not subject to the monitorship.

---

[3] CCRB investigates allegations related to stops and frisks. Since 2011, the number of allegations related to stops has declined by 40%. The CCRB already publishes extensive data about allegations and disciplinary outcomes on its website and in its annual and semi-annual reports.

*Appendix A*

   c.   <u>Documentation of Level 1 and Level 2 Encounters:</u>
As described above, this is unrealistic and evinces a lack of understanding of most Level 1 encounters in which a police officer approaches a person seeking information. Stopping to prepare a report for each such contact could have a chilling effect on public cooperation, turn simple conversations into prolonged *de facto* stops and impede police service.

   d.   <u>Advising Civilians of Their Rights During Level 1 and Level 2 Encounters:</u>
Advising a person of their "rights" during a Level 1 Request for Information encounter is unnecessary and impractical. Consider the examples of police officers approaching people in a park looking for a missing child or responding to a crime in progress. It would be unnatural and counterintuitive to begin the conversation with a warning that the person does not have to speak to the officer. Also, courts have recognized this need for the police to communicate with the public and seek information, and have constrained such warnings and limitations to custodial interrogations. Other proposals in this section have already been adopted by the Department. For example, the NYPD promulgated a policy requiring an explicit affirmation anytime an officer seeks consent to search an individual. Informing a person that they are free to leave at Level 1 and Level 2, if they ask, goes to what constitutes a stop and is addressed in the current investigative encounters training. The law recognizes that police officers may request identification from a person at any level of encounter and that a person may decline to provide identification in most situations. This is also addressed in Department policy and training.

*Appendix B*



| | |
|---|---|
| **2011** | • Stops peak at 684,300. |
| **March 2013** | • Floyd trial begins |
| **August 2013** | • Judge Scheindlin rules that the City is liable for constitutional violations and orders broad reforms. |
| **September 2013** | • Police unions move to intervene in the case. |
| **2013** | • 191,851 stops. |
| **January 2014** | • Mayor Bill Di Blasio sworn in as the 109th Mayor of New York City.<br>• William Bratton sworn in as NYPD Police Commissioner. |
| **January 2014** | • New York City drops appeal in Floyd case. |
| **October 2014** | • 2nd Circuit denies police unions motion to intervene. |
| **November 2014** | • Federal Monitor begins work. |
| **December 2014** | • First body-worn camera pilot begins. |
| **December 2014** | • NYPD and CCRB agree on new reconsideration process. |
| **2014** | • 45,878 stops. |

*Appendix B*

**February 2015**
- Memo is read at 10 consecutive roll calls in all commands detailing the reforms ordered by the Floyd litigation. Memo is posted in all commands and provided to all officers.

**April 2015**
- The City and the plaintiffs settle the Davis litigation, concerning stops in NYCHA buildings.

**April 2015**
- Court approves new training materials concerning investigative encounters for NYPD recruits.

**April 2015**
- Court approves new training materials concerning racial profiling for NYPD recruits.

**April 2015**
- Court approves new training materials concerning stops in NYCHA buildings for NYPD recruits.

**April 2015**
- Court approves new training materials concerning stops in TAP buildings for NYPD recruits.

**May 2015**
- NYPD begins NCO program in 4 precincts.

**June 2015**
- Field Training Officer Field Guide revised with respect to investigative encounters and trespass stops outside TAP buildings.

**June 2015**
- Field Training Officers given one-day training course on new stop and frisk training.

**July 2015**
- Pilot for new Stop Report begins.

**August 2015**
- Court approves new procedure for investigative encounters (P.G. 212-11).

**August 2015**
- Court approves new procedures prohibiting racial profiling (P.G. 203-25).

**September 2015**
- NYPD creates Investigative Encounters Resource Center, an online library concerning investigative encounters.

ii

*Appendix B*

| | |
|---|---|
| September 2015 | • NYPD delivers training on investigative encounters to training sergeants. |
| September 2015 | • Joint Remedial Process Advisory Committee begins meeting. |
| October-November 2015 | • Monitor approves memo on NYPD's revised racial profiling policy. Memo sent to all training personnel and read in its entirety at roll call trainings. |
| October 2015 | • Roll call video introducing new stop and frisk procedures is released. |
| 2015 | • 22,563 stops. |
| January-November 2016 | • QAD updates auditing procedures for investigative encounters. |
| February 2016 | • Roll call video for Level 1 Requests for Information is released. |
| February-April 2016 | • NYPD meets with over 20 external organizations to get feedback on proposed body-worn camera policy. |
| March 2016 | • First body-worn camera pilot ends. |
| March 2016 | • New Stop Report is approved. Supervisors must review report for completeness and accuracy and for the constitutionality of the stops and frisks. |
| May 2016 | • Roll call video for Level 2 Common-Law Right of Inquiry is released. |
| June 2016 | • New Stop Report rolls out. |

*Appendix B*

| June 2016 | • Roll call video for Level 3 Terry Stop is released. |

| June 2016 | • Court approves new procedures for interior patrols in TAP buildings (P.G. 212-59). |

| June 2016 | • Court approves new procedures for interior patrols in NYCHA buildings (P.G. 212-60). |

| June 2016 | • Trespass Crimes Fact Sheet is approved. |

| July 2016 | • Roll call video for documentation and supervision of stops is released. |

| June-August 2016 | • NYPD releases online questionnaires for the public and police officers to gather feedback on the proposed body-worn camera policy. |

| August 2016 | • Over 50% of commands are NCO commands. |

| July 2016 | • NYPD begins teaching new day-long SQF training for newly promoted sergeants and lieutenants. It is waiting final court approval. |

| July 2016 | • NYPD changes internal policy concerning consent searches. Officers must now inform people that they are not required to consent to a search and provide a contact card if the search does not lead to arrest. |

| September 2016 | • James O'Neill appointed NYPD Police Commissioner. |

| December 2016 | • Executive level in-service investigative encounter training begins. |

| 2016 | • 12,336 stops. |

*Appendix B*

| January 2017 | • Electronic stop report released. |
|---|---|
| January 2017 | • NYPD begins workshopping in-service investigative encounters training. Training is awaiting final approval. |
| February 2017 | • Characteristics of an Armed Suspect training is approved. |
| April 2017 | • NYPD releases report responding to public and officer questionnaires. |
| April 2017 | • Court approves body-worn camera policy (Operations Order 21-17). |
| April 2017 | • Court-ordered pilot begins with the rollout of body-worn cameras in the 34th precinct. |
| April - November 2017 | • Officers in 20 pilot precincts are issued and trained on the use of body-worn cameras. |
| April 2017 | • Department revises A.G. 303-27, setting out new standards for a building to remain in the TAP program. |
| June-August 2017 | • Two roll call videos concerning the TAP program are released. |
| June-August 2017 | • Two roll call videos concerning NYCHA are released. |
| July 2017 | • Court approves settlement between the City and the plaintiffs in the Ligon case. |

*Appendix B*

| October 2017 | • New performance evaluation system approved by the Monitor. |

| October 2017 | • NYPD held a public hearing for a contract with Fair and Impartial Policing, an entity that has provided training to law enforcement agencies around the country, to conduct training that includes IB/PJ concepts. |

| November 2017 | • Monitor approves training materials for the in-service training for existing sergeants and lieutenants. |

| November 2017 | • BWC rollout for court-ordered pilot completed. 1,300 officers in 20 pilot precincts are equipped with body-worn cameras. |

| December 2017 | • Phase 2 (citywide deployment) of body-worn camera program begins with rollout in the 23rd precinct |