UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DAVID FLOYD, *et al.*,                                       08 Civ. 1034

               Plaintiffs,

    - against -

CITY OF NEW YORK,

               Defendant.

-------------------------------------------------------------X

KELTON DAVIS, *et al.*,                                      10 Civ. 0699

               Plaintiffs,

    - against -

THE CITY OF NEW YORK and NEW YORK
CITY HOUSING AUTHORITY,

               Defendants.

-------------------------------------------------------------X

JAENEAN LIGON, *et al.*,                                     12 Civ. 2274

               Plaintiffs,

    - against -

CITY OF NEW YORK, et al.,

               Defendants.

-------------------------------------------------------------X

**<u>PLAINTIFFS' COMMENTS ON THE JOINT REMEDIAL PROCESS REFORMS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

TABLE OF RECOMMENDATIONS AND PLAINTIFFS' POSITIONS ...................................... ii

COMMENT ................................................................................................................... 1

   I.   Executive Summary ................................................................................................ 1

   II.   The Court Should Exercise its Broad Authority to Order the JRP Reforms ...................... 5

   III.   The JRP Reforms are Necessary to Remedy Established Constitutional Violations ........ 9

     1.   Inadequate Discipline (Rec. Nos. 2, 3) ........................................................... 9

     2.   Inadequate Documentation and Document Review (Rec. Nos. 4, 5, 6, 8) .................... 14

       i.   Documentation and Recording of Level 1 and 2 Encounters. .................................. 14

         a)   Documentation ..................................................................................... 18

         b)   Video recording ................................................................................... 19

       ii.   Advising People of Their Rights During Encounters .............................................. 22

     3.   Deliberate Indifference to Ongoing Constitutional Violations (Rec. Nos. 7, 9)............ 25

       i.   Community Board on Reform Implementation ........................................................ 25

       ii.   Community Survey on Reform Implementation ...................................................... 29

     4.   Inadequate Performance Monitoring Systems (Rec. No. 1) ................................... 30

     5.   Inadequate Training (Rec. No. 11) ................................................................ 33

     6.   Other Recommendations (Rec. Nos. 10, 12, 13, 14) .......................................... 34

   IV.   Conclusion ...................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**

*Berry v. School District*, 515 F. Supp. 344 (W.D. Mich. 1981) .................................................. 28

*Brown v. Plata*, 563 U.S. 493 (2011) ........................................................................................ 5

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) ................................................... 7

*Dowell v. Board of Education*, 465 F.2d 1012 (10th Cir. 1972) .................................................. 28

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000). 7

*Hutto v. Finney*, 437 U.S. 678 (1978) .......................................................................................... 6

*Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015) ................................................................... 6

*Milliken v. Bradley*, 433 U.S. 267 (1977) .................................................................................... 6

*Morgan v. Kerrigan*, 530 F.2d 401, 415 (1st Cir. 1976) ................................................. 6, 7, 27, 28

*People v. De Bour*, 352 N.E.2d 562 (1976) ................................................................... 14, 20, 22

*Singleton v. Jackson Municipal Separate School District*, 426 F.2d 1364 (5th Cir. 1970) ......... 28

*State v. Ashbaugh*, 244 P.3d 360 (Or. 2010) ............................................................................ 16

*Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971) .................................. 6

*United States v. Parma*, 661 F.2d 562 (6th Cir. 1981) .............................................................. 28

*Utah v. Strieff*, 136 U.S. 2056 (2016) ...................................................................................... 16

**Other Authorities**

Benjamin Mueller, *New York Police Challenging More of Review Board's Findings, Study Shows*, NY Times (July 19, 2017) ...................................................................................... 12

Devon W. Carbado, *(E)racing the Fourth Amendment*, 100 Mich. L. Rev. 946 (2002) .............. 16

Erika L. Johnson, *"A Menace to Society:" the Use of Criminal Profiles and Its Effects on Black Males*, 38 How. L.J. 629 (1995) ............................................................................................ 16

Kendall Taggart & Michael Hayes, *The NYPD's Secret Files*, BuzzFeed (Apr. 16, 2018) ......... 11

Mary Calvi, *NYPD Paid Nearly $1 Billion To Settle Lawsuits*, CBS News, Oct. 14, 2010 ........ 32

Sunita Patel, *Toward Democratic Police Reform: A Vision for "Community Engagement" Provisions in DOJ Consent Decrees*, 51 Wake Forest L. Rev. 793 (2016) .............................. 28

**TABLE OF RECOMMENDATIONS AND PLAINTIFFS' POSITIONS**

| Facilitator's Rec. No. | Plaintiffs' Position | Comment Page |
|---|---|---|
| 1. Creation of Feedback Structures | Support with modifications | 30 |
| 2. Monthly Discipline Report | Support | 9 |
| 3. Disciplinary Recs. | Support with modifications | 9 |
| 4. Body Worn Cameras | Support with modifications | 14, 19 |
| 5. Recoding Level 1 & 2 | Support with modifications | 14, 18 |
| 6. Accessing Stop Report | Support | 14, n.4 |
| 7. Community Engagement | Support with modifications | 25 |
| 8. Public Education Campaign | Only support as modified | 22 |
| 9. Community surveys | Support with modifications | 29 |
| 10. Youth informants | Support | 34 |
| 11. Disability training | Support | 32 |
| 12. LGBTQ training | Support | 34 |
| 13. Civil summonses | Support | 34 |
| 14. Trauma training | Support | 34 |

**COMMENT**

In the Final Report and Recommendations of the Hon. Ariel Belen (Ret.), *Floyd v. City of New York*, 08-cv-1034, Dkt # 597, *Davis v. City of New York*, 10-cv-699, Dkt # 399 ("Facilitator's Report"), the Facilitator recommends that the Court require the City to implement fourteen remedial measures. The Facilitator's recommendations are the product of a large-scale process that elicited comprehensive input from the parties and community stakeholders, in particular the people most affected by the City's unlawful stop-and-frisk and trespass enforcement practices. The Facilitator's extensive outreach included partnering with over 20 organizations to conduct 64 focus groups in which more than 500 people participated (Facilitator's Report at 34-35); convening focus groups with "patrol officers, line supervisors, and executives" from the New York City Police Department ("NYPD") (*id.* at 36); holding 18 meetings with 19 community and policy organizations (*id.* at 36-37); and assembling 28 structured community forums attended by 1,777 people. *Id.* at 37 and App. H. On behalf of the three citywide plaintiff classes we represent, we respectfully ask the Court to enter an order requiring the City to implement the Facilitator's recommendations, with certain modifications explained herein. Such an order is needed to bring the NYPD's stop-and-frisk and trespass enforcement practices into compliance with the Constitution and to ensure continued compliance.

I.    <u>Executive Summary</u>

The Facilitator's Report was issued pursuant to the Court's Remedial Order. *Floyd* Dkt # 372 at 32 (paragraph 9) ("Remedial Or."). In the Remedial Order, the Court directed the development of reforms through two separate avenues: (1) an "Immediate Reform Process" (the "IRP") that would develop a set of reforms through negotiations between the Monitor and the

attorneys for the parties, Remedial Or. at 13-28; and (2) a "Joint Remedial Process" (the "JRP") that would develop additional reforms based on community input, and which would involve the parties and community stakeholders. Remedial Or. at 28-32. The only reforms that have thus far been implemented in the remedial process have been developed through the IRP. The Court must now determine what reforms will be so-ordered through the JRP.

Throughout the course of the IRP, which has been ongoing since the end of 2014, the parties and the Monitor have worked together to develop and implement important reforms that have moved the Department toward compliance with the Constitution. Yet the IRP has left critical categories of necessary changes unaddressed, and the recommended JRP reforms fill that void. This is by design: The Court directed the parties to develop a "more thorough set" of remedial measures through the JRP that would "supplement" the IRP reforms. Remedial Or. at 14, 30. The JRP reforms are to focus, in particular, on developing "an improved system for monitoring, supervision, and discipline." *Id.* at 23.

While the IRP reforms have been developed through negotiations among lawyers, the JRP reforms have been developed based on input from and discussions with the people most affected by the NYPD's stop-and-frisk and trespass enforcement practices. As the Court opined in ordering the parties to engage in the JRP, "[t]he communities most affected by the NYPD's use of stop and frisk have a distinct perspective highly relevant to crafting effective reforms." Remedial Or. at 29. "No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety." *Id*. The Court has emphasized the "importan[ce] [of] the parties work[ing] together in one Joint Remedial Process to repair the damage that was done during the years that the defendants in these cases violated the plaintiffs' constitutional rights." Mem. Op. & Order, *Davis*

Dkt # 340 at 4. The JRP reforms are a central component of the *Floyd* Remedial Order and the *Davis* and *Ligon* settlements, and they are a prerequisite to the legitimacy of the remedial process. *See id*.

