# The Way Forward

## The NYPD's Response to the Joint Remedial Process Report

June 8, 2018

## Table of Contents

Part I: Introduction ..................................................................................................................... 1

Part II: Responses to the Facilitator's Recommendations ......................................................... 4

Recommendation #1 ............................................................................................................ 4

Recommendation #2 ............................................................................................................ 8

Recommendation #3: ........................................................................................................... 9

Recommendation #4 .......................................................................................................... 10

Recommendation #5 .......................................................................................................... 12

Recommendation #6 .......................................................................................................... 13

Recommendation #7 .......................................................................................................... 13

Recommendation #8 .......................................................................................................... 15

Recommendation #9 .......................................................................................................... 17

Recommendation #10 ........................................................................................................ 18

Recommendation #11 ........................................................................................................ 18

Recommendation #12 ........................................................................................................ 19

Recommendation #13 ........................................................................................................ 20

Recommendation #14 ........................................................................................................ 21

Part III: The Way Forward ........................................................................................................ 23

Community Engagement .................................................................................................... 23

Respect ............................................................................................................................... 26

Transparency ..................................................................................................................... 28

Accountability ................................................................................................................... 30

Conclusion ......................................................................................................................... 32

## Part I: Introduction

The past five years have been transformative for the NYPD.  Rejecting what were once conventional norms that placed an overreliance on enforcement metrics, the Department embarked on a journey to shift the paradigm toward a shared responsibility for public safety with the community.  To accomplish this, the Department has reimagined what it means to engage the community, provide oversight, train personnel, and incentivize the Department's workforce.  The Department has also refined and focused its crime-fighting strategies. Institutionalizing precision, collaborative policing has created a crime-fighting philosophy that we believe is contributing to the New York City's historically low crime rates.

Since 2011, when the number of stops peaked at over 680,000, and especially since 2013, when the *Floyd* case was decided, there is a profound sense of change within the Department.  In 2017, the NYPD documented approximately 10,000 stops, an over 90% decline from 2011.  Police officers are also issuing thousands of fewer summonses and making many, many fewer arrests. The immediate reform efforts around stop, question, and frisk ("SQF") and trespass enforcement by the Department, the Monitor, his team, and the attorneys who represent the plaintiff classes, have resulted in new policies, training materials, and reporting forms that are designed to help the Department achieve substantial compliance with the Fourth and Fourteenth Amendments.  The two-year process of re-training all 36,000 uniformed members of the service on the law of investigative encounters through small, interactive classes is well underway.  The Department is going beyond the court-ordered body-worn camera pilot program with plans to equip all patrol officers and supervisors with body-worn cameras by the end of 2018, a full year earlier than originally planned. The court's remedial order also created a Facilitator, Judge Belen, and directed him to engage the communities and criminal justice stakeholders most affected by the Department's SQF practices, get their input, and then work with the parties to develop additional, appropriate reforms that would supplement the reforms already ordered by the court.[1] These supplemental reforms are to be no broader than necessary to bring the NYPD's use of SQF into compliance with the Fourth and Fourteenth Amendments.

One stark takeaway from the Facilitator's report (the "Report") is how the overuse of stop, question, and frisk in certain communities has left the residents with such strong, enduring negative sentiments toward the police. The level of mistrust is a serious challenge to the reforms the Department is pursuing.  We owe it to the community to repair that trust, and we owe it to our police officers, who risk their lives on a daily basis and who need trusting partnerships with our communities to do their jobs safely and effectively.  There are four themes that were consistently

---

[1] *Floyd* Rem. Ord, Dkt # 372, at 28.

reiterated throughout this process and reflected in the Report: _respect_, _transparency_, _accountability_ and _community engagement._

**Part II** of this submission addresses each of the Facilitator's 14 recommendations. Due to the broad breadth of the Report and the more limited scope of the court's mandate for the Joint Remedial Process, this response does not attempt to address the scores of supplemental suggestions that are, as Judge Belen notes, outside the scope of the JRP.  The Department's objection to some aspects of the 14 recommendations should not be viewed as a rejection or trivialization of the community's perceptions. We have listened to the voice of the community and read the feedback from individuals and organizations that are in the Report. However, this process was meant to take six to nine months, and it has instead taken three years; during this period, the Department has already taken on many of the recommendations, either directly or in comparable form. Engagement with the communities most affected by stops is occurring through many of the initiatives described herein.  For example, the Department is already:

- Implementing enhancements to the Risk Assessment and Information Liability System ("RAILS") and performance evaluations to create more _accountability_ feedback loops;
- Drafting a discipline report and requesting legislative changes to Civil Rights Law 50-a to promote _transparency_ of discipline;
- Expediting the Department's response time to stop report requests;
- Accelerating and expanding the body-worn camera program;
- Training and conducting outreach regarding special populations (i.e. people with disabilities, the LGBTQ community, Crisis Intervention Training, and Fair and Impartial Policing training) to promote _respectful_ interactions; and
- Holding "Build the Block" meetings to increase local _community engagement_.

Overall, the Department is implementing or intends to implement, in whole or in part, the substance of 11 of the 14 recommendations. The three recommendations that the Department wholly objects to have considerations around concerns for public safety and privacy that are not fully explored in the Report.

The court contemplated input from the "communities most affected by the NYPD's use of stop and frisk" and referenced a "wide array" of stakeholders representing diverse points of view (e.g. NYPD personnel, district attorneys' offices, advocacy groups, groups concerned with public housing, etc.) and not just a single advocacy group or ideological perspective.  Although the Facilitator solicited input from a broad array of stakeholders, the proposals do not reflect these diverse perspectives, and moreover, the Report itself is partial towards the organizations affiliated with the plaintiffs' counsel with little to no regard for the feedback from officers, unions, or other law-enforcement groups. The tone of the Report implies that there is a consensus amongst all the stakeholders on these reforms; yet that is not the case. It

fails to indicate instances in which there was disagreement or contrary points/concerns were raised. Without an analysis or balancing of the various points of view, the recommendations are not placed in the proper context.  The NYPD has to balance the reforms proposed by a relatively small number of individuals with the realities of policing, privacy, officer and public safety, collective bargaining laws, and a host of other considerations.

The court was explicit that the "Joint Process Reforms must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments."[2] Some proposals raised by the Facilitator as well as various individuals and organizations can be interpreted as exceeding this threshold and are not necessary within the context of the transformation described in this response. These recommendations exceed the subject matter of the court order and the scope of the JRP. Thus, the objection of the Department is to the court ordering the recommendations; these topics are better addressed through conversations and community meetings. In the event that the court intends to order any of these recommendations, the Department respectfully requests that the terms of the order be negotiated and clearly define the reforms to be implemented by the Department, the reporting requirements by the Department and the Monitor to the court, as well as compliance metrics.

**Part III** details some of the additional coordinated innovations that have already taken place and are taking place in the Department around the themes of community engagement, respect, transparency, and accountability.

---

[2] *Floyd* Rem. Ord, Dkt # 372, at 30.

## Part II: Responses to the Facilitator's Recommendations

> **Recommendation #1**:  The NYPD must develop a program to systematically receive, assess, and act on information regarding adverse outcomes about the conduct of officers involving unlawful stops/trespass enforcement, to include:
>
>   a) Declinations to prosecute from District Attorney offices, and such feedback loop should include declination data being integrated into the Risk Assessment and Information Liability System ("RAILS");
>   b) Judicial suppression decisions based on a failure to adhere to the law;
>   c) Judicial adverse credibility findings, and such feedback loop should be guided by concrete protocols in a written policy developed by a working group to include the NYPD, the District Attorneys and the Law Department;
>   d) Denials of representation/indemnification by the Law Department due to malfeasance and such feedback loop should include the integration of this information into RAILS absent extraordinary circumstances;
>   e) Civil judgements due to police malfeasance in the opinion of the Law Department, and such feedback loop should be guided by a written policy that directs the integration of such judgements into RAILS;
>   f) Substantiated CCRB complaints.

The Department agrees that information that adversely reflects on the credibility of an officer is an important component of any feedback loop designed to be an early warning/intervention system for officer misconduct and can serve to enhance accountability. This information can be used to manage future risk to the Department when it is relevant and the data is available. The NYPD has had performance monitoring of employees for many years. As a result of the court's recommendation that the NYPD consider an early intervention system as a "…centralized source of information regarding officer misconduct,"[3] the Department has designed and implemented its IT solution, RAILS. RAILS is a personnel dashboard used by commanding officers as a management tool to conduct performance analysis.  RAILS aggregates personnel data in one place as well as other negative performance indicators such as civilian complaints, discipline, stop reports rejected by a supervisor, and transfers for cause. Commanders can actively query an individual's record as well as receive automatic alerts anytime one of these triggering events occurs in order to facilitate timely intervention. RAILS became operational in October 2017 but is still being further developed and enhanced.

