

ZACHARY W. CARTER
*Corporation Counsel*

**T**HE **C**ITY OF **N**EW **Y**ORK
**L**AW **D**EPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

DAVID COOPER
*Assistant Corporation Counsel*
phone: (212) 356-2579
fax: (212) 356-3509
email: dcooper@law.nyc.gov

June 8, 2018

**VIA ECF**
The Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *David Floyd, et al. v. City of New York*, 08 Civ. 1034 (AT);
*Kelton Davis, et al. v. City of New York, et al.*, 10 Civ. 669 (AT);
*Jaenean Ligon, et al. v. City of New York, et al.*, 12 Civ. 2274 (AT)

Your Honor:

I am an Assistant Corporation Counsel in the Office of Zachary W. Carter, Corporation Counsel of the City of New York, and the attorney assigned to the above-referenced matter on behalf of defendant City of New York ("City"). The New York City Law Department ("Law Department") respectfully submits comments on the Facilitator's Final Report and Recommendations ("Final Report") with respect to the Joint Remedial Process. The City's comments will focus on procedural and jurisdictional concerns with specific recommendations. Under separate cover, the New York City Police Department ("NYPD") will submit comments on internal policies as they relate to stop and frisk and trespass enforcement.

The Final Report recommends a number of proposals for the Court to consider when fashioning additional equitable relief in the above-captioned cases. The Law Department has not commented on all of the recommendations because they are not in the form of a final order at this time. The Monitorship of the NYPD involves a great number of complex, interconnected policies and practices. Whether an order implementing one or more of the recommendations might run afoul of the proper limits in this case would have to be evaluated in the context within which it was attempted to be deployed. Therefore, it would be premature to analyze the legality of many of these recommendations without more specifics.

However, several recommendations appear to be categorically outside of the scope of the proper exercise of the Court's power to order equitable relief in these cases. The

below remarks serve to provide the Court with the Law Department's observations as to: (1) Recommendation No. 10 ("Use of Stop, Question, and Frisk to Develop Youth Informants"); (2) Recommendation No. 11 ("Mental Health and Disability Training"); (3) Recommendation No. 12 ("LGBTQ-Specific Training and Community Engagement"); and (4) Recommendation No. 13 ("Implementing the Use of Civil Summonses for Trespass Enforcement by Extending the Criminal Justice Reform Act of 2016").

## I. Procedural Background

The Joint Remedial Process was one of several forms of injunctive relief ordered by the Court in Floyd. The Court provided detailed findings of fact before entering injunctive relief in accordance with the Federal Rules of Civil Procedure. *See Floyd v. City of New York* [hereinafter "*Floyd I*"], 959 F. Supp. 2d 540, 572 (S.D.N.Y. 2013); *see also Knox v. Salinas*, 193 F.3d 123, 129 (2d Cir. 1999) ("Pursuant to Fed. R. Civ. P. 65(d), an order entering an injunction 'shall set forth the reasons for its issuance.' Similarly, Fed. R. Civ. P. 52(a) requires special findings of fact and conclusions of law in support of a permanent injunction."); *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 814 (2d Cir. 1975) ("We find it plain that the entry of a permanent injunction without appropriate findings violates the command of Fed. R. Civ. P. 52(a)."). After analyzing an array of evidence, including statistical analyses of the NYPD's UF-250 database and witness testimony, the Court found that the evidence demonstrated that the City's prior stop and frisk policies ran afoul of both: (1) the Fourth Amendment's command that reasonable suspicion requires an individualized suspicion of wrongdoing for stops and frisks, *see Floyd I*, 959 F. Supp. 2d at 660; and (2) the Fourteenth Amendment's prohibition against "selective enforcement of the law based on considerations such as race." *See Floyd I*, 959 F. Supp. 2d at 660-61 (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

When entering the injunction in *Floyd*, the Court affirmed that "it is the essence of equity jurisdiction that a court is only empowered to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *See Floyd v. City of New York* [hereinafter "*Floyd II*"], 959 F. Supp. 2d 668, 674 (S.D.N.Y. 2013) (quoting *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011)). Accordingly, the *Floyd/Ligon* Remedial Order requires that "the Joint Process Reforms must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments." *See Floyd II*, 959 at 687. Therefore, any remedial measure proposed in the Final Report must remedy a harm that lies at the intersection of lack of individualized suspicion (the Fourth Amendment violation) and racial profiling (the Fourteenth Amendment violation). For the following reasons, the Law Department believes that several recommendations are broader than necessary to cure the harm found in *Floyd I*.

