# Arnold&Porter

Peter L. Zimroth
+1 212.836.7316 Direct
Peter.Zimroth@arnoldporter.com

June 25, 2018

<u>VIA ECF</u>

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007-1312

<div style="margin-left:2em">

Re:  *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
 *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
 *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
 <u>Recommendation Regarding In-Service Stop and Frisk Training for Patrol</u>
 <u>Officers</u>

</div>

Dear Judge Torres,

On December 5, 2017, this court approved training materials for NYPD's in-service training on Investigative Encounters for NYPD supervisors (sergeants and lieutenants). The training covered the fundamental principles of stop, question and frisk, trespass enforcement, and bias-free policing, and the materials conveyed the changes in NYPD procedures and what is expected of officers and supervisors regarding the documentation and supervision of stops.  The training materials I am submitting today are those for patrol officers and are based on what was approved for sergeants and lieutenants.

The Department started the stop and frisk training with supervisors in 2017.  Several thousand sergeants and lieutenants have now been trained.  The Department began training its patrol officers this February to pilot proposed changes to the training materials.  To increase the effectiveness of the training, the classes have been limited to 30-35 officers per class.  The course will be taught every weekday on both the day and evening tours.  The NYPD estimates that it will take up to 18 months for the bulk of its patrol officers to have taken the training.

Much of the training material for officers is the same as the training material for supervisors. As with the supervisors' training, officers will see the important statement by the Police Commissioner that explains how the training grew out of the stop and frisk litigation, how the overuse and misuse of stop and frisk harmed both the Department and some of the communities it serves, that the responsibility for this misuse rests with the leadership of the Department, and that the Department now owes its officers a comprehensive training course so they understand what, under the law and Department procedure, they can and cannot do. The video can be seen at http://nypdmonitor.org/resourcesreports/training.

Officers in the class will take the same pre-class written quiz that the supervisors took. The legal refresher course before the meal break is practically identical to the one approved by the court for the supervisors. However, the NYPD has added additional material covering the new Right to Know law. At the end of the legal refresher, the officers will take a SurveyMonkey quiz to assess whether the content of the class was absorbed by those attending.

The post-meal session covers when stop reports are required and how to complete them, particularly the narrative sections. Much of this material is the same as what was covered in the supervisors' training. The NYPD has added language regarding procedural justice and the Right to Know law. It has deleted some material from the supervisors' training that focused on the sergeants' and lieutenants' role as supervisors, particularly with regard to how to supervise stops and how to discuss stop reports with their subordinates. For the officers' training, the post-meal session will include reviews of body-worn camera (BWC) footage involving investigative encounters, after which the instructors will discuss both good and bad examples of stop reports for those encounters. Although the scenarios and BWC footage used in the officers' training are

different than those used for the supervisors' training, the substance of the material regarding the applicable legal standards and Department procedures is the same.

Training officers on stop and frisk is a critical component of the reforms in these cases. The training materials before the court meet the requirements of the court orders and the law. For this reason, I am recommending that the court approve the NYPD's in-service training materials for patrol officers on Investigative Encounters.

I am attaching the following for your review and approval:

1. Investigative Encounters In-Service Training: Instructor's Guide, Part IIA, for Officers
2. Investigative Encounters In-Service Training: Instructor's Guide, Part IIB, for Officers
3. Investigative Encounters In-Service Training: PowerPoint Presentation, Part IIA, for Officers
4. Investigative Encounters In-Service Training: PowerPoint Presentation, Part IIB, for Officers

The parties have informed me that they do not object to the approval of this recommendation.

**Redactions and Materials Filed Under Seal**

As with the supervisors' training previously approved by the court, I am submitting certain of the materials under seal and others with redactions. I am submitting for your approval the two Instructor's Guides (Part IIA for use before the meal break and Part IIB for use after the break) and the two corresponding PowerPoint presentations (also labeled Parts IIA and IIB).

Similar to the materials for sergeants and lieutenants, these materials include an anonymous quiz at the beginning of the class and a SurveyMonkey questionnaire after the legal portion of the training. The parties agree that, for pedagogical reasons, the quiz and SurveyMonkey questionnaire should not be available to members of the service before the training, and that those materials do not need to be part of the materials submitted to the court for

approval (although, for the court's information, they will be filed with the court under seal).  In addition, there are some parts of the Part IIA Instructor's Guide and PowerPoint presentation that reference the quiz questions and answers.  I have deleted the quiz answers from the Instructor's Guide and the PowerPoint presentation in my ECF filing but am filing un-redacted versions of the Part IIA materials under seal.

The training materials also include BWC videos and related lesson plans.  For forensic reasons, the parties agree that the BWC videos and lesson plans should not be part of the public record.  Neither the parties nor I believe that these materials require your approval.  However, the court may wish to review them to get a broader sense of the training.  For this reason, I am submitting under seal for your information the BWC videos and the lesson plans for the videos.

Respectfully submitted,

/s/ Peter L. Zimroth
Peter L. Zimroth
Monitor

Attachments:
1. Investigative Encounters In-Service Training: Instructor's Guide, Part IIA, for Officers
2. Investigative Encounters In-Service Training: Instructor's Guide, Part IIB, for Officers
3. Investigative Encounters In-Service Training: PowerPoint Presentation, Part IIA, for Officers
4. Investigative Encounters In-Service Training: PowerPoint Presentation, Part IIB, for Officers

# **Attachment 1**
## Publicly Filed with Redactions

# INVESTIGATIVE ENCOUNTERS IN-SERVICE TRAINING

# INSTRUCTOR'S GUIDE
## Part IIA

**Training Objectives**:

After attending this course, Members of the Service should understand:

1. The levels of investigative encounters, namely, Request for Information (Level 1), Common Law Right of Inquiry (Level 2), and *Terry* Stops (Level 3); the level of information or suspicion required for each level; and the investigative tools and authority that is available to an officer at each level.
2. How to use proper tactics during Investigative Encounters to ensure their safety, including the proper use of "protective measures" when an officer has a safety concern but does not have reasonable suspicion that a person is armed and dangerous.
3. The requirements of PG 203-25 (Prohibition Against Racial Profiling/Bias-based Policing), PG 212-11 (Investigative Encounters), PG 212-59 and 212-60 (Interior Patrols).
4. The importance of calibrating tone and actions to ensure that people who are questioned during Level 1 and 2 encounters feel free to leave.
5. When a frisk may and may not be performed during a Level 3 *Terry* stop.
6. The importance of conducting investigative encounters in a safe, professional and respectful manner and the importance of *explaining* to individuals at the conclusion of the encounter the reason they were approached or stopped.
7. The documentation and supervisory responsibilities associated with Investigative Encounters.

**Required Materials**:

1. Investigative Encounters PowerPoint presentation
2. Mounted poster-size 1-2-3 *DeBour* Chart
3. Copies of pre-quizzes for the class
4. Tally sheet for the pre-quiz
5. Blank Stop Reports, Mock Stop Reports, and Trespass Crime Fact Sheets
6. Attendees will need their Department smartphones. Each member of the class will be sent an e-mail with the link to the Survey Monkey quiz and copies of the new Stop Report, the new Trespass Crimes Fact Sheet, PG 212-11, PG 212-59, PG 212-60, and PG 203-25.

This course is a full tour. The first half will be an interactive lecture on the law and procedures of Investigative Encounters and will be co-taught by an attorney and UMOS instructors. The second half of the class involves scenario-based training.

This Guide reads like a script, but it is not intended to be one. It is a GUIDE. The comments associated with each slide are meant to provide background and suggest methods of presenting the information, but there is not enough time allotted for the legal lecture to say every word in this Guide. Instructors should strictly adhere to the legal principles in this Guide, and should cover the included topics, but should otherwise teach in a natural, interactive and concise manner. The PowerPoint, however, cannot be modified other than by the NYPD's Risk

Management Bureau after consultation with the federal monitor.  You will see that one introductory slide is optional, but otherwise the PowerPoint slides should not be deleted, changed or added.  PLEASE ENSURE YOU ARE USING THE MOST RECENT VERSION OF THE TRAINING MATERIALS.

**Getting Started**:

The first thing the class will be asked to do after signing in is to complete a short pre-quiz.  The purpose of the pre-quiz is two-fold.  (1) It will allow the instructors to gauge whether the attendees benefit from the course when they compare the results with the results of the Survey Monkey quiz after the legal refresher and (2) the instructors who tally the grades will hand the tally sheet to the instructor(s) doing the introduction.  If the class didn't do well, that can be mentioned to reinforce why the attendees really need to tune in.

Beta testing of this course revealed that some officers come into the class with some agitation over this topic.  They frequently convey concerns that the law is confusing and unrealistic.  They also convey concerns about CCRBs related to stops and what they perceive as the unfairness and harshness of those proceedings (not only because of the sanctions but the lengthy delays in the resolution of CCRB cases).  They express fear about doing stops, but the fear is not based on the inherent physical danger in conducting stops.  Rather, the fear is based on a concern that if they do their jobs, they do stops, and people file complaints, the Department won't have their backs. In other words, they are not afraid of doing their jobs, they are afraid of "The Job."

The attorney instructors need to acknowledge these concerns as they kick off the class in order to establish some credibility and avoid looking like someone who knows the law on the books but nothing about the reality of their job.  The instructor may want to vent for them, or allow some brief venting from them, but then pretty quickly, the instructor needs to get them to where they need to be: the reality is that they need to know this material.  If they do, they'll be less likely to get a CCRB complaint in the first place, and if they do, they'll be better prepared to confront it.

Questions regarding the CCRB may come up, so instructors should be prepared for comments about the CCRB.  UMOS instructors should help field these questions. The reality regarding CCRB stats is that the cases where the CCRB actually brings charges is way down (as of late 2016), and today (as compared to pre-2014 cases), the dispositions on bad stop cases are far more likely to be training rather than taking vacation days from an officer (which was more common in prior years).  The CCRB even acknowledged that the law surrounding investigative encounters is complex and that their prior approach of always recommending days was something they were moving away from in favor of training.  See pp. 45-46 CCRB's 2014 Annual Report:
http://www.nyc.gov/html/ccrb/downloads/pdf/2014-annual-reportrev2layout.pdf

Again, instructors should avoid spending too much time on the topic of CCRBs.  We can't change the fact that there will be CCRB complaints about stops, but we can improve an officer's chances of avoiding a CCRB or prevailing if there is one.  The above content is offered to prepare instructors for questions, not to affirmatively lecture on the topic.

Finally, many practitioners share the officers' frustration regarding *DeBour* and its progeny, but dwelling on how convoluted the case law is when teaching officers truly won't be helpful to them. The "grayness" can be acknowledged, but the goal of this course is to have officers walk out at the end of the day confident that they have a command of the basic framework of *DeBour*. They need to be able to understand it, apply it when making quick decisions, and then be able to articulate the rationale for their actions. Get in the habit of answering their "what if" questions with a clear "in my legal opinion that hypothetical is a level x because of (provide the reasons) and the officer could do y, and if she did, I would be prepared to litigate the validity of the stop in court" rather than saying "it's not clear," "it depends on the judge" or things of that nature. Better yet, try to get them to answer their own "what ifs" and then you follow up.

The goal of this training is to have our officers be confident in the fundamental principles of the *DeBour* framework. It is boiled down to 6 tools and they just need to know when they can reach for them. We want them to understand the basic framework and refresh themselves on it from time to time (with an online resource center that already exists). We want them to conduct Investigative Encounters in a fair, lawful, professional and a tactically-sound manner. And we want them to prepare professional paperwork. Those are the essential goals.

In addition to this Guide, instructors may also want to read Chapter 2 of Barry Kamins's New York Search & Seizure treatise. Instructors will also be provided with a "Case Examples of Levels 1, 2 & 3" chart that contains examples of Investigative Encounters from case law.

# INTRODUCTION

- UMOS instructors should hand out blank index cards.  Instruct class to write the first thing that comes to their minds when they hear "Stop and Frisk."
- UMOS instructors should hand out the 5-question pre-quiz and direct the class to complete it.
- Make sure they know the quiz is anonymous
- Quizzes and index cards should be collected before playing the PC video.  There are a number of ways the index cards can be used (see p. 9 for examples)
- UMOS instructors should grade quizzes using the tally sheet.
- Advise class of the program for the day/evening (first half is lecture-based with breaks and the second is hands-on scenarios)
- Advise class of what they can achieve by the end of the class:






Then a brief message from the Police Commissioner:

Video message: There was a debate in New York City during the past several years about the NYPD's use of stop, question, and frisk.  It was a tool that was over-used and sometimes misused, and that led to widespread resentment and distrust of our Department, especially in communities of color.  To be clear: I'm not laying fault for this on you. You did what the leadership of the Department asked, and the leadership bears responsibility for the consequences. The NYPD has since scaled back on stops dramatically.  The Department is now working with a court-appointed federal monitor to ensure that stop, question, and frisk in New York City meets constitutional standards.  The law surrounding this policing tactic can seem complicated, but it is critically important that we learn the law and work within its confines.  Doing so will protect you from legal action. It will also help preserve an essential policing tool.

In 1968, the U.S. Supreme Court recognized that – to do our job – officers must have the authority to conduct lawful stops based on reasonable suspicion of criminality. Cops know that stops help prevent and solve crimes every day. But it is also clear that their overuse, or misuse, undercuts both the legitimacy of the stops and the legitimacy of the police. As we move forward with neighborhood policing and seek greater connectivity with every community across the city, it is essential that enforcement generally - and investigative encounters in particular - are conducted with precision. Large numbers of arrests, summonses, and stops are not our goal. A safe city, is our goal. And we can best achieve it by working more closely with the people in every neighborhood, and by exercising our police powers with discretion and good judgment. Today, you will receive refresher training on the law of investigative encounters. Every member of the service, at all ranks, will be receiving this same training. Despite the debate, nothing has changed or diminished your authority in this area. You can still make a stop when you reasonably suspect that a crime is occurring, has occurred, or is about to occur. Our city's safety depends on good police work and strong community partnerships. I expect you to conduct investigative encounters lawfully and with the confidence that comes with a thorough knowledge of the law. This training will help you do what you do best – keep our city safe.

==Attorney portion of the lecture begins here and goes to the conclusion of this Guide.==

[We have found that asking the members of the class whether they have ever been stopped by the police can often lead to a very effective conversation in terms of the learning objectives for this class. Unfortunately and invariably, if the officers do raise their hands, they are often disproportionately officers of color. And if they feel comfortable enough to talk about their experiences, the anecdotes provide a range of both professional and unprofessional stops that can be used as references during the lesson. The conversations generally provide a glimpse back into the height of "Stop and Frisk" and the impact it had on communities of color. The conversations can powerfully convey the importance of being a professional and explaining your actions, and can sometimes help illustrate improper uses of race in law enforcement decision-making, as well as the negative impact such improper uses have on the persons stopped and their views and trust of police. The officers who were stopped can vividly remember details about the demeanor and actions of the officers who stopped them and it allows the lecturer to make the point that the level of professionalism the members of the class themselves use will also stay with the people they stop. The individuals they stop will remember their professionalism (or lack of it) when and if they are asked to be a witness in the future, they will remember it when they are called for jury duty 10 years later and have to assess the credibility of another officer, and they will remember it during any future encounter with a police officer. It will be part of their opinion about police officers. Anecdotes about pedestrian stops tend to be more productive than car stops for purposes of this class.

Depending on the instructor's style, the instructor may wish to: (1) ask the question and elicit anecdotes at the start of the class (keeping the conversation to about 10 minutes) or (2) just ask for a show of hands and come back to their anecdotes later in the lecture or (3) ask the question and elicit anecdotes when they are at or near the "One of your most powerful tools – how you talk to people" slide.]



This chart shows the number of stops conducted by NYPD officers from 2003 to 2017 – that's the blue. You can see it skyrocketed, peaking in 2011 at over 600,000 stops.

After rising public complaints, and after the Department was sued for its "Stop and Frisk" practices, the number of stops falls off a cliff.  There were about 22,000 reported stops in 2015. And in 2016 the number went down by another 10,000 approximately to 12,336.  The number of stops then slightly decreased in 2017. There were 10,861reported stops in 2017.

The red line is the crime rate for the "7 Majors."[1] [What does the class think of that?]



The PC in his message talked about where we've been with "Stop and Frisk" and where we need to go. He talked about the impact it had on our communities of color - and we can see it.  If we take 2011, when stops peaked, of the more than 600,000 stops that year, 51% of those questioned were black, 33% were Latino, and 9% were white, and stops of blacks were *less* likely to result

---

[1] The "7 Majors" are: murder and non-negligent manslaughter, rape, robbery, felony assault, burglary, grand larceny, and grand larceny of a motor vehicle. It does not include criminal possession of a weapon.

in an arrest than were stops of whites. How do you think the low correlation between stops and arrests affected people in communities of color who were stopped?



How has the decline in stops impacted the effectiveness of stops?  They are better.  A stop is more likely to yield an arrest or the recovery of contraband or a weapon because our stops are more accurate – we're using precision policing.



[The slide is a reference to what some officers refer to in class as "the numbers game." Instructor can use the index cards collected from the class to facilitate this discussion. Instructors can redistribute the cards and have members of the class read the cards of other members, the attorney instructor can read them out, Academy staff can compile a list of words from the cards on a sheet or posterboard, etc.]

These practices also had impact on you, and the changes that are being implemented also obviously have an impact on you.

8

In 2011, and the years leading up to it, cops were pushed beyond the point they should have been pushed to do stops.

After teaching a number of these classes, we've heard what some of you think about the topic of "Stop and Frisk."  We've started classes with "venting sessions" that have gone on for 2 hours. The reason we wanted people to be able to vent is because we felt if they didn't get it off their chests, they'd be less able to absorb the very important information you are going to hear today.

But we don't have two hours.  So let me vent for you.  (Alternatively, instructor may want to facilitate a brief class discussion).

I'm going to ask you to raise your hand if you agree with even just one thing I say.

Officers have said:

The law is confusing.
I don't know what's expected of me anymore.
With the environment that we're in now, it's not worth stopping anyone because the Department won't have our backs.
And it is definitely not worth doing the 250/Stop Report.  That form is toxic and there's too much paperwork - it's like doing a mortgage application.

Who agrees with at least one thing I said?

[This next slide is optional.  The point of the next slide is to get the class to see that, regardless of their gripes, this information is essential to their duties.  Instructors can use alternate ways to make this point and transition to the law.]

