UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID FLOYD, *et al.*,

        Plaintiffs,

        v.

CITY OF NEW YORK, *et al.*,

        Defendants.

No. 08 Civ. 1034 (AT)

## COMMENTS OF *AMICUS CURIAE* COMMUNITIES UNITED FOR POLICE REFORM ON FINAL JOINT REMEDIAL PROCESS REPORT

DEBEVOISE & PLIMPTON LLP

Gary W. Kubek
Jarrod L. Schaeffer

919 Third Avenue
New York, NY  10022
Tel:  (212) 909-6000
Fax: (212) 909-6836

*Attorneys for Communities United for Police Reform as Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1, *amicus curiae* Communities United for Police Reform states that (*i*) *amicus curiae* does not have a parent corporation; (*ii*) *amicus curiae* does not have stock or shares; and (*iii*) no publicly-traded corporation controls any 10% or greater ownership interest in *amicus curiae*.

# TABLE OF CONTENTS

**Page**

I.     STATEMENT OF INTEREST OF *AMICUS CURIAE* ..................................................... 1

II.    SUMMARY OF COMMENTS ...................................................................... 3

III.   THE JOINT REMEDIAL PROCESS ............................................................. 5

IV.    COMMENTS OF *AMICUS CURIAE* AND PROPOSED REFORMS ........................... 11

    A.    <u>Key Reform 1</u>:  Ensure transparent, meaningful, and timely discipline for officers, precincts, and commands found to have conducted unconstitutional or abusive stops and/or trespass enforcement interdictions.......................................................................... 12

    B.    <u>Key Reform 2</u>:  Require officers to affirmatively inform subjects of investigatory encounters of their right to terminate the encounter when they are free to do so. ......................................................... 17

    C.    <u>Key Reform 3</u>:  Require officers to record, and the NYPD to publish quarterly and annually, data reports on all Level 1 and Level 2 investigatory encounters, including geographic, and precinct and command information and demographic information (as collected for Level 3 stops). ......................................................... 20

    D.    <u>Key Reform 4</u>: Require officers to identify themselves, explain the reason for an investigatory encounter, and provide a pre-typed card with their name, rank, command, and shield number during all investigatory encounters, while ensuring a mechanism for New Yorkers to access stop reports following Level 3 stops.......................................................... 22

    E.    <u>Key Reform 5</u>:  Create an independent community board comprised of police accountability groups and organizations that serve, and are led by, members of directly-impacted communities, to update and advise the Court during the period of its supervision in this case. ....................... 23

V.     COMMENTS OF *AMICUS CURIAE* CPR ON THE NYPD'S RESPONSE ................. 26

VI.    CONCLUSION ............................................................................. 30

## TABLE OF AUTHORITIES

**CASES**

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................................................................21

*Capital Newspapers Div. of Hearst Corp. v. Burns*, 496 N.E.2d 665 (N.Y. 1986).....................27

*Connecticut v. Barrett*, 479 U.S. 523 (1987) .......................................................19

*Floyd, et al. v. City of New York, et al.*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013).....................3, 5, 7

*Floyd, et al. v. City of New York, et al.*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013)...................*passim*

*Floyd v. City of New York, et al.*, 770 F.3d 1051 (2d Cir. 2014)...................................23

*Ligon, et al. v. City of New York, et al.*, 925 F. Supp. 2d 478 (S.D.N.Y. 2013).............................3

*Michigan v. Tucker*, 417 U.S. 433 (1974).........................................................19

*Miranda v. Arizona*, 384 U.S. 436 (1966) ........................................................19

*New York v. Quarles*, 467 U.S. 649 (1984) .......................................................19

*Ohio v. Robinette*, 519 U.S. 33 (1996).............................................................18

*Patrolmen's Benevolent Ass'n of City of N.Y., Inc. v. N.Y. State Public Emp't Relations Bd.*, 848 N.E.2d 448 (N.Y. 2006) .........................................................28, 29

*People v. De Bour*, 352 N.E.2d 562 (N.Y. 1976) ...............................................4, 17, 19

*People v. Garcia*, 983 N.E.2d 259 (N.Y. 2012).....................................................4

*People v. Hollman*, 590 N.E.2d 204 (N.Y. 1992) .................................................4

*Terry v. Ohio,* 392 U.S. 1 (1968) ..................................................................4

**STATUTES**

New York Civil Rights Law § 50-a ...........................................................26, 27

**OTHER AUTHORITIES**

Al Baker, *Updated NYPD Anti-Crime System to Ask: 'How We Doing?'*, N.Y. Times (May 8, 2017)..........................................................................23

Chantal Da Silva, *NYPD Begins Implicit Bias Training Three Years After Eric Garner's Death*, Newsweek (Feb. 6, 2018)......................................................29

*NYPD to get 3-Day Retraining Course in Wake of Eric Garner Death*, Eye Witness News ABC 7 NY (Sept. 8, 2014), http://abc7ny.com/news/nypd-to-get-3-day-retraining-course-in-wake-of-eric-garner-death/299118/ ........................................................................29

Center for Constitutional Rights, *Stop and Frisk: The Human Impact* (2012)..............................13

Marc Santora, *Mayor de Blasio Announces Retraining of New York Police*, N.Y. Times (Dec. 4, 2014) ............................................................................................................29

NYC CIVILIAN COMPLAINT REVIEW BOARD, ANNUAL REPORT 9 (2017) ("CCRB Report") ........15

NYCLU, *Stop-and-Frisk Data*, https://www.nyclu.org/en/stop-and-frisk-data (last visited May 5, 2018)........................................................................................................21

WNYC, *Police Punishment: CCRB vs. NYPD*, https://project.wnyc.org/ccrb/ (last visited May 30, 2018)......................................................................................................15

*Amicus curiae* Communities United for Police Reform ("CPR") respectfully submits these Comments pursuant to this Court's orders dated May 7, 2018 (ECF No. 597), and June 19, 2018 (ECF No. 608), in response to the final report filed by the Honorable Ariel Belen (Ret.) (the "Facilitator") on May 15, 2018 (*see* ECF Nos. 597–98 (the "Final Report")).   Ninety-four additional organizations, each of which is listed in Addendum A together with its description and purpose, have reviewed this submission and endorse the positions set forth herein.

## I.     STATEMENT OF INTEREST OF *AMICUS CURIAE*

CPR is a non-partisan, multi-strategy campaign that seeks to end discriminatory and abusive policing practices in New York City.  Through community organizing, public education, policy advocacy, and other strategies, CPR seeks to build a broad-based movement to promote community safety and respect for the rights and dignity of all New Yorkers.  CPR's members and partners include over 200 local and national organizations, many of which are based in and led by constituencies directly impacted by the stop-and-frisk and trespass abuses found in *Floyd, et al. v. City of New York, et al.*, No. 08 Civ. 1034 (AT) (S.D.N.Y.); *Ligon, et al. v. City of New York, et al.*, No. 12 Civ. 2274 (AT) (S.D.N.Y.); and *Davis, et al. v. City of New York, et al.*, No. 10 Civ. 0699 (AT) (S.D.N.Y.).[1]  CPR's interest in these matters dates back nearly two decades, when, after the 1999 killing of Amadou Diallo by the Street Crimes Unit of the New York Police Department ("NYPD"), organizations that would later become founding members of CPR approached the Center for Constitutional Rights to file the lawsuit targeting stop-and-frisk practices captioned *Daniels, et al. v. City of New York, et al.*, No. 99 Civ. 1695 (SAS)

---

[1]   The following members of Communities United for Police Reform, which are counsel to parties in *Floyd*, *Ligon*, and *Davis*, have not participated in the preparation or submission of this brief:  (*i*) the Center for Constitutional Rights; (*ii*) the New York Civil Liberties Union; (*iii*) the Bronx Defenders; (*iv*) LatinoJustice PRLDEF; (*v*) the Legal Aid Society; and (*vi*) the NAACP Legal Defense and Educational Fund.

