

Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**MICHAEL J. GILBERT**

michael.gilbert@dechert.com
+1 212 698 3886 Direct
+1 212 698 0426 Fax

July 9, 2018

**VIA ECF AND E-MAIL**

Hon. Analisa Torres
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re: *Floyd v. City of New York*, No. 08 Civ. 1034 (S.D.N.Y.)
*Ligon v. City of New York*, No. 12 Civ. 2274 (S.D.N.Y.)
*Davis v. City of New York*, No. 10 Civ. 0699 (S.D.N.Y.)

Dear Judge Torres:

We represent the Patrolmen's Benevolent Association of the City of New York (the "PBA"). Pursuant to the Court's June 18, 2018 Order (Dkt. No. 608), the PBA submits the following comments in response to the Facilitator's Final Report and Recommendations regarding the New York Police Department's ("NYPD" or "Department") Stop, Question, and Frisk ("SQF" or "stop and frisk") and Trespass Enforcement Policies (Dkt. No. 597, the "Report").[1]

The PBA is the designated collective bargaining agent for the more than 23,000 police officers employed by the NYPD. The PBA negotiates with the City of New York (the "City") on behalf of police officers concerning their terms and conditions of employment and other matters relating to police officers' safety and general welfare. The core mission of the PBA is to advocate for and protect the rights and interests of its members. The PBA brings to this submission the perspective of thousands of New York City police officers who will be tasked with the daily street level implementation of the recommendations contained in the Report. The recommendations touch on, among other things, aspects of the officers' training, discipline, monitoring, supervision, and daily interaction with the public. The PBA seeks to ensure that any court-ordered injunctive remedy is narrowly tailored to address the specific harm found by the Court and does not

---

[1] The docket numbers throughout this submission refer to the *Floyd* docket (No. 08 Civ. 1034). Additionally, and to avoid confusion, the page numbers cited correspond to the ECF page numbers, where applicable.





encroach on the rights and legitimate interests of its officer members, who dedicate their careers and lives to protecting this City and its citizens.[2]

Many of the recommendations in the Report exceed the scope of the remedial order and do not give proper consideration to the relevant standards applicable in ordering supplemental equitable remedies in this action. *See* Dkt. No. 372 (the "Remedies Opinion"). Moreover, as noted in the NYPD's Response to the Joint Remedial Process Report (Dkt. No. 603, the "NYPD Response") and the City Law Department's letter to the Court dated June 8, 2018 (Dkt. No. 604, the "Law Department's Comments," and, together with the NYPD Response, the "City Response") and supplemented by this submission, many of the recommendations are inappropriate, lack an evidentiary basis necessary to support implementation, are not narrowly tailored, and are overbroad. Accordingly, the Court should limit the equitable relief it grants as outlined below.

**A. <u>The Scope of the Court's Authority is Not Without Limit</u>**

In determining the proper scope of equitable relief to be ordered, courts have articulated three considerations that are particularly relevant here: (1) the principles of federalism, (2) the relief necessary to cure the harm caused by the violation, and (3) the scope of the underlying violation itself.

*First*, the Supreme Court has cautioned that "appropriate consideration must be given to principles of federalism in determining the . . . scope of equitable relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976). Likewise, the Second Circuit has stated that "the court's 'discretion to frame equitable relief is limited by considerations of federalism, and remedies that intrude unnecessarily on a [local government's] governance of its own affairs should be avoided.'" *Schwartz v. Dolan*, 86 F.3d 315, 319 (2d Cir. 1996) (citations omitted); *see also Association of Surrogates v. New York*, 966 F.2d 75, 79 (2d Cir. 1992) ("[f]ederal courts must take care to exercise 'a proper respect for the integrity and function of local government institutions'"); *Dean v. Coughlin*, 804 F.2d 207, 213 (2d Cir.1986) (citing *Rizzo v. Goode*, 423 U.S. at 379).

Courts have been particularly cognizant of this concern when the equitable relief involves managing the inner workings of municipal agencies. For example, in *Dean v. Coughlin*, the court emphasized that, "since the court is usually 'ill equipped to deal with the increasingly urgent

---

[2] The PBA was surprised to see in the Report the assertion that the PBA declined a request to meet. *See* Report at 139. The PBA disagrees with this characterization. As the Court is well aware, the PBA previously moved to intervene in this litigation and has continued to participate. *See* Dkt. Nos. 436, 459, 484, and 608. In short, the PBA has conscientiously ensured that its members' interests and concerns were voiced throughout the remedial process.





problems of prison administration,' it owes 'deference to the appropriate prison authorities,' lest the imposition by the court of its own broad changes designed to cure a constitutional infirmity not only offend the [local government's] entitlement to respect but amount to an unnecessary overkill." 804 F.2d at 213 (citations omitted). Likewise, in *PBA v. City of New York*, Judge Scheindlin declined to impose injunctive relief relating to a department policy of transferring officers because "such an injunction represents an undue intrusion into a matter of state sovereignty, namely, the internal operation of the New York Police Department." No. 97 Civ. 7895, 2000 WL 1538608, at *3 (S.D.N.Y. Oct. 18, 2000). *See also Portland Police Ass'n v. City of Portland*, 658 F.2d 1272, 1275 n.3 (9th Cir. 1981) (holding that equitable relief is unavailable where it would require "federal courts to disturb the inner workings and structure of a local police department" due to "federalism concerns").

