UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DAVID FLOYD, *et al*.,                                08 Civ. 1034

     Plaintiffs,

  - against -

CITY OF NEW YORK,

     Defendant.

-------------------------------------------------------------X

KELTON DAVIS, *et al*.,                              10 Civ. 0699

     Plaintiffs,

  - against -

THE CITY OF NEW YORK and NEW YORK
CITY HOUSING AUTHORITY,

     Defendants.

-------------------------------------------------------------X

JAENEAN LIGON, *et al*.,                             12 Civ. 2274

     Plaintiffs,

  - against -

CITY OF NEW YORK, et al.,

     Defendants.

-------------------------------------------------------------X

## **PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THE JOINT REMEDIAL PROCESS REFORMS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ i

DISCUSSION .................................................................................................................................. 1

   I.     Introduction ........................................................................................................................ 2

   II.    The JRP Reforms are Measured, Necessary, and Appropriate ........................................ 7

      1.    Progressive Discipline Standards ................................................................................ 7

      2.    Monthly Report on Discipline ................................................................................... 10

      3.    Documentation of Level 1 and 2 Encounters ............................................................ 13

      4.    Video Recording of Level 1 Encounters ................................................................... 15

      5.    Community Board on Reform Implementation ......................................................... 18

      6.    Community Survey on Reform Implementation ........................................................ 20

      7.    Litigation Data in Performance Monitoring .............................................................. 21

      8.    Disability Information in Stop-and-Frisk Training .................................................... 23

      9.    Civil Summons .......................................................................................................... 27

   III.   Conclusion ...................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Badgley v. Santacroce*, 800 F.2d 33 (2d Cir. 1986).................................................. 8, 10

*City of New York v. MacDonald*, 607 N.Y.S.2d 24 (1st Dep't 1994)............................ 9

*Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986) .......................................................... 6

*Luongo v. Records Access Officer, Civilian Complaint Review Bd.*, 150 A.D.3d 13 (1st Dep't March 30, 2017), *leave to appeal denied*, 93 N.E.3d 1213 (2017)............................................ 11

*Patrolmen's Benevolent Association of the City of New York, Inc. v. DeBlasio, et al*, Index No. 153231/2018 (N.Y. Sup. Ct. 2018) ........................................................ 11

*Patrolmen's Benevolent Association of the City of New York v. NYS Pub. Emp't Relations Bd.*, 848 N.E.2d 448 (N.Y. 2006)............................................................... 8

*People v. De Bour*, 40 N.Y.2d 210 (N.Y. 1976)............................................ 15, 16, 17

*Sheppard v. Phoenix*, No. 91 Civ. 4148 (RPP), 1998 WL 397846, at *7–8 (S.D.N.Y. July 16, 1998) ............................................................................................. 9

*Todaro v. Ward*, 565 F.2d 48 (2d Cir. 1977) .............................................................. 5

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979).................................................................................................. 8, 10

**Statutes**

N.Y. City Admin. Code § 12-307(6)(b).......................................................... 9

N.Y. Crim. Proc. L. 160.50........................................................................... 14

NYS Civ. Rights Law 50-a ............................................................................ 10

**Other Authorities**

Joanna Schwartz, *Myths and Mechanics of Deterrence: The Role of Lawsuits in Law Enforcement Decision-mak*ing, 57 UCLA L. Rev. 1023 (2010) ............................... 22

## **DISCUSSION**

The NYPD suggests in its comment that its opposition to the JRP reforms is narrow, *see* NYPD Response to the Joint Remedial Process Report, Dkt # 603 ("NYPD Comment") at 2 (characterizing its position as agreeing to eleven recommendations), yet, in substance, the Department actually opposes most of the Facilitator's recommendations and argues it should not be ordered to implement any of them. *Id*. *See also*, Letter to Hon. Analisa Torres from David Cooper, dated June 8, 2018, Dkt # 604 ("Corp. Counsel Comment"). The NYPD further opposes almost all of the reforms that Plaintiffs prioritized in their comment, *see* Pls. Comments on the Joint Remedial Process Reforms, Dkt # 602 ("Plaintiffs' Comment"), including, *inter alia*: progressive discipline standards; documentation and recording of Level 1 and 2 investigative encounters; a community board and community survey to provide feedback on the NYPD's implementation of Court-ordered reforms; the inclusion of litigation data in performance monitoring; and improved information on people with disabilities in the stop-and-frisk training. As we explained in Plaintiffs' Comment, these reforms are necessary to bring the NYPD's stop-and-frisk and trespass enforcement practices into compliance with the Constitution and to ensure continued compliance. While the NYPD has made laudable changes to its policies outside of the JRP process, those changes—without the JRP reforms—do not remedy the constitutional problems that need to be addressed.

The Facilitator solicited robust input from a wide array of stakeholders over the course of three years, including members of the community most affected by the NYPD's practices, clergy, police policy experts, police officers, police union representatives, NYPD leadership, and elected officials. Thousands of community members gave input with the expectation that their feedback would be meaningfully incorporated into reforms of the NYPD's stop-and-frisk and

trespass enforcement practices. For the reasons set forth herein—in addition to the reasons articulated in Plaintiffs' Comment and the Facilitator's comprehensive report—we respectfully reiterate our request that the Court order the City to implement the JRP reforms.

## I.    <u>Introduction</u>

In opposing the Facilitator's JRP reform recommendations, the NYPD repeatedly argues that those recommendations are overbroad, when in fact the recommended reforms are quite measured. For example, the NYPD opposes discipline standards as somehow infringing on the Commissioner's authority, NYPD Comment at 9, yet those standards merely build on existing guidelines and would in no way constrain the Police Commissioner's complete discretion to choose the ultimate penalty imposed. *See infra* at 7-10. The NYPD similarly opposes documenting Level 1 and 2 investigative encounters as supposedly burdensome, NYPD Comment at 12, when officers would only be required to record slightly more information than they already record. *See infra* at 13-14. And the Department opposes a community board as purportedly undermining the Monitor and delaying reform implementation, NYPD Comment at 14, when a community board would gather critical feedback on reforms during the pendency of these cases in a more structured and practical manner than is otherwise available. *See infra* at 18-19.

A common thread of the NYPD's opposition is resistance to meaningful accountability and community participation in reform implementation. This opposition is especially stark because one of most repeated comments from the thousands of community members who participated in the JRP is that the NYPD needs to impose more serious consequences for police misconduct. Contrary to the NYPD's characterization, these comments did not come from a "small number of individuals." NYPD Comment at 3. In thirty-nine of forty of the *Floyd* focus

groups,[1] participants called for more stringent discipline to ensure lawful policing. The same is

true for twenty-two of twenty-four of the *Davis* focus groups,[2] and twenty-two of twenty-eight

