# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED

RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA

DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART

AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
MARGARET SEGALL D'AMICO
RORY A. LERARIS
KARA L. MUNGOVAN
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI

SPECIAL COUNSEL
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1243

WRITER'S EMAIL ADDRESS
echesler@cravath.com

October 1, 2018

Floyd, et al. v. City of New York, 08-CV-1034 (AT)
Ligon, et al. v. City of New York, et al., 12-CV-2274 (AT)
Davis, et al. v. City of New York, et al., 10-CV-0699 (AT)

Dear Judge Torres:

We represent the Monitor, Peter L. Zimroth, in connection with the pending dispute related to the proposed confidentiality order in the above-captioned cases. The Monitor submitted an application for that order on July 25, 2018. (ECF No. 622.[1]) He then submitted an amended proposed order (the "Order") on July 31, 2018. (ECF No. 625.) The parties and *amici* have since submitted briefs and letters related to the Order. The Monitor respectfully submits that the Order should be entered with the amendments discussed below.

1.   **Recent Events Have Prompted the Need for a Formal Confidentiality Order.**

The consensual flow of information among the parties to these cases has been essential to the achievements of the remedial process. Data, information and ideas

---

[1] All ECF cites refer to documents as filed on the *Floyd* docket.

were shared and helped shape many of the reforms already accomplished.  (*See, e.g.*, ECF No. 638 at 3; *Policies*, NYPD Monitor, http://nypdmonitor.org/reportsand otherdocuments/policies/ (last visited Sept. 24, 2018).)  These reforms would have been harder to accomplish without the collaborative atmosphere fostered by the confidentiality arrangements agreed to by the parties and the Monitor, as described below.

A full account of how information has been shared during the remedial process, and how recent events have risked compromise of that sharing, explains the need for the Order.  Information sharing often begins when the Monitor determines that certain information maintained by the NYPD would be helpful to the development, implementation or oversight of reforms.  The Monitor then requests that information from the NYPD, either at regular meetings he has with Plaintiffs, the NYPD and the City or through written data and information requests submitted to the Risk Management Bureau of the NYPD.  The NYPD works together with the Monitor to identify the available information best tailored to the Monitor's requests.

The NYPD sends the Monitor information as needed.  Much of the information has been sent on a weekly, monthly and quarterly basis.  Weekly information includes the schedule of the classes in which the NYPD trains recruits, and reports on the use of body-worn cameras.  Monthly information includes rosters of the commands for precincts participating in the pilot program for body-worn cameras, video recordings of weekly CompStat meetings, reports on compliance with the NYPD's policies and procedures on body-worn cameras and schedules identifying the instructors of stop-and-frisk training.  Quarterly information includes many more items, such as:  the NYPD's stop and frisk database that includes all the information on the NYPD's stop reports; the

results of audits conducted by the NYPD's Quality Assurance Division ("QAD") of stop reports and arrest reports, by NYPD command, along with a sample of the stop reports audited; reports by integrity control officers evaluating trespass stops at buildings in the Trespass Affidavit Program; data on trespass arrests for which prosecutions were declined, and other arrests for which prosecutions were declined based on stop, frisk, search or seizure issues; Internal Affairs Bureau ("IAB") spreadsheets identifying allegations of profiling and the status of NYPD investigations of those allegations; spreadsheets identifying complaints to the Civilian Complaint Review Board ("CCRB") that were substantiated; and requests made by the NYPD's Department Advocate Office to the CCRB asking for reconsideration of findings that officers committed misconduct and responses to those reconsideration requests from the CCRB.  These data and information are voluminous and often require further information and discussion to fully understand the way in which they were collected and, therefore, their meaning.

The Court is aware of the kinds of information provided to the Monitor and of course can review all the data and information sent to the Monitor upon the Court's request.  The Court does not, as a matter of course, view all the data and information that the Monitor reviews.  However, on occasion the Court has received samples of particular kinds of documents in order to understand issues that have arisen.  In addition, the Monitor has shared drafts of his recommendations and reports with the Court.  Once finalized, the Monitor's recommendations and reports have been filed on the public docket.

