

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

December 3, 2018

VIA ECF

Honorable Analisa Torres
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

**RE:   CPR Comments on the Monitor's Proposed Pilot Program to Record and Report on Level 1 and 2 Encounters and Body-worn Camera Activation in** *Floyd, et al. v. City of New York, et al.*, **Case No. 08-CV-1034 (AT)**

Dear Judge Torres:

      We represent Communities United for Police Reform ("CPR"), which is a named stakeholder in this remedial process (*see* ECF No. 372 at 29). In accordance with the Court's order dated November 26, 2018, (ECF No. 670), we respectfully submit these comments on the Monitor's Proposed Pilot Study Documenting Police-Citizen Level 1 and Level 2 Encounters and Activation of Body Worn Cameras ("BWCs") (ECF Nos. 660, 660-1 (the "Monitor's Proposal"). CPR has focused the majority of its comments on the recording of Level 1 ("L1") and Level 2 ("L2") encounters—one of the first five reforms recommended by the Joint Remedial Process ("JRP") Facilitator, and prioritized by community members as critical to addressing unconstitutional NYPD stop and frisk and trespass enforcement practices. (*See* ECF No. 611 at 25–27).[1]

      In your orders on July 19 and August 9, 2018 (ECF Nos. 619 and 634), you instructed the parties to submit proposals for two pilot programs, to be overseen by the Monitor, to study (a) the electronic recording of L1 and L2 police-citizen encounters, and (b) the activation of BWCs during L1 encounters. The order to record L1 and L2 encounters outlined that, among other things, the pilot program should include a report from the Monitor on whether "the benefit of recording lower-level encounters outweighs the financial, administrative, and other costs, and whether the program should be expanded or terminated." (ECF No. 619 at 3). The Monitor's Proposal, submitted on November 9, 2018, combined both of the Court-ordered pilot programs into one.

---

[1] With respect to the BWC aspect of the Monitor's Proposal, CPR has previously expressed its views on the NYPD's use of BWCs (*see generally* ECF Nos. 547, 547-1 and 547-2). In particular, CPR believes that a third-party government agency—and not the NYPD—should own, manage and control any BWC footage.

Honorable Analisa Torres                              2                              December 3, 2018

CPR believes there are critical features that are absent from the Monitor's Proposal but are necessary to ensure the successful development, implementation, and evaluation of a pilot program. CPR has reviewed Plaintiffs' objections and agrees with most of the concerns Plaintiffs raised in their November 21 submission (ECF No. 669), particularly as they relate to the electronic documentation of police-citizen encounters and the need for impacted community stakeholders to have a structured role in the pilot program.  Because CPR believes the Monitor's Proposal will not adequately address the proposed research questions, CPR respectfully submits that the Court should require the following additional or more specific revisions to the Monitor's Proposal:

- Development of formal and structured mechanisms for meaningful participation of communities directly impacted by stop-and-frisk and trespass enforcement abuses in the design, analysis and assessment of the pilot program.

- Inclusion of a fifth condition in the joint pilot program that will require *unobserved* electronic documentation of L1 and L2 encounters.

- Publication by the NYPD of quarterly and annual reports on L1 and L2 encounters for the duration of the pilot program.

These critical recommendations are discussed in more detail below.

### A. Development of Formal and Structured Mechanisms for Meaningful Community Participation in the Design, Analysis and Assessment of the Pilot Program

CPR believes that meaningful community input in the design, implementation, and analysis of the pilot program is required to ensure its success.  Community input has been recognized as "[a] vital part of a sustainable remedy in this case," *Floyd, et al. v. City of New York, et al.*, 959 F. Supp. 2d 668, 686 (S.D.N.Y. 2013), and community members emphasized during the JRP the importance of ensuring the community had a voice in any proposed reforms.  (*See, e.g.*, ECF No. 597 at 246–47).  Plaintiffs have similarly requested that the joint pilot program include a role for representatives of impacted communities.  (ECF No. 669 at 4; *see also* ECF No. 669-1 at 3–4 (noting the value of creating a diverse panel of experts to evaluate police-citizen encounters)). Including input from individuals who represent directly-impacted communities will foster legitimacy and trust in the pilot program.

