

ZACHARY W. CARTER
*Corporation Counsel*

THE CITY OF NEW YORK
## LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

DAVID COOPER
*Senior Counsel*
phone: (212) 356-2579
fax: (212) 356-3509
email: dcooper@law.nyc.gov

December 5, 2018

**VIA ECF**
The Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  *David Floyd, et al. v. City of New York*, 08 CV 1034 (AT);
*Kelton Davis, et al. v. City of New York, et al.*, 10 CV 669 (AT);
*Jaenean Ligon, et al. v. City of New York, et al.*, 12 CV 2274 (AT)

Your Honor:

I am a Senior Counsel in the Office of Zachary W. Carter, Corporation Counsel of the City of New York, and the attorney assigned to the above-referenced matter on behalf of defendant City of New York ("City"), writing on behalf of the New York City Law Department ("Law Department") and the New York City Police Department ("NYPD"). The City respectfully writes in response to plaintiffs' counsel's Objection, dated November 21, 2018, to provide its endorsement of the Monitor's pilot proposal regarding the documentation of *De Bour* Level 1 and Level 2 encounters and the activation of body-worn cameras ("BWCs") during Level 1.

The pilot proposal before the Court originated from two separate recommendations in the Facilitator's Final Report and Recommendations. The Facilitator first recommended that "the Court order that the NYPD require its officers to activate BWCs at the inception of Level 1 encounters with civilians." *See* Final Report & Recommendations, Floyd v. City of New York, No. 08 CV 1034 (AT), ECF No. 597 [hereinafter "Final Report"], at 226 (S.D.N.Y. May 15, 2018). Additionally, after observing that "[a]ll patrol officers now have iPhones and all patrol cars are equipped with iPads," the Facilitator recommended "that the Court order that an application be developed for installation into these communication devices that would allow a police officer to click and enter the approximate age, gender, race, and ethnicity of any person they approach at either Level 1 or Level 2 and then click if the encounter escalates to a Level 3." *See* Final Report, at 231.

In response to the Facilitator's recommendations, the Court first ordered the parties to "submit a joint proposal for a pilot program, to be overseen by the Monitor, to study the electronic recording of first- and second-level police citizen encounters." *See* Order Regarding Documenting Police-Citizen Encounters, Floyd v. City of New York, No. 08 CV 1034 (AT), ECF No. 619 [hereinafter "Order I"], at 2 (S.D.N.Y. July 19, 2018). Several weeks after handing down that Order, the Court further ordered the parties to "submit a joint proposal, to be overseen by the Monitor, to study requiring patrol officers to activate BWCs during Level 1 encounters under *De Bour*." *See* Order Regarding Body-Worn Cameras, Floyd v. City of New York, No. 08 CV 1034 (AT), ECF No. 634 [hereinafter "Order II"], at 3 (S.D.N.Y. Aug. 9, 2018). Both orders required the parties to consult with the Monitor and experts to develop the joint proposals. *See* Order I, at 2; Order II, at 3. The parties agreed that the Monitor's Team would be best-suited to develop the proposals, and the Monitor's Team ultimately combined the two pilots into one proposal. *See* Recommendation Regarding Combined Pilot Study, Floyd v. City of New York, No. 08 CV 1034 (AT), ECF No. 660 [hereinafter "Recommendation"] (S.D.N.Y. Nov. 9, 2018).

**I.     The Court should defer to the Monitor's proposed sample size.**

Plaintiffs' counsel request that the Court "direct the Monitor to conduct a new power analysis, in consultation with Professors Fagan and Glaser and the NYPD" and, if necessary, "increase the size of the sample to have sufficient statistical power." *See* Pls.' Objection, Floyd v. City of New York, No. 08 CV 1034 (AT), ECF No. 669 [hereinafter "Objection"], at 1-2 (S.D.N.Y. Nov. 21, 2018). However, the Monitor's Team has consulted extensively with the parties and plaintiffs' experts—including specifically Professors Fagan and Glaser themselves—before finalizing the proposal. *See* Recommendation, at 1-2. The Monitor circulated a draft proposal on September 12, 2018 and received feedback from the parties and experts, which were incorporated into a second draft circulated on October 16, 2018. *See* Recommendation, at 1-2. The Monitor then finalized the pilot proposal after an additional round of comments from the parties. *See* Recommendation, at 2. In light of this process, the City sees no reason to contest the Monitor's proposed sample size.

**II.    Any potential changes to the timing and method of documentation should be deferred to the end of the pilot program.**

Plaintiffs' counsel's objection to the timing and method of electronic documentation is premature. As the Monitor noted in connection with the BWC pilot program, "[a] pilot requires flexibility and the ability to respond quickly to changed circumstances . . . ." *See* Memorandum Regarding Approval of Policies for NYPD Body-Worn Camera Pilot Program, Floyd v. City of New York, No. 08 CV 1034 (AT), at 2 (S.D.N.Y. Apr. 11, 2017). These qualities are especially important for this Pilot Program because the NYPD has yet to develop a functional app for use during Level 1 and Level 2 encounters. *See* Outline of Proposed Pilot Study, Floyd v. City of New York, No. 08 CV 1034 (AT), ECF No. 660-1, at 5 (S.D.N.Y. Nov. 9, 2018).

