Arnold & Porter

**Peter L. Zimroth**
+1 212.836.7316 Direct
Peter.Zimroth@arnoldporter.com

December 20, 2018

**VIA ECF**

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
*Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
*Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
Recommendation Regarding IAB Guide and Training on Profiling Investigations

Dear Judge Torres,

I am pleased to submit my recommendation for the following:

1. Internal Affairs Bureau (IAB) Guide 620-58, Processing and Investigating Complaints of Profiling and Bias-Based Policing Patrol;

2. Internal Investigators Course, Module Number 04, Profiling and Bias-Based Policing.

3. Internal Investigators Course, Module Number 04, Profiling and Bias-Based Policing PowerPoint.

They meet the requirements of the court orders, and the parties have informed me that they do not object to the approval of this recommendation.

1. The IAB guide sets forth the procedures for the intake, classification, and investigation of complaints related to racial profiling and bias-based policing. The guide formalizes procedures that have been in place since 2015. All allegations of profiling are included in the IAB log and investigated by the NYPD. Under Patrol Guide 203-25, Department Policy Prohibiting Racial Profiling, profiling occurs whenever an officer's decision to initiate enforcement action against, or failure to perform a law enforcement action for, a person is

motivated, even in part, by a person's actual or perceived race, color, creed, national origin, religion, age, alienage or citizenship status, gender, sexual orientation, disability, or housing status, unless the officer's decision is based on a specific and reliable suspect description that includes not just race, age, and gender, but other identifying characteristics or information.

2.   The training module on investigating profiling complaints is designed to provide investigators with the fundamental skills to process and investigate complaints regarding the NYPD's policy prohibiting racial profiling and bias-based policing.   Upon completion of the module, class participants should understand the NYPD's policy, the procedures for investigating racial profiling and bias-based policing allegations, and strategies for investigating those allegations.

For these reasons, and upon consent of the parties, the recommendation should be approved.

Respectfully submitted,

*/s/ Peter L. Zimroth*
Peter L. Zimroth
Monitor

Enclosures

# ATTACHMENT 1

# INTERNAL AFFAIRS BUREAU GUIDE

| Section: Investigative | | Procedure No: 620-58 | |
|---|---|---|---|
| **PROCESSING AND INVESTIGATING COMPLAINTS OF PROFILING AND BIAS-BASED POLICING** | | | |
| DATE ISSUED: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE NO. 1 of 6 |

**PURPOSE**

To establish guidelines for the intake, classification, and investigation of complaints related to Racial Profiling and Bias-Based Policing (hereinafter collectively referred to as "Profiling").

**SCOPE**

Police-initiated enforcement actions, including but not limited to, Level 3 Terry stops, frisks, searches, summonses, arrests, and motor vehicle stops, must be based on the standards required by the Fourth and Fourteenth Amendments of the U.S. Constitution, Sections 11 and 12 of Article I of the New York State Constitution, Section 14-151 of the New York City Administrative Code, and other applicable laws.

An allegation of Profiling will be included in the Internal Affairs Bureau log whenever a complaint is received that indicates the officer's decision to initiate enforcement action against, or failure to perform a law enforcement action for, a person is motivated, **even in part**, by a person's actual or perceived race, color, creed, national origin, religion, age, alienage or citizenship status, gender, sexual orientation, disability, or housing status unless the officer's decision is based on a specific and reliable suspect description that includes not just race, age, and gender but other identifying characteristics or information. See Patrol Guide 203-25: Department Policy Prohibiting Racial Profiling and Bias-Based Policing.

**PROCEDURE**

When an allegation of Profiling is made against a member of the service:

**COMMAND CENTER INVESTIGATOR**

1. Upon receiving a complaint, generate an Internal Affairs Bureau log in the Internal Case Management System (ICMS).

2. Include the allegation of Profiling. Allegations may include more than express statements of Profiling (e.g. "I was profiled based on my race"). You should be mindful to categorize as Profiling those allegations that less directly indicate Profiling. An allegation may allege a failure to perform a law enforcement duty by an officer, such as refusal to take a report based upon the complainant's ethnicity (or other protected class). Such allegations should be investigated as a Profiling allegation.

3. If you are unsure whether an allegation should be classified as Profiling based on the initial statement you receive from the complainant, you must ask follow-up questions to clarify the complaint.

***NOTE:***

*Examples of statements that may suggest profiling and require follow-up include, but are not limited to:*

*a. "The officer did not stop other people doing the same thing"*

*b. "The officer targeted me"*
*c. "I didn't do anything wrong"*
*d. "The officer stopped me for no reason"*
*e. "This officer is always stopping me"*
*f. "The officer stopped me for something minor then started asking about drugs or other unrelated criminality out of the blue"*

*The follow-up questions should seek more information without suggesting that the investigator doubts or does not believe the allegations. Investigators should also keep in mind that people who believe that they have been subjected to discriminatory treatment might find it difficult to articulate why they believe the treatment was discriminatory. Follow-up questions should include but are not limited to questions such as "why specifically do you think the officer stopped you because of your race (nationality, religion, sexual orientation, etc.)?" Just as it is important to avoid "suggesting" that you have reached a conclusion about the complaint, during the investigation, it is also important that you refrain from in-fact actually making a conclusion about the complainant prior to the investigation's conclusion. You must keep an open mind when evaluating all of the facts and evidence associated with the complaint. Making a premature judgment of the case could impact your ability to objectively view the evidence and impact your ability to adequately investigate the complaint.*

4. Once you have reason to believe the complaint alleges Profiling, the applicable subcategory(s) must be selected:

   a. Race/Color/Ethnicity/National
   b. Gender/Gender Identity
   c. Sexual Orientation
   d. Age
   e. Disability
   f. Housing Status
   g. Citizenship Status
   h. Religion
   i. Other

5. Attach all readily available documents as well as audio/video recordings to the log. Indicate if the subject officer or any officers present were wearing a Department-issued body worn camera.

6. Electronically submit the log to the Command Center Supervisor for review.

**COMMAND CENTER SUPERVISOR**

1. Review log for accuracy and completeness.

2. Direct investigator to conduct additional interview of the complainant if further clarification about whether there is an allegation of Profiling is necessary.

3. Classify all logs that contain a Profiling allegation but no additional corruption allegation as a Misconduct Case.

***NOTE:*** *Complaints that include a Profiling allegation along with a corruption allegation will be investigated by the Internal Affairs Bureau as a Corruption Case. All other cases containing a Profiling allegation will be forwarded for investigation to the appropriate Bureau/Borough Investigations Unit.*

**CO, IAB COMMAND CENTER**

1. Review all logs and make determination regarding appropriate allegations, case classification, and assignment to appropriate investigative unit.

***NOTE:*** *Although the majority of cases containing a Profiling allegation will be assigned to an Investigations Unit as delineated below, Internal Affairs Bureau investigators and supervisors will, when appropriate, adhere to the following investigative guidelines related to Profiling allegations.*

**CO, INVESTIGATION UNIT**

1. Review all cases received via the Internal Case Management and Tracking (ICMT) system and assign to the appropriate unit personnel for investigation within ten (10) days of receiving the case, keeping the schedule of assigned investigator in mind, as to avoid any delay in the initial notification of the complainant.

**CASE OWNER/TEAM MEMBER**

1. Conduct a thorough review of all documents and audio/video recordings contained in the initial log.
2. Make initial notification (as soon as possible) to the complainant keeping in mind the 10 day notification requirement. Complete and finalize the complainant Notification Successful worksheet upon successful notification made to the complainant, or the Complainant Notification Attempt for any unsuccessful attempts made.

**NOTE** *If a letter is mailed or an email is sent as one of the attempts to notify a complainant, a copy of the correspondence will be uploaded to the appropriate worksheet.*

3. If the notification was made successfully, create a separate worksheet regarding the interview.
4. Interview the complainant(s), subject officer(s) and witness(es) as soon as possible. Whenever feasible, the complainant(s) and witness(es) should be interviewed in person. Each interview must be recorded independently on an Interview worksheet.

**NOTE** *Recorded interviews, regardless of whether or not they were conducted under the provisions of PG 206-13, should be uploaded to the appropriate interview worksheet.*

**CASE OWNER/TEAM MEMBER (Continued)**

5. Canvass the involved location to identify additional witnesses and to obtain photographic and visual documentation that could confirm or refute the allegation made.

6. All appropriate investigative steps must be conducted to thoroughly and expeditiously investigate all of the allegations, including the obtaining and review of all corresponding documents and pertinent audio/video recordings contained in the initial log and identified thereafter through further investigation and/or interviews of complainant(s), subject officer(s) and witness(es). All investigative steps taken during the scope of the investigation must be recorded on individual worksheets. These include Interviews, Notifications, General Investigation, PD Record Review, and Automated ICAD Requests.

7. In interviews related to allegations of Profiling, it is important to determine each parties' perspective of the incident.

8. If during the investigation, a subject officer, witness officer, or civilian witness is to be added, updated, or removed, use the appropriate worksheet.

   A. Utilize Subject Add/Remove/Update worksheet to add, remove or amend a subject officer.
   B. Utilize Person Add/Remove/Update worksheet to add, remove or amend any non-subject regardless of whether they are a member of the service in any capacity or a civilian non-MOS.

