# Ninth Report of the Independent Monitor

## Peter L. Zimroth

## January 11, 2019

*Floyd, et al. v. City of New York*
*Ligon, et al. v. City of New York, et al.*
*Davis, et al. v. City of New York, et al.*

# MONITOR TEAM

Peter L. Zimroth
Monitor

Richard Jerome
Deputy Monitor

Anthony A. Braga

Cassandra Chandler

Jennifer Eberhardt

Demosthenes Long

John MacDonald

James McCabe

Jane Perlov

James Yates

# TABLE OF CONTENTS

Page

I.    Introduction ................................................................................................1

II.   Policies ......................................................................................................2

     a.    Stop and Frisk ...............................................................................2

     b.    Stop Report Form ..........................................................................4

           1.    RISKS Reviews ................................................................6

     c.    Racial Profiling Policies ................................................................8

     d.    TAP Policies .................................................................................9

     e.    Patrol of NYCHA Properties .......................................................10

     f.    Trespass Crimes Fact Sheet (TCFS) ...........................................11

III.  Supervision ..............................................................................................11

IV.  Training ....................................................................................................14

     a.    In-Service SQF and Racial Profiling Training ...............................14

           1.    Content of the Training Materials ..........................................15

           2.    Rollout of Training .............................................................16

           3.    Observations of Training ....................................................17

     b.    Training for Newly Promoted Supervisors ....................................19

     c.    Basic Plainclothes Course ...........................................................19

     d.    Recruit Training ...........................................................................20

     e.    Housing One-Day Training ...........................................................21

     f.    Implicit Bias/Procedural Justice ..................................................21

     g.    FTO Training ................................................................................24

     h.    Training for 911 Operators ..........................................................24

V.   BWC ........................................................................................................25

     a.    Court-Ordered Pilot Program .......................................................25

     b.    Expansion of BWCs to Other Commands .....................................26

c.     PSA Quasi-Experiment for Housing Officers ....................................27

d.     Court-Ordered Pilot for Electronic Documentation of Level 1 and Level 2 Encounters and BWC Activation at Level 1 .......................................29

VI.     Performance-Evaluation System ............................................................29

a.     Description of New Performance-Evaluation System .........................29

b.     Assessment of the Performance-Evaluation System...........................32

VII.     Auditing ................................................................................................34

a.     Quality Assurance Division Audits ...................................................34

1.     Stop Report Audits ...................................................................35

i.     QAD Results...................................................................35

ii.     Monitor Review of QAD Results .................................37

2.     QAD Audits of BWCs Videos Associated with Stop Reports .................39

3.     Undocumented Stops.................................................................40

i.     RAND Audits .................................................................40

ii.     Audits of "Police-Initiated" Encounters......................42

iii.     TCFS Audits .................................................................43

b.     RAILS/Early Identification System ...................................................43

VIII.     Complaints and Discipline .....................................................................46

a.     Investigation of Profiling Allegations ...............................................46

1.     Outcomes of Profiling Investigations .......................................47

b.     NYPD Handling of Substantiated CCRB Cases..................................49

1.     DAO Request for Reconsideration of CCRB Recommendation .............53

2.     Reconsideration Request Data .................................................54

3.     NYPD Discipline and Penalties Imposed .................................57

4.     Other Misconduct Noted (OMN) .............................................61

IX.     Joint Remedial Process ..........................................................................62

X.     Conclusion .............................................................................................62

**Ninth Report of the Independent Monitor**

I.      **Introduction**

This is the ninth report of the Independent Monitor overseeing implementation of the court orders in the cases *Floyd v. City of New York*, *Ligon v. City of New York* and *Davis v. City of New York*.  The orders in the three cases require reforms related to stop and frisk, trespass enforcement (i.e., stops and arrests for trespass), and bias-free policing.  In these areas, the orders require changes in the New York City Police Department's (NYPD) policies, supervision, training, auditing, performance measurement, and handling of complaints and discipline.

In the last four years, much has been accomplished, although there are still challenges ahead and areas of reform that need work.  In sum, a substantial amount of training material has been developed and approved; body-worn cameras (BWC) will soon be deployed throughout the city and the evaluation of the monitor's pilot will soon begin; the Department has instituted a new performance evaluation system for patrol officers; and the Department has tested and instituted some improved auditing methods that better address the court-ordered reforms.

These and other positive developments will be described in more detail in the body of this report.  At the same time, the report will describe the persistent problem of underreporting of stops and the failure of supervisors to deal with that underreporting and the quality of the stop reports that are filed.  The monitor has been in discussion with the Department about these problems and about steps that can be taken to address and hopefully solve them.  These steps will be described in more detail below.

1

## II.   Policies

### a.  Stop and Frisk

The court's orders required that the NYPD Patrol Guide state what constitutes a stop, when a stop may be conducted, when a frisk may be conducted, and when a search may be conducted.

In August 2015, the court approved a new Patrol Guide section that included the NYPD's procedures on stop and frisk, P.G. 212-11, *Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops*.  The Patrol Guide also addresses investigative encounters between officers and civilians that are less intrusive than stops or arrests.  These encounters are governed by the New York State Court of Appeals decision in *People v. DeBour*,[1] which sets out four levels of encounters:  a simple Request for Information (Level 1); a Common Law Right of Inquiry (Level 2); a *Terry* stop, when an officer detains a person to investigate (Level 3); and an arrest (Level 4).  The investigative encounters procedures, P.G. 212-11, describe the standards that govern each level.

Since 2015, there have been several changes in P.G. 212-11.  In March 2016, the court approved changes to P.G. 212-11 to reconcile the procedures with the new stop report form. Additional changes were made when the stop report became electronic.  These were approved by the monitor and did not require further action by the court.

More recently, the Department proposed new changes to Patrol Guide 212-11 to comply with the recently enacted Right to Know Law (Local Law 54 of 2018 and Local Law 56 of 2018).  These laws require officers in certain nonemergency encounters to identify themselves by name, rank and command, explain the reason for the stop, and hand out business cards if no one is arrested or issued a summons.  They also require officers to inform people of their right not to

---

[1] 40 N.Y.2d 210 (1976).

consent to a search if consent would be necessary to perform the search. Officers must also document any consent to a search, either through a body camera, by writing, or both. On October 19, 2018, the monitor submitted the revised P.G. 212-11 for review, which the court approved on October 26.

To meet the requirements of the Right to Know Law, the Department has designed a business card that officers are required to offer to individuals at the end of most Level 2 and 3 encounters, as well as following other specified interactions. These pre-printed business cards contain the officer's name, rank, and shield number and a place for officers to write in their commands. On the back of the card is the URL for a new website (www.nyc.gov/police-encounters) that provides information on how to obtain body-worn camera footage, how to request a copy of a stop report, and how to make a complaint or comment regarding the encounter. This website has a link to an electronic form that allows a person to request a copy of a stop report by providing the date, time, and location of the stop.

The business card replaces two handouts the Department had been using: (1) the "What Is a Stop?" tear-off information card, required by the court order to be offered to persons who were stopped but not arrested or summonsed, and (2) the Contact Card, required to be provided to civilians who consented to a search after a Level 2 encounter. Plaintiffs' counsel agreed that the business card would be sufficient to meet the court's requirements, assuming that the NYPD responds timely to Freedom of Information Law (FOIL) requests. The NYPD has changed its procedures under FOIL, committing itself to a response within 10 business days. As stated on the website:

> Within 10 business days of receipt of your request, the NYPD will send out a copy of your Stop Report or a response indicating that there was no record found or insufficient information to find the Stop Report via US mail or email. In the alternative, you may go to One Police Plaza, room 110C, to obtain your Stop Report or a response that same day.

Along with the submission of the new P.G. 212-11, the monitor included a copy of the new business card for the court's information.  The business card is now being used in lieu of the "What Is a Stop" tear-off and the Contact Card.

### b.  Stop Report Form

The court orders require that the NYPD develop and implement a stop report form to be used by officers every time a person is stopped.  In March 2016, the court approved the NYPD's stop report form and in January 2017, the Department began using an electronic form that officers can fill out on their phones, on tablets, or on a computer at the command.

The stop report has two narrative sections:  one in which the officer states the reasons for the stop and a second in which the officer states the reasons for the frisk and the search, if conducted.  The stop report also has a section in which supervisors document the review required by NYPD policy (P.G. 212-11) and any follow-up action.  An officer's supervisor must confirm that he or she reviewed the constitutionality of the stop and discussed the facts of the stop with the officer.  The supervisor must check boxes indicating whether or not:  (1) the supervisor reviewed the encounter with the officer; (2) the report was accurate and complete; (3) the corresponding activity log entry was reviewed; (4) the supervisor was present on the scene; (5) there was a sufficient basis for the stop; and (6) there was a sufficient basis for the frisk or search, if conducted.  The supervisor must also note whether any corrective action was taken.

The Department proposed several changes to the stop report to comply with the Right to Know Law.  The proposed changes will require officers to state whether they asked the civilian for consent to be searched and whether consent was given.  Also, the officer will have to state whether the radio run was based on an anonymous source, an important factor in determining the level of authority an officer is legally allowed to exercise.  On October 19, 2018, the monitor

recommended to the court that it approve these changes, which recommendation was approved on October 26, 2018.

Although the stop report itself meets the requirements of the court order, there are two areas in which there are serious concerns regarding the Department's compliance with the court's requirements.  The first is an issue that the monitor has identified in several prior reports but has not yet been resolved:  the underreporting of stops.  In 2017, there were only 11,629 reported stops, while there are more than 22,000 patrol officers and sergeants.  The underreporting of stops has been acknowledged by the Department and by officers and supervisors in focus groups conducted by the monitor, and explicitly identified in audits discussed in Section VII below.  Any assessment of compliance with the court's remedial orders will be undermined if the NYPD's data are not accurate and complete.

Second, for reform to take hold, supervisors must take seriously their responsibility to review the constitutionality of stops.  At trial, the court found there to be pro forma approval of stops, meaning that there was no substantive supervisory review of the constitutionality of stops.  Although the forms and the policies for supervisory review are now in place, it is not clear that supervisors are meeting their responsibilities.  For the fourth quarter of 2017, out of 1,909 recorded stops reviewed by the Quality Assurance Division (QAD), only eight supervisors noted on the stop reports that the report failed to articulate reasonable suspicion.  For these same stop reports, QAD found that 496 (26%) did not articulate reasonable suspicion for the stop and 191 (10%) did not articulate reasonable suspicion for the frisk.  Similarly, in the first quarter of 2018, QAD evaluated 1,838 stop reports and found that 423 did not articulate reasonable suspicion for the stop, but only eight reviewing supervisors indicated on the stop reports that the reports failed to articulate reasonable suspicion.  In the second quarter of 2018, QAD determined that 326 stop reports of the 1,850 stop reports evaluated did not articulate reasonable suspicion, but reviewing

supervisors noted this same determination on only 10 reports.  This issue is discussed further in Supervision, Section III below.

It is clear that officers who do not submit stop reports after a stop and supervisors who do not adequately review those that are submitted are violating the Department's own stated policies.  It is equally clear that those statements of policy are not getting the job done.  The monitor has urged the Department to emphasize the need for compliance by instituting a process similar to Compstat in which commanding officers and other senior command officials are questioned about compliance, a light is shined on both poor performance and superior implementation, and those senior officers are expected to discuss ways to improve the performance of their subordinates.  The Department agreed to put such a process in place.  The NYPD's ideas for such a program are described in more detail below.

### 1.  RISKS Reviews

The NYPD has developed a plan that they label "RISKS (Remediation of Identified Situations Key to Success) Reviews" based on the monitor's suggestion.  Senior Department officials initially expressed some concern that a meeting focusing on underreporting might be misinterpreted to suggest that the NYPD wanted more stops.  At the same time, there was a belief that a regular periodic meeting on command-level compliance issues could be extremely beneficial.

As the plan for the meeting began to take shape, the Department decided that the meeting could also serve as a forum in which other identified issues of risk (those issues or situations which might be interfering with success) might be brought to light for evaluation.  One such issue is compliance with policies regarding the use of BWCs, including topics such as proper activation and deactivation and categorization and tagging of videos.  As this meeting becomes

6

part of the regular business of the Department, each command will designate a liaison with the Risk Management Bureau (RMB) to facilitate communications regarding issues of risk.

With respect to the protocols for the RISKS review meetings, each command will be brought in for a RISKS review at least twice a year. Underperforming commands will be brought in on a more frequent basis. At least three commands from the same borough will engage in the Review on a single day. During the period between meetings, relevant statistics (including those generated through self-inspections) will be generated for all commands, with rankings of boroughs and commands included. The first RISKS Review meeting occured in mid-December 2018. The meeting was convened by the First Deputy Commissioner, and he will be in attendance for at least a few of the early meetings as his schedule permits. RMB will review the results of that first meeting, make necessary changes, and then begin weekly meetings beginning in January 2019.

The meetings will be chaired by the Deputy Commissioner for Risk Management and co-chaired by the Chief of Strategic Initiatives. Required attendees from each command will include the Commanding Officer, the Executive Officer, the Integrity Control Officer, and the Training Sergeant. Members from the appropriate Patrol Borough will attend, as will representatives from both the Chief of Department's Office and the operational bureau under review (Patrol, Housing, or Transit).

