**Response to Court Order Regarding Facilitator's Recommendation No. 1**

The New York City Police Department (NYPD) uses data to identify members of the service (MOS) who may need intervention in the form of enhanced additional supervision, additional training, or other assistance. Any number of different criteria can cause the record of an MOS to be scrutinized in order to determine whether Departmental intervention would be warranted, and, if so, what form such intervention should take. Included in the criteria that currently triggers an evaluation of the record of an MOS are the following: excessive CCRB or other internally investigated complaints; relevant excessive litigation;[1] and adverse credibility findings as transmitted by various prosecutorial agencies in the City. The NYPD also collects, analyzes, and acts upon significant quantities of data through CompStat, ForceStat, and now RISKS[2] reviews. RISKS reviews, in particular, are dedicated to the review of *Terry* stops and the proper usage of body-worn cameras.

In addition, the Department reviews declinations to prosecute in order to spot any relevant trends either by individual MOS or units within the Department, although these have not yet been triggering factors for a more holistic review.

Beginning in 2013, the NYPD embarked on a project designed to consolidate disparate data in a single place and allow for that data to be used collectively to identify potentially at-risk MOS and allow for different levels of intervention in order to best remediate any identified issues. This early intervention system (EIS) is known as "RAILS" (Risk Assessment Information Liability System). Beyond its primary use as an early intervention system, RAILS is a personnel dashboard used by commanding officers as a management tool to analyze overall performance of MOS.

RAILS aggregates personnel data in one place as well as other risk performance indicators such as civilian complaints, discipline, stop reports marked by a supervisor as having an insufficient basis for the stop, frisk, or search, and transfers for cause.[3] Commanding Officers (COs) can actively query an MOS record through RAILS. In addition, COs receive auto-generated alerts anytime a designated event occurs.[4] This serves to both inform the CO of the event and

---

[1] "Excessive" can be dependent on frequency and/or outcomes. A single case that settles for over a certain threshold can trigger a review for monitoring

[2] Remediation of Identified Situations Key to Success.

[3] The fact of a stop report being marked by a supervisor as having an insufficient basis for a stop, frisk, or search is included both in RAILS and the Performance Evaluation (PERF) system. Both systems are fed directly from the Finest Online Records Management System (FORMS).

[4] Designated events include a certain number of CCRB complaints generally or CCRB complaints specifically for force within a certain period of time, negative performance evaluations, and disciplinary penalties of more than 10 days. Each alert is based on a single event. As RAILS matures, multiple events will allow for different thresholds and triggers that can alert supervisors at various levels of the command structure.

allow for timely intervention to the extent such is necessary.[5]  RAILS has been operational since October 2017 and is continually being enhanced.

Though there is currently no mechanism to assign a specific weight to particular performance indicators in RAILS, the Department plans to add such a mechanism and assign specific weights later this year.  The Risk Management Bureau (RMB) will by the end of January 2019 form a committee of stakeholders within the NYPD to determine the assignment of weight and set thresholds which will indicate the need for further review and/or intervention.[6]

This document outlines the plans of the NYPD to comply with the Court's order dated November 20, 2018 (the "Order"), ECF No. 662.  By that order, the NYPD is required to implement "a program for systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements.  This information includes: (a) declinations of prosecution by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or representation of police officers by the New York City Law Department; and (e) judgments and settlements against police officers in civil cases where in the opinion of the New York City Law Department, there exist evidence of police malfeasance." *See* The Facilitator's Final Report and Recommendations (the "Final Report"). Final Report at 219, ECF No. 597.

The NYPD proposes the following plan in order to comply with the Court's order.  Indeed, the NYPD's overall plan for RAILS will go substantially beyond the Court's order in terms of categories of information to be included in the system.  That being said, this document will deal exclusively with the Court's Order and will note, where relevant, whether information in a particular category will go beyond the minimum required by the Court.

Pursuant to the Court Order, the following categories will be included in the RAILS system and when fully developed, not only will allow for a notification of the event to an officer's CO for appropriate action, but will also allow for the weighting of each event as part of a buildup to thresholds which, when crossed, will trigger a broader review of an individual officer at the RMB level with a view toward imposing any additional necessary remedial action.

