January 28, 2019

*Via ECF*
Hon. Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     *Floyd v. City of New York*, 08 Civ. 1034
         *Davis v. City of New York*, 10 Civ. 699

Dear Judge Torres:

On behalf of Plaintiffs in the above-entitled actions, we write to provide our joint response to Defendant City of New York's Court-mandated proposed plan (*Floyd* Dkt. #681-1, *Davis* Dkt. #444-1) for implementation of the Court-appointed Facilitator's Joint Remedial Process Reform Recommendation No. 1 ("NYPD Proposal"). This recommendation requires the NYPD to develop and implement a program for "systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements." *Floyd* Dkt. #597, *Davis* Dkt. #399, at 219. This data collection program is meant to serve a dual purpose: early intervention with at-risk officers as well as "accessing and utilizing information from litigation for the monitoring and improvement of police conduct" through a "wider analyses of the data to ascertain any patterns of misconduct within units, squads, platoons, commands, and Patrol Boroughs." *Floyd* Dkt. #597, *Davis* Dkt. #399, at 220-221. The City's proposed plan completely ignores the second purpose and fails to meaningfully engage with the first.

The NYPD's Risk Assessment Information Liability System ("RAILS") offers the NYPD a way to strengthen early intervention opportunities for at-risk officers and their supervisors and identify areas of needed professional development. The RAILS tool should institutionalize effective early intervention, including embedding ongoing evaluations to maximize impact, improvement and refinement of early intervention protocols. Ongoing impact analysis of how effectively RAILS supports early intervention should involve a broad base of stakeholders (including Plaintiffs and community organizations) who may inform RAILS' operation and design. In the same vein, community-based authorities are the appropriate gatekeepers for RAILS data, rather than the internal committees and NYPD divisions referenced in the NYPD Proposal. Indeed, RAILS data is important to transparency and accountability, which are crucial to the integrity of—and public trust in—the Department's service to NYC residents.

As set forth below, Plaintiffs highlight key concerns, which are grounded in the Court's November 20, 2018 Order requiring the NYPD's implementation of the Facilitator's recommendation, see *Floyd* Dkt. #662, *Davis* Dkt. 432, as well as our expectation that the NYPD

1

RAILS system will serve as an effective tool for early intervention to identify and prevent individual and/or systemic problems with unlawful stop-and-frisk and/or trespass enforcement practices, which are at the heart of the Court-ordered monitoring and the Facilitator's recommendation.

1. **RAILS Must Facilitate Early Intervention, Not Merely Discipline, to Meet the Expectations of the Facilitator and this Court.**

The City's proposal fails to present a feedback mechanism to focus resources toward at-risk officers *before* a problem has major impact on the community. Effective early intervention requires an understanding that "[m]ost interventions are non-disciplinary, and the early intervention system is designed to identify and mitigate risks before formal disciplinary action is warranted."[1] In the Joint Remedial Process, experts and stakeholder organizations called for early intervention as a key reform,[2] and the Facilitator recognized the transformative opportunity in lower-level, formal and informal interventions (supervisor counseling, professional counseling). *Floyd* Dkt. #597, *Davis* Dkt. #399, at 98. The City's overreliance on threshold considerations limits RAILS' potential for effectively and timely intervention with "at-risk" officers, dramatically underutilizes the RAILS tool itself, and thereby fails to comply with the Facilitator's recommendation for a robust early intervention system.[3]

To meet the expectations of the Facilitator, the Plaintiffs, and this Court, RAILS must include formal structures designed to facilitate early intervention. These opportunities, which can be conceived of as teachable moments, are necessary to course-correct problematic behavior as soon as possible—ideally, well before officers' behaviors, habits, and expectations become entrenched. The City must therefore provide information about how the NYPD plans to implement these goals[4]—for example, how RAILS will be used to address officers' problematic behavior well before the threshold for Risk Management Review and intervention is reached, which is discussed in great detail in Section 3 of this submission.[5] The purpose of early intervention is to stop misconduct before it happens.

Likewise, the NYPD Proposal fails to describe how RAILS and other data will be utilized to identify patterns of misconduct beyond individual officers. The Facilitator's Recommendation

---

[1] JRP Final Report at 98 (citing JRP Final Report at 98 (citing Walker, Alpert & Kenney 2001; Walker, *Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide* at 18).

[2] JRP Final Report at 120-21, 186-7.

[3] Fidelity to the early intervention concept suggests *all* discernible events go into RAILS, including unsubstantiated complaints, weighted to trigger different types of inquiry (supervision and monitoring, training, etc.). In reality, ***all incredible officer court testimony and unconstitutional stops or searches that lead to suppression of evidence*** impact the community.

[4] RAILS should exploit opportunities to course-correct problematic behavior and refine its risk criteria and intervention protocols over time. Early intervention need not result in (or contribute to) discipline, loss of rank or privilege, or invoke concerns about due process, as implied by the nods to minimum thresholds throughout the City's proposal.

