**Response to Plaintiffs' Submissions on Department's Response to Court Order Regarding Facilitator's Recommendation No. 1**

### I.        Introduction

In an opinion and order issued on August 12, 2013, the Court directed that the parties participate in a community-input process (the "Joint Remedial Process") to develop reforms "no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments."[1]  As a result of this process, the Court, on November 20, 2018, ordered that the Department, in consultation with the Monitor, submit a plan to implement a program to systematically receive, assess, and act on five specific categories of "information regarding adverse findings of conduct of police officers involving illegal stops or illegal trespass enforcement" (the "Order").[2]  On January 14, 2019, the Department submitted its plan[3] to comply with this Order.  Counsel for the *Floyd* and *Davis* plaintiffs submitted a joint response[4] and *Ligon* counsel submitted a separate response[5] raising concerns regarding certain aspects of the plan.  The Department has reviewed these comments and we respond below.

The plan that the Department submitted in January sets forth how each of these five types of information will be received, assessed, and when appropriate, acted upon.   While the Department believes that the plan, as submitted, fulfils the requirements of the court order, this submission will further explain the process and will then address some of the concerns raised by the plaintiffs.  The Department appreciates the feedback and suggestions from the Facilitator, the

---

[1]  *Floyd v. City of New York*, 959 F. Supp. 2d 668, 687 (S.D.N.Y. 2013).
[2]  *Floyd* ECF No. 662.  The categories are: (a) declinations of prosecutions by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or representation of police officers by the New York City Law Department; and (e) judgments and settlements against police officers in civil cases where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance.  *Id.* at 2.
[3]  *Floyd* ECF No. 681.
[4]  *Floyd* ECF No. 686.
[5]  *Ligon* ECF No. 364.

Monitor, and the plaintiffs and is always looking for ways to improve its ongoing efforts to correct deficient behavior.

## II.        Our Current System

Timely and effective intervention is and has been a priority for the Department since well before the monitorship began.  Indeed, the NYPD has long had a variety of intervention programs and continues to add to the programs as part of its process of continuous improvement.[6]  The goal is for the NYPD to be able to identify problematic behavior at the earliest possible opportunity and correct it.

The Department is committed to providing all uniformed members of service (MOS)[7] the tools and knowledge necessary to succeed in each and every aspect of their job, which when properly employed avoid the need for formal intervention.  The Department's commitment begins with recruit training, followed by formalized field training, and, importantly, continues throughout the career of an MOS with frequent in-service training and one-on-one mentoring through regular supervision.  In addition, the success of MOS is measured on a quarterly basis through the performance evaluation system.  This training, mentoring and evaluation is effective and more than sufficient for the vast majority of MOS.  It is only a small percentage of individuals who require formal intervention to address shortcomings.

The purpose of formal early intervention is to utilize risk management strategies to intervene at the first opportunity in order to support employee wellness and professional development by attempting to identify and mitigate factors which may lead to negative

---

[6] As part of the continuous improvement process, it should be noted that the Police Commissioner recently indicated that the Department will be adopting all of the recommendations of the Report of the Independent Panel on the Disciplinary System of the NYPD including the study and consideration of adopting a disciplinary matrix.

[7] The term MOS as used herein refers to uniformed members of the service.  Early intervention strategies for civilian members of the service vary from those of uniformed members, and are beyond the scope of the Monitorship and this submission.

performance issues, employee discipline (or in some cases, additional discipline) and/or liability to the Department.  Formal intervention is not meant to be punitive or disciplinary in nature, although entry into the program may be engendered by a pending or completed disciplinary action.  Rather, formal intervention is a form of supervision, at its core, designed to mentor and coach an MOS so as to ensure that he or she is performing his or her job in a way that scrupulously adheres to the legal, moral and ethical principles to which the Department subscribes, avoids adverse consequences for the MOS in the future and limits potential liability of the Department.

Formal early intervention can occur at the command level or at the executive level coordinated through the Risk Management Bureau.  Early intervention at either level is engendered by virtue of the conduct of an MOS in specific designated categories called "indicators."  This designation has been adopted because each instance of conduct in these categories is an "indicator," either alone or in an aggregate, of an MOS being potentially "at-risk."  The commission of such conduct by an MOS will, in each instance generate a notification through the Risk Assessment Information Liability System (RAILS) to the command of the involved MOS.[8]  The Commanding Officer, either him or herself, or through his or her designee, will, pursuant to the Administrative Guide,[9] investigate the conduct and determine what, if any, action is appropriate.

