# MEMORANDUM

TO: Law Department, NYPD
FROM: *Floyd* and *Davis* Plaintiffs
DATE: July18, 2019
RE: Comments to Defendants' Draft RAILS Response

---

*Floyd* and *Davis* Plaintiffs appreciate the opportunity to comment on the City's draft response. Rather than providing line edits at this stage, for ease of reference, please see, numbered below, our comments to Plaintiffs' January 28 response to its original RAILS proposal. To this end, we tried to be thorough in identifying important issues, with the hopes of offering a clear framework to improve the proposal and this response. Please let us know whether there is additional information that could assist you.

1. Throughout the document, the City notes in very generalized terms its desire and intention to address misconduct and problems via executive-level assessments. Escalating these critical issues up the chain of command is important. But this step alone is not an actual plan, as required by the Court's November 20, 2018 Order. As the Court noted in its Liability Opinion, discretionary decisions to ignore or diminish the importance of Fourth and Fourteenth Amendment violations existed at the highest levels of NYPD, and thus, constitutional compliance cannot now be dependent on the subjective and arbitrary priorities and interests of the individuals who happen to hold high-level positions at a given time. Instead, the required plan must set forth the specific process by which the parties, the Monitor, the public, and the Court can be assured that the spirit and letter of the Facilitator's Recommendation and the Court's Order are enacted transparently, consistently, and effectively. Thus, "executive level assessment" is not a plan, but a step that requires further articulation and commitments, as per the Liability Opinion, the Remedial Order, and the Court's November 20, 2018 Order.

2. Throughout the City's draft response, conclusory claims about the effectiveness of different programs involving training, mentoring, supervision, and evaluations are not supported by specific measures or evidence. As these are within the scope of compliance, their effectiveness is subject to review and determination by the parties, the Monitor, and the Court. The City's response should include the bases for these conclusions and what measures ensure the conclusions are and remain accurate over time.

3. Immediate supervisors, per the Facilitator's Recommendation #1, must be included in the NYPD's "more structured and well-articulated policy for internal review." Yet, this draft, like the NYPD's original proposal, only specifies a process for commanding officers to receive this information, while

1

providing no details about whether or how immediate supervisors will receive, review, and act on this information.

4. With respect to declinations to prosecute, certain excluded categories (e.g., Prosecutorial Discretion, Requires Additional Information, Summonsable Offense) may implicate selective law enforcement or racial profiling. Examples include a police officer choosing to arrest in contravention of DA prosecution policy (for example, around fare beats or marijuana) or choosing to arrest rather than summons an individual under circumstances that suggest racial profiling. These exercises of discretion, if race-based, are explicitly prohibited by the Court and thus should be included in RAILS as part of the Monitorship.

5. Further, with respect to declinations, the Facilitator's Final Report specifically flagged that the review of DP information must be "more robustly structured in a more integrated, systematic manner," including specificity about how DPs will be analyzed. This recommendation, which the Court has so-ordered, remains undeveloped in the proposal, including a lack of specificity as to the review of DP information by commanding officers and immediate supervisors.

6. As we have stated before, every adverse credibility determination is a signal of misconduct, yet this is not reflected in the City's draft response. For the reasons we have previously stated, this is inadequate.

7. At our meeting in April, we discussed several areas where civil liability should be factored into performance evaluation and RAILS. This included, but is not limited to, the early settlement divisions of the NYPD and the Law Department, as well as all other entities authorized to settle a claim against an officer or police action on behalf of the City. All City governmental entities, within NYPD, the Law Department, or elsewhere, capable of authorizing resolution of civil claims or liability should be incorporated into the (a) civil judgments, and (b) Level I/II/III performance monitoring plans and discussed in the City's response.

8. Civil Judgments Due to Officer Malfeasance: NYPD may misapprehend the legal posture of the case and the relevant legal standard post-judgment. The new draft erroneously suggests that the "in the opinion of the Law Department" language is barred by work product. However, it is error to suggest, in remediation, (a) that NYPD should not have access to the work product of the Law Department, which is charged with providing NYPD with advice and opinion as a matter of law, (b) that the Law Department should not offer important insights as to what constitutes officer malfeasance, or (c) that building the effectiveness of this intervention (i.e., building the capacity for effective intervention by the Law Department and the ability and receptiveness to hear and implement this advice by the NYPD) is not

2

squarely within the role of the Monitorship. The NYPD's proposed modification of this RAILS category does not, in fact, comply with the intent of the Court's Order, which is to ensure an objective, independent assessment of the officer's conduct.

