# Arnold&Porter

**Peter L. Zimroth**
+1 212.836.7316 Direct
Peter.Zimroth@arnoldporter.com

January 7, 2020

<u>**VIA ECF**</u>

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:     *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
         *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
         *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
         <u>Tenth Report of the Independent Monitor</u>

Dear Judge Torres,

I am submitting for filing a corrected Tenth Report of the Independent Monitor.  In the report filed on December 16, 2019, there were inaccuracies in Chart 17, "PIE Audits with Command Responses," on page 66.  The attached report contains the corrected Chart 17.  There are no other changes from the original report filed in December 2019.

Respectfully submitted,

Peter L. Zimroth
Monitor

Attachment: Tenth Report of the Independent Monitor

# Tenth Report of the Independent Monitor

## Peter L. Zimroth

## December 16, 2019
### Corrected Report filed: January 7, 2020

*Floyd, et al. v. City of New York*
*Ligon, et al. v. City of New York, et al.*

*Davis, et al. v. City of New York, et al.*

## MONITOR TEAM

Peter L. Zimroth
Monitor

Richard Jerome
Deputy Monitor

Anthony A. Braga

Cassandra Chandler

Jennifer Eberhardt

Demosthenes Long

John MacDonald

James McCabe

Jane Perlov

James Yates

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................................... 1

II.    GUIDANCE FOR SUBSTANTIAL COMPLIANCE ....................................................... 4

III.   WRITTEN POLICIES ................................................................................................ 6

    A.    Stop and Frisk Policies ................................................................................ 6

    B.    Stop Report Form ........................................................................................ 9

    C.    Racial Profiling Policies ............................................................................. 14

    D.    *Davis*/NYCHA Interior Patrol Policies .................................................... 17

    E.    Trespass Affidavit Program (TAP) Policies .............................................. 22

    F.    Trespass Crimes Fact Sheet (TCFS) ......................................................... 29

IV.   SUPERVISION ....................................................................................................... 30

V.    TRAINING ............................................................................................................. 36

    A.    In-Service Stop and Frisk and Racial Profiling Training ........................... 37

    B.    Recruit Training ......................................................................................... 40

    C.    Training for Newly Promoted Supervisors ................................................ 43

    D.    Basic Plainclothes Course .......................................................................... 44

    E.    Housing One-Day Training ......................................................................... 44

    F.    Training for Investigating Profiling and Biased-Based Policing Complaints ................. 45

    G.    Field Training Officer (FTO) Guide and Training ...................................... 46

    H.    Training on Fair and Impartial Policing Training ....................................... 46

    I.    Refresher Training Course for Investigative Encounters ........................... 48

VI.   BODY-WORN CAMERAS ....................................................................................... 49

    A.    Precinct-Level BWC Pilot .......................................................................... 49

    B.    PSA BWC Pilot ........................................................................................... 51

    C.    Citywide Expansion of BWCs .................................................................... 52

    D.    Guidance for Compliance—Body-Worn Cameras ..................................... 52

VII.  AUDITING ............................................................................................................. 53

    A.    Auditing of Stop Reports and Activity Logs ............................................. 53

    B.    QAD Audits for Undocumented Stops ...................................................... 64

    C.    QAD Auditing of Trespass Crimes Fact Sheets ........................................ 66

    D.    Guidance for Compliance—Auditing ....................................................... 67

i

VIII.    PERFORMANCE EVALUATIONS ........................................................................ 68

   A.    Performance-Evaluation System for Officers and Detectives ..................... 68

   B.    Guidance for Compliance—Performance Evaluations ................................. 71

IX.    COMPLAINTS AND DISCIPLINE ...................................................................... 73

   A.    NYPD Investigations of Profiling Allegations ............................................. 73

   B.    NYPD Handling of Substantiated CCRB Cases ........................................... 79

X.    COMBINED PILOT .......................................................................................... 86

XI.    EARLY INTERVENTION PROGRAM ................................................................. 89

## TENTH REPORT OF THE INDEPENDENT MONITOR

## I.      INTRODUCTION

In 2008, a class action lawsuit was brought challenging the stop, question and frisk practices of the NYPD (*Floyd v. City of New York*).  A second lawsuit, *Ligon v. City of New York*, challenged stops and trespass arrests at private buildings that were enrolled in the Trespass Affidavit Program (TAP), whereby owners allowed the NYPD to patrol their buildings.  In a third case, *Davis v. New York*, plaintiffs challenged stops and trespass arrests and other trespass enforcement efforts in public housing developments.

After a nine-week trial in *Floyd,* the federal district court ruled that the NYPD's stop and frisk practices violated the Fourth Amendment protections against unreasonable search and seizure, and, because of the discriminatory nature of the stops, the Fourteenth Amendment's promise of equal protection under the law.  959 F. Supp. 2d 540 (2013).  The court found that officers were making stops without reasonable suspicion and were targeting persons of color.  *Id.* As a result, the court ordered the NYPD to implement reforms to ensure compliance with state and federal law.  959 F. Supp. 2d 668 (2013).

The court order, issued on August 12, 2013, required NYPD to make changes to its policies, training, supervision, auditing, performance evaluation system and discipline.  The court also directed NYPD to institute a pilot of police officer body-worn cameras (BWCs).  The court appointed a monitor, Peter Zimroth, to assist the parties in developing and implementing reforms, and to report to the court and the public on the Department's progress in complying with the court's requirements.  The court also directed the parties to participate in a community engagement process called the Joint Remedial Process overseen by a facilitator to determine whether additional remedial measures should be recommended and ordered.  In April 2015, the parties settled the

*Davis* case, involving policing at New York City Housing Authority (NYCHA) properties.  In July 2017, the parties in *Ligon* settled their case.  The court appointed Peter Zimroth monitor in those matters.  The *Ligon* and *Davis* settlements are each incorporated by court order into the monitorship.

The monitor's efforts started in November 2014 and is now entering its sixth year.  This report describes the compliance efforts made by the City and NYPD and what is left to do.  It also lays out guidance regarding how the monitor will decide whether to recommend to the court a finding that the NYPD is in substantial compliance with the court's orders.

There have been significant changes in the five years of the monitorship.

- **Policies.**  The Department has revised its policies on stop and frisk, interior patrol of TAP and NYCHA locations, and racial profiling, among others.

- **Training.**  The Department has developed and is implementing revised training on investigative encounters, racial profiling, interior patrol of NYCHA and TAP buildings, basic plainclothes training, promotional training, and training for Police Academy recruits.

- **Revisions to Auditing.**  The Department has instituted improved auditing methods and a new auditing plan will be submitted for court review.

- **Body-Worn Cameras.**  BWCs were initially launched for the pilot study required by the court, but are now being used by all patrol officers and sergeants citywide.

- **Performance Evaluation.**  The Department eliminated methods of evaluation that required officers to count their stops daily and monthly, which in turn had induced officers to increase these activities regardless of their legality.

At the same time these changes were being made, "neighborhood policing" was instituted in almost all commands; a program titled "Operation Impact" was eliminated, so the most inexperienced officers, just out of the Police Academy, were no longer assigned to "hot spots" in neighborhoods with the most crime.  Also, the New York City Council enacted new laws encouraging civil summonses instead of criminal summonses for low-level quality of life

violations (Criminal Justice Reform Act of 2016, https://council.nyc.gov/legislation/criminal-justice-reform/) and the Right to Know Law which require officers to provide more information to members of the public with whom they interact, and to get consent for many searches.  The Department and city prosecutors also shifted marijuana enforcement from arrests to criminal summonses (https://www1.nyc.gov/site/nypd/about/about-nypd/policy/marijuana-law.page).

Reported stops made by NYPD members have decreased dramatically since the apex of stops in 2011.  Reported stops went from 685,000 in 2011 to 11,238 in 2018.  The monitor has consistently raised concerns about stops not being reported, and the NYPD agrees that there are more stops than are being reported.  But the reality is that there has been a striking decrease in stops, even if the numbers of stops reported in recent years are undercounted.  This decrease occurred while violent crime in New York City continue to decline.  Concerns about changing the Department's prior stop and frisk approach and going "back to the bad old days" of high crime in the City were misplaced.

This report is organized in the following fashion.  Section II describes what is meant by "substantial compliance" and the approach that the monitor will take in making his assessment of substantial compliance.  In Section III, the report describes the court-ordered requirements for written policy changes pursuant to the *Floyd* remedial order and the *Ligon* and *Davis* settlements and then, for each policy requirement, reviews the efforts made by the Department to implement the policies in practice, and the monitor's assessment of those efforts.  After written policies, the report covers the requirements for compliance, the efforts made by NYPD to comply, and the monitor's assessment of those efforts for the following topics: Supervision (IV), Training (V), Body-Worn Cameras (VI), Auditing (VII), Performance Evaluations (VIII), and Complaints and Discipline (IX).  Section X describes a pilot study that the monitor has proposed and the court

approved to test the impact of two policy changes that the facilitator recommended.  Section XI reviews the court orders requiring the NYPD to implement a program for "systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or trespass enforcement," and the Department's efforts in doing so.

The NYPD has made many important changes in the five years of this monitorship. Plaintiffs' counsel have also contributed in a collaborative effort to advance the reforms required by the court orders.  The monitor's mandate is to focus on what has not yet been done in order for the Department to come into "substantial compliance"; and that mainly is what is discussed in this report.  But focusing on what is left to do should not be taken as a diminution of the significant achievements in the past five years or the hard work it took to get here.

## II.    GUIDANCE FOR SUBSTANTIAL COMPLIANCE

In its July 30, 2014, Order Modifying Remedial Order, the court included the following two provisions regarding substantial compliance:

> c. "Substantial compliance" in *Floyd* shall be defined as compliance with material aspects of the Immediate and Joint Process Reforms to be approved and so-ordered by the Court. "Substantial compliance" in *Ligon* shall be defined as compliance with all material aspects of the *Ligon* Preliminary Injunction Relief.  In either case, noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance will not constitute a failure of substantial compliance.  However, temporary compliance during a period of otherwise sustained non-compliance shall not constitute substantial compliance.

> d.  Substantial compliance shall be measured using the milestones to be set by the Monitor ….

The *Ligon* settlement stipulation and the *Davis* settlement have similar provisions regarding substantial compliance.

Pursuant to the court's order, the monitor and his team have undertaken the task of setting forth in detail how he will determine whether the NYPD is in substantial compliance and thus whether he will forward that recommendation to the court for approval.  The NYPD, the New York

City Law Department and plaintiffs' counsel met with the monitor team for many hours over the course of months to discuss these issues. The attempt was to come to mutual understandings of: (1) what the specific requirements of the remedial order were; (2) what sources of information the monitor would use to determine compliance; and (3) what sorts of analyses and metrics the monitor would use to evaluate compliance. Ultimately, although consensus might be desirable, it is the monitor's responsibility to make these determinations, subject of course to review by the court. As a result of this process, the monitor set out his views on more than 90 separate required tasks. Attached as Appendix 1 is an Excel spreadsheet listing each task, the text from which the requirement is derived, the definition of compliance, the methodology for assessing compliance, and the data needed for the monitor's compliance review.

The individual requirements are part of a broader assessment of whether the NYPD is in substantial compliance with the overriding requirements of the remedial order—to wit, whether there is lawful policing under the Fourth and Fourteenth Amendments. If there are individual incidents of non-compliance, the monitor will assess whether they have been identified and corrected through instruction, retraining and, when appropriate, discipline. As stated in the Monitor's Seventh Report, "[t]he question at the end of the day will be whether each of the remedial measures, working together, provides a system of constitutional, respectful policing."

For a few tasks, an assessment of compliance is simple. For example, the court ordered the NYPD to modify its stop report in specified ways. The NYPD made those changes and the court approved the revised stop report. However, for most tasks, the evaluation of compliance is more complicated. For the policy changes that are required, the monitor evaluates both the revisions or creation of the required policy and the implementation of that policy in practice.

5

"Changing written policy is not meaningful unless the change is implemented and sustained in the field.  That requires that officers be appropriately trained and supervised, that the NYPD's systems of rewards and discipline support the requirements, and that the Department have in place auditing and review mechanisms to detect when officers are not following the policies, and effective processes to correct violations and minimize future violations.  It is the monitor team's job to assess each of these areas."   Monitor's Seventh Report, p. 1.

For some requirements, there are specific quantitative targets that need to be met.  For others, the monitor will use a combination of quantitative measures and qualitative assessments of the NYPD's efforts.  In addition, if the NYPD achieves substantial compliance with regard to a specific task, the monitor's responsibility will be to assess whether compliance has been maintained and whether it is having the desired effect of meeting the fundamental goals of the court-ordered reforms.  For example, even though the court has approved basic stop and frisk training, if it turns out that certain aspects of that training are not being implemented on the street, the monitor and ultimately the court would have to consider whether changes are required in that training.

In the following sections, the report discusses each requirement for substantial compliance.

## III.   WRITTEN POLICIES

### A.   Stop and Frisk Policies

The NYPD's written policy regarding stop, question and frisk is in Section 212-11 of the Patrol Guide.  This Patrol Guide section describes the procedure to be followed when an officer stops a person based on reasonable suspicion that the person has committed, is committing, or is about to commit a felony or Penal Law misdemeanor.

The court in *Floyd* recognized that the practice, known as "stop and frisk" or "stop, question and frisk," can be an important tool to further public safety.  The court ruled, however,

that to comply with the Constitution, the Department needed to make the following changes to the

Patrol Guide:

- The Patrol Guide must state what constitutes a stop; when a stop may be conducted; when a frisk may be conducted; and when a search may be conducted.

- The Patrol Guide must include a definition of "reasonable suspicion," the standard needed for a stop.

- The Patrol Guide must state clearly that officers must have separate reasonable suspicion that a person is armed and dangerous in order to conduct a frisk of that person.

- The Patrol Guide must require officers to document the stop and articulate reasonable suspicion for the stop, and, if conducted, for the frisk.

- The Patrol Guide must require supervisory review of stops, including review of the constitutionality of the stop, and not just that a stop report form was filled out.

In August 2015, the court approved a new Patrol Guide section on stop and frisk, P.G. 212-

11, *Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level*

*3 Stops*.  The Patrol Guide also addresses investigative encounters between officers and civilians

that are less intrusive than stops or arrests.  These encounters are governed by *People v. DeBour*,

which sets out four levels of encounters:  a simple Request for Information (Level 1); a Common

Law Right of Inquiry (Level 2); a *Terry* stop, when an officer detains a person to investigate (Level

3); and an arrest (Level 4).  The investigative encounters procedures, P.G. 212-11, describe the

standards that govern each level.

Since 2015, there have been several changes to P.G. 212-11; some were approved by the

court, and those not requiring court approval were approved by the monitor.  In March 2016, the

court approved changes to P.G. 212-11 to reconcile the procedures with the new stop report form.

Additional changes were made when the stop report became electronic.  In October 2018, the

Department proposed and the court approved changes to P.G. 212-11 to comply with the Right to

Know Law enacted by the City Council.  These laws require officers in certain nonemergency

encounters to identify themselves by name, rank and command, explain the reason for the stop, and hand out business cards if no one is arrested or issued a summons.  They also require officers to inform people of their right not to consent to a search if consent would be necessary to perform the search.

### 1.       Guidance for Compliance—Written Stop and Frisk Policies and Implementation

As noted above, the NYPD has revised its policies to comply with the court's orders and the court has approved those changes.  It is now the role of the monitor to assess whether the policies are being implemented in practice.  Compliance with the court's requirements on stop and frisk policies will be achieved when:

1.       Stops made by NYPD officers comply with NYPD's new policies and with federal and state standards.

2.       Stop reports that do not articulate reasonable suspicion for the stop or the frisk, or do not articulate the basis for the search, are identified as deficient by supervisors, who then take appropriate action to deal with what they found.

3.       Stop reports that do not articulate reasonable suspicion are identified by the Department's auditing arm, the Quality Assurance Division (QAD), and corrective action is taken with respect to the relevant officers and supervisors.

4.       QAD evaluates BWC footage of stop encounters described in audited stop reports and identifies stops when the BWC footage is contrary to the reasonable suspicion articulated in the stop report, and corrective action is taken with respect to the relevant officers and supervisors.

5.       NYPD officers offer a business card to persons stopped but not arrested or issued summonses.

Substantial compliance will be assessed by a combination of quantitative measures (the percentage of compliant stops, frisks and searches) and a qualitative assessment of the Department's efforts to ensure that stops are constitutional, including an assessment of the Department's corrective measures mentioned in items 2 and 3 above.  The monitor team is also reviewing BWC footage and associated stop reports to assess whether the BWC footage and the stop reports are consistent, in order to evaluate whether officers are accurately reporting the encounters on their stop reports.

### B.     Stop Report Form

The court orders require that the NYPD develop and implement a stop report form to be used by officers every time a person is stopped.  In March 2016, the court approved the NYPD's stop report form, and in January 2017, the Department began using an electronic form that officers can fill out on their phones, on tablets, or on a computer at the command.

The stop report has two narrative sections:  one in which the officer states the reasons for the stop and a second in which the officer states the reasons for the frisk and the search, if conducted.  The stop report also has a section in which supervisors document the review required by NYPD policy (P.G. 212-11) and any follow-up action.  An officer's supervisor must confirm that he or she reviewed the constitutionality of the stop and discussed the facts of the stop with the officer.  The supervisor must check boxes indicating whether or not: (1) the supervisor reviewed the encounter with the officer; (2) the report was accurate and complete; (3) the corresponding activity log entry was reviewed; (4) the supervisor was present on the scene; (5) there was a sufficient basis for the stop; and (6) there was a sufficient basis for the frisk or search, if conducted. The supervisor must also note whether any corrective action was taken.

The Department has made several changes to the stop report.  When a stop is based on a radio run (a communication from a dispatcher over the radio, often based on a call for service),

officers are now required to indicate if the call was based on an anonymous or verified caller, since that information can determine the level of authority an officer is legally allowed to exercise.  To comply with the Right to Know Law, the new stop report requires officers to indicate if they sought consent to search and whether it was given.  The court approved these changes to the stop report form on October 26, 2018.

