# BELDOCK LEVINE & HOFFMAN LLP
## 99 PARK AVENUE, PH/26TH FLOOR
### NEW YORK, N.Y. 10016

CYNTHIA ROLLINGS
JONATHAN MOORE
JONATHAN K. POLLACK
HENRY A. DLUGACZ
STEPHEN J. BLUMERT
MARC A. CANNAN
DAVID B. RANKIN
LUNA DROUBI
MYRON BELDOCK (1929-2016)
LAWRENCE S. LEVINE (1934-2004)
ELLIOT L. HOFFMAN (1929-2016)

TEL: (212) 490-0400
FAX: (212) 277-5880
WEBSITE: blhny.com

COUNSEL
BRUCE E. TRAUNER
PETER S. MATORIN
KAREN L. DIPPOLD
JEFFREY A. GREENBERG
MARJORY D. FIELDS
EMILY JANE GOODMAN
  (JUSTICE, NYS SUPREME COURT, RET.)
FRANK HANDELMAN

REF:

WRITER'S DIRECT DIAL:
(212) 490-0400

January 17, 2020

*Via ECF*
Hon. Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

                Re:    *Floyd v. City of New York*, 08 Civ. 1034

Dear Judge Torres:

      On behalf of Plaintiffs in the above-entitled action, we write to respond to Defendant City of New York's December 20, 2019 filing, Dkt. #753-1, with respect to the Court-mandated proposed plan (Floyd Dkt. #681-1, Davis Dkt. #444-1) for implementation of the Court-appointed Facilitator's Joint Remedial Process Reform Recommendation No. 1. Plaintiffs renew their request to the Court for a hearing or status conference wherein the parties may discuss these matters directly with the Court.

      While the City's December 2019 submission does narrow some issues before the Court, it also raises, or reignites, key concerns raised by the Plaintiffs throughout this briefing, specifically around the need to strengthen the NYPD's early intervention programs. The City continues to resist meaningful early intervention by excluding important judicial decisions from its review; by refusing to recognize the importance of leadership capacity at all levels within the Department as a necessary part of early intervention; by rejecting outside expertise from early intervention, even for purposes of enriching the relevant metrics; by failing to target the racial discrimination inherent in the selective enforcement of the law; by refusing to consider peer intervention models, such as the EPIC program, currently in operation in numerous police departments; and by continuing to rely on arbitrary early intervention thresholds. Plaintiffs'

1

updated Proposed Order, attached hereto, sets forth and reconciles our shared early intervention priorities, which we maintain are necessary under *Floyd* court orders, with the evolution of NYPD's early intervention proposal.

1. **Important Judicial Decisions Absent From Early Intervention Monitoring**

While the NYPD's proposal does include judicial suppression decisions among its review-triggering thresholds, it is not clear that the NYPD procedure catches all relevant decisions involving NYPD officers, as required by the Court's order. Specifically, the NYPD proposal makes no mention of suppression decisions by the New York City Family Courts in juvenile delinquency cases, or in child abuse and neglect cases, or in decisions by the New York State Appellate Division reversing trial court denials of suppression motions. *See, e.g.*, *In re Darryl C.*, 98 A.D.3d 69 (1st Dep't 2012).

2. **Without a Court Order, NYPD Will Not Respect Any External Expertise, Even to Improve Upon its Indicators, Metrics, or Interventions**

As an initial matter, it appears that NYPD continues to defy this Court's November 18, 2018 Order, which requires NYPD's early intervention and RAILS proposals to systematically assess and act on "judgments and settlements against police officers in civil cases <u>where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance</u>." Dkt. #662 (emphasis added). Instead, NYPD proposed alternatives that evade Law Department oversight and avoid entering this information into RAILS in its prior briefing. Dkt. #729-1 at 6-7.[1] This is unacceptable. Not only does NYPD flagrantly disregard the Court's order and the Facilitator's Recommendation, it also creates the asymmetric, non-aligned, and ineffective monitoring thresholds for litigation discussed *infra* in Section 3 and frustrates leadership by eliminating command-level review, discussed *infra* in Section 5.

Beyond this, NYPD continues to reject any and all community, City, or other outside expertise in its early intervention metrics or procedures, beyond that which is specifically mandated by the Court. Although this case has established the importance of community perspectives in police accountability, *see* Dkt. #373, Rem. Ord., at 29 ("If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful"), there is no consideration of community inclusion in determining standards for early intervention. In addition, this means that NYPD rejects any and all involvement of the community or law enforcement agencies in determining when early intervention may be appropriate and in deterring misconduct. For example, the "bad cops" lists maintained by New York City's district attorneys[2] offer an invaluable citywide resource, particularly for information

---

[1] Even if NYPD has decided to accept the jurisdiction of the Court and obey the Order, it still has not set forth a clear and transparent plan to systematically receive, assess, and act on the City's advice in its briefing thus far.

