**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X

DAVID FLOYD, *et al.*,

                Plaintiffs,

-against-                        No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

                Defendants.

------------------------------------------------------------------ X

------------------------------------------------------------------ X

KELTON DAVIS, *et al.*,

                Plaintiffs,

-against-                        No. 10 Civ. 699 (AT)

CITY OF NEW YORK, *et al.*,

                Defendants.

------------------------------------------------------------------ X

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR EMERGENCY RELIEF

Jonathan C. Moore
Dominique Day
Marc Arena
Beldock Levine & Hoffman LLP
99 Park Avenue, Penthouse Suite
New York, NY 10016
212.490.0400

Darius Charney
Baher Azmy
Omar Farah
Guadalupe Aguirre
The Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
212.614.5475

*Attorneys for Floyd Plaintiffs*

Jin Hee Lee
Raymond Audain
Kevin Jason
Ashok Chandran
John Cusick
Patricia Okonta
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212.965.2200

Corey Stoughton
Steve Wasserman
The Legal Aid Society
199 Water Street
New York, NY 10038
212.577.3300

*Attorneys for Davis Plaintiffs*

**Table of Contents**

Table of Authorities................................................................................................iii

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

PROCEDURAL HISTORY....................................................................................... 6

ARGUMENT ............................................................................................................10
I.      LEGAL STANDARDS GOVERNING THE POST-JUDGMENT REMEDIAL PHASE...................10
      A.    The Court Has Broad Equitable Authority to Issue Further Relief to Enforce and Ensure Compliance With its Prior Orders.......................................................................... 10
      B.    The Courts' Powers to Enforce Their Prior Orders Necessarily Include the Authority to Order Discovery Needed to Assess Defendants' Compliance......................................12
II.     NYPD SOCIAL DISTANCING ENFORCEMENT ACTIVITIES ARE SUBJECT TO THE COURT'S PRIOR ORDERS IN FLOYD .................................................................................13
III.   EVIDENCE SHOWS COVID-19 POLICING MIRRORS STOP-AND-FRISK PRACTICES FOUND TO BE UNCONSTITUTIONAL BY THE *FLOYD* COURT ..................................14
      A.    Racial Profiling in COVID-19 Policing Violates the Court's Order in *Floyd* ........................... 14
           1.    The Lack of Reasonable Suspicion or Justification in Many COVID-19 Stops of Black and Latinx Individuals Shows Racial Profiling Persists ...........................14
           2.    The Court Has Already Ruled That the Use of Crime Suspect Data Cannot Justify Racial Disparities in Stops..........................................................................16
      B.    Selective Enforcement of the Law in COVID-19 Policing Directly Violates the Court Order ......................................................................................................................17
      C.    The NYPD is Exhibiting Similar Deliberate Indifference to Racial Discrimination in its COVID-19 Policing as in *Floyd*..............................................................................19
      D.    COVID-19 Policing Reprises Fourth Amendment Violations Identified in Floyd...............20
IV.    PLAINTIFFS ARE ENTITLED TO THE DISCOVERY THEY HAVE REQUESTED CONCERING NYPD SOCIAL DISTANCING ENFORCEMENT ..............................................................21
V.     THERE SHOULD BE A MORATORIUM ON NYPD SOCIAL DISTANCING ENFORCEMENT PENDING THIS COURT'S REVIEW OF THE MONITOR'S INVESTIGATION AND RESPONSES FROM ALL PARTIES ........................................................................23
      A.    The Context of NYPD Denialism with Respect to Ongoing Racial Discrimination Shows That Only Court Intervention Can Protect Rights, Health, and Safety of the Plaintiff Classes ....................................................................................................................24
      B.    Given the Heightened Risk of Infection from NYPD Interactions, Violations of the Court's Prior Orders Poses a Significant Threat to the Plaintiff Classes. ............................... 25
      C.    Public Health Officials, Elected Officials, and NYPD Rank-and-File Indicate NYPD Should Not Enforce Social Distancing Requirements, Suggesting No Reason to Risk Ongoing Violations of the Court's Orders in Floyd..........................................................................25
      D.    NYPD's Promises to Pull Back on Social Distancing Enforcement Does Not Eliminate the Need for Court Intervention..................................................................................27

E.      The Relief Requested is Narrowly Tailored to Address the City's Violations of the Court's Prior Orders. ............................................................................................................... 29

**CONCLUSION** ....................................................................................................................**31**

# Table of Authorities

## Cases

*Abdi v. McAleenan*, No. 1:17-CV-00721 EAW, 2019 WL 1915306 (W.D.N.Y. April 30, 2019) 13

*Aviation Consumer Action Project v. Washburn*, 535 F.2d 101 (D.C. Cir. 1976) ....................... 11

*Baez v. N.Y.C.H.A.*, 13 CV 8916, 2015 WL 9809872 (S.D.N.Y. Dec. 15, 2015) ................. 11, 30

*Benjamin v. Jacobson*, 172 F.3d 144 (2d Cir. 1999) ................................. 10

*Berger v. Heckler*, 771 F.2d 1556 (2d Cir. 1985) ......................... 11

*Cal. Dep't of Social Serv's v. Leavitt*, 523 F.3d 1025 (9th Cir. 2008).................................. 12, 13

*Campaign for S. Equal. v. Bryant*, 197 F. Supp. 3d 905 (S.D. Miss. 2016) ................................. 12

*Damus v. Wolf*, No. 18-578, 2020 WL 601629 (D.D.C. Feb. 7, 2020) ................................. 11, 30

*Emmerling v. Town of Richmond*, 434 F. App'x 10 (2d Cir. 2011) ............................................. 17

*Floyd v. City of New York, No. 08 CV 1034 (AT) (S.D.N.Y. Nov. 20, 2018)* ........................ *passim*

*Handschu v. Police Department of the City of New York, 219 F. Supp. 2d 388 (S.D.N.Y. 2016)* 11

*Hutto v. Finney*, 437 U.S. 678 (1979).............................................................................. 10, 12, 30

*Louis v. Metro. Transit Auth.,* 145 F. Supp. 3d 215 (E.D.N.Y. 2015).......................................... 17

*Melendres v. Arpaio*, 07-CV-2513, 2013 WL 5498218 (D. Ariz. Oct. 2, 2013)......................... 22

*Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 765 F. Supp. 1 (D.D.C. 1991) ...................................................................................................................... 11, 30

*Palmer v. Rice*, 231 F.R.D. 21 (D.D.C. 2005) ............................................................................ 12

*Shillitani v. United States*, 384 U.S. 364 (1966)......................................................................... 11

*Swann v. Chartlotte-Mecklenburg Bd of Educ*, 403 U.S. 1 (1974).............................................. 10

*United States v. Baltimore Police Dep't*, 17-cv-0099, Dkt # 2-2 (D. Md. Jan. 12, 2017)............ 23

*United States v. City of New Orleans*, 12-CV-1924, Dkt# 159-1 (E.D. La. Jan 11, 2013) .......... 22

*United States v. City of Newark,* 16-CV-1731, Dkt # 4-1 (D.N.J. April 29, 2016) ...................... 22

*United States v. Lopez*, 415 F. Supp. 3d 422 (S.D.N.Y.  Nov. 13, 2019)..................................... 17

*United States v. Visa USA, Inc.*, 98 Civ. 7076, 2007 WL 1741885 (S.D.N.Y. June 15, 2007) ............................................................................................ 11, 30

*Vulcan Society, Inc. et al. v. City of New York*, No. 07-CV-2067, 2013 WL 4042283 (E.D.N.Y. June 6, 2013) ....................................................................................................... 22

*Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) .................................................... 11

**Statutes**

N.Y.C. Admin. Code § 3-108 ........................................................................................... 14

**Other Authorities**

*AG James Calls on the NYPD to Ensure Equal Social Distancing Enforcement in NYC Communities*, N.Y. STATE OFFICE OF THE ATT'Y GEN. (May 13, 2020) .................................. 26

Centers for Disease Control, *COVID-19 in Correctional and Detention Facilities — United States, February–April 2020* (May 6, 2020) ............................................................................. 25

Tweet: Hakeem Jeffries questioning disparate enforcement across New York neighborhoods, @RepJeffries, Twitter (May 5, 2020) ..................................................................................... 26

Jarrett Murphy, *Eric Adams Says Cops Should Not Enforce Social Distancing*, CityLimits (May 7, 2020) ............................................................................................................................ 26

