# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

DAVID FLOYD, *et al.*,

      Plaintiffs,

   -against-                                          No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

      Defendants.
------------------------------------------------------------------------ X

**DECLARATION OF COMMUNITIES UNITED FOR POLICE REFORM (CPR) IN SUPPORT OF PLAINTIFFS' MOTION FOR EMERGENCY RELIEF**

I, Joo-Hyun Kang, pursuant to 28 U.S.C. § 1746 and subject to penalties of perjury, state the following is true and correct:

1. I submit this declaration in support of Plaintiffs' motion for emergency relief. I am not a party to the above-captioned case.

2. I have been the Director for Communities United for Police Reform (CPR), a citywide campaign to end discriminatory and abusive policing in New York since 2012. Among other responsibilities, in this position I coordinate planning and implementation of the coalition's multiple strategies (including policy, legal, community education, organizing, research, civic engagement, and communications) to end discriminatory policing; represent the campaign/coalition in meetings with elected officials; serve as a media spokesperson for CPR; meet with, organize and speak to community members impacted by discriminatory police practices, including unconstitutional stops and frisks.

3. I have been involved with police accountability issues in New York City since the mid-1990s. From 1996 to 2003, I served as Executive Director of the Audre Lorde Project, a community organizing center for Lesbian, Gay, Bisexual, Transgender communities of color. In this capacity, I was a founding member of the NYC Coalition Against Police Brutality (CAPB) which included and worked with a wide range of grassroots community organizations committed to fighting police brutality. As a founding member of CAPB, I organized, educated, and advocated to end discriminatory policing within Lesbian, Gay, Bisexual, Two Spirit, Trans and gender nonconforming communities of color, and helped to organize community rallies, events and forums aimed at achieving accountability for various cases of police brutality, including the brutality against Jalea Lamot and her family, torture of Abner Louima and death of Amadou Diallo in the late 1990s.

1

4. I am the co-author of "Organizing at the Intersections: A Roundtable Discussion of Police Brutality Through the Lens of Race, Class, and Sexual Identities", found in Zero Tolerance: Quality of Life and the New Police Brutality in New York City, editors Andrea McArdle and Tanya Erzen, New York University Press, 2001.

5. Around the year 2007, I worked with other grassroots organizations to co-found the People's Justice coalition following the killing of Sean Bell and other high-profile police shootings. People's Justice is a coalition of grassroots organizations committed to educating communities of color about their rights when interacting with police.

**About Communities United for Police Reform ("CPR")**

6. CPR, launched in 2012, is a non-partisan, multi-strategy campaign to end abusive and discriminatory policing practices in New York and reduce reliance on policing for community safety.

7. CPR runs coalitions of over 200 national, statewide and local organizations from across New York whose members include community members most impacted by police violence, community organizing groups, legal organizations, policy groups, research projects, and others. The organizations in CPR coalitions represent community members from all five New York City boroughs, different walks of life and include individuals with family members who are police officers. The majority of our member organizations are grassroots organizations whose constituencies, memberships or clients are based primarily in low-income communities of color, that are most impacted by abusive policing – including youth, LGBTGNC communities, immigrants, people with disabilities, homeless New Yorkers, public housing residents, and others. Members of these communities bear the bruch of the New York Police Department's ("NYPD") unjust stop and frisk practices. This includes organizations that have been leading work on police accountability in Black, Latinx and immigrant communities; organizations representing lesbian, gay, bisexual, and transgender communities; homeless New Yorkers; and youth organizations. Notably, young people of color have been documented as those most impacted by the NYPD's stop and frisk practices.

8. In addition, CPR partners with a broad range of additional organizations to advance our effort to create a safer New York City for everyone. Many of our partners work on behalf of the communities most unfairly targeted by the NYPD's stop and frisk practices.

9. CPR's work is largely focused on police accountability, particularly centering the experiences of those directly affected by discriminatory and abusive NYPD policies and practices. Relevant examples include but are not limited to:

> a) In 2019, CPR was able to effectively advocate for the inclusion of a change to the City Charter as a ballot item in the election. This ballot item expanded CCRB's authority to investigate instances where police officers make false official statements. In spite of significant funds driving a misinformation campaign by NYPD police unions, New

