**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID FLOYD, *et al.*,<br><br>                              Plaintiffs,<br><br>              -against-<br><br>CITY OF NEW YORK,<br>                              Defendant. | 08 Civ. 1034 (AT) |
| KELTON DAVIS, *et al.*,<br><br>                              Plaintiffs,<br><br>              -against-<br><br>CITY OF NEW YORK, *et al.*,<br>                              Defendants. | 10 Civ. 0699 (AT) |
| JAENEAN LIGON, *et al.*,<br><br>                              Plaintiffs,<br><br>              -against-<br><br>CITY OF NEW YORK, *et al.*,<br>                              Defendants. | 12 Civ. 2274 (AT) |

**JOINT BRIEF OF THE PARTIES REGARDING**
**NYPD'S EARLY INTERVENTION PROPOSAL**

Table of Contents

I.   Introduction....................................................................................................................1

II.  Areas of Disagreement .................................................................................................3

   a.  Declined Prosecutions: Prosecutorial Discretion and Summonsable Offenses (Plaintiffs'
     Proposed Order, Appendix A, Para. 1.a(xi)-(xii))...............................................3

     i. Plaintiffs' View ..............................................................................................3

     ii. City's View ....................................................................................................7

   b.  Including the Names of Police Officers on Scene

     (Plaintiffs' Proposed Order, Appendix A, Para. 1.b(i), 1.c(i), 1.d) .....................9

     i.  Plaintiffs' View ............................................................................................10

     ii. City's View ...................................................................................................12

   c.  Materials Relating to Law Department Declinations of Representation
     (Appendix A and B, Para. 1.d)..........................................................................12

     i.  Plaintiffs' View ............................................................................................13

     ii. City's View ...................................................................................................14

   d.  Judgment and Settlements Against Police Officers (Appendix A and B, Para. 1.e)...........16

     i.  Plaintiffs' View ............................................................................................16

     ii. City's View ...................................................................................................18

   e.  Adverse Findings Related to Racial Slurs (Appendix A and B, Para. 3.a) .........18

     i.  Plaintiffs' View ............................................................................................20

     ii. City's View ...................................................................................................26

   f.  Publicly Reported Committee Protocols and Committee Activities (Plaintiffs' Proposed
     Order, Appendix A, Para. 3.c) ..........................................................................29

     i.  Plaintiffs' View ............................................................................................29

     ii. City's View ...................................................................................................31

   g.  Protocols for use of Information in Officer Evaluations, Transfers, Discipline and
     Promotions (Plaintiffs' Proposed Order, Appendix A, Para. 3.d)......................33

     i.  Plaintiffs' View ............................................................................................33

    ii.  City's View ..........................................................................................................34

h.  EIS Committee Litigation Thresholds (Appendix A and B, Para. 3.e(vi)) ........................35

    i.  Plaintiffs' View .................................................................................................35

    ii.  City's View ..........................................................................................................36

i.  Number of Racial Profiling Complaints to Meet EIS Committee Threshold (Appendix A and B, Para. 3.e(vii))..........................................................................................................37

    i.  Plaintiffs' View .................................................................................................37

    ii.  City's View ..........................................................................................................38

j.  Annual Analysis and Reporting (Appendix A and B, Para. 4.a) .......................................38

    i.  Plaintiffs' View .................................................................................................39

    ii.  City's View ..........................................................................................................40

k.  Adverse Credibility Assessments by District Attorneys (Plaintiffs' Proposed Order, Appendix A, Para. 4.b) .................................................................................................41

    i.  Plaintiffs' View .................................................................................................41

    ii.  City's View ..........................................................................................................44

l.  Peer Intervention and Building Leadership Capacity

    (Plaintiffs' Proposed Order, Appendix A, Para. 5)........................................................48

    i.  Plaintiffs' View .................................................................................................48

    ii.  City's View ..........................................................................................................51

m. Early Intervention Mechanisms for Racial Profiling (Appendix A and B, Para. 6). ..........52

    i.  Plaintiffs' View .................................................................................................53

    ii.  City's View ..........................................................................................................58

## I.  Introduction

In an opinion and order issued on August 12, 2013, the Court directed that the parties participate in a community-input process (the Joint Remedial Process, or JRP) to develop reforms "no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments" and appointed a Facilitator to implement that process.[1]  On May 15, 2018, the Facilitator issued his Final Report and Recommendations.  JRP Final Report, ECF No. 597.  The Facilitator's first recommendation (Recommendation No. 1) was that the Court order the NYPD "to develop a program for systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements."  *Id.* at 219.

On November 20, 2018, the Court ordered that the Department, in consultation with the Monitor, submit a plan to implement an early intervention program to receive, assess, and act on five specific categories of "information regarding adverse findings of conduct of police officers involving illegal stops or illegal trespass enforcement."[2]  By that Order, the NYPD is required to implement "a program for systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements.  This information includes: (a) declinations of prosecution by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or representation of police officers by the New York City Law Department;

---

[1] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 588 (S.D.N.Y. 2013).

[2] *Floyd* ECF No. 662 (the "Order").

and (e) judgments and settlements against police officers in civil cases where in the opinion of the New York City Law Department, there exist evidence of police malfeasance." *Id.*

On January 14, 2019, the Department submitted its plan[3] to comply with this Order through the use of several internal committees and utilization of a computerized database. Counsel for the *Floyd* and *Davis* plaintiffs submitted a joint response[4] and *Ligon* counsel submitted a separate response[5] to the Department's plan raising concerns regarding certain aspects of the plan. There have since been many briefs submitted by the parties. In January 2020, the parties agreed to meet with the Monitor to find common ground among the parties and that the parties would file a final joint brief to the court laying out the areas of agreement and disagreement among the parties. This brief reflects that effort.

As a result of the meetings held in February 2020, there are now many areas of agreement. However, there are still 14 areas about which the parties disagree. The Plaintiffs' and the City's proposed orders lay out their respective plans for the Department's early intervention program, and are attached as Appendix A (Plaintiffs) and Appendix B (City). Each proposed order identifies and highlights the areas of disagreement. Each side submitted briefs to the Monitor laying out their positions. Below, each item of disagreement is summarized, followed by the Plaintiffs' and the City's arguments for their position on that item, quoting from their briefs. The positions of the parties are indented to make clear that they are quotes from their briefs and do not reflect the position of the Monitor. Plaintiffs also renew their request for oral argument on the motion, which

---

[3] *Floyd* ECF No. 681.

[4] *Floyd* ECF No. 686.

[5] *Ligon* ECF No. 364.

they believe is warranted given the significant amount of briefing and the detail with which the issues are being discussed at this point.

## II. Areas of Disagreement

### a. Declined Prosecutions: Prosecutorial Discretion and Summonsable Offenses (Plaintiffs' Proposed Order, Appendix A, Para. 1.a(xi)-(xii))

Plaintiffs and the City agree that NYPD must make reasonable efforts to systematically obtain from the District Attorney's Offices of Bronx, Kings, New York, Queens, and Richmond Counties (collectively, District Attorney's Offices), data, preferably in digitized, automated form, regarding all declinations of prosecutions falling into any one of ten categories (Appendix A and B, Para. 1.a.(i) – (x)).  They disagree, however, regarding whether the order should require the collection of data regarding declined prosecutions for prosecutorial discretion and summonsable offenses (Appendix A and B, Para. 1.a.(xi) – (xii)).

### i. Plaintiffs' View

'Prosecutorial discretion' and 'summonsable offenses' are important categories of declined prosecution (DP) data for effective early intervention that have been excluded from the NYPD proposed order. NYPD claims that these categories have no nexus to individual officer conduct.  However, and overwhelmingly in communities of color, NYPD officers make "dead-end" arrests despite proactive, longstanding, and publicly announced policy by district attorneys' offices declining to prosecute low-level misdemeanors like marijuana possession, fare evasion, and other charges widely associated with racial profiling.

The deliberate indifference toward members of Black and Latinx communities targeted by these arrests is directly at issue in the remedial phase.  NYPD's disregard of these exercises of discretion licenses the ongoing race-based operation of selective enforcement –

liable misconduct that was recognized and deemed unconstitutional by the trial court. *See* Liab. Op., Dkt. #373 at 191-92.  Where arrests occur with knowledge and foreseeability that the district attorney will not prosecute these charges, and consistently result in DPs,[6] the intent of the officer and the inference of selective enforcement of the law (i.e., racial profiling) is clear.  In these cases, declination of prosecution attributed to "prosecutorial discretion" or "summonsable offense," or other categories,[7] may reflect a judgment made by the prosecutor that the arrest was racially motivated  requiring corrective or remedial action.

Thus, NYPD officers' continued use of discretion to arrest on these grounds – as well as whom they choose to arrest – warrants scrutiny.  The tolerance of such abuses  of discretion by NYPD leadership recalls the deliberate indifference toward racial discrimination that the Court found at trial.  *See Floyd* Liab. Op.at 181 ("[s]enior officials in the City and at the NYPD have been deliberately indifferent to the intentionally discriminatory application of stop and frisk at the managerial and officer levels.").  Prosecutors have a duty to vet police officers, and their exercise of discretion, as does NYPD leadership.[8]  Any grounds for declining to prosecute that may implicate racial profiling should trigger rigorous review of both officer *and* supervisor conduct.  Thus, NYPD's wholesale refusal to deter pervasive and ongoing selective enforcement via early intervention, particularly in the exercise of discretion by officers, is untenable.

---

[6] At the very least, the Court should order NYPD to produce data on declinations of prosecution disaggregated by race of the arrestee and charge for the past several years.

[7] Notably, individual district attorneys may "code" these issues differently. Deferrals are another example of how individual assistant district attorneys might remediate selective enforcement.

[8] In addition, recent reporting suggests that officer conduct may be a more relevant basis for declination than NYPD suggests. *See* George Joseph and Ali Winston, *When Prosecutors Bury NYPD Officers' Lies*, Gothamist (Sept. 17, 2019) (available here: https://gothamist.com/news/when-prosecutors-bury-nypd-officers-lies).

Given this, The City's claim, *infra* at Section II.a.ii, that NYPD's "overriding interest in uniform standards for arrests, as it is tasked with enforcing the law in an even-handed manner throughout the City," is specious.  NYPD arrests in New York City have **never** reflected a uniform standard for arrests or even-handed enforcement of the law.  Only specific attention to data suggesting racial profiling (like DPs), and its drivers, can move the NYPD toward the goal of uniformity. Even today, over five years into the remedial process, low-level, "quality of life" stops and arrests overwhelmingly target Black and Latinx persons in New York City.[9]  It is the precise basis for NYPD's liability in this case and its ongoing non-compliance.  *See generally, Floyd,* Dkt. # 373 at 192 ("The Equal Protection Clause's prohibition on selective enforcement means that suspicious blacks and Hispanics may not be treated differently by the police than equally suspicious whites…. Equal protection guarantees that similarly situated individuals of these races will be held to account equally.").  Early intervention to target selective enforcement and racial profiling is an essential route to the very standards to which the City claims to aspire.

Nor does the City's claim of discussions with the District Attorneys' offices (or their varied underlying reasoning) insulate these important categories from review.  Even in the example cited by the City, police officers are clearly on notice that low-level marijuana offenses will not be prosecuted. In fact, NYPD consistently lobbies to retain provisions in the penal code, rather than decriminalizing them, precisely to facilitate authorized stops and investigative encounters. Tina Moore, *State police unions unanimously oppose legalizing marijuana*, N.Y. Post (Feb. 6, 2019). Yet NYPD responds by targeting continued marijuana

---

[9] *See infra* at n.23 (90% of people stopped for jaywalking by NYPD are Black and Latinx, 1/3 of jaywalking tickets given in New York are given in the Bronx), citing Samoylov, M. and Kuntzman, G., *NYPD Targets Blacks and Latinos for 'Jaywalking' Tickets*, StreetsBlogNYC (Jan 8, 2020) and others.

arrests almost exclusively at Black and Latinx persons, accrediting claims that racial harassment, rather than unbiased policing, motivates their behavior.[10]  The use of discretion selectively, i.e., continued decisions by officers to stop and arrest where it is demonstrated that these stops target Black and Latinx people, is a dramatic failure of equal protection that NYPD continues to tolerate.  *See also infra* at nn. 27, 28.

