# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- x

DAVID FLOYD, *et al.*, individually and on behalf of a class of
all others similarly situated

          Plaintiffs,

      - against –         08 CV 1034 (AT)

CITY OF NEW YORK, et al.,

          Defendants.

-------------------------------------------------------------------------- x

KELTON DAVIS, *et al*, individually and on behalf of a class of
all others similarly situated

          Plaintiffs,     10 CV 699 (AT)

      - against –

CITY OF NEW YORK, et al.,

          Defendants.

-------------------------------------------------------------------------- x

JAENEAN LIGON, *et al.*, individually and on behalf of a class
of all others similarly situated

          Plaintiffs,    12 CV 2274 (AT)

      - against –

CITY OF NEW YORK, et al.,

          Defendants.

-------------------------------------------------------------------------- x

## DECLARATION OF DAVID KAEN

**DAVID KAEN**, declares under penalty of perjury and pursuant to 28 U.S.C. §1746, that the following statements are true and correct:

1.      I am a uniformed employee of the New York City Police Department ("NYPD"). I hold the rank of Detective Specialist in the Department's Risk Management Bureau. I have been an employee with NYPD for seven years.

2.      This declaration is based on a review of official NYPD body worn camera ("BWC") footage relevant to certain matters cited by plaintiffs in their Motion for Emergency Relief, and the declarations attached thereto from Crystal Pope, Malik Harris and Steven Merete. This affidavit is submitted at the request of the New York City Law Department in support of their opposition to plaintiffs' motion.


**Incident Involving Steven Merete**

1.      On or about April 28, 2020, in the vicinity of 1236 Intervale Avenue, Bronx, New York, BWC footage shows officers approaching a group of people outside of a deli.

2.      Approximately two minutes into the video, Steven Merete can be seen on the BWC footage standing in front of what appears to be a residential building next to the deli. Mr. Merete is heard shouting in sum and substance: "At the end of the day I own this, they can't make me leave. Nobody"; and "I don't care, what, for what? It's a good day to die, it's a good day to die. I swear to god, I've got life insurance." BWC footage shows multiple people requesting Mr. Merete leave the location. A short time later, BWC footage captures Mr. Merete stating in sum and substance: "As a matter of fact, I'm out." At this point Mr. Merete is seen walking away towards the deli.

3.    A few seconds later, BWC footage captures Mr. Merete trying to get the attention of another individual down the block by shouting, in sum and substance, that someone's vehicle is being ticketed. Mr. Merete and a group of males can then be seen on the BWC footage walking towards the officers who are alongside nearby parked cars, and can be heard arguing about a ticket that was allegedly written for one of the men's vehicles. The BWC captures a brief scuffle between the officers and the group of men. The BWC footage shows that during the scuffle Mr. Merete is brought to the ground.  It further shows Mr. Merete struggling with the officers and officers can be heard instructing him to put his hands behind his back. The BWC captures Mr. Merete stating in sum and substance that he cannot breathe and inquire as to the location of his glasses. BWC footage shows officers locating Mr. Merete's glasses and returning them to him shortly thereafter. Within approximately one minute from the time officers brought Mr. Merete to the ground, the BWC footage shows the officers picking Mr. Merete up off of the ground and placing him in the back of a marked police vehicle.

4.    While in the back of the marked police vehicle, captured on an officer's BWC, Mr. Merete can be seen and heard screaming and cursing at the officers. A sound consistent with Mr. Merete banging on the inside of the vehicle's window can also be heard. Mr. Merete can also be heard on the BWC footage requesting that officers open the partition in the vehicle so he can spit on them.

5.    While being transported, Mr. Merete can be heard stating in sum and substance: "I already sued the 41st, I'm going to sue you too, alright. I own 1234 Intervale. Just remember that. Stupid motherfuckers"; "By the way, you got a heavy hitter in the car. Fuck this resisting arrest bullshit"; "Come on man hurry the fuck up you slow moving bitches. Fuck is wrong with you, scared of a little Corona, if you're real men and got your dicks hanging, open this door." While being taken from the RMP and walked into the precinct, Mr. Merete can also

3

be heard stating in sum and substance: "fucking bitch ass motherfucker, you think I'm scared of prison? Eventually you're going to get these cuffs of me." Once at the desk inside the 42nd Precinct, Mr. Merete can be heard on the BWC having the following exchange with officers, stating in sum and substance:

> P.O. One: Stay right there.
> Mr. Merete: Cuff me, I don't give a fuck, the more scars the more money I get. You think I don't know? I'm suing both of you. Yeah, yeah, I'm good right? I already sued the 41st bitch.
> *Mr. Merete then states P.O. One's name three times. Mr. Merete can then be seen turning and looking at P.O. Two's shield.*
> P.O. Two: *P.O. Two states the name on his shield twice.*
> Mr. Merete: Man, you're a punk ass Puerto Rican, suck my dick.
> P.O. Two: Oh so you're a racist now?
> Mr. Merete: Yea, I'm going to straight up motherfucking murder you bitch.
> P.O. Two: Say it to the camera.
> Mr. Merete: So let me turn around then, bitch.
> P.O. One: Just face this way and you're good.
> Mr. Merete: Man, get the fuck off me man.

6. Mr. Merete can then be seen on the BWC footage struggling with the officers until the officers take him down to the ground. While on the ground Mr. Merete can be heard shouting that the officers are breaking his arm. The BWC footage also captures the officers continually instructing him to stop resisting and to stop moving. Mr. Merete can then be heard on the BWC whispering in sum and substance, "I love pain" repeatedly. Mr. Merete can also be heard alternating between statements that the officers are breaking his arm and that the handcuffs are cutting him.

7. Approximately two-and-a-half minutes later, Mr. Merete can be seen on BWC continuing to struggle with officers, yelling, and refusing to wear a mask as an officer attempts to put one on him at the stationhouse desk.

**Incident Involving Crystal Pope**

8.      On or about April 4, 2020, at approximately 6:49 p.m., BWC footage shows two police officers in uniform approaching a group of males in the vicinity of 135 Hamilton Place, New York, New York. One officer can be heard repeatedly telling the males grouped in front of the building that they need to disperse. The BWC footage shows that some of the males in the group are wearing masks.

9.      The BWC footage shows officers speak with and identify one of the males in the group as 'Pope'. As officers instruct the group to leave, Mr. Pope states, in sum and substance, that he is waiting for his speaker to finish charging. Mr. Pope can also be heard on the BWC footage telling other people in the group, in sum and substance, to leave so he can finish charging his speaker.

10.     Approximately three minutes into the BWC footage, the group begins to disperse. At this point, the BWC footage shows two officers move to enter the vestibule of 135 Hamilton Place. As the officers move to enter the vestibule of the building, BWC footage shows Mr. Pope entering the building by walking between the two officers. BWC footage then captures a verbal dispute between one of the officers and Mr. Pope. In the midst of the verbal altercation, Mr. Pope is seen on BWC being pushed by one of the officers into the corner of the vestibule, and then towards the front door of the location.

11.     BWC footage shows a woman, likely Ms. Pope, entering the vestibule while yelling in sum and substance: "why the fuck are you putting your hands on him?" BWC footage captures the officer deploying his pepper spray towards the woman believed to be Ms. Pope.

