**STOP REPORT – AUDIT PLAN 2020**

**PURPOSE**

To describe procedures utilized by the Quality Assurance Division (QAD) to evaluate each command's compliance with Patrol Guide 212-11 *Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops*, Patrol Guide 212-59 *Interior Patrol Of Multiple Dwellings Enrolled In The Trespass Affidavit Program,* Patrol Guide 212-60 *Interior Patrol of Housing Authority Buildings*, Patrol Guide 212-123 *Use of Body-Worn Cameras.* QAD will evaluate approved Stop Reports, police-initiated enforcement (PIE) arrests, Trespass Crime Fact Sheets, and body-worn camera (BWC) videos on a weekly basis for each month. The expectation is that this approach will result in a faster assessment and approval of Stop Reports in commands, so earlier corrective action can be compiled in a simpler reporting format. QAD will also continue to perform audits to identify instances of suppression/underreporting of Stop Reports by auditing Police Initiated Enforcement actions and using RAND audits. There are additional reviews addressing the constitutionality of Level 3 Terry stops and trespass arrests at NYCHA and TAP buildings being conducted by the Department outside of the QAD audits. For example, the Department's RISKS Review meetings provide additional opportunities for reviewing the performance of commands, as well as requiring commands to be constantly auditing their own compliance with Department policy on these matters.

**METHODOLOGY**

**I. STOP REPORT AUDIT**

   **A. Sample**

Effective ___, 2020, QAD will audit approved Stop Reports in each Precinct, Transit District (TD), Police Service Area (PSA) and selected Specialized Units on a weekly basis for each month. The purpose of this frequency is to ensure that the commands are receiving timely feedback that will allow for the commands to take appropriate corrective actions.

The number of Stop Reports evaluated will be based on a command's annual number of Stop Reports prepared for the prior year. QAD utilizes a sampling methodology based on grouping the commands into the following four categories:

| # of SRs | # of commands | Audit% |
|---|---|---|
| 0-59 | 50 | 75% |
| 60-119 | 29 | 50% |
| 120-179 | 37 | 40% |
| 180-249 | 11 | 40% |
| 250-309 | 3 | 33% |
| ≥ 310 | 3 | 33% |

Each week a report will be generated in FORMS for the command's prior week's approved Stop Reports. Each week's run of Stop Reports will incorporate the previous week's run to ensure that all pending Stop Reports carry over and are part of the subsequent sample population. For example, for commands with 0-59 stop reports generated last year, QAD will audit three out of the four stop reports per week, if four stop reports were generated. If fewer than four stop reports were generated in a week, then QAD will audit 100% of the stop reports for those commands. At the completion of each quarter, a report will be generated incorporating the audit findings and forwarded to the command, through channels.

B.   **Substantive Audit Procedures:**

The objectives of the substantive audit procedures will be to assess: (1) whether the stop is explained to the civilian being stopped; (2) whether the stopping officer offered a business card to the civilian stopped or, if it was not offered did the officers' reason fall into one of the exceptions; (3) whether it appears (a) that the stop was based on reasonable suspicion, (b) that the frisk, if conducted, was based on reasonable suspicion that the suspect was armed and dangerous, and (c) that the search, if conducted, had a legally sufficient basis; and (4) whether the consent search, if conducted, was conducted according to Department policy.  These assessments will be based on the Stop Report, the BWC video for every audited Stop Report, and other documentation, such as an ICAD, crime pattern sheet, or activity log.

In addition, the audit will evaluate whether the Stop Report narratives sufficiently articulate: (a) reasonable suspicion for the stop, (b) reasonable suspicion for the frisk, if a frisk was conducted, and (c) a legally sufficient basis for the search, if a search was conducted.  Also, the BWC videos will be evaluated for: (1) whether the encounter is recorded, (2) whether the encounter is captured completely (meaning that the video captured sufficient information to

evaluate each level of the encounter), and (3) whether the Stop Report is consistent with the events depicted on the videos.

