**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X

DAVID FLOYD, *et al.*,

                          Plaintiffs,

 -against-                                    No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

                          Defendants.
------------------------------------------------------------------ X

------------------------------------------------------------------ X

KELTON DAVIS, *et al.*,

                          Plaintiffs,

 -against-                                    No. 10 Civ. 699 (AT)

CITY OF NEW YORK, *et al.*,

                          Defendants.
------------------------------------------------------------------ X

## PLAINTIFFS' REPLY MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR EMERGENCY RELIEF

Jonathan C. Moore
Luna Droubi
Marc Arena
Beldock Levine & Hoffman LLP
99 Park Avenue, Penthouse Suite
New York, NY 10016
212.490.0400

Darius Charney
Baher Azmy
Omar Farah
Guadalupe Aguirre
The Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
212.614.6464

Jin Hee Lee
Raymond Audain
Kevin Jason
Ashok Chandran
John Cusick
Patricia Okonta
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212.965.2200

Corey Stoughton
Steve Wasserman
The Legal Aid Society
199 Water Street
New York, NY 10038
212.577.3300

*Attorneys for Floyd Plaintiffs*

*Attorneys for Davis Plaintiffs*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT .......................................................................................................... 2

    POINT I. NYPD COVID-19 ENFORCEMENT PRACTICES ARE SUBJECT TO THE REQUIREMENTS OF THE *FLOYD* ORDERS AND *DAVIS* SETTLEMENT .................... 2

        A. NYPD COVID-19 Enforcement Actions Often Begin with Level 3 *Terry* Stops ......... 2

        B. The NYPD Uses COVID-19 Enforcement as a Pretext to Conduct Terry Stops, Frisks, Searches, and Arrests for Criminal Law Enforcement Purposes ................................. 5

    POINT II. PLAINTIFFS' MOTION IS NOT PROCEDURALLY DEFECTIVE .................. 7

    POINT III. NYPD COVID-19 ENFORCEMENT PRACTICES APPEAR TO VIOLATE THE COURT's PRIOR ORDERS IN *FLOYD* AND THE *DAVIS* SETTLEMENT ............... 9

        A. The Current Public Health Crisis and Protests Against Police Abuses Do Not Exempt COVID-19 and Curfew Enforcement from Constitutional Mandates ......................... 9

        B. There is Compelling Circumstantial Evidence that the NYPD Has Engaged in Racially Discriminatory COVID-19 Enforcement and thus Violated the Court's Orders to Remedy Its Finding of Intentional Discrimination ...................................... 10

    POINT IV.  A TEMPORARY MORATORIUM AND MONITOR INVESTIGATION OF NYPD COVID-19 ENFORCEMENT PRACTICES IS WARRANTED ............................. 13

        A. The Preliminary Injunction Standard Does Not Apply to This Post-Judgment Relief Request ................................................................................................. 13

        B. A Temporary Moratorium is Still Necessary to Prevent Continued Violations of Class Members' Constitutional Rights ................................................................. 14

        C. A Temporary Moratorium and Monitor Investigation Are In the Public Interest ....... 15

    CONCLUSION .......................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Abdi v. McAleenan*, No. 1:17-CV-00721 EAW, 2019 WL 1915306 (W.D.N.Y. April 30, 2019) . 8

*Arthur v. Nyquist*, 415 F. Supp. 904, 913 (W.D.N.Y. 1976) ....................................................... 11

*Ass'n for Reduction of Violence v. Hall*, 734 F.2d 63 (1st Cir. 1984) ........................................... 7

*Baez v. N.Y.C.H.A.*, 13 Civ. 8916, 2015 WL 9809872 (S.D.N.Y. Dec. 15, 2015) ....................... 13

*Belk v. Charlotte-Mecklenberg Bd. of Educ.,* 269 F.3d 305 (4th Cir. 2001) ............................... 10

*Cal. Dep't of Social Serv's v. Leavitt*, 523 F.3d 1025 (9th Cir. 2008) .......................................... 8

*Campaign for S. Equal. v. Bryant*, 197 F. Supp. 3d 905 (S.D. Miss. 2016) .................................. 8

*Damus v. Wolf*, No. 18-578, 2020 WL 601629 (D.D.C. Feb. 7. 2020) .................................. 13, 14

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 135 (2d Cir. 2020).................. 9

*Florida v. Royer*, 460 U.S. 491 (1983) ......................................................................................... 4

*Floyd v. City of New York*, 959 F.Supp.2d 668 (S.D.N.Y. 2013) ................................................ 15

*Hutto v. Finney*, 437 U.S. 678 (1979) .......................................................................................... 13

*Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638 (2d Cir. 1998) ........................................... 13

*Keyes v. School Dist. No. 1*, 413 U.S. 189 (1973) ....................................................................... 11

*Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y. 1975)........................................................................... 6

*Melendres v. Maricopa City*, 897 F.3d 1217 (9th Cir. 2018) ...................................................... 14

*NAACP v. Duval Cty Sch.*, 273 F.3d 960 (11th Cir. 2001).......................................................... 10

*Palmer v. Rice*, 231 F.R.D. 21 (D.D.C. 2005) .............................................................................. 8

*People v. Baur,* 102 Misc.2d 971, 423 N.Y.S.2d 800 (Nassau Co. Dist. Ct. 1980) ...................... 3

*People v. De Bour*, 40 N.Y.2d 210 (1976)..................................................................................... 4

*People v. Devinny*, 227 N.Y. 397 (1919)....................................................................................... 3

i

*People v. Vandover*, 20 N.Y.3d 235 (2012)................................................................. 4

*Smith v. Greene*, 06-CV-505, 2009 WL 10722414, *2 (N.D.N.Y. June 8, 2009)......................... 7

*Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971) .................................. 11

*U.S. v. Montoya de Hernandez,* 473 U.S. 531 (1985)..................................................... 4

*United States v. Scopo,* 19 F.3d 777 (2d Cir. 1994)..................................................... 5

*United States v. Visa USA, Inc.*, 98 Civ. 7076, 2007 WL 1741885 (S.D.N.Y. June 15, 2007).... 14

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ..................................................... 13

*Vining v. Runyon*, 99 F.3d 1056 (11th Cir. 1996)....................................................... 6

*Yang v. Kellner*, 20 Civ. 3325 (AT), 2020 WL 2129597 (S.D.N.Y, May 5, 2020)...................... 9

## PRELIMINARY STATEMENT

Three points stand out from the City's response to the Plaintiffs' Motion for Emergency Relief. First, the City has no answer for the Plaintiffs' core argument that NYPD street encounters— even when conducted in the name of COVID-19 enforcement— fall squarely within the ambit of this Court's Liability and Remedial Orders in *Floyd*. The City mistakenly pins its defense on the *purpose* of the stop and/or investigative encounter, as though that has some bearing on whether the police conduct at issue on this motion constitutes investigative encounters that meet the definition of a Level 3 *Terry* Stop. But the fact that the stops in this case were made pursuant to and/or were otherwise related in some way to the NYPD's COVID-19 enforcement efforts, rather than for some other purpose such as general enforcement of the criminal laws, does not exempt them from the *Floyd* Orders and the *Davis* Settlement.

Second, the City ignores the severe racial disparities in COVID-19 enforcement which Plaintiffs cite in their moving papers, disparities that closely resemble the disparities the Court found to be evidence of 14th Amendment violations in its *Floyd* Liability Opinion and which, like those prior disparities, cannot be plausibly explained by any race-neutral factors. Given the NYPD's established history of intentional racial discrimination, these recent disparities are powerful circumstantial evidence of ongoing NYPD violations of the Court's prior *Floyd* Orders and the *Davis* settlement.

Third, in disputing factually some of the incidents referenced in Plaintiffs' moving papers, the Defendants make the point that only a careful consideration of all the facts related to the COVID-19 enforcement must be made equally available to the Plaintiffs. It is therefore demonstrably unfair for the Defendants to oppose Plaintiffs' discovery demands with respect to COVID-19 enforcement, while at the same time relying on some of the very information the NYPD

refuses to produce to defend its conduct. Moreover, Defendants' reliance on this information underscores its clear relevance to the serious compliance questions raised by Plaintiffs' motion and should therefore be produced to Plaintiffs immediately.

In sum, Plaintiffs' motion should be granted in its entirety.

## ARGUMENT

### POINT I
### NYPD COVID-19 ENFORCEMENT PRACTICES ARE SUBJECT TO THE REQUIREMENTS OF THE *FLOYD* ORDERS AND *DAVIS* SETTLEMENT

#### A.  NYPD COVID-19 Enforcement Actions Often Begin with Level 3 *Terry* Stops

Defendants' attempts to distinguish the NYPD's COVID-19 and curfew enforcement actions from the stop-and-frisk practices covered by the *Floyd* and *Davis* monitorship must fail because most, if not all, of these enforcement actions commence as—or pass through—a Level 3 *Terry* stop. This is so because, notwithstanding Defendants' contention to the contrary, *Floyd* Dkt. No. 771 at 22–28, in the vast majority of these encounters, officers do not automatically have probable cause of a social distancing, curfew, or mask violation when they first observe and approach an individual on the street. If it were otherwise, these rules, while they remain in effect, would make an individual's mere existence on the City's streets in the presence of other people, or during the hours of the curfew, an immediately arrestable offense.

