

Three Bryant Park
1095 Avenue of the Americas
New York, NY  10036-6797
+1  212  698  3500  Main
+1  212  698  3599  Fax
www.dechert.com

**MICHAEL J. GILBERT**

michael.gilbert@dechert.com
+1 212 698 3886  Direct
+1 212 698 0426  Fax

June 16, 2020

**VIA ECF AND E-MAIL**

Hon. Analisa Torres
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:  *Floyd v. City of New York*, No. 08 Civ. 1034 (S.D.N.Y.)
     *Ligon v. City of New York*, No. 12 Civ. 2274 (S.D.N.Y.)
     *Davis v. City of New York*, No. 10 Civ. 0699 (S.D.N.Y.)

Dear Judge Torres:

We represent the Police Benevolent Association of the City of New York, Inc. (the "PBA"), and we respectfully request leave to submit the below letter as *amicus curiae* in support of the Defendant City of New York's (the "City") opposition to Plaintiffs' Motion for Emergency Relief (Dkt. No. 771, the "Opposition").[1]

For the reasons articulated in the City's Opposition, and for the reasons set forth below, Plaintiff's Motion for Emergency Relief (Dkt. No. 759) must be denied in its entirety because, *inter alia*, the relief sought is insufficiently tailored, it does not address the underlying violation, and Plaintiffs have no standing to request such relief.  Moreover, the monitorship has been a significant taxpayer expense for years and should not be prolonged, especially not for alleged violations that have nothing to do with the original relief granted and could not possibly have been foreseen at the time or trial.

*\*\*\**

The PBA is the designated collective bargaining agent for approximately 23,000 active police officers employed by the New York City Police Department ("NYPD").  The PBA negotiates with the City on behalf of police officers concerning their terms and conditions of employment and other matters relating to police officers' safety and general welfare.  The core mission of the PBA is to advocate for and protect the rights and interests of its members.  The PBA brings to this

---

[1]  The docket numbers throughout this submission refer to the *Floyd* docket (No. 08 Civ. 1034). Additionally, and to avoid confusion, the page numbers cited correspond to the ECF page numbers, where applicable.



Hon. Analisa Torres
June 16, 2020
Page 2

submission the perspective of tens of thousands of New York City police officers who are tasked with the daily street level implementation of the orders of the Court.

By and through its participation as *amicus curiae*,[2] the PBA seeks to ensure that any court-ordered injunctive remedy is narrowly tailored to address the specific harm found by the Court and does not encroach on the rights and legitimate interests of its officer members, who dedicate their careers and lives to protecting this City and its residents. After the Court found in 2013 that the NYPD's prior implementation of its stop, question, and frisk ("stop and frisk") policies and procedures resulted in unconstitutional and discriminatory stops, a Monitor was appointed to oversee the NYPD's implementation of the Court's remedies. Those remedies include certain improvements to the NYPD's policies, training, supervision, complaint processing, and discipline that specifically relate to its stop and frisk practices.

On May 26, 2020, Plaintiffs, on behalf of the *Floyd*, *Davis*, and *Ligon* classes, filed a Motion for Emergency Relief (Dkt. No. 760, the "Motion") that purports to provide "evidence" of "police misconduct in the enforcement of social distancing directives against Black and Latinx people" and asks the Court to: (1) declare the City in violation of the Court's stop and frisk orders; (2) compel the city to engage in discovery on the issue of the NYPD's social distancing enforcement; (3) mandate an expedited investigation into such enforcement; and (4) enjoin the NYPD from future social distancing enforcement. Motion at 1.

As articulated in the City's thorough Opposition, Plaintiffs' Motion is procedurally deficient and seeks relief that lies far outside the scope of the Court's orders and of the Court-appointed Monitorship. The Court should therefore deny Plaintiffs' motion, as outlined therein and below.

**A.** **<u>Equitable Relief Must Be Narrowly Tailored To The Underlying Violation at Issue</u>**

In determining the proper scope of equitable relief to be ordered, courts have articulated three considerations that are particularly relevant here: (1) the principles of federalism, (2) the relief necessary to cure the harm caused by *the violation*, and (3) the scope of *the underlying violation* itself.

*First*, the Supreme Court has cautioned that "appropriate consideration must be given to principles of federalism in determining the . . . scope of equitable relief." *Rizzo v. Goode,* 423 U.S. 362, 379 (1976). Likewise, the Second Circuit has stated that "the court's 'discretion to

---

[2] The PBA has participated in this matter since September 2013, initially by moving to intervene (*see* Dkt. Nos. 389, 436) and thereafter as *amicus curiae*, as suggested by the Second Circuit in its affirmation of the Court's denial of the PBA's motion to intervene (Dkt. No. 470; *see also* Dkt. Nos. 484, 613, 640).



