# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

————

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1080

WRITER'S EMAIL ADDRESS
bgruenstein@cravath.com

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE

DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO

KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
MARGARET SEGALL D'AMICO
RORY A. LERARIS
KARA L. MUNGOVAN

NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG

————

SPECIAL COUNSEL
SAMUEL C. BUTLER

————

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

June 18, 2020

<u>Floyd, et al. v. City of New York, 08-CV-1034 (AT)</u>
<u>Ligon, et al. v. City of New York, et al., 12-CV-2274 (AT)</u>
<u>Davis, et al. v. City of New York, et al., 10-CV-0699 (AT)</u>

Dear Judge Torres:

      I am counsel to the Monitor, Peter L. Zimroth, and respectfully submit this letter in connection with the ongoing dispute over Plaintiffs' proposed order to show cause in the above-captioned matters.  On May 26, 2020, the *Floyd* Plaintiffs filed a brief arguing that the City has violated three prior *Floyd* orders through NYPD officers' enforcement of the rules that state and local officials have promulgated to contain the spread of the COVID-19 virus ("COVID Rules"), such as social-distancing, mask-wearing, and shelter-in-place requirements.  (Pls.' Mem. of Law in Supp. of Their Mot. for Emergency Relief, ECF No. 760, at 1-2 (May 26, 2020) [hereinafter "*Floyd* Mem."].)  Plaintiffs principally argue that NYPD officers have enforced the COVID Rules against Black and Latinx people in a discriminatory fashion.  (*Id.* at 1-2, 14.)  As a result, Plaintiffs argue, the City has violated (1) the 2013 order in which this Court found that

the NYPD's stop-and-frisk program violated the Constitution; (2) the accompanying remedial order that formulated a process for remedying the City's violations and prescribed certain reforms to NYPD policy; and (3) a subsequent order approving a revision to the NYPD's policy against racial profiling that responded to the remedial order.  (*Id.* at 1.)

Plaintiffs also filed a proposed order with four provisions: one that would hold the City in violation of the three earlier orders, and three provisions prescribing remedies for those violations.  (Order to Show Cause, ECF No. 759 (May 26, 2020) [hereinafter "Proposed Order"].)  One proposed remedy would compel the City to produce a broad range of materials and information concerning the NYPD's enforcement of the COVID Rules.  (*Id.* ¶ 2.)  Another proposed remedy would direct the Monitor to investigate that enforcement and file a report within 30 days assessing its "legality" and "consistency with the requirements of the Court's orders."  (*Id.* ¶ 3.)  And the last proposed remedy would enjoin any further enforcement of the COVID Rules by the NYPD until the Monitor has filed the proposed report and this Court has ruled that the NYPD can continue that enforcement without violating this Court's previous orders.[1] (*Id.* ¶ 4.)  Plaintiffs subsequently filed a submission expanding their requests to compel discovery and to direct a 30-day investigation by the Monitor, so that both requests also address the NYPD's enforcement of the curfew order that Mayor de Blasio issued on

---

[1] The *Ligon* Plaintiffs have joined the requests to compel discovery and to direct an expedited investigation by the Monitor.  (Letter from The Bronx Defenders & NYCLU, ECF No. 420 (June 2, 2020) [hereinafter "*Ligon* Ltr."].)

June 2, 2020.[2]  (Pls.' Suppl. Submission in Supp. of Their Mot. for Emergency Relief, ECF No. 768, at 1-2 (June 3, 2020) [hereinafter "*Floyd* Suppl. Mem."].)

      Plaintiffs bear the burden of establishing that the City has violated the *Floyd* orders, and they have not done so.  They have identified racial disparities in the arrests and summonses that the NYPD has used to enforce the COVID Rules.  And they have alleged acts by particular NYPD officers enforcing the COVID Rules, especially acts of force, that were likely illegal if they occurred as described.[3]  But they have not shown that the City has violated any mandate in any of the orders.

      In addition, even if Plaintiffs had shown violations of the Court's orders, the remedies they request for the alleged violations are each inappropriate.  The requested injunction is overbroad: any injunction issuing from this dispute would have to be narrowly tailored to specific problems with the NYPD policies that were at issue in the proceedings that led to this monitorship: a widespread practice of suspicionless stops, frisks, searches, and trespass enforcement, and the explicit use of race in those policies. The proposed injunction would restrain *all* NYPD enforcement of the COVID Rules— legitimate or otherwise.  The request to compel discovery undermines the discovery process prescribed for this remedial process: this Court specifically appointed the Monitor to oversee the City's compliance with prior orders and avoid adversarial motion practice.  And the request for an expedited investigation and report from the Monitor

---

[2] The City subsequently filed a brief opposing Plaintiffs' motion.  (Def.'s Mem. of Law Opposing Pls.' Mot. for Emergency Relief, ECF No. 771 (June 9, 2020) [hereinafter "City Mem."]).  The *Floyd* and *Ligon* Plaintiffs then filed replies to that opposition.  (Pls.' Reply Mem. of Law in Supp. of their Mot. for Emergency Relief, ECF No. 780 (June 15, 2020) [hereinafter "*Floyd* Reply Mem."]; Letter from The Bronx Defenders & NYCLU, ECF No. 433 (June 16, 2020) [hereinafter "*Ligon* Reply Ltr."].)

[3] In its opposition papers, the City presents a different perspective on some of these encounters.

would unduly constrain his discretion in using limited resources: he expects to investigate and report on the enforcement of the COVID Rules and curfew order to the extent the enforcement intersects with his mandate, as described below.  The evidence at this time does not show that any special reporting is appropriate or required from him on those issues.

Plaintiffs have raised concerns about the enforcement of the COVID Rules—but those concerns should not be answered by an injunction that would exacerbate ongoing public-health challenges, by replacing a collaborative discovery process with an adversarial one, or by ordering special reporting from the Monitor before he has concluded that such reporting is appropriate.  Respectfully, Plaintiffs' requests should be denied.

