# Eleventh Report of the Independent Monitor

## Peter L. Zimroth

## October 28, 2020

*Floyd, et al. v. City of New York*
*Ligon, et al. v. City of New York, et al.*
*Davis, et al. v. City of New York, et al.*

# MONITOR TEAM

Peter L. Zimroth
Monitor

Richard Jerome
Deputy Monitor

Anthony A. Braga

Cassandra Chandler

Jennifer Eberhardt

Demosthenes Long

John MacDonald

James McCabe

Jane Perlov

James Yates

Table of Contents

Page

I.    INTRODUCTION ..................................................................................................1

II.   GUIDELINES FOR SUBSTANTIAL COMPLIANCE ...................................................5

III.  WRITTEN POLICIES ...........................................................................................7

      A.    Stop and Frisk Policies ............................................................................7

            1.    Compliance Assessment—Written Stop and Frisk Policies and
                  Implementation ..............................................................................8

      B.    Stop Report Form ...................................................................................12

            1.    Compliance Assessment—Stop Report Form and Implementation..........13

                  a.    CCRB Reports of Other Misconduct Noted (OMN) ...................14

                  b.    RAND Audits, Command RAND Audits, Automated RAND
                        Audits ...........................................................................15

                  c.    Police-Initiated Enforcement (PIE) Audits .................................16

                  d.    Supervisory Review of BWCs.....................................................16

                  e.    RISKS Reviews ........................................................................17

                  f.    Discipline and Correction of Officers with Unreported Stops......18

      C.    Racial Profiling Policies........................................................................19

            1.    Assessing Compliance—Racial Profiling Policy.....................................19

      D.    Davis/NYCHA Interior Patrol Policies .................................................24

            1.    Compliance Assessment—NYCHA Interior Patrol Policy ......................24

                  a.    Reviews of Stops at NYCHA Properties .....................................25

                  b.    Review of Trespass Arrests at NYCHA Properties......................26

                  c.    Review of BWC Videos at NYCHA Properties...........................27

      E.    Trespass Affidavit Program (TAP) Policies.........................................32

|  |  |  | 1. | Compliance Assessment—TAP Policies | 33 |

a. Reviews of Stops at TAP Locations ............................................... 34

b. 2019 Trespass Arrests at TAP Locations ...................................... 35

c. Review of BWC Videos at TAP Locations ................................... 35

2. Compliance Assessment—TAP Administration ...................................... 40

a. Patrol Borough Bronx ................................................................... 40

b. Patrol Borough Manhattan North ................................................. 42

F. Trespass Crimes Fact Sheet (TCFS) ........................................................... 43

1. Compliance Assessment—TCFS ........................................................... 44

G. Business Card Requirement ......................................................................... 44

IV. SUPERVISION .......................................................................................................... 45

1. Compliance Assessment—Supervision ................................................. 45

V. TRAINING ................................................................................................................. 51

A. In-Service Stop and Frisk and Racial Profiling Training ............................ 51

1. Compliance Assessment—In-Service Training for Stop and Frisk and Racial Profiling ............................................................................... 52

B. Training for Newly Promoted Supervisors .................................................. 59

1. Compliance Assessment—Newly Promoted Supervisor Training .......... 59

C. Housing Training .......................................................................................... 59

1. Compliance Assessment—In-Service Housing Training ........................ 60

D. Training for Investigating Profiling and Biased-Based Policing Complaints ... 61

1. Compliance Assessment—Training for Investigating Profiling and Biased-Based Complaints ....................................................................... 62

E. Basic Plainclothes Course ............................................................................ 63

1. Compliance Assessment—Basic Plainclothes Course ............................ 63

F. Recruit Training—Policing Legally ............................................................. 64

        **1.**      Compliance Assessment—Recruit Training—Policing Legally ..............65

**G.**     Recruit Training—Policing Impartially .......................................................65

        **1.**      Compliance Assessment—Recruit Training—Policing Impartially .........66

**H.**     Recruit Training—Characteristics of Armed Suspects ........................................66

        **1.**      Compliance Assessment—Recruit Training—Characteristics of Armed
                 Suspects ...............................................................................................67

**I.**      Recruit Training—Interior Patrol at NYCHA and TAP Locations .....................67

        **1.**      Compliance Assessment—Recruit Training—Interior Patrol .................67

**J.**      Field Training Guide and FTO training ...........................................................68

        **1.**      Compliance Assessment—Field Training Guide and FTO Training.........68

**K.**     Refresher Training Course for Investigative Encounters ....................................69

        **1.**      Compliance Assessment—Refresher Training Course for Investigative
                 Encounters .........................................................................................69

**VI.**   BODY-WORN CAMERAS ....................................................................................70

**A.**     Precinct-Level BWC Pilot...............................................................................70

        **1.**      Supervisory Review of BWC Videos.......................................................70

        **2.**      Preserving BWC Videos for Investigation of Complaints.......................71

        **3.**      Compliance Assessment—Precinct Level BWC Pilot ............................73

**B.**     PSA BWC Pilot ...............................................................................................73

        **1.**      Compliance Assessment—PSA BWC Pilot .........................................73

**VII.**  PERFORMANCE EVALUATIONS .........................................................................74

        **1.**      Compliance Assessment—Performance Evaluations..............................75

**VIII.** AUDITING...........................................................................................................77

**A.**     QAD Auditing of Stop Reports and Activity Logs..............................................78

**B.**     Monitor Team Review of Stop Report Audits....................................................80

**C.**     QAD Audits of BWC Videos Associated with Stop Reports and Arrests...........81

**D.**   QAD Audits for Undocumented Stops ...............................................83

    **1.**   RAND Audit Results ........................................................83

    **2.**   Results from PIE Audits ...................................................85

**E.**   QAD Auditing of Trespass Crimes Fact Sheets ..................................86

    **1.**   Compliance Assessment—Auditing.......................................87

IX.   EARLY INTERVENTION SYSTEM.......................................................89

**A.**   The Early Intervention Committee ..............................................90

    **1.**   Compliance Assessment—Early Intervention System ...........................93

X.   COMPLAINTS AND DISCIPLINE .......................................................93

**A.**   NYPD Investigations of Profiling Allegations....................................93

    **1.**   Compliance Assessment—Racial Profiling Investigations ....................95

**B.**   NYPD Handling of Substantiated CCRB Cases..................................96

    **1.**   NYPD Discipline and Penalties Imposed .................................96

    **2.**   DAO Reconsideration Requests ...........................................98

    **3.**   Compliance Assessment—DAO Handling of Substantiated CCRB Cases ...........................................................100

**C.**   Other Misconduct Noted; Failure to Complete Stop Report .............................101

XI.   ALTERNATIVE TO COMBINED PILOT...................................................102

**ELEVENTH REPORT OF THE INDEPENDENT MONITOR**

## I.   INTRODUCTION

This, the Monitor's 11th Report, comes at a time of extraordinary stress for the people of New York City, the New York City Police Department (NYPD or Department), and the relationship between the NYPD and the communities it polices, especially communities of color. The causes of the stress are many, but the most prominent ones stem from the coronavirus pandemic, the police-involved death of George Floyd in Minneapolis and others, and longstanding concerns about police misconduct in communities of color.

The first confirmed case of coronavirus was announced on March 1, 2020, and shortly after, it was clear that the virus, with its related disease, COVID-19, was both deadly and tremendously contagious.  On March 7, 2020, Governor Andrew Cuomo declared a disaster emergency for the state (Executive Order 202); on March 18, Governor Cuomo prohibited any gathering with 50 or more participants, and closed bars, restaurants, gyms, and entertainment venues (Executive Order 202.6); on March 20, the Governor required employees, other than essential workers, to work from home (Executive Order 202.8); and on April 15, he required persons to wear masks when out in public (Executive Order 202.17).  Mayor Bill De Blasio declared a state of emergency on March 12 (Executive Emergency Order 98); closed restaurants, bars, and entertainment venues on March 14 (EEO 100); and ordered businesses to have their employees work from home except for essential services (EEO 103) on March 25.  Until May 15, the NYPD had the responsibility of enforcing these executive orders, including social distancing and face-covering; thereafter, that responsibility was shifted to the New York City Sheriff.

Police officers, as essential workers, could not stay at home, but continued reporting to their commands and patrolling.  By April 6, 2020, it was reported that almost 7,000 uniformed

members of NYPD, about 19% of the force, were out sick.[1]  The number of COVID-19 patients skyrocketed, emergency room and ICU hospital beds were in short supply, and the number of persons on mechanical ventilators increased.  By April 11, many officers were returning to work and more NYPD members were coming back to work than were going out sick.

The death of George Floyd on May 25, 2020, sparked protests and demonstrations across the country, demanding changes in the way policing is conducted, with New York City experiencing some of the largest marches and demonstrations.  Protests and demonstrations have continued in New York City almost daily since then.  Four officers of the Minneapolis Police Department were charged by the Minneapolis attorney general in connection with Mr. Floyd's death—one with second-degree murder and three others with aiding and abetting second-degree murder and aiding and abetting manslaughter.

In June, the New York State Legislature enacted and Governor Cuomo signed ten bills on police reform.  The reforms include, among others: (a) repealing of Section 50(a) of the New York Civil Rights Law, which had been preventing the release of law enforcement disciplinary records (S.8496/A.10611); (b) establishing criminal penalties for chokeholds causing death or serious injury (S.6670-B/A.6144); (c) requiring officers to provide medical and mental health assistance to civilians when needed (S.6601-A/A8226); (d) requiring officers in New York State to wear body-worn cameras (BWCs) (S.8493/A.8774); and (e) appointing the state Attorney General as the independent prosecutor for police-involved deaths (S.2574-C/A.1601).[2]

_____

[1] Since March 12, 2020, 4,644 NYPD members have tested positive for COVID-19 (approximately 12 percent of the Department's sworn officers).

[2] See https://www.governor.ny.gov/news/governor-cuomo-signs-say-their-name-reform-agenda-package; https://www.governor.ny.gov/news/governor-cuomo-signs-policing-reform-legislation. Other legislation creates a Law Enforcement Investigative Office (S.3595-C/A.10002); requires officers to report firearms discharges within six hours ((S.2575-B/A.10608); requires the New

The City Council passed its own legislation, some overlapping with the state's and some going beyond.  For example, chokeholds were made a crime punishable by up to a year in jail, as were other methods of restraint that restrict breathing or blood flow.  The City legislation applies regardless of whether there is any injury, whereas the state criminal penalty applies only in cases of serious injury or death.  The City Council also passed legislation requiring the NYPD to develop a disciplinary matrix that outlines penalties for misconduct violations.  In addition, the Mayor and the City Council agreed on changes to the New York City budget, including moving school resource officers from the NYPD to the Department of Education in FY2022, eliminating a new class of police recruits that would have brought on an additional 1,000 officers, and introducing a $268 million cap on police overtime costs.

The NYPD itself also has made changes to its policing strategies. On June 15, Police Commissioner Shea announced the elimination of the plainclothes anti-crime units at precincts and other commands.  Approximately 600 officers previously in these anti-crime units have been transitioned to new assignments.  In his press conference announcing this step, Commissioner Shea said:  "We welcome reform, but we also believe that meaningful reform starts from within."  He said that it was "time to move forward and change how we police in this city. We can do it with brains, we can do it with guile.  We can move away from brute force."

News stories, editorials, and opinion pieces have filled the print media, television and cable networks, the internet and social media with prescriptions on how to change policing and the

---

York State Courts to compile and publish racial and other demographic information on low-level offenses (S.1830-C/A.10609); affirms the right to record law enforcement activity (S.3253-A/A.1360) and prohibits race-based 911 calls (S.8492/A.1531). https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-requiring-new-york-state-police-officers-wear-body-cameras-and; https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-affirming-right-record-law-enforcement-activity.

NYPD.  It is not the proper role of the Monitor to weigh in on these policy debates.  No matter how they are ultimately resolved, however, that resolution will have to include adherence to the Constitution.  And, insofar as stop, question and frisk and trespass enforcement are involved, that is the proper role of the Monitor.  That is the focus of this Report.

This is the Monitor's 11th report on the City's compliance with the Court-ordered requirements.  It covers data and information about NYPD policing in 2019 and, where data is available, policing in the first quarter of 2020.  Reported stops in 2019 rose to 12,958 from 11,238 in 2018.  The Monitor believes this is because of an increase in officers reporting their stops and not an increase in stops made by NYPD officers.  Reported crime in 2019 also decreased from 2018 (0.8%).  Since the 10th Report of the Monitor, a number of other changes of interest to the monitorship have occurred:

- The Court issued an order setting out the requirements for the NYPD's Early Intervention System (EIS)

- The NYPD's 2020 Auditing Plan was approved by the Court

- The NYPD has trained the vast majority of patrol officers and sergeants and lieutenants on stop and frisk policies

- The NYPD conducted one-day training for all Housing Bureau officers

- The NYPD has proposed a Disciplinary Matrix outlining penalties for misconduct violations

- The NYPD has completed the Fair and Impartial Policing training for its members

- In September 2020, the NYPD ended the Trespass Affidavit Program (TAP), in which officers conducted routine vertical patrols in certain private multi-unit residences.

- The Police Academy class of recruit officers planned to begin in April 2020 was cancelled because of the coronavirus; the new Academy recruit class that was to begin in July was cancelled after the City Council passed its budget in July 2020.

As noted above, policing now in 2020 looks different than policing in 2019, as a result of both COVID-19 and the deaths of George Floyd and other Black Americans.  Arrests and

summonses in the first quarter of 2020 went down by 22 percent and 16 percent, respectively, compared to the first quarter of 2019.  Reported stops in April 2020 were 31 percent fewer than in April 2019.  The City also has seen a spike in shootings and homicides since June of 2020.  Even with the decreases seen in March and April, the number of shootings and homicides in the first six-months of 2020 is higher than they were in 2019, following a trend affecting many other U.S. cities.   The next report of the Monitor will be able to report on how those changes have impacted stop and frisk and trespass enforcement data and practices, and NYPD compliance with the Court's orders.

### Organization of the Report

This report is organized in the following fashion.  Section II describes the summary appendix listing the Court's requirements and the Monitor's assessment of each requirement.  In Section III, the report describes the Court-ordered requirements for written policy changes pursuant to the *Floyd* remedial order and the *Ligon* and *Davis* settlements and then, for each policy requirement, reviews the efforts made by the Department to implement the policies in practice, and the Monitor's assessment of those efforts.  After written policies, the report covers the requirements for compliance, the efforts made by NYPD to comply, and the Monitor's assessment of those efforts for the following topics: Supervision (IV), Training (V), Body-Worn Cameras (VI), Performance Evaluation (VII), Auditing (VIII), Early Intervention System (IX), and Complaints and Discipline (X).  Section XI describes the City's proposed alternative to the Court-ordered pilot study to test the impact of two policy changes that the facilitator recommended.

## II.   GUIDELINES FOR SUBSTANTIAL COMPLIANCE

One of the first tasks set out for the Monitor by the Court was to specify for the City the milestones that the NYPD must achieve to demonstrate substantial compliance with the Court's requirements.  Although general milestones were established early in the monitorship, the Monitor

and his team then worked with the parties to detail each requirement and establish the benchmarks and standards the Monitor would use to determine compliance, including what sources of information the Monitor would use and what kinds of analysis and metrics would be used to evaluate compliance.  In the 10th Report, the Monitor included an Excel spreadsheet listing more than 90 separate tasks and for each task, the text from which the requirement is derived, the definition of compliance, the methodology for assessing compliance, and the data needed for the Monitor's compliance review.  For this 11th Report, the Monitor has included a column setting forth his view for each task as to whether the City has done the work necessary to meet the definition of compliance for that task.  (Appendix A)  The terms listed are as follows:

> **In Compliance.**  The NYPD has met the definition of compliance for this requirement at this time.  The Monitor's responsibility will be to assess whether compliance is maintained and whether it is having the desired effect of meeting the fundamental goals of the Court-ordered reforms.

> **Partial Compliance.**  The NYPD has made progress in implementing the requirement, but has not reached the level necessary for compliance, or there are additional steps that the Department needs to take to meet the definition of compliance.

> **Not Yet in Compliance.**  The NYPD has more work to do to implement the requirement, the level of non-compliance is too high, and there are additional steps the NYPD needs to take to meet the definition of compliance.

It should be noted that even where a task is listed as "In Compliance," that does not mean that the work for that task is complete, or that the Monitor will no longer assess whether the task is in compliance.  Compliance needs to be sustained over time.  In addition, even written policies that have been approved by the Court (and thus deemed to be in compliance with a requirement that the policy be developed) may need to be reexamined, if the Monitor determines that the policies were insufficient to achieve constitutional stops.

The individual requirements are part of a broader assessment of whether the NYPD is in substantial compliance with the overriding requirements of the remedial order—whether there is

lawful policing under the Fourth and Fourteenth Amendments.  If there are individual incidents of non-compliance, the Monitor will assess whether they have been identified and corrected through instruction, retraining, and, when appropriate, discipline.  As stated in the Monitor's Seventh Report, "[t]he question at the end of the day will be whether each of the remedial measures, working together, provides a system of constitutional, respectful policing."

## III.   WRITTEN POLICIES

### A.   Stop and Frisk Policies

The NYPD's written policy regarding stop, question and frisk is detailed in Section 212-11 of the Patrol Guide, *Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops*.  This Patrol Guide section describes the procedure to be followed when an officer stops a person based on reasonable suspicion that the person has committed, is committing, or is about to commit a felony or Penal Law misdemeanor.

The Court in *Floyd* recognized that the practice, known as "stop and frisk" or "stop, question and frisk," can be an important tool to further public safety.  The Court ruled, however, that to comply with the Constitution, the Department needed to make the following changes to the Patrol Guide:

- The Patrol Guide must state what constitutes a stop; when a stop may be conducted; when a frisk may be conducted; and when a search may be conducted.

- The Patrol Guide must include a definition of "reasonable suspicion," the standard needed for a stop.

- The Patrol Guide must state clearly that officers must have separate reasonable suspicion that a person is armed and dangerous in order to conduct a frisk of that person.

- The Patrol Guide must require officers to document the stop and articulate the circumstances that gave them reasonable suspicion for the stop, and, if conducted, for the frisk.

- The Patrol Guide must require supervisory review of stops, including review of the constitutionality of the stop, and not just that a stop report form was filled out.

### 1.   Compliance Assessment—Written Stop and Frisk Policies and Implementation

In August 2015, the Court approved a new Patrol Guide section on stop and frisk, P.G. 212-11.  The Patrol Guide also addresses investigative encounters between officers and civilians that are less intrusive than stops or arrests.  These encounters are governed by *People v. DeBour*, which sets out four levels of encounters:  a simple Request for Information (Level 1); a Common Law Right of Inquiry (Level 2); a *Terry* stop, when an officer detains a person to investigate (Level 3); and an arrest (Level 4).  The investigative encounters procedures in P.G. 212-11 describe the standards that govern each level.

There have been several changes to P.G. 212-11 since it was first approved by the Court in 2015.  In March 2016, the Court approved changes to P.G. 212-11 to reconcile the procedures with the new stop report form.  Additional changes were made when the stop report became electronic. In October 2018, the Department proposed and the Court approved changes to P.G. 212-11 to comply with the Right to Know Act enacted by the City Council.  These laws require officers in certain nonemergency encounters to identify themselves by name, rank, and command, explain the reason for the stop, and offer business cards if no one is arrested or issued a summons.  They also require officers to inform people of their right not to consent to a search if consent would be necessary to perform the search.

The NYPD revised its policies to comply with the Court's orders and the Court has approved those changes.  The City is in compliance with this requirement of the court orders (Task 1a).

As we have stated in prior reports, changing written policy is not meaningful unless the change is implemented and sustained in the field.  It is the Monitor's role to assess whether the policies are being implemented in practice.  Stops made by NYPD officers must comply with

NYPD's new policies and with federal and state standards.  Officers must articulate reasonable suspicion for the stop and the frisk, if conducted, and articulate a justifiable basis for the search, if conducted.  Stop reports that do not articulate reasonable suspicion should be identified by the Department and corrective action taken with respect to both the relevant officers and their supervisors.

Starting in the fourth quarter of 2016, the monitor team has obtained samples of stop reports to review.  The stop reports are evaluated by three members of the monitor team and any disagreements, either among the monitor team or between the monitor team and the NYPD's assessment of the stop reports, are reviewed by the Monitor and Deputy Monitor.  The stops are then discussed in monitor team meetings, and the results sent to the NYPD, which meets with the monitor team to discuss those cases in which there is a disagreement between the Department's and the Monitor's assessment.

In making assessments of stops, the monitor team members review the stop report, the activity log, and any associated ICAD[3] printout (the radio dispatch).  The team member examines the officer's narrative describing the circumstances that led to the stop, as well as what the officer listed as the crime suspected, to determine whether the officer articulated reasonable suspicion of a felony or Penal Law misdemeanor.  If a frisk and/or a search was conducted, the team member reviews the officer's narrative describing the circumstances of the frisk and/or the search to assess whether the officer had reasonable suspicion that the person stopped was armed and dangerous, justifying a frisk, or if the officer had a justifiable legal basis for the search.  Starting in 2018, monitor team members have also reviewed the BWC video of the encounter, if the officer making

---

[3] ICAD means Intergraph Computer-Aided Dispatch.

the stop had a BWC, to assess whether the stop report narratives were consistent with the BWC video.

For stops in 2019, the monitor team has reviewed the BWC video of all of the stop reports. monitor team members then make two different assessments: (1) taking the stop report, BWC video, and ICAD dispatch into account, was the stop, frisk, and search constitutional; and (2) did the stop report on its face articulate reasonable suspicion for the stop, reasonable suspicion for the frisk, if conducted, and a legal basis for the search, if conducted.  It is important to note that there are Level 3 encounters where the ICAD printout and BWC video show that the officer had reasonable suspicion for the stop, but the stop report did not sufficiently articulate reasonable suspicion.  A common example is where the officer makes a stop based on a verified call with a specific, detailed description of the suspect, but the stop report does not include the description (e.g., simply states "fit description").  The stop was a proper stop with reasonable suspicion, but the stop report would be listed as not in compliance because it did not articulate the basis for the stop.  The opposite also occurs; an officer could write the stop report and articulate an appropriate stop based on reasonable suspicion, but other sources, such as the BWC footage and the ICAD printout, might show that the stop was not in fact based on reasonable suspicion.  The court's Remedial Order requires both that the stop be a legal stop and that the stop report articulate reasonable suspicion in the officer's narrative.

Chart 1 below reports on the Monitor's assessment of stop reports from the fourth quarter of 2016 to the fourth quarter of 2019.  For each quarter, the chart shows the number of stop reports that the monitor team reviewed and, in the third column, the number and percentage of stop reports that the monitor team determined articulated reasonable suspicion for the stop.  The fourth column is the number of stop reports reviewed in which a frisk was conducted, and the fifth column reports

the number and percentage of stop reports that articulated reasonable suspicion that the person

stopped was armed and dangerous.  The sixth column reports the number of stops that included a

search, and the seventh column reports the number and percentage of stop reports that the monitor

team determined articulated a justification for the search.  The Monitor's assessment of stops

included only stops for which there was a stop report, and does not account for stops that were not

reported; see Section III.B below for discussion of undocumented stops.

As can be noted in the chart below, the level of compliant stop reports has improved over

time.  This is particularly true for whether the officer articulated reasonable suspicion for the stop,

which occurred in a little over 80 percent of stops for the second half of 2018 compared to less

than 60 percent in the first half of 2017.  The NYPD maintained that level of compliance in 2019

(79%).  The percentage of officers who articulated reasonable suspicion that the person stopped

was armed and dangerous (necessary for a frisk), or justification for the search, has also increased

over time, although the level of compliance was fairly high even in the fourth quarter of 2016.[4]

**Chart 1.        Monitor Team Review of Stop Reports 4Q 2016 through 4Q 2019**

| Quarter | # Stop Reports Reviewed by Monitor Team | Stop Reports That Articulate Reasonable Suspicion for the Stop | # Stop Reports in Which Suspect Was Frisked | Stop Reports that Articulate Reasonable Suspicion for the Frisk | # Stop Reports Where Suspect Was Searched | Stop Reports that Articulate Justification for the Search |
|---|---|---|---|---|---|---|
| 4Q2016 | 261 | 121 (46%) | 146 | 111 (76%) | 67 | 56 (84%) |
| 1Q2017 | 256 | 142 (55%) | 145 | 114 (79%) | 79 | 68 (86%) |
| 2Q2017 | 302 | 178 (59%) | 176 | 143 (81%) | 91 | 73 (80%) |
| 3Q2017 | 312 | 188 (60%) | 179 | 146 (82%) | 87 | 76 (87%) |
| 4Q2017 | 305 | 212 (70%) | 171 | 153 (89%) | 107 | 101 (94%) |

---

[4] As noted, Chart 1 details the monitor team's assessments of stop reports and associated documents (activity logs and ICAD printouts). The monitor team's preliminary assessment of stops, based on a review of 2019 stop reports that also had associated BWC videos, indicated that a small percentage of stops did not have a legal basis even though the stop report narrative articulated reasonable suspicion. However, a larger percentage (though still small) of stops appeared to be legal even though the stop report narrative did not articulate reasonable suspicion for the stop. Future monitor reports will discuss this issue in more detail.

| Quarter | # Stop Reports Reviewed by Monitor Team | Stop Reports That Articulate Reasonable Suspicion for the Stop | # Stop Reports in Which Suspect Was Frisked | Stop Reports that Articulate Reasonable Suspicion for the Frisk | # Stop Reports Where Suspect Was Searched | Stop Reports that Articulate Justification for the Search |
|---|---|---|---|---|---|---|
| 1Q2018 | 308 | 202 (66%) | 213 | 187 (88%) | 92 | 84 (92%) |
| 2Q2018 | 295 | 211 (72%) | 189 | 169 (89%) | 81 | 70 (87%) |
| 3Q2018 | 302 | 251 (83%) | 150 | 134 (89%) | 113 | 98 (87%) |
| 4Q2018 | 300 | 239 (80%) | 184 | 170 (92%) | 113 | 106 (94%) |
| 1Q2019 | 315 | 250 (79%) | 174 | 155 (89%) | 109 | 101 (93%) |
| 2Q2019 | 308 | 245 (80%) | 190 | 168 (88%) | 121 | 115 (95%) |
| 3Q2019 | 304 | 249 (82%) | 143 | 117 (82%) | 129 | 119 (92%) |
| 4Q2019 | 310 | 228 (74%) | 121 | 103 (85%) | 116 | 101 (87%) |

Based on the Monitor's review of stop reports and BWC video of stops, as well as the extent to which supervisors are identifying and correcting improper stops (see Section IV, Supervision) and the Quality Assurance Division (QAD) is identifying improper stops (see Section VIII, Auditing), the NYPD is in partial compliance with respect to implementing the Court-approved stop and frisk policies (Task 1b).

### B.      Stop Report Form

The court orders required that the NYPD develop and implement a stop report form to be used by officers every time a person is stopped.  The stop report must include a narrative section to explain the basis for the stop and a narrative section to explain the basis for the frisk or the search, if applicable.  The Court also required the Department to simplify and improve checkboxes that were in the prior stop report.

The Department implemented a new stop report in March 2016.  The stop report has the two narrative sections required by the Court:  the reasons for the stop and the reasons for the frisk and the search, if conducted.  The stop report also has a section in which supervisors document the review required by P.G. 212-11 and any follow-up action.  An officer's supervisor must confirm that he or she reviewed the constitutionality of the stop and discussed the facts of the stop with the

officer.  The supervisor must check boxes indicating whether or not: (1) the supervisor reviewed the encounter with the officer; (2) the report was accurate and complete; (3) the corresponding activity log entry was reviewed; (4) the supervisor was present on the scene; (5) there was a sufficient basis for the stop; and (6) there was a sufficient basis for the frisk or search, if conducted. The supervisor must also note whether any corrective action was taken.

