**Arnold & Porter**

**Peter L. Zimroth**
+1 212.836.7316 Direct
Peter.Zimroth@arnoldporter.com

November 30, 2020

<u>VIA ECF</u>

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
*Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
*Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
<u>Twelfth Report of the Independent Monitor</u>

Dear Judge Torres,

I am pleased to attach the Monitor's Twelfth Report: The Deployment of Body Worn Cameras (BWCs) on New York City Police Department (NYPD) Officers. This report describes the results of the evaluation of the NYPD's BWC pilot program, as required by the Court's Remedial Order and modified order. *Floyd* v. *City of New York*, 959 F. Supp. 2d 668, 685 (S.D.N.Y. 2013). The goal of the pilot program was to assess the effects of deploying cameras on policing outcomes, community perceptions of policing in their neighborhoods, and whether deployment results in reducing unconstitutional stops and frisks. The report describes the evaluation plan, presents analytical results, and discusses key findings.

One of the important goals of the pilot was to quantify the risks and benefits of deploying BWCs in order to assess whether BWCs should be deployed throughout the City. That goal has been overtaken by events: the Department made that decision, before the results of the study were known. However, the study can provide guidance for the continued use of BWCs, not only for the NYPD, but for police departments throughout the country. The use of BWCs is not a panacea, as the results of the study show. But it is a powerful tool for increasing transparency and accountability for the public and for police officials.

The pilot program evaluation design, developed by Professor Anthony Braga, Professor John MacDonald and other members of the monitor team, was a cluster randomized controlled trial. Forty precincts with the highest numbers of Citizen Complaint Review Board (CCRB) complaints against NYPD officers were identified and then matched into 20 pairs based on demographics, socio-economic characteristics, crime and police activity. Within each pair, one precinct was randomly assigned to have cameras (the treatment precinct) and the other was

**Arnold & Porter**

Honorable Analisa Torres
November 30, 2020
Page 2

assigned to be without cameras (the control precinct). Uniformed officers working the third platoon (3:00 PM to midnight shift) and plainclothes officers working Anti-Crime Unit assignments in the treatment precincts wore BWCs for a one-year period. Professor Braga and the monitor team then compared data from the matched pairs of precincts using four sets of outcome measures: civility of police-citizen interactions, policing activity, police lawfulness, and police–community relations.

The study showed that deployment of body-worn cameras was associated with a statistically significant decrease in CCRB complaints and a statistically significant increase in the number of stop reports completed by treatment officers relative to control officers. Contrary to the fear of expressed by some commentators, the number of arrests, arrests with force, summonses, domestic incident reports, and citizen crime complaint reports did not change when officers in the treatment precincts were compared to officers in the control precincts. Concerning police-community relations, based on surveys conducted in the treatment and control precincts both before and after the implementation of BWCs, there was no meaningful differences in resident perceptions of the police and of police-community relations as a result of BWC use. This should not be a surprising result. Views of the police are sometimes deeply imbedded, are formed over long periods of time, and can change based on events that have nothing to do with BWCs or the NYPD. It takes much more than deployment of BWCs for a year to change those perceptions.

In analyzing the stop reports of officers in the treatment and control precincts, the monitor team found that stop reports of officers in the BWC precincts were less likely to be deemed lawful. In stop reports that involved a frisk and/or a search, the justifications reported for frisking or searching citizens in BWC officer stop reports were also less likely to be judged by the monitor team as constitutional when compared to control officer reports. At first blush, this seems counter-intuitive. Why should using BWCs lead to less lawful results? Actually, there is a much more sensible explanation. When BWCs are being used, the officers know that there are extra sets of eyes on their actions, and therefore a failure to file a stop report when required is much more likely to be discovered. So what could be expected is an increase in the number of stop reports for encounters that may be problematic. That is in fact what happened. There was a meaningful increase in the number of stop reports filed by officers wearing BWCs.

This randomized controlled trial suggests that the placement of BWCs on officers resulted in the increased documentation of stop reports, particularly of those stops that may have reflected unlawful police actions. As such, BWCs can be a useful tool in reducing underreporting of stops and unlawfulness by making stops more transparent to NYPD supervisors and outside monitors (e.g., district attorneys, courts, CCRB).

**Arnold & Porter**

Honorable Analisa Torres
November 30, 2020
Page 3

      The Court and other readers will find a wealth of technical data and explanations in the Report.  It was very important to include this so that outside experts can closely review the results and the research methods and statistical models used for the study.

      Thank you for the Court's time and attention.

                                        Respectfully submitted,

                                        */s/ Peter L. Zimroth*
                                        Peter L. Zimroth
                                        Monitor

Enclosure