# DRAFT – Investigative Encounters

**On-camera Presence**

The laws related to Investigative Encounters are an essential part of policing in New York City.  It is vital that all members of the NYPD understand this area of the law because so many of our law enforcement duties come from these types of interactions with the public. Knowing your legal authority and articulating the facts of each encounter will allow you to respect and protect the rights of civilians encountered, protect yourself, and any evidence recovered, and comply with the law and Department policy.   Whether you're a police officer on patrol, a detective in the squad, a supervisor reviewing Stop Reports or an executive setting Department policy; every member of the NYPD needs to understand the law pertaining to Investigative Encounters. In order to ensure that as much information regarding these encounters is preserved, it is important that you activate your BWC as early as possible in an encounter and continue recording until the encounter is complete.

**Text on the Screen**

A New York State court decision (People v DeBour, 40 N.Y.2d 210, decided June 15, 1976) defined the four levels of investigative encounters with civilians, up to and including arrest. The levels are: Request For Information, Common Law Right Of Inquiry, Reasonable Suspicion Stop, and Probable Cause to Arrest:

> FOUR LEVELS OF ENCOUNTER:
> LEVEL 1 – REQUEST FOR INFORMATION
> LEVEL 2 – COMMON LAW RIGHT OF INQUIRY
> LEVEL 3 – *TERRY*  STOP
> LEVEL 4 –ARREST AND SUMMONSES

**On-camera Presence**

The four levels of Investigative Encounters define the powers available to you to effectively and legally carry out your duties while respecting the constitutional rights of the public you serve.   Understanding these rights will help to keep you safe and allow you to continue to build trust with the communities that you protect.  In this training module, we will illustrate and examine each of these levels of encounters and show you the tools you have to proceed at each level.    It is important to remember throughout the training that the Department absolutely prohibits the use of racial and bias-based profiling and the use of racial slurs or epithets in law enforcement actions. Conducting enforcement activities in an unbiased manner fosters and strengthens relationships between police officers and members of the community, and inspires confidence in, and support for, policing efforts.

Any action an officer takes regarding an individual must not be based on general crime data or previous experience alone.  For example, if the last few drug-related arrests you made in a particular area were of black males between the ages of 18 and 25, this would not give you reasonable suspicion to stop every black male between the age of 18 and 25 that you see in this area.  In order to stop someone, you need individualized facts or information that give you reasonable suspicion regarding that specific person.

**Title Card**
**Level 1 – Request for Information**

**On-Camera presence**

What have you got?

An anonymous 911 caller reported a robbery in the area, but gave no description or direction of flight of the suspect. Officers respond to the location within two minutes.

**Video Reenactment on Screen**

Video:

Officers approach the crowd to begin their investigation

Voiceover: The officers arrive at the location and find four people in the courtyard of a building. Nobody appears to be the victim of a robbery or is acting suspiciously in any way. The officers ask the civilians general, non-accusatory questions:

Video and audio of officers asking**:**

"Did anyone call 911?"

"Did you see anyone getting robbed?"

"Is anybody hurt?"

Some civilians decline to answer and others say:

"I didn't see anything"

"No, I didn't see a robbery"

"Nobody's hurt here"

 A male Hispanic, approximately 25 years old, dressed in a black hooded sweatshirt, blue jeans and black sneakers runs from the courtyard. The officers do not pursue the man.

Voiceover: Note that the officers do not pursue the man running away and only observe him from a distance.  I'll explain why in moment.

Video and Audio

Officers inquiring on the radio with Central for additional information

Officers reviewing the 911 application on their mobile device

Voiceover:  The officers check with Central for additional information and review the 911 job on their mobile device**.** Central confirms that there is nothing further.

> Video and audio

>> One of the civilians requests a business card, which the officer provides.

>> The officers resume patrol.

Voiceover: Officers must provide a business card if a civilian requests one or if the civilian asks for the officers identifying information. If you have no cards available, you must provide the requesting person an opportunity to record your information. With no further information, they resume patrol.

## On-Camera Presence

What we saw here is the lowest level of an investigative encounter, LEVEL 1 - a request for information. We have an anonymous 911 call for a robbery; however there is no description of a perpetrator, direction of flight or even evidence that a crime has actually occurred. The officers are canvassing for information about whether a crime occurred, or if anyone is hurt. The people in the courtyard who are questioned and a review of the 911 job on their NYPD-issued smartphone do not provide any additional information, and neither does Central when asked. Thus, officers have limited information available to them, so there are limitations on what they can do.

At this level, responding officers cannot ask pointed, accusatory questions to those people in the courtyard because they are not at LEVEL 2, common law right of inquiry nor are they at LEVEL 3, reasonable suspicion to stop. You cannot ask accusatory questions or ask for Consent to Search at Level 1.   The officers also cannot STOP any of them for questioning because, again, they did not have reasonable suspicion that any of the persons in the courtyard committed a crime.   Nor can an officer *treat* a person they are speaking to as if they are stopped; they may not surround the person, block his or her path, or order the person to whom the officer is speaking to stop. Because the officers are only at Level 1, with no other facts indicating any person is a FOCUS of criminality (Level 2) or providing reasonable suspicion that they committed the crime (Level 3), they cannot pursue or detain the man who fled from the courtyard.

What if the officers who arrived on the scene were aware of recent crime data showing that the majority of robberies recently reported in this area were committed by Hispanic males in their 20's? Same answer. Without a description of the suspect in this particular reported robbery, the fact that the fleeing man is from a demographic group that generally appears frequently in local crime suspect data does not, by itself, provide sufficient information to elevate this encounter beyond Level 1.

So what can you do during a Level 1 encounter?  You can ask general, non-accusatory questions that will help you find out what's going on.

## Text on Screen

Some examples include:

> CAN I TALK TO YOU?

> DID YOU SEE OR HEAR ANYTHING?

> ARE YOU OK?

> CAN I HELP YOU?

> DO YOU HAVE IDENTIFICATION?

3

WHAT'S YOUR NAME OR ADDRESS?

WHERE ARE YOU COMING FROM?

Voiceover:  These are all examples of general, non-accusatory questions that are meant to help you obtain useful information. A civilian is not required to answer any questions at any level of encounter.

You can ask for someone's identification, but individuals are not required to produce an ID unless they are driving a car. Also, you cannot keep the ID for an extended period of time, as the person would then not be free to leave.

You can also continue to observe or surveil anyone so long as you do not impede anyone's freedom of movement or reasonable expectations of privacy.  For many Level 1 situations, an officer won't reasonably be in fear for their safety.  But in the rare Level 1 encounter, because of the nature of the approach or the person's behavior, you may perceive that your safety is in jeopardy. Under those circumstances, you can engage in protective measures, for example, you may ask to see hands, or grab a hand if the circumstances suggest the person may be grabbing a weapon, or ask the person to put down an object that may be used as a weapon while you converse with them.

CAN ASK GENERAL, NON-ACCUSATORY QUESTIONS

CAN CONTINUE TO OBSERVE THE INDIVIDUAL

CAN ENGAGE IN PROTECTIVE MEASURES, IF NECESSARY

**On-Camera Presence**

At a Level 1 – Request for Information, you must have an objective credible reason for approaching someone to ask for information.  Unless you develop additional information from the 911 caller, witnesses at the scene, your own observations, your NYPD-issued smartphone, or Central, you remain at Level 1: request for information. During a Level 1 encounter, any member of the public that you interact with is free to leave; as mentioned, they can even run away and you cannot pursue them.

At any level, a person may refuse to answer your questions and remain silent during the interaction. Running away at Level 1 or remaining silent does not raise the level of encounter.  However, if they make false or inconsistent statements, that will elevate the level of the encounter.  It is important to understand that how you approach someone at Level 1 will help to determine whether a reasonable person would feel free to leave.  You cannot stop them, order them to stop, threaten to put your hands on them, block their path, surround them or in any way impede their freedom of movement.  Also, be mindful of the language that you use and the tone of your voice – you cannot order or direct anyone to stop at Level 1.

IN SUM:

- Level 1 **Request for Information**
  - Request for information, when we have an objective credible reason to approach someone that we do not suspect of criminal behavior.
  - Since you are only trying to gather information, you can ask general, non-accusatory questions of members of the public.
  - You may not frisk.
  - You may ask for ID, but the person or persons can refuse.

- You may not ask for consent to search.
- You may take protective measures when you reasonably fear for your safety.
- You do not have to offer your business card, but must provide one upon request.
- You must treat that person as free to leave, you may not order them to stop, surround them, or block their path.

**Title Card**
**Level 2 – Common Law Right of Inquiry**

**On-Camera Presence**

What have you got?

This time, the anonymous 911 caller reports that a 25-year-old male Hispanic with dark hair, wearing a white T-shirt, blue jeans and white sneakers, has just committed a strong-arm robbery and is still at the location. So now the officers have a detailed description of the suspect.

**Video Reenactment on Screen**

Video shows:

Cops en-route using the radio, department phone/tablet, and ICAD

(Do not have both/all officers using mobile devices, must show their maintenance of situational awareness in these images)

Voiceover: The officers activate their body-worn cameras and work to *verify* the information they have by calling back the 911 caller to either learn the caller's full name, or obtain eye-witness details from the caller. If there is no answer, they can review the ICAD job for additional eyewitness details that may be posted.

**Text on Screen**

CONTACT THE 911-CALLER TO:

LEARN THE CALLER'S FIRST AND LAST NAME

OBTAIN ADDITIONAL EYEWITNESS DETAILS

ALSO: CHECK ICAD JOB FOR ADDITIONAL EYEWITNESS DETAILS

Voiceover: They might be able to learn the caller's first and last name or obtain additional eyewitness details about the reported crime. They can also check the ICAD job for additional eyewitness details.

