CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

JOHN W. WHITE, EVAN R. CHESLER, RICHARD W. CLARY, STEPHEN L. GORDON, ROBERT H. BARON, DAVID MERCADO, CHRISTINE A. VARNEY, PETER T. BARBUR, THOMAS G. RAFFERTY, MICHAEL S. GOLDMAN, RICHARD HALL, JULIE A. NORTH, ANDREW W. NEEDHAM, STEPHEN L. BURNS, KATHERINE B. FORREST, KEITH R. HUMMEL, DAVID J. KAPPOS, DANIEL SLIFKIN, ROBERT I. TOWNSEND, III, PHILIP J. BOECKMAN, WILLIAM V. FOGG, FAIZA J. SAEED, RICHARD J. STARK, THOMAS E. DUNN, MARK I. GREENE, DAVID R. MARRIOTT, MICHAEL A. PASKIN, ANDREW J. PITTS, MICHAEL T. REYNOLDS, ANTONY L. RYAN, GEORGE E. ZOBITZ, GEORGE A. STEPHANAKIS, DARIN P. MCATEE, GARY A. BORNSTEIN, TIMOTHY G. CAMERON, KARIN A. DEMASI, DAVID S. FINKELSTEIN, DAVID GREENWALD, RACHEL G. SKAISTIS, PAUL H. ZUMBRO, ERIC W. HILFERS, GEORGE F. SCHOEN, ERIK R. TAVZEL, CRAIG F. ARCELLA, DAMIEN R. ZOUBEK, LAUREN ANGELILLI, TATIANA LAPUSHCHIK, ALYSSA K. CAPLES, JENNIFER S. CONWAY, MINH VAN NGO, KEVIN J. ORSINI, MATTHEW MORREALE, JOHN D. BURETTA, J. WESLEY EARNHARDT, YONATAN EVEN, BENJAMIN GRUENSTEIN, JOSEPH D. ZAVAGLIA, STEPHEN M. KESSING, LAUREN A. MOSKOWITZ, DAVID J. PERKINS, JOHNNY G. SKUMPIJA, J. LEONARD TETI, II, D. SCOTT BENNETT, TING S. CHEN, CHRISTOPHER K. FARGO, KENNETH C. HALCOM, DAVID M. STUART, AARON M. GRUBER, O. KEITH HALLAM, III, OMID H. NASAB, DAMARIS HERNÁNDEZ, JONATHAN J. KATZ, RORY A. LERARIS, KARA L. MUNGOVAN, MARGARET T. SEGALL, NICHOLAS A. DORSEY, ANDREW C. ELKEN, JENNY HOCHENBERG, VANESSA A. LAVELY, G.J. LIGELIS JR., MICHAEL E. MARIANI, LAUREN R. KENNEDY, SASHA ROSENTHAL-LARREA, ALLISON M. WEIN, MICHAEL P. ADDIS, JUSTIN C. CLARKE, SHARONMOYEE GOSWAMI, C. DANIEL HAAREN, EVAN MEHRAN NORRIS, LAUREN M. ROSENBERG

SPECIAL COUNSEL
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1080

WRITER'S EMAIL ADDRESS
bgruenstein@cravath.com

December 14, 2020

Floyd, et al. v. City of New York, 08-CV-1034 (AT)
Ligon, et al. v. City of New York, et al., 12-CV-2274 (AT)
Davis, et al. v. City of New York, et al., 10-CV-0699 (AT)

Dear Judge Torres:

I am counsel to the Monitor, Peter L. Zimroth, and respectfully write to request that this Court vacate its order approving the combined pilot study in the above-captioned matters and enter an order approving an alternative program.

In July and August of 2018, this Court ordered development of a program to study the electronic documentation of first- and second-level police-citizen encounters, as well as the use of body-worn cameras ("BWCs") in first-level encounters.[1] The Monitor submitted an initial proposal for this program on November 9, 2018,[2] and a revised proposal (the "Combined Pilot") on January 29, 2019.[3] The Combined Pilot sought to

---

[1] Order, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 619 (S.D.N.Y. July 18, 2018); Order, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 634 (S.D.N.Y. Aug. 9, 2018).

