**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X
DAVID FLOYD, *et al.*,

      Plaintiffs,

  -against-                                         No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

      Defendants.
-------------------------------------------------------------------- X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE COURT-APPOINTED MONITOR'S MOTION TO VACATE THE COURT'S ORDER APPROVING THE COMBINED PILOT

THE CENTER FOR
CONSTITUTIONAL RIGHTS
Darius Charney
Samah Sisay
666 Broadway, 7th Floor
New York, NY 10012
212.614.6464

BELDOCK LEVINE &
HOFFMAN LLP
Jonathan C. Moore
Luna Droubi
Marc Arena
99 Park Avenue, PH/26th Fl.
New York, NY 10016
212.490.0400

*Attorneys for the Floyd Plaintiffs*

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................... 1

II.     BACKGROUND .......................................................................................................... 2

   A.   The Court's Prior Rulings on the Importance of Narrative Explanations of the
        Reasons for an Investigative Encounter ................................................................ 2

   B.   The Facilitator's Recommendations Regarding Electronic Documentation of
        Level 1 and 2 Encounters and BWC Recording of Level 1 Encounters ............................ 3

   C.   The Court's July 19 and August 9, 2018 Orders ................................................... 5

   D.   The Combined Pilot .............................................................................................. 5

   E.   The City's Alternative Plan and the Monitor's Proposed Studies ............................. 7

III.    ARGUMENT ................................................................................................................ 9

   A.   Legal Standard for a Motion to Vacate/Modify an Injunctive Relief Order ................... 9

   B.   The Monitor Seeks to Vacate All Three of the Court's Prior Pilot Orders ...................... 11

   C.   The COVID-19 Pandemic is no Reason to Abandon the Combined Pilot Entirely
        or to Adopt the City's Alternative Plan .............................................................. 11

   D.   Replacing the Combined Pilot with the City's Alternative Plan Would Thwart
        the Purpose of the Court's Prior Pilot Orders and Run Counter to the Strong
        Public Interest in Transparency Around Level 1 and 2 Encounters ............................... 12

        1.  No BWC Recording of Level 1's Conducted in Response to Radio Calls
            about Past Crimes ...................................................................................... 12

        2.  BWC Metadata is Less Accurate and More Burdensome to Enter than an
            Electronic Report/Smartphone App .............................................................. 14

        3.  No Data on Encounter Escalation ............................................................... 15

        4.  No Data on Civilian Race in Level 1 Encounters .......................................... 16

        5.  No Documentation of Geographic Locations of Level 1 or 2 Encounters ........... 18

        6.  No Narrative Explanations of Officers' Reasons for Initiating Level 2
            Encounters ................................................................................................ 20

        7.  No Procedures for Regular Supervisory Review of the Legality of Officers'
            Level 1 and 2 Encounters ........................................................................... 21

   E.   The Alternative Plan and Proposed Studies Should Not Replace the Combined
        Pilot Unless They are Significantly Modified ...................................................... 21

        1.  Proposed Modifications to the Alternative Plan ............................................. 22

        2.  Piloting the Modified Alternative Plan and Assessing its Costs, Benefits,
            and Feasibility Through the Proposed Studies ............................................... 23

IV.     CONCLUSION ............................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Plata*, 563 U.S. 493 (2011)............................................................... 9

*Floyd v. City of N.Y.*, 302 F.R.D. 69 (S.D.N.Y. 2014) ................................... 9

*New York State Ass'n for Retarded Children v. Parisi*, 706 F.2d 956 (2d Cir. 1983)................. 10

*Sierra Club v. United States Army Corps of Eng'rs*, 732 F.2d 253 (2d Cir. 1984) ........................ 9

*Sys. Fed'n No. 91, Railway Emps.' Dept't v. Wright*, 364 U.S. 642 (1961).................................. 9

*United States v. Swift & Co.*, 286 U.S. 106 (1932)........................................................ 10

*United States v. United Shoe Mach. Corp.*, 391 U.S. 244 (1968).................................... 9

*United States v. Yonkers Bd. of Educ.*, 29 F.3d 40 (2d Cir. 1994)................................. 10

## I.       INTRODUCTION

Plaintiffs submit this memorandum of law in response to the Court-Appointed Monitor's motion to vacate the Court's prior order approving the Combined Pilot and replace the Combined Pilot with the City's "Alternative Plan" for documentation and BWC recording of Level 1 and 2 encounters and the Monitor's two "Proposed Studies." *See* ECF Nos. 805, 805-1, and 805-2.

The Monitor's motion, if granted, would upend three core principles of the this case: transparency, accountability, and community voice in stop-and-frisk reform. In asking to abandon the comprehensive Level 1 and 2 recording scheme of the Combined Pilot in favor of the much narrower one proposed in the Alternative Plan, the Monitor seeks to permanently and severely limit a reform championed by Plaintiffs, community stakeholders, and the Court-appointed JRP Facilitator as a potentially critical tool for increasing transparency and accountability around NYPD investigative street encounters before that reform has even been tested, thus thwarting the purpose of not one, but three prior relief orders of this Court. Moreover, his stated reason for doing so, the ongoing COVID-19 pandemic, only impacts the Monitor's chosen systemic social observation ("SSO") research and data collection method for the Combined Pilot; it in no way hinders NYPD officers' ability to document Level 1 and 2 encounters as comprehensively as the Facilitator recommended and the Combined Pilot contemplated, nor does it lessen the need to study that comprehensive documentation scheme to determine if it should be implemented by the NYPD. Accordingly, the Monitor's motion should be denied in its entirety.

If the Court is inclined to do away with the Combined Pilot, it should replace it with a modified version of the City's Alternative Plan that more closely tracks the comprehensive Level 1 and 2 recording and documentation scheme recommended by the Facilitator and included in the Combined Pilot. The Court should direct the NYPD to pilot this modified Alternative Plan and direct the Monitor to use his Proposed Studies to assess its relative costs, benefits, and feasibility,

and then report to the Court on whether the modified Plan should be implemented throughout the NYPD.

