UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
DAVID FLOYD, *et al.*,

      Plaintiffs,

  -against-                                            No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

      Defendants.
------------------------------------------------------------------ X

**DECLARATION OF DARIUS CHARNEY IN OPPOSITION TO THE COURT-APPOINTED MONITOR'S MOTION TO VACATE THE COURT'S ORDER APPROVING THE COMBINED PILOT**

      I, Darius Charney, declare, pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury, that the following is true and correct:

      1.      I am a senior staff attorney at the Center for Constitutional Rights.

      2.      Since January 2008 I have served as co-Plaintiffs' counsel in the above-entitled action.

      3.      I have personal knowledge of all of the events described in this declaration.

      4.      Pursuant to the Court's July 19, 2018 and August 9, 2018 Orders directing the parties in this matter to develop joint proposals for pilot programs to study the electronic recording of *De Bour* Level 1 and 2 encounters and requiring officers to activate body-worn cameras ("BWC") during *De Bour* Level 1 encounters, *see* ECF Nos. 619 at 2; 634 at 3, on September 12, 2018, co-Plaintiffs' counsel, Jonathan C. Moore, emailed to Defendants' counsel and the Court-Appointed Monitor Plaintiffs' draft proposal for a combined pilot program to study both the documentation of Level 1 and 2 encounters and requiring officers to activate BWC's during Level 1 encounters. A copy of this proposal is attached hereto as Exhibit 1.

5. Neither the Monitor nor Defendants' counsel ever provided specific feedback to Plaintiffs about their combined pilot proposal.

6. On October 26 and December 14, 2020, I emailed a series of questions to counsel for Defendants seeking clarification about certain aspects of the City's proposed Alternative Plan for documentation of *De Bour* Level 1 and 2 encounters and BWC recording of Level 1 encounters described in Defendants' February 21, August 18, and September 9, 2020 letters to the Independent Monitor. *See* ECF No. 805-1.

7. In my October 26, 2020 email, I asked whether and when the NYPD planned to completely transition from use of Vievu BWC's to Axon Body (AB)-2 and AB-3 BWCs, and whether the NYPD was willing to use the geolocation functionality of the AB-2 and AB-3 BWCs to record geographic location data for each Level 1 and 2 encounter that would be documented under the Alternative Plan.

8. In an emailed response on November 4, 2020, Defendants' counsel stated that:

(a) the NYPD plans to completely transition over to a combination of the AB-2 and AB-3 BWCs in the first half of 2021, though there is no timeline for full replacement of all AB-2s with AB-3s and AB-4s;

(b) the AB-3's built-in geolocation functionality will capture as metadata the geographic location information of each Level 1 and 2 encounter recorded on an AB-3 BWC; and

(c) the NYPD was not willing to use the AB-2's geolocation functionality, which involves pairing with the geolocation functionality of the recording officer's smartphone, because that pairing function is, in the NYPD's view, "sporadic at best."

9. On December 14, 2020, I emailed Defendants' counsel to ask: (a) whether the officer assignment and supervisor information for each Level 1 and 2 encounter that would be entered into the officer's electronic memobook under the Alternative Plan would be in a format that would allow for aggregation and statistical analysis, and (b) whether the assignment and supervisor information in the electronic memobook for a given Level 1 or 2 encounter could be linked to the other categories of information for that same Level 1 and 2 encounter that would be entered into the evidence.com platform under the Alternative Plan.

10. In an emailed response on December 16, 2020, Defendants' counsel indicated that (a) the officer assignment and supervisor information in the electronic memobook would not be in a format that would permit aggregation or statistical analysis because "the electronic memobook was not designed as a searchable database to ensure privacy of the individuals encountered," and (b) the information in the electronic memobook could not be linked to the other categories of information for Level 1 and 2 encounters in evidence.com because, for the same privacy-related reason, the electronic memobook was intentionally designed so that it could not be linked to other NYPD databases.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: December 22, 2020

