UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
DAVID FLOYD, *et al.*,

      Plaintiffs,

  -against-                                                No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

      Defendants.
------------------------------------------------------------------------ X

**DECLARATION OF COMMUNITIES UNITED FOR POLICE REFORM (CPR) IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE MONITOR'S MOTION TO VACATE THE COURT'S ORDER APPROVING THE COMBINED PILOT**

I, Joo-Hyun Kang, pursuant to 28 U.S.C. § 1746 and subject to penalties of perjury, state the following is true and correct:

1. I submit this declaration in support of Plaintiffs' opposition to the monitor's motion to vacate the Court's order approving the combined pilot. I am not a party to the above-captioned case.

2. I have been the Director for Communities United for Police Reform (CPR), a citywide campaign to end discriminatory and abusive policing in New York, since 2012. Among other responsibilities, in this position I coordinate planning and implementation of the coalition's multiple strategies (including policy, legal, community education, organizing, research, civic engagement, and communications) to end discriminatory policing; represent the campaign/coalition in meetings with elected officials; serve as a media spokesperson for CPR; meet with, organize and speak to community members impacted by discriminatory police practices, including unconstitutional stops and frisks.

3. I have been involved with police accountability issues in New York City since the mid1990s. From 1996 to 2003, I served as Executive Director of the Audre Lorde Project, a community organizing center for Lesbian, Gay, Bisexual, and Transgender communities of color. In this capacity, I was a founding member of the NYC Coalition Against Police Brutality (CAPB) which included and worked with a wide range of grassroots community organizations committed to fighting police brutality. As a founding member of CAPB, I organized, educated, and advocated to end abusive policing within Lesbian, Gay, Bisexual, Two Spirit, Trans and gender nonconforming communities of color, and helped to organize community rallies, events and forums aimed at achieving accountability for various cases of police brutality, including the brutality against Jalea Lamot and her family, torture of Abner Louima and killing of Amadou Diallo in the late 1990s.

4. I am the co-author of "Organizing at the Intersections: A Roundtable Discussion of Police Brutality Through the Lens of Race, Class, and Sexual Identities", found in Zero Tolerance: Quality of Life and the New Police Brutality in New York City, editors Andrea McArdle and Tanya Erzen, New York University Press, 2001.

**About Communities United for Police Reform ("CPR")**

5. CPR, launched in 2012, is a non-partisan, multi-strategy campaign to end abusive and discriminatory policing practices in New York and reduce reliance on policing for community safety.

6. CPR runs coalitions of over 200 national, statewide and local organizations from across New York whose members include community members most impacted by police violence, community organizing groups, legal organizations, policy groups, research projects, and others. The organizations in CPR coalitions represent community members from all five New York City boroughs, different walks of life and include individuals with family members who are police officers. The majority of our member organizations are grassroots organizations whose constituencies, memberships or clients are based primarily in low-income communities of color, that are most impacted by abusive policing – including youth, LGBTGNC communities, immigrants, people with disabilities, homeless New Yorkers, public housing residents, and others. Members of these communities bear the brunt of the New York Police Department's ("NYPD") unjust stop and frisk practices. This includes organizations that have been leading work on police accountability in Black, Latinx and immigrant communities; organizations representing Lesbian, Gay, Bisexual, and Transgender communities; homeless New Yorkers; and youth organizations. Notably, young people of color have been documented as those most impacted by the NYPD's stop and frisk practices.

7. In addition, CPR partners with a broad range of additional organizations to advance our effort to create a safer New York City for everyone. Many of our partners work on behalf of the communities most unfairly targeted by the NYPD's stop and frisk trespass enforcement practices.

