# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

———

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1080

WRITER'S EMAIL ADDRESS
bgruenstein@cravath.com

JOHN W. WHITE
EVAN R. CHESLER
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS

ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA

STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
RORY A. LERARIS
KARA L. MUNGOVAN
MARGARET T. SEGALL
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN M. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN

MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG
MICHAEL L. ARNOLD
HEATHER A. BENJAMIN
MATTHEW J. BOBBY
DANIEL J. CERQUEIRA
ALEXANDRA C. DENNING
HELAM GEBREMARIAM
MATTHEW G. JONES
MATTHEW M. KELLY
DAVID H. KORN
BRITTANY L. SUKIENNIK
ANDREW M. WARK

———

PARTNER EMERITUS
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

January 27, 2021

Floyd, et al. v. City of New York, 08-CV-1034 (AT)
Ligon, et al. v. City of New York, et al., 12-CV-2274 (AT)
Davis, et al. v. City of New York, et al., 10-CV-0699 (AT)

Dear Judge Torres:

We are counsel to the Monitor, Peter L. Zimroth, and respectfully write in further support of an order in the above-captioned matters replacing the combined-pilot study with an alternative program.

On December 14, 2020, we filed a letter (the "Opening Letter") explaining that the study, which was proposed in the Monitor's filing of January 29, 2019 and approved by this Court (the "Combined Pilot"),[1] cannot proceed because of the COVID-19 pandemic.[2] Accordingly, that Letter proposed a two-part substitute for the Combined Pilot that substantially achieves its aims: new requirements that New York City Police

---

[1] Ex. 1 to Letter from Benjamin Gruenstein, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 687-1 (S.D.N.Y. Jan. 29, 2019) [hereinafter "Combined Pilot"]; Order, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 691 (S.D.N.Y. Feb. 7, 2019) [hereinafter "Combined Pilot Order"].

[2] Letter from Benjamin Gruenstein, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 805, at 13 (S.D.N.Y. Dec. 14, 2020) [hereinafter "Opening Letter"].

Department ("NYPD") officers record and document their encounters with civilians, described in Appendix 1 to that Letter (the "Alternative Plan"), and new studies of NYPD officers' conduct, described in Appendix 2 to that Letter (the "Proposed Studies").[3]  That Letter also included, as Appendix 3, a draft order that would approve the proposed replacement of the Combined Pilot and order the Alternative Plan and Proposed Studies into effect (the "Proposed Order").[4]

On December 23, 2020, the *Floyd* Plaintiffs, *Davis* Plaintiffs, and City of New York (the "City") each filed papers requesting changes to particular aspects of the Alternative Plan, Proposed Studies, or Proposed Order.[5]  The Monitor carefully considered the parties' submissions and, as Section II will explain in detail, believes that the changes requested by Plaintiffs should be denied and that only one of the changes requested by the City should be accepted.  The Monitor respectfully requests that this Court resolve this dispute by entering a modified version of the Proposed Order, which is attached as Appendix 1 to this letter.

## I.    Background

The parties' papers have confused the background to this dispute. Clarification must begin with the scope of this remedial process, which is "specifically

---

[3] Opening Letter at 6-9, 14-20; App. 1 to Opening Letter [hereinafter "Alternative Plan"]; App. 2 to Opening Letter [hereinafter "Proposed Studies"].

[4] App. 3 to Opening Letter [hereinafter "Proposed Order"].

[5] Pls.' Mem. of Law in Opp'n to the Court-Appointed Monitor's Mot. to Vacate the Court's Order Approving the Combined Pilot, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 809 (S.D.N.Y. Dec. 23, 2020) [hereinafter "*Floyd* Mem."]; Letter from Keven E. Jason, *Davis v. City of New York*, No. 10-cv-00699-AT-HBP, ECF No. 546 (S.D.N.Y. Dec. 23, 2020) [hereinafter "*Davis* Letter"]; Letter from James E. Johnson, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 810 [hereinafter "City Letter"].

and narrowly focused on . . . remedy[ing] the constitutional violations described in the Liability Opinion."[6]  Those violations, in turn, were violations of the Fourth and Fourteenth Amendments to the U.S. Constitution.[7]  Specifically, this Court found (among other things) that through its inadequate programs for managing NYPD officers, the City had exhibited deliberate indifference to the risk that officers would conduct unconstitutional "stops, frisks, and searches," and thus was liable for violation of the Fourth and Fourteenth Amendments.[8]

