**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------- X

DAVID FLOYD, *et al.*,

                     Plaintiffs,

 -against-                             No. 08 Civ. 1034 (AT)

CITY OF NEW YORK, *et al.*,

                     Defendants.
------------------------------------------------------------------- X
------------------------------------------------------------------- X

KELTON DAVIS, *et al.*,

                     Plaintiffs,

 -against-                             No. 10 Civ. 699 (AT)

CITY OF NEW YORK, *et al.*,

                     Defendants.
------------------------------------------------------------------- X

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO MODIFY THE *FLOYD* REMEDIAL ORDER

Jonathan C. Moore
Luna Droubi
Marc Arena
Rebecca Pattiz
Katherine "Q" Adams
Beldock Levine & Hoffman LLP
99 Park Avenue, Penthouse Suite
New York, NY 10016
212.490.0400

Darius Charney
Omar Farah
Samah Sisay
The Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
212.614.5475

*Attorneys for Floyd Plaintiffs*

Jin Hee Lee
Raymond Audain
Ashok Chandran
John Cusick
Kevin Jason
Lauren Johnson
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212.965.2200

Corey Stoughton
Steve Wasserman
Molly Griffard
Jennvine Wong
The Legal Aid Society
199 Water Street
New York, NY 10038
212.577.3300

*Attorneys for Davis Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

I.    INTRODUCTION .................................................................................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ............................................... 3

  A.   The *Floyd* Liability and *Davis* Summary Judgment Rulings........................... 3

    1.   *Floyd* Liability Opinion............................................................................ 3

    2.   *Davis* Rulings .......................................................................................... 4

  B.   Key Provisions of the *Floyd* Remedial Order and *Davis* Settlement................. 5

    1.   *Floyd* Remedial Order ............................................................................. 5

    2.   *Davis* Settlement ..................................................................................... 7

  C.   Impacted Communities' Limited Engagement with the *Floyd-Davis* Monitorship ........... 8

    1.   The Joint Remedial Process ...................................................................... 8

    2.   Lack of Community Engagement After the Completion of the Joint Remedial Process. 9

  D.   Persistence of Racial Bias by the NYPD ....................................................... 11

  E.   The Monitor's Compliance Metrics and Recent Status Reports....................... 13

III.  ARGUMENT........................................................................................................... 15

  A.   The Court Has the Power to Modify the Remedial Order as Plaintiffs Request ............... 16

  B.   Lack of Community Engagement and Deficiencies in the Monitor's Compliance Metrics Threaten the Legitimacy and Success of the Monitorship ..................................... 18

  C.   The Court Must Modify the Remedial Order to Ensure Robust Community Engagement with the Monitorship ......................................................................................... 23

  D.   The Court Must Modify the Remedial Order to Include Community Perspectives and Qualitative Metrics in the Monitor's Compliance Assessments ............................... 25

    1.   Community Surveys................................................................................ 26

    2.   Community Collaborative Board ............................................................. 27

    3.   Field Audits/Integrity Testing ............................................................... 29

IV.  CONCLUSION ...................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Allen v. City of Oakland*, 00-CV-4599 (N.D. Cal.)......................................................... 26

*Ass'n against Discrimination in Emp't, Inc. v. Bridgeport*, 710 F.2d 69 (2d Cir. 1983) ............ 17

*Aurelius Capital Master, Ltd. v. Republic of Arg.*, 644 F. App'x. 98 (2d Cir. 2016) .................. 17

*Brown v. Plata*, 563 U.S. 493 (2011)...................................................................... 16

*Davis v. City of New York*, No. 10 CV 699 (AT) (S.D.N.Y. March 28, 2013).................. 4, 5, 7, 8

*Doe v. Village of Mamaroneck*, 462 F.Supp.2d 520 (S.D.N.Y. 2006) ......................... 22

*Floyd v. City of New York,* No. 08 CV 1034 (AT) (S.D.N.Y. Nov. 20, 2018) ..................... passim

*Illinois v. City of Chicago*, 17-cv-6260 (N.D. Ill. Jan. 31, 2019) .................................. 26

*In re Tronox Inc.*, 855 F.3d 84 (2d Cir. 2017) .............................................. 16

In re: New York City Policing During Summer 2020 Demonstrations, 21-cv-533 (CM)

(S.D.N.Y. 2021) .......................................................................................... 12

*King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 418 F.2d 31 (2d Cir. 1969) ..................... 17

*Melendres v. Penzone*, No. 07-cv-2513 (D. Ariz. Feb. 9, 2021) ................................ 14, 18, 24, 28

*N.Y.S. Assn. for Retarded Children, Inc. v. Carey*, 706 F.2d 956 (2d Cir. 1983)................. 16, 17

*Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228 (S.D.N.Y. 2004) ..................... 17

*Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367 (1992) ............................................ 17

*Uniformed Fire Officers Ass'n, et al. v. de Blasio, et al.*, No. 20-2789, ECF No. 269 (2d Cir. Oct.

29, 2020)...................................................................................................... 11

*United States v. City of Cleveland*, 15-cv-1046 (N.D. Ohio June 12, 2015) ............. 24, 26, 28, 29

*United States v. City of Ferguson*, 16-CV-181 (E.D. Mo. Apr. 19, 2016) ...................... 18, 25, 26

*United States v. City of New Orleans*, 12-CV-1924 (E.D. La. Jan. 11, 2013).............................. 18

*United States v. City of New York*, 07-CV-2067 (E.D.N.Y. 2013)............................... 25

*United States v. City of Newark*, 16-CV-1731 (D.N.J. Apr. 29, 2016)................................... 18, 26

*United States v. City of Seattle*, 12-cv-1282 (W.D. Wash. July 27, 2012) ................ 24, 25, 28, 29

*United States v. Police Dep't of Baltimore*, 17-CV-0099 (D. Md. Jan. 17, 2017) ................ 18, 26

**Other Authorities**

Ali Watkins, *2495 Reports of Police Bias. Not One Was Deemed Valid by the NYPD,* N.Y. TIMES

(June 26, 2019)...................................................................................................... 22

Alice Fontier et al., This is Sham NYPD Reform: But As Usual, the Mayor and Commissioner

Are Dodging, NY DAILY NEWS (Dec 15, 2020) ...................................................... 20

Allison McCann et al., N.Y.P.D. Says It Used Restraint During Protests. Here's What the Videos

Show, N.Y. TIMES (July 14, 2020) ......................................................................... 12

Amanda Luz Henning Santiago, Even black lawmakers get pepper-sprayed, CITY AND STATE

NEW YORK (June 3, 2020)....................................................................................... 12

Brian J. Fried et al., "Corruption and Inequality at the Crossroad," 45 LATIN AM. RES. REV.

76 (2010) ............................................................................................................... 30

Civil Rights Division, U.S Dep't of Justice, The Civil Rights Division's Pattern and Practice

Police Reform Work: 1994-Present (Jan. 2017) ..................................................... 24

Cleveland Community Police Commission, *Response to CDP's January Search and Seizure

Revisions* (Feb. 21, 2019)...................................................................................... 29

Dean Meminger and Catalina Gonella, Over 80 Percent of Social Distancing Summonses Went

to Black or Hispanic People, NYPD Says, NY1 (May 8, 2020)................................ 11

Ethan Geringer-Sameth, City Council Jumps Into Police Reform Action Amid De Blasio Delay

in Meeting Cuomo Mandate, GOTHAM GAZETTE (Feb. 2, 2021) ............................. 21

Human Rights Watch, "Kettling" Protesters in the Bronx: Systemic Police Brutality and Its Costs in the United States (Sep. 30, 2020) ........................................................................... 12

Jennifer L. Eberhardt, Strategies for Change: Research Initiatives and Recommendations to Improve Police-Community Relations in Oakland, California (Stanford Univ. 2016) 14, 26, 27

Josiah Bates, Police Data Reveals Stark Racial Discrepancies in Social Distancing Enforcement Across New York City, TIME (May 8, 2020) ........................................................................... 11

Letter from 50 Civil Rights Organizations to New York City Council Speaker Corey Johnson, dated March 25, 2021 ........................................................................... 21

Michael Gartland, 'The Mayor's Office Did Nothing': Advocates Blast de Blasio on State-Mandated Police Reform Efforts, N.Y. DAILY NEWS (Jan. 11, 2021) ....................................... 20

Morris Justice Project, A Community Survey of Police Practices in a Bronx Neighborhood (2012) ........................................................................... 27

MPD 150, Enough Is Enough: A 150 Year Performance Review of the Minneapolis Police Department (2020) ........................................................................... 27

N.Y.C. Dep't of Invest., Investigation into NYPD Response to the George Floyd Protests (Dec. 2020) ........................................................................... 12

N.Y.C. Dep't of Invest., Office of the Inspector General for the NYPD, Complaints of Biased Policing in New York City: An Assessment of NYPD's Investigations, Policies, and Training (June 2019) ........................................................................... 22

N.Y.C. Dep't of Invest., Seventh Annual Report, Office of the Inspector General for the NYPD (April 2021) ........................................................................... 22

N.Y.S. Office of the Attorney General, Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd, ("AG Report") (July 2020)..............................................................................................................12

New York City Council Fiscal Year 2021 Executive Budget Hearings before the Committee on Public Safety, 2020 NYC Council (May 14, 2020) ...................................................................11

New York City Council, A Report on NYPD Deputy Inspector James Francis Kobel and "Clouseau," (Nov. 2020).......................................................................................................13

New York City Police Dep't, *Process of Developing the NYPD Disciplinary System Penalty Guidelines and Response to Public Comments* (2021) ............................................................29

