# Arnold & Porter

**Peter L. Zimroth**
+1 212.836.7316 Direct
Peter.Zimroth@arnoldporter.com

September 1, 2021

**VIA ECF**

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

> Re:   *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
> *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
> *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
> Thirteenth Report of the Independent Monitor

Dear Judge Torres,

I am pleased to submit the Thirteenth Report of the Independent Monitor. This report examines racial disparities in New York City Police Department (NYPD) stop, question, and frisk (SQF) patterns in New York City (NYC) between the years 2013 and 2019. Below, I describe the background of this report and its conclusions.

In its liability decision in August 2013, this Court ruled that the NYPD's stop and frisk practices violated the Fourteenth Amendment. The Court found that the City adopted a "policy of indirect racial profiling by targeting racially defined groups for stops based on local crime suspect data. This has resulted in the disproportionate and discriminatory

Arnold & Porter

stopping of Blacks and Hispanics in violation of the Equal Protection Clause."[1] In support of the Court's conclusions regarding constitutional infirmities, the Court found, for the period between January 2004 and June 2012:

- Of the 4.4 million stops made by the NYPD in those years, 52 percent of those stopped were Black, 31 percent were Hispanic, and 10 percent were White.[2] In 2010, New York City's resident population was roughly 23 percent Black, 29 percent Hispanic, and 33 percent White.

- For the period 2004-2009, "when any law enforcement action was taken following a stop, Blacks were 30 percent more likely to be arrested (as opposed to receiving a summons) than Whites, for the same suspected crime."[3]

- In 23 percent of the stops of Blacks, and 24 percent of the stops of Hispanics, the officer recorded using force; the number for Whites was 17 percent.[4] The Court determined that, after controlling for suspected crime and precinct characteristics, Blacks who were stopped were about 14 percent more likely—and Hispanics 9 percent more likely—than Whites to be subjected to the use of force.[5]

In its remedial opinion, the Court directed the NYPD to revise its policies and training regarding racial profiling "to make clear that targeting 'the right people' for stops, as described in the Liability Opinion, is a form of racial profiling and violates the Constitution."[6] The NYPD has made those changes in its policies and training. The new procedures state that race, ethnicity, or national origin may be considered by officers in taking police enforcement action only when they are part of specific and reliable suspect descriptions, and that racially defined groups may not be targeted for stops simply because

---

[1] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 562 (S.D.N.Y. 2013) (*Floyd* Liability Opinion).
[2] *Floyd* Liability Opinion at 559.
[3] *Id*. at 560.
[4] *Id*. at 573.
[5] *Id.* at 560.
[6] *Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013) (*Floyd* Remedial Opinion).

**Arnold & Porter**

they appear more frequently in local crime suspect data. However, as noted in our prior reports, changes in policy and training are not meaningful unless those changes are implemented and sustained in the field. To assess the Department's compliance with its racial profiling policies and the Fourteenth Amendment, we use several statistical analyses of NYPD's stop and frisk data, conducted by the experts on my monitor team.

In the Monitor's Fifth Report, Dr. John MacDonald, a member of the monitor team, with input from other team members, examined trends in the NYPD's SQF data for the years 2013, 2014, and 2015. The analyses in that report indicated that racial disparities during 2013-15 were trending in the right direction; most measures showed a diminution of racial disparities, although some did not. However, that report drew no conclusion about the NYPD's constitutional compliance, because statistical data over a more extensive period was needed. Moreover, as noted in prior Monitor reports, NYPD officers are not documenting all stops, and underreporting of stops limits the reliability of analyses based on data that include only reported stops.

