# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

—————

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1080

WRITER'S EMAIL ADDRESS
bgruenstein@cravath.com

JOHN W. WHITE
EVAN R. CHESLER
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN

GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ

DAVID J. PERKINS
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
DAVID L. PORTILLA
RORY A. LERARIS
KARA L. MUNGOVAN
MARGARET T. SEGALL
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN

EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG
MICHAEL L. ARNOLD
HEATHER A. BENJAMIN
MATTHEW J. BOBBY
DANIEL J. CERQUEIRA
ALEXANDRA C. DENNING
HELAM GEBREMARIAM
MATTHEW G. JONES
MATTHEW M. KELLY
DAVID H. KORN
BRITTANY L. SUKIENNIK
ANDREW M. WARK

——————

PARTNER EMERITUS
SAMUEL C. BUTLER

——————

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY
KIMBERLEY S. DREXLER
NICOLE F. FOSTER
LILLIAN S. GROSSBARD
KIMBERLY A. GROUSSET
ANDREI HARASYMIAK

September 3, 2021

<u>Floyd, et al. v. City of New York, 08-CV-1034 (AT)</u>
<u>Davis, et al. v. City of New York, et al., 10-CV-0699 (AT)</u>

Dear Judge Torres:

   We are counsel to the Monitor, Peter L. Zimroth, and respectfully submit this letter in response to Plaintiffs' Motion to Modify the *Floyd* Remedial Order, filed on July 29, 2021 (the "Motion").  Plaintiffs' Motion asks this Court to modify the Remedial Order by imposing five new requirements (the "Proposed Modifications").  Under these Proposed Modifications:  (1) the Court would need to appoint a "Community Collaborative Board" ("CCB") "to advise the Monitor and the Court regarding the NYPD's implementation of and compliance with" reforms, and that CCB would have access to and the ability to publicly share documents prepared by the NYPD and Monitor; (2) the Monitor's compliance and progress reviews would need to include "annual community surveys assessing the public's perceptions of and experiences with . . .  investigative street encounters and trespass enforcement"; (3) the Monitor's compliance and progress reviews would need to include "[b]iannual field audits of the

stop-and-frisk and trespass enforcement activity of a representative sample of NYPD officers using integrity testing methods"; (4) the Court would need to hold biannual public status conferences with the Monitor, the parties, and the CCB; and (5) all proposals to reform NYPD disciplinary processes would need to be "developed in consultation with the CCB and using a notice and public comment process coordinated by the Monitor."  (ECF No. 843 (the "Proposed Order").)

       As explained in more detail below, the Court should not implement any of the Proposed Modifications:  the CCB is unnecessary because the community groups whose input it would solicit are already actively involved in the reform process, and further inappropriate because this Court has repeatedly found that the reform process would be impaired by public disclosure of information shared between its key decisionmakers (*see, e.g.*, ECF Nos. 622, 650, 844); public status conferences would not increase the current level of public engagement with the Monitorship; notice-and-comment procedures for implementing disciplinary reforms are not appropriate because interested parties already have the opportunity to comment on proposed reforms; and neither community surveys nor field audits are a feasible and reliable method for assessing the NYPD's compliance with applicable legal standards.

       Accordingly, Plaintiffs' Motion should be denied.

## I.   Relevant Factual Background

       This section summarizes the prior orders and aspects of the reform process relevant to deciding Plaintiffs' Motion.

A.      *The Remedial Order Is Tailored to Resolving the Violations in the Liability Opinion.*

In 2008, Plaintiffs sued the City under 42 U.S.C. § 1983, alleging that the NYPD's practices related to stops and frisks between 2005 and 2013 violated the Fourth and Fourteenth Amendments. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 557 & 563 (S.D.N.Y. 2013) (the "Liability Opinion"). The Court ruled for Plaintiffs, and held that the City caused unconstitutional stops and frisks through three kinds of official municipal policy: (1) NYPD policymakers articulated a policy of "conducting stops based in part on criminal suspect data," *id.* at 660, which amounted to directing officers to target racial groups heavily represented in criminal suspect data—an express racial classification violating the Fourteenth Amendment; (2) the NYPD's "standard operating procedure" of pervasive and persistent stops amounted to a policy of making stops without reasonable suspicion in violation of the Fourth Amendment; and (3) the NYPD was deliberately indifferent to Plaintiffs' Fourth and Fourteenth Amendment rights in its failure to modify its policies encouraging stops to be based on suspect data, and its policies for training, supervising, monitoring, and disciplining officers.

