# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID FLOYD, *et al.*,<br>      Plaintiffs,<br><br>-against-<br><br>CITY OF NEW YORK,<br>      Defendant. | 08 Civ. 1034 (AT) |
| KELTON DAVIS, *et al.*,<br>      Plaintiffs,<br><br>-against-<br><br>CITY OF NEW YORK, *et al.*,<br>      Defendants. | 10 Civ. 0699 (AT) |

**DECLARATION OF JEFFREY FAGAN**
**IN SUPPORT OF PLAINTIFFS' LETTER TO THE COURT**

  I, Jeffrey Fagan, pursuant to 28 U.S.C. § 1746 and subject to penalties of perjury, state the following is true and correct:

  1. I am the Isidor and Seville Sulzbacher Professor of Law at Columbia University Law School, Professor of Epidemiology in the Mailman School of Public Health at Columbia University, and a Senior Research Scholar at Yale Law School. I am an elected Fellow of the American Society of Criminology, and served on its Executive Board for three years. I served on the Committee on Law & Justice for the National Research Council. I was a consultant to the Civil Rights Division of the U.S. Department of Justice investigation of the 2015 Ferguson Police Department., and twice to the Civil Rights Division of the New York State Attorney General in its 2000 and 2013 investigations of the NYPD Stop and Frisk Program. I have been retained by the Plaintiffs in the above actions as a testifying expert.

2. As part of my work as an expert in this case, I have reviewed the Fourteenth Report of the Independent Monitor on NYPD Social Distancing Enforcement in 2020 (*Floyd* ECF No. 863-1), filed on October 12, 2021 ("Report"), as well as previous drafts of the Report dated June 28, 2021 and September 9, 2021.

3. I submit this declaration in support of Plaintiffs' objections to the Report.

**Report's Quantitative Analysis**

4. The Report estimates the probability of enforcement [P(Enf)] as the ratio of arrests and summonses to calls for service (CFS). CFS is thus the benchmark to estimate biases in social distancing enforcement. This assumes that CFS is a valid measure of social distancing violations that are observable to police. Unlike other benchmarks used in research on racial disparities in policing, this is highly dependent on the propensity of neighborhood residents to observe and report such violations, and to report them accurately in terms of the distance or spacing of people in an urban space. Because race and ethnicity are central to this question, CFS are not designed to generate accurate description of the race or ethnicity of a putative violator. More generally, the Report fails to acknowledge that there is, in fact, no reliable measure of the frequency of social distancing violations, nor of their distribution by race or ethnicity. Without a known base rate, the entire calculation is potentially biased and unreliable, and prone to error. Any external peer reviewer would raise this challenge, as is common in statistical analysis of racial disparities in policing.

5. Not even all of the enforcement actions included in the Report's data resulted from CFS for social distancing. In fact, the analysis of body-worn camera ("BWC") data, *see* Report at 20, indicates that most of the social distancing arrests in a random sample of 78 resulted from officer-initiated encounters, not from CFS. This undermines the Report's claim about the validity

of CFS as a benchmark. The CFS analyzed do not include, for example, observations made during a routine patrol or on a "radio run" for another matter, stops based on officers' observations of "suspicion of social distancing violations," and calls for other infractions (marijuana smoke, loud music, fights, car noise/racing) that attract police attention. Though 911 calls may include some officer-initiated interactions that are logged to dispatch, they do not, in my understanding, include all such interactions. Since there are enforcement actions in the data that resulted from something other than a CFS for social distancing, CFS is an inaccurate and incomplete basis to estimate the probability of enforcement and its racial distribution.

6. The Report also does not indicate that the CFS have been verified to determine whether they in fact correspond to social distancing violations. Therefore, they could easily be motivated by the desire to harass or retaliate against neighbors, rather than actually be responsive to observed violations. This further diminishes the reliability of CFS as a benchmark for the number of observed violations.

7. In addition, the Report fails to provide a proper denominator for the probability of enforcement that analyzes differential in total exposure of people to the police. Without this analysis, the probability of enforcement is uninterpretable. *See* Dean Knox, Will Lowe & Jonathan Mummolo, *Administrative Records Mask Racially Biased Policing*, 114 AM. POLITICAL SCI. REV. 619 (2020); Greg Ridgeway and John MacDonald, *Methods for Assessing Racially Biased Policing*, *in* Race, Ethnicity, and Policing: New and Essential Readings 180 (Stephen K. Rice and Michael D. White, eds., 2010). Comprehensive stop, question, and frisk data could provide additional or supplemental estimates of the presence of police. But substantial portions of the Report rely on a paltry six Stop-Question-and-Frisk reports, which are not even incorporated into its statistical analysis. These six reports cannot possibly account for the total

number of stops that occurred over the three-month period, and therefore provide little help in analyzing differential exposure to the police. A more accurate comparison would include the racial composition of persons stopped or arrested on suspicion of public order offenses, even though these too are likely biased toward disproportionate representation of minorities.

