# Sixteenth Report of the Independent Monitor
# May 6, 2022

**Mylan Denerstein**
**Monitor**

**Richard Jerome**
**Deputy Monitor**

**Anthony A. Braga**

**Jennifer Eberhardt**

**Demosthenes Long**

**John MacDonald**

**James McCabe**

**Jane Perlov**

**James Yates**

*Floyd, et al. v. City of New York*
*Ligon, et al. v. City of New York, et al.*
*Davis, et al. v. City of New York, et al.*

Table of Contents

Page

EXECUTIVE SUMMARY ................................................................................................3

I.          INTRODUCTION ........................................................................................17

II.         WRITTEN POLICIES ................................................................................19

      A.    Stop and Frisk Policies.........................................................................19

            1.    Compliance Assessment—Written Stop and Frisk Policies and
                  Implementation. ..................................................................20

      B.    Stop Report Form....................................................................................24

            1.    Compliance Assessment—Stop Report Form. ..........................24

      C.    Policy Prohibiting Racial Profiling....................................................25

            1.    Compliance Assessment—Policy Prohibiting Racial Profiling and
                  Implementation. ..................................................................25

      D.    NYCHA Interior Patrol Policies ........................................................27

            1.    Compliance Assessment—NYCHA Interior Patrol Policies....28

                  a.    Review of Stop Reports at NYCHA Properties............................29

                  b.    Review of BWC Videos at NYCHA Properties ............................30

      E.    Trespass Crimes Fact Sheets (TCFS) ................................................35

            1.    Compliance Assessment—Trespass Crimes Fact Sheet............35

      F.    Business Card Requirement .................................................................36

            1.    Compliance Assessment—Business Card Requirement............36

III.        UNDERREPORTING OF STOPS ........................................................37

                  a.    RISKS Reviews ...............................................37

                  b.    RAND Audits..................................................39

                  c.    Police Initiated Enforcement Audits..............................42

|  |  | **d.** | Review of BWC Videos............................................................43 |
|  |  | **e.** | CCRB-Identified Failures to Report ...............................45 |
|  |  | **f.** | Discipline and Correction of Officers with Unreported Stops.......45 |
|  |  | **g.** | Compliance Assessment – Underreporting...................................46 |

**IV.** *LIGON*/TRESPASS AFFIDAVIT PROGRAM (TAP)............................46

**V.** SUPERVISION.....................................................................................48

    **1.** Compliance Assessment—Supervision ....................................48

**VI.** TRAINING ...........................................................................................53

  **A.** In-Service Stop and Frisk and Racial Profiling Training.........................53

    **1.** Compliance Assessment—In-Service Training for Stop and Frisk and Racial Profiling ........................................................................54

  **B.** Training for Newly Promoted Supervisors ...........................................56

    **1.** Compliance Assessment—Newly Promoted Supervisors .......................56

  **C.** Housing Training ....................................................................................56

    **1.** Compliance Assessment—In-Service Housing Training .........................57

  **D.** Training for Investigations of Racial Profiling and Bias-Based Policing Complaints ............................................................................................57

    **1.** Compliance Assessment—Racial Profiling Complaint Investigations Training........................................................................58

  **E.** Training for Plainclothes Officers .........................................................59

    **1.** Compliance Assessment—Basic Plainclothes Course..............................59

  **F.** Recruit Training—Policing Legally .......................................................60

    **1.** Compliance Assessment—Recruit Training—Policing Legally ..............60

  **G.** Recruit Training—Policing Impartially.................................................61

    **1.** Compliance Assessment—Recruit Training—Policing Impartially..........61

  **H.** Recruit Training—Characteristics of Armed Suspects..........................61

       1.      Compliance Assessment—Recruit Training—Characteristics of Armed Suspects ................................................................................................62

**I.**      Recruit Training—Interior Patrol at NYCHA and TAP Locations ......................62

       1.      Compliance Assessment—Recruit Training—Interior Patrol .................63

**J.**      Field Training Guide and FTO Training.................................................................63

       1.      Compliance Assessment—Field Training Guide and FTO Training ........64

**K.**      Refresher Training Course for Investigative Encounters.....................................64

       1.      Compliance Assessment—Refresher Training Course for Investigative Encounters ..............................................................................................65

**VII.**      BODY-WORN CAMERAS ..................................................................................66

**A.**      Precinct-Level BWC Pilot ...................................................................................66

       1.      Compliance Assessment—Precinct Level BWC Pilot ...........................67

**B.**      PSA BWC Pilot...................................................................................................68

       1.      Compliance Assessment—PSA BWC Pilot ...............................................69

**C.**      Alternative to Combined Pilot and Monitor's Studies...........................................69

       1.      Compliance Assessment—NYPD's Alternative Plan and Monitor's Studies ...................................................................................................71

**VIII.**      PERFORMANCE EVALUATION ........................................................................72

       1.      Compliance Assessment—Performance Evaluations ...............................72

             a.      Review of Performance Evaluations with Ratings of "Needs Improvement" for Selected Performance Dimensions .................74

             b.      Review of Negative CRAFT Entries on Selected Performance Dimensions .....................................................................................75

             c.      Review of Quarterly Performance Evaluation Data for Sample Commands ...................................................................................76

**IX.**      AUDITING ...........................................................................................................77

**A.**      QAD Auditing of Stop Reports............................................................................78

**B.**      Monitor Team Review of Stop Report Audits.......................................................80

**C.**     QAD Audits for Undocumented Stops ................................................................82

          **1.**     RAND Audit Results ........................................................................82

          **2.**     Results from Police-Initiated Enforcement Audits ....................................84

**D.**     QAD Auditing of Trespass Crimes Fact Sheets ........................................85

          **1.**     Compliance Assessment—Audit Plan ......................................................86

          **2.**     Compliance Assessment—Monitoring Fourteenth Amendment
                    Compliance ......................................................................................87

**X.**      EARLY INTERVENTION SYSTEM ........................................................................87

          **1.**     Compliance Assessment—Early Intervention System ............................88

**XI.**     COMPLAINTS AND DISCIPLINE........................................................................92

**A.**     NYPD Investigations of Profiling Allegations ........................................92

          **1.**     Compliance Assessment—Racial Profiling Investigations ......................94

**B.**     NYPD Handling of Substantiated CCRB Cases ........................................95

          **1.**     NYPD Discipline and Penalties Imposed ..................................................95

          **2.**     DAO Reconsideration Requests ................................................................97

          **3.**     Discipline Matrix ....................................................................................98

          **4.**     Compliance Assessment—DAO Handling of Substantiated CCRB
                    Cases ..............................................................................................99

**C.**     Other Misconduct Noted, Failure to Complete Stop Report................................100

**XII.**    CONCLUSION ..............................................................................................101

**DEDICATION**

On August 12, 2013, the District Court appointed Peter L. Zimroth as the independent Federal Monitor to oversee the Court-ordered reforms.  Peter Zimroth was a champion of public service who believed the law was a tool for social good.  He was a prosecutor at the U.S. Attorney's Office in the Southern District of New York and the Manhattan District Attorney's Office, the Corporation Counsel of the City of New York, a professor at NYU Law School, and served as the Monitor while a partner at Arnold and Porter.  This report is dedicated to Peter Zimroth, who passed away on November 8, 2021.

**MONITOR'S FOREWORD**

I am honored to have been appointed as the independent Federal Monitor overseeing the Court-ordered remedial process governing the New York City Police Department's (NYPD) policing practices, which arose out of the three stop-and-frisk cases: *Floyd v. City of New York*, *Davis v. City of New York*, and *Ligon v. City of New York*.  As Monitor, I look forward to working with the Plaintiffs, the City of New York, the NYPD, and the community to ensure that members of the NYPD engage in constitutional policing.  I also look forward to working with the new administration and agree with Mayor Adams—the NYPD must "avoid the mistakes of the past."[1]  Likewise, I agree with the Mayor's "clear message[:]  Do it right.  Don't violate [people's] liberties . . . ."[2]  I am eager to work together with all of the parties to further those important goals.

Mylan Denerstein

---

[1]  Press Release, Office of the Mayor of the City of New York, Mayor Adams Releases Blueprint to End Gun Violence in New York City (Jan. 24, 2022), https://www1.nyc.gov/office-of-the-mayor/news/045-22/mayor-adams-releases-blueprint-end-gun-violence-new-york-city#/0.

[2]  Press Release, Office of the Mayor of the City of New York, Transcript:  Mayor Eric Adams Thanks NYPD Neighborhood Safety Teams and Makes Announcement (Mar. 21, 2022), https://www1.nyc.gov/office-of-the-mayor/news/148-22/transcript-mayor-eric-adams-thanks-nypd-neighborhood-safety-teams-makes-announcement.

## EXECUTIVE SUMMARY

This is the Court-appointed Monitor's Sixteenth Report regarding the work done pursuant to court orders in three federal lawsuits concerning New York City Police Department (NYPD or Department) practices and policies with respect to encounters between the police and civilians. Specifically, the three cases challenged the NYPD's practices and policies concerning "stop, question and frisk" (*Floyd v. City of New York*), stops and arrests for criminal trespass in New York City Housing Authority (NYCHA) buildings (*Davis v. City of New York*), and criminal trespass stops in and around certain private multiple dwelling buildings enrolled in the Trespass Affidavit Program (TAP) (*Ligon v. City of New York*). The Trespass Affidavit Program, also known as Operation Clean Halls, was a program in which building owners authorized the NYPD to conduct patrol activities inside and around their buildings, including, in some buildings, floor-to-floor inspections, called interior patrols or vertical patrols.

After a nine-week trial in 2013, the United States District Court ruled that the NYPD's "stop, question and frisk" practices violated the Fourth Amendment and Fourteenth Amendment and ordered remedial measures. The Court did not prohibit the use of stops, frisks, and searches, which, when used lawfully and professionally, can be important law enforcement tools. But the Court did require that any use of these tools must meet constitutional standards. The Court named an independent monitor to develop and implement the remedies in consultation with the NYPD and the Plaintiffs and to report to the Court on compliance.[1] The measures required by the Court in *Floyd*, *Davis*, and *Ligon* include revisions to NYPD policies, training, supervision, auditing, handling of complaints and discipline, performance evaluations, and practices related to body-

---

[1] *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) (Liability Opinion); *see Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013) (Remedial Order).

worn cameras (BWC), among other measures.  In the more than eight years since the Court issued its Remedial Order and the monitorship began, the NYPD has made significant strides in meeting the Court's requirements.

**Stop and Frisk Policies.**  With respect to the NYPD's written policies, the new procedures approved by the Court and put in place regarding stops, frisks, and searches clearly state the legal requirements governing stops, frisks, and searches.  A stop may be conducted only if a police officer has an individualized reasonable suspicion that the person stopped has committed, is committing, or is about to commit a felony or Penal Law misdemeanor.  A frisk may be conducted only if the officer has reasonable suspicion that the person stopped is armed and dangerous.  A search after a frisk may be conducted if the frisk reveals an object that the officer reasonably suspects may be a weapon.  The Court also required that after every stop, officers must complete a stop report that includes a narrative describing the officer's basis for stopping the person and, if a frisk or search was conducted, the basis for conducting the frisk or search.  The court-approved stop report is now an electronic form that officers may complete on their phones.

Compliance with the Court's directives requires not just a change in written policy, but also that officers are trained on the new procedures and that the procedures are being implemented and used on the job.  Working with the Monitor and the Plaintiffs, the NYPD developed and the Court approved new training on constitutional stops, frisks, and searches for both new and current officers.  By the end of October 2020, the Department completed delivering the training to more than 34,300 members of the service, including police officers, detectives, sergeants, and lieutenants.

Since the fourth quarter of 2016, the Monitor Team has obtained samples of stop reports to review to determine whether the NYPD's new procedures regarding stops, frisks, and searches

4

are being implemented and practiced.   In 2018, Monitor Team members began reviewing the Body-Worn Camera videos of the encounters as well.   From 2016 to 2020, the Monitor Team's review of stop encounters has shown an increase in the percentage of compliant stop reports and stops over time.   In the first quarter of 2016, more than 50 percent of the stop reports failed to articulate reasonable suspicion.   In contrast, the Monitor Team's review of stop reports in 2019 showed that 23.4 percent of stop reports failed to articulate reasonable suspicion.   In 2020, the Monitor Team was able to review BWC videos associated with the stop reports that were reviewed. Based on the stop reports, the BWC videos and printouts of the communications with NYPD dispatchers (e.g., for radio runs), the Monitor Team determined that 14.2 percent of the stops reviewed were improper, lacking reasonable suspicion.   The percentage of officers who articulated reasonable suspicion that the person stopped was armed and dangerous (necessary for a frisk) or justification for the search also increased over time.   In 2020, over 94 percent of reported frisks reviewed by the Monitor Team were proper and over 96 percent of reported searches reviewed were proper.

**Racial Profiling Policies.**   The NYPD also revised its policy forbidding racial profiling and bias-based policing as required by the Court's orders.   The policy was developed in collaboration with the Plaintiffs and the Monitor and approved by the Court.   The policy prohibits racial profiling, which it defines as police action, including stops, frisks, arrests, or other law enforcement actions, or the failure to perform a police action motivated, even in part, by the actual or perceived race, color, ethnicity, or national origin of an individual.   Race may be considered only if it is part of a reliable and specific suspect description that includes not just race, gender, and age, but other identifying characteristics or information.   Moreover, members of racially defined groups (e.g., Black or Hispanic persons) may not be targeted for stops simply because

local crime suspect data indicates that members of that racial group appear more frequently in the data.

Training on the procedures prohibiting racial profiling was included in the stop and frisk training, and a specific course on "policing impartially" was included in the curricula for police recruits.  In addition to the in-service training on racial profiling, the NYPD also trained its members on implicit bias and procedural justice.  "Implicit bias" is when people make automatic, unconscious associations between groups of people and stereotypes about those groups, and that those associations arise from the particular environment (neighborhood, family, friends, media, etc.) in which they grow up, live, and work.  "Procedural justice" is a phrase used to describe the necessity of treating civilians with respect, listening to them, and explaining the officer's actions.

Assessing implementation of the Department's policy prohibiting racial profiling is ongoing.  To assess the Department's compliance with its racial profiling policies and the Fourteenth Amendment, the Monitor has used a variety of statistical analyses of NYPD's stop and frisk data.  The Monitor's Thirteenth Report examined stop, question, and frisk (SQF) data for 2013-2019, comparing racial disparities in post-stop outcomes—frisks, searches, summonses, arrests, uses of force, and the percentage of frisks and searches that resulted in the recovery of contraband or weapons, also known as "hit rates"—after controlling for other potentially confounding factors.  The results of that analysis indicated that racial disparities between Black and Hispanic persons and similarly situated Whites and others in frisks, searches, summonses, arrests, uses of force, and the recovery of a weapon or other contraband diminished substantially after the Court's 2013 Remedial Order.  The analyses showed that there were still disparities when the impact of unreported stops is considered.  As the estimate of undocumented stops increased, the estimates for racial disparities also increased.  More needs to be done.

**Interior Patrols at NYCHA Properties.** The *Davis* settlement required revisions to the NYPD procedures governing interior patrols of New York City Housing Authority buildings. The settlement also required changes to related NYPD training materials and the use of a revised Trespass Crimes Fact Sheet (TCFS), an NYPD form used by officers to describe the circumstances leading to or supporting an arrest for trespass. The Court-approved procedures, developed in collaboration with the Plaintiffs and NYPD, state that officers must have an objective, credible reason to approach a person in or around an NYCHA building, and that simply entering, being in, or exiting an NYCHA building is not an objective credible reason for an approach.

In late 2019 and early 2020, the NYPD conducted full-day training on patrols in NYCHA housing for approximately 3,000 officers in the Housing Bureau and Patrol Services Bureau in precincts who patrol NYCHA buildings. The training made effective use of multiple instructors, all of whom were Housing Bureau members. Several instructors also had previous experience living as residents within NYCHA housing. The Housing one-day training classes were interactive and provided officers with guidance on how to maintain the proper balance between constitutionally enforcing the law and respecting the rights of residents and their guests.

The Monitor's Fifteenth Report examined the NYPD's trespass enforcement activities from 2013 to 2019. The report analyzed trends and patterns in trespass arrests, trespass summonses, and trespass stops made by NYPD officers in and around NYCHA housing developments during those years. It assessed whether Black and Hispanic persons are more likely to be subjected to NYPD trespass enforcement actions relative to Whites and other racial group members. Since the entry of the *Davis* settlement, citywide NYPD criminal trespass arrests have dropped by almost 74 percent, trespass summonses have declined by 80 percent, and trespass stops have decreased by 96 percent from 2013 to 2019. These substantial declines in NYPD trespass

enforcement activities were observed throughout New York City's five boroughs.  In addition, the results showed that the decreased trespass enforcement was not associated with increases in other enforcement activity in public housing or elsewhere.  The analyses in the Fifteenth Report also indicated that the percentages of area residents that are Black and Hispanic are no longer statistically significant predictors of trespass arrest, trespass summonses, and trespass stop rates in NYCHA buildings.

Even with the dramatic decrease in trespass stops, arrests, and summonses over the past several years, the trespass enforcement that did occur must comply with the Constitution and NYPD procedures.  The Monitor Team reviewed stops at NYCHA properties and officer BWC videos of interior patrols in NYCHA buildings.  With respect to stops at NYCHA properties, the percentage of stops for which the officers had reasonable suspicion increased from 61 percent for 2017/2018 to 72 percent in 2020.  More needs to be done.  An analysis of trespass arrests will be assessed in the next report.

**Trespass Affidavit Program.**  The Trespass Affidavit Program, sometimes called "Clean Halls," was a Department program in which police officers conducted interior patrols in certain private apartment buildings with the building owner's consent.  In 2020, the NYPD determined that the Trespass Affidavit Program is not an efficient use of police resources, and informed building owners that the program would end.  The Department formally ended the Trespass Affidavit Program on September 30, 2020.  The NYPD issued multiple communications to its members (called FINEST messages) in September and October 2020 announcing the dissolution of TAP.  The NYPD and the New York City Law Department also sent letters in September 2020 and January 2022 to building owners and managers of buildings that had been enrolled in TAP informing them of the end of the program and requesting that they remove all signs from their

buildings that were associated with the program.  The Monitor also requests that building owners comply and remove the signs from the buildings to eliminate any possible confusion.

The Monitor Team will be auditing and assessing whether the program has ended in practice.   The Monitor will submit a report on TAP dissolution to the Court in 2022.

**Documentation of Stops and Underreporting.**  The Court's Remedial Order required the NYPD to develop and implement a stop report form to be used by officers every time a person is stopped.  The stop report must include a narrative section to explain the basis for the stop and a narrative section to explain the basis for the frisk or the search, if applicable.  Officers now complete the reports electronically, and then send them to their supervisor for review and approval.

The NYPD will only be in full compliance with the Court's stop report requirements if officers use the stop report form to document their stops in practice.  The underreporting of stops has been acknowledged by the Department and explicitly identified in NYPD audits.  Any assessment of compliance with the Court's remedial orders will be impossible unless the Department finds ways to ensure that unreported stops are no longer a significant issue.  If the NYPD's data is not accurate and complete, the Monitor cannot find that the City is in substantial compliance.

The NYPD measures underreporting of stops in two ways:  RAND audits (labeled as such because these were initially developed by the RAND Corporation) and Police-Initiated Enforcement (PIE) audits.  Both estimates have decreased over several years.  The 2020 results of these audits showed that rates of underreporting were still at 29 percent for the RAND audits and 28 percent for the PIE Audits, although the figures for the first six months of 2021 were significantly better.  The Monitor identified a third way of estimating undocumented stops by reviewing a sample of BWC videos categorized as investigative encounters.  The Monitor Team

identified 112 stops, with 12 of those encounters that did not have stop reports, for a noncompliance rate of 11 percent. Meetings with NYPD command executives, labeled RISKS Reviews (Remediation of Identified Situations Key to Success) and other steps taken by the NYPD appear to have made some impact on documenting stops, but additional steps must be taken to address the issue of underreporting for the Department to be in compliance with the requirement to document all stops. It is critical that underreporting of stops be addressed long-term.

**Business Card Requirement.** NYPD officers are also required to offer a business card to persons who are stopped but who are not arrested or issued a summons, and also provide one any time an officer is asked for one. The Monitor Team's review of BWC video and stop report data indicates that in too many cases officers are not offering business cards to persons stopped but not arrested or summonsed. In 2020, the NYPD complied with offering the business card in 46.5 percent of the instances when it was required (309 out of 665 instances). It is critical that NYPD officers provide those who are stopped with business cards and doing so less than 50 percent of the time is not acceptable.

**Supervision.** The Court in *Floyd* found that NYPD supervisors did not take responsibility for reviewing the constitutionality of the stops made by officers under their supervision. The Remedial Order requires that supervisors review the constitutionality of the stop and, if conducted, the frisk and search. From the beginning of this monitorship, the Monitor has recognized that significant change in the NYPD depends on first-line supervisors. Sergeants on the street must embrace the changes and be responsible for the officers in their charge. An engaged supervisor who actively intervenes at the scene as well as reviewing reports sets the tone. Improper conduct is best identified and corrected, and good conduct recognized and rewarded, at this level of the organization. Supervisors must ensure that the stops, frisks, and trespass arrests made by their

officers are legal and proper and that these activities are properly documented.  If an officer's actions are improper, the officer's supervisor must take corrective action.

The Monitor Team's review of stops indicates that supervisors have not sufficiently embraced their responsibilities for their officers.  Supervisors routinely approved stops, frisks, and searches that the Monitor Team and the NYPD's own auditing division determined to be improper.  Although the NYPD is taking positive steps to get its supervisors to take an active role in overseeing, managing, and, when necessary, correcting their officers for improper stops, the NYPD is not yet in compliance with this Court-ordered requirement.

**Body-Worn Cameras.**  As part of the Remedial Order, the Court directed the Monitor to oversee a pilot of the use of BWCs by NYPD officers.  The goal of the pilot program was to assess the effects of deploying cameras on policing outcomes, community perceptions of policing in their neighborhoods, and whether deployment results in reducing unconstitutional stops and frisks.  In a randomized control trial, 1,200 officers in 20 pilot precincts wore cameras for a one-year period.  Those 20 precincts were matched with 20 precincts in which officers were not wearing cameras.  The study showed that deployment of BWCs was associated with a statistically significant decrease in Civilian Complaint Review Board (CCRB) complaints and a statistically significant increase in the number of stop reports completed by treatment officers relative to control officers.  The NYPD is also required to have supervisors review the BWC videos of their officers and provide the CCRB with BWC videos associated with citizen complaints.  The NYPD is in compliance with the BWC supervisory review requirement and with providing the CCRB with timely access to BWC videos.

The Department voluntarily equipped all uniformed officers performing patrol functions in Patrol precincts, Housing Police Service Areas (PSAs), and Transit Districts, as well as those

assigned to specialized units such as the Strategic Response Group, with BWCs.  In 2021, the NYPD changed its BWC policies to require officers to activate their BWCs for most Level 1 encounters (requests for information).

**Performance Evaluation.**  The Court found that the NYPD's performance objectives and the way that the NYPD measured officer performance put pressure on officers to make stops without regard to whether they were constitutional.  For that reason, the Court required the NYPD to implement a performance evaluation system for officers that does more than just count the number of enforcement actions (stops, arrests, summonses).  The NYPD implemented a new performance evaluation system for officers and detectives in November 2017.  The Monitor Team's review of the NYPD's performance evaluation system, as it is being implemented in practice, showed that it does not lead supervisors to pressure officers to make more stops without regard to the lawfulness of those stops.  Also, the Monitor Team did not find cases in which officers were given negative evaluations because of a lack of stop activity.

**Auditing.**  The Court's Remedial Order requires the NYPD to develop systems to monitor its members' compliance with constitutional and state law standards.  The Department's Quality Assurance Division (QAD) is the unit that conducts audits, including those relating to stop and frisk and trespass enforcement.  QAD also requires commands to submit self-inspections to monitor their compliance.  These audits and self-inspections examine each command's compliance with the Fourth Amendment and the NYPD's stop and frisk procedures.  In July 2020, the Court approved the NYPD's 2020 Audit Plan.

QAD currently conducts four types of audits relevant to the remedial measures: (1) audits of stop reports and associated BWC videos; (2) RAND audits to identify undocumented stops; (3) PIE audits, also to identify undocumented stops; and (4) audits of trespass arrests and Trespass

Crime Fact Sheets.  QAD also oversees stop report and PIE self-inspections by commands and compares its results with the results from the command self-inspections.

The Monitor worked with the NYPD and Plaintiffs to improve QAD's review of stops. Most significantly, the 2020 Audit Plan requires QAD to review BWC video corresponding to every stop report being audited.  QAD also reviews the BWC video associated with every audited trespass arrest and PIE arrest.  In addition, under the command self-inspection protocol in the 2020 Audit Plan, Integrity Control Officers (ICOs) at commands also must review the BWC video associated with each stop report being evaluated as part of stop report self-inspection.  Given these auditing measures, the NYPD is in compliance with Fourth Amendment auditing requirements.

The NYPD's 2020 Audit Plan does not cover the Department's responsibilities for monitoring its members' compliance with the Fourteenth Amendment, a separate task.  The Monitor and the parties recognize the importance of sound NYPD procedures for monitoring Fourteenth Amendment compliance.  The Department has not yet established procedures for monitoring its members' use of stop and frisk and trespass enforcement in compliance with the Fourteenth Amendment.

**Early Intervention.**  In 2020, the Court ordered the Department to implement an early intervention system, i.e., a program that systematically receives, assesses, and acts on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements.  The NYPD's Early Intervention Program is not a disciplinary system; its goal is to identify members with potential issues and at-risk behavior and take appropriate action before they escalate.  The interventions can be helpful in course correcting.  Members of the Service who trigger a designated threshold (e.g., has three CCRB complaints in one year) are reviewed by an Early Intervention Committee (EIC), which evaluates, among other things, the

member's assignment, tenure in the Department, disciplinary or performance monitoring history, the recommendations of the member's commanding officer, and the recommendations of the Risk Management Bureau (RMB).  The EIC may then determine an intervention plan, which may include training, further review of the officer's BWC videos, enhanced supervision, change of assignment, or a referral to the Internal Affairs Bureau (IAB) for potential disciplinary action, a District Attorney's Office for potential criminal investigation, or the NYPD's Health and Wellness Section.  The EIC has not yet reviewed any members of the Department based on one of the Court-ordered thresholds:  lawsuits alleging improper stop, trespass enforcement, or racial profiling or slurs where evidence existed that the police officer violated an NYPD rule.  The NYPD is in partial compliance with implementation of the early intervention system.

**Complaints and Discipline.**  The Court's Remedial Order required the NYPD to change its policies and practices with respect to investigations of racial profiling and other bias-based profiling allegations as well as its handling of civilian complaints that have been substantiated by the CCRB.

With respect to investigations of racial profiling complaints, in 2019 and 2020, the Monitor Team reviewed NYPD investigations of profiling complaints and found significant concerns regarding their thoroughness and impartiality.  As a result, the Department implemented changes to its training for profiling investigations and to the IAB Guide on profiling investigations.  Since then, the Monitor Team reviewed another set of more recent investigations.  The racial profiling investigations selected for review reflected an improvement over prior profiling investigations. The majority of the cases were more thoroughly investigated, and improvements were noted in the complaint intake process, complainant contact and interview, and subject/witness officer interviews.  Investigators also used BWC videos of the subject and other officers present in the

encounter.  However, one deficiency common among the cases was a lack of any analysis of trends or patterns of prior allegations and/or enforcement practices of the subject officer.  In 2022, the responsibility for investigating racial profiling complaints will be moved from the NYPD to the CCRB.  We are hopeful that this change will result in thorough and impartial investigations.

For complaints about stop and frisk encounters, the Department Advocate's Office (DAO) reviews CCRB findings and recommendations for discipline regarding allegations the CCRB has substantiated.  The Court found that the NYPD failed to impose meaningful discipline when the CCRB determined that officers engaged in unconstitutional stops and frisks.  It required that the DAO change its procedures to show "increased deference to credibility determinations by the CCRB," to adopt "an evidentiary standard that is neutral between the claims of complainants and officers," and to ensure there is "no general requirement of corroborating physical evidence."[2]  For the 2020 substantiated CCRB cases, the NYPD agreed that a violation occurred in all of the closed stop and frisk cases (there are some 2020 cases that remain open).  The NYPD did not challenge the CCRB's credibility determination in any of those cases.

In 2021, the NYPD published a publicly available discipline penalty matrix to outline the presumptive penalties for a wide variety of offenses.  The discipline matrix also lists mitigating and aggravating factors that should be considered when deciding on an appropriate penalty.  The presumptive penalty for an improper or wrongful stop, frisk, or search of an individual is set at three penalty days, with a mitigated penalty of training and an aggravated penalty of 15 penalty days.  These presumptive penalties for stop and frisk violations are more severe than the penalties that had been imposed for stop and frisk violations during the seven years of the monitorship, but it is unclear how the discipline matrix will be applied.

---

[2] *Floyd* Remedial Order, 959 F. Supp. 2d at 684.

The Court has directed the Monitor to prepare an in-depth study of the efficacy, fairness, and integrity of the City's policies, practices, and procedures for handling police misconduct during stops.  The Monitor will defer its assessment of discipline requirements until after the completion of the discipline study and report, which will occur later this year.

**Monitor's Studies.**  In conjunction with the change in the NYPD's BWC policy, the Monitor will be undertaking studies of the NYPD's BWC videos to address important questions about the NYPD's compliance with the Fourth and Fourteenth Amendments in police-citizen encounters.

\*      \*      \*

.

**SIXTEENTH REPORT OF THE INDEPENDENT MONITOR**

## I.   INTRODUCTION

This is the Sixteenth Report of the Independent Monitor for the New York City Police Department (NYPD) stop and frisk cases, *Floyd v. City of New York*, *Davis v. City of New York*, and *Ligon v. City of New York*.  This monitorship began with the District Court's August 2013 liability decision finding that the Department had violated the Fourth and Fourteenth Amendments and its Remedial Order setting forth necessary reforms.[3]

In the more than eight years since the Court's Remedial Order, the NYPD has made significant strides in meeting the Court's requirements.  New policies have been put in place, a new training has been conducted, a new stop report is in place, officers now wear Body-Worn Cameras, and the NYPD has implemented a new early intervention system, a revised performance evaluation system for police officers and detectives, and new auditing protocols.  This Report describes that progress, as well as the reforms that have yet to be accomplished and the requirements that have not yet been met.  One issue that was highlighted in the Monitor's First Report and continues to be a concern today, as discussed in this Report, is officers making stops of civilians but not documenting those stops in a stop report.  The Report below sets out several steps for the NYPD to take to address this problem of underreporting.

This Report is organized as follows:  in each section, the Report describes the Court-ordered requirements pursuant to the *Floyd* Remedial Order and the *Davis* settlements and then, for each requirement, reviews the efforts made by the Department to implement them in practice, and the Monitor's assessment of those efforts.  As discussed in the Report below, the NYPD

---

[3] *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) (Liability Opinion); *see Floyd v. City of New York*, 959 F. Supp. 2d 668 (S.D.N.Y. 2013) (Remedial Order).

terminated the Trespass Affidavit Program (TAP) in September 2020, so this Report will not include assessments for the TAP requirements under *Ligon*.  The Report covers the following topics:  Written Policies (Section II), Underreporting (III), Ligon/TAP (IV), Supervision (V), Training (VI), Body-Worn Cameras and the City's Alternative to the Court-ordered Pilot Study (VII), Performance Evaluation (VIII), Auditing (IX), Early Intervention System (X), and Complaints and Discipline (XI).

Appendix 1 to this Report details each of the Court-ordered requirements, the text from which the requirement is derived, the definition of compliance, the methodology used for assessing compliance, the data needed for the Monitor's compliance review, and whether the City has done the work necessary to meet the definition of compliance for that task.  The terms to describe the status of the Department's compliance are as follows:

**In Compliance.**  The NYPD has met the definition of compliance for this requirement at this time.  The Monitor's responsibility will be to assess whether compliance is maintained and whether it is having the desired effect of meeting the fundamental goals of the Court-ordered reforms.

**Partial Compliance.**  The NYPD has made progress in implementing the requirement, but has not reached the level necessary for compliance, or there are additional steps that the Department needs to take to meet the definition of compliance.

**Not Yet in Compliance.**  The NYPD has more work to do to implement the requirement, the level of noncompliance is too high, and there are additional steps the NYPD needs to take to meet the definition of compliance.

The Monitor's compliance assessment shows that the NYPD has put in place much of the policies and procedures required by the Court and trained its officers in those policies and procedures.  It is now the implementation on the street that is being measured by the Monitor Team, and this Report shows that there has been progress over the last year, but that there is still more work to be done in terms of supervision, documentation, monitoring of Fourteenth Amendment compliance, and discipline, among others.

18

Before delving into the requirements and NYPD implementation efforts, it is useful to provide some context to this Report.  This Report covers data and information about NYPD policing in 2020 and 2021.  Policing in 2020 and 2021 looked different than policing in 2019 because of both the COVID-19 pandemic and in response to the protests resulting from the murder of George Floyd and the deaths of other Black Americans.  Data from the last two years can be difficult to interpret.  Reported stops in 2019 rose to 12,958 from 11,238 in 2018, which appeared to have been the result of increased reporting as opposed to an increase in stops.  In 2020, reported stops fell to 9,544.  The numbers in 2021 for reported stops appear to be about that same level, with 8,947 stop reports filed in 2021.  This decrease in reported stops was likely due, in part, to fewer stops as a result of the COVID pandemic, but it is unclear whether there was a continued improvement in stop reporting.  While reported crime in New York City decreased from 2018 to 2019, the City saw a spike in shootings and homicides starting in June of 2020.  Shootings and homicides in 2020 in New York City were higher than they were in 2019, following a trend affecting many other U.S. cities.  This increase continued into 2021.

## II.  WRITTEN POLICIES

### A.  Stop and Frisk Policies

The Court in *Floyd* recognized that the practice, known as "stop and frisk" or "stop, question and frisk (SQF)" can be an important tool to further public safety.  The Court ruled, however, that the Department's practices of stops, frisks, and searches did not comply with the Constitution, and to remedy that, the Department needed to change its policies, procedures, and practices on stops, frisks, and searches.  The NYPD's written policy regarding stop, question, and frisk is detailed in Section 212-11 of the Patrol Guide (P.G.), *Investigative Encounters:  Requests for Information, Common Law Right of Inquiry and Level 3 Stops*.  The Court required the following changes made to the Patrol Guide:

19

- The Patrol Guide must state what constitutes a stop; when a stop may be conducted; when a frisk may be conducted; and when a search may be conducted.

- The Patrol Guide must include a definition of "reasonable suspicion," the standard needed for a stop.

- The Patrol Guide must state clearly that officers must have separate reasonable suspicion that a person is armed and dangerous to conduct a frisk of that person.

- The Patrol Guide must require officers to document the stop and articulate the circumstances that gave them reasonable suspicion for the stop, and, if conducted, for the frisk.

