**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Mylan L. Denerstein
Direct: +1 212.351.3850
Fax: +1 212.351.6350
MDenerstein@gibsondunn.com

February 10, 2023

<u>VIA ECF</u>

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:   *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
      *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
      *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
      <u>One-Year Monitor Update</u>

Dear Judge Torres:

As the Court is aware, I was appointed as the Independent Monitor approximately one year ago. I want to use the occasion to apprise the Court of important developments that have occurred over the past year. First, I would be remiss if I did not take the opportunity to thank the Parties (Plaintiffs, the NYPD, and the Law Department), community groups, and the Monitor team for making my transition as seamless as possible under the extraordinary circumstances. I very much appreciate their efforts. Second, I would also be remiss if I did not acknowledge all of the hard work of the prior Monitor, Peter Zimroth, who is very much missed by all.

## I. Transparency

**All-Parties Meetings.** Almost every month in 2022, the Parties met to discuss the NYPD's progress towards compliance and to address any issues of concern. These meetings are an important opportunity to work collaboratively to achieve the goal shared by all Parties—the NYPD's compliance.

**Community Liaison.** As a result of the almost eight months of extensive work by the Parties, community groups, and the Monitor team, the Court appointed Germain Thompson on December 16, 2022, to serve in the newly created role of independent Community Liaison. *Floyd*, No. 08 Civ. 1034, ECF No. 898. Mr. Thompson was appointed by the Court and was recommended by all the Parties, the Monitor team, and community groups who participated in

**GIBSON DUNN**

February 10, 2023
Page 2

the selection process.  The Parties worked very collaboratively in developing the role, and Mr. Thompson's appointment will ensure that the Monitor's assessment of the NYPD's compliance is informed by the perspectives and experience of community members who are directly impacted by the NYPD's stop and frisk practices.  We look forward to working with Mr. Thompson this year.

**Website and Social Media.**  Over the past year, the Monitor team worked with an excellent digital design firm to complete a wholesale redesign of the Monitor's website.[1]  The updated website is more visually appealing and easier to navigate.  It also includes additional valuable information about the Monitor's work, including a detailed summary of individuals' rights during stop and frisk encounters with NYPD officers—all available in eleven languages spoken in the City.  The Monitor team also worked with the design firm to create social media accounts on Facebook,[2] Instagram,[3] Twitter,[4] and LinkedIn,[5] which are being used to share updates on the work of the Monitor, key insights from the Monitor's reports, and other relevant information.  Both the redesigned website and newly created social media accounts are already proving to be valuable tools to provide community members and interested parties with increased visibility into the Monitor's work.  We look forward to continuing to build our online presence so we can be accessible to all stakeholders and the community.

## II. Training

As noted in prior reviews, the NYPD, working with the Monitor and the Plaintiffs, developed new training on constitutional stops, frisks, and searches for both new and current officers, which the Court approved.  By the end of October 2020, the Department completed delivering the training to more than 34,300 members of the service, including police officers, detectives, sergeants, and lieutenants.  This is significant, and this training has had a beneficial impact on officers' stop and frisk activities.  In addition to initial training, the NYPD recognizes the importance of refresher training.  The NYPD is developing training on investigative encounters that can be used as refresher training or as remedial training for officers with deficient stop activity compliance.

In 2022, the NYPD began producing refresher training videos using scripts created with input from the Monitor and Plaintiffs and approved by the Court.  To date, the NYPD has produced and disseminated an introductory video on investigative encounters and a training video on *DeBour* Level 1 encounters.  All members of the service engaging in patrol activities

---

[1] NYPD Monitor, https://www.nypdmonitor.org/ (last accessed Feb. 8, 2023).
[2] NYPD Monitor, Facebook, https://www.facebook.com/nypdmonitor/ (last accessed Feb. 8, 2023).
[3] NYPD Monitor, Instagram, https://www.instagram.com/nypdmonitor/ (last accessed Feb. 8, 2023).
[4] NYPD Monitor, Twitter, https://twitter.com/nypdmonitor/ (last accessed Feb. 8, 2023).
[5] NYPD Monitor, LinkedIn, https://www.linkedin.com/company/nypdmonitor/ (last accessed Feb. 8, 2023).

will be required to view the refresher training videos and complete quizzes on investigative encounters. As of January 18, 2023, 19,876 officers have reviewed the introductory video, and 12,986 officers have viewed the Level 1 video. We look forward to more officers completing refresher training this year and reviewing the four refresher training videos in production.

