# Eighteenth Report of the Independent Monitor

# Monitor's Audit of the Trespass Affidavit Program

## Mylan Denerstein

## March 3, 2023

*Floyd, et al. v. City of New York*
*Ligon, et al. v. City of New York, et al.*
*Davis, et al. v. City of New York, et al.*

# MONITOR TEAM

Mylan Denerstein
*Monitor*

Richard Jerome
*Deputy Monitor*

Anthony A. Braga

Jennifer Eberhardt

Demosthenes Long

John MacDonald

James McCabe

Jane Perlov

James Yates

**Table of Contents**

I.     **Executive Summary** .................................................................................................. 1

II.    **Background** ........................................................................................................... 3

III.   **Termination of TAP** ............................................................................................ 6

   A.   **Communications with Police Officers** ......................................................... 6

   B.   **Communications with District Attorneys' Offices** ...................................... 7

   C.   **Communications with Building Tenants, Landlords, Owners, and Property Managers** ........................................................................................................ 7

IV.   **Monitor Team Audit** ......................................................................................... 9

   A.   **Methodology** ............................................................................................... 9

   B.   **Results of Monitor Team Audit** ................................................................ 10

      1.   **BWC Videos Identified as Interior Patrol-TAP** ................................ 10

      2.   **Arrests and Summons** ....................................................................... 11

      3.   **Stops In and Around Former TAP Buildings** ................................... 14

      4.   **Interior Patrol BWC Videos** ............................................................ 17

   C.   **Crime Prevention Officer Focus Group** ................................................... 22

V.    **NYPD Guidance to Its Members** ..................................................................... 23

VI.   **Conclusion** ....................................................................................................... 25

**APPENDIX 1: TAP Owner's Affidavit Form** .................................................... 26

**APPENDIX 2: TAP Signs** ................................................................................... 27

**APPENDIX 3A: Administrative Bulletin—Guidelines for Entrance into Privately Owned Multiple Dwelling Residential Buildings** ................................................. 28

**APPENDIX 3B: NYPD Interior Patrol Guidelines Chart** .................................. 29

## I.      Executive Summary

The Trespass Affidavit Program (TAP) was a New York City Police Department (NYPD) program in which police officers conducted interior patrols in certain privately-owned apartment buildings, which the NYPD discontinued in 2020.  Owners of residential buildings would submit a form affidavit providing the NYPD with the authority to conduct interior patrols of their buildings, much like private security.  This program permitted officers to come into the private building at any and all hours of the day without a specific request or complaint, to patrol, stop, arrest, or eject people in the building who were not tenants or invited guests.  In March 2012, the class plaintiffs in *Ligon v. City of New York* sued, alleging that NYPD officers stopped residents and visitors of TAP-enrolled buildings without reasonable suspicion and that officers arrested individuals for criminal trespass in and around those buildings without probable cause.  At that time, a survey "revealed that there were over eight thousand buildings enrolled in TAP, including over three thousand in the Bronx."[1]

In 2017, the *Ligon* plaintiffs and the City entered a Stipulation of Settlement, which was so-ordered by the Court.  *Ligon*, ECF No. 296.  The number of buildings enrolled in TAP declined year to year from 2017 until the program ended in 2020.  In 2017, 3,591 buildings were enrolled in TAP, and by 2020, that number had decreased to 124.  On September 30, 2020, the NYPD ended the program.

After the NYPD officially ended TAP, it was important to ensure that officers stopped random self-initiated interior patrols in private residential buildings without a proper basis for entering those buildings.  For this reason, the Monitor team conducted this audit to determine if the NYPD actually ceased self-initiated interior patrols and trespass enforcement in former TAP

[1] *Ligon*, ECF No. 96 at 82–83 n.273.

buildings without a legitimate predicate to enter the building,[2] and whether stops and arrests in and around former TAP buildings met constitutional standards.

In order to assess whether the program had ceased, the Monitor team reviewed four sources of NYPD enforcement activities at buildings that had been previously enrolled in the TAP Program in the years 2019 and 2020: (a) body-worn camera (BWC) videos categorized in Axon's Evidence.com metadata as "Interior Patrol-TAP"; (b) stop reports prepared that listed an address previously enrolled in TAP; (c) a sample of arrest reports that listed an address previously enrolled in TAP; and (d) all Interior Patrol BWC videos that were recorded within 50 feet of a former TAP address.

The analysis revealed that most precincts did not appear to continue to engage in random or routine interior patrols of residential buildings that were formerly enrolled in TAP. The analysis also revealed that certain precincts appeared to engage in TAP-like activities and engaged in self-initiated activity in former TAP buildings after the program officially ended, such as vertical patrols. In particular, the review of arrests and summonses at former TAP buildings revealed interior patrols and arrests and summonses occurred after the program ceased in two precincts in Brooklyn in 2021 where it appeared that the officers did not have a criminal predicate for entering the buildings.

In addition, the Monitor team's review of the stops in and around former TAP buildings revealed serious compliance concerns with stop and frisk encounters. Officers had reasonable suspicion for only 61.8% of the 76 stop reports reviewed. This 61.8% compliance rate for stops

---

[2] Police officers cannot enter private residential apartment buildings without a legitimate basis for doing so, just as they cannot enter a private home without a legitimate reason, unless invited in by the owner, manager, or resident of the building. Such legitimate bases would include investigating recent criminality, wellness checks, and 311 or 911 calls for service.

at former TAP buildings compares unfavorably with the 85.8% compliance rate the Monitor found for NYPD stops in the first quarter of 2020 through the fourth quarter 2020, as reported in the Sixteenth Report of the Independent Monitor.[3]  Although there was only a small number of stops in and around former TAP buildings in this one year period, the compliance rate is very low and concerning.  Accordingly, the NYPD must take steps to improve compliance, including accountability for non-compliance.  A good starting point would be refresher training for officers in precincts with poor compliance.

Recently, the NYPD's Professional Standards Bureau[4] issued Department-wide guidelines on when officers may conduct interior patrols at private residential buildings.  This should provide guidance to officers.  Officers can and must continue to respond to calls to investigate criminality or to conduct wellness checks in private buildings and for other legally justifiable reasons.  However, officers should no longer conduct random interior patrols of private buildings without some predicate of timely criminality or other legally justifiable reason to enter the private residential building.

