UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/28/2023
```

DAVID FLOYD, *et al.*,

Plaintiffs,

-against-

CITY OF NEW YORK,

08 Civ. 1034 (AT)

Defendant.

KELTON DAVIS, *et al.*,

Plaintiffs,

-against-

10 Civ. 699 (AT)

CITY OF NEW YORK,

Defendant.

JAENEAN LIGON, *et al.*,

Plaintiffs,

-against-

12 Civ. 2274 (AT)

CITY OF NEW YORK,

**ORDER**

Defendant.

ANALISA TORRES, District Judge:

On August 12, 2013, the Court found Defendant, the City of New York (the "City"),

liable for violating the Fourth and Fourteenth Amendments to the U.S. Constitution due to the

New York City Police Department's ("NYPD") stop-and-frisk practices (the "Liability

Opinion"). *Floyd v. City of New York*, 959 F. Supp. 2d 540, 658–67 (S.D.N.Y. 2013). That

same day, the Court granted and defined a permanent injunction based on the violations

identified in the Liability Opinion (the "Remedial Order"). *Floyd v. City of New York*, 959 F.

Supp. 2d 668 (S.D.N.Y. 2013).[1]  Before the Court is a motion by the *Floyd* and *Davis*[2] Plaintiffs

("Plaintiffs") requesting that the Court "modify[] the Remedial Order" to increase "community

engagement and involvement" in the remedial process.  Pls. Mem. at 2–3, 15–16, 23, *Floyd*, ECF

No. 841; *e.g.*, *Floyd*, ECF No. 840; *see also*, *e.g.*, *Floyd*, ECF Nos. 372, 466.[3]  For the reasons

stated below, the motion is DENIED.[4]

## BACKGROUND

I.      <u>*Ligon*, *Floyd*, and *Davis* Cases</u>

        This litigation addresses the NYPD's stop, frisk, search, and trespass enforcement

policies and practices, also known as "stop-and-frisk."  *Floyd*, 959 F. Supp. 2d at 556.

        In *Ligon v. City of New York*, after a seven-day evidentiary hearing, on January 8, 2013,

the Court issued a preliminary injunction against the City, finding that the plaintiffs would likely

succeed in proving that the City, by its deliberate indifference, had a policy of conducting

unconstitutional stops in or near Bronx apartment buildings enrolled in the Trespass Affidavit

Program, which permitted the NYPD to patrol private buildings with their owners' consent.  925

F. Supp. 2d 478, 486 (S.D.N.Y. 2013), *amending and superseding Ligon v. City of New York*,

No. 12 Civ. 2274, 2013 WL 71800 (S.D.N.Y. Jan. 8, 2013).  In *Floyd v. City of New York*, after

years of litigation culminating in a nine-week trial, on August 12, 2013, the Court issued the

Liability Opinion.  *Floyd*, 959 F. Supp. 2d at 540.

        In the Remedial Order, issued the same day as the Liability Opinion, the Court appointed

---

[1] The Remedial Order also covers the constitutional violations at issue in *Ligon v. City of New York*, No. 12 Civ. 2274 (S.D.N.Y.).  *See Floyd*, 959 F. Supp. 2d 668, 671 (S.D.N.Y. 2013).
[2] On February 4, 2015, the parties in *Davis v. City of New York* adopted by stipulation the remedies set forth in the *Floyd* Remedial Order, including the appointment of the monitor.  *Davis*, No. 10 Civ. 699, ECF No. 330 (S.D.N.Y. Feb. 4, 2015).
[3] Except as otherwise noted, ECF citations refer to the docket in *Floyd v. City of New York*, No. 08 Civ. 1034.
[4] Plaintiffs' request for oral argument, ECF No. 864 at 20, is DENIED.

