# Nineteenth Report of the Independent Monitor

# Monitor's Audit of the Neighborhood Safety Teams

# Mylan Denerstein

# June 5, 2023



*Floyd, et al. v. City of New York*

*Ligon, et al. v. City of New York, et al.*

*Davis, et al. v. City of New York, et al.*

# MONITOR TEAM

Mylan Denerstein
*Monitor*


Richard Jerome
*Deputy Monitor*

Anthony Braga

Jennifer Eberhardt

Demosthenes Long

John MacDonald

James McCabe

Jane Perlov

James Yates


[nypdmonitor.org](nypdmonitor.org)

# Table of Contents

I.      Executive Summary ........................................................................................................ 1

II.     Background .................................................................................................................... 3

III.    Audit Methodology ........................................................................................................ 4

   A.    Review of Body-Worn Camera (BWC) Videos ................................................... 5
   B.    Review of Stop Reports Prepared by NST Officers ............................................. 6
   C.    Quarterly Review of Stop Reports for NST Commands in QAD Audits ........................... 7

IV.     Results of Compliance Assessment ............................................................................. 7

   A.    Substantially Fewer NST Stops Were Supported by Reasonable Suspicion than the
NYPD's Stops Were Generally ................................................................................................ 7
      1.   Comparing Compliance Rates for Different Categories of Stops ........................ 8
      2.   Frisk and Search Compliance .......................................................... 10
   B.    NST Officers' Compliance Is Lower than the Compliance of Other Officers on Patrol .. 10
   C.    The Performance of Individual Commands ..................................................... 12
      1.   Command-Level Performance ....................................................... 12
      2.   Improper Stops, Frisks, and Searches in the 41 Precinct ..................... 14
      3.   The Lack of Stop Documentation in the 32 and 105 Precincts ................ 16
   D.    Supervisory and Command Oversight Is Inadequate, and Deficiencies Are Not Identified
and Corrected ............................................................................................................ 17
   E.    Stops Were Primarily Self-initiated and For Weapons Offenses ............................ 21
   F.    NST Car Stops ................................................................................... 21
   G.    Race and Gender of Those Stopped, Frisked, and Searched ............................. 23

V.      Report Review Process ................................................................................................ 26

VI.     Conclusion ................................................................................................................. 27

Appendix ........................................................................................................................... 29

## I.      Executive Summary

A little over one year ago, at Mayor Eric Adams' direction, the New York City Police Department (Department or NYPD) initiated Neighborhood Safety Teams (NSTs) in certain precincts to combat gun violence in high-crime areas.  NSTs conduct stops, frisks, and searches in their assigned neighborhoods.  NSTs wear modified uniforms and drive unmarked cars.  Given the creation of NSTs and their use of *Terry* stops, the Monitor conducted a limited review of their activity to determine if NST officers are engaged in constitutional stops, frisks, and searches.[1]  The Monitor team reviewed a random sample of the NSTs' stop reports and body-worn camera videos.  Unfortunately, the results are disappointing.  Despite training and experience, NST officers overall appear to be stopping, frisking, and searching individuals at an unsatisfactory level of compliance.  Too many people are stopped, frisked, and searched unlawfully.  At the precinct level, sergeants, lieutenants, and commanding officers fail to identify and correct the unconstitutional policing.  The Department's oversight of these unlawful NST stops, frisks, and searches is inadequate at all levels.  Although policies and training are in place to address these issues, without accountability in the field and at all levels within the Department, the level of compliance will not improve.

There is a bright spot.  Some commands with NST units do appear to be engaging in constitutional stops, frisks, and searches consistently.  Those commands should serve as models for other commands that are performing inadequately.  The fact that some commands have a very high level of compliance makes clear that lawful and effective policing are not incompatible.

---

[1] As discussed below, the Monitor team reviewed random samples of NST stop reports and body-worn camera (BWC) videos using social science methodologies similar to the audits used by the NYPD's Quality Assurance Division (QAD).  The review was designed to provide the NYPD with a timely assessment of NST encounters.  The Monitor team will conduct a more comprehensive audit of NST encounters, as the NYPD has suggested.

Findings:

- NST officers appear to be making unlawful stops at a rate that is nine percentage points higher than the Department-wide compliance rate in 2020.

- For self-initiated encounters, NST officers had reasonable suspicion for only 69% of the stops.

- NST officers had reasonable suspicion for only 73% of the frisks assessed and had a legal basis for only 63% of the searches assessed.

- In eight commands selected in the 2Q2022 assessment, non-NST officers had a higher percentage of lawful stops than their NST counterparts, which is notable given the experience level and training of NST officers.

- The compliance levels of NST officers in the 41 Precinct was exceedingly low; only 41% of stops, 32% of frisks, and 26% of searches were lawful.

- Of 230 car stops, two resulted in the recovery of weapons, while another two recovered contraband that the Monitor team was unable to identify.

- Based on the stop reports, more than 97% of the people encountered were Black or Hispanic.

- First-line supervisors are not identifying and correcting improper stops, frisks, and searches, and oversight by the precinct command and the Department is similarly lacking.

The Department must focus on improving compliance levels.  Clearly, it can be done.  The law requires no less.

In light of the shortcomings identified in this assessment, a more comprehensive review by the Monitor team is necessary and will be conducted.  In addition, the NYPD is directed to

develop a plan for improved NST compliance within the next 30 days to submit to the Monitor, which will include but is not limited to:

    a. Reviews of NST commands with poor compliance or potential underreporting of stops;

    b. Enhanced management and oversight of NSTs by the Patrol Services Bureau and Housing Bureau;

    c. Thorough audits and assessments of NST compliance with the Fourth and Fourteenth Amendments.

The Monitor will review the plan submitted and provide direction.  The Monitor looks forward to working collaboratively with the Department to address compliance.

## II.   Background

A little over one year ago, Mayor Eric Adams and Police Commissioner Keechant Sewell announced that the NYPD would be commencing the NST program in 32 high-crime commands in which they are tasked with taking illegal guns off the street.  At the announcement, Mayor Adams emphasized that these teams must provide fair, effective, and responsive policing.[2] Further, the Mayor noted that it was the Monitor's "job to do the oversight" and that the Monitor would "make sure we are doing it correctly . . . ."[3]

Before the NYPD implemented the NSTs, Chief Kenneth Corey, the then-Chief of Department (the highest uniformed member of the NYPD), sent a January 2022 memorandum to the chiefs of Patrol Services Bureau and Housing Bureau.  As stated in the memo:

---

[2] Mayor Adams' March 21, 2022, press conference regarding NSTs, https://www.cbsnews.com/newyork/video/mayor-adams-announcement-on-nypd-neighborhood-safety-teams/.
[3] *Id.*

In order to balance the need to provide public safety with concerns about proactive policing by Precinct-based plainclothes teams, the Department must ensure that the best officers are selected for the position and that they are properly trained, equipped, and supervised. . . .

Selected members of the service will receive specialized training, which will be required, and which will focus on advanced plain clothes tactics, constitutional policing, risk identification/mitigation, active bystandership, case preparation and testimony, and investigative tools and technology, and which will include presentation from the community.

The Neighborhood Safety Teams will be strictly monitored at the Precinct, Borough, and Bureau levels, as well as by the Chiefs of Department, Chief of Crime Control Strategies, and the Risk Management Bureau,[4] in order to measure the effectiveness of enforcement actions (e.g., prosecution outcomes, crime patterns addressed, etc.), and to identify and correct any issues with police/community encounters (i.e., frequent review of Body-Worn Camera footage, Stop Reports, Vehicle Reports, Arrest Reports, etc.).

