# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Mylan L. Denerstein
Direct: +1 212.351.3850
Fax: +1 212.351.6350
MDenerstein@gibsondunn.com

February 26, 2025

**VIA ECF**

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007-1312

Re:    *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
       *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
       *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
       <u>2024 End of Year Monitor Update</u>

Dear Judge Torres:

This is the Monitor's third annual year-end report summarizing progress and substantial noncompliance by the NYPD in 2024.

Positive developments include:

- NYPD's training on stop, frisk, and search is thorough and comprehensive.

- NYPD's Quality Assurance Section ("QAS"), charged with auditing the legality of stops, frisks, and searches is more accurate than in prior years and is generally aligned with the Monitor teams' assessments of stops, frisks, and searches.

- NYPD has developed a proposed Fourteenth Amendment Compliance Plan.

Negative outcomes include:

- NYPD supervisors in the field and in commands are continuing to fail to identify unconstitutional stops, frisks, and searches.

- NYPD's compliance rates for self-initiated stops are extremely low (86.9% stops, 57.5% frisks, 61.2% searches), as opposed to when officers are responding to a radio run (90.2% stops, 84.6% frisks, 72.5% searches).

- Underreporting of stops continues (59%) to be a fundamental problem, making a true accounting of compliance impossible.

The NYPD must focus on accountability of supervisors at all levels of the Department, and we are hopeful that will happen in 2025.

**GIBSON DUNN**

Honorable Analisa Torres
February 26, 2025
Page 2


I.    **NYPD Leadership**

During my short tenure as Monitor, we have seen many changes in the leadership of the Department.  There have been four Commissioners in three years, which has presented several challenges for the Department.  We look forward to working with Commissioner Jessica Tisch and her team.

II.    **Accountability**

A.  **Early Intervention Program ("EIP")**

The EIP aims to identify and address at-risk officer behavior but has not been effective.  As the Monitor has noted previously, the EIP is not successful in changing officer behavior.  Over the last six months, the Department and Monitor have discussed making several changes to the EIP.  Michael Gerber, the Deputy Commissioner for Legal Matters now oversees EIP as of January 2025.  We are working together to make changes to EIP so it can achieve its objective to address at-risk officers and their supervisors.  Changes to the EIP should be made by June 2025.

B.  **ComplianceStat**

Last year, the NYPD initiated ComplianceStat.  The purpose is to monitor compliance with stops, frisks and searches, including underreporting of stops, by command.  ComplianceStat meetings, chaired by Chief of Department John Chell, review supervisory oversight and accountability by command and focus on specific failures to identify and correct improper stops, frisks and searches, or undocumented stops.[1]

Before ComplianceStat meetings are held, a unit in the Patrol Services Bureau reviews body-worn camera ("BWC") footage of the commands attending as well as data on stop reports, consent to search report forms, and vehicle reports from the prior 28-day period to identify potential undocumented stops, improper stops, frisks, and searches, and stop reports awaiting review and approval by supervisors.  Command executives must be prepared to address and answer questions about their command's practices.  At meetings, command executives have been called to task for undocumented *Terry* stops and improper frisks and searches.  For example, the Patrol Services Bureau has questioned command executives whether they are reviewing their officers' BWC videos and finding improper actions that have been identified by the Patrol Services Bureau during its audit.  The Monitor team has observed each ComplianceStat meeting and generally has been impressed by the focus on accountability at the meetings.  However, at a ComplianceStat meeting for the Housing Bureau, the Monitor

---

[1] When Chief Chell was the Chief of Patrol, he co-chaired the ComplianceStat meetings for Patrol Boroughs and the chief of the Housing Bureau or Transit Bureau, respectively, co-chaired ComplianceStat meetings for Housing Bureau and Transit Bureau commands.

**GIBSON DUNN**

Honorable Analisa Torres
February 26, 2025
Page 3

team did not find the same level of scrutiny and thoroughness as at other meetings. We are optimistic this will be corrected because Chief Chell will now be chairing Housing Bureau ComplianceStat meetings. We will be reviewing ComplianceStat to assess whether it is improving compliance in the field.

### C. Supervision

Supervisors in the field and executives at the command are not preventing or taking corrective or disciplinary action in response to unconstitutional stops, frisks, and searches. And the supervisors are not addressing underreporting. While the determinations of QAS's auditors more closely mirror the Monitor's assessment, command-level supervisors reach strikingly different results than QAS or the Monitor team when evaluating officer conduct. In the first half of 2024, reviewing supervisors (sergeants and lieutenant) found nearly *all* stops, frisks, and searches compliant, despite actual compliance being much lower, while QAS and the Monitor team are finding substantial non-compliance with the law during the same period.

|  | % of Stops Deemed Compliant (1H2024) | % of Frisks Deemed Compliant (1H2024) | % of Searches Deemed Compliant (1H2024) |
|---|---|---|---|
| Reviewing Supervisors | 99% | 98% | 97% |
| Command Executives | 94% | 78% | 77% |
| QAD Audits | 84% | 69% | 71% |
| Monitor Audits | 89% | 69% | 68% |

