

# Twenty-Sixth Report of the Independent Monitor

## The NYPD's Accountability Efforts

Mylan Denerstein

October 14, 2025

*Floyd, et al. v. City of New York, et al.*

*Ligon, et al. v. City of New York, et al.*

*Davis, et al. v. City of New York, et al.*

# MONITOR TEAM

Mylan Denerstein
*Monitor*

Richard Jerome
*Deputy Monitor*

Susan Prosnitz
*Associate Monitor*

Anthony Braga

Jennifer Eberhardt

Rudolph Hall

Demosthenes Long

John MacDonald

James McCabe

Jane Perlov

James Yates

nypdmonitor.org

**Table of Contents**

I.    Executive Summary ........................................................................................................ 1

II.   Command Responses to NYPD's Audits .................................................................... 6

III.  Early Intervention Program ...................................................................................... 10

  A.  Background ................................................................................................................ 10

  B.  Audit Methodology ..................................................................................................11

  C.  Monitor Team Observations .................................................................................. 12

     1.  Recommended Interventions .......................................................................... 12

     2.  Stop Reports ....................................................................................................... 14

     3.  BWC Categorization and Improper Frisks and Searches ......................... 14

  D.  2025 EIP Improvements .......................................................................................... 15

IV.   ComplianceStat ........................................................................................................... 16

  A.  Multiple PBBS Appearances .................................................................................. 17

  B.  Recent ComplianceStat Meetings ......................................................................... 21

V.    Conclusion ................................................................................................................... 24

## I.    Executive Summary

A key to compliance with the federal court's orders in *Floyd v. City of New York*, *Ligon v. City of New York*, and *Davis v. City of New York*,[1] is accountability for unconstitutional stops, frisks, and searches.  The New York City Police Department ("Department" or "NYPD") must hold all its officers, sergeants, lieutenants, and command executives accountable.  The Department's remedy for unconstitutional stops has been more and more training, but that has proved to be ineffective.  The Department needs to take action, including discipline at all levels for officers and supervisors who consistently fail to abide by the law.  As the Monitor noted in the Twenty-Third Report: "If supervisors and commands continue to fail to address unlawful stops, frisks, and searches and if they fail to address undocumented stops, then the Department must hold supervisors and commands accountable.  If some commands can police lawfully, then the rest can do it too, and when they repeatedly do not, then there should be serious consequences."[2]

More recently, the NYPD appears to be building systems of accountability that could address its deficiencies and lead to improved compliance.  The NYPD has begun to implement a more focused Eary Intervention Program ("EIP") and is now tracking the audits by patrol boroughs in preparation for ComplianceStat meetings.  Recent Department executive level action removing command officers from leadership positions and disbanding of borough specialized units where there are compliance failures is a positive development.  Going forward, the NYPD will be examining how commands respond to audits by its Quality Assurance Section ("QAS") so that officers and supervisors with repeat deficiencies are not simply given the same training or instructions.  These steps are a hopeful sign of future accountability.

---

[1] *Floyd, et al. v. City of New York*, 08-CV-1034 (AT); *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT); *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT).

[2] Twenty-Third Report of the Independent Monitor, *Floyd, et al. v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. Feb. 3, 2025), ECF No. 952-1, at 44.

This Report focuses on the efficacy of Department audits conducted by the NYPD's QAS, the Early Intervention Program ("EIP") and ComplianceStat.

- <u>Department Audits and Command Response</u>.  The NYPD's QAS audits a sample of stop reports from every command in the Department, to assess whether there was a sufficient legal basis for the stop, frisk, and search, as appropriate.  The results of these audits are then shared with the audited command, which must review the results of the QAS audit, address any deficiencies identified, and submit a report in response to the QAS audit, including corrective actions taken to improve performance.  The Monitor team reviewed the command responses to the audits in 2024 to see what actions the commands took to address unconstitutional stops, frisks, and searches.  Minimal to no discipline was imposed.

- <u>EIP</u>.  The NYPD's EIP is a type of "early warning system" ordered by the Court in 2020 to identify officers engaged in stop, frisk, or search violations and correct their behavior before misconduct escalates.  The NYPD was directed to systematically collect, assess, and act on information regarding adverse findings related to officers' illegal stops or illegal trespass enforcement.  The Department established an Early Intervention Committee ("EIC" or "Committee") to review officers who cross specific thresholds relating to at-risk behaviors.  In earlier reports, the Monitor determined that the system was ineffective in changing officers' behavior.[3]  In furtherance of that, the Monitor team reviewed the body-worn camera ("BWC") videos of officers who were evaluated by the NYPD to see whether the interventions directed by the EIC had the desired impact.  The Monitor team found that they did not.

---

[3] <u>Twenty-First Report of the Independent Monitor</u>, *Floyd et al. v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. Sept. 4, 2024), ECF No. 934-1, at 37-41.

- <u>ComplianceStat</u>.  In January 2024, the Department implemented ComplianceStat, a system of accountability intended to ensure compliance with Department policies and legal mandates, including the Court Order establishing the Federal Monitor NYPD oversight. At these meetings, NYPD leadership question patrol borough and command staff on their compliance efforts.  The Monitor tracked the performance of one of the patrol boroughs (Patrol Borough Brooklyn South, "PBBS") and the corrective actions taken to address the deficiencies identified in the ComplianceStat process.  The Monitor team also attended more recent ComplianceStat meetings for Patrol Borough Manhattan South ("PBMS") and Patrol Borough Brooklyn North ("PBBN").  The improvements made by PBBS as a result of the ComplianceStat meetings show that the NYPD can identify and remedy unconstitutional *Terry* stops, frisks, and searches among its members if it makes the effort to do so.

