**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Mylan L. Denerstein
Direct: +1 212.351.3850
Fax: +1 212.351.6350
MDenerstein@gibsondunn.com

February 17, 2026

**VIA ECF**

Honorable Analisa Torres
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:   *Floyd, et al. v. City of New York*, 08-CV-1034 (AT),
      *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT),
      *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT),
      2025 End of Year Monitor Update

Dear Judge Torres:

This is the Monitor's 2025 year-end report summarizing the efforts of the New York City Police Department ("NYPD" or "Department") to comply with the Constitution. After twelve years of Monitor oversight, the NYPD has yet to reach substantial compliance with this Court's 2013 order requiring constitutional policing. The City of New York ("NYC") and the NYPD have known the problems they need to correct to come into substantial compliance. These ongoing compliance problems generally fall into three main categories: (1) lack of meaningful accountability, (2) unlawfulness of self-initiated stops, and (3) persistent underreporting of *Terry* stops. In addition, the Department needs to implement a Fourteenth Amendment compliance plan.

This is not the year-end report that I had hoped to submit to the Court after four years, and I hope this serves as a wake-up call that the NYPD must comply with the Constitution. The residents of NYC deserve no less and there should not be a permanent monitor.

### I. Lack of Meaningful Accountability

#### A. Lack of Supervision

The lack of accountability has been a focal point of the last three annual reports, and it remains a focal point this year.[1] Supervisors routinely approve stops, frisks, and searches as lawful even when they are not. The NYPD must build a system where supervisors correct officers who are conducting illegal stops, frisks, and searches and address officers who repeatedly violate the law. Reliance solely on training without discipline has proven to be ineffective. It is time the

---

[1] Twenty-Sixth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. Oct. 14, 2025), ECF No. 969.

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

**GIBSON DUNN**

Honorable Analisa Torres
February 17, 2026
Page 2

NYPD deployed other tools to achieve accountability and, more importantly, constitutional policing.

In the first half of 2025, reviewing supervisors, such as sergeants and lieutenants, continued to find 99% of all stops, 95% of frisks, and 94% of searches compliant. During the same audit period, both the NYPD Quality Assurance Section ("QAS") and the Monitor team found substantial non-compliance. These statistics are concerning. The Monitor's audits determined that in the first six months of 2025, 11% of the stops were unlawful, while the reviewing supervisors determined that only 1% of these same stops were unlawful (see table below).

Executives at the command level showed improvements in identifying unlawful stops, frisks, and searches and identified a higher percentage of noncompliant encounters than did first-line supervisors. The NYPD should build on this by using command executives to help the reviewing supervisors do their jobs better, so they do not continue to find almost all stops, frisks, and searches constitutional.

Table 1: Compliance, First Half of 2025

|  | % of Lawful Stops | % of Lawful Frisks | % of Lawful Searches |
|---|---|---|---|
| Reviewing Supervisors | 99% | 95% | 94% |
| Command Executives | 92% | 88% | 86% |
| QAS Audits | 92% | 81% | 82% |
| Monitor Audits | 89% | 73% | 73% |

The NYPD needs to do more to hold supervisors and command executives accountable for the unlawfulness of NYPD stops, frisks, and searches. Training and prior instructions have not sufficiently addressed these issues. Therefore, it is necessary to implement more robust corrective actions, including discipline, for supervisors and officers who repeatedly do not comply with legal requirements. There is no excuse for the continued failures year after year.

### B. NYPD Compliance Mechanisms

The Department has created several oversight mechanisms—such as ComplianceStat and the Early Intervention Program—that are designed to identify problematic behavior and correct it early. The NYPD leadership must ensure that these and other mechanisms create accountability for those who fail to demonstrate improvement after their problematic behavior is identified. Absent meaningful accountability for command-level executives, frontline supervisors, and officers on the street, the NYPD will never reach substantial compliance with the Court's orders.

### 1. Compliance Stat

This year, the NYPD continued the ComplianceStat initiative that began in January 2024. ComplianceStat is modeled on CompStat (a longstanding program focused on crime reduction).

