# Thirty-Third Report of the Independent Monitor (Corrected)

## Report on Underreporting

Mylan Denerstein

October 6, 2026

*Floyd, et al. v. City of New York*

*Davis, et al. v. City of New York*



# MONITOR TEAM

Mylan Denerstein
*Monitor*

Richard Jerome
*Deputy Monitor*

Susan Prosnitz
*Associate Monitor*

Anthony Braga

Jennifer Eberhardt

Rudolph Hall

Demosthenes Long

John MacDonald

James McCabe

Jane Perlov

James Yates

nypdmonitor.org

## TABLE OF CONTENTS


I. Executive Summary .... 4

II. Results from the 2025 BWC Audit .... 6

A. Underreporting in 2025 Under the First Methodology .... 6

B. Underreporting in 2025 Under the New Methodology .... 7

C. Underreporting Across All Years, 2022–2025 .... 9

D. Underreporting by Level of Encounter .... 12

III. Implications for Compliance .... 14

IV. Conclusion .... 14

APPENDIX .... 16

I. Original Underreporting Audit Methodology for Assessing BWC Videos Categorized as Investigative Encounters .... 16

II. Decrease in Investigative Encounter BWC Videos .... 20

III. Reweighting the Sampling Design for Auditing Purposes .... 21

## I. Executive Summary

This report assesses the accuracy of the New York City Police Department's ("NYPD" or the "Department") documentation of *Terry* stops as required by the Court's Remedial Order.[1] More than a decade after the Court's 2013 order, underreporting of *Terry* stops remains a persistent and significant problem. Although the NYPD's underreporting compliance rate is trending in a positive direction, the Monitor estimates that over 5,500 *Terry* stops in 2025 were never documented.[2] Accurate reporting of *Terry* stops by the NYPD is essential to constitutional policing, accountability, and public trust. When NYPD officers fail to document stops, unlawful conduct becomes harder to detect, correct, and monitor, and lawful conduct goes unseen. Failing to properly record an investigative encounter as a *Terry* stop means that the number of stops recorded in the Department's stop and frisk database (the "SQF database") understates the actual number of *Terry* stops that occurred.

The Monitor audits Body-Worn Camera ("BWC") videos to identify potential *Terry* stops and then determine whether a stop report was completed by the officer making the stop. The Monitor team stratifies its video sample by the encounter level the officer assigned, which makes undocumented stops easier to identify.[3] Level classification is important because it determines the officer's legal authority to engage with an individual and that person's rights in response.

---

[1] *Floyd v. City of New York*, 959 F. Supp. 2d 668, 681–83 (S.D.N.Y. 2013) (*Floyd* Remedial Order). When a police officer detains a civilian such that the person is not free to leave, it is called a *Terry* stop, named after the U.S. Supreme Court case ruling that an officer must have at least reasonable suspicion of criminality before conducting a stop. *Terry v. Ohio*, 392 U.S. 1 (1968).

[2] The Monitor reported on NYPD underreporting in its Twenty-Second Report and in subsequent quarterly Compliance Snapshots (Twenty-Fourth, Twenty-Fifth, Twenty-Eighth, and Twenty-Ninth Reports). Twenty-Second Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-1034 (S.D.N.Y. Oct. 7, 2024), ECF No. 937-1; Twenty-Fourth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-1034 (S.D.N.Y. May 21, 2025), ECF No. 960-1; Twenty-Fifth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-1034 (S.D.N.Y. June 3, 2025), ECF No. 963-1; Twenty-Eighth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-1034 (S.D.N.Y. Jan. 20, 2026), ECF No. 974-1; Twenty-Ninth Report of the Independent Monitor, *Floyd v. City of New York*, No. 1:08-cv-1034 (S.D.N.Y. Feb. 26, 2026), ECF No. 979-1.

[3] In *People v. DeBour*, 40 N.Y.2d 210 (1976), the New York State Court of Appeals established four levels of investigative encounters. Level 1 encounters are known as "Requests for Information" and require an objective,

The Monitor's audit sample of BWC videos included a fixed number of videos from each category (Level 1, Level 2, Level 3, unlabeled, and Crimes in Progress), rather than a number proportional to how often each category occurs among all NYPD BWC videos. Because of that, the initial audit results describe underreporting only *within the sample itself*, and not underreporting across the NYPD's stops citywide. To address this, the Monitor team added a second step of reweighting the audit results, so that they reflect the overall citywide mixture of stops. This reweighting estimates how many *Terry* stops were mislabeled as Level 1 and Level 2 encounters and should have been recorded as Level 3 stops. This matters because accurate labeling is the foundation on which everything else rests. If stops are not labeled correctly, any compliance rate calculated from those labels will also be unreliable.