For the last three years, the Facilitator engaged dozens of community organizations and thousands of stakeholders to obtain community input from across the City, and to develop reforms based on that input. In his report, the Facilitator recommends that the Court order the City to implement fourteen remedial measures. Facilitator's Report at 218-260. Each measure is designed to be within the scope of the *Floyd* Remedial Order and the *Davis* and *Ligon* settlements. *See* Facilitator's Report at 218 (explaining that the Facilitator is recommending reforms that are consistent with the Remedial Order); *compare with id*. at 260 (explaining that the "policy considerations," unlike the reform recommendations, "fell beyond the scope" of the Remedial Order). Before the Facilitator issued his final report, the NYPD circulated a memorandum arguing that it was not necessary for the Court to order implementation of the JRP reforms. *See* NYPD Response to JRP Reform Proposals, *Floyd* Dkt # 598-3, *Davis* as Dkt # 399-3 ("NYPD Response") at 1, 13-14; *see also* Facilitator's Report at 39 (explaining that the NYPD Response was circulated during the course of JRP negotiations). We anticipate that the City might maintain this position in its comment on the Facilitator's Report. Therefore, in further support of the Facilitator's recommendations and to assist the Court, our comment explains why an order requiring implementation is both necessary and appropriate in light of the record evidence.

We begin our comment with an explanation of the flexible standard that governs the Court's broad authority to order injunctive remedies in a case, such as this, where the plaintiff has proven widespread and longstanding constitutional violations. *See* section II, *infra*. We then

address the substance of the Facilitator's recommendations, in two parts. *First*, we demonstrate that recommendations 1 through 9 and 11 are needed to redress the constitutional violations established at the *Floyd* trial and addressed by the *Davis* and *Ligon* settlements. *See* section III(1) to (5), *infra*. We believe these reforms are, collectively, the minimum necessary to bring the NYPD's practices into compliance with the Constitution. We discuss them in order of importance to the plaintiff classes, and we have organized them according to the violation that they remedy. For example, the progressive discipline standards and monthly discipline report address the Court's finding that the NYPD failed to adequately discipline officers, and therefore these reforms appear together under the sub-heading "Inadequate Discipline." *Second*, we provide our limited feedback on Recommendations 10 and 12 through 14. *See* section III(6), *infra*. Although we support implementation of these measures, we raise some cautions, and we believe that these reforms alone would be an insufficient remedy.

In considering which reforms should be so-ordered through the JRP, it is important to recall that the JRP was created in response to the City's demonstrated indifference to community complaints about the use of the stop-and-frisk tactic. *See* Liability Opinion, *Floyd* Dkt # 373 ("Liability Op.") at 60-63, 111-117, 178-180. Throughout the IRP, the City has made many improvements that constitute a notable accomplishment. This recent history, however, does not lessen the need for the remedial measures that have come through the JRP. The City's resistance to reforming its stop-and-frisk practices dates back decades and persisted in the face of sustained community outcry. Liability Op. at 60-63, 111-117, 178-180. As set forth in the Facilitator's Report, and as shown below, the City has not yet remedied crucial problems with its stop-and-frisk and trespass enforcement practices, and these problems persist. *See e.g.* Facilitator's Report

at 8 (reporting that "the communities most adversely affected by the widespread abuse of stop, question, and frisk and trespass enforcement" continue to experience those abuses).

Further, the NYPD has continued to resist remedying its discipline and monitoring practices, as is manifested by its opposition to the JRP reforms during negotiations. *See* NYPD Response, at xii-xiii. Notably, in "declin[ing]" to agree to court-ordered JRP reforms at that time, *id*. at 1, 13-14, the NYPD argued that an order requiring implementation was not necessary because of other policies it has initiated. *See* NYPD Response, *passim*. This is the precise argument the City made following the *Floyd* trial in effort to avoid an injunction, and the Court rejected it. *See* Defendant's Post-Trial Mem. of Law, Dkt # 364 at 24-25 (arguing that an injunction was unnecessary given systems the NYPD already had in place and suggesting that "internally created" reforms would be more effective); Remedy Op. at 7-8 (noting that "the City declined to participate" in developing remedies and instead "argued that 'the NYPD systems already in place' . . . would suffice to address any constitutional wrongs . . ." and entering injunction despite the City's argument). A court order implementing the Facilitator's recommendations, with the modifications we propose, is necessary to ensure that reforms to the systemic constitutional violations proven at trial and underpinning the settlement agreements are not vulnerable to the whims of agency officials, and to ensure enduring compliance.

II.    **The Court Should Exercise its Broad Authority to Order the JRP Reforms**

Federal courts have expansive authority to design injunctive remedies to redress constitutional violations, and this authority necessarily permits the Court broad flexibility in ordering specific reforms. *See Brown v. Plata*, 563 U.S. 493, 538 (2011) ("Courts have substantial flexibility when making . . . judgments" about remedial measures). Once constitutional violations have been shown, "the scope of a district court's equitable powers to

remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."
*Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (quoting *Milliken v. Bradley*, 433 U.S. 267, 281
(1977), in turn quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)).
*See also* Remedial Or. at 6 and n.12-17. A court may order any remedial measure that addresses
the constitutional violations at issue or "the condition that offends the Constitution." *Milliken*,
433 U.S. at 281. *See also Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) (opining that
a district court may order relief when "such relief is necessary to remedy a constitutional
violation") (internal citations and quotations omitted), *cert. denied sub nom. Maricopa Cty., Ariz.
v. Melendres*, 136 S. Ct. 799 (2016). Courts are therefore permitted wide latitude to design
whatever reforms are needed to cure the constitutional problem. *Swann*, 402 U.S. at 15 (opining
that the "essence of equity jurisdiction has been the power of the Chancellor to do equity and to
mould each decree to the necessities of the particular case."). As the Ninth Circuit explained in
the *Melendres* case, "an injunction exceeds the scope of a district court's power only if it is
'aimed at eliminating a condition that does not violate the Constitution or does not flow from
such a violation.'" *Melendres*, 784 F.3d at 1265 (quoting *Milliken*, 433 U.S. at 282).

The City previously suggested that changes in NYPD leadership since the trial and the
NYPD's recent and forthcoming extrajudicial and unilateral changes to policies relieve its
obligation to fully remedy the constitutional violations the plaintiffs proved. *See* NYPD
Response, *passim*. Yet the passage of time or changing of the guard since the *Floyd* trial does not
diminish the need for this Court to order the JRP reforms. First, plaintiffs are entitled to a remedy
that provides complete relief from the unlawful practices identified in the Court's liability
decision. *See Morgan v. Kerrigan*, 530 F.2d 401, 415, 419 (1st Cir. 1976) (rejecting, in a
desegregation case, "an attempt to reopen the findings of fact made by the district court at the

liability stage of the proceedings" because, once constitutional violations were proven and a remedial order is in effect, the "only question before the district court was how to accomplish the greatest amount of actual desegregation consistent with the practicalities of the circumstances"). Second, if a defendant's voluntary reforms could override the need for an injunction, "courts would be compelled to leave the defendant free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982)) (alterations adopted). The plaintiffs are entitled to complete relief, and complete relief must include the full breadth of reforms necessary to durably cure all of the proven constitutional violations and to prevent recurrence.

Additionally, the JRP remedies in the *Floyd* case extend entirely to *Davis v. City of New York*, No. 10-cv-699, and *Ligon v. City of New York,* No. 12-cv-2274. In the *Davis* settlement, it was agreed that "the Court-Ordered Monitoring related to trespass enforcement in or around NYCHA residences will be identical to the Court Ordered Monitoring in the Floyd Remedies Opinion . . . ." Stipulation of Settlement and Agreement, dated February 4, 2015, *Davis* Dkt # 330 at 10-11. *See also id.* at 4 (defining "Court-Ordered Monitoring" as "the remedies, including without limitation, the appointment of a Monitor to oversee reforms of the NYPD and the joint remedial process for developing supplemental reforms, ordered by the Court in the Floyd Remedies Opinion"). The *Ligon* settlement similarly incorporates the terms and provisions of the monitorship in the *Floyd* Remedial Order—including specifically the development of reforms through the JRP that bear on the NYPD's policies and practices regarding trespass enforcement in or around TAP buildings, including those related to training, supervision, auditing, monitoring, and discipline of officers. *See* Stipulation of Settlement and Order, *Ligon* Dkt # No. 296, at ¶¶ J(1)-(2) (providing for the development of additional reforms through "Court-Ordered

Monitoring"), B(14) (defining "Court-Ordered Monitoring" to include development of reforms "in the Joint Remedial Process" set out in the Aug. 12, 2013 *Floyd* remedial order), and E(1). Therefore, the authority to order reforms in Floyd entirely extends to ordering those reforms in *Davis* and *Ligon*.