However, some of the sources of information described in recommendation #1 are either not relevant predictors of risk or not practicable to integrate into RAILS; thus, the Department does not support a complete implementation of the recommendation.  The Report makes assumptions about the feasibility of integrating different technologies without having assessed the systems to determine

---

[3] *Floyd* Rem. Ord, Dkt # 372, at 23.

their compatibility.  Certain enhancements to RAILS, or external systems that may feed into RAILS, may require extensive IT engineering efforts and should only be initiated after a thorough cost/benefit analysis and an evaluation of whether the goals of the technology solution (i.e. feedback loops) can be accomplished through other means.

It is also important to note that the Report cites the New York City Department of Investigation – Office of the Inspector General for NYPD (OIG-NYPD) report on a review of data from NYPD litigation proceedings. This underscores the point that the NYPD already has oversight bodies reviewing its practices and policies regarding police conduct and any further court action would be unnecessary. Each point is discussed in more detail below.

a) <u>Declinations to Prosecute.</u>  The NYPD's Criminal Justice Bureau ("CJB") currently analyzes declinations to prosecute ("DP"), reports them to commands, and requires an inquiry and response by the commanding officer. Additionally, the Department plans to integrate data regarding DPs into RAILS. Declinations for selected grounds, including failure to establish probable cause, an officer's failure to appear to draw up charges, or an unlawful stop or search, will trigger alerts to commanding officers so that they may evaluate the declinations and act upon them, as appropriate.  Naturally, this would include declinations for a much broader set of cases than those arising from *Terry* stops or interior patrols.  Once the link between the "DP" database and RAILS is established, the NYPD will continue to maintain the inclusion of these data points, at least for the duration of the Monitor's oversight, with notice to the parties of any changes to the data related to stops/trespass enforcement.  It is anticipated that this data integration will be completed in summer 2018. Finally, the Risk Management Bureau plans to conduct periodic meetings with CJB to discuss patterns in declinations to prosecute, assess risk, and relay training needs to the Police Academy.

b) <u>Suppression Decisions</u>. Officers generally learn about suppression decisions, and the rationales for those decisions, from the Assistant District Attorneys who handle the suppression hearings, so, to that extent, there already is a feedback loop between the Department and our partners on the prosecution team.  The prosecutorial agency is in the best position to have accurate and complete information on suppression decisions, including the basis for decisions.  In order to institutionalize the agency-to-agency feedback loop, it would require that non-party agencies (either the DAs Offices or the courts) create and produce reporting mechanisms to the NYPD regarding the grounds for suppression. Compelling non-party agencies to submit reporting forms is broader than necessary to achieve substantial compliance by the NYPD and causing officers to self-report these decisions will lead to inaccurate data collection. The law of investigative encounters can be complex and fact-specific.  We believe we should focus our resources on feedback loops tied to clearer errors (i.e. declinations to prosecute) rather than the cases that

5

prosecutors have vetted and have deemed worthy of litigation at suppression hearings. Additionally, the overall suppression numbers are not indicative of a pattern of misconduct. If the suppression is based on a finding of adverse credibility, that would be reported as discussed below.

c) <u>Adverse Credibility Findings</u>.  The NYPD has an established procedure for reviewing adverse credibility findings by judges regarding an officer's testimony in a court proceeding. The Department receives notice of such findings from each of the five District Attorney's Offices in New York City, the Office of the Special Narcotics Prosecutor and the United States Attorney's Offices for the Southern and Eastern Districts of New York.[4]  Once a finding is received, it is logged into a tracking system and scheduled for review by the Department's Adverse Credibility Committee ("the Committee"). The Committee, which was formed in 2016, consists of Department executives from various Bureaus including the Legal and Risk Management Bureaus. The Committee meets as necessary depending on the number of findings received. The purpose of the Committee's review is to determine the appropriate action to be taken by the Department with respect to a specific finding. An adverse credibility determination is *not* the equivalent of a judicial finding that the officer committed perjury or a related crime (cases that present reasonable inferences of perjury/criminality are referred directly to the Internal Affairs Bureau).  In some of the referred cases, the officer failed to adequately review his or her notes or was unable to recollect facts.  In others, prosecutors failed to make sufficient factual records.  Members of the Committee closely review the materials received from the respective prosecutor's office, including the transcript of the officer's testimony and that of other parties in the case, as well as the judge's decision.

As a general matter, the Committee directs that every officer and his commanding officer be notified of the finding. In appropriate situations, the Committee may also direct remedial one-on-one training for the officer and/or recommend that the officer's commanding officer consider his or her re-assignment. In rare instances where serious misconduct is suspected and only first detected by the Committee, the Committee refers the matter to the Internal Affairs Bureau ("IAB") for investigation and possible discipline. A summary of the Committee's action, as well as the underlying transcript and/or judicial decision is also forwarded to the Department's Performance

---

[4]  In 2014, then-Commissioner William Bratton wrote to the city's five District Attorneys and our two U.S. attorneys, urging that the NYPD be informed of all adverse credibility rulings. Since then, the request has been reiterated by the Deputy Commissioner of Legal Matters to those parties, as well as to the Special Narcotics Prosecutor and the Corporation Counsel's Family Court Division, in the context of ongoing meetings and communications with those prosecutors' offices about adverse credibility findings and related issues. In this sense, the NYPD and the prosecutors already have a working group that addresses this process. Because there are no judicial findings of adverse credibility in either federal or state civil lawsuits for money damages, there is no need to include the Law Department in the working group.

Analysis Section for their review.  This process applies to all adverse credibility findings referred to the Department by prosecutors, not just those arising out of *Terry* stops or interior patrols. Since its inception, the Committee has received adverse credibility findings related to only three cases arising out of an SQF street encounter and one interior patrol/Housing Bureau case. The Department is also exploring the feasibility of incorporating adverse credibility findings into RAILS. The goal is to have this integration accomplished by September 2018. Given the Department's established process and the low number of relevant cases, court ordering an adverse credibility finding process for cases arising out of stops or interior patrols is broader than necessary for substantial compliance. However, NYPD would agree to confirm the continued use of the Committee to review information about adverse credibility findings related to stop/trespass enforcement during the period of the Monitorship. In addition, we will update the Monitor on the progress regarding integration of adverse credibility findings into RAILS.

d) <u>Law Department's Refusal to Indemnify/Represent for Malfeasance</u>. The Department is in continuous communication with the Law Department about all manners of civil litigation and is made aware of any denial of indemnification.  Much of that communication is subject to attorney-client privilege. However, the Law Department generally alerts the NYPD to any potential malfeasance by members of service.

e) <u>Civil Judgments due to Malfeasance</u>.  When an officer is the named defendant in a lawsuit, the Department has in place a feedback loop to evaluate the context of the case. There is: notification to IAB, an entry placed in the officer's personnel record, a review of the case by the Performance Analysis Section, possible entry into the civil lawsuit monitoring program, and finally, the results/impact of the monitoring program are evaluated. Placement in monitoring can result in a number of consequences against the officer such as change of assignment, restrictions on overtime, and increased supervision.

The Law Department may elect to defend or settle a lawsuit based upon a variety of factors. The NYPD confers with the Law Department regarding case strategy and outcomes. Additionally, the Department is in regular communication with the Law Department regarding settlements. The NYPD is made aware of any denial of indemnification, judgment, or verdict that occurs involving a member of the Department. Litigation history is a factor considered by the NYPD regarding the placement of a member of the Department in a monitoring program or other appropriate remedial action. The Department is having ongoing discussions with the Law Department as to whether the litigation data can be integrated into RAILS.

f) <u>Substantiated CCRB Complaints</u>.  RAILS currently captures all CCRB complaints (upon case initiation with only named officers) and alerts on the mere complaint, regardless of findings, if an officer has three or more cases in twelve

months and/or six or more cases in five years. The threshold for an alert is lower for CCRB complaints alleging excessive force (alerting upon four or more complaints in the prior two years or five or more force complaints in the prior four years). The Information Technology Bureau is also working on establishing alerts when a CCRB allegation is substantiated.   In addition, an officer's complete CCRB history (including allegations and outcomes) is included in his/her personnel record for the duration of the officer's employment. The personnel record and profile activity in RAILS are consulted and considered anytime an officer is evaluated or seeks a transfer, is eligible for promotion or a scholarship, or other Department personnel action.

> **Recommendation #2**: The NYPD must prepare a monthly report chronicling all findings of misconduct and the resultant disciplinary outcomes.

The Department is in the process of preparing a discipline report that will compile aggregate discipline data for publication to support our efforts to be more transparent surrounding the application of discipline. While the Department strives to ensure that disciplinary procedures are commenced and concluded in a timely and efficient manner, circumstances exist that may delay that process.  Given the duration of time that it takes to investigate and adjudicate discipline cases, annual reporting would be more meaningful than monthly. In addition, the Department intends to release case summaries for publication regarding discipline cases including the offense, the process, and the penalty.  Neither publication will disclose any personal identifying information about the complainants or officers involved. However, in April 2018 the Patrolmen's Benevolent Association commenced litigation arguing that such summaries violate Civil Rights Law Section 50-a. They were granted a temporary restraining order preventing the release of such information pending the resolution of litigation. Historically, New York courts have broadly applied Section 50-a.