## II. Recommendation 10: Use of Stop, Question, and Frisk to Develop Youth Informants

During the Joint Remedial Process, several participants in the focus groups remarked that stop and frisk had been used as a pretext for recruiting people to become confidential informants for the NYPD. *See* Final Report, at 251. The Facilitator noted:

> Although this issue, on the surface can be viewed as unrelated to stop, question, and frisk, and trespass enforcement, it is important to note that community members participating in focus groups and forums expressed the "stop" as being the initial contact in the development of some youth as informants. Essentially, it was reported that stops were used as excuses to engage youth.
> *See* Final Report, at 252-53.

In order to remedy this reported pretextual use of stop and frisk, the Facilitator recommended that "the NYPD create an auditing protocol for the review of youth-involved interactions and measures to address issues related to a violation of the Department's confidential informant policies." *See* Final Report, at 253.

The Law Department respectfully submits that the Court's findings of fact and conclusions of law pursuant to Rule 52(a)(1) never addressed the substance or application of the NYPD's confidential informant policy. As the Final Report acknowledged, stop and frisk is only tangential to the reported conduct at issue—namely, recruitment of confidential informants under the age of eighteen. Therefore, the Law Department believes that an order to audit the NYPD's compliance with its confidential informant policies would exceed the scope of the harm found in *Floyd I,* and such an order would exceed the proper scope of equitable remedies available in these cases.

### III.   Recommendation 11: Mental Health and Disability Training

The Facilitator recommended that "the Court order that the NYPD develop SQF training that includes specific units on engaging with people with mental, physical, or developmental disabilities, including different types of scenarios that officers may encounter in serving such individuals," and observed in support of this recommendation that "the behaviors of mentally ill or disabled individual[s] who are being questioned by police officers may be misinterpreted as furtive movements . . . ." *See* Final Report, at 253. Although furtive movements were addressed in *Floyd I*, this recommendation is not tailored to the particularities of the NYPD's stop and frisk policies that were laid out in detail in *Floyd I*.[1]  *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) ("We have instructed that injunctive relief should be narrowly tailored to fit specific legal violations, and that the court must mould each decree to the necessities of the particular case.") (internal citations omitted) (internal quotation marks omitted).

The Court's findings of fact and conclusions of law pursuant to Rule 52(a)(1) did not identify any issues relating to the NYPD's interactions with people with mental, physical, or developmental disabilities. Whatever the overall merits of the Facilitator's recommendation, in

---

[1] For example, the Court analyzed how often furtive movements were checked off on UF-250s and linked this to racial profiling, observing that "[u]nconscious bias could help explain the otherwise puzzling fact that NYPD officers check[ed] 'Furtive Movements' in 48% of the stops of blacks and 45% of the stops of Hispanics, but only 40% of the stops of whites." *See Floyd I*, 959 F. Supp. 2d at 581.

this case, injunctive relief that orders these trainings does not satisfy Federal Rules 52(a)(1) and 65(d).

### IV.   Recommendation 12: LGBTQ-Specific Training and Community Engagement

After engaging with members of the LGBTQ community, the Facilitator recommended that the Court order: (1) "more training around LGBTQ communities and de-escalation"; and (2) "that the [NYPD] monitor adherence to the 2012 Patrol Guide Revisions and take steps to ensure implementation." *See* Final Report, at 254-56. These recommendations were designed in part to address "the sense that this community was being targeted by the NYPD for unconstitutional stops often ostensibly for the offense of loitering with the intent to commit prostitution." *See* Final Report, at 254. There is no basis to support this type of injunctive relief. Addressing these community concerns and advancing these policy goals does not address a harm at the intersection of the Fourth and Fourteenth Amendments, as identified by the court in *Floyd*.