I get it.  But you still need to know the law - for MANY reasons -  and I'm going to give you a few of them right now:



1. Despite frustration with this, at the end of the day, you're going to do your job. If you saw, let's say, me/my sister/wife/daughter/mother walking home at 11 p.m. one night, being one of those typical, oblivious New Yorkers engrossed in my/her cellphone while walking, and you see 3 young guys following me/her, getting close but being careful not to get too close -- and they look very serious, they are dressed in dark clothes.  Each of

them ocassionally looks around as if they are checking to see if they are being watched. They are pointing at me/her as they follow me/her. And they follow me/her for 4 different turns during the route home. It's obvious. They are casing me/her. And what are you going to do about it? You know exactly what you are going to do. You are going to act. And it's going to bring you into the law of Investigative Encounters.

2.  The radio (and DPs). Putting aside the proactive work, the radio is always going to bring you into this subject. The robbery 2 minutes in the past with a description, or the anonymous gun run, these jobs bring you right into this area of law. And when you have to deal with them, it's important that you get it right. You can't competently do your job without knowing the basics.

3.  [Tell story re: DPs] In 2016, a perpetrator shot at two detectives in a borough that will remain namless. It turns out, the individual who shot at the cops had 3 prior gun collars DP'd. (The officers were shot AT, not shot). I wish I could say the DP's were all the fault of the screening ADAs. No. They were bad stops. We didn't get it right. Three times. Not the first, second, or third time. So this guy was free to get out and get another gun, time after time, and ultimately he used one of them to shoot at cops. Getting a gun off the streets is good, but getting the gun AND the bad guy is much better. So we need to get this right.

4.  I want you to be the smartest guy/woman in the room when it comes to this stuff. The "room" might be a street corner where someone is telling you "you can't stop me," or it might be on the phone with an ADA challeging you about the legality of your stop, or it might be in a CCRB interview. If you know the framework, if you are reasonable in applying it, and can articulate the reasons for your actions, you will incredibly increase your chances of avoiding the CCRB and the DPs.

So, hopefully I've convinced you you need to know this.       ***


[The Quiz Results?]


And so do you? Look at the tally sheet for the quiz – instructors should have cued you regarding the results. If the class didn't do well, tell them how many people got Ds or Fs. You can tell them that they weren't asked to take the quiz just to embarrass them about what they don't know. We need to know what we don't know. And we (as instructors) need to gauge whether what we're teaching here helps them learn it (because there will be another short quiz at the end of the refresher).



PG 212-11 has been revised. All of the do's and don'ts we're going to talk about today are in it. It grew from about 3 pages to about 12.  And no, it's not just 12 pages of different ways you can be disciplined.  You have ALWAYS been held to these standards, but the standards appear in various different Legal Bulletins that have been issued over the years.  Now, you have all of the information in one place.  Read the procedure.

I can pretty much guarantee that today, some of you – maybe even most of you - are going to say at some point during my presentation, when I'm going over some aspect of the law, "That sounds new.  That's not what I learned."

There was one change in 2000 regarding anonymous jobs which we'll talk about, but otherwise, the law hasn't really changed much since the 70's.   Most of you graduated from the academy after 2000, so for you, the law is essentially the same as what you learned in the academy.  But what happens is that you go out into the real world and those crisp legal principles you learned in the Academy fade into shorthand that you come to believe is correct, maybe because some stationhouse lawyer told you to forget what you learned in the Academy.  That's why we are here - to freshen you up.



The Dept. acknowledges that these encounters are complex and that you have to make decisions quickly.  It says it right there in the Patrol Guide: isolated good faith mistakes should not make an officer lose days.  Good faith does not mean good intentions (like the desire to get a gun off the street), and it is not an excuse to avoid learning and retaining the law and applying it reasonably. But if you do maintain a command of these principles and in good faith, you

11

reasonably conclude a situation justifies a Level 3 encounter, if others weigh these sometimes close-call facts differently later in the trial room, the outcome for such isolated good faith mistakes should be training.

While these encounters can be complex, we're going to try to un-complicate the law for you today. You need to make quick decisions, sometimes split-second decisions. So we're going to draw bright lines for you today. Literally – the lines are in the shape of a triangle I'm about to show you. All we can ask you to do is to know the framework and then make reasonable calls.



We are about to get into the law, but before we do, I need to make something crystal clear. No one, not from the PD, from the DAs Offices, no one anywhere, wants you frozen thinking "uh, is this a Level 2? Or a 3?" when you are dealing with a potentially dangerous investigative encounter. And we never want you to feel like you have to choose between being safe and being lawful.

And if I say something today that makes you think you will have to choose between being safe and being lawful, call me out on it. The class is always better when you do.

If you know the framework and work it, you won't have to choose. Know it well. If it is second nature then you can focus on what we want you to focus on: safety and tactics.

# MOVING INTO THE LEVELS



[The attendees are getting the above populated triangle graphic as a handout. Tell the class to take a picture of the handout with their phones so they have it with them always. ]

This is the law of Investigative Encounters in New York.

Simple as 1-2-3.

It comes from a New York State Court of Appeals case called *People v. DeBour*.[2]  In that case, our highest court set up this framework.  Basically, with investigative encounters, officers have an increasing scale of authority, but it is based on the information you have.  The more information you have, the more tools and authority you have.  Information is power.

There are 3 levels of pre-arrest Investigative Encounters (name them using chart).

Is there a Level 4?  Yes, that's an arrest – probable cause.[3]  We'll talk about Level 4 later.

Is there a Level Zero?  Not officially, no, but saying hello, giving directions, talking to people in your community, these are the things that should be happening and they are not on this scale.

To get on this scale, it means you are investigating something.


[The instructor can then briefly use the populated scale to list off the tools at each level.  Full explanations for each tool will come later.  It helps if the class is at least exposed to the Level 3 list for the Level 2 discussion on anonymous calls.]





You need to understand this concept for all 3 of the levels, so we're going to tackle it upfront.

This concept – <u>whether the person you are questioning feels free to leave</u> – comes up in all 3 levels.

---

[2] 40 N.Y.2d 210 (1976)
[3] *People v. Moore*, 6 N.Y.3d 496 (2006) ("[L]evel four arrest requires probable cause to believe that the person to be arrested has committed a crime.").

At Levels 1 and 2, the people you're questioning are free to leave.
At Level 3, they are not.

Whether the person is *treated as* though he's free to leave, and whether the person *actually feels free to leave* matter.[4]  The law, and our courts, look at what the officer knew, the information he had, and his actions, but they also look at the encounter from the other person's shoes – the person you're questioning.

Officers cannot make a person feel as though he/she is not free to leave during a Level 1 or 2 encounter. And if the person asks whether he/she is free to leave during a Level 1 or 2 encounter, you must tell the person that he/she is free to leave.

At Level 3, however, the person is NOT free to leave, and it is appropriate for officers to take actions that convey that.

The law defines a "stop," that is, a Level 3 *Terry* stop, as any investigative encounter in which a reasonable person would not feel free to disregard the officer and walk away.  The court will look at your actions.  Did you yell "stop!"?[5]  Did you and your fellow officers surround the person or block his path in a way that deprived him of freedom of movement, put your hands on him to stop him, threaten him, or draw a firearm?[6]  Any one of those actions will likely make the person feel that he or she is not free to walk away.  What the courts are asking here is whether you, by your words or actions, created a situation where the person would not feel free to leave. If you did, then it's a Level 3 *Terry* stop.  It's a detention.  And courts will consider whether you had enough information – whether you had Level 3 reasonable suspicion to support that stop.  If you had enough to support reasonable suspicion, then those actions that created a situation where a reasonable person would not feel free to leave are fine because IN FACT the person was NOT free to leave.

The problem arises when you only had a Level 1 or Level 2 amount of information but you handled the encounter like it was a stop, such as chasing someone when you only have Level 1 information – then we have a problem.  We have a problem because you reached for a tool – making someone feel stopped - before the information brought you to that level of authority.  You reached for a tool you didn't have yet.  That's when we confront things like the suppression of evidence.

At Level 1 AND Level 2, the person you are questioning is free to leave, and your actions and words can't make him feel otherwise.  We cannot elevate an encounter by our actions before the facts take us there.  If we chase someone at a Level 1 and he tosses drugs, that chase would

---

[4] *Florida v. Bostick*, 501 U.S. 429 (1991).
[5] *Ligon v. City of New York*, 925 F.Supp.2d 478 (S.D.N.Y. 2013) ("Indeed it is difficult to imagine many contexts in which an officer shouting [STOP, POLICE!!!], followed by the person stopping, would not constitute a *Terry* stop.").
[6] *United States v. Mendenhall*, 446 U.S. 544 (1980) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.") (Stewart, J. concurring).

violate the Constitution and Department policy, and thus the court will likely call that a forced abandonment and suppress the drugs.[7]  If we frisk at Level 2, that frisk would violate the Constitution and Department policy, and any gun we recover will therefore get suppressed.[8]  We can't reach for a tool unless the facts take us to the level where the tool is available.

We can't make a person feel as though he's not free to leave until we get to Level 3.  At that level, he is in fact not free to leave.

Some officers say, "if my partner and I walk up to someone, just the mere fact that we're police officers asking questions can make a person feel like they are not free to leave, no?"

Maybe some people are that sensitive about cops, but that's not how the law says a reasonable person should view it.  The mere fact that you are in a uniform or have a shield and you're asking someone questions does not create a "stop."

It's not *who* you are.  It's *how you act*.  It's how you ask the questions, and it's your words, your commands, your actions.

The point is that you need to control the intensity of the interaction.

During these encounters, if at any point you feel you raise the intensity of the interaction beyond where the facts have taken you, you can dial it back.

Examples on how to:  "Sir, I'm not holding you here, but the reason we're here doing this interior patrol is because the building has problems.  We want to keep everyone safe, and to do that we have to make sure everyone who is here has the right to be here, and that's why I am asking you these questions…."

---

[7] *See People v. Holmes*, 81 N.Y.2d 1056 (1993).
[8] *Matter of Darryl C.*, 98 A.D.3d 69 (1st Dept. 2012).

 

## Level 1

### Request for Information

### Objective Credible Reason

At a Level 1 Request for Information, you are looking into something, you are investigating something, but it does not necessasrily have to be a crime.  It could relate to criminality but it could also relate to a public safety function.

To approach and conduct a Level 1 Request for Information, you need AN OBJECTIVE CREDIBLE REASON  to approach.

WHAT DOES THIS MEAN?   The reason is based on facts and observations.  It's more than a mere hunch.

OBJECTIVE = it's not just what YOU in particular think, but what a reasonable person would see as a credible reason.

CREDIBLE = means it's believable.

A key feature of Level 1 is that you have no basis (or at least not a strong enough basis) to regard the person you're dealing with as a suspect.



Let's look at some EXAMPLES of Level 1 encounters (advise class that the examples you are going to talk about today are based on case law):

1. Sick Person:  You see a man on the ground.  He looks sick.  You go over and ask: "Sir, are you feeling ok?  Do you need assistance?"   You are asking him questions. You are acting on a concern for his safety and well-being. You are looking into something, but at

16

this point you have no reason to think you are investigating a crime – this is a Level 1 encounter.  Let's say it turns out this person is very sick, he passes out within a few seconds, you call EMS, and he's taken care of.  That started as a Level 1 and ended as a Level 1.  New York Search and Seizure ("Kamins") § 2.02[1] (Person in distress).

2.  Shots Fired:  You are responding to a job for shots fired near the courtyard of an apartment building.  It's about 9 p.m.  You get there within a few minutes and you see many people just hanging out, including some people gathered near and on a park bench. They are just calmly sitting there talking.  You have no basis to regard the people on the bench as suspects.  They might be witnesses and you have a basis to go up and request information, such as whether they saw or heard anything.  Kamins § 2.02[1] (Possible witnesses).

3.  Cabbie and Passenger Arguing:  Let's say you see a cabbie pulled over, the driver's door is open and he's standing beside it. He's having a heated (but not physical) argument with another man who appears to have been his passenger (he's standing outside the open door of the passenger compartment).   At this point, there isn't enough to think there's a crime here, or to regard either of them as a suspect, but you'd have a reason to approach and see what's going on to clear the situation and the area.  *See **People v. Thomas***, 201 A.D.2d 252 (1st Dept. 1994). [Be careful not to characterize the oral argument in this example as too dramatic, because in a recent case, ***People v. Cabrera***, 135 A.D.3d 412 (1st Dept. 2016), the court found that an individual angrily yelling and cursing at someone while waving bags with both hands was sufficient for Level 2 founded suspicion.[9]]

4.  Man looking at multiple mailboxes in NYCHA lobby:  Let's say you see a man in the lobby of a NYCHA building.  He's just standing there for several minutes and then he starts to look at all the mailboxes.  At this point, you don't have enough to regard him as a suspect.  He might have just moved in and is looking for his mailbox, but you have enough to approach him and ask basic, non-accusatory questions, such as whether he lives in the building.  *See **People v. Wighfall**, 55 A.D.3d 347 (1st Dept. 2008)

As we see from this list, sometimes there is simply <u>no</u> information, no basis at all to regard the person as a suspect at Level 1 and in others there is simply <u>not enough</u>.  Consider what the objective credible reasons to approach were in our examples:

---

[9] *See also People v. Hale*, 300 A.D.2d 55 (1st Dept. 2002) ("When, in a desolate area after midnight, a livery cab came to an unexplained stop in the middle lane and the driver immediately exited the cab simultaneously with defendant and another passenger, whereupon the driver flailed his arms as he pointed at a police officer while defendant and the other passenger looked at the officer and then fled in opposite directions, there was reasonable suspicion to justify the pursuit of defendant.").

For the sick guy, your objective credible reason was that you thought he might be sick and wanted to see if he needed assistance. For the shots fired job, the objective credible reason was to determine if anyone in the area saw or heard anything. For the cabbie and the passenger, your objective credible reason was to assess the situation, deescalate the situation and get everyone to move on, prevent the cabbie from obstructing traffic.



What can an officer do with only a Level 1 amount of information?

She has a few tools.

She has the tool of <u>observation</u> (which, actually, she always has).

She also can ask <u>non-accusatory questions</u>. Since this is a situation where the person or people you are talking to are <u>NOT suspects, the law requires us to communicate with them in a way that conveys that</u> – that conveys they are free to leave and that you do not suspect them of a crime.[10]

So what are some examples of some good, non-accusatory question?

Can I talk to you for a second?
Are you ok?
Did you see anything?
Good evening, Sir.  Do you live in the building?

Bad examples: "Stop right there, where do you think you're going?"  "Do you have any weapons?"

** You can always ask for ID, so long as you are at least at Level 1,[11] but the person does not have to produce it unless he is the driver of a vehicle.

---

[10] *People v. Hollman*, 79 N.Y.2d 181 (1992) ("Where the person approached from the content of the officer's questions might reasonably believe that he or she is suspected of some wrongdoing, the officer is no longer merely asking for information. The encounter has become a common-law inquiry that must be supported by founded suspicion that criminality is afoot.").

Protective Measures

Protective measures in this context basically include efforts by an officer to see or control a person's hands during an encounter, such as a request to take hands out of pockets or to put down an object that could hurt the officer.  For many Level 1 situations, an officer won't reasonably be in fear for her safety.  If you are searching for witnesses, you are not going to be telling every person to show you their hands.  But in the rare Level 1 encounter, because of the nature of the approach or the person's behavior, you may perceive that your safety is in jeopardy.

Provide the class with an example based on the facts of this slide:

**Protective Measures at Level 1?**  🛡NYPD

**Example: a male passes by two other men and continues to stare at them with a menacing, angry expression. You approach and ask him if there is a problem with those men. The male glares at you and begins to reach for his back pants pocket**

The use of the tool depends on a reasonable concern that your safety may be in jeopardy.

What would they do?

This example is based on a real case.  Initially, we're at Level 1, correct?  A man glaring at other people isn't a crime.  A man glaring at you as you approach him isn't a crime.  The court said it was an objective credible reason to approach and ask if there was a problem.  And in that instant, there was the reach.   The court said it was appropriate for the officer to put his hand on the man's pants pocket (and when he did he felt a gun).

> [*People v. Wyatt*, 14 A.D.3d 441 (1st Dept. 2005) - The court found officers had an objective credible reason for approaching a man in a crime-ridden area after observing him pass two other men and stare back at the two men repeatedly, with an angry, menacing look.   Upon approach, the officers asked if he had a problem with the two men but he did not answer their question, glared angrily at the officers and began to reach for his back pocket.  Court found the officer was justified in putting his hand on the defendant's back pocket to protect himself – they said this was not a frisk.  Upon feeling the hard object there was reasonable suspicion the defendant was armed.]

The reality is that in most cases, if there is a need to engage protective measures at Level 1, it is probably because the person's behavior has taken the encounter up to Level 2.  The man's movement toward his back pocket while glaring – did that take the encounter up to 2, maybe,

---

[11] *People v. McIntosh,* 96 N.Y.2d 521 (2001) ("It is well-settled that when an officer asks an individual to provide identification…during a police-initiated encounter, the request for information implicates the initial tier of *DeBour* analysis.").

probably, but the point of mentioning it here and including it in the chart with a "?" is that in situations like that it is a tool you can reach for.

Because protective measures are more commonly engaged at Level 2, we'll talk more about them when we get to Level 2.

What CAN'T an officer do at Level 1?

**At Level 1, you CAN'T:**
- ⊘ Ask pointed or accusatory questions
- ⊘ Seek consent to search
- ⊘ Detain the person, block his path or use force
- ⊘ Direct the person to stop

🛡 NYPD

This all makes sense because at Level 1, the person isn't a suspect. For example, seeking consent from the sick person would be weird, and barking accusatory questions at potential eyewitnesses would be not only weird but counterproductive. The rules make sense.

🛡 NYPD

**At Level 1 . . .**

# Does the person have to stay and answer questions?

The person you are interacting with during a Level 1 encounter:

- does not have to answer questions[12] - THEY DON'T HAVE TO ANSWER OUR QUESTIONS AT ANY LEVEL.
- can refuse to produce ID (unless he's the operator of a vehicle[13])
- And he can walk or EVEN RUN AWAY…..

---

[12] *People v. Howard*, 50 N.Y.2d 583 (1980) ("But while the police had the right to make the inquiry, defendant had a constitutional right not to respond.").
[13] *People v. Copeland*, 39 N.Y.2d 986 (1976).



That is what New York case law holds.  At Level 1, a person can walk or even run away.[14]

This can throw officers off because your instincts probably tell you that if the person starts running from you, he must be up to no good, so your reaction is to pursue.   But when we think about it, at Level 1, this "right to run away" rule also makes sense.  If the sick guy comes to, and it turns out he doesn't like the police, and walks off, he has every right do that.  And he can even run off.  He does not have to take help from you.  Same thing with the passenger and the cabbie.  If the passenger runs off and the cabbie just says "what a jerk that guy was" (rather than "he just robbed me!") the passenger gets to run off.   And witnesses don't have to answer questions, they can walk away from you.