(S.D.N.Y.).  Members of CPR are among the named plaintiffs, the main litigating nonprofit legal organizations, and key witnesses in the *Floyd*, *Ligon*, and *Davis* cases. Since Floyd was filed, CPR has submitted multiple amicus briefs to express the concerns of New Yorkers directly impacted by the NYPD's history and ongoing practice of unconstitutional and abusive stop-and-frisk practices and trespass arrests.

As a named stakeholder in the *Floyd* case,[2] CPR sought to fulfill the intent of the 2013 Remedial Order that those most affected by stop and frisk be fully involved in the Joint Remedial Process ("JRP").  The JRP included 28 community forums, with an estimated 1,777 participants – more than half of these participants' participation was facilitated by CPR members and partners.  (ECF No. 597 at 7–8.)[3]  CPR and CPR members participated consistently throughout the JRP Advisory Committee and process, helping the Facilitator to organize focus groups and recruit participants, and directly organized nine community forums, convening 530 members of directly-impacted communities across the five boroughs.  CPR partner organizations organized an additional 6 community forums with an additional 367 participants.  Through these activities, CPR endeavored to facilitate direct input in the JRP from New Yorkers most impacted by stop-and-frisk and trespass enforcement abuses, primarily low-income New Yorkers of color,

---

[2]   With regard to this remedial process, the Court specifically listed an array of stakeholders, including CPR, who would have the opportunity to be heard:  "members of the communities where stops most often take place; representatives of religious, advocacy, and grassroots organizations; NYPD personnel and representatives of police organizations; the District Attorneys' offices; the CCRB; representatives of groups concerned with public schooling, public housing, and other local institutions; local elected officials and community leaders; representatives of the parties, such as the Mayor's office, the NYPD, and the lawyers in this case; and the non-parties that submitted briefs: the Civil Rights Division of the DOJ, *Communities United for Police Reform*, and the Black, Latino, and Asian Caucus of the New York City Council."  *Floyd, et al. v. City of New York, et al.*, 959 F. Supp. 2d 668, 686 (S.D.N.Y. 2013) (emphasis added).

[3]   All references throughout this submission to electronically-filed documents refer to the ECF pagination of the documents.

including youth, those who are homeless, public housing residents, immigrants, LGBT and gender nonconforming New Yorkers, women and others. Those efforts culminated in a list of five foundational reform proposals that CPR offers as the input of directly-impacted communities, which the 2013 Order called a "vital part" of developing a sustainable remedy in this case. CPR advocated for these reforms during the final stages of JRP negotiations and for their inclusion in the Facilitator's Final Report.

## II.    SUMMARY OF COMMENTS

The JRP is the result of two federal class action lawsuits filed in the Southern District of New York challenging unconstitutional policies and practices employed by the New York Police Department ("NYPD"). *Ligon, et al. v. City of New York, et al.*, 925 F. Supp. 2d 478 (S.D.N.Y. 2013); *Floyd, et al. v. City of New York, et al.*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) (the "Liability Opinion"). These cases led the Court to order both immediate reforms and the opportunity for those most affected by the NYPD's unconstitutional practices to shape supplemental reforms. *See Floyd, et al. v. City of New York, et al.*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013) (the "Remedies Opinion"). Another case, captioned *Davis, et al., v. City of New York, et al.*, was later linked to the *Floyd* remedial process. *See* 959 F. Supp. 2d 324 (S.D.N.Y. 2013). On May 15, 2018, the Facilitator filed his final report, which sets forth fourteen recommended reforms intended to bring the NYPD into compliance with constitutional mandates, remedy the impact of prior unlawful procedures on New Yorkers, and deter future noncompliance. (*See* ECF No. 597 at 226–68.)

While CPR agrees with aspects of the Final Report and would welcome a number of the Facilitator's proposed reforms, five crucial reforms outlined by CPR at the conclusion of the JRP are necessary to provide a solid foundation for these and other proposals. These five reforms – most of which are partially reflected in the Facilitator's recommendations – would create

structural mechanisms designed to ensure the transparency and accountability necessary to sustain any reforms ultimately ordered by this Court.  In particular, CPR respectfully submits that any effective reforms depend on first establishing the following:

- Transparent, meaningful, and timely disciplinary standards, policies and practices for officers, as well as precincts and commands, determined to have conducted unconstitutional stops and/or trespass enforcement interdictions.

- Policies and supervision requiring officers to inform subjects of investigatory encounters of their right to leave and terminate the encounter when free to do so.[4]

- Policies requiring officers to record, and the NYPD to publish quarterly and annually, data on all Level 1 and Level 2 investigatory encounters within the meaning of *People v. De Bour* and its progeny, including in particular demographic, geographic, and precinct and command information.

- Policies requiring officers to identify themselves, explain the reason for an investigatory encounter, and provide a pre-typed card with their name, rank, command and shield during all encounters.

- An independent community board of at least 5–7 police accountability groups and organizations that serve, and are led by, members of directly-impacted communities to provide a structured and formalized mechanism for directly impacted communities to update and provide input to the Court during the remaining period of its supervision, including for the period following the discharge of the NYPD Monitor

These recommendations, as discussed in more detail herein, are consistent with the Facilitator's recommendations and essential to the success and legitimacy of any reforms ultimately ordered by the Court.  (*Cf.* ECF No. 597 at 227 ("It is the understanding of the Facilitation Team that without meaningful accountability and transparency reforms, any attempts at restoring good

---

[4]    In *People v. De Bour*, 352 N.E.2d 562 (N.Y. 1976), and *People v. Hollman*, 590 N.E.2d 204 (N.Y. 1992), the New York Court of Appeals articulated "four levels of police-citizen encounters and the attendant, escalating measures of suspicion necessary to justify each." *People v. Garcia*, 983 N.E.2d 259, 261 (N.Y. 2012).  Consistent with *De Bour* and *Hollman*, individuals remain free to leave in Level 1 and 2 encounters, but may not leave Level 3 (the equivalent of an investigatory stop within the meaning of *Terry v. Ohio,* 392 U.S. 1 (1968)) and Level 4 (arrest) encounters.  *Cf. De Bour*, 352 N.E.2d at 567.

police-community relations in the most affected communities will be ineffectual."). These crucial reforms prioritize fundamental concerns and recommendations raised repeatedly during the JRP – concerns that go to the heart of the constitutional, social, and cultural issues implicated by this case.

Any reforms ordered by this Court will be significant both for the NYPD and for New Yorkers whose constitutional rights were violated for over two decades, as well as those New Yorkers whose constitutional rights continue to be violated.  Such reforms should seek to enshrine protections for bedrock civil liberties, restore respect and dignity for communities of color, and confirm that constitutional policing reinforces safety and fairness.  The five key reforms summarized above, and discussed more fully herein, are necessary to fulfill the promise of the JRP and the overall remedial process to remedy the constitutional violations identified in the underlying litigations.  Conversely, there will be tremendous costs to our City, law enforcement, and all New Yorkers if these reforms are not enacted and the City fails to remedy the problematic conduct at the heart of *Floyd*, *Davis*, and *Ligon*.

## III.    THE JOINT REMEDIAL PROCESS

The *Floyd, Davis and Ligon* litigations implicate important constitutional guarantees that protect the rights of all New Yorkers.  On the same day that the Liability Opinion was issued, the Court issued its Remedies Opinion finding that Plaintiffs had demonstrated they were entitled to permanent injunctive relief and outlined appropriate remedies to address the violations in *Ligon* and *Floyd*.  *See generally* Remedies Opinion at 668.  The Court appointed a monitor (the "NYPD Monitor") to oversee the reform process, including developing and implementing immediate reforms.  *Id.* at 676.  In addition, the parties were ordered to participate in the JRP, under the guidance of a Facilitator, to develop additional reform measures reflecting community input.  *Id.* at 687.  Together, the immediate reforms and JRP proposals would provide a robust set of

reforms to bring the NYPD's practices into compliance with constitutional requirements.