*Second*, the Second Circuit has long established that it is "'the essence of equity jurisdiction' that a court is only empowered 'to grant relief no broader than necessary to cure the effects of the harm caused by the violation.'" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (quoting *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir.1997)). Thus, any injunctive relief granted should be "narrowly tailored to fit specific legal violations." *Id.* (quoting *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 50 (2d Cir.1996)). District courts should therefore "tailor [a] remedy to fit the nature and extent of the violation." *U.S. v. Yonkers*, 837 F.2d 1181, 1235 (2d Cir. 1987).

*Third*, an injunction would be overbroad to the extent that it addresses conduct that is not the subject of the underlying violation. The Second Circuit has made it clear that "[a]n injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." *See Mickalis Pawn Shop, LLC*, 645 F.3d at 145. In other words, "the equitable relief must be 'commensurate with the scope of the constitutional infraction.'" *Ass'n of Surrogates & Supreme Court Reporters Within City of New York v. State of N.Y.*, 966 F.2d 75, 79 (2d Cir.1992), *modified on reh'g*, 969 F.2d 1416 (2d Cir. 1992); *see also Mickalis*, 645 F.3d at 144–46 (rejecting as overbroad an injunction prohibiting multiple gun sale practices when the sole practice as issue was straw purchases).

The Court was in fact clear in its Remedies Opinion that the remedies imposed were to be "as narrow and targeted as possible." Dkt. No. 372 at 2. The Court even noted that, when acting pursuant to its equity jurisdiction, it "is only empowered to grant relief no broader than necessary to cure the effects of the harm caused by the violation" (*id*. at 6 (internal quotations omitted)), and the limited purpose of the Joint Remedial Process is "to develop any further reforms necessary to ending the constitutional violations described in the Liability Opinion" (*id.* at 12). Specifically, the Court stated that the Joint Process Reforms, which are the subject of the Report, "must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments." *Id.* at 30. The Report itself paid lip service to this standard by





stating: "The Joint Process Reforms must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance." Report at 226. However, in actuality, many of the recommendations in the Report do not adequately take into consideration the three limitations outlined above.

**B. <u>Changed Circumstances and Existing Oversight Should Be Taken Into Account</u>**

Not only must the limitations on equitable relief be applied in assessing any supplemental court-ordered reforms, which the Report does not, but the recommendations must be evaluated in the context of all that has occurred since the liability findings and in light of the considerable existing oversight to the Department.

*First*, in shaping its injunctive relief, the Court should not ignore the change in factual and legal circumstances that have transpired in the five years since the liability ruling. *See Juan F. By and Through Lynch v. Weicker*, 37 F.3d 874, 878 (2d Cir. 2003) (injunctive relief may be shaped by "a significant change in circumstances, factual or legal [where] the proposed modification is suitably tailored to deal with the changed circumstances") (citing *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 368 (1992) ("a flexible approach [to injunctive relief] is often essential to achieving the goals of reform litigation")); *see also U.S. v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need").

There is no doubt that there has been a dramatic shift in the SQF policing paradigm in the City of New York since the liability finding and the commencement of the remedial process. As the City points out in its Comments to the Report, the number of stops has already decreased dramatically—from 680,000 in 2011 to 10,000 in 2017. *See* NYPD Response at 3. To state the obvious, there has been a seismic shift in the number of stops and how those stops are conducted since *Floyd* was decided in 2013. The significant decline in stops is likely attributable to (i) certain voluntary reform measures implemented by the Department, (ii) changes in local law, and (iii) measures imposed and other actions that are, in whole or in part, a result of the Remedies Opinion. *See generally* NYPD Response (describing recent changes to Department polices). For example, as the PBA has asserted previously, the dramatic number of stops was the result of illegal quotas imposed by the Department, which were lifted at the end of the Bloomberg administration. *See id.* at 3 (acknowledging that, in the past five years, the Department has been "[r]ejecting what were once conventional norms that placed overreliance on enforcement metrics"). According to the Monitor's Second Status Report, stops had declined to under 46,000 annually by 2014, and by 2015 the number of stops had further declined to approximately 24,000. Dkt. No. 523 at 3. Further, in 2013, the City Council passed a bill that created a private right of action, permitting an individual subject to bias-based profiling to file a complaint with the New York City Commission on Human Rights or to bring a civil action. *See* N.Y.C. Admin.





Code § 14-151. This new regulation raised the prospect of civil liability for officers failing to comply with the law. Tellingly, Plaintiffs' counsel have not cited to evidence of new lawsuits arising out of unlawful stops based on race, even in light of the new law that permits individuals to sue for injunctive and declarative relief, attorneys' fees, and expert fees. *See id.* 14-151(d)(2)–(3). The Facilitator's recommendations do not take these changed circumstances into account, but the Court must.