---

[1] *See* 10/19/15 Focus Group Tr. at 15:17-20; 10/20/15 Focus Group Tr. at 23:13-14, 37:1-2 ("I'll lose my job if I have weed in my pocket. They can't lose their job if they shot somebody wrongfully?"); 10/21/15 Focus Group Tr. at 15:7-10; 10/22/15 Focus Group Tr. at 15:16-19; 10/27/15 Focus Group Tr. at 18:9-11 ("You gotta do some type of discipline. Because if [officers] see that their actions is not being disciplined they're gonna keep doing what they're doing now."); 10/28/15 Focus Group Tr. at 15:14-19 ("[Officers] should do their time for doing real criminal stuff, like beating on people for no reason. . . . They kill people and they get away with it."); 11/2/15 Focus Group Tr. at 19:18-20; 11/3/15 Focus Group Tr. at 28 ("I can sit here, as a police officer, I could punch her in the fucking head, and I'm getting desk duty with pay."); 11/5/15 Focus Group Tr. at 16:9-10; 11/17/15(10) Focus Group Tr. at 10:375-376 (expressing concern that police officers will violate the rights of others if they "feel like they're not going to get fired, then nothing bad's going to happen to them"); 11/17/15(11) Focus Group Tr. at 19:11-12; 11/17/15(12) Focus Group Tr. at 29:1283-1284 ("[T]hey do as they please, and . . . all they get is suspension or desk duty."); 11/18/15 Focus Group Tr. at 17:563-564 (Officers who have engaged in misconduct "get leave and they're still getting paid. You didn't feel no consequences. . . . There's no real affect in their life . . . ."); 12/8/15(14) Focus Group Tr. at 7:6; 12/8/15(15) Focus Group Tr. at 9:5-6 ("[I]t may be an officer with 50 complaints on him already. He's still okay. He still has his job. He's still out in the field, doing the same thing repetitively."); 12/9/15 Focus Group Tr. at 10:39-41 ("They have to be penalized for the things they're doing. . . . They need discipline."); 12/14/15(17) Focus Group Tr. at 10:30-31 ("When an officer gets in trouble, you know what they do? Desk work. They be at the desk. That's all they do. That's not a punishment."); 12/14/15(18) Focus Group Tr. at 10:42-43; 12/15/15(19) Focus Group Tr. at 11:464-465; 12/15/15(20) Focus Group Tr. at 11:9-12; 12/16/15(21) Focus Group Tr. at 11:503-12:506; 12/16/15(22) Focus Group Tr. at 12:23-34 ("If you don't pay a consequence, you're not going to learn anything."); 12/21/15(23) Focus Group Tr. at 17:19-20 ("[E]ven though they have evidence [of misconduct], the cop always wins the case . . . ."); 12/21/15(24) Focus Group Tr. at 20:34-38 ("[W]hen you start making noise . . . that's the only time that I know for a fact they even get a talking to. They're not really reprimanded or nothing like that."); 12/22/15(25) Focus Group Tr. at 19:16-17; 12/22/15(26) Focus Group Tr. at 14:5-7; 1/5/16 Focus Group Tr. at 15:25-27 ("We've made significant changes, but the new rules will only be as good as enforcement and accountability."); 1/6/16 Focus Group Tr. at 7:4-8 ("There's this culture in place where there's no accountability from within. . . . no one is holding [officers] accountable within their own team."); 1/12/16 Focus Group Tr. at 15:46-16:2 ("We have to start holding [the police] accountable because it's basically like you said, what are you going to take from this? Nothing."); 1/14/16 Focus Group Tr. at 21:36-40; 1/20/16 Focus Group Tr. at 15:44-46; 1/21/16(33) Focus Group Tr. at 23:12-14 ("No matter how many people you get to justify and say that person was in the wrong, as long as he has a badge, he's untouchable."); 1/21/16(34) Focus Group Tr. at 9:33-36; 1/26/16(35) Focus Group Tr. at 12:19-21; 1/26/16(36) Focus Group Tr. at 14:22-33 ("I see all my life cops break the law and nothing happens to them. . . . [I]f they're breaking the law there should be consequences."); 1/26/16(37) Focus Group Tr. at 17:44-45; 1/27/16 Focus Group Tr. at 20:895-897; 2/3/16(39) Focus Group Tr. at 22:19-25; 2/3/16(40)

community forums.[3] Community input calling for more direct community evaluation of the NYPD's implementation of reforms was similarly voluminous. In almost seventy percent of the community forums, participants spoke of the need to allow direct community participation in evaluating the NYPD's adherence to the law and the reforms in these cases.[4] In thirty of the forty *Floyd* focus groups[5] and ten of twenty-four *Davis* focus groups,[6] participants articulated the need

---

Focus Group Tr. at 11:25-26 ("There's no cops getting no type of type of repercussions for what they're doing.").

[2] 3/3/16 Focus Group Tr. at 15:24-26, 21:34-38; 3/5/16 Focus Group Tr. at 13:19-23, 20:45-21:13; 3/14/16 Focus Group Tr. at 9:16-22, 28-32; 3/24/16 Focus Group Tr. at 31; 3/28/16 Focus Group Tr. at 9:28-30; 3/30/16 Focus Group Tr. at 21:13-14, 18-19, 30-31; 3/31/16 Focus Group Tr. at 11:39-40, 13:30-31; 4/5/16 Focus Group Tr. at 21:7-17, 19:1-5; 4/14/16 Focus Group Tr. at 14:15, 45-46; 4/19/16 Focus Group Tr. at 4:23-25, 39; 5/3/16 Focus Group Tr. at 9:1-6; 5/5/16 Focus Group Tr. at 11:3-6, 17-18, 37-38; 5/12/16 (STPN) Focus Group Tr. at 9:16-20, 25-27; 5/12/16 Focus Group Tr. at 7:12-13, 18:4-6; 5/16/16 Focus Group Tr. at 13:11-13, 18:22-23; 5/20/16 Focus Group Tr. at 7:25-28, 38-42; 5/24/16 Focus Group Tr. at 17:7-10, 13:45-46; 6/2/16 Focus Group Tr. at 22:16-17; 6/6/16 Focus Group Tr. at 12; 6/8/16 Focus Group Tr. at 11:2-4, 9:33-35; 6/24/16 Focus Group Tr. at 22:26-32; 6/28/16 Focus Group Tr. at 15:19-21.

[3] *See* 10/13/16 Community Forum; 10/15/16 Community Forum; 10/20/16 Community Forum; 11/2/16 Community Forum; 11/3/16 Community Forum; 11/9/16 Community Forum; 11/14/16 Community Forum; 11/15/16 Community Forum; 11/16/16 Community Forum; 11/18/16 Community Forum; 11/19/16 Community Forum; 11/21/16 Community Forum; 11/22/16 Community Forum; 11/26/16 Community Forum; 11/28/16 Community Forum; 11/29/16 Community Forum; 11/30/16; 12/1/16 Community; 12/2/16; 12/3/16 Community Forum; 12/6/16 Community Forum; 12/16/16 Community Forum.

[4] *See* 10/13/16 Community Forum; 10/20/16 Community Forum; 11/2/16 Community Forum; 11/3/16 Community Forum; 11/9/16 Community Forum; 11/12/16 Community Forum; 11/14/16 Community Forum; 11/15/16 Community Forum; 11/16/16 Community Forum; 11/18/16 Community Forum; 11/21/16 Community Forum; 11/22/16 Community Forum; 11/26/16 Community Forum; 11/28/16 Community Forum; 11/29/16 Community Forum; 11/30/16 Community Forum; 12/1/16 Community Forum; 12/3/16 Community Forum; 12/6/16 Community Forum.