To ensure that Plaintiffs play a meaningful role in the reform process, the Monitor has requested that the NYPD make available to Plaintiffs confidential

information belonging to the NYPD, despite the fact that the discovery orders that pertained to the trials of these matters are no longer operative in the remedial phase. The documents shared with Plaintiffs are numerous and have included, as a few examples: draft and final protocols and templates used by auditors in QAD; quarterly spreadsheets of the results, by patrol borough, of QAD's audits of stop reports; sample reports to commands of the results of QAD's audits of stop reports; information on racial profiling investigations conducted by the IAB; quizzes and tests used by the NYPD to train its recruits and members; and sample individual stop reports prepared by members of the NYPD.[2] The Monitor has specifically selected this information for disclosure to Plaintiffs because he wants their input on it, and discloses to them only after obtaining the NYPD's consent.

In addition, significant data and information are shared and discussed at meetings that the Monitor has with the parties. These include regular meetings attended by all of the parties at which the parties report on progress relating to the monitorship and the remedial process, and smaller meetings on specific issues. The parties and the Monitor also routinely share drafts of sections of the NYPD Patrol Guide and Administrative Guide, NYPD interim orders and operations orders, training materials and curricula, and NYPD forms. These remain confidential until they are finalized, at which point they are either submitted by the Monitor to the Court for its review and approval or, if appropriate, made public on the Monitor's website. In the meetings with Plaintiffs and the NYPD, the Monitor often shares his preliminary thoughts on issues and seeks input from the parties.

---

[2] The NYPD has also provided plaintiffs access to its stop-and-frisk database.

Plaintiffs have been allowed to make the information they receive available for in-person inspection by representatives of Communities United for Police Reform ("CPR"), provided that Plaintiffs obtain both the NYPD's consent and a signed confidentiality agreement from each CPR representative.[3]  The Monitor is not aware of any instance in which the NYPD has refused to let Plaintiffs share information this way.

All of this exchange of information has been facilitated by a confidentiality arrangement among the parties and the Monitor that developed through the parties' course of conduct since the beginning of the monitorship.  Under that arrangement, all information, communications and materials about the remedial process that are shared by the parties and Monitor are treated as confidential and may not be publicly disclosed.  The only exceptions to this rule are for material that is already publicly available, publicly disclosed by the party that furnished the material, publicly disclosed by the Monitor in his reports, or obtained through the Freedom of Information Law ("FOIL").[4]

By covering all of the non-public information shared in this process, the arrangement under which the parties and the Monitor have been working does not draw distinctions likely to cause misunderstanding or dispute.  And until late in 2017, there were no disputes; indeed, the arrangement was successful in fostering a collaborative atmosphere.  Conversation and exchange were candid because no participant in the process feared that any other would use its privileged position to publish another's

---

[3] The confidentiality agreement with CPR is attached as Exhibit 2.

[4] The parties have never executed this arrangement in a writing, although they discussed doing so in February 2015.  The draft agreement negotiated between the parties and sent to the Monitor at that time is attached as Exhibit 1, and confirms the terms of the arrangement.

information and ideas.  In particular, the NYPD was willing to permit information sharing with Plaintiffs because of its confidence that the shared information would not be published in Plaintiffs' unilateral discretion.

The arrangement has certainly not prevented the public from receiving substantial information about the remedial process.  The Monitor routinely publishes reports and other filings on the public docket with otherwise-confidential information that the Monitor believes will keep the public informed about the process.  For example, the Monitor publishes citywide results of the QAD's reports on the results of its audits.[5]  It should be noted, however, that before the Monitor submits his reports and recommendations, drafts are provided to the parties, and sometimes to other stakeholders such as representatives of CPR and police unions.  In this way, the parties can offer comments and suggested edits and make corrections to any inaccurate data or information in the Monitor's submissions.  Furthermore, the NYPD itself publishes aggregate data on stops, frisks, searches, arrests and other crime data.