For these reasons, CPR requests that the pilot program include an advisory group consisting of at least five individuals representing organizations whose membership consists of directly-impacted communities. The advisory group will create a formalized structure for directly-impacted community members to provide meaningful input into the development, implementation and evaluation of the pilot program.  CPR respectfully requests that the Court require that the City of New York create and provide adequate resources for the advisory group.[2]

---

2   Similar to the design of the JRP, which recognized that stipends for advisory group representatives facilitate their participation in the program, CPR recommends that the pilot program provide reasonable stipends for individuals and organizations.

Honorable Analisa Torres             3                December 3, 2018

In particular, the Court should require that the advisory group:

- provide input into the development, implementation and evaluation of the pilot program, including the final electronic form to be used for recording L1 and L2 encounters, protocols related to systematic social observations ("SSO")[3] and any analysis or reports developed during the pilot program;

- provide input into the pilot program training materials and plans, supervisory protocols, draft Patrol Guide Sections and other materials that the NYPD will use to train officers on the pilot program or to communicate the pilot to the public;

- be provided with all of the data generated from the pilot program, including records of L1 and L2 encounters and those of the ride-along observers;[4] and

- participate with the Monitor's team of experts (ECF No. 660-1 at 6) who will evaluate the observers' narratives of police encounters and post-encounter debriefings to determine the propriety of each police encounter.[5]

**B. Inclusion of a Fifth Condition in the Joint Pilot Program Requiring Unobserved Electronic Documentation of L1 and L2 Encounters**

CPR believes that the sample size and design of the current pilot program does not allow for a meaningful or accurate representation of L1 and L2 encounters (*see* ECF No. 669 at 1–2) or account for the impact observers are likely to have on the pilot program and its ultimate findings.[6]

The Court's July 19 and August 9 orders require that proposed pilot proposals be designed in consideration of "social science best practices." (ECF No. 619 at 2; ECF No. 634 at 3). To ensure the pilot program generates statistically-meaningful data, it is necessary that the sample

---

[3] CPR believes that the staffing of the SSO should include representatives of communities historically impacted by stop-and-frisk abuses.

[4] To facilitate the advisory group's participation in the pilot, information provided to the advisory group should not be subject to the current confidentiality order (ECF No. 650), which unnecessarily limits the ability of organizations representing directly-impacted communities to share information and gather input from their members. CPR proposes that the advisory group be governed by a confidentiality arrangement similar to the one the JRP Facilitator developed and used during the JRP.

[5] CPR believes that the expert panel should include individuals who have been directly impacted by stop-and-frisk and trespass enforcement abuses.

[6] CPR supports Plaintiffs' recommendation that L1 and L2 encounters be documented electronically and opposes the use of "Investigative Encounter worksheets" as described by the Monitor. This is consistent with the JRP Facilitator's recommendation that L1 and L2 encounters be recorded electronically. (ECF No. 591 at 239). By taking this approach, metadata may be used to assess the amount of time it takes officers to record required information.

Honorable Analisa Torres                  4                        December 3, 2018

size and scope be sufficient to allow extrapolation of conclusions to the NYPD as a whole. Moreover, limiting the scope of the program to capture information about L1 and L2 encounters through observer ride-alongs and the Investigative Encounter worksheets, as the Monitor proposes, would not account for the impact observers may have on police officers. In addition, the sample size in this proposal would be too small to account for various conditions, including external variations, such as time of year or changes in an officer's duties.

     As a result, CPR believes that, in addition to those encounters recorded through field observation and the Investigative Encounter worksheets, officers in at least 40 different precincts should be required to electronically report *unobserved* L1 and L2 encounters.[7] The selected precincts should include those with the highest and lowest rates of reported stop and frisk activity based on historic records.[8] Officers participating in the study should include a range of officers who engage in L1 and L2 encounters—including officers from units that patrol public housing, officers in the Strategic Response Group, plainclothes officers in the anti-crime unit, and Neighborhood Coordination Officers.[9]

     Lengthening the pilot program would also provide a larger sample size and account for seasonal variations. CPR therefore proposes that the joint pilot program run for at least two years, and officers should record L1 and L2 encounters for at least four quarters. This would be consistent with past pilot studies in this matter and would substantially increase the likelihood that meaningful statistical data will be gathered and available for analysis. (*See* ECF No. 513 at 82 (recommending analysis of 40 different precincts, including a treatment group and a control group, and a duration of one year for the NYPD's BWC pilot that was ordered in 2015)).