Contemporaneous documentation of a Level 1 or Level 2 encounter will not be feasible under every set of circumstances, such as street encounters that transform into medical emergencies, or those that morph into prolonged pursuits consistent with the *De Bour* framework. Additionally, the City needs to ensure that the implementation of a documenting protocol does not run afoul of a competing policy goal: limiting the street encounter and the accompanying restriction on liberty to its appropriate time and scope. Strict adherence to a protocol that requires patrol officers to record immediately after an incident could lead to a situation where an officer recording the information requests that the citizen remain on scene until the information has been entered into the app. In that case, a street encounter that had started at Level 1 or Level 2 could be unintentionally converted into a Fourth Amendment seizure. Therefore, it may be more practical to record the information within a reasonable amount of time after the encounter, as opposed to immediately afterwards.

Until the app and its attendant protocols are field-tested, neither the Monitor nor the NYPD will be able to accurately assess the frequency of these unanticipated events, or the feasibility of documenting the required information directly after a Level 1 or Level 2 encounter in these situations. In the course of the pilot program, the NYPD will instruct patrol officers to record the required information in the app contemporaneously, or as soon as practicable thereafter, as a best practice. In light of the above, the City requests that the Court defer decision on this issue for the moment and revisit it at the close of the pilot program.

**III.    Analyses of the constitutionality of street encounters are the province of the Monitor's Team.**

The Monitor's Team is in the best position to assess the constitutionality of observed Level 1 and Level 2 encounters for two reasons. First, although currently structured as a pilot program, the results will determine whether the Court will convert the pilot program into long-term injunctive relief to be implemented by the Monitor. *See* Order I, at 3; *see also Floyd/Ligon* Remedial Order, Floyd v. City of New York, No. 08 CV 1034 (AT) [hereinafter "Remedial Order"], at 30-31 (S.D.N.Y. Aug. 12, 2013). In the event that the pilot program becomes a remedial measure, the constitutionality of a Level 1 or Level 2 encounter will become a metric for determining substantial compliance with the Remedial Order, and the Monitor is ultimately tasked with the responsibility to determine whether the City is in substantial compliance with the Remedial Order. *See* Remedial Order, at 12-13, ¶ 6. Second, the proposed arrangement is consistent with other practices in this monitorship: For example, the Monitor's Team reviews Quality Assurance Division audits of Stop Reports and Trespass Crimes Fact Sheets to determine the constitutionality of the underlying encounter. *See, e.g.*, Seventh Report of the Independent Monitor, Floyd v. City of New York, No. 08 CV 1034 (AT), at 33-43 (S.D.N.Y. Dec. 13, 2017). Therefore, the City maintains that selecting a panel of experts from the Monitor's Team to review the constitutionality of these encounters is an appropriate arrangement and the Court should support the Monitor's proposal.

### IV. The Monitor's latitude to develop observation protocols and instruments is consistent with the Remedial Order.

As an initial matter, the Remedial Order's structure ultimately gives the Monitor discretion as to the manner of implementation of remedial measures and pilot programs, including those stemming from the Joint Remedial Process. Overall, the Remedial Order states that "[a]fter the completion of the Joint Remedial Process, . . . the Monitor will work with the Facilitator and the parties to develop any further reforms necessary to ending the constitutional violations described in the Liability Opinion." *See* Remedial Order, at 12, ¶ 4. Additionally, in the context of the BWC pilot program, the Court gave the Monitor unqualified discretion to: (1) "establish procedures for the review of stop recordings by supervisors and, as appropriate, more senior managers"; (2) "establish procedures for the preservation of stop recordings for use in verifying complaints in a manner that protects the privacy of those stopped"; and (3) "establish procedures for measuring the effectiveness of [BWCs] in reducing unconstitutional stops and frisks."[1] *See* Remedial Order, at 27. As noted above, this discretion is particularly important for the supervision of a pilot program, and the City questions whether plaintiffs' counsel's counterproposal, which would add another level of review to the pilot design stage, is consistent with the flexibility required to administer the pilot program.

The City also notes that, although the Monitor's pilot program proposal does not call for direct community input in the development of observation protocols and instruments, communities that are directly affected by reforms to the NYPD's stop and frisk policies have also had a meaningful opportunity to influence the process. The Joint Remedial Process relied heavily on community-based participants and named stakeholders such as Communities United for Police Reform over a period of several years in order to gather feedback from affected communities and convert their concerns into recommendations to be considered by the Court. *See generally* Final Report. These community members' concerns have been afforded great weight: Two of those recommendations—which were contested by the NYPD during the comment phase following the filing of the Final Report—created the framework for the pilot program proposal now before the Court. In light of the fact that the Joint Remedial Process has proven to be an ample channel for community input, and additionally because the Monitor's pilot proposal is consistent with the way that the parties have previously developed reforms in the Immediate Reform phase, the City approves of the Monitor's approach to developing observation protocols and instruments.

---

[1] Although the text of the Remedial Order did not require the Monitor to consult with the parties before approving the NYPD's BWC policies, the Monitor did so consistent with the way that the parties had proceeded throughout the Immediate Reform phase. *See* Memorandum, at 2-3.

**Conclusion**

For the foregoing reasons, the City endorses the Monitor's pilot proposal regarding Level 1 and Level 2 documentation and activation of BWCs at Level 1 in its entirety.

Respectfully submitted,

/s/

DAVID COOPER
Senior Counsel
Special Federal Litigation Division

cc: **VIA ECF**
*All Parties on Record*