9. While conducting interviews of complainant(s), be careful not to suggest that you have reached a conclusion about whether Profiling occurred, rather include questions to elicit why the complainant felt targeted. Examples of such questions include but are not limited to: "Tell me what the Officer did that you believe was biased?" or "What precisely did the Officer do that appeared to be biased-based policing or that appeared to be targeting the complainant based on his/her age (or other protected class)?" Additionally the complainant should be asked to provide any document(s), audio and video recordings and identities of witnesses with information relevant to the incident that is being investigated. Just as it is important to avoid "suggesting" that you have reached a conclusion about the complaint, during the investigation, it is also important that you refrain from in-fact actually making a conclusion about the complaint prior to the investigation's conclusion. You must keep an open mind when evaluating all of the facts and evidence associated with the complaint. Making a premature judgment of the case could impact your ability to objectively view the evidence and impact your ability to adequately investigate the complaint.

**CASE OWNER/TEAM MEMBER (Continued)**

10. While conducting interviews of the subject officer related to an allegation of Profiling, the case investigator must pose questions to the officer to obtain the officer's perspective of the encounter. The officer should articulate in their own words, the specific circumstances that provided the basis for their actions or inactions. This should include more than cursory or summary assertions. After receiving the officer's perspective of events, the officer should be asked questions such as "the complainant says you stopped him/her because of their…", "what is your response to that?" If the officer's response to this question conflicts with their initial explanation of events, then clarifying questions are required.

11. Review subject officer's CPI, including prior civilian complaints, as well as lawsuits filed against him or her, and prior performance evaluations with an eye towards identifying patterns of bias/misconduct on the part of the subject officer.

***NOTE:*** *Even if the historical review of the subject officer does not identify a trend or pattern of Profiling or selective enforcement, the investigating officer cannot disregard the specific incident currently in question.*

12. Reach a finding for each allegation in the case after completing all necessary investigative steps. Create an Allegation Finding worksheet for each subject in the case. Submit completed Allegation Finding worksheets electronically to the Commanding Officer, Investigations Unit

***NOTE:*** *The investigator must adhere to Patrol Guide 203-25: Department Policy Prohibiting Racial Profiling and Bias-Based Policing when concluding the investigation and recommending a finding for the Profiling allegation.*

13. If requested, perform any additional steps upon the rejection of the Allegation Finding worksheet. Once additional steps are completed and documented, resubmit Allegation Finding worksheet for approval.

14. When the Allegation Finding worksheet is approved, continue with the Complainant and Subject Notification of Findings worksheets. Create a separate worksheet to memorialize each of the final notifications made.

15. Submit a case closing worksheet with a finding for each allegation and a summary of the investigative steps completed to the Investigations Unit Commanding Officer for review.

**COMMAND REPRESENTATIVE/ INVESTIGATION UNIT TEAM LEADER**

1. Monitor investigative steps taken and provide direction, instructions and oversight through-out the investigation.

2. Approve or reject case worksheets and instruct investigator on additional steps to be taken, if necessary.

3. Review Allegation Finding worksheets and Case Closing worksheet prior to review by the Commanding Officer, Investigations Unit and make appropriate recommendations for additional investigative steps and allegation findings.

**CO, INVESTIGATION UNIT**

1. Monitor investigative steps taken and provide direction, instructions and oversight through-out investigations being conducted by Unit personnel.
2. Review the Allegation Finding worksheet and approve or, if you determine that additional steps need to be taken and/or you do not agree with the findings regarding any of the allegations, then reject it.
3. Review the Case Closing worksheet and approve or, if you determine that additional steps need to be taken and/or you do not agree with the findings regarding any of the allegations, then reject it.
4. Submit approved Case Closing worksheets to Bureau/Borough Executive Officer for final determination.

**BUREAU/BOROUGH EXECUTIVE OFFICER**

1. Review investigative steps taken in all cases that contain an allegation of Profiling.
2. Review the Allegation Finding worksheet and approve or, if you determine that additional steps need to be taken and/or you do not agree with the findings regarding any of the allegations, then reject it.
3. Review the Case Closing worksheet and approve or, if you determine that additional steps need to be taken and/or you do not agree with the findings regarding any of the allegations, then reject it.
4. Approve case closing worksheet when appropriate.

**CO, INVESTIGATION UNIT**

1. Notify assigned investigator that case closing worksheet has been approved.

**Additional Data**

*Allegation Findings: each allegation must have a finding. This means that after a full and complete investigation and after considering all the evidence and information:*

***Substantiated*** *– Credible evidence exists that the accused MOS committed the alleged act of misconduct and such credible evidence outweighs the evidence that the accused MOS did not commit the alleged misconduct.*
***Unsubstantiated*** *– There is insufficient credible evidence to prove or disprove*

*the allegation.*
***Unfounded*** *– Credible evidence exists that the alleged act of misconduct did not occur or that the accused MOS did not commit the alleged act of misconduct and such credible evidence outweighs the evidence that the accused MOS did commit the alleged misconduct.*
***Exonerated*** *– Credible evidence exists that the alleged conduct occurred but it was lawful and proper.*

*If, after considering all the credible evidence, including that portion of the complainant's account found to be credible and including that portion of the officer's account found to be credible, the investigator finds that the credible evidence that the MOS committed an act of misconduct outweighs credible evidence that the MOS did not commit the alleged act of misconduct, the complaint is substantiated. If, after considering all the credible evidence, including that portion of the complainant's account found to be credible and including that portion of the officer's account found to be credible, the investigator finds that the credible evidence that the officer committed an act of misconduct does not outweigh credible evidence that the MOS did not commit the alleged act of misconduct, the complaint is not substantiated and may be found to be unfounded, unsubstantiated or exonerated, as the case may be.*

*The investigator may make these determinations solely on the basis of the credibility of the complainant's and member's accounts, even if there is no other credible corroborating evidence.*

**RELATED PROCEDURES**

Department Policy Prohibiting Racial Profiling and Bias-Based Policing (PG 203-25)
Investigative Encounters (PG 212-11)
Allegations of Corruption and Other Misconduct Against Members of the Service (PG 207-21)
Investigative Techniques (DG 502-01

# ATTACHMENT 2



# Internal Investigators Course

## Module Number: 04

## Profiling and Bias-Based Policing

**Instructor Guide**




## MODULE 04
## SYNOPSIS

**Date Prepared:** **Date Reviewed / Revised:**
**Prepared By:**
**Reviewed/Approved By:**

This module will provide the participant with the fundamental skills to process and investigate complaints regarding the New York City Police Department's policy prohibiting Racial Profiling and Bias-Based Policing.

**Method of Instruction:** Lecture / open forum discussion / review of videos/ question and answer.

**Time Allocated:** 2 Hours

**Training Need:** This module is required for completion of the Internal Affairs Bureau's Internal Investigations Course.

**Terminal Learning Objective:** At the completion of this module, class participants will be able to explain the Department's policy regarding Racial Profiling and Bias-Based Policing, as well as conduct investigations involving allegations of Racial Profiling and/or Bias-Based Policing.

**Learning Outcomes:**

1. Recite the Department's Prohibited Conduct policy regarding Racial Profiling and Bias-Based Policing.
2. Recite the IAB Allegation classifications regarding Racial Profiling and Bias-Based Policing.
3. Explain what constitutes Racial Profiling and Bias-Based Policing.
4. Describe the different types of effects Racial Profiling and Bias-Based Policing have on the community and law enforcement.
5. Explain that in 2013, after a trial concerning the stop and frisk practices of the NYPD, a federal judge ruled that the NYPD had violated the U.S. Constitution and ordered policing reforms.
6. Identify court ordered reforms and remedies.
7. Explain initiatives instituted by NYPD IAB.
8. Articulate the four levels of knowledge related to Investigative encounters (SQF and arrests).
9. Describe the administrative process relating to racial profiling and bias-based policing allegations.
10. Illustrate the strategies for investigating racial profiling and bias-based policing allegations.
11. Discuss the challenges faced by investigators in investigating profiling and bias-based policing allegations.




**Required Reading:**

- PG 212-11 Investigative Encounters: Request for Information, Common Law Right of Inquiry and Level 3 Stops (effective June 27, 2016)
- PG 203-25 Department Policy Prohibiting Racial Profiling and Bias-Based Policing
- PG 207-10 Bias Motivated Incidents
- PG 203-10 Public Contact – Prohibited Conduct
- PG 212-59 Interior Patrol
- PG 212-60 Interior Patrol of Housing Authority Buildings
- New York City Administrative Code 14-151
  IAB Guide Processing and Investigating Complaints of Profiling and Bias-Based Policing

**Instructional Resources Required:**

- PowerPoint projector, with video and sound abilities.
- Computer with monitor.
- Classroom seating.
- Testing materials for Internal Investigations Course initial and final examinations.

**Evaluation Strategies:**

- Observation of module learning outcomes as applied to classroom participation regarding discussion of topics and video footage.
- Evaluation of the level and quality of comprehension as it pertains to the course Pre-test and Post-test results.