With regards to Level 3 stops and BWC usage, the purpose of the RISKS review is to ensure compliance with the requirements pertaining to the preparation and supervisory review of stop reports and the activation of BWCs, not to seek an increase in police activity or stops. That message will be emphasized throughout the meeting itself, as well as during the preparation for the meeting. The review will be interactive in nature, with the chairs of the meeting eager to

hear from the attendees about potential barriers to full compliance in the areas of stops, trespass enforcement and BWC usage, as well as other risk issues faced by the command being reviewed.

The meeting will focus on statistics to be drawn from several Department sources, including specific self-inspection assignments drawn from events within the preceding month. It will also include an invitation to Commanding Officers to bring BWC examples of exemplary behavior by officers within the command.

Before a precinct has its first RISKS review meeting, RMB will undertake RISKS training for the attendees. This training will include an explanation of the RISKS reviews that will be held, a review of Patrol Guide requirements relative to stops, trespass enforcement and BWC recording, a discussion of possible strategies to gain further compliance with applicable Patrol Guide requirements, an explanation of the upcoming pilots, and a discussion of additional risks that may need to be addressed.

In addition to data relating to stops and BWCs, there are many other data points important to assess at the command level. These are currently being tracked and assessed in a piecemeal fashion. The RISKS Review has the potential to bring all this disparate data together to present a picture of the overall health of an individual command. A command report card will be completed and maintained, which will, at a high level, give an overview of current and past compliance, as well as compliance trends. The report card will call out the degree of compliance in designated areas and will compare compliance in a command with other commands in the borough and citywide. Aggregate data will be presented to the relevant operational bureaus as well as to the Chief of Department and Police Commissioner.

### c.   Racial Profiling Policies

The NYPD's policy barring racial profiling and other bias-based policing, P.G. 203-25, was approved by the court on August 24, 2015. As with the Department's stop and frisk policy,

substantial compliance regarding the racial profiling policy also requires that Department personnel be trained on the policy and that the Patrol Guide section be followed in practice. Training on the Department's racial profiling policies is part of the in-service training on stops and frisks.  *See* Section IV.a below.  The monitor will also be assessing the Department's compliance with its racial profiling policies and the Fourteenth Amendment through statistical analyses of NYPD's stop and frisk data.

### d.  TAP Policies

In June 2016, the court approved the new NYPD procedures for interior patrols in buildings enrolled in the Trespass Affidavit Program (TAP), P.G. 212-59, a program in which police officers conduct interior patrols in certain private apartment buildings.  The NYPD published a new P.G. 212-59 in April 2017 and conducted roll call training on interior patrols in TAP buildings in June and July 2017.  Stops inside and outside TAP buildings must comply with the NYPD's stop and frisk policies, P.G. 212-11.  In addition, P.G. 212-59 states that "mere presence" in a TAP building, or entry into or exit from a TAP building, does not constitute an "objective credible reason" for a *DeBour* Level 1 approach and request for information, nor does it constitute reasonable suspicion for a Level 3 *Terry* stop.

The Department also revised Administrative Guide 303-27, setting out the requirements and procedures for entry into the TAP program.  In order for a building to be enrolled in the program, the owner must certify concerns regarding criminal activity or community complaints in the building, such as trespassing or drug activity within the last year.  Crime prevention officers in each precinct are responsible for enrolling the buildings in the TAP program and then must assess every six months whether the buildings still meet the criteria for renewing enrollment.

In May 2018, the Department briefed the monitor team and counsel in *Ligon* on efforts to implement the new administrative procedures for the TAP program.  The Risk Management Bureau met with the crime prevention officers in each Patrol Borough to review the new criteria for enrolling and renewing buildings in the TAP program.  Each precinct then determined whether buildings already enrolled should remain in the program.  As of the first quarter of 2017, 3,591 buildings were enrolled in the TAP program; by the first quarter of 2018, only 1,174 buildings remained in the TAP program.

The monitor also met with the NYPD and *Ligon* plaintiffs in 2018 regarding what steps the monitor will take and what data the monitor should review in monitoring and reporting on the *Ligon* settlement agreement, filed in July 2017.  Attached as Appendix 1 is the *Ligon* Monitoring Plan, which sets forth the steps needed, including monitoring and reporting, to ensure compliance with the *Ligon* settlement.  The monitoring plan is still being finalized and the attachment is the current draft.  Future reports will include assessments of the Department's efforts to comply with the provisions of the *Ligon* settlement agreement.

### e.  Patrol of NYCHA Properties

The settlement in *Davis v. City of New York* required a new Patrol Guide provision for the interior patrol of NYCHA buildings (P.G. 212-60).  As with the procedures for TAP buildings, the procedures for NYCHA buildings state that "mere presence" in a NYCHA building is not an "objective credible reason" for a Level 1 request for information, nor does it establish reasonable suspicion for a Level 3 *Terry* stop.  P.G. 212-60 also states that arrests for trespass in restricted areas, such as roofs or roof landings, must be made with appropriate notice (e.g., through a conspicuously posted sign).  The revised policy for interior patrols of NYCHA buildings became effective on April 25, 2017.  NYPD officers viewed videos explaining the revised policies at roll calls in July, August, and September 2017.  In addition to roll call

training, the NYPD and the *Davis* plaintiffs are working to develop a one-day training for Housing officers, discussed in Section IV.e below.

**f.  Trespass Crimes Fact Sheet (TCFS)**

The settlements in *Davis* and *Ligon* require officers making trespass arrests in NYCHA and TAP buildings to document the arrests on a new form-the Trespass Crimes Fact Sheet (TCFS).  Officers must provide information about what led them to approach the person and what led them to believe that the person was a trespasser.  Since May 2017, the NYPD has used the court-approved TCFS for all trespass arrests in both NYCHA buildings and TAP buildings.

## III.  Supervision

As we have stated in past reports, for the changes required by the court to take hold, supervisors of officers on the street must embrace the changes and be responsible for the officers in their charge.  Sergeants and lieutenants must oversee and coach their officers and precinct and unit commanders must set the right direction and tone.  These supervisors must ensure that the stops, frisks, and trespass arrests made by their officers are legal and proper and that these activities are properly documented.  This means they must take an active role in supervision, oversight, teaching, and, when appropriate, discipline.

The changes to NYPD policy and reporting requirements set out these responsibilities. Patrol Guide 212-11 requires documentation of all stops and establishes the responsibilities of supervising officers up the chain of command.  Supervisors are required to respond to the scene of stops when feasible, discuss the circumstances of the stop with the officer making the stop before the end of the officer's tour, and review the officer's stop report form and activity log.  If a stop report is inaccurate or incomplete, the supervisor must direct the officer to make the necessary corrections.  If the supervisor determines that the officer did not have reasonable suspicion for the stop, reasonable suspicion for the frisk, or an appropriate basis for the search,

the supervisor must document that and specify an appropriate follow-up:  instruction, additional training, or, when warranted, discipline.

The new responsibilities of supervisors to ensure that their officers' actions are constitutional are among the most significant changes in the daily operations of the NYPD relating to this monitorship.  For this reason, and because it made sense to train supervisors before their officers were trained, sergeants and lieutenants were the first to have the comprehensive one-day stop and frisk training, discussed in Section IV.a below, which included several sections on the responsibilities of supervisors.  Although the NYPD has put in place the right policies and training, it appears that many supervisors have not yet embraced their leadership roles.

When the new stop report was first implemented, many supervisors signed the reports but failed to complete the supervisory review section of the form.  Even when the form was filled out, it was often apparent that the review was perfunctory and done by rote.  When the stop report went electronic, the new system prevented supervisors from completing and submitting the stop report without answering the supervisory review questions.

However, to date, there are still very few instances in which supervisors are noting on stop reports an insufficient basis for the stop, frisk, or search and identifying corrective action. Chart 1 below shows the following for the fourth quarter of 2017 and the first and second quarters of 2018:  the number of stop reports that QAD audited; the number of stop reports in those audits that QAD determined did not articulate reasonable suspicion (RS) for the stop; and the number of those same stop reports that the reviewing supervisor determined did not articulate reasonable suspicion for the stop.  The chart also compares the number of stop reports that QAD determined did not articulate reasonable suspicion for the frisk, if conducted, with the number of reports for which the supervisors found no reasonable suspicion for the frisk, and a similar

comparison of QAD's and the supervisors' determinations regarding the number of stops reports that did not articulate a basis for the search, if conducted.

**Chart 1.  Supervisory Actions on Stop Reports**

| Quarter | # Stop Reports Audited by QAD | # QAD Determined No RS for Stop | # Reviewing Supervisor Determined No RS for Stop | # QAD Determined No RS for Frisk | # Reviewing Supervisor Determined No RS for Frisk | # QAD Determined Search Not Justified | # Reviewing Supervisor Determined Search Not Justified |
|---|---|---|---|---|---|---|---|
| 4Q2017 | 1909 | 496 | 8 | 108 | 3 | 27 | 0 |
| 1Q2108 | 1838 | 423 | 8 | 102 | 4 | 29 | 0 |
| 2Q2018 | 1850 | 326 | 10 | 87 | 4 | 60 | 3 |

Although very few supervisors identifyied deficiencies on the completed stop reports, the NYPD has noted that supervisors have sent a significant number of stop reports back to the officers for corrections before they signed off on the reports.  Of the 4,176 stop reports audited by QAD in the first three quarters of 2018, the NYPD reports that 1,574 (38%) were initially rejected by a supervisor and sent back to the officer for revision.  Of the 9,324 reports completed in the first three quarters of 2018, 2,410 (26%) were sent back to the officers for correction.  However, the NYPD has not yet reported how many of those corrections related to the officers' articulation of reasonable suspicion for the stop or frisk or basis for the search, or instead were corrections for other reasons (e.g., typos or failure to complete other unrelated fields in the report).  The monitor team will continue its examination of supervisors' actions on stop reports to see whether there are improvements.

The Department has created a protocol to correct supervisors who repeatedly approve deficient stop reports.  Supervisors who have approved multiple stop reports that QAD determined to be deficient will be scheduled to take the in-service investigative encounters training if they have not already attended that training.  Those who have already received the training will be sent to a smaller refresher class.  Supervisors who have approved more than a

certain number of deficient stop reports will have their stop reports and other paperwork reviewed with a greater level of scrutiny.  They also will receive one-on-one training from an attorney in the Department's RMB aimed at the specific deficiencies that have been identified.

## IV.    Training

In the four years of the monitorship, the Department, the plaintiffs' counsel, and the monitor team devoted countless hours developing training materials required by the court orders and stop and frisk policies.  To date, the following training courses have been approved by the court:

> In-Service Stop and Frisk and Racial Profiling Training for Police Officers
> In-Service Stop and Frisk and Racial Profiling Training for Supervisors (Sergeants and Lieutenants)
> Training for Newly Promoted Supervisors
> Basic Plainclothes Training
> Recruit Training – Policing Legally
> Recruit Training – Policing Impartially
> Recruit Training – Interior Patrol (NYCHA and TAP buildings)

Several other training courses are being developed.  These, as well as the ones already approved by the court are discussed below. The current version of the approved training materials may be found at http://nypdmonitor.org/training/.

### a.   In-Service SQF and Racial Profiling Training

Patrol officers and supervisors are required to attend training annually to refresh their knowledge about important policing issues, to teach them about new developments in law, policy or police procedure, to impart specialized knowledge about particular areas of concern (e.g., dealing with emotionally disturbed people), to keep skills sharp (e.g., the use of weapons or other uses of force), and to talk about policies and practices that the Department thinks need emphasis. In the court's remedial order, the court identified certain incorrect statements in training materials that needed to be changed.  959 F. Supp. 2d 668, 679-680 (S.D.N.Y. 2013).

When the parties examined the Department's in-service training, however, it became apparent that there needed to be a significant overhaul beyond making the corrections noted in the court order. If the Department was going to spend the considerable resources needed to retrain roughly 22,000 patrol officers and supervisors, it was advisable to take a deeper look at not just the legal content of the materials, but whether they were best designed to engage the officers and convey the desired lessons.

### 1.  Content of the Training Materials

The training materials cover the fundamental principles of stop, question, and frisk, trespass enforcement, and bias-free policing.  Opportunities for discussion about the role of race in investigative encounters are included in several places.  The materials describe the difference between the constitutionally permissible use of race based on a specific, reliable suspect description and the constitutionally impermissible targeting of racially defined groups for stops. The materials also effectively convey the changes in NYPD procedures governing investigative encounters and interior patrols, as well as what is expected of officers and supervisors regarding the documentation and supervision of stops and trespass arrests.  In sum, the training materials meet the requirements of the court orders.

The class begins with a short written quiz (taken anonymously) about the law of stop, question and frisk.  In pilot classes, the quiz served its purpose of showing the class that there are misunderstandings about the law and NYPD procedures.  Attendees then see an important statement by the Police Commissioner that explains how the training grew out of the stop and frisk litigation, how the overuse and misuse of stop and frisk harmed both the Department and some of the communities it serves, that the responsibility for this misuse rests with the leadership of the Department, and that the Department now owes its members a comprehensive training

course so they understand what, under the law and Department procedure, they can and cannot do.  The video can be seen at http://nypdmonitor.org/resourcesreports/training.