---

[5] Today, the Performance Monitoring Unit screens MOS for potential placement into a monitoring program.  This screening is conducted when an MOS receives a negative evaluation, is administratively transferred, receives a disciplinary penalty of more than 10 days, or accumulates a total of 20 Central Personnel Index (CPI) points.  The CPI point system is no longer considered state of the art and will be replaced by the weighting system to be developed in RAILS.

[6] To the extent necessary or deemed advisable, the Committee will consult with outside experts to inform its decisions.

(a) <u>Declinations to Prosecute</u>

Declinations to Prosecute (DPs) are determinations made by prosecutors to not prosecute a case which has been presented for prosecution by an MOS. Since June 2018, DPs in certain categories have been included in RAILS. There are many reasons why prosecutors decline to prosecute cases, only some of which relate to an adverse finding regarding the conduct of an officer related to stops or trespass enforcement. DPs are categorized by the individual District Attorney's Office from a predetermined list of reasons which are then transmitted to the NYPD's Criminal Justice Bureau (CJB).[7] CJB personnel enter the information into a database which feeds the information to RAILS. The inclusion of an item into RAILS causes a notification to the officer's CO alerting them to the event. The categories of declinations to prosecute that are included in RAILS are:

Incorrect/missing paperwork
Insufficient evidence
Arresting officer refuses to cooperate
Arresting officer unavailable
Defendant merely present
Lacks element of crime
Lacks jurisdiction
No ID by complainant/witness
No nexus between defendant and crime
No nexus/drugs
No valid basis for stop or frisk
Unlawful search
Violation not observed

As RAILS is developed further, events will be weighted and categorized. Weighting will, in the future, be able to be assigned to each category allowing for multiple events (be they DPs or other events) to combine to cross a threshold beyond which RMB will undertake an in-depth review of the MOS and determine what remediation, if any, is appropriate for the officer. In addition, the Risk Management Bureau will be able to analyze the data looking for any trends or patterns which reveal training needs.

---

[7] The use of declination of prosecution memoranda to add information to RAILS has the potential to implicate state law sealing provisions. *See* N.Y. CRIM. PROC. LAW § 160.50(3)(i). The City has made efforts to strike a balance between the applicable privacy protections afforded to the accused under state law with the Court-mandated remedial measures required by the Order Regarding Facilitator's Recommendation No. 1. *See* Order, *Floyd v. City of New York*, No, 08 CV 1034 (AT) (S.D.N.Y. Nov. 20, 2018).

(b) <u>Suppression Decisions</u>

Today, absent an ad hoc notification from a prosecutorial agency, the NYPD does not collect or act upon negative suppression decisions. In response to the court's November 20, 2018 order which is the subject of this proposal, the Chief Administrative Judge of the New York State Court system has directed the implementation of a pilot to address the issue of reporting of suppression decisions. Commencing on February 1, 2019, when a court exercising criminal jurisdiction within New York City suppresses evidence as a result of an unlawful stop and search, the hearing court will direct the part clerk to report the ruling, along with the written decision to the chief clerk of the county. The chief clerk will then forward the information to the NYPD and any other appropriate stakeholders. The Chief Administrative Judge has also instructed his counsel to reach out to the chief clerks to create an operational procedure that will guide this process.

Once the NYPD begins to receive these suppression decisions, the Suppression Monitoring Committee[8] will conduct an internal review of each decision in order to determine if there was fault on the part of an individual officer, and to what degree that contributed to the suppression decision. RAILS will track this and other information relative to the suppression. The Suppression Committee will discuss any identified patterns or other risk factors observed. Once vetted[9] by the Committee, suppressions will be added to RAILS as an event causing an alert to be sent to officer's CO. Again, vetted events will be assigned a weight based on relative fault of the MOS, which, when taken in combination with other events, may cause a threshold to be crossed which will trigger a holistic review of the MOS by RMB with a determination as to what remedial steps, if any, are appropriate.

It is anticipated that suppressions related to unlawful stops and searches will be added to the RAILS system shortly after the Office of Court Administration finalizes their process and begins to forward them to the NYPD.