[5] In its Remedies Opinion, this Court acknowledged the importance of early intervention to accountability reforms, citing testimony that "[a] comprehensive approach is absolutely essential, because if any one of the components is absent or weak and ineffective, the entire accountability system begins to collapse." *Floyd* Dkt. #372 at 23.

adopted by the Court was not limited to data collection for the purposes of intervening solely with one officer at a time. Quoting the Office of Inspector General Report from 2015, the Facilitator endorsed the IG's conclusion: [t]he proper collection and analysis of police litigation data has the potential to reduce police misconduct, improve public safety, control costs, identify training opportunities, strengthen public confidence, and advance law enforcement oversight." *Floyd* Dkt. #597, *Davis* Dkt. #399, at 220. The Facilitator further specifically recommended "that the policy be expanded to allow for wider analyses of the data to ascertain any patterns of misconduct within units, squads, platoons, commands, and Patrol Boroughs. A higher level of accountability is equally as important, therefore the policy should include accountability measures for commanding officers and immediate supervisors based on the level of misconduct occurring under their supervision." *Id*. at 221. The value of this approach, the Facilitator concluded "may be, as recommended by the Monitor, to identify patterns and practices within commands, precincts, squads, and individual units. *Id*. at 222.

The City's proposal completely ignores the prospect of data collection and analysis beyond individual officers to evaluate squads, platoons, commands, and Patrol Boroughs; fails to identify the types of analysis that can be conducted to hold supervisors accountable for patterns of misconduct among the officers under their supervision; and fails to address how they would remedy any identified patterns.

## 2. Effective Early Intervention Requires Diverse Perspectives and Community-Based Expertise.[6]

Overarching commitments to transparency, accountability, and public input are central to all court-ordered reforms and must inform the design, implementation, and ongoing assessment and review of the RAILS tool. This Court acknowledged the importance of community involvement by recognizing that the stop-and-frisk reforms "are unlikely to be successful" if the reforms "are not perceived as legitimate by those most affected." *Floyd* Dkt. #372 at 29. To ensure this reform's success and mitigate any legitimacy concerns, the NYPD cannot be the sole arbiter determining *whether* and *when* information in the RAILS system triggers an intervention. But the NYPD proposal leaves no room for Plaintiff or community input. Accordingly, the review and decision-making associated with event weighting and intervention thresholds[7] must

---

[6] Plaintiffs seek clarification on key points of RAILS, namely what data is in the RAILS system, how it is used, and by whom it is used. For example, if the weight afforded an incident is very minor or zero, will a notification to the officer's commander still ensue (based on the fact of the event alone)? Presumptively, because this Court so mandated, RAILS includes *all events and incidents* relating to the five categories of adverse findings in the Court's November 20, 2018 Order (*Floyd* Dkt. #662, *Davis* Dkt. #432). In addition, Plaintiffs understand that an auto-alert to the commanding officer is triggered by *every instance* of declination of prosecution, suppression, judicial findings of no credibility, denials of indemnification, and judgments or settlements against police officers. Finally, it is not clear what cycle (annual or other) governs the accrual of incidents in advance of different types of intervention. Plaintiffs requests specific confirmation about these issues, among others, and leave to supplement this submission to the Court if necessary.

[7] As discussed above, Plaintiffs maintain that any qualified event—without any predetermined weighting— should be included in RAILS in order to achieve the broad, overall goal of early intervention. However, to the extent that the NYPD utilizes any weighting or thresholds to trigger certain acts of intervention, Plaintiffs and community stakeholders should participate in the development of those criteria.

include community and municipal government stakeholders outside of the NYPD. Indeed, the Facilitator contemplated such a "community commission," which would be comprised of an interdisciplinary "core group of volunteers from diverse disciplines . . . [who are] able to discuss and shape the patterns and practices within the NYPD." *Floyd* Dkt. #597, *Davis* Dkt. #399 at 215-16.

The effectiveness of RAILS depends on its capacity to improve the way that New York City residents and visitors experience policing and interact with police officers. Notably, this Court found "[t]he communities most affected by the NYPD's use of stop and frisk have a distinct perspective that is highly relevant to crafting effective reforms. No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety." *Floyd* Dkt. #372 at 29. Whether grounded in malice or negligence, according to the Court at trial, bad stops and searches, unlawful arrests, the use of force, and racial profiling dramatically impact community members, and their experience of policing, long before a court examines their legality. *Floyd* Liability Op., Dkt. #373 at 3.[8] Moreover, this Court identified the importance of the Joint Remedial Process "to repair the damage that was done during the years that the defendants in these cases violated the plaintiffs' constitutional rights." *Davis* Dkt. #340, at 4. It should, therefore, come as no surprise that community members have called for an early intervention tool for this exact purpose.[9]

At its core, the early intervention system must be operationalized to address and provide interventions to eliminate misconduct before it happens. Indeed, the Facilitator recognized this important goal by mandating that the New York City Law Department, the various District Attorneys' offices, and the New York City criminal courts should inform the determination on how to systematize review of misconduct by officers during Terry stops and trespass enforcement actions. *Floyd* Dkt. #597 at 221. Moreover, as specified in the Joint Remedial Process Final Report and Recommendations, "quality assurance" of the information described is also necessary for a robust review and consideration of various adverse events. *Floyd* Dkt. #597 at 221 *et seq*. Although there are many promising possibilities for effective early intervention, none of these benefits can be actualized without the inclusion of diverse perspectives and community-based experiences. The NYPD must thus address how it plans to comply with the Facilitator's recommendations, which are also reflected in this Court's opinions, about community input and perspectives as part of an early intervention system. As a starting point, we propose the solutions discussed below.