### III.      Overview of Plan Previously Submitted to the Court

---

[8] These notifications are made through RAILS.  In RAILS, as it exists today, notifications are limited to the Commanding Officer of the involved MOS.  In the future, it is anticipated that notification will be able to be made directly to immediate supervisors.

[9] Administrative Guide Section 320-49 requires commanding officers, upon receiving an alert, to review the member of the service's profile report, verify the accuracy of the information, select the appropriate type of acknowledgment, and enter details of the acknowledgement, if applicable, in the "Notes" section.  If appropriate, the commanding officer is directed to complete a plan of action within 30 days of the acknowledgement describing all relevant actions that have been taken or are planned to be taken regarding the particular member of the service.

### a.       Declinations to Prosecute

Declinations to Prosecute (DPs) are determinations made by prosecutors to not prosecute a case which has been presented for prosecution by an MOS.  Since June 2018, DPs in certain categories have been included in RAILS causing an alert to be sent to the commanding officer of the MOS.  Three DPs in these categories in a one-year period will cause a full executive level assessment of an MOS's status and any need for formal executive level early intervention.  The NYPD categorizes DPs based on how the DAs themselves categorize them.  The following DP categories are included in RAILS:

1. Incorrect/missing paperwork
2. Insufficient evidence
3. Arresting officer unavailable
4. Defendant merely present
5. Lacks element of crime
6. Lacks jurisdiction
7. No ID by complainant/witness
8. No nexus between defendant and crime
9. Search and seizure issues
10. Violation not observed

The following DP categories are not included in RAILS:

11. Complainant/Witness refuses to cooperate
12. Prosecutorial discretion
13. Requires additional information
14. Summonsable offense
15. Unable to locate Complainant/Witness

If a prosecution is declined for one of these reasons, there is no reason to think that the DP was based on officer conduct.  If officer conduct was involved, the DP would have been categorized in one of the categories 1-10.

### b.       Suppression Decisions

Today, absent an ad hoc notification from a prosecutorial agency, the NYPD does not collect or act upon decisions suppressing evidence.[10]  The NYPD will begin receiving this data pursuant to a pilot ordered by the Chief Administrative Judge of the New York State Court system mandating that the data be collected and sent to the NYPD.[11]  These decisions will be entered into RAILS with a corresponding alert sent to the relevant MOS's commanding officer. Until these decisions are incorporated into RAILS, commands will be notified manually.   A suppression decision will trigger an executive level assessment by the Adverse Credibility Committee[12] in order to determine the need for any formal executive level intervention.

### c.      Adverse Credibility Findings

The NYPD has been coordinating and will continue to coordinate with each of the five borough District Attorneys, the Office of the Special Narcotics Prosecutor, Corporation Counsel's Family Court Division, and the United States Attorney's Offices in the Eastern and Southern Districts of New York, to have those entities inform the NYPD of adverse credibility findings.  Currently, the Adverse Credibility Committee conducts an internal legal and factual review of each determination of adverse credibility as forwarded by prosecutors in order to determine the most appropriate response by the Department.[13]  The Committee has historically determined which of the following actions are appropriate under the circumstances: command notification only; appropriate training along with command notification; a recommendation that

---

[10] Some suppression decisions are already encompassed in reviews of adverse credibility decisions by the Adverse Credibility Committee.

[11] The monitor has indicated that he will confer with the Court to see if a similar arrangement can be developed with the Southern and Eastern Districts of New York.  Absent a similar arrangement, NYPD will endeavor to work with those offices to obtain the requisite information.

[12] The Adverse Credibility Committee is made up of high-level personnel from the Legal Bureau, the Risk Management Bureau, and the Detective Bureau.  The Committee will be renamed the Adverse Credibility and Suppression Committee.

[13] The Adverse Credibility Committee does not automatically view a finding of adverse credibility as the commission of misconduct. The Committee is focused on taking appropriate action based on a case-by-case evaluation.

the officer's assignment be changed; or referral of the matter to IAB for further investigation. The Adverse Credibility Committee will now also consider whether there is any need for intervention in the form of Performance Monitoring.  Going forward, the adverse credibility finding, along with the decision of the Adverse Credibility Committee will be entered into RAILS, with a command level notification being sent to the involved MOS's commanding officer.

### d.      Law Department Refusals to Indemnify

The NYPD has been tracking refusals to indemnify for some time.  However, that information has not been captured in a personnel record broadly accessible to the defendant officer's chain of command.  Going forward, each refusal to indemnify will be entered into RAILS causing an event alert to be sent to the officer's CO and cause an executive level assessment to determine whether there is any need for intervention in the form of Performance Monitoring or other appropriate remedial action.