9. Current NYPD Intervention Programs to Improve Officer Performance: We agree that a holistic and comprehensive approach is necessary. However, this section would benefit from more specificity (for example, how many deficient stop report approvals trigger a review). Rather than a plan, this is mere notice of what is occurring. The Court's Order requires, by its language, a plan, i.e., a detailed framework and infrastructure of the intervention, including how it is deemed effective and improving over time. Numerous organizations, institutions, and even governments confronting similar issues around early intervention have a vast body of resources and research to draw upon in piloting effective solutions.

10. Throughout the City's draft response (and particularly in the Current NYPD Intervention Programs to Improve Officer Performance section), NYPD references existing programs—some existing before trial—without offering a detailed plan, as required by the Order, or explaining how the concerns raised by the Court in the Liability and Remedial Orders have been measurably addressed or resolved (for example, the NYPD's Performance Monitoring Program). As we have discussed, at a minimum, the City's proposed Plan needs to improve the various interventions cited by the Court as ineffective or problematic at the time of trial. While Plaintiffs welcome the most comprehensive interventions available to improve officer performance, these interventions must have the "infrastructure" to overcome systemic problems that have facilitated constitutional violations during police encounters, including racial profiling.

11. Performance Evaluation System: To comply with the Facilitator's Recommendation, the City's response must explain how the aforementioned 5 categories of RAILS information will be incorporated into the Officer Performance Evaluation System (not merely the reverse).

12. Level I/II/III Monitoring: At our meeting in March or April, we discussed how several of the metrics used here are not narrowly tailored to the reality of the current enforcement system and, therefore, unlikely to be effective as early intervention mechanisms. We gave several examples at the time. For example, Level III monitoring may be triggered by 2 substantiated allegations of profiling, but the NYPD has never substantiated *any* allegation of profiling against any officer. Thus, this metric actually sets a threshold that is de facto impossible or improbable. Early intervention and monitoring should look for opportunities to intervene, rather than setting threshold criteria that will very likely result in no intervention. Moreover, there is no mention of whether or when any of the 5 required categories of RAILS information will

trigger screening for any Level of Performance Monitoring. If two substantiated CCRB complaints for illegal stops can trigger monitoring, then surely suppression decisions or adverse credibility determinations against an officer should trigger it as well.

13. The City's draft response addresses some of Plaintiffs' concerns by citing unrealistic expectations, future plans (for example, incorporating federal suppression decisions immediately, RAILS improvements, and an intention "to develop an electronic method of alerting particular supervisory officers"), or present limitations of NYPD systems (for example, RAILS, RISKS). However, during the months when the parties have been briefing these concerns, many of these issues could have been resolved, appended to a concrete timeline for resolution, or included in pilots (or subjected to their own pilots) for specific interventions.  For example:

    a. Either a concrete plan (with detailed description of the programs) or else a set timeline for "creating a program for systemically receiving, assessing and acting upon potentially adverse information" should be detailed in the City's draft response.

    b. The specific threshold considerations referenced in the City's draft response could be explained in greater detail.  (For example, the draft response indicates that the "thresholds for the additional indicator of declined prosecutions has not been set.")  At this point, specific thresholds—or at the very least a specific timeline for thresholds to be determined with certainty—must be provided.  Similarly, at p. 16 of the draft response, the general, one-sentence statement that there is a process for responding to RAILS alerts at the command level in no way satisfies the Facilitator's recommendation and Court's court-ordered requirements for a "structured and *well-articulated* policy [] for this internal review by commanding officers and immediate supervisors."