### 1.    Guidance for Compliance—Stop Report Form and Implementation

Although the stop report itself meets the requirements of the court order, the monitor must evaluate whether the court's requirements are being met in practice.  Compliance with this provision will be achieved when:

1.    Level 3 *Terry* stops made by NYPD officers are documented on stop reports.

2.    In stop reports, officers articulate reasonable suspicion for the stop and frisk, if conducted, and the basis for a search, if conducted.

3.    BWC footage of stops are not contrary to the reasonable suspicion articulated in stop reports of the same encounters.

4.    Officers who make stops and do not document them are instructed or disciplined as appropriate.

5.    Supervisors are reviewing the constitutionality of their officers' stops and documenting their reviews on stop reports.

The monitor has raised two areas of serious concern in prior reports.  The first is the underreporting of stops.  In 2018, although there were approximately 16,000 patrol officers, there were only 11,238 reported stops.  This underreporting of stops has been acknowledged by the Department and by officers and supervisors in focus groups conducted by the monitor, and explicitly identified in NYPD audits (discussed in Section VII below).  Any assessment of

compliance with the court's remedial orders will be impossible unless the Department finds ways to ensure that to a large extent unreported stops are no longer an issue.

The second area of concern is whether supervisors are taking seriously their responsibility to review the constitutionality of stops. At trial, the court found there had been pro forma approval of stops, meaning that there was no substantive supervisory review of the constitutionality of stops. The policies for supervisory review are now in place, and supervisors must state on the stop report form their views as to whether there was a sufficient basis for the stop and a sufficient basis for the frisk or search, if one was conducted. In 2018, out of 11,238 recorded stops, only 58 supervisors noted on the stop reports that the report failed to articulate reasonable suspicion. In the 58 cases in which the reviewing supervisor checked "No" under the caption "Sufficient Basis for Stop," the following follow-up actions were taken: five were given discipline; 40 were given training, instructions, or both training and instructions; and supervisors listed no follow-up for 13 officers. For the 6,659 stops in which a frisk was conducted, 65 supervisors checked "No" under the caption "Sufficient Basis for Frisk." In those 65 cases, the following actions were taken: four officers were given discipline; 46 were given training, instructions, or both training and instructions; and in 15 cases no follow-up action was reported. In 3,742 stops, a search was reported. In 45 cases, the supervisor checked "No" under the caption "Sufficient Basis for Search." The following actions were taken in those cases: 21 officers were given training, instructions, or training and instructions; and in 24 cases, no follow-up action was reported. This issue is discussed further in Supervision, Section IV below.

Officers who do not submit stop reports after a stop and supervisors who do not adequately review those that are submitted are violating the Department's policies and the court's orders. The monitor is evaluating how the Department is addressing these significant concerns. The monitor

has requested data from the NYPD regarding actions taken for the failure to complete a stop report, and will report on that data in a future report.  The monitor also pressed the Department to emphasize the need for compliance by instituting a process similar to Compstat.[1]  The suggestion was that this new process would bring commanding officers and other senior command officials to a meeting at which they would be questioned about compliance, a light would be shone on both poor performance and superior implementation, and those senior officers would be expected to discuss ways to improve the performance of their subordinates.  The Department has now put such a program in place—the RISKS Reviews discussed next.

### 2.    RISKS Reviews

The NYPD has developed a process it has labeled "RISKS Reviews" (Remediation of Identified Situations Key to Success) based on the monitor's suggestion.  Beginning in December 2018, the Department has held meetings with commands to serve as a forum in which identified issues of risk are brought to light for evaluation.  These issues include the underreporting of stops, constitutionality of stops, legality of trespass enforcement, and compliance with policies regarding the use of BWCs, including proper activation, deactivation and categorization, tagging and supervisory reviews of videos.

Each command will be brought in for a RISKS Review approximately twice a year.  During the period between meetings, relevant statistics (including those generated through audits and self-inspections) are generated for all commands, with rankings of boroughs and commands included.  The RISKS Review relies on a two-part process.  The first part is a "roll-out," where commands from an entire patrol borough are assembled together to get a presentation from the Risk

---

[1] Compstat is a management tool used by the NYPD involving weekly meetings at which commanders are brought to police headquarters to respond to questions and data from NYPD executives.

Management Bureau (RMB) about the key performance indicators being tracked and, therefore, the expectation for the commands.  The Chief of Department has attended these roll-outs and begun the sessions with a statement on the importance of conducting Level 3 stops constitutionally and documenting every stop.  RMB then provides an explanation of the RISKS Reviews, a review of Patrol Guide requirements for stops, trespass enforcement and BWC recording, a discussion of possible strategies to gain further compliance with applicable Patrol Guide requirements, and a discussion of additional risks that may need to be addressed.

The second part of the process is the "review."  The review involves 30-minute meetings at RMB with supervisory officers from each command in the Patrol Borough.  The meetings are chaired by the Deputy Commissioner for Risk Management and co-chaired by the Chief of Strategic Initiatives.  Required attendees from each command include the Commanding Officer, the Executive Officer, the Integrity Control Officer, the Special Operations Lieutenant and the Training Sergeant.  Members from the appropriate Patrol Borough attend, as well as representatives from both the Chief of Department's Office and the operational bureau under review (Patrol, Housing or Transit).

The first RISKS Review meeting occurred in mid-December 2018.  All commands went through their first RISKS Reviews by October 2019.  Members of the monitor team have attended most of these sessions.

With regard to Level 3 stops and BWC usage, the purpose of the RISKS Review is to ensure compliance with the requirements pertaining to the preparation and supervisory review of stop reports and the activation of BWCs, not to seek an increase in police activity or stops.  That message has been emphasized consistently at the RISKS Review meetings.  These reviews are

interactive and attendees discuss potential barriers as well as proactive efforts to overcome barriers to full compliance in the areas of stops, trespass enforcement and BWC usage.

Failure of documentation is one of the issues discussed.  Several of the commands have started doing their own RAND reviews (labeled as such because these were initially conducted by the RAND Corporation).  The command does a search of ICAD dispatches to identify encounters in which the words "Stopped," Warrant Check," "Holding" or "Show-up "are used.[2]  The Integrity Control Officer (ICO) (or other member doing the RAND audit) will evaluate the encounter to see if it appears that a stop occurred and, if so, check to see whether a stop report was prepared.  In addition, the Special Operations Lieutenants, who oversee the plainclothes anti-crime team at the command, have been queried about the team's activities and what efforts the command is making to identify stops that are not documented.  There has also been a consistent focus on the command's self-inspections of stop reports, with the Chief from Patrol Services noting that if deficiencies are missed in the self-inspections, that means there are failings at several levels:  the officer making the stop and writing the stop report; the supervisor who missed the deficiency in reviewing the stop report; the ICO who missed it in the self-inspection; and the Commanding Officer or Executive Officer who signed off on the self-inspection.

### C.    Racial Profiling Policies

The NYPD's policy barring racial profiling and other bias-based policing, P.G. 203-25, was approved by the court on August 24, 2015.  The patrol guide defines racial profiling as police action, including stops, frisks, arrests or other law enforcement actions, or the failure to perform a police action, motivated, even in part, by the actual or perceived race, color, ethnicity or national origin of an individual.  Race may be considered only if it is part of a reliable and specific suspect

---

[2] ICAD is the Intergraph Computer-Aided Dispatch.

description that includes not just race, gender and age, but other identifying characteristics or information.  The policy also includes a description of Section 14-151 of the New York City Administrative Code prohibiting bias-based profiling.  The Administrative Code includes demographic categories in addition to race, color and national origin: creed, age, alienage or citizenship status, gender, sexual orientation, disability and housing status.

### 1. Guidance for Compliance—Racial Profiling Policy

As with the Department's stop and frisk policy, substantial compliance regarding the racial profiling policy also requires that Department personnel be trained on the policy and that the Patrol Guide section be followed in practice.  Training on the Department's racial profiling policies is part of the in-service training on stops and frisks.  *See* Section V below.  Compliance with the Department's racial profiling policies will be achieved when:

1. Stops made by NYPD officers comply with NYPD's new policies and with federal and state standards regarding racial profiling.

2. Data on stops, frisks and searches made by NYPD officers do not show racial disparities that are not explained by legally justified reasons, and that are practically significant in magnitude and are unlikely to be due to chance.

3. Communications from NYPD leadership (executives, commanding officers and others) and in stop report narratives do not indicate a targeting of defined racial or ethnic groups for stops because of their prevalence in local crime suspect data.

The monitor will assess the Department's compliance with its racial profiling policies and the Fourteenth Amendment by using statistical analyses of NYPD's stop and frisk data conducted by experts on the monitor team.  The monitor team has examined whether rates of compliance with legal standards for stops, frisks and searches differed by race, and if so, whether those differences were due to chance or not.  The analysis also examined whether there were changes to racial

disparity over time.  A summary of the data and conclusions of this analysis is included in Section VII, Auditing, below.

The monitor team is considering other analyses of stop and frisk data to assess whether there are statistically and practically significant racial disparities and whether these racial disparities are declining over time.  However, significant underreporting would undermine the conclusions of these analyses.  For this reason, the analyses listed below will need to wait until the Department has sufficiently addressed the lack of documentation.

1.       An analysis of outcomes from stops (frisks, searches, summonses and arrests, force) for Blacks and Hispanics compared to similarly situated non-Hispanics; and

2.       An analysis of the recovery rate of contraband and weapons for stops of Blacks and Hispanics compared to similarly situated non-Hispanics.

The monitor team will also conduct analyses for assessing compliance with the *Davis* orders.  The monitor team is currently considering the following types of analyses:

1.       Comparison of trespass stops, arrests and summonses over time in and around NYCHA developments;

2.       Comparison of outcomes (frisk, searches, use of force, and enforcement activity) from stops in NYCHA developments and around NYCHA developments over time;

3.       Examination of whether outcomes vary by whether an officer is assigned to the Housing Bureau or other NYPD units;

4.       Examination of racial disparities in outcomes from stops in NYCHA developments compared to outcomes from stops of persons stopped in similar contexts;

16

5.      Assessment of enforcement activity (stops, arrests and summonses) at various distances from NYCHA (inside, immediate surroundings and further away) and whether the enforcement activities vary by race;

6.      Assessment of relative racial disparity in enforcement activity (stops, arrests and summonses) in NYCHA properties compared to disparities in areas with otherwise similar crime rates;

7.      Assessment of whether the rate of each outcome (e.g., level of enforcement activity) per block in and around NYCHA housing is similar to what one would expect from other blocks with comparable levels of crime; and

8.      Assessment of whether NYCHA developments with comparable levels of crime but different racial distributions of residents have different levels of enforcement activity (stops, arrests and summonses).

The monitor's assessment of compliance with the Department's racial profiling policies will also include qualitative analyses.  Among other things, the qualitative analysis will include: (1) how the NYPD addresses and investigates racial profiling complaints; (2) how it incorporates race issues in its training; and (3) communications from NYPD leadership (executives, commanding officers and others) to ensure that they do not target defined groups for stops because of their prevalence in local crime suspect data. Compliance or non-compliance with other requirements, such as ensuring documentation of stops, will also inform the monitor's assessment.

## D.      *Davis/*NYCHA Interior Patrol Policies

The *Davis* settlement, incorporated in a court order, requires that the Patrol Guide provision for the interior patrol of NYCHA buildings (P.G. 212-60) promote constitutional interactions between NYPD officers and persons encountered during interior patrols.  Among other things, the Patrol Guide states that, without more, entering, being in or exiting a NYCHA building is not an

"objective credible reason" justifying an officer's approach and request for information, nor does it establish reasonable suspicion for a Level 3 *Terry* stop.  P.G. 212-60 also states that arrests for trespass in restricted areas, such as roofs or roof landings, must be made with appropriate notice (e.g., through a conspicuously posted sign).  The policy for interior patrols of NYCHA buildings was approved by the court and became effective on April 25, 2017.

The Patrol Guide also requires officers to complete a form documenting all trespass arrests in NYCHA buildings (the Trespass Crimes Fact Sheet (TCFS)).  Officers must provide information about what led them to approach the person and what led them to believe that the person was a trespasser.  Since May 2017, the NYPD has used the court-approved TCFS for all trespass arrests in both NYCHA buildings and TAP buildings.

### 1.      Guidance for Compliance—NYCHA Interior Patrol Policy

Trespass enforcement at NYCHA properties has declined significantly.  From 2014 to 2018, trespass arrests in NYCHA developments declined by more than 70 percent.  Trespass summonses have declined similarly.  Stops at NYCHA properties have declined by more than 50 percent from 2015 to 2018.  Moreover, trespass arrests at NYCHA properties have declined for Blacks in a greater proportion than for Whites (see Appendix 2).  Even though fewer, the stops, summonses and arrests that are made must be legal and must meet the court's requirements. Compliance with this provision will be achieved when:

1.      Stops made by NYPD officers at NYCHA properties comply with NYPD's new policies and with federal and state standards.

2.      Stop reports that do not articulate reasonable suspicion for the stop or the frisk, or do not articulate the basis for the search, are identified as deficient by supervisors and appropriate corrective action is taken.

3.      Stop reports that do not articulate reasonable suspicion are identified by QAD, and corrective action is taken with respect to the relevant officers and supervisors.

4.      Trespass arrests made at NYCHA properties comply with the NYPD's policies and with federal and state standards.

The monitor team reviewed a sample of BWC videos tagged as Interior Patrols of NYCHA locations.  In 2018, there were 44,208 videos uploaded to the BWC data management system using the tag "Interior Patrol–NYCHA."   A sample of videos was selected to identify encounters in which it appeared likely that enforcement actions were taken, as well as to evaluate routine interior patrols.  The monitor team reviewed a sample of 180 videos tagged as including an enforcement action and 180 uncategorized videos.[3]

In only 101 of the 360 videos (28.1%), the recording officer had significant public contact with a person during the Interior Patrol.[4]  Even though 180 videos were tagged as involving an enforcement encounter, more than 80 of those videos did not include a significant public encounter.  There were 141 persons encountered in these 101 interior patrols.  The charts below identify the race and gender of the persons encountered, where the persons were first encountered and the level of the first encounter.

[3] Of the 44,208 videos recorded, 42,797 were labeled as "Uncategorized," and 1,411 videos were labeled as "Arrest," "Summons" or "Investigative Encounter."   A random sample of 180 "Uncategorized" videos and 180 videos tagged as including an enforcement action (stops, arrests or summonses) were selected.  Using a confidence level of 95 percent, a sample of 360 videos from a population of 44,208 results in a confidence interval of 5 percent.

[4] Significant public contact is defined as any encounter between the officer and a member of the public that lasts longer than 30 seconds.  Routine interactions with staff members of the building, other officers or persons in their official capacity (FDNY, EMS, Postal Service, etc.) were not considered.

**Chart 1.  NYCHA BWC Videos**

**Gender**

|        | Frequency | Percent |
|--------|-----------|---------|
| Male   | 104       | 73.8    |
| Female | 37        | 26.2    |
| Total  | 141       | 100     |

**Race**

|          | Frequency | Percent |
|----------|-----------|---------|
| White    | 12        | 8.5     |
| Black    | 95        | 67.4    |
| Hispanic | 33        | 23.4    |
| Asian    | 1         | .7      |
| Total    | 141       | 100     |

**Level at First Encounter**

|         | Frequency | Percent |
|---------|-----------|---------|
| Level 1 | 31        | 22.0    |
| Level 2 | 7         | 5.0     |
| Level 3 | 22        | 15.6    |
| Level 4 | 81        | 57.4    |
| Total   | 141       | 100     |

**Location of Encounter**

|                      | Frequency | Percent |
|----------------------|-----------|---------|
| Stairway             | 48        | 34.0    |
| Hallway              | 42        | 29.8    |
| Lobby                | 9         | 6.4     |
| Roof Landing/Stairs  | 18        | 12.8    |
| Roof                 | 6         | 4.3     |
| Inside Apartment     | 7         | 5.0     |
| Street/Front of Bldg.| 11        | 7.8     |
| Total                | 141       | 100     |

The monitor team's review of the BWC videos determined that the officers' actions appeared to meet the *Terry* and *DeBour* standards and Department policies in 94 of the 101

interactions (93%), involving 127 of the 141 persons (90%) encountered.  However, the monitor team did note that officers approached and questioned four people, in three encounters, when it did not appear that the officers had an objective credible reason to approach them.  Three of the four were detained without reasonable suspicion and one was asked accusatory questions without founded suspicion.  In four other encounters, officers stopped nine people when it did not appear that officers had reasonable suspicion to stop them.  In one of those encounters, a person was given a summons without the requisite probable cause.  For 22 others stopped, the officers appeared to have the appropriate legal justification for the stop.  For 81 people, the officers had probable cause to arrest when they were first encountered, mostly because they were on the roof or roof landing or were observed smoking marijuana or other drugs.  Of these 81 people, 48 (59%) were arrested and 11 (13%) were issued a summons; for 22 people (27%) engaged at Level 4, no enforcement action was taken.

The monitor team also reviewed a sample of criminal trespass arrests at NYCHA properties.  The Monitor requested the Trespass Crimes Fact Sheet (TCFS) and the Online Booking Sheets (OLBS) for 300 randomly selected trespass arrests at NYCHA locations.  The NYPD provided the OLBS for the 300 arrests, but provided the TCFS for only 67 arrests.  These were the TCFS that were audited by QAD; the Department will be collecting the other TCFS from PSAs and providing them to the monitor team.  In reviewing the 67 TCFS, the monitor team determined that eight (12%) did not articulate an objective credible reason for the approach.  In two of the 67 arrests (3%), the monitor team determined that the TCFS did not articulate probable cause for the trespass arrest.  The monitor team will revisit this data when the Department provides the other 233 TCFS.

### E.      Trespass Affidavit Program (TAP) Policies

In 2013, in the *Ligon* case, the court issued an injunction requiring changes to the NYPD's procedures for stops and frisks at TAP locations.   TAP is a program in which police officers conduct interior patrols in certain private apartment buildings. The injunction applied only to Bronx locations.   There followed a citywide settlement agreement, filed in July 2017, which spelled out the requirements for *DeBour* encounters at TAP locations.