[2] Since Plaintiffs' last filing, several of New York City's district attorneys have publicly released these lists. *See e.g.*, George Joseph, *Brooklyn DA Releases Secret Lists Of Cops They Don't Trust,* Gothamist (Nov. 6, 2019); John Annese, *Queens D.A. released list of 65 officers with credibility problems, following similar releases in Brooklyn and the Bronx*, N.Y. Daily News (Nov. 20, 2019); John Annese & Graham Rayman, *Manhattan prosecutors release list of cops with 'adverse credibility' issues in court testimony,* N.Y. Daily News (Dec. 13, 2019).

on officer credibility problems. Yet, NYPD has not even acknowledged this resource in its briefing, despite notice from the Plaintiffs. *See* Dkt. #686 at n. 10.

### 3. NYPD's Chosen Thresholds Frustrate Effective Early Intervention

The City's monitoring thresholds do not reflect genuine commitment to early intervention, i.e., the intention to identify, intervene, and correct misconduct *before* it requires disciplinary action, nor do they fully address the Facilitator's recommendation or the Court's November 20, 2018 Order. Early intervention must course-correct and deter bad practices, ensuring a culture of constitutionality. At heart, the NYPD's proposal is little more than the thresholds it maintains for monitoring and intervention. Any credible early intervention program should not exclude the precise unconstitutional conduct that conferred liability to NYPD under the Fourth and Fourteenth Amendments in this case, as is evident with respect to the thresholds pertaining to pending cases, settlement amounts, biased policing complaints, and early settlement units.

With respect to triggers for racial discrimination and selective enforcement, early intervention must target ongoing racial discrimination via selective enforcement of the law. *See* Dkt. 744 at 5, 12-13. One important mechanism for identifying ongoing racial discrimination is the analysis of declined prosecutions where officers are making arrests contrary to stated prosecution policies or practices. NYPD claims that arrests made in contravention of district attorneys' stated policies with respect to marijuana or fare beats are not relevant to individual officers' conduct (and that prosecutors agree). But this narrow view fails to address the race-based operation of selective enforcement in policing that was recognized and deemed unconstitutional by the trial court. *See* Liab. Op., Dkt. #373 at 191-92. Considerable data and recent reporting suggest this continues to be a valid concern.[3] Yet NYPD continues to refuse to consider categories of declinations of prosecution that are directly relevant to targeting unlawful racial discrimination. It bears scrutiny that evident and pervasive racial disparities and ongoing selective enforcement (widely acknowledged in reporting about policing) continues to be ignored by NYPD as an important focus of early intervention.

In addition, the NYPD's recent iteration of its early intervention proposal still fails to offer any basis or explanation for the litigation monitoring thresholds it sets forth. *See* Dkt.

---

[3] *See e.g.,* Martin Samoylov & Gersh Kuntzman, *NYPD Targets Blacks and Latinos for 'Jaywalking' Tickets*, StreetsBlogNYC (Jan. 8, 2020) (90% of people stopped for jaywalking by NYPD are Black and Latinx, and over half of jaywalking tickets were given in the Bronx); Priscilla DeGregory & Craig McCarthy, *State AG probing NYPD for 'racial biases' in fare-evasion crackdown,* The New York Post (Jan. 13, 2020) ("People of color accounted for almost 70 percent of summonses for fare evasion between October 2017 and June 2019 — and nearly 90 percent of arrests over the same time, NYPD data shows"); Kwame Opam, Tensions Over Subway Policing, Race and 'Arrest Quotas', The New York Times (Dec. 9, 2019); David Brand, *Nearly every single person arrested for weed in NYC this year was Black or Latinx*, Queens Daily Eagle (Aug. 21, 2019) ("Black and Latinx New Yorkers accounted for 94 percent of all low-level marijuana arrests in New York City during the first six months of the year, according to NYPD arrest data compiled by the state," mirroring "persistent disparities in fare evasion arrests."); Benjamin Mueller, et al., *Surest Way to Face Marijuana Charges in New York: Be Black or Hispanic*, The New York Times (May 13, 2018) (despite NYPD claim that racial disparity in marijuana arrests driven by local complaints, "among neighborhoods where people called about marijuana at the same rate, the police almost always made arrests at a higher rate in the area with more black residents").