John Annese, *Medical professionals, reform advocates ask NYPD to cool it with arrests because officers may spread coronavirus,* The Daily News (Apr. 23, 2020) ........................................ 26

Jonathan Shaw, *COVID-19 May Be Much More Contagious Than We Thought,* Harvard Magazine (May 13, 2020) ................................................................................................... 27

Josiah Bates, *'We Cannot Police Our Way Out of a Pandemic' Experts, Police Union Say NYPD Should Not Be Enforcing Social Distance Rules Amid COVID-19*, Time ................................ 26

Legal Aid Society, *Racial Disparities in NYPD's COVID-19 Policing: Unequal Enforcement of 311 Social Distancing Calls* (May 2020) .......................................................................... 5, 17

Letter from Scott M. Stringer, New York City Comptroller, to Mayor Bill de Blasio, Re: Request for Information on Enforcement of Social Distancing (May 22, 2020) ...................................... 5

N.Y. Executive Order No. 202.17: *Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency* (Apr. 15, 2020) ................................................................ 13

NYS Department of Health, *New York State on PAUSE*, (March 22, 2020) ................................ 13

Office of the Inspector General, *Complaints of Biased Policing* (July 2019) ...................... 19, 24

Plaintiffs respectfully submit this memorandum of law in support of their emergency motion for an Order to Show Cause directing the Defendant City of New York (the "City") and its agency, New York City Police Department (the "NYPD") to show why an order should not be entered (1) declaring the City in violation of the Court's Liability Ruling (Dkt # 373), Remedial Order (Dkt # 372), and August 24, 2015 Order (Dkt # 517) in *Floyd v. City of New York*; (2) compelling the City to produce discovery Plaintiffs have requested concerning the NYPD enforcement of social distancing directives; (3) mandating expedited investigation of police practices relating to investigative encounters, stops, frisks, searches, summons and arrests during the COVID-19 pandemic; and (4) temporarily enjoining the NYPD from enforcing the City's and the State's social distancing directives.

## PRELIMINARY STATEMENT

In recent weeks, New York City has become a global epicenter for COVID-19, with dramatically disproportionate and devastating health and economic consequences for Black and Latinx New Yorkers. At the same time, viral social media videos have emerged showing police misconduct in the enforcement of social distancing directives against Black and Latinx people. Publicly available information also shows differing treatment along racial lines with respect to NYPD's COVID-19 policing. This includes statistical evidence of stark racial disparities in the NYPD's COVID-19-related policing, including 81% of social distancing summonses being issued to Black and Latinx people– a rate nearly identical to the racial disparity in stops that led to this Court's 2013 finding that the NYPD engaged in widespread and systemic Equal Protection violations in *Floyd* – and for which there does not appear to be any plausible race neutral explanation  Publicly available pictorial and video evidence also show NYPD officers encouraging white residents navigating COVID-19 restrictions in the City but, in contrast,

treating Black and Latinx individuals with threats, force, and violence.  Preliminary evidence also indicates that social distancing encounters of Black and Latinx people are pretexts for more invasive law enforcement conduct.

The NYPD's social distancing enforcement practices are subject to the requirements of the Court's orders in *Floyd* because COVID-19 policing falls within the *De Bour* framework for police investigative encounters of pedestrians, *see People v. De Bour*, 40 NY2d 210 (1976). As such, merely observing people gathering or individuals lacking masks is inadequate to establish probable cause, given significant exceptions embedded in the COVID-19 directives. Thus, NYPD investigative street encounters in its COVID-19 policing are paradigmatic *Terry* stops, *see Terry v.* Ohio, 361 U.S. 1 (1968), squarely within the Court's jurisdiction.

This information raises serious and concrete concerns that, in direct violation of this Court's Liability and Remedial Orders entered in *Floyd*, the NYPD's Court-approved racial profiling policy, and the Fourth and Fourteenth Amendments, the NYPD continues to impermissibly discriminate in investigative street encounters. NYPD's discriminatory practices expose Plaintiff Classes to daily, escalating harm. The NYPD's refusal to share information about its policies or practices, or to respond to Plaintiffs' requests, creates an urgent need for clarity and transparency for class members in advance of the summer season and a likely "second wave" of COVID-19 infection.

## STATEMENT OF FACTS

Since the beginning of this pandemic, Black and Latinx New Yorkers have experienced disproportionate NYPD social distancing enforcement,[1] often involving the use of force and/or

---

[1]    As used throughout, the term, "COVID-19 Policing" or "NYPD enforcement of social distancing" are intended to include all policing activity related to the COVID-19 pandemic, including but not limited to social distancing directives, mask requirements, shelter in place and stay at home restrictions, as well as police encounters,

significant restraints to their liberty Between March 16 and May 5, 2020, 81 percent of NYPD summonses for social distancing violations were issued to Black and Latinx persons. One of them was 51-year old Steven Merete, a Latinx man from the Bronx. On April 28, 2020, Mr. Merete was outside his building with two other people when the police arrived and yelled at everyone to leave pursuant to social distancing directives and then immediately started detaining, handcuffing, and using force against people. Ex. 3, Merete Decl. ¶ 3.   Merete was picked up, thrown to the ground, punched in the chest, handcuffed, and detained for 24 hours before being released with a summons for disorderly conduct and resisting arrest. *Id*.

In addition, data recently released by the Brooklyn District Attorney's Office revealed that more than 97% of all social distancing-related arrests made by the NYPD in Brooklyn between March 17 and May 4, 2020, were of Black and Latinx individuals. Day Decl. ¶ 15. According to media coverage, one of these people was a Black man in Brownsville. A video of his arrest went viral, showing him walking slowly up the street when the police ran up on him, grabbed him by the throat, tackled him to the ground, and handcuffed him. Day Decl. ¶ 22. Another was a 37 year-old Black woman, arrested during the last weekend of March. She and her boyfriend were in the Bedford-Stuyvesant neighborhood of Brooklyn when she was approached by a large group of officers and ordered to leave the area. Before they could leave, the officers escalated the encounter, pepper-spraying two nearby people as a crowd of onlookers gathered. Even though they were not part of the group who the officers appeared to be dispersing, they were both arrested.   Day Decl. ¶ 16. Public reports reveal that, on May 13, 2020, Kaleemah Rozier was in the Atlantic Avenue subway station with her five-year-old son. Day Decl. ¶ 31. Their masks were pulled down to their chins as they climbed the stairs. *Id.* When stopped, she

---

stops, searches, and frisks arising from or implicating any restrictions to liberty or other rights because of the COVID-19 pandemic.

expressed annoyance at the interruption and tried to walk away, but she was followed, tackled, handcuffed, and arrested in the presence of her son. *Id*.

It is also clear that these social distancing enforcement actions often commence as and/or otherwise involve *Terry* stops, frisks, and searches. On April 4, Crystal Pope saw NYPD officers dispersing a group of adolescent Black boys pursuant to social distancing directives in Hamilton Heights and thereafter saw them walking into an apartment building. Ex. 2, Pope Decl. ¶ 3. After vacating the area, two boys entered the same building. *Id.* A uniformed officer turned and lifted the boy by the neck, choking him, and as she entered the same apartment building, an officer immediately maced her. *Id*. ¶ 5. Others were stopped by police while using the public transit system and asked to prove their status as "essential workers." Ex. 1 CPR Decl. ¶16. On May 2, 2020, Malik Harris was standing in the courtyard of his public housing complex with a mask in his hand when police approached him, referenced a social distancing violation, and arrested him. Ex. 4, Harris Decl. ¶¶ 2, 6.  At central booking, he was housed with over twenty men, without masks, soap, or hand sanitizer, in the 24 hours preceding arraignment and he spent 3 weeks on Rikers in parole revocation proceedings, housed in a crowded dorm with over fifty men and only one mask. Ex. 4, Harris Decl. ¶¶ 6-9. In all cases, some or all NYPD officers involved failed to wear masks, gloves, or other personal protective equipment to protect the public from infection. Ex. 4, Harris Decl. ¶¶ 3.

The stark racial disparities in NYPD social distancing enforcement cannot be explained by plausible race-neutral factors.  The Legal Aid Society issued a Report analyzing data on citizen complaints to the City's 311 System between March 28 and May 12, 2020, concerning social distancing violations, the NYPD's COVID-19 related summonses between March 16 and May 5, and internally-tracked COVID-19 related arrests. It found, among other things

4

- NYPD responses to 311 complaints for social distancing violations in majority Black or Latinx precincts are at least 2 times more likely to result in a summons or arrest than NYPD responses to those complaints in non-Black or Latino majority precincts, most of which are majority white.