> Yorkers voted in overwhelming support of the ballot item – it passed with over 70% of the vote.
>
> b) CPR organized a citywide coalition of over 200 community organizations, labor unions, advocacy organizations and others to pass the Right to Know Act in 2017, legislation in the City Council directly relevant to changing NYPD's practices with regards to common street encounters: Intro 0541-2014, a local law to mandate NYPD request consent to search an individual unless they have legal basis to engage in said search, and Intro 0182-2014, a local law that requires the New York Police Department officers provide a business card and the reason for law enforcement activity during certain interactions with the public.
>
> c) In 2013, CPR secured passage of the Community Safety Act in the City Council, a pair of bills which were directly relevant to increasing NYPD accountability: Intro 1079-2013, a local law to create a clear mechanism for NYPD oversight and increased transparency though establishment of an Inspector General, and Intro 1080-2013, a ban on biased-based profiling.
>
> d) In 2015 CPR, in partnership with families who have lost loved ones to police in New York, organized to ensure Governor Cuomo issued an Executive Order (Executive Order 147) creating the Office of the Special Prosecutor to investigate some cases where a person dies during an interaction with police in New York State.
>
> e) CPR members have trained tens of thousands of New Yorkers on their rights during interactions with police and while observing police to increase the safety of community members during police encounters.

10. Members of CPR organizations regularly express the concerns of community members impacted by abusive policing practices in many public arenas and media outlets. For example, members have testified about their discriminatory stop and frisk experiences in front of numerous venues including the New York City Council and the New York State Legislature, at press conferences, at townhall meetings, and in front of former President Obama's 21st Century Policing Task Force, the Congressional Black Caucus (CBC), Congressional Progressive Caucus (CPC), Congressional Hispanic Caucus (CHC), and Congressional Asian Pacific American Caucus (CAPAC) in Washington DC. In addition, CPR members have been quoted on policing, police oversight and police reform in the City of New York in media outlets as diverse as the Associated Press, the New York Times, Daily News, Gotham Gazette, El Diario, the Staten Island Advance, Black Entertainment Television, and Amsterdam News.

11. Historically, CPR's interest in these matters dates back two decades, when, after the 1999 killing of Amadou Diallo by the Street Crimes Unit of the New York Police Department, organizations that would later become founding members of CPR approached the Center for Constitutional Rights to file the lawsuit targeting stop-and-frisk practices (Daniels v City of New York). The information concerning racial disparities in stop-and-frisk obtained through

*Daniels* facilitated the filing of Floyd. CPR members are among the named plaintiffs, the main litigating nonprofit legal organizations and key witnesses in Floyd.

12. At different times CPR and/or its member organizations have been involved in *Floyd v. City of New York* and have a strong interest in the outcome of stop and frisk reform efforts. CPR is a named stakeholder in the Joint Remedial Process in Floyd v City of New York. (ECF No. #372) CPR has submitted multiple filings to the Court for consideration on this matter. On March 3rd, 2013 CPR submitted a motion for leave to file an *amicus curiae* brief in support of Plaintiffs' remedial proposals in Floyd. The following are just some of the filings we have had accepted by the court: On August 13th, 2013 the Court granted this motion and accepted the brief as filed. (Dkt. #377) On May 16th 2012, the Court granted a request by members of CPR (Bronx Defenders, Brotherhood/Sister Sol, the Justice Committee, the Justice Committee, Picture the Homeless, and Streetwise and Safe) to submit an amicus curiae brief in support of Plaintiffs' motion for class certification. (ECF No. # 208) In April 2017, CPR submitted to the Court concerning the NYPD's Body-Worn Camera Pilot (ECF No. #547-1). On July 9th 2018, CPR filed an *amicus curiae* is response to the Facilitator's Final Report uplifting priority reforms for the Court – this filing was supported by over 90 organizations. (ECF No. #611).

13. Communities United for Police Reform has worked to ensure directly impacted New Yorkers were able to participate in the Floyd legal process. CPR members and partners attended and packed the court every day of the historic nine-week Floyd trial. CPR participated extensively in the Joint Remedies Process ("JRP"). The JRP included 28 community forums, with an estimated 1,777 participants – more than half of these participants' participation was facilitated by CPR members and partners. (ECF No. 597 at 7–8.) CPR and CPR members participated consistently throughout the JRP Advisory Committee and process, helping the Facilitator to organize focus groups and recruit participants, and directly organized nine community forums, convening 530 members of directly-impacted communities across the five boroughs. CPR partner organizations organized an additional 6 community forums with an additional 367 participants. Through these activities, CPR endeavored to facilitate direct input in the remedial process from New Yorkers most impacted by stop- and-frisk and trespass enforcement abuses, primarily low-income New Yorkers of color. Since the end of the JRP, CPR and CPR members continue to engage with the Floyd remedial process including through filings with the Court.