Moreover, reasonable suspicion was explicitly rejected as a defense by the *Floyd* Court at trial, and is reflected in the Court's prohibition of focus on "the right people":

> The City and the NYPD's highest officials also continue to endorse the unsupportable position that racial profiling cannot exist provided that a stop is based on reasonable suspicion. This position is fundamentally inconsistent with the law of equal protection and represents a particularly disconcerting manifestation of indifference. As I have emphasized throughout this section, **the Constitution "prohibits selective enforcement of the law based on considerations such as race." Thus, plaintiffs' racial discrimination claim does not depend on proof that stops of blacks and Hispanics are suspicionless**.

*Floyd*, Dkt. 373 at 191 (emphasis added).

Continued stops for minor offenses, in the face of prosecutors' public statements declining to prosecute such offenses, unjustly subjects Black and Latinx New Yorkers to selective enforcement and are evidence of the NYPD's continued adherence, in practice, to impermissibly relying on race to motivate stops and arrests. These arrests are not rendered legal or appropriate by the applicability of an administrative or penal code provision.

---

[10] *See e.g.,* Brand, D., *Nearly every single person arrested for weed in NYC this year was Black or Latinx,* Queens Daily Eagle (Aug. 21, 2019) ("Black and Latinx New Yorkers accounted for 94 percent of all low-level marijuana arrests in New York City during the first six months of the year, according to NYPD arrest data compiled by the state," mirroring "persistent disparities in fare evasion arrests"); Mueller, B., et al., *Surest Way to Face Marijuana Charges in New York: Be Black or Hispanic*, The New York Times (May 13, 2018)(despite NYPD claim that racial disparity in marijuana arrests driven by local complaints, "among neighborhoods where people called about marijuana at the same rate, the police almost always made arrests at a higher rate in the area with more black residents").

Similarly, the volume of these DPs cannot render a valuable proxy criterion, like prosecutorial discretion, invalid. The "systematic approach" ordered by the Court requires early intervention protocols to deter or correct a large volume of concerning conduct before it rises to the level of disciplinary intervention, as set forth herein. *See infra* at Section II.f.i. NYPD's demonstrated inability to target racial profiling via discipline offers powerful evidence that early intervention is an important site to combat racial profiling, including by selective enforcement.

### ii. City's View

The City opposes including additional categories of declination of prosecution memoranda in its early intervention system, specifically with respect to prosecutorial discretion or summonsable offenses. These categories, standing alone, do not implicate individual officer behavior and therefore would be inappropriate to trigger a review for potential intervention. The Department's determination of which categories of DPs potentially implicate officer conduct and which do not was made in consultation with the local District Attorneys' Offices ("DA's Offices"). They agreed with the Department that DPs that are the result of the current policies of the DA's Offices not to prosecute certain low-level offenses are not a reflection on the particular officer's actions, nor do they identify risk factors for potential misconduct because they were consistent with the Department's policies.

Additionally, the lack of uniformity between different offices' policies diminish the utility of these categories with respect to the Department's early intervention system. For example, none of the DA's Offices have a policy of declining to prosecute all low-level quality of life offenses, and each office has a separate set of exceptions to their declination policy.

The disparate policies of the New York County District Attorney's Office ("DANY") and the Kings County District Attorney's Office ("KCDA") further illustrate this point. In late-July 2018, KCDA announced the office's prosecutors would decline to prosecute most low-level marijuana offenses, except in cases where the arrestee is "posing a threat to public safety," "creating a genuine nuisance," or "involved in violent criminal activity." *See Low-Level Marijuana Prosecutions in Brooklyn Plunged by Over 91% This Year as District Attorney's Office Expanded Declination Policy*, KINGS CNTY. DIST. ATTORNEY'S OFFICE (July 27, 2018), http://www.brooklynda.org/2018/07/27/low-level-marijuana-prosecutions-in-brooklyn-plunged-by-over-91-this-year-as-district-attorneys-office-expanded-declination-policy.

Several days later, DANY announced a comparable policy for low-level marijuana arrests that would apply to "[c]ases against sellers" or a "[d]emonstrated public safety threat." *See Tomorrow: D.A. Vance Ends Prosecution of Marijuana Possession and Smoking Cases*, N.Y. CNTY. DIST. ATTORNEY'S OFFICE (July 31, 2018), https://www.manhattanda.org/tomorrow-d-a-vance-ends-prosecution-of-marijuana-possession-and-smoking-cases.

The declination categories are also not identical between the two offices, and subject to interpretation. However, the Department has an overriding interest in uniform standards for arrests, as it is tasked with enforcing the law in an even-handed manner throughout the City. It would be manifestly unfair to subject police officers to early intervention merely because they correctly applied the law, but the DA's Offices policies concerning these arrests were based on its standards for prosecution and not on whether there was probable cause, is the basis for declining prosecution. Regardless of the DA's Offices' policies to decline to prosecute certain low-level marijuana charges, the State Legislature has not decriminalized marijuana possession, and it is still a summonsable offense. Police officers making arrests

consistent with the law cannot be said to have committed conduct that would subject them to early intervention for that lawful action.

Beyond the lack of relevance to individual officer behavior, the sheer volume of DPs due to prosecutorial discretion would diminish the effectiveness of the Early Intervention Committee ("Committee").  Based on an analysis of DPs in 2019, the Department estimates that the number of officers who would qualify for review based solely on prosecutorial discretion DPs is quadruple that of any other category.  The vast majority of these DPs are simply the result of individuals charged with low level offenses, consistent with the Department's policies, and being referred to diversion programs, a decision which has absolutely nothing to do with individual officer behavior.

### b.  Including the Names of Police Officers on Scene (Plaintiffs' Proposed Order, Appendix A, Para. 1.b(i), 1.c(i), 1.d)

All parties agree that the NYPD should collect suppression decisions in which evidence is precluded because of unlawful stops and searches, and judicial decisions finding an officer not credible.  They agree that the materials to be obtained should include aggregated data and individual decisions, including transcripts and written opinions and decisions.  However, plaintiffs would include in the order that the information obtained also include "the names of police officers on scene and/or testifying NYPD personnel."  (Appendix A and B, Para. 1.b(i), 1.c(i)).  The parties also agree that certain information should be obtained by the NYPD in civil cases where the New York City Law Department (Law Department) declines to represent or indemnify a police officer. They disagree whether that information should include the names of police officers on scene and/or testifying NYPD personnel.  (Appendix A and B, Para. 1.d).

### i. Plaintiffs' View

The NYPD's proposal fails to acknowledge a fundamental truth: officers work in pairs and teams and are enormously influenced by each other. Although the City seeks to limit interventions to individual officers, the letter and the spirit of the Court's November 2018 Order and the Facilitator's Recommendation No. 1 requires acknowledging the teamwork and shared responsibility in most intervention-worthy decision-making. Thus, effective early intervention must recognize that most police conduct (or misconduct) is not purely individual and target the team, not merely the reporting officer, to improve performance and shift culture.

Common police and court procedures confirm this conclusion. In police operations, an officer is frequently "assigned" to be the arresting officer for reporting purposes. This assignment may be arbitrary and is not necessarily reflective of the officer's role in the investigative encounter. Similarly, in pretrial hearings in criminal cases, the testifying officer is permitted to testify to hearsay and to the actions of his/her fellow officers in the course of the arrest, even if not personally observed. Judicial or prosecutorial decisions about suppression and credibility frequently implicate the conduct of multiple officers.

Thus, the officer reporting or testifying may not be the officer most in need of early intervention. Moreover, officers who repeatedly fail to intervene in unlawful stops and searches by their fellow officers may lack understanding of the constitutional and/or policy requirements for a lawful stop or search or their duty to intervene to stop constitutional violations, a parallel and compelling basis for early intervention.[11]  *See Anderson v. Branen,*

---

[11] One key intervention proposed by Plaintiffs in this regard, and in addition to other early intervention procedures, bystander, or peer, intervention programs facilitate immediately course-correcting misconduct, and build leadership capacity throughout the police force. *See Floyd* Dkt. # 686 at 12-13. Plaintiffs advised the Court that bystander intervention programs, like the EPIC program used in New Orleans, must be incorporated into the early intervention

17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."); *see also* NYPD Patrol Guide Section 221-02, Use of Force (effective Jun. 21, 2016) ("All members of the service must intervene to stop another member of the service from using excessive force.  Failure to intervene … is serious misconduct that may result in criminal and civil liability and will result in Department discipline, up to and including dismissal.").  *But see* Rocco Parascandola  and John Annese, *NYPD brass won't require officers to turn in colleagues for racially-biased policing,* N.Y. Daily News (Apr. 9, 2020) (NYPD rejects OIG recommendation requiring officers to report biased conduct they witness).  Equally concerning, officers who identify constitutional misconduct may lack the leadership skills or cultural institutional support to intervene appropriately in the moment. Early intervention requires NYPD to measure, track, record, and embed witness officers and bystanders in support of the process.

Police investigative procedures confirm the relevance of this approach. All officers on the scene are interviewed, as a matter of course, in IAB investigations.  *See* IAB Guide 620-58 §4; *see also* Internal Investigations Course Module 04 – Race & Biased Policing, at 30.  CCRB also interviews and reviews body-worn camera footage of officers who witnessed police misconduct.  *See* New York City Civilian Complaint Review Board, *Strengthening Accountability: The Impact of the NYPD's Body-Worn Camera Program on CCRB Investigations*, pp. 37, 109 (February 2020).  Thus, contrary to the City's point below, this provision does not seek to create an overbroad category of review, but to systematize

---

plan. Yet, the City and the NYPD continue to ignore this important priority, despite Plaintiffs' efforts to assist in identifying resources and collaborating to develop such plans. *See id.;* Dkt. # 686 at 12-13*;* Dkt.# 755 at 6; Dkt. 744 at 2.

recognized best practices. A "systematic approach" can easily distinguish officers merely securing a crime scene or supporting an operation from officers on scene operating jointly in the operation under review.

### ii. City's View

The City opposes the addition of a requirement that the Department obtain the names of <u>all</u> officers on the scene of any incident that, during the criminal prosecution, leads to a suppression decision, adverse credibility finding, or in the subsequent civil matter Law Department declines to indemnify or represent an officer.  This would cast far too wide a net to be systematically useful to the NYPD Early Intervention Committee. Officers often arrive on the scene of an incident as backup and take no substantive role in the incident itself.  More often than not, officers arrive at the scene after an encounter has already concluded.  To the extent that they are an active participant in the incident, and therefore worthy of potential review as part of EIS, this will be clear in the documents that are currently proposed to be collected.  The number of officers that would be implicated by obtaining information from every officer who arrived on the scene is too large to yield anything meaningfully relevant and the significance of being on the scene, by itself, is of such limited value, that this information would be unduly burdensome for the Committee members' time and resources were they to review these materials. The City's intention is not to limit intervention where it is warranted, but to laser focus on the officer who should be the subject to early intervention.

### c. Materials Relating to Law Department Declinations of Representation (Appendix A and B, Para. 1.d)

All parties agree that NYPD should obtain information in civil cases in which there are allegations of illegal stops, illegal trespass enforcements, or racial profiling where the Law

12

Department declined to indemnify or represent a police officer, including the declination letter and the general basis for the declination of indemnification or representation. The plaintiffs would require the NYPD to collect additional data: complaints, notices of claim, and other litigation materials in possession of the City that do not reflect privileged communications, including discovery produced in the course of the litigation. (Appendix A and B, Para. 1.d).

### i. Plaintiffs' View

A commitment to early intervention requires the NYPD to develop robust mechanisms to collect data, analyze, and deter misconduct, and identify patterns and trends. This includes, but is not limited to, discovery in civil cases, particularly transcripts of EBTs. Effective early intervention requires detailed data to inform a thoughtful decision. If, as the City claims *infra*, most cases are resolved or declined pre-discovery, the discovery provisions of the Court's putative order would not be triggered. However, even cases settled pre-filing, like the case of Eric Garner, involved notices of claim, 50h hearings and extrinsic evidence provided to the City in support of settlement determinations. Whatever discovery exists is relevant and necessary to early intervention consideration of subject officers. *See infra* at n. 12 and associated text; *see also infra* at Section II.d.i (discussing early settlement options and early intervention).