12.     No one asked for the officers' names and shield numbers and Business Cards on the BWC footage.

**Incident Involving Malik Harris**





Dated:  New York, New York
        June 8, 2020


DAVID KAEN

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- x

DAVID FLOYD, *et al.*, individually and on behalf of a class of all others similarly situated

                                        Plaintiffs,

                    - against –                        08 CV 1034 (**AT**)

CITY OF NEW YORK, et al.,

                                          Defendants.
-------------------------------------------------------------------------- x

KELTON DAVIS, *et al*, individually and on behalf of a class of all others similarly situated

                                        Plaintiffs,        10 CV 699 (**AT**)

                    - against –

CITY OF NEW YORK, et al.,

                                          Defendants.

-------------------------------------------------------------------------- x

JAENEAN LIGON, *et al.*, individually and on behalf of a class of all others similarly situated

                                        Plaintiffs,     12 CV 2274 (AT)

                    - against –

CITY OF NEW YORK, et al.,

                                          Defendants.

-------------------------------------------------------------------------- x

## DECLARATION OF CHIEF FAUSTO PICHARDO

**FAUSTO PICHARDO**, declares under penalty of perjury and pursuant to 28 U.S.C. §1746, that the following statements are true and correct:

1.      I am a uniformed member of the service employed by the New York City Police Department ("NYPD"). I am currently the NYPD Chief of Patrol Services Bureau. I have been in my current position as Chief of Patrol since December 2019 and have been with NYPD since July 1999.

2.      This declaration is based on a review of official NYPD records and databases, information provided to me from different units within NYPD, my personal knowledge and the work of NYPD to contain the spread of COVID-19. This declaration is submitted in opposition to plaintiffs' motion.

3.      Upon information and belief, no local executive orders governing social distancing were issued prior to March 16, 2020. On March 16, 2020, Governor Cuomo issued Executive Order No. 202.3. This order, and subsequent orders issued by the Governor and incorporated into the Mayor's Executive Orders issued after March-16th, became progressively restrictive throughout the pandemic, beginning with limits on the operations of restaurants and bars and other essential and non-essential businesses, and expanding to require wearing face coverings in public when social distancing is not possible and ban non-essential and large gatherings.

4.  NYPD issued guidelines beginning on March 16, 2020 through May 17, 2020, regarding the enforcement of the Mayor's executive orders.

5.      In March 2020, NYPD established a "Citywide All-Out Task Force," often referred to as the COVID-19 Task Force, with the primary function of education and enforcement

of the Governor's and Mayor's executive orders. At the end of March, nearly 700 officers and supervisors were detailed to the task force.

6.      While all patrol officers receive guidance on enforcement of the Governor's and Mayor's Executive Orders, the COVID-19 Task Force's primary goal is to use education and other non-law enforcement measures to ensure that members of the public follow social distancing guidelines. Task Force officers visit parks, supermarkets, bars, restaurants, and anywhere people might congregate. They post social distancing informational posters. The Department recorded a public service announcement in different languages that is broadcast over Department vehicles' loud speakers when officers observe groups of people not practicing appropriate social distancing.

7.      The Task Force also assists in NYPD's response to the immense number of social distancing complaints received by the 311 hotline. As of May 17th, the Task Force has responded to more than 13,000 calls for service regarding social distancing with visits and inspections, and has distributed 164,625 masks citywide.

8.      In addition, Patrol Services Bureau officers have visited 397,656 bars and restaurants; 186,286 supermarkets and pharmacies; 68,387 public places; and 169,277 personal care facilities. Collectively, the Department has distributed 373,050 masks citywide between March 16th and May 17th.

9.      In over one million social distancing interactions between March 16th and May 17th, officers issued only 444 summonses and made 128 arrests that are related to the pandemic. These numbers, collectively, represent less than one percent of enforcement actions of either summonses or arrests, that NYPD was forced to take as a last resort.

10.      Often, when members of service have had to take law enforcement actions, it has been to disperse large gatherings. Though they have been few in number, large gatherings

have represented a disproportionate share of the summonses and arrests. A small number of incidents during the 62-day period between March 16th and May 17th accounted for approximately 40% of all COVID-related summonses. Sixty-three of the City's 77 police precincts have recorded fewer than 10 summonses each over this period. Here are some examples from the 62-day period from March 16th to May 17th:[1]

- The 69th Precinct has led the city in COVID-related issuance of 66 summonses, representing 15% of the citywide summonses, but 65 of those summonses arose from a single incident on April 18, 2020 involving a large gathering inside a jam-packed illegal nightclub operating inside of a barbershop. There were also two individuals arrested for possession of loaded firearms.

- The 77th Precinct issued 22 summonses during this time period, 17 of which stem from a single occurrence on April 28, 2020 involving a large gathering. Efforts to convince the crowd to disperse failed, and NYPD officers were forced to take other enforcement actions. Here, four arrests were also made for possession of loaded firearms.

- Nine of the 21 summonses issued in the 47th Precinct were due to a single, crowded illegal social club on April 3, 2020; and

- 12 of the 18 summonses issued in the 44th Precinct were issued to individuals gathering in a supermarket basement to party and illegally gamble the first weekend in May.

11.    As for the COVID-19 related arrests, 56 of the 77 precincts recorded one or no arrests, and 65% of the 128 arrests were only marginally related to COVID-19, meaning that

---

[1] This data was delivered by the NYPD Chief of Patrol to the New York City Council on May 22, 2020.

these arrests were not for large gatherings or not wearing a face covering. Those arrests included hate crimes against Asian Americans, domestic violence incidents, weapons possession, individuals wanted on felony warrants, or on other non-social distancing grounds. NYPD even made one arrest of a bank robber who passed a note saying, "This is a bank robbery. I have COVID."

        12. Since the onset of the pandemic and the issuance of the first executive order, NYPD has maintained its primary mission of educating members of the public that compliance with these directives is essential to curtailing the spread of the COVID-19 virus. Uniformed members are instructed to attempt to persuade members of the public to comply with COVID-19 Executive Orders and only issue summonses or make arrests only as a last resort.

Dated:  New York, New York
       June 8, 2020

                                  _____
                          FAUSTO PICHARDO

# EXHIBIT C



**From:** Jonathan C. Moore [mailto:jmoore@BLHNY.com]
**Sent:** Wednesday, April 22, 2020 12:49 PM
**To:** SCHLANGER, JEFFREY; Zimroth, Peter L.; Richard Jerome; Cooper, David (Law); Savasta, Nancy (Law); Nelson, Genevieve (Law); Sundaran, Raju (Law)
**Cc:** Dominique Day; Luna Droubi; Lupe Aguirre; Katherine "Q" Adams; Marc Arena; Ian Head; Nahal Zamani; Omar Farah; 'dcharney@ccrjustice.org'
**Subject:** Current Police Behavior

Jeffrey,

We write to raise two issues.

**First**, as you no doubt heard on the call with CPR, many communities are concerned about police behavior during the COVID-19 crisis. As counsel for the Plaintiffs in *Floyd* we too are concerned about this issue. Street encounters related to enforcement of City and State shelter-in-place, face-covering, and social distancing requirements fall squarely within the scope of the liability and remedial orders in this case.

We are therefore requesting the following information:

- Any FINEST messages, operations or interim orders, training bulletins, announcements or training sessions, or other directives or guidance provided to NYPD MOS concerning enforcement of shelter-in-place, face-covering, and social distancing requirements during the COVID-19 crisis.
- Information on how these encounters are being documented and associated stop report, summonses, memo book entries and other documentation.
- A sampling of BWC videos that show the NYPD's enforcement of shelter-in-place, face-covering, and social distancing requirements.
- Information on what kind of supervisory instruction and review is being undertaken regarding the enforcement of shelter-in-place, face-covering, and social distancing requirements.
- Information concerning the number of summonses that have been issued stemming

from street encounters involving any reference to shelter-in-place, face-covering, and social distancing requirements.