Moreover, supervisory actions will be evaluated to determine whether the supervisor sufficiently evaluated the narrative sections prepared by the reporting officer. QAD will evaluate whether the supervisor approved a Stop Report, including any corrective history before approval, in circumstances in which the narrative did not make out reasonable suspicion for the stop or for the frisk and/or legally sufficient basis for the search, if one was conducted. When the supervisor identifies an insufficient narrative and/or legally insufficient stop, frisk, and/or search, the supervisory follow up section is evaluated for notation of instruction, training, and discipline. Below is a description of the necessary steps for the proposed audit methodology.

1. Review Stop Report and corresponding BWC videos and ICAD:
    a. Review to determine whether BWC videos are recorded.
        i. If a Stop Report selected has no BWC video, the command will be marked deficient for the encounter recorded.
    b. Review to determine whether BWC videos captured the encounter completely.
        i. If BWC video did not capture the entire encounter, this will be identified and shared with the command.
    c. Review the BWC, Stop Report and, if applicable, the related ICAD event and or crime pattern sheet and or wanted posters to determine:
        i. whether it appears that the stop was based on reasonable suspicion;
        ii. whether the stop narrative in the Stop Report is consistent with the BWC recording of the stop.
        iii. If the stop narrative in the Stop Report is not consistent with the BWC recording of the stop, note how the narrative was not consistent.
            - The BWC video of the stop may indicate that the stop was not based on reasonable suspicion even though the Stop Report narrative articulates reasonable suspicion; alternatively, the BWC video of the stop may indicate that the stop was based on reasonable suspicion, even when the Stop Report narrative does not articulate reasonable suspicion (e.g., when the narrative does not include the radio run description of the suspect).
    d. Review the BWC, Stop Report and, if necessary and applicable, the related ICAD event and/or crime pattern sheet and/or wanted posters to determine:
        i. whether it appears the frisk, if conducted, was based on reasonable suspicion;
        ii. whether the frisk narrative in the Stop Report is consistent with the BWC recording of the frisk.

   iii. If the frisk narrative in the Stop Report is not consistent with the BWC recording of the stop, note how the narrative was not consistent.
  e. Review the BWC, Stop Report and, if necessary and applicable, the related ICAD event and or crime pattern sheet and or wanted posters to determine:
   i. whether it appears that the search, if conducted, had a legally sufficient basis;
   ii. whether the search narrative in the Stop Report is consistent with the BWC recording of the search.
   iii. If the search narrative in the Stop Report is not consistent with the BWC recording of the stop, note how the narrative was not consistent.
  f. Review the video for compliance with the Right to Know Act; i.e., did the officer: (a) identify him or herself, (b) explain the reason(s) for the stop, and (c) offer the stopped person a Business Card, and if not, did one or more of the permissible exceptions to these requirements apply, e.g., arrest, summons, or exigency.
  g. Review the video for compliance with consent to search policy if a consent search was conducted.

2. Review of the Stop Report Narrative:
  a. Review the stop narrative section on the Stop Report and, if necessary and applicable, the related ICAD event and or crime pattern sheet and/or wanted posters and BWC video to determine whether the officer sufficiently articulated reasonable suspicion for the stop (i.e., if the facts articulated in the narrative section establish that it was reasonable for the officer to have suspected that the stopped person was committing, had committed or was about to commit a felony or Penal Law misdemeanor).
   i. Conclusory language such as "furtive movements," "fits description," "suspicious bulge," "evasive or uncooperative behavior," are insufficient to provide reasonable suspicion unless accompanied by more detailed, clarifying language. Moreover, mere presence in a "high crime area" or "drug prone location" alone cannot provide reasonable suspicion.
   ii. Must include **specific facts** establishing reason for the stop (hunches or gut feelings are not sufficient).
   iii. Must be **individualized** (reasonably suspect the specific person being stopped of criminal wrongdoing and describe the actions of the individual which constituted reasonable suspicion).
   iv. Cannot be based solely on an uncorroborated suspect description received from an anonymous source.
   v. Flight from police during a Level 2 investigative encounter elevates the encounter to reasonable suspicion. Flight during a Level 1 investigative encounter does not elevate the encounter to reasonable suspicion.