The language of and subsequently-issued guidance on the relevant executive orders which the NYPD is enforcing clearly illustrate the flaw in Defendants' argument. The Governor's Executive Order 202.10 reads, "Non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations or social events) are canceled or postponed at this time," thus explicitly exempting essential workers from the social distancing requirement. In addition, in press conferences held prior to and after the issuance of this executive order, Governor Cuomo expressly

clarified that individuals must practice social distancing of at six feet from *others outside of their household*.[1] Mayor de Blasio issued similar guidance for his analogous Emergency Executive Order No. 103.[2] Executive Order 202.17, meanwhile, expressly limits the face covering requirement to "any individual who is over age two and able to medically tolerate a face-covering." Similarly, the Mayor's curfew orders expressly exempted essential workers and required that the offense be "knowing," such that an order to disperse was arguably a prerequisite to arrest.[3]

  The exemptions set forth above are not provisos that require an affirmative defense. The plain language in Executive Order 202.17 indicates an intention to provide exceptions—namely for those under the age of two, or those medically unable to tolerate wearing a mask. The exemptions are also not conditional as the Defendants suggest in referencing the now-repealed anti-mask law, Penal Law 240.35(4). These were explicitly exempted in the Executive Order and/or accompanying guidance and should therefore be construed as exceptions, consistent with publicly released City and State guidance and CDC guidelines.[4]

  Thus, the plain language of the executive orders, coupled with numerous exemptions

---

[1] *See* https://abc7ny.com/governor-cuomo-gatherings-social-distancing-coronavirus-in-new-york/6205611/; https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order

[2] *See* Mayor's Office Press Conference March 25, 2020 ("If you're a family that people live under the same roof and you want to play with each other on the basketball court, that's fine.") https://www1.nyc.gov/office-of-the-mayor/news/192-20/transcript-mayor-de-blasio-holds-media-availability-covid-19

[3] *See* City of New York, Office of the Mayor, Emergency Executive Order No. 118 (June 1, 2020), *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf; Mayor's Office Curfew FAQ's available at https://www1.nyc.gov/assets/counseltothemayor/downloads/Curfew-FAQ.pdf?fbclid=IwAR13YXKsm_YZMjwJY-EYM32CwP4Sh5uyDCpQMdHHBB2mziDS52c7juEqQMg

[4] It has been held that said distinction between "exceptions" and "provisos" should not be so mechanically applied that substance yields to form. *See People v. Baur*, 102 Misc.2d 971, 973, 423 N.Y.S.2d 800 (Nassau Co. Dist. Ct. 1980); *see also People v. Devinny*, 227 N.Y. 397, 401 (1919). In addition, the distinction between a "proviso" and an "exception" may be wholly disregarded if necessary to give effect to the "manifest intention of the Legislature" (McKinney's Cons. Laws of NY, Book 1, Statutes § 211, at 369). Therefore, reference to the Governor's and Mayor's public statements providing guidance on compliance with the executive orders indicating that members of the same household and essential workers could be gathered together in public should be construed to intend an explicit exception to the orders, consistent with CDC guidelines on the definition of social distancing. *See, e.g.*, Centers for Disease Control, *Social Distancing*, (visited June 13, 2020) (specifying that social distancing applies to persons outside of one's household), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html,

included in the subsequent guidance from the Governor and Mayor, make clear that NYPD officers do not automatically have probable cause to arrest or summons any group of individuals they see standing on a public street or in the shared outdoor spaces of NYCHA housing without face coverings. "In determining probable cause, the standard to be applied is that it must appear to be at least more probable than not that a crime has taken place . . . for conduct equally compatible with guilt or innocence will not suffice." *People v. Vandover*, 20 N.Y.3d 235, 237 (2012); *see also People v. De Bour*, 40 N.Y.2d 210, 216 (1976) ("We have frequently rejected the notion that behavior which is susceptible of innocent as well as culpable interpretation, will constitute probable cause."). Without a further inquiry into whether an exemption applies or not, the behavior of being in public, even when standing within a group, is equally compatible with innocence. An officer would therefore need to at least inquire whether individuals were not members of the same household or essential workers, and/or did not appear to suffer from a medical condition that made them unable to tolerate a mask in order to establish probable cause of a violation of one or more of the executive orders.

In other words, any NYPD officer's encounter with an individual on the street or in the shared outdoor space of a NYCHA complex under the auspices of COVID-19 or curfew enforcement is, at most a Level 3 *Terry* stop premised on reasonable suspicion of a social distancing, mask, and/or curfew violation and requiring further investigation to verify or dispel the officer's suspicion. *See, e.g., United States v. Montoya de Hernandez,* 473 U.S. 531, 544 (1985) ("detention for the period of time necessary to either verify or dispel the suspicion was not unreasonable") (plurality opinion); *Florida v. Royer*, 460 U.S. 491, 500 (1983) (investigative methods in a *Terry* stop "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion"). For this reason, NYPD COVID-19 enforcement encounters fall

squarely within the Court's jurisdiction.