Hon. Analisa Torres
June 16, 2020
Page 3

frame equitable relief is limited by considerations of federalism, and remedies that intrude unnecessarily on a [local government's] governance of its own affairs should be avoided.'" *Schwartz v. Dolan*, 86 F.3d 315, 319 (2d Cir. 1996) (citations omitted); *see also Association of Surrogates v. New York,* 966 F.2d 75, 79 (2d Cir. 1992) ("[f]ederal courts must take care to exercise 'a proper respect for the integrity and function of local government institutions'"); *Dean v. Coughlin,* 804 F.2d 207, 213 (2d Cir.1986) (citing *Rizzo v. Goode,* 423 U.S. at 379).

Courts have been particularly cognizant of this concern when the equitable relief involves managing the inner workings of municipal agencies. For example, in *PBA v. City of New York*, Judge Scheindlin declined to impose injunctive relief relating to a department policy of transferring officers because "such an injunction represents an undue intrusion into a matter of state sovereignty, namely, the internal operation of the New York Police Department." No. 97 Civ. 7895, 2000 WL 1538608, at *3 (S.D.N.Y. Oct. 18, 2000). Likewise, in *Dean v. Coughlin*, the court emphasized that, "since the court is usually 'ill equipped to deal with the increasingly urgent problems of prison administration,' it owes 'deference to the appropriate prison authorities,' lest the imposition by the court of its own broad changes designed to cure a constitutional infirmity not only offend the [local government's] entitlement to respect but amount to an unnecessary overkill." 804 F.2d at 213 (citations omitted). *See also Portland Police Ass'n v. City of Portland*, 658 F.2d 1272, 1275 n.3 (9th Cir. 1981) (holding that equitable relief is unavailable where it would require "federal courts to disturb the inner workings and structure of a local police department" due to "federalism concerns").

*Second*, the Second Circuit has long established that it is "'the essence of equity jurisdiction' that a court is only empowered 'to grant relief no broader than necessary to cure the effects of the harm caused by *the violation*.'" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (emphasis added) (quoting *Forschner Grp., Inc. v. Arrow Trading Co.,* 124 F.3d 402, 406 (2d Cir.1997)). Thus, any injunctive relief granted should be "narrowly tailored to fit *specific legal violations*." *Id.* (quoting *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 50 (2d Cir.1996)) (emphasis added). District courts should therefore "tailor [a] remedy to fit *the nature and extent of the violation*." *U.S. v. Yonkers,* 837 F.2d 1181, 1235 (2d Cir. 1987) (emphasis added).

*Third*, an injunction would be overbroad to the extent that it addresses conduct that is not the subject of the underlying violation. The Second Circuit has made it clear that "[a]n injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly *the subject of litigation*." *See Mickalis Pawn Shop, LLC*, 645 F.3d at 145 (emphasis added). In other words, "the equitable relief must be 'commensurate with *the scope of the constitutional infraction*.'" *Ass'n of Surrogates & Supreme Court Reporters Within City of New York v. State of N.Y.*, 966 F.2d 75, 79 (2d Cir.1992), *modified on reh'g*, 969 F.2d 1416 (2d Cir. 1992) (emphasis added); *see also Mickalis*,



645 F.3d at 144–46 (rejecting as overbroad an injunction prohibiting multiple gun sale practices when the sole practice as issue was straw purchases).

To be clear, the Court's own Remedies Opinion states that the remedies imposed were to be "as narrow and targeted as possible." Dkt. No. 372 at 2. The Court even noted that, when acting pursuant to its equity jurisdiction, it "is only empowered to grant relief no broader than necessary to cure the effects of the harm caused by *the violation*" (*id.* at 6 (internal quotations omitted)) (emphasis added), and the limited purpose of the Joint Remedial Process is "to develop any further reforms necessary to ending *the constitutional violations described in the Liability Opinion*" (*id.* at 12) (emphasis added). Specifically, the Court stated that the Joint Process Reforms "must be no broader than necessary to bring *the NYPD's use of stop and frisk* into compliance with the Fourth and Fourteenth Amendments." *Id.* at 30 (emphasis added). So it is "the NYPD's use of stop and frisk" that is "the subject of this litigation," and nothing more.