## I.    Overview of the Three Allegedly Violated *Floyd* Orders

Plaintiffs ask this Court to find the City in violation of three prior orders in the *Floyd* litigation.  Those orders were the result of the findings made by this Court after trial, culminating in the mandates to remedy those findings and establishing this monitorship: (1) the opinion and order in which this Court concluded that the City's stop-and-frisk program violated the Constitution, *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) [hereinafter "Liability Opinion"]; (2) the order in which this Court created the process for remedying the legal violations it had identified (Op. and Order, ECF No. 372 (Aug. 12, 2013) [hereinafter "Remedial Order"]); and (3) the order approving the NYPD's revisions to its Patrol Guide policy related to racial profiling (Final Recommendations Regarding P.G. 212.11 and P.G. 203.25, ECF No. 517 (Aug.

24, 2015) [hereinafter "Revised Policy Approval"]).  (Proposed Order ¶ 1.)  This Section

provides the context from those orders relevant to assessing Plaintiffs' present requests.

> A.    *The August 2013 Liability Opinion*

>       The first order that the City allegedly violated is the Liability Opinion.

That order arose from Plaintiffs' suit against the City under 42 U.S.C. § 1983, which

alleged that the NYPD's practices related to stops and frisks between 2004 and 2013

violated the Fourth and Fourteenth Amendments.  Liability Opinion at 557, 563.

Plaintiffs prevailed, but not by showing merely that they had been unconstitutionally

stopped; a municipality cannot be held vicariously liable for the wrongs of its employees

under Section 1983.  *Id.* at 563-64.  Instead, a municipality can only be held liable for

unconstitutional conduct that was caused by "official municipal policy."  *Id.* (quoting

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)).  "Official

municipal policy" can consist of (1) the acts of the municipality's "policymaking

officials," (2) practices of municipal employees "so persistent and widespread as to

practically have the force of law," or (3) the municipality's failures to act, when those

failures have the "known or obvious consequence" of unconstitutional conduct.  *Id.* at

564 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  Inaction can only furnish

liability when it amounts to "deliberate indifference" by policymaking officials toward

others' rights, as when they disregard an "obvious" need for "particular" changes to

training or supervision programs that would prevent constitutional violations.  *Id.*

(quoting *Connick*, 563 U.S. at 61-62).  This Court held that the City caused

unconstitutional stops and frisks through all three kinds of official municipal policy.

*First*, this Court found that the NYPD's policymakers had articulated a policy of "conducting stops based in part on criminal suspect data." *Id.* at 660. As a result, officers were directed to "target young [Black] and [Latinx] men because these groups are heavily represented in criminal suspect data." *Id.* at 662. This Court held that the policy enforced an express racial classification in violation of the Fourteenth Amendment: though targeting people of certain ethnicities when investigating individualized suspect descriptions is facially race-neutral, targeting Black and Latinx people "in general" because of the racial skew of local crime data is not. *Id.* at 663-64. And this Court further held that even if the NYPD's policy were considered facially neutral, it still violated the Fourteenth Amendment because it had discriminatory effects and policymakers implemented it "because of, not merely in spite of," those effects on the profiled groups. *Id.* at 661-62 (internal punctuation omitted). Discriminatory effects were established by an expert statistical study of stops that, after controlling for relevant variables, found that the NYPD made more stops, with less justification, against Black and Latinx people than white people. *Id.* at 661 & n.759. And discriminatory intent was established by the policy's explicit use of "racially defined groups," "[t]ogether with Commissioner Kelly's statement that the NYPD focuses stops and frisks on young [Black and Latinx people] in order to instill in them a fear of being stopped."[4] *Id.* at 662.

---

[4] Plaintiffs state that "the Court recognized Fourteenth Amendment violations in NYPD's greater number of stops in Black and Latinx communities, greater likelihood of stopping and/or use of force against Black and Latinx people, and practice of stopping of Black and Latinx people with less justification than for stops of whites." (*Floyd* Mem. at 14.) However, the City's policy of deciding whom to stop using criminal-suspect data did not (and could not) violate the Fourteenth Amendment simply because it had racially disparate effects. Rather, that policy violated the Fourteenth Amendment because it also made explicit use of race and policymakers explicitly approved of the policy's effects on racially defined groups—key facts evidencing the conclusion that policymakers *intended* the disparities. Liability Opinion at 662.

*Second*, this Court held that the City violated the Fourth Amendment through a policy of making stops without reasonable suspicion—a policy that was established by a pattern of such stops "so pervasive and persistent" as to be part of the "NYPD's standard operating procedure."  *Id.* at 659-60.  That pattern was based on an expert statistical study finding that at least 200,000 of the 4.4 million stops made between 2004 and 2012 lacked reasonable suspicion.  *Id.* at 558, 659-60.

And *third*, this Court held that the NYPD was deliberately indifferent to Plaintiffs' Fourth and Fourteenth Amendment rights in its failures to modify (i) its policies of demanding more stops without regard to their constitutionality and encouraging that those stops be based on suspect data; (ii) its policies for monitoring, supervising, and disciplining officers; and (iii) its policies for training officers.  *Id.* at 590-624, 658-59, 665-67.  This Court found that NYPD policymakers ignored the "obvious" changes those policies needed to prevent stops that were based impermissibly on race or lacked reasonable suspicion.  *Id.* at 659, 666.  For example, this Court found that unconstitutional stops were a predictable consequence of the NYPD's failure to train officers on permissible and impermissible ways to select people for stops using race.  *Id.* at 616, 666-67.