In January 2017, the Department began using an electronic stop report form that officers can fill out on their phones, on tablets, or on a computer at the command.  In October 2018, the stop report form was revised to document compliance with the Right to Know Act, so it now requires officers to indicate if they sought consent to search and whether it was given.  In addition, when a stop is based on a radio run (a communication from a dispatcher over the radio, often based on a call for service), officers are now required to indicate if the call was based on an anonymous or a verified caller, since that information can determine the level of authority an officer is legally allowed to exercise.

### 1.      Compliance Assessment—Stop Report Form and Implementation

The revised stop report was approved by the Court in March 2016.  In October 2018, the Court approved the most recent changes to the stop report form.  The City is in compliance with the requirement that a new stop report be developed (Tasks 3, 8a).

As we have reported since the revised stop report was first put in place, the most significant aspect of this requirement is making sure that officers who make stops are actually completing stop reports.  The underreporting of stops has been acknowledged by the Department and by officers and supervisors in focus groups conducted by the Monitor, and explicitly identified in NYPD audits (discussed in Section VIII below).  Any assessment of compliance with the Court's remedial orders will be impossible unless the Department finds ways to ensure that unreported

stops are no longer an issue.  If the NYPD's data is not accurate and complete, the Monitor cannot find that the City is in substantial compliance.

There are a number of ways that the NYPD has attempted to determine the scope of underreporting of Level 3 *Terry* stops and to address the problem.   These include: (a) Civilian Complaint Review Board (CCRB) reports of stop-related complaints for which a stop report was not completed; (b) RAND audits (labeled as such because these were initially conducted by the RAND Corporation) of radio communications; (c) Police-Initiated Enforcement (PIE) audits; (d) supervisory review of BWC videos; (e) meetings with command executives, labeled RISKS Reviews (Remediation of Identified Situations Key to Success); and (f) discipline and correction of officers for unreported stops.  All these are discussed in the Report below and in Sections IV, VI, VIII and X.

### a.        CCRB Reports of Other Misconduct Noted (OMN)

When the CCRB investigates a complaint involving a stop and determines that the officer did not complete a stop report, it alerts the NYPD by sending an "Other Misconduct Noted" (OMN) to the Internal Affairs Bureau (IAB).  The NYPD then investigates the failure to complete a stop report to determine if it should be substantiated and, if so, determine the appropriate corrective action.  The numbers of OMN cases for failure to complete a stop report have gone down over the last several year, while the number of CCRB complaints involving a stop have remained steady.  However, there are still complaints made in 2019 for which the CCRB investigations have not been complete, so there may still be additional OMNs for failure to complete a stop report for 2019 CCRB complaints (Chart 2 below). Additional data regarding OMNs for failure to complete a stop report is detailed in Section X below.

14

**Chart 2.      Other Misconduct Noted for Failure to Complete Stop Report**

| 2017 CCRB Stop Complaints | 2017 Failure to Complete Stop Report OMNs (%) | 2018 CCRB Stop Complaints | 2018 Failure to Complete Stop Report OMNs (%) | 2019 CCRB Stop Complaints | 2019 Failure to Complete Stop Report OMNs (%) |
|---|---|---|---|---|---|
| 851 | 72 (8.5%) | 855 | 57 (6.7%) | 902 | 51 (5.7%) |

### b.      RAND Audits, Command RAND Audits, Automated RAND Audits

One audit conducted by the NYPD to assess underreporting is the RAND audit.  This audit is conducted by QAD and is designed to identify stop encounters using radio transmissions to identify instances in which stop reports should have been prepared.  QAD uses keyword searches of radio transmissions (ICADs) to identify events that likely involved stop encounters.  These keywords are "Stopped," "Show-up," "Holding," and "Warrant Check."  When a potential stop encounter is identified, NYPD records are reviewed to determine if a corresponding stop report was prepared.  If there is BWC video of the event, QAD reviews the video as part of this analysis.  If the auditor determines that a stop report may have been required, but was not prepared, the matter is referred to the command for further investigation.  The command then reports back to QAD whether the encounter did, in fact, require a stop report and whether one was filed.  From 2017 to 2019, the compliance level identified by QAD's RAND audits increased from 49 percent in 2017 to 70 percent in 2019, but was only 56 percent in the first quarter of 2020 (see Auditing Section, below).

The NYPD has expanded RAND audits in two ways.  First, several commands have started doing RAND audits of their own radio transmissions.  The command does a search of ICAD dispatches to identify encounters in which the words "Stopped," "Warrant Check," "Holding" or "Show-up" are used.  The command's Integrity Control Officer (ICO) (or other member doing the

15

RAND audit) will evaluate the encounter to see if it appears that a stop occurred and, if so, check to see whether a stop report was prepared.   Second, starting in February 2020, the Risk Management Bureau (RMB) has conducted a daily automated search of the keywords in ICAD transmissions of patrol commands, and sending the results to the command for investigation. RMB has also added the search word "canvass" to the ICAD search.  The Monitor has requested that NYPD track and report on undocumented stops identified using these methods.

### c.        Police-Initiated Enforcement (PIE) Audits

A second audit conducted by QAD to identify undocumented stops is the PIE audit.  These audits examine arrests in which the People of the State of New York are the complainants on the Complaint Report, such as criminal possession of a controlled substance and criminal possession of a weapon.  The arrest reports are reviewed to determine whether it appears that a stop report should have been completed for the encounter.  When an auditor determines that an arrest report possibly required a stop report and no stop report was completed, the arrest report is sent to the command for further investigation.  From 2017 to 2019, the compliance level identified by QAD's PIE audits increased from 34 percent in 2017 to 50 percent in 2019 (see Auditing, Section VIII, below).

### d.        Supervisory Review of BWCs

The NYPD can also identify stops that were not documented by having supervisors examine the BWC videos of their officers.    Sergeants are required to review five BWC videos of their officers per month and complete a self-inspection worksheet of their reviews.  In addition, other supervisors at the command level, such as training sergeants, platoon commanders, ICOs and others, review officer BWC videos.   Although the NYPD has tracked the number of supervisory BWC reviews, it has not tracked the number of BWC reviews that identified

undocumented stops, but should do so going forward.  This review should include instances in which BWC footage shows more people stopped than there are stop reports.

### e.    RISKS Reviews

The NYPD has developed an executive review of commands it has labeled RISKS Reviews.  Beginning in December 2018, the Department has met with every Patrol, PSA and Transit command to discuss the commands' efforts to address the following issues: underreporting of stops, constitutionality of stops, legality of trespass enforcement, and compliance with policies regarding the use of BWCs, including proper activation and deactivation, categorization, tagging, and supervisory reviews of videos.

Before each meeting with the command, RMB generates relevant statistics for the command (including those identified through audits and self-inspections), along with comparable statistics for other commands in the patrol borough.  At the RISKS Review meeting, the commanding officer of the command discusses problematic statistics and how the command plans to address concerns going forward. The meetings are chaired by the Deputy Commissioner of Risk Management.  Members from the appropriate Patrol Borough attend, as well as representatives from both the Chief of Department's Office and the operational bureau under review (Patrol, Housing, or Transit).  Attendees from each command include the commanding officer, the executive officer, the ICO, the special operations lieutenant and the training sergeant.

Failure of documentation is a key area covered.  The special operations lieutenants, who oversaw the plainclothes anti-crime team at a command, have been queried about the team's activities and what efforts the command made to identify stops that are not documented.  There has also been a consistent focus on the command's self-inspections of stop reports;  the Chief from Patrol Services and the Deputy Commissioner of RMB often note that if deficiencies are missed in the self-inspections, that means there are failings at several levels:  the officer making the stop

and writing the stop report; the supervisor who missed the deficiency in reviewing the stop report; the ICO who missed it in the self-inspection; and the Commanding Officer or Executive Officer who signed off on the self-inspection.

The RISKS Review meetings were put on hold at the beginning of the pandemic. At the end of June, the RISKS Review meetings resumed virtually. The elimination of the anti-crime units also meant that RISKS Review meetings since June no longer covered their activities. In 2019, there were 98 RISKS Review meetings, covering every numbered command, as well as transit and housing commands, with six commands having a second pass (Precincts 42, 60, 73, 102, 110, and 120).

### f.    Discipline and Correction of Officers with Unreported Stops

The Monitor requested data from the NYPD regarding any discipline, instructions or CRAFT entries for officers identified as not completing stop reports, especially those with a history of underreporting.[5]

**Chart 3.  Discipline, Instructions and CRAFT Entries for Failure to Complete Stop Report**

|      | Command Discipline | Instructions | CRAFT |
|------|--------------------|--------------|-------|
| 2017 | 13                 | 54           | 0     |
| 2018 | 16                 | 40           | 33    |
| 2019 | 27                 | 27           | 50    |

The NYPD has made significant efforts to address underreporting and the compliance rates from its PIE audits and RAND audits have improved. The number of reported stops increased in 2019, which appears to have been the result of increased reporting, perhaps in part a result of the

---

[5] CRAFT stands for Cop's Rapid Assessment Feedback Tool. Supervisors can issue a Supervisory Comment Form in the CRAFT system for an officer's positive actions or negative actions (Needs Improvement). The CRAFT "Needs Improvement" report is now used by NYPD instead of the Minor Violations Log, which was a logbook kept at the command but was not tracked department-wide.

Department's RISKS Review meetings and other efforts.  However, the level of undocumented stops still appears to be higher than required for the NYPD to be in compliance.  The Department is not yet in compliance with Task 1c. The Monitor will assess the impact of the elimination of the anti-crime units on stop reporting in a future report.

### C.     Racial Profiling Policies

The court orders require the NYPD to revise its Patrol Guide prohibition on racial profiling. The new procedures must state that race, ethnicity, or national origin may be considered by officers in taking police enforcement action only when it is part of a specific and reliable suspect description, and that racially defined groups may not be targeted for stops in general simply because they appear more frequently in local crime suspect data.  As with the Department's stop and frisk policy, substantial compliance regarding the racial profiling policy also requires that Department personnel follow the policy in practice, so that stops by NYPD officers comply with federal and state standards regarding racial profiling.  In addition, communications from NYPD leadership (executives, commanding officers, and others) and in stop report narratives cannot indicate a targeting of defined racial or ethnic groups for stops because of their prevalence in local crime suspect data.

#### 1.     Assessing Compliance—Racial Profiling Policy

The NYPD's policy barring racial profiling and other bias-based policing, P.G. 203-25, was approved by the Court on August 24, 2015.  The patrol guide defines racial profiling as police action, including stops, frisks, arrests, or other law enforcement actions, or the failure to perform a police action, motivated, even in part, by the actual or perceived race, color, ethnicity or national origin of an individual.  Race may be considered only if it is part of a reliable and specific suspect description that includes not just race, gender, and age, but other identifying characteristics or information.  The policy also includes a description of Section 14-151 of the New York City

Administrative Code prohibiting bias-based profiling.  The Administrative Code includes demographic categories in addition to race, color, and national origin: creed, age, alienage or citizenship status, gender, sexual orientation, disability, and housing status.  The policies comply with the Court's requirement for racial profiling policies (Task 2a).

Assessing implementation of the Department's racial profiling polices is not a simple task. Generally, it is not apparent from a stop report or a BWC video of a stop whether the officer was motivated, even in part, by race, other than when there is a suspect specific description.  The Monitor will assess the Department's compliance with its racial profiling policies and the Fourteenth Amendment by using a variety of statistical analyses of NYPD's stop and frisk data conducted by experts on the monitor team.  The Monitor will also consider the NYPD's compliance with other requirements, such as improved tracking and investigations of racial profiling complaints, in making an assessment of compliance with the racial profiling policy.

As part of the Monitor's assessment of the Department's compliance with its racial profiling policies, the Monitor examined whether rates of compliance with legal standards for stops, frisks and searches in 2019 differed by race, and, if so, whether those differences were due to chance or not.  The race of the person being stopped was noted in 97.5 percent of the stop reports that were reviewed by the Monitor.[6]  Chart 4 below shows, for each quarter, the number of stop reports reviewed by the monitor team broken down by the race of the person stopped, and then the percentage of those stop reports that the monitor team determined articulated reasonable

---

[6] For ease of interpretation of categories, the race of the person stopped was collapsed into three categories, representing whether the person was Black (Black, n=631, 51%), Hispanic (Black Hispanic, n=144, 12%, White Hispanic, n=290, 23%), White/Other (White, n=98, 8%; Asian, n=43, 4%; Middle Eastern, n=8, 1%), or Unknown (n=23, 2%). These are the same categories used in prior analyses by the Monitor and by plaintiffs' expert.

suspicion.[7]  As shown in Chart 4, the percentage of stop reports rated as justified with articulable reasonable suspicion is significantly lower for Hispanics (73%) than that for stops of Whites/Others (81%) and Blacks (82%).

**Chart 4.  Monitor Judgments that 2019 Stop Reports Articulate Reasonable Suspicion for Stop, by Race of Person Stopped**

| Audit Quarter | Total No., Percentage Justified White/Other | Total No., Percentage Justified Black | Total No., Percentage Justified Hispanic | Total No., Percentage Justified Total[8] |
|---|---|---|---|---|
| **1Q2019** | 48 | 178 | 89 | 315 |
| | 85% | 80% | 75% | 79% |
| **2Q2019** | 19 | 168 | 121 | 308 |
| | 89% | 82% | 74% | 80% |
| **3Q2019** | 64 | 139 | 101 | 304 |
| | 81% | 85% | 78% | 82% |
| **4Q2019** | 41 | 146 | 123 | 310 |
| | 73% | 82% | 64% | 74% |
| **Total** | 172 | 631 | 434 | 1,237 |
| | 81% | 82% | 73% | 79% |

The monitor team's expert, John MacDonald, examined these data to test whether the differences between the monitor team's ratings for stops of Whites/Others and Blacks and the monitor team's ratings for stops of Hispanics were likely due to chance or not.  The method used compared the disparities in justified stops by race identified by the monitor team to 1,000 simulations in which the ratings (the percentages of justified stops) were not associated with a

---

[7] The stop reports in Chart 4 are the same stop reports as reviewed and included in Chart 1.  Again, these analyses of stops, frisks, and searches are based on stops for which there was a completed stop report, and thus would not provide any information about stops that were not reported.

[8] The "Total" column in this chart does not include stop reports for which no race is indicated.

particular racial category, but were randomly scrambled among the racial categories.  The results from this test show that the lower percentage of justified stops in 2019 for Hispanics (73%) relative to Whites/Others (81%) would occur by chance in only 2.9 percent of 1,000 times, respectively.[9] The disparities between Hispanics compared to Whites/Others are statistically significant at the five percent level.

If a frisk or search occurred during the stops being reviewed, the monitor team also rated the officers' justification for the frisks and searches.  The percentage of frisks and searches that the monitor team rated as being justified has averaged 87 percent and 92 percent, respectively, over the four quarters of 2019 (see Charts 5 and 6, below).  However, the percentage of justified frisks was higher for Whites/Others (93%) than it was for Hispanics (87%) and Blacks (85%), as shown in Chart 5 below.  These differences in justified frisks would occur by chance 6.7 percent and 1.9 percent in 1,000 times, respectively.  The disparities between Blacks compared to Whites/Others are statistically significant at the five percent level.  This suggests that the Black-White/Other disparities for frisks is not likely a chance occurrence due to which cases were sampled for auditing.

**Chart 5.  Monitor Judgments that 2019 Stop Reports Articulate Reasonable Suspicion for Frisk, by Race of Person Stopped**

| Audit Quarter | Total No., Percentage Justified White/Other | Total No., Percentage Justified Black | Total No., Percentage Justified Hispanic | Total No., Percentage Justified Total[10] |
|---|---|---|---|---|
|  |  |  |  |  |
| **1Q2019** | 18 | 93 | 44 | 155 |
|  | 100% | 87% | 90% | 89% |
|  |  |  |  |  |
| **2Q2019** | 12 | 95 | 61 | 168 |
|  | 92% | 87% | 90% | 89% |

---

[9] Although the analysis shows that the racial disparity in justified stop reports would not have occurred by chance, the analysis does not determine the cause of the disparity.

[10] The "Total" column does not include stop reports for which no race was indicated.

| | Total No., Percentage Justified | Total No., Percentage Justified | Total No., Percentage Justified | Total No., Percentage Justified |
|---|---|---|---|---|
| | | | | |
| **3Q2019** | 27 | 50 | 40 | 117 |
| | 90% | 81% | 78% | 82% |
| | | | | |
| **4Q2019** | 41 | 44 | 47 | 132 |
| | 92% | 80% | 89% | 92% |
| | | | | |
| **Total** | 98 | 282 | 192 | 572 |
| | 93% | 85% | 87% | 87% |

There was a very small disparity by race in the percentage of searches in 2019 that were rated as justified, showing justified searches for 93 percent of Whites/Others, 92 percent of Blacks, and 90 percent of Hispanics, as shown in Chart 6, below. The small differences in the racial disparity in searches rated as justified would occur by chance 56 percent and 90 percent in 1,000 times, respectively, showing these are likely chance differences and not statistically significant.

**Chart 6. Monitor Judgments that 2019 Stop Reports Articulate Justification for Search, by Race of Person Stopped**

| | Total No., Percentage Justified | Total No., Percentage Justified | Total No., Percentage Justified | Total No., Percentage Justified | Total No., Percentage Justified |
|---|---|---|---|---|---|
| **Audit Quarter** | **White/Other** | **Black** | **Hispanic** | **No race indicated** | **Total** |
| | | | | | |
| **1Q2019** | 17 | 64 | 20 | 1 | 102 |
| | 89% | 94% | 91% | 100% | 93% |
| | | | | | |
| **2Q2019** | 10 | 60 | 45 | 1 | 116 |
| | 91% | 95% | 96% | 100% | 95% |
| | | | | | |
| **3Q2019** | 26 | 51 | 42 | 1 | 120 |
| | 93% | 89% | 95% | 100% | 92% |
| | | | | | |
| **4Q2019** | 12 | 44 | 45 | 0 | 101 |
| | 100% | 90% | 82% | - | 87% |
| | | | | | |
| **Total** | 65 | 219 | 152 | 3 | 439 |
| | 93% | 92% | 90% | 100% | 92% |

23

The monitor team also will consider other analyses of stop and frisk data to assess whether there are racial disparities that are not explained by legally justified reasons, but that are practically significant in magnitude and unlikely to be due to chance, and whether these racial disparities are declining or increasing over time.  Several such analyses have been considered for this report: an analysis of outcomes from stops (frisks, searches, summonses and arrests, force) for Blacks and Hispanics compared to similarly situated non-Hispanics; and an analysis of the recovery rate of contraband and weapons for stops of Blacks and Hispanics compared to similarly situated non-Hispanics.  These analyses might be done comparing outcomes from stops in and around NYCHA developments with outcomes from stops in areas with similar levels of reported crime.  However, the present level of underreporting would undermine the conclusions of these analyses.  The Monitor's expert (John MacDonald) will consider analyses that compensate for underreporting and its effect on the size of racial disparities in stops.  These analyses will be presented in a future report.

Based on the Monitor's analysis of racial disparities in the stop reports that the Monitor team found deficient in articulating reasonable suspicion for stops and frisks and legal justification for searches, the NYPD is not yet in compliance with implementation of the racial profiling policies (Task 2b).

**D.**     ***Davis*/NYCHA Interior Patrol Policies**

The *Davis* settlement, incorporated in a court order, requires that the Patrol Guide provision for the interior patrol of NYCHA buildings (P.G. 212-60) promote constitutional interactions between NYPD officers and persons encountered during interior patrols.

**1.       Compliance Assessment—NYCHA Interior Patrol Policy**

The policy for interior patrols of NYCHA buildings was approved by the Court and became effective on April 25, 2017.  Among other things, the Patrol Guide states that, without more,

entering, being in, or exiting a NYCHA building is not an "objective credible reason" justifying an officer's approach and request for information, nor does it establish reasonable suspicion for a Level 3 *Terry* stop.  P.G. 212-60 also states that arrests for trespass in restricted areas, such as roofs or roof landings, must be made with appropriate notice (e.g., through a conspicuously posted sign).

The Patrol Guide also requires officers to complete a form documenting all trespass arrests in NYCHA buildings (the Trespass Crimes Fact Sheet (TCFS)).  Officers must provide information about what led them to approach the person and what led them to believe that the person was a trespasser.  Since May 2017, the NYPD has used the Court-approved TCFS for all trespass arrests in both NYCHA buildings and TAP buildings.

The City is in compliance with the Court's requirement regarding written policies for NYCHA interior patrols (Task 10a) and the written requirement that trespass arrests be documented with a TCFS (Task 11a).  With respect to implementation, the monitor team reviewed stops at NYCHA properties, trespass arrests, and officer BWC videos of interior patrols in NYCHA buildings.

### a.      Reviews of Stops at NYCHA Properties

A sample of 300 stop reports was randomly sampled from the population of 1313 reports prepared in NYCHA in 2019.[11]  These reports were identified from the publicly available data on the NYC data portal.  For each stop report, the monitor team assessed whether the stop narrative articulated reasonable suspicion for the stop, whether the frisk narrative articulated reasonable suspicion that the persons stopped was armed and dangerous, and whether there was a sufficient

---

[11] The sample of 300 reports has a confidence interval of approximately 4.97% at a 95% confidence level.

legal basis for the search.  Below is a table that summarizes the Monitor's assessment of the legal sufficiency for the stop, frisk, and search on the 300 reports.

**Chart 7.  2019 NYCHA Stop Reports**

|  | Stop Reports Evaluated | Stop Narrative Articulates Reasonable Suspicion for Stop | Frisks Evaluated | Frisk Narrative Articulates Reasonable Suspicion for Frisk | Searches Evaluated | Search Narrative Articulates Legal Basis for Search |
|---|---|---|---|---|---|---|
| **2019** | 300 | 198 (66%) | 178 | 156 (88%) | 97 | 90 (93%) |

The monitor team made the following additional observations:

- Of the 102 stop reports that the monitor team determined did not articulate reasonable suspicion, all of the stop reports were approved by the supervising officers.  In only two cases did the supervisor determine that there was an insufficient basis for the stop.  In both instances, the monitor team disagreed and determined that there was a sufficient basis for the stop.

- Of the 22 stop reports in which, according to the monitor team's determination, there was insufficient articulation that the person frisked was armed and dangerous, the supervising officer concluded that there was an insufficient basis for the frisk in two of the 22 encounters and approved the frisk in the 20 others.

### b.      Review of Trespass Arrests at NYCHA Properties

The Monitor requested the TCFS and the Online Booking Sheet (OLBS) for 150 randomly selected trespass arrests at NYCHA locations from the first half of 2019.  The NYPD provided the OLBS for the 150 arrests, but was able to locate a TCFS for only 104 of the arrests. For the remaining 46 trespass arrests (31%), there was no TCFS.  In reviewing the arrest documents (the TCFS and OLBS), the monitor team determined that the officer had an objective credible reason to approach the person arrested in 119 arrests (79%), but did not have an objective credible reason to approach in 31 (21%) of arrests.  The monitor team also determined that the officer had probable cause for the arrest in 140 of the 150 trespass arrests, but did not have probable cause for a trespass arrest in ten of the 150 arrests (7%).

### c.      Review of BWC Videos at NYCHA Properties

As part of the monitoring plan, BWC video recordings are assessed to explore the lawfulness of encounters between police officers and members of the public inside and in the vicinity of NYCHA buildings.  Every six months, the Vievu and Axon data management systems are searched using the tag "Interior Patrol – NYCHA."

In 2019, there were 149,892 videos assigned the tag "Interior Patrol – NYCHA"; 32,225 recorded in the Axon system and 117,667 recorded in the Vievu system.  Due to the infrequency of encountering members of the public in routine interior patrols, the sample was stratified into two groups.  The first group was videos that were "uncategorized" with the additional tag of "Interior Patrol – NYCHA."  The second group consisted of videos that were assigned a category indicating there was police action involving a member of the public (arrest, summons, investigative encounter) and that also had the tag of "Interior Patrol – NYCHA."

|       |                     | Total   | System Total |
|-------|---------------------|---------|--------------|
| Vievu | Uncategorized       | 115,176 |              |
|       | Assigned a Category | 2,491   | 117,667      |
|       |                     |         |              |
| Axon  | Uncategorized       | 29,760  |              |
|       | Assigned a Category | 2,465   | 32,225       |
|       |                     |         |              |
|       | Total               |         | 149,892      |

The table above provides an illustration of the number and types of videos recorded in the 2019.  For 2019, a search of the Vievu system returned 115,176 "Uncategorized" videos, and 2,491 videos that were assigned a category indicating there was an encounter with a member of the public (arrest, summons, investigative encounter).    From the Axon system there were 29,760 "Uncategorized" videos and 2,465 videos with a possible encounter.  The videos from each system were combined by groupings and a random sample of 200 videos was selected from each group

27

for assessment.  This assessment focused on the lawfulness of significant public contacts between the police and the public.

For our purposes, significant public contact is defined as any encounter between the officer and a member of the public that lasts longer than 30 seconds, or any encounter in which it appears that the officer is engaged in an investigative encounter.  This would include contacts of less than 30 seconds during which the officer asked Level 1 or Level 2 questions.  Routine interactions with staff members of the building, other officers, or persons in their official capacity (FDNY, EMS, Postal, etc.) were not considered a significant public contact for this definition.  There was significant public contact in 14 percent (27 of 200) of the videos in the "uncategorized" and 66 percent (131 of 200) of the other categories.  Overall, in 158 of the 400 videos (40%), the recording officer had significant public contact with a person during the Interior Patrol.

A total of 296 individuals were encountered in the 158 videos[12] in which the officer was observed to have had significant public contact.  A worksheet was developed to evaluate the conduct of the officers during these interior patrols/encounters (Appendix B).  The monitor team made the following observations:

- The most common location of the 296 encounters was on the hallway (25%).

- Most encounters (N=128) started at Level 1 (43%).

- There were 97 encounters that started at Level 4 (33%).  In 23 of these encounters (24%) the person was issued a summons, in 44 cases (45%) the person was arrested, and in 30 cases (31%) no enforcement action was taken.

- During the 275 encounters about which a conclusion could be drawn, the officers acted lawfully in 256 (93%) of them, **at the initial approach**, and in 19 encounters the officers' approach was problematic.

---

[12] In several videos, more than one person were encountered during the Interior Patrol.  This was a combination of multiple persons at the same encounter or encounters with different people at different times during the same interior patrol.

- There were 25 encounters that escalated about which a conclusion could be drawn; of those, escalation was proper in 17 (68%) and without the appropriate legal authority in eight (32%)

- In the large majority of encounters, there was no frisk (83%). Of the encounters in which a frisk was conducted, the officer had reasonable suspicion that the person was armed and dangerous in 74 percent of those encounters.

- In the large majority of encounters there was no search (80%). Of the encounters in which there was a search, the officer had the legal authority to conduct the search in 86 percent of those encounters.