**On-Camera Presence**

In order to engage with someone at Level 2, also known as the Common Law Right of Inquiry, you must have a founded suspicion. That means facts and details that allow you to BEGIN TO FOCUS on the person as someone involved in criminality, based on either observable conduct OR an anonymous caller providing a detailed description of a suspect of a crime.   In this scenario, because the officers are unable to reach the 911 caller, and the ICAD job has no additional eye-witness details.  The officers remain at Level 2.

**Video on Screen**

   Video:

      Officers approach a 25-year-old male Hispanic with dark hair, wearing a white T-shirt, blue jeans and white sneakers, who is standing on the corner, drinking a soda.

Voiceover: On arrival, the officers observe an individual who matches the description of the suspect.  He does not appear to be engaged in criminality and is not doing anything that would elevate the officers' suspicions.  The officers' BWC's were activated en route to the location after they received the 911 call.

   Audio from Video:

      "Excuse me, can I speak with you for a second?"

       "Do you have any weapons on you?"

      "Do you have anything on you that you shouldn't have?"

**On-camera Presence**

These are pointed, accusatory questions that are intended to elicit an incriminating response based on the information the officers have, and based on the fact that the man on the corner matches the description of the alleged robber from an anonymous caller. Based on this information, the officers have a founded suspicion and begin to focus on this suspect as possibly being involved in criminal activity.   At Level 2, the person that you suspect of being involved in a crime is free to walk away and does not have to answer your questions.  If the person runs away, that elevates the encounter to Level 3 and you can stop them.  At Level 2, you must be mindful of your language, demeanor and tone towards the suspect because you cannot stop this person and you cannot make the suspect feel that they are not free to leave.

It is important to mention that at Level 2, (or any level) if the suspect provides false or inconsistent answers, this may elevate suspicion to level 3, and the person is no longer free to leave.

**Video Reenactment**

   Video:

      Officers are not impeding the suspect

Voiceover: You must not surround the suspect or impede his or her freedom of movement or order them to stop. The suspect should feel free to leave if he or she chooses. You can use protective measures as you have a right to be safe. If the suspect exhibits non-compliant hand movement or engages in other actions

or movements that cause you to reasonably fear for your safety you may exercise protective measures and request to see the suspect's hands. You <u>can</u> ask for consent to search. The request must be made without any promises or threats or coercion to gain consent. Consent to search must be voluntarily, knowingly and intelligently given to the officer by the suspect.

> Video and Audio:
>
>> "Can I search you?"
>>
>> "I can only search you with your consent, do you understand?"
>>
>> Person encountered answers yes.
>>
>> Officers searching with negative results

Voiceover: The suspect consents to the search, but nothing is found. No weapons or contraband are recovered.

> Video:
>
>> Officers call Central

Voiceover: The officers check with Central for additional information. Central confirms that there is nothing further.

> Video and Audio:
>
>> One of the officers explains the reason for the search: "We asked for your consent to search because you matched description of a robbery subject we were given."
>>
>> Officer offers the individual a business card captured on body-worn camera. The officers make Activity Log entries, fill out the Consent to Search Form, and resume patrol.

Voiceover: Officers should explain to the individual the reason for the search and a business card must be offered at all Level 2 encounters. The explanation for the encounter can be provided earlier in the interaction, at your discretion, if you believe it will help de-escalate the encounter. If a consent search was conducted, officers are also required to complete a "Consent to Search Report" found in the FORMS section of the NYPD Intranet. You must fill out this form anytime you request consent to search, even if the person does not consent to the search.

**On-camera Presence**

In this case, Level 2 — the Common Law Right of Inquiry, including the consensual search — did not develop additional information, so the officers had no authority to detain the individual. The fact that the individual matched the anonymous description reported to 911 is not, on its own, sufficient grounds to detain the individual. Also, if the individual changes his or her mind during the consent search, you must stop searching. Otherwise, any contraband or weapon recovered after consent is withdrawn could be suppressed at trial. The individual was also free to walk away, if he chose to do so. However, running away from you elevates this encounter from a Level 2 to a Level 3. In addition, if you observe additional

suspicious behaviors, such as the individual hiding or disposing of property in reaction to the police presence, such facts can elevate from Level 2 to Level 3.

IN SUM:

- Level 2 **Common Law Right of Inquiry**
    - Common law right of inquiry, when we have founded suspicion that a suspect is engaged in criminality based upon observable facts or information.
    - You can ask pointed, accusatory questions and seek consent to search from suspects.
    - You may not frisk.
    - You may ask for ID, but the person or persons can refuse.
    - You may ask for consent to search but a warning must be given: "I can only search if you consent. Do you understand?"
    - You may take protective measures when you reasonably fear for your safety.
    - You must offer your business card and explain the purpose of the encounter.
    - You must treat that person so that he or she feels free to leave, you may not order him or her to stop, surround him or her, or block his or her path.

**Title Card**
**Levels 2, 3 & 4 – Common Law Right of Inquiry leading to Reasonable Suspicion and Probable Cause to Arrest**

**On-camera Presence**

What have you got?  An anonymous 911 caller reports that a 25-year-old male Hispanic, with dark hair and wearing a white T-shirt, blue jeans, and white sneakers, has just committed a robbery and is still at the location.

**Video Reenactment**

> Video:
>> The officers activate their body worn cameras and upon arrival, they approach the person matching the given description. The suspect looks at the officers and then runs from them. The officers pursue the suspect on foot and apprehend him a few blocks away.

**On-camera Presence**

During a Level 2 encounter, the person that you suspect of being involved in a crime is free to walk away. One key difference between Level 1 and 2, is that at Level 2, if the individual runs away from police, it elevates the level of the encounter to a Level 3, and you can pursue the fleeing suspect and use a reasonable amount of force to stop or detain them.

In this scenario, the suspect matches the anonymous 911 description of the robbery suspect.  If the suspect simply stayed in place, you would not have reasonable suspicion to detain him; because the call was anonymous you were only at Level 2.  However, in this case, the suspect's flight at the sight of the police elevates the level of suspicion and gives the officers reasonable suspicion, allowing the pursuit and apprehension. The job is now escalated to a Level 3 and the officers have reasonable suspicion for a stop. Note also that this stop involves a proper use of the suspect's race; "Hispanic" was part of a detailed suspect-specific description that included more than just race, age and gender.

**Text on Screen**

> *TERRY* STOPS

> U.S. SUPREME COURT DECISION, *TERRY V. OHIO*

> REQUIRES INDIVIDUALIZED REASONABLE SUSPICION OF CRIMINAL ACTIVITY

9

SEPARATE REASONABLE SUSPICION THAT SUSPECT IS ARMED AND DANGEROUS OR REASONABLE SUSPICISION OF A VIOLENT CRIME IS NECESSARY FOR A FRISK

Voiceover: *Terry* stops are named for the landmark 1968 U.S. Supreme Court decision, <u>Terry v. Ohio</u>, that established the authority of police officers to stop, detain AND QUESTION suspects TO INVESTIGATE A CRIME when the officers have individualized reasonable suspicion that the person has committed, is committing, or is about to be commit a felony or penal law misdemeanor.  Suspicion has to be individualized, meaning that it is specific to the person you are stopping.

If the officers have separate reasonable suspicion that a suspect may be **<u>armed and dangerous</u>**, then they may frisk the suspect.  If the stop is based on reasonable suspicion of a violent crime, an officer has the right to believe the suspect may be armed due to the violent nature of the crime itself and therefore, the suspect may be frisked upon being stopped. If a person is stopped for reasonable suspicion of a *non-violent* crime, such as larceny, trespass, narcotics, the officer may NOT automatically frisk.  An officer can't simply say "I frisked for my safety." Only if an officer observes behaviors or bulges that INDICATE the presence of a weapon or they receive information that the person is armed will they have the ability to frisk during a stop on suspicion of a non-violent crime.  If no such indicators are present, an officer can still use protective measures, like ordering the suspect to show the officer his or her hands, if the suspect says or does something that causes the officer to reasonably fear for his or her safety.

Handcuffs may also be used during a stop under certain limited circumstances, but they should not be used as a routine matter.  Some situations in which a frisk is authorized would justify using handcuffs.  For example, handcuffs may be used if you have information that the suspect may be armed and handcuffs would be necessary due to the dangerous situation of the stop.  It might also be reasonable to use handcuffs if the suspect does not comply with a legally proper frisk or protective measure or the suspect runs away from you during the stop. Handcuffs should not be used for cooperative, non-violent suspects.

Since this stop is for a violent crime and the officers had a reasonable belief that the suspect is armed, they frisked and felt what they believed was a weapon.  This allowed them to now search that area of his clothing for that weapon they felt during the frisk.  Handcuffs were not used.  If the encounter does not escalate to probable cause, you must offer your Business Card and explain the basis for the stop.

**Video Reenactment**

Officers frisk the suspect and recover a loaded firearm in his back pocket. An arrest is made. The officers make Activity Log entries, fill out a Stop Report, transport the prisoner and process the arrest.

Voiceover: A frisk following a stop, results in the recovery of a loaded firearm. We are now at Level 4: probable cause to arrest on the gun possession charge.

WHEN an arrest occurs or summons is issued, a business card is **<u>NOT required to be</u> <u>offered,</u>** but an officer must still give the card at arrest or a summons if the officer's information is **requested.**  For all

exceptions regarding the business card see Patrol Guide Procedure No. 203-09.  In any arrest that is preceded by a stop, officers are required to complete a Stop Report.