[2] Attachment 1 to Letter from Peter L. Zimroth, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 660-1 (S.D.N.Y. Nov. 9, 2018).

[3] Ex. 1 to Letter from Benjamin Gruenstein, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 687-1 (S.D.N.Y. Jan. 29, 2019) [hereinafter "Combined Pilot"].

study the effects of the BWC recording and documentation policies by sending trained observers into the field with officers to note how the policies affected officer conduct, with the expectation that experts on the Monitor's team would study the resulting notes and derive findings.[4]  This Court approved the Combined Pilot in an order dated February 7, 2019 (the "Combined Pilot Order").[5]

The COVID-19 pandemic has undermined the ability of officers and observers to safely work alongside one another and, thus, made the Combined Pilot inadvisable.  However, the Monitor believes that the ends of the Combined Pilot may be substantially achieved if this Court orders implementation of a feasible substitute program, which has two parts.  *First*, the City should implement the set of policies that it proposed in letters to the Monitor dated February 21, 2020, August 18, 2020, and September 9, 2020 (the "Alternative Plan"), which are included as Appendix 1 to this letter.  The Alternative Plan will require New York City Police Department ("NYPD") officers to activate their BWCs for most first-level encounters and to document certain aspects of first- and second-level encounters.  *Second*, the City should fully fund and support certain studies that the Monitor's team designed to capture information that the Combined Pilot would have developed (the "Proposed Studies" or "Studies"), which are described in memoranda included as Appendix 2 to this letter.  The Proposed Studies will examine officers' compliance with applicable legal requirements in police-citizen encounters, racial disparities in officers' compliance and escalation in those encounters, and whether those encounters are appropriately documented.

---

[4] *Id.* at 1-2.

[5] Order, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 691 (S.D.N.Y. Feb. 7, 2019) [hereinafter "Combined Pilot Order"].

For the reasons detailed below, the Alternative Plan and Proposed Studies are together an appropriate and adequate substitute for the Combined Pilot. Accordingly, the Monitor respectfully requests that this Court approve and order them to take the Combined Pilot's place by entering the order included as Appendix 3 to this letter.

**I.     Background**

At the end of the Joint Remedial Process, the facilitator filed a report recommending that NYPD officers record first-level encounters using BWCs and document certain aspects of first- and second-level encounters.[6] Rather than order those policies into place, this Court ordered studies of those policies, which manifested in the Combined Pilot. This section explains the Combined Pilot as well as the Alternative Plan and Proposed Studies that were formulated to take its place.

**A.     The Combined Pilot**

The Combined Pilot was designed to study the effects of requiring officers to record first-level encounters using BWCs and electronically document first- and second-level encounters by implementing those policies in a select number of patrol precincts and service areas.[7]

Specifically, the Combined Pilot sought to answer four primary research questions: (1) to what extent are officers initiating first-, second-, and third-level encounters without legally requisite suspicion, and how does that vary among the four condition groups being studied; (2) to what extent are officers not documenting third-level encounters, and how does that vary among the four condition groups being studied; (3)

---

[6] Ariel E. Belen, Final Report and Recommendations, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 597 (S.D.N.Y. May 15, 2018).