## II.    BACKGROUND

### A.  The Court's Prior Rulings on the Importance of Narrative Explanations of the Reasons for an Investigative Encounter

The Court's prior rulings underscore the need for narrative explanations for all investigative encounters. The Court's Liability Opinion highlighted the difficulty of conducting thorough Fourth or Fourteenth Amendment review without the benefit of a narrative explanation for police stops. Even where officers completed UF-250 stop reports, checking the reason for a stop from a list, the Court found many of the form options vague and subjective. "Without an accompanying narrative explanation for the stop, these checkmarks cannot reliably demonstrate individualized reasonable suspicion." Liability Opinion, ECF No. 373 at 8. Moreover, the Court concluded that the NYPD had, for a decade, willfully disregarded officers' failure to properly document stops. *Id.* at 93. Accordingly, the Court's Remedial Order directed the NYPD to amend the UF-250 form to include a narrative section describing the reason for a stop in officers' own words. *See* Remedial Order, ECF No. 372 at 19. This is especially important where the reason for the stop, such as "high crime area" or "furtive movement", is vague and difficult to evaluate. In addition to narratives on stop reports, officers were also required to provide narratives of stops with specificity in their activity logs. The Monitor was instructed to assist the NYPD in ensuring that activity logs were properly completed and that officers who fail to comply with documentation requirements were adequately disciplined. *Id.* at 23.

**B. The Facilitator's Recommendations Regarding Electronic Documentation of Level 1 and 2 Encounters and BWC Recording of Level 1 Encounters**

As part of the remedies in this case, the Court created the Joint Remedial Process ("JRP"). This process was designed to uplift reform recommendations from the communities most affected by years of unconstitutional and racially discriminatory stops. The Court appointed the Honorable Ariel Belen (Ret.) as the Facilitator of this process. His team spent more than a year conducting focus groups and community forums, meeting with over 2,000 individuals from those New York City communities most heavily impacted by the NYPD's stop-and-frisk and trespass enforcement practices to consider their input on how to meaningfully reform those practices. *See* JRP Final Report and Recommendations, ECF No. 597, at iii-iv. As Judge Belen noted, "a constant message" from his team's community engagement was "that civilians overwhelmingly feel that they are not free to leave even during a Level 1 encounter," that "many investigative encounters quickly escalate into full blown *Terry* stops," and that "impacted community members consistently expressed a need to quantify" Level 1 and 2 encounters "so that appropriate monitoring and supervision of them can occur." *Id*. at 226, 230-31.

At the urging of the Plaintiffs and many community stakeholders, Judge Belen recommended that the NYPD adopt a system that would contemporaneously and comprehensively document Level 1 and 2 encounters. *See* Declaration of Communities United for Police Reform ("CPR Decl.") ¶¶ 14, 16, 18. Specifically, he recommended that the Court order the NYPD to create an application ("app") for department-issued smartphones on which officers would record (i) the age, (ii) gender, and (iii) race of all persons they approach at either Level 1 or Level 2, and (iv) whether the encounter escalates to Level 3, and, using the phones' location services, (v) the time and (vi) location of each encounter. *Id*. at 231. Judge Belen explained that "the entry of these data points on a pre-programed app could be accomplished in a matter of seconds, either at the

3

time or closely following an investigation of a crime scene," and that the data collected for each encounter "should be published quarterly and annually, disaggregated by demographic and geographic and precinct/command information," which "would allow both the NYPD and the public to observe and study trends in policing and enhance transparency and accountability around the current state of SQF policy." *Id.* at 232. More specifically, he emphasized that "collecting data on the subjects of Level 1 and Level 2 encounters is essential to understanding, after controlling for crime and other social factors, the extent to which police are initiating encounters on the basis of race," and that it is "vital to take all necessary to steps to determine why" community perception of racial targeting has continued even with the significant decrease in the number of reported Level 3 stops. *Id.* at 233.

In recommending the BWC recording of all Level 1 encounters, Judge Belen cited to the BWC policies of three large urban police departments—Washington, D.C., Philadelphia and Chicago, the latter two of which have, like New York, been sued for racially-biased stop-and-frisk practices—which require the BWC recording of either "all law enforcement-related encounters" or "all contacts initiated pursuant to a law enforcement investigation." *Id.* at 229-30 n. 270-272. He also noted that the NYPD's refusal to mandate BWC recording of all "Level 1 encounters that serve a law enforcement purpose" was "inconsistent with the findings in the Liability Opinion, the heightened need for transparency and accountability, and the acute importance of repairing the relationship between the police and the communities that bore the brunt of the NYPD's past unconstitutional practices." *Id* at 230.

The NYPD objected to both of Judge Belen's recommendations, arguing that any benefits of documenting Level 1 and 2 encounters and BWC recording of Level 1 encounters would be outweighed by the burdens and costs of these policy changes. *See* ECF No. 603. Specifically, the

NYPD cited to the millions of calls for service it receives each year that it suggested could all result in Level 1 investigative encounters which would be too burdensome and impractical for officers to document and too technologically infeasible for them to record on BWCs. *See* ECF No. 603 at 11-13. The NYPD also contended that the value of the information that would be collected through the documentation and BWC recording of Level 1 encounters was "highly questionable," "limited," and unlikely to further the NYPD's compliance with the Court-ordered reforms or the Fourth and Fourteenth Amendments. *Id*. at 11, 13.

Plaintiffs and community stakeholders active in the JRP meanwhile agreed with both of Judge Belen's recommendations but stated that his Level 1 and 2 documentation recommendation did not go far enough, urging that the electronic form for documenting Level 1 and 2 encounters should also include a section where officers would provide narrative descriptions of their reasons for initiating the encounters they conduct. ECF No. 602 at 19.; ECF No. 611; CPR Decl. ¶ 16.