\s\ Darius Charney
Darius Charney

# EXHIBIT 1



Darius Charney <dcharney@ccrjustice.org>

## RE: Lillie Binder/Kurt Maitland
1 message

**Jonathan C. Moore** <jmoore@blhny.com>  Wed, Sep 12, 2018 at 2:04 PM
To: "Zimroth, Peter L." <Peter.Zimroth@arnoldporter.com>, "aharris@naacpldf.org" <aharris@naacpldf.org>, "bazmy@ccrjustice.org" <bazmy@ccrjustice.org>, "cconti-cook@legal-aid.org" <cconti-cook@legal-aid.org>, "cdunn@nyclu.org" <cdunn@nyclu.org>, "dcharney@ccrjustice.org" <dcharney@ccrjustice.org>, "lHead@ccrjustice.org" <lHead@ccrjustice.org>, "jcusick@naacpldf.org" <jcusick@naacpldf.org>, "jennb@bronxdefenders.org" <jennb@bronxdefenders.org>, "jlee@naacpldf.org" <jlee@naacpldf.org>, "johannas@bronxdefenders.org" <johannas@bronxdefenders.org>, "jresetarits@shearman.com" <jresetarits@shearman.com>, "JWells@nyclu.org" <JWells@nyclu.org>, Luna Droubi <LDroubi@blhny.com>, "marikam@bronxdefenders.org" <marikam@bronxdefenders.org>, "mlenox@naacpldf.org" <mlenox@naacpldf.org>, "raudain@naacpldf.org" <raudain@naacpldf.org>, "shakeerr@bronxdefenders.org" <shakeerr@bronxdefenders.org>, "swasserman@legal-aid.org" <swasserman@legal-aid.org>, "anne.stone@nypd.org" <anne.stone@nypd.org>, "BENJAMIN.TUCKER@nypd.org" <BENJAMIN.TUCKER@nypd.org>, "cleopatra.takantzas@nypd.org" <cleopatra.takantzas@nypd.org>, "dcooper@law.nyc.gov" <dcooper@law.nyc.gov>, "DESMOND.MORALES@nypd.org" <DESMOND.MORALES@nypd.org>, "efarid@law.nyc.gov" <efarid@law.nyc.gov>, "jeffrey.schlanger@NYPD.org" <jeffrey.schlanger@nypd.org>, "jenu.brar@nypd.org" <jenu.brar@nypd.org>, "JOHN.COSGROVE@nypd.org" <JOHN.COSGROVE@nypd.org>, "JOSEPHINE.CORNIER@nypd.org" <JOSEPHINE.CORNIER@nypd.org>, "Matthew.Pontillo@nypd.org" <Matthew.Pontillo@nypd.org>, "REBECCA.BLUMENKOPF@nypd.org" <REBECCA.BLUMENKOPF@nypd.org>, "Robert.berger@nypd.org" <Robert.berger@nypd.org>, "robert.martinez2@nypd.org" <robert.martinez2@nypd.org>, "selena.holmes@nypd.org" <selena.holmes@nypd.org>, "SHAQUANA.HAYES@nypd.org" <SHAQUANA.HAYES@nypd.org>, "tanya.meisenholder@nypd.org" <tanya.meisenholder@nypd.org>, "Tgiovann@law.nyc.gov" <Tgiovann@law.nyc.gov>, "THERESA.SHORTELL@nypd.org" <THERESA.SHORTELL@nypd.org>, "tyear.middleton@nypd.org" <tyear.middleton@nypd.org>, "Jonathan C. Moore" <jmoore@blhny.com>
Cc: "a.braga@northeastern.edu" <a.braga@northeastern.edu>, "cmchand007@gmail.com" <cmchand007@gmail.com>, "demostheneslong@gmail.com" <demostheneslong@gmail.com>, "eberhard@stanford.edu" <eberhard@stanford.edu>, "jamesyateslaw@gmail.com" <jamesyateslaw@gmail.com>, "jane.perlov@gmail.com" <jane.perlov@gmail.com>, "jemccabe18@gmail.com" <jemccabe18@gmail.com>, "johnmm@sas.upenn.edu" <johnmm@sas.upenn.edu>, "mccabej@sacredheart.edu" <mccabej@sacredheart.edu>, "richard.jerome94@gmail.com" <richard.jerome94@gmail.com>, "Maitland, Kurt" <Kurt.Maitland@arnoldporter.com>

Peter,

Attached is our proposal combining the Body Worn Camera Pilot with the Level 1/Level 2 Documentation Pilot. As you can see, we have widely distributed it to all the concerned parties, including the NYPD. We are available to meet as soon as folks are ready to do so to discuss next steps in this process. As you are no doubt aware, we asked the Court today to extend the date for submission of the Level 1/Level 2 Documentation Pilot until October 19th, which is conveniently the date when the parties are supposed to submit their joint proposal regarding the Body Worn Camera Pilot. If we are to meet this deadline, it is imperative that we begin to discuss in depth this and whatever proposals are on or may be put on the table.