8. CPR's work is largely focused on police accountability, particularly centering the experiences of those directly affected by discriminatory and abusive NYPD policies and practices. Relevant examples include but are not limited to:

    a) In June of this year, CPR led the statewide campaign that resulted in the NYS legislature passing three of CPR's Safer New York Act bills, including the repeal of the police secrecy law 50a, the Police STAT Act mandating statewide reporting on police encounters and the special prosecutor law which codified and strengthened Governor Cuomo's 2015 executive order establishing the New York State Attorney General as special prosecutor for cases where police kill New Yorkers.

b) In 2019, CPR was able to effectively advocate for the inclusion of a change to the City Charter as a ballot item in the election. This ballot item expanded CCRB's authority to investigate instances where police officers make false official statements. In spite of significant funds driving a misinformation campaign by NYPD police unions, New Yorkers voted in overwhelming support of the ballot item – it passed with over 70% of the vote.

c) CPR organized a citywide coalition of over 200 community organizations, labor unions, advocacy organizations and others to pass the Right to Know Act in 2017, legislation in the City Council directly relevant to changing NYPD's practices with regards to common street encounters including Intro 0541-2014, a local law to mandate NYPD request consent to search an individual unless they have legal basis to engage in said search.

d) In 2013, CPR secured passage of the Community Safety Act in the City Council, a pair of bills which were directly relevant to increasing NYPD accountability: Intro 1079-2013, a local law to create a clear mechanism for NYPD oversight and increased transparency though establishment of an Inspector General, and Intro 1080-2013, a ban on biased-based profiling.

e) In 2015 CPR, in partnership with families who have lost loved ones to police in New York, organized to ensure Governor Cuomo issued an Executive Order (Executive Order 147) creating the Office of the Special Prosecutor to investigate some cases where a person dies during an interaction with police in New York State.

f) CPR members have trained tens of thousands of New Yorkers on their rights during interactions with police and while observing police to increase the safety of community members during police encounters.

9. Members of CPR organizations regularly express the concerns of community members impacted by abusive policing practices in many public arenas and media outlets. For example, members have testified about their discriminatory stop and frisk experiences in front of numerous venues including the New York City Council and the New York State Legislature, at press conferences, at townhall meetings, and in front of former President Obama's 21st Century Policing Task Force, the Congressional Black Caucus (CBC), Congressional Progressive Caucus (CPC), Congressional Hispanic Caucus (CHC), and Congressional Asian Pacific American Caucus (CAPAC) in Washington DC. In addition, CPR members have been quoted on policing, police oversight and police reform in the City of New York in media outlets as diverse as the Associated Press, the New York Times, Daily News, Gotham Gazette, El Diario, the Staten Island Advance, Black Entertainment Television, and Amsterdam News.

10. Historically, CPR's interest in matters related to stop-and-frisk dates back over two decades, when, after the 1999 killing of Amadou Diallo by the Street Crimes Unit of the New York Police Department, organizations that would later become founding members

of CPR approached the Center for Constitutional Rights ("CCR") to file the lawsuit targeting stop-and-frisk practices (*Daniels v. City of New York*). The information concerning racial disparities in stop-and-frisk obtained through *Daniels* facilitated the filing of *Floyd v. City of New York*. CPR members are among the named plaintiffs, the main litigating nonprofit legal organizations and key witnesses in Floyd.

11. At different times CPR and/or its member organizations have been involved in *Floyd v. City of New York* and have a strong interest in the outcome of stop and frisk reform efforts. CPR is a named stakeholder in the Joint Remedial Process in *Floyd v. City of New York* (ECF No. #372). CPR has submitted multiple filings to the Court for consideration on this matter. On March 3rd, 2013 CPR submitted a motion for leave to file an *amicus curiae* brief in support of Plaintiffs' remedial proposals in Floyd. The following are just some of the filings we have had accepted by the court: On August 13th, 2013 the Court granted this motion and accepted the brief as filed (Dkt. #377). On May 16th 2012, the Court granted a request by members of CPR (Bronx Defenders, Brotherhood/Sister Sol, the Justice Committee, the Justice Committee, Picture the Homeless, and Streetwise and Safe) to submit an *amicus curiae* brief in support of Plaintiffs' motion for class certification (ECF No. # 208). In April 2017, CPR submitted to the Court concerning the NYPD's Body-Worn Camera Pilot (ECF No. #547-1). On July 9th 2018, CPR filed an *amicus curiae* is response to the Facilitator's Final Report on the Floyd Joint Remedial Process, uplifting impacted community members' priority reforms for the Court – this filing was supported by over 90 organizations (ECF No. #611).