Those features of the Liability Opinion have two salient implications in this dispute: *first*, because this Court held the City liable for its indifference to unconstitutional "searches," all searches incident to stops are within the scope of this remedial process, including searches that officers believe are justified by civilians' consent.[9]  Indeed, this Court illustrated its holding through incidents where officers improperly searched (rather than frisked) civilians, and where officers' searches exceeded the scope of civilians' consent.[10]  *Second*, this Court did not hold that the City violated New York's law of police encounters from *People v. De Bour* and its progeny, so this Court can mandate the City's compliance with that law only to the extent that mandate is

---

[6] *Floyd v. City of New York*, 959 F. Supp. 2d 668, 676-77 (S.D.N.Y. 2013) [hereinafter "Remedial Order"].

[7] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 667 (S.D.N.Y. 2013) [hereinafter "Liability Opinion"].

[8] *Id.* at 659, 665-67.

[9] *See* Order, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 537, at 2 (S.D.N.Y. Nov. 22, 2016) (explaining that "non-consensual searches following a frisk" are within the scope of this process).

[10] Liability Opinion, 959 F. Supp. 2d at 653-56, 659.

tailored to improving the City's compliance with federal law.[11]  *De Bour* classifies encounters using four "Levels": Level 1, where an officer approaches a civilian to request information; Level 2, where an officer asks a civilian pointed questions suggesting that the civilian is a suspect; Level 3, where an officer stops or frisks a civilian; and Level 4, where an officer arrests a civilian.[12]  The NYPD conceptualizes encounters using this framework, so the participants in this remedial process do too, but the Liability Opinion adjudicated only Level 3 encounters—*Terry* stops, frisks, and related searches—and the Monitorship must focus on improving those encounters' compliance with federal law.

This Court was mindful of that limitation when it appointed a facilitator to recommend "Joint Process Reforms," explaining that the "Joint Process Reforms must be no broader than necessary to bring the NYPD's use of *stop and frisk* into compliance with the *Fourth and Fourteenth Amendments*."[13]  Those Reforms ultimately included a recording recommendation, under which officers would have to use body-worn cameras ("BWCs") to record encounters at Level 1 (adding to an existing requirement of recording encounters at higher Levels), and a documentation recommendation, under which officers would have to document civilians' age, gender, race, and ethnicity in encounters at Levels 1 and 2 (adding to an existing requirement of documenting that information in encounters at higher Levels).[14]  As those recommendations could be ordered only to the extent related to improving Level 3 encounters, the facilitator

---

[11] *See id.* at 569-70 ("*De Bour* and the Fourth Amendment draw the line between permissible and impermissible police encounters in different ways.").

[12] *See People v. Hollman*, 79 N.Y.2d 181, 184-85 (N.Y. 1992).

[13] Remedial Order, 959 F. Supp. 2d at 687 (emphasis added).

[14] Final Report and Recommendations, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 597, at 225-36 (S.D.N.Y. May 15, 2018).

explained that the recording recommendation might assist in monitoring the legality of encounters that "escalate into full blown *Terry* stops," and the documentation recommendation might "act as a bulwark against underreporting of Level 3 stops."[15]

This Court entered three orders in 2018 and 2019 requiring study of those recommendations, but none resolves the issues presented in this dispute. At first, the parties presented the question of whether the recommendations should be ordered in full or fully rejected, with Plaintiffs urging the former course and the City urging the latter.[16] This Court decided that it did not have enough information to answer that question, so it issued two orders instructing the parties to formulate a method for studying each recommendation in full and consider whether the two recommendations could be studied together.[17] The parties asked the Monitor to design the consolidated study, and he did, developing it around a state-of-the-art program of systematic social observation by which researchers would travel alongside officers in the field, take notes on how their conduct was affected by the recommendations, and provide those notes to experts who would help the Monitor formulate views about the wisdom of making those recommendations—in whole or in part—into citywide requirements.[18] After the Monitor proposed that study, the parties submitted additional briefing presenting the question of whether particular elements of the study's design not at issue in this dispute (such as sample size and choice

---

[15] *Id.* at 226, 235.