NYC Police Reform and Reinvention Collaborative Draft Plan, Part 1 (March 5, 2021)............20

NYC Police Reform and Reinvention Collaborative Draft Plan, Part 2 (March 12, 2021)..........20

PARC, *National Guidelines for Police Monitors* (2008).............................................................24

Sanja Kutnjak Ivkovic, "To Serve and Collect: Measuring Police Corruption," 93 J. CRIM. L. & CRIMINOLOGY 593 (2003).......................................................................................................30

Sean A. Kidd and Michael J. Kral, "Practicing Participatory Action Research," 52 J. OF COUNSELING PSYCHOLOGY 187 (2005)....................................................................................27

Sonja B. Starr, "Testing Racial Profiling: Empirical Assessment of Disparate Treatment by Police," 2016 UNIVERSITY OF CHICAGO LEGAL FORUM 485 (2016) .........................................30

U.S. Dep't of Justice, Civil Rights Div., The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present 25 (Jan. 2017) ............................................................................18

William K. Rashbaum and Alan Fleuer, *N.Y.P.D. Anti-Harassment Official Accused of Racist Rants*, N.Y. TIMES (Nov. 5, 2020)..........................................................................................12

Yasmeen Khan, *The NYPD Substantiated Its First Complaint of Biased Policing-But Not Against an Actual Officer*, WNYC News (Dec. 10, 2020) .................................................................. 22

Yasmeen Khan, The Unfinished Business of Bloomberg Era Stop-and-Frisk- Part 2, WNYC Radio (Feb. 25, 2020)............................................................................................................... 10

**Rules**

N.Y. Exec. Order 203 (June 12, 2020) ........................................................................................ 20

## I.     INTRODUCTION

Almost eight years ago, this Court found that the New York City Police Department ("NYPD") had engaged in a widespread and decades-long practice of suspicionless and racially discriminatory stops-and-frisks and directed the NYPD to implement a series of reforms to "ensure that the practice is carried out in a manner that protects the rights and liberties of all New Yorkers." *Floyd* Remedial Order, ECF No. 372, at 2. In doing so, the Court recognized that community input in the reform process was "a vital part of a sustainable remedy in this case" because "if the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful." *Id*. at 29. Thus, it mandated a Court-supervised Joint Remedial Process ("JRP"), which solicited input from more than 2,000 New Yorkers from those communities across the City most impacted by the NYPD's unconstitutional and racially discriminatory stop-and-frisk and trespass enforcement practices on how to effectively reform those practices. The JRP resulted in fourteen concrete and creative reform proposals—some of which the Court has already ordered and the rest of which remain under Court review—that are designed to increase transparency and accountability with respect to the NYPD's stop-and-frisk and trespass enforcement practices.

The JRP ended in the spring of 2018 and, unfortunately, so too did the meaningful engagement with, and role of, impacted communities in the *Floyd-Davis* Monitorship. Community stakeholders have had very little contact with the Court-appointed Monitor and his team in the past three years and have not had an audience with the Court during the entire six-and-a-half years of the Monitorship. In addition, participants in the Monitorship are bound by a broad confidentiality order that inhibits their ability to share almost any information about the remedial process with community partners, impacted community members, and the general public. The Monitor has also completely omitted community members' perspectives from his assessments of the

constitutionality of the NYPD's stop-and-frisk and trespass enforcement practices, particularly their experiences with how those practices actually operate on the street and in public housing residences. This omission is especially striking in the Monitor's assessments of Fourteenth Amendment compliance, which rely exclusively on the NYPD's incomplete stop-and-frisk data, statements of NYPD personnel, and civilian complaints that were recognized by this Court as an unreliable measure of the constitutionality of officer conduct to determine whether and to what extent NYPD stop-and-frisk and trespass enforcement encounters are still motivated by race.

The exclusion of impacted communities makes the *Floyd-Davis* Monitorship an outlier among federal court-mandated police monitorships nationally and is especially concerning in this current moment of citywide and national reckonings with police misconduct and racial injustice. The past year of public outcry about racially discriminatory and abusive policing—and the NYPD's often indifferent and sometimes violent responses to it—echo the "divisive public conflicts over stop and frisk" of a decade ago, which convinced the Court to require robust community involvement in the *Floyd-Davis* remedial process in the first place. *Floyd* ECF No. 372 at 30. By denying impacted community members a voice in the stop-and-frisk and trespass enforcement reform process at this stage, the Monitorship risks being out-of-touch with—and unresponsive to—both the national conversation and New Yorkers' clear demands for real, measurable, and fundamental change, which in turn seriously threaten the Monitorship's legitimacy. Moreover, without hearing from people actually subjected to NYPD stop-and-frisk and trespass enforcement encounters and without using more robust and reliable qualitative measures to assess racial bias, the Monitor and Court cannot accurately determine whether those encounters are conducted constitutionally and in a non-discriminatory manner, thus making it unclear whether the Court-ordered stop-and-frisk and trespass enforcement reforms have in fact been successful.

Plaintiffs therefore respectfully request that the Court exercise its broad equitable powers to remedy the NYPD's widespread constitutional violations by modifying the Remedial Order in certain modest but significant ways, as set forth more fully below and in the Proposed Order attached to this motion.[1] *See* Proposed Order to Modify the *Floyd* Remedial Order ("Proposed Order"). If enacted, these measures will ensure a meaningful role for community stakeholders in the Monitorship going forward, as well as more accurate assessments of the constitutionality of the NYPD's stop-and-frisk and trespass enforcement practices.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The *Floyd* Liability and *Davis* Summary Judgment Rulings

#### 1.   *Floyd Liability Opinion*

In its August 2013 ruling that the NYPD's stop-and-frisk policies and practices violated the Fourth and Fourteenth Amendments, the Court relied on far more than the racial disparities in the NYPD's stop report data. Specifically, the Court found evidence of the NYPD's racially discriminatory intent in its *de facto* policy of targeting "the right people"—i.e., young Black and Latinx men—for stops based on these two demographic groups' over-representation in general crime suspect data, a policy which was articulated in the oral testimony and off-the-record oral statements of NYPD officers, precinct-level commanders, and senior executives. *Floyd* Liability Opinion, ECF No. 373, at 82-88, 183-88.[2] The Court also found that NYPD officials had, for more

---

[1] Plaintiffs additionally intend to engage with the Monitor and the NYPD about modifying the Confidentiality Order, *Floyd* ECF No. 650, while still protecting truly sensitive information, to resolve the separate concern of how the Order undermines community engagement and the legitimacy of the Monitorship due to its extraordinarily broad provisions. As the declarations submitted in support of this motion by various community representatives demonstrate, the Confidentiality Order has prevented open communication about quite basic aspects of the remedial process, thus alienating community members from the process. *See* Charney Decl. Ex. 1 ¶ 16 , Ex. 2 ¶ 25, Ex.3 ¶¶ 23-25, Ex. 4 ¶¶ 13-14. It has also hindered the ability of Plaintiffs' counsel to engage members of the classes they represent and placed a veil of secrecy around what could and should be a more transparent process. However, Plaintiffs remain hopeful that the parties can achieve consensus on this important issue and, thus, do not seek the Court's intervention regarding the Confidentiality Order at this time.

[2] The Court labeled this policy "indirect racial profiling." *See Floyd* ECF No. 373 at 13, 61.

than a decade, been aware of and deliberately indifferent to community members' concerns about unconstitutional stops and racial profiling and that the NYPD's disciplinary system had systematically failed to hold officers accountable for their unconstitutional and racially discriminatory conduct during *Terry* stop encounters. *Id*. at 105-13.

In addition, the Court held that stops targeting Black and Latinx pedestrians violated the Fourteenth Amendment *even if supported by reasonable suspicion* because "[t]he Equal Protection Clause's prohibition on selective enforcement means that suspicious [B]lacks and Hispanics may not be treated differently by the police than equally suspicious whites." *Floyd* ECF No. 373 at 192. "[T]he targeting of certain races *within* the universe of suspicious individuals is especially insidious," the Court explained, "because it will increase the likelihood of further enforcement actions against members of those races as compared to other races, which will then increase their representation in crime statistics," so that "these races may then be subjected to even more stops and enforcement, resulting in a self-perpetuating cycle." *Id*. at 191-92 (emphasis included).

2. *Davis Rulings*

Although the *Davis* case did not go to trial or result in specific findings of fact and conclusions of law, this Court's summary judgment rulings make clear that the lawfulness of the NYPD's trespass enforcement policies and practices in public housing developments are of particular concern. In denying the City's motion for summary judgment on the Fourth and Fourteenth Amendment claims, the Court ruled, *inter alia*, that a "reasonable juror could conclude that the City has engaged in a practice of making unconstitutional stops and arrests in and around NYCHA buildings as part of its trespass enforcement practices, and that this practice is sufficiently persistent and widespread to serve as a basis for *Monell* liability." *Davis* ECF No. 268 at 54-55.

On the issue of intentional discrimination, the Court ruled that, "[i]n the absence of any

racially neutral explanation for this correlation, a reasonable juror could draw the troubling inference that the NYPD regards crimes by African Americans in NYCHA housing as a source of greater concern than identical crimes by similarly situated non-African Americans, and treats similar crime levels more aggressively when they occur in NYCHA buildings containing a higher proportion of African Americans." *Id.* at 70. The Court further noted that "[i]f the *Floyd* Plaintiffs succeed in showing that a discriminatory purpose has been a motivating factor for the NYPD's stop and frisk practices in general, . . . it is possible that the *Davis* Plaintiffs could show a discriminatory purpose in part based on evidence of *similarities* and *connections* between the NYPD's trespass enforcement program in NYCHA buildings and the stop and frisk policies outside of those buildings." *Id.* at 73 (footnote omitted). The *Floyd* Plaintiffs successfully proved discriminatory purpose at trial. *See Floyd* ECF No. 373 at 181-92.