The report accompanying this letter, the Monitor's Thirteenth Report, follows the statistical analyses developed and applied in the Monitor's Fifth Report and many other social science papers that compare racial disparities in post-stop outcomes–frisks, searches, summonses, arrests, uses of force, and "hit rates"–after controlling for other potentially confounding factors.[7] Dr. MacDonald shared the methodologies used and drafts of the report with the experts retained by the NYPD and by the Plaintiffs. To address the concern

---

[7] See Knowles, Persico, & Todd, 2001; Anwar & Fang, 2006; Fagan, 2010; MacDonald & Braga, 2019; MacDonald & Fagan, 2019; Neil & Winship, 2019. [put in full cites]

**Arnold & Porter**

that undocumented stops might undermine the validity of the analyses in the report, Dr. MacDonald conducted additional analyses to examine the extent to which undocumented stops may affect the estimates of racial disparities in post-stop outcomes. Results of the statistical analyses included the following:

- The analyses suggest that disparities in frisks of Blacks and Hispanics stopped relative to frisks of Whites and others diminish over time and, after the implementation of the Court's remedial order, frisk rates do not differ significantly across the racial groups. However, when adjustments were made to account for undocumented stops, it appears that Blacks were more likely to be frisked relative to Whites and other subjects between 2016 and 2019, with differences on the order of eight to 14 percentage points. Using the same approach to account for undocumented stops, Hispanics stopped were more likely to be frisked relative to Whites and others between 2016 and 2019, with differences on the order of five to seven percentage points.

- Search rate disparities between Blacks stopped relative to Whites and others also declined over time, with no differences in search rates noted between similarly situated racial groups after 2013. When undocumented stop rates were considered, however, Blacks were generally more likely to be searched during stops relative to Whites and others between 2016 and 2019. The analyses did not find statistically significant differences in search rates for Hispanics relative to search rates for Whites and others between 2013 and 2019 using several methodologies, including comparisons that considered undocumented stop rates.

- The analyses did not find statistically significant differences in summons rates when Blacks and Hispanics were compared to Whites and others stopped between 2013 and 2019 using the same methodologies used for analyzing search rates, including comparisons that considered undocumented stop rates.

- The analyses did not find consistent differences in arrest rates when comparing Blacks and Hispanics relative to Whites and others between 2013 and 2019. However, when adjustments were made to account for undocumented stops, the analyses suggested that Blacks were more likely to be arrested when compared to Whites and others between 2017 and 2019, with differences that ranged between six and eight percentage points. The same analyses found only one year (2018) where undocumented stops could lead to differences in arrest rates between Hispanics stopped and Whites and others stopped by the police.

**Arnold & Porter**

- The analyses did not find differences in the use of force rates when comparing Blacks and Hispanics relative to Whites and others stopped between 2014 and 2019. However, when adjustments were made to account for undocumented stops, the analyses suggested NYPD officers were more likely to use force during stops of Blacks relative to stops of Whites and others between 2017 and 2019, with differences on the order of seven percentage points. This same analysis did not find any use of force rate differences between Hispanics and Whites/Others stopped by the police.

- Hit rates for weapons and contraband from searches of Whites and others stopped were generally higher than hit rates for Blacks and Hispanics, suggesting a lower threshold for searching. However, the analyses found that the differences in search hit rates for weapons and contraband were not statistically significant when Blacks and Hispanics stopped were compared to Whites and others stopped in similar contexts.

The Report's analyses indicate that racial disparities between Blacks and Hispanics and similarly situated Whites and others in frisks, searches, summonses, arrests, uses of force, and the recovery of a weapon or other contraband diminished substantially after the Court's remedial order. However, undocumented stops raise concerns about the ability to draw strong conclusions about Fourteenth Amendment compliance. This is particularly the case for comparisons of frisks, arrests, and uses of force for Blacks, as the estimated disparities in stop outcomes increase if one uses a larger estimate of undocumented stops. Without complete data on stops, the NYPD will not be able to demonstrate, and I will not

Arnold & Porter

be able to inform the Court, that the NYPD is in substantial compliance with the Court's remedial order.

                                          Respectfully submitted,

                                          */s/ Peter L. Zimroth*
                                          Peter L. Zimroth
                                          Monitor

Attachment: Thirteenth Report of the Independent Monitor