Another order, issued the same day as the Liability Opinion, granted and defined a permanent injunction based on the legal violations identified in the Liability Opinion. *Floyd v. City of New York*, 959 F. Supp. 2d 668, 671 (S.D.N.Y. 2013) (the "Remedial Order"). This Court noted that it had a "broad" and "flexib[le]" power to determine an appropriate process for remedying those violations, but that the remedies could be "no broader than necessary to cure the effects of the harm caused by the violation[s]." (*Id.* at 674.) Recognizing that "it would be impractical . . . to engage in

direct oversight" of the remedies, this Court first exercised its power by appointing Mr. Zimroth as Monitor to "oversee the reform process." (*Id.* at 676.)  Mr. Zimroth was specifically charged with the "detection of non-compliance" with this Court's orders so as to avoid "motions practice between the parties to assess progress; a costly, contentious, inefficient, and time-consuming process." (*Id.* at 676-77 & n.31.)  To this end, he was empowered to "conduct compliance and progress reviews to assess the extent to which the NYPD has implemented and complied" with the reforms outlined in the Remedial Order. (*Id.* at 677-78.)  But consistent with the requirement of narrow tailoring, his "duties, responsibilities, and authority will be no broader than necessary to end the constitutional violations in the NYPD's stop and frisk practices described in the Liability Opinion." (*Id.* at 677.)

Rather than mandating self-executing changes to the NYPD's policies, the Court directed the Monitor to develop initial reforms to the NYPD's policies "in consultation with the parties," and prescribed certain elements for those "Immediate Reforms Regarding Stop and Frisk."[1]  The Court also ordered the parties to participate in a "Joint Remedial Process for Developing Supplemental Reforms," and directed that the Monitor oversee the implementation of any such reforms approved by the Court. (*Id.* at 677-78, 686-87.)  Plaintiffs were not given any independent oversight or discovery

---

[1] The "Immediate Reforms" were not self-executing.  But this Court did prescribe specific "elements" that they would ultimately, presumptively be required to include: revisions to the Patrol Guide and the NYPD training materials to clearly articulate the constitutional standards governing stops and frisks; changes to the forms and Patrol Guide provisions for documenting stops; improvements to the policies for monitoring, supervising, and disciplining officers in relation to their stops; the issuance of a FINEST message summarizing the *Floyd* litigation; and a study of the effects of body-worn camera usage. (*Id.* at 679-85.)

power; they have only the role of working with the Monitor to the extent he deems appropriate to "develop" reforms.  (*Id.* at 677.)

> B.   *The Remedial Order Provided for Direct Community Input Through the Joint Remedial Process.*

The Joint Remedial Process ("JRP") was the particular channel that the Court provided for direct community input on reforms.  The JRP was designed "to develop proposed remedial measures" (the "Joint Process Reforms") for the Monitor's and the Court's consideration; if the Court approved any Joint Process Reforms, the Monitor would then oversee their implementation.  (Remedial Order at 677, 688.)  The JRP was guided by a facilitator and team (the "Facilitation Team") that developed the Joint Process Reform recommendations (the "Recommendations") through several phases that extensively solicited direct community input:

*Convening Phase.*  The Facilitation Team met with more than 40 organizations directly affected by the NYPD's unconstitutional policies to gather input concerning proposed reforms and to help develop the remainder of the JRP.  (New York City Joint Remedial Process, Final Report and Recommendations at i-iv, ECF No. 597 (May 15, 2018) (the "JRP Report").)