### Report's Analysis of Racial Bias

8.  The Report purports to do a disparate impact test to determine whether social distancing enforcement was biased. In order to conduct a proper disparate impact test, however, it would be necessary to know which encounters did *not* result in the designated outcomes of arrests and summonses. *See* Ian Ayres, *Outcome Tests of Racial Disparities in Police Practices*, 4 Just. Research and Pol'y 131 (2002); Roland Neil and Christopher Winship, *Methodological Challenges and Opportunities in Testing for Racial Discrimination in Policing*, 2 ANNUAL REV. OF CRIMINOLOGY 73 (2019); J. Knowles, Nicola G. Persico, P. Todd, *Racial Bias in Motor Vehicle Searches: Theory and Evidence*, 109 JOURNAL OF POL. ECON. 203 (2001). The report lacks these data. These non-enforcement encounters provide a critical additional body of evidence to assess the potential for racial bias. *See* Katherine Y. Barnes, *Assessing the Counterfactual: The Efficacy of Drug Interdiction About Racial Profiling*, 54 DUKE L.J. 1089 (2005). Without knowing when social distancing-related interactions *do not* lead to arrests or summons, it is impossible to detect bias in the decision to approach or sanction rather than ignore violations.

9.  The Report fails to estimate a model to identify the predictors of enforcement by precinct controlling for CFS, *Terry/DeBour* stops, (total) arrests and summons, crime, and race, among other factors. By failing to include these other predictors that capture the totality of police-citizen encounters, the analysis is incomplete. Indeed, in these data, if a summons or arrest is made for almost every CFS, then there is an autocorrelation of the independent and dependent

4

variables analyzed in Figures 1 and 2. What is missing are any relevant or meaningful covariates that would provide a more precise estimate of the racial makeup of social distancing enforcement actions.

10. The Report analyzes the presence of possible bias in enforcement at the precinct level. But precincts are too large and often racially heterogeneous to provide a reliable unit of measurement for either the probability of enforcement or the presence of racial disparities in enforcement. Police are allocated to small areas, including patrol beats or sectors. Correlations of social distancing enforcement with racial composition are misleading when averaged across a large area, since there is no there is no control for the variation in the population characteristics across the many neighborhoods in most precincts. Comparing enforcement in the largely white population of the 19th precinct to the racially and ethnically heterogenous population of the 84th to the largely non-white population in the 40th, for example, ignores huge base rate differences in the racial composition of precincts. Such comparisons erase meaningful differences in enforcement by race and ethnicity.

11. Rather than measuring at the precinct level, the Monitor should have run a model showing where stops took place, and then controlling for racial composition where the enforcement actions occurred. This was what was done in the marijuana enforcement analysis from 2019, which showed that enforcement took place in minority areas after controlling for 911 and 311 calls. *See* Susan Stellin, *Is the 'War on Drugs' Over? Arrest Statistics Say No*, N.Y. Times (Nov. 5, 2019), https://www.nytimes.com/2019/11/05/upshot/is-the-war-on-drugs-over-arrest-statistics-say-no.html.

12. The Report problematically reaches conclusions of null results based on non-significance. This problem is especially acute given that the numbers are relatively small and so

statistical power is low (i.e., the probability of false-negative error is high). The problem is exacerbated by conducting comparisons within deciles, wherein sample sizes are very small (literally, one-tenth of the total).

13. The analysis of racial disparity is underpowered—the unit of analysis is precinct, and there are only a handful of precincts in each decile. A more appropriate test would collapse all the differences and compare above vs. below the 50 percent non-white, or perhaps to quintiles. Social distancing enforcements events are rare, but that only makes them harder to detect and prone to false negatives, *not*, as the Report implies, prone to false positives.

14. Figures 2 and 3 of the Report beg for a marginal effects analysis to test for the magnitude of differences within each decile net of other factors.

15. There are a variety of issues with Figure 2. First, it doesn't show what the Report claims it shows. There are four deciles with meaningful differences. Second, it does not include an analysis on total enforcement outcomes by precinct race. Third, it does not conduct separate analyses for the percentile Black and percentile Hispanic precincts. The differences in socio-economic status between Black and Hispanic communities are huge. That is blurred in the "non-white" denominator. Fourth, in a outcomes test, one of the tests should be on the more punitive choice that officers make – to use the arrest power over the summons option. Fifth, the models should include fixed effects for each decile to capture the potential effects of variables excluded from these models. In general, there is a substantial omitted variable problem in these analyses.

16. The Monitor concludes, on the basis of Figure 2, that "social distancing arrests are due to something other than percentage of non-white residents in a precinct." *See* Report at 23. But that conclusion is unwarranted because there are no other variables in the model that might explain it. In the highest non-white precincts, they could be making more arrests for other

violations or offenses, and therefore would not bother with lower priority social distancing enforcement. Omitted variables make Figure 2 uninterpretable.

**Report's Analysis of BWC footage**

17. The BWC analyses are of limited utility because of how few data points there are and how idiosyncratic they are. Since the sample of BWC footage was selected on the basis of availability (i.e. only if there was a BWC video available for the reported action), then the data is biased by officers' not activating cameras consistently. The Report does not account for their censorship of events that were not captured on BWC video.

18. With so few videos, no claim can be made about constitutionality.

Dated:      November 29, 2021
            New York, New York

*[signature]*

Jeffrey Fagan