- The Patrol Guide must require supervisory review of stops, including review of the constitutionality of the stop, and not just that a stop report form was filled out.

1. **Compliance Assessment—Written Stop and Frisk Policies and Implementation.**

**Task 1a In Compliance; Task 1b Partial Compliance.**

In August 2015, the Court approved a new P.G. 212-11 governing stops, frisks, and searches. The Patrol Guide also addresses investigative encounters between officers and civilians that are less intrusive than stops or arrests. These encounters are governed by *People v. DeBour*, which sets out four levels of encounters: a simple Request for Information (Level 1); a Common Law Right of Inquiry (Level 2); a *Terry* stop, when an officer detains a person to investigate (Level 3); and an arrest (Level 4). The investigative encounters procedures in P.G. 212-11 describe the standards that govern each level.

There have been several changes to P.G. 212-11 since it was first approved by the Court in 2015. In March 2016, the Court approved changes to P.G. 212-11 to reconcile the procedures with the revised stop report form required by the Court. Additional changes were made when the stop report form became electronic, allowing officers to more easily complete the form on their phones. In October 2018, the Department proposed, and the Court approved, changes to P.G. 212-11 to comply with the Right to Know Act enacted by the City Council. These laws require officers in

certain nonemergency encounters to identify themselves by name, rank, and command, explain the reason for the stop, and offer business cards if the person stopped is not arrested or issued a summons.  Further changes to P.G. 212-11 were made in 2018 when the NYPD launched its citywide BWC program and again in 2021 instructing officers to activate their BWCs at Level 1 and adding new requirements for the categorization of such videos (see BWC Section VII.C below, Alternative to the Combined Pilot).  These are all positive developments.

The revised Patrol Guide for stop and frisk policies meets the requirements of the Court's orders and the City is in compliance with this requirement (Task 1a).

As stated in prior Monitor Reports, compliance requires not just a change in written policy, but also that the policy change is implemented and sustained in the field.  Officers must articulate reasonable suspicion for the stop and the frisk, if conducted, and articulate a justifiable basis for the search, if conducted.  Stops, frisks, and searches that do not meet these constitutional requirements must be identified by the Department and corrective action taken with respect to both the relevant officers and their supervisors.

Starting in the fourth quarter of 2016, the Monitor Team has obtained samples of stop reports to review.  In 2018, Monitor Team members began reviewing the BWC video of the encounters.  The stop reports and BWC videos are evaluated by three members of the Monitor Team and any disagreements, either among the Monitor Team or between the Monitor Team and the NYPD's assessment of the stop reports, are reviewed by the Monitor and Deputy Monitor.  The stops are then discussed, and the results sent to the NYPD, which meets with the Monitor Team to discuss those cases in which there is a disagreement between the Department's and the Monitor's assessment.  As noted below in Section IX, Auditing, the level of agreement between the Department's assessments and the Monitor's assessments has increased each year.

Chart 1 below reflects the Monitor's assessment of stop reports from the fourth quarter of 2016 to the fourth quarter of 2020.  The chart shows the quarter and number of stop reports reviewed in the first two columns and the number and percentage of stop reports that the Monitor Team determined articulated reasonable suspicion for the stop in the third column.  The number of stops with frisks and the Monitor Team's assessment of whether those stop reports articulated reasonable suspicion that the person stopped was armed and dangerous are reported in the fourth and fifth columns.  The sixth column reports the number of stops that included a search, and the seventh column reports the number and percentage of stop reports that the Monitor Team determined articulated a suitable justification for the search.  The Monitor's assessment of stops included only stops for which there was a stop report and does not account for stops that were not reported; see Section III below for a discussion of undocumented stops.

**Chart 1.      Monitor Team Review of Stop Reports 4Q2016 through 4Q2019**

| Quarter | # Stop Reports Reviewed by Monitor Team | Stop Reports that Articulate Reasonable Suspicion for the Stop | # Stop Reports in Which Suspect Was Frisked | Stop Reports that Articulate Reasonable Suspicion for the Frisk | # Stop Reports Where Suspect Was Searched | Stop Reports that Articulate Justification for the Search |
|---|---|---|---|---|---|---|
| 4Q2016 | 261 | 121 (46%) | 146 | 111 (76%) | 67 | 56 (84%) |
| 1Q2017 | 256 | 142 (55%) | 145 | 114 (79%) | 79 | 68 (86%) |
| 2Q2017 | 302 | 178 (59%) | 176 | 143 (81%) | 91 | 73 (80%) |
| 3Q2017 | 312 | 188 (60%) | 179 | 146 (82%) | 87 | 76 (87%) |
| 4Q2017 | 305 | 212 (70%) | 171 | 153 (89%) | 107 | 101 (94%) |
| 1Q2018 | 308 | 202 (66%) | 213 | 187 (88%) | 92 | 84 (92%) |
| 2Q2018 | 295 | 211 (72%) | 189 | 169 (89%) | 81 | 70 (87%) |
| 3Q2018 | 302 | 251 (83%) | 150 | 134 (89%) | 113 | 98 (87%) |
| 4Q2018 | 300 | 239 (80%) | 184 | 170 (92%) | 113 | 106 (94%) |
| 1Q2019 | 315 | 250 (79%) | 174 | 155 (89%) | 109 | 101 (93%) |
| 2Q2019 | 308 | 245 (80%) | 190 | 168 (88%) | 121 | 115 (95%) |
| 3Q2019 | 304 | 249 (82%) | 143 | 117 (82%) | 129 | 119 (92%) |
| 4Q2019 | 308 | 202 (66%) | 213 | 187 (88%) | 92 | 84 (92%) |

For 2020, the Monitor Team's assessments of stops included the BWC video associated with the stop reports being reviewed.  The Monitor Team's review of BWC video determined

whether there were stops that did not have a legal basis even though the stop report narrative articulated reasonable suspicion.  The Monitor Team also was able to assess whether the BWC video showed that a stop encounter was legal, even though the written stop report narrative did not sufficiently articulate reasonable suspicion for the stop.  The Monitor Team's evaluation of stops, frisks, and searches in 2020 included all the available evidence, including the stop report, the ICAD (the radio dispatch system) printout, and BWC video.  Chart 2 below presents the Monitor Team's assessment of whether the stop was legal and whether the frisk, if conducted, was proper and whether the search, if conducted, was proper.

**Chart 2.        Monitor Team Review of Reported Stops 1Q2020 through 4Q2020**

| Quarter | # Stops Reviewed by Monitor Team | Stops That Had Reasonable Suspicion for the Stop | # Stop in Which Suspect Was Frisked | Frisks That Had Reasonable Suspicion for the Frisk | # Stop Where Suspect Was Searched | Stop That Had Justification for the Search |
|---|---|---|---|---|---|---|
| 1Q2020 | 303 | 252 (85%) | 161 | 153 (95%) | 117 | 109 (93%) |
| 2Q2020 | 302 | 237 (78%) | 138 | 127 (92%) | 119 | 113 (95%) |
| 3Q2020 | 300 | 280 (93%) | 152 | 142 (93%) | 127 | 119 (94%) |
| 4Q2020 | 298 | 264 (88%) | 140 | 136 (97%) | 107 | 100 (93%) |

Charts 1 and 2 indicate that the level of compliant stop reports and stops has improved over time.  More than half the stop reports in the first quarter of 2016 failed to articulate reasonable suspicion.  By 2019, the Monitor Team's review of stop reports showed that 23.4 percent of stop reports failed to articulate reasonable suspicion.  In 2020, based on the stop reports, the BWC videos and ICAD printouts reviewed, the Monitor Team determined that 14.2 percent of the stops reviewed were improper, lacking reasonable suspicion.  The percentage of officers who articulated reasonable suspicion that the person stopped was armed and dangerous (necessary for a frisk), or justification for the search, also increased over time, although the level of compliance was fairly high even in the fourth quarter of 2016.  In 2020, over 94 percent of reported frisks reviewed by the Monitor Team were proper and over 96 percent of reported searches reviewed were proper.

The Monitor's assessment of stops and stop reports can only be based on stops that have been documented by officers in a stop report. As discussed in Section III below, there are officers who are making stops but not documenting them in a stop report. The Monitor cannot assess the legality of stop encounters that have not been documented. Without more accurate and complete documentation of stop encounters, the Monitor cannot find the NYPD in compliance with the Court-ordered stop and frisk policies. Based on the Monitor's review of stop reports and BWC video of stops, as well as the extent to which supervisors and Integrity Control Officers are identifying and correcting improper stops (see Section V, Supervision) and the Quality Assurance Division is identifying improper stops (see Section IX, Auditing), the NYPD is in partial compliance with respect to implementing the Court-approved stop and frisk policies (Task 1b).

**B.     Stop Report Form**

The Court's order required the NYPD to develop and implement a stop report form to be used by officers every time a person is stopped. The stop report must include a narrative section to explain the basis for the stop and a narrative section to explain the basis for the frisk or the search, if applicable. The Court also required the Department to simplify and improve the checkboxes that were in the prior stop report.

**1.     Compliance Assessment—Stop Report Form.**

**Tasks 3, 8a In Compliance; Task 1c Partial Compliance.**

Revisions to the stop report were approved by the Court in March 2016. As required by the *Floyd* Remedial Order, two narrative sections were added to the stop report. The electronic version of the stop report in FORMS, the NYPD's Records Management System, was approved by the Court in November 2016. In October 2018, the Court approved revisions to the stop report for officers to document the type of information that led to the stop (self-initiated, radio run, or victim or witness report) and whether a radio run was anonymous or not. The current stop report

in use by the NYPD meets the requirement for a stop report form and the City is in compliance with Tasks 3 and 8a.  The NYPD will only be in full compliance with the Court's stop report requirements, however, if officers use the stop report form to document their stops in practice.  The underreporting of stops has been acknowledged by the Department and explicitly identified in NYPD audits (see Section III, Underreporting, below).  The Department is in partial compliance with Task 1c, implementation of the stop report form.

### C.   Policy Prohibiting Racial Profiling

The Court's orders and the parties' agreements require the NYPD to revise its Patrol Guide prohibition on racial profiling.  The new procedures must state that race, ethnicity, or national origin may be considered by officers in taking police enforcement action only when it is part of a specific and reliable suspect description, and that racially defined groups may not be targeted for stops simply because they appear more frequently in local crime suspect data.

### 1.   Compliance Assessment—Policy Prohibiting Racial Profiling and Implementation.

**Task 2a In Compliance; Task 2b Partial Compliance.**

In August 2015, the Court approved the Department's revised policy prohibiting racial profiling and bias-based policing, P.G. 203-25.  The policy defines racial profiling as police action, including stops, frisks, arrests, or other law enforcement actions, or the failure to perform a police action motivated, even in part, by the actual or perceived race, color, ethnicity, or national origin of an individual.  Race may be considered only if it is part of a reliable and specific suspect description that includes not just race, gender, and age, but other identifying characteristics or information.  The policy also includes a description of Section 14-151 of the New York City Administrative Code prohibiting bias-based profiling.  The Administrative Code includes

demographic categories in addition to race, color, and national origin:  creed, age, alienage or citizenship status, gender, sexual orientation, disability, and housing status.

In June 2021, the Department moved the racial profiling policy from the Patrol Guide to the NYPD's Administrative Guide, A.G. 304-17.[4]  The NYPD also added two sections to A.G. 304-17, which state that the Department is committed to complying with federal civil rights laws (e.g., Title VII, Section 504, Title IX) and that it is impermissible to retaliate against any individual under Title VI of the 1964 Civil Rights Act.  The Department policies comply with the Court's requirement for policies prohibiting racial profiling (Task 2a).

To assess the Department's compliance with its racial profiling policies and the Fourteenth Amendment, the Monitor has used a variety of statistical analyses of NYPD's stop and frisk data conducted by experts on the Monitor Team.

In the Monitor's Fifth Report, Dr. John MacDonald, a member of the Monitor Team, examined trends in the NYPD's SQF data for the years 2013, 2014, and 2015.  The analyses in that report indicated that racial disparities during 2013-15 were trending in the right direction; most measures showed a diminution of racial disparities, although some did not.  However, that report drew no conclusion about the NYPD's constitutional compliance, because statistical data over a more extensive period was needed.  Moreover, as noted in prior Monitor reports, NYPD underreporting of stops limits the reliability of analyses based on data that include only reported stops.

The Monitor's Thirteenth Report examined SQF data for 2013-2019, using the statistical analyses developed and applied in the Monitor's Fifth Report, comparing racial disparities in post-

---

[4] Moving the racial profiling policies to the Administrative Guide does not diminish its authority; any violations of the Administrative Guide are subject to discipline and correction just as are violations of the Patrol Guide.

stop outcomes—frisks, searches, summonses, arrests, uses of force, and the percentage of frisks and searches that resulted in the recovery of contraband or weapons, or "hit rates"—after controlling for other potentially confounding factors.  To address the concern that undocumented stops might undermine the validity of the analyses in the report, Dr. MacDonald conducted additional analyses to examine the extent to which undocumented stops may affect the estimates of racial disparities in post-stop outcomes.

The analyses in the Thirteenth Report indicated that racial disparities between Black and Hispanic persons and similarly situated Whites and others in frisks, searches, summonses, arrests, uses of force, and the recovery of a weapon or other contraband, diminished substantially after the Court's 2013 Remedial Order.  However, undocumented stops raise concerns about the ability to draw strong conclusions about Fourteenth Amendment compliance.  This is particularly the case for comparisons of frisks, arrests, and uses of force for Black persons, as the estimated disparities in stop outcomes increase if one uses a larger estimate of undocumented stops.

Without more complete data on stops, the NYPD is in partial compliance with implementation of the racial profiling policies (Task 2b).

### D.    NYCHA Interior Patrol Policies

The *Davis* settlement requires revisions to P.G. 212-60, which concerns interior patrols of New York City Housing Authority buildings.  The settlement also requires changes to related NYPD training materials and the use of a revised Trespass Crimes Fact Sheet (TCFS), an NYPD form used by officers to describe the circumstances leading to or supporting an arrest for trespass. The Court-approved policy states that officers must have an objective, credible reason to approach a person in or around an NYCHA building, and that simply entering, being in, or exiting an NYCHA building is not an objective credible reason for an approach.

27

1.     **Compliance Assessment—NYCHA Interior Patrol Policies.**

**Task 10a In Compliance; Task 10b Partial Compliance; Task 10c No Assessment.**

The Court approved the Department's revised policy regarding interior patrols of NYCHA buildings in June 2016.  It became effective on April 25, 2017.  The City is in compliance with the Court's requirement regarding written policies for NYCHA interior patrols (Task 10a).

The Monitor's Fifteenth Report examined the NYPD's trespass enforcement activities from 2013 to 2019.  The report analyzed trends and patterns in trespass arrests, trespass summonses, and trespass stops made by NYPD officers in and around NYCHA housing developments during those years.  It assessed whether Black and Hispanic persons are more likely to be subjected to NYPD trespass enforcement actions relative to Whites and other racial group members.  Since the entry of the *Davis* settlement, citywide NYPD criminal trespass arrests have dropped by almost 74 percent, trespass summonses have declined by 80 percent, and trespass stops have decreased by 96 percent from 2013 to 2019.  These substantial declines in NYPD trespass enforcement activities were observed in NYCHA buildings, in areas surrounding NYCHA buildings, and throughout New York City's five boroughs.  In addition, the results show clearly that trespass enforcement dropped significantly for Black and Hispanic individuals in NYCHA, and that the decreased trespass enforcement was not associated with increases in other enforcement activity.  The analyses in the Fifteenth Report also indicated that the percentages of area residents that are Black and Hispanic are no longer statistically significant predictors of trespass arrest, trespass summons, and trespass stop rates in NYCHA buildings or in census block groups at further distances from NYCHA developments.  Black and Hispanic subjects are now no more likely to be subjected to trespass enforcement activities relative to White and other racial group subjects.  These results support the analysis of the Monitor's Thirteenth Report.

The analysis in the Fifteenth Report did not examine individual trespass arrests, summonses, and stops for Fourth Amendment compliance.  That assessment was done for this Report.  With respect to implementation, the Monitor Team reviewed stop reports at NYCHA properties and officer BWC videos of interior patrols in NYCHA buildings.

### a.        Review of Stop Reports at NYCHA Properties

A sample of 300 stop reports was randomly selected from the population of 771 reports for stops in NYCHA developments in 2020.  These reports were identified from the publicly available data on the NYC data portal.  For each stop report, the Monitor Team assessed whether the stop narrative articulated reasonable suspicion for the stop, whether the frisk narrative articulated reasonable suspicion that the person stopped was armed and dangerous, and whether there was a sufficient legal basis for the search.  Chart 3 below summarizes the Monitor's assessment of the legal sufficiency for the stops, frisks, and searches listed in the 300 reports, along with the assessments from prior years.

**Chart 3 NYCHA Stop Reports**

| Period | Stop Reports Evaluated | Stop Narrative Articulates Reasonable Suspicion for Stop | Frisks Evaluated | Frisk Narrative Articulates Reasonable Suspicion for Frisk | Searches Evaluated | Search Narrative Articulates Legal Basis for Search |
|---|---|---|---|---|---|---|
| 2017/2018 | 412 | 253 (61%) | 225 | 200 (89%) | 183 | 176 (96%) |
| 2019 | 300 | 198 (66%) | 178 | 156 (88%) | 97 | 90 (93%) |
| 2020 | 300 | 215 (72%) | 197 | 179 (91%) | 129 | 114 (88%) |

The Monitor Team made the following additional observations:

- Of the 85 stop reports that the Monitor Team determined did not articulate reasonable suspicion, 80 of the stop reports were approved by the supervising officers.  In five cases, the supervisor and Monitor Team agreed that there was an insufficient basis for the stop. In one instance, the Monitor Team disagreed with the reviewing supervisor and determined that there was a sufficient basis for the stop.

29

- Of the 18 stop reports in which, according to the Monitor Team's determination, there was insufficient articulation that the person frisked was armed and dangerous, the supervising officer concluded that there was an insufficient basis for the frisk in two of the 18 encounters, approved the frisk in 14, and did not review the legal basis in two others.

### b.      Review of BWC Videos at NYCHA Properties

As part of the monitoring plan, BWC video recordings are assessed to explore the lawfulness of encounters between police officers and members of the public inside and in the vicinity of NYCHA buildings. Every six months, the Axon BWC data management system is searched using the tag "Interior Patrol–NYCHA." In 2020, there were 71,504 videos categorized as "Interior Patrol–NYCHA." This is approximately half of the more than 149,000 videos that were recorded in 2019 as Interior Patrol–NYCHA. Due to the frequency of videos in which no members of the public are encountered in routine interior patrols, the sample was stratified into two groups. The first group was videos that were "uncategorized" with a secondary category of "Interior Patrol–NYCHA." The second group consisted of videos assigned a category indicating there was police action involving a member of the public (arrest, summons, investigative encounter) and that also had the secondary category of "Interior Patrol–NYCHA." Two hundred videos from each stratum (uncategorized and category indicating police action) were randomly selected for assessment. This assessment focused on the lawfulness of significant public contacts between the police and the public.

For monitoring purposes, significant public contact is defined as any encounter between the officer and a member of the public that lasts longer than 30 seconds, or any encounter in which it appears that the officer is engaged in an investigative encounter. This would include contacts of less than 30 seconds during which the officer asked Level 1 or Level 2 questions. Routine interactions with staff members of the building, other officers, or persons in their official capacity (FDNY, EMS, Postal, etc.) were not considered a significant public contact for this definition.

There was significant public contact in 14 percent (27 of 200) of the "uncategorized" videos and 51 percent (101 of 200) of the other videos.  Overall, in 128 of the 400 videos (32%), the recording officer had significant public contact with a person during the Interior Patrol.

A total of 282 individuals were encountered in the 128 videos in which officers were observed to have had significant public contact.  Chart 4 below summarizes the results of the Monitor Team's review of the 128 videos

**Chart 4.  2020 NYCHA BWC Videos**

Table 1 – Location Where Person First Encountered

| Location | Count |
|---|---|
| APARTMENT | 38 |
| BASEMENT | 1 |
| ELEVATOR | 6 |
| HALLWAY | 95 |
| LOBBY | 16 |
| OUTSIDE | 35 |
| ROOF | 1 |
| ROOF LANDING | 24 |
| STAIRWAY | 66 |
| **Total** | **282** |

Table 2 – Level at First Encounter

| Level | Count |
|---|---|
| 0 | 13 |
| 1 | 191 |
| 2 | 22 |
| 3 | 10 |
| 4 | 44 |
| Inconclusive[5] | 2 |
| **Total** | **282** |

---

[5] There are a few reasons why a BWC video can be inconclusive, but it is often because the video was activated after the encounter started (so the viewer cannot see or hear what was said or done at the beginning of the encounter) or terminated early, before the end of the encounter.

Table 3 – Did It Appear that the Officers' Actions Were Lawful at First Encounter?

|  | Count |
| --- | --- |
| Inconclusive | 5 |
| No | 15 |
| Yes | 262 |
| **Total** | **282** |

Table 4 – Did the Encounter Escalate?

|  | Count |
| --- | --- |
| Inconclusive | 4 |
| No | 252 |
| Yes | 26 |
| **Total** | **282** |

Table 5 – If the Encounter Escalated, Did the Escalation Appear Lawful?[6]

|  | Count |
| --- | --- |
| No | 19 |
| Yes | 7 |
| **Total** | **26** |

Table 6 – Was the Person Frisked?

|  | Count |
| --- | --- |
| Inconclusive | 4 |
| No | 253 |
| Yes | 25 |
| **Total** | **282** |

Table 7 – Did the Frisk Appear Lawful?

|  | Count |
| --- | --- |
| No | 12 |
| Yes | 13 |
| **Total** | **25** |

---

[6] The Monitor Team determined whether there was improper escalation based on whether the officer had a legal basis for escalation (e.g., reasonable suspicion to escalate to Level 3 or Probable cause to escalate to Level 4 arrest).

Table 8 – Was the Person Searched?

|  | Count |
|---|---|
| Inconclusive | 4 |
| No | 251 |
| Yes | 27 |
| **Total** | **282** |

Table 9 – Did the Search appear lawful?

|  | Count |
|---|---|
| No | 13 |
| Yes | 14 |
| **Total** | **27** |

Table 10 – Enforcement Action Taken?

|  | Count |
|---|---|
| Inconclusive | 1 |
| None | 249 |
| Summons | 10 |
| Arrested | 22 |
| **Total** | **281** |

Table 11 – Did the Officer Offer a Right to Know (RTK) Business Card?

|  | Count |
|---|---|
| Inconclusive | 3 |
| Not Required | 229 |
| No | 45 |
| Yes | 5 |
| **Total** | **281** |

Table 12 – Did the Officer Explain His/Her Actions?

|  | Count |
|---|---|
| Inconclusive | 6 |
| No | 18 |
| Yes | 257 |
| **Total** | **281** |

Table 13 – Gender of Person Encountered

|  | Count |
|---|---|
| Inconclusive | 5 |

| | |
|---|---|
| Female | 87 |
| Male | 190 |
| **Total** | **282** |

Table 14 – Race of Person Encountered

| | **Count** |
|---|---|
| Inconclusive | 18 |
| Asian | 2 |
| Black | 173 |
| Hispanic | 75 |
| White | 14 |
| **Total** | **282** |

The Monitor Team made the following observations:

- The most common location of the 282 encounters was in the hallway (34%).

- Most encounters (N=191) started at Level 1 (68%).

- There were 44 encounters that started at probable cause (16%). In nine of these encounters (20%), the person was issued a summons; in 11 cases (25%), the person was arrested; and in 24 cases (55%), no enforcement action was taken.

- During the 282 encounters, the officers acted lawfully at the initial approach in 261 (93%) of them; in 15 encounters (5%), the officers did not appear to have a credible reason to approach, and five encounters were inconclusive.

- There were 26 encounters that appeared to escalate; of those, escalation was proper in seven (27%) and without the appropriate legal authority in 19 (63%).

- In the large majority of encounters, there was no frisk (91%). Of the 25 encounters in which a frisk was conducted, the officer had reasonable suspicion that the person was armed and dangerous in 13 (52%) of them.

- In the large majority of encounters, there was no search (90%). Of the 27 encounters in which there was a search, the officer had the legal authority to conduct the search in 14 (52%) of those encounters.

The Fifteenth Report showed that the level of NYPD trespass enforcement has decreased significantly. But the trespass enforcement that remains must be conducted constitutionally. The Monitor Team's review of reported stops in NYCHA buildings has shown an increase in stops

with reasonable suspicion, but only to a level of 72 percent compliance.  The reviews of BWC videos of Interior Patrols at NYCHA buildings showed improper escalation and officers' failure to offer persons their business card when required.  The Monitor Team determined that the NYPD is in partial compliance with implementing the revised policies regarding police patrols at NYCHA locations (Task 10b).  The Monitor Team will be reviewing 2021 trespass arrests for the next report and will assess compliance with Task 10c.

### E.     Trespass Crimes Fact Sheets (TCFS)

The *Davis* settlement requires officers making trespass arrests in NYCHA buildings to document the arrests on a new form—the Trespass Crimes Fact Sheet (PD 351-144).  NYPD officers must complete a TCFS prior to arraignment, and the TCFS must articulate a proper basis for the officer's approach and probable cause for the trespass arrest.

### 1.     Compliance Assessment—Trespass Crimes Fact Sheet

#### Task 11a In Compliance; Task 11b No Assessment.

Revisions to the TCFS were approved by the Court in June 2016.  The TCFS transitioned from a paper form to an electronic form that is available on officers' phones and in the NYPD's records management system in 2020.  The NYPD is in compliance with the written requirement that trespass arrests be documented with a TCFS (Task 11a).  The NYPD audited 2020 trespass arrests and found that a TCFS was completed in 94 percent of arrests at NYCHA locations.  The Monitor Team did not review 2020 trespass arrests and the TCFS associated with them.  The Monitor Team will be reviewing 2021 TCFS for the next report and will assess compliance with Task 11b.

### F.        Business Card Requirement

The *Floyd* Remedial Order specified that any "form or card given to stopped persons should provide the stated reasons for the stop, the badge numbers of the stopping officers, and information on how to file a complaint."[7]

#### 1.        Compliance Assessment—Business Card Requirement

<span style="color:red">**Task 14 Not Yet In Compliance.**</span>

In August 2015, as part of the submission of P.G. 212.11, the Department required officers to offer persons who are stopped but not arrested or summonsed a "What Is a Stop?" tear-off information card.  To comply with New York City's Right to Know Act, the "What Is a Stop?" tear-off information card was replaced with a single all-purpose Business Card that officers are required to offer individuals at the end of most Level 2 and Level 3 encounters and other specified interactions.  The Business Card is pre-printed with the officer's name and shield number and the back of the card lists a website where individuals who are stopped can request their stop report as well as BWC footage related to the encounter.  Plaintiffs agreed to this change on the condition that the Department respond to public requests for stop reports within 10 business days.

Although the Business Card was approved by the Court and meets the requirements of the Court's order, the Monitor Team's review of BWC video and stop report data indicates that in too many cases, officers are not offering Business Cards to persons stopped but not arrested or summonsed.  Chart 5 below illustrates the frequency that Business Cards are offered by members of the NYPD as observed on BWC footage during the Monitor Team's assessment of stop reports and videos associated with those stops.  In 2020, the NYPD complied with offering the Business

---

[7] Remedial Order, 959 F. Supp. 2d 668, 682.

Card in 46.5 percent of the instances when it was required (309 out of 665).  The NYPD is not yet in compliance with this requirement (Task 14).

**Chart 5.  Compliance with Business Card Requirement – 2020 Monitor Sample of Stops**

| Quarter | Total Events | RTK Card Not Required | RTK Card Required | RTK Card Offered | Compliance |
|---------|--------------|-----------------------|-------------------|------------------|------------|
| 1Q2020 | 288 | 109 | 179 | 91 | 50.80% |
| 2Q2020 | 275 | 114 | 161 | 71 | 44.10% |
| 3Q2020 | 275 | 120 | 155 | 68 | 43.90% |
| 4Q2020 | 280 | 110 | 170 | 79 | 46.50% |
| 2020 Total | 1118 | 453 | 665 | 309 | 46.50% |

## III.   UNDERREPORTING OF STOPS

Any assessment of compliance with the Court's remedial orders will be impossible unless the Department finds ways to ensure that unreported stops are no longer a significant issue.  If the NYPD's data is not accurate and complete, the Monitor cannot find that the City is in substantial compliance.

Trying to identify and report on actions that are not documented is difficult.  The Monitor and the NYPD have attempted to determine the scope of underreporting of Level 3 *Terry* stops and address the problem in a number of ways.  These include: (a) RISKS Reviews; (b) RAND audits of radio communications; (c) PIE audits; (d) supervisory review of BWC videos; (e) CCRB reports of stop-related complaints for which a stop report was not completed; and (f) discipline and correction of officers for unreported stops.  These measures are discussed in the Report below and in Sections V, IX, and XI.

### a.   RISKS Reviews

Starting in December 2018, the NYPD began meeting with every Patrol, PSA, and Transit command twice a year to discuss the commands' efforts to address the following issues:

underreporting of stops, constitutionality of stops, and compliance with policies regarding the use of BWCs, including proper activation and deactivation, categorization, and supervisory reviews of videos.  Before each meeting, the Risk Management Bureau prepares a profile of the command to be reviewed, including relevant statistics from audits by the Quality Assurance Division and data on BWC usage.  Underreporting is a key focus of the RISKS Review process.  Knowing that the stop reports and BWC videos of their subordinates will be discussed at the command's RISKS Review is an incentive for command leadership to ensure that there is meaningful review of the stop reports and BWC videos.  The Monitor Team attends the RISKS Review meetings, including those done remotely during the COVID-19 pandemic.  There were 175 RISKS Review meetings in 2020 and 98 RISKS Review meetings in the first six months of 2021.

Representatives from the Risk Management Bureau begin the meetings with every command with a statement about the purpose of the RISKS meetings.  Commanding Officers (COs) and their staffs are reminded that RISKS is designed to ensure that every stop, frisk, and search conducted is lawful, that every stop is documented, that every stop is recorded on BWC, and that stops are free from racial bias.  After this opening by RMB, COs are given the opportunity to discuss challenges related to the RISKS process and how they are meeting those challenges. The meeting then proceeds to examine the metrics reported in the RISKS profile for each command, and COs are expected to discuss deficiencies and a plan for correcting them.

The RISKS meetings are an important strategy for the NYPD to achieve substantial compliance.  Commands are adopting local strategies to address concerns identified in the RISKS Review meetings.  Some commands are adding keyword searches to the RAND audits (see subsection b below), while others are using the BWC system in proactive ways to identify underreporting.  The better-prepared Precinct Commanders are using the RISKS Review metrics

and developing practices designed to achieve compliance.  We hope to see even more COs using this process for addressing documentation and compliance issues.

### b.   RAND Audits

The NYPD relies on a methodology developed by the RAND Corporation (thus named the RAND audit) to search for encounters that might be stops, determine whether the encounter was a Level 3 stop, and if so, whether it was properly recorded on a stop report.  The RAND audit involves a search of radio dispatches (the ICAD system) for four keywords:  "stopped," "holding," "show-up," and "warrant check."  Presumably, if an officer reports a stop over the radio, one of these four keywords might be used.  For each command, QAD searches ICAD for a one-week period for these keywords.  QAD auditors then listen to the radio transmissions, review the ICAD printouts, and view BWC videos to assess if a stop might have occurred.  QAD then cross-references events that might be stops with the stop reports recorded in that command to determine if the stop was recorded.  If the auditor determines that a stop report may have been required but was not prepared, the matter is referred to the command for further investigation.  The command then reports back to QAD whether the encounter did, in fact, require a stop report and whether one was filed.  The Monitor Team has been tracking these audits since the first quarter of 2016.  The compliance rate for completed stop reports based on the RAND audits increased from 49 percent in 2017 to 71 percent in 2020 (see Auditing, Section IX, below).

Although the RAND audit results have shown an increase in completed stop reports for encounters that involved stops, the RAND audit methodology has been decreasing in its effectiveness in identifying events that may have been stops.  Officers are now using their NYPD phones instead of their radios for a variety of tasks, so those tasks will not appear in ICAD transmissions.

The figure below illustrates the relative effectiveness of RAND audits in identifying possible events that might be stops worth investigation by commands.  The blue line in Figure 1 illustrates the number of events that QAD identifies that might be possible stops per RAND audit. For example, in the first quarter of 2016, QAD conducted 28 RAND audits and identified 37 keyword incidents that could possibly be stops.  The orange line represents the percentage of possible stops compared to all of the events in ICAD that contained those keywords.  Again, for example, in the first quarter of 2016, there were 630 ICAD keywords identified during the search and 37 of them were determined by QAD to possibly be stops; in 5.9 percent of the keyword hits, a stop was suspected.  These indicators can be used as a measure of the RAND audit efficiency.

Both these measures have been decreasing since the first quarter of 2016.  This may be due, in part, to the fact that officers are now using their Department cellphones for many of the tasks for which they previously would call in on the radio, such as warrant checks.  The trend lines as noted by the dotted lines in each respective color show a downward slope.  It is the Monitor Team's assessment that the RAND audit has a diminished ability to identify possible stops based on the keywords in ICAD.  For this reason, the Monitor Team recommended in December 2021 that the NYPD consider using BWC auditing methods for identifying undocumented stops (see subsection d, below).  The Monitor anticipates a proposal from the NYPD for BWC audits in May 2022.

**Figure 1. Possible Stops per RAND Audit and Percentage Possible Stops per Keyword**



In addition to QAD RAND audits, commands have conducted their own RAND audits. Starting in February 2020, the RMB began conducting a daily automated search of the keywords in ICAD transmissions of patrol commands and sending the results to commands that subscribe to this report for investigation. In addition, some commands developed protocols over and above the RAND daily searches. They use additional keywords relevant to their commands, such as canvassing, or misspell keywords, such as "stp" in addition to "stop" to locate possible hits. This should be encouraged.

In both 2019 and 2020, the Monitor requested that NYPD track and report on undocumented stops identified by commands using these methods. However, the NYPD does not require commands to maintain this data, and the NYPD has not been collecting data from this

methodology.  To better identify and account for underreporting and achieve compliance with Task 1c, the NYPD will need to begin tracking and reporting this type of data to the Monitor.

### c.    Police Initiated Enforcement Audits

A second audit conducted by QAD to identify undocumented stops is the PIE audit.  These audits examine arrests in which the People of the State of New York are the complainants on the Complaint Report, such as criminal possession of a controlled substance and criminal possession of a weapon.  The arrest reports are reviewed to determine whether it appears that a stop report should have been completed for the encounter.  When an auditor determines that an arrest report possibly required a stop report and no stop report was completed, the arrest report is sent to the command for further investigation.  From 2017 to 2020, the compliance level identified by QAD's PIE audits increased from 34.2 percent in 2017 to 71.6 percent in 2020 (see Auditing, Section IX, below).