### III. Accountability

**Remediation of Identified Situations Key to Success ("RISKS") Reviews.** As the Court is aware, the Department began conducting reviews of each command's stop and frisk compliance on a quarterly basis in December 2018. Much like CompStat meetings, Department leadership would focus commands on problematic stops and ask probing questions about whether there was appropriate follow-up and accountability. As we have noted in our prior reports, RISKS Reviews were an important strategy for the NYPD to address unconstitutional stops, frisks, and searches. Although the material being reviewed was often dated, RISKS Reviews helped to ensure that improper investigative encounters within the command were being reviewed at the highest levels.

The Monitor team reviewed the materials utilized at the RISKS Reviews and was present for almost all the meetings. Although not Court-ordered, I found these meetings to be useful and demonstrative of the Department's commitment to accountability. Unfortunately, in September 2022, without any notice to or input from the Monitor or the Plaintiffs, the Department eliminated RISKS Reviews without a replacement in place. The Department noted that RISKS Reviews required too much work and had diminishing returns. Even more concerning, RISKS Reviews have not been replaced with any similar process or program for ensuring accountability for stop and frisk non-compliance. As we have advised the NYPD, we are concerned about the lack of any meaningful replacement and look forward to meeting with the Department to remedy this.

**Early Intervention System.** The goal of the Department's Early Intervention Program is to identify members with potential issues and at-risk behavior and take appropriate action before they escalate. The program collects information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements; it is not a disciplinary program. The Department's Early Intervention Committee ("EIC") reviews the adverse findings and determines the appropriate intervention.

The NYPD held four EIC meetings in 2022.[6] The EIC reviewed 52 members of the service in those meetings. Another 295 members of the service triggered an early intervention

---

[6] The Court's EIS order requires the EIC to convene "no less than once every three months." *Floyd* EIS Order, ECF No. 767 at 6. The NYPD held the four EIC meetings in February, June, August, and November of 2022.

GIBSON DUNN

February 10, 2023
Page 4

threshold, and the Risk Management Bureau determined that those 295 members did not warrant any intervention or discussion at the EIC meetings. Unfortunately, at the meetings to date, there has been very limited discussion, if any, of the members of the service being reviewed. For example, the November 10, 2022, EIC meeting covered 37 members of the service in 30 minutes. The first 11 members were reviewed because of adverse credibility determinations. Of the first seven, there was no discussion of the officers or the judges' adverse credibility determinations; officers were merely referred to Adverse Credibility Training as an intervention. We look forward to working with the NYPD to make the Early Intervention Program more effective.

**Stop, Question, Frisk (SQF) Dashboard.** One task the NYPD has not yet begun to implement is the requirement to establish and then implement procedures for monitoring members' use of stop and frisk and trespass enforcement in compliance with the Fourteenth Amendment (Monitor's Compliance Matrix Task Nos. 36c and 36d). After working with John MacDonald of the Monitor team, the Risk Management Bureau's Risk Analytics Unit developed a visualization/dashboard that tracks and analyzes NYPD's stop, frisk, search, and arrest data, among others, by officer, command, bureau or borough, and citywide. The dashboard also cross-references Census data. The NYPD provided a demonstration of the dashboard for the Monitor and the Plaintiffs, and the Monitor team believes that it can be a useful tool for monitoring Fourteenth Amendment compliance.

The NYPD has informed the Monitor that it is still vetting the SQF dashboard. The Department noted that it "remains unclear at this point" whether "the tool may potentially be utilized *someday* to assist in measuring the Department's compliance with the Fourteenth Amendment" (emphasis added). As the Parties know, the NYPD does not have a mechanism to measure compliance with the Fourteenth Amendment and needs one.