Given these findings, the Department will need to take additional steps to improve compliance and ensure that officers do not continue to engage in self-initiated interior patrols in private buildings without a legally justifiable reason for entry.  The Monitor will conduct additional assessments to evaluate the NYPD's practices.

## II.     Background

TAP, sometimes called "Clean Halls," was a NYPD patrol program, in existence since at least 1991, in which police officers conducted interior patrols in certain privately-owned apartment

---

[3] *Floyd*, ECF No. 885, https://www.nypdmonitor.org/wp-content/uploads/2022/09/16-Sixteenth-Report-.pdf.
[4] The Professional Standards Bureau used to be known as the Risk Management Bureau.

buildings pursuant to an owner's affidavit.  The officers would often start at the top of a residential building and walk down its stairs and hallways.  For a building to have been enrolled in the program, the owner must have certified that he or she had concerns regarding criminal activity in the building, such as trespassing or drug activity, and have submitted an "Owner's Affidavit," a form providing the NYPD with the authority to enter and patrol his or her residential buildings.  A copy of an Owner's Affidavit form is in Appendix 1.  The Owner's Affidavit allowed officers to enter the private building at any and all hours of the day, and to patrol, stop, question, and arrest or eject persons in the building who were not tenants, often for criminal trespass.

On March 28, 2012, the class plaintiffs in *Ligon* sued the NYPD alleging that NYPD officers engaged in unconstitutional stop and frisk practices in and around apartment buildings enrolled in TAP.  *Ligon*, ECF No. 1.  The plaintiffs alleged that officers stopped residents and visitors of TAP-enrolled buildings without reasonable suspicion, often just for entering in or exiting from the building, and that officers arrested individuals for criminal trespass without probable cause.  In February 2013, the Court granted the plaintiffs' motion for a preliminary injunction and ordered the NYPD to "immediately cease performing trespass stops outside TAP buildings in the Bronx without reasonable suspicion of trespass."  *Ligon*, ECF No. 96 at 142.  In August 2013, the Court issued a Remedial Order requiring reforms to NYPD policies, revisions to training programs, and supervision practices that would be necessary to cease the unjustified stops.  *Floyd v. City of New York*, ECF No. 372.[5]

---

[5] The August 2013 Remedial Order covered both the *Floyd* stop and frisk case and the *Ligon* case.  The Court detailed the reforms needed for supervisory review of stops at TAP buildings, revisions to the NYPD's training programs, and the changes needed in the Department's policies governing when officers may make a stop at a TAP building on suspicion of trespass.

Four years later, in January 2017, the *Ligon* plaintiffs and the City entered a Stipulation of Settlement, which was so-ordered by the Court on July 19, 2017. *Ligon*, ECF No. 296. The Court ordered that the settlement be part of the federal court-appointed Monitorship.

The Court's Remedial Order and the *Ligon* settlement required the NYPD to revise policies, training, and supervision for officers conducting interior patrols in TAP-enrolled buildings. The NYPD was also required to issue new NYPD Administrative Guide provisions governing the procedures and criteria for entry into and continued enrollment in the TAP program. The Department's revised policy regarding interior patrols of buildings enrolled in TAP, Patrol Guide Section 212-59, was approved by the Court in June 2016 and became effective in April 2017. The Department's revised policy regarding TAP administration, Administrative Guide Section 303-27, also became effective in April 2017.

Starting in 2017, after the implementation of the new administrative guidelines, the number of buildings enrolled in TAP declined each year. As of the first quarter of 2017, 3,591 buildings were enrolled in TAP; by the first quarter of 2018, only 1,174 buildings remained in TAP. In 2019, there were only 513 buildings enrolled in the program, and that number decreased even further to 124 in 2020.

In 2020, the NYPD decided to discontinue the TAP program, and informed the plaintiffs, building owners, landlords, and managing agents that the program was ending. The Department formally ended TAP on September 30, 2020. As a result, the NYPD patrol guide and administrative guide provisions governing TAP—Patrol Guide 212-59 and Administrative Guide 303-27—were officially revoked in October 2020.

Consequently, the Monitor undertook an audit to report on whether the program has ended in practice. This is that report.

### III.     Termination of TAP

As a result of the termination of TAP, officers are no longer permitted to conduct random interior patrols of private buildings as if such patrols were authorized by an owner's affidavit under TAP, without some predicate of criminality or other justifiable reason to enter the building.

#### A.     Communications with Police Officers

The NYPD and the City took several steps to notify officers and commands that TAP ended.  On September 14, 2020, a FINEST message[6] was transmitted to all members of the NYPD informing them that TAP was ending on September 30, 2020.   This message directed Crime Prevention Officers to cease enrollment of any new buildings in TAP.[7]  The FINEST message also directed Crime Prevention Officers to contact owners of buildings enrolled in TAP and to inform them that TAP would be ending effective September 30, 2020, and to direct building owners to remove any remaining TAP signage.  Many buildings had signs posted on their exteriors stating that they were enrolled in TAP.  Appendix 2 includes examples of TAP signs.  The message further directed Commanding Officers to post this message and read it at 20 consecutive roll calls.[8]   In addition, on September 15, 2020, the Chief of Department sent a memorandum to the Chief of Patrol entitled "Dissolution of the Trespass Affidavit Program ('TAP')."  In the memorandum, the Chief of Department advised again that TAP would be ending on September 30, 2020, and that Crime Prevention Officers were not to enroll any new buildings in TAP.  The memorandum also stated that Patrol Guide 212-59, entitled "Interior Patrols of Multiple Dwelling Buildings Enrolled

---

[6] A FINEST message is one way the Department communicates with its officers.

[7] Because TAP enrollment and Owner's Affidavits were required to be renewed every six months, the Crime Prevention Officers were also directed not to renew any Owner's Affidavits or TAP enrollments.