an independent monitor (the "Monitor")[5] to oversee the institution of certain reforms to remedy the NYPD's unconstitutional practices.  *Floyd*, 959 F. Supp. 2d at 676–78.[6]  The Court also directed the parties to participate in "a community-based joint remedial process" (the "JRP") under the guidance of a court-appointed facilitator (the "Facilitator") to develop additional reforms.  *Floyd*, 959 F. Supp. 2d at 563; *see also Floyd*, 959 F. Supp. 2d at 686–88.  The Facilitator filed his Final Report and Recommendations on May 15, 2018.  ECF No. 597.  The Monitor has submitted eighteen reports detailing the progress of the monitorship.  *See* ECF No. 905.

In *Davis v. City of New York*, the plaintiffs alleged unlawful, race-based enforcement of trespass laws in New York City Housing Authority developments.  The parties settled the case on February 4, 2015, agreeing, among other things, that they would participate in the *Floyd* and *Ligon* remedial process, and that orders issued in that process would be incorporated into the settlement.  *Davis*, No. 10 Civ. 699 (S.D.N.Y. Feb. 4, 2015), ECF No. 330 at 9–11.

II.    Plaintiffs' Motion to Modify the Remedial Order

Plaintiffs argue that the end of the JRP also marked the end of "meaningful engagement with, and role of, impacted communities in the *Floyd-Davis* [m]onitorship."  Pls. Mem. at 1; *see also id.* at 9–11.  Plaintiffs contend that "[c]ommunity stakeholders have had very little contact" with the Monitor, "have not had an audience with the Court," and that the Monitor has "completely omitted community members' perspectives from . . . assessments of the constitutionality of the NYPD's stop-and-frisk . . . practices."  *Id.* at 1–2.  Plaintiffs argue that,

---

[5] Peter L. Zimroth served as the monitor from August 12, 2013, until his death on November 8, 2021.  ECF No. 877.  On January 13, 2022, the Court appointed a new monitor, Mylan L. Denerstein.  *Id.*

[6] On July 19, 2017, the parties in *Ligon* settled the outstanding claims, agreeing to significant reforms to the NYPD's trespass enforcement practices, documentation, and training, and agreeing to continued participation in the remedial process.  *See Ligon*, No. 12 Civ. 2274 (S.D.N.Y. July 19, 2017), ECF No. 296.

without community input, "the Monitor and [the] Court cannot accurately determine whether [stop-and-frisk] encounters are conducted constitutionally and in a non-discriminatory manner, thus making it unclear whether the Court-ordered stop-and-frisk . . . reforms have in fact been successful." *Id.* at 2.  Plaintiffs request that "the Court exercise its broad equitable powers . . . [and] modify[] the Remedial Order" by: (1) having the Monitor include (a) "annual community surveys" and (b) "semiannual field audits of stop-and-frisk . . . activity" in its assessment of the City's compliance with the Remedial Order; (2) "hold[ing] public status conferences at least twice a year"; and (3) "appoint[ing] a Community Collaborative Board" that would (a) advise "the Monitor and the Court on the NYPD's implementation of the various Court-ordered reforms" and (b) "have direct input into, among other things, developing the contours of all discipline reforms submitted for Court approval."[7]  Pls. Mem. at 3, 15–16.  The City and the Monitor oppose Plaintiffs' motion.  ECF Nos. 854–55; *see also* ECF Nos. 892, 897.

On August 25, 2022, the Monitor submitted a proposal for a community liaison position and a corresponding job description.  *E.g.*, ECF No. 888.  The creation of the community liaison position is intended "to engage the community by offering the public, particularly members most impacted by the [NYPD's] . . . stop[-and-frisk practices], more opportunities to be heard and to provide input into the Court-ordered remedial reforms."  *Id.*  On September 9, 2022, the Court ordered supplemental briefing on whether the Monitor's community liaison proposal addressed Plaintiffs' concerns regarding community engagement and involvement in the remedial process.  ECF No. 889; *see also* ECF No. 893.  On September 30, 2022, Plaintiffs filed their supplemental brief.  ECF No. 891.  Plaintiffs state that the proposal "does not fully resolve" their concerns

---

[7] Plaintiffs' proposed order states that "[a]ll . . . disciplinary reform proposals shall be developed in consultation with the [Community Collaborative Board] and using a notice and public comment process coordinated by the Monitor." ECF No. 843 ¶ 4.