The Monitor team was briefed on the Department's plans to implement NSTs by the commanding officer of the Chief of Department's Office and the Chief of the Professional Standards Bureau.  The Monitor team attended several training sessions for NSTs, including Court-approved training on investigative encounters and characteristics of armed suspects.[5]  The Monitor team also observed a briefing by the Chief of Department for community members in one of the precincts in which the NSTs would be operating.

NST officers do not patrol in plainclothes, nor do they wear traditional uniforms.  Instead, they wear clothing specifically designed for NST officers that identify them as NYPD members.  (*See* Appendix 1, photos of the NST uniform.)  NSTs use unmarked cars, so the cars do not have "NYPD" lettering, emblems, or insignia on the side.

## III.   Audit Methodology

The Monitor's audit plan was designed to provide a snapshot of NST stop, frisk, and search

---

[4] The Risk Management Bureau has been renamed and has had some of its responsibilities changed.  It is now the Professional Standards Bureau.

[5] The training observed was based on Court-approved training on investigative encounters and recruit training on identifying armed suspects.

activities.  The time period covered began on April 1, 2022, and ended on October 30, 2022.

As of October 11, 2022, the NYPD assigned 205 members (lieutenants, sergeants, and police officers) to NSTs in 34 commands:  Precincts 23, 25, 28, 32, 34, 40, 41, 42, 43, 44, 46, 47, 48, 49, 52, 67, 69, 71, 73, 75, 77, 79, 81, 83, 101, 103, 105, 113, 114, and 120, and Police Service Areas (PSAs) 2, 3, 5, and 7.  Each of the teams have at most five officers and are supervised by either a sergeant or lieutenant.  The Monitor's assessment included a review of different sources of information described in this section.  Consistent with the Monitor's current practice for stop report audits, each stop report encounter was reviewed by two Monitor team members.  When there was a disagreement between them, the encounter was reviewed by other Monitor team members and the Monitor.[6]

### A.      Review of Body-Worn Camera (BWC) Videos

Each week from May 16, 2022, to October 30, 2022, for a total of 23 weeks, 20 NST members were randomly selected from the NST roster.  For each officer identified, one BWC video was randomly selected from the officer's list of videos recorded in the prior week (Monday to Sunday).  This resulted in a sample of approximately 20 BWC videos per week for review.  In total, 451 BWC videos were identified for the assessment.[7]

---

[6] The focus of the Monitor team's assessment was Fourth Amendment compliance.  The audit also provided demographic data regarding the persons stopped, frisked, and searched, as noted below in Section IV.G, but the sample sizes were too small to conduct an analysis of racial disparities and Fourteenth Amendment compliance.

[7] Although 20 BWC videos were identified for assessment each week, there were occasions when the BWC video selected did not contain any interactions between NST officers and a civilian.  Accordingly, those videos were excluded from the assessment, and the Monitor team reviewed the remaining 419 BWC videos.  In addition to the 419 randomly selected videos, the Monitor team also reviewed BWC videos of other officers present at those encounters.

**B.      Review of Stop Reports Prepared by NST Officers**

In addition, each week the Monitor team randomly selected and reviewed five stop reports. These reports were not for the same incidents as the BWC videos reviewed.  The stop reports were identified by searching the BWC metadata in Axon's evidence.com for videos categorized as Investigative Encounters that also had the sub-category "L3–*Terry* Stop."[8]  The process was as follows:

Step 1.  Randomly select five officers from the NST roster each week.

Step 2.  Search each officer's video recordings for the previous four weeks.

Step 3.  Download the metadata for that period and locate any videos with the category "L3–*Terry* Stop."

Step 4.  Identify a stop report number in the metadata.  In the event there were multiple stop report numbers in the metadata, the oldest stop report for the period was selected. Each week, only one stop report per officer was selected.

Step 5.  Request the stop reports from the NYPD.

Step 6.  Review the stop report and BWC recordings associated with the encounter to assess the legal sufficiency of the stop, frisk, and/or search.

The weekly sampling began with the four-week period from April 25, 2022, to May 22, 2022, and concluded with the four-week period from October 3, 2022, to October 30, 2022.  In total, 106 stop reports were assessed.

---

[8] A police detention is often called a *Terry* stop, after the 1968 Supreme Court case *Terry v. Ohio*, 392 U.S. 1 (1968), which required an officer to have reasonable suspicion of a crime before making a stop of an individual.

C.      **Quarterly Review of Stop Reports for NST Commands in QAD Audits**

As part of its regular monitoring of NYPD stop and frisk activities, each quarter, the Monitor team selects a stratified random sample of commands and requests the stop reports and related documents for those commands that have been audited by the NYPD's Quality Assurance Division (QAD).[9]   The Monitor team then reviews and assesses the stop reports and the BWC videos associated with the stops to evaluate compliance.   For the NST audit, the Monitor team included 10 NST commands in the list of commands from which the quarterly stop reports were to be provided.   The commands selected from the second quarter of 2022 (2Q2022) were the 25 Precinct, 32 Precinct, 41 Precinct, 42 Precinct, 67 Precinct, 77 Precinct, 105 Precinct, 113 Precinct, 120 Precinct, and PSA7.   There were 81 stop reports identified from 2Q2022 that were prepared by NST officers and audited by QAD in these 10 commands.

IV.    **Results of Compliance Assessment**

A.      **Substantially Fewer NST Stops Were Supported by Reasonable Suspicion than the NYPD's Stops Were Generally**

For the 184 (103 plus 81)[10] stops based on the stop reports and body worn camera videos and other documentation, the Monitor team determined that officers had reasonable suspicion for 139 (76%) of the stops.   This level of compliance lags behind the quarterly assessments conducted by the Monitor team in the Monitor's Sixteenth Report of 2020 stops Department-wide.[11]   By comparison, for stops made in 2020, the Monitor team determined that officers had reasonable

---

[9] The Department's Quality Assurance Division (QAD) is the unit in the NYPD that audits commands to assess compliance with Department policies.

[10] Three stop reports were in both the random stop report sample and the 2Q2022 audited stop report sample.

[11] Sixteenth Report of the Independent Monitor, *Floyd*, ECF No. 885, https://www.nypdmonitor.org/wp-content/uploads/2022/09/16-Sixteenth-Report-.pdf.

suspicion for 85% of the stops assessed.[12]   NST officers appear to be making unlawful stops at a rate that is nine percentage points higher than the Department-wide compliance rate in 2020, which is notable given the experience and training of NST officers.   Examples of stops that were made without reasonable suspicion included:

- Stops made based on calls from an anonymous source, without additional information corroborating the criminality referenced in the call;

- Stops based on an officer's observation of a bulge on a person without further description;

- Stops made because the person looked back at the officers or changed direction; and

- Encounters in which the reason for the stop described in the stop report narrative was inconsistent with the BWC videos.

### 1.        Comparing Compliance Rates for Different Categories of Stops

As background, generally, officers conduct stops in three ways: (1) based on radio runs reporting crimes; (2) based on information received from a member of the public reporting criminal activity; or (3) through officer self-initiated observations of suspicious activity.   This third category generally is the focus of officers assigned to NSTs.   Table 1 below compares the different categories of NST stops and whether or not there was reasonable suspicion for those stops.

---

[12] The Monitor team reviewed a limited sample of NST stop reports from 2022.   The review of stop reports in the Monitor's Sixteenth Report was a larger sample from 2020.   Thus, this is not a comparison using the same sample size from the same time period.