## III. Fourteenth Amendment

### A. Fourteenth Amendment Compliance Plan

Finally, the NYPD provided the Monitor and the Plaintiffs with a proposal to monitor compliance with the Fourteenth Amendment in January 2025. The NYPD's Fourteenth Amendment Compliance Plan includes a Racial Disparities Review Committee ("RDRC") to monitor and address racial disparities in stop and frisk practices to ensure compliance with the Fourteenth Amendment. The RDRC will replicate the multivariate statistical model the Monitor team used to analyze racial disparities in stops and stop outcomes in its reports. The Committee will also use the SQF Dashboard, a visualization dashboard that tracks and analyzes NYPD's stop, frisk, search, and arrest data, among others, by officer, command, bureau, or borough, and citywide. The goal of the plan is to have "a mechanism for the Department to quantify racial disparities in SQF enforcement; to track the trajectory of those disparities; to identify outlier commands that are driving those disparities; to explain why those disparities exist; and to take steps to reduce those disparities." The Monitor will be working

GIBSON DUNN

Honorable Analisa Torres
February 26, 2025
Page 4

with the parties to finalize its Fourteenth Amendment Compliance Plan so that it can begin implementation in 2025.

### B. CCRB's Racial Profiling Complaint Investigations

In 2021, the City Council passed Local Law 47 (2021), which amended the City Charter to clarify that investigations of allegations of "racial profiling and bias-based policing" falls under the Civilian Complaint Review Board's ("CCRB") "abuse of authority" jurisdiction.[2]  The CCRB began receiving complaints in October 2022.

At the end of 2024, the Racial Profiling and Bias Based Policing Unit had 547 open investigations of complaints that included at least one allegation of bias-based policing.  For the first half of 2024, the CCRB had closed complaints that included 253 allegations of bias-based policing.  Of those, 41 allegations were substantiated (23 race, 10 disability, 5 national origin, 2 color, 1 gender).  Once those matters are fully adjudicated, the NYPD must address the substantiated complaints, the Monitor will be reviewing the NYPD's actions and reporting on it.

In October 2024, the Monitor learned that the NYPD had a policy of closing cases substantiated by the CCRB if the statute of limitations ("SOL") was less than 60 days from when the CCRB referred the case to the NYPD.  The Monitor disagreed with this policy because it means there is not a check on officer misconduct.  In response to the Monitor's concerns, the City informed the Monitor that any substantiated CCRB case within the scope of the Monitorship, including stop, frisk, or search misconduct and bias-based policing, will not be subject to a cutoff based on proximity to the expiration of the SOL.  The NYPD should take substantiated complaints seriously and address them.

## IV.    Compliance Reviews

### A. Stop Report and BWC Audits

The Monitor's review of stops shows an increase in noncompliant stops, with unconstitutional reported stops increasing from 10.6% in 2021 to 11.3% in the first half of 2024.  Unconstitutional frisks rose dramatically from 15.8% in 2021 to 31.1% in the first half of 2024.  Unlawful searches also rose dramatically from 20.4% in 2021 to 32% in the first half of 2024.  These increases in unlawful stops, frisks, and searches are substantial.

---

[2] N.Y.C. Local Law No. 47 (2021), https://codelibrary.amlegal.com/codes/newyorkcity/latest/NYCadmin/0-0-0-132892.

# GIBSON DUNN

Honorable Analisa Torres
February 26, 2025
Page 5

### B. Underreporting Audits

The Monitor's 2024 audit of investigative encounter BWCs found that only 59% of the stops reviewed were documented by stop reports.  This means that the stop report with relevant information was not prepared.  This is the same percentage of underreporting as the Monitor found in the 2023 audit and is deeply concerning.  The Department must hold officers and supervisors accountable for failing to record *Terry* stops as required by law.

### C. Policing in NYCHA

As part of the *Davis* settlement, the Monitor reviews stops at NYCHA properties, BWC videos of interior patrols, and NYPD trespass arrests.  For the first half of 2024, the Monitor team determined that 81% of stops, 68% of frisks and 66% of searches were lawful, a rate too low but comparable with the Monitor's reviews of Department-wide stops in the same period.  For trespass arrests, the Monitor determined that officers had a proper basis for approaching the subject in 94% of the arrests and had probable cause for 96% of the arrests.

## V.    Discipline Report

On September 23, 2024, after a lengthy review process by all the parties, the Court filed Judge James Yates' Discipline Report,[3] and opened a 90-day period for public comments on the Report.  The Report is an in-depth, critical examination of the efficacy, fairness, and integrity of the City's policies, practices, and procedures with respect to police misconduct during stops.  The report includes recommendations for addressing the problems it identifies.

Sixteen members of the public and/or organizations submitted comments by visiting the Monitor's website, https://www.nypdmonitor.org/resources-reports/.   The Community Liaison also hosted a public Zoom event with the Monitor team and Judge Yates to discuss the Discipline Report on December 12, 2024.  Judge Yates will work with the NYPD and the parties to recommend next steps.