The key findings regarding the efficacy of the NYPD's accountability efforts are below:

- In 2024, there were few consequences and little supervisory accountability for unreported stops and improper stops, frisks, and searches.  For the four quarters reviewed by the Monitor team, QAS identified over 4,000 improper stops, frisks, or searches.  In only eight instances was a Command Discipline ("CD") issued to the officer for the unconstitutional action.  In another 110 instances, an officer was given a negative Cop's Rapid Assessment Feedback Tool ("CRAFT"),[4] which is the lowest form of sanction for misconduct.  In the other 98% of the incidents, the officer was either instructed, given training, or the violation was not addressed at all.  Meaningful accountability at the command level in response to

---

[4] CRAFT is a process that allows supervisors to issue a Supervisory Comment Form in the NYPD's personnel system for an officer's positive or negative actions.

QAS audits was absent.

- Officers identified as engaging in multiple unlawful actions and supervisors who failed to identify or address unlawful actions of officers received only training or instructions, demonstrating the inadequacy of these corrective measures where there were repeated failures.

- Closer monitoring of individual precincts is necessary to identify potentially more widespread Department deficiencies in applying appropriate corrective measures in response to unlawful stops, frisks, and searches.

- EIP has not been effective to date, with minimum interventions directed for officers who crossed the EIP thresholds relating to stops, frisks, and searches. Often where the Professional Standards Division ("PrSD") recommended a series of available interventions, the Commanding Officer ("CO") did not recommend any interventions available under the program. When an intervention was directed by the EIC, there was little to no structured follow-up to determine if directed corrective supervisory measures were implemented, and more importantly, the outcome of such measures.

- Moreover, EIP interventions did not impact officer behavior and thus were not effective in addressing Fourth Amendment compliance, stop report documentation, and BWC usage. A more intensive approach is necessary for meaningful change.

- PBBS went through the ComplianceStat process three times within a four-month period due to continued poor performance, including undocumented *Terry* stops, late activation and early deactivation of officers' BWC, inadequate supervision and little to no consequences for improper actions. By the third PBBS ComplianceStat meeting, the Department's pre-meeting audit showed significant improvements, with very few

undocumented stops. These improvements resulted from an intensive effort undertaken at the command and borough levels to conduct their own audits to identify and correct deficiencies, including identifying undocumented *Terry* stops. Actions taken by PBBS included removal of a precinct commander, Integrity Control Officer, and Special Operations Lieutenant ("SOL"), and in another command, disbanding of the NST team for failure to address these performance issues. These were positive actions taken by the command and patrol borough.

- The PBMN and PBBN ComplianceStat meetings revealed that several borough and command executives were unprepared for the meetings and unable to answer questions about the activities of their NSTs, PSTs, and CRTs. These executives did not review a sufficient number of BWC videos of their specialized teams and could not identify their officers' deficiencies or any actions taken to address those deficiencies. In response to inattention and ineffective oversight at the borough and command level, Department leadership directed several immediate personnel actions, including disbanding the PBBN PST, relieving the PBBN Inspector responsible for overseeing compliance of those duties, and reassigning officers and executives at the command level. If consistently undertaken, such personnel actions, particularly reassignment of personnel, may be highly effective in incentivizing compliance and demonstrating the Department's commitment to this goal.

ComplianceStat can be an effective accountability tool to motivate command and borough level supervisors and executives to identify and remedy unconstitutional practices among their officers. It is an innovative process that involves the highest level of leadership in the Department. The ComplianceStat model is the first Department initiative in which command and borough supervisors are facing meaningful consequences resulting from ineffective supervision and

executive engagement. However, it is still too early to tell whether these meetings will result in measurable improvements to command and borough level supervision of officers' stops, frisks, and searches. The Department is moving in the right direction, but to achieve compliance, accountability must be institutionalized and ComplianceStat must be taken seriously by all NYPD commands at all levels.

## II.    Command Responses to NYPD's Audits

The NYPD has established auditing procedures that identify unconstitutional *Terry* stops, frisks, and searches and a mechanism for correcting them. Each quarter, QAS selects a sample of stop reports from every command in the Department and assesses if there was a sufficient legal basis for the stop, frisk, and search as appropriate. The results of these audits are then shared with the audited command. COs in the command are required to review the results of the QAS audits, address any deficiencies identified, and submit a report about any corrective actions taken to improve performance.

In the last two years, the Monitor team has found that the QAS audits have become more thorough. QAS audits have improved and are now closely aligned with the Monitor team's audits. This is a positive step towards accountability. To achieve compliance, NYPD commands need to take QAS audits seriously, address the unconstitutional behaviors identified, and make the corrections necessary to improve performance. Unfortunately, the QAS command-level audit process appears to be mostly an administrative exercise, with little meaningful change occurring at the command level based upon these audits.

The Monitor team explored the QAS audit results for a one-year period from the fourth quarter of 2023 through the third quarter of 2024. QAS audited 10,621 of the 24,006 stop reports (44.2%) prepared in that 12-month period. The table below shows the level of lawfulness assessed by QAS of these encounters.