**GIBSON DUNN**

Honorable Analisa Torres
February 17, 2026
Page 3

One of the purposes of ComplianceStat is to hold command leadership accountable for the lawfulness of stops, frisks, and searches, as well as undocumented stops. Precinct commanders and their command staff are expected to explain deficiencies identified in the Bureau-level audit at the meeting. Until his retirement in October 2025, John Chell, former Chief of Department, chaired these meetings, supported by other Department executives. With Chief Chell's retirement, the Police Commissioner designated First Deputy Commissioner Tania Kinsella to head ComplianceStat.

The Monitor team attended fifteen ComplianceStat meetings in 2025, covering multiple Bureaus/Boroughs. The Monitor team tracked the performance of Patrol Borough Brooklyn South ("PBBS") and any corrective actions undertaken to address the deficiencies identified in the ComplianceStat process, beginning with a ComplianceStat meeting on December 4, 2024, covering the period of September 30, 2024, through October 27, 2024. In advance of this meeting, the Patrol Services Bureau reviewed numerous Body-Worn Camera ("BWC") videos and identified poor performance across several indicators, including failure to complete stop reports and consent to search forms. With one exception, all the officers involved in the undocumented stops were assigned to Public Safety Teams ("PST") or Neighborhood Safety Teams ("NST"). The command's response was insufficient and in only one instance was a member removed from their special team assignment.

Because of poor performance, PBBS was recalled to a second ComplianceStat on January 28, 2025, covering the period December 9, 2024, through January 5, 2025. Prior to the January session, the Patrol Services Bureau reviewed additional videos from PBBS commands, again identifying poor performance across several indicators with failures like the previous ComplianceStat meeting and a command response of only instruction or instruction with retraining. A sergeant who had been previously removed from his role as a PST supervisor, in part due to several undocumented *Terry* stops, continued to work with his former team and failed to document one of his *Terry* stops involving three individuals who were stopped. The command level response was limited to a negative Cop's Rapid Assessment Feedback Tool ("CRAFT"). The Chief of Department was not satisfied with these actions.

PBBS was recalled to a third ComplianceStat on March 5, 2025, covering the period January 27, 2025, through February 23, 2025. This time, the Patrol Services Bureau's review identified only two encounters (1%) where a stop report or consent to search form should have been completed. And this time, members with repeated failings were subject to more significant corrective action, including command discipline, removal from assignment, command changes, and in one command, the NST team was disbanded. These improvements resulted from the command and borough level's targeted and sustained efforts.

The improvements made by PBBS by the third ComplianceStat meeting show that the NYPD can identify and remedy unconstitutional *Terry* stops, frisks, and searches among its members, if it makes the effort to do so. Unfortunately, however, PBBS was again recalled to ComplianceStat a fourth time on January 6, 2026, with a return to the same problem of NYPD

commands not subjecting members with repeat failures to discipline. ComplianceStat will not be effective, and sustained change will not occur, until the NYPD leadership demands accountability through a consistent and more focused effort.

As part of the ComplianceStat process, Bureau/Borough commands developed compliance oversight plans for the Patrol and Transit Bureaus, as well as for the Housing Bureau. These plans detail activities and tasks for personnel to perform, ostensibly to ensure proper performance through regular monitoring and auditing. In general, these plans are a good first step as the Department integrates compliance into the broader management responsibility of commanders. However, the Monitor team's review of the plans indicates they are overly concentrated on administrative issues, such as proper BWC activation and categorization as well as timely completion of forms and reports, rather than placing emphasis on ensuring policing that is constitutional and free from racial bias.

The Monitor also reviewed data on the reassignment of supervisors and officers who were removed from specialized units for deficiencies as part of the ComplianceStat process. The purpose of the review is to ensure that the NYPD does not return these individuals to specialized team assignments. The review revealed, however, that some officers and supervisors have been assigned back to specialized teams with the same problems resurfacing, including engaging in unlawful encounters. This shows deficiencies in corrective measures for individuals removed from their assignments as a result of ComplianceStat. The NYPD can and must do more to ensure adherence to constitutional principles and that sufficient measures are taken to address the concerns that led to the removal of these individuals in the first instance.

The Department needs to send a clear message that constitutional policing is expected. While ComplianceStat shows promise for improving compliance, leadership must demand accountability at the same level required under CompStat to succeed. As demonstrated by CompStat, the model can work but only if poor supervisor performance consistently results in discipline or reassignment. Every supervisor and command must be convinced that they will face negative consequences for failure to demonstrate improvement. We are confident the Department can address this in 2026.