In addition, the Monitor's audit does not account for encounters that are not recorded by the officers on their BWCs. There is no practical method for the Monitor to assess the extent to which officers are not activating their BWCs during *Terry* stops.

While both methodologies provide a compliance rate, only the reweighted methodology estimates how much mislabeling exists across the Department's stops. The reweighted estimate is an important finding, as it puts a number on how many videos were likely mislabeled as Level 1 and Level 2 and should have been recorded as Level 3 stops.[4]

---

credible reason to approach the person. A Level 2 encounter is known as a "Common Law Right of Inquiry" and requires a founded suspicion that criminality might be present. Level 1 and Level 2 encounters do not require a stop report, although officers are now required under the How Many Stops Act to report those encounters on different forms. Level 3 encounters are *Terry* stops and require reasonable suspicion that the person stopped has committed, is committing, or is about to commit a felony or Penal Law misdemeanor, and a stop report documenting these encounters must be prepared. Level 4 encounters are ones in which the officer has probable cause for an arrest or a summons. For investigative encounters, officers are required to include the level of the encounter in the NYPD's BWC database, Evidence.com.

[4] The methodology for the Monitor's audits and the reweighting analysis is described in more detail in the Appendix.

Key findings include:

- **Unweighted results:** The Monitor's 2025 unweighted BWC audits found that NYPD officers completed a stop report for 74% of the stops identified in the audit sample, while 26% went unreported.
- **Weighted results:** After reweighting the audit results to reflect the actual citywide number of stops labeled Level 3, as well as encounters incorrectly labeled Level 1 and Level 2 and those with no level assigned, the Monitor estimates that over 5,500 *Terry* stops were not properly reported in 2025, an underreporting rate of 18% and a compliance rate of 82%.
- **Multi-year trend:** On a reweighted basis, *Terry* stop reporting compliance has ranged from a low of 60% in 2022 to a high of 82% in 2024 and 2025.

The Monitor's reweighted methodology demonstrates some improvement by the NYPD in addressing underreporting deficiencies, but persistent underreporting reflects an ongoing lack of accountability that must be remedied. Officers who misclassified stops as lower-level encounters and failed to prepare stop reports have rarely been disciplined, and supervisors and command executives have not been held accountable for their officers' failures. The NYPD has acknowledged that underreporting is a problem. More importantly, the NYPD is working on a plan to address it, including developing an underreporting auditing protocol and a uniform system for imposing discipline for failure to document a stop. The Monitor looks forward to reviewing the Department's plan to improve reporting and is confident the Department can do so.

## II. Results from the 2025 BWC Audit

### A. Underreporting in 2025 Under the First Methodology

Table 1 presents the Monitor team's initial BWC audit results from the first through the fourth quarter of 2025. In each quarter, the Monitor team randomly selects 50 BWC videos categorized by officers as Level 1, 100 videos categorized as Level 2, 25 videos categorized as

Level 3, and 50 BWC videos that were not assigned a label ("NA"), for a total of 225 Investigative Encounter videos for assessment. The Monitor team also reviews a random sample of 100 BWC videos categorized as "Crimes in Progress" ("CIP") each quarter.

The Monitor's audits for 2025 showed that 73.7% of the *Terry* stops reviewed were documented with a stop report; the remaining 26.3% were not.

**Table 1. Investigative Encounters Reviewed on BWC 1Q2025 to 4Q2025**

| Quarter | Total IE Videos | Documented Stops | Sample | Monitor Confirmed Stops | Stops Reported | Compliance rate | Margin of Error (95%) |
|---|---|---|---|---|---|---|---|
| 1Q2025 | 1,054,474 | 7,617 | 325 | 39 | 27 | 69.2% | |
| 2Q2025 | 1,086,639 | 6,814 | 325 | 40 | 29 | 72.5% | |
| 3Q2025 | 907,172 | 5,818 | 325 | 35 | 25 | 71.4% | |
| 4Q2025 | 778,278 | 5,687 | 325 | 38 | 31 | 81.6% | |
| **Total 2025** | **3,826,563** | **25,936** | **1,300** | **152** | **112** | **73.7%** | **±7.0%** |

### B. Underreporting in 2025 Under the New Methodology

The Monitor team applied a new approach to estimate underreporting across the total number of stops, not just those identified in the Monitor's audits. The first methodology specifically focused on identifying undocumented stops. The new methodology adjusts the audit results to reflect the citywide underreporting for all stops.