In applying these legal standards and agreements to the question of whether to order the JRP reforms, it is centrally relevant that the Court in *Floyd* found systemic constitutional violations based upon extensive evidence of wrongdoing throughout the ranks of the NYPD. Liability Op., *passim*. It is also central to this inquiry that the constitutional violations were not found to be isolated or the result of so-called "bad apples"; the violations and indifference to them constituted the City's operating policy, and that policy persisted for over a decade. *Id*. It is important, too, that the NYPD's widespread misuse of investigative tactics extended to trespass enforcement. As noted by the Court, the record evidence in *Davis* showed that "the NYPD's trespass enforcement policies and practices have resulted in thousands of trespass stops that apparently lacked reasonable suspicion, as well as large numbers of apparently unjustified trespass arrests." Decision & Order Granting Class Certification, *Davis* Dkt # 289 at 5 (footnotes and citations omitted). *See also*, Decision & Order Granting Preliminary Injunction, *Ligon* Dkt # 96, at 95-133.

Against this backdrop, the need for each of the specific reforms discussed below becomes a narrow question of whether the reform addresses the violations established at the *Floyd* trial, prevents a recurrence of those violations, or is otherwise covered by the *Davis* and *Ligon* settlements. As shown in the next section, the trial record and the JRP community input compel the implementation of the Facilitator's Recommendations.

III.     **The JRP Reforms are Necessary to Remedy Established Constitutional Violations**

     1.   **Inadequate Discipline (Rec. Nos. 2, 3)**

The Facilitator recommends that the Court order the NYPD to develop and publish progressive disciplinary standards and publicly report, on a monthly basis, findings of misconduct and disciplinary outcomes. Facilitator's Report at 222-25 (Rec. Nos. 2 & 3). These recommendations are tailored to addressing the NYPD's proven and systemic failure to impose meaningful discipline, which condoned unconstitutional conduct and significantly contributed to unlawful stops and trespass arrests.

The *Floyd* plaintiffs established at trial that the NYPD failed to hold officers accountable for misconduct and that this failure showed deliberate indifference and acquiescence to the pattern and practice of unlawful stops. Liability Op. at 105-111, 178-180. The Court's findings on the failure to discipline were not limited to discipline related to stops. *Id*. The Court instead found that systemic failures to discipline created an atmosphere that perpetuated widespread unlawful stop-and-frisk encounters. [1] *Id. See also id*. at 189-90 (finding the City liable based on deliberate indifference to racially discriminatory stops based in part on demonstrated discipline failures). A review of the Court's findings shows that the fundamental discipline failures included a policy and practice of not imposing serious penalties where misconduct was found; downgrading penalty recommendations from those recommended by the Civilian Complaint Review Board ("CCRB"); and not actually imposing penalties that had been issued. For example, the Court found that:

- "[W]hen confronted with evidence of unconstitutional stops, the NYPD routinely denies the accuracy of the evidence, refuses to impose meaningful discipline, and

---

[1] For this reason, we would respectfully modify the Facilitator's recommendation so that the disciplinary standards are not limited to stops and trespass arrests.

fails to effectively monitor the responsible officers for future misconduct." Liability Op. at 105.

• "Between 2007 and 2011, the [Department Advocate's Office ("DAO")] declined to pursue discipline in between 16% and 36% of the substantiated complaints forwarded by the CCRB, and in 2012 the percentage of substantiated cases resulting in no discipline rose again." Liability Op. at 109.

• "Several officers testified that they were never disciplined even after the CCRB substantiated complaints against them." Liability Op. at n.394 (Plaintiffs' Findings of Fact and Conclusions of Law, Dkt # 366 ("Pls. FOF") at ¶¶ 139 ("CCRB substantiated [plaintiff] Lino's complaint and recommended charges against Figueroa and Leek . . . but neither officer received any discipline as a result"), 140 ("CCRB substantiated as abuse of authority [plaintiff] Acevedo's complaint against detectives for stopping her . . . yet none were told that they did anything wrong in conducting a stop . . . [One of the officers] was thereafter the subject of an [Office of Chief of Department] stop complaint, yet no one discussed it with her or interviewed her regarding it."); and 141 ("[Officer] Salmeron was never spoken to or disciplined for a substantiated CCRB complaint for improper stop two years before she stopped [plaintiff] Dennis.")).

• "In addition, the NYPD consistently downgrades the discipline recommended by the CCRB, imposing only instructions—the least serious form of discipline—in the majority of cases in most cases." Liability Op. at 109 and n.395 (citing testimony of Chief Hall "that an officer who engages in stops that are not based on reasonable suspicion could be subjected to 'incredibly severe discipline,' up to and including termination" but he had no "personal knowledge of any officer being subjected to such discipline for a stop lacking reasonable suspicion.").

In making this last finding, the Court relied in part on evidence that the NYPD consistently imposed mere instructions—the least serious form of discipline—in most cases of misconduct, even though the CCRB recommended charges and specifications[2] most often. Liability Op at 109-10 and ns. 394-9. *See also* Pls. FOF ¶¶ 153 ("Since at least 2007, when the CCRB finds misconduct, the NYPD averts discipline by declining to pursue discipline and issuing instructions, the least serious form of discipline, in the majority of cases); 154 ("From

---

[2] The CCRB defines "charges and specifications" as the most severe disciplinary outcome, and it launches an administrative proceeding against an officer. *See* CCRB, *Police Discipline*, https://www1.nyc.gov/site/ccrb/prosecution/police-discipline.page (last visited June 7, 2018) ("CCRB Discipline Definitions").

2007 to 2011, CCRB recommended charges and specifications most often and instructions the least often . . . In the same period, the NYPD did the reverse.")). This pattern of disciplining officers primarily through instructions was also evident in the NYPD's handling of unlawful trespass stops in NYCHA buildings. *Davis,* Dkt # 253, Ex. 3 (excerpt of Schwartz deposition explaining use of instructions for disciplining), Ex. 46 (disposition of substantiated CCRB complaints for wrongful stops in NYCHA, mostly resulting in instructions). Based on these findings and this extensive evidence of failure to discipline, the Court ordered that reforms to discipline needed to be "[a]n essential aspect of the Joint Process Reforms." Remedial Or. at 23.

There have not yet been so-ordered reforms addressing these discipline findings, and the problem persists. The NYPD continues to either decline to pursue any discipline, or to impose instructions and formalized training—the "least severe discipline" (*see* CCRB Discipline Definitions)—a majority of the time, just as it did leading up to the trial. NYC Civilian Complaint Review Board, *Annual Report January—December 2017*, https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2017_annual.pdf (reporting that the NYPD pursued no discipline or instructions and formalized training in over sixty percent of substantiated cases). An investigative report recently disclosed NYPD disciplinary records that indicate officers have received minor penalties for misconduct related to stops. *See* Kendall Taggart & Michael Hayes, *The NYPD's Secret Files*, BuzzFeed (Apr. 16, 2018), https://www.buzzfeed.com/kendalltaggart/nypd-police-misconduct-database-explainer. We have, moreover, long been concerned that the CCRB reconsideration process would undermine the discipline reforms that are required in *Floyd*, and time has borne this out. In 2016, the last year for which complete data on reconsideration is available, the NYPD formally sought to have CCRB rescind its decision to substantiate civilian complaints in thirty-two percent of

substantiated cases. *See* CCRB 2017 Annual Report at 42. *See also* Benjamin Mueller, *New York Police Challenging More of Review Board's Findings*, *Study Shows*, N.Y. Times (July 19, 2017), https://nyti.ms/2uxOFi1 (characterizing the CCRB's report as showing that the DAO reconsideration process is "an extra avenue for police pushback" against police accountability "in a process whose final outcomes the department already controlled"). Meanwhile, since 2015, there have been at least 1,536 complaints of profiling made to the NYPD, yet the NYPD has failed to substantiate a single racial profiling allegation in the more than 700 complaints it has closed. Monitor's Seventh Status Report, December 13, 2017, *Floyd* Dkt # 576 at 45-46.

The Facilitator repeatedly notes the community's concern that police will continue violating the law unless officers face stricter and more consistent discipline for misconduct. The Facilitator found that "an overarching theme throughout the focus groups centered around accountability." Facilitator's Report at 153; *see also id.* at 162 (noting that "participants suggested an NYPD cultural change with regard to accountability and an officer accountability sliding scale with progressively more harsh penalties"); *id.* at 173 (stating that among the "repeated themes raised" at leadership meetings was "a perceived lack of accountability for misconduct at the NYPD"); *id.* at 192 (stating that community members "raised the need for meaningful consequences for misconduct," including "increased disciplinary severity for repeated unlawful stops and frisks").