The Department has routinely provided the Monitor and his team with robust data regarding discipline related to SQF and trespass enforcement encounters over the course of the Monitorship. Such data includes the case findings, charges, recommended penalties, reconsiderations, the Department Advocate's recommendation to the Police Commissioner, and the Police Commissioner's final decision. The Monitor also reviews complete case files upon request.[5] As an extension of the court, this exchange of data is compliant with Civil Rights Law 50-a and the Monitor does not publish identifying information in his reports. This process ensures accountability for the equitable application of discipline over the course of the Monitorship. The Department can use this data as a template to create a section in the report described above dedicated to aggregate SQF and trespass

---

[5] In the Monitor's Seventh Report (dated December 13, 2017), the Monitor notes that his team reviewed 63 complete cases and found only five cases in which the Monitor questioned the outcome. Upon further discussion with the NYPD, his team only disagreed with two.

enforcement data similar to the CCRB's reporting.[6] The Department also publishes an annual "Use of Force Report," as mandated by Local Law 85 of 2016, which describes findings of misconduct related to uses of force. If the Department is allowed to proceed and publish the summaries, they will be public and available for inspection by the Monitor and the plaintiffs' counsel.  The Department would agree to continue to release such publications about SQF and trespass cases during the period of the Monitorship. While the Department recognizes and supports the need for transparency around the disciplinary process overall, if the Court construes recommendation #2 too broadly, it is beyond the scope of the JRP for violations other than those related to SQF and trespass arrests.

---

**Recommendation #3:**  The NYPD must develop and publish progressive disciplinary standards for cases arising from unconstitutional stops and trespass enforcement regarding excessive force, abuse of authority, discourtesy or offensive language, and racial profiling allegations.

---

The Department understands the need for accountability and transparency in its disciplinary process and that the perceived lack thereof is a significant factor in the mistrust that the community feels towards the Department. This is why the Department supports changes to Civil Rights Law 50-a (and has endorsed the New York State Senate amended bill #2850, introduced January 17, 2017) and supports recommendation #2, with minor modifications. However, published discipline guidelines (i.e. a discipline "matrix") are not the proper way to ensure the equitable imposition of discipline as each case is fact-specific and discipline relies on the consideration of a number of mitigating or aggravating factors. Similar matrices in other jurisdictions have faced strong legal opposition for violating collective bargaining laws and denying officers their due process rights.  Furthermore, the New York City Charter and Administrative Code[7] give the Police Commissioner exclusive statutory authority over discipline. To create a presumptive standard of discipline would divest him of the authority to make decisions in each case based on the totality of the circumstances and eliminate his ability to exercise discretion.

The NYPD Department Advocate prosecutes NYPD internal disciplinary cases utilizing a progressive disciplinary standard in the evaluation of the appropriate penalties for the misconduct charged. The Department Advocate applies the "preponderance of the evidence" standard of proof for internal Department disciplinary cases. Beyond applying the standard of proof for each element of an offense, each case is evaluated on its own merits with the individual officer's past history and other factors taken into consideration when recommending discipline.

---

[6] CCRB investigates allegations related to stops and frisks. Since 2011, the number of allegations related to stops has declined by 40%. The CCRB already publishes extensive data about allegations and disciplinary outcomes on its website and in its annual and semi-annual reports.
[7] Administrative Code of the City of New York section 14-115.

The Department Advocate also evaluates any proposed penalty with respect to established precedent for consistency with similar cases.

The breadth of recommendation #3 goes far beyond "stop and frisk" to discipline in general and if construed in this manner, it is too broad to bring the use of *Terry* stops into compliance with the Fourth and Fourteenth Amendments. As described above, disciplinary recommendations are complex analyses that require consideration of many variables including aggravating and mitigating factors as well as recent precedent and judicial and administrative determinations. The imposition of standards would be impracticable, raise due process concerns, and would also likely run afoul of civil service laws as well as New York's collective bargaining agreements.

> **Recommendation #4**: Pending the results of the Monitor's pilot program, the NYPD should consider requiring officers to activate BWCs at the inception of all Level 1 encounters with civilians.

In developing the Department's body-worn camera policy, the NYPD engaged in extensive research of other police department policies and solicited input from stakeholders including District Attorneys' Offices, defense attorneys, health care providers, CCRB, privacy advocate groups, etc. In addition, the Department solicited public input on its draft policy by utilizing a comprehensive feedback process modeled on administrative notice-and-comment rulemaking that included an online questionnaire that allowed members of the public and members of the Department to participate.[8] The NYPD body-worn camera policy and report describing the development of that policy have been made publicly available.  The report and FAQ videos about body-worn cameras in several languages as well as sign language are available on the NYPD's website (http://www1.nyc.gov/site/nypd/index.page).

In 2013, the court order in *Floyd* directed the NYPD to conduct a one year, 1,000 camera, body-worn camera pilot under the supervision of the Monitor, who was to assess whether body-worn camera videos were effective in reducing unconstitutional stops.  The court's order came at a time when the NYPD had not yet designed a body-worn camera program but had been tracking their implementation at other police departments. For the Monitor's pilot, the Department rolled out body-worn cameras to the third platoon in 20 commands between April and November 2017. Right after the pilot was launched, the Department voluntarily began to expand the use of body-worn cameras and committed to deploy cameras to all patrol officers by the end of 2018.  As of June 1, 2018, officers in 49 commands have been issued cameras – over 7,600 so far.

---

[8] This process was achieved through a collaboration with the NYU School of Law's Policing Project as well as the NYU Marron Institute. Over 25,000 members of the public and over 5,000 officers participated.

The Department does not agree to change its policy to include recording *De Bour* Level 1 encounters nor do we agree with the characterization of other jurisdictions' policies which were extensively researched during the drafting of the NYPD policy. Recording all Level 1 encounters would effectively mandate activating the body-worn camera any time an officer engages with a member of the public which is not consistent with many jurisdictions' policies. Many cities do, in fact, separate out the public safety function (i.e. Level 1 encounters) from law enforcement encounters where there is criminality suspected (i.e. Level 2 + encounters). For example, Chicago has "community caretaking functions" which are discretionary to record unless and until the officer "has reason to believe the person...has committed or is in the process of committing a crime."[9] Additionally, what works in other cities does not necessarily work for NYPD as other cities have much smaller police departments (number of officers), smaller populations, and fewer calls/citizen encounters.

Recording Level 1 encounters has serious privacy implications and may have a chilling effect on community-police interactions which is inconsistent with the NYPD's Neighborhood Policing philosophy. The Department also has serious concerns about its technological ability (e.g. the bandwidth) to support the increase in the number of videos that would be added if this policy were to be implemented. Under the current policy, there are already close to 700,000 videos to date. The average length of video is 10 minutes. These numbers would increase exponentially if Level 1 encounters were included. The NYPD has a volume of ~4.5 million calls for service annually, with at least two responding officers to each. In addition, the Neighborhood Policing program has officers "off-radio" for a third of their tour to increase community engagement and problem solving. Potentially every one of these police-citizen interactions is a Level 1 encounter (e.g. call for service, aided care, seeking information). The number of body-worn camera videos would be immense and unmanageable.

Recording all Level 1 encounters does not further NYPD's compliance with the Fourth and Fourteenth Amendments. The constitutional standard in *Terry* for a stop is objective – that a reasonable person would not feel free to leave – not a subjective standard of how certain individuals actually felt. We require activation of cameras at Level 2 encounters which, due to the "tools" of accusatory questioning and consent to search, makes it more informative footage. The NYPD policy also requires recording all interior patrols, responses to calls for crimes in progress, as well as all encounters with emotionally disturbed persons ("EDPs"). The policy also allows officers to record non-mandatory encounters at their discretion as long as they are not otherwise prohibited. These categories capture many of the Department's Level 1 encounters, especially ones such as EDPs that are at risk for escalation or uses of force. The value of adding additional Level 1s such as a canvass for witnesses or searches for lost children is limited and the cost is enormous in terms of capacity, data management, and bandwidth as well as the privacy implications for individuals. There is also a risk that a casual encounter could be escalated into an adversarial

---

[9] http://directives.chicagopolice.org/directives/data/a7a57b38-151f3872-56415-1f38-89ce6c22d026d090.html

interaction upon activation of the body-worn camera. As for the suggestion that the Department could, at a minimum, include Level 1 encounters that "serve a law enforcement purpose," such a proposal is untenable. This would create an artificial distinction within Level 1 encounters that would be confusing to officers, difficult to train, and inconsistent with the law. It is also unnecessary as, again, many law enforcement-related Level 1 encounters are already captured under the mandatory and discretionary recording provisions.  It is premature to propose changes to the body-worn camera policy until the conclusion of the Monitor's pilot and issuance of his Report.  The Remedial Order states that recommendations about the program must be informed by the pilot study.

> **Recommendation #5**: The NYPD must add an application on officer iPhones/tablets that would allow an officer to input the approximate age, gender, race, and ethnicity of any person they approach at Level 1 or 2.