### V.   Recommendation 13: Implementing the Use of Civil Summonses for Trespass Enforcement by Extending the Criminal Justice Reform Act of 2016

The Facilitator recommended that "the Court order the City to extend the CJRA to create a civil trespass violation in the City's administrative code, and to adjudicate these cases in OATH." *See* Final Report, at 259. This recommendation is not narrowly tailored to address unconstitutional stops and frisks in New York City Housing Authority ("NYCHA") or Trespass Affidavit Program ("TAP") buildings, but is instead targeted at the collateral consequences of trespass arrests regardless of their legality: "Such an approach would help address the concerns of some residents and minimize the issuance of arrest warrants and permanent records." *See* Final Report, at 258.

The City believes that minimizing collateral consequences of arrests is a laudable policy goal and has taken steps to reduce them in other areas.[2] However, the issue of collateral consequences was not at issue in any of the prior proceedings, or prior remedial orders. Therefore, there is no evidentiary basis to support injunctive relief for this remedy.

Moreover, even if this were an appropriate subject of injunctive relief, the Second Circuit has cautioned against needlessly interfering with local government institutions when crafting injunctive relief. *See Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 198 (2d Cir.

---

[2] *See, e.g.*, *The Criminal Justice Reform Act: One Year Later*, N.Y.C. COUNCIL (2017), https://council.nyc.gov/the-criminal-justice-reform-act-one-year-later/ (recounting a ninety percent drop in criminal court summonses over a yearlong period and noting reduced collateral consequences); *NYC Commission on Human Rights Legal Enforcement Guidance on the Fair Chance Act, Local Law No. 63* (2015), N.Y.C. COMM'N ON HUMAN RIGHTS (June 24, 2016), https://www1.nyc.gov/assets/cchr/downloads/pdf/FCA-InterpretiveGuide-112015.pdf (discussing the Fair Chance Act which helped to reduce collateral consequences relating to arrest history).

2014) ("[O]ne of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions.") (quoting *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990)); *see also Schwartz v. Dolan*, 86 F.3d 315, 319 (2d Cir. 1996) (remarking that a district court's "discretion to frame equitable relief is limited by considerations of federalism, and remedies that intrude unnecessarily on a state's governance of its own affairs should be avoided."). This caution highlights significant difficulties with this recommendation.

The Law Department notes that the City's "Criminal Justice Reform Act" (CJRA) refers to a package of local laws that generally affected and amended unclassified offenses, contained in the City's Charter and Administrative Code. The Facilitator's recommendation goes further in that it seeks to extend CJRA to classified offenses established by the New York State Penal Law.

Although the City has recently taken limited legislative action related only to a single offense (in Local Law 229 of 2017 related to "disorderly behavior"), the legal and policy merits of a further extension of CJRA to the hierarchy of offenses in Article 140 of the Penal Law concerning burglary and trespass would require careful review by governmental actors, including the Law Department, the City Council and the Office of the Mayor. Moreover, the recommendation implies that the Court would order the City, acting through its City Council and Mayor, to take a legislative action that would ordinarily be within the exclusive policy discretion of the Council and Mayor. Involving the Court in the details and process of compelled legislation in furtherance of a remedy that goes beyond the core issues at stake would raise serious questions of both federalism and separation of powers.

## VI. Conclusion

The City recognizes the valuable service the Facilitator and his colleagues have provided in creating one of the largest police-focused surveys of residents in the country. Gathering and organizing community members' input on their perceptions of the City's policing policies was a time-intensive, worthwhile effort. The Final Report highlighted community concerns about a wide range of police-related topics, and although the City believes that some recommendations cannot be converted into an order in this case, the Final Report memorializes these concerns, and can serve as a useful common point of reference for dialogue among all stakeholders going forward. As to those recommendations within the proper scope of this case, the City anticipates working productively with the Monitor to develop and implement appropriate measures to achieve the goals shared by everyone involved—a safe city, policed constitutionally.

Sincerely,

/s/

DAVID COOPER
Assistant Corporation Counsel
Special Federal Litigation Division


cc: **VIA ECF**
*All Parties on Record*