One way to keep this in check:  during a Level 1 encounter, if someone runs from you – and again, here at Level 1, you have no (or not enough) information to suggest the person is engaged in any criminality  –  imagine what you'd put over the radio if you started to pursue?  What would you say?   "I'm pursuing someone on suspicion of… *running from me*?"  We know that's not in the Penal Law.

Please note that while officers do not have the right to pursue someone at Level 1, they can continue to observe, surveil and even follow (not *chase*) the person, provided they do not limit the person's freedom of movement.[15]

So to recap, at Level 1, people don't have to answer your questions, than can walk or run away, and none of this will elevate the encounter.

If an entire square block is considered a "high crime area" do you think you would have an objective credible reason to approach someone and conduct a Level 1 Request for Information of an individual you see simply walking down the block?  No. [16]

---

[14] *People v. Holmes*, 81 N.Y.2d 1056 (1993) ("While the police may have had an objective credible reason to approach defendant to request information…those circumstances, taken together with defendant's flight, could not justify the significantly greater intrusion of police pursuit.").
[15] Kamins § 2.04; *People v. Howard*, 50 N.Y.2d 583 (1980); *People v. Steinbergin*, 4 A.D.3d 192 (1st Dept. 2004)
[16] *People v. McIntosh*, 96 N.Y.2d 521 (2001) ("Even a discrete area of a city identified as a high crime area has not, by itself, been sufficient justification for informational requests…The fact that an encounter occurred in a high crime vicinity, without more, has not passed *DeBour* and *Hollman* scrutiny.").

Presence in a drug-prone location or a high-crime area without more does not give an officer an objective credible reason to approach.[17] An individual's desire to avoid eye contact alone also does not provide an officer with an objective credible reason to approach.[18]



False or inconsistent answers to your requests for information CAN elevate an encounter.[19]
[This applies to Level 2 as well]

We've talked about examples of Level 1 encounters.
We've talked about what you can and can't do.

Now let's show you one (provide background information about this clip from a body camera video before playing it)



Background: this is a clip from a body-camera video made by an officer in the 103rd Precinct during the Department's first small body camera pilot.

---

[17] *People v. McIntosh*, 96 N.Y. 2d 521 (2001)
[18] *Matter of Michael F*, 84 A.D. 3d 468 (1st Dept. 2001)
[19] *People v. Rodriguez*, 49 A.D.3d 431 (2d Dept. 2008) ("Defendant gave an answer that the officer immediately knew to be false…and this elevated the situation to a level-two common-law inquiry."); *People v. Hollman, 79 N.Y. 2d at 193*

We're going to simplify the facts for purposes of our training:

The officer wearing the camera and his fellow officers were investigating a shooting that occurred in an adjacent precinct involving ONE perpetrator. There is a male in a gray sweatshirt off-camera just outside the location talking to other officers. The officers had information that led them to believe the male in the gray sweatshirt may have been the shooter. They stopped him outside the Laundromat.

[Play clip as example of a Level 1 encounter]

That was a classic Level 1. The officer was just seeking information from potential witnesses. He asked non-accusatory questions. The people didn't have to asnwer questions. You saw - some just stared at him blankly, and they can do that. That was a Level 1.

At Level 1, an officer may approach someone and request information if she has an objective credible reason to do so. She may elect to further observe the individual, or approach and ask only non-accusatory questions. The person is free to leave and is not regarded as a suspect.



If we go back to our quiz question, now how would you answer it?



# Level 2

## Common Law Right Of Inquiry
## Founded Suspicion

At Level 2, also known as an encounter conducted pursuant to your Common Law Right of Inquiry, you have more information and this information gives you a basis to <u>start to focus on someone for suspected criminality</u>.

That's the key difference. At Level 1, you had either no reason at all, or not enough of a reason to approach someone and regard him or her as a suspect. At Level 2 this changes. We move up from just merely having a Level 1 objective credible reason to approach someone to having a foundation for suspicion of criminality. You have a FOUNDED SUSPICION.

At Level 2, you have more information, a higher level of suspicion, and more tools. Here you CAN seek consent to search, your questions CAN be pointed and accusatory, and you CAN pursue the person if he runs from you. We'll talk more about the tools but first let's go over some examples.



1. You are on patrol and you see a male on a corner conversing with another man and a woman. There have been recent complaints of drug activity at this corner. It's about 10 at night. As your van approaches, all three look in its direction. One of the men immediately flees. You see that the remaining male is dangling a small black leather bag in front of him. Then he backs up a few steps, almost to the wall, and places the bag behind his back so that it's hidden from your view. What do you think? Based on this, are you going to begin to focus on this individual as a possible suspect for criminality? Drug location, companion fled, he backs up, hides a bag. Would you begin to look at him as a possible suspect? Here the court said the officer had enough for Level 2

24

founded suspicion and was able to approach and use Level 2 tools (in this case, the officer said "what do you have in the bag?" and the suspect claimed the bag was his companion's and gave it to the officer, and the officer recovered a gun).  *See **People v. Boyd***, 91 A.D.2d 1045 (2d Dept. 1983)

2.  A Transit officer is watching a male inside a subway station over a surveillance video monitor.  The male is rapidly buying multiple MetroCards with multiple credit cards. Based on the officer's training and experience, he begins to suspect the man of using stolen credit cards to buy MetroCards.  The court said that these observations provided the officer with a founded suspicion for a Level 2 inquiry.  ***People v. Wilson***, 52 A.D.3d 239 (1st Dept. 2008).  We can see why the officer had a basis to focus on this individual.  The information was not strong enough - not yet – to justify a detention (a *Terry* stop), but it was a basis to focus on him and engage Level 2 tools (and in this case, in response to the officer's Level 2 questions, the defendant produced an ID and credit card that clearly did not belong to him, which led to probable cause for arrest).



The person is still <u>free to leave</u> at Level 2.  While Level 2 means you've gathered enough information to suggest that this individual may be involved in criminal activity, Level 2-type information is still not strong enough to detain a person.  The person does not have to answer questions.  And his walking off or refusal to answer your questions[20] does not elevate the encounter. HOWEVER, at Level 2, there's a change in the rule about running away. At Level 2 you have formed a founded suspicion that a particular person is engaged in possible criminality, and if that person RUNS from you at Level 2 – not walking away at a fast pace, but running - his *flight* from you elevates the encounter to 3 and you can pursue him.[21]

---

[20] *People v. Stevenson*, 7 A.D.3d 820 (2d Dept. 2004) ("The defendant had the right to refuse to answer the detective's questions, and the fact that he did not answer did not justify a further intrusion") (quoting *People v. Howard*).

[21] *People v. Williams,* 120 A.D.3d 1441 (2d Dept. 2014); *People v. Woods,* 115 A.D.3d 997 (2d Dept. 2014); *People v. Soscia*, 96 A.D.3d 1081 (2d Dept. 2012); *Matter of Jarvis H.*, 94 A.D.3d 570 (1st Dept. 2012); *People v. Agramonte*, 57 A.D.3d 333 (1st Dept. 2008); *People v. Delesline*, 52 A.D.3d 302 (1st Dept. 2008); *People v. Major,* 115 A.D. 3d 1 (1st Dept. 2014)



[Use chart to list Level 2 tools.]  Pointed, accusatory questions are permitted, you can seek consent to search,[22] you may engage appropriate protective measures, and false or evasive answers may elevate the encounter.[23]

Contrast Level 1 and Level 2 questions.  At Level 2, you can ask <u>pointed and accusatory questions</u>.  Tactically, you may choose not to because you may conclude a less accusatory tone may yield more answers, but you can ask pointed accusatory questions at this level.  Here are some Level 2 type questions that courts have allowed (remember, tone and actions matter):

    o  "Do you have anything you shouldn't have?"
    o  "Do you have any weapons?"
    o  "Do you have anything that will hurt me?"
    o  "What's in the bag?"[24]

    See Kamins § 2.03[1]

---

[22] *People v. Hollman,* 79 N.Y.2d 181 (1992).
[23] *People v. Kenon,* 291 A.D.2d 246 (1st Dept. 2002); *Matter of Troy F.*, 138 A.D.2d 707 (2d Dept. 1988).
[24] *People v. Boyd,* 91 A.D.2d 1045 (2nd Dept. 1983)

**CONSENT to SEARCH** 

 

_____

Consent to Search

[Note for instructors – the procedures for Consent to Search are PG 203-09, 204-09, 212-11, 218-13 and 221-16]

In order for consent to be valid, it must be truly voluntary, without coercion or duress.  When you are seeking consent to search, it must be conveyed as just that, a request not an order.

If you get consent to search from someone and end up recovering, let's say, narcotics, the court will hold a hearing to decide whether the consent was voluntary.

The court will look at the total picture, all the circumstances of the encounter and who you were dealing with.

They will look at things like:[25]

Was the person in custody? At a Level 2, the answer is no.

Was the person cooperative? Evasive?  Courts tend to doubt that the evasive, uncooperative person will turn into a voluntary consenter.

Was the person knowledgeable about police procedures?  Was it a young adult, who has had no experience with law enforcement, or a convicted felon who has dealt with the police many times? (The latter actually can work in your favor in the voluntariness analysis).

The Right to Know Act required the Department to change its policy on how to obtain consent to search.

Whatever you think of the change, I can tell you one thing: the change is going to take a lot of the guesswork out of proving a voluntary, valid consent in court.  One of the big factors courts look at is whether the person was told he could refuse – because of course they do actually have a 4th Amendment right to refuse.

_____

[25] *See generally People v. Gonzalez*, 39 N.Y.2d 122 (1976).

**Consent to Search - PG 212-11**   🛡 **NYPD**

## "Can I search your bag?"

## "I can only search your bag if you consent, do you understand?"

So here is what the law requires now.  It requires two questions that are both clearly phrased in a manner that will elicit either a yes or no answer.  You must ask the questions in a non-threatening and non-coercive manner.  In one question you ask whether you can search and in the second you convey that you need their consent to search and you ask if they understand.

If the person does not consent to a search, you cannot conduct a search.

If the person asks you: do I have to say yes? You have to tell him the truth, he does not.

When seeking consent to search a person or their property, vehicle, or home, if you are interacting with a person with limited English proficiency or a person who does not appear to understand you, you must use interpretation services pursuant to the NYPD's language access plan.

If you have a body camera and seek consent to search, you must record it and tell the person they may request the video by making a FOIL request through the NYPD website at www.nyc.gov/nypd.

Regardless of whether you are equipped with a body worn camera, you must document in your memo book the time, location, and date of the search or refusal, and the apparent race/ethnicity, gender and age of the person from whom you sought consent to search.  You must also document your name, precinct and shield number.  A new form will be provided in the future in order to assist with this documentation.

[This change sometimes prompts a class discussion.  Officers are skeptical that they'll ever get consent.  Even though there are some differences, officers had the same skepticism about getting *Miranda* waivers way back when, and we get them all the time.  It can sometimes come down to confidence and experience.]

Note:  Officers may ask about the situations where consent is not sought but it is offered i.e., "I don't have anything, you can look." and the person just opens a bag or lifts his shirt.  We see this happen in some of the body camera videos used in this class.  The officer does not violate the

28

policy if he/she fails to ask these questions when the search is entirely offered up by the person he's encountered.



There has been a recent change in the law.  From now on, officers must identify themselves to an individual who is the subject of law enforcement activity by providing their name, rank, and command.  Officers must also explain the purpose of the interaction in the following circumstances:

All Level 2 encounters
All Level 3 *Terry* stops
All frisks
Any search of person or property, including vehicles
Vehicle checkpoints
Home searches
Investigatory questioning of victims and witnesses to crimes

Additionally, unless the situation results in an arrest or summons, you must offer a Business Card at the end of the encounter. You are not required to offer a Business Card during investigatory questioning of victims and witnesses to crimes, unless you are the assigned detective or a card is requested by the person.

If the person you have interacted with is a minor, you must offer the business card either to the minor or, if they are present at the scene, a parent, legal guardian, or responsible adult.

All officers will receive pre-printed business cards by October 2018.  These business cards will include the officer's name, rank, shield number, and a space for the officer to write his/her command.  You should write your command on each business card you hand out.



Officers must also provide a Business Card if a person requests an officer's identifying information.

If you run out of pre-printed cards, you must offer to provide the person with the information on a handwritten card.  If you run out of cards altogether, you must offer this information verbally and provide the person sufficient time to write it down.



If explaining the purpose of the interaction would impair a criminal investigation, you do not have to do so.

Officers are not required to offer a Business Card to identify themselves if engaged in undercover activities, if exigent circumstances are present (for example, imminent physical injury or destruction of evidence, to name a couple), if it is a security search of someone attempting to enter a public building, an event, or an MTA facility, or if verifying the identity of a person seeking entry into an area restricted by the Department due to health or safety concerns.

Similarly, the Right to Know Act's requirements for consent searches do not apply if exigent circumstances are present or if it is a security search of someone attempting to enter a public building, an event, or an MTA facility where a person's entrance into the location constitutes implied consent to be searched under an exception to the warrant requirement.

<u>Protective Measures</u>.  Protective measures are defined in PG 212-11.



We talked about protective measures at Level 1.  It's a tool more often used at Level 2.

For our purposes today, when we use the phrase "protective measures," we're talking about the things you can do during investigative encounters when you *don't yet have enough to frisk* (and in some cases *you never will* have enough).

An officer may engage protective measures at any level when an officer does not yet possess enough information to support a reasonable suspicion that the person is armed and dangerous, but nevertheless perceives his safety may be in jeopardy. He is permitted to take protective measures short of a frisk that are reasonably related to the circumstances.  (*See*, Kamins § 2.03[1])

In these situations, an officer can:

-   Direct the person to put down an object he is carrying
-   Ask the suspect to take his hands out of his pockets/to show his hands
-   If a suspect refuses to take his hands out of his pockets, the officer can forcibly remove his hands
-   If the person moves his hand toward his waistband or pocket, the officer can grab the hand or place a hand on the pocket to prevent the person from drawing a weapon.
-   If the circumstances warrant it, *i.e.* an anonymous gun run, direct the person to raise his hands

You can't say "lift your shirt."  That's a search, not a protective measure. But you can say things like "take your hands out of your pockets," "raise your hands," "put that down," "open your hands," and when appropriate you can also engage protective measures or reflexive touches.

(Sometimes the class asks about this): Yes, you can engage these tools, *i.e.* direct someone to take his hands out of his pockets and if he refuses, take them out at Level 2 even though at Level 2 the person is free to leave and you can't by your words or actions make the person feel as though he is being detained or arrested.  Again, if you feel the circumstances have created a situation where the person feels as though he's not free to leave, you can say "sir, you're not under arrest, I need to ask you some questions, and while I do, I'm going to be safe and so are you, so take your hands out of your pockets…"

Move on to <u>Anonymous source</u> information in the context of a Level 2 encounter.



We can't leave Level 2 without talking about a pretty big category of cases that lives here at Level 2:

> Jobs that come over based on information from anonymous callers.

For starters, let's establish what we are NOT talking about.  If a person on the street comes up to you, is clearly frightened, and whispers "that guy around the corner with a green coat, he has a gun, he was just threatening some other guy with it!"  If you don't stop to get the person's name, and you run around the corner to address the situation, the person who reported this information to you is not anonymous. [26] This is a live person on the street with whom you had a face-to-face encounter.  In this section, as we discuss information you receive from anonymous sources, that's not the kind of situation we're talking about.

For purposes of the discussion we're having now, we're talking about an anonymous caller.  Let's say central advises that an anonymous caller reported that a M/H, early 20s, with a yellow T-shirt and jeans at a specific location has a gun.  Under the law, that kind of information only amounts to Level 2 founded suspicion.  If you only have a physical/clothing description and location, that does not get you to reasonable suspicion.  This rule was announced by the US Supreme Court in 2000 in **_Florida v. J.L._**

Here's the rationale behind the case law.  A jealous girlfriend may see where her boyfriend is, and see what he's wearing, but she might make up the fact about him having a gun to get him harassed.  So might a competitor drug dealer.  That's why the courts want more than just corroboration of where someone is and what they are wearing, and until we get it, we are stuck at Level 2.  It's like there is this wall between Levels 2 and 3 when the source is an anonymous caller, and we need some additional information in order to get over that wall and it has to be more than clothing and location.

---

[26] See _People v. Letriz_, 103 A.D.3d 446 (1st Dept. 2013); _People v. Appice_, 1 A.D.3d 244 (1st Dept. 2003).

Getting over the wall is important. And getting over it BEFORE you approach the suspect can be critical.

Continuing with the gun run based on the anonymous caller who described the M/H with the yellow T-shirt – you are at Level 2, we know that, so what can you do? Let's remember the toolbox you have at Level 2.

You can go up to the male matching the description and ask accusatory questions, like "Show me your hands – where is the gun?!"

You can engage protective measures – not let his hands out of your sight, keep them out of the suspect's pockets, etc.

You can seek consent to search. But what if he says No?
Now you've used up all your Level 2 tools.

If you go farther at this point - let's say frisk - the gun is going to be suppressed.

So you should be trying to get over that wall BEFORE you approach. If you do, you will have the full Level 3 toolbox, including being able to approach with guns drawn and frisk, BEFORE you approach.





HOW TO CORROBORATE THE CALLER <u>BEFORE</u> YOU GET TO THE SCENE

How do you get over the wall? How can you corroborate the caller beyond the facts of clothing description and location?

There are ways to do so, and you can accomplish any one of them in the 1 to 2 minutes that it is going to take you to respond to the job. Keep in mind, for these to work, you must promptly arrive at the location provided by the caller and you need to see a suspect(s) matching a sufficiently detailed description in the vicinity where the anonymous caller said they would be. If those things happen when you get there, the info you gather in the few minutes you have BEFORE you get there can allow you to get out of the car at Level 3. [Instructors should note: in commands, some officers, desk sergeants and dispatchers who work together regularly know

that the dispatcher or supervisor often call anonymous callers back.  So multiple people should not be calling the anonymous caller back.  Present these as options that they can resort to as appropriate.]

1.  GET A NAME. You all have smartphones. The call back # appears on your phone.  You can call back the ANI ALI with a tap of your finger.  Call the caller back.  Explain you may not be able to get this allegedly dangerous person off the block and you can't frisk for your safety without more information, seek their assistance and try to get the name.  It's important that we not pressure callers because we know many are truly afraid and we don't want to discourage crime reports.   Note, just because caller ID might provide a name, if a caller won't give his or her name to the dispatcher or you, it's considered anonymous.