> In the Remedies Opinion, the Court recognized that community input is:
>
> > [a] vital part of a sustainable remedy in this case.  The communities most affected by the NYPD's use of stop and frisk have a distinct perspective that is highly relevant to crafting effective reforms . . . .  If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful.

*Id.* at 686.  Community input from "those who are most affected by the NYPD's use of stop and frisk" was to be "[a]t the center of the Joint Remedial Process."  *Id.* at 687.  The Court listed an array of stakeholders, including CPR, who were to be offered the opportunity to be heard in the reform process.  *Id.* at 686.  The Court also observed that "[a]n essential aspect of the Joint Process Reforms will be the development of an improved system for monitoring, supervision, and discipline" of the NYPD in conducting stops and frisks, and left the discussion and development of such a system largely to the JRP process.  *Id.* at 683.

The Court created the JRP to provide a structured mechanism for New Yorkers who are most directly impacted by stop and frisk abuses to participate in the process of developing reforms to bring the NYPD's policies and practices into constitutional compliance.[5]  Community input was placed "[a]t the center of the Joint Remedial Process," *id.* at 687, in order to provide legitimacy and vitality to reforms aimed at creating a system of "monitoring, supervision, and discipline" of the NYPD in conducting stops and frisks.  *Id.* at 683.  To assist in this process, the Facilitator formed an Advisory Committee to gather input and provide process

---

[5]   Many community participants expressed concerns that unconstitutional stops are occurring frequently even after *Floyd*.  *See, e.g.*, *Floyd* Focus Group Transcript 1.10.19.15_1AY at 1–3 (one participant noting that he was stopped "[l]ast week," and another noting he was stopped 8-10 times over the summer of 2015).  Citations to transcripts from the JRP focus groups follow the naming conventions established by the Facilitator.  The transcripts are publicly available in electronic format.  (*See* ECF No. 598-8 at 2.)

recommendations.[6]  (ECF No. 597 at 41.).  The Facilitator also identified individuals and organizations that were most directly affected by the NYPD's unconstitutional practices, working with community organizations – including CPR – to hold focus groups to gather community input, and met with thought leaders in the community to seek reform ideas.  (*Id.* at 5– 7.)  The Facilitator held meetings with the parties and CPR to share draft reform concepts and sought written comments from them on proposed reforms.[7]  (*Id.* at 47.)  On May 15, 2018, the Facilitator filed his Final Report (*see* ECF Nos. 597–98), setting forth recommendations intended to provide a comprehensive set of "supervision, monitoring and disciplinary reforms" extending beyond the immediate reforms ordered in the Liability Opinion.  *See* Remedies Opinion at 684.

While the Facilitator identified "community engagement" as a proposed Joint Process Reform (ECF No. 597 at 244), CPR believes that it is critical to focus on recommendations that will require necessary transparency from the NYPD, ensure meaningful and timely discipline and accountability for unconstitutional and abusive policing, and formalize structural mechanisms for directly-impacted communities to access information critical to assess the NYPD's compliance and provide feedback to the Court.  As the Court said, it is only "[b]y strictly adhering to the rule of law [that] the NYPD will achieve greater cooperation between police officers and the communities they serve."  Remedies Opinion at 673.  Improved community-police relations are accomplished through constitutional policing, demonstrated

---

[6]    While representatives from police unions and police associations were invited by the Facilitator to participate in the Advisory Committee, they declined to participate in any of its meetings.  The suggestion in the NYPD's submission to this Court that the JRP represents the views of "just a single advocacy group or ideological perspective" is thus incorrect and misleading.  (ECF No. 603 at 4.)

[7]    Again, although the NYPD's submission to this Court implies that the Facilitator failed to consider a full range of views from diverse stakeholders, the NYPD often declined to share any positions or comments during the Final Report meetings, aside from rejecting various proposals.

police accountability, transparency and independent community-based assessments of compliance that are available to the public.  Improved community-police relations may be a by-product of constitutional policing, but improved relations are not the central goal of the remedies ordered by this Court.  Similarly, "community engagement" efforts that obscure power and resource differentials between the NYPD and directly-impacted communities are more likely to advance governmental public relations goals than address unconstitutional policing practices experienced by those communities.  In other words, improved community-police relations and "community engagement" are an outcome of policies and practices that respect dignity and rights, rather than remedies in and of themselves.

Community participants in the JRP expressed forcefully the serious harmful effects of the unconstitutional practices of the NYPD.  The JRP Final Report and its recommendations note many community members' "feelings of hopelessness [and] intense fear" (ECF No. 597 at 96) as a result of continual experiences with the NYPD's unconstitutional practices – practices that have "had the effect of traumatizing an entire generation of young people."  (ECF No. 597 at 11–12.)  In the words of one community participant:

> When I see a cop walking towards me, I . . . cringe. Sometimes they just keep walking, but sometimes they stop you or say something smart to you that, if you say something back, it makes the situation worse. They act like street bullies most of the time.

*Davis* Focus Group Transcript 7.03.29.16_7DY, at 11:28–31.  Through experiencing these practices first hand or by watching family members or friends being illegally stopped, questioned and frisked, community members have felt intimidated, humiliated and disrespected by the police for years.

Consistent with the Court's observation that community input from those most affected by the NYPD's unconstitutional policies and practices must be at the center of any remedial

effort, CPR is submitting as Addendum B to this response a small collection of letters from affected community members and organizations that represent affected community members. These letters are intended to demonstrate that concerns about unconstitutional policing practices persist, provide key insights from the community, reinforce directly to the Court themes that were articulated consistently during the JRP, and provide context for how the reforms discussed below are necessary to improve the lives of New Yorkers directly impacted by unconstitutional stop-and-frisk practices. CPR also urges the Court to hear directly from these members of the community as part of its review of the JRP reforms.

Community members called for increased accountability in cases of police misconduct. One focus group participant observed:

> [Police officers] should be supervised by their high-ranking officers to see how they're handling their situations – to see who's doing right and who's doing wrong. If they're doing wrong, they should be held accountable for what they did.

*Davis* Focus Group Transcript 12.04.19.16_12DY at 4:23–25. Many community members experienced unconstitutional stops and frisks as abuses of power by the NYPD that had no consequences for the offending officers or precincts that employed them. *See, e.g.*, *Floyd* Focus Group Transcript 6.10.82.15_2BY at 5:31–47. Community members advocated for progressive disciplinary standards for police, shaped with community input. *See, e.g.*, *Floyd* Focus Group Transcript 20.12.15.15_4BX at 10:41–11:18; *Floyd* Focus Group Transcript 38. 01.27.16_21DY at 21:922–36. And members called for the disclosure of disciplinary processes and outcomes in the form of periodic, publicly available reports. *See, e.g.*, *Floyd* Focus Group Transcript 38. 01.27.16_21DY at 15:644–16:729. The Facilitator responded to these calls, recommending the development of public disciplinary standards and the regular publication of reports on disciplinary decisions. (*See* ECF 597 at 230–33.)

9

The theme of transparency went beyond calls for increased disclosure of disciplinary standards and outcomes.   During encounters with the police, community members asked that officers provide greater disclosure regarding the reason for a stop and what rights they could exercise during the stop – i.e., their freedom to walk away or decline consent to a search.  *Floyd* Focus Group Transcript 28.01.06.16_3DX at 8:26–39.   One focus group participant said,

> For me, I don't actually feel comfortable walking away because even though they're saying, 'You are not being arrested or detained,' I don't know.  Police have a certain authority against you.  Like they have a higher authority.  So I feel like nowadays they can just do what they want and change the story later – say you did something[,] say you resisted arrest.  So I wouldn't just interfere. I would just cooperate to the most.