*Second*, the Department and its officers are a highly scrutinized municipal police force. In addition to the disciplinary authority that is vested in the Police Commissioners, the Department's Internal Affairs Bureau investigates alleged misconduct by police officers. Actions of police officers and the Department are scrutinized by the district attorney's offices in all five boroughs. NYPD members' actions are also scrutinized by U.S. Attorney's Offices in the Southern and Eastern Districts of New York. Additionally, the Civilian Complaint Review Board receives and investigates certain allegations of misconduct against police officers. *See* N.Y.C. Charter § 440(c)(1). The Inspector General for the NYPD, a unit of the Department of Investigation, is further charged with investigating corruption, fraud, waste, and abuse in the Department, along with investigating, auditing, and making recommendations relating to the operations, policies, programs, and practices of the Department. *See id.* § 803(c), (d). The Governor has even issued an executive order to appoint the State Attorney General as special prosecutor in certain matters relating to harm caused by law enforcement officers. *See* N.Y. Executive Order No. 147, issued July 8, 2015. Finally, according to the City, the Department has committed to having body cameras worn by every patrol officer by the end of this year. *See* NYPD Response at 12. In other words, there is a structure and system of oversight that is now in place to scrutinize the actions of the NYPD, including the proper utilization of the stop and frisk procedure.

The Report's recommendations cannot be reviewed in a vacuum. When viewed in light of the relevant standards, the current policies and practices, and the considerable existing oversight, the effect of the recommendations—both in the aggregate and individually—would be to usurp the proper role of State and local governments and to, in effect, micromanage the Department. Therefore, adoption of these recommendations would be in violation of the principles of federalism and would improperly extend the equitable relief beyond the scope of the issues before the Court.

**C. <u>Recommendation No. 1 Concerning So-Called Feedback Loops</u>**

The Report recommends that the Court order the NYPD to develop "a program for systematically receiving, assessing, and acting on" certain categories of information regarding police officers. *See* Report at 227. This recommendation is misguided, unworkable, and fundamentally unfair to the police officers it will impact. The Report recommends that these categories of information include:





> (a) declinations of prosecutions by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or representation of police officers by the New York City Law Department; and (e) judgments and settlements against police officers in civil cases where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance.

*Id*. The Report further recommends that, in some cases, this information should be incorporated into the Risk Analytics and Information Liability System ("RAILS"). Report at 229–30. What the Report fails to consider, however, is that this information, when taken out of context—as it surely will be when reduced to a single data point, as the Report suggests it should be—would be, at best, unreliable and, at worst, seriously harmful to police officers' livelihoods and careers, including opportunities for promotion and advancement. The PBA will address the Report's recommendation with regard to feedback loops in five parts.

*First*, the Report recommends that the process for the review of declinations be "more robustly structured in a more integrated, systematic manner." Report at 229. As the Department notes in its response, the NYPD already has a process in place for analyzing declinations to prosecute, reporting them to commands and requiring inquiry and response by the commanding officer—a fact that renders this recommendation unnecessary. *See* NYPD Response at 7. Declinations to prosecute, however, can occur for a variety of reasons, many of which have nothing to do with stop and frisk, and the Report draws no distinction between declinations that may be relevant and those that may not, suggesting instead that all declination decisions be integrated into RAILS. *See* Report at 229. Including declinations unrelated to SQF is overbroad and beyond the equitable reach of the Court, particularly because many declinations likely would not implicate any police misconduct. Having these decisions incorporated into the RAILS network—which, as the Department notes, is "used by commanding officers as a management tool to conduct performance analysis" (NYPD Response at 6)—would negatively impact police officers' careers, terms and conditions of employment, and opportunities for promotion, even where officers are not at fault, and is therefore inappropriate and should not be a part of the equitable relief ordered by the Court.[3]

---

3 Importantly, the Report suggests that all of the information collected be used "in evaluation of officers, transfer requests, disciplinary processes, and in discretionary promotional decisions." Report at 228. It should be noted that, to the extent that such recommendations impact the procedural aspects of employee performance evaluations, such changes must be bargained over. *See* 6 OCB2d 36, at 14; *PBA*, 6 OCB2d 33, at 10; *DC 37*, 75 OCB 13, at 11 (BCB 2005); *PBA*, 63 OCB 2, at 13 (BCB 1999); *City of Yonkers*, 39 PERB ¶ 4580, at 4660 (2006) ("it has long been





*Second*, the Report recommends that the Department should "create a more discernible and concrete system . . . to address adverse credibility findings by courts with respect to officer testimony." Report at 229. As with declinations to prosecute, the Department notes in its response that the NYPD already "has an established procedure for reviewing adverse credibility findings." NYPD Response at 8. Moreover, as with the recommendation with respect to declinations, this suggestion is overbroad and beyond the equitable reach of the Court because they are unrelated to the Department's SQF practices and their compliance with the Fourth and Fourteenth Amendments. Indeed, adverse credibility findings may be made for a variety of reasons and can often be made for reasons that do not implicate any misconduct on the part of a police officer. As the Department notes, "an adverse credibility determination is *not* the equivalent of a judicial findings that the officer committed perjury or a related crime." *Id*. The Report makes no mention of this fact, recommending instead that a policy be written for the evaluation of all adverse credibility findings, and that such policy include "any necessary remedial measures including reassignment, retraining, or referral for discipline and investigation." Report at 230. Such a suggestion has the potential to impact officers who have committed no wrongdoing at all and should not be implemented.