[5] *See* 10/20/15 Focus Group Tr. at 31:15-17; 10/21/15 Focus Group Tr. at 15:12-15; 10/22/15 Focus Group Tr. at 20:7; 10/27/15 Focus Group Tr. at 24:19-21; 10/28/15 Focus Group Tr. at 18:24-27; 11/2/15 Focus Group Tr. at 23:17-20; 11/3/15 Focus Group Tr. at 33; 11/5/15 Focus Group Tr. at 23:36-37; 11/17/15(11) Focus Group Tr. at 23:15-19; 11/17/15(12) Focus Group Tr. at 21:929-931; 11/18/15 Focus Group Tr. at 18:603-19:608; 12/8/15(15) Focus Group Tr. at 13:41-42; 12/9/15 Focus Group Tr. at 20:15-17; 12/14/15(17) Focus Group Tr. at 11:45; 12/15/15(20) Focus Group Tr. at 11:22-; 12/16/15(21) Focus Group Tr. at 13:582; 12/21/15(23) Focus Group Tr. at 18:36-39; 12/22/15(26) Focus Group Tr. at 12:32-33; 1/5/16 Focus Group Tr. at 16:2-7; 1/12/16 Focus Group Tr. at 14:9-11; 1/14/16 Focus Group Tr. at 21:2-3; 1/20/16 Focus

for more direct community feedback about officer activity and compliance with the law. In the Comments of *Amicus Curiae* Communities United for Police Reform, Dkt # 611 ("CPR Comment"), over ninety signatory organizations which represent a diverse cross section of community stakeholders centrally emphasized the need for more meaningful discipline and more direct and structured community feedback into reform implementation. *See* CPR Comment at 1, 12-17, 23-25.[7] The recommendations related to discipline standards and the community board are responsive to all of this input, and other changes the NYPD has made are not.

The federalism principles raised by the Patrolmen's Benevolent Association ("PBA"), *see* Letter to Hon. Analisa Torres from Michael J. Gilbert dated July 9, 2018, Dkt # 613 ("PBA Comment") at 2-4, 12-13, are no obstacle to implementation of the JRP reforms. As the Second Circuit has opined, federalism principles should not prevent a court from intervening to remedy constitutional violations, for courts must not "countenance an abdication of responsibility in correcting defects" in a system that deprived people of constitutional rights. *Todaro v. Ward*, 565 F.2d 48, 53-54 (2d Cir. 1977). *See also*, Remedies Op. at 6-7 (rejecting City's argument that federalism concerns precluded entry of injunction). As explained in Plaintiffs' Comment, this Court's broad equitable authority encompasses the power to direct the implementation of any reforms that are necessary to bring the City's practices into compliance with the Constitution. As

---

Group Tr. at 22:22; 1/21/16(32) Focus Group Tr. at 27:12-13; 1/21/16(34) Focus Group Tr. at 21:11-13; 1/26/16(35) Focus Group Tr. at 16:16-19; 1/26/16(36) Focus Group Tr. at 26:5-7; 1/26/16(37) Focus Group Tr. at 21:42 (recommending that police be "[s]upervised and evaluated by the community itself"); 1/27/16 Focus Group Tr. at 21:931-932; 2/3/16(39) Focus Group Tr. at 15:11-13; 2/3/16(40) Focus Group Tr. at 18:36-19:2 (recommending that a "civilian council" for monitoring).

[6] 3/3/16 Focus Group Tr. at 25:44, 26:1-3; 3/5/16 Focus Group Tr. 21:3-5; 3/24/16 Focus Group Tr. at 39; 3/28/16 Focus Group Tr. at 9:17; 5/12/16 Focus Group Tr. 18:8-21; 5/16/16 Focus Group Tr. 12:11-14; 5/20/16 Focus Group Tr. at 24:33-36; 5/24/16 Focus Group Tr. at 13:37-43; 6/24/16 Focus Group Tr. 22:26-27; 6/28/16 Focus Group Tr. 13:45, 14:4-5.

[7] *See also*, letters from named plaintiffs to the Court, annexed hereto as Appendix A.

also set forth in Plaintiffs' Comment, the JRP recommendations are needed to remedy the widespread problems that drove unlawful stops and trespass arrests, and to prevent recurrence.[8]

The NYPD and Corporation Counsel suggest throughout their submissions that the Court should refrain from ordering any JRP reforms until the details of those reforms have been negotiated. *See e.g.* NYPD Comment at 3. The City had an opportunity to negotiate the details of the JRP reforms, but the parties reached a complete impasse, which is the very reason the Facilitator had to issue his report. *See* Facilitator's Report at 40. Nonetheless, we would expect implementation of the JRP reforms to include negotiations about the rollout of those reforms after the Court enters an order requiring implementation. Indeed, that is precisely what has happened with all of the Immediate Reform Process ("IRP") reforms. For example, in August 2013, the NYPD was ordered to improve and redesign the UF 250 form—the form used to document stops at that time. Thereafter, the parties engaged in negotiations to design the new form before the final version was submitted to the Court for approval in March 2016. The same can and should happen with the JRP reforms. Postponing an order on the JRP reforms pending yet more consideration or negotiations at this juncture—after so much input has been obtained

---

[8] The Second Circuit's decision in *Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986), relied upon by the PBA, *see* PBA Comment at 2-3, is inapposite. The order that the Second Circuit vacated in *Dean* was issued after only a preliminary injunction hearing, *Dean*, 804 at 207; here, the order will follow a full trial on the merits and extensive factual findings. Further, the order that the Second Circuit directed the District Court to impose on remand in *Dean* contained detailed requirements for the internal management of the prison's dental health program, which was the program the plaintiffs had challenged. *Id.* at 216. In directing the District Court to enter that detailed order—despite the defendants' apparent willingness to implement the requirements voluntarily—the Second Circuit opined that the District Court "may go beyond what is constitutionally mandated . . . in view of the defendants' past failure to provide the minimum level of dental care required by the Constitution, [to] insure that that level will in the future be met by ordering the adoption of measures that would not otherwise be appropriate." *Id. Dean* thus stands for the principle that federalism concerns, while a necessary consideration, should not prevent the imposition of comprehensive remedies like those proposed here.

and after extensive negotiations have failed—would undermine the JRP and threaten the legitimacy of the remedial process.

Before turning to the merits of the recommendations, we make one final note about the NYPD's protestations that the JRP process and the Facilitator himself were somehow biased against the NYPD. *See e.g.* 2–3. High-ranking members of the NYPD attended numerous meetings about the JRP with the Facilitator, Plaintiffs' counsel, and community members throughout the several years it took to design and implement this process. The NYPD was present for discussions on the planning of the JRP, including plans for the focus groups, the leadership meetings, and the community forums. Nowhere does the NYPD specify what of their input the Facilitator purportedly ignored. *See* NYPD Comment at 3. At any point, if the NYPD believed the JRP was being designed or implemented in an objectionable manner, the NYPD could have sought relief from the Court. It did not. The NYPD's complaints to the Court about the process now—only after thousands of community members have participated—should be dismissed in light of the Department's prior acquiescence.

## II.   The JRP Reforms are Measured, Necessary, and Appropriate

### 1.   Progressive Discipline Standards

The NYPD responds to the recommendation on progressive discipline standards as though such standards would be completely novel, yet the NYPD's Patrol Guide already lists violations that will ordinarily result in certain consequences. *See* NYPD Patrol Guide §§ 206-03, 206-04, 206-05, 206-07.[9] The progressive discipline standards that Plaintiffs support would build on those existing guidelines. Additionally, as the NYPD noted in its Comment, the NYPD Department Advocate uses discipline standards to evaluate discipline recommendations. NYPD

---

[9] The NYPD Patrol Guide is available for viewing and download at https://www1.nyc.gov/site/nypd/about/about-nypd/patrol-guide.page.