For several years, the arrangement worked without the need to formalize it.  Then, in November 2017, Plaintiffs published an op-ed in the Daily News stating,

---

[5] The effect of refusing confidentiality to QAD results and other aggregate data would be to give the stakeholders other than the NYPD the unilateral power to disclose that data to the public.  Conferring that power on those stakeholders is unnecessary because the Monitor has been disclosing the data for which he believes publication serves the public interest.  For example, the Monitor is best positioned to publish the QAD results when it is appropriate to do so.  The NYPD frequently changes the QAD's auditing methods, meaning that the QAD results could be misrepresented if they are published without discussion of how they were generated.  Before deciding whether to publish QAD results, the Monitor and the experts on his team vet the information with the NYPD and then dispassionately assess when he should publish them, and how.  Because the NYPD does not fear inaccurate or confusing disclosures about the QAD audits when they can only be published by the Monitor, confidentiality preserves the NYPD's willingness to share this information with the Plaintiffs.

6

based on non-public information discussed by the NYPD at a prior all-parties meeting, that the NYPD had replaced an expert consultant on implicit bias.[6] The Monitor expressed concern to Plaintiffs that their op-ed violated the confidentiality arrangement, and met with them to emphasize the importance of strictly observing the arrangement in the future. Then, on January 25, 2018, Plaintiffs filed a letter on the public docket relating to the Joint Remedial Process ("JRP"), without consulting the Monitor or the NYPD, stating that "[in] December, after eight months of these discussions, the City took the position that no reforms should be so-ordered through the JRP and/or that the Court lacks authority to so-order JRP reforms." (ECF No. 581 at 1.) Four days later, this Court made clear that "[i]n order to facilitate a free and open exchange among stakeholders," it expected negotiations in the process to be confidential. (ECF No. 584 at 5.) Plaintiffs subsequently published an op-ed in the New York Times, again without consulting the Monitor or the NYPD, suggesting that the NYPD would "oppose reforms that black and Latino New Yorkers are asking for [in the JRP]" and would not even consider those reforms.[7]

These publications have created distrust and friction among the parties. From the NYPD's perspective, these publications not only violated the confidentiality arrangements in place, but also erroneously characterized the Department as not being serious about training on implicit bias, and not caring about meaningful change in the

---

[6] Darius Charney, *De Blasio's Weak Stop-and-Frisk Fix: Despite the Mayor's Boasts on the Policing Reform, His NYPD Has Miles to Go*, Daily News (Nov. 05, 2017, 5:00 AM), http://www.nydailynews.com/opinion/de-blasio-weak-stop-and-frisk-fix-article-1.3609363#.

[7] *See* Jenn Rolnick Borchetta, Darius Charney and Angel Harris, *Don't Let the Police Wreck Stop-and-Frisk Reforms*, N.Y. Times (Apr. 10, 2018), https://www.nytimes.com/2018/04/10/opinion/police-stop-and-frisk-reforms.html.

Department's policies and culture.[8] These publications have led to reluctance by the NYPD to continue sharing information with Plaintiffs. There have been data and materials that the NYPD has shared with the Monitor but recently has not been willing to share with Plaintiffs because of this distrust. In addition, these publications have made it more difficult to have open and candid exchanges of views at meetings with the parties.

The recent disputes and the lack of cooperation among the parties highlight the need to formalize the terms of the confidentiality arrangement. An important step toward fostering trust and reinforcing the collaborative atmosphere that has prevailed in this process is entering a formal order that memorializes the terms of the existing arrangement.

---

[8] In his final report the JRP Facilitator wrote:

"The NYPD in its written response to the Draft Final Report indicated a willingness to consider some of the reform recommendations, pending further discussion with the Facilitator.

On April 18, 2018, the New York Times published a previously submitted op-ed piece by counsel to the plaintiffs. In that op-ed, plaintiffs' counsel stated, among other things, the following: 'The problem is the police department suggested that it might oppose reforms that black and Latino New Yorkers are asking for. As much as the department wants to be seen as listening to community members, it doesn't actually want to be responsive to their needs.'

However, as mentioned above, the NYPD in its written response to the Draft Final Report, which had been shared with plaintiffs' counsel, had indicated a willingness to discuss and consider certain of the reform recommendations. Although the Facilitator was not confident that a consensus would be reached on all, or even most, of the reform recommendations, at no point did the NYPD ever indicate that it was not willing to discuss the recommendations." (ECF No. 597 at 40-41.)