---

[7]   CPR disagrees with Plaintiffs to the extent Plaintiffs seek to increase the sample size solely by increasing the total number of observations. Simply increasing the number of observations, without significantly increasing the number of officers in the pilot, does not allow for conclusions to be drawn about the frequency of L1 and L2 encounters on a precinct or city-wide basis, or the potential racial disparities that may exist among low-level police-citizen encounters. Expanding the pilot program to include recording of unobserved L1 and L2 encounters would provide additional data to draw statistically meaningful conclusions without significantly increasing the cost, as would be the case with increasing the number of ride-along observations.

[8]   CPR disagrees with the Monitor's recommendation that precincts designated for field observation be selected based on the level of "police-citizen contact" which "could be determined from department tallies of workload indicators." (ECF No. 660-1 at 3 and 3n.1). The selection criteria for precincts' participation in the pilot program should be based on the issues in this litigation: rates of stop and frisk and trespass enforcement activity.

[9]   The Strategic Response Group (SRG) is responsible for responding to "citywide mobilizations, civil disorders and major events," *Special Operations*, NEW YORK CITY POLICE DEPARTMENT, https://www1.nyc.gov/site/nypd/bureaus/patrol/citywide-operations.page (last visited Dec. 3, 2018), but is viewed by many community members as having taken on increased policing activities, including pedestrian and car stops.

Honorable Analisa Torres    5    December 3, 2018

**C. Require the NYPD to Publish Regular Reports on L1 and L2 Encounters**

The Court should require the NYPD to make available quarterly and annual reports on L1 and L2 encounters to permit the public to objectively assess the joint pilot program. Both the JRP Facilitator and the NYPD have found a "crucial link" between transparency and effective policing. (ECF No. 597 at 116). In his final report, the JRP Facilitator noted the importance of public reporting as part of the recommendation to document L1 and L2 encounters (*Id.* at 240).

To ensure appropriate transparency, and to be able to better assess the legality of L1 and L2 encounters, the reports should disclose information similar to the categories of data the NYPD publicly discloses for Level 3 stops. In particular, such reports should disclose (*i*) the total number of encounters initiated at L1 or L2, and be disaggregated by (*ii*) demographic information—specifically, officer's perception of the person's race/ethnicity, gender and age; (*iii*) the geographic location and date and time of the encounter; (*iv*) justification for the encounter; (*v*) precinct information for each encounter; (*vi*) whether force was used, and if so, the type of force used; (*vii*) whether the encounter resulted in a summons or arrest; (*viii*) whether a consent search or other search was conducted; (*ix*) whether the individual subject to the encounter declined a consent search; (*x*) whether a frisk was conducted for each incident.[10] The information should be stored and made public on the department's website and should be provided in a format that permits automated processing.

Without the above modifications, CPR believes the joint pilot program will not generate meaningful data to determine whether "the benefits of recording lower-level encounters outweigh the financial, administrative, and other costs, and whether the program should be expanded or terminated." (ECF No. 619 at 3). Therefore, CPR opposes the implementation of the Monitor's Proposal in its current form and respectfully requests that the Court modify the Monitor's Proposal to include these revisions.

Respectfully submitted,

*/s/ Gary W. Kubek*

Gary W. Kubek
gwkubek@debevoise.com

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000
Fax: (212) 909-6836

*Attorneys for Communities United for Police Reform as Amicus Curiae*

---

[10] CPR agrees with Plaintiffs' request that, absent exigent circumstances, officers document each L1 and L2 encounter contemporaneously with the encounter and that officers' phones' time and location functionality be used to record the time and location information for each encounter (*see* ECF No. 669 at 3).