**References:**

- PG 203-25 Department Policy Prohibiting Racial Profiling and Bias-Based Policing
- PG 207-10 Bias Motivated Incidents
- PG 203-10 Public Contact – Prohibited Conduct
- PG 212-11 Investigative Encounters: Request for Information, Common Law Right of Inquiry and Level 3 Stops (effective June 27, 2016)
- PG 212-59 Interior Patrol
- PG 212-60 Interior Patrol of Housing Authority Buildings
- New York City Administrative Code 14-151
- IAB Guide Processing and Investigating Complaints of Profiling and Bias-Based Policing
- Los Angeles Police Department Biased Policing Protocol
- http://quickfacts.census.gov/qfd/meta/long_RHI525211.htm
- https://www.policeforum.org/assets/docs/Free_Online_Documents/Racially-Biased_Policing/racially%20biased%20policing%20-%20a%20principled%20response%202001.pdf
- http://www.uscourts.gov/about-federal-courts/educational-resources




## Learning Outcomes

1) Prohibited Conduct
2) Bias-Based Profiling Categories
3) What is Profiling and Bias-Based Policing
4) Effects of Profiling and Bias-Based Policing
5) How did we get here?
6) Court Ordered Reforms
7) NYPD IAB Initiative
8) Investigative Encounters – SQ&F
9) Administrative Process
10) Investigative Protocol
11) Challenges faced by investigators

3

**Learning Outcomes:**

Upon completion of this module, class participants will be able to:

1. Recite the Department's Prohibited Conduct policy regarding Racial Profiling and Bias-Based Policing.
2. Describe the protected categories of individuals
3. Explain what constitutes Racial Profiling and Bias-Based Policing.
4. Describe the different types of effects Racial Profiling and Bias-Based Policing may have on the community and law enforcement.
5. Explain what transpired in order for the Department to get to where we are.
6. Identify court ordered reforms and remedies
7. Explain initiatives instituted by NYPD's IAB
8. Articulate the four levels of Investigative encounters
9. Describe the administrative process for investigating racial profiling and bias-based policing allegations
10. Illustrate the strategies for investigating racial profiling and bias-based policing allegations
11. Understand the challenges of investigating allegations of racial profiling and bias-based policing

**Instructor Notes:**
Instructor self-introduction and provide brief overview regarding the 11 learning outcomes.




***Learning Outcome # 1***
*Prohibited Conduct*

## Prohibited Conduct

Patrol Guide Procedure (203-25) and New York City Administrative Code (14-151) prohibit racial profiling and biased based policing in law enforcement actions, including but not limited to, De Bour Level 1 and Level 2 police-initiated encounters, Level 3 *Terry* stops, frisks, searches, summonses, arrests, and motor vehicle stops.

The protected categories covered by this prohibited conduct include a person's actual or perceived race, color, creed, national origin, religion, age, alienage or citizenship status, gender, sexual orientation, disability, and housing status.

**Instructor Notes:**
Students should be given the relevant Patrol Guide sections as well as the NYC Administrative Code for review and further discussion.




# Internal Investigations Course
## Module 04 – Profiling and Bias-Based Policing

**PROFILING AND BIAS-BASED POLICING**

Protected categories include a person's actual or perceived:

- Race/Color/Ethnicity/National Origin – Skin appearance, cultural heritage, and ancestry.
- Alienage/Citizenship Status – citizenship of any person or the immigration status of a person who is not a citizen of the USA.
- Gender/Gender Identity – Male or Female (born as such); Transgender; identifying oneself as opposite sex
- Sexual Orientation – Homosexual, heterosexual, or bisexual
- Age - Specific range (e.g., 18 to 21) OR ageism ("too old")
- Religion – Christian, Jewish, Muslim, Hindu, Buddhist, Atheist, etc.
- Disability – Law enforcement actions based upon any disability as defined in PG 207-10 Bias Motivated Incidents
- Housing Status – Homeless status and/or location of residence; use of public housing; use of a shelter system
- Other – Used when profiling concerned does not fit into the above categories, however, a citizen is singled out due to a non-physical characteristic such as type of vehicle driven, type of music playing, out of state license plate, etc.

7

***Learning Outcome # 2***
*Bias-Based Profiling Categories*

## Bias-Based Profiling Allegation Categories:

**Race/Color/Ethnicity**

**Race (these are the options on the new Stop Report PD 383-151):**

- American Indian/Alaska Native
- Asian/Pacific Islander
- Black
- Hispanic Black
- Hispanic White
- Middle Eastern/Southwest Asian
- White / Caucasian

**National Origin** – includes ancestry

**Alienage or Citizenship Status** – citizenship of any person or the immigration status of a person who is not a citizen of the USA.

**Gender/Gender Identity** – Those born as male or female, and transgender;

**Instructor Notes:**




identifying/portraying self as opposite sex. An individual's gender identity/expression shall include actual or perceived sex and shall also include a person's gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the legal sex assigned to that person at birth. See PG 203-10.

**Sexual Orientation** – Homosexuality, heterosexuality, or bisexuality

**Age** – Of course age may be an appropriate determinative action for some enforcement action, such as a perpetrator's juvenile status – but this category relates to a specific age or age range being used as an improper basis for enforcement action.

**Religion** – Christian, Jewish, Muslim, Hindu, Buddhist, Sikh, Atheist, etc.

**Disability** – means any actual or perceived physical, medical, mental, or psychological impairment or a history or record of such impairment. Law enforcement actions based upon any disability as defined in PG 207-10 Bias Motivated Incidents.

**Housing Status** – means the character of an individual's residence or lack thereof, whether publicly or privately owned, whether on a temporary or permanent basis, and shall include but not limited to:

(i) an individual's ownership status with regard to the individual's residence;
(ii) the status of having or not having a fixed residence;
(iii) an individual's use of publicly assisted housing;
(iv) an individual's use of the shelter system; and
(v) an individual's actual or perceived homelessness.

**Other** – Used when the profiling concerned does not fit into the above categories, however, a citizen is singled out due to a non-physical characteristic such as type of vehicle driven, type of music playing, out of state license plate, etc.

**Instructor Notes:**
For more information regarding race/ethnicity classifications please go to
http://quickfacts.census.gov/qfd/meta/long_RHI525211.htm
Races listed are those on the new Stop Report (PD 383-151).
National origin, gender, disability, sexual orientation and alienage or citizenship status are defined in the NYC Admin Code section 8-102. Housing status is defined in NYC Admin Code section 14-151.




**PROFILING AND BIAS-BASED POLICING**

*What is "Racial Profiling?"*

Racial profiling takes place when race, color, ethnicity, or national origin is used as a motivating factor for initiation of police enforcement action.

When an Officer's decision to initiate enforcement action against a person is motivated **even in part** by a person's actual or perceived race, color, ethnicity, or national origin that enforcement action violates Department policy unless the officer's decision is based on a specific and reliable suspect description that includes not just race, age, and gender, but other identifying characteristics or information.

9

***Learning Outcome # 3***
*Profiling and Bias-Based Policing*

## Racial Profiling

Race, color, ethnicity, or national origin may not be used as a motivating factor for initiating police enforcement action. When an officer's decision to initiate enforcement action against a person is motivated **even in part** by a person's actual or perceived race, color, ethnicity or national origin, that enforcement action violates Department policy unless the officer's decision is based on a specific and reliable suspect description that includes not just race, age, and gender, but other identifying characteristics or information.

Police officers must be able to articulate the factors that led them to take enforcement action, in particular those factors leading to either an objective credible reason, founded suspicion or reasonable suspicion for questioning a person; reasonable suspicion or probable cause for stopping a person; if appropriate, the Officer's basis for frisking or searching a person; or probable cause for arresting or issuing a summons to a person. Individuals may not be targeted for any enforcement action, including being stopped, because they are members of a racial or ethnic group that appears more frequently in local crime suspect data. When an Officer carries out a stop based on reasonable suspicion that a person fits a specific description, the Officer may consider the race, color, ethnicity, or national origin of the suspect, just as the Officer may consider the suspect's height or hair color. In accordance with Department policy, when a stop is not based on a specific suspect description, however, race, ethnicity or national origin may not be used at all as a motivation or justification for the stop.

**Instructor Notes:**
See Patrol Guide PG 203-25 Department Policy Prohibiting Racial Profiling and Bias-Based Policing.

Place emphasis on "race, color, ethnicity, or national origin may ONLY be considered when the stop is based on a specific and reliable suspect description that includes not just race, gender, and age, BUT also includes OTHER identifying characteristics or information."




## PROFILING AND BIAS-BASED POLICING

*What is "Bias-Based Policing?"*

An act of a member of the service that relies on actual or perceived race, national origin, color, creed, age, alienage or citizenship status, gender, sexual orientation, disability, or housing status as the determining factor in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that links a person or persons to suspected unlawful activity.

11

## Bias-Based Policing

Bias-based policing includes demographic categories in addition to race, color, and national origin. It is defined as "an act of a member of the force of the police department or other law enforcement officer that relies on actual or perceived race, national origin, color, creed, age, alienage or citizenship status, gender, sexual orientation, disability, or housing status as the determinative factor in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that links a person or persons to suspected unlawful activity."

Failure to perform a law enforcement duty by an officer (such as refusal to take a report based upon the complainant's housing status) is also prohibited as biased-based policing.

**Instructor Notes:**
The information noted on the slide is the definition of Bias-Based Profiling from the Administrative Code of the City of New York: NYC Administrative Code: 14-151. Please note the title difference between the NYPD patrol guide and the Administrative Code. However, there is no substantive difference.

The history of Administrative Code 14-151 as stated above can be found in the notes section of the Administrative Code, Title 14, Police.




PROFILING AND BIAS-BASED POLICING

*Local Crime Data*

It is also a violation of Department Policy to target individuals for any enforcement action, including Level 3 Terry Stops, because they are members of a racial or ethnic group that appears more frequently in local crime suspect data (PG 203-25)

13

## Local Crime Data

It is also a violation of Department Policy to target individuals for any enforcement action, including Level 3 Terry Stops, because they are members of a racial or ethnic group that appears more frequently in local crime suspect data (PG 203-25).

**Instructor Notes:**




**Selective Enforcement & Racially-Motivated Enforcement Actions**

- Selective enforcement means an officer taking law enforcement action against a member of a particular race (e.g. writing a summons for an open container violation) but not against a member of another race who is engaging in the same illegal activity.
- The Fourteenth Amendment of the US Constitution prohibits selective enforcement of the law.
- Similarly, the Constitution prohibits the use of race, ethnicity or national origin as a motivating factor even if there is a separate justification (e.g. a traffic violation) that is used as a ruse for the racially-motivated action.