An attorney from the Department's RMB or from a local District Attorney's office and uniformed members of the service then co-teach an interactive class on the law and procedures regarding investigative encounters.  The NYPD has added additional material covering the new Right to Know Law.  Just before the meal break, there is a SurveyMonkey quiz that officers complete anonymously on their smartphones to examine whether the content of the class was absorbed by those in attendance.

For the supervisors' course, the content of the post-meal session includes discussions of video footage from NYPD BWCs with a focus on sergeants' and lieutenants' role as supervisors, particularly with regard to how to supervise stops and how to discuss stop reports with their subordinates, and the need to ensure proper documentation of all stops.  For the officers' training, the post-meal session includes reviews of BWC footage involving investigative encounters, after which the instructors discuss both good and bad examples of stop reports for those encounters.  The Department has included two BWC videos of self-initiated stops to use during the post-meal session.  The NYPD also added a section on procedural justice in the post-meal session.

### 2.  Rollout of Training

The Department determined that supervisors would be trained first so the training can cover additional material on supervisory responsibilities.  On December 5, 2017, the court approved training materials for NYPD's in-service training on Investigative Encounters for NYPD supervisors (sergeants and lieutenants).

The Department began training its patrol officers in February 2018 to pilot proposed changes to the training materials.  After the training materials were revised to address Right to

Know Law issues, the stop and frisk course for patrol officers was submitted for court approval on June 25, 2018 and was approved by the court on July 10, 2018.  More than 22,000 members of the service will go through the training, which is being held at the Tactical Village at Rodman's Neck.  To increase the effectiveness of the training, each class is limited to 30-35 officers or supervisors.  The training is taught every weekday and is taught on both the day (7x3) and evening (3x11) tours.  As of November 28, 2018, approximately 11,000 police officers and detectives and 4,100 sergeants and lieutenants have gone through the training.  The NYPD estimates that it will take up to 18 months for the bulk of its patrol officers and supervisors to take the training.

### 3.  Observations of Training

Since January 2018, the monitor team has observed numerous classes of both supervisors and patrol officers.  Plaintiffs' counsel also have attended training classes.  The monitor team and plaintiffs' counsel have shared with the Department observations and views about the course materials, the way the materials have been presented, and the course instructors.

The monitor team discussed with the Department particular aspects of the training observed in individual classes attended.  Time management was one issue raised, as the legal refresher before the meal often went over the time allotted, which meant that the time available for discussion of scenarios, BWCs, documentation, and supervision was shortchanged.  As a result, Police Academy instructors are monitoring the classes to keep them on time, ensuring that scheduled breaks and meals end on time and that there are time limits to cover each section of the materials.  Based on suggestions from the monitor team, the SurveyMonkey questions also were reviewed by the NYPD and modified to make them clearer.  The goal was to make sure that if there continue to be problems with officers getting the correct answers, that would not be due

to confusing wording of the questions. The instructors could then be more confident that they know what issues need more focus in the training.

The monitor team also raised more general concerns. Standards for evaluation of instructors and for the effectiveness of the classes needed to be established. Clear standards and expectations for instructors would ensure that the course's themes are consistently addressed in the same manner. The NYPD had not been tabulating the results of class evaluations of the effectiveness of the classes and of the instructors to spot trends and monitor the success or failure of the course, and to identify areas or instructors that require additional focus or improvements. After meeting with the monitor team, the Department developed a plan for evaluation of the training. Items that the Department is considering in its evaluation of the training include:

- Class attendees now complete an "Investigative Encounters–Training Evaluation" form at the end of the class. Feedback from these evaluation forms is assessed and incorporated into quarterly reports. Results from these forms can be used to identify topic areas where the training can be improved. In addition, comments from class attendees can provide insight into instructors who may require additional coaching. Questions regarding an overall assessment of the course and any weaknesses can be a guide for areas requiring additional attention.

- The NYPD will be preparing periodic reports of an analysis of the results of the Training Evaluations, especially noting those instructors receiving above-average comments or out-of-norm positive/negative scores, as well as other recurring themes that may be indicative of the need for training improvements.

- The results of the SurveyMonkey quiz at the end of the class, which tests attendees' knowledge of the material, will be tabulated as a means of monitoring training impact. These results will be incorporated into quarterly reporting and scores in those question areas that are below average will be specifically noted.

The NYPD began implementing its training evaluation system in September 2018 and the first quarterly report will be available to the monitor in January 2019.

### b.  Training for Newly Promoted Supervisors

Training materials for newly promoted sergeants and lieutenants were submitted to the court by the monitor on February 22, 2018 and approved by the court on March 27, 2018.  A principle focus of this training is the expanded responsibilities of supervisors, particularly sergeants, under the new Patrol Guide procedure for investigative encounters and specifically with regard to the stop report.  The format of the training has been changed to encourage class participation and is similar to the in-service training described above for incumbent sergeants and lieutenants.

### c.  Basic Plainclothes Course

The NYPD conducts a three-day training course for officers who will be starting as plainclothes officers, including officers who will be joining a precinct-based anti-crime or conditions unit, or any other unit that works in plainclothes.  It is important to ensure that these officers get training on stop and frisk policies, because their work often involves actively seeking to detect and apprehend suspects and because they are making a significant proportion of the NYPD's reported stops.  The basic plainclothes course deals with tactical mindset, knowledge of the law and defensive tactics, among other necessary skills.  The monitor team conveyed to the Department the view that there should be greater emphasis on integrating the teaching of these skills.  Officers in plainclothes assignments must have a good knowledge of the law and how to use this knowledge and understanding of interpersonal dynamics to do their jobs more effectively and more safely, while at the same time protecting the rights of those encountered.

Together with the monitor team and the plaintiffs, the Department worked on revisions to sections of the training dealing with investigative encounters.  Among other things, the materials were revised to be consistent with the training on investigative encounters being taught to the patrol force.  BWC videos involving plainclothes officers were added to the training to

demonstrate some of the main teaching points. The parties agreed to these changes, and the monitor recommended approval by the court. The court approved the training on August 14, 2018.

### d. Recruit Training

Training materials for Police Academy recruit classes on stop and frisk, racial profiling and interior patrols for TAP and NYCHA buildings were rewritten and approved by the court in April 2015. The materials for these courses were revised when new NYPD policies were approved (e.g., P.G. 212-11, Investigative Encounters), and in response to continued review by the parties and the monitor team. The course on investigative encounters (titled Policing Legally) was updated to reflect the electronic stop report form. The course on interior patrols of TAP and NYCHA buildings was updated to reflect the new procedures governing those topics, P.G. 212-59 and P.G. 212-60.

In 2018, the parties agreed on additional changes to the Policing Legally recruit materials. The primary purpose of these changes was to ensure consistency with the in-service investigative encounters training that is currently being taught at Rodman's Neck to incumbent officers. One significant change was the addition of BWC videos as a tool to review each level of investigative encounter. Information regarding the requirements of the Right to Know Law was also added to this curriculum. The revised Policing Legally training materials were submitted to the court on July 25, 2018 and approved on August 14, 2018.

In May and July 2018, the monitor team and plaintiffs' counsel observed recruit classes and provided feedback to the NYPD. All of the instructors observed by the monitor team did a very good job presenting the material. There was a common theme of "community partnership" across many of the recruit training classes observed. Each instructor, regardless of the class topic, focused the discussions on a few policing themes:

- Watchman–We police to make people be and feel safe.

- Law–We police legally.

- Service–We police to help people solve problems–We use discretion when determining to arrest ("*If you find somebody having a bad day, make it better*").

These expectations were interwoven in classes on Interior Patrols, Policing Legally, Policing Impartially, and Policing in a Multicultural Society.

### e.   Housing One-Day Training

The Department is working on an additional day of in-service training that will be provided to all Housing officers.  This training will be in addition to the roll call training on the revised Patrol Guide section 212-60 and the in-service stop and frisk training.  The additional one-day training for Housing officers will include instruction on P.G. 212-60 (interior patrols) and on NYCHA house rules, and officers will role-play scenarios designed to illustrate how the law of investigative encounters applies when the officers are engaging in interior patrols in NYCHA buildings.  Many of the questions raised by the training materials issues have been resolved.  The monitor has scheduled a series of meetings with the parties and the monitor team to discuss the remaining issues.

### f.   Implicit Bias/Procedural Justice

In February 2018, the Department began a one-day training program addressing implicit bias and procedural justice that over the course of the next two years will be taught to all 36,000 uniformed members of the service, including those at the highest levels of the Department (e.g., the Commissioner, the First Deputy Commissioner, and all the commanding officers of the precincts and other commands).  This is an ambitious and worthwhile effort.

"Implicit bias" is the concept that describes the automatic, unconscious association people make between groups of people and stereotypes about those groups, which are beyond

their control and arise from the environment (neighborhood, family, friends, media, etc.) in which they grew up, live, and work. "Procedural justice" is a phrase used to describe the necessity of treating civilians and other members of the service with respect, listening to them and explaining officers' actions. The training will include discussion of the history of New York City and the NYPD, and how that history relates to legitimacy and procedural justice both within the Department and in the communities being policed. The point of the training is to make officers more aware of what those biases are so that they do not interfere with the officers' law enforcement functions.

The NYPD contracted with an outside vendor, Fair and Impartial Policing (FIP), http://www.fairimpartialpolicing.com/, to create the training materials and teach the course. Specific sessions of the training are tailored to particular audiences depending on whether they are senior executives, mid-level managers, supervisors, or police officers. The NYPD also conducted train-the-trainer sessions for instructors at the Police Academy who began presenting the training for recruit officers in August 2018. Members of the monitor team observed the material being taught by FIP instructors to senior executives of the Department. Jennifer Eberhardt, a member of the monitor team and one of the leading experts in the country on implicit bias in the law enforcement context, reviewed the training materials and provided feedback and suggestions for edits to the NYPD and FIP. Based on that input, the training materials were revised and improved. The monitor team and plaintiffs' counsel also observed FIP instructors presenting the full day of training and provided feedback.

In an email to all NYPD members in February 2018, as the training was getting rolled out, Commissioner O'Neill laid out the goals of the training:

Beginning this week and continuing through 2019, all uniformed members will take part in training that raises awareness and teaches the science behind implicit bias. It's a topic

that's been widely discussed for decades, and training like this is happening at law enforcement agencies across the nation.

While this training highlights the implications of bias-free policing for us in New York City, I want you to know:  The lessons you'll learn are not unique to the NYPD or even to the broader policing profession.   Understanding how perceptions can impact performance has relevance to a wide range of vocations, including the business world, the legal and medical professions, and more.  But we're cops, and we owe it to ourselves and to the people we serve to keep current with the latest training available.

The goal of this training is to help us understand our attitudes, and how to best use our judgment, experience, and intelligence to be as effective and safe as possible.  And that's what it's all about: fighting crime and keeping people safe–including ourselves.

In the last few years, we've made unprecedented gains in how we safeguard New York City.  Now, your challenge is to build on those accomplishments, because there's still more work to be done for us to achieve true legitimacy in the eyes of every New Yorker.

A significant area of discussion between the monitor team and the NYPD has been the issue of an evaluation of the FIP training.  Although implicit bias training for police officers, and the FIP training in particular, has been conducted throughout the country, there have not yet been any systematic scientific evaluations of the training.  The NYPD has been working with the IACP-University of Cincinnati Center on Police Research and Policy and with the Finn Institute for Public Safety at SUNY Albany to evaluate NYPD's implicit bias training of patrol officers.  The evaluation is designed to determine the effectiveness of the training in raising officers' awareness of and knowledge about unconscious bias and providing officers the skills to manage their own unconscious biases, and thus, it is hoped, reducing the disparities in enforcement actions against various racial and ethnic groups.

Several members of the monitor team (Anthony Braga, John MacDonald, Jennifer Eberhardt, and James McCabe) have assisted the IACP-UC Center and the Finn Institute researchers in developing the evaluation plan, including by helping develop the research design for the evaluation and helping identify the metrics to be used in evaluating the training.

One part of the evaluation design is a pre-training survey to be taken by officers on the day of their FIP training, and a similar post-training survey taken by other officers to be administered at the end of the day of FIP training.  Both versions include a common set of items designed to measure officers' knowledge of and attitudes toward implicit bias.  The post-training survey includes, in addition, questions on the trainees' assessment of the value of the training and the likelihood that they would apply the FIP skills.  The researchers will assess the immediate impacts of FIP training on officers' knowledge and attitudes through direct comparisons of pre- and post-training survey responses.  The researchers also plan a follow-up survey in 2019 to assess officers' knowledge of and attitudes toward implicit bias, just as the training-day survey does, so that they can assess decay in training effects.

### g.  FTO Training

The training for Field Training Officers (FTOs) has been revised to reflect similar changes to the in-service investigative encounters training.  In addition, BWC videos have been added to the training and the PowerPoint presentation has been made more engaging.

### h.  Training for 911 Operators

Training materials instructing 911 operators how to handle calls from anonymous callers were developed by the NYPD in 2018, were circulated to the parties, and are in the course of being delivered.  Under *Florida v. J.L.*,[2] information from an anonymous caller generally does not provide reasonable suspicion for an officer to stop someone.  The main purpose of this training is to ensure that 911 operators are able to gather and provide officers with sufficient information that the officers know whether or not they have the authority to make a Level 3 stop.