(c) <u>Adverse Credibility Findings</u>

The NYPD has been coordinating and will continue to coordinate with each of the five District Attorneys, the Office of the Special Narcotics Prosecutor, Corporation Counsel's Family Court Division, and the United States Attorney Offices in the Eastern and Southern Districts of New York, to have those entities

---

[8] The Suppression Monitoring Committee will include members selected by the Deputy Commissioner of Risk Management (DCRM) and be chaired by either the DCRM or his or her delegate

[9] A numerical weighting will be assigned to each suppression based on the relative degree of risk posed by the conduct of the MOS.

inform the NYPD of adverse credibility findings. The Adverse Credibility Committee[10] conducts an internal review of each determination of adverse credibility as forwarded by prosecutors in order to determine the degree of fault[11] of an individual officer in any given finding. The Committee determines what follow-up actions are appropriate under the circumstances. The members of the Committee can vote to provide command notification only, to require appropriate training with command notification, to recommend that the officer's assignment be changed, or to refer the matter to IAB for further investigation. Going forward, the decision of the Adverse Credibility Committee will be noted with the event of an adverse credibility finding and an appropriate weight, determined by degree of fault, being entered into RAILS. Again, any given event, when taken in combination with other events, may cause a threshold to be crossed which will trigger a holistic review of the MOS by RMB with a determination as to what remedial steps, if any, are appropriate.

It is anticipated that adverse credibility findings will be included in RAILS in the first quarter of 2019.

(d) <u>Law Department Refusals to Indemnify</u>

While the NYPD has been tracking refusals to indemnify for some time, the information has been utilized solely by the NYPD's Legal Bureau and has not served as an independent risk indicator for individual officers.[12] Going forward, each refusal to indemnify will be entered into RAILS causing an event alert to be sent to the officer's CO. Again, any given event, when taken in combination with other events, may cause a threshold to be crossed which will trigger a holistic review of the MOS by RMB with a determination as to what remedial steps, if any, are appropriate.

It is anticipated that refusals to indemnify will be included in RAILS in the first quarter of 2019.

(e) <u>Civil Judgments Due to Malfeasance</u>

Appreciating that a qualitative review of litigation data can have value in and of itself as a performance indicator, the Department implemented a Civil Lawsuit Monitoring program in September 2013. This program utilizes basic litigation data to identify officers eligible for the program. The criteria are initially based

---

[10] The Adverse Credibility Committee is made up of high-level personnel from the Legal Bureau, the Risk Management Bureau, and the Detective Bureau.

[11] The Adverse Credibility Committee does not automatically view a finding of adverse credibility as the commission of perjury or misconduct. The Committee is focused on taking appropriate action based on a case-by-case evaluation.

[12] The NYPD does perform pattern and trend analyses utilizing indemnification decisions.

solely on a quantitative analysis of the number and type of lawsuits filed against individual officers within a set time frame. Any officer fitting these criteria can be placed in a performance monitoring program after a further qualitative analysis of the lawsuits and the underlying events.

Going forward, police action litigation[13] will be entered directly into RAILS by the Police Action Litigation Section (PALS) unit of the NYPD's Legal Bureau, after a quantitative and qualitative assessment. Litigation will be curated to determine the extent of fault of any named MOS. To the extent that an officer is found to be at fault in such litigation, a weighting commensurate with the degree of fault will be entered into RAILS which will cause an event notification to the officer's CO. The Civil Lawsuit Monitoring Committee[14] will continue to assess the need for intervention for any given MOS. Again, any given event, when taken in combination with other events, may cause a threshold to be crossed which will trigger a holistic review of the MOS by RMB with a determination as to what remedial steps, if any, are appropriate.

Due to staffing constraints and technological challenges, it is anticipated that the inclusion of MOS-involved civil litigation in RAILS will not be fully accomplished until the end of 2019. The NYPD maintains that it is already in compliance with this aspect of the Court's Order in that the Civil Lawsuit Monitoring Committee is in place and operating and will continue to receive, assess, and act on this information, as appropriate.

---

[13] Police action litigation does not include lawsuits regarding line-of-duty injuries, automobile accidents, etc.
[14] The Civil Lawsuit Monitoring Committee is made up of high-level personnel from the Legal Bureau, the Risk Management Bureau, the Chief of Department's Office, the Personnel Bureau, and the Office of Equity and Inclusion. It meets on a monthly basis.