---

[8] In its Liability Opinion, the Court stated:

> [I]t is important to recognize the human toll of unconstitutional stops. While it is true that any one stop is a limited intrusion in duration and deprivation of liberty, each stop is also a demeaning and humiliating experience. No one should live in fear of being stopped whenever he leaves his home to go about the activities of daily life. Those who are routinely subjected to stops are overwhelmingly people of color, and they are justifiably troubled to be singled out when many of them have done nothing to attract the unwanted attention.

*Floyd* Dkt. #373 at 3

[9] *Floyd* Dkt. #597, *Davis* Dkt. #399, at 83 (citing Adams, E. L., Brewer, G., Siegel, N. *Improving Police Community Relations: A Report from a Series of Town Hall Meetings in Brooklyn and Manhattan* (2015).)

Stakeholder Committee

The City proposes to develop an internal NYPD committee of stakeholders "to determine the assignment of weight and set thresholds which will indicate the need for further review and/or intervention." *Floyd* Dkt. 681-1, *Davis* Dkt. 444-1, at 2. Presumably, this committee is charged with setting policy to inform decision-making in evaluating individual officer conduct in the five categories set forth in the Court's November 20, 2018 Order, including assigning specific weights to the various kinds of negative information about officers in RAILS and establishing concrete thresholds for various types of intervention, including systemic intervention. Outside expertise and perspectives will be solicited only "to the extent necessary or deemed advisable." *Id.* at n. 6.

This understanding of expertise and perspectives is limited and ineffective. Other non-NYPD municipal institutions and community representatives, are clearly stakeholders with important expertise that should also inform the development of these policies. Unilaterally setting RAILS information weights and intervention thresholds without input from community and other non-NYPD stakeholders contravenes the spirit and the letter of the Facilitator's recommendation. The recommendation consistently encourages NYPD to collaborate with outside stakeholders to develop notification and intervention protocols. *Floyd* Dkt. #597, *Davis* Dkt. 399, at 219 *et seq.* Plaintiffs believe that a Stakeholder Committee—representing a broader inclusion of perspectives and expertise—is instrumental to the success of an early intervention system.

Five Categories of Feedback

Determining what weight to assign information in RAILS delimits the universe of what early intervention and pattern recognition can be. Weighting of incidents also structures the possibilities for timely and appropriate interventions. NYPD should not be the sole arbiter of which data can and cannot inform early intervention and pattern recognition efforts. Effective early intervention with officers, supervisors, units and recurring patterns of misconduct requires an outside perspective more inclined to question than to rationalize or justify minor events.[10] Early intervention is not the canary in the coalmine, but the capacity to extract the canary the moment its song falters and preserve its life. Insight and awareness requires alternative framings and a critical inquiry. Without diversity of perspective and outside input at this stage, RAILS shifts from an important early intervention tool to merely a rubber stamp. This is of particular concern with respect to the following five categories, which involve managing and preventing misconduct in addition to early intervention.

(a) Declinations of Prosecutions by the District Attorneys in New York City;

---

[10] While this submission is limited to the categories of adverse findings contained within the Court's November 20, 2018 Order, *Floyd* Dkt. #662, *Davis* Dkt. #432, many of these categories involve extraordinary and unusual circumstances. For the early intervention analysis, other data could inform RAILS early intervention, including community input, existing lists of "officers of concern" maintained by the District Attorneys' offices, *see e.g.,* Joseph, G., *Lawsuit: Manhattan D.A.'s Office Tracks Cops With 'Credibility' Problems, But Refuses To Release Its List*, The Appeal (Oct. 22, 2018)(citing *Stengel v. Vance*, Index No.159740/2018 (Art. 78 Pet'n), and other extrinsic information.

The City's proposal for "systematically receiving, assessing, and acting on" cases where the relevant District Attorney has declined to prosecute (DPs) involves (i) entering only those DPs that fall within predetermined categories into RAILS, (ii) notification to a commanding officer, (iii) weighting and categorizing of DPs (in the future), and (iv) pattern/trend analysis by the Risk Management Bureau.

Unlike most other categories, the large number of DPs make them an important and valuable source of information and data for RAILS, offering fruitful data for early intervention and corrective action at multiple levels of supervision. As the Facilitator's Final Report rightly asserted, "[a] higher level of accountability is equally as important, therefore the policy should include accountability measures for commanding officers and immediate supervisors based on the level of misconduct occurring under their supervision." *Floyd* Dkt. #597, *Davis* Dkt. 399, at 221.