### e.      Civil Judgments Due to Malfeasance

As written, the Order contemplates that the NYPD's plan should utilize information regarding "judgments and settlements against police officers in civil cases where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance."[14]  The City has determined, after careful deliberation, that a literal reading of the Order would implicate opinion attorney work product produced by Law Department attorneys.  Nevertheless, the City also recognizes the value of information regarding potential police malfeasance in such cases. Therefore, the NYPD instead proposed a system that hews to the intent of this subsection of the Order.

---

[14] The Order at 2.

The Department implemented a Civil Lawsuit Monitoring program in September 2013. This program utilizes basic litigation data to identify officers eligible for the program. The criteria are initially based solely on a quantitative analysis of the number and type of lawsuits filed against individual officers within a set time frame and/or the dispositions of that lawsuit or lawsuits. Any officer fitting these criteria is subject to an executive level assessment by the Civil Lawsuit Monitoring Committee, including a qualitative analysis of the lawsuits and the underlying events. The committee determines whether there is any need for intervention in the form of Performance Monitoring or other appropriate remedial action. Though not currently in RAILS, commanding officers are notified directly by RMB regarding the committee's findings.

### IV.      Current NYPD Intervention Programs to Improve Officer Performance

In addition, it may be helpful to provide more information about the many ways, in addition to those noted above directly responsive to the Court's order, that the Department currently determines whether intervention with a particular police officer is appropriate. There are many data points which the Department today uses to assess, and, if necessary, intervene to modify the behavior of officers. The most significant of these programs are outlined below.[15]

#### a.   Performance Evaluation System

As described in the Monitor's October 20, 2017 letter to the Court,[16] the Department recently adopted a new performance evaluation system focused more on quality and effectiveness rather than strictly quantitative metrics. Evaluations are now done on a quarterly basis to better enable timely review, mentoring, supervision, and feedback. A significant component of this system is the Supervisory Feedback Form, which allows supervisors to highlight commendable action by an officer or note areas that need improvement via the Cops

---

[15] Additionally, the Department provides remedial training on Investigative Encounters to commands where needed or requested.
[16] *Floyd* ECF No. 562.

Rapid Assessment Feedback Tool (CRAFT). These forms can be filled out by any uniformed supervisor regarding any uniformed subordinate, even those outside their command. Supervisory Feedback Forms are among the documents that an officer's immediate supervisor is instructed to review when completing an officer's Quarterly Evaluation. Repeat negative evaluations are a factor in both command and executive level assessments of an MOS to determine the appropriate intervention and whether formal executive level intervention in the form of Performance Monitoring or other remedial action is warranted.

### b. NYPD Performance Monitoring Program

The Department's Performance Analysis Section (PAS) is responsible for implementing NYPD's Performance Monitoring program and for conducting most executive level assessments of MOS to determine whether Monitoring or other appropriate remedial intervention is warranted. The Department's Performance Monitoring program was in place well before the Court issued its August 12, 2013 Remedial Order. As stated in the Supervisor's Guide on Monitoring and Assistance Programs:

> The purpose of the monitoring programs is to heighten the scrutiny and supervision of probationary and permanent members who have engaged in conduct that raises questions concerning the acceptability of their performance or behavior. In order for these programs to operate at optimal efficiency, Commanding Officers must take a visible and proactive role in the monitoring process.
>
> It is the Commanding Officer's responsibility to ensure that members in monitoring programs are adequately supervised and that all behavior is appropriately documented. In addition, each Performance Evaluation of the monitored member must accurately reflect the attitude, appearance and work performance of the member. The evaluation must be reviewed with the member and submitted in a timely fashion. This review affords the member with an opportunity to discuss performance and establish long-term and short-term goals aimed at improving performance. Although the [NYPD's] Performance Monitoring Unit is responsible for the oversight of all monitoring programs and Performance Profiles, Commanding Officers will be held strictly accountable for ensuring individual members receive appropriate guidance and supervision. Failure of Commanding Officers to ensure that these functions are properly performed can

undermine the overall effectiveness of the various monitoring programs described in this booklet.

The Supervisor's Guide on Monitoring and Assistance Programs describes how NYPD's monitoring program works. The Performance Monitoring Unit of PAS is tasked with identifying, assessing and monitoring members of the service whose indicators have crossed an established threshold. There are a number of different static thresholds that may prompt a member to be assessed for monitoring or other remedial intervention. This assessment consists of a qualitative review of the member's entire disciplinary history and other relevant information such as their current and historical assignment.