14. Throughout the City's response, where the Administrative Guide (or other policy or regulator document) is referenced, a specific provision of the document needs to be cited *and specific language should be provided* (or attached) in order for the parties, the Monitor, and the Court to understand whether this is an effective and adequate response and intervention

15. Throughout the City's response, it should be clarified where NYPD will or will not codify its modifications to practice and procedure with reference to early intervention and RAILS in written policy instruments.  (For example, the Response notes that "Early intervention in each of these categories will include command-level notification coupled with a requirement for command-level inquiry, and, if indicated, documented remediation," but fails to note how this will be memorialized anywhere in the Patrol or

4

Administrative Guides, an operations order, or in some other written Departmental communication.)

16. The City's response should stipulate the specific required content and structure of "command-level inquiry, and, if indicated, documented remediation," because the Facilitator explicitly contemplated these as very formal and specific.

17. At p.18, the "detailed plan for intervention" is not responsive to Plaintiffs' concern, which is related to what the process is for command-level supervisors to respond to an alert they receive from RAILS about an officer in their command, which happens even if an officer is not screened for—or placed on—performance monitoring. In addition, we would ask whether there is there a process currently spelled out in the Administrative Guide for the CO who does receive RAILS alerts to inform the officer's immediate supervisors and ensure their involvement in responding to the conduct flagged in the alert? If so, please provide details on that process, and if not, then such process must be developed and included in the City's response. It appears that there are no written guidelines on when and how to involve immediate supervisors in responding to a RAILS alert at the command level, yet these must be part of any effective plan to address the Court's Order and the Facilitator's recommendation.

18. With reference to the arguments set forth at pp. 19-20, the Court has already opined in the Floyd Liability Opinion that the existing Performance Monitoring System's heavy reliance on CCRB complaints is ineffective, underinclusive, and inadequate for effective performance monitoring. This may be even more probative in the areas of suppression decisions, DPs, and adverse credibility decisions. For this reason, it is clear that the 5 RAILS categories should be explicitly incorporated into performance monitoring thresholds.

19. New York Civil Rights Law § 50-a and the Police Commissioner's disciplinary discretion are not a barrier to outside input and consultation. Plaintiffs are proposing outside input for the criteria that will be used to guide personnel decisions, not input into the personnel decisions themselves. Plaintiffs have not suggested outside input is required into individual early intervention determinations, but systems and structures should be informed by broader perspectives. This may be accomplished in many ways, including using aggregate or trend data, anonymized information where useful, and broader analysis about what measures may ensure the system is actually effective to the goals.

20. At p. 21, the City's draft response indicates that "When the Department formulates its weighting system and threshold triggers for the five categories of information in the Order, it will inform the Monitor. As in the past, the

5

    Monitor may determine that this information should be shared with the parties for their comments."  However, the weighting system must ultimately be submitted to and approved by the Court, after Plaintiffs have had a chance to provide input, because such weighting system is part of the NYPD's "program for systematically receiving, assessing, and acting on information regarding adverse findings on conduct of police officers involving illegal stops or illegal trespass enforcements."

21. Analyzes Patterns and Trends: Likewise, contrary to the Facilitator's recommendation, the NYPD draft response fails to describe how RAILS and other data will be utilized to identify patterns of misconduct beyond individual officers, instead primarily focusing on "keeping an eye out for any patterns." The Facilitator's recommendation, which was adopted by the Court, was not limited to data collection for the purposes of intervening solely with one officer at a time. Quoting the Office of Inspector General Report from 2015, the Facilitator endorsed the IG's conclusion that "[t]he proper collection and analysis of police litigation data has the potential to reduce police misconduct, improve public safety, control costs, identify training opportunities, strengthen public confidence, and advance law enforcement oversight." Floyd Dkt. #597, Davis Dkt. #399, at 220. The Facilitator further specifically recommended "that the policy be expanded to allow for wider analyses of the data to ascertain any patterns of misconduct within units, squads, platoons, commands, and Patrol Boroughs. A higher level of accountability is equally as important, therefore the policy should include accountability measures for commanding officers and immediate supervisors based on the level of misconduct occurring under their supervision." *Id*. at 221. The value of this approach, the Facilitator concluded "may be, as recommended by the Monitor, to identify patterns and practices within commands, precincts, squads, and individual units. *Id*. at 222.