In June 2016, the court approved P.G. 212-59, the NYPD procedures for interior patrols in buildings enrolled in TAP, a program in which police officers conduct interior patrols in certain private apartment buildings.   The NYPD published P.G. 212-59 in April 2017 and conducted roll call training on interior patrols in TAP buildings in June and July 2017.   Stops inside and outside TAP buildings must comply with the NYPD's stop and frisk policies, P.G. 212-11.   In addition, P.G. 212-59 states that "mere presence" in a TAP building, or entry into or exit from a TAP building, does not constitute an "objective credible reason" for a *DeBour* Level 1 approach and request for information, nor does it constitute reasonable suspicion for a Level 3 *Terry* stop.

The Department has also revised its administrative guide governing the requirements and procedures for entry into and continued enrollment in the TAP program, A.G. 303-27.   For a building to be enrolled in the program, the owner must certify concerns regarding criminal activity or community complaints in the building, such as trespassing or drug activity within the last year. Crime prevention officers in each precinct are responsible for enrolling the buildings in the TAP program and then must assess every six months whether the buildings still meet the criteria for renewing enrollment.

### 1.      Guidance for Compliance—TAP Policies

In 2017, the Risk Management Bureau (RMB) met with the crime prevention officers in each Patrol Borough to review the new criteria for enrolling and renewing buildings in the TAP

program.  Each precinct then determined whether buildings already enrolled should remain in the program.  As of the first quarter of 2017, 3,591 buildings were enrolled in the TAP program.  As of the second quarter of 2019, only 354 buildings remained in the TAP program.  With the reduction in buildings enrolled in TAP, there has also been a reduction in the use of trespass arrests and summonses at TAP locations.  In 2018, there were 145 stop reports at or within 300 feet of a TAP building, 47 trespass arrests at or within 300 feet of a TAP building and 31 Criminal Court trespass summonses at or within 300 feet of a TAP building.  As with *Davis*, the decline in enforcement does not obviate the need for NYPD to meet its constitutional obligations for the stops, arrests and summonses it does make at TAP buildings.  NYPD officers must follow the agreed-upon standards for investigative encounters and trespass enforcement activities in and around TAP buildings.

Compliance with these requirements will be achieved when:

1.     Stops made by NYPD officers at TAP locations comply with NYPD's policies and with federal and state standards.

2.     Stop reports that do not articulate reasonable suspicion for the stop or the frisk, or do not articulate the basis for the search, are identified as deficient by supervisors, who then take appropriate action to deal with what they found.

3.     Stop reports that do not articulate reasonable suspicion are identified by QAD, and corrective action is taken with respect to the relevant officers and supervisors.

4.     NYPD officers follow the agreed-upon standards for investigative encounters and trespass enforcement activities in and around TAP buildings.

The *Ligon* Monitoring Workplan, a draft of which was included as an appendix to the Monitor's Ninth Report, describes each requirement in the *Ligon* settlement and the data and analyses needed to assess compliance.  The *Ligon* Monitoring Workplan has not yet been finalized.

The monitor team reviewed a sample of BWC videos tagged as "Interior Patrol–TAP."  In 2018, there were 1,126 videos uploaded to the BWC data management system using the tag "Interior Patrol–TAP."  A sample of 160 of these videos was selected from that population for review.[5]

In just 26 of these videos (16.25%), the recording officer had significant public contact with a person during the Interior Patrol.[6]  There were 46 persons encountered in these 26 interior patrols.  In 134 of the 160 Interior Patrols sampled (83.8%), there were no significant public encounters.  The charts below identify the race and gender of the persons encountered, where the person was first encountered, and the monitor team's assessment of the level of the first encounter.

**Chart 2.  TAP BWC Videos**

**GENDER**

|        | Frequency | Percent |
|--------|-----------|---------|
| MALE   | 32        | 69.6    |
| FEMALE | 14        | 30.4    |
| Total  | 46        | 100     |

---

[5] Using a confidence level of 95%, a sample of 160 from a population of 1,126 results in a 7.18% confidence interval.

[6] Significant public contact is defined as any encounter between the officer and a member of the public that lasts longer than 30 seconds.  Routine interactions with staff members of the building, other officers, or persons in their official capacity (FDNY, EMS, Postal Service, etc.) were not considered.

**RACE**

|          | Frequency | Percent |
|----------|-----------|---------|
| WHITE    | 4         | 8.7     |
| BLACK    | 24        | 52.2    |
| HISPANIC | 18        | 39.1    |
| Total    | 46        | 100     |

**FIRST ENCOUNTERED**

|              | Frequency | Percent |
|--------------|-----------|---------|
| STAIRWAY     | 14        | 30.4    |
| HALLWAY      | 7         | 15.2    |
| LOBBY        | 4         | 8.7     |
| ROOF LANDING | 15        | 32.6    |
| ROOF         | 1         | 2.2     |
| INSIDE APT   | 3         | 6.5     |
| STREET       | 2         | 4.3     |
| Total        | 46        | 100     |

**LEVEL AT FIRST ENCOUNTER**

|       | Frequency | Percent |
|-------|-----------|---------|
| 1     | 18        | 39.1    |
| 2     | 1         | 2.2     |
| 3     | 2         | 4.3     |
| 4     | 25        | 54.3    |
| Total | 46        | 100     |

The monitor team's review of the TAP BWC videos determined that the officers' actions appeared to meet the *Terry* and *DeBour* standards and Department policies in 24 of the 26 interactions (92%), involving 42 of the 46 persons (91%) encountered.  In one BWC video, the sergeant was observed asking two people in the lobby of the building if they lived in the building without any basis for the approach.  Both persons were arrested for trespass.  In a second video,

25

the officer encountered two people in the stairway of the building, who then ran when they saw the officer.  The officer then called out for the individuals to stop.  Although the officer did have an objective credible reason to approach the persons, at Level 1, they were free to leave and even run from the officer, so the officer's command for them to stop was not lawful.  Both individuals were released after an investigation determined they lived in the building.

The monitor team also requested the TCFS and the OLBS for 47 randomly selected trespass arrests occurring within 300 feet from a TAP location.  It was determined, however, that most of the arrests were at buildings not part of the TAP program at the time of the arrest; several of the arrests were at NYCHA buildings located next to buildings in TAP.  The NYPD provided documents for three trespass arrests made at TAP locations.  In two of the three cases, the NYPD provided a TCFS, and both articulated an objective credible reason for the approach.

The monitor team also reviewed 30 trespass arrests at TAP locations audited by QAD.  Of the 30 arrests, a TCFS was prepared for 28 of the 30 arrests.  The monitor team determined that the TCFS articulated an objective credible reason to approach in 25 of the 28 (89%) trespass arrests.   For each of the trespass arrests, the arrest documents articulated probable cause for the arrest.

## 2.    TAP Administration

To assess the NYPD's compliance with NYPD Administrative Guide 303-27, Trespass Affidavit Program (the revised TAP guidelines), each quarter the monitor will review the TAP enrollment and renewal forms and supporting documents for a different NYPD Patrol Borough. Compliance with the TAP administrative requirements will be achieved when:

1.    Crime Prevention Officers (CPOs) obtain appropriate Trespass Crimes—Owner's Affidavit and complete TAP enrollment forms for buildings entering the program.

2.      CPOs review and evaluate whether to renew a building's participation in the program before the expiration of six months.

3.      Commanding Officers review and evaluate whether to renew a building's participation in the program before the expiration of one year.

4.      Borough Commanders are notified if there is a need for a building to remain in TAP beyond one year, and will recommend approval to the Office of the Chief of Patrol if they determine that the building should remain in the program.  The Office of the Chief of Patrol will issue the final approval for renewal.

The monitor reviewed the TAP enrollment and renewal forms for Patrol Borough Brooklyn North for the renewal period ending September 2018 and for Patrol Borough Queens South for the renewal periods ending December 2018 and June 2019.  The monitor team also conducted a focus group with crime prevention officers (CPOs) in May 2019.

 The CPOs described their efforts to administer the TAP program. If a building owner or manager asks to be in the program, the CPOs evaluate whether the building should be enrolled in the program.  For example, the CPOs will check to see if there are calls for service at the building concerning the problem(s) stated and will confer with the precinct's field investigation officer (FIO) and neighborhood community officers (NCOs).  The types of problems that are considered for inclusion in TAP include drug use in stairwells, unauthorized people in building/stairwells and quality of life offenses.[7]  If there are no records, the CPOs stated that they go to the building and speak with residents to verify the owner's complaint.  Before the Department revised its TAP procedures in 2017, building owners felt they had a right to be enrolled in TAP and renewals were

---

[7] Quality of life offenses would include drinking, gambling, graffiti, loitering and noise, as well as other violations deemed a nuisance by the building owner or manager and the NYPD.

pro forma.  Building owners also viewed the NYPD as their private security force.  Now, buildings are vetted to determine eligibility for enrollment.  To remain in TAP, building owners and managers must attempt to implement security measures, if recommended by the CPO.  If owners do not make good faith efforts to implement the recommended improvements, their buildings are unlikely to remain in TAP upon renewal.

As noted above, the monitor team requested from the NYPD and then reviewed the TAP enrollment and renewal forms and the owner's affidavits for two patrol boroughs to assess whether the Department was complying with the new TAP administrative procedures guide.  The documents thus far provided by the NYPD from Patrol Boroughs Brooklyn North and Queens South were not sufficient for the monitor to conclude that there had been compliance with TAP procedures.  For Brooklyn North, TAP enrollment/renewal forms were provided for only two precincts.  Consistent with TAP procedures, each form was prepared by the CPO and approved by the precinct commander.  However, the Trespass Crimes—Owner's Affidavits for the buildings in these precincts were not provided.  In four precincts, the Trespass Crimes—Owner's Affidavit for each building was provided, but the TAP enrollment/renewal forms were not.[8]

For Patrol Borough Queens South (PBQS), the NYPD provided TAP Renewal Forms for the renewal periods ending December 2018 and June 2019, Trespass Crimes—Owner's Affidavits, eight arrest reports and/or arrest-related documents, and data relating to criminal trespass arrests and criminal court summonses in PBQS for 2018.  The 101 Precinct is the sole command in PBQS with buildings enrolled in TAP during the renewal periods ending December 2018 and June 2019.  TAP enrollment declined from 22 buildings in the first quarter 2018 to eight buildings in the second quarter of 2019.  Four TAP renewal forms were submitted for the eight buildings in both the fourth

---

[8] There were no TAP buildings in the 75, 84, 90 and 94 Precincts in the third quarter 2018.

quarter 2018 and the second quarter 2019.  The 2018 renewal forms were approved by both the CPO and the precinct commander; the 2019 forms were approved by the CPO, but were not signed or dated by the precinct commander.  It is unclear from the documents provided by the NYPD whether any of the eight buildings, each of which has been enrolled in TAP for more than one year, required approval from the office of the Chief of Patrol.

Based on the monitor's review of the documents provided for these two patrol boroughs, it appears that in some situations, the precincts have not documented the steps required by the TAP Administrative Guide.  In other situations, the steps may have been taken, but the NYPD did not provide sufficient documentation to the monitor team.  In only a few buildings were the correct enrollment forms completed, showing that the CPO made the appropriate assessments of the building and the commanding officer approved of the building's enrollment or renewal.  Without enrollment/renewal forms, Trespass Crimes—Owner's Affidavits and documentation supporting enrollment or renewal for each building, it is not possible for the monitor to make a determination concerning the NYPD's compliance with its TAP procedures.

### F.    Trespass Crimes Fact Sheet (TCFS)

The settlements in *Davis* and *Ligon* require officers making trespass arrests in NYCHA and TAP buildings to document the arrests on a new form—the TCFS.

#### 1.    Guidance for Compliance—TCFS

Compliance with this requirement will be achieved when:

1.    NYPD officers complete a TCFS form (PD 351-144) prior to arraignment any time they effect an arrest for trespass in or around a NYCHA residence or TAP location.

2.     The TCFS articulates a proper basis for the approach and probable cause for the trespass arrest.

The monitor team reviewed a sample of trespass arrest reports and TCFSs for 2018 trespass arrests at TAP and NYCHA locations.  The monitor team's assessment of compliance with the TCFS requirements is described above in Sections III.D and III.E, above.

## IV.   SUPERVISION

From the beginning of this monitorship, the monitor has recognized that significant change in the NYPD depends on first-line supervisors.  Sergeants on the street must embrace the changes and be responsible for the officers in their charge.  Sergeants and lieutenants must oversee, mentor and educate their officers, and precinct and unit commanders must set the right direction and tone. If supervisors do not take an active role in supervision, oversight, teaching and, when appropriate, discipline, the reforms necessary to achieve compliance will not take hold.  Supervisors must ensure that the stops, frisks and trespass arrests made by their officers are legal and proper and that these activities are properly documented.

NYPD policies set out supervisors' responsibilities.  Patrol Guide 212-11 requires documentation of all stops and establishes the responsibilities of supervising officers up the chain of command.  Supervisors are required to respond to the scene of stops when feasible, discuss the circumstances of the stop with the officer making the stop before the end of the officer's tour, and review the officer's stop report form and activity log.  If a stop report is inaccurate or incomplete, the supervisor must direct the officer to make the necessary corrections.  If the supervisor determines that the officer did not have reasonable suspicion for the stop, reasonable suspicion for the frisk or an appropriate basis for the search, the supervisor must document that and specify an appropriate follow-up:  instruction, additional training or, when warranted, discipline.  These supervisory responsibilities have been emphasized in the Department's training, but putting in place the right policies and training is not the same as having those policies and that training applied in practice.

### 1.      Guidance for Compliance—Supervision

Compliance with this provision will be achieved when:

1.      Supervisors review stops for constitutionality in a comprehensive manner and take appropriate corrective action when they identify improper stops, frisks or searches.

2.      Supervisors who observe or learn of officers who make a stop but do not document the stop with a stop report take appropriate corrective action.

3.      ICOs complete self-inspections of stop reports and review the reports for constitutionality.

The monitor team has examined a sample of stop reports audited by QAD, as well as ICO self-inspections and QAD's audit of supervisory review.  The monitor team also assesses NYPD's efforts through RISKS Reviews and follow-up training conducted for supervisors who do not identify deficient stop reports or trespass arrests.

To date, there are still very few instances in which supervisors are noting on stop reports an insufficient basis for the stop, frisk or search and identifying corrective action.  Chart 3 below shows that supervisors:  identified an insufficient basis for the stop in 58 of 11,239 stop reports; identified an insufficient basis for a frisk in 65 of 6,659 stops in which a frisk was conducted; and identified an insufficient basis for a search in 45 of 3,742 stops in which a search was conducted.

**Chart 3.  Supervisory Actions on Stop Reports**

|  | # Stop Reports | # Reviewing Supervisor Determined No RS for Stop | # Stop Reports with Frisks | # Reviewing Supervisor Determined No RS for Frisk | # Stop Reports with Searches | # Reviewing Supervisor Determined Search Not Justified |
|---|---|---|---|---|---|---|
| Full Year 2018 | 11,239 | 58 | 6,659 | 65 | 3,742 | 45 |

Chart 4 below shows the following for each quarter of 2018:  the number of stop reports that QAD audited; the number of stop reports in those audits that QAD determined did not articulate reasonable suspicion (RS) for the stop; and the number of those same stop reports that the reviewing supervisor determined did not articulate reasonable suspicion for the stop.  The chart also compares the number of stop reports that QAD determined did not articulate reasonable suspicion for the frisk, if conducted, with the number of reports for which the supervisors found no reasonable suspicion for the frisk, and a similar comparison of QAD's and the supervisors' determinations regarding the number of stop reports that did not articulate a basis for the search, if conducted.

**Chart 4.  Supervisory Actions on Stop Reports Compared to QAD Assessments**

| Quarter | # Stop Reports Audited by QAD | # QAD Determined No RS for Stop | # Reviewing Supervisor Determined No RS for Stop | # QAD Determined No RS for Frisk | # Reviewing Supervisor Determined No RS for Frisk | # QAD Determined Search Not Justified | # Reviewing Supervisor Determined Search Not Justified |
|---|---|---|---|---|---|---|---|
| 1Q2108 | 1,838 | 423 | 8 | 102 | 4 | 29 | 0 |
| 2Q2018 | 1,850 | 326 | 10 | 87 | 4 | 60 | 3 |
| 3Q2018 | 1,503 | 236 | 20 | 84 | 4 | 15 | 4 |

Although very few supervisors identified deficiencies on the completed stop reports, the NYPD has noted that supervisors sent a significant number of stop reports back to the officers for corrections before they signed off on the reports.  According to the NYPD, supervisors corrected 28 percent of the stop reports completed in 2018.  The NYPD has not reported how many of those corrections related to the officers' articulation of reasonable suspicion for the stop or frisk or basis for the search, or instead were corrections for other reasons (e.g., typos or failure to complete other

unrelated fields in the report). The monitor team will be reviewing supervisors' corrections to stop reports to assess whether supervisors are taking additional appropriate actions on stop reports.

Another way the monitor assesses supervision is to examine the self-inspections of stop reports conducted by the command's ICO. Each month, the ICO of each command must examine the most recent 25 stop reports filed by officers in the command and review whether the stop and any frisk or search, if conducted, were proper, and whether the supervisor who approved the stop report properly assessed the legality of the stop. The self-inspection is then signed off by the command's executive officer or commanding officer. When QAD conducts its audits of each command, it also examines the command's self-inspections. If a stop report is reviewed by both the ICO in a self-inspection and QAD in its audit, QAD reviews whether the ICO's findings are consistent with its auditors' findings. Inconsistencies between the self-inspections and QAD's audits are identified in the command's RISKS Review profile. If the ICO determined that the stop or frisk narrative in the stop report was sufficient, but QAD determined that the stop report did not articulate reasonable suspicion, the ICO's self-inspection is discussed at the RISKS Review meeting. Chart 5 below show the results of QAD's assessments of the ICO self-inspections for 2018.