#753-1 at 9-10. *See also* Dkt. #744 at 14-15, Dkt. #686 at 2-3 (Plaintiffs' initial concerns relating to this issue). For example, monitoring is triggered by six or more pending lawsuits, multiple complaints or high value cash settlements exceeding $200,000, arbitrary thresholds that disregard the trial court's stated concern at the burden of filing CCRB complaints, let alone a lawsuit. *See* Dkt. #744 at 11 (quoting the trial court mandate that monitoring must account for the low likelihood of aggrieved individuals taking the time to file a complaint with CCRB).

However, because financial settlements rely on quantifiable damages, bad stops and trespass arrests rarely yield massive financial settlements even though, as this Court found, the chronic stress of police intervention and racial profiling profoundly impacts Black and Latinx New Yorkers. *See Floyd* Liability Op., Dkt. #373 at 6 ("No one should live in fear of being stopped whenever he leaves his home to go about the activities of daily life….Some plaintiffs testified that stops make them feel unwelcome in some parts of the City, and distrustful of the police."); *See also,* Geller A., Fagan J., et al., *Aggressive policing and the mental health of young urban men.* 104 Am J Public Health 2321 (2014) (increased police stops consistently associated with persistent "stigma," "trauma," "anxiety," "depressive symptoms" for young urban men).

Nor are NYPD's thresholds set at levels supported by other relevant data.[4] Many cases of misconduct similar or identical to the *Floyd*, *Davis*, and *Ligon* cases (i.e., unconstitutionally violative of the Fourth and Fourteenth Amendments) are resolved with cash settlements far less than $200,000. . For example, an original named plaintiff in *Davis*, Anthony Anderson, settled out of the class action for $75,000 in a Rule 68 settlement post-filing. *See Davis* Dkt. ##58, 69. According to the complaint, he was arrested for trespassing after dropping off his niece in a NYCHA building and incarcerated for almost two weeks. He lost his job and the trespass charges were dismissed. Situations like these are ideal for early intervention, yet Mr. Anderson's situation would not trigger scrutiny under the current early intervention plan *See also Ramirez v. City of New York,* 16-CV-4174 (S.D.N.Y. 2018) ($12,500 settlement after summary judgment awarded in favor of plaintiff unconstitutionally stopped for five-minute warrant check by NYPD). In fact, one database of federal filings against the NYPD for civil rights violations (www.capstat.nyc) suggests that nearly all cases in the last five years focused primarily on unconstitutional stops settle well below $200,000.[5] Publicly available data, pursuant to NYC Administrative Code § 7-114,[6] depicts the civil rights litigation landscape relating to NYPD misconduct: from fiscal year 2015 to 2019 (the latest available data), less than 1% (91 of 9,518) of settled lawsuits involved a payment by the City of $200,000 or more. By contrast, 99% of all

---

[4] Plaintiffs may only speculate as to what analysis supports NYPD's thresholds, but any metric determined by averaging the amount of money paid out, rather than the types of misconduct suitable for early intervention, is inadequate to satisfy the Facilitator's Recommendation No. 1 and the Court's November 2018 Order.

[5] *See e.g., Jones v. City of New York et al.,* No. 15-CV-332 (E.D.N.Y.) ($3,500 settlement where refusal to provide identification and attempt to leave led to arrest); *Harris v. Thomas,* 15-CV-4017 (SDNY) ($8,000 settlement where individual leaving friend's NYCHA apartment searched, arrested, and charged with criminal trespass); *Rogers v. Bisono*, 15-CV-6670 (S.D.N.Y.) ($14,500 settlement where police searched and arrested man sitting on a public bench for alleged consumption of alcohol in a public place, which was later dismissed and sealed.)

[6] From FY15-FY19, 19,449 filed lawsuits were pending against NYPD in New York City. 9,518 of these cases were settled or disposed of with a financial payout by the City by the end of FY19. Cases involving bad stops, racial profiling, or trespass in NYCHA or Clean Halls building are a subset of these. *See NYPD Alleged Misconduct Matters commenced in FY 2015-2019.* All NYC Administrative Code § 7-114 data is available here: https://www1.nyc.gov/site/law/public-resources/nyc-administrative-code-7-114.page

lawsuits against NYPD (9,427 out of 9,518 settled cases) settled under $200,000.  In the NYPD's proposal, <u>99% of all civil rights cases involving NYPD misconduct would trigger no scrutiny</u>.