- While slightly less than half (46.2%) of the 32,293 social distancing-related 311 complaints concerned violations in majority Black and Latino precincts, more than 78% of all known NYPD social distancing-related arrests and summonses for which the Legal Aid Society was able to identify a precinct were made in majority Black and Latino precincts.

- Conversely, while more than 53% of all social distancing-related 311 complaints came from precincts that are not majority Black or Latinx, less than 22% of all social distancing arrests and summonses for which the Legal Aid Society was able to identify a precinct took place in those precincts.

- While four of the five precincts receiving the most social distancing complaints through 311 were in precincts that are not majority Black or Latinx, four of the five precincts with the most COVID-19 related arrests and summonses—and 18 of the 20 precincts with the highest rates of such arrests and summons per 10,000 people—were in majority Black and Latinx precincts. [2]

The New York City Comptroller's office released similar findings, including that:

> the NYPD is reported to have taken action, including issuing summonses, making arrests, on a larger share of 311 complaints in lower-income communities of color while being more likely to conclude that no action was needed in whiter, more affluent neighborhoods of the city.[3]

In stark but predictable contrast, in white neighborhoods, irrespective of affluence, the NYPD generally chooses not to enforce social distancing, let alone issue summons, despite large gatherings and persistently crowded parks, bars, and religious schools or ceremonies. Day Decl.

---

[2]     *See* the Legal Aid Society, *Racial Disparities in NYPD's COVID-19 Policing: Unequal Enforcement of 311 Social Distancing Calls*, (May 2020).

[3]     Letter from Scott M. Stringer, New York City Comptroller, to Mayor Bill de Blasio, Re: Request for Information on Enforcement of Social Distancing (May 22, 2020).

¶¶ 32-39. *Cf. Floyd* Liab. Op., (Dkt. #373 at 183) ("Racial profiling constitutes intentional discrimination in violation of the Equal Protection Clause if it involves . . . the application of facially neutral criminal laws or law enforcement policies in an intentionally discriminatory manner.") (citations omitted).

The NYPD's discriminatory policing practices add insult to the catastrophic public health injury disproportionately impacting Black and Latinx communities. As predicted by experts on the social determinants of health, and as a result of structural and intersectional racism, Black and Latinx communities in New York City have experienced far greater rates of infection, greater severity of illnesses, and significantly increased fatalities. Day Decl. ¶¶ 3, 5. As "essential workers," these communities have also consistently been asked to bear the greatest risk and sacrifice in the pandemic. Day Decl. ¶ 4. Nevertheless, in heavily impacted communities, NYPD has not employed reasonable safeguards in their enforcement of social distancing to protect the health and safety of Black and Latinx New Yorkers. Day Decl. ¶¶ 10, 13. Police officers conducting NYPD enforcement of social distancing often fail to wear masks, gloves, or other protective equipment to ensure they do not infect citizens. Day Decl. at ¶ 11.

**PROCEDURAL HISTORY**

**A.  The Court's Prior Orders**

On three prior occasions in this case, the Court has issued orders explaining how the NYPD's targeting and treatment of Black and Latinx pedestrians during investigative street encounters violated the Equal Protection Clause of the Fourteenth Amendment and specifying the changes that the NYPD has to make to bring its stop-and-frisk practices into constitutional compliance. First, in its August 2013 Liability Opinion (*Floyd* Dkt # 373), the Court found, *inter alia*: (1) the NYPD carried out more investigative street encounters where there are more Black

and Latinx residents, even when other relevant variables were held constant; (2) NYPD officers were more likely to stop Black and Latinx pedestrians, even in predominantly white neighborhoods and even after controlling for other relevant variables; (3) NYPD officers were more likely to use force against Black and Latinx pedestrians, even after controlling for other relevant variables; (4) NYPD officers stopped Black and Latinx individuals with less justification; (5) Black pedestrians were about 30% more likely than White pedestrians to be arrested (as opposed to receiving a summons) after a stop for the same suspected crime, were subject to more law enforcement action, even after controlling for other relevant variables; and (6) the *de facto* policy of targeting "the right people" involved  disproportionately stopping members of racial groups heavily represented in the NYPD's crime suspect data and led to stops of Black and Latinx pedestrians who would not have been stopped if they were White. (Dkt # 373 at 58-60, 81-88, 183-84).

The Court recognized that the Fourteenth Amendment prohibits law enforcement action that is motivated, in part, by race, even if race was not "the sole, predominant, or determinative factor." *Id*. at 183-84. The Court also emphasized that the NYPD's racially disparate stops violated Equal Protection even if supported by reasonable suspicion because "the Constitution prohibits *selective* enforcement of the law based on considerations such as race" and "the targeting of certain races *within* the universe of suspicious individuals is especially insidious, because it will increase the likelihood of further enforcement actions against members of those races as compared to other races." *Id*. at 183-84, 191-92 (emphasis included). Finally, the Court found that "senior officials in the City and at the NYPD ha[d] been deliberately indifferent to the discriminatory application of stop and frisk at the managerial and officer level," as evidenced by those senior officials, including then-NYPD Commissioner Raymond Kelly and Mayor Michael

Bloomberg, "adopt[ing] an attitude of willful blindness toward statistical evidence of racial

disparities in stops and stop outcomes" and defending such disparities by invoking racial

disparities in crime suspect data. *Id*. at 190 n.776.

Second, in its August 2013 Remedial Order (Dkt # 372), the Court held that eradicating

selective enforcement, i.e., "eliminating the threat that Blacks and Hispanics will be targeted for

stops. . . even when there is reasonable suspicion," was "an important interest" justifying

permanent injunctive relief as to the NYPD's stop-and-frisk policies and practices. (Dkt # 372 at

4).  The Court ordered the City, in consultation with the court-appointed Monitor and *Floyd*

Plaintiffs, to develop, submit, and upon Court approval, *implement* a new policy on racial

profiling that prohibits use of a civilian's race as a motivation or justification for a stop except

when the person fits a specific and reliable description of a criminal suspect.  *Id*. at 14, 17.

Third, on August 24, 2015, the Court approved the NYPD's Revised Patrol Guide

Section 203-25, the Department's new Policy Prohibiting Racial Profiling, which provides that:

> Race, color, ethnicity, or national origin may not be used as a motivating factor for
> initiating police action. When an officer's decision to initiate enforcement action against
> a person is motivated even in part by a person's actual or perceived race, color, ethnicity
> or national origin, that enforcement action violates Department policy unless the officer's
> decision is based on a specific and reliable suspect description that includes not just race,
> age, and gender, but other identifying characteristics or information.

*Floyd* (Dkt # 517 at 5, 21).  As the Monitor has acknowledged, the NYPD is required to adhere

to this policy in practice. *See Floyd* (Dkt # 372 at 14); (Dkt # 536) (Monitor's 4th Status Rpt) at

8; (Dkt # 576) (Monitor's 7th Status Rpt) at 8-9; (Dkt # 680-1) (Monitor's 9th Status Rpt) at 8-9;

(Dkt # 754) (Monitor's 10th Status Rpt) at 15-16.

Moreover, pursuant to the Court-ordered settlement in *Davis v. City of New York*, the

NYPD Patrol Guide 212-60—which governs interior patrols of New York City Housing

Authority ("NYCHA") residences—makes clear that NYPD officers must "perform[] interior

patrols . . . in a manner that respects the rights of Housing Authority residents and guests."

Stipulation of Settlement and Order, endorsed by Court on Feb. 4, 2015, Ex. C, *Davis*, (Dkt.

#329-1 at 2); *see also* Monitor's Recommendation, approved by this Court on June 2, 2016, at

20, Attach. 3, *Davis*, #359. The related training of NYPD Housing Bureau officers, also

approved by this Court, further emphasized that because officers "are in people's homes," they

must "[t]reat [residents] with courtesy and respect. Treat people the way you would want you

and your guests to be treated in your home." Monitor's Recommendation Regarding Training

Materials for Housing Bureau Members, dated May 28, 2016, *Davis*, 464-1 at 16; Court

Approval of Monitor's Recommendation Regarding Training Materials for Housing Bureau

Members, dated May 29. 2016, *Davis*, (Dkt. #465). Thus, unduly stopping, searching, frisking,

issuing summons, arresting and/or using excessive force on NYCHA residents or guests, who are

overwhelmingly Black or Latinx,[4] would be anathema to this Court's orders. Indeed, the

NYPD's discriminatory and illegal conduct regarding the enforcement of social distancing is

even more egregious when it takes place in the homes of Black and Latinx public housing

residents, where they are required to shelter in place.