**Unconstitutional Stop-and-frisk Practices Persist in NYPD's 'Social Distance Enforcement'**

14. The issues of racial disparities in enforcement practices are not unfamiliar to the Court. Despite the drop in reported stops, racial disparities have persisted - in 2019 59% of stops were of Black people and 29% Latinx people. Year after year, Black and Latinx New Yorkers have comprised of 80-90% of stops by the NYPD. While comprehensive stop information has not been released for the COVID-19 period (which is its own problem), the limited enforcement data that has been publicly shared tracks with prior enforcement patterns: In one report by CBS, 92% of social distance related arrests were of Black and Latinx New Yorkers. In data released by Brooklyn District Attorney Eric Gonzalez, 35 of the 40 people arrested in Brooklyn for social distancing enforcement were Black, 4 were

4

Hispanic. In conjunction with the data, there have also been multiple videos released of abusive encounters where 'social distancing enforcement' was either the pretext and/or false explanation after-the-fact and have resulted in Black and Latinx people being punched, kicked, pepper-sprayed, thrown to the ground, or otherwise assaulted. Some of these began as unconstitutional stops, and we must not hide that.

15. The experiences captured in the data and the videos are only part of the picture. Since the emergence of the COVID-19 crisis, in our experience, there has been an uptick in what sound like unconstitutional stops and searches – and an uptick in those unconstitutional and unnecessary interactions escalating into physical violence. Through March and April we and CPR member groups have seen an increase in terms of overall support requests. As a result, CPR and CPR members have done intake with numerous New Yorkers since the pandemic was officially recognized in NYC who have had or have witnessed interactions with police during the COVID-19 period. Through this intake process, several trends have emerged including: (a) a majority of these interactions have involved Black and Latinx New Yorkers, primarily young people; (b) in situations where arrests were made or summons issued, the charges were unrelated to 'social distancing' violations in most interactions – they include "resisting arrest", "disorderly conduct" and/or "obstruction of governmental administration" – charges that are well known as police brutality cover-up charges; (c) in some interactions no summonses were issued or arrests made, even when force, such as pepper-spray, using chokeholds and tasing were used; (d) in interactions where no summonses were issued or arrests made officers consistently refused to provide the reason for initiating the stop OR a business card as is mandated by the Right to Know Act.

16. When New York State's "PAUSE" went into effect, we were notified of encounters where New Yorkers of color were stopped by police before entering the transit system or as they were leaving and asked to prove that they were essential workers. This is despite the fact that there are no directives stating that the subway can only be used for work-related travel and no guidance issued that New Yorkers must carry proof of the nature of their trips. This is just one example of the types of baseless and unconstitutional stops New Yorkers are being subjected to, regardless of their legal rights to be in public.

17. These abusive and discriminatory interactions are occurring in primarily Black and Latinx working class neighborhoods, including the South Bronx, Central Brooklyn, East New York, Harlem, Jamaica, Far Rockaway, Lower East Side and other neighborhoods throughout New York City. There is overlap between historically high stop precincts and some of the precincts with the highest number of complaints including, but not limited to the 75th and 40th precincts. Some of these interactions have occurred in and around public housing – in addition to the individual stories we have received, we have also heard of reports of ongoing, abusive and illegal behavior by police at or around public housing including engaging in unconstitutional and baseless stops and unwarranted arrests of public housing residents. At least one individual, a Black public housing resident in his 40s, commented to us that he has avoided leaving his apartment as much as possible since his last interaction with police and says he has been followed by police in unmarked vehicles once while going to the store and once while waiting for a cab.

18. In one encounter which occurred in the Lower East Side, NYPD claimed they approached two people on the street to engage in 'social distancing enforcement' but wound up arresting one person involved for marijuana possession. Similarly, in an incident in Brooklyn on May 2nd, a group of people were brutalized in what began as 'social distancing enforcement' and resulted in one of the people involved being charged with low-level marijuana possession. Both of these incidents happened in the context of low-level marijuana possession being decriminalized in New York State since 1977, and despite changes to NYPD operations orders and the further decriminalization of marijuana by the Legislature in 2019. In both scenarios, 'social distancing enforcement' was used as the pretext to initiate interactions (including potentially unconstitutional stops) which resulted in unrelated charges, and multiple people being physically harmed.