Importantly, no issues of privilege or work-product protection justify the withholding of relevant information, with respect to the concerns the City cites below. No communications or strategy are at issue. Nor do the materials implicate work product as they do not involve any analysis, research, conclusions, or theories prepared in anticipation of litigation. *Acwoo Intern. Steel Corp. v. Frenkel & Co.*, 165 A.D.2d 752 (1st Dep't 1990); *U.S. v. Adlman*, 134

F.3d 1194 (2d Cir. 1998).  In addition, although the Law Department represents individual officers, it also represents the agencies of the City of New York, including the NYPD and CCRB, the Mayor, and others.  As corporate counsel, its representation of any individual is subject to its overarching duty to represent the City and its agencies (including in compliance with the judgment in this case), as is certainly reflected in its retainer agreements, and conflict waivers, with individual officers.  The NYPD's expressed concerns, even if valid, could be accommodated with a litigation wall that shields the production of early intervention materials from the ongoing representation of an officer.

### ii.  City's View

The City's language in paragraph 1(d) provides that the Department will receive the two most relevant data points: the declination letter itself along with a general basis for the Law Department's declination to represent or indemnify.  Additional revisions to the language of paragraph 1(d) now ensure that the Department will also receive the civil complaint with each declination, as well as identification of non-privileged material underlying the Law Department's decision to decline representation or indemnification of individual police officers.  This information will provide context for the Committee's review, and its ability to conduct a targeted investigation into the officer's conduct.

The City opposes Plaintiffs' additional language that would require the Department to obtain the summons and notice of claim and now the GML 50-h hearing transcript.  The summons contains no substantive information related to the allegations against the officer and the allegations in the notice of claim are perfected in the civil complaint that is subsequently filed in the civil lawsuit.   Similarly, the substance of the claims made by the

14

complainant/plaintiff at a GML 50-h hearing are typically memorialized in the complaint as well. Thus, the need for these documents is obviated by the Department's requirement to obtain the civil complaint, which the Law Department will now provide along with the declination letter.

The plaintiffs request that the Department obtain notices of claim and 50-h transcripts in pre-filing matters is also untethered from the Court's Order Regarding Facilitator's Recommendation No. 1. That Order required the Department to develop a plan that would incorporate "denials of indemnification and/or representation *by the New York City Law Department*." Order, Floyd v. City of New York, No. 08 CV 1034 (AT) (S.D.N.Y. Nov. 20, 2018), ECF No. 662 (emphasis added). Notices of claim and 50-h transcripts are done before the commencement of a civil action, and the New York City Comptroller is the agency involved in the settlement of such cases – not the Law Department.  Not only does the Law Department lack involvement in the Comptroller's process, there would be no declination of representation or indemnification in those cases because there is no civil lawsuit in the first instance. For these reasons, the City opposes the Plaintiffs' proposal to include summonses and notices of claim and 50-h transcripts, in the early intervention system.

The City also opposed the Plaintiffs' conclusory catch-all language that would require the Department to collect "any available discovery produced by either side," as this phrase is not specific enough. *Cf. Peregrine Myanmar v. Segal*, 89 F.3d 41, 52 (2d Cir. 1996).  The majority of declination decisions occur in the pre-answer phase of litigation, before the parties engage in discovery, thus rendering plaintiffs' proposed language a dead letter in most cases. The City remedied this defect in the plaintiffs' proposed language by requiring that the Law Department identify material that directly underlies the general basis of the declination

15

decision instead of boilerplate categories of overbroad information. More importantly, most of the records related to an underlying incident would be the arrest records or investigatory files which the NYPD already possesses.  Therefore, to include a requirement to obtain "discovery" is an unnecessary addition that cannot be satisfied in most cases.

### d.   Judgment and Settlements Against Police Officers (Appendix A and B, Para. 1.e)

All parties agreed to limit the requirement that NYPD collect data regarding judgments and settlements against police officers to civil cases in which there are allegations of illegal stops, frisks, searches, trespass enforcement or racial profiling.  However, they disagree over which of these cases should be included in the requirement and over what information should be required to be obtained.  The City would require collection of information in cases "where there exists evidence that that police officer violated a rule or regulation of the NYPD."  The plaintiffs add the term "may have":  information must be obtained in cases "where there exists evidence that that police officer may have violated a rule or regulation of the NYPD."  The City's proposed order require that the NYPD obtain "identification of such evidence to the extent that the evidence is not protected from disclosure by operation of law or applicable privilege."  Plaintiffs would also include "notices of claims, civil complaints, and discovery made available by any party to the litigation."  (Appendix A and B, Para. 1.e).

### i.   Plaintiffs' View

The New York City Early Settlement Unit, operated through the Office of the City Comptroller, and the Corporation Counsel Early Settlement Unit, operated through the New York City Law Department, also have important early intervention information relating to officer malfeasance. The City's early settlement units play a significant and substantial role,

in terms of the expenditure of public money and in identifying and resolving allegations of official misconduct.[12]  Many cases settle following the filing of a notice of claim, but prior to the filing of a court complaint.  The paradigmatic example of this, the City's settlement with Eric Garner's estate, involved  issues similar to those that the Court addressed in *Floyd*, clear liability, and a significant monetary settlement via the Comptroller.   NYPD's early intervention system is inadequate unless it triggers monitoring or scrutiny under conditions such as those surrounding the death of Eric Garner.  The City's actions to quickly settle claims to avoid press or other attention deserves more consideration, not diminished regard, in the early intervention calculus within the NYPD.

Thus, as with declarations, *supra* at Section II.c.i, __***all***__ entities authorized to settle claims relating to police misconduct should inform early intervention, in accordance with the explicit language of the Court Order.  *See* Dkt. # 662.  *See also* Dkt. #744 at 5-6. NYPD should consider the outcomes of civil judgments and settlements based on a notice of claim, as well as filed civil lawsuits. Nevertheless, the NYPD dismisses the City's Early Settlement Unit as irrelevant or lacking in information. Dkt. #753-1 at 9.  However, even at the earliest stages, all relevant stop reporting and body-worn camera video are available for review, in addition to video or evidence in the possession of complainants. Commitment to early intervention requires robust commitments to collect data, analyze, and deter misconduct, and identify patterns and trends. This includes relevant litigation data, including but not limited to discovery in civil cases and EBTs [examinations before trial].

---

[12] *See* Craig McCarthy, et al., *NYPD's tally of lawsuit settlements fails to account for $22 million,* The New York Post (Sept 15, 2019) (noting $16.9 million paid out through the Comptroller's office in the first three months of 2019).

In addition, and importantly, the Law Department must embrace its important role to inform early intervention. The Law Department should not adopt a narrow construction that sidesteps the meaning of the Court's order or denies the lived experience of community members in ongoing improper stops, but should opine where the testimony of a witness, a sworn complaint or notice of claim indicates misconduct, with or without corroborating evidence outside the possession of the NYPD. Nor may the Law Department use the work product doctrine or New York Municipal Law § 50-k to evade its responsibility to guide the NYPD in this regard. First, Municipal Law § 50-k sets forth a scheme whereby the Law Department represents individuals acting within the scope of their public employment who were "not in violation of *any rule or regulation* of his agency at the time the alleged act or omission occurred." N.Y. GEN. MUN. LAW § 50-k, Paragraph 2. (emphasis added).

Clear determinations of violations of rules or regulations are frequently sidestepped in the legal process, to facilitate resolution of cases.  Thus, the Law Department should refer cases and case information where individual officers *may have* violated an agency rule or regulation, i.e., even absent definitive proof.  In early intervention, capture misconduct broadly is key. Intervention thresholds must not limit effective early intervention.

### ii.  City's View

The City rejects Plaintiffs' proposed language for paragraph 1(e) for the same reasons stated for paragraph 1(d).  In addition, we reiterate our objection to the inclusion of the Comptroller early settlement data from the Law Department: The Order Regarding Facilitator's Recommendation No. 1 specifically called for the Department to incorporate "judgments and settlements against police officers in civil cases where, *in the opinion of the*

*New York City Law Department*, there exists evidence of police malfeasance." Order, Floyd v. City of New York, No. 08 CV 1034 (AT) (S.D.N.Y. Nov. 20, 2018), ECF No. 662 (emphasis added). The Law Department settles matters post-filing for a variety of reasons connected to the merits of individual cases and unrelated to whether the allegations will be reported in the press. As discussed above though, the Law Department is not usually involved in the settlement of cases pre-filing, and is not in a position to formally opine on whether the conduct of a police officer named in a pre-filing allegation would constitute "police malfeasance." Neither is the Department "dismissing as irrelevant" the Comptroller's role in settlement.  That agency was not the subject of 1(e).  However, because of the Department's continued commitment to collect data, it will make reasonable efforts to systematically obtain this data directly from the Comptroller's Office.

Regarding the text of paragraph 1(e), the City determined that N.Y. GEN. MUN. LAW § 50-k provides an appropriate standard that would satisfy the requirement that the early intervention system plan incorporate information regarding "judgments and settlements against police officers in civil cases where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance," particularly because the determination by the Law Department to assume representation of any police officer is made under Section 50-k. *Compare* N.Y. GEN. MUN. LAW § 50-k *with* Order, Floyd v. City of New York, No. 08 CV 1034 (AT) (S.D.N.Y. Nov. 20, 2018), ECF No. 662.

Accordingly, under paragraph 1(e) the Law Department will identify evidence in any civil lawsuit that contains allegations of unconstitutional stops, unconstitutional trespass enforcement, or racial profiling which resulted in a judgment or settlement, and where the Law Department has determined that a police officer violated a rule or regulation of the

NYPD. This language ensures that an entity independent of the NYPD will make a determination about the propriety of a police officer's conduct, but does not infringe on any privileged material, including but not limited to attorney work-product, created by the Law Department in determining representation or during the course of litigation.

###### e.  Adverse Findings Related to Racial Slurs (Appendix A and B, Para. 3.a)

All parties agree that the Early Intervention Committee should be used to systematically assess information regarding adverse findings of racial profiling.  The Plaintiffs would also add racial slurs to this provision.   (Appendix A and B, Para. 3.a).  Plaintiffs would also add the term "racial slurs" to all other references to racial profiling.

###### i.  Plaintiffs' View

The City's claim that racial slurs used against the public by police, public servants and government officials, should not be subject to early intervention is untenable and, frankly, outrageous. While the taxonomy of separating racial slurs and epithets from racial profiling is convenient, a speech versus action distinction does not change the fact that each represents strong evidence of racial bias and that early intervention is an ideal option.  The Office of the Inspector General for the NYPD (OIG) recently acknowledged that the racial bias that animates both racial slurs and other acts of racial discrimination should be understood to have a common root.  *See* Office of the Inspector General for NYPD, *Complaints of Biased Policing* at 32-33 ("The inability of the NYPD/CCRB investigative processes to categorize and treat the [racial slurs] issue as biased policing may have negative implications for explicitly holding officers accountable…, as well as for the City's ability to track the full range of patterns and trends related to biased policing.").

As the *Floyd* Court ruled, the chronic stress of police intervention and racial profiling profoundly impacts Black and Latinx New Yorkers.[13]  The need to address racial profiling and racial slurs using early intervention was accredited by the *Floyd* trial court, which expressed its concern at the added burden to most individuals of filing even *one* CCRB complaint, let alone a state or federal lawsuit to redress racial discrimination. *See* Dkt. #744 at 11 (trial court mandates that monitoring must account for the low likelihood of aggrieved individuals taking the time to file a complaint with CCRB).  Nor has NYPD substantiated *any* complaint of racial profiling since trial, casting further doubt on the legitimacy of its commitment to eradicate racial profiling.

### a.   *NYPD has burden of proving racial discrimination is eradicated*

The Court found in August 2013 that the NYPD intentionally discriminated on the basis of race, in violation of the Fourteenth Amendment.  *See Floyd* Dkt # 373 (Liab Op.) at 181-88.   Having been found liable for racial discrimination in the conduct of stops, frisks, searches, and trespass investigations in communities and in public and private housing, NYPD has the burden to show that it has understood, identified, and eradicated policies and practices that tolerate, license, and facilitate racial discrimination, even unwittingly.