**Second**, on a related matter, we would also like to be advised as to whether the SQF training is continuing or has been suspended, as well as whether other training that includes instruction on SQF have been affected by the COVID-19 crisis.

All the best,

Jonathan Moore

On Behalf of Floyd counsel



**From:** SCHLANGER, JEFFREY [mailto:JEFFREY.SCHLANGER@nypd.org]
**Sent:** Friday, May 08, 2020 3:01 PM
**To:** 'Jonathan C. Moore'; Zimroth, Peter L.; Richard Jerome; Cooper, David (Law); Savasta, Nancy (Law); Nelson, Genevieve (Law); Sundaran, Raju (Law)
**Cc:** Dominique Day; Luna Droubi; Lupe Aguirre; Katherine "Q" Adams; Marc Arena; Ian Head; Nahal Zamani; Omar Farah; 'dcharney@ccrjustice.org'
**Subject:** RE: Current Police Behavior

No worries.  The City team will review and revert.

Have a good weekend.

Jeff

**From:** Jonathan C. Moore [mailto:jmoore@BLHNY.com]
**Sent:** Friday, May 8, 2020 2:59 PM
**To:** SCHLANGER, JEFFREY <JEFFREY.SCHLANGER@nypd.org>; Zimroth, Peter L. <Peter.Zimroth@arnoldporter.com>; Richard Jerome <richard.jerome94@gmail.com>; Cooper, David (Law) <dcooper@law.nyc.gov>; Savasta, Nancy (Law) <nsavasta@law.nyc.gov>; Nelson, Genevieve (Law) <gnelson@law.nyc.gov>; rsundara (rsundara@law.nyc.gov) <rsundara@law.nyc.gov>
**Cc:** Dominique Day <DDay@BLHNY.COM>; Luna Droubi <LDroubi@BLHNY.com>; Lupe Aguirre <laguirre@ccrjustice.org>; Katherine "Q" Adams <QAdams@BLHNY.COM>; Marc Arena <MArena@BLHNY.COM>; Ian Head <ihead@ccrjustice.org>; Nahal Zamani <nzamani@ccrjustice.org>; Omar Farah <ofarah@ccrjustice.org>; 'dcharney@ccrjustice.org' <dcharney@ccrjustice.org>
**Subject:** RE: Current Police Behavior

Jeff,

Sorry.  The referenced article is attached below.

Jonathan

https://www.nytimes.com/2020/05/07/nyregion/nypd-social-distancing-race-coronavirus.html?referringSource=articleShare

---

**From:** SCHLANGER, JEFFREY <JEFFREY.SCHLANGER@nypd.org>
**Sent:** Friday, May 8, 2020 2:55 PM
**To:** Jonathan C. Moore <jmoore@BLHNY.com>; Zimroth, Peter L. <Peter.Zimroth@arnoldporter.com>; Richard Jerome <richard.jerome94@gmail.com>; Cooper, David (Law) <dcooper@law.nyc.gov>; Savasta, Nancy (Law) <nsavasta@law.nyc.gov>; Nelson, Genevieve (Law) <gnelson@law.nyc.gov>; rsundara (rsundara@law.nyc.gov) <rsundara@law.nyc.gov>
**Cc:** Dominique Day <DDay@BLHNY.COM>; Luna Droubi <LDroubi@BLHNY.com>; Lupe Aguirre <laguirre@ccrjustice.org>; Katherine "Q" Adams <QAdams@BLHNY.COM>; Marc Arena <MArena@BLHNY.COM>; Ian Head <ihead@ccrjustice.org>; Nahal Zamani <nzamani@ccrjustice.org>; Omar Farah <ofarah@ccrjustice.org>; 'dcharney@ccrjustice.org' <dcharney@ccrjustice.org>
**Subject:** RE: Current Police Behavior

Thanks, Jonathan.  No article attached.

Jeff

---

**From:** Jonathan C. Moore [mailto:jmoore@BLHNY.com]
**Sent:** Friday, May 8, 2020 2:14 PM
**To:** SCHLANGER, JEFFREY <JEFFREY.SCHLANGER@nypd.org>; Zimroth, Peter L. <Peter.Zimroth@arnoldporter.com>; Richard Jerome <richard.jerome94@gmail.com>; Cooper, David (Law) <dcooper@law.nyc.gov>; Savasta, Nancy (Law) <nsavasta@law.nyc.gov>; Nelson, Genevieve (Law) <gnelson@law.nyc.gov>; rsundara (rsundara@law.nyc.gov) <rsundara@law.nyc.gov>
**Cc:** Dominique Day <DDay@BLHNY.COM>; Luna Droubi <LDroubi@BLHNY.com>; Lupe Aguirre <laguirre@ccrjustice.org>; Katherine "Q" Adams <QAdams@BLHNY.COM>; Marc Arena <MArena@BLHNY.COM>; Ian Head <ihead@ccrjustice.org>; Nahal Zamani <nzamani@ccrjustice.org>; Omar Farah <ofarah@ccrjustice.org>; 'dcharney@ccrjustice.org' <dcharney@ccrjustice.org>; Jonathan C. Moore <jmoore@BLHNY.com>
**Subject:** RE: Current Police Behavior

May 8. 2020

Jeffrey,

We write again to raise our concerns about current police behavior during the current Covid 19 crisis that we raised with you now over two weeks ago.  The article which we have affixed below, as well as other incidents which have been widely reported in the media,  raises serious issues concerning whether the NYPD is currently engaged in street encounters that run afoul of P.G. 203-25 and P.G. 212-11, not to mention the injunction which was issued in *Floyd.*

Please provide responses to our April 22nd email by COB Monday, May 11th. Failing that we will look into other options.

For the *Floyd* Plaintiffs,

Jonathan Moore

---

**From:** Jonathan C. Moore
**Sent:** Wednesday, April 22, 2020 12:49 PM
**To:** SCHLANGER, JEFFREY <JEFFREY.SCHLANGER@nypd.org>; Zimroth, Peter L. <Peter.Zimroth@arnoldporter.com>; Richard Jerome <richard.jerome94@gmail.com>; Cooper, David (Law) <dcooper@law.nyc.gov>; Savasta, Nancy (Law) <nsavasta@law.nyc.gov>; Nelson, Genevieve (Law) <gnelson@law.nyc.gov>; rsundara (rsundara@law.nyc.gov) <rsundara@law.nyc.gov>
**Cc:** Dominique Day <DDay@BLHNY.COM>; Luna Droubi <ldroubi@blhny.com>; Lupe Aguirre <laguirre@ccrjustice.org>; Katherine "Q" Adams <QAdams@BLHNY.COM>; Marc Arena <MArena@BLHNY.COM>; Ian Head <ihead@ccrjustice.org>; Nahal Zamani <nzamani@ccrjustice.org>; Omar Farah <ofarah@ccrjustice.org>; 'dcharney@ccrjustice.org' <dcharney@ccrjustice.org>
**Subject:** Current Police Behavior

Jeffrey,

We write to raise two issues.

**First**, as you no doubt heard on the call with CPR, many communities are concerned about police behavior during the COVID-19 crisis.  As counsel for the Plaintiffs in *Floyd* we too are concerned about this issue.  Street encounters related to enforcement of City and State shelter-in-place, face-covering, and social distancing requirements fall squarely within the scope of the liability and remedial orders in this case.