      vi. When a stop is made pursuant to a suspect description and/or an identified crime pattern, the narrative must include the details of that description and/or crime pattern.

      vii. A suspect description must include more details than just race, age, and gender in order to support reasonable suspicion for a stop.

      viii. In order for a crime pattern to support reasonable suspicion for a stop, the geographical area described should be specific, not broad (such as an entire precinct or borough).

3. Review the Frisk Narrative:
   a. Review the narrative section of Stop Reports where a frisk is indicated to determine whether the officer sufficiently articulated reasonable suspicion that the stopped person was armed and dangerous (i.e., it was reasonable for the officer to suspect that the stopped person was armed and dangerous at the time of the stop). The following is a list of examples of when a UMOS may reasonably suspect a person is armed and dangerous (this list is not comprehensive):
      i. Reasonable suspicion that the suspect has committed, is committing or is about to commit a violent crime (murder, assault, kidnapping, rape, robbery, burglary, criminal possession of a weapon).
      ii. Observing something on the person that the officer reasonably suspects is a weapon.
      iii. Statements made by the suspect.
      iv. Information known by the officer that the suspect may be carrying a weapon, such as statements from a victim or witness.

4. Review the Search Narrative:
   a. Review the narrative section of Stop Reports where a search is indicated to determine whether the officer articulated a legally sufficient basis for the search (i.e., feeling a hard object believed to be a weapon during a frisk; search incident to an arrest; consent to search).

5. Review the reason for checking "No" for caption "Did officer explain reason for stop?" (if applicable).  Permissible reasons include exigent circumstances and impairing a criminal investigation.

6. Review the reason for checking "No" for "Business Card Offered to Person Stopped?" (if applicable). Permissible reasons include arrest, summons, exigent circumstances.

7. Review the Supervisory Section of the Stop Report:
   a. Determine whether supervisor's captions are complete.

      b. Review the Supervisory Action section to determine whether the supervisor correctly evaluated the sufficiency of the stop, frisk and search narrative.
           i. Exclude administrative errors (e.g., if the supervisor checked "N" instead of "N/A" for "Sufficient Basis for Frisk" when there was no frisk).
      c. Review the correction history of the Stop Report and identify and track whether the deficiencies noted were substantive in nature, or administrative errors.
      d. Determine whether, in cases where the Supervisor noted one or more deficiencies with the Stop Report and/or an insufficient basis for the stop, frisk, and/or search, the Supervisor also indicated that follow-up actions were taken.
      e. During audit, compare Stop Reports with follow-up actions checked by the supervisor against related Department records (e.g., training records, CRAFT entries and command disciplines) to verify that the indicated follow-up action occurred and track the implementation of follow-up actions.

8. To the extent that deficiencies are identified in its weekly review, QAD will communicate with the command/boroughs as needed (e.g., insufficient Stop Report narratives, improper stops, frisks, and/or searches, failure to activate BWCs, Stop Reports not approved in a timely manner, business cards not being offered).

9. QAD will also review command responses to the quarterly reports to determine whether further investigation revealed no deficiency, or the command addressed deficiencies noted in the audit.

10. Review of the Command's Self-Inspections of Stop Reports:

      a. The two most recent self-inspections are reviewed.
      b. Identify the Stop Reports/BWC videos that were audited by QAD and the command during the self-inspection process and conduct an audit of those self inspection reports for consistency.
           i. For the Stop Report and BWC video, a comparison is made by QAD and the Command to determine if QAD's audit findings are consistent with the command's findings, including the self-inspection appendix.
           ii. QAD will review command responses to the quarterly reports to determine whether further investigation revealed no deficiency, or the command addressed deficiencies noted in the audit.