**B. The NYPD Uses COVID-19 Enforcement as a Pretext to Conduct Terry Stops, Frisks, Searches, and Arrests for Criminal Law Enforcement Purposes**

Otherwise lawful pretextual seizures violate the Constitution when conducted on the basis of race. *See United States v. Scopo,* 19 F.3d 777, 786 (2d Cir. 1994) ("Though the Fourth Amendment permits a pretext arrest, if otherwise supported by probable cause, the Equal Protection Clause still imposes restraint on impermissibly class-based discriminations.") (Newman, C.J., concurring). Plaintiffs' opening motion papers include compelling evidence of NYPD officers using their authority to enforce COVID-19 public health mandates—i.e., social distancing guidelines, facemask requirements, and the recently lifted curfew—as a pretext to approach and initiate *Terry* stops and other *De Bour* investigative encounters with Black and Latinx individuals for criminal law enforcement purposes unrelated to COVID-19 enforcement, encounters which clearly fall within the scope of the *Floyd* orders and *Davis* and *Ligon* settlements. *See Floyd* Dkt. Nos. 760 at 21; 761-1–761-4, *Ligon* Dkt. No. 402 at 3. Defendants' responses to this evidence do little to nothing to undermine it.

First, Defendants do not dispute at all the accuracy of *Ligon* Plaintiffs' accounts of NYPD's encounters with the public that began with apparent social-distancing enforcement without probable cause before escalating through the levels of *De Bour* and resulted in an arrest for conduct that occurred *after* the officers approached, as well as instances where officers asked people outside to disperse or cease an outdoor activity—even where a person was alone or outside with people who live in the same household—and then asked accusatory questions, demanded and seized identification, conducted frisks, and used force." *Ligon* Dkt. No. 420 at 3. The declaration of Communities United for Police Reform ("CPR") attests that the organization has received increased calls reporting pretextual and discriminatory social distancing enforcement consistent

with *Ligon* Plaintiffs' assessment and reinforces the conclusion that the NYPD is using COVID-19 public health mandates as a pretext to stop Black and Latinx New Yorkers. *Floyd* Dkt. No. 761-1 ¶¶ 15–18. Defendants, however, attempt to minimize CPR's institutional experience as lacking "persuasiveness and candor." *Floyd* Dkt. No. 771 at 35. Defendants' formalistic denial is unpersuasive in light of Plaintiffs' considerable pre-discovery evidence that the NYPD is targeting Black and Latinx New Yorkers in its COVID-19 enforcement, the NYPD's own data which confirms a large number of its COVID-related arrests were only "marginally related" to social distancing or mask violations, *see Floyd* Dkt. No. 773-1 at 13–14, and CPR's well-documented history of working closely with members of communities most heavily impacted by the NYPD's racially discriminatory stop-and-frisk practices.

Equally unavailing are Defendants' self-serving factual and legal conclusions drawn from body-worn camera ("BWC") footage they are withholding from Plaintiffs surrounding Mr. Merete, Mr. Harris, and Ms. Pope's encounters with the police. *See Floyd* Dkt. No. 771 at 36–39; Defendant cannot simultaneously shield information from Plaintiffs' scrutiny while relying on it to oppose the Plaintiffs' motion on the merits. *See Kinoy v. Mitchell*, 67 F.R.D. 1, 15 (S.D.N.Y. 1975) ("Either the documents are privileged, and the litigation must continue as best it can without them, or they should be disclosed at least to the parties, in which case the Court will rule after full argument on the merits."). The Court should therefore disregard Defendants' attempt to undercut the declarations of Messrs. Merete and Harris and Ms. Pope regarding pretextual COVID-19 policing or order production of the BWC footage, including the footage related to Mr. Harris that was filed under seal and *ex parte*, *Floyd* Dkt. Nos. 772, 775, and provide Plaintiffs an opportunity to address whatever the footage may actually contain. *See Vining v. Runyon*, 99 F.3d 1056, 1057 (11th Cir. 1996) ("Our adversarial legal system generally does not tolerate *ex parte* determinations

on the merits of a civil case. . . The right to due process encompasses the individual's right to be aware of and refute the evidence against the merits of his case.") (internal citations omitted); *Smith v. Greene*, 06-CV-505, 2009 WL 10722414, *2 (N.D.N.Y. June 8, 2009) (same); *see also Ass'n for Reduction of Violence v. Hall*, 734 F.2d 63, 67–68 (1st Cir. 1984) (vacating summary judgment granted to defendant where district court had relied on documents as to which it had denied plaintiffs discovery).