### B.     The Relief Sought By The Plaintiffs Does Not Address The Underlying Violation

Plaintiffs assert that the "COVID-19 policing" "emergency" relief[3] sought is subject to the Court's orders because the policing "falls within the *De Bour* [sic] framework."[4] Motion at 2. Under this faulty logic, any enforcement action by the NYPD could be subject to the Court's orders. Thankfully, that is not the standard for determining whether equitable relief is appropriate. Instead, as articulated in Section A above, the question is whether the equitable

---

[3]     Plaintiffs also seek emergency relief with regard to the NYPD's enforcement of the City's curfew, which was in place June 2 through June 7, 2020. *See* Dkt. No. 768; https://www1.nyc.gov/assets/ home/downloads/pdf/executive-orders/2020/eeo-122.pdf. Because the curfew is no longer in place, the Court has "no effective relief to offer," and Plaintiffs' request is moot. *See, e.g.*, *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 510 (2d Cir. 2005).

[4]     The *DeBour* framework originates from the New York State Court of Appeals decision in *People v. DeBour*, 40 N.Y. 2d 210 (1976). In short, the Court of Appeals found that (1) upon "objective credible reason," an officer can approach a civilian to request information; (2) upon "founded suspicion," an officer has a "common law right of inquiry"; (3) upon "reasonable suspicion," an officer may "stop and frisk" a civilian; and (4) upon "probable cause," an officer may arrest a civilian and search them, incident to the arrest. These four categories of encounters are now referred to as a "Level 1 Encounter" to a "Level 4 Encounter" by the NYPD. *See* NYPD Procedure No. 212-11, *available at* http://www.nyc.gov/html/nypd/downloads/pdf/analysis _and_planning/212-11.pdf. Notably, indicated by the City in its Opposition, the violation underlying this matter occurred at encounters up to Level 3, while the encounters eoffered by the Plaintiffs as evidence in support of their Motion are Level 4 Encounters, as social distancing violations are readily apparent and therefore an officer on approach has probable cause that a violation is in progress. *See* Opposition at 22-28.



Hon. Analisa Torres
June 16, 2020
Page 5

relief is narrowly tailored to correct the violation that was the subject of litigation in the matter at hand, which was "the NYPD's use of stop and frisk." Dkt. No. 372 at 30.

Plaintiffs allege, broadly, that the NYPD has engaged in "selective enforcement" of social distancing along racial lines. *See* Motion at 14-18; Day Decl. at 17-19. Although the Court acknowledged in its Liability Opinion (Dkt No. 373) that "the constitution prohibits selective enforcement of the law based on considerations such as race," that does not mean that any alleged selective enforcement by NYPD lies within the scope of this matter. Nor do the Plaintiffs' allegations of excessive force in the context of COVID-19 policing (*see* Motion at 20-21; Day Decl. at 10-17) relate to the underlying violation of the NYPD's former stop and frisk practices. Raising allegations of discriminatory policing that happen to be analyzed under the *DeBour* framework—but not under "Level 3," *see supra* note 4, which is the Level that was at issue in the underlying litigation—is insufficient to bring allegations into the fold of the scope of appropriate equitable relief.

As the City points out in its Opposition, the Plaintiffs' requested relief does not—because it cannot—lie within the scope of permissible equitable relief. *See* Opposition at 13-17. "COVID-19 is a novel virus at the center of one of the worst pandemics in history, with no known cure or containment protocol," and never in our lifetimes has society been presented with the task of enforcing "social distancing" measures designed to slow the spread of such a viral threat. *Id.* at 31. Social distancing practices did not even exist, let alone their enforcement contemplated or litigated, when the matter went to trial over seven years ago, and the review and/or regulation of those practices far exceeds the purpose of the Monitorship—which was to bring the NYPD's use of Level 3 *Terry* stops into compliance with the Fourth and Fourteenth Amendments. The NYPD's "COVID-19 policing" therefore cannot be the subject of equitable relief granted in this matter.

C. **The Plaintiffs Do Not Have Standing To Seek "COVID-19 Policing" Relief**

A plaintiff must have standing to raise their claims, meaning "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted). When it comes to class actions, the representative must be a member of the class, meaning they must "possess the same interest and suffer the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).

As outlined in detail by the City in its Opposition, Plaintiffs have not met their burden of demonstrating that they have standing to represent what they have essentially put forth as a new, proposed class of "persons who, since March 2020, have been subject to certain COVID-19 policing practices on the basis of being a member of the Black or Latinx community." *See* Opposition at 17-21. Plaintiffs' Motion, and their reply brief (Dkt. No. 780, the "Reply"), are



silent on the issue of standing, and, without first satisfying this threshold requirement, their Motion must be denied.