B.    *The August 2013 Remedial Order*

The second order that the City allegedly violated is the Remedial Order. That Order granted and defined a permanent injunction based on the legal violations identified in the Liability Opinion.  (Remedial Order at 1-2.)  This Court noted that it had a "broad" and "flexib[le]" power to determine an appropriate process for remedying those violations, but that the remedies could be "no broader than necessary to cure the effects

of the harm caused by the violation[s]."  (*Id.* at 6.)  Recognizing that "it would be impractical . . . to engage in direct oversight" of the remedies, this Court first exercised its power by appointing Mr. Zimroth as Monitor to "oversee the reform process."  (*Id.* at 9.)  He was specifically charged with the "detection of non-compliance" with this Court's orders so as to avoid "motions practice between the parties to assess progress; a costly, contentious, inefficient, and time-consuming process."  (*Id.* at 11 & n.31.)  To this end, he was empowered to "conduct compliance and progress reviews to assess the extent to which the NYPD has implemented and complied" with the reforms outlined in the Remedial Order.  (*Id.* at 12-13.)  But consistent with the requirement of narrow tailoring, his "duties, responsibilities, and authority [have been] no broader than necessary to end the constitutional violations in the NYPD's stop and frisk practices described in the Liability Opinion."  (*Id.* at 12.)

In spite of the "constitutional violations inherent in the NYPD's . . . use of stop and frisk," the Remedial Order did not make any self-executing changes to the NYPD's policies, recognizing that it "would be unwise and impractical for this Court to impose such reforms at this time, prior to input" from the Monitor and parties.  (*Id.* at 13.)  Instead, this Court directed the Monitor to develop initial reforms to the NYPD's policies "in consultation with the parties," and prescribed certain elements for those "Immediate Reforms Regarding Stop and Frisk."  (*Id.* at 13-14.)  The Court also ordered the parties to participate in a "Joint Remedial Process for Developing Supplemental Reforms," and directed that the Monitor would oversee the implementation of any such

reforms approved by the Court.[5]  (*Id.* at 12-14, 30-31.)  Plaintiffs were not given independent oversight or discovery power; they have only the role of working with the Monitor to the extent he deems appropriate to develop reforms.  (*See id.* at 12.)

The "Immediate Reforms" were not self-executing.  But this Court did prescribe specific "elements" that those reforms would presumptively include: revisions to the Patrol Guide and the NYPD training materials to clearly articulate the constitutional standards governing stops and frisks; changes to the forms and Patrol Guide provisions for documenting stops; improvements to the policies for monitoring, supervising, and disciplining officers in relation to their stops; and the issuance of a FINEST message summarizing the *Floyd* litigation.  (*Id.* at 14-25.)

C.  *The August 2015 Approval of the Revised Policy on Racial Profiling*

The third and final order that the City allegedly violated is this Court's approval of the revised Patrol Guide section on racial profiling.  As one of the "elements" of the "Immediate Reforms," the Remedial Order required the NYPD to revise its policies to "make clear that targeting 'the right people' for stops, as described in the Liability Opinion, is a form of racial profiling and violates the Constitution."  (*Id.* at 17.) The revised policy was required to explain that "[r]ace may only be considered where [a] stop is based on a specific and reliable suspect description."  (*Id.*)  Pursuant to those instructions, the Monitor worked with the parties to develop revised Patrol Guide Section 203-25.  (Revised Policy Approval at 1, 21.)  The revised section repeated the holding

---

[5] The "Joint Remedial Process" was a community-engagement effort to determine which reforms should supplement the "Immediate Reforms."  The Joint Remedial Process has been completed.

that race "may only be considered when [a] stop is based on a specific and reliable suspect description." (*Id.* at 21.)

Although the Remedial Order directed the NYPD to revise its racial-profiling policies only with respect to stops, the NYPD determined that a Patrol Guide section prohibiting profiling only for stops would not make sense.  Thus, Patrol Guide Section 203-25 prohibits the use of race "as a motivating factor for initiating police enforcement action" in general.  (*Id.*)  The Monitor submitted the revised section for this Court's approval in August 2015, and this Court approved it the same month.  (*Id.* at 1, 5.)  This order did not, however, change the scope of the Monitor's mandate, which remained focused on "the constitutional violations in the NYPD's stop and frisk practices described in the Liability Opinion."  (Remedial Order at 12.)  The Department's implementation of Patrol Guide 203-25 with respect to police activities other than stops, frisks, and trespass enforcement, such as jaywalking enforcement, marijuana arrests, or burglary or homicide investigations, is not within the Monitor's ambit.

## II.  Plaintiffs' Request to Find the City in Violation of this Court's Orders Should Be Denied for Failure to Establish Violations of those Orders

Plaintiffs ask this Court to find the City in violation of the three described *Floyd* orders.  (Proposed Order ¶ 1.)  That request should be denied because Plaintiffs have not shown that the City has violated any mandate of those orders.

Although Plaintiffs deny that they seek to hold the City in contempt, (*Floyd* Mem. at 11 & n.5) the Second Circuit has suggested that any claim "that [a] district court's orders are not being complied with" should be assessed using the standard for a motion for contempt, *Martens v. Thomann*, 273 F.3d 159, 172 (2d Cir. 2001).