## 2019 NYCHA BWC VIDEOS

**Encounter Information**

Table 1 – Location Where Person First Encountered

|  | Number | Percentage |
|---|---|---|
| APARTMENT | 49 | 17 |
| BASEMENT | 2 | 1 |
| COURTYARD/FRONT | 21 | 7 |
| ELEVATOR | 6 | 2 |
| HALLWAY | 73 | 25 |
| LOBBY | 33 | 11 |
| ROOF | 9 | 3 |
| ROOF LANDING | 41 | 14 |
| STAIRWAY | 62 | 21 |
| **Total** | **296** | **100.0** |

Table 2 – Level at First Encounter

| Level | Number | Percentage |
|---|---|---|
| 0 | 22 | 7 |
| 1 | 128 | 43 |
| 2 | 10 | 3 |
| 3 | 20 | 7 |
| 4 | 97 | 33 |
| Inconclusive or Unknown | 19 | 6 |
| **Total** | **296** | **100** |

Table 3 – Did It Appear that the Officers' Actions Were Lawful at the First Encounter?

|  | Number | Percentage |
|---|---|---|
| No | 19 | 7 |
| Yes | 256 | 93 |
| Inconclusive | 21 | |
| **Total** | **296** | **100.0** |

Table 4 – Did the Encounter Escalate?

|  | Number | Percentage |
|---|---|---|
| No | 252 | 88 |
| Yes | 33 | 12 |
| Inconclusive | 11 | |
| **Total** | **296** | **100.0** |

Table 5 – If the Encounter Escalated, did Escalation Appear Lawful?

|  | Number | Percentage |
|---|---|---|
| No | 8 | 32 |
| Yes | 17 | 68 |
| Inconclusive | 8 | |
| **Total** | **33** | **100.0** |

Table 6 – Was the Person Frisked?

|  | Number | Percentage |
|---|---|---|
| No | 238 | 83 |
| Yes | 48 | 17 |
| Inconclusive | 10 | |
| **Total** | **296** | **100.0** |

Table 7 – Did the Frisk Appear Lawful?

|  | Number | Percentage |
|---|---|---|
| No | 10 | 26 |
| Yes | 29 | 74 |
| Inconclusive | 9 | |
| **Total** | **48** | **100.0** |

Table 8 – Was the Person Searched?

|  | Number | Percentage |
|---|---|---|
| No | 228 | 80 |

| | | |
|---|---|---|
| Yes | 58 | 20 |
| Inconclusive | 10 | |
| **Total** | **296** | **100.0** |

Table 9 – Did the Search Appear Lawful?

| | **Number** | **Percentage** |
|---|---|---|
| No | 7 | 14 |
| Yes | 43 | 86 |
| Inconclusive | 8 | |
| **Total** | **58** | **100.0** |

Table 10 – Enforcement Action?

| | **Number** | **Percentage** |
|---|---|---|
| No Action | 189 | 64 |
| Arrested | 71 | 24 |
| Summons | 31 | 11 |
| Inconclusive | 5 | 2 |
| **Total** | **296** | **100.0** |

**Right to Know Act Information**

Table 11 – Did the Officer Offer a Business Card as Required?

| | **Number** | **Percentage** |
|---|---|---|
| No | 28 | 82 |
| Yes | 6 | 18 |
| Not Required | 256 | |
| Inconclusive | 6 | |
| **Total** | **296** | **100.0** |

Table 12 – Did the Officer Explain His/Her Actions?

| | **Number** | **Percentage** |
|---|---|---|
| No | 37 | 13 |
| Yes | 250 | 87 |
| Inconclusive | 9 | |
| **Total** | **296** | **100.0** |

**Demographic Information**

Table 13 – Gender of Person Encountered?

| | **Number** | **Percentage** |
|---|---|---|
| Male | 186 | 63 |

| | Number | Percentage |
|---|---|---|
| Female | 108 | 37 |
| Unknown | 2 | 1 |
| **Total** | **296** | **100.0** |

Table 14 – Race of the Person Encountered?

| | **Number** | **Percentage** |
|---|---|---|
| Black | 183 | 61.8 |
| Hispanic | 77 | 26.0 |
| White | 16 | 5.4 |
| Asian | 1 | 0.3 |
| Inconclusive | 19 | 6.4 |
| **Total** | **296** | **100.0** |

Based on the review of stops, interior patrol videos and trespass arrests at NYCHA buildings, the Monitor determined that the NYPD is in partial compliance with implementing the revised policies regarding police patrols at NYCHA locations (Tasks 10b, 10c and 11b).

### E. Trespass Affidavit Program (TAP) Policies

The Trespass Affidavit Program, sometimes called "Clean Halls," was a Department program in which police officers conduct interior patrols in certain private apartment buildings. For a building to have been enrolled in the program, the owner must have certified concerns regarding criminal activity or community complaints in the building, such as trespassing or drug activity within the last year, and submit an "Owner's Affidavit" providing the NYPD with the authority to patrol their buildings. *Ligon v. City of New York*, one of the three lawsuits that were combined in this monitorship, challenged stops and trespass arrests at buildings enrolled in TAP.

In September 2020, the NYPD determined that interior patrols of TAP buildings were not an effective crime prevention strategy and not an efficient use of police resources, and informed building owners that the program would end. Officers will continue to respond to calls for service and address crime problems at private buildings, but will no longer conduct routine interior patrols

of private buildings based on the owners' affidavit.  Although the Department ended TAP as of October 1, this Report includes the Monitor's review of the NYPD's TAP activities through 2019.

In the *Ligon* case, the Court issued an injunction requiring changes to the NYPD's procedures for stops and frisks at TAP locations (P.G. 212-59).  The new policy was required to state:  (1) the circumstances in which it is permissible to stop a person outside a TAP building on suspicion of trespass; (2) that stops inside and outside TAP buildings must comply with the new stop and frisk policies; and (3) that "mere presence" in a TAP building, and entry into or exit from a TAP building, do not constitute an "objective credible reason" for a *DeBour* Level 1 approach and request for information.

In July 2017, the City and the *Ligon* plaintiffs filed an agreement settling the litigation, which spelled out the requirements for *DeBour* encounters at TAP locations, including Level 1 and Level 2 encounters, as well as the requirements for criminal trespass arrests.  The settlement also detailed the requirements for the administration of TAP, including the criteria for buildings to enter into and be maintained in the program. Crime Prevention Officers (CPOs) were to obtain an appropriate Trespass Crimes—Owner's Affidavit and complete TAP enrollment forms for buildings entering the program.  Before the end of six months in the program, CPOs were required to review and evaluate whether to renew a building's participation in the program.  After one year in the program, commanding officers were to review and evaluate whether to renew a building's participation in the program, and the CO's assessment was to be sent through the Borough Commander to the Office of the Chief of Patrol for final approval.

### 1.    Compliance Assessment—TAP Policies

In June 2016, the Court approved P.G. 212-59, the NYPD procedures for interior patrols in buildings enrolled in TAP.  Stops inside and outside TAP buildings were required to comply with the NYPD's stop and frisk policies, P.G. 212-11.  In addition, P.G. 212-59 states that "mere

presence" in a TAP building, or entry into or exit from a TAP building, does not constitute an "objective credible reason" for a *DeBour* Level 1 approach and request for information, nor does it constitute reasonable suspicion for a Level 3 *Terry* stop. The policy also requires the documentation of Level 3 stops with a stop report and criminal trespass arrests with a TCFS. The NYPD published P.G. 212-59 in April 2017 and conducted roll call training on interior patrols in TAP buildings in June and July 2017.

The City was in compliance with the requirements for written policies regarding police patrol at TAP buildings (Tasks 5a, 6a, 8a, 9, and 12a).

### a.     Reviews of Stops at TAP Locations

Sixty-three stop reports in 2019 were identified in the NYPD database as being prepared at a TAP location. All of the 2019 TAP stop reports were selected for assessment. For each stop report, the monitor team assessed whether the stop narrative articulated reasonable suspicion for the stop, whether the frisk narrative articulated reasonable suspicion that the persons stopped was armed and dangerous, and whether there was a sufficient legal basis for the search. Below is a table that summarizes the monitor team's assessment of the legal sufficiency for the stop, frisk, and search on the 63 reports.

**Chart 8.  2019 TAP Stop Reports**

|  | Stop Reports Evaluated | Stop Narrative Articulates Reasonable Suspicion for Stop | Frisks Evaluated | Frisk Narrative Articulates Reasonable Suspicion for Frisk | Searches Evaluated | Search Narrative Articulates Legal Basis for Search |
|---|---|---|---|---|---|---|
| **2019** | 63 | 32 (51%) | 45 | 28 (62%) | 32 | 28 (88%) |

The monitor team made the following additional observations:

- In all the TAP stop reports, including the 31 in which the monitor team determined that the stop report did not articulate reasonable suspicion, the reviewing supervisor determined that there was a sufficient basis for the stop.

- Of the 45 TAP stops that involved a frisk, the reviewing supervisor determined that there was a sufficient basis for the frisk in 44 stop reports, including 16 of the 17 stop reports in which the monitor team determined that the frisk narrative did not articulate reasonable suspicion that the person stopped was armed and dangerous.  In the one instance in which the reviewing supervisor determined that there was not a sufficient basis for the frisk, the monitor team agreed with that assessment.

### b.      2019 Trespass Arrests at TAP Locations

The monitor team reviewed 50 2019 trespass arrests that the NYPD audited as TAP trespass arrests.  The monitor team determined that officers had probable cause for 46 of the arrests (92%).  However, the NYPD informed the Monitor that QAD had been using a TAP building list that had not been updated when buildings were taken out of the TAP program.  Of the 50 trespass arrests reviewed, only 17 arrests were made at buildings that were still enrolled in TAP.  All 17 arrests had probable cause.

### c.      Review of BWC Videos at TAP Locations

As part of the *Ligon* monitoring plan, BWC video recordings are assessed to explore the lawfulness of encounters between police officers and members of the public inside and in the vicinity of buildings enrolled in the Trespass Affidavit Program.  Every six months the Vievu and Axon data management systems are searched for videos having the tag "Interior Patrol – TAP."

For 2019, search of the BWC system for interior patrol videos at a TAP location returned 1,607 "uncategorized" videos, and 133 videos that were assigned a category indicating that there was police action involving a member of the public (arrest, summons, investigative encounter). Due to the infrequency of encountering members of the public in routine interior patrols, the sample was stratified.  One group of videos was randomly selected from videos categorized as "uncategorized."   A second group included all of the videos from the categories "arrest," "summons," and "investigative encounter."   This approach resulted in assessments of 124 "uncategorized" videos and 76 categorized videos.

There was significant public contact in 19 of 124 (15%) of the "uncategorized" videos and in 50 of 76 (66%) of the other categories.  Overall, in 69 of the 200 videos reviewed, the recording officer had significant public contact with a person during the TAP interior patrol.

There were 129 persons encountered in the 69 videos[13] in which the officer was observed to have had significant public contact.  A worksheet was developed to evaluate the conduct of the officers during these interior patrols/encounters (Appendix B).  The monitor team's review of the TAP BWC videos determined that the officers' actions appeared to meet the *Terry* and *DeBour* standards and Department policies, **at the first encounter,** in 104 of 118 (88%) encounters in which a conclusion could be drawn.  In the encounters that escalated, it appeared that the officers' actions were proper in 16 of 22 (73%) encounters in which a conclusion could be drawn.  Nineteen individuals were frisked during the encounters and 14 of the19 (74%) frisks appeared to be lawful.  Twelve individuals were searched, and 10 of the 12 (83%) searches appeared to be lawful.

The charts below detail information about the TAP encounters and the demographics of the persons encountered.

**2019 TAP BWC VIDEOS**

**Encounter Information**

Table 1 – Location Where Person First Encountered

|  | Number | Percentage |
|---|---|---|
| APT | 17 | 13 |
| HALLWAY | 16 | 12 |
| LOBBY | 18 | 14 |
| OTHER (office, basement, street) | 5 | 4 |
| ROOF | 2 | 2 |
| ROOF LANDING | 18 | 14 |
| STAIRS | 38 | 30 |
| STREET | 15 | 12 |
| **Total** | **129** | **100** |

---

[13] In several videos, more than one person were encountered during the Interior Patrol.  This was a combination of multiple persons at the same encounter or encounters with different people at different times during the same interior patrol.

Table 2 – Level at First Encounter

| Level | Number | Percentage |
|---|---|---|
| 1 | 64 | 50 |
| 2 | 0 | 0 |
| 3 | 16 | 12 |
| 4 | 41 | 32 |
| Inconclusive | 8 | 6 |
| **Total** | **129** | **100** |

Table 3 – Did It Appear that the Officers' Actions Were Lawful at the First Encounter?

| | Number | Percentage |
|---|---|---|
| No | 14 | 8 |
| Yes | 104 | 92 |
| Inconclusive | 11 | |
| **Total** | **129** | **100** |

Table 4 – Did the Encounter Escalate?

| | Number | Percentage |
|---|---|---|
| No | 100 | 78 |
| Yes | 23 | 18 |
| Inconclusive | 6 | 5 |
| **Total** | **129** | **100** |

Table 5 – If the Encounter Escalated, Did Escalation Appear Lawful?

| | Number | Percentage |
|---|---|---|
| No | 6 | 27 |
| Yes | 16 | 73 |
| Inconclusive | 1 | |
| **Total** | **23** | **100** |

Table 6 – Was the Person Frisked?

| | Number | Percentage |
|---|---|---|
| No | 105 | 81 |
| Yes | 19 | 15 |
| Inconclusive | 5 | 4 |
| **Total** | **129** | **100** |

Table 7 – Did the Frisk Appear Lawful?

|  | Number | Percentage |
|---|---|---|
| No | 5 | 26 |
| Yes | 14 | 74 |
| **Total** | **19** | **100** |

Table 8 – Was the Person Searched?

|  | Number | Percentage |
|---|---|---|
| No | 117 | 91 |
| Yes | 12 | 9 |
| **Total** | **129** | **100** |

Table 9 – Did the Search Appear Lawful?

|  | Number | Percentage |
|---|---|---|
| No | 2 | 17 |
| Yes | 10 | 83 |
| **Total** | **12** | **100** |

Table 10 – Enforcement Action?

|  | Number | Percentage |
|---|---|---|
| No Action | 75 | 58 |
| Arrested | 21 | 16 |
| Summons | 27 | 21 |
| Inconclusive | 6 | 5 |
| **Total** | **129** | **100** |

**Right to Know Act Information**

Table 11 – Did the Officer Offer a Business Card as Required?

|  | Number | Percentage |
|---|---|---|
| No | 25 | 100 |
| Yes | 0 | 0 |
| Not Required | 104 |  |
| **Total** | **129** | **100** |

Table 12 – Did the Officer Explain His/Her Actions?

|  | Number | Percentage |
|---|---|---|
| No | 7 | 5 |
| Yes | 114 | 88 |
| Inconclusive | 8 | 6 |
| **Total** | **129** | **100** |

**Demographic Information**

Table 13 – Gender of Person Encountered?

|  | Number | Percentage |
|---|---|---|
| Male | 86 | 67 |
| Female | 43 | 33 |
| **Total** | **129** | **100** |

Table 14 – Race of the Person Encountered?

|  | Number | Percentage |
|---|---|---|
| Black | 85 | 70 |
| Hispanic | 28 | 22 |
| White | 13 | 10 |
| Asian | 1 | 1 |
| Inconclusive | 2 | 2 |
| **Total** | **129** | **100** |

Based on the review of stops, interior patrol videos, and trespass arrests at TAP buildings, the Monitor determined that, as of the end of the TAP program, the NYPD was not in compliance with implementing the revised policies regarding police patrols at TAP locations and ensuring that every trespass arrest at a TAP location had a TCFS (Tasks 5b, 6b, 8b, 12b).

### 2.      Compliance Assessment—TAP Administration

The Department revised its administrative guide governing the requirements and procedures for entry into and continued enrollment in the TAP program, A.G. 303-27 in 2016.  For a building to be enrolled in the program, the owner must have certified concerns regarding criminal activity or community complaints in the building, such as trespassing or drug activity within the last year.  Crime prevention officers in each precinct were responsible for enrolling the buildings in the TAP program and then were to assess every six months whether the buildings still met the criteria for renewing enrollment.  The Court approved the revised TAP administrative guide, A.G. 303-27, and the NYPD is in compliance with the written requirements for the administration of TAP (Task 13a).

To assess whether the Department was complying with implementation of the TAP administrative procedures guide, the Monitor requested TAP enrollment forms, renewal forms and the owner's affidavits for Patrol Borough Manhattan North (PBMN) for the 2nd and 3rd quarters of 2019 and Patrol Borough Bronx (PBBX) for the 3rd and 4th quarters of 2019.

### a.      Patrol Borough Bronx

For PBBX, 30 buildings were enrolled in TAP during the 3rd quarter of 2019 and 35 buildings were enrolled in TAP during the 4th quarter of 2019.  As of the 4th quarter of 2019, there was one building enrolled in the 44 precinct, 20 buildings enrolled in the 46 precinct, nine buildings enrolled in the 47 precinct and five buildings enrolled in the 48 precinct.  There were no buildings enrolled in the 40, 41, 42, 43, 45, 49, 50, and 52 Precincts.

The NYPD provided 32 TAP enrollment forms:  six enrollment forms for the 1st quarter of 2019, sixteen enrollment forms for the 2nd quarter 2019, two enrollment forms for the 3rd quarter of 2019, and eight enrollment forms for the 4th quarter of 2019.  Since data from the 1st and 2nd quarters of 2019 were not requested, these quarters were not considered in this review.

The two 3rd quarter 2019 enrollment applications were examined.  The justification for enrollment on one application was left blank.  The justification for enrollment on the other application was descriptive but not quantitative.  For example:

- Violence multiple shootings in front of location
- Perps live in building
- Narcotics sales and people loitering within the building
- Trespassers using drugs in the alley or in the garage area.

The eight 4th quarter enrollments were quantitative but not descriptive.  For example:

- Three 311 calls, four arrests, two C-summonses—one for criminal trespass, four I-Cards, four OATH summonses, two active warrants
- Thirty-five 311 calls, 14 arrests, 10 I-Card, seven OATH Summonses, one active warrant, one ShotSpotter, one person on probation.

Although it would have been more informative if the enrollment justifications were both quantitative and descriptive, it is clear that the justification to enroll these buildings into TAP was sufficient.  Trespass Crimes—Owner's Affidavits were provided for two of the ten buildings enrolled in the TAP program during the 3rd and 4th quarters 2019.  The NYPD was unable to locate the remaining eight Trespass Crimes-Owner's Affidavits.  It is difficult to draw a conclusion concerning compliance because it is not known if the Trespass Crimes-Owner's Affidavits were simply misplaced or never prepared.

With respect to renewal in the program, there were 10 buildings in the 46 precinct and eight buildings in the 47 precinct that were enrolled in TAP for more than six months as of the 4th quarter 2019.  Therefore, six-month renewal applications, approved by the precinct commander, for these buildings were required for continued participation in TAP.  There were no buildings in TAP more than 12 months for the 4th quarter of 2019; therefore, no buildings required the approval of the Borough Commander and Office of the Chief of Patrol for continued participation in TAP.  The NYPD was unable to locate the six-month renewal applications, approved by the precinct commander, for these 18 buildings.  Again, the Monitor cannot find the NYPD in compliance

because it is not known if the six-month renewal applications, approved by the precinct commander, were simply misplaced or never prepared.

### b.    Patrol Borough Manhattan North

In PBMN, 204 buildings were enrolled in TAP during the 2nd quarter of 2019 and 146 buildings were enrolled in TAP during the 3rd quarter of 2019, a 28% decrease in enrollment. Of the 204 buildings in TAP in the 2nd quarter of 2019, four were enrolled 6 months or less, 27 were enrolled between seven and 12 months, and 173 were enrolled for more than 12 months. Many of these buildings required either a six-month or a 12-month renewal during the period evaluated, pursuant to A.G. 303-27. Of the 146 buildings in TAP in the 3rd quarter of 2019, 11 were enrolled six months or less, 11 were enrolled between seven and 12 months, and 124 were enrolled for more than 12 months. Several of these buildings were either initially enrolled or required a six-month or 12-month renewal during the period evaluated. The NYPD did not provide TAP enrollment forms, TAP renewal forms (six-month or 12-month), or Trespass Crimes—Owner's Affidavits for PBMN for the quarters requested. As such, the monitor team cannot find the NYPD in compliance with the TAP administrative procedures for buildings enrolled during these periods.

The NYPD did provide data regarding the number of buildings enrolled in TAP by precinct and the enforcement activities at TAP buildings during the periods examined (see chart below).

**Chart 9.  Buildings Enrolled in TAP**

| Precinct | 2nd Quarter 2019 | 3rd Quarter 2019 |
|---|---|---|
| 19 | 0 | 0 |
| 20 | 10 | 10 |
| 23 | 23 | 23 |
| 24 | 42 | 32 |
| 25 | 9 | 7 |
| 26 | 10 | 6 |
| 28 | 4 | 0 |
| 30 | 26 | 9 |
| 32 | 6 | 3 |
| 33 | 5 | 5 |
| 34 | 69 | 51 |

Thirty-six interior patrols were conducted during the 2nd quarter of 2019.  Four precincts did not conduct verticals in any of the building enrolled during the period.  Six felony and 20 misdemeanor arrests were made in TAP buildings during the period.  No felony arrests were reported in TAP buildings in three precincts and no misdemeanor arrests were reported in TAP buildings in four precincts.  No violation arrests were reported in any TAP building in any precinct and one criminal trespass arrest was reported during the quarter.  Five criminal court summonses were reported during the quarter, all in two precincts.  Only one stop report was reported during the quarter.

In the 3rd quarter of 2019, 132 verticals were conducted.  Five precincts did not conduct verticals in any of the building enrolled during the period.  Six felony and seven misdemeanor arrests were made in TAP buildings during the period.  No felony arrests were reported in TAP buildings in four precincts and no misdemeanor arrests were reported in TAP buildings in six precincts.  No violation arrests or criminal trespass arrest were reported in any precinct during the quarter.  Eight criminal court summonses were reported during the quarter, all in one precinct.  Two stop reports were reported during the quarter, one each in two precincts.  The number of complaints made via 311 for these buildings was not provided.

Because the NYPD was not able to provide data demonstrating compliance with the TAP administration requirement, the NYPD was not yet in compliance with this requirement (Task 13b) as of the end of 2019.

### F.     Trespass Crimes Fact Sheet (TCFS)

The settlements in *Davis* and *Ligon* require officers making trespass arrests in NYCHA and TAP buildings to document the arrests on a new form—the TCFS (PD 351-144).  NYPD officers must complete a TCFS form prior to arraignment, and the TCFS articulate a proper basis for the officer's approach and probable cause for the trespass arrest.

### 1.    Compliance Assessment—TCFS

For the 2019 trespass arrests at NYCHA and TAP locations that we reviewed, TCFS were completed in 69 percent of NYCHA trespass arrests and less than half of TAP trespass of arrests, respectively.  The NYPD also audited 2019 trespass arrests and found that TCFS were completed in 94 percent of arrests at NYCHA locations and 51 percent of TAP locations.  As of the end of 2019, the NYPD was in  partial compliance with this requirement with respect to NYCHA trespass arrests (Task 11b) and not yet in compliance with respect to TAP trespass arrests (Task 12b).

### G.    Business Card Requirement

The Court's August 2013 Remedial Order required that the NYPD, if it provided any form or card to a person stopped, include on that card the stated reasons for the stop, the badge numbers of the stopping officers, and information on how to file a complaint. [cite., p. 21].  In August 2015, as part of the submission of P.G. 212.11, the Department required officers to offer persons who are stopped but not arrested or summonsed a "What Is a Stop?" tear-off information card.  In 2018, when the Right to Know Act was passed, which requires business cards to be given to persons not arrested or summonsed, the NYPD designed business cards to cover both the Right to Know Act and the Court's Remedial Order.  The pre-printed business cards contain the officer's name, rank, and shield number and a place for the officer to write his or her command.  The back of the card lists a website (www1.nyc.gov/police-encounter) that provides information on how to obtain BWC footage, how to request a copy of a stop report, and how to make a complaint or comment regarding the encounter.

Although the business card was approved by the Court and meets the requirements of the court order, the monitor team's review of BWC video and stop report data suggests that in too many cases, officers are not offering business cards to persons stopped but not arrested or summonsed.  The NYPD is not yet in compliance with this requirement (Task 14).

44

## IV.   SUPERVISION

One of the findings of the Court in *Floyd* was that NYPD supervisors did not take responsibility for reviewing the constitutionality of the stops made by officers under their supervision.  From the beginning of this monitorship, the Monitor has recognized that significant change in the NYPD depends on first-line supervisors.  Sergeants on the street must embrace the changes and be responsible for the officers in their charge.  Reforms will be successful only if supervisors take an active role in supervision, oversight, mentoring, and, when appropriate, discipline.  An engaged supervisor who actively intervenes at the scene as well as reviewing reports sets the tone.  Improper conduct is best identified and corrected, and good conduct recognized and rewarded, at this level of the organization.  Supervisors must ensure that the stops, frisks, and trespass arrests made by their officers are legal and proper and that these activities are properly documented.

Compliance with the supervision requirements of the monitorship will be achieved when supervisors review stops for constitutionality in a comprehensive manner and take appropriate corrective action when they identify improper stops, frisks or searches; when supervisors who observe or learn of officers who make a stop but do not document the stop with a stop report take appropriate corrective action; and when ICOs properly complete self-inspections of stop reports and review the reports for constitutionality.

### 1.   Compliance Assessment—Supervision

NYPD policies set out supervisors' responsibilities.  Patrol Guide 212-11 requires documentation of all stops and establishes the responsibilities of supervising officers up the chain of command.  Supervisors are required to respond to the scene of stops when feasible, discuss the circumstances of the stop with an officer making a stop before the end of the officer's tour, and review the officer's stop report form and activity log.  If a stop report is inaccurate or incomplete,

the supervisor must direct the officer to make the necessary corrections. If the supervisor determines that the officer did not have reasonable suspicion for the stop, reasonable suspicion for the frisk or an appropriate basis for the search, the supervisor must document that and specify an appropriate follow-up: instruction, additional training, or, when warranted, discipline. The Court has approved these policies and the NYPD is in compliance with the required policies (Task 15a).

The NYPD has also required ICOs in commands to conduct self-inspections of stop reports to evaluate both the actions of their officers and the supervisory reviews of their sergeants. The specific details and criteria used for these self-inspections are part of an audit plan developed by the NYPD, which the Court approved on July 27, 2020 (see Section VIII, Auditing, below). The NYPD is in compliance with the requirement for written policies requiring ICO review of stops and frisks (Task 16a).

These supervisory responsibilities are set out in the Patrol Guide and have been emphasized in the Department's training, but putting in place the right policies and training is not the same as having those policies and that training applied in practice, with supervisors taking seriously their responsibility to review the constitutionality of stops. In 2018, out of 11,238 recorded stops, only 58 supervisors noted on the stop reports that the report failed to articulate reasonable suspicion. In 2019, out of 12,958 recorded stops, only 66 supervisors identified stop reports that failed to articulate reasonable suspicion (still only .5 percent). For the 7,290 stops in which a frisk was conducted in 2019, 60 supervisors checked "No" under the caption "Sufficient Basis for Frisk." In 4,721 stops, a search was reported. In 64 cases, the supervisor checked "No" under the caption "Sufficient Basis for Search."

**Chart 10. Supervisory Actions on Stop Reports**

|  | # Stop Reports | # Reviewing Supervisor Determined Insufficient Basis for Stop | # Stop Reports with Frisks | # Reviewing Supervisor Determined Insufficient Basis for Frisk | # Stop Reports with Searches | # Reviewing Supervisor Determined Insufficient Basis for Search |
|---|---|---|---|---|---|---|
| 2019 | 12,958 | 66 | 7,290 | 60 | 4,721 | 64 |

Chart 11 below shows the follow-up actions taken in 2019 by the supervisors in those cases in which the supervisor determined there was an insufficient basis for the stop, frisk, or search.