In SUM:

- Level 2 COMMON RIGHT OF INQUIRY
  - Common law right of inquiry, you must have founded suspicion that a suspect is engaged in criminality based upon observable facts or information.
  - You can ask pointed, accusatory questions and seek consent to search from suspects.
  - You may not frisk.
  - You may ask for ID, but the person or persons can refuse.
  - You may ask for consent to search but a warning must be given: "I can only search if you consent. Do you understand?"
  - You may take protective measures if you reasonably fear for your safety.
  - You must offer your business card and explain the purpose of the encounter.
  - You must treat that person so that they feel free to leave, you may not order them to stop, surround them, or block their path.

- Level 3 *TERRY* STOP
  - *Terry* Stop, to detain a person you must have individualized reasonable suspicion that the suspect has committed, is committing, or is about to be commit a felony or penal law misdemeanor.
  - At a Level 3 – Terry Stop, the suspect is not free to leave.
  - You can detain the suspect by issuing verbal commands, blocking his or her path that limits his or her ability to leave or, when necessary, through the use of a reasonable amount of force.
  - You can only frisk the suspect if you have reasonable suspicion that the suspect is armed and dangerous or if the stop is based on reasonable suspicion of a violent crime.
  - You may ask for ID, but the person or persons can refuse.
  - You may ask for consent to search, but a warning must be given: "I can only search if you consent. Do you understand?"
  - You may take protective measures if you reasonably fear for your safety.
  - You must offer your business card and explain the purpose of the encounter if the person is not arrested or given a summons.
  - You must complete a stop report.

- Level 4 –ARREST
  - Arrest, when officers have developed probable cause to take a suspect into custody.

o  If arrest (or summons), you are required to give your business card only if it is requested.

**Title Card**
**Level 3 & 4 – Terry Stop and Arrest**

**On-Camera Presence**

In this example, the officers have far more reliable information. They are responding to a radio run of a robbery of a cellphone and activate their body worn cameras. The call is from a verified 911 caller who describes the suspect as a 25-year-old male Hispanic with dark hair, wearing a white T-shirt, blue jeans, white sneakers and carrying a backpack.

**Video Reenactment**

Video:

Officers approach the victim with their body worn cameras already activated. The victim talks to the officers.

Voiceover: The officers arrive in three minutes and meet a middle-aged man, who tells them that he called 911 and is the victim of a robbery.

Video

The victim gestures down the street. Multiple sectors arrive and begin a canvass.

Voiceover: The victim tells officers that the suspect has headed down the street. Two sectors respond to the location and canvass, based on the victim's description of the robber now being broadcast in radio transmissions.

Video and Audio:

Officers canvassing for the suspect see a male fitting the description and walking in the direction stated by the victim. The officers activate their BWC. Officers exit the RMP and state, "Police. Don't move." They order the suspect to drop the backpack.

An officer frisks the suspect, but no weapons are recovered.

An officer then frisks the backpack at the suspect's feet but does not feel a weapon inside.

The officers detain the suspect for identification procedure.

Voiceover: Officers canvassing for the robber observe a male fitting the description, walking in the reported direction of the robber's flight, and stop him. They frisk both the suspect and the backpack but find no weapon. They hold the suspect. Handcuffs are not used during the stop because the suspect is cooperative and after the frisk of the suspect and the bag, there is no reason to believe he is armed.


**On-Camera Presence**

Based on the violent nature of the crime and the verified information provided by the victim, the officers have reasonable suspicion to stop and frisk the suspect because he matched the description.

When you have a suspect stopped and reasonably believe that he is armed and dangerous, you can frisk for weapons.  As previously mentioned, in the case of a violent crime, you can automatically frisk a suspect for weapons.  During a stop for a non-violent crime, such as larceny, trespass, or narcotics, you must be able to explain in detail the facts or circumstances that led to your belief that the suspect possessed a weapon in order for you to frisk separately from the initial stop.  Here, the suspect's backpack was frisked because the officers had reasonable suspicion to believe that he was armed and the backpack, that could have contained a weapon, was still accessible to him because it was at his feet.  But the officers could not open the backpack and search what was in it.

Here, despite the violent nature of the crime, the suspect is compliant, so handcuffs were not used.  It is important to remember that, as a general rule, handcuffs are reserved for arrests situations and should not be automatically used during a Level 3 Terry Stop. An officer may use handcuffs at a stop *when* he or she can articulate that they are necessary due to the threatening or dangerous circumstances of the stop. For example, handcuffs may be used if you have information the person may be armed and you need to handcuff the person to frisk him or her safely, or you believe a weapon may be nearby, or the person is non-compliant or ran from you.  When making a stop, officers should use the "least intrusive means reasonably available" to ensure the safety of the encounter.  The question is not whether there might have been some other alternative available, but whether the officers acted reasonably in not pursuing or in failing to recognize the alternative.


**Video Reenactment**

> Video and Audio

>> Officers ask the suspect pointed/accusatory questions:

>>> "What did you take from that man up the block?"

>>> "Where is his cellphone?"

>> The suspect remains silent.

**On-Camera Presence**

During a Level 3 encounter you can ask pointed and accusatory questions that are meant to elicit an incriminatory answer.  This is an effective way to develop probable cause to arrest. You may also ask for Consent to Search.  Handcuffs also impact your ability to gain voluntary consent to search.  Additionally, if the suspect is handcuffed during a stop, Miranda rights activate and you may only ask emergency or pedigree information. For example, "Where is the gun?," "Where is the girl?," "What is your name?" Once probable cause is established and the suspect is under arrest, questioning must cease unless the suspect was read Miranda warnings and they agreed to answer questions.

Remember, at any level, the suspect does not have to answer your questions, can refuse to consent to a search, and can remain silent during the encounter.  By remaining silent, the suspect does not elevate the level of the encounter.

**Video Reenactment**

> The assigned sector brings the victim to the suspect for the identification procedure. The victim positively identifies the suspect as having committed the robbery.
>
> > "That's the guy. That's him."
>
> Officers handcuff and search the suspect and place him in the backseat of the RMP.
>
> One officer picks up the backpack and places it in the trunk of the RMP.
>
> (Recommend it be the arresting officer who secures the backpack in the video to limit questions about chain of custody, etc.)

**On-Camera Presence**

A positive identification of the suspect by the victim raises this encounter to level four: Probable Cause to Arrest. The suspect is taken into custody and transported to the stationhouse for arrest processing.  [If the bag is not grabbable/reachable in the video AND the officers do not have a reasonable belief that the bag contains a weapon or destructible evidence – the officer cannot search it at the scene and the bag must be inventoried.]

**Video Reenactment**

> Video and Audio:
>
> > Cut to stationhouse where the arresting officer searches the suspect's backpack pursuant to an inventory search and find the victim's cellphone. The suspect asks for the officer's business card, which the officer provides. The officers fill out Stop Report, activity log, and process the arrest. The officer must send BWC footage to the DA's office.

Voiceover: Back at the stationhouse, the officers conduct an inventory search of the suspect's backpack and find the victim's cellphone. During arrest processing the suspect asks for the officer's business card; the officer must give a business card upon request, even if the requestor is an arrestee. The officers fill out a Stop Report since the stop preceded the arrest, and then process the arrest.  The officer must send BWC footage to the DA's office.


**On-Camera Presence**

In this training, we have reviewed all four levels of investigative encounters and learned how a particular situation may evolve from one level to another as new information becomes available


In SUM:

- Level 3 *TERRY* STOP
  - Terry Stop, officers can detain a person based on individualized reasonable suspicion that the suspect has committed, is committing, or is about to be commit a felony or penal law misdemeanor.
  - At a Level 3 – Terry Stop, the suspect is not free to leave.
  - You can detain the suspect by issuing verbal commands or, when necessary, through the use of a reasonable amount of force.
  - You can only frisk the suspect if you have reasonable suspicion that the suspect is armed and dangerous or when you have reasonable suspicion of a violent crime.
  - You may ask for ID, but the person or persons can refuse.
  - You may ask for consent to search but a warning must be given: "I can only search if you consent. Do you understand?"
  - You may take protective measures when you reasonably fear for your safety.
  - Handcuffs should not be used routinely during a Level 3 Terry Stop.
  - You must offer your business card and explain the purpose of the encounter, if the person is not arrested or summonsed.
  - You must complete a stop report

- Level 4 – ARREST
  - Officers have developed probable cause to take a suspect into custody.
  - If arrest (or summons), you must only give your business card upon request.


**Text on Screen**

FOUR LEVELS OF ENCOUNTER:
REQUEST FOR INFORMATION

COMMON LAW RIGHT OF INQUIRY
*TERRY* STOP
ARREST

Voiceover:

Level 1 REQUEST FOR INFORMATION

- 
  o Request for information, when we have an objective credible reason to approach someone that we do not suspect of criminal behavior.
  o Since you are only trying to gather information, you can ask general, non-accusatory questions of members of the public.
  o You may not frisk.
  o You may ask for ID, but the person or persons can refuse.
  o You may not ask for consent to search.
  o You may take protective measures when you reasonably fear for your safety.
  o You do not have to offer your business card, but must provide one upon request.
  o You must treat that person free to leave, you may not order him or her to stop or block his or her path.

Level 2 COMMON LAW RIGHT OF INQUIRY

- 
  o Common law right of inquiry, when we have founded suspicion that a suspect is engaged in criminality based upon observable facts or information.
  o You can ask pointed, accusatory questions and seek consent to search from the suspect.
  o You may not frisk.
  o You may ask for ID, but the person or persons can refuse.
  o You may ask for consent to search but a warning must be given: "I can only search if you consent. Do you understand?"
  o You may take protective measures when you reasonably fear for your safety
  o You must offer your business card and explain the purpose of the encounter.
  o You must treat that person free to leave, you may not order him or her to stop or block his or her path.