[7] Combined Pilot, *supra* note 3, at 1-5.

how burdensome would the recording and documentation requirements be; and (4) would documentation or recording provide useful data in assessing Fourth and Fourteenth Amendment violations?[8]  Furthermore, the Combined Pilot sought to answer four subsidiary research questions: (5) how frequently do encounters occur at each *De Bour* level; (6) how frequently do first- and second-level encounters escalate to higher levels; (7) are there encounters for which privacy costs outweigh the benefits of recording; and (8) how does the recording of first-level encounters affect citizens' orientation toward officers?[9] Finally, the Combined Pilot sought to collect and study data about the race of the citizens whom officers encountered to examine potential violations of the Fourteenth Amendment.[10]

The Combined Pilot intended to study four NYPD condition groups: (1) a control group of commands in which there would be no change in NYPD procedures; (2) commands in which officers would be required to activate their BWCs during first-level encounters; (3) commands in which officers would be required to electronically document first- and second-level encounters; and (4) commands in which both electronic documentation and BWC activation would be required.[11]

For the second condition, the Combined Pilot would have required BWC activation for all first-level encounters,[12] except for events that NYPD procedures had

---

[8] *Id.* at 1.
[9] *Id.*
[10] *Id.* at 8.
[11] *Id.* at 2-3.
[12] *Id.* at 2.

designated "do not record" events.[13] But, for first- and second-level encounters, officers would not have had to document the reason for the encounter or the race, ethnicity, gender, or age of persons encountered.[14]

For the third and fourth conditions, the NYPD agreed to create a new app or electronic form on officers' phones to gather information. Although development of the app was not completed, the information to be documented for each encounter would have included: ICAD number, call type, location, initial and final *De Bour* level, the gender, race, ethnicity, and age of the person encountered, whether there was BWC footage of the encounter, and the reason for the encounter.[15]

The Combined Pilot planned to use a research method known as systematic social observation ("SSO"), by which the Monitor's team would have sent trained graduate students into the field with officer teams to observe officer conduct for eight-hour shifts.[16] Officer teams were going to be randomly selected for observation from among the pool of officers who agreed to participate in the study.[17] Once paired with officer teams, the observers were to take notes on the officers' encounters and conduct, as well as the officers' responses to questions about the reasons for their conduct, and prepare narratives of each encounter.[18] Then, legal experts on the Monitor's team were to use the observers'

---

[13] *See* Patrol Guide 212-123 (11)(a)-(j): performance of administrative duties and non-enforcement functions, routine activities within the department facilities, departmental meetings or trainings, off duty employment including paid detail assignments, interviewing a current or a potential confidential informant, undercover officers, interviewing the victim of a sex crime as soon as the nature of the offense becomes apparent, strip searches, when present in a court facility, exception for immediate lodging of a prisoner, and the inside of a medical facility.

[14] Combined Pilot, *supra* note 3, at 2.

[15] *Id.*

[16] *Id.* at 4.

[17] *Id.* at 3.

[18] *Id.* at 6-7.

narratives to assess the propriety of the officers' conduct.[19]  From start to finish, the Combined Pilot was estimated to require 14.75 to 17 months.[20]

This Court approved the Combined Pilot on February 7, 2019.[21]

### B. The Alternative Plan

In letters included as Appendix 1, the City proposed the Alternative Plan as a way to achieve some of the policy objectives that the Combined Pilot sought to study and, thus, obviate part of the need for the Combined Pilot.

Under the Alternative Plan, if approved by the Court, the City would expand BWC recording by requiring NYPD officers citywide to activate their BWCs for first-level encounters, except when officers have those encounters (a) in situations that the NYPD has designated as "do not record" situations; (b) while addressing motor vehicle accidents; (c) in situations in which a person requires medical assistance, except that the involvement of an emotionally disturbed person is not a reason for not recording; or (d) while taking reports on past crimes.[22]

The Alternative Plan would also expand documentation of police-citizen encounters by requiring officers to manually enter information into a form on the BWC metadata system, evidence.com.  For first-level encounters, officers must enter the level of the encounter.  For second-level encounters, officers must enter the level of the encounter, the race and gender of the primary person encountered, and whether multiple persons were

---

[19] *Id*. at 6.

[20] *Id.* at 12.

[21] Combined Pilot Order, *supra* note 5.

[22] App'x 1, Letter from James E. Johnson to Peter L. Zimroth, at 2 (Feb. 21, 2020).