### C.  The Court's July 19 and August 9, 2018 Orders

Rather than deciding these benefit, burden, and feasibility questions itself, the Court concluded that each of Judge Belen's two reform recommendations required "further study." The Court accordingly directed that each reform be piloted for a period of time to assess its relative costs and benefits, after which the Monitor would report these cost-benefit findings to the Court, along with, in the case of Level 1 and 2 documentation, his views on whether the reform should be expanded or terminated. *See* ECF. No. 619 at 2-3; ECF No. 634 at 3.

### D.  The Combined Pilot

The Combined Pilot proposal developed by the Monitor and approved by the Court on

February 7, 2019, *see* ECF No. 691,[1] was designed to answer four questions, which directly address the costs and benefits of each of the two recommended reforms: (1) How does requiring officers to document their Level 1 and 2 encounters and/or record their Level 1 encounters on BWCs affect the legality of their conduct during Level 1 and 2 encounters and Level 3 *Terry* stops; (2)  How does requiring officers to document their Level 1 and 2 encounters and/or record their Level 1 encounters on BWCs affect their likelihood to document the Level 3 *Terry* stops they conduct; (3) What are the administrative workload and opportunity costs associated with officers documenting Level 1 and 2 encounters and recording Level 1 encounters on BWCs; and (4) Would documentation of Level 1 and 2 encounters and BWC recordings of Level 1 encounters provide useful data in assessing Fourth and Fourteenth Amendment violations. *See* ECF No. 687-1 at 1.

Under the Combined Pilot, certain groups of NYPD officers would record all Level 1 encounters they conduct on BWCs and/or document all of their Level 1 and 2 encounters on a smartphone app/electronic form that the NYPD agreed to develop, where officers would enter the following categories of information for each Level 1 and 2 encounter: (i) officer name, (ii) officer command, (iii) date of encounter, (iv) location of encounter, (v) initial level of encounter (1-2), (vi) final level of encounter (1-4), (vii) gender, age, and race of the civilian, and (viii) a narrative description of the officer's reasons for initiating the encounter. ECF No. 687-1 at 5, App'x 2.

The primary research methodology which the Monitor team would use in conducting the Combined Pilot study, systematic social observation ("SSO"), would involve trained observers riding along with NYPD officers participating in the pilot, recording data on those officers' conduct during the street encounters which the observers witness, and coding that data for analysis

---

[1] Prior to the Monitor's development and submission of his Combined Pilot proposal to the Court in November 2018, *Floyd* Plaintiffs developed their own combined pilot proposal which they circulated to the City and the Monitor in September 2018. However, it was rejected. *See* Declaration of Darius Charney in Opposition to the Monitor's Motion to Vacate ("Charney Decl") ¶¶ 4-5.

by the Monitor's research team to help answer the four research questions discussed above. ECF No. 687-1 at 1, 7, 10-11.

### E.  The City's Alternative Plan and the Monitor's Proposed Studies

In February 2020, before the Combined Pilot began and before the first COVID-19 case was detected in New York City, Defendants wrote to the Monitor requesting to discontinue the Combined Pilot and proposing  the NYPD's Alternative Plan for recording certain categories of Level 1 encounters on BWCs and recording certain information about each Level 1 and 2 encounters captured on BWCs. *See* ECF No. 805-1 at page 2 of 9. In requesting to discontinue the Combined Pilot, the Defendants identified issues that they believed would make executing and drawing conclusions from the pilot "difficult in the extreme," including selection of participating precincts, whether enough officers would volunteer to participate, and "significant safety and privacy concerns raised by the presence of the [observers]." *Id*. at pages 2-3 of 9. The City did not raise any concerns about NYPD officers recording all Level 1 encounters on BWCs or documenting all Level 1 and 2 encounters on a smartphone app/electronic form as the City had previously agreed to do as part of the Monitor's Combined Pilot proposal. *Id*.

Nevertheless, Defendants proposed abandoning the Level 1 and 2 documentation and Level 1 BWC recording protocols of the Combined Pilot in favor of recording some, but not all, categories of Level 1 encounters on BWCs. One category that officers would not record under the Alternative Plan is certain Level 1 encounters involving investigations of past crimes. ECF No. 805-1 at page 3 of 9.

As for documenting information about each BWC-recorded Level 1 and 2 encounter, the NYPD has proposed foregoing a contemporaneous documentation via a smartphone app/electronic form and instead requiring officers to enter some, but not all, of the categories of encounter

information previously included in the Monitor's Combined Pilot proposal in two places: the evidence.com software associated with the BWCs worn by officers and officers' electronic memobooks. Specifically, for each Level 1 encounter recorded on a BWC, documentation would include: (i) the category of encounter (i.e., Level 1), (ii) the encounter date and time, (iii) the officer name, and (iv) the length of BWC video entered into evidence.com, while (v) the officer's command, and (vi) the officer's supervisor would be entered into the electronic memobook. ECF No. 805-1 at pages 3-4 of 9.[2] For each Level 2 encounter recorded on a BWC, the same categories of information as for Level 1 would be recorded, and (i) the race and gender of the civilian (with categories chosen from drop-down menus), and (ii) whether the encounter involved more than one civilian would also be entered into evidence com. *See* ECF No. 805-1 at page 6 of 9.

The City's Level 1 and 2 documentation proposal would not capture the race or gender of the civilians in Level 1 encounters, the locations of Level 1 and 2 encounters, or narrative explanations of the officers' reasons for initiating Level 1 or 2 encounters. Moreover, the officer assignment/command and supervisor data entered in the electronic memobook for each Level 1 and 2 encounter could not be aggregated and statistically analyzed, nor could it be linked to the information for each encounter that is entered into evidence.com. Charney Decl. ¶ 10.