Jonathan

**Jonathan C. Moore | Partner**
**Beldock Levine & Hoffman LLP**
**99 Park Avenue, PH/26th Fl. | New York, NY 10016**

# MEMORANDUM

September 12, 2018

TO:   All Parties in Floyd, Davis and Ligon

FR:   Jonathan Moore, Darius Charney, Luna Droubi and Ian Head

RE:   Proposal for Combined Level 1 BWC and Level 1/2 Documentation Pilot

      Given the overlap between the Level 1/Level 2 Documentation Pilot and the Level 1 BWC Pilot, it seems to make sense to combine, if possible, the two into one Pilot. This will reduce the overall cost of the pilots and would eliminate any confusion caused by two pilots, that seem to overlap, running at the same time. We make this suggestion subject to further study and review by social science experts as to the feasibility of combining these two pilots into one. It may be, for analytical and evaluative purposes, that combining the two pilots into one will turn out to not be a good idea.

      We would propose a pilot involving some or all of the same 20 treatment precincts that participated in or are participating in the current Court-ordered BWC pilot. That pilot is scheduled to conclude, in terms of data gathering, by the end of November, 2018. We would propose that this new combined project would begin no sooner than December 1, 2018, after the end of the current BWC pilot. Using these same precincts would, we believe, have both logistical and methodological advantages. Logistically, it would make the roll-out of the new Level 1 BWC pilot much smoother because the stationhouses in those precincts are already technologically equipped for the cameras and the 3rd platoon officers in those precincts are already very well-versed in the camera technology and the Department's procedures for recording, tagging, and uploading videos. Methodologically, piloting the recording of Level 1 encounters with officers who are already comfortable using the cameras and familiar with the Department's BWC procedures may make it easier to isolate the unique effects of recording Level 1 encounters on officer behavior.

The 20 treatment precincts could in turn be divided up into 2 sub-treatment groups: (1) one group of precincts in which officers document Level 1 and 2 encounters but do not record Level 1's on their BWC's, and (2) a second group in which officers both document Level 1 and 2 encounters and record Level 1 encounters on their BWC's. Dividing the treatment precincts up in this way will help the Monitor team better evaluate separately the unique effects that each of the interventions (documenting Level 1 and 2 encounters and recording Level 1's on BWC's) have on officer behavior.

As for the control precincts, it may not be possible to use the same 20 that were part of the original BWC pilot because those precincts either have or will shortly start using BWC's as part of the NYPD's voluntary roll-out of BWC's to the entire Department by the end of 2018 or early 2019. Moreover, a "control" precinct for purposes of the Level 1 BWC pilot, should not be a precinct that does not use cameras or has only recent begun using cameras, but, rather, should be one in which officers have been using cameras for a while to record everything that is recorded by officers in the treatment precincts, other than Level 1 encounters. Defining control precincts in this way would allow the Monitor team to better isolate the specific effect, if any, that recording Level 1 encounters on BWC's has on officer behavior.

None of the treatment of control precincts will have been documenting Level 1 or Level 2 encounters prior to the commencement of the Combined Pilot, so the division of precincts between those who will document Level 1 or Level 2 encounters and those who don't would not seem to pose any great difficulties, setting aside for the moment the mechanics of how Level1 and Level 2 encounters will be documented. Similarly, because no NYPD precincts will have been recording Level 1 encounters on BWC before the commencement of the pilot, the division between treatment and control precincts should not be difficult, except that the control precincts should be ones where officers have been using the cameras for a while and thus are familiar with the technology and the relevant Departmental procedures.

As for the Level 1 BWC pilot, the same 40 precincts could appropriately be considered the test sample for the Level 1 BWC pilot.   That assumes, of course, that as of December 1, 2018, all 40 precincts that participated in the current BWC pilot would be outfitted with BWCs.   If not, some adjustments would have to be made.

2

The current SQF In Service training, which has spent considerable time training and re-training officers with regard to the four *DeBour* levels, will have prepared these officers to understand when they are engaged in a Level 1 or Level 2 encounter.   If Level 1, officers would be instructed to turn on their camera and make sure to document the encounter after it has concluded.   They are already being instructed as to engaging the BWC at Level 2 or higher, and, many of these officers may have been involved in Housing enforcement where, at least with vertical patrols, they would have been instructed to engage their BWC at Level 1.