12. CPR has worked to ensure directly impacted New Yorkers were able to participate in the Floyd legal process. CPR members and partners attended and packed the court every day of the historic nine-week Floyd trial. CPR also participated extensively in the Joint Remedies Process ("JRP"). The JRP included 28 community forums, with an estimated 1,777 participants – more than half of these participants' participation was facilitated by CPR members and partners (ECF No. 597 at 7–8.). CPR and CPR members participated consistently throughout the JRP Advisory Committee and process, helping the Facilitator to organize focus groups and recruit participants, and directly organized nine community forums, convening 530 members of directly-impacted communities across the five boroughs. CPR partner organizations organized an additional 6 community forums with an additional 367 participants. Through these activities, CPR endeavored to facilitate direct input in the remedial process from New Yorkers most impacted by stop- and-frisk and trespass enforcement abuses, primarily low-income New Yorkers of color. Since the end of the JRP, CPR and CPR members continue to engage with the Floyd remedial process including through filings with the Court.

**Opposition to The Monitor's Motion to Vacate This Court's Order Approving the Combined Pilot and Enter an Order Approving an Alternative Program**

13. In the Remedial Order issued by Judge Shira Scheindlin, Judge Scheindlin framed community input as a 'vital part' of developing a sustainable remedy in this case. While Judge Scheindlin noted an array of stakeholders who should be heard throughout the

remedies process, she specifically articulated the importance of centralizing and elevating the input of those most directly impacted by stop-and-frisk abuses.

14. This is particularly critical because the recommendation that Level 1 and Level 2 encounters be documented and publicly reported on was a product of community advocacy through the Joint Remedies Process ("JRP") that CPR contributed to and was a key community priority for the reform process – and was highlighted in CPR's 2018 amicus filing as a critical priority for the Courts' consideration.

15. In July 2018, the Court ordered the Monitor to develop a pilot program to study the implementation of the recommendation to document and publicly report on Level 1 and Level 2 encounters. The Court, through its order, recognized what CPR and other organizations had articulated: that the recording of and public reporting on Level 1 and Level 2 encounters was a critical reform that needed to be advanced. Unfortunately, despite opposition from CPR and serious concerns of the Floyd plaintiffs, the Monitor developed a proposal which combined the Level 1 and Level 2 recommendation with a separate recommendation for when Body Worn Cameras should be activated. This Combined Pilot was approved by the Court. Instead of moving forward with the Combined Pilot, the Monitor has now proposed an alternative proposal which focuses primarily on expanding when Body Worn Cameras are activated without collecting the necessary public data about Level 1 and Level 2 encounters.

16. The need to record and publicly report Level 1 and Level 2 encounters was a topline priority articulated by directly impacted communities through the JRP. This proposal was included among the recommended reforms for the Court outlined in the JRP Final Report published by the Facilitator and was prioritized as a critical reform in an amicus filing by CPR that was signed by 94 other local and national organizations (ECF No. 611 at 20).[1]

17. For CPR, it is necessary to record all investigative encounters, including Level 1 and Level 2 encounters because (1) the NYPD has consistently been found to under report Level 3 stops on an ongoing basis (as documented in the Monitor's 11th Report) - and sometimes mischaracterizing them as lower-level encounters and (2) many people during the JRP , including in townhalls, focus groups and in meetings with the Facilitator, expressed that regardless of whether they had a legal right to leave an interaction with police, they rarely felt free to do so. As a result, some level 1 and level 2 encounters are experienced as unconstitutional stops, regardless of how the NYPD categorizes the encounter.