[16] Order Regarding Body-Worn Cameras, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 634, at 3 (S.D.N.Y. Aug. 9, 2018); Order Regarding Documenting Police-Citizen Encounters, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 619, at 2 (S.D.N.Y. July 19, 2018).

[17] *Id.*

[18] *Id.*; Combined Pilot at 1-16.

of experts) should be modified in the study's final version.[19]  This Court answered that question in February 2019 by rejecting some of the critiques and accepting a final version of the study that was adjusted to reflect others, and ordered implementation of that version.[20]

In short, this Court never decided the question of whether the particular elements of the recommendations raised by this dispute should, in isolation from other elements, be studied—a question that has arisen because of how circumstances changed in 2020.  On February 21, 2020, the City wrote a letter to the Monitor explaining that it had reconsidered its full resistance to the recording and documentation recommendations and was willing to implement them, in substantial part, citywide.[21]  That letter was the foundation of the proposed Alternative Plan, under which NYPD officers must record all Level 1 encounters (with limited exceptions) and document many features of Level 1 and 2 encounters.[22]  Shortly after the Monitor received that letter, the pandemic struck.  The Monitor recognized that the Combined Pilot could not proceed as ordered or even with modifications, because it fundamentally relies on a technique—systematic social observation—that could no longer be done safely.  And the Monitor also recognized that if change was required, he should consider beginning that change with the City's proposal to implement the vast majority of the recording and documentation recommendations citywide.  Starting there, he confronted not the old question of whether

---

[19] Letter from Benjamin Gruenstein, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 687, at 1-28 (S.D.N.Y. Jan. 29, 2019).

[20] Combined Pilot Order at 1-2.

[21] Alternative Plan at 2.

[22] Opening Letter at 6-7.

the recommendations should be implemented, discarded, or studied in their entirety, but the very different question of whether the particular elements of the recommendations not implemented by the Alternative Plan should be implemented or studied on their own.

The Monitor presented this new question to Plaintiffs, the City, and his researchers, and they worked together on answering it throughout 2020.  The proposal in the City's February letter was not fully adequate to replace the Combined Pilot, but was revised so it could be.  The City incorporated feedback from Plaintiffs and the Monitor by expanding its proposal so that officers would be required to document the race and gender of civilians in Level 2 encounters.[23]  The Monitor's team, taking into account the parties' advice, designed the Proposed Studies to develop important research knowledge that would have been developed by the Combined Pilot.[24]  And the City agreed that it will be receptive to revisiting its policies in light of the Proposed Studies' findings.  At the end of that process, the Monitor believed that the two-part program of the Alternative Plan and Proposed Studies was an appropriate substitute for the Combined Pilot.  The elements of the Combined Pilot left out of that program were not, considered on their own, a cost-justified use of public resources.

## II.     This Court Should Resolve this Dispute by Entering the Proposed Order

The parties and Monitor agree that this Court has a "broad" and "flexible" power to change its orders on the Combined Pilot as warranted by the exercise of its sound discretion.[25]  They also agree that change is necessary because the Combined Pilot cannot proceed as ordered; the pandemic has undermined the systematic social

---

[23] Alternative Plan at 6.

[24] Opening Letter at 7-9.

[25] *Id.* at 13 (quoting *Brown v. Plata*, 563 U.S. 493, 542 (2011)); *Floyd* Mem. at 9.

observation technique at its core.[26]  This dispute is about the parties' objections to
elements of the particular changes that the Monitor requested from this Court in the
Opening Letter.  Plaintiffs contend that this Court should go further than the Alternative
Plan in requiring modifications of NYPD policy on Level 1 and 2 encounters, and should
order the Proposed Studies to focus more on the effects of expanding officers'
documentation of encounters.[27]  The City contends that the Proposed Studies exceed the
scope of the Monitorship insofar as they study whether searches were consensual, and
that the Proposed Order's language should be adjusted to resemble language from this
Court's original remedial order.[28]  For the reasons below, only one of the City's
objections warrants any change to the Monitor's proposal.

A.    *Plaintiffs' Arguments for Changes to the Alternative Plan Are
      Unpersuasive*

Plaintiffs argue that there are seven ways in which this Court should go
further than the Alternative Plan in requiring changes to NYPD policy on Level 1 and 2
encounters.  Their arguments are not persuasive.