### B. Key Provisions of the *Floyd* Remedial Order and *Davis* Settlement

#### 1. *Floyd Remedial Order*

In its August 2013 Remedial Order, the Court made clear that the purpose of the Court-ordered remedies—and the ultimate goal of the Court Monitorship—is "to ensure that the [stop-and-frisk] practice is carried out in a manner that protects the rights and liberties of all New Yorkers," and it described those remedies as comprising "a permanent injunction requiring the NYPD to conform its practices to the Constitution." *Floyd* ECF No. 372 at 2, 6.

Among the immediate reforms that the Order required the NYPD to develop, submit for, and *implement* upon Court approval was revision of its racial profiling policy "to make clear that targeting 'the right people' for stops, as described in the Liability Opinion, is a form of racial profiling and violates the Constitution." *Id.* at 17 (footnote omitted). Going forward, "[w]hen a stop is not based on a specific suspect description, . . . race may not be either a motivation or a justification for the stop," and "[NYPD] officers must cease the targeting of young [B]lack and

Hispanic males for stops based on the appearance of these groups in crime complaints." *Id*.

The Remedial Order further directed the Monitor to "regularly conduct compliance and progress reviews to assess the extent to which the NYPD has implemented and complied with" the Court-ordered reforms, and to detail the level of NYPD compliance with these reforms in six-month status reports to be filed with the Court and released to the public. *Id*. at 12-13. In addition, while the Order authorized the Monitor to determine which metrics he will use to assess the NYPD's compliance with the Court-ordered reforms, the Monitor is "subject to the supervision and orders of the Court," which "retains jurisdiction to issue orders as necessary to remedy the constitutional violations described in the Liability Opinion." *Id.* at 11-12.

Lastly, in establishing the JRP, the Court emphasized the importance of robust and meaningful community involvement in the remedial phase of the case to ensure the legitimacy and success of the Court-ordered reforms. *Id.* at 28-29 ("Although the remedies in this Opinion are not issued on consent and do not arise from a settlement, community input is perhaps an even more vital part of a sustainable remedy in this case. . . If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful."). The Court recognized that communities directly impacted by the NYPD's stop-and-frisk practices offer a "distinct perspective that is highly relevant to crafting effective reforms," which neither the Court, the Monitor, the parties, nor their attorneys can adequately represent. *Id*. at 29 ("No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety. . . Neither an independent Monitor, nor a municipal administration, nor this Court can speak for those who have been and will be most affected by the NYPD's use of stop and frisk."). The Court also specified that "an essential aspect of the [JRP] Reforms will be the development of an improved system for monitoring, supervision,

and discipline" of NYPD officers, and suggested that even the Court-mandated Immediate disciplinary reforms regarding the NYPD's Department Advocate's Office may, because of their complexity, be more appropriately developed through the JRP. *Id.* at 24.

2. *Davis Settlement*

In lieu of trial, the *Davis* parties negotiated a settlement agreement to resolve *Davis* Plaintiffs' claims, which was endorsed by this Court. Court Endorsed Stipulation of Settlement and Order dated February 4, 2015, *Davis* ECF No. 330 ("Stipulated Settlement"). The Stipulated Settlement provides that, "for purposes of resolving Plaintiffs' claims in [*Davis*], the Court-Ordered Monitoring related to trespass enforcement in or around NYCHA residences will be identical to the Court-Ordered Monitoring in the Floyd Remedies Opinion[.]" *Id.* at 10-11. The subsequent Stipulation and Order Incorporating the Terms and Provisions of the *Floyd/Ligon* Remedial Order into *Davis* ("Incorporation Stipulation"), endorsed by this Court on August 1, 2019, made the full incorporation of the Court monitoring and JRP into the *Davis* case clear:

> The terms and provisions of the *Floyd/Ligon* Remedial Order are incorporated in full into [*Davis*], including without limitation the duties of the Monitor and the Joint Remedial Process, for the purpose of enforcing the Stipulation of Settlement and Order as it pertains to reforms to the NYPD's practices that related to trespass enforcement in or around NYCHA residences, including training, supervision, monitoring, and disciplining of officers.

*Davis* ECF No. 481 ("Incorporation Stipulation") at 8. Importantly, this Incorporation Stipulation specifically empowered the Monitor to oversee the NYPD's compliance with the Fourth and Fourteenth Amendments and New York State common law in connection with trespass enforcement in NYCHA residences—the central issue in *Davis*:

> The duties of the Monitor in the Court-Ordered Monitoring in the [*Davis*] shall be identical to the duties of the Monitor in the Court-Ordered Monitoring in the *Floyd/Ligon* Remedial Order, except that the Monitor's duties, responsibilities, and authority in [*Davis*] shall be no broader than necessary to ensure that the NYPD's practices

related to trespass enforcement in or around NYCHA residences, including training, supervision, monitoring, and discipline of officers, are in compliance with the Fourth and Fourteenth Amendments to the United States Constitution and New York State common law.

*Id.* at 8-9.

## C. Impacted Communities' Limited Engagement with the *Floyd-Davis* Monitorship

### 1. *The Joint Remedial Process*

In his role as the Court-appointed Facilitator of the JRP, the Honorable Ariel Belen (ret.) and his team spent a year and a half working closely with various community stakeholder organizations to convene 64 focus groups and 28 community forums with more than 2,000 individuals from those New York City communities most adversely impacted by the NYPD's unconstitutional and racially discriminatory stop-and-frisk and trespass enforcement practices[3] to obtain their input on reform. *New York City Joint Remedial Process: Final Report and Recommendations*, *Floyd* ECF No. 597, at iii-iv, 34-36, 37-38. During the early stages of the JRP, Judge Belen also convened an Advisory Committee, comprised of representatives from various JRP stakeholders, to provide him with advice and input on how to effectively structure the process for gathering such community input. *Id.* at 33-34. This committee met monthly during much of the JRP, and "became a vehicle for dialogue" on substantive remedial issues. *Id.* at 34.

Based on the extensive community input he received, Judge Belen recommended fourteen separate stop-and-frisk and trespass enforcement-related reforms for Court approval, some of which are relevant here. First, he recommended that, "during the length of the Monitorship," an annual community survey "be designed and conducted by an outside entity in collaboration with

---

[3] The 64 focus groups included 40 that focused on street *Terry* stops and 24 that focused on trespass enforcement, and they were conducted in collaboration with community organizations, advocacy groups, community centers within NYCHA developments, and the NYPD. The 28 community forums were held throughout all five boroughs of New York City. *Floyd* ECF No. 597 at ii-iii.

the NYPD and in consultation with community stakeholders with significant insight on policing issues" to assess "public perception of police-community relations and of police-civilian street encounters, and to assess the public's experience with Court-ordered reforms." *Id.* at 250.

In addition, Judge Belen recommended the formation of a "Community Collaborative Board" ("CCB"), comprised of representatives from several "community groups and organizations active in police reform," who would advise and provide input to the NYPD, Monitor, and Court on the NYPD's implementation and compliance with the Court-ordered reforms and "the impact [those reforms] are having on affected communities." *Id.* at 244-46. Judge Belen explained that "community members have asked for a formal mechanism to offer feedback on the Court-ordered reforms during the course of the Monitorship," and that, "[i]n the absence of the CCB, the facilitation and outreach efforts of the Joint Reform Process will come to an abrupt stop, depriving individuals most affected by these reforms from having their voices heard." *Id.* at 247.

Eleven of Judge Belen's fourteen JRP reform recommendations, including the two described above, remain pending before the Court.

2. *Lack of Community Engagement After the Completion of the Joint Remedial Process*

The JRP officially came to an end when Judge Belen filed his Final Report and Recommendations in May 2018, *Floyd* ECF No. 597. The parties and several JRP stakeholders filed their responses to the Final Report with the Court in June and July 2018. *Floyd* ECF Nos. 602-604, 611-613, 616-617. Unfortunately, in the three years since, Judge Belen's fears about "the abrupt stop" of community outreach efforts and silencing of community members' voices in this Monitorship have come to pass. *Floyd* ECF No. 597 at 247. In stark contrast to the Monitor's frequent focus groups with NYPD line officers and supervisors, *see* Monitor's Tenth Status Report, *Floyd* ECF No. 754, at 10, 72; Monitor's Eleventh Status Report, *Floyd* ECF No. 795-1, at 13, the

Monitor team has not, to Plaintiffs' knowledge, regularly met with or otherwise attempted to gather information from community members about their experiences with the NYPD's stop-and-frisk and trespass enforcement practices. Moreover, the public's primary sources of information about recent Monitorship developments and the status of Court-ordered reforms are the Monitor's voluminous, highly technical, and irregularly-scheduled status reports to the Court, which are only available on the Court's PACER system and the Monitor's website, whose existence has never been publicized. *See*, *e.g.*, *Floyd* ECF Nos. 680-1, 754, 795-1.