*Focus Group Phase.*  The Facilitation Team conducted 64 focus group meetings between October 2015 and February 2017, in collaboration with community organizations, advocacy groups, community centers within NYCHA developments, and the NYPD (including patrol officers, sergeants, lieutenants, commanding officers, and executives).  (*Id.*)

*Leadership Meeting Phase.*  Between July 2016 and February 2017, the Facilitation Team met on 19 different occasions with thought leaders at community, advocacy, clergy, and policy organizations to further discuss reform ideas.  (*Id.*)

*Community Forum Phase.*  In October and December of 2016, the Facilitation Team collaborated with the NYPD as well as grassroots, community, clergy, and police reform organizations to conduct 28 community forums throughout the five boroughs to discuss solutions and reforms.  (*Id.*)

In the following year, the Facilitation Team worked to synthesize the information gathered throughout the various JRP phases, met with Plaintiffs, the Monitor's team, and the NYPD to further develop the proposed reforms, and generated a Final Report and Recommendations summarizing the process and recommending reforms.  (*Id.*)  Several of the reforms proposed in the JRP Report have been ordered into effect by the Court or otherwise implemented, including the recommendations on permanent feedback structures for officer conduct, body-worn cameras, monthly NYPD discipline reports, and other disciplinary recommendations.[2]  (*Id.* at 219, 222, 224-25.)

---

[2] With respect to Recommendation 1, the "Creation of Permanent Structures for Feedback Regarding Officer Conduct," the NYPD, in consultation with the Monitor and Plaintiffs' counsel, proposed a "plan to implement a program for systematically receiving, assessing, and acting on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements," a version of which the Court approved on June 2, 2020.  ECF No. 767.  With respect to Recommendation 4, "Body-Worn Cameras," the Court has approved the Monitor's Alternative Plan requiring NYPD officers to activate their body-worn cameras ("BWCs") for certain first-level encounters and to record certain descriptive information.  ECF No. 817.  The NYPD has also implemented various discipline-related reforms, including by developing the discipline matrix used as its Disciplinary System Penalty Guidelines, that implement Recommendations 2 and 3.

C.      *The Monitor Has Engaged the Public.*

The Monitor and his team have taken significant efforts to make the
remedial process accessible to the public.  First and foremost, they have published twelve
reports summarizing the status of that process on their website, the NYPD's website, and
the Court's docket.  But they have also sought and maintained direct connections with
community stakeholders, meeting with representatives of several groups—including
Communities United for Police Reform, Malcom X Grass Roots Movement, Justice
Committee, Make the Road NY, and others—during the monitorship.  Moreover, the
Monitor has asked community stakeholders to arrange calls and meetings with him when
they would like to discuss the remedial process.  Indeed, the Monitor has provided his
personal cellphone number to them and invited them to call—and they have,
occasionally, done so.

## II.     Applicable Legal Standards

As this Court recognized in its Remedial Order, it is "the essence of equity
jurisdiction that a court is only empowered to grant relief" that is "narrowly tailored to fit
specific legal violations," *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114,
144 (2d Cir. 2011) (citations omitted), and, therefore, "[t]he Monitor's duties,
responsibilities, and authority will be no broader than necessary to end the constitutional
violations in the NYPD's stop and frisk practices described in the Liability Opinion,"
Remedial Order at 677.

Ordinarily, "a court may modify a final or permanent injunction only
where conditions have so changed as to make such relief equitable, *i.e.,* a significant
change in the law or facts." *Sierra Club v. U.S.* Army *Corps of Eng'rs*, 732 F.2d 253,

256-57 (2d Cir. 1984).  Modifying a permanent injunction involves balancing the principles of *res judicata* with "the right of a court to apply modified measures to changed circumstances."  *Id.*  When an injunction's beneficiary seeks to enforce the injunction "more effectively, equity countenances the modification of an injunctive decree if a better appreciation of the facts in light of experiences indicates that the decree is not properly adapted to accomplishing its purposes".  *Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228, 244 (S.D.N.Y. 2004) (citation and quotation mark omitted); *see also Civic Ass'n of Deaf of New York City, Inc. v. Giuliani*, 970 F. Supp. 352, 362-63 (S.D.N.Y. 1997) (refusing plaintiff class's request to modify injunction to require city to restore alarm boxes where plaintiffs failed to provide evidence that modification would further purpose of injunction, and modification would also "impose a substantial financial burden" on defendants).