**Figure 2 – PIE Compliance**



### d.     Review of BWC Videos

The NYPD can also identify stops that were not documented by having supervisors or auditors examine the BWC videos of their officers.  Sergeants are required to review five BWC videos of their officers per month and complete a self-inspection worksheet of their reviews.  In addition, other supervisors at the command level, such as training sergeants, platoon commanders, Integrity Control Officers, and others, review officer BWC videos.  At RISKS Review meetings, command staff are asked about supervisory review of BWC videos and whether any undocumented stops were identified.  In 2021, several commands found stops that did not have stop reports through their review of BWC footage.  For example, at a recent RISKS Review, one command identified four unreported stops from radio runs based on reports of a person with a gun ("gun runs") by randomly viewing BWC videos recorded by the Public Safety Team.  None of these incidents were discovered by the RAND audits conducted by QAD or by the command.  In 2019 and again in 2020, the Monitor asked the NYPD to track the number of undocumented stops identified through command BWC video reviews, but the NYPD to date has not done so.  The NYPD will need to begin tracking and reporting this type of data to the Monitor to achieve compliance with Task 1c.

Review of BWC video can also be done by RMB in a more focused auditing fashion.  Most stops that have stop reports were categorized by the recording officer as "Arrests" or "Investigative Encounters" in the BWC metadata.  The NYPD should use these two categories to create samples of videos to search for undocumented stops.  Two other categories used frequently by officers to categorize recordings of Level 3 stops are "Crime in Progress" and "Stop-Pedestrian." These categories would be a good source of information to drive BWC audits for missing stop reports. For example, during the week of December 27, 2020, there were 12 BWC videos categorized as "Stop-Pedestrian," but only one stop report on file for that week.  That discrepancy calls for a

review of the 12 BWC videos to determine if they involved stops, and if so, determine appropriate corrective measures.

The Monitor Team has done its own review of BWC videos categorized as "Investigative Encounters." Beginning in the second quarter of 2020, the Monitor Team selected a random sample of BWC videos categorized as "Investigative Encounter" from the population of all videos recorded in that time period. The initial sample size was 75 videos from each quarter, and this was increased to 150 videos for the first quarter of 2021 and subsequent samples. The Monitor Team then views the videos from each quarter and seeks to determine if the encounter involved a stop, frisk, or search. If the video appears to illustrate a stop, frisk, or search, the video is sent to the NYPD to investigate if a stop, frisk, or search did occur and if the encounter was properly documented. The chart below illustrates the results of this effort:

**Chart 6 – Investigative Encounter BWC Video Analysis**

| Quarter | Number of Investigative Encounter BWC Videos | Sample BWC Videos | Possible Stops | NYPD Confirmed Stops | Monitor Identified as Stops | Stop Reports | Compliance rate |
|---|---|---|---|---|---|---|---|
| 2Q2020 | 10,915 | 75 | 24 | 19 | 19 | | |
| 3Q2020 | 9,478 | 75 | 21 | 19 | 20 | | |
| 4Q2020 | 8,352 | 75 | 24 | 18 | 18 | | |
| 1Q2021 | 10,039 | 150 | 67 | 47 | 55 | | |
| | 38,784 | 375 | 136 | 103 | 112 | 100 | 89.3% |

As noted in Chart 6 above, the Monitor Team assessed 375 BWC videos categorized as "Investigative Encounter" and determined that 136 of those videos appeared to capture a stop encounter. After the NYPD conducted its review of these recordings, it concluded that 103 of them were confirmed as stops. Of the 103 videos the NYPD confirmed as stops, the NYPD located 100 stop reports on file, and in three incidents the stop was not documented in a stop report. The NYPD determined the other encounters to either be events that started at probable cause or never

rose to the level of a Level 3 stop.  The Monitor Team again reviewed the BWC videos in light of the NYPD's views and agreed that some of those encounters did start with probable cause. However, there were nine additional encounters that the Monitor Team concluded were stops, for a total of 112 stops, with only 100 stop reports (89%).

### e.    CCRB-Identified Failures to Report

When a civilian makes a complaint for alleged misconduct, the CCRB may also find other misconduct beyond the CCRB's jurisdiction through their investigation of the original complaint, such as lack of documentation for a Level 3 stop.  These findings are classified as "Other Misconduct Noted" (OMN) and forwarded to the Department for further investigation.

The CCRB has referred to the NYPD a decreasing number of OMN cases alleging failure to complete a stop report over the past several years.  The CCRB referred 136 cases in 2015, 44 cases in 2020, and 16 cases in the first three quarters of 2021.  The number of these OMN cases that were substantiated by the NYPD also decreased, from 105 out of 136 total in 2015 to 24 out of 51 in 2019.  For 2020, the NYPD substantiated 10 (out of 44) OMN cases referred by the CCRB. For the first three quarters of 2021, the NYPD substantiated eight OMNs for failure to complete a stop report out of 16 OMNs referred by the CCRB, with two cases still open.

### f.    Discipline and Correction of Officers with Unreported Stops

The Monitor requested data from the NYPD regarding any discipline, instructions, or CRAFT entries for officers identified as not completing stop reports, especially those with a history of underreporting.[8]  The NYPD has informed the Monitor Team that it does not maintain data

---

[8] CRAFT stands for Cop's Rapid Assessment Feedback Tool.  Supervisors can issue a Supervisory Comment Form in the CRAFT system for an officer's positive actions or negative actions (Needs Improvement).  The CRAFT "Needs Improvement" report is now used by NYPD instead of the Minor Violations Log, which was a logbook kept at the command but was not tracked Department-wide.

regarding discipline or instructions at the command level for failing to complete a stop report. What data is available includes discipline, training, or instructions from RAND audit follow-up actions and CCRB OMN cases.  For negative CRAFT entries, the Monitor Team's review of fourth quarter 2020 CRAFT entries identified 11 negative entries for failure to complete a stop report. The NYPD will need to collect and report discipline or other corrective actions at the command level for members' failure to document their stops to achieve compliance with Task 1c.

### g.      Compliance Assessment – Underreporting

The NYPD has made significant efforts to address underreporting, but the issue is not sufficiently overcome for the City to be in compliance.  The noncompliance rates for the Department's RAND audits and PIE audits have decreased, although the 2020 results of both audits are still at 29 percent and 28 percent, respectively.  From a sample of BWC videos categorized as investigative encounters, the Monitor Team identified 112 stops with 100 stop reports, for a noncompliance rate of 11 percent.  The RISKS Reviews and other steps taken by the NYPD appear to have made some impact on documenting stops, but additional steps taken must be taken to address the issue of underreporting for the Department to be in compliance with the requirement to document all stops.

## IV.   *LIGON*/TRESPASS AFFIDAVIT PROGRAM (TAP)

The Trespass Affidavit Program, sometimes called "Clean Halls," was a Department program in which police officers conducted interior patrols in certain private apartment buildings. For a building to have been enrolled in the program, the owner must have certified concerns regarding criminal activity or community complaints in the building, such as trespassing or drug activity, and submit an "Owner's Affidavit" providing the NYPD with the authority to patrol their buildings.  The Court's Remedial Order and the *Ligon* settlement required revised policies and training for officers conducting interior patrols in TAP enrolled buildings, NYPD compliance with

a wide range of requirements governing officer activity in and around TAP buildings, a new Administrative Guide governing the requirements and procedures for entry into and continued enrollment in the TAP program, and compliance with those administrative requirements.

The Department's revised policy regarding interior patrols of buildings enrolled in TAP was approved by the Court in June 2016.  It became effective on April 25, 2017.  The Department's revised policy regarding TAP administration, A.G. 303-27, became effective on April 25, 2017.

In 2020, the NYPD determined that the Trespass Affidavit Program was not an efficient use of police resources, and informed building owners that the program would end.   The Department formally ended the Trespass Affidavit Program on September 30, 2020.   The Department should treat former TAP buildings in the same manner as any other private building. Officers will continue to respond to calls for service and address crime at private buildings. However, officers should no longer conduct routine interior patrols of private buildings based on the owner's affidavit under TAP.  In addition, Patrol Guide section 212-59 and Administrative Guide section 303-27 were officially revoked in October 2020.

The NYPD issued multiple FINEST messages in September and October 2020 announcing the dissolution of TAP and read those FINEST messages at consecutive roll calls.  The NYPD and the New York City Law Department also sent letters in September 2020 to landlords informing them of the end of the program and requesting that they remove all signs from their buildings that were associated with the program.

The City and *Ligon* counsel engaged in extensive negotiations regarding a formal end to the *Ligon* stipulation and a resolution is expected in 2022.  Additional notices of the termination of the program were sent to owners and managers of buildings that previously were enrolled in TAP.  A generic version of the notice sent in January 2022 is included in Appendix 2 along with

47

pictures of TAP signs.  The Monitor Team will audit and assess whether the program has ended in practice.  The Monitor Team will submit a report on TAP dissolution to the Court in 2022. Given that the Trespass Affidavit Program was terminated in 2020, this Report does not include assessments of compliance for TAP-related tasks.

## V.  SUPERVISION

The Court in *Floyd* found that NYPD supervisors did not take responsibility for reviewing the constitutionality of the stops made by officers under their supervision.  The Remedial Order requires that supervisory review of stops include a review not just of the completeness and accuracy of the stop report form, but of the constitutionality of the stop and, if conducted, the frisk and search.  If an officer's actions are improper, the officer's supervisor must take corrective action.  The *Davis* settlement provides that any additional reforms regarding supervision of officers engaged in trespass enforcement in or around NYCHA residences will be addressed by the Monitor in consultation with the parties.  Supervisors must ensure that the stops, frisks, and trespass arrests made by their officers are legal and proper and that these activities are properly documented.

### 1.  Compliance Assessment—Supervision

**Task 15a In Compliance; Task 15b Not Yet In Compliance; Task 16a In Compliance; Task 16b Partial Compliance.**

Patrol Guide 212-11 requires documentation of all stops and establishes the responsibilities of supervising officers up the chain of command.  Supervisors are required to respond to the scene of stops when feasible, discuss the circumstances of the stop with an officer making a stop before the end of the officer's tour, and review the officer's stop report form.  If a stop report is inaccurate or incomplete, the supervisor must direct the officer to make the necessary corrections.  If the supervisor determines that the officer did not have reasonable suspicion for the stop, reasonable suspicion for the frisk or an appropriate basis for the search, the supervisor must document that

and specify an appropriate follow-up: instruction, additional training, or, when warranted, discipline. The Court has approved these policies and the NYPD is in compliance with the required policies (Task 15a).

The NYPD has also required Integrity Control Officers (ICOs) in commands to conduct self-inspections of stop reports to evaluate both the actions of their officers and the supervisory reviews of their sergeants. The specific details and criteria used for these self-inspections are part of an audit plan developed by the NYPD, which the Court approved in July 2020 (see Section IX, Auditing, below). The NYPD is in compliance with the requirement for written policies requiring ICO review of stops and frisks (Task 16a).

The NYPD is responsible for ensuring that its supervisors are putting these policies regarding review of officers' stops into practice. Are supervisors taking seriously their responsibility to review the constitutionality of stops? For instance, the Monitor Team's review of stops showed that supervisors were not identifying the impermissible stops, frisks and searches of officers under their charge, but instead approving them (see Section II.D.1b above, Stop Reports at NYCHA Properties).

In 2020, out of 9,618 recorded stops, supervisors only identified 68 stop reports that failed to articulate reasonable suspicion (only 0.7 percent). For the 5,235 stops in which a frisk was conducted in 2020, supervisors checked "No" under the caption "Sufficient Basis for Frisk" for 72 stop reports (1.4 percent). Supervisors checked "No" under the caption "Sufficient Basis for Search" in 85 stop reports out of 4,001 stop reports in 2020 in which a search was reported (2.1 percent). In 2021, supervisors noted that the stop report failed to articulate reasonable suspicion

49

in only 19 stop reports out of 1,927 recorded stops as of March 31, 2021 (1.0 percent).[9]  Chart 7

below documents these statistics.

**Chart 7.  Supervisory Actions on Stop Reports**

|  | # Stop Reports | # Reviewing Supervisor Determined Insufficient Basis for Stop | # Stop Reports with Frisks | # Reviewing Supervisor Determined Insufficient Basis for Frisk | # Stop Reports with Searches | # Reviewing Supervisor Determined Insufficient Basis for Search |
|---|---|---|---|---|---|---|
| 2019 | 12,958 | 66 | 7,290 | 60 | 4,721 | 64 |
| 2020 | 9,618 | 68 | 5,235 | 72 | 4,001 | 85 |
| 1Q2021 | 1,927 | 19 | 1,068 | 18 | 902 | 27 |

Chart 8 below shows the follow-up actions taken in 2020 by the supervisors in those cases

in which the supervisor determined there was an insufficient basis for the stop, frisk, or search.

**Chart 8.  2020 Stop Report Follow-Up Actions by Reviewing Supervisors**

| Supervisor Determined Insufficient Basis | Stop | Frisk | Search |
|---|---|---|---|
| **Follow-Up Action** |  |  |  |
| Instruction Only | 21 | 24 | 28 |
| Training Only | 0 | 1 | 0 |
| Discipline Only | 0 | 2 | 2 |
| Instruction and Training | 32 | 34 | 32 |
| Instruction and Discipline | 0 | 1 | 0 |
| Instruction, Training, and Discipline | 4 | 8 | 6 |
| No Action Taken | 11 | 2 | 17 |
| Total | 68 | 72 | 85 |

Command ICOs are also required to evaluate a sample of the stops performed by officers

in their command and the supervision of the sergeants and lieutenants in their command.  Each

month, the ICO of each command must examine the most recent 25 stop reports filed by officers

in the command, review the BWC videos associated with those stop reports, and determine

---

[9] The NYPD has noted that supervisors are rejecting a large number of stop reports submitted by officers and having officers correct those stop reports.  According to the data in the NYPD's records management system, supervisors corrected 3,366 out of 9,618 stop reports (35%) in 2020.

whether the stop and any frisk or search, if conducted, were proper, and whether the supervisor who approved the stop report properly assessed the legality of the stop.  The self-inspection is then signed off by the command's executive officer or commanding officer.  When QAD conducts its audits of each command, it also examines the command's self-inspections.  If a stop report is reviewed by both the ICO in a self-inspection and QAD in its audit, QAD reviews whether the ICO's findings are consistent with its auditors' findings (see Chart 13 in Section IX, Auditing, below).  The ICO reviews are significantly more stringent than the supervisors' reviews.

The NYPD has tried to address concerns about supervision in several ways:  RISKS Review meetings; remedial training for commands and for supervisors who do not identify and correct deficient stop reports; and discipline.  During the RISKS Review meetings, Department leadership emphasize the importance of supervision to achieve compliance.  One particular focus of the meetings is whether the results of the command's self-inspections of stop reports are consistent with QAD's audits of stop reports.  If the command's self-inspection doesn't identify a problem with a stop report that QAD finds to be deficient, that means that not only did the officer fail to articulate reasonable suspicion, but also that the deficient stop report was not caught by the officer's supervisor when reviewing the report and completing the supervisory section, by the command ICO when reviewing the report for the self-inspection, and by the command's executive officer, who signs off on and approves the self-inspection.

The Department has implemented a protocol to correct supervisors who repeatedly approve deficient stop reports.  Supervisors who approve multiple deficient stop reports are provided a refresher class where they receive training from an RMB attorney aimed at the specific deficiencies that have been identified.  Fifty-one supervisors received remedial training in 2020 and the first six months of 2021.  In addition, RMB has provided training for supervisors from commands with

a high number of deficient reports.  The training involves one hour of refresher training and one hour of reviewing stop reports (see Chart 9 below).

**Chart 9.  Remedial Training for Command Supervisors (4Q 2020 and 1Q, 2Q 2021)**

| Date(s) | Number of Supervisors | Commands |
|---|---|---|
| 11/12/20 | 3 | 28 |
| 2/3/21; 2/9/21 | 5 | PSA 7 |
| 3/16/21 | 1 | 73 |
| 3/18/21; 6/23/21 | 2 | 103 |
| 3/23/21 | 3 | 30 |
| 3/25/21 | 4 | 60 |
| 4/2/21 | 3 | 105 |
| 4/8/21 | 4 | 67 |
| 4/15/21 | 5 | 79, 81, 90, PBMN, 104 |
| 5/12/21 | 12 | 75 |
| 5/26/21 | 6 | 81 |
| 6/2/21 | 3 | 70 |
| 6/15/21 | 4 | 46 |
| 6/16/21 | 2 | 121 |
| 6/24/21 | 3 | 49 |
| 6/29/21 | 2 | PSA8 |

RMB has also provided roll call training on supervisory review of stops for commands, as noted in Chart 10 below.

**Chart 10.  Remedial Roll Call Training**

| Command | Date(s) |
|---|---|
| 13 Pct. | 5/8/21 |
| 28 | 11/12/20 |
| 30 | 3/23/21 |
| 46 | 6/15/21 |
| 67 | 5/8/21 |
| 71 | 6/2/21 |
| 103 | 3/18/21 |
| 105 | 4/2/21 |
| 113 | 1/27/21; 3/16/21; 3/26/21 |
| 120 | 5/27/21 |
| 121 | 6/16/21 |

In some commands, command executives have taken actions to correct supervisors who do not sufficiently evaluate their officers' stop reports.  In the fourth quarter of 2020, 26 supervisors were

given negative CRAFT entries for failing to detect an improper stop, frisk, or search when reviewing stop reports, and two supervisors were given negative CRAFT entries for not ensuring that a stop report was prepared.

The NYPD is not yet in compliance with the supervisory review requirement of the Court's order (Task 15b).  With respect to the requirement that ICOs conduct self-inspections to assess the constitutionality of stops, the NYPD is in partial compliance with the Court-ordered requirement (Task 16b).

## VI.   TRAINING

The COVID-19 pandemic and other factors forced the cancellation of several recruit classes.  Other in-person trainings were also temporarily suspended and later resumed with social distancing protocols and mask mandates in place.  Due to concerns regarding the potential spread of COVID-19, the Department suspended all in-person observation of training in March 2020. Monitor Team observation of recruit trainings resumed in May 2021.

### A.   In-Service Stop and Frisk and Racial Profiling Training

The Court's Remedial Order required the NYPD to revise its training regarding stop and frisk to adhere to constitutional standards and New York State law.  Required topics include: when a stop may be conducted, when a frisk may be conducted, and when a search may be conducted; trespass enforcement and interior patrols; proper documentation of stops; and supervisors' responsibility for reviewing officers' stops and frisks.  The Remedial Order also required the NYPD to revise its training regarding the illegality of racial profiling to make clear that targeting "the right people" for stops is a form of racial profiling and violates the Constitution.  Members of racially defined groups may not be targeted for stops in general simply because members of that racial group appear more frequently in local crime suspect data.  Race may be considered only when the stop is based on a specific and reliable suspect description.  The training must clearly

convey the changes in NYPD procedures and what is expected of officers and supervisors regarding the documentation and supervision of stops.

1.      **Compliance Assessment—In-Service Training for Stop and Frisk and Racial Profiling**

**Tasks 17a, 17c, 18a, 18c, 19a, 19c In Compliance.**

A full-day in-service training for sergeants and lieutenants devoted to the law and procedures regarding investigative encounters was approved by the Court in December 2017.  In July 2018, a version of this training for police officers and detectives was approved by the Court. Each class was limited to 30-35 officers or supervisors, and training was taught every weekday and during both the day (7x3) and evening (3x11) tours.  By the end of October 2020, the Department completed delivering the critical training to more than 34,300 members of the service, including police officers, detectives, sergeants, and lieutenants.

The training materials covered the fundamental principles of stop, question and frisk, trespass enforcement, and bias-free policing.  Opportunities for discussion about the role of race in investigative encounters were included in several places.  The materials described the difference between the constitutionally permissible use of race based on a specific, reliable suspect description and the constitutionally impermissible targeting of racially defined groups for stops. The materials also effectively conveyed the changes in NYPD procedures governing investigative encounters and interior patrols, as well as what is expected of officers and supervisors regarding the documentation and supervision of stops and trespass arrests.  The training materials are in compliance with the requirements of the Court's orders (Tasks 17a, 18a, 19a).

The Monitor and the Monitor Team observed many trainings for both officers and supervisors.  Plaintiffs' counsel also attended training classes on a quarterly basis.  The Monitor Team and Plaintiffs' counsel shared with the Department their observations and views about the

course materials, the way the materials were presented, and the course instructors.  The instructors observed by the Monitor Team were knowledgeable and followed the approved materials.  They varied in style and in their ability to engage the officers, but the instructors were quite good.  The NYPD is in compliance with these training requirements (Tasks 17c, 18c, 19c).

In addition to the in-service training on stop and frisk and racial profiling, the NYPD also trained its members on implicit bias and procedural justice.  "Implicit bias" is when people make automatic, unconscious associations between groups of people and stereotypes about those groups, and that those associations arise from the particular environment (neighborhood, family, friends, media, etc.) in which they grow up, live, and work.  "Procedural justice" is a phrase used to describe the necessity of treating civilians with respect, listening to them, and explaining the officer's actions.  Although the implicit bias training was not a specific requirement of the Remedial Order, the Court had noted that "[i]t may also be appropriate to conduct training for officers on the effect of unconscious racial bias." *Floyd*, ECF 372, p. 17.  The NYPD contracted with an outside vendor, Fair and Impartial Policing, LLC (FIP), to create the training materials and conduct the course.  Thirty-five thousand members of the Department were trained, including those at the highest level of the Department.

The FIP training was oriented towards police officers' knowledge of implicit bias and its implications for policing.  The NYPD's stated objective for the program was to convey to police personnel:

- The science of implicit bias (convey to officers that all people, even well-intentioned people, including officers, can be impacted by implicit bias).

- How implicit biases might manifest in policing.

- The consequences of biased policing for community members, officers, and agencies.

- The skills that police personnel need to be fair and impartial.

### B.       Training for Newly Promoted Supervisors

Under NYPD's stop and frisk procedures, supervisors are responsible for reviewing the legality of stops.   For this reason, newly promoted supervisors must be trained on these responsibilities and on their responsibilities for reviewing trespass arrests.

#### 1.       Compliance Assessment—Newly Promoted Supervisors

**Tasks 20a, 20b In Compliance.**

Training materials for newly promoted sergeants and lieutenants were approved by the Court in March 2018.   After the in-service training for incumbent sergeants and lieutenants was approved, the training for newly promoted supervisors was changed to mirror the in-service training for supervisors, adding BWC video and encouraging more class participation.   The Monitor Team observed training of newly promoted supervisors before and after it was approved by the Court and again in February 2020 and September 2021.   The training covers the required material in the lesson plan, but, more importantly, the instructors engaged the class in interactive exercises and discussions and thorough questions and answers.   The NYPD is in compliance with these requirements (Tasks 20a, 20b).

### C.       Housing Training

The *Davis* settlement required the Department to provide in-service training to familiarize officers who conduct interior patrols in NYCHA buildings with the posted rules and regulations in those buildings and provide them with guidance on how to maintain the proper balance between constitutionally enforcing the law and respecting the rights of residents and their guests.   The proposed 45-minute training was expanded to a full-day training.   The NYPD also developed a useful pamphlet for Housing Bureau officers highlighting important features of the training.

56

1. **Compliance Assessment—In-Service Housing Training**

**Tasks 26a, 26b In Compliance.**

The Housing one-day training materials were approved by the Court in May 2019.  The training launched in September 2019 and ended in February 2020.  Over the course of five months, approximately 3,000 Housing officers and officers in precincts who patrol NYCHA buildings received this training.

The training made effective use of multiple instructors, all of whom were Housing Bureau members.  Several instructors also had previous experience living as residents within NYCHA housing.  The classes were interactive, with attendees being asked whether they had been stopped by the police, a discussion of Operation Impact [10] and its impact on the community and the bases for the lawsuits that led to the training.  The issue of discretion was emphasized throughout the class.  The Housing one-day training pressed the attendees to think differently and react differently based upon the NYPD's stated values of community partnership, valuing human life, respect, courtesy, and civility.  The NYPD is in compliance with the requirements for the creation of Housing training materials and the implementation of Housing training (Tasks 26a, 26b).

D. **Training for Investigations of Racial Profiling and Bias-Based Policing Complaints**

The Remedial Order requires the NYPD to track and investigate racial profiling complaints.  For this reason, training for investigators on the NYPD's racial profiling policies and how to go about conducting profiling investigations is also required.  The training is designed to provide investigators with the fundamental skills to process and investigate complaints regarding

---

[10] Operation Impact, a program implemented by the Department in 2003-2008, designated certain areas of high crime in the City as "impact zones" and, among other things, assigned newly graduated police recruits to footposts in those areas.  Operation Impact contributed to the pressure put on officers to make more stops and arrests and, as noted by the Court in the Liability Opinion, without regard to the constitutionality of those stops.

the NYPD's policy prohibiting racial profiling and bias-based policing.  The responsibility for investigating citizen complaints of racial profiling will be shifted to the CCRB some time in 2022, so this training will become moot.  Until the CCRB begins those investigations, however, the NYPD must still investigate those complaints and must train its investigators on how to conduct the investigations properly.

### 1.  Compliance Assessment—Racial Profiling Complaint Investigations Training

**Task 29a In Compliance; Task 29b Partial Compliance.**

Training for investigators of racial profiling allegations that provides guidance on how to conduct such investigations was approved by the Court in January 2019.  The NYPD revised the training in 2021 to address concerns raised by the Monitor about the thoroughness and impartiality of NYPD's investigations of racial profiling complaints.

The Monitor Team observed this training in July 2019 and in July 2021.  At the July 2021 training, the instructors went through the approved lesson plan and provided examples and scenarios to reinforce the content contained in the new slides that were added to the PowerPoint presentation.  For example, the investigators were told not to use guilty dispositions in criminal or summonses cases as a basis to unfound profiling allegations.  The Monitor Team also met in May 2021 with the investigators assigned to profiling investigations to share the Team's observations and findings from their review of NYPD racial profiling investigations.

The NYPD has shared the training materials with the CCRB, which will take over profiling investigations in 2022 as the result of City Council legislation.  The Department is in compliance with the requirement for training materials regarding racial profiling (Task 29a).  The Department is only in partial compliance with implementing the training, however, given the concerns

identified with respect to the thoroughness and impartiality of the actual investigations (See Section XI below) (Task 29b).

###### E.      Training for Plainclothes Officers

The NYPD conducts a three-day training course for officers who will be starting as plainclothes officers.  That course was required for officers who joined a precinct-based anti-crime unit, or any other unit that works in plainclothes.  The precinct anti-crime units were disbanded in June 2020, and the basic plainclothes training course was temporarily suspended.  The training was restarted in the summer of 2021.

###### 1.      Compliance Assessment—Basic Plainclothes Course

###### Task 30a In Compliance; Task 30b Partial Compliance.

In August 2018, the Court approved training materials for a module on investigative encounters that is part of the three-day course given to plainclothes officers.  The materials were revised to be consistent with the Court-approved in-service investigative encounters training.  The training materials meet the Court's requirements (Task 30a).

The Monitor Team observed the Basic Plainclothes Course in February 2020.  Although the instructor used the approved materials, the quality of the training was not sufficient.  There was little to no explanation of the material, no engagement with the attendees, and very little connection between the material covered and plainclothes policing.  In September 2021, the Monitor Team as well as counsel for Plaintiffs observed the restarted Plainclothes Course.  The instructor covered the approved material and did a good job engaging the officers.  He used his experiences as a patrol officer, anti-crime officer, and emergency services officer to illustrate and clarify course concepts.   The NYPD is in partial compliance with the implementation of plainclothes training (Task 30b).

### F.      Recruit Training—Policing Legally

Training for recruits on stop, question, and frisk must provide recruits with the standards for what a stop is, when a stop may be conducted, and when a frisk may be conducted.  A recruit training class entitled "Policing Legally—Street Encounters" covers the legal standards governing when an officer may stop, question, and frisk a person.  The training emphasizes that the legal authority for a stop does not automatically provide the authority for a frisk.  To frisk a person, the officer must have reasonable suspicion that the person stopped is armed and dangerous.  The training materials stress that an encounter between a civilian and an officer is a "stop" when a reasonable person would not feel free to disregard the officer and walk away.  Such an encounter requires the officer to have reasonable suspicion that the person was engaged in or is about to be engaged in a felony or a Penal Law misdemeanor.  The course covers *Terry v. Ohio* and the four levels of *DeBour* encounters.

### 1.      Compliance Assessment—Recruit Training—Policing Legally

**Tasks 17b, 17d, 19b, 19d In Compliance.**

Training materials for Police Academy recruit classes on stop and frisk were rewritten and approved by the Court in April 2015.  The materials for Policing Legally have been revised as new NYPD policies and new stop report forms were approved.  The course was revised in 2018 to ensure consistency with the in-service investigative encounters training and to add BWC videos as a tool to review each level of investigative encounters.  Information regarding the Right to Know Act was also added to the curriculum.  These changes were approved by the Court in August 2018.  The revised Policing Legally training materials are in compliance with the Court's requirements (Tasks 17b, 19b).

The Monitor Team observed Policing Legally classes early in the monitorship and returned to the Police Academy to observe these classes in 2018, 2019, 2020, and 2021.  Team members

found the instruction to be consistent with the Court-ordered materials and well presented, with significant recruit engagement.   The NYPD is in compliance with the requirements for implementing recruit training on stops and frisks (Tasks 17d, 19d).

### G.   Recruit Training—Policing Impartially

The NYPD's recruit training regarding racial profiling must clearly state the difference between the constitutionally permissible use of race in a stop based on a specific, reliable suspect description and the constitutionally impermissible targeting of racially defined groups for stops.

#### 1.   Compliance Assessment—Recruit Training—Policing Impartially

**Tasks 18b, 18d In Compliance.**

The Court approved the NYPD's training course for recruits on racial profiling, Policing Impartially, in April 2015.   The class material includes information regarding bias and police history and how knowledge of this history can help officers be more effective.   The training materials are in compliance with the Court's requirements (Task 18b).

Monitor Team members observed this class in 2018, 2019, and 2021.   The course followed the general course guide and approved material, although some of the classes observed could improve with more engagement and discussion of the materials.   The NYPD also provides all recruits with the FIP training on implicit bias and procedural justice.   The NYPD is in compliance with the requirement for recruit training on racial profiling (Task 18d).

### H.   Recruit Training—Characteristics of Armed Suspects

One recruit training segment identified in the *Floyd* liability and remedies decisions as needing revision was a training module conducted by the Firearms and Tactics Section on the characteristics of armed suspects. [11]   This training teaches recruits about factors that should raise

---

[11]   Liability Opinion, *Floyd v. City of New York*, 959 F. Supp. 2d 540, 614; *see* Remedial Order, *Floyd v. City of New York*, 959 F. Supp. 2d 668, 680.

their awareness when they attempt to determine whether or not an individual they encounter is armed.

1.    **Compliance Assessment—Recruit Training—Characteristics of Armed Suspects**

**Tasks 28a, 28b In Compliance.**

A revised version of this training was approved by the Court in February 2017 after review by the parties.  The NYPD is in compliance with the requirement for a revised curriculum (Task 28a).

Monitor Team members and Plaintiffs' counsel observed this training in 2019.  The class was taught by a 27-year veteran of the NYPD who has taught similar material for more than 10 years.   In the Monitor's Eleventh Report, the Monitor determined that the NYPD was in compliance with the requirement to implement this training (Task 28b).  The Monitor Team observed this class again in January 2022, this time taught by a different instructor.  The instructor knew the topic well and covered the Court-approved material.  The NYPD is in compliance with implementing recruit training on Characteristics of Armed Suspects (Task 28b).

I.    **Recruit Training—Interior Patrol at NYCHA and TAP Locations**

The *Davis* settlement requires revised recruit training governing the legal standards and procedures for when a person may (or may not) be stopped in or outside an NYCHA building (P.G. 212-60).  The training must instruct recruits that mere presence near, entry into, or exit from an NYCHA building is not an "objective credible reason" to approach a person to request information. The training also must cover trespass enforcement standards in and around NYCHA buildings, including the requirement of completing a TCFS for trespass arrests.

1.      **Compliance Assessment—Recruit Training—Interior Patrol**

**Tasks 25a, Task 25b In Compliance.**

Training materials for the Interior Patrol recruit course were approved by the Court in April 2015.  The NYPD combined the Court-approved recruit training materials regarding patrols at TAP buildings with the training materials approved by the Court in *Davis* governing housing patrols in and around NYCHA buildings.  The training also includes scenario-based role-play exercises for both TAP and NYCHA buildings.  Further revisions regarding updates to the stop report and Housing policies were negotiated by the parties and approved by the Monitor in May 2017.  Additional changes removing all references to TAP, adding guidance regarding the Right to Know Act and discretion, and reordering some of the material, were approved by the Monitor in February 2021.  The training materials meet the requirements of the Court's orders (Task 25a).

Monitor Team members have observed these classes and generally found the instruction to be consistent with the approved materials.  For some of the classes observed in 2020, however, the training did not meet the level of quality expected.  The Interior Patrol classes resumed in 2021, and the Monitor Team observed the training in November 2021 and March 2022.  The instructors provided the recruits with the Housing brochure that was distributed in the in-service Housing training.  The quality of the training observed varied based on the experience and proficiency of the instructor, but the instructors covered the approved materials and engaged with the trainees. The NYPD is in compliance with implementing recruit training on Interior Patrol (Task 25b).

**J.      Field Training Guide and FTO Training**

The Court's Remedial Order required the NYPD to revise its Field Training Guide and Field Training Officer (FTO) training materials to reflect the corrected policies governing trespass stops outside TAP buildings.  The Field Training Guide and the FTO materials also needed to be revised to conform with P.G. 212-11.

1.      **Compliance Assessment—Field Training Guide and FTO Training**

**Tasks 23a, 23b In Compliance.**

The Field Training Guide was revised in 2016 and training for Field Training Officers was revised to reflect changes to the in-service investigative encounters training. In addition, BWC videos were added to the training, and the PowerPoint presentation has been updated to be more engaging. The language in the Field Training Guide and FTO training materials mirrored the language approved by the Court in other trainings, and the Monitor approved the FTO Guide and the training materials. The FTO Guide and training materials are in compliance with the Court's requirements (Task 23a). The last FTO training was suspended while there were no Academy recruits graduating and becoming probationary officers but resumed in 2021 when recruits graduated from the Police Academy. The Monitor Team observed the FTO training in January 2022. The instructor had a good command of the Court-approved materials, covered the materials during the class, and asked questions and provided scenarios along the way to test the trainees' understanding of the information discussed. The instructor reinforced the FTO's responsibility to instruct probationary officers on the law and ensure they can state what they saw and how those factors impact the level of the encounter. The NYPD is in compliance with the requirements related to FTOs (Task 23b).

K.      **Refresher Training Course for Investigative Encounters**

In-service training for officers and supervisors on investigative encounters was completed in October 2020. The NYPD and the Monitor Team recognize that one-time training on stop and frisk policies and procedures is not sufficient or sustainable as officers are further in time from their training. This is especially true for newer officers whose last training on stop and frisk was from the Police Academy. For this reason, the NYPD must develop refresher training courses

("booster" training) to instruct officers on how to properly conduct stops and frisks, and to instruct supervisors on how to properly review stops and frisks.