IV.   **Auditing**

**Stop Report and Body Worn Camera ("BWC") Compliance and Underreporting.** The Monitor team has completed its review of 2021 stops and is now reviewing 2022 stops. The results of these reviews will be included in our next general compliance report. A preliminary summary of stop, frisk, and search compliance rates is provided below, as assessed

February 10, 2023
Page 5

by the Monitor team and QAD.⁷  As you will see, compliance rates decreased in all three areas in the fourth quarter of 2021, with frisk and search compliance rates declining significantly.⁸

|  | Stops | | Frisks | | Searches | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 3Q2021 | 4Q2021 | 3Q2021 | 4Q2021 | 3Q2021 | 4Q2021 |
| Monitor | 90.0% | 83.9% | 86.6% | 77.6% | 80.1% | 74.5% |
| QAD | 95.7% | 93.4% | 95.3% | 89.6% | 93.8% | 87.8% |

The Monitor team is currently reviewing stops from the first and second quarters of 2022.  We are waiting for the NYPD to provide us with additional data for stops made in the third and fourth quarters of 2022 that have already been audited by the NYPD.  In addition, the Monitor team reviewed a sample of stops made by members of the Neighborhood Safety Teams ("NST") between March 1 and October 31, 2022; our findings from those encounters will be included in a forthcoming report discussed below.

The Department's compliance rates for documenting stops in 2021 improved over earlier years, although underreporting concerns remain.  In the Monitor's Sixteenth Report, we reported the results of the Monitor team's audits of BWC videos categorized as investigative encounters, finding that for the four quarters between 2Q2020 and 1Q2021, inclusive, NYPD officers documented 89 percent of identified stops (100 stop reports for 112 stops).  For the first quarter of 2022, the Monitor team audits of investigative encounter BWC videos found that 23 of 31 (74%) stops were documented by stop reports—a fifteen percent decline from 2020–2021, which is concerning.

**Neighborhood Safety Teams.**  The Monitor team has conducted real-time audits of the NYPD's NST since they began in March 2022.  The Monitor team reviewed BWC videos and stop reports of NST members to assess the lawfulness of their encounters with civilians,

---

⁷ The Monitor team provided the NYPD with its assessment of 3Q2021 stops on November 22, 2022, and its assessment of 4Q2021 stops on January 3, 2022.  When the NYPD provides the Monitor with its views on these assessments, the compliance rates could change.

⁸ It should be noted that for the Monitor team's reviews of stops from the third and fourth quarter of 2021, if a stop was not based on reasonable suspicion, any subsequent frisk and/or search was also deemed deficient unless there was independent reasonable suspicion for the frisk or an independent legal basis for the search.  This is a change from the Monitor's prior approach to assessing frisks and searches and may account for a portion of the decline in compliance of frisks and searches.

**GIBSON DUNN**

February 10, 2023
Page 6

including some encounters that began as vehicle stops.⁹  We anticipate preparing a report of our findings this year.

**Trespass Affidavit Program.**  The NYPD formally ended the Trespass Affidavit Program on September 30, 2020.  As agreed by the Parties, the Monitor team has assessed whether the program ended in practice and prepared a report on TAP dissolution to submit to the Court, which the Parties are reviewing.

**Racial Profiling Complaint Investigations.**  In 2021, the City Council passed Local Law 47 (2021),¹⁰ which amended the City Charter to clarify that investigating allegations of "racial profiling and bias-based policing" falls under the Civilian Complaint Review Board's ("CCRB") "abuse of authority" jurisdiction.  Prior to this amendment, all profiling and biased policing complaints received by the CCRB or the NYPD were investigated by the NYPD.  In 2022, the CCRB established the Racial Profiling and Bias Based Policing Unit, a unit focused on investigating civilian complaints of profiling/biased policing by uniformed (not civilian) members of the NYPD based on ten protected categories: race, national origin/ethnicity, color, religion, age, immigration or citizenship status, gender/gender identity, sexual orientation, disability, and housing status.  The Monitor team will be reviewing how the NYPD handles profiling and bias policing complaints that are substantiated by the CCRB.

V.    **Reporting**

**Sixteenth Report.**  In May 2022, we filed the Sixteenth Report of the Independent Monitor, which describes the progress made over the eight years of the monitorship, as well as the reforms and the requirements that have not yet been accomplished.  The Monitor's compliance assessment showed that the NYPD has put in place many of the policies and procedures required by the Court and has trained its officers in those policies and procedures.  This is good news, and now the Department should focus on on-the-street implementation and accountability, including compliance with the Fourteenth Amendment.  As noted in the Sixteenth Report, to achieve substantial compliance with the Court's orders, the Department will need to improve accountability—including supervision, discipline, documentation, performance evaluation, and early intervention, among other measures—to ensure constitutional policing.  These are not nominal tasks; they are important and critical to ensuring constitutional policing.