[8] Roll calls are briefings held by supervisors for officers at the start of their shift to disseminate relevant information.

in the Trespass Affidavit Program," and Administrative Guide 303-27, entitled "Trespass Affidavit Program," would be revoked.  On September 30, 2020, another FINEST message was transmitted to officers reiterating the directives set forth in the earlier September 14, 2020 FINEST message, and informing officers and supervisors that that Patrol Guide 212-59 and Administrative Guide 303-27 were being revoked.

On September 30, 2020, October 3, 2020, and December 2, 2020, the NYPD conducted roll call training at the commands instructing Department members on the termination of TAP, including being instructed to cease enforcement under TAP and to disregard any still-posted signage referring to TAP.

On October 7, 2020, the NYPD issued Interim Order 85.  This Interim Order officially revoked Patrol Guide Section 212-59 and Administrative Guide Procedure 303-27.  In addition, the Interim Order revoked Department forms PD 651-051 entitled "Trespass Crimes-Owner's Affidavit" and PD 351-144 entitled "Trespass Crimes-Fact Sheet and Supporting Deposition."

### B.      Communications with District Attorneys' Offices

On September 17, 2020, the NYPD sent a letter to the New York County, Bronx County, Queens County, Kings County, and Richmond County District Attorneys' offices informing them that TAP would end effective September 30, 2020.

### C.      Communications with Building Tenants, Landlords, Owners, and Property Managers

To communicate the end of TAP to tenants, landlords, owners, and/or property managers, the City took several steps.  First, on September 17, 2020, the NYPD sent a letter to landlords, owners, and/or property managers of former TAP buildings, informing them that TAP would be ending.  That letter further requested that the landlords, owners, and/or property managers remove any remaining TAP signage.

Second, on December 8, 2020, the NYPD sent another letter to certain landlords, owners, and/or property managers of former TAP buildings, again advising them that TAP was terminated and requesting that they remove any TAP signage from their buildings.[9]   On March 11, 2022, the New York City Law Department mailed a similar letter to landlords, owners, and/or property managers of former TAP buildings which included a Notice to Tenants informing those residents that TAP had been dissolved.  The Law Department requested that this Notice be provided to tenants and posted at each building.

Third, on June 6, 2022, at the request of the Monitor, the City transmitted a letter to the Real Estate Board of New York.  The letter included the Notice to Tenants described above.  The letter advised the Board that TAP has ended and requested the Board's assistance with having information regarding the termination of TAP communicated to its members and with the removal of any remaining TAP and/or Operation Clean Halls signage.  At the request of the *Ligon* plaintiffs, the City sent the same letter to the New York City Rent Stabilization Association.

Despite repeated requests and advisories, it appears that many owners have failed to remove the TAP signage.[10]  Examples of TAP signs are included in Appendix 2.

---

[9] The landlords, owners, and/or property managers to whom this letter was sent were those whose buildings were: (1) enrolled in TAP from 2017 to 2019, (2) enrolled in TAP in the first three quarters of 2020, and/or (3) discussed in the Monitor's Eleventh Report.  The NYPD sent a third letter on January 24, 2022, to landlords, owners, and/or property managers of former TAP buildings.  This letter advised them that TAP had ended; requested that they remove any remaining TAP signage; and requested that they inform their residents that TAP had ended.

[10] Much like the City does not have the authority to enter buildings without any predicate, the City does not have the legal authority to remove any remaining signs.  However, the NYPD and the City can continue to encourage building owners and managers to remove signs that might indicate TAP is ongoing.

## IV.    Monitor Team Audit[11]

As part of the dissolution of the TAP program, the Monitor analyzed NYPD enforcement operations to determine if the NYPD actually ceased self-initiated interior patrols at former TAP buildings, without a legitimate predicate to enter the building.

### A.    Methodology

To assess the prevalence and frequency of NYPD police activity in former TAP buildings, the Monitor team used data and information provided by the NYPD.  The monitor team relied on the lists maintained by the NYPD indicating which buildings were enrolled in the program in the last two years of the program's existence—2019 and 2020.  In 2019, there were 513 buildings enrolled in the program; that number decreased to 124 buildings in 2020.  Because several residential buildings participated in the program during both years, there were 527 distinct buildings enrolled in the two-year period.  The locations of the 527 buildings were used to determine whether or not the NYPD was continuing to engage in random self-initiated interior patrols and other police activities as it had previously conducted during TAP.

To evaluate the scope and breadth of police activities at former TAP buildings, four sources of information were reviewed.  The Monitor team reviewed BWC videos categorized in Axon's Evidence.com metadata as "Interior Patrol-TAP," which would identify interior patrols conducted at former TAP buildings.  The team also evaluated stop reports and arrest and summons reports that listed a location that was one of the former TAP locations during the relevant time period.  In addition, the geolocation feature of Axon BWCs was used to identify BWC videos categorized as "Interior Patrol" that were activated within 50 feet of a former TAP address.  These four sources

---

[11] The Monitor uses the term "assessment" and "audit" interchangeably.  The Monitor team used representative samples of interior patrols and arrests and summonses, and other social science methodologies similar to the audits used by the NYPD's Quality Assurance Division (QAD).

of information were used to determine if the NYPD was conducting improper self-initiated enforcement operations after the TAP program ceased in buildings formerly in the program.

For the period from October 1, 2020, to September 30, 2021, the NYPD provided all arrest reports (N=430), summonses (N=166), and stop reports (N=79) prepared at any of those 527 locations. The Monitor team's assessment of these encounters included a review of the reports as well as associated BWC videos. Any documents and associated BWC videos were reviewed to determine if the encounter was self-initiated and appeared to be "TAP-related."[12]

The team also conducted a search of the Evidence.com metadata to identify all BWC videos labeled as "Interior Patrol" for the one-year period, from October 1, 2020, to September 30, 2021 (N=109,010). These events were mapped using the latitude and longitude coordinates from the metadata. With the interior patrols geocoded, the addresses of all 527 TAP locations were plotted on the same map. Any interior patrol videos recorded within a 50-foot buffer of a TAP building were identified and reviewed.