given the "uncertainty of the outcome of [the] process" of finalizing the community liaison's plan. *Id.* at 1–2. Plaintiffs request that the Court "hold Plaintiffs' motion in abeyance for a period of sixty days following the finalization of the [c]ommunity [l]iaison's [p]lan," or, alternatively, were the Court to deny Plaintiffs' request and motion, that "any such denial be without prejudice to move for similar relief at some future date." *Id.* at 1. The City opposes Plaintiffs' request. ECF No. 892. On November 15, 2022, the Monitor filed a response to the parties' submissions. ECF No. 897. The Monitor similarly requests that the Court deny Plaintiffs' motion. *Id.*

While the parties provided further briefing on Plaintiffs' motion, they also worked "extensive[ly]" with community groups and the Monitor team to identify suitable individuals for the community liaison position. *See* ECF No. 902 at 1–2; ECF No. 897 at 2–3. First, the Monitor established a selection committee consisting of representatives from Plaintiffs, the City, and the Monitor team (collectively, the "Selection Committee"). ECF No. 897 at 2. Then, the Selection Committee jointly reviewed applications, identified candidates to interview, interviewed the candidates and, "by consensus, recommended candidates to the Monitor and the Court." *Id.* The parties also assembled a community advisory group, which interviewed the final candidates and "provide[d] their input directly to the Monitor." *Id.* On December 16, 2022, after interviewing the finalists, the Court appointed Germain Thompson as the independent community liaison (the "Community Liaison"). ECF No. 898.[8]

---

[8] In its December 16, 2022 order, the Court stated that it would address Plaintiffs' requests and motion, ECF Nos. 840, 891, in a separate order. ECF No. 898 at 2 n.3. This is that decision.

5

**DISCUSSION**

I.     Legal Standard

"The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *Brown v. Plata*, 563 U.S. 493, 542 (2011) (citation and quotation marks omitted). The district court derives this power in part from Federal Rule of Civil Procedure 54(b), which provides that injunctive orders "may be revised at any time." Fed. R. Civ. P. 54(b). More broadly, the district court has inherent authority to revise or modify such orders. *See United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982). In exercising its discretion to modify an injunctive order, a court should not impose modifications that "thwart[] the purpose behind the injunction." *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 257 (2d Cir. 1984).

II.     Analysis

Plaintiffs argue that the Court should modify the Remedial Order because "[t]he Monitor cannot accurately assess whether NYPD officers are adequately implementing the Court-ordered stop-and-frisk . . . [reforms] in the field without hearing from the people who are being policed." Pls. Mem. at 25. The Court shall address Plaintiffs' requests in turn.

First, Plaintiffs request that the Court order that "the Monitor retain an outside entity to work in consultation with community stakeholders" and "conduct annual community surveys to assess 'public perception of police-civilian street encounters' and 'the public's experience with Court-ordered reforms.'" *Id.* at 26 (citing ECF No. 597 at 250). Plaintiffs contend that these community surveys "can empower individuals directly impacted by [the] NYPD's stop-and-frisk . . . practices to share critical information about how they actually experience encounters with police." *Id.* at 27. The Monitor's compliance matrix "has recently been revised to incorporate

the input of the Community Liaison and ensure that community members' experiences and input are adequately considered in measuring [the] NYPD's compliance with the law."  ECF No. 897 at 3; *see also* ECF No. 897-1.  Plaintiffs agreed with the Monitor's revisions and did not recommend any further amendments.  ECF No. 897 at 3.  The Court concludes that because these revisions incorporate community perspectives in the Monitor's compliance assessment, this request is moot.