**Table 1 – Type of Stop and Reasonable Suspicion**

| | # | % Reasonable Suspicion |
|---|---|---|
| **Radio Run** | **54** | |
| No reasonable suspicion for stop | 5 | |
| Yes, reasonable suspicion for stop | 49 | 91% |
| **Complainant Witness** | **6** | |
| No reasonable suspicion for stop | 1 | |
| Yes, reasonable suspicion for stop | 5 | 83% |
| **Self-Initiated** | **124** | |
| No reasonable suspicion for stop | 39 | |
| Yes, reasonable suspicion for stop | 85 | 69% |
| **Total** | **184** | |

As shown in Table 1 above (the Monitor team's assessments), in NST stops related to radio runs from 9-1-1 calls, the stops reviewed (54) were based on reasonable suspicion 91% of the time. This is on par with the citywide averages in 2020 reported by the Monitor.  When a member of the public provided information directly to the officer, 83% of the six stops were based on reasonable suspicion.  NST officers engaged in 124 self-initiated stops (more than double the number of radio-runs).  Yet, for these self-initiated encounters, the NST officers had reasonable suspicion in only 69% of the stops.  This is not an acceptable rate of compliance.  This means that out of every ten people stopped, three of those stops were unlawful.

For example, on July 7, 2022, in the 49 Precinct at 6:37 p.m., a male is stopped without reasonable suspicion.  The BWC video shows a male walking on the sidewalk with a fanny pack strapped around his chest.  Officers approached, stopped the person, and asked why he was hiding the bag.  The person advised the officers that he was not hiding the bag but putting money back into it after making a purchase.  The officers frisked and searched the bag and found a lawfully possessed knife inside.  A stop report was prepared to record the incident.  The stop report does

not articulate reasonable suspicion and merely describes a person on the street who immediately looked away nervously from officers who made eye contact with him.  The stop report and the video do not show reasonable suspicion for the stop or frisk.

### 2.    Frisk and Search Compliance

The Monitor team also reviewed the frisks and searches conducted during the NST stops. It appears that the assessments of frisks and searches exhibit the same pattern as the assessments of stops.  In only 115 of the 158 frisks assessed (73%) was the frisk based on reasonable suspicion, and in only 74 of the 118 searches (63%) was there a legal basis for the search reported (*see* Tables A7 and A8 in the Appendix).  These percentages reflect low levels of compliance and are very concerning because they are significantly lower than the citywide averages reported in prior Monitor Reports and call into question the NYPD's oversight.  Examples of frisks and searches found deficient include:

- Frisks when the officers did not have reasonable suspicion for the stop and there was no independent basis for believing the person was armed and dangerous;

- Frisks during stops that were for non-violent crimes;

- Searches of suspects before the victim or witness arrived to identify the suspect as the one who committed the offense and provide probable cause; and

- Encounters in which officers lifted the person's shirt or sweatshirt, or unzipped the person's jacket without probable cause.

### B.    NST Officers' Compliance Is Lower than the Compliance of Other Officers on Patrol

It also appears that NST officers have lower compliance rates than other officers in their own commands.  The stops from 2Q2022, which include both NST and non-NST officers, were used for this comparison.

To have a meaningful comparison, the Monitor team compared NST stop compliance on self-initiated stops for Criminal Possession of a Weapon (CPW) with non-NST patrol officers in their assigned commands.  Of the 81 stops present in the 2Q2022 QAD audit conducted by NST officers, 48 of them (59%) were self-initiated CPW stops.

According to the assessment of self-initiated CPW stops in 2Q2022, comparing NST officers to non-NST officers in the same command, there is a significant difference between stop compliance by NST officers and by non-NST officers.[13]   In eight commands selected in the 2Q2022 assessment, non-NST officers had a higher percentage of lawful stops than their NST counterparts, as shown in Figure 1 below.[14]

**Figure 1 – Percentage of Lawful Stops — NST v. Non-NST Officers in the Same Command**



---

[13] Chi-sqr. = 7.73; p<0.01.  Chi-square is a statistic that measures the difference between observed and expected frequencies of outcome variables.  In this case, if NST and non-NST officers had the same level of compliance, chi-square would be zero.  The "p" value is the probability that the differences were found by chance.  In this case, the probability that the differences between NST and non-NST stop compliance were found by chance was less than 1%.

[14] The 32 Precinct and 105 Precinct were excluded from this analysis because there were no NST stop reports assessed by QAD in 2Q2022, so the Monitor team did not have stop reports from those precincts to review.

Out of the 48 NST self-initiated CPW stops, the Monitor team determined that 22 of them (46%) were lawful and officers had reasonable suspicion for the stop.  Non-NST officers on the other hand had much greater compliance, with 24 of the 31 self-initiated CPW stops having reasonable suspicion (77%).  Experienced, specially trained, and closely supervised officers in NSTs should have performed at least as well as other members of their commands.  The results here suggest the exact opposite.

### C.    The Performance of Individual Commands

#### 1.    Command-Level Performance

A further evaluation of data reveals there is high compliance in certain commands and extremely low compliance in others.  Table 2 below shows that ten of the NST commands had all of the recorded stops and frisks in the Monitor's sample assessed as lawful, and 12 commands had a 100% compliance rate for searches in recorded stops.  For some of these precincts, the Monitor team's sample included only a small number of stops, and the Monitor's overall findings are based on the aggregate assessment of stops from all the NST commands and not on commands that only had one or two stops.  The 46 Precinct and 52 Precinct in the Bronx, and PSA2 and PSA3 in Brooklyn, for example, had 100% compliance in all three areas.  These commands are among the busiest in the City and show that policing can be done constitutionally and documented accordingly.

**Table 2 – Commands (Cmd.) with 100% Fourth Amendment Compliance of Stops, Frisks, and Searches**

| Cmd. | Stop Reports Prepared | Stop Report Compliance |
| --- | --- | --- |
| 46 | 4 | 100% |
| 47 | 1 | 100% |
| 52 | 4 | 100% |
| 69 | 3 | 100% |
| 73 | 6 | 100% |
| 83 | 9 | 100% |
| 103 | 1 | 100% |
| 105 | 1 | 100% |
| PSA2 | 2 | 100% |
| PSA3 | 12 | 100% |

| Cmd. | # Frisks Reported on Stop Reports | Frisk Compliance |
| --- | --- | --- |
| 40 | 6 | 100% |
| 46 | 4 | 100% |
| 47 | 1 | 100% |
| 52 | 3 | 100% |
| 73 | 4 | 100% |
| 75 | 2 | 100% |
| 83 | 4 | 100% |
| 103 | 1 | 100% |
| PSA2 | 1 | 100% |
| PSA3 | 11 | 100% |
| PSA5 | 4 | 100% |

| Cmd. | # Searches Reported on Stop Reports | Search Compliance |
| --- | --- | --- |
| 40 | 1 | 100% |
| 46 | 3 | 100% |
| 47 | 1 | 100% |
| 48 | 1 | 100% |
| 52 | 2 | 100% |
| 71 | 1 | 100% |
| 75 | 2 | 100% |
| 105 | 1 | 100% |
| PSA2 | 1 | 100% |
| PSA3 | 11 | 100% |
| PSA5 | 3 | 100% |

In contrast, Table 3 below shows the four commands reviewed where at least half the stops did not have reasonable suspicion. There were five commands where at least half the frisks were improper and 12 commands where at least half of the searches conducted were improper. For some of these commands, the Monitor's sample included only a small number of stops.