## VI.    Community Liaison

A little over two years ago, on December 16, 2022, the Court appointed Germain Thompson to serve in the newly created role of Community Liaison.  As Community Liaison, Mr. Thompson and his team are engaging with community members most impacted by the NYPD's stop-and-frisk practices and communicating their experiences, perspectives, and recommendations to the Monitor and the Court.

The Community Liaison continues to organize community meetings and listening sessions and conduct grassroots outreach.  In addition, the Liaison and the Monitor held two

---

[3] JAMES YATES, REPORT TO THE COURT ON POLICE MISCONDUCT AND DISCIPLINE (Sept. 19, 2024), https://www.nypdmonitor.org/wp-content/uploads/2024/09/Discipline-Report.pdf.

**GIBSON DUNN**

Honorable Analisa Torres
February 26, 2025
Page 6

community forums in 2024: on February 26 in Queens, and on September 12 in Manhattan. The Liaison also organized two panels on police accountability with the CCRB, the NYPD Inspector General, and the NY State Attorney General's Office in August and November 2024, where the Deputy Monitor participated.

The Community Liaison filed his Community Engagement plan on March 7, 2024. The plan outlines the initial efforts of the Liaison and the steps he plans to take, including outreach, education, and feedback. In November 2024, the Liaison filed its first quarterly report for the second quarter of 2024, discussing the challenges and successes of the Office. The Community Liaison will now focus on feedback sessions, in which community members provide their views of police encounters over the last 24 months. The Liaison will be using detailed questions and software to track data from the feedback sessions to provide to the Monitor.

## VII.    Monitor Reports

**Twenty-First Report: General Compliance Report.**   The Monitor's General Compliance Report was filed on September 4, 2024, and reviewed the NYPD's compliance with the Court's orders and assessed data about NYPD policing from 2020 through 2023.[4]

The report's findings include:

- *Terry* stops, frisks, and searches are increasing.

- Unconstitutional *Terry* stops, frisks, and searches are increasing.

- Underreporting of *Terry* stops is too high.

- Housing Bureau *Terry* stops are less compliant than the NYPD's stops as a whole, but Housing Bureau trespass arrests are compliant.

- Supervision of *Terry* stops, frisks, and searches needs to improve.

**Twenty-Second Report: Unreported Stops Report.**   The report filed on October 7, 2024, found that only 59% of identified *Terry* stops were documented with stop reports in 2023. The NYPD must take further action to record *Terry* stops properly. It must also hold officers and supervisors accountable for failing to record *Terry* stops as required by law.

**Twenty-Third Report: Follow-up Neighborhood Safety Teams Report.**   The Monitor's 23rd Report, filed on February 3, 2025, reported on the Monitor team's audits of NST and PST units and regular patrol officers. The results are disappointing. Compliance

---

[4] NEW YORK POLICE DEPARTMENT MONITOR, TWENTY-FIRST REPORT OF THE INDEPENDENT MONITOR (Sept. 4, 2024), https://www.nypdmonitor.org/wp-content/uploads/2024/09/21st-Monitor-Report-General-Compliance-Report_Stamped.pdf.

**GIBSON DUNN**

Honorable Analisa Torres
February 26, 2025
Page 7

rates for stops, frisks, and searches of NST officers were even lower than the prior report (75%, 58%, and 54%, respectively). PST officers also performed poorly. Both NST and PST officers conduct self-initiated stops at a much higher rate than regular patrol officers, and self-initiated encounters had much lower rates of lawful stops, frisks, and searches (65%, 38%, and 42%, respectively) than stops based on a radio dispatch in response to a 911 or 311 call.

Supervisory oversight of NST and PST units also continues to be inadequate. Despite significant numbers of unlawful stops, frisks, and searches, command-level supervisors determined that only 1% of stops were unlawful and 1% of frisks and searches were unlawful. In 95% of the stop reports in which race was identified, the person stopped was Black or Hispanic.

**ISLG Study.** Researchers from the City University of New York's Institute for State and Local Governance ("ISLG") conducted a study focused on Fourth and Fourteenth Amendment compliance in police-civilian encounters in the City. The study (1) assesses the prevalence of unreported stops and the conditions in which officers most often fail to document stops appropriately; (2) assesses how frequently officers conduct stops that violate the Fourth Amendment, including examining the conditions in which unconstitutional stops occur, and the ways that a stop was unconstitutional; and (3) analyzes racial and ethnic disparities in stops. The report will be filed with the Court in 2025.

**Stanford Study.** A second study, conducted by researchers initially associated with Stanford University, is assessing BWC footage using machine language methods to determine the extent of Fourth and Fourteenth Amendment compliance. The study is expected to be completed in 2025.

## VIII.     Conclusion

We are tired of monitoring the NYPD. It has been eleven years. The NYPD has very good mandatory training regarding stops, frisks, and searches. And after eleven years, we are pleased that the NYPD has presented a Fourteenth Amendment compliance plan. It is time for the NYPD to make it a priority for supervisors and officers to comply with the law and hold them accountable when they fail to do so. The NYPD can hold its supervisors and officers accountable. The Department needs to lean into doing so and make it part of the culture. New Yorkers deserve no less.

Respectfully,

Mylan L. Denerstein
Independent Monitor