6

**Table 1: QAS Assessment**

|  | Stops | | | | Frisks | | | Searches | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Total | Audited | #Lawful | %Lawful | Total | #Lawful | %Lawful | Total | #Lawful | %Lawful |
| **4Q2023** | 4069 | 1893 | 1694 | 89% | 1196 | 916 | 77% | 1035 | 716 | 69% |
| **1Q2024** | 6028 | 2645 | 2292 | 87% | 1618 | 1113 | 69% | 1489 | 944 | 63% |
| **2Q2024** | 5862 | 2585 | 2307 | 89% | 1545 | 1163 | 75% | 1356 | 926 | 68% |
| **3Q2024** | 6105 | 2705 | 2462 | 91% | 1704 | 1254 | 74% | 1490 | 1026 | 69% |
|  | 22064 | 9828 | 8755 | 89% | 6063 | 4446 | 74% | 5370 | 3612 | 67% |

The QAS assessment of the NYPD on the lawfulness of these encounters was fairly consistent. Stop compliance ranged from 87% to 91% with an average of 89% overall. Frisk compliance ranged from 69% to 75% with an average of 71%, and search compliance ranged from 63% to 69% with an average of 66%. After QAS completed its audit of a command's stop reports, the command was provided with a report of the auditor's findings and required to respond. The Monitor team reviewed these responses to evaluate the measures taken by the commands to improve compliance.

The table below illustrates those command-level measures and indicates that there is widespread leniency with respect to sanctions for unlawful stops, frisks, and searches.

**Table 2:  Accountability for Unconstitutional Policing—4Q2023–3Q2024**

|  | Deficiency | | | CRAFT | | | CD | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Stop | Frisk | Search | Stop | Frisk | Search | Stop | Frisk | Search |
| **4Q2023** | 209 | 280 | 319 | 4 | 4 | 11 | 0 | 0 | 2 |
| **1Q2024** | 353 | 505 | 545 | 5 | 5 | 12 | 0 | 2 | 4 |
| **2Q2024** | 278 | 382 | 430 | 4 | 1 | 15 | 0 | 0 | 0 |
| **3Q2024** | 243 | 450 | 464 | 13 | 18 | 18 | 0 | 0 | 0 |
| **Sub-Total** | 1,083 | 1,617 | 1,758 | 26 | 28 | 56 | 0 | 2 | 6 |
| **Totals** | | | 4,458 | | | 110 | | | 8 |

Over these four quarters, QAS identified 4,458 incidents of either an improper stop, frisk, or search. Other than training or instructions, which are not viewed by the NYPD as discipline, the most common measure taken by any command in the NYPD across this 12-month period was issuing a negative CRAFT report, which is the lowest form of sanction that a command can take

for misconduct. A handful of officers were issued a CD, and no officers were issued Charges and Specifications for unlawful stops, frisks, or searches.

Out of these 4,458 incidents, eight officers were given CDs and 110 officers were issued a negative CRAFT in these incidents. In the other 4,348 incidents (97.5%), the officer was either instructed, given training, or the violation was not addressed at all. The command responses do not report whether any of the CD's resulted in a penalty of days or hours forfeited. Essentially, there was little to no accountability for unconstitutional policing related to the QAS audits.

The 46 Precinct is an example of lax accountability taken with regards to unlawful stops, frisks, and searches. The 46 Precinct is one of 78 precincts in the NYPD. Although other precincts had better responses to QAS audits, the 46 Precinct is highlighted because it is among the more active precincts. The NYPD must closely monitor how precincts respond to unlawful stops, frisks, and searches. The table below illustrates the number of stops audited by QAS during the period in question. The data demonstrates low compliance rates of 78%, 57%, and 60% with respect to stops, frisks, and searches, respectively, below the NYPD overall average.

**Table 3: 46 Precinct—4Q2023–3Q2024 QAS Audit Results**

| | Stops | | | | Frisks | | | Searches | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Audited | #Lawful | %Lawful | Total | #Lawful | %Lawful | Total | #Lawful | %Lawful |
| **4Q2023** | 269 | 85 | 68 | 80% | 76 | 48 | 63% | 45 | 32 | 71% |
| **1Q2024** | 233 | 77 | 53 | 69% | 67 | 35 | 52% | 41 | 22 | 54% |
| **2Q2024** | 210 | 68 | 57 | 84% | 61 | 38 | 62% | 23 | 15 | 65% |
| **3Q2024** | 287 | 99 | 77 | 78% | 94 | 48 | 51% | 48 | 25 | 52% |
| **TOTAL** | 999 | 329 | 255 | 78% | 298 | 169 | 57% | 157 | 94 | 60% |

With high volume and poor performance, the NYPD should be monitoring activity in the 46 Precinct very closely. However, the command itself did little in the way of anything more than instructions and training when unlawful conduct was reported by QAS. The table below illustrates the 46 Precinct's response to the four QAS audits. For each member, the table below reports the number of times the officer was instructed for an unlawful stop, frisk, or search.