## 2. Early Intervention Program ("EIP")

In 2020, the Court ordered the NYPD to develop an EIP, which is a non-disciplinary initiative that uses risk-management strategies to identify and address potential officer performance issues early. The NYPD Early Intervention Committee ("EIC") provides oversight of the EIP process. The EIC is made up of Department executives who, in consultation with members of the Professional Standards Bureau, commanding officers, and borough executives, are tasked with determining what, if any, interventions should be applied to each officer under review. Last year, we reported that the EIP had not been successful in changing officer behavior, leading the Department to implement changes to more effectively address at-risk officers and supervisors.

Honorable Analisa Torres
February 17, 2026
Page 5

Despite changes made to the program in 2025, the Monitor team continues to find the EIP insufficient to reduce unlawful behavior.

In May 2025, the NYPD implemented changes to the EIP that incorporated input from the Monitor.  The Department modified its approach to more intensely focus on a smaller set of officers (five to ten) at monthly meetings of the EIC because the review of a much large number of officers at EIC meetings, with little time to address each subject officer, proved to be ineffective at identifying individual problems or modifying behavior.  In addition, the Department revised the program guidelines to require a supervisor to be assigned to the subject officer, with responsibility for the subject officer during the period of the intervention.  The EIC is now chaired by Deputy Commissioner of Legal Matters Michael Gerber.

Notwithstanding these policy changes, the program still falls short.  Too often, commanding officers responsible for intervening in problematic behavior are failing to recognize such behavior, and instead condone or justify it when observed, characterizing the officer as an "active cop."  In some instances, officers with multiple Civilian Complaint Review Board ("CCRB") complaints were not flagged early in the system or were sent to training on multiple occasions with no positive impact on behavior.  In addition, at several EIC meetings attended by the Monitor team, there was no mentor assigned to the subject officer, or the assignment of a responsible supervisor was ad hoc and done with little foresight.  This is evidence of a lack of accountability.  Command executives should be fully prepared to discuss problem officers.  Most importantly, there needs to be ongoing monitoring and the EIC must define and measure success for officers who come through the program.  The Monitor has provided ongoing feedback to the NYPD to enhance the efficacy of the EIC.  The EIC's process has improved and the Department has been responsive to feedback.  Absent further changes, however, the Monitor is unconvinced that EIP, even as redesigned, will positively impact officer behavior.

### 3.  QAS Audit Results

NYPD QAS audit results now closely align with the Monitor's audits. When QAS initially began to review NYPD encounters for constitutional compliance, they concluded that NYPD stops, frisks, and searches were compliant at rates much higher than those found by the Monitor. The Monitor team has worked collaboratively with the NYPD to improve the quality of internal audits, leading to these better results.

Table 2: Comparison of the Assessment of Unlawful Stops, Frisks and Searches, First Half 2025

|         | Stops | Frisks | Searches |
|---------|-------|--------|----------|
| QAS     | 8%    | 19%    | 18%      |
| Monitor | 11%   | 26%    | 29%      |

However, there is both a lack of command action in response to QAS audits and—in some precincts—a practice of rejecting QAS findings regarding the lawfulness of encounters, which

GIBSON DUNN

Honorable Analisa Torres
February 17, 2026
Page 6

presents additional concerns. In reviewing actions taken by NYPD commands in the first half of 2025 in response to QAS audits, the Monitor found that command staff took no action in 97 out of 305 cases in which QAS determined that the stop was unlawful. Where the NYPD did take action following QAS determinations, it was most often in the form of instructions (150) and CRAFT entries (21), with command discipline ("CD") issued in only 8 cases. In 29 cases, the command rejected the QAS determination regarding the lawfulness of the encounter. This practice is inconsistent with fundamental auditing principles and undermines compliance efforts.

## II. Persistent Problems with Self-Initiated Stops and Specialized Units

Nearly half of all reported police stops are initiated solely based on an officer's own observations, rather than a call for service or information from a witness. These self-initiated stops are far more likely to be unlawful than other types of encounters. This problem is especially pronounced within specialized units, where most encounters are self-initiated. Audits consistently show that these units conduct stops, frisks, and searches at significantly lower constitutional rates than patrol officers, and that supervisors fail to identify or correct this behavior.