To identify undocumented stops, the Monitor's first audit methodology oversampled encounters that officers labeled Level 2. Based on data from the Monitor's audits, encounters mislabeled as Level 2 are the most likely to be *Terry* stops that go unreported. The first audit methodology also undersampled videos labeled as Level 1 encounters. The sample of videos assessed for the Monitor's audit is not a random sample of all BWC videos. A simple random sample of all BWC videos categorized as Investigative Encounters would be dominated by Level 1 encounters, which make up the vast majority of BWC videos, leaving too few Level 2 and Level

3 videos to analyze. There were more than 2.1 million videos of Level 1 encounters recorded in 2025. Therefore, to estimate the compliance rate for the total number of stops, the Monitor team reweighted the audit results to more accurately reflect the share of the total BWC population that each level of investigative encounter represents.

Table 2 shows the results for estimating compliance in the overall population of stops after applying weights to each category of BWC videos. Reweighting the Monitor's audit results yields an estimate of approximately 33,000 videos not properly labeled as Level 3 stops in 2025 and a compliance rate of 82.4%, meaning that 17.6% of stops were not documented.[5]

**Table 2. Reweighted Assessment of 2025 Investigative Encounters**

| Year | Level | Total IE Videos | Sample Size | Confirmed Stops | Stops Not Reported | Compliance Percentage | Weight | Mislabeled Stop Videos | Missing Stop Reports |
|---|---|---|---|---|---|---|---|---|---|
| 2025 | CIP* | 1,253,032 | 400 | 17 | 5 | 70.6% | 1.06 | 15,663 | 2,610 |
| 2025 | NA** | 346,985 | 200 | 7 | 2 | 71.4% | 0.59 | 3,470 | 578 |
| 2025 | L1 | 2,143,277 | 200 | 1 | 1 | 0.0% | 3.64 | 10,716 | 1,786 |
| 2025 | L2 | 41,154 | 400 | 39 | 32 | 17.9% | 0.03 | 3,292 | 549 |
| 2025 | L3 | 42,115 | 100 | 88 | 0 | 100% | 0.14 | 0 | 0 |
| **2025** | **Total** | **3,826,563** | **1,300** | **152** | **40** | | | **33,141** | **5,524** |

* Videos labeled "Crimes in Progress"
** Investigative Encounter videos that were not assigned ("NA") a level

Supplementing the Monitor's BWC audits with reweighting resulted in a higher overall compliance rate. Only the reweighted methodology can properly be applied citywide, and on that valid basis, the NYPD failed to report close to one-fifth of its stops in 2025.

[5] The number of videos that are not properly labeled as Level 3 stops is not the same as the number of undocumented *Terry* stops, as there are generally many officers at the scene of an investigative encounter, each of whom may activate their BWC. Thus, there are likely to be several BWC videos for one *Terry* stop. A review of documented and undocumented stops in the Monitor's audits showed an average of six officers present at each encounter (each with their own BWC). Applying this assumption yields approximately 5,524 undocumented stops in 2025 (33,141 videos divided by six) and, compared to the 25,936 documented Level 3 stops, a compliance rate of 82.4%.

### C. Underreporting Across All Years, 2022–2025

Audit results from 2022–2025 using the Monitor's unweighted methodology show consistent underreporting:

- 2022: ~68.6% compliance
- 2023: ~59.2% compliance
- 2024: ~60.7% compliance
- 2025: ~73.7% compliance

**Figure 1. Underreporting from 2022 to 2025**




The 2025 audits show a slight improvement in reporting compliance compared to prior years, but that improvement is too small to be statistically meaningful; overall compliance remains low. Figure 1 above presents the Monitor team's BWC audit results from the first quarter of 2022

through the fourth quarter of 2025. These results show that underreporting has been and continues to be a serious problem.[6]

Table 3 presents the key result of this analysis: audit results reweighted (using the new methodology) to estimate citywide compliance rates across the Department's full population of stops. Annual estimates of videos not properly labeled as Level 3 stops ranged from approximately 32,900 in 2024 to 60,100 in 2022. The biggest contributors to these estimates are videos labeled as Level 1 or Crimes in Progress that should have been labeled as Level 3 and included a stop report.

[6] With annual sample sizes of 900 in 2022 through 2024 and 1,300 in 2025, the 95% confidence interval around each compliance estimate is approximately seven to nine percentage points. This means that year-to-year differences smaller than this range could plausibly occur due to sampling variability rather than reflecting a true change in compliance.