Throughout the JRP focus groups and community forums, members of the communities most affected by unlawful stops repeatedly called for more stringent penalties to address officer misconduct. Many expressed the need for strict penalties as a response to what they experienced

as years of no accountability. See, *e.g.*, 10/19/15 Focus Group Tr.[3] at 14:20-15:24; 10/20/15 Focus Group Tr. at 22:24, 21:13-4; 10/27/15 Focus Group at 10:13, 12:10-11; 11/3/15 Focus Group at 29; 11/17/15 at 20; 10/26/16 Community Forum (observing participants noted the need for "real consequences for rule breaking"); 11/3/16 Community Forum (need for stricter accountability for officers and protocols for penalties). As one focus group participant said, strict penalties encourage strict compliance with the Constitution:

> I feel like if they were told that if there's any instance where they're using their power out of hand that they will be fired, I think they would fear being fired. So they would try as hard as they can not to get into instances where they're violating somebody's rights because they don't want to get tired. But if they feel like they're not going to get fired, then nothing bad's going to happen to them, so they do it anyway.

11/17/15(10) Focus Group Tr., at 10:371-76.

Discipline standards that set strict penalties when police are found to have engaged in misconduct serve the remedial goal of ensuring that unconstitutional conduct is appropriately censured. Requiring the NYPD to regularly and publicly report on its imposition of discipline, and to explain any divergence from the standards, would further serve the purpose of ensuring the NYPD is held accountable for instituting meaningful discipline. These reforms directly address the NYPD's failure to impose serious consequences for misconduct, which the Court found led to massive numbers of unconstitutional stops and which also led to unconstitutional trespass enforcement activities. These reforms are further necessary to bring the NYPD's practices into compliance with the Constitution and to ensure ongoing compliance.

---

[3] Links to the focus group transcripts and community forum data are provided in Appendix H of the Facilitator's Report, *Floyd* Dkt # 598-8. If there was more than one focus group on a particular date, then we provide in parenthetical the prefix number assigned to the transcript within Dropbox. For example, the October 9, 2015 focus group is ascribed "1" as the prefix. Our citations to the community reforms refer to the transcribed community forum data sheets linked to in that appendix.

In addition to what the Facilitator recommends, we request that the discipline standards be developed with input from community stakeholders. Should the Court order a community board (*see infra* at III(3)(i)), then the development of the discipline standards should fall within the board's responsibilities.

### 2. <u>Inadequate Documentation and Document Review (Rec. Nos. 4, 5, 6, 8)</u>

#### i. Documentation and Recording of Level 1 and 2 Encounters.

The Facilitator recommends that the NYPD record, collect, and publicly report data on all Level 1 and 2 investigative encounters conducted by officers through both officer-generated records and body worn camera recordings. Facilitator's Report at 225-36 (Rec. Nos. 4 & 5).[4] As the Court is aware, a Level 1 encounter is a request for information that requires an "objective credible reason for that interference not necessarily indicative of criminality," and a Level 2 encounter is an officer's "common-law right to inquire" that requires only a "founded suspicion that criminal activity is afoot." *People v. De Bour*, 352 N.E.2d 562, 572 (1976). Level 1 and 2 encounters are investigations in which an officer does not have reasonable suspicion of crime and is not permitted to constrain a person's freedom to walk away, either by words or actions. *Id.* Documentation and recording of Level 1 and 2 encounters is necessary to ensure that officers fully understand and comply with the legal standards governing stops, as well as the Court-mandated requirements for documenting stops. *See* Remedial Or. at 15-16, 19-23.

In both its *Floyd* Liability and *Ligon* Preliminary Injunction rulings, the Court found that thousands of NYPD personnel were incorrectly trained on—and thus did not understand—the legal standard for what constitutes a stop under the Fourth Amendment, *i.e.*, a police encounter

---

[4] We do not specifically address the need to so-order Recommendation Number 6 ("Accessing Stop Reports"), because the NYPD is already implementing this pursuant to the Right to Know Act legislation recently passed by the New York City Council. *See* NYPD, *Police Encounters*, http://www1.nyc.gov/site/nypd/about/about-nypd/police-encounters.page.

in which a reasonable person would not feel free to leave. Liability Op. at n.375; *Ligon* Dkt # 96 at 91-92, 121, 130. The Court concluded that this misunderstanding created a serious risk that officers would both engage in conduct that amounted to forcible stops without the requisite reasonable suspicion and fail to record such encounters as stops, under the mistaken belief that they had only conducted a Level 1 or 2 encounter. *See* Liability Op. n.375; *Ligon*, Dkt # 96 at 129-30 and n.422.

Indeed, several *Floyd* and *Ligon* plaintiffs were stopped and/or frisked without reasonable suspicion and NYPD officers failed to document those encounters. *See*, *e.g.*, Liability Op. at 138-40 (Nicholas Peart April 2011 stop), 154-56 (Lalit Clarkson January 2006 stop), 161-63 (David Floyd April 2007 stop); *Ligon*, Dkt # 96 at 34-35, 70 (noting that the NYPD was unable to locate a stop report for any of the eleven named plaintiffs who had been stopped). Further, officers continue to fail to document stops. The NYPD's internal audits have found that, as recently as the second quarter of 2017, officers failed to document more than half of the stops audited by the NYPD's Quality Assurance Division (QAD). *See* Monitor's Seventh Status Report, *Floyd* Dkt # 576, at 40. Thus, the only way to reliably monitor whether officers are engaging in lawful stops is to record and review Level 1 and 2 encounters.

Meanwhile, a theme from community input was that the people most affected by the NYPD's unconstitutional stop-and-frisk practices commonly do not feel free to terminate police encounters and walk away. *See e.g.* 10/19/15 Focus Group Tr. at 7:33-34 ("Many people don't feel comfortable [walking away] – if they're going to shoot me, that's my life . . . ."); 10/20/15 Focus Group Tr. at 8:43 ("I never was able to walk away"); 11/17/15(2) Focus Group Tr. at 8:44-9:4 ("I wouldn't really feel comfortable walking away from a police officer because I feel like they would take that to the next level . . . like taze me or something like that . . . [so I] let it

play out."); 12/8/15(2) Focus Group Tr. at 6:11-34 ("In black neighborhoods, there's very little walking away;" "I know in my community, if a cop stops you and you're telling them 'I don't have to stay here and talk to you,' you're automatically going to get a ticket and fined for being disorderly."); 12/9/15 Focus Group Tr. at 11:41 (people do not feel free to walk away: "Those are the cases when you die."). As one focus group participant said:

> For me, I don't actually feel comfortable walking away from a police officer . . .
> Police have a certain authority against you. Like they have a higher authority. So I
> feel like nowadays they can just do what they want and change the story later –
> say you did something, say you resisted arrest. So I wouldn't just interfere. I
> would just cooperate to the most.

11/17/15(1) Focus Group Tr. at 6:193-199. This sentiment—repeatedly expressed throughout the JRP—suggests that the people who are most subjected to investigative encounters feel that their freedom to leave has been constrained in situations that officers might not be labeling as stops.

This sentiment is most prevalent in public housing, because of the greater likelihood of Level 1 encounters occurring in those residences. NYPD officers are authorized to enforce NYCHA rules and regulations, including those rules and regulations that are not criminal in nature. Mem. of Understanding Between the New York City Housing Authority and the City of New York on the Merger of the New York City Housing Authority Police Department and the New York City Police Department, *Davis* Dkt # 176-1 at 8-9. Accordingly, an officer may approach and question a person found in a NYCHA residence—including residents themselves—in a Level 1 encounter if they are suspected of violating a non-criminal NYCHA rule. Status Report, *Davis* Dkt # 358 at Attachment 3. Many *Davis* focus group participants described not feeling free to leave when questioned by police in their buildings or the buildings of their friends and family. *See e.g.* 3/3/16 *Davis* Focus Group Tr. at 5:43-45 ("They stop us and make us take them where we came from and search everything in sight….we [were] just moving

through a building that we know people in."); 3/8/16 *Davis* Focus Group Tr. at 8:46-9:2 (explaining they do not feel free to leave because officers immediately start interrogating: "that's essentially what they do, upon approaching anybody now, is that they just straight up and down interrogate you"); 6/24/16 *Davis* Focus Group Tr. at 7:43-45 ("I just came out my friend's apartment and walked. An officer was like, 'Stand right here. I heard there's trespassing in the building.'").