This recommendation is neither practical nor feasible.  Documenting all encounters that do not rise to the level of reasonable suspicion would be overly burdensome, unnecessary, and potentially have a chilling effect on community engagement.  Furthermore, such a practice could effectively turn every consensual encounter into a *de facto* Level 3 *Terry* stop unsupported by reasonable suspicion because, by asking for an individual's name and/or pedigree information, the officer necessarily interferes with the individual and unnecessarily prolongs the encounter.  The recommendation also implies that the officer should *guess* the person's age, gender, race, and ethnicity and then record the perceived pedigree information. This would create a database based solely on an officer's perception of the individual and thus would be of no value from an analytical standpoint.

The Department documents *Terry* stops and pursuant to local law (see, "Right to Know Act" in Part III), will also begin documenting encounters that involve a request for consent to conduct a search of a person or their belongings. The NYPD receives approximately 4.5 million service calls annually. Many of these involve some type of investigative encounter. Typical examples include asking a person encountered if they called the police, if they know who called the police, if they are okay, if they need an ambulance, if they know the crime victim lying on the ground, or if they saw what happened.  A police officer may respond to the scene of a shooting and walk among the large crowd that has gathered to ask if anyone saw anything or knew what happened. Each of those brief encounters or conversations, amount to a Level 1 Request for Information. It's not practical to document each of these encounters especially when time is of the essence such as when dealing with a victim or crime in progress. A review of body-worn camera footage shows it is impossible and unnecessary to document each of these interactions. State law, including CPL § 160.50, may prohibit documenting certain public encounters. Additionally, documenting these encounters does not serve any operational, public safety or quality control purpose.

12

As described above, this is unrealistic and evinces a lack of understanding of most Level 1 encounters in which a police officer approaches a person seeking information. Stopping to prepare a report for each such contact could have a chilling effect on public cooperation, turn simple conversations into prolonged *de facto* stops and impede police service. The highly questionable value of this information cannot be considered essential to substantial compliance, particularly when weighed against the costs in community relations and resources to develop and use the applications.

> **Recommendation #6**: The NYPD must create a protocol to expedite the processing of requests for stop reports.

In order to facilitate a quick turnaround of stop reports, the Department is in the process of implementing a procedure that will allow requestors to receive a copy of a stop report within 10 business days from receipt of the request (which can be in person, via mail or electronically). Requestors that seek to obtain a stop report will need to provide the date, time and location of the stop. Information regarding this new procedure is available at www.nyc.gov/police-encounters. Contrary to the Facilitator's understanding, this new protocol is not a result of the immediate reform process but is a voluntary undertaking by the NYPD to streamline its document production process.

> **Recommendation #7**: NYPD must formally engage affected communities at the Borough Command level through regular meetings. Also, the Court should order the establishment of a "Community Collaborative Board" to provide feedback on the Court-ordered reforms as they are being implemented.

Borough-Level Meetings

This past summer, in addition to the Neighborhood Coordination Officers' ("NCO") regular contact with local stores, schools, community organizations, and people on the street, the NYPD organized quarterly community meetings with NCOs at the sector level all across the city.  The meetings, known as "Build the Block" meetings, are run by the NCOs themselves, usually without the presence of higher-ranking officers, and are conceived as working sessions in which neighbors raise concerns and challenges in the neighborhood and discuss possible solutions with the officers who are actually responsible for the sector in which they live. The NYPD promotes these community engagement initiatives through the Department's social media platforms as well as a website (https://buildtheblock.nyc/) where people can learn more about the program, find their next local meeting, and sign up for informational emails. The NYPD also has the Community Partners Program. This program helps probationary police officers get to know the neighborhoods they will be serving by connecting newly graduated police officers with volunteer community members and

leaders. Finally, one-third of a steady sector officer's tour is set aside for community engagement and collaborative problem solving.

While these important programs are occurring at the sector and precinct levels, the Department agrees to the recommendation of a borough-level community engagement forum. We propose borough-level community meetings that are open to the public organizations that have not historically participated in community meetings. Participants could submit agenda items for discussion. We believe these borough meetings will be more effective when conducted every six months rather than monthly because there will likely need to be smaller interim meetings in between to address the issues raised and solve problems.

During the period of the Monitorship, NYPD can report to the Monitor and the court about such meetings and the suggestions made and issues raised. Plaintiffs' counsel can assist by submitting a list of organizations interested in participating. The organizations can confer in order to fashion priorities and create an agenda. The agenda and meeting minutes could potentially be online for public viewing.  The Department also intends to use other feedback and the Policy Considerations in the JRP Report to inform its agendas and discussions.  Finally, the Department already has some specific outreach programs for special populations that are described in more detail in Part III.

Community Collaborative Board

The recommendation for the establishment of a Community Collaborative Board ("CCB") to provide feedback from affected communities on the court-ordered reforms and make recommendations to the court and the Monitor is redundant to and undermining of the Monitorship/JRP and is not necessary to bring the use of *Terry* stops into compliance with the Fourth and Fourteenth Amendments.  This recommendation usurps the authority of the Police Commissioner to manage and administer the Department and as such violates the New York City Charter. In addition, there are other oversight entities available such as the OIG-NYPD and the CCRB to review matters beyond the purview of the Monitorship. The court was explicit in *Floyd* that the order was not meant to undermine the Police Commissioner's authority and was distinct from the role of the OIG-NYPD.[10] The Facilitator admits that the CCB would only have jurisdiction to offer feedback on SQF reforms thus limiting its agenda to a very narrow set of issues when there are many other areas that are ripe for conversation with the community. Such conversations are taking place in the community meetings and between many organizations and the NYPD on a regular basis.

The cities that are cited as having consent decrees with community councils have not had the benefit of five years of a monitorship and a three-year joint remedial process to do the very outreach that the recommendation anticipates. There is

---

[10] *Floyd* Rem. Ord, Dkt # 372, at 12.

already a court-appointed Monitor in place who has frequent contact with the organizations cited in the Report, in addition to the ultimate oversight imposed by the court. This proposal is tantamount to creating a second monitor and repeating the Joint Remedial Process. Such a proposal is unnecessary, would consume valuable resources, undermine the Monitor, and actually lengthen the delay in implementing remedial measures.

Moreover, this proposal contravenes the language of the court order. Although the Facilitator did not explain his criteria for the selection of his recommended board members, the court contemplated input from a variety of stakeholders that represented diverse points of view (e.g. NYPD personnel, district attorneys' offices advocates, etc.). The proposed members of CCB do not appear to reflect the diverse perspectives of many other stakeholders. The Department solicits input and conducts community outreach from a variety of stakeholders in many ways. Feedback and advice from community members' perspectives are better obtained through the Borough-level community meetings as outlined above. The meetings will allow for feedback from a multitude of organizations that better "reflect the diversity of New York City" beyond the handful of specific organizations that the Facilitator recommends as members of the CCB.

The assertion that the work of the Joint Remedial Process will come to an "abrupt stop" and deprive individuals of a voice is unfair and has no basis in fact. Over the past 4 years, outside of the JRP, the NYPD has engaged with many of the organizations listed in the Report and will continue to do so on a wide variety of issues that go beyond SQF reform. Furthermore, as most of the immediate reforms are currently in the implementation phase or have already been implemented, we are about to embark on the true "monitoring" phase of the remedial process. If the goal of the CCB is to give community members a mechanism to offer feedback on the reforms during the course of the Monitorship, going directly to the Monitor and his team is the appropriate mechanism to accomplish that goal. The Monitor's website contains a wealth of information and invites feedback. The Monitor can, and does, engage individuals and organizations and receives input into SQF reforms. If the court feels that the Monitor should receive more feedback from these organizations, the court should recommend to him that he increase his outreach efforts now that the policies are drafted and trainings are underway.

> **Recommendation #8**:  The Department must conduct a broad-based public education campaign to correct misunderstandings (*i.e.* educate the public that *Terry* stops <u>are</u> legal if based on reasonable suspicion), inform citizens about the rights and obligations of citizens and officers during investigative encounters, and update citizens about the changes to NYPD policies.

It is unfortunate that the court's finding has been misconstrued by some members of the public as declaring SQF illegal. This may be the result of media coverage and rumor; however, the NYPD has been consistent and careful in its phrasing around

the issues of SQF and is confident that the misunderstanding is not the result of any communications originating from the Department.[11] Further, it is not the Department's responsibility to quash rumors or provide legal advice to individuals. There are numerous advocacy groups, community leaders, and legal defense organizations as well as the CCRB that can, and do, have their own public education campaigns regarding interactions with police officers. Any education campaign spearheaded by the NYPD may be viewed as suspect by certain groups and individuals. The message is better coming from the Monitor, CCRB, or other organizations. Ultimately, the public's level of awareness and understanding of SQF—while certainly valuable—is not *required* for the Department to be in compliance with the Fourth and Fourteenth Amendment and some aspects of the recommendation such as radio and television public service announcements are very costly.

There are several sources of information that currently exist for individuals to learn about their rights and NYPD policies and procedures. For example, CCRB engages in broad public outreach and distributes the following information brochures: "What to Do if a Police Officer Stops You" and "What can you do if you think you've experienced or witnessed police misconduct."  This material is also available on their website: (http://www1.nyc.gov/site/ccrb/about/outreach/publications.page).  CCRB publishes extensive information and data about complaints and their outcomes on their website as part of their data transparency initiative. This information is updated weekly in addition to aggregate reports that are published semi-annually.