2.  CONFIRM CALLER JUST EYEWITNESSED CRIMINALITY.  If you call the caller back and can't get a name, get information about the caller's basis of knowledge.  How does the caller know the suspect has a gun? Did the caller actually see the person with the gun?  If the caller confirms (1) that he or she personally observed the criminality (i.e. the gun in the suspect's hand or in his possession) and (2) that this observation just occurred or is presently occurring, then this contemporaneous report of observed criminality combined with actually seeing someone at the given location with a matching description when you get there, can be enough to get over the wall to Level 3 reasonable suspicion.  It is not enough that the anonymous caller saw the suspect and his clothing first hand, he or she has to observe the criminality and call 911 immediately or shortly thereafter.  This is a developing area of law, so get as much information as you can to corroborate the caller's reliability.  If you call the caller back, you can and should make an assessment of whether you think the caller's account of just eye-witnessing criminality sounds credible.[27]  This applies to the original job memorialized by the 911 operator (see note below).

3.  INSIDE INFORMATION (This paragraph about predictive information is offered as background to instructors and can be integrated if appropriate, but there is no corresponding slide because this will be rare for officers performing patrol functions).   If the caller did or can provide predictive information that basically shows he has inside information, i.e., "in about an hour, a woman driving a blue Honda with NY tag xyxyxy will be leaving the parking lot of an apartment building located at x, she will have drugs with her in the car, and she will drive to a motel located at x in Queens."  If you then see a female leave the indicated lot in the matching car and make the trip the caller predicted, courts have found that to be enough for Level 3 reasonable suspicion because the anonymous information was sufficiently detailed to suggest it was coming from someone

---

[27] *People v. Argyris* 24 N.Y.3d 1138 (2014); *Navarette v. California*, 134 S Ct 1683 (2014); *United States v. Oden,* 2016 U.S. Dist. LEXIS 128329 (Sept. 12, 2016).

with inside knowledge.[28]  If you are relying on this, it has to be pretty detailed, not just "he's headed northbound, and he'll turn right."

If you can't reach the caller, you should know that these concepts apply to the content of the 911 caller's call which you can see from your phones.  If the original job is more than just a location and "M/B, early 20's, red T-shirt has a gun" but instead is very detailed and explicitly conveys an eyewitness account, such as the "caller stated she just saw the male put the gun behind the front passenger seat," and describes the car and the male in sufficient detail, thus revealing the basis of the caller's knowledge, that can be enough.  A job that simply conveys "caller reports a male with a gun…." does not reveal how the caller knows.

And the above list is not exhaustive.  They are techniques an officer can use.  In one case, the caller was reporting a crime and didn't give his name but gave his apartment number.  When the officers arrived to the building, the suspect was not outside.  They rang the buzzer # for the apt # the caller provided, they were buzzed in and they saw the suspect matching the description.  The court found getting buzzed in by the right apt. contributed to corroborating the call (it was not truly anonymous). See *Herold,* 282 A.D.2d 1 (1st Dept. 2001).

 

The above list all deal with ways you can corroborate the caller BEFORE you get to the location.

If these fail, there are things you can do ONCE YOU GET TO THE LOCATION to get over the wall to Level 3.  If you arrive near the location the caller provided and you see an individual matching the description, you may make observations (beyond location and clothing) that will be sufficient to corroborate the criminality and get you to Level 3.  Here are some examples:

1. PHYSICAL SIGNS OR MOVEMENTS THAT CORROBORATE CRIMINALITY, such as a bulge indicative of a weapon, blading, waistband adjustments, etc.  An anonymous caller reports a M/W/early 20s with a ponytail, jeans and a gray sweatshirt is at the corner of x/y and he has a gun. If you get to the location and see a male matching the description, and you also see a bulge in the individual's clothing that would reasonably allow you to believe it was a weapon, that observation will corroborate the caller and take you over the wall to Level 3. You can approach that individual with all the Level 3 tools (guns drawn if you elect to, frisk, etc.). Seeing a bulge that is consistent

---

[28] *Alabama v. White*, 496 U.S. 325 (1990).

with a weapon is not the only way to corroborate the anonymous caller's allegation of criminality.  Distinctive gestures, like seeing the suspect reach for his waistband,[29] adjust his waistband in a manner that, based on training and experience, is consistent with the possession of a weapon,[30] or observing the suspect nervously "blade" you,[31] or engage in other behavior that, based on your training and experience, would lead you to suspect the individual had a weapon.  These observations will be sufficient to corroborate the criminal nature of the anonymous caller's tip.

2. FALSE STATEMENTS made by the suspect who matches the anonymous report (in time, location and description) can also elevate the encounter to Level 3.[32]

Some additional examples:

a) Anonymous call of a man with a gun.  Officers respond.  They see a male matching the description provided at location.  Upon seeing police, the suspect quickened his pace and tried to get into a locked van and then discarded an envelope (cocaine) inside a tin container that sounded like a small caliber gun when it hit the ground at defendant's feet.  The 911 call plus the fact that the suspect quickened his pace at the sight of the officers, attempted to force his way into a nearby locked van and discard an envelope (later found to contain cocaine) was sufficient for Level 3 reasonable suspicion.  *See People v. Gregg* 203 A.D.2d 188 (1st Dept. 1994).

b) Anonymous caller reported shots fired and provided suspect location and description.  Once on scene, officers observed the defendant's associates warning him about the arrival of the police and they saw the defendant try to hide and flee from them as they approached = Level 3. *See Matter of Freddy S*, 84 A.D.3d 687 (1st Dept. 2001)

c) The corroborative observation can be an otherwise innocent fact, but based on the content of the tip, it corroborates the report of criminality, i.e. an anonymous caller reports that individuals ripped a mailbox off the wall of an apt. building.  Officers respond and find the defendants near the location matching the description and they see what appears to be sheetrock dust on their pants.  The observed fact (sheetrock on their pants) standing alone does not suggest criminality, but on these facts, the court said it sufficiently corroborated the caller for Level 3 reasonable suspicion.  *See People v. Watts* 43 A.D.3d 256 (1st Dept. 2007).

---

[29] *See People v. Williams*, 136 A.D.3d 1280 (4th Dept. 2016); *see also People v. Moore*, 6 N.Y.3d 497, 498 (2006); *People v. Benjamin*, 51 N.Y.2d 267 (1980).
[30] *People v. Benjamin*, 51 N.Y.2d 267 (1980).
[31] *People v. Williams*, 136 A.D.3d 1280 (4th Dept. 2016)
[32] *People v. Belk*, 100 A.D.2d 908 (2d Dept. 1984).

36

3.  FLIGHT.  If a suspect who matches the physical description is present at/near the location the anonymous caller provided, and the suspect runs when police approach, the flight corroborates the caller and it elevates the counter to Level 3.

To recap:

Not good enough (only Level 2):
    "M/B/30's wearing x,y,z at x location has a gun"

Good enough for Level 3 if officer's observations are consistent with the information provided by the caller:
    "A man driving a gray BMW, plate xyz 123, just ran me off the road.  He's headed northbound on the FDR near X Street."

We have no idea whether in the first example the caller's report was contemporaneous to the report or whether the caller made a first-hand observation.  In the second one we do.



What if a caller only provides their first name? Getting a first name alone is not enough to get you to Level 3.  However, in combination with other factors, such as correctly predicting the suspect's direction of travel, it can contribute to reasonable suspicion. See *People v. Dumit,* 136 A.D.3d 510 (1st Dept. 2016); *People v. Rivera,* 84 A.D.3d 636 (1st Dept. 2011); *People v. Hall*, 23 A.D.3d 151 (1st Dept. 2005).

What if an anonymous caller provides a very detailed description and you find someone meeting that very detailed description at the location described?  For example, what if the caller states that there's a woman with a green Mohawk, wearing a black shirt and has a tattoo on her left arm with a gun at the corner of 14th Street and 6th Avenue and you arrive at that corner and see the woman portrayed in the slide standing there.  What level are you at? Without more, you're still only at Level 2.[33]  Remember the rationale for the rule. The jealous boyfriend or rival drug dealer

---

[33] See *People v. McCall*, 2008 N.Y. Misc. LEXIS 6020 (Sup. Ct. Queens Cnty. 2008) (A "radio run of an armed man wearing a black hat and blue jacket with the word "Crimson" on the back in red writing, coupled with the police observation of the defendant, a male wearing a black doo-rag and a black jacket with the word "Crimson" on

likely knows exactly what the person they are trying to set up is wearing.  To get to Level 3, you should use the techniques we described earlier.



In *Florida v. J.L.*, the Supreme Court suggested that bomb threats are an exception to the rule about anonymous callers. Cases that followed recognized exceptions for true "ongoing emergencies" such as an anonymous call with a sufficient description and location and the caller states the individual is headed to shoot someone now (see *United States v. Simmons*, 560 F. 3d at 105 (2d Cir. 2009)(cases collected)), but there's no "gun possession" exception, and certainly no drug sales exception.  This means that a call about a "man with a gun" or a "man selling drugs" is not sufficiently specific to get you to Level 3.

For case support for the content re: Anonymous callers, see Anonymous section in Real Cases Digest and see also: *Alabama v. White*, 496 U.S. 325 (1990), *Florida v. J.L.*, 529 U.S. 266 (2000), *Navarette v. California*, 134 S. Ct. 1683 (2014), *People v. Argyris*, 24 N.Y.3d 1138 (2014).

Instructor Note: Instructors may get a question regarding multiple anonymous calls. The same caller calling twice and adding no new information does not get an officer to Level 3.  But what if there are anonymous calls that purport to be different callers (from different call back numbers).  In that case, based on the totality of the circumstances, if the officer believes they are actually two or more different callers and their information is corroborated, that may be enough for Level 3 reasonable suspicion.



At **Level 2**
- ✚ **Ask pointed or accusatory questions**
- ✚ **Seek consent to search**

- ⊘ **Detain the person or use or threaten to use force**
- ⊘ **Direct the person to stop**

---

its back in red writing, 1/2 block from the location described in the radio run less than a minute after its receipt" was insufficient to support a stop based on reasonable suspicion.).

Let's recap Level 2.  It's based on founded suspicion.  You can ask accusatory questions, you can seek consent to search, and you can engage protective measures. You can't use or threaten to use force, detain the person, or block his movement – he remains free go at Level 2.



- The person does not have to answer questions- They don't have to answer questions at any level.
- He does not have to produce ID (unless he's the operator of a vehicle)
- He does not have to consent to a search
- He can walk away
- None of this elevates the encounter

But if he runs away in response to the presence of police officers, that will elevate the encounter.



Do you know the answer now?

Proceed to play the "gun run" body camera clip. Do not tell the class anything about the level of the encounter depicted before you play the clip.

For purposes of today, assume these facts for this video.  It's the 103rd precinct again.  You need to pay close attention please, because you are going to write a Stop Report based on this video later today.]

There was an anonymous call for a male, black with dreadlocks, wearing a black T-shirt at a location and the caller said he had two guns.

Play video.



Ask class: was the stop good?  Why?

After playing the video, share with the class that the officers who responded to this call DID actually call the caller BEFORE they got there and corroborated that she was calling based on something she just saw – a contemporaneous report of a first-hand observation of the male with the guns, so they were at Level 3 when they arrived. What about the language the sergeant used: "Yo, my man, where are you going, come back here"? Is that Level 2 or Level 3? [This should prompt a class discussion. This is a close call. At what level were they acting?  Based on the information they had and their observations, what level were they legally permitted to be at? Whether this is Level 2 or 3 depends on their tone and actions.  Tone and actions matter.]

What actually happened in this case? They called back and reached the caller, who verified her basis of knowledge. They didn't get out with guns drawn – and I understand that there may be tactical reasons not to – but they could have if they wanted to because they were at Level 3 upon arrival and the suspect was alleged to have a weapon.

If they hadn't reached the caller, there's other corroboration we could argue, the weighted pocket.  But this team called in advance, which made it easier.  Two guns were recovered, the defendant was prosecuted, the search was good, and the defendant is in state prison.



Why do we call it a "Terry" stop?  The US Supreme Court in 1968 officially gave police officers this tool in the case of *Terry v. Ohio*.[34]  They recognized that officers needed the authority to briefly detain people they reasonably suspect of crimes, and possibly even frisk them if they reasonably suspect they might be armed and dangerous - even if they have not yet developed probable cause to arrest them.

An officer may conduct a *Terry* stop, meaning DETAIN someone for a brief period of time, if he reasonably suspects that the person either
- Committed
- was committing or
- is about to commit

any Felony or a Penal Law misdemeanor.  At Level 3, the quality or the quantity of the information you have goes up, and so does your authority.  You get more tools.



Allow me to provide you with some examples of Level 3 encounters based on case law, and let's start with the case that gave Level 3 its name – *Terry v. Ohio.*

1. *Terry v. Ohio.*  Det. McFadden, an experienced officer, saw two men on a street corner. He saw one of the men walk down the block, pause and look into a store – let's call it a jewelry store – and then return to the corner where the other male was.  Then the second male did the same while the first waited.  They alternated walking this identical path, pausing each time at the store and looking in.  They did this 12 times.  After each time one of them would complete the route, they would come together at the corner and have a conference.  During one of these, a third man came over to them who joined for the conference and then left very quickly.

   Det. McFadden was an experienced officer.  So are you.  What would you think if you saw that?  You'd think those two are going to rob that place.  They were casing.  Maybe the third guy was the lookout, or getaway driver?  But they were definitely casing.

   And that's what Det. McFadden thought.  He went right up to them, did a stop AND a frisk, and recovered guns off of both the men.  And the Supreme Court backed him up.

---

[34] 392 U.S. 1 (1968).

2.  Another classic example of a Level 3 is a 911 call of a robbery, let's say 1 minute in the past, the caller is IDENTIFIED, and provides a detailed physical description including clothing and a direction of flight.  You see someone matching the description in the area reported.  You have reasonable suspicion to stop, detain and in this case, frisk the individual for the period of time it will take to get the CW there for a show up.

3.  You can have reasonable suspicion based on a crime pattern, but it has to be an actual pattern and the details of the pattern have to be specific.  In other words, a robbery pattern in a certain area involving three male Hispanics in their early 20's is not going to give you reasonable suspicion for all male Hispanics in their 20's in that area.  But if the pattern included descriptive information beyond race, age and gender then it becomes suspect specific information, where race can be used because it is different and superior to just general crime data about Hispanics and robberies in the area.  For example, a pattern involving 3 light-skinned M/Hs committing robberies near a particular bus stop in the late evenings during the past two weeks and one of the M/Hs is described has having a distinctive hair style. If an officer saw 3 light-skinned M/Hs in their 20s hanging around that particular bus stop at 11 p.m. for an extended period, not getting on any busses, and one of them had the same distinctive hair style. The totality of those facts would support a reasonable suspicion that the men may be there to commit a robbery.

    Note about the FELLOW OFFICER RULE: information which justifies police action may be acted upon by an officer who lacks personal knowledge of the information as long as a fellow officer involved in the investigation has the requisite information.[35] In other words, if officer A has all the facts supporting reasonable suspicion, and officer B joins in the pursuit and doesn't, he can rely on a fellow sworn officer's direction to stop the person even if officer B doesn't know the information before making the stop.

[For instructor reference only – additional Level 3 examples if needed]

-   The First Department in *Darryl C.* (98 A.D.3d 69) has a good string cite with examples: "In *People v. Davenport* (92 AD3d 689, 939 NYS2d 473 [2012]), police received a radio call of a shooting at a specific location. Arriving in under a minute, the officers encountered the nervous defendant, his hand on his waistband, making a slow retreat after making eye contact with an officer (*id.* at 689-690.  In *People v Thanh Do* (85 AD3d 436, 924 NYS2d 380 [2011], *lv denied* 17 NY3d 905, 957 NE2d 1164, 933 NYS2d 660 [2011]), confidential information was received that a home

---

[35] *United States v. Colon*, 250 F.3d 130 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."); *People v. Ketcham*, 93 N.Y.2d 416 (1999) ("Under the fellow officer rule, a police officer can make a lawful arrest even without personal knowledge sufficient to establish probable cause so long as the officer is acting upon the direction or as a result of communication with a fellow officer or another police agency in possession of information sufficient to constitute probable cause for the arrest.").

invasion would take place at a specific location, where police encountered three men fitting the description of the robbers and searched the defendant after observing an L-shaped bulge in his waistband. Again, the information coupled with the observation justified the police action. In *People v Johnson* (22 AD3d 371, 802 NYS2d 444 [2005], *lv denied* 6 NY3d 754, 843 NE2d 1162, 810 NYS2d 422 [2005]), the defendant's "clothing and physical characteristics fit an armed robber's description that was sufficiently specific, given the temporal and spatial factors" (*id*. at 372). In *People v Greenidge* (241 AD2d 395, 661 NYS2d 605 [1997], *affd* 91 NY2d 967, 695 NE2d 715, 672 NYS2d 846 [1998]), police received a radio transmission of an armed robbery and, only three blocks from the location of the crime, observed a man matching the general description they had received and the defendant, who was clutching a jacket under his arm as if concealing something. In *People v Brown* (277 AD2d 107, 716 NYS2d 56 [2000], *lv denied* 96 NY2d 756, 748 NE2d 1078, 725 NYS2d 282 [2001]), defendant and another man were seen hurrying away from an unlocked car, which was in disarray and which they had just parked in an area known to have a high incidence of stolen vehicles. It was not registered to either man, each of whom reached for his waistband upon becoming aware of the presence of plainclothes officers (*id*. at 108)."

- Also: *People v. Nelson* 179 AD 2d 784 (2d Dept. 1992) Radio run for shots fired in an apt building, officers get there promptly, and witness confirms shots came from 3rd floor.  Officers see men in the small entry vestibule trying to exit, but upon seeing the officers, they slammed the inner vestibule door behind them and fled back into the narrow hallway.  Officers entered and ordered everyone to freeze. The court said this was a valid stop and frisk at Level 3.

And in *People v. Alston*, 23 A.D.3d 487 (2d Dept. 2005), there was reasonable suspicion to stop two men who were the only people on the street in an area where officers heard gunshots moments before.