*Floyd* Focus Group Transcript 10.11.17.15_5AY at 6:193–199.   In addition, community members called for reporting of all levels of stops and sought increased transparency from the police through access to stop reports and body-worn camera footage.  *See, e.g.*, *Floyd* Focus Group Transcript 38. 01.27.16_21DY at 15:644–66; *Davis* Focus Group Transcript 12.04.19.16_12DY at 4:39–46.   The themes discussed above were consistent across both the various phases of the JRP and the different groups consulted.   It is critical that the Joint Process Reforms reflect and comprehensively address these themes, and it is these themes that shape the form and substance of CPR's recommendations.

The Court contemplated that the outcome of the JRP would be a set of reforms found to be "necessary to bring the NYPD's use of stop and frisk into compliance with Fourth and Fourteenth Amendments."   Remedies Opinion at 687.  Such reforms are fundamental to the full relief in this litigation, and necessary to the legitimacy of the overall remedial process.   While generally declining to adopt the Facilitator's JRP recommendations, the NYPD and the City have acknowledged the necessity of responding to the community's concerns by moving to address ideas articulated throughout the JRP process.  (*See* ECF No. 598-3 at 2 (noting in its response to

the JRP recommendations that the NYPD "declines to consent to these reforms . . . because the majority of them – in some form – are already underway").)

CPR respectfully urges the Court to reaffirm the importance of the JRP process and ensure respect for the voices of communities impacted by the policing practices at issue by requiring full implementation of, and compliance with, five key reforms described in this submission as essential to the efficacy and legitimacy of the remedial process.  As the Court stated, "[n]o amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety."  Remedies Opinion at 686.  Above all, the goal of any policing practice must be to strengthen and protect our communities, with deep respect for those in the community and their constitutional rights. CPR believes that we cannot achieve that goal as a City – or as a nation – without permitting communities afflicted by unconstitutional policing practices to help shape the necessary reforms and to have a formal and structured role in assessing compliance from the perspective of directly impacted communities.

## IV.      COMMENTS OF *AMICUS CURIAE* AND PROPOSED REFORMS

The Final Report includes a number of important recommendations that reflect many of the core community concerns revealed during the JRP.  The five key reforms discussed below, most of which are consistent with and extend recommendations by the Facilitator, were put forward during the JRP by directly-impacted New Yorkers in focus groups, town halls and leadership meetings.  CPR urges the court to consider the following five reforms as baseline reforms that work to complement each other.  These reforms are necessary to ensure the success of any other reforms ordered by the Court, prevent future unconstitutional conduct, and confirm the legitimacy of the JRP and its outcome.  If other reforms are ordered beyond these baseline reforms, those further reforms should be understood as supplementing these five fundamental

11

reforms, rather than replacing them. Accordingly, CPR respectfully urges the Court to include the following reforms as the basis for any final remedies.

A.    **Key Reform 1:  Ensure transparent, meaningful, and timely discipline for officers, precincts, and commands found to have conducted unconstitutional or abusive stops and/or trespass enforcement interdictions.**

This requested reform has three main components:

- The development and publication of NYPD disciplinary standards and policies governing stop-and-frisk and trespass abuses or violations of protocol by officers, as set forth in the Facilitator's Recommendation #3, along with a formal mechanism by which directly-impacted communities can offer recommendations concerning the development of such standards and comments on any standards ultimately adopted by the NYPD.

- The public reporting of complaints, investigation status, findings and any disciplinary action taken by the NYPD regarding complaints concerning officers' conduct during stop-and-frisk encounters and trespass enforcement, as described in the Facilitator's Recommendation #2, along with regular reports disclosing the total number of complaints against officers, disaggregated by rank, command, precinct, geography, incident type, and any demographic categories currently required for reporting of stops (*e.g.*, race, ethnicity, age, or gender).  Reports concerning an investigation's status and findings should also disclose the length of time from the filing of a complaint to its final resolution.  Such reports should be published quarterly and annually.

- The implementation of meaningful and timely discipline for officers, precincts, and commands found to engage in, or tolerate, unconstitutional stops or trespass enforcement, along with a formal process by which members of directly-impacted communities can submit comments or evaluations concerning officers with whom those community members have had interactions.

The Court should require the NYPD to develop and publish formal policies setting forth effective disciplinary standards for violations.  In order for any reforms to be effective, members of the NYPD must be held accountable for implementing and complying with constitutional standards.  Officers, precincts, and commands should be subject to timely and meaningful discipline when officers repeatedly conduct unconstitutional and abusive stops or trespass enforcement.  Accountability is central to the effective implementation of constitutional policing,

and a systemic lack of timely and meaningful discipline in response to unconstitutional stops enables further abuses and erodes public trust.[8]

As noted in the Final Report, accountability is also deeply important to those whose rights were violated by the conduct at issue in *Floyd*, *Davis*, and *Ligon* and it is a core concern of those who participated in the JRP.[9]  *See, e.g.*, *Davis* Focus Group Transcript 12.04.19.16_12DY at 4:23–25 ("[Police officers] should be supervised . . . to see how they're handling situations – to see who's doing right and who's doing wrong.  If they're doing wrong, they should be held accountable for what they did.").  Individuals in focus groups and town hall meetings felt strongly that officers found to have conducted multiple unconstitutional stops, or who acted in a repeatedly abusive manner during stops, should be terminated in the interest of public safety.  *See Floyd* Focus Group Transcript 22.12.16.15_11DY2 at 12:5–21; *Floyd* Focus Group Transcript 1.10.19.15_1AY at 14:29–42.  While the immediate reforms ordered by the Court, the NYPD's subsequent efforts, and the Facilitator's recommendations may help identify and prohibit unconstitutional practices, those measures cannot succeed unless officers who violate established standards are held responsible for wrongful actions.  Clear, meaningful, and timely disciplinary standards are necessary to educate officers, deter wrongful conduct, and remove officers who engage in repeated wrongdoing.  (*See, e.g.*, ECF No. 598-1 at 22–25.)  To date, no

---

[8]     For example, in 2012 the Center for Constitutional Rights issued a "Human Impact" report that documented a series of interviews with individuals who had been stopped and frisked by the NYPD.  *See generally* Center for Constitutional Rights, *Stop and Frisk: The Human Impact* (2012).  The report reflected some New Yorkers' belief that NYPD officers were "untouchable" and "operating within 'their blue wall of silence,'" which made them immune to consequences for wrongful conduct.  *Id.* at 21 (citation omitted).

[9]     The Facilitator observed that public distrust of the NYPD stems in part from a perception that officers are not held accountable for wrongdoing.  (*See* ECF No. 597 at 231 ("During the course of the Joint Remedial Process, members of affected communities expressed distrust of both police officers and the NYPD itself.  Distrust of the NYPD as an institution is in large part due to the perception that the Department fails to hold officers accountable for misconduct.").)

discipline-specific reforms have been ordered by the court.

Underlying CPR's proposed reform is the commonsense observation that officers have little incentive to avoid unconstitutional or abusive conduct absent clear disciplinary consequences. *See also Floyd* Focus Group Transcript 38.01.27.16_21DY at 16:750–777 (observing that the failure to discipline a police officer for unconstitutional conduct leads to a "chain reaction" whereby other officers believe they can act similarly and "get away with it"). In order to deter and hold officers accountable for unconstitutional conduct, as included in the Facilitator's Recommendation #3, the Court should direct the NYPD to develop disciplinary standards that are meaningful and concrete, and which provide clear consequences for officers found to engage repeatedly in unconstitutional practices. Directly-impacted community members should be afforded a formal process by which to provide input during the development of such standards, and to submit comments when standards are adopted or modified. *See, e.g.*, *Floyd* Focus Group Transcript 38. 1.27.16_21DY at 21:931–32 ("I feel like in terms of evaluating police officers that the community members should have a voice."); *Floyd* Focus Group Transcript 2.10.20.15_2AY at 31:9–21 (observing that the community should receive reports on police conduct).