*Third*, the Report recommends that protocols be developed "for the entry into the RAILS network of adverse civil litigation results in section 1983 and tort actions arising from unconstitutional stops and trespass enforcements." Report at 230. Again, as the NYPD's Response notes that "the Department has in place a feedback loop to evaluate the context of the case." NYPD Response at 9. Moreover, and most importantly, the Department has noted that "the Law Department may elect to defend or settle a lawsuit based upon a variety of factors." *Id.* Simply making note of the existence of an adverse civil litigation result in the RAILS network does not capture any of these factors. Doing so could penalize officers based on litigation decisions that may be beyond their control or that do not indicate potential police misconduct related to SQF (or otherwise). This recommendation is therefore overbroad—insofar as it requires tracking of information unrelated to the Department's SQF practices and their compliance with the Fourth and Fourteenth Amendments—and should not be implemented.

*Fourth*, the Report recommends that "a denial of indemnification by the New York City Law Department after consultation with the NYPD is an event that should be entered into RAILS absent extraordinary circumstances." Report at 230. The PBA disagrees with this

---

held that procedures for the evaluation of employees are mandatory subjects of bargaining"), *aff'd*, 40 PERB ¶ 3001 (2007). The Second Circuit has made clear that unions' collective bargaining rights may be implicated even where the change arises from a court order, and "no provision of the settlement agreement . . . prevents the union from collectively bargaining." *See Floyd v. City of New York*, 770 F.3d 1051, 1062 & n.36 (2d Cir. 2014).





recommendation for the same reasons expressed in the NYPD's Response: the Department is already "in continuous communication with the Law Department" about these issues, and much of that communication is subject to attorney-client privilege (NYPD Response at 9). Additionally, the recommendation is overbroad insofar as, like the other feedback loop recommendations, it has the potential to negatively impact officers for decisions that do not necessarily implicate police misconduct.

*Fifth*, the Report recommends that "adverse verdicts or settlements" be analyzed and "considered for entry into the RAILS network." Report at 230. This recommendation is overbroad for the same reasons noted above, in that it involves tracking of information that is unrelated to the Department's SQF practices and their compliance with the Fourth and Fourteenth Amendments. Specifically, adverse verdicts, and settlements in particular, do not always indicate malfeasance but instead can be the result of a wide variety of strategic litigation decisions that do not necessarily indicate police misconduct. Accordingly, including this data in the RAILS network could negatively impact officers who have done nothing wrong, and this recommendation should therefore not be implemented.

**D. <u>Recommendation No. 2 Concerning Discipline Summaries</u>**

The Report recommends that "the Court order the NYPD to prepare ***and publish*** a monthly report—without disclosing personal identifying information—chronicling findings of misconduct and the resultant disciplinary outcomes as they relate to unlawful stops and trespass arrests" (the "Disciplinary Summaries"). Report at 230 (emphasis added). As discussed below, the proposed public release of Disciplinary Summaries is plainly illegal under longstanding and well-settled New York law, as confirmed by the New York Court of Appeals, as well as by the City itself.

As a preliminary matter, and as determined by a WNYC study cited in the Report, New York is one of the vast majority of states (38, to be exact) that has made the reasoned decision to limit access to police personnel records. Specifically, the study concluded that there are "***23 states plus the District of Columbia where police disciplinary records are pretty much always confidential***." *See* WNYC News, *Is Police Misconduct a Secret in Your State?* (Oct. 15, 2015), *https://www.wnyc.org/story/police-misconduct-records/* (emphasis added). In a further 15 states, police personnel records have "limited availability." *Id*. Indeed, even in the very small minority of states that generally make police records available, the study found that "many of these states" routinely keep various categories of documents confidential, including, for example, "records of unsubstantiated complaints or active investigations." *Id.* Thus, far from being an outlier (as erroneously suggested by certain stakeholders and the Report), New York is firmly within the great majority with respect to its treatment of police personnel records.





Further, police personnel records are confidential in New York pursuant to Civil Rights Law § 50-a, which was enacted more than 40 years ago. It states:

> ***All personnel records*** used to evaluate performance toward continued employment or promotion, under the control of any police agency . . . ***shall be considered confidential and not subject to inspection or review*** without the express written consent of such police officer . . . except as may be mandated by lawful court order.

CRL § 50-a (emphasis added). That being said, agencies and entities with oversight authority over police officers already have the ability to access personnel records under CRL § 50-a. As described by the Court of Appeals, CRL § 50-a "sets up a legal process whereby the confidentiality of the records may be lifted by a court." *Daily Gazette Co. v. City of Schenectady*, 93 N.Y.2d 145, 154 (1999). There is no dispute that a judge is able to publicly release police personnel records after she has (1) given all "interested parties the opportunity to be heard," including the individual police officer, and (2) conducted an *in camera* review of the documents in question. CRL § 50-a. Moreover, CRL § 50-a expressly provides for transparency, as the records can be accessed without a court order by "any district attorney or his assistants." *Id.* They can also be accessed by "the attorney general or his deputies or assistants" and the grand jury, as well as "any agency of government which requires the records . . . in the furtherance of their official functions."[4] *Id.* In short, the system proposed by the Facilitator would be redundant and in conflict with CRL § 50-a.