Comment at 9-10. The NYPD's argument that progressive discipline standards would purportedly contravene local law, *see* NYPD Comment at 9, is inconsistent with the NYPD's current use of discipline standards.

Moreover, progressive discipline standards are consistent with state law. Section 14-115, *see* NYPD Comment at 9, prohibits granting anyone other than the Commissioner authority to ultimately decide what discipline to impose in a particular case. *See Patrolmen's Benevolent Association of the City of New York v. NYS Pub. Emp't Relations Bd.*, 848 N.E.2d 448 (N.Y. 2006). Were the Court to order the NYPD to use and publicly disclose a set of progressive discipline standards, as this recommendation contemplates, then the Commissioner would retain complete discretion to choose a disciplinary outcome in each case, and he would have total authority to diverge from the standards whenever he deemed it appropriate.[10]

In any event, state law cannot prevent a federal court from ordering a state agency to undertake policy changes that are needed to end the agency's constitutional violations. *See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 658 (1979) (holding that a federal court could order a state agency "to prepare a set of rules that would implement the court's interpretation of the parties' rights even if state law withheld from them the power to do so" because "any state law prohibitions against compliance with the District Court's decree could not survive the command of the Supremacy Clause"); *Badgley v. Santacroce*, 800 F.2d 33, 38 (2d Cir. 1986) ("Even if a state court would hold [jail officials] in contempt for [complying with an injunction] or if compliance would otherwise violate state law, Supremacy Clause considerations require that the judgment of the federal court be respected.").

---

[10] Notably, too, the Commissioner is permitted to agree to the recommendation, putting aside the issue of whether it could be court-ordered. *See Lynch v. Giuliani*, 755 N.Y.S.2d 6 (1st Dep't 2003).

The NYPD suggests—in passing and without legal support—that progressive discipline standards would violate collective bargaining rights. *See* NYPD Comment at 9. First, discipline penalties are not subject to collective bargaining. The New York City Administrative Code establishes "the right of the city, or any other public employer, acting through its agencies, to . . . take disciplinary action" and provides that "[d]ecisions of the city or any other public employer on those matters are not within the scope of collective bargaining." N.Y. City Admin. Code § 12-307(6)(b); *see also City of New York v. MacDonald*, 607 N.Y.S.2d 24 (1st Dep't 1994) (ruling that "the disciplining of police officers, including the right to determine guilt or innocence of breach of disciplinary rules and the penalty to be imposed upon conviction," is not subject to mandatory bargaining). Consistent with that rule, this Court has already recognized that "the changes to stop-and-frisk policies, procedures, supervision, training, and monitoring outlined in the Remedial Order are precisely the kind of management prerogatives courts have held are not subject to collective bargaining." *See* Op. and Order dated July 30, 2014, Dkt # 465, at 74 (denying PBA's motion to intervene). Even if disciplinary policy might have some practical impact on the terms and conditions of officer employment, changes to the policy do not require bargaining. *See id.*

Second, collective bargaining agreements cannot prohibit the Department from instituting changes that are necessary to bring the Department's practices into compliance with the Constitution. *Id.* at 82 ("the Court's power to remedy constitutional violations cannot be constrained by [Public Employment Relations Board or Board of Collective Bargaining] decisions or the Union's state law rights."). *See also Sheppard v. Phoenix*, No. 91 Civ. 4148 (RPP), 1998 WL 397846, at *7–8 (S.D.N.Y. July 16, 1998) (opining that New York courts "have long recognized" that parties are prohibited from negotiating on certain subjects "because to do

so would be contrary to public policy" and "[t]here is no more compelling public policy than compliance with the mandates of the United States Constitution"). Moreover, the employment rights of officers are only further protected if the Department creates and publishes uniform standards for the imposition of discipline.

Finally, the NYPD opposes the progressive disciplinary standards, in part, based on an argument that the disciplinary penalty imposed should reflect an assessment of the particular facts and circumstances in each case. *See* NYPD Comment at 9. This argument is a red herring because progressive discipline standards would not prevent the Commissioner from tailoring a penalty to the particular facts of the case. Instead, standards—developed with community input, *see* CPR Comment at 12 *et seq*., and publicly disclosed—would communicate to officers the seriousness of constitutional violations, provide a disciplinary framework that ensures unlawful conduct is not condoned, and serve to counter the "operational policy" that constituted deliberate indifference to unconstitutional practices. *See* Pls. Comment at § III(1).

### 2.  Monthly Report on Discipline

The Department's response to the proposed monthly discipline report is not an objection in substance but rather an assurance that it would do more public reporting, but for state law obstacles. *See* NYPD Comment at 8. This is all the more reason for a Court order requiring implementation. *Cf. Washington*, 443 U.S. at 658; *Badgley,* 800 F.2d at 38. *See also* NYS Civ. Rights Law 50-a (prohibiting disclosure of records for inspection or review *"except as may be mandated by lawful court order"*) (emphasis added).

As the Department's response describes, its most recent attempt at publicly reporting discipline, even without the names of officers, was halted by the PBA's lawsuit claiming the disclosures would result in violations of New York State Civil Rights Law 50-a. *Id. See also*

*Patrolmen's Benevolent Association of the City of New York, Inc. v. DeBlasio*, *et al*, Index No. 153231/2018 (N.Y. Sup. Ct. 2018).[11] While "[n]othing in the Freedom of Information Law . . . restricts the right of the agency if it so chooses to grant access to records within any of the statutory exceptions, with or without deletion of identifying details," *Luongo v. Records Access Officer, Civilian Complaint Review Bd.*, 150 A.D.3d 13, 24 (1st Dep't March 30, 2017), *leave to appeal denied*, 93 N.E.3d 1213 (2017), a federal court order requiring the Department to publish disciplinary outcomes would summarily quell impediments to publishing information about discipline. Notably, the Facilitator's recommendation would have been appropriate even if it had gone farther and required inclusion of officers' names. Indeed, the City has publicly stated it wants to include officer names in discipline reporting, but for its broad interpretation of Civil Rights Law 50-a.[12] A Court order requiring the NYPD to publish disciplinary data is therefore a moderate reform that is consistent with the City's goals.

Court-ordered regular reporting of summaries of police disciplinary penalties would not be groundbreaking; federal courts have previously ordered public disclosure of disciplinary information as a remedy for systemic constitutional violations by police departments. *E.g.*, Consent Decree at 51, 107, *United States v. City of New Orleans*, No. 12-CV-01924 (E.D. La. 2013) (requiring the City of New Orleans to "post online its full decisions related to NOPD discipline in a timely manner."); Settlement Agreement at 62, *United States v. City of Cleveland*, No. 15-CV-01046-SO (N.D. Ohio May 26, 2015) (requiring the Office of Professional Standards and Cleveland Division of Police to annually assess and release a public report summarizing data

---

[11] *Davis* Plaintiffs' counsel, The Legal Aid Society, was granted leave to intervene in this matter on June 5, 2018.