**2.      Terms of the Proposed Order.**

The proposed Order generally confers confidentiality on all information, communications and materials about the remedial process that are shared between the parties and Monitor. It excepts material that is already publicly available, disclosed by the party that furnished the material, disclosed by the Monitor in his reports or obtained through the FOIL. Sections 4 through 7 describe the circumstances under which Confidential Material may permissibly be shared with non-parties. Those sections provide that the City may show Confidential Material to "other governmental entities" for operational purposes related to the NYPD, and that the parties may show Confidential Material to particular named, non-party stakeholders if those stakeholders view the Material in person, sign a confidentiality agreement and do not retain copies of the Material.

Three principal changes to the proposed Order as it was submitted in July are appropriate at this time: (1) Section 6 should clarify that the City is allowed to circulate only its own (and not other parties') Confidential Material to "other governmental entities"; (2) Section 5 should add CPR to the list of stakeholders to whom Confidential Material may be shown; and (3) Section 7 should be modified to keep in place the pre-existing confidentiality arrangements with the police unions, by which representatives of the PBA and the City's other police unions are now required to review Confidential Materials at the Monitor's office or at City or NYPD offices, but may not take copies of the documents with them or email the documents to others.[9] A version of

---

[9] The confidentiality agreement with the police unions is attached as Exhibit 3.

the Order incorporating these changes is attached as Exhibit 5.[10] A redline showing the changes that Exhibit 5 makes to the Order that was submitted in July is attached as Exhibit 6.

The first of these changes adequately addresses CPR's concern that Section 6 empowers the NYPD to use Confidential Material in "closed-door meetings" with elected officials, and thereby "cultivate and cement contested public narratives about NYPD conduct or misconduct, which . . . stakeholders including CPR cannot refute, because they lack commensurate access". (ECF No. 629-1 at 17-18.) The Order is not meant to interfere with each party's normal use of its own information. If the NYPD needs, for its operations, to share its own Confidential Material with a governmental entity or with its members or its police unions, it should be allowed to do so without violating the Order. Plaintiffs enjoy a parallel power: they may share their own Confidential Material with class representatives or with CPR without violating the Order.

The second and third modifications equalize the way the Order treats informational access by CPR and the police unions. These modifications should be adopted because they affirm the Order's evenhanded treatment of all involved stakeholders and simply formalize the pre-existing confidentiality arrangement.[11]

---

[10] Sections 1, 5, 6 and 7 have been rephrased to effect these amendments. CPR's letter raised the concern that the Order should clarify what parties may do with their own Confidential Material and with others', and the changes to those sections make that clarification.

[11] Thus, this Court should not adopt the Patrolmen Benevolent Association's suggested modification of the Order to permit the City to disseminate Confidential Material not belonging to the City to police unions, rather than requiring that the unions access the material at the City's, the NYPD's or the Monitor's offices and leave without copies of the material. (ECF No. 640 at 3.)

Notwithstanding these amendments, which bring the Order into full alignment with the existing arrangement, CPR suggests that the Order imposes a new and sweeping presumption of confidentiality "unlike any pre-existing confidentiality agreements." (ECF No. 641-1 at 6-7.) In fact, for years CPR and the parties have been operating under these exact conditions to which they have all agreed. When there is any data, information or documents related to the monitorship shared with CPR, it is through a pre-existing confidentiality agreement, whereby CPR members go to the offices of Plaintiffs' counsel and view the documents and data. Those documents remain confidential and may not be disclosed.

**3.     Entry of the Order Is Appropriate Under the Applicable Law.**

This Court has inherent equitable power to enter the Order and should do so because the Order is justified by good cause. There is good cause for the Order because it will result in a significant enhancement of trust and collaborative spirit among the parties, while not causing significant harm to the public interest in information about the remedial process (which is served already by the Monitor and the FOIL). Furthermore, the doctrine of judicial documents does not apply to documents made confidential by the Order, because those documents are not filed with the Court. Thus, those documents should remain confidential under the Order.