15

## Selective Enforcement and Racially-Motivated Enforcement Actions

It is also important to note that just because a stop, summons, or other enforcement action is supported by reasonable suspicion or probable cause does not automatically mean that racial profiling did not occur. The Fourteenth Amendment of the United States Constitution prohibits selective enforcement of the law, meaning that the police cannot take enforcement action against persons of one race or ethnicity who broke the law but not against persons of another race who engaged in the same or similar illegal conduct. Thus, if an officer stops and issues traffic summonses only to black motorists but not to white motorists who he or she observed make illegal right turns, that officer would still be violating the law and Department Policy, even though he or she had a legal basis to issue the tickets to the black motorists.

Similarly, the Fourteenth Amendment prohibits the use of race, ethnicity or national origin as a motivation or justification for the stop. This can still be the case even if a separate justification for a stop (e.g. a minor traffic violation) can be articulated if it is used as a ruse for another law enforcement action that is motivated by race. Thus, if

**Instructor Notes:**




POLICE
DEPARTMENT
CITY OF NEW YORK

Internal Investigations Course
Module 04 – Profiling and Bias-Based Policing

POLICE
DEPARTMENT
CITY OF NEW YORK

an officer believes that a black motorist in a fancy car is dealing drugs, he/she cannot stop the vehicle because of a failure to signal for the purpose of questioning the driver about drugs without any evidence other than a bias based on stereotyping the black motorist as a person likely to be involved in the drug trade.

**Instructor Notes:**

Module 04 – Profiling & Bias-Based Policing Internal Investigations Course 11




## Scenario

- During roll call for the 12X 8 tour in your precinct, the Platoon commander discusses the crime conditions for the past month in the precinct, which include a lot of street-level narcotics activity, particularly sale of marijuana, committed by Hispanic males in their late teens and early 20's. Later, around 0200 hours, while out on foot patrol with your partner, you observe four males, two Hispanic, one Asian and one white, in their late teens or early 20's, standing on the sidewalk and drinking what appear to be cans of beer, while a boombox held by the White male plays music very loudly. You approach the four males, confiscate the beers, and tell the white and Asian males to turn the music off and to go home, at which point the white and Asian males begin to walk away. You and your partners then ask the two Hispanic males for id and inform them you are going to issue them summonses for open container violations. They provide their ids, and while your partner is writing the summonses, you ask them if they have any marijuana on them. They say no, at which point you ask them if you can search their pockets, explaining that there have been reports of a lot of drug activity in the neighborhood.

17

**Scenario**:

During roll call for the 12X8 tour in your precinct, the Platoon commander discusses the crime conditions for the past month in the precinct, which include a lot of street-level narcotics activity, particularly sale of marijuana, committed by Hispanic males in their late teens and early 20's. Later, around 0200 hours, while out on foot patrol with your partner, you observe four males, two Hispanic, one Asian and one White, in their late teens or early 20's, standing on the sidewalk and drinking what appear to be cans of beer, while a boom-box held by the White male plays music very loudly. You approach the four males, confiscate the beers, and tell the white and Asian males to turn the music off and to go home, at which point the White and Asian males begin to walk away. You and your partners then ask the two Hispanic males for ID and inform them you are going to issue them summonses for open container violations. They provide their IDs, and while your partner is writing the summonses, you ask them if they have any marijuana on them. They say no, at which point you ask them if you can search their pockets, explaining that there have been reports of a lot of drug activity in the neighborhood.

**Instructor Notes:**




## Moderator Questions/Notes:

Did you have probable cause to issue the open container summonses? **YES**

Was it a proper exercise of your discretion to issue the summonses to the two Hispanic males while letting the White and Asian males off with a warning? **NO- selective enforcement** (important to emphasize that even if the law enforcement action is permissible under De Bour and the 4th Amendment, that law enforcement action runs afoul of the Equal Protection clause of the 14th Amendment, because the officers are treating similarly situated people of one race differently than similarly situated people of other races). The officers should have instead used their discretion to either; (a) issue summonses to and ask for consent to search all 4 males, or (b) let all four males off with warnings.

What if any impact does the precinct's drug crime suspect data have on whether or not it is permissible for you to take enforcement action against the Hispanic males? **None**. The fact that Hispanics are heavily represented in the precinct drug crime suspect data does NOT provide a legal basis for treating the Hispanic males differently from the white and Asian males. Basing the enforcement actions here (both the summonses and the request for consent to search) on that crime suspect data would make both enforcement actions "racially motivated" and thus prohibited under PG 203-25.

**Instructor Notes:**




**PROFILING AND BIAS-BASED POLICING**

*Effects of Bias-Based Profiling:*

- On the individual citizens
- On the community
- On the Department

19

***Learning Outcome # 4***
*Effects of Profiling and Bias-Based Policing*

## Effects of Racial Profiling and Bias-Based Policing

Bias-based policing endangers New York City's long traditions of serving as a welcoming place for people of all backgrounds. It alienates communities from law enforcement, violates New Yorkers' rights and freedoms, and is a danger to public safety and public trust. There are also widespread effects:

**On the individual**: it is a violation of the law to discriminate against a person because of their actual or perceived race, religion, gender, age, sexual orientation, disability, immigration, or housing status. When a person has had their constitutional rights violated, they may lose trust and confidence in the police.

**On the community**: the public expects that officers will serve, protect and enforce laws in an impartial and unbiased manner. When a police officer does not live up to these expectations, communities can develop a lack of trust, confidence, and respect towards all police officers. When police build a rapport with the community, citizens are more likely to be cooperative in police investigations and work with police to improve our communities.

**Instructor Notes:**
**See**: Racially Biased Policing, A Principled Response. A report based upon research conducted by the Police Executive Research Forum (PERF).




**On the Department**: Our mission states that we are to impartially enforce the law and treat all citizens with courtesy, professionalism, and respect. When we succeed in our mission, we have increased officer safety, decreased officer stress, fewer complaints and reduction in crime. Each negative police/citizen interaction has the potential to harm overall police/citizen trust in the Department and jeopardizes our ability to fulfill our mission.

**Instructor Notes:**
**See**: Racially Biased Policing, A Principled Response. A report based upon research conducted by the Police Executive Research Forum (PERF).




**PROFILING AND BIAS-BASED POLICING**

How did we get here?

- In 2002, NYPD made approximately 97,000 stops. By 2011, the number had increased to 685,000 with 80% being black and Hispanic.
- Between 2008 and 2012 a series of cases were filed alleging that NYPD's use of SQF violated people's rights.
- In 2013, the court ruled that NYPD had violated the Constitution and ordered reforms.

21

***Learning Outcome # 5***
*How Did We Get Here*

## How did we get here?

In 2002, NYPD made ~97,000 stops. By 2011, the number had increased to over 685,000 with more than 80% being black and Hispanic. It is within this context, that a series of cases were filed against the NYPD:

2008: *Floyd v. The City of New York*: alleged that the NYPD's use of Stop, Question and Frisk violated the Constitutional rights of black and Hispanic individuals by conducting stops without reasonable suspicion and on the basis of race.

2010: *Davis v. The City of New York*: alleged the NYPD violated the Constitutional rights of individuals (the majority of whom are Black or Hispanic) residing in NYCHA buildings, as well as their guests, by subjecting them to law enforcement activity for suspicion of trespass without the required level of suspicion and because of their race.

2012: *Ligon v. The City of New York*: alleged that the NYPD violated the Constitutional rights of residents of buildings enrolled in the Trespass Affidavit Program ("TAP"), their visitors, and other individuals likely to be stopped, questioned, frisked, searched, summonsed, or arrested on suspicion of trespass in and around TAP buildings.

**Instructor Notes:**




2013: After a 10-week trial, the federal court ruled in *Floyd* that the NYPD's use of stop, question and frisk violated the Constitutional rights of African-Americans and Hispanics. The Judge also ruled on one aspect of the *Ligon* case that dealt with unconstitutional stops outside TAP buildings in the Bronx. The remedies ordered by the Court in *Ligon* were spelled out in the Remedial order issued simultaneously in both the *Ligon and Floyd* cases.

2015: NYC settled *Davis*.

2017: NYC settled *Ligon*.

**Instructor Notes:**




## How did we get here?

The effects of Racial Profiling and bias-based policing are not limited to experiences in New York City or actions by NYPD. Rather, the effects can carry over from generation to generation and include actions by officers in other states and countries. We have to be cognizant that these experiences from another time or place can still affect interactions with us here and now.

The Department's past experience with Stop, Question and Frisk is also relevant for us to study.

How would we proceed if we opened an investigation where we were provided with a recording like the "Alvin" recording and the complainant made an allegation of racial profiling?

The clip offers a window into how the public perceives the Department's use of the Stop, Question and Frisk tool, community relations and how encounters such as Alvin's can influence the level of mistrust that some communities feel to this day, and how that perception possibly influences the level of mistrust we see today.

**Instructor Notes:**
After viewing this video, open classroom discussion to discuss "Alvin" and how a case would be handled based upon what is shown in the video. Based upon the video, discuss public perception and the impact it has on police-community relations.