---

[2] 529 U.S. 266 (2000).

V.      BWC

    a.  Court-Ordered Pilot Program

    The NYPD launched the BWC pilot program in April 2017; by November 2017, there
were approximately 1,200 officers in 20 pilot precincts wearing cameras for a one-year period
(see the table below).  Those 20 precincts were matched with 20 precincts where officers were
not wearing cameras in a randomized control trial.  The goal of the pilot program is to assess the
costs and benefits of deploying cameras and whether deployment would result in reducing
unconstitutional stops and frisks.  Beginning in November 2018, the monitor team began
working with the NYPD to collect the data for the outcome measures.

**Table 1.  BWC Intervention Periods for 20 Treatment Precincts**

| Treatment Precinct | Intervention Period | |
|---|---|---|
| Precinct 34 | Begin – April 24, 2017 | End – April 24, 2018 |
| Precinct 60 | Begin – June 7, 2017 | End – June 7, 2018 |
| Precinct 72 | Begin – June 20, 2017 | End – June 20, 2018 |
| Precinct 48 | Begin – July 13, 2017 | End – July 13, 2018 |
| Precinct 42 | Begin – July 17, 2017 | End – July 17, 2018 |
| Precinct 47 | Begin – July 24, 2017 | End – July 24, 2018 |
| Precinct 79 | Begin – August 8, 2017 | End – August 8, 2018 |
| Precinct 71 | Begin – August 14, 2017 | End – August 14, 2018 |
| Precinct 25 | Begin – August 24, 2017 | End – August 24, 2018 |
| Precinct 43 | Begin – August 28, 2017 | End – August 28, 2018 |
| Precinct 63 | Begin – September 13, 2017 | End – September 13, 2018 |
| Precinct 44 | Begin – September 25, 2017 | End – September 25, 2018 |
| Precinct 115 | Begin – October 3, 2017 | End – October 3, 2018 |
| Precinct 102 | Begin – October 10, 2017 | End – October 10, 2018 |
| Precinct 30 | Begin – October 16, 2017 | End – October 16, 2018 |
| Precinct 13 | Begin – October 18, 2017 | End – October 18, 2018 |
| Precinct 105 | Begin – October 23, 2017 | End – October 23, 2018 |
| Precinct 18 | Begin – October 31, 2017 | End – October 31, 2018 |
| Precinct 67 | Begin – November 6, 2017 | End – November 6, 2018 |
| Precinct 121 | Begin – November 14, 2017 | End – November 14, 2018 |

    On October 21, 2018, an officer noticed that smoke was coming out of his BWC, a Vievu
LE5 model; he took the camera off his uniform and the camera exploded.  The NYPD has
removed 2,900 LE5 cameras from service, including the cameras in Precinct 121.  However, the

lack of BWCs in Precinct 121 for the last two and one-half weeks of the one-year intervention period should not have a meaningful impact on the results of the randomized experiment. The monitor team will run the experimental analysis with and without outcome events that occurred during this two and one-half week period to determine whether the brief withdrawal of treatment in Precinct 121 had a significant impact on the overall results.

### b.   Expansion of BWCs to Other Commands

In January 2018, the Department announced that it was accelerating its rollout of BWCs to all patrol officers and detectives so they would have the cameras by the end of 2018 rather than the end of 2019, as previously projected. A public website detailed the timeline of the expedited rollout and contained an FAQ about the program as well as the underlying policy and information on how to make a FOIL request for BWC footage, https://www1.nyc.gov/site/nypd/about/about-nypd/equipment-tech/body-worn-cameras.page. The NYPD coordinated with Professor Anthony Braga of the monitor team to ensure that the accelerated rollout of BWCs would not interfere with the court-ordered BWC pilot. In April 2018, the Department began issuing BWCs to sergeants and lieutenants in the patrol force.

On January 8, 2018, the Department published Patrol Guide 212-123, governing the use of BWCs citywide. This policy replaced Operations Order 21 (2017), which applied only to the BWC pilot precincts and had been previously approved by the monitor. Minor changes were made to clarify when officers should activate and deactivate their cameras, how videos should be tagged and when and how videos should be shared within the Department and with District Attorneys' offices. Additionally, training sergeants and integrity control officers are now required periodically to review BWC footage to give feedback and address any performance deficiencies they see. Because of the increased deployment of BWCs, the number of videos

being captured is growing exponentially.  As of September 1, 2018, more than 1 million videos have been recorded.

### c.  PSA Quasi-Experiment for Housing Officers

Officers in NYPD's Housing Bureau patrolling NYCHA public housing developments in Police Service Areas (PSAs) were not included in the BWC randomized control trial.  PSAs overlap with the 40 precincts in the randomized control trial, and if a PSA were selected to have cameras, the randomized control trial could include areas that also might have been selected as part of a control precinct without cameras.  Professor Braga and other members of the monitor team developed a separate research plan to evaluate the use of cameras by Housing Bureau officers working in PSAs.

NYPD Housing Bureau officers working in the nine PSAs are receiving BWCs as part of the citywide rollout plan launched after the court-ordered pilot began.  It was not possible to design a randomized experimental evaluation of the placement of BWCs on NYPD PSA officers for two reasons:  first, there are only nine PSAs, too few for a randomized experimental design to work effectively; and second, because the NYPD was implementing BWCs citywide and PSAs and precincts overlap, there would be precincts with BWCs in areas that also were in PSAs designated as control precincts without cameras.  Instead, the monitor team will be using two separate quasi-experimental designs to evaluate BWC impacts on the provision of police services at the PSA command level and the PSA officer level, respectively.

NYPD Housing Bureau officers in the nine PSAs were equipped with BWCs over the course of a nearly 11-month time period.  The PSA implementation began the week of February 12, 2018 (PSA 8) and ended the week of December 16, 2018 (PSA 9).  The evaluation relies on the timing of BWC treatment in PSAs.  The staggered implementation of the BWCs in PSAs

enables the use of a "stepped-wedge" evaluation design.[3]  Figure 1 illustrates how the stepped-wedge design works.  Each of the clusters (in this case, officers in a PSA) starts out without BWCs–in other words, as part of the no-treatment control group.  Each cluster (officers within a PSA) will, over time, move from the control group to the treatment group (in this case, as each PSA gets BWCs).[4]  In the PSA BWC evaluation, the design will include a pre-intervention period in which none of the PSA commands ("clusters" of officers) are exposed to the BWC treatment.  Subsequently, at regular intervals (the "steps"), one PSA command will cross from the no-treatment control group to the BWC intervention group under evaluation.  This process will continue until all nine PSAs have crossed over to be part of the BWC intervention.  At the end of the study, there will be a period when all PSA commands are using BWCs.  Data collection will continue throughout the evaluation.

**Figure 1.  Cluster Design**





---

[3] Hu, Y., & Hoover, D.R. (2018).  "Non-Randomized and Randomized Stepped-Wedge Designs Using an Orthogonal Least Squares Framework." *Statistical Methods in Medical Research*, 27 (4): 1202 – 1218.

[4] Figure 1 was adapted from Hemming, K. et al. (2015).  "The Stepped Wedge Cluster Randomized Trial: Rationale, Design, Analysis, and Reporting."  *British Medical Journal* (Clinical Research ed.), 350: h391.

### d. Court-Ordered Pilot for Electronic Documentation of Level 1 and Level 2 Encounters and BWC Activation at Level 1

On July 19 and August 9, 2018, the court issued orders requiring the parties to develop pilots designed to provide the court with information to assist it in deciding how to address two recommendations from the Joint Remedial Process: (1) to require officers to electronically document Level 1 and Level 2 encounters; and (2) to require activation of BWCs for encounters at Level 1. The parties asked the monitor to undertake the task of providing a draft proposal for the pilots that could then be discussed by the parties. Professor Stephen Mastrofski, a consultant for the monitor, worked with other members of the monitor team to produce a draft proposal on September 12, 2018. The proposal combined the two pilots into a single pilot study. After accommodating comments by counsel and experts for the parties, the monitor team circulated a new draft on October 16, 2018. The monitor team made further revisions to the proposal based on additional comments from the parties. On November 8, 2018, the monitor submitted his recommendation for a pilot program to the court for approval. ECF No. 660-1.[5] The proposal is attached as Appendix 2. On November 21, 2018, the plaintiffs filed with the court a partial objection to the proposal and requested the court to make certain modification. ECF No. 669. The matter is currently pending before the court.

## VI. Performance-Evaluation System

### a. Description of New Performance-Evaluation System

On November 6, 2017, the court approved the monitor's recommendation regarding a new performance-evaluation system that the Department began earlier that year for patrol officers. In the court's order, the court referenced its liability opinion, finding that NYPD "officers [were] routinely subjected to significant pressure to increase their stop numbers,

---

[5] All ECF cites refer to documents as numbered in the *Floyd* docket.

without corresponding pressure to ensure that stops [were] constitutionally justified." *Floyd*, 959 F. Supp. 2d at 602. The NYPD's performance-evaluation system was one source of this pressure and Compstat meetings a second source. *Id.* at 590, 592-94.

The monitor's recommendation noted that the NYPD had taken steps to eliminate these two sources of pressure, including instituting a new performance-evaluation system. In the new system, the lawfulness of stops and the accuracy of stop reports play a role, but the number of stops does not. The court reviewed and approved the monitor's recommendation and ordered that the monitor review and assess certain aspects of the system. The review is to ensure that, in practice, the new system does not "reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness" or undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments.[6]

The new system is a significant improvement from the prior evaluation system. There are four main components of the new evaluation system. The first is the Officer Profile Report, an electronic form that is automatically generated monthly. This report compiles data from numerous Department databases and compares the officer to other officers in his or her precinct, their borough, and citywide. It does not count the number of stops conducted by the officer. The second component is the Supervisor Feedback Form, which allows supervisors to highlight commendable actions by an officer or note areas that may need improvement. A third

---

[6] Pursuant to the court order, "the Monitor shall, in his bi-annual reports, review and assess the NYPD's performance-evaluation system to ensure that, on paper and in practice, it does not (a) reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness or (b) undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments of the Constitution as required by the Remedies Opinion.

During the period of Court supervision, Court approval is required before the NYPD implements any proposed change to the performance-evaluation system that may (a) introduce a mechanism to count the number of stops conducted by an officer or (b) affect the manner in which the quality and lawfulness of stops are assessed. The NYPD shall notify the Monitor and the parties of any such proposed change so that the Monitor—in consultation with the parties—may seek Court approval."

component is the Officer Self-Report Form, which allows officers to document notable actions they consider to be positive, such as community engagement, problem-solving, or achievements in crime prevention.

The final component of the new evaluation system of officers is the Quarterly Evaluation, which took effect on April 1, 2017, for the first quarter of 2017.  Supervisors are instructed to review the Officer Profile Report as well as any Supervisor Feedback Forms and Officer Self-Report Forms from the relevant period prior to completing the Quarterly Evaluation. Supervisors must now use the Quarterly Evaluation to rate officers in 12 different dimensions on a scale from one to four.  The fourth quarter evaluation will provide the supervisor with a summary box to recap the officer's performance over the entire year.

The NYPD now uses 12 performance categories or "dimensions" to evaluate its members.  These are:

1.   Problem Identification/Solving
2.   Adaptability and Responsiveness
3.   Judgment
4.   Integrity
5.   Application of Law and Procedures
6.   Community Interaction
7.   Departmental Interaction
8.   Professional Image and Maintenance of Equipment
9.   Quality and Timeliness of Reports
10.  Initiative
11.  Leadership
12.  Implementation of Proactive Policing Strategies (for members who perform administrative functions, a different dimension, Competence in Unit's Mission, replaces this dimension).

It should be noted that the new evaluation system covers the evaluation of officers only, and does not change the evaluation system for sergeants, lieutenants, captains and other supervisors.  In April of 2019, sergeants and lieutenants are expected to begin being evaluated under the new performance-evaluation system.

### b.  Assessment of the Performance-Evaluation System

The first question is whether the system is working as designed.  Are the various types of data that are supposed to be feeding into the Officer Profile Report being incorporated into the system?  Are supervisors filling out Supervisor Feedback Forms?  Are officers completing Officer Self-report Forms?  And, importantly, are supervisors completing the evaluations of their officers?

The monitor team asked the NYPD to determine whether information from officers' stop reports was being fed into the performance evaluation system–in particular, if a supervisor found that there was an insufficient basis for the stop, frisk, or search, did that information show up in the Officer Profile Report?  In June 2018, the Risk Management Bureau identified a sample of six stop reports on which supervisors noted an insufficient basis for the stop, frisk, or search and noted whether or not any follow-up actions (instructions, training, or discipline) were appropriate.  It then examined whether that data was, in fact, automatically populating the given member's Officer Profile Report.  Of those six instances, data from only three was included in the Officer Profile Reports in the performance evaluation system.  The NYPD reports that its developer fixed the logic for the data feeding into the Officer Profile Reports in the performance evaluation system, and data from stop reports are now automatically being included in members' monthly Officer Profile Reports.

The monitor team also conducted a focus group with supervisors to get their views of the performance-evaluation system.  They expressed the view that in past years there had been significant pressure on officers to make stops, but that the Department is no longer pressuring officers to submit a certain number of stop reports and the performance-evaluation system does not put pressure on officers to make stops.