The value, credibility, and legitimacy of any future weighting and categorization of DP categories require broad representation in the decision process by municipal and other non-NYPD institutions. In addition, it is not clear which specific categories of declinations have been excluded from RAILS, and Plaintiffs would ask that this information be added to the City's proposal, with reasoning if necessary. The inclusion of additional categories into RAILS (e.g., arrests of minors later adjudicated in family court or non-prosecution as a matter of policy) may be warranted. For example, if a District Attorney has a policy not to prosecute low-level marijuana possession or turnstile jumping, these arrests may result in a DP and reflect inappropriate conduct and/or racial profiling without triggering one of the enumerated DP categories that feeds RAILS.

(b) Suppression Decisions Resulting from Unlawful Stops and Searches

The City's proposed process for incorporating into RAILS court decisions suppressing evidence in criminal cases is triggered by court-initiated notification of a suppression decision.[11] *Floyd* Dkt. #681-1, *Davis* Dkt. # 444-1, at 4. Then, the City proposes that an internal NYPD Monitoring Committee assess (i) *whether* an officer was at fault, and (ii) whether the officer's conduct contributed to the court's decision to suppress evidence. *Id.* Suppression incidents will be weighted according to these criteria and entered into RAILS. *Id.* NYPD does not provide a compelling reason to "vet" the court's decision, nor does it address putative concerns about how a process that lacks transparency could shield or provide cover for misconduct.

As an initial matter, the proposed process fails to respect the judicial process. A judicial finding deserves considerable deference. These suppression decisions are based typically on live testimony about how a police officer's conduct in some way ran afoul of the law. It is thus

---

[11] According to this Court's Nov. 20 Order and the Facilitator's recommendation, relevant information on suppression decisions is not limited to suppression decisions made by the courts of New York State. The City must also include suppression decisions against NYPD officers by federal courts in federal criminal cases. The NYPD's proposal must specify how notifications of suppression decisions from federal courts—including but not limited to SDNY and EDNY, as well as any other relevant jurisdictions, courts, or tribunals—will be conducted and how this information will be incorporated into RAILS.

inappropriate for NYPD personnel or others to parse a court's language to distill and allocate fault to an individual officer from a complex and holistic decision to suppress, especially when those reviewing are completely detached from the underlying proceedings.

Second, the NYPD's proposal is an unworkable mechanism due to the individuality of trial courts. Courts rule on suppression in various forms, including in published written decisions, orally from the bench and, in some cases, courts rule on the papers or by stipulation of the parties. Some judges offer extensive reasoning, while other judges support their conclusions with minimal analysis. In many cases, a review of transcripts and case files would be required to discern a court's reasoning with respect to specific officers. Many courts are also very careful to avoid assigning fault, tracking the language of case law and referring to "the totality of the circumstances." It is wildly aspirational to suggest that an NYPD committee could evaluate a particular officer's conduct vis-à-vis a court's decision to suppress, absent extraordinary circumstances.

Third, the vast majority of pretrial suppression hearings in New York City directly focus on a court's opinion of individual officers' conduct—for example, challenging the appropriate use of identification procedures (*Wade* hearings), statements (*Huntley* hearings), property (*Mapp* hearings), probable cause (*Dunaway* hearings), and to a lesser extent, search warrants (*Darden* hearings) in criminal prosecutions. Review and ranking of courts' analyses on these topics is inappropriate and unnecessary.

Fourth, there is no reason to believe that an internal NYPD Monitoring Committee will have greater or even comparable expertise in determining whether an officer was at fault, to that of an experienced criminal court judge who evaluates the credibility of police officer testimony on a daily basis. Permitting review by an internal, "black box" NYPD committee would effectively undercut or undermine the credibility determinations made by a judge who listens to testimony and reviews documents.

For these reasons, it is inappropriate and ineffective for an internal-only NYPD committee to conduct the weighting of suppression decisions in RAILS. Absent extraordinary circumstances, a suppression decision implicates the officers directly and indirectly involved. Even if certain officers were less involved in the stop, search, and/or arrest, an early intervention system can promote the understanding that accountability requires incentives for every officer involved to insist upon appropriate behavior. At the very least, the New York City Law Department, the relevant district attorneys, defense attorneys, Plaintiffs' representatives, and community perspectives should inform any weighting of these incidents and the possibilities for effective early intervention and systemic reform.

(c)  Court Findings of Non-credible Testimony

Like the suppression context, a judicial finding that a police officer lacks credibility under oath is a serious event.[12] However, the City proposes that an internal, NYPD-only Adverse Credibility Committee will review and determine an individual's level of fault as a threshold consideration. *Floyd* Dkt. #681-1, *Davis* Dkt. #444-1, at 5. Only then would the event and the assigned weight be entered into RAILS. *Id.* The Adverse Credibility Committee is also charged with mandating the appropriate interventions, ranging from command notification to training to assignment change to IAB referral. *Id.*

The City's approach is problematic in two respects. First, unlike the NYPD Proposal, the Adverse Credibility Committee must include perspectives from community-based and municipal institutions outside of NYPD. Second, as set forth in the suppression context, the NYPD should grant deference, not further review, to judicial decision-making, out of respect for the judicial process and because the record may not adequately detail the court's reasoning with respect to a particular officer's conduct.