If a threshold listed below is crossed, the member is assessed by PAS for monitoring or other appropriate remedial intervention:[17]

- ➢ **Level I Monitoring**
  - o Three (3) or more CCRB complaints in a one (1) year period.
  - o Six (6) or more CCRB complaints in the past five (5) years.
  - o MOS has four (4) or more force complaints in the last two (2) years; or five (5) or more force complaints in the last four (4) years.
  - o Two (2) or more profiling complaints in a one (1) year period.
  - o Referral by competent authority (Commanding Officer, ICO, etc.).
  - o *Suspension/Modified Assignment.
  - o *Administrative Transfer.
  - o *Disciplinary Penalty of more than ten (10) days.
  - o *Negative quarterly Performance Evaluations (below standards overall or in specific areas or dimensions).

- ➢ **Level II Monitoring**
  - o *Guilty of one (1) set of Charges and Specifications for Force within five (5) years.
  - o Two (2) or more substantiated Force, Abuse, Discourtesy or Offensive Language complaints within a four (4) year period.
  - o Receipt of two (2) or more civilian complaints while on Level I CCRB Monitoring.
  - o *Charges and Specifications resulting in a disciplinary penalty of twenty (20) days or more.
  - o Behavior remains substandard after Level I monitoring.

---

[17] Categories marked by an asterisk (*) automatically subject an officer to monitoring.

- o   Two below standards quarterly Performance Evaluations (overall or in specific areas or dimensions) in a three-year period.
- o   Performance remains substandard after Level I monitoring.
- o   One substantiated profiling allegation.
- o   Three or more commenced lawsuits for police action within the last twelve months.
- o   Six or more commenced lawsuits for anything within the last five years.
- o   One or more disposed lawsuits for $200,000 or more for anything within the last twelve months.

➢ **Level III Monitoring**
- o   Two or more substantiated profiling allegations.
- o   *Placement in this program as a result of being found guilty in a department trial or by a negotiated plea agreement relating to corruption or serious misconduct. (dismissal probation)

When a member is placed in a monitoring program, the member is interviewed by both their Commanding Officer and a supervisor from PAS.  They also are required to attend an exit interview at the time they are scheduled to be taken off of monitoring.  When appropriate, the member may also be interviewed by a high-ranking executive such as a Borough Commander.

If a member is placed in Level I Monitoring, the Commanding Officer develops a plan of action to correct the member's behavior.  This plan includes actions that will be taken by the direct supervisors of the MOS.  Members in this program are evaluated in the tenth month to assess the need for continuation in Level I Monitoring, or placement into Level II Monitoring at the twelfth month.  Level I Monitoring is for a scheduled 12 month period.

Level II Monitoring is designed to scrutinize and supervise performance and behavior of members who have had an excessive number of FADO complaints, serious disciplinary problems, certain risk indicators present in civil lawsuits, or two or more negative Performance Evaluations.  Commanding officers must prepare quarterly Performance Profiles for members in Level II Monitoring which are submitted to PAS.  Level II Monitoring is for a period of up to 18 months and can be extended by PAS at the request of the member's Commanding Officer.

Level III Monitoring is the most intensive form of monitoring.  It is intended to scrutinize and supervise the performance and behavior of members who are on Dismissal Probation.[18] Additional incidents of misconduct or negative behavior and/or performance while in the program may result in the member being dismissed from the Department without a Department trial.

Depending on which level of monitoring the member is placed, there are limitations on the member's activities. Members on Level II or Level III Monitoring are prohibited from participating in a paid detail, working the first platoon, and commencing a tour later than 1800 hours.  Members on Level III Monitoring are prohibited from performing anti-crime duties. Monitoring protocols exist for each level, although the protocol may be altered slightly depending on the underlying reason for inclusion.