**Chart 5. QAD Audit v. Command Self-Inspections of 2018 Stop Reports**

| Quarter | # Stop Reports Audited by QAD | # Stop Reports Audited by QAD in Command Self-Inspection | % Stop Reports Audited by QAD in Command Self-Inspection | # QAD/Cmd Consistent | % QAD/Cmd Consistent |
|---------|------|------|-----|-----|-----|
| 1Q2018 | 1,838 | 1,396 | 76% | 858 | 62% |
| 2Q2018 | 1,850 | 1,386 | 75% | 896 | 65% |
| 3Q2018 | 1,809 | 1,181 | 65% | 756 | 64% |
| 4Q2018 | 1,696 | 865 | 51% | 585 | 68% |
| Total | 7,193 | 4,828 | 67% | 3,095 | 64% |

The Department has created a protocol to give supplemental training to supervisors who repeatedly approve deficient stop reports.  Supervisors who have approved multiple stop reports that QAD determined to be deficient are scheduled to take the in-service investigative encounters training if they have not already attended that training.  Those who have already received the training are sent to a smaller refresher class.  Supervisors who have approved more than three deficient stop reports have their stop reports and other paperwork reviewed by attorneys in RMB.  They also receive one-on-one training from an attorney in RMB aimed at the specific deficiencies that have been identified.  The chart below lists the number of supervisors who have been retrained based on their approval of deficient stop reports.

**Chart 6.  Supervisor Retraining**

|  | 2 Deficient Stop Reports Approved by Supervisor; Supervisor Retrained | 3 or More Deficient Stop Reports Approved; Supervisor Retrained |
|---|---|---|
| **1Q2018** | 28 | 9 |
| **2Q2018** | 5 | 3 |
| **3Q2018** | * | 12 |
| **4Q2018** | * | 3 |
| **1Q2019** | * | 12 |

* In the first six months of 2018, RMB sent supervisors for retraining who approved two deficient stop reports, but sent supervisors who approved three deficient stop reports for retraining after that, leaving it to the command to take corrective action for those who approved one or two deficient reports.

In addition to retraining, a number of commands have issued CRAFT reports for supervisors who approve deficient stop reports.[9]  In the fourth quarter of 2018, 91 supervisors were given a "Needs Improvement" CRAFT report for approving a deficient stop report.

---

[9] CRAFT stands for Cop's Rapid Assessment Feedback Tool.  Supervisors can issue a Supervisory Comment Form in the CRAFT system for an officer's positive actions or negative actions (Needs Improvement).  The CRAFT "Needs Improvement" report is now used by NYPD instead of the Minor Violations Log, which was a logbook kept at the command but was not tracked Department-wide.

The Department's RISKS Reviews are also a way for the Department leadership to emphasize the importance of supervision to achieve compliance.  The monitor team has attended RISKS Reviews for all of the patrol precincts.  During these meetings, Department leadership looks to the commanding officer to describe the proactive steps the command is taking to address compliance problems.  The command profile provided to the command for RISKS Review meetings highlights compliance (or lack thereof) with respect to stop encounters and stop documentation and with BWC procedures.  One particular area examined is whether the results of the command's self-inspections of stop reports, generally performed by the ICO, are consistent with QAD's audits of stop reports.  Another focus of these meetings is the review by supervisors of officers' BWC video, with the Department stressing that the reviews are not just a box checked, but an opportunity to identify positive conduct, negative conduct and training opportunities.  Each command will be called back for a review roughly six months after the first review, and they are told that the Department expects to see improvement in any area in which it is needed.

The general philosophy behind the RISKS Reviews is that they are not "gotcha" meetings, but a collaborative approach to understanding barriers to full compliance.  This is an appropriate strategy, but the process must create the right incentive for compliance.  Expected performance must be reinforced and poor performance must be identified.  Here, as elsewhere, there needs to be both positive reinforcement of expected performance and negative consequences for poor performance, so that sought-for behavior becomes habitual.  The monitor has provided the NYPD with recommendations for potential ways to improve the RISKS Reviews.  Additional information that could be included in a command profile and discussed at the RISKS Review meetings include:

- Stop reports identified by supervisors on the report as deficient, and any follow-up actions noted, along with stop reports determined by QAD to be deficient, but not identified by supervisors

- Stop and frisk post-training exam scores from each command

- Discipline imposed for serious failures, such as failing to complete a stop report when one was required.

- Number of profiling complaints in the command

The monitor also recommended that RMB document any "homegrown" proactive efforts to address compliance at the command level to share with the Department.

## V.   TRAINING

The Department, plaintiffs' counsel and the monitor team have worked diligently over the five years of the monitorship to develop training materials required by the court orders and stop and frisk and trespass enforcement policies.  To date, the following training courses have been approved by the court:

> In-Service Stop and Frisk and Racial Profiling Training for Police Officers
> In-Service Stop and Frisk and Racial Profiling Training for Supervisors (Sergeants and Lieutenants)
> Recruit Training—Policing Legally
> Recruit Training—Policing Impartially
> Recruit Training—Interior Patrol (NYCHA and TAP buildings)
> Recruit Training—Characteristics of Armed Suspects
> Training for Newly Promoted Supervisors
> Basic Plainclothes Training
> Investigating Racial Profiling and Biased Based Policing Complaints
> One-Day Housing Training for Housing Bureau officers

The court also approved the scripts for roll call training videos on investigative encounters and interior patrols in NYCHA and TAP buildings after the Department developed court-approved Patrol Guide sections on those topics.  The current version of the approved training materials may be found at http://nypdmonitor.org/training/.

Compliance with the training requirements will be achieved when:

**1.**      NYPD training instructors provide training consistent with the court-approved training materials.

2.      NYPD patrol officers and detectives are trained on the subjects of the court-approved training.

3.      NYPD supervisors are trained on the subjects of the court-approved training for reviewing officer stops and documentation of stops.

4.      NYPD recruit officers are trained on the court-approved training.

The monitor's assessment of substantial compliance with the court's training requirements will also take into account whether officers are applying the training in the field, as reflected in their stop reports, trespass arrest documentation and an assessment of unreported stops.

**A.      In-Service Stop and Frisk and Racial Profiling Training**

**1.      Content of the Stop and Frisk Training Materials**

The training materials cover the fundamental principles of stop, question and frisk, trespass enforcement and bias-free policing.  Opportunities for discussion about the role of race in investigative encounters are included in several places.  The materials describe the difference between the constitutionally permissible use of race based on a specific, reliable suspect description and the constitutionally impermissible targeting of racially defined groups for stops. The materials also effectively convey the changes in NYPD procedures governing investigative encounters and interior patrols, as well as what is expected of officers and supervisors regarding the documentation and supervision of stops and trespass arrests.  In sum, the training materials meet the requirements of the court orders.

At the beginning of the training, attendees see an important statement by the Police Commissioner that explains how the training grew out of the stop and frisk litigation, how the overuse and misuse of stop and frisk harmed both the Department and some of the communities it

serves, that the responsibility for this misuse rests with the leadership of the Department, and that the Department now owes its members a comprehensive training course so they understand what, under the law and Department procedure, they can and cannot do.  The video can be seen at http://nypdmonitor.org/resourcesreports/training.

An attorney from the Department's RMB or from a local district attorney's office and uniformed members of the service co-teach an interactive class on the law and procedures regarding investigative encounters.  The NYPD has added additional material covering the new Right to Know Law.  After this portion of the course, the class breaks for a meal.

For the supervisors' course, the content of the post-meal session includes discussions of video footage from NYPD BWCs with a focus on sergeants' and lieutenants' role as supervisors, particularly with regard to how to supervise stops and how to discuss stop reports with their subordinates, and the need to ensure proper documentation of all stops.  For the officers' training, the post-meal session includes reviews of BWC footage involving investigative encounters, after which the instructors discuss both good and bad examples of stop reports for those encounters. The NYPD has added a section on procedural justice in the post-meal session for officers and supervisors and has also included BWC videos of self-initiated stops.

The court approved training materials for NYPD's in-service training on Investigative Encounters for NYPD supervisors (sergeants and lieutenants) on December 5, 2017.  After the training materials were revised to address Right to Know Law issues, the stop and frisk course for patrol officers was approved by the court on July 10, 2018.

## 2.    Roll-out of Stop and Frisk Training

The Department determined that supervisors would be trained first so the training could cover additional material on supervisory responsibilities.  Training for supervisors began in December 2017.  The Department began training its patrol officers in February 2018 to pilot

proposed changes to the training materials.  Training for officers continued after the training materials were revised to address Right to Know Law issues.  The training is being held at the Tactical Village at Rodman's Neck.  To increase the effectiveness of the training, each class is limited to 30-35 officers or supervisors.  The training is taught every weekday and is taught on both the day (7x3) and evening (3x11) tours.

According to the NYPD, as of September 5, 2019, 17,843 police officers and 592 detectives have gone through the training and 2,775 sergeants and 1,001 lieutenants have been through training.  Still to be trained as of that date, according to the NYPD, were 4,222 police officers, 4,844 detectives, 1,719 sergeants and 709 lieutenants.  The Department currently anticipates that all uniformed members of the service will have received this training by the summer of 2020.

### 3.    Observations of Stop and Frisk Training

Since January 2018, the monitor team has observed numerous classes of both supervisors and patrol officers.  Plaintiffs' counsel also have attended training classes on a quarterly basis. The monitor team and plaintiffs' counsel have shared with the Department observations and views about the course materials, the way the materials have been presented and the course instructors. The monitor team observed SQF training in April, July and October 2019.  The instructors observed by the monitor team were knowledgeable and followed the approved materials. Although they varied in style and in their ability to engage the officers, the instructors were quite good.

One area in the morning sessions was not covered sufficiently.  The material about NYCHA and TAP interior patrols was covered in approximately five minutes. Although, as noted by one of the instructors, a full day of instruction will be given to the Housing Bureau and precinct personnel who patrol public housing in their commands, this section should be discussed more

thoroughly, as patrol officers policing TAP buildings will not be getting the Housing Bureau training.

The afternoon session included viewing and discussion of video footage and completed stop reports. The classes went through the strengths and weakness of stop reports completed in class, as well as common errors and mistakes in stop reports. There was also a new emphasis from previously observed sessions on the four elements of procedural justice: Voice (actively listening); Neutrality (ensuring fairness); Respect (treating people with dignity); and Trustworthiness (being transparent).

### B.   Recruit Training

Recruit training was a particular focus of attention for the parties and monitor at the beginning of the remedial effort, as there was a recruit class that started in January 2015, shortly after the start of this monitorship. The monitor, the NYPD and the plaintiffs recognized that the new class of recruits could not be trained using materials that the court and the NYPD had found inadequate. The parties worked to develop new student guides, lesson plans, PowerPoint presentations and scenarios for several subjects. Training materials for Police Academy recruit classes on stop and frisk, racial profiling and interior patrols for TAP and NYCHA buildings were rewritten and approved by the court in April 2015. The materials for these courses have been revised as new NYPD policies were approved (e.g., P.G. 212-11, Investigative Encounters). The course on investigative encounters (Policing Legally) was also updated to reflect the electronic stop report form. The course on interior patrols of TAP and NYCHA buildings was updated to reflect the new procedures governing those topics, P.G. 212-59 and P.G. 212-60.

### 1.   Recruit Training on Stop, Question and Frisk

A recruit training class entitled "Policing Legally—Street Encounters" covers the legal standards governing when an officer may stop, question and frisk a person. The training

emphasizes that the legal authority for a stop does not automatically provide the authority for a frisk. To frisk a person, the officer must have reasonable suspicion that the person stopped is armed and presently dangerous. The training materials stress that an encounter between a civilian and an officer is a "stop" when a reasonable person would not feel free to disregard the officer and walk away. Such an encounter requires the officer to have reasonable suspicion that the person was engaged in or is about to be engaged in criminal conduct. The course covers *Terry v. Ohio* and the four levels of *DeBour* encounters.

In 2018, the parties agreed on additional changes to the Policing Legally recruit materials. The primary purpose of these changes was to ensure consistency with the in-service investigative encounters training being taught at Rodman's Neck to incumbent officers. One significant change was the addition of BWC videos as a tool to review each level of investigative encounter. Information regarding the requirements of the Right to Know Law was also added to this curriculum. The revised Policing Legally training materials were approved by the court on August 14, 2018.

The Monitor team observed Policing Legally classes early in the monitorship, and returned to the Police Academy to observe these classes in the summer of 2018 and the summer of 2019. Team members found the instruction to be consistent with the court-ordered materials and well presented, with significant recruit engagement.

### 2. Recruit Training—Policing Impartially

The remedial order requires new training on the NYPD's prohibition of racial profiling. Under that policy, officers may not use race as a motivating factor, even in part, for law enforcement action, unless the action is based on a reliable and specific suspect description. A general suspect description, such as "young, black male," is not sufficient; in addition, the fact that a particular group may appear more frequently in local crime statistics is not enough information

41

for there to be reasonable suspicion for a stop.  The class material includes information regarding bias and police history and how knowledge of this history can help officers be more effective.

Monitor team members observed this class in 2018 and in July and October 2019. Plaintiffs' counsel also observed two sessions.  The course was presented well and followed the general course guide and approved material.  The instructor for the April 2019 class opened the course describing how everyone has biases, and how the way in which officers approach individuals may be a reflection of those biases.  He noted that officers must make an effort to be aware of and control their biases, and that biases are more likely in situations when officers have discretion to take law enforcement action.  The instructor also reinforced the difference between criminal profiling and racial profiling several times.  The instructor for the October class followed the instructor materials, but did not elaborate on the materials and engage the recruits, although there was opportunity to do so.

Monitor team members have noted that discussions of bias-based policing, profiling and community respect have been interspersed in several of the recruit training courses and the associated scenario-based training, beyond Policing Impartially.  Incorporating these themes consistently throughout the training modules will support the building of a Department culture.

### 3.      Recruit Training—Interior Patrol

In 2015, the NYPD combined recruit training materials regarding patrols at TAP buildings with the training materials approved by the court in *Davis* governing housing patrols in and around NYCHA buildings.   The training materials were approved by the monitor and meet the requirements of the court orders.  The training instructs recruits that mere presence near, entry into or exit from a TAP or NYCHA building is not an "objective credible reason" to approach a person to request information.   The training also includes hypothetical scenarios for both TAP and

NYCHA buildings.  Monitor team members have observed these classes and have found the instruction to be consistent with the approved materials.

### 4.    Recruit Training—Recognizing the Characteristics of Armed Suspects

One recruit training segment identified in the *Floyd* liability and remedies decisions as needing revision was a training module conducted by the Firearms Training Section on the characteristics of armed suspects.[10]  This training teaches recruits about factors that should raise their awareness when they attempt to determine whether or not an individual they encounter is armed.  A revised version of this training was approved by the court in February 2017.

Monitor team members and plaintiffs' counsel observed this training in July 2019.  The class was taught by a 27-year veteran of the NYPD who has taught similar material for more than 10 years.  The instruction followed the court-approved lesson plan and covered all of the learning objectives.  The instructor went to great lengths to emphasize that this was not a stand-alone lesson and that this training must be considered in the context of all other lessons/training received (e.g., investigative encounters training).  He noted that none of the characteristics singularly was sufficient to show reasonable suspicion that a person was carrying a firearm.

### C.    Training for Newly Promoted Supervisors

Training materials for newly promoted sergeants and lieutenants were approved by the court on March 27, 2018.  A principal focus of this training is the expanded responsibilities of supervisors, particularly sergeants, under the new Patrol Guide procedure for investigative encounters and specifically with regard to the stop report.  The format of the training has been changed to encourage class participation and add BWC video, and is similar to the in-service

---

[10]  *Floyd v. City of New York*, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013) (liability decision); *see Floyd v. City of New York*, 959 F. Supp. 2d 668, 680 (S.D.N.Y. 2013) (remedies opinion).

training described above for incumbent sergeants and lieutenants.  The monitor team has not observed this training since 2017, and will plan to observe and report on the training in the next report.

### D.   Basic Plainclothes Course

The NYPD conducts a three-day training course for officers who will be starting as plainclothes officers, including officers who will be joining a precinct-based anti-crime or conditions unit, or any other unit that works in plainclothes.  It is important to ensure that these officers get training on stop and frisk policies, because their work often involves actively seeking to detect and apprehend suspects and because they are making a significant proportion of the NYPD's reported stops.

On August 14, 2018, the court approved revised training materials for a module on investigative encounters that is part of a three-day course given to plainclothes officers.  The revisions were done to make sure the materials were consistent with the in-service investigative encounters training.  In addition, BWC videos involving plainclothes officers were added to the training to demonstrate some of the main teaching points.  The monitor team plans to observe upcoming plainclothes training and report in a future report.

### E.   Housing One-Day Training

On May 29, 2019, the court approved materials for a one-day training that will be given to all Housing officers.  The *Davis* settlement requires that the Department provide in-service training so that officers who conduct interior patrols in NYCHA buildings are familiar with the posted rules and regulations in those buildings and have guidance on how to maintain the proper balance between enforcing the law and respecting the rights of residents and their guests.  After a long period of negotiations, the parties came to a consensus on language that carefully strikes this balance.  The training encourages officers to use their discretion when appropriate.  The NYPD

began this training in October 2019.  The monitor team and plaintiffs' counsel observed this training in November 2019.

### F.      Training for Investigating Profiling and Biased-Based Policing Complaints

Training for Internal Affairs Bureau (IAB) investigators and investigators from patrol borough investigative units regarding investigations of profiling allegations (Internal Investigators Course, Module Number 04, Profiling and Bias-Based Policing) was approved by the court in January 2019.  The training module is designed to provide investigators with the fundamental skills to process and investigate complaints regarding the NYPD's policy prohibiting racial profiling and bias-based policing.  Upon completion of the module, class participants should understand the NYPD's policy, the procedures for investigating racial profiling and bias-based policing allegations, and strategies for investigating those allegations.  The standards for when investigators can substantiate or find a profiling allegation unfounded, even in the absence of corroborating physical or documentary evidence, are explained.

The monitor team observed this training in July 2019.  The instructors used the court-approved PowerPoint slides and lesson plan, were familiar with the material and did a good job covering it, including the learning objectives stated at the beginning of the presentation.  The instructors emphasized Department policy prohibiting officers from targeting members of a racial or ethnic group for police action because they appear more frequently in local crime suspect data.  Although this was not part of the written training materials, the instructors addressed a number of additional issues on racial profiling investigations:

- The officers should not close out a case as unfounded because the complainant was found guilty of the underlying criminal case.

- The fact that the subject officer and the complainant are of the same race does not mean that there is no racial profiling; that cannot be a reason for closing the case as unfounded.

- If the investigator has not been able to contact the complainant, the investigator should check to see if the complainant might be incarcerated.