It is unacceptable that NYPD's high threshold for early intervention excludes virtually all litigation focused on the precise conduct ruled unconstitutional in the *Floyd*, *Davis*, and *Ligon* cases, including low-money judgments and settlements where the Law Department determined there was evidence of officer malfeasance, which is a category of lawsuits the NYPD is mandated to include and consider in its early intervention system. *See* Dkt #597 at 219; Dkt #662 at 2.  As Plaintiffs have stated, monitoring and intervention thresholds should be set according to an analysis of the prevalence of the misconduct; the metrics should reflect a target quantity of deterrable officer misconduct to capture, e.g., a majority, rather than focusing on high monetary settlements. *See* Dkt. #744 at 14-15; Dkt. #686 at 2-3. This was affirmed by the Facilitator in the JRP Final Report. Dkt. #597 at 99.

Similarly, citywide data pursuant to NYC Administrative Code § 7-114 reports approximately 6195 unique police officer defendants in FY15-FY19 lawsuits. The City's determination to focus on officers with six or more cases within the last five years translates to approximately 1948 officers, less than one-third of officers being sued for misconduct and, as importantly. However, without a stated rationale or associated analysis, it also excludes an additional 1791 officers facing four or five lawsuits in this period, officers equally ripe for review and intervention.[7]

In the same vein, the City's early settlement unit within the Comptroller's office is dismissed by NYPD as irrelevant or lacking in information at the early stages. Dkt. #753-1 at 9. Yet, even at the earliest stages, all relevant stop reporting, body camera video, and the nature of the complaint being considered by the City are available for review. The City's settlement with Eric Garner's estate, perhaps the most relevant and notable case in this category involved the exact issues the Court referenced in *Floyd,* clear liability, and a significant cash settlement, but would not trigger any monitoring or scrutiny under NYPD's early intervention proposal. *See also* Dkt. #744 at 6. The City's actions to quickly settle claims to avoid press or other attention deserves more consideration, not diminished regard, in the early intervention calculus within the NYPD.

Finally, it is clear that the review-triggering threshold for biased policing complaints, two complaints in a 12-month period, is too high. This is particularly true given the importance this Court has placed on eradicating racially-biased policing in the NYPD. Like the other metrics discussed herein, the threshold should be set according to analyses that seek to capture and deter potential racialized misconduct.  As an initial matter, the threshold should be instead no lower than two biased policing complaints in a 24-month period.

---

[7] To be clear, the officers subject to review are described by NYPD as those "named or identified" in lawsuits. These should, of course, include undercover officers who are not named, but are identified by number, in public filings, and whose personnel information is under the control of NYPD as well as officers identifiable through assignment date, description, and location.

### 4. NYPD Thwarts Effective Early Intervention By Ignoring Leadership Capacity Building and a Systematic Approach

Plaintiffs welcome the important involvement of NYPD executive leadership in early intervention. But this alone cannot create the necessary capacity to effectively recognize, deter, and prevent systemic misconduct. Instead, there must be commitment at every level of the NYPD. Yet, NYPD has failed to incorporate this key principle of building leadership capacity at every level into its design, even where minimal modifications would render important benefits. For example, the current plan for executive level review involves a case-by-case review of individual officers by an Early Intervention Committee (EIC) where the various thresholds associated with RAILS are triggered. Dkt. #753-1 at 3. However, this sidesteps an important capacity-building opportunity for leadership. The <u>EIC should also review the leadership responses to misconduct</u>, i.e., evaluate the real-time responses by the commanding officers, team leaders, line supervisors, and others who are proximate to the issue. Particularly in cases where command notifications are issued, the EIC should seize a teachable moment with lower-level leadership (who are responsive to their senior management) by determining what, if any, command response ensued, its effectiveness, and the understanding of the commanding officers with respect to their roles in early intervention and subsequently providing feedback to the command. It is recommended that a more structured and well-articulated policy be developed for this internal review by commanding officers and immediate supervisors

In addition, despite notice, NYPD ignores practicable interventions employed by other police departments and large organizations. *See* Dkt. #686 at 12-13, Dkt. #744 at 2. These include leadership coaching and peer intervention programs that promote active bystander accountability (like New Orleans' EPIC program). *Id.* As previously noted, these have been largely ignored by NYPD in the development of this proposal and throughout this briefing, *see* Dkt. #744 at 3-4. If the Court is inclined to defer to NYPD's intention to handle early intervention on a case-by-case basis as set forth in its briefing, it is even more imperative for executive interventions to be laser-focused on the quality and the capacity of leadership below the executive level. This is particularly important given NYPD's ongoing challenges with ensuring supervision quality. *See, e.g.,* Dkt. #744 at 3 (despite underreporting, supervisors caught only 1.5-3% of bad stop reports from 4Q17 to 2Q18).