**B. NYPD Has Refused Plaintiffs' Requests for Information Regarding NYPD Enforcement of Social Distancing**

On April 22, 2020, Plaintiffs sent an email to NYPD Deputy Commissioner of Risk

Management Jeffrey Schlanger, Counsel for the City, and the Monitor, requesting several

categories of materials and information related to the NYPD's social distancing enforcement

efforts, including:

> a. Any training or written guidance provided to NYPD personnel concerning enforcement of social distancing restrictions;

---

[4] As of January 1, 206, NYCHA residents are 45.6% Black and 44.5% Latinx. NYCHA Resident Data Summary, Special Tabulation of Resident Characteristics, https://www1.nyc.gov/assets/nycha/downloads/pdf/ Resident-Data-Summaries.pdf.

    b.   Information on how street encounters related to social distancing enforcement are documented and associated stop report, summonses, memo book entries and other NYPD documentation of such encounters;

    c.   A sampling of NYPD body camera videos of such social distancing enforcement-related encounters;

    d.   Information on supervisory instruction and review of NYPD officers' social distancing enforcement activity; and

    e.   Data on the number of summonses that have been issued stemming from street encounters involving any reference to social distancing enforcement.

*See* Day Decl. ¶¶ 52-53, Ex. 6.  After receiving no response for over two weeks, Plaintiffs followed up by email to the same recipients on May 8, 2020. *See id*. ¶ 56, Ex. 7.  This information was also verbally requested in two videoconferences hosted by the Monitor on April 29, 2020 and May 7, 2020. *Id.* ¶¶ 54-55. To date, Defendants have not produced any of the materials or information requested by Plaintiffs, nor has the Monitor responded to Plaintiffs' discovery requests.

## ARGUMENT

**I.    LEGAL STANDARDS GOVERNING THE POST-JUDGMENT REMEDIAL PHASE**

    **A. The Court Has Broad Equitable Authority to Issue Further Relief to Enforce and Ensure Compliance With its Prior Orders.**

Federal courts, by necessity, have broad equitable power and discretion to ensure compliance with their orders. *Hutto v. Finney*, 437 U.S. 678, 687 (1979) ("[F]ederal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced."); *Swann v. Chartlotte-Mecklenburg Bd of Educ*, 403 U.S. 1, 15 (1974) ("[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Benjamin v. Jacobson*, 172 F.3d 144, 157 (2d Cir. 1999) ("It is well established that a federal court ordinarily has the power to enforce its own orders and judgments."). "Ensuring compliance with a prior order is an equitable

goal which a court is empowered to pursue even absent a finding of contempt."[5] *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985).

Accordingly, a court has the authority to issue additional orders imposing additional remedial measures to enforce a prior injunction, as "equitable authority is broad, particularly where the enjoined party has not fully complied with the court's earlier orders." *Damus v. Wolf*, No. 18-578, 2020 WL 601629, *2 (D.D.C. Feb. 7, 2020) (internal quotations omitted); *Baez v. N.Y.C.H.A.*, 13 CV 8916, 2015 WL 9809872, at *2 (S.D.N.Y. Dec. 15, 2015) (issuing further orders to guarantee compliance with injunction); *see also Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 765 F. Supp. 1, 13 (D.D.C. 1991) (same). As with an initial injunction, the further relief must be "narrowly tailored to remedy the specific harm." *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976) *see also United States v. Visa USA, Inc.*, 98 Civ. 7076, 2007 WL 1741885, *14 (S.D.N.Y. June 15, 2007) (additional relief imposed as remedy for defendant's violation of original judgment was "narrowly tailored to the purpose of giving present and prospective effect to [that judgment]").

The court's actions to enforce its prior orders in *Handschu v. Police Department of the City of New York*, 219 F. Supp. 2d 388 (S.D.N.Y. 2016), is illustrative of this Court's obligation to investigate and enforce its prior orders in this case. In *Handschu*, a 1971 filing where class members challenged surveillance practices of the NYPD as First Amendment violations, resulted in a court-ordered consent decree in 1985 and agreed constitutional procedures set forth in the Handschu Guidelines. Forty years after the suit began, and over 25 years after the injunction was

---

[5]     The Court's power to enforce its orders includes the inherent power to find a party in contempt for violations of prior orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793 (1987) ("It is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders"). While Plaintiffs believe a contempt finding against the City may be warranted here, they have chosen, in light of the emergent public health crisis and in the interests of judicial economy, to forego a contempt motion and instead ask the Court to impose other measures that are well within its power in order to cure the City's non-compliance with its prior orders.

ordered, class members learned from news reports in 2011 that the NYPD appeared to be engaged in a program of suspicionless surveillance of Muslim persons in violation of the 40-year old injunction. *Id*. at 391 Class members sought discovery and enforcement of the injunction's terms from the same district court.  *Id*. at 391-93. That enforcement action resulted in a substantial modification of the injunction's terms to ensure protection of religious association. *Handschu v. Police Dep't of the City of New York*, 241 F. Supp. 3d 433 (S.D.N.Y. 2017).

Similarly, in *Hutto v. Finney*, the district court found that its prior order failed to prevent continued Eighth Amendment violations in Arkansas' use of punitive isolation in prisons, and issued a subsequent order categorically barring punitive isolation for more than 30 days. The Supreme Court upheld this order as a narrowly-tailored exercise of the district court's enforcement powers, ruling that the district court "had ample authority to go beyond earlier orders and to address each element contributing to the violation" of which individuals' lengthy stays in isolation was one. 437 U.S. at 686-87.

### B. The Courts' Powers to Enforce Their Prior Orders Necessarily Include the Authority to Order Discovery Needed to Assess Defendants' Compliance

A federal court's broad inherent power to enforce its prior judgments also includes the power to order discovery requested by a prevailing plaintiff "to aid the court in determining whether [the defendant] had complied with a judgment in [plaintiff's] favor." *Cal. Dep't of Social Serv's v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008); *see also Palmer v. Rice*, 231 F.R.D. 21, 25 (D.D.C. 2005) (permitting "post-judgment discovery" where the "plaintiffs will not be able to determine whether the government has complied with the court's injunctions"); *Campaign for S. Equal. v. Bryant*, 197 F. Supp. 3d 905, 914 (S.D. Miss. 2016) ("plaintiffs are entitled to reasonable discovery to enforce an injunction against the parties bound by that injunction"). "Appropriate discovery should be granted where 'significant questions regarding

12

noncompliance [with a court order] have been raised.'" *Abdi v. McAleenan*, No. 1:17-CV-00721 EAW, 2019 WL 1915306, at *2 (W.D.N.Y. April 30, 2019) (authorizing discovery requests, including depositions regarding possible violations of the preliminary injunction) (internal citations omitted)(internal citation and quotations omitted); *Leavitt*, 523 F.3d at 1033-34 (applying "significant questions" standard in ordering discovery to plaintiff necessary to determine if defendant had violated permanent injunction)

## II.    NYPD SOCIAL DISTANCING ENFORCEMENT ACTIVITIES ARE SUBJECT TO THE COURT'S PRIOR ORDERS IN FLOYD

The NYPD's social distancing enforcement practices are subject to the requirements of the Court's orders in *Floyd* because COVID-19 policing falls within the *De Bour* framework for police investigative encounters of pedestrians. In most cases, police officers should investigate possible non-compliance with social distancing restrictions as Level 1, 2, or 3 investigative encounters, under *De Bour*.