19. When considering the enforcement data, the direct experiences being recounted through the intake process, and the recent media coverage and related viral videos, it is evident that NYPD's ongoing selective enforcement practices have resulted in 'social distancing enforcement' being used a pretext to initiate and escalate interactions, primarily street encounters, with Black and Brown New Yorkers. For the last year, members of Communities United for Police Reform have said that stop-and-frisk is occurring with greater frequency – and that in certain neighborhoods, the experience of rates of stops are similar to those prior to the findings in Floyd v. City of New York. In light of the COVID-19 crisis, in our experience, there has been an uptick in what sound like unconstitutional stops and searches – and an uptick in those unconstitutional and unnecessary interactions escalating into physical violence. Through March and April we and CPR member groups have seen an increase in terms of overall support requests.

20. Understanding the long history of discriminatory and abusive street encounters at the core of Floyd v City of New York – and seeing the disparate enforcement practices emerging from 'social distancing enforcement' it was alarming to hear Police Commissioner Dermot Shea say he "would not stand for" the police department being called racist at a May 13th press conference. In his comments, the Police Commissioner also attempted to discredit what New Yorkers saw with their eyes on video by broadly claiming that the people being targeted "have open gun cases," and "are gang members" though there is no evidence in support of either blanket claim. Even if true, such claims would not negate whether an unconstitutional stop or abusive policing took place. These types of defensive, inflammatory and dismissive remarks regarding valid criticism of the NYPD's racist practices are dangerous. It is meant to discredit those who are victimized by police violence, facilitates under-reporting of complaints, and functions as part of the City and NYPD's misleading public relations with claims that the NYPD has been "reformed" and "transformed" since Floyd -- while this is far from true in the areas that the Floyd, Davis and Ligon litigations raised.  The fearmongering is akin to how Mayor Bloomberg & Police Commissioner Kelly responded to community concerns about stop-and-frisk, including falsely claiming that Black and other New Yorkers of color were "understopped". It is very similar to Mayor Bloomberg and the NYPD's talking points in the period before Judge Scheindlin's Floyd ruling, and before the City Council passed the Community Safety Act – as well as their remarks in trying to unsuccessfully appeal both. The immediate practical impact of under-reporting is largely due to the fact that Black, Latinx and other New Yorkers of color have

6

seen that historically – including the recent period – the NYPD does not discipline or terminate abusive officers when they harm civilians in a meaningful or timely way. The fact that Officer Francisco Garcia was only put on modified duty instead of being suspended, with no word of whether disciplinary charges would be brought re the incident in the Lower East side is a perfect example for why many in communities of color do not have faith in the legitimacy of the NYPD or the City of New York's response to unconstitutional and abusive policing.

21. Unfortunately, Commissioner Shea is acting like Commissioner Kelly in defending the NYPD's inexcusable practices, refusing to hold officers accountable for abusive and violent behavior, and attempting to demonize Black and other communities of color as a way to deflect and justify unconstitutional, racist and violent policing. CPR and CPR's member and partner organizations had to resist and overcome this same demonization and deflection when Kelly was the Commissioner.

22. These enforcement trends are deeply concerning to us. In mid-March, CPR released a letter calling for a moratorium on low-level enforcement including for 'quality of life' offenses including so-called 'sweeps' of homeless New Yorkers, and low-level drug enforcement, including marijuana-related stops, summonses and arrests. Since then, we have only seen abusive encounters increase. We are concerned that as the weather gets warmer and more New Yorkers head outside, unnecessary interactions between police and New Yorkers of color will continue to increase – and unfortunately, bring with them an increase in abusive encounters. This will be particularly perilous in light of conflicting messaging and directives from the city and state in regards to recommended behavior and norms during the pandemic.

23. Mayor de Blasio's recent announcement that NYPD will not be issuing summons or making arrests for social distance violations "absent of a crime or other violation being committed" has already been shown as baseless given the continued NYPD abuses, and would still allow NYPD to use 'social distancing enforcement' as a pretext to start an interaction. Historical and current practices show that this "discretion" will be applied in racially-targeted ways and will continue to negatively impact Black, Latinx and other New Yorkers of color. For CPR, this situation is untenable and we fear that unnecessary and unconstitutional interactions that police routinely escalate will result in additional violence against New Yorkers, even risking unjustified killings by police.

24. For all of the reasons provided above and in the interest of justice, CPR supports the Plaintiffs' motion for emergency relief.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the forgoing is true and correct.

**Joo-Hyun Kang**

Digitally signed by Joo-Hyun Kang
DN: cn=Joo-Hyun Kang, o=Communities United for Police Reform Action Fund, ou, email=jkang@changethenypdaction.org, c=US
Date: 2020.05.25 17:59:23 -04'00'

Dated:   New York, New York
         May 25, 2020                              Joo-Hyun Kang