The *Floyd* Court articulated this principle, specifying that the monitorship will continue until "the City can show by a preponderance of the evidence [] that it has achieved substantial compliance with all of the Immediate and Joint Process Reforms to be approved

---

[13] *See Floyd* Liability Op., Dkt. #373 at 6 ("No one should live in fear of being stopped whenever he leaves his home to go about the activities of daily life….Some plaintiffs testified that stops make them feel unwelcome in some parts of the City, and distrustful of the police."); *See also,* Geller A., Fagan J., et al., *Aggressive policing and the mental health of young urban men.* 104 Am J Public Health 2321 (2014) (increased police stops consistently associated with persistent "stigma," "trauma," "anxiety," "depressive symptoms" for young urban men).

and so-ordered by the Court in *Floyd*." *Floyd* Dkt # 466 at 1 (emphasis added); s*ee also Freeman v. Pitts,* 503 U.S. 467, 494 (1992); *Missouri v. Jen*kins, 515 U.S. 70, 150 (1995) (stating, in the school desegregation context, that "[t]he burden of showing that these conditions to finding partial unitary status have been met rests (as one would expect) squarely on the constitutional violator who seeks relief from the existing remedial order"); *Jeff D. v. Otter*, 643 F.3d 278, 285 (9th Cir. 2011) (state healthcare system found to have violated constitutional rights of indigent children with emotional and mental health needs, the "framework" of the plaintiff bearing the burden of proof "was not appropriate for determining whether the Defendants had sufficiently complied with the consent decrees so that they were entitled to have the decrees vacated").

### b. The City misconstrues the relevant standard

In arguing racial slurs are not an appropriate focus of early intervention, the City misconstrues the relevant standard.  Suggesting racial slurs should not be subject to review in early intervention because racial slurs cannot by themselves be adequate to prove *liability* under Section 1983 in this Circuit is inapposite.   Even if racial slurs alone may not form the basis for a Section 1983 claim, they remain powerful direct evidence of racial animus toward the person or group of people against whom an officer takes law enforcement action.  *See e.g., Ali v. Connick*, 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015) (noting "officers' use of racial epithets may be regarded as direct evidence of racial animus").  This is particularly true where officers have a demonstrated history of racial slurs.

The City's citation to case law holding that the use of racial slurs alone cannot support a Section 1983 claim, *see infra* Section II(e)(ii), therefore misunderstands both the posture of

this case and the purpose of early intervention. First, in the post-liability posture of this case burden has shifted to NYPD to prove it is no longer racially discriminating. *See, e.g.*, *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 362 (1977) (noting that, after a determination of a pattern or practice of discrimination, courts employ an inference that subsequent decisions "w[ere] made in pursuit of that policy"). Second, as the City has recognized, in this and prior briefing, only an expansive understanding of early intervention meets the spirit and the letter of the Court's Order. By its very definition, early intervention must capture conduct short of actionable constitutional violations. To limit early intervention to only those circumstances where an officer would be liable for unconstitutional conduct would create no additional correctives. NYPD's handling of the ongoing use of racial slurs and epithets by NYPD officers is thus an integral part of early intervention that requires broad, mandated cooperation, not voluntary participation as the City suggests.

### c. Early intervention must address intersectional racial profiling and racial slurs

In addition, addressing pervasive practices of racial profiling requires NYPD to examine racial slurs and bias broadly and intersectionally.[14]  The taxonomy of racial bias should not exclude racial slurs and/or profiling against Black and Latinx LGBTQI people, i.e., expressions of racial bias channeled through multiple and intersecting identities, like gender, sexual orientation, gender identity, or disability.[15]  Black complainants comprised half

---

[14] *See e.g.,* Kimberle Crenshaw, *Mapping the Margins: Intersectionality, Identity Politics, and Violence against Women of Color,* 43 Stanford L. Rev. 1241 (Jul. 1991) (noting authentic commitment to combat racial discrimination recognizes race as a coalition of identities, rather than a separate or parallel identity: "intersectionality provides a basis for re-conceptualizing race as a coalition between men and women of color…. [R]ace can also be a coalition of straight and gay people of color…").

[15] Notably, the OIG raised this concern in 2017, also noting the inappropriate distinction between hate speech and policing action for LGBTQ persons and submitted a recommendation, rejected by the NYPD, that "NYPD Internal Affairs Bureau's complaint system should be configured to categorize and track all LGBTQ-related allegations that

of LGBTQI complainants who filed reports with CCRB, including for the use of slurs, where race was known.[16] Latinx complainants were over one-third of complainants where race was known.[17] A February 2020 New York City Bar Association report to the New York State Legislature, in support of A.654/S.2253 (informally, urging repeal of the "walking while trans" ban), noted the disproportionate stops, arrests, and police misconduct that women of color and transgender women of color face.[18] The 2015 U.S. transgender study noted that Black respondents had significantly higher incidences of police misconduct – including misgendering, verbal harassment, transphobic questions, and forced sexual activity to avoid arrest, physical or sexual assault, and assumptions that they were sex workers – than white respondents.[19] Addressing racial discrimination in these contexts requires recognizing the misogyny and transphobia in which the racial profiling may be cloaked. These, too, are manifestations of racial bias within the scope of this monitorship. Addressing merely a subset of racial slurs and profiling will not redress liability under *Floyd*.

### d. Court intervention is required, as NYPD leaders' rejected racial slurs as bias

---

implicate biased conduct, and not just 'profiling.' LGBTQ-related allegations involving bias would include violations of the 2012 Patrol Guide revisions and 'offensive language.'" JRP Final Report, Dkt. #594, at 256.

[16] *See* NYC Civilian Complaint Review Board, *Pride, Prejudice and Policing: An Evaluation of LGBTQ-Related Complaints from January 2010 through December 2015* (2016) ("Black people comprised 31% of the LGBTQ-related victims and are the largest group of victims or alleged victims that reported their ethnicity. Hispanics represent the second highest reporting demographic at 21%. White individuals comprise an overall 10%, and Asians comprise 1%. When data on victims or alleged victims with unknown ethnicity is removed, then 49% are Black, 34% Hispanic, 16% White, 1% Asian and less than 1% American Indian.").

[17] *Id.*

[18] *See* New York City Bar Association, *Report On Legislation by the Committees on Lesbian, Gay, Bisexual, Transgender and Queer Rights, Civil Rights, Criminal Justice Operations, Immigration and Nationality Law, and Sex and Law* (Feb. 2020) (available at: https://s3.amazonaws.com/documents.nycbar.org/files/2020630-RepealWalkingWhileTrans_FINAL_2.3.20.pdf).

[19] *See 2015 U.S. Transgender Study | Report on Black Experiences* at 16 (available at https://www.transequality.org/sites/default/files/docs/usts/USTSBlackRespondentsReport-Nov17.pdf)

NYPD will only target racial bias via racial slurs in its early intervention system if mandated by this Court. The leadership of the NYPD has already rejected calls by the OIG and others to investigate racial slurs as evidence of bias.[20] Yet, whether racial bias is manifest in speech or in police action, it is unacceptable for public servants. NYPD should have a zero-tolerance policy for racist behavior.

A central aspect of NYPD's liability for intentional racial discrimination in this case is the deliberate indifference to the officers, supervisors, and executive leadership who deployed or failed to appreciate, curb, or discipline racially discriminatory conduct. *See Floyd* Liab. Op. (Dkt # 373) at 189-192. NYPD cannot effectively remediate pervasive racial profiling while tolerating – and thereby implicitly licensing – racial bias. Racial profiling, racial slurs or epithets, and racial bias are particularly appropriate targets for early intervention, especially given the NYPD's inability to discipline, much less identify, instances of racial profiling. There is a patent need to address the underlying racial bias, of which racial slurs can be a strong indicator, that motivates racial profiling in order to effectively remediate it.

Thus, the ongoing use of racial slurs, with impunity, are clearly relevant to the Court's ruling in *Floyd* and the effectiveness of remediating racial profiling, as well as being strong indicators of racial bias. Yet, the NYPD has already publicly rejected OIG recommendations

---

[20] *See* Rocco Parascandola and John Annese, *NYPD brass won't require officers to turn in colleagues for racially-biased policing*, The N.Y. Daily News (Apr. 9, 2020) ("Besides setting aside a suggestion requiring cops to report their colleagues' suspected biased actions, the NYPD has also declined the IG's suggestion that it more aggressively investigate officers' alleged "use of offensive or derogatory language associated with an individual's actual or perceived protected status, such as racial slurs." In rejecting the IG's recommendation on its handling of alleged slurs, the NYPD said that in some cases such offenses are already covered by Civilian Complaint Review Board investigations. Also, the department says, racial slurs by themselves do not constitute biased policing.")

relating to racial slurs and epithets.  At this point, only an order from this Court can require the NYPD to investigate and mitigate racial bias within its early intervention system, by considering racial slurs and epithets in early intervention.

### ii.  City's View

The City has already accepted inclusion of racial profiling complaints into the Department's early intervention system. We note at the outset, however, that the Order Regarding Facilitator's Recommendation No. 1 required the Department to submit an implementation plan involving five discrete categories of information:

> (a) declinations of prosecutions by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or representation of police officers by the New York City Law Department; and (e) judgments and settlements against police officers in civil cases where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance.

*See* Order, *Floyd v. City of New York*, No. 08 CV 1034 (AT) (S.D.N.Y. Nov. 20, 2018), ECF No. 662. Although none of those categories include racial profiling data, the Department will voluntarily review racial profiling data in connection with its existing early intervention system in light of the fact that, based on the findings of fact in the *Floyd* Liability Opinion, the Court has jurisdiction to remedy racial profiling that occurs in connection with the Department's stop-and-frisk policies.  Accordingly, the City does not object to requiring the Committee to assess information regarding racial profiling in connection with stop and frisk when there are two or more racial profiling complaints.

Regardless of the policy merits of including additional categories for early intervention, in the context of *this* monitorship the Court is limited to ordering categories of

information that remedy findings of fact in the Liability Opinion. Pursuant to Rule 52(a), detailed findings of fact and conclusions of law that the City's previous stop-and-frisk policies ran afoul of the Fourteenth Amendment's prohibition against "selective enforcement of the law based on considerations such as race."  *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 660-61 (S.D.N.Y. 2013).  Therefore, there is a basis for the Court to exercise jurisdiction over the inclusion of racial profiling data with respect to stop and frisk.  *Cf. Knox v. Salinas*, 193 F.3d 123, 129 (2d Cir. 1999) ("Pursuant to Fed. R. Civ. P. 65(d), an order entering an injunction 'shall set forth the reasons for its issuance.'  Similarly, Fed. R. Civ. P. 52(a) requires special findings of fact and conclusions of law in support of a permanent injunction."); *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 814 (2d Cir. 1975) ("We find it plain that the entry of a permanent injunction without appropriate findings violates the command of Fed. R. Civ. P. 52(a).").

However, for similar reasons, the City declined to include allegations of racial slurs in isolation as a basis for early intervention.  Despite plaintiffs' characterization to the contrary, exclusion of racial slurs is not a "convenient taxonomy" but rather a jurisdictional requirement. The Order Regarding Facilitator's Recommendation No. 1 arose out of the Joint Remedial Process, and the attendant reforms "must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments." *Cf. Floyd v. City of New York*, 959 F. Supp. 2d 668, 687 (S.D.N.Y. 2013).

Racial slurs alone cannot form the basis of a court-ordered early intervention system because the court's authority to order relief is ultimately dependent on the findings of fact that form the basis of liability under Section 1983 in *Floyd*.  Simply as a matter of law, "[o]ffensive racial comments cannot form the basis of a §1983 claim."  *See Haussman v. Fergus*, 894 F.

Supp. 142, 149 n.20 (S.D.N.Y. 1995) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986)). "Furthermore, verbal threats do not violate the [F]ourteenth [A]mendment unless accompanied by physical force or the present ability to effectuate the threat." *Harris v. Lord*, 957 F. Supp. 471, 475 (S.D.N.Y. 1997). The *Floyd* Liability Opinion is consistent with this line of cases, and it is noteworthy that of the stops and frisks that formed the basis of that Opinion, not one contained a claim or allegation of a racial slur or epithet and the Court imposed no related reforms in its Remedies Order. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, *passim* (S.D.N.Y. 2013); *Floyd v. City of New York*, 959 F. Supp. 2d 668, *passim* (S.D.N.Y. 2013). Therefore, the City rejects the inclusion of racial slurs in light of the fact that slurs alone do not constitute constitutional violations that can be remedied by the Court-ordered early intervention system plan in this monitorship.