We are therefore requesting the following information:

- Any FINEST messages, operations or interim orders, training bulletins, announcements or training sessions, or other directives or guidance provided to NYPD MOS concerning enforcement of shelter-in-place, face-covering, and social distancing requirements during the COVID-19 crisis.
- Information on how these encounters are being documented and associated stop report, summonses, memo book entries and other documentation.
- A sampling of BWC videos that show the NYPD's enforcement of shelter-in-place, face-covering, and social distancing requirements.
- Information on what kind of supervisory instruction and review is being undertaken regarding the enforcement of shelter-in-place, face-covering, and social distancing requirements.
- Information concerning the number of summonses that have been issued stemming from street encounters involving any reference to shelter-in-place, face-covering, and social distancing requirements.

**Second**, on a related matter, we would also like to be advised as to whether the SQF training is continuing or has been suspended, as well as whether other training that includes instruction on SQF have been affected by the COVID-19 crisis.

All the best,

Jonathan Moore

On Behalf of Floyd counsel

# EXHIBIT D



No. 202

E X E C U T I V E   O R D E R

**Declaring a Disaster Emergency in the State of New York**

**WHEREAS**, on January 30, 2020, the World Health Organization designated the novel coronavirus, COVID-19, outbreak as a Public Health Emergency of International Concern;

**WHEREAS**, on January 31, 2020, United States Health and Human Services Secretary Alex M. Azar II declared a public health emergency for the entire United States to aid the nation's healthcare community in responding to COVID-19;

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue; and

**WHEREAS**, New York State is addressing the threat that COVID-19 poses to the health and welfare of its residents and visitors.

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by the Constitution and the Laws of the State of New York, hereby find, pursuant to Section 28 of Article 2-B of the Executive Law, that a disaster is impending in New York State, for which the affected local governments are unable to respond adequately, and I do hereby declare a State disaster emergency for the entire State of New York. This Executive Order shall be in effect until September 7, 2020; and

**IN ADDITION**, this declaration satisfies the requirements of 49 C.F.R. 390.23(a)(I)(A), which provides relief from Parts 390 through 399 of the Federal Motor Carrier Safety Regulations (FMCSR). Such relief from the FMCSR is necessary to ensure that crews are available as needed.

**FURTHER**, pursuant to Section 29 of Article 2-B of the Executive Law, I direct the implementation of the State Comprehensive Emergency Management Plan and authorize all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety.

**IN ADDITION**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 6, 2020 the following:

Section 112 of the State Finance Law, to the extent consistent with Article V, Section 1 of the State Constitution, and to the extent necessary to add additional work, sites, and time to State contracts or to award emergency contracts, including but not limited to emergency contracts or leases for relocation and support of State operations under Section 3 of the Public Buildings Law; or emergency contracts under Section 9 of the Public Buildings Law; or emergency contracts for professional services under Section 136-a of the State Finance Law; or emergency contracts for commodities, services, and technology under Section 163 of the State Finance Law; or design-build or best value contracts under and Part F of Chapter 60 of the Laws of 2015 and Part RRR of Chapter 59 of the Laws of 2017; or emergency contracts for purchases of commodities, services, and technology through any federal GSA schedules, federal 1122 programs, or other state, regional, local, multi-jurisdictional, or cooperative contract vehicles;

Section 163 of the State Finance Law and Article 4-C of the Economic Development Law, to the extent necessary to allow the purchase of necessary commodities, services, technology, and materials without following the standard notice and procurement processes;

Section 97-G of the State Finance Law, to the extent necessary to purchase food, supplies, services, and equipment or furnish or provide various centralized services, including but not limited to, building design and construction services to assist affected local governments, individuals, and other non-State entities in responding to and recovering from the disaster emergency;

Section 359-a, Section 2879, and 2879-a of the Public Authorities Law to the extent necessary to purchase necessary goods and services without following the standard procurement processes;

Sections 375, 385 and 401 of the Vehicle and Traffic Law to the extent that exemption for vehicles validly registered in other jurisdictions from vehicle registration, equipment and dimension requirements is necessary to assist in preparedness and response to the COVID-19 outbreak;

Sections 6521 and 6902 of the Education Law, to the extent necessary to permit unlicensed individuals, upon completion of training deemed adequate by the Commissioner of Health, to collect throat or nasopharyngeal swab specimens from individuals suspected of being infected by COVID-19, for purposes of testing; and to the extent necessary to permit non-nursing staff, upon completion of training deemed adequate by the Commissioner of Health, to perform tasks, under the supervision of a nurse, otherwise limited to the scope of practice of a licensed or registered nurse;

Subdivision 6 of section 2510 and section 2511 of the Public Health Law, to the extent necessary to waive or revise eligibility criteria, documentation requirements, or premium contributions; modify covered health care services or the scope and level of such services set forth in contracts; increase subsidy payments to approved organizations, including the maximum dollar amount set forth in contracts; or provide extensions for required reports due by approved organizations in accordance with contracts;

Section 224-b and subdivision 4 of section 225 of the Public Health Law, to the extent necessary to permit the Commissioner of Health to promulgate emergency regulations and to amend the State Sanitary Code;

Subdivision 2 of section 2803 of the Public Health Law, to the extent necessary to permit the Commissioner to promulgate emergency regulations concerning the facilities licensed pursuant to Article 28 of the Public Health Law, including but not limited to the operation of general hospitals;

Subdivision 3 of section 273 of the Public Health Law and subdivisions 25 and 25-a of section 364-j of the Social Services Law, to the extent necessary to allow patients to receive prescribed drugs without delay;

Section 400.9 and paragraph 7 of subdivision f of section 405.9 of Title 10 of the NYCRR, to the extent necessary to permit general hospitals and nursing homes licensed pursuant to Article 28 of the Public Health Law ("Article 28 facilities") that are treating patients during the disaster emergency to rapidly discharge, transfer, or receive such patients, as authorized by the Commissioner of Health, provided such facilities take all reasonable measures to protect the health and safety of such patients and residents, including safe transfer and discharge practices, and to comply with the Emergency Medical Treatment and Active Labor Act (42 U.S.C. section 1395dd) and any associated regulations;

Section 400.11 of Title 10 of the NYCRR, to the extent necessary to permit Article 28 facilities receiving patients as a result of the disaster emergency to complete patient review instruments as soon as practicable;

Section 405 of Title 10 of the NYCRR, to the extent necessary to maintain the public health with respect to treatment or containment of individuals with or suspected to have COVID-19;

Subdivision d and u of section 800.3 of Title 10 of the NYCRR, to the extent necessary to permit emergency medical service personnel to provide community paramedicine, transportation to destinations other than hospitals or health care facilities, telemedicine to facilitate treatment of patients in place, and such other services as may be approved by the Commissioner of Health;

Paragraph 3 of subdivision f of section 505.14 of Title 18 of the NYCRR, to the extent necessary to permit nursing supervision visits for personal care services provided to individuals affected by the disaster emergency be made as soon as practicable;

Sections 8602 and 8603 of the Education Law, and section 58-1.5 of Title 10 of the NYCRR, to the extent necessary to permit individuals who meet the federal requirements for high complexity testing to perform testing for the detection of SARS-CoV-2 in specimens collected from individuals suspected of suffering from a COVID-19 infection;

Subdivision 4 of section 6909 of the Public Health Law, subdivision 6 of section 6527 of the Education Law, and section 64.7 of Title 8 of the NYCRR, to the extent necessary to permit physicians and certified nurse practitioners to issue a non-patient specific regimen to nurses or any such other persons authorized by law or by this executive order to collect throat or nasopharyngeal swab specimens from individuals suspected of suffering from a COVID-19 infection, for purposes of testing, or to perform such other tasks as may be necessary to provide care for individuals diagnosed or suspected of suffering from a COVID-19 infection;