## II.  TRESPASS ARRESTS AUDIT

### A.  Sample:

At a minimum, fifty percent (50%) of Trespass arrests in and around NYCHA buildings or TAP buildings will be audited on a weekly basis when criminal trespass was a charge in a NYCHA/TAP building. QAD will obtain the Trespass Crimes - Fact Sheet and Supporting Deposition (PD 351-144) ("TCFS") for the arrests to be audited.

### B.  Substantive Audit Procedures:

The objectives of the substantive audit procedures for the Trespass Arrests Audit are as follows: (1) was a TCFS prepared; (2) did the officer sufficiently articulate in the TCFS a basis for approach; (3) did the officer sufficiently articulate probable cause and did the arrest adhere to the Department's Criminal Trespass Arrest Policy; (4) whether a Stop Report should have been prepared as a result of the encounter; and (5) whether the BWC video of the encounter is consistent with the TCFS/arrest documents.

1. Review Trespass Crimes – Fact Sheet:
    a. Determine if TCFS is prepared.
    b. Review TCFS to determine if the officer sufficiently described the factors that led him/her to approach and question the individual.
    c. Review the TCFS/arrest documents and determine whether the officer sufficiently articulated probable cause and the arrest adhered to the Department's Criminal Trespass Arrest Policy.
    d. Determine whether a Level 3 stop occurred and if so, whether a Stop Report was prepared.

2. BWC review
    a. Review the BWC video with corresponding TCFS/arrest documents for one (1) TAP and one (1) NYCHA arrest for each command per week.
    b. Review to determine whether BWC videos are recorded. If a Trespass Arrest selected has no BWC video, the command will be marked deficient for the encounter recorded.
    c. Review to determine whether BWC videos captured the encounter completely.
    d. Review to determine whether the TCFS/Arrest Documents and/or Stop Report are consistent with the BWC videos.
        i. Is the approach reported in the TCFS consistent with the BWC recording of the approach? If not, record how they are inconsistent.
        ii. Is the arrest reported in the arrest documentation consistent with the BWC recording of the arrest?  If not, report how they are inconsistent.

  e. If a Stop Report was prepared for a TAP/NYCHA arrest, it must be included in the Stop Report sample and evaluated accordingly.
  f. Review the video for compliance with the Right to Know Act.
  g. Review the video for compliance with consent to search policy if a consent search was conducted (e.g., did the officer ask for consent to search in the appropriate manner).

3. QAD will reach out to the command/boroughs, as needed regarding TCFS deficiencies.

4. As described in Patrol Guide 212-59 and 212-60, additional guidance should be considered during this review:
  a. Officers may not conduct a reasonable suspicion stop pursuant to P.G. 212-11 or arrest any person for a violation of Housing Authority rules, unless the rule violation is also a criminal offense.
  b. Mere lingering in a common area, without more, is not a criminal offense for which a person may be stopped or arrested.
  c. Mere presence near, entry into or exit out of a Housing Authority building or a TAP building, without more, is not sufficient to establish reasonable suspicion to stop a person on suspicion of trespass nor is it an objective credible reason to approach and question any person.
  d. A person's silence or refusal to provide information or identification when questioned by the police does not support reasonable suspicion to stop or probable cause to arrest.
  e. A person should not be arrested on the basis of trespassing in a restricted area of a building – including the roof, roof landing or boiler room – in the absence of conspicuously posted rules, unless the officer knows or has other credible information that the person knows that their presence in the restricted area is prohibited.
  f. If an individual was stopped based upon Reasonable Suspicion, or a reasonable person would not have felt free to leave under the circumstances, a Stop Report must be completed pursuant to P.G. 212-11.