**POINT II**
**PLAINTIFFS' MOTION IS NOT PROCEDURALLY DEFECTIVE**

Defendants' arguments that the *Floyd* and *Davis* Plaintiffs' motion is "procedurally defective" are meritless. To begin with, contrary to Defendants' assertion, *see Floyd* Dkt. No. 771 at 17, both the *Floyd* and *Davis* Plaintiff classes do encompass persons impacted by the NYPD's social distancing enforcement practices because, as discussed in Plaintiffs' opening brief and herein, these practices often involve racially-motivated *Terry* stops, frisks, and searches of Black and Latinx individuals, including those who reside in public housing. *See Floyd* Dkt. No. 760 at 4, 13–14.

Defendants' claim that Plaintiffs were required but failed to seek discovery related to the NYPD's COVID-19 enforcement efforts through the Monitor rather than directly from the City is not supported by the record. First, the *Floyd* Remedial Order contains no such requirement, nor does it include—in its detailed list of 12 Monitor roles and responsibilities—resolution of discovery disputes between the parties or the determination of what remedial-phase discovery *Floyd* Plaintiffs are or may be entitled to receive from the NYPD. *Floyd* Dkt. No. 372 at 12–13. When contending that "for six years requests for discovery from NYPD are made through the monitor," *Floyd* Dkt. No. 771 at 18, Defendants ignore that Plaintiffs' most significant and longstanding remedial-phase discovery requests—requests for periodic opportunities to observe

7

the NYPD's various Court-mandated stop-and-frisk and biased policing-related training classes—
were made directly to the NYPD and resolved by the parties independently from the Monitor, who
expressly indicated that he did not have the authority to compel the NYPD to provide the requested
discovery to Plaintiffs. Moreover, the Monitor was aware of the Plaintiffs' COVID-19-related
discovery requests several weeks before the filing of the instant motion. Notwithstanding that
knowledge, Plaintiffs are unaware of any action the Monitor has taken himself to obtain the
information that Plaintiffs requested from the City or to otherwise address Plaintiffs' requests.
Given the emergent situation, Plaintiffs had no choice but to seek relief from the Court.

Finally, Defendants' argument that Plaintiffs have no right to seek remedial-phase
discovery independently from the Monitor because such right is not expressly conferred in the
*Floyd* Remedial Order, *Floyd* Dkt. No. 771 at 18–19, is not supported by legal precedent. As
discussed in Plaintiffs' opening brief, federal courts have repeatedly granted prevailing plaintiffs
remedial-phase discovery relevant to assessing defendants' compliance with prior injunctions,
even when the prior injunctive orders themselves did not expressly confer remedial-phase
discovery rights to those plaintiffs. *See*, *e.g.*, *Cal. Dep't of Social Serv's v. Leavitt*, 523 F.3d 1025,
1033 (9th Cir. 2008); *Palmer v. Rice*, 231 F.R.D. 21, 25 (D.D.C. 2005); *Campaign for S. Equal.
v. Bryant*, 197 F. Supp. 3d 905, 914 (S.D. Miss. 2016); *Abdi v. McAleenan*, No. 1:17-CV-00721
EAW, 2019 WL 1915306 (W.D.N.Y. April 30, 2019).[5] Those Plaintiffs were entitled to discovery
because "significant questions regarding noncompliance [with a court order] ha[d] been raised,"
*Abdi*, 2019 WL 1915306 at *2; *Leavitt*, 523 F.3d at 1033–34—a standard which, as discussed
below and in their opening brief, *Floyd* and *Davis* Plaintiffs clearly satisfy. Defendants suggest

---

[5] Defendants' reliance in their opposition on their own renditions of some of the very materials (e.g. body-worn camera videos, arrest records and data regarding NYPD COVID-19 enforcement actions) that Plaintiffs seek in their discovery requests, *see Floyd* Dkt. Nos. 771 at 33–40; 773-1 at 3–8, underscores the relevance of these materials to the question of whether the NYPD's COVID-19 enforcement practices violate the requirements of the *Floyd* Orders.

that these discovery rights are somehow diminished by the presence of the Court-Appointed Monitor but, tellingly, do not cite a single case to support their assertion. Instead, Plaintiffs cite ample authority that remedial-phase discovery is routinely granted to plaintiffs in institutional reform cases involving police departments and other municipal agency defendants notwithstanding the presence of a court-appointed monitor overseeing and assessing those defendants' compliance with a court-ordered injunction or consent decree. *See Floyd* Dkt. No. 760 at 22–23; Dkt. No. 771 at 19. There is no reason for the Court to depart from this common practice here.