In addition, "a plaintiff must show a likelihood of future injury to have standing to seek prospective relief." *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570-LAK-KHP, 2017 WL 3727230, at *5 (S.D.N.Y. Aug. 11, 2017), *report and recommendation adopted*, No. 17-CV-4570 (LAK), 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017). Where, as here, there is no risk of future harm, there is no standing to seek injunctive relief. *Id.*

Here, each allegation of discriminatory "COVID-19 policing" offered by Plaintiffs' counsel took place prior to Mayor de Blasio's May 15, 2020, announcement that the NYPD would no longer issue citations or make arrests to enforce social distancing or mask requirements.[5] *See* Day Decl. at 10-20. Similarly, any attempt to bring curfew enforcement within the scope of remedial order suffers the same defect. *See supra* note 3. Because both social distancing enforcement and curfew enforcement by the NYPD are no more, there is no ongoing harm. Without any assertion of *ongoing* harm as a result of *ongoing* "COVID-19 policing" or curfew enforcement, Plaintiffs do not having standing to seek the injunctive relief they request.

### D.     The Monitorship, A Taxpayer Expense, Should Last No Longer Than Necessary

The *Floyd* trial took place in April 2013, the Remedial Order and Liability Opinion were issued in August 2013 (Dkt. Nos. 272, 273), and the Court-mandated Monitorship began in late 2014. In the more than five years since, the Monitor has issued *ten* Reports, the most recent emphasizing that "the NYPD has made many important changes in the five years of this Monitorship." Dkt. No. 754 at 9.

---

[5]     "Transcript: Mayor de Blasio Holds Media Availability" (May 15, 2020). *Located at* https://www1.nyc.gov/office-of-the-mayor/news/348-20/transcript-mayor-de-blasio-holds-media-availability. Although Plaintiffs, in their Reply, purport to present "evidence" of "continued violations of Class Members' Constitutional Rights," their presentation falls short. Reply at 18. The chart presented, containing "data relating to social distancing enforcement actions," merely logs the date of the complaint, the date of the alleged incident, the ethnicity of the complainant, and whether the complaint was one for "force allegations" or for "stop and search related allegations," which are the only categories of data that Plaintiffs requested. Dkt. No. 781-2 (Charney Decl. Ex. 2). Because each of the complainants is listed as "black" or "unknown," Plaintiffs jump to the conclusion that "there is still a very real risk that [] Plaintiff class members will continue to be subjected to racially motivated, unconstitutional police encounters." Reply at 18. But such a bald assertion, offered devoid of necessary detail and context, is unfounded, speculative, and an insufficient basis for the relief Plaintiffs request in their Motion.



Hon. Analisa Torres
June 16, 2020
Page 7

The costs associated with monitorships are a known burden.[6] True to form, this Monitorship has been extremely costly for New York City taxpayers—in part because of the disruptions associated with NYPD administrative tasks relating to the Monitorship (responding to the Monitor's requests for documents and interviews, periodically providing data and other reports in response to the Monitor's audits, etc.) but also because the fees paid to the Monitor and his extensive team are paid for by the City. Similarly, unnecessarily expanding the scope of the matter will no doubt expand the scope of Plaintiffs' applications for attorneys' fees, which are also paid by taxpayers and have already reached over $10 million (and counting). *See* Dkt. Nos. 540, 587. In light of this heavy taxpayer burden, it is imperative that the Monitorship remain as narrow and focused as possible, as directed by the Court, to address the underlying violations that were at issue—the NYPD's former stop and frisk practices—and continue only as long as is absolutely necessary to achieve those directives.

## **CONCLUSION**

These are challenging and unprecedented times. Social distancing and curfew enforcements simply did not exist at the time of the underlying litigation. Whatever the merits of the substantive claims (and the PBA avers that Plaintiffs' claims are meritless) raised in this request for "emergency relief," piggybacking off Mr. Floyd, Mr. Davis, and Ms. Ligon's stop and frisk class litigation in an effort to expand the Monitorship to include further investigation into, and potential redress of, allegations that were not the subject of the nine-week, 2013 trial is simply not permissible under the applicable legal standards. The Court should therefore deny Plaintiffs' Motion.

Respectfully submitted,

*/s/ Michael J. Gilbert*

Michael J. Gilbert
Lindsay E. Ray

cc:      All counsel of record (via ECF)

---

[6]    *See, e.g.*, "How To Avoid and 'Survive' the Dreaded Monitorship," Law.com (Jan. 10, 2020); *available at* https://www.law.com/newyorklawjournal/2020/01/10/how-to-avoid-and-survive-the-dreaded-monitorship/; "Selection of Monitors in Criminal Division Matters," U.S. Department of Justice, Criminal Division (October 11, 2018), *available at* https://www.justice.gov/criminal-fraud/file/1100366/download.