Under that standard, the City should only be judged to have violated this Court's orders if Plaintiffs have established that those orders have "clear and unambiguous" mandates, there is "clear and convincing" evidence of the City's noncompliance with those mandates, and the City has not "diligently attempted to comply in a reasonable manner." *Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009). However, at least one court in this District has assessed whether a party violated its orders using the more relaxed standard of a "motion to enforce," under which Plaintiffs would bear the lesser evidentiary burden of demonstrating violation "only by a preponderance of the evidence." *United States v. Visa U.S.A., Inc.*, No. 98 CIV. 7076 (BSJ), 2007 WL 1741885, at *4 (S.D.N.Y. June 15, 2007). The distinction makes little difference here: Plaintiffs have not shown violations of any of the orders they cite even under the standard for motions to enforce.[6]

A.  *Plaintiffs Have Not Established that the City Violated the Liability Opinion*

The Liability Opinion has no mandates that can furnish the basis for a motion for contempt or to enforce orders. Such motions can only be used to enforce mandates that articulate forbidden and required acts "precisely" and leave "no uncertainty in the minds of those to whom [they are] addressed" about what must be done. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995); *see also Visa U.S.A.*, 2007 WL

---

[6] Plaintiffs write that "[h]aving been found liable for racial discrimination in the conduct of stops, frisks, searches, and trespass investigations in communities and in public and private housing, the NYPD must show that any racial disparities are unrelated to the Court findings of discriminatory practices and policies in order to be fully compliant with this Court's orders." (*Floyd* Mem. at 14; *see also Floyd* Reply Mem. at 10.) However, whether the standard applied here is that of a motion for contempt or a motion to enforce prior orders, the burden of establishing violations of the three *Floyd* orders rests with Plaintiffs.

1741885, at *1-2 (granting a motion to enforce mandates that articulated specifically what the defendant was enjoined from doing).  In other words, those motions cannot be used to assess the City's actions under the general legal principles articulated in the Liability Opinion; the proper vehicle for that assessment would be a new action.  *See, e.g.*, *Roache v. Green*, No. CIV.A. 94-1533, 2004 WL 1505360, at *1 (E.D. Pa. June 15, 2004).  The Liability Opinion does not contain any mandates: it stated at the beginning and the end that mandated "remedies" would be addressed "in a separate opinion," meaning the Remedial Order.  Liability Opinion at 557, 667.  Accordingly, Plaintiffs' request to find the City in violation of the Liability Opinion should be denied.

B.      *Plaintiffs Have Not Established that the City Violated the Remedial Order*

The Remedial Order's specific mandates to the City require particular changes to the "NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk."  (Remedial Order at 12, 14-25.)  Other than suggesting that the revision to the policy against racial profiling has not been implemented, Plaintiffs do not argue that any of the changes required by the Remedial Order were not made, or that the City violated any other clear commandment of that Order.

C.      *Plaintiffs Have Not Established that the City Violated the Order Approving the Revised Policy Against Racial Profiling*

The Remedial Order instructed that the City must clearly prohibit officers from using race in deciding which people to stop.  (Remedial Order at 17.)  The revised Patrol Guide Section 203-25 made that change; this Court approved it and ordered that the City put it into effect.  (Revised Policy Approval at 1, 5.)  The City did so, and the

record does not show that the City has refused to implement the policy; thus, the City has not violated this Court's order.

The Second Circuit's opinion in *Latino Officers Association* is instructive here.  558 F.3d 159.  In that case, the district court entered a judgment and order providing (among other things) that in decisions about employee discipline, the NYPD "will not allow discrimination based on actual or perceived race."  *Id.* at 162.  The plaintiffs moved for a finding that the NYPD violated that order, citing statistical data showing that minority officers were considerably more likely to receive formal and informal discipline than their white counterparts.  *Id.* at 163-64.  The district court denied the motion "for one basic reason: defendants did not warrant that racial discrimination never again would occur in the NYPD discipline system."  *Id.* at 163.  It explained that the evidence fell "far short" of "establishing that the NYPD is 'allowing discrimination,' even assuming that discriminatory behavior occurs from time to time."  *Id.* (internal brackets omitted).  On appeal, the Second Circuit panel was unanimously "in complete agreement" with the district court.  *Id.* at 165.

Here, by analogy, this Court's order approving Patrol Guide Section 203-25 does not impose strict and vicarious liability on the City for impermissible racial profiling by particular officers.  As discussed, the NYPD has put the Section into effect as that order required.  In arguing that the NYPD has not adequately implemented the Section, Plaintiffs cite statistics and affidavits suggesting that the COVID Rules have been enforced more often and more severely against Black and Latinx people than others.  (*E.g.*, *Floyd* Mem. at 3, 5, 14-18.)  But those disparities do not show that the NYPD is refusing to enforce the Section against officers who target people for enforcement based

on race.[7]  Accordingly, Plaintiffs' request to find the City in violation of that order should be denied.

### III.     Plaintiffs' Request for an Injunction Preventing the NYPD from Enforcing the COVID Rules Should Be Denied as Overbroad

Plaintiffs ask for an injunction against the NYPD's enforcement of the COVID Rules until such time as the Monitor has investigated and reached a conclusion about the legality of that enforcement, the parties have commented on that conclusion, and this Court has ruled that the Rules can legally be enforced.  (Proposed Order ¶ 4.) That request should be denied for two reasons.  *First*, the requested injunction would be overbroad, restraining far too much legitimate enforcement of the COVID Rules.  And *second*, the requested injunction would intrude improperly upon the public-health decision-making of state and local officials.

This Court has inherent equitable power to enter an injunction enforcing its prior orders—a power that is strictly discretionary and cannot be invoked as of right. *Berger v. Heckler*, 771 F.2d 1556, 1569 (2d Cir. 1985); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Though that power is broad, it is "the essence of equity jurisdiction that a court is only empowered to grant relief" that is "narrowly tailored to fit specific legal violations." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (internal quotation marks omitted).  "An injunction is

---

[7] The argument for finding the City in violation of this Court's order is particularly weak because that order only requires the City to implement the revised policy with respect to stops and frisks, consistent with the fact that those were the law-enforcement actions on which this Court based its Liability Opinion holdings and its Remedial Order.  (*See* Remedial Order at 17; Revised Policy Approval at 1.)  The disparities in the record mostly concern arrests, summonses, and other law-enforcement actions.  (*E.g.*, *Floyd* Mem. at 2-6; Day Decl., ECF No. 761, ¶ 9.)

overbroad when it seeks to restrain [a defendant] from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." *Id.* at 145. And the power is further "limited by considerations of federalism[;] remedies that intrude unnecessarily on a state's governance of its own affairs should be avoided." *Ass'n of Surrogates & Supreme Court Reporters Within the City of New York v. New York*, 966 F.2d 75, 79 (2d Cir. 1992).