**Chart 11.  2019 Stop Report Follow-Up Actions by Reviewing Supervisors**

| Supervisor Determined Insufficient Basis | Stop | Frisk | Search |
|---|---|---|---|
| **Follow-Up Action** |  |  |  |
| Instruction Only | 19 | 22 | 22 |
| Training Only | 1 | 2 | 0 |
| Discipline Only | 0 | 0 | 0 |
| Instruction and Training | 23 | 20 | 14 |
| Instruction, Training, and Discipline | 4 | 5 | 3 |
| No Action Taken | 19 | 11 | 25 |
| **Total** | **66** | **60** | **64** |

According to the NYPD, in 2019, supervisors sent back for corrections 30 percent of stop reports submitted by their officers (over 4,300 corrections).  However, NYPD data do not show how many of those corrections (or what percentage) related to the officers' articulation of reasonable suspicion for the stop or frisk or basis for the search (versus corrections for other reasons, e.g., typos or failure to complete other unrelated fields in the report).  The data supplied by the NYPD do show, however, the total number of follow-up corrective actions that supervisors directed for their officers: 304 were given instructions, 126 were sent to training; and 27 were disciplined.

Command ICOs are also required to evaluate the stops of officers in their command and the supervision of the sergeants and lieutenants in the command.   Each month, the ICO of each

command must examine the most recent 25 stop reports filed by officers in the command and review whether the stop and any frisk or search, if conducted, were proper, and whether the supervisor who approved the stop report properly assessed the legality of the stop.  The self-inspection is then signed off by the command's executive officer or commanding officer.  When QAD conducts its audits of each command, it also examines the command's self-inspections.  If a stop report is reviewed by both the ICO in a self-inspection and QAD in its audit, QAD reviews whether the ICO's findings are consistent with its auditors' findings.

There are three additional ways the NYPD has tried to address concerns about supervision: RISKS Review meetings; remedial training for commands and for supervisors who are not identifying deficient stop reports; and discipline.  The monitor team has attended most of the RISKS Review meetings, including those done remotely during the pandemic.  During these meetings, Department leadership emphasized the importance of supervision to achieve compliance.  One particular focus of the meetings was whether the results of the command's self-inspections of stop reports, generally performed by the ICO, are consistent with QAD's audits of stop reports.  Another item emphasized was the supervisory review of officers' BWC video, with the Department stressing that the reviews are not just a box checked, but an opportunity to identify positive conduct, negative conduct, and training opportunities.  There were several changes made in 2019 in the command profiles that are discussed at the RISKS Reviews.  The command profiles now compare statistics to the command's prior RISKS Review profile.  RMB also added: (1) statistics on the number of stop reports on which the supervisor incorrectly evaluated the sufficiency of the narratives; (2) the number of TAP buildings in the command, and information

on criminal trespass arrests at NYCHA and TAP buildings; and (3) CCRB complaints and racial profiling complaints.[14]

The Department also conducts several types of remedial training for individual officers or commands that demonstrate compliance issues. RMB reviews the quarterly audits of commands to determine whether remedial training might be helpful. Supervisors from commands that have a high number of stop reports found to be deficient by QAD are brought in for such training. Stop reports from these commands are reviewed to determine the most common issues, which are then addressed in the remedial training. The remedial training consists of approximately one hour of refresher training on the law and how to complete a stop report and then an hour of reviewing specific deficient stop reports and associated video. A question and answer session then follows. The following command remedial sessions have taken place in 2020.

**Chart 12. Remedial Training for Command Supervisors**

| Date | Number of Supervisors | Commands |
| --- | --- | --- |
| 3/6/2020 | 33 | 20, 28, 34, 41, 49, 52, 75, 79, 84 |
| 3/13/2020 | 11 | 109, 110, 114, 115 |
| 6/24/2020 | 41 | 9, 26, 41, 48, 73, 75, 79, 81, 83, 90, 101 |
| 7/7/2020 | 7 | 48, 81, 83, 90 |
| 8/5/2020 | 70 | PSAs 1-9 |
| 8/6/2020 | 70 | PSAs 1-9 |

RMB has also provided remedial training on investigative encounters for specific commands either at the request of command executives or when RMD identified issues of concern at the command. RMB sends an attorney or officer with training experience to a roll call in that command to provide a refresher on the law and answer any questions. The remedial training is

---

[14] Now that the TAP program has been terminated, information about criminal trespass arrests in TAP buildings is no longer included in the command profiles.

customized to cover issues that have been identified in the command.  The roll call remedial sessions provided as of August 15 are listed below.

**Chart 13.  Remedial Roll Call Training**

| Command | Date |
|---|---|
| 13 | 3/14/2019 |
| 26 | 8/28/2018, 2/7/2019 |
| 28 | 5/17/2019, 6/30/2020 |
| 33 | 11/6/2019 |
| 40 | 1/28/2020 |
| 46 | 7/3/2019 |
| 72 | 3/18/2020 |
| 94 | 1/15/2020 |
| 100 | 3/18/2019 |
| 101 | 7/5/2019 |
| 102 | 1/10/2019, 2/11/2019, 12/10/2019 |
| 103 | 10/17/2019, 10/18/2019 |
| 105 | 11/28/2018, 1/30/2020 |
| 107 | 10/3/2019 |
| 108 | 3/21/2019 |
| 110 | 9/24/2019 |
| 111 | 10/2/2019 |
| 112 | 9/17/2019 |
| 113 | 1/27/2020, 7/29/2020 |
| 114 | 10/8/2019 |
| PBBN (73 and 75) | 3/6/2019 |
| PSA 2 | 11/7/2019 |
| PSA 5 | 6/12/2019 |
| PSA 6 | 10/30/2019 |
| PSA 7 | 5/13/2019 |
| PSA 8 | 12/11/2019, 1/29/2020 |
| PSA 9 | 10/24/2018, 11/14/2018 |
| SRG 3 | 9/4/2019 |
| SRG (Bronx) | 10/2/2019 |
| TD 32 | 9/25/2019 |

The Department also identifies supervisors for supplemental training who have approved deficient stop reports from three or more encounters.  Supervisors who have approved multiple deficient stop reports have their stop reports and other paperwork reviewed by attorneys in RMB. The supervisors attend the morning session of  the Investigative Encounters training and then receive one-on-one training from an attorney in RMB aimed at the specific deficiencies that have

50

been identified.  In 2018, 67 supervisors received this remedial training.  In 2019, 39 supervisors received remedial training.  As of August 15, 2020, 18 supervisors have been retrained this year.

There have also been commands who have corrected supervisors who do not sufficiently evaluate their officers' stop reports.  In 2019, 76 supervisors were given CRAFT entries for failing to detect an improper stop, frisk, or search when reviewing stop reports, and 127 supervisors were given instructions or retraining.

The NYPD is taking positive steps to get its supervisors to take an active role in overseeing, managing, and, when necessary, correcting their officers for improper stops.  However, to date, not all supervisors have fully embraced their responsibilities for their officers.  For example, as noted above, the monitor team's review of stops and trespass arrests at NYCHA and TAP locations showed that supervisors approved numerous deficient stop reports and did not require TCFS for many trespass arrests.  The NYPD is not yet in compliance with the supervisory review requirements (Task 15b).  The NYPD is in partial compliance with the requirement of ICO self-inspections (Task 16b).

## V.   TRAINING

Effective training requires well-written training materials and quality instruction so that the materials are communicated successfully.  The monitor team spent many hours working with the parties on the development of training curricula and then observing, in many instances with the plaintiffs. how the NYPD conducted training.  The training section below starts with the requirements for in-service training for incumbent officers, and then details the Department's recruit training.

### A.   In-Service Stop and Frisk and Racial Profiling Training

Training for current members of the service is critically important and the most time-consuming of the NYPD's training tasks.  The Remedial Order requires the NYPD to revise its

training regarding stop and frisk to adhere to constitutional standards and New York State law. The in-service training must cover: when a stop may be conducted, when a frisk may be conducted and when a search may be conducted; trespass enforcement and interior patrols; proper documentation of stops; and supervisors' responsibility for reviewing officers' stops and frisks. The Court's Remedial Order also required the NYPD to revise its training regarding racial profiling to make clear that targeting "the right people" for stops (as described in the Court's Liability Opinion) is a form of racial profiling and violates the constitution.  Racially defined groups may not be targeted for stops in general simply because they appear more frequently in local crime suspect data.  Race may be considered only where the stop is based on a specific and reliable suspect description. The training must clearly convey the changes in NYPD procedures and what is expected of officers and supervisors regarding the documentation and supervision of stops.

### 1.    Compliance Assessment—In-Service Training for Stop and Frisk and Racial Profiling

The NYPD began its training for incumbent officers with roll call training shortly after the Department revised its stop and frisk policies, P.G. 212-11 in 2015.  The NYPD produced five short videos that were played at command roll call.  The five videos covered the following: (1) an introductory video by James O'Neill, then Chief of Department, briefly explaining the new policy for investigative encounters; (2) Level 1 Requests for Information, (3) Level 2 Common Law Right of Inquiry, (4) Level 3 *Terry* stops, and (5) documentation requirements and supervisory responsibilities for Level 3 stops.  The video covering Level 3 stops also corrected information from a 2012 training video, which incorrectly suggesting that just verbal commands such as "STOP POLICE!" would not constitute a seizure.  The introductory video was played at successive roll calls in October 2015, while the next four videos were played at successive roll calls in February,

52

May, June, and July 2016.  The 2016 Level 3 roll call video addressed the corrections required by the Remedial Order (Task 24).

In 2016, the Department also began working on a lesson plan and PowerPoint presentation for a day-long in-class training course on stop and frisk.  The Monitor and the plaintiffs worked with the Department to develop the curriculum and scenarios for role-play exercises illustrating key lessons in the training.  The role-play exercises were later replaced with BWC videos of NYPD encounters.  The NYPD piloted the training for several months to improve the course.  The NYPD determined that it would train supervisors first so that they would be prepared to review the stops of their officers, and included additional material on supervisory responsibilities in the lesson plan.

At the beginning of the training, instructors show a video of the Police Commissioner explaining how the training grew out of the stop and frisk litigation, how the overuse and misuse of stop and frisk harmed both the Department and the communities it serves, that the responsibility for this misuse rests with the leadership of the Department, and that the Department now owes its members a comprehensive training course so they understand what, under the law and Department procedure, they can and cannot do.  The video can be seen at http://nypdmonitor.org/resourcesreports/training.

An attorney from the Department's RMB or from a local district attorney's office and uniformed members of the service co-teach an interactive class on the law and procedures regarding investigative encounters and interior patrols  The NYPD has added additional material covering the new Right to Know Act.  After this portion of the course, the class breaks for a meal.

For the supervisors' course, the content of the post-meal session includes discussions of video footage from NYPD BWCs with a focus on sergeants' and lieutenants' role as supervisors, particularly with regard to how to supervise stops and how to discuss stop reports with their

subordinates, and the need to ensure proper documentation of all stops.  For the officers' training, the post-meal session includes reviews of BWC footage involving investigative encounters, after which the instructors discuss both good and bad examples of stop reports for those encounters. The NYPD has added a section on procedural justice in the post-meal session for officers and supervisors and has also included BWC videos of self-initiated stops.  "Procedural justice" is a phrase used to describe the necessity of treating civilians with respect, listening to them and explaining the officer's actions.  The post-meal session includes viewing and discussion of video footage and completed stop reports.  The classes review the strengths and weakness of stop reports completed in class, as well as common errors and mistakes in stop reports.

The training materials cover the fundamental principles of stop, question and frisk, trespass enforcement, and bias-free policing.  Opportunities for discussion about the role of race in investigative encounters are included in several places.  The materials describe the difference between the constitutionally permissible use of race based on a specific, reliable suspect description and the constitutionally impermissible targeting of racially defined groups for stops. The materials also effectively convey the changes in NYPD procedures governing investigative encounters and interior patrols, as well as what is expected of officers and supervisors regarding the documentation and supervision of stops and trespass arrests.

The Court approved training materials for NYPD's in-service training on Investigative Encounters for NYPD supervisors (sergeants and lieutenants) on December 5, 2017.  After the training materials were revised to address Right to Know Act issues, the stop and frisk course for patrol officers was approved by the Court on July 10, 2018.  The training materials meet the requirements of the court orders (Tasks 17a, 18a, 19a, and 21a).

Training for supervisors began in December 2017.  Training for patrol officers began in February 2018 to pilot proposed changes to the training materials, and then continued after revisions were made and the course materials were approved by the Court.  From 2017 through March 2020, the training was held at the Tactical Village at Rodman's Neck.  Each class was limited to 30-35 officers or supervisors and training was taught every weekday and on both the day (7x3) and evening (3x11) tours.  Training was paused because of the coronavirus, but it has resumed at the Police Academy, because the Academy building provides for more space between officers.

As of September 11, 2020, 32,689 members of the service have gone through the stop and frisk training.  As of that date, there were 1,845 members still to be trained, mainly non-enforcement members (167 lieutenants, 375 sergeants, 1,031 detectives, and 272 police officers). The NYPD anticipates completing the training by the winter of 2020.

From 2017 to 2020, the monitor team has observed numerous classes of both supervisors and patrol officers.  Plaintiffs' counsel also have attended training classes on a quarterly basis. The monitor team and plaintiffs' counsel have shared with the Department observations and views about the course materials, the way the materials have been presented and the course instructors. The instructors observed by the monitor team were knowledgeable and followed the approved materials.  Although they varied in style and in their ability to engage the officers, the instructors were quite good.  The Department completed training of patrol officers in 2019 and continued its training of all members of the service from the rank of police officer to lieutenant, including those in non-enforcement bureaus.  Ninety-four percent of NYPD's members have been trained on stop and frisk policies; the NYPD is in compliance with these requirements (Task 17c, 19c, and 21b),

Some of the instructors did a better job than others in addressing issues of race and engaging the class in a discussion of how race intersects with stop and frisk encounters, but the course as a whole sufficiently covered the NYPD policies on racial profiling and bias-free policing. The Department also covers NYPD racial profiling policies in other training it has conducted, including training of new supervisors, training of housing officers, and a course on implicit bias that was delivered to the entire force.  Ninety-four percent of NYPD's members have been trained on NYPD's racial profiling policies; the NYPD is in compliance with these requirements (Task 18c).

The Court's Remedial Order noted that it may be appropriate for the Department to conduct training "on the effect of unconscious racial bias."  *Floyd*, ECF 372, p. 17.  Early in the monitorship, the Department committed to training its members on implicit bias and procedural justice.  "Implicit bias" is the concept that people make automatic, unconscious associations between groups of people and stereotypes about those groups, and that those associations arise from the particular environment (neighborhood, family, friends, media, etc.) in which they grow up, live, and work.

In 2017, the NYPD contracted with an outside vendor, Fair and Impartial Policing, LLC (FIP), http://www.fairimpartialpolicing.com/, to create the training materials and teach the course. FIP developed specific training sessions for senior executives, mid-level managers, supervisors and police officers.  The training included discussion of the history of New York City and the NYPD, and how that history relates to legitimacy and procedural justice both within the Department and in the communities being policed.  The point of the training is to make officers more aware of biases so that those biases do not interfere with the officers' law enforcement functions.

56

Professor Jennifer Eberhardt, a member of the monitor team and one of the leading experts in the country on implicit bias in law enforcement, reviewed the training materials and provided feedback and suggestions for edits to the NYPD and FIP.  Plaintiffs' counsel and one of the plaintiffs' experts, Professor Jack Glaser, also a leading expert on these matters, provided feedback and edits to FIP.  Based on that input, some parts of the training materials were revised.  FIP instructors presented the training to the monitor team and plaintiffs' counsel, who provided feedback as well.  In September 2019, the plaintiffs reviewed the revised FIP training materials and expressed their concerns about some aspects of the materials to the CEO of FIP.  Neither the monitor team nor plaintiffs' counsel observed the training being provided to NYPD members, because FIP and the NYPD believed that the attendance of outside observers in the class would inhibit candid discussion of the material.  Professor Eberhardt concurred with that assessment.

In February 2018, the Department began the FIP training for all 36,000 uniformed members of the service, including those at the highest levels of the Department (e.g., the Commissioner, the First Deputy Commissioner, and all the commanding officers of the precincts and other commands).  The NYPD also conducted train-the-trainer sessions for instructors at the Police Academy, who began presenting the training for recruit officers in August 2018.  As of March 20, 2020, when FIP training concluded, 34,870 members of the service (MOS) had been trained.

Although implicit bias training for police officers, and the FIP training in particular, has been conducted throughout the country, what is less clear is what impact this training has on officers' attitudes and behavior.  Systematic scientific evaluations of such training are rare and are only now being conducted.  The NYPD worked with the IACP-University of Cincinnati Center on Police Research and Policy and with the Finn Institute for Public Safety at SUNY Albany to evaluate NYPD's implicit bias training of patrol officers.  The evaluation was designed to

determine the effectiveness of the training in raising officers' awareness of and knowledge about implicit bias and providing officers the skills to manage their own implicit biases.

The FIP training was oriented towards police officers' knowledge of implicit bias and its implications for policing.  The NYPD's stated objective for the program was to convey to police personnel:

- The science of implicit bias (convey to officers that all people, even well-intentioned people (officers) can be impacted by implicit bias).

- How implicit biases might manifest in policing.

- The consequences of biased policing for community members, officers and agencies.

- The skills that police personnel need to be fair and impartial.

To determine whether the FIP training met those objectives, the evaluation team collected survey data on the day of training and after officers and supervisors were back in the field.  The training-day surveys were collected using an experimental design, with classes being randomly assigned to take the survey immediately before (control) or immediately after (treatment) the FIP training, making it possible to see if FIP training influenced officer perceptions.

The evaluation team found that the training did have some effect on officers' beliefs and attitudes.  For example, consistent with NYPD objectives, the FIP training was successful on the day of training in raising officers' awareness of implicit bias, procedural justice, and concern with bias.  These effects were achieved despite the fact that the FIP content was delivered as a mandatory, one-shot, lecture-style training—conditions that can dampen its effectiveness, but were made necessary by the size of the NYPD.  Because these results were measured on the day the training was conducted, it is uncertain how enduring the changes in officers' beliefs and attitudes will be.  Enduring change requires not only passively learning about bias, but actively attending to the conditions that give rise to it.  Supporting the FIP training program and its

evaluation was one among a number of steps the NYPD has taken to increase the effectiveness of officers and build trust with the community. These are ongoing efforts, and their success is not yet fully known.

### B.      Training for Newly Promoted Supervisors

Training for newly promoted sergeants, lieutenants, and captains covering supervisory responsibilities, along with a refresher on investigative encounters, is an important and necessary component of NYPD's compliance

### 1.      Compliance Assessment—Newly Promoted Supervisor Training

Training materials for newly promoted sergeants and lieutenants were approved by the Court on March 27, 2018. The format of the training has been changed to encourage class participation and add BWC video, and is similar to the in-service training for incumbent sergeants and lieutenants. The monitor team observed promotional training before and after it was approved by the Court and again in February 2020. The same two instructors have been teaching this course for every promotional class since 2017 and the class is one of the most impressive training classes the monitor team has observed. The training covers all of the required material in the lesson plan, but, more importantly, the instructors engage the class in interactive exercises and discussions and thorough questions and answers. The NYPD is in compliance with these requirements (Tasks 20a, 20b).

### C.      Housing Training

The *Davis* settlement requires that the Department provide in-service training so that officers who conduct interior patrols in NYCHA buildings are familiar with the posted rules and regulations in those buildings and have guidance on how to maintain the proper balance between enforcing the law and respecting the rights of residents and their guests. After a long period of negotiations, the parties came to a consensus on language that carefully strikes this balance. The

training encourages officers to use their discretion when appropriate. The morning session begins with a video from the then-Chief of the Housing Bureau, Chief Secreto, and then proceeds to a discussion of the legal issues involving trespass enforcement and Housing patrol, including documentation of trespass arrests using the TCFS. The post-meal session includes role-play scenarios illustrating various aspects of interior patrols. The NYPD also developed a useful pamphlet for Housing Bureau officers highlighting important features of the training.

### 1.    Compliance Assessment—In-Service Housing Training

On May 29, 2019, the Court approved materials for a one-day training to be given to all Housing Bureau officers. The NYPD began the training in October 2019. The monitor team and *Davis* counsel observed this training in November 2019 and in January and February 2020. After the November training, plaintiffs' counsel and the Monitor provided the NYPD with recommendations for improvements to the training, including emphasizing that NYCHA properties are people's homes, the importance of de-escalation under appropriate circumstances, and the value of exercising discretion for trespass arrests. *Davis* counsel particularly stressed the need to meaningfully engage Housing Bureau officers regarding the issues of racial bias and stereotyping. All Housing Bureau officers had attended the training by the end of February 2020.

The training made effective use of multiple instructors, which breaks up the potential monotony of one or two instructors. All of the instructors were Housing Bureau members. Instructors opened their block of instruction by informing the class of their longevity in the NYPD and giving a summary of their commands. Their longevity and current assignment to a PSA patrol command or Community Affairs gave them credibility with the class. Several instructors also had previous experience living as residents within NYCHA housing.

The classes were interactive, with attendees being asked whether they had been stopped by the police, a discussion of Operation Impact and its impact on the community, and the bases for

the lawsuits that led to the training.  Attendees in some classes, however, were less engaged than the officers in other classes.  The issue of discretion was emphasized throughout the class.  One class discussed how overenforcement could ruin lives and how discretion can mean de-escalating a situation.

The post-meal scenarios were instructive.  In one scenario, the instructors had the officers go through, in detail, why there was justification to approach.  Another scenario illustrated discretion and included an effective demonstration of how an individual might not feel free to leave when approached by officers.  During one debrief, an instructor had a student switch places with him and the instructor approached the student as he had been approached in the exercise.  He then asked if the student would feel free to leave in that situation and the student agreed that he wouldn't.

With respect to the discussion of race in the training, the instructor providing the introduction of the class reviewed the history of stop and frisk litigation and explicitly touched on race, noting that NYPD stopped people based on race.  The theme of race was revisited by subsequent instructors, but sometimes less explicitly.  Although the plaintiffs believe that the course did not sufficiently discuss the issue of race, the monitor team disagrees.

The Housing one-day training provided attendees with more than skills and knowledge improvements; it influenced the attendees to think differently and react differently based upon NYPD's stated values of community partnership, valuing human life, respect, courtesy, and civility.  The NYPD is in compliance with the requirements for the creation of Housing training materials and the implementation of Housing training (Task 26a, 26b).

### D.     Training for Investigating Profiling and Biased-Based Policing Complaints

The Remedial Order requires the NYPD to track and investigate racial profiling complaints.  For this reason, training for investigators on the NYPD's racial profiling policies and

how to go about conducting profiling investigations is also required.  The training is designed to provide investigators with the fundamental skills to process and investigate complaints regarding the NYPD's policy prohibiting racial profiling and bias-based policing.  Upon completion of the class, participants should understand the NYPD's policy, the procedures for investigating racial profiling and bias-based policing allegations, and strategies for investigating those allegations.  The standards for when investigators can substantiate or find a profiling allegation unfounded, even in the absence of corroborating physical or documentary evidence, are explained.

### 1.   Compliance Assessment—Training for Investigating Profiling and Biased-Based Complaints

The training curriculum for IAB investigators and investigators from patrol borough investigative units regarding the investigations of profiling allegations (Internal Investigators Course, Module Number 04, Profiling and Bias-Based Policing) was approved by the Court in January 2019.

The monitor team observed this training in July 2019.  The instructors used the Court-approved PowerPoint slides and lesson plan, were familiar with the material, and covered the learning objectives stated at the beginning of the presentation.  The instructors emphasized Department policy prohibiting officers from targeting members of a racial or ethnic group for police action because they appear more frequently in local crime suspect data.  The instructors discussed investigative steps that should be taken when investigating racial profiling allegations: contact the complainant; permit the complainant to tell the full story without interruption and ask follow-up questions after; and don't close a case simply because the complainant is uncooperative.  Although this was not part of the written training materials, the instructors also addressed additional issues on racial profiling investigations:

- Investigators should not close out a case as unfounded because the complainant was found guilty of the underlying criminal case.

- The fact that the subject officer and the complainant are of the same race does not mean that there is no racial profiling; this cannot be a reason for closing the case as unfounded.

- If the investigator has not been able to contact the complainant, the investigator should check to see if the complainant might be incarcerated.

Although the Court approved the training curriculum for this course, the Monitor's review of profiling investigations (as well as the review by plaintiffs' counsel of a smaller sample of investigations) identified numerous problems with the Department's profiling investigations (see Monitor's Corrected 10th Report, pp. 74-79), and the Monitor made recommendations for changes to the protocols for investigations.  Based on these findings and recommendations, the NYPD has proposed additional changes to the IAB guidelines for profiling investigations, which will be submitted for court approval.  Changes to the training curriculum for profiling investigations also will need to be made.  The Department is in partial compliance with the written training materials (Task 29a) and not yet in compliance with implementing the training requirements regarding racial profiling (Task 29b).

## E.     Basic Plainclothes Course

The NYPD conducts a three-day training course for officers who will be starting as plainclothes officers.  That course was required for officers who joined a precinct-based anti-crime unit, or any other unit that works in plainclothes.  While there are no longer anti-crime units, there will still be officers in various units that work in plainclothes, so this training will continue to be needed.  It is important to ensure that these officers get training on stop and frisk policies, because their work often involves actively seeking to detect and apprehend suspects.

### 1.     Compliance Assessment—Basic Plainclothes Course

On August 14, 2018, the Court approved revised training materials for a module on investigative encounters that is part of a three-day course given to plainclothes officers.  The revisions were done to make sure the materials were consistent with the in-service investigative

encounters training.  In addition, BWC videos involving plainclothes officers were added to the training to demonstrate some of the main teaching points.  The training materials meet the Court's requirements (Task 30a).

The monitor team observed the Basic Plainclothes Course on February 24, 2020.  Although the instructor used the approved materials, the quality of the training was not sufficient.  There was little to no explanation of the material, no engagement with the attendees, and very little connection between the material covered and plainclothes policing.  The instructor should provide an introduction and overview to this part of the three-day course, so that participants understand why they are getting this training.  Plainclothes enforcement often requires substantially different tactics and this course should integrate the law with tactics.  Knowledge of the law and what one can do at the various levels is an important tactic, and it will ensure that officers use their authority correctly.  A firm understanding of the law of investigative encounters will give officers a tactical advantage and protect the rights of the people they encounter.  Weaving Investigative Encounters instruction into the physical skills component of the plainclothes training would help to reinforce both.  The NYPD is not yet in compliance with the implementation of plainclothes training (Task 30b).

### F.  Recruit Training—Policing Legally

A recruit training class entitled "Policing Legally—Street Encounters" covers the legal standards governing when an officer may stop, question and frisk a person.  The training emphasizes that the legal authority for a stop does not automatically provide the authority for a frisk.  To frisk a person, the officer must have reasonable suspicion that the person stopped is armed and presently dangerous.  The training materials stress that an encounter between a civilian and an officer is a "stop" when a reasonable person would not feel free to disregard the officer and walk away.  Such an encounter requires the officer to have reasonable suspicion that the person

was engaged in or is about to be engaged in criminal conduct.  The course covers *Terry v. Ohio* and the four levels of *DeBour* encounters.

### 1.  Compliance Assessment—Recruit Training—Policing Legally

Recruit training was a particular focus of attention for the parties and Monitor at the beginning of the remedial effort, as a recruit class started in January 2015, shortly after the start of this monitorship.  The parties recognized that the new class of recruits could not be trained using materials that the Court had found inadequate.  Training materials for Police Academy recruit classes on stop and frisk were rewritten and approved by the Court in April 2015.  The materials for Policing Legally have been revised as new NYPD policies and new stop report forms were approved.  The course was revised in 2018  to ensure consistency with the in-service investigative encounters training being taught at Rodman's Neck and to add BWC videos as a tool to review each level of investigative encounter; information regarding the Right to Know Act was also added to the curriculum.  These changes were approved by the Court on August 14, 2018.  The revised Policing Legally training materials are in compliance with the Court's requirements (Tasks 17b, 19b).