17

Level 3 REASONABLE SUSPICION (TERRY) STOP

- 
  - Terry Stop, when officers detain a person based on individualized reasonable suspicion that the suspect has committed, is committing, or is about to be commit a felony or penal law misdemeanor.
  - At a Level 3 – Terry Stop, the suspect is not free to leave.
  - You can detain the suspect by issuing verbal commands or, when necessary, through the use of a reasonable amount of force.
  - You can only frisk the suspect if you have reasonable suspicion that the suspect is armed and dangerous or for suspicion of a violent crime.
  - You may ask for ID, but the person or persons can refuse.
  - You may ask for consent to search but a warning must be given: "I can only search if you consent. Do you understand?"
  - You may take protective measures when you reasonably fear for your safety.
  - Handcuffs should not be used routinely during a Level 3 Terry Stop.
  - You must offer your business card and explain the purpose of the encounter, if the person is not arrested or given a summons.
  - You must complete a stop report.

Level 4 PROBABLE CAUSE ARREST

- 
  - Arrest, when officers have developed probable cause to take a suspect into custody.
  - If arrest (or summons), you must only give your business card upon request.

**On-Camera Presence**

Knowing — and putting into practice — the distinctions among these four levels of investigative encounter are essential to effective police work.  Officers must remain aware of changing circumstances as new information develops to gauge their responses accordingly and in order to remain safe.  A good stop or a good arrest, as well as an officer's safety, depends on this kind of analysis.

OUR PRIORITY IS TO HAVE A LEGAL BASIS TO TAKE ACTION.  OUR POLICY IS NOT TO FOCUS ON QUANTITY OF STOPS OR QUANTITY OF ARRESTS. OUR PRIORITY IS THE QUALITY OF OUR ACTIONS - BY USING DISCRETION TO USE THE FULL AUTHORITY OF THE LAW.

DOING SO WILL PROTECT YOU AND THE COMMUNITIES WE SERVE

Stay alert and stay safe on the streets.

<u>**NYCHA Interior Patrols**</u>

**On-Camera Presence**

Hello, I'm ==XXXXX== and I am assigned to ==XXXX==. I'm here to provide guidance on patrolling buildings owned by the New York City Housing Authority, or NYCHA. Patrols of these buildings are not an exception to the laws of investigative encounters or PG 212-11. The standards in PG 212-11 apply to patrolling in NYCHA locations.  However, there are specific considerations that should be taken into account when patrolling these buildings.

**Text on Screen**

Officers are authorized to conduct interior patrols of NYCHA residential buildings. These patrols assist the Housing Authority in addressing criminal activity, providing a safe and secure environment and in enforcing NYCHA rules to ensure the habitability of NYCHA buildings.

**On-Camera Presence**

It is critical that NYPD officers patrol NYCHA buildings in full compliance with the law while being mindful that their encounters are occurring in someone's home. When conducting interior patrols, officers should remember to:

**Text on Screen**

- Gather intelligence by using the apps on your smartphone or tablet before entering the location;
- Notify the Communications Section of your patrol and provide the time and street address upon entering the building;
- Stay with your partner, absent exigent circumstances. Do not conduct an interior patrol alone. Patrolling with a partner at all times is essential for your safety;
- Always use proper tactics;
- Make sure you have the proper equipment, including a flashlight and O.C. spray; and
- Prepare proper documentation when required, such as activity logs, stop reports, consent to search forms, Trespass Crime Fact Sheets ("TCFS"), and field reports.
- Activate your BWC before you start an interior patrol.

   THINGS TO REMEMBER:

   GATHER INTELLIGENCE ON SMARTPHONE OR TABLET

   NOTIFY COMMUNICATIONS SECTION

   STAY WITH YOUR PARTNER.   DO NOT CONDUCT AN INTERIOR PATROL ALONE.

1

USE PROPER TACTICS

HAVE THE PROPER EQUIPMENT, SUCH AS A FLASHLIGHT OR O.C. SPRAY

PREPARE PROPER DOCUMENTATION

ACTIVATE BWC BEFORE STARTING INTERIOR PATROL

**On-Camera Presence**

The vast majority of the people that officers encounter during interior patrols of NYCHA buildings are law-abiding residents and their guests. To build positive relationships with building residents, officers must observe the legal boundaries that govern their role in patrol, while at the same time conducting all interactions in a courteous, professional, and respectful manner.

The mere presence of a person in or near a NYCHA building common area, like a lobby or hallway, or simply entering or exiting a NYCHA building does not provide a basis to approach and to conduct any investigative encounter.

**Text on Screen**

- When officers suspect that a person is possibly committing Criminal Trespass or other crime in a NYCHA building they should keep in mind that:

  - The burden of proving that a person does not have authority to be in the building rests with the officer
  - A person is not required to answer questions, even about their right to be in the building. Their refusal to answer your questions alone does not elevate suspicion or the level of the encounter
  - A person's refusal or inability to produce identification or provide information does not elevate the level of the encounter

WHEN CRIMINALITY, INCLUDING TRESPASS, IS SUSPECTED IN A NYCHA BUILDING, REMEMBER:

PROVING THAT A PERSON DOES NOT HAVE AUTHORITY TO BE IN THE BUILDING RESTS WITH THE OFFICER

A PERSON IS NOT REQUIRED TO ANSWER QUESTIONS EVEN ABOUT THEIR RIGHT TO BE IN THE BUILDING

A PERSON'S REFUSAL TO PRODUCE IDENTIFICATION OR PROVIDE INFORMATION DOES NOT ELEVATE THE LEVEL OF THE ENCOUNTER

2

**On-Camera Presence**

In order to approach and question a person about their authority to be in a building, officers must possess at least some objective credible information, such as observed behavior or witnessing a Housing Authority violation, to approach the person at DeBour Level 1 (Request for Information). As this is only a Level 1 encounter, the person is free to leave and may not be detained. The officer must make sure the person feels free to leave by their tone and treatment of that person.  Race may not be a factor in initiating police enforcement action unless it is part of a suspect-specific description.

**Text on Screen**

Once an officer has an objective credible reason, an officer may approach and ask non-accusatory questions, like:

- Do you live in the building?
- Are you visiting someone in the building?
- Do you have business in the building?

WITH CREDIBLE INFORMATION, OFFICERS MAY APPROACH AND ASK NON-ACCUSATORY QUESTIONS:

- DO YOU LIVE IN THE BUILDING?
- ARE YOU VISITING SOMEONE IN THE BUILDING?
- DO YOU HAVE BUSINESS IN THE BUILDING?

**On-Camera Presence**

If an officer suspects that the person does not have authority to be in a building, and the person cannot or refuses to explain their presence, the officer may instruct the person to return to their apartment, and if they do not, the officer may instruct the person to leave the building and explain that they may face arrest if they do not comply. An officer may only arrest a person if there is probable cause to believe the person committed a trespass.  Refusal to leave, after being warned of an arrest, provides probable cause for an arrest for Criminal Trespass  In general, a reasonable investigation is necessary to determine whether there is probable cause for trespass.

**Text on Screen**

If conspicuously posted signs prohibit entrance into restricted areas, a person found in a restricted area may be arrested, or the officer may instruct the person to leave. In cases of residents or invited guests (and persons in the location conducting legitimate business), officers are encouraged to exercise restraint and to ask the person to leave the restricted area, rather than making an arrest, unless the officer has knowledge that the person has been previously warned that the area is restricted. In any case, the officer may not let the person remain in the restricted area.

RESTRICTED AREAS WITH POSTED SIGNS PROHIBITING ENTRANCE:

PERSONS OBSERVED IN A RESTRICTED AREA MAY BE ARRESTED OR INSTRUCTED TO LEAVE.

IN CASES OF RESIDENTS OR INVITED GUESTS WHO ARE OBSERVED FOR THE FIRST TIME IN RESTRICTED AREAS, OFFICERS ARE ENCOURAGED TO EXERCISE RESTRAINT AND ASK THE PERSON TO LEAVE RATHER THAN MAKING AN ARREST.

**Text on Screen**

In the absence of conspicuously posted rules or regulations, residents and authorized visitors found on a roof, on a roof landing, in a boiler room, or in any other restricted area should be instructed to leave the area when there is no other basis to arrest them. The person may not be allowed to remain in the restricted area. If the person refuses to leave after they have been instructed to do so, there is probable cause for an arrest.

Unauthorized visitors should be instructed to leave the building, when there is no other basis to arrest.  If they refuse to leave, there is probable cause to arrest.

RESTRICTED AREAS WITHOUT POSTED SIGNS:

RESIDENTS OR AUTHORIZED VISITORS IN RESTRICTED AREAS SHOULD BE INSTRUCTED TO LEAVE THE AREA WHEN THERE IS NO OTHER BASIS TO ARREST.

UNAUTHORIZED VISITORS MAY BE INSTRUCTED TO LEAVE THE BUILDING, WHEN THERE IS NO OTHER BASIS TO ARREST. IF THEY REFUSE TO LEAVE, THERE IS PROBABLE CAUSE TO ARREST.

4

**On-Camera Presence**

When there is probable cause to arrest a person for trespassing, officers *may* arrest OR exercise their discretion, refrain from arrest, and instruct the person to leave the building under appropriate circumstances.   The Department is encouraging officers to use their discretion, including the exercise of restraint when appropriate, and find different ways to correct conditions in their command.   In every case when an arrest is made for criminal trespass in a NYCHA building, the arresting officer must prepare a Trespass Crimes Fact Sheet and document the reasons for the officer's initial approach to the person in question.