Case 1:08-cv-01034-AT   Document 805   Filed 12/14/20   Page 7 of 20

7

encountered.[23] The manually-entered information supplements the information that would be automatically captured by the BWC recordings: date, time, officer and supervisor information, assignment information, and length of recording.[24]

Unlike the Combined Pilot, the Alternative Plan will not require officers to record the age, gender, race, and ethnicity of individuals encountered at the first *De Bour* level, and will not require officers to record the reason for first- or second-level encounters.

### C. The Proposed Studies

Although the Alternative Plan will achieve some of the objectives sought by the Combined Pilot, it will not develop the full body of knowledge that the Combined Pilot sought to create. Accordingly, the Monitor's team formulated the Proposed Studies to answer questions that this Court raised in the course of ordering the Combined Pilot and provide additional information to the Monitor that will be useful in assessing the City's legal compliance.[25] If approved, these Studies will be conducted by both the Institute for State and Local Governance ("ISLG") and a team of researchers from Stanford University, including Dr. Jennifer Eberhardt.

The Proposed Studies will examine the NYPD's compliance with the Fourth and Fourteenth Amendments in police-citizen encounters as an alternative to the Combined Pilot.[26] The Studies will examine legal compliance in police-citizen encounters, racial

---

[23] *Id.* at 2-3.

[24] *Id.*

[25] *See* App'x 2, Reagan Daly et al., Sampling for Alternative Study to the Combined Pilot (May 18, 2020); Reagan Daly et al., Proposed Study of Police-Citizen Encounters (May 28, 2020); Nick Camp et al., Using Machine Learning Techniques to Analyze Body-Worn Camera Footage (June 2020).

[26] *Id.*

disparities in compliance and escalation, and appropriate documentation of encounters.[27]

The Studies will explore the following research questions:

1) *Compliance*: How often does officer behavior in police-citizen encounters violate the Fourth Amendment or Fourteenth Amendment?  What are the key reasons for officers' failure to comply with legal requirements?  Are there racial disparities in the legality of police-citizen encounters?

2) *Free to Leave*: How do officers, through their words, create a situation where a reasonable person would not feel free to leave?

3) *Escalation*: How often do police-citizen encounters escalate from lower to higher levels?  Are there racial disparities in the legality of escalated encounters?

4) *Stops and Citizen Complaints*: What actions and communications by officers during stops lead to citizen complaints?

5) *Consent Searches*: How is consent sought for searches during stops, and are there racial differences in officers' requests for consent and when citizens grant consent?

6) *Documentation*: Does the expansion of mandatory BWC recording to most first-level encounters increase the number of third-level encounters that are reported?  After expansion of BWC recording, what is the documentation rate of third-level encounters?  Are undocumented third-level encounters associated with race and ethnicity or legal non-compliance?[28]

The Proposed Studies would use the same legal experts as the Combined Pilot—a group of retired state-court judges.  However, the Proposed Studies will not require observer ride-alongs, because instead of reviewing observers' notes about encounters, the legal experts will review BWC footage of the encounters.

In addition, the Stanford researchers will be using a method of research to evaluate BWC footage—machine learning—that would not have been used in the Combined Pilot.  Transcripts based on BWC footage will be created, after which the researchers will develop algorithms to extract and analyze officer language.  There are

---

[27] *Id.*

[28] *Id.*

significant advantages to using machine learning to examine issues of compliance and escalation in encounters. For example, once the transcripts are produced and the algorithms are set, humans are no longer needed to judge each and every encounter, and statistical comparisons can be made of officer language and behavior across precincts, time periods, demographic categories, or encounter outcomes. Moreover, since BWC recordings are constantly being generated by officers, machine learning can be used to assess the efficacy and impact of policy change, various trainings, and other interventions on a rolling basis. This approach involves simply analyzing the data that are already being collected on a routine basis, and will not require officers to do much beyond what they normally do.