Several of the community stakeholders who championed the comprehensive documentation of Level 1 and 2 encounters during the JRP met with the NYPD and the Monitor in April 2020 to express their concerns with these very omissions from the Alternative Plan and requested that the NYPD incorporate the missing Level 1 and 2 information categories into the

---

[2] The Monitor's motion to vacate inaccurately states that officer assignment and supervisor information will be automatically entered into evidence.com. *See* ECF No. 805 at 7. However, the City's February 21, 2020 letter to the Monitor outlining its Alternative Plan clearly states that those two data points would be entered into the officer's electronic memobook, not evidence.com. *See* ECF No. 805-1 at page 3 of 9.

Alternative Plan. *See* CPR Decl. ¶ 22. However, their concerns and requests are not reflected in the Alternative Plan submitted to the Court.

The Monitor's Proposed Studies would not attempt to answer several questions related to the relative costs and benefits of documenting Level 1 and 2 encounters which the Combined Pilot did intend to address, including (1) the administrative burdens of documenting certain categories of information about Level 1 and 2 encounters in evidence.com, and (2) whether Level 1 and 2 documentation and BWC recordings of Level 1 encounters impacts the legality of officer conduct during investigative street encounters. ECF Nos. 687-1 at 1; 805-2.

## III.   ARGUMENT

### A.   Legal Standard for a Motion to Vacate/Modify an Injunctive Relief Order

As this Court has recognized, "[t]he power of a court of equity to modify a decree on injunctive relief is long-established, broad, and flexible." *Floyd v. City of N.Y.*, 302 F.R.D. 69, 126 (S.D.N.Y. 2014) (citing *Brown v. Plata*, 563 U.S. 493, 542 (2011)). This power is not without limits, however, and a court abuses its discretion when vacatur or modification "thwarts the purpose behind the injunction." *Sierra Club v. United States Army Corps of Eng'rs*, 732 F.2d 253, 257 (2d Cir. 1984).

It is well-established that a district court has the power to modify its past injunctive decrees to account for changed circumstances. *See, e.g., United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 248-49 (1968); *Sys. Fed'n No. 91, Railway Emps.' Dept't v. Wright*, 364 U.S. 642, 646-48 (1961) ("a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen"); *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("continuing decree of injunction directed to events to come is subject always to adaptation as

events may shape the need"); *New York State Ass'n for Retarded Children v. Parisi*, 706 F.2d 956, 967 (2d Cir. 1983). However, " a court should [also] keep the public interest in mind in ruling on a request to modify based on a change in conditions." *Id.* "When a constitutional violation has been established, the defendant does not shoulder its burden at the remedy stage merely by coming forward with a plan. The defendant must come forward with a plan that promises realistically to work, and promises realistically to work *now.*" *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 43 (2d Cir. 1994) (emphasis in original, quotations and citations omitted) (holding district court did not abuse its discretion by rejecting those aspects of the defendant's plan it found ineffectual).

The Court-appointed Monitor asks this Court to vacate the Court-ordered Combined Pilot in favor of the City's Alternative Plan and the Monitor's Proposed Studies because "the COVID-19 pandemic has made the Combined Pilot inadvisable and the alternative program proposed here offers a suitable substitute." ECF No. 805 at 13. While changed circumstances due to the COVID-19 pandemic may justify the departure from the Combined Pilot's SSO research methodology, with observers riding along with officers during their tours, these circumstances have not changed the purpose of or need for the Combined Pilot. The City's recommendation to abandon the Combined Pilot in favor of its Alternative Plan predates the COVID-19 pandemic and the related limitations to successful execution of an SSO study. *See* ECF No 805-1 at 2-4. The Alternative Plan and Proposed Studies are not adequate substitutes for the Combined Pilot, absent documentation of the race of individuals stopped at Level 1, locations of Level 1 and 2 encounters, encounter escalation, and narratives created by officers detailing the reasons for the  encounters at Levels 1 and 2. The Monitor's proposal would thwart the purpose of the Combined Pilot and the Court's July 18 and August 8, 2018 Orders, namely studying the benefits and burdens of comprehensively recording and documenting Level 1 and 2 encounters. For these reasons and

those argued herein, this Court should not vacate the entirety of the Combined Pilot or approve the Alternative Plan or Proposed Studies in their current form.

### B. The Monitor Seeks to Vacate All Three of the Court's Prior Pilot Orders

While the Monitor's motion states that he is only requesting that the Court vacate its February 7, 2019 Order approving the Combined Pilot, *see* ECF No. 805 at 1, 20, replacing the Combined Pilot with the Alternative Plan and Proposed Studies would also effectively vacate the Court's July 19 and August 9, 2018 Pilot Orders. *See* ECF Nos. 619, 634. Those two orders mandated the piloting of Judge Belen's recommendations of comprehensive electronic documentation of all Level 1 and 2 encounters and BWC recording of all Level 1 encounters to assess these two reforms' relative costs, benefits, and feasibility so that the Court could determine if the NYPD should implement them department-wide. ECF No. 619 at 2-3; ECF No. 634 at 3. The Monitor now seeks to bypass piloting either of Judge Belen's recommended reforms and get Court approval for NYPD department-wide implementation of Level 1 and 2 documentation and BWC recording protocols that are much narrower than what the Court originally ordered to be piloted. *See* ECF. Nos. 805-1; 805-2 at pages 9-12 of 28. Thus, in analyzing the present motion, the Court must determine if the Monitor has met the standard for vacatur or modification of all three of the Court's prior Pilot Orders, which, as described below, he clearly has not.