We should reject categorically any proposed pilot that involves the approach of systematic observations, which, as I understand it, would involve having observers riding with officers in their cars during a shift.   First, we believe that the Court's order on this particular project contemplated actual documentation of Level 1 and Level 2 encounters, and we see no reason to deviate from the Court's intentions in this regard.   Second, the NYPD has long argued that the presence of observers in a room where officers are being trained has the effect of chilling the officers from fully engaging in the training.   That concerned would seem to be exacerbated many fold by the presence of an observer in the back of an RMP.   In fact, the risk of collecting unreliable data would seem to be more pronounced in the situation where an observer would be sitting in a car with officers.   They will always be acutely aware of that person's presence, unlike the classroom situation where an observer sits quietly at the back of a room of 30 to 40 officers.

Here is a rough outline of our proposal:

**Duration of Pilot:**

We would propose at least one year as the minimum time necessary to provide sufficiently robust data in order to evaluate the efficacy of this combined pilot.

**Size of Pilot:**

The current BWC pilot, scheduled to end from a data collection standpoint at the end of November, would seem to be the appropriate size for our proposed combined pilot. The current BWC pilot evaluates the use of the BWC on only one of three shifts per day. Given what is becoming the widespread distribution of BWCs in the Department, we see no reason why, in the 20 precincts, that will be selected to document Level 1 and Level 2 investigatory encounters, as well as engage their BWCs for all Level 1 investigatory encounters, all shifts in a precinct should not be required to participate in the pilot.

**What Information Should Be Recorded:**

In the Level 1/2 documentation portion of the pilot, the officers should be required to document the time, date, location of the encounter, the perceived race, age, and gender of the person stopped, the Level of the encounter (1 or 2), and whether the encounter escalates to a Level 3. Beyond this information, in order to permit some meaningful review of the data generated by the pilot, officers should be required to document the reason/basis for the encounter. This will facilitate an understanding as to whether officers are able to demonstrate a sufficient understanding of what is a Level 1 and Level 2 encounter. It would also permit meaningful supervisory review and auditing and data analysis. Given the training officers are receiving on Level 1 and Level 2 encounters, we see no major hurdles to including on an electronic form the "reason for encounter." If the encounter is a Level 1 encounter, the officer could simply set forth, in narrative form, the facts that support the objective credible reason for the encounter. Likewise, if the encounter is a Level 2 encounter, the officer would be expected to set forth relevant facts which would constitute "founded suspicion." Officers would not need to be retrained on this aspect of the form because that constitutes the core of the current SQF In Service training they are currently receiving.

As the Facilitator indicated in his report, collecting this data on Level 1 and Level 2 encounters is "essential of understanding after controlling for crime and other social factors, the extent to which police are initiating encounters on the basis of race." (Dkt. 597, p. 241).

Plaintiffs also note that this information is required on the reports of consensual street encounters analogous to Level 1's and 2's that are completed by officers in the Boston and Cambridge, MA police departments. This documentation would hopefully provide insight into how well officers understand the differences between (and the limits of their authority) at each DeBour Level.

Like the current Electronic Stop Report, there should be a box that indicates whether the encounter was recorded on a BWC, which is important for the supervisory review and auditing/analysis pieces discussed below.

Finally, we recommend that there should be some information about the outcome of the encounter, such as whether it resulted in an arrest, summons, weapons or contraband recovery. This is probably more relevant for Level 2 encounters than Level 1.

With regard to the Level 1 BWC aspect of this combined pilot, the only difference, in terms of the duties and responsibility of a police officer involved in the pilot, is the act of physically engaging the camera at the commencement of a Level 1 encounter.

**Monitoring/Auditing/Supervisory Review**

A picture of how the selected precincts are documenting Level 3 and above stops currently, as well as how they have utilized their BWCs, should be developed before the pilot starts, so that the results of the pilot can be compared to officer performance before the pilot.