18. During the JRP, one focus group participant said: "For me, I don't actually feel comfortable walking away because even though they're saying, 'You are not being arrested or detained,' I don't know. Police have a certain authority against you. Like they

---

[1] CPR filed an amicus brief opposing the Monitor's pilot program because (1) it lacked a structure for directly-impacted community members to meaningfully participate in the design, analysis & assessment of the pilot; (2) the design of the pilot would not provide sufficient or comprehensive data due to the size & observation-model; and (3) it did not include any public reporting – despite this being a critical need recognized by community members & the JRP Facilitator.

have a higher authority. So, I feel like nowadays they can just do what they want and change the story later – say you did something, say you resisted arrest. So, I wouldn't just interfere. I would just cooperate to the most." Floyd Focus Group Transcript 10.11.17.15_5AY at 6:193–199. This sentiment is widespread and was expressed repeatedly at the community forums organized by CPR and other organizations, came up frequently at the JRP advisory committee meetings and reflects what CPR members and partners continue to highlight today.

19. Even the Court-approved Combined Pilot recognized the need for independent documentation of Level 1 and 2 encounters. Yet, the Monitor's alternative proposal does not include a separate component requiring the documentation of Level 1 and Level 2 encounters outside of Body Worn Camera footage. This is despite the fact that the documenting of Level 1 and Level 2 encounters was a core component of the Combined Pilot and a priority reform arising out of the JRP. Like is done with Level 3 stops, the NYPD should document Level 1 and Level 2 encounters in a way where key information, including demographic and geographic information, can be aggregated and publicly reported on regardless of when Body Worn Cameras are activated. This is a core aspect of what the Facilitator's recommendation included in the JRP Final Report.

20. Furthermore, the information being recorded in the Monitor's alternative proposal is not comprehensive. While there were some categories of information that will be recorded, that information does not include key metrics like demographic information about the person being stopped (such as their race, ethnicity, age and gender), geographic information, or justification for the encounter.  This information is important to make assessments about whether street stops and level 1 and 2 encounters continue to be conducted to disproportionately target Black and Latinx New Yorkers.

21. Lastly, there is no mention of any public reporting in the Monitor's alternative proposal. A critical part of the Facilitator's recommendation from the JRP was public reporting on the information collected, as a mechanism for legitimacy and public oversight in the Floyd remedial process. The public should be able to access underlying data to make assessments about the outcomes of the Pilot.

22. In fact, several CPR representatives met virtually with the monitor and the NYPD in April of this year to communicate these very same concerns about the City's alternative proposal for documenting Level 1 and 2 encounters. CPR is thus very disappointed to see that priority concerns of communities most impacted by stop-and-frisk are not reflected in the proposal that the Monitor has now submitted for Court approval.

23. CPR is in opposition to the Monitor's alternative proposal– and to the enactment of any Pilot Proposal that does not address the core community priorities in its development and implementation. CPR would recommend the following changes:

    a) Require that the NYPD document Level 1 and Level 2 encounters in the same format to current documentation of Level 3 stops, regardless of whether or not

       Body Worn Cameras are activated. All information should be recorded in a way that can be easily aggregated.

   b) Mandate that the following information for all Level 1 and Level 2 encounters is documented, (a) the initial level of the encounter, (b) the reason for why an encounter was initiated, (c) demographic information of the person being stopped (perceived race/ethnicity, age, gender), (d) where the encounter occurred, (e) whether the encounter escalated and to which level and (f) whether force was used during the encounter.

   c) Instruct the NYPD to release public reports on the information on Level 1 and Level 2 encounters that is collected. These public reports should include aggregate data on the total number of level 1 and level 2 encounters disaggregated by (a) – (e) outlined in (b) above and should occur on a quarterly and annual basis as is the case with reporting on Level 3 stops.

24. CPR believes these changes will significantly improve the existing proposal and overall make it more aligned with what was articulated in the Combined Pilot as well as the Facilitator's recommendation stemming from community input during the JRP. Without separate, comprehensive documentation of Level 1 and Level 2 encounters, it will be impossible to understand the scope of the NYPD's discriminatory stop-and-frisk practices, which are at the core of this remedial process.

25. For all of the reasons provided above and in the interest of justice, CPR supports Plaintiffs' opposition to the monitor's motion to vacate the Court's order approving the combined pilot.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Dated:    New York, New York  
           December 21, 2020                                      Joo-Hyun Kang