*First*, the *Floyd* Plaintiffs argue that this Court should eliminate the
"arbitrary" exception in the Alternative Plan's recording requirement by which officers

---

[26] Opening Letter at 13; *Floyd* Mem. at 11 ("[T]he pandemic undoubtedly makes the
Combined Pilot's SSO research methodology infeasible to conduct safely . . . .").

[27] *Floyd* Mem. at 12-25; *Davis* Letter at 1-6.  The *Floyd* Plaintiffs also raise a high-
level objection that the "only reason" the Monitor provided for the proposed changes to
this Court's orders is the pandemic.  *Floyd* Mem. at 11.  Of course, that objection ignores
the many pages in which the Opening Letter explained why the Alternative Plan and
Proposed Studies appropriately achieve the aims of the Combined Pilot, and why the
discontinued elements of the Combined Pilot are not cost-justified on their own.  *See*
Opening Letter at 9-13, 14-20.  Unsurprisingly, the *Floyd* Plaintiffs quickly move on to
their specific objections to particular elements of the Monitor's proposal.  *Floyd* Mem. at
12.

[28] City Letter at 1-5.

need not record Level 1 encounters that occur in the course of radio runs regarding past crimes.[29] But, as the Opening Letter explained, the encounters covered by that exception do not escalate to Level 3 and thus are not within the scope of this remedial process.[30] The Monitor confirmed this point with the City, which has represented that the exception should not cover any encounter in which an officer takes investigative steps beyond the routine taking of a crime report—steps that could *risk* escalating an encounter—nor any encounter that *in fact* escalates to Level 2 or beyond.[31] That clarification answers Plaintiffs' concern that the exception could cover "particularly important" encounters— the exception will cover only Level 1 encounters, and then only those that neither escalate nor pose a substantial risk of escalating—and it answers their related concern that the exception could cover an encounter in which officers pursue someone who flees when they request information: by pursuing, the officers would obviously elevate the encounter beyond Level 1, out of the exception and into the recording requirement.[32]

Second, the *Floyd* Plaintiffs argue that this Court should require officers to document information about Level 1 and 2 encounters using an app on their smartphones because that method of documentation is more accurate and less burdensome than using evidence.com, as the Alternative Plan requires.[33] Regarding accuracy, Plaintiffs quote

---

[29] *Floyd* Mem. at 12-14, 22.

[30] *See* Opening Letter at 14. Because these encounters are outside the scope of this process, they are presumably not the encounters that the facilitator had in mind when he said that failing to require the recording of certain Level 1 encounters might be "inconsistent with the findings in the Liability Opinion," *Floyd* Mem. at 13.

[31] The City represented that the Risk Management Bureau is developing guidance for officers that will communicate the limits on the scope of the exception, and the Monitor will check whether the guidance is appropriate.

[32] *Floyd* Mem. at 13-14.

[33] *Id.* at 14-15, 23-24.

the Monitor's researchers, who explained in the Proposed Studies that a system like evidence.com "will often contain multiple records of the same encounter because each officer present [at the encounter] will activate their camera," which could result in overrepresentation of encounters with multiple officers.[34]  But Plaintiffs fail to quote the researchers' solution to that problem: it is possible to, and the Proposed Studies will in fact "link recordings of the same encounters" so that they are grouped together and the related encounters are not overrepresented.[35]  Regarding burden, Plaintiffs argue that an app would enable officers to document encounters in the field, while evidence.com requires officers to document encounters from a computer terminal in the precinct house.[36]  But Plaintiffs' assertion about evidence.com is mistaken: officers can already enter data into evidence.com not only at computer terminals, but also on their smartphones.[37]  And the Patrol Guide and Alternative Plan require officers to use evidence.com to categorize recordings of Level 1 and 2 encounters—describing whether they are related to a homicide investigation, arrest, summons, or investigative encounter, as well as their Levels—regardless of how officers are required to document demographic data for those encounters.[38]  Introducing an app would therefore not be a burden-relieving alternative to evidence.com; it would be a burden-increasing addition.

---

[34] *Id.* (quoting Proposed Studies at 6).

[35] Proposed Studies at 6.  Of course, under the Proposed Order, the NYPD must support the researchers' efforts to link the recordings for purposes of the Proposed Studies.