Unsurprisingly, these stakeholders have begun to feel shut out of the Monitorship and to lose faith in its ability to bring about meaningful and lasting changes to the NYPD's stop-and-frisk and trespass enforcement practices. In late February 2020, WNYC New York City Public Radio ran a two-part story on the current status of the Court-ordered reform process, part two of which focused on community members' views of the process. The story included interviews with community members who voiced frustrations about the lack of opportunities to share their experiences with the Monitor and the Court.[4] These interviewees also expressed doubts about whether the Monitor could successfully reform the NYPD's stop-and-frisk practices without regularly consulting with community members and learning their perspectives.[5]

These sentiments are echoed by many representatives of the very same community organizations that participated extensively in the JRP—serving on the JRP Advisory Committee and attending and even helping to organize and facilitate several of the focus groups and community forums—who, for the past three years, have been largely unable to provide much input to, or receive updates from, the Monitor or the Court on the NYPD's current stop-and-frisk and

---

[4] See Yasmeen Khan, The Unfinished Business of Bloomberg Era Stop-and-Frisk- Part 2, WNYC Radio (Feb. 25, 2020), available at https://www.wnyc.org/story/unfinished-business-bloomberg-era-stop-and-frisk-part-2/.
[5] *Id.*

trespass enforcement activity or the progress of the Court-ordered reforms. *See* Charney Decl., Ex 1. ¶¶ 13-16, 18; Ex. 2 ¶¶ 20-24; Ex. 3 ¶¶ 27-38; Ex. 4 ¶¶15-25; Ex. 5 ¶¶ 6-7.

### D.  Persistence of Racial Bias by the NYPD

Even as the lack of ongoing, meaningful community engagement threatens this Monitorship's legitimacy, recent events demonstrate the persistence of racial bias within the NYPD that further delegitimizes a Monitorship that was supposed to address this very problem.

For example, in the spring of 2020, media reports and NYPD arrest and summons data revealed stark racial disparities in how the NYPD was enforcing a series of New York State and City emergency executive orders regarding social distancing and mask-wearing that were issued in response to the COVID-19 pandemic.[6] This racially disparate enforcement activity led to widespread public outcry, serious concerns expressed by local elected officials, an emergency motion by the *Floyd* and *Davis* Plaintiffs, and this Court's acknowledgement that some of the activity fell "squarely within the ambit of *Floyd v. City of New York*."[7]

In late May and early June 2020, when the murder of George Floyd by Minneapolis police officers "galvanized historic levels of public engagement and calls for change across the country, including in New York,"[8] thousands of New Yorkers from diverse backgrounds took to the streets to march in protest against police abuses and racial injustice, but were repeatedly met with the kind

---

[6] Josiah Bates, Police Data Reveals Stark Racial Discrepancies in Social Distancing Enforcement Across New York City, TIME (May 8, 2020), available at https://time.com/5834414/nypd-social-distancing-arrest-data/.

[7] Dean Meminger and Catalina Gonella, Over 80 Percent of Social Distancing Summonses Went to Black or Hispanic People, NYPD Says, NY1 (May 8, 2020), available at https://www.ny1.com/nyc/all-boroughs/news/2020/05/09/most-social-distancing-summonses-went-to-black-or-hispanic-people; see also New York City Council Fiscal Year 2021 Executive Budget Hearings before the Committee on Public Safety, 2020 NYC Council (May 14, 2020), available at https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=783198&GUID=6D7B527A-48AF-4000-BA17-6CA9C5400764&Options=&Search=; Floyd ECF No. 760, ECF No. 790 at 8.

[8] *See* Brief for City Appellees in *Uniformed Fire Officers Ass'n, et al. v. de Blasio, et al.*, No. 20-2789, ECF No. 269 at 10 (2d Cir. Oct. 29, 2020).

of police violence they were marching to end.[9] The NYPD's heavy-handed and often violent responses to these protests were the subject of scathing reports by state and local government agencies and an internationally-recognized human rights organization, as well as federal lawsuits by the New York State Attorney General, civil rights organizations, and private civil rights attorneys, many of whom are counsel in *Floyd* and *Davis*.[10]

Concerns about racial bias within the NYPD erupted yet again late last year, when newspapers began reporting on a series of explicitly racist, misogynist, and homophobic posts by an NYPD member with the screen name "Clouseau" on the message board Law Enforcement Rant.[11] Those posts referred to Black and Latinx New Yorkers as "urban ghetto types" and claimed that "25,000 years of evolution continues to elude these poor unfortunate creatures."[12] Another post by "Clouseau" described the family of Eric Garner, a Black man killed by NYPD, as a "grape soda drinkin,' cheese doodle and chicken wing eatin' . . . family of bastard children and grandchildren." "Clouseau" also described public housing residents in East Harlem as "savages" and suggested that City Council Speaker Corey Johnson, an openly gay man, deserved to be sexually assaulted for criticizing the NYPD's stop-and-frisk practices. Investigations by the New

---

[9] Allison McCann et al., N.Y.P.D. Says It Used Restraint During Protests. Here's What the Videos Show, N.Y. TIMES (July 14, 2020), available at https://www.nytimes.com/interactive/2020/07/14/nyregion/nypd-george-floyd-protests.html; Amanda Luz Henning Santiago, Even black lawmakers get pepper-sprayed, CITY AND STATE NEW YORK (June 3, 2020), available at https://www.cityandstateny.com/articles/politics/news-politics/even-black-lawmakers-get-pepper-sprayed.html.

[10] *See* Human Rights Watch, "Kettling" Protesters in the Bronx: Systemic Police Brutality and Its Costs in the United States (Sep. 30, 2020), available at https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states; N.Y.C. Dep't of Invest., Investigation into NYPD Response to the George Floyd Protests (Dec. 2020), available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf ("The inconsistent application of the curfew similarly generated legitimate public concerns about selective enforcement."); N.Y.S. Office of the Attorney General, Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd, ("AG Report") (July 2020), available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf; In re: New York City Policing During Summer 2020 Demonstrations, 21-cv-533 (CM) (S.D.N.Y. 2021).

[11] William K. Rashbaum and Alan Fleuer, *N.Y.P.D. Anti-Harassment Official Accused of Racist Rants*, N.Y. TIMES (Nov. 5, 2020), *available at* https://www.nytimes.com/2020/11/05/nyregion/james-kobel-nypd-racism.html.

[12] *Id.*

York City Council, the *New York Times*, and the NYPD Internal Affairs Bureau revealed that the author of the posts was Deputy Inspector James F. Kobel—the commanding officer of the NYPD's Office of Equal Employment Opportunity.[13]

### E.  The Monitor's Compliance Metrics and Recent Status Reports

Beginning in March 2019 and continuing for several months thereafter, the Monitor and the parties met to discuss the metrics and methodologies to be used in assessing the NYPD's compliance with the Court-ordered Immediate and Joint Process reforms in *Floyd*, *Davis*, and *Ligon*. In advance of the first meeting, *Floyd* and *Davis* Plaintiffs sent a letter to the Monitor outlining several elements they felt must be included in the Monitor's compliance assessment plan, including community surveys recommended by the Court-appointed JRP Facilitator and mechanisms for keeping community stakeholders abreast of Monitorship developments and the status of Court-ordered reforms beyond the Monitor's voluminous and highly technical status reports. *See* Charney Decl., Ex. 6 (Plaintiffs' March 18, 2019 Letter to the Monitor) at 1-2.

In July 2019, the *Floyd* and *Davis* Plaintiffs sent the Monitor a memorandum outlining several metrics—beyond statistical analyses of the NYPD's incomplete stop report data—for assessing compliance with the Fourteenth Amendment racial profiling aspects of the Court's orders. These included: (i) field-based performance (as opposed to stop report) audits of NYPD officers' investigative encounter activity to assess racially selective enforcement; and (ii) community surveys to assess whether community members' experiences with stop-and-frisk differ by race. Charney Decl., Ex. 7 (*Floyd* and *Davis* Plaintiffs July 22, 2019 Mem.) at 6-8. Notably, the Monitor's own biased-policing expert, Dr. Jennifer Eberhardt, recommended the

---

[13] New York City Council, A Report on NYPD Deputy Inspector James Francis Kobel and "Clouseau," (Nov. 2020) *https://council.nyc.gov/press/wp-content/uploads/sites/56/2020/11/PDF-FINAL-combined-Clouseau-Report-public-11-5-20-1-1.pdf*

latter of these two metrics in her study of biased policing practices in Oakland, California.[14]

In December 2019 and October 2020, the Monitor submitted to the Court versions of the "Compliance Metrics" he intends to use to assess the NYPD's compliance with the Court-ordered reforms. *Floyd* ECF Nos. 752-2, 795-1 Appendix. A. Neither version includes community surveys or any other metric that measures community members' experiences with being stopped-and-frisked or subjected to NYPD trespass enforcement actions in public housing. In addition, both versions identify only three metrics for assessing compliance with the Fourteenth Amendment racial profiling aspects of the *Floyd* orders and *Davis* settlement: (i) analyses of the incomplete NYPD stop report data, (ii) reviews of NYPD biased policing complaint investigation files, data and investigator trainings, and (iii) reviews of unspecified "communications from NYPD leadership (executives, [commanding officers] and others)." *See id.* at Tasks 2b,[15] 35b.

In October 2020, the Monitor filed his Eleventh Status Report, noting that the underreporting of NYPD stops-and-frisks was an ongoing problem acknowledged by NYPD leadership, supervisors, and line officers and "explicitly identified in NYPD audits." *Floyd* ECF No. 795-1 at 13. The NYPD's most recent "RAND" audit found that NYPD officers failed to document 44% of their stops with stop reports. And this was an improvement; the audit done six months earlier had found that 50% of stops went unreported. *Id.* at 83-84, Chart 20. Similarly, the NYPD's quarterly police-initiated enforcement audits from the first quarter of 2016 through the third quarter of 2019 found that NYPD officers failed to complete stop reports for between 38%

---

[14] See Jennifer L. Eberhardt, *Strategies for Change: Research Initiatives and Recommendations to Improve Police-Community Relations in Oakland, California* at 49-50 (Stanford Univ. 2016), available at http://www2.oaklandnet.com/%20oakca1/groups/police/documents/webcontent/oak059292.pdf

[15] Plaintiffs note that the "Methodology for Assessing and Achieving Compliance" column of Task 2b cuts off vital information as filed in the 11th Report. The Monitor's Compliance Metrics attached to the 10th Report suffer from similar formatting issues which cut off similarly important metrics. The Monitor's Compliance Metrics should be formatted such that all criteria are clearly viewable and compliance is able to be tracked over time. *See e.g.*, *Melendres v. Penzone*, No. 07-cv-2513, ECF No. 2594 at 6-9 (D. Ariz. Feb. 9, 2021).