## III.    Plaintiffs' Motion to Modify the Remedial Order Should be Denied Because the Proposed Modifications Do Not Advance the Remedial Order's Purposes

Plaintiffs ask this Court substantially to modify the Remedial Order by imposing five new requirements that they claim are necessary to increase "community involvement" with the Monitorship.  (Mot. at 17.)  But Plaintiffs' Motion fails to explain why the current version of the Remedial Order is "not properly adapted to accomplishing its purposes," or how "enforcement of the decree without modification would be detrimental to the public interest," and fails to demonstrate that the Proposed Modifications are narrowly tailored to remedying the constitutional violations at issue. (*Id.*)  Therefore, the Proposed Modifications lack legal warrant, and Plaintiffs' Motion should be denied.  *See Civic Ass'n of Deaf*, 970 F. Supp. at 362-63.

A.      *The Court Should Not Modify the Remedial Order to Mandate the Creation of a Community Collaborative Board.*

Plaintiffs' Proposed Modifications center around their request that the Court appoint a seven-member Community Collaborative Board, funded by the City, to advise the Monitor and Court regarding the formulation and implementation of reforms. (Proposed Order ¶ 3.)  The CCB, Plaintiffs say, "would provide [] input to the Monitor and Court through Monitor meetings, presentations at public status conferences, and reports".  (Mot. at 28.)  The CCB would also "have access to and the ability to publicly share all documents, information and data from the NYPD and Monitor that it needs to complete its work."  (Proposed Order ¶ 3.)  The only justification Plaintiffs offer for this significant change is that input from the community is important to the reform process. (Mot. at 29.)  But Plaintiffs' request would not enhance the Remedial Order's ability to accomplish its purposes, for three reasons.

*First*, the community groups whose input the CCB would elicit already have ample opportunities to provide input in the reform process.  As an initial matter, those groups have the opportunity to provide their input through Plaintiffs' counsel, who have consistently channeled that input in providing feedback on the formulation and implementation of reforms, as this very Motion illustrates.  This is procedurally appropriate in light of Plaintiffs' role as counsel to a class of "[a]ll persons" who have illegally been stopped by NYPD officers: the principal representatives of the communities impacted by stop-and-frisk policies in this process are, and always have been, Plaintiffs' counsel and not other groups.[3]  And the remedial process has been

_____

[3] *See* Opinion and Order at 6, 08 Civ. 1034 (SAS) (S.D.N.Y. May 16, 2012) (ECF No. 206) (approving certification of a class of "[a]ll persons who since January 31, 2005 have been, or in the future

enhanced by channeling those groups' input through Plaintiffs' counsel, who bring depth of experience with the law governing the remedial process and depth of familiarity with the process's seven years of factual development, remedial proposals, legal arguments, and rulings.  Adding further, uninitiated community representatives to the core group of remedial-process decisionmakers would add inefficiency to a process that has taken seven years and is already set to take more.

Plus, community groups also have avenues for providing direct input to the Monitor and Court.  As to the Monitor, Communities United for Police Reform (CPR) has had the opportunity to review and comment on draft policy reforms under the Confidentiality Order, subject to the Monitor's permission (which he has always granted).  (ECF No. 650 at ¶ 5.)  Furthermore, CPR and other community groups are able to communicate with the Monitor directly (and periodically do).  As to the Court, community groups may make *amicus* filings commenting on the reform recommendations that the Monitor files (and they have, in fact, done so).  (*See, e.g.*, ECF Nos. 551, 611, 656, 673; *see also* ECF No. 842-1 at ¶ 11 (highlighting CPR's past submissions in the *Floyd* case).)  Given that the Monitor and the Court already receive feedback from community groups, the fundamental alteration to the current remedial process that would occur in enacting the CCB is not narrowly tailored to meet any specific remedial goal.

---

will be, subjected to the New York Police Department's policies and/or widespread customs or practices of stopping, or stopping and frisking, persons in the absence of a reasonable, articulable suspicion that criminal activity has taken, is taking, or is about to take place in violation of the Fourth Amendment, including persons stopped or stopped and frisked on the basis of being Black or Latino in violation of the Equal Protection Clause of the Fourteenth Amendment").