      1.    **Compliance Assessment—Refresher Training Course for Investigative Encounters**

               **Task 31a In Compliance; Task 31b Not Yet in Compliance.**

The Department is continuing production of a series of short videos that will serve as refresher training for all NYPD members following the completion of the investigative encounters in-service training. It is anticipated that there will be nine videos in total. The first four videos will correspond to Levels 1 through 4 of the *DeBour* framework. There will also be videos on the topics of racial profiling, supervision, Housing policies, the Right to Know Act, and the stop report. Scripts for these videos were approved by the Court in January 2021.

In working with the scripts, the NYPD determined that revisions were needed to make the training more user-friendly in a video presentation. The Department worked with the Plaintiffs and the Monitor Team to revise and approve new scripts. The NYPD's Creative Services Unit will begin production of the videos in early 2022. The videos will be approximately 4-5 minutes in length and consist of narration and fact pattern scenarios. The videos will be posted on NYPD-U, which is accessible to all NYPD members via both the Department intranet and their Department smartphones. All members will be required to view the training videos and attain a passing score on quizzes related to their content. The quiz questions were developed with the parties and approved by the Monitor. The length and format of these videos are designed to work as mandated refresher training, remedial training for officers as appropriate, as well as a tool for an officer who wants a quick refresher based on circumstances he or she encounters on patrol. The NYPD is in compliance with the requirements for developing the materials for refresher training

(Task 31a).  The NYPD is not yet in compliance with implementation of the refresher training (Task 31b).

## VII.   BODY-WORN CAMERAS

### A.     Precinct-Level BWC Pilot

As part of the Remedial Order, the Court directed the Monitor to oversee a pilot of the use of BWCs by NYPD officers.  The goal of the pilot program was to assess the effects of deploying BWCs on policing outcomes, community perceptions of policing in their neighborhoods, and whether deployment results in reducing unconstitutional stops and frisks.  The Monitor's research and evaluation design for the BWC pilot program was developed and executed by Dr. Anthony Braga, Dr. John MacDonald, and other members of the Monitor Team.

The NYPD launched the BWC pilot program in April 2017.  In a randomized control trial, 1,200 officers in 20 pilot precincts wore BWCs for a one-year period.  Those 20 precincts were matched with 20 precincts in which officers were not wearing BWCs.

As part of the BWC pilot, the Court directed the Monitor to "establish procedures for the review of stop recording by supervisors and, as appropriate, more senior managers."  *Floyd*, ECF 372, p. 27.  In 2017, the NYPD developed a self-inspection protocol for the review of BWC videos by sergeants in the commands with BWCs.  Sergeants must review five BWC videos each month.  After reviewing these videos, sergeants must complete a BWC self-inspection worksheet for each video; the sergeant's platoon commander or lieutenant must then review two of the videos and complete the self-inspection worksheet; and the command's executive officer must review and approve the BWC self-inspection worksheet.

The Remedial Order also directed the Monitor to "establish procedures for the preservation of stop recordings for use in verifying complaints in a manner that protects the privacy of those stopped."  *Id.*  When the BWC pilot was launched, the NYPD shared BWC video with the CCRB

within 10 days of a CCRB request.  The BWC patrol guide, P.G. 212-123, states that "[t]he Internal Affairs Bureau will process requests from the Civilian Complaint Review Board for body-worn camera video as per P.G. 211-14," but it did not provide a specific protocol for how those videos would be shared or any time frame for when they would be shared.  In November 2019, the NYPD and CCRB entered into a Memorandum of Understanding (MOU) to expedite production and sharing of BWC footage.  Under the MOU, the NYPD agreed to establish a facility with at least 10 secure computer terminals so that CCRB investigators can review BWC footage directly.  The NYPD must provide CCRB with BWC footage requested within 25 days if any redactions are needed, and within 10 days if no redactions are needed.

### 1.   Compliance Assessment—Precinct Level BWC Pilot

<span style="color:green">**Tasks 32a, 32b, 32c In Compliance**</span>

The precinct level BWC pilot was completed in December 2018 and the Monitor published the Twelfth Report—The Deployment of Body Worn Cameras on New York City Police Department (NYPD) Officers—in November 2020.  The Twelfth Report showed that the deployment of BWCs was associated with a statistically significant decrease in CCRB complaints and a statistically significant increase in the number of stop reports completed by treatment officers relative to control officers.  The randomized controlled trial showed that the placement of BWCs on officers resulted in the increased documentation of stop reports, particularly of those stops that may have reflected unlawful police actions.  As such, BWCs can be a useful tool in reducing underreporting of stops and unlawfulness by making stops more transparent to NYPD supervisors and outside monitors (e.g., district attorneys, courts, the CCRB).

In addition, as part of the pilot, the NYPD developed protocols for supervisory review of BWC videos that the Monitor approved in August 2017.  With respect to the sharing of BWC videos with the CCRB, the COVID-19 pandemic and the shelter-at-home orders postponed the

establishment of the shared facility to expedite production.  In addition, there were a significant number of new complaints and additional requests for BWC videos after the protests over the murder of George Floyd.  However, after the CCRB raised concerns about the delays in obtaining BWC videos, the NYPD made significant progress in providing the CCRB with BWC videos for complaint investigations related to the protests and in reducing the backlog of BWC requests.  As of March 31, 2022, there were 91 pending requests for BWC footage, which accounts for three percent of the open CCRB investigations.  Of those, 41 percent of the requests were less than 30 days old, while 50 percent of the requests were over 90 days old.[12]  The NYPD and CCRB have developed protocols for timely CCRB access to BWC videos.  The NYPD is in compliance with the BWC pilot requirements of Tasks 32a, 32b, and 32c.

After the commencement of the pilot, the Department voluntarily decided to equip all uniformed officers performing patrol functions in Patrol precincts, Housing Police Service Areas (PSAs), and Transit Districts, as well as those assigned to specialized units such as the Strategic Response Group with BWCs.  The Department is integrating the increased quantity of BWC footage into its training and oversight.

### B.    PSA BWC Pilot

Dr. Braga and other members of the Monitor Team developed a separate research and evaluation plan for the use of BWCs by Housing Bureau officers working in PSAs to assess how BWC videos impact policing in and around NYCHA properties.  NYPD Housing Bureau officers in the nine PSAs were equipped with BWCs over the course of nearly 11 months, starting with PSA 8 in February 2018 and ending with PSA 9 in December 2018.  The study will compare

---

[12] https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/monthly_stats/2022/04062022_monthlystats.pdf.

officer data for the 36 months before officers were equipped with BWCs to officer data for the 12 months the officers were equipped with BWCs.

### 1. Compliance Assessment—PSA BWC Pilot

### Task 33 Assessment Not Complete.

The Monitor Team is analyzing the data for the PSA BWC study.  For this reason, the Monitor's assessment is not complete (Task 33).

### C. Alternative to Combined Pilot and Monitor's Studies

In July and August 2018, the Court ordered a pilot program to study two recommendations for NYPD reforms:  the electronic documentation of Level 1 and 2 encounters and the activation of BWCs during Level 1 encounters.[13]  In November 2018, the Monitor submitted a proposal combining the two Court-ordered pilots into one, which the Court approved in February 2019.[14] The combined pilot was to be overseen by the Monitor, who retained Dr. Stephen Mastrofski and CUNY's Institute for State and Local Governance (ISLG) to assist in planning and implementation.  As designed, the pilot was to use systematic social observations, i.e., trained observers who would ride along with officers and collect data.  Results from the pilot would then inform the Court on the impact of implementing one or both proposed policy changes.

Because of the COVID-19 pandemic, it was no longer feasible to have trained observers ride with NYPD officers.  Moreover, on February 21, 2020, the NYPD proposed an alternative to the combined pilot.  In the NYPD's Alternative Plan, the NYPD would voluntarily adopt one of the two policy changes—mandatory activation of BWCs for Level 1 encounters.  The NYPD proposed to adopt this requirement citywide, except for those Level 1 encounters that are: (1)

---

[13] *Floyd*, ECF No. 619; *Floyd*, ECF No. 634.

[14] *Floyd*, ECF No. 691.

currently "Do Not Record" scenarios, such as interviewing confidential informants, work by undercover officers, and strip searches; (2) aided situations, other than with emotionally disturbed persons; and (3) taking reports for past crimes.  Under the Alternative Plan, the NYPD would not have officers electronically document Level 1 and Level 2 encounters on their phones, but the BWC metadata (Evidence.com) would include certain information about encounters.

In response to the City's proposed alternative, and because the systematic social observation study was no longer feasible, the Monitor proposed studies to improve the City's Alternative Plan, to answer questions raised by the Court in its orders for the pilots, and to provide additional information to assist the Monitor in assessing compliance.  The NYPD's Alternative Plan and the Monitor's Studies were approved by the Court in February 2021.  The Court's Order and the research designs for the Monitor's Studies are attached as Appendix 3.  Officers are now required to record the majority of Level 1 encounters on their BWCs and to more extensively categorize videos that capture certain types of investigative encounters. [15]  For encounters that end at Levels 1, 2, or 3, officers will now be required to document the final level of encounter.  For encounters that end at Level 2, officers will now be required to document the race and gender of the primary person encountered and whether multiple people were encountered.

The Monitor's Studies will be conducted by ISLG and a team of researchers (originally at Stanford University), including Dr. Jennifer Eberhardt.  These studies address important questions about the NYPD's compliance with the Fourth and Fourteenth Amendments in police-citizen encounters:  legal compliance in police-citizen encounters, racial disparities in compliance and escalation of encounters, and appropriate documentation of encounters.  The studies will also generate important descriptive information about the nature of police-citizen encounters.

---

[15] *Floyd*, ECF No. 817.

1.      **Compliance Assessment—NYPD's Alternative Plan and Monitor's Studies**

**Task 40a In Compliance; Tasks 40b, 40c Partial Compliance.**

The Court approved the NYPD's Alternative Plan and the Monitor's Studies in February 2021.  The NYPD revised and issued its revised BWC policies in May 2021, requiring NYPD members to activate their cameras during most Level 1 encounters.  P.G. 212-123.  Pursuant to P.G. 212-123, BWC activation is required for all levels of investigative encounters except for vehicle collisions, missing persons, aided cases not involving an emotionally disturbed person, and past crime investigations.  Under the documentation requirements of the BWC policy, for all investigative encounters that are captured on BWC that do not end in an arrest or summons, officers must document the level of the encounter.  For all Level 2 encounters, officers must document the race and gender of the primary person encountered, and whether or not the encounter was with more than one individual.  The NYPD is in compliance with the requirements for policy changes for the Alternative Plan (Task 40a).

Although the BWC policy was revised in May 2021, the revised policy was not implemented until after the NYPD trained its members on the policy and made changes to the BWC metadata in Evidence.com.  The NYPD began its training in September 2021 and made changes to the BWC system in October 2021.  The NYPD is now tracking the extent to which officers are documenting the *DeBour* level of investigative encounters and the demographics of persons in Level 2 encounters.  These new categories are custom fields for the NYPD, so officers cannot record them using their phones while they are in the field; instead, they have to finish their tour, dock the camera, upload the video, and then come back to the metadata (likely the next day) to add these categories.  Officers are only now starting to do this, and many videos do not yet have

these categories documented.  The NYPD is in partial compliance with the implementation of the Alternative Plan (Task 40b).

With respect to the Monitor's Studies, the research team has hired and begun training graduate students for coding the BWC videos and has begun training the legal experts who will be reviewing the BWC videos.  The NYPD has provided the research teams with relevant data to prepare for the studies.  With the training of the graduate students and the legal experts complete, ISLG began a pilot test of the study in March 2022.  The NYPD is in partial compliance with the requirements of the Monitor's Studies (Task 40c).

## VIII.  PERFORMANCE EVALUATION

The Court found that the NYPD's performance objectives and the way that the NYPD measured officer performance put pressure on officers to make stops without regard to whether they were constitutional.  For that reason, one reform requirement is to implement a performance evaluation system for officers that does more than just count the number of enforcement actions.

### 1.    Compliance Assessment—Performance Evaluations

**Task 38a In Compliance; Task 38b Partial Compliance.**

Changes to the Department's performance evaluation system for officers and detectives were approved by the Court in November 2017.  The NYPD is in compliance with the requirements for a revised performance evaluation system (Task 38a).

Officers and detectives are now evaluated quarterly and on an annual basis on their performance in 12 different dimensions.  The 12 performance dimensions are:

1.    Problem Identification/Solving
2.    Adaptability and Responsiveness
3.    Judgment
4.    Integrity
5.    Application of Law and Procedures
6.    Community Interaction
7.    Departmental Interaction

8.    Professional Image and Maintenance of Equipment
9.    Quality and Timeliness of Reports
10.    Initiative
11.    Leadership
12.    Implementation of Proactive Policing Strategies (for members who perform administrative functions, a different dimension, Competence in Unit's Mission, replaces this dimension)

Two dimensions of particular relevance to the monitorship are "Application of Law and Procedures" and "Quality and Timeliness of Reports."  Supervisors are asked to rate their subordinates based upon, among other factors, the lawfulness of the officer's stops and the accuracy and completeness of the officer's stop reports.  In approving the performance evaluation system, the Court directed the Monitor to review and assess it to ensure "on paper and in practice, it does not (a) reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness or (b) undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments to the Constitution."[16]

In the fourth quarter of 2020, the NYPD reported the following data with regards to the performance evaluation system:

- There were 14,149 total performance evaluations completed for officers and detectives in 4Q2020.  There were 987 missing evaluations (6.5% missing).

- There were 8,264 CRAFT supervisory feedback forms completed in 4Q2020.  There were 5,123 positive CRAFT entries and 3,141 negative CRAFT entries.

- In 4Q2020, officer profiles contained the following information related to stops:
      Insufficient Basis for Stop:    20
      Insufficient Basis for Frisk:    24
      Insufficient Basis for Search: 27

- There were 902 follow-ups indicated from the preparation of stop reports in 4Q2020.

---

[16] *Floyd*, ECF No. 564.

The Monitor has undertaken a number of steps to evaluate whether the performance evaluation system meets the Court's criteria.  The Monitor Team reviewed evaluations for officers receiving a "Needs Improvement" rating for Application of Law and Procedures, Quality and Timeliness of Department Reports, and Implementation of Proactive Policing for the fourth quarter of 2020.  The Monitor Team reviewed data on officers receiving a "Needs Improvement" CRAFT supervisory feedback report for those dimensions.  In addition, the Monitor Team reviewed the quarterly evaluations in a sample of eight precincts, one PSA, and one Transit District.

> **a.** **Review of Performance Evaluations with Ratings of "Needs Improvement" for Selected Performance Dimensions**

For the fourth quarter of 2020, there were only 117 out of over 14,000 performance evaluations that had a "Needs Improvement" rating for the performance dimensions Application of Law and Procedures, Quality and Timeliness of Department Reports, and/or Implementation of Proactive Policing.  These performance evaluations came from 21 different commands.  The dimension Application of Law and Procedure had 12, Proactive Policing had 95, and Quality and Timeliness of Written Reports had 10.  In total, there were 26 CRAFT entries made in relation to these 117 Needs Improvement ratings.  One officer was issued two CRAFT entries and was instructed on how to properly conduct a stop of a person suspected of a crime.  There were no negative CRAFT entries or Needs Improvement ratings because of stop report activity or lack thereof.

Most of the comments provided by supervisors in the performance evaluations—not limited to evaluations with Needs Improvement ratings—contained boilerplate language.  For example, one supervisor used the comment "The officer performed the duties entailed in the above area as described by the chosen attributes" for numerous officers during the period.  This comment

74

was used regardless of the rating given and without any additional specificity about what behavior or activities were being addressed.

**b.      Review of Negative CRAFT Entries on Selected Performance Dimensions**

In the fourth quarter of 2020, there were more than 8,000 CRAFT entries prepared. There were 5,123 for "exceeds expectations," and 3,141 for "needs improvement." In the selected performance dimensions of Application of Law and Procedures, Implementation of Proactive Policing, and Quality and Timeliness of Written Reports, there were 777 CRAFT entries that were listed as "needs improvement." These entries were examined to identify areas related to stops. Chart 11 below shows the breakdown of stop-related CRAFT entries in those performance dimensions. The reasons supervisors provided to describe the nature of the feedback was diverse. An attempt was made to condense those descriptions into major themes and categories to permit a better understanding of the areas identified most often.

**Chart 11. 4Q2020 Negative CRAFT Entries on Selected Performance Dimensions**

| Application of Law and Procedure | Count |
|---|---|
| ACTIVITY LOG DEFICIENT | 38 |
| APPROVED STOP REPORT WITH DEFICIENCIES | 21 |
| BUSINESS CARD NOT OFFERED | 23 |
| BWC RELATED | 48 |
| DID NOT ENSURE A STOP REPORT WAS PREPARED | 2 |
| FAILED TO PREPARE STOP REPORT | 6 |
| LACKS REASONABLE SUSPICION FOR FRISK | 11 |
| IMPROPER SEARCH | 5 |
| LACKS REASONABLE SUSPICION FOR STOP | 56 |
| **Total** | **210** |

| Quality and Timeliness of Written Reports | Count |
|---|---|
| APPROVED STOP REPORT WITH DEFICIENCIES | 5 |
| BUSINESS CARD NOT OFFERED | 1 |
| BWC RELATED | 6 |
| FAILED TO PREPARE STOP REPORT | 4 |
| ACTIVITY LOG DEFICIENT | 2 |

| | |
|---|---|
| **Total** | **18** |

| Implementation of Proactive Policing | Count |
|---|---|
| ACTIVITY LOG DEFICIENT | 2 |
| BUSINESS CARD NOT OFFERED | 16 |
| BWC ACTIVATION RELATED | 10 |
| FAILED TO PREPARE STOP REPORT | 1 |
| IMPROPER FRISK | 2 |
| IMPROPER SEARCH | 1 |
| STOP REPORT DEFICIENT | 2 |
| FAILED TO MAKE STOP | 4 |
| **Total** | **38** |

### c.   Review of Quarterly Performance Evaluation Data for Sample Commands

Quarterly performance evaluations from the following commands were examined: Precincts 9, 32, 52, 60, 73, 103, 114 and 121, PSA6 and TD34.   In total, there were more than 1,300 performance evaluations reviewed from this group of 10 commands.   In only 12 instances did the reviewing supervisor rate the officer as Needs Improvement in any of the 12 performance dimensions.   Therefore, out of the 1,337 evaluations completed, only 0.07% contained a Needs Improvement rating on any one of the performance dimensions rated.   The Monitor Team's evaluation of the NYPD's 2019 performance evaluations in the Eleventh Report showed what is known as a "halo effect" in performance evaluation systems—every officer received a positive evaluation in all 12 dimensions regardless of negative CRAFT entries.   The halo effect observed from the 2019 period still appears to be present in the fourth quarter of 2020.

The Monitor Team compared negative CRAFT entries for the selected performance dimensions that were for insufficient legal basis for stop encounters with the ratings given by supervisors in performance evaluations during the 4Q2020 performance rating period.   In the 10 selected commands, there were 14 officers and supervisors who had a negative CRAFT entry related to stops in one of the three performance dimensions.   Four of those officers' performance

76

evaluations are missing.  A review of the performance evaluations of the 10 remaining officers revealed that one received a rating of meets standards, five received a rating of exceeds standards, and four were rated as exceptional.  Again, as in our previous assessment, it is not clear that there is a connection between the presence of a negative CRAFT entry and the member's rating on the quarterly evaluation.

The Monitor Team's review of the data indicates that the NYPD's performance evaluation system, as it is being implemented in practice, does not lead supervisors to pressure officers to make more stops without regard to the lawfulness of those stops.  Also, the Monitor Team did not find cases in which officers were given negative evaluations because of a lack of stop activity.  Based on the Monitor Team's review of performance evaluation data, the City is in partial compliance with the performance evaluation requirements (Task 38b).

## IX.    AUDITING

The Court's Remedial Order requires the NYPD to develop systems to monitor its members' compliance with constitutional and state law standards.  The Department's auditing function is designed to discover and then correct deviations from NYPD policy and the law.  The Department's QAD is the unit that conducts audits, including those relating to stop and frisk and trespass enforcement.  QAD also requires commands to submit self-inspections to monitor their compliance.  In July 2020, the Court approved the NYPD's 2020 Audit Plan.  These audits and self-inspections examine each command's compliance with the Fourth Amendment and the NYPD's stop and frisk procedures.

In submitting the NYPD 2020 Audit Plan for Court approval, the Monitor noted that the plan covers only audits conducted by QAD and self-inspections conducted by executives at the command level.  These audits and self-inspections examine each command's compliance with the Fourth Amendment and compliance with the Department's stop and frisk and BWC policies.  The

Audit Plan does not cover the Department's responsibilities for monitoring its members' compliance with the Fourteenth Amendment, a separate task. The Monitor and the parties recognize the importance of sound NYPD procedures for monitoring Fourteenth Amendment compliance, a requirement which the Monitor has added to the compliance matrix in Appendix 1.

### A.    QAD Auditing of Stop Reports

Under the Court-approved Audit Plan, auditors now review BWC footage for every audited stop report. QAD examines whether the encounter was recorded in full or in part, whether the BWC video was consistent or inconsistent with the stop report, and whether the stop report and the BWC video indicate that there was reasonable suspicion for the stop or frisk (if conducted) or a legally sufficient basis for any search conducted. The Audit Plan also changed the sampling methodology so that the number of stop reports audited now depends upon the number of stop reports prepared in each command during the prior year. Additionally, the Audit Plan now ensures that all commands are audited on a weekly basis, which allows for timely feedback and corrective action without having to wait for quarterly audit results.

Chart 12 below shows QAD's determinations of the percentage of stop reports that articulated reasonable suspicion for the stop, the percentage of stop reports that articulated reasonable suspicion that the person frisked was armed and dangerous, and the percentage of stop reports that articulated a legal basis for the search conducted. Based on the assessments from QAD audits, the NYPD's level of compliance improved from 2017 to 2018, remained at about the same level for 2019, and improved in 2020.

**Chart 12.  QAD Stop Report Audits**

| Period | Stop Reports Evaluated | Stop Narrative Articulates Reasonable Suspicion for Stop | Frisks Evaluated | Frisk Narrative Articulates Reasonable Suspicion for Frisk | Searches Evaluated | Search Narrative Articulates Legal Basis for Search |
|---|---|---|---|---|---|---|
| **2017** | 7,526 | 5,448 (72%) | 4,480 | 3,920 (88%) | 2,458 | 2,256 (92%) |
| **2018** | 7,134 | 5,839 (82%) | 4,119 | 3,739 (91%) | 2,421 | 2,277 (94%) |
| **2019** | 7,475 | 6,050 (81%) | 3,434 | 3,233 (94%) | 2,473 | 2,312 (93%) |
| **2020** | 5,144 | 4,493 (87%) | 2,551 | 2,371 (93%) | 2,127 | 1,961 (92%) |

QAD's review of command self-inspections indicates that the percentage of reports in which QAD and the command came to the same conclusion reached 90 percent during the last two quarters of 2020 and 95 percent in the first quarter of 2021.  See Chart 13 below.

**Chart 13.  QAD Audits and Command Self-Inspections of 2018-1Q2021Stop Reports**

| Quarter | # Stop Reports Audited by QAD | # Stop Reports Audited by QAD in Command Self-Inspection | # QAD, Command Consistent | % QAD, Command Consistent (Column 3 divided by Column 4) |
|---|---|---|---|---|
| 1Q2018 | 1,862 | 1,414 | 868 | 61% |
| 2Q2018 | 1,852 | 1,458 | 948 | 65% |
| 3Q2018 | 1,761 | 1,343 | 942 | 70% |
| 4Q2018 | 1,659 | 1,088 | 765 | 70% |
| 1Q2019 | 1,741 | 1,110 | 884 | 80% |
| 2Q2019 | 2,172 | 1,313 | 1,078 | 82% |
| 3Q2019 | 1,915 | 1,244 | 972, | 78% |
| 4Q2019 | 1,647 | 1,094 | 842 | 77% |
| 1Q2020 | 1,823 | 1,105 | 833 | 75% |
| 2Q2020 | 1,537 | 1,117 | 896 | 80% |
| 3Q2020 | 768 | 426 | 385 | 90% |
| 4Q2020 | 1,016 | 654 | 597 | 91% |
| 1Q2021 | 1,014 | 624 | 564 | 90% |
| 2Q2021 | 963 | 571 | 540 | 95% |

QAD's assessment of whether BWC videos of a stop are consistent with the narrative in the related stop report find a fairly high level of consistency, except for the third quarter of 2020. See Chart 14 below.

**Chart 14.  QAD Audit of Stop Reports with Associated BWC Video**

|  | Number of Videos Reviewed | Video Consistent with Stop Report Narrative | Video Inconsistent with Stop Report Narrative |
|---|---|---|---|
| **1Q2018** | 82 | 61 (74%) | 21 (26%) |
| **2Q2018** | 164 | 141 (86%) | 23 (14%) |
| **3Q2018** | 258 | 222 (86%) | 36 (14%) |
| **4Q2018** | 476 | 406 (85%) | 70 (15%) |
| **1Q2019** | 755 | 666 (88%) | 89 (12%) |
| **2Q2019** | 940 | 863 (92%) | 77 (8%) |
| **3Q2019** | 947 | 877 (93%) | 70 (7%) |
| **4Q2019** | 870 | 797 (92%) | 73 (8%) |
| **1Q2020** | 905 | 817 (90%) | 88 (10%) |
| **2Q2020** | 879 | 812 (92%) | 67 (8%) |
| **3Q2020** | 740 | 577 (78%) | 163 (22%) |
| **4Q2020** | 972 | 886 (91%) | 86 (9%) |
| **1Q2021** | 996 | 899 (90%) | 97 (10%) |
| **2Q2021** | 948 | 862 (91%) | 86 (9%) |

### B.      Monitor Team Review of Stop Report Audits

Starting with the audits from the fourth quarter of 2016, the Monitor Team has obtained QAD's audits of a sample of commands along with the audited stop reports from those commands. The goal is to evaluate the auditors' work and to review a sufficient number of stops to be able to make meaningful statements about citywide compliance.  The stop reports are evaluated by three members of the Monitor Team.  When they disagree, the stop reports are reviewed by the Monitor and Deputy Monitor.  These disagreements are discussed in Monitor Team meetings, and then the

results are sent to QAD, which meets with the Monitor Team to discuss those cases in which there is a disagreement between QAD's and the Monitor's assessment.

Chart 15 below compares the number and percentage of stop reports each quarter that QAD determined articulated reasonable suspicion with the number and percentage of stop reports that the Monitor Team determined described justified stops.  Both QAD audits and those conducted by the Monitor Team show an improvement in the stops meeting the standard of reasonable suspicion. Chart 15 shows that although the Monitor Team's assessment of compliance is lower than the NYPD's assessment of compliance, the difference between the Monitor Team's assessments and QAD's assessments has decreased over time.  This is likely due at least in part to the meetings with the Monitor Team and NYPD and a more thorough review of the stop reports by QAD as a result.

**Chart 15.  Monitor and QAD Assessments of Stops**

| | QAD (No., % Articulating Reasonable Suspicion) | Monitor (No., % Containing Justified Stops) | Total |
|---|---|---|---|
| 1Q2017 | 197 (77%) | 142 (55%) | 256 |
| 2Q2017 | 209 (69%) | 178 (59%) | 302 |
| 3Q2017 | 219 (70%) | 188 (60%) | 312 |
| 4Q2017 | 221 (72%) | 212 (70%) | 305 |
| 1Q2018 | 222 (72%) | 202 (66%) | 308 |
| 2Q2018 | 238 (81%) | 211 (72%) | 295 |
| 3Q2018 | 240 (79%) | 251 (83%) | 302 |
| 4Q2018 | 232 (77%) | 239 (80%) | 300 |
| 1Q2019 | 263 (83%) | 250 (79%) | 315 |
| 2Q2019 | 255 (83%) | 245 (80%) | 308 |
| 3Q2019 | 257 (85%) | 249 (82%) | 304 |
| 4Q2019 | 233 (75%) | 228 (74%) | 310 |
| 1Q2020 | 252 (83%) | 256 (85%) | 303 |
| 2Q2020 | 243 (80%) | 237 (78%) | 302 |
| 3Q2020 | 281 (94%) | 280 (93%) | 300 |
| 4Q2020 | 274 (92%) | 264 (88%) | 298 |

C.      QAD Audits for Undocumented Stops

1.      RAND Audit Results

QAD continues to audit the potential underreporting of stops by implementing the recommendations of the RAND Corporation.  The RAND audit program is designed to identify stop encounters using radio transmissions to discover instances in which stop reports should have been prepared.  QAD uses keyword searches of ICADs to identify events that likely involved stop encounters.  These keywords are "Stopped," "Show-up," "Holding," and "Warrant Check."  Once a potential stop encounter is identified through the review of ICADs and/or listening to the corresponding radio transmission, NYPD records are reviewed to determine whether a corresponding stop report was prepared.  If there is BWC video of the event, QAD reviews the video as part of this analysis.  If an auditor determines that a stop report may have been required, the event is sent back to the command for further investigation.  When a command investigates an encounter for the purposes of a RAND audit and determines that a stop report was necessary but not completed, the command directs that a stop report be completed and takes corrective action.

Chart 16 below shows that in 2020, QAD's RAND audits identified 23 *Terry* stops for which no stop report was prepared.

**Chart 16.  RAND Audit with Command Responses**

|  | Total RAND Audits Indicating a Possible Stop | Stop Reports Prepared | Report Deemed Not Necessary After Command Investigation | Total *Terry* Stops | *Terry* Stop Without Stop Report | Compliance Rate (%) (Stop Reports Prepared/Total Stops) |
|---|---|---|---|---|---|---|
| 4Q2016 | 28 | 8 | 8 | 20 | 12 | 40% |
| 1Q2017 | 28 | 6 | 10 | 17 | 11 | 35% |
| 2Q2017 | 31 | 6 | 9 | 22 | 16 | 27% |
| 3Q2017 | 21 | 12 | 4 | 17 | 5 | 71% |
| 4Q2017 | 23 | 12 | 6 | 17 | 5 | 71% |
| 1Q2018 | 21 | 10 | 7 | 14 | 4 | 71% |

| | Total RAND Audits Indicating a Possible Stop | Stop Reports Prepared | Report Deemed Not Necessary After Command Investigation | Total *Terry* Stops | *Terry* Stop Without Stop Report | Compliance Rate (%) (Stop Reports Prepared/Total Stops) |
|---|---|---|---|---|---|---|
| 2Q2018 | 25 | 13 | 5 | 20 | 7 | 65% |
| 3Q2018 | 26 | 6 | 12 | 14 | 8 | 43% |
| 4Q2018 | 25 | 9 | 5 | 20 | 11 | 45% |
| 1Q2019 | 19 | 13 | 4 | 15 | 2 | 87% |
| 2Q2019 | 18 | 11 | 5 | 13 | 2 | 85% |
| 3Q2019 | 28 | 13 | 2 | 26 | 13 | 50% |
| 4Q2019 | 22 | 16 | 2 | 20 | 4 | 80% |
| 1Q2020 | 40 | 20 | 4 | 36 | 16 | 56% |
| 2Q2020 | 38 | 28 | 6 | 32 | 4 | 88% |
| 3Q2020 | 15 | 9 | 3 | 12 | 3 | 75% |
| 4Q2020 | 11 | 8 | 3 | 8 | 0 | 100% |
| 1Q2021 | 23 | 21 | 1 | 22 | 1 | 95% |
| 2Q2021 | 11 | 9 | 2 | 9 | 0 | 100 |

When a command investigates a RAND audit encounter and determines that it was a stop without a stop report, the command directs the officer involved to complete a stop report and takes corrective action.  Chart 17 below details follow-up actions taken by commands for members who did not document stops.

**Chart 17.  Command Follow-Up Actions from RAND Audit**

| | *Terry* Stop Without Stop Report | Command Discipline | Instructions/ Training | Minor Violations Log or CRAFT Supervisory Report | No Disciplinary Action |
|---|---|---|---|---|---|
| 4Q2016 | 12 | 2 | 3 | 5 | 2 |
| 1Q2017 | 11 | 0 | 6 | 5 | 0 |
| 2Q2017 | 16 | 0 | 8 | 5 | 3 |
| 3Q2017 | 5 | 0 | 3 | 1 | 1 |
| 4Q2017 | 5 | 4 | 1 | 0 | 0 |
| 1Q2018 | 4 | 2 | 0 | 1 | 1 |
| 2Q2018 | 7 | 0 | 2 | 3 | 2 |
| 3Q2018 | 8 | 1 | 4 | 3 | 0 |
| 4Q2018 | 11 | 1 | 1 | 7 | 2 |
| 1Q2019 | 2 | 0 | 0 | 2 | 0 |

|  | *Terry* Stop Without Stop Report | Command Discipline | Instructions/ Training | Minor Violations Log or CRAFT Supervisory Report | No Disciplinary Action |
|---|---|---|---|---|---|
| **2Q2019** | 2 | 0 | 0 | 1 | 1 |
| **3Q2019** | 13 | 1 | 0 | 11 | 1 |
| **4Q2019** | 4 | 0 | 0 | 4 | 0 |
| **1Q2020** | 16 | 1 | 1 | 14 | 0 |
| **2Q2020** | 4 | 0 | 1 | 2 | 1 |
| **3Q2020** | 3 | 0 | 1 | 2 | 0 |
| **4Q2020** | 0 | 0 | 0 | 0 | 0 |
| **1Q2021** | 1 | 0 | 1 | 0 | 0 |
| **2Q2021** | 0 | 0 | 0 | 0 | 0 |

### 2.   Results from Police-Initiated Enforcement Audits

QAD also uses police-initiated enforcement (PIE) audits to detect undocumented stop encounters.  These audits look at arrests in each command from the audit period that resulted from police-initiated enforcement.  These are defined as arrests in which the People of the State of New York are the complainants on the Complaint Report, such as criminal possession of a controlled substance, criminal possession of a weapon, or trespass.  Each week, the most recent PIE arrest from each command is audited.  Arrest reports are reviewed to determine whether or not a stop report should have been filled out for the encounter.  When an auditor determines that the arrest report possibly required a stop report and no such stop report was filled out, the arrest report is returned to the command for further investigation.  See Chart 18 below.