---

⁹ If a car is stopped and other police actions are taken that go beyond enforcement of the vehicle and traffic laws, the encounter may fall within the purview of *Terry* and *Floyd*.  *See People v. Hinshaw*, 35 N.Y.3d 427, 434-35 (2020); *People v. Garcia*, 20 N.Y.3d 317, 323 (2012) (requiring the "evenhanded application of the *De Bour/Hollman* framework to street encounters and traffic stops alike").
¹⁰ Local Law No. 47 (2021).

GIBSON DUNN

February 10, 2023
Page 7

**Seventeenth Report.** On October 17, 2022, we filed the Seventeenth Report of the Independent Monitor, which presented the results of the Monitor's evaluation of the deployment of BWCs by NYPD Housing Bureau officers in and around New York City Housing Authority ("NYCHA") developments. The report found that Housing Bureau officers' use of BWCs was associated with statistically significant improvements in the civility of officers' interactions with civilians as well as large increases in the documentation of stops. Further, the Seventeenth Report found that after BWCs were deployed, stops were more likely to involve violent and other crimes, rather than drug and disorder offenses. Finally, the Seventeenth Report found that Housing Bureau officers who wore BWCs were less likely to search, arrest, or issue a disorder summons to the person stopped, but searches that did occur were less likely to be deemed lawful by Monitor team audits. The latter result appeared to be driven by increased documentation of stops rather than an increase in unlawful searches, but it nonetheless demonstrates that BWCs provide the Department with an important tool to monitor stop and frisk compliance and intervene when necessary.

**ISLG and Stanford Studies.** Researchers from the City University of New York's Institute for State and Local Governance ("ISLG") and Stanford University are conducting studies focused on Fourth and Fourteenth Amendment compliance in police-civilian encounters in the City. The studies cover legal compliance in police-citizen encounters, racial disparities in compliance and escalation of encounters, and appropriate documentation of encounters.

In addition to examining legal compliance with the Fourth Amendment and NYPD policies, the ISLG researchers will analyze whether there are racial disparities in noncompliant encounters, e.g., whether stops, frisks, or searches that are determined to be noncompliant by former New York State judges are more likely to occur in encounters with Black and Hispanic civilians than White civilians. The Stanford researchers will examine: (i) Level 3 stops with requests for consent to search and stops when consent is given; (ii) escalation in Level 3 stops; and (iii) encounters that officers characterize as low-level investigative encounters but that the legal experts determine are Level 3 stops. The Stanford researchers will utilize machine learning methodologies in their analyses and will examine whether there are racial disparities in encounters, e.g., whether NYPD officers request consent to search Black and Hispanic civilians differently than White civilians, and whether rates of consent to such searches differ by race.

**Discipline Report.** James Yates, a member of the Monitor team, has drafted his report describing the NYPD's discipline system. This will be completed this year.

**Racial Disparities Report.** In addition, John MacDonald, a member of the Monitor team, will be conducting another analysis of racial disparities in stops, frisk, and searches

February 10, 2023
Page 8

during the coming year.  He will be drafting a report on his findings and their implications for Fourteenth Amendment compliance, which we anticipate will be completed in late 2023.

### VI.  Conclusion

Over the past year, I have been encouraged by the training and policies that the Department has implemented.  I am concerned about the elimination of RISKS Reviews and the apparent decline in compliance rates in stop and frisk encounters.  As the Parties have acknowledged, the training and policy changes have led to important positive change, and the Department should be commended for its hard work in those areas.  Now, the Department must focus on accountability and ensure that its training and policy changes are translating to consistent constitutional policing on the ground.  The Department has come a long way since the monitorship began, but accountability is the difficult "last mile problem" that the Department must address to live up to its obligation to "protect[] the rights and liberties of all New Yorkers, while still providing much needed police protection."[11]

We also very much look forward to working with Mr. Thompson and believe that his input will be extremely helpful to the Monitor team as well as to the Parties.  We want to continue to amplify the work of the Monitor, the Community Liaison, and the Parties.  We also want to work with all the Parties to make sure we are reviewing data in real time.  This requires the cooperation of all the Parties.

We recognize the very important and challenging job the NYPD has.  We appreciate all the hard work that officers do every day to help people.  We look forward to working together with the NYPD, the Plaintiffs, the Community Liaison, and community members to improve constitutional policing in our beloved City.

Respectfully,

*/s/ Mylan L. Denerstein*

Mylan L. Denerstein
Independent Monitor

cc: All Parties of Record

---

[11] *Floyd*, *Ligon* Remedial Order, *Floyd*, ECF No. 372 at 2.