## B.  Results of Monitor Team Audit

### 1.  BWC Videos Identified as Interior Patrol-TAP

In January 2021, the Monitor team searched the NYPD's BWC metadata, Evidence.com, for encounters categorized as "Interior Patrol-TAP" that were recorded in the fourth quarter of 2020 (i.e., between October 1, 2020, and December 31, 2020). This search produced more than 300 videos in more than 60 commands across the entire city.[13] The Monitor team provided the

---

[12] The terms "TAP-related" and "TAP-like" are used to reference interior patrols that appeared to be self-initiated and not based on any criminal complaint or other legitimate predicate for entry into the building; after the termination of TAP, commands no longer had "owner's affidavits" authorizing the NYPD to patrol the buildings.

[13] Videos not categorized as Interior Patrols were not assessed. In April 2021, the NYPD removed the category "Interior Patrol-TAP" from the BWC app, evidence.com, thereby preventing additional videos from being categorized as such.

NYPD with the list of BWC videos to review.  Analysis showed that most (235 out of 305) of the videos categorized as Interior Patrol-TAP were inaccurately categorized (e.g., they were interior patrols at New York City Housing Authority (NYCHA) buildings or were not interior patrols at all).[14]  However, a number of the videos were identified as interior patrols at former TAP buildings.  Indeed, in Staten Island, officers in the 120 Precinct continued to engage in self-initiated interior patrols at former TAP buildings after TAP had ended.[15]  The NYPD met with the command in March 2021 to reinstruct them and direct them to cease interior patrols at former TAP buildings without a predicate for entering those buildings.  After reinstruction, officers no longer conducted random interior patrols at these buildings.

### 2.    Arrests and Summons

From the arrest reports (N=430) and summonses (N=166) provided by the NYPD, a random sample of 210 arrests and 119 summonses were selected for review.  After reviewing the BWC videos of 329 arrests and persons issued summonses, the Monitor team identified 70 arrests and summonses that might be "TAP-related."  The 70 arrests and summonses appeared to be the result of a self-initiated interior patrol instead of a call for service or other information about

---

[14] Officers may have inadvertently categorized interior patrols as "Interior-Patrol-TAP" when they were not actually TAP buildings, because on the phone, officers might not have been able to see the "-TAP" portion of the category.

[15]  In 2023, the NYPD provided a new explanation for the 120 command's interior patrols at former TAP buildings.  It stated that officers in that command (who also patrol NYCHA buildings) incorrectly believed that the former TAP buildings were NYCHA buildings, but mistakenly categorized them as "Interior Patrol-TAP."  This explanation years later is not persuasive.  During the fourth quarter of 2020, 120 Precinct officers categorized their interior patrols of NYCHA buildings as "Interior Patrol-NYCHA."  If the officers in the 120 Precinct were able to categorize the interior patrols at NYCHA buildings as "Interior Patrol-NYCHA" it is not credible that the officers thought the former TAP buildings were NYCHA buildings but inadvertently categorized them as "Interior Patrol-TAP."  More likely, they categorized the buildings as "Interior Patrol-TAP" because they thought they were TAP buildings and that they had the authority to continue TAP patrols.

criminal activity.  Arrests related to interior patrols could be identified by several factors.  The absence of a complainant directing the officers to a problem, or the identification of a 911 or 311 call, and the location in the building where the officers were patrolling (up to the roof and out without public interaction or going directly to an apartment), would signal to the Monitor team that an interior patrol likely happened and that the officers were not mobilized to make the arrest or issue the summons by some other means.  These arrests and summonses were conducted in former TAP buildings in the 44, 46, 71, 73, 79, 81, and 120 Precincts in the Bronx, Brooklyn, and Staten Island.  The Monitor team sent the list of arrests and summonses to the NYPD for review and requested additional information about the encounters, including the arrest reports and any related Interior Computer Aided Dispatch (ICAD) printouts.[16]

After reviewing the information provided by the NYPD, the Monitor team determined that 26 of the 70 arrests or summonses were not related to "TAP-like" activities.  In some instances, the encounters corresponded with ICAD printouts identifying calls to 911 referencing specific criminal activity that prompted an appropriate police response, while others involved police responding to illegal gambling or other criminal activity outside the building.  The NYPD provided some additional information about the remaining 44 arrests and summonses (3 from the 44 Precinct, 9 from the 71 Precinct, 1 from the 73 Precinct, and 31 from the 81 Precinct), but the data was insufficient to justify the "TAP-like" activities.  For example, some of these arrests and summonses did not have any ICAD printouts, so there was no documentation about why the officers were patrolling private buildings.  Other ICAD printouts had generic information and did not include any information provided to the officers prior to their entry into the buildings.  These

---

[16] ICAD printouts provide information about any 911 calls for service, the communications between the dispatcher and the officers, and the results of the call.

ICADs did not list any calls or complaints about criminality at the building and appeared to be generated by the officer after entry into the private building. Some of the information from the commands about why the officers entered the buildings, provided by the NYPD listed only general requests from owners of the building asking for police patrols. This is essentially TAP without being called TAP. In other instances, the same rote explanation was provided for 29 of the arrests and summonses identified in the 81 Precinct, while another explanation simply stated, "Officer addressed quality of life issue in his Sector."

The information provided by the NYPD, including post-hoc explanations from the NYPD, did not provide a legal basis for the officers to enter the former TAP buildings. The additional information reinforced the Monitor's assessment that TAP had not been terminated in all commands in October 2020 after the program ceased. In addition to the interior patrols in the 120 Precinct in the fourth quarter of 2020 (identified in 2021 by the Monitor team), interior patrols in 2021 by officers in the 71 and 81 Precinct reflected activities that appear be a continuation of TAP.