Plaintiffs also ask the Court to direct the Monitor to "conduct regular, biannual field audits of NYPD officers' stop-and-frisk . . . activity using integrity testing methods to assess Fourth and Fourteenth Amendment compliance."  Pls. Mem. at 29.  Plaintiffs argue that these audits "would address some of the inherent limitations in the Monitor's [s]top [r]eport data analyses," such as officer underreporting.  *Id.* at 30.  Plaintiffs propose that the Monitor use "testers" to "assess whether and to what extent officers respond differently on the basis of race and/or conduct stops, arrests, frisks, and/or searches without adequate legal bases," stating that "[s]imilar methods have been used to study discrimination in employment, housing, lending, and public accommodations."  *Id.* at 29–30.  The City contends that this methodology is unreliable and that its use as a compliance metric is "untested."  ECF No. 855 at 22.  The Monitor shares some of the City's concerns, noting that, *inter alia*, "such field audits are cumbersome and difficult to implement, especially considering that almost 400 field audits would be required every six months to get a representative sample."  ECF No. 897 at 4.  Plaintiffs have not shown that their proposal is well-suited to address the concerns they identify.  The proposal is neither tailored to the context of this monitorship, nor is it supported by real-world examples suggesting that it would be safe, feasible, or reliable.  Therefore, the Court finds that this proposal is unlikely to further the purpose of the Remedial Order.

Accordingly, Plaintiffs' request that the Court modify the Remedial Order to include annual community surveys and semiannual stop-and-frisk field audits in the Monitor's assessment of the City's compliance with the Remedial Order is DENIED.

Second, Plaintiffs request that the Court hold public status conferences at least twice a year. Plaintiffs argue that "[r]egular public status conferences would facilitate community stakeholders' engagement with, and understanding of, the workings and current status of the *Floyd-Davis* [m]onitorship because they would be able to hear" from the Monitor, the parties, and the Court. Pls. Mem. at 25. The Court does not believe that public status conferences are necessary at this time. Should the Court determine that one or more status conferences would be helpful, it shall schedule them in due course.

Accordingly, Plaintiffs' request that the Court modify the Remedial Order to require the Court to hold public status conferences at least twice a year is DENIED.

Third, Plaintiffs request the appointment of a Community Collaborative Board ("CCB") for "additional and sustained community involvement" in the monitorship. ECF No. 864 at 5. Plaintiffs argue that the CCB "would expand the number of stakeholders with . . . important information and engage the perspectives of community members most affected by stop-and-frisk . . . enforcement." *Id.* at 11. The Court agrees that, "[i]f the reforms to stop[-]and[-]frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful." *Floyd*, 959 F. Supp. 2d at 686. The Community Liaison, whose "purpose . . . is to engage the community by offering the public, particularly members most impacted by the [NYPD's] stop[-]and[-]frisk . . . practices, more opportunities to be heard and to provide input into the reform process," will work to achieve that goal. ECF No. 888-1 at 1. The Court disagrees with Plaintiffs' characterization of this monitorship as an "outlier among federal court-mandated

8

police monitorships nationally." ECF No. 864 at 8. This monitorship differs from the ones Plaintiffs cite, Pls. Mem. at 18 & n.16, because it does not involve a consent decree—the Court ordered reforms after it found the City liable for constitutional violations. In addition, through the work of the parties, the Monitor, and the Community Liaison, the Court is seeking to reach out to and include community members through multiple avenues. The same cannot be said of all federal monitorships. The Court agrees with Plaintiffs that "[e]nsuring the protection of . . . rights requires engaging with the people who are most affected by underlying wrongs and who are invested in changing their interactions with institutions like the police in tangible, meaningful ways." ECF No. 864 at 1. The Court concludes, however, that the Community Liaison is best situated to obtain input from the communities most affected by the NYPD's stop-and-frisk practices and address the "public perception" of the reform process. *Id.* at 4. The Court recognizes that the work of the monitorship is ongoing and complex, but it is committed—as are the parties and the Monitor—to achieving the goal of constitutional policing. *See* ECF No. 902 at 1.

Accordingly, Plaintiffs' request that the Court modify the Remedial Order to appoint a CCB is DENIED.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to modify the Remedial Order, ECF Nos. 840, 891, is DENIED. Plaintiffs' request that the Court hold Plaintiffs' motion in abeyance, ECF No. 891, is DENIED as moot.

SO ORDERED.

Dated: March 28, 2023
         New York, New York

_____
ANALISA TORRES
United States District Judge

9