**Table 3 – Commands with 50% Compliance or Lower on Stops, Frisks, or Searches**

| Cmd. | Stop Reports Prepared | Stop Report Compliance |
|---|---|---|
| 48 | 2 | 50% |
| 71 | 2 | 50% |
| 81 | 4 | 50% |
| 41 | 27 | 41% |

| Cmd. | # Frisks Reported on Stop Reports | Frisk Compliance |
|---|---|---|
| 69 | 2 | 50% |
| 48 | 2 | 50% |
| 71 | 2 | 50% |
| 81 | 4 | 50% |
| 41 | 25 | 32% |

| Cmd. | # Searches Reported on Stop Reports | Search Compliance |
|---|---|---|
| 83 | 2 | 50% |
| 23 | 2 | 50% |
| 43 | 2 | 50% |
| 79 | 2 | 50% |
| 69 | 2 | 50% |
| 113 | 9 | 44% |
| 49 | 3 | 33% |
| 42 | 3 | 33% |
| 81 | 3 | 33% |
| 41 | 19 | 26% |
| 67 | 5 | 20% |
| 103 | 1 | 0% |

**2.      Improper Stops, Frisks, and Searches in the 41 Precinct**

As described above, the 2Q2022 QAD audit was assessed as part of the Monitor team's routine monitoring, and the audit included 39 stops from the 41 Precinct, located in the Hunts Point and Longwood sections of the Bronx.  Of the 39 stops, 27 (71%) were conducted by NST officers.  Of the 27 stops by NST officers, 16 stops—more than half (59%)—were unlawful and not supported by reasonable suspicion.  Of the 27 individuals stopped by NST officers, 25 were frisked (93%).  Of the 25 frisks conducted, 17 (68%) were unlawful because the officer did not have reasonable suspicion that the person frisked was armed and dangerous.  Of the 27 individuals stopped by NST officers, 19 were searched (70%).  Of the 19 individuals searched, 14 (74%) of the searches were unlawful and not supported by probable cause or consent.  The performance of the 41 Precinct NST on constitutional compliance—stops (41%), frisks (32%) and searches

(26%)—is disturbingly low and was almost 50% below the investigative encounters performance measures of the NYPD generally.[15]

**Figure 2 – Lawfulness of 41 Precinct NST Stops, Frisks, and Searches**



The Lawfulness of Stop pie chart shows 41% Lawful and 59% Unlawful. The Lawfulness of Frisk pie chart shows 32% Lawful and 68% Unlawful. The Lawfulness of Search pie chart shows 26% Lawful and 74% Unlawful. Legend: ■ Lawful ■ Unlawful

Equally troubling is the review of these stops by the officers' supervisors.  Reviewing supervisors (precinct sergeants and lieutenants) in the 41 Precinct noted no deficiencies with respect to stops or frisks and only one deficiency with respect to a search.  Perhaps most troubling is that 19 of the 27 NST stops for 2Q2022 were reviewed as part of the 41 Precinct Command-Level Self-Inspection process, and no deficiencies were noted in the self-inspection with respect to stops, frisks, or searches for the 19 stops reviewed.

The Department must take action to correct these deficiencies.  This demonstrates the importance of looking at the data at each command/precinct.  Beginning in December 2018, the NYPD implemented an executive review of commands it labeled RISKS (Remediation of Identified Situations Key to Success) Reviews.  The Department would meet with every Patrol, PSA, and Transit command to discuss the commands' efforts to address the following issues: underreporting of stops, constitutionality of stops, legality of trespass enforcement, and

---

[15] The NYPD disagreed with the Monitor team's assessments in four stops, four frisks, and two searches in the 41 Precinct.  But even if the NYPD's assessments are correct, only 12 of 27 stops (56%), 12 of 25 frisks (48%), and 7 of 19 frisks (37%) would be deemed proper.  In other words, the 41 Precinct's compliance levels are exceedingly low regardless.

compliance with policies regarding the use of BWCs, including proper activation and deactivation, categorization, tagging, and supervisory reviews of videos. In September 2022, however, the NYPD eliminated the RISKS Reviews for overseeing compliance at the command level. The Department has not replaced the RISKS Reviews with anything comparable.

### 3. The Lack of Stop Documentation in the 32 and 105 Precincts

The NSTs began operation on March 11, 2022. The Monitor team received the first roster of NST personnel on April 8, 2022. This roster showed one sergeant and five officers assigned to both NSTs from the 32 Precinct and the 105 Precinct. 2Q2022 consists of the months April, May, and June, during which time the NSTs were deployed. QAD did not review any NST stop reports for either the 32 or the 105 Precinct in its 2Q2022 audits, which required the Monitor team to inquire further because QAD audited a substantial number of stops in these precincts.[16] As a result, the Monitor learned there were only six stop reports completed by NST officers in the 32 Precinct and only three stop reports completed by NST officers in the 105 Precinct during the three-month 2Q2022 period (April 1, 2022, to June 30, 2022). The fact that there were very few stop reports by NST officers in these two commands should have raised red flags about possible underreporting or inactivity. Either these teams did not properly document the stops they made, or they were not policing proactively.[17] This points to insufficient oversight.

---

[16] QAD employs a selection method whereby approximately half of all stop reports in a command are assessed for compliance. During the 2Q2022 audit, QAD assessed 15 stops in the 32 Precinct (51.7%) and 20 stops in the 105 Precinct (54.1%). However, the stops reported by the NST officers in the 32 and 105 Precincts were not included in the QAD quarterly audit due to the QAD selection method.

[17] By way of comparison, the other eight commands selected as part of the 2Q2022 assessment had an average of 13.25 stops assessed by QAD during that quarter and as noted earlier, QAD only audits about half of the stops made in a precinct.

**D.      Supervisory and Command Oversight Is Inadequate, and Deficiencies Are Not Identified and Corrected**

The Monitor team's assessment also shows that supervision and oversight need improvement.  Supervision and management of stops and documentation of these encounters is critical.  NSTs are typically deployed with a supervisor.  There is usually a sergeant or lieutenant at the scene of the encounter supervising officer performance.  Out of the 184 stop reports assessed, the reviewing supervisor (the sergeant or lieutenant) was at the scene of the encounter 150 (82%) times.  However, out of these 150 stops, the stop was determined by the Monitor team to be lawful in 110 (73%) encounters.  Again, this is lower than Department-wide averages.

Whether or not the supervisors were on the scene, the sergeants and lieutenants did a poor job assessing the work of their subordinates.  A review of the 184 stop reports indicates that in no instances (0%) did an NST-reviewing sergeant or lieutenant determine that any of the stops were unlawful.  The Monitor team, however, determined that 45 stops out of the 184 (24%) were unlawful.

The situation did not improve at the command level.  Each quarter, the precinct/command Executive Officer is required to conduct a self-inspection of all the stops in that command.  This is a basic audit function performed by a captain at the command.  As noted in the Methodology Section III.C above, the Monitor team reviewed stop reports by NST officers that were included in QAD's 2Q2022 quarterly audits.  Included in QAD's quarterly audits are also the results of the command's self-inspections of stop reports prepared by the command Executive Officer.  Table 4 below reports the audit results for reviewing supervisors (sergeants and lieutenants), the command self-inspection (command Executive Officer), QAD, and the Monitor team.