**Table 4:  46 Precinct Stop Report Deficiencies Identified by QAS 4Q2023–3Q2024**

| Rank | Pseudonym No. | 4Q2023 Instruction or Training | 1Q2024 Instruction or Training | 2Q2024 Instruction or Training | 3Q2024 Instruction or Training |
|---|---|---|---|---|---|
| PO | 1 | 1 | 4 | 1 | 2 |
| PO | 2 | 5 | 5 | 1 | 4 |
| PO | 3 | 0 | 0 | 0 | 0 |
| PO | 4 | 1 | 0 | 0 | 0 |
| PO | 5 | 0 | 0 | 1 | 3 |
| PO | 6 | 0 | 0 | 0 | 0 |
| PO | 7 | 0 | 5 | 0 | 4 |
| PO | 8 | 2 | 4 | 3 | 5 |
| PO | 9 | 3 | 3 | 1 | 5 |
| PO | 10 | 0 | 0 | 3 | 5 |
| PO | 11 | 0 | 0 | 2 | 4 |
| PO | 12 | 0 | 0 | 0 | 0 |
| PO | 13 | 1 | 0 | 0 | 0 |
| PO | 14 | 0 | 2 | 1 | 6 |
| | Total | 13 | 23 | 13 | 38 |
| | | | | | |
| Rank | | Supervisor Deficiencies | Supervisor Deficiencies | Supervisor Deficiencies | Supervisor Deficiencies |
| SGT | 1 | 0 | 1 | 1 | 6 |
| SGT | 2 | 8 | 1 | 6 | 6 |
| SGT | 3 | 0 | 0 | 0 | 13 |
| SGT | 4 | 3 | 8 | 8 | 0 |
| | Total | 11 | 10 | 15 | 25 |

Police Officer 8, for example, was instructed or referred for training 14 times in the 12-month period.  The list indicates that regardless of the repeated recommendation for instruction and training, the overall performance of the command did not improve.  In no circumstances was anything more severe than instructions or training reported in response to unlawful activity.

In addition, the table reports the number of times one of the unit supervisors was instructed for failing to identify an unlawful action by a member of their team.  Sgt. 2, for example, was put on notice by the precinct's Integrity Control Officer 21 times for failing to identify unlawful actions.  These numbers demonstrate that continued training and instruction is not the answer.

The NYPD needs to recognize that discipline and/or reassignment—both for officers and supervisors—may be necessary to address poor performance.  It also needs to hold supervisors accountable for identifying the unlawful actions of officers under the supervisor's command.

## III.    Early Intervention Program

### A.  Background

In June 2020, the Court ordered the Department to develop an EIP.  The program's goal is for the NYPD to identify potential issues and at-risk behavior by officers, and to take action before their misconduct escalates.   The Court ordered the NYPD to implement "a program for systematically receiving and assessing information regarding adverse findings on the conduct of police officers involving illegal stops or illegal trespass enforcements."[5]  The Court set out several thresholds that would trigger NYPD review, such as a court's suppression decision in a case involving an unlawful stop, frisk, or search, or the Law Department's decision to deny indemnification or representation of an officer in a case involving an unconstitutional stop.[6]  The Court ordered the Department to establish an EIC to review the record of officers who cross a threshold and determine what intervention, if any, is appropriate.  An officer's CO or other NYPD units can also, in their discretion, refer an officer for EIC review.

The EIC first met in August 2020 and has convened regularly ever since.  The Monitor team has observed each of the EIC meetings.  The EIC may choose from an array of interventions, including training, mentoring, further review of the officer's BWC videos, enhanced supervision, change of assignment, and conferral with Bureau leadership.  The EIC may also decide that no

---

[5] Early Intervention System Order, *Floyd et al. v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. June 2, 2020), ECF No. 767, at 7-8.

[6] The designated thresholds include: three or more declinations to prosecute in a 12-month period in certain specified categories; a suppression decision in a case involving unlawful *Terry* stops, frisks, or searches, trespass enforcement, racial profiling, or racial slurs; a court finding of non-credible testimony; a declination by the Law Department to represent or indemnify the officer in a lawsuit alleging an unconstitutional stop, trespass enforcement, racial profiling, or racial slur; a judgment or settlement in a lawsuit that names the officer and alleges an unconstitutional stop, an unconstitutional trespass enforcement, racial profiling, or racial slurs, where evidence exists that the police officer violated an NYPD rule or regulation; and any Civilian Complaint Review Board ("CCRB") complaint against the officer involving racial profiling or a racial slur.  In addition to the Court's order, a section of New York City's Administrative Code, NYC Administrative Code § 14-190, added additional factors to be used as triggers for the Department's EIP.

intervention is necessary. The EIC can also refer an officer for performance monitoring, for an assessment with the Health and Wellness Section, to the Internal Affairs Bureau for potential disciplinary action, or to a district attorney's office for potential criminal investigation. Other than Health and Wellness referrals, the Monitor has not observed these types of referrals in the EIC meetings from 2020 through 2025.

Since 2022, the Monitor team has begun to do a deeper review on the effectiveness of the EIP and provided recommendations to the Department for improving the system. The Monitor team found that too often, the officer's CO would recommend no intervention and would justify the officer's actions to the EIC because the officer was "an active cop," even though the officer was an EIC candidate. In addition, the Committee meetings were pro forma, with the PrSD providing a minimal summary of over 20 officers and little to no participation by the Committee members. Because the EIP is not disciplinary, when intervention was directed, the interventions were minimal, such as requiring more training, additional review of the officer's BWC videos, or command-level mentoring. Also missing from the Department's program was any effort to track and review whether the interventions directed by the EIC resulted in any change in the officer's behavior, so the Department was unable to evaluate the effectiveness of the EIP.

## B. Audit Methodology

The Monitor team reviewed the officers assessed by the EIC in the third and fourth quarters of 2023 and the first quarter of 2024. The team identified eight officers from the third and fourth quarters of 2023 and ten officers from the first quarter of 2024 who met EIC thresholds relating to improper stop and frisk practices. Thresholds for inclusion in this audit included recent Civilian Complaint Review Board ("CCRB") complaints for improper stops, frisks, or searches;[7] internal

---

[7] CCRB complaints may have not been fully adjudicated at the time the officer is reviewed by EIP.

investigations for similar actions; or a prosecutor's decision to decline to prosecute a case due to a constitutional violation related to a stop and frisk incident. The interventions directed by the EIC included the following: stop and frisk training (12 officers); command-level mentoring (6 officers); enhanced BWC review (4 officers); supervisory guidance (3 officers), adverse credibility training (2 officers); BWC reinstruction (2 officers); Borough interview (2 officers); and tactical communications training (1 officer).[8] For four officers, no interventions were directed by the EIC.