Self-initiated stops have substantially lower compliance rates than those which result from radio runs or complainant/witness information. For the first half of 2025, the NYPD's compliance rates for self-initiated stops (79.4% stops, 64.0% frisks, 53.3% searches) remained significantly lower than compliance rates for radio runs (96.5% stops, 91.4% frisks, 83.2% searches) and rates for stops based on information from complainants or witnesses (90.9% stops, 75.0% frisks, 85.7% searches).

The Monitor's Twenty-Fourth, Twenty-Seventh and Twenty-Eighth reports ("compliance snapshots") provide quarterly updates on the lawfulness of NYPD stops, frisks, and searches.[2] As noted above, the Monitor's 2025 audits show continued failure at the supervisor and command level to identify unlawful stops, frisks, and searches. The compliance rates for stops, frisks, and searches during encounters based on an officer's self-initiated observations are much lower than the compliance rates for stops, frisks, and searches based on a radio run in response to a 911 or 311 call, or stops based on in-person information from a witness or complainant.

Reports from the Office of Community Liaison ("OCL") and specific problematic encounters identified by the Monitor team in its audit reviews underscore the problems with self-initiated stops. OCL has shared an instance in which it was alleged that the NYPD twice stopped, frisked, or searched the same individual without legal justification. Monitor team audits have identified two instances during which an NYPD training officer or supervisor who should be

---

[2] Twenty-Eighth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. Jan. 20, 2026), ECF No. 974; Twenty-Seventh Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. Oct. 22, 2025), ECF No. 971-1; Twenty-Fourth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. May 21, 2025), ECF No. 960.

modeling constitutional policing practices for new officers but instead engaged in multiple unlawful encounters. These encounters and the statistics highlight the lack of accountability.

Table 3: Percent Lawful by Type of Stop, First Half 2025

|  | Stop | Frisk | Search |
|---|---|---|---|
| Complainant Witness | 91% | 75% | 86% |
| Radio Run | 97% | 91% | 83% |
| Self-Initiated | 79% | 64% | 53% |

Problems with self-initiated stops are magnified in the specialized units since the vast majority of stops conducted by officers assigned to these units are self-initiated rather than based on radio runs or information from complainants or witnesses. In 2025, the Monitor team continued to review the activities of the NYPD's specialized units, including the NSTs, PSTs, and Community Response Teams ("CRTs").[3] Only 75% of the stops assessed made by NST officers were lawful. The lawfulness of PST stops was even lower at 64%. Also, NST frisks and searches were found lawful in only 58% and 54% of the encounters, respectively. And again, reviewing supervisors determined that only 1% of these stops, frisks, and searches were unlawful, illustrating a critical gap in supervisory oversight.

The Monitor's Twenty-Fifth Report focused on the NYPD's CRTs.[4] Again, the Monitor found an absence of adequate supervisor review of CRT stops—a consistent theme across the Department. The Monitor included specific compliance targets for the specialized teams in this report and the NST report, stating that the NSTs, PSTs, and CRTs should achieve compliance levels of at least 85% by the end of the third quarter of 2025 and at least 90% by the end of the year. In late 2025, the Monitor again examined NST, PST, and CRT stop, frisk, and search activities. The Monitor's preliminary audit findings show that the NYPD is unlikely to meet the third quarter target of 85% or the year-end target of 90%. This is not acceptable.

On November 7, 2025, the Department eliminated its PSTs and, in certain commands, replaced them with NSTs. It is too early to evaluate the impact of this change. The Monitor will track the encounters of specialized team members in new assignments (and otherwise) to determine whether or how the Department is holding these officers accountable for noncompliant stops, frisks, and searches.

---

[3] Twenty-Third Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. Feb. 3, 2025), ECF No. 952-1. The report concluded that NST and PST officers are not performing stops, frisks, and searches at constitutional levels and that supervisors are not appropriately overseeing their officers.

[4] Twenty-Fifth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. June 3, 2025), ECF No. 963. The report concluded that CRT officers unlawfully stopped, frisked, and searched individuals at higher rates than patrol officers.