**Table 3. Reweighted Estimates of Mislabeled Stops and Missing Stop Reports, 2022–2025**

| Year | Level | Total IE Videos | Sample Size | Confirmed Stops | Stops Not Reported | Compliance | Weight | % Missing | Missing Stop Videos | Missing Stop Reports |
|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | NA | 1,079,904 | 200 | 6 | 2 | 67% | 1.15 | 0.26% | 10,799 | 1,800 |
| 2022 | L1 | 3,083,786 | 200 | 3 | 3 | 0% | 3.28 | 1.09% | 46,257 | 7,709 |
| 2022 | L2 | 31,089 | 400 | 39 | 31 | 21% | 0.02 | 0.06% | 2,409 | 402 |
| 2022 | L3 | 30,794 | 100 | 73 | 2 | 97% | 0.07 | 0.01% | 616 | 103 |
| **2022** | **Total** | **4,225,573** | **900** | **121** | **38** | | | **1.42%** | **60,081** | **10,014** |
| 2023 | NA | 756,328 | 200 | 7 | 5 | 29% | 0.72 | 0.40% | 18,908 | 3,151 |
| 2023 | L1 | 3,923,556 | 200 | 2 | 1 | 50% | 3.73 | 0.42% | 19,618 | 3,270 |
| 2023 | L2 | 19,767 | 400 | 52 | 43 | 17% | 0.01 | 0.04% | 2,125 | 354 |
| 2023 | L3 | 27,985 | 100 | 64 | 2 | 97% | 0.05 | 0.01% | 560 | 93 |
| **2023** | **Total** | **4,727,636** | **900** | **125** | **51** | | | **0.87%** | **41,211** | **6,868** |
| 2024 | NA | 601,547 | 200 | 7 | 4 | 43% | 0.68 | 0.30% | 12,031 | 2,005 |
| 2024 | L1 | 3,293,089 | 200 | 2 | 1 | 50% | 3.74 | 0.42% | 16,465 | 2,744 |
| 2024 | L2 | 27,437 | 400 | 72 | 58 | 19% | 0.02 | 0.10% | 3,978 | 663 |
| 2024 | L3 | 41,806 | 100 | 82 | 1 | 99% | 0.09 | 0.01% | 418 | 70 |
| **2024** | **Total** | **3,963,879** | **900** | **163** | **64** | | | **0.83%** | **32,893** | **5,482** |
| 2025 | CIP | 1,253,032 | 400 | 17 | 5 | 70.6% | 1.06 | 0.41% | 15,663 | 2,610 |
| 2025 | NA | 346,985 | 200 | 7 | 2 | 71% | 0.59 | 0.09% | 3,470 | 578 |
| 2025 | L1 | 2,143,277 | 200 | 1 | 1 | 0.0% | 3.64 | 0.28% | 10,716 | 1,786 |
| 2025 | L2 | 41,154 | 400 | 39 | 32 | 17.9% | 0.03 | 0.09% | 3,292 | 549 |
| 2025 | L3 | 42,115 | 100 | 88 | 0 | 100% | 0.14 | 0.00% | 0 | 0 |
| **2025** | **Total** | **3,826,563** | **1,300** | **152** | **40** | | | **0.87%** | **33,141** | **5,524** |

Note: NA=no label assigned; L1=Level 1; L2=Level 2; L3=Level 3; CIP=Crimes in Progress

Assuming an average of six officers per Level 3 stop and one stop report per stop, the reweighted audit estimates that there were approximately 10,014, 6,868, 5,482, and 5,524 undocumented Level 3 stops in 2022, 2023, 2024, and 2025, respectively. Compared to the number of properly documented Level 3 stops of 15,102, 17,652, 25,386, and 25,936 for those same years, this suggests compliance rates of 60%, 72%, 82%, and 82%.

These estimates come with considerable uncertainty due to the small number of stops found and not reported in the Level 1 and CIP strata, where the overall populations of BWC videos are

large. In these situations, a single unreported stop can substantially change the estimated total. For example, the 2025 Level 1 sample contains only one stop found and not documented, which accounts for roughly a third of the overall estimated stops not reported. If that single stop were not present in the sample (or if there were a second unreported stop in the sample), there would be a large change in the estimate. This sensitivity underscores the importance of robust audit procedures to ensure stops are properly documented and not misclassified. Also, these estimates do not account for stops that are not recorded on a BWC. Gaps in documentation can have major implications for underreporting estimates.