Courts and academics have recognized that the experience articulated by the focus group participants is a widespread phenomenon. *See, e.g.*, *Utah v. Strieff*, 136 U.S. 2056, 2070 (2016) (Sotomayor, J., dissenting) ("[I]t is no secret that people of color are disproportionate victims of this type of scrutiny. . . For generations, black and brown parents have given their children "the talk"—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them."); *State v. Ashbaugh*, 244 P.3d 360, 368 n.15 (Or. 2010) (recognizing that Fourth Amendment analysis of "encounters between police and black males" should "consider how the race of the person confronted by the police might have influenced his attitude toward the encounter"); Devon W. Carbado, *(E)racing the Fourth Amendment*, 100 Mich. L. Rev. 946, 985 (2002) ("The interaction of black male identity with white male police authority creates a physically confining social situation every bit as real as (and operating independently from) being on a bus. Most, if not all, black people--especially black men--are apprehensive about police encounters."); Erika L. Johnson, *"A Menace to Society:" The Use of Criminal Profiles and Its Effects on Black Males*, 38 How. L.J. 629, 663 (1995) ("Given the history of police brutality against blacks in this country, as well as the present climate of fear and distrust toward police officers, very few black citizens would feel free to ignore an officer. Further, black males,

often targets of police harassment and brutality, will not feel free to leave a police officer without considering the possible repercussions -- bodily injury or death.").

With these factual findings and considerations in mind, we turn next to addressing how documentation and video recording of Level 1 and 2 encounters will help to bring the NYPD's practices into compliance with the Constitution.

### a) Documentation

Documentation of Level 1 and 2 encounters will address two of the problems described above, *i.e.* that officers do not fully understand the limits on their authority in investigative encounters; and that members of the plaintiff classes are likely to not feel free to leave even when the officer did not intend for the investigative encounter to rise to the level of a stop. If the NYPD's and the Monitor's assessment of the constitutionality of stops is limited only to what officers have actually documented as Level 3 encounters, it is a foregone conclusion that the assessment—and the monitoring of stops—will be insufficient. That analysis would omit many forcible stop encounters that lack reasonable suspicion but were misclassified by the stopping officers as Level 1 and 2 encounters, and thus were never documented on stop reports. Such an assessment leads to an inaccurate appearance of constitutional compliance. Indeed, the Court has warned that a decline in unjustified stops may be "attributable to officers interpreting the NYPD's new policies as an instruction not to fill out UF–250 forms when a Terry stop was not based on reasonable suspicion," which "would not necessarily show an improvement in the NYPD's practices." Summary Judgment Decision, *Davis* Dkt # 268 at 59-60 and n.158. Capturing and assessing information about Level 1 and 2 encounters is necessary to ensure an

accurate assessment of the constitutionality of the NYPD's stop-and-frisk practices, which is needed to ultimately bring those practices into compliance with the Constitution.[5]

Accordingly, the Court should order the NYPD to collect and publicly report data on all Level 1 and 2 encounters conducted by its officers, as the Facilitator recommends. Plaintiffs respectfully ask that the Facilitator's recommendation be modified in one respect. For Level 2 encounters, officers should be required to record a brief narrative of the facts surrounding the encounter and whether a consent search was conducted, in addition to time, date, and location. This additional data is necessary to accurately assess the extent to which officers are mistakenly classifying stops without reasonable suspicion as Level 2 encounters and, for the reasons articulated by the Facilitator, would be minimally burdensome for NYPD officers to record on their Department-issued smartphones or tablets. *See* Facilitator's Report at 231.

### b) Video recording

The Court found that an officer's written documentation can only provide a limited and one-sided account of the facts surrounding a police encounter. *See* Liability Op. at 94 n.326; Remedial Or. at 26. The Court opined that Body Worn Cameras ("BWC's") "are uniquely suited to addressing that constitutional harms at issue in this case," Remedial Or. at 27, and would, in particular, "provide an objective record of stops and frisks [to] allow[ ] for the review of officer conduct by supervisors and the courts." Remedial Or. at 26.

---

[5] This reform is also in line with a recent consent decree between the United States Department of Justice and Ferguson, Missouri Police Department, which includes as a remedy for addressing a pattern and practice of racially-biased and unconstitutional pedestrian stops, a requirement that the Ferguson Police Department collect and report annually data on "voluntary contacts" conducted by its officers. *See* Consent Decree ¶ 415, *United States v. City of Ferguson*, 16-cv-000180, Dkt # 41 (E.D. Mo. Apr. 19, 2016). "Voluntary contacts" are defined in the Decree to include both "social contacts, which are non-investigative conversations," and "non-custodial interviews, in which the officer seeks to investigate the person he or she questions" and in which the civilian "is free to leave." *Id.* ¶ 77(b). This definition encompasses both Level 1 and 2 encounters as defined under New York law.

The people and entities that oversee and review officer stops—including the officer's supervisor, NYPD internal auditors, and the Independent Monitor—can use videos to better assess whether officers understand, and abide by, the distinctions between each level of *De Bour* investigative encounters and whether they are complying with the stop documentation requirements of the Remedial Order. Further, Level 1 encounters can and often do escalate very quickly into more intrusive encounters. One need look no further than the encounter in *DeBour* itself, which began as a self-initiated Level 1 request for information and, within a matter of minutes, escalated to a search and then arrest. *De Bour*, 352 N.E.2d at 565. The Monitor has recognized this important function of BWC video as a reason to record all Level 2 encounters, *see* Letter addressed to Judge Analisa Torres from Peter L. Zimroth, dated April 11, 2017, *Floyd* Dkt # 545 at 6-7, *Davis* Dkt # 372 at 6-7, and this reasoning is equally applicable to the recording of Level 1 encounters.[6]

As the Facilitator notes, recording of those *De Bour* Level 1 encounters that take place inside of public housing and privately owned apartment buildings and in response to certain calls for service are mandatory under the current NYPD BWC policy. *See id.* at 15. However, recording self-initiated Level 1 encounters on the street, like the one at issue in *De Bour* itself, is not required. In order to ensure that BWC videos enable a more effective assessment of the constitutionality of stops, it is critical that all Level 1 encounters be recorded on BWC's. Failure to record Level 1 encounters will undermine the BWC's ability to "provide a contemporaneous, objective record of stops and frisks," Remedial Or. at 26, and NYPD supervisors, auditors, and the Court's review of any Level 3 encounter that began as a Level 1 encounter will be deprived of significant information about the basis for the stopping officer's decision to make the stop.

---

[6] *See also*, Pls. Obj. re: Letter Mem. Regarding Approval of Body Worn Camera Policies, dated April 19, 2017, Dkt # 546 at 3-4.

Further, as the Facilitator highlights, requiring BWC video recording of all Level 1 encounters would bring the NYPD in line with the BWC policies of several other large metropolitan police departments which each require recording of *all* encounters conducted by law enforcement. Facilitator's Report at 228-30. In addition to the Facilitator's examples, *id*. at 228-29, we further refer the Court to the BWC policies of the Dallas, Texas police department;[7] the Cincinnati, Ohio police department;[8] the Phoenix, Arizona police department;[9] and the St. Paul, Minnesota police department.[10]

Notably, too, the results of both the public and police officer NYU BWC surveys show that clear majorities of both public and police officer respondents (82 and 58% respectively) support the recording of Level 1 encounters. *See* Objection to Monitor's Recommendation, dated April 19, 2017, *Floyd* Dkt # 546, Ex. A at 14, Ex. B at 7; *Davis* Dkt # 373, Ex. A at 24, Ex. B at 7.[11] Given the Court's recognition that "no amount of legal or policing expertise can replace a

---

[7] Dallas Police Department, *General Order 332: Body Worn Cameras*, at 14, https://www.bwcscorecard.org/static/policies/2015-08-31%20Dallas%20BWC%20Policy.pdf ("Officers will activate their body worn camera to record all contacts that are conducted within the scope of an official law enforcement capacity.").

[8] Cincinnati Police Department, *Procedure 12.540 "Body Worn Camera System,"* at 4, https://www.bwcscorecard.org/static/policies/2017-04-27%20Cincinnati%20BWC%20Policy.pdf) ("Officers will use BWC equipment to record **all** calls for service and self-initiated activities.") (emphasis in original).

[9] Phoenix Police Department, *Operations Order 4.49: Body-Worn Video technology*, subsection 4.49(3)(B)(3)(a), at 2, http://kjzz.org/sites/default/files/11-14-17PhoenixPDoperations_orders.pdf ("The body-worn camera must be activated during all investigative or enforcement contacts.").

[10] St. Paul Police Department, 442.18 Body Worn Camera Policy, at Section 10(A), https://www.stpaul.gov/sites/default/files/Media%20Root/Police/442.18%20Body%20Worn%20Camera%20Policy_revised%205%201%2018.pdf ("[O]fficers must activate their BWCs when preparing for or initiating any law enforcement action" and "when responding to any call or incident").

[11] According to the NYU public and police officer surveys, 82% of public respondents and 58% of officer respondents believe officers should be required to activate their cameras "anytime an officer approaches someone as part of investigating criminal activity," *See Floyd* Dkt # 546, Ex. A, at 14; Ex. B, at 7. Encounters where police officers approach civilians to request information related to their criminal law enforcement- and not their more general public service- function

community's understanding of the likely practical consequences of reforms in terms of both liberty and safety," Remedial Or. at 29, and given police officers' on-the-ground, firsthand experience with the tactical challenges and safety risks of investigative encounters, these survey responses should be afforded significant weight.