The NYPD publishes its operations manual, the Patrol Guide, on the Department's website where it is available for public inspection. The Patrol Guide includes policies related to investigative encounters, interior patrols, and profiling.  All of the court-approved materials are on the Monitor's website:  (http://nypdmonitor.org/).  The NYPD also has programs available to civilians to learn about policing such as the Citizen's Police Academy and the Citizen's Police Academy International. These are training programs open to any interested community member that meet once a week for ten weeks twice a year. The Academy takes civilians through an experiential training curriculum similar to the NYPD recruit training experience. Attendees participate in hands-on and classroom instruction in various law enforcement and policing topics, such as Investigative Encounters, Crisis Intervention, driver training, officer safety, and use of firearms. The International variation is language and neighborhood specific and includes matters such as immigration issues.  These are done in collaboration with the local precinct and other providers, such as the local District Attorney's Office.

---

[11] Please note the irony that the Facilitator is seeking to correct the misconception that stopping and frisking is illegal yet used a picture for the cover of his Report that says "End Stop & Frisk Hands Off The Kids." Disseminating photos like this is precisely what the Department is trying to communicate against and the NYPD repeatedly asked the Facilitator to remove this photo for that reason.

Notwithstanding all that is being done, the Department is open to drafting, with input from the parties, a plain language guide to police services/interactions in the model of the Toronto Police Department.[12] We can disseminate this information via social media and at community meetings. We do not believe that the services of a social psychology expert are necessary to accomplish this task nor does this require ongoing court involvement.

> **Recommendation #9**: The NYPD must implement annual community surveys at the precinct/PSA level that track police-community relations broadly and public perceptions of street encounters, specifically.

The NYPD is committed to receiving feedback from the public regarding police-community relations and we do so in many ways, as described herein.  The Department pays close attention to media coverage and meets regularly with a number of community groups and elected officials who are elected to speak on behalf of their constituents.  We hold community meetings and encourage individuals to leave comments on our website and through 3-1-1. These are very productive ways to determine public sentiment and gain valuable feedback.

The Department has been working with ELUCD, a data analytics group, to conduct surveys and analyze responses in order to measure community sentiment at the micro-neighborhood level on an ongoing basis and in real time.  The Department was looking for a regular, ongoing measurement of sentiment to be used as another management metric to augment the current Compstat process.  This has developed into the Sentiment Meter. The Sentiment Meter collects data around three key dimensions from residents of each sector: trust, satisfaction, and perception of safety.  ELUCD has developed a multi-modal data collection model that allows them to reach all segments of the population and collect data based on a representative sample for a specific neighborhood's demographics. These survey responses are used to develop indexes around those three key dimensions which are similar to FICO credit scores for each neighborhood.  This information is not intended to predict an outcome (such as a specific percentage of people who are satisfied with NYPD); rather, it is intended to be utilized as a means to observe trends over time and what drives those dimensions of sentiment up or down.  This data will be analyzed in relation to other data such as the crime data that the Department already collects to see what factors may affect sentiment. This analysis is meant to be used as a tool for police executives and commanding officers to understand what is going on in their sectors, commands, and the city overall.

While the Department acknowledges that the questions for the Sentiment Meter are not specifically SQF-related, they do get at police-community relations broadly and are tracked over time. The Sentiment Meter data is designed to be used by precinct commanders to better deploy their resources. The fact that the data is not public,

---

[12] See, http://www.torontopolice.on.ca/d13/20131023-d13_guide_on_calling_police.pdf.

and not known to the Facilitator, does not negate its important effect on assisting NYPD to assess community-police relations at a local geographic level. Thus, ordering the NYPD to conduct additional community surveys on an ongoing basis would be at great expense to city taxpayers with little benefit beyond the feedback we already receive; further, it does not appear to be essential to bring the Department's SQF and trespass enforcement practices into compliance with the Fourth and Fourteenth Amendments.

> **Recommendation #10**: The NYPD must review and audit its policies and practices with regard to the cultivation of youth confidential informants.

The development of confidential informants, of all ages, is a necessary component in gathering criminal intelligence and is an important tool for the NYPD. Thus, there are specific protocols in place to govern this process and there is no policy that condones the practices described in the Report on pages 219-220. In fact, Patrol Guide 212-68 specifically states that if a prospective confidential informant is less than 18 years of age, in order to register the contact, a parent or guardian must be present and the NYPD must obtain written permission by co-signing the registration form.  Any issues with the cultivation of youth confidential informants should be addressed through training. We can reference the Report when finalizing the training for plainclothes officers in an effort to integrate instruction on appropriate and inappropriate practices; however, the Report is vague on the scope of this issue and the feedback appears to be anecdotal and not indicative of a widespread pattern.  Additionally, the Department reiterates the legal issues with this recommendation that the Law Department elaborates on in its response.

> **Recommendation #11**: The Department's SQF training must include specific units on engaging with people with mental, developmental or physical disabilities, and utilize scenarios.

The parties have been working on drafting SQF training for more than two years. The plaintiffs' counsel and Monitor's team have collaborated with NYPD on and allowed for the filing of several SQF courses (including scenarios) without objection. The SQF curricula for both newly-promoted and incumbent sergeants and lieutenants have been approved by the court and thousands of supervisors have already been trained. The main remedial SQF in-service training day is jam-packed with law, videos, scenarios, and report-writing exercises.  To add additional topics would do a disservice to both the existing content and any newly proposed subject. In general, the course already reinforces de-escalation techniques. The Department has other trainings that address officer awareness and understanding of interacting with individuals with a variety of disabilities. Furthermore, as the Law Department explained in its response to the JRP, the court did not undertake any fact-finding with regards to NYPD's interactions with disabled individuals in the context of SQF. The concerns noted by the plaintiffs' counsel are anecdotal and not indicative of a

pattern and practice of abuse. Therefore, ordering that this content be included in the SQF training (or as a separate training related to this litigation) is outside of the scope of the JRP.

Specifically regarding mental health issues, the Department has had extensive collaboration with mental health professionals, mentally disabled individuals, and others to develop policies and training to increase officer awareness and understanding of mental health issues and to implement de-escalation techniques for interacting with such individuals.  Last year, the NYPD responded to over 169,000 calls regarding emotionally disturbed individuals, so it is critical that its officers are better equipped to contend with these situations and increase the likelihood of bringing them to successful and safe conclusions. Specifically, a four-day class, Crisis Intervention Training ("CIT"), that teaches active listening skills, among other techniques, is being provided to all members of the service. Officers learn how to demonstrate empathy and build rapport with subjects, slowing down situations and de-escalating the subject's negative emotions. The training is supported by interactive scenarios and role-play situations to impart a better understanding of mental illnesses that will help officers assist a person in crisis and gain voluntary compliance. The Department launched its first wave of CIT in June 2015. Since its inception, more than 9,200 police officers have received this training; every patrol lieutenant has taken the course; and all sergeants will be trained by September 2018. Training for officers is ongoing at a rate of three sessions per week.

In addition, the Behavioral Health Diversion Program has launched in all four precincts on Staten Island. This program is designed to improve access to community-based behavioral health treatment and reduce demands on police and emergency medical services. Under this program, calls to 9-1-1 involving non-violent EDPs will be diverted from a conventional NYPD/EMS response to NYC Well, the city's crisis intervention and referral service. This service offers free confidential support for anyone seeking help for mental health or substance abuse concerns. Anyone who is determined to be at imminent risk of danger to themselves or others will continue to receive a direct NYPD/EMS response.

To enhance the Department's services to the hearing impaired, the Police Academy has partnered with the National Action Network Deaf Club to develop scenario-based training and to review the curriculum for recruits in dealing with the deaf community. Finally, the Department has also drafted an ADA compliance plan that includes updates to training to provide guidance on the requirements of the ADA as well as appropriate ways to serve people with disabilities.

> **Recommendation #12**: There should be more training and community engagement with regard to the LGBTQ community, with a particular focus on de-escalation.  The Department should monitor adherence to the 2012 Patrol Guide revisions and take steps to ensure their implementation.

The Department currently has a designated LGBTQ liaison assigned to the Police Commissioner's Office who is responsible for addressing issues specifically related to the LGBTQ community.  The liaison is familiar with Department policy regarding LGBTQ issues, as well as with recent federal, state, and local laws affecting the LGBTQ community's interactions with the Department. The liaison maintains regular contact with local leaders, community groups, advocacy groups and service providers that represent and serve the LGBTQ community in New York City.  In 2012, the Police Commissioner assembled an LGBTQ Advisory Board which developed new patrol guide procedures regarding engaging with the LGBTQ public. Community advocates were brought in to train police officers at the Police Academy on the new procedures.  This Advisory Board is still active.