At Level 3, you have better information, and more tools:



**Review the Level 3 tools:**

At Level 3, you can:

**DETAIN** a person for a reasonable period of time[36] to investigate your suspicion, and while you do this, the person is not free to leave – he is not free to walk or run away.  How long can you detain someone during a Terry stop?  The courts have not set a time limit.  The duration has to be reasonably related to the purpose of the detention.  Most stops can be completed within 20 minutes.  Courts will generally uphold stops that are under an hour.[37]  Can you transport the suspect to another location during a Terry stop, for example, if you confront an angry crowd or if you need to take the suspect to the location of the crime or witness for a show up?  Yes.[38]

If necessary, reasonable **FORCE** may be used to stop a person. A gun run from an identified caller will allow an approach with guns drawn, but a radio run for a petit larceny where there's no information regarding a weapon will not allow for an approach with guns drawn.  It's common sense.  The use or show of force must be reasonable.

**FRISK**.  We're going to get into frisks in a minute.  You see there's a question mark next to it.  This is a tool that is not always available at Level 3, hence the question mark.

[THE NEXT THREE TOOLS ARE TOOLS WE CARRY OVER FROM LEVEL 2]

You can ask **POINTED (ACCUSATORY) QUESTIONS**.

You can still seek **CONSENT TO SEARCH**, and since there may be Level 3 situations where you can't lawfully frisk, this is an important tool.  Again, we must convey this as a request not an order.  Any consent must be voluntarily given without any coercion or duress.

You can engage **PROTECTIVE MEASURES** such as directing someone to take their hands out of their pockets or show you their hands, and the tool is easier to use here because you don't have to worry about making the person feel as though he's not free to leave – because he isn't.

---

[36] *United States v. Sharpe*, 470 U.S. 675 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.")(citations omitted).
[37] Kamins § 2.06[2].
[38] Kamins § 2.06[3].



**STOP and POSSIBLY FRISK**

Operator: "What's your emergency?"

Store Manager Lisa Jenkins: "We need the police - this couple was just in our store – they were here last week and ran up about $2500 on stolen credit cards – my security guard spotted them just now and was about to approach them – they ran out of the store, we're on 14th street – they ran down University. It's a young man and woman in their 20's. He is white, has brown curly hair, glasses, purple T-shirt ....

Use this example to set up the rule. The manager of a clothing store on 14th Street calls 911 and identifies herself. She says this couple just ran out of her store. They are in their early 20s, the female is Asian with a short bob haircut and the male has brown curly hair, glasses, and is wearing a purple T-shirt. He's very thin. They were in the store last week and they used what turned out to be stolen credit cards to run up about $2,500 dollars in purchases. They appeared back in the store, and when the security officer in the store started to approach them, they took off and ran toward University Place.

That's Level 3. You've got reasonable suspicion. Known caller. Details of a felony in the past. Good description.

Now let's say you are the first sector to get to University Pl. The security guard is canvassing with another sector. You and your partner spot the couple matching the descriptions exactly walking very quickly down University Pl.

You get out of the car and direct them to stop. You can do that. This is Level 3. They are not free to go. You have the authority to hold them there until the witness arrives for the show up.

You can walk up to them and ask accusatory questions, such as "do you have any weapons?"

You can direct them to keep their hands out of their pockets. And let's say they do. They say they have no weapons and they comply by keeping their hands out of their pockets.

WHILE YOU WAIT FOR THE 3 MINUTES IT IS GOING TO TAKE TO GET THE WITNESS THERE FOR THE SHOW UP – CAN YOU FRISK THESE TWO?

No. Not based on these facts.

A frisk is only authorized when you have a reasonable suspicion that the person was or is about to commit a crime AND YOU ALSO have a reasonable suspicion that the person is **armed and dangerous**.[39]

"I frisked for my safety…"

"…because I believed the suspect was armed and dangerous"

When officers say "I frisked for my safety," under the law, they are only saying half the sentence. Why did they fear for their safety? To validly frisk someone, this fear must be supported by reasonable suspicion that the person was engaged in criminality AND a reasonable suspicion that the person was armed and dangerous. That's the complete sentence… "because I believed the suspect was armed and dangerous."

Your authority to frisk someone is not the same as your authority to stop. You can stop someone whenever you have reasonable suspicion that the person committed, is in the act of committing, or is about to commit a felony or Penal Law misdemeanor. This allows you to detain the person, ask accusatory questions, seek consent to search, engage protective measures, pursue if the person walks or runs way, and use reasonable force, if necessary.

In order to frisk, on the other hand, you also need reasonable suspicion that the person is armed and dangerous.  There are two parts of reasonable suspicion for frisking.

It's as if the toolbox for Level 3 has two compartments.  One is opened up by reasonable suspicion of a felony or Penal Law misdemeanor, and it leads you to all the tools EXCEPT frisk (so it opens the compartment where you can reach your right to detain, pursue, etc.).  But the tool of frisk is in its own compartment and the only thing that will open up that compartment is a separate reasonable suspicion that the person is armed and dangerous.

For some crimes, the compartments open at the same time.  That's when the crime you suspect is a violent crime, like robbery or an assault.

But for others [take our Grand Larceny example] reasonable suspicion of the crime itself doesn't open up the compartment to reach for frisk.  But other things can, such as:

- Statement by a victim or witness that the suspect is armed (i.e. in our example, the manager of the store says "and when the guy ran out, we saw he had a box cutter.")

---

[39] *Arizona v. Johnson,* 555 U.S. 323 (2009) ("To justify a pat down of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.").

- Admission by suspect that he or she is armed (you ask "do you have any weapons?" and he admits he does)
- Visible bulge characteristic of a weapon
- Suspect threatens MOS with physical harm



Can you handcuff someone during a Terry stop? You can use the example above if useful re: the couple who fled from the clothing store - if they are compliant, not trying to flee or hurt you, are you going to cuff them for the show up?  Explain that visible cuffs can impact the validity of the show up.

In addition, the general rule is the handcuffs are for ARRESTS and should not be an automatic step in a *Terry* stop.   However, if an officer has to deal with a rapidly unfolding, dangerous situation, handcuffs may be used during a *Terry* stop.   If a suspect acts violently, resists being detained, or tries to flee, handcuffs may be used.  If the suspect may be armed or there may be a weapon near the site of the stop, handcuffs may be used.

If you do need to handcuff a suspect during a *Terry* stop, if you are going to continue to ask the suspect questions while he is handcuffed, the best practice is to Mirandize him before you continue to question the suspect.  If you have reasonable suspicion that the suspect is armed and dangerous and are about to conduct a frisk, you may ask whether or not the suspect has any weapons on them without first providing *Miranda* warnings.[40]

Also, if you do need to handcuff the suspect, cover or block the view of the handcuffs during any show up identification.

SUSPICIOUS BULGES

One fact that can lead you to suspect the person is armed and dangerous are visible signs of a weapon, including the famous "**suspicious bulge**."

Just how "distinctive" the bulge must be depends on all the other facts.

---

[40] *People v. Martinez*, 53 A.D.3d 508 (2d Dept. 2008); *People v. Maxwell*, 22 A.D.3d 314 (1st Dept. 2005); *People v. Burgos*, 255 A.D.2d 199 (1st Dept. 1998); *People v. Jenkins*, 208 A.D.2d 459 (1st Dept. 1994).



[This photo can be used to facilitate the conversation. The class can be asked whether, based on their training and experience, they could articulate a reasonable suspicion that this is a firearm, particularly if they had additional facts.]

In a nutshell, if you see someone just walking down the street minding his own business. He's not related to any radio run. He's not casing anyone. He's just walking down the street, and you see a bulge. In order for you to lawfully frisk him, the bulge has to be very distinctive. You have to see the **outline of some feature of a weapon**.[41] This is a high standard, but it makes sense since, in this situation, the bulge is the only fact that is the basis to believe the individual is armed and dangerous. There are no other facts pointing to even a Level 1 objective credible reason to approach. So, for a bulge alone to be sufficient to warrant a frisk, it has to be very distinctive.

Conversely, when you do have other information of criminality, like an anonymous call with a detailed description, you just need to see something on the suspect's person that you **reasonably suspect is a weapon**.[42] If you see a bulge you reasonably suspect is a weapon, you don't need to wait and look for outlines of features of a gun. But remember, not every bulge you see gives you reasonable suspicion that a person is armed. There are many everyday objects that people typically carry in their clothing pockets such as cell phones, wallets, and keys that create bulges. But those bulges do not automatically give you reasonable suspicion that the person has a weapon.

The location of the bulge is noteworthy because unlike a pocket bulge, which could be caused by any number of innocuous objects, a waistband bulge is more often a sign of a weapon.[43]

Suspects carrying a weapon are often self-conscious. They are usually nervous and unable to prevent themselves from touching the weapon periodically with some part of their body such as

---

[41] *People v. Wright*, 253 A.d.2d 720 (1st Dept. 1998) ("Defendant was seen by one of the arresting officers with his pants pocket weighted down by an "L-shaped" object, which the arresting officer believed to be the outline of a gun. The arresting officer's observation provided reasonable suspicion to believe that defendant was armed and dangerous.").

[42] Patrol Guide 212-11.

[43] *People v. Holmes*, 81 N.Y.2d 1056 (1993) ("As we have recognized, a pocket bulge, unlike a waistband bulge, could be caused by any number of innocuous objects.").

their hand, wrist, forearm, elbow, or bicep.  So their gestures near or adjustments of a bulge may also provide reasonable suspicion that the bulge is a weapon.

Remember, if you have someone stopped for a violent felony, like robbery, you don't have to wait to see bulges.  You can frisk automatically.



What about bags?  What if you have reasonable suspicion for a suspect for a gunpoint robbery two minutes in the past, he fits the description, you stop him, tell him to drop this bag, he does, you frisk him, you don't find a gun on him, but this bag is next to him at his feet.  Can you "frisk" the bag?  Yes, an officer can frisk a suspect's bag if the officer has the right to frisk the suspect and the bag is in the suspect's "grabbable" area.[44]  If you have handcuffed the suspect, but the bag is within their grabbable area, you can still frisk the bag.[45]  If the suspect has a hard case rather than a soft backpack, in other words, if the case does not lend itself to being "frisked," then the officer can open it if it is unlocked.[46]  Frisks are for safety.  If the container is locked, nothing in it can hurt you.  This pertains to Level 3 encounters.

Now turning to Level 4 encounters and sticking with our gunpoint robbery hypothetical:  If the CW is already on the scene when officers arrive, she points the suspect out, and the officers place the suspect under arrest.  A suspect's bag may be searched if it is within his grabbable area and the officer has: (1) a reasonable belief the bag contains destructible evidence, or (2) a reasonable belief that the suspect may gain possession of a weapon in the bag  Once the defendant is in handcuffs and arrested and no longer has access to his belongings, unless the

---

[44] *People v. Emerhall*, 181 Misc. 2d 400 (Sup. Ct. Kings Co. 1999) ("After reviewing the pertinent appellate cases, certain rules can be discerned. The presence of reasonable suspicion permits a stop and frisk of a suspect for weapons as well as a frisk or pat down of any bag that he might be carrying or that is within his reachable area. A bag that is flexible and whose contents can be felt by touching its exterior must be patted down and may be opened for a search only when after a pat down, the officer reasonably believes it contains a weapon. When, however, due to a closed container's rigid exterior, its contents are not susceptible of being identified by touch, then a bag or container may be opened and visually inspected…").

[45] *People v. Bowden*, 87 A.D.3d 402 (1st Dept. 2011).

[46] Kamins § 2.05[1].

officer knows that there is a weapon[47] in his belongings, he has to wait to search them in the precinct per an inventory search, get consent, or get a warrant.

In ***People v. Jimenez***, 22 N.Y.3d 717 (2014), officers established probable cause to arrest the defendant for a residential trespass but had no information she was armed, placed her under arrest, searched her handbag at the scene and recovered a gun.  The gun was suppressed.  The court held that the warrantless search of the closed container found on the defendant's person incident to arrest required one of the two exigencies listed above, but found that neither of the exigencies were present (there was no indication that the bag contained either a weapon or destructible evidence).  Thus, officers needed consent, a warrant, or a legitimate inventory search pursuant to PG 218-13.



# What's a FRISK?
# What's a SEARCH?

## FRISKS AND SEARCHES

Frisks and searches are two distinct events.

A FRISK is the running of your hands on the outside of a person's clothing to feel for weapons and only weapons, not vials, not marijuana.  This is not a search for contraband or other evidence of a crime, just weapons.  This is **solely for your safety**.[48]   Note: we tend to use the phrase "pat down."  A "pat down" is a frisk.   It's not some lesser intrusion that requires less suspicion.  If you are running – or patting – your hands down someone's clothing, that's a frisk.

> What if you feel something, you know it isn't a weapon but you are pretty sure the items are vials. What can you do?  Not search.  But you could say,
> "What's in your pocket?"  Or seek consent to search the pocket.

A SEARCH is when you go inside, i.e., a pocket, a bag, upon feeling the hard object.
If and only if you feel something during the frisk that you reasonably believe may be a weapon, may you search that specific area, that is, actually put your hands in the area, such as a pocket, where you feel the possible weapon.

---

[47] *People v. Alvarado*, 126 A.D.3d 803 (2d Dept. 2015) (officers could search backpack that had been moved three feet from handcuffed defendant incident to his arrest because he stated that there were guns in the backpack).
[48] N.Y. CPL § 140.50.

If you are sure it IS NOT a weapon, you can't go in and search.[49]
If it you reasonably suspect it might be, you can't rule it out, then search.[50]  Remember, it's not about 100 percent certainty but a hunch is not enough.

The purpose of the next slide is to put a fine point on the point:



Ask class how they'd answer this question now.

---

[49] *People v. Diaz*, 81 N.Y.2d 106 (1993) ("There can be no question that reaching into defendant's pocket and seizing the drugs were not within the scope of the *Terry* pat-down.").
[50] Patrol Guide 212-11.

51



Are the levels coming together for them? Pause here and spend a few minutes to make sure the class is getting a sense of the degrees of information at these levels.  Can they see the difference between a 1 (sick person, or the verbal dispute between the cabbie and his fare) vs. a 2 (guy in front a drug building hiding the bag) vs. a 3 (clear and apparent casing, or a known caller who reports a crime in progress and provides a specific description).

[Time permitting, instructors may want to test the class with some examples from the "Case Examples of Levels 1, 2 & 3" chart provided separately]

They should at this point be getting a sense of the flavor for the levels.  Level 2 is probably the hardest.  If an officer doesn't know where he is, it's probably Level 2, and the best tactic might be to wait and watch if he can.



[Use ShotSpotter as a way of discussing the different levels and how they can change quickly.]

The deployment of ShotSpotter sensors around the City is expanding.   Here's how it works.  The sensors detect the sound and location of gunfire, send a recording of the possible gunfire to an employee at ShotSpotter who is trained in the recognition of the sound of shots being fired, and if he or she concludes the sound was gunfire, he or she transmits a message to the NYPD with GPS information regarding the location of the shots.  The average time from discharge to the NYPD receiving an alert is approximately 45 seconds.  Right now the messages are dispatched through the operations unit but will soon likely go through Central.   The pinpoint for the shot has a 40 foot range approximately (in any direction from the pin point) and if the technology improves, the range may get closer.   The alert can be for a single shot or multiple, obviously multiple shots are more reliable.

Here are some typical transmissions:

"Operations Unit to Central.  Receiving ShotSpotter alert for multiple gunshots at 2911 Ave D. 4 shots fired.  Location appears to be the corner of the location.

"Operations Unit to Central.  Receiving ShotSpotter alert for possible gunfire at 1690 E 174th Street.  Possible three shots fired.  Location appears to be the side of the building.

The transmissions themselves convey a range of certainty.  Possible vs. multiple (stronger).
There's no case law on ShotSpotter yet.
What level is a response to a ShotSpotter call?
We can treat it like a call for shots fired.  We know the source, it's not anonymous, but there's never a physical description of the suspect.

So if you get to the location quickly and you see a crowd of 20 people just milling around – what level? (Level 1, possible witnesses).

Now say 19 of them are watching one guy walk away.  They are looking at you, and then him, and then you, and then him. What level? (Level 2 – similar to an actual case for shots fired, *People v. Salva*, 228 A.D.2d 344 (1st Dept. 1996)).

Now say, as you begin to approach the individual walking away, he runs.  What level? Level 3.



This is a transition point to a drive home the importance of:

- Details and considering and articulating the totality of the circumstances
- The need for individualized suspicion
- Race, how it can be improperly used (unless the topic was covered in a prior discussion with the class)
- How race may be used in a description and the requirements of a sufficient description

What should be clear at this point is that the devil is in the details.  It's all about absorbing all of the details you can and then being able to articulate them. The slide above can be used to make the point that the stronger the facts – the ingredients if you will - the stronger the flavor (the

higher the level).  The instructor can use the list to highlight that certain facts alone are not enough, and the facts can't be general facts, like "I saw this individual in a high crime area." Remember, mere presence in a high crime area, by itself, is not enough for even a Level 1 encounter, much less a Level 3 stop.  The suspicion has to be individualized.  What do you see this particular person doing in this high crime area? That's what the case law means when it talks about requiring individualized suspicion. More than 90% of the people who live in that high crime area are law abiding people and we can't treat them differently because of the small percentage of people who commit crimes there.

And even if "high crime area" is part of your basis for reasonable suspicion, you must describe that "area" with specificity. In other words, it cannot be an entire precinct or borough.

The same goes for "furtive movements."  Furtive movements, standing alone, are an insufficient basis for a stop or a frisk.[51]  Even when cited in combination with other factors supporting a stop or a frisk, you must be able to specifically describe the suspicious nature of the "furtive movements" you observed (e.g. "blading the left side of his body" or "repeatedly touching an object in his waistband.").

It's not that we need all of the facts listed on the above slide to arrive at Level 3.  We saw this with the examples above – clear casing behavior can be enough.  A known caller reporting a crime with a sufficient suspect description and location can be enough.

Since a description is a common ingredient, let's talk about what makes a description sufficient.



A description has to be sufficiently specific.  Race, age and gender alone are not enough.  When you are responding to a description from a radio run, there generally will be more.  The caller will provide some information about when the incident occurred and the location.  That can serve as the additional information we need.  And often we get at least one item of clothing in the description.  A general description can only be sufficient to conduct a stop if the suspect is found

---

[51] *People v. Rossetti*, 148 A.D.2d 357 (1st Dept. 1989) ("We have previously held that so-called furtive movements by occupants of a vehicle do not justify a vehicle stop."); *Floyd v. City of New York*,, 959 F. Supp. 2d 688 (S.D.N.Y. 2013) ("'Furtive movements' are an insufficient basis for a stop or frisk if the officer cannot articulate anything more specific about the suspicious nature of the movement.")

in close temporal and spatial proximity to the crime and is the only person at the scene who fits the general description.[52]

But as we discussed above, a crime pattern that only provided age, race, and gender (e.g. pattern of daytime burglaries committed by Hispanic males between the ages of 18 and 25) or covered a very broad geographic area or time period (e.g. several daytime burglaries in the 77th precinct over the past three months) would not be sufficient without more.