Given their importance to the goal of enshrining constitutional norms within the practices and procedures of the NYPD, disciplinary standards should be developed with significant input from directly affected New Yorkers, including the plaintiffs and class members in *Floyd*, *Davis*, and *Ligon*, as well as members of relevant community organizations.[10] *See, e.g.*, *Floyd* Focus Group Transcript 38. 01.27.16_21DY at 21:931–32 ("I feel like in terms of evaluating police

---

[10]   CPR believes input from directly impacted community members is a critical part of any ongoing police reforms. Additional structural mechanisms for establishing ongoing community engagement, including community input into NYPD disciplinary standards, are described *infra*.

officers that the community members should have a voice."). These stakeholders have extensive experience with these issues and this litigation, and can offer uniquely relevant insights on the sufficiency of any proposed standards in light of past abuses. Any disciplinary standards should also be public – CPR urges that disciplinary standards be made available through the NYPD's website and be updated promptly to reflect any subsequent changes in policy.

Further, to incentivize supervisors to monitor the behavior of their subordinates, disciplinary standards should include consequences for precincts and commands that persistently record significant numbers of unconstitutional or abusive stops or trespass enforcement, yet continue to employ officers who engage in that conduct. Existing disciplinary procedures have failed to hold supervisors and precincts accountable for failures to record interactions with the public. For example, the NYPD Monitor's Fourth Report noted that in a random audit of officer encounters, thirty-six events were identified as potential Level 3 stops, but in fourteen of those instances officers failed to file required reports. (ECF No. 536 at 33.) Moreover, while the Civilian Complaint Review Board ("CCRB") recommended the highest level of disciplinary action in 175 cases in 2012, 76 instances resulted in no disciplinary action at all. WNYC, *Police Punishment: CCRB vs. NYPD*, https://project.wnyc.org/ccrb/ (last visited May 30, 2018).[11] Disciplinary policies and procedures must ensure accountability both for police officers and for those who supervise them.

CPR believes that the development of additional disciplinary standards is necessary, as current procedures provide merely that an officer who has unlawfully detained, questioned, and

---

[11] Notably, the CCRB found that a large proportion of all substantiated incidents – more than a quarter in 2013 – resulted in no disciplinary action by the NYPD. *See* NYC CIVILIAN COMPLAINT REVIEW BOARD, ANNUAL REPORT 32 (2017) ("CCRB Report"). During this period, nearly half of offending officers merely received additional training or instructions not to repeat the misconduct. *Id.*

searched a New Yorker is added to the command's "minor violation log" – logs that are not centrally tracked, not part of an officer's record, and do not carry penalties (*see* ECF No. 536 at 33 n.4) – or receives a "command discipline action," which is a non-judicial correction that avoids formal charges. NYPD Patrol Guide 206-02. Meaningful, concrete, and public disciplinary standards would serve to correct misconduct and reinforce constitutional requirements, and requiring that disciplinary standards also hold precincts and commands accountable will ensure that those standards are implemented and closely monitored.

As described above, these standards and statistics regarding discipline for violations thereof should be disclosed to the public. *See, e.g.*, *Floyd* Focus Group Transcript 38. 01.27.16_21DY at 15:644–52 (noting that, to hold police accountable, there must be public disclosure of complaints and disciplinary measures). In addition, the Court should order the NYPD to publish quarterly and annual reports disclosing (*i*) the number of misconduct complaints against officers; (*ii*) whether the complaints were filed with the NYPD, the CCRB, or the City's Human Rights Commission; (*iii*) the number of substantiated misconduct complaints; and (*iv*) the disciplinary sanctions, if any, imposed as a result of any substantiated complaints. Although such reports need not identify individual officers or complainants, these reports also should disclose the aggregate number of complaints against officers, disaggregated by rank, command, precinct, geography, incident type, and any demographic categories currently required for reporting of stops (*e.g.*, race, ethnicity, age, or gender). Reports concerning an investigation's status and findings should also disclose the length of time from the filing of a complaint to its final resolution.

These reforms are vitally important to the remedial process. Failing to establish and maintain a disciplinary framework that acknowledges and enforces the need to deter and punish

unconstitutional conduct would threaten the effectiveness of any reforms, and undermine the legitimacy of the JRP.  Simply put, a lack of accountability and effective disciplinary standards for constitutional violations renders reform proposals toothless.  And a disciplinary policy that neither deters nor implements meaningful and timely consequences for violations undermines public confidence in the police.  CPR therefore respectfully urges the Court to require the NYPD to develop, implement, and publicize effective disciplinary policies to impose accountability for constitutional violations, and to regularly report on misconduct complaints and related outcomes.

**B.**    **Key Reform 2:  Require officers to affirmatively inform subjects of investigatory encounters of their right to terminate the encounter when they are free to do so.**

The Court should direct officers conducting Level 1 and Level 2 investigatory encounters to disclose that individuals are permitted to leave those encounters.  This reform is responsive to observations made by the Facilitator (*see, e.g.*, ECF No. 597 at 238 ("A constant message from the focus groups and community forums was that people in affected communities generally did not feel free to leave a police encounter, even if it was their right to leave.  To a civilian in these communities and probably to any average resident of New York City, it does not matter whether an officer believes he is conducting a Level 1 or Level 2 encounter or a Level 3 stop under the *De Bour* paradigm.")), and it is also consistent with views expressed by Plaintiffs in their comments on the Final Report.  (*See* ECF No. 602 at 26–29 (urging the Court to order that officers be required to inform people when they are free to leave investigatory encounters).)

As the Final Report notes, "[f]irst, and foremost, . . . community engagement has shown that civilians overwhelmingly feel that they are not free to leave even during a Level 1 encounter . . ."  (ECF No. 597 at 234.)  Many individuals are uneducated about the scope and extent of their rights during an encounter with the NYPD, which provides fertile ground for both intentional and unintentional constitutional deprivations.  *See, e.g.*, *Floyd* Focus Group Transcript 28.

01.06.16_3DX at 8:31–34; *Floyd* Focus Group Transcript 2.10.20.15_2AY at 8:25–29; *Floyd* Focus Group Transcript 23. 12.21.15_13DY at 20:20–26.  This issue was evident during JRP community sessions.  For example, one individual stated:

> I know in my community, if a cop stops you and you're telling them "I don't have to stay here and talk to you," you're automatically going to get a ticket and fined for being disorderly.

*Floyd* Focus Group Transcript 15.12.08.15_4BX at 6:32–34.  Likewise, another noted:

> I personally wouldn't walk away, I'd rather they leave first because how do I know they're not going to interpret my actions as me fixing my belt and shooting me in the back?"

*Floyd* Focus Group Transcript 38. 01.27.16_21DY at 9:373–375.

Community members frequently called for more transparency from the NYPD regarding the rights New Yorkers have during police encounters.  *See, e.g.*, *Floyd* Focus Group Transcript 28. 01.06.16_3DX at 8:31–34 (requesting that NYPD officers provide explanations for stops along with a summary of the rights individuals may exercise when interacting with police). Participants in the JRP sought clear directives that officers provide individuals with information regarding the reason for the stop, as well as their rights during the encounter. *See, e.g.*, *Floyd* Focus Group Transcript 4.10.22.15_1DY2 at 11:6–36 (requesting that officers inform individuals whether they can leave or decline a search);  *Floyd* Focus Group Transcript 2.10.20.15_2AY at 8:25–29 (opining that officers should notify individuals of their rights).  As the reforms of the JRP are implemented, requiring that officers inform New Yorkers about their right to leave Level 1 and Level 2 investigatory encounters will better ensure that such investigatory encounters do not become unconstitutional stops lacking reasonable suspicion.