There can be absolutely no dispute that the proposed Disciplinary Summaries are precluded from release by CRL § 50-a. The Court of Appeals has acknowledged that, pursuant to CRL § 50-a, a "personnel record" is a record that is "of significance to a superior in considering continued employment or promotion." *Prisoners' Legal Servs. v. New York State Dep't of Corr. Servs.*, 73 N.Y.2d 26, 31–32 (1988). Earlier this year, the City confirmed that the disciplinary documents disclosed in the proposed Disciplinary Summaries, such as "trial room decisions," "are considered by the NYPD whenever such officers are considered for promotions, transfers, or

---

4 Importantly, New York courts have consistently held that CRL § 50-a "is designed to protect the police officer, not the [NYPD]" and therefore cannot be waived by the City. *See, e.g.*, *Molloy v. NYPD*, 50 A.D.3d 98, 100 (1st Dep't 2008). Earlier this year, the City confirmed that it is unable to waive the civil rights of police officers that are protected by CRL § 50-a, telling the First Department that the statute "could not be clearer that NYPD lacks authority to disclose covered material on its own discretion." Brief for Respondent NYPD, *Luongo v. Records Access Appeals Officer*, Index No. 160232/2016 (1st Dep't, Jan. 31, 2018).





assignments." Brief for Respondent NYPD, *NYCLU v. NYPD*, APL-2017-00184 (Feb. 6, 2018). Thus, the City conceded that "[t]here is no dispute that [such documents] are personnel records covered by section 50-a of the New York State Civil Rights Law." *Id.*

Significantly, numerous New York courts *and* the City of New York have recognized that where, as here, an underlying document is protected by CRL § 50-a, ***any summaries of that document are entitled to the exact same protection***. Indeed, just last year the First Department held that there is "no question" that summaries of disciplinary records "fall squarely within a statutory exemption of Civil Rights Law § 50-a(1) and are thus not subject to disclosure," further emphasizing that:

> Civil Rights Law § 50-a makes no distinction between a summary of the records sought and the records themselves. Releasing a summary of protected records would serve to defeat the legislative intent of the statute in exempting those records from disclosure[.] "Such a facile means of totally undermining the statutory protection of section 50-a could not have been intended by the Legislature."

*Luongo v. Records Access Officer, Civilian Complaint Review Bd.*, 150 A.D.3d 13 (1st Dep't 2017), *appeal denied*, 30 N.Y.3d 908 (2017) (quoting *Matter of Daily Gazette Co. v City of Schenectady*, 93 N.Y.2d 145, 158 (1999)).

Moreover, the City itself recently acknowledged in submissions to New York's highest court that the Disciplinary Summaries cannot be disclosed in light of CRL § 50-a. Specifically, in February 2018, the City filed a brief with the Court of Appeals in which it explicitly recognized that New York law prevents the release of "redacted disciplinary summaries" that have purportedly been de-identified and asked the Court to create an entirely new "judicial exception" to allow for such disclosure. The Court of Appeals has not yet ruled on the City's request to rewrite CRL § 50-a. In the interim, however, the City nevertheless announced a plan to release "de-identified" summaries of police disciplinary records, and litigation was commenced to challenge that determination. On April 9, 2018, the New York Supreme Court entered an order enjoining the City from releasing such "de-identified" summaries and thereafter denied the City's motion to dismiss the lawsuit, citing "the law, common sense, and simple justice." *See PBA v. de Blasio, et al.*, Index No. 153531/2018 (Sup. Ct., N.Y. Cnty. June 19, 2018).

The Report's suggestion that the Disciplinary Summaries be "de-identified" would not only be illegal under well-established New York law but would also place New York City police officers and their families in grave risk of danger. For the past forty years, the Court of Appeals has made clear that where, as here, a statute precludes the disclosure of an individual's confidential records, the government cannot avoid the statute by deleting, redacting, or otherwise "de-identifying"





those records. *See, e.g.*, *Short v. Bd. of Managers of Nassau Cnty. Medical Center*, 57 N.Y.2d 399 (1982) (finding that where a statute precluded the release of "medical records," such documents could not be disclosed even after "deletion of all personal identifying details" because they were still "medical records" regardless of any deletions). As such, even if the so-called "de-identification" of Disciplinary Summaries could be done in a manner that would ensure police officer confidentiality and safety—which the PBA firmly believes cannot be accomplished—it would nevertheless still run afoul of New York law.[5]

Further, the NYPD itself has recognized that purporting to redact or "de-identify" documents is plainly insufficient to maintain confidentiality because, *inter alia*, "unique factual details remain," individuals can "cross-reference the unredacted details" against public data to identify officers, and "anyone interested in discerning the identity of an officer . . . might be able to do so by matching information from news reports or other publicly available or FOIL-able sources against the unredacted portions of the decisions." Brief for Respondent NYPD, *NYCLU v. NYPD*, APL-2017-00184 (Feb. 6, 2018). Indeed, numerous journalists have recently confirmed just how easy it is to engage in this type of information matching. *See, e.g.*, Kendall Taggart & Mike Hayes, *Busted: Secret NYPD Files*, BuzzFeed News (March 5, 2018) ("BuzzFeed News was able to identify [an otherwise anonymous police officer] by matching details of a January 2009 arrest with . . . court documents from [a] civil lawsuit," which BuzzFeed then used to find the police officer's home address and publish photos of him standing outside of his home).