[12] City of New York, *Mayor DeBlasio Outlines Core Principles of Legislation to Make the Disciplinary Records of Law Enforcement and Other Uniformed Personnel Subject to Disclosure* (2016), http://www1.nyc.gov/office-of-the-mayor/news/820-16/mayor-de-blasio-outlines-core-principles-legislation-make-disciplinary-records-law.

on misconduct complaints); Consent Decree at 142-44, *United States v. Police Dep't of Baltimore City*, No. 1:17-CV-00099-JKB (D. Md. Jan. 12, 2017) (requiring quarterly reporting of aggregate data on complaints against officers, outcomes of misconduct investigations, and disposition of charges, as well as making "detailed summaries" of the disciplinary hearing process and outcomes). Court-ordered reporting would simply restore transparency to the pre-2016 level of access to such information that was available since 1972, when the Department began making summaries of substantiated investigations available to reporters through the Deputy Commissioner of Public Information and to the public at the City Hall archives. *See* Rocco Parascandola and Graham Rayman*, Exclusive: NYPD Suddenly Stops Sharing Records On Cop Discipline In Move Watchdogs Slam As Anti-Transparency* (New York Daily News 2016), http://www.nydailynews.com/new-york/exclusive-nypd-stops-releasing-cops-disciplinary-records-article-1.2764145?barcprox=true.

Transparency of data, policies, and procedures was recognized as one of the Six Pillars of reform by the President's 21st Century Policing Task Force. *See* Office of Community Oriented Policing Services, *Implementation Guide* (2015), http://noblenational.org/wp-content/uploads/2017/02/President-Barack-Obama-Task-Force-on-21st-Century-Policing-Implementation-Guide.pdf. Public transparency, and the individual and department-wide accountability that transparency ultimately serves, is fundamentally different than allowing limited access to discipline information to the Monitor or even the Plaintiffs. *See* NYPD Comment at 9. Public disclosure of police disciplinary information is required here to identify, prevent, and meaningfully address constitutional violations by officers.

### 3. <u>Documentation of Level 1 and 2 Encounters</u>

The NYPD and PBA contend that documenting all Level 1 and 2 encounters in the manner recommended by the Facilitator would be unnecessary, burdensome, and "potentially have a chilling effect on community engagement," *see* NYPD Comment at 12; PBA Comment at 14-15, but these arguments do not hold water and are wholly without merit.

As an initial matter, Plaintiffs note that the NYPD's and PBA's arguments relate only to Level 1 Requests for Information; nowhere do they specifically explain why documenting Level 2 encounters would pose problems or otherwise be improper. *See* NYPD Comment at 12-13; PBA Comment at 14-15. Thus, at a minimum, the propriety and feasibility of documenting Level 2 encounters is undisputed.

Second, for the reasons set forth in both the Facilitator's Report and Plaintiffs' Comment, documenting Level 1 and 2 encounters is necessary to accurately assess the constitutionality of the NYPD's stop-and-frisk and trespass enforcement practices. It is further needed to assess the level of underreporting of Level 3 *Terry* stops, which is in turn necessary for determining whether the NYPD has achieved substantial compliance with the Court-ordered reforms and thus has brought its stop-and-frisk practices into compliance with the Constitution. *See* Facilitator's Report at 231-235, Pls. Comment at 18–19. [13]

Third, the NYPD and PBA overstate the burden that the recommended documentation of Level 1 encounters would impose on NYPD officers. To begin with, while 4.5 million is

---

[13] As Plaintiffs explained in their comment, the need for documenting lower level encounters is, in part, because of the NYPD's persistent under-recording of stops. *See* Pls. Comment at 15. It is important to bear in mind, though, that, even if we assume the total number of stops has decreased since the *Floyd* trial after accounting for under-recording, this does not mean the tens of thousands of stops that have been conducted were lawful. The reduced number of stops does not establish the lawfulness of the NYPD's stop-and-frisk practice, and it does not obviate the pressing need for reforms.

certainly a large number of service calls in a year, that actually averages out to less than one call per day for each NYPD officer on patrol for a department the size of the NYPD. Further, as the Facilitator explains, the NYPD's current technological capabilities would enable an officer to document the race/ethnicity, gender, age, and location information for each Level 1 and 2 encounter in a matter of seconds: either during or at the end of each encounter or once the officer has finished canvassing the scene. Facilitator's Report at 231–32. While the NYPD raises legitimate concerns about the burdens associated with documenting multiple separate Level 1 inquiries during a single crime scene canvassing, these concerns can and should be addressed as the protocols for this reform are developed; it is not a reason to reject this reform altogether.

Finally, the NYPD's claim that the proposed documentation reform "could have a chilling effect on public cooperation [and] turn simple conversations into prolonged *de facto* [*Terry*] stops," NYPD Comment at 13, is a non-sequitur. The NYPD mistakenly assumes that officers would be required to ask every civilian during a Level 1 and 2 encounter for their "name and/or pedigree information," *id*. at 12, but no such requirement is mentioned anywhere in the Facilitator's reform recommendation or Plaintiffs' proposed modification to it. Instead, the Facilitator's proposal contemplates officers recording only their own perceptions and observations of demographic traits (the race, gender, and "approximate age") of someone they approach at Level 1 or 2, which would not require officers to ask for photo identification or any pedigree information or otherwise "prolong" a Level 1 or 2 encounter.[14]

---

[14] The NYPD's reference to New York Criminal Procedure Law Section 160.50 is inaccurate. *See* NYPD Comment at 12. N.Y. Crim. Proc. L. 160.50 does not prohibit documenting encounters; it instead requires the sealing of records related to an arrest or prosecution that results in dismissal. While the NYPD might have to develop protocols for properly sealing Level 1 and 2 documents in certain covered cases, nothing in the sealing statute bars implementation of a documentation requirement. Notably, the NYPD already has protocols for sealing stop stop reports that are covered under CPL 160.50 that are of minimal burden.

As for the NYPD's belief that demographic data based on an "officer's perception of the individual" is "of no value from an analytical standpoint," NYPD Comment at 12, much of the demographic information in the NYPD's stop-and-frisk database has long been based on officers' perceptions of stopped persons' races, ages, and genders, since people are not required to and often refuse to provide photo identification or demographic information to officers during pedestrian *Terry* stops. Yet, no one has suggested that analyzing the racial disparities in the stop, question, and frisk data is of no value. In fact, it is precisely officers' *perceptions* of civilians' race, ethnicity, age, and gender which are most relevant when analyzing the extent to which officers' biases may be impacting the way they conduct investigative encounters.

### 4.  Video Recording of Level 1 Encounters

The NYPD's myriad objections to mandating officers to record Level 1 investigative encounters on their body-worn cameras ("BWC's") are full of mischaracterizations and ignore the actual reasoning upon which the Facilitator based his recommendation. First, the NYPD's assertion that "Recording all Level 1 encounters would effectively mandate activating the BWC any time an officer engages with a member of the public," NYPD Comment at 11, contradicts the NYPD's own training on investigative encounters and the *De Bour* decision itself. In its SQF in-service training for police officers, which was recently submitted for Court approval, the NYPD specifies that officers are only at *De Bour* Level 1 or higher if they "are investigating something," and expressly places interactions with civilians in which an officer is merely "saying hello, giving directions, talking to people in [his or her] community," outside of the *De Bour* investigative encounter framework altogether. *See Floyd* Dkt # 609 at 18. This distinction stems from the *De Bour* holding itself in which the New York Court of Appeals, when discussing Level 1 "Requests for Information," did not characterize them as *any* conversation between a

police officer and civilian, but instead mentioned only officers approaching civilians while "engaged in their criminal law enforcement function" and, with respect to officers' public service function, "mak[ing] inquiry of passers-by to find the parents of a lost child," and "render[ing] assistance to those in distress." *People v. De Bour*, 40 N.Y.2d 210, 218–19 (N.Y. 1976).