**A.     The Order Is Justified by Good Cause Because It Will Foster Trust Among the Remedial Participants Without Significantly Impacting the Public's Informational Interest.**

The submissions suggest that the Order is governed by Federal Rule of Civil Procedure 26(c), but that Rule only treats confidentiality orders in the context of pre-trial discovery. *See* Fed. R. Civ. P. 26(c); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 n. 16 (3d Cir. 1994). A pre-trial protective order governs how documents will

11

be used inside the course of litigation, by describing what information must be filed under seal; this Order, by contrast, governs the extent to which information may be disclosed to the public. This Court's power to enter the Order derives from its equitable powers under the Remedial Order. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35-36 (1984) (describing the "inherent equitable powers of courts of law" to enter a protective order "[w]hether or not [a] Rule itself [so] authorizes"); *see also Hunt v. Enzo Biochem, Inc.*, 904 F. Supp. 2d 337, 343 (S.D.N.Y. 2012) ("It is well-established that courts have inherent equitable powers to grant confidentiality orders."). This Court should exercise that power to enter the Order if the Order is justified by good cause, meaning that the benefit of securing confidentiality through the Order outweighs the harm. *See Pansy*, 23 F.3d at 786-87 ("Whether . . . disclosure will be limited depends on a judicial balancing of the harm to the party seeking protection (or third persons) and the importance of disclosure to the public." (quoting Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts*, 105 Harv. L. Rev. 427, 432-33 (1991))).

If entered, the Order will enhance the flow of information and spirit of collaboration among the parties. It is important that Plaintiffs continue to receive confidential information so that they can continue to make valuable contributions to the remedial process. Once the terms of the confidentiality agreement are formalized, the NYPD and Monitor will be able to resume sharing information with more confidence. Trust is about more than documents, though—it is about the manner in which this process will proceed. The litigation is over; all stakeholders are now joined in the effort to achieve effective reform. By guaranteeing that all non-public information shared in this

process will not be published, the Order prevents any stakeholder from treating this process as an opportunity to gain information to use in publicity campaigns against other stakeholders. In so doing, the Order encourages stakeholders to resolve disagreements among themselves, cooperatively, rather than by publicly divulging confidential information. By enhancing the trust among stakeholders, the Order will maximize the amount of information that each stakeholder is able to receive from the others.[12]

The public's interest in learning about the remedial process is served by the Monitor. Information sharing with the public is important, but the Remedial Order specifically provides that the way the public will learn about the process is through the Monitor's periodic reports. (ECF No. 372 at 13 (providing that the Monitor must "issue public reports every six months detailing the NYPD's compliance with the Immediate and Joint Process Reforms"); *see also id.* at 11 n.32 ("[I]t is not realistic to ask 'the public electorate' to monitor the police department to ensure that the department's stop-and-frisk practices are consistent with the Constitution.").) That makes sense because the Monitor has significantly more information than most stakeholders and does not represent a particular constituency affected by this process. Given his independence, he

---

[12] *Cf. Jones v. Metro. Life Ins. Co.*, No. C-08-03971-JW, 2010 WL 4055928, at *10-11, 15 (N.D. Cal. Oct. 15, 2010) (striking from the docket disclosures that violated a local rule of confidentiality for all communications in connection with mediation, because "confidentiality encourages candor between the parties and on the part of the mediator, and confidentiality serves to protect the mediation program from being used as a discovery tool for creative attorneys"); *Bernard v. Galen Grp., Inc.*, 901 F. Supp. 778, 783-84 (S.D.N.Y. 1995) (sanctioning an attorney for breach of a confidentiality order stating that the "entire mediation process" at issue "is confidential", because "[i]f participants cannot rely on the confidential treatment of everything that transpires . . . then counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner", which "would surely destroy the effectiveness of [the] program" (quoting *Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608 F.2d 928, 930 (2d Cir. 1979))).

is best-positioned to decide what information should be shared, and how, with the public. And he has performed his function in this regard with great care, reviewing the available information and regularly disclosing what he believes helpful to the public's understanding in his filings on the public docket. In addition to his periodic progress reports, the Monitor files publicly his recommendations to the Court, which include NYPD policies, training materials and other materials for the Court's review and approval.