**PROFILING AND BIAS-BASED POLICING**

*Some of the Court Ordered Reforms*

- Revision of Department Patrol Guide procedures regarding stops, question , frisk, racial profiling and bias-based policing, and vertical patrols;
- Refine NYPD's practices for auditing stops and increase supervisor responsibilities;
- Refine NYPD's practices for investigation, discipline and monitoring of unconstitutional stops;
- NYPD's implementation of a Body-worn camera pilot program
- Changes to how the NYPD tracks and investigates civilian complaints of Racial Profiling

25

***Learning Outcome # 6***
*Court Ordered Reforms*

## Court Ordered Reforms

The Court ordered a number of policy changes and remedial actions including the appointment of a Federal Monitor to oversee NYPD's reforms. The Monitor (Peter Zimroth) is responsible for seeing that the "immediate" reforms are implemented and evaluating whether the reforms result in more lawful stops. The court-ordered reforms include:

- Revisions to the Patrol Guide sections regarding stop, question, and frisk, racial profiling and bias-based policing, and vertical/interior patrols
- Training and re-training on the laws relating to stop question and frisk, racial profiling and bias-based policing
- Devising a new Stop Form that now includes a narrative section and requires the recording of additional information
- Refining our practices and procedures relating to supervising stops
- Refining our practices for investigating, disciplining and monitoring bad stops, and civilian allegations of racial profiling and bias-based policing.
- Launching a body-worn camera pilot program

**Instructor Notes:**

 

PROFILING AND
BIAS-BASED POLICING
NYPD IAB Initiatives:
Track allegations in ICIS regarding bias-based profiling
Enhanced training of bias-based policing for personnel assigned to IAB and Borough/Bureau Investigations Units
Proper techniques regarding the classification and investigation of bias-based policing and profiling allegations.
25

***Learning Outcome # 7***
*NYPD IAB Initiatives*

## NYPD, Internal Affairs Bureau Initiatives

As a result of the Court Orders and Agreements made in *Floyd*, the Bureau and Borough Investigations Units are now responsible for investigating allegations of racial profiling and bias-based policing received from complainants. Since many of these complaints arise out of stops, in order for you to assess whether an officer conducted a legal bias-free Level 1, 2 or 3 investigative encounters, you need to be familiar with the basic legal principles that govern investigative encounters.

To assist you with this, we are going to make some primers on the law available to you. Also, PG 212-11, as written, now provides you with a detailed explanation of the levels of an investigative encounter and the procedures for each level.

And we'll also provide a quick overview here:

**Instructor Notes:**




PROFILING AND
BIAS-BASED POLICING

Investigative Encounters:

- Levels of the Encounter:
  - Level 1 – Request for Information.
  - Level 2 – Common Law Right of Inquiry.
  - Level 3 – *Terry* Stop
  - Level 4 – Arrest

15

***Learning Outcome # 8***
*Investigative Encounters – SQ&F*

## Investigative Encounters – Stop, Question, and Frisk

**LEVEL 1: REQUEST FOR INFORMATION**

The request for information is an encounter between a civilian and a uniformed member of service conducted for the purpose of requesting information from the citizen. During a Level 1 encounter, an officer can approach a person to request information when there is "some **objective credible reason** for that interference which is not necessarily indicative of criminality." The intrusion cannot be based on whim, caprice, curiosity, bias, or a desire to harass. During a Level 1 encounter, the officer may not ask accusatory questions. At this level, the person is free to leave and is not required to provide answers. An officer may inform the person that he or she is free to leave, but is not required to do so. If asked by the citizen whether he or she is free to leave, the officer must answer truthfully and advise the citizen that he or she may do so. The person may walk or even run away and the officer cannot pursue. Refusal to answer questions or walking/running away does not elevate the encounter. The officer cannot hold the person at the scene, block his path or otherwise use force. The officer may not seek consent to search.

**Instructor Notes:**

*People v. Debour* (1976) – This case outlines the four levels of police-civilian street encounters, and defines the amount of information an officer must have for each level.
This information was taken from Policing Legally: Investigative Encounters with the Public (NYPD Police Academy).




**LEVEL 2: COMMON LAW RIGHT OF INQUIRY**

A Level 2 inquiry is an encounter between a civilian and a uniformed member of the service conducted for the purpose of asking the civilian pointed or accusatory questions, because the police officer has a **"founded suspicion that criminal activity is afoot."** The officer must be able to express why he or she thought that **suspicious** or **unusual activity indicative of criminality** was taking place. Similar to a Level 1 encounter, during a Level 2 encounter an individual may refuse to answer questions, answer only some questions, or walk away, and the individual may not be detained. An officer may inform the person that he or she is free to leave, but is not required to do so. If asked by the citizen whether he or she is free to leave, the officer must answer truthfully and advise the citizen that he or she may do so. [Moreover, the officer may not create a situation (either by words or actions) where a reasonable person would not feel free to walk away: that would turn a Level 2 encounter into a Level 3 Terry Stop.

**Types of Questions**

This level results in a wider scope and more intense level of questioning because the encounter **focuses on the citizen as a possible suspect of a particular crime.** The officer's questions can be **pointed, invasive, and accusatory** in nature and can be intended to elicit an incriminating response. The officer, however, may not touch the person, display a weapon, or act in a threatening manner.

**Difference between Level 1 and Level 2**

In the first level, the officer must have an objective credible reason to ask for information. In the second level, the officer must have founded suspicion that indicates criminal activity is occurring. His or her questions must be related to the possible criminal activity. Therefore, innocuous (i.e., harmless, innocent) behavior may justify a Level 1 approach, but not a Level 2.

Officers may not use force to detain a person during a Level 2 encounter.

Officers may seek consent to search during a Level 2 encounter.

**LEVEL 3 TERRY STOP**

(Individualized Reasonable Suspicion)

The third level of permissible police intrusion is the right to forcibly stop a citizen. A Level 3 stop is also known as a "Terry stop." A stop occurs any time a reasonable person would not feel free to disregard the officer and walk away. Under this level, an Officer may forcibly stop and detain a person when he or she has reasonable

**Instructor Notes:**




The officer may detain the person for a reasonable amount of time necessary only to confirm or dispel the officer's suspicion, and may conduct a frisk of the individual when the police officer reasonably suspects that the person stopped is armed and dangerous. The frisk must be strictly limited to a running of the hands or pat-down over the outside of a person's clothing, feeling for weapons that could harm the police officer or others nearby. A frisk may not be conducted to discover evidence or the proceeds or instrumentalities of a crime, or other contraband such as drugs. Most importantly, the fact that a police officer has a legal right to stop someone does not mean that he or she automatically has the right to frisk that person.

In the third level of police intrusion, a police officer has the right to forcibly stop and investigate a person for suspected criminal activity. Thus, a constitutionally valid stop, question, and possible frisk consists of the following elements:

1. Reasonable suspicion that a person has committed, is committing or will commit a felony or Penal Law misdemeanor;
2. A stop and detention of a person where the officer conveys to the person through words and/or actions that the person is not free to leave;
3. Reasonable force may be used if necessary to prevent the person from leaving;
4. Takes place within the officer's geographical area of employment ("GAOE");
5. May frisk when there is reasonable suspicion that the stopped person is armed and dangerous;
6. The officer conducts questioning regarding the suspected crime(s);
7. Investigation lasts for a reasonable amount of time only to confirm or dispel the officer's suspicion.

**Reasonable Suspicion** – The Court of Appeals has defined reasonable suspicion as the "quantum of knowledge sufficient to induce an ordinarily prudent and cautious Police Officer under the circumstances to believe criminal activity is at hand." Additionally, the U.S. Supreme Court requires that an officer have a "particularized and objective basis for suspecting" the stopped person of criminal conduct. The officer must be able to articulate specific facts justifying the stop; hunches/gut feelings are not sufficient. This is an objective standard requiring police officers to point to specific facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion on a citizen's liberty interest. In addition, the reasonable suspicion must be individualized. REMEMBER, except when it is part of a detailed description of a specific criminal suspect, race cannot contribute in any way to an officer's reasonable suspicion.

**Instructor Notes:**
Terry v. Ohio, 392 US 1-Supreme Court 1968.




**LEVEL 4: ARREST**

(Probable Cause)
The fourth and final level of police intrusion is the arrest stage. An arrest involves the seizure of a suspected criminal offender. The purpose for the arrest is to bring the suspect before the appropriate court to answer charges against the person.

The police officer must be able to articulate facts that support a finding of probable cause. Probable cause is a legally recognized standard of proof because it results in a significant interference of the person's liberty and is the initial stage of a criminal prosecution that may result in incarceration.

Probable cause consists of facts and circumstances within the arresting officer's knowledge, and of which he or she has reasonably trustworthy information, that would warrant a person of reasonable caution to believe that an offense is being or has been committed and that the person to be arrested committed it.

**Instructor Notes:**




*Administrative Process*

ALL allegations of bias-based policing or profiling are classified as "M" Cases and referred to the appropriate Investigations Unit**

** Unless there is a corruption component (then the bias-based policing allegations are investigated by IAB as a "C" Case, and all allegations will be investigated thoroughly).

In order to be closed, Bias-Based Policing or Profiling Cases MUST be signed off by the Bureau / Borough Executive Officer of Administration (i.e., a one-star Chief or higher)

29

***Learning Outcome # 9***
*The Administrative Process*

## Administrative Process

All cases containing allegations of racial profiling or bias-based policing will be classified as a Misconduct Case and will be assigned to the appropriate Bureau/Borough Investigations Unit. However, if the case contains additional allegations that include allegations of corruption, then the case would be classified as a Corruption Case and IAB will investigate all of the allegations, including the allegations of corruption and racial profiling or bias-based policing.