There was some confusion about how the performance evaluation system is supposed to work, what types of conduct fit in the different dimensions, and how the composite scores of the performance evaluation system operate.  The sergeants also expressed a need for more training on the system.  It was evident that additional training would be helpful because some supervisors were unsure how an officer who is an "effective crime fighter" could be rated better than the officer who "looks good in his uniform but just stands around every day."  Another issue raised in the focus group was the extent to which supervisors use the "needs improvement" rating.  In fact, very few of the supervisors have used that rating.  The sergeants also noted that the Supervisors Feedback Form, which is on the member's phones through the CRAFT system, would be much easier to use if it were on the computer and not just on members' phones.

The monitor team's review of the NYPD's performance evaluation system, as it is being implemented in practice, indicates that it is not undermining the goals of the remedial process, and, in particular, it does not lead supervisors to pressure officers to make more stops without regard to the lawfulness of those stops.

In addition to the primary issue identified by the remedial order, the Department may wish to consider other issues identified by the monitor team in its review of the performance evaluation system.  The review raised questions about whether supervisors are using the evaluation system to achieve one of its stated purposes–to identify NYPD high-achievers and those who need improvement.  All the evaluations from a sample precinct for the fourth quarter of 2017 were reviewed.  Those evaluations showed what is known as a halo effect in performance evaluation systems.  No officer in the precinct was rated "needs improvement" in any of the 12 dimensions.  It is possible that the precinct reviewed was an exemplary precinct that did not have any officers who needed any improvement.  More likely, however, is that the

supervisors did not wish to use the performance evaluation as a tool to identify problematic behavior.

## VII.  Auditing

### a.  Quality Assurance Division Audits

The Quality Assurance Division (QAD) monitors compliance with Department policies and the law, including those relating to stop and frisk and trespass enforcement.  QAD evaluates all precincts, transit districts, and housing commands, as well as several specialty units.  The audit procedures address both the quality of the documentation (i.e., whether the paperwork was properly prepared) and the quality of the information contained therein (e.g., whether the stop met constitutional standards).  The Department also performs audits to assess the extent to which stops and frisks are being conducted but not documented.

Because the stop report is now electronic and many of the data fields on the stop report form must be completed in order for officers to submit the report, much of the administrative review to determine if the fields were complete and legible is no longer necessary.  Also, the data from electronic stop reports can be aggregated and analyzed to allow for more meaningful and actionable information to be provided to commanding officers and Integrity Control Officers (ICOs) in the commands.  As a result of these changes, the NYPD is in the process of making additional changes to its audit procedures, some of which (discussed below) are being implemented.

QAD is currently conducting four types of audits relevant to the remedial measures: (1) audits of stop reports; (2) RAND audits to identify undocumented stops; (3) audits of police-initiated enforcement (called PIE audits), also to identify undocumented stops; and (4) audits of trespass arrests.  Each is described more fully below, along with the results of these audits from the third quarter of 2016 through the first quarter of 2018.  In addition to these audits by QAD,

the monitor team has reviewed a sample of stop reports that were also reviewed by QAD.  Below at Section VII.a.1.ii is a report on whether the monitor's conclusions differed from QAD's.

QAD also periodically requires commands to do self-inspections to monitor their compliance.  Commanding officers oversee self-inspections in their commands.  Concerning stop, question, and frisk, the ICO in each command must identify and evaluate the last 25 stop reports and corresponding activity log entries.  If there are fewer than 25 stop reports for the month reviewed, the ICO must evaluate all of them.  The results of these "self-inspections" are reported up the chain of command in the precinct and the borough and then QAD reviews a subset of the results.

### 1.  Stop Report Audits

#### i.  QAD Results

Commands are evaluated quarterly to ensure that (i) activity logs are complete and accurate, (ii) officers are sufficiently articulating reasonable suspicion for stops, (iii) officers are sufficiently articulating the legal basis for frisks and searches, and (iv) supervisors are correctly reviewing the stop reports and related paperwork and correctly identifying illegality and taking appropriate follow-up actions.

QAD audit findings suggest that officers' compliance has shown some improvement. The chart below shows the results of QAD's audits for the last six quarters.  For each quarter, the chart shows the number of stop reports audited and the number and percentage of stop reports that QAD determined articulated reasonable suspicion for the stop.  That percentage increased from 74 percent in the fourth quarter of 2016 to 77 percent in the first quarter of 2018.  The chart also shows the number of stop reports in which the officer reported a frisk, and, for those reports, the number and percentage of stop reports that QAD determined articulated reasonable suspicion that the person was armed and dangerous.  That percentage increased from 83 percent for the

fourth quarter of 2016 to 91 percent in the first quarter of 2018.  Similarly, the chart shows the number of stop reports in which the officer reported a search, and QAD's assessment of whether the stop reports articulated a justification for the searches.  As determined by QAD, the percentage of appropriate searches rose from 89 percent in the first quarter of 2016 to 96 percent in the fourth quarter of 2018.

**Chart 2.  QAD Stop Report Audits 4Q 2016 Through 1Q 2018**

| Quarter | # Stop Reports Audited | # Stop Reports Articulate RS for the Stop | % Stop Reports Articulate RS for the Stop | # Stop Reports Where Suspect Was Frisked | # Stop Reports Articulate RS for the Frisk | % Stop Reports Articulate RS for the Frisk | # Stop Reports Where Suspect Was Searched | # Stop Reports Articulate Justification for the Search | % Stop Reports Articulate Justification for the Search |
|---|---|---|---|---|---|---|---|---|---|
| 4Q2016 | 1495 | 1106 | 74% | 918 | 760 | 83% | 454 | 402 | 89% |
| 1Q2017 | 1627 | 1161 | 71% | 959 | 765 | 80% | 509 | 445 | 87% |
| 2Q2017 | 2015 | 1438 | 71% | 1237 | 1090 | 88% | 673 | 600 | 89% |
| 3Q2017 | 1975 | 1436 | 73% | 1176 | 1074 | 91% | 640 | 602 | 94% |
| 4Q2017 | 1909 | 1413 | 74% | 1108 | 1000 | 90% | 636 | 609 | 96% |
| 1Q2018 | 1838 | 1417 | 77% | 1116 | 1014 | 91% | 662 | 633 | 96% |

In the second quarter of 2018, QAD began piloting a procedure in Patrol Borough Queens North for its audits of stop reports to focus more on substantive review of the reports and make the audits more helpful to the commands.  The Department expanded the pilot in the third quarter of 2018 to include Patrol Boroughs Queens South and Staten Island.  For the fourth quarter of 2018 the entire department will be under the new auditing process.  Under this new process, auditors review stop reports weekly for the commands in the pilot.  This allows a shorter feedback loop between the commands and QAD to identify and correct issues more quickly.  Auditors are increasing their review of ICAD reports (Intergraph Computer Aided Dispatching) to determine whether a stop was proper and focusing more on whether supervisors sufficiently reviewed the underlying constitutionality of a stop.  When these audits are conducted, QAD is providing commands with more information on specific areas that require improvement and specific officers and supervisors who need to do better.  Commands are provided with a detailed assessment of their performance in the most recent quarter as compared to prior quarters.

### ii.  Monitor Review of QAD Results

Starting with the audits from the fourth quarter of 2016, the monitor team has obtained a sample of the stop reports audited by QAD, along with the QAD audits of those reports.  The goal was to evaluate the auditors' work and also review a sufficient number of stops to be able to make meaningful statements about citywide compliance.  The stop reports are evaluated by three members of the monitor team.  When they disagree, the stop reports are reviewed by the monitor and deputy monitor.

Below is a chart that reports the monitor's assessments.  For each quarter, the chart shows the number of stop reports that the monitor team reviewed and the number and percentage of stop reports that the monitor team determined articulated reasonable suspicion for the stop.  That percentage increased from 46 percent in the fourth quarter of 2016 to 64 percnet in the first quarter of 2018.  The chart also shows the number of stop reports in which the officer reported a frisk and, for those stop reports, the number and percentage of reports that the monitor team determined articulated reasonable suspicion that the person was armed and dangerous.  That percentage increased from 76 percent for the fourth quarter of 2016 to 87 percent in the first quarter of 2018.  Similarly, the chart shows the number of stop reports in which the officer reported a search, and the monitor team's assessment of whether the stop reports articulated a justification for the searches.  As determined by monitor team, the percentage of appropriate searches rose from 84 percent in the first quarter of 2016 to 92 percent in the fourth quarter of 2018.  Like the results from QAD's audits of stop reports, the results from the monitor team's assessments show an increase in the level of compliance over time.

**Chart 3.  Monitor Team Review of Stop Reports 4Q 2016 through 1Q 2018**

| Quarter | # Stop Reports Reviewed by Monitor Team | # Stop Reports Articulate RS for the Stop | % Stop Reports Articulate RS for the Stop | # Stop Reports Where Suspect Was Frisked | # Stop Reports Articulate RS for the Frisk | % Stop Reports Articulate RS for the Frisk | # Stop Reports Where Suspect Was Searched | # Stop Reports Articulate Justification for the Search | % Stop Reports Articulate Justification for the Search |
|---|---|---|---|---|---|---|---|---|---|
| 4Q2016 | 261 | 121 | 46% | 146 | 111 | 76% | 67 | 56 | 84% |
| 1Q2017 | 256 | 131 | 51% | 143 | 111 | 78% | 76 | 65 | 86% |
| 2Q2017 | 302 | 180 | 60% | 178 | 140 | 79% | 90 | 81 | 90% |
| 3Q2017 | 304 | 165 | 54% | 180 | 126 | 70% | 88 | 71 | 81% |
| 4Q2017 | 305 | 211 | 69% | 172 | 154 | 90% | 108 | 102 | 94% |
| 1Q2018 | 309 | 198 | 64% | 212 | 184 | 87% | 93 | 86 | 92% |

As noted above, there are two purposes of the monitor's stop report assessments: first, to measure officers' compliance with Department policies and constitutional standards, and second, to evaluate the work of QAD in auditing Department efforts.  The monitor team's results in Chart 3 above show lower compliance results than the QAD audits shown in Chart 2.  In the fourth quarter of 2016, for example, QAD determined that 66 percent of the stop reports articulated reasonable suspicion for the stop, while the monitor team determined that only 46 percent of the stop reports sampled articulated reasonable suspicion.  In the first quarter of 2018, QAD determined that 77 percent of the stop reports articulated reasonable suspicion, while the monitor team determined that 64 percent of the reports articulated reasonable suspicion.

After each quarter, the monitor team meets with QAD to review the stop reports when there are differences between the monitor team's and QAD's evaluation.  In part as a result of these meetings, the differences between the QAD results and the monitor team results are decreasing over time.  Further analysis of the level of agreement between QAD and the monitor team can quantify the inter-rater reliability (IRR).  In statistics, IRR is the degree of agreement among raters.  It is a score from 0 to 1 that reports the consistency in ratings among various evaluators, in this case regarding whether or not a stop report articulated the appropriate level of suspicion.

The IRR between the monitor team's and QAD's assessment for the last five quarters (1Q2017 thru 1Q2018) on the determination (yes or no) if the report articulated reasonable suspicion for the stop is 0.707 with a confidence interval of +/- 0.0372. This means that there is a 95 percent probability that the agreement is between 3.72 percent higher or lower than 70.7 percent. This could be described as moderate agreement between the monitor team and QAD. An IRR greater than 0.8 is considered strong.

## 2. QAD Audits of BWCs Videos Associated with Stop Reports

In the fourth quarter of 2017, QAD began auditing videos associated with the five most recent stop reports that indicate there is a corresponding BWC video. These videos and their corresponding stop reports are reviewed for completeness, professionalism, consistency with the narratives, and whether the "What Is a Stop?" information card was handed out. A similar analysis is performed for the five most recent arrest reports that indicate they have corresponding BWC videos. In the case of arrests, the videos and arrest reports are reviewed for completeness and whether a stop report was prepared if the arrest arose out of a stop. In the majority of cases, QAD found that the video was either consistent with the narratives in the stop report or inconclusive.

**Chart 4. QAD Audits of Stop Reports with Associated BWC Video**

|  | Number of Videos Reviewed | Video Consistent with Stop Narrative | Video Inconsistent with Stop Narrative | Video Inconclusive with Regard to Stop Narrative |
|---|---|---|---|---|
| **4Q2017** | 64 | 58% | 0% | 42% |
| **1Q2018** | 84 | 68% | 3% | 30% |

|  | Number of Videos Reviewed | Video Consistent with Frisk Narrative | Video Inconsistent with Frisk Narrative | Video Inconclusive with Regard to Frisk Narrative |
|---|---|---|---|---|
| **4Q2017** | 40 | 60% | 0% | 40% |
| **1Q2018** | 59 | 61% | 3% | 36% |

### 3. Undocumented Stops

The NYPD has acknowledged that undocumented Level 3 *Terry* stops are a serious issue that needs to be addressed. QAD performs two types of audits to determine whether stops are being properly documented: RAND audits, reviewing NYPD radio transmissions; and police-initiated enforcement audits, reviewing arrests that started as Level 3 *Terry* stops, including trespass arrests that started as Level 3 *Terry* stops.