The Facilitator's recommendations encourage collaboration among a broad range of perspectives and expertise. The Facilitator recognized that events in the referenced five categories were already recorded, but that integration of robust and systematic processes and expertise could positively impact the quality and the timeliness of interventions. *Floyd* Dkt. #597, *Davis* Dkt. #399, at 219-21. "NYPD should create a more discernible and concrete system, ***in conjunction with the various New York City District Attorneys and the New York City Law Department,*** to address adverse credibility findings by courts with respect to officer testimony." *Id.* at 221 (emphasis added). Thus, in addition to questioning the appropriateness of NYPD "review" of a judicial finding of a lack of credibility, Plaintiffs note that unilateral decision-making about weights and thresholds in this context is contrary to the Facilitator's recommended course of action.

(d)  Denials of Indemnification and/or Representation of Police Officers

The City's proposal indicates that all denials of indemnification or representation by the New York City Law Department will be entered into RAILS. *Floyd* Dkt. #681-1, *Davis* Dkt. #444-1, at 5. This is warranted as these denials typically involve extreme and unusual circumstances. The City also indicates that NYPD already tracks refusals to indemnify in this area.

As discussed throughout, community-based perspectives confer legitimacy, while driving innovation and effectiveness by broadening the scope of critical inquiry, information, and

---

[12] As with suppression decisions, *supra,* and according to this Court's Nov. 20 Order and the Facilitator's Recommendations, relevant information on adverse credibility determinations is not limited to findings made by the courts of New York State. The City is also required to include adverse credibility determinations against NYPD officers by federal courts in federal criminal cases. The NYPD's proposal must specify how notifications of adverse credibility determinations from federal courts, including but not limited to, SDNY and EDNY, as well as any other relevant jurisdictions, courts, or tribunals, will be conducted and how this information will be incorporated into RAILS.

interests. Particularly when analyzed against the other categories referenced in the Court's November 20, 2018 Order and other variables in RAILS data, this information (and whatever statistically linked variables might exist) could reveal key avenues for early intervention. These possibilities should be explicitly factored into the design, operation, and enhancements to the RAILS tool, as well as the importance of including community-based resources and perspectives.

(e) Judgments and Settlements Against Police Officers in Civil Cases

The City's proposal asserts that the NYPD will internally assess litigation against NYPD officers via the NYPD Legal Bureau and the Civil Lawsuit Monitoring Committee, which is comprised of high level NYPD legal, risk management, and human resources personnel. *Floyd* Dkt. #681-1, *Davis* Dkt. #444-1, at 6. This quantitative and qualitative assessment of the subject officer's fault in the litigation will determine what weight, if any, a particular case receives in RAILS. However, this procedure violates the Court's November 20, 2018 Order mandating inclusion of litigation information "where, *in the opinion of the New York City Law Department*, there exists evidence of police malfeasance." *Floyd* Dkt. #662, *Davis* Dkt. #432 (emphasis added). This Court specifically required, with respect to litigation, that threshold determinations about officers' fault in litigation must be made by the New York City Law Department—not the NYPD Legal Bureau, as proposed by the City. Thus, the City is incorrect to assert that the preexisting Civil Lawsuit Monitoring Committee satisfies this aspect of the Court's Order. *Floyd* Dkt. #681-1, *Davis* Dkt. #444-1, at 6.

Like the other categories of conduct at issue here, the NYPD's proposal does not engender public legitimacy or sufficient commitment to effective early intervention and systemic intervention by involving only NYPD personnel, without any outside input or perspective. Additionally, as discussed above, the NYPD Proposal fails to describe how it will collect and analyze data and remedy patterns of misconduct beyond early intervention with individual officers. Litigation data could be particularly helpful in identifying reoccurring violations to improve guidelines, training, and supervision of officers so that future violations may be prevented.

**3. Effective Early Intervention Requires Investing in Leadership at Every Level.**

The NYPD Proposal fails to detail how supervisors and managers at the command level will address incidents recorded in RAILS or otherwise ripe for early intervention. It appears that each of the five categories above will trigger a command notification. In addition, the City asserts that, within RAILS, "[w]eighting will, in the future, be able to be assigned to each category allowing for multiple events (be they DPs or other events) to combine to cross a threshold beyond which [Risk Management Bureau] will undertake an in-depth review of the MOS and determine what remediation, if any, is appropriate for the officer." *Floyd* Dkt #681-1, *Davis* Dktt. #444-1, at 2. Laudably, and consistent with the Facilitator's recommendations, "the Risk Management Bureau will be able to analyze the data looking for any trends or patterns which reveal training needs." *Id.* at 3. Contrary to the Facilitator's recommendation, however, they limit the pattern recognition analysis to declined prosecutions. *Id.*

As noted by this Court and the Facilitator, supervisors and managers on the front lines of early intervention must also engage with RAILS data in a timely and consistent manner. This Court found that an early intervention program will allow the information "to be reviewed systematically and analyzed by supervisors and officers as a matter of course, fostering greater accountability." *Floyd* Dkt. #662, *Davis* Dkt. #432 (citing JRP Final Report, *Floyd* Dkt. #597, *Davis* Dkt. #399, at 222). Yet there is no information in the NYPD Proposal regarding how squad and unit supervisors, platoon commanders, and even commanding officers will regularly engage and use RAILS. Nor has the City set forth a plan to build out leadership capacity and quality to create effective avenues and incentives for early intervention by supervisors and officers. Not only does this seriously underutilize the RAILS tool, it also fails to maximize ground-level, local, timely interventions between officer and supervisor that have the most potential to effectively course-correct potentially problematic behavior.