### c.  RISKS Review

Another method the NYPD uses to assess and, if necessary, correct officer behavior is RISKS Reviews.  The NYPD has developed and begun to implement a plan for periodic command-level meetings related to officer performance called "RISKS (Remediation of Identified Situations Key to Success) Reviews."  These meetings, attended by executive staff from both the precinct and its borough command, are designed to be held with each precinct twice a year and to serve as a forum in which identified issues of risk are brought to light for evaluation.  The current RISKS meetings are focused on issues surrounding stops including members of the service not documenting Level 3 *Terry* stops when required; Stop Reports identified by the Quality Assurance Division (QAD) as not articulating the basis for the stop, frisk or search; compliance with policies regarding the use of body-worn cameras (BWCs), such

---

[18] Dismissal probation is a one-year probationary period which allows the Department to automatically terminate an officer if he or she engages in misconduct during the period.

as proper activation and deactivation and categorization and tagging of videos; and the role of precinct-level supervisors in recognizing and correcting deficiencies in all of these areas.  The intervention from these meetings cascades down to individual officers through the command staff with whom there has been a detailed discussion relative to compliance levels of individual MOS.

The first RISKS Review meeting occurred in mid-December 2018.  The meeting was convened by the First Deputy Commissioner, and he will periodically attend meetings, as his schedule permits.  Both the Deputy Commissioner for Risk Management (DCRM) and the Chief of Strategic Initiatives actively participated in the meeting.  The Risk Management Bureau reviewed the results of that first meeting, made necessary changes, and has since conducted meetings with multiple commands, and formulated a schedule for continued meetings

The meetings are now being chaired by the DCRM and co-chaired by the Chief of Strategic Initiatives.  Required attendees from each command include the Commanding Officer, the Executive Officer, the Integrity Control Officer, and the Training Sergeant.  Members from the appropriate Patrol Borough attend, as do representatives from both the Chief of Department's Office and the operational bureau under review (Patrol, Housing, or Transit).

With regard to Level 3 stops and BWC usage, the purpose of the RISKS Review is to ensure compliance with the requirements pertaining to the preparation and supervisory review of Stop Reports and the activation of BWCs, not to seek an increase in police activity or stops. That message is emphasized throughout the meeting itself, as well as during the preparation for the meeting.  Both the chairs of the meeting and the attendees are engaged in a discussion of potential barriers to full compliance in the areas of stops, trespass enforcement and BWC usage, as well as other risk issues faced by the command being reviewed.

The meetings focus on statistics from several Department sources. The Risk Management Bureau (RMB) also invites Commanding Officers to bring BWC examples of exemplary behavior by officers within the command.

Before a precinct has its first RISKS Review meeting, RMB delivers RISKS training to the attendees. This training includes an explanation of the RISKS Reviews that will be held, a review of the law and Patrol Guide requirements relative to stops, trespass enforcement and BWC recording, a discussion of possible strategies to gain further compliance with applicable Patrol Guide requirements, an explanation of the upcoming pilots, and a discussion of additional risks that may need to be addressed.

In addition to data relating to stops and BWCs, there are other data points important to assess at the command level. The RISKS Review process brings together this disparate data to present a picture of the overall health of an individual command, including an overview of current and past compliance, as well as compliance trends. This includes the creation of a "report card" which calls out the degree of compliance in designated areas and compares compliance in a command with other commands in the borough. Aggregate data will be presented to the relevant operational bureaus as well as to the Chief of Department and Police Commissioner.

### d. Force Review Process

The Department engages in a similarly exacting process to assess and, if necessary, correct officer behavior, with regard to use of force reporting. The Force Review process is an internal audit overseen by RMB and the First Deputy Commissioner's Office that looks at numerous reports and BWC footage to determine whether reportable force was used and if so, if it was properly documented. Each month, this process culminates in a Force Review Evaluation,

modeled on CompStat, for the selected commands for that session. Each audited command reports to a Force Review Evaluation four times a year. The main goal of these evaluations is to ensure compliance and address deficiencies when they are spotted, through changes to policy, underlying technology, training, and if necessary, the imposition of discipline. The Force Review process identifies specific officers who may benefit from early intervention by his or her supervisors.

### e.   Retraining for Supervisors Who Approve Deficient Stop Reports

The Department has also created a protocol to correct supervisors who repeatedly approve deficient Stop Reports. Supervisors who have approved multiple Stop Reports that QAD has determined to be deficient, are scheduled to take the in-service investigative encounters training if they have not already attended that training. Those who have already received the training are sent to a smaller refresher class, which includes one-on-one training from an RMB attorney aimed at the specific deficiencies that have been identified. Supervisors who have approved more than a certain number of deficient Stop Reports have their Stop Reports and other paperwork reviewed with a greater level of scrutiny.

### V.   NYPD's Response to Plaintiffs' Concerns

The Department's plan to comply with the Order described the Department's intent to use RAILS to the extent of its current capabilities. However, it is important to note the present limitations of the system. RAILS was designed as a personnel management system which permits quick access to a variety of heretofore disparate personnel data. It notifies Commanding Officers of individuals in their commands who have had a defined event involving an indicator. Either in response to an alert, or on their own initiative, a Commanding Officer can use RAILS to review information regarding an officer to decide whether an intervention is appropriate.