The instructors discussed investigative steps that should be taken when investigating racial profiling allegations: contact the complainant; permit the complainant to tell the full story without interruption and ask follow-up questions after; and don't close a case simply because the complainant is uncooperative. Investigators were encouraged to look for trends such as similar allegations against the subject officer, and to compare the officer's activity to those of peers on similar tours. It was also suggested that investigators check the officer's Civilian Complaint Review Board (CCRB) history for "racial slurs" or other offensive language allegations. However, there was limited description of what would constitute a pattern and how investigators should identify trends. This training was not a "how to" course for investigating racial profiling investigations; rather, the NYPD states that borough investigators receive detailed instructions on investigations in other IAB courses. The monitor recommends that the training be conducted in a more interactive manner, perhaps by reviewing prior investigations or including scenarios of good and poor interviews of complainants and subject officers.

### G. Field Training Officer (FTO) Guide and Training

The training for FTOs has been revised to reflect changes to the in-service investigative encounters training. In addition, BWC videos have been added to the training and the PowerPoint presentation has been made more engaging.

### H. Training on Fair and Impartial Policing Training

The court's Remedial Order noted that it may be appropriate for the Department to conduct training "on the effect of unconscious racial bias." Early in the monitorship, the Department committed itself to developing training on implicit bias and procedural justice. "Implicit bias" is the concept that people make automatic, unconscious associations between groups of people and

stereotypes about those groups, and arise from the particular environment (neighborhood, family, friends, media, etc.) in which they grew up, live and work.  "Procedural justice" is a phrase used to describe the necessity of treating civilians with respect, listening to them and explaining the officer's actions.

In 2017, the NYPD contracted with an outside vendor, Fair and Impartial Policing, LLC (FIP), http://www.fairimpartialpolicing.com/, to create the training materials and teach the course. Specific sessions of the training are tailored to particular audiences depending on whether they are senior executives, mid-level managers, supervisors or police officers.  The training includes discussion of the history of New York City and the NYPD, and how that history relates to legitimacy and procedural justice both within the Department and in the communities being policed.  The point of the training is to make officers more aware of biases so that those biases do not interfere with the officers' law enforcement functions.

Professor Jennifer Eberhardt, a member of the monitor team and one of the leading experts in the country on implicit bias in the law enforcement context, reviewed the training materials and provided feedback and suggestions for edits to the NYPD and FIP, as did plaintiffs' counsel and one of the plaintiffs' experts, Professor Jack Glaser.  Based on that input, some parts of the training materials were revised.  FIP instructors presented the training to the monitor team and plaintiffs' counsel, who provided feedback.  In September 2019, the plaintiffs reviewed the revised FIP training materials and discussed their views with the CEO of FIP.

In February 2018, the Department began the FIP training for all 36,000 uniformed members of the service, including those at the highest levels of the Department (e.g., the Commissioner, the First Deputy Commissioner, and all the commanding officers of the precincts and other

47

commands).  The NYPD also conducted train-the-trainer sessions for instructors at the Police Academy, who began presenting the training for recruit officers in August 2018.

Although the court did not require training on implicit bias or procedural justice, the monitor believes that this training could contribute to the Department's efforts to reach substantial compliance.  As of September 20, 2019, 30,611 members of the service have gone through the FIP training.

| PC | 1st Dep. | Chief of Staff | D.C | Chief | Asst. Chief | Deputy Chief | Insp. | DI | Capt. | Lt. | Sgt. | P.O. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | 14 | 14 | 15 | 45 | 89 | 163 | 340 | 1,821 | 4,454 | 20,086 |

Although implicit bias training for police officers, and the FIP training in particular, has been conducted throughout the country, what is less clear is what impact this training has on officers' attitudes and behavior.  There have not yet been any systematic scientific evaluations of the training.  The NYPD is working with the IACP-University of Cincinnati Center on Police Research and Policy and with the Finn Institute for Public Safety at SUNY Albany to evaluate NYPD's implicit bias training of patrol officers.  The evaluation is designed to determine the effectiveness of the training in raising officers' awareness of and knowledge about unconscious bias and providing officers the skills to manage their own unconscious biases.

## I.    Refresher Training Course for Investigative Encounters

The NYPD and the parties recognize that the one-time training on stop and frisk at Rodman's Neck or at the Police Academy will not be sufficient to instruct and prepare recruits and officers to properly conduct stops and frisks and supervisors to review stops and frisks.  The NYPD has taken several steps beyond the Rodman's Neck training, including:  delivery of refresher training at precinct roll calls upon requests of training sergeants; placement of the investigative

encounters lesson plan on the RMB website; creation, distribution and posting of an investigative encounters summary chart; and delivery of refresher training at RISKS roll-out meetings.

In addition, the NYPD has committed to developing "booster" or refresher training for officers and supervisors, including officers who recently graduated from the Police Academy. The supervisors' "booster" training will include additional material regarding review of stop reports and the responsibilities of supervisors. This training will likely be in the form of an online course, and will include a post-training quiz. The training materials for this course will be reviewed by the parties and the monitor and submitted for court review.

Compliance with the requirements for refresher training will be achieved when:

1.      NYPD provides training consistent with court-approved training materials.

2.      NYPD incumbent and probationary officers have taken a refresher course on investigative encounters.

3.       NYPD supervisors have taken a refresher course on investigative encounters and supervisory responsibilities for review of stop reports and documentation.

## VI.    BODY-WORN CAMERAS

### A.      Precinct-Level BWC Pilot

As part of the Remedial Order, the court directed the monitor to oversee a pilot of the use of BWCs by NYPD officers. The goal of the pilot program is to assess the costs and benefits of deploying cameras and whether deployment would result in reducing unconstitutional stops and frisks.

The NYPD launched the BWC pilot program in April 2017; by November 2017, there were approximately 1,200 officers in 20 pilot precincts wearing cameras for a one-year period. In a randomized control trial, those 20 precincts were matched with 20 precincts in which officers were not wearing cameras. The last of the 20 pilot precincts completed the one-year study period in

November 2018.  The monitor team is currently working with the NYPD to obtain the data necessary to complete the analysis of the study and prepare a report on the pilot.  The study will examine outcome measures relating to the civility of police-civilian encounters, police activity and police lawfulness.

### 1. Supervisory Review of BWC Videos

As part of the BWC pilot, the court directed the monitor to "establish procedures for the review of stop recording by supervisors and, as appropriate, more senior managers."  In 2017, the NYPD developed a self-inspection protocol for the review of BWC videos by sergeants in the commands with BWCs.  Sergeants must review five BWC videos each month.  After reviewing these videos, sergeants must complete a BWC self-inspection worksheet for each video; the sergeant's platoon commanders or lieutenant must then review two of the videos and complete the self-inspection worksheet; and the command's executive officer must review and approve the BWC self-inspection worksheet.  In addition to the self-inspection, the NYPD's BWC patrol guide, P.G. 212-123, directs the patrol supervisor, training sergeant and ICO to "[p]eriodically review BWC video as appropriate, to provide positive feedback and address any performance or tactical deficiencies observed."  The monitor approved the Department's protocols for supervisory review of BWC videos in August 2017.  The monitor team will be reviewing a sample of BWC self-inspections for the next report.

### 2. Preserving BWC Videos for Investigation of Complaints

The Remedial Order also directed the monitor to "establish procedures for the preservation of stop recordings for use in verifying complaints in a manner that protects the privacy of those stopped."  When the BWC pilot was launched, the NYPD did set out a procedure for sharing BWC video with the CCRB.  The BWC patrol guide, P.G. 212-123, states that "[t]he Internal Affairs Bureau will process requests from the Civilian Complaint Review Board for body-worn

camera video as per P.G. 211-14," but it does not provide any protocol for how those videos would be shared or any timeframe for when they would be shared. Initially, there was agreement between the NYPD and the CCRB that requested BWC videos would be provided within seven business days, but this was at a time when there were only 1,000 cameras in the pilot program.

The CCRB issued its Executive Director's November 2019 Statistical Report, with data through October 2019, about pending requests for BWC footage. According to the CCRB, there were 574 requests for BWC footage pending in November 2019, with half of the video requests pending for more than 30 days and 28 percent of the requests pending for more than 60 days. The monitor worked with the NYPD, Law Department and CCRB to determine the extent of delays and their causes, and develop a procedure for prompt access to BWC footage by the CCRB. On November 21, 2019, the NYPD and CCRB entered into a Memorandum of Understanding (MOU) to expedite production and sharing of BWC footage. The MOU is attached as Appendix 3.

### B.    PSA BWC Pilot

Officers in NYPD's Housing Bureau patrolling NYCHA public housing developments in Public Housing Police Service Areas (PSAs) were not included in the BWC randomized control trial. PSAs overlap with the 40 precincts in the randomized control trial, and if a PSA were selected to have cameras, the randomized control trial could include areas that also might have been selected as part of a control precinct without cameras. Professor Anthony Braga and other members of the monitor team have developed a separate research and evaluation plan for the use of cameras by Housing Bureau officers working in PSAs.

The Monitor's Eighth Report describes the monitor's research plan for evaluating BWCs for Housing Bureau officers. NYPD Housing Bureau officers in the nine PSAs were equipped with BWCs over the course of nearly 11 months, starting with PSA 8 in February 2018 and ending

with PSA 9 in December 2018.  The study will compare officer data for the 36 months before officers were equipped with BWCs to 12 months after they were equipped with BWCs.

### C.    Citywide Expansion of BWCs

Equipping officers with body cameras continues to be a priority for the Department.  In February 2019, the NYPD completed its roll-out of BWCs to all uniformed officers performing patrol functions in Patrol Services Bureau, Housing and Transit.  There are now approximately 20,000 BWCs in use by those officers.  In March 2019, the NYPD began equipping with BWCs approximately 4,000 members of the service assigned to specialized units such as the Emergency Services Unit, the Strategic Response Group and Critical Response Command.  The roll-out to specialty units was completed in July 2019.[11]  NYPD continues to expand the BWC program, and will cover executives in Patrol Services, Housing and Transit commands.  Lieutenants have been issued BWCs, and two-thirds of other executives (Captains through Inspectors) have also been issued BWCs.

The quantity of BWC footage being captured continues to grow exponentially.  As of December 1, 2019, more than seven million videos have been recorded.  As noted above, BWC videos are being added to trainings to demonstrate real-world conditions and scenarios.  BWC footage is being used by precinct-level supervisors as a tool to improve their ability to supervise members of the service and has also become part of the Department's auditing efforts.

### D.    Guidance for Compliance—Body-Worn Cameras

Compliance with the BWC provisions will be achieved when:

1.    The NYPD provides the monitor with all the data necessary to complete the BWC analysis and report.

---

[11] https://www1.nyc.gov/site/nypd/about/about-nypd/equipment-tech/body-worn-cameras.page.

2. The NYPD implements supervisory reviews of BWCs consistent with the review protocols approved by the monitor.

3. The NYPD shares BWC videos with the CCRB consistent with procedures approved by the monitor.

## VII. AUDITING

The Quality Assurance Division (QAD) monitors compliance with Department policies and the law, including those relating to stop and frisk and trespass enforcement. QAD also periodically requires commands to submit self-inspections in order to monitor their compliance. The audit procedures address whether the appropriate paperwork was prepared (e.g., was a stop report completed), whether Department reports were prepared properly, and the quality of the information contained in the Department reports (e.g., whether the stop met constitutional standards). QAD is currently conducting four types of audits relevant to the remedial measures: (1) audits of stop reports, activity logs and associated BWC videos; (2) RAND audits to identify undocumented stops; (3) audits of police-initiated enforcement (called PIE audits), also to identify undocumented stops; and (4) audits of trespass arrests and Trespass Crime Fact Sheets (TCFS).

### A. Auditing of Stop Reports and Activity Logs

#### 1. QAD Stop Report Audit Results

QAD uses two auditing methodologies, one for Patrol Bureau commands and another for other commands, including Housing PSAs and Transit Districts. Since the fourth quarter of 2018, QAD has adopted a new auditing methodology for all Patrol Bureau commands. Stop reports in these commands are now evaluated weekly. Stop reports in other commands, including PSAs and Transit Districts, continue to be evaluated quarterly. QAD provides a detailed assessment of each command's performance in the most recent quarter as compared to prior quarters.

**Chart 7.  QAD Stop Report Audits**

| Period | Stop Reports Evaluated | Stop Narrative Articulates Reasonable Suspicion for Stop | Frisks Evaluated | Frisk Narrative Articulates Reasonable Suspicion for Frisk | Searches Evaluated | Search Narrative Articulates Legal Basis for Search |
|---|---|---|---|---|---|---|
| **2017** | 7,526 | 5,448 (72%) | 4,480 | 3,920 (88%) | 2,458 | 2,256 (92%) |
| **2018** | 6,902 | 5,272 (76%) | 3764 | 3,424 (91%) | 2175 | 2,055 (95%) |
| **1Q19** | 1,741 | 1,410 (81%) | 838 | 797 (95%) | 533 | 501 (94%) |

Note that QAD reviews only frisks and searches from stops that are lawful.  If QAD determines that the stop report did not articulate reasonable suspicion, the frisk and search, if conducted, are not reviewed by QAD in its audits and not included in the calculations, in Chart 7 above, of the percentage of frisks with reasonable suspicion and searches with a legal basis.

As noted in Section IV, Supervision, commanding officers oversee self-inspections in their commands.  Concerning stop, question and frisk, the ICO in each command must identify and evaluate the last 25 stop reports and corresponding activity log entries.  If there are fewer than 25 stop reports for the month reviewed, the ICO must evaluate all of them.  The results of these self-inspections are reported up the chain of command in the precinct and the borough and then QAD reviews a subset of the results to assess whether the results of the command's self-inspection of stop reports are different than the results of QAD's audit of stop reports.  Stop reports that QAD finds deficient but that the command's self-inspection did not, are identified in the command's RISKS profile and are raised at the command's RISKS Review meeting.

## 2.    Monitor Team Review of Stop Report Audits

Starting with the audits from the fourth quarter of 2016, the monitor team has obtained QAD's audits of a sample of commands, along with the audited stop reports from those commands. The goal is to evaluate the auditors' work and also review a sufficient number of stops to be able to make meaningful statements about citywide compliance.  The stop reports are evaluated by

three members of the monitor team.  When they disagree, the stop reports are reviewed by the monitor and deputy monitor.  These disagreements are discussed in monitor team meetings, and then the results are sent to QAD, which meets with the monitor team to discuss those cases in which there is a disagreement between QAD's and the monitor's assessment.

Chart 8 below reports on the monitor's assessment after all these steps.  For each quarter, the chart shows the number of stop reports that the monitor team reviewed and, in the second column, the number and percentage of stop reports that the monitor team determined articulated reasonable suspicion for the stop.  The third column is the number of stop reports reviewed in which a frisk was conducted, and the fourth column reports the number and percentage of stop reports that articulated reasonable suspicion that the person stopped was armed and dangerous. For example, in the fourth quarter of 2016, there were 146 stops that included a frisk.  The monitor team determined that 111 of those 146 stops (or 76 percent) articulated reasonable suspicion for the frisk.  The fifth column reports the number of stops that included a search, and the sixth column reports the number and percentage of stop reports that the monitor team determined articulated a justification for the search.

Several things can be noted based on the monitor team's review of stop reports.  First, the level of compliant stop reports has improved over time.  This is particularly true for whether the officer articulates reasonable suspicion for the stop, which occurred in a little over 80 percent of stops for the second half of 2018 compared to less than 60 percent in the first half of 2017.  The percentage of officers who articulate reasonable suspicion that the person stopped was armed and dangerous (necessary for a frisk), or justification for the search, has also increased over time, although the level of compliance was fairly high even in the fourth quarter of 2016.

**Chart 8.  Monitor Team Review of Stop Reports 4Q 2016 through 4Q 2018**

| Quarter | # Stop Reports Reviewed by Monitor Team | Stop Reports That Articulate Reasonable Suspicion for the Stop | # Stop Reports in Which Suspect Was Frisked | Stop Reports That Articulate Reasonable Suspicion for the Frisk | # Stop Reports Where Suspect Was Searched | Stop Reports That Articulate Justification for the Search |
|---------|------|------------|------|------------|------|------------|
| 4Q2016 | 261 | 121 (46%) | 146 | 111 (76%) | 67 | 56 (84%) |
| 1Q2017 | 256 | 142 (55%) | 145 | 114 (79%) | 79 | 68 (86%) |
| 2Q2017 | 302 | 178 (59%) | 176 | 143 (81%) | 91 | 73 (80%) |
| 3Q2017 | 312 | 188 (60%) | 179 | 146 (82%) | 87 | 76 (87%) |
| 4Q2017 | 305 | 212 (70%) | 171 | 153 (89%) | 107 | 101 (94%) |
| 1Q2018 | 308 | 202 (66%) | 213 | 187 (88%) | 92 | 84 (92%) |
| 2Q2018 | 295 | 211 (72%) | 189 | 169 (89%) | 81 | 70 (87%) |
| 3Q2018 | 302 | 251 (83%) | 150 | 134 (89%) | 113 | 98 (87%) |
| 4Q2018 | 300 | 239 (80%) | 184 | 170 (92%) | 113 | 106 (94%) |

Chart 9 below compares the number and percentage of stop reports each quarter that QAD determined articulated reasonable suspicion with the number and percentage of stop reports that the monitor team determined to be justified.  Both QAD audits and those conducted by the monitor team show an improvement in the stops meeting the standard of reasonable suspicion.  Chart 9 shows that although the monitor team's assessment of compliance is lower than the NYPD's assessment of compliance, the difference between the monitor team's assessments and QAD's assessments has decreased over time.  This is likely due at least in part to the meetings with the monitor team and NYPD and a more thorough review of the stop reports by QAD as a result.