### 5. The NYPD's Proposal Still Ignores Several Key Elements of the Facilitator's Recommendation

Finally, the NYPD's proposal still fails to address several key elements of the Facilitator's Recommendation. For example, the Facilitator specified that the NYPD should develop "a written policy with specific protocols . . . for entry into the RAILS network of adverse civil litigation results" including "a denial of indemnification by the New York City Law Department" and verdicts and settlements where it appears there was officer malfeasance. Dkt #597 at 221.

However, it appears from its most recent submission that the NYPD is no longer planning to include this information in RAILS. *See* Dkt #753-1 at 5 n.11, 8-9. This is a significant omission because, as the NYPD itself notes, "RAILS is an important tool that helps enable

6

command level review" of at-risk officers by providing commanding officers with information about indicators of possible at-risk behavior by officers in their command so that the commanding officers can implement appropriate command-level early interventions when necessary. Dkt. #729-1 at 3; # 753-1 at 4.[8] Yet, under the process described in the NYPD's latest submission, commanding officers will only learn of adverse litigation information about their subordinate officers if the Early Intervention Committee decides to take action in response to the information. Dkt. #753-1 at 4. If the Committee decides not to take action, the subject officer's commanding officer will not receive the adverse information and thus not be able to consider it if and when the commanding officer is deciding how to respond to similar problematic behavior by the same officer in the future. Such information deficits can therefore seriously undermine the effectiveness of command-level early interventions.

Additionally, as Plaintiffs have noted in our previous submissions, the NYPD's proposal still provides no details on how, or even whether, any of the five categories of adverse information listed in the Court's November 20, 2018 Order are considered "in evaluations of officers, transfer requests, disciplinary processes, and in discretionary promotional decisions," Dkt. #597 at 219-20; Dkt. #744 at 6. None of these categories of information appears in the Officer Profile that serves as the basis of the quarterly officer performance evaluation system approved by the Court, *see* Dkt. #562, Att. 2, nor do the NYPD's original or revised early intervention proposals to the Court articulate a process for ensuring that these categories of information are provided to an officer's immediate supervisor, who conducts the quarterly officer performance evaluation of that officer. Similarly, none of the NYPD's early intervention submissions set forth a process for ensuring that these five categories of information are shared with the Department Advocate's Office so that they may be considered, along with the rest of an officer's employment history in the NYPD, when determining a disciplinary penalty for that officer when he or she is the subject of a substantiated civilian misconduct complaint.

Finally, the structured solution set forth by the Facilitator specifically criticized NYPD "notice" systems based on transmittal of information alone, *see* Dkt. #744 at 12. Despite the fact that the NYPD data systems have the ability to "speak" directly to DA and OCA data systems,[9] the current proposal repeatedly cites to forms it will receive from various parties, rather than data systems that will be fed into RAILS automatically and efficiently and, most importantly, subject to review and analysis by the parties, the Monitor, the Court, and the public. A commitment to early intervention requires the NYPD to develop robust mechanisms to collect data, analyze and deter misconduct, and identify patterns and trends.

---

[8] Such command-level interventions are critical because, as the NYPD correctly points out, "formal intervention is a form of supervision, at its core, designed to mentor and coach an MOS so as to ensure that he or she is performing his or her job in a way that scrupulously adheres to the legal, moral and ethical principles to which the Department subscribes." Dkt. #729-1 at 3.

[9] One example of this is the NYPD's data repository called, the Online Prisoner Arraignment System (referred to as "OLPA" or "zOLPA"). This NYPD data system collects, organizes, and maintains data related to arrests and is fed automatically by data generated after the arrest is closed, including data from the district attorney's office and the courts (OCA).

**Conclusion**

For the foregoing reasons, Plaintiffs ask this Court to set this matter for oral argument or, in the alternative, to grant the relief requested herein, including signing the attached Proposed Order, and ordering the City and NYPD to immediately incorporate all revisions raised in Plaintiffs' briefing into its RAILS and early intervention protocols.

Sincerely,

\s\ Dominique Day
Dominique Day
Jonathan C. Moore
Luna Droubi
Marc Arena

BELDOCK LEVINE & HOFFMAN LLP

Darius Charney
Guadalupe Aguirre

CENTER FOR CONSTITUTIONAL RIGHTS

On behalf of *Floyd* Plaintiffs

Encl.

cc:   all parties (via ECF)