Officers who merely observe what appear to be violations of the social distancing restrictions, e.g., a group of men standing within six feet of each other or unmasked on a sidewalk, do not automatically have probable cause to arrest or issue a summons. In part, this is because City and State social distancing restrictions embed important, but perhaps imperceptible, exceptions such as the exception to the mask requirement for individuals who cannot "medically tolerate a face-covering" and the exception to social distancing requirements for medical and other essential workers. *See e.g.,* NYS Department of Health, *New York State on PAUSE*, (March 22, 2020), N.Y. Executive Order No. 202.17: *Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency* (Apr. 15, 2020). Thus, at most, police officers may approach, temporarily detain, and question an individual to confirm or defeat their suspicion of a violation of the executive orders, a misdemeanor under

City law. *See* N.Y.C. Admin. Code § 3-108 (classifying violations of the Mayor's emergency executive orders as Class B misdemeanors). This kind of street encounter is a paradigmatic example of a pedestrian *Terry* stop, or Level 3 *De Bour* encounter, i.e., a forcible detention by a police officer of a civilian on the street, based on the officer's suspicion that the civilian committed a crime, the purpose of which is to confirm or defeat the officer's suspicion.

## III.   EVIDENCE SHOWS COVID-19 POLICING MIRRORS STOP-AND-FRISK PRACTICES FOUND TO BE UNCONSTITUTIONAL BY THE *FLOYD* COURT

The Court has ordered the NYPD to eradicate policies and practices that tolerate, license, and facilitate racial discrimination. NYPD's enforcement of social distancing has involved racial profiling, selective enforcement, and pretextual stops similar to those found to have violated the Fourth and Fourteenth Amendments in the Court's Liability Opinion, Remedial Order, and August 2015 Racial Profiling Policy Order.  Having been found liable for racial discrimination in the conduct of stops, frisks, searches, and trespass investigations in communities and in public and private housing, *see Floyd* Liab. Op. (Dkt # 373) at 181-88, the NYPD must show that any racial disparities are unrelated to the Court findings of discriminatory practices and policies in order to be fully compliant with this Court's orders.

### A.  Racial Profiling in COVID-19 Policing Violates the Court's Order in *Floyd*

#### 1.   The Lack of Reasonable Suspicion or Justification in Many COVID-19 Stops of Black and Latinx Individuals Shows Racial Profiling Persists

In *Floyd*, the Court recognized Fourteenth Amendment violations in NYPD's greater number of stops in Black and Latinx communities, greater likelihood of stopping and/or use of force against Black and Latinx people, and practice of stopping of Black and Latinx people with less justification than for stops of whites. *Floyd* Liab. Op., (Dkt. #373 at 183). Today, reports of use of force in enforcement of social distancing have predominated among Black and Latinx

persons only. *See* Ex. 2, Pope Decl. ¶ 4 (after NYPD dispersed a group of Black kids, Ms. Pope observed a uniformed officer choking one child and was immediately pepper sprayed when she went to enter the building); Ex. 3, Merete Decl. ¶ 3 (police approach and immediately slammed him to the ground, punched, handcuffed, and arrested him).

In several cases, people were stopped with little or no apparent justification. Day Decl. ¶¶ 22, 23, 24-25. These situations frequently started with social distancing and then escalated to stops and the use of force against bystanders. Day Decl. at ¶¶ 23, 25. At times, police seemed to target people who are intentionally video recording police stops of Black and Latinx persons and the use of force in COVID-19 policing, like Hawk Newsome, the head of Black Lives Matter Greater New York. Day Decl. ¶ 24.

Even the posture of the police toward the community is discernibly different in majority Black and Latinx communities.  For example, the NYPD patrol car broadcasting COVID-19 public service announcements in Soho and Nolita offers a friendly "reminder" to maintain a safe distance in public places, and "Please help us keep you safe, thank you for your cooperation." Day Decl. ¶ 57.  In Queensbridge, however, the PSA used by the NYPD against people in the courtyard of their own homes threatens arrest: "This gathering is unlawful and you are ordered to disperse. If you fail to disperse immediately, you are subject to arrest."" Day Decl. ¶ 27. *Cf. Floyd* Rem. Ord., (Dkt. #372 at 29) ("If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful"). *Compare*  Court Approval of Monitor's Recommendation Regarding Training Materials for Housing Bureau Members, dated May 29. 2016, *Davis*, (Dkt. #465) (NYPD Housing Bureau training, approved by the Court, which emphasizes that officers must "[t]reat [residents] with courtesy and respect,"

and instructs officers to "Treat people the way you would want you and your guests to be treated in your home.").

## 2. The Court Has Already Ruled That the Use of Crime Suspect Data Cannot Justify Racial Disparities in Stops

In the *Floyd* remedial process, the NYPD claimed to have curbed its practices of focusing on "the right people," a racial dog whistle for the over-policing of Black and Latinx communities and principal rationale for racial profiling advanced by NYPD at trial, and ruled unconstitutional by the *Floyd* court. Yet, recently, and despite this Court's ruling, NYPD leadership publicly invoked the race of those suspected of committing crime in the area, i.e., crime suspect data, to justify, defend, and attempt to deny racial profiling. Yet, as the court held at trial, the NYPD's attempt to "refute the allegation of racial profiling in fact provides evidence of racial profiling." *Floyd* Liab. Op., (Dkt. # 373 at 58).

During the COVID-19 crisis, public demand for data on racial disparities in NYPD enforcement of social distancing grew once viral videos of police misconduct began circulating on social media. NYPD initially delayed releasing statistics of its enforcement of social distancing, but then began promoting a statistic that 90% of those arrested for actual crime during the COVID-19 pandemic were Black or Latinx.  Day Decl. at ¶ 46. *Cf. Floyd* Liab. Op., (Dkt. #373 at 181) (Fourteenth Amendment violated by "NYPD's policy of conducting stops based in part on criminal suspect data, of which race is a primary factor;"), *id.* at 13 ("[T]he City adopted a policy of indirect racial profiling by targeting racially defined groups for stops based on local crime suspect data."). NYPD leadership's implication that the race of crime suspects justifies racially discriminatory policing and racial disparities in stops in Black and Latinx communities offers the Court direct evidence of ongoing violations of the Court's prior orders in

*Floyd*.  As at trial, the City's "defense *against* the charge of racial profiling… is [instead] a defense *of* racial profiling." *Floyd* Liability Order, (Dkt. #373 at 56) (emphasis in original).

### B.  Selective Enforcement of the Law in COVID-19 Policing Directly Violates the Court Order

The *Floyd* court found selective enforcement of the law in the pervasive targeting of Black and Latinx people for stops, frisks, and searches. Today, despite widely reported persistent crowds of white New Yorkers in parks and elsewhere, Day Decl. at ¶¶ 13, the overwhelming majority of NYPD's social distancing stops have been conducted against Black and Latinx persons. Day Decl. at ¶ 9. This is true even though the majority of citizen complaints to the police for social distancing violations have been in precincts that are not majority-Black and Latinx.  *See* the Legal Aid Society, *Racial Disparities in NYPD's COVID-19 Policing: Unequal Enforcement of 311 Social Distancing Calls*, (May 2020). Selective enforcement of the law involves (1) differential treatment from 'similarly situated' others; (2) based on "impermissible considerations such as race…." *See Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011). This standard requires that a reasonable person would find the comparators roughly equivalent, or similarly situated to the plaintiffs in all material respects. *See Louis v. Metro. Transit Auth.,* 145 F. Supp. 3d 215, 227 (E.D.N.Y. 2015); *United States v. Lopez*, 415 F. Supp. 3d 422, 427 (S.D.N.Y.  Nov. 13, 2019) ("where a [party] who is a member of a protected group can show that that group has been singled out … to a statistically significant extent in comparison with other groups, this is sufficient to warrant further inquiry and discovery.").

Critically, the possibility that officers have reasonable suspicion or probable cause to stop, issue summonses and/or arrest any of the Black and Latinx individuals targeted by their social distancing enforcement does not obviate concerns about violation of their Fourteenth Amendment rights. The *Floyd* court specifically emphasized that the City and the NYPD's belief

17

that reasonable suspicion somehow neutralizes concerns about racial profiling was simply wrong. "The Equal Protection Clause's prohibition on selective enforcement means that suspicious blacks and Hispanics may not be treated differently by the police than equally suspicious whites." *Floyd* Liab Op. (Dkt # 373 at 191-92); *see also Floyd* Liab. Op., (Dkt. #373 at 190) (this position is "fundamentally inconsistent with the law of equal protection and represents a particularly disconcerting manifestation of indifference").