Plaintiffs' reliance on *Ali v. Connick*, 136 F. Supp. 3d 270 (E.D.N.Y. 2015), is, at best, misplaced, or, at worst, disingenuous. *Ali* involved allegations of excessive force "based upon the plaintiff's ethnicity, as an American Muslim, and a man of Middle Eastern appearance . . . ." *See id.* at 277. In other words, plaintiff's claim under the Equal Protection Clause did not stem from the alleged racial slurs, standing alone. Thus, contrary to Plaintiffs' selective quote from *Ali*, that court emphasized that racial slurs, standing alone, may not establish an equal protection claim. *See id.* at 279-80 ("In the context of claims brought against law enforcement officers, courts in this circuit and elsewhere have held that officers' use of racial epithets may be regarded as direct evidence of racial animus and, ***when combined with*** physical abuse or other unlawful actions, may establish an equal protection violation.") (emphasis added).

Indeed, Plaintiffs' even concede that "racial slurs alone may not form the basis for a Section 1983 claim." In fact, *Ali* cited several other circuits that reaffirmed the same, well-

settled legal principle. *See id.* at 279-80 (citing *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1012-13 (5th Cir. 2003) (affirming district court's conclusion that "racial slurs alone are [not] actionable under the Fourteenth Amendment."); *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999) (holding "that an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation."); *King v. City of Eastpointe*, 86 F. App'x 790, 814 (6th Cir. 2003) ("The use of a racial epithet by itself is not an actionable violation of the Equal Protection Clause.").  As such, the *Floyd* Plaintiffs insistence on the addition of racial slurs to the Early Intervention System is without merit and not supported by well-established legal precedent.

As such, *Floyd* Plaintiffs conclusory assertion, without any factual support, that racial slurs should be included in early intervention as "powerful direct evidence of racial animus toward the person or group of people . . . where [law enforcement] officers have a demonstrated history of racial slurs" falls flat and must be summarily rejected.

### f.  Publicly Reported Committee Protocols and Committee Activities (Plaintiffs' Proposed Order, Appendix A, Para. 3.c)

The plaintiffs would include a provision requiring that the Committee establish and seek Court approval for protocols to govern its decision-making.  The proposed paragraph would also require the Committee to publicly report its intervention activities, whether its decisions adhered to the protocol, and if not, to explain departures.  The City opposes the inclusion of this paragraph. (Appendix A and B, Para. 3.c).

### i.  Plaintiffs' View

As the Court and the Facilitator recognized, genuine commitment to early intervention can prevent serious misconduct but that only a transparent, accountable, and systematic

approach can accommodate the necessary volume.  To the contrary, NYPD proposes a case-by-case process wherein the Early Intervention Committee will operate without specific criteria, standards, protocols, or potential interventions are offered as part of the "systematic plan" presented to the Court.  While some discretion is warranted, the Committee's putative case-by-case review raises concerns of inconsistency, volume, favoritism, and black box decision-making.  Even more troubling, there is no mention of written policy guiding the work of the Committee, although this was specifically called for by the Facilitator's EIS recommendation.  *See Floyd* Dkt # 597 at 221-22 (recommending the NYPD "set forth a written policy for the evaluation of [adverse credibility findings] and any necessary remedial measures including reassignment, retraining, or referral for discipline and investigation.").

This is a significant deficiency.  Assessments shielded from scrutiny, and subjective and undocumented decision-making by commanding officers, do not meet the standard set by the Court's Order or the Facilitator's recommendation.  Deferring decision-making to case-by-case decisions in executive-level assessments occults the systematic approach called for by the Facilitator and the Court.  In addition, this policy decision drastically reduces the number of police officers who may benefit from early intervention to the interest and/or availability of commanding officers and executive leadership to prioritize intervention among their other responsibilities.  This is true despite the NYPD's claim that early intervention should operate like mentoring and supervision, where intervention is the ordinary and preferred course.

Concerns about the volume of necessary interventions cannot serve as a basis to limit early intervention.  By definition, early intervention identifies officers *before* they commit serious misconduct triggering formal discipline or departmental investigation, necessitating a

higher volume of early interventions than other internal NYPD programs, despite the City's claim throughout this document that the potential volume of cases is a basis to exclude certain conduct from review. To the contrary, unless the system can accommodate a large volume of putative interventions, there is no authentic commitment to early intervention. The early intervention system must operate formulaically for most situations, hence the call for clear and transparent protocols. Ultimately, the appointment of a secretariat to organize, rank, and make recommendations to the Early Intervention Committee would add consistency to the process and transparency to the monitoring of early intervention efforts. The early intervention system should operate according to clear, written decision-making guidance, as well as guidelines to ensure consistent, fair, and proportionate outcomes (like a decision matrix).

### ii. City's View

The City maintains that the "clear and consistent protocols" that Plaintiffs' counsel seek to impose in paragraphs 3.c is beyond the scope of what is already in the proposed order and would drastically limit the utility of the proposed early intervention system. The proposed order already specifies the makeup of the Committee and how often it will meet, the documents the Department will take reasonable measures to obtain for purposes of early intervention, the thresholds for review, the types of information and factors the Committee will consider when making a decision, the potential interventions for an officer, the follow-up process with the commanding officer, and that the Risk Management Bureau will be tracking these efforts both to ensure compliance and consistency and to guide the Committee's decisions going forward.

In addition, the Committee will consider the individual officer's history, including but not limited to: (1) disciplinary history; (2) assignment history; (3) performance evaluations; (4) the commanding officer's (or the commanding officer's designee's) recommendations; (5) the officer's past appearances before the Committee. The Committee will also review the specific facts of the threshold(s) reached.

Upon its review, the Committee will determine whether intervention is required. Possible interventions include, but are not limited to: (1) re-trainings; (2) mentoring; (3) monitoring; (4) enhanced supervision; (5) change of assignment; (6) health and wellness referrals; and (7) referral for potential disciplinary action to an internal Department bureau or criminal investigation to an external agency, such as a District Attorney's Office. The Committee will have the discretion to employ other types of interventions not enumerated herein, and/or to tailor the interventions set forth herein to each individual officer's circumstances.

Each action of the Committee will be taken with the goal of preventing misconduct in the future by appropriately dealing with potentially at-risk officers through tailored interventions. When an officer crosses one of the thresholds described in paragraph 3 of the proposed order, the Early Intervention Committee will review the available relevant details related both to the underlying facts of the incident(s) that triggered one of the intervention thresholds and the specific officer in question, including a profile of that officer's disciplinary history and past and current assignments. The Committee's decision will be communicated to the subject officer and coordinated with appropriate resources through the Risk Management Bureau. Any further specificity would be counterproductive to the primary purposes of the proposed early intervention system.

The proposed early intervention system is remedial in nature and not meant to be disciplinary; it is a holistic look at individual officers that may be at risk of future contacts with the disciplinary system.  A disciplinary system requires clear standards and predictability of outcome in order to be perceived as legitimate.  This early intervention system, however, is intended to be tailored to the individual officer's unique circumstances to prevent escalating problematic behavior.  Identifying behaviors before they result in disciplinary actions is a necessary and useful tool for both officers and supervisors.  An early intervention system, to correct those behaviors as soon as they are identified, needs to be outside the disciplinary process and cannot be used in a punitive manner.  The Committee requires discretion in reaching its decision to deter continued behavior that placed the officer at risk.  As such, general and adaptable guidelines are preferable to less flexible court-ordered protocols. For these reasons, the City advocates for striking paragraph 3.c from the Plaintiffs' version of the final order.

> **g.  Protocols for use of Information in Officer Evaluations, Transfers, Discipline and Promotions (Plaintiffs' Proposed Order, Appendix A, Para. 3.d)**

The plaintiffs would include a provision requiring the Committee to develop protocols for how the five categories of information in the Court's Order will be considered in evaluations of officers, transfer requests, disciplinary processes, and in discretionary promotional decisions.  The City opposes the inclusion of this paragraph.  (Appendix A and B, Para. 3.d).

> **i.  Plaintiffs' View**

Adverse findings information must inform decision-making throughout NYPD, including discipline, promotion, transfer, and performance evaluation.  As Plaintiffs have

33

noted in our previous submissions, the NYPD's proposal still provides no details on how, or even whether, any of the five categories of adverse information listed in the Court's November 20, 2018 Order are to be considered "in evaluations of officers, transfer requests, disciplinary processes, and in discretionary promotional decisions," which is expressly called for by the Facilitator's recommendation which the Court's November 20, 2018 Order directed the NYPD to implement.  Dkt. #597 at 219-20 ("The NYPD should develop a formal process to systematically collect such information, and to consider this information, along with substantiated CCRB civilian complaints, in evaluations of officers, transfer requests, disciplinary processes, and in discretionary promotional decisions."); Dkt. #744 at 6.  None of these categories of information appears in the Officer Profile, which serves as the basis of the quarterly officer performance evaluation system approved by the Court, see Dkt. #562, Att. 2. Nor do the NYPD's original or revised early intervention proposals to the Court articulate a process for ensuring that these categories of information are provided to an officer's immediate supervisor, who conducts the quarterly officer performance evaluation of that officer.

Similarly, none of the NYPD's early intervention submissions set forth a process for ensuring that these five categories of information are shared with the Department Advocate's Office so that they may be considered, along with the rest of an officer's employment history in the NYPD, when determining a disciplinary penalty for that officer when he or she is the subject of a substantiated civilian misconduct complaint.

### ii.  City's View

At the outset, the City observes that Plaintiffs' proposed language for paragraphs 3.c and 3.d contain substantively identical language regarding protocols. As such, all of the

arguments that the City made with respect to the former paragraph would apply with full force to this paragraph as well.  The City also notes that the Court's Order did not include a requirement that the adverse findings be used for officer evaluations, transfers, discipline, or promotions. Moreover, the proposed order already specifies how the Committee will assess and act on the information collected.  For these reasons, the City advocates for striking paragraph 3.d from the Plaintiffs' version of the final order.

### h.  EIS Committee Litigation Thresholds (Appendix A and B, Para. 3.e(vi))

In the City's proposed order, one threshold for review by the Early Intervention Committee is any officer who "is a named defendant in any lawsuit alleging an unconstitutional stop, an unconstitutional trespass enforcement, or racial profiling where there has been a judgment or settlement against a police officer, and where there exists evidence that the police officer violated a rule or regulation of the NYPD."  The Plaintiffs' proposed order adds "or racial slurs" after "racial profiling" and would include judgments or settlements where there exists evidence that the police officer "may have" violated a rule or regulation of the NYPD. (Appendix A and B, Para. 3.e(vi)).

### i.  Plaintiffs' View

Early intervention is only as effective as its intervention thresholds.  The City's updated provision requires intervention where an officer "is a named defendant in any lawsuit alleging an unconstitutional stop, an unconstitutional trespass enforcement, or racial profiling where there has been a judgment or settlement against a police officer, and where there exists evidence that the police officer violated a rule or regulation of the NYPD."  *See* Proposed Order at 3(e)(vi).  Plaintiffs do not object to this modification, with the clarifying language

that an officer may have violated a rule or regulation, i.e., 'where there exists evidence that the police officer ***may have*** violated a rule or regulation of the NYPD.'

### ii.   City's View

The City originally relied on the Civil Lawsuit Committee's litigation thresholds, which appeared in paragraph 3(e)(vii) through 3(e)(ix) (collectively, "Civil Lawsuit Committee Litigation thresholds"), because the parties could not reach a consensus on how to craft language that would adequately respond to the Court's Order to incorporate "judgments and settlements against police officers in civil cases where, in the opinion of the New York City Law Department, there exists evidence of police malfeasance" into the Department's early intervention system.  *Cf.* Order, Floyd v. City of New York, No. 08 CV 1034 (AT) (S.D.N.Y. Nov, 20, 2018), ECF No. 662.  However, the City believes that the solution lies with the language that now appears in paragraph 1(e).  Accordingly, the threshold in paragraph 3(e)(vi) now mirrors paragraph 1(e)'s language.  The City maintains that this language adequately sets a threshold that would capture instances of "police malfeasance," thus rendering the former Civil Lawsuit Committee litigation thresholds obsolete.

The revised language has the added benefit of eliminating a major point of controversy between the parties: the limits to properly set for the complaint and monetary thresholds. Instead of basing the "police malfeasance" threshold on the number of lawsuits or settlement and judgment amounts, the City's solution rests on a clear rule that the Law Department's determination that a police officer violated a rule or regulation of the NYPD in the specified classes of cases will *automatically* trigger review by the Committee upon judgment or settlement.