Section 596 of Title 14 of the NYCRR to the extent necessary to allow for rapid approval of the use of the telemental health services, including the requirements for in-person initial assessment prior to the delivery of telemental health services, limitations on who can deliver telemental health services, requirements for who must be present while telemental health services are delivered, and a recipient's right to refuse telemental health services;

Section 409-i of the Education Law, section 163-b of the State Finance Law with associated OGS guidance, and Executive Order No. 2 are suspended to the extent necessary to allow elementary and secondary schools to procure and use cleaning and maintenance products in schools; and sections 103 and 104-b of the General Municipal Law are suspended to the extent necessary to allow schools to do so without the usual advertising for bids and offers and compliance with existing procurement policies and procedures;

Article 7 of the Public Officers Law, section 41 of the General Construction Law, and section 3002 of the Public Health Law, to the extent necessary to permit the Public Health and Health Planning Council and the State Emergency Medical Services Council to meet and take such actions as authorized by law, as may be necessary to respond to the COVID-19 outbreak, without meeting quorum requirements or permitting the public in-person access to meetings, provided that any such meetings must be webcast and means for effective public comment must be made available; and

**FURTHER,** I hereby temporarily modify, for the period from the date of this Executive Order through April 6, 2020, the following laws:

Section 24 of the Executive Law; Sections 104 and 346 of the Highway Law; Sections 1602, 1630, 1640, 1650, and 1660 of the Vehicle and Traffic Law; Section 14(16) of the Transportation Law; Sections 6-602 and 17-1706 of the Village Law; Section 20(32) of the General City Law; Section 91 of Second Class Cities Law; Section 19-107(ii) of the New York City Administrative Code; and Section 107.1 of Title 21 of the New York Codes, Rules and Regulations, to the extent necessary to provide the Governor with the authority to regulate traffic and the movement of vehicles on roads, highways, and streets.

G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

seventh day of March in the year two

thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

# EXHIBIT E



No. 202.8

<u>E X E C U T I V E   O R D E R</u>

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS,** on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York;

**WHEREAS,** both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**WHEREAS,** in order to facilitate the most timely and effective response to the COVID-19 emergency disaster, it is critical for New York State to be able to act quickly to gather, coordinate, and deploy goods, services, professionals, and volunteers of all kinds; and

**NOW, THEREFORE,** I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order, rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 19, 2020 the following:

- In accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis,  any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby tolled from the date of this executive order until April 19, 2020;
- Subdivision 1 of Section 503 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a driver's license, in order to extend for the duration of this executive order the validity of driver's licenses that expire on or after March 1, 2020;
- Subdivision 1 of Section 491 of the Vehicle and Traffic Law, to the extent that it provides for a period of validity and expiration of a non-driver identification card, in order to extend for the duration of this executive order the validity of non-driver identification cards that expire on or after March 1, 2020;
- Sections 401, 410, 2222, 2251, 2261, and 2282(4) of the Vehicle and Traffic law, to the extent that it provides for a period of validity and expiration of a registration certificate or number plate for a motor vehicle or trailer, a motorcycle, a snowmobile, a vessel, a limited use vehicle, and an all-terrain vehicle, respectively, in order to extend for the duration of this executive order the validity of such registration certificate or number plate that expires on or after March 1, 2020;
- Section 420-a of the vehicle and traffic law to the extent that it provides an expiration for temporary registration documents issued by auto dealers to extend the validity of such during the duration of this executive order.
- Subsection (a) of Section 602 and subsections (a) and (b) of Section 605 of the Business Corporation Law, to the extent they require meetings of shareholders to be noticed and held at a physical location.

**NOW, THEREFORE**, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of Executive Order through April 19, 2020:

- The provisions of Executive Order 202.6 are hereby modified to read as follows: Effective on March 22 at 8 p.m.: All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. An entity providing essential services or functions whether to an essential business or a non-essential business shall not be subjected to the in-person work restriction, but may operate at the level necessary to provide such service or function. Any business violating the above order shall be subject to enforcement as if this were a violation of an order pursuant to section 12 of the Public Health Law.
- There shall be no enforcement of either an eviction of any tenant residential or commercial, or a foreclosure of any residential or commercial property for a period of ninety days.
- Effective at 8 p.m. March 20, any appointment that is in-person at any state or county department of motor vehicles is cancelled, and until further notice, only on-line transactions will be permitted.
- The authority of the Commissioner of Taxation and Finance to abate late filing and payment penalties pursuant to section 1145 of the Tax Law is hereby expanded to also authorize abatement of interest, for a period of 60 days for a taxpayers who are required to file returns and remit sales and use taxes by March 20, 2020, for the sales tax quarterly period that ended February 29, 2020.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

twentieth day of March in the year

two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

# EXHIBIT F



**State of New York**

**Executive Chamber**

No. 202.17

## E X E C U T I V E   O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to be continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through May 15, 2020:

- The directive contained in Executive Order 202.16 related to issuance of no-action or no-filing letters is modified to require such letters be issued by the Attorney General.

- Effective at 8 p.m. on Friday, April 17, 2020 any individual who is over age two and able to medically tolerate a face-covering shall be required to cover their nose and mouth with a mask or cloth face-covering when in a public place and unable to maintain, or when not maintaining, social distance.

G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

fifteenth day of April in the year two

thousand twenty.



BY THE GOVERNOR

Secretary to the Governor

# EXHIBIT G



No. 202.35

E X E C U T I V E  O R D E R

**Continuing Temporary Suspension and Modification of Laws
Relating to the Disaster Emergency**

**WHEREAS**, on March 7, 2020, I issued Executive Order Number 202, declaring a State disaster emergency for the entire State of New York; and

**WHEREAS**, both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue;

**NOW, THEREFORE**, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to issue any directive during a disaster emergency necessary to cope with the disaster, I hereby issue the following directives for the period from the date of this Executive Order through June 28, 2020:

- Executive Order 202.34, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, 202.13, 202.14, 202.28, and 202.31 which each closed or otherwise restricted public or private businesses or places of public accommodation, and Executive Order 202.32 as modified by Executive Order 202.33 which required postponement, cancellation, or restriction on size of all non-essential gatherings of more than ten individuals, and which together constitute New York On PAUSE, is hereby continued until and unless later amended or extended by a future Executive Order, provided, however:

  o  That effective at 1:00 p.m. on May 29, 2020 that the reductions and restrictions on the in-person workforce at non-essential businesses or other entities shall no longer apply to Phase Two industries:

    ▪ Professional Services, Administrative Support, Information Technology,
    ▪ Real estate services, Building and Property Management, Leasing, Rental, and Sales Services,
    ▪ Retail In-store Shopping, Rental, Repair, and Cleaning,
    ▪ Barbershops and Hair Salon (limited services), and
    ▪ Motor Vehicle Leasing, Rental, and Sales.

  o  Businesses or entities in industries open in Phase Two must be operated subject to the guidance promulgated by the Department of Health.

o   As of May 29, 2020 the regions meeting the prescribed public health and safety metrics required for Phase Two reopening are: Finger Lakes, Central New York, Mohawk Valley, Southern Tier, and the North Country. Any additional regions which meet the criteria after such date will be deemed to be incorporated into this Executive Order without further revision and will be permitted to re-open Phase two industries, subject to the same terms and conditions.



G I V E N   under my hand and the Privy Seal of the

State in the City of Albany this

twenty-ninth day of May in the year

two thousand twenty.