## III. POLICE INITIATED ENFORCEMENT AUDIT

### A. Sample:

Police Initiated Enforcement arrests will be audited on a weekly basis for each month from the sample population. Each week, the one (1) most recent PIE arrest (i.e., CPCS, CPW, Trespass, and those arrests where PSNY is the complainant on the Complaint Report) will be selected for a command. The arrests must be the result of police initiated enforcement but will exclude all arrests that were initiated by a VTL crime or infraction.

**B. Substantive Audit Procedures:**

The objectives of the substantive audit procedures for Police Initiated Enforcement: (1) to determine if the officer sufficiently articulated probable cause for the arrest; and (2) whether a Stop Report may have been required to detect any underreporting of Level 3 stops.

1. Review arrest documents:
    a. Determine if the officer sufficiently articulated probable cause for the arrest.
    b. Determine whether a Stop Report may have been required.
        i. Activity Log entries and Court Affidavits (when applicable) are evaluated to determine if the officer sufficiently articulated probable cause for the arrest; and whether a Stop Report may have been required.
    c. Review BWC videos with corresponding Arrest Reports for each command's weekly PIE run:
        a. If the Arrest Report selected has no BWC video, the command will be marked deficient for the encounter recorded.
    d. Review to determine whether BWC videos captured the encounter completely.
    e. Determine whether the encounter involved a Level 3 stop.
    f. Determine whether Stop Reports are prepared for Level 3 encounters indicated on BWC videos.
    g. Review to determine whether BWC videos are consistent with the arrest documents.
    h. If a Stop Report was prepared for a PIE arrest, it must be included in the Stop Report sample and evaluated accordingly.
    i. Review the video for compliance with the Right to Know Act.
    j. Review the video for compliance with consent to search policy if a consent search was conducted.

2. To the extent that deficiencies are identified in its weekly review, QAD will communicate with the command/boroughs as needed (e.g., Stop Reports not approved in a timely manner, business cards not being offered).

3. QAD will also review command responses to QAD's quarterly reports to determine whether further investigation revealed no deficiency, or the command addressed deficiencies noted in the audit.

4. Review of the Command's Police Initiated Enforcement Self-Inspections:

    a. The two (2) most recent PIE self-inspections are reviewed.

    b. Identify the Arrest Reports that were audited by QAD and the command during the self-inspection process.

        i. For the Arrest Report, a comparison is made by QAD and the Command, to determine whether QAD's audit findings are consistent with the commands.

## IV. RAND AUDIT

### A. Sample:

Approximately four (4) commands (i.e., precincts, police service areas and transit districts) will be evaluated for a seven-day period each week in 2020. All patrol commands will be audited semi-annually and all Police Service Areas and Transit Districts will be audited annually. The objective of this audit is to detect underreporting.

### B. Substantive Audit Procedures:

1. A search in the ICAD system is conducted using the keywords: "stopped," "holding," "show-up" and "warrant check."

2. The results are examined and categorized as follows: false positive, violation, traffic violation, probable cause, aided case, complainant/victim on the scene, Stop Report found, or further investigation required.

3. For encounters which may have required the preparation of a Stop Report, check the Stop Report database to determine if Stop Reports were prepared.

4. When a Stop Report is not indicated during a final disposition or not located by QAD, the Communications Division is supplied with a list of ICAD events identified for further review. An audio review is conducted of each event to further ascertain if a person was stopped and if a Stop Report was necessary.

5. The Stop Report database is again examined to determine if a Stop Report was prepared.

6. For encounters which were required to be recorded on BWC and which also appeared to require the preparation of a Stop Report, review of BWC video will be conducted. A maximum of five (5) BWC videos will be reviewed for each Command.

7. In instances where further investigation is required and a Stop Report cannot be found, a communication regarding the incident is sent through channels to the Borough Investigations Unit for investigation and a response is required.

8. QAD will review responses to determine whether deficiencies were addressed and Stop Reports were prepared, if necessary, and this information will be tracked.