**POINT III**
**NYPD COVID-19 ENFORCEMENT PRACTICES APPEAR TO VIOLATE THE COURT'S PRIOR ORDERS IN *FLOYD* AND THE *DAVIS* SETTLEMENT**

### A. The Current Public Health Crisis and Protests Against Police Abuses Do Not Exempt COVID-19 and Curfew Enforcement from Constitutional Mandates

Defendants disturbingly imply that the unconstitutional exercise of racially discriminatory stops, summonses, and arrests is excusable because these actions are being taken to enforce "emergency orders during twin crises of an ongoing pandemic and widespread demonstrations and unrest," and should thus be "analyzed under a different and more deferential standard than government actions in the normal course." *Floyd* Dkt. No. 771 at 14, 16. No such deference to the NYPD is warranted here. There is no question that the current pandemic presents a grave threat to public health. However, public health emergencies do not provide license to government officials to resort to discriminatory policing. As the Second Circuit has recently warned, "constitutional boundaries are not transgressed by considerations of expediency." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 135 (2d Cir. 2020); *see also Yang v. Kellner*, 20 Civ. 3325 (AT), 2020 WL 2129597 (S.D.N.Y, May 5, 2020). That there is currently a pandemic does not excuse the NYPD's discriminatory policing. A *Terry* stop made in the context of COVID-19 or curfew enforcement, like *Terry* stops made for general criminal law enforcement purposes, must comply

with the requirements of the Fourth and Fourteenth Amendments, the *Floyd* Liability, Remedial and Racial Profiling Policy Orders, and the *Davis* Settlement. As discussed below and in Plaintiffs' opening brief, they often do not.

### B. There Is Compelling Circumstantial Evidence that the NYPD Has Engaged in Racially Discriminatory COVID-19 Enforcement and thus Violated the Court's Orders to Remedy Its Finding of Intentional Discrimination

Defendants' efforts to dismiss circumstantial evidence of racially discriminatory COVID-19 enforcement as irrelevant completely ignore the procedural posture of this case. This Court has already found the City to be liable for intentional discrimination in its stop-and-frisk practices, and the central purpose of this monitoring is to remedy the entrenched racial bias that pervaded those practices throughout the entire Department. Within the challenging remedial process of reforming these practices, it is remarkable for Defendants to suggest that circumstantial evidence of racial bias in COVID-19-related summons and arrests does not raise valid and substantive concerns that the stops preceding those summons and arrests were likewise racially discriminatory in violation of this Court's prior orders.

Longstanding federal case law regarding court monitoring of school desegregation cases—remedying prior findings of intentional discrimination—is instructive here. In the school desegregation context, a defendant that was found to have intentionally discriminated ordinarily bears the burden of demonstrating that the vestiges of its prior wrong have been eradicated. *See Belk v. Charlotte-Mecklenburg Bd. of Educ.,* 269 F.3d 305, 327 (4th Cir. 2001) ("[O]nce a court has found an unlawful dual school system, those alleging the existence of racial disparities are entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the defendants.") (internal citation omitted); *NAACP v. Duval Cty Sch.*, 273 F.3d 960, 966 (11th Cir. 2001) (when a school board operated *de jure* segregated

schools in the past, "there is a presumption that any current racial disparities are the result of its

past unlawful conduct") (citing *Keyes v. School Dist. No. 1*, 413 U.S. 189, 208–09 (1973)). In

*Arthur v. Nyquist*—which examined whether Buffalo's schools were intentionally segregated—

the court described that burden as "considerable." 415 F. Supp. 904, 913 (W.D.N.Y. 1976) (*aff'd*

*in part, rev'd in part,* 573 F.2d 134 (2d Cir. 1978)). Intentional discrimination in police

departments is no less egregious—and certainly no less urgent to remedy—than in public school

settings. Indeed, the United States Supreme Court in *Swann v. Charlotte-Mecklenburg Board of*

*Education* made clear that "a school desegregation case does not differ fundamentally from other

cases involving the framing of equitable measures to repair the denial of a constitutional right."

402 U.S. 1, 15–16 (1971).

Moreover, because of its prior intentional discrimination finding, this Court should

consider the significant racial disparities in social distancing summonses and arrests within the

context of the NYPD's history of racially discriminatory practices—not, as the City would have

it, in isolation, as if that history never occurred. The Supreme Court endorsed this holistic inquiry

in *Keyes*, where it found that discriminatory practices in one area are "not devoid of probative

value" when assessing possible additional discrimination in another. 413 U.S. at 207 (citing 2 J.