    A.    *The Requested Injunction Would Restrain Too Much Legitimate Law Enforcement*

    The injunction that Plaintiffs seek would prevent all NYPD enforcement of the COVID Rules—not just enforcement that violates or threatens to violate particular legal requirements—and thus is plainly overbroad. Particular problems with NYPD policy that were fairly the subject of litigation could be enjoined, but not all enforcement of the COVID Rules.

    This Court's Remedial Order is instructive. Though this Court had concluded, with the benefit of all the evidence presented at trial, that the NYPD's policies related to the general use of stops and frisks were illegal, this Court emphasized that under the requirement of narrow tailoring it would not enjoin stops or frisks in the enforcement of any law. (Remedial Order at 2.) Instead, this Court formulated the remedial process and prescribed particular changes to the NYPD's "policies, training, supervision, monitoring, and discipline regarding stop and frisk." (*Id.* at 12, 14.) Similarly in *Ligon*, this Court did not enjoin enforcement of the trespass laws generally, even though it found a widespread practice of making stops enforcing the trespass law that lacked reasonable suspicion. (Am. Op. & Order, ECF No. 105, at 119-20, 141, 143,

146-49 (Feb. 14, 2013).)  Instead, it ordered the NYPD to cease performing trespass stops

without reasonable suspicion, and prescribed particular changes to the NYPD's written

policy, supervision, documentation, and training regarding trespass stops.  (*Id.* at 143,

146-49.)  By analogy, any injunction here should allow legitimate enforcement of the

COVID Rules by the NYPD to continue, and the requested injunction does not.[8]

   Plaintiffs' assertion that "non-law enforcement City agencies" may still

enforce the COVID Rules does not save the requested injunction from being

impermissibly overbroad.  (*Floyd* Mem. at 29.)  As explained, courts cannot seek to

restrain "legal conduct" or "illegal conduct that was not fairly the subject of litigation."

*Mickalis Pawn Shop*, 645 F.3d at 145.  Consequently, the NYPD cannot be enjoined from

enforcing the COVID Rules to the extent such enforcement is legal, on the assumption

that there are other ways the City could enforce those Rules—courts can only enjoin

illegal enforcement of the Rules.  The remedies in the *Floyd*, *Ligon* and *Davis* matters

have been tailored accordingly.  (*See* Remedial Order at 2.)  Moreover, now is not the

time to test Plaintiffs' hypothesis that City employees who lack training in race-neutral

law enforcement would enforce the COVID Rules effectively and neutrally.  (*Floyd*

Mem. at 29.)

---

[8] This failure of tailoring distinguishes the injunction requested here from the injunctions requested in
the two cases on which Plaintiffs most rely.  *See Hutto v. Finney*, 437 U.S. 678, 685-88 (1978) (approving
an injunction tailored to remedying one of the elements of prison conditions found to violate the Eighth
Amendment); *Handschu v. Police Dep't of the City of New York*, 219 F. Supp. 3d 388, 392 (S.D.N.Y.
2016) (considering a motion for an injunction on particular NYPD policies to the extent they allegedly
violated the provisions of a court-ordered consent decree).

B.      *The Requested Injunction Would Intrude Improperly on Public-Health*
       *Decisions*

Furthermore, an injunction here should be refused in the exercise of this

Court's sound discretion.  The requested injunction would pose an additional challenge to

public-health decision-making that is already encumbered with excessive challenges.

State and local officials, working together with public-health experts, have designed the

COVID Rules and their enforcement to prevent the spread of infection in a pandemic that

continues to pose a profound danger to the residents of New York City.  Even after

hearing and reaching conclusions about all the evidence presented at trial, this Court

refused to make any changes to NYPD policy whatsoever before study and input, calling

the alternative "unwise and impractical."  (Remedial Order at 13.)  At least as much

caution is appropriate in making changes to the enforcement of the COVID Rules while

the pandemic continues.

C.      *Plaintiffs Have Not Shown that the City's Conduct in the Enforcement of*
       *the COVID Rules Was Fairly the Subject of Litigation*

Even if this Court were inclined to try tailoring the requested injunction,

Plaintiffs have not shown a way of properly doing so.  As explained, this Court can only

restrain the City's conduct to the extent it is "illegal conduct" that was "fairly the subject

of litigation."  *Mickalis Pawn Shop*, 645 F.3d at 145.  Plaintiffs have not shown that the

City has committed conduct here—meaning official municipal policy, under the *Monell*

framework discussed in Section I.A.—that was fairly the subject of litigation and ruled

illegal in *Floyd*.

As an initial matter, this Court has already concluded that the illegal

conduct litigated in *Floyd* was "policies related to stop and frisk."  (Remedial Order at 2.)