The monitor team observed Policing Legally classes early in the monitorship and returned to the Police Academy to observe these classes in 2018, 2019, and 2020.  Team members found the instruction to be consistent with the Court-ordered materials and well presented, with significant recruit engagement.   The NYPD is in compliance with the requirements for implementing recruit training on stops and frisks (Tasks 17d, 19d).

### G.  Recruit Training—Policing Impartially

The remedial order requires revised training on the NYPD's prohibition of racial profiling.  Under that policy, officers may not use race as a motivating factor, even in part, for law enforcement action, unless the action is based on a reliable and specific suspect description.  A

general suspect description, such as "young black male," is not sufficient; in addition, the fact that a particular group may appear more frequently in local crime statistics is not enough information for there to be reasonable suspicion for a stop. The class material includes information regarding bias and police history and how knowledge of this history can help officers be more effective.

### 1. Compliance Assessment—Recruit Training—Policing Impartially

The Court approved the NYPD's training course for recruits on racial profiling, Policing Impartially, in April 2015. The training materials are in compliance with the Court's requirements (Task 18b).

Monitor team members observed this class in 2018 and 2019. The course followed the general course guide and approved material, although some of the classes observed could improve with more engagement and discussion of the materials. Monitor team members have noted that discussions of bias-based policing, profiling, and community respect have been included in several of the other recruit training courses and associated scenario-based training, beyond Policing Impartially. Incorporating these themes consistently throughout the training modules will support the building of a Department culture. The NYPD also provided all recruits with the FIP training on implicit bias and procedural justice. The NYPD is in compliance with the recruit training on racial profiling (Task 18d). The Monitor will observe the Policing Legally class when the NYPD resumes Police Academy recruit training.

### H. Recruit Training—Characteristics of Armed Suspects

One recruit training segment identified in the *Floyd* liability and remedies decisions as needing revision was a training module conducted by the Firearms Training Section on the characteristics of armed suspects.[15] This training teaches recruits about factors that should raise

---

[15] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013) (Liability Opinion); *see Floyd v. City of New York*, 959 F. Supp. 2d 668, 680 (S.D.N.Y. 2013) (Remedial Order).

their awareness when they attempt to determine whether or not an individual they encounter is armed.

1. **Compliance Assessment—Recruit Training—Characteristics of Armed Suspects**

A revised version of this training was approved by the Court in February 2017. The NYPD is in compliance with the requirement for a revised curriculum (Task 28a).

Monitor team members and plaintiffs' counsel observed this training in 2019. The class was taught by a 27-year veteran of the NYPD who has taught similar material for more than 10 years. The instruction followed the Court-approved lesson plan and covered all of the learning objectives. The instructor went to great lengths to emphasize that this was not a stand-alone lesson and that this training must be considered in the context of all other lessons/training received (e.g., investigative encounters training). He noted that none of the characteristics singularly was sufficient to show reasonable suspicion that a person was carrying a firearm. The NYPD is in compliance with the requirement to implement this training (Task 28b).

I. **Recruit Training—Interior Patrol at NYCHA and TAP Locations**

Both the *Davis* settlement and the *Ligon* settlement require revised recruit training governing the legal standards and procedures for when a person may (or may not) be stopped in or outside a TAP or NYCHA building (P.G. 212-59 and P.G. 212-60). The training must instruct recruits that mere presence near, entry into, or exit from a TAP or NYCHA building is not an "objective credible reason" to approach a person to request information. The training also must cover trespass enforcement standards for TAP and NYCHA buildings, including the requirement of completing a TCFS for trespass arrests.

1. **Compliance Assessment—Recruit Training—Interior Patrol**

The NYPD combined the Court-approved recruit training materials regarding patrols at TAP buildings with the training materials approved by the Court in *Davis* governing housing patrols in and around NYCHA buildings. The training also includes scenario-based role-play exercises for both TAP and NYCHA buildings. The training materials were approved by the Monitor and meet the requirements of the court orders (Tasks 22a, 25a).

Monitor team members have observed these classes and generally found the instruction to be consistent with the approved materials. For some of the classes observed in 2020, however, the training did not meet the level of quality expected. The Monitor recommends that when police recruit classes resume, the instructors of the in-service One-Day Housing training class meet with the instructors for the Interior Patrol recruit class and compare materials. It will also be helpful for the recruit class to provide the Housing brochure that was distributed in the in-service Housing training. In addition, the training materials will need to reflect the termination of TAP. The NYPD is in partial compliance with these requirements (Tasks 22b, 25b).

**J.      Field Training Guide and FTO training**

The Court's Remedial Order required the NYPD to revise its Field Training Guide and Field Training Officer (FTO) training materials to reflect the corrected policies governing trespass stops outside TAP buildings. The Field Training Guide and the FTO materials also needed to be revised to conform with P.G. 212-11.

**1.      Compliance Assessment—Field Training Guide and FTO Training**

The Field Training Guide was revised in 2016 and training for FTOs was revised to reflect changes to the in-service investigative encounters training. In addition, BWC videos have been added to the training and the PowerPoint presentation has been made more engaging. The language in the Field Training Guide and FTO training materials mirrored the language approved by the Court in other trainings, and the Monitor approved the guide and the training materials. The

training observed by the monitor team was in compliance with the Court's requirements (Tasks 23a, 23b).  The last FTO training was conducted in March 2020.  As there is no current class of Academy recruits, it is unclear when the next FTO training will occur.

### K.    Refresher Training Course for Investigative Encounters

The NYPD and the parties recognize that the one-time training on stop and frisk at Rodman's Neck or at the Police Academy will not be sufficient to instruct and prepare recruits and officers to properly conduct stops and frisks, and supervisors to review stops and frisks.  The NYPD has delivered additional training at precinct roll calls upon requests of training sergeants and at RISKS roll-out meetings.  NYPD is also developing "booster" or refresher training for officers and supervisors, including officers who recently graduated from the Police Academy.  The supervisors' "booster" training will include additional material regarding review of stop reports and the responsibilities of supervisors.  NYPD plans to conduct this training as an online course, which will include a post-training quiz.

### 1.    Compliance Assessment—Refresher Training Course for Investigative Encounters

The NYPD has developed draft scripts for the following refresher module topics: Investigative Encounters, Level 1-4; Documenting Stops; Right To Know Act; Racial Profiling; Patrolling NYCHA and TAP Properties; and Supervisor's Responsibility.  The NYPD distributed the refresher training scripts to the parties at the beginning of September.  After the parties review and comment on the draft scripts, the NYPD will film the refresher modules for the parties' review and develop post-training tests.  The materials will then be submitted for the Court's review.  The NYPD is in partial compliance with the requirements for developing the materials for refresher training (Task 31a) and not yet in compliance with implementation (Task 31b).

## VI.    BODY-WORN CAMERAS

### A.    Precinct-Level BWC Pilot

As part of the Remedial Order, the Court directed the Monitor to oversee a pilot of the use of BWCs by NYPD officers.  On April 24, 2017, the NYPD launched its BWC pilot program for a one-year period pursuant to the requirements of the amended remedial order in *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013) (Remedial Order).  The goal of the pilot program is to assess the effects of deploying BWCs on policing outcomes, community perceptions of policing in their neighborhoods, and whether deployment results in reducing unconstitutional stops and frisks.  The Monitor's research and evaluation design for the BWC pilot program was developed and executed by Professor Anthony Braga of Northeastern University, Professor John MacDonald of the University of Pennsylvania, and other members of the monitor team.

The NYPD launched the BWC pilot program in April 2017.  In a randomized control trial, 1,200 officers in 20 pilot precincts wore cameras for a one-year period.  Those 20 precincts were matched with 20 precincts in which officers were not wearing cameras.  The monitor team is currently completing its work on a report to the Court on the study, examining outcome measures relating to the civility of police-civilian encounters, police activity, and police lawfulness.

### 1.    Supervisory Review of BWC Videos

As part of the BWC pilot, the Court directed the Monitor to "establish procedures for the review of stop recording by supervisors and, as appropriate, more senior managers."  In 2017, the NYPD developed a self-inspection protocol for the review of BWC videos by sergeants in the commands with BWCs.  Sergeants must review five BWC videos each month.  After reviewing these videos, sergeants must complete a BWC self-inspection worksheet for each video; the sergeant's platoon commanders or lieutenant must then review two of the videos and complete the self-inspection worksheet; and the command's executive officer must review and approve the

BWC self-inspection worksheet.  For one month out of each quarter, the BWC compliance unit selects the five BWC videos for each sergeant in the command.

In addition to the self-inspection, the NYPD's BWC patrol guide, P.G. 212-123, directs the patrol supervisor, training sergeant, and ICO to "[p]eriodically review BWC video as appropriate, to provide positive feedback and address any performance or tactical deficiencies observed."  At the command RISKS Review meetings, NYPD leadership examines the number of BWC videos reviewed by supervisors and discusses with the commanding officer what criteria the command uses for its reviews.

## 2.  Preserving BWC Videos for Investigation of Complaints

The Remedial Order also directed the Monitor to "establish procedures for the preservation of stop recordings for use in verifying complaints in a manner that protects the privacy of those stopped."  When the BWC pilot was launched, the NYPD set out a procedure for sharing BWC video with the CCRB.  The BWC patrol guide, P.G. 212-123, states that "[t]he Internal Affairs Bureau will process requests from the Civilian Complaint Review Board for body-worn camera video as per P.G. 211-14," but it does not provide any protocol for how those videos would be shared or any timeframe for when they would be shared.  Initially, there was agreement between the NYPD and the CCRB that requested BWC videos would be provided within seven business day; but this was at a time when there were only 1,000 cameras in the pilot program, fewer complaints involving BWCs, and thus fewer requests for BWC videos.

In 2018 and 2019, the length of time it took for the NYPD to respond to CCRB requests for BWC videos became a significant problem for CCRB's investigation.  The CCRB reported that in November 2019, there were 574 requests for BWC footage pending, with half of the video requests pending for more than 30 days and 28 percent of the requests pending for more than 60 days.  The Monitor worked with the NYPD, Law Department, and CCRB to determine the extent

of delays and their causes, and develop a procedure for prompt access to BWC footage by the CCRB.

On November 21, 2019, the NYPD and CCRB entered into a Memorandum of Understanding (MOU) to expedite production and sharing of BWC footage.  Under the MOU, the NYPD will establish a facility with at least ten secure computer terminals so that CCRB investigators can review BWC footage directly.  The NYPD must provide CCRB with BWC footage requested within 25 days if any redactions are needed, and within ten days if no redactions are needed.  In a February 2020 CCRB report on BWCs, the chair of the CCRB stated that these new protocols  "will allow CCRB investigators to search for videos alongside NYPD personnel, view unredacted footage, and more rapidly isolate and request the portions of video that are relevant to CCRB investigations.  It is our hope that this new system will streamline CCRB's access to BWC footage, which is pivotal to our work."

The coronavirus pandemic and the shelter-at-home orders upended the BWC protocol established in the MOU.  The NYPD has not yet been able to set up the shared facility to expedite production, and the CCRB staff is working remotely.  In addition, there were a significant number of new complaints and additional requests for BWC videos after the protests over the death of George Floyd.  However, after the CCRB raised concerns about the delays in obtaining BWC videos, the NYPD made significant progress in providing the CCRB with BWC videos for complaint investigations related to the protests and in reducing the backlog of BWC requests.  In its most recent September 2020 Statistical Report, the CCRB reported that 173 requests for BWC videos were pending as of August 31, 2020, a significant decrease from the 641 requests that were pending as of July 31, 2020. See,

https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2020/20200909_monthlystats.pdf.

### 3. Compliance Assessment—Precinct Level BWC Pilot

The precinct level BWC pilot has been completed. As part of the pilot, the NYPD developed protocols for supervisory review of BWC videos that the Monitor approved in August 2017. Prior to the November CCRB/NYPD Memorandum of Agreement, however, the NYPD did not have an adequate procedure for preserving and providing BWC videos in a timely manner to the CCRB for complaint investigations. Now that the MOU has been signed and the NYPD and CCRB have developed protocols for CCRB access to BWC videos, the NYPD is in compliance with the BWC pilot requirements of Tasks 32a, 32b, and 32c.

### B. PSA BWC Pilot

Professor Anthony Braga and other members of the monitor team developed a separate research and evaluation plan for the use of BWCs by Housing Bureau officers working in PSAs, to assess how BWC videos impact policing in and around NYCA properties. The Monitor's 8th Report describes that study. NYPD Housing Bureau officers in the nine PSAs were equipped with BWCs over the course of nearly 11 months, starting with PSA 8 in February 2018 and ending with PSA 9 in December 2018. The study will compare officer data for the 36 months before officers were equipped with BWCs to officer data for the 12 months the officers were equipped with BWCs.

### 1. Compliance Assessment—PSA BWC Pilot

The monitor team is in the process of collecting and analyzing the data for the PSA BWC study. The NYPD is in partial compliance with the requirement for the PSA BWC pilot (Task 33).

## VII.   PERFORMANCE EVALUATIONS

The Court found that the NYPD's performance objectives and the way that the NYPD measured officer performance put pressure on officers to make stops without regard to whether they were constitutional.  For that reason, one condition for NYPD compliance is to put in place a performance evaluation system for officers that does more than just count the number of enforcement actions. The NYPD developed and implemented a new performance evaluation system in 2017.  In the new system, the lawfulness of stops and the accuracy of stop reports play a role, but the number of stops does not.

Part of the new system is the Officer Profile Report, an electronic form that is automatically generated monthly.  This report compiles data from numerous Department databases and compares the officer to other officers in his or her precinct, borough and citywide.  It does not count the number of stops made by the officer.  Supervisors are to review the Officer Profile Report each quarter and complete a Quarterly Evaluation.  Supervisors use the Quarterly Evaluation to rate officers in 12 performance categories or "dimensions" on a scale from one to four.  The fourth quarter evaluation will provide the supervisor with a section to recap the officer's yearly performance.

The 12 performance dimensions are:

1.    Problem Identification/Solving
2.    Adaptability and Responsiveness
3.    Judgment
4.    Integrity
5.    Application of Law and Procedures
6.    Community Interaction
7.    Departmental Interaction
8.    Professional Image and Maintenance of Equipment
9.    Quality and Timeliness of Reports
10.   Initiative
11.   Leadership

74

12.  Implementation of Proactive Policing Strategies (for members who perform administrative functions, a different dimension, Competence in Unit's Mission, replaces this dimension)

### 1.  Compliance Assessment—Performance Evaluations

In November 2017, the Court approved the NYPD's performance-evaluation system for patrol officers.  In doing so, the Court ordered that the Monitor review and assess certain aspects of the system.  The review is to ensure that, in practice, the system does not "reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness" or undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments. ECF 564.[16]

To evaluate whether the performance evaluation system meets these criteria, the Monitor has undertaken a number of steps.  The monitor team reviewed the evaluations for officers receiving a "Needs Improvement" rating for Application of Law and Procedures, Quality and Timeliness of Department Reports, and Implementation of Proactive Policing for the third quarter of 2019.  The monitor team also reviewed data on officers receiving a "Needs Improvement" CRAFT supervisory feedback report for those dimensions.  In addition, the monitor team reviewed the quarterly evaluation in a sample of precincts, as well as a PSA and Transit District.

In the third quarter of 2019 there were more than 6,000 CRAFT entries in the selected Performance Dimensions of Application of Law and Procedures, Implementation of Proactive Policing, and Quality and Timeliness of Written Reports.  These entries were examined to identify

---

[16]  Pursuant to the court order, "the Monitor shall, in his bi-annual reports, review and assess the NYPD's performance-evaluation system to ensure that, on paper and in practice, it does not (a) reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness or (b) undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments of the Constitution as required by the Remedies Opinion."

areas related to stops.  The table below shows the breakdown of stop-related CRAFT entries in those performance dimensions.  The reasons supervisors provided to describe the nature of the feedback was diverse.  An attempt was made to condense those descriptions into major themes and categories to permit a better understanding of the areas identified most often.

**Chart 14.  CRAFT Entries on Select Performance Dimensions, 3rd Q2019**

| Performance Dimension | #3Q2019 Entries |
|---|---|
| **Application of Law and Procedures** | **119** |
| ACTIVITY LOG DEFICIENT | 4 |
| APPROVED STOP REPORT WITH DEFICIENCIES | 25 |
| DID NOT ENSURE STOP REPORT PREPARED | 4 |
| FAILED TO PREPARE A STOP REPORT | 27 |
| FAILURE TO OFFER BUSINESS CARD | 21 |
| IMPROPER STOP | 2 |
| STOP REPORT DID NOT ARTICLUATE RS | 5 |
| STOP REPORT DID NOT ARTICULATE RS | 28 |
| STOP REPORT DID NOT ARTICULATE RS FOR FRISK | 3 |
| **Implementation of Proactive Policing** | **11** |
| ACTIVITY LOG DEFICIENT | 8 |
| FAILURE TO OFFER BUSINESS CARD | 1 |
| PROFESSIONAL STOP | 2 |
| **Quality and Timeliness of Written Reports** | **88** |
| ACTIVITY LOG DEFICIENT | 9 |
| APPROVED STOP REPORT WITH DEFICIENCIES | 31 |
| FAILED TO PREPARE A STOP REPORT | 13 |
| FAILURE TO OFFER BUSINESS CARD | 5 |
| IMPROPER STOP | 1 |
| STOP REPORT DID NOT ARTICLUATE RS | 28 |
| STOP REPORT DID NOT ARTICULATE RS FOR FRISK | 1 |
| **Total** | **218** |

The monitor team also reviewed the quarterly evaluations for nine precincts, one PSA, and one Transit District, totalling 1,276 evaluations.  Those evaluations showed what is known as a "halo effect" in performance evaluation systems.  In none of the 1,276 evaluations did a supervisor

rate an officer as "Needs Improvement" in any of the 12 dimensions.  This was the case even for the seven officers who received a negative CRAFT entry for failing to prepare a stop report, one officer who received two negative CRAFT entries for failing to prepare a stop report, 13 officers who received negative CRAFT entries for failing to articulate reasonable suspicion for a stop or a frisk, and one officer who received two negative CRAFT entries for failing to provide a business card.  Indeed, the rating for "Application Law and Procedures" for each one of these 22 officers was either "Exceptional" or "Exceeds Standards."  This suggests that supervisors are not using the evaluation system to achieve one of its stated purposes—to identify and correct performance that need improvement.

The monitor team's review of the data indicates that the NYPD's performance evaluation system, as it is being implemented in practice, does not lead supervisors to pressure officers to make more stops without regard to the lawfulness of those stops.  The monitor team did not find cases in which officers were given negative evaluations because of a lack of stop activity.  However, the Monitor has not reviewed the performance evaluations of officers who conducted multiple improper stops or frisks or failed to complete stop reports to examine whether those deficiencies were taken into account in their evaluations.  High performance evaluations, including in the dimension of "Application of Law and Procedures," may indicate that the performance evaluation system is undermining rather than supporting the goals of the remedial process.  For this reason, the Monitor is deferring the compliance determination for the performance evaluation requirement until the monitor team reviews more data as indicated above (Task 38b).

## VIII.   AUDITING

The Court's Remedial Order requires the NYPD to develop systems to monitor its members' compliance with constitutional and state law standards.  The Department's auditing function is designed to discover and then correct deviations from NYPD policy and the law.  The

Department's QAD is the unit that conducts audits, including those relating to stop and frisk and trespass enforcement.  QAD also requires commands to submit self-inspections in order to monitor their compliance.  The audit procedures address whether Department reports were properly prepared (e.g., whether a stop report was completed), and the quality of the information contained in the Department reports (i.e., whether the stop met 4th Amendment standards).  QAD is currently conducting four types of audits relevant to the remedial measures:  (1) audits of stop reports and associated BWC videos; (2) RAND audits to identify undocumented stops; (3) PIE audits, also to identify undocumented stops; and (4) audits of trespass arrests and Trespass Crime Fact Sheets (TCFS).

On July 27, the Court approved the NYPD's 2020 Audit Plan.  These audits and self-inspections examine each command's compliance with the 4th Amendment and the NYPD's stop and frisk procedures.  Now that the Court has approved the 2020 Auditing Plan, the Department has begun to put it into operation.  The sections below report on the changes from earlier auditing protocols to what the Department is now beginning to implement after court approval.

### A.    QAD Auditing of Stop Reports and Activity Logs

QAD had been using two auditing methodologies, one for Patrol Bureau commands and another for other commands, including Housing PSAs and Transit Districts.  For all Patrol Bureau commands, stop reports were evaluated weekly.  Stop reports in other commands, including PSAs and Transit Districts, were evaluated quarterly.  Now that the 2020 Audit Plan has been approved, QAD will be auditing all commands, including PSAs and Transit Districts, weekly.  QAD provides each command a detailed assessment of their performance in the most recent quarter and  compares that performance to prior quarters.   Chart 15, below, shows QAD's determinations of the percentage of stop reports that articulate reasonable suspicion for the stop, the percentage of stop reports that articulate reasonable suspicion that the person frisked was armed and dangerous, and

the percentage of stop reports that articulated a legal basis for the search conducted.  Based on the assessments from QAD audits, the NYPD's level of compliance improved from 2017 to 2018, and remained at about the same level for 2019.

**Chart 15. QAD Stop Report Audits**

| Period | Stop Reports Evaluated | Stop Narrative Articulates Reasonable Suspicion for Stop | Frisks Evaluated | Frisk Narrative Articulates Reasonable Suspicion for Frisk | Searches Evaluated | Search Narrative Articulates Legal Basis for Search |
|---|---|---|---|---|---|---|
| **2017** | 7,526 | 5,448 (72%) | 4,480 | 3,920 (88%) | 2,458 | 2,256 (92%) |
| **2018** | 7,134 | 5,839 (82%) | 4,119 | 3,739 (91%) | 2,421 | 2,277 (94%) |
| **2019** | 7,475 | 6,050 (81%) | 3,434 | 3,233 (94%) | 2,473 | 2,312 (93%) |

Note that for stops in 2017-2019, QAD reviewed only frisks and searches from stops that were deemed lawful.  If QAD determined that the stop report did not articulate reasonable suspicion, the frisk and search, if conducted, were not reviewed by QAD in its audits and not included in the calculations of the percentage of frisks with reasonable suspicion and searches with a legal basis in Chart 15 above.  Under the 2020 Audit Plan, QAD will now be reviewing all frisks and searches, even if the stop that led to the frisk or search was deemed improper.

As noted in Section IV, Supervision, commanding officers oversee self-inspections in their commands.  Concerning stop, question, and frisk, the ICO in each command must identify and evaluate the last 25 stop reports and corresponding activity log entries.  If there are fewer than 25 stop reports for the month reviewed, the ICO must evaluate all of them.  The results of these self-inspections are reported up the chain of command in the precinct and the borough, and then QAD reviews a subset of the results to assess whether the results of the command's self-inspection of stop reports are different than the results of QAD's audit of stop reports.  Stop reports that QAD finds deficient, but that the command's self-inspection did not, are identified in the command's RISKS profile and are raised at the command's RISKS Review meeting.  Chart 16 below shows

improvement from 2018 to 2019 in the percentage of stop reports for which QAD auditors and command self-inspections came to the same conclusions.

**Chart 16.  QAD Audits and Command Self-Inspections of 2018-1Q2020 Stop Reports**

| Quarter | # Stop Reports Audited by QAD | # Stop Reports Audited by QAD in Command Self-Inspection | # QAD, Command Consistent | % QAD, Command Consistent (Column 3 divided by Column 4) |
|---------|---------|---------|---------|---------|
| 1Q2018 | 1,862 | 1,414 | 868 | 61% |
| 2Q2018 | 1,852 | 1,458 | 948 | 65% |
| 3Q2018 | 1,761 | 1,343 | 942 | 70% |
| 4Q2018 | 1,659 | 1,088 | 765 | 70% |
| 1Q2019 | 1,741 | 1,100 | 884 | 80% |
| 2Q2019 | 2,172 | 1,313 | 1,078 | 82% |
| 3Q2019 | 1,915 | 1,244 | 972 | 78% |
| 4Q2019 | 1,647 | 1,094 | 842 | 77% |
| 1Q2020 | 1,823 | 1,105 | 833 | 75% |

### B.    Monitor Team Review of Stop Report Audits

Starting with the audits from the fourth quarter of 2016, the monitor team has obtained QAD's audits of a sample of commands, along with the audited stop reports from those commands. The goal is to evaluate the auditors' work and also to review a sufficient number of stops to be able to make meaningful statements about citywide compliance.  The stop reports are evaluated by three members of the monitor team.  When they disagree, the stop reports are reviewed by the Monitor and Deputy Monitor.  These disagreements are discussed in monitor team meetings, and then the results are sent to QAD, which meets with the monitor team to discuss those cases in which there is a disagreement between QAD's and the Monitor's assessment.

Chart 17 below compares the number and percentage of stop reports each quarter that QAD determined articulated reasonable suspicion with the number and percentage of stop reports that the monitor team determined to be justified.  Both QAD audits and those conducted by the monitor

team show an improvement in the stops meeting the standard of reasonable suspicion.  Chart 17 shows that although the monitor team's assessment of compliance is lower than the NYPD's assessment of compliance, the difference between the monitor team's assessments and QAD's assessments has decreased over time.  This is likely due at least in part to the meetings with the monitor team and NYPD and a more thorough review of the stop reports by QAD as a result.

**Chart 17.  QAD and Monitor Ratings of Justified Stop Reports**

|  | QAD (No., % Yes) | Monitor (No., % Yes) | Total |
|---|---|---|---|
| **1Q2017** | 197 (77%) | 142 (55%) | 256 |
| **2Q2017** | 209 (69%) | 178 (59%) | 302 |
| **3Q2017** | 219 (70%) | 188 (60%) | 312 |
| **4Q2017** | 221 (72%) | 212 (70%) | 305 |
| **1Q2018** | 222 (72%) | 202 (66%) | 308 |
| **2Q2018** | 238 (81%) | 211 (72%) | 295 |
| **3Q2018** | 240 (79%) | 251 (83%) | 302 |
| **4Q2018** | 232 (77% | 239 (80%) | 300 |
| **1Q2019** | 263 (83%) | 250 (79%) | 315 |
| **2Q2019** | 255 (83%) | 245 (80%) | 308 |
| **3Q2019** | 257 (85%) | 249 (82%) | 304 |
| **4Q2019** | 233 (75%) | 228 (74%) | 310 |
| **Total** | 2,786 (77%) | 2,595 (72%) | 3,617 |

### C.      QAD Audits of BWC Videos Associated with Stop Reports and Arrests

In the fourth quarter of 2017, QAD began auditing BWC videos associated with the five most recent stop reports that indicate there is a corresponding BWC video.  These videos and their corresponding stop reports are reviewed to assess whether the BWC video is complete and to test the accuracy of the stop report narratives.  QAD will identify stops where the narrative for the stop or the frisk in the stop report is inconsistent with what is recorded on the BWC video of the encounter.  Chart 18 below shows QAD's findings regarding whether the BWC videos are inconsistent with the Stop Report narrative of the encounter.  The number of videos listed in the second column of the chart below are only those for which the auditor was able to make a conclusion about the consistency of the video and the stop report narrative.  QAD's methodology

changed in 2Q2019 to eliminate "inconclusive" as a determination.  QAD auditors now assess

whether there is any inconsistency between the BWC video and the stop report narrative, and if

there are no inconsistencies, the video is listed as consistent.