BEAT

Thank you for your attention and stay safe.

[CLOSING SLIDE]

For additional guidance see

- *Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops* (P.G. 212-11)

- *Interior Patrol of Housing Authority Buildings* (P.G. 212-60)

## Racial Profiling and Bias-Based Policing

**On-Camera Presence**

Hello, I'm XXXXX and I am assigned to XXXX. I'm here to speak to you about Department policies prohibiting racial profiling and bias-based policing. Conducting enforcement in a race-neutral and unbiased manner protects the constitutional rights of each person that we are sworn to protect and fosters and strengthens relationships between police officers and members of the community. It instills confidence in, and support for, our policing efforts. It is also required by state and federal law and Department policy.

**Text on Camera**

New York City Police Department is dedicated to and insists on impartial enforcement of the law and the protection of constitutional rights. To ensure that all members of service engage only in constitutional policing practices, the Department explicitly prohibits the use of racial and bias-based profiling in law enforcement actions under PG 203.25.

IMPARTIAL ENFORCEMENT OF THE LAW AND PROTECTION OF CONSTITUTIONAL RIGHTS.

NYPD PROHIBITS THE USE OF RACIAL AND BIAS-BASED PROFILING

**On-Camera Presence**

The law allows a police officer the authority to stop and question a person whom an officer reasonably suspects has committed, is committing, or is about to commit a felony or Penal Law misdemeanor. The law also allows a police officer to frisk a person when the officer reasonably suspects the person is armed and dangerous or involved in a violent crime. In other words, reasonable suspicion must be particularized and objective to each person stopped, and must be articulated to show a particularized belief a person is armed in order to justify a frisk. This is also known as a Level 3 *Terry* stop. Race may not play any part in developing reasonable suspicion, except when part of a suspect-specific description.

**Text on Screen**

Police enforcement actions, including, but not limited to, arrests, Level 3 *Terry* stops, frisks, searches, summonses, and motor vehicle stops, must be based on the standards required by applicable laws. Police officers must be able to articulate the reasons that led them to take these enforcement actions. Race may not play any part in developing reasonable suspicion except when part of a suspect-specific description.

ARRESTS, *TERRY* STOPS, FRISKS, SEARCHES, SUMMONSES, AND MOTOR VEHICLE STOPS MUST BE BASED ON APPLICABLE LAWS.

1

POLICE OFFICERS MUST BE ABLE TO ARTICULATE THE REASONS THAT LED THEM TO TAKE ENFORCEMENT ACTIONS.

RACE MAY NOT PLAY ANY PART IN DEVELOPING REASONABLE SUSPICION EXCEPT WHEN PART OF A SUSPECT-SPECIFIC DESCRIPTION.

FOR EXAMPLE, IF THERE WAS A PATTERN OF BURGLARIES COMMITTED BY HISPANIC MALES BETWEEN 18 AND 25 IN THE 77TH PRECINCT, COULD YOU STOP EVERY HISPANIC MALE BETWEEN 18 AND 25 IN THAT AREA? NO, YOU NEED MORE INDIVIDUALIZED INFORMATION.

Let's talk about a "suspect-specific description." How specific does it have to be?

Race, age and gender alone are not enough. When you are responding to a description from a radio run, there generally will be more. The caller will provide some information about when the incident occurred and the location. That can serve as the additional information we need. And often we get at least one item of clothing in the description. A general description can only be sufficient to conduct a stop if the suspect is found close in time and in close proximity to the crime and is the only person at the scene who fits the general description.

But what if a crime pattern only provided age, race, and gender (e.g. pattern of daytime burglaries committed by Hispanic males between the ages of 18 and 25) or covered a very broad geographic area or time period (e.g. several daytime burglaries in the 77th precinct over the past three months)? Those would not be sufficient without more. In such a situation, you would need to gather more individualized information in order to make a stop.

**Title Card on Screen**:

RACIAL  PROFILING

**On-Camera Presence**

Race, color, ethnicity, or national origin may not be used as motivating factors for initiating police enforcement action. When an officer's decision to take enforcement action is influenced, even in part, by a person's actual or perceived race, color, ethnicity or national origin, the enforcement action violates Department policy federal, state, and local laws as well as the New York State and the United States Constitutions.

**Text on Screen**

No person may be targeted for any enforcement action, including stops, because they are a member of a racial or ethnic group that appears *more frequently* in local crime suspect data.

2

NO PERSON MAY BE TARGETED BECAUSE THEIR RACIAL OR ETHNIC GROUP
APPEARS MORE FREQUENTLY IN LOCAL CRIME SUSPECT DATA

Let's delve into that a bit more. Suppose a particular precinct last year had 32 shootings. 90% of
the perpetrators were described as male, black 18 to 24 years old. You might consider this a high
crime area, but does that mean you can stop every black male who is 18-24 years old? Of course
not. This kind of suspect data does not give you reasonable suspicion for all young black men in
the area. *The fact that a person is a member of a racial or ethnic group that appears more
frequently in local crime suspect data cannot, by itself, or even in combination with other stop
factors, establish reasonable suspicion for a Terry Stop.* You need individualized suspicion.
What is it about the particular person you are stopping, aside from his or her race that gives you
reasonable suspicion? Is it the person's behavior (e.g. blading, clutching waistband, casing), is
there a bulge resembling a weapon you observe in their waistband, etc.?

We know that a person's presence in a high crime area alone does not give you reasonable
suspicion. That person does not become any more suspicious if he is a young, black man and
most of the recent robberies in the area were committed by black males in their early 20's.

**Text on Screen**

In fact, even knowledge of a particular person's prior criminal history does not, by itself, provide
enough information to conduct a Level 3 *Terry* stop.

A PERSON'S PRIOR CRIMINAL HISTORY DOES NOT, BY ITSELF, PROVIDE CAUSE
FOR A TERRY STOP.

**On-Camera Presence**

Race, color, ethnicity, or national origin may be considered as part of the justification for a Level
3 *Terry* stop when the reason for the stop is based on a description that contains specific details
beyond race, age, and gender. You may also obtain additional information or observe behaviors
at the scene that provide you with reasonable suspicion to stop. Additional identifying
characteristics that could be used to justify the stop of a suspect may include, height, weight,
clothing, hair style, tattoos/scars, facial hair, or items the suspect is carrying. The time of day,
how quickly you arrive on the scene, and whether anyone else is present, are other factors that
may help justify a stop.

For example, if a verified caller provides the description of a robbery suspect as a black male in
his 20s, would that be enough to justify stopping all black males in their 20s in the area?
Probably not. What if it's 4 AM, you've gotten to the scene within a minute of the call, and the
only person in the specified area is a black male in his 20s? In that case, due to the close
proximity in time, the matching description, and the lack of anyone else around, you would now
have enough information to stop the man.

**Title Card on Screen:**

BIASED-BASED PROFILING

**On-Camera Presence**
Section 14-151 of the New York City Administrative Code - and Department policy (PG 203.25) - prohibit bias-based profiling on the basis of demographic categories in addition to race, color, and national origin.

**Text on Screen**

Bias-based profiling occurs when an officer relies on actual or perceived race, national origin, color, creed, age, alienage or citizenship status, gender, sexual orientation, disability, neighborhood, or housing status, as the primary reason for taking law enforcement action against a person. A person's mere presence in, living in, or walking through a generally "high crime" area does not provide a basis to approach or stop a person. The laws of Investigative Encounters that govern when you can approach to question or to stop a person as explained in PG 212.11 must be followed.

BIAS-BASED PROFILING:

ANY POLICE ACTION BASED IN WHOLE OR IN PART ON THE RACE, NATIONAL ORIGIN, COLOR, CREED,

AGE, ALIENAGE OR CITIZENSHIP STATUS, GENDER,

SEXUAL ORIENTATION, DISABILITY, NEIGHBORHOOD, OR HOUSING STATUS OF AN INDIVIDUAL (EXCEPT IN SUSPECT-SPECIFIC DESCRIPTIONS)

**On-Camera Presence**

Enforcement actions can only be justified by a person's behavior or other information or circumstances that link the person or persons to suspected unlawful or criminal activity. Even where there is evidence of criminal behavior, officers are not allowed to engage in enforcement actions in a selective manner. For example, if you see four teenagers drinking in public and two are white and two are black, giving summonses to the two black teenagers but not to the two white teenagers would be an example of selective enforcement, which is strictly prohibited.

BEAT
Policing in an unbiased manner fosters and strengthens relationships between police officers and New York City's communities. It instills confidence in, and support for, our policing efforts. But most of all, it is the right thing to do. It is the law.

4

Thank you for your attention and stay safe.

[CLOSING SLIDE]

For additional guidance see:

*Department Policy Prohibiting Racial Profiling and Bias-Based Policing (*P.G. 203-25)

*Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops* (P.G. 212-11)

## <u>Supervisor Responsibilities</u>

**On-Camera Presence**

Hello, I'm XXXXX and I am assigned to XXXX. I'm here to speak to you about the responsibilities of supervisors with respect to conducting and documenting Investigative Encounters.

Supervisors must provide guidance and oversight of officers to maintain compliance with the law of Investigative Encounters and related Department policies.  For officers to be safe both professionally and physically, they need to know the law, and that means supervisors need to know it as well.  Being confident about the law and Department procedures is the best way for a supervisor to establish their authority and earn the respect of their officers.

We will now briefly recap the law of investigative encounters.  In the case of *Terry v. Ohio*, the U.S. Supreme Court established the authority of the police to stop and possibly frisk a person, under certain circumstances, based upon reasonable suspicion. This type of stop is known as a Level 3 *Terry* stop.