### D. Differences and Similarities Between the Combined Pilot and the Alternative Plan and Proposed Studies

In many ways, the Alternative Plan and Proposed Studies together accomplish the goals of the Combined Pilot. In fact, in some ways, they go beyond the Combined Pilot; and in other ways, they are different and do not collect the same data as the Combined Pilot. Below are differences and similarities between the Combined Pilot and the Alternative Plan and Proposed Studies.

1. Both the Alternative Plan and the Combined Pilot would require BWC activation for the vast majority of first-level encounters. The Combined Pilot would exempt "do not record" events, while the Alternative Plan would exempt "do not record" events as well as motor vehicle crashes, aided situations not involving emotionally disturbed persons, and encounters in which officers were taking reports of crimes that occurred in the past (10-20 series). These additional carve-outs in the Alternative Plan would be a very small percentage of first-level encounters and are not the kinds of situations that escalate to higher *De Bour* levels.

2. The Combined Pilot proposed a study of only 16 commands (12 of 77 eligible precincts and four of nine eligible Police Service Areas ("PSAs")), while the Alternative Plan would be implemented in all 98 NYPD commands citywide (77 patrol precincts, nine PSAs, 12 transit districts). Accordingly, while the encounters reviewed in the Combined Pilot would have been limited to those 16 commands, the encounters in the proposed ISLG study will be a random sample of citywide encounters.

3. The Combined Pilot would require officers to complete an electronic form for every first- and second-level encounter, documenting the event type, ICAD number, time, date, location, age, gender, race, and ethnicity of the individuals encountered, whether there is BWC footage of the encounter, and the reason for the encounter. Under the Alternative Plan, there would be no app, but encounters and associated data from encounters would be documented in the BWC metadata system, evidence.com.

    a. For first-level encounters under the Alternative Plan, the officer's BWC would automatically record the date, time and location of the encounter, as well as officer and supervisor information, assignment information, and length of recording. Officers would also manually enter the level of the encounter in the BWC system. Unlike the Combined Pilot, however, the Alternative Plan would not require officers to document the age, gender, race, and ethnicity of encountered individuals, nor the reasons for encounters.

    b. For second-level encounters under the Alternative Plan, the BWC would automatically record the date, time and location of the encounter, as well as officer and supervisor information, assignment information, and length of recording. The

Alternative Plan would require officers to manually enter the level of the encounter, race of the primary individual encountered, gender of the primary individual encountered, and whether the encounter was with more than one individual. But, unlike the Combined Pilot, the Alternative Plan would not require recording of the reasons for encounters and the age of persons encountered.

4. Both the Proposed Studies and the Combined Pilot would use retired state-court judges as legal experts to review encounters and assess compliance with the Constitution and *De Bour* standards, but they differ in the following ways:

a. The Combined Pilot followed an SSO research method and would have used trained observers, while the Proposed Studies would review BWC footage.

b. The Combined Pilot would have reviewed all encounters occurring during the tours and shifts in which the observers rode along with the officers; that means that a large percentage of the encounters would have been only first-level encounters. Of the Proposed Studies, the ISLG study would focus on encounters at the second level or higher, but would also include encounters that started at the first level and then escalated to the second level or higher. In addition, the ISLG study would review a sample of encounters that officers categorize as first-level encounters to assess whether officers are accurately categorizing the encounters. The Stanford study would focus on third-level encounters and encounters that are categorized by officers as second-level encounters, but that might be third-level stops.

c. Both the Combined Pilot and Proposed Studies would examine many of the same research questions relating to inappropriately initiated police encounters,

undocumented third-level stops, Fourth and Fourteenth Amendment assessment, and escalation of encounters. The Proposed Studies would not examine the administrative workload of requiring documentation of first- and second-level encounters using an app. However, the Proposed Studies would involve a number of analyses that were not part of the Combined Pilot, including:

    i. Examining officer language and behavior during third-level stops that are most likely to result in citizen complaints. This analysis could shed light on the dynamics in police-citizen interactions that underlie complaints of unprofessional conduct or officer disrespect. It also may provide data useful for examining racial differences among complaints—perhaps a certain set of officer linguistic features is more likely to lead to complaints by White citizens, while another set is more predictive for Black citizens.