### C. The COVID-19 Pandemic is no Reason to Abandon the Combined Pilot Entirely or to Adopt the City's Alternative Plan Order

The only reason the Monitor gives for foregoing the Combined Pilot altogether and replacing it with the City's Alternative Plan and the Proposed Studies is the COVID-19 pandemic. *See* ECF No. 805 at 13. While the pandemic undoubtedly makes the Combined Pilot's SSO research methodology infeasible to conduct safely, it in no way impacts NYPD officers' ability to electronically document all of the data points for Level 1 and 2 encounters listed in the Combined

Pilot proposal or to record all law enforcement-related Level 1 encounters on BWCs. *See* ECF No. 687-1 at 5, App'x. 2. Moreover, given the NYPD's significant and ongoing problems with unreported and racially disparate Level 3 *Terry* stops described by the Monitor, *see* ECF No. 795-1 at 20-23, 83-84, 85-86, the need to assess whether Judge Belen's Level 1 and 2 documentation and Level 1 BWC reform recommendations can help address these problems—which the Combined pilot was expressly designed to do, *see* ECF No. 687-1 at 1—has never been greater.

### D. Replacing the Combined Pilot with the City's Alternative Plan Would Thwart the Purpose of the Court's Prior Pilot Orders and Run Counter to the Strong Public Interest in Transparency Around Level 1 and 2 Encounters

As discussed above, the Court ordered the piloting of two JRP reforms recommended by Judge Belen and prioritized by Plaintiffs and community stakeholders— comprehensive documentation of Level 1 and 2 encounters and BWC recording of all Level 1 encounters— specifically to assess their benefits, costs, and feasibility before deciding whether the NYPD should implement them on a department-wide basis. *See* ECF No. 619 at 2-3; ECF No. 634 at 3; ECF No. 687-1 at 1; ECF No. 691 at 2. Yet, contrary to the Monitor's characterization, the Alternative Plan does not "meaningfully achieve" this purpose. ECF No. 805 at 14. Instead, as described below, replacing the Combined Pilot with the Alternative Plan will eliminate significant elements of these two reforms before their costs, benefits, and feasibility have even been assessed, thus thwarting the primary purpose of the Court's July 19, 2018, August 9, 2018 and February 7, 2019 Pilot Orders and seriously undermining what community stakeholders identified as critical stop-and-frisk transparency reforms during the JRP.

### 1. No BWC Recording of Level 1's Conducted in Response to Radio Calls about Past Crimes

First, the Monitor proposes adopting the City's Alternative Plan not to record on BWC's Level 1 encounters conducted in response to radio calls regarding past crimes. The JRP's final

report recognized the trend in most large city police departments—including in cities where stop and frisk practices have been litigated—is to record *all* law enforcement-related encounters with civilians. *See* JRP, Final Report, ECF No. 597 at 229. Judge Belen concluded that any policy that did not require recording of all Level 1 encounters that "serve a law enforcement purpose" would be "inconsistent with the findings in the Liability Opinion, the heightened need for transparency and accountability, and the acute importance of repairing the relationship between the police and the communities that bore the brunt of the NYPD's past unconstitutional practices." *Id.* Deciding not to record Level 1 encounters involving investigation of past crimes, which doubtless "serve a law enforcement purpose," defies current best practices and the purposes of the Liability Order.

The decision to exclude these stops from recording is also arbitrary and is not supported by evidence that this category of Level 1 encounters account for "a small percentage of first level encounters." *See* Monitor's Motion, ECF No. 805 at 14. If anything, this assertion suggests that the burden of recording and documenting these stops, which are apparently rare, would be low. But Plaintiffs are also unaware of any evidence that reflects the percentage of Level 1 encounters that involve investigation of past crimes.

Moreover, a decision not to record Level 1 stops involving investigation of past crimes deprives the Parties and the Monitor of information about a category of Level 1 encounters that may be particularly important to assessing the constitutionality of officer behavior during investigative encounters. Declining to record Level 1 encounters arising from investigation of past crimes may exclude police encounters with civilians resulting from calls for service placed by a third party. If police encounters with witnesses who did not themselves call police for service are classified as investigations of past crimes, rather than independent Level 1 encounters, they would not be recorded under the alternative plan.

13

Plaintiffs cannot anticipate each potential encounter that might be exempted from recording requirements because it involves investigation of past crimes, but the recent tragic police shooting of Antonio Williams is an illustrative example. The NYPD has not explained why officers approached Mr. Williams on September 29, 2019, but NYPD communications indicate that a shooting had taken place three days earlier in the public housing complex where Mr. Williams was standing, waiting for a cab. Police officers approached Mr. Williams, perhaps to ask whether he had information about the recent shooting. Mr. Williams fled from police, as is permitted at Level 1. The police nonetheless pursued him, leading to a struggle and shooting resulting in the death of Mr. Williams and an NYPD officer. *See* 47 Precinct Officer Involved Shooting September 29, 2019 (Dec. 13, 2019) https://www.youtube.com/watch?v=9EQ3hzZ5EIY; *see also, Williams v. City of New York, et al.,* Index No. 34180/2020E (Bronx Cty. Sup. Ct.). If NYPD officers indeed did approach Mr. Williams to investigate a past crime in the area, this Level 1 encounter escalated quickly and became fatal, and is emblematic of the type of encounter that warrants study in this pilot.

    2.   <u>BWC Metadata is Less Accurate and More Burdensome to Enter than an Electronic Report/Smartphone App</u>

The Monitor's own experts note in their summary of the Proposed Studies that collecting data on Level 2 encounters in an electronic report like the current report for Level 3 *Terry* stops, which is accessible through NYPD officers' smartphones, is preferable to using the metadata from BWC videos of those encounters, as contemplated by the Alternative Plan, because that metadata is potentially less reliable in certain important respects. Specifically, a BWC metadata-based system like evidence.com "will often contain multiple records of the same encounter because each officer present [at the encounter] will activate their camera," potentially causing an inflated count

of the actual number of Level 1 and 2 encounters conducted by NYPD officers. ECF No. 805-2 at page 6 of 28.