In terms of auditing/reviewing both Level 1 and 2 documentation by officers and Level 1 BWC engagement during the pilot, we recommend that there should be some formof monthly review by supervisors at the command level of all Level 1 and Level 2 encounters that are documented, either electronically or via BWC. This should also include, potentially, a review of Level 1 and 2 encounter BWC videos recorded by the officers in the pilot to assess both (1) non-documentation of Level 1, 2 and 3 encounters, (2) inaccuracies/mistakes in the Level 1 and 2 reports, and (3) misclassification of the level of encounter by the officer who documented it. This would further support combining the Level 1 and Level 2 Documentation Pilot with the Level 1 BWC pilot which has also been ordered by the Court.

In addition, the Right to Know Act process for currently requesting one's Terry Stop report and BWC footage of one's Terry stop should be expanded to include these Level 1/2 encounter reports BWC videos of such encounters. To facilitate this process, during the pilot, officers should be required to provide the civilian with a business card at the end of every Level 1 and 2 encounter and that the civilian could then go online to request a copy of the report from their Level 1 or 2 encounter (as well as the BWC footage from the encounter).

There should also be quarterly QAD audits of the Level 1 and 2 documentation and Level BWC recordings, similar to that which is currently being conducted by QAD of Level 3 stop reports and BWC videos.
These audits should include an evaluation of the quality of the command level supervisory review of the Level 1 and 2 reports and Level 1 BWC videos, including whether supervisory review caught inaccuracies and other problems in the Level 1 and 2 reports and, if so, whether appropriate follow up action was taken by supervisors.

We also believe that we should explore a review of the metadata of the smart phones used by officers in the pilot to analyze how long, on average, it takes them to fill out a single Level 1 or Level 2 encounter report.

**Evaluation**

The consensus among the experts with whom we have consulted leads to the following observations.   The experimental design should be similar to the current BWC pilot.   The Pilot should be at least a year long so as to be able to measure any changes in officer behavior over time.

The evaluation of the Pilot should include a community member survey and/or interview component similar to what the Public Science Project did with the NYCLU survey.

Evaluations over the length of the Pilot should occur pre-Pilot, at the 3 month mark, the 6 month mark, the 9 month mark, and at the end of the Pilot. In addition, there should be a way to use the data on people who take advantage of the Right-to-Know Act information request process to identify potential interviewees.

Throughout the duration of the Pilot, the NYPD should publish, quarterly and annually, reports which at a minimum disclose the number of all Level 1 and Level 2 investigatory encounters disaggregated by demographic information, justification for the encounter, geographic location and precinct information for each incident.   This will permit monitoring of patterns and trends.   These reports should be publicly posted on the NYPD website.

We also would recommend the creation of a participatory advisory group of directly-impacted community members and policing experts who will help to develop research instruments and research questions, and will have access to the materials produced by this research and the materials being used to analyze the efficacy of the Pilot.    The advisory group should be regarded as co-researchers, must be independent of the NYPD, and we would recommend that participants be provided with a stipend to facilitate their participation.    Advisory group members should have access to misconduct records, as they relate to encounters and stops, of officers engaged in the Pilot program.

We would also recommend focus groups with officers to get their perspectives on how the Level 1 and 2 documentation and recording requirements from the Combined Pilot make their jobs easier/harder, and whether they can identify any problems with the forms that will be developed for the Pilot.

**Outcome Measures**

The outcome measures for this Combined Pilot would include, *inter alia,* the level of non-reporting of Terry Stops, racial disparities in Level 1 and 2 and 3 encounters, Community members' perspectives (survey and interview responses) on how they were treated during encounters, including whether they felt free to leave during Level 1 and 2 encounters, officers understanding of the differences between the *DeBour* Levels and their authority under each Level

**Training**

We don't anticipate the need for any extensive re-training of officers who will be participating in the combined pilot.   Many if not most of the officers who will be participating in the training will have attended the SQF In Service Training. Those officers who have not been through the SQF In Service Training should be

identified and directed to attend on a priority basis this training before they are assigned to the Combined Pilot.

This training on identifying the different levels of investigatory encounters under *DeBour* will also facilitate the Level 1 BWC part of the Combined Pilot. The only difference with how officers are using the BWCs now is that they would be required to engage them, absent some clearly defined exigent circumstances, at the commencement of all Level 1 investigatory encounters.

This combined pilot will obviously include officers who participated in the BWC pilot that concludes at the end of November, 2018.   Again, this should not impose any difficulty as the only difference between the cohort precincts grouped together is the need to engage at Level 1, not wait for Level 2.