[36] *Floyd* Mem. at 15.

[37] *See* N.Y.C. Police Dep't, Patrol Guide 212-123, at 5 (Oct. 7, 2020).

[38] *Id.*; Alternative Plan at 3-4.

*Third*, the *Floyd* Plaintiffs argue that this Court should require officers to document both the initial and final Levels of their encounters, rather than documenting only final Levels as the Alternative Plan requires.[39]  Plaintiffs point out that if initial Levels are not documented, it will be more difficult for the NYPD to identify escalated encounters, and thus to study and draw inferences about them.[40]  But Plaintiffs overlook the fact that the Combined Pilot also would not have required officers to document initial Levels for encounters that escalated to Levels 3 or 4; rather, it would have required only completion of stop reports and, for arrests, arrest reports, neither of which document initial Levels.  Moreover, escalated encounters can in fact be studied without officer-provided initial-Level information: the Monitor's researchers are slated to do so through a random sample of BWC recordings in the Proposed Studies without that information, and would not use that information to specially sample escalated encounters even if they had it.[41]  Plaintiffs contend that the researchers' style of review is "too time-consuming" for the NYPD to review "enough videos to regularly analyze" escalated encounters—but that empirical assertion will be tested by the Proposed Studies, and if in the course of their analyses the researchers think of recommendations on how to analyze escalated encounters more easily or effectively, those recommendations can be addressed down the line.[42]  Plaintiffs also assert that the lack of officer-provided initial-Level information would "eliminate any meaningful contemporaneous review [of escalated encounters] by

---

[39] *Floyd* Mem. at 15-16, 22.

[40] *Id.* at 16.

[41] *See* Proposed Studies at 2-6, 9.  The Monitor's team will review BWC recordings to classify their initial Levels, and will provide the results of that review to the ISLG and Stanford researchers.

[42] *Floyd* Mem. at 16 & n.3.

supervisors"—but in fact that information would be of little use for that purpose, since it sheds no light on whether encounters were legal.[43]   It is the BWC recordings required by the Alternative Plan that will actually aid supervisory review.

> *Fourth*, the *Floyd* and *Davis* Plaintiffs argue that this Court should require officers to document the age, gender, race and ethnicity of civilians in Level 1 encounters, rather than only in higher-Level encounters as the Alternative Plan requires.[44] Plaintiffs focus on a straw man by asserting that the Monitor's decision not to support this requirement is based on the size of the burden that the requirement would impose on officers.[45]   In fact, the Opening Letter explained that the concern is not burden alone, but benefit, as the requirement would not yield information about bias in officer activity (whether for analysis under the Fourteenth Amendment or otherwise).[46]   That is because demographic data on the people subject to a particular type of officer activity can show bias only if researchers understand how that data would look if the activity was performed in an unbiased way.   Bias can be measured for Level 3 encounters because they are supposed to be based on a reasonable suspicion of criminal behavior.[47]   Among other things, that requirement offers a metric by which to assess whether stops are successful—they are successful if they reveal criminal behavior, such as possession of contraband—and so researchers have a way to approximate the extent to which officers are stopping a group of people because of unbiased objective criteria (i.e., likelihood of

---

[43] *Id.*

[44] *Floyd* Mem. at 16-18, 22; *Davis* Letter at 2-4.

[45] *Floyd* Mem. at 17; *Davis* Letter at 2-3.

[46] Opening Letter at 16-18.

[47] Liability Opinion, 959 F. Supp. 2d at 567.

revealing criminal behavior) rather than subjective bias.  If stops of one group of people often reveal criminal behavior while stops of a second group overwhelmingly do not, researchers might infer that officers are excessively stopping people of the second group because of bias.[48]  Bias cannot, by contrast, be measured for Level 1 encounters, which are supposed to be based on an "objective, credible reason" to approach.[49]  That requirement offers no metric by which to assess whether Level 1 encounters are successful—they are not supposed to be based on a probability of any particular outcome—and thus researchers cannot, as with stops, approximate the extent to which officers are initiating those encounters because of objective criteria.