14

and 74% of their stops that resulted in arrests. *Id*. at 85, Chart 22. The Monitor also acknowledged that "[a]ny assessment of compliance with the Court's remedial orders will be impossible unless the Department finds ways to ensure that unreported stops are no longer an issue." *Id.* at 13-14.

In his Twelfth Status Report, filed in November 2020, the Monitor reported on the results of the Court-ordered body-worn camera ("BWC") pilot that ran from April 2017 to November 2018. *Floyd* ECF No. 798-1. Among the Report's findings were that stop reports completed by officers wearing BWCs were more likely to involve Black pedestrians and less likely to be judged lawful by the Monitor team and NYPD auditors than stop reports completed by officers who did not wear BWCs. *Id*. at 74. The Monitor concluded that, taken together, these findings "may mean that the undocumented encounters could be obscuring continued stop practices and patterns that violate the 4th Amendment and the Equal Protection Clause of the 14th Amendment." *Id*. Nonetheless, the Monitor has not proposed modifications to the "Compliance Metrics" to reduce his reliance on the NYPD's own stop report data.

## III.    ARGUMENT

Because the Monitor's current Compliance Metrics will not adequately assist this Court in assessing the NYPD's substantial compliance and do not reflect the Court's recognition of the important role of impacted communities in the overall remedial process, Plaintiffs request that the Court amend the Remedial Order to include among the compliance assessment and progress reviews: (1) annual community surveys, and (2) semiannual field audits of stop-and-frisk and trespass enforcement activity.  Proposed Order at ¶ 1. Plaintiffs further request that this Court hold public status conferences at least twice a year. *Id.* ¶ 2. Finally, Plaintiffs request that the Court appoint a Community Collaborative Board ("CCB"), as recommended by the Court-Appointed Facilitator, and that this CCB advise the Monitor and the Court on the NYPD's implementation of

the various Court-ordered reforms in the field and have direct input into, among other things, developing the contours of all discipline reforms submitted for Court approval. *See Id*. ¶¶ 3-4.

Plaintiffs' proposed amendments to the Remedial Order not only adhere to, but *advance*, the purpose of the Order as incorporated into the *Davis* settlement. *Floyd* ECF No. 372 at 2. ("The purpose of this Opinion . . . is to determine what remedies are appropriate . . . to ensure that the practice is carried out in a manner that protects the rights and liberties of all New Yorkers."). In the almost eight years since the Remedial Order was issued, the Court-appointed Monitor has not fulsomely employed appropriate and valuable qualitative and quantitative methods to assess Defendants' compliance with the Fourteenth Amendment. With greater inclusion of community perspectives, Plaintiffs' proposed outcome metrics would further the goal of the *Floyd* and *Davis* remedies and better assist this Court in accurately assessing the NYPD's compliance. This Monitorship also continues to lack the transparency of other police monitorships with regards to community engagement and involvement, which, absent the requested modifications, will continue to threaten its legitimacy and harm the public interest. *See* Section III.B., *infra*.

**A.  The Court Has the Power to Modify the Remedial Order as Plaintiffs Request**

"The power of a court of equity to modify a decree on injunctive relief is long-established, broad, and flexible." *Brown v. Plata*, 563 U.S. 493, 542 (2011) (quoting *N.Y.S. Assn. for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983)); *In re Tronox Inc*., 855 F.3d 84, 112 (2d Cir. 2017) ("The [d]istrict court plainly had jurisdiction to interpret and enforce its own prior order. . . . The court's choice of how to enforce the order is reviewed for abuse of discretion.") (internal quotation marks, citation, and alterations omitted). "It is well recognized that in institutional reform litigation . . . judicially-imposed remedies must be open to adaptation . . . when a better understanding of the problem emerges[.]" *Ass'n against Discrimination in Emp't, Inc. v.*

*Bridgeport*, 710 F.2d 69, 74 (2d Cir. 1983) (quoting *Carey*, 706 F.2d at 969).

"An important question in this inquiry is whether the objective of the injunction has been achieved." *Aurelius Capital Master, Ltd. v. Republic of Arg.*, 644 F. App'x. 98, 106 (2d Cir. 2016). Where "it is not the enjoined party that seeks relief from an injunction but the injunction's beneficiary that seeks to enforce it more effectively, equity countenances the modification of an injunctive decree if 'a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes.'" *Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228, 244 (S.D.N.Y. 2004) (quoting *King-Seeley Thermos Co. v. Aladdin Industries, Inc.*, 418 F.2d 31, 35 (2d Cir. 1969)). This is true even when defendants have made their best efforts to comply with the terms of the injunction. *Carey*, 706 F.2d at 970-71 ("Where an affirmative obligation is imposed by court order on the assumption that it is realistically achievable, the court finds that the defendants have made a good faith effort to achieve the object by the contemplated means, and the object nevertheless has not been fully achieved, clearly a court of equity has power to modify the injunction in the light of experience.") (internal citations and quotations omitted). Modification is also appropriate "when enforcement of the decree without modification would be detrimental to the public interest." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384 (1992) (internal citation omitted).

As set forth below, it has become increasingly evident that, notwithstanding the NYPD's implementation of the more process-oriented of the Court-ordered reforms  (*e.g.,* new trainings, Patrol Guide changes, new audit and stop documentation protocols), the Monitorship's legitimacy and ability to achieve the *Floyd* Remedial Order's stated goal of constitutional, unbiased policing are at great risk due to the absence of ongoing, meaningful community involvement and the Monitor's narrow compliance metrics. Thus, the Court is well within its broad powers to modify

the *Floyd* Remedial Order to address these very real obstacles to a successful Monitorship.

Plaintiffs' request for modification also has clear precedent in other federal court police monitorships. It is common—in fact, it is standard practice—for outcome metrics to be re-assessed over the course of a monitorship in light of experience. Since approximately 2010, the U.S. Department of Justice's Civil Rights Division has included in nearly every police reform consent decree and court-ordered settlement agreement a provision requiring the monitor to conduct a "comprehensive re-assessment" of whether modifications to the consent decree, including modification of the metrics established for assessing substantial compliance, are necessary in light of changed circumstances or an assessment of whether the consent decree is achieving its essential aims.[16] According to the Civil Rights Division, the purpose of such a provision "is to ensure that the outcome measures respond to the dynamic nature of policing and continue to properly assess whether the underlying goal of police reform—to restore community trust and promote effective, constitutional policing—is being accomplished."[17] Such goals should likewise guide this Court when evaluating the efficacy of the Remedial Order in light of the significant concerns raised by Plaintiffs in this motion. Indeed, amendments or modifications to injunctions have been obtained by plaintiffs in other federal police reform litigation even several years into the monitoring phase.[18]

## B.  Lack of Community Engagement and Deficiencies in the Monitor's Compliance Metrics Threaten the Legitimacy and Success of the Monitorship

The aforementioned exclusion of community stakeholders and the Monitor's narrow

---

[16] *See, e.g., United States v. Police Dep't of Baltimore*, 17-CV-0099, ECF No. 2-2 ¶¶ 469-70 (D. Md. Jan. 17, 2017) (requiring re-assessment every two years); *United States v. City of Newark*, 16-CV-1731, ECF No. 4-1 ¶ 182 (D.N.J. Apr. 29, 2016); *United States v. City of Ferguson*, 16-CV-181, ECF No. 41 ¶ 437 (E.D. Mo. Apr. 19, 2016); *United States v. City of New Orleans*, 12-CV-1924, ECF No. 159-1 ¶ 456 (E.D. La. Jan. 11, 2013).

[17] U.S. Dep't of Justice, Civil Rights Division, *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present* 25 (Jan. 2017), available at https://www.justice.gov/crt/file/922421/download.

[18] *See Melendres v. Penzone*, *supra*, ECF No. 2431 at 4-8 (D. Ariz. June 3, 2019) (modifying provisions of 2013 permanent injunction to require that Monitor, rather than defendant sheriff's office, hold regular public meetings to update members of the public on defendant's implementation of the injunction).

metrics for assessing Fourteenth Amendment compliance threaten the success of the entire Court-Ordered stop-and-frisk and trespass enforcement reform process in two important ways.

*First*, as the Court recognized, "[i]f the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful." *Floyd* ECF No. 372 at 29. By not consistently engaging with members of those communities most impacted by the NYPD's stop-and-frisk and trespass enforcement practices for the past three years or including their perspectives in assessments of the NYPD's compliance with the Court-ordered stop-and-frisk and trespass enforcement reforms, the Monitorship has put the legitimacy of those reforms at risk. As discussed *supra*, many of these community stakeholders are frustrated by the lack of information about many of the Court-ordered reforms and the lack of opportunities to provide their own views on how NYPD stop-and-frisk and trespass enforcement encounters are playing out in people's lives and thus have begun to lose faith in the Monitorship's ability to meaningfully change the NYPD's stop-and-frisk and trespass enforcement practices. *See* Charney Decl., Ex. 1 ¶¶ 13-16, 18, Ex. 2 ¶¶ 20-24; Ex. 3 ¶¶ 27-38, Ex. 4 ¶¶ 15-25, Ex. 5 ¶¶ 6-7.