Moreover, Plaintiffs' reliance on the commissions established in the *Seattle*, *Cleveland*, and *Melendres* cases is misplaced. (Mot. at 28 n. 41, 29 n. 42.) The Settlement Agreements reached in *Seattle* and *Cleveland* were broad agreements between the United States Department of Justice and the cities that provided for specific obligations relating to a range of issues.[4] Pursuant to those agreements, *the cities* agreed to establish community commissions with specific duties—the commissions were not court-appointed, like the commission Plaintiffs propose here.[5] Similarly, the Judgment Order in *Melendres* reached beyond specific legal violations like those in this case, with provisions that aimed "[t]o rebuild public confidence and trust" and "to improve community relationships".[6] Here, by contrast, the Remedial Order cannot be any broader than necessary to end the NYPD's violations of the Fourth and Fourteenth Amendments described in the Liability Opinion, and the CCB is not tailored to ending those violations. (Remedial Order at 677.)

*Second*, in light of the existing channels by which impacted communities can participate in the remedial process, the key to the CCB's purported incremental value in engaging the public is its ability to publicize information privately provided by the Monitor and NYPD—yet this Court has repeatedly found that public dissemination of that information would significantly impair the remedial process. The first of these

---

[4] *See* Settlement Agreement and Stipulated [Proposed] Order of Resolution, *United States v. City of Seattle*, 12-cv-1282 (W.D. Wash. July 27, 2012) (ECF No. 3-1) ("Seattle Settlement"); Settlement Agreement, *United States v. City of Cleveland*, 15-cv-1046 (N.D. Ohio June 12, 2015) (ECF No. 7-1) ("Cleveland Settlement").

[5] Proposed Order ¶ 3; Seattle Settlement ¶ 6; Cleveland Settlement ¶ 15.

[6] Supplemental Permanent Injunction/Judgment Order ¶ 107, *Melendres v. Penzone*, No. 07-cv-2513 (D. Ariz. Oct. 2, 2013) (ECF No. 606).

findings was in the dispute that led to the Confidentiality Order, which began when the
Monitor applied for that order on July 25, 2018.  (ECF No. 622.)  In opposing the
Monitor's application, Plaintiffs argued that only a very narrow confidentiality order was
necessary, covering draft reforms and status reports and communications regarding those
materials.  (ECF No. 627 at 1.)  The Court rejected that argument and agreed with the
Monitor, entering a Confidentiality Order that found that "all stakeholders' interests are
best served by ensuring the confidentiality of information and materials discussed in the
remedial phase of the above-captioned actions," and that "without such a confidentiality
order, the effectiveness of the remedial phase of [the] actions may be seriously
compromised".  (ECF No. 650.)  And just weeks ago, this Court reaffirmed that holding,
rejecting Plaintiffs' motion to compel public access to certain information protected by
the Confidentiality Order because of the "need to preserve the free flow of information
between the Monitor and the parties".  (ECF No. 844.)

      *Third*, the CCB would require this Court to draw arbitrary lines
separating the stakeholders who should get access to information about the remedial
process from stakeholders who should not.  This Court would need to explain, for
example, why the CCB should include representatives of some community groups and
not others that would like a seat, and why the core group of decisionmakers should
include the community representatives eligible to sit on the CCB but not the
representatives of the process's many other stakeholders, such as "NYPD personnel,"
"police organizations," or "the District Attorneys' offices".  (Remedial Order at 686.)
By contrast, there is nothing arbitrary about confining the core group of decisionmakers

to the parties, whose lawsuit brought this remedial process into existence, and the
Monitor, who was appointed to oversee the process on the Court's behalf.