**Chart 18.  PIE Audits with Command Responses**

|  | Arrests Audited Possibly Requiring Stop Reports | Stop Report Not Required | Command Response Missing | Stop Report Required | Stop Report on File | Percentage Compliance (SR on file/SR Required) |
|---|---|---|---|---|---|---|
| **4Q2016** | 103 | 50 | 7 | 46 | 20 | 44% |
| **1Q2017** | 161 | 95 | 23 | 43 | 19 | 44% |
| **2Q2017** | 154 | 104 | 6 | 44 | 13 | 30% |
| **3Q2017** | 194 | 122 | 26 | 46 | 12 | 26% |
| **4Q2017** | 225 | 171 | 0 | 54 | 20 | 37% |

| | Arrests Audited Possibly Requiring Stop Reports | Stop Report Not Required | Command Response Missing | Stop Report Required | Stop Report on File | Percentage Compliance (SR on file/SR Required) |
|---|---|---|---|---|---|---|
| **1Q2018** | 122 | 74 | 4 | 44 | 18 | 41% |
| **2Q2018** | 149 | 103 | 5 | 41 | 16 | 39% |
| **3Q2018** | 190 | 121 | 19 | 50 | 22 | 44% |
| **4Q2018** | 166 | 74 | 37 | 55 | 34 | 62% |
| **1Q2019** | 156 | 63 | 72 | 21 | 13 | 62% |
| **2Q2019** | 128 | 94 | 1 | 33 | 20 | 61% |
| **3Q2019** | 149 | 96 | 0 | 53 | 21 | 40% |
| **4Q2019** | 138 | 103 | 0 | 35 | 16 | 46% |
| **1Q2020** | 132 | 95 | 0 | 37 | 24 | 65% |
| **2Q2020** | 141 | 96 | 0 | 45 | 24 | 53% |
| **3Q2020** | 81 | 43 | 0 | 38 | 30 | 79% |
| **4Q2020** | 94 | 38 | 0 | 56 | 53 | 95% |
| **1Q2021** | 58 | 21 | 0 | 37 | 29 | 78% |
| **2Q2021** | 66 | 17 | 0 | 49 | 42 | 86% |

### D.    QAD Auditing of Trespass Crimes Fact Sheets

Officers are required to fill out a TCFS for all trespass arrests in and around NYCHA buildings.  QAD auditors review whether a TCFS was prepared when required, whether the officer articulated a proper basis for the approach on the TCFS, and whether the arrest documentation articulates probable cause for the arrest.

QAD audits find that the majority of trespass arrests in NYCHA are properly documented by a TCFS, and that paperwork associated with these arrests indicates that there was a proper basis to approach and then arrest the individual.  See Chart 19 below.

**Chart 19.  QAD Audits of Trespass Arrests and TCFS**

| | NYCHA Trespass Arrest Had TCFS | NYCHA TCFS Articulated Proper Basis for Approach | NYCHA Trespass Arrests Articulated Probable Cause |
|---|---|---|---|
| **2018** | 85% (516/604) | 97% (501/516) | 94% (567/604) |
| **2019** | 94% (520/555) | 98% (508/520) | 93% (515/555) |
| **2020** | 94% (240/255) | 94% (225/240) | 94% (240/255) |
| **Six months 2021** | 99% (155/156) | 97% (151/155) | 99% (155/156) |

### 1.      Compliance Assessment—Audit Plan

**Tasks 36a, 36b In Compliance.**

In its Liability Opinion, the Court held that the NYPD was deliberately indifferent to unconstitutional stops and frisks, in part because it had "no meaningful procedures for auditing stop paperwork to monitor the constitutionality of stops." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 609 (S.D.N.Y. 2013).  In particular, the Court found that QAD's process of reviewing stops consisted of "a superficial review of whether paperwork was completed, not a substantive review of whether a stop was constitutional." *Id.* at 609-10.  To address that finding, the Court's Remedial Order instructed the Monitor to work with the parties to develop reforms to the NYPD's "monitoring . . . regarding stop and frisk." *Floyd v. City of New York*, 959 F. Supp. 2d 668, 677 (S.D.N.Y. 2013).

The Monitor has worked with the NYPD and Plaintiffs to make QAD's review of stops more effective.  In July 2020, the Court approved the NYPD's 2020 Audit Plan, which includes important improvements over the prior protocols.  Most significantly, the Plan requires QAD to review BWC video corresponding to every stop report being audited.  Under the 2020 Audit Plan, QAD also reviews the BWC video associated with every audited trespass arrest and PIE arrest.  In addition, under the new command self-inspection protocol in the 2020 Audit Plan, the ICOs at commands review the BWC video associated with each stop report being evaluated as part of the command stop report self-inspection.

The NYPD is required to establish auditing procedures that identify noncompliant stops, frisks, searches, and trespass arrests and a mechanism for correcting them.  With the 2020 Audit

Plan, the NYPD is in compliance with this requirement (Task 36a).[17]  The NYPD has implemented these protocols in the fourth quarter of 2020 and the first two quarters of 2021.  The NYPD is in compliance with implementing the 2020 Audit Plan (Task 36b).

### 2. Compliance Assessment—Monitoring Fourteenth Amendment Compliance

**Tasks 36c, 36d Not Yet In Compliance.**

The Department has not yet established procedures for monitoring its members' use of stop and frisk and trespass enforcement in compliance with the Fourteenth Amendment.  The NYPD has developed a system that provides a visualization of stop and frisk data that can be used in monitoring Fourteenth Amendment compliance and identifying areas for further investigation. The NYPD demonstrated the dashboard to the Monitor Team in March 2022.  The NYPD will be providing a demonstration for the Plaintiffs.  The NYPD is not yet in compliance with developing and implementing procedures for monitoring Fourteenth Amendment compliance (Tasks 36c and 36d).

## X. EARLY INTERVENTION SYSTEM

In November 2018, the Court ordered the Department, in consultation with the Monitor, to submit a plan for an early intervention system:  a program that systematically receives, assesses, and acts on information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements.  The five specific categories of required information regarding officer conduct are:  (a) declinations by the District Attorneys in New York City; (b) suppression decisions by courts precluding evidence as a result of unlawful stops and searches; (c) court findings of incredible testimony by police officers; (d) denials of indemnification and/or

---

[17] QAD's audits and command self-inspections assess compliance with the Fourth Amendment and the Department's stop and frisk policies.  The NYPD is also required to develop sound procedures for monitoring Fourteenth Amendment compliance.

representation of police officers by the New York City Law Department; and (e) judgment and settlements against police officers in civil cases where there exists evidence of police malfeasance.[18]

The Department submitted a plan for its Early Identification Program (EIP) to the Court in December 2019, to which the Plaintiffs objected.  After significant negotiations overseen by the Monitor, the parties submitted a joint filing to the Court delineating the remaining points of disagreement among the parties regarding the Department's EIP plan.  The Court issued an order in June 2020 setting out the requirements for the early intervention system.[19]  In addition to the Court's order, a new section of New York City's Administrative Code, NYC Administrative Code § 14-190, has created additional requirements for the Department's early intervention system.[20]

### 1.    Compliance Assessment—Early Intervention System

<span style="color:green">**Task 37a In Compliance;**</span> <span style="color:orange">**Task 37b Partial Compliance.**</span>

The NYPD submitted to the Court its plan for receiving, assessing, and acting on information regarding adverse findings regarding unlawful stops and trespass enforcement.  The Court then issued an order setting out the requirements for the early intervention system.  The NYPD is in compliance with this requirement (Task 37a).

The NYPD's EIP is designed to utilize risk management strategies to intervene to support employee professional development by attempting to identify and mitigate factors which may lead to negative performance issues, employee discipline, or negative interactions with the public. Under the EIP, when a designated threshold is triggered, RMB staff prepare an overview of the officer's history with the Department and make a recommendation for a potential intervention.

---

[18] *Floyd*, ECF No. 662.
[19] *Floyd*, ECF No. 767.
[20] Local Law 68-2020.

The designated thresholds include, but are not limited to, three or more declinations to prosecute in a 12-month period in certain specified categories; a suppression decision in a case involving stops, trespass enforcement, or racial profiling or slurs; a court finding of incredible testimony; a declination by the Law Department to represent or indemnify the officer in a lawsuit; a lawsuit naming the officer alleging an unconstitutional stop, an unconstitutional trespass enforcement, or racial profiling or racial slurs where there has been a judgment or settlement against a police officer, and where there exists evidence that the police officer violated a rule or regulation of the NYPD, and any CCRB complaint against the officer involving racial profiling or a racial slur. The officer's commanding officer is also asked to make a recommendation regarding potential intervention, and the officer's profile and the RMB's and CO's recommendations are sent to an Early Intervention Committee.

The Early Intervention Committee (EIC) is chaired by the Chief of RMB and includes executive-level personnel representing the Deputy Commissioner of Legal Matters, the Deputy Commissioner of Equity and Inclusion, the Chief of the Department, the Chief of Detectives, the Chief of Patrol, and the Chief of Personnel. In addition to the thresholds specified in the Court's order, the EIC will also review any officer who meets certain criteria regarding civil litigation,[21] force complaints,[22] and other indicators specified in legislation enacted by the City Council.[23]

---

[21] Three or more commenced lawsuits in a 12-month period; six or more commenced lawsuits in a five-year period; one lawsuit disposed for $200,000 or greater in a 12-month period.

[22] Two or more force complaints in a 12-month period; four or more force complaints in a two-year period; five or more force complaints in a four-year period.

[23] These indicators include CCRB and Internal Affairs Bureau (IAB) investigations, criminal arrests and investigations of an officer, vehicle pursuits and collisions, violations of the Patrol Guide, and arrests and summonses for resisting arrest, obstructing governmental administration, and disorderly conduct. Local Law 68-2020. The bill took effect on September 1, 2020.

When evaluating an officer, the EIC must consider: relevant details relating to the incident or incidents that caused the officer to meet the designated threshold; their tenure with the Department, including whether the officer has previously been presented to the EIC; the subject officer's history or disciplinary and performance monitoring; and the officer's performance evaluations and past and current assignments.  In October 2021, the NYPD published guidelines for the Early Intervention Program in its Administrative Guide, A.G. 320-54.  The EIC has several potential interventions from which to choose, including training, mentoring, further review of the officer's BWC videos, enhanced supervision, change of assignment, and conferral with Bureau leadership.  Where necessary, officers may be referred for a determination of whether monitoring is appropriate, for an assessment with the Health and Wellness Section, to the Internal Affairs Bureau for potential disciplinary action, or to a District Attorney's Office for potential criminal investigation.  The EIC may also decide that no intervention is necessary.

Within seven business days of making a decision, the EIC will inform the commanding officer and other applicable internal stakeholders of its recommendation.  Within 30 days, the commanding officer is required to report back on the implementation of the EIC's recommendation.

Pursuant to the June 2020 Court order, the Department is required to post aggregate data regarding officers who have been assessed by EIC on a quarterly basis.[24]  Pursuant to the new Administrative Code section, the Department is required to submit an annual report to the Mayor

---

[24] *Floyd*, ECF No. 767.

and the Speaker of the City Council regarding the Department's use of early intervention during the previous year.[25] Both sets of reports are publicly available on the NYPD website.[26]

The EIC first met in August 2020 and has convened approximately monthly since then. The Monitor Team has observed each of the EIC meetings convened thus far. From August 2020 through December 2021, the EIC reviewed 712 members of the service. Those members crossed thresholds relating to CCRB complaints, declined prosecutions, racial profiling and racial slur complaints, use of force, and suppression decisions. In addition, four of the 712 were referred to the EIC for review by their Commanding Officer. In February 2022, the EIC reviewed officers who had been identified by the Kings County (Brooklyn) District Attorney's Office as lacking in credibility. The EIC has not yet reviewed any members of the Department based on lawsuits alleging improper stop, trespass enforcement, or racial profiling or slurs where evidence existed that the police officer violated an NYPD rule. Another requirement of the Court's early intervention order is for the NYPD to use information from the EIP for making performance evaluations and transfer or discretionary promotional decisions on a case-by-case basis as the Police Commissioner deems appropriate. The NYPD has not yet established protocols for implementing that requirement.

There are some very positive aspects of the NYPD's Early Intervention Program. The goal of the program is for the NYPD to identify potential issues and at-risk behavior and take action before they escalate. The interventions can be helpful in steering members in the right direction. The inclusion of the Employee Assistance Unit in the EIC is quite beneficial. The Monitor Team did note that there were members of the service who clearly should have been flagged by the

---

[25] NYC Administrative Code § 14-190.

[26] https://www1.nyc.gov/site/nypd/stats/reports-analysis/early-intervention-program-reports.page.

NYPD earlier for review but who may have either avoided oversight or the earlier interventions were unsuccessful; at the same time, however, the fact that these members were reviewed by the EIC indicates that the thresholds are identifying officers who need review.  The Monitor Team also had concerns, shared with the NYPD, that many of the COs are not recommending any intervention for officers who meet the EIP thresholds.  The Monitor Team will continue working with the NYPD on implementation of the EIP and the Court's order.  The NYPD is in partial compliance with implementation of the early intervention system (Task 37b).

## XI.   COMPLAINTS AND DISCIPLINE

The Court's Remedial Order required the NYPD to change its policies and practices with respect to investigations of racial profiling and other bias-based profiling allegations as well as its handling of civilian complaints that have been substantiated by the CCRB.

### A.   NYPD Investigations of Profiling Allegations

The NYPD currently investigates all profiling allegations related to race and bias-based policing, whether the allegation is made directly to the Department or referred from the CCRB. Investigation of racial profiling complaints filed by a citizen will move from NYPD to CCRB commencing some time in 2022, due to an amendment of the Charter.[27]  Until that transfer is made, however, the NYPD will continue to investigate racial profiling complaints.

Profiling complaints have decreased each year since 2017, with 127 complaints filed in the first two quarters of 2021.  The NYPD had not substantiated any profiling allegations prior to 2020 but has now substantiated three allegations against uniformed members and one against a school safety agent in profiling investigations.  See Chart 20 below.  The allegations against the three uniformed members were for racist internet postings.  The Department brought charges and

---

[27] Charter 440, LL 2021/047, effective January 20, 2022.

specifications against these officers for prohibited conduct under P.G. 2013-10 (now A.G 304.06), which prohibits "using discourteous or disrespectful remarks regarding another person's age, ethnicity, race, religion, gender, gender identify/expression sexual orientation, or disability." The NYPD did not charge a violation of its policy against racial profiling, A.G. 304.17, because posting on the internet is not a police enforcement action, which is required by the racial profiling prohibition in the Administrative Guide. The allegation against the school safety agent involved an ethnic and religious slur. Complaints against a uniformed member for a racial or ethnic slur would be investigated by the CCRB. Because this complaint was against a school safety agent, the CCRB did not have jurisdiction, and the NYPD investigated the complaint. The Department's charges and specifications in this case also were for prohibited conduct and not racial profiling.

There are 18 members of the service who have had four or more racial profiling complaints, with two of those members having seven complaints and one having six.

**Chart 20. Profiling Case Dispositions by Year, 2014 – December 31, 2021**

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Unfounded** | 2 | 173 | 226 | 331 | 319 | 211 | 84 | 39 | 1,385 |
| **Unsubstantiated** | 6 | 120 | 285 | 464 | 365 | 231 | 103 | 65 | 1,639 |
| **Exonerated** | 2 | 11 | 0 | 2 | 8 | 4 | 4 | 2 | 33 |
| **Partially Substantiated\*** | 0 | 37 | 44 | 50 | 40 | 50 | 25 | 9 | 255 |
| **Information and Intelligence** | 0 | 0 | 0 | 2 | 2 | 1 | 1 | 0 | 6 |
| **Open or Active** | 0 | 1 | 3 | 3 | 1 | 1 | 17 | 93 | 119 |
| **Substantiated** | 0 | 0 | 0 | 0 | 1 | 0 | 3 | 0 | 4 |
| **Closed to File** | 0 | 1 | 4 | 5 | 9 | 15 | 3 | 1 | 39 |
| **Total** | 10 | 343 | 562 | 858 | 745 | 513 | 240 | 209 | 3,480 |

\* These are cases in which other allegations in a complaint were substantiated, but not profiling allegations. The chart above includes three cases in the "Substantiated" category because an allegation of biased policing was substantiated, even though other allegations in the complaint were not substantiated, so the case might otherwise be considered "Partially Substantiated."

1.    **Compliance Assessment—Racial Profiling Investigations**

**Task 35a In Compliance; Task 35b Partial Compliance.**

In January 2019, the Court approved an IAB Guide section and related training that provide detailed guidance on how to investigate profiling complaints.  In 2019 and 2020, the Monitor Team reviewed profiling investigations and developed significant concerns regarding the investigations' thoroughness and impartiality.  See Monitor's Tenth and Eleventh Reports.  Based on the Monitor's recommendations, the NYPD made changes to how it investigates profiling complaints and made changes to profiling investigations training and to the IAB Guide on profiling investigations.  Revisions to the IAB Guide section were approved by the Court in December 2020.  In May 2021, the Monitor Team met with profiling investigators to discuss the revisions to the IAB Guide and to provide feedback on how to best conduct such investigations.  The NYPD is in compliance with the requirement for written protocols for profiling investigations (Task 35a).

Since the Eleventh Report, the Monitor Team reviewed another set of 18 profiling investigations, conducted from 2019 to 2021.  Cases were selected for review based upon specific criteria, including:

- Profiling cases in which a police officer was named as a subject in three or more profiling complaints; the officer was identified as a subject in recorded civil actions and settlements involving profiling complaints; or the officer was identified via EIC or RISKS Reviews.

- Profiling cases in which the underlying police encounter involved a stop, frisk, or search.

- Cases from different Patrol Boroughs and the Housing, Detective, and Transit Bureaus.

Overall, the racial profiling investigations selected for review reflected an improvement over prior profiling investigations reviewed by the Monitor Team.  The majority of the cases were thoroughly investigated, and a few investigations were very well done.  Improvements were noted in the complaint intake process, complainant contact and interview, subject/witness officer interviews, and the general investigative approach taken with these cases.  The amount of time

between the assignment of the case to an investigator and that investigator contacting the complainant decreased.  Investigators asked complainants to describe the interaction with the subject officer without interruption.  In addition, there were fewer cases in which the subject and witness officers were asked leading questions.  Investigators also consistently used BWC videos of the subject and other officers present in the encounter.  The BWC videos recorded by the subject officer and other members at the scene were informative and helped identify inconsistencies between statements and what actually transpired.

Although there was overall improvement in the investigation of profiling cases, there were deficiencies noted in each case reviewed.  One deficiency common among all of the cases was that either the investigation lacked any analysis of trends or patterns of prior allegations and/or enforcement practices of the subject officer, or the analysis that was included in the investigation was faulty.  This was the case even though a number of investigations concerned members of the service with multiple prior profiling investigations.  The NYPD is in partial compliance with this requirement (Task 35b).

**B.**      **NYPD Handling of Substantiated CCRB Cases**

The Department Advocate's Office (DAO) reviews CCRB findings and recommendations for discipline regarding allegations the CCRB has substantiated.  The Court required that the DAO change its procedures to show "increased deference to credibility designations by the CCRB," to adopt "an evidentiary standard that is neutral between the claims of complainants and officers," and to ensure there is "no general requirement of corroborating physical evidence."  *Floyd*, ECF 372, p. 24.

**1.**      **NYPD Discipline and Penalties Imposed**

At trial, the Court found that the NYPD failed to impose meaningful discipline when the CCRB determined that officers engaged in unconstitutional stops and frisks.  *Floyd*, ECF 373, p.

105.   Chart 21 below shows the recommendations made by the CCRB to the NYPD for substantiated stop and frisk cases.  Chart 21 shows that the discipline recommended by the CCRB to the NYPD has decreased over the period from 2014 to 2020.  The number of substantiated stop and frisk cases also declined over that period.

**Chart 21.  CCRB's Initial Disciplinary Recommendations, 2014-2020**

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| **Instructions** | 20 | 58 | 4 | 4 | 15 | 6 | 12 |
| **Training** | 1 | 22 | 69 | 22 | 14 | 24 | 20 |
| **Command Discipline-A** | 4 | 65[28] | 72 | 41 | 15 | 16 | 18 |
| **Command Discipline-B** | 51 | 74[29] | 44 | 16 | 28 | 37 | 15 |
| **Charges and Specifications** | 102 | 48 | 23 | 19 | 15 | 13 | 3 |
| **Other** | 1[30] | 1[31] | 0 | 0 | 1[32] | 0 | 0 |
| **TOTAL** | 179 | 268 | 212 | 102 | 88 | 96 | 68 |

The Police Commissioner makes the final determination about the discipline imposed. Chart 22 below compares the CCRB's initial discipline recommendations with the final discipline imposed by the NYPD for 24 closed 2020 cases involving stops, frisks, and searches.  In most cases, the Police Commissioner imposed the same discipline as the CCRB, a change from many

---

[28] Includes five cases in which instructions were also recommended and three cases in which training was also recommended.

[29] Includes one case in which Instructions were also recommended and four cases in which training was also recommended.

[30] In 2014, there was one case in which the CCRB's disciplinary recommendation is listed in the data as "Command Discipline" without specifying whether level A or B was recommended.

[31] In 2015, one case is listed as "NDA" (No Disciplinary Action) in the data.  The notes on the case indicate that the complaint was received after the statute of limitations had run.

[32] CCRB initially recommended charges and specifications, but then reconsidered on its own and unsubstantiated the case.

years in the past.   In the three cases in which the CCRB recommended Instructions, the Commissioner imposed Training, and in another case, the CCRB's recommendation for Command Discipline Level B was changed to Command Discipline Level A by the Commissioner.   Two cases in which Training was recommended were closed administratively because the members resigned and two cases in which Command Discipline Level A was recommended were closed administratively because one of the members resigned and the other retired.   There were no closed substantiated cases in 2020 in which the Commissioner took no disciplinary action (NDA).

**Chart 22.  Comparison of Recommended Penalties to Final Disposition, 2020 Closed Cases**

| 2019 Penalty Type, Closed Cases | CCRB Recommended Discipline | Final Penalty |
|---|---|---|
| Charges and Specifications | 0 | 0 |
| Command Discipline-B | 3 | 2 |
| Command Discipline-A | 14 | 13 |
| Training | 4 | 5 |
| Instructions | 3 | 0 |
| No Disciplinary Action | 0 | 0 |
| Case Closed Administratively* | N/A | 4 |
| **Total** | 24 | 24 |

 *Three members resigned and one member retired.

### 2.      DAO Reconsideration Requests

In 2014, the NYPD and the CCRB established a new "reconsideration process," in which the DAO may ask the CCRB to reconsider its findings on whether allegations were substantiated or its recommendations for discipline.   The CCRB would then choose to change or maintain its original conclusions.   Alternatively, in certain circumstances (such as when a case is running out of time under the statute of limitations), the DAO may unilaterally recommend a different disposition or discipline to the Police Commissioner without requesting reconsideration by the CCRB.   In either case, the Police Commissioner would make the final decision on what discipline,

if any, to impose after reviewing both the CCRB's and the DAO's findings and recommended remedy. The NYPD requested no reconsiderations for 2020 or 2021 CCRB cases.

As noted above, for the 2020 closed stop and frisk cases, there were no cases in which the Commissioner declined to impose discipline, and in the one case in which the Commissioner changed the disposition from a recommended Command Discipline Level B to Command Discipline Level A, the Commissioner issued a departure letter explaining his rationale.

### 3.   Discipline Matrix

In January 2019, the Independent Panel on the Disciplinary System of the New York City Police Department, a panel of judges and former prosecutors, made 13 recommendations to improve the Department's internal discipline process. The recommendations included that the NYPD should consider creating a discipline penalty matrix to outline the presumptive penalties for a wide variety of possible offenses. In June 2020, a new NYC Administrative Code provision, NYC Administrative Code § 14-186, required that a discipline matrix be published on the NYPD's website. The NYPD published a draft discipline matrix in August 2020, solicited public comments, and made revisions based on the comments received. The matrix was published and went into effect on January 15, 2021. In addition to setting presumptive penalties for acts of misconduct and violations of Department policy, the discipline matrix also lists mitigating and aggravating factors that should be considered when deciding on an appropriate penalty. The presumptive penalty for an improper or wrongful stop, frisk, or search of an individual is set at three penalty days, with a mitigated penalty of training and an aggravated penalty of 15 penalty days. These presumptive penalties for stop and frisk violations are more severe than the penalties that had been imposed for stop and frisk violations from 2014 to 2021, but it is unclear whether the presumptive penalty of three penalty days for stop and frisk violations will be imposed going forward.

In February 2021, the Department and the CCRB entered into a Memorandum of Understanding regarding the application of the discipline matrix. The CCRB agreed to use the penalty guidelines set forth in the discipline matrix as the framework for its recommendations and will only deviate from those recommendations in extraordinary circumstances. The NYPD agreed to provide the CCRB with the subject officer's employment history, including the officer's disciplinary history. To date, few of the substantiated stop and frisk cases in which the CCRB has used the discipline matrix have been completed and closed by the NYPD, so the Monitor Team is not able to evaluate the impact of this change.

### 4. Compliance Assessment—DAO Handling of Substantiated CCRB Cases

#### Tasks 34a, 34b No Assessment.

The Court's Remedial Order requires the NYPD to improve its procedures for handling CCRB findings of substantiated misconduct during stops. Specifically, the DAO must provide more deference to credibility determinations made by the CCRB, use an evidentiary standard that is neutral between the claims of complainants and officers, and not require that physical evidence corroborate the complaint. For the 2020 substantiated CCRB cases, the NYPD agreed that a violation occurred in all of the closed cases. Even in cases in which the NYPD imposed a less severe penalty than the CCRB recommended, the NYPD did not challenge the CCRB's credibility determination. In these 24 cases, the NYPD was compliant with the Court's specific discipline requirements.

Although the DAO has made changes to its practices for handling substantiated CCRB complaints, the procedures have not yet been submitted for Court approval. Instead, the Court directed the Monitor to prepare an in-depth study of the efficacy, fairness, and integrity of the City's policies, practices, and procedures for handling police misconduct during stops. The Court

requested that any recommendations regarding the DAO protocols be incorporated in the discipline study report. The Monitor brought on Jim Yates, a former state court judge and counsel to four New York State Assembly Speakers, to conduct the study and draft the discipline report, which will be completed in 2022. The report will include an analysis of: (1) police discipline, including disciplinary processes and outcomes; (2) the civilian complaint process (both at the CCRB and the NYPD); and (3) the prosecution and adjudication of such complaints. The Monitor will defer its assessment of discipline requirements until after the completion of the discipline study and report.

### C.  Other Misconduct Noted, Failure to Complete Stop Report

If the CCRB investigates a complaint involving a stop, frisk, or search and determines that the subject member or members made a *Terry* stop but did not complete a stop report for the encounter, the CCRB refers the case to the NYPD as Other Misconduct Noted (OMN). If the failure to complete a stop report is associated with a complaint that CCRB substantiates, then the CCRB sends the OMN with the substantiated complaint, and the DAO handles both. If there is no substantiated complaint associated with the failure to complete a stop report, the OMN is sent to the IAB, the IAB logs the case, and the NYPD assigns it to the command for investigation and tracks the outcome.

Chart 23 below details outcomes of the NYPD's investigations of CCRB's OMN referrals for failure to complete a stop report for completed CCRB cases from 2015 through the first three quarters of 2021. For 2020, the CCRB has made 44 OMN referrals to the Department for failure to compete a stop report; of those, 10 were substantiated. For the first three quarters of 2021, the CCRB referred 16 OMNs for failure to complete a stop report; of those, eight were substantiated (seven Charges and Specs and one Instructions) and only two are still open. For the cases for which investigations were completed and substantiated in 2020 and 2021, none of the cases listed a penalty imposed on the officer.

**Chart 23.  Outcomes for Failure to Complete Stop Report (OMN Cases)**

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| **Substantiated, Command Discipline** | 29 | 21 | 18 | 9 | 7 | 0 | 0 |
| **Substantiated, C&S** | 2 | 0 | 1 | 0 | 0 | 0 | 7 |
| **Substantiated, Training** | 2 | 15 | 6 | 2 | 0 | 0 | 0 |
| **Substantiated, Instructions** | 60 | 53 | 19 | 9 | 14 | 8 | 1 |
| **Substantiated, Minor Procedural Violations** | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| **Substantiated, Warn and Admonish** | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Substantiated, NDA** | 7 | 1 | 7 | 0 | 2 | 2 | 0 |
| **NDA-DUP** | 3 | 8 | 7 | 1 | 0 | 0 | 0 |
| **Exonerated** | 5 | 7 | 2 | 10 | 11 | 9 | 1 |
| **Unfounded** | 3 | 2 | 4 | 0 | 2 | 1 | 0 |
| **Unsubstantiated** | 2 | 3 | 2 | 16 | 12 | 13 | 0 |
| **Information and Intelligence** | 0 | 0 | 2 | 5 | 3 | 1 | 1 |
| **Open/Pending** | 9 | 0 | 0 | 0 | 0 | 0 | 2 |
| **Other*** | 9 | 4 | 2 | 5 | 0 | 10 | 4 |
| **Total** | 136 | 115 | 72 | 57 | 51 | 44 | 16 |

* Includes the following dispositions:  Filed, No Allegation, No Record Found.

## XII.   CONCLUSION

The Monitor Team's review of NYPD policies and practices in 2020 and 2021 shows a continued improvement in NYPD's compliance with the Court's reform requirements and with the Fourth and Fourteenth Amendments with respect to stop, frisk and search.  The Monitor Team's review of stop reports and BWC footage showed an increase in the percentage of compliant stops from 2019 to 2020, from 77 percent to 86 percent.  The percentage of compliant frisks increased from 87 percent in 2019 to 92 percent in 2020, and the percentage of compliant searches remained steady at 93 percent for both years.  Again, however, as noted in earlier Monitor Reports and in this one, the issue of underreporting of stops remains a concern and limits the extent to which the

Monitor can draw conclusions from this data.  Other issues to be addressed include discipline, supervision, offering Business Cards when required, and the development of a process for monitoring compliance with the Fourteenth Amendment.  There is still additional work to be done. In the Compliance Matrix in Appendix 1 to this Report, the Monitor has determined that the City is in compliance with 43 tasks, but only in partial compliance with 13 tasks, and not yet in compliance with five tasks.  Also, there are five tasks for which the Monitor provided no assessment and will review in future reports.  To achieve substantial compliance with the Court's orders, the Department will need to accelerate its efforts to improve supervision, discipline, documentation, performance evaluation, and early intervention, among other measures, to finish the job.  These are not nominal tasks; they are important and critical to ensuring constitutional policing.

## LIST OF RESOURCES

Since the last general Monitor Report at the end of 2020, the Monitor has published four special reports on specific topics related to the monitorship:

- Twelfth Report – The Deployment of Body Worn Cameras on New York City Police Department (NYPD) Officers

- Thirteenth Report – Racial Disparities in NYPD Stop, Question, and Frisk Practices:  An Analysis of 2013 to 2019 Stop Reports

- Fourteenth Report – NYPD Social Distancing Enforcement, 2020

- Fifteenth Report – Analysis of New York City Police Department (NYPD) Trespass Enforcement Activity in and Around New York City Housing Authority (NYCHA) Buildings

Other resources are listed below:

- Monitor's Website, https://www.nypdmonitor.org/, including Monitor Reports, NYPD Policies, NYPD Training Materials, Court Opinions and Orders and NYPD Reference Materials.