Police officers cannot enter a private residential building without a proper basis. Even if officers know that a private building has been the site of prior criminal activity (e.g., a "crime-prone location"), that is not a sufficient basis for officers to go into the private building to do an interior patrol. In addition, the complaint or information about criminality must be timely—there must be a sufficient temporal connection to the criminality to justify patrol of the building. For example, information that there were trespassers in a private building yesterday would not provide a basis for an interior patrol of that building days later.[17]

---

[17] In a letter to the Monitor, the NYPD stated its position that the BWC videos of the 71 and 81 Precinct arrests and summonses "did not demonstrate a revival of the Trespass Affidavit Program (TAP)." August 18, 2022, Letter from the NYPD to the Monitor. The letter states that "an interior patrol in a private building is not—by itself—synonymous with TAP. . . . Absent an affidavit making officers agents of the landlord—the hallmark of TAP—such patrols do not implicate

The concern identified by the Monitor team regarding the continuation of TAP in practice does not appear to be a citywide problem—it is focused in primarily two precincts: the 71 and 81 precincts.  The NYPD has addressed the concerns raised about TAP activities in the 120 Precinct.  This conclusion is also supported from our review of BWC interior patrols at former TAP buildings, noted *infra*.  The parties had discussed that should the Monitor find that TAP enforcement-related activities were still occurring, the City would work with the Monitor to cure those deficiencies within a reasonable period of time.  Action by the NYPD to address the concerns in these two precincts would resolve this issue.  Unfortunately, the NYPD has yet to address the Monitor's concerns, so the Monitor cannot conclude that TAP has ceased.[18]

### 3.    Stops In and Around Former TAP Buildings

The NYPD provided the Monitor team with all of the stop reports for stops at former TAP buildings during the one-year study period.  There were only 76 stop reports during that year, a relatively small number.[19]  The Monitor team reviewed the stop reports for legal sufficiency of the stop and any frisk or search, if conducted, as well as to assess whether the stops suggested an indication of TAP being continued.  The BWC videos associated with each stop report were also reviewed.  Tables 1–5 below list the commands in which the stops occurred, whether the stops,

---

TAP."  *Id*.  The Department is sadly mistaken.  If officers are acting as if they have such authority, even without an affidavit, and make random or routine self-initiated interior patrols in a private building without an appropriate predicate for the patrols, that indicates the precinct is continuing "TAP-like" activities.

[18] The NYPD continues to assert that each of the arrests and summonses was based on information about criminality provided to the NYPD prior to entry to the building, but that is belied by the record.

[19] The NYPD provided 79 stop reports in response to the Monitor's request for all stop reports at former TAP buildings during the one-year period.  Of the 79, one stop started in a subway station, and two stops were made in commercial locations.

frisks, and searches, respectively, were proper, and whether the stop occurred in the building or outside the building.

**Table 1: Officer's Command for Stop**

| Command | # of Stops | Borough |
|---|---|---|
| 13 | 1 | Manhattan |
| 23 | 2 | Manhattan |
| 24 | 3 | Manhattan |
| 25 | 3 | Manhattan |
| 32 | 4 | Manhattan |
| 34 | 2 | Manhattan |
| 43 | 5 | Bronx |
| 44 | 1 | Bronx |
| 46 | 7 | Bronx |
| 47 | 3 | Bronx |
| 48 | 1 | Bronx |
| 62 | 7 | Brooklyn |
| 70 | 1 | Brooklyn |
| 71 | 7 | Brooklyn |
| 73 | 6 | Brooklyn |
| 79 | 2 | Brooklyn |
| 81 | 5 | Brooklyn |
| 83 | 2 | Brooklyn |
| 101 | 2 | Queens |
| 110 | 2 | Queens |
| 120 | 10 | Staten Island |
| **Total** | **76** | |

The stops reported at former TAP locations appear to be widely distributed, appearing in 21 precinct commands of the 38 precincts that had a TAP building enrolled in 2019 or 2020 (55.3%) with 17 precincts recording no stops.

**Table 2: Reasonable Suspicion for Stops**

| Reasonable Suspicion for Stop | # | % |
|---|---|---|
| No | 29 | 38.2% |
| Yes | 47 | 61.8% |
| **Total** | **76** | |

**Table 3: Reasonable Suspicion for Frisks**

| Reasonable Suspicion for Frisk | # | % |
|---|---|---|
| No | 8 | 23.4% |
| Yes | 26 | 76.5% |
| **Total** | **34** | |

**Table 4: Legally Sufficient Searches**

| Search Legally Sufficient | # | % |
|---|---|---|
| No | 5 | 18.5% |
| Yes | 22 | 81.5% |
| **Total** | **27** | |

**Table 5: Searches by Location**

| Location | # | % |
|---|---|---|
| Inside | 29 | 38.2% |
| Outside | 47 | 61.8% |
| **Total** | **76** | |

Although the stops reviewed did not provide evidence of a continuation of TAP, the 76 stops at former TAP buildings reviewed by the Monitor team revealed serious compliance concerns.  Of the 76 stops, only 61.8% articulated reasonable suspicion.  Even with the small set of stop reports, this result is disappointing.  Moreover, the stops inside the buildings had a lower compliance rate than the stops outside the buildings, as shown in Table 6 below.  Of the 29 stops inside former TAP buildings, officers had reasonable suspicion for only 14 of the stops (48.3%).  Of the 47 stops outside the former TAP buildings, officers had reasonable suspicion for 33 of the stops (70.2%).

**Table 6: Stop Location and Lawfulness**

| Stop Location | Reasonable Suspicion | # | % |
|---|---|---|---|
| Inside (N=29) | No | 15 | 51.7% |
| | Yes | 14 | 48.3% |
| Outside (N=47) | No | 14 | 29.8% |
| | Yes | 33 | 70.2% |
| **Total** | | **76** | |

The 61.8% compliance rate for stops at former TAP buildings does not compare favorably with the 85.8% compliance rate the Monitor found for stops in the first quarter of 2020 through the fourth quarter 2020 reported in the Sixteenth Report of the Independent Monitor. This low level of compliance requires further scrutiny by the Department.

### 4.   Interior Patrol BWC Videos

To assess the prevalence and frequency of NYPD police activity in former TAP buildings after the termination of TAP, the Monitor team examined BWC videos of interior patrols at the 527 buildings that were enrolled in the program in the calendar years 2019 and 2020. Any interior patrol videos recorded within a 50-foot buffer of a former TAP building were identified and reviewed.