**Table 4 – Fourth Amendment Compliance Assessment by Reviewer for Stops Assessed in 2Q2022**

| Reviewer | # of Stop Reports Assessed | % Legally Sufficient | # Frisks | % Frisks Legally Sufficient | # Searches Assessed | % Searches Legally Sufficient |
|---|---|---|---|---|---|---|
| Reviewing Supervisor | 81 | 100% | 68 | 100% | 55 | 96.7% |
| Command Self-Inspection | 53 | 90.6% | 44 | 86.4% | 35 | 85.7% |
| QAD | 81 | 72.8% | 68 | 74.6% | 55 | 84.3% |
| Monitor Team | 81 | 63.0% | 68 | 58.8% | 55 | 45.5% |

During 2Q2022, QAD audited 81 stops involving NST officers in the ten selected commands. Out of the 81 stops assessed by QAD in 2Q2022, QAD determined that 59 (73%) were lawful. The Monitor team, however, determined that 51 (63%) of these stops in 2Q2022 were lawful.

The Monitor team also compared its assessments of stop reports with that of the command Executive Officers. In each quarterly audit, QAD will review two command self-inspections that were conducted in that quarter. In the 2Q2022 QAD audit, there were 53 stops assessed in the command self-inspections,[18] and command Executive Officers determined that 48 (91%) were lawful. The Executive Officers' assessments are slightly more critical than the performance of the reviewing supervisors, but they compare unfavorably to the Monitor team's assessment, which concluded that only 32 of the 53 (60%) of the stops were lawful. The Monitor team identified 21

---

[18] Because of the sampling methodology implemented in this process, only stop reports from the second quarter of 2022 had self-inspections available for inclusion in this analysis. The self-inspections for these stop reports were available because they are included with the regular quarterly assessments conducted by the Monitor team. In addition, because there were only two monthly self-inspections from the previous quarter for QAD to audit, there is a different number of stop reports in the command self-inspections (53) compared to QAD's quarterly audit totals (81).

unlawful stops, while the precinct Executive Officer identified only five unlawful stops.  Figure 3 below illustrates the comparative assessments by each reviewer (Monitor team, QAD, command Executive Officer in the self-inspections, and reviewing supervisor).

**Figure 3 – Overall Compliance Assessment by Reviewer for Stops Assessed in 2Q2022**



In addition, not one reviewing supervisor assessed that a frisk was deficient.  The precinct Executive Officers determined that 38 of the 44 frisks (87%) were lawful.  This does not compare favorably with either QAD's assessments (75%) or the Monitor's assessments (59%) of the legal sufficiency of the frisks conducted during the stops (*see* Table A11 in the Appendix).[19]

---

[19] It is important to note that the NYPD uses a different standard than the Monitor for assessing frisks and searches when the stop was not based on reasonable suspicion.  If a stop is improper, the Monitor will also assess the frisk and/or search as improper, unless there is an intervening event or additional facts beyond those considered by the officer in making the stop that support conducting a frisk (i.e., indicating that the person stopped is armed and dangerous), or that support conducting a search (e.g., voluntary consent for a search).  The NYPD assesses the frisk and/or search independently of the stop; e.g., it disregards the impropriety of the stop and would review the frisk and count it as proper if the stop was for a violent crime even if the stop was not a lawful one.

Similarly, all but two searches were determined by the reviewing supervisor to be lawful (97%).  The precinct Executive Officers found that 30 of the 35 searches (86%) were lawful, while QAD found that 84% of the searches were lawful.  However, the Monitor team found that only 46% of the searches in 2Q2022 were lawful.  This indicates that the Department is failing to identify unlawful stops, frisks, and searches.

The Professional Standards Bureau has referred to errors made in self-inspections by the command Executive Officers as "triple errors."  First, the officer gets it wrong (with an unlawful stop), then the reviewing supervisor gets it wrong (by not identifying the error), and finally, the captain gets it wrong (by also not identifying the unlawful stop), and the report is then sent to QAD for assessment.  Failing to identify unlawful stops and failures to fill out stop reports at the command level must be addressed by the Department.

Based on this review, it appears that the precinct command review process is not effectively identifying stops that were not based on reasonable suspicion.  This failing makes it very difficult to correct unlawful behavior.  Compounding this dilemma, lieutenants and sergeants are regularly at the scenes of these stops and presumably supervising the officers' actions during these encounters.  If the first-line supervisor fails to recognize that a stop is unlawful, even when they are present on the scene, and the precinct Executive Officer does not recognize the deficiencies, it will be difficult for the Department to correct these behaviors.

One bright spot in this analysis is the QAD audits.  While these audits are not detecting unlawful stops at the same level as the Monitor team, QAD's assessments are much more critical than the precinct assessments.  Ordinarily, this would be a welcome finding; however, with the discontinuation of the RISKS Reviews, the impact of a negative QAD audit is significantly

diminished, as it appears that little is now done with the information in QAD's audits.[20]   This is very concerning.

### E.    Stops Were Primarily Self-initiated and For Weapons Offenses

The Level 3 reported stops made by NST members and reviewed in the Monitor's stop report assessment were predominantly focused on weapons, consistent with the NST mandate. The review of NST stop reports showed that 164 of the 184 (89%) stops assessed were for the crime of Criminal Possession of a Weapon (CPW).  In addition, there were 41 arrests for CPW out of the 164 stops where CPW was suspected.  Furthermore, the arrest charges for the 61 arrests made by NST officers during stop encounters were overwhelmingly for CPW and crimes of violence, such as Robbery, Assault, and Menacing.  *See* Table A18 in the Appendix.

### F.    NST Car Stops

The Monitor team assessed 419 randomly selected BWC videos for this study.[21] Approximately 55% (230 of 419) of the recordings by NST officers involved stopping cars for Vehicle and Traffic Law (VTL) violations (e.g., rear seat passenger not wearing a seatbelt, failure to signal a turn, equipment violation, dark-tinted window, etc.).[22]

---

[20] In December 2018, the NYPD began meeting with commands twice a year to discuss efforts to address underreporting of stops, constitutionality of stops, and compliance with policies regarding the use of BWCs.  These meetings were called RISKS Reviews.  These RISKS Reviews incentivized command leadership to ensure that there were meaningful reviews of stop reports and BWC videos.  In September 2022, without input from the Monitor or the Parties, the Department eliminated the RISKS Reviews, and there is nothing comparable in place.

[21] As noted in footnote 5, the Monitor team initially sampled 451 videos but excluded 32 videos because the police did not interact with any civilians in those videos.  For the 419 BWC videos that did involve an encounter with civilians, the Monitor team also viewed other BWC videos associated with those 419 encounters, using the "multicam" feature of the BWC evidence.com system.

[22] If a driver or passenger is frisked during a car stop, or if the driver or passenger is detained beyond the time for the vehicle traffic stop and is searched, the encounter is governed by the standards set out in *Terry v. Ohio*, 392 U.S. 1 (1968) and *People v. DeBour*, 40 N.Y.2d 210 (1976). *See Arizona v. Johnson*, 555 U.S. 323, 326-327 (2009) ("To justify a pat down of the driver or a

Of the 230 car stops, 197 (86%) involved only the VTL violation and did not appear to escalate to a Level 3 stop (e.g., involving a frisk or a search of the driver or passenger), 29 (13%) did escalate to a Level 3 stop, and in four incidents (2%) the Monitor team could not determine whether a stop occurred based on the available information. Of the 230 car stops, 205 (89%) did not result in a frisk, 22 (10%) resulted in a frisk, and in three incidents (1%) the determination as to whether a frisk occurred was inconclusive based on the available information. Of the 22 frisks conducted, contraband was recovered only twice (9%), neither of which were weapons.

In 64 car stops (28%) a motorist, passenger, or car was searched.[23] In nine incidents, the NST officer requested consent to search an individual's vehicle, but the officer did not appear to have a founded suspicion of criminality, which is required for a request for consent to search. Of the 64 searches conducted, contraband was recovered in seven instances (11%). Weapons were recovered in two searches, stolen property was recovered in three searches, and the Monitor team was not able to determine what contraband was recovered in the remaining two searches.