For the eight officers who were reviewed by the EIC in the third and fourth quarters of 2023, a Monitor team member reviewed 628 BWC videos recorded by those officers for the months of January, February, and March 2024. For the ten officers reviewed by the EIC in the first quarter of 2024, a member of the Monitor team reviewed 868 BWC videos recorded by those officers in May 2024. The audit focused on any potential stop of a member of the public and whether the encounter was documented with a stop report if needed, categorized appropriately in the BWC database, and whether the actions by the officer complied with the Fourth Amendment and New York State law.[9] The Monitor team also reviewed stop reports and ICAD printouts[10] for encounters that appeared to be *Terry* stops.

### C. Monitor Team Observations

#### 1. Recommended Interventions

For the officers in the Monitor's audit, the interventions recommended by the PrSD and those by a subject officer's CO were not always aligned. One officer, included in the third quarter 2023 EIC was placed in EIP due to an adverse credibility finding. In 2023, he received two CCRB

---

[8] The NYPD uses tactical communication training to teach officers how to de-escalate tense situations and communicate effectively during critical incidents.

[9] *People v. DeBour*, 40 N.Y.2d 210 (1976).

[10] ICAD (Intergraph Computer Aided Dispatch) is the computer-aided dispatch system used by the NPYD to help call takers and dispatchers communicate with the public and the NYPD.

complaints, one alleging improper search of a vehicle and frisk of the occupant, and the second alleging an improper frisk. His CO recommended no intervention, while PrSD recommended and the EIC directed the following:

- BWC reinstruction by the Integrity Control Officer ("ICO")
- Enhanced BWC review
- Tactical communication training
- Stop, Question, and Frisk ("SQF") refresher training
- Supervisory guidance
- Borough Adjutant interview
- Adverse credibility finding training

This represents a significant disconnect in how the officer is perceived by his command compared to PrSD. The officer completed the NST two-day refresher training in October 2023, SQF Module 5 refresher video (*DeBour* Levels 3 and 4) in November 2023, and the SQF Module 6 refresher video (Investigative Encounters summary) in January 2024. Despite this training, the Monitor's audit found five encounters between January and March 2024, post refresher training, that required stop reports, and *none* were prepared.

Another officer, identified in the first quarter 2024 EIC, received nine CCRB complaints in 2023, five of which involved stops, frisks, and/or searches. The officer was involved in ten encounters where a stop report should have been prepared but was not. However, neither the CO nor PrSD recommended any interventions, and no intervention was directed by the EIC—a clear failure of corrective action.

In multiple cases, COs provided no recommendations for intervention. When COs did make recommendations, they had little structured follow-up processes in place, at least not observed by the Monitor team. For example, when a 30-day BWC review was recommended, there was no requirement that an after-action report be submitted to PrSD indicating who reviewed the videos, how they were selected, or what the review concluded.

### 2. Stop Reports

Of the 628 BWC videos reviewed for the eight officers from the third and fourth quarter 2023 EIC, 55 videos recorded encounters that appeared to be *Terry* stops.  Of the 55 encounters, only 24 had stop reports prepared.  Thirty-one encounters were flagged to the NYPD as possibly requiring a stop report.  Of those 31, the NYPD agreed that 18 should have had a stop report prepared, but did not.  Thus, of the 42 stops (24 + 18) that should have had a stop report, at minimum 18 did not (43%).

Of the 868 BWC videos reviewed for the ten officers from the first quarter of 2024, 79 videos were of encounters that appeared to have required a stop report.  Seventeen stop reports were prepared for these encounters.  Sixty-two encounters were flagged to the NYPD as possibly requiring a stop report.  Of those 62, the NYPD agreed that in 26 of those encounters, a stop report should have been prepared but was not.  Thus, out of 43 (26 + 17) stops, only 17 had stop reports, leaving a staggering 60.5% of stops missing reports.

### 3. BWC Categorization and Improper Frisks and Searches

The audit also revealed that multiple officers may be unclear about how to properly categorize their BWC videos.  One officer repeatedly categorized his videos as "Investigative Encounters" even when there was no interaction with a member of the public.  Another officer categorized car stops as Level 1 Investigative Encounters instead of using the category "car stop."

The Monitor's review of stop reports showed that some officers used boilerplate language to justify stops, but the actions observed in the BWC videos did not match the narratives.  Other encounters involved improper frisks, either because the officer began the frisk before or while asking for consent, or because the officer did not have reasonable suspicion that the person frisked was armed and dangerous.

14

Several officers activated their BWC late or deactivated it too early. Complete recording of encounters is necessary for effective review of the circumstances of the stop by the Department and the Monitor. Supervisors on scene during Level 3 encounters often failed to ensure that a stop report was prepared. In addition, officers frequently asked for consent to search in encounters where there was nothing apparent in the BWC footage (observed or heard) that provided founded suspicion to support the request. The Monitor team rarely observed officers asking for "consent to search" in compliance with the Right to Know Law.[11]

Overall, the required interventions did not impact officer behavior and thus were not effective in addressing several concerns regarding Fourth Amendment compliance, stop report documentation and BWC usage. A more intensive Department approach is necessary to realize meaningful change.