Honorable Analisa Torres
February 17, 2026
Page 8

### III. Underreporting of Approximately 30% of Stops

Underreporting of stops has been an issue for more than a decade and remains a problem today. Officers continue to fail to document a substantial number of stops, even when documentation is legally required. Although reporting has improved compared to prior years, nearly one-third of stops identified through audits were still not properly recorded in 2025. Accurate reporting is essential for accountability, transparency, and public trust. When stops are not documented, unlawful conduct is harder to detect and correct.

The Monitor's 2024 audits of investigative encounters found that only 61% of the stops reviewed were documented by stop reports. The Monitor's 2025 audits showed that 71% of the stops reviewed in the audits were properly documented. Although this is an improvement from 2024, it still shows substantially lower than acceptable levels of compliance. The NYPD needs to fix this.

### IV. Discipline Report

In the Spring of 2025, the Monitor established a Discipline Working Group ("DWG") which includes representatives from the plaintiffs, the City (New York City Law Department and NYPD), and the Monitor team. The DWG met throughout the year to discuss the recommendations in Judge James Yates' in-depth September 23, 2024, report and determine which recommendations could be agreed to by all parties.[5] Based on these discussions, the parties identified several recommendations about which there was tentative concurrence and potential for submission to the Court in the form of a proposed order. This intensive process included each party presenting a detailed explanation of their support or objection to specific recommendations and the development, in certain instances, of alternative recommendation language to address concerns.

Unfortunately, the DWG had to be paused because at the end of 2025, the City sent a letter to the Monitor seeking to revamp the entire working group process. The City also informed the parties that it was only able to agree to a few of the recommendations. This was extremely disappointing and disheartening, especially given the amount of time the parties had spent working on reaching agreements on the recommendations. After discussions with the Monitor and the parties, the City withdrew its letter requesting to revamp the working group, but it is still only willing to agree to a few recommendations.

Going forward, the Monitor team expects to work closely with select representatives from the parties to return to consensus on many of the recommendations in the Yates' report and to present those recommendations to the Court for consideration. This effort aligns with the Monitor's findings regarding accountability and reflects the critical link between discipline and

---

[5] Discipline Report, *Floyd v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. Sept. 23, 2024), ECF No. 936.

changing behavior. We look forward to working on advancing the recommendations with the new Administration in 2026.

### V. Fourteenth Amendment Compliance

#### A. *Fourteenth Amendment Compliance Plan*

The NYPD has continued its work on development of a Fourteenth Amendment Compliance Plan. The Department sought and received comments on a draft plan from the Monitor, as well as from the *Davis*, *Floyd*, and *Ligon* plaintiffs. On December 31, 2025, the NYPD provided the Monitor with a revised plan. This plan includes a Racial Disparities Review Committee ("RDRC") to monitor and address racial disparities in stop, frisk, and search practices to ensure compliance with the Fourteenth Amendment. The objective is to provide the Department with a means to quantify racial disparities in stops, frisks, and searches; track the trajectory of those disparities; identify outlier commands that are driving those disparities; examine why those disparities exist; and take steps to reduce those disparities.

In October 2025, the NYPD hired Sharad Goel, Professor of Public Policy at the Harvard Kennedy School, as an academic advisor; and Alex Cholas-Wood, an Assistant Professor of Computational Science at New York University, to support implementation of the Fourteenth Amendment Compliance Plan. The newly hired consultants will be analyzing racial disparities in stop, frisk, and search data and will assist the NYPD in developing responsive strategies. The Monitor has reviewed the revised plan from the NYPD and provided comments to the NYPD. The Monitor will closely follow implementation of a pilot, expected to begin in 2026, to assess its efficacy.

To examine racial disparities in stops and post-stop outcomes, the Department will be using a statistical model for quantitative analysis similar to the model used by the Monitor team in the Monitor's Twentieth Report.[6] Updated data and findings from this analysis will be presented to the RDRC at its monthly meetings. The Monitor team will review the Department's analysis and work with the Department and its academic advisors so that appropriate action is taken to reduce unexplained racial disparities.