### D. Underreporting by Level of Encounter

Investigative encounter video audits reveal that stops that officers mislabel as Level 2 in the NYPD's BWC database are much less likely to have stop reports than stops that officers correctly label as Level 3. In the Monitor's audits in 2022, only 20.5% of 39 confirmed *Terry* stops that officers incorrectly labeled Level 2 had a stop report; in 2023, just 17.3% of 52 confirmed stops mislabeled Level 2 had a stop report; in 2024, 19.4% of 72 confirmed stops mislabeled Level 2 had a stop report; and in 2025, 17.9% of 39 confirmed stops mislabeled Level 2 had a stop report.[7] By comparison, on average, 98% of stops that officers labeled as Level 3 had stop reports on file from 2022 through 2025. These differences are statistically significant at the 95% level and are unlikely to be explained by sampling variation. Table 4 below shows the documentation compliance rates for *Terry* stops for each BWC video category.

[7] Because there are usually several officers at the scene of an investigative encounter, there may be circumstances where some of the officers mislabel the encounter as a Level 2 encounter, but at least one officer labels the encounter a Level 3 stop and completes a stop report.

**Table 4. Stop Report Compliance by BWC Video Category, 2022–2025**

| Level | Total IE Videos | Sample Size | Confirmed Stops | % Stops Per Sample | Stop Reports Prepared | Compliance Rate |
|---|---|---|---|---|---|---|
| NA | 1,079,904 | 200 | 6 | 3.0% | 4 | 66.7% |
| L1 | 3,083,786 | 200 | 3 | 1.5% | 0 | 0.0% |
| L2 | 31,089 | 400 | 39 | 9.8% | 8 | 20.5% |
| L3 | 30,794 | 100 | 73 | 73.0% | 71 | 97.3% |
| **2022** | **4,225,573** | **900** | **121** | **13.4%** | **83** | **68.6%** |
| NA | 756,328 | 200 | 7 | 3.5% | 2 | 28.6% |
| L1 | 3,923,556 | 200 | 2 | 1.0% | 1 | 50.0% |
| L2 | 19,767 | 400 | 52 | 13.0% | 9 | 17.3% |
| L3 | 27,985 | 100 | 64 | 64.0% | 62 | 96.9% |
| **2023** | **4,727,636** | **900** | **125** | **13.9%** | **74** | **59.2%** |
| NA | 601,547 | 200 | 7 | 3.5% | 3 | 42.9% |
| L1 | 3,293,089 | 200 | 2 | 1.0% | 1 | 50.0% |
| L2 | 27,437 | 400 | 72 | 18.0% | 14 | 19.4% |
| L3 | 41,806 | 100 | 82 | 82.0% | 81 | 98.8% |
| **2024** | **3,963,879** | **900** | **163** | **18.1%** | **99** | **60.7%** |
| CIP | 1,253,032 | 400 | 17 | 4.3% | 12 | 70.6% |
| NA | 346,985 | 200 | 7 | 3.5% | 5 | 71.4% |
| L1 | 2,143,277 | 200 | 1 | 0.5% | 0 | 0.0% |
| L2 | 41,154 | 400 | 39 | 9.8% | 7 | 17.9% |
| L3 | 42,115 | 100 | 88 | 88.0% | 88 | 100% |
| **2025** | **3,826,563** | **1,300** | **152** | **11.7%** | **112** | **73.7%** |

Note: CIP=Crimes in Progress; NA=no level assigned; L1=Level 1; L2=Level 2; L3=Level 3

Undocumented stops associated with BWC videos labeled Level 1, and with investigative encounter videos assigned no level ("NA"), warrant particular attention. The results of the Monitor team's BWC audits show that 3.0–3.5% of investigative encounters with no level assigned were determined to be Level 3 *Terry* stops, and 0.5–1.5% of encounters labeled as Level 1 were determined to be Level 3 *Terry* stops. While the percentages of identified undocumented stops are low for these categories, the potential magnitude of underreporting is large.

## III. Implications for Compliance

The persistence of underreporting by the NYPD, even with the improvements reported here, has several critical implications. First, because of underreporting, the Department's level of compliance with the Constitution and the Court's requirements cannot be reliably measured. If a substantial share of *Terry* stops is not recorded, the Department's data cannot accurately reflect actual practices. Second, when *Terry* stops are not properly labeled as *Terry* stops and there is no stop report, they are not reviewed by the first-line supervisor, command self-inspections, the Department's Quality Assurance Section ("QAS"), the Monitor, or the Court. Because undocumented stops evade supervisory review and judicial oversight, constitutional violations may go undetected.

Finally, the NYPD's current accountability mechanisms are insufficient. The continued scale of underreporting indicates that existing audits, policies, and incentives have not sufficiently corrected the problem.

## IV. Conclusion

As the Monitor's reweighting methodology demonstrates, accurate labeling of stops is essential to measuring the NYPD's compliance rate. Mislabeled stops distort the picture of how well the Department is documenting its stop activity.