### ii.  Advising People of Their Rights During Encounters

The Facilitator recommends that the NYPD conduct a campaign to educate the public about "their rights and obligations" under the law, because community members expressed a desire to better understand their rights. Facilitator's Report at 249 (Rec. No. 8). We agree it is important to provide the community with such an education, but we respectfully submit that it would better serve the remedial goals of the JRP to require that the NYPD advise people during Level 1 and 2 encounters that they are free to walk away. This requirement would be consistent with the Facilitator's findings and recommendations, and it is supported by input from many of the focus groups that the Facilitator coordinated.

The Facilitator states that an NYPD-operated public education campaign would inform people that stop-and-frisk is not illegal, increase trust, and reduce complaints. *Id*. at 250. We are concerned that a mass NYPD-campaign that tells people their "obligations" during police encounters runs contrary to the remedial purpose of stemming unlawful stops. On the other hand, requiring officers to inform people of their rights *during investigative encounters* would serve to bring the NYPD's practices into compliance with the Constitution. For example, as the Court recognized, one way to ensure that officers do not inadvertently transform a Level 1 or 2 encounter into a forcible stop without reasonable suspicion is to require that officers advise

---

were precisely the kind of encounters the Court of Appeals addressed in *De Bour*. 40 N.Y.2d at 218-20.

people of the voluntary nature of the encounter—*i.e.*, to inform people of their right to walk away. *See* Remedial Op. at 15 n.38.

A requirement that officers advise people of their rights during encounters would also further the goals articulated by the Facilitator in recommending a public education campaign, because it would ensure that people know when they are free to leave, which would in turn decrease the frustration that community members reported. The community input the Facilitator amassed through focus groups demonstrates that community members repeatedly called for requiring officers to tell people what their rights are during investigative encounters. In one representative example, participants in a focus group expressed that "many people don't feel comfortable walking away" because "if they're going to shoot me, that's my life," and that people would feel free to leave only if officers informed them of their rights during the encounter, similar to how people are given "Miranda Rights." 10/19/15 Focus Group Tr. at 7:33-8:46. *See also*, *e.g.*, 10/20/15 Focus Group Tr. at 6:25-11:24 (discussing that, ordinarily, participants do not feel free to leave unless an officer tells them they are free to go because they don't want to be "another Trayvon Martin" and suggesting officers need to tell them their rights in that moment to make them feel free to leave); 10/22/15 Focus Group Tr. at 10:41-11:18 (participants saying that, to feel free to walk away, they would need the officer to "let me know that I can walk away," or "you can walk away or you can deny this [search]"); 11/5/15 Focus Group Tr. at 10:13-14 (same); 12/9/15 Focus Group Tr. at 13:33-38 (same); 12/21/15 Focus Group Tr. at 6:16-31, 7:40-46 (same). Advising people of their freedom to leave will help prevent inadvertent stops where officers might believe they have conducted themselves in such a way that a reasonable person would feel free to walk away: By advising of the freedom to leave,

officers will ensure they do not intrude further than Level 1 or 2 permit, and that they have not inadvertently raised the intrusiveness of the encounter to a Level 3.

This requirement would also be consistent with recent United States Department of Justice consent decrees. The recent consent decree with the Ferguson Police Department to reform unconstitutional stop practices requires that Ferguson police officers conducting "non-custodial interviews" (which are analogous to Level 2 encounters in New York) "[n]otify the person(s) encountered that they are free to leave and do not have to answer any questions." Consent Decree, ¶ 77(b), *United States v. City of Ferguson*, 4:16-cv-00180, Dkt # 41 (E.D. Mo. Apr. 19, 2016); U.S. Department of Justice, Civil Rights Division, *Investigation of the Ferguson Police Department*, 17-19 (Mar. 4, 2015) (discussing the Ferguson Police Department's pattern of unconstitutional stops). Similarly, the recent consent decree between with the Baltimore Police Department to reform the latter's unconstitutional and racially discriminatory stop, question and frisk practices includes a provision requiring Baltimore police officers who are conducting voluntary "field interviews" (which are analogous to Level 1 and 2 encounters in New York) to "inform individuals [whom they've asked to provide a physical form of identification] that providing identification is voluntary." Consent Decree, ¶¶ 34-35, *United States v. Baltimore Police Dep't*, 17-cv-00099, Dkt # 2-2 ¶¶ 34- 35 (D.Md. April. 7, 2017); *cf.* United States Department of Justice, *Investigation of the Baltimore City Police Department*, at 27-30, 48-52 (Aug. 10, 2016) (discussing Baltimore Police Department's pattern of unconstitutional and racially discriminatory stops-and-frisks).

A court order requiring officers to advise people during investigative Level 1 and 2 encounters that they are free to leave would thus help ensure compliance with the Constitution

and this Court's orders, and it would respond to the important community feedback that the Facilitator elicited.

**3.  Deliberate Indifference to Ongoing Constitutional Violations (Rec. Nos. 7, 9)**

**i.  Community Board on Reform Implementation**

The Facilitator recommends that the Court order the NYPD to create a community board to monitor and advise the NYPD on the implementation of reforms, as well as to regularly meet with those most impacted by unlawful stop and trespass enforcement practices to obtain feedback on reforms and compliance with reforms. Facilitator's Report at 236-47 (Rec. No. 7). This reform addresses the City's deliberate indifference to community outcry about the stop-and-frisk practice. Plaintiffs established in the *Floyd* trial that the NYPD deliberately ignored community complaints and concerns about unlawful stops over an extended period of time. This deliberate indifference included ignoring individual complaints formally submitted by class members and ignoring community leaders who raised red flags. This indifference was evidenced by testimony from high-ranking NYPD officials who admitted that they knew of—yet did nothing to heed—community concerns about racial profiling in the use of stops. For example, the Court found:

- "The NYPD has repeatedly turned a blind eye to clear evidence of unconstitutional stops and frisks." Liability Op. at 178.

- "Throughout the class period, the need for better supervision, monitoring, training, and discipline to protect against constitutional violations was obvious, but senior officials at the NYPD '"fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs."' Even if 'deliberate indifference' were not the standard for liability, it would still perfectly describe the attitude of senior officials at the NYPD toward the risk of officers conducting stops, frisks, and searches in violation of the Fourth Amendment." Liability Op. at 179-80.

- "The NYPD has received thorough and consistent notice of constitutional problems in its stop practices from multiple sources, including the media, community members,

community and legal organizations, individual police officers, and the class members and attorneys in this case." Liability Op. at 111.

- "Chief Esposito is aware of media reports that the NYPD racially profiles young black and Hispanic males in its stop activities, and has personally heard complaints from community organizations, civil liberties groups, and elected officials about racial profiling in stops." Liability Op. at 112.

- "Chief Shea testified that when members of the community participate in the multicultural immersion course for newly graduated officers, community leaders have repeatedly shared complaints involving stops based on racial profiling." Liability Op. at 112.

- "Despite frequent and ongoing notice of troubling racial disparities in stops, the NYPD has long shown its lack of concern for racial profiling through the failure of NYPD officials and managers to discuss racial profiling among themselves or at Compstat meetings, and through the numerous failures of supervision, monitoring, training, and discipline discussed above." Liability Op. at 189-90 (citing Pls. FOF ¶¶ 186, 187 ("After 4 years as Department Advocate, Schwartz never discussed with anyone in the NYPD racial profiling or how to combat it."), 188 (racial profiling was never discussed at CompStat in violation of internal policy), 189 (commanding officers never discussed racial profiling with subordinates in violation of internal policy), 190 (collecting testimony establishing that supervisors did not in practice discuss racial profiling with subordinates)).

- The head of DAO – the division responsible for holding officers accountable on substantiated CCRB complaints – "testified that she was not concerned about allegations that the DAO is biased in favor of police officers." Liability Op. at 108-109.

The Facilitator's Report recognized that those most harmed by the NYPD's systemic constitutional violations have called for increased community input and oversight. In particular, the Facilitator reports that community groups recommended "independent oversight structures," such as "a permanent structure in which civilians from directly impacted communities, support and advocacy organizations, and police reform organizations, develop metrics to review whether the NYPD is in compliance with mandated reforms based on those metrics." Facilitator's Report at 187; *see also id.* at 190-91 (observing that "thought leaders recommended . . . a permanent structure in which directly impacted communities are able to see that the NYPD has complied

with independent oversight" and that this structure "be comprised of people living in impacted communities, organizations representing impacted communities, and representatives of police reform organizations"). Similarly, community groups called for greater public input into policies, programs, training reforms, and assessment protocols needed to remedy the NYPD's unlawful practices. *See, e.g.*, *id.* at 192 ("There was also a call for greater community involvement in developing the policies governing the BWC pilot as well as any program that is implemented as a result. This included involving community members, advocates, and policing experts in the evaluation of the program.").