The Department has promulgated policies and conducted training for incumbent officers and recruits on such issues as respecting gender identity and recognizing preferred gender when it comes to certain enforcement decisions (e.g. recording identity, searching and lodging of prisoners). The Department conducts outreach to encourage LGBTQ crime victims to report abuse and hate crimes, and promotes LGBTQ services at specified Department of Homeless Services' shelters. The Department's Community Affairs Bureau also has a LGBTQ Outreach Unit. Additionally, since 1982, the NYPD has had an official fraternal organization for LGBTQ law enforcement members, the Gay Officers Action League, that assists on addressing LGBTQ matters for employees in the workplace and serves as a bridge between the law enforcement community and the LGBTQ community at large.

While we agree these efforts are crucial and are committed to ongoing efforts to engage the LGBTQ community, this recommendation is outside the scope of this for the reasons that the Law Department stated in its response. The Report incorporates some aspects of the OIG-NYPD report entitled "Review of NYPD's Implementation of Patrol Guide Procedures Concerning Transgender and Gender Nonconforming People." Again, the OIG-NYPD report and NYPD response demonstrate that oversight and communication on matters not related to SQF reform are ongoing outside of the Monitorship and JRP. Thus, additional action by the court is unnecessary.

> **Recommendation #13**: The NYPD must implement the use of civil summons for trespass enforcement by extending the Criminal Justice Reform Act of 2016.

The characterization of trespass as a low-level crime that should be decriminalized and subject only to a civil summons is an unsafe and untrue assertion and the recommendation to do so is irresponsible.  In addition to the legal concerns raised in the Law Department's response, enforcement of trespass violations can prevent more serious crimes such as burglary, rape, and narcotics sales. Taking away the tool of criminal enforcement of trespass crimes most adversely affects the safety of residents in public housing developments and other distressed apartment buildings.

There are 400,000 residents living in NYCHA buildings; the Facilitator received feedback from a very limited number of residents and the transcripts of focus groups do not indicate that they want a decrease in enforcement against actual trespassers. This recommendation implies a mischaracterization of the plaintiffs' classes in *Ligon* and *Davis*. The classes were comprised of residents and guests who were improperly stopped and arrested – NOT actual trespassers. To de-criminalize trespass broadly would diminish the Department's ability to preserve public safety, particularly in NYCHA developments.

As a result of the *Ligon* and *Davis* settlements, the Department has already implemented, or is currently working on, a number of reforms regarding its interior patrol policies, training, administration, and management. Compliance with these reforms is being closely tracked by the Monitor and plaintiffs' counsel. Officers already have discretion to use options to resolve situations in ways that do not always involve criminal enforcement such as a trespass summons or ejection from the building.[13] Between 2011 and 2017, the number of trespass arrests in Housing Bureau public service areas has decreased by 56% due to the application of precision policing, but when enforcement is necessary, officers need to know they have the tools available to arrest individuals and force their removal from buildings. Also, Criminal Trespass is an essential element to, and lesser-included offense of, Burglary under the Penal Law.

The areas that were the target of the Criminal Justice Reform Act of 2016 were low-level, quality-of-life offenses that are not inherently dangerous or injurious to society (e.g. public urination, littering, unreasonable noise, etc.). Conversely, trespass is criminalized in order to ensure the safety and security of individuals in their homes and property. Further, the Criminal Justice Reform Act of 2016 clearly gives officers discretion to arrest or summons in these cases – it is not a requirement to summons in lieu of arrest.  Unlike CJRA offenses, trespass is a crime under the New York State Penal law. The law specifically includes trespass in a public housing development in order to provide residents of NYCHA with the same type of safety protections afforded residents of private buildings. The Department needs criminal trespass enforcement as a tool to ensure that residents and guests of these buildings have a safe and secure environment.

> **Recommendation #14**: The NYPD must implement a program for training officers on trauma and the implications of trauma for public safety. The NYPD should seek to work with social service practitioners to teach officers more about the debilitating effects of trauma and its manifestations for both officers and community members.

---

[13] Patrol Guide sections 212-59 and 212-60 both state: "Even if there is probable cause to arrest a person for trespassing, officers may exercise their discretion to refrain from arresting that person, and instead instruct that person to leave under appropriate circumstances."

The Department acknowledges the importance of understanding trauma and training officers to interact with people in crisis; that is why the NYPD has committed to Department-wide CIT training, expanded homeless outreach, and enhanced victim services. The Fair and Impartial Policing training that is being conducted also addresses these issues (see, Part III). However, the NYPD does not support court action on this recommendation as part of the JRP. We are already providing officers with Crisis Intervention Training (as mentioned above) and have established a co-response team including members of the NYPD and the New York City Department of Health and Mental Hygiene ("DOHMH") in an effort to improve the city's response to individuals with mental illnesses. The co-response team uses real-time information and data analyses to identify individuals who are suffering from mental illness and provide assistance to those who have an elevated risk of violence to themselves or others. Each response team deployment consists of two police officers and one DOHMH clinician who are specially trained to recognize and respond to behaviors and symptoms of mental illnesses. The co-response team commenced operations in March 2016 and is staffed with one lieutenant, two sergeants, nine police officers, and one director, one supervisor and eight clinicians from the DOHMH. Based on the success of this program, the Department has received funding to hire an additional sergeant and 26 additional police officers to expand the unit in FY 19.

## Part III: The Way Forward

The Report focuses on four main themes of community-police relations: _community engagement, respect, transparency,_ and _accountability_. Thus, we would like to take this opportunity to use this response to share with the court and the community that many reforms related to these themes are already being/have been implemented. The initiatives discussed were conceived as parts of an overarching plan with each component supporting the others and should be read with the understanding that, while the separate initiatives appear to stand on their own, they are a collection of parts in a comprehensive approach to operational, organizational, and cultural change.  The Department pursued these new initiatives to increase and enhance the Department's engagement in local communities while pushing crime down to historic lows, even as the gross number of enforcement actions – arrests, summonses, and stops – have declined sharply. With the close of 2017, New York City marks three new crime reduction benchmarks: the first time the total number of major felony crimes has fallen below 100,000; the first time the number of shooting incidents has fallen below 800; and the first time the total number of murders has fallen below 300.[14] This reduction in murders has resulted in the lowest per-capita murder rate in nearly 70 years. However, there is still more work to be done. And by partnering with all the people that the Department serves and embracing the themes described herein, we can continue to make lasting change in our society.


### Community Engagement

In addition to the specific community engagement reforms that have been discussed elsewhere in this response, such as "Build the Block" community meetings, we would like highlight some additional efforts below.

Neighborhood Policing Philosophy

The NYPD has achieved remarkable public safety successes in recent decades, and as Commissioner James P. O'Neill has said, the police have a moral obligation to maintain and improve on those successes. Keeping people safe is what police officers do, but they don't, and can't, do it alone. Public safety is a shared responsibility. Neighborhood Policing acknowledges that fact and builds upon it and, therefore, community engagement is the cornerstone of Neighborhood Policing.

---

[14] For 2017, there were 96,517 major felony crimes reported, compared with 102,052 in 2016 (-5.4%); 290 murders reported, compared with 335 in 2016 (-13.4%); and 789 shooting incidents reported, compared with 997 in 2016 (-20.9%). By contrast, in 1990, New York City recorded 2,245 murders and over 5,000 shootings.

Neighborhood Policing is a fully-developed policing philosophy that is ingrained in every aspect of the Department. It is designed to provide sector[15] or neighborhood-centric policing in New York City. Each precinct has been realigned internally to establish three to five sectors within the precinct, and the borders of each sector have been selected to conform as much as possible to the boundaries of actual neighborhoods as they have developed organically. Groups of police officers have been identified and assigned to provide police service exclusively within each sector and spend one-third of their tour "off-radio" to engage with the community. Supporting the sector officers and filling out each sector team are two officers designated as the neighborhood coordination officers ("NCOs"). The NCOs are liaisons between the police and the community, and also key crime-fighters and problem-solvers in the sector. The NCOs immerse themselves in the community by attending meetings with community leaders and clergy, visiting schools and businesses, following up on previous incidents, and using creative techniques and adaptive skills to fight crime and address quality-of-life conditions unique to their particular sectors. To date, 63 of our 77 Patrol precincts are NCO commands plus all 9 of our Housing Bureau police service areas. This year we will finish converting all precincts and expand into all 12 Transit Districts by the beginning of 2019.

Engagement with Special Populations

The feedback from the focus groups and forums revealed a concern within the community about how the NYPD deals with special populations. We've already discussed engagement with the LGBTQ community as well as individuals with disabilities. Here we would like to focus on some other categories of special populations, particularly ones where NYPD policy has been created and implemented through coordination with a variety of external collaborators.

- *The Homeless Population*: the NYPD has created a new Homeless Outreach Unit under the direction of an NYPD chief. This Unit works closely with the Department of Homeless Services' to enhance its outreach and ability to provide essential services to homeless people. The Unit has conducted training for DHS peace officers to ensure safe environments for homeless shelter residents. In addition, the NYPD has worked with other city agencies and community organizations to put in place policies for addressing important issues related to the homeless population such as encampments, extreme weather situations, and available services. Working with these city agencies, community organizations and other non-governmental organizations ("NGOs"), the NYPD supports intervention in order to facilitate the appropriate services at the precinct level.