Now, other than the aforementioned detailed suspect description, are there any other situations where you can stop a person based on his or her race? The answer is no. Under the Department's policy prohibiting racial profiling and bias-based policing, Patrol Guide 203-25, race can only be considered when the stop is based on a specific and reliable suspect description beyond simply race, gender, and age. Otherwise, an officer's decision to stop a person may not be based only *or even in part* on that person's race, ethnicity, or national origin. What does that mean?

Well, suppose a particular precinct last year had 32 shootings. 90% of the perpetrators were described as male, black 18 to 24 years old. You might consider this a high crime area, but does that mean you can stop every black male who is 18-24 years old? Of course not. This kind of suspect data does not give you reasonable suspicion for all young black men in the area. *The fact that a person is a member of a racial or ethnic group that appears more frequently in local crime suspect data cannot, by itself, or even in combination with other stop factors, establish reasonable suspicion for a Terry Stop.* You need individualized suspicion. What is it about the particular person you are stopping, aside from his or her race that gives you reasonable suspicion? Is it the person's behavior (e.g. blading, clutching waistband, casing), is there a bulge you observe in their waistband, etc.?

We know that a person's presence in a high crime area alone does not give you reasonable suspicion. And that person does not become any more suspicious if he is a young, black man and most of the recent robberies in the area were committed by black males in their early 20's.

Remember the example we discussed at Level 2, the one involving two men and a woman in front of a drug-prone location, a location that had been the subject of recent complaints of drug activity? It was the example where one of the men walked off as the police pulled up and the remaining man hid a bag behind his back. Assume the community complaints did not include physical descriptions of the alleged narcotics dealers working at this location. If you were aware that all of the drug arrests in that precinct or general area in the prior month were Hispanic Males (not prior arrests at this specific location, but rather arrest data for the precinct or general area), would that information elevate your level of suspicion as to these three individuals? No.

*Remember, reasonable suspicion has to be INDIVIDUALIZED. Treating entire racial or ethnic groups as more suspicious than other racial or ethnic groups is COLLECTIVE SUSPICION, which is illegal, unconstitutional, and has no place in policing in a multicultural, democratic society.*

---

[52] *See* Kamins § 2.05[2][f]; *People v. Ellison,* 222 A.D.2d 693 (2d Dept. 1995) (General description of "two male blacks in their early twenties, one about six feet tall, and the other one shorter," was held to be sufficient, where the defendants were the only people on a subway platform, "in close proximity to the crime scene shortly after the crime occurred."), *People v. Green,* 10 A.D.3d 664 (2d Dept. 2004); *People v. Chin,* 178 A.D.2d 423.

*But it's not just illegal and undemocratic, it's ineffective. Why? Because decades of criminological research have shown that, even in high crime communities, the vast majority of crime is committed by a very small percentage of the population. Even if crime data indicates, for example, that most recent narcotics sales are committed by young Hispanic males in a particular area, the vast majority of young Hispanic males in that neighborhood are NOT involved in the drug trade. In other words, except when they match a specific description of a suspect in a reported crime or crimes, a person's race tells us nothing about their likelihood to engage in criminal activity and cannot support your decision to make a Terry Stop.*



We're about to get into the details of the full toolbox we have at Level 3, but first we should talk about one of your most powerful tools: how you talk to people.  Do not underestimate your power to de-escalate a situation, gain compliance and cooperation, and avoid a CCRB based solely on how you talk to people and how you treat them.

Here the instructor can either call back to the question that was raised at the start of the class (has anyone here be stopped by the police?) or raise it now and try to get stories that make the point as described in the introduction of this Guide.

Whether the class offers personal accounts or not, the instructor should follow up with a story of an actual stop which will be shared in instructor workshops.  The story will demonstrate:

- How race was improperly used by an officer
- How the officer's lack of professionalism stayed with the stopped individual to this day. It's a story that would naturally be shared with friends and family members.  The damage to our legitimacy and trust is multiplied over and over.
-

56

## Interior Patrols in NYCHA and TAP buildings



You are likely to conduct investigative encounters during interior patrols.  There are two types of interior patrols.  One is patrols of private multiple dwelling buildings for criminal activity including trespassing under the Trespass Affidavit Program (TAP).  Under this program, building owners authorize the police to inspect the common areas of these buildings for illegal activity.  The other type of patrol is of New York City Housing Authority (NYCHA) residential buildings.  Interior patrols of NYCHA buildings are designed to assist the Housing Authority in enforcing its rules, addressing criminal activity, providing a safe and secure environment and ensuring the habitability of its residential buildings for Housing Authority residents and their guests.

**BE PROFESSIONAL AND RESPECTFUL**.  When conducting an interior patrol of NYCHA or TAP buildings, it is important that all members of the Department understand the legal boundaries that accompany their role.  Understanding these legal boundaries and conducting all interactions in a courteous, professional and respectful manner are critical parts of building a positive relationship with residents.

While conducting an interior patrol, it is important to remember that these interactions are taking place in the common areas of residents' homes.  Most of the people you will encounter in these buildings will be law-abiding residents and their guests who want to live in or visit an orderly, crime-free environment.  Positive interactions can create allies and negative interactions can lead to a permanent distrust of police.

Use professional language.  Make sure your tone of voice is appropriate for the situation.  Remember that by de-escalating a situation, you help yourself stay in control of the interaction.  When in doubt, remember what is written on every police vehicle: courtesy, professionalism, respect.



**THERE IS NO 4TH AMENDMENT EXCEPTION FOR INDIVIDUALS IN OR IN FRONT OF TAP/NYCHA BUILDINGS**.  Interior patrols of TAP and NYCHA buildings must comply with Patrol Guide 212-11.  They are not an exception to the law of investigative encounters. Everything we've covered that you can and cannot do at each level on the triangle chart is just as true when you're conducting an interior patrol.

**MERE PRESCENCE near, entry into, or exit out of a TAP or NYCHA building is not an objective credible reason to approach an individual.**


**DOING AN INTERIOR PATROL**.  As is the case with car stops, there are unique dangers present during interior patrols.  Check current information about the building on your smartphone.  Before entering a building to conduct an interior patrol, let communications know the location of the building you are about to patrol.  This will ensure that any responding officers know your location and will also ensure that you know the address of the location you are about to enter.  There have been many times when police officers have attempted to call for assistance only to realize that they do not know where they are.

Prior to conducting a NYCHA interior patrol, notify/query VIPER unit personnel whenever practical.

Prior to conducting a TAP interior patrol, confirm that your command has a current Owner's Affidavit on file (signed within the last 6 months).

Lower your radio if appropriate.

Document the "no trespass" signs.

Stay together.  Do not conduct an interior patrol alone. Patrolling with a partner at all times is essential for your safety



## PG 212-60:

*Even if there is probable cause to arrest a person for trespassing, officers **may** exercise their discretion to refrain from arresting that person, and instead instruct that person to leave under appropriate circumstances.*

**HYPOTHETICAL VERTICAL**

If you see guys hanging out in front of the building – what do you have?  Nothing.  Mere presence isn't OCR.

What if you encounter a female in the stairwell?  That is OCR.  You are at Level 1.

> Stairs are meant for coming and going, not hanging out.  Since you have an objective credible reason, you may ask if she lives in the building, is visiting someone in the building or has business in the building.  Let's say the female says she's just hanging out, she's visiting her friend in 7J, then it turns to 10J, and she doesn't know her friend's name.

> That went from a Level 1 to Level 3.  Now you have reasonable suspicion to believe this individual may be trespassing and you would have the authority to hold her there for a reasonable period to enable you to complete your investigation.[53]

Be alert for persons who may be engaged in Criminal Trespass.  If there is an objective credible reason to approach such a person based on observed behavior or other credible information, you may approach and ask in a non-threatening and non-accusatory manner:[54]

> (1) If he or she lives in the building
> (2) If he or she is visiting someone in the building
> (3) If he or she has business in the building

If the person says NO to all three questions, you have probable cause to arrest for trespass.  Even if you do have probable cause to arrest someone for trespass, you have the discretion to instruct that person to leave the building instead.  Use your best judgment.

Now let's discuss how you can deal with a person who is uncooperative and won't answer your questions, or where you can't verify a person's authority to be in the building.

At Levels 1 and 2, when individuals are free to walk away, a person's decision to leave the building, remain silent, or refuse to provide information or identification when questioned by the

---

[53] *People v. Wigfall*, 2005 N.Y. Misc. LEXIS 3493 (Sup. Ct. Bronx Co. 2005).
[54] *People v. Wannamaker*, 93 A.D.3d 426 (1st Dept. 2012) (NYCHA building: "[T]he police had an objective credible reason for approaching defendant and asking him if he was a resident or visitor."); *People v. Greene*, 271 A.D.2d 235 (1st Dept. 2000) (TAP building).

police does not give you reasonable suspicion to stop or probable cause to arrest.  Even at Level 3, you may detain the person, but he or she is still not required to answer your questions.

Remember, the burden of proving that an individual does not have authority to be in the building rests on the Police.  The individual is not required to answer questions, not even about his or her authority to be in the building.

If you suspect the person does not have authority to be in the building, but the person cannot or refuses to explain his or her presence in the building, and you are unable to verify the person's authority to be in the building, you may instruct that person that he or she must leave the building, and that refusal may result in arrest for Criminal Trespass.

However, you may only arrest a person if there is probable cause to believe the person committed a trespass.  A reasonable investigation is ordinarily necessary to determine whether probable cause exists.  A person's refusal or inability to produce identification or provide information does not elevate the level of the encounter.



Make sure you fill out a Trespass Crimes Fact Sheet for all trespass arrests you make in and around NYCHA and TAP buildings.

60

Beyond Level 3, is Level 4.  Probable Cause.  Reasonable suspicion is what you need to detain someone.  Probable cause is what you need to arrest someone.  Probable cause = more likely than not.



What about issuing a summons?  If you are issuing someone a summons, can you direct him to take his hands out?  Yes.  Can you frisk the person?

A SUMMONS IS NOT A FREE TOSS.

When someone is ARRESTED for a violation, they can be **searched incident to the arrest**. However, when an officer decides to give a person a summons, officers do not have the automatic right to frisk the individual. [55]   Courts have required specific and reasonable safety concerns based on the facts of the encounter to justify a frisk.  In cases involving Disorderly Conduct (*St. Clair*),[56] playing a car stereo too loudly (*Driscoll*),[57] a traffic infraction (*Randall*),[58] and carrying an open container (*Muhammad*),[59] New York courts have ruled frisks to be improper.  However, if the officer has specific and reasonable safety concerns based on the facts of the encounter, a frisk is permitted.[60]   You don't need to see the outline of a weapon or a distinctive bulge.  If the person is aggressive, hostile, or suspiciously uncooperative during processing for a summons, that kind of behavior can provide a reasonable basis to have a safety concern and conduct a frisk.  For example, in *People v. Aponte*,[61] another Disorderly Conduct case, the defendant was among a group blocking the sidewalk, acting boisterously and interfering with pedestrian traffic from a nearby social club.  The defendant refused to comply with the

---

[55] Kamins § 2.05[3][c].
[56] *People v. St. Clair*, 54 N.Y.2d 900 (1981).
[57] *People v. Driscoll,* 101 A.D.3d 1466 (3d Dept. 2012).
[58] *People v. Randall*, 85 A.D.2d 754 (3d Dept. 1981).
[59] *People v. Muhammad*, 120 A.D.2d 937 (4th Dept. 1986).
[60] *People v. King*, 65 N.Y.2d 702 (1985) ("Although the fact that a person has been stopped for a violation does not ordinarily justify a frisk, a limited pat down for concealed weapons was reasonable in light of the defendant's uncooperative and suspicious conduct after he had been ordered to stop by the officer.")
[61] 959 N.Y.S.2d 91 (Bronx Co. 2012)

officer's direction to disperse and confronted the officer.  The court permitted a frisk based on the violation committed in the officer's presence combined with the defendant's behavior.  In *People v. Nichols*,[62] the officer observed the defendant drinking in public.  As he was being processed for a summons, the defendant was agitated, trembling, and refused to answer questions.  On these facts, the court permitted a frisk.   Finally, in *People v. King*,[63] an officer observed the defendant committing a gambling violation, approached him, the defendant fled to a nearby store and refused to come out until the officer pried the door open.  The officer frisked the defendant and recovered a loaded firearm.  The court permitted a frisk in this case based upon the defendant's "uncooperative and suspicious" behavior during processing for a summons.

During a summons encounter, an officer may ask if the person has any weapons.

Ex: Young man riding his bike on the sidewalk.  He is a messenger.  You've seen him do this before.  You approach him.  He stops.  He's compliant and respectful.  His hands are out of his pockets while you write his summons.  Are you going to frisk him?

Ex: You see male with an open container at a parade.  You approach him.  He's intoxicated and belligerent and he smashes his beer bottle on the ground.  Are you going to frisk him?



For Police Officer/Det classes: ADA/Atty instructor and UMOS instructor do mock complaint room presentations based on facts and outcomes of actual cases.

For Supervisor Classes – optional variation: Do the same role play but with an officer and a Sgt. instead – the Attorney instructor can follow up with how the court ruled.

---

[62] 250 A.D.2d 370 (1st Dept. 1998).
[63] 65 N.Y.2d 702 (1985).

## Contact Us

 

- Risk Management Bureau
    - 1 Police Plaza, Room 1408
    - 646-610-7900
    - rmbsolquestions@nypd.org

- Compliance Division
    - 253 Broadway, 6th Floor
    - 212-618-3100

- Legal Bureau, Criminal Section
    - 1 Police Plaza, Room 1406
    - 646-610-5400



SURVEY
MONKEY

[MEAL]

# **<u>Attachment 2</u>**

---

# INVESTIGATIVE ENCOUNTERS
# IN-SERVICE TRAINING

## INSTRUCTOR'S GUIDE
## Part II B
## [For Police Officers & Detectives]

---



  

# DOCUMENTATION



**Do the Stop Report for:**



 

**NARRATIVE
REASONABLE SUSPICION**

At T/P/O Deft matched radio run description of a male black possibly carrying a firearm.

**NARRATIVE
REASONABLE SUSPICION
(GOOD REPORT)**



At T/P/O the above listed officer responded to a radio run of a male with a firearm from a verified caller. Approximately 5 minutes from receiving the call, officers arrived on scene and observed a male black fitting the description; male black, approximately 5'10", slim build, black hat, black t-shirt, black short, dreadlocks.

**NARRATIVE
FRISK / SEARCH**



At T/P/O Deft was searched after lawful arrest.

**NARRATIVE
FRISK / SEARCH
(GOOD REPORT)**



Upon arrival of responding officers, Deft did attempt to leave by walking in opposite direction of officers. While attempting to walk away, Deft did tense up and bladed his body away from officers. Deft had a large bulge in his left cargo short pocket in the outline of a weapon. A loaded Highpoint 9mm firearm was recovered.

Replay above body camera video and have the class prepare a Stop Report for this stop.  (Post mock location, time, pedigree, etc. information so that the class may complete the report).

The class should hand in their Stop Reports.

One instructor should display the narratives of "bad" Stop Reports for this stop from a pre-existing collection that includes a mocked-up "bad" report and other anonymous examples collected from prior classes.  The class should discuss the deficiencies in these examples.

Meanwhile, other instructors should go through the reports prepared by the class and look for a good example to display.

Display a good example from a member of the class or the mocked-up "good" report on the overhead projector and discuss it.



This is a takeaway from the previous exercise.  The narrative should lay out the facts that established reasonable suspicion.  Did the Stop Report they each just prepared do that?  We saw what one looks like when it does and when it does not lay out all of the facts, and we'll see more examples later.



Discuss **<u>WHEN</u>** officers should be completing Stop Reports:

You must ALWAYS do a Stop Report anytime you stop someone, meaning <u>anytime you conduct an encounter that would make a reasonable person feel like he or she is not free to walk away</u>.  This includes a stop of someone in a TAP or a NYCHA building.

3

Remember, the triggering event for you to do the Stop Report is not whether you think you have reasonable suspicion to stop someone.  It is whether you conducted an encounter in a way that would make a reasonable person feel as though he was not free to leave.  If you did so, then it was a "stop" and a Stop Report must be prepared.

**Any time an encounter passes through Level 3, you need to document the encounter in a Stop Report.**

So, <u>what if</u>:

- A gun run based on an anonymous call <u>starts as a Level 2 but goes up to a 3</u> because the subject runs when you get there? You give chase, catch him, frisk him, and recover a gun from him and he's under arrest.   Since there is an arrest, do you have to do a Stop Report?  <u>Yes</u>, because this started as a 2 and became a 3.  You effected a Terry Stop and a Terry Stop = a Stop Report, even if it ends in an arrest.

- What about a <u>summary arrest</u>?  It's an assault two minutes in the past, and when you arrive, the complainant is on the scene and points the person out. Would you need to fill out a Stop Report for that?  No.  It was at probable cause/Level 4 when you arrived.  The event never passed through Level 3.

- What about a <u>VTL stop</u>?  What if you order the passengers out but do <u>not</u> frisk? No Stop Report.   Now what if you DO <u>frisk</u> them?  You should do a Stop Report.  The authority to frisk someone does not flow from the moving violation itself but rather is authorized when you develop Level 3 reasonable suspicion that the person is armed and dangerous during the traffic stop.

- What if it's a stop, and the person matched the description perfectly, but it was the wrong person and there is a <u>cordial</u>, smooth disengagement?  It was a *Terry* stop, so you still need a Stop Report.

- Let's do one more example involving a <u>summons</u> – not a traffic summons, but a penal code or administrative violation.  What if you observe a person urinating in public and begin to issue the person a summons?  And let's say the individual is aggressive toward you or blades you while you are processing him for the summons.  You feel concerned for your safety and frisk the individual.  Was that a Terry stop?  No.  Your authority to frisk flowed from an articulable safety concern during a Level 4 summons-in-lieu-of-arrest encounter and not from an investigatory detention pursuant to *Terry*, so you do not need to fill out a Stop Report.