While the Constitution does not generally require that law enforcement officers inform subjects when they are free to leave, *see, e.g.*, *Ohio v. Robinette*, 519 U.S. 33, 35 (1996), requiring that the NYPD implement such a policy during the period of this Court's supervision is

an appropriate prophylactic measure to remedy prior widespread abuses in communities of color. (*See generally* ECF 598-1 at 55 (noting that 87% of all stops and frisks in 2011 involved African-Americans and Latinos).)   Indeed, the Court previously noted this possibility in the *Floyd* remedial order, observing:

> There could be a simple way to ensure that officers do not unintentionally violate the Fourth Amendment rights of pedestrians by approaching them without reasonable suspicion and then inadvertently treating them in such a way that a reasonable person would not feel free to leave.  Officers could, for example, begin *De Bour* Level 1 and 2 encounters by informing the person that he or she is free to leave.  Nevertheless, the Constitution does not prohibit a police department from adopting this policy *or a court from ordering it as a means of avoiding unconstitutional stops*, where—as here—officers have been incorrectly trained on the definition of a stop.

Remedies Opinion at 679 n.38 (emphasis added).

Even outside the immediate remedial sphere, courts have the power to craft prophylactic rules designed to safeguard constitutional rights.  *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 471 (1966) (holding that "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation" as a prophylactic rule designed to safeguard Fifth Amendment rights); *see also Connecticut v. Barrett*, 479 U.S. 523, 528 (1987) (quoting *Miranda*, 384 U.S. at 469) (explaining that "[t]he fundamental purpose of the Court's decision in *Miranda* was 'to assure that *the individual's right to choose* between speech and silence remains unfettered throughout the interrogation process'") (emphasis in original); *New York v. Quarles*, 467 U.S. 649, 654 (1984) (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)) (stating that "[t]he prophylactic Miranda warnings . . . are 'not themselves rights protected by the Constitution" but "[r]equiring Miranda warnings before custodial interrogation provides 'practical reinforcement' for the Fifth Amendment right").

Greater public education and engagement around these issues is also necessary, but knowledge asymmetries during investigatory encounters (and the power imbalance inherent

between officers and civilians) can be addressed immediately by requiring NYPD officers to inform all individuals of their rights during such encounters.  Indeed, the Monitor submitted proposed training materials advising NYPD officers that they can avoid escalating an investigative encounter to a Level 3 stop by informing individuals that they are free to leave and have a right to decline a search.  (*See* ECF No. 609 at 20, 33 (noting officers can "dial . . . back" the intensity of an investigative encounter by saying, "Sir, I'm not holding you here . . . ." and, with respect to consensual searches, asking "I can only search your bag if you consent, do you understand?").)  This practice should not be burdensome or disruptive to law enforcement efforts, and ultimately will result in fewer allegations of unlawful detention by NYPD officers.[12]

C.    **Key Reform 3**:  **Require officers to record, and the NYPD to publish quarterly and annually, data reports on all Level 1 and Level 2 investigatory encounters, including geographic, and precinct and command information and demographic information (as collected for Level 3 stops).**

As recommended in the Facilitator's Recommendation #5, the Court should require the NYPD to make available regular reports on investigatory law enforcement encounters to ensure transparency and compliance with regard to reforms implemented as a result of this litigation.  In particular, such reports should, at a minimum, disclose (*i*) the number of all Level 1 and Level 2 investigatory encounters, and be disaggregated by (*ii*) demographic information; (*iii*) geographic location; and (*iv*) precinct information for each incident to permit monitoring of patterns and trends.  (*See, e.g.*, ECF No. 598-1 at 17–21.) Based on community members' experiences in certain precincts, CPR and many of its member and partner organizations have concerns that some portion of recent decreases in reported stops are due not to an actual decrease in stops, but

---

[12]    To the extent the Court considers any remedy including a public education campaign to inform New Yorkers of their rights during investigatory stops, CPR does not believe that such a campaign should be designed or conducted by the NYPD.  Any public education campaign should be designed and conducted by community organizations with a track record of conducting know your rights trainings.

rather to under-reporting of Level 3 stops incorrectly characterized as Level 1 and 2 encounters. (*See* ECF 597 at 11 (noting "serious concern[s]" about under-reporting of stops).)   Multiple reports by the NYPD Monitor substantiate this concern.  (*See, e.g.*, ECF No. 523 at 32, 64–65).

Requiring regular reports disclosing the above metrics is important to permit the public objectively to assess compliance with the requirement of constitutional stops and trespass enforcement.  Transparency in reporting is also essential to ensure that the reforms enacted as part of this remedial process are maintained after the monitorship and this Court's supervision end.  Because the public must rely on disclosures by the NYPD, which has exclusive possession of the relevant data, to evaluate police performance objectively, transparency is necessary to preserve accountability and oversight.

As the United States Supreme Court has recognized, "[p]ublicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (per curiam) (quoting L. Brandeis, Other People's Money 62 (Nat'l Home Library Found. ed. 1933)).  While effective policy reforms may encourage compliance with constitutional mandates, evaluating compliance with those policies requires public disclosure of data concerning NYPD policies, practices, procedures, and performance.  Organizations rely on public disclosures of NYPD data in order to evaluate its performance.[13]  Indeed, as the Facilitator recognized, absent the NYPD's public disclosure of the UF-250 database information requested by the NYCLU, the plaintiffs *in this case* would have lacked sufficient information to prosecute their claims.  (*See* ECF No. 597

---

[13]   For example, the New York Civil Liberties Union ("NYCLU") analyzes stop-and-frisk data released by the NYPD in quarterly reports to evaluate officers' compliance with the Fourth Amendment.  *See generally* NYCLU, *Stop-and-Frisk Data*, https://www.nyclu.org/en/stop-and-frisk-data (last visited May 5, 2018).  Since 2002, the NYCLU found that nearly 90% of five million stops and street interrogations failed to uncover any wrongdoing.  *Id.*

at 59 ("Access to UF-250 data later helped establish the allegations in Floyd.").)  While CPR hopes that this litigation and the JRP process will lead to lasting and meaningful reforms, public access to data that can be collected, analyzed, and studied is essential to the community's ability to verify that the NYPD continues to comply with constitutional guarantees in the future.

### D.   Key Reform 4: Require officers to identify themselves, explain the reason for an investigatory encounter, and provide a pre-typed card with their name, rank, command, and shield number during all investigatory encounters, while ensuring a mechanism for New Yorkers to access stop reports following Level 3 stops.

In order to ensure greater transparency with regard to the nature and scope of New Yorkers' rights in all encounters – and to enable New Yorkers to obtain further information about stops to which they are subjected – this Court should require the NYPD to adopt a policy mandating that officers (*i*) identify themselves; (*ii*) explain the reason for an investigatory encounter; and (*iii*) provide identifying information, including each officer's name, rank, command, and shield number on a pre-printed business card.  Supplying this information during investigatory encounters will allow subjects of investigatory encounters to understand why they are being questioned and will allow them to take further action, if necessary, to address any deprivations of essential rights once the police encounter has concluded.[14]  This practice should not be burdensome or disruptive to law enforcement efforts, as the NYPD will soon be required by local law to employ similar procedures during Level 2 investigatory encounters and Level 3 stops.  Indeed, as of October 2018, NYPD officers will be required to provide subjects of Level 2 and Level 3 investigatory encounters with pre-printed cards that include identification and other

---

[14]   In connection with this reform, the Court should also implement the Facilitator's Recommendation #6, which would require access to stop reports for individuals who are subjected to stops.  The NYPD has indicated it plans to make such stop reports available to subjects within 10 business days (*see* ECF No. 603 at 15), and CPR agrees that this is an appropriate period of time in which the Court should require compliance.

information, and to explain the reason for the encounter.  *See* NYPD Patrol Guide 212-11.