Unfortunately, it is a matter of recent public record that there are individuals who seek to exploit publicly-available data in order to physically injure and harass New York City police officers. Indeed, in just the last few months alone:

- According to the Department of Justice, an alleged murderer recently sent a bomb through the mail to police officers who were part of a NYPD unit that arrested him after he methodically "conducted internet searches and made telephone calls to determine the locations of the officers' residences." *See* Press Release, Department of Justice, *Brooklyn Man Arrested for Using a Weapon of Mass Destruction* (Feb. 28, 2018). In fact, the bomber sent the bomb to the wrong address and the civilian who received the package was murdered when the bomb detonated. *Id.*

---

5 In *Short*, the Court noted the possibility that "an underlying purpose [of the relevant statute]—that of preservation of individual confidentiality—may be served by deletion of identifying details." 57 N.Y.2d at 406. But the Court found that this was nothing more than "a predicate on which to ground an argument to the Legislature that the statute should be amended"; the possibility of the deletion of identifying details "provides no basis, however, for judicial revision of the statute." *Id.*





- According to NYPD Police Commissioner O'Neill, an arrested individual was able to locate the home address and telephone number of a New York City police officer and left the following voicemail:

> Hey, [officer's name], highway cop motherf**ker. Hope all is well. I'll be seeing you very shortly. I hope you and your family on [address of officer's family] are doing very well. I'll see you soon.[6]

These are not hypothetical concerns or speculative fears. They are recent examples of New York City police officers being subjected to deadly attacks and threats to their families' physical safety—just for doing their job—because individuals have taken advantage of publicly-available information about police officers. The proposed Disciplinary Summaries that, among other things, chronicle "the particulars of the incident," the "actual discipline that was imposed," and the specific "geographic and precinct location" of the alleged incident would provide yet another tool to those who would seek to do New York City police officers harm. Report at 231, 240.

*Finally*, and significantly, as mentioned above, CRL § 50-a allows those who play some recognized role in overseeing police officers in our system of government to access personnel records "in the furtherance of their official functions." The concern that animates the recommendations, whether properly founded or not, can be adequately addressed within the existing framework of the law.

**E. Recommendation No. 3 Concerning Disciplinary Standards**

The Report further recommends that the Court order the development and publication of "progressive disciplinary standards to be used in cases arising from unconstitutional stops and trespass enforcement regarding excessive force, abuse of authority, discourtesy or offensive language, and racial profiling allegations." Report at 232. As the City notes in its submission, "[t]he breadth of [this recommendation] goes far beyond 'stop and frisk' to discipline in general and if construed in this manner, it is too broad to bring the use of Terry stops into compliance with the Fourth and Fourteenth Amendments." *See* NYPD Response at 12. Indeed, the recommendation makes no attempt to delineate how this remedy would be limited to the underlying violation and not go beyond its scope to cover all disciplinary matters.

More fundamentally, in recommending this potential remedy, the Report does not address the acute federalism concerns raised by requesting that a federal court mandate how the Police Commissioner exercises his authority to discipline his members. By statute, the Police

---

6 May 14, 2018 O'Neill Presentation to NYC Council.





Commissioner is intended to have the ultimate authority over the police department and police officers he leads, and those statutory provisions provide the framework and protect the rights of New York City police officers in those proceedings. *See* Charter § 434(a) ("The commissioner shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department."); N.Y.C. Admin Code § 14-115 (discipline of members). It is difficult to contemplate a scenario where this recommendation would satisfy the standard of being "no broader than necessary to bring the NYPD's use of stop and frisk into compliance." Remedies Opinion at 30. Finally, as the City acknowledges, "[t]he imposition of standards would be impracticable, raise due process concerns, and would also likely run afoul of civil service laws as well as New York's collective bargaining agreements." *See* NYPD Response at 12. The imposition of the recommended disciplinary standards would therefore be improper.

**F. <u>Recommendation Nos. 4 and 5 Concerning Level 1 and 2 Encounters</u>**

The recommendations regarding recording Level 1 stops as part of the body worn camera ("BWC") program and documenting Level 1 and 2 encounters are equally problematic. *See* Report at 233–44. The Report does not explain how either of these recommendations is "no broader than necessary to bring the NYPD's use of stop and frisk into compliance," given the concerns raised by the Department as to their limited and questionable value, combined with practicality and feasibility concerns outline by them. *See* NYPD Response at 14 ("This recommendation is neither practical nor feasible"); 15 ("The highly questionable value of this information cannot be considered essential to substantial compliance, particularly when weighed against the costs in community relations and resources to develop and use the applications").