The concern that a "casual encounter could be escalated into an adversarial interaction upon activation of the body-worn camera" (*see* NYPD Comment at 11–12) ignores the results of the NYU survey of members of the public which the NYPD cites in its own Comment. *See* NYPD Comment at 10 n.8. As highlighted in Plaintiffs' Comment, eighty-two percent of the 26,000 surveyed New Yorkers supported the filming of Level 1 encounters on officer body-worn cameras.[15] *See* Pls. Comment at 21. Such overwhelming public support for recording Level 1 encounters suggests that such encounters will not turn adversarial if and when a member of the public learns that the officers with whom they are interacting have turned on their body-worn cameras.

The NYPD also tries to sweep away and distort the Facilitator's well-researched comparisons with BWC policies from other large metropolitan police departments. For example, the NYPD scrutinizes the Facilitator's depiction of the Chicago Police Department's BWC policy by focusing on the part of Chicago's policy which addresses "community caretaking functions" that are discretionary to record unless and until the officer has reason to suspect the person being recorded of engaging in criminal activity. *See* NYPD Comment at 11. However, the NYPD fails to mention the Chicago policy's mandated activation "for all law-enforcement-related activities," *See* Chicago Police Department, *Special Order S03-14*, (2018),

---

[15] We note our continued request that the BWC footage be maintained by an independent third party. *See* Letter to Hon. Analisa Torres from Darius Charney, dated April 19, 2017, Dkt # 546 (*Floyd* and *Davis* objection to body-worn camera policy), Ex. A at 11, 13-14, 20, 22.

http://directives.chicagopolice.org/directives/data/a7a57b38-151f3872-56415-1f38-89ce6c22d026d090.html, which would necessarily include all Level 1 Requests for Information made by officers while engaged in their criminal law enforcement function. *See De Bour,* 40 N.Y. 2d at 218–20. This is precisely the addition to the NYPD's body camera policy for which Plaintiffs advocated in their April 19, 2017 submission to the Court. *See Floyd* Dkt # 546 at 3-4.[16]  In addition, the NYPD claims that "what works in other cities does not necessarily work for NYPD" because those other cities have smaller police departments and smaller populations, *see* NYPD Comment at 11, but offers no explanation to support this conclusory statement. Indeed, the NYPD ignores that Chicago and Philadelphia feature mandated recording of all law enforcement-related Level 1 encounters in their body camera policies, and they are, respectively, the second and third largest municipal police departments in the country and they both police populations of well over one million people.

The NYPD also references technological burdens in filming Level 1 encounters—that including these recordings would make the number of videos "immense and unmanageable." *See* NYPD Comment at 11. This argument would make more sense if the NYPD had not chosen, on its own, before the Court-ordered pilot was even close to completion, to expand its BWC program to cover the entire Department, with 18,000 officers to be equipped with body worn cameras throughout the city by the end of 2018. *See* New York City, *De Blasio Administration,*

---

[16] The NYPD contends that mandating the recording of only law enforcement-related, rather than all, Level 1 encounters "would create an artificial distinction within Level 1 encounters that would be confusing to officers, difficult to train, and inconsistent with the law." NYPD Comment at 12. But the New York Court of Appeals in *De Bour* recognized this very distinction as a clear and legally relevant one. *See* 40 N.Y.2d at 218-19 ("Generally, in the performance of their public service functions, not related to criminal law enforcement, the police should be given wide latitude to approach individuals and request information. . . However, when police officers are engaged in their criminal law enforcement function their ability to approach people involves other considerations and will be viewed and measured by an entirely different standard of reasonableness.").

*NYPD Announce All Officers on Patrol to Wear Body Cameras by End of 2018, One Year Earlier Than Expected*, (2018), http://www1.nyc.gov/office-of-the-mayor/news/071-18/de-blasio-administration-nypd-all-officers-patrol-wear-body-cameras-end-2018-#/0. If the Department is so concerned about amassing too much video, it could have waited until the conclusion of the pilot before so drastically increasing the number of body cameras on the street, which in turn increases the amount of video being recorded by its officers. This rapid expansion of its body camera program in the middle of the Court-ordered pilot is also why the NYPD's argument that changes to its body worn camera policy are premature, *see* NYPD Comment at 12, rings hollow.[17]

## 5. Community Board on Reform Implementation

The NYPD argues that the City should not develop a community board to provide structured feedback on reform implementation during the pendency of these cases because it already participated in the JRP, *see* NYPD Comment at 14, as though the purpose of the JRP was community outreach for the sake of community outreach. The purpose of the JRP is—and always has been—to develop reforms to the NYPD's practices. The NYPD has not complied with the Court's Remedial Order in *Floyd* or its settlement agreements in *Davis* and *Ligon* unless and until it has implemented the JRP reforms. The proposed community board is necessary to provide critical feedback to the Department and to ensure stop-and-frisk and trespass enforcement reforms are fully and durably implemented.

The Department's suggestion that community members can simply go to the Monitor to offer feedback, NYPD Comment at 15, is impractical. First, draft reforms are subject to

---

[17] While the PBA criticizes that the Facilitator's body-worn camera recommendation for its "focus on discipline," PBA Comment at 14, nowhere in this recommendation does the Facilitator mention disciplining officers. *See* Facilitator's Report at 225-230.

confidentiality restrictions such that Plaintiffs' counsel is often constrained from publicly disclosing reforms that are under consideration. The community cannot respond to reforms that it does not know exist and drafts of which it is not allowed to see. Second, largely because of the confidentiality restrictions, soliciting community feedback on draft IRP reforms has proven prohibitively burdensome to community members. For example, named plaintiffs have been permitted to see draft IRP reforms to offer feedback, but Plaintiffs' counsel cannot share drafts until they are near final and clients must come to our offices to review hard copies of the drafts, which often means having to review voluminous drafts in one sitting for hours at a time. Given this reality, there is a need for a less burdensome and more structured feedback mechanism for providing community feedback on reforms, and the community board serves that need.

The NYPD complains that the members of the community board that the Facilitator suggests do not mirror the JRP stakeholders, *see* NYPD Comment at 15, but that is because the community board serves a purpose different than the JRP. The community board is a reform tailored to addressing the NYPD's deliberate indifference to complaints from the community about its use of stop-and-frisk and its trespass enforcement practices. The stakeholders identified for participation in the community board are representatives of the kinds of organizations and community groups that the NYPD deliberately failed to hear. Moreover, we support the funding, composition, and operational guidelines for the community board set out in CPR's amicus submission, CPR Comment at 24 *et seq.*, which would ensure the board serves the important purpose of being "an effective mechanism for continued involvement by communities directly impacted by this litigation." CPR Comment at 24.