The Monitor's disclosures alone amply serve the public's interest in information. But that interest is further served by New York's FOIL. Under the FOIL, the NYPD must "make available for public inspection and copying *all* records", subject to certain limited exceptions. N.Y. Public Officers Law § 87(2) (McKinney 2015) (emphasis added). The legislature has decided that the public's interest in knowledge about information kept by the NYPD—no matter how important that need for knowledge, and no matter how sensitive the information at issue—is generally served through the FOIL process. *See Abdur-Rashid v. New York City Police Dep't*, 100 N.E.3d 799, 803 (N.Y. 2018). FOIL requests go to a specialized unit of the NYPD that must respond to every request within specified time limits, N.Y. Public Officers Law § 89(3)(a) (McKinney 2017), and whose denial of any request is subject to judicial review, *id.* § 89(4)(b)-(c). There is no reason to treat the interest in information relevant to the remedial process differently than the interests in other NYPD information that the legislature has directed to the FOIL process.[13]

---

[13] To the extent that information is expressly exempted from availability under the FOIL, the legislature has already weighed the public's interest in acquiring that information and determined that the information is better left confidential. Courts respect

Plaintiffs suggest that the Order should not confer confidentiality on information that could be obtained through the FOIL (as opposed to information in fact obtained through the FOIL). (*See* ECF No. 627 at 9.) But if that suggestion were adopted, then every time the parties disagreed about the FOIL's applicability, this Court would have to make a new FOIL determination—rather than, in the first instance, the experts at the FOIL unit whom the legislature empowered to make initial FOIL determinations. This Court would also be saddled with the new responsibility, in effect, of processing FOIL requests outside the normal FOIL process. Thus, the Order's blanket protection for non-public information shared in this process should remain.

The Monitor's disclosures and the FOIL each ensure that even after the Order's confidentiality provision is entered, the public will be well-informed about this process. Indeed, as the Order is just a restatement of the arrangement that has existed for several years, it does not present any new barrier to the public's knowledge.

B.  **The Judicial Documents Doctrine Does Not Apply to the Documents Made Confidential by the Confidentiality Order, Because They Are Not Filed.**

Plaintiffs suggest that the Order is overbroad because it confers confidentiality on unfiled documents that the Monitor shows to the Court. (ECF No. 627 at 9-12.) They claim that the public has a constitutional and common-law right of access to these documents under the doctrine of judicial documents. The judicial documents

---

that determination by finding good cause for keeping information that is exempted from a freedom-of-information law's reach confidential under order. *See, e.g.*, *Livingston v. McDevitt*, No. 09 C 7725, 2010 WL 9941378, at *2 (N.D. Ill. May 10, 2010) (finding good cause for protecting the confidentiality of files by order because they were exempted from disclosure under a freedom-of-information law); *Huthnance v. Dist. of Columbia*, 255 F.R.D. 285, 296 (D.D.C. 2008) (same); *Williams v. McCausland*, Nos. 90 Civ. 7563 (RWS), 91 Civ. 7281 (RWS), 1992 WL 309826, at *3 (S.D.N.Y. Oct. 15, 1992) (same).

doctrine prevents the court from declaring confidential those documents that the public needs to "provide[] judges with critical views of their work and deter[] arbitrary judicial behavior". *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995). Because not every document shared among the parties as part of a court-supervised process serves that aim, the public does not have a right to see every such document. *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 139 (2d Cir. 2017). Indeed, although any document raised to a judge's attention could conceivably affect her decisions, the valued protection of confidentiality will not be destroyed for documents that lack a necessary relationship to a judicial decision. *Id.* at 141 (rejecting application of the judicial documents doctrine to documents shared by an independent monitor with the judge when the documents were not "*necessarily*...relevant" to a judicial decision) (emphasis in original)). The Second Circuit has drawn the line between what the public must be able to access, and what it need not access, at filed documents: "[though] filing a document with the court is not sufficient to render the document a judicial record, it is very much a prerequisite". *Id.* at 139 (quoting *SEC v. Am. Int'l Grp.*, 712 F.3d 1, 4 (D.C. Cir. 2013)); *see also United States v. Erie Cty.*, 763 F.3d 235, 240 (2d Cir. 2014) ("What matters [in concluding that the reports are judicial documents] is that the reports are filed with the District Court and become relevant to its judicial activities."); *United States v. Amodeo*, 44 F.3d 141, 145-46 (2d Cir. 1995) ("We think that the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access.").