**Instructor Notes:**
A stand-alone allegation refers to a circumstance where the only allegation made against the Officer is that enforcement action was initiated based on profiling or bias-based allegations.




## Investigative Protocol

**Allegation Intake Procedures**

- Initial Complaint/Phone Interview:
  - Allow Complainant to tell the complete story.
  - Probe for additional info; ask questions only after Complainant is done telling the story.
  - Question any inconsistencies.
  - While remaining empathetic, you **must** ask "Why specifically do you think the Officer stopped you because of your race (nationality, religion, sexual orientation, etc.)?"
  - Ensure all allegations are thoroughly explored.
  - Provide a summary of info back to the complainant.

33

***Learning Outcome # 10***
*Investigative Protocol*

### Investigative Protocol – Allegation Intake

There are many different strategies that can be employed regarding Racial Profiling and Bias-Based Policing allegations. We will take some time to hit some points in order to ensure that the investigation commences (and continues) in the right direction.

**Initial Complaint**: When interacting with a complainant regarding a Racial Profiling or Bias-Based Policing allegation, it is important to allow them to tell their side of the story without being interrupted with questions from the investigating officer. It is equally important for you to realize that when citizens feel they have been profiled, having their constitutional rights violated, they are often in an elevated emotional state which may make it difficult for them to explain what happened in a succinct, linear fashion. Also, we must be cognizant that not every person has the ability to communicate as clearly as others. As investigators, we must be aware that some disabilities and/or accents may make it difficult for some complainants to explain the details of their complaint. Always let the complainant tell the whole story, then ask additional questions that will help you understand the situation at hand.

**Instructor Notes:**
Distribute Internal Affairs Bureau Guide Procedure No.: 620-58: Processing and Investigating Complaints of Profiling and Bias-Based Policing.




You must be ready to ask the complainant detailed questions about why the complainant feels the officer's actions were motivated even in part by the complainant's race (or whatever protected category forms the basis of the alleged profiling). When asking these questions, bear in mind that people who have faced discrimination may also often have faced doubt and disbelief from others, particularly people who are not the same race or ethnicity, about what they experienced. If you suggest you do not believe them, this might cause them to distrust the Department or to question whether the Department is taking their complaint seriously. You should be cautious not to question a complainant in a way that suggests you doubt their allegations. Your goal is to get information to allow for a complete investigation into the incident.

Just as it is important to avoid "suggesting" that you do not believe the complainant, during the investigation, it is also important that you refrain from making a conclusion about the complaint prior to the investigation's conclusion. You must keep an open mind when evaluating all of the facts and evidence associated with the complaint. Making a premature judgment of the case could impact your ability to objectively view the evidence and impact your ability to adequately investigate the complaint.

Remember race/ethnicity/national origin cannot be a motivating factor for an enforcement action. Basing a decision to stop someone *in part* on the fact that the person is black, even when combined with other reasons, is impermissible profiling unless the person matches a detailed physical description of a black suspect in a reported crime. Individuals may not be targeted for any enforcement action, including stops, because they are members of a racial or ethnic group that appears more frequently in local crime suspect data. However, a stop of a person who matches the specific description of a suspect in a recently reported crime or series of crimes that includes not only race, age, and gender, but other information such as clothing description and a physical location is permissible.

For the other categories: gender, gender identity, sexual orientation, age, religion, disability, and housing status – ask the complainant why he or she feels that his or her membership in the category was the reason the officer took the law enforcement action.

**Instructor Notes:**




Other recommended questions for the complainant that often yield useful information include:

- What were statements made or actions taken by the officer during the encounter that may indicate bias? Statements could include not only slurs and patently biased statements but words purportedly neutral on their face that, in context, convey a meaning that may implicate discriminatory intent. Actions could include different treatment of other individuals of different races at the scene who were engaged in the same activity as the complainant or enforcement actions that are disproportionately intrusive/aggressive given the original basis for the encounter (e.g. searching the complainant's car for drugs during a routine traffic stop for an illegal right turn)
- Did the officer provide the complainant with a reason for the enforcement action taken, and, if so, what was the reason or reasons given by the officer?
- The complainant should also be asked either during the initial intake or follow-up interview to identify any and all documents, audio recordings, Body-Worn Camera and other video footage, and witnesses of which he or she is aware that may have information relevant to the allegations in the complaint.

Always provide a **verbal summary** of the complaint to the complainant at the conclusion of the phone interview. This step will ensure the message delivered by the complainant was clear and the interviewer understood all aspects of the complaint.

**Instructor Notes:**




Investigative Protocol
*Continued*

**Investigation Procedures**

Researching the Incident (Gathering Info)

- Review Department information databases.
- Obtain photo and/or video documentation if possible (including Body-worn camera footage)
- Canvass location for additional witnesses.
- Interview Complainant in person.
- Ask complainant to identify any witnesses, documents, video and audio recordings with information relevant to the incident
- Interview witnesses if applicable, including the officer's partner or other officers that responded to the location, if applicable.
- Review enforcement activity (Terry stops/arrest/summons) of accused MOS as well as his/her complaint history – look for patterns of bias/misconduct.

33

## Investigative Protocol – Researching the Incident

Make sure to gather and review all documents related to the incident. In addition to various Department reports, and the subject officer's activity log, consider Command Log, Activity Log, Interrupted Patrol Log, Telephone Communication Log, etc. as a source of information that may aid in the investigation. Furthermore, make yourself aware of any audio/video recordings or in-car or officer Body Worn camera recordings that might exist regarding the incident.

If the incident in question involved an arrest or summons, attempt to determine the final outcome of any related traffic, civil or criminal proceeding (e.g., decline to prosecute, dismissal of charges, conviction, acquittal, guilty plea) and the reasons for that outcome. The outcome of a case, however, is not determinative of whether racial profiling occurred. If a prosecutor has not declined to prosecute, the charges have not been dismissed, or a person pled guilty to an offense, racial profiling could still have occurred. Query of the ICAD and DAS Lite databases and any active crime pattern sheets in the subject officer's command at the time of the incident might supply a wealth of information and should be considered valuable options for investigatory purposes.

**Instructor Notes:**
Distribute a copy of DCIA 49 # 2015-015-71 for review, and engage the class in a discussion of directives key points.




The ICAD system and crime pattern sheets may help identify if there were any descriptions of suspects transmitted in regards to the location (or close proximity) and matching the make-up of the complainant. Reviewing these databases will help identify any action taken as a result of a radio run or other transmitted information. In other words: Was action taken as a result of a radio run or other transmitted information such as a Be On the Look Out flyers (BOLO)? What did the complainant look like in comparison to the description contained in the transmission?

We cannot stress enough that a description must be **more than** gender, age and race. If the description was only gender, age and race, and the officer did not indicate any basis other than description as motivating the action, this is a red flag.

Conducting a canvass of the involved location as soon after the incident as possible may enable you to identify additional witnesses as well as help you obtain photographic and visual documentation that could confirm or refute the allegation made.

All complainants and witnesses must be interviewed. There will be times when it is not possible to speak with a witness because, for example, you were provided with an incorrect address or contact information for the witness. You must make diligent efforts to locate and interview all witnesses. All attempts, whether they yield positive or negative results, must be recorded in the case notes.

**Instructor Notes:**




## Investigative Protocol
*Continued*

**Investigation Procedures**

Interviewing the Subject Officer

- Ask what were the reasons for the enforcement action(s) taken by the officer?
  - For conclusory responses like "officer safety", "high crime area," "drug prone location", "furtive movements", "uncooperative", "erratic behavior", or "consensual encounter," probe further for articulation of more specific details
- Make sure to ask the officer for the reasons for every enforcement action taken during the incident in question. DON'T STOP AT THE STOP.
- You **must** ask the Subject Officer "the complainant says you stopped him/her because of their…", "what is your response to that?".

37

## Investigative Protocol – Interviewing the Subject Officer

All subject officers must be interviewed. This includes cases where there is overwhelming evidence which strongly refutes the allegation, such as video or audio recordings.

Recommended Questions for Subject Officers that are likely to elicit useful information include:

What were the reasons for the enforcement action or actions taken by the officer?

For conclusory responses like "officer safety", "high crime area," "drug prone location", "furtive movements", "uncooperative", "erratic behavior", or "consensual encounter," probe further for articulation of more specific details.

NOTE: Make sure to ask the officer for the reasons for every enforcement action taken during the incident in question. So, for example, if the incident involved a Terry stop during which a frisk and search was conducted, ask the officer to specifically articulate

**Instructor Notes:**




the specific basis for the stop, the frisk and the search. Even if the initial stop was legally justified, the circumstances surrounding the frisk and/or search may suggest a racial motivation, as discussed above. In other words, DON'T STOP AT THE STOP.

Compare reasons provided by officer during interview with the reasons provided in the officer's written reports of the incident to determine if there are any significant inconsistencies. Such inconsistencies could be a red flag.

Review the location of the officer when he first encountered the complainant.

Was the complainant's race or other protected group (e.g., gender, age, religion, sexual orientation, etc.) a factor in the action taken by the officer? If yes, have the officer explain more specifically how race or other bias factor played a role in the officer's decision making.

In addition to the aforementioned questions, when interviewing the Subject Officer, you must ask the following question: "The complainant stated that you stopped him/her because of their…, what is your response to that?" Only ask this question after you have asked the officer to explain what happened during the incident in question. If the officer's answer conflicts with what the officer previously said happened, probe further, and note any inconsistencies between responses. .