### i. RAND Audits

As discussed in prior reports, the RAND audit program is designed to identify stop encounters using radio transmissions to discover instances in which stop reports should have been prepared. The audit begins with keyword searches of ICADs to identify events that may have involved stop encounters. These keywords are "Stopped," "Show-up," "Holding," and "Warrant Check." QAD then reviews the ICADs and/or listens to the corresponding radio transmissions to winnow the list to identify events more likely to be encounters requiring stop reports. NYPD records are then reviewed to determine if a corresponding stop report was prepared. If there is BWC video of the event, QAD reviews the video. If the auditor determines that a stop report may have been required, the matter is referred to the command for further investigation. The command then reports back to QAD whether the encounter did, in fact, require a stop report and whether one was filed. Commands are required to submit a response through Department channels within six weeks of when the matter was referred.

The data below summarize the RAND audits conducted from the fourth quarter of 2016 through the first quarter of 2018, and command responses to those audits. The number of stops that did not have the required stop reports declined over this period and the percentage of compliance, based on the RAND audits, increased.

**Chart 5.  RAND Audits with Command Responses**

| | 4Q2016 | 1Q2017 | 2Q2017 | 3Q2017 | 4Q2017 | 1Q2018 |
|---|---|---|---|---|---|---|
| Total RAND Audits Indicating a Stop | 28 | 28 | 31 | 21 | 23 | 21 |
| Stop Reports on File During QAD Audit | 4 | 2 | 4 | 5 | 12 | 10 |
| ICAD Events Requiring Investigation | 24 | 26 | 27 | 16 | 11 | 11 |
| Stop Made by Another Command and Report on File | 0 | 1 | 0 | 0 | 0 | 0 |
| Deemed Not Necessary After Command Investigation (False Positive) | 8 | 10 | 9 | 4 | 6 | 7 |
| Stop Report Prepared at the Time of the Event, But Not in System | 4 | 3 | 2 | 7 | 0 | 2 |
| Stop Made by Another Command and No Report on File | 0 | 1 | 0 | 0 | 0 | 0 |
| ***Terry* Stops Without Stop Report** | **12** | **11** | **16** | **5** | **5** | **2** |
| **Total *Terry* Stops** | **20** | **17** | **22** | **17** | **17** | **14** |
| **Compliance Rate (%)** | **40.0%** | **35.3%** | **27.3%** | **70.6%** | **70.6%** | **85.7%** |

Below are the follow-up actions taken by the commands for members who did not document stops.[7]

**Chart 6.  Command Follow-Up Action**

| | 4Q2016 | 1Q2017 | 2Q2017 | 3Q2017 | 4Q2017 | 1Q2018 |
|---|---|---|---|---|---|---|
| ***Terry* Stops Without Stop Report** | **12** | **11** | **16** | **5** | **5** | **2** |
| Command Discipline | 2 | 0 | 0 | 0 | 4 | 1 |
| Instructions/Training | 3 | 6 | 8 | 3 | 1 | 0 |
| Minor Violations Log or Supervisory Report | 5 | 5 | 5 | 1 | 0 | 1 |
| Stop Without Report, but No Disciplinary Action | 2 | 0 | 3 | 1 | 0 | 0 |

---

[7] The minor violations log was a logbook kept at each command that recorded minor violations of Department rules by members of the service.  The information in these logs was not tracked centrally, it did not become part of a member's personnel record, and there were no penalties or additional consequences for being listed in the log.  The NYPD has replaced the minor violations log with a Supervisor's Comment Form.

ii.  **Audits of "Police-Initiated" Encounters**

These audits look at the last 25 arrests in each command from the audit period that result

from police-initiated enforcement.  These are defined as arrests where the People of the State of

New York are the complainants on the Complaint Report, such as criminal possession of a

controlled substance or criminal possession of a weapon.  These 25 arrest reports are reviewed to

determine whether a stop report should have been filed.  When an auditor determines that a stop

report was likely required but not filed, the matter is referred to the command for further

investigation.  Below in Chart 7 are the results of these audits from the fourth quarter of 2016 to

the first quarter of 2018.  The "Arrests Audited" column is not always a multiple of 25 because

in some commands there may not have been 25 police-initiated enforcement arrests.  The next

column represents arrests that the auditors or the command determined did not start as a *Terry*

stop, and so a stop report was not required.  If a command did not respond to QAD's inquiry

about an arrest, the stop report is included in the "Command Response Missing."  The chart then

reports the number of arrests for which a stop report was required, the number of stop reports

filed, and the percentage of compliance.

**Chart 7.  PIE Audits with Command Responses**

| Quarter | Arrests Audited | Stop Report Not Required | False-Positive | Command Response Missing | Stop Report Required | Stop Report on File | % Compliance |
|---------|-----------------|--------------------------|----------------|--------------------------|----------------------|---------------------|--------------|
| 4Q2016  | 103 | 50  | 48.5% | 7  | 46  | 20  | 43.5% |
| 1Q2017  | 161 | 95  | 59.0% | 23 | 43  | 19  | 44.2% |
| 2Q2017  | 154 | 104 | 67.5% | 6  | 44  | 13  | 29.5% |
| 3Q2017  | 194 | 122 | 62.9% | 26 | 46  | 12  | 26.1% |
| 4Q2017  | 225 | 171 | 76.0% | 0  | 54  | 20  | 37.0% |
| 1Q2018  | 120 | 74  | 61.7% | 4  | 42  | 18  | 42.9% |
| **Total** | 957 | 616 | 64.4% | 66 | 275 | 102 | 37.1% |

These findings indicate that officers still are not completing stop reports when required.

If the source of the failure to document stops is an erroneous belief that completing an arrest

report obviates the need for a stop report, then the in-service training being conducted as well as review by supervisors should remedy these errors.  However, it appears that other measures emphasizing the importance of documenting stops are necessary.  See, e.g., Section II.b.1 above.

### iii.  TCFS Audits

In the fourth quarter of 2017, QAD began auditing Trespass Crime Fact Sheets (TCFSs). Officers are required to fill out TCFSs for all trespass arrests in and around NYCHA buildings and buildings enrolled in the Trespass Affidavit Program (TAP).  QAD auditors review both whether or not a TCFS was prepared when required and whether or not the officer articulated a proper basis for the approach of the person arrested.  QAD found that all trespass arrests at TAP and NYHA buildings had an accompanying TCFS.  Thus far, QAD has found sufficient articulation of a proper basis to approach someone in the large majority of TCFS it has reviewed.

**Chart 8.  TCFS Audit Results**

|  | Number of TAP Trespass Arrests Audited | TAP TCFS Articulating Proper Basis for Approach | Number of NYCHA Trespass Arrests Audited | NYCHA TCFS Articulating Proper Basis for Approach |
|---|---|---|---|---|
| 4Q2017 | 44 | 93% | 136 | 94% |
| 1Q2018 | 57 | 98% | 189 | 97% |

### b.  RAILS/Early Identification System

The Department created the Risk Assessment Information Liability System (RAILS) to aggregate personnel data and negative performance indicators such as civilian complaints, discipline, stop reports rejected by supervisors, and transfers for cause.  Commanders receive automatic alerts for a number of triggering events and can query the records of their subordinates at any time.  Following a pilot, RAILS became operational Department-wide in October 2017.

Data regarding declinations to prosecute were integrated into RAILS in June 2018.  The NYPD receives its information about declinations directly from the District Attorneys'

offices. Based on the information received, the Department sorts those declinations into categories to fit into the RAILS system. The categories of declinations that are included in RAILS are:

- Incorrect/missing paperwork
- Insufficient evidence
- Arresting officer refuses to cooperate
- Arresting officer unavailable
- Defendant merely present
- Lacks element of crime
- Lacks jurisdiction
- No ID by complainant/witness
- No nexus between defendant and crime
- No nexus/drugs
- No valid basis for stop or frisk
- Unlawful search
- Violation not observed

All such declinations trigger an alert to the commanding officer.

The NYPD is currently planning to expand RAILS to include more indicators.  One such indicator of risk is a judicial finding of adverse credibility.  Adverse credibility findings are not currently included in RAILS. However, the Legal Bureau is coordinating with NYPD's IT Bureau (ITB) to add such findings to the system, including addressing technology issues.  ITB has to create a mechanism for the Legal Bureau to enter the adverse credibility findings into the Central Personnel Index (CPI). The CPI is the database at the NYPD that aggregates all personnel information about NYPD members.  RAILS is designed so that data must be in the CPI before it can be imported into RAILS.  Once the adverse credibility findings are in the CPI, they can then be added to RAILS.  ITB is creating an electronic worksheet for the program that enters data into the CPI so that adverse credibility findings can be included.  Once the electronic worksheet is created, it will be used to enter adverse credibility decisions into RAILS.

In addition to adding adverse credibility findings to RAILS, the Department currently has a process for addressing adverse credibility findings. The Department receives notices of adverse credibility determinations from the District Attorneys' and United States Attorneys' offices. In 2016, it created an Adverse Credibility Committee to review these findings to determine what follow-up actions are appropriate. The Committee meets periodically and can vote to direct training, recommend that the officer's commanding officer consider reassignment, or refer the matter to the Internal Affairs Bureau (IAB) for further investigation.

Similar to adverse credibility findings, civil judgments due to members' malfeasance are not currently included in RAILS. The Department has informed the monitor that it plans to add this data to RAILS. There are two issues the Department is addressing. First, it wants to curate the litigation data to distinguish between judgments resulting from malfeasance and judgments settled by the Law Department for nuisance value or judgments in lawsuits in which the member was named but he or she did not participate in any misconduct. Second, similar to adverse credibility determinations, certain IT steps need to be taken to incorporate the litigation data into the RAILS system.

The NYPD has informed the monitor that it intends to use the RAILS system as part of its efforts to respond to the court's order issued on November 20, 2018. The court ordered the NYPD "after consultation with the Monitor, [to] submit for approval a plan to implement a program for systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements." ECF No. 662 at 2.[8]

---

[8] The court order states that the information to be included in the program must include: (a) declinations of prosecutions by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or representation of police officers by

## VIII.   Complaints and Discipline

The court's remedial order required the NYPD to change its policies and practices with respect to investigations of racial profiling and other bias-based profiling allegations as well as its handling of civilian complaints that have been substantiated by the Civilian Complaint Review Board (CCRB).

### a.   Investigation of Profiling Allegations

The NYPD investigates all profiling allegations related to race and biased-based policing, no matter how the allegation is made to the NYPD (e.g., in writing, in a 311 or 911 call, by a call or visit to a precinct, directly to the IAB, or directly to the CCRB, which refers these cases to the NYPD).  When it receives a complaint, IAB logs the matter into the Internal Case Management System and the complaint is reviewed and assigned for investigation.  In the Seventh Monitor Report, we began reporting on these investigations.

On January 3, 2019, the court approved the monitor's recommendation regarding IAB's guide for investigating complaints of racial profiling and IAB's internal investigators' course on profiling and biased-based policing.  The IAB guide sets forth the procedures for the intake, classification, and investigation of complaints related to profiling and bias-based policing.  The guide formalizes procedures that have been in place since 2015.  IAB collects all available documents, as well as audio and video recordings, including recordings of BWCs, if any.  IAB then decides which allegations fall within the definition of profiling and assigns those matters for investigation.  The investigator must take all appropriate investigative steps, including obtaining and reviewing all documents related to the incident, such as audio and video recordings, canvassing involved locations, and interviewing the complainant, subject officers, and witnesses.

---

the New York City Law Department; and (e) judgments and settlements against police officers in civil cases where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance.  ECF No. 662 at 2.

When an investigation is complete, the investigator submits an Allegation Finding Worksheet that contains the results of the investigation and recommended findings.   Each allegation must have a finding reflecting one of four determinations:

1. Substantiated–Credible evidence exists that the accused officer committed the alleged act of misconduct and such credible evidence outweighs the evidence that the accused officer did not commit the alleged misconduct.

2. Unsubstantiated–There is insufficient credible evidence to prove or disprove the allegation.

3. Unfounded–Credible evidence exists that the alleged act of misconduct did not occur or that the accused officer did not commit the alleged act of misconduct and such credible evidence outweighs the evidence that the officer did commit the alleged misconduct.

4. Exonerated–Credible evidence exists that the alleged conduct occurred but the subject officer's actions were determined to be lawful.

### 1.   Outcomes of Profiling Investigations

In 2017, the NYPD opened 817 cases, consisting of 1,175 allegations of profiling or bias-based policing, alleged against 748 officers.   From January 1, 2018, through May 30, 2018, 378 profiling cases were opened, with 547 allegations made against 350 officers.   The status of these cases, along with cases opened in 2014–2016, is outlined in the chart below.

**Chart 9.   Profiling Allegations by Year, 2014 – May 30, 2018**

|  | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Total Profiling Allegations | 15 | 339 | 556 | 1175* | 547** |
| Unfounded | 4 | 154 | 156 | 242 | 56 |
| Exonerated | 2 | 11 | 201 | 0 | 2 |
| Unsubstantiated | 9 | 105 | 0 | 363 | 75 |
| Partially Substantiated*** | 0 | 27 | 22 | 44 | 10 |
| Substantiated | 0 | 0 | 0 | 0 | 0 |
| Open or Active | 0 | 42 | 177 | 526 | 404 |

\*        These allegations were made in 817 cases.
\*\*       These allegations were made in 378 cases.
\*\*\*      These are cases in which other allegations in a profiling complaint were substantiated, but not profiling allegations.