(a) Management and Supervisors at Every Level Should Participate in RAILS, Including Documenting Interventions.

The City's failure to build out the early intervention role of supervisors and command-level leadership contravenes the Facilitator's recommendation of a viable early intervention system. Underscoring the role of direct supervision, the Facilitator recommended that RAILS incidents "be reviewed systematically and analyzed by supervisors and officers as a matter of course, fostering greater accountability." *Floyd* Dkt. #597, *Davis* Dkt. #399, at 221 (emphasis added). RAILS is a means to bring accountability and transparency measures to street-level encounters systematically: "early intervention systems foster a culture of accountability and give managers better data with which to make decisions." *Id.* at 99. The Facilitator stated that a primary benefit of a robust early intervention system is "to identify patterns and practices within commands, precincts, squads, and individual units." *Id.* at 222.

Early intervention requires commitment across an organization; it is more than risk management. The Final Report recognized this importance: "As with any organization, effective performance depends on a shared understanding of organizational objectives and task-specific requirements, the ability of supervisors to monitor performance, and the expectation that both good and bad performance will be met with the appropriate response." *Id.* at 108. Yet, outside of intervention by the Risk Management Bureau, intervention contemplated in the NYPD Proposal largely involves auto-generated alerts to commanding officers. Importantly, the City does not explain what these command notifications involve or require from the commander. Most American adults today are inundated with digital notifications; mere "breaking news" notifications—without investigation or action prompts—are not an effective mechanism for early individual or systemic intervention.

Moreover, the NYPD Proposal fails to address critical aspects of early intervention systems, including but not limited to: (i) whether command notifications are limited to precinct commanders, (ii) what response or action is required, if any, upon receiving command notifications, (iii) what notifications, if any, are received by squad supervisors, unit sergeants, platoon commanders, and others with direct supervisory authority over line officers, (iv) whether and how supervisors are required to document their responsive interventions (within RAILS or otherwise), (v) how analysis of supervisor interventions will inform early intervention, and (vi)

10

how the NYPD can measure the effectiveness of the interventions documented based on RAILS notifications (or other sources).

Consistent with the Facilitator's discussion of effective early intervention systems in the JRP Final Report, RAILS should facilitate interventions by line supervisors, sergeants, commanding officers, and other managers formally and informally, as well as promote these managers' individual investment in effective oversight and compliance.[13] At a minimum, supervisors and team leaders at every level should be required to receive and respond to RAILS-related notifications and document their investigations and interventions. NYPD must create a data bank of interventions, which can be analyzed for effectiveness, innovation, scalability, and refinement. Plaintiffs ask that the City "complete the narrative" of early intervention, which extends beyond flagging potential risk or misconduct, but includes building robust and effective systems for intervention and prevention.

(b) Effective Early Intervention Requires Building Leadership Capacity and Quality

The City offers no information on how RAILS will link early intervention to building leadership capacity and quality, a necessary component of early intervention. Robust early intervention systems incentivize managers and supervisors to take responsibility for their team's compliance, curating supervising officers' personal investment in early intervention. RAILS can put at-risk officers and problematic issues on the radar sooner, creating room to explore individualized, positive interventions at multiple supervision levels. Once notified, the JRP Final Report notes, "supervisors use data *and their own analysis* to determine root causes and select appropriate risk treatments." *Floyd* Dkt. #597, *Davis* Dkt. #399, at 98 (emphasis added). An effective early intervention system requires a data bank of recorded interventions by supervising officers and shared accountability for organizational goals.

The City makes no reference to this very significant aspect of any early intervention system: using RAILS, the NYPD must invest in managers as a means of ensuring constitutional policing and mitigating racial profiling. The proposal should include affirmative intervention at teachable moments by squad or unit supervisors, platoon commanders, sergeants, and commanding officers. An effective early intervention system "allows for the data metrics, threshold counts, and interventions to be passed up the chain so that departmental leadership can make better policy decisions and department-wide interventions, creating a chain of accountability." *Floyd* Dkt. #597, *Davis* Dkt. #399, at 99. Although the NYPD Proposal fails to acknowledge this overarching priority, the NYPD must promote a robust incentive structure around compliance[14] and set forth quality assurance mechanisms to refine and perfect early intervention.[15] RAILS must include clear metrics to build a managerial mindset: *I am responsible*

---

[13] JRP Final Report, *Floyd* Dkt. #597, *Davis* Dkt. #399, at 98 (citing Walker, *Institutionalizing Police Accountability Reforms: The Problem of Making Police Reforms Endure*, 32 St. Louis U. Pub. L. Rev. at 77. )

[14] This may include awards and recognition, as well as inclusion into exclusive mentoring and coaching cohorts.