Today, the Department is working hard to enhance its personnel tracking system in order to fully leverage the potential benefits of RAILS.  In the future, it is anticipated that the early intervention features of RAILS will be enhanced, allowing for the notification of all appropriate supervisors for potential intervention.

### a. NYPD's Plan Addresses At-Risk Members and Requires Department Response and Action as Appropriate.

The plaintiffs argue that there should be an intervention by the NYPD before an officer triggers an alert in RAILS.  ECF No. 686, at 2.  Indeed, NYPD officers are subjected to constant intervention on a multitude of informal levels.

(1) As noted above, MOS are required to attend frequent trainings in the Department. Additionally, there is constant intervention in the form of supervisory mentoring, instruction and training at the command level.  The Department consistently strives to better MOS through the transfer of experience of more seasoned peer officers as well as supervisors.  This transfer of knowledge and experience occurs at all ranks throughout the Department in both formal and informal settings.[19]  It is simply unrealistic to believe that all such on-going transfers of knowledge can, or indeed should be documented.

(2)  Commanding Officers are empowered with the authority to consider interventions regardless of whether the officer meets one of the criteria for an existing monitoring program. Commanders can query the records of their subordinates at any time and use RAILS profiles to help manage their personnel and take action in situations whether or not there is a RAILS alert. Indeed, through the viewing of BWC footage, informal command-level initiated intervention is significantly increasing in areas such as tactics, citizen interactions, investigative encounters, and compliance with BWC activation mandates.  Further, RAILS aggregates significant amounts of

---

[19] The formal settings include CompStat, Force Reviews and RISKS Review meetings, to name a few.

personnel data and performance indicators of members of the service, both positive (e.g., training history, special skills, awards, years of service) and negative (civilian complaints, discipline, Stop Reports rejected by supervisors, transfers for cause) to create a profile of the MOS.  These profiles are available to Commanding Officers at all times and can, and do, inform any performance questions Commanding Officers may have relative to MOS in their command.

(3) The plaintiffs' critique misapprehends the characteristics of the NYPD's formal early intervention system.  At the command level, RAILS provides a commanding officer with an alert that must be acknowledged when a triggering event occurs.[20]   While the various indicators identify officers who may be at risk; they are not per se indications of misconduct.  As required by Administrative Guide 320-49, the Commanding Officer, either him or herself or through a designated supervisor in the command, investigates any alert in order to determine what, if any command-level action is appropriate.

In addition, at the executive level, RMB, working with other stakeholders in the Department, performs the function of determining whether an individual officer requires more formal and structured early intervention.  Thresholds for an assessment today exist for CCRB complaints,[21] adverse credibility findings,[22] civil litigation,[23] as well as an aggregation of a

---

[20] There are fourteen types of acknowledgement a commanding officer can choose from: (1) RAILS profile reviewed. Referred to Administrative Lieutenant for command orientation; (2) Personnel file forwarded to new command; (3) Will confer with DAO for next steps; (4) Subject officer will be reviewed for assessment of current assignment; (5) Reviewed with subject officer. No further action deemed appropriate at this time; (6) Referred to Integrity Control Officer for follow-up; (7) Referred to executive officer for follow-up; (8) Referred to supervisor indicated (specify in "Notes"); (9) Conferred with command Training Sergeant. No further action. (10) Conferred with platoon commander. No further action. (11) Subject officer reviewed for intervention. No changes at the present time. (12) Subject officer referred to RMB for appropriate training and intervention; (13) No further action necessary at this time; (14) Inaccurate alert.
[21] This includes a quantitative and qualitative assessment of relevant complaints.
[22] A single adverse credibility finding will trigger an assessment.
[23] This includes a quantitative and qualitative assessment of relevant litigation.

variety of different potential indicators captured in the Central Personnel Index.[24] As noted above, the additional indicators specified in the Court's Order will likewise trigger formal intervention either at the command or executive level or both.

Simply put, in each of the five data categories identified in the Order, the NYPD either currently has, or is in the process of creating a program for systemically receiving, assessing and acting upon potentially adverse information involving illegal stops or illegal trespass enforcement. Early intervention in each of these categories will include command-level notification coupled with a requirement for command-level inquiry, and, if indicated, documented remediation. In addition, executive level assessment, through RMB, will occur when these five indicators, either alone or in conjunction with other established indicators, exceed designated thresholds. To the extent that such assessment indicates that formal executive level intervention is required, such intervention will be undertaken and documented. This intervention may include counseling, training, monitoring, or referral to any number of different existing units in the Department. To the extent that it appears that discipline is appropriate, a referral either to the MOS command or to Internal Affairs would be made.