**Chart 9.  QAD and Monitor Ratings of Justified Stop Reports**

| Audit Quarter | QAD (No., % Yes) | Monitor (No., % Yes) | Total |
|---|---|---|---|
| | | | |
| **1Q2017** | 197 | 142 | 256 |
| | 77% | 55% | 100% |
| | | | |
| **2Q2017** | 209 | 178 | 302 |
| | 69% | 59% | 100% |
| | | | |
| **3Q2017** | 219 | 188 | 312 |
| | 70% | 60% | 100% |
| | | | |
| **4Q2017** | 221 | 212 | 305 |
| | 72% | 70% | 100% |
| | | | |
| **1Q2018** | 222 | 202 | 308 |
| | 72% | 66% | 100% |
| | | | |
| **2Q2018** | 238 | 211 | 295 |
| | 81% | 72% | 100% |
| | | | |
| **3Q2018** | 240 | 230 | 272 |
| | 88% | 85% | 100% |
| | | | |
| **4Q2018** | 232 | 239 | 300 |
| | 83% | 80% | 100% |
| | | | |
| **Total** | 1,778 | 1,602 | 2,350 |
| | 76% | 68% | 100% |

### 3.     Analysis of Racial Disparities in Stop Reports Deemed Not Justified

As part of the monitor's assessment of the Department's compliance with its racial profiling policies, the monitor conducted an analysis of whether there are racial disparities in the stop reports that the monitor team found deficient in articulating reasonable suspicion for stops, frisks or searches.  The race of the person being stopped was noted in 97.5 percent of the forms that were reviewed by the monitor.[12]   Chart 10 below shows, for each quarter, the number of stop

---

[12] For ease of interpretation of categories, the race of the person stopped was collapsed into three categories, representing whether the person was Black (Black, n=1,295, 56.48%, Black Hispanic,

reports reviewed by the monitor team broken down by the race of the person stopped, and then the percentage of those stop reports that the monitor team determined articulated reasonable suspicion.[13]

The overall improvement in constitutionality of reported stops according to the monitor team's review of stop reports appears to have occurred primarily among persons stopped who were identified as being Black or Hispanic.  This is reflected in the fact that for Blacks and Hispanics stopped, there is a substantial improvement in the overall percentage of stops rated as meeting constitutional standards.  The percentage of stop reports audited over time (1Q2017 to 4Q2018) that were judged to meet constitutional standards, however, continues to be significantly lower for stops of Blacks and Hispanics than that for stops of Whites.

---

n=222, 9.68%), Hispanic (White Hispanic, n=520, 22.68%), White/Other (White, n=211, 9.2%; Asian, n=42, 1.83%; Middle Eastern, n=3, 0.13%).  These are the same categories used in prior analyses by the monitor and by plaintiffs' expert.

[13] Again, it should be noted that these analyses (stops, frisks and searches) are based on stops for which there was a completed stop report, and thus would not provide any information about stops that are not reported.

**Chart 10.  Monitor Judgments That Stop Reports Articulate Reasonable Suspicion, by Race of Person Stopped**

| Audit Quarter | Total No., Percentage Justified White/Other | Total No., Percentage Justified Black | Total No., Percentage Justified Hispanic | Total No., Percentage Justified No race indicated | Total No., Percentage Justified Total |
|---|---|---|---|---|---|
| **1Q2017** | 54 | 156 | 41 | 5 | 256 |
|  | 67% | 49% | 59% | 100% | 55% |
| **2Q2017** | 38 | 191 | 70 | 3 | 302 |
|  | 74% | 60% | 51% | 0% | 59% |
| **3Q2017** | 33 | 213 | 57 | 9 | 312 |
|  | 79% | 60% | 56% | 22% | 60% |
| **4Q2017** | 23 | 181 | 91 | 10 | 305 |
|  | 74% | 69% | 73% | 40% | 70% |
| **1Q2018** | 15 | 210 | 74 | 9 | 308 |
|  | 80% | 67% | 58% | 67% | 66% |
| **2Q2018** | 21 | 215 | 53 | 6 | 295 |
|  | 71% | 71% | 72% | 83% | 72% |
| **3Q2018** | 41 | 153 | 68 | 10 | 272 |
|  | 78% | 84% | 87% | 100% | 85% |
| **4Q2018** | 31 | 198 | 66 | 5 | 300 |
|  | 90% | 76% | 85% | 100% | 80% |
| **Total** | 256 | 1,517 | 520 | 57 | 2,350 |
|  | 76% | 67% | 68% | 65% | 68% |

The monitor team's expert, John MacDonald, examined these data to test whether the differences between the monitor's ratings for stops of Whites and the monitor's ratings for stops of Blacks or Hispanics were likely due to chance or not.  The method used compared the disparities in justified stops by race identified by the monitor team to 1,000 simulations where the ratings (the percentages of justified stops) were not associated with a particular racial category, but were randomly scrambled among the racial categories.  The results from this test show that the lower

59

percentage of justified stops for Blacks (67%) and Hispanics (68%) relative to Whites (76%) would occur by chance in only 0.1 percent and 1.8 percent of 1,000 times, respectively. Looking at the more recent stop reports for 2018, however, the difference in ratings for justified stops for Blacks (74%) and Hispanics (75%) relative to Whites/Others (81%) is smaller. Using the same test, one would expect these differences to occur by chance 17 percent and 25 percent in 1,000 times, respectively. This disparity is no longer statistically significant at the five percent level. The 2018 data indicates that there appears to be some narrowing of the racial disparity gap in the constitutionality of rated stops in the more recent quarters.

The monitor team also rated the constitutional justification for frisks if they occurred during the audited stops. The percentage of frisks that the monitor team rated as being justified has also improved over time, from a low of 79 percent in the first quarter of 2017 to a high of 92 percent in the fourth quarter of 2018. Just as interesting, the percentage of justified frisks was higher for Blacks (86%) and Hispanics (88%) compared to Whites (84%). These differences in justified frisks would occur by chance 51 percent and 18 percent in 1,000 times, respectively. These disparities are not statistically significant at the five percent level. This suggests that the racial disparities for frisks is narrow, if at all, and likely a chance occurrence due to which cases were sampled for auditing.

**Chart 11.  Monitor Assessments that Frisk Is Justified, by Race of Person Frisked**

| Audit Quarter | Total No., Percentage Justified White/Other | Total No., Percentage Justified Black | Total No., Percentage Justified Hispanic | Total No., Percentage Justified No race indicated | Total No., Percentage Justified Overall |
|---|---|---|---|---|---|
| **1Q2017** | 17 | 108 | 19 | 1 | 145 |
| | 71% | 80% | 79% | 100% | 79% |
| | | | | | |
| **2Q2017** | 14 | 117 | 43 | 2 | 176 |
| | 79% | 81% | 84% | 50% | 81% |
| | | | | | |
| **3Q2017** | 14 | 126 | 36 | 3 | 179 |
| | 79% | 82% | 81% | 100% | 82% |
| | | | | | |
| **4Q2017** | 12 | 106 | 48 | 5 | 171 |
| | 75% | 90% | 92% | 100% | 90% |
| | | | | | |
| **1Q2018** | 6 | 152 | 50 | 5 | 213 |
| | 100% | 86% | 92% | 80% | 88% |
| | | | | | |
| **2Q2018** | 10 | 150 | 24 | 5 | 189 |
| | 80% | 90% | 92% | 80% | 90% |
| | | | | | |
| **3Q2018** | 17 | 77 | 38 | 6 | 138 |
| | 100% | 87% | 95% | 100% | 91% |
| | | | | | |
| **4Q2018** | 22 | 124 | 35 | 3 | 184 |
| | 91% | 94% | 89% | 100% | 92% |
| | | | | | |
| **Total** | 112 | 960 | 293 | 30 | 1,395 |
| | 84% | 86% | 88% | 90% | 87% |

The monitor team also rated the constitutional justification for searches if they occurred during the audited stops.  The percentage of searches that the monitor team rated as being justified also has improved over time, from a low of 80 percent in the second quarter of 2017 to a high of 94 percent in the fourth quarter of 2018.  The results show a lower percentage of searches rated as being justified for Blacks (88%) and Hispanics (90%) compared to Whites (96%).    These differences would occur by chance 1.5 percent and 4.6 percent in 1,000 times, respectively.  This

suggests that the racial disparity gap in justification of searches is not likely a chance occurrence, due to cases sampled.

**Chart 12.  Monitor Assessments That Search Is Justified, by Race of Person Searched**

| Audit Quarter | Total No., Percentage Justified<br>White/Other | Total No., Percentage Justified<br>Black | Total No., Percentage Justified<br>Hispanic | Total No., Percentage Justified<br>No race Indicated | Total No., Percentage Justified<br>Total |
|---|---|---|---|---|---|
| | | | | | |
| **1Q2017** | 15 | 39 | 24 | 1 | 79 |
| | 100% | 77% | 92% | 100% | 86% |
| | | | | | |
| **2Q2017** | 11 | 53 | 27 | | 91 |
| | 82% | 85% | 70% | | 80% |
| | | | | | |
| **3Q2017** | 11 | 56 | 20 | | 87 |
| | 100% | 80% | 100% | | 87% |
| | | | | | |
| **4Q2017** | 8 | 64 | 30 | 2 | 107 |
| | 100% | 95% | 91% | 100% | 94% |
| | | | | | |
| **1Q2018** | 7 | 52 | 30 | 3 | 92 |
| | 100% | 87% | 97% | 100% | 91% |
| | | | | | |
| **2Q2018** | 2 | 63 | 16 | | 81 |
| | 50% | 87% | 87.5% | | 86% |
| | | | | | |
| **3Q2018** | 12 | 60 | 32 | 2 | 106 |
| | 100% | 93% | 91% | 100% | 93% |
| | | | | | |
| **4Q2018** | 11 | 74 | 26 | 2 | 113 |
| | 100% | 93% | 92% | 100% | 94% |
| | | | | | |
| **Total** | 77 | 461 | 208 | | 756 |
| | 96.% | 88% | 90% | | 90% |

**4.     QAD Audits of BWC Videos Associated with Stop Reports and Arrests**

In the fourth quarter of 2017, QAD began auditing BWC videos associated with the five most recent stop reports that indicate there is a corresponding BWC video.  These videos and their corresponding stop reports are reviewed for completeness, professionalism, consistency with the

stop report narratives and whether the "What Is a Stop?" information card or, more recently, the officer's business card was handed out. Chart 13 below. A similar analysis is performed for the five most recent arrest reports that indicate they have corresponding BWC videos. Chart 14 below. In the case of arrests, the videos and arrest reports are reviewed for completeness and whether a stop report was prepared if the arrest arose out of a stop. In the majority of cases, QAD found that the video was either consistent with the narratives in the stop report or inconclusive.

**Chart 13. QAD Audits of Stop Reports with Associated BWC Video**

|  | Number of Videos Reviewed | Video Consistent with Stop Narrative | Video Inconsistent with Stop Narrative | Video Inconclusive with Regard to Stop Narrative |
|---|---|---|---|---|
| **4Q2017** | 64 | 58% | 0% | 42% |
| **1Q2018** | 84 | 68% | 3% | 30% |
| **2Q2018** | 168 | 124 (74%) | 1 (0.5%) | 43 (26%) |
| **3Q2018** | 277 | 230 (83%) | 7 (3%) | 40 (15%) |
| **4Q2018** | 466 | 367 (79%) | 63 (13%) | 36 (8%) |
| **1Q2019** | 757 | 660 (87%) | 96 (13%) | 1 (0.1%) |

**Chart 14. QAD Audits of Arrest Reports with Associated BWC Video**

|  | Number of Videos Reviewed | Video Consistent with Arrest Report | Video Inconsistent with Arrest Report |
|---|---|---|---|
| **2Q2018** | 38 | 37 (97%) | 1 (3%) |
| **3Q2018** | 144 | 139 (96%) | 5 (4%) |
| **4Q2018** | 418 | 410 (98%) | 8 (2%) |
| **1Q2019** | 818 | 764 (93%) | 54 (7%) |

The monitor team will be reviewing the BWC videos audited by QAD for the first quarter of 2019 and will report on those reviews in the next report.

**B.       QAD Audits for Undocumented Stops**

The documentation of stops is essential for the Department to demonstrate substantial compliance with the remedial orders.  QAD performs two types of audits to determine whether or not stops are being properly documented:  RAND audits and police-initiated enforcement audits.

**1.       RAND Audit Results**

QAD continues to audit the potential underreporting of stop reports by using what has been labeled a RAND audit.  As discussed above, this audit program is designed to identify stop encounters using radio transmissions to identify instances in which stop reports should have been prepared.  QAD uses keyword searches of ICADs to identify events that likely involved stop encounters.  These keywords are "Stopped," "Show-up," "Holding" and "Warrant Check."  Once a potential stop encounter is identified, through the review of ICADs and/or listening to the corresponding radio transmissions, NYPD records are reviewed to determine if a corresponding stop report was prepared.  If there is BWC video of the event, QAD reviews the video as part of this analysis.  If the auditor determines that a stop report may have been required, the matter is referred to the command for further investigation.  The command then reports back to QAD whether the encounter did, in fact, require a stop report and whether one was filed.

Chart 15 below shows that in 2018, there were 26 *Terry* stops without a stop report prepared.

**Chart 15.  RAND Audits with Command Responses**

| | Total RAND Audits Indicating a Possible Stop | Stop Reports Prepared | Report Deemed Not Necessary After Command Investigation | Total *Terry* Stops | *Terry* Stop Without Stop Report | Compliance Rate (%) (Stop Reports Prepared/Total Stops) |
|---|---|---|---|---|---|---|
| **4Q2016** | 28 | 8 | 8 | 20 | 12 | 40% |
| **1Q2017** | 28 | 6 | 10 | 17 | 11 | 35% |
| **2Q2017** | 31 | 6 | 9 | 22 | 16 | 27% |
| **3Q2017** | 21 | 12 | 4 | 17 | 5 | 71% |
| **4Q2017** | 23 | 12 | 6 | 17 | 5 | 71% |
| **1Q2018** | 21 | 12 | 7 | 14 | 2 | 86% |
| **2Q2018** | 25 | 13 | 5 | 20 | 7 | 65% |
| **3Q2018** | 26 | 6 | 12 | 14 | 8 | 43% |
| **4Q2018** | 25 | 11 | 5 | 20 | 9 | 55% |
| **1Q2019** | 17 | 11 | 6 | 13 | 2 | 85% |

Below are the follow-up actions taken by the commands for members who did not document stops.

**Chart 16.  Command Follow-Up Action**

| | *Terry* Stop Without Stop Report | Command Discipline | Instructions/ Training | Minor Violations Log or CRAFT Supervisory Report [14] | No Disciplinary Action |
|---|---|---|---|---|---|
| **4Q2016** | 12 | 2 | 3 | 5 | 2 |
| **1Q2017** | 11 | 0 | 6 | 5 | 0 |
| **2Q2017** | 16 | 0 | 8 | 5 | 3 |
| **3Q2017** | 5 | 0 | 3 | 1 | 1 |
| **4Q2017** | 5 | 4 | 1 | 0 | 0 |
| **1Q2018** | 2 | 1 | 0 | 1 | 0 |
| **2Q2018** | 7 | 1 | 3 | 3 | 0 |
| **3Q2018** | 8 | 1 | 4 | 3 | 0 |
| **4Q2018** | 9 | 1 | 0 | 8 | 0 |
| **1Q2019** | 2 | 0 | 0 | 2 | 0 |

---

[14]  The minor violations log was a logbook kept at each command that recorded minor violations of Department rules by members of the service.  The information in these logs was not tracked centrally, it did not become part of a member's personnel record, and there were no penalties or additional consequences for being listed in the log.  The NYPD has replaced the minor violations log with a CRAFT Supervisor's Comment Form.

### 2. Results from Audits of Police-Initiated Enforcement

QAD also uses police-initiated enforcement audits to detect undocumented stop encounters. These audits look at the last 25 arrests in each command from the audit period that result from police-initiated enforcement (PIE). These are defined as arrests in which the People of the State of New York are the complainants on the Complaint Report, such as criminal possession of a controlled substance and criminal possession of a weapon. Arrest reports are reviewed to determine whether or not a stop report should have been completed for the encounter. When an auditor determines that an arrest report possibly required a stop report and no stop report was filled out, the arrest report is sent to the command for further investigation.

**Chart 17. PIE Audits with Command Responses**

|  | Arrests Audited Possibly Requiring Stop Reports | Stop Report Not Required | Command Response Missing | Stop Report Required | Stop Report on File | Percentage Compliance (SR on file/SR Required) |
|---|---|---|---|---|---|---|
| **4Q2016** | 103 | 50 | 7 | 46 | 20 | 44% |
| **1Q2017** | 161 | 95 | 23 | 43 | 19 | 44% |
| **2Q2017** | 154 | 104 | 6 | 44 | 13 | 30% |
| **3Q2017** | 194 | 122 | 26 | 46 | 12 | 26% |
| **4Q2017** | 225 | 171 | 0 | 54 | 20 | 37% |
| **1Q2018** | 120 | 74 | 4 | 42 | 18 | 43% |
| **2Q2018** | 149 | 103 | 5 | 41 | 16 | 39% |
| **3Q2018** | 192 | 121 | 19 | 52 | 22 | 42% |
| **4Q2018** | 162 | 74 | 37 | 51 | 34 | 67% |
| **1Q2019** | 156 | 63 | 72 | 21 | 13 | 62% |

### C. QAD Auditing of Trespass Crimes Fact Sheets

Officers are required to fill out a TCFS for all trespass arrests in and around NYCHA buildings and buildings enrolled in TAP. QAD auditors review whether or not a TCFS was prepared when required, whether or not the officer articulated a proper basis for the approach, and

whether the arrest documentation articulates probable cause for the arrest. As noted in Chart 18 below, in the first quarter of 2019, NYPD officers completed a TCFS for only 21 of 30 (70%) trespass arrests at TAP locations, and articulated probable cause for trespass arrests at TAP locations in only 18 of 30 arrests (60%). These levels of compliance require particular attention.