Thus, *even if* all Black and Latinx persons stopped were failing to properly socially distance, *Floyd* nevertheless clearly prohibits selectively choosing Black and Latinx people for law enforcement activity. *Id* ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race . . . plaintiffs' racial discrimination claim does not depend on proof that stops of blacks and Hispanics are suspicionless."). Selective enforcement is a significant concern in COVID-19 policing. For example, and consistent with public information showing racial disparities in COVID-19 policing, on May 3, 2020, one woman biking in Red Hook observed NYPD officers enter a park where multiple families were congregated, but dispersed the only Black family in the park. Ex. 5, Reese Decl. ¶ 3-5

Finally, the contrast between the absence of NYPD enforcement of social distancing in crowded parks, synagogues, and bars frequented by white persons, with few exceptions, adds urgency and credence to current concerns of racial profiling. A key concern of the *Floyd* Court was that "[i]f the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful." *Floyd* Remedial Order, (Dkt. #372 at 29).[6]

---

[6]    Indeed, prosecutors have declined to prosecute these social distancing cases, Day Decl. at ¶ 42, which is a welcome development, but raises questions about the efficacy of the NYPD's practices that leaves police misconduct unsupervised and unregulated as NYPD has declined to provide data, reporting, and information relating to its enforcement of social distancing. In addition, selective enforcement of the law is often apparent to Black and Latinx people during a police encounter or stop, including during the COVID-19 pandemic. Day Decl. ¶ 25; Ex. 2, Pope Decl. ¶ 6 .

### C.  The NYPD is Exhibiting Similar Deliberate Indifference to Racial Discrimination in its COVID-19 Policing as in *Floyd*

The NYPD has defended the obvious racial disparities in its COVID-19 policing by denying the *even the possibility* of discrimination, including by referencing the racial diversity on the force. *See* Day Decl. at ¶ 48 (NYPD commissioner states, "I will push back strongly on any notion… that this is "racist police." I think this could not be anything further from the truth. Let's remember, we are a minority-majority police department – fact."); *But see* Office of the Inspector General, *Complaints of Biased Policing*, 29-30 (July 2019) (finding racial profiling complaints improperly closed based on NYPD's erroneous belief that a police officer cannot racially profile a person of the same race).

This diversity proposition – which was similarly true during the timing of the *Floyd* trial – is still wholly irrelevant to evaluating the possibility of racial discrimination and only suggests continued deliberate indifference by the NYPD. *Cf. Floyd* Liab. Op., (Dkt. #373 at 189-90) (NYPD's disregard of ample notice of racial discrimination reflects "an attitude of willful blindness toward statistical evidence of racial disparities in stops and stop outcomes"). In addition, Commissioner Shea suggested videos of police misconduct were taken out of context and that video evidence of racially biased policing was a myth created by the media.  *See* Day Decl. at ¶ 43 ("I would urge caution to everyone now... before it's turned into an agenda for a press conference."). This, too, exhibits willful blindness.  *See Floyd* Liab. Op., (Dkt. #373 at 190-91) (finding willful blindness by senior NYPD officials toward racial disparities and that "*this indifference was further demonstrated by many officials' apparent belief that racial profiling is a myth created by the media*.") (emphasis added); *see also* Day Decl. ¶ 47 (after reviewing viral video, NYPD commissioner defends officer conduct, claims punching is not excessive force).

19

**D.  COVID-19 Policing Reprises Fourth Amendment Violations Identified in Floyd**

As in *Floyd*, the intentional and unjustified targeting of Black and Latinx individuals in COVID-19 policing also leads to violations of the Fourth Amendment, as well as dehumanization and violence.  Indeed, in some cases, dispersal of groups has led to individuals being choked, slammed to the ground and punched by officers, and pepper sprayed.  *See e.g.,* Ex. 2, Pope Decl. ¶¶ 4-6; Ex. 3, Merete Decl. ¶¶ 3-4; Ex. 1, CPR Decl. ¶¶ 16, 19. In other cases, people were stopped by the police and asked to prove their status as essential workers, which is not required by law but nevertheless indicates to the person they are not free to leave. Ex. 1 CPR Decl. ¶ 16. In one viral video, Kaleemah Rozier tried to leave police seeking to enforce a mask violation, and was subject to a violent takedown and arrest, in front of her five-year old son.  Day Decl. ¶ 31. In many cases, NYPD officers, engaged in a stop of one person or group, ultimately redirect the enforcement of social distancing toward a person recording the stop. Day Decl. ¶¶ 25. In other cases, people experienced excessive restraints on their liberty during police stops that did not originate with individualized reasonable suspicion. Ex. 3, Merete Decl. ¶ 2; Ex. 1, CPR Decl. ¶ 15.

Several people reported COVID-19 policing experiences that were similar to those labeled unconstitutional by the trial court. Ms. Pope's experience of an illegal stop, escalation to force, including pepper spray, Ex. 2, Pope Decl. ¶¶4-5, mirrors that of Plaintiff Almonor at the *Floyd* trial, who was stopped by plainclothes officers and immediately frisked and handcuffed in what the court deemed was a violation of Almonor's rights under the Fourth Amendment.  *See Floyd* Liab. Op., Dkt. #373 at 127-28 ("The circumstances did not justify any restraint of Almonor's liberty, much less immediate physical restraint and the use of handcuffs").

Similarly, on April 28, 2020, Steven Merete was sitting in front of his apartment building when officers ordered people to disperse and then immediately began detaining people and using force. "They forcefully picked me up and slammed me in the ground. I was punched in the chest." Ex. 3, Merete Decl. ¶ 3. This fact pattern is similar to one in the *Floyd* trial, held to violate the Fourth Amendment. *See Floyd* Liab. Op., (Dkt. #373 at 122-23) (officers who exited unmarked police car, pushed Plaintiff Downs to the ground lacked adequate grounds for the stop and frisk)

In addition, as in *Floyd*, the use of social distancing enforcement as a pretext for racialized independent law enforcement action is illegal. *See* Floyd Liab Op at 181-82. As set forth in the declarations accompanying this motion, individual declarants experienced street encounters with NYPD officers that began under the auspices of social distancing enforcement but proceeded to temporary forcible detentions, *see* Ex. 2, Pope Decl. ¶¶ 3-5 (describing escalation of social distancing encounter into violent *Terry* stop unrelated to social distancing), Ex. 4, Harris Decl. ¶ 6, for criminal law enforcement purposes unrelated to social distancing enforcement. These encounters closely resemble those experienced by the named Plaintiffs and testifying Plaintiff class members at the *Floyd* trial.

## IV.   PLAINTIFFS ARE ENTITLED TO THE DISCOVERY THEY HAVE REQUESTED CONCERING NYPD SOCIAL DISTANCING ENFORCEMENT

At minimum, Plaintiffs have raised significant questions about whether the NYPD's social distancing enforcement efforts run afoul of the Court's prior rulings and injunctive directives regarding the use of race in law enforcement decision making, and the documents, data, and other materials Plaintiffs requested will provide information needed to resolve those questions. Specifically, NYPD officers' written reports, body-worn camera video recordings, and data on summonses and arrests issued as a result of social distancing enforcement-related

street encounters will provide: (a) important information on officers' reasons for initiating these encounters, (b) the racial breakdown of who is being subjected to the encounters, and (c) other relevant details about the encounters (e.g., time, date, and location, whether a frisk, search or use of force occurred, and the final outcomes of the encounter) relevant to assessing whether and how NYPD officers' social distancing enforcement activities run afoul of the Court's orders. Similarly, the requested NYPD written guidance, training materials, and supervisory review information will help Plaintiffs and the Court determine what steps, if any, the Department has taken to ensure that its officers conduct social distancing enforcement in a manner consistent with the requirements of the Court's prior orders and the Constitution.

The Court-appointed Monitor's ongoing role in overseeing and assessing the City's efforts to comply with the Court's Liability Opinion and Remedial Order in no way diminishes Plaintiffs' rights to the requested discovery. As representatives of the prevailing Plaintiff class, Plaintiffs and their counsel have an independent right and duty to monitor the City's compliance efforts to ensure that the injunctive relief awarded to the Class and court-ordered settlement benefiting is fully implemented. Recognizing this principle, federal courts have repeatedly afforded plaintiffs broad access to remedial-phase discovery notwithstanding the presence of a court-appointed monitor overseeing reforms to unconstitutional policies and practices of police departments and other municipal government agencies. *See*, *e.g.*, *United States v. City of New Orleans*, 12-CV-1924, Dkt# 159-1 ¶ 473 (E.D. La. Jan 11, 2013); *Vulcan Society, Inc. et al. v. City of New York*, No. 07-CV-2067, 2013 WL 4042283, *11 (E.D.N.Y. June 6, 2013); *Melendres v. Arpaio*, 07-CV-2513, 2013 WL 5498218, *36 (D. Ariz. Oct. 2, 2013), *aff'd and vacated in part on other grounds*, 784 F.3d 1254 (9th Cir. 2015); *United States v. City of Newark,* 16-CV-

1731, Dkt # 4-1, ¶ 202 (D.N.J.  April 29, 2016); *United States v. Baltimore Police Dep't*, 17-cv-0099, Dkt # 2-2, ¶ 485 (D. Md. Jan. 12, 2017).