The proposed threshold in paragraph 3(c)(vi) is also far more responsive to the Order Regarding Facilitator's Recommendation No. 1 than the Civil Lawsuit Litigation Committee thresholds.  Thus, the new language targets those matters that are relevant by the nature of the allegations, i.e. unconstitutional stops, trespass enforcements and racial profiling.  For these reasons, the City has removed the Civil Lawsuit Committee litigation thresholds from its proposed order in their entirety and would only rely on the threshold in paragraph 3(e)(vi) to assess when instances of "police malfeasance" will warrant early intervention.

      i.   Number **of Racial Profiling Complaints to Meet EIS Committee Threshold (Appendix A and B, Para. 3.e(vii)**

Both parties agree that racial profiling complaints should be an element of the EIS Committee's threshold for reviewing a police officer.  The City proposes that an officer who receives two or more complaints containing allegations of racial profiling in a one-year period should be assessed by the Committee.  The plaintiffs propose that an officer who receives any racial profiling or racial slur complaint should be assessed.

      i.  **Plaintiffs' View**

Consistent with the Court's Liability Opinion, which notes the burden of filing even one complaint with CCRB in requiring the NYPD to address intentional racial discrimination, the early intervention threshold cannot be more than one complaint (and should also involve racial slurs and other early indicia of racial profiling).  The *Floyd* court rejected a similar approach as inadequate at trial:

> The City's proposed findings describe at great length the NYPD's performance monitoring system, which tracks officers who have received multiple substantiated CCRB complaints.  See Def. Findings ¶¶ 36–42; Pl.  Findings ¶ 138.  However, this system is ineffective for monitoring unjustified stops because of the low likelihood that a wrongfully stopped person will have the

> knowledge and take the time to file a CCRB complaint. The
> likelihood of multiple complaints against the same officer is even
> lower.

*See* Liability Op., Dkt. # 373, at 110, n. 396. In addition, as is set forth *supra* at Section

II.e.1, early intervention is an important site to address, mitigate, and deter racial bias by

taking very seriously <u>any</u> evidence of racial profiling or racial discrimination, including

individual complaints.

### ii.  City's View

The City opposes Plaintiffs' proposal that the Committee assess any officer who

receives a racial profiling or slur complaint.  As noted earlier, even though the Order

Regarding Facilitator's Recommendation No. 1 did not include racial profiling data, the

NYPD will voluntarily review this data as it relates to stop and frisk in connection with its

early intervention system, but excluded racial slurs in light of the fact that they do not

constitute constitutional violations that should be remedied by this monitorship.  However,

civilian complaints of racial profiling are directed to other units within NYPD for review and

investigation.  Thus, the Committee should not undertake that role nor should the committee

interfere with that process. The City proposes setting two complaints in a year as the threshold

for evaluation by the Committee after the disciplinary process concludes, regardless of

whether the complaints were substantiated.

A single complaint by itself is simply a set of allegations that will be investigated by

the NYPD outside the proposed early intervention system.  However, two complaints,

regardless of disposition, regarding the same officer may suggest a potential pattern that

should be looked at more closely by the Committee to see if there is a problem that requires

intervention, separate and apart from the investigation of each individual complaint. The Committee should not duplicate the functions of other divisions of the NYPD by investigating the merits of individual complaints.

### j. Annual Analysis and Reporting (Appendix A and B, Para. 4.a)

The City's proposed order would require the Committee annually to report to the Monitor on the number of officers who crossed the threshold for early intervention, what intervention was recommended by the Committee, and whether police officers subject to early intervention continued to be flagged for monitoring once the recommended intervention was complete. The Monitor would then determine what information should be shared with the Plaintiffs and what should be reported publicly to the Court. The Plaintiffs would require the Committee annually to report this information to the parties, the Monitor and the public for the duration of the Court-Ordered Monitoring, and to the public thereafter. (Appendix A and B, Para. 4.a).

### i. Plaintiffs' View

Public reporting is required for the transparency and accountability contemplated by the Court and the Facilitator. No meaningful participation in early intervention may occur without publicly reporting early intervention data to the parties and the public. Plaintiffs and the public have the experience and expertise to know whether early intervention is effective, what modifications could improve its operation, and how successfully it improves citizen experience of policing over time. Yet, the early intervention system, as designed by the NYPD, allows for no input or visibility for outside stakeholders in the justice system or in the community. If the Court is inclined to allow NYPD's early intervention decision-making to proceed entirely within the "black box" of the Early Intervention Committee, only regular public reporting of data relating to early information can offer some transparency and

accountability.  Plaintiffs have no objection to the reporting of data in the aggregate, as the City suggests below.

In addition, the Plaintiffs must be a partner in developing and consulting on remedies, as the prevailing party in this case.  Among other things, having tried this case, Plaintiffs are uniquely capable of clarifying where Defendants attempt to define compliance using the same conduct the Court used to define liability.  Even in this early intervention briefing, Plaintiffs have had occasion to note where the City and the NYPD have obscured information from the Court and/or relitigated issues on which the Court has already ruled. *See e.g.,* Dkt. #744 at 11-12 ("[r]eviving a strategy used at trial, NYPD seeks to convince this Court that systems previously in place are adequate for compliance.  Yet, the trial court clearly found that the existing policies, practices and procedures were inadequate and that they in fact licensed misconduct, including racial profiling and constitutional violations") (citations omitted). Such instances highlight the importance of Plaintiffs involvement in the development and consultation on remedies.

### ii.  City's View

The City objects to Plaintiffs' counsel's proposal to report data to "the parties, the Monitor, and the Court," and instead proposes reporting such data directly to the Monitor alone, which is an approach that is contemplated by the Remedial Order.  Plaintiffs' position – namely, that they "must be a partner in developing and consulting on remedies" – is already enshrined in the remedial Order:  "The Monitor's initial responsibility will be to *develop, based on consultation with the parties*, a set of reforms of the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk."

40

Accordingly, any report on data should be submitted to the Monitor, who can then decide how or whether to share the information with the Plaintiffs, and in what form the Court should receive the report.   Additionally, should the Court be inclined to require the Department to submit annual data reports, the City requests that this order should specify that the data be reported in aggregate format to ensure that officer interventions remain confidential, and that the reporting requirement be limited to the duration of the Court-ordered monitoring.

### k.  Adverse Credibility Assessments by District Attorneys (Plaintiffs' Proposed Order, Appendix A, Para. 4.b)

The Plaintiffs' proposed order would require the NYPD to include in the early intervention database information pertaining to officers identified by the District Attorneys as "lacking in credibility or otherwise problematic."   The City opposes inclusion of this paragraph.  (Appendix A and B, Para. 4.b).

### i.  Plaintiffs' View

Credibility determinations by district attorneys must factor into early intervention.  In New York City, the District Attorney is the chief law enforcement agent in each county.  The conclusion of a district attorney, or a judge, that an officer is so unreliable that their testimony cannot support a prosecution is a serious conclusion that should immediately trigger early intervention and immediate, serious scrutiny by the NYPD, which largely functions to support law enforcement.  Yet, the NYPD has repeatedly rejected prosecutorial opinions in considering early intervention and in deterring misconduct.

For example, New York City's district attorneys maintain lists of officers with credibility problems.  Several of New York City's district attorneys have publicly released

41

these lists, and even more fulsome lists may be available privately.  *See e.g.,* George Joseph, *Brooklyn DA Releases Secret Lists of Cops They Don't Trust,* Gothamist (Nov. 6, 2019); John Annese, *Queens D.A. released list of 65 officers with credibility problems, following similar releases in Brooklyn and the Bronx*, N.Y. Daily News (Nov. 20, 2019); John Annese & Graham Rayman, *Manhattan prosecutors release list of cops with 'adverse credibility' issues in court testimony,* N.Y. Daily News (Dec. 13, 2019); George Joseph, *New York City's DAs Keep Secret Lists Of Cops With Questionable Credibility*, Gothamist (Apr. 22, 2019). Similarly, prosecutors' disclosures of officers' bad acts, internal affairs bureau and disciplinary records, and other information, like the *Giglio* Disclosure Letters currently in use by the Office of the District Attorney of New York County, are extremely probative.  These offer invaluable early intervention resources that should be incorporated into the early intervention plan.

The NYPD should be vitally concerned with credibility determinations made by district attorneys and should redeploy that information toward course-correcting officer conduct.  Yet, the NYPD never acknowledged this resource in its previous briefing, let alone contested its usefulness, despite ample notice from the Plaintiffs.  *See* Dkt. #755 at 2-3; Dkt. #744 at 5; Dkt. #686 at n. 10.  Yet, there is precedent in *Floyd* for focus on a "hot list" or a "bad cops" list.  The RAND Report, commissioned by the City, recommended that certain officers who were disproportionally making stops should be identified and their work scrutinized by the Department.  *See* RAND, *Analysis of Racial Disparities in the New York Police Department's Stop, Question, and Frisk Practices* (2007).

The City's ongoing objections *infra* are inapposite.  The language of the order compels the NYPD, not the district attorneys, and directly responds to the NYPD's distaste for the

term the media has used, i.e., "bad cops list," and may be modified.  The City cites *Stengel v. Vance*, No. 159740/2018, 2020 N.Y. Misc. LEXIS 102 (N.Y. Sup. Ct., N.Y. Cnty. Jan. 6, 2020), to suggest the work product doctrine should be bar relevant information about officer credibility and reliability.  However, in *Stengel*, the court denied public disclosure of notes and conclusions pursuant to FOIL.  *See id.* at *13-14. Unlike *Stengel,* the inquiry before this Court is whether the City may disclose this information only within its own agencies. In the early intervention system designed by the NYPD, with the exception of public reporting of outcomes, neither the proceedings nor the evidence supporting individual early intervention decisions are contemplated to be made public.

Thus, the sharing of information in the possession of New York City district attorneys is more analogous to the frequent, open sharing of information among law enforcement entities, rather than the public disclosure contemplated by FOIL.  In addition, several of the district attorneys have already made their lists, or sections thereof, public.  Early intervention is not discipline; the mere notice of an officer's presence on a "hot list" or a "bad cops" list is useful to the determination of what intervention may be necessary. NYPD's disinterest in outside oversight or opinions, implied throughout this briefing, is fatal to effective early intervention.[21]  To the contrary, NYPD should be vitally concerned about the utility of their

---

[21] Related to this, all judicial determinations suppressing evidence or finding an officer incredible, whether in civil, criminal, federal, state, or municipal courts, fall within the Court's November 2018 Order and must immediately trigger the NYPD's early intervention system. Dkt. # 744 at 7, 12-13; Dkt. #755 at 2.  Yet, it is not clear that the NYPD procedure catches all relevant decisions involving NYPD officers, as required by the Court's order.  NYPD must make reasonable efforts to ensure it is aware of and has access to relevant judicial decisions, particularly where a sealing provision may be involved.  This includes developing a system to procure all relevant decisions in cooperation with the Office of Court Administration (OCA).  NYPD must also ensure that it tracks decisions from *all* relevant courts, including suppression decisions by the New York City Family Courts in juvenile delinquency cases, or in child abuse and neglect cases, or in decisions by the New York State Appellate Division reversing trial court denials of suppression motions.  *See* Dkt. #755 (citing *In re Darryl C*., 98 A.D.3d 69 (1st Dep't 2012)).  Upon information and belief, Plaintiffs believe the parties may now be in agreement about the importance and necessity of deferring to judicial guidance.

operations to the chief law enforcement officers of New York City and should seek the Court's

assistance in accessing this information, not avoiding it.

### ii.  City's View

The City opposes entry of this paragraph as an order in any form.  First, paragraph

4(b) violates the spirit and scope of Rule 65(d).  Rule 65(d) requires that "an injunction be

specific and definite enough to apprise those within its scope of the conduct" required of them.

*Cf. City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143 (2d Cir. 2011) (quoting

*S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001)) (internal

alterations omitted).  Currently, paragraph 4.b of Plaintiffs' proposed order obligates the

Department to review "**all relevant data** pertaining to officers identified as lacking in

credibility **or flagged as ineffective** by the District Attorneys of the City of New York."

However, the bolded portions run afoul of Rule 65(d) for the following reasons:

**"[A]ll relevant data":**  This phrase is too vague to place the City on notice as

to what information would be required.  The Second Circuit has held that

similar language violated Rule 65(d)'s specificity requirement.  *See Peregrine*

*Myanmar v. Segal*, 89 F.3d 41, 52 (2d Cir. 1996) (vacating a catch-all provision

in an order that required a party to take "all other reasonably needful actions"

in service of an injunction)

**"[O]r flagged as ineffective":**  This term is similarly vague, and would require

the City to determine what behavior aside from a credibility ruling would fall

within  the  scope  of  the  injunction  without  providing  any  meaningful

guideposts.  Indeed, to the extent there are other matters beyond a credibility

ruling, with respect to the scope of this injunction, they are not relevant.