BY THE GOVERNOR

Secretary to the Governor

# EXHIBIT H



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EMERGENCY EXECUTIVE ORDER NO. 98

DECLARATION OF LOCAL STATE OF EMERGENCY

March 12, 2020

EMERGENCY EXECUTIVE ORDER

WHEREAS, there is currently an outbreak of novel coronavirus disease 2019 ("COVID-19"), a respiratory illness, first detected in Wuhan City, Hubei Province, China, and it continues to expand with a growing number of international locations, including the United States. A "novel coronavirus" is a strain that has not been previously found in humans;

WHEREAS, on January 31, 2020, the United States Secretary of Health and Human Services announced a nationwide public health emergency to respond to COVID-19;

WHEREAS, on March 1, 2020, the City of New York confirmed its first case of COVID-19;

WHEREAS, on March 11, 2020, the World Health Organization characterized COVID-19 as a pandemic, the first ever pandemic caused by a coronavirus;

WHEREAS, COVID-19 has been detected in thousands of people worldwide and can be spread from person to person. The City has been working to identify and test others in the City that have potentially been exposed to COVID-19;

WHEREAS, this worldwide outbreak of COVID-19 is emerging and rapidly evolving;

WHEREAS, the number of confirmed cases of COVID-19 has risen steadily;

WHEREAS, the City and all of its agencies are prepared to respond to COVID-19 and are committed to protecting the health and well-being of all New Yorkers;

WHEREAS, the City urges the public to stay home if they are ill and consult with their doctor if they are experiencing more severe symptoms such as shortness of breath, are older adults, or are any age with chronic medical conditions that increase the likelihood of more severe COVID-19 disease;

WHEREAS, the public is directed to call 311 if they are unable to contact a health provider to seek care for any reason;

WHEREAS, the City recommends all New Yorkers follow the Centers for Disease Control's stringent guidance for cleaning and disinfection;

WHEREAS, the City is working closely and coordinating with its agency partners, including the Metropolitan Transportation Authority and Port Authority of New York and New Jersey, as well as State and Federal officials to ensure that it is prepared and ready to address any future cases of COVID-19;

WHEREAS, the risk of community spread throughout New York City impacts the life and health of the public and public health is imperiled by the person-to-person spread of COVID-19; and

WHEREAS, on March 7, 2020, New York State Governor Andrew Cuomo declared a State disaster emergency for the entire State of New York to address the threat that COVID-19 poses to the health and welfare of New York residents and visitors;

NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the Charter and Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency, it is hereby ordered:

Section 1. State of Emergency. A state of emergency is hereby declared to exist within the City of New York.

Section 2. I hereby direct all agency heads, including Emergency Management, the Department of Health and Mental Hygiene, Community Affairs, Fire, Police, Sanitation, Buildings and Transportation to take all appropriate and necessary steps to preserve public safety and the health of their employees, and to render all required and available assistance to protect the security, well-being and health of the residents of the City.

Section 3. The State of Emergency shall remain in effect for a period not to exceed thirty days or until rescinded, whichever occurs first. Additional declarations to extend the State of Emergency for additional periods not to exceed thirty days will be issued if needed. The remainder of this Order shall remain in effect for five (5) days unless terminated at an earlier date. This Order may be extended for additional periods not to exceed five (5) days each during the pendency of the local state of emergency.

Section 4. This Executive Order shall take effect immediately.

Bill de Blasio,
MAYOR

# EXHIBIT I



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EMERGENCY EXECUTIVE ORDER NO. 108

April 19, 2020

EMERGENCY EXECUTIVE ORDER

WHEREAS, on March 7, 2020, New York State Governor Andrew Cuomo declared a State disaster emergency for the entire State of New York to address the threat that COVID-19 poses to the health and welfare of New York residents and visitors; and

WHEREAS, Emergency Executive Order No. 98, issued March 12, 2020 and extended by Emergency Executive Order No. 106, issued April 9, 2020, contains a declaration of a state of emergency in the City of New York due to the threat posed by COVID-19 to the health and welfare of City residents, and such declaration remains in effect for a period not to exceed thirty (30) days or until rescinded, whichever occurs first; and

WHEREAS, this Order is given because of the propensity of the virus to spread person-to-person and also because the actions taken to prevent such spread have led to property loss and damage; and

WHEREAS, measures taken to combat the spread of COVID-19 may prevent individuals, businesses and other entities from meeting legally imposed deadlines for the filing of certain documents or for the completion of other required actions; and

WHEREAS, this Order is given in order to ensure that the Governor's orders are enforced; and

NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:

Section 1. I hereby direct that sections 1, 2, 3, 4 and 5 of Emergency Executive Order No. 107, dated April 14, 2020, are extended for five (5) days.

§ 2. I hereby suspend sections 20-225 and 20-226 of the Administrative Code, to the extent such sections impose limitations on the amount of time permitted for action by agencies, community boards, the City Council, or elected officials, and order that any such time limitations are tolled for the duration of the emergency.

§ 3. I hereby suspend section 11-06 of title 62 of the Rules of the City of New York concerning privately owned public space signage requirements, to the extent such section imposes a deadline for the submission of a complete design review package by an owner of a privately owned public space that does not have previously approved signage, or that does have previously approved signage that does not include a statement that such space is open to the public and the hours such space is open, and order that such deadline is tolled for the duration of the emergency.

§ 4. This Order incorporates any and all relevant provisions of Governor Executive Order No. 202 and subsequent orders issued by the Governor of New York State to address the State of Emergency declared in that Order pursuant to his powers under section 29-a of the Executive Law.

§ 5. I hereby direct the Fire Department of the City of New York, the New York City Police Department, the Department of Buildings, the Sheriff, and other agencies as needed to immediately enforce the directives set forth in this Order in accordance with their lawful enforcement authorities, including but not limited to Administrative Code sections 15-227(a), 28-105.10.1, and 28-201.1, and section 107.6 of the New York City Fire Code. Violations of the directives set forth in this Order may be issued as if they were violations under the New York City Health Code, title 24 Rules of the City of New York section 3.11, and may be enforced as such by the Department of Health and Mental Hygiene or any other agency named in this section.

§ 6. This Emergency Executive Order shall take effect immediately, and shall remain in effect for five (5) days unless it is terminated or modified at an earlier date.

Bill de Blasio,
MAYOR

# EXHIBIT J



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EMERGENCY EXECUTIVE ORDER NO. 115

May 24, 2020

EMERGENCY EXECUTIVE ORDER

WHEREAS, on March 7, 2020, New York State Governor Andrew Cuomo declared a State disaster emergency for the entire State of New York to address the threat that COVID-19 poses to the health and welfare of New York residents and visitors; and

WHEREAS, Emergency Executive Order No. 98, issued March 12, 2020, and extended by Emergency Executive Order No. 112, issued May 9, 2020, contains a declaration of a state of emergency in the City of New York due to the threat posed by COVID-19 to the health and welfare of City residents, and such declaration remains in effect; and

WHEREAS, this Order is given because of the propensity of the virus to spread person-to-person and also because the actions taken to prevent such spread have led to property loss and damage; and

WHEREAS, measures taken to combat the spread of COVID-19 may prevent individuals, businesses and other entities from meeting legally imposed deadlines for the filing of certain documents or for the completion of other required actions; and

WHEREAS, this Order is given in order to ensure that the Governor's orders are enforced; and

NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:

Section 1.  I hereby direct that sections 1 and 2 of Emergency Executive Order No. 114, dated May 19, 2020, are extended for five (5) days.

§ 2.  I hereby direct that section 3(b) of Emergency Executive Order No. 103 is amended to read as follows: In order to avoid the mass congregation of people in public places and to reduce the opportunity for the spread of COVID-19, any non-essential gathering of individuals of any size

for any reason shall be cancelled or postponed, provided however that gatherings of ten (10) or fewer individuals where such individuals adhere to applicable social distancing protocols and cleaning and disinfection protocols are permitted. Any drive-in or remote religious service may continue in excess of the ten person limit provided there is no in-person contact between participants. Vehicle caravans are permitted.