Wigmore, Evidence 200 (3d ed. 1940)). In fact, courts have long held that past discriminatory

behavior is, at a minimum, probative of intent. *See, e.g., N. Carolina State Conference of NAACP*

*v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016) (state's "shameful history of past discrimination"

should inform inquiry into voter suppression) (citing *Village of Arlington Heights v. Metro.*

*Housing Development Corp.*, 429 U.S. 252 (1977)); *Chabad Lubavitch of Litchfield Cty., Inc. v.*

*Litchfield Historic Dist. Commission*, 768 F.3d 183, 199 (2d Cir. 2014) ("In determining whether

a facially neutral statute was selectively enforced, we look to both direct and circumstantial

evidence of discriminatory intent, as instructed by the Supreme Court in *Arlington Heights*."). If past discrimination is probative for court determinations of intentional discrimination in the first instance, surely it is even more probative when there has already been a finding of discrimination, and the court is called upon to determine whether that discrimination is ongoing and not remedied.

Defendants do not even attempt to refute Plaintiffs' circumstantial evidence of the NYPD's racially selective enforcement of social distancing directives. Defendants make conclusory assumptions that NYPD COVID-19 enforcement is not based on race, claiming that it was based on the "discretion of the individual officer involved who observed unlawful conduct" and thus had reasonable suspicion. But this Court already held that "plaintiffs' racial discrimination claim does not depend on proof that stops of blacks and Hispanics are suspicionless" because "[t]he Equal Protection Clause's prohibition on selective enforcement means that suspicious blacks and Hispanics may not be treated differently by the police than equally suspicious whites." Dkt. No. 373 at 191–92. The preliminary data presented by Plaintiffs show that majority-white precincts received more 311 complaints. While Defendants contend that most precincts recorded fewer than 10 summonses through mid-May, *Floyd* Dkt. No. 773-1 at 36, this does not rebut Plaintiffs' main objection: four of the five precincts with the most summonses and arrests were majority Black or Latinx and were not among those with the highest number of complaints. And their response that COVID-19-related summonses and arrests were rare and used as a last resort by officers, Dkt. No. 773-1 at 30, fails to account for the inverse relationship between 311 calls and the number of summonses and arrests within precincts. Plaintiffs and this Court, therefore, are left with unanswered questions about the details of the NYPD's social distancing enforcement that demands discovery and investigation, and those concerns apply equally to the NYPD's curfew enforcement.

**POINT IV**
**A TEMPORARY MORATORIUM AND MONITOR INVESTIGATION OF NYPD**
**COVID-19 ENFORCEMENT PRACTICES IS WARRANTED**

### A.  The Preliminary Injunction Standard Does Not Apply to This Post-Judgment Relief Request

Defendants' attempt to shoehorn the preliminary injunction standard into the analysis of Plaintiffs' request for the temporary moratorium on NYPD social distancing enforcement, *see Floyd* Dkt. No. 771 at 11, 40–46, has no basis in law. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998) (quoting *Camenisch*). Here, the Court has already held a full trial on the merits and entered a judgment of liability and permanent injunction against Defendants in *Floyd* which the NYPD appears to have subsequently violated through the racially discriminatory way it has conducted COVID-19 enforcement. Thus, Plaintiffs request a temporary moratorium on the NYPD's COVID-19 enforcement efforts to prevent further violations of the Court's previously entered final judgment on the merits and permanent injunction. There is no reason for the Court to determine whether Plaintiffs' are entitled to a preliminary injunction since they already obtained a *permanent* injunction against the Defendants for the conduct at issue in this motion.

Indeed, when presented with evidence that a defendant has not fully complied with an earlier injunction, federal courts have not hesitated to use their broad inherent equitable powers to enforce prior orders by imposing further (and more prescriptive) injunctive relief to ensure compliance with the earlier injunction. *See e.g.*, *Hutto v. Finney*, 437 U.S. 678, 686–89 (1979); *Damus v. Wolf*, No. 18-578, 2020 WL 601629, at *2–5 (D.D.C. Feb. 7, 2020); *Baez v. N.Y.C.H.A.*, 13 Civ. 8916, 2015 WL 9809872, at *3 (S.D.N.Y. Dec. 15, 2015); *United States v. Visa USA, Inc.*, 98 Civ. 7076, 2007 WL 1741885, at *12–15 (S.D.N.Y. June 15, 2007). The only limitation on

such further injunctive relief is that it "be narrowly tailored to remedy the specific harm alleged," *Melendres v. Maricopa City*, 897 F.3d 1217, 1221 (9th Cir. 2018) (internal citations omitted); *Damus* 2020 WL 601629, at *2; *Visa USA, Inc.*, 2007 WL 1741885, at *14, which, as discussed in Plaintiffs' opening brief, the temporary moratorium is. *See Floyd* Dkt. No. 760 at 29-30.