Accordingly, the specific relief that this Court ordered as a result of *Floyd* consisted of "reforms to the NYPD's policies, training, supervision, monitoring and discipline regarding stop and frisk." (*Id.* at 14.) Plaintiffs have not shown that the City is using a policy related to stop and frisk in enforcing the COVID Rules. Indeed, such a policy would be hard to square with the fact that Mayor de Blasio has ordered that enforcement in decrees that define the Rules as misdemeanors for which the law does not give officers the power to conduct stops. N.Y. Crim. Proc. Law § 140.50 (giving NYPD officers the power to stop only for a "felony" or "misdemeanor defined in the penal law"); *e.g.*, N.Y.C. Office of the Mayor, Emergency Exec. Order No. 100, at §§ 18-19 (Mar. 16, 2020). Though Plaintiffs claim that the COVID Rules have been enforced using stops, the majority of their evidence is about arrests and summonses, which only strengthens the point that the policies at stake on this motion were not fairly the subject of litigation in *Floyd*.[9] (*E.g.*, *Floyd* Mem. at 2-6; Day Decl., ECF No. 761, ¶ 9.) For that reason, no injunction on enforcement of the COVID Rules is appropriate here.[10]

Even under a broader view of the conduct that was litigated in *Floyd*, going beyond stop-and-frisk policies, Plaintiffs have not shown that the City's

---

[9] The fact that the majority (probably the vast majority) of enforcement of the COVID Rules has used techniques other than stops is unsurprising in light of the observation that the level of suspicion officers have to enforce those Rules is almost always probable cause. For example, when officers observe a person in public not wearing a mask, it is "more probable than not" that the person is violating the COVID Rules, giving the officers probable cause to enforce the Rules against her. *People v. Vandover*, 20 N.Y.3d 235, 237 (2012). The officers' probable cause would not be defeated by the low probability that the person is subject to one of the limited exceptions to the mask-wearing requirement, such as for those who cannot medically tolerate a face covering. The failure to wear a mask is not "conduct equally compatible with guilt or innocence." *Id.*

[10] Evidence that some officers have failed to take appropriate public-health precautions when interacting with the public also does not support the requested injunction, because those failures were not fairly the subject of litigation in *Floyd*. (*Floyd* Mem. at 4, 25.)

enforcement of the COVID Rules involves illegal conduct that was fairly the subject of that litigation.  As explained in Section I.A., the Liability Opinion held the City liable for three kinds of policy in the NYPD's stop-and-frisk program.  Plaintiffs have not shown that the enforcement here involves policies that are similar to the ones litigated at trial in the respects that made the litigated policies illegal.

*First*, the Liability Opinion held that the NYPD violated the Fourteenth Amendment through a policy of targeting people for stops whose races appeared most in criminal-suspect data: by *explicitly* encouraging officers to disproportionately stop Black and Latinx people, policymakers enforced express racial classifications and intended racial disparities in stops.  Here, the record does not show that the NYPD has explicitly encouraged officers to enforce the COVID Rules on the basis of race, so the legality of that enforcement was not fairly the subject of litigation at trial.[11]

*Second*, the Liability Opinion held that the NYPD violated the Fourth Amendment through a practice of stops lacking reasonable suspicion that was so widespread—numbering over 200,000—as to constitute de facto NYPD policy.  Here, the

---

[11] The record does not show that the NYPD has a policy of explicitly using race to determine which people to enforce the COVID Rules against, whether by using local crime data to make enforcement decisions or otherwise.  Plaintiffs write that "NYPD leadership publicly invoked the race of those suspected of committing crime in the area, i.e., crime suspect data, to justify, defend, and attempt to deny racial profiling" and that NYPD leadership has implied "that the race of crime suspects justifies racially discriminatory policing and racial disparities in stops in Black and Latinx communities."  (*Floyd* Mem. at 16-17; Day Decl., ECF No. 761, ¶ 46.)  However, these claims are not supported by the article that Plaintiffs cite, which reported on the NYPD's response to requests for demographic information about the people against whom the COVID Rules had been enforced.  *See* Anthony M. DeStefano, *COVID-19-related arrests in the city not racially motivated, NYPD says*, Newsday (May 12, 2020), https://www.newsday.com/news/health/coronavirus/nypd-social-distancing-minorities-arrests-1.44590671.  The article does not state that the NYPD tried to justify, defend, or deny racial profiling, and does not support the claim that the NYPD has used the race of crime suspects to justify racial disparities in enforcement of the COVID Rules.

record does not reflect a similarly pervasive pattern of suspicionless stops enforcing the COVID Rules.  (*E.g.*, *Floyd* Mem. at 15, 21; Day Decl., ECF No. 761, ¶¶ 22-24.)

   *Third*, the Liability Opinion held that the NYPD violated the Fourth and Fourteenth Amendments because policymakers disregarded the need for obvious policy changes that would prevent officers from performing stops based impermissibly on race or lacking reasonable suspicion.  Here, the record does not show that policymakers have ignored a need for obvious policy changes, similar to those litigated at trial, and thereby caused the COVID Rules to be enforced impermissibly on the basis of race or without constitutionally adequate suspicion.[12]  As explained in Section II.C., the NYPD's revised policy against racial profiling does not itself have obvious flaws—it was approved by this Court—and the record does not show that the NYPD has declined to implement that policy in good faith.

---

[12] The argument that the NYPD has exhibited "deliberate indifference" to impermissible racial profiling by officers enforcing the COVID Rules does not correctly articulate the law and record.  (*Floyd* Mem. at 19.)  Plaintiffs observe that Commissioner Shea recently denied that racial disparities in the enforcement of the COVID Rules should be attributed to "racist police," but they do not suggest that he has failed to take any obvious action to prevent racial profiling.  (*Id.*)  Section 1983 only creates liability for "deliberate indifference" when policymakers disregard the fact that their actions and inactions have the "known or obvious consequence" of unconstitutional conduct.  Liability Opinion at 564 (quoting *Connick*, 563 U.S. at 61).  Furthermore, Plaintiffs state that "Commissioner Shea suggested videos of police misconduct were taken out of context and that video evidence of racially biased policing was a myth created by the media."  (*Floyd* Mem. at 19; Day Decl., ECF No. 761, ¶ 48.)  However, reading the full set of Commissioner Shea's relevant remarks, he said "I think we can all agree what we've seen on some of those videos is incredibly disheartening, it's not what we want to see," and that reporting on police misconduct should exercise "caution" to protect officer safety.  Transcript: Mayor de Blasio Holds Media Availability (May 13, 2020), https://www1.nyc.gov/office-of-the-mayor/news/344-20/transcript-mayor-de-blasio-holds-media-availability.