**Chart 18. QAD Audit of Stop Reports with Associated BWC Video**

|  | Number of Videos Reviewed | Video Consistent with Stop Narrative | Video Inconsistent with Stop Narrative | Video Inconclusive with Regard to Stop Narrative |
|---|---|---|---|---|
| 1Q2018 | 82 | 61 (74%) | 21 (26%) |  |
| 2Q2018 | 164 | 141 (86%) | 23 (14%) | 43 |
| 3Q2018 | 258 | 222 (86%) | 36 (14%) | 40 |
| 4Q2018 | 476 | 406 (85%) | 70 (15%) | 36 |
| 1Q2019 | 755 | 666 (88%) | 89 (12%) | 1 |
| 2Q2019 | 940 | 863 (92%) | 77 (8%) |  |
| 3Q2019 | 947 | 877 (93%) | 70 (7%) |  |
| 4Q2019 | 870 | 797 (92%) | 73 (8%) |  |
| 1Q2020 | 905 | 817 (90%) | 88 (10%) |  |

QAD also conducts a similar analysis for the five most recent arrest reports in the PIE

audits that indicate they have corresponding BWC videos.  In the case of arrests, the videos and

arrest reports are reviewed for completeness, whether a stop report was prepared if the arrest arose

out of a stop, and whether the BWC video was consistent with the arrest report.  The arrest reports

reviewed are for all PIE arrests not only trespass arrests.  Chart 19 below shows QAD's findings.

**Chart 19. QAD Audits of Arrests with Associated BWC Video**

|  | Number of Videos Reviewed | Video Consistent with Arrest Report | Video Inconsistent with Arrest Report |
|---|---|---|---|
| 2Q2018 | 38 | 37 (97%) | 1 (3%) |
| 3Q2018 | 144 | 139 (96%) | 5 (4%) |
| 4Q2018 | 418 | 410 (98%) | 8 (2%) |
| 1Q2019 | 924 | 894 (97%) | 30 (3%) |
| 2Q2019 | 1,089 | 1,077 (99%) | 12 (1%) |
| 3Q2019 | 1,016 | 1,008 (99%) | 8 (1%) |
| 4Q2019 | 1,021 | 1,011 (99%) | 10 (1%) |
| 1Q2020 | 988 | 982 (99%) | 6 (1%) |

**D.      QAD Audits for Undocumented Stops**

The documentation of stops is essential for the Department to demonstrate substantial compliance with the remedial orders.  QAD performs two types of audits to determine whether or not stops are being properly documented:  RAND audits and PIE audits.

**1.      RAND Audit Results**

QAD continues to audit the potential underreporting of stop reports by using what has been labeled a RAND audit.  As discussed above, this audit program is designed to identify stop encounters using radio transmissions to identify instances in which stop reports should have been prepared.  QAD uses keyword searches of ICADs to identify events that likely involved stop encounters.  These keywords are "Stopped," "Show-up," "Holding," and "Warrant Check."  If a potential stop encounter is identified through the review of ICADs and/or listening to the corresponding radio transmissions, QAD checks NYPD records to determine if a stop report was prepared.  If there is BWC video of the event, QAD reviews the video as part of this analysis.  If the auditor determines that a stop report may have been required, QAD refers the matter to the command for further investigation.   The command then reports back to QAD whether the encounter did, in fact, require a stop report and whether one was filed.

Chart 20 below shows that in 2019, there were 21 *Terry* stops without a stop report prepared.  The compliance levels have fluctuated, with the 1Q2020 at 56 percent compliance.

**Chart 20.  RAND Audit with Command Responses**

|  | Total RAND Audits Indicating a Possible Stop | Stop Reports Prepared | Report Deemed Not Necessary After Command Investigation | Total *Terry* Stops | *Terry* Stop Without Stop Report | Compliance Rate (%) (Stop Reports Prepared/Total Stops) |
|---|---|---|---|---|---|---|
| **4Q2016** | 28 | 8 | 8 | 20 | 12 | 40% |
| **1Q2017** | 28 | 6 | 10 | 17 | 11 | 35% |

| | Total RAND Audits Indicating a Possible Stop | Stop Reports Prepared | Report Deemed Not Necessary After Command Investigation | Total *Terry* Stops | *Terry* Stop Without Stop Report | Compliance Rate (%) (Stop Reports Prepared/Total Stops) |
|---|---|---|---|---|---|---|
| **2Q2017** | 31 | 6 | 9 | 22 | 16 | 27% |
| **3Q2017** | 21 | 12 | 4 | 17 | 5 | 71% |
| **4Q2017** | 23 | 12 | 6 | 17 | 5 | 71% |
| **1Q2018** | 21 | 10 | 7 | 14 | 4 | 71% |
| **2Q2018** | 25 | 13 | 5 | 20 | 7 | 65% |
| **3Q2018** | 26 | 6 | 12 | 14 | 8 | 43% |
| **4Q2018** | 25 | 9 | 3 | 22 | 13 | 41% |
| **1Q2019** | 19 | 13 | 4 | 15 | 2 | 87% |
| **2Q2019** | 18 | 11 | 5 | 13 | 2 | 85% |
| **3Q2019** | 28 | 13 | 2 | 26 | 13 | 50% |
| **4Q2019** | 22 | 16 | 2 | 20 | 4 | 80% |
| **1Q2020** | 40 | 20 | 4 | 36 | 16 | 56% |

When a command investigates a RAND audit encounter and determines that it was a stop without a stop report, the command directs the officer to complete a stop report and takes corrective action. Below are the follow-up actions taken by the commands for members who did not document stops.

**Chart 21. Command Follow-Up Actions from RAND Audit**

| | *Terry* Stop Without Stop Report | Command Discipline | Instructions/ Training | Minor Violations Log or CRAFT Supervisory Report | No Disciplinary Action |
|---|---|---|---|---|---|
| **4Q2016** | 12 | 2 | 3 | 5 | 2 |
| **1Q2017** | 11 | 0 | 6 | 5 | 0 |
| **2Q2017** | 16 | 0 | 8 | 5 | 3 |
| **3Q2017** | 5 | 0 | 3 | 1 | 1 |
| **4Q2017** | 5 | 4 | 1 | 0 | 0 |
| **1Q2018** | 3 | 2 | 0 | 1 | 0 |
| **2Q2018** | 7 | 0 | 2 | 3 | 2 |
| **3Q2018** | 8 | 1 | 4 | 3 | 0 |
| **4Q2018** | 10 | 1 | 1 | 7 | 1 |
| **1Q2019** | 2 | 0 | 0 | 2 | 0 |

| | *Terry* Stop Without Stop Report | Command Discipline | Instructions/ Training | Minor Violations Log or CRAFT Supervisory Report | No Disciplinary Action |
|---|---|---|---|---|---|
| **2Q2019** | 2 | 0 | 0 | 1 | 1 |
| **3Q2019** | 13 | 1 | 0 | 11 | 1 |
| **4Q2019** | 4 | 0 | 0 | 4 | 0 |
| **1Q2020** | 16 | 1 | 1 | 14 | 0 |

### 2.    Results from PIE Audits

QAD also uses PIE audits to detect undocumented stop encounters.  These audits look at the last 25 arrests in each command from the audit period that result from police-initiated enforcement.  These are defined as arrests in which the People of the State of New York are the complainants on the Complaint Report, such as criminal possession of a controlled substance or criminal possession of a weapon.  Arrest reports are reviewed to determine whether or not a stop report should have been completed for the encounter.  When an auditor determines that an arrest report possibly required a stop report and no stop report was filled out, the arrest report is sent to the command for further investigation.

**Chart 22.  PIE Audits with Command Responses**

| | Arrests Audited Possibly Requiring Stop Reports | Stop Report Not Required | Command Response Missing | Stop Report Required | Stop Report on File | Percentage Compliance (SR on file/SR Required) |
|---|---|---|---|---|---|---|
| **4Q2016** | 103 | 50 | 7 | 46 | 20 | 44% |
| **1Q2017** | 161 | 95 | 23 | 43 | 19 | 44% |
| **2Q2017** | 154 | 104 | 6 | 44 | 13 | 30% |
| **3Q2017** | 194 | 122 | 26 | 46 | 12 | 26% |
| **4Q2017** | 225 | 171 | 0 | 54 | 20 | 37% |
| **1Q2018** | 122 | 74 | 4 | 44 | 18 | 41% |
| **2Q2018** | 149 | 103 | 5 | 41 | 16 | 39% |
| **3Q2018** | 190 | 121 | 19 | 50 | 22 | 44% |
| **4Q2018** | 166 | 74 | 37 | 55 | 34 | 62% |
| **1Q2019** | 156 | 63 | 72 | 21 | 13 | 62% |
| **2Q2019** | 128 | 94 | 1 | 33 | 20 | 61% |
| **3Q2019** | 149 | 96 | 0 | 53 | 21 | 40% |

|  | Arrests Audited Possibly Requiring Stop Reports | Stop Report Not Required | Command Response Missing | Stop Report Required | Stop Report on File | Percentage Compliance (SR on file/SR Required) |
|---|---|---|---|---|---|---|
| **4Q2019** | 138 | 103 | 0 | 35 | 16 | 46% |

### E.      QAD Auditing of Trespass Crimes Fact Sheets

Officers are required to fill out a TCFS for all trespass arrests in and around NYCHA buildings and buildings enrolled in TAP.  QAD auditors review whether or not a TCFS was prepared when required, whether or not the officer articulated a proper basis for the approach, and whether the arrest documentation articulates probable cause for the arrest.  As noted in Chart 23 below, in 2019, NYPD officers completed a TCFS for only 20 of 39 (51%) trespass arrests at TAP locations, an insufficient level of compliance.  QAD determined that all of the 20 TCFS articulated a proper basis for the approach, and that of the 39 trespass arrests, 85 percent of the arrest documentation articulated probable cause.  For trespass arrests at NYCHA properties, 94 percent had a TCFS, 98 percent of the TCFS articulated a proper basis for the approach, and 93 percent of the arrest documents articulated probable cause.  It appears that Housing officers, who make trespass arrests more frequently than precinct patrol officers, are more familiar with the requirement of a TCFS for every trespass arrest.

**Chart 23. QAD Audits of Trespass Arrests**

|  | TAP Trespass Arrest Had TCFS | TAP TCFS Articulated Proper Basis for Approach | TAP Trespass Arrests Articulated Probable Cause | NYCHA Trespass Arrest Had TCFS | NYCHA TCFS Articulated Proper Basis for Approach | NYCHA Trespass Arrests Articulated Probable Cause |
|---|---|---|---|---|---|---|
| **2018** | 82% (140/171) | 98% (137/140) | 75% (129/171) | 85% (516/604) | 97% (501/516) | 94% (567/604) |
| **2019** | 51% (20/39) | 100% (20/20) | 85% (33/39) | 94% (520/555) | 98% (508/520) | 93% (515/555) |

### 1.    Compliance Assessment—Auditing

In its Liability Opinion, the Court held that the NYPD was deliberately indifferent to unconstitutional stops and frisks, in part because it had "no meaningful procedures for auditing stop paperwork to monitor the constitutionality of stops." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 609 (S.D.N.Y. 2013).  In particular, the Court found that QAD's process of reviewing stops consisted of "a superficial review of whether paperwork was completed, not a substantive review of whether a stop was constitutional." *Id.* at 609-10.  Partly to address that finding, the Court's Remedial Order instructed the Monitor to work with the parties to develop reforms to the NYPD's "monitoring . . . regarding stop and frisk." *Floyd v. City of New York*, 959 F. Supp. 2d 668, 677 (S.D.N.Y. 2013).

The Monitor has worked with the NYPD and plaintiffs to make QAD's review of stops more effective.  That process has produced many changes through the years.  In 2016, new methods were developed and implemented for reviewing representative samples of stop reports in the precincts.  In 2017, more stringent criteria were developed for assessing whether stop reports articulate reasonable suspicion; a new worksheet was created to improve the commands' self-inspections of encounters; and QAD went beyond stop reports to start auditing TCFS.  And in 2019, QAD began auditing stop reports from precincts weekly, rather than monthly, and began reviewing the BWC footage related to some of the stop reports it audited.

On July 27, 2020, the Court approved the NYPD's 2020 Auditing Plan.  The 2020 Audit Plan was the result of substantial feedback shared among the monitor team, plaintiffs, and NYPD. The 2020 Audit Plan includes important improvements over the prior protocols.  Most significantly, the plan requires QAD to review BWC video corresponding to every stop report being audited.  In this BWC review, QAD will examine:  whether the encounter was recorded in full or in part; whether the BWC video was consistent or inconsistent with the stop report, and, in

particular, whether the video indicates that the stop report does not accurately articulate reasonable suspicion for the stop or frisk, or a legally sufficient basis for the search; and whether the officer complied with the Right to Know Laws, including compliance with the consent to search policy. This is a substantial increase in BWC review over the prior protocols.  Also, under the prior protocols, QAD reviewed only a sample of BWC videos associated with trespass arrests and PIE arrests as part of QAD Trespass Arrests audits and PIE audits.  Under the 2020 Audit Plan, QAD will review the BWC video associated with every audited trespass arrest and PIE arrest.  In addition, under the new command self-inspection protocol in the 2020 Audit Plan, the ICOs at commands will review the BWC video associated with each stop report being evaluated as part of the command stop report self-inspection.

With respect to the frequency of audits, QAD implemented a pilot program in which it now audits precincts on a weekly basis.  This frequency provides those commands with timely feedback, allowing them to take appropriate corrective actions more quickly than audits conducted quarterly.  Under the 2020 Audit Plan, this weekly audit protocol will now also be applied to Transit Districts, PSAs, and selected Specialized Units.

The NYPD is required to establish auditing procedures that identify non-compliant stops, frisks, searches, and trespass arrests and a mechanism for correcting them.  With the 2020 Audit Plan, the NYPD is in compliance with this requirement (Task 36a).[17]

Because the 2020 Audit Plan has just recently been approved, the Monitor is not yet able to assess how the NYPD is implementing these protocols to determine compliance in practice.

---

[17] QAD's audits and command self-inspections assess compliance with the 4th Amendment and the Department's stop and frisk policies.  The NYPD also is required to develop sound procedures for monitoring 14th Amendment compliance as well.

That will be reported in our next Report.  As of this Report, the NYPD is in partial compliance (Task 36b).

## IX.   EARLY INTERVENTION SYSTEM

On November 20, 2018, the Court ordered the Department, in consultation with the Monitor, to develop a program for "systematically receiving, assessing, and acting" on five categories of "information regarding adverse findings of conduct of police officers involving illegal stops or illegal trespass enforcement."[18]   The information to be included in the early intervention system are: (a) declinations of prosecutions by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or representation of police officers by the New York City Law Department; and (e) judgments and settlements against police officers in civil cases where there exists evidence of police misconduct.  *Id.*  The purpose of the "early intervention system" is to identify members who engage in potentially problematic behavior, not as part of the NYPD's discipline system, but to mentor, support, and correct members of the service so as to prevent officers from future misconduct.

The Department submitted its first plan for its early intervention system in January 2019. After the plaintiffs objected to a number of aspects of the NYPD plan and numerous pleadings in response and reply, the Department in December 2019 submitted a revised plan to comply with the Court's order.  Negotiations among the parties followed, and a joint submission was made to the Court laying out the remaining differences between the parties.  On June 2, 2020, the Court issued a final order regarding the Department's early intervention system.  *Floyd*, ECF Dkt. 767.

---

[18] *Floyd,* ECF No. 662.

## A.        The Early Intervention Committee

The NYPD has provided the Monitor with information regarding how it is implementing the Court's early intervention order. The central component of the Department's system is the Early Intervention Committee (the "Committee").  This Committee is chaired by the Deputy Commissioner of Risk Management and includes executive-level personnel representing the Deputy Commissioner of Legal Matters, the Deputy Commissioner of Equity and Inclusion, the Chief of Department, the Chief of Detectives, the Chief of Patrol, and the Chief of Personnel.  The Committee replaces the existing Civil Lawsuit Monitoring and Adverse Credibility Committees, which had their last meetings to assess officers who met specific thresholds prior to June 1, 2020.

The Committee will review officers who met designated thresholds from June 1, 2020 onward for potential intervention.  The thresholds for review by the Committee include three or more declinations to prosecute in a 12-month period for 12 specified categories,[19] a suppression decision, a court finding of incredible testimony, a declination by the Law Department to represent or indemnify the officer, a judgment or settlement where there exists evidence the officer violated Department policy, or a complaint containing an allegation of racial profiling or racial slurs.  In addition to the thresholds specified in the Order, the Committee will also review any officer who

---

[19] The 12 categories are: complainant or witness failed to positively identify defendant; incorrect or missing paperwork; insufficient evidence; lack of element of a crime; lack of jurisdiction; lack of nexus between defendant and crime; mere presence of defendant at location; no personal observation of violation by arresting officer; potential search and seizure issue; unavailability of arresting officer; prosecutorial discretion; summonsable offense.

meets certain criteria regarding civil litigation,[20] force complaints,[21] and other indicators specified in a bill recently passed by the City Council and signed by the Mayor.[22]

When a threshold is triggered, RMB staff prepare a profile of the officer and the Committee evaluates the officer for potential intervention. As required by the Court's order, guidelines for the Committee's evaluation process will be set out in a written policy that will be posted on the Department's website. The Department anticipates that the guidelines will be published in the fourth quarter of 2020. When evaluating an officer, the Committee will consider relevant details relating to the incident that caused the officer to meet the threshold, the officer's disciplinary and monitoring history, the officer's tenure with the Department, the officer's performance evaluations, the officer's past and current assignments, arrest history, and sick leave, and whether the officer has previously appeared before the Committee. Additionally, the Committee will examine any information related to a prosecutor's office's determination that an officer's testimony lacks credibility or is otherwise ineffective. Prior to making a decision, the Committee will ask the commanding officer for their recommendation regarding early intervention and the effectiveness of any prior interventions regarding the officer in question.

The Committee has a number of potential interventions from which to choose, including refresher trainings, mentoring, monitoring, mediation, enhanced supervision, change of

---

[20] Three or more commenced lawsuits in a 12-month period; six or more commenced lawsuits in a five-year period; one disposed lawsuit for $200,000 or greater in a 12-month period.

[21] Two or more force complaints in a 12-month period; four or more force complaints in a two-year period; five or more force complaints in a four-year period.

[22] These indicators include CCRB and Internal Affairs Bureau (IAB) investigations, criminal arrests and investigations of an officer, vehicle pursuits and collisions, violations of the Patrol Guide, and arrests and summonses for resisting arrest, obstructing governmental administration, and disorderly conduct. The bill took effect on September 1, 2020.

assignment, a health and wellness referral, or referral for discipline or prosecution. Within seven business days of making a decision, the Committee will inform the commanding officer and other applicable internal stakeholders of its recommendation. Within 30 days, the commanding officer will be required to report back on the implementation of the Committee's recommendation.

RMB has created a new unit to gather the necessary information for the Committee, input information regarding the Committee's activities into a central database, and ensure that commanding officers are implementing the Committee's recommendations. When an officer triggers one of the designated thresholds, the relevant documents will be collected by RMB and entered into the early intervention database. RMB will create a profile for that particular officer, which will be sent to the Committee and entered into the early intervention database. In addition to containing relevant details of the incident that caused the officer to trigger the threshold, the profile will contain information regarding the officer's tenure, the officer's past and current assignments, any history of CCRB or IAB investigations, the number of arrests made by the officer, RMB's analysis and recommendation for intervention, and the Commanding Officer's recommendation to the Committee. RMB will enter the Committee's recommendation into the early intervention database, track whether commanding officers respond within 30 days, and ensure that the Committee's recommendations have been implemented.

As required by the Court's order, RMB will track relevant data on a quarterly basis and report them to the Committee. Aggregate data will be posted publicly, including the number of officers assessed by the Committee, the number and types of interventions, the number of officers who have successfully completed the written action plans, and the number of officers terminated or placed on dismissal probation following intervention. RMB will also perform analyses of racial profiling and bias complaints and report those findings to the Committee. These analyses and data

will assist in informing the Committee whether there are potential issues on which the Department should focus and how to improve the effectiveness of the early intervention program going forward.

### 1.      Compliance Assessment—Early Intervention System

The NYPD submitted to the Court its plan for receiving, assessing, and acting on information regarding adverse findings regarding unlawful stops and trespass enforcement.  The Court then issued an order setting out the requirements for the early intervention system.  The NYPD is in compliance with this requirement (Task 37a).

Concerning implementation, the monitor team observed the Early Intervention Committee meetings in August and September 2020.  NYPD provided the monitor team with the officer profiles of the members being reviewed by the Committee.  After the Committee meetings, the monitor team shared its observations and recommendations with RMB.  The Monitor recognizes that the Early Intervention System is an important opportunity to identify potential at-risk officers and steer them in the right direction.   A significant effort has been put into getting it off the ground.  It is, however, a work in progress and thus too soon to assess its implementation in practice.  The NYPD is in partial compliance with implementation of the early intervention system (Task 37b).

## X.      COMPLAINTS AND DISCIPLINE

The Court's remedial order required the NYPD to change its policies and practices with respect to investigations of racial profiling and other bias-based profiling allegations as well as its handling of civilian complaints that have been substantiated by the CCRB.

### A.      NYPD Investigations of Profiling Allegations

The NYPD investigates all profiling allegations related to race and biased-based policing, whether the allegation is made directly to the Department or referred from the CCRB.  Profiling complaints have decreased each year since 2017, with 160 complaints filed in the first half of 2020.

However, to date, the NYPD has not substantiated any profiling allegations.  See Monitor's 10th Report at 73.

**Chart 24.  Profiling Case Dispositions by Year, 2014 – June 30, 2020**

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|---|
| **Unfounded** | 2 | 160 | 205 | 311 | 318 | 202 | 20 | 1,218 |
| **Unsubstantiated** | 6 | 112 | 267 | 449 | 365 | 212 | 40 | 1,451 |
| **Exonerated** | 2 | 11 | 0 | 2 | 8 | 4 | 1 | 28 |
| **Partially Substantiated*** | 0 | 32 | 36 | 46 | 39 | 46 | 2 | 201 |
| **Information and Intelligence** | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 5 |
| **Open or Active** | 0 | 28 | 54 | 49 | 12 | 47 | 97 | 287 |
| **Substantiated** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | 10 | 343 | 562 | 858 | 744 | 513 | 160 | 3,190 |

* These are cases in which other allegations in a profiling complaint were substantiated, but not profiling allegations.

In January 2019, the Court approved an IAB guide section and related training that provide detailed guidance on how to process and investigate profiling complaints.  The NYPD also made changes to the way that it investigates profiling complaints, based on the recommendations of the monitor team in the last report.  Changes to NYPD's procedures for profiling investigations included : (1) a reduction in time to assignment of case and contact with complainant; (2) a review of public social media of both complainant and subject officer, when appropriate; (3) designation of specific investigators at the Borough Investigations Unit level as primary investigators for these cases; and (4) additional training for supervisors up to and including the borough adjutant regarding proper review of these cases.[23]  These changes, along with others reflecting the monitor team's and the plaintiffs' counsel's review of investigative files, will be included in a revised IAB investigative guide that will be submitted for court review and approval.  The NYPD has also

---

[23] The borough adjutant is the executive in each patrol borough who supervises the borough investigations unit and oversees the disciplinary system in the borough command.  P.G. 202-02.

included profiling complaints made against officers in a command in that commands' RISKS Review profiles, and profiling complaints will also be a threshold criterion for the Department's early intervention system.

### 1.    Compliance Assessment—Racial Profiling Investigations

Although the IAB Guidelines for Racial Profiling Investigations were approved by the Court, additional changes to the guidelines are necessary to ensure that the investigations conducted are thorough and impartial.  The NYPD is in partial compliance with this requirement (Task 35a).

Since the 10th Report, the monitor team reviewed another set of 46 profiling investigations, conducted from late 2016 to early 2019.  Cases selected for the review were based upon specific criteria, including:

- Profiling cases in which a police officer was named as a subject in three or more profiling complaints and/or the officer was identified as a subject in recorded civil actions and settlements involving profiling complaints;

- Profiling cases in which the complaint was referred to IAB from the CCRB or the profiling allegation refers to an encounter relating to a companion CCRB investigation;

- Profiling cases in which BWC video was initiated during the encounter or some other video was noted; and

- Profiling cases in which the subject officer was also the subject of a corruption investigation stemming from the same event or encounter.

However, because these investigations were all conducted before the NYPD began implementing the changes recommended by the monitor team, it is not possible to make an assessment of whether the investigations being done today meet the requirements of the monitorship.  The Monitor is now reviewing another 23 more recent profiling investigations to assess whether the changes in the NYPD investigation protocols have improved the thoroughness

and impartiality of the investigations.  The NYPD is not yet in compliance with this requirement (Task 35b).

### B.       NYPD Handling of Substantiated CCRB Cases

At trial, the Court found that the NYPD failed to impose meaningful discipline when the CCRB determined that officers engaged in unconstitutional stops and frisks.  The Court's order requires the NYPD to improve its procedures for handling CCRB findings of substantiated misconduct during stops.  Specifically, the Department Advocate's Office (DAO) must provide more deference to credibility determinations made by the CCRB, use an evidentiary standard that is neutral between the claims of complainants and officers, and not require that physical evidence corroborate the complaint.

### 1.       NYPD Discipline and Penalties Imposed

The charts below show the final discipline and penalties imposed for substantiated CCRB cases sent to the NYPD in 2014 through 2019.  The data illustrate the decline in the incidence and severity of the final discipline and penalties imposed.  This decline resulted from both changes in the initial CCRB recommendations made to the NYPD and the final disposition and penalties imposed by the NYPD.

The Monitor examined CCRB disciplinary recommendations in cases involving allegations relating to stop and frisk cases and trespass enforcement cases specifically.  Based on data provided by the NYPD to the Monitor, it appears that the CCRB's recommendations have shifted over time, with a decrease in severity from 2014 to 2016 and a slight increase in severity since then. Recommendations of charges and specifications declined from 57 percent of the total in 2014 to 11 percent of the total in 2016, and then rose slightly to 14 percent in 2019.   CCRB recommendations for Command Discipline-B went from 28 percent in 2014 to 21 percent in 2016 and then increased to 39 percent in 2019.

**Chart 25.  CCRB's Initial Disciplinary Recommendations, 2014-2018**

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| **Instructions** | 20 | 58 | 4 | 4 | 15 | 6 |
| **Training** | 1 | 22 | 69 | 22 | 14 | 24 |
| **Command Discipline-A** | 4 | 65[24] | 72 | 41 | 15 | 16 |
| **Command Discipline-B** | 51 | 74[25] | 44 | 16 | 28 | 37 |
| **Charges and Specifications** | 102 | 48 | 23 | 19 | 15 | 13 |
| **Other** | 1[26] | 1[27] | 0 | 0 | 1[28] | 0 |
| **TOTAL** | 179 | 268 | 212 | 102 | 88 | 96 |

The Police Commissioner makes the final determination about the discipline imposed. Chart 26 below compares the CCRB's initial discipline recommendations with the final discipline imposed by the NYPD for 50 closed 2019 cases involving stops, frisks and searches.   In many of the cases in which the CCRB recommended a Command Discipline-B, the Police Commissioner imposed Command Discipline-A or training.   The Police Commissioner also imposed command discipline-a in the two cases in which the CCRB recommended charges and specifications.   There were four cases in which the Police Commissioner imposed no discipline (labeled "NDA," no disciplinary action).

---

[24] Includes five cases in which instructions were also recommended and three cases in which training was also recommended.

[25] Includes one case in which Instructions were also recommended and four cases in which training was also recommended.

[26] In 2014, there was one case in which the CCRB's disciplinary recommendation is listed in the data as "Command Discipline" without specifying whether level A or B was recommended.

[27] In 2015, one case is listed as "NDA" in the data.  The notes on the case indicate that the complaint was received after the statute of limitations had run.

[28] CCRB initially recommended charges and specifications, but then reconsidered on its own and unsubstantiated the case.