The New York State Court of Appeals in the case of *People v. DeBour* established four types— or levels—of investigative encounters and the authority of the police at each level, consistent with federal Constitutional standards.

**Text on Screen**

The Levels of Investigative Encounters are:

- Level 1: Request for Information
- Level 2: Common Law Right of Inquiry
- Level 3: *Terry* Stop
- Level 4: Arrest

FOUR LEVELS OF INVESTIGATIVE ENCOUNTERS:

LEVEL 1: REQUEST FOR INFORMATION

LEVEL 2: COMMON LAW RIGHT OF INQUIRY

LEVEL 3: *TERRY* STOP

LEVEL 4: ARREST

**On-Camera Presence**

Whenever feasible, supervisors should respond to the scenes of investigative encounters. If the encounter involved a stop, before the officer prepares a Stop Report, the supervisor should

discuss the circumstances of the encounter with the officer and identify any facts that may have been overlooked which occurred during the encounter that help to establish whether or not there was reasonable suspicion for the stop and any frisk conducted, and a reasonable basis for any search conducted.   Supervisors must also comply with Patrol Guide Procedure 212-11: Investigative Encounters, when reviewing the circumstances of an encounter and signing off on the Stop Report.

**Text on Screen**

Supervisors must:

- When feasible, respond to the scene of a *Terry* Stop and ensure that actions taken by officers are constitutional and otherwise lawful, and must identify and correct the issue when that is not the case.
- When not present at the stop, discuss the circumstances of the stop with the officer prior to preparation of the Stop Report to assess whether the stop and/or frisk were independently supported by reasonable suspicion and, if a search was conducted, whether there was a reasonable basis for that search.  Reviewing the BWC video of the stop is also important  to your review. Check to ensure the officer is complying with PG 212-123, meaning that the BWC was activated to capture the whole event, from before a person is stopped, until the end of the entire encounter, including offering a Business Card, where applicable.
- Ensure that all captions are completed and all relevant check boxes are checked on the Stop Report and that they accurately reflect the circumstances as they occurred.
- Confirm that the Stop Report identifies in plain language the circumstances that led to the stop and the specific suspected felony or Penal Law misdemeanor observed, and that every aspect of the narrative is accurate.
- Confirm that the Stop Report identifies in plain language the circumstances that led to the frisk and/or search, if conducted, and that every aspect of the narrative is accurate.
- Ensure that officers comply with the requirements of the Right to Know Act by properly identifying themselves, explaining the reason for the interaction, offering a Business Card, and conducting consent searches as required. If a Business Card was not offered, you must review the relevant section of the Stop Report for the reason why it was not offered. Make sure that the officer had an adequate reason for not offering the card. Short of an emergency exception, the card must be offered at all Level 2 encounters and above (stops, frisks, searches) when the person is not arrested or summonsed, or at any time a person requests a card.

SUPERVISORS MUST:

WHEN ON SCENE ENSURE THAT ALL ACTIONS BEING TAKEN ARE CONSTITUTIONAL AND OTHERWISE LAWFUL

DISCUSS THE CIRCUMSTANCES OF THE STOP WITH THE STOPPING OFFICER, PRIOR TO PREPARATION OF THE STOP REPORT, TO DETERMINE WHETHER THE STOP, FRISK AND SEARCH WERE CONSTITUTIONAL AND OTHERWISE LAWFUL

ENSURE THAT ALL CAPTIONS AND CHECKBOXES ON A STOP REPORT ACCURATELY REFLECT THE CIRCUMSTANCES AS THEY OCCURRED AND ARE COMPLETE

ENSURE THAT THE STOP REPORT PROPERLY IDENTIFIES THE SUSPECTED FELONY OR MISDEMEANOR

CONFIRM THAT THE STOP NARRATIVE IS COMPLETE AND ARTICULATES REASONABLE SUSPICION OF A FELONY OR PENAL LAW MISDEMEANOR

CONFIRM THAT THE FRISK NARRATIVE, IF APPLICABLE, IS COMPLETE AND ARTICULATES REASONABLE SUSPICION THAT THE PERSON WAS ARMED AND DANGEROUS

CONFIRM THAT THE SEARCH NARRATIVE, IF APPLICABLE, IS COMPLETE AND ARTICULATES A SUFFICIENT BASIS FOR THE SEARCH

ENSURE THAT OFFICERS ARE COMPLYING WITH THE RIGHT TO KNOW ACT

**On-Camera Presence**

Supervisors must first determine, based on his or her observations of the stop and/or discussions about the stop with the stopping officer, whether the stop and any frisk conducted, were supported by reasonable suspicion and, if a search was conducted, whether there was a reasonable basis for it. Then, supervisors must evaluate the officer's description in the narrative sections of the Stop Report, which should describe in accurate detail the facts that formed the basis of the officer's decision to make the stop and the frisk and/or search, if conducted.

**Text on Screen**

Supervisors must determine whether

- the stop and any frisk conducted, were supported by reasonable suspicion

- if a search was conducted, whether there was a reasonable basis for it.

Supervisors must confirm that the narrative sections of the Stop Report accurately explain:

- Reasonable suspicion for the stop

- If a person was frisked, what was the reasonable suspicion to believe that the suspect was armed and dangerous or involved with a violent crime;
- And, if a person was searched, the facts and circumstances of a search including the area searched and whether weapons or other contraband were recovered.

SUPERVISORS MUST DETERMINE WHETHER:

THE STOP AND ANY FRISK CONDUCTED, WERE SUPPORTED BY REASONABLE SUSPICION

IF A SEARCH WAS CONDUCTED, WHETHER THERE WAS A REASONABLE BASIS FOR IT

SUPERVISORS MUST CONFIRM THAT THE NARRATIVE ACCURATELY EXPLAINS:

REASONABLE SUSPICION FOR THE STOP

REASONABLE SUSPICION THAT THE PERSON WAS ARMED AND DANGEROUS OR INVOLVED IN A VIOLENT CRIME, IF THE PERSON WAS FRISKED

CIRCUMSTANCES OF A SEARCH, INCLUDING:

AREA SEARCHED

WEAPONS OR CONTRABAND RECOVERED

**On Camera Presence**

It is important that supervisors closely read the Stop Report narratives of their subordinates before signing off on the report.

There are common deficiencies in Stop Reports you should keep an eye out for.  First, stop narratives sometimes fail to identify the suspect description that was provided and how the suspect matched that description.  Simply saying "fits description" is insufficient.  Second, stop narratives for stops that involve multiple individuals sometimes fail to specify which person the narrative is referencing.  Officers should not repeat the same narrative in multiple Stop Reports, since suspicion has to be individualized for each person you stop.  Third, stop narratives sometimes fail to explain how an anonymous call, which is usually only enough for a Level 2 encounter, escalated by facts or circumstances into a Level 3 *Terry* stop.  Fourth, some narratives fail to provide enough detail about how a bulge resembled a weapon, justifying a frisk of the

suspect. A generic bulge, which could be a cell phone or a wallet, is insufficient, by itself, to justify a frisk.  Last, some narratives fail to specify the facts or details that led an officer to conclude that there was reasonable suspicion of a crime and instead use conclusory language (e.g. casing to commit a robbery).

If force was used, the supervisor must determine whether the use of force was reasonable under the circumstances of the encounter and comply with appropriate Department policies regarding documentation.

**BEAT**

**Title Card on Screen**

**STOP REPORT IN FORMS**

**On-Camera Presence**

Supervisors must complete the "Supervisory Action" section of the Stop Report in FORMS. Based upon a review of the Stop Report, activity log entry, body-worn camera footage, ICAD printout and discussions with the uniformed member of the service, the supervisor will determine if the stop report requires additional information.

**Screen Shot on Screen of Application Interface [showing the use of FORMS application)**

If the Stop Report is incomplete or requires additional information, supervisors will check "No" following the question "Report Accurate and Complete?"  They will then enter instructions to the reporting officer in the "Note" section in FORMS, and select the "Check" icon to return the Stop Report to the reporting officer for correction.

If the Stop Report is complete, but the supervisor determines that the officer did not have reasonable suspicion for the stop, the supervisor should choose "NO" to the question "Sufficient Basis for Stop?"

Where a supervisor answers the questions on the report regarding "Sufficient Basis for Search?" or "Sufficient Basis for Frisk?", "N/A" should be chosen rather than "NO" in cases where no search or frisk was conducted. **"NO" should be chosen when the supervisor determines that there was a frisk or search, but that there was no legal basis to search or frisk based on the facts**.

[SCREEN SHOT PANS ON TO THE DROP DOWN WITH YES/NO/NA]

[SCREEN SHOT SHOWS THE CLICKS]

During your review, look for other common mistakes:

- Insufficient narratives
- Omitting basis for the use of force
- Omitting the details of the suspect description provided from Radio Dispatcher or witness in the narrative
- Documentation re: the business card.  If refused, note that on report.
- Reason for Frisk: "Officer Safety"

**On-Camera Presence**

Supervisors should instruct uniformed members of the service regarding any unlawful stops, frisks, and searches and any deficiencies in the Stop Report and refer UMOS for additional training or other remedial action when appropriate. In cases of intentional misconduct or repeated failures, CRAFT entries or disciplinary action should be considered.

**Screen Shot on Screen of Application Interface [showing the use of FORMS application]**

Supervisors should note these supervisory actions under the "Follow-Up Action (if appropriate)" caption on the Stop Report. Once the supervisors have determined Stop Reports are accurate and complete, they should approve and finalize the reports in FORMS.