    ii. Examining officer language and behavior during third-level stops in which a consent search was requested to assess the voluntariness of consent search requests, the factors that lead to civilians granting consent, and whether there are racial disparities in these encounters.

    iii. Examining how an officer's communication can lead to the escalation of an encounter, whether officers' words are predictive of improper escalation, and whether there are racial disparities in escalation.

    iv. The Stanford study will also review encounters that were categorized by officers as second-level encounters, but that the Monitor's legal experts determined to be third-level encounters because the citizen was not free to leave. Stanford researchers will examine whether there are

>>linguistic features that can predict whether an encounter was a second- or third-level encounter.

As discussed below, the Alternative Plan would adopt and implement the facilitator's fourth recommendation citywide and would document many of the data points that the facilitator's fifth recommendation would have documented. When combined with the Proposed Studies, it will allow the Monitor's research teams to examine the questions raised by the Combined Pilot and several more.

**II.     The Combined Pilot Order Should Be Vacated and the Alternative Plan and Proposed Studies Should Be Ordered in its Place**

This Court has a "broad" and "flexible" power to modify its past orders in the exercise of its "sound discretion." *Brown v. Plata*, 563 U.S. 493, 542 (2011). It should use that power to vacate the Combined Pilot Order because the Combined Pilot is inadvisable during the pandemic, and replace that order with an order approving and instructing implementation of the Alternative Plan and Proposed Studies, which together will substantially achieve the Combined Pilot's aims.

**A.     The Combined Pilot Order Should Be Vacated Because of the COVID-19 Pandemic**

Because the COVID-19 pandemic has made the Combined Pilot inadvisable and the alternative program proposed here offers a suitable substitute, this Court should vacate the Combined Pilot Order. The Combined Pilot can succeed only by sending observers into the field with officers to collect data, and the pandemic has undermined the ability to do that safely in light of the close quarters they would have to share, including with civilians.

> B. **The Alternative Plan and the Proposed Studies Are an Appropriate Substitute for the Combined Pilot**

The Alternative Plan and Proposed Studies meaningfully achieve the aims of the Combined Pilot and should be approved in its place. The Alternative Plan would expand the NYPD's mandatory activation of BWC recording to include the vast majority of all first-level encounters citywide. The NYPD will undertake documentation of first- and second-level encounters through evidence.com; that documentation will include many of the data elements that were required in the Combined Pilot. In addition, the Proposed Studies go further than the Combined Pilot in examining officer compliance with law and policy.

The policy of requiring activation of BWCs for first-level encounters does not need to be tested with a pilot program, because if the Court issues the order included in Appendix 3 then the NYPD will require activation of BWCs for first-level encounters citywide.[29]

Although the Alternative Plan does not require BWC activation for motor vehicle crashes, aided situations not involving emotionally disturbed persons, and officers taking reports on past crimes, these are a small percentage of first-level encounters. Implementing BWC activation for first-level encounters citywide, even with these carve-outs, will result in more BWC recordings than the Combined Pilot would have, and these carve-outs do not involve encounters that tend to escalate to higher *De Bour* levels. By requiring all officers to record most first-level encounters, the Alternative Plan effectively renders the BWC aspects of the Combined Pilot moot. For these reasons, enforcement of

---

[29] *See* App'x 1, Letter from James E. Johnson to Peter L. Zimroth, at 1 (Feb. 21, 2020).

the Combined Pilot's requirement of testing first-level BWC activation would be no longer equitable.