Moreover, the documentation of Level 1 and 2 encounters through the evidence.com platform that would take place under the Alternative Plan is potentially more burdensome and time-consuming for officers than documenting these encounters on a smartphone-based electronic report app as envisioned by the Combined Pilot. As Plaintiffs' BWC technological expert Harlan Yu has explained, while the electronic report app could easily be designed to enable an officer to complete it very quickly on their phone while in the field—which was Judge Belen's expectation— it is not at all clear whether NYPD officers can even access the evidence.com platform from their smartphones or must instead log on to a computer terminal back at the precinct house at the end of their tour to enter the required metadata categories into evidence.com. *See* Declaration of Harlan Yu ("Yu Decl.") ¶¶ 10, 15, 24.

3.  No Data on Encounter Escalation

Contrary to the Level 1 and 2 documentation protocols for the Combined Pilot, *see* ECF No. 687-1 at 5, App'x 2, the Alternative Plan would only permit officers to enter one category (or *De Bour* level) for each recorded Level 1 and 2 encounter in evidence.com, *see* ECF No. 805-1 at pages 3-4 of 9, thus preventing the NYPD from collecting and analyzing aggregate data on Level 1 and 2 encounters that escalate to higher levels, as recommended by Judge Belen. As Judge Belen explained in recommending that officers document both the initial and final levels of their investigative encounters, collecting data on Level 1 and 2 encounters that escalate to higher *De Bour* levels is useful for "determining whether officers are confusing the *De Bour* levels and/or improperly escalating Level 1 and Level 2 encounters into *Terry* stops." ECF No. 597 at 235. Documenting this additional data point would likely place little to no additional burden on officers,

as it could be accomplished by adding a second category field with a drop-down menu of the *De Bour* levels (1-4) to either the electronic report phone app or evidence.com, which officers could complete in a matter of seconds. *See* Yu Decl. ¶ 22, Ex. B.

Without documenting this additional data point, the only way to obtain information on Level 1 and 2 encounters that escalate would be to review individual BWC recordings, which would be much too time-consuming to allow review of enough videos to regularly analyze Department-wide patterns in the escalation of Level 1 and 2 encounters.[3] Such a scheme would also eliminate any meaningful contemporaneous review by supervisors, which is essential to ensuring the NYPD's compliance with constitutional safeguards. Thus, at minimum, the NYPD should pilot the documentation of both the initial and final *De Bour* levels of investigative encounters that begin at Level 1 or 2 to determine if this documentation will in fact provide the kind of useful information that Judge Belen predicted.

4.   No Data on Civilian Race in Level 1 Encounters

In recommending comprehensive documentation at Level 1 and 2 encounters, Judge Belen reasoned that "collecting data on the subjects of Level 1 and Level 2 encounters is essential to understanding, after controlling for crime and other social factors, the extent to which police are initiating encounters on the basis of race." ECF No. 597 at 233. The Court in turn cited this reasoning in its July 19, 2018 Order mandating the piloting of Judge Belen's recommendation to assess its relative benefits, costs, and feasibility. *See* ECF No. 619 at 2.

---

[3] The limitations of this kind of review are further illustrated by the Monitor's Proposed Studies, in which his team of researchers will conduct a lengthy review of BWC recordings to locate encounters for the studies' escalation analysis, because, as described in the study proposals, it is not clear that this review will even identify any encounters which began at Level 1 and then escalated. *See* ECF No. 805-2 at page 4 of 28. In addition, this review will ultimately result only in a sample of 2500 videos on total. *Id.*

Yet, the Monitor, in defending the Alternative Plan's omission of data on the race of civilians in Level 1 encounters, concludes without having conducted *any* such assessment that "the burdens of that documentation outweigh the benefits." ECF No. 805 at 15. The Monitor parrots the very argument the City made in opposing Judge Belen's Level 1 documentation recommendation in 2018: because the millions of calls for service the NYPD answers each year could all result in Level 1 encounters, it would not be feasible or manageable for officers to collect this data for every Level 1 encounter they conduct. *See* ECF No. 613 at 12; ECF No. 805 at 16. This argument did not convince the Court to reject Judge Belen's recommendation outright in 2018, and no developments over the past two years have made it more convincing now. In fact, upon close examination, this burden claim seems exaggerated. Even if NYPD officers answer 9 million calls for service each year, with approximately 24,000 NYPD officers assigned to patrol functions and accounting for the fact that two officers answer each call, that averages out to about 750 calls per officer per year or, assuming 20 tours per officer per month, just over 3 calls (and potential Level 1 encounters) per officer each day. Moreover, entry of information regarding a civilian's race for a Level 1 encounter in either the electronic report phone app or evidence.com could be accomplished in a matter of seconds using a data category field with a drop-down menu of demographic categories (e.g. Black, white, Latinx, Asian-Pacific Islander, etc.), which is precisely what the Alternative Plan already envisions officers doing for Level 2 encounters. *See* ECF No. 805-1 at page 6 of 9; *see* also Yu Decl. ¶ 15.

As for benefits, the Monitor argues that recording race data for Level 1 encounters would "not yield useful information for Fourteenth Amendment analysis" because it is not possible to construct "an appropriate benchmark" needed to determine whether "more Black people were encountered than should have been encountered" at Level 1. ECF No. 805 at 16. The Monitor

17

reasons that "with so many different kinds of encounters with the shared label of Level 1. . . there is no standard for determining who 'should have been' encountered assuming there was no discrimination," and that unlike for Level 3 *Terry* Stops, where "the benchmark used is based on the legal framework of reasonable suspicion," for Level 1 encounters, "there is no way to identify the relevant population for whom an officer might have an objective credible reason to approach." *Id*. at 16-17.