The *Davis* Plaintiffs concede that the task of analyzing aggregate bias in Level 1 encounters is "complicated," but assert that it is not "impossible"—yet they fail to explain how it could properly be done.[50]  The *Floyd* Plaintiffs do not attempt that feat either, instead arguing that Level 1 race data should be recorded because it could be used to assess bias in encounters that escalate to Level 2 or 3.[51]  But the Alternative Plan will require officers to document race in Level 2 encounters (as well as Level 3 encounters) so the data necessary for that analysis will already be captured.  Indeed, the *Floyd* Plaintiffs acknowledge that the Proposed Studies plan on analyzing racial disparities in escalated

---

[48] This Court endorsed a similar analysis when it found that "for the period 2004 through 2009 . . . the odds of a stop resulting in any further enforcement action were 8% *lower* if the person stopped was black than if the person stopped was white.  In addition, the greater the black population in a precinct, the less likely that a stop would result in a sanction.  These results show that blacks are likely targeted for stops based on a lesser degree of objectively founded suspicion than whites."  *Id.* at 589.

[49] *People v. Hollman*, 79 N.Y.2d 181, 184 (N.Y. 1992).

[50] *Davis* Letter at 3.

[51] *Floyd* Mem. at 18.

encounters—and plan on doing so, of course, without officer-provided Level 1 race data.[52]

*Fifth*, the *Floyd* Plaintiffs argue that this Court should order study of a requirement that officers document the precise locations of Level 1 and 2 encounters, rather than the precincts in which those encounters occur (as the Alternative Plan requires).[53]  This argument does not warrant any change because its prescription is substantially reflected in the Monitor's existing plan: his researchers will examine location information for a sample of encounters in the Proposed Studies, and they can advise whether that information would be useful for future analyses.  Furthermore, the NYPD's existing plans reflect Plaintiffs' suggestion that officers document location information using Axon AB-3 BWCs: the NYPD is phasing officers into the use of those BWCs, which will automatically document the locations where recordings occur, making an additional documentation requirement unnecessary.[54]  The City has represented that the resulting location data currently cannot be produced "in a format that would allow it to be aggregated and statistically analyzed," contrary to Plaintiffs' assertion,[55] but the City will ask Axon to give it that ability in the future.

*Sixth*, the *Floyd* and *Davis* Plaintiffs argue that this Court should require officers to document their reasons for initiating Level 1 and 2 encounters, rather than

---

[52] *Id.* (quoting Proposed Studies at 10-11).

[53] *Floyd* Mem. at 18-20.

[54] *Id.* at 19.  The City confirmed this information in dialogue with the Monitor's team.

[55] *Id.*  Plaintiffs' assertion is not clearly backed by the declaration paragraphs they cite or their generalized reference to Axon's BWC manuals.  *Id.*

only their reasons for initiating Level 3 encounters (as existing NYPD policy requires).[56] Plaintiffs assert that without this information about Level 1 and 2 encounters, they and the Monitor's researchers will be unable to assess the legality of those encounters.[57]  But the key problem with Plaintiffs' argument is that officers' compliance with the law of Level 1 and 2 encounters is not itself an object of this remedial process; this Court can order only remedies designed to improve compliance with federal constitutional requirements.  Furthermore, the Alternative Plan will require officers to record those encounters on their BWCs, and the recordings can be used to assess the encounters' legality, along with any other documentation related to those encounters such as the printouts of the Intergraph Computer Aided Dispatch ("ICAD") system.  The experts involved in the Proposed Studies will be using BWC recordings and associated documentation for just this purpose.  Indeed, the Monitor's team routinely assesses legality with only the aid of BWC recordings, such as when analyzing encounters in interior patrols, for which no ICAD printouts or other reports exist in many cases.  The *Floyd* Plaintiffs acknowledge that BWC recordings can be used to assess Level 1 and 2 encounters, but contend that this method of review is inadequate because it "allows for *ex-post facto* justification of unlawful behavior."[58]  Yet requiring officers to provide the reasons for encounters after those encounters happen is no safeguard against such justification.

---

[56] *Id.* at 20-21; *Davis* Letter at 2-4.

[57] *Id.*

[58] *Floyd* Mem. at 20-21.

*Seventh*, the *Floyd* Plaintiffs argue that this Court should order the NYPD to establish protocols for supervisory review of Level 1 and 2 encounters, which the Alternative Plan does not contain.[59]  But the Combined Pilot did not contain protocols for supervisory review of Level 1 and 2 encounters either; and, in any event, the City has represented that it has planned meetings with Department stakeholders to develop protocols for supervisory review of Level 1 and 2 encounters, so no order on this subject is necessary at this time.