Ensuring that communities most impacted by stop-and-frisk and trespass enforcement reforms "hav[e] their voices heard" at this stage of the Monitorship, *Floyd* ECF No. 597 at 247, is as critical to the legitimacy and success of the *Floyd-Davis* remedial process as it was in 2013. Much like the "divisive public conflicts over stop and frisk" of a decade ago, which led the Court to establish the JRP, *Floyd* ECF No. 372 at 30, the citywide protests of the past year against police violence and discrimination against Black people—and the NYPD's antagonistic and sometimes violent responses to them, *see* Section II.D, *supra*—have damaged the trust between the NYPD and the communities they police and highlighted the importance of centering the lived experiences and needs of historically over-policed communities of color in any successful effort to produce

real institutional change within the NYPD. By ignoring those experiences, this Monitorship seriously risks being out of touch with, and unresponsive to, the current moment and New Yorkers' demands for meaningful and fundamental changes to policing.

The risks that excluding impacted communities' perspectives pose to the legitimacy of a police reform process were recently illustrated by New York City's "Police Reform and Reinvention Plan,"[19] developed in response to Executive Order 203 issued by New York Governor Andrew Cuomo last June in the wake of George Floyd's murder and the ensuing protests. The Order directed local governments throughout New York State to convene with community stakeholders to develop police reform plans based on consultations with members of communities with high numbers of police interactions and "tailored to the specific needs of the community."[20] After months of delay and without meaningful engagement of community stakeholder groups in the planning process, the NYPD launched a series of "listening sessions" in October 2020 that were rolled out with little notice, using in-person invitations limited to carefully selected individuals and an agenda which community members played no role in developing. Unsurprisingly, this process drew widespread criticism from many quarters and undermined community confidence in the City's final Plan—submitted to the City Council in late March 2021—which was widely rejected by numerous community stakeholders who have long worked on police accountability and racial justice issues, including many who participated in the JRP.[21]

---

[19] NYC Police Reform and Reinvention Collaborative Draft Plan, Part 1 (March 5, 2021), *available at* https://www1.nyc.gov/assets/home/downloads/pdf/reports/2021/Final-Policing-Report.pdf; and Part 2, March 12, 2021, *available at* https://www1.nyc.gov/assets/policereform/downloads/Police_Reform_Part_2_Final.pdf.

[20] N.Y. Exec. Order 203 (June 12, 2020), *available at* https://www.governor.ny.gov/news/no-203-new-york-state-police-reform-and-reinvention-collaborative.

[21] Alice Fontier et al., This is Sham NYPD Reform: But As Usual, the Mayor and Commissioner Are Dodging, NY DAILY NEWS (Dec 15, 2020), available at https://www.nydailynews.com/opinion/ny-oped-this-time-we-need-fundamental-nypd-reform-20201215-kg4hyd3jdnc57ntyq6smq27o2e-story.html; Michael Gartland, 'The Mayor's Office Did Nothing': Advocates Blast de Blasio on State-Mandated Police Reform Efforts, N.Y. DAILY NEWS (Jan. 11, 2021), available at https://www.nydailynews.com/news/politics/new-york-elections-government/ny-nyc-nypd-reform-de-blasio-20210111-3v4fs7ymlvb3lk4xhlkyouepca-story.html; Ethan Geringer-Sameth, City Council Jumps

*Second*, the Monitor's current Compliance Metrics cannot accurately assess the NYPD's compliance with the Fourteenth Amendment and its own racial profiling policies, making it impossible to determine whether the goals of the Court-ordered reforms and this Monitorship have in fact been accomplished. The Monitor intends to assess compliance through: (i) statistical analyses of the NYPD Stop Report data; (ii) reviews of civilian profiling complaints and complaint data; and (iii) reviews of communications from NYPD leadership. *Floyd* ECF No. 795-1 at 114, Task 2b. Each of these metrics is at best incomplete, and, collectively, they fall short of providing enough information to accurately assess the NYPD's Fourteenth Amendment compliance.

The Monitor's reliance on NYPD officers' self-reported data about stops, while simultaneously ignoring the perspectives of those who are stopped, is especially troubling because, as long acknowledged by the Monitor, the Stop Report data is compromised by officers' significant and persistent underreporting.[22] The Monitor admits that "[a]ny assessment of compliance with the Court's remedial orders will be impossible unless the Department finds ways to ensure that unreported stops are no longer an issue."[23] Yet, such underreporting shows little sign of improving, as recent NYPD quarterly internal audits continue to indicate that officers are failing to record at least 40% of their stops on Stop Reports. *Floyd* ECF No. 795-1 at 84 Chart 20, 85-86 Chart 22. As this Court recognized, a data set missing this much information cannot be used to reliably analyze racial disparities in the NYPD's stop-and-frisk activity because of the risk of sample selection bias, *Floyd* ECF No. 373 at 58 n.193, a substantial risk in light of the Monitor's conclusion in his

---

Into Police Reform Action Amid De Blasio Delay in Meeting Cuomo Mandate, GOTHAM GAZETTE (Feb. 2, 2021), available at https://www.gothamgazette.com/city/10100-nypd-police-reform-de-blasio-cuomo-mandate; Letter from 50 Civil Rights Organizations to New York City Council Speaker Corey Johnson, dated March 25, 2021, available at https://www.changethenypd.org/releases/50-civil-rights-organizations-call-city-council-reject-resolution-mayor-de-blasio%E2%80%99s.

[22] *See, e.g.,* Monitor's Eleventh Status Report, *Floyd* ECF No. 795-1 at 19 ("The underreporting of stops has been acknowledged by the Department . . . and explicitly identified in NYPD audits.").

[23] *Id*. at 19-20.

Twelfth Status Report that underreporting of stops may be racially disparate. *Floyd* ECF No. 798-1 at 74. Moreover, even complete Stop Report data will never reveal instances of selective enforcement because officers do not document decisions *not* to stop suspicious white persons. *Doe v. Village of Mamaroneck*, 462 F.Supp.2d 520, 545 (S.D.N.Y. 2006) ("Because law enforcement agencies do not make or keep records on individuals they do not stop, and certainly not on 'similarly situated' individuals they do not stop. . . [,] the [individual] challenging a traffic stop for selective enforcement, must be allowed to show discriminatory effect in some other way.").

There are also inherent limitations in relying on civilian racial profiling complaints to measure the extent of racially discriminatory stop-and-frisk behavior within the NYPD. In its *Floyd* Liability Opinion, the Court noted that tracking civilian complaints against NYPD officers is an "ineffective" means of "monitoring unjustified stops because of the low likelihood that a wrongfully stopped person will have the knowledge and take the time to file a CCRB complaint." *Floyd* ECF No. 373 at 110 n.396. Moreover, the well-publicized and significant deficiencies in the NYPD's profiling investigations recently documented by the NYPD's Office of Inspector General ("NYPD-OIG") and the Monitor[24]—and the Department's resistance to several NYPD-OIG recommendations for improving those investigations[25]—have likely damaged what was already rather low public confidence in the civilian complaint process,[26] making it even less likely that

---

[24] *See, e.g.*, N.Y.C. Dep't of Invest., Office of the Inspector General for the NYPD, *Complaints of Biased Policing in New York City: An Assessment of NYPD's Investigations, Policies, and Training* (June 2019) available at www1.nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf; *see also* Monitor's 10th Report, *Floyd* ECF No. 754 at 74-76 (Jan. 7, 2020); Ali Watkins, *2495 Reports of Police Bias. Not One Was Deemed Valid by the NYPD*, N.Y. TIMES (June 26, 2019), available at https://www.nytimes.com/2019/06/26/nyregion/nypd-bias.html; Yasmeen Khan, *The NYPD Substantiated Its First Complaint of Biased Policing-But Not Against an Actual Officer*, WNYC NEWS (Dec. 10, 2020)**Error! Bookmark not defined.**, available at www.wnyc.org/story/nypd-substantiated-its-first-complaint-biased-policing-not-against-actual-officer/.
[25] N.Y.C. Dep't of Invest., Seventh Annual Report, Office of the Inspector General for the NYPD at 14-18 (April 2021), available at
https://www1.nyc.gov/assets/doi/reports/ pdf/2020/OIGNYPDAnnualRpt_4012021.pdf.
[26] *See Floyd* ECF No. 373, at 109-10.

people with meritorious racial profiling allegations will file complaints. Thus, the numbers and outcomes of civilian profiling complaints against NYPD officers almost certainly understate the extent of racial bias within the NYPD, and any recent reduction in the number of such complaints should not be considered evidence of improved Fourteenth Amendment compliance.

The Monitor also proposes that compliance will be achieved when communications from NYPD leadership and Stop Report narratives "do not indicate a targeting of defined racial or ethnic groups for stops because of their prevalence in local crime suspect data"[27]—again relying on NYPD personnel's own statements and writings or lack thereof. But there is also a high likelihood that that the Monitor's team will fail to detect messages from commanders and senior leaders about racial targeting. It is not clear how the Monitor could possibly detect such communications since NYPD executives and commanding officers are unlikely to express such views in writing or at RISKS or CompStat meetings where Monitor team members are present to observe.

### C. The Court Must Modify the Remedial Order to Ensure Robust Community Engagement with the Monitorship

It is therefore critical that communities most impacted by the NYPD's stop-and-frisk and trespass enforcement practices be able to engage with the Monitorship and remedial processes in a more direct, meaningful, and consistent way than they have over the past three years.