> B.     *The Court Should Not Modify the Remedial Order to Require Biannual Public Status Conferences or to Require a Notice-and-Comment Process for Disciplinary Reforms.*

Plaintiffs request that the Court modify the Remedial Order to require
biannual "public status conferences with the Monitor, the parties, and the [CCB]"
(Proposed Order ¶ 2), and to require that "[a]ll Immediate and Joint Process disciplinary
reform proposals [] be developed in consultation with the CCB and using a notice and
public comment process coordinated by the Monitor" (*id.* at ¶ 4).  Plaintiffs have not
demonstrated that either of these Proposed Modifications would further the purpose of
the Remedial Order.

*First*, status conferences are an unnecessary and inefficacious way of
"facilitat[ing] community stakeholders' engagement with, and understanding of, the
workings and current status of the *Floyd-Davis* Monitorship."  (Mot. at 25.)  The
Monitor's existing public-engagement efforts are significant, and there is no need that he
be ordered to enhance them.  The Monitor's periodic status reports provide clear and
comprehensive overviews of any developments in and the status of the reform process,
and each is available on this Court's public docket, the Monitor's website, and the
NYPD's website.[7]  Moreover, throughout the Monitor's term, he has worked

---

[7] Plaintiffs claim that the status reports "are only available on the Court's PACER system and the Monitor's website, whose existence has never been publicized."  (Mot. at 10.)  As noted above, the reports are also available on the NYPD's website.  Moreover, a Google search for the phrase "NYPD Monitor" returns as its top two results the Monitor's website and the NYPD's website, each with direct links to the status reports.  Plaintiffs' counsel can also post the Monitor's reports on their organizations' websites, which, to date, they have not done.

collaboratively with the parties, advocacy groups, and individual community members and law-enforcement officers.  For example, the Monitor and his team have met on multiple occasions with CPR, including with members of its constituency organizations, and have had phone calls and meetings with individual stakeholders and community members.  If Plaintiffs' counsel would like to see more engagement, they too are able to share non-confidential information about the remedial process with members of the public in whatever format they deem best and elicit the public's input for sharing with the Monitor and Court.

As to efficacy, status conferences held in a federal courthouse are unlikely to increase the number of people that engage with the Monitorship, as the status conferences would not be conveniently timed or located and would not be designed for communication with the general public.  Therefore, this Proposed Modification would not effectively enhance public engagement with the Monitorship, while imposing additional obligations on the Court, the Monitor, and the Parties.[8]

*Second*, disciplinary reforms should not be ordered to undergo a notice and comment process.  There has already been significant public engagement with disciplinary reforms in the JRP, and the disciplinary recommendations from that process effectively have been implemented, pursuant to changes in the New York City Charter or

---

[8] Though Plaintiffs point out that certain other monitorships employ public status conferences (Mot. at 24-25), those examples may reflect differences from this case in any of many variables, such as courts' preferences about how to receive updates, norms about the channels by which community stakeholders may communicate with the courts, and monitors' efforts to engage the public outside of conferences.  In this case, community stakeholders may engage with the monitorship and have done so by communicating with the Monitor and Plaintiffs' counsel, through *amicus* submissions, and through the materials regarding the workings and status of the monitorship that the Monitor makes substantial efforts to publish.  Thus, conferences are not necessary here.

City ordinances, including a disciplinary matrix (now labeled the NYPD's Disciplinary

System Penalty Guidelines).  Moreover, community organizations have the opportunity

to, and have continued to, provide the Monitor with their views regarding disciplinary

reforms, both directly and through the Plaintiffs' counsel.  In addition, Plaintiffs' counsel

are free to publicize filed disciplinary reforms, which are susceptible to community input

through Plaintiffs' counsel and through *amicus* submissions from community groups.

Indeed, Plaintiffs provide no basis for concluding that potentially interested parties are

more likely to participate in a notice and comment process than to submit the same or

similar written feedback in the form of an *amicus* filing.  On the other hand, requiring the

Monitor to implement and coordinate a notice and comment process for disciplinary

reforms would require the Monitor team to expend significant resources developing and

managing the process.

        The logic of not requiring a notice and comment process for disciplinary

reforms is reinforced by the fact that no such process was required for reforms on other

matters, including reforms on policy, training, documentation, supervision, and auditing.