- Civilian Complaint Review Board, https://www1.nyc.gov/site/ccrb/index.page

- NYPD Website, https://www1.nyc.gov/site/nypd/about/about-nypd/about-nypd-landing.page

- Center for Constitutional Rights Website, https://ccrjustice.org/ourcases/current-cases/floyd-et-al

- Communities United for Police Reform, https://www.changethenypd.org

- NAACP LDF Website, https://www.naacpldf.org/case-issue/davis-v-city-new-york/

- NYCLU Website, https://www.nyclu.org/en/cases/ligon-v-city-new-york-challenging-nypds-aggressive-patrolling-private-apartment-buildings

# APPENDIX 1

# COMPLIANCE MATRIX

| 11th Report Status | 16th Report Status | Standard | Task No. and Source of Requirement | Essence of Requirement | Compliance Definition | Methodology for Assessing and Achieving Compliance |
|---|---|---|---|---|---|---|
| **Requirements for Policies and Procedures** | | | | | | |
| In Compliance | In Compliance | Creation of Written policies, procedures, and Training Materials | Task #1a,             Source: Floyd remedial order, p.14 | Revise policies regarding stop and frisk to adhere to constitutional standards and New York state law | Compliance with this provision will be achieved when NYPD develops new policies  regarding stops which comply with federal and state constitutional standards and which are approved by the Monitor and the Court. | Revise policies for stops to comport with federal and state constitutional standards. |
| Partial Compliance | Partial Compliance | Implementation | Task #1b              Source: Floyd remedial order, p.14 | NYPD stops and frisks comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. Stops made by NYPD MOS comply with NYPD's new policies and with federal and state standards. 2. Stop reports that do not articulate reasonable suspicion for the stop or the frisk, or do not articulate the basis for the search are identified as deficient by supervisors and the officer is corrected.                             3. Stop reports that do not articulate reasonable suspicion are identified by QAD, and corrective action is taken with respect to the relevant MOS (officers and supervisors). 4. QAD evaluates BWC footage of stop encounters described in audited stop reports, identifies stops when the BWC footage is contrary to the reasonable suspicion articulated in the stop report, and corrective action is taken with respect to the relevant officers and supervisors. | Percentage of compliant stops must increase over time.  Reviews of BWC footage and associated stop reports will be made to assess the accuracy of stop reports and whether the BWC footage and stop reports are consistent. Compliance on this task is dependent on demonstration of compliance with documentation (Task 1c).  Compliance must be consistent over time and across commands. Substantial compliance will be assessed by a combination of a quantitative measure (percentage of compliant stops) with a qualitative assessment of the Department's efforts, including RISK Reviews, correction and discipline, and EIS. Compliance or non-compliance with other tasks/requirements will also inform the Monitor's qualitative assessment. |
| Not yet in Compliance | Partial Compliance | Implementation | Task #1c             Source: Floyd remedial order, p.14 | Stops and Frisk are Documented on Stop Reports | Compliance with this provision will be achieved when 1. Stops made by NYPD MOS are documented on Stop Reports;                                          2. In stop reports, officers articulate reasonable suspicion for the stop and frisk, if conducted, and the basis for a search, if conducted. 3. BWC footage of stops are not contrary to the reasonable suspicion articulated in stop reports of the same encounters. 4. Officers who make stops and do not document them are corrected through instructions and discipline. | RISKS Reviews, QAD audits, BWC Reviews.  The Monitor team will review a combination of RAND audit compliance rates, PIE audit compliance rates and CCRB OMN rates for failure to complete stop reports. The Monitor team will also review samples of BWC videos. The Monitor will review the Department's efforts to correct undocumented stops, including RISK Reviews, supervisory actions and officer instructions and discipline.  The Monitor also will assess NYPD efforts (by leadership and supervisors) to communicate the importance of documenting stops. Compliance must be consistent over time and across commands. |
| In Compliance | In Compliance | Creation of Written policies, procedures and Training Materials | Task #2a             Source: Floyd remedial order, p.17 | Revise policies regarding racial profiling to make clear targeting "right people" for stops is racial profiling and violates Constitution | Compliance with this provision will be achieved when NYPD develops new policies regarding racial profiling. | Revise policies to ensure race is not used improperly when officers conduct stops |

| Status | Implementation / Creation | Task / Source | Requirement | Compliance | Assessment |
|---|---|---|---|---|---|
| Not yet in Compliance | | | | | |
| Partial Compliance | Implementation | Task #2b Floyd remedial order, p.17 | NYPD stops and frisks comply with NYPD policies and with state and federal standards regarding racial profiling | Compliance with this provision will be achieved when: 1. Stops made by NYPD MOS comply with NYPD's new policies and with federal and state standards regarding racial profiling. 2. Data on stops, frisks and searches made by NYPD MOS do not show racial disparities that are not explained by legally justified reasons, and that are practically significant in magnitude and statistically significant, based on analyses conducted by Monitor experts. 3. Communications from NYPD leadership (executives, CO's and others) and officers' stop report narratives do not indicate a targeting of defined racial or ethnic groups for stops because of their prevalence in local crime suspect data. | Assessment of this task will be both quantitative and qualitative. Compliance or non-compliance with other tasks/requirements, such as Task 1c (documentation of stops) and Task 35 (racial profiling investigations), will inform the Monitor's assessment. Analyses will be conducted to assess whether there are racial disparities that are statistically significant and practically significant, and whether racial disparities are declining over time. Monitor team analyses may include: (1) An analysis of outcomes from stops (frisks, searches, summonses and arrests, force) for Blacks and Hispanics compared to similarly-situated non-Hispanics; (2) An analysis of the recovery rate of contraband and weapons for stops of Blacks and Hispanics compared similarly-situated non-Hispanics; (3) An analysis of whether there are racial disparities in the stop reports that the Monitor team found deficient in articulating reasonable suspicion for stops, frisks or searches, including an assessment of how MOS are using the term "fits description." The Monitor team will also conduct an analysis that will examine racial disparity by place, over time. The Monitor team will also conduct analyses for assessing compliance with the Davis case. The Monitor team has conducted the following types of analyses: A. Descriptive results and multivariate analyses for 2013-2019, for NYCHA: (1) Comparison of trespass stops, arrests, and summonses over time in and around NYCHA developments; (2) Examination of whether outcomes vary by whether an officer is assigned to the Housing Bureau or other NYPD units. B. Spatial analysis of overall enforcement activity and disparities by race-ethnicity for Davis case: (3) Assess enforcement activity (stops, arrests, summonses) at various distances from NYCHA (inside, immediate surrounding, and further away) and whether the enforcement activities vary by race; (4) Assessment of relative racial disparity in enforcement activity (stops, arrests, summonses) in NYCHA properties compared to disparities in areas with otherwise similar crime rates; (5) Assess whether NYCHA developments with comparable levels of crime but different racial distributions of |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #3 Floyd remedial order, p.19 | Stop Report must include a narrative section to explain basis for the stop and a narrative section to explain basis for frisk or search, if applicable, and the stop report checkboxes must be simplified and improved. | Compliance with this provision will be achieved when: 1. NYPD revises its stop report form to include a narrative section for the officer to explain the reason for the stop. 2. NYPD revises its stop report form to include a narrative section for the officer to explain the reason for the frisk or search. 3. NYPD prepares a stop report form which contains simplified and improved checkboxes | |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #4 Floyd remedial order, p.25 | NYPD must transmit FINEST message explaining Floyd and related reforms to entire Department | Compliance with this provision will be achieved when NYPD prepares and distributes a FINEST message detailing the Floyd litigation disposition and constitutional standards NYPD personnel have to comply when conducting stops | Prepare and distribute a FINEST message to all NYPD personnel summarizing the constitutional standards for conducting stops and frisks and prohibiting racial profiling |

| Status | | Category | Task & Source | Description | Compliance achieved when | Notes |
|---|---|---|---|---|---|---|
| In Compliance | No Assessment | Creation of Written policies, procedures and Training Materials | Task #5a    Source: Floyd remedial order (Ligon remedies section), p.33-34; Ligon stipulation of settlement, p.11 | NYPD shall develop and adopt the standards set forth in subparagraph E(1)(a) though (m) of the Ligon stipulation of settlement regarding enforcement activities in and around TAP buildings | Compliance with this provision will be achieved when: 1. NYPD revises its policy to specify when it is legally permissible to stop a person outside a TAP building on suspicion of trespass; 2. NYPD develops and adopts specified standards regarding enforcement activities in and around TAP buildings | Revise policies for stops to comport with federal and state constitutional standards. |
| Not yet in Compliance | No Assessment | Implementation | Task #5b    Source: Floyd remedial order (Ligon remedies section), p.33-34; Ligon stipulation of settlement, p.11 | NYPD shall implement policies and procedures, training, supervision and monitoring programs sufficient to consistently follow, apply and use the standards regarding enforcement in and around TAP buildings specified in Paragraph E(1)(a) through (m) of the Ligon stipulation of settlement. | Compliance with this provision will be achieved when: 1. Stops made by NYPD MOS at TAP locations comply with NYPD's new policies and with federal and state standards. 2. Stop reports that do not articulate reasonable suspicion for the stop or the frisk, or do not articulate the basis for the search are identified as deficient by supervisors and the officer is corrected.    3. Stop reports that do not articulate reasonable suspicion are identified by QAD, and corrective action is taken with respect to the relevant MOS (officers and supervisors). 4. NYPD MOS follow the agreed-upon standards for investigative encounters and trespass enforcement activities in and around TAP buildings. | Percentage of compliant stops must increase over time. Compliance with this task is dependent on demonstration of compliance with documentation (Task 1c). Compliance must be consistent over time across commands. |
| In Compliance | No Assessment | Creation of Written policies, procedures and Training Materials | Task #6a    Source: Floyd remedial order (Ligon remedies section), p.34 | Amend Interim Order 22 with specified language regarding mere presence near, entry into or exit out of TAP building | Compliance will be achieved when revisions are made to NYPD policy (P.G. 212-59) on interior patrols in buildings enrolled in the Trespass Affidavit Program buildings specifying that mere presence outside of or entry into or exit from a TAP building does not constitute an objective credible reason to approach an individual under a DeBour analysis. | Revise and publish PG 212-59 |
| Not yet in Compliance | No Assessment | Implementation | Task #6b    Source: Floyd remedial order (Ligon remedies section), p.34 | NYPD MOS must have OCR to approach person at TAP locations | Compliance will be achieved when NYPD MOS have OCR for Level 1 encounters at TAP locations. | |
| In Compliance | No Assessment | Creation of Written policies, procedures and Training Materials | Task #7    Source: Floyd remedial order (Ligon remedies section), p.34 | Draft FINEST message explaining revisions to Interim Order 22 | Compliance with this provision will be achieved when NYPD drafts and promulgates FINEST message explaining revisions to IO 22 | Draft and promulgate FINEST message explaining revisions to IO 22 |
| In Compliance | No Assessment | Creation of Written policies, procedures and Training Materials | Task #8a    Source: Floyd remedial order (Ligon remedies section), p.35; Ligon stipulation of settlement, p.7 | Develop procedures to ensure Stop Reports are completed for every trespass stop at TAP locations | Compliance with this provision will be achieved when the NYPD has developed procedures to ensure that Stop Reports are prepared for all stops in and around TAP buildings | NYPD needs to revise its procedures to make clear that Stop Reports are required for all stops including stops for trespass outside of TAP buildings |

| Status | Assessment | Category | Task / Source | Provision | Compliance Achievement | Monitoring |
|---|---|---|---|---|---|---|
| Not yet in Compliance | No Assessment | Implementation | Task #8b Source: Floyd remedial order (Ligon remedies section), p.35, Ligon stipulation of settlement, p.7 | All stops at TAP locations must be documented by a Stop Report | Compliance with this provision will be achieved when all stops conducted in or around TAP buildings. | QAD Audits, RISK Reviews. Monitor team will review a combination of RAND audit compliance rates, PIE audit compliance rates and CCRB OMN rates for failure to complete stop reports. Compliance must be consistent over time and across commands. |
| In Compliance | No Assessment | Implementation | Task #9 Source: Floyd remedial order (Ligon remedies section), p.36 | Distribute revised TAP policies and procedures to each NYPD member and redistribute two additional times at six-month intervals | Compliance with this provision will be achieved when the revised version of P.G. 212-59 has been distributed to all MOS. | Distribution of P.G. 212-59 |
| In Compliance | In Compliance | Creation of Written policies, procedures and Training Materials | Task #10a Source: Davis stipulation of settlement, p.9 | Revise Patrol Guide 212-60 | Compliance with this provision will be achieved when the Department revises its policy on interior patrols in NYCHA buildings to promote constitutional interactions. | Revise PG 212-60 to promote constitutional interactions. |
| Partial Compliance | Partial Compliance | Implementation | Task #10b Source: Davis stipulation of settlement, p.9 | NYPD interior patrols, stops and frisks at NYCHA properties comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. Stops made by NYPD MOS at NYCHA properties comply with NYPD's new policies and with federal and state standards. 2. Stop reports that do not articulate reasonable suspicion for the stop or the frisk, or do not articulate the basis for the search are identified as deficient by supervisors and the officer is corrected. 3. Stop reports that do not articulate reasonable suspicion are identified by OAD, and corrective action is taken with respect to the relevant MOS (officers and supervisors). | Percentage of compliant stops must increase over time. Compliance of this task is dependent on demonstration of compliance with documentation (Task 1c#) |
| Partial Compliance | No Assessment | Implementation | Task #10c Source: Davis stipulation of settlement, p.9 | NYPD trespass arrests at NYCHA properties comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. Trespass arrests made at NYCHA properties comply with the NYPD's policies and with federal and state standards | Percentage of compliant arrest must increase over time. Compliance must be consistent over time and across commands. |
| In Compliance | In Compliance | Creation of Written policies, procedures and Training Materials | Task #11a Source: Davis stipulation of settlement, p.10, Ligon stipulation of settlement, p.12 | Revise Trespass Crimes Fact Sheet | Compliance with this provision will be achieved when the Department revises the Trespass Crimes Fact Sheet | Revise Trespass Crimes Fact Sheet |
| Partial Compliance | No Assessment | Implementation | Task #11b Source: Davis stipulation of settlement, p.10, Ligon stipulation of settlement, p.12 | MOS use Trespass Crime Fact Sheet for Housing trespass arrests | Compliance with this provision will be achieved when: 1. NYPD MOS complete a Trespass Crime Fact Sheet form (PD 351-144) prior to arraignment, any time they effect an arrest for trespass in or around a NYCHA residence. 2. The TCFS articulates a proper basis for the approach and probable cause for the trespass arrest. | Compliance must be consistent across commands and over time. |

| Compliance | Phase | Task / Source | Description | Compliance Criteria | Action / Monitor |
|---|---|---|---|---|---|
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #12a Source: Ligon stipulation of settlement, p.10 | NYPD officers are required to complete a Trespass Crimes Fact Sheet for every trespass arrest made in or around a TAP building | Compliance with this provision will be achieved when officers are required to complete a Trespass Crimes Fact Sheet for all trespass arrests made in or around TAP buildings prior to arraignment. | Require officers to complete a Trespass Crimes Fact Sheet for all trespass arrests made in or around TAP buildings prior to arraignment |
| Not yet in Compliance | Implementation | Task #12b Source: Ligon stipulation of settlement, p.10 | NYPD officers complete a Trespass Crimes Fact Sheet for every trespass arrest made in or around a TAP building | Compliance with this provision will be achieved when: 1. Officers complete a Trespass Crimes Fact Sheet for all trespass arrests made in or around TAP buildings prior to arraignment; 2. The TCFS articulates a proper basis for the approach and probable cause for the trespass arrest. | Compliance must be consistent across commands and over time. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #13a Source: Ligon stipulation of settlement, p.13-14 | Revise and promulgate Administrative Guide 303-27 | Compliance with this provision will be achieved when the NYPD promulgates the revised AG 303-27. | Promulgate the revised AG 303-27. |
| Not yet in Compliance | Implementation | Task 13b Source: Ligon stipulation of settlement, p.10 | Implement Administrative Guide 303-27 | Compliance with this provision will be achieved when the NYPD implements the revised AG 303-27: 1. CPOs obtain appropriate Trespass Crimes Owner's Affidavit and complete TAP enrollment form for buildings entering the program. 2. CPOs review and evaluate whether to renew a building's participation in the program before the expiration of six months. 3. COs review and evaluate whether to renew a building's participation in the program before the expiration of one year. 4. Borough Commanders are notified if there is a need for a building to remain in TAP beyond one year, and will recommend approval to the Officer of the Chief of Patrol if they determine that the building should remain in the program. The Office of the Chief of Patrol will issue the final approval for renewal. | |
| Not yet in Compliance | Implementation | Task #14 Source: Floyd remedial order, p.21 | NYPD Business Card given to person stopped but not arrested or summonsed, replacing the tear-off receipt | Compliance will be achieved when NYPD MOS offer a business card to persons stopped but not arrested or summonsed | Monitor team will review BWC videos and Stop Reports to assess whether persons stopped but not arrested or summonsed are offered or business card. |
| **Supervisory Review Requirements** | | | | | |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #15a Source: Floyd remedial order, p.24 | Sergeants and must address constitutionality of stops of their subordinates | Compliance with this provision will be achieved when: 1. NYPD policies and procedures require supervisors to review stops for constitutionality in a comprehensive manner; 2. NYPD requires supervisors to complete Supervisory Review section of Stop Report; | Add Supervisor checkboxes "Sufficient Basis to Stop," "*Sufficient Basis for Frisk" and Sufficient Basis for Search" on the Stop Report, which requires supervisor to determine whether officer had reasonable suspicion to stop and, if applicable, frisk or search the individual; |

| Compliance | Implementation / Type | Task / Source | Requirement | Compliance Criteria | Monitoring |
|---|---|---|---|---|---|
| Not yet in Compliance | Implementation | Task #15b Source: Floyd remedial order, p.24 | Sergeants review and assess the constitutionality of stops of their subordinates | Compliance with this provision will be achieved when: 1. Supervisors review stops for constitutionality in a comprehensive manner and take appropriate corrective action when they identify improper stops, frisks or searches. 2. Supervisors who observe or learn of MOS who make a stop but do not document the stop with a stop report take appropriate corrective action. | Monitor team will examine a sample of stop reports audited by QAD, as well as ICO self-inspections and QAD's audit of supervisory review. Monitor team will also assess NYPD's efforts through RISKS Reviews and follow-up training conducted for supervisors who do not identify deficient stop reports. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #16a Source: Floyd remedial order, p.24 | ICOs must address constitutionality of stops of their subordinates | Compliance with this provision will be achieved when: 1. NYPD prepares ICOs self-inspection procedures and forms for review of Stop Reports for constitutionality | ICO SQF self-inspection protocols revised |
| Partial Compliance | Implementation | Task #16b Source: Floyd remedial order, p.24 | ICOs conduct Self-Inspections to assess the constitutionality of stops | Compliance with this provision will be achieved when: 1. ICOs complete SQF self-inspections and review Stop Reports for constitutionality. | Monitor team will assess a sample of ICO Self-Inspections as well as reviewing the QAD audit findings of ICO self-inspections. ICO efforts to review BWC footage will also be considered. |

## Training Requirements

| Compliance | Implementation / Type | Task / Source | Requirement | Compliance Criteria | Monitoring |
|---|---|---|---|---|---|
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #17a Source: Floyd remedial order, p.14 | Revise training regarding stop and frisk to adhere to new NYPD policies, constitutional standards and New York state law | Compliance with this provision will be achieved when 1. NYPD develops new In-Service training regarding stops which comply with federal and state standards and which are approved by the Monitor and the Court; 2. NYPD develops new In-Service training for supervisors regarding their responsibilities for reviewing officer stops and documentation of stops. | Revise training materials for stops to comport with federal and state standards. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #17b Source: Floyd remedial order, p.14 | Revise recruit training regarding stop and frisk to adhere to new NYPD policies, constitutional standards and New York state law | Compliance with this provision will be achieved when 1. NYPD develops new Recruit training regarding stops which comply with federal and state standards and which are approved by the Monitor and the Court. | Revise training materials for stops to comport with federal and state standards. |
| In Compliance | Implementation | Task #17c Source: Floyd remedial order, p.14 | NYPD has trained its members regarding stops to comply with NYPD policies and state and federal standards | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD patrol officers and detectives are trained on investigative encounters. 3. NYPD supervisors are trained on investigative encounters and their responsibility for reviewing officer stops and documentation of stops; | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance. Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. Qualitative assessment of SQF training will also take into account outcome measures, such as the level of compliance of MOS as reflected in their stop reports and an assessment of unreported stops. Sustained compliance will be assessed in conjunction with refresher training in Task 31b. |

| Status | Status | Category | Source | Description | Compliance Achieved When | Requirement |
|---|---|---|---|---|---|---|
| In Compliance | In Compliance | Implementation | Task #17d Source: Floyd remedial order, p.14 | NYPD has trained its recruits regarding stops to comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD recruit officers are trained on investigative encounters. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance. Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. Qualitative assessment of SQF training will also take into account outcome measures, such as the level of compliance of MOS as reflected in their stop reports and an assessment of unreported stops. Sustained compliance will be assessed in conjunction with refresher training in Task 31b. |
| In Compliance | In Compliance | Creation of Written policies, procedures and Training Materials | Task #18a Source: Floyd remedial order, p.17 | Revise in-service training regarding racial profiling to make clear targeting "right people" for stops is racial profiling and violates Constitution | Compliance with this provision will be achieved when NYPD develops new in-service training regarding racial profiling | Revise training to ensure race is not used improperly when officers conduct stops |
| In Compliance | In Compliance | Creation of Written policies, procedures and Training Materials | Task #18b Source: Floyd remedial order, p.17 | Revise recruit training regarding racial profiling to make clear targeting "right people" for stops is racial profiling and violates Constitution | Compliance with this provision will be achieved when NYPD develops new recruit training regarding racial profiling | Revise training to ensure race is not used improperly when officers conduct stops |
| In Compliance | In Compliance | Implementation | Task #18c Source: Floyd remedial order, p.17 | NYPD has trained its members regarding stops to comply with NYPD policies and with state and federal standards regarding racial profiling | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD patrol officers, detectives and supervisors are trained regarding racial profiling. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance. Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. Qualitative assessment of SQF training will also take into account outcome measures, such as the level of compliance with Task #2b. Sustained compliance will be assessed in conjunction with refresher training in Task 31b. |

| Status | Category | Task / Source | Description | Compliance achieved when | Notes |
|---|---|---|---|---|---|
| In Compliance | Implementation | Task #18d Source: Floyd remedial order, p.17 | NYPD has trained its recruits regarding stops to comply with NYPD policies and with state and federal standards regarding racial profiling | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD recruit officers are trained regarding racial profiling. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance. Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistency with the curricula and consistently provided over time, based on Monitor Team observation. Qualitative assessment of SQF training will also take into account outcome measures, such as the level of compliance with Task #2b. Sustained compliance will be assessed in conjunction with refresher training in Task 31b. |
| In Compliance | Creation of Written policies, procedures, and Training Materials | Task #19a Source: Floyd remedial order, p.21 | NYPD has developed in-service training in use of new Stop Report | Compliance with this provision will be achieved when NYPD develops new training guidelines for officers to explain reasons for stopping and frisking the individual, especially why the officer had reasonable suspicion that individual was committing or about commit criminal activity and was armed and dangerous. | Revise training for stops and frisk to comport with federal and state standards |
| In Compliance | Creation of Written policies, procedures, and Training Materials | Task #19b Source: Floyd remedial order, p.21 | NYPD has developed recruit training in use of new Stop Report | Compliance with this provision will be achieved when NYPD develops new training guidelines for recruits to explain reasons for stopping and frisking the individual, especially why the officer had reasonable suspicion that individual was committing or about commit criminal activity and was armed and dangerous. | Revise training for stops and frisk to comport with federal and state standards |
| In Compliance | Implementation | Task #19c Source: Floyd remedial order, p.21 | NYPD has trained its members regarding the use of the new Stop Report | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD patrol officers, detectives and supervisors are trained regarding the use of the new Stop Report. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance. Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistency with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Implementation | Task #19d Source: Floyd remedial order, p.21 | NYPD has trained its recruit members regarding the use of the new Stop Report | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD recruit officers are trained regarding the use of the new Stop Report. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance. Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistency with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Creation of Written policies, procedures, and Training Materials | Task #20a Source: Floyd remedial order, p.24 | NYPD has developed training on supervisory responsibilities for newly promoted supervisors | Compliance with this provision will be achieved when: 1. NYPD has developed training, approved by the monitor and the Court, for newly promoted NYPD supervisors on investigative encounters and their responsibility for reviewing officer stops and documentation of stops. | |

| Compliance Status | Type | Task / Source | Description | Compliance Criteria | Notes |
|---|---|---|---|---|---|
| In Compliance | Implementation | Task #20b Source: Floyd remedial order, p.24 | NYPD has trained its newly promoted supervisors on supervisory responsibilities for newly promoted supervisors | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. Newly promoted NYPD supervisors are trained on investigative encounters and their responsibility for reviewing officer stops and documentation of stops. | The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| No Assessment | Creation of Written policies, procedures and Training Materials | Task #21a Source: Floyd remedial order (Ligon remedies section), p.36; Ligon stipulation of settlement, p.16 | NYPD must develop stop and frisk training at Rodman's Neck that incorporates instruction specifically targeting the problem of unconstitutional stops outside TAP buildings | Compliance with this provision will be achieved when the SQF in-service training materials at Rodman's Neck incorporates instruction specifically aimed at the preventing unconstitutional stops outside TAP buildings. | SQF in-service training needs to include instruction specifically aimed at preventing unconstitutional stops outside TAP buildings. |
| No Assessment | Implementation | Task #21b Source: Floyd remedial order (Ligon remedies section), p.36; Ligon stipulation of settlement, p.16 | NYPD has trained its members regarding stops at TAP locations to comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD patrol officers, detectives and supervisors are trained on stops at TAP locations. | Patrol officers, detectives and supervisors in the Patrol Services Bureau, Housing Bureau and Transit Bureau must be trained regarding investigative encounters to demonstrate substantial compliance. Other MOS with enforcement responsibilities, such as those in Narcotics and Gang Units and the Strategic Response Group also must be trained. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| No Assessment | Creation of Written policies, procedures and Training Materials | Task #22a Source: Floyd remedial order (Ligon remedies section), p.36 | NYPD must develop training regarding stops outside TAP buildings for new recruits | Compliance with this provision will be achieved when the recruit training includes the constitutional standard for when an officer may and may not stop someone outside of a TAP building | Recruit training needs to include instruction specifically on when an officer may and may not stop someone outside of a TAP building |
| Partial Compliance | Implementation | Task #22b Source: Floyd remedial order (Ligon remedies section), p.36 | NYPD has trained its recruits regarding stops at TAP locations to comply with NYPD policies and with state and federal standards | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD recruits are trained on stops at TAP locations. | Interior Patrol training course must be part of Recruit Curriculum taken by each recruit class. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #23a Source: Floyd remedial order (Ligon remedies section), p.36 | Field Training Guide and FTO training materials must be revised to reflect formal written policy governing trespass stops outside TAP buildings | Compliance with this provision will be achieved when the Field Training Guide and FTO training materials have been revised to reflect the formal written policy governing trespass stops outside of TAP buildings. | The Field Training Guide and FTO training needs to include instruction regarding the formal written policy governing trespass stops outside of TAP buildings. |

| Status | Category | Task / Source | Provision | Compliance Criteria | Remedial Notes |
|---|---|---|---|---|---|
| In Compliance | Implementation | Task #23b  Source: Floyd remedial order (Ligon remedies section) p.36 | NYPD has trained its FTOs on TAP policies and procedures | Compliance with this provision will be achieved when FTOs have been trained on TAP policies and procedures | SQF Training module must be part of each FTO training class. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Implementation | Task #24  Source: Floyd remedial order (Ligon remedies section) p.36 | SQF Training Video No. 5 must be revised to state information in earlier video was incorrect | Compliance with this provision will be achieved when the Department disseminates an SQF video stating that the information in the previous training video was incorrect and explain why it was incorrect. | Create SQF video stating that the information in the previous training video was incorrect and explaining why it was incorrect. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #25a  Source: Davis stipulation of settlement, p.9 | Revise Interior Patrol recruit training | Compliance with this provision will be achieved when the Department revises its recruit training on interior patrols in NYCHA buildings to promote constitutional interactions. | Revise Interior Patrol recruit training to promote constitutional interactions in and around NYCHA buildings. |
| Partial Compliance | Implementation Compliance | Task #25b  Source: Davis stipulation of settlement, p.9 | Train recruits at the Academy on Interior Patrol | Compliance with this provision will be achieved when the Department trains its recruits in the Police Academy on interior patrols in NYCHA buildings to promote constitutional interactions. | Interior Patrol Training Course must be part of Recruit Curriculum taken by each recruit class. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #26a  Source: Davis stipulation of settlement, p.9 | Revise training regarding NYCHA rules, regulations, and signage | Compliance with this provision will be achieved when the Department: 1. Develops roll call training for Housing officers on NYPD policies on interior patrol; 2. Develops training for Housing officers that includes instruction on NYCHA rules, regulations, and signage utilizing material contained in Exhibit E (lesson plan) contained in the Davis stipulation. | Create Housing one-day training that includes instruction based on Exhibit E of the stipulation, specifically including instruction on NYCHA rules, regulations, and signage |
| In Compliance | Implementation | Task #26b  Source: Davis stipulation of settlement, p.9 | Implement training regarding NYCHA rules, regulations, and signage | Compliance with this provision will be achieved when: 1. NYPD disseminates roll call training on NYPD interior patrol policies to Housing officers; 2. NYPD training instructors provide training for Housing officers consistent with the court approved training materials. 3. NYPD Housing officers and supervisors are trained on NYCHA rules, regulations, and signage utilizing material contained in Exhibit E (lesson plan) of the Davis stipulation. | The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| Partial Compliance | Implementation | Task #27  Source: Ligon stipulation of settlement, p.16 | Ensure every member of NYPD who is involved in administration of TAP is trained on specified standards | Compliance with this provision will be achieved when TAP administrators have been trained on the specified standards. | Revise TAP enrollment form and instructions and meet with relevant actors to go over how to implement the revisions. |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #28a  Source: Floyd remedial order p.16 | Training on constitutional standard for a frisk - reasonable suspicion that a stopped person is armed and dangerous to correct overbroad definition of furtive behavior, the misleading training on unusual firearms | Compliance with this provision will be achieved when: 1. Errors identified in the training materials ("furtive behavior," "unusual firearms") have been corrected; 2. The proper legal standards for a frisk or search are clearly articulated in the SQF training; | Revise recruit and in-service trainings to correct identified errors and clearly articulate the proper legal standards regarding stops and frisks |

| Compliance | Implementation / Creation | Task & Source | Description | Compliance achieved when | Monitor Notes |
|---|---|---|---|---|---|
| In Compliance | Implementation | Task #28b   Source: Floyd remedial order p.16 | Training on constitutional standard for a frisk - reasonable suspicion that a stopped person is armed and dangerous to correct overbroad definition of furtive behavior, the misleading training on unusual firearms | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD recruits are correctly trained on identifying characteristics of armed suspects. | Monitor team observation of Characteristics of Armed Suspects recruit training. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| Partial Compliance | Creation of Written policies, procedures and Training Materials | Task #29a   Source: Floyd remedial order p.24-25 | NYPD develops training for its investigators on racial profiling complaint investigations | Compliance with this provision will be achieved when: 1. IAB develops an Internal Investigators Course on profiling and bias-based policing. | |
| Not yet in Compliance | Implementation | Task #29b   Source: Floyd remedial order p.16 | NYPD must train investigators on racial profiling complaint investigations | Compliance with this provision will be achieved when: 1. IAB intake personnel are trained on handling complaints; 2. Investigators in Investigations Units who will be undertaking profiling investigations have been trained on investigating profiling complaints | Monitor team observation of Internal Investigators course, Module #4. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. Assessment of the training will be informed by the Monitor's review of profiling investigations, Task 35(b). |
| In Compliance | Creation of Written policies, procedures and Training Materials | Task #30a   Source: Floyd remedial order p.14 | NYPD must develop training for officers newly assigned to plainclothes assignments | Compliance with this provision will be achieved when: 1. NYPD has developed training, approved by the monitor and the Court, for officers newly assigned to plainclothes units on investigative encounters and the standards for stops and frisks. | |
| Partial Compliance | Implementation | Task #30b   Source: Floyd remedial order p.14 | Training is provided for officers newly assigned to plainclothes assignments | Compliance with this provision will be achieved when: 1. NYPD training instructors provide training consistent with the court approved training materials. 2. NYPD MOS assigned to plainclothes units are trained on investigative encounters. | SQF Training module must be part of each Basic Plainclothes training class. The training must be effective and consistent, both in terms of consistent with the curricula and consistently provided over time, based on Monitor Team observation. |
| Partial Compliance | Creation of Written policies, procedures and Training Materials | Task #31a   Source: Floyd remedial order p.14 | NYPD develops SQF refresher training for incumbent and probationary officers, and for supervisors | Compliance with this provision will be achieved when: 1. NYPD develops SQF refresher training for incumbent and probationary officers. 2. NYPD develops SQF refresher training for supervisors. | Create refresher course for incumbent and probationary officers |
| Not yet in Compliance | Implementation | Task #31b   Source: Floyd remedial order p.14 | NYPD conducts SQF refresher training for incumbent and probationary officers | Compliance with this provision will be achieved when: 1. NYPD provide training consistent with court approved training materials. 2. NYPD incumbent and probationary officers have taken a refresher course on investigative encounters. 3. Supervisors have taken a refresher course on investigative encounters and supervisory responsibilities for review of stop reports and documentation. | Conduct SQF refresher for incumbent and probationary officers. |

**Body-Worn Camera Requirements**

| Status | Status | Category | Task / Source | Description | Compliance Criteria | Notes |
|---|---|---|---|---|---|---|
| In Compliance | In Compliance | Implementation | Task #32a  Source: Floyd remedial order p.27 | NYPD must institute one-year BWC pilot project | Compliance with this provision will be achieved when: 1. The Monitor reports on the results of his BWC Pilot with respect to the effectiveness of body-worn cameras in reducing unconstitutional Stop and Frisks. | Acquire BWC technology; Create BWC policy PG 212-123; equip MOS in pilot commands with BWC for use on the third platoon; train affected MOS in proper use of BWC's. Retaining BWC footage for use by Monitor's team. |
| In Compliance | In Compliance | Implementation | Task #32b  Source: Floyd remedial order p.27 | NYPD must develop procedures for supervisory review of BWC videos | Compliance with this provision will be achieved when: 1. NYPD implements supervisory reviews of BWCs consistent with the review protocols approved by the Monitor. | |
| In Compliance | In Compliance | Implementation | Task #32c  Source: Floyd remedial order p.27 | NYPD must develop procedures for sharing BWC videos with the CCRB for complaint investigations | Compliance with this provision will be achieved when: 1. NYPD shares BWC videos with CCRB consistent with procedures approved by the Monitor. | |
| Partial Compliance | No Assessment | Implementation | Task #33  Source: October 2018 Court approval of stop report | NYPD must implement a BWC pilot for Housing officers working in PSA | Compliance with this provision will be achieved when the Monitor reports on the results of his PSA BWC Pilot with respect to the effectiveness of body-worn cameras in reducing unconstitutional Stop and Frisks. | |
| | | **Complaints and Discipline Requirements** | | | | |
| Partial Compliance | No Assessment | Creation of Written policies, procedures and Training Materials | Task #34a  Source: Floyd remedial order, p.24 | DAO must improve procedures for imposing discipline by increasing deference to CCRB credibility determinations, applying evidentiary standard that is neutral between claims of complainants and officers and not requiring corroborating physical evidence | Compliance with this provision will be achieved when NYPD improves its procedures regarding imposing discipline in response to CCRB findings of substantiated misconduct during stops. | Establish Department Advocate's Office procedures relating to handling and prosecution of substantiated complaints received from the CCRB. |
| Partial Compliance | No Assessment | Implementation | Task #34b  Source: Floyd remedial order, p.24 | DAO handling of substantiated CCRB complaints must meet improved procedures | Compliance with this provision will be achieved when: 1. The DAO's handling of substantiated CCRB complaints reflects: (a) Increased deference to CCRB's factual findings; (b) A neutral evidentiary standard; and (c) No general requirement of corroborating physical evidence. 2. NYPD tracks and analyzes CCRB complaints and discipline imposed. | Monitor review of DAO handling of CCRB complaints, including case files for Reconsideration Requests and Provision II retention cases. |
| Partial Compliance | In Compliance | Creation of Written policies, procedures and Training Materials | Task #35a  Source: Floyd remedial order, p.24-25 | NYPD must begin tracking and investigating racial profiling complaints | Compliance with this provision will be achieved when: 1. IAB establishes a procedural guide for processing and investigating cases of profiling and bias-based policing | |

| Not yet in Compliance | Partial Compliance | In Compliance | Implementation | | | |
|---|---|---|---|---|---|---|
| | | In Compliance | Implementation | Task #35b    Source: Floyd remedial order, p.24-25 | Racial Profiling complaints must be thoroughly and fairly investigated | Compliance with this provision will be achieved when:<br>1. NYPD tracks and investigates profiling investigations;<br>2. NYPD investigations are thorough and impartial and consistent with the IAB guide.<br>3. NYPD analyzes trends and patterns of profiling complaints. | Any complaints that contain an allegation of profiling will be processed and inputted into the IAB case management system, appropriately assigned to an investigator in IAB (for C cases) or in an Investigation Unit, and the results of the investigation will be tracked by IAB. Investigators assigned to Investigations Units and IAB will receive training and guidance regarding investigation of allegations of racial profiling.  Monitor review of profiling investigation files. |