Table 7 below illustrates the distribution of several types of interior patrol videos recorded from October 2020 through September 2021. A total of 108,934 videos of interior patrols were geocoded and compared with the addresses from the 527 locations enrolled in TAP in 2019 and 2020.[20] There were 448 of those 108,934 videos for which the BWC was activated within 50 feet of a former TAP address. Review of those 448 BWC videos activated within 50 feet of a former TAP address revealed 178 that appeared to be interior patrols that might reflect a continuation of

---

[20] Seventy-six BWC videos did not have a date/time stamp and were excluded from this analysis, which is why this figure differs from the 109,010 figure in Section IV.A above.

TAP.[21]  In many instances there were multiple officers on the same interior patrol, so there were multiple BWC videos of a single interior patrol.  These duplicate recordings were removed, resulting in 132 unique interior patrols.  Table 7 illustrates the number of unique interior patrols captured on video during the one-year examination period that did not appear to have a predicate for entry into the building.

**Table 7: Interior Patrol BWC Video Overview, 10/1/2020 to 9/30/2021**

|  | Total Recorded | 50 FT from TAP | Videos TAP-Related | Unique TAP Int. Patrol |
|---|---|---|---|---|
| Oct | 7,494 | 54 | 22 | 16 |
| Nov | 3,556 | 20 | 2 | 2 |
| Dec | 8,547 | 154 | 116 | 79 |
| Jan | 8,489 | 35 | 14 | 14 |
| Feb | 11,612 | 20 | 5 | 5 |
| Mar | 14,564 | 14 | 1 | 1 |
| Apr | 10,252 | 19 | 0 | 0 |
| May | 8,435 | 18 | 0 | 0 |
| Jun | 8,068 | 25 | 0 | 0 |
| Jul | 10,071 | 28 | 7 | 6 |
| Aug | 9,162 | 36 | 8 | 7 |
| Sep | 8,684 | 25 | 3 | 2 |
| **Total** | **108,934** | **448** | **178** | **132** |

To understand the scope of these interior patrols, the number of interior patrols at former TAP buildings after the termination of the program was compared to the number of interior patrols that were conducted at these buildings during the existence of TAP in 2019 and the first half of

---

[21] Each BWC video determined to be TAP-related was reviewed by at least two Monitor team members who previously were NYPD officers and later executives to help to determine whether officers conducting the interior patrols had a predicate for entry to the buildings.  The BWC videos were also identified to the NYPD so that it could provide additional information or documentation of the basis for the interior patrols.   Several interior patrols were eliminated because the documentation (ICADs, 311 calls or Activity Logs) supported the entry.  There were other interior patrols where the officers were justified in going to the building but, after arriving and finding that the reason for the call no longer existed at the building, conducted an interior patrol in any case. This is not appropriate.

2020.  The Monitor team reviewed interior patrol videos recorded in TAP buildings and captured the metadata for that 18-month period before the NYPD announced the elimination of the TAP program.  In 2019, there were 1,740 interior patrol-TAP BWC videos recorded at TAP buildings, and 1,399 were recorded in the first six months of 2020.

For the 18-month period before the elimination of TAP, the NYPD recorded approximately 175 interior patrol-TAP videos each month.  During the one-year period of observation after TAP was terminated, that figure dropped to approximately 15 per month, or a 91% reduction.  Also, the majority of interior patrol-TAP videos recorded in the one-year period of observation were those recorded in the 120 Precinct in the fourth quarter of 2020.  After the NYPD reinstructed officers from the 120 Precinct, the incidence of recorded BWC videos of interior patrols at former TAP locations declined precipitously, from 116 to 16.  However, there were two videos of interior patrols conducted as late as September 20, 2021, that did not appear to have a basis for entry into the building.

Table 8 below is a breakdown of the unique "TAP-like" interior patrols recorded by command and month.  There are 12 commands city-wide that recorded what appeared to be an interior patrol without a predicate for entry during the one-year period, with the vast majority occurring in former TAP buildings in the 120 Precinct—106 or 80.3% of the 132 interior patrols recorded.

**Table 8: Unique TAP-Related Interior Patrols by Month and Command**

| Command | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Total |
|---------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 23      |     | 1   |     |     |     |     |     |     |     | 1   | 1   |     | 3     |
| 25      | 1   |     |     |     |     |     |     |     |     |     |     |     | 1     |
| 30      |     |     | 6   |     |     |     |     |     |     |     |     | 1   | 7     |
| 32      |     |     |     |     |     |     |     |     |     |     | 1   |     | 1     |
| 34      |     |     | 1   |     |     |     |     |     |     |     |     |     | 1     |
| 67      | 1   |     |     |     |     |     |     |     |     |     |     |     | 1     |
| 70      |     |     |     |     |     |     |     |     |     | 3   | 3   |     | 6     |
| 77      |     |     | 1   |     |     |     |     |     |     |     |     |     | 1     |
| 81      |     |     |     |     |     |     |     |     |     | 1   |     | 1   | 2     |
| 101     |     |     |     |     |     |     |     |     |     | 1   |     |     | 1     |
| 120     | 14  | 1   | 69  | 14  | 5   | 1   |     |     |     |     | 2   |     | 106   |
| SRG5    |     |     | 2   |     |     |     |     |     |     |     |     |     | 2     |
| **Total** | 16 | 2 | 79 | 14 | 5 | 1 | 0 | 0 | 0 | 6 | 7 | 2 | 132 |

Table 9 below shows that of the 132 interior patrols, only 13 involved an encounter with members of the public, while in the remaining 119 interior patrols, officers did not encounter any person in the building and had no apparent predicate for patrolling the interior of the private buildings.