Below is an example of an unlawful frisk and search associated with NSTs' car stop procedures. In this incident, officers from the 81 Precinct at 12:40 a.m. on June 16, 2022, conducted a car stop of an Uber car because the rear passenger was not wearing a seat belt. Once the car was stopped, the sergeant reported on the stop report that the rear passenger "leaned to his right and dipped his shoulder" while in the back seat of the Uber. This was the only basis provided to remove and frisk the sole passenger from the back seat of the Uber, and it was insufficient. Being in the back of a car and leaning in a certain direction are not indicia that a person is armed

---

passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous").

[23] There are instances in which a VTL stop may result in a search of the car. Not all car searches were determined to be a Level 3 stop of the driver or passenger.

and dangerous or that there is contraband in the vehicle.  The body-worn camera video starts after the car is stopped and does not show that the passenger was leaning or dipping.  The sergeant at the scene frisked and searched the passenger and asked him questions.  The passenger, who was on the phone with his mother, explained he was going home after being at party.  The sergeant also searched the back seat of the car where the young Black man had been sitting.  Nothing was recovered.  NST officers had very limited success recovering contraband conducting frisks and searches during car stop encounters.[24]  Oversight of car stops, frisks, and searches of motorists and vehicles should be examined and monitored closely.

### G.    Race and Gender of Those Stopped, Frisked, and Searched

NSTs were established in 34 commands (30 precincts and four PSAs) that accounted for 80% of the City's reported violent crime.  The areas in which these NSTs were deployed are largely communities of color.  The individuals stopped, frisked, and/or searched by these NSTs are largely persons of color.  Of the 419 encounters observed on the BWC videos, 66% were Black (277), and 29% were Hispanic (121).  The racial distribution recorded in stop reports follows the same pattern.  Of the 184 stop reports prepared, the suspect was identified as Black in 135 (74%), Hispanic in 46 (25%), White in two (1%), and Asian in one (1%).  Also, of the 419 encounters observed, 92% were male.  Based on the stop reports, more than 97% of the people encountered were Black or Hispanic.

---

[24] The Monitor team's review of car stops was drawn from a small sample of encounters (230 car stops, 22 frisks, and 64 searches, and contraband was recovered in two frisks and seven searches).

**Figure 4 – Race of Person Encountered by Type of Documentation**



The overwhelming number of people encountered by NST officers were male.  Out of the 603 total observations from the BWC videos and stop reports, there were 559 (93%) males encountered or stopped.  Of the 603 individuals encountered, the Monitor team was not able to determine the apparent race of seven individuals.  The Monitor team was able to identify the race and gender of 596 individuals encountered.  The majority of those encountered were also younger than 30.  Combining race and gender, 379 of the 596 (64%) people encountered or stopped were Black males, or almost two-thirds of the entire group, and 158 of the 596 (27%) were Hispanic males.  Combined, 90% of the people encountered by NST officers were Black or Hispanic males.

**Figure 5 – Race and Gender of Persons on 184 Stop Reports**



**Figure 6 – Apparent Race and Gender of Persons Encountered on 419 BWC Videos**



The demographic data reported here, when put in context with the high percentage of unlawful stops, should be examined carefully by the Department.[25]

---

[25] The NYPD has not, to date, implemented measures to audit and monitor officers' Fourteenth Amendment compliance.

## V.      Report Review Process

As is the customary practice, the Monitor provided the City and the Plaintiffs with a draft of this NST Report for their review.  In addition, the Monitor provided the NYPD with a spreadsheet of the stop reports evaluated for this Report and the Monitor team's assessment of whether or not each stop, frisk, or search was lawful.  The NYPD agreed with the Monitor that 25 of 45 stops (56%), 28 of 45 frisks (62%), and 31 of 44 (72%) searches were improper.  The NYPD disagreed with the Monitor's assessments for 20 stops (44%), 17 frisks (38%), and 13 (28%) searches, and provided the Monitor with its rationale.  In other words, the Department agreed with the Monitor's assessment the majority of the time.

The Monitor team re-evaluated the encounters based on the additional information provided by the NYPD and changed its assessments for a total of four encounters.  In general, the Department's defense of certain stops was extremely troubling.  For example, the Department insisted that two searches were proper because the stops were based on information provided by a confidential informant, and thus provided probable cause for each search, even though the stop reports did not reference a confidential informant.  After requesting information confirming that the stops were based on information from a confidential informant, the Department changed its position and advised that the stops were not based on information from a confidential informant but insisted the stops were still proper.

The Department also suggested that several court cases supported their positions, but in fact the cases did not support their position.  For example, the Department claimed it was permissible for an officer to unzip a person's jacket to conduct a frisk (without probable cause for a search) if the jacket is bulky, citing *People v. Wilson*, 50 A.D.3d 1609 (4th Dep't 2008).  In that case, however, the court did not authorize unzipping the person's jacket.  In fact, the court states that the officer "did not conduct a full-blown search by lifting defendant's heavy leather jacket to

ascertain whether defendant had a weapon in his waistband," but instead conducted a "limited protective frisk for weapons," which was reasonable based on the bulkiness of the jacket.  *Id.* Moreover, the NYPD's own training and policies teach officers not to unzip clothing if they do not have a basis for a search, and the jacket in the encounter reviewed was thin and not bulky. Other cases cited to justify NST stops did not apply to the facts of the encounters reviewed.  For example, in *Matter of Freddy S.,* 84 A.D.3d 687 (1st Dep't 2001), a suspect matched a description, hid from the police, and then fled.  Whereas in the encounter at issue, there was no description of a suspect, and the person stopped was a teen running from an area where shots were fired.  The Department also cited Judge Barry Kamins's (retired) treatise on New York search and seizure law.  We reviewed a number of the BWC videos and stop reports with Judge Kamins, who agreed with the Monitor's assessment in every case.  In addition, there were several instances in which the Department's own internal auditors, QAD, disagreed with the NYPD and agreed with the Monitor's assessments of deficient stops, frisks, and searches.  The defense of unlawful stops, frisks, and searches is troubling, and we recommend the Department focus its efforts on correcting improper behavior rather than justifying it.

## VI.    Conclusion

The Monitor team's assessment of stops, frisks, and searches indicates that NST performance is below acceptable standards.  Although some commands have 100% compliance, others fall far short of the mark.  Also, it is very troubling that certain NST teams have very few stop reports, which is inconsistent with the mission of the NST and leads to serious concerns about underreporting, i.e., stops occurring and the police failing to complete stop reports.   The Department must take corrective action immediately to remedy this situation, and it must address accountability.  As we have stated repeatedly, the elimination of RISKS Reviews with no apparent procedure to replace it indicates a lack of accountability for compliance.  The NSTs' compliance

issues are troubling, and there is insufficient oversight at the supervisor, command, and Department level.

As noted in this report, there is no NYPD monitoring of Fourteenth Amendment compliance. This monitorship has been going on for nine years, and the Department does not have a Fourteenth Amendment compliance system in place. The Department should take steps to address this issue.

As we noted in Section IV.D, there appears to be very limited accountability. The Department should take this opportunity to enhance its training and accountability instead of attempting to justify illegal stops. Sadly, we know all too well the consequences of failures of accountability. We expect the Department to take this opportunity to increase its compliance. Given the concerning findings, the Monitor will be conducting a more comprehensive audit.