### D. 2025 EIP Improvements

Beginning in May 2025, the NYPD introduced changes to various aspects of EIP, including candidate identification, command engagement, data collection and analysis, meeting format, and program administration. The most significant changes are that the EIC will be meeting monthly and will focus on a much smaller set of officers (between five and ten). In addition, the EIP will focus on supervisory responsibility. The EIC will be considering whether there have been gaps in supervision; for example, whether multiple officers have the same immediate supervisor leading to inadequate oversight. In addition, the intervention plan for a subject officer will now include assigning a particular supervisor to be responsible for that officer during the intervention period. The EIC will also collect data and report during a six-month look-back period, to assess whether

---

[11] The Right to Know law requires that officers, when asking for consent to search, explain that searches will not be conducted if a person does not provide consent to the search. N.Y.C.C. §§ 14-173–74.

the intervention was successful.  These are all positive changes that will hopefully result in a more effective program that increases accountability.

Even so, the EIP needs to have a strategic approach in addressing issues at the command level.  The EIP approach is narrowly focused on individual officers, triggering events, and remedies directed at the officer.  The recent EIP revisions call for looking at supervisors too, and loosely assigns responsibility for the intervention, but the problematic behavior could also be a function of the command.  COs need to take ownership of not just individual officer behavior, but the command environment that fostered problematic behavior in the first place.  When precinct commanders present to the EIC, they should address not only the individual officer and the intervention, but what is being done to prevent other officers from engaging in other triggering events.  In addition, as the Monitor has previously noted for the NYPD, the Department should track the results of EIP interventions and conduct an evaluation of the program.

The Monitor will continue to audit the program to evaluate whether these improvements have been implemented and have impacted officer behavior.

## IV.    ComplianceStat

In January 2024, the NYPD implemented a new procedure to assess compliance, modeled after the NYPD's CompStat meetings, that the Department calls "ComplianceStat."  These meetings are chaired by Chief of Department John Chell and Assistant Chief John Cosgrove, CO of the Professional Standards Bureau, supported by a "panel" of other Department executives. ComplianceStat meetings emphasize the need for a process at the borough and command levels to review several compliance metrics, including *Terry* stops and BWC recordings of those stops to "detect and correct" deficiencies.  For example, to identify undocumented *Terry* stops, the Patrol Services Bureau (or relevant Bureau) conducts an audit of a sample of BWC videos.  When a BWC video suggests that a *Terry* stop occurred, the relevant database is queried to see if a stop report

16

was prepared.  Deficiencies found in the audit are shared with the Patrol Borough and precinct commanders prior to the ComplianceStat meeting.  Precinct commanders and their command staffs are expected to explain deficiencies identified in the Bureau-level audit at the meeting.

To highlight the Monitor's concern about the lack of accountability at the command and borough levels, the Monitor tracked the performance of PBBS and the corrective actions taken to address the deficiencies identified in the Patrol Bureau's audits.  PBBS was required to undergo ComplianceStat scrutiny three times within a four-month period due to continued poor performance.

### A.  Multiple PBBS Appearances

On December 4, 2024, PBBS attended a ComplianceStat meeting covering the period September 30, 2024, through October 27, 2024.  The Patrol Services Bureau audited a sample of 200 BWC videos recorded by PBBS commands during the ComplianceStat period and identified poor performance across several indicators.  Among other deficiencies, there were twenty-three encounters (12%) where Patrol Services identified that a stop report or a Consent to Search may have been required.  Of the 23 encounters, seven involved instances where a *Terry* stop occurred and a stop report had not been prepared contemporaneous to the stop.  All of the officers involved in the undocumented stops were assigned to PST or NST, and one was related to a Special Operations Lieutenant overseeing one of these units.  The table below lists the command level actions taken in response to the seven undocumented stops.

**Table 5:  PBBS Undocumented Stops—First Appearance**

| MOS | Command | Incident Date | Corrective Action |
|---|---|---|---|
| Sgt 1 | 69 - PST | 10/2/24 | Instruction, retraining and reassigned |
| PO 1 | 71 - NST | 10/3/24 | Instruction |
| Lt 1 | 69 - SOL | 10/11/24 | Instruction |
| Lt 1/Sgt 1 | 69 - PST | 10/11/24 | Instruction, retraining and reassigned for Sgt 1; silent for Lt 1 |
| Sgt 1 | 69 - PST | 10/12/24 | Instruction, retraining and reassigned |
| PO 2 | 69 - NST | 10/16/24 | Instruction |
| Sgt 2 | 69 - NST | 10/19/24 | Instruction |

Instruction and retraining were the command responses to these deficiencies.  In one instance, a member was removed from their special team assignment.  Due to poor performance indicators across several commands, PBBS was recalled to ComplianceStat on January 28, 2025, to report on the period of December 9, 2024 through January 5, 2025.  Questions from the Department executive panel centered on several poor performance indicators of the precincts and the weak oversight provided by the borough.  It was noted that PBBS performance indicators were worse in January 2025 than they were in December 2024.

Prior to the January session, the Patrol Services Bureau conducted an audit of 180 BWC videos from PBBS commands recording during the ComplianceStat period and identified poor performance across several indicators.  Seventeen investigative encounters (9%) were identified that may have required a stop report or Consent to Search form as required.  Of the 17, the audit identified six encounters involving eleven individuals in which a *Terry* stop occurred; a stop report had not been prepared for eight of the 11 individuals stopped.  The chart below lists the command level actions taken for the six investigative encounters accounting for the eight undocumented stops.