#### B. *CCRB's Racial Profiling Complaint Investigations*

The Court's remedial orders directed the NYPD to track and investigate racial profiling allegations against NYPD officers. Historically, neither the NYPD nor the CCRB did so. Consistent with the Court's orders, the NYPD began to track and investigate allegations of racial profiling in early 2014. In November 2021, the City Council passed Local Law 47 (2021), which amended the City Charter to clarify that investigations of allegations of "racial profiling and bias-

---

[6] Twentieth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-010304-AT (S.D.N.Y. April 11, 2024), ECF No. 927-1.

Honorable Analisa Torres
February 17, 2026
Page 10

based policing" fall under the CCRB's "abuse of authority" jurisdiction.[7] The CCRB began receiving complaints in October 2022.

At the end of 2025, the Racial Profiling and Bias-Based Policing Unit had over two hundred open investigations of complaints that included at least one allegation of profiling or bias-based policing. For the first half of 2025, the CCRB completed investigations of several complaints that included substantiated allegations of bias-based policing. The Police Commissioner retained jurisdiction over five cases involving eight officers where the CCRB requested that Charges and Specifications be filed against the subject officers. In all five cases, the Police Commissioner found that although the officer's conduct was improper, it was not racially motivated and therefore did not warrant issuance of Charges and Specifications.

The CCRB substantiated several other complaints including allegations of racial profiling in 2025 and filed Charges and Specifications against NYPD officers. However, in October 2025, the City advised the Monitor that the CCRB had discovered an error in how those cases were pled and the legal standard being applied by the CCRB, with cases charged as bias-based policing rather than racial profiling. For racial profiling, the Department must prove that race was a motivating factor, at least in part, for the officer's police action. For bias-based policing allegations, the legal standard is higher, and the Department must prove that race was the determinative factor for the officer's police action. The CCRB is currently reviewing these cases to determine the appropriate action going forward.

### VI. Institute for State & Local Governance ("ISLG") Study

On February 12, 2021, the Court approved studies to examine compliance with applicable legal requirements in police-civilian encounters, racial disparities in officer's compliance in these encounters, and whether these encounters are appropriately documented. The City University of New York ISLG conducted a study examining policing encounters recorded by BWCs between March 16, 2022, and May 5, 2022. A team of retired New York State judges reviewed the recordings and related documents to determine compliance with the Fourth Amendment.

The Monitor submitted the ISLG study to the Court on May 1, 2025. The study reached similar conclusions as the Monitor's audits, finding that unconstitutional stops were particularly prevalent among self-initiated stops (46%) and stops conducted by members of the NST or where an NST officer was present (35%). The study further found that officers failed to submit a stop report when one should have been submitted for 23% of persons stopped. For encounters that officers categorized as low level encounters, the judges identified stops that were not documented in 3% of encounters. The study further concluded that NYPD supervisors rarely identified unconstitutional stops, doing so for only 1% of stops. The researchers also conducted a statistical analysis of data examining whether Black and Hispanic people are more likely to experience an

---

[7] N.Y.C. Local Law No. 47 (2021), *available at* https://codelibrary.amlegal.com/codes/newyorkcity/latest/NYCadmin/0-0-0-132892.

unconstitutional stop relative to similarly-situated persons, but the results of this analysis were inconclusive.

### VII.   Stanford Study

The Monitor continues to work with a group of researchers initially associated with Stanford University (the "Stanford team") using machine language methods to examine the extent of Fourth and Fourteenth Amendment compliance by the NYPD. The team completed a preliminary analysis of the use of machine learning models to identify potential underreporting of *Terry* stops and review the language used in consent search requests. The Monitor and members of the Stanford team met with the Court on October 23, 2025, to present a status update on this project. The Stanford team has provided a draft report to the Monitor and the parties, and the Monitor expects to submit a final report to the Court soon.

### VIII.   Community Liaison

On December 16, 2022, the Court appointed Germain Thompson to serve in the newly created role of Community Liaison, overseeing the OCL. As Community Liaison, Mr. Thompson and his team are responsible for engaging with community members most impacted by the NYPD's stop and frisk practices and communicating their experiences, perspectives, and recommendations to the Monitor and the Court.

This year, the Monitor established an affirmative process for review and referral to the NYPD of problematic police encounters reported to the Monitor team by the Community Liaison. Through this process, the Monitor team can bring particularly troubling encounters to the immediate attention of Department leadership for review and appropriate action.