Underreporting of *Terry* stops remains a persistent problem regardless of how it is measured. Accurate documentation is foundational. Without it, neither the NYPD nor the Court can determine whether constitutional policing requirements are being met. To guard against officers "gaming" the system by mislabeling stops, the NYPD's own auditing methods must assess how many encounters labeled Level 1 and Level 2 should have been labeled Level 3 *Terry* stops. While improvements in stop documentation since 2022 are notable, more needs to be done today by the Department to improve compliance rates and build public trust. The Department has

recognized that further action is necessary, including implementing a plan to address underreporting. The Department should finalize its plan to improve reporting and submit it to the Monitor within 45 days.

# APPENDIX

## I. Original Underreporting Audit Methodology for Assessing BWC Videos Categorized as Investigative Encounters

From the second quarter of 2020 through the present, the Monitor team has audited BWC videos categorized as Investigative Encounters.[8] Each quarter, the Monitor team selects a stratified sample of tours and days to develop the sampling frame. During each day, there are three shifts of working hours for officers, or tours of duty.[9] In the first quarter of 2025, there were 90 days, for a total of 270 tours. The Monitor team selects a random sample of 10% of these tours/days and requests all of the BWC metadata for any video categorized as an Investigative Encounter.

The BWC metadata from the 10% sample of Investigative Encounter videos is further stratified by level of encounter. In each quarter, the Monitor team randomly selects 50 videos categorized by officers as Level 1, 100 videos categorized as Level 2, 25 videos categorized as Level 3, and 50 BWC videos that were investigative encounters but not assigned a level ("NA"), for a total of 225 Investigative Encounter videos for assessment. Table A1 shows the basic sampling design.

[8] When officers engage in Investigative Encounters, they are expected to label that encounter as such in the Evidence.com system and specify the level of the investigative encounter that was recorded.

[9] The NYPD has three general patrol shifts. The First Platoon is scheduled from 11:30 p.m. to 8:05 a.m.; the Second Platoon is scheduled from 7:05 a.m. to 3:40 p.m.; and the Third Platoon is scheduled from 3:15 p.m. to 11:50 p.m. The times selected for the sampling frame approximate this three-platoon schedule.

**Table A1. Quarterly Review of BWC Investigative Encounters**

| Encounter Level | 7×3 Tour | 3×11 Tour | 11×7 Tour | Total |
|---|---|---|---|---|
| Level 1 | ~17 | ~17 | ~16 | 50 |
| Level 2 | ~33 | ~33 | ~34 | 100 |
| Level 3 | ~8 | ~8 | ~9 | 25 |
| Not Labeled | ~17 | ~17 | ~16 | 50 |
| Total | 75 | 75 | 75 | 225 |

Note: ~ represents approximation

This methodology is designed to identify undocumented stops as effectively as possible; it does not produce a representative sample of all videos categorized as Investigative Encounters. A simple random sample of all BWC videos categorized as Investigative Encounters would be ineffective, as it would disproportionately sample Level 1 encounters, which make up the vast majority of BWC videos. There were more than 3.9 million Level 1 encounter videos recorded in 2023, approximately 3.3 million Level 1 encounter videos in 2024, and 2.1 million Level 1 encounter videos in 2025.

Instead of random sampling, the Monitor team has used a stratified method of sampling to more efficiently identify stops that were not documented. If an officer categorizes an encounter as a Level 3 *Terry* stop, there is a reasonable expectation that the officer is aware that a stop report is required. Therefore, the sample is stratified to review only 25 of these encounters. This assumption is supported by the finding that almost 100% of the BWC videos categorized as Level 3 *Terry* stops also have a stop report on record documenting the encounter.

By contrast, encounters labeled Level 2 hold the greatest potential for undocumented Level 3 *Terry* stops. Therefore, the Monitor team oversamples this category and reviews 100 videos labeled Level 2 each quarter.

The Monitor team also stratified Level 1 and unlabeled encounters to provide a sample size appropriate for assessing documentation at those levels. A random sample of 50 encounters at

these levels each quarter provides an acceptable level of confidence to assess performance in this area. This is also supported by the stable nature of the results, which consistently show similar rates of underreporting in these categories year to year. As discussed below, the Monitor team reweighted the results of the audits by strata (Level 1, Level 2, Level 3, unlabeled) to produce an underreporting estimate for the total population of stops.