In the focus groups of the people most affected by the NYPD's stop-and-frisk practice, participants repeatedly spoke to the need to require the NYPD to meaningfully respond to community criticism and called for a committee of community stakeholders to oversee reforms to stop and frisk. *See, e.g.*, 10/20/15 Focus Group Tr. at 31:1-32:28 (calling for a community survey and for a precinct to face consequences for failing to heed community feedback); 10/28/15 Focus Group Tr. at 7:1 (expressing a need for the police to "hear us more"); 11/5/15 Focus Group Tr. at 5:28-40 (calling for community organizations to audit NYPD performance because "if you allow [the NYPD] to do the audit, nothing's ever going to get changed"); 12/21/15 (24) Focus Group Tr. at 20:2-3 ("they should have a committee of civilians that [supervise] the stop and frisk program"); 11/15/16 Community Forum (calling for community oversight and evaluation of NYPD compliance with reforms).

Community boards such as the one the Facilitator proposes have long been recognized as appropriate to reform systemic constitutional violations. They were commonly utilized in school and housing desegregation cases. *See e.g.*, *Morgan v. Kerrigan*, 530 F.2d 401, 429 (1st Cir. 1976) (upholding district court's order requiring community councils designed to monitor

implementation of reforms and "identify and resolve problems" and opining that "[s]uch groups have been approved in many cases") (citing *Dowell v. Brd. of Ed.*, 465 F.2d 1012, 1015-16 (10th Cir. 1972); *Singleton v. Jackson Municipal Separate School District*, 426 F.2d 1364, 1370 (5th Cir. 1970)). *See also* Mem. of Law in Support of Plaintiffs' Requested Injunctive Relief, *Floyd* Dkt # 268, at 12 (collecting cases, including, *inter alia*, *United States v. Parma*, 661 F.2d 562, 577 (6th Cir. 1981) (affirming and "strongly endorsing" community housing committee), and *Berry v. Sch. Dist.*, 515 F. Supp. 344, 379-80 (W.D. Mich. 1981)). They are also often included within Department of Justice consent decrees that reform police practices. *See* Sunita Patel, *Toward Democratic Police Reform: A Vision for "Community Engagement" Provisions in DOJ Consent Decrees*, 51 Wake Forest L. Rev. 793, 816 (2016) (collecting examples).

Community outcry over racial bias in the NYPD's use of stop and frisk was not muted. Over more than a decade, there was a sustained and organized public protest against the NYPD's stop-and-frisk practice, particularly among those who are now organizational community stakeholders in the JRP. Liability Op. at 61-63, 111-17. Although the NYPD's leadership has demonstrated a willingness to change since the trial, the injury that must be remedied is the injury proven during the trial phase of this case that has not been remedied. *Cf. Morgan*, 530 F.2d at 419 (where fact of segregation had been established at trial, explaining that sole remaining before court was how to accomplish desegregation). The Facilitator's recommendation of a community board—comprised of those organizations concertedly involved in stop-and-frisk reform—that is responsible for facilitating implementation of reforms in this case is necessary to remedy the NYPD's sustained and proven deliberate indifference to racially discriminatory stops, and to ensure compliance with the reforms.

### iii.   Community Survey on Reform Implementation

The Facilitator recommends that the Court order the NYPD to conduct an annual survey to assess, from the community's perspective, the implementation of reforms. Facilitator's Report at 250-51 (Rec. No. 9.). This reform is necessary and appropriate for the same reasons as the community board: The City allowed unlawful stops to flourish by turning a blind eye to public complaints, and input through the JRP repeatedly emphasized the need for community feedback on reform implementation. *See supra* at III(i). Moreover, as the Court opined in ordering the JRP, "[n]o amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety." Remedial Or. at 29. Without a community survey that elicits data on whether the NYPD has implemented in practice reforms developed on paper, the Court will lose information that is centrally relevant to determining whether the City is in compliance with the Constitution.

We emphasize that there is a distinction between surveying the community about the NYPD's compliance with reforms and surveying the community's trust in the NYPD. Trust in the police may be a laudable goal, but the goal of the remedial process in *Floyd*, *Davis*, and *Ligon* is to ensure that the NYPD brings its stop-and-frisk and trespass enforcement practices into compliance with the Constitution. The community survey would need to elicit information about whether the NYPD is complying with reforms from the perspective of the community in order to serve the purposes of the injunction, agreements, and orders in *Floyd*, *Davis*, and *Ligon*. Further, we respectfully ask that, during the length of the Court-ordered monitorship, the survey results be incorporated into the Monitor's periodic assessments of the NYPD's compliance with the Court-ordered Immediate and Joint Process reforms and reported in the Monitor's biannual status reports to the Court. Notably, for the past several years, Department of Justice police

29

pattern and practice consent decrees have regularly included a community survey component in the compliance assessments conducted by court-appointed monitors.[12]

### 4. **Inadequate Performance Monitoring Systems (Rec. No. 1)**

The Facilitator recommends that the Court order the NYPD to improve monitoring and intervention when litigation data—including judicial and prosecutorial decisions, as well as lawsuit allegations—indicate potential officer misconduct. Facilitator's Report at 219-22 (Rec. No. 1). The Facilitator's recommendation would require the NYPD to collect and address information that suggests officer misconduct in stop and trespass enforcement activities, including through the creation of a centralized database on stop and trespass encounters to track, review, and respond to patterns of misconduct. *Id*. This reform is tailored to addressing the City's failure to monitor and intervene in officer misconduct, and it is necessary to ensure the City employs a monitoring system that allows the NYPD to remedy and prevent unlawful enforcement activity.

Specifically, the Court in *Floyd* found that "when confronted with evidence of unconstitutional stops, the NYPD routinely denies the accuracy of the evidence, refuses to impose meaningful discipline, and fails to effectively monitor the responsible officers for future misconduct." Liability Op. at 105. The City's inadequate monitoring of unlawful stops included a failure to meaningfully follow up on allegations of wrongdoing and a failure to assess available information concerning misconduct, Liability Op. at 109 n. 394 (citing Pls. FOF at ¶¶ 139-141),

---

[12] *See, e.g.*, Consent Decree ¶¶ 456, 459, 506, *United States v. Baltimore Police Dep't*, 17-cv-00099, Dkt # 2-2 (D. Md. Apr. 7, 2017); Consent Decree at 12, *United States v. City of Newark*, 16-cv-1731, Dkt # 5, at 12 (D.N.J. May 5, 2016); Consent Decree at 107-08, *United States v. City of Ferguson*, 16-cv-180, Dkt # 41, at 107-08 (E.D. Mo. Apr. 19, 2016); Consent Decree at 83-84, *United States v. City of Cleveland*, 15-cv-1046, Dkt # 7-1 (N.D. Ohio June 12, 2015); Consent Decree at 57, *United States v. City of Seattle*, 12-cv-1282, Dkt # 3-1 (W.D. Wash. July 27, 2012).

which together undermined the NYPD's ability to prevent and remedy problematic enforcement activity. *See* Liability Op. at 105-111; *see also* Remedial Or. at 23 (favorably citing testimony from Plaintiffs' remedies expert Professor Samuel Walker on the need for an improved intervention system); Pls. FOF ¶ 203. The Court's finding that the NYPD failed to effectively monitor officer misconduct arose even though the NYPD had, at the time of the trial, an extensive system for monitoring officer misconduct. *See* Liability Op. at 110 n. 396 (finding that the NYPD monitoring system at the time of trial was "ineffective for monitoring unjustified stops"). *See also* 4/29 Trial Tr. at 5374-5378; 4/30 Trial Tr. at 5392-5395, 5445-5448; 4/24 Trial Tr. at 4886 *et seq*. Plaintiffs demonstrated that an effective system would need to include a centralized database that tracked information about lawsuits and judicial proceedings against officers. 5/16 Trial Tr. at 7505-7509. Plaintiffs further demonstrated that a complete picture of officer conduct from a broad array of data would allow the Department to connect patterns of misbehavior and effectively intervene to prevent future misconduct. *See id*.

The Court recognized that an improved monitoring system was needed to prevent unlawful stops and that such a system should be designed through the JRP. Remedial Or. at 23-24 (citing Professor Walker's recommendation of "an early intervention system based on a centralized source of information regarding officer misconduct"). Though the NYPD currently has a monitoring system, that system—just as at the time of trial—is insufficient because it is not a centralized database and it does not analyze important warning indicators from lawsuits against police officers. *See* NYPD Response at App. A at vii.[13] This lapse has persisted despite the New York City Bar Association reporting on the need to include lawsuit information in 2000, *see*

---

[13] While the NYPD currently tracks whether or not an officer is a named defendant in a civil suit through their Central Personnel Index, NYPD Response at App. A at vii, this does not include important information, including, for example, whether the officer is found liable. *See id*.; *see also* 5/15/13 Trial Tr. at 7342.