- *Domestic Violence Victims*: the Department works with Safe Horizon and the Family Justice Centers in each county to address domestic violence issues

---

[15] A sector is a geographically defined subdivision within a precinct boundary. Sectors are delineated in order to organize precinct resources and manage workflow more efficiently.

and ensure that victims are receiving appropriate services. Additionally, the Department conducts "DV-Stat" meetings to examine patterns of domestic violence, troubleshoot concerns, and hold police commanders accountable for the domestic violence service and intervention programs under their stewardship.

- *Sex Trafficking Victims*: the NYPD partners with several NGOs to rescue victims of sex trafficking. The NYPD Vice Enforcement Division focuses enforcement on the criminality of pimps and "Johns" rather than routinely arresting sex workers. Through a coordinated response after an enforcement action, the partner NGO provides education and services to potential sex trafficking victims. The Department has also promulgated a policy whereby condoms possessed by prostitutes are no longer invoiced as arrest evidence. The Department is developing public and internal guidelines for the submission and review process for "T-visa" declarations submitted by victims of trafficking. Additionally, the NYPD has established a 24/7 telephone hotline so that victims of human trafficking can now report incidents directly to the Department's Human Trafficking Unit. This hotline allows victims to contact seasoned investigators directly, and lessens the burden faced by victims hesitant to engage with law enforcement.

Performance Evaluations

The NYPD has reformed its performance evaluations to include community engagement as a metric. This ensures that officers are held accountable for their interactions with the community and reinforces the importance of community engagement as a job function. The Department began to research possible revisions to its officer evaluation system more than two years ago. Plaintiffs' counsel and the Monitor's team provided input and recommendations during that process. The new system stresses problem solving over quantity and measures an officer for performance in a manner that is much more aligned with the goals of Neighborhood Policing. Specifically, the new system has mechanisms to evaluate officers' community engagement. As discussed in more detail below under "Accountability," the system is based on 12 rating dimensions. One of the 12 dimensions, Community Interaction, is specifically designed to measure the nature of an officer's community engagement, such as whether the officer engages the community in a proactive and positive manner, treats others with courtesy and professionalism, is an active listener, and refers community members to appropriate services when needed. Other dimensions support the goal of community engagement as well. One example is the "Problem Identification/Solving" dimension which evaluates an officer's initiative and innovative thinking with respect to appropriately identifying and addressing the needs of the command and community effectively and efficiently. The system includes officer self-report entries, enabling officers to report acts of meaningful community interaction. It also includes the ability for supervisors to submit feedback forms regarding a subordinate's positive or negative community

interaction.  These self-reports and supervisory feedback forms feed into an officer's monthly profile report and are considered during the officer's quarterly evaluation.

<u>Deputy Commissioner Collaborative Policing</u>

Finally, the NYPD Office of Collaborative Policing, which was established in 2014, has been actively pursuing opportunities for cross-agency collaboration in city government and collaboration with public interest and service organizations such as non-profits, community-based organizations, the faith community, and other community stakeholders on a wide variety of public safety initiatives. Over the last five years, the Office of Collaborative Policing has focused on several key areas including: victims of crime, creative crime reduction efforts, diversion programs to keep people out of the criminal justice system when their interests and society's interests would be better served in other ways, and public safety initiatives that highlight collaboration with other city agencies, advocates and non-profits. The result is coming up with better solutions as part of a shared responsibility with outside partners engaging with the NYPD on problem-solving and improving public safety. This is a major departure from the past practice of the Department working largely on its own.

## Respect

<u>Implicit Bias and Police Legitimacy</u>

Beginning in February 2018, the NYPD commenced a training program, Fair and Impartial Policing ("FIP"), addressing fairness and due process in policing as well as the potential effects of unconscious bias for all members of the Department. FIP's client list includes dozens of local, state, federal, and international law enforcement agencies including the U.S. Department of Justice, Office of Community Oriented Policing Services.[16]  Social psychologists have shown that "implicit" or "unconscious" bias can impact what people perceive and do, even in people who consciously hold non-prejudiced attitudes. Well-intentioned humans may manifest biases at the subconscious level that can impact their perceptions and behavior. This full-day training program will raise officer awareness and provide some tools to deal with this phenomenon. There are specific training curricula that are individually tailored towards patrol officers, direct supervisors, mid-managers, and executives. In addition, the training session for borough commanders is a day and a half and includes members of the community so they can work through these issues together. The Department estimates that it will take two years to complete the training for all uniformed members of the service.

Between 2014 and 2015, the Department also provided training called "Blue Courage" to all uniformed members of the service on procedural justice and police legitimacy. Procedural Justice is an approach to policing that emphasizes the

---

[16] For more information on Fair and Impartial Policing, see www.fairimpartialpolicing.com.

importance of policing in a fair, respectful, and transparent way. By following the tenets of Procedural Justice, a police force enhances its legitimacy and gains trust and cooperation from the community it services. Starting in Spring 2018, the Department began delivering Blue Courage to civilian members of the service. Police Academy instructors are also working to develop a recruit curriculum on implicit bias and procedural justice and to infuse the concepts into all Department trainings, where possible, to reinforce respectful interactions.

Diversity and Inclusion

In 2018, the Police Commissioner formed the Office of the Deputy Commissioner, Equity and Inclusion to oversee the Department's equity and inclusion strategies. Working with other bureaus such as Personnel and Training, the Office of Equity and Inclusion will work to implement changes in policy, training, and recruitment to ensure a comfortable, inclusive, and accommodating work environment for all employees who come from a variety of backgrounds.  We are a majority-minority police department and are constantly working towards furthering diversity and inclusiveness at every rank.

Recognizing that the traditional methods of outreach are of limited effectiveness in this digital age, the Department is utilizing additional outreach methods such as social media (e.g. Twitter, Facebook, Instagram, YouTube, and SnapChat) to reach broader groups of people. This has been effective in making contact with portions of the population who have historically not participated in NYPD activities such as community meetings. Using a targeted social media outreach approach, we are able to direct information to certain demographics. For example, a recent recruitment campaign has demonstrated that NYPD has the ability to reach a large groups of individuals – in one week, our social media advertising resulted in a combined ~64,000 clicks from Facebook, Instagram, Twitter, SnapChat, Google, and YouTube to the Department's Recruitment landing page.

Precision Policing

Prior to 2014, NYPD placed too great an emphasis on general enforcement activity – arrests, summonses, and stops –  and not enough on the targeted enforcement strategies that the NYPD has come to call "precision policing." Precision policing focuses resources on the individuals responsible for a significant amount of crime as opposed to concentrating enforcement activity geographically. The NYPD is preventing crime and disorder with greater interagency and community collaboration, employing less intrusive tactics, and fostering a renewed sense that public safety means pursuing security and public approval in tandem. By connecting with the community, information flows from the community residents to the NYPD and over the past 4 years, these relationships have led to the acquisition of valuable information that has been integral to our investigations. This method of crime-fighting focuses on the real drivers of crime by listening to and respecting the members of our communities and assigning our resources towards the small

percentage of the city's population responsible for the most violence. The Neighborhood Policing structure facilitates this information flow and teamwork; as officers learn more about their sectors, they are developing a substantial quantity of good information about local crime and local criminals.

Done right, NYPD's Compstat tool is a precision instrument that helps precincts and the various support commands coordinate and focus their efforts on important cases, patterns, and conditions while simultaneously promoting best practices and a high level of professional policing skill. Today, the emphasis on general enforcement activity has been entirely removed from Compstat, replaced by a focus on addressing specific problems in effective ways. When arrests and summonses are discussed at Compstat, the focus is whether such enforcement was necessary and effective in addressing a particular crime problem. The Monitor has observed Compstat and noted that the emphasis on enforcement numbers has been eliminated. [17]  Partly as a consequence, arrests are down 30 percent compared with five years ago, and summonses are down 63 percent.  Significantly, reported stops are down in excess of 90 percent from their high in 2011.

## Transparency

"Right to Know Act"

In 2016, the Department and the New York City Council Speaker reached an agreement to revise the Patrol Guide to add requirements regarding officer identification and consent to search. Officers are required to identify themselves to individuals who are the subjects of law enforcement activity by providing their name, rank, and command. They must also explain the purpose of the interaction in certain circumstances including investigative encounters. In addition, officers are required to ask for consent to search "in a manner that elicits a clear 'yes' or 'no' response," state explicitly that he or she can only conduct the search if the individual consents and inquire as to whether the person understands.