    - Alternatively, what if a male, who matches the description for a robbery perfectly, is stopped and frisked, and a knife with a six inch blade is recovered from him. The male is NOT identified in a show up and the actual perpetrator is

4

apprehended shortly thereafter.  Then you would do the Stop Report because the frisk was due to a *Terry* stop.  The *Terry* stop preceded the probable cause for the violation.

[Note the contrast here between VTL summonses and pedestrian (for lack of better label) summonses.]

## Discuss **<u>HOW MANY</u>** Stop Reports to prepare:

You must do <u>one for each individual you stopped</u> and the narratives must relate to the particular individual named in the Stop Report.

So <u>what if</u> a complaining witness reports that 5 young men robbed him on a train, and 5 young men matching the various descriptions provided by the complainant are stopped near the station and brought back for a show up, but the CW only ID's 3 of them - how many Stop Reports have to be prepared?  FIVE, because five people were STOPPED.



Do you know what this is?
It's the 250 that cost a cop two days.  Because he didn't do one.

I'm joking but it is a serious point.  It is important that you understand your legal authority to do a stop and it's also important that you document them when you do them, both in a Stop Report and in your Activity Log.  Cops today are, to some degree, avoiding this form like it is toxic.  It's not.  It's a basic form. By the end of today, you are going to know how to write an excellent Stop Report and what to say in your Activity Log entry.  Please understand that you run a much greater risk of getting into trouble for a stop if you don't document it.



Go over what Patrol Guide 212-11 requires supervisors to do regarding their Stop Reports.

No one should be using paper anymore.  You should be using the app on your phones.

[Make the class take out their phones and show them where they can find the App.  Walk them through the main sections of the Stop Report including the checkboxes and the narratives.]
**Remind the class of the following:**

- **Do not select "Other" and write in the term "furtive movements" when describing the basis for the stop, as seen in the Basis for the Stop/Identification/Suspected Crime slide.**
- **Put a description of the suspect in the box that says "Other (Scars, Tattoos, Outer Garments, Etc.)" as seen in the Basis for Stop/Identification/Suspected Crime slide.**

- **If the stop is in response to a radio run, write whether the 911 caller is verified or anonymous in your narrative. An unverified call is the equivalent of an anonymous call.**

**Common Mistakes in Stop Reports**

- Not enough info to show reasonable suspicion for frisk
- Not enough info on person stopped
- Crime suspected does not match story in narrative
- "Fits Description" but no description provided

**Common Mistakes in Stop Reports**

- No indication if caller was anonymous or not
- Pedigree info (name, address) put in narrative
- Documentation of Tear-Off Card
- Do not write in "Furtive Movements" in Stop Report

The form must be complete.  You must fill out all fields and clearly explain the basis for why you believe you had reasonable suspicion to stop, frisk or search in the report. You should check off all of the stop factor checkboxes that relate to your reason(s) for making the stop and all of the frisk/search factor checkboxes that relate to your reasons(s) for conducting the frisk and/or search. The narrative sections should include all of the facts and information you relied upon to conclude that there was reasonable suspicion.

The content contained within the four corners of a Stop Report should make clear to whoever is reading it why you stopped the individual and the basis for any frisk or search.

A narrative that fails to convey the essential facts is a common error we see in Stop Reports.

The first narrative section is utilized to explain why you stopped an individual.

The second narrative section is utilized to explain why you frisked or searched the person stopped if one or both of those actions were taken.

In each of the narrative sections on the Stop Report, you must explain in your own words the facts supporting each of the checkbox stop factors checked off on the front side of the Report and each of the checkbox frisk and search factors you checked off on the back of the Report.  For example:

1. If you check off "Matches a specific suspect description," you must include in the narrative all the details of that description, beyond just race, age and gender, as well as whether that description was provided by an anonymous or identified source.
2. If you check off "Identified Crime Pattern," you must provide all of the details of that crime pattern in the narrative.
3. If you check off "Concealing or Possessing a Weapon," you must provide all the facts which led you to suspect the person of possessing a weapon. Don't just write conclusory

statements like "furtive movement" or "bulge observed." Provide detailed and specific facts (e.g. "bulge observed in waistband" or "suspect repeatedly touching object in waistband while staring at officer").



If there are errors or omissions in your Stop Report, your supervisor will reject it and send it back to you with an electronic note telling you how it is deficient.  Once you have corrected it, resubmit it to your supervisor.

**The Activity Log Entry**



**You need to include:**
- Date, time and location of stop
- Pedigree information (name, date of birth, address, telephone #), unless refused
- Detailed description of the person stopped
- Refusal to provide pedigree information, if applicable
- ICAD number, if applicable

[Go over the requirement to do an Activity Log entry.]

[For background information, the reason that we cannot include pedigree information (name, address, social security number) in the Stop Report is that the city is prohibited under CPL 140.50 (4) from recording pedigree information from stops that do not result in an arrest or summons in an electronic database. When the Activity Log becomes electronic, the pedigree information will have to be noted elsewhere.  Officers should be alert for further instruction from the Department when that transition occurs.]

8



**Consent to Search and BWC Footage**

· If you asked for consent to search the person:

1. Record the entire interaction on your Body Worn Camera

2. Offer the person information on obtaining a copy of that video recording by directing them to the NYPD's FOIL page on the NYPD website or www.nyc.gov/police-encounters

3. Offer the person a Business Card, if they are not arrested or issued a summons

The Right to Know Act requires officers to record all requests for consent to search through the conclusion of the encounter.  It further requires that officers provide the person with information on how to obtain the Body Worn Camera video and offer a Business Card at the conclusion of the encounter.  Body Worn Camera video may be obtained through the NYPD's FOIL page or via the website on the back of the Business Card.  As discussed in the legal portion of the training, officers will also be required to document all requests for consent to search (both refusals and when consent was given).




The Business Card

Remember, the Business Card must be offered and officers must also explain the purpose of the interaction in the following circumstances:

All Level 2 encounters
All Level 3 *Terry* stops
All frisks
Any search of person or property, including vehicles
Vehicle checkpoints
Home searches
Investigatory questioning of victims and witnesses to crimes

One important exception re: the requirement to offer this card is **exigent circumstances**. For example: You have stopped someone who matches a description and are waiting for the complainant to respond. While you are waiting, you are collecting this guy's pedigree. The complainant gets there, there's a negative ID and then at that moment over the radio you hear

they've spotted another individual matching the description and they need back up. You do need to gather pedigree information for the person you stopped but then you can quickly assist your fellow officers – and hand the card out if practicable.

Otherwise, you need to offer this card. Those offered the card can decline to accept it.  If they do decline it, document that on the Stop Report if there's room or in your memo book. If they accept the card, complete the information on the card and give it to them.

Remember, Body Worn Camera video may be obtained through the NYPD's FOIL page or via the website on the back of the Business Card.  In addition, if a person wants to obtain more information about their stop or a copy of their Stop Report, you should tell them to go to the website on the back of the Business Card.

It is important to note that soon every stop you make will be captured on video, by at least one body-worn camera, so if there are exigent circumstances or the person declines the Business Card, there will be proof that you can depend upon. However, by that same token, if you fail to offer a Business Card in a situation where you are required by the Patrol Guide to do so, that too will be captured on video.  Remember to inform the individual how to obtain Body Worn Camera video as explained above.



**The Dust Off**

So let's say you get a radio run with a description of a male who committed an armed robbery two minutes in the past.  You see someone nearby who fits the description.  You and your partner stop him.  Guns drawn, full frisk.   If you find a weapon and the complainant IDs him, then you do a Stop Report (because this involved a *Terry* stop and ended in an arrest) but you don't offer him a Business card – these cards are for the people you suspect but then conclude should NOT be arrested.

But, what if you do the frisk, the person has no weapons, and the complainant arrives in a few minutes to do the show up and says "that is definitely not the guy"? You still are going to gather pedigree information from him to complete a Stop Report.  Let's say another sector catches the actual robber and it turns out the person you stopped was just on his way home from work.

Some cops call what follows the "dust off" or "selling the stop." Whatever you call it, it is important to explain to this person why you stopped him, not just because it is legally required. One important thing to remember here is that most Level 3 stops begin and end with a stop. Most don't lead to an arrest. That's a fact. It doesn't mean that they are bad stops just because they don't end in an arrest. If you have reasonable suspicion, you are doing your job when you stop the person. Period. But the male we just stopped in this hypo, who was the wrong person, who just happened to be in the wrong place at the wrong time, is going to go home to his family and tell them what happened, and the person on today's Stop Report could be tomorrow's witness, or his mom could be tomorrow's juror, and we need to think about that. You know you have heard people say these words: 'it sucked but the cop was a gentleman about it' or 'he was just doing his job.' So explaining why you stopped the person in this situation is important and the card helps you do that. If people feel that they were treated in a respectful manner and you EXPLAIN to them why you did what you did (i.e. the process is transparent), you are gaining legitimacy for both yourself and the police in general.

How you talk to people is an important component in achieving legitimacy. Legitimacy here means that the public sees you as entitled to exercise your authority as police officers to enforce the law and maintain social order. If people see the police as legitimate, they will be more willing to accept your authority and comply with your orders. Legitimacy is not an entitlement. It must be earned.

How can you achieve legitimacy? By policing in a procedurally just manner. Even if "procedural justice" is a new term for you, you are already familiar with the basic idea. It is part of the Department's mission to treat every citizen with compassion, courtesy, professionalism, and respect.

There are four elements of procedural justice – voice, neutrality, respect, and trustworthiness.

Voice means allowing the person you are interacting with to provide their point of view or offer an explanation. This makes them feel like they are part of the process and that they have input

11

into the decision, even if what they say does not change the result. Non-verbal cues are also important so pay attention not only to what you and the other person are saying but also to how each of you is acting toward one another.

Neutrality means fairness, that is acting consistently and without bias, applying the same rules to everyone.

Respect means treating everyone with dignity, having consideration and understanding for others' point of view and experience.  This validates the person as a human being.

Trustworthiness means providing a fair and transparent process (transparency) by conveying professionalism, competence and good character to the public. A person with good character has integrity, maturity, and respect for others. A competent person has the knowledge and skills to do their job effectively. These characteristics make you trustworthy to the public.

An important component of procedural justice is explaining to the person what you are doing and the reasons behind your actions.  For example, explaining the reasons for the stop.





Show the class how to access the investigative encounters videos they previously viewed at roll call via the intranet and their Smartphones.

**Body Camera Videos**





Bodega Stop - VIDEO 1

**BODY WORN CAMERA VIDEOS**



**NARRATIVE
REASONABLE SUSPICION**

At T/P/O subject matched description of a Hispanic male who was suspected of a dispute with a firearm and subject was at location.



**NARRATIVE
REASONABLE SUSPICION**
(GOOD REPORT)

A radio run for a 10-52 with a firearm came over at 350 Audubon Ave. **Verified Caller** states suspect displayed a firearm while in a dispute with another male. Caller stated suspect is wearing a grey jacket, grey pants with white sneakers and is in a group of 8 people.

13

NARRATIVE
FRISK / SEARCH 

Subject was frisked because he was a confirmed Hispanic male who was at the location of a crime.

NARRATIVE
FRISK / SEARCH
(GOOD REPORT) 

Subject was at the location and matching the description of a male with a grey jacket, grey pants with white sneakers. Frisk was conducted due to a violent crime with a weapon.

Mace Assault - VIDEO 2.1 

Mace Assault - VIDEO 2.2

NARRATIVE
REASONABLE SUSPICION 

At T/P/O defendant matched description of a female wanted for assault.

NARRATIVE
REASONABLE SUSPICION
(GOOD REPORT) 

At T/P/O officer responded to a radio run of a female wanted for assault by **spraying people with mace**. Information was received from a **verified 911 caller**. Approximately 5 minutes from receiving the call, officers arrived on scene and observed a black female fitting the description; female black, approximately 5'6", average build, long curly black hair, black sweater, black and white dress.

NARRATIVE
FRISK / SEARCH 

Upon arrival of officers, defendant tried to leave. Defendant was searched; a canister of mace was recovered in her handbag.

NARRATIVE
FRISK / SEARCH
(GOOD REPORT)

Defendant had possession of her handbag and volunteered consent to search. Police Officer recovered mace from her bag. She said, **"That's my pepper spray."** Defendant admitted to spraying the mace at someone. Show-up was conducted with a positive id.

14



Rite Aid - VIDEO 3.1 — NYPD

Rite Aid - VIDEO 3.2 — NYPD

**NARRATIVE**
**REASONABLE SUSPICION** — NYPD

At T/P/O P.O. received radio run of a female Hispanic, short hair, boarding a bus after shoplifting in Rite Aid. After boarding bus, officers notice female matching description, P.O.s took the female off bus.

**NARRATIVE**
**REASONABLE SUSPICION**
(GOOD REPORT) — NYPD

At T/P/O officers received a radio run from a **verified** caller that a Hispanic female, short hair, wearing glasses did shoplift from a Rite Aid store and board a city bus. Upon boarding the bus officers did observe female matching that description. After receiving a more thorough description from Central, officers did take female off the bus.

**NARRATIVE**
**FRISK / SEARCH** — NYPD

Search conducted, S.I.L.A.

**NARRATIVE**
**FRISK / SEARCH**
(GOOD REPORT) — NYPD

Defendant voluntarily consented to a search of her bag.  Suspect was a positive ID from c/v.  SILA  defendant was asked to open her jacket and bulges revealed stolen property from Rite Aid store.

For the final segment of the day, play selected series of body camera videos depicting real investigative encounters and have class evaluate the legality, professionalism and tactical soundness of the encounters according to instructor notes for the selected videos.

Instructors should also display mock narratives corresponding to the videos and have the class assess the narratives.

Videos will be added to the course material for this segment as they are identified, along with corresponding instructor notes.

15



Instructors should then proceed to the final scenario.

# **Attachment 3**
## Publicly Filed with Redactions



**INVESTIGATIVE ENCOUNTERS**

# Learning Objectives:



- **Understand the different levels of Investigative Encounters and the tools you have at each level**

- **Understand the documentation responsibilities, including how to prepare a good Stop Report**

- **Understand what is expected during the supervisory debriefs that follow stops**

- **Understand the proper procedures for interior patrols in TAP and NYCHA buildings**

- **Understand the appropriate and inappropriate use of race in conducting Investigative Encounters**







## NYC Stops in 2011



# Precision Policing: Stop Outcomes













# Protect and Serve

# Decline to Prosecute









# Patrol Guide Procedure 212-11



### PATROL GUIDE

| Section: Command Operations | Procedure No: 212-11 |
|---|---|

**INVESTIGATIVE ENCOUNTERS: REQUESTS FOR INFORMATION, COMMON LAW RIGHT OF INQUIRY AND LEVEL 3 STOPS**

| DATE ISSUED: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 06/27/16 | 06/27/16 | | 1 of 12 |

**PURPOSE**   To describe the types of encounters a uniformed member of the service may initiate with a member of the public during the course of his or her official duties, the level of knowledge required for each type of encounter, the scope of a police officer's authority for each type of encounter, the measures that are permissible to protect uniformed members of the service from injury while engaged in such encounters, and the procedures to be followed by a member of the service during these encounters.

**SCOPE**   In accordance with their oath to uphold the law, uniformed members of the service must conduct investigative encounters in a lawful and respectful manner; however, nothing in this section is intended to deter an officer from initiating appropriate inquiries and investigative encounters, including stops, or using any lawful and appropriate tactics to ensure the officer's safety during such investigative encounters. Moreover, this procedure should not be interpreted to discourage an officer from engaging in voluntary consensual conversations with members of the public. Members of the service are encouraged to develop positive relationships with the communities they serve. Such positive interactions with the community foster trust and understanding that will in turn enhance public safety and officer safety.

# The law is not new

# The law in the PG 212-11 isn't new, but THIS is:



*Minor or inadvertent mistakes in documentation or isolated cases of erroneous but good-faith stops or frisks by members of the service should ordinarily be addressed through instruction and training.* In most instances, instruction and training should be accomplished at the command level. The application of the law in this area can be complicated, and investigative encounters are fluid situations in which one event or observation can alter the level of suspicion or danger. A single erroneous judgment will not generally warrant referral to the Legal Bureau for retraining. However, members of the service who evince a lack of comprehension of the core concepts of the law governing this procedure should be referred to the Legal Bureau.







**New York City Police Department**

**FREE TO LEAVE** **1**

**Non-accusatory Questions**
**Protective Measures?**

**OBJECTIVE CREDIBLE REASON**
**Request for Information**

**FREE TO LEAVE RUNNING AWAY ELEVATES** **2**

**Pointed Questions**

**Consent to Search**

**Protective Measures**

**FOUNDED SUSPICION**
**Common Law Right of Inquiry**



**STOP** **3**

Detain

Force?

Frisk?

PointedQuestions

Consent to Search

Protective Measures

**REASONABLE SUSPICION**
**Terry Stop**







# Level 1



# Request for Information

# Objective Credible Reason







# Level 1 Tools

**NYPD**
New York City Police Department



# Non-accusatory Questions

---

# Protective Measures?



# Protective Measures at Level 1?

**Example: a male passes by two other men and continues to stare at them with a menacing, angry expression. You approach and ask him if there is a problem with those men. The male glares at you and begins to reach for his back pants pocket.**

**The use of the tool depends on a reasonable concern that your safety may be in jeopardy.**

18

# At Level 1, you CAN'T: 

- ⊘ **Ask pointed or accusatory questions**
- ⊘ **Seek consent to search**
- ⊘ **Detain the person, block his path or use or threaten to use force**
- ⊘ **Direct the person to stop**



# At Level 1 . . .

# Does the person have to stay and answer questions?











# False or Inconsistent Answers can

# the Encounter







# Back to our Quiz:

> **If you have an objective credible reason to approach someone and request information, then you are permitted to ask the person pointed questions.**

| TRUE | FALSE | IT DEPENDS | I HAVE NO IDEA |
|------|-------|------------|----------------|
| ☐ | ☐ | ☐ | ☐ |

[Page intentionally omitted from public filing.]