      **E.**    **Key Reform 5**:  **Create an independent community board comprised of police accountability groups and organizations that serve, and are led by, members of directly-impacted communities, to update and advise the Court during the period of its supervision in this case.**

Lastly, in order to ensure accountability and transparency throughout the duration of this Court's period of supervision of the NYPD, it is vital that there be a formalized structure for the perspectives of directly-impacted communities to inform remedial efforts, provide feedback on the implementation and efficacy of reforms, and offer further recommendations to the Court. During focus groups and community forums, community members emphasized the importance of ensuring the community has an ongoing voice in evaluating the effectiveness of any police reforms.  Such mechanisms are necessary to foster legitimacy and trust in the remedial process. A structured mechanism for community engagement with the Court for the remainder of the remedial process, including the period following the discharge of the NYPD Monitor, will be essential to ensure the effective implementation of any ordered reforms.[15]

---

[15]   *See Floyd v. City of New York, et al.*, 770 F.3d 1051, 1056 (2d Cir. 2014) (noting the parties' agreement that the Court's supervision extends for at least two years after the conclusion of the monitorship).  CPR opposes the Facilitator's Recommendation #9 that the NYPD conduct surveys of community experiences and attitudes as a JRP reform.  (ECF No. 597 at 258.)  Even if the Court were to determine that community surveys are useful, the NYPD is not the appropriate body to develop or conduct those surveys.  The JRP is replete with documentation of the affected communities' extensive distrust of the NYPD – communities that will not only question the legitimacy of such surveys' results, but whose distrust of the NYPD will compromise its findings.  For instance, some community organizations are suspicious of the NYPD's potential use of survey data.  Al Baker, *Updated NYPD Anti-Crime System to Ask: 'How We Doing?'*, N.Y. Times (May 8, 2017) (quoting Black Youth Project 100's national director, "we're talking about an agency that has the power to surveil, monitor and can inflict violence on people with impunity.").  That distrust compromises the reliability of such surveys.  *Id.* (quoting Campaign Zero's founder, "[w]ho feels safe to even reply back? And who, in the marginalized community, is going to trust the police and send an honest answer back?").  This recommendation would not advance the purpose of the JRP, which focused on soliciting input from marginalized communities, because it would institute a feedback mechanism likely to quiet or ignore the very voices from which the NYPD needs to hear.  Any effective survey of the community must be developed and controlled by

CPR therefore supports the proposal to create a community board (*see* ECF No. 597 at 252–54), but respectfully requests that this board be enhanced and funded to allow it to serve as an effective mechanism for continued involvement by communities directly impacted by this litigation.   The Court should require the City of New York to create and provide adequate resources for an independent community board (the "Community Board") to carry out an ongoing community-led assessment of the NYPD's compliance with reforms arising out of the JRP.   Composed of at least 5–7 organizations that serve communities directly impacted by this litigation and that have experience with police accountability issues and the specific issues in the underlying litigation, the Community Board would draw on the accountability and transparency measures outlined above to monitor compliance during the remainder of the Court's period of supervision.[16]   In particular, the Court should require that:

- The Community Board shall prepare and issue annual reports concerning the perspectives of directly impacted community members regarding the NYPD's compliance with JRP reforms, which shall be filed publicly with the Court;

- The Community Board shall be provided with all information identified above

---

community based organizations that represent those most impacted by stop-and-frisk and trespass enforcement abuses .

[16]   The Facilitator has proposed that CPR be allocated two seats on a Community Board.   In addition, to promote consistency and continuity with respect to the issues in these litigations, CPR suggests that the Malcolm X Grassroots Movement and the Justice Committee, two organizations that have been involved in this and related litigation for the past 19 years, should be named to the Community Board.   CPR further urges the Court to ensure that remaining seats afford adequate representation to vulnerable communities, including representatives for organizations that represent directly impacted youth, immigrants, LGBTQ communities, and the homeless and insecurely housed. CPR objects to the identification of a part-time "executive director," and respectfully submits that the Community Board will be more effective if empowered to select an organization with significant history in stop-and-frisk and police accountability issues to identify a reasonable staff for the Community Board to employ, sufficient to accomplish its stated objectives.

in connection with the other key reforms, and shall be permitted to request from the NYPD any additional information reasonably necessary to provide impacted communities the information necessary to assess the NYPD's compliance with JRP reforms;

- The NYPD shall provide to the Community Board all information reasonably necessary to assess the NYPD's compliance with JRP reforms, and, in the event the NYPD refuses to provide certain information (*e.g.*, on the grounds that disclosure would endanger individuals or disrupt ongoing law enforcement activity), it shall provide the Community Board with a written explanation for its refusal. The Community Board should be permitted to appeal to the Court to evaluate disagreements;

- The Community Board shall be permitted, as part of its annual reports, to submit to the Court policy and practice recommendations designed to procure the NYPD's compliance with JRP reforms;

- The Community Board shall solicit input from directly impacted community members on NYPD disciplinary standards and provide a formal response to the standards adopted by the NYPD each time they are modified;

- The Community Board shall develop a formal process for evaluating officers' performance based on input from community members with whom the officers interact; and

- The City of New York shall fund Community Board programs to collect, analyze, and report on data concerning the NYPD's compliance with JRP reforms, and shall provide reasonable stipends to those who serve on the Board in order to permit service by members of directly-impacted communities.

Community participation and monitoring of the NYPD's compliance with JRP reforms should commence immediately; such involvement will be particularly crucial prior to a finding by the Monitor of "substantial compliance" by the NYPD, and during the subsequent period following the discharge of the NYPD Monitor and before the termination of this Court's supervision.  While this Court retains supervisory authority over the NYPD, the Community Board will serve important roles as both steward of the reforms and third-party observer of the NYPD's progress and compliance.[17]

---

[17] The informal "conversations" facilitated by the NYPD's "Build the Block" meetings,

## V.     COMMENTS OF *AMICUS CURIAE* CPR ON THE NYPD'S RESPONSE

On June 8, 2018, the NYPD filed its response to the Final Report, which generally objects to all of the reforms proposed by the Facilitator, dismisses the proposed reforms as unnecessary, or suggests narrower reforms may be palatable until completion of the Monitorship. (*See generally* ECF No. 603.)  The NYPD's response contains significant mischaracterizations about the Final Report, its recommendations, the overall JRP process, and the need for further reforms.

*First*, the Court should reject the underlying contention of the NYPD's comments that the JRP – and the reform proposals it produced – are unnecessary.  Rather, this Court should reaffirm the central role of directly-impacted communities in evaluating and informing the policing practices to which they are subjected.  For the reasons explained in this submission, CPR strongly disagrees with the NYPD's assumption that the JRP is irrelevant or unnecessary to ensuring future constitutional compliance by the NYPD.