Specifically, the Report asks the Court to order that the Department require officers to activate BWCs at the inception of Level 1 encounters. *See* Report at 234. The Report struggles to justify how recording Level 1 stops is relevant to remedying the Fourth Amendment violation, despite conceding that the Department has gone "well beyond the requirement" of the BWC pilot program. *See* Report at 233–38. The subject of BWC was "inadvertently" raised during the proceedings, and the Court relied on the results from a "small police department" in *Rialto* to state that there is "hope" that there will be benefits from the use of camera. *See* Remedies Opinion at 25, 28. Yet, a subsequent study that evaluated the effects of BWCs found that "results suggest that we should recalibrate our expectations of BWCs' ability to induct large-scale behavioral changes in policing, particularly in contexts similar to Washington, DC." Yokum, David et al., *Evaluating the Effects of Police Body-Worn Cameras: A Randomized Controlled Trial*, The Lab, DC (Oct. 20, 2017), *https://bwc.thelab.dc.gov/TheLabDC_MPD_BWC_Working_Paper_10.20.17.pdf*. In light of this uncertainty as to the benefit of BWCs, the recommendation surely and prematurely interferes with the Department's pilot BWC program that has already begun without fully studying the results of that pilot program.





Further, given the complexities of the various levels of stops, the Report's focus on discipline is misguided. Recently, the Committee on Prosecutors of the New York State Bar's Criminal Justice Section reviewed other states to determine other methods of evaluating police-citizen encounters. That report noted that no state has adopted *DeBour*'s framework. *See Close Encounters of the Police Citizen Kind: A National Study of Police Citizen Encounters in Other States and Federal Court in Relation to People v. DeBour*, NYSBA (2018), *http://www.nysba.org /workarea/DownloadAsset.aspx?id=81573*. That report further notes that differences between the levels, particularly Levels 1 and 2, have been a "source of confusion among prosecutors, defense attorneys, and judges" and that "some attorneys even carry an index card into court listing the tiers of *DeBour*." *Id.* at 150. The report concludes that if trained lawyers, including prosecutors, defense attorneys, and judges remain "confounded by the intricacies of *DeBour*," then law enforcement officers are going to be "confounded by the tiered levels as well." *Id.* at 151; *see also* Robert C. Power, Criminal Law: Technology and the Fourth Amendment: A Proposed Formulation for Visual Searches, 80 J. Crim. L. & Criminology 1, 50–51 (1989) ("Standards such as the reasonable suspicion standard applicable to police stops are inherently difficult to apply; where there is no attempt to provide a coherent definition, they become completely unmanageable."). In other words, the focus for any errors or misapplication of the various levels should not be discipline but appropriate training and re-training as necessary.

Similarly, the Report's recommendation that the Department develop an application allowing an officer to input approximate age, gender, race, and ethnicity of any person they approach at Levels 1 or 2 is, in substantial part, beyond the scope of the underlying order. The Report's suggestion that the "recording of basic data about all encounters," by commencing a few "clicks" "in a matter of seconds," would be a "simple" process evidences a lack of understanding of street level encounters. *See* Report at 239–40. To echo the Department's concern, this recommendation evidences a basic misunderstanding of Level 1 encounters. The NYPD's Patrol Guide 212-11, which the Court so-ordered, defines a Level 1 encounter, or a "Request for Information," as "an encounter between a civilian and a uniformed member of the service conducted for the purpose of requesting information from the civilian." *See* Dkt. No. 517 at 6. At the scene of a crime, if a police officer asks the crowd for information, would the officer have to document that encounter? If so, how would that relate to the Department's SQF enforcement policies that were at issue in this case? And, in that scenario, how is the police officer to determine the age, race, or ethnicity of any person they encounter, as recommended by the Report? Will the police officer be allowed to request that information? Does a request for such information infringe upon the civilian's privacy rights? By asking for such information, does that risk increasing the level of the encounter? *See* NYPD Response at 14 ("Furthermore, such a practice could effectively turn every consensual encounter into a de facto Level 3 *Terry* stop unsupported by reasonable suspicion because, by asking for an individual's name and/or pedigree information, the officer necessarily interferes with the individual and unnecessarily prolongs the





encounter"). As the City notes, the NYPD receives approximately 4.5 million service calls annually, and many of these involve some type of investigative encounters. *See id.* The Report does not address how many potential encounters could be captured by this proposal, and none of these fundamental concerns has been adequately addressed in the Report. In short, as the Department clearly notes, this recommendation simply is "neither practical nor feasible." *Id.* The recommendations relating to the BWC program should not be adopted.

**G. <u>Recommendation No. 6 Concerning FOIL</u>**

Recommendation No. 6 asks the Court to weigh in on how requests under New York's Freedom of Information Law ("FOIL") are to be managed. Report at 244. But how promptly FOIL requests should be processed is another intrusion that has no discernible connection to the reduction of the constitutional violations at issue. FOIL has its own procedures, standards, and disclosure requirements, and there was no underlying finding that the NYPD was not complying with its FOIL obligations. Therefore, the Court should not include this recommendation in its final determination.