### 6.  Community Survey on Reform Implementation

The NYPD acknowledges that the "Sentiment Meter" survey questions it is developing "are not specifically SQF-related," NYPD Comment at 17, and the NYPD's description of the survey makes clear that it will not otherwise "assess the public's experience with Court-ordered reforms." Facilitator's Report at 250. That admission proves the need for this reform: without measuring community feedback on the implementation of stop-and-frisk and trespass enforcement reforms, the NYPD's own community surveys would offer "little benefit beyond the feedback [the NYPD] already receive[s]." NYPD Comment at 18.  Moreover, failure to include these measurements would undermine the Court's ability to accurately assess whether the NYPD is in compliance with the orders and agreements in these cases.

As for the PBA's contention that such surveys are "beyond the scope of the Court's authority and intrudes on how the NYPD operates," PBA Comment at 15, Plaintiffs reiterate that recent federal court-ordered Department of Justice pattern-and-practice consent decrees with municipal police departments have routinely required that such surveys be part of the court-appointed monitors' assessments of those departments' compliance with the court-ordered reforms, which is precisely what the Facilitator's recommendation, as modified by Plaintiffs, envisions. *See, e.g.*, Consent Decree ¶¶ 456, 459, 506, *United States v. Police Dep't of Baltimore City*, No. 1:17-CV-00099-JKB (D. Md. Jan. 12, 2017); Consent Decree at 12-13, *United States v. City of Newark*, No. 2:16-CV-01731-MCA-MAH (D.N.J. April 29, 2016); Consent Decree at 107-14, *United States v. City of Ferguson*, No. 4:16-CV-000180-CDP (E.D. Mo. March 17, 2016); Consent Decree at 83-88, *United States v. City of Cleveland*, No. 15-CV-01046-SO (N.D. Ohio May 26, 2015); Consent Decree at 57-61, *United States v. City of Seattle*, No. 2:12-CV-01282 (W.D. Wash. July 27, 2012).

### 7.   **Litigation Data in Performance Monitoring**

The Department objects to the incorporation of litigation data into its Risk Assessment and Information Liability System ("RAILS") system, claiming that it falls outside of "relevant predictors of risk" and that it may require "extensive IT engineering efforts." NYPD Comment at 4-5. The Department also objects because it claims that the Office of Inspector General's report about litigation data proved it has sufficient oversight in that regard. These objections are unfounded.

Whether or not litigation data may be a relevant predictor of risk has no bearing on whether the Court should order the Department to collect that information in RAILS. The original purpose of RAILS was not exclusively to be an early warning system for individual officers alone, but also to be an "enterprise management system" that would assist the Department in learning about patterns of misconduct by using available information, including litigation data. Department of Investigation, *Ongoing Examination of Litigation Data Involving NYPD*, (2018), 9-10.[18] Only later was its purpose reconfigured as "strictly" an early warning system for individual officers. *Id*. This original purpose of the RAILS system—to assist the Department in identifying patterns of misconduct—is aligned with this Court's liability findings. Liability Op. at 109 n.394 (citing Pls FOF at 139–141) (the monitoring system should "assess available information concerning misconduct"). The Court specifically cited the failure of the Department to collect a broad array of available data as undermining the NYPD's ability to prevent and remedy problematic enforcement activity. Plaintiff's Comment at 30–31 citing Liability Op. at 105–111; Remedial Or. at 23–24. Litigation data may, as the Department itself has acknowledged, play an important role in improving police conduct regardless of its

---

[18] http://www1.nyc.gov/assets/doi/reports/pdf/2018/April/21NYPDLitData_Report_43018.pdf.

"predictive" value. Plaintiffs' Comment at 32, n.15 (citing Letter from Lawrence Byrne, NYPD Deputy Commissioner, to Bill DeBlasio, Mayor, *et al*, dated July 17, 2015, at 2). Countless other legal, policy, and scholarly authorities have likewise called for the Department to collect and analyze litigation data. Plaintiff's Comment at 32 (citing New York City Bar Association report, City Council legislation, and Inspector General report). *See also* Joanna Schwartz, *Myths and Mechanics of Deterrence: The Role of Lawsuits in Law Enforcement Decision-mak*ing, 57 UCLA L. Rev. 1023, 1067 (2010).

The Department also argues that "extensive IT engineering efforts" make litigation data too hard to incorporate into RAILS. NYPD Comment at 5. The Department describes itself as the "most technologically advanced police department in the nation" that "utilizes cutting-edge technology and equipment," NYPD, *Technology and Equipment*, https://www1.nyc.gov/site/nypd/about/about-nypd/equipment-and-tools.page, and the City already publishes data about civil rights litigation. *See* Law Department, *NYC Administrative Code Section 7-114: Civil Actions Regarding the Police Department*, (2018), http://www1.nyc.gov/site/law/public-resources/nyc-administrative-code-7-114.page (spreadsheet of 5 years' worth of civil rights litigation data). Certainly, there is a technological solution that the NYPD and the Law Department can develop to integrate litigation data into RAILS.

Lastly, the Department cites the Inspector General's report as evidence that "NYPD already has oversight bodies reviewing its practices and policies . . . ." NYPD Comment at 5. Yet, it fails to mention that the Inspector General's most recent report was a rebuke of the Department's recalcitrance in failing to respond to requests about its decision not to implement litigation analysis into RAILS. Department of Investigation, *Ongoing Examination of Litigation Data Involving NYPD*, (2018) (detailing how the NYPD refused to respond to several requests

from DOI, withheld information based on legal privilege, refused to make NYPD lawyers available for DOI interviews, and directed DOI to the Law Department for further consultation). The NYPD's refusal to learn from litigation data makes a Court order absolutely necessary in order to create a system where the Department is not just considering litigation data in its early warning system for officers, but more importantly, is using all available information to identify and address systemic patterns of misconduct.

### 8.   Disability Information in Stop-and-Frisk Training

The City and PBA argue that the Facilitator's recommendation that the NYPD develop a stop-and-frisk training that "includes specific units on engaging with people with mental, physical, or developmental disabilities" is "categorically outside of the scope of the proper exercise of the Court's power" to order relief in this case. *See* Corp. Counsel Comment at 1, 3 (quoting Facilitator's Report at 253); *see also* PBA Comment at 16 (characterizing the Facilitator's recommendations for more training, including the Facilitator's disability reform recommendation No. 11, as "laudable goal[s]" but "beyond [the] scope of available relief"). Along with the NYPD, the Law Department argues that the Court's "findings of fact . . . did not identify any issues relating to the NYPD's interactions with people with mental, physical, or developmental disabilities." Corp. Counsel Comment at 3; *see also* NYPD Comment at 18-19. However, in its findings of fact in *Floyd*, the Court concluded that the NYPD conducted at least 200,000 stops without the appropriate reasonable suspicion, and in violation of the Fourth Amendment. As Plaintiffs' counsel has previously explained—and feedback from the JRP community forums indicates—disability is relevant to stop, question, and frisk practices because movements and behaviors that may be associated with disability may also erroneously contribute to the development of reasonable suspicion. Facilitator's Report at 253, App. B at 9; *see also*

Plaintiffs' Comment at 33–34 (describing the notes from JRP community forums detailing the inclusion of people with disabilities on the list of groups subject to stops by police and requesting police training with respect to people with disabilities).