Therefore, the judicial documents doctrine does not reach documents and information that the Monitor shares with the Court that are not filed with the Court on

ECF. Indeed, the Order does not purport to confer confidentiality on any document after the point at which it is filed on the public docket. (Exhibit 5 § 1(a)(i)(2).) If a party wishes documents to be confidential after filing, it must petition the Court to file those documents under seal. (*Id.* § 8.) Thus, the Order and the data and information it protects are unaffected by the judicial documents doctrine.[14]

4.  **The Order Should Not Have a Narrower Confidentiality Provision nor Require Confidentiality Designations at the Time of Disclosure.**

This Court should not adopt Plaintiffs' narrowed confidentiality provision nor their suggestion that information not be deemed confidential unless specifically designated as such.

Plaintiffs suggest that the Order should only confer confidentiality on draft documents and the Monitor's and parties' comments on (a) those drafts, (b) data compiled by the NYPD or Monitor, (c) NYPD training classes observed by the Monitor or parties and (d) the parties' proposals for NYPD compliance with the remedial order. (ECF No. 627 at 2.) This suggestion is a significant change from the existing arrangement's provision of confidentiality for all information, communications and materials about the remedial process shared by the parties and the Monitor. (Exhibit 5 § 1(a).) Plaintiffs' definition would exclude much of the information described above that has been, up to now, regarded as confidential by all parties, including NYPD QAD

---

[14] In the section devoted to the judicial documents doctrine, Plaintiffs say they are concerned about section 3 of the Order, which provides that its terms do not "limit the ability of the Monitor or Facilitator to communicate and share information with the Court." (ECF No. 627 at 9). Plaintiffs do not argue that the Order should be rejected based on this concern. Nonetheless, the Court should be aware that from early in the monitorship, the parties agreed that the monitor would be communicating regularly with the Court freely and without the presence of counsel to the parties. See the letter attached as Exhibit 4.

17

audits, IAB materials, statements of instructors and students in training classes observed by Plaintiffs' counsel, and CCRB cases and DAO requests for reconsideration.

The existing arrangement does not draw lines that are likely to generate confidentiality disputes. But Plaintiffs' suggestion draws many as to what counts as "confidential" and what does not. Furthermore, by refusing protection to a significant amount of NYPD information, Plaintiffs' suggestion is likely to reduce the pace with which all remedial actors receive sensitive information from the NYPD, which information is often most important in shaping appropriate reforms. The remedial forum exists to design and implement remedies, and Plaintiffs are participants in that forum under the existing agreement. If they are dissatisfied with the amount of NYPD information that the Monitor is disseminating to the public, then their recourse is to discuss further with the Monitor and then, if need be, resort to the FOIL process. As discussed above, this Court should not be involved in resolving disputes over the confidentiality of sensitive documents.

Plaintiffs also suggest that material should not be made confidential unless and until designated as such by the disclosing party, rather than made confidential automatically as the Order currently provides. (ECF No. 627 at 6 n.2.) Plaintiffs' suggestion is misplaced in this remedial process. In the typical, pre-trial discovery setting, the designation process usefully requires parties to apply the agreed-to definition of confidentiality to the materials they produce, when they produce them. The producer will not designate materials that do not contain confidential information, thereby saving the parties and court from pointless misunderstandings about the confidentiality of those materials in the future.

By contrast, setting a narrower definition of confidentiality and then requiring the Monitor and parties to designate documents confidential at the time of disclosure would slow down, if not chill altogether, the transfer of information. Moreover, unlike in the pre-trial discovery setting, much of the information shared among the parties during the remedial process in these cases is shared orally; the Monitor routinely calls and meets with the parties. A designation requirement would demand that he, before saying anything, think through whether his statement is based on any Confidential Material that the NYPD shared with him or on internal communications he had with his team concerning preliminary views of factual information, disputed issues or plans for the monitorship going forward. And the number of people who share Confidential Material in this process is extraordinary—many dozens, between the monitorship team, Plaintiffs and the NYPD. All of these people could not be expected to identify the portions of their conversations that convey information based on Confidential Material. Rather than paying dividends to this process, the designation requirement would impair dialogue and foster disputes.

* * *

For the foregoing reasons, the Monitor respectfully requests that the Court enter the amended Order as attached in Exhibit 5.

Evan R. Chesler
Benjamin Gruenstein
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

Phone: (212) 474-1000
Fax: (212) 474 3700
echesler@cravath.com
bgruenstein@cravath.com

Hon. Analisa Torres
   United States District Court
      Southern District of New York
         500 Pearl Street
            New York, New York 10007-1312

BY ECF