**Instructor Notes:**




**Investigative Protocol**
*Continued*

Circumstantial Evidence

- Direct evidence of bias (e.g. slurs) are rare. Circumstantial evidence must also be considered. Not one element is indicative of bias-based policing – must look at the TOTALITY of the circumstances.
- Examples may include:
  - Inconsistent statements by officer – possibly contradicted by behavior or documented evidence (or a lack thereof)
  - Officer's history of biased conduct
  - Patterns or trends in officer's enforcement activity
  - No apparent legal justification for officer's enforcement action
  - Officer's more lenient treatment of a civilian of different race/ethnicity who engaged in same conduct as complainant

39

## Investigative Protocol – Circumstantial Evidence

It is important to note that direct evidence of bias or discriminatory motive on the part of the subject officer, such as an admission that he or she acted on the basis of the complainant's race or explicit statements indicating bias (e.g. slurs), will be rare. Circumstantial evidence may be available and should be considered such as:

**Officer's stated reasons for actions contradicted by his or her behavior.**
For example, if the officer says he/she stopped the complainant on suspicion of trespassing in a NYCHA building, which is a non-violent crime, because the officer observed the complainant enter the building without a key and then refused to tell the officer which apartment he was visiting, but then the officer frisked the complainant for weapons and/or sought consent to search him for drugs.

**Officer's stated reasons for actions given to investigator contradicted by reasons given earlier.**

**Officer's stated reasons for actions contradicted by documentary evidence, or a lack thereof.**
If the reasons given by the officer during the interview are contradicted or unsupported by documentary, audio or video evidence of the incident, including the officer's own written reports of the incident and/or footage on the officer's body worn camera or camera in his or her police vehicle.

**Officer's History of Biased Conduct** - A review of the Officer's CPI, including prior substantiated and unsubstantiated CCRB complaints and other civilian complaints, as well as lawsuits filed against him or her, and performance evaluations, may also reveal that he or she has engaged in similar biased behavior in the past. Although not conclusive evidence of bias conduct, an officer's history of biased conduct is strong circumstantial evidence supporting a finding of discriminatory motive or bias.




**Officer's more lenient treatment of a civilian of a different race who engaged in similar behavior as the complainant.** Recall that selective enforcement of the law is a form of biased policing prohibited by law and Department Policy. Evidence that the subject officer took enforcement action against the complainant but not against a civilian of a different race whom the officer also observed engaging in the same or similar behavior as the complainant can be strong circumstantial evidence of racial bias.

**NOTE ON RACE OF OFFICER**: The fact the subject officer is of the same race, gender, etc. as the complainant may be relevant but is not controlling. As the Supreme Court has noted, "because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." Castaneda v. Partida, 430 U.S. 482, 499 (1977).

It is important to note that DCIA 49 # 2015-015-71 identified the following key points:

- Racial Profiling and Bias-Based Policing cases must be a priority.
- Cases have been reviewed and it has been found that there are serious lapses regarding the investigation and the associated findings.
- Racial Profiling and Bias-Based Policing cases are to be thoroughly and expeditiously investigated.

NEW SLIDES: Allegation Findings – the new slides will be inserted here once finalized; however due to formatting of the lesson plan, they are currently at the end of the document.




Internal Investigations Course
Module 04 – Profiling and Bias-Based Policing

## Closing the Case

- At the conclusion of the investigation, the investigator must make a recommendation about the appropriate finding and disciplinary disposition for each allegation before closing the case.
- For each finding, this means that after a full and complete investigation and after considering all the evidence and information…

21

Module 04 – Profiling & Bias-Based Policing Internal Investigations Course 35




## Allegation Findings

- Substantiated - Credible evidence exists that the accused MOS committed the alleged act of misconduct and such credible evidence outweighs the evidence that the accused MOS did not commit the alleged misconduct.
- Unsubstantiated – There is insufficient credible evidence to prove or disprove the allegation.

22

If, after considering all the credible evidence, including that portion of the complainant's account found to be credible and including that portion of the officer's account found to be credible, the investigator finds that the credible evidence that the MOS committed an act of misconduct outweighs credible evidence that the MOS did not commit the alleged act of misconduct, the complaint is substantiated. If, after considering all the credible evidence, including that portion of the complainant's account found to be credible and including that portion of the officer's account found to be credible, the investigator finds that the credible evidence that the officer committed an act of misconduct does not outweigh credible evidence that the MOS did not commit the alleged act of misconduct, the complaint is not substantiated and may be found to be unfounded, unsubstantiated or exonerated, as the case may be.

The investigator may make these determinations solely on the basis of the credibility of the complainant's and member's accounts, even if there is no other credible corroborating evidence.

It may be helpful to provide some additional guidance to the investigators on the standard for a "substantiated" allegation:

To substantiate a profiling allegation, the evidence of the civilian complainant must be more convincing and persuasive to you than the evidence opposed to it. The difference in persuasiveness need not be great: it requires only that you find that the scales tip, however slightly, in favor of the allegation- that what the complainant claims is more likely than not true. If you find that the credible evidence as to a particular issue is evenly divided, then you must find in favor of the subject officer. What is important here is the quality and persuasiveness of the evidence, and not the number of witnesses or documents.




**Internal Investigations Course**
**Module 04 – Profiling and Bias-Based Policing**

## Allegation Findings (cont.)

- Exonerated – Credible evidence exists that the alleged conduct occurred but it was lawful and proper.
- Unfounded - Credible evidence exists that the alleged act of misconduct did not occur, or that the accused MOS did not commit the alleged act of misconduct and such credible evidence outweighs the evidence that the accused MOS did commit the alleged misconduct.

23

**Instructor Notes:**

**Module 04 – Profiling & Bias-Based Policing** **Internal Investigations Course** 37




## Challenges Faced

- Since 2014, there have been thousands of allegations of profiling against NYPD officers that have been investigated. These cases are hard and every one must be individually assessed and carefully investigated.
- Be aware of your own unconscious biases.

24

***Learning Outcome # 11***
*Challenges faced*

## Challenges Faced

We recognize that these investigations are challenging and that emotions can run high.

Furthermore, as investigators, you must be aware of your own unconscious biases and take steps to identify and interrupt them when they arise in the course of your investigations.

**Instructor Notes:**




## Commissioner O'Neill

- The NYPD achieved what many said was unachievable – making New York the safest big city in America – we have to acknowledge that we did so sometimes at the expense of vital support of some of the communities we swore to protect. We did so sometimes in ways that inflamed old wounds, especially among people of color. And those wounds run very deep….
- It is now our mission to do all we can to help heal those old wounds without re-opening them, and to gain through partnership a new level of public support and public action that achieves our common mission of public safety.
- Members of every community should feel they are understood by their police, and know they are treated fairly. We need all New Yorkers to view their police through a lens of trust."

41

### Commissioner O'Neill's Comments

In closing I would like to reiterate the statements made by Police Commissioner O'Neill regarding the departmental changes to the investigative encounter policy.

"The NYPD achieved what many said was unachievable – making New York the safest big city in America – we have to acknowledge that we did so sometimes at the expense of vital support of some of the communities we swore to protect. We did so sometimes in ways that inflamed old wounds, especially among people of color. And those wounds run very deep….

It is now our mission to do all we can to help heal those old wounds without re-opening them, and to gain through partnership a new level of public support and public action that achieves our common mission of public safety.

Members of every community should feel they are understood by their police, and know they are treated fairly. We need all New Yorkers to view their police through a lens of trust."

**Instructor Notes:**




## In Summary:

The instruction provided in this class will empower the participants to be able to:

1. Recite the Department's Prohibited Conduct policy regarding Racial Profiling and Bias-Based Policing.
2. Describe the protected categories of individuals
3. Explain what constitutes Racial Profiling and Bias-Based Policing.
4. Describe the different types of effects Racial Profiling and Bias-Based Policing may have on the community and law enforcement.
5. Explain what transpired in order for the Department to get to where we are.
6. Identify court ordered reforms and remedies
7. Explain initiatives instituted by NYPD's IAB
8. Articulate the four levels of Investigative encounters
9. Describe the administrative process for investigating racial profiling and bias-based policing allegations
10. Illustrate the strategies for investigating racial profiling and bias-based policing allegations
11. Understand the challenges of investigating allegations of racial profiling and bias-based policing

# ATTACHMENT 3



PROFILING AND
BIAS-BASED POLICING
POLICE
DEPARTMENT
CITY OF NEW YORK
IAB TRAINING UNIT
1

# Learning Outcomes

1) *Prohibited Conduct*
2) *Bias-Based Profiling Categories*
3) *What is Profiling and Bias-Based Policing*
4) *Effects of Profiling and Bias-Based Policing*
5) *How did we get here?*
6) *Court Ordered Reforms*
7) *NYPD IAB Initiative*
8) *Investigative Encounters – SQ&F*
9) *Administrative Process*
10) *Investigative Protocol*
11) *Challenges faced by investigators*

# PROFILING AND BIAS-BASED POLICING

## *Prohibited Conduct*

NYPD's Policy – Patrol Guide procedure 203-25

New York City Administrative Code Section 14-151

# PROFILING AND BIAS-BASED POLICING

**Protected categories include a person's actual or perceived:**

- Race/Color/Ethnicity/National Origin – Skin appearance, cultural heritage, and ancestry.
- Alienage/Citizenship Status – citizenship of any person or the immigration status of a person who is not a citizen of the USA.
- Gender/Gender Identity – Male or Female (born as such); Transgender; identifying oneself as opposite sex
- Sexual Orientation – Homosexual, heterosexual, or bisexual
- Age - Specific range (e.g., 18 to 21) OR ageism ("too old")
- Religion – Christian, Jewish, Muslim, Hindu, Buddhist, Atheist, etc.
- Disability – Law enforcement actions based upon any disability as defined in PG 207-10 Bias Motivated Incidents
- Housing Status – Homeless status and/or location of residence; use of public housing; use of a shelter system
- Other – Used when profiling concerned does not fit into the above categories, however, a citizen is singled out due to a non-physical characteristic such as type of vehicle driven, type of music playing, out of state license plate, etc.