Proving bias against an individual officer is difficult because it requires a conclusion about that officer's state of mind.  The NYPD, like other major police departments around the country, has not substantiated any.  It is therefore very important to ensure that the Department's profiling investigations are thorough.  The monitor team has been reviewing samples of profiling investigations to make this evaluation.  Special attention is paid to cases involving officers against whom there are multiple allegations made or commands in which there is a high incidence of claims.  When the monitor team completes its review of a sufficient number of these cases, the results will be reported.

In January 2016, the NYPD combined four categories of allegations (race, color, ethnicity, and nationality) into one category–"Race/Color/Ethnicity/National Origin."  This category continues to have the largest percentage of profiling allegations investigated in 2017.  Other categories included age, gender, religion, disability, gender identity, sexual orientation, and housing status.

**Chart 10.  Profiling Allegations by Outcome**

| Profiling Allegations | Open | Exonerated | Unfounded | Unsubstantiated | Total |
|---|---|---|---|---|---|
| Profiling – Age | 10 | 0 | 6 | 1 | 17 |
| Profiling – Citizenship Status | 6 | 0 | 3 | 1 | 10 |
| Profiling – Color* | 19 | 3 | 85 | 51 | 158 |
| Profiling – Disability | 22 | 0 | 14 | 4 | 40 |
| Profiling – Ethnicity* | 7 | 3 | 48 | 18 | 76 |
| Profiling – Gender | 0 | 0 | 11 | 1 | 12 |
| Profiling – Gender Identity | 2 | 0 | 2 | 0 | 4 |
| Profiling – Gender, Gender Identity | 34 | 0 | 18 | 11 | 63 |
| Profiling – Housing Status | 11 | 0 | 4 | 3 | 18 |
| Profiling – National Origin* | 1 | 0 | 21 | 7 | 29 |
| Profiling – Other | 259 | 0 | 122 | 67 | 448 |
| Profiling – Race* | 7 | 2 | 31 | 16 | 56 |
| Profiling – Race, Color, Ethnicity, National Origin | 628 | 1 | 277 | 197 | 1103 |
| Profiling – Religion | 45 | 1 | 39 | 21 | 106 |

| Profiling Allegations | Open | Exonerated | Unfounded | Unsubstantiated | Total |
|---|---|---|---|---|---|
| Profiling – Sexual Orientation | 53 | 0 | 18 | 13 | 84 |
| **Total** | **1104** | **10** | **699** | **411** | **2224** |

*These four allegation types were combined into one category effective January 1, 2016. The allegations listed in these separate categories were made in 2014 and 2015.

Among the profiling cases investigated by the NYPD, there were several individual officers named in more than one case. Twenty-eight officers were the subject of three or more profiling cases. In addition, 10 precincts had 20 or more profiling cases investigated against officers in their command. Two Traffic commands had 40 or more profiling cases investigated against officers in their command.

**Chart 11. Member of Service and Precinct Overview in Profiling Allegations**

| | |
|---|---|
| Number of Officers Named in More than Two Profiling Cases (2014 – May 2018) | 28 |
| Number of Officers Named in More than Four Profiling Cases (2014 – May 2018) | 4 |
| Number of Precincts with 20 or more Profiling Cases | 10 |
| Number of Traffic Commands with 20 or More Profiling Cases | 4 |
| Number of Traffic Commands with 40 or More Profiling Cases | 2 |

**b. NYPD Handling of Substantiated CCRB Cases**

At trial, the court found that the NYPD failed to impose meaningful discipline when the CCRB determined that officers engaged in unconstitutional stops and frisks. The court's order requires the NYPD to improve its procedures for handling CCRB findings of substantiated misconduct during stops. Specifically, the Department Advocate's Office (DAO) must provide more deference to credibility determinations made by the CCRB, use an evidentiary standard that is neutral between the claims of complainants and officers, and not require that physical evidence corroborate the complaint.

The CCRB handles four types of complaints: (1) Excessive or Unnecessary Force, (2) Abuse of Authority (such as an improper stop, question, frisk, search, strip search, vehicle

stop and search, and refusal to provide name and shield), (3) Discourtesy (for example cursing or using foul language), and (4) Offensive Language (e.g., using slurs about a person's race, ethnicity, religion, sex, sexual orientation, or physical disability).   These types of matters are referred to as FADO allegations (Force, Abuse of Authority, Discourtesy, and Offensive Language).   Non-FADO cases are referred by CCRB to IAB or the Office of the Chief of Department (OCD).   FADO cases involving more serious or criminal allegations are investigated by both the CCRB and IAB.   All complaints against NYPD members of service reported to the CCRB are entered into the CCRB's complaint tracking system, but only those with a FADO allegation are investigated.

Prior to conducting a full investigation, the CCRB determines if a complaint is suitable for mediation.   If it is and both the complainant and subject officer agree to mediate, a mediation session is held to resolve allegations of misconduct.   Professionally trained mediators not affiliated with either the NYPD or the CCRB are used.   The sessions are confidential and the parties hear each other's explanations for what occurred.   In 2017, there were 417 cases in which both the complainant and officer agreed to mediation.   In slightly more than half those cases (213 cases), mediation was attempted, but the complainant did not appear for the mediation session or failed to respond to requests for scheduling.   When both parties attended mediation sessions, there was a high success rate.   In 2017, the CCRB conducted 226 mediation sessions with 204 cases being successfully mediated (a 90 percent success rate).[9]

When a case is not suitable for mediation, or if the complainant who initially agreed to mediation is not satisfied with that process and requests an investigation, the case is returned to the Investigations Division. At the conclusion of the investigation, the investigator prepares an

---

[9] The number of cases mediated includes all mediated FADO complaints, not just complaints involving stop and frisk and trespass enforcement.

investigation report and refers the case findings and disposition recommendations to the CCRB Board.  A panel of three board members or the full board reviews cases and makes a finding as to each complaint allegation of misconduct (e.g. substantiated, unfounded, exonerated, unsubstantiated) and, for substantiated findings, makes discipline recommendations to the Police Commissioner, who has the sole authority to impose discipline.

The CCRB can "truncate" and close a case when an investigation could not be completed because there is pending litigation or the complainant is unavailable, is uncooperative, or requests that his or her case be withdrawn.  Prior to truncating a case based on unavailable or uncooperative complainants, the CCRB has protocols for delineating steps that should be attempted to try to contact and locate a complainant.  If there is video evidence clear enough to make a determination on the merits, the CCRB will not truncate the case when the complainant is unavailable or uncooperative. In 2017, the CCRB received 4,487 cases within its jurisdiction and 2,256 (55%) were truncated.  CCRB can also close a case as "Officer Unidentified" if the investigation was unable to identify any of the officers accused of the alleged misconduct.  Cases that are fully investigated by the CCRB are closed with one of the following dispositions for each FADO allegation: Substantiated, Unsubstantiated, Unfounded, or Exonerated.  The definitions for these dispositions are the same definitions as used by the NYPD.  See Section VIII.a above.  If the CCRB investigation determines there was other misconduct outside the CCRB's jurisdiction, the CCRB refers the case to the NYPD for additional action as Other Misconduct Noted (OMN).

Approximately 33 percent of the complaints closed by the CCRB in 2017 were fully investigated (1,349 complaints).  Among the complaints received, the number of allegations involving stop, question, frisk and search of persons rose slightly from 871 in 2016 to 903 in 2017.  Although the number of these allegations increased, the number of substantiated

allegations overall declined.

The NYPD has provided the monitor team with data regarding substantiated CCRB complaints from 2014 to August 31, 2018, involving stop, question, frisk and/or search allegations, and the final disposition of those cases by the NYPD.  Chart 12 below sets out the complaints from 2014 to August 31, 2018.  Among the 102 stop and frisk complaints that the CCRB substantiated and sent to the NYPD in 2017, 32 were substantiated for misconduct that involved only unlawful stop allegations; 25 for only unlawful frisks; six for misconduct in questioning; five for only unlawful searches; and 33 for a combination of stop, question, frisk, and/or search allegations.  One 2017 complaint involved only trespass enforcement.

**Chart 12.  Types of Allegations Identified in Substantiated Cases**

| Allegation Type | 2014 | 2015 | 2016 | 2017 | 2018 – Aug. 31 | Total |
|---|---|---|---|---|---|---|
| Combined SQF and/or Search | 59 | 94 | 65 | 33 | 12 | 263 |
| Stop Only | 50 | 83 | 73 | 32 | 15 | 253 |
| Question Only | 11 | 10 | 8 | 6 | 2 | 37 |
| Frisk Only | 40 | 59 | 49 | 25 | 21 | 194 |
| Search Only | 19 | 21 | 17 | 5 | 8 | 70 |
| Trespass | 0 | 1 | 0 | 1 | 0 | 2 |
| Total | 179 | 268 | 212 | 102 | 58 | 819 |

When the CCRB substantiates an allegation, the Board makes discipline recommendations that fall within the following categories:

- **Charges and Specifications**. The subject officer is prosecuted by the CCRB Administrative Prosecution Unit and the discipline recommendation can include termination.

- **Command Discipline B**.  The commanding officer can impose discipline ranging from a reprimand up to ten days loss of vacation.

- **Command Discipline A**.  The commanding officer can impose discipline ranging from a reprimand up to five days loss of vacation.

- **Training**.  The required training will depend on the circumstances of the violation and the history of the officer.

- **Instruction.** The officer receives counseling and direction.

### 1.  DAO Request for Reconsideration of CCRB Recommendation

The Department Advocate's Office (DAO) is the division within the NYPD that receives CCRB findings and recommendations for discipline.  In 2014, the NYPD and the CCRB established a new "reconsideration process" in which the DAO can ask the CCRB to reconsider its decision to substantiate an allegation or its recommended discipline.  The DAO must state in writing why it is making the reconsideration request.  In response, the CCRB can modify its substantiated finding and/or discipline recommendation, or it can decide to maintain the original finding and recommendation.  In either situation, the police commissioner makes the final decision on what discipline to impose, if any, after reviewing both the DAO's and the CCRB's findings and recommendations.

The monitor team undertook a review of DAO reconsideration requests made in 2017 and in the first six months of 2018 (for substantiated CCRB cases decided in 2015, 2016, and 2017) to determine whether the court's requirements, set forth above at Section VIII.b, were being met. The monitor team reviewed 51 cases containing stop, question, frisk, or search allegations, involving 88 officers.

The monitor team reviewed the DAO's reconsideration memoranda and the CCRB's responses in all 51 cases.  Many of the cases involved the DAO's request that the CCRB reduce its discipline recommendation.  Because the DAO was not challenging the disposition, it was clear on the face of the DAO memos that its requests did not present an issue with regard to credibility.  However, in eight cases, involving 11 officers, it was necessary to review not only the DAO memo to the CCRB but also the underlying investigative files consisting of witness statements and summaries, NYPD documents (such as radio runs, stop reports, and memo books), and multiple video and audio recordings.

After reviewing these files and discussing these cases with the NYPD, the monitor team's view was that the DAO did not give sufficient deference to the CCRB's credibility findings in three cases (involving four officers) out of the eight given additional review.

## 2. Reconsideration Request Data

The NYPD provided the monitor with data regarding substantiated CCRB cases involving stop, question, frisk, or search allegations, the DAO reconsideration requests, and the outcomes of those reconsideration requests. The DAO agreed with CCRB's findings and recommendations in a majority of the cases in which allegations were substantiated by the CCRB. However, the rate of agreement decreased from 2014 to 2017. In 2014, the DAO agreed with the CCRB findings and recommendations in 82 percent of cases. In 2015, the DAO agreed with 64 percent of the substantiated CCRB cases. In 2016, the rate of agreement was 52 percent; in 2017, it was 54 percent.

**Chart 13. DAO Agreement with CCRB Recommendations, 2014-2017**

| Year | Substantiated SQF CCRB Cases Sent to NYPD | Cases in Which NYPD Agrees with CCRB Discipline Recommendation (%) | Cases in Which DAO Requested Reconsideration | Cases in Which NYPD Changed Disposition or Discipline Recommendation Without Reconsideration |
|------|------|------|------|------|
| 2014 | 193 | 159 (82%) | 20 | 14 |
| 2015 | 355 | 226 (64%) | 47 | 82 |
| 2016 | 222 | 115 (52%) | 88 | 19 |
| 2017 | 79 (closed cases) | 43 (54%) | 11 | 25 |

**Chart 14. Reconsideration Cases**

| Year | Total Number of Reconsideration Cases | Number of Cases Seeking Reconsideration of Disposition | Number of Cases Seeking Reconsideration of Discipline Recommendation |
|------|------|------|------|
| 2014 | 20 | 2 (1 partial)* | 19 (1 partial) |
| 2015 | 47 | 22 (7 partial) | 32 (7 partial) |
| 2016 | 88 | 48 (9 partial) | 49 (9 partial) |
| 2017 | 11 | 10 (4 partial) | 5 (4 partial) |

\* Cases are listed as "partial" if there are multiple allegations and the DAO requests a different reconsideration (disposition or discipline recommendation) for each

allegation, or if one or more allegations are reconsidered while other allegations in the case are not.