[15] For example, "executive coaching" could be an effective tool in this context. This common intervention could thrive inside NYPD organizational culture. NYPD should create a competitive and exclusive" Coaching Cohort" of stellar mentor officers who could train, mentor, and intervene as necessary. This should include modeling

*for the professional development, the success, and the retention of my people.* These goals should be baked into the promotion structure: promotion criteria should include outcomes around oversight and supervision goals.

Similarly, a robust early intervention system must develop ***active bystanders*** who will deter, mitigate, or report unconstitutional policing, racial profiling, or other misconduct. Building leadership in, and commitment to, a shift in organizational culture among bystander peer officers and sergeants situates the prevention of misconduct directly within the "We Take Care of Our Own" culture, shifting mutual support from potential cover-up to prevention.[16] This strategy has been used very effectively in police reform initiatives and in the U.S. military. In New Orleans, the police department's EPIC policy,[17] developed as part of the federal consent decree monitorship there, "created an expectation that officers should step in when a colleague is misbehaving… and stop the bad acts before they happen or else report them."[18] In addition to enhancing constitutionality and citizen respect, this approach is associated with a significant drop in civilian complaints *and* union support it helps officers avoid disciplinary problems through a front-end, supply-side intervention.[19] Similarly, the U.S. military's approach to its well-documented and longstanding sexual harassment and assault problem has been culture shift via active bystandership, refocusing training toward the idea that personnel should not witness misconduct without intervening.[20] This shift to create a collective culture of compliance can be supported by RAILS, including by pattern analysis for officers and units most at risk.

Thus, with respect to both supervisors and bystanders, linking early intervention with leadership incentives and expectations has the added benefit of leveraging existing principles of NYPD's organizational culture. As the Facilitator stated in the JRP Final Report, "misconduct occurs when police departments formally and informally support misconduct."[21] NYPD has always had a very strong, ingrained, distinct organizational culture. Recruits are habituated to NYPD official and unofficial norms as though entering a "brotherhood." As the Facilitator recognized, RAILS creates an opportunity to leverage the strength of NYPD's chain of command and its organizational culture in favor of our shared compliance goals.[22] *Floyd* Dkt. #597, *Davis*

---

appropriate interventions for managers and leaders of teams flagged for early intervention. The Department could task supervising officers with refining what best practices look like and reward innovation accordingly.

[16] Organizational transformation experts would refer to this as "building champions."

[17] EPIC stands for Ethical Policing Is Courageous.

[18] See Jackman, T., *New Orleans police pioneer new way to stop misconduct, remove 'blue wall of silence'*, The Washington Post (Jan. 24, 2019).

[19] *Id*.

[20] See e.g., Miller, C., *Sexual Harassment Training Doesn't Work. But Some Things Do*, The New York Times (Dec. 11, 2017); Elliman, T. D., et al., *Prevalence of Bystander Intervention Opportunities and Behaviors Among U.S. Army Soldiers*, 45 Health Educ. & Behav. 741 (Jan. 20, 2018) (demonstrating significantly higher incidence of opportunities to intervene and intervention among lower-ranked personnel).

[21] *Floyd* Dkt. #597, *Davis* Dkt. #399, at 99.

[22] In the JRP Final Report, the Facilitator also placed considerable emphasis on shift in organizational culture as important to durable change and accountability:

Dkt. #399, at 93. By creating and aligning leadership incentives with compliance goals, RAILS can be an important way to tap into organizational culture as a means of compliance.

### 4. Ongoing Assessment and Review of RAILS Should Inform Monitoring Process.

The design, enactment, operation, metrics, and ongoing evaluation of RAILS should be tied to the monitoring process and must incorporate ongoing input from the Plaintiffs and other non-NYPD sources. As with any algorithm or tool, testing it "in operation" must be institutionalized.[23] Where, as here, the impact of this intervention is best measured against community experience of policing, it is important that the Plaintiffs and the Monitor are involved in curating the RAILS process and interventions to best achieve its goals. The purpose of an early intervention is to prevent unlawful behavior by police officers and the collateral consequences to community members that result from unconstitutional policing and racial profiling. This early intervention tool must aim to disrupt patterns feeding unlawful stops, seizures, and arrests. In operation, relevant challenges, strengths, and improvements to RAILS will be important feedback to inform the monitoring process.

Indeed, the Facilitator made his recommendation for an early intervention system, which the Court subsequently ordered to be implemented, in the context of this Monitoring process to reform entrenched and systemic NYPD policies and practices that had led to widespread constitutional violations. Early intervention and the prevention of unlawful police conduct is, therefore, at the very core of what the Monitoring process seeks to measure and mitigate. The Plaintiffs and the Monitor should invest heavily in its success. An effective RAILS early intervention is essential to the successful reform of the NYPD. Thus, ensuring the rigor of the RAILS instrument and RAILS review should be institutionalized as a regular aspect of the Monitoring process.