Plaintiffs' suggestion, that there be an intervention before an officer reaches a threshold for executive level intervention is addressed by the command-level notification and required response, as well as the day to day supervision of officers which occurs in commands.

The plaintiffs assert that the NYPD plan does not provides a "feedback mechanism" for addressing at-risk officers. They state that simply triggering a notification to the Commanding Officer is insufficient. ECF Dkt 686 at 9-10. However, the NYPD plan is not simply a notification system for Commanding Officers. The Department's Administrative Guide section

---

[24] The Central Personnel Index (CPI) point system utilizes a simple count of weighted negative items to determine if an individual officer should be assessed for placement in Performance Monitoring or other remedial intervention. The CPI is used to screen officers on a daily basis.

320-49 mandates that Commanding Officers acknowledge the alert and review the information in RAILS to determine if any interventions are called for.   Once all of the various internal committees have been formed and appropriate thresholds have been set, PAS in cooperation and consultation with Commanding Officers, will review officers who cross these thresholds to assess what actions may be appropriate, and to implement appropriate interventions.

Plaintiffs' counsel criticize the NYPD plan because they say it fails to dictate how Commanding Officers should respond to information in RAILS.   However, if the information meets the criteria for intervention, there is in fact a detailed plan for intervention.   When an officer crosses a threshold set out in the Department's performance monitoring plan, the NYPD screens the officer and the Commanding Officer and the member must develop a monitoring plan for performance improvement.  The Department's Performance Monitoring program, as described above, sets forth the types of thresholds used and the types of interventions and actions that are taken in response to concerns about member performance.   For information received by a commanding officer which does not meet the criteria for intervention, the commanding officer evaluates the information and decides what, if any, command level intervention is appropriate.

Plaintiffs question whether and how sergeants, squad supervisors, platoon commanders or other supervisory personnel (besides COs) will be involved in the system without getting alerts. ECF. 686 at 10.  The Department intends, in the future, to develop an electronic method of alerting particular supervisory officers.[25]  However, although such an electronic alert system may be desirable, it is by no means necessary to ensure that the police officer's immediate supervisors know that he or she may be at risk.  Commanding Officers involve sergeants, squad supervisors,

---

[25] Currently there is no database or electronic method for determining which officers report to which supervisors because the Department does not yet have a computerized system of tracking members' assignments.  When a digital personnel roster is implemented, the NYPD will be able send alerts to other supervisors below the Commanding Officers.

platoon commanders and others in their efforts to manage and supervise their personnel.  That is their job.  Direct supervisors are empowered to, and expected to, correct officer behavior, when necessary.  Each Commanding Officer will decide how they will respond to an alert in the system and whether a particular intervention is required.  In making those determinations, it will be up to the Commanding Officer to decide how best to utilize other personnel, such as training sergeants, squad supervisors, platoon commanders or others to collectively work to improve an officer's performance, depending on what the alert was for and the individual circumstances of the MOS.

**b. The Department Has a Plan for Analyzing and Acting on the Five Categories of Information in the Court Order.**

As noted above, the Department has a plan for analyzing and acting on the five categories of information in the Court Order.  The plan calls for a combination of alerting commanding officers through RAILS of the occurrence of an individual item and a full review by RMB's Performance Analysis Section upon either a single event or combination of different events included in the Order.

**c. NYPD's System for Analyzing and Acting on Information Reflecting At-Risk Officer Behavior Includes Data on Major Events, Such as Excessive Force and Corruption, But Also Includes Information Related to Investigative Encounters, Bias, and False Statements**

As described in Section IV.b above, the NYPD's Performance Monitoring program identifies officers who have crossed thresholds for at-risk behavior.  Those thresholds encompass behavior related to investigative encounters, bias, and false statements.  For example, an important component of the monitoring program is complaints made to the CCRB, and a significant portion of these relate to stops, improper searches and arrests.  Moreover the performance monitoring described in Section IV is only one way in which the NYPD monitors

such behavior.   As described in Section III above, declined prosecutions, suppression decisions, adverse credibility findings, refusals to indemnify, and civil judgments and settlements already play important roles to supplement the monitoring program.   RISKS Reviews are designed specifically to focus on the issues at the center of the monitorship.   Moreover, as the Department gains experience with these and other mechanisms, improvements are likely.