**Chart 18. QAD Audits of TCFS**

| | TAP Trespass Arrest Had TCFS | TAP TCFS Articulated Proper Basis for Approach | TAP Trespass Arrests Articulated Probable Cause | NYCHA Trespass Arrest Had TCFS | NYCHA TCFS Articulated Proper Basis for Approach | NYCHA Trespass Arrests Articulated Probable Cause |
|---|---|---|---|---|---|---|
| **2018** | 82% (140/171) | 98% (137/140) | 75% (129/171) | 85% (516/604) | 97% (501/516) | 94% (567/604) |
| **1Q19** | 70% (21/30) | 91% (19/21) | 60% (18/30) | 93% (146/157) | 99% (144/146) | 92% (145/157) |

### D. Guidance for Compliance—Auditing

The NYPD has revised its auditing protocols and methodologies many times during this monitorship, often in response to suggestions from the monitor and the parties. Protocols, templates and worksheets for audits will continue to be revised in an iterative process to improve the Department's process for identifying and correcting errors. However, the Department will need to finalize an auditing plan for the court's review that describes the types of audits that will be conducted and the general methodology for those audits. The protocols, worksheet and templates used by the auditors can be submitted to the court for its information, without requiring changes to these documents to be approved each time there is a revision. Compliance with auditing requirements will be achieved when the NYPD establishes an auditing plan that:

1. Provides a sampling methodology for auditing stop reports and includes a review of BWC videos as part of the SQF audits.

2.      Provides audit procedures for stop reports, assessing whether: (i) officers sufficiently articulated reasonable suspicion as the basis for the stop; (ii) officers sufficiently articulated the legal basis for a frisk and/or search, if applicable; and (iii) supervisors reviewed the form and made correct determinations about the legality of the stop, frisk and search and took appropriate follow-up action.

3.      Includes a review and audit of command self-inspections.

4.      Includes audit procedures for trespass arrests and associated TCFS at NYCHA and TAP locations, assessing whether (i) officers sufficiently articulated a legal basis for the approach; (ii) officers sufficiently articulated probable cause for the arrest; and (iii) there was appropriate supervisory review.

5.      Provides procedures for audits of police-initiated enforcement arrests.

6.      Provides procedures for RAND audits.

The NYPD distributed its Auditing Plan to the parties in September and the monitor team and parties met to discuss the plan.  In November, the NYPD distributed a revised Auditing Plan that addressed the monitor team's and plaintiffs' concerns.  Going forward, for example, the NYPD plans to review the BWC videos associated with each of the stop reports that it audits.  The monitor and the parties will be working to finalize an auditing plan to submit to the court for review.

## VIII.   PERFORMANCE EVALUATIONS

### A.      Performance-Evaluation System for Officers and Detectives

At trial, the court found that NYPD "officers [were] routinely subjected to significant pressure to increase their stop numbers, without corresponding pressure to ensure that stops [were] constitutionally justified." *Floyd*, 959 F. Supp. 2d at 602.  The NYPD's performance-evaluation system was one of the sources of this pressure. *Id.* at 590, 592-94.  In November 2017, the court

approved the monitor's recommendation regarding a new performance-evaluation system that the Department began earlier that year for patrol officers.

In the new system, the lawfulness of stops and the accuracy of stop reports play a role, but the number of stops does not.  The court reviewed and approved the monitor's recommendation and ordered that the monitor review and assess certain aspects of the system.  The review is to ensure that, in practice, the new system does not "reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness" or undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments.  ECF 564.[15]

There are four significant components of the new evaluation system.  The first is the Officer Profile Report, an electronic form that is automatically generated monthly.  This report compiles data from numerous Department databases and compares the officer to other officers in his or her precinct, borough and citywide.  It does not count the number of stops made by the officer.  The second component is the Supervisor Feedback Form, which allows supervisors to highlight commendable actions by an officer or note areas that may need improvement.  A third component is the Officer Self-Report Form, which allows officers to document notable actions they consider

---

[15]  Pursuant to the court order, "the Monitor shall, in his bi-annual reports, review and assess the NYPD's performance-evaluation system to ensure that, on paper and in practice, it does not (a) reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness or (b) undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments of the Constitution as required by the Remedies Opinion."

"During the period of Court supervision, Court approval is required before the NYPD implements any proposed change to the performance-evaluation system that may (a) introduce a mechanism to count the number of stops conducted by an officer or (b) affect the manner in which the quality and lawfulness of stops are assessed.  The NYPD shall notify the Monitor and the parties of any such proposed change so that the Monitor—in consultation with the parties—may seek Court approval."

to be positive, such as community engagement, problem-solving or achievements in crime prevention.

The fourth component is the Quarterly Evaluation, which took effect in April 2017 for the first quarter of 2017.  Supervisors are instructed to review the Officer Profile Report as well as any Supervisor Feedback Forms and Officer Self-Report Forms from the relevant period prior to completing the Quarterly Evaluation.  Supervisors use the Quarterly Evaluation to rate officers in 12 performance categories or "dimensions" on a scale from one to four.  The fourth quarter evaluation will provide the supervisor with a summary box to recap the officer's performance over the entire year.

The 12 performance categories are:

1.     Problem Identification/Solving
2.     Adaptability and Responsiveness
3.     Judgment
4.     Integrity
5.     Application of Law and Procedures
6.     Community Interaction
7.     Departmental Interaction
8.     Professional Image and Maintenance of Equipment
9.     Quality and Timeliness of Reports
10.    Initiative
11.    Leadership
12.    Implementation of Proactive Policing Strategies (for members who perform administrative functions, a different dimension, Competence in Unit's Mission, replaces this dimension)

An important question for the monitor is whether the system is working as designed.  Are the data that are supposed to be feeding into the Officer Profile Report being incorporated into the system?  And, importantly, are supervisors completing the evaluations of their officers?  An initial problem with the performance evaluation system was that when a supervisor found an insufficient basis for a stop, frisk or search, that data from the stop reports was not showing up in the Officer Profile Report.  After the monitor raised this issue with the NYPD in 2018, a technical fix was

instituted so that the data now automatically populates the given member's monthly Officer Profile Report.

In June 2019, the monitor team met with the NYPD to review the operation of the performance evaluation system. The Personnel Bureau is now responsible for ensuring that supervisors are completing evaluations of their officers. For the third quarter of 2018, evaluations were completed for 16,288 officers, but 3,891 evaluations were not completed on time. For the fourth quarter of 2018, evaluations for 15,819 officers were completed, but evaluations for 4,154 were not completed on time. The Personnel Bureau states that it is focusing on the problem of late evaluations or supervisors who fail to complete evaluations of their officers, and the monitor will examine this issue going forward.

The new evaluation system covers the evaluation of officers and detectives only, and does not change the evaluation system for sergeants, lieutenants, captains and other supervisors. Expansion of this system to sergeants and lieutenants will be a topic of discussion during the next round of collective bargaining with the NYPD sergeants' and lieutenants' unions.

**B.     Guidance for Compliance—Performance Evaluations**

Compliance with court requirements for the Performance Evaluation system will be achieved when on paper and in practice it does not:

1.     Reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness.

2.     Undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments of the Constitution as required by the Remedial Opinion.

To evaluate whether the performance evaluation system meets these criteria, the Monitor has undertaken a number of steps. The monitor team has reviewed the evaluations for officers receiving a "Needs Improvement" rating for Application of Law and Procedures, Accuracy and

Timeliness of Department Reports and Implementation of Proactive Policing for the fourth quarter of 2018.  The monitor team also reviewed data on officers receiving a "Needs Improvement" CRAFT supervisory feedback report for those dimensions.  In addition, the monitor team has conducted focus groups of supervisors regarding the performance evaluation system, and talked with officers and supervisors when making site visits to commands.

The monitor team's review of that data and discussions with supervisors indicates that the NYPD's performance evaluation system, as it is being implemented in practice, does not lead supervisors to pressure officers to make more stops without regard to the lawfulness of those stops. The monitor team did not find cases in which officers were given negative evaluations because of a lack of stop activity.  Nor was there evidence that the system is undermining the goals of the remedial process.

In reviewing the Supervisory Feedback Forms, we noted that the largest category of negative CRAFT entries was for an officer's failure to activate his or her BWC when NYPD policy required mandatory activation, or for turning off the BWC prematurely.  There were a small number of negative CRAFT reports for officers whose stop reports did not articulate reasonable suspicion for the stop or frisk, or for failure to complete a stop report when a stop was made, and there were also some negative CRAFT entries for supervisors who approved stop reports when a self-inspection or a QAD audit determined that the stop report was deficient.  These examples support the goals of the remedial process.  There was one aspect of the performance evaluation system that the monitor did raise with the NYPD.  According to the NYPD's Performance Evaluation System Guide, when a supervisor rates an officer as "Needs Improvement," "Exceeds Expectations" or "Exceptional," the rating should be supported by official documentation.  In reviewing the quarterly evaluations with a "Needs Improvement" rating, however, the monitor

team noted that many supervisors did not comment on or document the reasons for that rating, but instead left blank the field for comments and documentation.

## IX. COMPLAINTS AND DISCIPLINE

The court's remedial order required the NYPD to change its policies and practices with respect to investigations of racial profiling and other bias-based profiling allegations as well as its handling of civilian complaints that have been substantiated by the CCRB.

### A. NYPD Investigations of Profiling Allegations

The NYPD investigates all profiling allegations related to race and biased-based policing, whether the allegation is made directly to the Department or referred from the CCRB. On January 3, 2019, the court approved an IAB guide section and related training that provide detailed guidance on how to process and investigate profiling complaints. All allegations of profiling are included in the IAB log and investigated by the NYPD.

Complaints of biased policing are down thus far in 2019. IAB received 641 such complaints between January 1, 2018 and October 31, 2018 and only 429 during the same period in 2019. However, as noted in the Monitor's Ninth Report and continuing today, there have been no profiling allegations substantiated.

**Chart 19. Profiling Case Dispositions by Year, 2014 – October 31, 2019**

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| Unfounded | 2 | 159 | 204 | 310 | 311 | 120 | 1,106 |
| Unsubstantiated | 6 | 109 | 261 | 444 | 361 | 132 | 1,313 |
| Exonerated | 2 | 11 | 0 | 2 | 8 | 2 | 25 |
| Partially Substantiated* | 0 | 30 | 35 | 45 | 36 | 23 | 169 |
| Information and Intelligence | 0 | 0 | 0 | 1 | 1 | 1 | 3 |
| Open or Active | 0 | 34 | 62 | 56 | 27 | 151 | 330 |
| Substantiated | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 10 | 343 | 562 | 858 | 744 | 429 | 2,946 |

\*   These are cases in which other allegations in a profiling complaint were substantiated, but not profiling allegations.

As noted in Section V, Training, the NYPD has revised its training for investigators of profiling complaints:  investigators should not close out a case as unfounded because the complainant was found guilty of the underlying criminal case; the fact that the subject officer and the complainant are of the same race does not mean that there is not racial profiling and investigators cannot close a case for that reason; and if the investigator has not been able to contact the complainant, the investigator should check to see if the complainant might be incarcerated.  In addition, the NYPD made improvements to its case management system so that investigators now cannot close a case unless they have documented at least three attempts to contact the complainant.

### 1.    Monitor Review of Profiling Investigations

The monitor team reviewed a sample of 24 racial profiling cases in 2017 and reviewed another sample of 22 cases in 2019.  The sample chosen for review was of cases in which officers had multiple profiling complaints.  Many of the investigations reviewed were completed before the NYPD made changes to its case management system, which now requires certain investigatory steps be taken.  In September and October 2019, the NYPD provided the monitor team with an additional 43 cases for review, which the monitor team will review for a later report.

The monitor team's review included listening to the investigators' interviews with the complainants, subject officers and other witnesses, as well as examining any video evidence or documents in the investigative file.  Although some investigations were quite thorough and impartial, based on the monitor team's review, there were others reviewed that did not meet the standards necessary for an NYPD investigation.  Each deficiency listed below appeared in at least one of the cases reviewed:

- Not interviewing the complainant, or witness, or subject and witness officers
- Asking questions of the complainant or the subject and witness officers that suggested the investigator had already reached a conclusion
- Asking questions of the complainant that suggested the investigator doubted the validity of the complaint or the credibility of the complainant
- Conducting perfunctory interviews (some interviews of subject officers lasted less than four minutes)
- Not following up on leads
- Taking too long to contact either the complainant or the subject officer
- Not doing the appropriate investigative canvasses for video or eyewitnesses
- Not connecting important pieces of evidence across cases from the same unit
- Failing to note trends in the subject officer's actions, words or behavior, including not examining the subject officer's Central Personnel Index (CPI) and prior complaints

The inadequacies of the investigations that the monitor team reviewed should have been caught by the immediate supervisor or during the review process up the chain of command, but all of the investigations were approved by supervisors without the problems being addressed. Even in the investigations that the monitor team determined to be thorough, the investigations could have been improved with some structural changes to the way these complaints are being investigated. For example, in most of the cases reviewed, there was a substantial delay in contacting and interviewing the complainant. Complaints received at the IAB Command Center are processed and either assigned to an Investigations Unit or investigated by IAB personnel. Pursuant to the IAB's guide for processing and investigating profiling complaints, IAB Guide 620-58, the commander of an Investigations Unit has up to ten days after receiving a case to assign that case to an investigator. The assigned investigator then has up to ten days to make initial contact with the complainant. Missed opportunities to interview potential witnesses or secure evidence (e.g., from video recording systems) can result from a lengthy case intake and case assignment.

Although the IAB guide for processing and investigating profiling complaints was reviewed by the parties and approved by the monitor and then by the court, the monitor team's review of investigations determined that this process should be modified. Profiling investigations

should be pursued with the same vigor and creative thinking that NYPD investigators apply to criminal cases.   Impartial and thorough investigations are imperative, even if thorough investigations of the profiling allegations reviewed by the monitor team might still have resulted in insufficient evidence to substantiate the allegations.

In order to assess how these investigations might be better handled, the monitor team met with three groups of NYPD investigators who specialize in investigations: homicide detectives, IAB investigating supervisors and EEO investigators.   The monitor team identified several recommendations for improving the investigation of profiling complaints based on its review of profiling cases, the results of the focus groups with IAB case investigators, homicide detectives and EEO investigators, and discussions with the parties.   The monitor shared these recommendations with the NYPD in September 2019:

1.  *Improve initial case assessment and assignment.*  IAB and the Detective Bureau have guidelines for steps that investigators need to take within the first 72 hours of being assigned a case, including contacting the complainant within 24 hours.  NYPD should establish similar guidelines for profiling investigations to ensure that evidence is preserved, video is obtained, witnesses are located and complainants are interviewed while their memory is fresh.  Complainants should be contacted as soon as possible to arrange a time and place to meet.  When appropriate, a canvass of the area for possible witnesses and to secure video or other evidence should take place within 72 hours of the NYPD receipt of the complaint.

2.  *Investigative steps that should be taken.*  Investigators should include the following steps in their investigations:  review of the public social media of both the complainant and subject officer; video canvass of the location of the incident (included in the IAB

procedures for investigating profiling complaints, IAB Guide 620-58, step 5); BWC review; and in-person interview of complainant in a neutral or comfortable location. Also, a canvass of the scene during the same time that the incident occurred may be more likely to identify witnesses. Investigators should be granted access to the IAB Computer Crimes Unit, which has expertise in social media searches, to review the public social media of complainants and officers. Prior profiling allegations against the subject officer should be reviewed and assessed for trends and commonality with respect to the officer's behavior or types of statements in the case being investigated. This is also set out in the IAB procedures, IAB Guide 620-58, step 11. Investigators also should permit the complainants to provide an account of the incident, uninterrupted by questions.

3. *Improve case management and supervision.* The Detective Bureau has timelines for investigative reports and supervisory review and feedback. An initial investigative report must be completed and reviewed by a supervisor within three days; at day seven, the case is discussed and supervisory direction is given; at 21 days, decisions are made on the status of the case (close case, make arrest, additional steps to be taken in case). A similar case review system should be set up for profiling investigations, with the 21-day review perhaps extended, if appropriate, to accommodate subject officer interviews. The investigator's immediate supervisor plays a critical role in ensuring a comprehensive investigation. Supervisors should document their analyses and conclusions.

4. *Develop a mediation program for profiling complaints.* Although the CCRB offers mediation as an option for complainants and officers in certain cases, the NYPD does

not have a mediation program for complainants and officers to discuss each other's perspective on the encounter that led to allegations of profiling.  The NYPD agrees that mediation may be a beneficial way to address some of the profiling allegations.

The NYPD recently informed the monitor that it is in the process of amending its procedures for profiling investigations in light of the monitor's recommendations as follows:  (1) a reduction in time to assignment of case and contact with complainant; (2) a review of public social media of both complainant and subject officer when appropriate; (3) designation of specific investigators at the borough Investigations Unit level as primary investigators for these cases; and (4) additional training for supervisors up to and including the borough adjutant regarding proper review of these cases.[16]  These changes will be reflected in a revised IAB investigative guide that will be reviewed by the parties and submitted for court review.  The NYPD is working with the CCRB to develop a mediation pilot for profiling complaints that the Department expects to launch in January 2020.

In addition to investigating the individual profiling complaints, there are other steps that the monitor discussed with the NYPD that the Department should consider in addressing concerns about racial profiling.

1.  *Leverage the IAB Statistical Unit to analyze racial profiling complaints.*  The IAB Statistical Unit or some other unit in the NYPD should analyze patterns and trends of profiling complaints, as well as examining social media.  The unit can examine enforcement practices to assess whether Department or command policy or practices are contributing to the generation of profiling complaints.  The NYPD should examine

---

[16] The borough adjutant is the executive in each patrol borough who supervises the borough investigations unit and oversees the disciplinary system in the borough command.  P.G. 202-02.

whether such policies or practices are examples of selective enforcement or, alternatively, legitimate policies that still may lead to the impression that a particular group is being targeted for enforcement purposes.

2. *Integrity testing.*  IAB does integrity testing to test a variety of policy and law violations.  The monitor will be discussing with the NYPD what kind of integrity tests are currently being done and whether they can be adapted to develop integrity testing for racial profiling, as well as illegal stops and frisks and trespass arrests.

3. *Include profiling complaints in the command's RISKS Review* (see Section III above).

4. *Include profiling complaints, even if not substantiated, in the Department's early intervention system (EIS).*  The NYPD has informed the monitor that it plans to make changes to its EIS so that there will be a review of officers with multiple profiling complaints.

5. *Review BWC videos of the encounters that led to profiling complaints to examine whether there are particular aspects of the encounters that lead to complaints.*  This could be a particularly useful way to assess the interactions of officers who have multiple profiling complaints.  The NYPD also could compare the BWC videos of officers with multiple complaints with BWC videos of officers in the same squad without complaints.  Review of the BWC videos may help the Department develop a template or methodology for identifying and addressing problems leading to complaints.