Accordingly, Plaintiffs are entitled to the discovery they have requested.

**V.    THERE SHOULD BE A MORATORIUM ON NYPD SOCIAL DISTANCING ENFORCEMENT PENDING THIS COURT'S REVIEW OF THE MONITOR'S INVESTIGATION AND RESPONSES FROM ALL PARTIES**

This Court can, and should, intervene immediately to protect the plaintiff classes in this case and to ensure compliance with its prior orders by (1) directing the monitor to conduct an expedited investigation and evaluation of the NYPD's social distancing enforcement practices with consultation with all parties, including Plaintiffs (2) impose a temporary moratorium on NYPD social distancing enforcement pending the completion of that investigation and a determination by the Court about whether and under what circumstances the NYPD can conduct that enforcement constitutionally going forward.  The likelihood of serious, ongoing violations of class members' Fourth and Fourteenth Amendment rights counsels  the Court to temporarily suspend the NYPD's social distancing enforcement (in favor of that role being undertaken by ready-and-able community and non-NYPD City agencies) until an investigation and the protection of class members' rights can be assured.  Because of the NYPD's persistent denialism and deflection class members have no avenue to protect their rights other than the Court's intervention.  The risks associated with these constitutional violations are heightened, given the devastating, disproportionate impacts this public health crisis is having on Black and Latinx communities.

**A. The Context of NYPD Denialism with Respect to Ongoing Racial Discrimination Shows That Only Court Intervention Can Protect Rights, Health, and Safety of the Plaintiff Classes**

Plaintiffs' application is falls within the scope of the monitorship, but the urgency and the necessity of this Court's intervention is bolstered by a climate of denial and disregard of ongoing racial discrimination. The systemic failure to take racial discrimination seriously is evident in NYPD's denialism and self-exonerating excuses for racial profiling,[7] rapid escalation to use of force with Black and Latinx individuals, Day Decl. ¶ 24-25; Ex. 3, Merete Decl. ¶ 3, Ex. 2, Pope Decl. ¶ 5, and the ongoing public denials by NYPD leadership in the face of video evidence. These positions reflect not only the longstanding approach to racial discrimination at NYPD, but the barriers within NYPD to dismantling systemic discrimination. *Compare Floyd* Liab. Op., (Dkt. #373, at 178) ("Further evidence of deliberate indifference is found in the City's current positions as expressed at trial. The City continues to argue that *no* plaintiff or class member was subjected to an unconstitutional stop or frisk"). Absent judicial investigation and intervention Plaintiffs are held captive to NYPD's willful blindness.

Notably, this cavalier attitude toward ongoing racial discrimination is also consistent with persistent racial disparities and racial profiling in NYPD's low-level stops, summonses, and arrests. Recent data and reporting, indicating that 90% of arrests for jaywalking, fare evasion, and possession of small amounts of marijuana were of Black and Latinx people, demonstrates how selective enforcement of the law continues to drive discretionary stops and arrests. Day Decl. at ¶ 12. 91% of discretionary criminal summons were also issued to Black and Latinx people. *Id.* Acting consistently with misconduct already deemed unlawful at trial, and

---

[7]    *See* Office of the Inspector General, *Complaints of Biased Policing* (July 2019) (noting investigative inadequacies and that NYPD has not sustained a single instance of racial profiling since the *Floyd* trial, despite thousands of complaints filed)

evidencing nearly the exact same racial disparities, the NYPD and the City offer powerful

evidence that the NYPD continues its selective enforcement and racial profiling since trial.

**B.  Given the Heightened Risk of Infection from NYPD Interactions, Violations of the Court's Prior Orders Poses a Significant Threat to the Plaintiff Classes.**

Allowing the NYPD's discriminatory and abusive social distancing enforcement to

continue poses grave risks to the Plaintiff Classes' health and safety. NYPD itself has

experienced high COVID-19 rates among its personnel and is a source entity for transmission of

infection. *See* Centers for Disease Control, *COVID-19 in Correctional and Detention Facilities

— United States, February–April 2020* (May 6, 2020) ("Because staff members move between

correctional facilities and their communities daily, they might be an important source of virus

introduction into facilities.").  Considerable evidence indicates that NYPD enforcement of social

distancing has already led to widespread unprotected contact with officers lacking masks or

gloves, Ex. 4, Harris Decl. ¶¶ 3 (some officers not wearing masks or gloves), transfers to the

precinct and/or hospital, Ex. 3, Merete Decl. ¶¶ 5-6; Ex. 4, Harris Decl. ¶¶ 8-9 (transfer to

COVID-19 epicenter, Rikers Island, for parole revocation proceedings), Day Decl. ¶ 24 (Hawk

Newsome, head of BLMNY transferred to precinct and released with summons),  or potential

contact with ACS or child welfare authorities, Day Decl. ¶¶ 31. Those arrested for violations can

then be sent to crowded jails which are festering hotbeds of COVID-19 outbreak and suffering.

Thus, the attendant risk to these increased contacts can be fatal.

**C.  Public Health Officials, Elected Officials, and NYPD Rank-and-File Indicate NYPD Should Not Enforce Social Distancing Requirements, Suggesting No Reason to Risk Ongoing Violations of the Court's Orders in Floyd**

Increasingly, because of mounting evidence of racial discrimination, a broad base of

support exists to remove NYPD from enforcement of social distancing. Public health experts,

public officials and the police rank-and-file acknowledge the harm in continued NYPD

enforcement of social distancing. Community stakeholders and public officials[8] have called for any enforcement of social distancing to come from public health officials and community-based organizations, rather than police. Ex. 1, CPR Decl. ¶¶ 22-23. Notably, police officers themselves have decried the vague guidelines, mixed messages, and officer uncertainty that is pervasive in COVID-19 policing,[9] implicitly acknowledging the impact of the deliberate indifference of the City and NYPD leadership to the rights of the Plaintiff Classes and the Court's prior orders.

In April 2020, 200 medical professionals noted the significant COVID-19 infection rate among NYPD personnel and asked the police to reduce unnecessary interactions with the public in order to mitigate the risk of infection.[10] The medical professionals stated, "we are alarmed at the high rate of infection among NYPD officers and fear that unnecessary interactions between the NYPD and the public will further exacerbate the public health crisis unfolding in New York City and rapidly spreading across the country." *Id.* Similarly, a Harvard epidemiologist noted the importance of attention to local susceptibility to infection and at-risk populations specifically in

---

[8]    Several public officials stated NYPD enforcement of social distancing is associated with increased risk, racial profiling, and escalation to violence and arrest. *See* Jarrett Murphy, *Eric Adams Says Cops Should Not Enforce Social Distancing*, CityLimits (May 7, 2020) ("When you talk about police officers enforcing social distancing, the police department that has historical tension in certain communities, you're now encouraging the largest interaction with these groups in the history of the police department. It is alarming."); *AG James Calls on the NYPD to Ensure Equal Social Distancing Enforcement in NYC Communities*, N.Y. STATE OFFICE OF THE ATT'Y GEN. (May 13, 2020) (announcing investigation and indicating it is "[t]he apparent unequal enforcement of social distancing policies is deeply troubling, and deepens the divide between law enforcement and the people they are tasked to protect.")*; See*  Hakeem Jeffries, @RepJeffries Twitter (May 5, 2020) ("Why are sunbathers who violate social distancing guidelines treated one way and young men in certain communities another? This MUST end."); *see also* Brad Lander, @bradlander, Twitter (May 8, 2020) ("A better way: as part of a new NYC Public Health Corps (that also does contact-tracing, quarantine support, economic recovery), hire a set of people as diverse as New York City, to do public health outreach & social distancing compliance.").

[9]    *See* Josiah Bates, *'We Cannot Police Our Way Out of a Pandemic' Experts, Police Union Say NYPD Should Not Be Enforcing Social Distance Rules Amid COVID-19*, Time (NYPD union president decries vague guidelines, mixed messages, and officer uncertainty).