Moreover, there is no standard for the district attorneys' lists: each DA's Office has its own

procedures for making determinations about how officers make this list, which are not limited

solely to credibility findings, so there is no uniformity in the process or outcome.  As such,

the Court should decline to incorporate paragraph 4.b into the final EIS order.

Second, paragraph 4.b poses a jurisdictional issue to the extent that it can be

interpreted to compel the DA's Offices to undertake certain actions.  Nonparties cannot be

enjoined under Rule 65(d) unless they are "officers, agents, servants, employees, attorneys,

or persons in active concert and participation" with a party.  *See Doctor's Assocs. v. Reinert*

*& Duree, P.C.*, 191 F.3d 297, 304 (2d Cir. 1999) (quoting Fed. R. Civ. P. 65(d)) (internal

alterations omitted). None of the DAs for the five boroughs were ever parties to *Floyd.*

Therefore, to the extent that paragraph 4.b can be interpreted to impose an obligation on the

DA's Offices to disclose material to the Department in connection with an early intervention

system, the Court would lack jurisdiction to enforce such an order with respect to the DAs.

*Cf. Paramount Pictures Corp. v. Carol Publ'g Grp.*, 25 F. Supp. 2d 372, 375 (S.D.N.Y. 1998)

("Rule 65(d) does not authorize jurisdiction over persons who act independently and whose

rights have not been adjudicated.") (citing *Heyman v. Kline*, 444 F.2d 65, 65-66 (2d Cir.

1971)).

Third, even if the Court could enforce such an order, the material contemplated by

paragraph 4.b is entitled to near-absolute protection under the attorney work-product doctrine.

"The work-product doctrine . . . is intended to preserve a zone of privacy in which a lawyer

can prepare and develop legal theories and strategy with an eye towards litigation . . . ." *See United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998).  Work-product that includes the "mental impressions, conclusions, opinions, or legal theories of an attorney" is entitled to near-absolute protection, even if the individual or entity generating the work-product is not a party to the action.  *See, e.g.*, *Jean v. City of New York*, No. 09-CV-801 (RJD) (VVP), 2010 U.S. Dist. LEXIS 2282, at *5-6 (E.D.N.Y. Jan. 12, 2010) (collecting cases); *cf. United States v. Nobles*, 422 U.S. 225, 238 (1975) ("Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital.  The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case.").

A recent New York Supreme Court case demonstrates how the material sought by plaintiffs in paragraph 4.b implicates the attorney work-product doctrine.  In *Stengel v. Vance*, the court determined that a list maintained by the DA's Office for New York County ("DANY") was entitled to work-product protection because:

> the police tracking spreadsheet, used by an assistant district attorney in determining disclosure obligations, contains information including *legal research, opinions and communications between DANY attorneys*.  While DANY's office does compile information in the spreadsheet regarding adverse credibility findings, this is only some of the information gathered to assist assistant district attorneys with disclosure obligations.  *The adverse credibility finding is ultimately assessed by the attorney, familiar with the particular facts of the case, and must be analyzed within the context of a particular criminal case where a police officer may testify.*

*Stengel v. Vance*, No. 159740/2018, 2020 N.Y. Misc. LEXIS 102, at *13-14 (N.Y. Sup. Ct., N.Y. Cnty. Jan. 6, 2020) (emphasis added).  An individual DA's Office's list may include officers who do not have a formal adverse credibility finding but whom, for reasons known only to individual prosecutors, are placed on the list.  Without the underlying reasons – which are subject to attorney work-product protection – the Department cannot ascertain why an officer has been placed on a list and thus it would be patently unfair to that officer to be subject to EIS for unknown reasons because they were placed on a list.

Nor can the DA's Offices be compelled to turn over their work product to the Department. It would be inappropriate to require the DA's Offices to produce their work product if that would require individual prosecutors to change their behavior in anticipation of production. *Cf. Tankleff v. Cnty. of Suffolk*, No. 09-CV-1207 (JS), 2011 U.S. Dist. LEXIS 135691 at *5 (E.D.N.Y. Nov. 22, 2011) ("Work product protection is appropriate where disclosure would . . . alter attorney behavior . . . or . . . interfere with ongoing litigation.") (internal quotation marks omitted). Although Plaintiffs assume that it is a simple matter to share work product between agencies, they ignore the fact that the DA's Offices represent the People of the State of New York, and have interests that are distinct from those of the Department, as evidenced by the marijuana declination policies of DANY and KCDA. Sharing this information with the Department may also change the way that prosecutors record their credibility assessments, which goes toward whether an officer will be called as a witness in pending or future prosecutions.

In light of the foregoing, the courts' own records of findings of incredible testimony are the best source for information on credibility rulings, and the Court should decline to incorporate paragraph 4(b) into the final order.

**l.   Peer Intervention and Building Leadership Capacity (Plaintiffs' Proposed Order, Appendix A, Para. 5).**

Plaintiffs would add a paragraph in the proposed order requiring the NYPD to commit to building leadership capacity, including, but not limited to, efforts to promote peer intervention, such as "active bystandership programs."  The City opposes this addition.  (Appendix A and B, Para. 5).

### i.   Plaintiffs' View

*a. Effective leadership, a core NYPD objective, requires care, attention, and deliberation*

Any systematic plan to act on the Court's order requires building leadership at every level.  It is particularly important that the early intervention plan systematically evaluates the role, capacity, and possibilities for leadership in the key areas identified by the Court and cited by the Facilitator in Recommendation No. 1:

> A higher level of accountability is equally as important, therefore the policy should include ***accountability measures for commanding officers and immediate supervisors based on the level of misconduct occurring under their supervision***…. Similarly, a careful analysis should be done with respect to any adverse verdicts or settlements to ensure that a ***police officer who is engaging in malfeasance or serial misconduct during stops and trespass enforcements is being adequately monitored and supervised***.

*See* JRP Final Report, Dkt. # 597, at 221-22 (emphasis added).  This is of particular, and ongoing, relevance in this context: despite dramatic underreporting of stops, supervisors caught only 1.5-3% of bad stop reports filed between the fourth quarter of 2017 and the second quarter of 2018.  *See* Monitor's Ninth Report, Dkt. # 680-1, at 5-6.  The 97-98.5% ongoing rate of failed supervision demonstrates that the existing intervention—refresher courses for supervisors—is inadequate.  Fundamentally, early intervention systems require determining

(1) when intervention is appropriate, and (2) how "at-risk" behavior should be addressed and/or resolved, including how supervisors understand and respond to adverse events. Building leadership capacity and effectiveness must be a major part of *all* components of early intervention.  In order to be effective, the early intervention system must build the necessary capacity to effectively recognize, deter, and prevent systemic misconduct.  As Plaintiffs have suggested in earlier briefing, this should include creating incentives for members of service to embrace and robustly enhance leadership skills.

For example, the current plan for executive level review involves a case-by-case review of individual officers by an Early Intervention Committee where the various thresholds associated with the early intervention database are triggered.  *See* Dkt. #753-1 at 3.  However, this bypasses an important capacity-building opportunity for leadership.  The EIC should also evaluate the effectiveness of supervisors' and commanders' responses to misconduct, i.e., evaluate the real-time responses by the commanding officers, team leaders, line supervisors, and others who are proximate to the issue.  Particularly in cases where command notifications are issued, the Early Intervention Committee should seize teachable moments with lower-level leadership (who are responsive to their senior management) by determining what, if any, command response ensued, its effectiveness, and commanding officers' understanding of their roles in early intervention and in providing feedback to the command.  NYPD must develop a more structured and well-articulated policy be developed for this internal review by commanding officers and immediate supervisors.

The role of leadership in early intervention has  been ignored by NYPD in the development of this proposal and throughout this briefing, *see* Dkt. #744 at 3-4.  If the Court is inclined to defer to NYPD's request to handle early intervention on a case-by-case basis, as

set forth in its briefing, it is even more imperative for executive interventions to be laser-focused on the quality and the capacity of leadership below the executive level. NYPD's ongoing challenges with ensuring supervision quality confirm this. *See, e.g.,* Dkt. #744 at 3 (despite underreporting, supervisors caught only 1.5-3% of bad stop reports 4Q17 - 2Q18).

This intervention is not, as the City suggests, premature, nor should the Court defer to the City's proposed plan in the implementation period. In fact, targeted Court intervention is required, as NYPD has already publicly indicated its rejection of peer intervention.[22] Throughout the five years of the remedial period, the parties have observed NYPD's significant – and possibly insurmountable – challenges of improving and ensuring supervision quality, even in very discrete areas like properly reporting Level 3 stops, as referenced above. Yet NYPD consistently, as it did during the trial, cites supervision as the first line of early intervention and remediation, including with respect to individual officers. Any early intervention system responsive to the Court's November 2018 Order cannot be effective without building leadership capacity.

### b. Peer intervention works, but has been publicly rejected by NYPD leadership

In addition, despite notice, NYPD ignores practicable interventions employed by other police departments and large organizations. *See* Dkt. #686 at 12-13, Dkt. #744 at 2. These include leadership coaching and peer intervention programs that promote active bystander accountability (like New Orleans' EPIC program). *Id.* NYPD already has peer intervention

---

[22] *See e.g.,* Rocco Parascandola and John Annese, *NYPD brass won't require officers to turn in colleagues for racially-biased policing*, The N.Y. Daily News (Apr. 9, 2020) ("Besides setting aside a suggestion requiring cops to report their colleagues' suspected biased actions, the NYPD has also declined the IG's suggestion that it more aggressively investigate officers' alleged "use of offensive or derogatory language associated with an individual's actual or perceived protected status, such as racial slurs.")

policies that could be strengthened, leveraged, and complemented toward early intervention with the adoption of a robust peer intervention program. *See e.g.,* NYPD Patrol Guide Section 221-02, Use of Force (effective Jun. 21, 2016) ("All members of the service must intervene to stop another member of the service from using excessive force. Failure to intervene … is serious misconduct that may result in criminal and civil liability and will result in Department discipline, up to and including dismissal."). NYPD must encourage peer accountability at all levels, recognizing that warning signs or red flags may be evident to a subject officer's peers, with whom they are in frequent contact, in advance of serious misconduct. Peers and supervisors should have tools and incentives to vigilantly promote accountability if someone is suspected of racial bias or other misconduct.

### ii. City's View

The City opposes entry of paragraph 5, which would commit the Department to "building leadership capacity" through peer intervention programs, and "leadership and management coaching." Regardless of the policy merits of improving the Department's leadership, the requested programs far exceed the narrow mandate from this Court to implement a program that focuses on "adverse findings on the *conduct of police officers* involving illegal stops or illegal trespass enforcements." *See* Order, Floyd v. City of New York, No. 08 CV 1034 (AT) (S.D.N.Y. Nov. 20, 2018), ECF No. 662. Notably, although the Facilitator's Final Report referred to "accountability measures for commanding officers and immediate supervisors based on the level of misconduct occurring under their supervision," the Court's Order implementing this recommendation focused solely on the conduct of individual officers rather than the quality of their supervision or leadership and management coaching, and the City tailored the NYPD's plan for an early intervention system accordingly.

*Compare* Final Report & Recommendations at 221, Floyd v. City of New York, No. 08 CV 1034 (AT) (S.D.N.Y. May 15, 2018), ECF No. 597, *with* Order, Floyd v. City of New York, No. 08 CV 1034 (AT) (S.D.N.Y. Nov. 20, 2018), ECF No. 662.

Additionally, the early intervention practices of other jurisdictions have no bearing on the shape of the NYPD's system in the context of this litigation.  The Second Circuit has advised that:

> [w]e have repeatedly been cautioned . . . not to move too quickly where it appears that the state, in the exercise of its administrative authority, will in its own way adopt reforms bringing its system into compliance with the Constitution, and . . . to give the state a reasonable opportunity to remedy a constitutional deficiency . . . .

*See Dean v. Coughlin*, 804 F.2d 207, 213 (2d Cir. 1986) (collecting Supreme Court cases). The Department has developed a plan to implement an early intervention system designed to remedy the specific Fourth and Fourteenth Amendment violations found at trial, and this plan should be afforded deference during the implementation stage.