§ 3.  I hereby suspend section 37-78(b) of the Zoning Resolution concerning periodic compliance reporting and section 25-114(f) of the Administrative Code concerning inspections of privately owned public spaces to the extent such provisions impose deadlines for inspections or submission of compliance reports, and order that such deadlines are tolled for the duration of the emergency.

§ 4.  This Order incorporates any and all relevant provisions of Governor Executive Order No. 202 and subsequent orders issued by the Governor of New York State to address the State of Emergency declared in that Order pursuant to his powers under section 29-a of the Executive Law.

§ 5.  I hereby direct the Fire Department of the City of New York, the New York City Police Department, the Department of Buildings, the Sheriff, and other agencies as needed to immediately enforce the directives set forth in this Order in accordance with their lawful enforcement authorities, including but not limited to Administrative Code sections 15-227(a), 28-105.10.1, and 28-201.1, and section 107.6 of the New York City Fire Code. Violations of the directives set forth in this Order may be issued as if they were violations under the New York City Health Code, title 24 Rules of the City of New York sections 3.07 and 3.11, and may be enforced as such by the Department of Health and Mental Hygiene or any other agency named in this section.

§ 6.  This Emergency Executive Order shall take effect immediately, and shall remain in effect for five (5) days unless it is terminated or modified at an earlier date.

Bill de Blasio,
MAYOR

# EXHIBIT K



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, NY 10007


EMERGENCY EXECUTIVE ORDER NO. 117

DECLARATION OF LOCAL STATE OF EMERGENCY

June 1, 2020

EMERGENCY EXECUTIVE ORDER


WHEREAS, on March 12, 2020, the City issued a Declaration of Emergency Related to the presence of COVID-19 in the City ("COVID-19 Declaration of Emergency"); and

WHEREAS, Emergency Executive Order No. 98, issued March 12, 2020, and extended by Emergency Executive Order No. 112, issued May 9, 2020, contains a declaration of a state of emergency in the City of New York due to the threat posed by COVID-19 to the health and welfare of City residents, and such declaration remains in effect; and

WHEREAS, large gatherings increase the potential for spread of the virus; and

WHEREAS, peaceful demonstrations began in the City in response to the death of George Floyd, a Black man in Minneapolis who died after one or more officers knelt on his neck, the latest in a long line of deaths of Black men and women that have spurred protests across our nation, but demonstration activities were subsequently escalated, by some persons, to include actions of assault, vandalism, property damage, and/or looting; and

WHEREAS, the City remains subject to State and City Declarations of Emergency related to the novel coronavirus disease, COVID-19; and

WHEREAS, the violent acts have been happening primarily during the hours of darkness, and it is especially difficult to preserve public safety during such hours; and

WHEREAS, the imposition of a curfew is necessary to protect the City and its residents from severe endangerment and harm to their health, safety and property;

NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law § 24(1)(a), the Charter and Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:

Section 1. A state of emergency is hereby declared to exist within the City of New York.

Section 2. I hereby order a City-wide curfew from 11:00pm on June 1, 2020 until 5:00am on June 2, 2020.  During this time, no persons or vehicles may be in public.

Section 3. This Order shall not apply to police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies. "Essential work" is work performed by essential businesses or entities as defined or permitted by the Empire State Development Corporation.

Section 4. This Order shall take effect immediately. This Order shall remain in effect through June 2, 2020 unless rescinded, superseded, or amended by further Order.  Failure to comply with this Order shall result in orders to disburse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor.

_____
Bill de Blasio,
MAYOR

# EXHIBIT L



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, NY 10007

EMERGENCY EXECUTIVE ORDER NO. 118

DECLARATION OF LOCAL STATE OF EMERGENCY

June 1, 2020

WHEREAS, on March 12, 2020, the City issued a Declaration of Emergency Related to the presence of COVID-19 in the City ("COVID-19 Declaration of Emergency"); and

WHEREAS, Emergency Executive Order No. 98, issued March 12, 2020, and extended by Emergency Executive Order No. 112, issued May 9, 2020, contains a declaration of a state of emergency in the City of New York due to the threat posed by COVID-19 to the health and welfare of City residents, and such declaration remains in effect; and

WHEREAS, large gatherings increase the potential for spread of the virus; and

WHEREAS, peaceful demonstrations began in the City in response to the death of George Floyd, a Black man in Minneapolis who died after one or more officers knelt on his neck, the latest in a long line of deaths of Black men and women that have spurred protests across our nation, but demonstration activities were subsequently escalated, by some persons, to include actions of assault, vandalism, property damage, and/or looting; and

WHEREAS, the City remains subject to State and City Declarations of Emergency related to the novel coronavirus disease, COVID-19; and

WHEREAS, the violent acts have been happening primarily during the hours of darkness, and it is especially difficult to preserve public safety during such hours;

WHEREAS, the imposition of a curfew is necessary to protect the City and its residents from severe endangerment and harm to their health, safety and property; and

WHEREAS, on June 1, 2020 I declared a state of emergency to exist within the City of New York,

NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law § 24(1)(a), the Charter and Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:

Section 1. A state of emergency is hereby declared to continue to exist within the City of New York.

Section 2. I hereby order a City-wide curfew from 8:00pm on June 2, 2020 until 5:00am on June 3, 2020.  During this time, no persons or vehicles may be in public.

Section 3. This Order shall not apply to police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies. "Essential work" is work performed by essential businesses or entities as defined or permitted by the Empire State Development Corporation.

Section 4. This Order shall take effect immediately. Sections 2 and 3 of this Order shall remain in effect through June 3, 2020 unless rescinded, superseded, or amended by further Order. Failure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor.

_____
      Bill de Blasio,
      MAYOR

# EXHIBIT M



### THE CITY OF NEW YORK
### OFFICE OF THE MAYOR
### NEW YORK, NY 10007

EMERGENCY EXECUTIVE ORDER NO. 119

June 2, 2020

**WHEREAS**, on March 12, 2020, the City issued a Declaration of Emergency Related to the presence of COVID-19 in the City ("COVID-19 Declaration of Emergency"); and

WHEREAS, Emergency Executive Order No. 98, issued March 12, 2020, and extended by Emergency Executive Order No. 112, issued May 9, 2020, contains a declaration of a state of emergency in the City of New York due to the threat posed by COVID-19 to the health and welfare of City residents, and such declaration remains in effect; and

WHEREAS, large gatherings increase the potential for spread of the virus; and

**WHEREAS**, peaceful demonstrations began in the City in response to the death of George Floyd, a Black man in Minneapolis who died after one or more officers knelt on his neck, the latest in a long line of deaths of Black men and women that have spurred protests across our nation, but demonstration activities were subsequently escalated, by some persons, to include actions of assault, vandalism, property damage, and/or looting; and

**WHEREAS**, the City remains subject to State and City Declarations of Emergency related to the novel coronavirus disease, COVID-19; and

WHEREAS, the violent acts have been happening primarily during the hours of darkness, and it is especially difficult to preserve public safety during such hours;

WHEREAS, the imposition of a curfew is necessary to protect the City and its residents from severe endangerment and harm to their health, safety and property; and

WHEREAS, on June 1, 2020 I declared a state of emergency to exist within the City of New York,

NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law § 24(1)(a), the Charter and Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:

Section 1. I hereby order a City-wide curfew to be in effect each day from 8:00pm until 5:00am, beginning at 8:00pm on June 3, 2020 and ending at 5:00am on June 8, 2020.  During this time, no persons or vehicles may be in public between the hours of 8:00pm and 5:00am.