### B.  A Temporary Moratorium Is Still Necessary to Prevent Continued Violations of Class Members' Constitutional Rights

Recent data Plaintiffs obtained from the CCRB through a Freedom of Information Law (FOIL) request suggests that NYPD officers have continued to engage in improper COVID-19 enforcement actions, including stops, frisks, and searches, since the City's announcement in mid-May of a so-called "shift" in COVID-19 enforcement practices, and that such actions have targeted Black New Yorkers. The CCRB data indicates that the CCRB has received at least 19 civilian complaints stemming from NYPD COVID-19 enforcement incidents occurring after May 15 in which the complainant made an allegation of an improper stop, frisk, and/or search, and for the 11 complainants where the race of the complainant was known, *all* of the complainants were Black. Charney Reply Decl., Ex. 2. Therefore, notwithstanding the "shift" that the City claims it made in its COVID-19 enforcement efforts in mid-May, *Floyd* Dkt. No. 771 at 41–42, there is still a very real risk that *Floyd* and *Davis* Plaintiff class members will continue to be subjected to racially motivated, unconstitutional police encounters if the NYPD is allowed to continue to conduct COVID-19-related enforcement. And an unspecific and unverifiable stated change in an apparently discriminatory NYPD policing practice is insufficient to protect Plaintiff class members' constitutional rights. Unless and until the Monitor, Court, and Plaintiffs can determine whether and how the NYPD can conduct this enforcement consistently with the requirements of the *Floyd* Orders, the *Davis* Settlement, and the Constitution, the social distancing and mask requirements should be enforced by entities other than the NYPD.

14

### C.  A Temporary Moratorium and Monitor Investigation Are in the Public Interest

Temporarily halting NYPD COVID-19 enforcement until the Monitor, Court, and the parties can determine whether and how that enforcement can be conducted consistently with the Court's prior *Floyd* orders and constitutional mandates is not against the public interest. After all, as this Court has correctly noted, "it is clear and plain that the public interest in liberty and dignity under the Fourth Amendment, and the public interest in equality under the Fourteenth Amendment, trumps whatever modicum of added safety might theoretically be gained by the NYPD making *unconstitutional* stops and frisks." *Floyd v. City of New York*, 959 F.Supp.2d 668, 673 (S.D.N.Y. 2013) (internal quotations omitted). Moreover, as set forth in Plaintiffs' opening brief, numerous local elected officials, law enforcement and public health experts, and organizations that work directly with communities of color in New York City hit hardest by the COVID-19 pandemic have gone on record expressing their strong belief that transferring enforcement of social distancing and mask requirements from the NYPD to other entities would not compromise but instead improve public health and safety outcomes. *Floyd* Dkt. No. 760 at 25–27.

The City's arguments about the State's "broad authority to utilize police powers in the event of a public health emergency," and the Mayor's emergency powers to enact "social distancing and other protective health measures" to combat the COVID-19 pandemic, *Floyd* Dkt. No. 771 at 42–43, miss the point because Plaintiffs do not seek to repeal these critical public health rules but, rather, to transfer authority to enforce them to entities other than the NYPD. Similarly, the City's claim that investigating the City's racially disparate COVID-19 enforcement practices would somehow distract the Monitor from his "important work and obligations under the *Floyd* 'stop-and-frisk' orders," *Floyd* Dkt. No. 771 at 45-46, is a non-sequitur because, as discussed above, the practices themselves implicate and run afoul of those orders and the *Davis* settlement.

## **CONCLUSION**

For the reasons stated above and in Plaintiffs' opening memorandum of law, Plaintiffs' Motion for Emergency Relief should be granted in its entirety.

Dated: New York, New York
       June 15, 2020


                                 \s\Darius Charney
                                 CENTER FOR CONSTITUTIONAL RIGHTS
                                 By: Darius Charney
                                      Baher Azmy
                                      Omar Farah
                                      Guadalupe Aguirre
                                 666 Broadway, 7th Floor
                                 New York, NY 10012
                                 Tel. (212) 614-6464
                                 dcharney@ccrjustic.org

                                 *Attorneys for Floyd Plaintiffs*


                                 \s\Jonathan C. Moore
                                 BELDOCK LEVINE & HOFFMAN LLP
                                 By: Jonathan C. Moore
                                      Luna Droubi
                                      Marc Arena
                                 99 Park Avenue, Suite 1600
                                 New York, NY 10016
                                 Tel. (212) 490-0900
                                 jmoore@blhny.com

                                 *Attorneys for Floyd Plaintiffs*


                                 \s\Jin Hee Lee
                                 NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
                                 By: Jin Hee Lee
                                        Raymond Audain

Kevin Jason
Ashok Chandran
John Cusick
Patricia Okonta
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-3702
jlee@naacpldf.org

*Attorneys for Davis Plaintiffs*


\s\Corey Stoughton
THE LEGAL AID SOCIETY
By: Corey Stoughton
    Steven Wasserman
199 Water Street, 6th Fl.
New York, NY 10038
Tel: (212) 577-3367
cstoughton@legal-aid.org
swasserman@legal-aid.org

*Attorneys for Davis Plaintiffs*

17