**IV.    Plaintiffs' Request to Compel Discovery Should Be Denied as Procedurally Improper**

        The *Floyd* Plaintiffs ask this Court to compel discovery of a broad range of materials and information concerning the enforcement of the COVID Rules and the City's recent curfew order.[13]  (*Floyd* Mem. at 9-10; *Floyd* Suppl. Mem. at 1.)  The *Ligon* Plaintiffs join the request for materials and information concerning the enforcement of the COVID Rules.  (*Ligon* Ltr. at 1.)  Those requests should be denied because they exceed both the scope and procedures of the remedial process prescribed by this Court.

      A.    *Plaintiffs' Discovery Requests Are Overbroad*

        Plaintiffs' discovery requests concern the enforcement of the COVID Rules and the City's recent curfew order in general.  (Floyd Mem. at 9-10; Floyd Suppl. Mem. at 1.)  Thus they are not tailored to the scope of information that can be demanded from the City in this remedial process: information "necessary to end[ing] the constitutional violations in the NYPD's stop and frisk practices described in the Liability Opinion."  (Remedial Order at 12.)  Plaintiffs (and for that matter, the Monitor) cannot compel discovery of information exceeding that scope.  *See Jones v. Wetzel*, No. 4:13-CV-1400, 2017 WL 4284416 at *2 (M.D. Pa. Sept. 27, 2017), *aff'd*, 737 F. App'x 61 (3d Cir. 2018).

---

[13] Plaintiffs specifically request: (1) any training or written guidance provided to NYPD personnel concerning enforcement of the COVID Rules; (2) information on how street encounters related to enforcement of the COVID Rules are documented, and associated stop reports, summonses, memo book entries, and other NYPD documentation of those encounters; (3) a sampling of NYPD body-camera videos of such encounters; (4) information on supervisory instruction and review of NYPD officers' enforcement of the COVID Rules; and (5) data on the number of summonses that have been issued stemming from street encounters involving any reference to the COVID Rules.  (*Floyd* Mem. at 9-10.)  In their supplemental submission, Plaintiffs seek to expand these requests to cover enforcement of the recent curfew order. (*Floyd* Suppl. Mem. at 1.)

B.      *Plaintiffs' Discovery Requests Undermine the System for Assessing Compliance Established by the Remedial Order*

Even if the requests were tailored to this remedial process, they should still be denied because they undermine this Court's system for assessing the City's compliance.  Plaintiffs assert that they are entitled to discovery under this Court's inherent power to "order discovery requested by a prevailing plaintiff 'to aid the court in determining whether [the defendant] had complied with a judgment in [plaintiff's] favor.'"  (*Floyd* Mem. at 12 (quoting *Cal. Dep't of Soc. Servs. v. Leavitt*, 523 F.3d 1025, 1033 (9th Cir. 2008).)  Plaintiffs are correct that this Court has inherent power to compel discovery for assessing whether the City has complied with its orders.  But their argument neglects the fact that this Court has already determined how it will perform that assessment: through the Monitor, and without motion practice.[14]  As explained above, the Remedial Order gives the Monitor responsibility for "assess[ing] the extent to which the NYPD has implemented and complied with" the reforms called for by the Liability Opinion.  (Remedial Order at 12-13.)  Plaintiffs do not have a comparable oversight function.  This Court specifically intended that this system would avoid the cost and contention of assessing compliance through motion practice.[15]  (*Id.* at 11.)

---

[14] Plaintiffs' discovery requests should be denied for the further reason that they can only invoke this Court's inherent power to compel discovery if they have raised "significant questions regarding noncompliance," and the discovery is tailored to those significant questions.  *See Leavitt*, 523 F.3d at 1034. For the reasons explained in Section II, Plaintiffs have not raised significant questions about the City's noncompliance with this Court's orders and, in any event, their discovery requests are not tailored to those questions.

[15] The *Ligon* consent decree, like the Remedial Order, does not give Plaintiffs a right to discovery: it expressly provides that the City must only disclose the information "that the Monitor determines should be disclosed to Class Counsel . . . at intervals determined by the Monitor."  (Stipulation of Settlement and Order, ECF No. 296, at 20 (July 19, 2017).)  The *Ligon* Plaintiffs acknowledge that they are only entitled to the information that the Monitor determines should be disclosed to them.  (*Ligon* Reply Ltr. at 1-2.)

The Remedial Order's system has worked: the NYPD has cooperated with the Monitor's requests for information, and the Monitor has shared information with Plaintiffs' counsel that has empowered them to play a meaningful role in developing reforms.  And that system will work here.  The Monitor will send requests for information about the enforcement of the COVID Rules and the curfew order that are tailored to this remedial process.  Those will include requests for information necessary to evaluate stops, frisks, searches and trespass enforcement in the course of enforcing the COVID Rules and curfew order.[16]  There is no need for a court order requiring the City to comply with those requests; the City has already told the Monitor that it will.  Then, when the Monitor receives the requested information, he will assess and report on that information in the ways, and to the extent, consistent with his mandate.  (*See* Remedial Order at 12-13.)

Plaintiffs' requests to compel discovery should be denied because they threaten to undermine the working system without improving this Court's oversight.[17]

---

The *Floyd* Plaintiffs observe that the Remedial Order does not contain similarly express language giving them a right to the City's information only to the extent the Monitor deems appropriate.  (*Floyd* Reply Mem. at 7.)  But that observation does not change the analysis here: the Remedial Order has preempted motions to compel discovery like theirs by giving oversight power to the Monitor with the express intention of avoiding motion practice.  Their further observation that the City has sometimes given Plaintiffs information independently of the Monitor is similarly irrelevant: while Plaintiffs are free to request information from the City, and the City is free to provide it to them, Plaintiffs have no right to that information that can justify a motion to compel.  (*Id.* at 7-8.)