**Chart 26.  Comparison of Recommended Penalties to Final Disposition, 2019 Closed Cases**

| 2019 Penalty Type, Closed Cases | CCRB Recommended Discipline | Final Penalty |
|---|---|---|
| Charges and Specifications | 2 | 0 |
| Command Discipline-B | 22 | 3 |
| Command Discipline-A | 9 | 16 |
| Training | 15 | 22 |
| Instructions | 2 | 1 |
| No Disciplinary Action | 0 | 4 |
| Case Closed Administratively | 0 | 4[29] |
| **Total** | 50 | 50 |

### 2.      DAO Reconsideration Requests

In 2014, the NYPD and the CCRB established a new "reconsideration process," in which the DAO may ask the CCRB to reconsider its findings on whether allegations were substantiated or its recommendations for discipline.  The CCRB may then choose to change or maintain its original conclusions.  Alternatively, in certain circumstances (such as when a case is running out of time under the statute of limitations), the DAO may unilaterally recommend a different disposition or discipline to the police commissioner, without requesting reconsideration by the CCRB.  In either case, the police commissioner makes the final decision on what discipline, if any, to impose after reviewing both the CCRB's and the DAO's findings and recommended remedy. In addition, pursuant to a Memorandum of Understanding between the CCRB and the NYPD, if the police commissioner determines that CCRB's prosecution of charges and specifications a substantiated case "would be detrimental to the Police Department's disciplinary process," the police commissioner may retain the cases.  The police commissioner's authority to retain cases is contained in Provision 2 of the MOU.  In such cases, the NYPD will determine if charges and specifications will be served and what discipline, if any, will be imposed.

---

[29] Of the cases closed administratively, two MOSs resigned, one retired, and one lost three days before the statute of limitations expired.

Chart 27 below shows how the NYPD handled the 50 closed cases that were substantiated by the CCRB in 2019.  For the 50 cases closed in 2019, four were closed administratively because the member resigned or retired or the statute of limitations (SOL) expired.  The DAO agreed with CCRB's findings and recommendations in 32 of the remaining 46 cases (70 percent) and disagreed with the recommendation in 14 cases (30 percent).  The DAO requested reconsideration in five cases, retained two cases using its authority under Provision 2 of the MOU, and changed the penalty without reconsideration in seven cases.  In ten of the 14  cases in which the NYPD disagreed with the CCRB's recommendation, the disagreement was with the discipline recommended by the CCRB, rather than with the CCRB's investigation, its credibility determinations, or its substantiated findings.  In four cases, the NYPD disagreed with the CCRB's disposition and imposed no penalty.

**Chart 27.  2019 Substantiated CCRB Cases**

|  | 2019 Closed CCRB Cases |
|---|---|
| **DAO Agrees with CCRB Recommendation** | **32** |
| **DAO Agrees with Disposition, Disagrees with Penalty, Asks for Reconsideration** | **3** |
| **DAO Agrees with Disposition, Disagrees with Penalty, NYPD Changes Penalty Without  Reconsideration (Includes Two cases Retained Under Provision 2)** | **7** |
| **DAO Disagreed with Both Disposition and Penalty and Asked for Reconsideration, and Imposed No Disciplinary Action** | **2** |
| **DAO Disagreed with Both Disposition and Penalty and Imposed No** | **2** |

|  | 2019 Closed CCRB Cases |
|---|---|
| **Disciplinary Action Without Reconsideration** | |
| **Case Closed Due to Resignation, Retirement or SOL** | 4 |
| **Total Closed CCRB Cases** | 50 |

Of the five reconsideration requests, the Police Commissioner imposed training or instructions in three cases in which the CCRB recommended Command Discipline-B, and imposed no discipline (NDA) in two cases in which the CCRB recommended Command Discipline-B.   Of the seven cases with a different final disposition, but no reconsideration request, five involved command discipline recommended by the CCRB in which the Police Commissioner imposed training, while the Police Commissioner imposed no discipline (NDA) in two cases in which the CCRB recommended instructions.  The NYPD explained that no reconsideration was requested in these seven cases either because of a short statute of limitations period, or because the DAO disagreed with the CCRB's recommendation after the initial 30 days from when the CCRB provided its recommendations to the NYPD.

### 3.    Compliance Assessment—DAO Handling of Substantiated CCRB Cases

The Court's Remedial Order requires the NYPD to improve its procedures for handling CCRB findings of substantiated misconduct during stops.  Specifically, the DAO must provide more deference to credibility determinations made by the CCRB, use an evidentiary standard that is neutral between the claims of complainants and officers, and not require that physical evidence corroborate the complaint.  Although the DAO has made changes to its procedures for handling substantiated CCRB complaints, the procedures have not yet been submitted for court approval.

For 32 (70%) of the substantiated CCRB cases in 2019, the NYPD agreed with the CCRB's substantiation disposition and imposed the discipline recommended by the CCRB.  In those cases,

the NYPD was compliant with the Court's requirements.  The NYPD disagreed with the CCRB's recommendation in 14 cases.  In 10 of these, the NYPD disagreed with the recommended penalty and not the CCRB's credibility determination; so in those cases, the DAO did not challenge the CCRB's credibility determinations, use an improper evidentiary standard, or require corroboration of the complaint.  There were only four cases out of 50 closed cases in 2019 in which the DAO disagreed with the CCRB's substantiation finding. For two officers, the DAO requested reconsideration of the CCRB's disposition because it disagreed with the legal conclusions of the CCRB, based on the same set of facts.  For two other officers, the DAO disagreed with the CCRB's legal conclusions, but did not request reconsideration.  At this time, the Monitor concludes that the NYPD is in partial compliance with the Court's requirements (Tasks 34a, 34b).

### C.    Other Misconduct Noted; Failure to Complete Stop Report

If the CCRB, in the course of its investigation, identifies misconduct outside its jurisdiction, it refers the misconduct to the NYPD for investigation and any additional action. These cases are referred to as Other Misconduct Noted, or OMN, cases.  For example, if the CCRB investigates a complaint involving a stop, frisk, or search, and determines that the subject member or members made a *Terry* stop but did not complete a stop report for the encounter, the CCRB refers the case to the NYPD as OMN.  If the failure to complete a stop report is associated with a complaint that CCRB substantiates, then the CCRB sends the OMN with the substantiated complaint, and the DAO handles both.  If there is no substantiated complaint associated with the failure to complete a stop report, the OMN is sent to the IAB, the IAB logs the case, and the NYPD assigns it to the command for investigation and tracks the outcome.

Below are the outcomes of the NYPD's investigations of CCRB's OMN referrals for failure to complete a stop report for completed CCRB cases from 2015 through 2020.  For the year 2020, as of July 31, 2020, the CCRB has made 41 OMN referrals to the Department for failure to

compete a stop report; of those, 22 cases are still open and being investigated at the commands. For the cases for which investigations were completed and substantiated in 2019 and 2020, the majority listed no penalty imposed on the officer.

**Chart 28.  Outcomes for Failure to Complete Stop Report (OMN Cases)**

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| **Command Discipline** | 4 | 17 | 30 | 8 | 6 | 2 |
| **C&S** | 1 | 0 | 1 | 0 | 0 | 0 |
| **Training** | 1 | 4 | 11 | 9 | 1 | 0 |
| **Instructions** | 14 | 59 | 42 | 15 | 4 | 1 |
| **Minor Procedural Violations** | 0 | 0 | 3 | 0 | 0 | 0 |
| **Substantiated, Warn and Admonish** | 1 | 4 | 0 | 0 | 0 | 0 |
| **Substantiated (no penalty listed)** | 0 | 0 | 0 | 8 | 14 | 11 |
| **Substantiated NDA** | 1 | 2 | 10 | 8 | 0 | 0 |
| **NDA-DUP** | 3 | 3 | 5 | 8 | 1 | 0 |
| **Exonerated** | 3 | 2 | 8 | 6 | 15 | 1 |
| **Unfounded** | 2 | 1 | 5 | 1 | 1 | 0 |
| **Unsubstantiated** | 1 | 1 | 4 | 13 | 9 | 1 |
| **Information and Intelligence** | 0 | 0 | 0 | 7 | 0 | 3 |
| **Open/Pending** | 3 | 11 | 4 | 1 | 0 | 22 |
| **Other\*** | 1 | 2 | 2 | 3 | 1 | 0 |
| **Total** | 35 | 106 | 125 | 87 | 52 | 41 |

\* Includes the following dispositions: Filed, No Allegation, No Record Found.

## XI.   ALTERNATIVE TO COMBINED PILOT

On May 15, 2018, the Court-appointed facilitator, the Hon. Ariel Belen, filed his Final Report and Recommendations on the Joint Remedial Process with the Court.  ECF No. 597.  Judge Belen recommended that the Court order 14 specific reforms.  On July 19, 2018, the Court ordered a pilot program to study one of the facilitator's recommendations, the electronic documentation of Level 1 and 2 encounters.[30]  Three weeks later, the Court ordered a pilot program to study another

---

[30] *Floyd*, ECF No. 619.

of the facilitator's recommendations, the activation of BWCs during Level 1 encounters.[31]   On November 9, 2018, the Monitor submitted a proposal combining the two Court-ordered pilots into one.  In response to objections from plaintiffs' counsel, the Monitor submitted a reply and revised proposal in January 2019, which was approved by the Court on February 7, 2019.[32]  The combined pilot was to be overseen by the Monitor, who retained Professor Stephen Mastrofski and CUNY's Institute for State and Local Governance (ISLG) to assist in planning and implementation.  As designed, the pilot was to use systematic social observations—in other words, trained observers, who would ride along with officers and collect data.  Results from the pilot would then inform the Court on the impact of implementing one or both of the proposed policy changes.

Because of the pandemic, it is no longer feasible to have trained observers ride with NYPD officers.  Moreover, on February 21, 2020, the NYPD proposed an alternative to the combined pilot.  In the NYPD's alternative, the NYPD would voluntarily adopt one of the two policy changes —mandatory activation of BWCs for Level 1 encounters.  The NYPD proposed to adopt this requirement citywide, with the exception of those Level 1 encounters that: (1) are currently "Do Not Record" scenarios, such as interviewing confidential informants, undercover officers, and strip searches; (2) are aided situations, other than with emotionally disturbed persons; and (3) are taking reports for past crimes.

Under this proposed alternative, the NYPD would not have officers electronically document Level 1 and Level 2 encounters on their phones, but the BWC metadata (Evidence.com) would include certain information about encounters, including the date and time of the encounter and the applicable level of the encounter.  In addition, for Level 2 encounters, the officer would

---

[31] *Floyd*, ECF No. 634.

[32] *Floyd*, ECF No. 691.

record in Evidence.com the race and gender of the primary individual encountered and whether the encounter was with more than one individual.  The City will be submitting its proposed alternative for court approval.

In response to the City's proposed alternative, and because the systematic social observation study is no longer feasible, the Monitor has proposed studies to improve the City's alternative proposal, to answer questions raised by the Court in its orders for the pilots, and to provide additional information to assist the Monitor in assessing compliance.  These studies would be conducted by ISLG and a team of researchers from Stanford University, including Dr. Jennifer Eberhardt.  These studies will address important questions about the NYPD's compliance with the Fourth and Fourteenth Amendments in police-citizen encounters:  legal compliance in police-citizen encounters, racial disparities in compliance and escalation of encounters, and appropriate documentation of encounters.  All these issues can be examined on a broader scale following the introduction of the new policy proposed by NYPD to record nearly all police-citizen encounters at every *De Bour* level with BWCs.  With a more complete record of police-citizen encounters available on BWC, the studies can supply novel insights into officer compliance with the Fourth and Fourteenth Amendments and the degree of NYPD documentation of police-citizen encounters without direct observation of officers.

The proposed studies to be conducted by the Stanford team are using a methodology that the monitor team has not used before—harnessing "machine learning."  Although BWCs are being implemented by more and more police agencies, the video footage from BWCs is more often used as evidence to evaluate particular interactions than as data to inform practice and policy.  The Stanford team has developed scalable computational tools for quickly and accurately analyzing police-community interactions captured by BWCs, and for examining broad patterns in those

interactions.  The Stanford studies will analyze the language that officers use during investigative

encounters.  An officer's words are of great legal import: they can signal to citizens whether they

are detained or free to leave, request their consent, or provoke their complaint.  More broadly, the

manner in which officers relate to the public is consequential for building or eroding citizens' trust

in the law and law enforcement, their support for law enforcement, and whether they personally

cooperate with the police.

The ISLG and Stanford studies will explore the following research questions:

1. *Compliance*: How often does officer behavior in police-citizen encounters violate the Fourth Amendment or Fourteenth Amendment?  What are the key reasons for officers' failure to comply with legal requirements?  Are there racial disparities in the legality of police-citizen encounters?

2. *Consent Searches*: Do officers seek overt consent to search in Level 3 encounters?  If so, when and how is consent sought?  What language used by officers is associated with citizen consent versus refusal to search?

3. *Escalation*: How often do police-citizen encounters escalate from lower to higher levels?  Are there racial disparities in the frequency and nature of escalated encounters?

4. *Citizen Complaints*: What elements of officer language and behavior in Level 3 encounters are most likely to result in citizen complaints?

5. *Documentation*:   Does the expansion of mandatory BWC recording to most Level 1 encounters increase the number of Level 3 encounters that are reported?  Post-expansion of BWC recording, what is the documentation rate of Level 3 encounters? Are undocumented Level 3 encounters associated with race and ethnicity or legal non-compliance?

In addition to addressing these substantive research questions, the studies will generate important

descriptive information about the nature of police-citizen encounters.

# APPENDIX A

# COMPLIANCE MATRIX

| Status | Standard | Task No. and Source of Requirement | Essence of Requirement | Compliance Definition | Methodology for Assessing and Achieving Compliance |
|---|---|---|---|---|---|
| **Requirements for Policies and Procedures** | | | | | |
| In Compliance | Creation of Written policies, procedures, and Training Materials | Task #1a,        Source: Floyd remedial order, p.14 | Revise policies regarding stop and frisk to adhere to constitutional standards and New York state law | Compliance with this provision will be achieved when NYPD develops new policies  regarding stops which comply with federal and state constitutional standards and which are approved by the Monitor and the Court. | Revise policies for stops to comport with federal and state constitutional standards. |
| Partial Compliance | Implementation | Task #1b Source: Floyd remedial order, p.14 | NYPD stops and frisks comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. Stops made by NYPD MOS comply with NYPD's new policies and with federal and state standards. 2. Stop reports that do not articulate reasonable suspicion for the stop or the frisk, or do not articulate the basis for the search are identified as deficient by supervisors and the officer is corrected.                                     3. Stop reports that do not articulate reasonable suspicion are identified by QAD, and corrective action is taken with respect to the relevant MOS (officers and supervisors). 4. QAD evaluates BWC footage of stop encounters described in audited stop reports, identifies stops when the BWC footage is contrary to the reasonable suspicion articulated in the stop report, and corrective action is taken with respect to the relevant officers and supervisors. | Percentage of compliant stops must increase over time.  Reviews of BWC footage and associated stop reports will be made to assess the accuracy of stop reports and whether the BWC footage and stop reports are consistent. Compliance on this task is dependent on demonstration of compliance with documentation (Task 1c).  Compliance must be consistent over time and across commands. Substantial compliance will be assessed by a combination of a quantitative measure (percentage of compliant stops) with a qualitative assessment of the Department's efforts, including RISK Reviews, correction and discipline, and EIS. Compliance or non-compliance with other tasks/requirements will also inform the Monitor's qualitative assessment. |
| Not yet in Compliance | Implementation | Task #1c        Source: Floyd remedial order, p.14 | Stops and Frisk are Documented on Stop Reports | Compliance with this provision will be achieved when 1. Stops made by NYPD MOS are documented on Stop Reports;                                        2. In stop reports, officers articulate reasonable suspicion for the stop and frisk, if conducted, and the basis for a search, if conducted. 3. BWC footage of stops are not contrary to the reasonable suspicion articulated in stop reports of the same encounters. 4. Officers who make stops and do not document them are corrected through instructions and discipline. | RISKS Reviews, QAD audits.  The Monitor team will review a combination of RAND audit compliance rates, PIE audit compliance rates and CCRB OMN rates for failure to complete stop reports.  The Monitor will review the Department's efforts to correct undocumented stops, including RISK Reviews, supervisory actions and officer instructions and discipline.  The Monitor also will assess NYPD efforts (by leadership and supervisors) to communicate the importance of documenting stops. Compliance must be consistent over time and across commands. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #2a        Source: Floyd remedial order, p.17 | Revise policies regarding racial profiling to make clear targeting "right people" for stops is racial profiling and violates Constitution | Compliance with this provision will be achieved when NYPD develops new policies regarding racial profiling. | Revise policies to ensure race is not used improperly when officers conduct stops |

| | | | | | |
|---|---|---|---|---|---|
| Not yet in Compliance | Implementation | Task #2b        Source: Floyd remedial order, p.17 | NYPD stops and frisks comply with NYPD policies and with state and federal standards regarding racial profiling | Compliance with this provision will be achieved when: 1. Stops made by NYPD MOS comply with NYPD's new policies and with federal and state standards regarding racial profiling. 2. Data on stops, frisks and searches made by NYPD MOS do not show racial disparities that are not explained by legally justified reasons, and that are practically significant in magnitude and statistically significant, based on analyses conducted by Monitor experts.            3. Communications from NYPD leadership (executives, CO's and others) and officers' stop report narratives do not indicate a targeting of defined racial or ethnic groups for stops because of their prevalence in local crime suspect data. | Assessment of this task will be both quantitative and qualitative. Compliance or non-compliance with other tasks/requirements, such as Task 1c (documentation of stops) and Task 35 (racial profiling investigations), will inform the Monitor's assessment. Analyses will be conducted to assess whether there are racial disparities that are statistically significant and practically significant, and whether racial disparities are declining over time.  Monitor team analyses may include: (1) An analysis of outcomes from stops (frisks, searches, summonses and arrests, force) for Blacks and Hispanics compared to similarly-situated non-Hispanics; (2) An analysis of the recovery rate of contraband and weapons for stops of Blacks and Hispanics compared to similarly-situated non-Hispanics; (3) An analysis of whether there are racial disparities in the stop reports that the Monitor team found deficient in articulating reasonable suspicion for stops, frisks or searches, including an assessment of how MOS are using the term "fits description."  The Monitor team will also conduct an analysis that will examine racial disparity by place, over time. The Monitor team will also conduct analyses for assessing compliance with the Davis case.  The Monitor team is currently considering the following types of analyses: A.  Descriptive results and multivariate analyses for 2015-2018, for NYCHA:  (1) Comparison of trespass stops, arrests, and summonses over time in and around NYCHA developments; (2) Comparison of outcomes (frisk, searches, use of force, and enforcement activity) from stops in NYCHA developments and around NYCHA developments over time; (3) Examination of whether outcomes vary by whether an officer is assigned to the Housing Bureau or other NYPD units; (4) Examination of racial disparities in outcomes from stops in NYCHA developments compared to outcomes from stops of individuals stopped under similar contexts. B.  Spatial analysis of overall enforcement activity and disparities by race/ethnicity for Davis case;  (5) Assess enforcement activity (stops, |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #3        Source: Floyd remedial order, p.19 | Stop Report must include a narrative section to explain basis for the stop and a narrative section to explain basis for frisk or search, if applicable, and the stop report checkboxes must be simplified and improved. | Compliance with this provision will be achieved when: 1. NYPD revises its stop report form to include a narrative section for the officer to explain the reason for the stop.            2. NYPD revises its stop report form to include a narrative section for the officer to explain the reason for the frisk or search. 3. NYPD prepares a stop report form which contains simplified and improved checkboxes | |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #4        Source: Floyd remedial order, p.25 | NYPD must transmit FINEST message explaining Floyd and related reforms to entire Department | Compliance with this provision will be achieved when NYPD prepares and distributes a FINEST message detailing the Floyd litigation disposition and constitutional standards NYPD have to comply when conducting stops | Prepare and distribute a FINEST message to all NYPD personnel summarizing the constitutional standards for conducting stops and frisks and prohibiting racial profiling |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #5a        Source: Floyd remedial order (Ligon remedies section), p.33-34; Ligon stipulation of settlement, p.11 | NYPD shall develop and adopt the standards set forth in subparagraph E(1)(a) though (m) of the Ligon stipulation of settlement regarding enforcement activities in and around TAP buildings | Compliance with this provision will be achieved when: 1. NYPD revises its policy to specify when it is legally permissible to stop a person outside a TAP building on suspicion of trespass;            2. NYPD develops and adopts specified standards regarding enforcement activities in and around TAP buildings | Revise policies for stops to comport with federal and state constitutional standards. |

| Status | Type | Task | Description | Compliance | Action |
|---|---|---|---|---|---|
| Not yet in Compliance | Implementation | Task #5b   Source: Floyd remedial order (Ligon remedies section), p.33-34; Ligon stipulation of settlement, p.11 | NYPD shall implement policies and procedures, training, supervision and monitoring programs sufficient to consistently follow, apply and use the standards regarding enforcement in and around TAP buildings specified in Paragraph E(1)(a) through (m) of the Ligon stipulation of settlement. | Compliance with this provision will be achieved when: 1. Stops made by NYPD MOS at TAP locations comply with NYPD's new policies and with federal and state standards. 2. Stop reports that do not articulate reasonable suspicion for the stop or the frisk, or do not articulate the basis for the search are identified as deficient by supervisors and the officer is corrected.                     3. Stop reports that do not articulate reasonable suspicion are identified by QAD, and corrective action is taken with respect to the relevant MOS (officers and supervisors). 4. NYPD MOS follow the agreed-upon standards for investigative encounters and trespass enforcement activities in and around TAP buildings. | Percentage of compliant stops must increase over time.  Compliance on this task is dependent on demonstration of compliance with documentation (Task 1c).  Compliance must be consistent over time and across commands. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #6a   Source: Floyd remedial order (Ligon remedies section), p.34 | Amend Interim Order 22 with specified language regarding mere presence near, entry into or exit out of TAP building | Compliance will be achieved when revisions are made to NYPD policy (P.G. 212-59)  on interior patrols in buildings enrolled in the Trespass Affidavit Program buildings specifying that mere presence outside of or entry into or exit from a TAP building does not constitute an objective credible reason to approach an individual under a DeBour analysis. | Revise and publish PG 212-59 |
| Not yet in Compliance | Implementation | Task #6b   Source: Floyd remedial order (Ligon remedies section), p.34 | NYPD MOS must have OCR to approach person at TAP locations | Compliance will be achieved when NYPD MOS have OCR for Level 1 encounters at TAP locations. | |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #7   Source: Floyd remedial order (Ligon remedies section), p.34 | Draft FINEST message explaining revisions to Interim Order 22 | Compliance with this provision will be achieved when NYPD drafts and promulgates FINEST message explaining revisions to IO 22 | Draft and promulgate FINEST message explaining revisions to IO 22 |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #8a   Source: Floyd remedial order (Ligon remedies section), p.35; Ligon stipulation of settlement, p.7 | Develop procedures to ensure Stop Reports are completed for every trespass stop at TAP locations | Compliance with this provision will be achieved when the NYPD has developed procedures to ensure that Stop Reports are prepared for all stops in and around TAP buildings | NYPD needs to revise its procedures to make clear that Stop Reports are required for all stops including stops for trespass outside of TAP buildings |
| Not yet in Compliance | Implementation | Task #8b   Source: Floyd remedial order (Ligon remedies section), p.35; Ligon stipulation of settlement, p.7 | All stops at TAP locations must be documented by a Stop Report | Compliance with this provision will be achieved when MOS complete a Stop Report for all stops conducted in or around TAP buildings. | QAD Audits, RISK Reviews.  Monitor team will review a combination of RAND audit compliance rates, PIE audit compliance rates and CCRB OMN rates for failure to complete stop reports.  Compliance must be consistent over time and across commands. |
| In Compliance | Implementation | Task #9   Source: Floyd remedial order (Ligon remedies section), p.36 | Distribute revised TAP policies and procedures to each NYPD member and redistribute two additional times at six-month intervals | Compliance with this provision will be achieved when the revised version of P.G. 212-59 has been distributed to all MOS. | Distribution of P.G. 212-59 |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #10a   Source: Davis stipulation of settlement, p.9 | Revise Patrol Guide 212-60 | Compliance with this provision will be achieved when the Department revises its policy on interior patrols in NYCHA buildings to promote constitutional interactions. | Revise PG 212-60 to promote constitutional interactions. |
| Partial Compliance | Implementation | Task #10b   Source: Davis stipulation of settlement, p.9 | NYPD interior patrols, stops and frisks at NYCHA properties comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. Stops made by NYPD MOS at NYCHA properties comply with NYPD's new policies and with federal and state standards. 2. Stop reports that do not articulate reasonable suspicion for the stop or the frisk, or do not articulate the basis for the search are identified as deficient by supervisors and the officer is corrected.                     3. Stop reports that do not articulate reasonable suspicion are identified by QAD, and corrective action is taken with respect to the relevant MOS (officers and supervisors). | Percentage of compliant stops must increase over time.  Compliance on this task is dependent on demonstration of compliance with documentation (Task 1c#) |

| Status | Category | Task | Provision | Compliance | Notes |
|---|---|---|---|---|---|
| Partial Compliance | Implementation | Task #10c Source: Davis stipulation of settlement, p.9 | NYPD trespass arrests at NYCHA properties comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. Trespass arrests made at NYCHA properties comply with the NYPD's policies and with federal and state standards | Percentage of compliant arrest must increase over time. Compliance must be consistent over time and across commands. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #11a Source: Davis stipulation of settlement, p.10, Ligon stipulation of settlement, p.12 | Revise Trespass Crimes Fact Sheet | Compliance with this provision will be achieved when the Department revises the Trespass Crimes Fact Sheet | Revise Trespass Crimes Fact Sheet |
| Partial Compliance | Implementation | Task #11b Source: Davis stipulation of settlement, p.10, Ligon stipulation of settlement, p.12 | MOS use Trespass Crime Fact Sheet for Housing trespass arrests | Compliance with this provision will be achieved when: 1. NYPD MOS complete a Trespass Crime Fact Sheet form (PD 351-144) prior to arraignment, any time they effect an arrest for trespass in or around a NYCHA residence.   2. The TCFS articulates a proper basis for the approach and probable cause for the trespass arrest. | Compliance must be consistent across commands and over time. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #12a Source: Ligon stipulation of settlement, p.10 | NYPD officers are required to complete a Trespass Crimes Fact Sheet for every trespass arrest made in or around a TAP building | Compliance with this provision will be achieved when officers are required to complete a Trespass Crimes Fact Sheet for all trespass arrests made in or around TAP buildings prior to arraignment. | Require officers to complete a Trespass Crimes Fact Sheet for all trespass arrests made in or around TAP buildings prior to arraignment |
| Not yet in Compliance | Implementation | Task #12b Source: Ligon stipulation of settlement, p.10 | NYPD officers complete a Trespass Crimes Fact Sheet for every trespass arrest made in or around a TAP building | Compliance with this provision will be achieved when: 1. Officers complete a Trespass Crimes Fact Sheet for all trespass arrests made in or around TAP buildings prior to arraignment; 2. The TCFS articulates a proper basis for the approach and probable cause for the trespass arrest. | Compliance must be consistent across commands and over time. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #13a Source: Ligon stipulation of settlement, p.13-14 | Revise and promulgate Administrative Guide 303-27 | Compliance with this provision will be achieved when the NYPD promulgates the revised AG 303-27. | Promulgate the revised AG 303-27. |
| Not yet in Compliance | Implementation | Task 13b Source: Ligon stipulation of settlement, p.10 | Implement Administrative Guide 303-27 | Compliance with this provision will be achieved when the NYPD implements the revised AG 303-27: 1. CPOs obtain appropriate Trespass Crimes Owner's Affidavit and complete TAP enrollment form for buildings entering the program. 2. CPOs review and evaluate whether to renew a building's participation in the program before the expiration of six months. 3. COs review and evaluate whether to renew a building's participation in the program before the expiration of one year. 4. Borough Commanders are notified if there is a need for a building to remain in TAP beyond one year, and will recommend approval to the Officer of the Chief of Patrol if they determine that the building should remain in the program.  The Office of the Chief of Patrol will issue the final approval for renewal. | |
| Not yet in Compliance | Implementation | Task #14 Source: Floyd remedial order, p.21 | NYPD Business Card given to person stopped but not arrested or summonsed, replacing the tear-off receipt | Compliance will be achieved when NYPD MOS offer a business card to persons stopped but not arrested or summonsed | Monitor team will review BWC videos and Stop Reports to assess whether persons stopped but not arrested or summonsed are offered a business card. |
| | | | | | |
| | **Supervisory Review Requirements** | | | | |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #15a Source: Floyd remedial order, p.24 | Sergeants and must address constitutionality of stops of their subordinates | Compliance with this provision will be achieved when: 1. NYPD policies and procedures require supervisors to review stops for constitutionality in a comprehensive manner; 2. NYPD requires supervisors to complete Supervisory Review section of Stop Report; | Add Supervisor checkboxes "Sufficient Basis to Stop," "Sufficient Basis for Frisk" and Sufficient Basis for Search" on the Stop Report, which requires supervisor to determine whether officer had reasonable suspicion to stop and, if applicable, frisk or search the individual; |