[SCREEN SHOT SHOWS THE CLICKS]

It is critical that supervisors ensure that Stop Reports are completed for all stops that occur.  You know the jobs your officers are handling, and you are aware of the encounters they are having, because you are with them, you are checking on them, or you hear their work over the radio. Make sure they are properly documenting the stops they conduct.

**On-Camera Presence**

The utilization of stops based on reasonable suspicion is a valuable tool for law enforcement, but all stops must, of course, be conducted within the guidelines of the law. It's the responsibility of supervisors to provide guidance and oversight to ensure that their officers are in compliance with state and local laws, the U.S. Constitution, the Right to Know Act and all related Department policies.

Thank you for your attention and stay safe.

[CLOSING SLIDE]

For additional guidance see:

Patrol Guide section 203-09, Public Contact – General

Patrol Guide section XXXX—Consent Search

Patrol Guide section 203-25, Department Policy Prohibiting Racial Profiling and Bias-Based Policing

Patrol Guide section 212-11, Investigative Encounters: Requests for Information, Common Law right of Inquiry and Level 3 Stops

**"Right to Know Act"**

**On Camera Presence**

Hello, I'm <mark>XXXXX</mark> and I am assigned to <mark>XXXX</mark>.  Today I'm here to talk to you about the Right to Know Act, business cards and Consent to Search Forms.

The Right to Know Act was enacted in October, 2018 by the New York City Council.  The law requires officers to identify themselves by providing their names, ranks, and commands to civilians during certain interactions and to offer business cards with this information printed on them when required.  For certain specified encounters, including all Level 2 and 3 encounters, frisks, searches, and vehicle checkpoints, officers are required to explain the purpose of the encounter unless it would impede an investigation.  The explanation for the encounter can be provided at any time, at your discretion.  It may help to provide an explanation earlier rather than later in an encounter in order to de-escalate the situation.  Officers who request to conduct a search of a person are also required to explain to that person that he/she has the right to refuse to allow the officer to search.  Requests for consent to search must be recorded on BWC.

**Text on Screen**

An officer's business card lists the their rank, last name, and shield number. It provides a space to write in the officer's command. The back of the card lists phone numbers for the counterterrorism hotline, Crime Stoppers, and 311. It also lists a website where people can submit a comment or a civilian complaint, or request more information about an encounter, including instructions on how to request body-worn camera footage of the interaction.

>    OFFICER'S BUSINESS CARD SHOWS:

>        THE OFFICER'S RANK, LAST NAME, AND SHIELD NUMBER

>        SPACE TO WRITE THE OFFICER'S COMMAND

>    THE BACK OF THE CARD SHOWS:

>        PHONE NUMBERS FOR THE COUNTERTERRORISM HOTLINE, CRIMESTOPPERS, AND 311.

>        WEBSITE WHERE PEOPLE CAN SUBMIT A COMMENT OR A CIVILIAN COMPLAINT OR REQUEST MORE INFORMATION CONCERNING THE ENCOUNTER

**Text on Screen**

The Right to Know Act requires officers to offer a business card during all Level 2 encounters, Level 3 Terry stops, frisks, and vehicle checkpoints. Officers must offer a card after all <u>searches</u> of people, property, vehicles, or homes that do not result in an arrest and all <u>requests</u> to search, whether or not the request results in a search or not. Officers must also provide a card when one is requested.

MUST IDENTIFY YOURSELF AND OFFER BUSINESS CARD:

- ALL LEVEL 2 ENCOUNTERS
- ALL LEVEL 3 TERRY STOPS
- WHEN A PERSON IS FRISKED
- AT VEHICLE CHECKPOINTS
- REQUEST TO SEARCH
- SEARCHES OF:
    - PEOPLE
    - PROPERTY
    - VEHICLES
    - HOMES

**On-Camera Presence**

Assigned detectives on a case are required to offer business cards at their initial interviews with victims or witnesses of the crime being investigated.  Officers must also provide a business card to anyone upon request.  They may also offer cards to any other member of the public they choose. Offering the cards demonstrates the Department's willingness to work with people and helps to foster positive communication with the community.

It is the responsibility of all officers to order new cards when their supplies run low. Officers who are without business cards during an encounter are required to offer to write out the business card information themselves or verbally give the information and allow the person enough time to record or write it down.

**Text on Screen**

There are exceptions to the requirement to offer a business card.  The exceptions are:

- If the encounter ends in an arrest or summons (except it must be provided upon request)
- If the encounter involves undercover activity
- If the encounter involves a search of a bag belonging to a person who is entering a subway station at an authorized checkpoint, or entering public facilities such as a courthouse or large events or gatherings, such as a parade (except it must be provided upon request).

BUSINESS CARD ARE NOT REQUIRED TO BE OFFERED WHEN THE ENCOUNTER:

ENDS IN AN ARREST OR SUMMONS (EXCEPT IT MUST PROVIDE UPON REQUEST)

INVOLVES UNDERCOVER ACTIVITY

INVOLVES THE SEARCH OF A BAG BELONGING TO A PERSON WHO IS ENTERING:

SUBWAY STATION AT AN AUTHORIZED CHECKPOINTS (EXCEPT IT MUST PROVIDE UPON REQUEST)

PUBLIC FACILITIES SUCH AS A COURTHOUSE OR LARGE EVENTS OR GATHERINGS SUCH AS A PARADE

**Text on Screen**

Additionally, officers are not required to offer a business card if there are exigent circumstances that make it impractical at the time of the encounter, including risk of physical injury, imminent risk of damage to property, the escape of a suspect, destruction of evidence, or ID check at closed area or street for public safety/health or security reasons.

BUSINESS CARD NOT REQUIRED IN EXIGENT CIRCUMSTANCES SUCH AS:

RISK OF PHYSICAL INJURY

IMMINENT RISK OF DAMAGE TO PROPERTY

ESCAPE OF A SUSPECT

DESTRUCTION OF EVIDENCE

ID CHECK AT CLOSED AREA OR STREET FOR PUBLIC
SAFETY/HEALTH OR SECURITY REASONS

**On-Camera Presence**

The Right to Know Act also addresses situations in which an officer seeks to conduct a search but does not have legal justification to do so without a person's consent.  In these situations, officers can never threaten or promise anything in order to gain consent.

**Text on Screen**

When requesting consent to search a person, officers must:

- Activate their body-worn camera, if so equipped, to record the entire encounter and then categorize the video accordingly
- Ensure that the person's consent is given voluntarily, knowingly, and intelligently
- Inform the subjects that they can only be searched with their consent
- If consent is granted, explain again to the person that the search will not proceed if the person refuses

WHEN REQUESTING CONSENT TO SEARCH, OFFICERS MUST:

- ACTIVATE BODY WORN CAMERAS AT THE BEGINNING OF ENCOUNTER
- ENSURE THAT CONSENT IS GIVEN VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY
- INFORM SUBJECTS THAT THEY CAN ONLY BE SEARCHED WITH THEIR CONSENT
- IF CONSENT IS GRANTED, EXPLAIN AGAIN THAT THE SEARCH WILL NOT PROCEED IF THE PERSON REFUSES

**[For each of the three following on-camera presence sections, begin with the spokesperson on camera and switch to the image of the form in question]**

**On-Camera Presence**

To overcome any language barrier that may prevent consent from meeting the required criteria, officers shall use the department's interpretation services as per Patrol Guide 212-90, Guidelines for Interaction with Limited English Proficient (LEP) Persons

SHOW PATROL GUIDE 212-90,

GUIDELINES FOR INTERACTION WITH LIMITED ENGLISH PROFICIENT (LEP) PERSONS

**On-Camera Presence**

If officers request consent to search during a Level 2 encounter, pursuant to their common-law right of inquiry, they must document the encounter on the Common Law Right of Inquiry Consent to Search Report located in FORMS and also in their activity logs. This must be done regardless of whether consent was granted or a search took place.

SHOW CONSENT TO SEARCH REPORT

**On-Camera Presence**

If officers conduct a consent search during a Level 3 encounter, or *Terry* Stop, they will not prepare the Consent to Search Report in FORMS.  Instead, they will fill out the appropriate captions related to the encounter on the Stop Report and also in their activity logs.

**SHOW APPROPRIATE PART OF THE STOP REPORT**


**On-Camera Presence**

Similar to the rules about offering business cards, the rules governing consent to search requests do not apply to searching someone's bag when the person is entering the subway system at an authorized checkpoint, or entering public facilities such as a courthouse, or large events or gatherings such as a parade, or if there are exigent circumstances.  The rules do not apply to arrested persons, who may be searched incidental to a lawful arrest without their consent.

Thank you for your attention and stay safe.

[CLOSING SLIDE]

For additional guidance see

Patrol Guide section 203-09, Public Contact - General

Patrol Guide section 212-11, Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops

Patrol Guide section 212-90, Guidelines for Interaction with Limited English Proficient (LEP) Persons

Patrol Guide section xxx Right to Know and Consent to Search

## DOCUMENTATION: "STOP REPORTS"

Hello, I'm XXXXX and I am assigned to XXXX.  Today I'm here to talk to you about when and how to prepare a Stop Report.

In the case of *Terry v. Ohio*, the U.S. Supreme Court established the authority of the police to stop and, under appropriate circumstances, frisk a person, based upon reasonable suspicion.

The New York State Court of Appeals in the case of *People v. DeBour* defined the types or levels of investigative encounters and the authority of the police at each level, consistent with federal constitutional standards.