The Alternative Plan and the Proposed Studies are justified as a substitute for the Combined Pilot even though the Alternative Plan does not involve an app for documenting lower-level encounters.  The Alternative Plan documents many of the data elements that were to be documented in the Combined Pilot.  Lower-level encounters will be recorded on BWCs and many elements of the encounters will be included in the BWC metadata through evidence.com: date, time, officer and supervisor information, assignment information, and length of recording.  Officers will also be required to manually enter the level of the encounter into evidence.com.  For second-level encounters, the same elements will be automatically captured: date, time, officer and supervisor information, assignment information, and length of recording.  In addition, officers will be required to manually enter the level of encounter, the race and gender of the primary person encountered, and whether multiple persons were encountered.[30]

As explained above, there are data elements that will not be documented in the Alternative Plan that would have been in the Combined Pilot: the age, gender, race and ethnicity of individuals stopped during first-level encounters, as well as the age of individuals encountered in second-level interactions.  Declining to require documentation of this information is justified, however, because the burdens of that documentation outweigh the benefits.  There was no guarantee that this Court would have ordered that documentation at the conclusion of the Combined Pilot—the Court would have needed to assess whether the burdens of that documentation were unmanageable or in excess of the

---

[30] *See* App'x 1, Letter from James E. Johnson to Peter L. Zimroth, at 1 (Feb. 21, 2020).

benefits. The burdens of that documentation would be significant. Given the fact that any one of the approximately nine million calls for service that the NYPD answers each year can result in a first-level encounter with one or more individuals, requiring officers to manually document the race, age, and gender of the persons encountered in every one of those encounters would be time-consuming and difficult to manage.

As for the benefits, collecting aggregate data on the race, age, and gender of persons encountered during first-level encounters would not yield useful information for a Fourteenth Amendment analysis, undermining a key rationale for the facilitator's recommendation. Suppose, for example, that the data showed that a higher percentage of Black people than White people were encountered in first-level encounters. That would show disparities, but it would not show discrimination unless the analysis could show that more Black people were encountered than "should have been" encountered, based on an appropriate benchmark. It does not appear that an appropriate benchmark can be found.[31]

- For an analysis of racial discrimination regarding first-level stops, the benchmark used is based on the legal framework of reasonable suspicion: the critical task is to identify the relevant population at risk of being stopped. For first-level encounters, however, there is no way to identify the relevant population for whom an officer might have an objective credible reason to approach.

---

[31] *See* Ridgeway, Greg, and John MacDonald. "Methods for assessing racially biased policing." *Race, ethnicity, and policing: New and essential readings* (2010): 180-204. NY, New York University Press; Neil, Roland, and Christopher Winship. "Methodological challenges and opportunities in testing for racial discrimination in policing." *Annual Review of Criminology* 2 (2019): 73-98; National Academies report, Proactive Policing: Effects on Crime and Communities, Weisburd and Majmundar, 2017, Ch. 7 (a meaningful benchmark for assessing racial discrimination is difficult even for traffic and pedestrian stops).

- Because there are so many different kinds of encounters with the shared label of Level 1, there is no similarity among them, and therefore, there is no standard for determining who "should have been" encountered assuming there was no discrimination.  Types of first-level encounters include, but are not limited to, officers at the scene of a crime asking people whether they saw anything or have other useful information to aid in an investigation; officers asking someone if they are in need of assistance, such as someone who is intoxicated or appears to be lost; officers responding to disputes (family disputes, landlord-tenant disputes, vendor-customer disputes); officers responding to 311 calls involving noise disputes; officers seeking information about missing persons; and officers responding to disorderly groups.

- The majority of first-level encounters are ones in which officers are responding to a call from a citizen (e.g., medical-assistance calls, calls to file a police report, or calls seeking help, such as directions or because someone is locked out of a vehicle).  For these calls, the data that would have been collected in the Combined Pilot would show only the race, age, and gender of the persons calling the police.  Because officers are responding to calls, there is no officer choice in initiating the encounter, so the data would not be useful in assessing either the officers' motivations or the agencies' decisions in responding to the calls.