However, the Monitor fails to mention one very important category of Level 1 encounters which his own team thinks is important enough to analyze for racial disparities as part of the Proposed Studies: Level 1 encounters which escalate to Level 2 or 3. *See* ECF No. 805-2 at 10-11 of 28 ("[W]e will examine whether Level 1 or 2 encounters escalate more often if the citizen is black or Hispanic and whether there are racial disparities in the compliance rate of escalated encounters."). Since the legal standards for Level 2 and 3 encounters are "founded suspicion" and "reasonable suspicion" of criminal activity, respectively, there is a benchmark which the Court has already recognized as appropriate for this kind of racial disparity analysis: NYPD data on reported crimes. *See* ECF No. 373 at 49-58.

Thus, if combined with the encounter escalation data discussed above, data on the race of people encountered at Level 1 could provide a useful tool for assessing whether NYPD officers' conduct during investigative encounters complies with the Fourteenth Amendment. Such a potentially important benefit clearly merits the NYPD at least piloting the documentation of civilian race in Level 1 encounters going forward.

5.   No Documentation of Geographic Locations of Level 1 or 2 Encounters

The Monitor's motion does not acknowledge that the Alternative Plan would also not include documentation on the geographic locations of Level 1 and 2 encounters, a data point that

was included in both Judge Belen's recommendation and the Combined Pilot. *See* ECF No. 597 at 231; ECF No. 687-1 at 5. App'x 2. Here again, the potential benefits and technological feasibility of collecting this data with minimal burden on officers supports, at minimum, piloting the documentation of this information for all Level 1 and 2 encounters. The utility of this information for assessing Fourteenth Amendment compliance is clearly illustrated by the Court's Fourteenth Amendment analysis in its Liability Opinion in this case, which found, after controlling for crime rates, significant disparities in the level of *Terry* stop activity between predominantly white and predominantly Black and Latinx neighborhoods of New York City and that Black and Latinx pedestrians were more likely than white pedestrians to be stopped even in racially-mixed and predominantly white areas of the City. ECF No. 373 at 59-60.

In addition, Plaintiffs' policing technology expert Harlan Yu notes that the geolocation functionality of NYPD officers' smartphones would allow accurate encounter location information to be automatically entered into the electronic report smartphone app, and the geolocation functionality of the Axon AB-2 and AB-3 BWCs that NYPD officers will begin using exclusively in the first half of 2021 would similarly allow location information to be automatically uploaded as metadata to evidence.com. Yu Decl. ¶¶ 13-14, 19-21; Charney Decl. ¶ 8. Under either platform, the encounter location data would be entered in a format that would allow it to be aggregated and statistically analyzed, as Judge Belen recommended. Yu Decl. ¶¶ 19-20, Ex. B; ECF No. 597 at 231-32.

Meanwhile, the officer assignment (precinct) data that would be collected for each Level 1 and 2 encounter under the Alternative Plan is not at all an adequate substitute for location data for two reasons. First, NYPD precincts encompass very large geographic areas that include many neighborhoods with differing demographic characteristics and levels of police activity. Second,

this assignment/precinct data will be entered into officers' electronic memobooks in a format that does not allow for aggregation and statistical analysis and, because of security concerns, cannot link to the other encounter information contained in evidence.com. Charney Decl. ¶ 10. Thus, under the Alternative Plan, the NYPD would be unable to even track the number of Level 1 and 2 encounters by precinct or compare the racial disparities in those encounters in one precinct with the disparities in another, making it difficult, if not impossible to "observe and study trends in policing and enhance transparency and accountability around the current state of SQF policy." ECF No. 597 at 233.

6.   No Narrative Explanations of Officers' Reasons for Initiating Level 2 Encounters

Unlike the Combined Pilot, the proposed Alternative Plan also lacks a requirement that officers record a narrative reflecting the reasons for conducting Level 1 and 2 encounters. The Combined Pilot anticipated SSO research, with observers riding along with police and writing detailed narratives of police encounters with civilians. While Plaintiffs agree that it is not currently feasible for observers to have extensive in-person contact with officers given the public health emergency, the narrative element is essential to measuring compliance, especially regarding compliance with the Fourth Amendment, and to provide for meaningful supervisory review. As written, the Alternative Plan does not require any documentation by the officer for the reason for initiating Level 1 or 2 encounters. Accordingly, it will be impossible for Plaintiffs and the Monitor's Proposed Studies to assess the legality of stops and the extent to which unlawful stops are occurring. Indeed, it is unclear how the Proposed Studies could assess "the key reasons for officers' failure to comply with legal requirements" without knowing the stated reason for officers' low-level encounters. *See* ECF No. 805 at 8. Even if these encounters are recorded with a BWC, the lack of documentation of the reason for the encounter allows for *ex-post facto* justification of

unlawful behavior. Officers must already inform stopped persons of the reason for a Level 2 encounter. Apart from the City's premature and unsupported claims, there is no indication that requiring officers to take the additional step of documenting that information for Level 2 encounters would be excessively burdensome.

Lastly, as Dr. Yu points, out documenting these narratives in evidence.com could be accomplished easily through the creation of a free-form text custom metadata field. *See* Yu Decl. ¶ 24, Ex. 2.

    7.  <u>No Procedures for Regular Supervisory Review of the Legality of Officers' Level 1 and 2 Encounters</u>

The Alternative Plan also does not require supervisory review of officers' Level 1 and 2 encounters, meaning that there will be no ability to track discipline or interventions with respect to officers who regularly conduct unlawful Level 1 and 2 stops. Supervision, monitoring, and discipline were essential elements of the Court's Liability Opinion. *See* ECF No. 597 at 63. The Court specifically found that NYPD failed to provide an adequate mechanism for supervisory review of unconstitutional stops. ECF No. 373 at 108 of 198 ("Consequently, the NYPD is unable to hold officers accountable for those stops or prevent them from happening in the future."). Supervisory review of low-level encounters, and appropriate discipline following improper stops, are at the core of the Liability Order and cannot be omitted from a pilot program.