B.    *Plaintiffs' Requests for Changes to the Proposed Studies Should Be Denied*

Plaintiffs also requested three changes to the Proposed Studies, which should be denied.

*First*, the *Floyd* Plaintiffs ask this Court to order a pilot study of a "modified Alternative Plan," which would test the effects of requiring officers to use smartphones to document additional encounter information pursuant to Plaintiffs' proposed changes to the Alternative Plan.[60]  But for the reasons above, Plaintiffs' proposed changes to the Alternative Plan should be rejected, so there is no need for a pilot study focused on the effects of those changes.

*Second*, the *Floyd* Plaintiffs ask this Court to modify the Proposed Studies' research questions so that they focus not only on the effects of expanding BWC recording on officer conduct (as they currently do) but also on the effects of expanding documentation of encounters.[61]  But the Alternative Plan's principal policy change is its

---

[59] *Id.* at 21, 23.

[60] *Id*. at 23.

[61] *Id.* at 24.

expansion of BWC recording; documentation will also be expanded, though this is partly the result of expanding the use of BWCs, which automatically document certain encounter information.  This Court should reject Plaintiffs' requests for additional documentation requirements, and thus there is no need for additional research questions focused on documentation.  The research questions should be allowed to focus on the Alternative Plan's principal impact, and the researchers' expert judgment on this subject should not be disturbed.

Third, the *Davis* Plaintiffs ask this Court to order the Monitor to give them "important information" about the implementation of the Proposed Studies as well as "opportunities for consultation and feedback."[62]  Plaintiffs focus attention on the Stanford team's machine-learning study of officer encounters, explaining that the team's memorandum included as an appendix to the Opening Letter did not include "critical details about the machine-learning techniques and tools," such as how those tools will "weight various metrics and variables," so the memorandum has not facilitated meaningful feedback on those tools.[63]  Plaintiffs are particularly concerned that those tools might be developed using biased training data that could cause those tools to replicate biases in their results.[64]

But this Court need not order the Monitor to give Plaintiffs important information and opportunities for feedback on the Proposed Studies; he already plans to do so.  The Stanford team's memorandum did not contain the technical details that

---

[62] *Davis* Letter at 4.

[63] *Id.* at 5.

[64] *Id.*

Plaintiffs reference because it was written for a non-technical audience and many of those details must be developed as the study proceeds.  The Stanford team is prepared to explain those details to Plaintiffs as necessary and welcomes their input.  And the team very much shares Plaintiffs' concern about the risk that machine-learning tools will replicate the biases of training data; in fact, much of the team's research is aimed at understanding that risk, and the team will explain its methods for addressing that risk to Plaintiffs.

      C.      *The City's Requests for Changes to the Proposed Studies and Proposed Order Warrant One Minor Change to the Proposed Order*

The City requests one change to the scope of the Proposed Studies and two changes to the language of the Proposed Order.  Those requests merit a minor change to the Proposed Order.

*First*, the City asks this Court to eliminate the line of research in the Proposed Studies that will ask, "[h]ow is consent sought for searches during stops, and are there racial differences in officers' requests for consent and when citizens grant consent?"[65]  The City contends that this line of research is outside the scope of the Monitorship, citing a 2016 order in which this Court wrote that "[c]onsensual searches are not the subject matter of this litigation."[66]  But the City's selective account of that order misleads.  In that order, this Court addressed the question of whether the remedial process encompassed a revision to the Patrol Guide that required officers to notify civilians of their right to refuse consent to search when asking for that consent in Level 2

---

[65] City Letter at 4.

[66] *Id.*

and 3 encounters.[67]  This Court found that the revision was not in scope by way of a distinction between "non-consensual searches following a frisk," which are in scope, and "[c]onsensual searches," which are not.[68]  In other words, the revision was not adequately addressed to searches that are "non-consensual" within the meaning of the Fourth Amendment—and that makes sense, because the Supreme Court has expressly rejected the view that officers must, as under the Patrol Guide revision, notify civilians of their right to refuse as a precondition for "consensual" searches under the Amendment.[69]  By contrast, the Proposed Studies' research is directed at the very issue of whether searches are "non-consensual" within the Amendment's meaning.  That research is clearly focused on remedying this Court's finding that the City had inadequately managed officers' unconstitutional searches.[70]

> *Second*, the City asks this Court to modify the Proposed Order so that it requires the Monitor to "provide the City with a workplan every six months with a detailed breakdown regarding anticipated costs" for the Proposed Studies.[71]  But the Monitor cannot agree to providing six-month workplans at this time, when there is still

---

[67] Order, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 537, at 1-3 (S.D.N.Y. Nov. 22, 2016).