Meaningful and ongoing community engagement has been widely recognized as a necessary component of successful police monitorships. In its *2008 National Guidelines for Police Monitors*, the Police Assessment Resource Center ("PARC")[28] counseled that a "monitor should

---

[27] Monitor's Eleventh Status Report, *Floyd* ECF No. 795-1, at 114, Task 2b.

[28] Founded in 2001, PARC is one of the nation's leading independent, non-partisan police oversight and accountability research and consulting organizations, having consulted with more than a dozen of the largest municipal police departments around the nation and served as the independent monitor of both the Seattle Police and Los Angeles County Sheriff's Departments. About PARC, *available at* http://www.parc.info/about-parc.

establish protocols for communicating with the general public and stakeholders."[29] Because "the general public and stakeholders are likely to have considerable interest in the monitor's ongoing assessments of police performance," and because "a monitor needs to know how they view the police and evaluate progress[,] [m]onitors should regularly touch base with stakeholders and the general public, community groups, and their representatives."[30] Similarly, in its 2017 Report on more than 20 years of work in federal court monitorships of municipal police departments, the DOJ's Civil Rights Division noted that a "core" aspect "critical to the overall success" of a monitorship is to "constructively engage communities and stakeholders in the reform process."[31] The NYPD Monitor thus can and should do this kind of proactive community engagement in conjunction with the Community Collaborative Board discussed in Section III.D *infra*, just as the monitors have done in Seattle, Cleveland, and Maricopa County, Arizona.[32]

The Court should also adopt another critical public-facing feature of *all* the federal court police monitorships referenced in this brief: regularly-scheduled, public court status conferences with the Monitor and the parties. *See* Proposed Order ¶ 2. A review of the federal court dockets in all of these monitorships reveals that the court in each case typically held public status conferences with the monitor and the parties two or more times a year throughout the entire duration of the

---

[29] *See* PARC, *National Guidelines for Police Monitors* (2008) at 56, *available* at https://static1.squarespace.com/static/5498b74ce4b01fe317ef2575/t/54d3b1eae4b07e4908f9ed64/1423159786656/Monitoring+Guidelines.pdf; The *Floyd-Davis* Deputy Monitor, Richard Jerome, contributed to these 2008 Guidelines. *See id.* at 5.

[30] *Id.*

[31] See Civil Rights Division, U.S Dep't of Justice, *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present* at 21 (Jan. 2017), available at https://www.justice.gov/crt/file/922421/download.

[32] *See United States v. City of Seattle*, 12-cv-1282, ECF No. 3-1 ¶¶ 9, 192 (W.D. Wash. July 27, 2012) (providing that Monitor meet with Community Police Commission, which will hold public meetings "to discuss the Monitor's reports and to receive community feedback about [police department's] progress or compliance with the [settlement agreement]"); *United States v. City of Cleveland*, 15-cv-1046, ECF No. 7-1 ¶¶ 18(c), 379 (N.D. Ohio June 12, 2015) (same); *Melendres*, *supra*, ECF No. 670 ¶¶ 114(b), 117-18 (D. Ariz. April 4, 2014) (requiring monitor to attend meetings of Community Advisory Board, which will "gather concerns from the community about [sheriff's office] practices that may violate provisions of the [injunction].").

monitorship.[33] Regular public status conferences would facilitate community stakeholders' engagement with, and understanding of, the workings and current status of the *Floyd-Davis* Monitorship because they would be able to hear the perspectives from not only the Monitor, but also from Plaintiffs, the NYPD, and, most importantly, the Court itself. The Court should also emulate the Seattle and Ferguson monitorships in using the status conferences to hear directly from the Community Collaborative Board, as discussed below, about how the NYPD's Court-mandated stop-and-frisk and trespass enforcement reforms are implemented in the field. *Id.*[34] Providing this level of transparency will, in turn, help ensure community stakeholders can meaningfully participate in compliance assessments, as discussed in the next section.

### D.  The Court Must Modify the Remedial Order to Include Community Perspectives and Qualitative Metrics in the Monitor's Compliance Assessments

The Monitor cannot accurately assess whether NYPD officers are adequately implementing the Court-ordered stop-and-frisk and trespass enforcement policy changes in the field without hearing from the people who are being policed. As the Court has recognized, "no amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety," and "[n]either an independent Monitor, nor a municipal administration, nor this Court can speak for those who have been and will be most affected by the NYPD's use of stop and frisk." *Floyd* ECF. No. 372 at 29.

---

[33] In addition, in the ongoing federal court monitorship to reform the New York City Fire Department's racially discriminatory hiring practices, the presiding court has held quarterly public status conferences with the monitor and parties throughout the eight years of the monitorship. *United States v. City of New York*, 07-CV-2067 (E.D.N.Y.).

[34] *See* Verbatim Report of Proceedings before the Hon. James L. Robart, United States District Judge, June 30, 2015, *United States v. City of Seattle*, 12-cv-1282 (W.D. Wash.) at 5 (testimony by Community Police Commission at public status hearing); Transcript of Status Conference before Hon. Catherine D. Perry, U.S.D.J., Jan. 8, 2020, *United States v. City of Ferguson*, 16-Cv-00180 (E.D. Mo.), *available at* https://fergusonmonitor.com/wp-content/uploads/2020/02/Transcript-of-2020.01.08-A-Status-Conference.pdf (providing public comment period at in-person status conference); Transcript of Status Conference before Hon. Catherine D. Perry, U.S.D.J., June 4, 2020, *United States v. City of Ferguson*, 16-cv-00180, *available at* https://fergusonmonitor.com/wp-content/uploads/2020/06/Transcript-of-2020.06.04-Status-Conference.pdf (videoconference with publicly available livestreamed audio and pre-submitted public comments).

Given the unreliability of the Monitor's existing metrics for assessing any racial motivation in the NYPD's stop-and-frisk and trespass enforcement practices, the inclusion of community members' perspectives and more qualitative measures of racial bias is critical to ensure an accurate assessment of the NYPD's constitutional compliance. Thus, the Court should modify the Remedial Order to require that the Monitor's compliance assessments incorporate the following elements:

1. _Community Surveys_

First, the Court should adopt Judge Belen's recommendation that the Monitor retain an outside entity to work in consultation with community stakeholders with significant insight on policing issues to design and conduct annual community surveys to assess "public perception of police-civilian street encounters" and "the public's experience with Court-ordered reforms." _Floyd_ ECF No. 597 at 250; Proposed Order ¶ 1. Such surveys have frequently been used in federal court police monitorships to assess whether the monitored police department has achieved sustained improvements in constitutional policing, which it must do to achieve "substantial" or "full and effective" compliance with the requirements of the court-ordered consent decree.[35] In 2014, the City of Oakland, whose police department has been under a federal court monitorship for more than fifteen years,[36] engaged a research team led by the _Floyd-Davis_ Monitor's biased policing expert, Jennifer Eberhardt, to survey residents of different racial backgrounds about their attitudes towards and recent encounters with Oakland police.[37] Dr. Eberhardt has recommended such

---

[35] _See, e.g._, _United States v. City of Cleveland_, _supra_, ECF No. 7-1, ¶¶ 361, 363, 367, 401; ECF No. 214, Appendix A, (ALG Research, Key Findings and Recommendations for 2018 Biennial Survey of Community Perceptions of the Cleveland Division of Police) at 5-7, 13-15 (N.D. Ohio July 16, 2018); _United States v. City of Newark_, _supra_, ECF No. 4-1 ¶¶ 22-24, 174, 175, 222; _United States v. City of Newark_ Consent Decree: Independent Monitor Second Quarterly Report 35-37, App B and E (Oct. 6, 2017), available at   https://www.newarkpdmonitor.com/wp-content/uploads/2017/10/Monitoring-Team-Second-Quarterly-Report.pdf; _United States v. City of Ferguson_, _supra_, ECF No. 41 ¶¶ 429, 430, 434, 435, 462; ECF No. 128-2 (Ferguson Community Survey) (E.D. Mo. Jan. 31, 2020); _United States. v. Police Dep't of Baltimore_, _supra_, ECF No. 2-2; ¶¶ 23(a), 459(a), 506; ECF No. 302-1 (Community Survey Report) (D. Md. Mar. 26, 2020); _Illinois v. City of Chicago_, 17-cv-6260, ECF No. 703-1 ¶¶ 645-48 (N.D. Ill. Jan. 31, 2019); ECF No. 885 (N.D. Ill. Aug. 26, 2020).
[36] See _Allen v. City of Oakland_, 00-CV-4599 (N.D. Cal.).
[37] _See_ Eberhardt, _Strategies for Change_, _supra_ note 14, at 26-36.

surveys as a strategy to mitigate racial disparities and improve relations with communities of color because such "community data show where to look for racial disparities in stops" and allow police departments "to test the impact of . . . new policies on community attitudes over time."[38]

Community surveys that employ a participatory action research ("PAR") methodology encourage meaningful participation from community members who are most impacted by NYPD practices. This community-driven research methodology[39] can empower individuals directly impacted by NYPD stop-and-frisk and trespass enforcement practices to share critical information about how they actually experience encounters with police. PAR projects have been used to collect data about community experiences with police.[40] A PAR project coordinated by the City University of New York's Graduate Center and the New York Civil Liberties Union in 2016 and 2017 surveyed over 1,500 residents in New York City communities with historically high and historically low levels of stops-and-frisk activity to assess the extent that people experience investigative encounters differently depending on where they live. *See* Charney Decl., Ex. 8.

2. *Community Collaborative Board*

The Court should adopt, with some modifications, Judge Belen's recommendation for a Community Collaborative Board ("CCB") comprised of representatives of communities most heavily impacted by NYPD stop-and-frisk and trespass enforcement practices to advise and provide community stakeholder input to the Court and Monitor on the NYPD's implementation of the various Court-ordered reforms. *Floyd* ECF No. 597 at 244-46; Proposed Order ¶ 3. The

---

[38] *Id*. at 50.