Plaintiffs have not provided, and cannot provide, any convincing rationale for treating

disciplinary reforms differently.  Although a notice and comment process may be a useful

way for the NYPD to develop and implement policy changes, it is not required to

formulate this Court's remedies.

     C.    *The Court Should Not Modify the Remedial Order to Require Annual*
          *Community Surveys or Biannual Field Audits.*

        Plaintiffs propose that, to assess "the extent to which the NYPD has

implemented and complied with the Immediate and Joint Process Reforms to remedy the

Court's findings of Fourth and Fourteenth Amendment violations," the Monitor should be required to conduct both "[a]nnual community surveys" and "[b]iannual field audits of the stop-and-frisk and trespass enforcement activity of a representative sample of NYPD officers using integrity testing methods".  (Proposed Order ¶ 1.)  However, neither community surveys nor field audits offer feasible and reliable methods for assessing the NYPD's compliance with constitutional standards, and therefore neither is narrowly tailored to remedying the constitutional violations at issue.  We note that the Court's findings of Fourth and Fourteenth Amendment violations were based to a great extent on the same type of analysis that the Monitor now uses to assess compliance.  The Court's findings were not based on community surveys or field audits.  Instead, the Court relied on statistical regression analyses for its Fourteenth Amendment analysis (Liability Opinion at 583-89), and relied on a review of stop reports for its Fourth Amendment analysis (*id.* at 578-83).

        i.        <u>The Community Surveys Plaintiffs Propose Cannot Reliably Be Used to Assess Compliance and Are Not Necessary.</u>

Community surveys will not improve the Monitor's compliance metrics because they cannot be used to provide reliable, objective data about the legality of police conduct.  Plaintiffs' own description of the purpose of the proposed community surveys highlights why they are not an appropriate tool for assessing compliance:  "to assess 'public perception of police-civilian street encounters' and 'the public's experience with Court-ordered reforms.'"  (Mot. at 26.)  The public's perceptions and experiences are important information, but do not bear directly on the NYPD's compliance with the Fourth and Fourteenth Amendments.  They are neither part of legal compliance for law-

enforcement activity nor tailored in any way to determining that compliance.[9]

Community surveys should not be introduced to the Remedial Order, which must be

tailored to achieving legal compliance.

Plaintiffs point to the use or proposed use of community surveys in other

contexts, which is not informative here.  The community surveys Judge Belen

recommended in his Final Report were for the purpose of "track[ing] police-community

relations ***broadly***" (JRP Report at 250 (emphasis added)), not for assessing the NYPD's

compliance with legal standards.  And the other surveys Plaintiffs cite (which have been

discussed by Dr. Jennifer Eberhardt, an expert on the Monitor's team) were

recommended to "help the [Oakland police] department understand its reputation in the

community at large", not to assess compliance with legal standards.[10]  Similarly, the

majority of cases to which Plaintiffs point (Mot. at 26 n.35) do not involve a situation

where a court required that community surveys be used to assess compliance with the

Fourth and/or Fourteenth Amendment.[11]  As noted above, the Monitor's duties and

---

[9] This problem is exacerbated by Plaintiffs' proposal that the community surveys employ "participatory action research [("PAR")] methods."  (Proposed Order ¶ 1, Mot. at 27.)  PAR is a research methodology that uses a cyclical process of engagement throughout the research process, meaning that researchers and participants take on active roles in collecting, analyzing, and drawing conclusions from data using an iterative process.  Put more simply, PAR involves a series of interactions between researchers and subjects to observe information, reflect on that information, make further observations, re-reflect, and so on.  Because it focuses on collective discussion and reflection, the PAR methodology leads to study results that are necessarily shaped by the attitudes and opinions of the researchers and subjects, rather than objective data.  *See, e.g.,* Alice McIntyre, *Participatory Action Research* 1 (2008).  The PAR methodology is also inherently limited in the number of subjects that can realistically be studied.  It would simply not be feasible to use PAR methodology to survey a representative sample of individuals, and obtaining the idiosyncratic perceptions of a small and non-representative subset of New York City residents would not assist the Monitor in assessing compliance.