**Auditing Requirements**

| Not yet in Compliance | Partial Compliance | In Compliance | Implementation | | | |
|---|---|---|---|---|---|---|
| | | In Compliance | Creation of Written policies, procedures and Training Materials | Task #36a Source: Floyd remedial order, p.23 | NYPD establishes auditing procedures that identify non-compliant stops, frisks, searches, trespass arrests and a mechanism for correcting them | Compliance will be achieved when the NYPD establishes an auditing plan that:<br>1. Provides a sampling methodology for auditing Stop Reports;<br>2. Provides audit procedures for Stop Reports, assessing whether: (i) officers sufficiently articulated reasonable suspicion as the basis for the stop, (ii) officers sufficiently articulated the legal basis for a frisk and/or search, if applicable; (iii) supervisors reviewed the form and made correct determinations about the legality of the stop, frisk and search and took appropriate follow-up action;<br>3. Includes a review of BWC videos as part of the SQF audits;<br>4. Includes a review and audit of Command Self-Inspections;<br>5. Includes audit procedures for trespass arrests and associated TCFS at NYCHA and TAP locations assessing whether: (i) officers sufficiently articulate a legal basis for the approach; and (ii) officers sufficiently articulated probable cause for the arrest;<br>6. Provides procedures for audits of Police Initiated Enforcement arrests;<br>7. Provides procedures for RAND audits. |

| | | | Task / Source | Requirement | Compliance Criteria | Monitor Review |
|---|---|---|---|---|---|---|
| In Compliance | In Compliance | Implementation | Task #36b Source: Floyd remedial order, p.23 | NYPD implements auditing procedures that identify non-compliant stops, frisks, searches, trespass arrests and a mechanism for correcting them | Compliance will be achieved when: 1. The NYPD conducts auditing in accordance with a plan approved by the Court and the Court; 2. QAD audits identify non-compliant stops, frisks, searches and trespass arrests; 3. Commands take appropriate action in response to QAD findings | Monitor team will review a representative sample of stop reports, along with BWC footage, and will compare QAD audit results with Monitor audit results. |
| No Assessment | Not yet in Compliance | Creation of Written policies, procedures and Training Materials | Task #36c Source: Floyd remedial order, p. 24 | NYPD establishes procedures for monitoring members' use of stop and frisk and trespass enforcement in compliance with the Fourteenth Amendment | Compliance will be achieved when: 1. The NYPD establishes procedures for monitoring its members' use of stop and frisk and trespass enforcement in compliance with the 14th Amendment, in accordance with a plan approved by the monitor and the Court. | |
| No Assessment | Not yet in Compliance | Implementation | Task #36d Source: Floyd remedial order, p. 24 | NYPD implements procedures for monitoring members' compliance with the Fourteenth Amendment | Compliance will be achieved when: 1. The NYPD conducts efforts to monitor its members' use of stop and frisk and trespass enforcement in compliance with the 14th Amendment, in accordance with a plan approved by the monitor and the Court. | |

## Early Intervention System

| | | | Task / Source | Requirement | Compliance Criteria | Monitor Review |
|---|---|---|---|---|---|---|
| In Compliance | In Compliance | Creation of Written policies, procedures and Training Materials | Task #37a Source: Court Order Regarding Facilitator's Recommendation No. 1 | NYPD to design a program to receive, assess, and act on information regarding adverse findings regarding unlawful stops and trespass enforcements | Compliance will be achieved when the Department submits a plan, approved by the Court, to receive, assess, and act on information regarding adverse findings regarding unlawful stops and trespass enforcements | |
| Partial Compliance | Partial Compliance | Implementation | Task #37b Source: Court Order Regarding Facilitator's Recommendation No. 1 | NYPD to implement a program to receive, assess, and act on information regarding adverse findings regarding unlawful stops and trespass enforcements | Compliance will be achieved when: 1. The NYPD implements a program to receive, assess, and act on information regarding adverse findings regarding unlawful stops and trespass enforcements, in accordance with a plan approved by the Court; 2. Data on declined prosecutions, adverse credibility findings, suppression decisions, lawsuits and denials of indemnification are included in the Department's early intervention system; 3. Commanding Officers and RMB implement and document interventions for officers identified through data on at-risk behaviors in the categories identified by the court. | Monitor will review EIS system to ensure that appropriate data is included in system and that Commanding Officers and RMB implement interventions when MOS reach threshold triggers. |

## Performance Evaluation

| | | | | | Monitor Action |
|---|---|---|---|---|---|
| In Compliance | In Compliance | Creation of Written policies, procedures and Training Materials | Task #38a Source: Floyd remedial order, p.17, Floyd Order approving PERF, 1/6/2017 | Performance Evaluation System that does not pressure MOS to make stops without regard to constitutionally | Compliance will be achieved when: 1. NYPD eliminates Operation Order 52 and any improper performance objectives from its performance evaluation system; 2. NYPD establishes a performance evaluation system that does not pressure MOS to make stops without regard to their constitutionality; 3. NYPD establishes a performance evaluation system that does not undermine the goals of the remedial process. | |
| No Assessment | Partial Compliance | Implementation | Task #38b Source: Floyd remedial order, p.17 Floyd Order approving PERF, 1/6/2017 | Implementation of Performance Evaluation System that does not pressure officers to make stops without regard to constitutionally | Compliance with this provision will be achieved when the NYPD's performance-evaluation system, on paper and in practice, does not: 1. Reinstitute pressures that result in a focus on the quantity of stops without regard to their lawfulness; or 2. Undermine the goals of the remedial process, including compliance with the Fourth and Fourteenth Amendments of the Constitution as required by the Remedies Opinion. | |
| | | **Joint Remedial Process/Alternative Plan/Monitor's Studies** | | | | |
| In Compliance | In Compliance | Implementation | Task #39 Source: Floyd remedial order, p.30 | NYPD must participate in the Joint Remedial Process | Compliance with this provision will be achieved when: 1. NYPD participates in the Joint Remedial Process; 2. Facilitator submits his report and recommendations to the parties, the monitor and the Court. | Participate in JRP meetings and respond to Facilitator's Final Report. |
| N/A (New Task) | In Compliance | Creation of Written policies, procedures and Training Materials | Task #40a Source: Court Order Regarding NYPD Alternative Plan and Monitor's Studies | The NYPD must develop procedures for requiring officers to activate their BWC videos at Level 1 at the inception of Level 1 encounters with civilians | Compliance will be achieved when the NYPD develops and publishes procedures for requiring officers to activate their BWC at Level 1 encounters. | |
| N/A (New Task) | Partial Compliance | Implementation | Task #40b Source: Court Order Regarding NYPD Alternative Plan and Monitor's Studies | The NYPD must train its officers regarding the revised BWC policy and officers must implement the procedures. | Compliance will be achieved when 1. The NYPD completes training of its members regarding the revised BWC policies; 2. Members activate their cameras at Level 1 encounters and correctly document Level 1 and Level 2 encounters in the BWC metadata. | |
| N/A (New Task) | Partial Compliance | Implementation | Task #40c Source: Court Order Regarding NYPD Alternative Plan and Monitor's Studies | NYPD must participate in the Monitor's Studies and provie the Monitor Team with the relevant data. | Compliance will be achieved when 1. The NYPD participates in the studies and provides the Monitor Team the relevant data to complete its analyses and report; 2. Monitor submits its report to the Court. | |

# APPENDIX 2

# NOTICE OF TAP DISSOLUTION TO BUILDING OWNERS

# EXAMPLE OF TRESPASS AFFIDAVIT PROGRAM SIGN

 POLICE DEPARTMENT

January 24, 2022

123 Smith Street
John Doe
123 Smith Street
New York, NY 10007

RE:    **Dissolution of Trespass Affidavit Program**
        **123 Smith Street**

Dear Landlord or Property Manager:

You are receiving this letter because our records indicate that your buildings were previously enrolled in the NYPD's Trespass Affidavit Program ("TAP"), formerly known as Operation Clean Halls. **On September 30, 2020, the New York City Police Department ended TAP. As a result, NYPD officers will no longer conduct routine interior patrols of your buildings.**

Going forward, NYPD's Neighborhood Coordination Officers and Crime Prevention Officers are the points of contact  for you and your tenants to address any persistent quality of life offenses or crime in your buildings. In addition, NYPD will continue to respond to calls for service in your buildings. For any non-emergency calls for service or complaints, please dial "311." As always, in the event of an emergency dial "911" for assistance.

**You must immediately remove any signage, concerning TAP or Operation Clean Halls near, in, or on your buildings.** If you so choose, you may replace those signs with generic "No Trespassing" signs.

NYPD remains committed to keeping your community and your buildings safe.

Thank you.