**Table 9: Number of People Contacted**

| # of People Contacted | # Int. Patrols |
|-----------------------|----------------|
| 0                     | 119            |
| 1                     | 10             |
| 2                     | 3              |
| **Total**             | **132**        |

The level of encounters[22] were as follows:

### Table 10: Level at First Encounter

| Level at First Encounter | # |
|---|---|
| 0 | 3 |
| 1 | 8 |
| 4 | 1 |
| Inconclusive | 1 |
| **Total** | **13** |

### Table 11: Location of Encounter

| Location of Encounter | # |
|---|---|
| Elevator | 1 |
| Hallway | 3 |
| Lobby | 4 |
| Stairway | 4 |
| Street | 1 |
| **Total** | **13** |

### Table 12: Distribution by Gender

| Gender of Primary Person Encountered | # |
|---|---|
| Female | 2 |
| Male | 11 |
| **Total** | **13** |

### Table 13: Distribution by Race

| Race of Primary Person Encountered | # |
|---|---|
| Black | 10 |
| Hispanic | 3 |
| White | 0 |
| Asian | 0 |
| **Total** | **13** |

---

[22] For definitions of the levels of encounters, as set out by the New York Court of Appeals, *see* https://www.nypdmonitor.org/know-your-rights/.

In each of 13 interior patrols in which a civilian was encountered it was not clear that the officers had an appropriate legal basis to enter the private building and begin the interior patrol. However, the officers' interactions with individuals in the former TAP buildings appeared to be legally appropriate in each of the 13 interior patrols reviewed.  There were no stops or frisks observed and no searches or requests seeking consent to search in any of the encounters.  No contraband was recovered, and no enforcement action was taken in any encounter.  Further, in each of the encounters, the officers provided an explanation for their actions.

Data collected and analyzed concerning interior patrols conducted at former TAP buildings during the one-year period suggest that the NYPD largely discontinued the practice of self-initiated interior patrols at former TAP buildings.  Twelve commands accounted for 132 unique interior patrols during this one-year period that did not appear to have a legal predicate for entry to the residential buildings.  In those instances, the majority, 74% (97/132) occurred within the first three months following the termination of TAP and most of these interior patrols were concentrated in one precinct in Staten Island.  After the NYPD realized these practices continued in that precinct, the Department took steps to address these unauthorized interior patrols by reinstructing the officers in the command.  The following nine-month period saw a significant decrease in self-initiated interior patrols in former TAP buildings.  These interior patrols were distributed among ten commands located in Staten Island, Brooklyn, Manhattan, and Queens.  While the number of unauthorized interior patrols at former TAP building decreased, in a few instances, the practice appeared to persist in a small number of commands.

### C.    Crime Prevention Officer Focus Group

When TAP was operating, for a building to be enrolled in TAP, the owner must have certified concerns regarding criminal activity or community complaints in the building, such as

trespassing or drug activity within the prior year.  It was the responsibility of Crime Prevention Officers (CPOs) in each precinct to determine whether a building should be enrolled in TAP and then to assess every six months whether the buildings still met the criteria for renewing enrollment.

The Monitor team conducted a focus group with CPOs in December 2022 to discuss their prior participation in the program, how the NYPD communicated the termination of the program, and how they are now dealing with the buildings and building owners and managers.  The CPOs from the commands with the greatest number of TAP buildings enrolled at the discontinuation of the program (one command from each Patrol Borough) participated in the focus group.  The CPOs stated that they communicated with building managers and owners when the TAP program was discontinued.  Several also mentioned that they requested building managers to remove the TAP signs.  The CPOs stated that they told building managers to contact them, the command Neighborhood Coordination Officer, or the local precinct if there were crime issues in the building that needed to be addressed.  The CPOs stated that the Department conducted training for officers in the command regarding the end of TAP and that the officers were aware of when they could enter a private building and when not.

The general consensus of the group was that building managers and owners are aware that the TAP program has ended.  Similarly, the consensus of the group was that officers are aware that the TAP program has ended.  This is good news.

## V.    NYPD Guidance to Its Members

In June 2021, the Department provided its training sergeants with an interior patrol guidelines chart with guidance on the differences between entering NYCHA buildings and private buildings, for dissemination to their commands as part of an in-service refresher.  The guidance correctly notes that an officer must have "a recent communication from someone with apparent

authority (Ex. Building owner, superintendent, resident) asking for [the officer's] assistance in addressing a recent problem and giving [the officer] permission to enter to do so. **It is important to preserve such requests in your Activity Log and any/or communications of this request in your work cell to support your lawful presence in the building**" (emphasis in original). The lack of such records in the 71 and 81 Precincts reinforces concerns about the identified encounters.

In November 2022, the NYPD provided a revised chart and Administrative Bulletin to the Monitor. The NYPD guidance also sets out certain specific bases for when an officer may enter a private building and conduct an interior patrol. The guidance correctly cited recent calls for service (311 or 911) and in-person complaints, victim/witness follow-up, and canvassing/searching for a missing person. The November guidance also stated that investigating a crime or violation would also be a proper basis for an interior patrol. However, as noted earlier, complaints or information regarding crimes or violations must be timely, especially if the officer is entering the building without permission.

More concerning, the November guidance stated that an officer may enter and conduct an interior patrol to address "community outreach or awareness programs." This guidance purported to give officers broad authority to enter buildings without any invitation or communications from someone with authority and could lead to improper entries. For example, officers should not be able to enter any building at any time just because they wish to do outreach and give residents their business cards. Nor should they be able to enter any private building, without invitation, for an awareness program (e.g., to tell tenants that the precinct command is starting a new summer crime prevention program or that the Department is looking to hire new recruits). For these reasons, the Monitor advised the Department to revise its guidance. A revised interior patrol guidelines chart

and administrative bulletin, which addressed the Monitor's concerns, was issued in January 2023. The revised chart and administrative bulletin are included in Appendix 3.

## VI.   Conclusion

The Monitor team's assessment of NYPD documents, BWC videos, and communications from 2020 and 2021 indicate that, for the most part, TAP was terminated.   For most commands, officers did not continue to engage in random or routine interior patrols of former TAP buildings. However, the Monitor team's review of arrests and summonses at former TAP buildings identified improper interior patrols at former TAP buildings in the 71 and 81 Precincts in 2021 that did not appear to have a predicate for entry to buildings.   In addition, the review of BWC videos of interior patrols identified a small number of self-initiated interior patrols in a few commands without a legal basis.   Separately, the level of compliance of the stops at former TAP buildings reviewed by the Monitor team was well below an acceptable level, which is very troubling.   Given these findings, the Department will need to take additional steps to ensure that police activities replicating TAP do not continue in practice.   Also, the Monitor team will review more recent police activities in some commands to make sure the NYPD has ceased conducting random interior patrols without a legitimate basis for entry, and to see if compliance has improved.