## APPENDIX 1

## Pictures of NST Uniforms



**APPENDIX 2**

**NST DESCRIPTIVE DATA TABLES**

**Table A1 – Distribution of BWC Videos and Stop Reports from NST Commands**

| Command | # of Videos from Part 1 BWC Audit | # Stop Reports from Part II and III Stop Report Audits | Borough |
|---|---|---|---|
| 23 | 21 | 3 | Manhattan |
| 25 | 14 | 11 | Manhattan |
| 28 | 7 | 0 | Manhattan |
| 32 | 9 | 0 | Manhattan |
| 34 | 11 | 0 | Manhattan |
| 40 | 15 | 6 | Bronx |
| 41 | 14 | 27 | Bronx |
| 42 | 16 | 7 | Bronx |
| 43 | 17 | 3 | Bronx |
| 44 | 10 | 0 | Bronx |
| 46 | 11 | 4 | Bronx |
| 47 | 21 | 1 | Bronx |
| 48 | 15 | 2 | Bronx |
| 49 | 12 | 3 | Bronx |
| 52 | 8 | 4 | Bronx |
| 67 | 16 | 11 | Brooklyn |
| 69 | 10 | 3 | Brooklyn |
| 71 | 13 | 2 | Brooklyn |
| 73 | 6 | 6 | Brooklyn |
| 75 | 12 | 3 | Brooklyn |
| 77 | 13 | 13 | Brooklyn |
| 79 | 7 | 3 | Brooklyn |
| 81 | 15 | 4 | Brooklyn |
| 83 | 13 | 9 | Brooklyn |
| 101 | 15 | 8 | Queens |
| 103 | 11 | 1 | Queens |
| 105 | 15 | 1 | Queens |
| 113 | 17 | 10 | Queens |
| 114 | 15 | 0 | Queens |
| 120 | 20 | 11 | Staten Island |
| PSA2 | 16 | 2 | Housing – Brooklyn |
| PSA3 | 13 | 12 | Housing – Brooklyn |
| PSA5 | 14 | 4 | Housing – Manhattan |
| PSA7 | 9 | 10 | Housing – Bronx |
| **Total** | **451** | **184** | |

**Table A2 – Type of Encounter of Part 1 BWC Videos**

| Primary Category | # | % |
|---|---|---|
| Car Stop | 130 | 28.8% |
| Arrest | 87 | 19.3% |
| Investigative Encounter | 75 | 16.6% |
| Crime in Progress/Radio Run | 37 | 8.2% |
| Summons | 15 | 3.3% |
| Stop – Pedestrian | 4 | 0.9% |
| Interior Patrol – NYCHA | 4 | 0.9% |
| All Other | 35* | 7.8% |
| Not Categorized | 64 | 14.2% |
| **Total** | **451** | **100.0%** |

*Disorderly groups, bicycle stops, warrant enforcement, precinct assignment, witness statements, evidence, and hazmat incidents

**Table A3 – Crime Suspected for Stop Reports**

| Crime Suspected | # | % |
|---|---|---|
| Assault | 4 | 2.2% |
| Attempted Murder | 1 | 0.5% |
| Burglary | 2 | 1.1% |
| Criminal Possession of a Weapon | 164 | 89.1% |
| Criminal Trespass | 1 | 0.5% |
| Grand Larceny – Auto | 2 | 1.1% |
| Petit Larceny | 1 | 0.5% |
| Reckless Endangerment | 5 | 2.7% |
| Robbery | 4 | 2.2% |
| **Total** | **184** | **100.0%** |

**Table A4 – Did the Officers Have Reasonable Suspicion for the Stop?**

| | # | % |
|---|---|---|
| No | 45 | 24.5% |
| Yes | 139 | 74.5% |
| **Total** | **184** | **100.0%** |

Note: data from Phase I and Phase II stop report assessment

**Table A5 – Overall Stop, Frisk, and Search Compliance, by Command**

| Cmd. | Stop Reports Prepared | # Stop Reports Articulate RS for Stop | Stop Report Compliance | Cmd. | # Frisks Reported on Stop Reports | # Frisks Articulate RS | Frisk Compliance | Cmd. | # Searches Reported on Stop Reports | # Searches Legally Sufficient | Search Compliance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 46 | 4 | 4 | 100.0% | 40 | 6 | 6 | 100% | 46 | 3 | 3 | 100.0% |
| 47 | 1 | 1 | 100.0% | 46 | 4 | 4 | 100.0% | 47 | 1 | 1 | 100.0% |
| 52 | 4 | 4 | 100.0% | 47 | 1 | 1 | 100.0% | 52 | 2 | 2 | 100.0% |
| 69 | 3 | 3 | 100.0% | 52 | 3 | 3 | 100.0% | 75 | 2 | 2 | 100.0% |
| 73 | 6 | 6 | 100.0% | 73 | 1 | 1 | 100.0% | 105 | 1 | 1 | 100.0% |
| 83 | 9 | 9 | 100.0% | 75 | 1 | 1 | 100.0% | PSA2 | 1 | 1 | 100.0% |
| 103 | 1 | 1 | 100.0% | 83 | 4 | 4 | 100.0% | PSA3 | 11 | 11 | 100.0% |
| 105 | 1 | 1 | 100.0% | 103 | 2 | 2 | 100.0% | PSA5 | 3 | 3 | 100.0% |
| PSA2 | 2 | 2 | 100.0% | PSA2 | 5 | 5 | 100.0% | 40 | 1 | 1 | 100.0% |
| PSA3 | 12 | 12 | 100.0% | PSA3 | 11 | 11 | 100.0% | 48 | 1 | 1 | 100.0% |
| 101 | 8 | 7 | 87.5% | PSA5 | 4 | 4 | 100.0% | 71 | 1 | 1 | 100.0% |
| 77 | 13 | 11 | 84.67% | 101 | 8 | 7 | 87.5% | 77 | 7 | 6 | 85.7% |
| 40 | 6 | 5 | 83.3% | 77 | 12 | 10 | 83.3% | 73 | 6 | 5 | 83.3% |
| 120 | 11 | 9 | 81.8% | 120 | 9 | 7 | 77.8% | 101 | 6 | 5 | 83.3% |
| PSA7 | 10 | 8 | 80.0% | PSA7 | 10 | 7 | 70.0% | PSA7 | 7 | 5 | 71.4% |
| PSA5 | 4 | 3 | 75.0% | 25 | 10 | 7 | 70.0% | 120 | 6 | 4 | 66.7% |
| 67 | 11 | 8 | 72.7% | 113 | 9 | 6 | 66.7% | 25 | 7 | 4 | 57.1% |
| 25 | 11 | 8 | 72.7% | 23 | 3 | 2 | 66.7% | 83 | 2 | 1 | 50.0% |
| 42 | 7 | 5 | 71.4% | 43 | 3 | 2 | 66.7% | 23 | 2 | 1 | 50.0% |
| 113 | 10 | 7 | 70.0% | 49 | 3 | 2 | 66.7% | 43 | 2 | 1 | 50.0% |
| 23 | 3 | 2 | 66.7% | 79 | 3 | 2 | 66.7% | 79 | 2 | 1 | 50.0% |
| 43 | 3 | 2 | 66.7% | 42 | 5 | 3 | 60.0% | 69 | 2 | 1 | 50.0% |
| 49 | 3 | 2 | 66.7% | 67 | 7 | 4 | 57.1% | 113 | 9 | 4 | 44.4% |
| 75 | 3 | 2 | 66.7% | 69 | 2 | 1 | 50.0% | 49 | 3 | 1 | 33.3% |
| 79 | 3 | 2 | 66.7% | 48 | 2 | 1 | 50.0% | 42 | 3 | 1 | 33.3% |
| 48 | 2 | 1 | 50.0% | 71 | 2 | 1 | 50.0% | 41 | 19 | 5 | 26.3% |
| 71 | 2 | 1 | 50.0% | 81 | 4 | 2 | 50.0% | 67 | 5 | 1 | 20.0% |
| 81 | 4 | 2 | 50.0% | 41 | 25 | 7 | 28.0% | 103 | 1 | 0 | 0.0% |
| 41 | 27 | 11 | 40.7% | 105 | 0 | 0 | NA | 81 | 3 | 0 | 0.0% |