**Table 6:  PBBS Undocumented Stops—Second Appearance**

| MOS | Command | Incident date | Corrective Action |
|-----|---------|---------------|-------------------|
| PO 3 | 71 - PST | 12/16/24 | Instruction |
| POs 4, 5 | 67 - PST | 12/18/24 | Instruction |
| PO 6 | 71 - NST | 1/1/25 | Negative CRAFT |
| PO 7 | 186 | 1/1/25 | Training |
| Sgt 3, PO 8 | 67 - NST | 1/2/25 | Not Noted |
| Sgt 1 | 69 - Special Projects | 1/2/25 | Negative CRAFT |

Again, instruction was the action most often taken, followed by retraining.  Sgt 1 had been removed from his role as a PST supervisor, in part for several undocumented *Terry* stops.  Notwithstanding his removal as a PST supervisor, he continued to work with his former PST.  The Patrol Bureau audit revealed that 87 of Sgt 1's 91 BWC activations during the ComplianceStat period were with members of his former PST unit.  The command level corrective action taken for Sgt 1's undocumented stops was a negative CRAFT and reassignment.  However, the action taken to correct the supervisor's deficient practices did not have the desired impact on his behavior.

The command and borough level performance as it related to supervision and accountability was also poor.  Undocumented *Terry* stops were rarely identified and corrected at the command and borough levels during the first two ComplianceStat periods.  PBBS also struggled in several other performance areas, including late activations of officers' BWCs.  As a result, PBBS was recalled again for ComplianceStat on March 5, 2025, covering the period January 27, 2025 through February 23, 2025.  Prior to the meeting, the Patrol Services Bureau conducted a review of 175 BWC videos recorded by PBBS commands during the ComplianceStat period to identify instances where an officer failed to prepare a stop report and/or Consent to Search form.  The audit identified two encounters (1%) that may have required a stop report or Consent to Search form, which were not completed.

The improvements achieved in this performance area for the third ComplianceStat period resulted from an intensive effort undertaken at the command and borough levels to identify and correct deficiencies, including investigative encounters which were *Terry* stops and for which stop reports were not prepared contemporaneous to the investigative encounter. This effort included a documented borough compliance plan with multiple, layered requirements. Among the requirements are completion of a weekly oversight report, assignment of BWC video review to multiple supervisors, identification of corrective actions in response to deficiencies, and follow-up to determine if the corrective actions were undertaken. The plan requires compliance team review of all stop reports, Consent to Search Reports, Use of Force forms, and Vehicle Stop Reports to identify underreporting of stops. The borough's plan also mandates that violators will be brought to the attention of the borough commander.

Prior to the January 2025 ComplianceStat meeting, the PBBS compliance team consisted of one sergeant overseeing thirteen commands. After that meeting, the borough compliance team was staffed with additional members. The borough compliance plan resulted in an extraordinary amount of BWC reviews at both the command and borough levels. During the period reviewed for their third appearance at ComplianceStat, the borough command reviewed 1,091 BWC videos, a significant increase over the prior period. As a result of these efforts, 105 investigative encounters were identified (52 by command-level reviews and 53 by borough-level reviews) in which a stop report should have been prepared but was not prepared contemporaneous with the investigative encounter.

The corrective actions taken to address these deficiencies included instruction, retraining, negative CRAFT entries and for members with repeated failings, command discipline and removal

from assignment.  In one command, the precinct commander, ICO, and Special Operations Lieutenant were removed, and in another command, the NST team was disbanded.

### B.  Recent ComplianceStat Meetings

On June 10, 2025, PBMN attended a ComplianceStat meeting covering the period April 28, 2025, through May 25, 2025.  Prior to the meeting, the Patrol Services Bureau conducted a review of 210 BWC videos recorded by PBMN commands during the ComplianceStat period to identify instances where an officer failed to prepare a stop report and/or Consent to Search form. The audit identified eight encounters that may have required a stop report or Consent to Search form, which were not completed.

The Department Chief of Patrol and other panel members expressed continued concerns about failure by lieutenants and sergeants to supervise at the command level.  Department leadership emphasized that the CRT needs to improve, not just in PBMN, but citywide, with training or retraining not being a sufficient means to correct ongoing behavior.  The Department leadership also pointed to continued problems with underreporting and the command's failure to identify and properly categorize *Terry* stops, instead categorizing them as Level 2 investigative encounters.  Several precinct commanders were unable to answer basic questions about their specialized teams' activities in their commands.  The Chief of Department noted that BWC activations across several commands were down compared to the prior ComplianceStat period. One precinct executive officer was asked to explain how there can be 686 BWC activations yet only one reported stop.  That precinct executive officer stated they watched 17 BWC videos of specialized team members during the period but could not recall any deficiencies.  Generally, the precinct commanders found few deficiencies after reviewing BWC videos of their specialized team

members.  It appeared that the some of the precinct executives presenting at ComplianceStat did not have a firm grasp on the performance data of their commands.

In contrast with some commanders who were unprepared for the rigors of ComplianceStat, the Monitor's team observed one CO who was quite knowledgeable of his command's operations, performance data, and compliance concerns.  He was queried about the number of *Terry* stops conducted by the command's specialized units during the compliance period.  Given the historical level of violence in that precinct, the commander was asked if the number of *Terry* stops recorded for the period made sense.  In short, Department executives were probing underreporting.  The commander responded by articulating a focused approach to reducing crime and violence that did not rely heavily on self-initiated investigative encounters.  It was clear from the exchanges between the precinct commander and Department executives that this commander knew the precinct, its compliance concerns, and had a plan to address them.