Since the Monitor's last update, the Community Liaison has enhanced community feedback mechanisms through implementation of technology advancements including Salesforce and Form Assembly. These data collection and analysis tools enable a more streamlined collection of detailed input from community members, community leaders, youth, and advocates regarding NYPD stops, frisks, and searches.

The Community Liaison continues to organize community meetings, listening sessions and other forms of outreach. The OCL has partnered with diverse grass-roots community organizations and City departments focused on youth. The OCL also has conducted information sessions designed to educate community members regarding the basis of stops by the NYPD. In addition, in 2025, the OCL held three community forums with the Monitor, in the Bronx, Staten Island, and Brooklyn.

The Community Liaison filed three quarterly reports in 2025, with the fourth quarterly report expected to be completed in early 2026. These reports include benchmarks, milestones, and anecdotal evidence to measure OCL achievement of its objectives. The reports note consistent themes including confusion regarding the definition of a "police stop," community fatigue and

distrust in NYPD reform implementation, and a desire for transparent communication and accountability. At the same time, the reports emphasize progress with respect to the commencement of formal feedback sessions and the use of new technology to track feedback.

## IX. Conclusion

The Department's failure to achieve substantial compliance is not due to a lack of guidance, information, or opportunity. The issues identified are longstanding, well-documented, and have been repeatedly communicated to the City and Department leadership.

In sum:

- Little to no discipline is imposed on officers, supervisors, or command staff for noncompliant stops, frisks, and searches, or for underreporting.

- Corrective measures of training and instruction are too often the chosen remedy and otherwise fail to result in changes to officer behavior.

- Supervisors concluded that nearly all encounters were lawful notwithstanding QAS and Monitor findings to the contrary.

- ComplianceStat can only be effective with sustained, focused efforts targeting officers who fail to engage in lawful encounters and supervisors who fail to identify such encounters in the first instance.

- In several instances, command staff rejected QAS findings regarding the lawfulness of encounters and refused to take action to address problematic behavior.

- While redesigned, the EIC remains ineffective with the absence of ranked executive leadership and no follow-up or measurement on how success is defined.

- Self-initiated stops continue to have compliance rates significantly lower than stops in response to radio calls or information from complainants or witnesses, with specialized teams performing far below officers assigned to patrol on compliance metrics.

- Underreporting remains problematic with almost one-third of encounters either not reported or improperly categorized.

GIBSON DUNN

Honorable Analisa Torres
February 17, 2026
Page 13

     None of this is surprising or new. The NYPD can and must do more to comply with the law. I look forward to working with the Administration and NYPD to achieve compliance.

Respectfully,

*[signature: Mylan L. Denerstein]*

Mylan L. Denerstein
Independent Monitor

**APPENDIX**
**MONITOR REPORTS**

Since the last annual update, the Monitor published six reports (in addition to the 2024 One-Year Update published on February 26, 2025) generally focused on accountability and compliance. Key findings of these reports are summarized below.

**Twenty-Third Report: NYPD's NST and PST Units' Stop, Frisk and Search Practices.** The report, filed on February 3, 2025, found:

- NST and PST officers are not performing stops, frisks, and searches at sufficient constitutional levels.

- Compliance rates for stops, frisks, and searches of NST officers were even lower than the Monitor's prior report (75%, 58%, and 54%, respectively).

- PST officers also performed poorly (64% stop, 16% frisk, 62% search compliance).

- Both NST and PST officers conduct self-initiated stops at a much higher rate than regular patrol officers, and self-initiated encounters had much lower rates of lawful stops, frisks, and searches (65%, 38%, and 42%, respectively) than stops based on a radio dispatch in response to a 911 or 311 call.

- Supervisory oversight of NST and PST units also continues to be inadequate. Despite significant numbers of unlawful stops, frisks, and searches, command-level supervisors determined that only 1% of stops were unlawful and 1% of frisks and searches were unlawful.

- In 95% of the stop reports in which race was identified, the person stopped was Black or Hispanic.