In 2025, the Monitor added BWC videos to the audit sample. Over the course of the audits, the Monitor team identified videos categorized as Crimes in Progress ("CIP") as a likely source of unreported Level 3 encounters. Starting with the first quarter of 2025, the Monitor team began assessing samples of videos categorized as CIP, reviewing a random sample of 100 CIP videos each quarter. These videos were added to the sample of selected Investigative Encounters each quarter.

After the sample videos are selected, the Monitor team assesses each video to make a preliminary determination of whether the encounter was a possible *Terry* stop. In doing so, the Monitor team does not have any ICADs[10] or other reports that may have been prepared in connection with the individual investigative encounter.[11] A list of the videos in which a possible stop was identified is sent to the NYPD for its assessment. The NYPD provides its assessment of the encounter, whether it believes a stop occurred, and whether a stop report was prepared to document the stop. The Monitor team then revisits its preliminary assessment and makes a final determination whether a stop actually occurred, and if so, whether a stop report was prepared. Table A2 shows the audit results, including the NYPD's assessment of whether a possible stop was a *Terry* stop and the Monitor's final assessment.

[10] ICADs ("Intergraph Computer Aided Dispatch") are transcripts of calls to police dispatchers.

[11] With the ICAD, the Monitor team can assess whether the encounter was based on a verified caller or an anonymous one. Without the ICAD, stop report, or arrest report, it is more difficult to assess whether the encounter was a stop or whether the officers had probable cause at the beginning of the encounter.

**Table A2. Encounters Reviewed on BWC 1Q2022 to 4Q2025**[12]

| Quarter | Total IE/CIP Videos | Total Stops | Sample | Possible Stops | NYPD Confirmed | Monitor Confirmed | Reported | Compliance rate | Margin of Error (95%) |
|---|---|---|---|---|---|---|---|---|---|
| 1Q2022 | 850,925 | 3,735 | 225 | 34 | 25 | 31 | 23 | 74.2% | ±15.4% |
| 2Q2022 | 1,056,066 | 4,260 | 225 | 37 | 28 | 31 | 19 | 61.3% | ±17.1% |
| 3Q2022 | 1,166,782 | 3,690 | 225 | 38 | 25 | 28 | 22 | 78.6% | ±15.2% |
| 4Q2022 | 1,151,800 | 3,417 | 225 | 48 | 29 | 31 | 19 | 61.3% | ±17.1% |
| **Total 2022** | **4,225,573** | **15,102** | **900** | **157** | **107** | **121** | **83** | **68.6%** | **±8.3%** |
| 1Q2023 | 1,138,860 | 4,860 | 225 | 25 | 16 | 17 | 7 | 41.2% | ±23.4% |
| 2Q2023 | 1,237,882 | 4,445 | 225 | 51 | 38 | 42 | 23 | 54.8% | ±15.1% |
| 3Q2023 | 1,187,707 | 3,977 | 225 | 39 | 25 | 31 | 22 | 71.0% | ±16.0% |
| 4Q2023 | 1,163,187 | 4,370 | 225 | 44 | 35 | 35 | 22 | 62.9% | ±16.0% |
| **Total 2023** | **4,727,636** | **17,652** | **900** | **159** | **114** | **125** | **74** | **59.2%** | **±8.6%** |
| 1Q2024 | 1,226,426 | 6,361 | 225 | 53 | 39 | 45 | 25 | 55.6% | ±14.5% |
| 2Q2024 | 1,155,501 | 6,193 | 225 | 48 | 38 | 40 | 25 | 62.5% | ±15.0% |
| 3Q2024 | 816,502 | 6,503 | 225 | 52 | 33 | 38 | 20 | 52.6% | ±15.9% |
| 4Q2024 | 765,450 | 6,329 | 225 | 51 | 33 | 40 | 29 | 72.5% | ±13.8% |
| **Total 2024** | **3,963,879** | **25,386** | **900** | **204** | **143** | **163** | **99** | **60.7%** | **±7.5%** |
| 1Q2025 | 1,054,474 | 7,617 | 325 | 60 | 37 | 39 | 27 | 69.2% | ±14.5% |
| 2Q2025 | 1,086,639 | 6,814 | 325 | 56 | 36 | 40 | 29 | 72.5% | ±13.8% |
| 3Q2025 | 907,172 | 5,818 | 325 | 54 | 29 | 35 | 25 | 71.4% | ±15.0% |
| 4Q2025 | 778,278 | 5,687 | 325 | 46 | 32 | 38 | 31 | 81.6% | ±12.3% |
| **Total 2025** | **3,826,563** | **25,936** | **1,300** | **216** | **134** | **152** | **112** | **73.7%** | **±7.0%** |

[12] For 2022 to 2024, the data includes only BWC videos categorized as Investigative Encounters. For 2025, the data includes BWC videos categorized as Investigative Encounters and BWC videos categorized as Crimes in Progress.