NYC Bar Association Committee on New York City Affairs, *The Failure of Civil Damages to Modify Police Practices, and Recommendations for Change*, 55 Rec. Ass'n B. City N.Y. 533, 539 (2000), despite successive New York City Comptrollers recommending the NYPD make this reform in 1992 and 1999, *see id.* at 533-34, despite the City Council pushing the NYPD to make this reform since 2009, *see* Mary Calvi, *NYPD Paid Nearly $1 Billion To Settle Lawsuits*, CBS News (Oct. 14, 2010) , http://newyork.cbslocal.com/2010/10/14/nypd-paid-nearly-1-billion-to-settle-lawsuits/, and despite the Office of Inspector General more recently reporting on the need to collect and assess that information, *see* New York City Department of Investigation's Inspector General for the NYPD, *Ongoing Examination of Litigation Involving* NYPD, 27 (April 2018) ("OIG-NYPD Report").[14] *See* Facilitator's Report at 220. This lapse has persisted even though the NYPD itself acknowledged that litigation data—when properly gathered and analyzed—can play an important role in improving police conduct. *See* Letter from Lawrence Byrne, NYPD Deputy Commissioner, to Bill de Blasio, Mayor, *et al.*, dated July 17 2015, at 2.[15] Instead, though the NYPD appeared at one point to be moving toward improvements, it has since backtracked. *See* OIG-NYPD Report at 3, 9-10.

A court order is therefore needed to ensure the NYPD creates an effective monitoring system consistent with the Facilitator's recommendations. In addition to what the Facilitator has recommended, we respectfully ask the Court to also require the NYPD to publicly disclose the protocol that gets developed for tracking, assessing, and acting on the data collected, and we further request the development of a clear and objective protocol for determining when to include information regarding settlements.

---

[14] http://www1.nyc.gov/assets/doi/reports/pdf/2018/April/21NYPDLitData_Report_43018.pdf.
[15] http://www1.nyc.gov/assets/doi/oignypd/response/nypd_response_oig_reusing_data_from_Lawsuits_legal_claims.pdf.

### 5. **Inadequate Training (Rec. No. 11)**

The Facilitator recommends that the Court order the NYPD to develop a specific unit within the stop-and-frisk training on engaging people with disabilities, including, but not limited to, people with mental, physical, and/or developmental disabilities. Facilitator's Report at 253 (Rec. No. 11). This reform is necessary to remedy the overbroad conception of suspicious behavior and furtive movements that drove unlawful stops because, as illustrated below, disabilities—and the movements and behaviors that may be associated with disabilities—might be mistaken for suspicious behavior.

Specifically, the Court found that officers misunderstood what constituted furtive movements that might give rise to reasonable suspicion. *See e.g.* Liability Op. at 11-12 (reviewing the range of officer testimony at trial that suggested that officers believe almost anything could constitute a furtive movement on which to base reasonable suspicion). The risk of an erroneous perception of suspicion is perhaps even greater when an investigative encounter involves a person with a disability, because a lack of knowledge about disabilities can easily lead officers to mistake the disability for suspicious behavior. In a recent NYPD training about characteristics of armed suspects, an instructor shared with the class that he once mistook a metal rod in someone's leg for a weapon and accidentally burst another person's colostomy bag based on the same suspicion. Facilitator's Report at 253, App. B at 9, n.4. If officers are not trained about or aware of disability, they may interpret a movement or behavior related to the disability as criminal or suspicious. *See* Pls. JRP Recs., Dkt #598-2 at 9 (relying on testimony of Michael Sullivan, nationally recognized expert on disability issues, before U.S. Senate explaining that officers need to be trained to recognize behaviors that might be associated with a disability so

that they are equipped to make proper assessments of the situations they may face and know how to respond appropriately).

As the Facilitator documents, the issue of "NYPD interactions with people with disabilities" came up at several community forums during the JRP. *See e.g.*, 11/17/16 Community Forum. Notes from one community forum listed "mentally ill" under a category listing groups that are "profiled" and "targeted" using SQF, and at another community forum "disability" was listed among group members that are subject to "abusive policing." *See id*.; *see also* 12/6/16 Community Forum. In a forum dedicated to public housing residents, community members recommended "frequent and updated trainings for NYPD in regards to residents with special needs." 11/17/16 Community Forum; *see also* 11/15/17 Community Forum (recommending "training/sensitivity training for people with disability [sic] and people with mental illness").

Therefore, this reform is appropriate and necessary to bring the NYPD's practices into compliance with the Constitution. We respectfully ask that the proposed disability portion of the training be developed, and if possible, taught by people with disabilities or community-based organizations and experts that have experience working with people with disabilities.

### 6.   Other Recommendations (Rec. Nos. 10, 12, 13, 14)

With respect to Recommendations Number 10 and 12 through 14, we believe that these are within the scope of the Remedial Order, as explained by the Facilitator, and we generally support their implementation for the reasons the Facilitator sets forth. Facilitators Report at 251-52, 254-60. Below, we raise some cautions with respect to Recommendations 12 through 14.

For Recommendations 12 and 14, which are both related to improving trainings, it is important that training reforms not substitute for reforms to discipline and monitoring. The *Floyd*

trial proved that unlawful stops were caused in large part by the City's deliberate indifference to adequate supervision, discipline, and monitoring. Liability Op. at 89-99, 105-111. While the Court found deficiencies and inaccuracies in the NYPD's trainings that contributed to unlawful stops and needed to be changed, *id*. at 99-105, the Court also found that "[t]he gravest problems in the NYPD's stop and frisk practices stem not from inadequate training but from a divergence between the NYPD's written training materials and the "operational policy" carried out on the streets." *Id*. at 100. While improved trainings are generally a step in the right direction, and trainings on certain subjects are necessary to ensure lawful stops and trespass arrests, an order that requires only or mostly modifications to trainings will fail to bring the NYPD's practices into compliance with the Constitution. The NYPD's failure to meaningfully monitor or discipline officer misconduct caused unlawful and racially biased stops, as explained *passim*, and constitutional compliance cannot be achieved without meaningful monitoring and discipline systems.

Additionally, with respect to Recommendation 13, we support the effort to offer a civil alternative for incidents of trespassing in public housing and TAP buildings. Facilitator's Report at 257. As demonstrated by the facts presented in the *Davis* case, the experience of getting handcuffed, arrested, transported to a police station, fingerprinted, detained in a holding cell, and all the other indignities associated with an arrest can be a traumatic and humiliating event, especially for individuals who are arrested for purportedly trespassing in their own homes or while visiting friends and family. Complaint, *Davis* Dkt # 1 at 12-25. Issuing a civil summons in lieu of an arrest will prevent these and other severe collateral consequences attendant to having an arrest record, such as loss of employment or housing. Moreover, during the period in which the IRP and JRP reforms bring the NYPD into compliance with the requirement of probable

cause for any trespass arrest or summons, the alternative of issuing a civil summons may serve to mitigate the constitutional harm visited on individuals where officers otherwise would erroneously conduct full arrests without probable cause. We recognize, however, that the introduction of civil summonses for trespassing will require an act of the City Council. We also caution that civil proceedings for trespass can lead to serious consequences without having the benefit of a right to counsel, including the potential loss of public housing, so it is important to guard against the possibility that officers might come to view civil summonses as a "less harsh" option in circumstances where an officer does not have probable cause of trespass. Indeed, substituting a civil summons for an arrest does not make the enforcement action any more lawful without the requisite showing of probable cause.

## IV.   **Conclusion**

Based on the forgoing, we respectfully request that the Court enter an order requiring that the NYPD implement the Facilitator's Recommendations, with the modifications proposed herein.

Respectfully submitted,

/s/ *J.R.B.*
Jenn Rolnick Borchetta
The Bronx Defenders

Darius Charney
Britney Wilson
The Center for Constitutional Rights

Jonathan C. Moore
Luna Droubi
Beldock Levine & Hoffman LLP

*Attorneys for the Floyd Plaintiffs*

Angel Harris
Jin Hee Lee

36

NAACP Legal Defense Fund

Steve Wasserman
Cynthia Conti-Cook
The Legal Aid Society

*Attorneys for the Davis Plaintiffs*

Jordan Wells
Christopher Dunn
New York Civil Liberties Union

Johanna B. Steinberg
Shakeer Rahman
The Bronx Defenders

*Attorneys for the Ligon Plaintiffs*