This agreement was further codified in 2018 in two laws, Local Law 54 and Local Law 56, which are together known as the "Right to Know Act." Beginning on October 19, 2018, police officers will be required to provide individuals with a business card when the officer is conducting certain law enforcement activities. These business cards will include the officer's name, rank, shield number, and a space for the officer to write their command. They also direct individuals to a website where they can learn more about their interaction and how to obtain their body-worn camera

---

[17] In his recent recommendation to the court regarding the Department's new evaluation system, the Court-appointed Monitor reported that the pressure on officers to make stops irrespective of their lawfulness has been removed from Compstat. The Monitor's recommendation noted that, "[o]ne or more members of the Monitor team have watched almost all the Compstat meetings from April 2016 through mid-July 2017.  There is seldom any mention of stops, and never criticism of the number of stops or lack of stops."

footage and/or stop report. The consent to search procedure was also expanded to include a requirement that the officer document all requests for consent to search, including the time, location, and date of the search or refusal, and the apparent race/ethnicity, gender and age of the person from whom the officer sought consent to search. Finally, the officer must record the consent to search with a body-worn camera, if available. The Department supports these new procedures as a way to increase transparency regarding police-community interactions by giving subjects of these interactions information about the officer they are interacting with and their right to refuse a request for consent to search.

Body-Worn Camera Footage of Officer Shootings

One of the areas where the Department received significant feedback in the body-worn policy report mentioned in recommendation #4 was regarding the release of body-worn camera footage of officer shootings with over half the participants wanting release of footage as soon as possible. Given the complexities of internal and external investigations in these cases, the Department declined to implement a specific policy regarding release of officer-involved shootings and chose to address them on a case by case basis after consultation with the prosecuting authority and other stakeholders. However, since the report was issued, there have been four officer involved shootings in which the Department has released the body-worn camera footage. The Department has rethought its position and has determined that it should have a defined policy regarding the release of such footage. A policy is currently pending within the Department and is expected to be finalized shortly. Unfortunately, as with other reforms the Department is attempting to implement, publishing the policy will be on hold due to a lawsuit initiated by the Patrolmen's Benevolent Association. A New York State judge had dismissed the case and ruled against the police union on May 4, 2018 on procedural grounds; however, the union exercised their right to appeal and the appellate court has issued a temporary ruling blocking the NYPD from releasing body-worn camera footage pending a ruling on the merits. The Department believes that allowing the public to see footage of officer shootings is an important way to demonstrate our commitment to transparency and will continue to advocate for such a policy.

Published Policy and Data

The success of our public safety mission depends on creating a relationship of trust with the community. We need the knowledge and assistance of the community and acknowledge that information must flow both ways. One way to do so is through transparency and insight into our data reporting and policies. Since January 2017, the Department has published the Patrol Guide on its website. In addition, the Department has made a vast array of other data available to the public via the city's OpenData website (https://opendata.cityofnewyork.us). Historical incident-level crime data is available from 2000 to the present and the incorporation of additional datasets is set to be included this calendar year including victim and suspect demographics, arrest incidents, shooting incidents, and criminal court summonses.

29

Additionally, the Department makes more than 30 statistical reports available on its website including domestic violence, hate crimes, uses of force, school safety incidents, and traffic collisions, among others. The Department is also working with the New York City Comptroller's office to include more information regarding procurements on its CheckBook site (www.checkbooknyc.com) so the public can see and understand how the NYPD spends its budget with outside vendors and contractors.

## Accountability

Use of Force Policy and Review Board

The NYPD has long had effective policies governing officer use of firearms, including clear rules on when firearms can be used, full reporting about firearms use, and recurring semi-annual training with the firearm itself. These policies have had a highly positive impact, reducing the number of firearm discharges, the number of people shot, and the number of people killed all by about 90 percent since 1971. It is the goal of the new NYPD use of force policy to bring the same degree of oversight, reporting, and training that has been characteristic in NYPD firearms discharges to all uses of force. In the past three years, the NYPD has made significant progress toward achieving this goal, improving both training and oversight and establishing a clear operational framework for reporting and investigating uses for force including firearms discharges. Starting in 2016, the NYPD began publishing its use of force data in an annual, public "Use of Force Report," available on its website.

The NYPD introduced a new use of force policy in June 2016 that clarifies definitions, establishes levels of appropriate force, and mandates reporting and review procedures for each level of force used while emphasizing the sanctity of life and the grave responsibilities vested in police officers. This policy established the Threat, Resistance or Injury Incident Worksheet ("T.R.I") for documenting uses of force by and against members of the service. The policy does not change what officers are legally empowered to do in force situations, but it does ensure that officers, and the NYPD as a whole, take responsibility for and justify police actions in every case. The new policy requires the application of de-escalation techniques when feasible, rendering aid to persons subjected to force, if necessary, and intervention in the event of unnecessary or excessive force.

T.R.I.s are prepared by the members of the service involved in any reportable use of force incident, any time unnecessary force is suspected or alleged, incidents in which any person sustains an injury relating to police action or in police custody, and when prisoners commit or attempt suicide. The T.R.I. is also prepared when force is used against officers. The responsible supervisor makes a determination as to whether further investigation is needed (e.g. by a Department executive, IAB, or FID). To ensure compliance with the policy and overall quality of the reporting and investigation of force incidents, there are various levels of organizational review and oversight. The Department convenes monthly oversight meetings during which

T.R.I.s are reviewed, the quality of the supervisors' investigations is evaluated, and commanders are held accountable for compliance with the process.

In July 2015, the NYPD established a new Force Investigation Division ("FID") to investigate all officer-involved shootings, all deaths in custody, and all deaths related to police activity.  In past practice, these reviews were decentralized and performed at the borough level in each of eight patrol boroughs.  Borough personnel would handle policy issues, the Detective Bureau handled the criminal aspects of the cases, and the Internal Affairs Bureau evaluated police misconduct. The new FID, with citywide jurisdiction, reports to the office of the First Deputy Commissioner and handles all aspects of each firearm discharge incident, including building cases against armed criminals who have fired on police officers as well as investigating possible police misconduct. The division's experienced detectives and supervisors conduct high-quality investigations with an eye toward extracting tactical lessons from each incident that can be used to strengthen training and prevent future tactical errors.

Evaluation System: Quality over Quantity

As part of the NYPD's efforts to reduce its emphasis on the sheer number of enforcement activities, the Department has developed a reformed police officer performance evaluation system that evaluates officers on a range of skills, placing less emphasis on quantitative measures and more on abilities and accomplishments.

One procedural component of the former system included the use of performance objectives for police officers based upon quantifiable enforcement activity and stated that supervisors "can and must set performance goals for proactive enforcement."  The court noted that this provision "made clear that supervisors must evaluate officers based on their activity numbers, with particular emphasis on summonses, stops, and arrests, and that officers whose numbers are too low should be subjected to increasingly serious discipline if their low numbers persist."[18] The NYPD has revoked the policies that placed this emphasis on enforcement activity.

The new evaluation system considers 12 dimensions that are essential to quality policing including: problem identification/solving, adaptability and responsiveness, judgment, integrity, application of law and procedures, community interaction, departmental interaction, professional image and maintenance of equipment, quality and timeliness of written reports, initiative, leadership, and implementation of proactive policing strategies/competence in supporting unit's/squad's mission. Only one dimension – implementation of proactive policing strategies – considers enforcement.  The NYPD supervisor's guidebook for preparing the evaluations unequivocally states, "[t]he overall message from the 12 performance dimensions is clear: it is about the quality and effectiveness of our work.  It's not purely about quantitative metrics."

---

[18] *Floyd* Liab. Ord, Dkt # 373, at 78.

In the past, important aspects of police service, like problem-solving and community engagement, were not captured in an organized way and generally not considered during the evaluation process. The new system provides officers with the opportunity to self-report their problem-solving work, their community interaction and engagement, and their notable accomplishments. A notable accomplishment might be an exceptional enforcement action, a medical intervention, a missing person found, a conflict de-escalation, or innovative use of technology.

The system also provides supervisors with the opportunity to prepare positive or corrective Feedback Forms for tasks performed by their subordinates in the 12 different dimensions or categories of skills and activities upon which officers are evaluated. The supervisor's Feedback Form replaces the Minor Violations Log, where supervisors could only record misconduct by officers but could not enter commendations.  The Self-Report and Feedback Forms appear in an officer's monthly Profile Report along with other data points about the officer's work providing a more complete picture of the officer.  Supervisors then evaluate their subordinates in the same 12 categories or dimensions on a quarterly basis.

As the NYPD expands Neighborhood Policing, it is essential that the Department evaluate its officers on the kinds of skills necessary to make this approach work effectively. The Department has new expectations for patrol officers to reflect its prioritization of Neighborhood Policing, and the reformed performance evaluation system is designed to measure the success of officers in meeting those expectations.

## Conclusion

The last five years have been a transformative time at the NYPD during which the Department has holistically reimagined the way police services are provided to the city. Beginning in 2014, the NYPD has moved forward with a series of complementary initiatives that have touched virtually every aspect of its operations, including its patrol model; its operational oversight; its accountability through Compstat and Risk Management; its investigative strategies; its recruit and in-service training, and executive development; its use-of-force policy; its evaluation system for police officers; and its community outreach and assistance to victims of crime. The result is a model of police service for the 21st century that has been institutionalized throughout the Department. While many of the suggestions offered by the Facilitator are thoughtful and meritorious, the Department believes that formal, "court-ordered Joint Remedial reforms," are unnecessary because the majority of them – in some form – are already underway in the Department. By continuing to implement these reforms, the Department and the community will make our way forward together.