# Level 2

# Common Law Right Of Inquiry Founded Suspicion










**New York City Police Department**

## Level Two



**FREE TO LEAVE**

**1**

**Non-accusatory Questions**
**Protective Measures?**

**FREE TO LEAVE RUNNING AWAY ELEVATES**

**2**

**Pointed Questions**

**Consent to Search**

**Protective Measures**

**FOUNDED SUSPICION**
**Common Law Right of Inquiry**



# Level 1 Questions   v.   Level 2 Questions

- **Can I talk to you for a second?**
- **Name, address, destination, reason for being in the area?**
- **Did you see anything?**
- **Did you hear shots?**
- **What's going on?**

- **Do you have any weapons?**
- **Do you have anything you shouldn't have?**
- **What's in the bag?**

# CONSENT to SEARCH






# Consent to Search - PG 212-11

## "Can I search your bag?"

## "I can only search your bag if you consent, do you understand?"

# RIGHT TO KNOW ACT





**+**

**Explain purpose for the encounter**

- All Level 2 encounters
- All Level 3 *Terry* stops
- Frisks
- Searches
- Vehicle checkpoints
- Detectives only:
   questioning of
   witnesses and victims

35





**New York City Police Department**

**Jane Longname Doe**
Police Officer
Shield Number 94735

_____        _____
Command                    Phone Number

To request body worn camera footage, to get more information about a stop, or to submit a comment or complaint, visit:

**www.nyc.gov/police-encounters**
or
**For Comments, Call 311**

**BUSINESS CARD** PD 142-012 (03-18)



# Right to Know Act Exceptions





# Protective Measures



## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-11 | 10/05/15 | | 6 of 12 |

*Protective measures: Even if an officer does not have reasonable suspicion that a person is armed and dangerous, there are tactics for officer safety that an officer may use short of a frisk when the officer perceives her/his safety is at risk.  These include ordering the individual to take her/his hands out of her/his pockets, put down or step away from an otherwise lawful object that could be used as a weapon, grabbing the person's hands if the circumstances suggest the person may be grabbing a weapon, or forcibly removing the person's hands from her/his pockets if the individual refuses to remove them from her/his pockets.  Any lawfully possessed article that is removed/safeguarded by a member of the service during an investigative encounter should be returned to the individual at the conclusion of the encounter (unless probable cause is developed and the individual is arrested).*



# Protective Measures



**<u>What you can say</u>:**

- **"Show me your hands"**

- **"Put that down"**

- **"Take your hands out of your pockets"**

- **"Raise your hands"**

**<u>What you can do</u>:**

- **You can forcibly remove the person's hands from their pockets, if they refuse to show them**

- **You can grab the person's hands, if they reach for their pocket or waistband**





**Anonymous Source**

**FREE TO LEAVE**

**1**

**Non-accusatory Questions**
**Protective Measures?**

**FREE TO LEAVE**
**RUNNING AWAY ELEVATES**

**2**

**Pointed Questions**

**Consent to Search**

**Protective Measures**



**STOP**

**3**

**Detain**

**Force?**

**Frisk?**

**PointedQuestions**

**Consent to Search**

**Protective Measures**

**OBJECTIVE CREDIBLE REASON**
Request for Information

**FOUNDED SUSPICION**
Common Law Right of Inquiry

**REASONABLE SUSPICION**
Terry Stop

40



# Corroborating an
# ANONYMOUS CALLER
# **BEFORE** YOU GET TO THE SCENE



# Call ANI ALI
# Get a NAME



# If you can't get a name:

## Did caller JUST EYEWITNESS CRIMINALITY?
### Get caller's basis for knowing about the crime

## Does the ORIGINAL JOB convey sufficient details of observed criminality and a basis of knowledge?





# Corroborating an
# ANONYMOUS CALLER
# WHEN YOU GET TO THE SCENE

# Observations that corroborate alleged criminality

# ANONYMOUS

**+**





# ENOUGH
# TO GET TO 3?

## ANONYMOUS
## EXCEPTIONS





NOT:



# At Level 2

➕ **Ask pointed or accusatory questions**

➕ **Seek consent to search**

🚫 **Detain the person or use or threaten to use force**

🚫 **Direct the person to stop**



# At Level 2, does the person have to:

- Answer your questions?
- Produce ID?
- Consent to a search?
- Can he walk away?
- Does his refusal to consent or answer questions elevate the encounter?



# Back to our Quiz:

Founded suspicion is not enough to seek consent to search.  In order to seek consent to search, you need at least reasonable suspicion.

TRUE ☐          FALSE ☐          IT DEPENDS ☐          I HAVE NO IDEA ☐

48

[Page intentionally omitted from public filing.]





# Level 3

## The Terry Stop

## Reasonable Suspicion







**NYPD**
New York City Police Department

**Level Three**

FREE TO LEAVE

**1**

**Non-accusatory Questions**
**Protective Measures?**

FREE TO LEAVE
RUNNING AWAY ELEVATES

**2**

**Pointed Questions**

**Consent to Search**

**Protective Measures**



STOP

**3**

Detain

Force?

Frisk?

PointedQuestions

Consent to Search

Protective Measures

**OBJECTIVE CREDIBLE REASON**
Request for Information

**FOUNDED SUSPICION**
Common Law Right of Inquiry

**REASONABLE SUSPICION**
Terry Stop

53



# STOP and

# POSSIBLY FRISK



**Operator: "What's your emergency?"**

**Store Manager Lisa Jenkins: "We need the police - this couple was just in our store – they were here last week and ran up about $2500 on stolen credit cards – my security guard spotted them just now and was about to approach them – they ran out of the store,  we're on 14th street – they ran down University.  It's a young man and woman in their 20's.  He is white, has brown curly hair, glasses, purple T-shirt ….**



# "I frisked for my safety..."

# "...because I believed the suspect was armed and dangerous"

# Handcuffs during a Level 3 Stop?



**If questioning continues: Mirandize**







**STOP**

IF YOU HAVE REASONABLE SUSPICION THAT ARMED AND DANGEROUS

**+**

BAG IN GRABBABLE AREA

**YES- FRISK**

**CAN OPEN UNLOCKED HARD CASE**

**ARREST**

IF YOU HAVE REASONABLE BELIEF THAT BAG CONTAINS A WEAPON OR DESTRUCTIBLE EVIDENCE

**+**

BAG IN GRABBABLE AREA

**YES- SEARCH**

**IF NOT, INVENTORY OR WARRANT ONLY**

59



# What's a **FRISK?**
# What's a **SEARCH?**



# Remember

**There is no requirement that you be absolutely certain the suspect is armed.**

**Reasonable suspicion deals with probabilities and not hard certainties – just be able to explain your reason based on clear facts.**



# Back to our Quiz:

**If you have reasonable suspicion that a person just committed a Grand Larceny, you can frisk the person.**

TRUE ☐     FALSE ☐     IT DEPENDS ☐     I HAVE NO IDEA ☐

[Page intentionally omitted from public filing.]

# Coming together?













**Behavior**
**Intelligence about the area**
  **"high crime area"**
**Description**
    **Race, Age, Gender +**
**Location**
**Time**
**Pattern**
**Furtive movements**
**Flight**
**And more?**



# HE MATCHED
# THE DESCRIPTION

Race should not play any part in a decision to approach or take action unless race is part of a sufficient suspect description.



# How you talk to people

# One of your most powerful tools



**TAP and NYCHA Interior Patrols**

# There's no 4th Amendment Exception
# The law applies to NYCHA and TAP



**Mere presence**  **an Objective Credible Reason**



**FOR TAP VERTICALS, CONFIRM CURRENT OWNERS AFFIDAVIT (SIGNED WITHIN PAST 6 MONTHS)**







**75-1**

**ARE NO TRESPASSING SIGNS PROMINENTLY DISPLAYED?**



71









# PG 212-60:

*Even if there is probable cause to arrest a person for trespassing, officers* **may** *exercise their discretion to refrain from arresting that person, and instead instruct that person to leave under appropriate circumstances.*



 **TRESPASS CRIMES – FACT SHEET
AND SUPPORTING DEPOSITION**
PD 351-144 (Rev. 04-17)

**NOTE:** This Form Must be Completed by the Officer Who Made the Observations that Led to the Defendant's Arrest.

Defendant's Name: _____     Arrest No.: _____

I, _____, Shield No. _____, a New York City Police Officer/Detective

assigned to the _____ (*command*), deposes and swears as follows:

On _____ (*date*), at _____ (*time*), at _____ (*location*),

while on patrol inside this dwelling, an apartment building where people reside, I observed the defendant inside this

location as described below.

# What about Level 4?



## Probable Cause to Arrest





# A **SUMMONS** is a **Level 4** encounter.

# Can you frisk someone you are going to summons?

# Real Cases . . .



# Contact Us

- **Risk Management Bureau**
  - **1 Police Plaza, Room 1408**
  - **646-610-7900**
  - **rmbsqfquestions@nypd.org**

- **Compliance Division**
  - **253 Broadway, 6th Floor**
  - **212-618-3100**

- **Legal Bureau, Criminal Section**
  - **1 Police Plaza, Room 1406**
  - **646-610-5400**

78



# SURVEY MONKEY

# **Attachment 4**



# Investigative Encounters In-Service Training

# Part II
# For Police Officers and Detectives









# Do the Stop Report for:



**NARRATIVE**
**REASONABLE SUSPICION**

At T/P/O Deft matched radio run description of a male black possibly carrying a firearm.

4



# NARRATIVE
# REASONABLE SUSPICION
## (GOOD REPORT)

At T/P/O the above listed officer responded to a radio run of a male with a firearm from a verified caller. Approximately 5 minutes from receiving the call, officers arrived on scene and observed a male black fitting the description; male black, approximately 5'10", slim build, black hat, black t-shirt, black short, dreadlocks.



## NARRATIVE
## FRISK / SEARCH

At T/P/O Deft was searched after lawful arrest.



# NARRATIVE
# FRISK / SEARCH
## (GOOD REPORT)

Upon arrival of responding officers, Deft did attempt to leave by walking in opposite direction of officers. While attempting to walk away, Deft did tense up and bladed his body away from officers. Deft had a large bulge in his left cargo short pocket in the outline of a weapon. A loaded Highpoint 9mm firearm was recovered.



# A Good Stop Report

# DOES THE TALKING FOR YOU





# Patrol Guide 212-11 requires Supervisors to:

- <u>Discuss</u> the circumstances of the stop with the officer.

- Determine if stops, frisks and searches conducted by their officers were supported by Reasonable Suspicion.

- Assess whether the Stop Report fully explains the basis for the stop  and the basis for any frisk/search, if conducted.

- Take corrective action if a stop, frisk, or search itself was improper, or the paperwork was not filled out correctly.



# Stop Report App



**STOP REPORT**                                          GREEN : REQUIRED   50:46

## Incident Information

**Occurrence Date**

| MM/DD/YYYY 📅 | HH:MM |

**Period of Observation Prior to Stop**          **Duration of Stop**

| Minutes | | Minutes |

## Location of Stop

**Location Type**

| Select... ▼ |

**Address Type**

| Select... ▼ |

**Suspected Crime Location**

| Select... ▼ |

## Basis for Stop/Identification/Suspected Crime

**Stop Was**

| Select... ▼ |

**Officer in Uniform?**

| Select... ▼ |

**Crime Suspected**

| Select... ▼ |

**Factors That Led to Stop**

| None selected ▾ |







# The Narrative:  DETAILS, DETAILS, DETAILS

FORMS

STOP REPORT                                                                                      GREEN : REQUIRED   39:54

**Narrative (Describe the circumstances that led to the Stop)**

[DO THE FACTS SUPPORT A STOP? ARE ALL CHECKBOXES EXPLAINED? IS THE RADIO RUN DESCRIPTION INCLUDED <u>AND</u> HOW THE SUSPECT MATCHED IT?]

**Frisked/Searched/Weapon/Contraband Information**

Was person frisked?
Select...

Was person searched?
Select...

Was weapon found?
Select...

Was other contraband found?
Select...

**Narrative (Describe the circumstances that led to the Frisk and/or Search)**

[WHY DID YOU FRISK?  WHY DID YOU SEARCH?]

# Common Mistakes in Stop Reports

- Not enough info to show reasonable suspicion for frisk

- Not enough info on person stopped

- Crime suspected does not match story in narrative

- "Fits Description" but no description provided

16

# Common Mistakes in Stop Reports

- No indication if caller was anonymous or not

- Pedigree info (name, address) put in narrative

- Documentation of Tear-Off Card

- Do not write in "Furtive Movements" in Stop Report

17



# FORMS

## Signoff

### Note

Officer Brand, you need to add additional information in your first narrative, explaining the reason for the Stop, as well as more detailed information in your activity log.

### Endorsement Status

Rejected ▼

Corresponding Activity Log Entry Reviewed?
Yes ▼

**Follow-Up Action(If Appropriate):**

| Instruction | Training | Disciplinary Action |
|---|---|---|
| Yes ▼ | No ▼ | No ▼ |

18



# The Activity Log Entry

## You need to include:

- Date, time and location of stop
- Pedigree information (name, date of birth, address, telephone #), unless refused
- Detailed description of the person stopped
- Refusal to provide pedigree information, if applicable
- ICAD number, if applicable

# Consent to Search and BWC Footage

- **If you asked for consent to search the person:**

1. **Record the entire interaction on your Body Worn Camera**

2. **Offer the person information on obtaining a copy of that video recording by directing them to the NYPD's FOIL page on the NYPD website or www.nyc.gov/police-encounters**

3. **Offer the person a Business Card, if they are not arrested or issued a summons**

20

Case 1:08-cv-01034-AT   Document 609   Filed 06/25/18   Page 187 of 216





**Jane Longname Doe**
Police Officer
Shield Number 94735

_____    _____
Command                                    Phone Number

To request body worn camera footage, to get more information about a stop, or to submit a comment or complaint, visit:

**www.nyc.gov/police-encounters**
or
**For Comments, Call 311**

**BUSINESS CARD** PD 142-012 (03-18)

# The Dust Off





# How to achieve <span style="color:red">LEGITIMACY</span>?

# Procedural Justice



# Four Elements of Procedural Justice:

- **VOICE – Listening**
- **NEUTRALITY – Fairness**
- **RESPECT – Treating People with Dignity**
- **TRUSTWORTHINESS – Transparency**



# How to Direct UMOS to Investigative Encounters Training Videos

- **Available on NYPD-U in "My Available Courses" under the Deputy Commissioner of Training**

  - **Video #1 – Request for Information**
  - **Video #2 – Common Law Right of Inquiry**
  - **Video #3 –** *Terry* **Stops and Reasonable Suspicion**
  - **Video #4 – Documentation and Supervision**
  - **Public Contact and Consent to Search (Right to Know)**



Tactical Response Hood Inventory System

TACTICS - Training Attendance Certification Transcript Integrated Collection System

Transit Bureau Inquiry Request System



https://s1ppidca03.nypd.finest/TACTICS/Secure/RootMenu.aspx#

File   Edit   View   Favorites   Tools   Help

TACTICS Home

NYPD Tactics

Training
Attendance
Certification
Transcript
Integrated Collection System

CIV BLUMENKOPF (358251) | Logout

**Notification Action Center**

TACTICS Change Log

**Home Page**

Report Management

**To Do List**

You have no messages

view details ▶

## Distance Learning

## NYPDU

**Message Center**

new message(s)   read message(s)

**New Messages**

None

view details ▶

TACTICS - Design and Implementation by ITB - Information Technology Services Division

Application version: 7.6.0.0      Build date: 5/10/2017 10:13:01 AM

About | Contact Us









# Step 1: Click the NYPDU Tile





**Step 2: Enter your department login credentials.**
**Username: (lastnameTAX)**
**Password: Same used to access all Department applications**





**Step 3: Click the Deputy Commissioner of Training link under the available courses page**



# BODY  WORN CAMERA VIDEOS

# Bodega Stop - VIDEO 1





## NARRATIVE
## REASONABLE SUSPICION

At T/P/O subject matched description of a Hispanic male who was suspected of a dispute with a firearm and subject was at location.

34



**NARRATIVE**
**REASONABLE SUSPICION**
**(GOOD REPORT)**

A radio run for a 10-52 with a firearm came over at 350 Audubon Ave. **Verified Caller** states suspect displayed a firearm while in a dispute with another male. Caller stated suspect is wearing a grey jacket, grey pants with white sneakers and is in a group of 8 people.



**NARRATIVE**
**FRISK / SEARCH**

Subject was frisked because he was a confirmed Hispanic male who was at the location of a crime.



**NARRATIVE**
**FRISK / SEARCH**
**(GOOD REPORT)**

Subject was at the location and matching the description of a male with a grey jacket, grey pants with white sneakers. Frisk was conducted due to a violent crime with a weapon.

37

# Mace Assault - VIDEO 2.1



# Mace Assault - VIDEO 2.2





# NARRATIVE
# REASONABLE SUSPICION

At T/P/O defendant matched description of a female wanted for assault.



### NARRATIVE
### REASONABLE SUSPICION
### (GOOD REPORT)

At T/P/O officer responded to a radio run of a female wanted for assault by **spraying people with mace**. Information was received from a **verified 911 caller**. Approximately 5 minutes from receiving the call, officers arrived on scene and observed a black female fitting the description; female black, approximately 5'6", average build, long curly black hair, black sweater, black and white dress.

41



**NARRATIVE**
**FRISK / SEARCH**

Upon arrival of officers, defendant tried to leave. Defendant was searched; a canister of mace was recovered in her handbag.

42



**NARRATIVE**
**FRISK / SEARCH**
**(GOOD REPORT)**

Defendant had possession of her handbag and volunteered consent to search. Police Officer recovered mace from her bag.  She said, **"That's my pepper spray**." Defendant admitted to spraying the mace at someone. Show-up was conducted with a positive id.

43

# Rite Aid - VIDEO 3.1



# Rite Aid - VIDEO 3.2





## NARRATIVE
## REASONABLE SUSPICION

At T/P/O P.O. received radio run of a female Hispanic, short hair, boarding a bus after shoplifting in Rite Aid. After boarding bus, officers notice female matching description, P.O.s took the female off bus.



**NARRATIVE**
**REASONABLE SUSPICION**
**(GOOD REPORT)**

At T/P/O officers received a radio run from a **verified** caller that a Hispanic female, short hair, wearing glasses did shoplift from a Rite Aid store and board a city bus. Upon boarding the bus officers did observe female matching that description.  After receiving a more thorough description from Central, officers did take female off the bus.



## NARRATIVE
## FRISK / SEARCH

# Search conducted, S.I.L.A.



**NARRATIVE**
**FRISK / SEARCH**
**(GOOD REPORT)**

Defendant voluntarily consented to a search of her bag.  Suspect was a positive ID from c/v.  SILA  defendant was asked to open her jacket and bulges revealed stolen property from Rite Aid store.

49



# Contact Us

- **Risk Management Bureau**
  - **1 Police Plaza, Room 1408**
  - **646-610-7900**
  - **rmbsqfquestions@nypd.org**

- **Compliance Division**
  - **253 Broadway, 6th Floor**
  - **212-618-3100**

- **Legal Bureau, Criminal Section**
  - **1 Police Plaza, Room 1406**
  - **646-610-5400**

50