*Second*, many of the NYPD's objections to the Facilitator's Final Report make expansive assertions that would exclude all meaningful community participation from the reform process. For example, while the NYPD acknowledges the value of publishing regular reports concerning misconduct complaints and disciplinary outcomes, as recommended in the Final Report (*see* ECF No. 597 at 230–31), the NYPD largely rejects a requirement that it do so purportedly in light of concerns that New York Civil Rights Law § 50-a may bar publication of summaries disclosing

---

Community Partners programs (*see* ECF No. 603 at 15–16) or Borough-based meetings embodied in the Facilitator's Recommendation #7 are not a sufficient alternative.  Those programs seek to foster understanding and cooperation among communities and the rank-and-file officers with whom they interact, while the Community Board that CPR proposes would institute a formal mechanism for directly-impacted community members to provide observations and feedback to the Court and senior administrators regarding constitutional compliance.

specific disciplinary cases.  (ECF No. 603 at 10–11.)  Such concerns, however, do not justify a refusal to publish, as CPR urges, *aggregate* data about complaints, misconduct, disciplinary outcomes, and demographic and geographic information outside the scope of section 50-a.  *See, e.g.*, *Capital Newspapers Div. of Hearst Corp. v. Burns*, 496 N.E.2d 665, 665 (N.Y. 1986) (noting that the "narrowly specific" purpose of section 50-a is "to prevent the time-consuming and perhaps vexatious investigation" concerning individual officers).[18]

Furthermore, the NYPD incorrectly claims that establishing a community board "to provide feedback from affected communities on the court-ordered reforms and make recommendations to the court" would "usurp[] the authority of the Police Commissioner to manage and administer the [NYPD] and . . . violate[] the New York City Charter."[19]  (ECF No. 603 at 16.)  But a structural mechanism for community feedback on policing practices in no way compromises the authority of the Police Commissioner to run the NYPD.[20]  And while the

---

[18]  The NYPD also opposes any "public education campaign . . . to . . . inform citizens about the rights and obligations of citizens during investigative encounters" on the ground that "it is not the Department's responsibility to . . . provide legal advice."  (*See* ECF No. 603 at 17–18).  No one is asking the NYPD to provide legal advice, but as explained *supra*, requiring the NYPD to inform New Yorkers of their rights during specific encounters is within the Court's remedial authority.  Nor would requiring officers to record information actually observed during Level 1 and Level 2 stops authorize officers to seek *more* information or transform such stops into Level 3 encounters.  (*See id.* at 14.)  And to the extent the NYPD has valid concerns about exigent circumstances (*see, e.g., id.* at 11, 14), such concerns may be addressed by requiring that reports be completed as soon as it is safe and prudent to do so.

[19]  *See* Admin. Code of the City of New York § 14-115 (providing, *inter alia*, that the NYPD Police Commissioner has the authority, "in his or her discretion," to discipline police officers).

[20]  Despite the NYPD's purported concern that the creation of a community board would strip the Police Commissioner of his or her authority, the NYPD itself acknowledges that such a board "would only have jurisdiction to offer feedback on SQF reforms[,] thus limiting its agenda to a very narrow set of issues."  (ECF No. 603 at 16.)  It is not clear, nor does the NYPD explain, how community feedback would impair the Police Commissioner's authority over the NYPD.

NYPD suggests that the development and publication of disciplinary standards would violate legal and collective bargaining requirements (*see* ECF No. 603 at 11–12), the New York Court of Appeals recognized that disciplinary standards are not appropriate subjects for collective bargaining.  *See Patrolmen's Benevolent Ass'n of City of N.Y., Inc. v. N.Y. State Public Emp't Relations Bd.*, 848 N.E.2d 448, 453–54 (N.Y. 2006) (finding collective bargaining over disciplinary matters is prohibited where legislation specifically commits police discipline to the discretion of the Police Commissioner).  Merely developing and publishing the *standards* against which officers' actions are measured would not unfairly dictate specific outcomes in particular cases of alleged misconduct.  To the contrary, open and uniform standards would reinforce core goals of transparency and fairness by informing both officers and the public about what constitutes acceptable behavior.

*Third*, that the NYPD has taken steps to reduce the number of stop, question, and frisk occurrences since *Floyd* was decided does not lessen the need for further reforms.  Absent from the NYPD's response is any acknowledgment that the NYPD's "journey" over the past several years was occasioned by lawsuits challenging unconstitutional policing practices, which resulted in judgments by a federal court finding that the NYPD's unconstitutional practices had not merely sown "mistrust" in "certain communities" (ECF No. 603 at 3), but had deprived New Yorkers of constitutionally-guaranteed liberties.  The Court should not ignore that the genesis of those reforms was lengthy, costly, federal litigation contested fiercely by the NYPD for 19 years, since *Daniels*.  As such, CPR agrees with the Plaintiffs in those actions that additional reforms are necessary to ensure that any changes continue through and beyond the period of the Monitorship.  (*Cf.* ECF No. 602 at 10.)

*Fourth*, CPR notes that both the Final Report and the NYPD Response address several

recommendations that call for new training programs.  (*See* ECF No. 603 at 20–24; ECF No. 597 at 261–65; 267–68; 280–82.)  While training is crucial for all professions, CPR strongly urges the Court to focus – in the first instance – on the important structural reforms set forth herein, which will institute demonstrable and measurable changes designed to guide officers' behavior and ensure compliance with the Constitution.  Training has often been heralded by some elected officials and members of the NYPD as the sole solution to constitutional abuses, but CPR believes that time and experience have demonstrated that training alone is never a satisfactory solution for systemic failures of accountability and transparency.  The JRP provides the community and the Court with a unique opportunity to implement structural changes to the NYPD's policies and practices.  That opportunity should be focused on solutions more fundamental and far-reaching than additional training programs.[21]  Police training reforms, on the other hand, are both appropriately and sufficiently left to the political process.[22]

---

[21]  The effectiveness of the NYPD's training programs is questionable.  For example, between 2014 and 2016, the instances in which the NYPD required officers to undergo formalized training rose from 2% to 43%.  *See* CCRB Report, *supra* n.4, at 32.  Despite the increased frequency of additional training, however, the total number of complaints alleging stop and frisk abuses also rose during the period from 2015 to 2017.  *See id.* at 17.  If the Court adopts training as part of its reforms, CPR respectfully urges the Court to require officers to undergo pre- and post-training assessments regarding their understanding of the substance of the training to measure improvement, and to impose consequences on officers who fail post-training assessments.

[22]  For instance, following the grand jury's decision not to indict after the death of Eric Garner, Mayor de Blasio called for a complete re-training of 22,000 NYPD officers.  Marc Santora, *Mayor de Blasio Announces Retraining of New York Police*, N.Y. Times (Dec. 4, 2014), https://www.nytimes.com/2014/12/05/nyregion/mayor-bill-de-blasio-retraining-new-york-police-dept-eric-garner.html.  The Mayor's announcement followed a City Council meeting on re-training, *see NYPD to get 3-Day Retraining Course in Wake of Eric Garner Death*, Eye Witness News ABC 7 NY (Sept. 8, 2014), http://abc7ny.com/news/nypd-to-get-3-day-retraining-course-in-wake-of-eric-garner-death/299118/, and culminated in a training program for officers regarding interactions with the public along with plans for future crisis intervention training.  Chantal Da Silva, *NYPD Begins Implicit Bias Training Three Years After Eric Garner's Death*, Newsweek (Feb. 6, 2018), http://www.newsweek.com/nypd-begins-implicit-bias-training-three-years-after-eric-garners-death-800326.

## VI.    CONCLUSION

"If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful."  Remedies Opinion at 686.  The proposals detailed above, which were presented to the Facilitator during the JRP by CPR and members of the communities most impacted by this litigation, are essential to that legitimacy and to the effective implementation of successful reforms.  For the foregoing reasons, as well as those set forth in the plaintiffs' response to the Facilitator's Final Report, CPR respectfully requests that the Court consider and adopt the alternative and additional reforms set forth in this response.

Further, because CPR believes that the most accurate and important information arises from engagement with directly-impacted communities, CPR respectfully requests that the Court hold a hearing to permit representatives of directly-impacted communities to address the Court concerning these issues.  Community input has been at the center of the JRP and is essential to shaping legitimate and effective reforms.  Hearing directly from those impacted by any reforms would significantly inform and aid this Court's decision-making process.

Dated:  July 9, 2018

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: */s/ Gary W. Kubek*

Gary W. Kubek
Jarrod L. Schaeffer

919 Third Avenue
New York, NY 10022
Tel:  (212) 909-6000
Fax: (212) 909-6836

*Attorneys for Communities United for Police Reform as Amicus Curiae*