**H. <u>Recommendation Nos. 7 and 9 Concerning Community Collaborative Board and Precinct-Level Surveys</u>**

Recommendation Nos. 7 and 9 also stray from the requirement that the proposed equitable remedy be no broader than necessary. *See* Report at 244–55, 258–59. Recommendation No. 7 asks the Court to order a creation of Community Collaborative Board ("CCB") to serve as an "advisor to the City." *Id.* at 252. The PBA agrees with the Department that "[t]he recommendation for the establishment of a [CCB] to provide feedback from affected communities on the court-ordered reforms and make recommendations to the court and the Monitor is redundant to and undermining of the Monitorship/JRP and is not necessary to bring the use of Terry stops into compliance with the Fourth and Fourteenth Amendments." *See* NYPD Response at 16.

Similarly, Recommendation No. 9 asks that the Court order the NYPD to conduct annual precinct surveys "that track police-community relations broadly, including public perception of policy-community relations and of police-civilian street encounters, and to assess the public's experience with Court-ordered reforms." Report at 258. The PBA concurs that the community's view of police services is something that should always be at the forefront of Department priorities, and the NYPD in its Response explains how it effectuates that priority, but the recommendation here is beyond the scope of the Court's authority and intrudes on how the NYPD operates. As the City states, there is no assessment of how this additional expense to taxpayers—to conduct precinct-level surveys, in light of all the other feedback the NYPD receives—would be a meaningful addition. There was no suggestion in the Remedies Opinion that the Court contemplated that the





stakeholders would be involved in some permanent capacity with the NYPD. Equally significant, there is no analysis in the Report that demonstrates how the surveys are necessary to bring the NYPD into compliance with the law that was found to have been violated here. *See* NYPD Response at 20. Recommendations No. 7 and 9 are unnecessary; they should not be adopted by the Court.

**I. <u>Recommendation Nos. 10 and 13 Concerning Confidential Informant Policies and Civil Summons for Trespass</u>**

Other recommendations also attempt to reform conduct that was not at issue in the underlying litigation. Recommendation No. 10 concerns confidential informant policies and seeks to insert some undefined "disclaimers" in training material "with respect to the cultivation of confidential informants" and then to develop an audit protocol on violation of confidential information policies. *See* Report at 259–61. The Report itself concedes that this is outside the scope by acknowledging that this recommendation "on the surface can be viewed as unrelated to stop, question, and frisk, and trespass enforcement," but the Report then offers no cogent explanation as to why it is not beyond scope. *Id.* As the City also argues, stop and frisk is only tangential to the reported conduct at issue—namely the recruitment of confidential informants under the age of eighteen. *See* Law Department's Comments at 3. Thus, any recommendations related to auditing or reforming confidential informant policies would exceed the proper scope of equitable remedies and interfere with the NYPD's fundamental public safety and crime fighting mission.

Similarly, Recommendation No. 13 regarding civil summons for trespass is an improper remedy. *See* Report at 265–67. First, federalism concerns are implicated because the Facilitator is asking the Court to dictate to a local sovereign what type of enforcement mechanisms it should pursue. Second, the recommendation itself is not tailored to address the stop and frisk violations that were found to have occurred.

**J. <u>Recommendation Nos. 11, 12, and 14 Concerning Training</u>**

Recommendations No. 11, 12, and 14 ask the Court to order additional training. *See* Report at 261–65, 267–68. Raising the level of training for police officers is a laudable goal and is generally welcomed by police officers, who seek to better service their community. However, as noted by the City and NYPD, those recommendations are beyond scope of available relief. *See* Law Department's Comments at 4 ("There is no basis to support this type of injunctive relief. Addressing these community concerns and advancing these policy goals does not address a harm at the intersection of the Fourth and Fourteenth Amendments, as identified by the court in *Floyd*"); NYPD Response at 21 ("Therefore, ordering that this content be included in the SQF training (or as a separate training related to this litigation) is outside the scope of the JRP") and at 22 ("While we agree these efforts are crucial and are committed to ongoing efforts to engage the





LGBTQ community, this recommendation is outside the scope of this for the reasons that the Law Department stated in its response"). Because the additional training is beyond the scope of available relief, the Court should refrain from ordering that it take place.

**CONCLUSION**

There are numerous instances where Report asks the Court to order supplemental equitable remedies without properly establishing the need for imposing the recommendations. Moreover, the Report fails to properly consider the limitations of the scope of the violations, the harm those violations were found to have caused, and the federalism concerns raised by unnecessarily intruding into the operation of a local sovereign. The Facilitator's recommendations also fail to take into account the circumstances that have changed since the Court's Remedies Opinion was issued and the significant oversight of the NYPD that currently exists. Finally, the recommendations are unworkable and will unnecessarily impede police operations, potentially undermining the fundamental public safety mission of the NYPD.

Respectfully submitted,

*/s/ Michael J. Gilbert*

Michael J. Gilbert
Lindsay E. Ray

cc: All counsel of record