Additionally, the City contends that "although furtive movements were addressed in *Floyd I*, this recommendation is not tailored to the particularities of the NYPD's stop and frisk policies that were laid out in detail in [the case]." Corp. Counsel Comment at 3. It bases this conclusion on the fact that the Court in *Floyd* mentions that officers' use of "furtive movements" as their explanation for stopping people relates to "racial profiling," City's Response at 3, n.1— and presumably, by extension—not with officer interactions with people with disabilities. However, that rationale mistakenly assumes two things: 1) that people of color and people with disabilities are two mutually exclusive groups and/or 2) that an individual's race, disability, or both could not have been the basis for an officer conducting a stop.  Thus, the PBA's contention that this training reform "does not address a harm at the intersection of the Fourth and Fourteenth Amendments," PBA Comment at 16, is incorrect because the proposed incorporation of disability into the SQF training does exactly that. It addresses the *intersection* of race and disability and how those factors might work together to influence an officer's perceptions of, and subsequent interactions with, the people they stop during investigative encounters based on perceptions of individuals based on their race, in violation of the Fourteenth Amendment, and mistakenly believing that an individual's movements or behavior gives an officer reasonable suspicion to stop them under the Fourth Amendment.

Contrary to the Law Department's suggestion, while "furtive movements" may have been a term used to profile people according to race, it may not have been used to profile people according to race *alone*. For example, the main problem with the use of the term to explain a stop

was that it was too "vague" and did not sufficiently explain the officer's reasoning or justification for the stop. *Floyd*, 959 F. Supp. 2d at 559. The combination of that ambiguity, community feedback from JRP forums regarding NYPD interactions with people with disabilities, and the NYPD's practice of making determinations about people's criminality based at least in part on people's movements, *see* Facilitator's Report at 253, App. B at 9, n.4, suggests that Black and Latino New Yorkers *with disabilities* fall within the scope of this Court's authority.

Further, the NYPD argues that it is already "training and conducting outreach" regarding people with disabilities. NYPD Comment at 2. For example, the NYPD cites a Behavioral Health Diversion Program which is designed to "reduce demands on police and emergency medical services" with respect to people with mental health or substance abuse concerns. NYPD Comment at 19; *see also* New York City, *Mayor de Blasio Announces $90 Million Investment in Reducing Low-Level Arrests for People with Behavioral Health Needs*, (2017), http://www1.nyc.gov/office-of-the-mayor/news/302-17/mayor-de-blasio-90-million-investment-reducing-low-level-arrests-people-with. While such programs would provide necessary alternatives to arrest and jail for people who face these issues, it may be incomplete if police officers are not trained on how to recognize these needs in the people they stop during street encounters in the first place.

The NYPD argues that the stop-and-frisk in service training already "reinforces de-escalation techniques" and that it has a Crisis Intervention Training. S*ee* NYPD Comment at 18–19. Yet, while de-escalation and procedural justice techniques are important lessons, de-escalation is often not discussed in detail and, even when it is discussed, it is not usually discussed with respect to interactions with people with disabilities.

Additionally, like Crisis Intervention Training, de-escalation training only trains officers on interactions with people with certain types of mental disabilities. *See* Stephen Eide & Carolyn Gorman, *CIT and Its Limits* (City-Journal 2017), https://www.city-journal.org/html/cit-and-its-limits-15329.html. The NYPD says that it has partnered with the National Action Network Deaf Club to "develop scenario-based training" for recruits on interacting with the deaf community. NYPD Comment at 19. The Facilitator's recommendation for similar partnerships with other members of the disability community to develop relevant scenarios to be used in the context of stop-and-frisk is therefore consistent with what the Department is already doing. The NYPD also does not currently have a training in place that helps officers recognize physical or mobility-related disabilities, which may involve movements that officers deem furtive or suspicious. Finally, even if the NYPD conducts separate disability-related trainings, it is important for disability to also be discussed in the context of stop-and-frisk because of the role disability may play in the development of reasonable suspicion. Just as officers have trainings that reference important topics, such as race, on more than one occasion, disability can and should be re-emphasized in the stop-and-frisk training.

Therefore, this Court should so-order the Facilitator's recommendation for disability training to ensure that the NYPD is required to follow through on a plan to be more aware of and attentive to, the needs and concerns of people with disabilities. If the Court orders reforms related to disability training, it should also order that officers be required to undergo pre- and post-training assessments regarding their understanding of the substance of the training to measure learning, and the Department should ensure consequences if officers fail post-training assessments. *See* CPR Comment at 29 n.21.

### 9. <u>Civil Summons</u>

The City's responses to the recommendation of a civil alternative for trespass enforcement are unavailing. Neither the NYPD nor the Law Department disputes that a civil summons alternative would mitigate the direct constitutional harm of officers conducting trespass enforcement absent probable cause—harm that will continue to be visited on Trespass Affidavit Program ("TAP") and New York City Housing Authority ("NYCHA") residents unless and until the NYPD achieves compliance with the requirement of probable cause for trespass arrests and summonses. Moreover, the NYPD grossly mischaracterizes the proposal as "[t]aking away the tool of criminal enforcement of trespass crimes," NYPD Comment at 20, where the Facilitator merely is recommending the adoption of an enforcement *alternative*—not a replacement. The Law Department focuses almost entirely on the uncontested fact that this reform would require local legislation, Corp. Counsel Comment at 5, but both it and the NYPD fail to explain why this reform, if adopted, would not aid in remedying ongoing constitutional harms to the *Ligon* and *Davis* plaintiff classes.

## III. <u>Conclusion</u>

The City raised myriad objections in its two submissions in response to the Facilitator's report—some meriting a response more than others. The fact that we do not include in this reply a specific counter-argument to each point raised should not be considered a concession. Nevertheless, all of the arguments from Corporation Counsel and the NYPD must ultimately fail because of two premises. First, as explained in Plaintiffs' Comment, this Court has broad equitable authority that allows for the flexible development of any reforms needed to address the widespread constitutional violations established at trial and required by the settlement agreements. *See* Pls. Comment, *passim*. Second, the NYPD has not yet implemented reforms that

would address the overwhelming input from the community that stop-and-frisk and trespass enforcement reforms must include more serious discipline and more community oversight. *See supra* at 2-4.

For the reasons set forth in the Facilitator's Report, Plaintiffs' Comment, the CPR Comment, and this reply, we respectfully request that the Court enter an order requiring that the NYPD implement the Facilitator's Recommendations, with the modifications proposed in Plaintiffs' Comment and the CPR Comment. We further reiterate our request for oral argument, and we support the request from *amicus curiae* CPR for a hearing that permits directly-impacted members of the community to provide comments to the Court. *See* CPR Comment at 30.

Respectfully submitted,

*/s/ J.R.B.*
Jenn Rolnick Borchetta
The Bronx Defenders

Darius Charney
Britney Wilson
The Center for Constitutional Rights

Jonathan C. Moore
Luna Droubi
Beldock Levine & Hoffman LLP

*Attorneys for the Floyd Plaintiffs*

Angel Harris
Jin Hee Lee
NAACP Legal Defense Fund

Steve Wasserman
Cynthia Conti-Cook
The Legal Aid Society

*Attorneys for the Davis Plaintiffs*

Jordan Wells
Christopher Dunn

New York Civil Liberties Union

Johanna B. Steinberg
Shakeer Rahman
The Bronx Defenders

*Attorneys for the Ligon Plaintiffs*