# PROFILING AND BIAS-BASED POLICING

## *What is "Racial Profiling?"*

Racial profiling takes place when race, color, ethnicity, or national origin is used as a motivating factor for initiation of police enforcement action.

When an Officer's decision to initiate enforcement action against a person is motivated **even in part** by a person's actual or perceived race, color, ethnicity, or national origin that enforcement action violates Department policy unless the officer's decision is based on a specific and reliable suspect description that includes not just race, age, and gender, but other identifying characteristics or information.

# PROFILING AND BIAS-BASED POLICING

*What is "Bias-Based Policing?"*

An act of a member of the service that relies on actual or perceived race, national origin, color, creed, age, alienage or citizenship status, gender, sexual orientation, disability, or housing status as the determining factor in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that links a person or persons to suspected unlawful activity.

# PROFILING AND BIAS-BASED POLICING

*Local Crime Data*

It is also a violation of Department Policy to target individuals for any enforcement action, including Level 3 Terry Stops, because they are members of a racial or ethnic group that appears more frequently in local crime suspect data (PG 203-25)

# Selective Enforcement & Racially-Motivated Enforcement Actions

- Selective enforcement means an officer taking law enforcement action against a member of a particular race (e.g. writing a summons for an open container violation) but not against a member of another race who is engaging in the same illegal activity.
- The Fourteenth Amendment of the US Constitution prohibits selective enforcement of the law.
- Similarly, the Constitution prohibits the use of race, ethnicity or national origin as a motivating factor even if there is a separate justification (e.g. a traffic violation) that is used as a ruse for the racially-motivated action.

# Scenario

- During roll call for the 12X 8 tour in your precinct, the Platoon commander discusses the crime conditions for the past month in the precinct, which include a lot of street-level narcotics activity, particularly sale of marijuana, committed by Hispanic males in their late teens and early 20's. Later, around 0200 hours, while out on foot patrol with your partner, you observe four males, two Hispanic, one Asian and one white, in their late teens or early 20's, standing on the sidewalk and drinking what appear to be cans of beer, while a boombox held by the White male plays music very loudly. You approach the four males, confiscate the beers, and tell the white and Asian males to turn the music off and to go home, at which point the white and Asian males begin to walk away. You and your partners then ask the two Hispanic males for id and inform them you are going to issue them summonses for open container violations. They provide their ids, and while your partner is writing the summonses, you ask them if they have any marijuana on them. They say no, at which point you ask them if you can search their pockets, explaining that there have been reports of a lot of drug activity in the neighborhood.

# PROFILING AND BIAS-BASED POLICING

***Effects of Bias-Based Profiling:***

- On the individual citizens
- On the community
- On the Department

# PROFILING AND BIAS-BASED POLICING

*How did we get here?*

- In 2002, NYPD made approximately 97,000 stops. By 2011, the number had increased to 685,000 with 80% being black and Hispanic.
- Between 2008 and 2012 a series of cases were filed alleging that NYPD's use of SQF violated people's rights.
- In 2013, the court ruled that NYPD had violated the Constitution and ordered reforms.

# PROFILING AND BIAS-BASED POLICING

## How did we get here?

Video removed for emailing purposes.

ABC News, Nightline Report

# PROFILING AND BIAS-BASED POLICING

*Some of the Court Ordered Reforms*

- Revision of Department Patrol Guide procedures regarding stops, question , frisk, racial profiling and bias-based policing, and vertical patrols;
- Refine NYPD's practices for auditing stops and increase supervisor responsibilities;
- Refine NYPD's practices for investigation, discipline and monitoring of unconstitutional stops;
- NYPD's implementation of a Body-worn camera pilot program
- Changes to how the NYPD tracks and investigates civilian complaints of Racial Profiling

# PROFILING AND BIAS-BASED POLICING

*NYPD IAB Initiatives:*

- Track allegations in ICIS regarding bias-based profiling
- Enhanced training of bias-based policing for personnel assigned to IAB and Borough/Bureau Investigations Units
- Proper techniques regarding the classification and investigation of bias-based policing and profiling allegations.

# PROFILING AND BIAS-BASED POLICING

*Investigative Encounters:*

- Levels of the Encounter:
  - Level 1 – Request for Information.
  - Level 2 – Common Law Right of Inquiry.
  - Level 3 – *Terry* Stop
  - Level 4 – Arrest

# Administrative Process

ALL allegations of bias-based policing or profiling are classified as "M" Cases and referred to the appropriate Investigations Unit**

** Unless there is a corruption component (then the bias-based policing allegations are investigated by IAB as a "C" Case, and all allegations will be investigated thoroughly).

In order to be closed, Bias-Based Policing or Profiling Cases MUST be signed off by the Bureau / Borough Executive Officer of Administration (i.e., a one-star Chief or higher)

# *Investigative Protocol*

## **Allegation Intake Procedures**

- Initial Complaint/Phone Interview:
  - Allow Complainant to tell the complete story.
  - Probe for additional info; ask questions only after Complainant is done telling the story.
  - Question any inconsistencies.
  - While remaining empathetic, you **must** ask “Why specifically do you think the Officer stopped you because of your race (nationality, religion, sexual orientation, etc.)?”
  - Ensure all allegations are thoroughly explored.
  - Provide a summary of info back to the complainant.

# Investigative Protocol

*Continued*

## Investigation Procedures

Researching the Incident (Gathering Info)

- Review Department information databases.
- Obtain photo and/or video documentation if possible (including Body-worn camera footage)
- Canvass location for additional witnesses.
- Interview Complainant in person.
- Ask complainant to identify any witnesses, documents, video and audio recordings with information relevant to the incident
- Interview witnesses if applicable, including the officer’s partner or other officers that responded to the location, if applicable.
- Review enforcement activity (Terry stops/arrest/summons) of accused MOS as well as his/her complaint history – look for patterns of bias/misconduct.

# *Investigative Protocol*

*Continued*

## <u>**Investigation Procedures**</u>

### Interviewing the Subject Officer

- Ask what were the reasons for the enforcement action(s) taken by the officer?
  - For conclusory responses like “officer safety”, “high crime area,” “drug prone location”, “furtive movements”, “uncooperative”, “erratic behavior”, or “consensual encounter,” probe further for articulation of more specific details
- Make sure to ask the officer for the reasons for every enforcement action taken during the incident in question. DON’T STOP AT THE STOP.
- You <u>**must**</u> ask the Subject Officer “the complainant says you stopped him/her because of their…”, “what is your response to that?”.

# Investigative Protocol

*Continued*

Circumstantial Evidence

- Direct evidence of bias (e.g. slurs) are rare. Circumstantial evidence must also be considered. Not one element is indicative of bias-based policing – must look at the TOTALITY of the circumstances.
- Examples may include:
  - Inconsistent statements by officer – possibly contradicted by behavior or documented evidence (or a lack thereof)
  - Officer's history of biased conduct
  - Patterns or trends in officer's enforcement activity
  - No apparent legal justification for officer's enforcement action
  - Officer's more lenient treatment of a civilian of different race/ethnicity who engaged in same conduct as complainant

# Closing the Case

- At the conclusion of the investigation, the investigator must make a recommendation about the appropriate finding and disciplinary disposition for each allegation before closing the case.

- For each finding, this means that after a full and complete investigation and after considering all the evidence and information…

# *Allegation Findings*

- Substantiated - Credible evidence exists that the accused MOS committed the alleged act of misconduct and such credible evidence outweighs the evidence that the accused MOS did not commit the alleged misconduct.

- Unsubstantiated – There is insufficient credible evidence to prove or disprove the allegation.

# Allegation Findings (cont.)

- Exonerated – Credible evidence exists that the alleged conduct occurred but it was lawful and proper.

- Unfounded - Credible evidence exists that the alleged act of misconduct did not occur, or that the accused MOS did not commit the alleged act of misconduct and such credible evidence outweighs the evidence that the accused MOS did commit the alleged misconduct.

# Challenges Faced

- Since 2014, there have been thousands of allegations of profiling against NYPD officers that have been investigated. These cases are hard and every one must be individually assessed and carefully investigated.
- Be aware of your own unconscious biases.

# Commissioner O'Neill

- The NYPD achieved what many said was unachievable – making New York the safest big city in America – we have to acknowledge that we did so sometimes at the expense of vital support of some of the communities we swore to protect. We did so sometimes in ways that inflamed old wounds, especially among people of color. And those wounds run very deep….
- It is now our mission to do all we can to help heal those old wounds without re-opening them, and to gain through partnership a new level of public support and public action that achieves our common mission of public safety.
- Members of every community should feel they are understood by their police, and know they are treated fairly. We need all New Yorkers to view their police through a lens of trust."

# Review

1) *Prohibited Conduct*
2) *Bias-Based Profiling Allegations*
3) *What is Profiling and Bias-Based Policing*
4) *Effects of Profiling and Bias-Based Policing*
5) *How did we get here?*
6) *Court Ordered Reforms*
7) *NYPD IAB Initiative*
8) *Investigative Encounters – SQ&F*
9) *Administrative Process*
10) *Investigative Protocol*
11) *Challenges faced by investigators*

*??? ANY QUESTIONS ???*