When the DAO requested the CCRB to reconsider its disposition or discipline recommendation, it agreed with the reconsideration request (on either the findings, the discipline recommendation, or both) in four cases in 2014, 13 cases in 2015, 13 cases in 2016 and one case in 2017.   When the DAO requested reconsideration but the CCRB maintained its recommendation and did not change its disposition or discipline recommendation, the DAO forwarded to the Police Commissioner both the CCRB findings and recommendation and the DAO recommendation.

In 2014, the Police Commissioner agreed with the DAO in 15 cases in which the DAO and CCRB disagreed; agreed with the CCRB in one case; and imposed a penalty that was in between the CCRB's and the DAO's recommendations in one case.   In 2015, the Police Commissioner agreed with the DAO recommendation in 27 cases, agreed with the CCRB in three cases, and disagreed with both recommendations in five cases.   In 2016, the Police Commissioner agreed with the DAO in 46 cases, agreed with the CCRB in 14 cases, and disagreed with both in 13 cases.

## Chart 15.  Outcome of Reconsideration Requests 2014

| Reconsideration Outcome | |
|---|---|
| CCRB agreed with DAO reconsideration request | 4 |
| CCRB reduced discipline recommendation, but not as far as DAO suggested | 11 |
| CCRB disagreed with DAO reconsideration request, and Police Commissioner agreed with the CCRB recommendation | 1* |
| CCRB disagreed with DAO reconsideration request and Police Commissioner agreed with DAO recommendation | 15** |
| Police Commissioner disagreed with both CCRB and DAO recommendations | 1 |

    *     Partial
    **   5 Partials

**Chart 16.  Outcome of Reconsideration Requests 2015**

| Reconsideration Outcome | |
|---|---|
| CCRB agreed with DAO reconsideration request | 13* |
| CCRB reduced discipline recommendation, but not as far as DAO suggested | 14 |
| CCRB disagreed with the DAO reconsideration request, and Police Commissioner agreed with the CCRB recommendation | 3 |
| CCRB disagreed with DAO reconsideration request and the Police Commissioner agreed with DAO recommendation | 27** |
| Police Commissioner disagreed with both CCRB and DAO recommendations | 5 |

    *  2 Partials
    **  6 Partials

**Chart 17.  Outcome of Reconsideration Request 2016**

| Reconsideration Outcome | |
|---|---|
| CCRB agreed with DAO reconsideration request | 13* |
| CCRB reduced discipline recommendation, but not as far as DAO suggested | 4 |
| CCRB disagreed with DAO reconsideration request, and Police Commissioner agreed with CCRB recommendation | 14** |
| CCRB disagreed with DAO reconsideration request and Police Commissioner agreed with DAO recommendation | 46*** |
| Police Commissioner disagreed with both CCRB and DAO recommendations | 13 |

    *  1 Partial
    **  5 Partials
    ***  13 Partials

In 2017, among 79 cases closed, there were 11 requests from the DAO seeking reconsideration of CCRB's disposition or recommended discipline.  Of the 11 cases in which the DAO requested reconsideration, the CCRB agreed to change its discipline recommendation in one case, agreed to reduce its discipline recommendation but not as far as the DAO requested in a second, and either declined to reconsider or maintained its recommendation in the other nine cases.  After reviewing both the CCRB recommendations and the DAO's recommendation, the Police Commissioner agreed with the DAO in seven of the ten matters and agreed with the CCRB in one case.  In two matters, the Police Commissioner disagreed with both the DAO and the CCRB regarding the final disposition of the case.

56

**Chart 18.  Outcome of Reconsideration Request 2017**

| Reconsideration Outcome | |
|---|---|
| CCRB agreed with DAO reconsideration request | 1 |
| CCRB reduced discipline recommendation, but not as far as the DAO suggested | 1 |
| CCRB disagreed with the DAO reconsideration request, and the Police Commissioner agreed with the CCRB recommendation | 1 |
| CCRB disagreed with the DAO reconsideration request and the Police Commissioner agreed with the DAO recommendation | 7 |
| Police Commissioner disagreed with both the CCRB and the DAO recommendations | 2 |

### 3.  NYPD Discipline and Penalties Imposed

The graphs and charts below illustrate the final discipline and penalties imposed for substantiated CCRB cases sent to the NYPD in 2014 through 2017.  The data show that the final discipline and penalties imposed have declined over these years.  This decline resulted from (1) changes in the initial CCRB recommendations made to the NYPD and (2) the final disposition and penalties imposed by the NYPD.  The monitor will be evaluating the appropriateness of these outcomes in a future report.

**Figure 2.  Discipline and Penalties for Substantiated Cases Sent to NYPD in 2014**



| Discipline | Number of Cases | Days or Hours Lost |
|---|---|---|
| Losing Vacation Days After Trial or Through Negotiated Plea | 51 | 270 Days Lost |
| Command Discipline B | 6 | 25 Days Lost |
| Command Discipline A | 17 | 1 Day Lost, 1 Hour Lost |
| Training Only | 35 | |
| Instructions Only | 31 | |
| Training and Instructions | 4 | |
| Member Found Not Guilty | 12 | |
| Case Dismissed | 3 | |
| No Disciplinary Action | 13 | |
| Case Closed Administratively | 7 | |
| Total Closed Cases | 179 | |

**Figure 3.  Discipline and Penalties for Substantiated Cases Sent to NYPD in 2015**



| Discipline | Number of Cases | Days or Hours Lost |
|---|---|---|
| Losing Vacation Days After Trial or Through Negotiated Plea | 31 | 239 Days Lost |
| Command Discipline B | 17 | 6 Days Lost; 1 Hour Lost |
| Command Discipline A | 67 | 25 Hours Lost |
| Training Only | 70 | |
| Instructions Only | 23 | |
| Training and Instructions | 27 | |
| Member Found Not Guilty | 11 | |

| Discipline | Number of Cases | Days or Hours Lost |
|---|---|---|
| Case Dismissed | 1 | |
| No Disciplinary Action | 10 | |
| Case Closed Administratively | 11 | |
| Total Closed Cases | 268 | |

**Figure 4.  Discipline and Penalties for Substantiated Cases Sent to NYPD in 2016**



| Discipline | Number of Cases | Days or Hours Lost |
|---|---|---|
| Losing Vacation Days After Trial or Through Negotiated Plea | 14 | 121 Days Lost |
| Command Discipline B | 8 | 4 Days Lost; 10 Hours Lost |
| Command Discipline A | 49 | 4 Days Lost; 6 Hours Lost |
| Training Only | 82 | |
| Instructions Only | 7 | |
| Training and Instructions | 23 | |
| Member Found Not Guilty | 0 | |
| No Disciplinary Action | 17 | |
| Case Closed Administratively | 9 | |
| Total Closed Cases | 212 | |

**Figure 5.  Discipline and Penalties for Substantiated Cases Sent to NYPD in 2017**



| Discipline | Number of Cases | Days or Hours Lost |
|---|---|---|
| Losing Vacation Days After Trial Or Through Negotiated Plea | 1 | 7 Days Lost |
| Command Discipline B | 2 | No Days or Hours Lost |
| Command Discipline A | 19 | 1 Day Lost; 8 Hours Lost |
| Training Only | 33 | |
| Instructions Only | 3 | |
| Training and Instructions | 7 | |
| Member Found Not Guilty | 0 | |
| No Disciplinary Action | 6 | |
| Case Closed Administratively | 8 | |
| Total Closed Cases | 79 | |

**Chart 19.  Comparison of Recommended Penalties to Final Disposition**

| Penalty Type in 2017 Closed Cases | CCRB Recommended Discipline | Final Penalty |
|---|---|---|
| Command Discipline B | 15 | 2 (2 resigned before penalty imposed) |
| Command Discipline A | 35 | 19 (1 resigned before penalty imposed) |
| Training | 20 | 33 |
| Instructions | 3 | 3 |
| Charges and Specifications | 4 | 1 (2 retired before penalty imposed) |

| Penalty Type in 2017 Closed Cases | CCRB Recommended Discipline | Final Penalty |
|---|---|---|
| No Disciplinary Action | 0 | 6 |
| Case Closed Administratively | 2* | 8 (6 retired/resigned) |
| Total | 79 | 79 |

*CCRB changed its recommended disposition before reconsideration request.

### 4.  Other Misconduct Noted (OMN)

If the CCRB, in the course of its complaint investigation, identifies misconduct outside of its jurisdiction, the Board refers the misconduct to the NYPD for investigation and any additional action.  These cases are referred to as Other Misconduct Noted, or OMN, cases.  For example, if the CCRB investigates a complaint involving a stop, frisk, or search, and determines that the subject member or members made a *Terry* stop but did not complete a stop report for the encounter, the CCRB refers the case to the NYPD as OMN.  The CCRB would also make an OMN referral where the investigation determines that a member of service may have made a false official statement in a case involving stop, frisk, or search allegations. The Internal Affairs Bureau logs these cases, assigns them to the command for investigation, and tracks the outcomes.  Below are the outcomes of the NYPD's investigations of CCRB's OMN referrals for completed CCRB cases from 2015 through July 2018.

**Chart 20.  Outcomes for Failure to Complete Stop Report (OMN Cases)**

| | 2015 | | 2016 | | 2017 | | 2018 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Command Discipline** | 16 | 29% | 18 | 16% | 10 | 13% | 0 | 0% | 44 | 14% |
| **Training** | 0 | 0% | 15 | 13% | 1 | 1% | 0 | 0% | 16 | 5% |
| **Instructions** | 31 | 56% | 56 | 48% | 24 | 32% | 0 | 0% | 111 | 36% |
| **Minor Procedural Violation** | 0 | 0% | 3 | 3% | 3 | 4% | 0 | 0% | 6 | 2% |
| **Substantiated*** | 0 | 0% | 0 | 0% | 1 | 1% | 13 | 22% | 14 | 5% |
| **Sub-NDA** | 0 | 0% | 1 | 1% | 7 | 9% | 0 | 0% | 8 | 3% |
| **NDA-DUP** | 0 | 0% | 10 | 9% | 3 | 4% | 0 | 0% | 13 | 4% |
| **Exonerated** | 2 | 4% | 4 | 3% | 2 | 3% | 6 | 10% | 14 | 5% |
| **Unfounded** | 0 | 0% | 2 | 2% | 4 | 5% | 0 | 0% | 6 | 2% |

| | 2015 | | 2016 | | 2017 | | 2018 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Unsubstantiated** | 0 | 0% | 3 | 3% | 3 | 4% | 10 | 17% | 16 | 5% |
| **Other**\*\* | 2 | 4% | 1 | 1% | 1 | 1% | 12 | 20% | 16 | 5% |
| **Still Open** | 4 | 7% | 3 | 3% | 17 | 22% | 19 | 32% | 43 | 14% |
| | **55** | **100%** | **116** | **100%** | **76** | **100%** | **60** | **100%** | **307** | **100%** |
| | | | | | | | | | | |
| **Filed** | 1 | | 1 | | 0 | | 0 | | 2 | |
| **Info/Intel** | 0 | | 0 | | 0 | | 8 | | 8 | |
| **No Disposition** | 0 | | 0 | | 0 | | 2 | | 2 | |
| **No Record Found** | 1 | | 0 | | 1 | | 2 | | 4 | |

\* Substantiated disposition, but no penalty listed.
\*\* Includes the following dispositions: Filed (2), Info/Intel (8), No Disposition (2), No Record Found (4).

## IX. Joint Remedial Process

On May 15, 2018, the court-appointed facilitator, Hon. Ariel Belen, filed his Final Report and Recommendations on the Joint Remedial Process with the court.  ECF No. 597.  Judge Belen recommended that the court order 14 specific reforms.  As noted in Section V.d, the court ordered pilot programs to assess the advisability of ordering two of the facilitator's recommendations:  (1) electronic documention of Level 1 and 2 investigative encounters; and (2) BWC activation to record Level 1 encounters.  ECF Nos. 619 and 634.  As noted in Section VII.b, the court issued an order relating to a third recommendation, directing the NYPD to develop and implement a "program for systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements."  ECF No. 662.

## X. Conclusion

During the course of this monitorship, the NYPD has made many required changes to its policies, supervision, training, auditing, performance measurement, and handling of complaints and discipline.  Most of the court-ordered policy changes have been made and the training

courses and materials related to those policies have been developed and approved by the court. Body-worn cameras have been launched in the majority of commands. And the Department has instituted improved auditing methods that better address the court-ordered reforms. A significant portion of the monitor's task is now to assess whether these changes are being implemented in the field so that the instances of unconstitutional stops and frisks are reduced, and, when such events occur, they are identified and the members corrected. Addressing the persistent problem of underreporting of stops and the failure of supervisors to deal with that underreporting and the quality of the stop reports that are filed must be part of that effort, and the monitor is hopeful that the Department's RISKS review program will move the NYPD toward that goal. Much work has been done in the course of this monitorship, and the Department is planning more, such as the RISKS review discussed in Section II.b.1. Going forward, the monitor will have to determine how those efforts translate into constitutional and respectful policing in the street and submit his conclusions to the court.