### 5. Public Data, the Industry Standard, Is Particularly Important

Importantly, the RAILS and other data referenced in the NYPD Proposal should be public, open aggregate data. In the JRP Final Report, the Facilitator emphasizes the importance of open data in order to reverse the public's eroded trust in the Department.[24] Particularly with

---

Accountability also requires that organizations ensure members are adhering to organizational standards, rules, values, and expectations. This may be achieved through ongoing enterprise risk management, the implementation of effective internal controls, clear ways to escalate identified risks, internal 'watchdog' groups, rewards for operating within the established framework, clear directives from leadership, willingness to correct noncompliance, and a fair disciplinary process.

*Floyd* Dkt. #597, *Davis* Dkt. #399, at 93

[23] Archbold, C., *Managing the bottom line: risk management in policing,* 28 Policing: Int'l J. of Police Strategies & Mgt. 30 (2005).

[24] JRP Final Report, *Floyd* Dkt. #597, *Davis* Dkt. #399, at 104 (*citing* Harris, *How Accountability-Based Policing Can Reinforce – or Replace – the Fourth Amendment Exclusionary Rule*, 7 Ohio St. J. Crim. L. at 177-78 *and* Stephens, *Police Discipline: A Case for Change*, at 21).

respect to public agencies, open data increases community trust, supports a public check function and legitimacy, and widens the base of problem-solvers refining and improving our solutions.

Even more importantly, the public is entitled to this information. Maintaining the maximum public disclosure of this data also improves the quality of an early intervention protocol. The transformative potential of data-driven tools, like the RAILS tool, lies in the State and the City of New York's commitments to open data elsewhere. The open data commitment recognizes that allowing maximum public access to data can promote innovation and build legitimacy. New York has specifically been a leader in its commitments to opening government data for robust public-driven reforms.[25]

McKinsey's Public Sector Group noted in 2014 that, for government, "[t]he expansion of open data, combined with advances in big data analytics, is freeing information that was once trapped inside the dusty pages of overlooked reports, enabling improved decision making, new product and service offerings, and greater accountability."[26] The potential for expansive and transformative open data solutions in this case abound: for example, challenges in using and evaluating narrative data have been the subject of rigorous study and innovative scientific solutions in recent years.[27] These include approaches to assessing qualitative and narrative data relating to state of mind and skill level.[28]

With respect to RAILS, the Court and the NYPD should seek to maximize transparency in the spirit of the Open Data Law, which acknowledges that (1) public resources, including data, should be public, and (2) remarkable innovation and advancements in "big data" interventions have relied on widespread access to large scale data sets.

---

[25] The Open Data Plan was codified on March 7, 2012 as New York City Administrative Code Section 23-501 *et seq.* and further developed in the 2015 report, *Open Data For All*, which states:

> The promise of Open Data is transparent, free, accessible data. Data is more than just numbers – it's information that can create new opportunities and level the playing field for New Yorkers. It's the illumination that changes frameworks, the insight that turns impenetrable issues into solvable problems. It's the invitation for more voices to join critical conversations. Open Data is the commitment that all of these benefits are not confined to only a select few who are in the know, or who can pay for information – they are for everyone. New York City is dedicated to putting this power into the hands of all New Yorkers.

City of New York, *Open Data for All* at 5 (July 2015).

[26] Michael Chui, Diana Farrell, and Kate Jackson, *How Government Can Promote Open Data and Help Unleash Over $3 Trillion in Economic Value*, GOVERNMENT DESIGNED FOR NEW TIMES, McKinsey & Co. Public Sector Group (Apr. 2014) (available here).

[27] *See e.g.,* Tausczik, Y. R. & Pennebaker, J. W., *The Psychological Meaning of Words: LIWC and Computerized Text Analysis Methods'*, 29 J. OF LANGUAGE AND SOC. PSYCHOL. 24, (2010) (describing how Linguistic Inquiry & Word Count, a transparent text analysis program, can "detect meaning in a wide variety of experimental settings, including to show attentional focus, emotionality, social relationships, thinking styles, and individual differences").
[28] *See e.g.,* Al-Mosaiwi, M., & Johnstone, T. *In an Absolute State: Elevated Use of Absolutist Words Is a Marker Specific to Anxiety, Depression, and Suicidal Ideation*, 6 Clinical Psychol. Science 529 (2018) (scientifically linking use of words like "always" and "never" in writing to presence of depression in the writer) and Brooks, B. et al., *Using Word Clouds For Fast, Formative Assessment Of Students' Short Written Responses,* 48 Chem. Engineering Ed. 190 (Fall 2014) (using of word clouds as "a formative assessment tool that can provide instructors and students with valuable, timely feedback").

14

Thank you for your time and consideration.

Respectfully submitted,


\s\ Dominique Day
Dominique Day
Jonathan C. Moore
Luna Droubi
BELDOCK, LEVINE & HOFFMAN, LLP

\s\ Darius Charney
Darius Charney
Guadalupe Aguirre
CENTER FOR CONSITUTIONAL RIGHTS

*Attorneys for Floyd Plaintiffs*


\s\ Jin Hee Lee
Jin Hee Lee
John Cusick
Aaron Sussman

NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.


\s\Cynthia Conti-Cook
Cynthia Conti-Cook
Steven Wasserman
THE LEGAL AID SOCIETY

*Attorneys for Davis Plaintiffs*