### d. When Appropriate, the NYPD will Consult with and Obtain the Input of Outside Entities

Plaintiffs' counsel suggests that entities and individuals outside the Department should be included in making decisions regarding whether early intervention is warranted for a particular officer, as well as included in the various Department internal committees that would be reviewing various determinations regarding individual members of the service.   To the extent that this would necessitate providing information that is not currently public, New York Civil Rights Law § 50-a prohibits the Department from doing so, even in redacted form.[26]   Even if 50-a did not prohibit the Department from sharing much of this information, it would be inappropriate to add outside individuals to the Department's personnel decision-making processes.   Just as final disciplinary decisions are the sole province of the Police Commissioner to make,[27] personnel decisions regarding an individual officer's performance improvement must also be within the bailiwick of the Department.

All five of the types of information identified by the Order necessitate a legal analysis by in-house counsel.   This requires open and honest communication between stakeholders within the Department and its attorneys.   The direct participation of outside entities would threaten the

---

[26] *Matter of New York Civil Liberties Union v. New York City Police Dep't,* 32 N.Y.3d 556 (2018).

[27] New York City Charter § 434 ("The commissioner shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department").  Relatedly, it should be noted that performance monitoring has been found to be outside the scope of mandatory collective bargaining and insofar and it impacts discipline, is prohibited altogether from being negotiated (See *PBA v. City of New York,* Board of Collective Bargaining Decision B-12-2004).

necessary candor of these communications and negatively impact the quality of legal advice that the Department's attorneys would be able to provide.

All that said, the NYPD has and will continue to consult with outside entities on issues raised by the Order. The Department works with the city's district attorney's offices on DP decisions and how to address them. There is already an NYPD working group with the DAs on how best to address adverse credibility findings.

Insofar as the parties to this litigation are concerned, the process leading to the filing of the plan and the additional information in this filing has given them detailed knowledge of the system for receiving, analyzing and acting on information about negative police conduct. As the Department continues to formalize this system for the five categories of information in the Order, it will inform the Monitor. As in the past, the Monitor may determine that this information should be shared with the parties for their comments. The Department is always willing to hear from them about any suggested improvements. If plaintiffs wish to transmit comments from others, such as Communities United for Police Reform (CPR), the Department will receive and review them in good faith. Finally, and most important, the Monitor will be reviewing the system's implementation and reporting on it to the Court and the public, in the way similar to how the Monitor reviews and reports on NYPD's performance evaluation system and other efforts. In this way, there will be an ongoing assessment of RAILS, the RISKS Review meetings, and other aspects of the Department's system for receiving, analyzing, and acting on adverse findings.

### e.   The NYPD Analyzes Patterns and Trends

Plaintiffs' counsel asserts that the plan "ignores the prospect of data collection and analysis beyond individual officers."[28]   This is incorrect.   The plan specifies that the Risk Management Bureau will look for "trends and patterns" regarding declinations to prosecute,[29] the Adverse Credibility Committee will "discuss any identified patterns" of suppression and adverse credibility decisions,[30] and that the Department already performs "pattern and trend analyses utilizing" refusals to indemnify.[31]   In addition, the Civil Lawsuit Monitoring Committee will continue to keep an eye out for any patterns they see in the data and take action when necessary.

In addition, there are other ways that the NYPD looks for patterns or trends of misconduct.   The Internal Affairs Bureau, for example, analyzes trends and patterns of corruption and misconduct cases (including profiling cases), as well as force investigation cases. It provides bi-annual Command Integrity Profiles to commanding officers.   RMB, as part of the RISKS Reviews, as described in Section IV.c above, will be examining patterns and trends, including those related to stop and frisk.   RMB plans to look for patterns by individuals or squads and in precincts and borough commands.   Local commands also will be encouraged in the RISKS Review meetings to identify and prevent patterns of misconduct.

For the foregoing reasons, the Department asks that the Court approve the plan previously submitted on January 14, 2019.

---

[28] *Floyd* ECF No. 686 at 3.
[29] *Floyd* ECF No. 681-1 at 3.
[30] *Floyd* ECF No. 681-1 at 4. Since the initial plan was submitted to the Court, it was decided rather than create a separate committee devoted solely to evaluating suppression decisions to instead make use of the expertise of the already existing Adverse Credibility Committee.
[31] *Floyd* ECF No. 681-1 at 5.