**B.      NYPD Handling of Substantiated CCRB Cases**

At trial, the court found that the NYPD failed to impose meaningful discipline when the CCRB determined that officers engaged in unconstitutional stops and frisks.  The court's order

requires the NYPD to improve its procedures for handling CCRB findings of substantiated misconduct during stops. Specifically, the Department Advocate's Office (DAO) must provide more deference to credibility determinations made by the CCRB, use an evidentiary standard that is neutral between the claims of complainants and officers, and not require that physical evidence corroborate the complaint. The sections below provide updated data on the NYPD handling of substantiated CCRB cases through April 2019.

### 1. NYPD Discipline and Penalties Imposed

The graphs and charts below show the final discipline and penalties imposed for substantiated CCRB cases sent to the NYPD in 2014 through 2018. The data illustrate the decline in the incidence and severity of the final discipline and penalties imposed. This decline resulted from both changes in the initial CCRB recommendations made to the NYPD and the final disposition and penalties imposed by the NYPD.

The past several years has seen a substantial change in the frequency with which the CCRB recommends charges and specifications. The monitor examined CCRB disciplinary recommendations in cases involving allegations relating to stop and frisk cases and trespass enforcement cases specifically. Based on data provided by the NYPD to the monitor, it appears that, over time, in such cases the CCRB's recommendations have generally decreased in severity. In particular, recommendations of charges and specifications declined sharply from 2014 to 2018, from 102 cases in 2014 (57 percent of the total) to 15 in 2018 (17 percent of the total).

**Chart 20.  CCRB's Initial Disciplinary Recommendations, 2014-2018**

|  | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Instructions** | 20 | 58 | 4 | 4 | 15 |
| **Training** | 1 | 22 | 69 | 22 | 14 |
| **Command Discipline A** | 4 | 65[17] | 72 | 41 | 15 |
| **Command Discipline B** | 51 | 74[18] | 44 | 16 | 28 |
| **Charges and Specifications** | 102 | 48 | 23 | 19 | 15 |
| **Other** | 1[19] | 1[20] | 0 | 0 | 1[21] |
| **TOTAL** | 179 | 268 | 212 | 102 | 88 |

The police commissioner makes the final determination about the discipline imposed.  The chart below compares the CCRB's initial discipline recommendations with the final discipline imposed by the NYPD for 39 closed 2018 cases involving stops, frisks and searches.

**Chart 21.  Comparison of Recommended Penalties to Final Disposition, 2018**

| 2018 Penalty Type, Closed Cases | CCRB Recommended Discipline | Final Penalty |
|---|---|---|
| Charges and Specifications | 1 | 1 |
| Command Discipline B | 15 | 2 |
| Command Discipline A | 9 | 12 |
| Training | 7 | 12 |
| Instructions | 6 | 3 |
| No Disciplinary Action | 0 | 6 |
| Case Closed Administratively | 1 | 7[22] |
| Total | 39 | 39 |

---

[17] Includes five cases in which instructions were also recommended and three cases in which training was also recommended.

[18] Includes one case in which Instructions were also recommended and four cases in which Training was also recommended.

[19] In 2014, there was one case in which the CCRB's disciplinary recommendation is listed in the data as "Command Discipline" without specifying whether level A or B was recommended.

[20] In 2015, one case is listed as "NDA" in the data.  The notes on the case indicate that the complaint was received after the statute of limitations had run.

[21] CCRB initially recommended charges and specifications, but then reconsidered on its own and unsubstantiated the case.

[22] Of the seven cases closed administratively, one was unsubstantiated by the CCRB, three were closed because the statute of limitations expired, two officers were dismissed on unrelated cases, and one case involving force had been previously adjudicated by the NYPD.

### 2. DAO Reconsideration Request Data

The DAO reviews the CCRB's findings and recommendations for discipline regarding allegations the CCRB has substantiated.  In 2014, the NYPD and the CCRB established a new "reconsideration process," in which the DAO may ask the CCRB to reconsider its findings on whether allegations were substantiated or its recommendations for discipline.  The CCRB may then choose to change or maintain its original conclusions.  Alternatively, in certain circumstances (such as when a case is running out of time to be tried under the statute of limitations), the DAO may unilaterally recommend a different disposition or discipline to the Police Commissioner, without requesting reconsideration by the CCRB.  In either case, the Police Commissioner makes the final decision on what discipline, if any, to impose after reviewing both the CCRB's and the DAO's findings and recommended remedy.

The NYPD provided the monitor with data regarding substantiated CCRB cases involving stop, question, frisk, search or trespass allegations, the DAO reconsideration requests, and the outcomes of those reconsideration requests.  The DAO agreed with CCRB's findings and recommendations in a majority of the cases in which allegations were substantiated by the CCRB.  However, the rate of agreement decreased from 2014 to 2018.  In 2014, the DAO agreed with the CCRB findings and recommendations in 82 percent of cases.  In 2015, the DAO agreed with 73 percent of the substantiated CCRB cases.  In 2016, the rate of agreement was 52 percent; in 2017, it was 57 percent; and in 2018, it was 51 percent.  The data below for 2017 and 2018 do not include 12 and 49 cases, respectively, that were substantiated by the CCRB but are still being considered for reconsideration or for which the reconsideration process has not been completed.

**Chart 22.  DAO Agreement with CCRB Recommendations, 2014-2017**

| Year | Substantiated SQF CCRB Cases Sent to NYPD | Cases in Which NYPD Agreed with CCRB Discipline Recommendation[23] (%) | Cases in Which DAO Requested Reconsideration of CCRB Discipline and/or Disposition | Cases in Which NYPD Changed Disposition or Discipline Recommendation Without Reconsideration |
|---|---|---|---|---|
| 2014 | 193 | 159 (82%) | 20 | 14 |
| 2015 | 355 | 260 (73%) | 47 | 48 |
| 2016 | 222 | 115 (52%) | 88 | 19 |
| 2017 | 90 | 57 (54%) | 14 | 25 |
| 2018 | 39 | 20 (51%) | 6 | 13[24] |

In almost half of the cases in which the DAO sought reconsideration, the DAO's disagreement was with the discipline recommended by the Board panel, rather than with the CCRB's investigation, its credibility determinations or its substantiated findings.  Additionally, in those cases where there was no reconsideration request, but the DAO recommended to the Police Commissioner a different result than recommended by the CCRB, the majority of those cases involved a disagreement about the CCRB's discipline recommendation, not about whether the allegations should be substantiated.  For example, in 2018, of the 39 closed cases, the DAO disagreed with the CCRB's substantiation finding in six cases:  three in which the DAO asked for reconsideration and three in which it did not.  Chart 23 below shows the number and percentage of cases in which the DAO asked for reconsideration of CCRB's substantiation of stop and frisk or trespass cases.  The DAO has requested reconsideration of the CCRB's findings in a relatively small portion of cases with allegations based on stop, question, frisk, searches or trespass

---

[23] These numbers include cases where the CCRB recommended instructions but the NYPD imposed training.

[24] This includes seven cases closed administratively.

enforcement:  six percent of cases substantiated in 2015, 22 percent of those substantiated in 2016,

11 percent of those substantiated in 2017, and eight percent of those substantiated in 2018.

**Chart 23.  DAO Reconsideration of CCRB Finding of Substantiation**

|  | Total CCRB Cases | DAO Reconsideration of CCRB Substantiated Finding (%) |
|---|---|---|
| **2015** | 355 | 22 (6%) |
| **2016** | 222 | 48 (22%) |
| **2017** | 90 | 10 (11%) |
| **2018** | 39 | 3 (8%) |

The reconsideration process creates an opportunity for dialogue between the CCRB and

the DAO about particular cases.  Sometimes, with the benefit of the DAO's views or new facts or

disciplinary information the DAO provides, the CCRB will agree with the DAO's suggested

disposition.  Other times, the CCRB will modify its recommended discipline in response to a DAO

request, but not to the extent the DAO suggested.  The approximate numbers of stop and frisk

cases in which either outcome has occurred are summarized in the following chart.

**Chart 24. CCRB Determinations on Reconsideration Requests in Cases**

| Year | Total Reconsideration Reqs. | CCRB Agreed with DAO Request | CCRB Reduced Discipline But Not as Far as DAO Suggested |
|---|---|---|---|
| 2015 | 47 | 13 (2 partial)* | 14 |
| 2016 | 88 | 13 (1 partial) | 4 |
| 2017 | 14 | 2 (1 partial) | 1 (partial) |
| 2018 | 6 | 0 | 0 |

* "Partial" means that there was more than one substantiated allegation in a complaint, and that the CCRB agreed with the DAO reconsideration request or reduced the discipline for at least one of the allegations in the complaint.

### 3.     Variance Memoranda

Currently, the MOU between the Department and CCRB provides that, in cases prosecuted

by the CCRB's Administrative Prosecution Unit (APU), the Police Commissioner should notify

CCRB when he or she intends to impose discipline that is of a lower level than that recommended

by CCRB or by an NYPD Trial Commissioner.  The notice is to be given ten days prior to imposition of the discipline with a detailed explanation of the reasons for deviating from CCRB's recommendation.  CCRB has five days to respond before the final determination.

By reason of recently adopted changes to the NYC Charter, the Police Commissioner will now have to write a "written report" no later than 45 days after imposing a "different penalty or level of discipline than that recommended by the Board or by the deputy commissioner responsible for making disciplinary recommendations …."  The report will include a "detailed explanation of the reasons for deviating" from the recommendations.  Further, if the imposed penalty or level of discipline is lower than the recommendations, the report will "also include an explanation of how the final disciplinary outcome was determined, including each factor the Police Commissioner considered in making his or her decision."   The requirement took effect immediately upon certification of the election results by the Board of Elections on December 6, 2019.  It is unclear, at this time, what amendments, if any, may be made to the MOU as a result of this additional mandate.

### 4.        Other Misconduct Noted; Failure to Complete Stop Report

If the CCRB, in the course of its complaint investigation, identifies misconduct outside of its jurisdiction, the Board refers the misconduct to the NYPD for investigation and any additional action.  These cases are referred to as Other Misconduct Noted, or OMN, cases.  For example, if the CCRB investigates a complaint involving a stop, frisk or search, and determines that the subject member or members made a *Terry* stop but did not complete a stop report for the encounter, the CCRB refers the case to the NYPD as OMN.  The CCRB also makes an OMN referral where the investigation determines that a member of service may have made a false official statement in a case involving a stop, frisk or search allegation.  The Internal Affairs Bureau logs these cases, assigns them to the command for investigation and tracks the outcomes.  Below are the outcomes

of the NYPD's investigations of CCRB's OMN referrals for failure to complete a stop report for completed CCRB cases from 2015 through 2018.  For the year 2019, as of September 1, 2019, the CCRB has made three OMN referrals to the Department for failure to compete a stop report; those three cases are still open and being investigated at the commands.

**Chart 24.  Outcomes for Failure to Complete Stop Report (OMN Cases)**

| | 2015 | | 2016 | | 2017 | | 2018 | |
|---|---|---|---|---|---|---|---|---|
| **A-CD** | 32 | 24% | 18 | 16% | 22 | 31% | 9 | 16% |
| **B-CD** | 3 | 2% | 5 | 4% | 0 | 0% | 1 | 2% |
| **C&S** | 0 | 0% | 0 | 0% | 1 | 1% | 0 | 0% |
| **Training** | 7 | 5% | 19 | 16% | 8 | 11% | 2 | 4% |
| **Instructions** | 61 | 45% | 53 | 46% | 26 | 36% | 12 | 21% |
| **Minor Procedural Violations** | 0 | 0% | 2 | 2% | 1 | 1% | 0 | 0% |
| **Substantiated** | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 2% |
| **NDA-DUP-None** | 14 | 10% | 6 | 5% | 8 | 11% | 5 | 9% |
| **Exonerated** | 4 | 3% | 4 | 3% | 2 | 3% | 7 | 12% |
| **Unfounded** | 2 | 2% | 2 | 2% | 1 | 1% | 0 | 0% |
| **Unsubstantiated** | 1 | 1% | 4 | 3% | 2 | 3% | 14 | 25% |
| **Other** | 4 | 3% | 3 | 3% | 1 | 1% | 2 | 4% |
| **Still Open** | 8 | 6% | 0 | 0% | 0 | 0% | 4 | 7% |
| | 136 | 100% | 116 | 100% | 72 | 100% | 57 | 100% |

  * Substantiated disposition, but no penalty listed.
 ** Includes the following dispositions: Filed, Info/Intel, No Disposition, No Record Found, Resigned.

## X.   COMBINED PILOT

On May 15, 2018, the court-appointed facilitator, the Hon. Ariel Belen, filed his Final Report and Recommendations on the Joint Remedial Process with the court.  ECF No. 597.  Judge Belen recommended that the court order 14 specific reforms.  On July 19, 2018, the court ordered a pilot program to study one of the facilitator's recommendations, the electronic documentation of Level 1 and 2 encounters.[25]  Three weeks later, the court ordered a pilot program to study another

---

[25] *Floyd* ECF No. 619.

of the facilitator's recommendations, the activation of BWCs during Level 1 encounters.[26]   On November 9, 2018, the monitor submitted a proposal combining the two court-ordered pilots into one.  In response to objections from plaintiffs' counsel, the monitor submitted a reply and revised proposal in January 2019, which was approved by the court on February 7, 2019.[27]

The combined pilots will be overseen by the monitor, who retained Professor Stephen Mastrofski and CUNY's Institute for State and Local Governance (ISLG) to assist in its planning and implementation.  The pilot will use systematic social observations—in other words, trained observers will ride along with officers and collect data.  Results from the pilot will inform the court on the impact of implementing one or both of these proposed changes.  Among the questions to be addressed by the pilot are:

1.   How frequently do encounters occur at each level?

2.   How frequently do Level 1 and Level 2 encounters escalate to higher levels?

3.   To what extent are police initiating Level 1, Level 2 and Level 3 encounters without appropriate levels of knowledge or suspicion?

4.   Would either of the proposed changes, or both together, reduce the risk of police-citizen encounters contrary to *Terry* and *DeBour* standards?

5.   To what extent are police not documenting Level 3 stops, and would (either or both) the proposed changes reduce undocumented stops?

6.   Would additional documentation or BWC recording provide useful data in assessing Fourth and Fourteenth Amendment violations?

7.   Are there encounters for which recording would not provide benefits (e.g., encounters not involving an investigative or law enforcement purpose), such that privacy concerns might outweigh any justification for recording?

8.   What is the additional burden placed upon the police by requiring additional documentation of the citizen encounters?

---

[26] *Floyd* ECF No. 634.
[27] *Floyd* ECF No. 691.

The pilot study will observe officers operating under the four different conditions:  (a) control—no change in policy; (b) electronic documentation of Level 1 and Level 2 encounters; (c) mandatory activation of BWCs at Level 1 encounters; and (d) electronic documentation for Level 1 and Level 2 encounters and BWC activation at Level 1.  Observations of the police encounters with the public will occur in a range of police units that frequently engage the public—precinct officers assigned to patrol cars, plainclothes anti-crime teams, and PSA Housing officers performing interior patrols.  The study anticipates observing approximately 170 tours, which should yield over 1,500 observed contacts.  Based on this expected sample size, the study will have sufficient statistical power to detect differences among the four conditions. The study also will include efforts to measure whether and how officers will react to having observers.  It will compare the activity of officers when observers are in the car with the activity of the same officers on comparable shifts the week before and week after, when they do not have observers.

Extensive efforts are being made to prepare for the pilot program, including: developing the data collection instruments and protocols for the observers; creating a sampling frame for selection of the commands and officers to be observed; recruiting and training the observers; field-testing the instruments and protocols; and having the NYPD develop an operations order for the commands that will be implementing the new procedures during the pilot.  The NYPD is in the process of developing a phone application for officers to record data during Level 1 and Level 2 encounters.  In addition, because the officers being observed must voluntarily consent to be observed, the confidentiality of observer information is critical.  The monitor submitted and the court approved a confidentiality order ensuring that the information observers obtain through participation in the study will be used only for the study's purposes. *Floyd v. City of New York*,

88

ECF No. 735.  The monitor team anticipates that the combined pilot, including the observations in the field, analysis of the data collected and writing the report will be completed in 18 months.

Compliance will be achieved when:

1.      The NYPD participates in the pilot study and provides the monitor team the relevant data to complete its analysis and report.

## XI.     EARLY INTERVENTION PROGRAM

In response to another recommendation made in the facilitator's report, the court, on November 20, 2018, ordered that the Department, in consultation with the monitor, submit a plan to implement a program to systematically receive, assess and act on five specific categories of information regarding officer conduct.[28]  The categories are: (a) declinations of prosecutions by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or representation of police officers by the New York City Law Department; and (e) judgments and settlements against police officers in civil cases where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance.

The Department submitted its plan to the court on January 14, 2019.[29]  Plaintiffs' counsel submitted two responses raising concerns regarding certain aspects of the plan.[30]  Since then, there have been ongoing discussions between the parties in an attempt to achieve consensus on the best way for the Department to take this information into account and act upon it, when appropriate.

Compliance will be achieved when:

---

[28] *Floyd*, ECF No. 662.
[29] *Floyd*, ECF No. 681.
[30] *Floyd*, ECF No. 686; *Ligon*, ECF No. 364.

1.      The NYPD implements a program to receive, assess, and act on information regarding adverse findings on unlawful stops and trespass enforcements, in accordance with a plan approved by the court.

2.      Data on declined prosecutions, adverse credibility findings, suppression decisions, lawsuits and denials of indemnification are included in the Department's early intervention system.

3.      Commanding officers and RMB implement and document interventions for officers identified through data on at-risk behaviors in the categories identified by the court.

# APPENDIX 1

# GUIDANCE FOR COMPLIANCE ASSESSMENTS

# APPENDIX 2

# TRESPASS ARRESTS IN NYCHA AND ELSEWHERE

**TRESPASS ARRESTS IN NYCHA LOCATIONS AND OTHER LOCATIONS**



No. Trespass Arrests in NYCHA and Elsewhere

# APPENDIX 3

# MEMORANDUM OF UNDERSTANDING BETWEEN THE

# CIVILIAN COMPLAINT REVIEW BOARD AND THE NYPD