[10]    *See* John Annese, *Medical professionals, reform advocates ask NYPD to cool it with arrests because officers may spread coronavirus,* The Daily News (Apr. 23, 2020).

New York in evolving policy responsive to COVID-19, noting that governments should "put resources into protecting the vulnerable people who end up in the hospital at higher rates."[11]

Thus, from a public health perspective, racial disparities in infection and the disproportionate number of Black and Latinx people serving as essential workers indicate these communities deserve the lightest touch and the greatest protection.  Because this is a public health crisis, not a law enforcement crisis, the City should instead leverage the credibility and legitimacy of public health workers and community-based organizations to enforce social distancing as necessary. Ex. 1, CPR Decl. ¶ 20. Shifting enforcement toward community-based entities also addresses the *Floyd* court's own stated concerns that impacted communities best understand how to mitigate risk and protect their own safety.  *See Floyd* Remedial Ord., (Dkt. #372 at 29) ("The communities most affected by the NYPD's use of stop and frisk have a distinct perspective that is highly relevant to crafting effective reforms. No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety.").

### D.  NYPD's Promises to Pull Back on Social Distancing Enforcement Does Not Eliminate the Need for Court Intervention.

After two months of NYPD enforcement of social distancing, it remains unclear how the police add value to the COVID-19 pandemic response. After the viral video depicting the tackle and arrest of Kaleemah Rozier and her young child in the Atlantic Avenue subway station (her face mask was pulled down to her chin, exposing her nose and mouth), *see* Day Decl. at ¶ 31, NYPD indicated it would delegate enforcing face mask compliance to NYPD civilian employees after City Council threatened budget cuts.  However, given the NYPD's denialism and deflection

---

[11]    *See* Jonathan Shaw, *COVID-19 May Be Much More Contagious Than We Thought,* Harvard Magazine (May 13, 2020) (citing forthcoming research that each COVID-19 patient may infect 5-6 others in cities like New York).

regarding even the possibility of racial profiling, these vague representations provide little comfort to Black and Latinx New Yorkers.

It remains unclear what policy governs NYPD pandemic conduct.  Plaintiffs' request for information and discovery in this regard were ignored, then dismissed, then refused. Day Decl. at ¶¶ 51-57. NYPD delayed the public release of relevant data and then promoted manipulations of the data that mirrored tactics found racially discriminatory at trial. *See e.g., infra* at III.A.2.  And Despite the Mayor's assurance that a "reset" of NYPD enforcement of social distancing measures would address criticisms, he continues to maintain that police enforcement is an "essential part of the equation," and has offered no insight as to the City's directives to NYPD or NYPD leadership's directives to the rank-and-file. Mayor de Blasio Holds Media Availability, Press Conference (May 15, 2020) available at https://www1.nyc.gov/office-of-the-mayor/news/348-20/transcript-mayor-de-blasio-holds-media-availability. Thus, it appears that New Yorkers can expect that policing will remain a critical component of the enforcement of social distancing rules and may continue violating the Court's prior orders in *Floyd*.

The concerns this raises for the Plaintiff classes are neither minimal nor remote. Most acknowledge that New York City may face a second wave of COVID-19 infection.  Already, "quarantine fatigue" has parks, beaches, and streets crowded with people. Day Decl. at ¶¶ 13, 29. As summer arrives, weather and crowded living conditions will push people outside, as happens each year.  In particularly congested areas, including New York City public housing, being outside might be safer than being inside, from a public health perspective.  Declining media attention could license further impunity in the violation of this Court's prior orders in this case, including the ongoing racial profiling and selective enforcement set forth herein.

This suggests that protecting the Classes, supporting the monitoring of the remedy awarded to the Plaintiffs, and enforcing the Court's prior orders entails granting Plaintiffs the relief requested. Community stakeholders' concerns that racial profiling and selective enforcement in COVID-19 policing was a particularly significant risk in the stress of a pandemic has borne fruit.  Ex. 1, CPR Decl. ¶ 22.  The Court cannot trust the NYPD to carry out its obligations under the *Floyd* orders on its own.

### E.  The Relief Requested is Narrowly Tailored to Address the City's Violations of the Court's Prior Orders.

The relief requested by Plaintiffs is no broader than what is necessary to protect the rights, health, and safety of the Black and Latinx class members. To begin, as with the injunctive remedies originally imposed by the Court, *see Floyd*, (Dkt # 372), the moratorium requested by Plaintiffs would not interfere with ordinary policing (e.g., arrests, summonses) constitutionally, nor would it stop the City from enforcing its and the State's social distancing orders via non-law enforcement City agencies without a history of racially discriminatory practices. In addition, supplemental relief is warranted because no aspect of the *Floyd* Court-ordered remedies developed and implemented thus far have deterred or remediated racial discrimination in NYPD enforcement of social distancing.  Neither the NYPD's Court-approved policy prohibiting racial profiling, *see Floyd*, (Dkt # 517), nor the new written procedures for supervision of street encounters on the scene and after-the-fact, (Dkt # 527), have ensured legally proper, unbiased social distancing policing on the streets. Day Decl. at ¶ 40. Much-touted training programs on investigative encounters and fair and impartial policing have not impacted actual police conduct adequately to prevent racial discriminatory social distancing enforcement in practice.

When presented with evidence that injunctive relief failed to prevent ongoing constitutional or statutory violations, federal courts have not hesitated to impose more

prescriptive relief on those defendants to cure those violations, even absent a contempt finding. *See, e.g., Baez,* 2015 WL 9809872, *2-3; *Damus*, 2020 WL 601629, at *2-5; *Visa USA, Inc*., 2007 WL 1741885, at *12-14; *National Law Ctr. On Homelessness and Poverty*, 765 F. Supp. at 6-13. Here, as in *Hutto*, 437 U.S. at 686-88, a categorical bar on further NYPD's social distancing enforcement efforts is appropriate, because the arbitrary way in which NYPD officers have been authorized to conduct this enforcement without any apparent guidance from Department leadership is contributing to an ongoing pattern of racially discriminatory enforcement of the law that violates the Court's orders and the Fourteenth Amendment. Moreover, the moratorium will provide the Monitor, NYPD, Plaintiffs and the Court the opportunity to determine what policies, procedures, and other measures should be put in place to prevent racially discriminatory social distancing enforcement action going forward.

In addition, the independent investigation and evaluation of the NYPD's social distancing enforcement efforts requested by the Plaintiffs is narrowly tailored to cure the violations of the Court's prior orders. The Remedial Order specifically authorizes and tasks the Court-appointed Monitor with assessing and reporting to the Court on the City's implementation of and compliance with the Court-ordered reforms, of which August 2015 Policy Prohibiting Racial Profiling is one. *See Floyd* (Dkt # 372) at 12-13. The Monitor is empowered and required to "work with the parties to address any barriers to compliance." *Id*. at 13. The requested investigation and evaluation of the NYPD social distancing enforcement practices will help determine why those practices are running afoul of the Court's Liability, Remedial and Racial Profiling Policy Orders and what measures need to be put in place to cure those violations.

## CONCLUSION

For the foregoing reasons, *Floyd* and *Davis* Plaintiffs ask this Court to order the City to show cause why the Court should not grant the emergency relief requested.

Dated: May 26, 2020
     New York, New York

/s/ Dominique Day

BELDOCK LEVINE & HOFFMAN LLP
By: Dominique Day
    Jonathan C. Moore
    Luna Droubi
    Marc Arena
99 Park Avenue, Suite 1600
New York, NY 10016
Tel. (212) 490-0900
*Attorney for* Floyd *Plaintiffs*


/s/ Darius Charney

CENTER FOR CONSTITUTIONAL RIGHTS
By: Darius Charney
    Guadalupe Aguirre
    Omar Farah
    Baher Azmy
666 Broadway, 7th Floor
New York, NY 10012
Tel. (212) 614-6439
*Attorney for Plaintiffs*


NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
By: Jin Hee Lee
    Raymond Audain
    Kevin Jason
    Ashok Chandran
    John Cusick
    Patricia Okonta
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-3702
jlee@naacpdlf.org

THE LEGAL AID SOCIETY
By:  Corey Stoughton
        Steven Wasserman
199 Water Street, 6th Fl.
New York, NY 10038
Tel: (212) 577-3367
cstoughton@legal-aid.org
swasserman@legal-aid.org