### m. Early Intervention Mechanisms for Racial Profiling (Appendix A and B, Para. 6).

All parties agree that the NYPD should systematically embed investigation and analysis of racial profiling in its early intervention program to deter and correct racial discrimination. Plaintiffs add the term "bias" and include racial slurs.  Plaintiffs would also require the NYPD to implement "the RAND recommendations for early intervention," or such other protocol as is agreed by the Monitor, the Plaintiffs, and the NYPD.   (Appendix A and B, Para. 6).

### i.  Plaintiffs' View

It is fairly clear that many issues raised at trial persist today, including racial profiling. Ongoing racial disparities persist in police action.  Especially where these occur in defiance of clear guidance from lawmakers and district attorneys, racial disparities implicates the subjective intent of NYPD officers.  For example, ongoing racial disparities in NYPD officers' use of discretion to give a criminal summons (instead of a civil fine) in quality of life cases, a nullification of the 2016 Criminal Justice Reform Act, suggests that the use of discretion may be directly fueled by racial discrimination.[23]  Recent data and reporting that 90% of arrests for jaywalking, fare evasion, and marijuana were of Black and Latinx people demonstrates how selective enforcement of the law continues to drive discretionary stops and arrests.[24]  Yet, as discussed here and *supra* at Section II(a)(i)*,* NYPD refuses to address racial discrimination or selective enforcement via early intervention.

Notably, other means of addressing racial profiling have not succeeded.  NYPD has shown no success in identifying, investigating or remedying racial profiling through its own internal affairs bureau investigations.  *See* Office of the Inspector General for NYPD,

---

[23] Samar Kurshid, *NYPD Continues Move Away from Criminal Penalties for Low-Level Offenses, But Racial Disparities Remain*, The Gotham Gazette (Sept. 4, 2019) ("91% of criminal summonses were given to people of color. For comparison, out of 8,690 civil summonses given out in that same period, 15.3% were issued to whites; nearly 32% to black New Yorkers; 39.2% to Hispanics; and 7.6% to Asians and Pacific Islanders….Officers continue to use an exception that allows them to give out a criminal summons instead of a that could indicate , vaguely citing "law enforcement reason" as a criteria.")

[24] *See e.g.,* Samoylov, M. and Kuntzman, G., *NYPD Targets Blacks and Latinos for 'Jaywalking' Tickets*, StreetsBlogNYC (Jan 8, 2020) (90% of people stopped for jaywalking by NYPD are Black and Latinx, 1/3 of jaywalking tickets given in New York are given in the Bronx); Brand, D., *Nearly every single person arrested for weed in NYC this year was Black or Latinx,* Queens Daily Eagle (Aug. 21, 2019) ("Black and Latinx New Yorkers accounted for 94 percent of all low-level marijuana arrests in New York City during the first six months of the year, according to NYPD arrest data compiled by the state," mirroring "persistent disparities in fare evasion arrests"); Mueller, B., et al., *Surest Way to Face Marijuana Charges in New York: Be Black or Hispanic*, The New York Times (May 13, 2018)(despite NYPD claim that racial disparity in marijuana arrests driven by local complaints, "among neighborhoods where people called about marijuana at the same rate, the police almost always made arrests at a higher rate in the area with more black residents").

*Complaints of Biased Policing in New York City* (Jul. 2019) (identifying systematic investigative deficiencies and noting that not a single claim of racial profiling has been substantiated in since the trial in *Floyd* in 2013).   Nor has the advent of new technology routinely facilitated transparency of officer conduct where racial profiling might be at issue, for CCRB or IAB.   *See, e.g.,* N.Y.C. Civilian Complaint Review Board *Strengthening Accountability: The Impact of NYPD's Body-Worn Cameras on CCRB Investigations,* at 53-54 (noting 'false negative' results where officers' relevant and existing body-worn camera footage relating to civilian complaints is not identified in response to investigator requests).

As referenced *supra* at Section II.e.i.c, racial profiling and bias at the intersections of race, gender, gender identity and sexual orientation, and elsewhere persist and reflect the complexity of racial profiling in ways NYPD has yet to acknowledge or address.   Early intervention efforts to combat racial bias, including slurs and profiling, must recognize that, for example, "[i]nteractions between law enforcement and the LGBTQ community are not monolithic. Each instance can be viewed through the lens of race, class, age, immigration status, gender identity or expression."[25]   *See supra* at Section II.e.i.

In addition, the record, and the law of this case, has firmly established the NYPD's longstanding unwillingness to adopt recommendations relating to effectively addressing racial profiling as early intervention, particularly recommendations deemed effective by external entities.   One such recommendation originated in a RAND study.   In 2007, RAND issued a report on the NYPD's SQF practices.   *See* RAND, *Analysis of Racial Disparities in the New York Police Department's Stop, Question, and Frisk Practices* (2007).   RAND was able to

---

[25] *See* NYC Civilian Complaint Review Board, *Pride, Prejudice and Policing: An Evaluation of LGBTQ-Related Complaints from January 2010 through December 2015* (2016).

identify specific officers whose racial distribution for stops was "skewed substantially from those of their colleagues." *Id.* at 46.

RAND specifically recommended that the NYPD review these flagged officers and flag officers with racial stop patterns that differ greatly from their peers. *Id.* By identifying officers at risk of engaging in biased policing, deriving key data from their practices, flagging at-risk officers who deviate from their peers in the racial distribution of their stops, and deploying leadership to investigate and address disparities, an early intervention mechanism that is non-disciplinary could help address the racial profiling ruling made by the Court.

This is merely one of several early intervention mechanisms that could impact racial profiling. Yet, not only does it fail to appear in the current plan for early intervention, it was fiercely resisted at trial. *Floyd* Trial Tr. at 7232-35 (examination of Deputy Commissioner Michael Farrell confirming NYPD's refusal to implement this RAND recommendation). Although this recommendation was favorably cited by the trial court, which ruled it to be evidence of NYPD's notice and deliberate indifference to unconstitutional policing by its officers*, see Floyd* Liability Op., Dkt. # 373, at n. 429, it continues to be resisted by the NYPD. At this time, it appears the City's principal objection to the trial court's RAND recommendation is a Rule 65 objection to its incorporation by reference in the Court order. *See infra* at II.l.ii. However, this is easily remedied with detailed language setting out the necessary analysis.

It is critical that the NYPD systematically embed analysis of racial profiling and bias potential throughout its early intervention mechanisms. As set forth *supra* at Section II(a)(i), there is clear evidence of racial profiling in Black and Latinx communities. Any systematic

plan must assess whether there is a possible inference of racial discrimination or racial profiling that may be drawn where an adverse finding or other triggering event exists. The NYPD's inability to substantiate a single racial profiling claim since the trial in this case confirms that it is essential to target possible racial discrimination in multiple and overlapping ways in early intervention.

In addition, given this, it is clear that the review-triggering threshold for biased policing complaints, two complaints in a 12-month period, is too high. Any complaint of biased policing should trigger review. This is particularly true given the importance this Court has placed on eradicating racially biased policing in the NYPD. Like the other metrics discussed herein, the threshold should reflect the intention to capture and deter potential racialized misconduct.

Consideration of racial profiling cannot be limited to passive acceptance of racial profiling complaints by those people upset enough to file a claim. The *Floyd* trial court explicitly recognized the burden of filing even *one* CCRB/IAB complaint suggested passive reception of complaints, or existing monitoring programs, was not an adequate way to identify or remediate racial profiling and racial discrimination, rejecting a similar strategy as inadequate at trial:

> The City's proposed findings describe at great length the NYPD's performance monitoring system, which tracks officers who have received multiple substantiated CCRB complaints. See Def. Findings ¶¶ 36–42; Pl. Findings ¶ 138. However, ***this system is ineffective for monitoring unjustified stops because of the low likelihood that a wrongfully stopped person will have the knowledge and take the time to file a CCRB complaint. The likelihood of multiple complaints against the same officer is even lower.***

56

*See* Liab. Op., Dkt. # 373, at 110, n. 396 (emphasis added). *See also* Dkt. #744 at 11 (remediation must account for low likelihood of aggrieved individuals filing complaints).

In reality, much of the misconduct targeted by early intervention is racialized; targeting it requires a critical perspective, a perspective the Court already found lacking in the NYPD's own reasoning. *See e.g., Floyd* Liab. Op., Dkt. # 373, at 56-61 ("Rather than being a defense *against* the charge of racial profiling, … this reasoning is a defense of racial profiling."). This is particularly relevant in the context of declinations of prosecution, as discussed *supra* at Section II(a)(i), and in leadership context, as discussed *supra* at Section II(k)(i). Racial profiling cannot be deterred or corrected where it is not recognized. If an officer, supervisor, or executive cannot acknowledge racialized misconduct, the systematic cultural changes the Court has ordered will not occur.

Thus, for early intervention systems to be effective, sergeants, lieutenants, captains, and commanding officers (as well as executive leadership) must develop insights on how bias and racial profiling occur in practical policing contexts and develop an ability to recognize the drivers of misconduct in real time. This includes explicitly looking at whether an inference of racial profiling may be drawn in individual situations, and developing strategies to discuss and deter this misconduct. This also requires acknowledgment of the NYPD's ongoing challenges to comprehend what conduct constitutes racial profiling and racial bias. *See Floyd* Liab. Op. at 58 ("correlation highlighted by the City and its experts in their attempt to refute the allegation of racial profiling in fact provides evidence of racial profiling."). These needs are particularly suited to the early intervention, enterprise risk management context.

### ii.  City's View

The City agreed to the first sentence of paragraph 6, but revised it so that it only applies to racial profiling by deleting the words "and bias, including racial slurs" for consistency with paragraph 3.a, and identified the jurisdictional reason for this distinction in that section  The City opposes entry of the second sentence of paragraph 6.  The call for implementation of the "RAND recommendations" violates Rule 65(d)(1)(C) because it incorporates an extrinsic document by reference.  *See* Rule 65(d)(1)(C) ("Every order granting an injunction . . . must . . . describe in reasonable detail—and not by referring to the complaint or other document—the act or acts . . . required."); *Mickalis Pawn Shop*, 645 F.3d at 144 ("[I]njunctions that do not satisfy the requirements of Rule 65(d) will not withstand appellate scrutiny.") (internal quotation marks omitted).  The City has committed to embedding investigation and analysis of racial profiling into the NYPD's early intervention system, thus ensuring that the Monitor will oversee implementation of this language.

### III.    Conclusion

For the foregoing reasons, the parties request that the Court consider the respective proposed orders submitted herewith.

Dated: New York, New York
          May 28, 2020

                                                        Respectfully submitted,


\s\ Dominique Day                                    \s\ David Cooper
BELDOCK LEVINE & HOFFMAN LLP              NEW YORK CITY LAW DEPARTMENT
By: Dominique Day                                    Office of James E. Johnson
     Jonathan C. Moore                               Corporation Counsel of the City of New York
     Luna Droubi                                     By: David Cooper
99 Park Avenue, Suite 1600                                Genevieve Nelson

New York, NY 10016
Tel. (212) 490-0900
*Attorney for* Floyd *Plaintiffs*

Raju Sundaran
Nancy Savasta
100 Church Street
New York, NY 10007
Tel. (212) 356-1000
*Attorney for Defendant City*


\s\ Darius Charney
CENTER FOR CONSTITUTIONAL
RIGHTS
By: Darius Charney
666 Broadway, 7th Floor
New York, NY 10012
Tel. (212) 614-6439
*Attorney for* Floyd *Plaintiffs*

\s\ Ashok Chandran
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
By:  Jin Hee Lee
Raymond Audain
Kevin Jason
Ashok Chandran
John Cusick
Patricia Okonta
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-3702
achandran@naacpdlf.org
*Attorneys for* Davis *Plaintiffs*

 \s\ Corey Stoughton
THE LEGAL AID SOCIETY
By: Corey Stoughton
Steven Wasserman
199 Water Street, 6th Fl.
New York, NY 10038
Tel: (212) 577-3367
*Attorneys for* Davis *Plaintiffs*


\s\ Peter L. Zimroth
INDEPENDENT FEDERAL MONITOR
Peter L. Zimroth
Richard Jerome

59

250 W. 55th Street
New York, NY 10019
Tel: (212) 751-1010