Section 2. This Order shall not apply to police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies. "Essential work" is work performed by essential businesses or entities as defined or permitted by the Empire State Development Corporation.

Section 3. This Order shall take effect immediately. Failure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor.

Bill de Blasio,
MAYOR

# EXHIBIT N



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, NY 10007

EMERGENCY EXECUTIVE ORDER NO. 122

June 7, 2020

WHEREAS, Emergency Executive Order No. 98, issued March 12, 2020, and most recently extended by Emergency Executive Order No. 112, issued May 9, 2020, contains a declaration of a state of emergency in the City of New York due to the threat posed by COVID-19 to the health and welfare of City residents, and such declaration remains in effect; and

WHEREAS, Emergency Executive Order No. 118, issued on June 1, 2020, declared a state of emergency to exist within the City of New York; and

WHEREAS, Emergency Executive Order No. 119, issued on June 2, 2020 and Executive Order 121, issued on June 5, 2020, ordered a City-wide curfew to be in effect each day from 8:00 pm until 5:00 am, beginning at 8:00 pm on June 3, 2020 and ending at 5:00 am on June 8, 2020; and

WHEREAS, the restriction on the movement of persons and vehicles between the hours of 8:00 pm and 5:00 am can now be safely ended, effective immediately;

NOW, THEREFORE, it is hereby ordered:

Section 1. The City-wide curfew declared by Emergency Executive Orders 119 and 121 is hereby ended.

Section 2. Restrictions imposed by section 2 of Emergency Executive Order 121 related to For Hire Vehicles, Citi Bike and Revel services, are hereby ended.

Section 3. This Order shall take effect immediately.

_____
Bill de Blasio,
MAYOR

# EXHIBIT O

Office of the Vice-Chairman/Majority Leaders
Ross/Cuite (1964- 1985)
Series: Introduction of Bills

Box# 052536

Local Laws 31

Emergency measures for riots

1968

April 22, 1968

Statement of R. Harcourt Dodds, Deputy Commissioner in charge of
Legal Matters, to the City Affairs Committee of the City Council
on the Establishment of Emergency Measures for Riots and Other
Disorders

Mr. Chairman and members of the City Affairs Committee:

The proposal under consideration would add a new section,
§8a-5.0, to the Administrative Code. This new section permits the
Mayor to declare a state of emergency, upon receiving written
certification from the Emergency Control Board that there exists
a clear and present danger of riot or widespread civil disorder.

The Emergency Control Board was created by Executive
Order No. 107 dated December 22, 1961, and consists of the Mayor
as Chairman, the City Administrator, the Director of Civil Defense,
and the Commissioners of Police, Fire, Hospitals, Sanitation, Public
Works and Water Supply, Gas and Electric and the Chairman of the
New York City Transit Authority. Executive Order No. 82, dated
January 13, 1964, added the Commissioner of Health to the Board.

Upon receipt of the certification, the Mayor may declare
that such an emergency exists in the entire city or in any part or
parts thereof.

Immediately upon a declaration of emergency, whether for
the entire city or any part or parts of the city, the sale, pur-
chase, loan, or display of all guns, firearms and ammunition is
prohibited throughout the city. Furthermore, upon such declara-
tion, the possession of rifles and shotguns in public places is
prohibited on a city-wide basis.

Upon this declaration, the Mayor may, in his discretion,
institute certain emergency measure. Under subsection 3 of para-
graph (b), he may:

1. Establish a curfew;

2. Prohibit the sale of alcoholic beverages as defined
   in the New York State Alcoholic Beverage Control law;

3. Close theaters and other places of public assemblage;

4. Prohibit the sale or transfer of gasoline or other
   flammable or combustible liquid altogether or except
   for delivery into the tank of a motor vehicle or boat
   or aircraft; and

5. Prohibit the possession in a public place of any portable
   receptacle containing gasoline or any other flammable or
   combustible liquid.

The bill further provides that the declaration and any
emergency measure must be filed with the City Clerk and published
in the City Record. Copies of these documents must also be
delivered to appropriate news media for publication and broadcast.
Further, if practicable, the declaration and emergency measures
must be publicized by other means such as posting and loud-
speakers.

A state of emergency declared by the Mayor under this
section will last for fifteen days unless terminated by the Mayor
at an earlier time. Within the fifteen day period, an additional
state of emergency may be declared pursuant to paragraph (a) of
the proposal.

A violation of any emergency measure or provision of
this section is made a misdemeanor punishable by one year imprison-
ment or by 500 dollars fine or by both.

- 3 -

Presently the powers of the Mayor are defined in extremely broad, general terms. Sections 3 and 8(a) of the New York City Charter provide that the Mayor is the Chief Executive of the City and exercises all powers vested in the city, subject to other provisions of the Charter. Section 20, subdivision 13 of the New York State General City Law provides that cities are empowered to maintain order, enforce the laws, protect property and preserve and care for the safety, health, comfort and general welfare of the inhabitants of the city and visitors thereto.

There is a complete lack of any emergency powers, delineated by either state or local law, vested in the office of the Mayor.

This legislation is necessary for several reasons. The law would provide specific penal sanctions for violations of its provisions and for any emergency measures which the Mayor might invoke.

This is extremely important because without such sanctions, enforcement of any emergency order would be very difficult. Of even greater importance is the fact that the bill would give the city's residents notice as to what measures will be in effect automatically, such as restrictions on the sale and display of guns and firearms, and what measures may be invoked by the Mayor in his discretion. In effect, it would warn the law-abiding citizen beforehand as to what measures can be used and what would be expected from him in such an emergency.

Further, the bill provides for a workable procedure guaranteeing the city's residents adequate notice of the declaration of an emergency and the adoption of emergency measures.

- 4 -

The law also contains a safeguard for all concerned in that there is a constitutional standard, the "clear and present danger" test, which must be met before the Emergency Control Board makes its certification. By reliance on the Emergency Control Board, the proposed law assures that consultation among those with necessary expertise concerning the city's critical services will be a condition precedent to the implementation of emergency measures.

This overall procedure also gives the Police Department a set of realistic parameters for the training of personnel which would otherwise be unavailable.

Let us consider some of the specific emergency measures in light of the recommendations of the National Advisory Commission on Civil Disorders. Subdivisions 8a-5.0-2(a) and 2(b) provide for a ban on sale and display of firearms. Subdivision 3(b) would ban sale of alcoholic beverages and subdivision 3(d) would ban sale or transfer of gasoline and other flammable liquids.

The National Advisory Commission on Civil Disorders, after discussing the merits of restricting sales of particular items stated:

> "The Commission recommends that laws be enacted to permit closing of potentially dangerous businesses during riot situations. The authority to impose such restrictions would primarily rest with the mayor or city manager."
> (P. 525, Bantam Edition)

Subdivision 8a-5.0-3(a) refers to a curfew. The Commission recommended that mayors be empowered to impose curfews.

- 5 -

These measures are intended not to oppress the city's
residents but rather to reduce as much as possible the risk to
life and property arising in emergency situations.  It is most
critical that the emergency services of the fire, health, police
and other municipal departments be allowed to function in a manner
free from any encumbrances which decrease their effectiveness.
The powers contained in this legislation clearly serve this end.

As you know, a riot is an extremely dangerous situation,
the seriousness of which cannot be overemphasized.  It is vitally
important that a workable framework be established in advance for
coping with such an unfortunate eventuality.

Thank you.