[16] The Monitor's effort to obtain appropriate discovery will include working with the Civilian Complaint Review Board to obtain the data about stop, question, frisk and search allegations "relating to social distancing enforcement action."  (Charney Decl., ECF No. 781, ¶ 2.)

[17] Plaintiffs refer to cases in which courts have granted post-judgment discovery to prevailing plaintiffs despite the presence of court-appointed monitors—but, as the City observes, the discovery in each of those cases was granted pursuant to the terms of the courts' remedial orders.  (*Floyd* Mem. at 22-23; City Mem. at 19.)  This Court created a different system, tasking the Monitor with managing the discovery necessary to assess the defendant's compliance.

*See Kifafi v. Hilton Hotels Ret. Plan*, 79 F. Supp. 3d 93, 110 (D.D.C. 2015) (explaining

that where existing information channels are "sufficient for the Court to evaluate

Defendants' compliance with the Court's judgment," post-judgment discovery is not

appropriate), *aff'd*, 752 F. App'x 8 (D.C. Cir. 2019).

### V.    Plaintiffs' Request to Direct the Monitor to Evaluate the NYPD's Enforcement of the COVID Rules and Curfew Order Should Be Denied as Overbroad and Imprudent

Plaintiffs ask this Court to direct the Monitor to evaluate the NYPD's

enforcement of the COVID Rules and the City's recent curfew order for "legality" and

"consistency with the requirements of the Court's orders." (Proposed Order ¶ 3; *see also*

*Floyd* Suppl. Mem. at 1; *Ligon* Ltr. at 1.) They ask that his investigation include review

of "all . . . investigative encounter, arrest and summons activity thus far [concerning those

rules], all written and verbal guidance [concerning those rules] . . . provided to NYPD

rank-and-file officers by NYPD senior management and command-level supervisors, and

all data on NYPD efforts to investigate and discipline officers involved in allegedly

improper" enforcement of those rules. (Proposed Order ¶ 3.) They ask that the Monitor

share all discovered information with Plaintiffs, and file a report with his findings within

30 days. (*Id.*) This directive should not be issued because it exceeds the scope of the

Monitor's authority and, to the extent it is within that authority, would unduly constrain

the Monitor's discretion in his use of resources to handle all aspects of his work in

monitoring compliance and developing reforms.

As explained above, this Court has given the Monitor broad authority

while recognizing that such authority cannot extend beyond the limit of its equitable

power: "[t]he Monitor's duties, responsibilities, and authority will be no broader than

necessary to end the constitutional violations in the NYPD's stop and frisk practices described in the Liability Opinion."  (Remedial Order at 12.)  Plaintiffs' requested directive exceeds that authority in at least two respects.  *First*, the Monitor does not have freestanding power to assess the "legality" of the City's actions; he can only assess the City's compliance with the orders in these matters.  And *second*, the Monitor cannot and should not assess "all" information concerning enforcement of the COVID Rules; any information he requests must be tailored to ending the constitutional violations described in the Liability Opinion.

What remains is a requested directive instructing the Monitor to investigate the enforcement of the COVID Rules and the City's recent curfew order to the extent relevant to the stop, frisk, search, and trespass-enforcement violations in the Liability Opinion, and to report on the extent to which that enforcement has been consistent with the prior orders in these matters—all within 30 days.  This Court should decline to add this directive to the Monitor's duties in "the exercise of its sound discretion," because the directive would unduly constrain the Monitor's discretion in his use of resources.  *Brown v. Plata*, 563 U.S. 493, 542 (2011) (explaining the standard for assessing proposed "amendments to [an] existing order").

The Monitor has limited resources with which to assess the NYPD's work and develop reforms in these matters and, on this record, it does not appear that the enforcement of the COVID Rules and curfew order calls for special reporting from his team.  Moreover, there are other officials who will likely be reporting on that enforcement.  For example, the New York Attorney General's office is investigating potential misconduct in the NYPD's response to the recent protests, and it has already

requested data and information from the City regarding enforcement of social-distancing rules.[18]  Any reporting made by the Attorney General may make certain reporting from the Monitor duplicative and wasteful.  The best course is the ordinary one: the Monitor should exercise his sound judgment to gather information regarding the NYPD's compliance with the Court's previous orders, and report on that information, in the ways he deems appropriate and useful to this Court.

\* \* \*

For the foregoing reasons, Plaintiffs' requests should be denied.


Respectfully submitted,


/s/ Benjamin Gruenstein
Benjamin Gruenstein

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone:  (212) 474-1000
Fax:  (212) 474-3700
bgruenstein@cravath.com

---

[18] *See* Press Release, N.Y. State Office of the Att'y Gen., Attorney General James Announces Special Advisors in Investigation into Interactions Between NYPD and General Public (June 10, 2020), https://ag.ny.gov/press-release/2020/attorney-general-james-announces-special-advisors-investigation-interactions; Press Release, N.Y. State Office of the Att'y Gen., AG James Calls on the NYPD to Ensure Equal Social Distancing Enforcement in NYC Communities (May 13, 2020), https://ag.ny.gov/press-release/2020/ag-james-calls-nypd-ensure-equal-social-distancing-enforcement-nyc-communities; Letter from Jessica Clarke, Chief, N.Y. State Office of the Att'y Gen., to Dermot Shea, Commissioner, New York City Police Department (May 8, 2020), https://ag.ny.gov/sites/default/files/oag_letter_request_to_nypd_data_social_distancing_final.pdf.

Hon. Analisa Torres
   United States District Court
      Southern District of New York
         500 Pearl Street
            New York, New York 10007-1312
BY ECF