| | | | | | |
|---|---|---|---|---|---|
| Not yet in Compliance | Implementation | Task #15b        Source: Floyd remedial order, p.24 | Sergeants review and assess the constitutionality of stops of their subordinates | Compliance with this provision will be achieved when: 1. Supervisors review stops for constitutionality in a comprehensive manner and take appropriate corrective action when they identify improper stops, frisks or searches. 2. Supervisors who observe or learn of MOS who make a stop but do not document the stop with a stop report take appropriate corrective action. | Monitor team will examine a sample of stop reports audited by QAD; as well as ICO self-inspections and QAD's audit of supervisory review. Monitor team will also assess NYPD's efforts through RISKS Reviews and follow-up training conducted for supervisors who do not identify deficient stop reports. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #16a        Source: Floyd remedial order, p.24 | ICOs must address constitutionality of stops of their subordinates | Compliance with this provision will be achieved when: 1. NYPD prepares ICOs self-inspection procedures and forms for review of Stop Reports for constitutionality | ICO SQF self-inspection protocols revised |
| Partial Compliance | Implementation | Task #16b        Source: Floyd remedial order, p.24 | ICOs conduct Self-Inspections to assess the constitutionality of stops | Compliance with this provision will be achieved when: 1. ICOs complete SQF self-inspections and review Stop Reports for constitutionality; | Monitor team will assess a sample of ICO Self-Inspections as well as reviewing the QAD audit findings of ICO self-inspections.  ICO efforts to review BWC footage will also be considered. |
| | **Training Requirements** | | | | |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #17a        Source: Floyd remedial order, p.14 | Revise training regarding stop and frisk to adhere to new NYPD policies, constitutional standards and New York state law | Compliance with this provision will be achieved when 1. NYPD develops new In-Service training regarding stops which comply with federal and state standards and which are approved by the Monitor and the Court; 2. NYPD develops new In-Service training for supervisors regarding their responsibilities for reviewing officer stops and documentation of stops. | Revise training materials for stops to comport with federal and state standards. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #17b        Source: Floyd remedial order, p.14 | Revise recruit training regarding stop and frisk to adhere to new NYPD policies, constitutional standards and New York state law | Compliance with this provision will be achieved when 1. NYPD develops new Recruit training regarding stops which comply with federal and state standards and which are approved by the Monitor and the Court. | Revise training materials for stops to comport with federal and state standards. |
| In Compliance | Implementation | Task #17c        Source: Floyd remedial order, p.14 | NYPD has trained its members regarding stops to comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.                    2. NYPD patrol officers and detectives are trained on investigative encounters.                                  3. NYPD supervisors are trained on investigative encounters and their responsibility for reviewing officer stops and documentation of stops; | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance  Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation.  Qualitative assessment of SQF training will also take into account outcome measures, such as the level of compliance of MOS as reflected in their stop reports and an assessment of unreported stops. Sustained compliance will be assessed in conjunction with refresher training in Task 31b. |
| In Compliance | Implementation | Task #17d        Source: Floyd remedial order, p.14 | NYPD has trained its recruits regarding stops to comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.                    2. NYPD recruit officers are trained on investigative encounters. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance  Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation.  Qualitative assessment of SQF training will also take into account outcome measures, such as the level of compliance of MOS as reflected in their stop reports and an assessment of unreported stops. Sustained compliance will be assessed in conjunction with refresher training in Task 31b. |

| Status | Category | Task / Source | Provision | Compliance | Notes |
|---|---|---|---|---|---|
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #18a    Source: Floyd remedial order, p.17 | Revise in-service training regarding racial profiling to make clear targeting "right people" for stops is racial profiling and violates Constitution | Compliance with this provision will be achieved when NYPD develops new in-service training regarding racial profiling | Revise training to ensure race is not used improperly when officers conduct stops |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #18b    Source: Floyd remedial order, p.17 | Revise recruit training regarding racial profiling to make clear targeting "right people" for stops is racial profiling and violates Constitution | Compliance with this provision will be achieved when NYPD develops new recruit training regarding racial profiling | Revise training to ensure race is not used improperly when officers conduct stops |
| In Compliance | Implementation | Task #18c    Source: Floyd remedial order, p.17 | NYPD has trained its members regarding stops to comply with NYPD policies and with state and federal standards regarding racial profiling | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.                     2. NYPD patrol officers, detectives and supervisors are trained regarding racial profiling. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance  Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation.  Qualitative assessment of SQF training will also take into account outcome measures, such as the level of compliance with Task #2b.  Sustained compliance will be assessed in conjunction with refresher training in Task 31b. |
| In Compliance | Implementation | Task #18d    Source: Floyd remedial order, p.17 | NYPD has trained its recruts regarding stops to comply with NYPD policies and with state and federal standards regarding racial profiling | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.                     2. NYPD recruit officers are trained regarding racial profiling. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance  Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation.  Qualitative assessment of SQF training will also take into account outcome measures, such as the level of compliance with Task #2b.  Sustained compliance will be assessed in conjunction with refresher training in Task 31b. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #19a    Source: Floyd remedial order, p.21 | NYPD has developed in-service training in use of new Stop Report | Compliance with this provision will be achieved when NYPD develops new training guidelines for officers to explain reasons for stopping and frisking the individual, especially why the officer had reasonable suspicion that individual was committing or about commit criminal activity and was armed and dangerous. | Revise training for stops and frisk to comport with federal and state standards |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #19b    Source: Floyd remedial order, p.21 | NYPD has developed recruit training in use of new Stop Report | Compliance with this provision will be achieved when NYPD develops new training guidelines for recruits to explain reasons for stopping and frisking the individual, especially why the officer had reasonable suspicion that individual was committing or about commit criminal activity and was armed and dangerous. | Revise training for stops and frisk to comport with federal and state standards |
| In Compliance | Implementation | Task #19c    Source: Floyd remedial order, p.21 | NYPD has trained its members regarding the use of the new Stop Report | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.                     2. NYPD patrol officers, detectives and supervisors are trained regarding the use of the new Stop Report. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance  Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |

| Status | Category | Task/Source | Provision | Compliance Standard | Requirements |
|---|---|---|---|---|---|
| In Compliance | Implementation | Task #19d     Source: Floyd remedial order, p.21 | NYPD has trained its recruit members regarding the use of the new Stop Report | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.               2. NYPD recruit officers are trained regarding the use of the new Stop Report. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance  Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Creation of Written policies procedures, and Training Materials | Task #20a  Source: Floyd remedial order, p.24 | NYPD has developed training on supervisory responsibilities for newly promoted supervisors | Compliance with this provision will be achieved when the monitor and the Court, for newly promoted NYPD supervisors on investigative encounters and their responsibility for reviewing officer stops and documentation of stops. | |
| In Compliance | Implementation | Task #20b     Source: Floyd remedial order, p.24 | NYPD has trained its newly promoted supervisors on supervisory responsibilities for newly promoted supervisors | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.     2. Newly promoted NYPD supervisors are trained on investigative encounters and documentation of stops. | The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #21a     Source: Floyd remedial order (Ligon remedies section), p.36; Ligon stipulation of settlement, p.16 | NYPD must develop stop and frisk training at Rodman's Neck that incorporates instruction specifically targeting the problem of unconstitutional stops outside TAP buildings | Compliance with this provision will be achieved when the SQF in-service training materials at Rodman's Neck incorporates instruction specifically aimed at the preventing unconstitutional stops outside TAP buildings. | SQF in-service training needs to include instruction specifically aimed at preventing unconstitutional stops outside TAP buildings. |
| In Compliance | Implementation | Task #21b     Source: Floyd remedial order (Ligon remedies section), p.36; Ligon stipulation of settlement, p.16 | NYPD has trained its members regarding stops at TAP locations to comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.               2. NYPD patrol officers, detectives and supervisors are trained on stops at TAP locations. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance  Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #22a     Source: Floyd remedial order (Ligon remedies section), p.36 | NYPD must develop training regarding stops outside TAP buildings for new recruits | Compliance with this provision will be achieved when the recruit training includes the constitutional standard for when an officer may and may not stop someone outside of a TAP building | Recruit training needs to include instruction specifically on when an officer may and may not stop someone outside of a TAP building |
| Partial Compliance | Implementation | Task #22b  Source: Floyd remedial order (Ligon remedies section), p.36 | NYPD has trained its recruits regarding stops at TAP locations to comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.     2. NYPD recruits are trained on stops at TAP locations. | Interior Patrol training course must be part of Recruit Curriculum taken by each recruit class.  The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #23a     Source: Floyd remedial order (Ligon remedies section), p.36 | Field Training Guide and FTO training materials must be revised to reflect formal written policy governing trespass stops outside TAP buildings | Compliance with this provision will be achieved when the Field Training Guide and FTO training materials have been revised to reflect the formal written policy governing trespass stops outside of TAP buildings. | The Field Training Guide and FTO training needs to include instruction regarding the formal written policy governing trespass stops outside of TAP buildings. |

| Status | Type | Task & Source | Description | Compliance | Notes |
|---|---|---|---|---|---|
| In Compliance | Implementation | Task #23b Source: Floyd remedial order (Ligon remedies section), p.36 | NYPD has trained its FTOs on TAP policies and procedures | Compliance with this provision will be achieved when FTOs have been trained on TAP policies and procedures | SQF and TAP Training module must be part of each FTO training class. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Implementation | Task #24 Source: Floyd remedial order (Ligon remedies section), p.36 | SQF Training Video No. 5 must be revised to state information in earlier video was incorrect | Compliance with this provision will be achieved when the Department disseminates an SQF video stating that the information in the previous training video was incorrect and explain why it was incorrect. | Create SQF video stating that the information in the previous training video was incorrect and explaining why it was incorrect. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #25a Source: Davis stipulation of settlement, p.9 | Revise Interior Patrol recruit training | Compliance with this provision will be achieved when the Department revises its recruit training on interior patrols in NYCHA buildings to promote constitutional interactions. | Revise Interior Patrol recruit training to promote constitutional interactions in and around NYCHA buildings. |
| Partial Compliance | Implementation Compliance | Task #25b Source: Davis stipulation of settlement, p.9 | Train recruits at the Academy on Interior Patrol | Compliance with this provision will be achieved when the Department trains its recruits in the Police Academy on interior patrols in NYCHA buildings to promote constitutional interactions. | Interior Patrol Training Course must be part of Recruit Curriculum taken by each recruit class. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #26a Source: Davis stipulation of settlement, p.9 | Revise training regarding NYCHA rules, regulations, and signage | Compliance with this provision will be achieved when the Department: 1. Develops roll call training for Housing officers on NYPD policies on interior patrol; 2. Develops training for Housing officers that includes instruction on NYCHA rules, regulations, and signage utilizing material contained in Exhibit E (lesson plan) contained in the Davis stipulation. | Create Housing one-day training that includes instruction based on Exhibit E of the stipulation, specifically including instruction on NYCHA rules, regulations, and signage |
| In Compliance | Implementation | Task #26b Source: Davis stipulation of settlement, p.9 | Implement training regarding NYCHA rules, regulations, and signage | Compliance with this provision will be achieved when: 1. NYPD disseminates roll call training on NYPD interior patrol policies to Housing officers; 2. NYPD training instructors provide training for Housing officers consistent with the court approved training materials. 3. NYPD Housing officers and supervisors are trained on NYCHA rules, regulations, and signage utilizing material contained in Exhibit E (lesson plan) of the Davis stipulation. | The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| Partial Compliance | Implementation | Task #27 Source: Ligon stipulation of settlement, p.16 | Ensure every member of NYPD who is involved in administration of TAP is trained on specified standards | Compliance with this provision will be achieved when TAP administrators have been trained on the specified standards. | Revise TAP enrollment form and instructions and meet with relevant actors to go over how to implement the revisions. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #28a Source: Floyd remedial order p.16 | Training on constitutional standard for a frisk - reasonable suspicion that a stopped person is armed and dangerous to correct overbroad definition of furtive behavior, the misleading training on unusual firearms | Compliance with this provision will be achieved when: 1. Errors identified in the training materials (furtive behavior," "unusual firearms") have been corrected; 2. The proper legal standards for a frisk or search are clearly articulated in the SQF training; | Revise recruit and in-service trainings to correct identified errors and clearly articulate the proper legal standards regarding stops and frisks. |
| In Compliance | Implementation | Task #28b Source: Floyd remedial order p.16 | Training on constitutional standard for a frisk - reasonable suspicion that a stopped person is armed and dangerous to correct overbroad definition of furtive behavior, the misleading training on unusual firearms | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD recruits are correctly trained on identifying characteristics of armed suspects. | Monitor team observation of Characteristics of Armed Suspects recruit training. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| Partial Compliance | Creation of Written policies, procedures and Training Materials | Task #29a Source: Floyd remedial order p.24-25 | NYPD develops training for its investigators on racial profiling complaint investigations | Compliance with this provision will be achieved when: 1. IAB develops an Internal Investigators Course on profiling and bias-based policing. | |

| | | | | | |
|---|---|---|---|---|---|
| Not yet in Compliance | Implementation | Task #29b       Source: Floyd remedial order p.16 | NYPD must train investigators on racial profiling complaint investigations | Compliance with this provision will be achieved when: 1. IAB intake personnel are trained on handling profiling complaints; Investigators in Investigations Units who will be undertaking profiling investigations have been trained on investigating profiling complaints | Monitor team observation of Internal Investigators course, Module #4. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation.  Assessment of the training will be informed by the Monitor's review of profiling investigations, Task 35(b). |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #30a       Source: Floyd remedial order p.14 | NYPD must develop training for officers newly assigned to plainclothes assignments | Compliance with this provision will be achieved when: 1. NYPD has developed training, approved by the monitor and the Court, for officers newly assigned to plainclothes units on investigative encounters and the standards for stops and frisks. | |
| Not yet in Compliance | Implementation | Task #30b       Source: Floyd remedial order p.14 | Training is provided for officers newly assigned to plainclothes assignments | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials.         2. NYPD MOS assigned to plainclothes units are trained on investigative encounters. | SQF Training module must be part of each Basic Plainclothes training class.  The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| Partial Compliance | Creation of Written policies, procedures and Training Materials | Task #31a Source: Floyd remedial order p.14 | NYPD develops SQF refresher training for incumbent and probationary officers, and for supervisors | Compliance with this provision will be achieved when: 1. NYPD develops SQF refresher training for incumbent and probationary officers.                          2. NYPD develops SQF refresher training for supervisors. | Create refresher course for incumbent and probationary officers |
| Not yet in Compliance | Implementation | Task #31b Source: Floyd remedial order p.14 | NYPD conducts SQF refresher training for incumbent and probationary officers | Compliance with this provision will be achieved when: 1. NYPD provide training consistent with  court approved training materials.                                     2. NYPD incumbent and probationary officers have taken a refresher course on investigative encounters.         3. Supervisors have taken a refresher course on investigative encounters and supervisory responsibilities for review of stop reports and documentation. | Conduct SQF refresher for incumbent and probationary officers. |
| | | | | | |
| | **Body-Worn Camera Requirements** | | | | |
| In Compliance | Implementation | Task #32a       Source: Floyd remedial order p.27 | NYPD must institute one-year BWC pilot project | Compliance with this provision will be achieved when: 1. The Monitor reports on the results of his BWC Pilot with respect to the effectiveness of body-worn cameras in reducing unconstitutional Stop and Frisks. | Acquire BWC technology; Create BWC policy PG 212-123; equip MOS in pilot commands with BWC for use on the third platoon; train affected MOS in proper use of BWC's. Retaining BWC footage for use by Monitor's team. |
| In Compliance | Implementation | Task #32b       Source: Floyd remedial order p.27 | NYPD must develop procedures for supervisory review of BWC videos | Compliance with this provision will be achieved when: 1. NYPD implements supervisory reviews of BWCs consistent with the review protocols approved by the Monitor. | |
| In Compliance | Implementation | Task #32c       Source: Floyd remedial order p.27 | NYPD must develop procedures for sharing BWC videos with the CCRB for complaint investigations | Compliance with this provision will be achieved when: 1. NYPD shares BWC videos with CCRB consistent with procedures approved by the Monitor. | |
| Partial Compliance | Implementation | Task #33       Source: October 2018 Court approval of stop report | NYPD must implement a BWC pilot for Housing officers working in PSA | Compliance with this provision will be achieved when the Monitor reports on the results of his PSA BWC Pilot with respect to the effectiveness of body-worn cameras in reducing unconstitutional Stop and Frisks. | |
| | | | | | |
| | **Complaints and Discipline Requirements** | | | | |
| Partial Compliance | Creation of Written policies, procedures and Training Materials | Task #34a       Source: Floyd remedial order, p.24 | DAO must improve procedures for imposing discipline by increasing deference to CCRB credibility determinations, applying evidentiary standard that is neutral between claims of complainants and officers and not requiring corroborating physical evidence | Compliance with this provision will be achieved when NYPD improves its procedures regarding imposing discipline in response to CCRB findings of substantiated misconduct during stops. | Establish Department Advocate's Office procedures relating to handling and prosecution of substantiated  complaints received from the CCRB. |

| | | | | | |
|---|---|---|---|---|---|
| Partial Compliance | Implementation | Task #34b        Source: Floyd remedial order, p.24 | DAO handling of substantiated CCRB complaints must meet improved procedures | Compliance with this provision will be achieved when: 1. The DAO's handling of substantiated CCRB complaints reflects:                (a) Increased deference to CCRB's factual findings;                (b) A neutral evidentiary standard; and                (c) No general requirement of corroborating physical evidence.        2.  NYPD tracks and analyzes CCRB complaints and discipline imposed. | Monitor review of DAO handling of CCRB complaints, including case files for Reconsideration Requests and Provision II retention cases. |
| Partial Compliance | Creation of Written policies, procedures and Training Materials | Task #35a        Source: Floyd remedial order, p.24-25 | NYPD must begin tracking and investigating racial profiling complaints | Compliance with this provision will be achieved when: 1. IAB establishes a procedural guide for processing and investigating cases of profiling and bias-based policing | |
| Not yet in Compliance | Implementation | Task #35b        Source: Floyd remedial order, p.24-25 | Racial Profiling complaints must be thoroughly and fairly investigated | Compliance with this provision will be achieved when: 1. NYPD tracks and investigates profiling investigations; 2.  NYPD investigations are thorough and impartial and consistent with the IAB guide. 3.   NYPD analyzes trends and patterns of profiling complaints. | Any complaints that contain an allegation of profiling will be processed and inputted into the IAB case management system, appropriately assigned to an investigator in IAB (for C cases) or in an Investigation Unit, and the results of the investigation will be tracked by IAB. Investigators assigned to Investigations Units and IAB will receive training and guidance regarding investigation of allegations of racial profiling.  Monitor review of profiling investigation files. |
| | **Auditing Requirements** | | | | |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #36a Source: Floyd remedial order, p.23 | NYPD establishes auditing procedures that identify non compliant stops, frisks, searches, trespass arrests and a mechanism for correcting them | Compliance will be achieved when the NYPD establishes an auditing plan that:                                1. Provides a sampling methodology for auditing Stop Reports;                                                      2. Provides audit procedures for Stop Reports, assessing whether: (i) officers sufficiently articulated reasonable suspicion as the basis for the stop, (ii) officers sufficiently articulated the legal basis for a frisk and/or search, if applicable; (iii) supervisors reviewed the form and made correct determinations about the legality of the stop, frisk and search and took appropriate follow-up action;                                            3. Includes a review of BWC videos as part of the SQF audits;                                                          4. Includes a review and audit of Command Self-Inspections;                                                    5. Includes audit procedures for trespass arrests and associated TCFS at NYCHA and TAP locations assessing whether: (i) officers sufficiently articulate a legal basis for the approach; and (ii) officers sufficiently articulated probable cause for the arrest;                          6. Provides procedures for audits of Police Initiated Enforcement arrests;                                    7. Provides procedures for RAND audits. | |
| Partial Compliance | Implementation | Task #36b Source: Floyd remedial order, p.23 | NYPD implements auditing procedures that identify non-compliant stops, frisks, searches, trespass arrests and a mechanism for correcting them | Compliance will be achieved when:                        1. The NYPD conducts auditing in accordance with a plan approved by the monitor and the Court; 2.  QAD audits identify non-compliant stops, frisks, searches and trespass arrests;                                      3. Commands take appropriate action in response to QAD findings | Monitor team will review a representative sample of stop reports, along with BWC footage, and will compare QAD audit results with Monitor audit results. |
| | | | | | |

| | **Early Intervention System** | | | | |
|---|---|---|---|---|---|
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #37a          Source: Court Order Regarding Facilitator's Recommendation No. 1 | NYPD to design a program to receive, assess, and act on information regarding adverse findings regarding unlawful stops and trespass enforcements | Compliance will be achieved when the Department submits a plan, approved by the Court, to receive, assess, and act on information regarding adverse findings regarding unlawful stops and trespass enforcements | |
| Partial Compliance | Implementation | Task #37b          Source: Court Order Regarding Facilitator's Recommendation No. 1 | NYPD to implement a program to receive, assess, and act on information regarding adverse findings regarding unlawful stops and trespass enforcements | Compliance will be achieved when:        1. The NYPD implements a program to receive, assess, and act on information regarding adverse findings regarding unlawful stops and trespass enforcements, in accordance to a plan approved by the Court;                         2. Data on declined prosecutions, adverse credibility findings, suppression decisions, lawsuits and denials of indemnification are included in the Department's early intervention system; 3. Commanding Officers and RMB implement and document interventions for officers identified through data on at-risk behaviors in the categories identified by the court. | Monitor will review EIS system to ensure that appropriate data is included in system and that Commanding Officers and RMB implement interventions when MOS reach threshold triggers. |
| | | | | | |
| | **Performance Evaluation** | | | | |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #38a          Source: Floyd remedial order, p.17; Floyd Order approving PERF, 11/6/2017 | Performance Evaluation System that does not pressure MOS to make stops without regard to constitutionality | Compliance will be achieved when:                              1. NYPD eliminates Operation Order 52 and any improper performance objectives from its performance evaluation system; 2. NYPD establishes a performance evaluation system that does not pressure MOS to make stops without regard to their constitutionality; 3. NYPD establishes a performance evaluation system that does not undermine the goals of the remedial process. | |
| Deferring Assessment | Implementation | Task #38b          Source: Floyd remedial order, p.17; Floyd Order approving PERF, 11/6/2017 | Implementation of Performance Evaluation System that does not pressure officers to make stops without regard to constitutionality | Compliance with this provision will be achieved when  the NYPD's performance-evaluation system, on paper and in practice, does not:                                    1. Reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness; or 2. Undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments of the Constitution as required by the Remedies Opinion. | The monitor team will undertake focus groups of officers and focus groups of supervisors to assess whether the PERF system pressures MOS to make stops without regard to constitutionality; monitor team will review data on MOS who receive rating of "needs improvement" for dimensions of Application of Law and Procedure, Quality and Timeliness of Written Reports, and Proactive Policing, and the documentation for those ratings, as well as CRAFT Supervisory Feedback forms. |
| | | | | | |
| | **Joint Remedial Process** | | | | |
| In Compliance | Implementation | Task #39          Source: Floyd remedial order, p.30 | NYPD must participate in the Joint Remedial Process | Compliance with this provision will be achieved when: 1. NYPD participates in the Joint Remedial Process;                    2. Facilitator submits his report and recommendations to the parties, the monitor and the Court. | Participate in JRP meetings and respond to Facilitator's Final Report. |
| Not yet in Compliance | Implementation | Task #40          Source: Court Order Regarding Body-Worn Cameras, 8/9/2018 | The NYPD must conduct a pilot to test requiring officers to activate BWCs at the inception of all Level 1 encounters with civilians | Compliance will be achieved when 1. The NYPD participates in the pilot study and provides the Monitor Team the relevant data to complete its analysis and report; 2. Monitor submits its report to the Court | |
| Not yet in Compliance | Implementation | Task #41          Source: Court Order Regarding Documenting and Recording Police-Citizen Encounters, 7/19/2018 | The NYPD must conduct a pilot to test requiring officers to electronically document Level 1 and Level 2 encounters with civilians | Compliance will be achieved when 1. The NYPD participates in the pilot study and provides the Monitor Team the relevant data to complete its analysis and report; 2. Monitor submits its report to the Court | Development of Level 1 and Level 2 electronic documentation app |
| | | | | | |
| | | | | | |
| | | | | | |

# APPENDIX B

# BWC VIDEOS ASSESSMENT WORKSHEET

**Appendix B – BWC Videos Assessment Worksheet**

**NYPD BWC INTERIOR PATROL – VIDEO OBSERVATION DATA ENTRY FORMS**

1. BWC File number?                                                                          _____
2. MOS Name                                                                                      _____
3. MOS Tax                                                        _____
4. MOS Command                                                                              _____
5. How many members of the public did the officer have significant
   contact with during the BWC activation?                                      _____
6. Where in the building was the person first encountered?           _____
7. What time did the encounter begin?                                          _____
8. How long was the encounter?                                                    _____
9. What was the person's gender?                                                _____
10. What was the person's race/ethnicity?                                    _____
11. What was the person's approximate age?                              _____
12. When the officer first encountered this person, what was the highest level   _____
    of knowledge available to the officer?
13. Was the officer's conduct legally appropriate? (If N, indicate why in comments)   (Y/N)
14. Did the level of the encounter escalate?                                                              (Y/N)
15. If the encounter escalated was the officer's conduct legally appropriate
    at the escalated level? (If N, indicate why in comments)
    (Y/N/NA)
16. Did the officer ask if the person live/visit/work in the building?
    (Y/N/NA)
17. Was the person advised that the encounter was being recorded by the                   (Y/N)
    officers BWC?
18. Was the person frisked during the encounter? (If N, go to Q20)                             (Y/N)
19. Did it appear that the officer had RS to frisk?                                                      (Y/N)
20. Was the person searched during the encounter? (If N, go to Q23)                        (Y/N)
21. Did the search appear legally justified?                                                               (Y/N)
22. If the officer requested consent to search was it done as per the PG?
    (Y/N/NA)
23. Did the police recover any contraband on the person?                                         (Y/N)
24. Was the person arrested or summonsed?                                                            (A/S/N)
25. Did the officer explain the reason for the encounter?                                          (Y/N)
26. Did the officer offer a Business Card?                                                          (Y/N/NA)
27. Was the Interior Patrol recorded in its entirety?
    (Yes=1, Start Late=2, End Early=3, Start Late AND End Early=4)                    (1/2/3/4)

COMMENTS:_____

_____