**Text on Screen**

The levels of investigative encounters are:

> Level 1: Request for Information
> Level 2: Common Law Right of Inquiry
> Level 3: *Terry* Stop
> Level 4: Arrest


> LEVELS OF INVESTIGATIVE ENCOUNTERS:

>> LEVEL 1: REQUEST FOR INFORMATION

>> LEVEL 2: COMMON LAW RIGHT OF INQUIRY

>> LEVEL 3: *TERRY* STOP

>> LEVEL 4: ARREST

**On-Camera Presence**

In this module, we will be discussing Level 3 stops.

It's critically important that officers understand the legal standards applicable to investigative encounters, as well as when and how to document stops in a "Stop Report." The authority to detain a person during a Level 3 *Terry* stop is based on the officer possessing individualized reasonable suspicion that the stopped person has committed, is committing, or is about to commit a felony or Penal Law misdemeanor. Officers may ask pointed, accusatory questions at Level 3 and may also ask for consent to search. Only when an encounter also involves reasonable suspicion that a person is armed and dangerous may a frisk occur.

**Text on Screen**

To conduct a frisk, an officer must establish either: (1) that a he or she had reasonable suspicion that a violent crime is being, has been, or was about to be committed by the person stopped, because suspicion of violent crime indicates a person may be armed and dangerous; or (2) in the case of non-violent crimes, the officer must have information, made observations, or noted behaviors that give the officer reasonable suspicion that the stopped person is armed and dangerous.  Examples of non-violent crimes include larceny, trespass, and drug crimes.  Suspicion of these crimes require further independent information,

such as the suspect blading, or observation of an item that appears to be a weapon, in order to conduct a frisk.  An officer always has the right to employ protective measures to ensure they can see a suspect's hands during a stop. The right to employ protective measures does not give the officer the right to conduct a frisk or search if the suspect is compliant and the officer can see the suspect's hands.

TO CONDUCT A FRISK, AN OFFICER MUST

HAVE REASONABLE SUSPICION THAT A VIOLENT CRIME IS BEING, HAS BEEN, OR WAS ABOUT TO BE COMMITTED BY THE PERSON STOPPED

OR

HAVE REASONABLE SUSPICION BASED UPON INFORMATION, OBSERVATIONS, OR NOTED BEHAVIORS THAT INDICATE THAT THE PERSON STOPPED IS ARMED AND DANGEROUS

**On-Camera Presence**

Officers are empowered to frisk to protect their own safety when they have reasonable suspicion that the suspect is armed and dangerous. With this power, comes the responsibility to conduct frisks and any consequent searches in full accordance with the law. An officer must be able to explain with sufficient detail and in their own words the specific facts or circumstances that caused the officer to believe that each person frisked was armed and dangerous. Simply stating that the frisk was conducted "for officer safety" or because the officer observed "a suspicious bulge" or a "furtive movement" is insufficient to demonstrate reasonable suspicion.

**Text on Screen**

When making a stop, officers should use the "least intrusive means reasonably available" to ensure the safety of the encounter.  Officers should not use handcuffs as a routine matter during a Level 3 *Terry* stop. Handcuffs may be used only if there is a reasonable basis to believe the stopped person poses a threat to the officer's safety, such as:

- A rapidly unfolding, dangerous situation;
- The suspect acts violently;
- The suspect tries to <u>run;</u>
- The suspect resists being detained and/or resists being frisked;
- Information is available that the suspect is armed or that there is a weapon nearby

OFFICERS SHOULD NOT USE HANDCUFFS AS A ROUTINE MATTER DURING A LEVEL 3 STOP.  HANDCUFFS MAY BE USED ONLY IF:

DANGEROUS SITUATION

SUSPECT ACTS VIOLENTLY

SUSPECT TRIES TO <u>RUN</u>

SUSPECT RESISTS BEING DETAINED

INFORMATION IS AVAILABLE THAT THE SUSPECT IS ARMED OR THAT THERE IS A WEAPON NEARBY

HANDCUFFS SHOULD NOT BE USED WHEN THESE CONDITIONS ARE NOT PRESENT

**On-Camera Presence**

When a person is placed in handcuffs, they are in our custody and cannot be questioned or interrogated without first being read their Miranda rights.

TEXT ON SCREEN:

Miranda Rights MUST be read when a person is in custody and BEFORE being questioned or interrogated.


Narration and Text on Screen:

However, before being read their Miranda rights, the person may be asked:

- Pedigree information

- Officer safety concerns such as their possession of sharp instruments before a frisk

- Public safety emergencies


TITLE CARD: THE STOP REPORT

**On-Camera Presence**

For all *Terry* Stops/Level 3 encounters, a STOP REPORT is required for EACH person stopped. A Stop Report is not prepared for Level 1 and Level 2 encounters unless the encounter escalates to a Level 3 *Terry* Stop. For summary arrests, Criminal Court summonses, or Civil summonses returnable to the Office of Administrative Trials and Hearing, a Stop Report does not need to be prepared unless the suspect was detained for an investigation in a Level 3 *Terry* Stop prior to the arrest. However, keep in mind that any encounter where information is developed that elevates the encounter to a *Terry* stop requires a Stop Report. The Stop Report is also not prepared for traffic stops based on violations of the Vehicle and Traffic Law, unless the officer develops reasonable suspicion that the person committed a felony or Penal Law misdemeanor, and must be detained, or the officer has reasonable suspicion the person is armed and dangerous and conducts a frisk. Even when a Level 3 stop results in an arrest, and the officer completes an arrest report, the officer must also complete a Stop Report.


**Images and Text on Screen**

When a Stop Report is required to document an encounter, the officer will review the circumstances surrounding the stop with their supervisor; the officer will use FORMS to prepare a Stop Report prior to the end of tour; and will ensure a separate form is prepared for each person stopped in an encounter. The officer will select the "Check" icon to submit the report to the patrol/unit supervisor. When documenting

3

an encounter with a Stop Report, officers must comply with Patrol Guide section 212-11, Investigative Encounters: Level 1-Requests for Information, Level 2-Common Law Right of Inquiry and Level 3 Stops.

**[SHOW STOP REPORT]**

PATROL GUIDE PROCEDURE 212-11

INVESTIGATIVE ENCOUNTERS: REQUESTS FOR INFORMATION, COMMON LAW RIGHT OF INQUIRY AND LEVEL 3 STOPS.

**Text on Screen**

Officers documenting an encounter with a Stop Report in FORMS must:

- Review the circumstances of the stop with their supervisor
- Complete all captions and relevant check boxes pertaining to the encounter
- Complete all data fields shaded in green
- Write the "narrative" sections of the Stop Report in plain language and explain in detail:
  - The specific felony or Penal Law misdemeanor the officer suspected the person had committed, was committing, or was about to commit
  - How the encounter began and what led it to be a Level 3 *Terry* Stop, including all facts which led the officer to conclude that he or she had reasonable suspicion to make a stop. This could include information received from a corroborated source that provided a description and sets out how the person stopped matched the description. Officers must describe those facts specifically and in their own words, and should avoid using conclusory language such as "furtive movements," or "suspicious bulge."
  - The facts and circumstances of any frisk that led the officer to conclude that he or she had reasonable suspicion that the person stopped was armed and dangerous.
  - The facts and circumstances of any search, including the area searched and whether a weapon or other contraband was recovered.

DOCUMENTING AN ENCOUNTER ON THE STOP REPORT IN FORMS:

COMPLETE ALL CAPTIONS AND CHECK BOXES

COMPLETE ALL DATA FIELDS SHADED IN GREEN

WRITE THE "NARRATIVE" SECTIONS AND EXPLAIN IN DETAIL:

THE SPECIFIC FELONY OR PENAL LAW MISDEMEANOR SUSPECTED

WHAT FACTS AND CIRCUMSTANCES WERE RELIED ON TO CONCLUDE THAT THE OFFICER HAD REASONABLE SUSPICION TO BELIEVE THAT A FELONY OR PENAL LAW MISDEMEANOR HAD BEEN COMMITTED, WAS BEING COMMITTED OR WAS ABOUT TO BE COMMITTED BY THE PERSON BEING STOPPED

4

WHAT FACTS AND CIRCUMSTANCES WERE RELIED ON BY THE OFFICER TO CONCLUDE THAT THE PERSON STOPPED WAS ARMED AND DANGEROUS, IF THE PERSON WAS FRISKED

WHAT FACTS AND CIRCUMSTANCES LED TO THE DECISION BY THE OFFICER TO CONDUCT A SEARCH OF THE PERSON STOPPED, WHAT AREA WAS SEARCHED, AND WHETHER A WEAPON OR OTHER CONTRABAND WAS RECOVERED, IF THE PERSON WAS SEARCHED

On-Camera Presence

Other important information to document on the Stop Report, when applicable, includes:

- The ICAD number;
- The Pattern number; and
- Whether a body camera captured part or all of the encounter.

All supervisors are responsible to provide guidance and to ensure that officers are in compliance with the law of investigative encounters, related department policies, and the reporting requirements of the Stop Report.

[CHANGE FOCAL LENGTH]

Police are granted the authority to stop and detain a person briefly when they have reasonable suspicion of criminal activity.  They can frisk a stopped person when they have reasonable suspicion that the person is armed and dangerous.  With this authority comes a great responsibility, which officers should never take lightly. Know the legal boundaries that constrain the authority to stop and the authority to frisk and don't cross over them.

Complete a Stop Report after all Level 3 *Terry* stops and frisks whether or not those stops result in an arrest.

Thank you for your attention and stay safe.

[CLOSING SLIDE]

For additional guidance see:

Patrol Guide section 212-11, Investigative Encounters: Requests for Information, Common Law Right of Inquiry and Level 3 Stops

Patrol Guide section 203.09, Right to Know Act

Patrol Guide section XXX-__Consent to Search

Patrol Guide section 212.123 Use of Body-Worn Cameras