- Even for officers' self-initiated encounters, there is no standard for identifying the relevant population that might be encountered for benchmarking purposes.  For example, if officers approach an intoxicated person to see if she needs assistance, there is no ability to identify whether there might be other persons that the officer

could have approached, but did not. Without knowing what opportunities the officers declined to follow, there is no way to say anything meaningful about selective enforcement.

- Various examples illustrate these points: if there were a higher percentage of Black people than White people whom officers encountered when assisting persons who needed help, that could be because more Black people requested assistance, or it appeared to officers that there were more Black people that needed assistance. One could not attribute the racial disparity to officers having a higher level of suspicion of Black people. Similarly, a higher percentage of Black people encountered after vehicle accidents would likely be due to a greater percentage of accidents involving Black people than White people, not because officers were being discriminatory in responding to accidents of Black people. Another example would be officers responding to Shot-Spotter or a shots-fired call. There is no way to estimate the relevant population of persons in the vicinity of firearms discharges, so even if there were a racial disparity in persons who were approached after a firearms discharge, there is no appropriate benchmark against which that data could be compared to assess whether the disparity was due to racial discrimination.

Furthermore, the Proposed Studies are much more effective at accounting for the relationship between race and *De Bour* encounters, including first-level encounters, than the electronic documentation of first-level encounters mandated by the Combined Pilot.

Even without the app for documenting first- and second-level encounters, the Alternative Plan and Proposed Studies allow for extensive analysis of lower-level encounters. The Monitor's legal experts will review encounters that start at Level 1 and

escalate to higher levels, as well as encounters that start at Level 2.  They will then evaluate whether officers' actions were legally compliant at each *De Bour* level, including first- and second- level encounters.  The researchers also will examine whether there are racial disparities in legal compliance across police-citizen encounters that are reviewed.  They will assess Fourteenth Amendment violations by examining whether certain citizens, such as Black and Latinx people, are more likely to experience constitutional violations in their interactions with officers, while controlling for other aspects of the encounters that might affect compliance.[32]  The Proposed Studies will also collect a sample of encounters categorized by officers as first-level encounters to assess the accuracy of categorization and legal compliance in encounters that are found to rise above Level 1.[33]  If the research team finds that there is an unacceptable number of encounters at higher levels mischaracterized as first-level encounters, the team will increase the number of first-level encounters reviewed.  The Studies will examine in greater depth the accuracy of officers' second-level categorizations, to assess whether encounters in which a reasonable person would not feel free to leave were inaccurately categorized as second-level encounters.  Thus, the Proposed Studies will more effectively examine Fourth and Fourteenth Amendment issues than the Combined Pilot.

The Alternative Plan, with BWC activation at all *De Bour* levels, and the Proposed Studies will uncover potential issues within the realm of the Fourth and Fourteenth Amendments that the Combined Pilot was designed to achieve, but, again, on

---

[32] In this analysis of compliance, the sample will capture encounters that legal experts determine are third-level stops, but were not reported as stops by officers.

[33] Although the NYPD officers will not record the race and gender of person encountered at Level 1, ISLG will have graduate students code the encounters and record the individuals' race and gender.

a citywide scale.  The Alternative Plan and the Proposed Studies will provide more data to the Monitor in measuring and assessing the stated goals of increased documentation of first- and second-level encounters than the Combined Pilot.  And it would do so without burdening officers with completing an electronic form during every first- and second-level encounter.

\* \* \*

For the foregoing reasons, the Monitor respectfully requests that this Court exercise its "sound discretion" under *Brown v. Plata*, 563 U.S. 493, 542 (2011) to vacate the Combined Pilot Order and enter the order included in Appendix 3 that approves and instructs implementation of the Alternative Plan and Proposed Studies.

Respectfully submitted,

/s/ Benjamin Gruenstein
Benjamin Gruenstein

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone:  (212) 474-1000
Fax:  (212) 474-3700
bgruenstein@cravath.com

Hon. Analisa Torres
　　United States District Court
　　　　Southern District of New York
　　　　　　500 Pearl Street
　　　　　　　　New York, New York 10007-1312
BY ECF