    **E.  The Alternative Plan and Proposed Studies Should Not Replace the Combined Pilot Unless They are Significantly Modified**

As the preceding sections make clear, replacing the Combined Pilot with the City's Alternative Plan as currently constructed would thwart the purpose not only of the Combined Pilot itself, but also the Court's July 19 and August 9, 2018 Orders. Accordingly, if the Court is still inclined to cancel the Combined Pilot altogether, it should also order that the Alternative Plan be

modified in several significant respects, that this modified Alternative Plan be piloted in the NYPD for a period of time, and that the Monitor use his Proposed Studies to assess the relative costs, burdens, and feasibility of the modified Alternative Plan and report the findings of those assessments to the Court.

    1.   <u>Proposed Modifications to the Alternative Plan</u>

In order for the Alternative Plan to be consistent with Judge Belen's recommendations for comprehensive documentation of Level 1 and 2 encounters and BWC recording of Level 1 encounters and thus meet the goals of the Court's July 19 and August 9, 2018 Pilot Orders, it must be modified as follows:

    a.  The list of Level 1 categories subject to mandatory BWC recording must be expanded to include Level 1 encounters conducted in response to radio runs related to reports of past crimes (i.e., "10-20 series");

    b.  The electronic documentation of Level 1 and 2 encounters must be expanded to include the following additional categories of information:

        i.     Race and gender of civilians in Level 1 encounters;

        ii.    Data on the geographic locations of Level 1 and 2 encounters, to be automatically supplied by the geolocation services of the officers' smartphone, BWC, or BWC paired to the smartphone;

        iii.   Both the *De Bour* Levels at which the encounter began and ended;

        iv.   For Level 2 encounters, a narrative description of the officers' reasons for initiating the encounter if it began at Level 2 or for escalating the encounter if it began at Level 1; and

v.   The officer assignment/command information for each Level 1 and 2 encounter should be entered into the same platform as the categories of information documented for each encounter, i.e. either evidence.com or the electronic report smartphone app.

c.   Level 1 and 2 documentation should be piloted with two separate groups of officers on two separate platforms, (i) evidence.com and (ii) the electronic report smartphone app that the NYPD was developing for the Combined Pilot, to compare the relative ease of use (for officers and reviewing supervisors) and data accuracy of the two platforms.

d.   The NYPD must establish protocols for regular supervisory review (i.e. review by line supervisors or other supervisors in the same command) of officers' documented Level 1 and 2 encounters.

2.   <u>Piloting the Modified Alternative Plan and Assessing its Costs, Benefits, and Feasibility Through the Proposed Studies</u>

The modified Alternative Plan described above should be piloted for a period of time, e.g. 6-12 months, with at least two groups of NYPD officers: (i) one group that will document their Level 1 and 2 encounters on the electronic report smartphone app, and (ii) one group that will document their Level 1 and 2 encounters on evidence.com. The Monitor should use his Proposed Studies, with slight modifications discussed below, to assess the costs, benefits, and feasibility of the modified Alternative Plan.

In order to assess the costs, benefits, and feasibility of the modified Alternative Plan, the Proposed Studies should be modified as follows:

a.   The Proposed Studies' research questions should be modified as follows:

      i.     The "Documentation" research question in the ISLG study should be amended to examine whether *both* expansion of mandatory BWC recording to most Level 1 encounters *and* documentation of Level 1 and 2 encounters increase the number of Level 3 encounters that are reported.

      ii.    The Proposed Studies should also include research questions similar to those in the Combined Pilot which examine (a) whether documentation of Level 1 and 2 encounters and BWC recording of Level 1 encounters affect the legality of officer conduct during Level 2 and 3 encounters, (b) the administrative workload and opportunity costs associated with comprehensive documentation of Level 1 and 2 encounters, and (c) whether documentation of Level 1 and 2 encounters and BWC recordings of Level 1 encounters provide useful data for assessing officers' Fourth and Fourteenth Amendment compliance during investigative encounters. *See* ECF No. 687-1 at 1.

b.  The Proposed Studies should expand their data sources to include the data from the electronic documentation of Level 1 and 2 encounters under the modified Alternative Plan.

At the conclusion of the Proposed Studies, the Monitor should report to the Court on the relative benefits and costs of the modified Alternative Plan and whether it should be terminated or expanded department-wide within the NYPD.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs request that the Court deny the Monitor's motion, ECF No. 805, in full, or, in the alternative, that it (i) vacate its February 7, 2019 Order approving

the Combined Pilot, ECF No. 691, (ii) modify the City's proposed Alternative Plan as described

above, (iii) order that a pilot of the modified Alternative Plan shall replace the Combined Pilot,

and (iv) direct the Monitor to submit for Court approval by a date certain a proposal for using the

Monitor's Proposed Studies to assess relative costs and benefits of the modified Alternative Plan.

Dated:  December 23, 2020
      New York, New York

                                         Respectfully submitted,


                                         \s\ Darius Charney
                                         CENTER FOR CONSTITUTIONAL
                                         RIGHTS
                                         By: Darius Charney
                                             Samah Sisay
                                       666 Broadway, 7th Floor
                                       New York, NY 10012
                                       Tel. (212) 614-6464


                                       \s\ Jonathan C. Moore
                                         BELDOCK LEVINE & HOFFMAN LLP
                                       By: Jonathan C. Moore
                                             Luna Droubi
                                             Marc Arena
                                       99 Park Avenue, PH/26[th] Floor
                                       New York, NY 10016
                                       Tel. (212) 490-0900

                                       *Attorneys for Floyd Plaintiffs*