[68] *Id.* at 2.

[69] *Schneckloth v. Bustamonte*, 412 U.S. 218, 231-33 (1973) ("One alternative that would go far toward proving that the subject of a search did know he had a right to refuse consent would be to advise him of that right before eliciting his consent. That, however, is a suggestion that has been almost universally repudiated by both federal and state courts, and, we think, rightly so. . . . [W]e cannot accept the position of the Court of Appeals in this case that proof of knowledge of the right to refuse consent is a necessary prerequisite to demonstrating a 'voluntary' consent.  Rather it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.").

[70] *See* Liability Opinion, 959 F. Supp. 2d at 659.

[71] City Letter at 4.

uncertainty about the time at which the Alternative Plan will be implemented and the Proposed Studies will begin, and when the Monitor's researchers lack a record of the time that the NYPD will require to provide certain data and assistance, which is essential to accurately projecting the timing of the Proposed Studies' work.  Unless the workplans are likely to be accurate, they will only create conflict and delay.  The Monitor has agreed to provide the parties with quarterly progress reports, and that should be enough for now; after all, this Court did not require workplans or related reports from the Monitor when ordering the Combined Pilot.

Finally, the City asks this Court to modify the Proposed Order so that it requires the City to provide all "reasonable" (rather than "necessary") funding for the Proposed Studies, and so that it does not require the City to provide "full support for [the Studies'] implementation as directed by the Monitor."[72]  But the Proposed Studies are an integral part of this remedial process, and the City's full support for them will be an integral part of their success.  For this reason, the Monitor does not agree with changing the language that requires the City to provide full support for the Proposed Studies' implementation.[73]  With respect to costs, although the Monitor has concerns that using the term "reasonable" will give the City a greater opportunity to challenge the Monitor's implementation of the Proposed Order, he believes that if the Court signs the Order, that will be a sufficient signal that it is leaving the question of costs to the Monitor.  As he has said on many occasions, the Monitor is mindful of the question of costs and would not approve any implementation that unnecessarily adds to those costs. For this reason, he

---

[72] *Id.* at 1-2, 5; Proposed Order at 2.

[73] Proposed Order at 2.

agrees that the Proposed Order should mirror this Court's original remedial order and require the City to be responsible for "reasonable" costs, and the version of the Proposed Order attached as Appendix 1 reflects that change.[74]

\* \* \*

For the foregoing reasons, the Monitor respectfully requests that this Court resolve this dispute by entering the order attached as Appendix 1 to this letter.

Respectfully submitted,

*/s/ Benjamin Gruenstein*

Benjamin Gruenstein
Bradley Niederschulte
Sara Bodner

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone:  (212) 474-1000
Fax:  (212) 474-3700
bgruenstein@cravath.com

---

[74] This version of the Proposed Order is also revised to explain that it will have the effect of vacating not only this Court's February 7, 2019 order, which ordered the Combined Pilot into effect, but also the July 19, 2018 and August 9, 2018 orders requiring studies of documentation and recording, which were ultimately effectuated through the Combined Pilot.  *See* Combined Pilot Order at 1-2; Order Regarding Body-Worn Cameras, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 634 (S.D.N.Y. Aug. 9, 2018); Order Regarding Documenting Police-Citizen Encounters, *Floyd v. City of New York*, No. 08-cv-1034 (AT), ECF No. 619 (S.D.N.Y. July 19, 2018). While the *Floyd* Plaintiffs do not request this clerical revision to the Proposed Order in their filing, they suggest that the Order would be more complete if it were made, and the Monitor agrees.  *Floyd* Mem. at 11.

Hon. Analisa Torres
   United States District Court
      Southern District of New York
        500 Pearl Street
          New York, New York 10007-1312
BY ECF