[39] Sean A. Kidd and Michael J. Kral, "Practicing Participatory Action Research," 52 JOURNAL OF COUNSELING PSYCHOLOGY 187 (2005) ("PAR is, ideally, a process in which people (researchers and participants) develop goals and methods, participate in the gathering and analysis of data, and implement the results in a way that will raise critical consciousness and promote change in the lives of those involved.").

[40] See e.g. Morris Justice Project, A Community Survey of Police Practices in a Bronx Neighborhood (2012), available at https://morrisjustice.org/reports/; MPD 150, Enough Is Enough: A 150 Year Performance Review of the Minneapolis Police Department (2020), available at https://www.mpd150.com/report/.

modifications Plaintiffs propose are that the CCB should be 7 instead of 10 members and that, in addition to the two representatives from Communities United for Police Reform, the two housing representatives recommended by Judge Belen should both come from the NYCHA tenant community since the Trespass Affidavit Program at issue in *Ligon v. City of New York*, 12-cv-2274, is winding down, and the remaining three CCB members should be from organizations that serve directly impacted communities *and* have experience working on the specific policing practices at issue in *Floyd* and *Davis*. Proposed Order ¶ 3. Several such representatives served on the JRP Advisory Committee. *Floyd* ECF No. 597 at 132-34. The CCB would provide this input to the Monitor and Court through Monitor meetings, presentations at public status conferences, and reports.  *Id*. at 246. Similar bodies serving similar functions have been used in recent police monitorships which, like this one, focus on reforming racially discriminatory policing practices.[41]

Further, as Plaintiffs proposed three years ago in their response to Judge Belen's Final JRP Report, *see Floyd* ECF. No. 602 at 14, the CCB should also have direct input into the contours of all NYPD discipline reforms developed and submitted for Court approval during the Monitorship. Proposed Order ¶ 4. The Monitor should be required to solicit and incorporate CCB feedback on all draft discipline reform proposals before they are finalized, as he does with the *Floyd* and *Davis* parties, and, once final proposals are submitted to the Court, the CCB, like the parties, should have

---

[41] *See*, *e.g.*, *United States. v. City of Seattle*, *supra*, ECF No. 3-1, at 2-4 (W.D. Wash. July 27, 2012) (providing for creation of Community Police Commission to issue "reports or recommendations to the City on the implementation of the Settlement Agreement" and receive community feedback on the "[Police Department's] progress or compliance with the agreements."); *United States v. City of Cleveland*, *supra*, ECF No. 7-1 at 4-6 (N.D. Ohio June 12, 2015) (providing for creation of Community Police Commission with the authority to "review and comment on  [Cleveland Division of Police]'s implementation of initiatives, programs, and activities that are intended to support reform" and "hold public meetings to discuss Monitor's reports and receive community feedback concerning CDP's compliance with [the] Agreement."); *Melendres v. Penzone*, *supra*, ECF No. 670 ¶¶ 115-18, ECF No. 2431 ¶¶ 115-18 (D. Ariz. June 3, 2019) (amending permanent injunction to provide for the creation of "a Community Advisory Board . . . to provide specific recommendations to [sheriff's office] and the Monitor about policies and practices that will increase community trust" and "relay or gather concerns from the community about [defendant sheriff's office] practices that may violate the provisions of this Order and the court's previous injunctive orders entered in this matter and transmit them to the Monitor and the [sheriff's office] for investigation and/or action.").

the opportunity to file comments for the Court to consider in deciding whether to approve, amend, or reject those proposals. The Seattle and Cleveland Community Police Commissions played similar reform development roles in the monitorships in those cities.[42]  In addition, the Monitor should coordinate a notice and public comment process for each draft discipline reform proposal and share the public comments with the CCB and parties as they work with the Monitor to finalize those proposals.[43] Such public-facing reform processes are especially appropriate for discipline reforms in this Monitorship, given (i) the Court's  recognition that discipline reform development lends itself to community stakeholder input, *Floyd* ECF No. 372 at 24, (ii) the public's  interest in and concerns about the NYPD's discipline system, *Floyd* ECF No. 597 at 117-119, 161, 185-86, 217; and (iii) many community groups' expertise and involvement in several recent and important police accountability reform efforts in New York City and State. *See* Charney Decl., Exs. 1-4.

### 3.   *Field Audits/Integrity Testing*

Lastly, the Monitor should conduct regular, biannual field audits of NYPD officers' stop-and-frisk and trespass enforcement activity using integrity testing methods to assess Fourth and Fourteenth Amendment compliance. *See* Proposed Order ¶ 1. These audits would analyze officer behavior in the field in real time by using trained testers with very similar traits except for race to engage in the same pre-scripted non-violent "suspicious" behaviors designed to attract police attention (*e.g.*, casing, drinking from an open container) to assess whether and to what extent officers respond differently on the basis of race and/or conduct stops, arrests, frisks and/or searches

---

[42] *See, e.g., United States v. City of Seattle, supra*, ECF Nos. 206-1 (W.D. Wash. May 18, 2015), 240 (W.D. Wash. Oct. 16, 2015), 268 (Feb. 1, 2016); *United States v. City of Cleveland, supra*, ECF No. 260 (N.D. Ohio May 10, 2019); Cleveland Community Police Commission, *Response to CDP's January Search and Seizure Revisions* (Feb. 21, 2019), *available at* https://clecpc.org/wp-content/uploads/Search-and-Seizure-Updated-GPO-Feedback-Feb-2019.pdf.

[43] The NYPD itself recently employed such a process in developing its officer disciplinary penalty guidelines that went into effect in January 2021. *See* New York City Police Dep't, *Process of Developing the NYPD Disciplinary System Penalty Guidelines and Response to Public Comments* (2021), available at https://www1.nyc.gov/site/nypd/about/about-nypd/policy/response-to-public-comments.page.

without adequate legal bases.[44] Similar methods have been used to study discrimination in employment, housing, lending, and public accommodations.[45] Moreover, the NYPD and other large police departments have used similar integrity testing methods to investigate patterns of officer corruption and other misconduct.[46] Thus, Plaintiffs submit that the Monitor could feasibly and safely conduct methodologically rigorous field audits of NYPD officer stop-and-frisk and trespass enforcement activity using current and former undercover and internal affairs officers from other law enforcement agencies as testers.[47] Such audits would address some of the inherent limitations in the Monitor's Stop Report data analyses, particularly the selection bias risks caused by the underreporting of stops and the inability of Stop Report data to track officers' racially selective decisions *not* to stop white people engaged in suspicious conduct.

## IV.    CONCLUSION

For the reasons stated above, *Floyd* and *Davis* Plaintiffs respectfully request that the Court grant their motion to modify the *Floyd* Remedial Order, *Floyd* ECF No. 372, as modified by *Floyd* ECF No. 466, and enter the Proposed Order.

Dated:      July 29, 2021
            New York, New York


\s\ Darius Charney                        \s\ Jin Hee Lee
Darius Charney                            Jin Hee Lee
Omar Farah                                Raymond Audain
Samah Sisay                               Ashok Chandran
CENTER FOR CONSTITUTIONAL                 John Cusick
RIGHTS                                    Kevin Jason

---

[44] Sonja B. Starr, "Testing Racial Profiling: Empirical Assessment of Disparate Treatment by Police," 2016 UNIVERSITY OF CHICAGO LEGAL FORUM 485, 518-19, 521-24 (2016), *available at* https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1574&context=uclf.
[45] *Id.* at 519-21 (citing studies).
[46] *Id.* at 520, 528; *Floyd* ECF No. 373 at 94 n.327; Sanja Kutnjak Ivkovic, "To Serve and Collect: Measuring Police Corruption," 93 J. CRIM. L. & CRIMINOLOGY 593, 617-19 (2003); Brian J. Fried et al., "Corruption and Inequality at the Crossroad," 45 LATIN AM. RES. REV. 76 (2010) (study using integrity testing methods to assess whether Mexico City police officers' patterns of misconduct during traffic stops differ based on driver socioeconomic status).
[47] *See* Starr, *supra*, at 521-25, 527-30.

<table>
<tr><td>

666 Broadway, 7th Floor
New York, NY 10007
(212) 614-6464
dcharney@ccrjustice.org
ofarah@ccrjustice.org
ssisay@ccrjustice.org

</td><td>

Lauren Johnson
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
jlee@naacpldf.org
raudain@naacpldf.org
achandran@naacpldf.org
jcusick@naacpldf.org
kjason@naacpldf.org
ljohnson@naacpldf.org

</td></tr>
</table>

\s\Jonathan C. Moore _____

Jonathan C. Moore
Luna Droubi
Marc Arena
Rebecca Pattiz
Katherine. Q. Adams
BELDOCK, LEVINE & HOFFMAN, LLP
99 Park Avenue, Penthouse Suite
New York, NY 10016
(212) 490-0400
jmoore@BLHNY.com
ldroubi@BLHNY.com
marena@BLHNY.com
rpattiz@BLHNY.com
qadams@BLHNY.com

*Attorneys for Floyd Plaintiffs*

\s\ Corey Stoughton _____

Corey Stoughton
Steve Wasserman
Molly Griffard
Jennvine Wong
THE LEGAL AID SOCIETY
199 Water Street
New York, NY 10038
(212) 577-3300
cstoughton@legal-aid.org
swasserman@legal-aid.org
mgriffard@legal-aid.org
jwong@legal-aid.org

*Attorneys for Davis Plaintiffs*