[10] *See* Jennifer L. Eberhardt, *Strategies for Change: Research Initiatives and Recommendations to Improve Police-Community Relations in Oakland, California* at 50 (Stanford Univ. 2016), available at http://www2.oaklandnet.com/%20oakca1/groups/police/documents/webcontent/oak059292.pdf.

[11] *See* Consent Decree ¶ 416, *United States v. City of Ferguson*, 16-CV-181 (E.D. Mo. Apr. 19, 2016) (ECF No. 41); Consent Decree ¶ 174, *United States v. City of Newark*, 16-CV-1731 (D.N.J. Apr. 29, 2016)

responsibilities in this case may be no broader than necessary to end the NYPD's

constitutional violations described in the Liability Opinion.  (Remedial Order at 677.)

       Finally, Plaintiffs' concerns that the compliance metrics are biased in

favor of law enforcement data and perspectives are already addressed by the Monitor

Team's methodology for evaluating police-civilian encounters.  The Monitor Team's

assessments of police-civilian encounters are not limited to the officer's stop report,

which only includes the officer's description and assessment of the encounter.  In

addition to the stop report, Monitor Team reviews the BWC footage of the encounter, so

the Monitor Team can assess the accuracy and consistency of the officer's narratives

against the BWC footage.  Furthermore, Plaintiffs' concerns will be addressed by the

study that this Court approved on February 12, 2021, which will be conducted by the

Institute for State and Local Governance (ISLG).  (*See* ECF No. 817.)  The ISLG study

will assess officer compliance with Fourth and Fourteenth Amendment standards,

whether police-citizen encounters are appropriately documented, and the circumstances

under which encounters may escalate, through the analysis of BWC footage by the

studies' legal experts, consisting of retired judges.  (*Id.* at Exhibit B.)  The legal experts'

analysis will be used in further statistical analyses to identify racial disparities in

compliance, documentation, and escalation.  Accordingly, the study will offer a vantage

on compliance that is based not on the perspectives of NYPD personnel, but on the

perspectives of independent legal experts.

---

(ECF No. 4-1); Consent Decree ¶ 456, *United States v. Police Dep't of Baltimore*, 17-CV-0099 (D. Md. Jan. 17, 2017) (ECF No. 2-2).

ii.   Biannual Field Audits Cannot Realistically Be Used to Assess
Compliance.

Plaintiffs propose that biannual field audits be used to "analyze officer behavior in the field in real time by using trained testers . . . to assess whether and to what extent officers respond differently on the basis of race and/or conduct stops, arrests, frisks and/or searches without adequate legal bases." (Mot. at 29-30.)   Plaintiffs seek not just field audits in which auditors would observe police officer actions, they also specify that these audits must use "integrity testing methods". (Proposed Order ¶ 1.)  Integrity testing would require that actors/testers (Plaintiffs suggest undercover officers from other agencies) be on scene and execute "'suspicious' behaviors designed to attract police attention." (Mot. at 29.)  These integrity testing methods raise significant safety concerns for the civilian "target," the officers, and bystanders.  Moreover, these audits cannot feasibly be implemented to assess the City's legal compliance—a task that, as Plaintiffs observe, would require auditing a "representative sample of NYPD officers."  (Proposed Order ¶ 1.)  To obtain such a sample, the Monitor's experts determined that there would need to be nearly 400 audits every six months.  Those audits would constitute an unreasonably massive undertaking.  The burden of the proposed biannual field audits would not be outweighed by their incremental benefit, considering that the Monitor's compliance metrics already contain methods for assessing the legality of officers' conduct, and considering that those metrics are complemented by the ISLG study, which will provide an independent assessment of officers' compliance with legal standards and racial disparities in police-citizen encounters.

* * *

For the foregoing reasons, Plaintiffs' motion should be denied.


Respectfully submitted,



_/s/ Benjamin Gruenstein_
Benjamin Gruenstein
Bradley Niederschulte
Emma Kolesar

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Phone:  (212) 474-1000
Fax:  (212) 474-3700
bgruenstein@cravath.com

Hon. Analisa Torres
   United States District Court
      Southern District of New York
         500 Pearl Street
            New York, New York 10007-1312
BY ECF