# APPENDIX 3

# ALTERNATIVE PLAN AND MONITOR STUDIES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                │
│ DOCUMENT                                 │
│ ELECTRONICALLY FILED                     │
│ DOC #: _____            │
│ DATE FILED:  2/12/2021                   │
└─────────────────────────────────────────┘
```

DAVID FLOYD, *et al.*,

                                    Plaintiffs,

            -against-

CITY OF NEW YORK,                                    08 Civ. 1034 (AT)

                                    Defendant.

KELTON DAVIS, *et al.*,

                                    Plaintiffs,

            -against-

                                                     10 Civ. 699 (AT)

CITY OF NEW YORK,

                                    Defendant.

JAENEAN LIGON, *et al.*,

                                    Plaintiffs,

            -against-                                12 Civ. 2274 (AT)

CITY OF NEW YORK,                                    **ORDER**

                                    Defendant.

ANALISA TORRES, District Judge:

On July 19, 2018, this Court ordered the parties to submit a joint proposal for a pilot program to study the electronic documentation of certain elements of first- and second-level police-citizen encounters. ECF No. 619. On August 9, 2018, this Court further ordered that the proposed program study the use of body-worn cameras ("BWCs") in first-level encounters. ECF No. 634. The parties then asked the Monitor to develop a program to satisfy both orders. After consulting with the parties, the Monitor submitted a proposal on November 9, 2018, ECF No. 660-1, and submitted a revised proposal (the "Combined Pilot") on January 29, 2019, ECF No. 687. This Court approved the Combined Pilot on February 7, 2019. ECF No. 691.

The Combined Pilot was a study using graduate students riding in police cars with New York City Police Department ("NYPD") officers to observe police-citizen encounters. Because of the COVID-19 pandemic, that study is now not advisable. Accordingly, on December 14, 2020 and January 27, 2021, the Monitor made submissions asking this Court to vacate its July 19, 2018, August 9, 2018, and February 7, 2019 orders and, in their place, enter a new order requiring two things. ECF Nos. 805, 816. First, the Monitor requested that the new order require the City to implement the plan it developed to make some of the policy changes that the Combined Pilot would have studied (the "Alternative Plan"), which is detailed in the City's February 21, 2020, August 18, 2020, and September 9, 2020 letters included as Appendix 1 to the Monitor's December 14, 2020 submission and as Exhibit A to this order. Second, the Monitor requested that the new order require the City to give full support to certain studies designed to capture information that the Combined Pilot would have developed (the "Proposed Studies"), which are described in the memoranda included as Appendix 2 to the Monitor's December 14, 2020 submission and as Exhibit B to this order.

The Alternative Plan has two principal parts. First, it will require NYPD officers citywide to activate their BWCs for first-level encounters, except when officers have those encounters (a) in situations that the NYPD has designated as "do not record" situations; (b) while addressing motor vehicle accidents; (c) in situations where a person requires medical assistance, except that the involvement of an emotionally disturbed person is not a reason for not recording; or (d) while taking reports on past crimes. Second, it will require officers to manually enter information into a form on evidence.com: for first-level encounters, officers must enter the level of the encounter; for second-level encounters, officers must enter the level of the encounter, the race and gender of the primary person encountered, and whether multiple persons were encountered. The manually entered information supplements the information that will be captured by the BWC recordings: date, time, officer information, command, and length of recording.

The Proposed Studies will principally examine officers' compliance with applicable legal requirements in police-citizen encounters, racial disparities in officers' compliance and escalation in those encounters, and whether those encounters are appropriately documented. As with the Combined Pilot, the Proposed Studies can succeed only if the City embraces them by paying for all of their reasonable costs and fully supporting them as the Monitor directs.

Together, the Alternative Plan and Proposed Studies are an appropriate and adequate substitute for the Combined Pilot in light of the circumstances, for the reasons articulated in the Monitor's December 14, 2020 and January 27, 2021 submissions. Accordingly, it is hereby ORDERED that:

1. This Court's July 19, 2018, August 9, 2018, and February 7, 2019 orders requiring studies of potential documentation and recording requirements are VACATED.

2. The Alternative Plan, described in the letters attached as Exhibit A to this order, is APPROVED, and the City is ordered to implement the requirements of that Plan.

2

3. The Proposed Studies, described in the memoranda attached as Exhibit B to this order, are APPROVED, and the City is ordered to assume all reasonable costs of those Studies and provide full support for their implementation as directed by the Monitor.

SO ORDERED.

Dated: February 12, 2021
      New York, New York

ANALISA TORRES
United States District Judge

# Exhibit A



THE CITY OF NEW YORK
## LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, N.Y. 10007-2601

**JAMES E. JOHNSON**
*Corporation Counsel*

(212) 356-0800
FAX: (212) 356-0809
jajohnso@law.nyc.gov

February 21, 2020

Peter Zimroth, Esq.
Arnold & Porter LLP
250 West 55th Street
New York, NY 10019

Re:  *David Floyd, et al. v. City of New York, 08 Civ. 1034 (AT);*
*Kelton Davis, et al. v. City of New York, et al., 10 Civ. 668 (AT);*
*Jaenean Ligon, et al. v. City of New York, et al., 12 Civ. 2274 (AT)*

Dear Mr. Zimroth:

By this letter, the City of New York seeks the modification of the process by which the New York City Police Department (NYPD) will achieve compliance with certain Facilitator recommendations, specifically, recommendation 4 and 5 concerning the activation of Body-Worn Cameras (BWCs) and documenting police encounters.

As you know, the Court, in response to the Facilitator's report, concluded that further study was needed on the recommendations for the activation of BWCs for Level 1 encounters, as well as additional documentation of Level 1 and 2 encounters. The Court ordered the parties to submit a joint proposal for a pilot program to be overseen by the Monitor to provide further information about the benefits and burdens associated with the recommendations (the "Combined Pilot"). After significant deliberation, the City has decided to request the discontinuation of the Combined Pilot and instead voluntarily adopt and implement the material elements of the Facilitator's recommendations. Doing so will, we believe, accomplish the goals of the recommendations without expending additional time and resources on a study about these recommendations.

### 1. Expansion of Video-Recording

NYPD is prepared to expand video-recording to the majority of Level 1 encounters and to require appropriate documentation of both Level 1 and Level 2 encounters. We are proposing this solution in spite of the fact that a significant amount of work has already been undertaken in connection with the Combined Pilot. As a result of that work, we are convinced that the Combined Pilot is fraught with issues that will make its execution and conclusions to be

drawn therefrom difficult in the extreme. Among those issues are: the difficulty in selecting commands for the pilot; the question of whether a sufficient number of officers would voluntarily participate in the Combined Pilot; and the significant safety and privacy concerns raised by the presence of Social Science Observers. At the same time, we recognize that increased body-worn camera video recording of a significant portion of Level 1 encounters has a number of benefits, many within the realm of the 4th and 14th Amendment issues with which the Court is concerned.

NYPD is prepared to expand its mandatory activation policy to include all Level 1 encounters with the exception of those currently designated as "Do Not Record" situations, as well as motor vehicle crashes, non-EDP (emotionally disturbed person) aided situations, and past crimes (10-20 series). We believe that these exceptions balance the benefit of expanded recording with the costs and burdens involved. These costs and burdens of mandatory activation and increased documentation include privacy issues, the impact on the willingness of citizens to cooperate with law enforcement, additional infrastructure costs related to storage and maintenance of a significantly increased volume of recordings, as well as the additional time that will be required of officers derivative from a revised mandatory recording policy.

### 2. Additional Documentation

NYPD will voluntarily undertake additional documentation, and has balanced the benefit of same with the inherent cost added by the additional documentation imposed by the expansion of video recording. It is important to recognize that NYPD answers approximately 9,000,000 calls for service each year, each one of which carries with it the likelihood of at least a Level 1 encounter with one or more individuals. To the extent that these additional encounters are now going to be recorded, they will require uploading and categorization. Even if that process only takes an additional one-minute on average per recording, a minimum of an additional 300,000 hours of time burden per year will be incurred (1-minute x a minimum of two officers x 9,000,000). Notwithstanding this this tremendous added burden, NYPD is prepared to move forward with the additional video recording and categorization, which will work in conjunction with memo book entries to provide basic information on Level 1 encounters.

Data points that would be collected through this process include those that are automatically populated by evidence.com using the body camera information, i.e., date, time, officer information, the length of the recording, as well as data entered by the recording officer in a revised categorization schema, which would include a category describing the level of encounter. The information captured in the electronic memo book would include assignment and supervisor of the officer. Therefore, for Level 1 encounters, the following documentation will occur:

- MOS info
- Assignment info

- Supervisor info
- Date
- Time
- Length of video
- Applicable level of encounter

### 3. Procedures for Level 2 Encounters

With respect to Level 2 encounters, which under current policy are being recorded, the same documentation protocol would be adopted. To the extent that a consent search is requested during a Level 2 encounter, that Level 2 encounter under current policy has an entirely separate form with additional information relative to the individual from whom consent is requested, including apparent age, gender, and race. This policy would, of course, continue.

### 4. Implementation

Adoption of this proposal would require the issuance of new policies regarding mandatory BWC activation and categorization of videos, and the completion of additional documentation as well as the development of new training. NYPD anticipates that this process could be completed during the third quarter of 2020 subject to expeditious court approval.

In addition to striking the correct balance between cost and benefits, we believe that prompt citywide implementation of expanded recording and documentation as described, would not only obviate the need for an expensive and extensive study projected to end the third quarter of 2021, but would best serve the goals that are sought by the Combined Pilot.

\* \* \*

We hope that you find that the City's proposal to have NYPD significantly expand its current mandatory activation policy to capture the vast majority of Level 1 encounters and electronically document both Level 1 and Level 2 encounters as described above, as an alternative to the Combined Pilot, strikes the appropriate balance between cost and benefit and adequately addresses the ultimate goal of the Court. We stand ready to discuss and answer any questions you might have related to this proposal.

Sincerely,

James E. Johnson



POLICE DEPARTMENT
Risk Management Bureau
375 Pearl Street, 20th Floor,
Suite 2000
New York, NY 10038

August 18, 2020

BY EMAIL
Peter Zimroth, Esq.
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710

> Re: *Floyd v. City of New York, 08 Civ. 1034*
> *Davis v. City of New York, 10 Civ. 699*
> *Ligon v. City of New York, 12 Civ. 2274*
> Proposals Re: Additional Data Collection as Part of the Proposed Alternative
> to the Combined Pilot

After numerous conversations with plaintiffs' counsel and the Monitor's team, and as a show of its willingness to reach agreement on a path forward to compliance, the NYPD will include additional data to that which would be collected under the February 21, 2020 proposal. Specifically, for Level 2 encounters, the following additional data would be collected through evidence.com:

1. The race of the primary individual encountered. This would be achieved by adding five additional potential categories: Race – Asian, Race – Black, Race –Hispanic, Race – White, Race – Unknown or Other.
2. The gender of the primary individual encountered. This would be achieved by adding three additional potential categories: Gender – Female, Gender – Male, Gender – Unknown or Other.
3. Whether the encounter was with more than one individual. This would be achieved by the addition of one category: More than one individual encountered (or words to that effect).

The Department would absorb the development costs associated with these new categorizations. While there have been delays associated with COVID-19, the Department anticipates that the proposed Alternative to the Combined Pilot can be implemented no later than the first quarter of 2021. This timeline will, of course, depend on when the proposal is approved by the Court as an Alternative to the Combined Pilot.

Jeff Schlanger
Deputy Commissioner of Risk Management



**THE CITY OF NEW YORK**

**JAMES E. JOHNSON**
*Corporation Counsel*

**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

(212) 356-0800
jajohnso@law.nyc.gov

September 9, 2020

BY EMAIL
Peter Zimroth, Esq.
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019-9710

Re:  *Floyd v. City of New York, 08 Civ. 1034*
*Davis v. City of New York, 10 Civ. 699*
*Ligon v. City of New York, 12 Civ. 2274*
Additional Data Collection as Part of the Proposed Alternative to the
Combined Pilot

Dear Peter:

In furtherance of the City's letter dated February 21, 2020, after numerous conversations with plaintiffs' counsel and the Monitor's team, and as a show of willingness to reach an agreement on a path forward to substantial compliance, the New York City Police Department (the "Department") will include additional data to that which it previously agreed to collect under the February 21st proposal.  Specifically, for Level 2 encounters, the following additional data would be collected through evidence.com:

1.  Race of Primary Individual Encountered:  This would be achieved by adding five additional potential categories:  Race – Asian, Race – Black, Race –Hispanic, Race – White, Race – Unknown or Other.
2.  Gender of Primary Individual Encountered:  This would be achieved by adding three additional potential categories:  Gender – Female, Gender – Male, Gender – Unknown or Other.
3.  Whether Encounter was with More than One Individual:  This would be achieved by the addition of one category, such as more than one individual encountered (or words to that effect).

Additionally, the Department would absorb the development costs associated with these new categorizations.  While there have been delays associated with COVID-19, the Department

anticipates that the proposed Alternative to the Combined Pilot can be implemented no later than the first quarter of 2021. This timeline will, of course, depend on when the proposal is approved by the Court as an Alternative to the Combined Pilot.

Sincerely,

James E. Johnson

cc: Class Counsel for *Floyd, Davis, Ligon*

Exhibit B

# Sampling for Alternative Study to the Combined Pilot

Institute for State and Local Governance[1]
Stanford Team[2]
May 18, 2020

To address the research questions for the alternative to the Combined Pilot, ISLG and the Stanford team have developed a new framework for sampling encounters to be reviewed by legal experts.[3] Specifically, in this alternative study, the two teams will need a sample of at least 2,500 police citizen encounters that are *De Bour* Level 2 or above. The sample will be drawn in two waves with the first including approximately 1,500 encounters that will be reviewed by legal experts and the second approximately 1,000 encounters. The initial sample will capture a random sample of encounters that both ISLG and the Stanford team will utilize to answer primary research questions. In contrast, the second sample will be targeted in order to facilitate the use of machine learning techniques to identify Level 3 encounters. The following memo outlines core elements of the sampling plan. The sample will be drawn after the NYPD implements the two proposed policies that expand body worn camera (BWC) recording and categorization of encounters.

The sampling framework in the revised study differs substantially from that of the Combined Pilot because of fundamental changes to the research design. The Combined Pilot was a cluster randomized experiment testing the efficacy of two policy changes. As such, sampling was built around the selection of 16 commands for treatment and control and selecting 168 officer tours for observation across the selected commands. In contrast, the revised study is an observational study, which eliminates the need to focus on a limited number of comparable commands for treatment and control. Selection of encounters (rather than commands or tours) permits the direct selection of a much larger number of observations, which reduces the necessity of employing certain tactics such as stratification.

## Sample 1

Both the ISLG and Stanford teams' studies require a random sample of police citizen encounters that are *De Bour* Level 2 and above.[4] Observations will be randomly selected from the universe of encounters recorded by officers on their BWCs. The sample will be representative of police encounters with citizens in New York City that rise above Level 1.[5] In a

---

[1] Kathleen Doherty, Reagan Daly and Li Sian Goh.

[2] Nick Camp, Jennifer Eberhardt, and Rob Voigt.

[3] This memo specifically concerns the procedure to sample interactions to be reviewed by expert judges. Additional encounters or alternative sampling regimes (e.g., conditioned on citizen complaints or consent searches) may be necessary by ISLG or Stanford for questions that do not require legal expert judgments.

[4] Within an encounter, there may be interaction with multiple citizens. Legal experts will consider the legality of the officer's actions with regard to each citizen who interacts with the officer.

[5] There is one exception. Officers who consistently turn on their camera less or fail to turn on their BWC in a timely manner will be underrepresented in the study. This is only problematic if failing to turn on the BWC is associated with legally non-compliant behavior.

sample drawn from encounters, active officers will have more presence, because they engage in more encounters. This contrasts with a selection process based on officers, which is generalizable to the average officer. The proposed sample, however, will be more representative of the encounters, which will permit us to speak directly to how citizens experience policing.

The sample will include only encounters that reach Level 2 and above. Such a sample will generate more information on encounters that raise Fourth Amendment concerns relative to a simple random sample. The sample will also be more squarely focused on the Monitorship's mission of reducing unconstitutional Level 3 encounters. Without limiting the sample in this way, legal experts will review many encounters that do not raise constitutional concerns. As a result, we will have less information on more invasive encounters, which could leave us in a position where we cannot speak meaningfully to important questions about escalation or racial disparities.

*Timing of Sampling*
As mentioned above, the revised study will be executed after the NYPD has implemented its proposed policies of categorizing encounters and recording almost all encounters on BWCs. There will likely be a period of time where officers become accustomed to implementing the new policies. In consequence, we plan to commence data collection 4 weeks after the new policies take effect. This provides officers an adjustment period before data collection begins.

Selection will occur over an 8 week period. It is important to collect data over a period of time that is sufficiently long in order to minimize the influence of idiosyncratic events on the results. While improving the quality of the data collection, a longer time frame will increase the amount of time necessary to complete the study. To minimize delay, we propose to randomly select encounters at four points throughout the 8 week study period. One advantage to this approach is that ISLG and the Stanford team can begin coding, matching relevant reports, and transcribing encounters without having to wait until the conclusion of the study period.

*Stratification*
In the alternative to the Combined Pilot, it will be no longer necessary to stratify based on officer or precinct characteristics. The sampling regime will use stratification to address two distinct issues. First, we will stratify by officer categorization of *De Bour* level as a mechanism for including review of encounters labeled Level 1. Second, the study will stratify by citizen race to support our ability to detect disparities in officer behavior.

Random selection of encounters will produce a sample that reflects the population as the number of observations selected increases. Approximately 1,500 encounters Level 2 and above will ultimately be selected. As a result, encounters may be randomly selected without stratification on officer unit or command characteristics while yielding a sample where officer

2

units and commands will be approximately representative of their presence in the pool of encounters.[6]

Both the Stanford and ISLG studies will analyze encounters that reach Level 2 or above. Identifying a sample that excludes Level 1 is challenging. Researchers will have access to officer categorization of the *De Bour* level for each encounter, but officer categorization will be an imperfect indicator of the actual *De Bour* level if officers err in their identification of the *De Bour* level. It is not feasible to take a simple random sample of all *De Bour* levels because of the frequency with which we expect Level 1 encounters to occur. Level 1 encounters would comprise the vast majority of the sample and review of those encounters would be costly and an inefficient use of legal experts' expertise.

To address concerns related to officer miscategorization more efficiently, the study will stratify the sample selection by the officer's labeling of the *De Bour* level. This strategy permits the selection of a random sample of encounters labeled Level 2, 3 or 4 *and* a smaller random sample of encounters labeled Level 1.[7] The selected Level 1 encounters will be screened to determine whether each could plausibly be a higher level encounter. ISLG in consultation with the Stanford team will develop a coding protocol for identifying encounters that are clearly Level 1. Any encounter that *potentially* rises above Level 1 will be included in the sample sent to legal experts. If legal experts determine that the *De Bour* level is 2 or above, the encounter will be included in the analyses. This approach ensures that a sample of encounters labeled Level 1 by officers are reviewed to determine whether they are in fact a higher level while limiting the costs associated with reviewing every Level 1 encounter captured in a random sample. This approach will also help the team ascertain, on a department wide basis, the frequency with which higher level encounters are miscategorized as Level 1 encounters.

There is one key issue associated with this approach. If encounters that were miscategorized as Level 1 differ significantly in compliance, escalation, and documentation from encounters that were accurately categorized, the results will not be representative of the city. Stratifying sample selection by the officer's labeling of the *De Bour* level may provide a skewed sample because Level 1 will be sampled below their prevalence in the actual universe of encounters. The extent to which stratifying sample selection by officer categorization skews the sample depends on the frequency with which higher level encounters are miscategorized as Level 1. To address this

---

[6] Stratification by officer unit and characteristics of the command were particularly important in the Combined Pilot, because only 16 commands and 168 officers were selected for observation. As a result, a random sample was very likely going to be unrepresentative of the population.

[7] The number of encounters selected in each group has not yet been determined. There are two issues that affect the number of encounters selected: 1) the percent of BWC recordings that are be usable, 2) the rate of miscategorization of Level 1 encounters. For example, incomplete recordings will not be sent to judges for review. If recordings are often incomplete, then we may need to increase the number of encounters selected to ensure that we reach 1,500 encounters for legal expert review. We also do not know the rate of encounters that are miscategorized as Level 1 but are, in fact, Level 2 or above. If encounters are frequently miscategorized then we may need to select fewer encounters, because more of the encounters selected will be sent to legal experts. After the NYPD has implemented the new policy, there will necessarily be a pilot period where we examine BWC recordings and assess the appropriate number of encounters for selection in each group.

skew, the sample of higher level encounters miscategorized as Level 1 can be weighted based on estimates of their frequency.

Stratification by citizen race will increase the ability of both studies to discern racial disparities in analyses on compliance, escalation and procedural justice. In a random sample of encounters of approximately 1,500 police encounters, there may be too few encounters with white or Asian citizens captured in the sample to discern differences by citizen race. In 2019, black and Hispanic citizens constituted 89 percent of Level 3 encounters and 79 percent of arrests.[8] If we assume that citizens in Level 2 encounters exhibit a similar racial identity, there may be too few encounters with white or Asian citizens to meaningfully detect differences in legal compliance or officer language. This poses the danger that the study may find no evidence of racial disparities even if disparities are present, because the analysis is underpowered.

The primary means of addressing this issue is to stratify by citizen race, as labeled by officer, where such data are available.[9] We will select white and Asian citizens at a higher rate than their expected presence in a random sample to enhance our ability to detect differences across racial groups. While it may be counterintuitive to oversample white and Asian citizens when investigating Fourteenth Amendment violations, there must be sufficient encounters in each racial group to be able to discern meaningful differences. A very large increase in sample size of the study would also increase statistical power, but stratification is a more efficient means of increasing our ability to detect disparities without dramatically increasing the size and cost of the study. We will conduct power analysis to determine the appropriate numbers of encounters by race to include in the sample, taking care to oversample only to the minimum extent necessary.[10] We note that this will be difficult to implement if the NYPD's categorization of Level 2 encounters does not include information on citizen race.

Stratification by citizen race may have implications for the interpretation of results. For example, if whites are oversampled and encounters with white citizens are more likely to be compliant, the compliance rate of the sample will not be an accurate representation of compliance in the city. Fortunately, it is possible to address this issue by weighting encounters of different racial groups to reflect their presence in the population of encounters when producing estimates for compliance city wide. Stratification can facilitate disparities analysis without detracting from the generalizability of the study to the city.

*Selection Process*
The NYPD has a record of Level 3 and 4 encounters as well as some Level 2 encounters (those with a consent search) through reports submitted by officers. Under the NYPD's proposal for documentation, there will be no database of information on all police citizen encounters Level

---

[8] The data on Level 3 encounters were provided by the Monitor team and the data on arrests were found on NYC Open Data.

[9] Citizens' racial identification may differ from officers' perception of their race; however, officers' perception of race is more germane to questions of racial disparities in legal compliance and disrespect.

[10] We note that parity in the presence of racial groups is not necessary to be able to detect differences.

4

2 and above. Most Level 2 encounters will be documented only in the BWC system, unless the NYPD adopts a combined Level 2/Level 3 form. An investigative encounter form that documents both Level 2 and Level 3 encounters would be advisable, unless it would create insurmountable logistical or operational concerns. Without a combined Level2/Level 3 form, the primary data source with information on the universe of encounters is the BWC metadata. By BWC metadata, we refer to the record of each recording made by an officer, including the officer's name, date, time, length of video and sometimes information on the encounter. The NYPD proposed to include the *De Bour* level into the BWC system so that officers can categorize and report on the frequency of Level 1 and 2 encounters. (The NYPD has indicated that these data will be able to be accessed through the Axon system website evidence.com.) As a result, we will sample encounters from the BWC metadata for the study.

There are several unique challenges associated with selecting encounters through the BWC metadata in contrast to using a database of reported encounters. First, the system will often contain multiple records of the same encounter because each officer present will activate their camera. Before selection, recordings of the same encounter will have to be linked. If not, the probability of selecting an encounter for the study will increase as the number of officers present during the encounter increases. This would bias the study toward selecting encounters with more officers, which are more likely to be anti crime officers and more serious encounters. The NYPD will need to support our efforts to link recordings of the same encounters prior to selection.[11]

**Sample 2**

An open question for the Stanford team is whether computational techniques can distinguish between correctly and incorrectly labelled Level 2 encounters through features in metadata, language, or video recordings. If so, this approach could scale legal experts' judgments to the interactions outside of our sampling regime. However, it is impossible to judge the feasibility of such a model until Sample 1 is collected. Supervised learning methods require judges to provide labels for a set of training data (i.e., whether Level 2 labelled encounters are actually Level 2 or Level 3). The model is trained against these labels and is then tested against a separate sample to determine its accuracy.

In addition to an initial sample of 1,500 encounters, we will select a second sample of 1,000 encounters for this purpose. If the Stanford team is able to build an adequately predictive model from the initial sample of encounters, then this second sample would consist of the 1,000 encounters most useful for refining the model (i.e., those closest to the boundary between correctly and incorrectly labelled Level 2 encounters).

---

[11] BWCs will recognize when another camera is activated nearby. However, it is not apparent from metadata which records may be of the same encounter.

However, if improperly categorized Level 2 encounters are rare, or if the differences between properly and improperly labelled encounters are exceedingly subtle, then a computational model may not be feasible for detecting compliance. If this is the case, we propose allocating these 1,000 additional encounters using the same sampling regime as Sample 1. This would allow for greater statistical power to measure the influence of covariates of interest (e.g., whether an encounter occurred during a housing patrol, the location in which an encounter occurred, etc.).

# Proposed Study of Police-Citizen Encounters

Institute of State and Local Governance

May 28, 2020

**Introduction**

ISLG proposes to carry out a study that will address fundamental questions about the NYPD's compliance with the Fourth and Fourteenth Amendments in police-citizen encounters as an alternative to the Combined Pilot. Crucially, the study will examine legal compliance in police-citizen encounters, racial disparities in compliance and escalation, and appropriate documentation of encounters. All of which can be examined on a broader scale following the introduction of a new policy proposed by NYPD to record nearly all police-citizen encounters at every *De Bour* level with body-worn cameras (BWC). With a more complete record of police-citizen encounters available on BWC, the study will supply novel insights into officer compliance with the Fourth and Fourteenth Amendments and the degree of NYPD documentation of police-citizen encounters without direct observation of officers.

The study will explore the following research questions:

1) *Compliance*: How often does officer behavior in police-citizen encounters violate the Fourth Amendment or Fourteenth Amendment? What are the key reasons for officers' failure to comply with legal requirements? Are there racial disparities in the legality of police-citizen encounters?
2) *Escalation*: How often do police-citizen encounters escalate from lower to higher levels? Are there racial disparities in the legality of escalated encounters?
3) *Documentation*: Does the expansion of mandatory BWC recording to most Level 1 encounters increase the number of Level 3 encounters that are reported? Post-expansion of BWC recording, what is the documentation rate of Level 3 encounters? Are undocumented Level 3 encounters associated with race and ethnicity or legal non-compliance?

In addition to addressing these substantive research questions, the study will generate important descriptive information about the nature of police-citizen encounters. After the expansion of BWC recording, analysis of BWC footage by ISLG and legal experts will provide a more nuanced portrait of the police-citizen encounters than is currently available.

**Approach for answering key research questions**

*1) Compliance with the Fourth and Fourteenth Amendments*

One key area of responsibility for the Monitorship is legal compliance in police-citizen encounters. The study will investigate officer compliance with the Fourth and Fourteenth Amendments in encounters with citizens. To do so, ISLG will conduct three primary analyses. To address compliance with the Fourth Amendment, we will employ legal experts to assess encounters to determine whether there are any Fourth Amendment violations at each *De Bour* level, leading to an ultimate assessment of legal compliance for the encounters. To assess Fourteenth Amendment violations, we will examine whether

1

there are racial disparities in compliance across encounters and provide the legal experts the ability to indicate whether they found a Fourteenth Amendment violation in an individual encounter.

To establish the legality of officer compliance with the Fourth Amendment, a panel of retired judges (legal experts) will utilize BWC footage plus relevant documentation to determine and code the *De Bour* levels present in an encounter, whether officer actions were legally compliant and the reasons for non-compliance by *De Bour* level. Each encounter will be randomly assigned to at least two legal experts to establish consensus on legality.[1] With these data, ISLG will be able to analyze and report compliance of encounters by *De Bour* level.[2] In addition to documenting the rates of legal compliance, the assessments completed by the legal experts will also provide insight into the reasons that encounters were deemed non-compliant. Using the coded data, ISLG will report the most prevalent reasons cited by the legal experts for non-compliant encounters thus providing the NYPD with important information on the specific nature of Fourth Amendment violations.

The legal experts, as former judges, will be able to provide valuable analysis on Fourth Amendment concerns in police-citizen encounters. ISLG will utilize their expertise to supplement closed-ended coding. Each legal expert will complete an open-ended narrative that summarizes the most frequent causes of Fourth Amendment violations in the encounters that they analyzed and explain the nature of these violations. They can do so in greater depth and with more nuance than is possible in closed ended coding. These analyses will enable the NYPD to refine its training and oversight in ways that will improve the legality and quality of officer-citizen encounters.

Importantly, the study will assess encounters for Fourteenth Amendment violations in addition to Fourth Amendment violations, and this will be done in two ways. First, legal experts will be asked to identify any Fourteenth Amendment violations in each encounter they review. Second, ISLG will examine whether there are racial disparities in legal compliance across police-citizen encounters that are reviewed. We will assess the effect of citizen race on legal compliance while controlling for other aspects of the encounter that may affect compliance, thus determining whether black and Hispanic citizens are more likely to experience Fourth Amendment violations in their interactions with officers. It is important to note that this analysis will examine Fourteenth Amendment violations in encounters that occur, providing valuable information regarding disparities, or lack of disparities, in NYPD treatment of citizens in encounters.

### 2) Escalation

The expansion of BWC recording to most Level 1 encounters provides an opportunity to examine and better understand encounters that escalate from a Level 1 or 2 to Level 3 or 4. In this second analysis, ISLG will both explore the prevalence and legality of escalations in police-citizen encounters and examine any racial disparities in these encounters. Specifically, we will explore how often escalation occurs in encounters, whether escalated encounters are more likely to be non-compliant with Fourth

---

[1] A third legal expert will review any legal questions where there is disagreement in the initial review.

[2] We will also report descriptive information about encounters where there is disagreement among legal experts. This will provide nuance into those cases where a determination of compliance was complex and led to split decisions among the legal experts.

Amendment requirements, and whether there are racial disparities in the frequency and nature of escalations.

As described above, the first analysis will generate novel data on the *De Bour* levels contained in police-citizen encounters and legal compliance at each level. With these data, we will have the ability to describe *De Bour* escalation patterns in different ways. First, we will report the proportion of all encounters that escalated. This provides information on how common escalation through *De Bour* levels is in the universe of all encounters in the sample. Another analysis of interest is the proportion of Level 3 encounters that escalated from at least a Level 2. This will provide insight into the share of Level 3 encounters that resulted from escalation versus encounters where officers immediately detained an individual. After we have identified Level 3 encounters that escalated, we can compare compliance in escalated encounters relative to those encounters that did not escalate. Lastly, we will examine the proportion of Level 2 encounters that escalate to Level 3 or above. Using the definition of escalation above, encounters only escalate if they begin at Level 2 or below. This will establish the rate of escalation among those encounters where escalation is possible.

We will also examine racial disparities in *De Bour* escalation through two strategies. First, we will examine whether Level 1 or 2 encounters escalate more often if the citizen is black or Hispanic and whether there are racial disparities in the compliance rate of escalated encounters.[3] A second analysis will focus on describing racial differences in Level 3 encounters. Specifically, we will examine whether Level 3 encounters with black and Hispanic citizens are more likely to have escalated from a Level 1 or 2 as compared to white citizens. This will provide insight into whether there are differences by race in how Level 3 encounters are initiated. We will then examine whether Level 3 encounters that escalated from a Level 1 or 2 are less likely to be legally compliant and whether there are any differences by citizen race.

It is important to note that this analysis may be descriptive, because the sample may be small if escalation across *De Bour* levels is rare. While we will explore the possibility of looking at other factors and circumstances that may increase the likelihood of escalation, it may not be possible if there is not sufficient data.

A second analysis will consider escalation in a more fine-grained manner than through *De Bour* levels, which will permit a more nuanced assessment of escalation. The Fourteenth Amendment requires that similarly situated individuals be treated equally (see Liability Opinion, pg. 27). Examining escalation through *De Bour* levels may mask important differences in the intensiveness of encounters within *De Bour* level. Officers may take a range of actions within a *De Bour* level that affect the experience of the encounter for the citizen. For example, a Level 3 encounter may involve a frisk, but may not. Existing research has sequenced citizen and officer actions. We will use BWC footage to sequence the actions of an encounter to identify actions that might be associated with escalation across *De Bour* levels, especially inappropriate actions. By breaking down encounters into a sequence of actions, we can examine how officers interact with citizens, factors that trigger escalation in the actions that officers take, and inequalities in how interactions progress. This will also examine disparities in how

---

[3] The analysis will not be able to assess racial disparities in the probability of a citizen of having a Level 1 or 2 encounter.

encounters escalate. This work will complement analysis of language executed by the Stanford team. We will explore existing measures of escalation and consider how they might be adapted.

### 3) Documentation

The presence of undocumented stops limits the ability of the Monitor to assess the legality of Level 3 encounters. This is especially important if there is a relationship between documentation of an encounter and its legality. ISLG will examine the issue of officer documentation in two ways. First, we will assess the effect of expanding BWC recording to almost all encounters on the number of reported Level 3 encounters. Second, *after* BWC recording expands, we will determine the current rate of documented Level 3 encounters.

Changing the NYPD BWC recording policy to include most Level 1 encounters will increase the transparency of police-citizen encounters, which may affect an officer's decision to report a Level 3 encounter.[4] We will assess whether this policy change affects the number of reported Level 3 encounters. Because assessing reported Level 3 encounters relies on administrative data rather than BWC footage, we will be able to examine all officers on patrol rather than a sample of officers. The NYPD could provide a count of tours and reported Level 3 encounters by officer for approximately 12 weeks before and after the introduction of the policy. With these data, we will assess whether policy change is associated with an increase in the number of reported Level 3 encounters while controlling for other factors that affect the prevalence of Level 3 encounters. Ultimately, the strategy for analysis will depend on whether the City rolls out the new policy gradually by commands or citywide. We can better assess a causal effect between the policy and documented Level 3 encounters if the City rolls the policy out gradually. It permits differentiation between time trends and the effect of the policy on reported Level 3 encounters.

If the City rolls out the policy gradually by commands, ISLG can adopt an analytic strategy that better accounts for trends that change over time in addition to the policy change.[5] Using an officer-by-week unit of analysis would allow ISLG to control for individual officers' propensity to stop, as well as variations in time or seasonality   i.e., officer and week-fixed effects. In addition, ISLG would control for differences across precincts.  NYPD can provide data on the number of stops each officer reported, as well as the number of tours each officer worked every week. From this, the number of stops per tour each officer reported every week can be calculated. Level 3 encounters will be calculated per tour as we must account for the opportunity to stop a citizen (or the number of tours worked).

---

[4] One outstanding issue is the form of documentation for Level 1 and 2 encounters. Categorization by *De Bour* level of these encounters would also affect transparency and may further affect the incentive to report. As yet, it is unknown what that categorization will look like or even whether it will be implemented with changes in BWC policy.

[5] One possibility is to conduct a difference-in-differences analysis in which the number of documented Level 3 encounters in commands which have implemented the policy, both prior to and after the policy change, are compared with commands which have not yet implemented the policy.

If the City chooses to implement the policy citywide, 'control' precincts in which the policy has not yet been implemented will be unavailable for comparison.[6] As discussed above, this approach is less desirable than a roll-out of the policy. Implementing the policy citywide provides only one pre-post point of comparison   the time period prior to roll-out and the time period after it. In comparison, rolling out the policy gradually would provide multiple points of comparison, in addition to allowing ISLG to control for variance in officer propensity to stop, seasonality, and crime trends.

A challenge common to both approaches is that it will be difficult to differentiate between an increase in actual Level 3 encounters and an increase in the reporting of those encounters. Moreover, we cannot differentiate between reporting and incidence with regard to the distribution of levels in stops, because Level 1 and 2 stops are not currently documented. A possible solution would be to conduct audits of potentially undocumented stops using radio transmissions to identify instances in which stops appear to have been made, but a stop report was not recorded, in each precinct during the pre- and post-intervention periods, as was done throughout the quarters between 2016   2018 (RAND audits).[7]

The second analysis on documentation will focus on the accurate documentation of Level 3 encounters *after* the BWC policy change is implemented. Legal expert coding will identify the *De Bour* level of all encounters for a sample of encounters. With that information, we will be able to identify Level 3 encounters that were not reported by officers and calculate the rate of undocumented Level 3 encounters.  Once undocumented Level 3 encounters have been identified, it is possible to explore whether there is any relationship between documentation and legal compliance or citizen race. This analysis may be descriptive, because the sample size will likely be small.

*        *        *

Jennifer Eberhardt, Rob Voigt and Nick Camp (Stanford team) can build on this analysis by utilizing machine learning tactics to examine officer categorization of *De Bour* levels in a much wider set of encounters. We will provide legal expert coding and documentation information to them so that they may use legal expert identification of *De Bour* level to further their efforts.

**Data Collection and Analysis:**

The proposed analyses will rely on three sources of data: BWC footage, police reports, and administrative data. ISLG will descriptively code encounters, organize reports and administrative data by encounter, and then assign encounters to legal experts for review. This will generate a dataset of encounters that can be analyzed to generate new information on several distinct questions about compliance with the Fourth and Fourteenth Amendments, accurate documentation and the dynamics of escalation in encounters. BWC footage will serve as the primary data source for sampling and coding

---

[6] One possibility is to use an interrupted time-series design, in which trends in reported stop outcomes observed post-implementation will be compared to the trends observed prior to implementation.

[7] If the RAND audits suggest increased compliance in reporting after the policy change is implemented, then any increase in the number of reported stops is likely a result of increased reporting. However, if the reporting rate from the RAND audits remains constant, an increase in the number of reported stops will be the result of officers conducting more stops and not increasing the rate at which they document stops.

encounters. Therefore, the study will primarily be confined to documenting and analyzing encounters *after* the NYPD expands BWC recording to include Level 1 encounters.  Importantly, ISLG will coordinate with the Stanford team on sampling, the coding of BWC videos, and the legal expert instrument to ensure the data collected serves the needs of ISLG's analyses as well as the Stanford team's analysis of language.

ISLG and the Stanford team will need a sample of at least 2,500 police-citizen encounters that are *De Bour* Level 2 or above. The sample will be drawn in two waves with the first including approximately 1,500 encounters and the second approximately 1,000 encounters. The initial sample will capture a random sample of encounters that both ISLG and the Stanford team will utilize to answer primary research questions. In contrast, the second sample will be narrower in order to facilitate the use of machine learning techniques to identify Level 3 encounters. The samples will be drawn after the NYPD implements the two proposed policies that expand body worn camera recording and categorization of encounters.  A separate memo outlines the in detail the joint sampling plan for ISLG and the Stanford team.

Once a sample of encounters has been selected, ISLG will employ graduate student research assistants to code each encounter with a revised survey instrument. First, graduate students will assess whether the BWC footage for a selected encounter is sufficiently clear and complete for inclusion in the study. We will track the number of events that have to be excluded for failure to turn on BWC for the entirety of the encounters as well as any other reasons that an event needed to be excluded. After the footage has be deemed sufficient, graduate students will code key elements of each encounter. Coding will include information about citizens in the encounter as well as actions officers took. These data will provide descriptive information on encounters.  The data will also aggregate features of encounters that will be important in the analyses conducted by both ISLG and the Stanford team.  We will coordinate on the development of a new instrument to code data.

ISLG will also obtain several types of administrative data. First, we require the BWC metadata. These data are necessary for sample selection and in order to obtain important information about encounters, including their length. ISLG also requires other types of data from the NYPD on sampled encounters, including officer reports, ICAD data, and personnel information. For each encounter, ISLG will need to obtain any relevant reports submitted by officers (such as arrest reports, use of force reports). We will also extract the relevant portion of the ICAD data for the encounter. Importantly, ISLG must also acquire data on officer documentation for all Level 1 and 2 encounters. (The form of that documentation is not yet certain, but we note that it will be needed.)

The next step in the data collection will be legal expert review of sampled encounters.  ISLG will bundle BWC footage with reports and ICAD data in preparation for legal expert review of the encounter. ISLG will then assign events to legal experts for evaluation through a web application.  Assessment of legality will include identification of the *De Bour* level(s), a judgment of legality at each *De Bour* level in an encounter, and identification of Fourteenth Amendment violations. At least two legal experts will review each encounter. If there is a conflict between two experts on any legal judgments, a third legal expert will also review the encounter, but the third expert's evaluation will be confined to the questions that generated conflict between the first two legal experts.  This process establishes a consensus opinion for each legal question. If officer actions are determined to be non-compliant, legal experts will provide the legal reason for non-compliance.

6

At the conclusion of their coding of individual encounters, the legal experts will have the opportunity to write a narrative analysis of the trends that they observed. The aim of this analysis is to provide the NYPD with more nuanced information on areas where officer behavior in encounters might be improved through training and oversight. The legal experts will be provided with a set of summary statistics on the encounters that they reviewed, including the number of encounters by *De Bour* level, the rate of non-compliance, and the reasons provided for non-compliance.[8] The legal experts will have the ability to review their coding for any specific encounter and to view relevant BWC footage. This may be useful, for example, if an expert wants to discuss a set of encounters which exhibited similar legal issues. They will complete an open-ended narrative setting forth their analysis on the nature of the Fourth Amendment violations that they observed. ISLG will supplement the quantitative analysis in its report with observations drawn from the legal experts' analyses.

The analysis on reported Level 3 encounters before and after the expansion of BWC recording will rely only on NYPD administrative data, which will permit analysis of the universe of officers on patrol. ISLG requires incident-level information on Level 3 stops, specifically the precinct number, the time and date, and an identification number for the officer who made the stop. All except the last is published in the publicly available SQF data. In addition, information on each tour that officers worked over the time period including precinct, date, shift duration (accounting for whether the shift went into overtime), officers' identification numbers, and the identification number of officers they were on tour with, is required. (The data can be de-identified as long as the same random ID number is provided for an officer across all the data.) If the policy is rolled out over time, NYPD would have to report when commands changed policy and the length of the data collection period may need to increase depending on the timing of the roll-out.

ISLG will draw on these different sources of data to conduct analysis for each research question listed above. Analysis for some research questions will utilize only a subset of the encounters that occur in the sample. For example, the analysis on documentation of Level 3 encounters will focus only on encounters that the legal experts identify as Level 3.

---

[8] The aim of providing legal experts with descriptive statistics is to minimize the salience of recent or unusual events in their consideration of trends.

# Using Machine Learning Techniques to Analyze Body-Worn Camera Footage

**Stanford Team**
**June 2020**

**Using Machine Learning Techniques to Analyze Body-Worn Camera Footage**     1

Overview and Aims     2

    Background     3

    Proposed Directions     4

Phase 1   Analysis of Existing Data     4

    Prerequisites     5

    Sampling Procedure     5

    Study 1.a.  Retrospective Analysis of Complaints     6

    Study 1.b.  Linguistic Behavior in Consent Searches     6

    Study 1.c.  Escalation in Level 3 Encounters     7

Phase 2   Analysis of Future Data     9

    Prerequisites     9

    Sampling Procedure     9

    Study 2.a.  Analysis of Officer Compliance     9

    Study 2.b.  De Bour Escalation     11

Concluding Remarks     12

# Overview and Aims

Support for officer body worn cameras (BWCs) is broad and growing. By some estimates, 95% of police departments across the country have invested in (or plan to invest in) them. Yet, despite the growing support for these cameras, and the large number of encounters they capture each day, BWC recordings are more often used as evidence to evaluate particular interactions than as data to inform practice and policy.

The Stanford team fills this gap by developing scalable computational tools for quickly and accurately analyzing police community interactions captured by BWCs, and for examining broad patterns in those interactions. The NYPD, for example, could use such footage to examine the extent to which officers are complying with departmental practices and policies during encounters with the public. The footage could also be used to understand how such encounters might escalate unnecessarily. Because the first phase of Stanford's proposal relies on BWC videos and data already recorded, this part of the proposal can begin before the NYPD makes the changes outlined in the City's letter dated February 21, 2020 regarding an alternative to the combined pilot ordered by the Court.

The language officers use during investigative encounters is central to the above questions. Indeed, an officer's words are of great legal import: they can signal to a citizen whether they are detained or free to leave, request their consent, or provoke their complaint.   More broadly, the manner in which officers relate to the public is consequential for building or eroding citizens' trust in the law, support for law enforcement, and even whether they personally cooperate with the police[1].

Police officers' treatment of the public during police citizen encounters is also central to the monitorship and consent decrees in the *Floyd*, *Ligon* and *Davis* cases. The Court found the City liable for violating plaintiff's Fourth and Fourteenth Amendment rights. Not only were racially defined groups targeted for stops, but "[b]oth statistical and anecdotal evidence showed that minorities are indeed treated differently than whites. For example, once a stop is made, Blacks and Hispanics are more likely to be subjected to the use of force than whites."  (p.13, Liability Opinion). The Court, in its finding regarding discrimination, highlighted the fact that Blacks who were subject to law enforcement action following their stop were about 30% more likely than Whites to be arrested (as opposed to receiving a summons) after a stop for the same suspected crime, even after controlling for relevant variables, and Blacks who were stopped were about 14% more likely than Whites to be subjected to the use of force (p.59 60, Liability Opinion). In the words of the Court, the Fourteenth Amendment's Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike" (p.27,Liability Opinion). Thus, the question of whether officers treat Black and White citizens alike in encounters recorded on BWCs is paramount.

---

[1] Tyler, T. R., & Huo, Y. (2002). Trust in the law: Encouraging public cooperation with the police and courts. Russell Sage Foundation.

Here, we outline possible areas where a machine learning approach to body worn camera footage can help us understand and evaluate police initiated pedestrian encounters. Specifically, we highlight the benefits of such an approach for evaluating four target areas:

- *complaints* the actions taken on the part of an officer that lead encounters to result in a complaint
- *consent searches* the language used by officers to request consent searches from citizens, and the impact of different language choices on community responses to that request
- *compliance* the extent to which officers correctly classifying their encounters with public
- *escalation* the manner in which an encounter becomes more fraught over time even when the De Bour level remains steady, and/or moves across De Bour levels, such as from Level 1 to 2 or Level 2 to 3.

We seek to answer these questions in two phases. The first phase aims to explore questions related to complaints and consent searches, which we can evaluate using existing data and footage from 2019. The second phase examines compliance and escalation using a sample of footage to be collected in coordination with ISLG and coded by legal experts.

## Background

Our team has already used machine learning to develop a novel algorithm to extract and analyze officer language from a large corpus of body camera footage from the Oakland Police Department. Across nearly 1,000 routine traffic stops, we found that officers spoke more respectfully to White vs. Black community members, even after controlling for the location and outcome of the stop, the severity of the infraction, and the officer's race. This respect deficit, which is present from the beginning of the stop to the end, is significant because it can contribute to racial differences in reported experiences with law enforcement as well as community members' trust in the law.

In another series of studies, we extended our analysis from *what* words officers use during routine traffic stop interactions to *when* they use them during those interactions. Applying computational dialog methods to the same corpus of footage, we identified 11 discrete conversational actions that police officers take during stops (e.g., greeting the driver, asking for documents), and developed another novel algorithm to automatically tag footage for these acts. Disaggregating officer language and respect at the act (vs. stop) level can further help law enforcement agencies identify when community members are most likely to perceive disrespect or distrust, and to target social tactics training accordingly.

We have also begun to analyze officers' tone of voice during traffic stops. Once again, we find that officers speak to White drivers more respectfully than Black drivers. In addition, we find

3

that those community members who listen to short clips of officers' tone as they speak to White drivers (as opposed to Black drivers) state that they have greater trust in law enforcement more generally and expect more positive interactions with the police. These findings directly demonstrate how racial disparities in treatment during interactions could bolster or erode trust.

## Proposed Directions

This approach can shed light on officer initiated investigative encounters in New York City, and how they might differ by citizen race. Below, we discuss possible approaches we would take to explore particular questions related to complaints, consent searches, compliance, and escalation, using machine learning techniques to better understand and evaluate police initiated pedestrian encounters. The scale of our analysis further lets us test the extent to which there are racial disparities in these aspects of police citizen interactions. We propose two phases as follows.

*Phase 1*. In the first phase of this research, we constrain our sample to Level 3 stops from 2019. Since these Level 3 stops are already recorded and tagged by officers, we are able to sample and analyze interactions resulting in **complaints**, the linguistic characteristics of **consent searches**, and the conditions surrounding **escalation**. This work can begin immediately given existing department procedures for data collection and storage.

*Phase 2*. In the second phase of this research, in collaboration with the ISLG team, we propose to obtain a sample of Level 1, 2 and 3 encounters. As outlined in the ISLG sampling memo, this sampling requires NYPD officers to assign a De Bour level to each of their recordings. By obtaining judgments from legal expert coders evaluating the footage, it will be possible to study the linguistic dimensions of officer **compliance** and **De Bour escalation**.

# Phase 1 - Analysis of Existing Data

In the first phase of research, we address a set of questions that can be examined under current procedures and policies for data collection, using existing data (encounters recorded in 2019). This will allow our team to begin the research process immediately, and thereby establish our cooperative relationship with the NYPD for exchanging data, as well as our research pipeline for data processing. This will facilitate sampling and matching recordings in collaboration with ISLG during Phase 2.

## Prerequisites

The studies described in this section rely on the following:

- Computer readable metadata, such as spreadsheets of stop reports, for all Level 3 encounters taking place during 2019
- Computer readable records of citizen complaints taking place during 2019
- Computer readable records of consent searches taking place during 2019
- Download access to footage from the sample for transcription and computational analysis

## Sampling Procedure

For Study 1.a. (Retrospective Analysis of Complaints), we will sample the full population of BWC recorded Level 3 encounters resulting in a citizen complaint. For a quasi control group for comparison, we will use propensity score matching using automatically extracted metadata and linguistic features of interactions to establish a comparable sample of equal size composed of interactions similar to the above but which did not result in a complaint.

For Study 1.b. (Linguistic Behavior in Consent Searches), we will sample the full population of BWC recorded Level 3 encounters documented as including a consent search.

For Study 1.c. ( Escalation in Level 3 Encounters), we will leverage the population of samples collected for Studies 1.a. and 1.b. to examine those in which escalation occurred.

We will begin this work by having these sampled encounters professionally transcribed, including per utterance timestamps and speaker diarization (record of who is talking to whom for each utterance).

5

## Study 1.a.    Retrospective Analysis of Complaints

*Research Questions:* What elements of officer language and behavior in Level 3 encounters are most likely to result in citizen complaints?

A large number of citizen complaints against the police concern whether citizens feel that officers communicate appropriately and professionally with them. This study would seek to identify elements of police stops that are most predictive of citizen complaints, compared to otherwise similar stops that did not result in a citizen complaint. Specifically, we would focus our analysis on the subset of citizen complaints associated with Level 3 stops, where the encounter in question was captured on officer body worn camera.

To address this question, we will train a machine learning model to learn how to distinguish between Level 3 encounters that led to complaints and those that did not. As in our previous work on officer respect, we can do this both with general distributional information about the words officers use, as well as with reference to a targeted set of linguistic features or strategies that are likely to be predictive. Our model will learn weights which quantitatively measure the influence of any given feature on a prediction of complaint/no complaint, allowing us to determine which sorts of linguistic behaviors most strongly distinguish these kinds of encounters.

Such a model would shed light on the dynamics in police citizen interactions that underlie complaints of unprofessional conduct or officer disrespect.  An interesting possibility that such a model opens up is the ability to look for racial differences among complaints   perhaps a certain set of officer linguistic features are more likely to lead to complaints by White citizens, while another set is more predictive for Black citizens.

## Study 1.b.    Linguistic Behavior in Consent Searches

*Research Questions:* Do officers seek overt consent to search in Level 3 encounters? If so, when and how is consent sought? What language used by officers is associated with citizen consent versus refusal to search? When consent is granted, when and how is it done linguistically?

Upwards of 90% of warrantless police searches are conducted by means of the consent exception to the Fourth Amendment, but the conditions under which such searches are truly "voluntary" is a complex subject of legal inquiry that is ultimately tied to officers' communication in interactions.[2] Officers may voice a request to search in any number of ways, and citizens stopped and questioned by the police may not understand the full weight of the

---

[2] See, for instance: Simmons, Ric. "Not Voluntary but Still Reasonable: A New Paradigm for Understanding the Consent Searches Doctrine." Indiana Law Journal, vol. 80, no. 3, Summer 2005, p. 773-824

request or their option to refuse it. These challenges may be exacerbated by disparities in treatment and general miscommunication between police and members of the public.

Therefore we propose to examine the linguistic considerations surrounding consent searches by examining a transcribed sample of footage from encounters in which officers request a citizen's consent to search (both accepted and rejected consent searches). Note that in this study we aim to descriptively characterize the procedural facts surrounding searches so as to quantify potential disparity. To do so, we will develop algorithms that can automatically identify the occasion(s) of a request to search in the transcript of an interaction.

This will allow us to first ask basic distributional questions about these requests, such as: When in an interaction do they tend to occur? Considering the linguistic form such requests may take, are requests overt ("Can I search you?"), covert ("You mind if I check that out for a second?"), or even framed as commands or declarative statements ("Let me look in here.")? To the extent that the linguistic framings of these requests differ, are officers more likely to use more covert requests with Black and Hispanic citizens? And are some framings more likely to elicit a citizen's consent than others? When consent from the citizen is granted, is it clear and overt ("Yes, that's fine.") or indirect, hesitant, or ambiguous ("I guess." or "I'm good.")?

We can further examine the trajectories of the stops before and after consent searches take place, whether with reference to escalation as will be discussed below in Study 1.c., or in terms of conversational events in the encounter, like whether the officer provides the reason for the stop or an explicit reason for the search.

## Study 1.c.    Escalation in Level 3 Encounters

*Research Questions:* How can an officer's communication lead to the escalation of an encounter? When does citizen language lead officers to act more or less respectfully?

In order to determine which encounters escalate (e.g. low level enforcement stops), and when they might escalate (e.g. in response to an insult) or de escalate (e.g. once an officer gives the reason for a stop), we will map the trajectories of stops sampled for questions 1a and 1b. Specifically, we will measure the frequency of linguistic correlates of officer respect and citizen agitation over the time course of a stop. A stop can be said to escalate when the officer becomes less respectful and a citizen more agitated over time. We will validate these linguistic ratings against human judgments of whether the encounter is becoming more or less fraught over time.

7



Figure 1. Schematic trajectories of police-citizen encounters. Each line represents a stop; note that interactions can vary in their starting position, ending position, and general trajectories

By charting the trajectory of each encounter, we can then ask what variables influence a) the starting state of Level 3 encounters (i.e. the intercept of this trajectory), b) the rate of escalation (i.e. the slope), and c) inflections in trajectories (i.e. going from a positive to a negative slope within an interaction). For example, does whether, when, and how officers state the reason for the encounter influence the likelihood that the encounter will escalate? Do citizens' procedural questions change the trajectory of police encounters?

# Phase 2 - Analysis of Future Data

In the second phase of this research, in collaboration with ISLG, we aim to address questions surrounding the relationship between officer communication and legal standards of conduct: compliance with NYPD documentation and categorization of stops and De Bour escalation in officer encounters.

The questions we address in this phase require officers to categorize BWC recordings of Level 1 and Level 2 encounters as outlined in the ISLG sampling procedures. Further, since these questions concern the assignment and change in De Bour levels, they require legal experts' judgments.

## Prerequisites

The studies described in this section rely on the following:
- Computer readable metadata, such as spreadsheets of stop reports, for all encounters taking place during the period of the sample
- Interactions sampled by ISLG as per the attached sampling memo
- Download access to footage from the sample for transcription and computational analysis
- Race of citizen information, obtained either from officer generated metadata (e.g. combined Level 2/Level 3 stop reports), ISLG coding, or both.

## Sampling Procedure

The sampling procedure for Phase 2 will be coordinated with ISLG in the interest of obtaining generalizable population level estimates of officer behavior with regards to compliance and escalation. This procedure is discussed in detail in the attached sampling memo.

We will begin this work by having the sample of encounters   those coded by ISLG and sent to legal experts for judgment   professionally transcribed, including per utterance timestamps and speaker diarization (record of who is talking to whom for each utterance).

## Study 2.a.    Analysis of Officer Compliance

*Research Question:* How do officers, through their words, create a situation where a reasonable person would not feel free to leave?

NYPD patrol guidelines indicate that an officer "may not create a situation (either by words or actions) when a reasonable person would not feel free to walk away" during a Level 2

9

encounter; in contrast, in a Level 3 encounter, officers may detain the subject (i.e. "a reasonable person would not feel free to disregard the officer and walk away"). The goal of this study is to identify linguistic features that correspond to this distinction, confirm that they communicate appropriate levels of freedom or constraint on the part of the subject, and identify cases where legal experts judge that officers' language might create a situation where a reasonable person would not feel free to leave.

In coordination with ISLG, we will obtain legal expert judgments which either validate an officers' categorization of a stop or contradict it. We expect encounters labeled by officers as Level 3 but which legal experts judge to be Level 2 to be relatively rare. Therefore we distinguish three core types of encounters: basic Level 2 and Level 3 encounters, which are so categorized by officers and then validated by legal experts, and non compliant Level 2 encounters (which we will refer to as NC L2 encounters), which were categorized as Level 2 by officers but contradicted by legal experts who tagged them as Level 3 stops.

We can examine officer language and behavior across these different kinds of encounters by analyzing transcripts. Specifically, we will use machine learning techniques to build a model which aims to predict whether an encounter was Level 2 or Level 3 on the basis of the officers' words alone. This model will be trained on legal expert judgments.

Such a system inherently allows us to extract similarity between encounters to quantify the "severity" of an NC L2: whether it more closely resembles a Level 2 or a Level 3 encounter. NC L2 encounters that resemble Level 2 encounters linguistically (i.e., they are difficult to distinguish using officer words alone) may result from officer misinterpretation of NYPD policies which could be remedied with clarification. On the other hand, NC L2 encounters that look very similar to Level 3 encounters, may indicate that officers are more aware of the non compliance and are intentionally underreporting. Such a system would allow us to determine which of these scenarios is more prevalent, and to what degree. Moreover, we could identify whether a racial disparity exists within NC L2 encounters: whether NC L2 stops of White pedestrians more closely resemble Level 2 encounters than stops of Black pedestrians.

In our previous work on officer respect we identified linguistic strategies officers used which conveyed respect , developed algorithms to measure those linguistic strategies in transcripts, and used them as features for a computational model of respect. In this case we could follow that methodological paradigm, both by identifying which words were most predictive as described above, and by consulting with legal and police experts as well as the ISLG team as to key linguistic strategies for compliance. We would distill these findings down to a set of key features and train a model to quantify their usage in the three types of encounters, which could be evaluated in terms of racial disparity as well. We could find, for instance, that a higher rate of NC L2 encounters among Black pedestrians could be explained by the use of certain phrases which officers are independently more likely to use when interacting with Black people. Additionally, this approach would provide concrete strategies for policy and training. For instance, if a certain phrase or set of phrases are highly indicative of NC L2 encounters but

rarely occur in Level 2 and Level 3 encounters, a policy intervention that these be avoided could be implemented.

## Study 2.b.    De Bour Escalation

*Research Questions:* To what extent are officers' words predictive of improper escalation? To what extent does escalation, on the part of either the citizen or the officer, lead to an escalation in De Bour level?

A second area of interest concerns the escalation of Level 3 encounters (i.e. whether these encounters began at a lower level), the propriety of such escalation, and racial disparities in these trajectories. Our goal in these studies would be to identify key phrases or speech events that indicate escalation from legal expert judgments, build a predictive model to identify those features in a large amount of unseen data, and then examine the immediate context of these features (e.g. the officer observes contraband, a subject makes a complaint).  Our power to answer these questions, and the granularity of our analyses depends on the prevalence of Level 3 encounters that began as Level 1 or Level 2 encounters.

To test this question, in coordination with ISLG we would ensure that for each encounter in our sample, legal experts viewing the footage determine whether the encounter starts at Level 3, and, if not, at what timepoint in the recording the interaction crosses that threshold.

As in our other studies, our goal would be to scale expert judgments to unseen data with computational modelling. Just as we have applied a computational dialog approach to categorize elements of traffic stops (greetings, document requests, sanctions, e.g.), we would identify phases of Level 3 encounters, including the point at which they cross the boundary from lower level encounters to Level 3 ones. Such a model serves two proximate goals. First, it would allow us to compare the trajectory of different encounters across citizen race (how quickly encounters move from introductory phases to the Level 3 boundary); second, it could potentially let us flag other Level 3 encounters with similar trajectories in unseen data.

If we are able to obtain a large enough sample of Level 3 encounters escalated from Levels 1 or 2 (either through expert judgment or model assisted identification), we can examine what conversational events precede escalation. For example, an officer may develop reasonable suspicion in response to a citizen's answer to a question, or an officer may improperly detain a citizen who refuses to answer their questions in a common law right of inquiry. To address this question, we will create a coding scheme to categorize citizen language immediately preceding escalation and implement it algorithmically for analysis. While we acknowledge that some precursors to escalation are nonverbal (e.g. subject fleeing or an officer spotting contraband), this analysis could provide insight on officer citizen dynamics in escalated encounters.

11

# Concluding Remarks

The question of how officers communicate with the public is of critical legal, social, and policy importance: they literally give voice to the law. BWC recordings provide an unobtrusive means of observing how officers interact with citizens: how effectively law enforcement communicates citizens' rights, when encounters escalate, and when they might lead to citizen complaints against the police.

The analyses we propose here provide a means to address these questions at scale and with minimal cost by harnessing machine learning and expert judgment. There are huge advantages to taking a machine learning approach to examine issues of compliance and escalation in investigative encounters. For example, once the transcripts are produced and the algorithms are set, human raters are no longer needed to judge each and every encounter. Moreover, since BWC recordings are constantly being generated by officers, our models can assess the efficacy and impact of policy change, various trainings and other interventions. Perhaps most importantly, the approach involves simply analyzing the data that is already being collected on a routine basis. That is, data collection and analysis will not require officers to do much beyond what they normally do.