**APPENDIX 1: TAP Owner's Affidavit Form**

 **TRESPASS CRIMES –
OWNER'S AFFIDAVIT**
PD 651-051 (05-12)

1. **Whereas** the undersigned is the owner, managing agent or other person in authority relating to the supervision of the premises located at:

_____
(Address of Location)

2. **Whereas** the building described above is a dwelling in which only tenants, invited guests, and authorized personnel are licensed or privileged to enter or remain; and

3. **Whereas** the undersigned is fearful that in recent months, persons who are neither tenants, nor invited guests, nor authorized personnel have occupied the above-described premises for the purchase and use of illegal drugs or to commit other illegal activity; now

4. **THEREFORE IT IS AGREED THAT** the undersigned, having proper permission and authority to do so, hereby binds the owner from the date indicated below for six months, granting full permission and authority to the New York City Police Department (the Department), its employees and agents to enter upon the above described premises at any and all hours of the day for the purpose of arresting those persons found thereon who are not tenants, their family members or invited guests.

5. **IT IS AGREED THAT** members of the Department performing this function act as agents of the undersigned, and are hereby entitled to revoke a person's license and privilege to be in a building if the person, when approached by an officer, refuses to establish a legitimate reason for being in the building.  That person should be ordered to leave the building and may be arrested for trespass if he or she refuses to leave the building after being so ordered.

6. **IT IS AGREED THAT** the policy of license and privilege set forth herein has been adequately communicated to all tenants and management personnel.

7. **IT IS AGREED THAT** the undersigned shall place conspicuous signs alerting all persons to building policy that access is limited to tenants, invited guests, and authorized personnel, and that compliance with police inquiries is a condition of building access and use.

FALSE STATEMENTS MADE HEREIN ARE PUNISHABLE AS A CLASS "A" MISDEMEANOR
PURSUANT TO PENAL LAW SECTION 210.45.

_____
(Print Name of Owner/Managing Agent)

_____
(Signature of Owner/Managing Agent)                                    (Date)

26

**APPENDIX 2: TAP Signs**





### APPENDIX 3A: Administrative Bulletin—Guidelines for Entrance into Privately Owned Multiple Dwelling Residential Buildings

During the course of your official duties, it may be necessary to enter a privately owned apartment building. The attached "*Interior Patrol Guidelines*" chart is a training aid that can help you to identify the circumstances under which you may enter a privately owned apartment building and clarify the differences between interior patrols in privately owned apartment buildings and interior patrols in New York City Housing Authority buildings.

<u>**Privately Owned Apartment Buildings**</u>

You may enter the common area of a privately owned apartment building if a proper basis for entry is established, as described in the attached chart. Once inside the common areas, you are permitted to observe activities occurring in common areas (i.e. hallways, lobbies, stairwells). However, you cannot take enforcement action or make an arrest unless you have sufficient facts to establish probable cause of a crime or a violation. Additionally, you must adhere to the laws of investigative encounters when approaching or stopping individuals for investigatory purposes.

Prior to entering any building, activate your Body-Worn Camera. Continue recording uninterrupted until you depart the location and conclude any police action. If feasible, record any "No Trespassing" signs posted in the building.

You may see signs in some privately owned apartment buildings referencing the "Trespass Affidavit Program" (TAP). This program was terminated on September 15, 2020 (See FINEST MESSAGE #38208187 dated 9/14/2020). Therefore, private building owners may no longer give officers permission to enter their building at any time for the purpose of conducting random routine patrols. Instead, officers must have a specific and recent basis to enter each time they do so as described in the attached "*Interior Patrol Guidelines"* chart.

*Please see:*

*Attached chart* "*Interior Patrol Guidelines"*

*PG 212.11*

*PG 212.60*

*PG 212.123*

*PG 212.08*                                                                       * Issued 1/2023

**APPENDIX 3B: NYPD Interior Patrol Guidelines Chart**

| INTERIOR PATROL GUIDELINES | | |
| --- | --- | --- |
| **INTERIOR PATROLS** | **NYCHA BUILDINGS** | **PRIVATE BUILDING** |
| May I conduct <u>random</u> interior patrols of a building? | **YES.** NYPD is authorized to patrol NYCHA buildings on a regular basis, including restricted areas of the building. (PG 212.60) | **NO.** |
| May I enter a building and conduct an interior patrol in response to specific conditions reported in the building? | **YES.** See above. | **Yes, but only if** you have a recent communication from someone with apparent authority (Ex. Building owner, superintendent, resident) requesting your assistance in addressing a recent problem (Ex. Complaints of recent prostitution, drug sale/use, homeless). **It is important to preserve such requests in your Activity Log. Also, preserve any communications received on your Department phone to support your lawful presence in the building.** |
| May I enter and conduct an interior patrol to address:<br>• Recent call for service (3-1-1 or 9-1-1)<br>• In-person complaint or victim/witness follow-up or canvass/searching for missing person<br>• Investigation of a recent crime or violation | **YES.** | **YES.**<br>It is important to preserve such information in your Activity Log. Also, preserve any communications received on your Department phone to support your lawful presence in the building. |
| Must I activate my BWC pursuant to PG 212.123 prior to entering a building? | **YES.** | **YES.** |
| Must I complete appropriate documentation (including Field Reports, Consent to Search/Level 2 requests, Stop Reports, Trespass Crime Fact Sheets) when required? | **YES.**<br>(See PG 212.60 and PG 212.11) | **YES.**<br>(*except for Field Reports and Trespass Crime Fact Sheets, which are NYCHA specific. Also, see PG 212.11) |
| May I obtain an owner's affidavit in order to allow me to *randomly* patrol a building and use it as a supporting deposition? | **N/A.** | **NO.** See 9/14/2020 FINEST message discontinuing "TAP" (Trespass Affidavit Program). To support a Trespass arrest, you must have a complaining witness who can sign a supporting deposition. |

29