**Table A6 – Type of Stop and Reasonable Suspicion**

|  | # | % Reasonable Suspicion |
|---|---|---|
| **Complainant Witness** | 6 | |
| No reasonable suspicion for stop | 1 | |
| Yes, reasonable suspicion for stop | 5 | 83.3% |
| **Radio Run** | 54 | |
| No reasonable suspicion for stop | 5 | |
| Yes, reasonable suspicion for stop | 49 | 90.7% |
| **Self-Initiated** | 124 | |
| No reasonable suspicion for stop | 39 | |
| Yes, reasonable suspicion for stop | 85 | 68.5% |
| **Total** | **184** | |

Note:  data from Phase I and Phase II stop report assessment

**Table A7 – Did the Officers Have Reasonable Suspicion for the Frisk?**

|  | # | % |
|---|---|---|
| No | 43 | 27.2% |
| Yes | 115 | 72.8% |
| Total | 158 | 100.0% |

**Table A8 – Did the Officers Have a Legal Basis for a Search?**

|  | # | % |
|---|---|---|
| No | 44 | 37.3% |
| Yes | 74 | 62.7% |
| Total | 118 | 100.0% |

**Table A9 – Self-Initiated Stops for Criminal Possession of a Weapon**

| Reviewer | # of Stop Reports Assessed | % Legally Sufficient |
|---|---|---|
| NST | 48 | 45.8% |
| Non-NST | 31 | 77.4% |

**Table A10 – Compliance Assessments by Reviewing Supervisor**

| Reviewer | Number of Stop Reports Reviewed | % Legally Sufficient for Stop |
|---|---|---|
| Reviewing Supervisor | 184 | 100% |
| Monitor Team | 184 | 75.5% |

**Table A11 – Compliance Assessments by Reviewer for Stops Assessed in 2Q2022**

| Reviewer | # of Stop Reports Assessed | % Legally Sufficient | # Frisks | % Frisks Legally Sufficient | # Searches Assessed | % Searches Legally Sufficient |
|---|---|---|---|---|---|---|
| Reviewing Supervisor | 81 | 100% | 68 | 100% | 55 | 96.7% |
| Command Self-Inspection | 53 | 90.6% | 44 | 86.4% | 35 | 85.7% |
| QAD | 81 | 72.8% | 68 | 74.6% | 55 | 84.3% |
| Monitor Team | 81 | 63.0% | 68 | 58.8% | 55 | 45.5% |

**Table A12 – Type of Encounter of BWC Videos Reviewed**

| Type of Encounter | # |
|---|---|
| CAR STOP | 230 |
|     Investigative Encounter | 137 |
|     Radio Run | 21 |
|     Level 3 Pedestrian Stop | 23 |
|     Other | 8 |
| **Total** | **419** |

**Table A13 – Level 3 Stop Encounter During Car Stops**

| L3 Stop | # |
|---|---|
| CAR STOP | 230 |
|     Inconclusive | 4 |
|     No Level 3 Stop | 197 |
|     Yes Level 3 Stop | 29 |
| **Total** | **230** |

**Table A14 – Frisks During Car Stops**

| Frisk | # |
|---|---|
| CAR STOP | 230 |
| Inconclusive | 3 |
| No Frisk | 205 |
| Yes Frisk | 22 |
| **Total** | **230** |

**Table A15 – Contraband Recovered from Frisks During Car Stops**

| Contraband – Frisk | # |
|---|---|
| CAR STOP | 230 |
| Inconclusive | 3 |
| No Frisk | 205 |
| Yes Frisk | 22 |
| No Contraband | 20 |
| Yes Contraband | 2 |
| **Total** | **230** |

**Table A16 – Searches During Car Stops**

| Car Stop – Search | # |
|---|---|
| CAR STOP | 230 |
| Inconclusive | 2 |
| No search | 164 |
| Yes search | 64 |
| **Total** | **230** |

**Table A17 – Contraband Recovered During Searches at Car Stops**

| Contraband – Search | # |
|---|---|
| CAR STOP | 230 |
| Inconclusive | 2 |
| No Search | 164 |
| Yes, Search | 64 |
| No Contraband | 57 |
| Yes, Contraband | 7 |
| **Total** | **230** |

**Table A18 – Crime Charged in Phase I and Phase II Stop Report Encounters**

| Crime Charged | # | % |
|---|---|---|
| Assault | 2 | 3.3% |
| Criminal Possession of Controlled Substance | 4 | 6.69% |
| Criminal Possession of a Weapon | 42 | 68.9% |
| Disorderly Conduct | 1 | 1.6% |
| Possession – Imitation Pistol | 3 | 4.9% |
| Menacing | 1 | 1.6% |
| Petit Larceny | 1 | 1.6% |
| Resisting Arrest | 1 | 1.6% |
| Robbery | 1 | 1.6% |
| Traffic Offense | 1 | 1.6% |
| Unknown | 3 | 4.9% |
| Arrest on Warrant | 1 | 1.6% |
| **Total** | **61** | **100.0%** |

**Table A19 – Apparent Race of Person Encountered**

| | BWC # | Stop Report | Total # | % |
|---|---|---|---|---|
| Black | 277 | 135 | 412 | 69.1% |
| Hispanic | 121 | 46 | 167 | 28.0% |
| Middle Eastern | 2 | 0 | 2 | 0.3% |
| White | 10 | 2 | 12 | 2.0% |
| Asian | 2 | 1 | 3 | 0.5% |
| | | | 596 | 100% |
| Inconclusive or Unknown | 7 | 0 | 7 | |
| **Total** | **419** | **184** | **603** | |

**Table A20 – Apparent Gender of Person Encountered**

| | BWC # | Stop Report | Total # | % |
|---|---|---|---|---|
| Male | 386 | 173 | 559 | 93.0% |
| Female | 31 | 11 | 42 | 7.0% |
| | | | 601 | 100% |
| Inconclusive or Unknown | 2 | 0 | 2 | |
| **Total** | **419** | **184** | **603** | |

**Table A21 – Apparent Age of Person Encountered**

| Age of Person Stopped | # | % Total | % Age Known |
|---|---|---|---|
| Under 20 | 60 | 32.6% | 35.3% |
| 20-29 | 64 | 34.8% | 37.6% |
| 30-39 | 34 | 18.5% | 20.0% |
| 40-49 | 9 | 4.9% | 5.3% |
| 50 and above | 3 | 1.6% | 1.8% |
| NR | 1 | 7.6% | |
| **Total** | **184** | | |

**Table A22 – 41 Precinct Stop Report Legal Sufficiency by Reviewer**

| Reviewer | % Legally Sufficient | | |
|---|---|---|---|
| | Stop | Frisk | Search |
| Reviewing Supervisor | 100.0% | 100.0% | 94.4% |
| Command Self-Inspection | 100.0% | 100.0% | 100.0% |
| QAD | 58.3% | 61.1% | 81.3% |
| Monitor | 40.7% | 32% | 26.3% |