During the ComplianceStat meeting, individual cases were reviewed, including two cases from one command involving the same SOL.  The first one involved a *Terry* stop at less than reasonable suspicion and a search of that individual that was not recorded on the stop report or identified at the command level as improper.  When questioned, the precinct commander acknowledged that he had not viewed the BWC prior to attending the meeting.  The second case was a PST *Terry* stop of an individual who was ordered to "come here" and subsequently ordered to show the officer what was in his hand.  This was not documented and the SOL was on the scene with the officers.  The SOL was not at the meeting, but the precinct commander advised that the SOL had received a negative CRAFT.  The Chief of Department was appalled at the inability of precinct and borough executives to recognize the insufficiency of a CRAFT entry as a sanction in these circumstances or to otherwise hold people accountable.

On July 9, 2025, PBBN attended a ComplianceStat meeting for the period May 26, 2025 through June 22, 2025. Prior to the meeting, the Patrol Services Bureau conducted a review of 263 BWC videos recorded by PBBN commands during the ComplianceStat period to identify instances where an officer failed to prepare a stop report and/or Consent to Search form. The audit identified 23 encounters that may have required a Stop Report or Consent to Search form, which were not completed. This ComplianceStat session focused equally on the borough's oversight and compliance efforts regarding its ten precincts and the precincts' command staff oversight and compliance efforts with respect to its officers. While the borough identified deficiencies through audits, the Borough Adjutant who was responsible for compliance oversight was unable to identify either actions taken to address the deficiencies or outcomes. For example, Department executives at the meeting noted that as part of a first quarter 2025 audit of NST, one officer was identified as requesting consent searches without having a legal basis for doing so. That officer was sent to retraining in May 2025. The borough command was unable to report on whether the training was effective. In fact, the same officer was identified in a June 2025 audit asking for a consent search without a legal basis for doing so.

Of the six borough supervisors tasked with oversight of the borough's PST, none had reviewed BWC videos from the PST sergeant and only two of the six had reviewed BWC videos from the PST police officers. The borough PST had no *Terry* stops reported, which the Department executives found not credible. In response, Department leadership directed that the borough PST be disbanded immediately and the officers returned to patrol. This action underscored the importance of supervisory accountability and the necessity of improvements to compliance. The panel also discussed supervisory reviews of BWC videos of precinct specialized team officers and their supervisors. The benchmark for each command is to review 33% of the team's BWC

activations. Several commands did not meet this threshold and could not explain why. Supervisors unable to explain their low number of BWC video reviews, notwithstanding direction to improve following the previous ComplianceStat meeting, were removed.

The panel examined three cases in one precinct involving the same PST member, a probationary officer who appeared to be making *Terry* stops without reasonable suspicion and also had incidents of late BWC activation. The officer had amassed 19 flags including four closed and seven pending CCRB cases. The CO was not aware of the number of CCRB complaints the probationary officer accumulated, and the borough had not conducted a weekly CCRB inquiry, as required to identify officers with three or more CCRBs lodged against them in the previous 12 months. This officer should have been flagged for intervention.

Due to ineffective oversight at the borough and command levels, Department leadership directed several personnel actions based on inattention and ineffective compliance oversight at the borough and command levels, including disbanding the borough PST, relieving a Borough Adjutant responsible for overseeing compliance of those duties, and reassigning officers and executives at the command level. These personnel actions send a clear message that there are consequences for failed accountability. Commands need to be fully prepared to explain deficiencies at ComplianceStat meetings, and more importantly, to address these deficiencies in advance.

## V. Conclusion

Demonstrated commitment by the NYPD to enhanced supervisor accountability at all levels of the organization is critical to ensuring the lawfulness of stops, frisks, and searches. Recent actions suggest the Department is seeking to move in the right direction. The NYPD informed the Monitor that it will begin to examine how commands respond to QAS audits so that officers with repeat deficiencies are not simply given the same training or instructions. While this is an

important first step, the NYPD has not yet implemented this change, including ways to hold the supervisors themselves directly responsible for failure to supervise.

The NYPD also acknowledged the concerns raised by the Monitor regarding the effectiveness of the EIP and is implementing a set of new procedures to focus on the more problematic officers and on supervisory responsibility.  With respect to ComplianceStat, each patrol borough now has a compliance team in place and the Department is tracking and reporting the findings of those units.  In addition, the NYPD is updating the Command Discipline database to fully digitalize the Command Discipline system to allow for better tracking of discipline related to improper stops, frisks, or searches issued at the command and borough level.

One source of improvement is the pivot towards substantive discipline for repeated unconstitutional practices as outlined in the Police Commissioner's memorandum (#2025-01-20) issued on February 5, 2025, titled "Discipline in Connection with Level 3 Stops."  This memorandum addressed the lack of discipline imposed on officers who repeatedly engage in unconstitutional practices as it relates to *Terry* stops.  The memorandum stated that the NYPD "cannot allow officers to repeatedly make the same errors without consequence, and we cannot allow reckless or deliberate misconduct."  It further noted that the NYPD's "failure to impose proper discipline for repeated or intentional violations of law and policy in connection with Level 3 stops undermines the integrity of our disciplinary system and puts the long-term independence of that system at significant risk.  That failure ends with this memo."  The actions being taken by the NYPD to improve accountability are necessary to achieve compliance.  Training and policies are not enough if they are not implemented.  Officers and supervisors must be held accountable for failures to comply with the law.  Going forward, the Monitor team will issue regular reports on

accountability, a cornerstone to improving NYPD compliance rates and ensuring the lawfulness of stops, frisks, and searches.