**Twenty-Fourth Report: Compliance Snapshot of NYPD's Stop, Frisk, and Search Practices.** The report, filed on May 21, 2025, found:

- An increase in compliance over the first three quarters of 2024, with 91% of stops, 79% of frisks, and 78% of searches being lawful in the third quarter of 2024.

- The Monitor audits, however, also found that compliance rates were low for stops based on an officer's self-initiated observations compared to compliance rates for stops based on a radio run or in-person information from a witness or complainant.

- For the third quarter of 2024, the compliance rates for self-initiated stops were 79% for stops, 60% for frisk and 66% for searches.

**GIBSON DUNN**

Honorable Analisa Torres
February 17, 2026
Page 15

**Twenty-Fifth Report: NYPD's Community Response Team's Stop, Frisk and Search Practices.** The report, filed on June 3, 2025, found:

- CRT officers, like NSTs or PSTs, are engaging in self-initiated stops (stops based on the officers' observations rather than 911 or 311 calls). For example, 96% of stop reports prepared by CRT officers in the third quarter of 2024 were self-initiated stops.

- Like NST and PST officers, CRT officers stopped, frisked, and searched individuals unlawfully at higher rates than patrol officers. The lawfulness of CRT encounters in this audit (84% for stops, 64% for frisks, and 59% for searches) compares unfavorably to the compliance rates for patrol officers found in the Monitor's Twenty-Third Report (92% for stops, 89% for frisks, 77% for searches).

- NYPD reviewing supervisors determined that all but one of fifty reported CRT stops had a legal basis and that all of the reported frisks and searches were lawful, even though the Monitor determined that there were unlawful stops, frisks, and searches.

- Ninety-seven percent of the persons stopped, frisked, and searched by CRT officers during *Terry* stops in this audit were Black and Hispanic men.

**Twenty-Sixth Report: NYPD's Accountability Efforts.** The report, filed on October 14, 2025, found:

- In 2024, there were few consequences and little supervisory accountability for unreported stops and improper stops, frisks, and searches. Meaningful accountability at the command level in response QAS audits was absent.

- For the four quarters reviewed by the Monitor team, QAS identified over 4,000 improper stops, frisks, or searches. In only eight instances was a CD issued to the officer for the unconstitutional action. In another 110 instances, an officer was given a negative CRAFT, which is the lowest form of sanction for misconduct. In the other 98% of the incidents, the officer was either instructed, given training, or the violation was not addressed at all.

- EIP has not been effective to date, with minimum interventions directed for officers who crossed the EIP thresholds relating to stops, frisks, and searches. When an intervention was directed by the EIC, there was little to no structured follow-up to determine if directed corrective measures were implemented, and more importantly, the outcome of such measures. EIP interventions did not appear to impact officer behavior and thus were not effective in addressing Fourth Amendment compliance, stop report documentation, and BWC usage.

- ComplianceStat can be an effective accountability tool to motivate command and borough-level supervisors and executives to identify and remedy unconstitutional practices among their officers if there are meaningful consequences resulting from ineffective supervision.

GIBSON DUNN

Honorable Analisa Torres
February 17, 2026
Page 16

**Twenty-Seventh Report: Compliance Snapshot of NYPD's Stop, Frisk and Search Practices.**
The report (focused on the fourth quarter of 2024), filed originally on October 22, 2025, with a corrected version filed on November 19, 2025, found:

- For the fourth quarter of 2024, overall compliance rates were 89% for stops, 71% for frisks, and 73% for searches.

- Compliance rates for stops based on an officer's self-initiated observations continued to be lower than compliance rates for stops based on a radio run or in-person information from a witness or complainant.

- Based on Monitor team review of BWC videos, officers failed to complete stop reports in 27.5% of stops identified in the Monitor's audits for underreporting.

**Twenty-Eighth Report: Compliance Snapshot of NYPD's Stop, Frisk and Search Practices.**
The report, filed on January 20, 2026, found:

- For the first quarter of 2025, overall compliance rates were 86% for stops, 69% for frisks and 68% for searches.

- Self-initiated stops, frisks, and searches continue to have unacceptably low compliance rates.

- NYPD reviewing supervisors continue to fail to identify nearly all unlawful stops, frisks, and searches.

- NYPD has improved in its documentation of stops, but still almost one-third of stops identified in the Monitor's audits are not properly documented.