## II. Decrease in Investigative Encounter BWC Videos

The Monitor team recently identified a significant reduction in the number of BWC videos categorized as Investigative Encounters, particularly those labeled Level 1 and those with no level identified. In the first quarter of 2024, there were 1.23 million videos labeled Investigative Encounters. In the first quarter of 2025, there were 752,813 Investigative Encounter videos. By in the fourth quarter of 2025, there were only 492,099 Investigative Encounter videos recorded. A decrease of this magnitude reflects more than seasonal fluctuation; it suggests a fundamental change in how these encounters are recorded.

The decrease in videos labeled as Level 1 investigative encounters coincides with the implementation of the How Many Stops Act in July 2024, which requires officers to document their Level 1 encounters at the end of each tour.[13] Moreover, as shown in Table A3 below, as the number of videos labeled investigative encounters decreased, the number of videos labeled "Non-Crime Corrected" increased.

**Table A3. Investigative Encounter Videos Compared to Non-Crime Corrected Videos**

| | 2023 | | | 2024 | | | 2025 | | |
|---|---|---|---|---|---|---|---|---|---|
| | July | Aug. | Sept. | July | Aug. | Sept. | July | Aug. | Sept. |
| **Investigative Encounter** | 411,425 | 394,653 | 370,767 | 278,765 | 266,232 | 263,660 | 205,890 | 188,618 | 182,815 |
| **Non-Crime Corrected** | 88,546 | 87,600 | 86,744 | 173,210 | 183,552 | 185,734 | 273,787 | 282,372 | 282,683 |
| **Total** | 499,971 | 482,253 | 457,511 | 451,975 | 449,784 | 449,394 | 479,677 | 470,990 | 465,498 |

Officers are not required to document encounters labeled "Non-Crime Corrected," and the Monitor's audits have not included any videos with this label. If these videos contain even a small percentage of *Terry* stops, the number of undocumented stops would increase substantially, and

[13] Local Law 43 of 2024.

the Monitor's estimates of compliance would be affected. Going forward, the Monitor's audits will include a sample of videos labeled "Non-Crime Corrected."

## III. Reweighting the Sampling Design for Auditing Purposes

As noted in the Report, the Monitor's audits are designed to identify undocumented stops. To do so, the sample intentionally departs from the underlying distribution of NYPD videos: it underrepresents Not Assigned and Level 1 encounters and overrepresents Level 2 and Level 3 encounters. With respect to Level 2 and Level 3 encounters, the Monitor's audits review four times as many Level 2 videos as Level 3 videos, even though encounters labeled Level 3 outnumber encounters labeled Level 2 in most audit periods. These design choices have offsetting implications for estimated compliance. A larger sample of Level 2 encounters (where *Terry* stops tend not to be reported) than of Level 3 encounters (where reporting is expected to be higher) tends to bias compliance rates downward, while underrepresenting Level 1 and Not Assigned encounters tends to bias them upward. For this reason, the Monitor team has developed a process for reweighting the audit results to account for this potential bias.

To estimate the number of underreported videos in the full BWC population (approximately 4 million videos), the Monitor team applied sampling weights to adjust for intentional over- and undersampling in the collected sample by Investigative Encounter strata (Level 1, Level 2, Level 3, NA) and Crimes in Progress. The following post-stratification weighting scheme was used.

Let:

- $\pi_g$ = Population proportion of category (g) (Level 1, 2, 3, NA, CIP)
- $s_g$ = Sample proportion of category (g) (Level 1, 2, 3, NA, CIP)
- $w_g$ = Sampling weight for category (g) (Level 1, 2, 3, NA, CIP)

The weight for each observation in category (g) is calculated as:

$$w_g = \frac{\pi_g}{s_g}$$

This formula ensures that each sampled observation contributes to the analysis in proportion to its true representation in the population. In 2024, for example, the shares for non-labeled ("NA"), Level 1, Level 2, and Level 3 in the investigative encounter audit sample were 22%, 22%, 44%, and 11%, respectively, while their actual shares of the total BWC population are 15%, 83%, 0.69%, and 1.1%. The observations are then reweighted using the population share ($\pi_g$) divided by the sample share ($s_g$). These weights are then used to estimate the number of missing videos of stops based on the labeled video categories. In practice, this means audits from underrepresented groups (e.g., Level 1) are upweighted, while those from overrepresented groups (e.g., Level 2 and Level 3) are downweighted to provide an overall estimate of undocumented stops in the population.